WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
In re                                    :
                                         :    Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :    Case No. 18-_____ (RDD)
                                         :
                   Debtors.¹             :    (Joint Administration Requested)
-------------------------------------------------------------x
```

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF DEBTORS FOR AUTHORITY TO (I) CONTINUE
USING EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS,
AND BUSINESS FORMS, (II) IMPLEMENT ORDINARY COURSE CHANGES
TO CASH MANAGEMENT SYSTEM, (III) CONTINUE INTERCOMPANY
TRANSACTIONS, AND (IV) PROVIDE ADMINISTRATIVE EXPENSE PRIORITY
FOR POSTPETITION INTERCOMPANY CLAIMS AND RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent

in support of this motion (the "**Motion**"):

## Background

1.     On the date hereof (the "**Commencement Date**"), each of the Debtors

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**").   The Debtors are authorized to continue to operate their

business and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.   No trustee, examiner, or statutory committee of creditors has

been appointed in these chapter 11 cases.

2.     Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.     Additional information regarding the Debtors' business, capital structure,

and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for*

2

*Southern District of New York*, sworn to on the date hereof (the "**Riecker Declaration**"),[2] which

has been filed with the Court contemporaneously herewith and is incorporated herein by

reference.

## Jurisdiction

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before

this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Relief Requested

5.      By this Motion, the Debtors request authority, pursuant to sections 105(a),

363, 364, 503, and 507 of the Bankruptcy Code, but not direction, to (a) continue their existing

cash management system, including, without limitation, the continued maintenance of their

existing bank accounts and business forms; (b) subject to the DIP Order and the DIP Loan

Documents, implement changes to their cash management system in the ordinary course of

business, including, without limitation, opening new or closing existing bank accounts;

(c) continue to perform under and honor intercompany transactions with Debtor and non-Debtor

affiliates in the ordinary course of business, in their business judgment and at their sole

discretion, but subject to the terms and conditions set forth herein, and in the DIP Order and the

DIP Loan Documents; (d) honor obligations with respect to service fees and chargebacks in

connection with existing agreements with banks, credit card companies, and non-cash payment

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

WEIL:\96759283\1\73217.0003

processors; and (e) provide administrative expense priority for certain postpetition intercompany claims, and related relief.[3]

6.      The Debtors further request that the Court authorize, but not direct, the financial institutions at which the Debtors maintain various bank accounts to (a) continue to maintain, service, and administer the Debtors' bank accounts; (b) debit the bank accounts in the ordinary course of business, to the extent of available funds, on account of (i) wire transfers or checks drawn on the bank accounts, provided that any payments drawn, issued, or made prior to the Commencement Date shall not be honored absent direction of the Debtors and an order of the Court authorizing such prepetition payment, or (ii) undisputed service charges owed to the banks for maintenance of the Debtors' cash management system, if any; and (c) authorize credit card companies and processors to net chargebacks and fees.

7.      A proposed form of order granting the relief requested in the Motion on an interim basis is attached hereto as **Exhibit A** (the "**Proposed Interim Order**").

### The Debtors' Cash Management System and Bank Accounts

8.      As described in the Riecker Declaration, in the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations (the "**Cash Management System**").  In broad terms, the Cash Management System is similar to the cash management systems used by other major corporate enterprises.  The Cash Management System is tailored to meet the Debtors' operating needs as an operator of retail department stores and other related businesses.  The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and

---

[3] The Debtors do not currently invest their cash and, therefore, are not seeking authority to continue to make investments.

4

monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate account balances and other financial data.  It is critical that the Cash Management System remain intact during these chapter 11 cases to ensure the seamless continuation of transactions and uninterrupted collection of revenues.

9.      The Cash Management System is comprised of 154 bank accounts (collectively, the "**Bank Accounts**") maintained at various financial institutions (the "**Banks**") and is designed to accommodate different business divisions and to collect, organize, and track various forms of cash receipts and disbursements.  The Bank Accounts are in the name of various Debtors.  Most of the Debtors' Bank Accounts are located at Banks designated as authorized depositories by the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**"), pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Guidelines**").[4]  The majority of the Debtors' Bank Accounts are held with Bank of America, N.A. ("**Bank of America**").  Only thirty-eight (38) Bank Accounts are located at Banks that are not designated as authorized depositories under the UST Guidelines, but such Bank Accounts never maintain a balance above $250,000.

### Description of the Debtors' Cash Management System

10.      An average of $186 million in receipts and disbursements flow through the Cash Management System per banking day.  A general overview of the flow of funds through the Cash Management System is illustrated by the diagram attached hereto as **Exhibit C**.

11.      The Cash Management System operates in an automated three-phase process that repeats daily:  collection, concentration, and disbursement.  First, cash generated

---

[4] A list and description of each Bank Account, including the name of the Debtor holding each Bank Account, and the name of the Bank that holds each Bank Account, is attached hereto as **Exhibit B**.

5

from the Company's retail operations, whether generated from *Sears®* or *Kmart®* stores, is deposited into various deposit accounts (collectively, the "**Depository Accounts**"), which, with certain exceptions, generally are designated by region. The Company maintains eighty-three (83) Depository Accounts. Cash collected from the Company's retail operations is deposited into the Depository Accounts on a regular basis, although not always daily.

12.    At the end of each day, cash is automatically swept from the various Depository Accounts into two concentration accounts, one for the Sears business, and one for the Kmart business (the "**Sears Concentration Account**" and the "**Kmart Concentration Account**," respectively and, together, the "**Main Concentration Accounts**").[5] Credit card receivables generated from the Company's operations are deposited by credit card companies directly into specified accounts for each of the *Sears®* and *Kmart®* businesses (the "**Credit Card Receivables Accounts**"). Cash in the Credit Card Receivables Accounts is swept automatically into the Main Concentration Accounts at the end of each day.

13.    Funds received from sources outside of the Company's daily retail transactions are deposited into certain accounts maintained by the Company (the "**Third Party Payment Accounts**" and, together with the Depository Accounts, the "**Collection Accounts**"). For example, when a customer redeems a coupon at a store, the Company bills the merchant that issued the coupon, which merchant writes a check to the Company that is deposited in the Third Party Payment Account designated to receive such coupon payments. Another example is the Company's real estate tenants, whose rent checks are received into a designated Third Party Payment Account for real-estate-related receivables. The Company maintains five (5) Third

---

[5] In certain cases, cash flows through intermediate accounts before reaching the Main Concentration Accounts. For example, cash deposited in regional banks not held with Bank of America is first transferred to an intermediate account with Bank of America before being sent to the Main Concentration Accounts.

WEIL:\96759283\1\73217.0003

Party Payment Accounts. Cash collected from the Third Party Payment Accounts, similar to the Depository Accounts, is swept into the Main Concentration Accounts on a regular basis.

14.      In addition to the Main Concentration Accounts, the Company maintains various other intermediate concentration accounts to serve various purposes (together with the Main Concentration Accounts, the "**Concentration Accounts**"). Ultimately, however, each day all cash is swept into the Main Concentration Accounts. On April 17, 2017, Bank of America first notified the Company that Bank of America may implement a cash dominion policy (the "**Cash Dominion Policy**") whereby, on a daily basis, the available funds in the Main Concentration Accounts automatically would be used to pay down the Company's Revolving Credit Facility. On May 4, 2017, Bank of America implemented the Cash Dominion Policy. To the extent cash remains in the Main Concentration Accounts after paying down the Revolving Credit Facility, such cash is held in the Company's cash reserve account (the "**Reserve Account**"), held in the name of Debtor Sears Roebuck Acceptance Corporation ("**SRAC**"). In addition, any funds the Company receives after the time of day at which the funds in the Main Concentration Accounts are used to pay down the Revolving Credit Facility are stored in the Reserve Account. On any given day, if the amount outstanding under the Revolving Credit Facility exceeds the total amount available in the Main Concentration Accounts, any cash sitting in the Reserve Account cash is used to pay down the Revolving Credit Facility as well.

15.      The final phase of the Cash Management System is disbursement. The Company maintains various disbursement accounts, which are designated by the type of disbursement (*e.g.*, payroll, accounts payable, etc.) (collectively, the "**Disbursement Accounts**"). The Disbursement Accounts are "zero-balance" accounts (each, a "**ZBA**"), such that any cash that remains in the Disbursement Accounts at the end of the day is swept back into

7

the Main Concentration Accounts.   When an authorized draw is made on a Disbursement Account, the Company draws down on the Revolving Credit Facility by making written requests to Bank of America, which the Company submits to Bank of America on a daily basis.   Bank of America then funds the Reserve Account in accordance with the Cash Dominion Policy.   The Company then wires the cash from the Reserve Account to the Main Concentration Accounts, and then to the applicable Disbursement Account.

16.     The Cash Management System is overseen by the personnel in the Debtors' finance department (the "**Finance Department**").   Although much of the Cash Management System is automated, Finance Department personnel monitor the Bank Accounts and manage the proper collection and disbursement of funds.

17.     The Debtors maintain robust controls relating to the Cash Management System.   Members of the Finance Department, including the Chief Financial Officer, review daily reports with respect to the Debtors' cash balances and disbursements.   Various levels of required authorizations are determined by the size and type of the disbursement.   On an almost daily basis, the Finance Department prepares and sends to Bank of America a file listing all authorized check disbursements to be processed and honored.   The Finance Department then initiates wires through a dedicated Bank of America application and sends automated clearing house ("**ACH**") payment notifications to Bank of America.   As of the Commencement Date, a majority of the Company's disbursements are effectuated by manual wire transfers; only a few are made through ACH payment.   These procedures ensure that Bank of America only processes and honors payments that the Debtors expressly have authorized.   In the rare event that the Debtors' reports and Bank Account records do not match, the Finance Department works with Bank of America to resolve such discrepancies quickly and efficiently.

8

18.     Maintaining the Cash Management System in its current state is crucial to the Debtors' continued operations, given the significant volume of cash transactions processed through the Cash Management System each day.   Any disruption to the Cash Management System would unnecessarily and significantly hinder the Debtors' complex day-to-day operations and impede the successful administration of their chapter 11 estates.

19.     In furtherance of the foregoing, the Debtors request, subject to the DIP Order and the DIP ABL Loan Documents, that all Banks be authorized, but not directed, to continue to administer the Bank Accounts as they were maintained and administered prepetition, without interruption and in the usual and ordinary course, and to honor all representations from the Debtors as to which checks should be honored or dishonored.  The Banks also should be authorized, but not directed, to pay all checks, drafts, wires, and ACH payments issued on the Bank Accounts for payment of any claims authorized by the Debtors arising on or after the Commencement Date, so long as those accounts contain sufficient funds.  To the extent that the Debtors have directed that any prepetition checks be dishonored, they reserve the right to issue replacement checks to pay the amounts related to any dishonored checks, consistent with orders of this Court.  To the extent that the Debtors have represented to any of the Banks that a check, draft, wire, or ACH Payment should be dishonored, the Debtors request that the Banks be authorized to comply with such representation, either through utilizing the Banks' stop-payment system, or through voiding the check, draft, wire, or ACH Payment using the relevant Banks' internal procedures.

A.     **Intercompany Transactions and Claims**

20.     In the ordinary course of business, the Debtors maintain business relationships with each other and with other non-Debtor affiliates.  Intercompany transactions

9

(the "**Intercompany Transactions**") among entities are governed by an intracompany cash management agreement and result in intercompany receivables and payables (the "**Intercompany Claims**"). The Intercompany Claims are generated primarily from cash advances and cash transfers, given the nature of the Company's business and its centralized Cash Management System.

21.     *Debtor Intercompany Transactions*.  The main Intercompany Transactions among Debtors (the "**Debtor Intercompany Transactions**") giving rise to Intercompany Claims are:

a.     <u>Cash Receipts Activities</u>. As described above, in accordance with the Cash Management System, the Company concentrates its revenue into the Main Concentration Accounts, which are owned by Sears, Roebuck and Co. ("**Roebuck**") and Kmart Corporation ("**Kmart Corp.**"), respectively. As a result, to the extent the revenue in the Main Concentration Accounts is transferred from another Company entity, an Intercompany Transaction is recorded by Roebuck or Kmart Corp. with the particular Company entity that transferred the funds to the Main Concentration Accounts.

b.     <u>Disbursement Activities</u>. Likewise, in accordance with the Cash Management System, any disbursement made from the Main Concentration Accounts on behalf of another Company entity gives rise to an intercompany receivable to Roebuck or Kmart Corp., as applicable.

c.     <u>Inventory</u>. Inventory transfers between and among Debtors also give rise to Intercompany Claims. For example, if Roebuck transfers inventory to Kmart Corp. to fulfill certain inventory needs, the Company's accounting system records this Intercompany Transaction as having resulted in an intercompany receivable due to Roebuck and an intercompany payable due from Kmart Corp. Inventory transfers do not occur between Debtors and non-Debtor affiliates.

22.     Intercompany Claims (other than the Intercompany Notes (as defined below)) are not settled by actual transfers of cash among Company entities. The Company tracks all Intercompany Transactions electronically in its accounting system, which transactions concurrently are recorded on the applicable Company entities' balance sheets. The accounting

system requires that all general-ledger entries be balanced at the legal-entity level; therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.  For example, if Kmart Corp. makes a payroll disbursement on behalf of another Kmart entity, the Company's accounting system automatically enters an intercompany receivable on Kmart Corp.'s balance sheet and an intercompany payable on the balance sheet of the other Kmart entity.  This results in a net balance of zero when accumulating all intercompany accounts.  The Company maintains records of all transactions processed through its Cash Management System and is able to ascertain, trace, and account for all Intercompany Transactions, including all Intercompany Claims held by and against non-Debtor affiliates.  The Debtors request authority to continue to perform under and honor Debtor Intercompany Transactions in the ordinary course of business.

23.    *Foreign Affiliate Intercompany Transactions*.   Many of the Debtors' wholly owned non-Debtor foreign affiliates, other than Sears Reinsurance Company, Ltd. ("**Sears Re**") (all such foreign affiliates, excluding Sears Re, collectively, the "**Foreign Affiliates**"), are entities that provide services, such as back-office information-technology and sourcing services (collectively, "**Support Services**"), at a significant cost advantage to the Company.  The fees with respect to such services are recorded as Intercompany Transactions (the "**Foreign Affiliate Intercompany Transactions**").   To the extent that there is excess cashflow from a foreign affiliate, such funds flow back to the relevant parent entity in the form of a dividend, creating a foreign tax credit.  The Company maintains certain controls over the Foreign Affiliates, including by overseeing all of the cash flowing to and from the Foreign Affiliates.  If the Company were unable to obtain Support Services from the Foreign Affiliates,

11

WEIL:\96759283\1\73217.0003

the Company would have to find alternative service providers, which would neither offer the same cost-saving benefits nor possess the same institutional knowledge as the Foreign Affiliates. The Debtors request authority to continue to perform under and honor Foreign Affiliate Intercompany Transactions in amounts up to $5 million per Foreign Affiliate, per month, without further order of the Court.

24.    *Sears Re*.  Sears Re insures and/or reimburses the Debtors in connection with certain service, protection, and warranty agreements (the "**Warranty Agreements**") that the Debtors sell to customers in the ordinary course of business.  In exchange for these services, certain of the Debtors pay Sears Re quarterly premiums in the form of cash consideration, in connection with which the Company records an Intercompany Transaction (the "**Warranty Payments**").  The Warranty Payments serve as an additional source with which Sears Re can satisfy the Bermuda Monetary Authority's (the "**BMA**") capital requirements, in tandem with the KCD Asset-Backed Notes and SRAC Medium Term Notes, as described below.  In turn, Sears Re pays Company affiliates to perform the actual repair and protection services required under the protection agreements, which also results in an Intercompany Transaction.  The intercompany payable owed to Sears Re for Warranty Payments, and the intercompany receivable owed by Sears Re for labor services, however, are not necessarily equivalent.  Certain amounts remain with Sears Re and are transferred to its parent, SRe Holding Corporation ("**SRe**"), a non-Debtor affiliate, in the form of a dividend, which is then dividended to Sears Holdings, the parent of SRe.[6]  The sale of Warranty Agreements is a crucial part of the Debtors' overall business, and any disruption with respect to honoring the Warranty Agreements will

---

[6] The Debtors also pay Sears Re premiums in exchange for which Sears Re reinsures certain of the Debtors' insurance policies (the "**Reinsurance Payments**").  Sears Re's reinsurance liabilities are small relative to its liabilities under the Warranty Agreements.

WEIL:\96759283\1\73217.0003

undermine consumer confidence in the Debtors' brand.  The Debtors estimate that the Warranty Payments total approximately $550 million on an annual basis.  The Debtors request authority to continue to perform under and honor Warranty Payments without further order of the Court.

25.    In addition to the Warranty Payments, Sears Re receives cash by virtue of its ownership of two Intercompany Notes (as defined herein).  SRAC has issued approximately $2.3 billion in SRAC Medium Term Notes and approximately $377.5 million of commercial paper, of which Sears Re holds approximately $1.4 billion of SRAC Medium Term Notes and approximately $232.4 million of commercial paper.  In addition, KCD IP, LLC ("**KCD**"), a non-Debtor affiliate, has issued approximately $900 million in KCD Asset-Backed Notes (together with the SRAC Medium Term Notes and the commercial paper issued by SRAC and held by Company affiliates, the "**Intercompany Notes**"), which are held by Sears Re.  The KCD Asset-Backed Notes and certain of the SRAC Unsecured Notes serve to meet certain capital requirements imposed by the BMA on Sears Re.  Absent an agreement with the BMA that any cash transferred to Sears Re will not be prohibited from being dividended to its parent entities, for which the Debtors will seek Court approval, the Debtors do not intend to honor the Intercompany Notes.

26.    The Company's intellectual property ("**IP**") portfolio is held by certain of the Debtors.  In exchange for use of the IP, cash is transferred and an Intercompany Transaction (each, an "**IP Intercompany Transaction**") is recorded between the Debtor that holds the IP and the Company affiliate that uses the IP.  For example, KCD, which holds a substantial portion of the Company's IP, receives cash from other Company entities in exchange for use of its IP. The Debtors do not intend to effect Intercompany Transactions with respect to KCD.

13

**B.      Non-Cash Transaction-Related Service Charges and Chargebacks**

27.      The Debtors incur periodic service charges, costs, expenses, and other fees from the Banks in connection with the maintenance of the Cash Management System (collectively, the "**Bank Fees**"), which average approximately $1 million per month and are paid through net settlement procedures.  Similarly, the Debtors' credit card, debit card, check, and gift card processors, including, but not limited to, Citibank, N.A. ("**Citi**"), PayPal Holdings, Inc., The American Express Company ("**American Express**"), and First Data Corporation ("**First Data**") (collectively, the "**Payment Processing Companies**") deduct or otherwise accrue service charges before transferring the Debtors' credit card, debit card, and check receivables on a daily basis.  With respect to gift cards, Payment Processing Companies maintain real-time, electronic accounting of all outstanding gift card balances.  As described more fully in the *Motion of Debtors for Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations* filed contemporaneously herewith, the Debtors intend to honor gift cards in the ordinary course.  This service is critical to the Debtors' ability to continue allowing customers to use previously issued gift cards.  Service fees payable under the applicable agreements with Payment Processing Companies generally are between 1.2 and 3.5 percent per annum (collectively, the "**Processing Fees**," and, together with the Bank Fees, the "**Service Charges**").  Payment of any prepetition Service Charges is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds are not delayed.  Further, because the majority, if not all, of the Banks, credit card processors, and debit card processors have setoff rights for the Service

WEIL:\96759283\1\73217.0003

Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in these chapter 11 cases.

28.    In addition, the Debtors seek authority to allow First Data and American Express, among other Payment Processing Companies, to continue to net out Chargebacks (as defined herein) and setoff against payables to the Debtors without regard to the Commencement Date.    When customers who used credit or debit cards to make purchases either return merchandise to the Debtors or dispute charges with respect to the Debtors, the Debtors may be obligated to refund the relevant Payment Processing Company the purchase price of the returned or disputed merchandise, subject to certain adjustments (collectively, the "**Chargebacks**" and, together with the Processing Fees, the "**Processing Obligations**").    Generally, Chargebacks are satisfied by netting the purchase price of the returned or disputed merchandise against pending payments owed by a Payment Processing Company to the Debtors or by deducting the amount of the Chargeback from a reserve account maintained by the Payment Processing Company. Because the Debtors have a six-month return policy, it is possible that Chargebacks on account of merchandise purchased prior to the Commencement Date may not have been fully netted out against the previous payments received by the Debtors or by the deduction of the Chargeback from reserve accounts maintained by the Payment Processing Companies prior to the Commencement Date.    Continuing credit card processing in the ordinary course is critical to the Debtors' businesses and their customer relationships.    In addition to the Payment Processing Companies' potentially having recoupment rights, the Debtors' estates will not be prejudiced by the satisfaction of Chargebacks because the relevant inventory is remitted by a customer whenever a Chargeback is triggered.

15

C.      **The Debtors' Existing Business Forms and Checks**

29.     In the ordinary course of business, the Debtors use several types of checks. Additionally, the Debtors use a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders, and invoices (collectively, the "**Business Forms**").

30.     To minimize expenses, the Debtors seek authorization to continue using all Business Forms and checks substantially in the forms used immediately prior to the Commencement Date, without reference to the Debtors' status as debtors in possession; provided that in the event that the Debtors generate new Business Forms and/or checks during the pendency of these Chapter 11 Cases other than from their existing stock, such Business Forms and checks will include a legend referring to the Debtors as "Debtors-In-Possession." To the extent practicable, the Debtors also will laser print such legend on any Business Forms and checks electronically generated during these cases.

31.     The Debtors have prepared communication materials to distribute to the various parties with whom they conduct business, which will, among other things, notify such parties of the commencement of these chapter 11 cases. The Debtors believe that these direct communications will provide adequate notice of the Debtors' status as debtors in possession.

<u>**The Relief Requested Should Be Granted**</u>

A.      **Continuing the Cash Management System Is in the Best Interests of the Debtors, Their Creditors, and All Other Parties in Interest**

32.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtors. The Cash Management System provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs

WEIL:\96759283\1\73217.0003

and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

33.     The operation of the Debtors' businesses requires that the Cash Management System continue, subject to the DIP Order and the DIP Loan Documents, during the pendency of these Chapter 11 Cases.  As a practical matter, because of the Debtors' corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a separate cash management system for each Debtor.  Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be extraordinarily disruptive and harmful to their operations.  The Company has established systems and technologies that would have to be completely rewritten and reorganized in order to create self-contained cash management systems on an entity-by-entity basis.  For example, the Company's system for recording Intercompany Transactions currently assumes an integrated Cash Management System where cash can flow from entity to entity on an automated basis.  Any such disruption would have a severe and adverse impact upon the Debtors' chapter 11 estates. Consequently, maintaining the existing Cash Management System is in the best interest of all parties in interest and is necessary to avoid severe disruptions to the Debtors' operations.

34.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."   The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc.* (*In re Crystal Apparel, Inc.*), 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included

17

within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp.* (*In re Amdura Corp.*), 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority under section 363(c)(1) to continue the collection, concentration, and disbursement of cash pursuant to their Cash Management System.

35.      Even if continuation of the Cash Management System and other relief requested herein is outside of the ordinary course, the Court may approve it pursuant to section 363 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to permit a contractor to pay prepetition claims of suppliers).

36.      In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "'protect and preserve the estate, including an operating business' going-concern value,'" on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re*

18

*CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").   Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).   Continuing the Company's Cash Management System without interruption is vital to the Debtors' business operations and the success of these Chapter 11 Cases.  Therefore, it is within the Court's equitable powers under section 105(a) to approve the continued use of the Cash Management System.

37.     In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–

19

86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

38.    This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."). The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11— "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

39.    Indeed, courts in this and other districts specifically have authorized debtors to maintain and continue using their existing cash management systems and prepetition bank accounts. *See In re Tops Holding II Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); *In Re BCBG Max Azria Glob. Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Fairway Grp. Holdings Corp.*, Case No. 16-11241 (MEW) (Bankr. S.D.N.Y. Jun. 1, 2016); *In re The Great Atl. & Pac. Tea Co.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. August 11, 2015); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011); *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Apr. 13, 2015); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014); *In re dELiA*s, INC.*, Case No. 14-23678

20

(RDD) (Bankr. S.D.N.Y. Dec. 24, 2014); *In re Inversiones Alsacia S.A.*, Case No. 14-12896
(MG) (Bankr. S.D.N.Y. Dec. 4, 2014); *In re SIGA Techs., Inc.*, Case No. 14-12623 (SHL)
(Bankr. S.D.N.Y. Oct. 23, 2014).

          40.     Maintaining the existing Cash Management System is in the best interests
of the Debtors' estates and all parties in interest, and, therefore, should be approved.  If the
Debtors are required to significantly alter the way in which they collect and disburse cash
throughout the Cash Management System, their operations will experience severe disruptions,
which ultimately would frustrate the Debtors' ability to maximize value for their stakeholders.

          41.     If the Debtors are not permitted to maintain and continue to use their Bank
Accounts and Business Forms, the resulting prejudice will include (i) severe and likely
irreparable disruption of the Debtors' ordinary financial affairs and business operations,
(ii) delay in the administration of the Debtors' estates and (iii) cost to the estates to set up new
systems, open new accounts, and order new Business Forms.  Accordingly, the Debtors request
that they be permitted to maintain and continue to use their existing Bank Accounts and Business
Forms to the extent set forth herein.

**B.     Authorizing Debtors to Continue Performing Under and Honoring Intercompany
Transactions and Claims Is Necessary and Appropriate**

          42.     Because the Debtors engage in Intercompany Transactions on a regular
basis and such transactions are common among enterprises similar to the Company, the Debtors
believe the Intercompany Transactions are ordinary course transactions within the meaning of
section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval, at least
among the Debtors.  Nonetheless, out of an abundance of caution, the Debtors are seeking
express authority to engage in such transactions on a postpetition basis.  The continued

WEIL:\96759283\1\73217.0003

performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their business as debtors in possession.

43.     To the extent the Debtors' continued payment of non-Debtor affiliates pursuant to the Intercompany Transactions described above is outside of the ordinary course of business, the Debtors submit that such continued payment is justified by the circumstances. The operations of the Company's non-Debtor affiliates are dependent on access to and participation in the Cash Management System. Requiring the Company to extract its non-Debtor affiliates from the Cash Management System would create an unnecessary administrative and financial burden on the Debtors' estates, which would distract the Debtors, whose full attention is required to administer their Chapter 11 Cases during this critical time. Many of the Foreign Affiliates perform critical Support Services for the Debtors at significant cost advantages and have institutional knowledge that cannot easily be replaced. Therefore, the Court should authorize the Debtors to continue performing under and honoring Intercompany Transactions and Intercompany Claims, including with respect to those involving non-Debtor affiliates.

44.     In addition, the Debtors seek authority to pay Sears Re the Warranty Payments as and when due. Sears Re provides the Debtors with significant value by covering a large portion of the costs associated with the sale of and performance under the Warranty Agreements that the Company sells to its customers and by lowering the effective cost of their insurance policies. The sale of Warranty Agreements is a crucial part of the Debtors' overall business, and customer confidence in the Debtors' brand would be undermined if the Debtors were to stop honoring their obligations under the Warranty Agreements. Therefore, the Debtors seek authority pursuant to this Motion to continue to perform under and honor the Warranty Payments.

22

C.      **Granting Administrative Expense Priority to Postpetition Intercompany Claims Is Necessary and Appropriate**

45.      The Debtors' funds are aggregated in the Cash Management System.  The Debtors track all fund transfers in their accounting system and have the ability to account for all Intercompany Transactions related to cash receipts, disbursements, and the centralized distribution of goods for sale.  Continuation of the Intercompany Transactions in the Cash Management System is in the best interests of the Debtors, their estates, and all parties in interest.  To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims arising after the Commencement Date be accorded administrative expense priority, junior in all respects to the administrative expense priority claims granted pursuant to the DIP Orders.  In a similar vein, all Intercompany Claims of a non-Debtor against a Debtor that arise after the Commencement Date should be accorded administrative expense priority pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, junior in all respects to the administrative expense priority claims granted pursuant to the DIP Orders.[7]

D.      **Honoring Certain Prepetition Obligations Related to the Cash Management System Should Be Approved**

46.      Maintaining the use of credit cards and other payment mechanisms is essential to the continuing operation of the Debtors' business because the majority of the Debtors' sales are made using non-cash payments methods such as credit and debit cards.  In order to avoid disrupting vital processing services, the Debtors (a) seek authority to continue to pay the Processing Obligations in the ordinary course of their business and (b) request that the

---

[7] The treatment of claims by Debtors against non-Debtors is addressed starting at paragraph 23 above.

23

Court authorize the Payment Processing Companies to offset the Processing Obligations, including Chargebacks, against amounts remitted to the Debtors or from reserve accounts maintained by Payment Processing Companies, in each case in the ordinary course, whether arising before or after the Commencement Date.

**E.     Maintenance of the Debtors' Existing Bank Accounts and Business Forms Is Warranted**

47.     The Debtors request that the Court waive the requirements of the UST Guidelines, which require, among other things, the closure of the Debtors' prepetition Bank Accounts, the opening of new bank accounts, and the immediate ordering of new business forms and checks with a legend referencing the Debtors as "Debtors-In-Possession."  The Debtors seek an order authorizing the Banks, including, but not limited to those listed on **Exhibit B**, to continue to treat, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the usual and ordinary course and to receive, process, honor, and pay, to the extent of available funds, all checks, drafts, wires, or ACH payments drawn on the Bank Accounts after the Commencement Date by the holders or makers thereof, as the case may be; provided that any payments issued or made prior to the Commencement Date will not be honored absent direction of the Debtors and an order of the Court.

48.     In order to enable the Banks to effectively manage the large number of outstanding checks, wires, drafts, and ACH Payments as of the Commencement Date, the Debtors request that, to the extent that the Debtors have represented to any of the Banks that a check, draft, wire, or ACH Payment should be dishonored, the Banks be authorized to comply with such representation, either through utilizing the Banks' stop-payment system, or through voiding the check, draft, wire, or ACH Payment using the relevant Banks' internal procedures.

24

49.      The Debtors believe that their chapter 11 cases will be more orderly if they are permitted to maintain all Bank Accounts with the same account numbers during these chapter 11 cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties in interest, including employees, vendors, and customers, will be best served by the relief requested.  In addition, subject to the DIP Order and the DIP Loan Documents, to the extent necessary, the Debtors request authorization to open new bank accounts at their existing Banks or other authorized depositories designated by the U.S. Trustee.

50.      To minimize expenses, the Debtors further request they be authorized to continue to use their Business Forms and checks, substantially in the forms existing immediately before the Commencement Date, without reference to their status as debtors in possession; provided that in the event that the Debtors generate new Business Forms and/or checks during the pendency of these cases other than from their existing stock, such Business Forms and checks will include a legend referring to the Debtors as "Debtors-In-Possession."  To the extent practicable, the Debtors will work with their systems personnel and outside consultants to determine what computer system changes are required to reflect their status as debtors in possession on electronically generated Business Forms and checks, and the Debtors will implement such changes.

51.      By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors transact, it is important that the Debtors be permitted to continue to use their existing Business Forms without alteration or change, except as requested herein.  Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result

25

of the publicized nature of these cases and the notice of commencement the Debtors are distributing to such parties, changing their Business Forms would be unnecessary and unduly burdensome.

### Reservation of Rights

52.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### The Debtors Have Satisfied Bankruptcy Rule 6003(b)

53.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  Fed. R. Bankr. P. 6003(b).

26

54.     The Cash Management System is critical to the Debtors' ongoing operations.   Modifications of and disruptions to the Cash Management System likely would cause large-scale payment delays and impede the Debtors' ability to track the flow of funds efficiently.   Late payments could frustrate the Debtors' relationships with vendors and cause other severe and irreparable disruptions to the Debtors' business.   Additionally, changes to the Cash Management System could impair the Debtors' ability to obtain important financial information in a timely manner.   Ultimately, these outcomes would cause a diminution in the value of the Debtors' estates, which would have a negative impact on all parties in interest. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003(b) is satisfied.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

55.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).   As explained above and in the Riecker Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.   Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

### Notice

56.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the twenty (20) largest unsecured claims against

27

the Debtors (on a consolidated basis); (iii) counsel for Bank of America, N.A., as administrative agent under the First Lien Credit Facility and the DIP ABL Agent; (iv) counsel for Citibank, N.A., as administrative agent under the Stand-Alone L/C Facility; (v) counsel for JPP, LLC, as administrative agent under the Second Lien Credit Facility, the IP/Ground Lease Term Loan, and the Consolidated Secured Loan Facility; (vi) counsel for Computershare Trust Company N.A., as indenture trustee for the Second Lien PIK Notes, the Holdings Unsecured PIK Notes, and the Holdings Unsecured Notes; (vii) counsel for Wilmington Trust, National Association, as indenture trustee for the Second Lien Notes; (viii) counsel for The Bank of New York Mellon Trust Company, N.A., as successor trustee for the SRAC Unsecured PIK Notes, the SRAC Unsecured Notes, and the SRAC Medium Term Notes; (ix) the Pension Benefit Guaranty Corporation; (x) the Unions; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) the United States Attorney's Office for the Southern District of New York; and (xiv) the Banks.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

57.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of interim and final orders granting the relief requested herein and such other and further relief as is just.

Dated: October 15, 2018
New York, New York

/s/ Ray C. Schrock
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

WEIL:\96759283\1\73217.0003

**<u>Exhibit A</u>**

**Proposed Interim Order**

WEIL:\96759283\1\73217.0003

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
In re                                       :
                                            :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,         :
                                            :        Case No. 18- _____ (RDD)
                                            :
                      Debtors.[1]           :        (Jointly Administered)
                                            :
----------------------------------------------------------------x
```

## INTERIM ORDER AUTHORIZING DEBTORS TO
## (I) CONTINUE USING EXISTING CASH MANAGEMENT SYSTEM,
## BANK ACCOUNTS, AND BUSINESS FORMS, (II) IMPLEMENT
## ORDINARY COURSE CHANGES TO CASH MANAGEMENT
## SYSTEM, (III) CONTINUE INTERCOMPANY TRANSACTIONS,
## AND (IV) PROVIDE ADMINISTRATIVE EXPENSE PRIORITY FOR
## POSTPETITION INTERCOMPANY CLAIMS AND GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Sears Holdings Corporation and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"),

pursuant to sections 105(a), 363, 364, 503, and 507 of title 11 of the United States Code (the

"**Bankruptcy Code**"), for an order (i) authorizing the Debtors to (a) continue their existing cash

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

management system, including, without limitation, the continued maintenance of their existing bank accounts and business forms; (b) implement changes to their cash management system in the ordinary course of business, including, without limitation, opening new or closing existing bank accounts; (c) continue to perform under and honor intercompany transactions with Debtor and non-Debtor affiliates in the ordinary course of business, in their business judgment and at their sole discretion, but subject to the terms and conditions set forth herein; (d) honor obligations with respect to service fees and chargebacks in connection with existing agreements with banks, credit card companies, and non-cash payment processors; and (e) provide administrative expense priority for certain postpetition intercompany claims, and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the interim relief requested in the Motion having been given as provided in the Motion; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis on October 15, 2018 (the "**Interim Hearing**"); and upon the Riecker Declaration filed contemporaneously with the Motion, the record of the Interim Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, and it appearing that the interim relief requested in the Motion is necessary to avoid immediate and irreparable

2

harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, provides a net

benefit to the Debtors and their estates after taking into account the Bankruptcy Code's priority

scheme, and is in the best interests of the Debtors, their estates, their creditors, and all parties in

interest; and after due deliberation and sufficient cause appearing therefor,

<div align="center"><b>IT IS HEREBY ORDERED THAT:</b></div>

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtors are authorized and empowered pursuant to sections 105(a),

363, 364, 503, and 507 of the Bankruptcy Code to continue using their integrated cash

management system described in the Motion (the "**Cash Management System**") and to

collect, concentrate, and disburse cash in accordance with the Cash Management System,

including intercompany funding among Debtor and non-Debtor affiliates.

3.      The Debtors are authorized, subject to the DIP Order and the DIP Loan

Documents, to implement changes to the Cash Management System in the ordinary course of

business, including the opening of any new Bank Accounts and the closing of any existing

Bank Accounts as they may deem necessary and appropriate in their sole discretion; provided

that (a) any such new account is with a bank that is (i) insured with the Federal Deposit

Insurance Corporation or the Federal Savings and Loan Insurance Corporation and (ii)

designated as an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee's

Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees and

(b) the Debtors provide notice to the DIP ABL Agent and the U.S. Trustee of the opening of

such account.

4.      The relief, rights, and responsibilities provided for in this Interim Order

shall be deemed to apply to any and all Bank Accounts maintained in the Debtors' names,

<div align="center">3</div>

including any new bank accounts, whether or not such Bank Accounts are identified on **Exhibit B** to the Motion, and any Banks at which new accounts are opened shall be subject to the rights and obligations of this Interim Order.

5.      The Debtors are authorized to (a) continue to use, with the same account numbers, all of the Bank Accounts in existence as of the Commencement Date, including, those accounts identified on **Exhibit B** to the Motion; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) use, in their present form, all correspondence and business forms (including, but not limited to, letterhead, purchase orders, and invoices) (collectively, the "**Business Forms**"), as well as checks and all other documents related to the Bank Accounts existing immediately before the Commencement Date, without reference to the Debtors' status as debtors in possession; _provided_ that in the event the Debtors generate new Business Forms and/or checks during the pendency of these chapter 11 cases, such Business Forms and checks shall include a legend referring to the Debtors as "Debtors-In-Possession," and, to the extent practicable, the Debtors shall laser print such legend on any Business Forms and checks electronically generated during these cases.

6.      The Debtors are authorized and empowered, subject to the DIP Order and the DIP Loan Documents, to continue performing under and honoring Intercompany Transactions, including Intercompany Transactions with their non-Debtor affiliates, in the ordinary course of business; _provided_ that the Debtors shall (a) keep records of any postpetition Intercompany Transactions that occur during the chapter 11 cases and (b) implement accounting procedures to identify and distinguish between prepetition and postpetition Intercompany Transactions; _provided_ _further_ that any transfers to or for the benefit of a non-Debtor affiliate by a Debtor, shall not exceed $5 million per Foreign Affiliate, per

4

month.  From and after the Commencement Date, the transfer of cash to or for the benefit of

any Debtor directly or indirectly from any Debtor or non-Debtor affiliate shall entitle the

transferring affiliate to an allowed claim in the recipient Debtor's Chapter 11 Case.  In

accordance with sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, all Intercompany

Claims arising after the Commencement Date shall be accorded administrative expense

priority, junior in all respects to the administrative expense priority claims granted pursuant to

the DIP Orders.  The Debtors shall maintain records of all Intercompany Transactions, and

provide such records, on a bi-weekly basis to the professionals retained by the DIP ABL

Agent, with the first such records to be submitted on the second Wednesday following the

entry of this Interim Order.

    7.    The Debtors are authorized and empowered to pay any amounts due with

respect to the Warranty Payments.

    8.    The Debtors shall account for the movement of cash and any

collection/disbursement activity between Debtors and affiliates through intercompany

accounting.

    9.    Except as otherwise expressly provided in this Interim Order, all banks at

which the Bank Accounts are maintained (collectively, the "**Banks**") are authorized, but not

directed, to continue to service and administer the Bank Accounts as accounts of the Debtors as

debtors in possession, without interruption and in the ordinary course, and to receive, process,

honor, and pay any and all checks, drafts, wires, and ACH Payments issued by the Debtors and

drawn on the Bank Accounts after the Commencement Date to the extent the Debtors have

sufficient funds standing to their credit with such Bank; provided that any payments drawn,

5

issued or made prior to the Commencement Date shall not be honored absent direction of the Debtors and a separate order of the Court authorizing such prepetition payment.

10.    The Debtors are authorized to pay and honor both prepetition and postpetition Bank Fees, Processing Fees, Service Charges, and Chargebacks, and the Banks, credit card companies, credit card processors, debit card processors, check processors, and gift card processors (collectively, the "**Payment Processing Companies**") are authorized to charge and collect, including, for the avoidance of doubt, by deducting such amounts from any reserve account maintained by the Banks and Payment Processing Companies, as applicable, in accordance with the terms of the governing agreement, whether such amounts accrued before or after the Commencement Date, and any amounts which are not so paid shall be entitled to priority as administrative expenses pursuant to section 503(b)(1) of the Bankruptcy Code.

11.    The Payment Processing Companies are authorized to offset or apply and deposit against any Processing Obligations, whether or not they have arisen before the Commencement Date.

12.    Each of the Banks is authorized, but not directed, to debit the Debtors' Bank Accounts in the ordinary course of business, to the extent of available funds, without need for further order of this Court for (i) all checks, items, and other payment orders drawn on the Debtors' Bank Accounts that are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Bank's receipt of notice of the commencement of these chapter 11 cases; (ii) all checks, ACH entries, and other items deposited or credited to one of the Debtors' accounts with such Banks prior to the Commencement Date that have been dishonored, reversed, or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such costs and fees

6

prior to the Commencement Date; and (iii) all prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as Service Charges for the maintenance of the Cash Management System.

13.     As of the Commencement Date, the Banks may rely on the representations of the Debtors with respect to whether any check, item, or other payment order drawn or issued by the Debtors prior to the commencement of these Chapter 11 Cases should be honored pursuant to this or any other order of this Court, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein and shall not be deemed to be, nor shall be, liable to any party on account of (a) following the Debtors' representations, instructions, directions, or presentations as to any order of the Court (without any duty of further inquiry); (b) honoring of any prepetition checks, drafts, wires, or ACH payments in a good faith belief or upon a representation by the Debtors that the Court has authorized such prepetition check, draft, wire, or ACH payments; or (c) a mistake made despite implementation of reasonable handling procedures.  Further the Banks may rely, without a duty of inquiry, upon the failure of the Debtors to issue a stop payment order with respect to any item, whether such item is issued prepetition or postpetition, as a direction by the Debtors that such item will be paid.  To the extent that the Debtors have represented to any of the Banks that a check, draft, wire, or ACH Payment should be dishonored, the Banks are hereby authorized to comply with such representation, either through utilizing the Banks' stop-payment system, or through voiding the check, draft, wire, or ACH Payment using the relevant Banks' internal procedures.

14.     The Debtors' credit and debit card providers are authorized and directed to transfer all credit and debit card receivables payable to the Debtors and to deduct any Service

7

Charges, Bank Fees, Processing Fees, and Chargebacks, whether arising before or after the Commencement Date, payable by the Debtors from such transfers.

15.     The Debtors shall maintain accurate records of all transfers within the Cash Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Commencement Date.

16.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services, subject to their compliance with applicable law.

17.     Those certain existing deposit agreements between the Debtors and the Banks shall continue to govern the postpetition cash-management relationship between the Debtors and the Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect. Either the Debtors or the Banks may, without further order of this Court, implement changes to the Debtors' Cash Management System in the ordinary course of business pursuant to the terms of those certain existing deposit agreements, and subject to the DIP Order and the DIP Loan Documents, including the opening and closing of bank accounts.

18.     As soon as practicable after the entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on those Banks that make disbursements pursuant to the Cash Management System.

19.     Except as otherwise provided herein, nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due

8

prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

20.     Notwithstanding anything in the Motion or this Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable:  (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

21.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

22.     Nothing contained in the Motion or this Interim Order, or any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

23.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

9

24.    Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

25.    Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

26.    This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

27.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

28.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

[*Remainder of page intentionally left blank*]

10

29.    The Final Hearing on the Motion shall be held on _____, **2018, at**

_____ (**Prevailing Eastern Time**), and any objections or responses to the Motion shall be in

writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Ray C.

Schrock, P.C., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.); (ii) the

Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York,

New York 10014 (Attn: Paul Schwartzberg, Esq. and Richard Morrissey, Esq.); and

(iii)  counsel for the DIP ABL Agent, with a copy to the Court's chambers, in each case so as

to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2018**.

Dated: _____, 2018
       White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

11

## Exhibit B

**Bank Accounts**

WEIL:\96759283\1\73217.0003

| # | Legal Entity | Financial Institution | Last Four Digits of Account Number | Type | Description |
|---|---|---|---|---|---|
| 1 | KCD IP LLC | Bank of America | 4907 | SPC | KCD IP LLC |
| 2 | Kmart Corporation | Banco Popular | 6180 | Concentration | location reporting |
| 3 | Kmart Corporation | Banco Popular | 0247 | Depository | Flexicuenta |
| 4 | Kmart Corporation | Bancorpsouth Bank | 3945 | Concentration | Master Account |
| 5 | Kmart Corporation | Bank of America | 2102 | Concentration | Corporate Concentration |
| 6 | Kmart Corporation | Bank of America | 3929 | Concentration | Master Account |
| 7 | Kmart Corporation | Bank of America | 7811 | Depository | Credit Card |
| 8 | Kmart Corporation | Bank of America | 7798 | Depository | Gift Cards |
| 9 | Kmart Corporation | Bank of America | 8978 | Depository | Kmart Misc Disb |
| 10 | Kmart Corporation | Bank of America | 7769 | Depository | Misc Wires |
| 11 | Kmart Corporation | Bank of America | 6911 | Depository | Store Cash |
| 12 | Kmart Corporation | Bank of America | 7756 | Depository | WIC / EBT |
| 13 | Kmart Corporation | Bank of America | 7772 | Disbursements | Beer / Wine |
| 14 | Kmart Corporation | Bank of America | 3896 | Disbursements | CT Lottery |
| 15 | Kmart Corporation | Bank of America | 3531 | Disbursements | Field Checking |
| 16 | Kmart Corporation | Bank of America | 7539 | Disbursements | GA Lottery |
| 17 | Kmart Corporation | Bank of America | 7743 | Disbursements | Hunting / Fishing |
| 18 | Kmart Corporation | Bank of America | 0136 | Disbursements | Import Payments |
| 19 | Kmart Corporation | Bank of America | 0986 | Disbursements | Kmart A/P Checks |
| 20 | Kmart Corporation | Bank of America | 0994 | Disbursements | Kmart A/P Disbursements |
| 21 | Kmart Corporation | Bank of America | 1000 | Disbursements | Kmart BRAC MN WC/GL Checks |
| 22 | Kmart Corporation | Bank of America | 3295 | Disbursements | Kmart Payroll Checks |
| 23 | Kmart Corporation | Bank of America | 7785 | Disbursements | Lottery |
| 24 | Kmart Corporation | Bank of America | 7542 | Disbursements | NC Lottery |
| 25 | Kmart Corporation | Bank of America | 6005 | Disbursements | Real Estate |
| 26 | Kmart Corporation | Bank of America | 7808 | Disbursements | Sales Tax |
| 27 | Kmart Corporation | Bank of America | 7555 | Disbursements | TN Lottery |
| 28 | Kmart Corporation | Bank of America | 7824 | Disbursements | Western Union MO |
| 29 | Kmart Corporation | Bank of America | 7837 | Disbursements | Western Union Wires |
| 30 | Kmart Corporation | Bank of America | 0508 | LockBox | Coupon - 12670 / Lockbox |
| 31 | Kmart Corporation | Bank of America | 3816 | LockBox | Pharmacy - 12658 / Lockbox |
| 32 | Kmart Corporation | Bank of America | 4404 | LockBox | Real Estate - 12664 / Lockbox |
| 33 | Kmart Corporation | Bank Of Oklahoma | 5769 | Concentration | location reporting |
| 34 | Kmart Corporation | BB&T Bank | 8654 | Concentration | location reporting |
| 35 | Kmart Corporation | Capital One Bank | 9632 | Concentration | location reporting |
| 36 | Kmart Corporation | Centennial Bank | 6879 | Depository | Master Account |

| # | Legal Entity | Financial Institution | Last Four Digits of Account Number | Type | Description |
|---|---|---|---|---|---|
| 37 | Kmart Corporation | Cherokee State Bank | 0494 | Depository | Master Account |
| 38 | Kmart Corporation | Citizens Bank | 7910 | Depository | location reporting |
| 39 | Kmart Corporation | Citizens National Bank | 7818 | Depository | Master Account |
| 40 | Kmart Corporation | Commercial Savings Bank | 0537 | Depository | Master Account |
| 41 | Kmart Corporation | Community Bank  NA | 5246 | Depository | Master Account |
| 42 | Kmart Corporation | Community First Bank | 9501 | Depository | Master Account |
| 43 | Kmart Corporation | First and Farmers Bank | 0543 | Depository | Master Account |
| 44 | Kmart Corporation | First Bank and Trust Company | 9130 | Depository | Master Account |
| 45 | Kmart Corporation | First Hawaiian Bank | 0940 | Concentration | location reporting |
| 46 | Kmart Corporation | First Interstate Bank of Billings  NA | 2277 | Depository | Master Account |
| 47 | Kmart Corporation | First Interstate Bank of Riverton | 1274 | Depository | Master Account |
| 48 | Kmart Corporation | First National Bank | 0001 | Depository | Master Account |
| 49 | Kmart Corporation | First National Bank in Alamogordo | 5501 | Depository | Master Account |
| 50 | Kmart Corporation | First National Bank Oelwein | 2180 | Depository | Master Account |
| 51 | Kmart Corporation | First National Bank of Grayson | 4081 | Depository | Master Account |
| 52 | Kmart Corporation | First National Bank of Pierre | 9326 | Depository | Master Account |
| 53 | Kmart Corporation | First Security Bank | 7014 | Depository | Master Account |
| 54 | Kmart Corporation | First Security Bank and Trust Company | 9005 | Depository | Master Account |
| 55 | Kmart Corporation | First State Bank | 6705 | Depository | Master Account |
| 56 | Kmart Corporation | First Tennessee | 0555 | Depository | Master Account |
| 57 | Kmart Corporation | Hilltop National Bank | 4003 | Depository | Master Account |
| 58 | Kmart Corporation | Houghton State Bank | 0927 | Depository | Master Account |
| 59 | Kmart Corporation | Huntington National Bank | 9688 | Depository | location reporting |
| 60 | Kmart Corporation | Independent Bank East Michigan | 0812 | Depository | Master Account |
| 61 | Kmart Corporation | Iowa State Bank | 4408 | Depository | Master Account |
| 62 | Kmart Corporation | M&T Bank | 2880 | Concentration | location reporting |
| 63 | Kmart Corporation | National Bank and Trust Company of Norwich | 0573 | Depository | Master Account |
| 64 | Kmart Corporation | Old National Bank | 5501 | Depository | Master Account |
| 65 | Kmart Corporation | PNC Bank | 0169 | Concentration | location reporting |
| 66 | Kmart Corporation | PNC Bank | 9553 | Depository | Returned Checks Check Cashing |
| 67 | Kmart Corporation | PNC Bank | 3334 | Depository | TC Return Items |
| 68 | Kmart Corporation | Premierbank | 7399 | Depository | Master Account |
| 69 | Kmart Corporation | Union Bank | 1583 | Concentration | location reporting |
| 70 | Kmart Corporation | United Missouri Bank | 4642 | Concentration | Master Account |
| 71 | Kmart Corporation | United Missouri Bank | 0553 | Depository | location reporting |

| # | Legal Entity | Financial Institution | Last Four Digits of Account Number | Type | Description |
|---|---|---|---|---|---|
| 72 | Kmart Corporation | United Missouri Bank | 3100 | Depository | Master Account |
| 73 | Kmart Corporation | Wells Fargo Bank | 0318 | Depository | location reporting |
| 74 | Kmart Corporation | Wesbanco Bank | 1260 | Depository | Master Account |
| 75 | Kmart Corporation | Western State Bank | 0859 | Depository | Master Account |
| 76 | Kmart Corporation | Zions National Bank | 6778 | Depository | Master Account |
| 77 | Sears Holdings Corp | Bank of America | 6719 | Depository/Disbursements | Sears Holdings Corp |
| 78 | Sears Holdings Corp | Bank of America | 4266 | Disbursements | SHC Disbursement |
| 79 | Sears Holdings Corp | Standard Bank Ltd. Mauritius | 7001 | Depository | Sears Holding Mauritius Co |
| 80 | Sears Holdings Mgmt Corp | Bank of America | 6722 | Depository | Sears Holdings Management Corp |
| 81 | Sears Holdings Mgmt Corp | Bank of America | 5426 | Disbursements | SHMC Disbursements |
| 82 | Sears Holdings Mgmt Corp | US Bank | 8942 | Depository/Disbursements | SHMC / KCD |
| 83 | Sears Protection Co | Bank of America | 4583 | Special Purpose | Sears Protection Company |
| 84 | Sears Protection Co - PR | Banco Popular | 5678 | Special Purpose | Sears Protection Co - PR |
| 85 | Sears Protection Co- FL | Bank of America | 4596 | Special Purpose | Sears Protection Company - FL |
| 86 | Sears Roebuck & Co | Banco Popular | 1580 | Checking | PR Merchant |
| 87 | Sears Roebuck & Co | Banco Popular | 7665 | Concentration | Master Account |
| 88 | Sears Roebuck & Co | Bank of America | 5261 | Concentration | Concentration |
| 89 | Sears Roebuck & Co | Bank of America | 1595 | Concentration | Master Account |
| 90 | Sears Roebuck & Co | Bank of America | 5468 | Concentration | Sears Concentration |
| 91 | Sears Roebuck & Co | Bank of America | 7857 | Concentration | ServiceLive - Concentration |
| 92 | Sears Roebuck & Co | Bank of America | 8868 | Depository | CA Bldrs - Receipts |
| 93 | Sears Roebuck & Co | Bank of America | 4120 | Depository | Credit Card Settlement |
| 94 | Sears Roebuck & Co | Bank of America | 8855 | Depository | FL Bldrs - Receipts |
| 95 | Sears Roebuck & Co | Bank of America | 7607 | Depository | Gift Cards |
| 96 | Sears Roebuck & Co | Bank of America | 8986 | Depository | Licensed Business cc Settlements |
| 97 | Sears Roebuck & Co | Bank of America | 8960 | Depository | SCUC Inc. |
| 98 | Sears Roebuck & Co | Bank of America | 7776 | Depository | Sears Brands Mgmt Corp |
| 99 | Sears Roebuck & Co | Bank of America | 1938 | Depository | Sears Global Technology Services LLC |
| 100 | Sears Roebuck & Co | Bank of America | 7802 | Depository | Inc. |
| 101 | Sears Roebuck & Co | Bank of America | 8981 | Depository | Sears Master Disb |
| 102 | Sears Roebuck & Co | Bank of America | 8965 | Depository | Sears Misc Disb |
| 103 | Sears Roebuck & Co | Bank of America | 7828 | Depository | ServiceLive - Receipts |
| 104 | Sears Roebuck & Co | Bank of America | 7844 | Depository | ServiceLive - Retail Installation |
| 105 | Sears Roebuck & Co | Bank of America | 8871 | Depository | ServiceLive Conc Disb |
| 106 | Sears Roebuck & Co | Bank of America | 8994 | Depository | ServiceLive Operations Disb |

| # | Legal Entity | Financial Institution | Last Four Digits of Account Number | Type | Description |
|---|---|---|---|---|---|
| 107 | Sears Roebuck & Co | Bank of America | 8973 | Depository | SHP Inc. |
| 108 | Sears Roebuck & Co | Bank of America | 7969 | Depository | SL - LeadGen Receipts / CC |
| 109 | Sears Roebuck & Co | Bank of America | 7972 | Depository | SL - NON LeadGen Receipts / CC |
| 110 | Sears Roebuck & Co | Bank of America | 8884 | Depository | Starwest - Receipts |
| 111 | Sears Roebuck & Co | Bank of America | 9939 | Depository | STG Commercial Credit - Western Auto |
| 112 | Sears Roebuck & Co | Bank of America | 3618 | Depository | Innovel - opened at BOA receipts |
| 113 | Sears Roebuck & Co | Bank of America | 5885 | Depository | SHC-SYWR/WallyLab/SL/Comm Inc - merged |
| 114 | Sears Roebuck & Co | Bank of America | 0556 | Depository | Commercial One |
| 115 | Sears Roebuck & Co | Bank of America | 7831 | Disbursements | ASA ServiceLive |
| 116 | Sears Roebuck & Co | Bank of America | 6850 | Disbursements | CA Builders |
| 117 | Sears Roebuck & Co | Bank of America | 7770 | Disbursements | Florida Buiders Disbursement |
| 118 | Sears Roebuck & Co | Bank of America | 0149 | Disbursements | Import Payments |
| 119 | Sears Roebuck & Co | Bank of America | 0895 | Disbursements | Sears A/P Checks |
| 120 | Sears Roebuck & Co | Bank of America | 0903 | Disbursements | Sears A/P Disbursements |
| 121 | Sears Roebuck & Co | Bank of America | 6654 | Disbursements | Sears OneCard |
| 122 | Sears Roebuck & Co | Bank of America | 0911 | Disbursements | Sears Payroll Checks |
| 123 | Sears Roebuck & Co | Bank of America | 0937 | Disbursements | Sears Payroll Disbursements |
| 124 | Sears Roebuck & Co | Bank of America | 0952 | Disbursements | Sears Payroll Garnishment Disb |
| 125 | Sears Roebuck & Co | Bank of America | 0929 | Disbursements | Sears Payroll Manual Checks |
| 126 | Sears Roebuck & Co | Bank of America | 0945 | Disbursements | Sears Payroll Manual Disbursements |
| 127 | Sears Roebuck & Co | Bank of America | 4205 | Disbursements | Sears Payroll T/C Manual Checks |
| 128 | Sears Roebuck & Co | Bank of America | 0978 | Disbursements | Sears SHP Disbursements |
| 129 | Sears Roebuck & Co | Bank of America | 6667 | Disbursements | Sears US Customs Drawdowns |
| 130 | Sears Roebuck & Co | Bank of America | 9396 | Disbursements | Starwest , LLC |
| 131 | Sears Roebuck & Co | Bank of America | 1451 | Lockbox | Sears National Claims Center |
| 132 | Sears Roebuck & Co | Bank of America | 3107 | Special Purpose | Sears as Master Servicer |
| 133 | Sears Roebuck & Co | Bank of America | 6570 | Special Purpose | BCBSIL |
| 134 | Sears Roebuck & Co | Bank of America | 9415 | Special Purpose | uses handwritten checks occ. |
| 135 | Sears Roebuck & Co | Bank of America | 9457 | Special Purpose | Interest Bearing account |
| 136 | Sears Roebuck & Co | Bank of America | 0679 | Special Purpose | Sears Political Action - open at BOA |
| 137 | Sears Roebuck & Co | Bank Of Oklahoma | 1048 | Concentration | location reporting |
| 138 | Sears Roebuck & Co | Capital One Bank | 9999 | Concentration | location reporting |
| 139 | Sears Roebuck & Co | Capital One Bank | 4557 | Depository | ACH Incoming |

| # | Legal Entity | Financial Institution | Last Four Digits of Account Number | Type | Description |
|---|---|---|---|---|---|
| 140 | Sears Roebuck & Co | Citizens Bank | 3397 | Depository | location reporting |
| 141 | Sears Roebuck & Co | First Hawaiian Bank | 8911 | Concentration | Master Account |
| 142 | Sears Roebuck & Co | Key Bank | 1056 | Concentration | Rebate Checks |
| 143 | Sears Roebuck & Co | Key Bank | 4236 | Concentration | Master Account |
| 144 | Sears Roebuck & Co | PNC Bank | 2515 | Concentration | location reporting |
| 145 | Sears Roebuck & Co | PNC Bank | 3424 | Depository | ATM Deposits |
| 146 | Sears Roebuck & Co | PNC Bank | 7191 | Depository | Carpet and Upholstery |
| 147 | Sears Roebuck & Co | PNC Bank | 3342 | Depository | TC Return Items |
| 148 | Sears Roebuck & Co | Regions Bank | 5433 | Concentration | location reporting |
| 149 | Sears Roebuck & Co | Union Bank | 4871 | Concentration | location reporting |
| 150 | Sears Roebuck & Co | Wells Fargo Bank | 2397 | Concentration | location reporting |
| 151 | Sears Roebuck Acceptance Corp | Bank of America | 6815 | Concentration | C/P BOA |
| 152 | Sears Roebuck Acceptance Corp | Bank of America | 9512 | Concentration | Operating Account |
| 153 | Sears Roebuck Acceptance Corp | Bank of America | 0955 | Depository | SRAC CASH Reserves |
| 154 | SHMC Beverly Group | Bank of America | 5508 | Depository | Dividend receipt |

## Exhibit C

**Cash Management System Diagram**

Kmart (Inflows)
Lockboxes
Credit Card Receipts
Regional Banks
Location Reporting
WIC/EBT
Gift Cards
Account never used
Store Receipts
Other
Store Cash
Misc. Wires
Master Account
Revolver
Sears (Inflows)
ASA ServiceLive
Payroll T/C Manual Checks
Brands Mgmt. Corp
Regional Depository Accounts
Credit Card Settlement
ServiceLive Receipts
Appliance Builders Distributions
Holding Management Corp
Innovel - Opened at BOA Receipts
SHC - SYWR/Wally Lab/SL/ Lockbox
Sears Concentration
Master Account
SL - LeadGen Receipts
SL - Non LeadGen Receipts
ServiceLive Concentration
Revolver
Commercial One
Home Improvement Products, Inc
SCUC Inc.
STG Commercial Credit - Western Auto
Gift Cards
Licensed Business cc Settlements
Home Services National Claims Center Lockbox
SHP Inc.
Concentration
Standalone (Intercompany)
Protection Co-PR
Protection Company
Protection Company-FL
Reinsurance Ltd.
Concentration
Operating Account
C/P BOA
SRAC
C/P BOA
Operating Account
SRAC Cash Reserves Inactive
Kmart (Outflows)
Sales Tax
Beer/Wine
Lottery
Payroll Checks
Hunting/Fishing
Western Union
A/P Checks
A/P Checks
A/P Disbursements
BRAC MN WC/GL Checks
Import Payments
Real Estate
Borrow Daily
SRAC Operating
SRCO Sears Master Disbursements
SFHC Operating
Corporate Concentration
Sears (Outflows)
A/P Checking
A/P Disbursements
SHP Disbursements
Import Payments
Payroll & Benefits
US Customs Drawdowns
ServiceLive Retail Installation
ServiceLive Conc Disbursements
ServiceLive Operations Disbursements
Misc. Disbursements
Appliance Builders Distributions
Standalone (Excluding Intercompany)
Foundation - opened at BOA - uses handwritten checks
Foundation - opened at BOA - Interest Bearing account
Political Action - open at BOA
Carpet and Upholstery
Rebate Checks
BCBSIL
Master Servicer
Global Technology Services LLC
OneCard
KCD IP LLC
Holding Mauritius Co.
Holdings Corp.
SHMC/KCD
Dividend receipt
SHMC Disbursements
SHC Disbursements

