WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail
Jacqueline Marcus
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-_____ (RDD)** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Requested)** |

--------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF DEBTORS FOR AUTHORIZATION TO
(I) CONTINUE, MAINTAIN, AND RENEW THEIR INSURANCE POLICIES AND
WORKERS' COMPENSATION PROGRAMS; (II) HONOR ALL OBLIGATIONS
WITH RESPECT THERETO; AND (III) MODIFY THE AUTOMATIC
STAY WITH RESPECT TO THE WORKERS' COMPENSATION PROGRAMS**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent in support of this motion (the "**Motion**"):

<u>**Background**</u>

1.      On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for*

2

*Southern District of New York*, sworn to on the date hereof (the "**Riecker Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

## Jurisdiction

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      By this Motion, the Debtors request authority pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, but not direction, to (i) continue, maintain, and renew their Insurance Policies and Workers' Compensation Programs (each as defined herein), including the Debtors' Premium Financing Agreements; (ii) and honor their Insurance Obligations and Workers' Compensation Obligations (each as defined herein) in the ordinary course of business during the administration of these chapter 11 cases; (iii) pay any prepetition Insurance Obligations and Workers' Compensation Obligations; and (iv) modify the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

6.      A proposed form of order granting the relief requested in the Motion on an interim basis is attached hereto as **Exhibit A** (the "**Proposed Interim Order**").

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

WEIL:\96759524\1\73219.0006

## The Debtors' Insurance Policies, Programs, and Obligations

7.      In connection with the operation of the Debtors' business and the management of their properties, the Debtors maintain various insurance policies related to, among other things, general liability, umbrella/excess liability, sponsorship liability, aircraft liability, foreign product liability, business travel accident liability, directors' and officers' liability, fiduciary liability, workers' compensation, and property, crime, automobile, pollution, contractual liability, and cyber liability (collectively, the "**Insurance Policies**" and all premiums and other obligations related thereto, including fees, assessments, and taxes, collectively, the "**Insurance Obligations**") through several different insurance carriers (the "**Insurers**"), including, but not limited to, those Insurance Policies listed on **Exhibit 1** to the Proposed Interim Order (the "**Insurance Schedule**").[3]

8.      The Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and other assets.  Certain of the Insurance Policies are required by the various regulations, laws, and contracts that govern the Debtors' commercial activities. Section 1112(b)(4)(C) of the Bankruptcy Code provides, for example, that "failure to maintain appropriate insurance that poses a risk to the estate or to the public," is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  Additionally, the Guidelines of the Office of the United States Trustee for Region 2 (the "**UST Guidelines**") require debtors to maintain insurance coverage throughout their chapter 11 cases.

A.      **Insurance Policies & Premiums**

9.      The Debtors employ JLT Specialty Insurance Services ("**JLT**") and Aon Risk Consultants, Inc. (collectively, the "**Brokers**") for brokerage, consulting, and financing

---

[3] The Debtors reserve the right to amend, modify, or otherwise supplement the Insurance Schedule.  Further, the Debtors may, in the future, renew or enter into new Insurance Policies, financing arrangements, and/or other agreements with Insurers that are not listed on the Insurance Schedule.

4

services with respect to their Insurance Policies.  In exchange for certain fees (the "**Broker Fees**") the Brokers help the Debtors procure, negotiate, and evaluate the Insurance Policies and also assist the Debtors with identifying and reviewing claims that arise under the Insurance Policies.  The Debtors also employ Sedgwick Claims Management Services, Inc. ("**Sedgwick**") which provides the Debtors with services related to, among other things, the adjustment of claims, and the management of payments in exchange for certain fees (the "**Administrative Fees**" and, together with the Broker's Fees, the "**Service Provider's Fees**").

10.     The Debtors make premium payments to the Brokers or in some cases directly to the Insurers, on different schedules, depending upon the applicable Insurance Policy, which range from as frequently as monthly, to as infrequently as annually.  Pursuant to the Insurance Policies, the Debtors pay premiums based upon fixed rates established and billed by each Insurance Carrier (collectively, the "**Insurance Premiums**," including, but not limited to, those listed on **Exhibit 1** to the Proposed Interim Order).[4]

11.     The aggregate annual cost of the Insurance Premiums is approximately $27 million.[5] While the Debtors are current on all Insurance Premiums, the Debtors estimate that they will pay approximately $850,000 on account of Insurance Premiums within the first thirty (30) days of the chapter 11 cases.  Additionally, the aggregate annual cost of the Service Provider Fees is approximately $12.5 million, of which, $200,000 will come due within the first thirty (30) days of the chapter 11 cases. As of the Commencement Date, the Debtors do not owe any Service Provider's Fees.

---

[4] The Insurance Premiums include amounts due under the Premium Financing Agreements (as defined herein).

[5] The estimate provided herein is based upon the policies in place as of the Commencement Date.

WEIL:\96759524\1\73219.0006

**B.      Premium Financing Agreements**

12.      The Debtors finance premiums under certain of their Insurance Policies (collectively, the "**Financed Policies**") because it is not economically advantageous for the Debtors to consistently pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis. Accordingly, in the ordinary course of business, the Debtors finance the premiums on the Financed Policies pursuant to three premium financing agreements (the "**Premium Financing Agreements**") with AFCO Credit Corporation ("**AFCO**"). The amount financed under the Premium Financing Agreements typically accrues interest at a rate between five (5) and six (6) percent.

13.      The Debtors' obligations under the Premium Financing Agreements are secured by a security interest in all sums payable to the applicable Debtor under the Insurance Policies included in the Premium Financing Agreements, including, among other things, any gross unearned premiums and any payment on account of loss that results in a reduction of unearned premium in accordance with the terms of said Insurance Policies.

14.      The Premium Financing Agreement with respect to the Debtors' excess umbrella policy (the "**Excess Umbrella PFA**") requires the Debtors to pay AFCO an initial down payment of approximately $326,000 beginning on August 1, 2018, followed by nine (9) monthly payments of approximately $55,635 (due on the first day of each month), in exchange for AFCO's obligation to pay the insurance premiums on account of the Debtors' excess umbrella policy.

15.      The Premium Financing Agreement with respect to the Debtors' property insurance (the "**Property PFA**") requires the Debtors to pay AFCO an initial down payment of approximately $3,163,812 beginning in June 1, 2018 followed by nine (9) monthly payments of

6

approximately $762,612.06 (due on the first day of each month), in exchange for AFCO's obligation to pay the insurance premiums on account of the Debtors' property policy.

16.     The Premium Financing Agreement with respect to the Debtors' crime policy (the "**Crime PFA**") requires the Debtors to pay AFCO an initial down payment of approximately $88,589.00 beginning on March 31, 2018 followed by seven (7) monthly payments of approximately $30,092.78 (due on the first day of each month), in exchange for AFCO's obligation to pay the insurance premiums on account of the Debtors' crime policy.

17.     As of the Petition Date the Debtors have made (i) two (2) out of the nine (9) monthly payments on account of the Excess Umbrella PFA; (ii) four (4) out of the nine (9) monthly payments on account of the Property PFA; and (iii) six (6) out of the seven (7) payments on account of the Crime PFA. The Debtors are current on all of their payments under the Premium Financing Agreements; however, thirteen (13) payments totaling approximately $4.2 million will become due and payable after the Commencement Date.  In particular, the Debtors estimate that approximately $850,000 of premium financing payments will become due and payable within the first thirty (30) days of these chapter 11 cases.

18.     By this Motion, the Debtors request authority, but not direction, to continue making payments pursuant to the Premium Financing Agreements, and to renew such agreements and enter into new Premium Financing Agreements as necessary in the ordinary course of business.

## C.     Workers' Compensation Programs

19.     With certain limited exceptions, the Debtors maintain a system in each of the states in which their business operates for paying claims arising from the various states' workers' compensation laws (collectively, the "**Workers' Compensation Programs**" and, the

7

claims, the "**Workers' Compensation Claims**").[6]    The Debtors' Workers' Compensation Programs fall into three general categories.   For a majority of states, the Debtors have insurance in place through Ace American Insurance Company ("**Ace**") that covers Workers' Compensation Claims (the "**Ace Policy**").[7]   In connection with the Ace Policy, the Debtors pay Ace premiums and in consideration, Ace covers certain Workers' Compensation Claims subject to a $2 million deductible for reimbursable losses.

20.    Some states, however, do not permit companies to purchase commercial insurance to cover workers' compensation claims.   In certain of these locations, affected Debtors purchase insurance directly from the state, in connection with which the Debtors pay premiums to the applicable state.   In certain other states (and/or for certain Debtors), the Debtors self-insure their Workers' Compensation Programs.

21.    In states where the Debtors self-insure, the Debtors post letters of credit or purchase surety bonds in favor of the respective states to secure their obligations (collectively, the "**Collateral**").    As of the Commencement Date, the aggregate amount of outstanding Collateral posted by the Debtors in support of their Workers' Compensation Obligations is approximately $225 million.

22.    As discussed above, to administer all of their current Workers' Compensation Programs, the Debtors employ Sedgwick which provides the Debtors with services related to, among other things, investigating, administering, and paying claims arising under their Workers' Compensation Program and other Insurance Policies.   For the Workers'

---

[6] The Company has opted out of the Texas Workers' Compensation System and has established its own benefit program that provides benefits for work related injuries to all of the Company's associates in Texas.

[7] The Debtors also have certain legacy workers compensation policies in place Ace Fire Underwriters Insurance Company, Travelers Indemnity Company and affiliates, Liberty Mutual Fire Insurance Company that cover *de minimis* historical claims of the Debtors. The nature of the applicable provider's coverage, funding and collateral depends upon the policy.

WEIL:\96759524\1\73219.0006

Compensation Programs, the Debtors pay claim amounts to Sedgwick, who administers payment on the Debtors' behalf using a bank account that is replenished by the Debtors on a daily basis.

23.     In total, the Debtors estimate that they pay approximately $3 million per month on account of the Workers' Compensation Programs, which includes premiums paid to Ace, premiums paid to state workers' compensation funds, payments made to holders of Workers' Compensation Claims under the deductible policies or programs of states where the Debtors self-insure, and fees paid to Sedgwick (collectively, the "**Workers Compensation Obligations**").    Given the Debtors' number of employees and Workers' Compensation Claims, it is likely that during the interim period the Debtors may, in the exercise of their reasonable business judgment, settle certain Worker's Compensation Claims that arose prior to the Commencement Date.  The Debtors estimate that approximately $3 million in such Workers' Compensation Obligations may become due and owing within the first thirty (30) days of the chapter 11 cases.

24.     Accordingly, the Debtors seek permission to pay prepetition Workers' Compensation Obligations in the ordinary course of business, maintain the Workers' Compensation Programs, and post any Collateral in connection therewith.

## The Relief Requested Should Be Granted

**A.      Maintaining the Insurance Policies and Payment of Insurance Obligations Related Thereto Is Warranted under the Bankruptcy Code**

25.     As set forth above, the Debtors seek authority to continue to maintain their Insurance Policies and Workers' Compensation Programs, honor their Insurance Obligations and Workers' Compensation Obligations in the ordinary course of business, and pay any outstanding prepetition Insurance Obligations and Workers' Compensation Obligations.

9

26.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers).

27.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "'protect and preserve the estate, including an operating business' going-concern value,'" on behalf of the debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

10

11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).

28.    In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

29.    This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code.").  The

11

rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

30.    As noted herein, the nature of the Debtors' business makes it essential for the Debtors to maintain all Insurance Policies on an ongoing and uninterrupted basis.  If any of the Debtors' Insurance Policies are terminated or lapse, the Debtors could be exposed to substantial liability, which would be detrimental to all parties in interest.  Additionally, the Debtors must maintain most of the Insurance Policies to comply with the UST Guidelines.  Thus, the Court should authorize the Debtors to pay their Insurance Obligations, whether they arise before or after the Commencement Date, including any Service Provider's Fees.  Further, the Brokers are intimately familiar with the Debtors' Insurance Policies and Insurance Obligations.  Losing the services provided to the Debtors by the Brokers would result in an extremely costly disruption to the smooth administration of the Debtors' chapter 11 estates.

31.    The Debtors also are required by law to maintain the Workers' Compensation Programs.  If the Debtors fail to maintain the Workers' Compensation Programs, applicable state law could, among other things, prohibit the Debtors from operating their stores.  Granting authority to pay all Workers' Compensation Obligations, therefore, is crucial to the continued operation of the Debtors' business.

**B.    Automatic Stay Should Be Modified for Workers' Compensation Claims**

Section 362(a)(1) of the Bankruptcy Code operates to stay:

the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

12

11 U.S.C. § 362(a)(1).  Section 362(d)(1), however, permits a debtor or other party in interest to request a modification or termination of the automatic stay for "cause."

32.    To the extent the Debtors' employees hold valid claims under the Workers' Compensation Program, the Debtors request a modification of the automatic stay to permit the Debtors' employees to proceed with their Workers' Compensation Claims, in the appropriate judicial or administrative forum, and for the Debtors to pay and honor any prepetition Workers' Compensation Claims.  There is cause to modify the automatic stay because staying the Workers' Compensation Claims could cause employee departures or otherwise harm employee morale, which would severely disrupt the Debtors' business and prevent a successful reorganization.

33.    Courts in this district and others have regularly approved modification of the automatic stay to permit the debtors' employees to proceed with their workers' compensation claims.  *See, e.g., In re Tops Holdings Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. March 22, 2018) (ECF No. 186) *In re Walter Inv. Mgmt. Corp.*, Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 6, 2017) (ECF No. 66); *In re Golfsmith Int'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Sept. 15, 2016) (ECF No. 68); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 20, 2016) (ECF No. 64); *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) (ECF No. 84); and *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Nov. 30, 2011) (ECF No. 61).

## C.    The Debtors Should be Authorized to Honor and Renew the Premium Financing Arrangements

34.    The Debtors respectfully submit that payment of any amounts owed, whether arising before or after the Commencement Date, under the Premium Financing Agreements is also necessary and appropriate, and may be authorized under sections 105(a) and

WEIL:\96759524\1\73219.0006

363(b).  Moreover, pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured postpetition debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (stating that with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Prod. Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and  reasonable for benefit of estate).

35.     If the Debtors were unable to continue honoring their obligations under the Premium Financing Agreements, AFCO may seek relief from the automatic stay to terminate the Financed Policies to recoup its losses. In total, approximately $850,000 in premium finance payments arising under the Premium Financing Agreements will become due and owing within the first thirty (30) days following the Commencement Date under their existing terms.  Without the Premium Financing Agreements, the Debtors could be required to obtain replacement insurance on an expedited basis and likely at a significant cost to their estates.  Even if the Financed Policies were not terminated, any interruption in the Debtors' payments could have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

36.     In addition, to the extent that the Premium Financing Agreements expire during the course of these chapter 11 cases, the Debtors seek authority to renew their Premium Financing Agreements without further Court approval. The Debtors respectfully submit that renewal of the Premium Financing Agreements falls squarely within the ordinary course of their business and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Premium Financing Agreements. To reduce the

14

administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Premium Financing Agreements when and as necessary in the Debtors' business judgment.

37.     As discussed above, the Debtors believe that continuing to perform under the Premium Financing Agreements on a postpetition basis is in the best interests of their estates. Moreover, in light of their financial circumstances, alternative premium finance companies may not be willing to provide premium financing to the Debtors on attractive market terms on a postpetition basis. Simply put, it is critical for the Debtors to continue to perform under their existing Premium Financing Agreements.

### **Reservation of Rights**

38.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### **The Debtors Have Satisfied Bankruptcy Rule 6003(b)**

39.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate,

15

including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b). As described herein and in the Riecker Declaration, the Debtors are legally and contractually required to maintain many of their Insurance Policies and Workers' Compensation Programs. In addition, the termination or non-renewal of any of the Insurance Policies and Workers' Compensation Programs as a result of the Debtors' failure to pay their obligations thereunder could subject the Debtors to substantial administrative liability and a potential cessation of operations. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003(b) is satisfied.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

40. To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Riecker Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

### Notice

41. Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel for Bank of America, N.A., as administrative agent under the First Lien Credit Facility and the DIP ABL Agent; (iv) counsel for Citibank, N.A., as administrative agent under the Stand-Alone L/C Facility; (v) counsel for JPP, LLC, as

16

administrative agent under the Second Lien Credit Facility, the IP/Ground Lease Term Loan, and the Consolidated Secured Loan Facility; (vi) counsel for Computershare Trust Company N.A., as indenture trustee for the Second Lien PIK Notes, the Holdings Unsecured PIK Notes, and the Holdings Unsecured Notes; (vii) counsel for Wilmington Trust, National Association, as indenture trustee for the Second Lien Notes; (viii) counsel for The Bank of New York Mellon Trust Company, N.A., as successor trustee for the SRAC Unsecured PIK Notes, the SRAC Unsecured Notes, and the SRAC Medium Term Notes; (ix) the Pension Benefit Guaranty Corporation; (x) the Unions; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) the United States Attorney's Office for the Southern District of New York; (xx) the Brokers; (xxi) AFCO; (xxii) Sedgwick; and (xxiii) the Insurers listed on **Exhibit 1** to the Proposed Interim Order. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

42.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WEIL:\96759524\1\73219.0006

WHEREFORE the Debtors respectfully request entry of interim and final orders granting the relief requested herein and such other and further relief as is just.

Dated: October 15, 2018
New York, New York

/s Ray C. Schrock, P.C.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re                                      :
                                           :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,        :
                                           :        Case No. 18-_____ (RDD)
                                           :
          Debtors.¹                        :        (Jointly Administered)
-----------------------------------------------------------------x
```

### INTERIM ORDER AUTHORIZING DEBTORS TO
### (I) CONTINUE, MAINTAIN, AND RENEW THEIR INSURANCE POLICIES AND
### WORKERS' COMPENSATION PROGRAMS; (II) HONOR ALL OBLIGATIONS
### WITH RESPECT THERETO; AND (III) MODIFY THE AUTOMATIC
### STAY WITH RESPECT TO THE WORKERS' COMPENSATION PROGRAMS

Upon the motion (the "**Motion**")[2] of Sears Holdings Corporation and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of title 11 of the United

States Code (the "**Bankruptcy Code**"), for an order authorizing but not directing the Debtors to

(i) continue, maintain, and renew their Insurance Policies and Workers' Compensation Programs

(each as defined herein), including the Debtors' Premium Financing Agreements; (ii) and honor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

their Insurance Obligations and Workers' Compensation Obligations (each as defined herein) in the ordinary course of business during the administration of these chapter 11 cases; (iii) pay any prepetition Insurance Obligations and Workers' Compensation Obligations; and (iv) modify the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program; and (v) granting related relief all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief, requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the interim relief requested in the Motion having been given as provided in the Motion; such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis on October 15, 2018 (the "**Interim Hearing**"); and upon the Riecker Declaration filed contemporaneously with the Motion, the record of the Interim Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, provides a net benefit to the Debtors and their estates after taking into account the Bankrupt Code's priority scheme and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

WEIL:\96759524\1\73219.0006

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted on an interim basis to the extent set forth herein.

2.    The Debtors are authorized, but not directed, to pay, in the ordinary course of business, all Insurance Obligations (including, without limitations payments under Premium Financing Agreements and the Service Provider's Fees) arising under or relating to the Insurance Policies including, without limitation, any new Insurance Policies, and whether or not such Insurance Policies are listed on **Exhibit 1** to this Interim Order, regardless of whether accruing or relating to the period before or after the Commencement Date; *provided that*, the Debtors are authorized, but not directed, to pay only amounts due and payable as of the Commencement Date and amounts that are or become due and payable between the Commencement Date and the date that a final order on the Motion is entered, unless otherwise ordered by the Court.

3.    The Debtors are authorized, but not directed, to honor the terms of their existing Premium Financing Agreements, and to renew the Premium Financing Agreements, and to enter into new premium financing agreements in the ordinary course of business.

4.    The Debtors are further authorized, but not directed, to maintain their Insurance Policies in accordance with practices and procedures that were in effect before the Commencement Date.

5.    The Debtors are further authorized, but not directed, to revise, extend, supplement or otherwise modify their insurance coverage as needed, including without limitation, through the purchase or renewal of new or existing insurance policies or through entering into or renewing new or existing premium financing agreements.

6.    The Debtors are authorized, but not directed, to pay all Workers' Compensation Obligations, including, without limitation, any Workers' Compensation

3

Obligations related to any new Workers' Compensation Programs, regardless of whether accruing or relating to the period before or after the Commencement Date; *provided that*, the Debtors are authorized, but not directed, to pay only amounts due and payable as of the Commencement Date and amounts that are or become due and payable between the Commencement Date and the date that a final order on the Motion is entered, unless otherwise ordered by the Court.

7.      The Debtors are authorized, but not directed, to maintain the Workers' Compensation Programs in accordance with practices and procedures that were in effect before the Commencement Date.

8.      The Debtors are authorized, but not directed, to revise, extend, supplement or otherwise modify their workers' compensation coverage as needed, including, without limitation, through the purchase of new or renewal of existing Workers' Compensation Programs.

9.      Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

10.      Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable:  (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**"); (ii) the other documentation governing the Debtors' use of

4

cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

11.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

12.     Nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors;  (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

13.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

14.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

15.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

16.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

17.     This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; *provided that*, the Court's ultimate disposition

5

of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

18.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

19.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

20.    The Final Hearing on the Motion shall be held on _____, **2018, at _____ (Prevailing Eastern Time)**, and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Ray C. Schrock, P.C., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.); (ii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Paul Schwartzberg, Esq. and Richard Morrissey, Esq.); and (iii)  counsel for the DIP ABL Agent, with a copy to the Court's chambers, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2018**.

Dated: _____, 2018
       White Plains, New York

                          _____
                          THE HONORABLE ROBERT D. DRAIN
                          UNITED STATES BANKRUPTCY JUDGE

WEIL:\96759524\1\73219.0006

**Exhibit 1**

**Insurance Schedule**

## Exhibit 1

| | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 1. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | ACE American Insurance Company | RLOD3739824A011 | 06/01/2018 - 06/01/2019 | $440,679.61 |
| 2. | Primary Casualty | ACE American Insurance Company | WLR C65226236 | 08/01/2018 - 01/01/2019 | $1,690,069.00 |
| 3. | Primary Casualty | ACE American Insurance Company | WCU C65226273 | 08/01/2018 - 01/01/2019 | $42,956.00 |
| 4. | Primary Casualty | ACE American Insurance Company | ISA H25159895 | 08/01/2018 - 01/01/2019 | $15,208.00 |
| 5. | Primary Casualty | ACE American Insurance Company | ISA H25159871 | 08/01/2018 - 01/01/2019 | $96,494.00 |
| 6. | Primary Casualty | ACE American Insurance Company | ISA H25159883 | 08/01/2018 - 01/01/2019 | $5,000.00 |
| 7. | Primary Casualty | ACE American Insurance Company | CGO G71097778 | 08/01/2018 - 01/01/2019 | $22,000.00 |
| 8. | Primary Casualty | ACE American Insurance Company | HDO G71097614 | 08/01/2018 - 01/01/2019 | $124,886.00 |
| 9. | Primary Casualty | ACE American Insurance Company | HDO G71097730 | 08/01/2018 - 01/01/2019 | $97,794.00 |
| 10. | Primary Casualty | ACE American Insurance Company | HDO G71097651 | 08/01/2018 - 01/01/2019 | $74,626.00 |
| 11. | Primary Casualty | ACE American Insurance Company | HDO G71097699 | 08/01/2018 - 01/01/2019 | $62,061.00 |
| 12. | Miscellaneous Programs | ACE American Insurance Company | PHF D42183659 002 | 08/01/2018 - 08/01/2019 | $40,000.00 |
| 13. | Environmental | ACE American Insurance Company | G71136553 001 | 05/30/2018 - 05/30/2019 | $692.13 |
| 14. | Primary Casualty | ACE Fire Underwriters Insurance Company | SCF C65226315 | 08/01/2018 - 01/01/2019 | $175,800.00 |
| 15. | FSG Program | ACE Fire Underwriters Insurance Company | G2823708A 002 | 08/01/2018 - 08/01/2019 | $20,325.00 |
| 16. | Umbrella / Excess Liability | ACE Property and Casualty Insurance Company | XOO G28144799 003 | 08/01/2018 - 08/01/2019 | $1,344,874.00 |

| | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 17. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | AIG Europe Limited | PTNAM1802875 | 06/01/2018 - 06/01/2019 | $559,151.00 |
| 18. | FSG Program | Allianz Global Risks US Insurance Company | USF00087418 | 05/15/2018 - 05/15/2019 | $1,101,000.00 |
| 19. | Umbrella / Excess Liability | Allied World Assurance Co. Ltd. | C018491/006 | 08/01/2018 - 08/01/2019 | $252,875.00 |
| 20. | Umbrella / Excess Liability | Allied World Assurance Co. Ltd. | C005782/013 | 08/01/2018 - 08/01/2019 | $57,375.00 |
| 21. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Allied World Assurance Company | P003839/015 | 06/01/2018 - 06/01/2019 | $766,648.00 |
| 22. | Environmental | Allied World Assurance Company | 0310-5748 | 04/01/2017 - 04/01/2020 | $14,683.20 |
| 23. | FSG Program | Argo Re Ltd. | ARGO-ASIDE-17-001041.1 | 05/15/2018 - 05/15/2019 | $412,500.00 |
| 24. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Aspen Specialty Insurance Company | PXAA52818 | 06/01/2018 - 06/01/2019 | $86,792.00 |
| 25. | Miscellaneous Programs | AXA Insurance Company | 01-334-12-17-00034 | 01/15/2018 - 01/15/2019 | $13,000.00 |
| 26. | FSG Program | AXIS Insurance Company | MCN738227/01/2017 | 05/15/2018 - 05/15/2019 | $522,000.00 |
| 27. | FSG Program | AXIS Insurance Company | MCN793165012018 | 03/31/2018 - 03/31/2019 | $157,296.00 |
| 28. | Umbrella / Excess Liability | Berkshire Hathaway Specialty Insurance Company | 47-XSF-302809-03 | 08/01/2018 - 08/01/2019 | $101,150.00 |
| 29. | Umbrella / Excess Liability | Bunker Hill International Insurance Bermuda | 748901 | 08/01/2018 - 08/01/2019 | $10,115.00 |

2

| | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 30. | Umbrella / Excess Liability | Chubb Bermuda Insurance Ltd. | SHLD-0221/BSF03 | 08/01/2018 - 08/01/2019 | $92,500.00 |
| 31. | Umbrella / Excess Liability | Chubb Bermuda Insurance Ltd. | SHLD-PD/18 | 08/01/2018 - 08/01/2019 | $134,487.00 |
| 32. | Miscellaneous Programs | Chubb Insurance Hong Kong Limited | HCP0573325 | 11/01/2017 - 10/31/2018 | per rate schedule |
| 33. | FSG Program | Continental Casualty Company | 596686796 | 05/15/2018 - 05/15/2019 | $864,000.00 |
| 34. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Crum & Forster | PPP-910258 | 06/01/2018 - 06/01/2019 | $101,959.00 |
| 35. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Endurance Worldwide Insurance Ltd. | PTNAM1802912 | 06/01/2018 - 06/01/2019 | $468,563.00 |
| 36. | Umbrella / Excess Liability | Everest National Insurance Company | XC5EX00224-181 | 08/01/2018 - 08/01/2019 | $101,150.00 |
| 37. | FSG Program | Federal Insurance Company | 82472277 | 03/31/2018 - 03/31/2019 | $80,000.00 |
| 38. | Miscellaneous Programs | Federal Insurance Company (Chubb) | 76401454 | 02/01/2018 - 02/01/2019 | $106,049.00 |
| 39. | Miscellaneous Programs | Global Aerospace, Inc. | 13000678 | 02/26/2018 - 02/26/2019 | $14,500.00 |
| 40. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Great Lakes Insurance SE | PTNAM1802903 | 06/01/2018 - 06/01/2019 | $104,125.00 |
| 41. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Hamilton Re, Ltd. | PX18-4217-01 | 06/01/2018 - 06/01/2019 | $287,500.00 |

WEIL:\96759179\1\73219.0006

|  | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 42. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | HDI Global Insurance Company | XPD1488701 | 06/01/2018 - 06/01/2019 | $136,068.91 |
| 43. | FSG Program | Hiscox $2M / ACT $3M | FSUSC1802479 | 05/15/2018 - 05/15/2019 | $587,207.10 |
| 44. | FSG Program | Hiscox Insurance Company Inc. | UKA3001668.16 | 09/01/2016 - 09/01/2019 | $27,396.00 |
| 45. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Hudson Specialty Insurance Company | HCS102360 | 06/01/2018 - 06/01/2019 | $36,444.00 |
| 46. | FSG Program | Illinois National Insurance Company (AIG) | 01-423-04-29 | 05/15/2018 - 05/15/2019 | $340,000.00 |
| 47. | FSG Program | Illinois National Insurance Company (AIG) | 01-423-10-78 | 05/15/2018 - 05/15/2019 | $1,133,333.00 |
| 48. | Environmental | Illinois Union Insurance Company (ACE) | PPLG24882688 001 | 11/01/2009 - 11/01/2019 | $73,675.00 |
| 49. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Ironshore Specialty Insurance Company | 000423109 | 06/01/2018 - 06/01/2019 | $170,245.00 |
| 50. | Umbrella / Excess Liability | Iron-Starr Excess Agency Ltd. | IS0004392 | 08/01/2018 - 08/01/2019 | $57,375.00 |
| 51. | Property-Specific Programs | Lexington Insurance Company | 060437348-00 | 05/17/2018 - 05/17/2019 | $11,248.80 |
| 52. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Liberty Mutual Fire Insurance Company | MJ2L9L426774038 | 06/01/2018 - 06/01/2019 | $287,499.00 |
| 53. | FSG Program | Lloyd's of London (AIG 80% / ACT 20%) | FSUSC1801090 | 05/15/2018 - 05/15/2019 | $176,163.00 |

WEIL:\96759179\1\73219.0006

| | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 54. | FSG Program | Lloyd's of London (Beazley 37.5% / Aspen 15% / ACT 20% / StartPoint 12.5% / AIG 15% (UK)) | FSUSC1801088 | 05/15/2018 - 05/15/2019 | $704,650.00 |
| 55. | FSG Program | Lloyd's of London (Beazley) | FSUSC1800413 | 05/15/2018 - 05/15/2019 | $901,330.00 |
| 56. | FSG Program | Lloyd's of London (Hiscox 50% / AIG 30% / ACT 20% (UK)) | FSUSC1800971 | 05/15/2018 - 05/15/2019 | $676,322.00 |
| 57. | FSG Program | Lloyd's of London (StartPoint 50% / Aspen 30% / ACT 20% (UK)) | FSUSC1800410 | 05/15/2018 - 05/15/2019 | $1,253,863.00 |
| 58. | Environmental | Lloyd's Syndicates 623/2623 | W18A4D150101 | 05/29/2015 - 05/29/2025 | $130,847.00 |
| 59. | Environmental | Lloyd's Syndicates 623/2623 | W18BF6150101 | 06/12/2015 - 06/12/2025 | $113,940.02 |
| 60. | Environmental | Lloyd's Syndicates 623/2623 | W18DCF150101 | 06/30/2015 - 06/30/2025 | $100,481.71 |
| 61. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Lloyd's Syndicate No. 1183 (TAL, BRT) | PTNAM1802913 | 06/01/2018 - 06/01/2019 | $309,773.00 |
| 62. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Lloyd's Syndicate No. 1414 (ASC) | PTNAM1802914 | 06/01/2018 - 06/01/2019 | $355,327.00 |
| 63. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Lloyd's Syndicate No. 1955 (Barbican) | 042768061812 | 06/01/2018 - 06/01/2019 | $200,442.00 |
| 64. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Lloyd's Syndicate No. 1955 (Barbican) | 042768061808 | 06/01/2018 - 06/01/2019 | $27,919.00 |

5

|  | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 65. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Lloyd's Syndicate No. 2468 (Neon) | BNPD18AA158Z | 06/01/2018 - 06/01/2019 | $156,188.00 |
| 66. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Lloyd's Syndicate No. 318 (MSP) | PTNAM1801122 | 06/01/2018 - 06/01/2019 | $569,434.00 |
| 67. | Umbrella / Excess Liability | Magna Carta Insurance Limited | MCEV204734 | 08/01/2018 - 08/01/2019 | $10,115.00 |
| 68. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Markel Bermuda Ltd. | 1374862-9606-PRMAN-2018 | 06/01/2018 - 06/01/2019 | $175,000.00 |
| 69. | Miscellaneous Programs | National Casualty Company | KEO0007542100 | 08/01/2018 - 08/01/2019 | $2,966.25 - quarterly |
| 70. | Miscellaneous Programs | National Casualty Company | XKO0007542300 | 08/01/2018 - 08/01/2019 | $6,847.25 - quarterly |
| 71. | Miscellaneous Programs | National Union Fire Ins Co of Pittsburgh, PA | GTP9129594 | 01/31/2016 - 01/31/2019 | $53,230.00 |
| 72. | Environmental | Navigators Specialty Insurance Company | CH17ESP0BHJV2NC | 09/01/2017 - 09/01/2020 | $61,704.00 |
| 73. | Property-Specific Programs | North American Elite Insurance Company | NAP200246800 | 04/15/2018 - 04/15/2019 | $57,999.00 |
| 74. | FSG Program | North American Specialty Insurance Company | DAX 2000102 00 | 05/15/2018 - 05/15/2019 | $1,023,435.00 |
| 75. | FSG Program | Old Republic Insurance Company | ORPRO 39488 | 05/15/2018 - 05/15/2019 | $170,000.00 |
| 76. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | PartnerRe Ireland Insurance da | PTNAM1802911 | 06/01/2018 - 06/01/2019 | $72,888.00 |

WEIL:\96759179\1\73219.0006

|  | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|---|---|---|---|---|---|
| 77. | Primary Casualty | Scottsdale Insurance Company | BCS0037278 | 08/14/2018 - 08/14/2019 | $61,920.00 |
| 78. | Primary Casualty | Scottsdale Insurance Company | XLS0107980 | 08/14/2018 - 08/14/2019 | $4,495.39 |
| 79. | Property - Stock Throughput | Starr Indemnity & Liability Company | MASICNY0264US18 | 06/01/2018 - 06/01/2019 | $2,900,000.00 |
| 80. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Starr Surplus Lines Insurance Company | SLSTPTY11075718 | 06/01/2018 - 06/01/2019 | $312,427.00 |
| 81. | FSG Program | Stratford Insurance Company (Validus) | PDX0000018 | 05/15/2018 - 05/15/2019 | $170,000.00 |
| 82. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Tokio Marine America Insurance Company | LCP648016707 | 06/01/2018 - 06/01/2019 | $255,174.00 |
| 83. | FSG Program | Underwriters at Lloyds | MPL1732387.18 | 07/30/2018 - 07/30/2019 | $56,800.00 |
| 84. | FSG Program | Underwriters at Lloyds | MPL2078696.18 | 10/10/2018 - 10/10/2019 | $6,633.00 |
| 85. | Environmental | Underwriters at Lloyds | PEM10062-02 | 08/01/2018 - 08/01/2019 | $32,597.25 |
| 86. | Environmental | Virginia Surety Company Inc. | 2722 | 02/01/2018 - 02/01/2019 | $700,000.00 |
| 87. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Westport Insurance Corporation | NAP045210506 | 06/01/2018 - 06/01/2019 | $411,026.00 |
| 88. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | XL Bermuda Ltd. | XL PRP 714637 18 | 06/01/2018 - 06/01/2019 | $75,000.00 |
| 89. | FSG Program | XL Specialty Insurance Company | ELU149912-17 | 05/15/2018 - 05/15/2019 | $935,000.00 |

WEIL:\96759179\1\73219.0006

|     | Type of Coverage | Insurer | Policy Number | Policy Term | Premium |
|-----|------------------|---------|---------------|------------|---------|
| 90. | Property - Domestic Property, Boiler & Machinery and Stock Throughput | Zurich American Insurance Company | XPP926068011 | 06/01/2018 - 06/01/2019 | $620,493.19 |

WEIL:\96759179\1\73219.0006