WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------x
In re                                      :
                                           :    Chapter 11
SEARS HOLDINGS CORPORATION, et al.,        :
                                           :    Case No. 18-_____ (RDD)
                                           :
             Debtors.1                     :    (Joint Administration Requested)
--------------------------------------------------------------x
```

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION OBLIGATIONS TO CRITICAL VENDORS; (II) APPROVING PROCEDURES TO ADDRESS VENDORS WHO REPUDIATE AND REFUSE TO HONOR THEIR CONTRACTUAL OBLIGATIONS TO THE DEBTORS; AND (III) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent in support of this motion (the "**Motion**"):

## PRELIMINARY STATEMENT

1.      The lifeline of the Debtors' businesses is their access to, and relationship with, their network of vendors and suppliers that deliver essential goods to the Debtors' stores and other facilities.  As an operator of retail stores, service centers, and websites, the Company's ability to generate income is dependent on sales, the volume of which, in large part, is dependent upon customer traffic and satisfaction.  If the quality and volume of the Company's inventory goes down, so too will its sales.  Even minor disruptions in the Debtors' supply chain would have far-reaching economic and operational impacts on the entire enterprise and irreparably harm the goodwill the Debtors have garnered with their customers during their century of operations.

2.      The Debtors rely on a network of vendors to provide a consistent stock of essential goods that customers expect to find in the Debtors' well-known stores, as well as non-merchandise goods and services necessary to support those sales, such as product delivery, installation and repair, and other necessary services to support the Debtors' operations (collectively, the "**Critical Vendors**" and, their prepetition claims, the "**Critical Vendor Claims**").  A significant number of other products sold in the Debtors' stores and websites have high turnover rates because they have "high visibility" among customers due to factors like brand recognition, seasonal demand, and local and regional trends.  It is absolutely essential to

2

the Debtors' businesses and the success of these chapter 11 cases that the Debtors' inventory and supply chain remain uninterrupted so that the Company is able to maintain a full and replenishable stock of merchandise.  In addition to their merchandise vendors, the Debtors also require the services of a number of non-merchandise vendors to assist the Debtors in managing their supply chain and providing critical support across the Debtors' footprint of stores.

3.      The vast majority of the Debtors' inventory is provided by a broad network of thousands of vendors that primarily conduct business with the Debtors on an invoice-by-invoice or purchase order basis, and not pursuant to long-term contracts.  These vendors typically supply customers with products on trade terms based on their experience with, and perceived risk of, conducting business with such customers.  Over the past two years, many of the Debtors' key vendors reacted negatively to news of the Debtors' financial challenges by either imposing new and onerous trade terms or refusing to ship merchandise, all of which have further impaired the Debtors' liquidity position and their ability to remain competitive with peer retailers.  In fact, in the two weeks leading up to the commencement of these case, approximately 200 of the Debtors' vendors have stopped or refused to ship merchandise to the Debtors, which has had a significant impact on the Debtors' liquidity position.

4.      It is vital to the success of the Debtors' chapter 11 strategy, including the Debtors' ability to fund their estates during the pendency of these cases, that they be able to repair its supply chain and relationships with key vendors.  Failure to continue sourcing inventory through its existing network of vendors on commercially reasonable terms could have catastrophic consequences for the Company.  To restore the confidence of their suppliers and customers, and to remedy the damage caused by recent trade contraction, the Debtors seek

3

authority to pay the prepetition claims, of certain vendors verified as "critical" to the Debtors' businesses up to a specified cap.

5.      As described in further detail below, the Debtors have put into place detailed procedures for identifying and selecting Critical Vendors and ensuring that only Critical Vendors will be paid pursuant to this Motion on account of their prepetition claims.  The Debtors are not seeking to pay all prepetition claims of the Critical Vendors, but rather to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices.  Accordingly, payments to the Critical Vendors will be contingent on their agreement to continue to sell goods or provide services to the Debtors on terms at least as favorable as those in effect before the Commencement Date (as defined herein).

## Background

6.      On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

8.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for the*

4

*Southern District of New York*, sworn to on the date hereof (the "**Riecker Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

### Jurisdiction

9.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

10.       By this Motion, the Debtors request, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code, entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay up to $70 million on an interim basis (the "**Interim Critical Vendor Cap**" and $90 million on a final basis (the "**Final Critical Vendor Cap**", and together with the Interim Critical Vendor Cap, the "**Critical Vendor Caps**") in aggregate prepetition Critical Vendor Claims; (ii) approving procedures to address those vendors who repudiate and refuse to honor their contractual obligations to the Debtors; and (iii) granting related relief.

11.       The Debtors also seek approval of (i) their protocol for reviewing and approving requests for payment of Critical Vendor Claims (the "**Critical Vendor Payment Protocol**"); (ii) the form of notice of the Critical Vendor Payment Protocol that will be provided to any vendors requesting Critical Vendor status and payment of Critical Vendor Claims, substantially in the form annexed hereto as **Exhibit B** (the "**Critical Vendor Notice**"); (iii) the form of vendor agreement, annexed to the Critical Vendor Notice as **Exhibit 1** (the "**Vendor**

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

Agreement"); (iv) the form of notice to be sent to any contract counterparty that threatens or refuses to perform their postpetition contractual obligations unless the Debtors pay their prepetition claims (any such counterparty, a "**Repudiating Vendor**"), substantially in the form annexed hereto as **Exhibit C** (the "**Notice of Repudiating Vendor**"); and (v) the form of order to show cause for any Repudiating Vendor, substantially in the form annexed hereto as **Exhibit D** (the "**Order to Show Cause**").

12.     A proposed form of order granting the relief requested in the Motion on an interim basis is attached hereto as **Exhibit A**.

### The Debtors' Business Model and Supply Chain

13.     The Debtors operate a national network of stores under the "Sears" and "Kmart" banners, which consists of approximately 687 full-line and specialty retail stores located throughout the United States.  In addition, the Debtors operate a number of websites under the "sears.com" and "kmart.com" banners, which offer millions of products to be purchased by customers through cross-channel transactions. The Debtors' stores and websites offer a wide array of products across many merchandise categories, including consumer electronics, outdoor living products, toys, lawn and garden equipment, grocery products, apparel, jewelry, sporting goods, and home fashion products and appliances. The Debtors are also a leading supplier of automotive repair and maintenance services.

14.     *Merchandise Vendors*. The success of the Debtors' businesses is based, in large part, on the Debtors' ability to keep shelves stocked with a variety of goods readily available to satisfy a diverse range of customer needs and demands. Maintaining this ability relies on a steady supply of merchandise from key merchandise suppliers (the "**Merchandise Vendors**"). For example, both *Sears®* and *Kmart®* stores offer products from Merchandise Vendors sold under well-known brands to which the Debtors hold the exclusive rights, including

6

*Jaclyn Smith*®, *Joe Boxer*®, and *Route 66*®.  The Debtors also offer *Craftsman*® tools and products for sale in many of their stores.  Additionally, the Company sells products under certain key proprietary brands, including *Kenmore*® appliances and *DieHard*® automotive batteries. These and other popular brands are invaluable to the Debtors' operations and the Debtors depend on Merchandise Vendors to supply them with the inventory for these in-demand goods. Additionally, the Debtors specialty stores and businesses such as Sears Auto Centers and Sears Home Services require support from the Merchandise Vendors to operate and fulfill customer obligations. A small portion of the Merchandise Vendors also have consignment relationships with the Debtors.  Importantly, a significant percentage of the Merchandise Vendors are foreign vendors with limited or no ties to the United States. Without a continuous supply of merchandise from the Merchandise Vendors, the Debtors risk losing their core identity and damaging customer and brand loyalty that the Debtors have worked to create.

15.    *Non-Merchandise Vendors*. In addition to the Merchandise Vendors, the Debtors also rely on a significant number of non-merchandise vendors and suppliers that provide important marketing and support services for the debtors' business operations and sales strategy (the "**Non-Merchandise Vendors**"). The Non-Merchandise Vendors provide critical operational and in-store support, refurbishment, maintenance and other important services. In certain instances, the Non-Merchandise Vendors are the only vendors able to provide their services to meet the Debtors' needs. The Debtors' also rely on the Non-Merchandise Vendors to drive both online traffic to the Debtors' websites and *Shop Your Way*®, and foot traffic to the Debtors *Sears*® and *Kmart*® stores. The Non-Merchandise Vendors provide invaluable services to create a seamless engagement with the customer across all of the Debtors' platforms and products.

7

## The Critical Vendors

16.     Many of the Critical Vendors are invaluable to the Debtors' operations, as such vendors are sole- or limited-source or high-volume suppliers of certain popular branded or otherwise "in-demand" goods (due to regional or geographic preferences or seasonal demand) or other "high-turnover" goods.   As noted above, the Debtors do not have long-term supply agreements with most of their Critical Vendors and, instead, source goods on an order-by-order basis.   As a result, the Debtors have limited leverage to compel performance from Critical Vendors on commercially reasonable terms.   The Debtors' position is further weakened by their inability to obtain certain branded products in highest demand from alternative Merchandise Vendors.   Moreover, because the Debtors' vendor network includes a number of nominally-distinct, but affiliated Critical Vendors, the Debtors' failure to pay one Critical Vendor could have a ripple effect, negatively impacting the Debtors' relationship with multiple Critical Vendors and access to their product offerings on commercially reasonable terms.

17.     As set forth above, the Debtors' relationships with many of their vendors have grown increasingly strained in the months leading up to the commencement of these chapter 11 cases.   Certain vendors have demanded reduced payment schedules, while others have gone further, requiring the Company to pay cash in advance or even ceasing to ship altogether. Increasingly onerous trade terms have limited the Company's ability to purchase inventory and, as a result, to operate its stores at productive levels.

18.     The Debtors anticipate that this trade contraction and downward pressure on their liquidity will accelerate upon the news of the commencement of these chapter 11 cases. Any further reduction in inventory could prove devastating to the Debtors' operations and efforts to maximize value for their estates. Accordingly, the Debtors require the relief requested herein

8

in order to preserve goodwill and to assure customers, vendors, and employees that the Company will continue to operate in the ordinary course of business, with product offerings consistent with what customers are accustomed to finding and purchasing from the Debtors.

### Critical Vendor Pre-Screening Process

19.    Prior to the Commencement Date, the Debtors and their advisors engaged in a comprehensive process (the "**Critical Vendor Pre-Screening Process**") to (i) identify those vendors, suppliers, and service-providers that may be "critical" to the Debtors' businesses (the "**Potential Critical Vendors**"), and (ii) develop the Critical Vendor Caps based on an estimate of the aggregate amount of outstanding Critical Vendor Claims as of the Commencement Date.

20.    More specifically, the Debtors and their advisors spent significant time and effort reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships which, if lost, could materially harm the Debtors' businesses, shrink their market share, reduce their enterprise value, and/or impair their restructuring process.  In this Critical Vendor Pre-Screening Process, the Debtors considered a variety of factors, including the following:

- General

  - the goods or services provided;

  - general terms of vendor performance over the past twelve (12) months;

  - the Debtors' business needs for the goods or services provided in light of potential store closures;

- Consequences of Non-Payment

  - whether goods or services are provided pursuant to a contract or on a purchase order basis;

- o whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or provide critical services on a postpetition basis;

- o whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation;

- Potential to Move to Alternative Vendor

  - o whether the vendor is a sole- or limited-source or high-volume supplier for branded and "in-demand" inventory due to particular local, regional, or national customer preferences;

  - o whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

  - o the degree to which replacement costs (including pricing, transition expenses, professional fees and lost sales or future revenue) would exceed the amount of a vendor's prepetition claim; and

  - o whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor.

The Debtors also considered whether and the extent to which all or a portion of any Potential Critical Vendor's claim may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

21.     Through the Critical Vendor Pre-Screening Process, the Debtors determined that a substantial majority of the Critical Vendors are vendors that (i) supply top-of-mind brands customers expect to find in the Debtors' stores, (ii) do not have a long term contractual relationship with the Debtors, and (iii) are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations.   The Debtors do not intend to afford any contract counterparties critical

10

vendor status unless absolutely necessary for the preservation of the Debtors' business and otherwise consistent with business judgment.

22.     Based on the movement of merchandise to their stores and other facilities and their historical supply chain practices, the Debtors believe that a significant amount of the goods that may be the subject of the Potential Critical Vendor Claims were delivered to the Debtors within the twenty-day period prior to the Commencement Date. In fact, based on their review of the total accounts payable outstanding to Potential Critical Vendors as of the Commencement Date, the Debtors estimate that approximately 48% of their outstanding trade payables may be entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.  Accordingly, a significant amount of the Potential Critical Vendors are likely entitled to administrative expense status regardless of whether they are treated as a Critical Vendor.

23.     Furthermore, a large percentage of the prepetition claims owed to Potential Critical Vendors are owed to vendors and service providers located overseas with little or no contact with the United States.  Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtors believe that there is a serious risk that the Potential Critical Vendors holding claims against the Debtors may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay provisions of the Bankruptcy Code, and engage in conduct that would disrupt the Debtors' domestic and international operations.  Thus, foreign entities that believe the automatic stay does not govern their actions may exercise self-help, which could include denying the Debtors access to essential goods and services.

WEIL:\96759578\1\73219.0006

## Critical Vendor Payment Protocol

24.    Given the size, scope, and nature of their operations, it is essential that the Debtors implement a process for assessing each request for treatment as a Critical Vendor and payment of a Critical Vendor Claim on a case-by-case basis.  To that end, the Debtors request approval of the Critical Vendor Payment Protocol.

25.    The Critical Vendor Payment Protocol will ensure that the Debtors make payments with respect to Critical Vendor Claims only to the extent necessary to preserve business stability during these chapter 11 cases and maintain liquidity or access to essential goods or services.  Payments made pursuant to the relief requested herein will be made in the ordinary course of business when due, and not on an accelerated basis.[3]

26.    The Critical Vendor Payment Protocol can be generally summarized as follows:[4]

- The Debtors will establish a centralized, high-level team (the "**Vendor Contingency Team**") consisting of executives and other employees of the Debtors and professionals from M-III Partners, LP and Weil, Gotshal & Manges LLP.

- All requests for treatment as a Critical Vendor and payment of a Critical Vendor Claim will be emailed to and reviewed by the Vendor Contingency Team.

- The Vendor Contingency Team will evaluate whether a requesting vendor is eligible for Critical Vendor status based on the Critical Vendor Pre-Screening Process and the factors identified above.

- If the Vendor Contingency Team determines that a requesting vendor is eligible for treatment as a Critical Vendor, all proposed payments to such Critical Vendor must be documented pursuant to an executed Vendor Agreement (defined and explained in greater detail below).

---

[3]    Nothing in this Motion should be construed as a waiver of any of the Debtors' rights to contest any invoices or amounts otherwise claimed as owed by any Critical Vendor under applicable law.

[4]    The Debtors reserve all rights to amend, supplement, revise, or modify the Critical Vendor Payment Protocol in their reasonable business judgment.

WEIL:\96759578\1\73219.0006

- Once a Vendor Agreement is finalized, payment may only be physically executed by designated members of the Debtors' accounts payable and treasury departments, upon presentation of completed documentation.

- In addition to being vetted and approved by the Vendor Contingency Team, any Vendor Agreement that provides for payment of a Critical Vendor Claim in excess of $500,000 must be approved by the Debtors' Chief Restructuring Officer or Chief Financial Officer.

- The Debtors will maintain a "**Critical Vendor Matrix**" summarizing (i) the name of each vendor requesting Critical Vendor status, (ii) the amount and timing of any Critical Vendor payment, (iii) the amount of the Critical Vendor's claim satisfied by the Critical Vendor payment, including any amount entitled to priority under section 503(b)(9) of the Bankruptcy Code, and (iv) a summary of the material payment terms. For the first forty-five (45) days after entry of an order approving this Motion, the Critical Vendor Matrix will be provided on a weekly basis, and, thereafter, on a monthly basis (or such other agreed-upon time period), to (a) the U.S. Trustee, and (b) the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases, <u>provided</u> that the professionals for any such committee shall keep the Critical Vendor Matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any statutory committee of creditors, without prior written consent of the Debtors.

27.    The Debtors have already taken steps to ensure a seamless implementation of the Critical Vendor Payment Protocol, subject to the Court's approval.    Specifically, the Debtors have established the Vendor Contingency Team and educated members of the team on the Critical Vendor Payment Protocol.    The Debtors have also begun educating the Debtors' personnel on critical vendor issues to ensure compliance with the Critical Vendor Payment Protocol.    Finally, the Debtors have created a template for the Critical Vendor Matrix and will use the schedule of Potential Critical Vendors to facilitate their review of Requests as they are received

13

A.      **Critical Vendor Notice**

28.      To timely implement the Critical Vendor Payment Protocol, the Debtors also seek approval of the Critical Vendor Notice.  The Critical Vendor Notice, along with a copy of the Proposed Interim Order or the final order approving the relief requested herein (the "**Final Order**"), as applicable, will be provided to any vendors requesting treatment as a Critical Vendor and payment of Critical Vendor Claims and will also be available on the website maintained by the Debtors' claims and noticing agent for these chapter 11 cases.  The Critical Vendor Notice summarizes key aspects of the Critical Vendor Payment Protocol and key terms of the Interim Order and/or the Final Order, and includes as an exhibit a copy of the Vendor Agreement

B.      **Vendor Agreement**

29.      As set forth above, the Debtors will use commercially reasonable efforts to require Critical Vendors to continue to provide trade terms in line with historical practice.  Thus, in accordance with the Critical Vendor Payment Protocol, the Debtors seek authority to require as a condition to a payment of a Critical Vendor Claim that the applicable Critical Vendor (including a Critical Vendor whose Critical Vendor Claim may be entitled to priority under section 503(b)(9) of the Bankruptcy Code) enter into a Vendor Agreement.  The Vendor Agreement requires a Critical Vendor to continue to supply goods or services to the Debtors with whom the Critical Vendor conducts business on "**Customary Trade Terms**" until the earlier of (i) the effective date of a chapter 11 plan for the Debtors and (ii) two (2) years from the date of such agreement.  As defined in the Vendor Agreement, "Customary Trade Terms" means trade terms at least as favorable to the Debtors as those terms governing practices and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, coupon reconciliation, product mix, availability, processing of vendor receivables,

14

such as rebates and volume credits, and other programs) within the twelve (12) months prior to the Commencement Date, or such other trade terms that are acceptable to the Debtors in their sole discretion. The Vendor Agreement, once agreed to and accepted by a Critical Vendor, shall be the legally binding contractual relationship between the parties governing the commercial trade relationship as provided therein.

30.     The Debtors also seek the authority, to be exercised in rare circumstances, to pay a Critical Vendor Claim in the event that no Vendor Agreement has been executed, only if the Debtors' determine, in their reasonable business judgment, that a Vendor Agreement is unnecessary to ensure the applicable Critical Vendor's continued performance on Customary Trade Terms.

## C.     Additional Payment Terms and Conditions

31.     Certain of the Critical Vendors may possess mechanics' liens, possessory liens, or similar state law trade liens (the "**Trade Liens**") on the Debtors' assets arising from Critical Vendor Claims. The Debtors propose that, as a further condition to receiving payment of a Critical Vendor Claim, a Critical Vendor must agree to take all necessary actions to remove any Trade Lien at the Critical Vendor's sole expense.

32.     In the event that (i) a Critical Vendor breaches the terms or conditions of a Vendor Agreement or (ii) regardless of whether a Vendor Agreement has been executed, a Critical Vendor accepts payment with respect to a Critical Vendor Claim and does not continue supplying goods or services to the Debtors on Customary Trade Terms, the Debtors request authority, in their discretion, to (a) declare that the payment of the Critical Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations), (b) declare that the Critical Vendor shall immediately return the

15

payment of its Critical Vendor Claim to the Debtors without giving effect to any alleged setoff rights, recoupment rights, adjustments, or other offsets of any type whatsoever, and the Critical Vendor Claim shall be reinstated to such amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the Critical Vendor Claim had been made, and/or (c) if there exists an outstanding postpetition balance due from the Debtors to such Critical Vendor, recharacterize and apply any payment made pursuant to the relief requested in the Motion to such outstanding postpetition balance and such Critical Vendor shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

**Repudiating Vendor Procedures**

33.     Although the Debtors primarily do business with their vendors pursuant to short-term purchase orders, certain of their suppliers and most of the Debtors' service-providers are parties to longer term contracts with the Debtors.   Section 365 of the Bankruptcy Code requires such parties to perform their postpetition contractual obligations to the Debtors.  *See e.g. City of Covington v. Covington Landing Ltd.*, 71 F.3d 1221, 1226 (6th Cir. 1995) (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 11303, 1310 (5th Cir. 1985)) ("Section 365 is intended to provide a means whereby a debtor can force another party to an executory contract to continue to perform under the contract . . . . This provision provides a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so."); *see also CIT Commcn's Fin. Corp. v. Midway Airlines Cor. (In re Midway Airlines Corp.)*, 406 F.3d 229, 234 (4th Cir. 2005) ("the [debtor] can force the lessor to continue performing under the lease"); *Gwinnett Prado, L.P. v. Rhodes, Inc. (In re Rhodes, Inc.)*, 321 B.R. 80, 91 (Bankr. N.D. Ga. 2005) ("As a general proposition, the non-

16

debtor party to an unexpired lease or other executory contract is obliged to perform it until it is assumed or rejected."); *In re Nat'l Steel Corp.*, 316 B.R. 287, 305 (Bankr. N.D. Ill. 2004) (stating that "before an executory contract is assumed or rejected under § 365(a), that contract continues to exist, enforceable by the debtor-in-possession, but not enforceable against the debtor-in-possession"); *McLean Indus., Inc. v. Medical Lab. Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 447-50 (Bankr. S.D.N.Y. 1989) (same).

34.    Further, section 362 of the Bankruptcy Code prohibits such vendors from ceasing performance or threatening to do so, based on the Debtors' failure to pay prepetition claims. *See generally Collier on Bankruptcy* ¶ 362.03 (Alan N. Resnick and Henry J. Somme reds. 15th ed. Rev. 2008) ("As property of the estate, the debtor's interests in . . . [executory] contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3)").

35.    The Debtors anticipate that they may encounter certain Repudiating Vendors, notwithstanding these clear and unambiguous provisions and requirements under the Bankruptcy Code.  The Debtors intend to resist these threats and take actions to enforce their rights under the Bankruptcy Code to require any such Repudiating Vendors to continue providing goods and services to the Debtors in accordance with their contractual commitments. However, in light of the severity of disruptions to the Debtors' businesses that could be caused by Repudiating Vendors, the Debtors seek the authority to implement the following procedures (the "**Repudiating Vendor Procedures**"):

- If, because the Debtors have not paid the prepetition claim of a Repudiating Vendor, such Repudiating Vendor refuses to perform its postpetition obligations pursuant to an executory contract with one or more of the Debtors, the Debtors are authorized, but not directed, to pay such claim provisionally (and such payment shall not count against the Critical Vendor Caps).

17

- Regardless of whether a payment has been made, if a Repudiating Vendor refuses to perform its postpetition obligations pursuant to an executory contract with one or more of the Debtors, the Debtors may (i) file a Notice of Repudiating Vendor, substantially in the form attached hereto as **Exhibit C**, setting forth (a) the name of the Repudiating Vendor, (b) the identity of the agreement governing the Debtors' relationship with the Repudiating Vendor, (c) the Debtors' belief that the Repudiating Vendor is in violation of the Bankruptcy Code, and (d) the amount(s) and date(s) of any prepetition amounts paid; and (ii) seek entry of an Order to Show Cause, substantially in the form attached hereto as **Exhibit D**, requiring the Repudiating Vendor to show cause at a hearing to be scheduled by the Court why it should not be found to have willfully violated sections 362 and 365 of the Bankruptcy Code and why it should not be required return any payments made to it by the Debtors, plus accumulated interest.

36.     To be clear, the Debtors may elect to pay a claim of a contract counterparty without regard to the Repudiating Vendor Procedures (but in compliance with the Critical Vendor Protocol, in which case, any such payment will apply against the Critical Vendor Caps).  The Debtors only intend to do so if affording a contract counterparty critical vendor status is necessary for the preservation of the Debtors' business and where the critical vendor factors favor such treatment, including, among other things, (i) where the Debtors otherwise intend to assume such vendor's contract during the chapter 11 cases; (ii) the contract counterparty is the Debtors' sole source supplier; or (iii) the Debtors constitute a substantial portion of the applicable vendor's business.

37.     The Repudiating Vendor Procedures are substantially similar to procedures previously approved by this Court with respect to repudiating vendors.  *See, e.g.*, *In re Tops Holding II Corp.*, Case No. 18-22279 (Bankr. S.D.N.Y. Feb. 26, 2018 and March 22, 2018) (ECF Nos. 62 & 183) interim and final orders authorizing repudiating vendor procedures; *In re The Great Atl. & Pac. Tea Co.*, Case No. 15-23007 (Bankr. S.D.N.Y. July 21, 2015 and August 11, 2015) (ECF Nos. 95 & 503) (same); *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2012 and Jan. 27, 2012) (ECF Nos. 76 & 196) (same); *In re*

18

*Metaldyne Corp.*, Case No. 09-13412 (MG) (Bankr. S.D.N.Y. May 29, 2009 and June 22, 2009)

(ECF Nos. 66 & 275) (same); *In re Chrysler LLC*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y.

May 6, 2009 & May 20, 2009) (ECF Nos. 358 & 1318) (same); *In re Dana Corp.*, No. 06-10354

(BRL) (Bankr. S.D.N.Y. Mar. 3, 2006 and Mar. 29, 2006) (ECF Nos. 54 and 722) (order and

amended final order authorizing repudiating vendor procedures).

## The Relief Requested Should Be Granted

### A.    Payment of Critical Vendor Claims Is Necessary and Appropriate

38.    The Court may grant the relief requested herein pursuant to section 363 of

the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that

"[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the

Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound

business purpose exists for doing so.  *See In re Ionosphere Clubs, Inc.,* 98 B.R. 174 (Bankr.

S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of

prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A.

Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy

Code to allow contractor to pay prepetition claims of suppliers).

39.    In addition, the Court has the authority, pursuant to its equitable powers

under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because

such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a)

of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of

the debtor-in-possession" to act as a fiduciary to "'protect and preserve the estate, including an

operating business' going-concern value,'" on behalf of the debtor's creditors and other parties in

interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re*

19

*CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee."). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 – 25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).

40.     In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g., Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), cert. denied 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

41.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical

prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."). The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11: "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

42.     The relief requested in this Motion is an appropriate exercise of the Debtors' business judgment and is necessary to ensure continued operation of the Debtors' business and, in turn, preserve and enhance of the value of the Debtors' estates. The Debtors have carefully reviewed their accounts payable and undertaken a process to identify vendors, suppliers, and service providers essential to ongoing operations. Absent payment of the Critical Vendor Claims, the Debtors could quickly become unable to maintain sufficient levels of inventory of a variety and quality that their customers have come to expect. The Debtors must be able to continue operating their businesses in the ordinary course of business to maximize the value available for distribution to creditors, which requires cooperation from Critical Vendors.

43.     The relief requested in this Motion also will provide the Debtors with sufficient leverage to get Critical Vendors to continue to provide or return to providing goods and services to the Debtors on Trade Terms. Absent such relief, Critical Vendors may have no incentive to continue providing the Debtors with trade credit. As noted, many vendors already have begun demanding accelerated payment, cash-in-advance, or stopped shipping altogether.

21

Further trade contraction from additional vendors could irreparably harm the Company's reputation and business operations. In contrast, the preservation of working capital through the retention or reinstatement of trade credit in sufficient amounts and on favorable terms will conserve liquidity, stabilize the Company's operations, and facilitate the Debtors' ability to administer their estates in a value-maximizing manner. The retention and reinstatement of Trade Terms will enable the Debtors to restore the confidence of their customers, vendors, and employees, and will mitigate the uncertainty caused by the commencement of these chapter 11 cases.

44.     Given the nature of the goods and services provided by the Critical Vendors, the consequences if the Critical Vendors cease providing such goods and services to the Debtors, and the loss of value to the Debtors' estates that would result, the relief requested herein is necessary and appropriate. The Debtors' authority to address their Critical Vendor Claims at the outset of these cases will send a clear signal to suppliers and customers that the Debtors are both willing and, importantly, able to conduct business as usual during the pendency of their chapter 11 cases. Failure to authorize the Debtors to pay Critical Vendor Claims as provided herein would jeopardize the Debtors' chapter 11 strategy and the viability of their businesses on a go-forward basis.

**B.       The Relief Requested Is Supported by Section 503(b)(9) of the Bankruptcy Code**

45.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Claims subject to section 503(b)(9) of the Bankruptcy Code must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A).

22

46.     The Bankruptcy Code does not prohibit a debtor from paying claims arising under section 503(b)(9) before confirmation of a chapter 11 plan.  Courts in this district and others have regularly authorized the payment of such claims before confirmation.  *See, e.g., In re Westinghouse Elec. Co., LLC*, Case No. 17-10751 (MEW) (Bankr. S.D.N.Y. June 1, 2017) (ECF No. 640) (authorizing debtors to pay vendors' claims entitled to priority under section 503(b)(9) of the Bankruptcy Code);  *In re Angelica Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 12, 2017) (ECF No. 177) (same); *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y June 3, 2016) (ECF No. 244) (authorizing payment of claims entitled to administrative priority pursuant to section 503(b)(9) up to \$4 million); *In re The Great Atl. & Pac. Tea Co.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (ECF No. 503) (authorizing payment of claims entitled to administrative priority pursuant to section 503(b)(9) up to \$28.3 million); *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Apr. 14, 2015) (ECF No. 275) (authorizing debtors to pay vendors' claims entitled to priority under section 503(b)(9) of the Bankruptcy Code "in the ordinary course if the Debtors determine it is in the estates' best interests to do so"); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13. 2011) (ECF No. 504) (authorizing payment of claims entitled to administrative priority pursuant to section 503(b)(9) up to \$5 million); *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 8, 2009 and July 31, 2009) (ECF No. 245) (authorizing payment of claims entitled to administrative priority pursuant to section 503(b)(9) up to \$46.3 million); *In re Chrysler LLC*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. May 20, 2009) (ECF No. 1318) (authorizing debtors to pay uncapped "claims of any creditors or claimants entitled to administrative priority pursuant to section 503(b)(9) . . . in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem

WEIL:\96759578\1\73219.0006

appropriate") *In re BPS US Holdings, Inc.*, Case No. 16-12373 (KJC) (Bankr. D. Del. Nov. 28

2016) (ECF No. 200) (same); *In re Trump Entertainment Resorts, Inc.*, Case No. 14-12103 (KG)

(Bankr. D. Del. Oct. 6, 2014) (ECF No. 218) (same).

## Reservation of Rights

47.     Nothing contained herein is intended to be or shall be construed as (i) an

admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim

against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any

creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any

agreement, contract, program, policy, or lease between the Debtors and any third party under

section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any

payment made pursuant to the Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim

subsequently.

## The Debtors Have Satisfied Bankruptcy Rule 6003(b)

48.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to

avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a

motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate,

including a motion to pay all or part of a claim that arose before the filing of the petition" before

twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b). The Debtors'

inability to repair their relationships with Critical Vendors and maintain an uninterrupted supply

chain could be catastrophic for the Debtors' chapter 11 strategy and ongoing business operations.

The failure to maintain a stock of merchandise of a variety and quality that lives up to the

Company's reputation and brands could cause the Debtors to lose customers to competitors at an

WEIL:\96759578\1\73219.0006

already challenging time for their businesses. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003(b) is satisfied.

**Compliance with Bankruptcy Rules 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

49.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Riecker Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

**Notice**

50.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel for Bank of America, N.A., as administrative agent under the First Lien Credit Facility and the DIP ABL Agent; (iv) counsel for Citibank, N.A., as administrative agent under the Stand-Alone L/C Facility; (v) counsel for JPP, LLC, as administrative agent under the Second Lien Credit Facility, the IP/Ground Lease Term Loan, and the Consolidated Secured Loan Facility; (vi) counsel for Computershare Trust Company N.A., as indenture trustee for the Second Lien PIK Notes, the Holdings Unsecured PIK Notes, and the Holdings Unsecured Notes; (vii) counsel for Wilmington Trust, National Association, as indenture trustee for the Second Lien Notes; (viii) counsel for The Bank of New York Mellon Trust Company, N.A., as successor trustee for the SRAC Unsecured PIK Notes, the SRAC

25

Unsecured Notes, and the SRAC Medium Term Notes; (ix) the Pension Benefit Guaranty Corporation; (x) the Unions; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; and (xiii) the United States Attorney's Office for the Southern District of New York. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

51.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of interim and final orders granting the relief requested herein and such other and further relief as is just.

Dated: October 15, 2018
      New York, New York

    /s/ Ray C. Schrock, P.C.
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York  10153
    Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007
    Ray C. Schrock, P.C.
    Jacqueline Marcus
    Garrett A. Fail
    Sunny Singh

    *Proposed Attorneys for Debtors*
    *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
In re                                                            :
                                                                 :    **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*                        :
                                                                 :    **Case No. 18-_____ (RDD)**
                                                                 :
Debtors.[1]                                                      :    **(Jointly Administered)**
------------------------------------------------------------------x

### INTERIM ORDER (I) AUTHORIZING
### DEBTORS TO PAY CERTAIN PREPETITION OBLIGATIONS
### TO CRITICAL VENDORS; (II) APPROVING PROCEDURES TO ADDRESS
### VENDORS WHO REPUDIATE AND REFUSE TO HONOR THEIR CONTRACTUAL
### OBLIGATIONS TO THE DEBTORS; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of Sears Holdings Corporation and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the

United States Code (the "**Bankruptcy Code**"), for an order (i) authorizing, but not directing, the

Debtors to pay up to $70 million on an interim basis (the "**Interim Critical Vendor Cap**" and

$90 million on a final basis (the "**Final Critical Vendor Cap**, together with the Interim Critical

Vendor Cap, the "**Critical Vendor Caps**"), in aggregate prepetition claims of certain vendors,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

suppliers, service providers, and other similar entities that the Debtors determine, in their reasonable business judgment, are essential to their ongoing business operations and maximization of value of the enterprise (collectively, the "**Critical Vendors**" and, their prepetition claims, the "**Critical Vendor Claims**"); (ii) approving (a) the Critical Vendor Payment Protocol, (b) the form of Critical Vendor Notice, substantially in the form attached to the Motion as **Exhibit B**, (c) the form of Vendor Agreement, substantially in the form attached to the Critical Vendor Notice as **Exhibit 1**, (d) the Repudiating Vendor Procedures, (e) the form of Notice of Repudiating Vendor, substantially in the form attached to the Motion as **Exhibit C**, and (f) the form of Order to Show Cause, substantially in the form attached to the Motion as **Exhibit D**; and (iii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the interim relief requested in the Motion having been given as provided in the Motion; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the interim relief requested in the Motion on an interim basis on October 15, 2018 (the "**Interim Hearing**"); and upon the Riecker Declaration, filed contemporaneously with the Motion, the record of the Interim Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the interim relief requested in the Motion is necessary to avoid

2

immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, provides a net benefit to the Debtors and their estates after taking into account the Bankruptcy Court's priority scheme, and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, to pay Critical Vendor Claims in accordance with the Critical Vendor Payment Protocol up to the Interim Critical Vendor Cap, upon such terms and in the manner provided in this Interim Order and the Motion.

3.      The Critical Vendor Payment Protocol and form of Critical Vendor Notice are hereby approved.

4.      The form of Vendor Agreement is approved in its entirety.   Except as otherwise set forth herein, the Debtors shall condition payment of Critical Vendor Claims pursuant to this Interim Order upon the execution of a Vendor Agreement.   The Debtors are authorized, but not directed, to enter into such Vendor Agreements when and if the Debtors determine, in the exercise of their sole reasonable business judgment, that it is appropriate to do so.   A Vendor Agreement, once agreed to and accepted by a Critical Vendor, shall be the legally binding contractual relationship between the parties governing the commercial trade relationship as provided therein; _provided_ that the Debtors may agree to implement such modifications to the form of Vendor Agreement the Debtors deem necessary or advisable in the reasonable exercise of their business judgment to obtain Customary Trade Terms (defined below) from the

3

applicable Critical Vendor; <u>provided</u> further that the Debtors may pay a Critical Vendor Claim without the applicable Critical Vendor having executed a Vendor Agreement only if the Debtors determine, in their reasonable business judgment, that a Vendor Agreement is unnecessary to ensure the applicable Critical Vendor's continued performance on Customary Trade Terms (defined below).

5.      Any party who accepts payment from the Debtors of a Critical Vendor Claim (regardless of whether a Vendor Agreement has been executed) shall take all actions necessary to remove any mechanics' liens, possessory liens, or similar state law trade liens on the Debtors' assets such party may have based upon such Critical Vendor Claim at such party's sole expense.

6.      Any party who accepts payment from the Debtors of a Critical Vendor Claim (regardless of whether a Vendor Agreement has been executed) shall be deemed to have agreed to the terms and provisions of this Interim Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employee up to the amount paid.

7.      In the event (i) a Critical Vendor breaches the terms or conditions of a Vendor Agreement or (ii) regardless of whether a Vendor Agreement has been executed, a Critical Vendor accepts payment from the Debtors of a Critical Vendor Claim and does not continue supplying goods or services to the Debtors on trade terms at least as favorable to the Debtors as those terms governing the Debtors' practices and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, coupon reconciliation, product mix, availability, processing of vendor receivables, such as rebates and

4

volume credits, and other programs), with respect to that particular Critical Vendor, within the 360 days prior to the Commencement Date, or such other trade terms that are acceptable to the Debtors in their sole discretion (collectively, the "**Customary Trade Terms**"), the Debtors may, in their discretion, (a) declare that the payment of the Critical Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations), (b) declare that the Critical Vendor shall immediately return the payment of its Critical Vendor Claim to the Debtors without giving effect to any alleged setoff rights, recoupment rights, adjustments, or other offsets of any type whatsoever, and the Critical Vendor Claim shall be reinstated to such amount as so to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the Critical Vendor Claim had been made, and/or (c) if there exists an outstanding postpetition balance due from the Debtors to such Critical Vendor, recharacterize and apply any payment made pursuant to the relief requested in the Motion to such outstanding postpetition balance and such Critical Vendor shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

8.      All Vendor Agreements will terminate upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

9.      In the event a Critical Vendor breaches the terms or conditions of its Vendor Agreement, the Debtors may, in their discretion, declare that such Vendor Agreement has terminated; provided that the Vendor Agreement may be reinstated if:

  i.    after notice and a hearing (following a motion filed by the respective Critical Vendor), the Bankruptcy Court reverses the Debtors' decision to

5

terminate the Vendor Agreement for good cause shown that the Debtors' determination was materially incorrect;

ii.   the Critical Vendor fully cures the underlying default of the Vendor Agreement within five (5) business days from the date of receipt of notice of termination of the Trade Agreement; or

iii.   the Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party.

10.   Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims or liens held by any Critical Vendor and the Debtors' rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such claims are fully preserved.

11.   The Debtors shall maintain a "**Critical Vendor Matrix**" summarizing (i) the name of each vendor requesting Critical Vendor status, (ii) the amount and timing of any Critical Vendor payment, (iii) the amount of the Critical Vendor's claim satisfied by the Critical Vendor payment, including any amount entitled to priority under section 503(b)(9) of the Bankruptcy Code, and (iv) a summary of the material payment terms.  For the first forty-five (45) days after entry of this Order, the Critical Vendor Matrix will be provided on a weekly basis, and, thereafter, on a monthly basis, to (a) the U.S. Trustee and (b) the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases; provided that the professionals for any such committee shall keep the Critical Vendor Matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any statutory committee of creditors, without prior written consent of the Debtors.

12.   The Repudiating Vendor Procedures are approved in their entirety. In addition, the forms of Notice of Repudiating Vendor and Order to Show Cause are each hereby approved.

6

13.     If a Repudiating Vendor refuses to perform its postpetition obligations pursuant to an executory contract with one or more of the Debtors, the Debtors are authorized, but not directed, to pay such claim provisionally (and such payment shall not count against the Critical Vendor Caps).

14.     Regardless of whether a payment has been made, if a Repudiating Vendor refuses to perform its postpetition obligations pursuant to an executory contract with one or more of the Debtors, the Debtors may (i) file a Notice of Repudiating Vendor setting forth (a) the name of the Repudiating Vendor, (b) the identity of the agreement governing the Debtors' relationship with the Repudiating Vendor, (c) the Debtors' belief that the Repudiating Vendor is in violation of the Bankruptcy Code, and (d) the amount(s) and date(s) of any prepetition amounts paid; and (ii) seek entry of an Order to Show Cause requiring the Repudiating Vendor to show why it should not be found to have willfully violated sections 362 and 365 of the Bankruptcy Code and why it should not be required return any payments made to it by the Debtors, plus any accumulated interest.

15.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing

16.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**")

17.     Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or

7

approved hereunder, shall be subject in all respects to, as applicable: (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "DIP Orders"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

18.      To the extent there is any inconsistency between the terms of any of the DIP Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

19.      Nothing contained in the Motion or this Interim Order, or any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

20.      The requirements of Bankruptcy Rule 6003(b) have been satisfied.

21.      Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

22.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

23.      This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that, the Court's ultimate disposition

8

of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

24.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

25.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

26.    The Final Hearing on the Motion shall be held on _____, **2018, at _____ (Prevailing Eastern Time)**, and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Ray C. Schrock, P.C., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.); (ii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Paul Schwartzberg, Esq. and Richard Morrissey, Esq.); and (iii)  counsel for the DIP ABL Agent, with a copy to the Court's chambers, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2018**.

Dated: _____, 2018
      White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96759578\1\73219.0006

**<u>Exhibit B</u>**

**Form of Critical Vendor Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                            :
In re                                       :        **Chapter 11**
                                            :
**SEARS HOLDINGS CORPORATION,** *et al*.    :        **Case No. 18-_____ (RDD)**
                                            :
                    Debtors.[1]             :        **(Joint Administration Requested)**
                                            :
------------------------------------------------------------------x

### Notice of Critical Vendor Payment Protocol

On October 15, 2018 (the "**Commencement Date**"), Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed voluntary petitions for relief under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

On the Commencement Date, the Debtors filed the *Motion of Debtors for Authorization to Pay Certain Prepetition Obligations to Critical Vendors and Related Relief* [Docket No. __] (the "**Motion**").[2]

On October [__], 2018, the Court entered an order [Docket No. __] granting the relief requested in the Motion on interim basis (the "**Order**").

To ensure the continued postpetition delivery of goods and services to the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not defined herein shall have the meaning set forth in the Motion.

on market terms following the Commencement Date, including credit terms, and facilitate orderly negotiations relating thereto, pursuant to the Order, among other things, the Bankruptcy Court approved certain procedures for the Debtors' review and authorization to pay certain prepetition claims of certain vendors, suppliers, service providers, and other similar entities that the Debtors determine, in their sole discretion and based on their sound business judgment, are essential to their ongoing business operations and maximizing the value of their enterprise (the "**Critical Vendors**" whose prepetition claims shall be referred to as the "**Critical Vendor Claims**") who agree to, among other things, provide postpetition goods and/or services to the Debtors on Customary Trade Terms (as defined herein).

This Notice summarizes certain key provisions of the Order and the Critical Vendor Payment Protocol. In the event of any inconsistency between this Notice and the Order, the Order shall control in all respects.

1.      <u>Payment Requests</u>.  All requests for payment of a Critical Vendor Claim must be emailed to SHCvendors@primeclerk.com.

2.      <u>Vendor Agreement</u>.  The Debtors will condition the payment of Critical Vendor Claims on the execution by each Critical Vendor of a vendor agreement substantially in the form attached hereto as **Exhibit 1** (each, a "**Vendor Agreement**"), which agreement shall constitute a legally binding contractual relationship between the parties.

3.      <u>Customary Trade Terms</u>.  Pursuant to the Vendor Agreement, in order to receive payment of a Critical Vendor Claim, a Critical Vendor must agree to continue supplying goods or services to the Debtors on trade terms at least as favorable to the Debtors as those terms governing practices and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, coupon reconciliation, product mix, availability, processing of vendor receivables, such as rebates and volume credits, and other programs) within the 360 days prior to the Commencement Date, or such other trade terms that are acceptable to the Debtors in their sole discretion (collectively, the "**Customary Trade Terms**").

4.      <u>Debtors' Remedies</u>.  If a Critical Vendor breaches its Vendor Agreement or otherwise accepts payment from the Debtors of a Critical Vendor Claim and does not continue supplying goods or services to the Debtors on Customary Trade Terms, the Debtors may, in their discretion, (i) declare that any payment of the Critical Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations), (ii) declare that the Critical Vendor shall immediately return the payment of its Critical Vendor Claim to the Debtors without giving effect to any alleged setoff rights, recoupment rights, adjustments, or other offsets of any type whatsoever, and the Critical Vendor Claim shall be reinstated to such amount as so to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the Critical Vendor Claim had been made, and/or (iii) if there exists an outstanding postpetition balance due from the Debtors to such Critical Vendor, recharacterize and apply any payment of a Critical Vendor Claim to such outstanding postpetition balance and such Critical Vendor shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

2

5.      <u>Termination and Reinstatement</u>.  All Vendor Agreements will terminate upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.  In addition, if a Critical Vendor breaches its Vendor Agreement, the Debtors may, in their discretion, declare that such Vendor Agreement has terminated.  To the extent a Vendor Agreement is terminated on account of breach of the terms or conditions thereof by a Critical Vendor, such terminated Vendor Agreement may nevertheless be reinstated as the result of one or more of the following:  (i) after notice and a hearing (following a motion filed by the applicable Critical Vendor), the Bankruptcy Court reverses the Debtors' decision to terminate the Vendor Agreement for good cause shown that the Debtors' determination was materially incorrect; (ii) the Critical Vendor fully cures the underlying default of the Vendor Agreement within five (5) business days from the date of receipt of notice of termination of the Vendor Agreement; or (iii) the Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party.

6.      <u>Effect of Acceptance</u>.  Except as otherwise provided in the Vendor Agreement, any party who accepts a payment from the Debtors on account of a Critical Vendor Claim (regardless of whether a Vendor Agreement has been executed) shall be deemed to have agreed to the terms and provisions of the Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employee up to the amount paid.

7.      <u>Reservation of Rights</u>.  Nothing contained herein, in the Order, or as a result of any payment made pursuant thereto is intended to or should be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve the right to contest any demand for payment made with respect to Critical Vendor Claims pursuant to the Bankruptcy Code, any order of the Court, or applicable non-bankruptcy law.  Any payment made pursuant to the relief requested in the Motion is not intended to and should not be construed as an admission of the validity of any claim or a waiver of the Debtors' right to dispute such claim subsequently.

Dated: [_____], 2018
       New York, New York

                                        _____
                                         WEIL, GOTSHAL & MANGES LLP
                                         767 Fifth Avenue
                                         New York, New York  10153
                                         Telephone:  (212) 310-8000
                                         Facsimile:  (212) 310-8007
                                         Ray C. Schrock, P.C.
                                         Jacqueline Marcus
                                         Garrett A. Fail
                                         Sunny Singh

                                         *Proposed Attorneys for Debtors*
                                         *and Debtors in Possession*

**Exhibit 1**

**Form of Vendor Agreement**

WEIL:\96750518\1\73219.0006

### Vendor Agreement

The Debtors (as defined herein) and **[_____]** ("**Vendor**") hereby enter into the following vendor agreement (this "**Vendor Agreement**") dated as of this **[___, 2018]**.

### Recitals

WHEREAS on October 15, 2018 (the "**Commencement Date**"), Sears Holdings Corporation and certain affiliated entities (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

WHEREAS on October **[__]**, 2018, the Court entered the *Interim Order Authorizing Debtors to Pay Certain Prepetition Obligations to Critical Vendors and Related Relief* (the "**Critical Vendor Order**") [Docket No. __] authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain vendors, including Vendor, subject to the terms and conditions set forth therein.[1]

WHEREAS pursuant to the Critical Vendor Order, the Court approved certain payment procedures, summarized in the *Motion of Debtors for Authorization to Pay Certain Prepetition Obligations to Critical Vendors and Related Relief* [Docket No. __] (the "**Critical Vendor Payment Protocol**").

WHEREAS pursuant to the Critical Vendor Order, to receive payment on account of prepetition claims, each Critical Vendor must agree to continue to supply goods or services to the Debtors on "Customary Trade Terms."  As used herein and in the Critical Vendor Order, "**Customary Trade Terms**" are trade terms at least as favorable to the Debtors as those terms governing practices and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, coupon reconciliation, product mix, availability, processing of vendor receivables, such as rebates and volume credits, and other programs) within the 360 days prior to the Commencement Date, or such other trade terms that are acceptable to the Debtors in their sole discretion.

WHEREAS the Debtors and Vendor (collectively, the "**Parties**") agree to the following terms as a condition of payment on account of certain prepetition claims Vendor may hold against the Debtors.

### Agreement

1.      The Parties hereby agree that Vendor is a "Critical Vendor" (as defined in the Critical Vendor Order).

2.      The balance of Vendor's aggregate prepetition claim(s) against the Debtors is $[•] (the "**Agreed Critical Vendor Claim**").

---

[1]      Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Vendor Order.

3.      Following execution of this Vendor Agreement, the Debtors will pay Vendor $[•] (the "**Payment Amount**") in full satisfaction of the Agreed Critical Vendor Claim. The Payment Amount will be paid pursuant to the Customary Trade Terms set forth below, and will be applied to any invoices previously received by the Debtors on account of the Agreed Critical Vendor Claim.

4.      [The parties hereby agree that Vendor delivered to the Debtors, and the Debtors received, goods valued at $[•] within 20 days before the Commencement Date, for which Vendor did not receive payment (the "**Agreed 503(b)(9) Claim**"). $[•] of the Payment Amount will be applied toward the Agreed 503(b)(9) Claim.]

5.      For a period from the date this agreement is executed until the earlier of (i) the effective date of a chapter 11 plan for the Debtors and (ii) two (2) years from the date of this Vendor Agreement, Vendor shall supply goods **[and/or]** services to the Debtors based on the following Customary Trade Terms: _____.

6.      The Parties further agree, acknowledge and represent that:

(a)     the Parties have reviewed the terms and provisions of the Critical Vendor Order and consent to be bound by such terms and that this Vendor Agreement is expressly subject to the Critical Vendor Order;

(b)     any payments made on account of the Agreed Critical Vendor Claim shall be subject to the terms and conditions of the Critical Vendor Order, including any orders of the Court granting the relief requested in the Critical Vendor Order on a final basis, as applicable;

(c)     if Vendor refuses to supply goods or services to the Debtors as provided herein or otherwise fails to perform any of their obligations hereunder, the Debtors may exercise all rights and remedies available under the Critical Vendor Order, the Bankruptcy Code, or applicable law;

(d)     Vendor will not separately seek payment for any claims pursuant to section 503(b)(9) of the Bankruptcy Code or other similar claims outside of the terms of the Critical Vendor Order or this Vendor Agreement unless Vendor's participation in the vendor payment program authorized by the Critical Vendor Order is terminated;

(e)     in consideration for receiving the Payment Amount, Vendor shall not file or otherwise assert against the Debtors, their estates, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to Vendor by the Debtors arising from agreements entered into before the Commencement Date. Furthermore, if Vendor has taken steps to file or assert a lien before entering into this Vendor Agreement, Vendor agrees to take all necessary steps to remove the lien as soon as possible at its sole cost

2

and expense;

(f)    if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Debtors may, in their discretion, and without further order of the Bankruptcy Court, (a) declare that any payment of the Payment Amount is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from Vendor (including by setoff against postpetition obligations), (b) declare that Vendor shall immediately return the Payment Amount to the Debtors without giving effect to any alleged setoff rights, recoupment rights, adjustments, or other offsets of any type whatsoever, and Vendor's claim shall be reinstated to such amount as so to restore the Debtors and Vendor to their original positions as if the Vendor Agreement had never been entered into and the Payment Amount had not been paid, and/or (c) if there exists an outstanding postpetition balance due from the Debtors to Vendors, the Debtors may elect to recharacterize and apply the Payment Amount to such outstanding postpetition balance and Vendor shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise;

(g)    if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Debtors may, in their discretion, declare that such Vendor Agreement has terminated; provided that the Vendor Agreement may be reinstated if:

i)    after notice and a hearing (following a motion filed by the respective Critical Vendor), the Bankruptcy Court reverses the Debtors' decision to terminate the Vendor Agreement for good cause shown that the Debtors' determination was materially incorrect;

ii)    the Critical Vendor fully cures the underlying default of the Vendor Agreement within five (5) business days from the date of receipt of notice of termination of the Vendor Agreement; or

iii)    the Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party; and it is further

(h)    the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute arising under or in connection with this Vendor Agreement.

7.    Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, and unless it otherwise becomes public without a breach of this Vendor Agreement, Vendor agrees to hold in confidence and not disclose to any party: (a) any and all payments made by the Debtors pursuant to this Vendor Agreement; (b) the terms of payment set forth herein; (c) the Customary Trade Terms; and (d) this Vendor Agreement (collectively, the "**Confidential Information**"); provided that if any party seeks to compel Vendor's disclosure of any or all of the

Confidential Information, through judicial action or otherwise, or Vendor intends to disclose any or all of the Confidential Information, Vendor shall immediately provide the Debtors with prompt written notice so that the Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; provided further that if such remedy is not obtained, Vendor shall furnish only such information as Vendor is legally required to provide.

8.      The undersigned hereby represent and warrant that:  (a) they have full authority to execute this Vendor Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Vendor Agreement; and (c) they are fully authorized to bind the Party to all of the terms and conditions of this Vendor Agreement.

9.      This Vendor Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Vendor Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

10.     This Vendor Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[APPLICABLE DEBTOR]**                    **[VENDOR  ]**

_____            _____

WEIL:\96750518\1\73219.0006

**<u>Exhibit C</u>**

**Form of Notice of Repudiating Vendor**

WEIL:\96759578\1\73219.0006

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
SEARS HOLDINGS CORPORATION, *et al.*,   :        Case No. 18-_____ (RDD)
                                        :
        Debtors.[1]                     :        (Joint Administration Requested)
                                        :
---------------------------------------------------------------x

## NOTICE OF REPUDIATING VENDOR

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On October 15, 2018 (the "**Commencement Date**"), Sears Holdings

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), filed voluntary petitions for relief under title 11 of

the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the

Southern District of New York (the "**Court**").

2.      On the Commencement Date, the Debtors filed the Motion of Debtors for

Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Obligations

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

to Critical Vendors, (II) Approving Procedures to Address Vendors Who Repudiate and Refuse

to Honor Their Contractual Obligations to the Debtors; and (III) Granting Related Relief. [ECF

No. [**TO COME**]] (the "**Motion**").[2]

3.        On [**TO COME**], 2018, the Court entered an order [ECF No. [**TO

COME**]] granting the relief requested in the Motion on **[an interim/a final]** basis (the

"**Order**").

4.        Pursuant to the Order, the Debtors have identified _____

(the "**Vendor**") as a Repudiating Vendor due to the Vendor's refusal to perform its obligations

under the [**NAME OF AGREEMENT**], in violation of the Bankruptcy Code.  [**The Debtors

have conditionally paid the Vendor's prepetition claim in the amount of $_____, on

_____, 20[__] (the "Provisional Payment")**.]

5.        Contemporaneously herewith, the Debtors are filing a proposed Order to

Show Cause requesting that the Court order the Vendor to appear before the Court at a hearing to

be held on _____, **2018, at** _____ **(Prevailing Eastern Time)**, in the Bankruptcy Court,

Courtroom _____, 300 Quarropas Street, White Plains, New York 10601, and demonstrate why

the Vendor should not be held to have violated sections 362 and 365 of the Bankruptcy Code

**[and why the Vendor should not be required to return the Provisional Payment]**.

---

[2]    Capitalized terms used but not defined herein shall have the meaning set forth in the Motion.

WEIL:\96759578\1\73219.0006

Dated: [_____], 2018
    New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

WEIL:\96759578\1\73219.0006

**Exhibit D**

**Form of Order to Show Cause**

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                       :

In re                              :         **Chapter 11**

                                         :

**SEARS HOLDINGS CORPORATION**, *et al.*,   :         **Case No. 18-_____ (RDD)**

                                         :

               **Debtors.**[1]             :         **(Joint Administration Requested)**

                                         :

----------------------------------------------------------------x

## ORDER TO SHOW CAUSE

1.      Upon the Notice of Repudiating Vendor dated _____, 20__ [ECF No. ____] (the "**Notice**") filed by Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"); the Court having reviewed the Notice and the *[Interim/Final]* Order (I) Authorizing Debtors to Pay Certain Prepetition Obligations to Critical Vendors, (II) Approving Procedures to Address Vendors Who Repudiate and Refuse to Honor Their Contractual Obligations to the Debtors; and (III) Granting Related Relief [ECF No. ____] (the "**Critical Vendor Order**"),[2] pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179

[2]    Capitalized terms used but not defined herein shall have the meaning set forth in the Order.

which the Notice was filed; and the Court having jurisdiction over this matter in accordance with 28. U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtors having provided sufficient notice of the relief requested herein; and the Debtors having complied with the terms and conditions set forth in the Critical Vendor Order,

### IT IS HEREBY ORDERED THAT

1.        That _____ (the "**Vendor**"), who is identified by Debtors as a Repudiating Vendor, is hereby ordered, at a hearing to be conducted before this Court on **_____, 2018, at _____ (Prevailing Eastern Time)**, in the Bankruptcy Court, Courtroom _____, 300 Quarropas Street, White Plains, New York 10601 (the "**Hearing**"), to show cause why the Vendor should not (a) be held to have violated sections 362 and 365 of the Bankruptcy Code for willfully threatening to withhold essential [**goods and/or services**] from the Debtors under one or more contracts between the Debtors and Vendor, as identified in the Notice **[and (b) be required to return any payment(s) of a Critical Vendor Claim (as such term is defined in the Critical Vendor Order) made to it by the Debtors, plus the accumulated interest]** and it is further

2.        That service of this Order to Show Cause is to be made by the Debtors upon (a) the Vendor; (b) the Office of the United States Trustee for Region 2;(c) the attorneys for the Debtors' proposed postpetition lenders; and (d) the attorneys retained by any official committee of unsecured creditors appointed in these chapter 11 cases; and it is further

3.        That this Court shall retain jurisdiction to hear and determine all matters arising from implementation of this Order to Show Cause.

Dated: _____, 2018
        White Plains, New York

                                        By order of the Court.

3