WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :     **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : |
| | :     **Case No. 18-_____ (RDD)** |
| | : |
| Debtors.[1] | :     **(Joint Administration Requested)** |

------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF DEBTORS FOR ENTRY OF
ORDER (I) AUTHORIZING BUT NOT DIRECTING
THE DEBTORS TO (A) PAY CERTAIN PREPETITION
WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND
HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE
EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent in support of this motion (the "**Motion**"):

## Background

1.       On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

2.       Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.       Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for*

WEIL:\96100653\22\73219.0006

*Southern District of New York*, sworn to on the date hereof (the "**Riecker Declaration**"),[2] which

has been filed with the Court contemporaneously herewith and is incorporated herein by

reference.

## Jurisdiction

4.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before

this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Relief Requested

5.        By this Motion, the Debtors request (i) authority, pursuant to sections

105(a), 363, and 507(a) of the Bankruptcy Code, but not direction, to pay certain prepetition

amounts, and maintain and continue to honor and pay, in their sole discretion, all amounts with

respect to the Debtors' business practices, programs, and policies for their employees or

supplemental workforce as such were in effect on the Commencement Date and as such may be

modified or supplemented from time to time in the ordinary course of business as provided

herein (the "**Workforce Obligations**"), including (a) Unpaid Compensation; (b) Deductions and

Payroll Taxes; (c) the obligations owed to the supplemental workforce; (d)  Reimbursable

Expenses; (e) the Corporate Card Program; (f) the Employee Benefit Programs; (g) the non-

insider Severance Program; (h) the Former Employee Benefit Plans; and (i) the Other Employee

Programs (each as defined herein); and (ii) related relief.  Such relief, including any and all

authorizations or payments requested herein, shall be subject to and implemented in accordance

with the provisions of the DIP Orders.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

6.      A proposed form of order granting the relief requested in the Motion on an interim basis is attached hereto as **Exhibit A** (the "**Proposed Interim Order**").

### Compensation and Benefits Programs

7.      As with similarly situated Companies, the Debtors maintain various compensation and benefits programs and pay various administrative fees and premiums in connection therewith (the "**Compensation and Benefits Programs**").  The Debtors believe that the vast majority of their Employees (as defined herein) rely exclusively or primarily on the compensation and benefits they receive through the Compensation and Benefits Programs to pay their daily living expenses and support their families.  Employees will face significant financial consequences if the Debtors are not permitted to pay or continue to administer the Compensation and Benefits Programs in the ordinary course of business.  Further, the Debtors' failure to honor their obligations in connection with the Compensation and Benefits Programs likely would result in attrition at a time when the Debtors need their Workforce to perform at peak efficiency.

8.      Subject to the Court's approval and the terms and conditions set forth herein, the Debtors intend to continue to administer their Compensation and Benefits Programs in the ordinary course.  The Debtors further request confirmation of their right to modify, change, and discontinue any of their Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases, in their discretion and without the need for further Court approval, subject to applicable orders entered in these chapter 11 cases, including the DIP Orders and the DIP Loan Documents, any agreements executed in contemplation of these chapter 11 cases, and the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

4

9.    The Debtors estimate that, as of the Commencement Date, they owe approximately $107.6 million in aggregate Workforce Obligations, $118.2 of which will become due and payable during the period between the Commencement Date and the final hearing on the Motion (the "**Interim Period**").

| Compensation and Benefits Program | Interim Amount | Final Amount |
|---|---|---|
| Unpaid Compensation | $39,200,000 | $39,200,000 |
| Deductions and Payroll Taxes | $36,000,000 | $36,000,000 |
| Supplemental Workforce Obligations | $5,500,000 | $8,300,000 |
| Reimbursable Expenses | $1,200,000 | $1,200,000 |
| Corporate Card Program | $6,900,000 | $6,900,000 |
| Employee Benefit Programs | $17,200,000 | $17,200,000 |
| Severance Program | — | — |
| Former Employee Benefit Programs | $1,500,000 | $1,500,000 |
| Other Employee Programs | $110,000 | $110,000 |
| **Workforce Obligations** | **$107,600,000** | **$110,400,000** |

## Debtors' Workforce Obligations

### I.    Debtors' Workforce

10.    As of the Commencement Date, the Debtors employ approximately 68,000 employees, consisting of approximately 32,000 full-time employees (the "**Full-Time Employees**") and approximately 36,000 part-time employees (the "**Part-Time Employees**", together with the Full-Time Employees, the "**Employees**"). Approximately 1,400 of the Employees are seasonal (the "**Seasonal Employees**"). The Debtors have the greatest need for their Seasonal Employees during the holiday shopping season, which runs during the months of September through January. The Debtors pay approximately 88% of Employees on an hourly basis, while the remaining Employees are paid on a salaried basis.

WEIL:\96100653\22\73219.0006

11.     As of the Commencement Date, approximately 1,300 Employees are represented by collective bargaining units (the "**Unions**" and the Employees so represented, the "**Unionized Employees**").    The Debtors are party to 19 collective bargaining agreements (collectively, the "**CBAs**") with bargaining units of certain international and local unions, including Teamsters Local Union 705, Workers United Local 196, Workers United Local 512, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") Local 8275, UAW Local 2901, Teamsters Local Union 243, United Steelworkers of America District 10 Local Union 5852-28, United Food and Commercial Workers International Union ("**UFCW**") Local 881, Teamsters Local Union 174, UFCW Local 880, Teamsters Local Union 688, International Union of Operating Engineers ("**IUOE**") Local 399, IUOE Local 70, Teamsters Local Union 150, Teamsters Local Union 348, International Brotherhood of Electrical Workers Local 8.

12.     In addition to their Employees, the Debtors rely on services from a supplemental workforce (the "**Supplemental Workforce**" and the obligations with respect thereto, the "**Supplemental Workforce Obligations**") consisting of temporary employees and independent contractors and consultants varying in number from month to month that provide services related to the Debtors' operations and information infrastructure.    The Debtors do not directly employ or pay any independent contractors or temporary employees.    Rather, the Debtors procure and manage the Supplemental Workforce through third parties, including staffing supply agencies such as Crossfire, Manpower, and PeopleReady, and payment aggregation and technology providers, such as Beeline (collectively, the "**Supplemental Workforce Agencies**").

6

## II.        Wages, Salaries and Other Compensation

### A.        Unpaid Compensation

13.        The Debtors segment their Employee base into several categories based on various factors, including whether the Employee has a field or corporate role and whether the Employee works in a Sears or Kmart store.  The Debtors' payroll obligations generally include wages, salaries, incentive programs, and payments on account of unused vacation time and other paid time off (the "**Payroll Obligations**").   The Debtors' recent gross payroll has totaled approximately $171 million per month. The majority of the Debtors' payroll is made by direct deposit through the electronic transfer of funds to the Employees' accounts.[3]

14.        In the ordinary course of business, the Debtors segment their Employee base into weekly, bi-weekly, or semi-monthly payment cycles.  Approximately 12% of the Debtors' Employees are paid on a semi-monthly basis (the "**Semi-Monthly Employees**") on the 15th and last day of each month.  The Semi-Monthly Employees include salaried Employees that staff the Debtors' corporate offices. Most of the Employees are paid biweekly, with such employees placed in one of two groups paid in alternating staggered biweekly cycles.  The remaining Employees are paid weekly in compliance with various state law obligations.  The Debtors remit to ADP the necessary cash to fund payment several days in advance of a payment

---

[3] The Debtors rely on third parties (the "**Third Party Servicers**") such as ADP to distribute, process and administer funds in connection with their Workforce Obligations. The Debtors rely on ADP, for example, to (i) administer direct deposits of employee wages, payroll checks, and other banking services, and (ii) payroll processing services, and (iii) payroll taxes. Historically, the Debtors pay ADP approximately (i) $4,000 per month for direct deposit and banking services (ii) $50,000 per month for payment processing services, and (iii) approximately $28,000 for payroll taxes.  The Debtors are seeking authority to pay any prepetition amounts owed to ADP on account of these services. The Debtors pay Equifax Inc. $175,000 yearly (typically coming due in January) and seek to continue to pay such amounts when they come due. The Debtors estimate they could owe approximately up to $130,000 on account of obligations to the Third Party Servicers, and seek to pay prepetition amounts with respect to such obligations.

WEIL:\96100653\22\73219.0006

date. For example, for the Semi-Monthly Employees paid on October 15, 2018, the Debtors funded accounts with ADP on Wednesday October 10, 2018.

        i.     ***The Incentive Plans***

15.     As a part of overall compensation, the Debtors maintain an annual incentive program (the "**AIP**") for certain of the Debtors' Employees. The AIP designates a payment (the "**AIP Payment**"), on a quarterly and annual basis, as applicable, to eligible Employees, a percentage of the applicable Employees' salary in accordance with written procedures established by a senior compensation executive or by the Compensation Committee of the Board of Directors of Sears Holdings Corporation (as applicable, the "**AIP Procedures**"). The Debtors determine the amount of the AIP Payment using a combination of Employee performance, the Employee's business unit performance, and the performance of the Company as a whole, as compared with the target performance goals set for the Employee, business unit, and Company under the AIP Procedures.

16.     In addition the Debtors maintain a long term incentive plan (the "**LTIP**" and together with the AIP, the "**Incentive Plans**") for certain of the Debtors' Employees. The LTIP is a cash incentive program that calculates an incentive payment to an eligible Employee as a combination of a metric based on Company EBITDA (75% weighting) and length of Employee service (25% weighting). The LTIP is generally payable once a year after the completion of a fiscal plan year on April 15. The next payment in 2019 will apply to the 2016 fiscal year participants. To be eligible for a payment under the LTIP, an Employee must have been employed at the Company for approximately 3 fiscal years. The Debtors do not believe there are any accrued prepetition obligations on account of the Incentive Plans. The Debtors seek

8

authority to continue their Incentive Plan obligations in the ordinary course and solely for non-insiders.

17.    As of the Commencement Date, the Debtors estimate they owe approximately $39.2 million to Employees on account of prepetition Payroll Obligations (the "**Unpaid Compensation**") (including issued but uncashed checks).  Because Payroll Obligations due to the Semi-Monthly Employees, whose next payment date is October 15, 2018, were already remitted to ADP, the Debtors believe that no Employees are owed Unpaid Compensation in an amount exceeding the $12,850 cap imposed by section 507(a)(4) of the Bankruptcy Code.  For the avoidance of doubt, the Debtors do not seek authority to pay any Unpaid Compensation in excess of the statutory cap of $12,850 imposed by section 507(a)(4) of the Bankruptcy Code.

### B.    Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes

18.    For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, union fees, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain of the Employee Benefit Programs discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, and 401(k) contributions) (collectively, the "**Deductions**").  The Debtors cause Deductions to be made from Employees' paychecks, including approximately $20,000 in union dues and initiation fees, which the Debtors then remit to the appropriate third-party recipients,  The Debtors may not have forwarded certain of the Deductions collected prepetition to the appropriate third-party recipients prior to the Commencement Date.

WEIL:\96100653\22\73219.0006

19.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withheld Amounts**").  The Debtors must then match from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**").  In the aggregate, the Debtors pay approximately $45 million per month in Payroll Taxes, inclusive of the Employee and employer portions.  As of the Commencement Date, the Debtors estimate they could owe approximately $36.0 million on account of prepetition Deductions and Payroll Taxes, including approximately $34.9 million in Payroll Taxes.

20.     To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients before the Commencement Date, the Debtors seek authority to forward such Deductions and Payroll Taxes (and to continue to forward Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

**III.     Supplemental Workforce Obligations**

21.     The Debtors procure and manage temporary workers and contractors through third-party staffing supply agencies such as CrossFire Group, PeopleReady, and Manpower.  The Debtors rely on such temporary workers and contractors to provide warehouse support, as well as specialized skills.  The applicable third party agencies invoices Beeline, which in turn aggregates and invoices the Debtors for such temporary work.  The Debtors remit compensation for temporary workers and for management and operational capabilities to the

10

Supplemental Workforce Agencies to Beeline on a weekly basis and then Beeline pays the Debtors' staffing supply agencies. Monthly payments vary significantly throughout the year. As of the Commencement Date, the Debtors estimate they could owe Supplemental Workforce Agencies $8.3 million in aggregate for prepetition services provided by temporary employees and for management systems that monitor and procure the Supplemental Workforce (the "**Supplemental Workforce Obligations**"). For the avoidance of doubt, the Debtors do not seek authority to pay any individual of the Supplemental Workforce compensation for prepetition services in excess of the statutory cap of $12,850 imposed by section 507(a)(4) of the Bankruptcy Code.

22.     The Debtors believe it is necessary to pay the obligations owed, subject to the section 507(a)(4) cap, to Supplemental Workforce Agencies, for the benefit of temporary employees, so that Supplemental Workforce Agencies will continue to provide services and so that the temporary employees who are members of the Debtors' workforce will continue to work for the Debtors.

### IV.     Reimbursable Expenses

23.     In the ordinary course of business, the Debtors reimburse certain Employees and all directors for travel and other business expenses incurred in connection with their employment duties which are not charged on the Company's corporate cards (collectively, the "**Reimbursable Expenses**"), including car mileage driven on an Employee's own car, as well as other expenses. Employees file reimbursement requests through the Debtors' reimbursement software. After receiving audit department and manager approval, expense detail is passed from the software to the Debtors' finance department for processing, payment, and monitoring. Employee expense reports are submitted once per month. Directors submit expense reports to the office of the General Counsel. As of the Commencement Date, not all

11

reimbursement requests have been processed by the Debtors and, in some cases, Employees and Directors may not have submitted reimbursement requests in time to be processed prior to the Commencement Date. On average, the Debtors' Employees incur approximately $845,000 per month in Reimbursable Expenses. Based on historical figures, the Debtors estimate they could owe at least $1.2 million on account of prepetition Reimbursable Expenses as of the Commencement Date and seek authority to honor such obligations.

### V.    Corporate Card Program

24.    The Debtors offer two corporate credit cards which Employees use to make authorized business purchases on behalf of the Debtors or in connection with their employment duties (the "**Corporate Card Program**"). Certain of the corporate cards are issued in the Debtors' name; others are issued under an individual Employees' name, but in all instances the Debtors pay such cards directly. The corporate credit cards are primarily used by Employees for travel-related purposes such as gas and fuel while they provide services to the Debtors' customers such as installing or repairing appliances. To maintain uninterrupted operations in the Debtors' profitable home services segment, the Debtors believe they need to be able to provide assurance to Employees incurring these costs on their corporate cards that such expenses will be reimbursed.

25.    In the aggregate, the Debtors' Employees have recently incurred approximately $9.1 million per month in business expenses charged to the corporate cards. Based on historical figures, the Debtors estimate they could owe $6.3 million on account of prepetition business expenses charged to such corporate credit cards as of the Commencement Date. To prevent Employees from being held liable for any underlying purchases, and any associated negative impact on the Employees' credit scores, the Debtors seek authority to honor their obligations under the Corporate Card Program, to pay prepetition fees on account of the

WEIL:\96100653\22\73219.0006

Corporate Card Program, and to continue such program in the ordinary course. The Corporate Card Program is critical to the Debtors' business operations insofar as it is one of the mechanisms by which Employees' expenses incurred in the ordinary-course discharge of their employment duties are paid without requiring the Employees themselves to advance funds on the Debtors' behalf.

26.     The Debtors rely on third-parties for administration of their Employee Benefit Programs including Alight and Willis Towers Watson. The Debtors estimate they could owe approximately $425,000 on account of such administrative costs and seek authority to pay such amounts.

## VI.    Employee Benefit Programs

27.     In the ordinary course of business, the Debtors maintain various employee benefit plans and policies, including, without limitation, a medical plan, a dental plan, a vision plan, life insurance plans, long-term disability insurance, short-term disability insurance, flexible spending programs, commuter benefits, an adoption assistance program, vacation, other paid time off, Employee discount programs, and other Employee programs (collectively, the "**Employee Benefit Programs**"). The Employee Benefit Programs are, in each case, available to the Full-Time Employees and the Part-Time Employees (with respect to each program they participate in, the "**Program Participants**"). The Debtors seek authority, in the exercise of their discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of business and consistent with past practice, relating to the Employee Benefit Programs, subject to the Debtors' rights, if any, to modify or discontinue any Employee Benefit Programs to reduce applicable costs or the benefits provided thereunder. As of the Commencement Date, the Debtors estimate that they owe approximately $17.2 million in connection with the Employee Benefit Programs.

WEIL:\96100653\22\73219.0006

28.     The Debtors rely on third-parties, including Alight and Willis Towers Watson, for administration of their Employee Benefit Programs.  The debtors estimate they could owe approximately $425,000 on account of such administrative costs and seek authority to pay such amounts.

A.     **Health Care Plans**

29.     Employees can participate in Employee Benefit Programs providing medical insurance coverage (the "**Medical Plans**"), dental insurance coverage (the "**Dental Plans**"), and vision insurance coverage (the "**Vision Plans**", together with the Medical Plans and the Dental Plans, the "**Health Care Plans**").

30.     The Debtors offer a blend of self-funded and fully-insured Medical Plans, which are administered by Alight.[4]  The majority of Medical Plans are self-insured.  Hourly Full-time Employees are eligible to participate in the Medical Plans after ninety (90) days of employment.  Salaried Full-time Employees are eligible to participate on the date of hire. The eligibility of Part-time Employees is based on the hours worked by the employee during the period following the hire date.  Medical contributions are deducted from participating Employees' weekly payroll and are remitted to Alight together with the Debtors' contributions on a monthly basis.  The Debtors pay approximately $14.1 million per month of prepetition premiums related to the Medical Plans including Employee contributions of approximately $6.5 million.

31.     The Dental Plans are fully-insured and administered by MetLife Inc. ("**MetLife**").  The eligibility criteria for the Dental Plans are the same as the criteria for the Medical Plans.  The Dental Plans include a basic option that provides more limited coverage and

_____

[4] Formerly Aon plc.

WEIL:\96100653\22\73219.0006

an enhanced option with greater coverage.  Dental contributions are deducted from participating Employees' regular payroll and are remitted to MetLife together with the Debtors' contributions on a monthly basis.  The Debtors pay approximately $825,000 per month, almost all of which represents the Employees' contributions for coverage under the Dental Plans.

32.    The Vision Plans are fully insured and administered by EyeMed Vision Care ("**EyeMed**").  The eligibility criteria for the Vision Plans are the same as the criteria for the Medical Plans and the Dental Plans.  The Vision Plans include a basic option that provides more limited coverage and a premier option with greater coverage.  Vision contributions are deducted from participating Employees' regular payroll and are remitted to EyeMed in conjunction with the Debtors' contributions on a monthly basis.  The Debtors pay approximately $140,000 per month, all of which represents the Employees' contributions for coverage under the Vision Plans.  The Debtors estimate, based on historical obligations and withholdings, that, as of the Commencement Date, they owe $15.5 million on account of premiums and withheld funds in connection with the Health Care Plans.

33.    As of the Commencement Date, some Employees and their dependents as well as former Employees and their dependents who qualify to elect continuation of benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**").  COBRA applies when the Employees and/or dependents are no longer eligible for the Debtors' sponsored benefits.  If the eligible Employee is eligible for, and timely elects to continue, coverage under COBRA, the Debtors pay for a certain period that is determined based on the eligible Employees' job classification.  An administrator collects COBRA premiums from participants and remits COBRA premiums back to the Debtors after deducting a 2% fee for administration of the program. The costs of administration are passed on back to the participating former

WEIL:\96100653\22\73219.0006

Employees.   Accordingly, the Debtors do not believe they owe any amounts on account of COBRA.

34.    Unionized Employees at the Chambersburg, Pennsylvania facility are eligible to participate in a fully-funded medical plan (the "**Chambersburg Plan**").  Pursuant to the Chambersburg Plan, the Debtors make contributions on a monthly basis. The Debtors believe that, as of the Commencement Date, they owe approximately $90,000 on account of the Chambersburg Plan and seek to pay such amount.  The remaining Unionized Employees other than those under the Chambersburg Plan receive benefits that match the Debtors' non-unionized Employees.

### B.    Insurance Plans and Disability Plans

35.    The Debtors provide Employees basic life insurance coverage at no cost, in an amount equal to one (1) time annual base pay (to a maximum of $50,000) (the "**Basic Life Insurance Plan**").   The Debtors also offer optional life insurance to their Employees (the "**Optional Life Insurance Plan**") in an amount that is equal to up to eight (8) times the Employee's base salary up to $4,000,000 (the "**Optional Life Insurance Amount**").   The Debtors also provide accidental death and dismemberment insurance coverage in an amount equal to a portion of the Optional Life Insurance Amount depending on the severity of the injury (the "**AD&D Plan**" together with the Basic Life Insurance Plan and the Optional Life Insurance Plan, the "**Insurance Plans**").

36.    The Basic Life Insurance Plan is funded solely by company contributions and administered by Securian Financial Group, Inc. ("**Securian**").  The Optional Life Insurance Plan and the AD&D Plan are funded solely by Employee contributions and administered by Securian.  The Debtors pay premiums in connection with the Basic Life Insurance Plan.  The

16

Debtors pay or transfer to Securian approximately $630,000 per month in premiums and withheld Employee contributions in connection with the Insurance Plans.

37.    The Debtors also provide most Full-time Employees with short-term disability coverage (the "**Short-Term Disability Plan**") through Life Insurance Company of North America ("**Cigna**").  Hourly Full-time Employees are eligible to participate in the Short-Term Disability Plan after working for ninety (90) days.  Salaried Full-time Employees are eligible to participate in the Short-Term Disability Plan on the date of hire.  When a claim is duly made, the Short-Term Disability Plan provides 100% of weekly earnings for the first thirteen weeks and 50% of weekly earnings for the next seven weeks, depending on the service length of the Employee, up to a maximum of twenty (20) weeks.  The Short-Term Disability Plan is funded by the Debtors.  The Debtors' cost for the Short-Term Disability Plan is approximately $830,000 per month.

38.    The Debtors also offer their Employees access to long-term disability coverage (the "**Long-Term Disability Plan**" and, together with the Short-Term Disability Plan, the "**Disability Plans**") through Cigna.  Employees may participate in the Long-Term Disability Plan when they become eligible for the Short-Term Disability Plan.  The Long-Term Disability Plan is fully insured by Cigna and funded by Employee contributions.  For salaried Employees, when a claim is duly made, the Long-Term Disability Plan pays 60% of an Employee's annual salary, up to a maximum of $12,500 per month.  For hourly Employees, the Long-Term Disability Plan pays 50% of an hourly employee's salary, up to a maximum of $10,417 per month.  The Debtors transfer to Cigna approximately $375,000 per month in withheld Employee contributions related to the Long-Term Disability Plan.

WEIL:\96100653\22\73219.0006

39.    In total, as of the Commencement Date, the Debtors estimate that they owe approximately $150,000 on account of prepetition premiums and Employee contributions in connection with the Insurance Plans and the Disability Plans.

**C.    Flexible Spending Program**

40.    The Debtors offer Employees the ability to contribute a portion of their pre-tax compensation to pay for certain health care and expenses or dependent care expenses through a program (the "**Flexible Spending Program**") managed by Alight.  Employees are eligible to participate in the Flexible Spending Program when they become eligible to participate in the Medical Plans.  Pursuant to the Flexible Spending Program, the Debtors withhold funds from Program Participants' pre-tax payroll, with maximum annual contributions of $2,600 for health care expenses and $5,000 for dependent care expenses.  Claims are paid by the Debtors using withheld funds.  Approximately 1,570 Employees participate in the Flexible Spending Program.  The Debtors estimate that they withhold approximately $194,000 per month in connection with the Flexible Spending Program and, as of the Commencement Date, estimate that they hold withholdings of approximately $194,000 in connection therewith.  In addition, the Debtors pay Alight approximately $26,000 per month in fees related to administering the Flexible Spending Program. As of the Commencement Date, the Debtors estimate that they owe approximately $210,000 under the Flexible Spending Program.

**D.    Commuter Benefits**

41.    The Debtors offer all Employees the ability to contribute a portion of their pre-tax compensation to pay for the cost of commuting (the "**Commuter Benefits Program**") through Alight.  Commuter benefit accounts are funded with deductions from Program Participants' pre-tax payroll, with maximum monthly contributions limited to $255 per Program

18

WEIL:\96100653\22\73219.0006

Participant.  The Debtors estimate that they withhold approximately $21,000 per month to fund Program Participants' commuter benefit accounts. The Commuter Benefits Program is funded a month in advance.   As of the Commencement Date, the Debtors estimate that they hold approximately $21,000 in withholdings intended to fund commuter benefit accounts.

### E.      Vacation, Paid Time Off, and Employee Discounts

42.      The Debtors maintain a policy (the "**PTO Policy**") of providing paid time off to certain Employees in the form of vacation days, sick pay, personal days, holidays, bereavement pay, and payment for absences due to jury duty ("**PTO**").   Under the PTO Policy, select Employees accrue PTO. The accrual and use of PTO under the PTO Policy varies depending on, among other things, the particular type of paid time off in question.[5]  In addition, the Debtors provide Employees and their family members discounts on purchases of eligible items at the Debtors' stores (the "**Employee Discount Program**"). The Employee Discount Program provides Employees "points" on their purchases under the Debtors' *Shop Your Way®* program, and on purchases of hardline goods.

### F.      401(k) Savings Plans

43.      The Debtors maintain defined contribution plans for the benefit of Eligible Employees meeting the requirements of section 401(k) of the Internal Revenue Code (the

---

[5] For those Program Participants who accumulate Accrued PTO, the amount of annual vacation days available to a given Program Participant ranges from two to five weeks based on length of service or as stipulated in the Program Participant's employment agreement or offer letter, as applicable.  For example, salaried Full-time Employees are entitled to ten (10) days of vacation during their first year and thereafter accrue vacation in five (5) day increments based on their length of service up to twenty-five (25) days of vacation per year.  Hourly Full-time Employees are entitled to five (5) days of vacation and thereafter accrue vacation in five (5) day increments based on their length of service up to twenty-five (25) days of vacation per year. Hourly Part-time Employees are entitled to five (5) days of vacation and thereafter accrue vacation in five (5) day increments based on their length of service up to twenty (20) days of vacation per year.

WEIL:\96100653\22\73219.0006

"**401(k) Savings Plans**"),[6] which are administered by Alight, and managed by Sears Holdings

Savings Plan Master Trust ("**Master Trust**"). The trustee of the Master Trust is State Street

Bank and Trust Company.  The Debtors do not make matching contributions to the 401(k)

Savings Plans.  There are approximately 33,000 Employees or former Employees with current

account balances in the 401(k) Savings Plans (the "**401(k) Program Participants**"). The

Debtors withhold approximately $4.8 million each month from active 401(k) Program

Participants' paychecks on account of contributions to the 401(k) Savings Plans and repayments

of 401(k) loans (the "**401(k) Savings Plan Withholdings**").  As of the Commencement Date, the

Debtors estimate that they hold approximately $2.2 million in prepetition 401(k) Savings Plan

Withholdings.  The Debtors seek the authority by this Motion to continue to transfer such

amounts to the 401(k) Savings Plans and honor their other obligations under 401(k) Savings

Plans in the ordinary course.

## VII.    Severance

44.    In their normal course of operations, the Debtors have a general practice

of paying severance to certain non-insider Employees (the "**Severance Program**").  Pursuant to

the Severance Program, upon being involuntarily terminated in covered circumstances, including

unit closings, job elimination, and reorganization, the Debtors generally provide one to 20 weeks

of pay, depending on the Employee's length of service and employment classification.[7]

Specifically, upon a qualifying termination, eligible Program Participants are paid 1 week's base

pay for every year of service paid in installments in the same time and manner as their applicable

---

[6] Employees who are classified as temporary, seasonal, on-call, peak or interns, and Unionized Employees that work in certain collective bargaining units are not eligible to enroll or participate in the 401(k) Savings Plan.

[7] The Severance Program is organized under a Master Transition Pay Plan effective January 1, 2007, which organizes plans for distribution center Employees, store Employees, support center Employees, and Employees working in Puerto Rico.

WEIL:\96100653\22\73219.0006

payroll.[8]   Pursuant to the relief requested by this Motion, the Debtors seek authority, in the exercise of their discretion, to continue the Severance Program post petition for non-insiders only and to make payments thereunder in the ordinary course.   The Debtors are not seeking authority to make payments on account of prepetition severance obligations.   For the avoidance of doubt, the Debtors are not requesting authority to and will not make any payments that fall outside the limitations of section 503(c), to the extent applicable.

## VIII.   Former Employee Benefits

### A.      Non-Qualified Plans

45.     The Debtors make contributions to three discontinued supplemental income plans for the benefit of select former Employees (the "**Supplemental Income Plans**"): the Sears Supplemental Retirement Income Plan, Sears Supplemental Past Service Plan, and Kmart Supplemental Benefit.   The Supplemental Income Plans provide a lump sum, monthly annuity payment, or combination of both, to plan participants upon eligible termination or death circumstances and are funded through the Debtors' payroll. The plans are maintained for the purpose of providing deferred compensation.   As of the Commencement Date, there were approximately 165 retired Employees participating in the Supplemental Income Plans.   The Debtors estimate that payments on account of the Supplemental Income Plans are approximately $70,000 per month and the Debtors believe that, as of the Commencement Date, they owe approximately $70,000 in aggregate on account of the Supplemental Income Plans.

---

[8]   Separate and apart from the Severance Program discussed herein, the Debtors are party to agreements with individual Employees that provide for severance in certain circumstances. The Debtors are reviewing such agreements and to the extent the Debtors determine to seek further relief from the Court, the Debtors reserve their rights to seek relief with respect to such agreements, if necessary.

21

B.     **Qualified Pension Plans**

46.     The Debtors maintain two company-sponsored single employer pension plans: Sears Holdings Pension Plan 1 and Sears Holdings Pension Plan 2 (the "**Pension Plans**," together with the Supplemental Income Plan, the "**Former Employee Benefit Plans**"). While the Pension Plans are frozen, pension obligations continue to exist for past service performed by certain Employees and former Employees. The Pension Plans cover approximately 94,000 participants. Both Pension Plans are noncontributory defined benefit pension plans covering Plan Participants of certain Debtors. In 2016,

47.     The Pension Plans are insured by the Pension Benefit Guarantee Corporation ("**PBGC**"), a wholly owned United States government corporation established under 29 U.S.C. § 1302 to administer the pension plan termination insurance program created under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301–1461 (2012 & Supp. II 2014).

48.     In March 2016, the Company entered into a five-year pension plan protection and forbearance agreement (the "**PPPFA**") with the Pension Benefit Guaranty Corporation ("**PBGC**"). Pursuant to the PPPFA, the Company agreed to "ring fence" the real estate assets and intellectual property (collectively, the "**Ring-Fenced Assets**") held by certain of the Company's subsidiaries (collectively, the "**Ring-Fenced Subsidiaries**").[9] Pursuant to the deposit of certain funds into an escrow account maintained by the PBGC for the benefit of the Pension Plans (the "**PBGC Escrow**") (of which approximately $280.6 million remains on

---

[9]     At the time, the Ring-Fenced Subsidiaries consisted of (i) SRC Depositor Corporation; (ii) SRC O.P. Corporation; (iii) SRC Real Estate (TX), LP; (iv) SRC Real Estate Holdings (TX), LLC; (v) SRC Facilities Statutory Trust No. 2003-A; and (vii) KCD IP, LLC.

WEIL:\96100653\22\73219.0006

deposit therein), the real estate assets and the intellectual property relating to the *Craftsman®* brand were released from the "ring fence" and the springing liens.

49.    The Debtors have been required to make minimum funding contributions based on actuarial calculation to the Pension Plans on a quarterly basis (the "**Quarterly Contributions**"). In November 2017, the Debtors entered into an amendment to the PPPFA that funded a combination of the Pension Plans and the PBGC Escrow through approximately the end of 2019 with cash contributions. The last Quarterly Contribution was made in December 2017. By this Motion, the Debtors are not seeking authority to pay Quarterly Contributions on account of the Pension Plans but reserve all rights to seek such relief by separate motion.

50.    In addition, in connection with the Qualified Pension Plans, the Debtors are obligated to make certain statutory insurance premium payments to the PBGC (the "**PBGC Premiums**"). The Debtors' PBGC Premiums are payable annually and the Debtors estimate that the PBGC Premium due in September 2019 will be approximately $35 million. The Debtors have historically paid all PBGC Premiums as and when due and, accordingly, do not believe that they owe any prepetition amounts on account of PBGC Premiums.

## C.    Other

51.    The Debtors sponsor a medical plan for certain retired employees (the "**Retiree Medical Programs**"). Under the Retiree Medical Program, the Debtors make an annual payment to assist in maintaining a medical plan that retired Employees can decide to participate in. The Debtors make payments to Securian and other insurance companies in connection with life insurance plans provided to select retired Employees and their spouses and dependents (the "**Retiree Life Insurance Plan**"). The Company purchases and pays premiums on life insurance policies for the benefit of Eligible retired Employee participants under the Retiree Life Insurance

WEIL:\96100653\22\73219.0006

Plan.  The Debtors expect to owe retired Employees approximately $1.5 million on account of the Other Plans.

## IX.     Other Employee Programs

52.     In addition to the foregoing, the Debtors have certain other practices, programs, and policies that provide benefits to their Employees (the "**Other Employee Programs**"), including, but not limited to, a cell phone reimbursement program ("bring your own device," or BYOD) that allows Employees to be reimbursed for using their own phone for work purposes, a military leave policy, and an Employee assistance program provided by Aetna. The Debtors believe that, as of the Commencement Date, they owe approximately $110,000 on account of the Other Employee Programs.  The Debtors seek authority to continue to honor their obligations under the Other Employee Programs after the Commencement Date, as such practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtor's operations.

<u>**The Relief Requested Should Be Granted**</u>

## I.     Payment of Workforce Obligations is Warranted Under Section 363(b)(1) of the Bankruptcy Code and Doctrine of Necessity.

53.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A.*

24

*Phillips, Inc.*), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy

Code to allow contractor to pay prepetition claims of suppliers).

54.    In addition, the Court has the authority, pursuant to its equitable powers

under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because

such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a)

of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of

the debtor-in-possession" to act as a fiduciary to "'protect and preserve the estate, including an

operating business' going-concern value,'" on behalf of the debtor's creditors and other parties in

interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re

CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of

Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr.

S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through

its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an

order authorizing the payment of certain pre-petition wages, salaries, medical benefits, and

business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25

(D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for

the payment of prepetition claims).

55.    In a long line of well-established cases, courts consistently have permitted

payment of prepetition obligations where necessary to preserve or enhance the value of a

debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport, C&S W.R.*

WEIL:\96100653\22\73219.0006

*Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

56.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code.").  The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11: "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

57.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. Authorizing the Debtors to pay prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to

26

continue without interruption.  Without the relief requested herein being granted, the Debtors' Employees and Supplemental Workforce may seek alternative opportunities, perhaps with the Debtors' competitors.  The loss of valuable Employees and Supplemental Workforce would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy.

58.    Moreover, failure to satisfy certain prepetition obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  Morale and loyalty is critical to maintain now, as the Debtors begin to increase hiring of Supplemental Workforce to assist in the increased demand during the Holiday season.

59.    Portions of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  And, existing financial difficulties will only be exacerbated if policies such as the expense reimbursement policy are not continued.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Insurance Plans, the Employees may become obligated to pay certain health care claims or risk not having health care coverage if the Debtors have not paid the respective insurance providers.  The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Employees who allow coverage to lapse for one or more months in a given calendar year face penalties under the Affordable Care Act.  *See* 26 U.S.C. § 5000A.  Additionally, as set forth above, Employee

27

attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture. Certain obligations the Debtors seek to pay are also entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and, therefore, payment at this time will not diminish the assets available for payment of general unsecured claims.

## II.   Payment of Certain of Workforce Obligations Is Required by Law.

60.   The Debtors seek authority to pay Deductions and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefit Programs and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich.* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Deductions and the Payroll Taxes to the proper parties in the ordinary course of business.

28

III.    **The Debtors Do Not Seek to Make Severance Payments Outside Scope of Section 502(b)(7) and Section 503(c) of the Bankruptcy Code, As Applicable.**

61.    In an effort to provide comfort to the Employees given the uncertainty attendant to a company operating in chapter 11, the Debtors request authority to continue the Severance Program with respect to Employees terminated postpetition in the ordinary course of business.  Making such payments will not prejudice any party in interest because the full amount of severance owed to an employee terminated postpetition is generally payable as an administrative expense.  *See Straus-Duparquet, Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 386 F.2d 649, 651 (2d Cir. 1967); *see also In re Spectrum Info. Techs., Inc.*, 193 B.R. 400, 405–06 (Bankr. E.D.N.Y. 1996) (citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 104 (2d Cir. 1986) (confirming that despite criticism, *Straus-Duparquet* remains the law in the Second Circuit with respect to severance pay being administrative priority)); *but see also Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 104 (2d Cir. 1986) (distinguishing severance pay as compensation "'earned' when the employees are dismissed" and therefore entitled to administrative priority from compensation for "past services" not entitled to priority); *Cohen v. Drexel Burnham Lambert Group* (*In re The Drexel Burnham Lambert Group, Inc.*), 138 B.R. 687, 696, 710 (Bankr. S.D.N.Y. 1992) (under the Bankruptcy Code, drawing distinction between the former Act and current Code, and between severance pay allowable as an administrative expense and severance pay owed pursuant to an executory contract); *In re Hooker Invs. Inc.*, 145 B.R. 138, 147 (Bankr. S.D.N.Y. 1993) (questioning applicability of *Straus-Duparquet* to executives' high termination payments).   For the avoidance of doubt, the Debtors are not requesting authority to and will not make any payments that fall outside the limitations of section 503(c), to the extent applicable.

29

62.    The Severance Program does not implicate section 503(c)(3) because the Debtors are not proposing to make any payments outside the ordinary course of the Debtors' business.  *See* 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside the ordinary course of business").  If section 503(c) is not implicated, the Court may grant the requested relief if it finds that the Severance Program satisfies the requirements of section 363(b) of the Bankruptcy Code.  *See In re Mesa Air Grp., Inc.*, Ch. 11 Case No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that compensation plans within the ordinary course of business are governed by section 363 of the Bankruptcy Code, not section 503(c)).  For the reasons stated, discretion to continue this plan—like all of the relief sought in this Motion—is critical and necessary to assuage Employee fears and motivate them to achieve the Debtors' chapter 11 objectives.  Accordingly, the requested relief should be approved.

### Reservation of Rights

63.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**The Debtors Have Satisfied Bankruptcy Rule 6003(b)**

64.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b). The Debtors request authority, on an interim basis, to the honor and satisfy any Workforce Obligations as they become due and payable prior to the entry of a final order. As described above, the Debtors' Employees and Supplemental Workforce are vital to the Debtors' operations. Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first 21 days of these chapter 11 cases will jeopardize their loyalty and trust, which may cause such individuals to leave the Debtors' employ or service at a time when they are needed most. The disruption to the Debtors' businesses and operations would be severe and potentially irreparable. Moreover, the Debtors' Employees and Supplemental Workforce rely on the Debtors' compensation, benefits, and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous if the Debtors cannot immediately pay them in the ordinary course of business. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003(b) is satisfied.

**Compliance with Bankruptcy Rule 6004(a)**
**and Waiver of Bankruptcy Rule 6004(h)**

65.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Riecker Declaration,

31

the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## Notice

66.    Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel for Bank of America, N.A., as administrative agent under the First Lien Credit Facility and the DIP ABL Agent; (iv) counsel for Citibank, N.A., as administrative agent under the Stand-Alone L/C Facility; (v) counsel for JPP, LLC, as administrative agent under the Second Lien Credit Facility, the IP/Ground Lease Term Loan, and the Consolidated Secured Loan Facility; (vi) counsel for Computershare Trust Company N.A., as indenture trustee for the Second Lien PIK Notes, the Holdings Unsecured PIK Notes, and the Holdings Unsecured Notes; (vii) counsel for Wilmington Trust, National Association, as indenture trustee for the Second Lien Notes; (viii) counsel for The Bank of New York Mellon Trust Company, N.A., as successor trustee for the SRAC Unsecured PIK Notes, the SRAC Unsecured Notes, and the SRAC Medium Term Notes; (ix) the Pension Benefit Guaranty Corporation; (x) the Unions; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) the United States Attorney's Office for the Southern District of New York; and (xiv) the Banks.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

67.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WEIL:\96100653\22\73219.0006

WHEREFORE the Debtors respectfully request entry of interim and final orders

granting the relief requested herein and such other and further relief as is just.

Dated: October 15, 2018
       New York, New York

/s/ Ray C. Schrock P.C.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
In re                                                    :
                                                         :        Chapter 11
SEARS HOLDINGS CORPORATION, *et al.*,                    :
                                                         :        Case No. 18-_____ (RDD)
                                                         :
                              Debtors.[1]                :        (Jointly Administered)
------------------------------------------------------------------x

### INTERIM ORDER (I) AUTHORIZING BUT NOT DIRECTING THE DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 363 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order granting the Debtors (i) authority, but not direction, to pay certain prepetition amounts, and maintain and continue to honor and pay, in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

their sole discretion, all amounts with respect to the Workforce Obligations,[2] and (ii) related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the interim relief requested in the Motion having been given as provided in the Motion; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis on October 15, 2018 (the "**Interim Hearing**"); and upon the Riecker Declaration, filed contemporaneously with the Motion, the record of the Interim Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, provides a net benefit to the Debtors and their estates after taking into account the Bankruptcy Code's priority scheme, and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted on an interim basis to the extent set forth herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

WEIL:\96100653\22\73219.0006

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363, and 507(a) of the Bankruptcy Code, to pay and honor all prepetition obligations associated with the Workforce Obligations and to continue programs and maintain funding in the ordinary course of business, as described in the Motion, including on account of: (a) Unpaid Compensation; (b) Deductions and Payroll Taxes; (c) Supplemental Workforce Obligations; (d) Reimbursable Expenses; (e) the Corporate Card Program; (f) the Employee Benefit Programs; (g) the non-insider Severance Program; (h) the Former Employee Benefit Plans; and (i) the Other Employee Programs (each as defined herein); *provided* that, the Debtors are authorized, but not directed, to pay only amounts due and payable as of the Commencement Date and amounts that are or become due and payable between the Commencement Date and the date that a final order on the Motion is entered, unless otherwise ordered by the Court; *provided*, *further*, that, pending entry of a final order, the Debtors shall not pay or honor Unpaid Compensation, Reimbursable Expenses, amounts due under the Severance Program, or amounts due under the PTO Policy in amounts in excess of the priority amounts set forth at sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code.

3.      The Debtors are authorized, but not directed, to continue to honor and pay retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code) in the ordinary course.

4.      Nothing herein restricts the Debtors' ability to modify or discontinue any benefit program to reduce or eliminate program expenses or the benefits provided thereunder, at any time, in their sole discretion without prior approval of this Court, subject to any contractual or non-bankruptcy law limitations.

3

5.      The Debtors and any applicable third parties are authorized to continue to allocate and distribute Deductions and Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

6.      The Debtors are further authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Workforce Obligations.

7.      Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

8.      Nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors;  (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code, including, without limitation, any CBA or Pension Plan.

9.      Nothing in the Motion or this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

4

10.    Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

11.    The requirements of Bankruptcy Rule 6003(b) have been satisfied.

12.    Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

13.    Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

14.    This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; *provided* that, the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

15.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

16.    Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable:  (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

WEIL:\96100653\22\73219.0006

17.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

18.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

19.     The Final Hearing on the Motion shall be held on _____, **2018, at** _____ **(Prevailing Eastern Time)**, and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Jacqueline Marcus, Esq., Garrett A. Fail, Esq., and Sunny Singh, Esq.); (ii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Paul Schwartzberg, Esq. and Richard Morrissey, Esq.); and (iii)  counsel for the DIP ABL Agent, with a copy to the Court's chambers, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on** _____, **2018**..

Dated: _____, 2018
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

6