## Exhibit B

**DIP ABL Term Sheet**

**$1,830,000,000 Senior Secured Superpriority Priming Debtor-In-Possession
Asset-Based Credit Facility
Summary of Terms and Conditions[1]**

**October 15, 2018**

Set forth below is a summary of certain key terms for a proposed senior secured superpriority priming post-petition debtor-in-possession asset-based credit facility. This summary of proposed terms and conditions (the "**Term Sheet**") shall be a binding agreement with respect to the New Money Loans (as defined below) but does not purport to summarize all the terms, conditions, representations and other provisions with respect to the Final DIP Facility, which will be set forth in the DIP Loan Documents (as defined below).

The obligations of the Initial Lenders to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the terms and conditions set forth herein.

| | |
|---|---|
| **Borrowers:** | SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation ("**SRAC**"), and KMART CORPORATION, a Michigan corporation ("**Kmart Corp**", and together with SRAC, the "**Borrowers**"), in each case as debtors and debtors-in-possession in cases (including any cases filed by domestic or international subsidiaries or controlled affiliates of any Borrower that are jointly administered with the cases of the Borrowers, the "**Chapter 11 Cases**") under chapter 11 or any other chapter of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). |
| **Guarantors:** | The obligations of the Borrowers under the DIP Facility (as defined below) (the "**DIP Obligations**") and under any cash management services or bank products entered into with a Lender, any Agent or any of their respective affiliates as of the Initial Closing Date (as defined below) or at the time of entering into such arrangements (the "**Cash Management/Bank Product Obligations**", and collectively with the DIP Obligations, the "**Secured Obligations**"), shall be guaranteed, jointly and severally on a senior secured priming basis, by Sears Holdings Corporation, a Delaware corporation ("**Holdings**") and each of the "Subsidiary Guarantors" under and as defined in the Prepetition ABL Credit Agreement (as defined below), and all other affiliates of Holdings that have commenced Chapter 11 Cases (the "**Debtors**") (other than SRC Sparrow 1 LLC, a Delaware limited liability company, SRC Sparrow 2 LLC, a Delaware limited liability company, SRC O.P. LLC, a Delaware limited liability company, SRC Facilities LLC, a Delaware limited liability company, and SRC Real Estate (TX) LLC, a Delaware limited liability company, collectively, the "**Sparrow Entities**"), in each case as debtors and debtors-in-possession in the Chapter 11 Cases (collectively with Holdings, the "**Guarantors**," and together with the Borrowers, the "**Loan Parties**"). |

---

[1] Capitalized terms used herein but not defined herein are given the meanings assigned to them in the Prepetition ABL Credit Agreement (as defined herein).

-1-

Each of the Guarantors hereby jointly and severally, unconditionally and irrevocably, guarantees to the Control Co-Collateral Agent (as defined below) under the caption Appointment of Agents, Etc., for the ratable benefit of the DIP Credit Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by each Borrower when due of the DIP Obligations.

The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**".

| | |
|---|---|
| **Joint Lead Arrangers and Book Runners:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated ("**MLPFS**"), Wells Fargo Bank, National Association ("**Wells Fargo**") and Citibank, N.A. ("**Citibank**"; collectively with MLPFS and Wells Fargo in such capacities, the "**Joint Lead Arrangers**"), with MLPFS acting as lead left arranger in all marketing materials. |
| **Administrative Agent:** | Bank of America (in such capacity, the "**Agent**"). |
| **Co-Collateral Agents:** | Bank of America and Wells Fargo Bank (each in such capacity, a "**Co-Collateral Agent**," and together with the Agent, the "**Agents**"). |
| **Lenders:** | On the Initial Closing Date, Bank of America, Wells Fargo and Citibank (each in such capacity, an "**Initial Lender**") and, on and as of the Final Closing Date (as defined below), each Prepetition Lender that chooses to roll up its prepetition extensions of credit as set forth herein. No Person that is an Affiliate of Holdings or any of its subsidiaries may be a Lender under the DIP Facility. |
| **Prepetition ABL Credit Agreement; Prepetition ABL Guarantee and Collateral Agreement; Prepetition Second Lien Facilities:** | "**Prepetition ABL Credit Agreement**" shall mean the Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof), by and among Holdings, the Borrowers, the banks, financial institutions and other institutional lenders from time to time party thereto (collectively, the "**Prepetition Lenders**"), the Issuing Lenders (as defined therein) from time to time party thereto (the "**Prepetition Issuing Lenders**"), and Bank of America, as administrative agent (in such capacity, the "**Prepetition Administrative Agent**"), as a co-collateral agent, and as swingline lender, Wells Fargo Bank, National Association, as a co-collateral agent (together with Bank of America in such capacity, the "**Prepetition Co-Collateral Agents**," and together with the Prepetition Lenders, the Prepetition Administrative Agent, and the Prepetition Issuing Lenders, the "**Prepetition Credit Parties**"), and the other parties from time to time party thereto, providing for a $1,500,000,000 asset-based revolving credit facility (the "**Prepetition Revolving Facility**"), a term loan facility in an aggregate original principal amount of $1,000,000,000 (the "**Prepetition Term Loan Facility**"), a term loan facility in an aggregate original principal amount of $750,000,000 (the "**Prepetition 2016 Term Loan Facility**"; and the loans thereunder, the "**Prepetition 2016 Term Loans**"), and a "first-in, last-out" facility in an original principal amount of $125,000,000 (the "**Prepetition 2018 FILO Facility**," and collectively with the Prepetition Revolving Facility, the Prepetition Term Loan Facility and the Prepetition 2016 Term Loan Facility, the "**Prepetition Facilities**"). As of the date hereof, the Prepetition Term Loan Facility has been paid in full, the outstanding principal amount of the Prepetition |

2016 Term Loan Facility is $570,776,250, the outstanding principal amount of the Prepetition 2018 FILO Facility is $125,000,000, and the Total Extensions of Credit (as defined below) under the Prepetition Revolving Facility are $959,602,130.

"**Prepetition L/C Facility**" shall mean that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date), by and among Holdings, the Borrowers, as borrowers, the L/C lenders from time to time party thereto, and Citibank, N.A., as administrative agent and as issuing bank.

"**Prepetition Second Lien Facilities**" shall mean:

(i) that certain Second Lien Credit Agreement dated as of September 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Second Lien Credit Agreement**") by and among Holdings, the Borrowers, as borrowers, and the lenders from time to time party thereto;

(ii) that certain Indenture dated as of October 12, 2010 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Second Lien Cash Notes Indenture**") by and among Holdings, certain guarantors from time to time party thereto, and Wilmington Trust, National Association, as successor trustee and collateral agent thereunder; and

(iii) that certain Indenture dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Second Lien PIK Notes Indenture**") by and among Holdings, certain guarantors from time to time party thereto, and Computershare Trust Company, N.A., as trustee thereunder; the secured parties under the Prepetition Second Lien Facilities, the "**Prepetition Second Lien Secured Parties**."

| | |
|---|---|
| **Prepetition Security Documents:** | "**Prepetition ABL Guarantee and Collateral Agreement**" shall mean the Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof), by and among Holdings, each Borrower, each Subsidiary of Holdings from time to time party thereto, and each Prepetition Co-Collateral Agent. |

The term "**Prepetition Second Lien Security Agreement**" means that certain Amended and Restated Security Agreement dated as of March 20, 2018 by and among Holdings, certain guarantors from time to time party thereto, in favor of Wilmington Trust, National Association, in its capacity as collateral agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

| | |
|---|---|
| **Prepetition Collateral:** | The collateral securing the "Obligations" under and as defined in the Prepetition ABL Credit Agreement, including, but not limited to, "cash collateral" (as defined in Section 363 of the Bankruptcy Code), is referred to herein as the "**Prepetition ABL Collateral**." |

-3-

"**Prepetition Second Lien Collateral**" means, collectively, Collateral (as defined in the Prepetition Second Lien Security Agreement).

**DIP Facility:** Each Lender will make loans to the Borrowers pursuant to an up to $1,830,378,380 secured superpriority priming debtor-in-possession asset-based facility (which shall be denominated in U.S. dollars) (the "**DIP Facility**") consisting of:

(i) subject to the terms and conditions set forth in this Term Sheet and the Interim Order (as defined below):

(a) new money asset-based term loans in an aggregate principal amount of $111,889,241 (the "**Incremental DIP Term Loans**") to be made available to the Borrowers by the Initial Lenders in one draw on the Initial Closing Date; and

(b) a new money asset-based revolving credit facility to be made available to the Borrowers by the Lenders during the period commencing on the date the funds in the Disbursement Account (as defined below) have been reduced to zero (the "**Revolver Availability Date**") and ending on the Termination Date (as defined below) with aggregate revolving commitments of $188,110,759 (the "**Incremental DIP Revolving Facility**"; the revolving loans thereunder, "**Incremental DIP Revolving Loans**," and the commitments thereunder, the "**Incremental DIP Revolving Commitments**"; the Incremental DIP Revolving Loans and the Incremental DIP Term Loans, collectively, the "**New Money Loans**"); and

(ii) subject to the terms and conditions set forth in this Term Sheet, the DIP Loan Documents, the Final Order, and subject to the entry of the Final Order:

(a) the total amount of Revolving Extensions of Credit which the lenders under the Prepetition Revolving Facility (the "**Prepetition Revolving Lenders**") roll up into loans and participations in letters of credit under the DIP Facility (such loans, the "**Rolled-Up Revolving Loans**"; the Rolled-Up Revolving Loans collectively with the Incremental DIP Revolving Loans, the "**DIP Revolving Loans**");

(b) amounts outstanding under the Prepetition 2016 Term Loan Facility (the "**Prepetition 2016 Term Lenders**") elect to roll up into loans under the DIP Facility (such loans, the "**Rolled-Up Term Loans**", the Rolled-Up Term Loans collectively with the Incremental DIP Term Loans, the "**DIP Term Loan**"; the Rolled-Up Term Loans together with the Rolled-Up Revolving Loans, the "**Rolled-Up Loans**"; and the Rolled-Up Loans together with the New Money Loans, the "**DIP Loans**")); in each case on the terms and conditions further described below.  After the Roll Up on the Final Closing Date, all DIP Revolving Loans shall consist of one class of loans with identical terms and the DIP Term Loan shall consist of one class of loans with identical terms; and

(c) in addition to (a) and (b) above, Bank Products (other than Bank Products constituting the Prepetition L/C Facility) and Cash Management Obligations owed to a Lender shall roll up on the Final Closing Date.

The terms governing the borrowing, reborrowing, repayment, interest and other mechanics of the New Money Loans and the Incremental DIP Revolving Commitments shall be as set forth in Articles II and III of the Prepetition ABL Credit Agreement. In addition, the provisions of Section 2.15 of the Prepetition ABL Credit Agreement shall apply to the New Money Loans as if set forth herein, *mutatis mutandis.*

After giving effect to the New Money Loans and the Rolled-Up Loans (and assuming all Prepetition Credit Parties participate), the DIP Facility will be a $1,830,378,380 total facility consisting of DIP Revolving Commitments of $1,147,712,889 and a DIP Term Loan of $682,665,491.

**Syndication of the New Money Loans; Roll Up:**

*Syndication of the New Money Loans.* During the period between the entry of the Interim Order and the date that all of the terms and conditions precedent set forth opposite the heading "Conditions Precedent to the DIP Credit Agreement" below have been satisfied or waived by the Joint Lead Arrangers and the Rolled-Up Loans become effective (such later date, the "**Final Closing Date**"), the Joint Lead Arrangers shall use their commercially reasonable efforts to syndicate:

(i) the Incremental DIP Revolving Commitments to the Prepetition Revolving Lenders by offering each such Prepetition Revolving Lender the ability to participate in the Incremental DIP Revolving Commitments on a pro rata basis based on the Revolving Extensions of Credit of such Prepetition Revolving Lender under the Prepetition Revolving Facility; and

(ii) the Incremental DIP Term Loans to Prepetition 2016 Term Lenders by offering each such Prepetition 2016 Term Lender the ability to participate in the Incremental DIP Term Loans on a pro rata basis based on the outstanding principal amount of the Prepetition 2016 Term Loans held by such Prepetition 2016 Term Lender under the Prepetition 2016 Term Loan Facility.

*Assistance with Syndication.* Until the Final Closing Date, each Loan Party shall actively assist the Joint Lead Arrangers in achieving a syndication of the New Money Loans that is reasonably satisfactory to the Joint Lead Arrangers and the Loan Parties. Such assistance shall include each of Holdings and the Borrowers (a) providing and causing its officers and advisors to provide the Joint Lead Arrangers upon their written request with all information reasonably deemed necessary by the Joint Lead Arrangers to complete syndication of the New Money Loans, (b) assisting in the preparation of customary confidential information memoranda and other materials reasonably requested by the Joint Lead Arrangers to be used in connection with the syndication of the New Money Loans (collectively with any additional summary of terms prepared for distribution to Lenders, the "**Information Materials**") and providing a customary letter authorizing the dissemination by the Joint Lead Arrangers of the Information Materials, (c) using its reasonable best efforts to ensure that the syndication efforts of the Joint Lead Arrangers benefit materially from its existing banking relationships, and (d) otherwise assisting the Joint Lead Arrangers in their syndication efforts, including by making its officers and advisors available from time to time to attend and make presentations regarding the business and prospects of the Loan Parties, as appropriate, at one or more meetings of prospective Lenders. It is understood and agreed that the Joint Lead

-5-

Arrangers will manage and control all aspects of the syndication of the New
Money Loans.

*Roll-Up of Prepetition Lenders (the "Roll Up").* On the date of the Final Order
and subject to the conditions set forth herein and in the DIP Loan Documents:

(i) each Prepetition Revolving Lender that elects to participate in the Incremental
DIP Revolving Commitments (which participation shall be to the full extent of
such Prepetition Revolving Lender's pro rata share of the Incremental DIP
Revolving Commitments) shall have its Revolving Extensions of Credit rolled
up into Rolled-Up Revolving Loans; and

(ii) each Prepetition 2016 Term Lender that elects to participate in the
Incremental DIP Term Loans (which participation shall be to the full extent of
such Prepetition 2016 Term Lender's pro rata share of the Incremental DIP
Term Loans) shall have its Prepetition 2016 Term Loans rolled up into Rolled-
Up Term Loans.

*DIP Revolving Facility*. The commitments of any Lender to make DIP
Revolving Loans and Rolled-Up Revolving Loans (the "**DIP Revolving
Commitments**") will be equal to such Lender's Incremental DIP Revolving
Commitments plus the amount of Rolled-Up Revolving Loans. The DIP
Revolving Commitments may be repaid and reborrowed subject to the terms and
conditions set forth herein, in the DIP Loan Documents (subject to the
Documentation Principles) and in the DIP Financing Orders (the "**DIP
Revolving Facility**"). The DIP Revolving Facility will include "Permitted
Overadvances" on terms consistent with the Prepetition ABL Credit Agreement.

**Letter of Credit
Subfacility:**

The DIP Revolving Facility shall include a subfacility for letters of credit (the
"**Incremental Letters of Credit**") in an aggregate face amount of up to
$50,000,000.  Subject to the approval of the Bankruptcy Court, letters of credit
outstanding under the Prepetition ABL Credit Agreement as of the Petition Date
shall be deemed to be issued under the DIP Facility. The Initial Lenders hereby
irrevocably agree to accept and purchase participations in the Incremental Letters
of Credit pursuant to Section 3.04 of Prepetition ABL Credit Facility as if set
forth herein, *mutatis mutandis*. To the extent any participations in letters of credit
under the Prepetition ABL Credit Facility are not rolled into the DIP Facility, the
Lenders and the Borrowers shall negotiate in good faith appropriate provisions to
eliminate the fronting exposure of the Issuing Lenders with respect to such non-
rolled up participations in letters of credit.

Letters of Credit shall be issued by Bank of America and Wells Fargo (each an
"**Issuing Lender**"). The Letter of Credit Subfacility shall be available in U.S.
dollars.

The Letter of Credit Subfacility shall be on substantially the same terms as the
Letter of Credit subfacility in the Existing ABL Credit Agreement, subject to the
Documentation Principles (as defined below).

Unless the context otherwise requires, references herein to the Lenders shall
include the Issuing Lenders.

-6-

"**L/C Obligations**" shall mean, at any time, an amount equal to the sum of
(a) the aggregate then undrawn and unexpired amount of the then outstanding
Letters of Credit and (b) the aggregate amount of drawings under Letters of
Credit that have not then been reimbursed or discharged pursuant in accordance
with the DIP Loan Documents.

**Swingline Loan Subfacility:**    The DIP Facility shall include a subfacility in an aggregate amount of up to
$25,000,000 available, in the sole and absolute discretion of Bank of America (in
such capacity, the "**Swingline Lender**"), for swingline loans ("**Swingline
Loans**") upon same-day notice. Any such swingline borrowings shall reduce
Capped Excess Availability under the DIP Facility on a dollar-for-dollar basis.

The Swingline Loan Subfacility shall be on substantially the same terms and
conditions as the Swingline Loan subfacility in the Existing ABL Credit
Agreement, subject to the Documentation Principles.

**Termination Date:**    The DIP Facility will mature, and the commitments thereunder shall terminate,
on the date (the "**Termination Date**") that is the earliest of:

(a) 12 months after the Petition Date, (b) 36 days after the Petition Date (or such
later date as the Agents may approve in writing in their sole and absolute
discretion) if the Final Order (as defined below) has not been approved by the
Bankruptcy Court prior to the expiration of such period, (c) 43 days after the
entry of the Interim Order if the Final Closing Date has not occurred, (d) the
substantial consummation (as defined in Section 1101 of the Bankruptcy Code
and which for purposes hereof shall be no later than the "effective date" thereof)
of a plan of reorganization filed in the Chapter 11 Cases that is confirmed
pursuant to an order entered by the Bankruptcy Court, (e) the consummation of a
sale of all or substantially all of the Prepetition ABL Collateral, (f) the
acceleration of the DIP Loans and the termination of the DIP Revolving
Commitments in accordance with the DIP Loan Documents and (g) the
"termination date" (or any similar term) occurs under the Junior DIP.

"**Final Order**" shall mean an order of the Bankruptcy Court authorizing and
approving the DIP Facility on a final basis in form and substance satisfactory to
the Agents in their sole and absolute discretion.

Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and
subject to the applicable provisions of the Interim Order or the Final Order, as
the case may be, upon the Termination Date (whether by acceleration or
otherwise), the Agents, Issuing Lenders, and Lenders shall be entitled to
immediate payment of all obligations under the DIP Facility and to enforce the
remedies provided for under the DIP Loan Documents or under applicable law,
without further notice, motion or application to, hearing before, or order from,
the Bankruptcy Court.

**Purpose:**    Borrowings under the DIP Facility and Letters of Credit shall be used by the
Borrowers for operating, working capital and other general corporate purposes of
the Loan Parties, in each case consistent with, subject to, and within the
limitations contained in, the Budget (as defined below), including to pay fees,

costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Chapter 11 Cases; *provided*, *however*, that no proceeds of the DIP Facility or cash collateral shall be used to, among other things, (x) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under or the liens and security interests granted under the DIP Facility or in connection with the Prepetition ABL Credit Agreement and any Debt thereunder or (y) investigate, initiate or prosecute any claims and defenses or commence causes of action against the Agents, the Joint Lead Arrangers or the Lenders under or relating to the DIP Facility or the Prepetition ABL Credit Agreement; and provided further, that if an official creditors' committee (the "**Committee**") is appointed, then it or its counsel may use up to $100,000 to investigate, for a sixty (60) day period from the date of the appointment of the Committee, the validity, perfection, priority, extent or enforceability of the liens securing the obligations under the Prepetition ABL Credit Agreement.

| | |
|---|---|
| **DIP Loan Documents:** | The definitive documentation evidencing the DIP Facility, including, without limitation, this Term Sheet, the credit agreement (the "**DIP Credit Agreement**") and all definitive guaranty, collateral, security, and other credit documentation (together with the Budget and the DIP Financing Orders (each as defined below), the "**DIP Loan Documents**") shall be in form and substance satisfactory to the Joint Lead Arrangers in their sole and absolute discretion. |
| | The DIP Credit Agreement shall be based upon the Prepetition ABL Credit Agreement with such changes that are necessary or desirable in the sole and absolute discretion of the Joint Lead Arrangers to reflect (i) the terms set forth herein (subject to the Junior DIP Modifications), (ii) a usual and customary (as determined by the Joint Lead Arrangers) retail debtor-in-possession financing arranged by any of the Joint Lead Arrangers, (iii) changes necessary to reflect the terms of the Interim Order and the Final Order, (iv) material reductions in or elimination of baskets, thresholds and carve outs in negative covenants and further limitations on certain activities and rights including, without limitation, the rights of affiliates and (v) such other changes that are required by the Joint Lead Arrangers in their sole and absolute discretion (the "**Documentation Principles**"). |
| **Potential Junior DIP:** | In the event the Bankruptcy Court enters an order approving the Junior DIP on an interim or final basis, then the terms of this Term Sheet and the DIP Loan Documents shall be revised to permit the Junior DIP and to make changes implementing the following: (i) that the proceeds of the Junior DIP Term Loans shall be deposited directly into the Disbursement Account and after such funding, there shall be no drawing of DIP Revolving Loans until the funds in the Disbursement Account are depleted, (ii) the Junior DIP Facility will have *pari passu* liens on three specified properties and one commercial tort claim on Annex C hereto, and junior liens on all other DIP Collateral (as defined below); (iii) the funding of the Winddown Account will be adjusted to reflect the impact of the *pari passu* liens securing the Junior DIP; (iv) the Store Footprint Plan may be adjusted and (v) such other changes as the Joint Lead Arrangers and the Loan Parties shall mutually agree including, without limitation, allocation of funding of the Carve-Out (as defined in the Interim Order) ((i) – (v), the "**Junior DIP Modifications**"). Each Junior DIP Modification shall be satisfactory to the Joint |

-8-

Lead Arrangers in their sole and absolute discretion.

"**Store Footprint Plan**" means a schedule of store footprint changes prepared by the Borrowers including, without limitation, dates of commencement and completion of sales and store closings.

"**Junior DIP**" means a junior term loan debtor-in-possession facility in an aggregate principal amount of up to $300,000,000 (the "**Junior DIP Term Loans**") provided by ESL Investments, Inc. or its affiliates on terms and conditions (including without limitation, amount and timing of initial funding) acceptable to the Joint Lead Arrangers in their sole and absolute discretion.

| | |
|---|---|
| **DIP Borrowing Base; Availability:** | *Incremental DIP Term Loans.* The full amount of the Incremental DIP Term Loans shall be available to the Borrowers in one draw on the Initial Closing Date on the terms and conditions set forth herein, in the Financing Orders and in the DIP Loan Documents.  Proceeds of the Incremental DIP Term Loans shall be deposited into a segregated account (the "**Disbursement Account**") of the Borrower.  Funds in such loan proceeds account shall be fully utilized prior to any Borrowings under the DIP Revolving Facility. |

*DIP Revolving Facility.* Each Revolving Lender severally agrees, on the terms and conditions set forth herein and in the other DIP Loan Documents, to make revolving advances ("**Advances**") to the Borrowers from time to time on any Business Day commencing on the Revolver Availability Date until the Termination Date, in an aggregate amount at any one time outstanding not to exceed, when added to such Revolving Lender's Revolving Extensions of Credit, the Line Cap.

The Total Extensions of Credit (as defined below) at any time shall not exceed the Line Cap (as defined below) at such time.

"**Availability Reserves**" means "Availability Reserves" as defined in the Prepetition ABL Credit Agreement plus such additional reserves as either Agent shall deem necessary or appropriate for debtor-in-possession facilities of this type in the Agent's Permitted Discretion.

"**Extensions of Credit**" means as to any Lender at any time, an amount equal to the sum of (a) the aggregate Revolving Extensions of Credit of such Lender and (b) the outstanding principal amount of the DIP Term Loan held by such Lender.

"**Revolving Extensions of Credit**" means as to any Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Advances held by such Revolving Lender then outstanding, (b) such Revolving Lender's percentage of the aggregate principal amount of Swingline Advances then outstanding and (c) such Revolving Lender's percentage of the L/C Obligations then outstanding.

"**Total Extensions of Credit**" means at any time, the aggregate amount of the Extensions of Credit of the Lenders outstanding at such time.

"**Line Cap**" shall mean, at any time, the lesser of the aggregate DIP Revolving

Commitments at such time <u>and</u> the DIP Borrowing Base (as defined below) at such time.

"**DIP Borrowing Base**" shall mean:

(x) prior to the Final Closing Date, the result of (a) $150,000,000, <u>plus</u> (b) 7.5% of the Net Orderly Liquidation Value of Net Eligible Inventory at such time, <u>minus</u> (c) 100% of the then Availability Reserves, <u>minus</u> (d) the Borrowing Base Carve-Out Reserve (as defined below); <u>*and*</u>

(y) from and after the Final Closing Date, the result of (a) 87.5% of the aggregate outstanding Eligible Credit Card Accounts Receivable at such time, <u>plus</u> (b) 87.5% of the Eligible Pharmacy Receivables at such time <u>plus</u> (c) (i) 87.5% of the Net Orderly Liquidation Value of Net Eligible Inventory (other than Eligible Inventory at a Store being closed or identified to be closed) at such time and (ii) 87.5% of the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at a Store being closed or identified to be closed during the closing period, <u>minus</u> (d) 100% of the then Availability Reserves, <u>minus</u> (e) the Borrowing Base Carve-Out Reserve, <u>minus</u> (f) exposure under the Prepetition ABL Credit Agreement, <u>minus</u> (g) the FILO Reserve under the Prepetition ABL Credit Agreement; it being understood that the Agent may, in its Permitted Discretion, adjust Eligible Inventory, Availability Reserves and Inventory Reserves used in computing the DIP Borrowing Base.

"**Borrowing Base Carve-Out Reserve**" shall mean the Carve-Out Reserve Amount (as defined in the Interim Order) less the current balance of the Carve-Out Account (as defined in the Interim Order).

"**Capped Excess Availability**" shall mean, at any time, an amount equal to (a) the Line Cap at such time, <u>minus</u> (b) Total Extensions of Credit at such time.

"**Store Closing Net Orderly Liquidation Value**" means the Net Orderly Liquidation Value of Net Eligible Inventory associated with stores that are closing or that are identified to be closing as determined by the Agents in consultation with Berkeley Research Group, LLC ("**BRG**") and the appraiser or liquidator as appropriate.

**Eligible Inventory at Closed Stores:**

For purposes of calculating the DIP Borrowing Base from and after the Final Closing Date, clause (f) *(inventory at Closed Stores)* of the definition of Eligible Inventory shall be disregarded.

**Borrowing Base Certificates; Pro Forma Borrowing Base Certificates:**

The DIP Borrowing Base shall be computed and reported weekly (as of the last business day of each week), and a borrowing base certificate (a "**Borrowing Base Certificate**") presenting the Borrowers' computation of the DIP Borrowing Base (including appropriate supporting data therefor) will be delivered to the Agent promptly, but in no event later than the Tuesday following the end of each week.

In connection with any material asset sale, a pro forma Borrowing Base Certificate giving effect to such sale shall be delivered at least 3 Business days prior to the closing of such sale.

-10-

**DIP Budget:**    The Borrowers shall deliver to the Agents and the Lenders 13-week cash flow forecasts together with accompanying schedules supporting line items included in such 13-week cash flow (such as rollforward of inventory sales and receipts, rollforward of merchandise and other payables and other documentation which may be requested by the Agents) on a rolling 13-week basis (each, a "**Budget**"). The initial Budget shall be approved by the Joint Lead Arrangers in their sole and absolute discretion (as the same shall be either reaffirmed or revised pursuant to the "Budget" section of the Case Milestones set forth on Annex E hereto, the  "**Approved Initial Budget**"). The Loan Parties shall be required to comply with such Approved Initial Budget, subject to the Permitted Variance (as defined below).

The Borrowers shall deliver to the Agents and the Lenders each of the following: (a) on each Wednesday beginning October 31, 2018, a 13-week cash flow forecast delivered every week for the immediately following consecutive 13 weeks (each, a "**Rolling Budget**"), (b) on each Wednesday beginning October 31, 2018, reports detailing operating and financial performance (the "**Weekly Flash Reporting Package**") which shall include cash flow performance compared to the Budget for the previous week together with accompanying schedules supporting line items included in the weekly cash flow results (such as rollforward of inventory sales and receipts, rollforward of merchandise and other payables of each Loan Party as of the end of the prior week, in each case, in reasonable detail) and (c) other information as may be reasonably requested by the Agents. The Agents and the Lenders shall also be entitled to receive on a timely basis other customary information and documents, including reasonable approval rights with respect thereto, to be set forth in the DIP Loan Documents.

The Borrowers shall also provide a budget variance report/reconciliation (the "**Budget Variance Report**") by Wednesday of each week for any prior four week period included in the Approved Initial Budget (each, a "**Testing Period**") (i) showing by line item actual cash receipts, disbursements and inventory receipts for each week, in a comparable form to what has been provided to the Agents prior to the Initial Closing Date, noting therein the variance, on a cumulative basis, of the Borrowers' total net cash flow, excluding proceeds from asset sales, except for proceeds from the sale of inventory, and also excluding financing related items (the **"Net Cash Flow"**) for such four week period relative to the Approved Initial Budget, and shall include explanations for any material variance for such four week period.  The Borrowers shall arrange for weekly (unless waived by the Agents in their sole and absolute discretion) conference calls with the Agents and BRG discussing and analyzing cash flow and related forecast for the prior week, the financial condition, liquidity, and results of operations of each of the Loan Parties, status of the Chapter 11 Cases and progress in achieving the Case Milestones.

The Borrowers will supplement the Weekly Flash Reporting Package and the Budget Variance Report from time to time upon the request of the Agents.

The Loan Parties shall be required to comply with Approved Initial Budget, including having made all scheduled payments to the Prepetition Lenders and the DIP Lenders, as applicable, and when required, subject to the following (the

-11-

"**Permitted Variance**"): the Borrowers' Net Cash Flow shall not be less than the Net Cash Flow set forth in the Approved Initial Budget minus the Applicable Variance Percentage of the absolute value of the Net Cash Flow set forth in the Approved Initial Budget; *provided*, *however*, to the extent any amounts owed to professionals are permitted to be paid in accordance with the foregoing covenant but are not actually paid during the subject period, such amounts may be paid during a subsequent period. Such covenant shall be tested on Saturday each second week (commencing on November 10, 2018) (but shall be reported each week) on a cumulative basis from the Petition Date until the fourth (4th) week after the Petition Date and then on a rolling four (4) week basis, pursuant to the Budget Variance Report delivered by the Borrowers to the Agents.

"**Applicable Variance Percentage**" shall mean, from the Initial Closing Date until November 10, 2018, 20%; from November 24, 2018 until the Termination Date, 15%.

The DIP Credit Agreement will contain a mechanism to update the Approved Initial Budget from time to time with the consent of the Agents.

| | |
|---|---|
| **Cash Management; Cash Dominion:** | The Loan Parties shall operate their cash management system in a manner that is the same as or substantially similar to its pre-petition cash management system, in compliance Section 6.01(m) of the Prepetition ABL Credit Agreement, including delivery of notices (subject to the Documentation Principles, *provided* that any changes from such pre-petition cash management system must be acceptable to the Co-Collateral Agents in their reasonable discretion). |

The Loan Parties shall be subject to full cash dominion at all times, consistent with the provisions of Section 6.01(m) of the Existing ABL Credit Agreement and the Documentation Principles.

Each Borrower hereby authorizes the Agent to charge the loan account to pay any amount due hereunder or the other DIP Loan Documents and the Borrowers shall be deemed to have requested a base rate Revolving Loan to make such payment.

**Interest Rates and Fees:**    As set forth on Annex A attached hereto.

**Mandatory Prepayments:**    The Borrowers shall repay the outstanding DIP Loans:

(a) in amounts equal to 100% of the net proceeds of insurance and condemnation recoveries with respect to DIP Collateral;

(b) in amounts equal to 100% of the net proceeds from asset sales of DIP Collateral (other than the sale of Prepetition Unencumbered Assets, inventory in the ordinary course of business and intercompany transfers among Loan Parties), including, for the avoidance of doubt, all net cash proceeds received by the Loan Parties in respect of asset sales by subsidiaries whose equity constitutes DIP Collateral;

(c) in amounts equal to 100% of the net proceeds from asset sales of DIP

-12-

Collateral constituting Prepetition Unencumbered Assets, which shall be applied *first* to the Winddown Account until the Winddown Account is funded in the amount of $200,000,000 and *second* to a new cash collateral account established with Bank of America for the benefit of the Lenders on terms and conditions satisfactory to the Agents in their sole discretion; *provided*, that the Loan Parties waive their right to seek to use the funds in such cash collateral account (with or without the consent of the DIP Agents) as Cash Collateral or otherwise;

(d) in amounts equal to 100% of the net proceeds of any issuance of equity securities or from any capital contribution (other than any such issuance or contribution solely between Loan Parties);

(e) in amounts equal to 100% of the net proceeds of the issuance or incurrence of indebtedness (other than indebtedness permitted under the DIP Loan Documents (including the Junior DIP (as defined below), if any);

(f) on the date of delivery of any Borrowing Base Certificate, if the Total Extensions of Credit exceed the Line Cap, the Borrowers shall prepay Advances in an amount equal to such excess, provided that if the aggregate principal amount of Advances then outstanding is less than the amount of such excess (because L/C Obligations constitute a portion thereof), the Borrowers shall, to the extent of the balance of such excess, replace outstanding Letters of Credit and/or deposit an amount in cash in a cash collateral account established with the Agent for the benefit of the Lenders on terms and conditions reasonably satisfactory to the Agent, *provided further* that if, after the prepayment of any Advances and the cash collateralization of L/C Obligations under this clause (f) the Total Extensions of Credit exceed the Line Cap, the Borrowers shall prepay the DIP Term Loan in an amount equal to such excess (with a *pro rata* reduction in the DIP Revolving Commitments);

(g) on any day the Borrowers are not in compliance with the Term/Revolver Loan to Value Ratio, until the Borrowers are in compliance with such ratio; and

(h) on any day the Borrowers are not in compliance with the Prepetition Loan to Value Ratio, until the Borrowers are in compliance with such ratio.

Mandatory Prepayments made pursuant to clauses (a), (b), (d), (e) above shall be applied as follows: *first*, to Advances until paid in full; provided that if the aggregate principal amount of Advances then outstanding is less than the amount of such new proceeds (because L/C Obligations constitute a portion thereof), the Borrowers shall, to the extent of the balance of such net proceeds, replace outstanding Letters of Credit and/or deposit an amount in cash in a cash collateral account established with the Agent for the benefit of the Lenders on terms and conditions reasonably satisfactory to the Agent and *second,* to the Disbursement Account.

Mandatory Prepayments made pursuant to clauses (g) – (h) above shall be applied as follows: *first*, to Advances until paid in full, *second* to replace outstanding Letters of Credit and/or deposit an amount in cash in a cash collateral account established with the Agent for the benefit of the Lenders on terms and conditions reasonably satisfactory to the Agent, *third* to the DIP Term

-13-

Loan until paid in full (with a *pro rata* reduction in the DIP Revolving Commitments); and *fourth* after payment in full of the DIP Facility, the secured obligations under the Prepetition ABL Credit Agreement in accordance with the post-default payment waterfall in the Prepetition Collateral and Guarantee Agreement.

"**Winddown Account**" shall mean a cash collateral account at Bank of America that, prior to the discharge in full of all obligations under the DIP Facility, may only be used to pay winddown costs of the Loan Parties at the discretion of the Borrowers following entry of the Final Order.

| | |
|---|---|
| **Voluntary Prepayments and DIP Revolving Commitment Reductions:** | Voluntary reductions of the unutilized portion of the DIP Revolving Commitments and voluntary prepayments of DIP Loans (in the case of DIP Term Loans, with a *pro rata* reduction in the DIP Revolving Commitments) will be permitted at any time without premium or penalty upon at least 3 Business Days' prior notice (or 1 business day in the case of a voluntary prepayment of Base Rate loans), subject to (i) reimbursement of the Lenders' redeployment costs in the case of a prepayment of Eurodollar Rate borrowings other than on the last day of the relevant interest period and subject to breakage costs, if applicable, (ii) prepayment of borrowings as necessary so that Total Extensions of Credit do not exceed the Line Cap after giving effect to such DIP Revolving Commitment reduction, and (iii) each partial reduction being in a minimum amount consistent with the Prepetition ABL Credit Agreement. |
| **DIP Financing Orders:** | The Bankruptcy Court shall enter an interim order (such order, the "**Interim Order**", and together with the Final Order, the "**DIP Financing Orders**"), substantially in the form and substance set forth on Annex G hereto in the case of the Interim Order or otherwise satisfactory to the Joint Lead Arrangers in their sole and absolute discretion, which order shall have been entered not later than three (3) Business Days following the Petition Date (or such later date as the Agent may agree in its sole and absolute discretion), (i) authorizing and approving the DIP Facility in the amounts and on terms and conditions set forth herein, (ii) the granting of the superpriority claims and liens and other liens referred to below opposite the heading "Security and Priority" below, (iii) granting adequate protection to the secured parties under the Prepetition ABL Credit Agreement as set forth in this Term Sheet and the Interim Order and acceptable to the Prepetition Administrative Agent in its sole and absolute discretion, and (iv) shall require the Borrowers to comply with Term/Revolver Loan to Value Ratio and the Prepetition Loan to Value Ratio and the reporting and prepayment provisions related thereto (the "**LTV Provisions**"). The Bankruptcy Court shall enter the Final Order in form and substance satisfactory to the Agents in their sole and absolute discretion, on terms substantially similar to the Interim Order or as otherwise set forth herein. The failure to so comply shall constitute a default under the DIP Financing Orders. |
| | The DIP Financing Orders shall not be vacated, reversed, modified, amended or stayed in any respect without the prior written consent of Bank of America, in its capacities as Agent and Prepetition Administrative Agent. |
| **Initial Closing** | The date on which the Incremental DIP Term Loans are funded and all of the terms and conditions precedent set forth opposite the heading "Conditions |

-14-

**Date:**                    Precedent to the Initial Closing" below have been satisfied or waived by the
                             Joint Lead Arrangers (the "**Initial Closing Date**"), which date shall occur on or
                             before the earlier of (a) October 19, 2018 and (b) 3 Business Days after the entry
                             of the Interim Order.

**Conditions**               The effectiveness of this Term Sheet and the obligations of the Initial Lenders to
**Precedent to the**         fund their Incremental DIP Term Loans and to provide their Incremental
**Initial Closing:**         Revolving Commitments, shall be subject to the following conditions precedent:

A.  This Term Sheet and the fee letter of even date herewith between Holdings,
    the Borrowers and the Joint Lead Arrangers (the "**Fee Letter**") shall have
    been executed and delivered by each party thereto.

B.  The Borrowers shall have delivered a borrowing notice to the Agent.

C.  The Petition Date shall have occurred, and each Loan Party shall be a debtor
    and a debtor-in-possession in the Chapter 11 Cases.  In addition, the Joint
    Lead Arrangers shall have received drafts of all of the "first day" pleadings,
    proposed orders and other filings by the Debtors for the Chapter 11 Cases, in
    each case, in form and substance satisfactory to the Joint Lead Arrangers in
    their sole and absolute discretion as practicably in advance of the Petition
    Date as possible for the Joint Lead Arrangers' counsel to review, analyze,
    and provide comment regarding the same, including, but not limited to, (i)
    the Interim Order and motion and related documents filed seeking approval
    thereof, (ii) the motion and order (the "**Cash Management Order**")
    authorizing the Debtors to maintain their cash management systems and (iii)
    the motion and order (the "**Employee Order**") authorizing and directing the
    Debtors to pay certain reimbursable employee expenses, and all such orders
    shall have been entered by the Bankruptcy Court in form and substance
    satisfactory to the Joint Lead Arrangers in their sole and absolute discretion
    and remain in effect.

D.  The Joint Lead Arrangers shall have received a signed copy of the Interim
    Order, which Interim Order shall not have been vacated, reversed, modified,
    amended or stayed in any respect.

E.  No trustee, responsible officer or examiner having powers related to
    operation of the business (beyond those set forth under Sections 1106(a)(3)
    and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other
    than a fee examiner) shall have been appointed or elected with respect to the
    Loan Parties, any of their subsidiaries, or any of their respective properties,
    or any Loan Party or its subsidiaries shall have applied for, consented to, or
    acquiesced in, any such appointment, with respect to the Loan Parties, any of
    their subsidiaries or their respective properties.

F.  All reasonable and documented out-of-pocket costs, fees, and expenses
    (including, without limitation, reasonable and documented legal fees and
    expenses) set forth in the DIP Loan Documents or otherwise required to be
    paid to any Agent, any Joint Lead Arranger or any Lender on or before the
    Initial Closing Date shall have been paid.

-15-

G.  The Joint Lead Arrangers shall have approved the Approved Initial Budget.

H.  The Joint Lead Arrangers shall have received and be satisfied, in their sole and absolute discretion, with (i) a cash flow forecast for the 13-week period ending after the Initial Closing Date dated as of a date not more than 1 Business Days prior to the Initial Closing Date, (ii) a Borrowing Base Certificate dated as of a date not more than 1 Business Days prior to the Initial Closing Date and (iii) a Store Footprint Plan dated as of a date not more than 1 Business Days prior to the Initial Closing Date.

I.  The Joint Lead Arrangers shall have received customary closing deliverables consistent with the Prepetition ABL Credit Agreement, including but not limited to resolutions, good standing certificates in each Loan Party's jurisdiction of formation (to the extent such concept is applicable), incumbency certificates, organizational documents and lien searches, all in form and substance reasonably satisfactory to the Agents and the Joint Lead Arrangers.

J.  Since the Petition Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by any of the Loan Parties or their subsidiaries and the commencement of the Chapter 11 Cases) that, individually or in the aggregate, has had or could reasonably be expected to have, a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of Holdings and its subsidiaries taken as a whole, or (b) the ability of the Loan Parties taken as a whole to perform their obligations under the DIP Loan Documents or (c) the validity or enforceability of the DIP Loan Documents or the rights and remedies of the Agent, the Co-Collateral Agents or the Lenders under any DIP Loan Document (including, but not limited to, the enforceability or priority of any Liens granted to any Co-Collateral Agent under the DIP Loan Documents) (any of the foregoing being a "**Material Adverse Effect**").

K.  There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect.

L.  Upon entry of the Interim Order, the entry into this Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

M.  The Co-Collateral Agents, for the benefit of the Agents, the Issuing Lenders, the Lenders and the providers of cash management services and bank products (collectively, the "**DIP Credit Parties**") upon entry of the Interim Order shall have the valid and perfected liens on the security interests in the DIP Collateral of the Loan Parties contemplated by the terms set forth opposite the heading "Security and Priority" below and the Loan Parties shall have authorized the Agents to file uniform commercial code financing

-16-

statements.

N.  The Agent shall have received any requested environmental review reports
to the extent previously prepared and readily available to the Loan Parties.

O.  The Borrowers shall have paid the fees payable pursuant to the Fee Letter.

P.  The Joint Lead Arrangers shall be satisfied in their sole and absolute
discretion with all cash management and cash dominion arrangements
effective with respect to the DIP Facility, and all automated clearing house
(ACH) obligations shall have been settled and reduced to zero prior to the
Petition Date.

**Conditions
Precedent to Final
Closing Date:**
The effectiveness of the Credit Agreement shall be subject to the satisfaction (or
waiver by the Agent) of the conditions set forth above across from the caption
"Conditions Precedent to Initial Funding" above and such other conditions as are
customary for facilities of this type and acceptable to the Agent in its sole and
absolute discretion, including, without limitation, the following conditions:

A.  The Joint Lead Arrangers shall have received customary closing
deliverables, including but not limited to resolutions, good standing
certificates in each Loan Party's jurisdiction of formation (to the extent such
concept is applicable), incumbency certificates, organizational documents,
title insurance policies (to the extent in the possession of and readily
available to the Loan Parties) and lien searches, all in form and substance
reasonably satisfactory to the Agents and the Joint Lead Arrangers.

B. The Joint Lead Arrangers shall have received flood insurance certificates and
related endorsements to the extent requested by the Agents.

C. The Joint Lead Arrangers shall have a winddown budget, monthly
projections, consisting of income statement, balance sheet and cash flow
statements, of the Loan Parties through the end of Holdings' fiscal year, shall
have been delivered to the Agents not later than 15 days after the Petition
Date.

D. The Joint Lead Arrangers shall have received customary opinions of counsel.

E. The Agents shall have received endorsements naming the Co-Collateral
Agents, on behalf of the DIP Credit Parties, as an additional insured and
lender loss payee, as applicable, under all insurance policies required to be
maintained with respect to the DIP Collateral pursuant to the terms of the
DIP Loan Documents.

F. Each Agent, each Issuing Lender and each Lender shall have received "know
your customer" and similar information (including information required by
regulatory authorities under the 31 C.F.R. § 1010.230 (the **Beneficial
Ownership Regulation**")).

G. The retention by the Loan Parties prior to the Final Closing Date of one or
more liquidation consultants and an independent, nationally recognized,
professional retail inventory liquidation firm that provides full liquidation
services on a fee basis, which liquidation consultants and liquidation firm shall
be acceptable to the Agents in their sole and absolute discretion pursuant to
contracts acceptable to the Agents in their sole and absolute discretion.

**Conditions Precedent to Each Loan and Letter of Credit:**

Each extension of credit or issuance of a Letter of Credit shall be subject to the
satisfaction (or waiver by the Agent) of conditions customary for facilities of this
type and acceptable to the Agent in its sole and absolute discretion, including
without limitation the following conditions: (i) there shall exist no default or
Event of Default (as defined below) hereunder or under the DIP Loan
Documents nor would a Default or Event of Default result therefrom, (ii) the
representations and warranties of the Loan Parties herein or in any DIP Loan
Document and in any other certificate or document delivered in connection
herewith or therewith shall be true and correct in all material respects (or in the
case of representations and warranties with a "materiality" qualifier, true and
correct in all respects) immediately prior to, and after giving effect to, such
extension of credit or issuance, (iii) such extension of credit or issuance shall not
violate any requirement of law and shall not be enjoined, temporarily,
preliminarily or permanently, (iv) such extension of credit or issuance shall not
result in Total Extensions of Credit exceeding the Line Cap or a violation of the
LTV Provisions, (v) such extension of credit or issuance shall not result in the
aggregate outstandings under any DIP Facility exceeding the amount authorized
for such DIP Facility by the Interim Order or the Final Order, as applicable, (vi)
the Interim Order or Final Order, as the case may be, shall be in full force and
effect and shall not have been vacated, reversed or stayed in any respect or,
except as expressly permitted by the DIP Loan Documents, modified or amended
in any adverse manner to any DIP Credit Party or Prepetition Credit Party and
(vii) in the case of the DIP Revolving Loans, the Disbursement Account shall
have been reduced to zero.

**Representations and Warranties:**

The representations and warranties set forth on Annex B hereto shall be true and
correct on the Initial Closing Date. The representations and warranties to be set
forth in the DIP Credit Agreement shall be substantially consistent therewith.

**Affirmative Covenants:**

Until the Final Closing Date, the Loan Parties shall comply with the affirmative
covenants as set forth in the Prepetition ABL Credit Agreement, this Term Sheet
and the DIP Financing Orders.

The DIP Credit Agreement will contain such affirmative covenants as are
satisfactory to the Joint Lead Arrangers in their sole and absolute discretion,
including, without limitation:

A. Notice of defaults, material litigation events, material adverse effect, ERISA
events and other material events.

B. Compliance with laws, Etc.

C. Payment of taxes and other claims.

-18-

D.  Maintenance of certain insurance, insurance certificates and endorsements.

E.  Preservation and maintenance of existence, business and properties.

F.  Inspection rights; access rights of and cooperation with BRG.

G.  Keeping of books.

H.  Maintenance of Properties, Etc.

I.  Transactions with Affiliates.

J.  Further assurances.

K.  Collateral monitoring and review.

L.  Landlord waivers, access agreements and customs broker agreements.

M.  Cash management (subject to full cash dominion at all times).

N.  Liens on non-collateral assets.

O.  Physical inventories.

P.  Letters of credit.

Q.  Litigation and other notices.

R.  Provision of additional collateral, guarantees and mortgages.

S.  Continued retention of a Chief Restructuring Officer, restructuring advisor and a financial advisors reasonably satisfactory to the Agents in their reasonable discretion; it being understood and agreed that Moshin Y. Meghji and Miii Partners are acceptable to the Agents.

T.  Delivery to the Agent of copies of all formal proposals, letters of interest, letters of intent, bids, agreements, and any final proposed definitive documentation for the sale of any or all of the Loan Parties' assets (other than sales of inventory in the ordinary course of business) or for any investment pursuant to which additional capital is to be received by the Loan Parties.

U.  Upon request by the Agents, delivery of a status report and updated information relating to any sale permitted under the DIP Loan Documents promptly upon such request and in form and substance acceptable to the Agents in their reasonable discretion.

V.  Irrevocable waiver of any right, pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any lien of equal or greater priority than the DIP Liens (as defined below), or to approve a claim of equal or greater priority than the DIP Superpriority Claims other than as expressly set

-19-

forth in a DIP Financing Order.

W. The Disbursement Account shall be funded on the Initial Closing Date with the proceeds of the Incremental DIP Term Loan.

X. Compliance with the Go Forward Plan attached as Annex D hereto.

**Negative Covenants:**

Until the Final Closing Date, the Loan Parties will not create any lien, incur any debt, merge or consolidate with any person, make any investments (other than intercompany investments between Loan Parties), make any restricted payments, grant any negative pledge, or allow any restrictions on subsidiary distributions in each case without the written consent of the Joint Lead Arrangers.

The DIP Credit Agreement will contain such negative covenants as are satisfactory to the Joint Lead Arrangers in their sole and absolute discretion, including, without limitation:

A. Limitations on liens on any asset of any Loan Party.

B. Limitations on fundamental changes.

C. Limitations on acquisitions.

D. Limitations on restricted payments.

E. Limitations on negative pledges.

F. Limitations on clauses restricting subsidiary distributions.

G. Limitations on accounting changes.

H. Limitations on dispositions (including sale and leaseback transactions).

I. Limitations on payment, modification and subordination of indebtedness, except, in the case of prepetition debt, pursuant to (x) the DIP Financing Orders, the Cash Management Order, Employee Order or any other substantive order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agents in their sole and absolute discretion, or (y) any administrative "first day order" or other administrative order entered by the Bankruptcy Court, all of which shall be in form and substance reasonably satisfactory to the Agents.

J. Limitations on investments.

K. Limitations on store closings.

L. Limitations on debt.

M. Limitations on amendment to material documents.

N. Limitations on transactions with affiliates.

1120389.09-CHISR02A

O. [Reserved.]

P. Limitations on payment of other superpriority claims.

Q. Limitations relating to return of inventory to any creditor under Section 546(c) of the Bankruptcy Code or permitted setoff or recoupment against prepetition indebtedness.

R. Prohibitions on incurrence of any superpriority administrative claim which is pari passu with or senior to any claims of the Agent or the Lenders except as permitted by the DIP Financing Orders.

S. Prohibitions on seeking, consenting to, or permitting to exist any Bankruptcy Court order granting authority to take any action that is inconsistent with the DIP Loan Documents, the Interim Order, or the Final Order.

T. Compliance with the LTV Provisions.

| | |
|---|---|
| **Maximum Loan to Value (Prepetition Term/Revolver):** | The Borrowers shall not permit the sum of (a) the outstanding principal amount of Advances under the Prepetition ABL Credit Agreement, <u>plus</u> (b) the outstanding principal amount of Swingline Advances under the Prepetition ABL Credit Agreement, <u>plus</u> (c) the amount of L/C Obligations under the Prepetition ABL Credit Agreement <u>plus</u> (d) the outstanding principal amount of outstanding 2016 Term Loans under the Prepetition ABL Credit Agreement (the sum of clauses (a) through (d), the "**Prepetition Revolver/Term Exposure**"), <u>plus</u> Total Extensions of Credit at any time to exceed 87.5% of the sum of (1) aggregate outstanding Eligible Credit Card Receivables at such time, <u>plus</u> (2) aggregate Eligible Pharmacy Receivables at such time, <u>plus</u> (3) aggregate Net Orderly Liquidation Value of Net Eligible Inventory at such time, <u>minus</u> (4) Availability Reserves at such time, <u>minus</u> (5) the Borrowing Base Carve-Out Reserve minus (6) the prepetition FILO Reserve (the "**Maximum Loan to Value (Term/Revolver)**" and such calculation, the "**Term/Revolver Loan to Value Ratio**"). |
| **Maximum Loan to Value (Prepetition):** | The Borrowers shall not permit the sum of Prepetition Revolver/Term Exposure, <u>plus</u> the outstanding 2018 FILO Extensions of Credit under the Prepetition ABL Credit Agreement, <u>plus</u> Total Extensions of Credit, at any time to exceed 97.5% of the sum of (1) aggregate outstanding Eligible Credit Card Receivables at such time, <u>plus</u> (2) aggregate Eligible Pharmacy Receivables at such time, <u>plus</u> (3) aggregate Net Orderly Liquidation Value of Net Eligible Inventory at such time <u>minus</u> (4) Availability Reserves at such time, <u>minus</u> (5) the Borrowing Base Carve-Out Reserve minus (6) the prepetition FILO Reserve (the "**Maximum Loan to Value (Prepetition)**" and such calculation, the "**Prepetition Loan to Value Ratio**"). |
| **Financial Covenant:** | Compliance with the Approved Budget, subject to Permitted Variance as set forth in herein. |
| **Financial Reporting** | Consistent with the Documentation Principles, including, without limitation:<br><br>(i) monthly unaudited consolidated financial statements of Holdings and its |

-21-

**Requirements:** subsidiaries within 30 days (or, in the case of a fiscal month that ends on the same day as the end of a fiscal quarter, 45 days) after the end of each fiscal month, certified by Holdings' chief financial officer;

(ii) quarterly unaudited consolidated financial statements of Holdings and its subsidiaries within 45 days of quarter-end for the first 3 fiscal quarters of the fiscal year, certified by Holdings' chief financial officer, accompanied by a customary management's discussion and analysis;

(iii) annual audited consolidated financial statements of Holdings and its subsidiaries within 90 days of year-end, certified with respect to such consolidated statements by an independent certified public accountant reasonably acceptable to the Agent in its reasonable discretion, accompanied by a customary management's discussion and analysis;

(iv) copies of all reports on Form 10-K, 10-Q or 8-K filed with the Securities and Exchange Commission;

(v) the weekly Rolling Budget and Weekly Flash Reporting Package;

(vi) Budget Variance Report;

(vii) provide the Agent daily certificates containing the calculations of the Term/Revolver Loan to Value Ratio and the Prepetition Loan to Value Ratio for such day;

(viii) such other information as any Joint Lead Arranger may request from time to time; and

(ix) monthly projections consistent with the 13 week cash flow forecast as reflected in the approved Initial Budget by October 19, 2018.

The Borrowers shall also provide the Agent with Borrowing Base Certificates as set forth opposite the heading "Borrowing Base Certificates; Pro Forma Borrowing Base Certificates".

**Other Reporting Requirements; Appraisals:** Consistent with the Documentation Principles, and including, without limitation, a requirement to provide monthly updates to appraisals and a requirement to comply with the provisions set forth opposite the heading "DIP Budget" above. The Borrowers authorize the Agents to discuss all inventory valuations and request updated appraisals with an appraiser as frequently as they deem necessary or appropriate.

The Co-Collateral Agents shall have the right, at the sole expense of the Loan Parties, to engage real estate appraisers.

**Events of Default:** Without limitation of the Events of Default to be set forth in the DIP Loan Documents, each of the following shall be an Event of Default hereunder and under the DIP Loan Documents (each, an "**Event of Default**"):

-22-

A. Failure to pay (i) principal, (ii) interest or fees or (iii) within 3 days after the same becomes due and payable, any other amount.

B. Representations and warranties (including, without limitation, the representations and warranties made in this Term Sheet) incorrect in any material respect when made or deemed made.

C. Failure to comply with covenants (including, without limitation, the Go Forward Plan, Case Milestones, the LTV Provisions, and strict adherence to and compliance with the Budget, subject to Permitted Variance).

D. Cross-default to payment defaults on other post-petition or unstayed indebtedness in excess of $25,000,000 of the Loan Parties, or any other default or event of default with respect to any such indebtedness if the effect is to accelerate or permit acceleration, and cross-default and cross-acceleration to any such indebtedness.

E. Any unstayed or post-petition judgment in excess of $25,000,000.

F. The occurrence of certain material ERISA events; *provided* that for the purposes of this Term Sheet, the provisions of Section 7.01(h) of the Prepetition ABL Credit Agreement shall be incorporated herein by reference.

G. Actual or asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any DIP Loan Document or any "Loan Document" under and as defined in the Prepetition ABL Credit Agreement (including the failure of any lien to remain perfected).

H. (i) The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by a Loan Party or an affiliate thereof of a motion or other pleading seeking entry of such an order;

(ii) A trustee, responsible officer or an examiner having powers related to operation of the business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Chapter 11 Cases, a Debtor applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Agents in their sole and absolute discretion;

(iii) The entry of an order staying, reversing or vacating the Interim Order, the Final Order, the Cash Management Order or the Employee Order or modifying or amending the Interim Order, Final Order, Cash Management Order or the Employee Order other than in form and substance satisfactory to the Agents in their sole and absolute discretion, or the filing by a Debtor of an application, motion or other pleading seeking entry of such an order;

(iv) The entry of an order in any of the Chapter 11 Cases denying or

-23-

terminating use of cash collateral by the Loan Parties;

(v) The entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any assets of the Loan Parties in excess of $25,000,000;

(vi) The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral or Prepetition ABL Collateral under Section 506(c) of the Bankruptcy Code against the DIP Credit Parties or Prepetition Credit Parties or the commencement of other actions by any Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Credit Parties under the DIP Facility or Prepetition Credit Parties under the Prepetition ABL Credit Agreement in any of the Chapter 11 Cases or in a manner inconsistent with the DIP Loan Documents;

(vii) Without the prior written consent of the Agent and other than in respect of the DIP Facility and the Carve-Out, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (v) granting superpriority administrative expense status to any claim pari passu with or senior to the claims of the DIP Credit Parties under the DIP Facility, (w) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (x) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (y) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (z) authorizing the Debtors to take other actions adverse to any DIP Credit Party or any Prepetition Credit Party or their rights and remedies under the DIP Loan Documents, the Prepetition ABL Credit Agreement or their interest in Prepetition ABL Collateral or the DIP Collateral under Section 364 of the Bankruptcy Code;

(viii) The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization;

(ix) There shall arise any superpriority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the DIP Superpriority Claims, except with respect to the Carve-Out and as set forth in the DIP Financing Orders; or

(x) The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's prepetition creditors, contrary to the terms and conditions of any DIP Financing Order or DIP Loan Documents.

I.    The making of any payments in respect of prepetition obligations other than (i) as permitted by the Interim Order or the Final Order, (ii) as permitted by the Cash Management Order or any other substantive order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agent in its sole and absolute discretion, (iii) as permitted by any administrative "first day order" or other administrative order entered by the

-24-

Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agents in their sole and absolute discretion, or (iv) as otherwise agreed to in writing by the Agents.

J.   [Reserved].

K.   [Reserved].

L.   Other than with respect to the Carve-Out and the liens provided for in the DIP Facility, and the DIP Financing Orders, the Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any claim or lien which is *pari passu* with or senior to any liens under the Prepetition ABL Credit Agreement, the adequate protection liens and adequate protection obligations granted under the DIP Financing Orders.

M.   [Reserved].

N.   Noncompliance by any Loan Party or any of its affiliates with the terms of the Interim Order, the Final Order, the Cash Management Order or the Employee Order in any material respect or in a manner adverse to the DIP Credit Parties.

O.   The Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, acquiesce to, or otherwise participate as an adverse party in any suit or other proceeding against any Agent, any Issuing Lender or any of the Lenders regarding the DIP Facility or the Prepetition Credit Parties regarding the Prepetition Facilities.

P.   A plan of reorganization shall be filed by the Debtors, or confirmed in any of the Chapter 11 Cases that is not an Acceptable Plan of Reorganization (as defined below), or any order shall be entered which dismisses any of the Chapter 11 Cases and which order (i) does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the DIP Facility, (ii) does not provide for release and exculpatory provisions relating to the Agents, the Joint Lead Arrangers and the Lenders that are satisfactory to the Agent in its sole and absolute discretion and (iii) is not otherwise reasonably satisfactory to the Agent in its sole and absolute discretion, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents), shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

Q.   The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors or its subsidiaries unless (i) such order contemplates repayment in full in cash of the DIP Facility and the Prepetition Facilities upon consummation of the sale or (ii) consummated as part of an Acceptable Plan of Reorganization.

R.   The entry of an order in the Chapter 11 Cases avoiding or permitting

-25-

recovery of any portion of the payments made on account of the obligations under the DIP Facility, the DIP Loan Documents, any Prepetition Facility or the Prepetition ABL Credit Agreement or related documents, or the taking of any action by any Loan Party to challenge, support or encourage a challenge of any such payments.

S.   The Final Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral.

T.   If the Final Order does not include a waiver, in form and substance satisfactory to the Agent in its sole and absolute discretion, of (A) the right to surcharge the Prepetition ABL Collateral and/or the DIP Collateral under Section 506(c) of the Bankruptcy Code; (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Loan Party after the Petition Date and (C) the doctrine of marshalling.

U.   If, unless otherwise approved by the Agent in its sole and absolute discretion, an order of the Bankruptcy Court shall be entered providing for a change of venue with respect to any of Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days.

V.   The filing or support of any pleading by any Loan Party (or any affiliate thereof) seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default.

**Remedies**

Upon the occurrence of an Event of Default hereunder or under any other DIP Loan Document, the Agent in its reasonable discretion, on behalf of the Lenders, may (and at the direction of the Required Lenders, shall) take any or all of the following actions:

(i) declare the Revolving Commitment of each Revolving Lender to be terminated, whereupon the same shall forthwith terminate;

(ii) declare the Advances and the DIP Term Loan, all interest thereon and all other amounts payable under this Term Sheet and the other Loan Documents (including all amounts of the L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be forthwith due and payable, whereupon the Advances, the DIP Term Loan, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers;

(iii) declare interest on the DIP Obligations to accrue at the default rate set forth in this Term Sheet, whereupon the interest on the DIP Obligations shall automatically accrue at the default rate;

(iv) subject to the Remedies Notice Period (as defined in the Interim Order), (i)

enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all DIP Collateral, (iii) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations (including any accrued interest) in any sale of the DIP Collateral (or any part thereof), which credit bid may incorporate a credit bid of the Prepetition ABL Facilities (including any accrued interest), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise;

(v) take whatever other commercially reasonable action the Agent or the Required Lenders may deem necessary or desirable for the protection of the interests of the Secured Parties (including, subject to the Remedies Notice Period, in respect of the DIP Collateral);

(vi) exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP Facility, this Term Sheet, the DIP Loan Documents, the Interim Order, the Final DIP Order or applicable law (including, subject to the Remedies Notice Period, in respect of the DIP Collateral);

(vii) declare the termination of the DIP Loan Documents as to any future liability or obligation of the Agents, the Issuing Lenders and the Lenders, but without affecting any of the DIP Liens or the liabilities or obligations of any Loan Party;

(viii) declare a termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral; and/or

(ix) subject to the Remedies Notice Period, with respect to any Event of Default arising out of the failure of the Loan Parties to complete any material step in the Going Concern Sale Process (as defined in the DIP Motion), direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Obligor to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code).

All rights, remedies and powers granted to the Agents hereunder and under the DIP Loan Documents or the Interim Order or Final DIP Order, as applicable, are cumulative, not exclusive and enforceable, in such Agent's discretion, alternatively, successively, or concurrently.

Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Debtor or any other obligor under this Term Sheet or any of the DIP Loan Documents or the Interim Order or Final DIP Order, as applicable (including the exercise of any right of

1120389.09-CHISR02A

setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to the guaranties or any DIP Collateral or any other property of any such Debtor, without the prior written consent of the Agent. The provisions of this paragraph are for the sole benefit of the Lenders and the Agent and shall not afford any right to, or constitute a defense available to, any Debtor.

**Case Milestones:**    The Loan Parties shall comply with the Case Milestones in accordance with the applicable timing referred to on such Annex E (or such later dates as approved by the Agents), in each case on terms and conditions, and subject to documentation (including, without limitation, motions and orders) in form and substance acceptable to the Agents in their sole and absolute discretion.

**Carve-Out**    As defined in the Interim Order.

**Security and Priority:**    The Secured Obligations, including all obligations of each Guarantor in respect of its guarantee of all of the foregoing, shall, subject to the Carve-Out, at all times:

(a) pursuant to Sections 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party, with priority over all other allowed chapter 11 and chapter 7 administrative expense claims now existing or hereinafter arising, of any kind whatsoever, including expenses of a chapter 11 and chapter 7 trustee (the "**DIP Superpriority Claims**");

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by an automatically perfected first priority security interest and lien on all unencumbered assets of the Loan Parties that are not subject to a valid and perfected lien on the Petition Date (the "**Prepetition Unencumbered Assets**");

(c) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by an automatically perfected junior security interest and lien on all assets of each Loan Party (other than Prepetition ABL Collateral) that is subject to valid and perfected security interests in favor of third parties as of the Petition Date; and

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming security interest and lien on the Prepetition ABL Collateral of each Loan Party on which the Prepetition Lenders held a first priority security interest and lien and the Prepetition Second Lien Secured Parties held a second priority security interest and lien (such liens and security interests, the "**Priming Liens**"), in each case to the extent that such Prepetition ABL Collateral is subject to existing liens that secure the obligations of the applicable Loan Party, including under the Prepetition ABL Credit Agreement and the Prepetition Second Lien Facilities (collectively, the "**Primed Liens**") and such Priming Liens (x) shall be senior in all respects to the interests in such property of the Prepetition Lenders under the Prepetition ABL Credit Agreement and the other "secured parties" referred to therein (collectively, the "**Prepetition ABL Credit Agreement Primed Parties**"), and of the Prepetition Second Lien Secured Parties under the Prepetition Second Lien Facilities (collectively, the

-28-

"**Prepetition Second Lien Primed Parties**"), (y) shall also be senior to any
liens granted to provide adequate protection in respect of any of the Primed
Liens, and (z) subject to valid, perfected and unavoidable liens (other than
Primed Liens) in favor of third parties that were in existence immediately prior
to the Petition Date and permitted under the Prepetition ABL Credit Agreement
("**Permitted Prior Liens**").

All of the liens described above shall be effective and automatically perfected
upon entry of the Interim Order.

In addition, the Loan Parties hereby grant to the Control Co-Collateral Agent, for
the benefit of the DIP Credit Parties a security interest in all of their respective
rights, title and interests in the DIP Collateral whether now or hereafter acquired,
which security interest shall have the priority and be fully perfected as described
above, in each case to secure the DIP Obligations.

"**DIP Collateral**" shall mean the Prepetition ABL Collateral and all other assets
of the Loan Parties, whether now owned or hereafter acquired, and all proceeds
thereof, including, without limitation, any claims and causes of action of the
Loan Parties of any kind or nature (including proceeds of any actions for
preferences, fraudulent conveyances, and other avoidance power claims under
Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code) and all
deposit accounts, securities accounts, cash and cash equivalents of the Loan
Parties.

"**DIP Liens**" shall mean the liens granted on the DIP Collateral to secure the DIP
Facility.

Each Loan Party authorizes the Control Co-Collateral Agent to file financing
statements with respect to the Collateral in such form and in such offices as the
Agents may determine appropriate in their sole and absolute discretion. Any
such financing statement or amendment may describe the DIP Collateral in the
same manner as described in any security agreement or pledge agreement to  be
entered into by the parties in connection herewith, or may contain an indication
or description of collateral that describes such property in any other manner as
the Agents may determine, in their sole and absolute discretion, is necessary,
advisable or prudent to ensure the perfection of its security interest in the DIP
Collateral, including describing such property as "all assets (or all personal
property), whether now owned or hereafter acquired" or words of similar
meaning.

Lien Priority Chart:

| Prepetition ABL Collateral | Encumbered Property That Is Not Prepetition ABL Collateral | Prepetition Unencumbered Property |
|---|---|---|
| Carve-Out | Carve-Out | Carve-Out |
| Permitted Prior Liens | All liens in existence as of the Petition Date | DIP Liens |

-29-

| DIP Liens | DIP Liens | Prepetition Facilities Adequate Protection Liens |
|---|---|---|
| Prepetition Facilities Adequate Protection Liens | Prepetition Facilities Adequate Protection Liens | 2018 FILO Adequate Protection Liens |
| 2018 FILO Adequate Protection Liens | 2018 FILO Adequate Protection Liens | Prepetition L/C Facility Adequate Protection Liens |
| Prepetition L/C Facility Adequate Protection Liens | Prepetition L/C Facility Adequate Protection Liens | Prepetition Second Lien Adequate Protection Liens |
| Prepetition Facilities Liens | Prepetition Second Lien Adequate Protection Liens | |
| Prepetition Second Lien Adequate Protection Liens | | |
| Prepetition Second Lien Facilities Liens (except on Specified Non-Prepetition Second Lien Collateral) | | |

"Specified Non-Prepetition Second Lien Collateral" means the property that constitutes Prepetition ABL Collateral, but which is not Prepetition Second Lien Collateral.

| | |
|---|---|
| **Adequate Protection for Prepetition Liens**: | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition ABL Credit Agreement Primed Parties (other than the 2018 FILO Lenders) will be entitled to receive the following adequate protection for any diminution in value of their interests in the Prepetition ABL Collateral, as a result of the sale, lease or use by the Loan Parties (or other decline in value) thereof, including as a result of the priming of their security interests in and liens on the Prepetition ABL Collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code: |

(i) subject to the Carve-Out and the DIP Superpriority Claims, a superpriority administrative expense claim as contemplated by Section 507(b) of the Bankruptcy Code immediately junior to the DIP Superpriority Claims (the "**Prepetition ABL Superpriority Claim**");

(ii) subject to the Carve-Out, replacement liens on all Prepetition ABL Collateral, which liens shall be junior only to the DIP Liens and Permitted Prior Liens, and senior to any other liens;

(iii) subject to the Carve-Out, the DIP Liens and any other liens (if any), new liens on all DIP Collateral to the extent not constituting Prepetition ABL Collateral (clauses (ii) and (iii) the "**Prepetition ABL Adequate Protection Liens**");

-30-

(iv) (x) upon entry of the Interim Order, payment in cash of all accrued and unpaid interest and letters of credit, unused commitment and other fees under the Prepetition ABL Credit Agreement as of the Petition Date at the applicable rate(s) provided for under the Prepetition ABL Credit Agreement and (y) thereafter, monthly in arrears, payment in cash of all interest and letters of credit, unused commitment and other fees that accrue on and after the Petition Date at the non-default rate provided for under the Prepetition ABL Credit Agreement;

(v) upon entry of the Interim Order and thereafter, payment in cash of all accrued and unpaid fees and expenses of the Prepetition Agent, the Prepetition Co-Collateral Agents, and the Prepetition Lenders to the extent provided for in the Prepetition ABL Credit Agreement, including reasonable and documented legal and other professional fees and expenses;

(vi) compliance with any repayment requirements imposed by the LTV Provisions; and

(vi) reporting, information, and rights to access collateral substantially similar to those granted to the Agents and the Joint Lead Arrangers pursuant to the DIP Loan Documents.

Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the 2018 FILO Lenders will be entitled to receive the following adequate protection for any diminution in value of their interests in the Prepetition ABL Collateral, as a result of the sale, lease or use by the Loan Parties (or other decline in value) thereof, including as a result of the priming of their security interests in and liens on the Prepetition ABL Collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code:

(i) subject to the Carve-Out, the DIP Superpriority Claims and the Prepetition ABL Superpriority Claim, a superpriority administrative expense claim as contemplated by Section 507(b) of the Bankruptcy Code immediately junior to the Prepetition ABL Superpriority Claims;

(ii) subject to the Carve-Out and any Permitted Prior Liens, replacement liens on all Prepetition ABL Collateral, which liens shall be junior only to the DIP Liens, Permitted Prior Liens and the Prepetition ABL Adequate Protection Liens, and senior to any other liens;

(iii) subject to the Carve-Out, the DIP Liens, the Prepetition ABL Adequate Protection Liens, and any other liens (if any), new liens on all DIP Collateral to the extent not constituting Prepetition ABL Collateral (clauses (ii) and (iii), the "**2018 FILO Adequate Protection Liens**");

(iv) upon entry of the Interim Order and thereafter, payment in cash of all accrued and unpaid fees and expenses of the Prepetition Agent, the Prepetition Co-Collateral Agents, and the Prepetition Lenders to the extent provided for in the Prepetition ABL Credit Agreement, including

-31-

reasonable and documented legal and other professional fees and expenses solely to the extent applicable to their capacity as a Prepetition Credit Parties; and

(v) compliance with any repayment requirements imposed by the LTV Provisions.

**Section 506(c)/552(b) Waiver:**

The Final Order shall provide that the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Credit Parties, the Prepetition ABL Collateral, DIP Credit Parties and the DIP Collateral.

The Final Order shall provide that the liens securing the extensions of credit under the DIP Facility shall not be subject to an assertion by the Debtors of the "equities of the case" exception of section 552 of the Bankruptcy Code.

**No Marshaling**

The Agents, the Issuing Lenders, the Lenders, and the Prepetition Credit Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition ABL Collateral.

**Limitation on Challenges**

The Interim Order and Final Order shall contain stipulations by the Debtors to the validity and priority of the liens securing the Prepetition ABL Credit Agreement and the outstanding amounts of the Prepetition ABL Credit Agreement, which stipulation shall be binding on the Debtors' estates and all parties in interest, including, without limitation, all committees.

**Appointment of Agents; Etc.:**

Each Initial Lender hereby irrevocably designates and appoints (i) Bank of America as Agent, and (ii) Bank of America and Wells Fargo as Co-Collateral Agents, under this Term Sheet and the DIP Loan Documents, and each such Initial Lender irrevocably authorizes the Agent and the Co-Collateral Agents, in such capacity, to take such action on its behalf under the provisions of this Term Sheet and the DIP Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent and the Co-Collateral Agents, as applicable, by the terms of this Term Sheet and the other Loan Documents, together with such other powers as are reasonably incidental thereto.

Wells Fargo Bank, National Association hereby irrevocably appoints Bank of America, N.A., in its capacity as a Co-Collateral Agent, as agent to the Agents for purposes of filing financing statements, mortgages, control agreements, notices and other documents, in connection with the perfection of a security interest in the DIP Collateral that is granted for the benefit of the DIP Credit Parties (the "Control Co-Collateral Agent"). Each Debtor acknowledges that any and all actions to be taken by the Co-Collateral Agents under the DIP Financings Order, this Term Sheet, and the other DIP Loan Documents, may be taken individually by the Control Co-Collateral Agent, and all such actions shall have the full force and effect as though taken jointly by both Agents.

*Exculpatory Provisions*.  Neither any Agent nor any Joint Lead Arranger nor any of their respective officers, directors, employees, agents, attorneys in fact or

1120389.09-CHISR02A

affiliates shall be (i) liable for any action lawfully taken or omitted to be taken
by it or such Person under or in connection with this Term Sheet or any DIP
Loan Document (except to the extent that any of the foregoing are found by a
final and non-appealable decision of a court of competent jurisdiction to have
resulted from its or such Person's own gross negligence or willful misconduct)
or (ii) responsible in any manner to any of the Lenders for any recitals,
statements, representations or warranties made by any Loan Party or any officer
thereof contained in this Term Sheet or any DIP Loan Document or in any
certificate, report, statement or other document referred to or provided for in, or
received by the Agents under or in connection with, this Term Sheet or any DIP
Loan Document or for the value, validity, effectiveness, genuineness,
enforceability or sufficiency of this Term Sheet or any DIP Loan Document or
for any failure of any Loan Party that is a party thereto to perform its obligations
hereunder or thereunder.  Neither the Agents nor any Joint Lead Arranger shall
be under any obligation to any Lender to ascertain or to inquire as to the
observance or performance of any of the agreements contained in, or conditions
of, this Term Sheet or any DIP Loan Document, or to inspect the properties,
books or records of any Loan Party.

The Lenders agree to indemnify the Agent and each Co-Collateral Agent in its
capacity as such (to the extent not reimbursed by Holdings or the Borrowers and
without limiting the obligation of Holdings or the Borrowers to do so), ratably
according to their respective pro rata shares from and against any and all
liabilities, obligations, losses, damages, penalties, actions, judgments, suits,
costs, expenses or disbursements of any kind whatsoever that may at any time be
imposed on, incurred by or asserted against such Agent in any way relating to or
arising out of, the DIP Facility, this Term Sheet, any of the other Loan
Documents or any documents contemplated by or referred to herein or therein or
the transactions contemplated hereby or thereby or any action taken or omitted
by such Agent under or in connection with any of the foregoing; provided that no
Lender shall be liable for the payment of any portion of such liabilities,
obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses
or disbursements that are found by a final and non-appealable decision of a court
of competent jurisdiction to have resulted from the Agent's or any Co-Collateral
Agent's gross negligence or willful misconduct.

*Reliance*.  The Agent and Co-Collateral Agents shall be entitled to rely, and shall
be fully protected in relying, upon any instrument, writing, resolution, notice,
consent, certificate, affidavit, letter, telecopy, telex or teletype message,
statement, order or other document or conversation believed by them to be
genuine and correct and to have been signed, sent or made by the proper Person
or Persons and upon advice and statements of legal counsel (including counsel to
Holdings or the Borrowers), independent accountants and other experts selected
by the Agent.  The Agent may deem and treat the payee of any Note as the
owner thereof for all purposes unless a written notice of assignment, negotiation
or transfer thereof shall have been filed with the Agent.  The Agent and Co-
Collateral Agents shall be fully justified in failing or refusing to take any action
under this Term Sheet or other DIP Loan Document unless they shall first
receive such advice or concurrence of the Required Lenders (or, if so specified
by this Term Sheet or the DIP Credit Agreement, the Supermajority Lenders or
all Lenders) as they deem appropriate or they shall first be indemnified to its

-33-

satisfaction by the Lenders against any and all liability and expense that may be incurred by them by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Term Sheet and the other DIP Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders or all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Advances.

**Expenses and Indemnification:**   Without regard to whether the DIP Facility and related DIP Loan Documents are executed and transactions related thereto and described therein are consummated, the Borrowers and each Guarantor hereby agree to jointly and severally pay or reimburse the Agents and the Joint Lead Arrangers for all reasonable and documented out-of-pocket costs and expenses incurred by the Agents and the Joint Lead Arrangers (including, without limitation, the reasonable fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP, Choate Hall & Stewart LLP and BRG and the other counsel, appraisers, advisors and consultants of the foregoing parties) in connection with (i) the preparation, negotiation and execution of this Term Sheet and the DIP Loan Documents; (ii) the syndication and funding of the DIP Loans and any issuance of Letters of Credit; (iii) the creation, perfection or protection of the liens under the DIP Loan Documents (including all search, filing and recording fees); (iv) the on-going administration of the DIP Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto); and (v) the Chapter 11 Cases (including the preparation therefor).

The Borrowers and each Guarantor further agrees to jointly and severally pay or reimburse each Agent, the Joint Lead Arrangers and the Lenders for all reasonable and documented out-of-pocket costs and expenses, including reasonable and documented attorneys' fees and expenses (in the case of the Lenders, limited to one counsel for the Lenders in connection with the enforcement of or protection of its rights hereunder), incurred by each such Person in connection with (i) the enforcement of the DIP Loan Documents, the DIP Financing Orders and the Cash Management Order; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Loan Documents, the DIP Financing Orders or the Cash Management Order.

Holdings and the Borrowers jointly and severally agree to indemnify and hold harmless the Agent, each Co-Collateral Agent, the Joint Lead Arrangers, each Issuing Lender and each Lender and each of their Affiliates and their officers, directors, employees, agents and advisors (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) this Term Sheet, the DIP Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the Letters of Credit or the

-34-

proceeds of the Advances, and (ii) the actual or alleged presence of Hazardous Materials on any property of Holdings, the Borrowers or any of their Subsidiaries or any Environmental Action relating in any way to Holdings, the Borrowers or any of their Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  Such indemnity shall be effective whether or not any investigation, litigation or proceeding is brought by Holdings, any Borrower, its directors, equityholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Holdings and the Borrowers also agree not to assert any claim for special, indirect, consequential or punitive damages against the Agent, any Co-Collateral Agent, any Lender, any of their Affiliates, or any of their respective directors, officers, employees, attorneys and agents, on any theory of liability, arising out of or otherwise relating to this Term Sheet, the DIP Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the Letters of Credit or the proceeds of the DIP Facility.

| | |
|---|---|
| **Assignments and Participations:** | As set forth in the Prepetition ABL Credit Agreement subject to Documentation Principles. |
| **Required Lenders:** | Lenders holding greater than 50% of DIP Loan commitments or exposure under the DIP Facility (the "**Required Lenders**"). Defaulting lenders shall not be included in the calculation of Required Lenders. |
| **Amendments:** | Required Lenders, except for amendments customarily requiring approval by affected Lenders, supermajority lenders (which shall be the Lenders holding greater than 66 2/3% of the outstanding Revolving Exposure and DIP Term Loans (or, if the DIP Revolving Commitments have been terminated, Total Extensions of Credit) including, without limitation, amendments with respect to the DIP Borrowing Base (or component definitions thereof) or the LTV Provisions, or all lenders, including, without limitation, amendments with respect to advance rates or reductions in the rates of interest payable under the DIP Facility. |
| **Miscellaneous:** | The DIP Loan Documents will include (i) yield protection and LIBOR fallback provisions, (ii) beneficial ownership provisions, (iii) waivers of consequential damages and jury trial, and (iv) agency, set-off and sharing language, in each case consistent with the Documentation Principles. |
| **Governing Law and Submission to Exclusive Jurisdiction:** | State of New York and, to the extent applicable, the Bankruptcy Code. |
| **Counsel to Agent:** | Skadden, Arps, Slate, Meagher & Flom LLP. |
| **Counsel to Wells Fargo as Co-** | Choate Hall & Stewart LLP |

-35-

**Collateral Agent:**

**Financial Advisors**       Berkeley Research Group, LLC
**to the Agent:**

**BANK OF AMERICA, N.A.**, as Agent and Co-Collateral Agent and Initial Lender

By: _Elizabeth A. Ratto_

Name: Elizabeth A. Ratto

Title: Managing Director

[DIP Facility Term Sheet]

**CITIBANK, N.A.**, as Initial Lender

By:

Name: David Smith

Title: Vice President

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Co-Collateral Agent and Initial Lender

By:

Name: Keith Vercauteren

Title: Senior Managing Director

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be executed by their
respective officers thereunto duly authorized, as of this 15th day of  October,  2018.

HOLDINGS:

**SEARS HOLDINGS CORPORATION**, a Delaware
corporation

By: _____

Name: Robert A. Riecker

Title:   Chief Financial Officer

BORROWERS:

**SEARS ROEBUCK ACCEPTANCE CORP.**, a
Delaware corporation

By: _____

Name:  Robert A. Riecker

Title:    Chief Financial Officer

**KMART CORPORATION**, a Michigan corporation

By: _____

Name: Robert A. Riecker

Title:   Chief Financial Officer

[DIP Facility Term Sheet]

GUARANTORS:

**A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
KLC, INC.
KMART OF MICHIGAN, INC.**

By: _____

Name:  Robert A. Riecker

Title:    Vice President

**CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.**

By: _____

Name: Robert A. Riecker

Title: Chief Financial Officer

**SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.
SOE, INC.
STARWEST, LLC**


By: _____

Name: Robert A. Riecker

Title:  President


**KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC**
By:  Kmart Corporation, its Member


By: _____

Name:  Robert A. Riecker

Title:   Chief Financial Officer


**KMART.COM LLC**
By:  BlueLight.com, Inc., its Member


By: _____

Name: Robert A. Riecker

Title:  Vice President

**FBA HOLDINGS INC.**


By: _____

Name:  Robert A. Riecker

Title:    Vice President

**INNOVEL SOLUTIONS, INC.**


By: _____

Name:  Robert A. Riecker

Title:    Chief Financial Officer

**MAXSERV, INC.**


By: _____

Name:  Robert A. Riecker

Title:    Vice President

**SEARS DEVELOPMENT CO.**

By: _____

Name:  Robert A. Riecker

Title:    President

**BIG BEAVER OF FLORIDA DEVELOPMENT, LLC**


By:

Name:  Robert A. Riecker

Title:    President

**KBL HOLDING INC.**


By: _____

Name:  Robert A. Riecker

Title:    Vice President

**SEARS BRANDS BUSINESS UNIT
CORPORATION**


By: _____

Name:  Robert A. Riecker

Title:    Vice President

**SHC DESERT SPRINGS, LLC**
By: Kmart Corporation, its Member


By: _____

Name:  Robert A. Riecker

Title:    Chief Financial Officer

**STI MERCHANDISING, INC.**

By: _____

Name:  Robert A. Riecker

Title:   President

**TROY COOLIDGE NO. 13, LLC**
By: Kmart Corporation, its Member

By: _____

Name:  Robert A. Riecker

Title:    Chief Financial Officer

**BLUELIGHT.COM, INC.**

By: _____

Name:  Robert A. Riecker

Title:   Vice President

**SEARS BRANDS, L.L.C.**


By: _____

Name:  Robert A. Riecker

Title:   Vice President

**SEARS BUYING SERVICES, INC.**


By: _____

Name:  Robert A. Riecker

Title:    President

**SERVICELIVE, INC.**


By: _____

Name:  Robert A. Riecker

Title:   Chief Financial Officer

**SEARS HOME & BUSINESS FRANCHISES, INC.**


By: _____

Name:   Robert A. Riecker

Title:    Vice President

**SEARS HOLDINGS PUBLISHING COMPANY, LLC**

By: _____

Name:  Robert A. Riecker

Title:   Vice President

[DIP Facility Term Sheet]

**SEARS PROCUREMENT SERVICES, INC.**

By: _____

Name:  Robert A. Riecker

Title:   Vice President

**SEARS PROTECTION COMPANY (PR) INC.**

By: _____

Name:  Robert A. Riecker

Title:    Vice President

**SYW RELAY LLC**
By: Sears, Roebuck and Co., its Member


By: _____

Name:  Robert A. Riecker

Title:    Chief Financial Officer

[DIP Facility Term Sheet]

**SEARS INSURANCE SERVICES, L.L.C.**

By: _____

Name:  Robert A. Riecker

Title:    Chief Financial Officer

**WALLY LABS LLC**


By: _____

Name:  Robert A. Riecker

Title:   Vice President

ANNEX A

**$1,830,000,000 Senior Secured Superpriority Priming Debtor-In-Possession
Asset-Based Revolving Credit Facility**

**Interest Rates And Fees**

| | |
|---|---|
| **Interest Rates:** | *Revolver:* Eurodollar Rate <u>plus</u> 4.50% or the Base Rate <u>plus</u> 3.50%. |
| | *DIP Term Loan:* Eurodollar Rate <u>plus</u> 8.00% or the Base Rate <u>plus</u> 7.00%; |
| | <u>*provided*</u> that until the Final Closing Date, all Extensions of Credit shall bear interest at the Base Rate plus the applicable margin set forth above. |
| **Default Interest:** | The applicable interest rate (after giving effect to the margin) <u>plus</u> 2% per annum with respect to the principal amount of all DIP Loans, the face amount of all Letters of Credit, and all other DIP Obligations outstanding during the existence of any Event of Default (whether or not acceleration or demand for payment has been made), and including, to the extent permitted by applicable law, all past due interest. |
| **Payment of Interest:** | Each Borrower shall pay interest on the unpaid principal amount of each Advance or DIP Term Loan Borrowing made to it and owing to each Lender from the date of such Advance or DIP Term Loan Borrowing until such principal amount shall be paid in full: |
| | (i) in the case of Base Rate Advances, in arrears monthly on the 5th day subsequent to the last day of each month, on the Final Closing Date and on the date such Base Rate Advance shall be converted or paid in full; and |
| | (ii) in the case of Eurodollar Rate Advances, in arrears on the last day of the applicable Interest Period, on the Final Closing Date and on the date such Eurodollar Rate Advance shall be converted or paid in full. The Borrowers may select Interest Periods of two weeks of one month. |
| **Unused Commitment Fees:** | The Borrowers shall pay a commitment fee of 0.75% per annum on the average daily unused portion of the DIP Facility, calculated based upon the actual number of days elapsed over a 360-day year, payable monthly in arrears. |
| **Letter of Credit Fees:** | A per annum fee equal to the margin applicable to the Eurodollar Rate in effect at such time, which will accrue on the aggregate face amount of outstanding Letters of Credit, payable monthly in arrears; <u>provided</u>, <u>however</u>, that with respect to any Letter of Credit that by its terms provides for one or more automatic increases in the amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is in effect at such time. |
| | Such fees shall be distributed to the Lenders pro rata in accordance with their DIP Revolving Commitments, with exceptions for defaulting lenders. |

A-1

In addition, the Borrowers shall pay to each Issuing Lender, for its own account, (a) a fronting fee in an amount not to exceed 0.125% of the aggregate face amount of the outstanding Letters of Credit (provided, however, that with respect to any Letter of Credit that, by its terms provides for one or more automatic increases in the amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is in effect at such time), payable on the terms set forth in the DIP Loan Documents, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary negotiation, issuance, amendment and administration fees, and other fees incurred in connection with effecting payment thereunder.

A-2

Annex B

## Representations and Warranties

The DIP Loan Documents will contain representations and warranties customary for transactions of this nature, including those related to real property and leased premises, insurance, licenses, USA PATRIOT Act and the following (subject to certain exceptions, qualifications and carve outs to be set forth in the applicable DIP Loan Documents):

(a)    **Organization; Requisite Power and Authority.**  Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect. No Loan Party is an EEA Financial Institution (to be defined in the DIP Credit Agreement in a manner consistent with market practice).

(b)    **Due Authorization; No Conflict.** Upon entry of the Interim Order (and the Final Order, when applicable), the execution, delivery and performance by each Loan Party of the DIP Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Loan Party's powers, have been duly authorized by all necessary organizational action, and do not contravene (i) the charter or by-laws or other organizational or governing documents of such Loan Party or (ii) law or any contractual restriction binding on or affecting any Loan Party, except, for purposes of this clause (ii), to the extent such contravention would not reasonably be expected to have a Material Adverse Effect.

(c)    **Government Approvals; Consents.**  Except the entry of the Interim Order (and Final Order, when applicable), no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by any Loan Party of any DIP Loan Document to which it is a party that has not already been obtained if the failure to obtain such authorization, approval or other action could reasonably be expected to result in a Material Adverse Effect.

(d)    **Due Execution**.  Each DIP Loan Document has been duly executed and delivered by each Loan Party party thereto.  Upon entry of the Interim Order (and the Final Order, when applicable), this Term Sheet constitutes, and each other DIP Loan Document will constitute upon execution, the legal, valid and binding obligation of each Loan Party party thereto enforceable against such Loan Party in accordance with the respective terms and the Interim Order (and the Final Order, when applicable), subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(e)    **Litigation.**  Other than the Chapter 11 Cases, there is no action, suit, investigation, litigation or proceeding, including any Environmental Action, which is pending or, to Holdings or any Borrower's knowledge, threatened affecting Holdings, the Borrowers or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect other than as reported in filings with the SEC made prior to the date hereof.

B-1

(f)    **Margin Stock.** Following application of the proceeds of each Advance and the issuance of each Letter of Credit, not more than five (5%) percent of the value of the assets of the Borrowers and their respective Subsidiaries on a consolidated basis will be margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System).

(g)    **Investment Company Act.** No Loan Party is an "investment company", or a company "controlled" by an  "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(h)    **Taxes.** All United States Federal income tax returns and all other material tax returns which are required to be filed have been filed by or on behalf of Holdings, the Borrowers and their respective Subsidiaries, and all Taxes due with respect to Holdings, the Borrowers and their respective Subsidiaries pursuant to such returns or pursuant to any assessment received by Holdings, the Borrowers or any Subsidiary have been paid except to the extent permitted in Section 6.01(b) of the Pre-Petition ABL Credit Agreement, provided that, neither the Loan Parties or any Subsidiary shall be required to pay or discharge any such tax, assessment, charge or claim (i) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and become enforceable against its other creditors or (ii) if such non-payments, either individually or in the aggregate would not be reasonably expected to have a Material Adverse Effect. The charges, accruals and reserves on the books of Holdings, the Borrowers and their Subsidiaries in respect of Taxes or other governmental charges have been made in accordance with, and to the extent required by, GAAP.

(i)    **Information; Accuracy.** All written factual information (including the Initial Budget and each Rolling Budget) heretofore furnished by Holdings, the Borrowers or their Subsidiaries to the Agent, any Co-Collateral Agent or any Lender and the Lenders for purposes of or in connection with this Term Sheet or any other DIP Loan Document, taken as a whole, was true and correct in all material respects on the date as of which such information was stated or certified, provided that with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

(j)    **Collateral.** (i) Each Loan Party has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property necessary for the conduct of its business and except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, and (ii) no Inventory (as defined by the Uniform Commercial Code), Credit Card Account Receivable, DC or Related Intellectual Property is subject to any Lien except the DIP Liens and certain permitted liens existing on the date hereof.

(k)    **Intellectual Property.** Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (i) each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted; (ii) no material claim has been asserted and is pending by any Person challenging  or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor do Holdings or the Borrowers know of any valid basis for any such claim; and (iii) the use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

(l)    **ERISA.**  Except as would not reasonably be expected to result in a Material Adverse Effect, (i) neither a Reportable Event nor a failure to meet minimum required contributions (in

accordance with Section 430 or any prior applicable section of the Internal Revenue Code or Section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, (ii) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other applicable federal or state laws, and (iii) no termination of a Single Employer Plan has occurred. No Lien imposed under the Internal Revenue Code or ERISA exists on account of any Plan, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Each Single Employer Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the United States Internal Revenue Service (the "**IRS**") and, to the best knowledge of Holdings and the Borrowers, nothing has occurred which would cause the loss of, such qualification.

Except as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 430 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 430 of the Internal Revenue Code has been made with respect to any Plan. There are no pending or, to the best knowledge of Holdings and the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary duty rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur, in each case that would reasonably be expected to result in a Material Adverse Effect. Neither any Loan Party nor any ERISA Affiliate has incurred, or would reasonably be expected to incur, any liability under Title IV of ERISA with respect to any Pension Plan, other than premiums due and not delinquent under Section 4007 of ERISA or as would not reasonably be expected to have a Material Adverse Effect; neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and, to the knowledge of the Borrowers, no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan except as would not reasonably be expected to have a Material Adverse Effect; and neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA. Except as would not reasonably be expected to have a Material Adverse Effect, neither Holdings, the Borrowers nor any Commonly Controlled Entity has had a complete or partial withdrawal (as such terms are defined in Sections 4203 and 4205 of ERISA, respectively) from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA. No such Multiemployer Plan is in Reorganization or Insolvent except as would not reasonably be expected to result in aggregate liability to Holdings and its Subsidiaries of $100,000,000 or more.

(m)    **Environmental Matters.** Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Group Member (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(n)    **Insurance Matters.** The properties of the Loan Parties are insured as required pursuant to Section 6.01(c) of the Pre-Petition ABL Credit Agreement, this Term Sheet and the DIP Loan Documents. Each insurance policy required to be maintained by the Loan Parties pursuant to Section 6.01(c) of the Pre-Petition ABL Credit Agreement is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

B-3

(o)    [Reserved]

(p)    **Equity Interests.** As of the date of this Term Sheet: (1) there are no outstanding rights to purchase any equity interests in any Subsidiary of a Loan Party, and (2) the copies of the organization and governing documents of each Loan Party and each amendment hereto provided to the Lenders are true and correct copies of each such document, each of which is valid and in full force and effect.

(q)    **Labor.** As of the date of this Term Sheet, except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of Holdings or any Borrower, threatened, (b) the hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign law dealing with such matters.

(r)    **Certain Employment Matters.** All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. No Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or any material bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (excluding in each case individual employment agreements) and (ii) no employee of a Loan Party is also an employee of the ESL Investments, Inc. and any of its Affiliates other than a Loan Party. There are no representation proceedings pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, in each case which would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries which would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the DIP Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(s)    **WARN Act**. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or any similar federal or state law that remains unpaid or unsatisfied and is in excess of $100,000 individually or $750,000 in the aggregate for all such liabilities.

(t)    **Brokerage Fees.** No broker or finder brought about the obtaining, making or closing of the Advances or transactions contemplated by the DIP Loan Documents, and, other than amounts payable pursuant to this Term Sheet and the DIP Loan Documents, no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

(u)    **Financial Statements.** The consolidated balance sheet of Holdings and its Subsidiaries as at February 3, 2018, and the related consolidated statements of income and cash flows of Holdings and its Subsidiaries for the fiscal year then ended, accompanied by an opinion of Deloitte & Touche LLP, independent public accountants, copies of which have been furnished to the Agent, fairly present the consolidated financial condition of Holdings and its Subsidiaries as at such date and the consolidated results of the operations of Holdings and its Subsidiaries for the period ended on such date, all in accordance with GAAP consistently applied.

(v)    **Material Adverse Effect.** Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(w)    **Limitations on Certain Transactions.** No Loan Party has any obligation to ESL Investments, Inc. or any of its Affiliates other than a Loan Party, with respect to any consulting, management or similar fee; provided, that, for the avoidance of doubt, the foregoing shall not apply to (i) any arrangement disclosed in Holdings' annual report on form 10-K for the fiscal year ended February 3, 2018; (ii) any employment arrangement between any Loan Party and an individual Person who is also an employee of ESL Investments, Inc. and any of its Affiliates other than a Loan Party, so long as such employment arrangements are (x) on terms that are fair and reasonable and comparable to terms provided to employees in comparable positions for companies of a comparable size and no less favorable to such Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not an employee of ESL Investments, Inc. and any of its Affiliates other than a Loan Party and (y) in the case of any officer (as defined in Rule 16a-1 under the Securities Exchange Act of 1934) or director of Holdings, any beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of more than 10.0% of Holdings' equity interests or any Person that ranks in the top five in compensation among all employees of the Loan Parties, approved by a majority of disinterested members of the board of directors of Holdings in good faith; or (iii) any obligation arising from any financial advisory, financing or underwriting services or other investment banking activities provided by ESL Investments, Inc. and any of its Affiliates other than a Loan Party, so long as (x) such services directly relate to and are provided in conjunction with an acquisition or divestiture or other specific transaction conducted outside the ordinary course of business, (y) such services are on terms that are fair and reasonable and comparable to terms provided by independent financial advisory, financing or underwriting service provider or other investment banking service providers and (z) compensation for such services are approved by a majority of disinterested members of the board of directors of Holdings in good faith.

(x)    **PATRIOT Act; Anti-Corruption.** To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the United States Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977, and (iv) the Corruption of Foreign Public Officials Act, as amended (the "FCPA"). No part of the proceeds of any credit extensions will be used, directly or, to the Loan Parties' knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(y)    **Pension Plan Matters.** None of Holdings, the Borrowers, any of their respective Subsidiaries, nor ESL Investments, Inc. and any of its Affiliates other than a Loan Party or Significant Holder is an Affiliate of the SRAC Holdings Pension Plan. The SRAC Holdings Pension

Plan qualifies as an Eligible Assignee pursuant to the definition thereof (without giving effect to clause (c) of such definition).

(z)    **Sanctions; OFAC.** None of Holdings, the Borrowers, nor any of their respective Subsidiaries, nor, to the knowledge of the Borrowers, any director, officer, employee, agent or affiliate of the Borrowers is an individual or entity (for purposes of this clause (aa), a "Person") that is, or is owned or controlled by Persons that are (A) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury or other applicable sanctions authority or pursuant to the U.S. Iran Sanctions Act, as amended, or Executive Order 13590 (collectively, "Sanctions") or (B) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, without limitation, Burma/Myanmar, Iran, North Korea, Sudan and Syria). The Loan Parties will not, directly or, to their knowledge, indirectly, use the proceeds of any credit extensions, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person in any manner that would directly or indirectly result in a violation of Sanctions by any Person.

(aa)    **Interim and Final Orders**.

(i) The Interim Order or, at all times after its entry by the Bankruptcy Court, the Final Order, is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the reasonable written consent of the Agents;

(ii) Upon the occurrence of the Termination Date (whether by acceleration or otherwise), the Agent shall, subject to the provisions of the "Events of Default" section in the Term Sheet and the applicable provisions of the applicable Interim or Final Order, be entitled to immediate payment of such obligations, and to enforcement of the remedies provided for under the DIP Credit Documents in accordance with the terms thereof and such Interim or Final Order, as applicable, without further application to or order by the Bankruptcy Court.

(iii) If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Interim or Final Order, the extension of credit or the performance by any Obligor of any of its obligations under any of the DIP Loan Documents shall be the subject of a presently effective stay pending appeal. The Debtors, the Agents and the Lenders shall be entitled to rely in good faith upon the Interim or Final Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Debtors, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with the DIP Loan Documents notwithstanding any such objection or appeal, unless the relevant Interim or Final Order has been stayed by a court of competent jurisdiction.

(bb)    **Security Interest.**  Upon entry of each of the Interim Order (and the Final Order, when applicable) each such DIP Order shall be effective to create in favor of the Co-Collateral Agents, for the benefit of the Lenders, a legal, valid enforceable and perfected security interest in the DIP Collateral and proceeds thereof, as and to the extent contemplated by each such DIP order, as described in this Term Sheet and the other DIP Credit Documents.

(cc)    **Appointment of Trustee or Examiner; Liquidation**.  No order has been

B-6

entered in any of the Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (c) to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases.

(dd)    **No other Insolvency Proceeding**.  Other than the Chapter 11 Cases, none of the Loan Parties is a debtor in any Insolvency Proceeding.

(ee)    **Superpriority Claims; Liens**.  Upon the entry of each of the Interim Order and the Final Order, each such Interim or Final Order and the DIP Loan Documents is sufficient to provide the superpriority claims and security interests and DIP Liens on the DIP Collateral of the Loan Parties described in, and with the priority provided in, the DIP Loan Documents.

(ff)    **Sparrow Entities.** Since August 4, 2018, no Loan Party has transferred any assets to any Sparrow Entity or KCD IP, LLC other than as reported in filings with the SEC made prior to the date hereof.

ANNEX C

### SPECIFIED PARI PASSU COLLATERAL

|  | STORE NUMBER | STREET ADDRESS | CITY | STATE |
|---|---|---|---|---|
| **1.** | **7777** | **TO BE PROVIDED TO AGENTS** | **NEW YORK** | **NY** |
| **2.** | **7749** | **TO BE PROVIDED TO AGENTS** | **NEW YORK** | **NY** |
| **3.** | **9423** | **TO BE PROVIDED TO AGENTS** | **BRIDGEHAMPTON** | **NY** |

4. Any direct or indirect claim, cause of action, or right to payment of any Loan Party or of any of the successors of any such Loan Party in respect of (i) anti-trust claims or other claims against any of Visa Inc., Mastercard Inc., JPMorgan Chase & Co, Citigroup N.A., Bank of America N.A., or any of their respective affiliates in relation to certain practices with respect to merchant processing fees and merchant processing agreements and (ii) any settlement with respect to the foregoing, including without limitation any direct or indirect settlement with any such financial institution or other person.

C-1

<u>**Go Forward Plan**</u>

1.      <u>Store Rationalization and Sale Process</u>.  To save as many of their stores and preserve as many jobs as possible, the Debtors have developed the following detailed plan to guide their path forward in these Chapter 11 Cases (the "**Go Forward Plan**").  Pursuant to this Go Forward Plan, the Debtors have determined to quickly rationalize their store footprint in accordance with a detailed plan (the "**Store Footprint Plan**") while also implementing the following key actions:

*Initial Store Rationalization*

- On the Petition Date, the Debtors will file a motion to approve procedures (the "**GOB Procedures**") to complete certain store closings in accordance with the Store Footprint Plan (the "**Initial Store Rationalization**") and will seek an order approving the GOB Procedures for the Initial Store Rationalization within eight (8) days following the Commencement Date.

- The Initial Store Rationalization will start no later than eight (8) days following the Petition Date and a material portion of the Initial Store Rationalization will be underway within 21 days of the Commencement Date.

- The Debtors will file a motion no later than seven (7) days after the Commencement Date and will obtain an order from the Bankruptcy Court no later than thirty (30) days after the Commencement Date authorizing the rejection of any leases associated with stores included in the Initial Store Rationalization.

*Secondary Store Rationalization*

- The Debtors will undertake a detailed review and analysis of the profitability of a further group of stores identified in the Store Footprint Plan over the next several weeks.

- No later than November 1, 2018, the Debtors will file a notice, pursuant to the GOB Procedures, to commence a second round of store rationalizations in accordance with the Store Footprint Plan (the "**Secondary Store Rationalization**" and, together with the Initial Store Rationalization, the "**Store Rationalizations**").

- The Debtors will obtain court approval of, and commence a material portion of, the Secondary Store Rationalization no later than November 15, 2018.

- The Debtors will file a motion no later than November 20, 2018 and will obtain an order from the Bankruptcy Court no later than December 15, 2018 authorizing the rejection of any leases associated with stores included in the Secondary Store Rationalization.

*Going Concern Sale Process*

- Pursuant to the Go Forward Plan, while the Store Rationalizations are in process the Debtors will pursue the sale (the "**Going Concern Sale Process**") of a group of stores identified in the Store Footprint Plan (the "**Go Forward Stores**").

- Given the cash-burn associated with the continued operation of the Debtors' businesses, the Debtors must, by December 15, 2018, obtain and find acceptable a non-contingent and fully-financed (with committed financing containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provision)) stalking horse bid for the sale of the Go Forward Stores that is reasonably acceptable to the Agents.

- The Debtors will file a motion requesting approval of bidding procedures and the selection of a stalking horse bid for the sale of the Go Forward Stores pursuant to section 363 of the Bankruptcy Code no later than December 27, 2018, and will obtain an order of the Bankruptcy Court approving such motion no later than January 14, 2019.

- An auction for the sale of the Go Forward Stores (and potentially certain other assets) will be conducted, or the stalking horse bidder, if any, will be named as the winning bidder to the extent no other higher and better offers for the Go Forward Stores are received, no later than February 2, 2019.

- The Debtors will obtain on order approving the sale of the Go Forward Stores pursuant to section 363 of the Bankruptcy Code no later than February 4, 2019, and will close the sale of the Go Forward Stores by no later than February 8, 2019.

1120389.09-CHISR02A

**ANNEX E**

**Case Milestones**

**DIP Loan**

(i)      Not later than the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of the DIP Facility, this Term Sheet, the DIP Loans, and all fees, expenses, indemnification, and other obligations contemplated thereunder.

(ii)      Not later than 3 days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

(iii)      Not later than November 6, 2018, finalize DIP Credit Agreement and authorize posting to Prepetition ABL Lenders.

(iv)      Not later than November 20, 2018, the Bankruptcy Court shall have entered the Final Order.

(v)      Not later than November 27, 2018, the Final Closing Date shall have occurred.

**Lease Assumption / Rejection**

(vi)      Not later than 30 days following the Petition Date, the Debtors shall have filed a motion requesting, and not later than 45 days following the Petition Date, shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall extend 210 days after the Petition Date.

**Inventory Appraisals**

(viii)      Not later than the 10th day of every month commencing with the first full month immediately following the Petition Date, an updated inventory appraisal shall be delivered to the Agent.

**Budget**

(ix)      On or before November 21, 2018, the Joint Lead Arrangers have (i) reaffirmed their approval, based on then current information, of the Approved Initial Budget or (ii) the Loan Parties have adopted a revised budget acceptable to the Joint Lead Arrangers in their sole and absolute discretion.

**Plan and Disclosure Statement**

(x)      Not later than February 18, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan of Reorganization and a disclosure statement with respect thereto.

(xi)      Not later than March 25, 2019, the Bankruptcy Court shall enter an order approving a disclosure statement with respect to an Acceptable Plan of Reorganization.

(xii)      Not later than April 29, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan of Reorganization.

(xiii)      Not later than May 14, 2019, such Acceptable Plan of Reorganization shall become effective.

"**Acceptable Plan of Reorganization**" means a plan of reorganization for each of the Chapter 11 Cases that (i) provides for the termination of the DIP Revolving Commitments and the payment in full in cash

E-1

and full discharge of the DIP Obligations at emergence, (ii) contains releases and other exculpatory provisions for the DIP Credit Parties, Prepetition Credit Parties, the Joint Lead Arrangers and each of their respective affiliates in form and substance satisfactory to the Agent in its sole and absolute discretion and (iii) is otherwise in form and substance reasonably satisfactory to the Agent with respect to any provision that may adversely affect the DIP Credit Parties and/or the Prepetition Credit Parties.

1120389.09-CHISR02A

**ANNEX G**

**Interim Order**

*See attached*