Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 18-23538-rdd

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6

7  SEARS HOLDINGS CORPORATION,

8

9       Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12              United States Bankruptcy Court

13              300 Quarropas Street, Room 248

14              White Plains, NY 10601

15

16              October 15, 2018

17              2:13 PM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

Page 2

1    HEARING re Notice of Hearing/ Notice of Commencement of

2    Chapter 11 Cases and Agenda for First Day Hearing Motion of

3    Debtors for Entry of Order Directing Joint Administration of

4    Related Chapter 11 Cases filed by Ray C Schrock on behalf of

5    Sears Holdings Corporation. (document#4)

6

7    HEARING re Debtors Motion for Authority to (A) Obtain

8    Postpetition Financing, (B) Use Cash Collateral, (C) Grant

9    Certain Protections to Prepetition Secured Parties, and (D)

10   Schedule Second Interim Hearing and Final Hearing (document

11   #7)

12

13   HEARING re Motion of Debtors For Authority to (I) Continue

14   Using Existing Cash Management System, Bank Accounts, and

15   Business Forms, (II) Implement Ordinary Course Changes to

16   Cash Management System, (III) Continue Intercompany

17   Transactions, and (IV) Provide Administrative Expense

18   Priority for Postpetition Intercompany Claims and Related

19   Relief (document #5)

20

21   HEARING re Motion of Debtors for Entry of Order Implementing

22   Certain Notice and Case Management Procedures (document #22)

23

24

25

1    HEARING re Motion of Debtors for Entry of Order (I)

2    Authorizing but Not Directing the Debtors to (A) Pay Certain

3    Prepetition Wages and Reimbursable Employee Expenses, (B)

4    Pay and Honor Employee Medical and Other Benefits, and (C)

5    Continue Employee Benefits Programs, and (II) Granting

6    Related Relief (document #31)

7

8    HEARING re Motion of Debtors for Authority to Pay Certain

9    Prepetition Taxes and Fees(document #19)

10

11   HEARING re Motion of Debtors for Authorization to (I)

12   Continue, Maintain, and Renew Their Insurance Policies and

13   Workers Compensation Programs; (II) Honor all Obligations

14   with Respect Thereto; and (III) Modify the Automatic Stay

15   with Respect to the Workers Compensation Programs (document

16   #17)

17

18   HEARING re Motion of Debtors for Entry of Interim and Final

19   Orders (I) Authorizing Debtors to Pay Certain Prepetition

20   Obligations to Critical Vendors, (II) Approving Procedures

21   to Address Vendors who Repudiate and Refuse to Honor Their

22   Contractual Obligations to The Debtors, and (III) Granting

23   Related Relief(document #18)

24

25

Page 4

```
 1    HEARING re Motion of Debtors for Interim and Final Authority
 2    to (I) Pay Prepetition Claims of (A) Shippers, Warehousemen,
 3    and Other Non-Merchandise Lien Claimants, and (B) Holders of
 4    PACA/PASA Claims, and (II) Confirm Administrative Expense
 5    Priority for Prepetition Order Delivered to the Debtors
 6    Postpetition and Satisfy Such Obligations in the Ordinary
 7    Course of Business (document #10)
 8
 9    HEARING re Motion of Debtors for Interim and Final Authority
10    to (I) Pay Prepetition Claims of (A) Shippers, Warehousemen,
11    and Other Non-Merchandise Lien Claimants, and (B) Holders of
12    PACA/PASA Claims, and (II) Confirm Administrative Expense
13    Priority for Prepetition Order Delivered to the Debtors
14    Postpetition and Satisfy Such Obligations in the Ordinary
15    Course of Business (document #14)
16
17    HEARING re Motion of Debtors for Authority to (I) Maintain
18    Certain Trust Fund Programs, (II) Release Certain Funds Held
19    in Trust, and (III) Continue to Perform and Honor Related
20    Obligations (document #15)
21
22    HEARING re Motion of Debtors for Interim and Final Orders
23    Establishing Notification Procedures and Approving
24    Restrictions on Certain Transfers of Interests in, and
25    Claims Against, the Debtors and Claiming a Worthless Stock
```

Page 5

1    Deduction (document #20)

2

3    HEARING re Motion to Extend Deadline to File Schedules or

4    Provide Required Information / Motion of Debtors for Entry

5    of Order Extending Time to File Schedules of Assets

6    and Liabilities, Schedules of Executory Contracts and

7    Unexpired Leases, and Statement of Financial Affairs

8    (document 328)

9

10   HEARING re Motion of Debtors for Entry of Order (1) Waiving

11   the Requirement to (A) File List of Creditors (B) Prepare

12   and File the List of Equity Security Holders and (C)

13   Provide Equity Security Holders with the Notice of

14   Commencement, and (11) Granting Debtors Authority to

15   Establish Procedures for Notifying Creditors of

16   Commencement of Chapter 11 Cases (document #21)

17

18   HEARING re Application of Debtors Pursuant to 11 U.S.C. §

19   105 (a), 28 U.S.C § 156(c), and Local Rule 5075-1 for an

20   Order Appointing Prime Clerk LLC as Claims and

21   Noticing Agent (document #27)

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    SKADDEN, ARPS, SLADE, MEAGHER & FLOM LLP

4         Attorneys for DIP ABL Agent

5         4 Times Square

6         New York, NY 10036

7

8    BY:  PAUL D. LEAKE

9         GEORGE R. HOWARD

10        SHANA A. ELBERG

11

12   MILBANK, TWEED, HADLEY & MCCLOY LLP

13        Attorneys for Cyrus Capital Management

14        2029 Century Park East, 33rd Floor

15        Los Angeles, CA 90067

16

17   BY:  ERIC R. REIMER

18        THOMAS R. KRELLER

19

20   CHOI & PARK, LLC

21        11 Broadway, Suite 615

22        New York, NY 10004

23

24   BY:  HYUN SUK CHOI

25

1   KELLEY DRYE & WARREN LLP

2        101 Park Avenue

3        New York, NY 10178

4

5   BY:  ROBERT L. LEHANE

6

7   DAVIS POLK & WARDWELL LLP

8        Attorneys for CitiBank

9        450 Lexington Avenue

10       New York, NY 10017

11

12  BY:  MARSHALL S. HUEBNER

13

14  JENNER & BLOCK LLP

15       Attorneys for Electrolux

16       919 Third Avenue

17       New York, NY 10022

18

19  BY:  MARC B. HANKIN

20

21

22

23

24

25

Page 8

1    WEIL, GOTSHAL & MANGES LLP

2          Attorneys for the Debtor

3          767 Fifth Avenue

4          New York, NY 10153

5

6    BY:  RAY C. SCHROCK

7          JARED R. FRIEDMANN

8          PAUL R. GENENDER

9

10   BALLARD SPAHR LLP

11         1675 Broadway, 19th Floor

12         New York, NY 10019

13

14   BY:  DAVID L. POLLACK

15         DUSTIN T. BRANCH (TELEPHONICALLY)

16

17   CHIESA SHAHINIAN & GIANTOMASI PC

18         One Boland Drive

19         West Orange, NJ 07052

20

21   BY:  SCOTT A. ZUBER

22

23

24

25

CHOATE

      Attorneys for Wells Fargo

      Two International Place

      Boston, MA 02110

BY:  KEVIN J. SIMARD

LOCKE LORD LLP

      111 South Wacker Drive

      Chicago, IL 60606

BY:  DAVID W. WIRT

CLEARY GOTTLIEB STEEN & HAMILTON LLP

      Attorneys for ESL

      One Liberty Plaza

      New York, NY 10006

BY:  SEAN A. O'NEAL

      JAMES L. BROMLEY

Page 10

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  PAUL K. SCHWATZBERG

7         RICHARD C. MORRISSEY

8

9    GOODWIN PROCTER LLP

10        Attorneys for Waste Management National Services

11        620 Eighth Avenue

12        New York, NY 10018

13

14   BY:  GREGORY W. FOX

15

16   BAKER HOSTETLER

17        45 Rockefeller Plaza

18        New York, NY 10111

19

20   BY:  FERVE KHAN

21

22

23

24

25

1    ALSO APPEARING TELEPHONICALLY:

2    JULIAN BULAON

3    GINGER CLEMENTS

4    CINDY DELANO

5    TED A. DILLMAN

6    PETER M. GILHULY

7    RONALD E. GOLD

8    ADAM J. GOLDBERG

9    TAYLOR B. HARRISON

10   BRENT HERLIHY

11   CATHY HERSCHCOPF

12   EDWARD M. KING

13   SIDNEY P. LEVINSON

14   KEITH MARTORANA

15   KEVIN MCCOLGAN

16   SUMMER M. MCKEE

17   ADAM S. RAVIN

18   DAVID ROSENZWEIG

19   MITCHELL SEIDER

20   ERIN P. SEVERINI

21   WENDY SIMKULAK

22   RONALD M. TUCKER

23   ADAM J. WEBB

24   RASHIDA ADAMS

25   BARRY BAZIAN

Page 12

1    JOSH BRANT

2    AMY CARBINS

3    EMMA CARLSON

4    RICHARD CHESLEY

5    MARVIN CLEMENTS

6    RONALD A. CLIFFORD

7    HOWARD A. COHEN

8    ANDREW S. CONWAY

9    KELLY CUSICK

10   ALEXANDER DEFELICE

11   JASON DIBATTISTA

12   JAMIE L. EDMONSON

13   DANIEL M. EGGERMAN

14   NICLAS A. FERLAND

15   ROBERT E. FITZGERALD

16   GREGG M. GALARDI

17   KIMBERLY B. GIANIS

18   STEPHANIE J. GLEASON

19   MICHAEL S. GREGER

20   TAYLOR HAMMOND

21   CRAIG HELMREICH

22   CALEB T. HOLZAEPFEL

23   ANA LUCIA HURTADO

24   VINCENT INDELICATO

25   WILLIAM M. JONES

Page 13

1    HAROLD KAPLAN

2    STEVEN C. KRAUSE

3    DAVID E. KRONENBERG

4    JEFFREY KURTZMAN

5    DONNA LIEBERMAN

6    MARK LIGHTNER

7    JONATHAN D. MARSHALL

8    MORGAN J. MCCASKEY

9    MICHELLE M. MCGREAL

10   PATRICK MOHAN

11   BRYANT OBERG

12   THOMAS ONDER

13   JOSEPH A. PACK

14   BRIAN A. RAYNOR

15   STEVEN J. REISMAN

16   LILLIAN A. RIZZO

17   BETH E. ROGERS

18   ADAM ROGOFF

19   JASON B. SANJANA

20   MICHELLE E. SHRIRO

21   PETER B. SIROKA

22   MICHAEL A. SMITH

23   CHRIS STAUBLE

24   RICHARD A. STIEGLITZ

25   ERIC STODOLA

1    MICHAEL B. SULLIVAN

2    BRAD SWEENEY

3    RONALD M. TUCKER

4    MICHARL J. WALSH

5    MEGAN WASSON

6    JAMILA WILLIS

7    ERIC R. WILSON

8    JAMES WILTON

9    EVAN J. ZUCKER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good morning.  In re Sears Holding,

3     Corporation.

4              MR. SCHROCK:  Good afternoon, Your Honor.  Ray

5     Schrock, Weil, Gotshal & Manges, proposed counsel for Sears

6     Holdings and its affiliated debtors and debtors in

7     possession.  Your Honor, with me today in the courtroom that

8     will be presenting in addition to myself will be Sunny Singh

9     from Weil, Gotshal, Jackie Marcus, Jessica Liou, and Paloma

10    Van Groll.

11             THE COURT:  Okay.

12             MR. SCHROCK:  Your Honor, first, I'd just like to

13    thank the Court for getting us into court so quickly.  It

14    was absolutely critical that we do this today.  We know that

15    we threw quite a bit of paper at the Court at the last

16    minute, and we've been involved in marathon negotiations, at

17    least according to most major news sources.

18             THE COURT:  Okay.  All right.  Well, I've been

19    able to go through the binder and the pleadings, so that's

20    no problem.

21             MR. SCHROCK:  Thank you, Your Honor.

22             Your Honor, also in courtroom with me today are

23    Rob Riecker.  He is the company's chief financial officer,

24    also a member of the newly formed office of the CEO.  Also

25    in the courtroom is our chief restructuring officer, Mo

Page 16

1    Meghji, of M-III Partners.

2         THE COURT:  Good afternoon.

3         MR. SCHROCK:  And our investment banker, Brandon

4    Aebersold of Lazard.

5         THE COURT: Good afternoon.

6         MR. SCHROCK:  Your Honor, before we get started, I

7    would like to -- also to thank the senior lenders and ESL.

8    We've been negotiating for many, many days trying to put

9    together debtor in possession financing for Sears that's

10   critical to its ongoing operations because they do

11   appreciate their support.

12        We've worked with the U.S. Trustee prior to

13   arriving here.  I think -- I believe we've resolved all of

14   their concerns.  There was one objection to the DIP

15   financing filed by American Greetings, but we have resolved

16   our concerns because they are part of the relief in the

17   trust fund motions.

18        THE COURT:  Okay.

19        MR. SCHROCK:  Your Honor, we did file an agenda.

20   It's at Docket Number 13.  But before we get started, if

21   you'll allow me just for the parties in interest, we do have

22   a quick demonstrative that we'd like to give the Court an

23   overview of the proceedings and the case.

24        THE COURT:  Okay.

25        MR. SCHROCK:  And we do have copies for anybody --

Page 17

1    I think they grabbed them all I believe we do have

2    (indiscernible) copies.

3              THE COURT:  Okay.

4              MR. SCHROCK:  This is similar to the one you had

5    before.  It's just got non-debtor (indiscernible).

6              THE COURT:  All right.

7              MR. SCHROCK:  Your Honor, on behalf of Sears and

8    its more than 68,000 employees, again, I want to emphasize

9    to the Court that we are very grateful for Your Honor taking

10   the time to be able to meet with us today and hear the

11   company's request for emergency relief to avoid irreparable

12   harm to the estate.

13             I think that, you know, just in terms of

14   recognizing what Sears is, I think everybody knows Sears is

15   an American icon.  It used to be the largest retailer in the

16   country at one time.  It's certainly been a part of many

17   people's lives and, you know, has continued to be part of

18   many people's lives, you know, even into the 21st century.

19             Sears first began operating stores back in 1925.

20   They moved from rural to urban areas.  They supplemented

21   their catalog business and quickly expanded their portfolio

22   beyond retail from 1930 to 1980.  They used to own Allstate

23   Insurance, Dean Whitter, Coldwell Banker, Discover card.

24   They founded -- they, you know, were the owner of the Sears

25   Tower.  And, you know, really when you get to know the store

1   and the corporation a little more, it's amazing with the

2   corporation this age, size, and scale exactly what is still

3   owned within the estate.

4          Now, as Your Honor may know, in 2004, Sears merged

5   with Kmart Holding following Kmart's emergence from Chapter

6   11.  Sears Holdings was formed to serve as the parent entity

7   of that post-merger reorganization.  The company has

8   undergone quite a few store reductions even prior to

9   entering Chapter 11, but the company still operates 687

10  Sears, Kmart, and Sears Auto Center locations in 49 states,

11  Guam, Puerto Rico, and the U.S. Virgin Islands.  And as we

12  did mention, the company employs approximately 68,000

13  people.

14         I'm going to go a little bit out of order here,

15  Judge, and just point out something regarding the key

16  stakeholders in this case.  Despite the company's sprawling

17  size and scope, the number of key players that I think Your

18  Honor will see in the stakeholder groups and the capital

19  structure is relatively manageable.

20         There's the ABL and first lien turn loan lenders.

21  They're represented by Skadden Arps and BRG.  2L notes have

22  some other -- there are various counsel, but they are

23  substantially similar holders to the first lien notes.

24  There are real estate loans that are owned by Cascade, ESL

25  Investments, the company's largest shareholder, represented

1    by Cleary Gottlieb and Moelis & Company.  They're also the

2    company's largest creditor; the PBGC, represented by PJT

3    Partners Locke Lord.  The unsecured noteholders, the largest

4    claim Fairholme, represented by Sullivan & Cromwell.  The

5    landlord are various, but certainly there's quite a bit of

6    concentration within the large maul of landlords.

7              The vendors, there's many vendors.  There's 12,000

8    vendors to the company, which is obviously a large group.

9    But the company's trade credit has been substantially

10   limited coming into Chapter 11.  And what we've seen is that

11   as the company has continued to suffer losses, it's

12   continued to struggle, its trade credit was not surprisingly

13   substantially compressed.  So most of the trade credit is

14   within the 503(b)(9) 20-day threshold.

15             You know, the Debtors, we've already introduced

16   who their professionals are.  But, you know, for us and I

17   think everybody involved in this case, including all of the

18   lenders, all the stakeholders, this case is very much about

19   the nearly 70,000 employees that are still working for Sears

20   and were here to fight for Sears and give them a chance to

21   reorganize.

22             I think that given the complexity of Sears'

23   capital structure, we did find the chart to be helpful.  And

24   we've got a column on the chart that actually notes the ESL

25   ownership percentage of some of the debt instruments, which

Page 20

1    I think could be relevant as we move forward.  The company's

2    DIP lenders are up in the upper left-hand corner, the

3    revolving credit facility lenders as well as the turn loan

4    lenders.

5            And what's being proposed, Your Honor is that the

6    facilities up in the upper left-hand corner, the green box,

7    the revolving credit facility down through the turn loan B,

8    those are the portions of the credit facility that are

9    proposed to be rolled up in a final order.  The FILO would

10   not be rolled up, and the -- what's been titled the 1 1/2

11   lien LC facility, which is a cash collateralized LC facility

12   with cash backed by two non-debtors, you know, would stay in

13   place.

14           The 2L credit agreement substantially owned by

15   ESL, that's another $887 million.  The second lien notes,

16   there's PIK toggle notes and 2L notes, those are

17   substantially the same as the first lien.  They do not --

18   and for them as well as the second lien credit agreement,

19   they don't have a lien on pharmacy assets or cash.

20           There's a real estate loan that has Cascade and

21   JPP, which is an affiliate of ESL, has 88 properties in that

22   silo.  And then there's the sparrow entities.  These sparrow

23   entities are in the gray boxes over here in the middle.

24   Those are special purpose entities that hold about 138

25   properties that were released by the PBGC as part of that

1   settlement.

2          And, you know, we've been speaking with them about

3   becoming a debtor.  And, you know, we weren't able to get

4   there, you know, due to a discussion about fees, basically

5   amendment fees and the like.  But we're going to continue

6   speaking with them.  I think that we could see those

7   entities enter the cases and be jointly administered, but

8   the company would just simply -- frankly, we just ran out of

9   time.

10          Another relevant entity to focus on, Judge, is in

11   the lower left-hand corner.  It's called KCD IP.  That is

12   the PBGC ring-fenced entity that has Kenmore and DieHard in

13   it.  That entity did not file Chapter 11.  I think they may

14   file Chapter 11.  They have an independent director.  We had

15   a board meeting with them over the weekend, and they're

16   certainly considering I think what to do next.

17          The reason that's relevant and there's another

18   entity over here called Sears Re over on the upper right-

19   hand corner.  What happens is the company pays royalties on

20   account of their intellectual property held in that box KCS

21   or DieHard and Kenmore that that those royalties are then

22   used to pay on account of what are the orange KCD asset-

23   backed notes.  So there's notes that go from KCD over to

24   Sears Re.  Sears Re is not a debtor.  It's a Bermuda

25   insurance company.

1           And what happens with the royalty amounts, they go

2    up through Sears Re and then they put -- the cash is

3    recycled back into the dividend and back up into the

4    structure to be used on account of warranty claims and the

5    like, you know, for products.  That structure was put in

6    place, you know, a long time ago, frankly, when there was a

7    -- I think certain advantages to it.

8           But what we're requesting at the first day hearing

9    here, we're not requesting to put money into the KCD box and

10   put it up through Sears Re because what we don't want to

11   have happen is on our royalty -- in our warranty programs,

12   send money into that -- those two entities and have it get

13   stuck outside of the estate.  So until we work out what

14   happens there with Sears Re and KCD -- and listen, you know,

15   if KCD is liable on $900 million worth of notes, you know,

16   there's certainly I think a compelling reason why they would

17   enter the cases.  But we will certainly work through that.

18   But I thought that was worth emphasizing, Judge, so you

19   understand the landscape.

20          There's also unsecured notes that are there in the

21   pink and some SRAC notes that are there in purple, which we

22   described in the first day affidavit.

23          The main picture here is, listen, this is a

24   complicated capital structure.  It's unlike a lot of capital

25   structures.  It's largely silo'd in terms of the collateral.

Page 23

1    There are still unencumbered assets within Sears.  And one

2    of the things that we're focused on as part of the debtor in

3    possession financing is that we are granting a lien as part

4    of the first day -- proposed first day relief on

5    unencumbered assets.

6         But a very important and, frankly, hard-fought

7    negotiated point is that the first $200 million of proceeds

8    that come from unencumbered asset sales are going to be put

9    in a winddown reserve account.  That winddown reserve

10   account is there for the estate that if they sell their

11   assets, if they have an estate that needs to be

12   administered, they're really there to make sure that the

13   company has sufficient funds to always wind down the estate

14   and importantly pay severance, pay other administrative

15   claims of the company.

16        And it's there so that the debtors have a cushion

17   to make sure that we're always going to be administratively

18   solvent in these cases.  So that was -- when you look a t

19   the puts and takes in the debtor in possession financing

20   negotiation, that $200 million reserve is something that we

21   think's unique but it's also we think a really benefit for

22   not just the estate but also unsecured creditors in general.

23        I think we've talked basically about the capital

24   structure on page 7.  And the circumstances leading to

25   Chapter 11, Judge, I think it's been well-documented that,

Page 24

1    listen, Sears has been struggling for some time.  We've been

2    involved with the company for some time.  And I think it's

3    fair to say in our opinion that it's hard to find a company

4    that they tried so very hard to avoid Chapter 11 because

5    they had a good faith belief that they're going to maximize

6    value outside of Chapter 11 and without running through a

7    Chapter 11 proceeding.

8            They believed that there was going to be, you

9    know, significant destruction of value and that, you know,

10   they did everything they could, I think it's fair to say, to

11   try and avoid commencing these Chapter 11 cases.  So it's

12   definitely -- it's a very tough day for the company, but

13   we'd like to think that we have a plan that gives Sears a

14   chance to reorganize around a smaller footprint and a chance

15   for, importantly, many tens of thousands of jobs to be

16   saved.

17           But it really has to happen on an expedited time

18   frame.  This is really when you look at the cash burn

19   associated with the overhead of the enterprise, it's really

20   something where things have to move very quickly.

21           We did receive, you know, a good deal of support,

22   obviously, in the form of loans that are there from our

23   largest shareholder.  But we did want to emphasize we put in

24   place on Page 10 some -- several measures regarding

25   governance.  We've appointed two independent directors, Alan

1   Carr and William Transier.  We have appointed a CRO who

2   reports to a restructuring committee.  That restructuring

3   committee is composed solely of independent directors.

4   There's Mr. Carr, Mr. Transier, there's Ms. Ann Reese, and

5   Mr. DePodesta, Paul DePodesta.

6          The restructuring committee is tasked with

7   overseeing the debtor's restructuring process and has full

8   decision making authority with respect to certain aspects of

9   the Chapter 11 cases.  And I think it's fair to say we're

10  going to be pretty deferential as a company to the

11  restructuring committee.

12         We've also formed a subcommittee just with those

13  two new members to review pre-petition transactions

14  involving affiliates, including ESL.  That subcommittee has

15  retained Paul Weiss.  I believe that they're in the midst of

16  retaining a banker.  We already received a document request

17  from those professionals.  And they are working very

18  quickly.

19         I won't talk about the DIP financing just yet, but

20  I did want to talk about the timeline on Page 12 that this

21  is a tight timeline.  I think it's fair to say that in our

22  experience even for a retail debtor.  But we look at this

23  and we say that -- we told ourselves that we have to move

24  quickly if we have a chance to save the enterprise.  And

25  there's a lot of people pulling and moving everything

1    possible to see to make sure that we give Sears the best

2    possible chance to reorganize.  This is the schedule that

3    we're proposing.

4         We had the first day hearing today.  We've

5    proposed store closing procedures, a hearing, and we're

6    working with your chambers on trying to get that set for,

7    you know, within, you know, I think the relatively near

8    term.  We have proposed junior debtor in possession

9    financing that's not to be heard today, but we're asking for

10   an interim hearing on that 15 days out while we continue to

11   conduct marketing for that facility to see if it can be

12   improved or if there's better financing available.

13        We've got a second day hearing in early November.

14   And then there's a -- you know, a key decision making point

15   here on November 15th.  And that decision -- right now we're

16   looking at closing 142 stores immediately in these cases.

17   There's another set of stores that are bring reviewed to

18   determine if we can improve lease terms, can we do other

19   things in the stores to see if we can make them profitable,

20   and is there a way to package them as part of an overall

21   store footprint to see if we can make that part of a going

22   concern sale package.

23        That decision's got to be made relatively quickly.

24   We've been in negotiations with one likely bidder, which is

25   ESL.  But we are prepared and will be marketing, you know,

Page 27

1   those assets immediately and proposing bidding procedures

2   with the Court in the near term.

3           We really believe, especially with the winddown

4   reserve, that Chapter 11 plan negotiations, that moving

5   quickly on a Chapter 11 plan so that we have an opportunity

6   to get the case completed before the administrative costs,

7   frankly, put the company in a difficult spot.  It is

8   absolutely critical, so we are going to be talking with our

9   major stakeholders, and we've already begun talking with our

10  major stakeholders, many of them prior to the petition date.

11          The real deadline in these cases as it currently

12  stands -- and this is under the debtor in possession

13  financing in accordance with the company's plan and

14  consistent with our cash flows -- is December 15th, 2018.

15  That is the date by which the company is to receive

16  committed financing for a go-forward store transaction, 60

17  days.  We are -- you know, there's possibilities that that

18  date can move around, but right now based upon what we know,

19  that's the date and we're going to be pushing hard toward

20  that.

21          We've got a target date for a plan filing in late

22  December.  A disclosure statement hearing in January.  The

23  deadline under the DIP financing and consistent with our

24  store plan to have an auction on the go-forward stores is

25  late January, and a deadline to close go-forward -- the go-

Page 28

1    forward store transaction is February 10th, 2019.  And we've

2    got plan confirmation out in March of 2019.

3           So, Your Honor, that is our plan coming into the

4    case.  It's moving -- it has to move quickly.  We are

5    committed to do whatever we can to move the cases along as

6    expeditiously as possible.  And we're -- you know, I believe

7    we have the support of many of our key stakeholders to make

8    sure that happens.

9           There's about 400 stores that are 4-wall EBITDA

10   positive before any lease concessions.  We will be engaging

11   a real estate advisor to negotiate with landlords quickly.

12   There could be many other stores that are profitable on a 4-

13   wall basis following that.  We think that selling these

14   stores under a 363 sale is probably the best approach to

15   expeditiously preserve as many as going stores as possible.

16   And as I did mention, we have 142 unprofitable stores and

17   are going to move to conduct going out of business sales at

18   those stores, unfortunately, immediately.

19           We are proposing -- I want to emphasize that we

20   continue to honor our severance programs, not for pre-

21   petition severance but on a go-forward basis for non-

22   insiders.  That's a really important component of everything

23   that we're doing here.  We don't like, obviously, having to

24   sever anyone.  But if we're going to give Sears a chance to

25   survive, we must cut the footprint and cut some of these

1    unprofitable locations as quickly as possible.

2            So, Your Honor, that really emphasizes that, you

3    know, for us, you know, time is absolutely of the essence.

4    We have to do this for Sears and its employees.  And, you

5    know, we're going to fight, you know, for the right thing to

6    do.

7            Okay.  With that, thanks for indulging me.

8            THE COURT:  Sure.  That came through in the

9    pleadings, too.  But it's worth emphasizing for those who

10   haven't read them.

11           MR. SCHROCK:  Thank you.

12           You know, before we move in, I'd like to take, if

13   it's acceptable to Your Honor, I'd like to move the

14   declarations we filed with the Court into evidence subject

15   to the right of parties to cross-examine witnesses.  I've

16   got the First Day Declaration of Rob Riecker, the CFO, at

17   ECF Number 3; Declaration of Mo Meghji, Chief Restructuring

18   Officer, at ECF Number 10; and the Declaration of Brandon

19   Aerbersold, our investment banker, at ECF Number 9.  The

20   last two are in support of the debtor in possession

21   financing.

22           THE COURT:  Okay.  I've read each of those

23   declarations.  I normally ask when I'm requested to admit a

24   declaration whether anyone wants to cross-examine any of the

25   declarants.  But anyone here has the right to do that when a

1    particular motion comes up.  So I'm not going to ask you to

2    do that at this point.  But, again, I've read each of the

3    declarations and unless anyone has any objection to their

4    admission, I'm prepared to admit them into evidence.

5            All right.  So they're admitted.

6            MR. SCHROCK:  Thank you, Your Honor.  Just moving

7    forward in the agenda, the first motion is the -- at Number

8    2 is the Motion of Debtors for Entry of Order Directing

9    Joint Administration of the cases, we'd ask that the relief

10   be granted.

11           THE COURT:  Right.  Okay.  I'll grant this motion.

12   Obviously, there are multiple debtors.  The caption says

13   Sears right in the heading so there's no confusion there.

14   So clearly there's a basis to administratively consolidate

15   the debtors.

16           MR. SCHROCK:  Thank you, Your Honor.

17           Your Honor, next on the agenda we have the

18   Debtors' Motion For Debtor In Possession Financing.  And we

19   did file that motion this morning.  And we did receive a

20   couple of comments from the U.S. Trustee that we can walk

21   through with Your Honor.  But, you know, suffice to say this

22   motion, we're not seeking approval of the junior debtor in

23   possession financing reference in there, although we believe

24   the company really does need it.

25           This is a motion for the senior debtor in

1    possession financing.  There's not a roll-up on day one.

2    There's only a roll-up proposed at the back end.  We did

3    everything we could to make it as non-controversial as

4    possible.  We believe it's consensual priming that's taking

5    place under the facilities on an interim basis, at least by

6    the required lenders that were present in the negotiations.

7           We have submitted the declarations of Mo Meghji

8    and Brandon Aerbersold about the need for the debtor in

9    possession financing, the cash flows as well as, you know

10   the reasonableness of the fees underlying it.  Now we did

11   file a motion to seal a fee -- or redact a fee letter.  I

12   have a copy of that fee letter for Your Honor --

13           THE COURT:  I've reviewed that.

14           MR. SCHROCK:  -- if I could approach.

15           THE COURT:  No.  I've reviewed it already.

16           MR. SCHROCK:  Okay.

17           THE COURT:  Someone from your office brought it

18   around earlier today.

19           MR. SCHROCK:  All right.

20           THE COURT:  I understand the U.S. Trustee has it,

21   too?

22           MAN 1:  That is correct, Your Honor.

23           THE COURT:  Okay.  Before we go further, and this

24   really goes for all of the motions, can you just go through

25   the notice that you gave for today's hearing?

1          MR. SCHROCK:  Oh, yes.  Sorry, Your Honor.  Yes.

2     We did --

3          THE COURT:  Obviously, around 100 people got

4     notice because they're in the courtroom, but I just want to

5     get --

6          MR. SCHROCK:  Yes.  We've been with them all week,

7     Judge.  Yes, Your Honor.  We did -- let me just get my notes

8     here -- yeah, we did serve the certificate of service

9     serving the top 20 creditors the agenda and the other

10    parties in interest at ECF Number 46.  There's also a more

11    substantial notice around some of the pleadings that is at

12    ECF Number 58.

13         THE COURT:  Okay.  And that went out this morning

14    early?

15         MR. SCHROCK:  It went out this morning, Your

16    Honor.

17         THE COURT:  Okay.

18         MR. SCHROCK:  And I wouldn't say early.  It went

19    out this morning.  I think we finished filing the pleadings

20    around 9:30.  But we have been in very substantial

21    negotiations with many of our creditors.  I'd submit that

22    just about every newspaper reported we were filing for

23    Chapter 11 --

24         THE COURT:  Right.

25         MR. SCHROCK:  -- last night.  And they wouldn't be

1    surprised to find us in court here today.  And they

2    certainly know where to find us if they had any concerns.

3                THE COURT:  Okay.  In addition to the people in

4    the courtroom, I have five pages of single-spaced parties

5    who are participating on CourtCall today.  So it does appear

6    to be that even though this hearing is in the afternoon of

7    the day that the Debtors filed, there was substantial actual

8    notice of the relief that you're seeking.

9                MR. SCHROCK:  Thank you, Your Honor.

10               I get thirsty when I'm a little tired.  It's been

11   a long week.

12               So, Your Honor, in terms of the actual debtor in

13   possession financing that's up before the Court, we did

14   begin negotiating with our lenders, you know, over the last

15   ten days.  There was certainly a very significant fear, I

16   think, among the company who were working on out-of-court

17   restructuring efforts that once we took that step of

18   actually, you know, negotiating with third parties who are

19   on debtor in possession financing, that the company, you

20   know, would suffer, you know, frankly a crash in trade and

21   that it would leak that that's in fact what the company was

22   doing.

23               And, you know, for what it's worth, that did

24   happen, you know, when we started meeting with parties.  I

25   don't think that -- I think everybody there was negotiating

1    very good in good faith.  I don't have any reason to believe

2    that there was anybody leaking terms.  But that was the

3    reason primarily as laid out in the Aerbersold declaration

4    regarding, you know, why the DIP negotiations took place so

5    close to the petition date.

6              So under those circumstances, you know, meeting

7    with our senior DIP lenders, our existing lenders, you know,

8    a core group that included Citibank, Wells, and led by Bank

9    of America, we're literally there at (indiscernible) offices

10   for, you know, roughly the last better part of a week.

11   We've been negotiating day and night and not just around

12   senior financing, but we also entertained is there any way

13   to do junior debtor in possession financing.

14             We did come around to allowing for a roll-up at

15   the final hearing but only with that winddown reserve where,

16   as referenced in the first day demonstrative on Page 11,

17   that 100 percent of the net proceeds from sales of currently

18   unencumbered assets are swept into the winddown account

19   until it was funded up to $200 million.  There's the

20   interest rate, we thought, was quite, you know, competitive

21   relatively speaking: the LIBOR plus 450, an undrawn

22   commitment fee of 75 basis points, an LC fee of 4 1/2, and a

23   fronting fee of .125 percent.

24             The term loan has an administrative LIBOR plus

25   800.  Those will apply to the entire facility once it's

Page 35

1    rolled up.  The fee letter, as Mr. Aerbersold testified,

2    shows fees that he believes were reasonable and within

3    market norms.

4           The U.S. Trustee had a couple of comments to the

5    order itself around the Chapter 7 carveout, moving that from

6    50,000 to 500,000, which the debtors and the lenders had

7    agreed to.  The challenge period was moved from the entry of

8    the final order 60 days from entry of the final -- or from

9    the formation of the committee to 60 days from the entry of

10   the final order consistent with the local rules.  And we are

11   removing an event of default related to change in venue.

12   The U.S. Trustee asked for that request, and we were okay

13   with that.  We have a New York corporation --

14          THE COURT:  I was going to ask for that, too, so

15   that's fine.

16          MR. SCHROCK:  Yes, Your Honor.  Although we

17   weren't going to object to that.

18          I'm happy to answer any questions you have about

19   the financing.

20          THE COURT:  Well, let me -- does anyone have

21   anything further to say on the motion for approval?

22          MR. LEHANE:  Good, Your Honor.  Robert LeHane from

23   Kelley Drye & Warren on behalf of numerous landlords,

24   including Brookfield, Reed US, Inc, which if formerly GGP,

25   LBA Realty Advisors, which is the landlord to five

1     distribution centers in the excess of two million square

2     feet, numerous other landlords.

3              Your Honor, obviously, a difficult day.  Just

4     wanted to put to rest any questions Your Honor may have had.

5     I've worked with Mr. Schrock and his team before and many of

6     the lenders.  They got it right with respect to all the

7     landlord issues on liens on leases and collateral access.

8              THE COURT:  Right.

9              MR. LEHANE:  There's no lien on the leases in

10    this.  They may seek one in the final.  And, certainly, with

11    respect to collateral access, everything is status quo until

12    further order of the Court or a written consent of landlords

13    already in place.  We certainly appreciate this.  We realize

14    it's a very difficult day and look forward to working with

15    the debtor and all parties in interest to try and help the

16    company get through a reorganization quickly and save jobs.

17             THE COURT:  Right.  Okay.  Yeah, I noticed those

18    provisions and that saved us about half an hour of

19    discussions, so I appreciate that, too.

20             MR. DIETDERICH:  Good afternoon, Your Honor.  Andy

21    Dietderich, Sullivan & Cromwell, for Fairholme Funds.  I'm

22    not exactly sure what the right moment for this is in the

23    proceeding, but I thought I could just speak very briefly

24    about our perspective on the case for no more than a minute

25    or two.

1            THE COURT:  Okay.

2            MR. DIETDERICH:  It may be relevant to Your

3     Honor's consideration of the DIP.  Fairholme is listed as a

4     party in interest.  I want to make sure that the Court

5     understands that Fairholme was a mutual fund.  It was not

6     involved in negotiations prior to these hearings.

7     Fairholme's no substitute for the creditors committee this

8     case needs.

9            We have reviewed on the way to court today the

10    motions that were proposed, and we have no objection to the

11    relief being requested today.  We think a creditor's

12    committee needs to be formed and do its work.  I do think

13    it's useful for Your Honor to understand that at least from

14    the perspective of Fairholme, which is a substantial

15    unsecured creditor, holding about $330 million face in

16    secured bonds, this is not so much a melting ice cube as a

17    puddle.

18            As the first day affidavit says, most of Sears is

19    already gone.  Only a few years ago the company had an

20    unencumbered portfolio with some of the best brands in the

21    country and some of the best real estate in the country.  It

22    doesn't today.  What happened?

23            Unlike most bankruptcies, this one is about the

24    past as much as it's about the future.  These cases are the

25    last mile in a multi-year liquidation, one that happened

1    without court supervision.

2              Fairholme is ready to support a fair compromise to

3    the past, but this requires a fair process.  Fairholme does

4    not believe the debtors, still under ESL corporate control,

5    should hand-pick who conducts that process, nor should ESL

6    continue to dictate a money-losing business plan for a

7    company that has never shown a potential for profitable

8    operations.  We'll be talking to other creditors in the next

9    few days about how to proceed.  We're not going to carry the

10   water as Fairholme, but we do look forward to the formation

11   of a fiduciary committee for creditors.

12              THE COURT:  Okay.

13              MR. DIETDERICH:  Thank you.

14              THE COURT:  Okay.  That's fine.  And I think that

15   highlights, again, one of the reasons that it's important

16   for these debtors to ensure as best they can that they don't

17   become administratively insolvent so that type of review can

18   actually take place in a proper way, whatever that way is.

19   I'm not saying what it is at this point.

20              MR. HUEBNER:  Good afternoon, Your Honor.  For the

21   record, Marshall Huebner of Davis Polk & Wardwell --

22              THE COURT:  Good afternoon.

23              MR. HUEBNER:  -- on behalf of Citibank, North

24   America.  Your Honor, just for a moment, not to complicate

25   things, but tucked into the DIP order is, of course,

1      adequate protection and other things as well.

2              Just because I know there's a lot to cover today,

3      I did want to note for the Court's benefit there's a $271

4      million LC facility within the stack of the ABL for which

5      Citibank, as agent -- in an effort to be maximally

6      accommodating to the Debtors, the agent and the lenders

7      thereunder are not asking for a roll-up.

8              It's asking for a very standard package in which

9      essentially the LCs will continue to auto-renew during the

10     case, which is the cheapest and most effective way for the

11     Debtors to maintain the $271 million of LC capacity.

12     There's an (indiscernible) layered junior adequate

13     protection lien as well as agent fees and expenses.  And

14     it's actually, I think, the most elegant way we could find

15     to support the debtor through the LCs that are already

16     outstanding under the facility.

17              THE COURT:  Right.  Okay.

18              MR. BROMLEY:  Good afternoon, Your Honor.

19              THE COURT:  Good afternoon.

20              MR. BROMLEY:  James Bromley from Cleary Gottlieb

21     on behalf of ESL.  I think it's important for us to stand

22     for a moment today to make a couple of statements.  First of

23     all, we are 100 percent behind the Debtors and their

24     efforts.  We intend to cooperate entirely with the special

25     committee with respect to the requests that have been made

 1    for information.

 2            It's critical, though, to note that when we're

 3    sitting here, there is a process and that process should

 4    take place.  The Fairholme representatives are people who

 5    have been involved in this case.  They've served on the

 6    direct -- as directors of this Sears, signed off on multiple

 7    transactions.  All of the transactions that took place here,

 8    Your Honor, took place with the strictest of corporate

 9    governance oversight.  And we look forward to having all of

10    the facts examined and appropriately addressed.

11            THE COURT:  Okay.

12            MR. BROMLEY:  Thank you, Your Honor.

13            THE COURT:  Thanks.

14            MS. KHAN:  Good afternoon, Your Honor.

15            THE COURT:  Good afternoon.

16            MS. KHAN:  Ferve Khan from Baker Hostetler, on

17    behalf of American Greetings.  We had filed an objection to

18    the motion to accept (indiscernible) priming lien against

19    our merchandise.  In light of Mr. Schrock's representations

20    on the record today that that motion will be handled in the

21    trust account procedures, we'll be resolving that objection

22    consensually.

23            THE COURT:  Okay.  Very well.  Thank you.

24            MR. WIRT:  Good afternoon, Your Honor.

25            THE COURT:  Good afternoon.

1          MR. WIRT:  David Wirt with Locke Lord.  We're

2     counsel for Pension Benefit Guaranty Corporation, PBGC for

3     short.  I just wanted to note based upon Your Honor about

4     the question about cross-examining witnesses today.  We note

5     the interim nature of these orders, and while I have no

6     objection today, would reserve our rights to test the

7     evidence in the future once these orders migrate into a --

8          THE COURT:  Sure.  Everyone has that right.

9          MR. WIRT:  Thank you, Your Honor.

10          THE COURT:  Okay.  All right.  Well, really very

11     little of that was actually about the DIP motion, but that's

12     fine.  I appreciate people taking their views.  I have to

13     say I had very few comments on the motion or the order.  I

14     think that's reflected in some of the things I've already

15     said as far as the treatment of landlords, the preservation

16     of most issues that are potentially problematic until the

17     final hearing, and the like.

18          So I have just a handful of comments that I'm

19     happy to give you.

20          MR. SCHROCK:  Certainly.

21          THE COURT:  But with those comments properly

22     addressed, I'm prepared to grant the motion on an interim

23     basis.  I appreciate that as stated in the Lazard

24     declaration, the DIP loan process, while it may have

25     compressed a lot of time in terms of hours spent, started

Page 42

1    quite recently.  On the other hand, given the capital

2    structure of these Debtors, I agree with the declaration

3    that it's highly unlikely that there would have been a DIP

4    lender there on an interim basis, at least, that would be

5    willing to lend other than on a consensual basis priming

6    itself, which is what we have here.

7             Maybe then -- maybe I'm wrong and in a couple of

8    weeks someone will show up that will surprise us, but I'm

9    comfortable that the process has been at arms-length and in

10   good faith with regard to the --

11            MR. SCHROCK:  And we are going to continue to

12   market the loans, Your Honor, post-petition.

13            THE COURT:  Right.  And that's clearly stated as

14   well and including as part of the process with the

15   contemplated $300 million junior loan, DIP loan.

16            So as far as comments are concerned, they're

17   pretty minor.  On Page 7 in the Debtors' stipulations, the

18   stipulations are all properly qualified by the rights in

19   Paragraphs 40 and 41.  But the stipulations in (f) starting

20   on Page 12 going through (k) on 16 -- actually (l), excuse

21   me -- (l), all deal with the second liens.  And the

22   Paragraphs 40 and 41 properly just set a deadline for

23   objecting to the ABL.  So really there's no -- there's other

24   cases -- well, shouldn't really be covered here.  They could

25   be Debtors' assertions, but they shouldn't be wrapped into

1    the mechanism of a fish-or-cut-bait format.

2              MR. SCHROCK:  Obviously, we're fine with that,

3    Your Honor.

4              THE COURT:  Okay.

5              MR. SCHROCK:  We'll just remove those.

6              THE COURT:  Okay.  And then on Page 6, it has --

7    well, maybe I missed something here.  I'm just focusing on

8    the introduction now, but let me just look at one point

9    here.

10             MR. DIETDERICH:  Your Honor, I need to make one

11   question, one other question.

12             THE COURT:  Right.

13             MR. DIETDERICH:  Sorry.  It's a question for the

14   Debtor just clarification.

15             THE COURT:  Could you just state your name for the

16   record again?

17             MR. DIETDERICH:  Sure.  Andy Dietderich, Sullivan

18   & Cromwell.  Your Honor, we would be concerned, we might ask

19   for clarification from the Debtor to make sure that none of

20   the debt held directly or indirectly by the ESL

21   (indiscernible) stipulations (indiscernible).

22             MR. SCHROCK:  But certainly the intent that --

23             THE COURT:  You know, there's a footnote that says

24   that I believe.

25             MR. SCHROCK:  Yeah.  There was a lot of paper and

1    (indiscernible).  Thank you.

2              THE COURT:  Okay.  Yes, on Paragraph 6, Page 29,

3    there's an authorization to pay certain sums, including fees

4    to the DIP lenders.  It's qualified a little bit in

5    paragraph E on Page 45 as far as the mechanism for reviewing

6    the reasonableness, so maybe in addition to saying subject

7    to Paragraph 19, you could say and 18E at the intro to that.

8              And then in Paragraph 12 on Page 32, the DIP ABL

9    collateral basically extends to everything with the carve

10   outs and other exceptions including the wind down account.

11   In the last sentence of that paragraph says, "In the

12   proposed final order, the Debtors will request that all of

13   the proceeds of avoidance actions also go to secure the

14   claim."

15             But it's not carved out before that, so I think

16   you need to carve it out on Page 32, you know, avoidance

17   actions and the proceeds thereof.

18             MAN 1:  Will do, Your Honor.

19             THE COURT:  Okay.  And then we talked about the

20   venue point.  On Page 76, this is the list of defaults, I

21   didn't understand D.  It says, "To pay any fees or similar

22   amounts, like a topping fee, without prior consent of the

23   ABL agents...", in most of the other provisions you say

24   except as approved by the Court.  To me this gives the ABL

25   agents, without having that language there, it gives the ABL

Page 45

1   agents leverage over a sale, particularly when they are

2   given the right to credit bid.  It didn't seem to work

3   there.  I think it should have except as approved by the

4   Court.

5          I understand it would be an event of default if

6   the Debtor paid something out of the ordinary course that

7   wasn't Court approved, but if I approved it with obviously

8   on notice to everyone, I don't think that it should be an

9   event of default if the lenders disagree with that.

10          And then in F it says, "To use or seek to use cash

11   collateral while the DIP obligations are outstanding...".  I

12   can see a motion saying we'll pay them off with the

13   replacement facility, that shouldn't be the basis for an

14   event of default.  So, "seek to use".  I think it should --

15   maybe I'm just not reading this right, but I think it's to

16   use or seek to use unless the motion to seek to use provides

17   for payment of the facility.

18          MAN 1:  I understand the point, Your Honor.  If

19   we're going to pay them off...

20          THE COURT:  Right.  Making the motion to pay them

21   off shouldn't be an event of default.

22          MR. SCHROCK:  Yes, I think that should be fine.

23          THE COURT:  Okay.  And then on the challenge

24   period point, I certainly agree with the U.S. Trustee's

25   point that you've adopted.  I think as a practical matter

Page 46

1    this is not going to be the case in this case.  If you look

2    at 78(d) it says that, "Unless there's a challenge, the pre-

3    petition ABL obligations shall constitute allowed claims not

4    subject to counter-claims, setoffs, subordination

5    recharacterization, reduction, defense or avoidance."

6         Well, under 506(a) you could reduce based on the

7    value of the collateral and that's not really covered by a

8    challenge.  I normally require, you know, except as provided

9    based on valuation of the collateral under 506(a) to be

10   inserted in language like that.  It's probably a non-issue

11   here.

12        MR. SCHROCK:  Sounds good.

13        THE COURT:  And then the last point I have is

14   really a minor one and it goes for a lot of these where

15   there's a notice of final hearing paragraph, Page 87

16   Paragraph 56.  Just as a preview, I'm likely to grant the

17   case management order so I think it should just say the

18   notice will be done as per the case management order so

19   there's no conflict there.

20        But with those really relatively minor changes I'm

21   prepared to approve this and enter the interim order that

22   I've gone through.

23        MR. SCHROCK:  Thank you, Your Honor.  May I have

24   just one moment?

25        THE COURT:  Yes.

Page 47

1         MR. SCHROCK:  Your Honor, we're just discussing

2    one point on Page 67 Paragraph D regarding the Debtors'

3    right to use cash collateral.

4         THE COURT:  That's fine.

5         MR. SCHROCK:  Just a moment.  Sorry, Judge.  So,

6    Your Honor, in Paragraph D Page 67, we just want to add the

7    proviso "or for the contested use of cash collateral".  I

8    think that this is just going to be an issue that the entry

9    of the final order we'll just have to work with the lenders

10   on -- you know, we can waive those rights.

11        THE COURT:  Okay.  Well, again, you can use cash

12   collateral if the motion says that you're paying it off.

13        MR. SCHROCK:  Yes.

14        THE COURT:  Okay.

15        MR. SCHROCK:  Okay.  Thank you, Your Honor.

16        THE COURT:  Okay.

17        MR. SCHROCK:  With that, Your Honor, I'm happy to

18   make your changes and I'll turn to the podium over to Mr.

19   Singh.

20        THE COURT:  So, with this order and all the other

21   ones you could send me the blackline pages and the final

22   version of the order.  Hopefully they'll get entered today,

23   but people can act in reliance on them because literally I

24   have no other changes to the order than the ones I laid out

25   on the record and that you laid out in light of your

Page 48

1    agreement with the U.S. Trustee.

2             MR. SCHROCK:  Thanks very much, Your Honor, and

3    just really quickly before I sit down, regarding the

4    comments of Mr. Dietderich, suffice it to say that the

5    Debtors have their own views on those issues.  They weren't

6    relevant to cash collateral.  I'm not going to get into them

7    today, but I think that's for another day.

8             THE COURT:  I agree.

9             MR. SCHROCK:  Okay.  Thank you, Your Honor.

10            MR. SINGH:  Good afternoon, Your Honor.  Sunny

11   Singh, Weil Gotshal on behalf of Sears, Your Honor.

12            THE COURT:  Afternoon.

13            MR. SINGH:  Very long couple of days.  I believe

14   I'm in the right courtroom at the right time.

15            Judge, one thing I would just mention on the

16   interim DIP order there were also some other clarification

17   type changes where we added on areas where there's no

18   release or bar with respect to investigation of ESL.  We

19   worked that out with counsel for the DIP lenders.  We'll

20   have those changes in the redline that we send out to you as

21   well as a reservation of rights that was provided by Chubb

22   Insurance with respect to LCs that they have, effectively

23   that we're not priming any LCs that they're holding onto.

24            THE COURT:  Right.  This is consensual priming

25   only as I understand it.

Page 49

1          MR. SINGH:  That's right, Judge, and that property

2    is sitting with them.

3          THE COURT:  And as far as anyone that arguably in

4    American Greetings' position, you can't grant a lien on

5    something you don't own.  I don't think the Debtors are

6    pulling any fast ones today.

7          MR. SINGH:  Exactly, Judge.  We agreed to add the

8    language and counsel for the DIP lenders is okay with it as

9    well.

10          THE COURT:  Okay.

11          MR. SINGH:  Judge, if I could just talk scheduling

12    for one second, it will just be relevant because we do have

13    on the agenda today, as Mr. Schrock mentioned, some real

14    estate motions that are not going forward today -- that's

15    the GOB procedures as well as the lease rejection procedures

16    at the omnibus lease rejection with respect to the dark

17    stores.

18          So, we are working on a date with your chambers to

19    try and get back early next on just the GOB procedures

20    motion.  But, Your Honor, we do have I believe you are

21    available and so we can start collecting these dates into

22    some of the proposed orders, Thursday November 1st at 2:00

23    PM with respect to the junior DIP financing piece and then

24    Thursday November 15th at 10:00 a.m. as to the second day

25    hearing.

1          THE COURT:  Okay.  If that's what Miss Lee told

2     you, she knows better than I do.

3          MR. SINGH:  And I think that all fits within the

4     milestones that, Your Honor, set out.

5          THE COURT:  Okay.

6          MR. SINGH:  Your Honor, going to cash management

7     next, it's a pretty typical cash management system that

8     Sears operates under; three tiers, collection, concentration

9     and payment through zero balance accounts.  We've got 154

10    accounts that are mostly with Bank of America.  There are a

11    few accounts that are not on the U.S. Trustee's list, but

12    they are less than $250,000 typically held in those

13    accounts.

14          Your Honor, I would note with respect to the

15    intercompany transactions, Mr. Schrock summarized them for

16    you earlier as to the KCD notes and Sears Re, so we're not

17    seeking any relief with respect to those types of

18    transactions in the cash collateral motion.

19          Although we are going to continue the warranty

20    arrangement of course with Sears Re so there's no disruption

21    to that part of the business.  But there are some

22    transactions that we do seek authority for in an

23    intercompany scope.

24          As to Debtors in the ordinary course of business

25    we'll obviously record administrative expense claims and

1    monitor those.  But as to non-Debtor foreign affiliates, and

2    in particularly, Your Honor, we have three -- Hong Kong,

3    India and Israel, where we really have back office and

4    support services that are being provided by those foreign

5    entities and so amounts are effectively being paid really

6    only to make payroll there.  If we didn't make payroll there

7    we'd have to outsource for these services which are call

8    centers, certain sourcing and IT support.

9              THE COURT:  So they're still needed.

10             MR. SINGH:  Yes, we absolutely need it.  They are

11   providing the service.  We do have some controlled mechanics

12   and we did, based upon how much we spend on a regular basis,

13   propose a cap, Your Honor, of $5 million per month per

14   million.  But we do need that ability to continue to operate

15   the business.

16             THE COURT:  Okay.  And then on Sears Re, Mr.

17   Schrock did explain --

18             MR. SINGH:  That's right.  We'll have to come

19   back.

20             THE COURT:  Unless there's some solution to the

21   flow of funds, it's going to stop it.

22             MR. SINGH:  That's right.  We'll have to come back

23   to you on that one as well as the KCD notes.

24             Your Honor, the other relief in the cash

25   management motion relates to chargebacks and our credit card

1    processors.  We've got a number of them, Your Honor, and

2    basically whenever credit card charges are made, and there

3    are tons through the Sears stores, these entities, whether

4    it's credit card company directly like with AmEx, First Data

5    who is a processor, handles all of these sort of cash flow

6    ins and outs and net settles on effectively a daily basis.

7    It may not happen exactly on a daily basis, but effectively

8    on a daily basis, so we need those arrangements to continue

9    in accordance with their terms, Your Honor.

10            We believe those parties are protected anyway with

11   the set off and/or (indiscernible) rights.  So, in order for

12   the ordinary course operation in the business we've sought

13   (indiscernible) continue this.

14            THE COURT:  Right, which really is ordinary

15   course.

16            MR. SINGH:  Absolutely, Judge.  I think that

17   summarizes the cash management motion unless you have any

18   questions.

19            THE COURT:  Okay.  Does the U.S. Trustee have any

20   position on this relief?

21            MR. SCHWARTZBERG:  Paul Schwartzberg from the U.S.

22   Trustee's Office, Your Honor.  No, Your Honor.

23            THE COURT:  Okay.  All right.  I've reviewed the

24   motion and my only questions about it have been answered

25   and, given that, I'll grant it on an interim basis.  It's

Page 53

1    really in the Debtors' interest.  It needs the relief and in

2    some respects it probably doesn't need an order, to make

3    these changes to the cause to what would otherwise be

4    required under the Bankruptcy Rules.

5           MR. SINGH:  Thank you, Judge.  Your Honor, next

6    just quickly I'll handle the case management procedures.  I

7    think they are in line with the procedures Your Honor has

8    entered in other cases and unless you have any questions,

9    we'd ask that it be entered.

10           THE COURT:  Well, I think there -- unfortunately,

11   I think you're going to have to make a few changes here.

12   First on Page 3, where it says filing of documents.  We're

13   going to something called NextGen, and there's actually

14   little pamphlets outside my Courtroom on it.

15           So I think the best thing to do here is to check

16   with the Clerk's Office.  But I think Paragraph 4, you're

17   going to have to revise.  Maybe you should make a reference

18   in that paragraph to Local Rule 5005-2, instead of General

19   Order 399, but I'm not sure.  I think I had this right, that

20   you're just supposed to use PDF's and not Word or Windows-

21   based documents when you file.

22           MR. SCHROCK:  Okay. We'll check and make the

23   changes.

24           THE COURT:  Okay.  And then on Paragraph 9, I'm

25   not sure why there's a distinction between the Debtors and

1    the Committee on one hand and other parts on the other, as

2    far as service is concerned.  I think I'd rather just have

3    it as you provide for everyone else, unless there's some

4    reason why those two should be different.  And encouraging,

5    obviously, email service.

6            On Page 21, I have my own procedures for pretrial

7    orders that are on the website.  And this kind of adopts

8    them, but kind of doesn't, as far as the parties can set a

9    briefing schedule and then just submit an order.  I'd rather

10   they just follow the procedures on the website.

11           And similarly, for Paragraph 28 and Paragraph 36,

12   these are paragraphs that deal with notices of presentment

13   and submitting orders where there's a certification of no

14   objection.  And I have a procedure where I require you, when

15   you submit that by email to chambers, you need to submit the

16   underlying motion papers and the certificate of service, so

17   we don't have to go through trolling through the docket to

18   find them because I read them.

19           And similarly, on 42 where it refers to discovery

20   disputes.  Before, as you say, before people contact

21   chambers, they should do their best to resolve the dispute.

22   But I'd prefer it to have -- if you can't resolve it, to

23   have the parties email chambers with a brief letter

24   explaining the dispute and requesting a call to be set up.

25           And then lastly, Paragraph 47 deals with arranging

Page 55

1    telephonic appearances.  And I, along with Judge Chapman,

2    are conducting an experiment to use a company called Court

3    Solutions.  Many of you on the phone reached out to Court

4    Solutions because you know that, but we're in a different

5    Courtroom.  This is a jury assembly room, and I use it for

6    my large Chapter 13 docket for large hearings.  They're only

7    set up for Court Call, so that's why the people on the phone

8    got a notice saying we're not going to -- from Court

9    Solution saying we're not handling your call today, reach

10   out to Court Call.

11           I don't know how you're going to -- I think most

12   of the hearings will be in the other, my regular Courtroom.

13   So I think you should probably modify this to say contact

14   Court Solutions.  The good thing about Court Solutions is,

15   you don't have to contact chambers.  You can just do it

16   through them, so the people in the Clerk's Office don't have

17   to field 20 or 30 calls.

18           MR. SCHROCK:  Okay, we'll make that change.

19           THE COURT:  Then I suppose, if we're back in here

20   for something, we'll do that on an ad hoc basis.  Like

21   today, Court Solutions will notify people that they need to

22   make some other arrangement.

23           MR. SCHROCK:  Okay.

24           THE COURT:  But I think you have someone behind

25   you that wants to say something on this motion.

1          MR. GADSDEN:  Very briefly, Your Honor.  James

2     Gadsden, Carter Ledyard & Milburn, for Bank New York Mellon,

3     Trust Company and as Trustee.  Since we're getting an order

4     in making notice provisions, I've given Mr. Singh my firm's

5     notice detailed for use for the Bank New York Mellon.

6          THE COURT:  Okay, all right.  I sometimes do these

7     procedures after a committee is formed, so that other people

8     can look at them.  But there's a paragraph in here that says

9     that these can be changed on notice, so that could still

10    happen.  If I miss something, if someone feels that there's

11    some procedural disadvantages in this order, they can

12    request that it be amended.

13         MR. SCHROCK:  Okay, Your Honor.

14         THE COURT:  So with those changes, I'll approve

15    it.

16         MR. SCHROCK:  We'll make amendments right away.

17    Your Honor, I'm going to turn the podium over to my

18    colleague, Jessica Liou.

19         THE COURT:  Okay.

20         MS. LIOU:  Good afternoon, Your Honor.

21         THE COURT:  Afternoon.

22         MS. LIOU:  Jessica Liou from Weil, Gotshal &

23    Manges, counsel for Sears Holding Corporation and its

24    affiliated Debtors.  I've got three matters before you, all

25    routine, but very important motions to the Debtors.

1           The first one is agenda item no. 6 is the Debtors'

2    motion to pay employee wages and honor employee obligations,

3    benefits and continue existing benefit program.

4           As you know, the Debtors have a very large

5    workforce and that workforce is incredibly important to a

6    retailer like Sears.  And in addition to the 68,000

7    employees that they have, they also have a supplemental

8    workforce they're paying for.

9           We are seeking to pay all outstanding accrued

10   prepetition wages and other obligations related to the

11   ongoing program.  But there are a few things that I would

12   like to note: the first thing is that we are not seeking to

13   pay any specific employee or member in the supplemental

14   workforce above the priority wage that we spoke of.

15           THE COURT:  And that's in the aggregate, whether

16   it's wages or accrued vacation.

17           MS. LIOU:  That's correct.

18           THE COURT:  Okay.

19           MS. LIOU:  And the second item I'd like to note is

20   that our motion describes two incentive plans that the

21   Debtors have and continue to support the proceeding to

22   continue in the ordinary course.

23           The U.S. Trustee has raised some questions with

24   respect to those programs and would like to learn more about

25   them.  So we have agreed with the U.S. Trustee that, at

Page 58

1    least with respect to an interim order and on an interim

2    basis, they're not seeking any emergency meeting with

3    respect to those two bonus programs.  We don't believe that

4    there are going to be any amounts due and owing under the

5    bonus programs anyway.

6              THE COURT:  Over the next couple of weeks.

7              MS. LIOU:  Exactly, over the next couple of weeks.

8              THE COURT:  Okay.

9              MS. LIOU:  Most of the payments will be made on an

10   annual basis, although some will be quarterly, but not due

11   over the next several weeks.

12             The third item I'd like to note is that we did

13   also provide disclosure in our motion about the post-

14   petition severance program that the Debtors would like to

15   continue in the ordinary course.

16             And as my colleague, Mr. Schrock, mentioned, it is

17   incredibly important to the Debtors to be able to operate

18   and show their workforce that they're incredibly important,

19   especially during this critical time where we've got 142

20   stores that are going dark and we're going to need employees

21   around to continue to sell our inventory.

22             And so, we believe in ordinary course, we would

23   like it to go forward.  The U.S. Trustee has indicated some

24   concerns with having the severance program continue during

25   this interim period, but we are requesting that it continue.

Page 59

1              We also note that in the motion, and we can

2    include language to this effect in the order as well, but we

3    are not seeking to make any payments that would violate

4    Section 503(c) with acceptable severance.

5              THE COURT:  As far as insiders are concerned.

6              MS. LIOU:  Correct.

7              THE COURT:  Okay, all right.  Did that resolve the

8    U.S. Trustee's issue?

9              MS. LIOU:  No, it did not.

10             THE COURT:  Okay, all right.  So in terms of the

11   projected cash payments, this contemplates -- obviously,

12   some of these are estimates.

13             MS. LIOU:  Correct.

14             THE COURT:  $107,600,000?

15             MS. LIOU:  Yes, that's right for the interim

16   period.

17             THE COURT:  Okay.  And that's, that number is

18   consistent with the DIP loan and the budget and they all

19   synch together?

20             MS. LIOU:  I believe it is.

21             MR. SCHROCK:  Yes, it is.

22             THE COURT:  Okay, all right.  Okay.  All right,

23   well, did anyone have anything to say on this motion?

24             MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

25   with the U.S. Trustee's Office.  I'd like to thank the

1    Debtor for putting off the incentive portion of the motion

2    at our request.  You know, that just left the severance

3    part.  As per the motion, nothing is actually due today.

4    They (indiscernible) prepetition (indiscernible) due because

5    it's made on an emergency basis, we didn't see the need for

6    it to be done today and to be put off.

7              Exactly our and the Debtors' concept of

8    (indiscernible) may or may not entirely differ.  And so, we

9    thought it should be put off until there's a little more

10   disclosure regarding who's actually getting severance or may

11   get severance.  And it doesn't need to be done today, for

12   the reason there's no emergency.

13             THE COURT:  Okay.  Does anyone else have anything

14   to say on this motion?  On that point, I think, particularly

15   given the case law in the Second Circuit, by authorizing the

16   Debtors to make a payment in respect to severance, I'm not

17   really doing anything other than saying pay an

18   administrative expense, unless, of course, someone is an

19   insider.

20             And, I mean, this is post-petition severance we're

21   talking about here?

22             MS. LIOU:  That's correct.

23             THE COURT:  And as far as insiders are concerned,

24   I believe that based on my review of the motion, there is a

25   -- just as with the critical vendor motion, there's a

Page 61

1    sophisticated team that's in charge of this process, and

2    that the Debtors would be careful not to pay -- make a

3    payment on an interim basis that would even arguably violate

4    503(c).  So with that bit of warning, I'll grant the motion.

5              MR. SCHWARTZBERG:  Your Honor, there's language in

6    the motion that talks about how they're not going to make

7    any payments in violation of 503(c).

8              THE COURT:  Right.

9              MR. SCHWARTZBERG:  I would ask that the Debtor

10   could track that language into the order.

11             THE COURT:  No, I think counsel said that they

12   would.

13             MR. SCHWARTZBERG:  Thank you, Your Honor.

14             THE COURT:  Okay.

15             MS. LIOU:  Thank you, Your Honor.

16             THE COURT:  But clearly, as with most, although

17   not all, businesses, the employees are critical to the

18   continued operation of the business, even where they may be

19   employees in stores that are slated to be closed.  So it

20   appears clear to me that these payments will provide a net

21   benefit to the Debtors' estates, after taking into account

22   the priority scheme of the Bankruptcy Code.

23             There may be some admin and creditors that are

24   ahead of the, you know, the $12,000 priority, but those

25   creditors aren't likely to get the type of assurance that

Page 62

1    they'll get to get paid unless the employees are paid.

2            So I view this as basically, these types of

3    motions as motions for approval out of the ordinary course

4    of a transaction under 363(b).  There's clearly a legitimate

5    and good business reason to make these payments.  It's being

6    made out of collateral for the DIP lenders and the secured

7    lenders who are fully aware of this and have budgeted for

8    it.  So for all those reasons, I'll grant the motion, as

9    slightly revised as you said on the record.

10           MS. LIOU:  Thank you very much.

11           THE COURT:  Okay.

12           MS. LIOU:  I think that brings us to the next item

13   on the agenda, item no. 7.  That's Debtors' motion seeking

14   to pay certain taxes, prepetition taxes and fees, including

15   sales and use, franchise, income, real estate, and other

16   types of licensing miscellaneous.

17           Your Honor, this is a pretty routine motion,

18   payment of taxes are pretty important.  Failure to pay these

19   taxes will subject the Debtors to potential secured claims,

20   liens and fines, interruptions to its business, and also a

21   portion of the taxes themselves (indiscernible) property of

22   the Debtors' estate because they are trust fund taxes.

23           THE COURT:  Right.

24           MS. LIOU:  So with that, we ask for [OFF MIC]

25   grant the motion.

1          THE COURT:  Okay.  And, again, this is -- these

2     payments are subsumed within the DIP budget?

3          MS. LIOU:  Correct.

4          THE COURT:  Right, okay.  Does anyone have

5     anything to say on this motion?  All right.  Most of these

6     taxes, it's really a no-brainer that they need to be paid.

7     Many of them are pass throughs for the landlords.  Others,

8     as you say, are trust fund taxes, or necessary for the

9     Debtors to continue to operate various segments of their

10    business, like, for licensing, for example.

11          And to the extent that they're not, they would be

12    priority claims; and if not paid, would leave to either, as

13    you say, liens or penalties or both.  So I'll grant the

14    motion and authorize the payment.

15          MS. LIOU:  Thank you, Your Honor.  Next is the

16    Debtors' motion seeking to continue their insurance and

17    workers' compensation programs, and also to pay certain

18    prepetition amounts due with respect to their insurance

19    policies and also workers' compensation program.  That

20    agenda item no. 8.

21          THE COURT:  Right.

22          MS. LIOU:  And just to clarify, with respect to

23    the motion itself.  The Debtors believe that during the

24    interim period, there will only be, you know, various

25    premium financing amounts that will come due that relate to

1    the prepetition period, and that's a small amount, probably

2    about $850,000.

3              And then there is an expected amount that would

4    come due in the interim period related to potential workers'

5    compensation obligations, including potential settlements of

6    claims that arose prepetition, and that would be an

7    estimated $3 million.

8              So it's the $3 million, plus the $850 that we're

9    seeking authority to pay in the interim.

10             THE COURT:  Right.  And the workers' comp is

11   partly done by insurance and partly self-financed, in

12   essence?

13             MS. LIOU:  That's right.

14             THE COURT:  Okay, all right.  Does anyone have

15   anything to say on this motion?  You didn't attach the

16   actual premium financing arrangements, but I'm assuming that

17   the only lien that the finance lender has is on the policy

18   and the unpaid -- the proceeds for the unpaid premiums,

19   right?  There's no other lien that they get.

20             MS. LIOU:  I'd have to verify that.

21             THE COURT:  Okay.  I mean, that's typically how

22   they work.  I just want to make -- if they -- I'm assuming

23   that's the case.  If it's not, then we'll deal with it at

24   the final hearing.  The DIP lenders will probably check that

25   too.  But having said that, I'll grant the motion.

1          MS. LIOU:  Thank you, Your Honor.  With that, I'll

2     cede the podium to my colleague, Jacqueline Marcus.

3          MS. MARCUS:  Good afternoon, Your Honor.

4     Jacqueline Marcus, Weil Gotshal & Manges, on behalf of the

5     Sears Holding Corporation and its affiliated Debtors.

6          Your Honor, no. 9 on the agenda today is the

7     Debtors' critical vendors motion.

8          THE COURT:  Right.

9          MS. MARCUS:  Pursuant to this motion, the Debtors

10    seek interim and final orders authorizing to implement a

11    critical vendor protocol, and in connection they were to pay

12    prepetition claims of critical vendors up to an aggregate of

13    $70 million on an interim basis and $90 million on a final

14    basis.

15          As Your Honor is aware, this type of relief has

16    become fairly standard, particularly in retail cases, so the

17    Debtors can ensure their businesses will continue to operate

18    without too much disruption of (indiscernible).

19          The motion describes the factors that the Debtors

20    and their advisors considered in determining, or will

21    consider in determining which vendors are critical,

22    including whether the claims of the vendor would otherwise

23    be entitled to Section 503(b) status.

24          In addition, the motion describes the procedures,

25    and importantly, the internal controls that will be applied

Page 66

1    with respect to paying critical vendors.  And I think Your

2    Honor gave me a little bit of a hint a few minutes ago about

3    a time you would use other protocol.  The protocol, Your

4    Honor, is the same as we previously applied in both the

5    (indiscernible) cases.

6            The Debtors will try to get vendors to enter into

7    vendor agreements, which will require the vendors to provide

8    trade terms similar to those that were in effect prior to

9    the commencement date.  Any payments in excess of $500,000

10   to a particular vendor would require the approval of the

11   Debtors' CRO or CFO.  The Debtors intend to maintain

12   critical vendor matrix -- matrix, excuse me -- that will

13   track all payments.

14           Importantly, the critical vendor motion also

15   contemplate that the Debtors will exercise their rights

16   under the Bankruptcy Code to compel vendors with whom they

17   have executory contracts to continue to perform on a post-

18   petition basis pending the Debtors' attorneys whether to

19   assume or reject those executory contracts.

20           To that end, the motion sets forth certain

21   procedures for redress in the Court in the event there are

22   any, what we call, reputiating vendors who refuse to comply

23   with their obligations.

24           In short, Your Honor, Debtors believe that the

25   critical vendor protocol outlined in the motion provide the

1    Debtors, as well as their critical vendors, with procedures

2    that will enable the Debtors to obtain merchandise that is

3    critical to their ongoing operations, providing the Debtors

4    with the flexibility to do that which is necessary, while at

5    the same time giving due regard to the interest of other

6    creditors.

7              I anticipate your question regarding the DIP

8    financing.  Yes, these amounts are in the DIP budget; and,

9    in fact, I think every single one of our first day orders

10   has a provision that says it must keep revising with the DIP

11   financing.

12             THE COURT:  Okay.

13             MS. MARCUS:  Your Honor, the U.S. Trustee's

14   Office, Mr. Schwartzberg did indicate that they have

15   concerns with the critical vendor motion.  Would you prefer

16   that to be heard now?

17             THE COURT:  Okay.

18             MR. SCHWARTZBERG:  I noticed there's someone else

19   standing up.  I didn't know (indiscernible).

20             Your Honor, there were two concerns the U.S.

21   Trustee has on the motion.  First, as Debtor had says, $70

22   million is a (indiscernible) to go on this.  But the money

23   isn't going to go out today, it's not going to go out

24   tomorrow, we're setting up the procedure.  So the U.S.

25   Trustee would like to have this put off, to have a committee

Page 68

1    perhaps, look and determine whether they agree with the

2    procedure, and have the Debtors have a say in that since

3    it's not an emergency.

4              Second, under the critical vendor motion should be

5    (indiscernible) necessity.  This procedure puts that, the

6    decision of who makes the critical vendor list on the

7    Debtors, whether it should be something the Court determines

8    and should provide the Court and the U.S. Trustee and

9    perhaps the committee before the money goes out a list of

10   who is to get paid.  And it's a question that I think should

11   be raised before the Court so the Court makes the

12   determination.

13             THE COURT:  Well, on the first part, I didn't

14   understand, maybe I just misread the motion.  I thought that

15   they were contemplating making these payments right away if

16   someone truly is critical.

17             MR. SCHWARTZBERG:  I believe they have to send out

18   a notice, and if the vendors ask for a committee to be set

19   up, and then they committee makes the determination.

20             THE COURT:  Well, I mean, they've already served

21   it.  It's already on the docket.  I'm assuming that if

22   there's a critical vendor, they've already seen it, they're

23   going to send in the notice right away.  Let me ask it a

24   little differently.  When are you contemplating having the

25   unsecured creditors committee formation meeting?

1          MR. SCHWARTZBERG:  Well, it depends.  We slated it

2    for October 24th.  We are waiting for the Debtors to avail

3    themselves -- or obtain a space that we can have it.  We

4    can't have it in our 341 room; it's not large enough, I

5    don't think, to accommodate the crowd.  So if the Debtor is

6    able to get a space by October 24th, once that space is

7    provided, the name is provided to us, we have slotted into

8    the notice and we can send that out ASAP.

9          And Debtors did file a top 20 list.  We prefer a

10   top 40 list.  I spoke with counsel anticipating a top 40

11   list.  And on that top 40 list, we would like just to

12   release to my office the email addresses; otherwise, we're

13   going to have to track them down.  We can get that out as

14   soon as we get the location of the meeting.

15         THE COURT:  Okay.

16         MR. SCHWARTZBERG:  So it would be Wednesday.

17         THE COURT:  So we're talking 9 or 10 days.

18         MR. SCHWARTZBERG:  Yes, Your Honor.

19         THE COURT:  All right.  I know there are different

20   models for doing the analysis for these types of programs.

21   But I guess I take much more comfort in making sure that the

22   people that are making the decisions follow the right

23   protocols, rather than making them, to me, in a public

24   context.

25         It's not like a sale of a major asset.  You're

1    basically put in -- the alternative is to put on the record,

2    you know, who's really important and who isn't.  And, to me,

3    that can be very destructive of a business.  As opposed to

4    relying on capable objective people who've done this before

5    and who work closely with the operations people who've never

6    done it to, you know, winnow down the list as to being as

7    small as you can.

8           So I just think process is more important than

9    having, in this type of motion, having a public airing of

10   it, including with the people who are on the committee as

11   opposed to committee professionals.  It just seems to me

12   that there are problems with either approach.  But if you're

13   going to look at it as a practical matter, you really need

14   to have the trust that the professionals that handle this

15   are going to be on top of it.

16          And certainly, as this is laid out in this motion,

17   that's what -- they're doing -- put it differently.  They're

18   asking the questions that I would ask at a hearing with

19   regard to each one of these.

20          If you look at Paragraphs 19 through 23, these are

21   exactly the questions I would ask.  And I think it's -- I

22   mean, it's followed up by a report.  They know it's going to

23   be reported to the committee counsel and the committee

24   professionals.  So if they screw up, there'll be

25   consequences, but these are the very things that you ask,

Page 71

1    and some of these are clearly judgment calls.

2              You know, Harvey Miller was one of the most

3    aggressive people on this ever and saying I'm not going to

4    pay anything we have to, you know, we have contracts with

5    movie studios and they can't pull films from our

6    distributor.  And that was all well and good until the

7    studios started sending doo-doos to, "Oh, My Car" instead

8    of, you know, "A Star is Born."  So there are judgment calls

9    involved, but I'd rather leave it up to the professionals

10   than those.

11             MR. SCHWARTZBERG:  Thank you, Your Honor.

12             THE COURT:  Okay.

13             MR. SCHWARTZBERG:  And one thing I would urge the

14   Debtor (indiscernible).

15             THE COURT:  Well, I think -- no, I think in the

16   order, you and the committee professionals.

17             MR. SCHWARTZBERG:  I was asking to back to the

18   committee formation.

19             THE COURT:  Oh, on the emails and the -- yes,

20   yeah.  Yeah, that's going to come up later.  I thought the

21   20 was a little short too, as opposed to 40.

22             MR. SCHWARTZBERG:  Thank you, Your Honor.

23             THE COURT:  Okay.  Did you have something to say

24   on this, sir?

25             MR. FOX:  Yes, Your Honor.  Good afternoon.  My

Page 72

1    name is Greg Fox, Goodwin Procter, on behalf of Waste

2    Management International Services.

3            THE COURT:  All right.

4            MR. FOX:  I believe we're known as a critical

5    vendor.  I just rise to preview an important time sensitive

6    issue that my client is facing.  My client provides waste

7    and recycle services at all of the Sears and Kmart stores.

8    It's one of the Debtors' largest prepetition unsecured

9    creditors.  It's owed approximately $4.8 million in invoiced

10   and unbilled amounts; over $1 million of that is past due

11   and prior to petition date, September 28th and October 8th.

12   My client sent notice of termination for vendor

13   (indiscernible) services agreement to the parties.

14           And I'm here today just to preview an issue.  That

15   is, that every time Sears or Kmart liquidates one of these

16   stores, they request of my client a lot of extra services --

17   more frequent pickups, additional clean dumpsters -- and

18   that raises the invoices that my client incurs my

19   approximately $80,000, depending on the size of the store.

20   And if you multiply that by 140 stores that they're talking

21   about today, that's over $1 million.

22           And under the NSA that the parties are a party to,

23   subject to the termination notices, my client bills in

24   arrears and is getting paid on 45-day terms.  So by the time

25   my client is paid for these services, between 75 and 90 days

Page 73

1    may have gone by.

2              And we just don't know where this case is going to

3    be in 90 days, so I just wanted to preview to the Court and

4    the parties in the Courtroom that in the next 24 hours or

5    so, we'll be filing a motion for next day seeking adequate

6    protection, adequate assurances, and critical vendor status

7    to ensure that, you know, any liquidations of stores,

8    including these 140 stores they're talking about today, are

9    not financed by Waste Management.

10             THE COURT:  Okay, that's fine.  But, again, I

11   gather your client has a long-term contract with the

12   Debtors?

13             MR. FOX:  Which we terminated prior to the

14   bankruptcy.

15             THE COURT:  Okay.  Well, I guess they'll be

16   looking at that closely.

17             MR. FOX:  They believe, and whether, though, these

18   extra services are required to be provided under that

19   contract.

20             THE COURT:  But, again, one of the points Mr.

21   Schrock made is that up to $200 million of the sale proceeds

22   go into the winddown accounts.  So it's intended, I believe,

23   to protect people like your client.

24             MR. FOX:  Understood, Your Honor.

25             THE COURT:  Okay.

1           MR. FOX:  And we've all been (indiscernible).

2           THE COURT:  I appreciate that.

3           MR. FOX:  I appear today just to introduce

4    yourself and the issue.  And I rose now just because it

5    wasn't clear when the appropriate time because they haven't

6    filed a utility motion and apparently, the going out of

7    business hearing will be sometime next week.  So I would

8    request that we be in contact with chambers in terms of our

9    motion.

10          THE COURT:  Well, there's the -- look at the case

11   management order.

12          MR. FOX:  Okay.  Thank you, Your Honor.

13          Just in terms of urgency and timing on just

14   closing the loop on the critical vendor motion, the Debtors

15   have already established a task  in their headquarters of

16   people that are working on this initiative, and we have

17   already gotten numerous communications from vendors who seem

18   to be treated as critical vendors.

19          So, we appreciate Your Honor's decision,

20   hopefully, to enter the interim order today so that we don't

21   have to keep people waiting and we can take care of this

22   very -- I hate to use the word critical again, but critical

23   initiative.

24          THE COURT:  Okay.  All right, I will grant the

25   motion on an interim basis. I think the Debtors fully

Page 75

1    understand this isn't a license to willy-nilly pay

2    prepetition debt, then that they will instead go through the

3    procedures that they outlined in the motion, particularly in

4    the paragraphs that I mentioned.

5            Again, as with the employee order, I believe,

6    based on the record before me at least, that these payments

7    are what's almost by definition necessary, and providing

8    that benefit to the Debtors' estates, after taking into

9    account Bankruptcy Code's priority scheme, so that a vendor

10   that might have an unsecured claim, nevertheless is so

11   important to the Debtors' operations, or so outside of my

12   practical power, i.e. and foreign vendor that doesn't have

13   any real assets here, that they are critical.  And that the

14   cost of making the payment is exceeded by the value of

15   continuing to have the vendor work.

16           Unlike with employees, there's a judgment call

17   involved with this type of motion.  As I said before in

18   response to the U.S. Trustee, I think it's a judgment call

19   that the Debtors in this case, heavily assisted by their

20   professionals, should be making.  I think the Debtors fully

21   understand that based on the statements in the motion.

22           They'll also have a committee looking over their

23   shoulder eventually to make sure that they've done it right,

24   which is another level of assurance that they will do it

25   right.  So, you can email that order to chambers.

1          MS. MARCUS:  Thank you, Your Honor.  Item Number

2     10 on the agenda is the Debtors' request for interim and

3     final orders authorizing payment of prepetition claims

4     related to certain lienholders, shippers, warehouses and

5     others, who have similar claims.

6          Specifically, the Debtors seek authority to pay

7     the following categories of claims: shipping and warehousing

8     charges, non-merchandise lien claims, such as those of

9     repairman and other third-party service providers; PACA and

10    PACLA claims, which are claims related the Debtors' grocery

11    business, arising under the Perishable Agricultural

12    Commodity Pact, and the Packers and Stockers Act of 1921.

13         And finally, the last element of this motion, Your

14    Honor, is something of a comfort order that we're

15    requesting.  We're requesting an order to provide assurance

16    to vendors who have merchandise orders that were placed

17    prepetition but have not yet delivered the goods, that if

18    they deliver the goods post-petition, their claims for those

19    goods will be treated as administrative expenses of these

20    cases under Exception 503(b) of the Bankruptcy Code.

21         I'm not aware of any objections, Your Honor, and

22    we would request that you grant the motion.

23         THE COURT:  Right.  Does anyone have anything to

24    say on this motion?  Okay.  Almost by definition, these

25    people are the critical vendors, or have, either because of

1   what they're providing or because of the rights they have

2   under either a statute or based on statutory lien rights,

3   and therefore, the same logic applies to this request for

4   relief that applied to the last one.

5            As far as the confirmation of the administrative

6   claim status, in my view, although they're both

7   administrative claims, 503(b)(1) is better than 503(b)(9),

8   but it's fine to say that in the order.  I have no problem

9   with that.

10           MS. MARCUS:  Thank you, Your Honor.  The next

11  motion, Your Honor, Number 11 on the agenda, is Debtors'

12  motion for authorization to retain certain customer

13  programs.  As we all know, Your Honor, customers are the

14  lifeblood of any retail business, particularly at a time

15  when stories in the media may have created uncertainty about

16  the future of this business.

17           The Debtors believe that it is essential that we

18  obtain this order so that we can provide assurance to our

19  customers that it is business as usual at Sears and Kmart,

20  at least from the customers' point of view.

21           In the motion, we describe a litany of customer

22  programs that we seek to continue, many of which involve

23  transactions that bridge the pre- and post-petition periods.

24           For example, we would like to honor programs

25  relating to returns and exchanges, sales promotions, coupon

1    programs, gift card programs, the Debtors' Shop Your Way

2    program, which I'm sure you'll be hearing more about as

3    these cases unfold; the Citibank Private Label credit card;

4    warranty and service programs; charitable programs.

5           None of these items are particularly large, but

6    together, they are critical and we would ask that the Court

7    approve the motion.  If Your Honor is so inclined, we did

8    want to make one change to the proposed order at the request

9    of Citibank.  So, not to jump the gun, but I'll read the

10   language into the record and we'll provide it in the revised

11   order.

12          It's in Paragraph 3 of the order, and we're adding

13   a few words.  So, it will read, "The Debtors are authorized

14   but not directed to honor, perform under, and otherwise

15   satisfy all of their obligations in connection with the

16   Citibank credit card program, whether arising prepetition or

17   post-petition, including that limitation permitting and

18   affecting any rights to settle for recoupment thereunder,

19   maintaining, expending, renewing, replacing or amending the

20   letter of credit issued in connection therewith."  And the

21   rest goes on just saying it's that, "extending, renewing,

22   replacing, or amending" that we have been asked to insert

23   into the order.

24          And with that, Your Honor --

25          THE COURT:  Okay.  But the Debtors' wouldn't do

Page 79

1   anything out of the ordinary course as far as extending,

2   amending?

3             MS. MARCUS:  That's correct.

4             THE COURT:  Okay.

5             MS. MARCUS:  That's correct.

6             THE COURT:  All right.

7             MS. MARCUS:  And we're not seeking to assume the

8   Citibank agreement.  We're just seeking --

9             THE COURT:  Performing under it.  All right.

10            MS. MARCUS:  That's correct.

11            THE COURT:   So, I had -- on the return and

12  exchange, let me make sure I understand this.  So, if the

13  store that you bought your lawnmower at is closing, you can

14  exchange it somewhere else?  How is that going to work?  Is

15  that what's intended?

16            MS. MARCUS:  I don't think we're intending to pick

17  up the return policy with respect to GOB sales.

18            THE COURT:  Okay.

19            MS. MARCUS:  My understanding is that those --

20            THE COURT:  No, I understand that.

21            MS. MARCUS:  Yes.

22            THE COURT:  And the GOB order, I think, will say

23  that.  But I'm -- let's say you bought a lawn mower a month

24  ago and for whatever reason it doesn't work.  So, that's not

25  -- it's not a GOB --

```
 1              MS. MARCUS:  Correct.

 2              THE COURT:  -- but the place that you -- the store

 3    you bought it at is going to be closing, you know, let's

 4    just assume for the moment it's going to close in December.

 5    When it says that the Debtors are going to honor return and

 6    exchange policies, does that mean you can take the lawnmower

 7    to another store that's open like in, I don't know, Purchase

 8    as opposed to White Plains?

 9              MS. MARCUS:  Let me confirm, but I think that is

10    the answer, Your Honor.

11              THE COURT:  Okay.  All right.

12              MS. MARCUS:  And we think it's essential to

13    continue to have customers --

14              THE COURT:  Right, because --

15              MS. MARCUS:  -- continue buying and be able to do

16    that.

17              THE COURT:  -- because the store that's open is

18    going to stay open and --

19              MS. MARCUS:  Correct.

20              THE COURT:  -- you want people to continue to shop

21    at Sears.

22              MS. MARCUS:  That's correct.

23              THE COURT:  Okay.  Okay, does anyone have anything

24    to say on this motion?

25              MR. HUEBNER:  Good afternoon again, Your Honor.
```

1    Marshall Huebner, Davis Polk, for Citibank.

2              Your Honor, when we handled the DIP order, you

3    indicated that the order would be entered with no further

4    changes other than discussed, and the parties could rely on

5    it.

6              Citibank is actually standing ready to send

7    today's wire transfer to Sears, which is actually in the

8    millions of dollars, in fact.  It's not such a little

9    relationship at all, it's actually quite a big one.  And

10   based on if Your Honor would orally indicate that the order

11   will be entered with the addition of the four words --

12             THE COURT:  On this order?

13             MR. HUEBNER:  -- Ms. Marcus read in we can

14   literally send the wire to them right now and

15   (indiscernible).

16             THE COURT:  All right.  That's exciting.

17             (Laughter)

18             MR. HUEBNER:   And, Your Honor, I've also gotten

19   the bank to agree that we will actually replace your lawn

20   mower for you --

21             (Laughter)

22             MR. SCHROCK:  -- (indiscernible).

23             THE COURT:  Okay.  Does anyone else have anything

24   to say on this motion?  All right.  I will grant the motion,

25   without the lawnmower, for interim approval of continuation

Page 82

1    of the customer policies and programs.

2            MS. MARCUS:  Thank you, Your Honor.

3            THE COURT:  These are obviously all programs that

4    are intended to promote business.  The more they work, or

5    the better they work, the more business there is.  So,

6    again, there is a net benefit to the estate of paying what

7    arguably are out of the ordinary course payments of

8    prepetition debt.

9            MS. MARCUS:  Thank you, Your Honor.  We appreciate

10   the Citibank accommodation funding without having the order.

11           THE COURT:  So, it's approved, except with that

12   one small change that was read into the record.

13           MS. MARCUS:  Thank you, Your Honor.  The next one,

14   Your Honor, is the Debtors' motion for authority to maintain

15   certain trust fund programs, to release certain funds held

16   in trust and to continue to operate such programs.

17           As set forth in the motion, the Debtors maintain a

18   variety of programs pursuant their state, collect funds on

19   behalf of unaffiliated third parties.  The motion describes

20   various programs and provides a general range of the amounts

21   at issue.

22           Their arrangements, for example, regarding lottery

23   programs, franchises, third-party gift cards, Western Union,

24   both wire transfer and money orders, and CoinStar, that

25   machine that you can put your coins in to get change.

```
 1                 THE COURT:  Right.

 2                 MS. MARCUS:  The Debtors believe that continuation

 3      of the trust fund programs is essential to their continued

 4      operation and would not implicate the interests of their

 5      creditors inasmuch as the funds are not property of the

 6      Debtors' estate.  And this is the motion where American

 7      Greetings would be picked up as being --

 8                 THE COURT:  What do they -- they have like trust

 9      fund flowers, or what do they...?

10                 MS. MARCUS:  I think they're cards.

11                 MR. SCHROCK:  Gift cards.

12                 THE COURT:  Cards.

13                 MS. MARCUS:  Gift cards.

14                 THE COURT:  Oh, gift cards.  Okay, that makes

15      sense.  Okay.  All right.  Does anyone have anything to say

16      on this motion?  Are you going to just -- we're relying on

17      the record that they're covered by this?

18                 MS. MARCUS:  No, I --

19                 THE COURT:  We're going to put it in the order?

20                 MS. MARCUS:  I think we'll put it in the order.

21                 THE COURT:  Okay.  Okay, I'll grant this motion.

22      I view this really as a comfort order.  I don't think the

23      Debtors could do anything with this money.  But just to be

24      safe, it's fine to memorialize it in an order.

25                 MS. MARCUS:  And the last one -- well, the last
```

Page 84

1    one that I'm responsible for -- is probably the most

2    complicated one, but it's also very important.  It's the

3    Debtors' request for interim and final orders establishing

4    notification procedures and approving restrictions on

5    certain transfers of interest in and claims against the

6    Debtors, and the assertion of worthless stock deductions by

7    security holders.

8            As reflected in the motion, due to their losses

9    over the past several years, the Debtors have accumulated

10   net operating losses in excess of $5 billion.  This motion

11   is intended to preserve the Debtors NOLs, which are property

12   of the estate and may end up having substantial value.

13           The procedures outlined in the motion are designed

14   to avoid an inadvertent ownership change, which could impair

15   the value of the NOLs.  In very brief terms, even though the

16   motion is very long, the motion seeks authorization to

17   establish a set of noticing procedures which will enable the

18   Debtors to monitor and make sure such an ownership change

19   does not occur.

20           Similar relief has been granted in other large

21   cases, and we request that the Court enter the order on an

22   interim basis.

23           THE COURT:  Right.  And the interim relief is as

24   to the -- for stockholders.  If you're going to -- if

25   someone is going to do an L-5 plan, then you'll seek relief

Page 85

 1    for...  Well, not then, but that's when the procedures would

 2    kick in for --

 3              MS. MARCUS:  So, it --

 4              THE COURT:  -- for claim transfers.  But you're

 5    not seeking that on an interim basis today?

 6              MS. MARCUS:  It's the ability to -- we're not

 7    seeking that on an interim basis today, but it's the ability

 8    later to turn around and go back and compel certain people

 9    to re-transfer.

10              THE COURT:  If you're doing a --

11              MS. MARCUS:  That's correct.

12              THE COURT:  -- an L-5 plan that deals with debt.

13              MS. MARCUS:  That's correct.

14              THE COURT:  Okay.  All right, does anyone have

15    anything to say on this motion?

16              These issues have been around for a long time, and

17    the -- I think the shareholder and claim trader community

18    has gotten reasonably comfortable with these specific

19    procedures that are laid out in this motion, which are the

20    same procedures that, as you said, have been approved in a

21    number of cases over the years, where net operating loss and

22    other tax benefits are potentially significant for the

23    Debtors estate.

24              I went through the procedures pretty carefully and

25    compare them to procedures that I previously approved, and

1    then my colleagues have approved.  They're basically the

2    same.  And the underlying premise for the relief is

3    accurately laid out in the motion.

4              So, on an interim basis, I'll grant the relief

5    sought.  Given the size of the net operating loss here, it's

6    a potential significant asset that needs to be protected.

7    The notice, which is to be provided only by large

8    shareholders -- you have to be getting close to five percent

9    -- should not be particularly onerous for any shareholder

10   here that falls under that category.

11             So, you can email that order to chambers also.

12             MS. MARCUS:  Thank you, Your Honor.  And with

13   that, I'll cede the podium to my colleague, Paloma Van

14   Groll.

15             THE COURT:  Oh, could I just -- on that motion --

16   and this relates to the next couple of motions -- you don't

17   really know who all the shareholders are.  Do you have a

18   sense of who the large shareholders are, besides ESL?  So,

19   are you giving actual notice to them, or are you basically

20   relying on the publication notice and the record of this

21   hearing?

22             MS. MARCUS:  We know some, Your Honor.

23             THE COURT:  All right.

24             MS. MARCUS:  But we are pretty much relying on the

25   --

1          THE COURT:  So, you'll give the ones you actually

2    know notice, and then rely on publication for the rest?

3          MS. MARCUS:  Yes.

4          THE COURT:  Okay.  All right.

5          MS. MARCUS:  And then Ms. Van Groll will handle

6    the balance of today's agenda.

7          THE COURT:  Okay.

8          MS. VAN GROLL:  Good afternoon, Your Honor.

9    Paloma Van Groll --

10          THE COURT:  Good afternoon.

11          MS. VAN GROLL:  -- of Weil Gotshal & Manges,

12    proposed counsel to the Debtor.

13          THE COURT:  Good afternoon.

14          MS. VAN GROLL:  Your Honor, the next item on the

15    agenda, Docket Number 28, which is the Debtors' motion for

16    an extension of time to file schedules and SOFAs.  We

17    believe due to the size and complexity of these cases that

18    45 days, plus the 14 that we have under statute, so in total

19    a month and two days would be sufficient to get the

20    schedules and SOFAs on file.  But we reserve the right to

21    request additional time if we need it.

22          THE COURT:  Okay.  And are you amenable to making

23    it a top 40 instead of a top 20?

24          MR. SCHROCK:  Yes.

25          MS. VAN GROLL:  Yes.  I think we're amenable to

Page 88

1    that.

2              THE COURT:  Okay.  All right.  Does anyone have

3    anything to say on this motion?  All right.  Given the size

4    and complexity of the Debtors' asset and debt picture, I

5    believe the Debtors have laid out sufficient cause for their

6    requested extension.  Obviously, at some point on your

7    timeline you're going to have to do this and get out a

8    notice, but I think it just works, looking at your timeline.

9    So, I'll grant the relief.

10             MS. VAN GROLL:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             MS. VAN GROLL:  The next item on the agenda is

13   Docket Number 21, which is the Debtors' motion waiving the

14   requirement to file a creditor list, equity holder list, and

15   authorizing certain notice procedures in connection with the

16   commencement of these cases.

17             THE COURT:  Okay.  Does anyone have anything to

18   say on this motion?  All right.  I will grant this relief

19   for the relief stated in the motion.  It ties into the

20   relief stated in the motion.  It ties into the Prime Clerk

21   motion, which is next.  Given their role in the case and the

22   extension of time that I just granted, this motion makes

23   sense.  So, I'm granting it.

24             MS. VAN GROLL:  Thank you, Your Honor.  The next

25   and last item on the agenda is at Docket 27, which is the

Page 89

1   Debtors' application for authorization to appoint and obtain

2   Prime Clerk as claims and noticing agent to the Debtors.

3          Your Honor, we have reviewed the motion with the

4   clerk's office and we've incorporated the changes they had

5   and we believe they've signed off.

6          THE COURT:  All right.  They've confirmed that to

7   me.  This is largely their motion rather than mine, since

8   Prime Clerk would be acting as their agent in essence.  But

9   based on my review it's consistent with similar orders that

10  I've granted in the past.  So, I'll grant this motion also.

11  You can email that order to chambers.

12         MS. VAN GROLL:  Thank you, Your Honor.  We'd just

13  like to note for the record a correction to Paragraph 6 of

14  the Steele declaration.  It should say that Prime Clerk ran

15  conflicts against the Debtors' top 50 general unsecured

16  creditors, and not the top 100.

17         THE COURT:  I'm sorry?

18         MS. VAN GROLL:  That Prime Clerk ran conflicts

19  against the Debtors' top 50 general unsecured creditors, and

20  not the top 100 (indiscernible).

21         THE COURT:  Okay.  All right.  But they're -- I

22  mean, they're the noticing agent, so I'm not too bothered by

23  that.

24         MS. VAN GROLL:  Exactly.

25         THE COURT:  Okay.

1              MS. VAN GROLL:  Thank you, Your Honor.  I believe

2    this concludes our presentation.  Thank you for your time.

3              THE COURT:  Okay.  Thank you.

4              MR. SCHROCK:  Thanks very much, Your Honor.

5              THE COURT:  Okay.

6              MR. SCHROCK:  See you very soon.

7              THE COURT:  Okay.

8              (Whereupon these proceedings were concluded at

9    0:00 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 91

1                           I N D E X

2

3                            RULINGS

4                                           Page        Line

5

6   Motion of Debtors for Entry of Order       30         11

7   Directing Joint Administration Granted

8

9   Cash Management Motion Granted on an       52         25

10  Interim Basis

11

12  Debtors' Motion to Pay Employee Wages      61         4

13  and Honor Employee Obligations, Benefits and Continue

14  Existing Benefit Program Granted

15

16  Debtors' Motion Seeking to Pay Certain Taxes, 64      25

17  Prepetition Taxes and Fees Granted

18

19  Debtors' Critical Vendors Motion Granted   77         8

20

21  Customer Programs Motion Granted           81         24

22

23  Trust Fund Programs Motion Granted         83         21

24

25

Page 92

1    Debtors' request for interim and final          86          4

2    orders establishing notification procedures and approving

3    restrictions on certain transfers of interest in and claims

4    against the Debtors, and the assertion of worthless stock

5    deductions by security holders Granted on an Interim Basis

6

7    Debtors' motion for an extension of time to  88          9

8    file schedules and SOFAs Granted

9

10   Debtors' motion waiving the requirement          88          18

11   to file a creditor list, equity holder list, and authorizing

12   certain notice procedures in connection with the

13   commencement of these cases Granted

14

15   Prime Clerk Motion Granted                       89          10

16

17

18

19

20

21

22

23

24

25

Page 93

1              C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya
                              Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde, o,
     Ledanski Hyde            ou, email=digital1@veritext.com,
7                             c=US
                              Date: 2018.10.16 16:56:55 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 16, 2018