**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

-------------------------------------------------------------x

### AFFIDAVIT OF PUBLICATION

I, Jesse Offenhartz, depose and say that I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

This Affidavit of Publication includes sworn statements verifying that the Interim Publication Notice pursuant to the Interim Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interest in, and Claims Against, the Debtors and Claiming Certain Worthless Stock Deductions [DN 109] as conformed for publication, was published in the *New York Times* on October 19, 2018, as described on **Exhibit A** attached hereto.

Dated: October 22, 2018

Jesse Offenhartz

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on October 22, 2018, by Jesse Offenhartz, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:

PAUL PULLO
Notary Public, State of New York
No. 01PU6231073
Qualified in Nassau County
Commission Expires Nov. 15, 20

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**<u>Exhibit A</u>**



**The New York Times**
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

October 19, 2018

I, Shannon Schmidt, in my capacity as a Principal Clerk of the Publisher of *The New York Times* a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of

*The New York Times* on the following date or dates, to wit on

October 19, 2018 - pg. B2 (NYT + Natl)

Shannon Schmidt

Sworn before me the

19 day of Oct, 2018

Deirdre C. Deignan

Notary Public

DEIRDRE C. DEIGNAN
Notary Public, State of New York
Registration #01DE6271693
Qualified In Nassau County
Commission Expires Nov. 5, 2020

ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF: (I) SECURITIES ISSUED BY SEARS HOLDINGS CORPORATION OR ITS SUBSIDIARIES AND (II) CERTAIN CLAIMS AGAINST SEARS HOLDINGS CORPORATION OR ITS SUBSIDIARIES:

Upon the motion (the "Motion") of Sears Holdings Corporation ("Sears Holdings") and its subsidiaries (the "Debtors"), on October 16, 2018, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having jurisdiction over the chapter 11 cases of the Debtors, captioned *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (RDD) (the "Chapter 11 Cases"), entered an interim order establishing procedures (the "Procedures") with respect to direct and indirect transfers of, and claims of worthless stock deductions with respect to, interests in the Debtors and scheduling a hearing on a final order with respect to such Procedures.

In certain circumstances, the Procedures restrict (i) transactions involving, and require notices of the holdings of and proposed transactions by, any person, group of persons, or entity that is or, as a result of such a transaction, would become a Substantial Securityholder of the common stock issued by Sears Holdings (the "Common Stock") or any other interest in a Debtor treated as stock (within the meaning of applicable Treasury Regulations) (together with the Common Stock, the "Sears Holdings Securities") and (ii) claims by any Majority Securityholder of a worthless stock deduction under section 165(g) of the Internal Revenue Code with respect to the Sears Holdings Securities. For purposes of the Procedures, a "Substantial Securityholder" is any person or entity (including certain persons making a coordinated acquisition) that beneficially owns, directly or indirectly (and/or owns options to acquire) at least 5,177,135 shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock) or at least 4.75% of any other class of Sears Holdings Securities, and a "Majority Securityholder" is any person that beneficially owns at least 51,771,556 shares of Common Stock (representing approximately 47.5% of all issued and outstanding shares of Common Stock) or any person that would be a "50-percent shareholder" (within the meaning of section 382(g)(4)(D) of the Internal Revenue Code) of Sears Holdings Securities (as defined in the Procedures) if such person claimed a worthless stock deduction with respect to such securities. Any prohibited acquisition or other transfer of, or claim of a worthless stock deduction with respect to, Sears Holdings Securities will be null and void ab initio and may lead to contempt, compensatory damages, or other sanctions being imposed by the Bankruptcy Court.

In addition, the Debtors have requested approval of additional procedures (the "Claims Procedures") as part of the final order that set forth (i) certain future circumstances under which any person, group of persons, or entity holding, or which as a result of a proposed transaction may hold, a substantial amount of certain claims against the Debtors may be required to file notice of its holdings of such claims and of proposed transactions, which transactions may be restricted, and (ii) certain limited circumstances thereafter under which such person(s) may be required to sell, by a specified date following the confirmation of a chapter 11 plan of the Debtors, all or a portion of any such claims acquired during the Chapter 11 Cases.

The Procedures, as approved on an interim basis and as requested on a final basis (inclusive of the Claims Procedures), are available on the website of Prime Clerk LLC, the Debtors' Court-approved claims agent, located at https://www.primeclerk.com/sears, and on the docket of the Chapter 11 Cases, Docket No. 18-23538 (RDD) (Bankr. S.D.N.Y.), which can be accessed via PACER at https://www.pacer.gov.

A direct or indirect holder of, or prospective holder of, securities issued by Sears Holdings that may be or become a Substantial Securityholder, a Majority Securityholder or a direct or indirect holder of, or prospective holder of, a substantial amount of claims against the Debtors should consult the Procedures.

PLEASE TAKE NOTICE that the Final Hearing on the Motion shall be held on November 15, 2018, at 10:00 a.m. (Prevailing Eastern Time), and any objections or responses to the Motion shall be filed and served in accordance with the Case Management Order so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on November 8, 2018.

PLEASE TAKE FURTHER NOTICE that the requirements set forth in the Procedures are in addition to the requirements of Bankruptcy Rule 3001(e) and applicable securities, corporate, and other laws and do not excuse non-compliance therewith.

Dated: New York, New York, October 16, 2018    BY ORDER OF THE COURT
Weil, Gotshal & Manges LLP

# How Hedge Fund Manager Running Sears Was Able to Cut His Losses

**By JULIE CRESWELL and MICHAEL CORKERY**

The hedge fund manager Edward S. Lampert has spent the last 14 years steering Sears as it spun off businesses, took on debt and, this week, filed for bankruptcy protection.

It has been a long, and often painful, trip, but how has Mr. Lampert fared?

His hedge fund, ESL Investments, appears to have racked up a much more modest loss than the company's Chapter 11 bankruptcy filing would suggest, according to corporate filings and interviews with analysts and investors.

ESL's nearly 50 percent stake in Sears will probably be wiped out in bankruptcy. But that loss is offset by gains elsewhere. For example, Mr. Lampert has collected hundreds of millions of dollars in interest and fees from Sears. He also took stakes in businesses that were spun off from the company, and some of those investments are doing well.

He and his hedge fund played an unusual role at Sears. In addition to being the company's controlling shareholder, ESL was one of its biggest lenders. Mr. Lampert is the retailer's chairman and, until Monday, he was also its chief executive.

For years, the company warned investors in regulatory filings that his interests "may be different than your interests" — a disclaimer that few publicly traded companies make.

But Mr. Lampert said he had always acted in the best interests of Sears. During a speech on Tuesday at the company's headquarters in Hoffman Estates, Ill., he told employees that he could have cashed out years ago. Instead, he said, he "doubled down."

"I did everything I could think of to try to make this company great again," Mr. Lampert said, according to an audio recording of his remarks obtained by The New York Times.

Here's how he made out on the various parts of Sears.

## LOSS

### His investment in Sears stock is mainly worthless

In 2005, Mr. Lampert orchestrated one of the biggest retail mergers in history by using the discount retailer Kmart to buy the department-store giant Sears & Company.

A few years earlier, he had started buying up Kmart's debt after the company filed for bankruptcy protection. His investment totaled $700 million, he told Fortune magazine in 2006. When Kmart came out of bankruptcy in 2003, ESL was its largest shareholder and Mr. Lampert its chairman.

The merger created the nation's third-largest retailer. The deal was meant to help Sears and Kmart better compete against Walmart, which had overtaken both companies in the 1990s on its way to becoming the world's largest retailer.

The deal was a wild success — at least in the early years. The stock of the combined company, Sears Holdings, soared, and ESL's investment was worth $5 billion by 2007. The company was flush with cash and spent $6 billion buying back its own stock from 2005 through 2012. The hedge fund did not sell any of its shares.

Critics, including former Sears executives and employees, said the money would have been better spent improving Sears and Kmart stores and developing a better digital strategy. Mr. Lampert has said that he put money into stores and the online business, but that the investments did not pay off.

The good times did not last long. Sales started sliding in 2007, and the company's steady profits turned into big losses a few years later. Sears needed money, and it increasingly turned to the Bank of Lampert for cash.

ESL and its affiliates lent Sears nearly $2.6 billion, about half its total debt as of September. The hedge fund could lose money on those loans. But because much of the retailer's debt is secured by real estate and intellectual property ESL could recoup at least some of that investment.

The hedge fund has also collected about $400 million in interest and fees on that debt, helping to reduce Mr. Lampert's losses on the company's stock to about $300 million.

## WIN

### Lands' End, now independent, lives on

Sears acquired Lands' End in 2002, hoping to bolster its struggling apparel business. But the preppy clothing never quite fit in at a company that made much of its money selling home appliances, tools and other household necessities.

Lands' End lost ground to the likes of L.L. Bean in part because its clothing was mostly sold in worn-out Sears stores and on an outdated website. In 2014, Sears spun the business off into a separate publicly traded company. ESL got 15.4 million shares, or nearly half, of the new company, at no additional cost.

ESL and its affiliates bought $6 million more shares of Lands' Ends as the stock price climbed.

Their stake is now worth about $207 million.

## LOSS

### Sears Canada and others have not done as well

To raise cash, Sears spun off a number of other divisions. In almost every transaction, ESL bought shares in the new companies, becoming a significant or even the majority owner. For the most part, these corporate offspring have struggled or failed.

In late 2011, Sears spun shares in Orchard Supply Hardware to its shareholders, including ESL. But unable to compete against Home Depot and Lowe's and saddled with debt, Orchard filed for bankruptcy protection a year later and was eventually acquired by Lowe's.

In 2012, ESL and Mr. Lampert invested about $216 million in a public offering of Sears Hometown and Outlet Stores, which sells appliances and lawn and garden equipment. After hitting a high of nearly $56 a share in 2013, Sears Hometown's stock has slumped. Today, it trades at just $2.55, putting ESL's stake at $37.8

million.

In the case of Sears Canada, Mr. Lampert came close to making a profit. When the company was partially spun off from Sears Holdings in 2012, ESL got a 28 percent stake at no additional cost. The hedge fund collected $168 million in special dividends that Sears Canada paid out that year and in 2013.

In 2014, ESL spent $212 million to buy more Sears Canada shares. But the company filed for bankruptcy last year and subsequently closed all its stores. Taking the dividends into account, ESL lost about $44 million.

## WIN

### Seritage: A successful real estate play

Many Wall Street analysts and investors have speculated that Mr. Lampert's primary interest in Sears was its real estate. The retailer had hundreds of stores in prime malls and shopping plazas across the United States. These properties could be sold to more profitable retailers or become something else entirely, like movie theaters, condominiums or offices.

That was the idea behind Seritage Growth Properties, a publicly traded real estate company Mr. Lampert helped to establish in 2015 to acquire 235 stores from Sears.

ESL invested $745 million, and Mr. Lampert became Seritage's chairman. Its share price has soared 45 percent since its initial public offering and prominent investors like Warren E. Buffett have bought into the company. Mr. Lampert's stake in this business is now worth approximately $1.1 billion.

## UNCLEAR

### The bankruptcy and what comes next

The bankruptcy will most likely wipe out ESL's equity stake and could reduce the value of the loans it has made to Sears.

But Mr. Lampert could still end up with what's left of its other real estate and businesses. On Monday, he said he hoped to buy 400 profitable Sears and Kmart stores. If his bid is the highest, Mr. Lampert could continue to run the stores with no debt and less costly leases or he could sell off some of the best locations.

In August, he offered to buy Kenmore, the Sears appliance brand, for $400 million — the final price could change in bankruptcy. Kenmore, which has a loyal following and last year started to sell air-conditioners, refrigerators and other products on Amazon, could flourish as an independent company.



BERTO MATTHEWS/ASSOCIATED PRESS

The Sears store in the Flatbush section of Brooklyn, above, is one valuable real estate asset held by ESL Investments, the hedge fund controlled by Edward S. Lampert. When Sears spun off Lands' End in 2014, ESL got nearly half the company's stock.

TIM BOYLE/GETTY IMAGES

---

## Sears' Lampert Was a Wizard. Now He's Facing Up to Failure.

*From First Business Page*

frustrating and fatiguing for me to watch," Mr. Berkowitz told his investors.

Thanks to this early successes, Mr. Lampert is still very, very rich; his fortune today is estimated at $1.1 billion, according to the latest Forbes survey. He will likely emerge from the Sears collapse with many more assets than most people realize. He owns lavish homes in Greenwich, Conn., and Indian Creek, Fla.,

just off Miami Beach. But he no longer makes the cut for Forbes's 400 richest Americans. His net worth has plunged by $5 billion since peaking at $4.5 billion in 2007, the magazine estimates. At Sears, all of his compensation was in stock. He never sold a share. The stock is now all but worthless.

"I've taken a huge personal hit," Mr. Lampert told me this week in a wide-ranging interview, his first since the bankruptcy filing. "Not just in money,

but time. There's been an enormous opportunity cost."

There was widespread skepticism when Mr. Lampert first merged two once-popular but struggling retailers in 2005. On one flank was the mighty Walmart. On the other was the fast-growing Amazon. Sears lacked Walmart's economies of scale and Amazon's digital reach. But Mr. Lampert knew that great fortunes aren't made by following conventional wisdom.

"Being a contrarian, being an independent thinker has never bothered me," Mr. Lampert said. "I knew it was going to be hard no matter what. But I was trying to be opportunistic. I was willing to make a very big bet in money and time." He pointed out that Jeff Bezos, Amazon's founder, is now the richest person in the world, and Sam Walton, the Walmart patriarch, was the richest American in his day.

"They both took advantage of an opportunity."

The opportunity that Mr. Lampert, but few others, saw was the combination of Sears's brands and customer loyalty and Kmart's attractive real estate, most of it in prime stand-alone locations rather than within aging malls. That promise seemed to be borne out in the early years. But the financial crisis and the collapse of the housing market hit Sears's appliance and houseware sales. Sears never regained momentum.

By 2009, Mr. Lampert told me, he realized that nothing less than a radical transformation of Sears's culture would allow it to keep up with the digital revolution that was transforming the retail industry. That year, he launched the store's ShopYour-Way campaign as the cornerstone of a new data-driven and customer-focused strategy to compete with Amazon.

That's where Mr. Lampert met his match. He said he didn't pick the best executives to fully embrace the company's digital makeover. "I underestimated

how difficult it is to and how critical are the right people to lead and to get people to buy in," he said.

As one example, he cited his attempt to convert underutilized space into internet lounges, which offered customers free Wi-Fi and a place to relax. It was an attempt to get customers, many of whom didn't have internet access at home at the time, into stores, much as Starbucks had attracted laptop-toting coffee drinkers.

This was anathema to traditional retailers, who measured success strictly in terms of sales per square foot and for whom any space not dedicated to merchandise was a waste. Nonetheless, the computer-equipped internet lounges were rolled out in 100 Sears locations — but in a halfhearted manner. "I'd visit a store, and there'd be 10 computers," Mr. Lampert recalled. "Half of them wouldn't work." The lounges were abandoned. "We didn't have store leaders or a

C.E.O. at the time who embraced the idea," Mr. Lampert said.

In 2013 Mr. Lampert himself became chief executive, something he said he had never aspired to. He expected to stay in the role only a few months. "I wanted to be an idea generator," he said. "I was trying to be a catalyst, not the operating person."

By then it was too late. Caught in a spiral of declining sales, huge losses, store closings, forced asset sales and relentless competition from online rivals, Sears struggled for its day-to-day existence, a war of attrition that ended with this week's bankruptcy.

It's far from clear that successful internet lounges, or even an agile culture that embraced change, would have saved Sears. Mr. Lampert has reaped criticism for underinvesting in Sears's physical stores; for trying to run the company from his Florida office, far from the company's Hoffman Estates, Ill.,

headquarters; and for a revolving door in the executive suites. In the end, though, none of that may have mattered much, either.

"I had a vision and a passion, but I never thought of myself as the only person who could save it," he said. "I may have been the only person who tried to save it." He noted that no one ever approached him about buying Sears, even at a bargain price. "It wasn't lost on me that other people didn't think it was possible."

Mr. Lampert insisted to me that ShopYourWay was showing promise but required far more time and capital than Sears could muster. "If I could have raised billions, I could have done things differently," he said. "The ability to incubate ideas requires a huge investment."

Mr. Lampert added: "I'm not fine with the outcome, but I'm fine with the effort. I've never worked harder or stretched further beyond my limits."



MINH UONG/THE NEW YORK TIMES

**ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF,** (I) SECURITIES ISSUED BY SEARS HOLDINGS CORPORATION OR ITS SUBSIDIARIES AND (II) CERTAIN CLAIMS AGAINST SEARS HOLDINGS CORPORATION OR ITS SUBSIDIARIES:

Upon the entry by the United States Bankruptcy Court for the Southern District of New York... [legal notice text continues]

**COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES**

| OFFICE SPACE | COMMERCIAL & INDUSTRIAL PROPERTIES (300) | Queens 307 |
| Offices—Manhattan 105 | Manhattan 305 | INVESTMENT PROPERTIES (600) |