WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
In re                                    :
                                         :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :        Case No. 18-23538 (RDD)
                                         :
                     Debtors.1           :        (Jointly Administered)
----------------------------------------------------------------x
```

**NOTICE OF HEARING ON APPLICATION OF DEBTORS**
**TO RETAIN M-III ADVISORY PARTNERS, LP TO PROVIDE A CHIEF**
**RESTRUCTURING OFFICER AND CERTAIN ADDITIONAL PERSONNEL**
**FOR THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

PLEASE TAKE NOTICE that a hearing on the annexed *Application of Debtors to Retain M-III Advisory Partners, LP to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel Nunc Pro Tunc to the Commencement Date* (the "**Application**") of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **November 15, 2018 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Application shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Order Implementing Certain Notice and Case Management Procedures*, entered on October 17, 2018 (ECF No. 139), so as to be filed and received no later than **November 8, 2018 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

WEIL:\96775009\1\73219.0006

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Application, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Application, which order may be entered without further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: October 25, 2018
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

Hearing Date and Time:  November 15, 2018 at 10:00 a.m. (Eastern Time)
Objection Date and Time:  November 8, 2018 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re                                                        :      **Chapter 11**
                                                             :
**SEARS HOLDINGS CORPORATION,** *et al.,*                    :      **Case No. 18- 23538 (RDD)**
                                                             :
               **Debtors.[1]**                               :      **(Jointly Administered)**
                                                             :
-------------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**APPLICATION OF DEBTORS
TO RETAIN M-III ADVISORY PARTNERS, LP TO PROVIDE A CHIEF
RESTRUCTURING OFFICER AND CERTAIN ADDITIONAL PERSONNEL
FOR THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

respectfully represent as follows in support of this application (the "**Application**"):

### Background

1.     Beginning on October 15, 2018 (the "**Commencement Date**") and

continuing thereafter, each of the Debtors commenced with this Court a voluntary case under

chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     On October 24, 2018, the United States Trustee for Region 2 appointed an

official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner

has been appointed in these chapter 11 cases.

3.     The Debtors' chapter 11 cases are being jointly administered for procedural

purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**").

4.     Additional information regarding the Debtors' business, capital structure,

and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn to on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[2]

## Jurisdiction

5.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Relief Requested

6.    Pursuant to sections 105 and 363(b) of the Bankruptcy Code, the Debtors seek to (i) employ and retain M-III Advisory Partners, LP ("**M-III**"), pursuant to the terms of that certain engagement letter dated October 10, 2018, annexed hereto as **Exhibit B** (the "**Engagement Letter**"), *nunc pro tunc* to the Commencement Date and (ii) designate Mohsin Y. Meghji as Chief Restructuring Officer ("**CRO**") for the Debtors to assist them with their  reorganization efforts over the course of the Debtors' chapter 11 cases as provided in the Engagement Letter.  The Engagement Letter also states that M-III will provide additional professionals (collectively with the CRO, the "**Engagement Team**") as necessary to assist the CRO in the execution of the duties set forth more fully herein.

7.    In support of M-III's retention and his designation as CRO, the Debtors submit the Declaration of Mohsin Y. Meghji attached hereto as **Exhibit C** (the "**M-III Declaration**").

8.    A proposed form of order granting the relief requested in the Application is attached hereto as **Exhibit A**.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

## Retention of M-III and Designation of Mr. Meghji as CRO

9.      In consideration of the size and complexity of their business, as well as the exigencies of the circumstances surrounding the commencement of these chapter 11 cases, the Debtors have determined that the services of the Engagement Team will substantially enhance their attempts to maximize the value of their estates.   M-III is well qualified to provide these services in light of their extensive knowledge and expertise with respect to chapter 11 proceedings. On a combined basis, M-III's senior professionals have served as Chief Restructuring Officer in more than 15 engagements and have worked on more than 200 restructurings throughout their careers.  *See, e.g., In re Relativity Media, LLC,* No. 18-11358 (MEW) (ECF No. 306);  *In re Real Industry, Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Jan. 17, 2018) (ECF No. 333); *In re Pappas Telecasting, Inc.*, No. 08- 10916 (PJW) (Bankr. D. Del June 26, 2008) (ECF No. 184); *In re HNI Holdco, Inc.*, No. 10-29101 (EPK) (Bankr. S.D. Fla. Jul. 23, 2010) (ECF No. 192); *In re Capmark Fin. Grp., Inc.*, No. 09-13684 (CSS) (Bankr. D. Del. Dec. 14, 2009) (ECF No. 451).

10.     The M-III professionals comprising the Engagement Team specialize in interim management, restructuring advisory, turnaround consulting, operational due diligence, creditor advisory services, and performance improvement.  M-III's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans, and related assessments of a business's strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

11.     Mr. Meghji is the Managing Partner of M-III and leads its restructuring practice.  Mr. Meghji has more than 25 years of financial restructuring, interim management, turnaround and management consulting experience.  He has been involved in all aspects of the

reorganization process, including the development and evaluation of restructuring alternatives, preparation of and evaluation of business plans, the implementation of liquidity management strategies, and advising on numerous in and out-of-court restructurings, including chapter 11 proceedings.

12.     Over the past 25 years, Mr. Meghji has performed an array of restructuring advisory and consulting services for a variety of different types of companies, and has a deep understanding of the economic, regulatory, operational, strategic and financial factors that drive businesses operating in chapter 11.   Mr. Meghji's prior experience includes a wide range of services and activities targeted at restructuring, stabilizing, and improving a company's financial position, including: (a) developing and implementing business plans; (b) developing and executing turnaround strategies; (c) planning and implementing financial and operational restructurings and debt reorganizations; (d) financial modeling; (e) managing negotiations with stakeholders; and (f) stabilizing business and liquidity.   Specifically, Mr. Meghji has served as a chief restructuring officer in the chapter 11 cases of *In re Real Industry, Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Jan. 17, 2018 2017) (ECF No. 333); *In re HNI Holdco, Inc.*, No. 10-29101 (EPK) (Bankr. S.D. Fla. Jul. 23, 2010) (ECF No. 192); *In re Capmark Fin. Grp., Inc.*, No. 09-13684 (CSS) (Bankr. D. Del. Dec. 14, 2009) (ECF No. 451); *In re Pappas Telecasting, Inc.*, No. 08-10916 (PJW) (Bankr. D. Del June 26, 2008) (ECF No. 184); *In re Ogden New York Servs., Inc. (Covanta Energy Corp.)*, No. 02-40826 (JLG) (Bankr. S.D.N.Y June 27, 2002) (ECF No. 608). Such experience makes Mr. Meghji the ideal candidate to advise the Debtors' management in connection with the Debtors' operations and to assist with the myriad issues that may arise in these chapter 11 cases.

13.     Mr. Meghji and a team of M-III professionals  began providing advisory assistance to the Debtors in 2016.  Since then, Mr. Meghji and other M-III professionals have worked

closely with the Debtors' management and other professionals on a broad range of strategic, operational, financial, and restructuring and bankruptcy related matters. Over this period of time, Mr. Meghji and his team have become very familiar with the Debtors' business, financial affairs, and capital structure, and have gained first-hand knowledge of the Debtors' systems and operations. For these reasons, the Debtors believe that Mr. Meghji, with the support of the Engagement Team, is well qualified and uniquely suited to act as CRO to the Debtors in these chapter 11 proceedings.

14.     The Debtors believe that M-III has developed significant relevant expertise and institutional knowledge regarding the Debtors' operations and the unique circumstances of these chapter 11 cases. For these reasons, M-III is both well qualified and uniquely suited to deal effectively and efficiently with matters that may arise in the context of these cases. Accordingly, the Debtors submit that the retention of M-III, including the provision of Mohsin Y. Meghji as CRO on the terms and conditions set forth herein, is necessary and appropriate, is in the best interests of the Debtors' estates, creditors, and all other parties in interest, and should be granted in all respects.

## Scope of Services

15.     Consistent with the Engagement Letter,[3] the CRO shall serve as the principal contact with the Debtors' creditors in connection with financial and operational matters. The CRO shall report to the Restructuring Committee of the Board of Directors of Sears Holdings (the "**Restructuring Committee**"). At the direction of the Restructuring Committee, in

---

[3] The description of the Engagement Letter herein is a summary. To the extent that this Application and the terms of the Engagement Letter are inconsistent, the terms of the Engagement Letter shall control unless otherwise set forth herein. Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Engagement Letter.

accordance with the Engagement Letter, and subject to approval by the Court, M-III and Mr. Meghji will, among other things:

> (i)      Supervise, and if necessary, assist the Debtors in the development and administration of its short-term cash flow forecasting and related methodologies, as well as their cash management planning;

> (ii)     Supervise, and if necessary, assist the Debtors in the identification and implementation of operational improvement activities and cost reductions;

> (iii)    Provide such assistance as reasonably may be required by management of the Debtors in connection with (a) development of their business plan, (b) any restructuring plans and strategic alternatives intended to maximize the enterprise value and (c) any related forecasts that may be required by creditor constituencies in connection with negotiations or by the Debtors for other corporate purposes;

> (iv)     Supervise, and if necessary, assist the professionals who are representing the Debtors in the reorganization process or who are working for the Debtors' various stakeholders to coordinate their effort and individual work product in order to be consistent with the Debtors' overall restructuring goals;

> (v)      Assist, if required, the Debtors in communications and negotiations with their outside constituents, including creditors, trade vendors and their respective advisors;

> (vi)     Assist in obtaining and presenting such information as may be required by the parties in interest in these chapter 11 cases; and

> (vii)    Provide such other services as are reasonable and customary for a CRO in connection with the administration and prosecution of a bankruptcy proceeding or as M-III and the Debtors shall otherwise agree in writing;

(collectively, the "**Services**").

16.     In addition, the Engagement team shall, at the direction of the Restructuring Committee:

> (i)      serve as a principal liaison of the Debtors to the Debtors' creditor constituencies and other stakeholders with respect to the financial and operational matters relating to the Debtors; and

(ii)    lead and direct the efforts of the Debtors and their professional advisors to develop and implement restructuring plans and other strategic alternatives intended to maximize the enterprise value of the Debtors.

### M-III's Disinterestedness

17.    To the best of the Debtors' knowledge, information, and belief, other than as set forth in the M-III Declaration, M-III: (i) has no connection with the Debtors, their creditors, other parties in interest, or the attorneys or accountants of any of the foregoing, or the United States Trustee or any person employed in the Office of the United States Trustee; and (ii) does not hold any interest adverse to the Debtors' estates.

18.    Although the Debtors submit that the retention of M-III is not governed by section 327 of the Bankruptcy Code, the Debtors attach the M-III Declaration, which discloses, among other things, any relationship that M-III, Mr. Meghji or any individual member of the Additional Personnel has with the Debtors, their significant creditors, or other significant parties in interest known to M-III.    Other than as set forth in the M-III Declaration, the Debtors submit that M-III is a "disinterested person" as that term is defined by section 101(14) of the Bankruptcy Code.

19.    In addition, as set forth in the M-III Declaration, if any new material facts or relationships are discovered or arise, M-III will provide the Court with a supplemental declaration.

### Terms of Retention

20.    In consideration of the Services, subject to Court approval, and in compliance with the Amended Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals, dated December 21, 2010, the Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York, dated January 23, 2013, and the U.S. Trustee Fee Guidelines (collectively, the "**Fee Guidelines**"), the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and any applicable

orders of the Court, the Debtors have agreed to pay M-III the compensation set forth in the Engagement letter (the "**Fee Structure**"). Specifically, pursuant to the terms and conditions of the Engagement Letter, and subject to this Court's approval, the Debtors propose to: (a) compensate M-III for the Services based on a combination of a flat rate and hourly fees as set forth in the Engagement Letter; (b) reimburse actual and necessary costs and expenses incurred by M-III in connection with all the services performed on behalf of the Debtors; and (c) pay a transaction fee, each as further described below.

(i)    <u>Compensation for Services</u>. In accordance with the terms of the Engagement Letter, M-III shall be entitled to non-refundable professional fees at a flat rate of (a) during such time as the Core Team[4] is comprised of the CRO plus ten (10) additional professionals, $900,000 per month and (b) during such time as the Core Team is comprised of the CRO plus eight (8) additional professionals, $750,000 per month. If additional staffing is required, additional professionals will be billed at a rate which is $50 less than M-III's standard hourly rates set forth below:

| Billing Category | Hourly Billing Rate |
|---|---|
| Managing Partner | $975.00 |
| Managing Director | $875.00 |
| Director | $675.00 |
| Vice President | $575.00 |
| Senior Associate | $475.00 |
| Associate | $400.00 |
| Senior Analyst | $350.00 |
| Analyst | $325.00 |

(ii)    <u>Out-of-Pocket Expenses</u>: In addition to any compensation for providing the Services, the Debtors shall reimburse M-III, upon receipt of periodic billings, for all reasonable and necessary out-of-pocket expenses incurred by M-III in the performance of the Services (including, without limitation, reasonable travel costs).

(iii)    <u>Transaction Fee</u>: In addition to all other compensation provided for herein, M-III shall be entitled to an additional fee equal to (a) $2,000,000, if a material portion of the business of the Debtors is sold through one or

---

[4] The "Core Team" is defined in the Engagement Letter as the CRO and ten (10) other professionals and, unless the CRO and the Restructuring Committee otherwise mutually agree, will be reduced to the CRO and eight (8) other professionals after three months.

more section 363 or other sales within six months following the Commencement Date or emerges from bankruptcy as a going concern, or (b) $1,000,000, if a material portion of the business of the Debtors is sold through one or more section 363 or other sales within nine months following the Commencement Date or emerges from bankruptcy as a going concern.

21.     M-III received an initial retainer of $500,000 (the "**Retainer**") upon execution of the Engagement Agreement.

### Indemnification

22.     As part of the overall compensation payable to M-III under the terms of the Engagement Letter, the Debtors have agreed to certain indemnification and contribution provisions described in the Engagement Letter (the "**Indemnification Provisions**").  As more fully set forth in the Engagement Letter, the Indemnification Provisions provide that the Debtors will indemnify and hold harmless M-III and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively, including M-III, "**Indemnified Persons**") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to the retention of M-III, the execution and delivery of the Engagement Letter, the provision of the Services or other matters relating to or arising from the Engagement Letter, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted.  The Debtors shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance.

23.     All requests by Indemnified Persons for the payment of indemnification, contribution or otherwise as set forth in the Engagement Letter during the pendency of these chapter 11 cases will be made by means of an application to the Court and will be subject to review

by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought; *provided that* in no event shall any Indemnified Person be indemnified in the case of its own gross negligence or willful misconduct.

24.    The terms of the Engagement Letter, including the Indemnification Provisions, were fully negotiated between the Debtors and M-III at arm's length, and the Debtors respectfully submit that the Indemnification Provisions, as modified by the Proposed Order, are customary, reasonable and in the best interests of the Debtors, their estates and creditors. Accordingly, the Debtors respectfully request that the Court approve the Indemnification Provisions.

## Fees and Reporting

25.    If the Court approves the relief requested herein, M-III will be retained to provide the Debtors with the Engagement Team pursuant to section 363 of the Bankruptcy Code. Because M-III is not being employed as a professional under section 327 of the Code, M-III will not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code. Instead, M-III will file with the Court, and provide notice to the U.S. Trustee of reports of compensation earned and expenses incurred on at least a monthly basis. Such compensation and expenses shall be subject to court review in the event that an objection is filed.

26.    As stated above, prior to the Commencement Date, the Debtors paid M-III the Retainer (in the amount of $500,000).

27.    In the 90 days prior to the Commencement Date, M-III received retainers and payments totaling $2,636,196.20 in the aggregate for services performed for the Debtors. M-III has applied these funds to amounts due for services rendered and expenses incurred prior to the Commencement Date. The aggregate remaining retainer as of the Commencement Date (the

"**Remaining Retainer**"), is estimated to total approximately $321,000. The Remaining Retainer will not be segregated in a separate M-III account, and will be held until the end of these chapter 11 cases. The Remaining Retainer will be credited against any amounts due at the termination of the Engagement Letter.

## Relief Requested Should Be Granted

28.    The Debtors seek approval of the employment of M-III pursuant to section 363 of the Bankruptcy Code *nunc pro tunc* to the Commencement Date.   Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).   Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this  title." 11 U.S.C. § 105(a).

29.    Under applicable case law, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See*, *e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re JohnsManville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

30.    Accordingly, the retention of interim corporate officers and other temporary employees is proper under section 363 of the Bankruptcy Code. This Court has  authorized retention

of officers utilizing this provision of the Bankruptcy Code on numerous occasions. *See*, *e.g., In re Tops Holdings II Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. March 22, 2018) (ECF No. 190); *In re Aereo*, Inc., Case No. 14- 13200 (SHL) (Bankr. S.D.N.Y. Dec. 24, 2014) (ECF No. 103); *In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2008) (ECF No. 2278)*; In re PRC, LLC*, Case No. 08-10238 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008) (ECF No. 182).

31.     The retention of Mr. Meghji as CRO, and M-III and its professionals, is a sound exercise of the Debtors' business judgment.   Mr. Meghji has extensive experience as a senior officer and as an advisor for many troubled companies.   The Debtors believe that the Engagement Team   will provide services that benefit the Debtors' estates and creditors.   Based upon the foregoing, the Debtors submit that the retention of M-III, on the terms set forth herein and in the Engagement Letter, is essential, appropriate, and in the   best interest of the Debtors' estates, creditors, and other parties in interest and should be granted in these chapter 11 Cases.

### *Nunc Pro Tunc* **Relief Is Warranted**

32.     The Debtors believe that employment of M-III effective *nunc pro tunc* to the Commencement Date is warranted under the circumstances of these chapter 11 cases so that M-III may be compensated for its services prior to entry of an order approving M-III's retention. Further, the Debtors believe that no party-in-interest will be prejudiced by the granting of the *nunc pro tunc* employment because M-III has provided, and will continue to provide, valuable services to the Debtors' estate in the interim period.

33.     Courts in this jurisdiction routinely approve *nunc pro tunc* employment similar to that requested herein. *See*, *e.g., In re Tops Holdings II Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Mar. 22, 2018) (ECF No. 190); *In re Aereo*, Inc., Case No. 14- 13200 (SHL)

(Bankr. S.D.N.Y. Dec. 24, 2014) (ECF No. 103); *In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2008) (ECF No. 2278)*; In re PRC, LLC*, Case No. 08-10238 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008) (ECF No. 182).

### Waiver of Bankruptcy Rule 6004(h)

34.     The Debtors request that the Court waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) so that the relief requested herein can take effect immediately upon entry of the order approving this Application.

### Notice

35.     Notice of this Application will be provided in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 139) (the "**Case Management Order**").  The Debtors respectfully submit that no further notice is required.

36.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:  October 25, 2018
      Hoffman Estates, Illinois

SEARS HOLDINGS CORPORATION, *et al*.
(for itself and on behalf of its affiliates as
Debtors and Debtors in Possession)

/s/ Robert A. Riecker
Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                        :
In re                                   :        **Chapter 11**
                                        :
**SEARS HOLDINGS CORPORATION**, *et al.*,   :        **Case No. 18-23538 (RDD)**
                                        :
        **Debtors.**[1]                   :        **(Jointly Administered)**
                                        :
-------------------------------------------------------------x

### ORDER AUTHORIZING
### DEBTORS TO RETAIN M-III ADVISORY PARTNERS, LP TO PROVIDE
### A CHIEF RESTRUCTURING OFFICER AND CERTAIN ADDITIONAL
### PERSONNEL FOR DEBTORS *NUNC PRO TUNC* TO COMMENCEMENT DATE

Upon the application (the "**Application**")[2] of Sears Holdings Corporation and its

debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of title 11 of the United States

Code (the "**Bankruptcy Code**"), for an order authorizing the Debtors to retain M-III Advisory

Partners, LP  ("**M-III**) and for the provision of Mohsin Y. Meghji as Chief Restructuring Officer

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]    Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Application.

("**CRO**") *nunc pro tunc* to the Commencement Date, pursuant to the terms of that certain engagement letter dated October 10, 2018 (the "Engagement Letter**"**) annexed to the Application as **Exhibit B**; and upon the Declaration of Mohsin Y. Meghji in support of the Application annexed thereto as **Exhibit C**; all as more fully set forth in the Application; and the Court having jurisdiction to decide the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.) and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Application having been provided in accordance with the Case Management Order; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Application (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Application is granted to the extent set forth herein.

2.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors are hereby authorized to (i) retain M-III as financial advisors and (ii) designate Mohsin Y. Meghji as the Debtors' Chief Restructuring Officer, *nunc pro tunc* to the Commencement Date on the terms set forth in the Engagement Letter.

3.    The terms of the Engagement Letter, including without limitation, the fee provisions and the indemnification provisions, as modified by this Order, are reasonable terms and conditions of employment and are hereby approved; subject to the following terms, which apply notwithstanding anything in the Engagement Letter or the Application to the contrary:

(i)    All requests by Indemnified Persons for the payment of indemnification, contribution or otherwise as set forth in the Engagement Letter during the pendency of these chapter 11 cases shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought; *provided that* in no event shall any Indemnified Person be indemnified in the case of its own gross negligence or willful misconduct;

(ii)    In the event an Indemnified Person seeks reimbursement from the Debtors for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in M-III's Monthly Statements (as defined below), and such invoices and time records shall be subject to the Fee Guidelines and the approval of the Bankruptcy Court pursuant to sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code;

(iii)    In the event the Debtors seek to have M-III personnel assume executive officer positions that are different than the positions disclosed in the Application, or to materially change the terms of the engagement by either (a) modifying the functions of personnel, (b) adding new executive officers, or (c) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed;

(iv)    No principal, employee or independent contractor of M-III and its affiliates shall serve as a director of any of the above-captioned Debtors during the pendency of the above-captioned cases;

(v)    M-III shall file with the Court, and provide notice to the U.S. Trustee and all official committees, reports of compensation earned and expenses incurred on a monthly basis (the "**Monthly Statements**").    All compensation shall be subject to review by the Court in the event an objection is filed;

3

(vi)    For a period of three (3) years after the conclusion of the engagement, neither M-III nor any of its affiliates shall make any investments in the Debtors or the Reorganized Debtors; and

(vii)   M-III shall disclose any and all facts that would reasonably be expected to have a bearing on whether M-III, its affiliates, and/or any individuals working on the engagement have any interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.  The obligation to disclose identified in this subparagraph is a continuing obligation.

4.      The Debtors are authorized to pay M-III in such amounts and at such times as is provided in the Engagement Letter without further order of this Court.

5.      To the extent there is inconsistency between the terms of the Engagement Letter, the Application, and this Order, the terms of this Order shall govern.

6.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

7.      The Debtors are authorized to take all action necessary to the relief granted in this Order.

8.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2018
       White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

**Executed Engagement Letter**



October 10, 2018

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attention:  Robert A. Riecker
                    Chief Financial Officer

Engagement Letter

Ladies and Gentlemen:

This letter agreement (this "***Agreement***") sets forth the terms and conditions of the engagement (the "***Engagement***") of M-III Advisory Partners, LP ("***M-III***") to provide the Services (as defined below) to Sears Holdings Corporation (the "***Client***").  M-III and the Client are collectively referred to in this Agreement as the "***Parties***."

This Agreement supersedes in its entirety the letter agreement, dated April 26, 2016 (as the same has been amended, supplemented and otherwise modified from time to time), between the Parties.  Such existing letter agreement shall govern the relationship of the Parties with respect to the matters contemplated thereby through (but not including) the date hereof, but shall be terminated as of the date hereof.

    1.  Services.  (a)  The Client hereby retains M-III to provide, and M-III hereby agrees to provide, Mohsin Y. Meghji as the Chief Restructuring Officer (the "***CRO***") of the Client.  The CRO shall have such powers and duties as are set forth herein, such others as are normally associated with the position of chief restructuring officer of entities comparable to the Client and such other powers and duties as M-III and the Client shall mutually agree.   The CRO shall report to the Restructuring Committee (the "***Restructuring Committee***") of the Board of Directors of the Client.

    (b) The Engagement Team will provide the following services (the "***Services***"), subject to the direction of the Restructuring Committee, upon the terms and subject to the conditions set forth in this Agreement:

            (i)  Supervise, and if necessary, assist the Client in the development and administration of its short-term cash flow forecasting and related methodologies, as well as its cash management planning;

            (ii)  Supervise, and if necessary, assist the Client in the identification and implementation of operational improvement activities and cost reductions;

(iii) Provide such assistance as reasonably may be required by management of the Client in connection with (i) development of its business plan, (ii) any restructuring plans and strategic alternatives intended to maximize the enterprise value and (iii) any related forecasts that may be required by creditor constituencies in connection with negotiations or by the Client for other corporate purposes;

(iv) Supervise, and if necessary, assist the professionals who are representing the Client in the reorganization process or who are working for the Client's various stakeholders to coordinate their effort and individual work product in order to be consistent with the Client's overall restructuring goals;

(v) Assist, if required, the Client in communications and negotiations with its outside constituents, including creditors, trade vendors and their respective advisors;

(vi) In the event that the Client commences a bankruptcy case (the "*Case*"), the Client so requests and, to the extent necessary, the relevant United States Bankruptcy Court (the "*Court*") so approves, assist the Client in obtaining and presenting such information as may be required by the parties in interest to the Case and bankruptcy process, including any creditors' committees and the Court; and

(vii) Provide such other services as are reasonable and customary for a CRO in connection with the administration and prosecution of a bankruptcy proceeding or as M-III and the Client shall otherwise agree in writing.

(c) The Engagement Team shall, at the direction of the Restructuring Committee:

(i)     serve as a principal liaison of the Client to the Client's creditor constituencies and other stakeholders with respect to the financial and operational matters relating to the Client; and

(ii)    lead and direct the efforts of the Client and its professional advisors to develop and implement restructuring plans and other strategic alternatives intended to maximize the enterprise value of the Client.

2. <u>Engagement Term</u>.   The Engagement shall commence on October 3, 2018 (notwithstanding any later acceptance of this Agreement) and may be terminated by either Party at any time upon ten business days' written notice.  Following any such termination, neither Party shall have further liability to the other, except with respect to fees and expenses earned and incurred through the date of termination and any provisions of this Agreement which are expressly stated to survive its termination or expiration.

3. <u>Staffing</u>.  (a)  It is anticipated that the team providing the Services initially will be comprised of the CRO and ten other professionals and, unless the CRO and the Restructuring Committee otherwise mutually agree, will be reduced to the CRO and eight other professionals



after three months (the "***Core Team***").  It is M-III's intent to deliver the Services in an effective and cost-efficient manner in accordance with the terms of this Agreement.  In the event that the CRO, following consultation with the Chief Financial Officer of the Client, determines that a change in the size of the team is warranted (with any team members added pursuant to such change being referred to herein as the "***Supplemental Team***"; and, together with the Core Team, the "***Engagement Team***"), then the CRO shall review such determination with the Restructuring Committee prior to making a change in the size of the team and shall make such change only with the prior written approval of the Client.  The members of the team (other than the CRO) are subject to change by the CRO from time to time in his sole discretion.

(b)  Notwithstanding anything to the contrary contained herein, except for the CRO, neither M-III nor any of its personnel performing the Services hereunder is being retained as, or shall be deemed to be, an agent, employee, or director of the Client, but rather M-III shall be deemed to be an independent contractor for the Client and such personnel shall remain employees of M-III.  M-III is being retained by Client only as a consultant and shall have no fiduciary duty to the Client or any of its affiliates.

(c)  In the event that a Case is commenced, it is M-III's intention to work with the Office of the United States Trustee and the Court to ensure that M-III is retained pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code consistent with the "Jay Alix Protocols."

4.  <u>Compensation for Services</u>.  (a)  M-III's compensation for services rendered under this Agreement shall be paid by the Client by wire transfer of immediately available funds in accordance with instructions provided from time to time by M-III to the Client and will consist of the following:

(i)  <u>Retainer</u>:  The Client shall provide a retainer of $500,000 immediately upon execution of this Agreement (the "***Retainer***").  Once received by us, the Retainer and any additional amounts received by M-III as replenishment of the Retainer will irrevocably become the property of M-III and shall not be subject to any claim of set-off, recoupment or other defense in respect of M-III's ownership thereof or entitlement to such funds under the terms hereof.  For the avoidance of doubt, the Retainer is not intended to be an estimate of the fees and expenses for the Engagement.

(ii)  <u>Compensation for Services</u>:  As compensation for providing the Services hereunder, M-III shall be entitled to non-refundable professional fees (the "***Core Fee***") at a flat rate of (x) during such time as the Core Team is comprised of the CRO plus 10 additional professionals, $900,000 per month and (y) during such time as the Core Team is comprised of the CRO plus 8 additional professionals, $750,000 per month.  In the event that additional staffing is required as contemplated by Section 3, then each member of the Supplemental Team will be billed to the Client at a rate which is $50 per hour less than M-III's standard hourly rates set forth below (together with the Core Fee, the "***Service Fee***"):



| Professional | Rate |
|---|---|
| Managing Partner | $975.00 |
| Managing Director | $875.00 |
| Director | $675.00 |
| Vice President | $575.00 |
| Senior Associate | $475.00 |
| Associate | $400.00 |
| Senior Analyst | $350.00 |
| Analyst | $325.00 |

M-III reserves the right to modify such hourly rates at any time and from time to time upon prior notice to the Client.

(iii) <u>Out-of-Pocket Expenses</u>: In addition to any compensation for providing the Services, the Client shall reimburse M-III for all reasonable and documented out-of-pocket expenses incurred in the performance of the Services (including, without limitation, reasonable travel costs). M-III shall from time to time furnish to the Client copies of a reasonably detailed invoice for reimbursement of amounts owing under this clause (iii) (which invoice shall include back-up for expenses in excess of $100 and as otherwise required by applicable law) and such amounts shall be paid in accordance with the provisions of Section 4(b) below.

(iv) <u>Transaction Fee</u>: In addition to all other compensation provided for herein, M-III shall be entitled to receive an additional fee equal to (x) $1,750,000, if the Client successfully consummates an out of court restructuring, (y) $2,000,000, if a Case is commenced with respect to the Client and, within six months after such commencement, the Client emerges from bankruptcy as a going concern and/or is sold (in whole or in part) through a Section 363 or other sale, or (z) $1,000,000, if a Case is commenced with respect to the Client and, within nine months after such commencement, the Client emerges from bankruptcy as a going concern and/or is sold (in whole or in part) through a Section 363 or other sale. Such transaction fee shall be paid by wire transfer of immediately available funds within five business days following the consummation of an out-of-court restructuring or simultaneous with the Client's emergence from bankruptcy, as applicable.

(b) All amounts payable under clauses (ii) and (iii) of Section 4(a) above shall be billed on or about the 15th and 30th of each month (or, at the election of M-III at any time and from time to time, more frequently) by presentment of a reasonably detailed invoice for the amounts payable and shall be paid by drawings against the Retainer, with the Client being obligated to promptly replenish the Retainer to its initial amount or such alternate amount as agreed among the parties. To the extent that the Retainer is insufficient to pay any amounts then due, the Client shall pay such excess by wire transfer of immediately available funds within 5 days after the date of service of the relevant invoice.



(c)  In the event that amounts payable hereunder are not paid within the periods specified above, M-III reserves the right to suspend further Services until the Retainer is appropriately replenished (after giving effect to receipt of payment on past due amounts); *provided* that M-III will not suspend the Services to the extent that the balance of the Retainer is sufficient to pay all billed and unbilled amounts owing to M-III.  In the event that M-III so suspends the Services, M-III shall not be responsible or liable for any resulting loss, damage or expense due to such suspension.

(d) M-III may elect from time to time to have its invoices paid directly to its affiliate, M-III Partners, LP ("*M3PLP*"), and to have the Retainer held by M3PLP on behalf of M-III.  Such election by M-III, the receipt by M3PLP of payments on behalf of M-III, and the retention of the Retainer by M3PLP shall not imply or create any responsibility by M3PLP for the obligations of M-III under this Agreement.  The Client acknowledges and agrees that its sole recourse with respect to matters relating to this Agreement shall be to M-III.

(e) The provisions of this Section shall survive the termination or expiration of this Agreement.

5.  <u>Cooperation from Client</u>.  In order to properly perform the Services and fulfill its responsibilities on a timely basis, M-III will rely on the timely cooperation of the Client and its other professional advisors, including, without limitation, making available to M-III relevant data, information and personnel, performing any tasks or responsibilities assigned to the Client and notifying M-III of any issues or concerns that the Client may have relating to the Services.  The Client will provide M-III with full access to all personnel, books and records of the Client, as well as to all advisors and professionals retained by the Client.  The Client understands and acknowledges that M-III's proper delivery of the Services is dependent upon timely decisions and approvals by the Client and its management. M-III shall have no responsibility or liability for any delays, additional costs or other deficiencies caused by the Client failing to properly fulfill its responsibilities under this Agreement.

6.  <u>Deliverables</u>.  (a) In connection with the Engagement, M-III may furnish the Client with information, advice, reports, analyses, presentations and other materials (the "***Deliverables***"). The Deliverables may contain factual data, the interpretation of which may change over the project term as more information or better understanding becomes available.  The Client acknowledges that M-III will have no obligation to update the Deliverables as part of the Services in the event of such a change.

(b) Because the Deliverables may contain proprietary or other information of M-III that is deemed to be Confidential Information (as defined below) for purposes of this Agreement, the Parties agree that (i) all Deliverables (whether written or oral) furnished by M-III in connection with the Engagement are intended solely for the benefit and use of the Client in connection with this Agreement, and (ii) no such information shall be used for any other purpose, disseminated to any third parties, or quoted or referred to, with or without attribution to M-III, at any time, in any manner or for any purpose without M-III's prior written approval (which shall not be unreasonably



withheld or delayed), except as required by applicable law or by order or act of any court or governmental or regulatory authority or body or if required in connection with the Case.

    (c)  The provisions of this Section shall survive the termination or expiration of this Agreement.

    7.  <u>Limitations on Services</u>.  (a)  The Services are limited to those specifically noted in this Agreement.

    (b)  M-III does not provide accounting or tax-related assistance and no Deliverable or other information or advice provided to the Client shall be deemed to be accounting or tax-related assistance.  The Client shall be solely responsible for determining the accounting and tax-related implications of the Deliverables and other information and advice provided to it by M-III.  M-III shall not express any professional opinions on financial statements or perform attest procedures with respect to other information in conjunction with the Engagement.  The Services are not designed, nor should they be relied upon, to disclose weaknesses in internal controls, financial statement errors, irregularities or illegal acts.  M-III shall assume the accuracy and completeness of all information submitted by or on behalf of the Client to M-III for analysis and which will form the basis of M-III's conclusions, without any obligation of M-III to verify the accuracy or completeness of such information, and M-III shall not be responsible for any analysis, advice or other Services to the extent based on inaccurate or incomplete information provided or accepted by or on behalf of the Client.

    (c)  The Services shall not include preparing, auditing or otherwise attesting in any way (including without limitation, with respect to the accuracy, achievability, reliability, relevance, usefulness or other appropriateness) to the Client's financial projections, and the Client has not engaged M-III for that purpose.  The Services are provided based upon the understanding that the Client has sole responsibility for its financial projections (including preparation thereof), developing underlying assumptions and providing any disclosure related thereto.  To the extent that, during the performance of Services hereunder, M-III is required to consider the Client's financial projections, the Client understands that M-III's procedures with respect to such projections do not constitute an examination in accordance with procedures established by the American Institute of Certified Public Accountants and do not and are not intended to provide any assurance on any aspect of such projections, including, without limitation, the reasonableness of the assumptions underlying such projections, nor do they provide assurance that M-III might not become aware of significant matters affecting the reasonableness of the projections that might be disclosed by more extensive procedures.  There will usually be differences between projected and actual results, and those differences may be material.  The Client understands and agrees that M-III will have no responsibility or liability relating to any such differences.

    (d)  To the extent that the performance of the Services requires that M-III form conclusions or reach opinions, M-III shall do so without regard to or consideration of the impact that such conclusions or opinions may have on the initiation or outcome of any litigation to which the Client is or may become a party.



(e) M-III does not provide investment advice and the Services shall not include the provision of investment advice.  The Client shall have sole responsibility for all investment decisions made by it.

(f) The provisions of this Section shall survive the termination or expiration of this Agreement.

8.  <u>Non-Solicitation; No Investment</u>.  (a)  Each of the Client and M-III (the "***Restricted Party***") covenants and agrees that, prior to the first anniversary of the termination or expiration of this Agreement, it will not, directly or indirectly, hire directly or as an independent contractor, or refer to another for employment, any person who was during the term of this Agreement an employee or contractor of the other Party to this Agreement (the "***Employer Party***") or any of its affiliated entities, in each case who was involved on behalf of the Employer Party with the Engagement or the performance of the Services. In the event of the breach of the foregoing covenant, the Restricted Party shall be liable to the Employer Party, and shall pay on demand to the Employer Party, liquidated damages equal to 200% of the total annual compensation of each relevant employee for the preceding calendar year (and, in the event that any such employee was not employed for the full year, the amount equal to 200% of his or her annualized salary).  The Parties mutually agree that the actual damages that would be sustained by the Employer Party as the result of any such breach will be substantial and will be impossible to measure accurately, and that the foregoing liquidated damage amount is fair and reasonable.

(b)  For a period of three years after the conclusion of the Engagement, neither M-III nor any of its affiliates shall make any investments in the Client or any of its subsidiaries.

(c) The provisions of this Section shall survive the termination or expiration of this Agreement.

9.  <u>Bankruptcy Proceedings</u>.  In the event that a Case is commenced, the Client will promptly apply to the Court for approval of M-III's retention as financial advisor, *nunc pro tunc* to the date of filing and use commercially reasonable efforts to obtain an order of the Bankruptcy Court authorizing the engagement of M-III upon the terms of this Agreement.  The Client shall provide a copy of such application and proposed order to M-III for review as much in advance of filing as is practicable and such application and order must be acceptable to M-III in its sole discretion.  Following entry of the order authorizing M-III's employment, the Client shall pay all fees and expenses due pursuant to this Agreement, as approved by the Bankruptcy Court, as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with M-III to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. M-III shall have no obligation to provide services under this Agreement unless M-III's retention under this Agreement is approved by final order of the Bankruptcy Court which is acceptable to M-III and which approves this Agreement in all material respects. The Client shall reimburse M-III for all reasonable costs and expenses incurred by M-III (including, without limitation, reasonable fees of counsel to M-III) in obtaining such



order of the Bankruptcy Court. If the order authorizing M-III's employment is not obtained, or is later reversed, modified or set aside for any reason, then M-III may terminate this Agreement, and the Client shall promptly reimburse M-III for all fees and expenses due pursuant to this Agreement. The provisions of this Section shall survive the termination or expiration of this Agreement.

10. <u>Confidentiality</u>. (a) Each Party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party in the scope of the Engagement (the "***Confidential Information***"), and neither party will disclose any Confidential Information to any other person or entity. For the avoidance of doubt, the term "Confidential Information" shall include (i) the terms of this Agreement, (ii) all non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results and models and (iii) any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants. In performing the Services, M-III will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information.

(b) The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, M-III from making such disclosures of Confidential Information that M-III reasonably believes are required by law or any regulatory requirement or authority, or to clear client conflicts or the Client from disclosing the terms of this Agreement in connection with M-III's retention in the case. M-III also may disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information for the proper performance of the Services or otherwise in connection with the Engagement. M-III may make reasonable disclosures of Confidential Information to third parties to the extent that M-III reasonably believes that such disclosure is consistent with its performance of the Services. In addition, M-III will have the right to disclose to any person that it provided services to the Client and its affiliates and a general description of such services.

(c) The provisions of this Section shall survive the termination or expiration of this Agreement.

11. <u>Intellectual Property</u>. Upon payment in full of all amounts owing to M-III hereunder, the Client will own all Deliverables furnished by M-III to the Client in connection with the Services, *provided* that M-III will retain ownership of (a) all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by M-III in connection with the Services and (b) all other intellectual property not containing Confidential Information which has been developed by M-III outside of the provision of the Services (the "***M-III Tools***"), it being understood that M-III will have no ownership right to, and will maintain in accordance with the provisions of this Agreement the confidentiality of, any Confidential Information contained in the M-III Tools. To the extent that the Deliverables include any M-III Tools, M-III hereby grants the Client a non-exclusive, non-transferable, non-sublicensable worldwide, royalty-free license to use and copy the M-III Tools solely as part of the Deliverables and subject to the confidentiality



provisions contained in this Agreement.   The provisions of this Section shall survive the termination or expiration of this Agreement.

12. <u>Indemnification</u>.   (a)   The Client hereby irrevocably and unconditionally agrees to indemnify and hold harmless the Indemnities (as defined in Annex I hereto) in accordance with the provisions of Annex I hereto.  The indemnity and expense reimbursement obligations set forth herein (i) shall be in addition to any liability the Client may have to M-III at common law or otherwise, (ii) shall survive the termination or expiration of this Agreement and (iii) shall be binding on any successors and assigns of the Client.

(b)   In addition to (and not in limitation of) the provisions of Section 12(a), the CRO and any other M-III employees who may from time to time serve as directors or officers of the Client or any of its affiliates will receive the benefit of the most favorable indemnification provisions provided by the Client to its directors, officers and any equivalently placed employees, whether under the Client's charter or by-laws, by contract or otherwise.  Additionally, the Client shall specifically include and cover the CRO and any M-III employees, contractors and agents who may from time to time serve as directors or officers of the Client or any of its affiliates with direct coverage under the Client's policy for liability insurance covering its directors, officers and any equivalently placed employees (the "***D&O Insurance***").  Upon request of M-III, the Client shall provide M-III with a copy of the policy documentation for its then-current D&O Insurance, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as M-III may reasonably request evidencing the appointment and coverage of the indemnitees.  Additionally, the Client shall give not less than 30 days' prior written notice to M-III of any cancellation, non-renewal or material adverse change in coverage, scope of amount of such D&O Policy. The Client will maintain such D&O Insurance coverage for the period through which claims can be made against such persons. The Client disclaims a right to distribution from the D&O Insurance coverage with respect to such persons. In the event that the Client is unable to include the CRO or any other such M-III employee or agent under the Client's D&O Insurance coverage or does not have first dollar coverage reasonably acceptable to M-III in effect for at least $25 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), then M-III may, at its option, attempt to purchase a separate D&O insurance policy providing such coverage that will cover the CRO and any such other M-III employees and agents only.  The cost of such separate policy shall be invoiced to the Client as an out-of-pocket expense.  If M-III is unable or unwilling to purchase such separate D&O insurance policy, then M-III reserves the right to terminate the Agreement.

(c)   The Client's indemnification obligations in this Section shall be primary to, and without allocation against, any similar indemnification obligations that M-III may offer to its personnel generally, and the Client's D&O Insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by M-III or otherwise).

(d)   Notwithstanding anything to the contrary contained in this Section 12, the indemnity owing from the Client to the Indemnified Parties shall not exceed the terms of any indemnities



provided to the Client's other officers and directors under the corporate bylaws and applicable state law, plus any insurance coverage under the Client's D&O Insurance.

(e) The provisions of this Section shall survive the termination or expiration of this Agreement.

13. <u>Limitation on Damages</u>.  In no event shall M-III or any other Indemnified Party be liable to the Client or its affiliates, successors, or any person claiming on behalf of or in the right of the Client (including the Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors) for (i) any amount which, when taken together with all losses for which M-III and the Indemnified Parties are liable in connection with this Agreement or the Engagement, would exceed the amount of fees for the Services actually received by M-III from the Client in connection with the Engagement during the immediately preceding 12 months or (ii) any special, consequential, incidental or exemplary damages or loss (or any lost profits, savings or business opportunity).  Notwithstanding the foregoing, the Engagement Team shall operate under the direction of the Restructuring Committee and M-III shall have no liability to the Client for the acts or omissions of the Engagement Team related to the performance or non-performance of services at the direction of the Restructuring Committee and consistent with the requirements of the Engagement and this Agreement.  This paragraph shall apply regardless of the nature of any claim(s) (including claims based on contract, statute, negligence, tort, strict liability or otherwise), regardless of any failure of the essential purpose of any remedy and whether or not M-III was advised of the possibility of the damage or loss asserted, but shall not apply to the extent finally determined by final and non-appealable judgment of a court of competent jurisdiction to be prohibited by applicable law.  The provisions of this Section (including, without limitation, the provisions of Annex I) shall survive the termination or expiration of this Agreement.

14. <u>Client Acknowledgement</u>.  The Client hereby acknowledges and agrees that M-III may, in the ordinary course of its business, serve clients who are competitive with, or have conflicting interests with, the Client.  M-III will maintain the confidentiality of the Confidential Information in accordance with the terms of this Agreement and, similarly, will not share confidential information of any client, potential client or former client of M-III with the Client.  The provisions of this Section shall survive the termination or expiration of this Agreement.

15. <u>Conflicts</u>.  M-III is not currently aware of any relationship that has created or would create a conflict of interest with the Client or those parties-in-interest of which you have made us aware in writing.  In the event that M-III becomes aware of any such conflict of interest, M-III will promptly notify the Client in writing.

16. <u>Miscellaneous</u>.  (a)  This Agreement (i) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements (both written and oral) among the parties with respect to the subject matter hereof, and (ii) may be modified, amended or supplemented only by prior written agreement of each of the Parties.



(b)   The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction.  If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; *provided* that, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(c)   M-III's services hereunder are personal in nature and may not be assigned without the written consent of the Client.

(d)   This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.

(e)   This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts to be executed and performed within such state.  The Parties hereby submit to the exclusive jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement; *provided*, *however*, that, during such time as the Court has jurisdiction over the Case, the Court shall have exclusive jurisdiction and venue with respect to any such dispute.  The provisions of this paragraph shall survive the termination or expiration of this Agreement.

*[Remainder of Page Intentionally Left Blank]*



This Agreement shall be binding upon the Parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M-III ADVISORY PARTNERS, LP

By _____
Name:  Mohsin Y. Meghji
Title:  Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

SEARS HOLDINGS CORPORATION

By: _____
Name:  Robert A. Riecker
Title:  CFO



AGREEMENTS REGARDING INDEMNIFICATION

In consideration of M-III performing the Services for the benefit of the Client, the Client (the "**_Indemnitor_**") shall indemnify M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors, including past, present or future partners, principals and personnel of each (collectively hereinafter called the "**_Indemnitees_**") against all costs, fees, expenses, damages, and liabilities (including defense costs) associated with any pending or threatened third party claim, action or proceeding (a "**_Claim_**") relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement ("**_Losses_**").  This provision is intended to apply regardless of the nature of any Claim (including contract, statute, any form of negligence, whether of the Client, M-III, or others, tort, strict liability or otherwise), except to the extent such Losses are determined to be the result of M-III's bad faith, gross negligence or willful misconduct.

The Indemnitor shall not, without M-III's prior written consent (which will not be unreasonably withheld) settle, compromise, or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification could reasonably be sought hereunder (whether or not M-III or any other Indemnitee is an actual or potential party to such Claim), if such settlement, compromise, or consent does not include an unconditional release of each Indemnitee from all liability arising out of such Claim; _provided_, _however_, that the Indemnitor shall not enter into any such settlement, compromise or consent of a Claim without M-III's prior written consent (which may be granted or withheld in M-III's sole discretion) if such settlement, compromise or proceeding provides for injunctive relief against an Indemnitee or an admission of liability by an Indemnitee.  The Indemnitor shall not be liable hereunder to any Indemnitee for any amount paid or payable in the settlement of any action, proceeding or investigation entered into by such Indemnitee without the Indemnitor's written consent.

Upon receipt by an Indemnitee of actual notice of a Claim against such Indemnitee in respect of which indemnity may be sought hereunder, such Indemnitee shall promptly notify the Indemnitor with respect thereto.  In addition, an Indemnitee shall promptly notify the Indemnitor after any action is commenced (by way of service with a summons or other legal process giving information as to the nature and basis of the claim) against such Indemnitee in respect of which indemnity may be sought hereunder.  In any event, failure to notify the Indemnitor shall not relieve the Indemnitor from any liability which the Indemnitor may have on account of this indemnity or otherwise, except to the extent, and only to the extent, that the Indemnitor shall have been materially prejudiced by such failure.

Indemnitor shall advance all expenses indemnifiable hereunder that are reasonably incurred by or on behalf of each Indemnitee in connection with any Claim within thirty (30) days after receipt by Indemnitor of a statement or statements from Indemnitee requesting such advance or advances



from time to time, whether prior to or after final disposition of such Claim. Such statement or statements shall reasonably evidence the expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified against such expenses. Any advances and undertakings to repay pursuant to this paragraph shall be unsecured and interest free.

To the extent that the Indemnitor so elects, it shall be entitled to assume the defense, with counsel selected by the Indemnitor (and approved by M-III, with such approval not to be unreasonably withheld), of any action that is the subject of the proceeding in respect of which indemnity may be sought. After notice to the Indemnitees of its election to assume the defense thereof, the Indemnitor will not be liable to the Indemnitee under this Agreement for any expenses subsequently incurred by such Indemnitee in connection with the defense thereof except as otherwise provided below. Such Indemnitee shall have the right to employ counsel of its choice in such Claim, but the fees and expenses of such counsel incurred after notice from the Indemnitor of the assumption of the defense thereof shall be at the expense of the Indemnitee unless the employment of counsel by the Indemnitee has been authorized by the Indemnitor, in which case the reasonably incurred fees and expenses of such counsel of the Indemnitee shall be at the expense of the Indemnitor.

In the event that any M-III personnel are requested or required to appear as a witness in connection with any claim, action or proceeding relating to or arising as a result of the Engagement, the provision of the Services or other services previously or hereafter provided to the Client, the Client's use or disclosure of the Deliverables, or this Agreement, the Indemnitor shall, to the extent permitted by applicable law, reimburse M-III for all reasonable and documented out-of-pocket expenses incurred by it in connection with such personnel appearing and preparing to appear as a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel, and to compensate M-III at a rate equal to M-III's then standard hourly rate for the relevant personnel for each day that such personnel is involved in preparation, discovery proceedings or testimony pertaining to such Claim.

Neither termination or expiration of this Agreement or the Engagement, nor the filing of a petition under Chapter 7 or Chapter 11 of the Bankruptcy Code (nor the conversion o an existing case to one under a different Chapter), shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

The rights provided herein shall not be deemed exclusive of any other rights to which any Indemnitee may be entitled under the certificate of incorporation or bylaws of the Client, any other agreements, any vote of stockholders or disinterested directors of the Client, any applicable law or otherwise.

The provisions of this Annex I shall be deemed to be an integral part of this Agreement to which this Annex I is affixed and shall survive the termination or expiration of this Agreement for any reason. The provisions of this Annex I shall be binding upon the Client and its successors and assigns.



## Exhibit C

**M-III Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                 :
In re                                            :        **Chapter 11**
                                                 :
**SEARS HOLDINGS CORPORATION,** *et al.*,        :        **Case No. 18-22279 (RDD)**
                                                 :
Debtors.[1]                                      :        **(Jointly Administered)**
                                                 :
---------------------------------------------------------------x

### DECLARATION OF MOHSIN Y. MEGHJI
### IN SUPPORT OF APPLICATION OF DEBTORS
### TO RETAIN M-III ADVISORY PARTNERS, LP TO PROVIDE A CHIEF
### RESTRUCTURING OFFICER AND CERTAIN ADDITIONAL PERSONNEL
### FOR THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

I, Mohsin Y. Meghji, under penalty of perjury, declare as follows:

1.      I am the Managing Partner of M-III Advisory Partners, LP  (together with

employees of its professional service provider affiliates (all of which are wholly-owned by its parent

company and employees), its wholly-owned subsidiaries and independent contractors, "**M-III**"), a

restructuring advisory services firm.  I submit this declaration on behalf of M-III (the "**Declaration**")

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

in support of the *Application of Debtors to Retain M-III Advisory Partners, LP to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel Nunc Pro Tunc to the Commencement Date* (the "**Application**")[2] on the terms and conditions set forth in the Application and the engagement letter dated October 10, 2018, entered into between the Debtors and M-III and attached to the Application as **Exhibit B** (the "**Engagement Letter**"), *nunc pro tunc* to the Commencement Date. Except as otherwise noted, I have personal knowledge of the matters set forth herein.[3]

## Disinterestedness and Eligibility

2.      M-III utilizes certain procedures (the "**M-III Procedures**") to determine its relationships, if any, to parties that may have a connection to any of the Debtors in these chapter 11 cases.  In implementing the M-III Procedures, the following actions were taken to identify parties that may have connections to the Debtors and to determine M-III's relationship with such parties:

(a)      M-III requested and obtained from the Debtors extensive lists of interested parties and significant creditors (the "**Potential Parties in Interest**").[4]  The list of categories of Potential Parties in Interest which M-III  reviewed is annexed hereto as Schedule 1.  The Potential Parties in Interest reviewed include, among others, the Debtors, prepetition and proposed post-petition lenders, current officers and directors, potential, significant unsecured creditors of the Debtors (on a consolidated basis) comprising greater than eighty percent (80%) of open accounts payable, significant competitors, parties holding greater than 5% ownership interests in the Debtors, insurance providers, unions, UCC lien holders, litigation parties, lender institutions, landlords, Bankruptcy Judges and Trustees and various professionals related to the engagement.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Application.

[3]    Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at M-III and are based on information provided by such professionals.

[4]    As may be necessary, M-III will supplement this Declaration if it becomes aware of a relationship that may adversely affect M-III's retention in these cases or would otherwise require disclosure.

(b)     Senior professionals of M-III then reviewed the names of each of the Potential Parties in Interest and M-III compared the names on the list with its records concerning current and former clients and key parties in interest with respect to those current and former clients.

(c)     Known connections between former or recent clients of M-III and the Potential Parties in Interest were compiled for purposes of preparing this Declaration.   These connections are listed in Schedule 2 annexed hereto.

3.      As a result of the M-III Procedures, I have thus far ascertained that, except as may be set forth herein, upon information and belief, if retained, M-III:

(a)     is not a creditor of the Debtors (including by reason of unpaid fees for prepetition services) or an equity security holder of the Debtors;

(b)     is not and has not been, within two (2) years before the date of the filing of the petition, a director, officer (other than by virtue of M-III employees serving in the roles as Engagement Team (pre- and postpetition) as described in the Application), or an employee of the Debtors; and

(c)     does not have any interest materially adverse to the interests of the Debtors' estates, or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

4.      As can be expected with respect to any international professional services firm such M-III, M-III provides services to many clients with interests in the Debtors' chapter 11 cases.  To the best of my knowledge, except as indicated below, M-III's services for such clients do not relate to the Debtors' chapter 11 cases.

5.      M-III and the Debtors were parties to each of (a) an engagement letter dated April 26, 2016 (as amended, supplemented and otherwise modified from time to time, including by a supplemental engagement letter dated November 18, 2016), pursuant to which M-III provided financial advisory services to the Debtors, including on a limited range of strategic, operational and financial matters and (b) an engagement letter dated June 23, 2017, pursuant to which M-III

agreed to serve as "Designated Financial Institution" pursuant to a certain consent between certain of the Debtors and the Pension Benefit Guaranty Corporation. The provision of services under the April 26, 2016 engagement letter concluded immediately prior to the execution of the Engagement Letter and services under the other engagement letters described in the preceding sentence had concluded prior to such date. No amounts were owed by the Debtors to M-III as of the Commencement Date.

6.      Further, as part of its diverse practice, M-III appears in numerous cases and proceedings, and participates in transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who represent claimants and parties-in-interest in the Debtors' chapter 11 cases. Further, M-III has performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of which may be involved in these proceedings. Based on my current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which M-III is to be employed, and none are in connection with these cases.

7.      If any new material relevant facts or relationships are discovered or arise, M-III will promptly file a supplemental declaration.

### Compensation

8.      Subject to Court approval of the Application and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, applicable U.S. Trustee guidelines, and the Local Rules for the United States Bankruptcy Court for the Southern District of New York, M-III will seek from the Debtors payment for compensation on a monthly basis for the CRO and the Core Team described in the Engagement Letter and on an hourly basis for all Additional Personnel, as well as reimbursement of actual and necessary expenses incurred by M-

III.  M-III's customary hourly rates as charged in bankruptcy and non-bankruptcy matters of this type by the professionals assigned to this engagement are outlined in the Application.  These hourly rates are adjusted annually.

9.      To the best of my knowledge, (i) no commitments have been made or received by M-III with respect to compensation or payment in connection with these cases other than in accordance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and (ii) M-III has no agreement with any other entity to share with such entity any compensation received by M-III in connection with these chapter 11 cases.

10.     By reason of the foregoing, I believe M-III is eligible for retention by the Debtors pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules.

Dated:  October 25, 2018
         New York, New York

By: /s/ Mohsin Y. Meghji
    Mohsin Y. Meghji
    Managing Partner
    M-III Advisory Partners, LP

## <u>Schedule 1</u>

### List of Categories of Potential Parties in Interest

- Debtors and Affiliates
- Debtors' Trade Names and Aliases (last 8 years)
- Current and Former Officers and Directors (last 2 years) and Known Affiliations
- Debtors' Greater-than-5% Equity Ownership
- Professionals Retained by the Debtors
- Top 40 Unsecured Creditors
- Unsecured Creditors' Committee Members and Known Professionals
- Landlords
- Lienholders
- Banks
- Secured Lenders
- Secured Notes
- Unsecured Notes
- Indentures
- Vendors
- Supplemental Workforce Agencies
- Employee Benefits
- Customer Programs
- Utilities
- Insurers and Insurance Brokers
- Unions
- Significant Competitors
- Parties to Litigation
- United States Trustee, Judges, and Court Contacts for the Southern District of New York (and Key Staff Members)
- Governmental
- Notice of Appearance Parties
- Other Parties in Interest and Known Professionals

## Schedule 2

### Potential Connections or Related Parties

M-III Advisory Partners, LP and its affiliates have current relationships or have recently had relationships with the following entities or their affiliates, as described below:

- Abriano, Victor:  US Trustee financial advisor for an engagement (Relativity Media) in which Colin Adams, a senior professional at M-III and member of the Engagement Team, serves as CRO and M-III performs related services.  Such engagement is unrelated to the Debtors.

- Aetna:  Currently is one of the approved and available providers of health insurance to M-III employees under its employee benefits plans.

- Ally Bank:  Member of the steering committee for an engagement in which M-III is advising the agent.  Such engagement is unrelated to the Debtors.

- Ares Management: M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- AXA Insurance Company:  Parent company of XL.  See below.

- Bank of America, N.A.:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Berkadia Commercial Mortgage:  Senior professionals were engaged by Berkadia while at a previous firm for matters unrelated to the Debtors.

- Black Diamond Capital Management: M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Capital One:  Agent bank for an engagement in which M-III is advising the debtor.  Such engagement is unrelated to the Debtors.

- Centerbridge:  M-III has previously provided advisory services to Centerbridge and is currently representing the agent bank and lenders on an engagement in which

Centerbridge is the controlling shareholder of the debtor.  All of such matters are unrelated to the Debtors.

- CIT Group:  M-III has advised CIT on various restructurings unrelated to the Debtors.

- Citibank, N.A.:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Citizens Bank:  Member of a bank syndicate for an engagement in which M-III is advising the agent.  Such engagement is unrelated to the Debtors.

- Fifth Third Bank:  Member of a bank syndicate for an engagement in which M-III is advising the agent.  Such engagement is unrelated to the Debtors.

- General Electric Capital Corporation:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Goldman Sachs & Co.:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Greenberg Traurig:  Has performed legal work for M-III on employee compensation matters unrelated to the Debtors.  Such work has been completed and no current relationship exists.

- Harvest Partners LP:  Controlling shareholder of a company for which M-III provides advisory services.  Such engagement is unrelated to the Debtors.

- HSBC Bank:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- JP  Morgan Chase Bank / Chase Manhattan Bank:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Key Bank:  Member of a bank syndicate for an engagement in which M-III is advising the agent.  Such engagement is unrelated to the Debtors.

- Kohlberg Kravis Roberts & Co. LP: M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Morgan Stanley:  Colin Adams, a senior professional at M-III who is a member of the Engagement Team, was formerly employed by Morgan Stanley.  None of his work at Morgan Stanley involved the Debtors.

- Morrison & Foerster:  Serves as counsel to the residual estate of Real Alloy, for which Mohsin Y. Meghji is the Chief Restructuring Officer and M-III performs related services.  Such engagement is unrelated to the Debtors.

- Oaktree Capital Management (and certain affiliates):  Seller of a significant interest in Infrastructure and Energy Alternatives, Inc. ("IEA") to an affiliate of M-III and remains controlling shareholders of that entity.  Such matter is unrelated to the Debtors and, to the knowledge of M-III, IEA has no relationship with the Debtors.

- Pension Benefit Guaranty Corporation: M-III was retained by Sears Holdings Corporation in June 2017 to serve as "Designated Financial Institution" with respect to certain deferred compensation from the sale of the Debtors' "Craftsman" business to Stanley Black & Decker, Inc. that was to be held in escrow under a consent agreement between the Debtors and the Pension Benefit Guaranty Corporation.  As Designated Financial Institution, M-III was responsible under certain circumstances to notify the escrow agent (U.S. Bank National Association) of the relative allocation of such deferred compensation as between two pension plans (Sears Holdings Pension Plan 1 and Sears Holdings Pension Plan 2).   Such notification was provided in June 2018 and M-III has no continuing obligations on account of this engagement.

- Prime Clerk:  Claims agent for an engagement in which M-III is serving as CRO to the debtor.  Such engagement is unrelated to the Debtors.

- Rabobank:  Member of a bank syndicate for an engagement in which M-III is advising the agent on a matter unrelated to the Debtors.    Additionally, M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- RegionsBank:  Member of a bank syndicate for an engagement in which M-III is advising the agent.   Such engagement is unrelated to the Debtors.

- TD Bank:  Member of a bank syndicate for an engagement in which M-III is advising the agent.  Such engagement is unrelated to the Debtors.

- Toys "R" Us Delaware Inc. (Vendor and Director affiliation):  Mohsin Y. Meghji serves as an independent director of Toys 'r Us.  His activities and discussions relating to Toys 'r Us have not involved the Debtors.

- UBS Inc.:  M-III or its senior professionals have previously provided advisory services on matters unrelated to the Debtors.

- Vedder Price Kaufman & Kammholz:  M-III retained Vedder Price at the request of Sears Holdings Corporation (and with fees paid by SHC) in 2016 in connection with certain personnel matters relating to M-III's engagement by SHC.  Such work was completed in

2016 and, to the knowledge of M-III, is unrelated to the matters at issue in these chapter 11 proceedings.

- Wells Fargo Bank / Wachovia Bank:  M-III has been retained by counsel to Wachovia, as agent bank, to advise the agent bank and the lenders in connection with an ongoing engagement.  Such engagement is unrelated to the Debtors.

- Winston & Strawn:  Serves as counsel to the bankruptcy estate of Relativity Media, for which Colin Adams, a senior professional at M-III and a member of the Engagement Team, serves as Chief Restructuring Officer and M-III performs related services.  Such engagement is unrelated to the Debtors.

- XL Insurance:  Currently provides D&O, general liability and E&O insurance to M-III.

- Zipes, Greg:  Serves as US Trustee for an engagement (Relativity Media) in which Colin Adams, a senior professional at M-III and member of the Engagement Team, serves as Chief Restructuring Officer. Such engagement is unrelated to the Debtors