**Hearing Date and Time: November 15, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: November 8, 2018 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
In re                               :
                                    :        Chapter 11
SEARS HOLDINGS CORPORATION, et al., :
                                    :        Case No. 18-23538 (RDD)
                                    :
                  Debtors.¹         :        (Jointly Administered)
-------------------------------------------------------------x
```

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

**NOTICE OF HEARING ON MOTION OF DEBTORS FOR
ENTRY OF ORDER (I)(A) APPROVING BIDDING PROCEDURES
FOR SALE OF SEARS HOME IMPROVEMENT BUSINESS, (B) APPROVING
STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR
AND HEARING TO APPROVE SALE OF SEARS HOME IMPROVEMENT
BUSINESS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE,
AUCTION, AND SALE HEARING, (E) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, (II) APPROVING THE SALE OF SEARS
HOME IMPROVEMENT BUSINESS IN ACCORDANCE WITH THE
<u>STALKING HORSE AGREEMENT AND (III) GRANTING RELATED RELIEF</u>**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "**Motion**"),

of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to

sections 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"),

Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), Rules 6004-1, 6005-1, and 6006-1 of the Local Bankruptcy Rules for the

Southern District of New York (the "**Local Rules**"), and the Amended Guidelines for the Conduct

of Asset Sales, adopted by General Order M-331, as amended by General Order Amending M-

383, (i)(a) approving bidding procedures for the sale of the Debtors' home improvement business,

(b) approving stalking horse bid protections, (c) scheduling an auction for and hearing to approve

the sale of the Debtors' home improvement business, (d) approving form and manner of notice of

sale, auction, and sale hearing, (e) approving assumption and assignment procedures, (ii)

approving the sale of the Debtors' home improvement business in accordance with the Stalking

Horse Agreement and (iii) granting related relief, all as more fully set forth in the Motion, will be

held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States

Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street,

White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **November 15, 2018 at 10:00

a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be filed and received no later than **November 8, 2018 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

3

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: November 3, 2018
New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Proposed Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96776496\7\73219.0004

**Hearing Date and Time: November 15, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: November 8, 2018 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

----------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

**MOTION OF DEBTORS FOR ENTRY OF ORDER
(I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF
SEARS HOME IMPROVEMENT BUSINESS, (B) APPROVING STALKING
HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR
AND HEARING TO APPROVE SALE OF SEARS HOME IMPROVEMENT
BUSINESS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE,
AUCTION, AND SALE HEARING, (E) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, (II) APPROVING THE SALE OF SEARS HOME
IMPROVEMENT BUSINESS IN ACCORDANCE WITH THE STALKING
HORSE AGREEMENT AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**

1.      The Debtors are seeking to sell all assets, properties and rights exclusively related to, used exclusively in or held exclusively for use in the home improvement business ("the **SHIP Business**") owned by the Debtors (collectively, the "**Assets**").

2.      The SHIP Business is the leading provider of home improvement services nationwide, with over 2,000 active service professionals and independent service contractors. SHIP services include home improvement services, including flooring, kitchen remodeling, exteriors replacement services for entry doors, siding, roofing, windows, and garage doors, HVAC systems, and dehumidifier/humidifier and water heater maintenance and repair services.

3.      The vast majority of the SHIP Business's assets and services are separate from the Sears retail business, with independent functions including, in addition to the provision of services described above, sales, marketing, product management, fulfillment, customer service, accounting and finance, information technology, and human services.

WEIL:\96776496\7\73219.0004

4.      On November 2, 2018, the Debtors and Service.com (the "**Stalking Horse Bidder**") entered into an asset purchase agreement (the "**Stalking Horse Agreement**") for the sale of the SHIP Business, pursuant to which: (i) the Stalking Horse Bidder agreed to pay sixty million dollars ($60,000,000) in cash, prior to adjustment of such amount in accordance with the terms of the Stalking Horse Agreement (the "**Cash Purchase Price**"), and to assume certain assumed liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Assets, subject to higher or better offers, and Court approval; and (ii) the Debtors agreed that, in the event that the Court approves the purchase of the SHIP Business by any bidder other than the Stalking Horse Bidder, to pay the Stalking Horse Bidder and such transaction is consummated, a break-up fee in the amount of 1.5% of the Cash Purchase Price (the "**Break-Up Fee**").

5.      In conjunction with negotiating the Stalking Horse Agreement, so as to obtain the highest and best offer for the SHIP Business, the Debtors developed bidding and auction procedures to govern the sale of the SHIP Business (the "**Bidding Procedures**").  The Bidding Procedures allow interested parties to submit bids for the SHIP Business, subject to the terms and provisions therein.

6.      The Bidding Procedures were designed with the objective of generating the greatest level of interest in and the best value for the SHIP Business, while affording the Debtors maximum flexibility to execute a sale of the SHIP Business as quickly and efficiently as possible. The Debtors are confident that the Bidding Procedures and the other relief requested herein will facilitate the sale of the SHIP Business for the highest or otherwise best value, for the benefit of the Debtors' estates and their creditors.

WEIL:\96776496\7\73219.0004

**Background**

7.      Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

9.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

10.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[2]

**Jurisdiction**

11.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

---

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures and/or the Riecker Declaration, as applicable.

.

WEIL:\96776496\7\73219.0004

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Relief Requested

12.     By this Motion, pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 6004-1, 6005-1, and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), and the Amended Guidelines for the Conduct of Asset Sales, adopted by General Order M-331, as amended by General Order Amending M-383, the Debtors request entry of

    a.    the "**Bidding Procedures Order**," substantially in the form attached hereto as **Exhibit A**:

        i.    authorizing and approving the Bidding Procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, in connection with the sale of the SHIP Business (the "**Sale Transaction**");

        ii.    scheduling an auction of the Assets (the "Auction") to be held on **December 13, 2018 at 10:00 a.m. (prevailing Eastern Time)**;

        iii.    scheduling a hearing (the "**Sale Hearing**") to consider approval of the proposed Sale Transaction, to be held on **December 18, 2018 at 10:00 a.m. (prevailing Eastern Time)**;

        iv.    authorizing and approving the form and manner of notice of the Sale Transaction, Auction, and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**");

        v.    approving bidding protections for the sale of the SHIP Business to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement;

        vi.    authorizing and approving notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired non-residential real

property lease (collectively, the "**Contracts** and **Leases**") regarding the Debtors' potential assumption and assignment of their Contracts or Leases and of the Debtors' calculation of the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Assumption and Assignment Notice**");

vii.    authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

viii.    granting related relief; and

b.    an order (the "**Sale Order**"), which will be filed with the Court at least 14 days prior to the Sale Hearing approving the Stalking Horse Agreement or the asset purchase agreement executed by the Successful Bidder, attached hereto as **Exhibit B**.

## Marketing and Sale Process

13.    The Debtors, with the assistance of various advisors, have been marketing the SHIP Business in January of 2018. During the summer of 2018, the Debtors received numerous indications of interest from potential purchasers of the SHIP Business, including ESL Investments Inc., an affiliate of the Debtors. At that time, the Debtors had determined that the Stalking Horse Bidder's offer was the best offer for the SHIP Business. The Debtors had made substantial progress negotiating the terms of a transaction, when the chapter 11 cases were commenced.

14.    On November 1, 2018, the Debtors filed a motion seeking approval of global bidding and sale procedures for the marketing, auction, and sale of a substantial portion of their retail business as a going concern (the "**Global Bidding Procedures**"). The Debtors believe, however, that it is critical that they sell the SHIP Business separately from the rest of their assets and on an accelerated timetable.

WEIL:\96776496\7\73219.0004

15.    After discussions with multiple potential purchasers of their assets, the Debtors are of the view that a sale of the SHIP Business will not adversely affect the potential sales to be conducted under the Global Bidding Procedures, nor the sale of the Sears Home Services business.

16.    Since the Commencement Date, the Stalking Horse Bidder has been the only stalking horse bidder that has continued to show interest in the SHIP Business. Shortly after the Commencement Date, the Debtors reengaged in negotiations with the Stalking Horse Bidder.  On November 2, 2018, the Debtors and the Stalking Horse Bidder entered into the Stalking Horse Agreement.

17.    A prompt sale of the SHIP Business will allow the Debtors to maximize the value of the SHIP Business, which has begun to deteriorate as a result of the commencement of the chapter 11 cases.  The sale of the SHIP Business will generate a substantial price, nearly all of which will be available to begin funding the Winddown Account (as defined in the DIP ABL Term Sheet attached as Exhibit B to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to The Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (ECF No. 101)).

### Need for a Timely Sale Process

18.    The Debtors believe that sufficient cause exists to shorten the notice period for a hearing on the Motion. In view of their challenging financial condition, the substantial benefit of funding the Winddown Account in the near-term, and the extensive marketing of the SHIP Business that occurred prepetition, the Debtors believe that the proposed timeline for the marketing

7

and sale process for the SHIP Business is both reasonable and necessary under the circumstances of these chapter 11 cases.

19.     Absent the sale process and transactions contemplated by this Motion, the Debtors believe they will be unable to maximize the value of the SHIP Business for the benefit of all stakeholders.  Thus, a prompt sale of the Assets is critical.

### The Stalking Horse Agreement[3]

20.     Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Debtors' SHIP Business and assume certain contracts, leases and other liabilities in connection therewith.

21.     The assets proposed to be purchased include, among other things, contracts and leases, real property, vehicles and transportation equipment, certain inventory, deposits, equipment, intellectual property, books and records, SHIP Business customer data, and permits.

22.     Under the Stalking Horse Agreement, the purchase price for the SHIP Business is comprised of a base purchase price of $60,000,000 (the "**Base Purchase Price**"), in addition to the following:

a.     Assumption of liabilities associated with customer deposits and unearned or deferred revenue in accordance with the net working capital terms of the Stalking Horse Agreement;

b.     Payment of the Cure Costs up to a maximum aggregate amount equal to $5,000,000 (the "**Cure Cost Adjustment**"); and

c.     Payment of a pro rata portion of any bonus in respect of the calendar year or the corporate quarter in which the closing of the Sale Transaction occurs that Transferred Employees (as defined in the Stalking Horse Agreement) would have been paid had they remained employees of the Debtors through the date of payment of

---

[3] The summary description of the Stalking Horse Agreement is for illustrative purposes only, does not restate the terms of the Stalking Horse Agreement in their entirety, and in the event of any inconsistency with the Stalking Horse Agreement, the Stalking Horse Agreement will govern.

WEIL:\96776496\7\73219.0004

the bonus and obligations to Transferred Employees arising under any key employee retention plan or key employee incentive plan approved by the Bankruptcy Court, subject to a cap of $2,000,000.

23.    The Stalking Horse Agreement requires the Stalking Horse Bidder to, within one (1) business day of the execution of the Stalking Horse Agreement, deposit into an escrow account a deposit in the amount of $6,000,000.

24.    Upon the closing of the Sale Transaction, the Debtors will assume and assign certain executory contracts and unexpired leases to the Stalking Horse Bidder. The Debtors are responsible for paying any Cure Costs related to the assumption and assignment of the Transferred Contracts in excess of the Cure Cost Adjustment.

25.    The Stalking Horse Agreement provides for the payment of the Break-Up Fee in the event that the Stalking Horse Bidder is not the Successful Bidder and the Debtors consummate a sale of the SHIP Business to another bidder. In the event it is not the winning bidder for the Assets at the Auction, the Stalking Horse Bidder has agreed to act as a "Back-Up Bidder" and, as such, hold open its binding offer to purchase the Assets for a period of time after the Auction in the event the winning bid at the Auction is not consummated.

26.    The Stalking Horse Agreement includes customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Bidder, as well as certain conditions to closing and rights of termination. The transactions contemplated by the Stalking Horse Agreement are subject to, entry of the Bidding Procedures Order and entry of the Sale Order.

## Bidding Procedures

### A.    Overview

27.    The Bidding Procedures are designed to promote a competitive and expedient sale process. If approved, the Bidding Procedures will allow the Debtors to solicit and

9

identify bids from potential buyers that constitute the highest or best offer for the SHIP Business

on a schedule that enables the Debtors to improve their liquidity position.

        28.     The salient terms of the Bidding Procedures are set forth below:[4]

a.    **Form of Consideration**. Any bid must include a statement confirming that the bid is (i) based on an all-cash offer, and (ii) sufficient cash consideration to pay the Break-Up Fee.

b.    **Allocation of Value**. The Debtors reserve the right to ask any bidder to allocate the value ascribed to a bid for any particular Asset, and to ask about any significant assumptions on which such valuations are based.

c.    **Purchase Price; Minimum Bid**. Each bid submitted must (i) be a bid for all of the Assets contained in the Stalking Horse Bid, except that it shall not be required to designate the same Business Contracts (as defined in the Stalking Horse Agreement) as assumed or excluded Assets, as they are designated by the Stalking Horse Bidder; and (ii) exceed the cash purchase price in the Stalking Horse Bid, plus the Break-Up Fee or (iii) propose an alternative transaction that provides better terms than the Stalking Horse Bid, taking into account the Break-Up Fee.

    If the value of the bid relative to the Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in the Stalking Horse Agreement), the bid must include a detailed analysis of the value of any additional non-cash component and any back-up documentation to support such value.

d.    **Good Faith Deposit**. A Qualified Bid must be accompanied by a "**Good Faith Deposit**" in the form of cash in the amount equal to ten percent (10%) of the proposed purchase price.

e.    **Proposed Asset Purchase Agreement**. A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (a "**Proposed APA**"), which Proposed APA must be marked to reflect the differences between the Stalking Horse Agreement and the Prospective Bidder's Proposed APA.

f.    **Employee and Labor Terms**. A Qualified Bid must include a statement of proposed terms for employees, including with respect to the Debtors' affected collective bargaining agreements (the "**Affected Labor Agreements**") and affected labor unions (the "**Affected Unions**"), if applicable.

---

[4] The terms of the Bidding Procedures listed herein are a summary only, and do not restate the Bidding Procedures in their entirety. The failure to specifically include or reference any particular provision of the Bidding Procedures in this Motion shall not diminish or otherwise impair the effectiveness of such procedures, which are attached in their entirety as Exhibit 1 to the Bidding Procedures Order.

WEIL:\96776496\7\73219.0004

g.  **Financing Information**. A Qualified Bid must include:

1.  A statement that Prospective Bidder is financially capable of consummating the Sale Transaction contemplated by the Proposed APA.

2.  Information supporting the Prospective Bidder's ability to comply with requirement to provide adequate assurance of future performance under Bankruptcy Code section 365(f)(2) and, if applicable, Bankruptcy Code section 365(b)(3), including the Prospective Bidder's financial wherewithal and willingness to perform under the Contracts and Leases of the Debtors that would be assumed and assigned in connection with the Sale Transaction (the "**Proposed Assumed Contracts**") and any other Contracts and Leases that may later be designated by the Prospective Bidder (if named a Successful Bidder) for assumption and assignment in connection with a Sale Transaction (such information, "**Adequate Assurance Information**").

3.  Sufficient evidence that the Prospective Bidder has, or can obtain, the financial wherewithal to consummate the Sale Transaction contemplated in the Prospective Bidder's Proposed APA in a timely manner.

h.  **Required Approvals**.

1.  If applicable, a Qualified Bid must include a statement that Prospective Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and pay any related fees.

2.  A Qualified Bid must include an explanation and/or evidence of the Prospective Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the SHIP Business from and after closing the Sale Transaction and the proposed timing for the Prospective Bidder to undertake the actions required to obtain such approvals

i.  **Authorization**. A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the Sale Transaction contemplated by the applicable Proposed APA.

j.  **Other Requirements**.  A Qualified Bid shall:

1.  Except as otherwise provided in the Stalking Horse Agreement, state that the Prospective Bidder agrees to serve as a back-up bidder (a "**Back-Up Bidder**") if such Prospective Bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid with respect to the Assets.

2.  State that the bid is formal, binding, and unconditional (except as set forth in an applicable asset purchase agreement ultimately executed by the Debtors); is not subject to any further due diligence; and is irrevocable until

the first business day following the close of a Sale Transaction with the Successful Bidder for the Assets.

3.    With the exception of any Stalking Horse Bid, state and acknowledge that the Prospective Bidder shall not be entitled to any break-up fee, expense reimbursement, or other bid protection unless otherwise granted by the Debtors and approved by the Court.

4.    Waive any claim or right to assert any substantial contribution claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction.

5.    Not contain any financing contingencies.

6.    Be accompanied by any reasonable information requested by a consumer privacy ombudsman, should one be appointed in the Debtors' chapter 11 cases.

k.    **Determination and Announcement of Baseline Bids**.  The Debtors shall make a determination regarding:

1.    the highest or best Qualified Bid (each, a "**Baseline Bid**" and, such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction; and

2.    which bids have been determined to be Qualified Bids.

As soon as practicable, but in no event later than the next calendar day, the Debtors will provide copies of the Baseline Bid to the Stalking Horse Bidder.

B.    **Key Dates and Deadlines**

29.    Consistent with the Debtors' need to consummate a sales of the SHIP Business as quickly and efficiently as possible, the Debtors propose the following key dates and deadlines for the sale process:

| November 15, 2018, at 10:00 a.m. (prevailing Eastern Time) | Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order |
|---|---|
| November 27, 2018 | Deadline for Debtors to provide applicable Counterparties Adequate Assurance Information with respect to the Stalking Horse Bidder (and its proposed assignee, if applicable) |
| December 11, 2018, at 4:00 p.m. (prevailing Eastern Time) | Deadline for competing bidders to submit binding bids, together with copy of an Asset Purchase Agreement blacklined against the Stalking Horse Agreement and Good Faith Deposit |
| December 11, 2018, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to (i) proposed Sale Transaction, (ii) Debtors' proposed Cure Costs, and (iii) the assumption of and assignment |

12

| | |
|---|---|
| **November 15, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order |
| | to the Stalking Horse Bidder of any Contracts Proposed to be Assumed in the Stalking Horse Agreement |
| **December 12, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to notify Prospective Bidders of their status as Qualified Bidders |
| **December 13, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Auction to be held at offices of Weil, Gotshal & Manges LLP (if necessary) |
| **December 14, 2018 at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to file with the Bankruptcy Court the Notice of Auction Results and to provide applicable Counterparties with Adequate Assurance Information for the Successful Bidder |
| **December 17, 2018 at noon (prevailing Eastern Time)** | Deadline to objection to (i) conduct of the Auction, (ii) sale of the SHIP Business and (iii) the assumption of and assignment of Proposed Assumed Contracts to the Successful Bidder |
| **December 18, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Date of Sale Hearing |

C.    **Noticing Procedures**

30.    In addition, the Bidding Procedures provide for the following Noticing

Procedures:

a.    **Sale Notice**. Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the website maintained by Prime Clerk LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.primeclerk.com/sears/ (the "**Prime Clerk Website**") a Sale Notice, setting forth (i) a complete list and general description of the Assets for sale; (ii) the date, time, and place of the (a) Auction and (b) Sale Hearing (as hereinafter defined); and (iii) the deadlines and procedures for objecting to the proposed Sale Transaction.

b.    **Publication Notice**. Within five (5) business days after entry of the Bidding Procedures Order, the Debtors will cause the information contained in the Sale Notice to be published once in *The New York Times* and *The Wall Street Journal*.

c.    **Notice of Auction Results**. The Debtors will use commercially reasonable efforts to, by **December 14, 2018 at 4:00 p.m. (prevailing Eastern Time)**, file with the Court, serve on the Sale Notice Parties (including each Counterparty to a Proposed Assumed Contract in a Successful Bid and each Counterparty to any known Contracts or Leases that may later be designated by a Successful Bidder for assumption and assignment), and cause to be published on the Prime Clerk Website, a notice of the results of the Auction (the "**Notice of Auction Results**"), which shall (i) identify the Successful Bidder and Back-Up Bidder; (ii) list all Proposed Assumed Contracts in the Successful Bid and Back-Up Bid; (iii) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the

WEIL:\96776496\7\73219.0004

Successful Bidder); (iv) list all known Contracts and Leases that may later be designated for assumption and assignment by the Successful Bidder; and (v) and set forth the deadline and procedures for filing Adequate Assurance Objections (as defined herein) in response to the Notice of Auction Results.

31.     The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Sale Objection Deadline, the Bid Deadline, and the time and location of the Auction and the Sale Hearing. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances, and comply with the requirements of Bankruptcy Rule 2002.

**Assumption and Assignment Procedures**

32.     In connection with the Sale Transaction, the Debtors may seek to assume and assign to the Successful Bidder (or their designated assignee) or the Stalking Horse Bidder (if no Qualified Bids are submitted or the Stalking Horse Bidder is a Successful Bidder) certain Contracts and Leases. The Assumption and Assignment Procedures set forth herein are designed to, among other things, govern the Debtors' provision of Adequate Assurance Information and notice of Cure Costs to relevant Counterparties. Specifically, the Assumption and Assignment Procedures are as follows:

(a) **Assumption and Assignment Notice**. The Debtors shall use commercially reasonable efforts to, within five (5) days of the entry of the Bidding Procedures Order, file with the Court, serve on the Sale Notice Parties, including each relevant Counterparty, and cause to be published on the Prime Clerk Website, the Assumption and Assignment Notice, which shall (i) identify the Proposed Assumed Contracts in the Stalking Horse Bid and, if known, any other Contracts or Leases that may be designated for assumption and assignment by the Stalking Horse Bidder (or its known proposed assignee) pursuant to the terms and provisions of the Stalking Horse Agreement (the "**Designation Rights Contracts**"); (ii) list the Debtors' good faith calculation of the Cure Costs with respect to each Contract and Lease identified on the Assumption and Assignment Notice; (iii) provide or cause to be provided the Stalking Horse Bidder's Adequate Assurance Information; (iv) expressly state that assumption or assignment of a Contract or Lease is not guaranteed and is subject to Court approval; (v) prominently display the deadline to file a Cure Objection and an

14

Adequate Assurance Objection (each as hereinafter defined); and (vi) prominently display the date, time, and location of the Sale Hearing.

(b) **Designation of Contracts and Leases**. In accordance with the Stalking Horse Agreement, the Debtors may, until eight (8) business days prior to the Sale Hearing, add Contracts and Leases to the Designation Rights Contracts by filing supplemental Assumption and Assignment Notices, which will be deemed to update any previously filed Assumption and Assignment Notices.

In accordance with the terms of the Stalking Horse Agreement, on or before a date that is four (4) business days before the Sale Hearing (the "**Designation Deadline**"), the Stalking Horse Bidder shall provide to the Debtors a final schedule of Designation Rights Contracts.

The Debtors will use commercially reasonable efforts to, as soon as reasonably practicable after the Designation Deadline, and prior to the Sale Hearing, file with the Court, serve by overnight delivery on the applicable Counterparty, and cause to be published on the Prime Clerk Website, a notice of assumption and assignment of the applicable Designation Rights Contracts to the Stalking Horse Bidder (the "**Notice of Assumed and Assigned Contracts**").

The same procedures will apply with respect to any designation rights of a Successful Bidder pursuant to the terms of an asset purchase agreement executed by the Debtors.

(c) **Cure Objections**.

(i) Cure Objection Deadlines. Any Counterparty who wishes to object to the Debtors' calculation of the Cure Costs with respect to the Counterparty's Contract or Lease, must file with the Court and serve on the Objection Recipients, in accordance with the Debtors' Case Management Order (as defined herein), a written objection (a "**Cure Objection**") that (i) identifies the applicable Contract or Lease; (ii) states, with specificity, the legal and factual bases thereof, including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; and (iii) includes any appropriate documentation in support thereof, by no later than **December 11, 2018 at 4:00 p.m. (prevailing Eastern Time**).

(ii) Resolution of Cure Objections. If a timely Cure Objection cannot otherwise be resolved by the parties prior to the Sale Hearing, the amount to be paid or reserved with respect to such Cure Objection shall be determined by the Court at the Sale Hearing, unless the Cure Objection is adjourned in accordance with the following paragraph. The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.

WEIL:\96776496\7\73219.0004

(iii) <u>Adjourned Cure Objections</u>. A Cure Objection may, at the Debtors' option, after consulting with Stalking Horse Bidder or the Successful Bidder, as applicable, be adjourned (an "**Adjourned Cure Objection**") to a subsequent hearing.  An Adjourned Cure Objection may be resolved after the closing date of the Sale Transaction in the Debtors' discretion; <u>provided that</u>, the Debtors maintain a cash reserve equal to the cure amount asserted by the objecting Counterparty.

(iv) <u>Failure to File Timely Cure Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Recipients a timely Cure Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the cost to cure any defaults under the relevant Contract or Lease and any proof of claim asserting a claim for such amount shall be expunged without further order of the Court.  The Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract or Lease, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract or Lease, through the date of assumption and assignment, whether in a proof of claim or otherwise, as against the Debtors, the Successful Bidder, or their property.

(d) **Confidentiality of Adequate Assurance Information.** Adequate Assurance Information will be provided, to the extent it is publicly available information, with the Assumption and Assignment Notice.  To the extent Adequate Assurance Information includes non-public information, it shall be provided to affected Counterparties on a strictly confidential basis.  The Assumption and Assignment Notice shall include instructions for requesting and obtaining such non-public Adequate Assurance Information on a strictly confidential basis. Counterparties shall not use any Adequate Assurance Information for any purpose other than to (i) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2) and, if applicable, Bankruptcy Code section 365(b)(3), have been satisfied; and (ii) to support any Adequate Assurance Objection filed by the Counterparty.

(e) **Adequate Assurance Objections**.

(i) <u>Adequate Assurance Objection Deadline</u>.  Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is the Stalking Horse Bidder's or a Successful Bidder's (a) ability to provide adequate assurance of future performance or (b) the proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "**Adequate Assurance Objection**"), shall file with the Court and serve on the Objection Recipients, including the Successful Bidder, its Adequate Assurance Objection, which must (i) be in writing; (ii) identify the applicable Contract

16

or Lease; (iii) comply with Debtors' Case Management Order; (iv) state, with specificity, the legal and factual bases for the Adequate Assurance Objection; and (v) include any appropriate documentation in support thereof by no later than:

1. **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)**, if the Adequate Assurance Objection is with respect to assumption and assignment to the Stalking Horse Bidder of any Proposed Assumed Contract or Designation Rights Contract that was identified in and noticed pursuant to the Assumption and Assignment Notice; and

2. **December 17, 2018, at noon (prevailing Eastern Time)**, (a) if the Adequate Assurance Objection is with respect to the assignment to a Successful Bidder (including the Stalking Horse Bidder, if named a Successful Bidder) of any Proposed Assumed Contract or Contract or Lease that later may be designated by a Successful Bidder for assumption and assignment, that was identified and noticed pursuant to the Notice of Auction Results, and (b) if the Adequate Assurance Objection is with respect to assumption and assignment to the Stalking Horse Bidder of any Proposed Assumed Contract or Designation Rights Contract that was identified in and noticed pursuant to a supplemental Assumption and Assignment Notice.

(ii) <u>Resolution of Adequate Assurance Objections</u>.    If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Stalking Horse Bidder or the Successful Bidder (as applicable).

(iii) <u>Failure to File Timely Adequate Assurance Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Recipients, including the Stalking Horse Bidder or the Successful Bidder, a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the relevant Contract or Lease. The Stalking Horse Bidder or the Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to the applicable Contract or Lease in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or Lease or any other document.

WEIL:\96776496\7\73219.0004

## Extraordinary Provisions Under Local Guidelines

33.     Collectively, the Bidding Procedures and the Stalking Horse Agreement contain the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by General Order M-331, as amended by General Order M-383, require to be separately disclosed:

a.  <u>Requested Findings as to Successor Liability</u>:  The Stalking Horse Agreement requires that the Sale Order shall provide for the transfer of the Assets and the assumed liabilities to the Stalking Horse Bidder free from all successor or transferee liability to the fullest extent permitted by section 363 of the Bankruptcy Code.

b.  <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>:  The Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), as further described herein.

### Approval of the Relief Requested Is Warranted and in the Best Interests of the Debtors and Their Economic Stakeholders

### A.     The Bidding Procedures are Fair and Reasonable

34.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"), *appeal dismissed* 3. F. 3d 49 (2d Cir. 1993); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer").  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See In re Integrated Res. Inc.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

WEIL:\96776496\7\73219.0004

35.     The Bidding Procedures provide for an orderly, uniform, and competitive bidding process through which interested parties may submit offers to purchase the SHIP Business. Given the time constraints, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the best or highest offer reasonably available for the Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction. Moreover, the Debtors' entry into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtors will obtain fair market value for the SHIP Business by setting a minimum purchase price that will be tested in the marketplace. The Debtors and their creditors can, therefore, be assured that the consideration obtained will be fair and reasonable and at or above market value.

36.     Courts in this and other districts routinely approve procedures substantially similar to the proposed Bidding Procedures. *See, e.g., In re The Great Atl. & Pac. Tea Comp., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (ECF No. 495); *In re Central Grocers, Inc.* Case No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) (ECF No. 338); *In re Golfsmith Internat'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Dec. 13, 2016) [ECF No. 548]; *In re Golfsmith Internat'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) [ECF No. 196]; *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. Jul. 29, 2016) (ECF No. 527); *In re Sports Authority, Inc.*, Case No. 16-10257 (MFW) (Bankr. D. Del. Apr 14, 2016) [ECF No. 1186]. Accordingly, the Bidding Procedures should be approved, because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

WEIL:\96776496\7\73219.0004

B.      **The Break-Up Fee Is Reasonable and Appropriate and Should Be Approved**

37.     Bidding incentives such as the Break-Up Fee have become commonplace in connection with sales of significant assets under section 363 of the Bankruptcy Code.

38.     The Break-Up Fee will be paid to the Stalking Horse Bidder only if the Sale Transaction is ultimately consummated by a Successful Bidder other than the Stalking Horse Bidder.  Approval of break-up fees as administrative expense claims as a form of bidder protection in connection with a sale of assets has become a recognized practice in chapter 11 cases, because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. *See, e.g. See, e.g.*, *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

39.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as the Bid Protections under the "business judgment rule" and it is well established in this District that courts consider whether:  (i) the relationship of the parties who

negotiated the break-up fee was tainted by self-dealing or manipulation, (ii) the fee hampers, rather than encourages, bidding, and (iii) the amount of the fee is unreasonable relative to the proposed purchase price. *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014) (citing *In re Metaldyne Corp.,* 409 B.R. at 670); *see also In re Integrated Res., Inc.*, 147 B.R. at 657–58 (holding that in evaluating bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith absent self-dealing and in the exercise of honest judgment).

40.      The Break-Up Fee is the product of good faith, arm's length negotiations between the Debtors, who were acting not in their own self-interest, but rather, in the interest of their estates consistent with their fiduciary duties, and the Stalking Horse Bidder. Furthermore, the Stalking Horse Agreement provisions relating to the Break-Up Fee (as well as the other Stalking Horse Agreement provisions) were scrutinized by the Debtors' professionals, and approved by the Restructuring Committee of the Debtors' board of directors.

41.      The Stalking Horse Bidder was unwilling to act as a stalking horse without assurance of payment of the Break-Up Fee under the conditions set forth in the Stalking Horse Agreement. The Break-Up Fee promotes more competitive bidding for the SHIP Business by inducing the Stalking Horse Bidder to hold its offer open as a minimum bid upon which other bidders and the Debtors can rely. In doing so, the Stalking Horse Bidder has helped lay the foundation for the Debtors' process for the sale of the SHIP Business. The Stalking Horse Bid will serve as a catalyst for other Qualified Bids. Executing the Stalking Horse Agreement has put the Debtors in the position to solicit competitive bids that may be materially higher or of otherwise better value to the Debtors' estates than the Stalking Horse Bid. The Stalking Horse Bid also increases the likelihood that the price at which the Assets in the Stalking Horse Package are sold

will reflect their true worth. Accordingly, the Break-Up Fee is appropriate and the Stalking Horse Bidder is entitled to be compensated for the risk it is assuming and the substantial value it is conferring on the Debtors' estates.

42.     The proposed Break-Up Fee is within the 1% to 3% range that is customarily required by this and other Courts. Moreover, under the Stalking Horse Agreement, the Debtors are not obligated to pay any expense reimbursement to the Stalking Horse Bidder.

43.     Moreover, the Stalking Horse Bid provides the Debtors with an opportunity to move forward with a sale transaction that has a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Break-Up Fee will not deter or chill bidding, is reasonable, and its availability to the Debtors will enable the Debtors to maximize the value of their estates.

## C.     The Sale Transaction Should Be Approved as an Exercise of the Debtors' Sound Business Judgment

44.     Ample authority exists for approval of the Sale Transaction contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace Defense Co., v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009). Once a court is satisfied that there is a sound business justification for the

WEIL:\96776496\7\73219.0004

proposed sale, the court must then determine whether (i) the debtor has provided the interested

parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the

purchaser is proceeding in good faith. *Id.*, at 407 B.R. at 493-94; *Polvay v. B.O. Acquisitions, Inc.

(In re Betty Owens Sch.)*, 1997 WL 188127, *4 (S.D.N.Y. Apr. 17, 1997).

> a.    ***The Debtors Have Demonstrated a Sound Business Justification
> for the Proposed Sale Transactions***

45.    A sound business purpose for the sale of a debtor's assets outside the

ordinary course of business exists where such sale is necessary to preserve the value of the estate

for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788

F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores,

Inc.*, 107 F.3d at 564-65 (recognizing that paramount goal of any proposed sale of property of

estate is to maximize value).

46.    As set forth above, a strong business justification exists for the sale of the

SHIP Business as described herein.  The Debtors believe they can get the most value for the Assets

by selling the SHIP Business expeditiously and in advance of the schedule set forth in the Global

Bidding Procedures.  The Sale Transaction for the SHIP Business was considered by the

Restructuring Committee of the Debtors' board of directors which, in conjunction with advice

from experienced professionals, exercised sound and appropriate business judgment, and

determined to pursue the Sale Transaction on the terms of the Stalking Horse Agreement, subject

to competitive bidding sanctioned by the Court.

> b.    ***The Debtors Will Provide Adequate and Reasonable Notice of the
> Sale Transaction***

47.    The Sale Notice will be served in a manner that provides at least twenty-

one (21) days' notice of, among other things, the Sale, the Bidding Procedures, the Auction, and

the Sale Hearing.  Accordingly, the Debtors submit that the Sale Notice will provide adequate

notice of the Sale by the time of service thereof.

> c.    ***The Sale Transaction Will Produce a Fair and Reasonable Purchase Price for the Assets***

48.    As set forth above, the Debtors believe that the Sale Transaction will

produce a fair and reasonable purchase price for the Assets.  The sale of the SHIP Business has

been subjected to an extensive marketing process and scrutinized by the Debtors and their advisors.

The Stalking Horse Bid is an offer to purchase the Assets for a price that the Debtors have

determined to be fair and reasonable.

49.    In addition, the Bidding Procedures were carefully designed to facilitate

a robust and competitive bidding process.  The Bidding Procedures provide an appropriate

framework for the Debtors to review, analyze, and compare all bids received to determine which

bid is in the best interests of the Debtors' estates and their stakeholders.  The Sale Transaction

governed by the Bidding Procedures undoubtedly will serve the important objective of obtaining

not only a fair and reasonable purchase price for the SHIP Business, but also the highest or best

value for the SHIP Business, which will inure to the benefit of all parties in interest in the Chapter

11 Cases.

> d.    ***The Bidding Procedures Ensure that the Sale Transaction Will Be Consummated in Good Faith***

50.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's

interest in property purchased from a debtor notwithstanding that the sale conducted under section

363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, section

363(m) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] … does not affect the validity of a sale … to an
> entity that purchased … such property in good faith, whether or not

> such entity knew of the pendency of the appeal, unless such
> authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).

51.    Section 363(m) of the Bankruptcy Code fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").  The Second Circuit has held that a purchaser's good faith is shown by the integrity of his or her conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.  *See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (holding that a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted).

52.    The Stalking Horse Bidder is not affiliated with the Debtors.  The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith, and through extensive arms' length negotiations. To that end, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and in the sale process

WEIL:\96776496\7\73219.0004

generally.  To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under section 363(m) of the Bankruptcy Code.

53.      Further, and as set forth above, the Bidding Procedures are designed to produce a fair, transparent, and competitive bidding process.  Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arms' length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder if named the Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

54.      Based on the foregoing, the Debtors have demonstrated that the proposed Sale Transaction is a sound exercise of the Debtors' business judgment and should be approved.

### D.    The Sale of the Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests Is Warranted and Should Be Approved

55.      In the interest of attracting the best offer, the sale of the Assets should be free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if (i) applicable non-bankruptcy law permits the sale of such property free and clear of such interest, (ii) such entity consents, (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (iv) such interest is in bona fide dispute, or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  *See* 11 U.S.C. § 363(f)(1) – (5); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*,

26

333 B.R. 30, 50 (S.D.N.Y. 2005) (where a sale is to be free and clear of existing liens and interests

other than those of the estate, one or more of the criteria specified in section 363(f) must also be

met), *rev'd*, 600 F. 3d 231 (2d Cir. 2010); *In re Dundee Equity Corp.*, 1992 WL 53743 (Bankr.

S.D.N.Y 1992) (same).

      56.      The Debtors believe that any of the parties holding liens in the Assets

could be compelled to accept a monetary satisfaction of such interests.  Where the purchase price

for a debtor's assets is the best available purchase price under the circumstances, a court may

authorize the sale free and clear of existing liens, claims, and encumbrances pursuant to section

363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens,

claims, and encumbrances.  *See In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr.

S.D.N.Y. 2010); *In re Beker Indus., Inc.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y. 1986).  The

procedures outlined in the Bidding Procedures and the Debtors' extensive pre- and postpetition

efforts to market the SHIP Business ensure that the purchase price paid for the Assets is the best

available.  Accordingly, the Debtors believe that the sale of the Assets will satisfy the statutory

prerequisites of section 363(f) of the Bankruptcy Code and the Sale Transaction should be

approved free and clear of all liens, claims, and encumbrances against the Assets.

      **E.**      **Assumption and Assignment of Proposed Assumed Contracts**

      57.      Section 365(a) of the Bankruptcy Code provides that a debtor in

possession "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its

sound business judgment in determining to assume an executory contract or unexpired lease, courts

will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v.

Costich* (*In re Klein Sleep Prods.*, *Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).  The

assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of the Proposed Assumed Contracts is necessary to obtain the best value for the SHIP Business.  Moreover, the Determined Cure Costs, up to a cap of $5 million, will be paid by the Stalking Horse Bidder.  Given that consummation of the Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and their stakeholders, the Debtors' assumption of the Proposed Assumed Contracts is an exercise of sound business judgment and should be approved.

58.    The consummation of the Sale Transaction, which will involve the assignment of the Proposed Assumed Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Proposed Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court, and serve on each non-Debtor party to a Purchased Contract, a. Assumption and Assignment Notice indicating the Debtors' calculation of the Cure Cost for each such contract.  Non-Debtor parties to the Proposed Assumed Contracts will have the opportunity to file objections to the proposed assumption and assignment of the Proposed Assumed Contracts to the Successful Bidder, including the proposed Cure Costs.

59.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

28

(citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

60.    As set forth in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid Adequate Assurance Information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Proposed Assumed Contracts. The Debtors will provide Adequate Assurance Information to all Counterparties to the Proposed Assumed Contracts and Counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing. Based on the foregoing, the Debtors' assumption and assignment of the Proposed Assumed Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

61.    In addition, to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Proposed Assumed Contracts, whether such provisions expressly prohibit or have

the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under

section 365(f) of the Bankruptcy Code.[5]

### F.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

62.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property…is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n

order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is

stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

Fed. R. Bankr. P. 6006(d).  In light of the current circumstances and the financial condition of the

Debtors, the Debtors believe that to maximize value, and improve the Debtors' liquidity position,

the sale of the Assets pursuant to the Sale Transaction must be consummated as soon as practicable.

Accordingly, the Debtors request that each of the Bidding Procedures Order and the Sale Order be

effective immediately upon its entry and that the fourteen (14)-day stay periods under Bankruptcy

Rules 6004(h) and 6006(d) be waived.

### <u>Reservation of Rights</u>

63.      Nothing contained herein is intended to be or shall be construed as (i) an

admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim

against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any

---

[5] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

WEIL:\96776496\7\73219.0004

creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

64.     Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures* (ECF No. 405) (the "**Case Management Order**").  The Debtors respectfully submit that no further notice is required.

65.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: November 3, 2018
      New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

## Exhibit A

**Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
In re                         :

                            :        Chapter 11

SEARS HOLDINGS CORPORATION, *et al.*,  :

                            :        Case No. 18-23538 (RDD)

                            :

            Debtors.[1]        :        (Jointly Administered)
------------------------------------------------------------------x

ORDER (I)(A) APPROVING BIDDING PROCEDURES
FOR SALE OF SEARS HOME IMPROVEMENT BUSINESS, (B) APPROVING
STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR
AND HEARING TO APPROVE SALE OF SEARS HOME IMPROVEMENT
BUSINESS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE,
AUCTION, AND SALE HEARING, (E) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, (II) APPROVING THE SALE OF SEARS
HOME IMPROVEMENT BUSINESS IN ACCORDANCE WITH THE
<u>STALKING HORSE AGREEMENT AND (III) GRANTING RELATED RELIEF</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

WEIL:\96778612\7\73219.0004

Upon the motion, dated November 3, 2018 (ECF No. [__]) (the "**Motion**"),[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1, 6005-1, and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), for an order (i)(a) approving the Bidding Procedures, substantially in the form attached hereto as **Exhibit 1** (the "**Bidding Procedures**"), in connection with a sale of the Sears Home Improvement business (the "**SHIP Business**") owned by the Debtors (the "**Sale Transaction**"); (b) authorizing the Debtors to offer certain bid protections (the "**Bid Protections**") to the **Stalking Horse Bidder**; (c) scheduling an auction of the Assets (the "**Auction**") and a hearing for approval of the proposed Sale Transaction (the "**Sale Hearing**"); (d) authorizing and approving the form and manner of notice of the Sale Transaction, Auction, and Sale Hearing, substantially in the form attached hereto as **Exhibit 2** (the "**Sale Notice**"); (e) authorizing and approving the procedures for the assumption and assignment of executory contracts or unexpired non-residential real property leases of the SHIP Business (collectively, the "**Contracts and Leases**," and such procedures, the "**Assumption and Assignment Procedures**") and approving the notice to each non-Debtor counterparty (each a "**Counterparty**") to a relevant Contract or Lease regarding the Debtors' potential assumption and assignment of Contracts and Leases and the Debtors' calculation of the amount necessary to cure any monetary defaults under such Contracts and Leases (the "**Cure Costs**"), substantially in the form attached hereto as **Exhibit**

---

[2] Capitalized terms utilized but not defined herein shall have the meanings given them in the Motion or the Bidding Procedures, as applicable.

**3** (the "**Assumption and Assignment Notice**"); (ii) approving the sale of the SHIP Business in accordance with the Stalking Horse Agreement; and (iii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures* (ECF No. 405), such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on November 15, 2018, at 10:00 a.m. (prevailing Eastern Time) (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED THAT:

A.	The Bidding Procedures are fair, reasonable, and appropriate, and are designed to maximize the value of the proceeds of the sale of the Assets.

B.	The Bidding Procedures comply with the requirements of Local Rule 6004-1.

WEIL:\96778612\7\73219.0004

C.      The Assumption and Assignment Procedures are fair, reasonable, and appropriate, and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

D.      The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Bid Protections, (iii) the Sale Notice, (iv) the Assumption and Assignment Procedures, and (v) the Assumption and Assignment Notice.

E.      Good and sufficient notice of the relief sought in the Motion has been provided under the circumstances, and no other or further notice is required, except as set forth in the Bidding Procedures and the Assumption and Assignment Procedures.    A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest, including those persons and entities entitled to notice pursuant to Bankruptcy Rule 2002.

F.      The Assumption and Assignment Procedures, Sale Notice, and Assumption and Assignment Notice are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale Transaction, the Auction, the Sale Hearing, the Bidding Procedures, the Assumption and Assignment Procedures, the proposed Cure Costs, the potential assumption and assignment of Contracts and Leases, and all relevant important dates and deadlines with respect to the foregoing, and no other or further notice of the sale of the SHIP Business or the assumption and assignment of Contracts and Leases in connection therewith is required.

G.      The Debtors' ability to provide Bid Protections, including the Break-Up Fee, to the Stalking Horse Bidder is necessary to ensure that the Stalking Horse Bidder will continue to pursue the Sale Transaction contemplated by the Stalking Horse Agreement.    To the extent payable under the Stalking Horse Agreement, the Break-Up Fee is (i) an actual and

4

necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate with the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; and (iii) fair, reasonable, and appropriate in light of the size and nature of the proposed Sale Transaction and the efforts that have been and will be expended by a Stalking Horse Bidder in connection with the Debtors' sale process.

H.    The Bidding Procedures were negotiated in good faith, and are reasonably designed to promote active bidding at and participation in the Auction, to ensure that the highest or best value is generated for the Assets.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    The Motion is granted.

2.    All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are hereby overruled and denied on the merits with prejudice.

3.    The Bidding Procedures are hereby approved in their entirety, are incorporated herein by reference, and shall govern the bids and proceedings related to the sale of the Assets and the Auction.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

4.    Absent further order of the Court, no person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement or break-up, "topping,"

termination, or other similar fee or payment by the Debtors for submitting a bid for the SHIP Business, or in any way participating in the Auction or the Debtors' SHIP sale process.

**Bidding Procedures**

5.      The deadline for submitting Qualified Bids (the "**Bid Deadline**") is **December 11, 2018, at 4:00 p.m. (Eastern Time)**.  The Debtors shall promptly provide copies of all bids to each of the Consultation Parties, but in no event later than the next calendar day, subject to the provisions of the Bidding Procedures.

6.      For all purposes under the Bidding Procedures, the Stalking Horse Bidder shall be considered a Qualified Bidder, and the Stalking Horse Bid shall be considered a Qualified Bid.  In the event that the Stalking Horse Bid is the only Qualified Bid received by the Debtors in respect of the Assets by the Bid Deadline, the Debtors shall not be required to conduct an Auction for the Assets, and the Stalking Horse Bidder shall be deemed the Successful Bidder with respect to the Assets included in the Stalking Horse Agreement.

7.      If, in addition to a Stalking Horse Bid, the Debtors receive at least one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction of the Assets in accordance with the Bidding Procedures.

8.      The Auction will take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on **December 13, 2018, at 10:00 a.m. (Eastern Time)**, or at such other time and location as the Debtors, after consulting with the Consultation Parties and providing notice to the Sale Notice Parties, may determine in their reasonable business judgment.

9.      All proceedings of the Auction shall be conducted openly, and all creditors and other parties in interest shall be permitted to attend; provided that, the Debtors may, in their

6

reasonable business judgment, and in consultation with the Consultation Parties, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other parties in interest at the Auction. The proceedings of the Auction shall be transcribed and/or video recorded.

10.    Each Qualified Bidder participating in the Auction shall confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets in its bid if selected as a Successful Bidder.

11.    Subject to this Order, the Bidding Procedures, and the rights of the Stalking Horse Bidder under the Stalking Horse Agreement, the Debtors shall have the right to, after consulting with the Consultation Parties, in the exercise of their reasonable business judgment, (i) determine which bidders qualify as "Qualified Bidders," and which bids qualify as "Qualified Bids;" (ii) determine the "Baseline Bid;" (iii) determine the amount of each Minimum Overbid; (iv) determine which Qualified Bids are the Successful Bid and the Back-Up Bid; (v) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, this Order, or any other order of the Court, or (c) contrary to the best interests of the Debtors and their estates; (vi) adjourn or cancel the Auction, after providing notice of such adjournment or cancellation in accordance with the Bidding Procedures; and (vii) adjourn the Sale Hearing after providing notice of such adjournment in accordance with the Bidding Procedures.

12.    The Debtors shall have the right, in their reasonable business judgment, after consulting with the Consultation Parties, in a manner consistent with their fiduciary duties and applicable law, to modify the Bidding Procedures, including to (i) waive terms and conditions

7

with respect to all Prospective Bidders; (ii) extend the deadlines set forth therein; and (iii) announce at the Auction modified or additional procedures for conducting the Auction. Except as provided in the Stalking Horse Agreement, nothing in this Order or the Bidding Procedures shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.

## The Sale Hearing and Sale Objection Deadline

13.    In accordance with the Bidding Procedures, the Sale Hearing shall be held before the Court on **December 18, 2018, at 10:00 a.m. (prevailing Eastern Time)** to consider (i) a sale of the SHIP Business to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse Agreement, if no Qualified Bid is received by the Debtors prior to the Bid Deadline, or (ii) if another Qualified Bid is received by the Debtors prior to the Bid Deadline, a sale of the SHIP Business to the Successful Bidder at the Auction (which bidder could be the Stalking Horse Bidder); provided that, the Debtors may seek an adjournment of the Sale Hearing, as the Debtors deem appropriate in the exercise of their reasonable business judgment.

14.    Objections to the Sale Transaction, including any objection to the sale of the Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of a Sale Order (each, a "**Sale Objection**") shall (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; and (iv) be filed with the Court and served on the Objection Recipients by no later than **December 11, 2018, at 4:00 p.m. (Eastern Time)** (the "**Sale Objection Deadline**"); provided that, the Debtors may extend the Sale Objection Deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing.

WEIL:\96778612\7\73219.0004

15.     Any party who fails to file with the Court and serve on the Objection Recipients a Sale Objection by the Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Motion, or to the consummation and performance of the Sale Transaction contemplated by the asset purchase agreement between the Debtors and the Successful Bidder (including the Stalking Horse Bidder if named the Successful Bidder), including the transfer of Assets to the Successful Bidder (and any Back-Up Bidder subsequently deemed a Successful Bidder), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

### Noticing Procedures

16.     The Sale Notice is approved, and no other or further notice of the sale of the Assets, the Auction, the Sale Hearing, or the Sale Objection Deadline shall be required if the Debtors serve and publish such notice in the manner provided in the Bidding Procedures and this Order.  The Sale Notice contains the type of information required under Bankruptcy Rule 2002 and Local Rule 6004-1, and complies in all respects with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

17.     Within two (2) business days after entry of this Order, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the on the website maintained by Prime Clerk LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.primeclerk.com/sears/ (the "**Prime Clerk Website**"), the Sale Notice, which shall set forth (i) a complete list and general description of the Assets for sale; (ii) the date, time, and place of the (a) Auction and (b) Sale Hearing; and (iii) the deadlines and procedures for objecting to the proposed Sale Transaction.

WEIL:\96778612\7\73219.0004

18.     Within five (5) business days after entry of this Order, the Debtors shall cause the contents of the Sale Notice to be published once in *The New York Times* and *The Wall Street Journal*.

19.     Within one (1) calendar day after the conclusion of the Auction, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website, a notice containing the results of the Auction (the "**Notice of Auction Results**"), which shall (i) identify the Successful Bidder and the Back-Up Bidder; (ii) list all Proposed Assumed Contracts (as defined below) in the Successful Bid and the Back-Up Bid; (iii) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the Successful Bidder); (iv) list any known Contracts and Leases that may later be designated by the Successful Bidder for assumption and assignment in connection with the Sale Transaction; and (v) set forth the deadline and procedures for filing Adequate Assurance Objections in response to the Notice of Auction Results.

**Assumption and Assignment Procedures**

20.     The Assumption and Assignment Notice is reasonable, fair, and appropriate, and contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Debtors' proposed Cure Costs or the proposed assumption and assignment of Contracts and Leases (such Contracts and Leases, the "**Proposed Assumed Contracts**") shall be required if the Debtors file and serve such notice (and, subsequently, the Notice of Auction Results and any applicable Notice of Assumed and Assigned Contracts) in accordance with the Assumption and Assignment Procedures and this Order.

21.     The Debtors shall use commercially reasonable efforts to, within five (5) days of the entry of the this Order, file with the Court, serve on the Sale Notice Parties, including

each relevant Counterparty, and cause to be published on the Prime Clerk Website, the Assumption and Assignment Notice, which shall (i) identify the Proposed Assumed Contracts in the Stalking Horse Bid and, if known, any other Contracts or Leases that may be designated for assumption and assignment by the Stalking Horse Bidder (or its known proposed assignee) pursuant to the terms and provisions of the Stalking Horse Agreement (the "**Designation Rights Contracts**"); (ii) list the Debtors' good faith calculation of the Cure Costs with respect to each Contract and Lease identified on the Assumption and Assignment Notice; (iii) provide or cause to be provided the Stalking Horse Bidder's Adequate Assurance Information (as defined herein); (iv) expressly state that assumption or assignment of a Contract or Lease is not guaranteed and is subject to Court approval; (v) prominently display the deadline to file a Cure Objection and an Adequate Assurance Objection (each as hereinafter defined); and (vi) prominently display the date, time, and location of the Sale Hearing.

22. In accordance with the Stalking Horse Agreement, the Debtors may, until eight (8) business days prior to the Sale Hearing, add Contracts and Leases to the Designation Rights Contracts by filing supplemental Assumption and Assignment Notices, which will be deemed to update any previously filed Assumption and Assignment Notices.

23. In accordance with the terms of the Stalking Horse Agreement, on or before a date that is four (4) business days before the Sale Hearing (the "**Designation Deadline**"), the Stalking Horse Bidder shall provide to the Debtors a final schedule of Designation Rights Contracts.

24. The Debtors will use commercially reasonable efforts to, on or before a date that is three (3) business days before the Sale Hearing, file with the Court, serve by overnight delivery on the applicable Counterparty, and cause to be published on the Prime Clerk Website, a

WEIL:\96778612\7\73219.0004

final notice of assumption and assignment of the applicable Designation Rights Contracts to the Stalking Horse Bidder (the "**Notice of Assumed and Assigned Contracts**").

25.     The same procedures shall apply with respect to any designation rights of a Successful Bidder pursuant to the terms of an asset purchase agreement executed by the Debtors.

26.     Any Counterparty who wishes to object to the Debtors' calculation of the Cure Costs with respect to the Counterparty's Contract or Lease, must file with the Court and serve on the Objection Recipients, in accordance with the Debtors' Case Management Order, a written objection (a "**Cure Objection**") that (i) identifies the applicable Contract or Lease; (ii) states, with specificity, the legal and factual bases thereof, including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; and (iii) includes any appropriate documentation in support thereof, by no later than **December 11, 2018 at 4:00 p.m. (prevailing Eastern Time**).

27.     If a timely Cure Objection cannot otherwise be resolved by the parties prior to the Sale Hearing, the amount to be paid or reserved with respect to such Cure Objection shall be determined by the Court at the Sale Hearing.  The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to paragraph 28 of this Order.

28.     A Cure Objection may, at the Debtors' option, after consulting with the Stalking Horse Bidder or the Successful Bidder, as applicable, be adjourned (an "**Adjourned Cure Objection**") to a subsequent hearing.  An Adjourned Cure Objection may be resolved after the closing date of the Sale Transaction in the Debtors' discretion; provided that, the Debtors maintain a cash reserve equal to the cure amount asserted by the objecting Counterparty.

WEIL:\96778612\7\73219.0004

29.     If a Counterparty fails to file with the Court and serve on the Objection Recipients a timely Cure Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the cost to cure any defaults under the relevant Contract or Lease and any proof of claim asserting a claim for such amount shall be expunged without further order of the Court.  The Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract or Lease, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract or Lease, through the date of assumption and assignment, whether in a proof of claim or otherwise, as against the Debtors, the Successful Bidder, or their property.

30.     In accordance with the Bidding Procedures, to qualify as a Qualified Bidder, each Prospective Bidder shall provide with its bid information supporting the Prospective Bidder's (or any other proposed assignee's) ability to comply with the requirement to provide adequate assurance of future performance under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), including the Prospective Bidder's financial wherewithal and willingness to perform under the Proposed Assumed Contracts and any other Contracts or Leases that may later be designated by the Prospective Bidder (if named a Successful Bidder) for assumption and assignment in connection with a Sale Transaction (such information, "**Adequate Assurance Information**").

31.     Adequate Assurance Information will be provided, to the extent it is publicly available information, with the Assumption and Assignment Notice.  To the extent Adequate Assurance Information includes non-public information, it shall be provided to affected

13

Counterparties on a strictly confidential basis. The Assumption and Assignment Notice shall include instructions for requesting and obtaining such non-public Adequate Assurance Information on a strictly confidential basis. Counterparties shall not use any Adequate Assurance Information for any purpose other than to (i) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2) and, if applicable, Bankruptcy Code section 365(b)(3), have been satisfied; and (ii) to support any Adequate Assurance Objection filed by the Counterparty.

32.    Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is the Stalking Horse Bidder's or a Successful Bidder's (a) ability to provide adequate assurance of future performance or (b) the proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "**Adequate Assurance Objection**"), shall file with the Court and serve on the Objection Recipients, including the Successful Bidder, its Adequate Assurance Objection, which must (i) be in writing; (ii) identify the applicable Contract or Lease; (iii) comply with Debtors' Case Management Order; (iv) state, with specificity, the legal and factual bases for the Adequate Assurance Objection; and (v) include any appropriate documentation in support thereof by no later than:

(i)    **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)**, if the Adequate Assurance Objection is with respect to assumption and assignment to the Stalking Horse Bidder of any Proposed Assumed Contract or Designation Rights Contract that was identified in and noticed pursuant to the Assumption and Assignment Notice; and

(ii)    **December 17, 2018, at noon (prevailing Eastern Time)**, (a) if the Adequate Assurance Objection is with respect to the assignment to a Successful Bidder (including the Stalking Horse Bidder, if named a Successful Bidder) of any Proposed Assumed Contract or Contract or Lease that later may be designated by a Successful Bidder for assumption and assignment, that was identified and noticed pursuant to the Notice of Auction Results, and (b) if the Adequate Assurance Objection is with respect to assumption and assignment to the Stalking Horse Bidder of any

14

Proposed Assumed Contract or Designation Rights Contract that was identified in and noticed pursuant to a supplemental Assumption and Assignment Notice.

33.     If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled by the Debtors in their discretion.

34.     If a Counterparty fails to file with the Court and serve on the Objection Recipients, including the Stalking Horse Bidder or the Successful Bidder, a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the relevant Contract or Lease. The Stalking Horse Bidder or the Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to the applicable Contract or Lease in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or Lease or any other document.

35.     The inclusion of a Contract, Lease, or Cure Costs with respect thereto on the Assumption and Assignment Notice, the Designation Notice or the Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder, or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on the Assumption and Assignment Notice, the Designation Notice and the Notice of Auction Results. The Debtors' inclusion of any Contract or Lease on the Assumption and Assignment Notice, Designation Notice or the Notice of Auction Results shall not be a guarantee that such contract or lease ultimately will be assumed or assumed and assigned.

15

**General Provisions**

36.     All persons and entities (whether or not selected as a Qualified Bidder) that submit a bid for any of the Assets during the sale process, including at the Auction, shall be deemed to have knowingly and voluntarily (i) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Assets, the Auction, and the Sale Transaction; (ii) consented to the entry of a final order by the Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction, and/or any Sale Transaction) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (iii) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

37.     For purposes of Section 363(b)(1) of the Bankruptcy Code, if the Debtors seek to transfer any personally identifiable information about individuals through or in connection with the Sale Transaction, other than pursuant to Company privacy policies, the Debtors will promptly alert the US Trustee, who will determine whether appointment of a consumer privacy ombudsman is required.

38.     Prior to mailing and publishing the Sale Notice and the Assumption and Assignment Notice, as applicable, the Debtors may fill in any missing dates and other information, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

39.     Notwithstanding anything in the Motion or this Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder,

16

shall be subject in all respects to, as applicable:  (i) the terms of any interim or final order of the Bankruptcy Court approving debtor-in-possession financing or use of cash collateral ("**DIP Orders"**), including the *Interim Order (i) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (ii) Granting Adequate Protection to the Prepetition Secured Parties; (iii) Modifying the Automatic Stay; (iv) Scheduling Final Hearing; and (v) Granting Related Relief* [ECF No. 101]; and (ii) the documentation governing the Debtors' use of their senior debtor-in-possession facility.

40.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

41.     Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective, final and enforceable immediately upon entry and its provisions shall be self-executing.

42.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

43.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2018
     White Plains, New York

                                   _____
                                   THE HONORABLE ROBERT D. DRAIN
                                   UNITED STATES BANKRUPTCY JUDGE

WEIL:\96778612\7\73219.0004

## Exhibit 1

**Bidding Procedures**

WEIL:\96778612\7\73219.0004

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re                                              :
                                                   :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,          :
                                                   :        **Case No. 18-23538 (RDD)**
                                                   :
              Debtors.[1]                          :        **(Jointly Administered)**
-------------------------------------------------------------x

## BIDDING PROCEDURES FOR SALE OF
## SEARS HOME IMPROVEMENT BUSINESS

      The procedures set forth herein (the "**Bidding Procedures**") will be employed in connection with a sale or disposition of the Sears Home Improvement business (the "**SHIP Business**") owned by Sears Holdings Corporation and its affiliates (collectively, the "**Debtors**").

      By the *Motion of Debtors for Entry of Order (i)(A) Approving Bidding Procedures for Sale of Sears Home Improvement Business (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures, (ii) approving the sale of Sears Home Improvement Business in Accordance with the Stalking Horse Agreement, and (iii) Granting Related Relief* (the "**Motion**"), the above-captioned Debtors, as debtors in possession (collectively, the "**Debtors**"), sought, among other things, approval of the Bidding Procedures for soliciting bids for, conducting

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

an auction (the "**Auction**") of, and consummating a sale of the assets of SHIP Business, as further described herein (the "**Sale Transaction**").

On November __, 2018, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), entered the *Order (A) Approving Bidding Procedures for Sale of Sears Home Improvement Business, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption And Assignment Procedures, and (F) Granting Related Relief* (ECF No. [__]) (the "**SHIP Bidding Procedures Order**").[2]

On November 2, 2018, the Debtors and Service.com (the "**Stalking Horse Bidder**") entered into an asset purchase agreement (the "**Stalking Horse Agreement**") for the sale of the SHIP Business, pursuant to which: (i) the Stalking Horse Bidder agreed to pay Sixty million dollars ($60,000,000) in cash, prior to adjustment of such amount in accordance with the terms of the Stalking Horse Agreement (the "**Cash Purchase Price**"), and to assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Acquired Assets, subject to higher or better offers, the outcome of the Auction (as defined herein) and Court approval; and (ii) the Debtors agreed in the event that the Court approves the purchase of substantially all of the Acquired Assets by any bidder other than the Stalking Horse Bidder and the sale to that bidder is consummated, then the Stalking Horse Bidder will be paid a break-up fee in the amount equal to 1.5% of the Cash Purchase Price (the "**Break-Up Fee**").

## I.
## Description of the Assets

The Debtors are seeking to sell all assets, properties and rights exclusively related to, used exclusively in or held exclusively for use in the SHIP Business (the "**Assets**"), including, but not limited to, intellectual property, business contracts, real estate, customer data, receivables, and all other assets identified as "Transferred Assets" in the Stalking Horse Agreement, attached to the Motion as **Exhibit B**.

A party must submit a bid for all of the Assets and all liabilities identified as "Transferred Assets" and "Assumed Liabilities" in the Stalking Horse Agreement, except that a party shall not be required to assume or exclude the same Business Contracts (as defined in the Stalking Horse Agreement) as assumed or excluded by the Stalking Horse Bidder.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold (brandon.aebersold@lazard.com) and Levi Quaintance (levi.quaintance@lazard.com)).

---

[2] All capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion and the SHIP Bidding Procedures Order.

WEIL:\96776713\10\73219.0004

## II.
## Important Dates and Deadlines

| | |
|---|---|
| **November 15, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order |
| **November 27, 2018** | Deadline for Debtors to provide applicable Counterparties Adequate Assurance Information with respect to the Stalking Horse Bidder (and any proposed assignee/designee of the assets, if applicable) |
| **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for competing bidders to submit binding bids, together with copy of an Asset Purchase Agreement blacklined against the Stalking Horse Agreement and Good Faith Deposit |
| **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to (i) the proposed Sale Transaction, (ii) Debtors' proposed Cure Costs, and (iii) the assumption of and assignment to the Stalking Horse Bidder of any Contracts Proposed to be Assumed in the Stalking Horse Agreement |
| **December 12, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to notify Prospective Bidders of their status as Qualified Bidders |
| **December 13, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Auction to be held at the offices of Weil, Gotshal & Manges LLP (if necessary) |
| **December 14, 2018 at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to file with the Bankruptcy Court the Notice of Auction Results and to provide applicable Counterparties with Adequate Assurance Information for the Successful Bidder |
| **December 17, 2018 at noon (prevailing Eastern Time)** | Deadline to object to (i) conduct of the Auction, (ii) sale of the SHIP Business and (iii) the assumption of and assignment of Proposed Assumed Contracts to the Successful Bidder |
| **December 18, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Date of Sale Hearing |

## III.
## Noticing

### A.    Consultation Parties

Throughout the sale process, as necessary or appropriate, the Debtors and their advisors will consult with the following parties (collectively, the "**Consultation Parties**"):

     i.    Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Ira S. Dizengoff, Esq., Philip C. Dublin, Esq., Abid Qureshi, Esq., Allison P. Miller, Esq., Sara L. Brauner, Esq.), attorneys for the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"); and

     ii.    Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036 (Attn: Paul D. Leake, Esq., Shana A. Elberg, Esq., and George R. Howard, Esq.), attorneys for Bank of America, N.A., administrative agent under the First Lien Credit Facility and the "**DIP ABL Agent**" under the senior debtor-in-possession ("**DIP**") facility.

3

The Debtors shall promptly provide copies of all bids received by the Debtors to the Consultation Parties, but in no event later than the next calendar day after receipt; provided that the Consultation Parties must treat such bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder. Further, the Debtors shall not consult with or provide copies of bids to any Consultation Party or any insider or affiliate of the Debtors pursuant to the terms of these Bidding Procedures if such party has a bid for the Assets pending or if the Bid Deadline (as defined hereafter) has not passed at the applicable time.  Notwithstanding the foregoing, if a member of the Creditors' Committee submits a Qualified Bid (as hereinafter defined), the Creditors' Committee will maintain its consultation rights as a Consultation Party; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding a transaction involving the applicable Assets, and shall not provide any confidential information regarding the Assets or a transaction involving the Assets to the bidding committee member.

For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment. Rights that Consultation Parties may have pursuant to the terms of other agreements or orders of the Court shall not be affected by these Bidding Procedures or the Bidding Procedures Order.

## B.     Bid Notice Parties

Qualified Bids must be submitted in writing to the following parties (collectively, the "**Bid Notice Parties**"):

   i.     the Debtors, c/o Sears Holdings Corporation, 3333 Beverly Road, Hoffman Estates IL 60179 (Attn: Stephen Sitley Esq., and Luke J. Valentino, Esq. (counsel@searshc.com);

   ii.    the Debtors' attorneys, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com); Jacqueline Marcus, Esq. (jacqueline.marcus@weil.com); Gavin Westerman, Esq. (gavin.westerman@weil.com); Garrett A. Fail, Esq. (garrett.fail@weil.com) and Sunny Singh, Esq. (sunny.singh@weil.com)); and

   iii.   the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold (brandon.aebersold@lazard.com) and Levi Quaintance (levi.quaintance@lazard.com))

## C.     Sale Notice Parties

The "**Sale Notice Parties**" shall include the following persons and entities:

   i.     the Consultation Parties;

WEIL:\96776713\10\73219.0004

ii.     the Master Service List identified in the Bankruptcy Court's *Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405] (the "**Case Management Order**");

iii.    all persons and entities known by the Debtors to have expressed an interest to the Debtors in a transaction involving any material portion of the SHIP Business during the past nine (9) months, including any person or entity that has submitted a bid for any material portion of the SHIP Business;

iv.     all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors);

v.      all non-Debtor parties (each, a "**Counterparty**") to any executory contracts or unexpired non-residential real property leases utilized in the SHIP Business (collectively, the "**Contracts** and **Leases**") that could be assumed or rejected in connection with a Sale Transaction;

vi.     any governmental authority known to have a claim against the Debtors in these chapter 11 cases;

vii.    all applicable federal, state, and local taxing and regulatory authorities, including the Internal Revenue Service;

viii.   all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency, if applicable;

ix.     the United States Attorney General;

x.      the United States Attorney for the Southern District of New York;

xi.     the Office of the Attorney General and Office of the Secretary of State in each state in which the Debtors operate;

xii.    the Antitrust Division of the United States Department of Justice;

xiii.   the Federal Trade Commission;

xiv.    all other persons and entities as directed by the Bankruptcy Court.

Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the website maintained by Prime Clerk LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.primeclerk.com/sears/ (the "**Prime Clerk Website**"), a notice (the "**Sale Notice**") setting forth (i) a complete list and general description of the Assets for sale; (ii) the date, time, and place of the (a) Auction and (b) Sale Hearing (as hereinafter defined); and (iii) the deadlines and procedures for objecting to the proposed Sale Transaction.

5

Within five (5) business days after entry of the Bidding Procedures Order, the Debtors shall cause the information contained in the Sale Notice to be published once in *The New York Times* and *The Wall Street Journal*.

## D.    Objection Recipients

Sale Objections (as hereinafter defined) shall be filed with the Bankruptcy Court and served on the following parties (collectively, the "**Objection Recipients**"): (i) the Bid Notice Parties; (ii) the Master Service List identified in the Case Management Order and (iii) counsel to the Stalking Horse Bidder by no later than (x) **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)**, (the "**Sale Objection Deadline**").

## E.    Notices Regarding Assumption and Assignment

The Debtors shall provide all notices regarding the proposed assumption, assignment, and designation of Contracts and Leases in accordance with the Bidding Procedures Order.

## IV.
## Bidder Qualifications

Each person or entity that desires to participate in the Auction (each, a "**Prospective Bidder**") must be determined by the Debtors, in consultation with the Consultation Parties, to satisfy the following eligibility requirements:

## A.    Due Diligence

To be eligible to participate in the Auction, a Prospective Bidder must first execute a confidentiality agreement, in form and substance satisfactory to the Debtors. Upon execution of a valid confidentiality agreement, any Prospective Bidder identified by the Debtors to be reasonably likely to be a Qualified Bidder (as hereinafter defined) that wishes to conduct due diligence on the SHIP Business may be granted access to confidential information regarding the same, including an information package containing information and financial data with respect to the applicable Assets and access to a data room (the "**Data Room**") with confidential electronic data concerning the SHIP Business and the Assets. If the Debtors, in consultation with the Consultation Parties, determine that a Prospective Bidder does not qualify as a Qualified Bidder, the Prospective Bidder shall not be entitled to access to the Data Room or receive additional non-public information regarding the SHIP business, the Assets, or the sale process.

Once an interested party is deemed a Prospective Bidder and such party has executed a valid confidentiality agreement, such bidder's identity may, in the Debtors' discretion, and in consultation with the Consultation Parties, be disclosed to the Stalking Horse Bidder.

The Debtors will work to accommodate all reasonable requests for additional information and due diligence access from Prospective Bidders. All due diligence requests shall be directed to the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold (brandon.aebersold@lazard.com) and Levi Quaintance (levi.quaintance@lazard.com)).

6

**B.**     **Bid Deadline**

Any Prospective Bidder that intends to participate in the Auction must submit a Qualified Bid (as hereinafter defined) on or before **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**") in writing to the Bid Notice Parties.

The Debtors may, after consulting with the Consultation Parties, extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, for all or certain Prospective Bidders.

**C.**     **Qualified Bid Requirements**

To qualify as a "**Qualified Bid**," a bid must (i) be the Stalking Horse Bid, or (ii) be in writing and determined by the Debtors, in consultation with the Consultation Parties, to satisfy the following requirements:

1.     Identification of Bidder.  A Qualified Bid must fully disclose the legal identity of each person or entity bidding for the Assets or otherwise participating in the Auction in connection with such bid (including any equity holders or other financial backers, if the Prospective Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and the complete terms of any such participation, and must also disclose any connections, arrangements or agreements, whether oral or written, with the Debtors, any other known Prospective Bidder or Qualified Bidder, and/or any officer or director of the foregoing.

2.     Purchased Assets.  A Qualified Bid must clearly identify the following:

   a.     the Assets to be purchased, including any Contracts and Leases of the Debtors that would be assumed and assigned in connection with the proposed Sale Transaction (all such Contracts and Leases, the "**Proposed Assumed Contracts**");

   b.     the liabilities, if any, to be assumed, including any debt to be assumed; and

   c.     the cash purchase price of the bid.

The Debtors reserve the right to ask any bidder to allocate the value ascribed to a bid for any particular Asset, and to ask about any significant assumptions on which such valuations are based.

3.     Form of Consideration.

   a.     All-Cash Offer.  The bid must include a statement confirming that the bid is (i) based on an all-cash offer, and (ii) sufficient cash

7

consideration to pay the Break-Up Fee.  No credit bidding shall be allowed in connection with a bid for the Assets.

4.  <u>Purchase Price; Minimum Bid</u>. Each bid submitted must (i) be a bid for all of the Assets contained in the Stalking Horse Bid, except that it shall not be required to designate the same Business Contracts (as defined in the Stalking Horse Agreement) as assumed or excluded Assets, as they are designated by the Stalking Horse Bidder; and (ii) exceed the cash purchase price in the Stalking Horse Bid, plus the Break-Up Fee or (iii) propose an alternative transaction that provides better terms than the Stalking Horse Bid, taking into account the Break-Up Fee.

If the value of the bid relative to the Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in the Stalking Horse Agreement), the bid must include a detailed analysis of the value of any additional non-cash component and any back-up documentation to support such value.

5.  <u>Good Faith Deposit</u>.   Other than as provided in the Stalking Horse Agreement, a Qualified Bid must be accompanied by a "**Good Faith Deposit**" in the form of cash in an amount equal to ten percent (10%) of the proposed purchase price offered to purchase the Assets.  Good Faith Deposits shall be deposited prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**"), pursuant to the escrow agreement to be provided by the Debtors to Prospective Bidders, and Qualified Bidders shall provide information reasonably requested by the Escrow Agent to establish the deposit, including KYC information.  All Good Faith Deposits shall be held in escrow until no later than ten (10) days after the conclusion of the Auction (except for the Good Faith Deposits of the Successful Bidder and the Back-Up Bidder), and thereafter returned to the respective bidders in accordance with the provisions of Part VII of these Bidding Procedures.

To the extent that a bid is modified at or prior to the Auction, to the extent the bidder is the Successful Bidder or the Back-Up Bidder, the bidder must pay an additional amount into escrow, within two (2) business days of the Auction, such that the final Good Faith Deposit for the bid equals ten percent (10%) of the proposed purchase price offered to purchase the Assets.

6.  <u>Proposed Asset Purchase Agreement</u>.  A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (a "**Proposed APA**"), which Proposed APA must be marked to reflect the differences between the Stalking Horse Agreement and the Prospective Bidder's Proposed APA.

8

Specifically, a Proposed APA shall (i) specify the purchase price in U.S. dollars; (ii) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors); (iii) identify any Proposed Assumed Contracts; and (iv) be executed by the Prospective Bidder.

7.    <u>Employee and Labor Terms</u>.  A Qualified Bid must include a statement of proposed terms for employees, including with respect to the Debtors' affected collective bargaining agreements (the "**Affected Labor Agreements**") and affected labor unions (the "**Affected Unions**").

8.    <u>Financial Information</u>. A Qualified Bid must include the following:

a.    a statement that the Prospective Bidder is financially capable of consummating the Sale Transaction contemplated by the Proposed APA;

b.    if applicable, information supporting the Prospective Bidder's (or any other proposed assignee's) ability to comply with the requirement to provide adequate assurance of future performance under Bankruptcy Code section 365(f)(2) and, if applicable, Bankruptcy Code section 365(b)(3), including (i) the Prospective Bidder's financial wherewithal and willingness to perform under Proposed Assumed Contracts and any other Contracts and Leases that may later be designated by the Prospective Bidder (if named a Successful Bidder)  for assumption and assignment in connection with a Sale Transaction; and (ii) the identity of any known proposed assignee of applicable Contracts or Leases (if different from the Prospective Bidder) with contact information for such person or entity (such information, "**Adequate Assurance Information**"), which Adequate Assurance Information may also include (x) a corporate organizational chart or similar disclosure identifying ownership and control of the proposed assignee of applicable Contracts and Leases; and (y) financial statements, tax returns, and annual reports; and

c.    sufficient evidence, as reasonably determined by the Debtors, to allow the Debtors, after consulting with the Consultation Parties, to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to consummate the Sale Transaction contemplated in the Prospective Bidder's Proposed APA in a timely manner.

9.    <u>Representations and Warranties</u>. A Qualified Bid must include the following representations and warranties:

9

a. a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the SHIP Business and the Assets prior to submitting its bid; and

b. a statement that the Prospective Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Prospective Bidder's Proposed APA ultimately accepted and executed by the Debtors.

10. <u>Required Approvals</u>. A Qualified Bid must include a statement or evidence (i) that the Prospective Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("**HSR Filings**"), as amended, if applicable, and pay the fees associated with such filings; and (ii) an explanation and/or evidence of the Prospective Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the SHIP Business from and after closing the Sale Transaction and the proposed timing for the Prospective Bidder to undertake the actions required to obtain such approvals. A Prospective Bidder further agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain the Prospective Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed APA.

11. <u>Authorization</u>. A Qualified Bid must include evidence of corporate authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the transaction contemplated by the Prospective Bidder's Proposed APA in accordance with the terms of the bid and these Bidding Procedures.

12. <u>Other Requirements</u>. A Qualified Bid shall

a. expressly state that the Prospective Bidder agrees to serve as a back-up bidder (a "**Back-Up Bidder**") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid (as hereinafter defined) with respect to the Assets;

10

b.        state that the bid is formal, binding, and unconditional (except as set forth in an applicable asset purchase agreement ultimately executed by the Debtors); is not subject to any further due diligence; and is irrevocable until the first business day following the close of a Sale Transaction with the Successful Bidder for the Assets;

c.        with the exception of the Stalking Horse Bid, expressly state and acknowledge that the Prospective Bidder shall not be entitled to any break-up fee, expense reimbursement, or other bid protection in connection with the submission of a bid for the Assets or otherwise participating in the Auction or sale process;

d.        expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction;

e.        not contain any unsatisfied financing contingencies of any kind;

f.        a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

g.        be accompanied by any reasonable information requested by a consumer privacy ombudsman, should one be appointed in the Debtors' chapter 11 cases pursuant to section 363(b)(1)(B) of the Bankruptcy Code;

h.        be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the Consultation Parties;

i.        include contact information for the specific person(s) the Debtors should contact in the event they have questions about the Prospective Bidder's bid; and

j.        a covenant to comply with the terms of the Bidding Procedures and the Bidding Procedures Order.

For the avoidance of doubt, the Stalking Horse Bid is a Qualified Bid that complies with or is exempted from the foregoing requirements.

11

**D.      Qualified Bidders**

A bid received for the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the requirements set forth in Section C above will be considered a "Qualified Bid," and the Stalking Horse Bidder, and any bidder that submits a Qualified Bid (including the Stalking Horse Bid) will be considered a "**Qualified Bidder**."

The Debtors may amend or waive the conditions precedent to being a Qualified Bidder at any time, in their reasonable business judgment, and in consultation with the Consultation Parties, in a manner consistent with their fiduciary duties and applicable law (as reasonably determined in good faith by the Debtors in consultation with their outside legal counsel).

**V.**
**Bid Review Process**

The Debtors will evaluate timely bids, in consultation with the Consultation Parties and, may, based upon their evaluation of the content of each bid, engage in negotiations with Prospective Bidders who submitted bids, as the Debtors deem appropriate, in their reasonable business judgment, and in a manner consistent with their fiduciary duties and applicable law. In evaluating the bids, the Debtors may take into consideration the following non-binding factors:

1.      the amount of the purchase price set forth in the bid;

2.      any Business Contracts included in or excluded from the bid, including any Proposed Assumed Contracts;

3.      the value to be provided to the Debtors under the bid, including the net economic effect upon the Debtors' estates, taking into account the Stalking Horse Bidder's rights to the Break-Up Fee;

4.      any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities;

5.      the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals;

6.      the impact on employees, employee claims against the Debtors, Affected Labor Agreements, if applicable, and whether the Prospective Bidder has reached an agreement with the Affected Unions, if applicable;

7.      the impact on trade creditors and landlords; and

8.      any other factors the Debtors may reasonably deem relevant.

12

The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as a Qualified Bids, and will notify Prospective Bidders whether they have been selected as Qualified Bidders by no later than **December 12, 2018**.

The Debtors reserve the right to work with any Prospective Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid. Without the prior written consent of the Debtors and consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid.

In consultation with the Consultation Parties, the Debtors shall make a determination regarding the following:

1.      the highest or best Qualified Bid (each, a "**Baseline Bid**" and, such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction; and

2.      which bids have been determined to be Qualified Bids.

As soon as practicable, but in no event later than the next calendar day, the Debtors will provide copies of each Baseline Bid to the Consultation Parties, and the Stalking Horse Bidder. The Debtors will consult with the Consultation Parties regarding the designation of the Baseline Bid and advise the Consultation Parties of the designated Baseline Bid within one (1) calendar day of the Debtors' determination of the Baseline Bid.

## VI.
## The Auction

If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will not conduct an Auction for the Stalking Horse Bid, and shall file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website a notice indicating that the Auction for the Stalking Horse Bid has been cancelled and that the Stalking Horse Bidder is the Successful Bidder, and setting forth the date and time of the applicable Sale Hearing.

**Except as provided in the Stalking Horse Agreement, nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.**

The Auction, if any, will be conducted at the offices of Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153 on **December 13, 2018, at 10:00 a.m. (prevailing Eastern Time)**, or at such other time and location as designated by the Debtors, after consulting with the Consultation Parties and providing notice to the Sale Notice Parties. If held, the proceedings of the Auction will be transcribed and/or video recorded.

## A.      Participants and Attendees

Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.

13

Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative. The Auction will be conducted openly, and all creditors will be permitted to attend; provided that the Debtors may, in their reasonable business judgment, and in consultation with the Consultation Parties, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder and other parties in interest at the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction, and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets if selected as the Successful Bidder.

**B.    Auction Procedures**

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment, in consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law:

1.    Baseline Bid.  Bidding shall commence at the amount of the Baseline Bid.

2.    Minimum Overbid.  Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid. The Debtors shall, after consulting with the Consultation Parties, announce at the outset of the Auction the minimum required increments for successive Qualified Bids (each such bid, a "**Minimum Overbid**").  The Debtors may, in their reasonable business judgment, and after consulting with the Consultation Parties, announce increases or reductions to Minimum Overbids at any time during the Auction.

3.    Stalking Horse Credit for Break-Up Fee. If a Qualified Bidder who is not the Stalking Horse Bidder bids at the Auction, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the Break-Up Fee to be counted toward its bid. The cash and other considerations proposed by such Qualified Bidder must exceed the Stalking Horse Bid by the purchase price contained in the Stalking Horse Bid, plus the Break-Up Fee, by at least the amount of the Minimum Overbid to advance to the next round of bidding. To the extent that the Stalking Horse Bidder submits a competing bid for the Assets, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the Break-Up Fee to be counted toward its bid and the computation of the Minimum Overbid for bidders to advance to the next round of bidding.

3.    Highest or Best Offer.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or best offer (each such bid, a "**Leading Bid**").  Each round of bidding will conclude after each participating Qualified

14

Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

The Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to their Proposed APA at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, and in consultation with the Consultation Parties, negotiate with any and all Qualified Bidders participating in the Auction.

The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in their reasonable business judgment, which bid is the highest or best bid and reject, at any time, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or the best interests of the Debtors and their estates; except that, if the Stalking Horse Bid as reflected in the Stalking Horse Agreement is the only Qualified Bid received, the foregoing shall be inoperative with respect to the Stalking Horse Bid. No attempt by the Debtors to reject a bid pursuant to this paragraph will modify any rights of the Debtors or the Stalking Horse Bidder under the Stalking Horse Agreement (although the same may be consensually modified during the Auction).

## C.    Auction Results

1.    Successful Bid.  Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Qualified Bids constitute the highest or best Qualified Bid (the "**Successful Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identity of the bidder who submitted the Successful Bid (the "**Successful Bidder**") and the amount of the purchase prices and other material terms of the Successful Bid.

A Successful Bidder shall, within one (1) business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. The Successful Bid may not be assigned to any party without the consent of the Debtors after consulting with the Consultation Parties.

2.    Back-Up Bids. Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, and except as provided in the Stalking Horse Agreement, which Qualified Bid is the next highest or next best Qualified Bid after the Successful Bid (such bid, the "**Back-Up Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identities of the

15

Back-Up Bidder and the amount of the purchase price and other material terms of the Back-Up Bid.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) the first business day after the consummation of a Sale Transaction with the Successful Bidder; (ii) January 31, 2019; and (iii) the release of the applicable Back-Up Bid by the Debtors (such date, the "**Back-Up Termination Date**"). If the Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Termination Date, the Back-Up Bidder shall be deemed the new Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid at the Auction.

The Debtors will, within one (1) calendar day after the conclusion of the Auction, file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website a notice of the results of the Auction (the "**Notice of Auction Results**"), which shall (i) identify the Successful Bidder and Back-Up Bidder; (ii) list all Proposed Assumed Contracts in the Successful Bid and Back-Up Bid; (iii) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the Successful Bidder); (iv) list any known Contracts and Leases that may later be designated by the Successful Bidder for assumption and assignment in connection with the Sale Transaction; and (v) set forth the deadline and procedures for filing Adequate Assurance Objections in response to the Notice of Auction Results.

## VII.
## Disposition of Good Faith Deposits

### A.    Prospective Bidders

Within three (3) business days after the Bid Deadline, the Escrow Agent shall return to each Prospective Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Prospective Bidder's Good Faith Deposit, plus any interest accrued thereon. Upon the authorized return of such Prospective Bidder's Good Faith Deposit, the bid of such Prospective Bidder shall be deemed revoked and no longer enforceable.

### B.    Qualified Bidders

1. Forfeiture of Good Faith Deposit. The Good Faith Deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the applicable Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures; or (ii) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate a Sale Transaction in accordance with these Bidding Procedures and the terms of the transaction documents with respect to the Successful Bid. The Escrow Agent shall release the Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a written notice by an authorized officer of the

16

Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

2. <u>Return of Good Faith Deposit</u>.  With the exception of the Good Faith Deposits of the Successful Bidder and the Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Good Faith Deposit, plus any interest accrued thereon, within ten (10) business days after the conclusion of the Auction.

3. <u>Stalking Horse Bidder</u>.  Notwithstanding anything to the contrary herein, any Good Faith deposit provided by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement (including any required return of such deposit) shall be governed by the terms and conditions of the Stalking Horse Agreement.

4. <u>Back-Up Bidders.</u>  The Escrow Agent shall return the Back-Up Bidder's Good Faith Deposit, plus any interest accrued thereon, within ten (10) business days after the occurrence of the Back-Up Bid Termination Date.

5. <u>Successful Bidder</u>. The Good Faith Deposit of the Successful Bidder shall be applied against the cash portion of the purchase price of the Successful Bid upon the consummation of the Sale Transaction.

## C.    Escrow Instructions

The Debtors and, as applicable, the Prospective Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent providing instructions for the return of any Good Faith Deposit, to the extent such return is required by these Bidding Procedures.  If either party fails to execute such written notice, the Good Faith Deposit may only be released by an order of the Bankruptcy Court.

## VIII.
## <u>Sale Hearing</u>

At a hearing before the Bankruptcy Court (the "**Sale Hearing**"), the Debtors will seek the entry of orders authorizing and approving, among other things, the following Sale Transaction (each, a "**Sale Order**"), to the extent applicable:

1. if no other Qualified Bid is received by the Debtors, a sale of such assets to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse Agreement; and

2. if another Qualified Bid is received by the Debtors, a sale of applicable Assets to the Successful Bidder at the Auction (which bidder could be the Stalking Horse Bidder).

The Debtors may, in their reasonable business judgment, after consulting with the Consultation Parties and the Successful Bidder (including the Stalking Horse Bidder if named a Successful Bidder), adjourn or reschedule any Sale Hearing with sufficient notice to the Sale

17

Notice Parties, including by (i) an announcement of such adjournment at the applicable Sale Hearing or at the Auction, or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in the Stalking Horse Agreement.

Any objections to (A) a proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order (a "**Sale Objection**"); (B) the Debtors' proposed Cure Costs set forth in a Notice of Assumption and Assignment (a "**Cure Objection**"); and (C) provision of adequate assurance of future performance with respect to any Proposed Assumed Contracts or Contracts or Leases that may later be designated for assumption and assignment by a Successful Bidder in connection with a Sale Transaction (an "**Adequate Assurance Objection**") must (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) include any appropriate documentation in support thereof; and (v) be filed with the Bankruptcy Court and served on the Objection Recipients by the Sale Objection Deadline.

All Sale Objections not otherwise resolved by the parties shall be heard at the Sale Hearing. Any party who fails to file with the Bankruptcy Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Stalking Horse Agreement, or asset purchase agreement with a Successful Bidder, including the transfer of the Assets to the Stalking Horse Bidder, or the Successful Bidder (including any Back-Up Bidder subsequently deemed a Successful Bidder), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing, in accordance with the terms of the Bidding Procedures Order, the Debtors may, in their discretion, and in consultation with the Stalking Horse Bidder or the Successful Bidder (as applicable), adjourn Cure Objections and Adequate Assurance Objections to be considered at a later hearing and assign Proposed Assumed Contracts while such objections remain outstanding.

## IX.
## Consent to Jurisdiction and Authority as Condition to Bidding

All Prospective Bidders and the Stalking Horse Bidder shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating to the Sale Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating to the Sale Transaction; and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, an Auction, or the construction or enforcement of any agreement or any other document relating to the Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

WEIL:\96776713\10\73219.0004

## X.
## Reservation of Rights

The Debtors reserve the right, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, to modify these Bidding Procedures, waive terms and conditions set forth herein with respect to all Prospective Bidders, extend the deadlines set forth herein, announce at the Auction modified or additional procedures for conducting the Auction, alter the assumptions set forth herein, and provide reasonable accommodations to the Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids by such bidder (including extending deadlines as may be required for the Stalking Horse Bidder to comply with any additional filing and review procedures with the Federal Trade Commission in connection with its previous HSR Filings), in each case, to the extent not materially inconsistent with these Bidding Procedures, the Bidding Procedures Order, and the Stalking Horse Agreement. **Nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.**

All Consultation Parties reserve the right to seek relief from the Bankruptcy Court on an expedited basis if they disagree with any actions or decision made by the Debtors as part of these Bidding Procedures. The rights of all Consultation Parties with respect to the outcome of the Auction are reserved.

## XI.
## Sale Is "As Is/Where Is"

The Assets sold pursuant to these Bidding Procedures will be conveyed at the Closing in their then-present condition, "**as is, with all faults, and without any warranty whatsoever, express or implied.**"

19

## **Exhibit 2**

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re                                              :
                                                   :          **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*          :
                                                   :          **Case No. 18-23538 (RDD)**
                                                   :
                    Debtors.[1]                    :          **(Jointly Administered)**
-------------------------------------------------------------------x

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING
### FOR THE SALE OF SEARS HOME IMPROVEMENT BUSINESS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On November 3, 2018, Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") the *Motion of Debtors for Entry of Order (i)(A) Approving Bidding Procedures for Sale of Sears Home Improvement Business (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures, (ii) approving the sale of Sears Home Improvement Business in Accordance with the Stalking Horse Agreement, and (iii) Granting Related Relief* (ECF No. [__]) (the "**Motion**"), seeking, among other things, approval of the bidding procedures for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

WEIL:\96778612\7\73219.0004

soliciting bids for, conducting an auction (the "**Auction**") of, and consummating a sale (the "**Sale Transaction**") of the Sears Home Improvement business (the "**SHIP Business**").

On November [__], 2018, the Bankruptcy Court entered the *Order (A) Approving Bidding Procedures for Sale of Sears Home Improvement Business, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption And Assignment Procedures, and (F) Granting Related Relief* (ECF No. [__]) (the "**SHIP Bidding Procedures Order**").[2]

On November 2, 2018, the Debtors and Service.com (the "**Stalking Horse Bidder**") entered into an asset purchase agreement (the "**Stalking Horse Agreement**") for the sale of the SHIP Business, pursuant to which: (i) the Stalking Horse Bidder agreed to pay Sixty million dollars ($60,000,000) in cash, prior to adjustment of such amount in accordance with the terms of the Stalking Horse Agreement (the "**Cash Purchase Price**"), and to assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Assets, subject to higher or better offers, the outcome of the Auction (as defined herein), and Court approval; and (ii) the Debtors agreed in the event that the Court approves the purchase of substantially all of the Acquired Assets by any bidder other than the Stalking Horse Bidder to pay the Stalking Horse Bidder a break-up fee in the amount of 1.5% of the Cash Purchase Price (the "**Break-Up Fee**").

### Description of the Assets

The Debtors are seeking to sell all assets, properties and rights exclusively related to, used exclusively in or held exclusively for use in the SHIP Business (the "**Assets**"), including, but not limited to, intellectual property, business contracts, real estate, customer data, receivables, and all other assets identified as "Transferred Assets" in the Stalking Horse Agreement, attached to the Motion as **Exhibit B**.

A party must submit a bid for all of the Assets and all liabilities identified as "Transferred Assets" and "Assumed Liabilities" in the Stalking Horse Agreement, except that a party shall not be required to assume or exclude the same Business Contracts (as defined in the Stalking Horse Agreement) as assumed or excluded by the Stalking Horse Bidder.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold (brandon.aebersold@lazard.com) and Levi Quaintance (levi.quaintance@lazard.com)).

---

[2] All capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion and the SHIP Bidding Procedures Order.

WEIL:\96778612\7\73219.0004

## IMPORTANT DATES AND DEADLINES

- **Bid Deadline.** Any person or entity interested in participating in the Auction must submit a Qualified Bid to the Bid Notice Parties **on or before December 11, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

- **Sale Objection Deadline**. Objections to a proposed Sale Transaction, including any objection to the sale of the Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order must be (i) filed in accordance with the Bidding Procedures, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Recipients (as identified and defined in the Bidding Procedures) by no later than **December 11, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "**Sale Objection Deadline**").

- **Auction.** An Auction for the Assets has been scheduled for **December 13, 2018 at 10:00 a.m. (prevailing Eastern Time)** and will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (if necessary).

- **Notice of Auction Results Objection Deadline**. Adequate Assurance Objections in response to the Notice of Auction Results and Objections to the conduct of the Auction must be filed with the Bankruptcy Court, and served on the Objection Recipients (as identified and defined in the Bidding Procedures) by no later than **December 17, 2018 at noon (prevailing Eastern Time)** (the "**Auction Notice Objection Deadline**").

- **Sale Hearing.** The Sale Hearing shall be held before the Honorable Robert D. Drain on **December 18, 2018 at 10:00 a.m. (prevailing Eastern Time)**, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.

## Procedures for Sale Objections

Any objections to the proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order (a "**Sale Objection**"); (B) the Debtors' proposed Cure Costs set forth in a Notice of Assumption and Assignment (a "**Cure Objection**"); and (C) provision of adequate assurance of future performance with respect to any Proposed Assumed Contracts or Contracts or Leases that may later be designated for assumption and assignment by a Successful Bidder in connection with a Sale Transaction (an "**Adequate Assurance Objection**") must (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) include any appropriate documentation in support thereof; and (v) be filed with the Bankruptcy Court and served on the Objection Recipients by the Sale Objection Deadline.

All Sale Objections not otherwise resolved by the parties shall be heard at the Sale Hearing. Any party who fails to file with the Bankruptcy Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Stalking Horse Agreement, or asset purchase agreement with a Successful Bidder, including the transfer of the

Assets to the Stalking Horse Bidder, or the Successful Bidder (including any Back-Up Bidder subsequently deemed a Successful Bidder), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing, in accordance with the terms of the Bidding Procedures Order, the Debtors may, in their discretion, and in consultation with the Stalking Horse Bidder or the Successful Bidder, as applicable, adjourn Cure Objections to be considered at a later hearing and assign Proposed Assumed Contracts while such objections remain outstanding.

### Additional Information

Copies of the Motion, the Bidding Procedures Order, and the Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC, located at https://restructuring.primeclerk.com/Sears.

### Reservation of Rights

The Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, modify the Bidding Procedures, waive terms and conditions set forth therein, extend the deadlines set forth therein, and announce at the Auction modified or additional procedures for conducting the Auction. **Except as provided in the Stalking Horse Agreement, nothing shall obligate the Debtors to consummate or pursue any transaction with any bidder.**

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER BY THE APPLICABLE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, SALE ORDER, THE PROPOSED SALE TRANSACTION, OR THE DEBTORS' CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER ASSET PURCHASE AGREEMENT EXECUTED BY THE DEBTORS AND A SUCCESSFUL BIDDER AT THE AUCTION.**

Dated _____, 2018

                                       _____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Proposed Attorneys for Debtors and Debtors in Possession*

4

**<u>Exhibit 3</u>**

**Assumption and Assignment Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

In re                            :

                                :      **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,  :

                                :      **Case No. 18-23538 (RDD)**

                                :

             **Debtors.**[5]        :      **(Jointly Administered)**

------------------------------------------------------------------x

## NOTICE OF ASSUMPTION AND ASSIGNMENT
## IN CONNECTION WITH SALE OF SEARS HOME IMPROVEMENT BUSINESS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On November 3, 2018, Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") the *Motion of Debtors for Entry of Order (i)(A) Approving Bidding Procedures for Sale of Sears Home Improvement Business (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures, (ii) approving the sale of Sears Home Improvement Business in Accordance with the Stalking Horse Agreement, and (iii) Granting Related Relief* (ECF

---

[5] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

WEIL:\96778612\7\73219.0004

No. [__]) (the "**Motion**"), seeking, among other things, approval of the bidding procedures for soliciting bids for, conducting an auction (the "**Auction**") of, and consummating the sale (the "**Sale Transaction**") of the Sears Home Improvement business (the "**SHIP Business**").

On November [__], 2018, the Bankruptcy Court entered the *Order (A) Approving Bidding Procedures for Sale of Sears Home Improvement Business, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption And Assignment Procedures, and (F) Granting Related Relief* (ECF No. [__]) (the "**SHIP Bidding Procedures Order**").[6]

On November 3, 2018, the Debtors and Service.com (the "**Stalking Horse Bidder**") entered into an asset purchase agreement (the "**Stalking Horse Agreement**") for the sale of the SHIP Business, pursuant to which: (i) the Stalking Horse Bidder agreed to pay sixty million dollars ($60,000,000) in cash, prior to adjustment of such amount in accordance with the terms of the Stalking Horse Agreement (the "**Cash Purchase Price**"), and to assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Assets, subject to higher or better offers, the outcome of the Auction (as defined herein), and Court approval; and (ii) the Debtors agreed in the event that the Court approves the purchase of substantially all of the Acquired Assets by any bidder other than the Stalking Horse Bidder, and such transaction is consummated, to pay the Stalking Horse Bidder a break-up fee in the amount of 1.5% of the Cash Purchase Price (the "**Break-Up Fee**").

The SHIP Bidding Procedures Order authorizes and approves the procedures for the assumption and assignment of executory contracts or unexpired non-residential real property leases of the SHIP Business (collectively, the "**Contracts and Leases**," and such procedures, the "**Assumption and Assignment Procedures**") and approving the notice to each non-Debtor counterparty (each a "**Counterparty**") to a relevant Contract or Lease regarding the Debtors' potential assumption and assignment of Contracts and Leases and the Debtors' calculation of the amount necessary to cure any monetary defaults under such Contracts and Leases (the "**Cure Costs**").

**You are receiving this Notice because you may be a Counterparty to a Contract or Lease of the Debtors that is proposed to be assumed and assigned to the Stalking Horse Bidder in connection with the sale of the SHIP Business.**

### Stalking Horse Bidder's Adequate Assurance Information

The Stalking Horse Bidder's information, which is intended to provide the Counterparties to the Contracts and Leases with adequate assurance of future performance and to support the Stalking Horse Bidder's ability to comply with the requirements of adequate assurance of future performance, including the Stalking Horse Bidder's financial wherewithal and willingness to perform under the Contracts and Leases, is annexed hereto as **Exhibit B**. In addition, Exhibit B includes instructions for requesting and obtaining any non-public Adequate Assurance

---

[6] All capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion and the SHIP Bidding Procedures Order.

WEIL:\96778612\7\73219.0004

Information, which shall be provided on a strictly confidential basis, in accordance with the SHIP Bidding Procedures Order.

## Proposed Assumed Contracts and Cure Costs

The Proposed Assumed Contracts in the Stalking Horse Bid and, if known, any other Contracts or Leases that may be designated for assumption and assignment by the Stalking Horse Bidder pursuant to the terms and provisions of the Stalking Horse Agreement (the "**Designation Rights Contracts**"), and the Debtors' calculation of the Cure Costs with respect to the Designation Rights Contracts, are set forth on **Exhibit B** hereto.

The inclusion of any Contract or Lease on Exhibit B does not constitute an admission that a particular Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract or Lease ultimately will be assumed or assigned.  Assumption or assignment of a Contract or Lease is subject to Court approval.  All rights of the Debtors with respect thereto are reserved.

Additional Contracts and Leases may become  Designation Rights Contracts, in accordance with the Stalking Horse Agreement, by the Debtors' filing of supplemental Assumption and Assignment Notices of Schedules of Executory Contracts until eight (8) Business Days prior to the Sale Hearing, and any previously filed Notice of Assumption and Assignment shall be deemed to be updated accordingly.

The Stalking Horse Bidder may elect not to assume any Contract or Lease that is a Designation Rights Contract at any time up to four (4) business days prior to the Sale Hearing. The Debtors will file, on or before a date that is three (3) business days prior to the Sale Hearing, a final Notice of Assumed and Assigned Contracts, listing all Contracts and Leases that will be assumed and assigned to the Stalking Horse Bidder upon the closing of the Sale Transaction.

## Objections

### A.  Cure Objections

Any Counterparty who wishes to object to the Debtors' calculation of the Cure Costs with respect to the Counterparty's Contract or Lease, must file with the Court and serve on the Objection Recipients, in accordance with the Debtors' Case Management Order, a written objection (a "**Cure Objection**") that (i) identifies the applicable Contract or Lease; (ii) states, with specificity, the legal and factual bases thereof, including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; and (iii) includes any appropriate documentation in support thereof, by no later than **December 11, 2018 at 4:00 p.m. (prevailing Eastern Time**).

If a timely Cure Objection cannot otherwise be resolved by the parties prior to the Sale Hearing, the amount to be paid or reserved with respect to such Cure Objection shall be determined by the Court at the Sale Hearing.  The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.

WEIL:\96778612\7\73219.0004

A Cure Objection (and only a Cure Objection) may, at the Debtors' option, after consulting with the Stalking Horse Bidder (or Successful Bidder, as applicable), be adjourned (an "**Adjourned Cure Objection**") to a subsequent hearing.  An Adjourned Cure Objection may be resolved after the closing date of the Sale Transaction in the Debtors' discretion; <u>provided</u> that, the Debtors maintain a cash reserve equal to the cure amount asserted by the objecting Counterparty.

**IF A COUNTERPARTY FAILS TO FILE WITH THE COURT AND SERVE ON THE OBJECTION RECIPIENTS A TIMELY CURE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY SUCH OBJECTION WITH REGARD TO THE COST TO CURE ANY DEFAULTS UNDER THE RELEVANT CONTRACT OR LEASE AND ANY PROOF OF CLAIM ASSERTING A CLAIM FOR SUCH AMOUNT SHALL BE EXPUNGED WITHOUT FURTHER ORDER OF THE COURT. THE CURE COSTS SET FORTH IN THE ASSUMPTION AND ASSIGNMENT NOTICE SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE CONTRACT OR LEASE UNDER BANKRUPTCY CODE SECTION 365(b), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT, AND THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH CONTRACT OR LEASE, THROUGH THE DATE OF ASSUMPTION AND ASSIGNMENT, WHETHER IN A PROOF OF CLAIM OR OTHERWISE, AS AGAINST THE DEBTORS, THE STALKING HORSE BIDDER, OR THEIR PROPERTY.**

### B.    Adequate Assurance Objections

Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is the Stalking Horse Bidder's (a) ability to provide adequate assurance of future performance or (b) the proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "**Adequate Assurance Objection**"), shall file with the Court and serve on the Objection Recipients, including the Stalking Horse Bidder, its Adequate Assurance Objection, which must (i) be in writing; (ii) identify the applicable Contract or Lease; (iii) comply with Debtors' Case Management Order; (iv) state, with specificity, the legal and factual bases for the Adequate Assurance Objection; and (v) include any appropriate documentation in support thereof by no later than: **December 11, 2018, at 4:00 p.m. (prevailing Eastern Time)**.

If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled by the Debtors in their discretion.

**IF A COUNTERPARTY FAILS TO FILE WITH THE COURT AND SERVE ON THE OBJECTION RECIPIENTS, INCLUDING THE STALKING HORSE BIDDER OR THE SUCCESSFUL BIDDER, A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY SUCH OBJECTION WITH REGARD TO THE RELEVANT CONTRACT OR LEASE. THE**

4

**STALKING HORSE BIDDER OR THE SUCCESSFUL BIDDER SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 365(F)(2)(b) AND, IF APPLICABLE, BANKRUPTCY CODE SECTION 365(b)(3), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE OR ANY OTHER DOCUMENT.**

### C. Objection Recipients

Objection Recipients include the following parties:

   i.   The Debtors, c/o Sears Holdings Corporation, 3333 Beverly Road, Hoffman Estates IL 60179 (Attn: Stephen Sitley Esq., and Luke J. Valentino, Esq. (counsel@searshc.com);

   ii.  the Debtors' attorneys, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com); Jacqueline Marcus, Esq. (jacqueline.marcus@weil.com); Gavin Westerman, Esq. (gavin.westerman@weil.com); Garrett A. Fail, Esq. (garrett.fail@weil.com) and Sunny Singh, Esq. (sunny.singh@weil.com)); and

   iii. the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold (brandon.aebersold@lazard.com) and Levi Quaintance (levi.quaintance@lazard.com)).

   iv.  Each of the parties identified as the Master Service List on the *Amended Order Implementing Certain Notice and Case Management Procedures* (ECF No. 405) (the "**Case Management Order**").

   v.   The Stalking Horse Bidder's attorneys, Sidley Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas, Texas 75201 (Attn: Aaron Rigby (arigby@sidley.com)), and 1501 K Street, N.W. #600, Washington, DC 20005 (Attn: David E. Kronenberg (dkronenberg@sidley.com)).

### Sale Hearing

The Sale Hearing shall be held before the Honorable Robert D. Drain on **December 18, 2018 at 10:00 a.m. (prevailing Eastern Time)**, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.

WEIL:\96778612\7\73219.0004

**<u>Additional Information</u>**

Copies of the Case Management Order, the Motion, the Bidding Procedures Order, and the Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC, located at https://restructuring.primeclerk.com/Sears (the "**Prime Clerk Website**").

Dated: _____, 2018

                                  _____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

6

## Exhibit B

**Stalking Horse Agreement**

**EXECUTION VERSION**

———————————————

SHIP ASSET PURCHASE AGREEMENT

by and between

SEARS HOLDINGS CORPORATION

and

SERVICE.COM, INC.

Dated as of November 2, 2018

———————————————

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS ........................................................................1

     Section 1.01      Specific Definitions..............................................1
     Section 1.02      Other Terms ........................................................1
     Section 1.03      Other Definitional Provisions ...........................2

ARTICLE II      PURCHASE AND SALE OF THE BUSINESS ...........................................3

     Section 2.01      Purchase and Sale of the Business ....................3
     Section 2.02      Excluded Assets .................................................4
     Section 2.03      Assumption of Liabilities...................................5
     Section 2.04      Excluded Liabilities ...........................................6
     Section 2.05      Purchase Price; Assumed Liabilities; Deposit ...7
     Section 2.06      Purchase Price Determination ...........................8
     Section 2.07      Closing; Delivery and Payment .......................11
     Section 2.08      Transfer Taxes.................................................12
     Section 2.09      Allocation of Purchase Price............................13
     Section 2.10      Excluded Contracts ..........................................13
     Section 2.11      Nonassignability of Transferred Assets ............13
     Section 2.12      Escrow Accounts..............................................14

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF SELLER .......................15

     Section 3.01      Organization and Authority of Seller and its Subsidiaries...................15
     Section 3.02      No Conflict; Consents and Approvals ..............16
     Section 3.03      Financial Information........................................17
     Section 3.04      Absence of Certain Changes or Events...............17
     Section 3.05      Real Property....................................................17
     Section 3.06      Title and Sufficiency of Transferred Assets ......18
     Section 3.07      Absence of Undisclosed Liabilities...................19
     Section 3.08      Litigation .........................................................19
     Section 3.09      Compliance with Law ......................................19
     Section 3.10      Material Contracts............................................20
     Section 3.11      Labor and Employment Matters .......................22
     Section 3.12      Employee Benefit Plans ...................................23
     Section 3.13      Intellectual Property.........................................25
     Section 3.14      Taxes ...............................................................27
     Section 3.15      Environmental Matters.....................................28
     Section 3.16      Intercompany Arrangements.............................29
     Section 3.17      Insurance .........................................................29
     Section 3.18      Brokers and Finders .........................................29
     Section 3.19      Books and Records...........................................29
     Section 3.20      Contractors and Vendors..................................29

i

Section 3.21          Product Warranty ........................................................................29

ARTICLE IV          REPRESENTATIONS AND WARRANTIES OF BUYER.......................30

Section 4.01          Organization and Authority of Buyer ...................................................30
Section 4.02          No Conflict; Consents and Approvals ..................................................30
Section 4.03          Brokers and Finders ............................................................................30
Section 4.04          Financial Capability ............................................................................31
Section 4.05          Litigation ..............................................................................................31
Section 4.06          Independent Investigation; No Other Representations and
                             Warranties .............................................................................................31

ARTICLE V          BANKRUPTCY COURT MATTERS .......................................................32

Section 5.01          Competing Transaction .......................................................................32
Section 5.02          Bankruptcy Court Filings.....................................................................33
Section 5.03          Assumption of Assigned Contracts......................................................34

ARTICLE VI          CERTAIN COVENANTS OF SELLER AND BUYER.............................35

Section 6.01          Registrations, Filings and Consents ...................................................35
Section 6.02          Conduct of Business.............................................................................37
Section 6.03          Post-Closing Obligations of the Business to Certain Employees ........39
Section 6.04          Access to Information ..........................................................................45
Section 6.05          Consents ..............................................................................................46
Section 6.06          Books and Records ..............................................................................46
Section 6.07          Confidentiality .....................................................................................46
Section 6.08          Intellectual Property Matters...............................................................47
Section 6.09          Further Assurances; Cooperation ........................................................49
Section 6.10          Compliance with WARN .....................................................................49
Section 6.11          Taxes ....................................................................................................50
Section 6.12          Notification of Certain Matters ...........................................................50
Section 6.13          Receivables ..........................................................................................51
Section 6.14          Credit Support for the Business ..........................................................51
Section 6.15          Insurance Matters................................................................................52
Section 6.16          Real Property.......................................................................................53
Section 6.17          Critical Vendors ..................................................................................53
Section 6.18          Continued Occupancy .........................................................................53

ARTICLE VII          CONDITIONS TO THE PURCHASE AND SALE ...................................53

Section 7.01          Conditions of Buyer to the Purchase and Sale ....................................53
Section 7.02          Conditions of Seller to the Purchase and Sale ....................................55

ARTICLE VIII          AMENDMENT AND WAIVER........................................................55

Section 8.01          Amendment and Modification .............................................................55
Section 8.02          Waiver..................................................................................................55

WEIL:\96692952\39\73219.0008

ARTICLE IX        SURVIVAL ..................................................................................................56

    Section 9.01        Survival ........................................................................................56
    Section 9.02        No Waiver for Fraud ....................................................................56

ARTICLE X        MISCELLANEOUS ....................................................................................56

    Section 10.01        Termination ................................................................................56
    Section 10.02        Effect of Termination ................................................................58
    Section 10.03        Expenses ....................................................................................59
    Section 10.04        Assignment ................................................................................59
    Section 10.05        Entire Agreement; Interpretation ..............................................59
    Section 10.06        Schedules ...................................................................................59
    Section 10.07        Counterparts ..............................................................................60
    Section 10.08        Section Headings .......................................................................60
    Section 10.09        Notices .......................................................................................60
    Section 10.10        Governing Law; Submission to Jurisdiction; Waiver of Jury
                    Trial ............................................................................................61
    Section 10.11        Illegality ....................................................................................62
    Section 10.12        Public Announcements ..............................................................62
    Section 10.13        No Third Party Beneficiaries .....................................................63
    Section 10.14        Specific Performance ................................................................63
    Section 10.15        No Recourse ...............................................................................63
    Section 10.16        Bulk Sales ..................................................................................64

**Annexes**

    Annex I        Guarantee

**Exhibits**

    Exhibit A        Definitions
    Exhibit B        Services Agreement
    Exhibit C        Illustrative Calculation of Net Working Capital
    Exhibit D        IP Assignment Agreement
    Exhibit E        Trademark License Agreement
    Exhibit F        Business Financial Statements
    Exhibit G        Bill of Sale and Assignment and Assumption Agreement

WEIL:\96692952\39\73219.0008

## SHIP ASSET PURCHASE AGREEMENT

THIS SHIP ASSET PURCHASE AGREEMENT is made and entered into as of November 2, 2018 (this "Agreement") by and between Sears Holdings Corporation, a Delaware corporation ("Seller"), and Service.com, Inc., a Delaware corporation ("Buyer").

## RECITALS

A.    WHEREAS, on October 15, 2018, Seller and certain of its affiliates commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

B.    WHEREAS, Seller is a debtor-in-possession under the Bankruptcy Code and manages its properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

C.    WHEREAS, Seller owns and operates, through direct and indirect Subsidiaries, the Business;

D.    WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase from Seller, the Transferred Assets, and Buyer desires to assume the Assumed Liabilities, in each case as more specifically provided herein and upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code;

E.    WHEREAS, the transactions contemplated by this Agreement are, as more specifically provided herein, subject to the approval by the Bankruptcy Court of this Agreement and will only be consummated pursuant to the Sale Order entered in the Chapter 11 Cases; and

F.    WHEREAS, in order to induce Seller to enter into this Agreement, concurrently with the execution and delivery of this Agreement, the Guarantor is executing a guarantee in favor of Seller, in the form of Annex I (the "Guarantee"), pursuant to which the Guarantor has agreed, subject to the terms and conditions set forth therein, to guarantee the performance of any obligation or payment of any liability of Buyer hereunder.

In consideration of the mutual covenants and undertakings contained herein, and subject to and on the terms and conditions herein set forth and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01**    Specific Definitions.  As used in this Agreement, the terms identified on Exhibit A shall have the meanings set forth or referred to in Exhibit A.

**Section 1.02**    Other Terms.  Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.

**Section 1.03**    <u>Other Definitional Provisions</u>.

(a)    The words "hereof," "herein," "hereby," "hereto" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    Whenever the words "include," "includes" or "including" (or any variation thereof) are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(c)    References herein to "days," unless indicated otherwise, are to consecutive calendar days.

(d)    References to specific Articles and Sections are to the Articles and Sections of this Agreement, unless specifically stated otherwise.

(e)    The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa, and words denoting any gender shall include all genders.

(f)    All references to "dollars" or "$" shall mean "U.S. dollars" unless specifically stated otherwise.

(g)    All references to "written" or "in writing" shall include in electronic form.

(h)    All references herein to a particular "Schedule" shall mean such schedule as it is included in the Disclosure Schedules attached hereto.

(i)    All references herein to a particular "Exhibit" shall mean such exhibit as it is attached hereto.

(j)    All references herein to a particular "Annex" shall mean such annex as it is attached hereto.

(k)    References herein to documents (other than the Schedules, this Agreement and the Ancillary Agreements) having been "provided," "made available" or "delivered" to Buyer "prior to the date hereof" shall be deemed to be satisfied if such documents shall have been included in the Data Room in folders with access afforded to Buyer and its Representatives at least one (1) Business Day prior to the date of this Agreement.

(l)    References to "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not mean "if," references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or" unless otherwise specified.

(m)    References to "ordinary course of business" or "ordinary course" shall mean "ordinary course of business consistent with past practice through the Closing."

(n)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the

**2**

reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF THE BUSINESS

Section 2.01    Purchase and Sale of the Business.    Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall, and shall cause its Subsidiaries to, sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from Seller and its Subsidiaries, all of their respective right, title and interest in, to and under, in each case free and clear of all Encumbrances to the maximum extent permitted by Section 363(f) of the Bankruptcy Code (other than Permitted Encumbrances), all assets, properties and rights exclusively related to, used exclusively in or held exclusively for use in the Business, which are not an Excluded Asset, including the following (collectively, including clauses (a)-(n) below, the "Transferred Assets"):

(a)    (i) all Intellectual Property owned by Seller or any of its Subsidiaries that is exclusively related to, used exclusively in or held exclusively for use in the Business, including the Intellectual Property identified in Schedule 2.01(a)(i), (ii) all Intellectual Property owned by Seller or any of its Subsidiaries in or to Labeling and Marketing Materials and (iii) all Internet domain names consisting of, containing or incorporating any of the SHIP Marks (the Intellectual Property described in (i), (ii) and (iii), collectively, the "Transferred IP", provided, that in the case of each of (i), (ii) and (iii) excluding any SEARS Marks and SHIP Marks), and the Transferred IP shall also include the rights, (A) to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation, dilution or other violation thereof, (B) to collect future royalties and other payments thereunder, (C) to claim priority thereon under any Law, (D) to prosecute, register, maintain and defend such Intellectual Property before any public or private agency, office or registrar and (E) to fully and entirely stand in the place of Seller or any of its Subsidiaries, as applicable, in all matters related thereto.    For the avoidance of doubt, the Transferred IP excludes the SEARS Marks and SHIP Marks;

(b)    the Assumed Contracts;

(c)    the real property owned by Seller and its Subsidiaries described in Schedule 2.01(c), including, in each case, all of the right, title and interest of Seller and its Subsidiaries to, all buildings, structures or improvements thereon, and all easements and other rights and interests appurtenant thereto (the "Owned Real Property") and any associated rights to off-site parking;

(d)    with respect to the Real Property Leases, all prepaid rent thereunder;

(e)    prepaid expenses, credits, deposits (including the security deposits under the Real Property Leases), refunds, rights of recovery, rights of set-off, rights of recoupment, and other advance payments to the extent related to the Business;

(f)    all rights in connection with causes of action, lawsuits, judgments, claims, warranties, indemnities, demands or similar rights of any nature and any other Actions, in each case, to the extent arising out of the Business, the Transferred Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

WEIL:\96692952\39\73219.0008

(g)    all equipment, fixtures appurtenant to the Leased Real Property (if owned by Seller or its Subsidiaries) and the Owned Real Property, machinery, laboratory equipment, instruments, furniture, tools, test devices, prototypes, models, accessories, materials and all other tangible personal property, including all specifications, materials, drawings, schemes, blueprints and maintenance records related thereto that is exclusively related to, used exclusively in or held exclusively for use in the Business;

(h)    Books and Records;

(i)    Customer Data;

(j)    accounts receivable to the extent related to the Business;

(k)    inventory and products exclusively related to, used exclusively in or held exclusively or use in the Business;

(l)    the Business Permits (including any applications that are in process) exclusively related to, used exclusively in or held exclusively for use in, the Business, to the extent transferable;

(m)    all automobiles, trucks, vehicles and other transportation equipment exclusively related to, used exclusively in or held exclusively for use in, the Business (the "Assumed Vehicles"), and all inventory contained on the Assumed Vehicles; and

(n)    all of Seller's and its Subsidiaries' goodwill, going-concern value and other intangible assets, if any, to the extent related to the Business, including the right to represent to third parties that Buyer or its Subsidiaries is the successor to the Business.

Section 2.02    Excluded Assets.  Notwithstanding any other provision of this Agreement, the following assets shall not be Transferred Assets, nor shall they be delivered at the Closing (collectively, the "Excluded Assets"):

(a)    all (i) cash and cash equivalents on hand, wherever located, including bank balances and bank accounts, monies in the possession of any banks, savings and loans or trust companies and similar cash items (except for such cash or cash equivalents included in the Transferred Assets under Sections 2.01(d) and (e)), (ii) escrow monies and deposits in the possession of landlords and utility companies (unless included in the Transferred Assets under Section 2.01(e) or exclusively related to the Business or the Transferred Assets, including the Real Property Leases), and (iii) investment securities and other short- and medium-term investments;

(b)    all rights in connection with any causes of action, lawsuits, judgments, claims and demands of any nature to the extent arising out of or relating to any of the Excluded Assets or Excluded Liabilities, whether arising by way of counterclaim or otherwise;

(c)    any refunds (or credits in lieu thereof) of any Seller Taxes;

(d)    except as otherwise expressly provided in Section 2.01(e), all funds, guarantees or credit supports, letters of credit or letters of comfort, surety or performance bonds

4

WEIL:\96692952\39\73219.0008

or any other similar instruments and amounts held in escrow or trust, in each case provided, furnished or posted, as applicable, by Seller or any of its Subsidiaries or any third party on behalf thereof (including those posted or deposited with or in favor of any Governmental Authority to support Seller's or any of its Subsidiaries' financial responsibility or bonding requirements under any Permit);

(e)    all Contracts (other than the Real Property Leases and the Business Contracts) to which Seller or any of its Subsidiaries is a party, including those Contracts set forth in Schedule 2.02(e));

(f)    except as otherwise expressly provided in Section 6.03, all the assets of, and all the assets relating to, the Seller Plans;

(g)    all Intellectual Property and goodwill not expressly included in the Transferred Assets, including any rights to the SEARS Marks, and any goodwill relating to or symbolized by the SEARS Marks; and

(h)    all Retained Data.

Notwithstanding anything herein to the contrary, from and after the Closing, Seller and its Subsidiaries shall retain all of their right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, the Excluded Assets.

**Section 2.03**    Assumption of Liabilities.  From and after the Closing, Buyer shall assume and fully pay, discharge, satisfy and perform when due all Liabilities of Seller and its Subsidiaries solely to the extent arising out of or relating to the operation of the Business and the Transferred Assets, in each case, after the Closing (other than Excluded Liabilities), including the following Liabilities (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of Seller and its Subsidiaries arising under or relating to the Assumed Contracts (other than Liabilities included in Section 2.03(c)) solely to the extent arising out of and relating to the period after the Closing and not to the extent arising out of any actual or alleged breach, default or other failure to perform under any such Assumed Contract occurring prior to the Closing;

(b)    subject to Section 2.10, all of the Determined Cure Costs with respect to such Assumed Contracts;

(c)    all accounts payable to the extent related to the Business, in each case to the extent that such accounts payable are included in the calculation of Net Working Capital as a current liability; provided, that, for the avoidance of doubt, such accounts payable shall not include (i) any intercompany or Affiliate loan or payable among Seller and/or its Affiliates or (ii) the amount of any uncleared checks, wires-in-transit or drafts issued by the Seller or its Subsidiaries on or prior to the Closing;

(d)    all Taxes imposed with respect to the Business or the Transferred Assets, other than any Seller Taxes;

(e)      all Liabilities with respect to the Transferred Employees (i) solely to the extent arising as a result of an event, action or omission that occurs following the Closing (other than those Liabilities expressly retained by Seller and its Subsidiaries pursuant to Section 6.03) or (ii) expressly assumed by Buyer pursuant to Section 6.03, provided, however, in the case of this clause (ii) and solely with respect to Liabilities assumed pursuant to Sections 6.03(a)-(e) and 6.03(h)-(q) that relate to the employment of the Transferred Employees by Seller and its Subsidiaries, only to the extent that such Liabilities are included in the calculation of Net Working Capital as a current liability;

(f)      all Liabilities for warranties (other than warranties relating to Intellectual Property) for the goods and services of the Business sold or performed prior to the Closing to the extent that such warranties are of the same types taken into account in the preparation of the Audited Financial Statements;

(g)      all Liabilities arising under the Real Property Leases solely to the extent such Liabilities arise or accrue following the Closing; and

(h)      all Liabilities arising out of or relating to any action, charge, claim (including any cross-claim or counter-claim), suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation with respect to the Business relating to any period after the Closing.

**Section 2.04**    Excluded Liabilities.    Notwithstanding any other provision of this Agreement, Seller and its Subsidiaries shall retain and remain responsible for all Liabilities of Seller or any of its Subsidiaries of any kind or nature whatsoever other than the Assumed Liabilities (collectively, the "Excluded Liabilities").    Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, the Excluded Liabilities shall also include the following:

(a)      all Liabilities arising out of or relating to the ownership or operation of the Business or the Transferred Assets prior to the Closing, other than those Liabilities specifically identified as Assumed Liabilities in any subsection of Section 2.03;

(b)      all Indebtedness of Seller or any of its Subsidiaries;

(c)      all Liabilities to the extent arising out of, or relating to, the Excluded Assets;

(d)      all Liabilities arising under or relating to Contracts other than the Assumed Contracts;

(e)      all Liabilities arising under or relating to the Business Contracts arising prior to the Closing, including all Liabilities whether incurred or arising prior to or after the Closing to the extent related to any actual or alleged breach, default or other failure to perform under any such Business Contract by Seller or its Subsidiaries occurring prior to the Closing;

(f)      all Liabilities (i) under the Seller Plans, (ii) in respect of (A) any compensation earned by, payable to or accrued with respect to any Business Employee prior to the Closing, and (B) any Taxes related thereto, (iii) relating to all current and former employees of

Seller and service providers to Seller and its Subsidiaries (including the Business Employees) other than the Assumed Liabilities set forth in Section 2.03(e), and (iv) those Liabilities relating to the Transferred Employees expressly retained by Seller and its Subsidiaries pursuant to Section 6.03;

(g)    all Liabilities arising under or relating to Environmental Laws or Hazardous Substances with respect to facts or circumstances concerning the ownership or operation of the Business, the Owned Real Property, the Leased Real Property or the other Transferred Assets (including offsite waste disposal), which facts or circumstances first occurred or arose prior to the Closing, including obligations arising prior to the Closing under the Consent Decree in *U.S.* v. *Sears Home Improvement Products, Inc.*, Case No. 1:16-cv-09302 (N.D. Ill.) and the Settlement Agreement in *Commonwealth of Massachusetts v. Sears, Roebuck & Co.*, Case No. 08-3676 (Commonwealth of Mass.) (except to the extent any Liability arises from Buyer's failure to comply after the Closing with any order or decree disclosed on Schedule 3.09 (if any such order or decree is applicable to Buyer);

(h)    the Seller Transaction Expenses;

(i)    all Liabilities arising out of or relating to any action, charge, claim (including any cross-claim or counter-claim), suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation with respect to the Business relating to any period prior to the Closing; and

(j)    all Seller Taxes.

**Section 2.05**    Purchase Price; Assumed Liabilities; Deposit.

(a)    Upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Buyer, Buyer shall (i) pay to Seller (for the benefit of Seller and all of its Subsidiaries that have any right, title or interest in, to or under any Transferred Assets) the Base Purchase Price, as adjusted pursuant to Section 2.06 and as adjusted by any payments expressly described in this Agreement as being treated as "an adjustment to the purchase price" or words of similar import (the "Purchase Price"), and (ii) assume the Assumed Liabilities.

(b)    On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing. Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying or causing to be paid at or prior to the Closing, or providing adequate assurance of prompt payment on or after the Closing, of the Determined Cure Costs.

(c)    Within one (1) Business Day of the execution of this Agreement, Buyer shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into an escrow account (the "Deposit Escrow Account") to be established and maintained by Citibank, N.A. (the "Escrow Agent") pursuant to a mutually agreed escrow agreement (the "Escrow Agreement"), to be entered into as of the date hereof, by and among Seller, Buyer and the Escrow Agent. The Deposit Escrow Amount shall be distributed as follows:

WEIL:\96692952\39\73219.0008

(i)       if the Closing shall occur, (A) a joint written instruction from Buyer and Seller shall be delivered to the Escrow Agent in accordance with the Escrow Agreement directing that the Deposit Escrow Amount be disbursed to Seller, and (B) the Deposit Escrow Amount shall be applied towards the Purchase Price payable by Buyer to Seller under Section 2.05(a) and the Deposit Escrow Amount shall be delivered to Seller at the Closing;

(ii)      if this Agreement is terminated by Seller pursuant to Section 10.01(d), (A) a joint written instruction from Buyer and Seller shall be delivered to the Escrow Agent in accordance with the Escrow Agreement directing that the Deposit Escrow Amount be disbursed to Seller, and (B) the Deposit Escrow Amount shall be delivered to Seller within two (2) Business Days following delivery of such joint written instruction; or

(iii)     if this Agreement is terminated for any reason other than by Seller pursuant to Section 10.01(d), (A) a written instruction from Buyer (which, for the avoidance of doubt, shall only be required to be executed by Buyer) shall be delivered to the Escrow Agent, with a copy to Seller in accordance with the Escrow Agreement, directing that the Deposit Escrow Amount be disbursed to Buyer and (B) the Deposit Escrow Amount shall, in each case, be returned to Buyer within two (2) Business Days following delivery of such written instruction from Buyer.

**Section 2.06**    Purchase Price Determination.

(a)       On or prior to the fifth (5th) Business Day prior to the Closing Date, Seller shall deliver to Buyer a statement (the "Estimated Closing Statement") setting forth its good faith estimate of Net Working Capital, which statement shall be in the form of Exhibit C and shall be certified by Seller as having been prepared in good faith using GAAP (to the extent applicable), the definition of "Net Working Capital" in this Agreement (including the defined terms used in such definition) and the methodologies described in Schedule 2.06(a) and this Section 2.06, along with reasonable supporting detail.  The Net Working Capital as taken from the Estimated Closing Statement (as it may be modified prior to the Closing pursuant to Section 2.06(b)) is referred to herein as the "Estimated Net Working Capital Value".

(b)       If Buyer disagrees with any portion of the Estimated Closing Statement, at Buyer's request, Seller and Buyer shall seek in good faith during the period prior to the Closing to resolve in writing such disagreements.  If Seller and Buyer reach a resolution with respect to all such matters before the Closing, then the Estimated Closing Statement, as modified by such resolution, shall be used by the Parties for purposes of determining the amount payable by Buyer at the Closing as the Closing Date Payment pursuant to Section 2.07.  If the Parties do not reach a resolution with respect to all such matters before the Closing, the Estimated Closing Statement as originally delivered by Seller (as modified to reflect any such matters that were resolved by the Parties) shall be used by the Parties for purposes of determining the amount payable by Buyer at the Closing as the Closing Date Payment pursuant to Section 2.07.  In no event shall any disagreement raised or not raised by Buyer prior to the Closing, or any resolution agreed to by Seller and Buyer with respect thereto prior to the Closing, be deemed to limit Seller's or Buyer's rights pursuant to this Section 2.06.

WEIL:\96692952\39\73219.0008

(c)     As soon as practicable after the Closing Date, but no later than sixty (60) days following the Closing, Buyer shall prepare and deliver, or cause to be prepared and delivered, to Seller a draft statement (the "Draft Closing Statement") setting forth Buyer's good faith determination of the actual Net Working Capital, along with reasonable supporting detail. The Draft Closing Statement will be in the same form as the Estimated Closing Statement and shall be certified by Buyer as having been prepared in good faith using GAAP (to the extent applicable) and the definition of "Net Working Capital" in this Agreement (including the defined terms used in such definition) and the methodologies described in Schedule 2.06(a), and this Section 2.06. The Net Working Capital as taken from the Draft Closing Statement is referred to herein as the "Draft Net Working Capital Value".

(d)     Until the Final Closing Statement becomes binding and conclusive on the Parties in accordance with Section 2.06(e), (i) Seller shall make available to Buyer, or its Affiliates and Representatives, Seller's and its Subsidiaries' books and records and the relevant personnel of Seller and its Subsidiaries and the work papers of any third-party, in each case related to or involved in the preparation of the Estimated Closing Statement or the calculation of the Estimated Net Working Capital Value, and (ii) solely following the Closing, Buyer shall make available to Seller the Books and Records and the personnel of Buyer, including the relevant Transferred Employees, in each case related to or involved in the preparation of the Draft Closing Statement or the calculation of Draft Net Working Capital Value.

(e)     If Seller notifies Buyer that Seller agrees with the Draft Closing Statement within forty-five (45) days of receipt thereof or fails to deliver a Protest Notice to Buyer of its disagreement therewith within such forty-five (45) day period, the Draft Closing Statement shall be the "Final Closing Statement," which will be binding and conclusive on the Parties. If Seller disagrees with the amounts of or any part of the calculation of the Net Working Capital as set forth on the Draft Closing Statement, Seller shall give Buyer notice of all such objections (the "Protest Notice") to the Draft Closing Statement (which notice shall include a reasonably detailed statement of the basis of Seller's objections) within forty-five (45) days following the delivery of the Draft Closing Statement to Seller. If Seller timely gives the Protest Notice, then the Parties shall negotiate in good faith to reach an agreement on the Net Working Capital. If the Parties are able to resolve their differences within forty-five (45) days after the end of the forty-five (45) day protest period described above, the Parties will jointly revise the Draft Closing Statement to reflect their agreement, and such revised statement shall be the "Final Closing Statement," which will be binding and conclusive on the Parties. If the Parties are unable to resolve differences that they have in respect to any matter specified in such Protest Notice within such forty-five (45) day period, either Party may submit such disagreement to the CPA Firm for review and resolution, and the CPA Firm shall act as an expert and not an arbiter. Each Party agrees to execute, if requested by the CPA Firm, a customary engagement letter. If unresolved items specified in the Protest Notice are submitted to the CPA Firm for resolution, (i) each Party will furnish to the CPA Firm such work papers and other documents and information relating to such unresolved items as the CPA Firm may request and are available to such Party (or its independent public accountants), and will be afforded the opportunity to present to and discuss with the CPA Firm any information relating to such unresolved items, (ii) neither Buyer nor Seller shall have the ability to introduce new issues or amounts of dispute subsequent to Seller issuing the Protest Notice, (iii) the CPA Firm will consider and make a determination only on the specific, unresolved items included in the Protest Notice and no other items contained in the Draft Closing Statement, (iv) the

9

determination by the CPA Firm of the value of the disputed items shall be a final and binding resolution, and non-appealable by the Parties, (v) the CPA Firm may not assign value to any item greater than the greatest item claimed by any Party or less than the smallest value for such item claimed by any Party, (vi) the fees and expenses of the CPA Firm shall be borne by each Party in inverse proportion to their respective success in prevailing on the items in the Protest Notice resolved by the CPA Firm, which proportionate allocations shall also be determined by the CPA Firm at the time the determination of the CPA Firm is rendered on the merits of the outstanding disputed items and (vii) the Parties will otherwise be responsible for paying their own expenses incurred in connection with this <u>Section 2.06</u>.  Following the CPA Firm's determination of the disputed items, the CPA Firm shall be instructed to restate the Draft Closing Statement to reflect the items that the Parties were in agreement on and the CPA Firm's resolution of the disputed items, and such restated statement shall be the "<u>Final Closing Statement</u>," which will be binding and conclusive on the Parties.  The Net Working Capital as taken from the Final Closing Statement is referred to herein as the "<u>Final Net Working Capital Value</u>."

(f)     No later than five (5) Business Days following the date on which the Final Closing Statement becomes binding and conclusive on the Parties in accordance with <u>Section 2.06(e)</u>:

(i)     if the Adjustment Payment Amount is a positive number, then (A) in the event that the Adjustment Payment Amount is less than or equal to the Adjustment Escrow Amount, the Adjustment Escrow Amount shall be released promptly to Seller from the Adjustment Escrow Account following delivery of a joint written instruction from Buyer and Seller to the Escrow Agent in accordance with the Escrow Agreement directing that the Adjustment Escrow Amount be disbursed to Seller and (B) in the event that the Adjustment Payment Amount exceeds the Adjustment Escrow Amount (such excess amount, the "<u>Seller Adjustment Payment Excess Amount</u>"), Buyer or its designee will pay to Seller or its designee an amount equal to the Seller Adjustment Payment Excess Amount, in immediately available funds in U.S. Dollars by wire transfer to such bank account as Seller shall specify in writing; or

(ii)     if the Adjustment Payment Amount is a negative number, then (A) in the event that the absolute value of the Adjustment Payment Amount is less than the Adjustment Escrow Amount, (1) the absolute value of the Adjustment Payment Amount shall be released promptly to Buyer from the Adjustment Escrow Account and (2) the amount by which the Adjustment Escrow Amount exceeds the absolute value of the Adjustment Payment Amount (such excess amount, the "<u>Seller Adjustment Payment Remainder Amount</u>") shall be released promptly to Seller from the Adjustment Escrow Account, in each case, following delivery of a joint written instruction from Buyer and Seller to the Escrow Agent in accordance with the Escrow Agreement directing that the Adjustment Payment Amount be disbursed to Buyer and the Seller Adjustment Payment Remainder Amount be disbursed to Seller, (B) in the event that the absolute value of the Adjustment Payment Amount is equal to the Adjustment Escrow Amount, the Adjustment Escrow Amount shall be released promptly to Buyer from the Adjustment Escrow Account following delivery of a joint written instruction from Buyer and Seller to the Escrow Agent in accordance with the Escrow Agreement directing that the Adjustment Escrow Amount be disbursed to Buyer, and (C) in the event that the absolute value of the Adjustment

Payment Amount exceeds the Adjustment Escrow Amount (such excess amount, the "Buyer Adjustment Payment Excess Amount"), (1) the Adjustment Escrow Amount shall be released promptly to Buyer from the Adjustment Escrow Account following delivery of a joint written instruction from Buyer and Seller to the Escrow Agent in accordance with the Escrow Agreement directing that the Adjustment Escrow Amount be disbursed to Buyer and (2) Seller or its designee will pay to Buyer or its designee an amount equal to the Buyer Adjustment Payment Excess Amount, in immediately available funds in U.S. Dollars by wire transfer to such bank account as Buyer shall specify in writing.

Section 2.07    Closing; Delivery and Payment.

(a)    Closing Date.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 at 10:00 a.m., New York time, on no later than the third (3rd) Business Day after the last of the conditions to the Closing set forth in ARTICLE VII are satisfied or waived (other than those conditions that by their terms require the delivery of a document or taking of any other action at the Closing but subject to the satisfaction of such conditions), or on such other date or at such other time as may be mutually agreed upon in writing by the Parties; provided, that neither Party shall be required to effect the Closing unless all the conditions to such Party's obligation to effect the Closing in ARTICLE VII are satisfied or waived at the Closing.    The day on which the Closing takes place shall be the "Closing Date."

(b)    Delivery and Payment.    At the Closing:

(i)    Buyer shall pay the Closing Date Payment (less the Deposit Escrow Amount, which shall be released to Seller by the Escrow Agent) to Seller in accordance with Seller's written instructions in immediately available funds in the amounts and to the bank accounts directed in writing by Seller to Buyer, which account designations shall be made by Seller not less than five (5) Business Days prior to the Closing Date;

(ii)    Seller shall deposit (or cause to be deposited) an amount equal to the Adjustment Escrow Amount into an escrow account (the "Adjustment Escrow Account") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement, which Adjustment Escrow Amount shall be a source of funds to make the applicable payments to Buyer as provided in Section 2.06(f)(ii) and Section 2.12.

(iii)    Seller shall, and shall cause its Subsidiaries to, deliver to Buyer all instruments of transfer, assignment, conveyance (including all applicable Ancillary Agreements) duly executed by Seller or the applicable Subsidiaries and other instruments sufficient to convey, transfer and assign to Buyer or its designee the Transferred Assets together with possession of such Transferred Assets, including special or limited warranty deeds in the case of the Owned Real Property (the "Deeds") and, in the case of each Real Property Lease, an Assignment and Assumption of Lease;

(iv)    Seller shall deliver to Buyer the Customer Data, electronic or tangible embodiments of the Transferred IP (including all Software object code and source code), and all materials and documentation (in electronic and editable form, to the extent

11

existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Transferred IP, or for the operation of the Business as currently conducted, to the extent not delivered at the Closing under Section 2.01;

(v)      Seller shall deliver to Buyer a counterpart of each of the other applicable Ancillary Agreements, duly executed by Seller or its Subsidiaries, as the case may be;

(vi)      Seller shall deliver to Buyer a certified copy of the resolutions of the Restructuring Committee authorizing and approving this Agreement, the Ancillary Agreement and all transactions contemplated hereby and thereby;

(vii)      Seller shall deliver to Buyer a good standing certificate for Seller from the Secretary of State of the State of Delaware, dated no earlier than five (5) Business Days prior to the Closing Date;

(viii)      Buyer shall deliver to Seller a counterpart of each of the other applicable Ancillary Agreements, duly executed by Buyer or its Affiliates, as the case may be;

(ix)      Buyer shall deliver to Seller the Bill of Sale and Assignment and Assumption Agreement and any other instruments of assumption duly executed by Buyer or its Affiliates sufficient to assume, discharge or perform when due, all of the Assumed Liabilities, all in form and substance reasonably satisfactory to Seller; and

(x)      Seller and Buyer shall deliver, each to the other Party, such documents as are required pursuant to ARTICLE VII.

**Section 2.08**   _Transfer Taxes_.   All sales taxes, transfer taxes, stamp taxes, conveyance taxes, value-added taxes, mortgage taxes, intangible taxes, documentary recording taxes, license and registration fees, and recording fees imposed by any Governmental Authority, if any, imposed upon the transfer of the Transferred Assets hereunder (the "Transfer Taxes") shall be borne equally by Buyer and Seller, and any Tax Returns that must be filed in connection with such Transfer Taxes shall be prepared and filed when due by the Party primarily or customarily responsible under the applicable Law for filing such Tax Returns.   A Party filing a Tax Return pursuant to the preceding sentence will use its commercially reasonable efforts to provide such Tax Return to the other Party at least ten (10) days prior to the due date for such Tax Return, and such other Party shall promptly pay to the filing Party an amount equal to its share of any liability for Transfer Taxes (as described in the preceding sentence) shown as due on such Tax Return at least one (1) Business Day prior to such due date.   The Parties shall reasonably cooperate with each other in any mutually agreeable, reasonable and lawful arrangement designed to minimize any applicable Transfer Taxes.   In accordance with the foregoing, (i) as soon as reasonably practicable following the date of this Agreement, Seller shall provide Buyer with a list of all taxing jurisdictions where (A) transfers of merchandise pursuant to this Agreement are or may be subject to Transfer Taxes and (B) such Transfer Taxes may be reduced or eliminated by Buyer's delivery of resale exemption certificates and (ii) Buyer shall deliver resale exemption certificates for all such taxing jurisdictions at, or as soon as is reasonably practicable following, the Closing.

WEIL:\96692952\39\73219.0008

**Section 2.09**    Allocation of Purchase Price.    As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to Seller a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Transferred Assets for Tax purposes) (the "Allocation Schedule").    The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code.    The Allocation Schedule shall be deemed final unless Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.    In the event of any such objection, Buyer and Seller shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and Seller are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.    The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and Seller.    Each of Buyer and Seller agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to Section 2.06 shall be allocated in a manner consistent with the Allocation Schedule.

**Section 2.10**    Excluded Contracts.    Pursuant to Section 5.03(b), Buyer shall be entitled, in its sole discretion, by written notice to Seller up to three (3) Business Days prior to the date of the Sale Hearing, to elect not to purchase or assume one or more Business Contract or Real Property Lease, in which case, notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, such Business Contract or Real Property Lease shall be considered an excluded contract ("Excluded Contract") (and shall constitute Excluded Assets and not included in the Transferred Assets) for all purposes of this Agreement and Buyer shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract.    Each assignable Business Contract or Real Property Lease that Buyer does not elect to remove from the list of Business Contracts and Real Property Leases pursuant to Section 5.03(b) shall be an Assumed Contract.

**Section 2.11**    Nonassignability of Transferred Assets.    Notwithstanding anything to the contrary contained in this Agreement, to the extent that the sale, assignment, lease, sublease, transfer, conveyance or delivery or attempted sale, lease, sublease, assignment, transfer, conveyance or delivery to Buyer of any asset that would be a Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information), or would require Consents of a Governmental Authority or other Third Party (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), and such Consents shall not have been obtained prior to the Closing, the Closing shall proceed (subject to the satisfaction or waiver of all conditions in ARTICLE VII) and Buyer shall pay the full Closing Date Payment at the Closing without the sale, assignment, lease, sublease, transfer, conveyance or delivery of such asset (and the failure to obtain such Consent itself and the failure to sell, lease, sublease, assign, transfer, convey or deliver such assets shall not constitute a breach of this Agreement by Seller), and this Agreement shall not constitute a sale, assignment, lease, sublease, transfer, conveyance or delivery of such asset or an attempt thereof.    In the event that the Closing proceeds without the sale, transfer, lease, sublease, assignment, conveyance or delivery of any such asset, then following the Closing, the Parties shall continue to use their respective reasonable best efforts and cooperate with each other to obtain

WEIL:\96692952\39\73219.0008

promptly such Consents, including by entering into additional agreements to the extent required to render the transfer to Buyer of personally identifiable information included in the Transferred Assets permissible under any applicable Law; provided, however, in each case that neither of the Parties nor any of their respective Affiliates shall be required to (A) relinquish or forbear any rights, (B) pay any consideration to any Third Party for the purpose of obtaining any such Consents, or (C) pay any costs or expenses of any other Person resulting from the process of obtaining any such Consents. Pending such Consents, effective as of the Closing or as promptly as practicable thereafter, Seller shall hold such asset in trust for the use and benefit of Buyer, and Seller shall and shall cause its applicable Subsidiary to take such other actions as may be reasonably requested by Buyer to provide to Buyer the benefits of use of such asset and the benefits, including any indemnities, that Buyer would have obtained had the asset been sold, assigned, leased, subleased, transferred, conveyed or delivered to Buyer at the Closing. In the event that Buyer is provided the benefits pursuant to this Section 2.11 of any Contract, Buyer shall perform, as agent or subcontractor for Seller and for the benefit of the other Persons that are parties thereto, the obligations of Seller thereunder and promptly pay, discharge and satisfy any related Liabilities under such Contract, in each case to the extent that such Liabilities would constitute Assumed Liabilities but for the lack of the Consents required to assign such Contract to Buyer. Once Consent for the sale, assignment, lease, sublease, transfer, conveyance or delivery of any such asset not sold, assigned, leased, subleased, transferred, conveyed or delivered at the Closing is obtained, Seller shall assign, lease, sublease, transfer, convey or deliver such asset to Buyer at no additional cost to Buyer. To the extent that any such asset cannot be transferred or the full benefits of use of any such asset cannot be provided to Buyer following the Closing pursuant to this Section 2.11, then Buyer and Seller shall enter into such commercially reasonable arrangements as the Parties may agree (including leasing, subleasing, licensing, sublicensing or subcontracting) to provide to such parties the economic and operational equivalent, to the extent permitted, of obtaining such Consent and the performance by Buyer of the obligations thereunder. Seller shall pay to Buyer promptly upon receipt thereof, all income, proceeds and other monies received by Seller or any of its Subsidiaries in connection with their use of any asset in connection with the arrangements under this Section 2.11. Nothing in this Section 2.11 shall be deemed to (i) cause any asset not sold, assigned, leased, subleased, transferred, conveyed or delivered at the Closing with respect to which the required Consent has not been obtained to constitute an Excluded Asset, (ii) modify in any way the obligations of the Parties pursuant to Section 2.08, Section 6.01, Section 6.07 or Section 6.09, or (iii) conflict with or override the provisions of any Ancillary Agreement.

**Section 2.12**   Escrow Accounts. The Adjustment Escrow Amount shall be used to satisfy all or a portion of the payment obligations of Seller pursuant to Section 2.06(f)(ii). At the Closing, the Deposit Escrow Amount shall be used to satisfy the payment obligations of Buyer pursuant to Section 2.07(b)(i), otherwise the Deposit Escrow Amount shall be released to Buyer or Seller pursuant to Section 2.05(c). Upon the final release of all of the Adjustment Escrow Amount pursuant to the terms of the Escrow Agreement, the Escrow Agreement shall terminate. Any fees owed to the Escrow Agent and obligations under the Escrow Agreement shall be borne equally by Buyer and Seller. The Deposit Escrow Amount shall be held in trust for the benefit of Seller and shall not be subject to any encumbrance, attachment, trustee process or any other judicial process of any creditor of any party hereto, and shall be held and disbursed solely for the purposes and in accordance with the terms of this Agreement and the Escrow Agreement. The Adjustment Escrow Amount shall be held in trust for the benefit of Buyer and shall not be subject to any encumbrance,

WEIL:\96692952\39\73219.0008

attachment, trustee process or any other judicial process of any creditor of any party hereto, and shall be held and disbursed solely for the purposes and in accordance with the terms of this Agreement and the Escrow Agreement.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in, or qualified by any matter set forth in, the correspondingly numbered Schedule to any Section in this ARTICLE III (it being agreed that any matter disclosed in any Schedule corresponding to a Section of this ARTICLE III shall be deemed to have also been disclosed in each other Schedule corresponding to a Section of this ARTICLE III to which the applicability of such disclosure is reasonably apparent on its face), Seller hereby represents and warrants to Buyer as follows:

**Section 3.01**    Organization and Authority of Seller and its Subsidiaries.

(a)    Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and has, subject to the necessary authority of the Bankruptcy Court, the requisite power (corporate or otherwise) and authority required to own, lease and use its property and to operate and carry on its business as now being conducted, including the Business and the Transferred Assets.  Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction, if any, in which the nature of the Business as now being conducted by it or the property owned, leased or used by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not be material to the Business.  Subject to Bankruptcy Court approval, Seller has full power (corporate or otherwise) and authority to enter into this Agreement and the Ancillary Agreements to which it is or will be a party, and to perform its obligations and consummate the transactions contemplated hereunder and thereunder.    This Agreement, and the consummation of the transactions contemplated hereby, has been duly authorized by the Restructuring Committee, has been executed and delivered by Seller and (assuming due authorization, execution and delivery by Buyer) constitutes a legal, valid and binding agreement of Seller, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.  No other action or proceeding on the part of Seller, the Board of Directors of Seller, the Restructuring Committee, any of Seller's Subsidiaries, or its or their stockholders is necessary to authorize this Agreement or any Ancillary Agreement to which it or any of its Subsidiaries is a party or to consummate the transactions contemplated hereby and thereby.  Upon execution and delivery by Seller and/or its Subsidiaries, as applicable, each Ancillary Agreement (and the consummation of the transactions contemplated thereby) will have been duly authorized, executed and delivered by Seller and/or its Subsidiaries, as applicable, and (assuming due authorization, execution and delivery by Buyer), subject to the approval of the Bankruptcy Court, will constitute a legal, valid and binding agreement of Seller and/or its Subsidiaries, as applicable, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

15

(b)     Each of Seller's Subsidiaries through which Seller operates the Business is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization, and has, subject to the necessary authority of the Bankruptcy Court, the requisite power (corporate or otherwise) and authority required to own, lease and use its property and to operate and carry on its business as now being conducted, including the Business and the Transferred Assets.  Each of Seller's Subsidiaries through which Seller operates the Business is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction, if any, in which the nature of the Business as now being conducted by it or the property owned, lease or used by it makes such qualification necessary.   Subject to Bankruptcy Court approval, each of Seller's Subsidiaries through which Seller operates the Business has full power (corporate or otherwise) and authority to enter into the Ancillary Agreements to which it will be a party, and to perform its obligations and consummate the transactions contemplated thereunder. Each of Seller's Subsidiaries through which Seller operates the Business is, directly or indirectly, wholly-owned by Seller.

**Section 3.02**   No Conflict; Consents and Approvals.   The execution, delivery and performance by Seller of this Agreement does not, and the execution, delivery and performance by each of Seller and the applicable Subsidiaries through which Seller operates the Business of the Ancillary Agreements will not, and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and the compliance by Seller and such Subsidiaries with the terms hereof and thereof does not and will not:

(a)     violate any provision of the certificate of incorporation or by-laws or other similar organizational documents of Seller or any Subsidiary of Seller that has any right, title or interest in, to or under any Transferred Assets;

(b)     subject to the entry of the Sale Order, violate any Law or any Order to which Seller, the Business, any Transferred Asset or any Assumed Liability is subject, except where such violation would not reasonably be expected to be, individually or in the aggregate, material to the Business;

(c)     require any Consent of, notice to or filing with any Governmental Authority (other than (i) expiration or termination of any applicable waiting periods under the HSR Act, (ii) those that, if not obtained, made or given, would not reasonably be expected to be, individually or in the aggregate, material to the Business and (iii) as required by the Bankruptcy Code or the Sale Order); or

(d)     except as set forth on Schedule 3.02(d), subject to the entry of the Sale Order, result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to any other Person any rights of termination, amendment, acceleration or cancellation of, trigger the grant or loss of any rights or payment terms of, require any Consent of any Person, or result in the creation of any Encumbrance (except for Permitted Encumbrances) on, any of the Material Contracts or any Real Property Lease or any other material Transferred Asset, except in each such case, for any violations, breaches, defaults or other matters that would not be reasonably expected to be, individually or in the aggregate, material to the Business.

**Section 3.03**    <u>Financial Information</u>.

(a)    <u>Exhibit F</u> hereto sets forth a correct and complete copy of (i) the audited financial statements of, respectively, income, cash flows and divisional equity of the Business in each case for the fiscal years ended January 30, 2016, January 28, 2017 and February 3, 2018 and the audited balance sheets of the Business as of January 30, 2016, January 28, 2017 and February 3, 2018 (the "<u>Audited Financial Statements</u>") and (ii) the unaudited financial statements of, respectively, income and cash flows of the Business, in each case, for the months from and including February 2018 to September 2018 and the unaudited balance sheets of the Business as of the end of each month from and including February 2018 to September 2018 (the "<u>Unaudited Financial Statements</u>" and, collectively with the Audited Financial Statements, and any notes thereto, the "<u>Business Financial Statements</u>").

(b)    The Business Financial Statements were derived from the books and records of Seller and its Subsidiaries and fairly present in all material respects, in conformity with GAAP applied on a consistent basis (except as may be indicated in the notes thereto), the financial position and the results of operations of the Business, as of the dates thereof or for the periods then ended and, in the case of the Unaudited Financial Statements, subject to normal and recurring year-end adjustments; <u>provided</u>, that the Business Financial Statements are qualified in their entirety by the fact that the Business has not operated as a separate standalone entity and has received certain allocated charges and credits which do not necessarily reflect amounts which would have resulted from arm's length transactions or which the Business would incur on a standalone basis.

**Section 3.04**    <u>Absence of Certain Changes or Events</u>.    Except as set forth in <u>Schedule 3.04</u>, since May 5, 2018 through the date hereof, (a) there has been no Material Adverse Effect, and to the Knowledge of Seller, no events, facts or circumstances exist, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect, and (b) Seller and its Subsidiaries have conducted the Business in all material respects in the ordinary course of business and have not taken any action that, if taken after the date of this Agreement, would require the written consent of Buyer pursuant to <u>Section 6.02(b)</u>.

**Section 3.05**    <u>Real Property</u>.

(a)    Seller or one of its Subsidiaries has good and marketable fee simple title to each parcel included among the Owned Real Property, free and clear of Encumbrances (other than Permitted Encumbrances) and subject to the entry of the Sale Order, Buyer will be vested to the fullest extent permissible under Section 363(f) of the Bankruptcy Code with good and valid title to the Owned Real Property. To Seller's Knowledge, there are no existing, pending or threatened condemnation proceedings or similar actions relating to any of the Owned Real Property. <u>Schedule 3.05(a)</u> sets forth a correct and complete list of all Owned Real Property which any Person other than Seller or its Subsidiaries has any present or future right (whether by lease, sublease, license, purchase option, right of first refusal, right of first offer or otherwise) to acquire, use or occupy and the nature of such right.    Seller acknowledges and agrees that the Owned Real Property is the only owned real property of Seller or its Subsidiaries that is transferring to Buyer.

(b)    <u>Schedule 3.05(b)</u> sets forth a complete list of each parcel of Real Property that is occupied exclusively in, or held exclusively for use in the Business and is leased, subleased,

17

licensed or occupied by Seller or one of its Subsidiaries (the "Leased Real Property"). Schedule 3.05(b) sets forth a correct and complete list of all material leases, licenses, subleases and other occupancy agreements, together with any material amendments or modifications thereto and guarantees thereof and any material documents or instruments affecting in any material respect the rights or obligations thereunder of any of the parties thereto, including SNDAs and estoppels (the "Real Property Leases"), pursuant to which Seller or any of its Subsidiaries has the right to use or occupy any land, buildings, structures, improvements or other interest in the Leased Real Property, correct and complete copies of which have been made available to Buyer prior to the date hereof.  Each Real Property Lease is in full force and effect and, subject to the approval of the Bankruptcy Court, constitutes a legal, valid, binding and enforceable obligation of Seller and its Subsidiaries and, to the Knowledge of Seller, but without inquiry, of the other parties thereto, except where such failures to be valid, binding, enforceable or in full force and effect would not be reasonably expected to be, individually or in the aggregate, material to the Business, and subject to the effect of any applicable Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in an Action at equity or at law).  Seller has not received, since January 29, 2017, written notice of any actual or alleged violation or failure to comply with a Real Property Lease, which has not been cured or confirmed to not be a default.  Except as set forth in Schedule 3.05(b), (i) subject to the entry of the Sale Order, Seller will at the Closing transfer to Buyer or its designees, the interest of Seller and each of its Subsidiaries in the leasehold, license or similar interest in the Leased Real Property which leasehold interest (as distinguished from the underlying real property) shall be free and clear of all Encumbrances, except for Permitted Encumbrances; (ii) neither Seller nor any of its Subsidiaries that is the tenant, licensee or similar party under the Real Property Lease has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof which has not been terminated or expired by its terms; and (iii) to Seller's Knowledge, there are no existing, pending or threatened condemnation proceedings or similar actions relating to any material part of the Leased Real Property.

(c)    All buildings, structures, facilities and improvements, including buildings, structures, facilities and improvements which are under construction (collectively, "Improvements"), with respect to Owned Real Property, comply in all material respects with valid and current certificates of occupancy or similar permits to the extent required by Laws for the use thereof, and conform in all material respects with all applicable Laws. The Improvements are (A) in good operating condition and repair (ordinary wear and tear excepted) and (B) suitable and adequate for continued use in the manner in which they are presently being used, in each case of clauses (A) and (B), except as would not be reasonably expected to be, individually or in the aggregate, material to the Business.

**Section 3.06**    Title and Sufficiency of Transferred Assets.  Seller or one of its wholly-owned Subsidiaries (directly or indirectly) owns or leases and has the legal right to use all of the Transferred Assets (excluding the Intellectual Property, which is the subject of Section 3.13, and the Real Property, which is the subject of Section 3.05) and subject to the entry of the Sale Order, Buyer will be vested to the fullest extent permissible under Section 363(f) of the Bankruptcy Code with good and valid title to the Transferred Assets (excluding the Intellectual Property, which is the subject of Section 3.13, and the Real Property, which is the subject of Section 3.05) free and

WEIL:\96692952\39\73219.0008

clear of all Encumbrances, except for Permitted Encumbrances. Except for the Excluded Assets listed in <u>Sections 2.02(a)</u>–<u>(h)</u>, the Transferred Assets, together with the rights and services granted to Buyer pursuant to this Agreement and the Ancillary Agreements, will constitute on the Closing Date all of the assets, rights, properties and services used or held for use by Seller and its Subsidiaries that are necessary to operate the Business in all material respects as is presently conducted.

**Section 3.07**    <u>Absence of Undisclosed Liabilities</u>.    There exist no Liabilities that constitute Assumed Liabilities except (a) as disclosed, reflected or reserved against in the Business Financial Statements for the fiscal quarter ended May 5, 2018, (b) for liabilities and obligations incurred in the ordinary course of business since May 5, 2018, (c) for liabilities that will be discharged, settled, eliminated, paid off or released in full prior to or at the Closing, (d) as set forth on <u>Schedule 3.07</u> or (e) for other liabilities and obligations not otherwise described in <u>(a)</u>, <u>(b)</u> or <u>(c)</u> of this <u>Section 3.07</u> that would not be, individually or in the aggregate, material to the Business.

**Section 3.08**    <u>Litigation</u>.    <u>Schedule 3.08</u> sets forth a list as of the date hereof of each pending or, to Seller's Knowledge, threatened Action or Order, at Law, in equity or otherwise, in, before, or by, any court or Governmental Authority brought by or against Seller or any of its Subsidiaries (or any of their respective assets) that is related to the Business or the Transferred Assets. There are no Orders nor any Action pending or, to Seller's Knowledge, threatened against Seller or any of its Subsidiaries or to which Seller or any of its Subsidiaries are otherwise a party, relating to this Agreement or any other Ancillary Agreement or the transactions contemplated hereby or thereby that are not stayed under Section 362 of the Bankruptcy Code or that would prevent, or materially impair or delay the ability of, Seller or any of its Subsidiaries to perform their respective obligations under this Agreement or any Ancillary Agreement, or affect the Transferred Assets in any material respect after the entry of the Sale Order.

**Section 3.09**    <u>Compliance with Law</u>.

(a)    Since January 29, 2017, other than as set forth in <u>Schedule 3.09(a)</u>, (i) Seller and its Subsidiaries, with respect to the Business, the Transferred Assets, the Assumed Liabilities and the Business Employees, have conducted and are conducting the Business in material compliance with all Laws and have not been in violation of any Law or Order, except where the failure to be in compliance would not be reasonably expected to be, individually or in the aggregate, material to the Business, and (ii) no written notice, action or assertion with respect to the Business, the Transferred Assets, the Assumed Liabilities and the Business Employees has been received by Seller or its Subsidiaries, or have been filed, commenced or, to the Knowledge of Seller, threatened against Seller or its Subsidiaries alleging any violation of Law or Order, except where such alleged violation would not be reasonably expected to be, individually or in the aggregate, material to the Business.

(b)    <u>Schedule 3.09(b)</u> sets forth a correct and complete list as of the date hereof of all Permits required to conduct the Business as currently conducted, except for such Permits that are immaterial to the Business (such Permits listed on <u>Schedule 3.09(b)</u>, the "<u>Business Permits</u>"). Such Business Permits have been obtained, except where the failure to obtain such Permits would not reasonably be expected to be, individually or in the aggregate, material to the

WEIL:\96692952\39\73219.0008

Business.  Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, Seller and its Subsidiaries are and since January 29, 2017 have been, in compliance with the Business Permits and no Action is pending or, to Seller's Knowledge, threatened to revoke, suspend, cancel or adversely modify any Business Permit.

(c)    Except as would not be, either individually or in the aggregate, material to the Business, Seller and its Subsidiaries (i) are, and since January 29, 2017, have been, in compliance with all applicable United States and other Laws (including sanctions) relating to import and export controls (including but not limited to any regulations administered by U.S. Customs and Border Protection, the Export Administration Regulations administered by the Department of Commerce, economic sanctions regulations administered by the Department of Treasury and anti-boycott regulations administered by the Internal Revenue Service and the Department of Commerce) and (ii) since January 29, 2017, have not made or provided any false statement or omission to any Governmental Authority or to any customer in connection with importation or exportation of equipment, inventory, technical data or services, including valuation, classification, duty treatment, eligibility for favorable duty rates or other special treatment, country-of-origin declaration or marking, export licensing, or any other matter arising directly out of Laws applicable to import and export controls, economic sanctions or anti-boycott regulations.

(d)    Except as would not be, either individually or in the aggregate, material to the Business, neither Seller nor any of its Subsidiaries have, since January 29, 2017, made, offered or agreed to offer anything of value, directly or indirectly, to any employees, representatives or any customers of a Person (including Seller and its Subsidiaries), as applicable, or to any foreign or domestic governmental official, political party or candidate for government office or any of its employees or representatives in any manner which would result in Seller being in violation of any applicable Law, including the Foreign Corrupt Practices Act of 1977, as amended ("FCPA").  Except as would not be, either individually or in the aggregate, material to the Business, neither Seller nor any of its Subsidiaries are currently the subject of, nor since January 29, 2017 have they been the subject of, an investigation, inquiry, audit, or compliance assessment, or been the recipient of a subpoena, letter of investigation or other document alleging a violation, or possible violation, of the FCPA or other applicable anti-bribery legislation or regulations.  Seller has developed and implemented an anti-corruption compliance program that includes corporate policies and procedures designed to ensure compliance with the FCPA and any other applicable anti-corruption Laws.

Section 3.10    Material Contracts.

(a)    Schedule 3.10 sets forth a correct and complete list of the Contracts exclusively related to the Business, Transferred Assets or Assumed Liabilities (other than any Seller Plans not included in clause (iii) of this Section 3.10 and any Real Property Leases) between Seller or any of its Subsidiaries, on the one hand, and any third party (including Seller and any of its Subsidiaries), on the other hand, that provide for or include any of the following, in each case, which are in effect as of the date hereof (such Contracts, together with all amendments, supplements and modifications thereto and, without limiting the obligations set forth in Section 6.02, together with any Contract which, had it been entered into prior to the date hereof, would have been required to be listed in Schedule 3.10, the "Material Contracts"):

(i)        any provision expressly (A) prohibiting or restricting Seller or any of its Subsidiaries from conducting the Business as now conducted; (B) limiting or purporting to limit Seller or any of its Subsidiaries from engaging in any line of business or competing with any Person in any geographic area or during any period of time; (C) limiting or purporting to limit Seller or any of its Subsidiaries from using any Transferred IP; (D) providing for any exclusivity restriction on the Business, the Transferred Assets or the Assumed Liabilities; or (E) providing "most favored nations," best pricing or similar provisions;

(ii)        any obligation of, or any entitlement of any counterparty to, Seller and its Subsidiaries, to purchase, sell or obtain a minimum or specified amount (other than where such minimum amount is less than $100,000) per annum of any products and services;

(iii)        any right of first refusal, right of first offer or similar right with respect to any material assets of the Business, the Transferred Assets or the Assumed Liabilities;

(iv)        any loan, advance or extension of credit to any Person (other than extensions of credit to customers or suppliers in the ordinary course of business) related to the Business, the Transferred Assets or the Assumed Liabilities;

(v)        any grant of an Encumbrance (other than a Permitted Encumbrance) upon the Business, the Transferred Assets or the Assumed Liabilities;

(vi)        annual payments or consideration furnished by or to Seller or its Subsidiaries in respect of the Business (or that is expected to be furnished by or to the Business) in excess of $500,000 in fiscal year 2018;

(vii)        any guarantee, indemnity, surety or performance bond, letter of credit or letter of comfort, bank guarantee, keepwell agreement or other similar commitment, understanding or obligation in an amount in excess of $250,000 relating to the Business, any Transferred Assets or any Assumed Liabilities or any other Financial Assurance;

(viii)        any disposition or acquisition of assets, properties, rights or equity related to the Business or involving the Transferred Assets or Assumed Liabilities with a fair market value in excess of $100,000 (other than dispositions or acquisitions of inventory in the ordinary course of business), or any merger, consolidation or similar business combination transaction related to the Business, Transferred Assets or the Assumed Liabilities;

(ix)        any obligation of Seller or its Subsidiaries to make non-discretionary capital expenditures related to the Business in excess of $100,000, in any 12-month period following the date hereof;

WEIL:\96692952\39\73219.0008

(x)     any joint venture, strategic alliance, partnership or similar arrangement involving a sharing of profits or expenses of payments based on material revenues or profits of the Business;

(xi)    any Contract between Seller or any of its Subsidiaries or other Affiliates, on the one hand, and any Subsidiary or other Affiliate of Seller, on the other hand;

(xii)   any Contract under which Seller has agreed to indemnify any Person or that relates to a settlement of any Action under which Seller or its Subsidiaries has any continuing Liability related to the Business, the Transferred Assets or the Assumed Liabilities;

(xiii)  any Contract with any Governmental Authority related to the Business;

(xiv)   any IP Contract; or

(xv)    any commitment to enter into any Contract of the types described above in this Section 3.10.

(b)     Each Material Contract is in full force and effect and constitutes a legal, valid, binding and enforceable obligation of Seller and its Subsidiaries and, to the Knowledge of Seller, of the other parties thereto, except where such failures to be valid, binding, enforceable and in full force and effect would not be, individually or in the aggregate, material to the Business, and subject to the effect of any applicable Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in an Action at equity or at law).  Except solely as a direct result of the filing of the Chapter 11 Cases, Seller is not in material breach or default of any Material Contract, nor has Seller received, since January 29, 2017, written notice of any actual or alleged violation or failure to comply with a Material Contract, and, to the Knowledge of Seller, no other party to any Material Contract is in material breach or default or has repudiated any term thereof.  Since May 5, 2018, Seller has not received any written notice of termination, cancellation or non-renewal with respect to any Material Contract, and to the Knowledge of Seller, no other party to a Material Contract intends to terminate, cancel or not renew any Material Contract.  Correct and complete copies of all Material Contracts and all amendments thereto have been made available to Buyer prior to the date hereof.

**Section 3.11**   Labor and Employment Matters.

(a)     Since January 29, 2017, neither Seller nor any of its Subsidiaries (i) is or has been a party to, is or has been bound by, is or has been negotiating, any labor agreement or collective bargaining agreement respecting the Business Employees, and (ii) is or has been a party to, and they are not affected by or, to Seller's Knowledge, threatened with, any dispute or controversy with a labor union or with respect to unionization or collective bargaining involving any of their current or former employees, including any actual or threatened labor strikes,

22

walkouts, slow downs, work stoppages, interruptions of work, picketing, or any other union organizing effort.

(b)    Since January 29, 2017, the Seller and its Subsidiaries have been in material compliance with WARN, and neither the Seller nor any of its Subsidiaries has taken any action that has required notification of any of the current or former employees of the Seller or any of its Subsidiaries pursuant to WARN.

(c)    Since January 29, 2017, Seller and its Subsidiaries have been in material compliance with any Law regarding (i) the terms and conditions of employment of any Business Employee or (ii) any other employment-related matters (including discrimination, fair labor standards, wage payment, employment record keeping, equal opportunity, work authorization, harassment, leaves, reasonable accommodations, occupational health and safety, wrongful discharge, classification, or violation of personal rights) with respect to any Business Employee.

(d)    As of the date hereof, there are no pending Actions with respect to any of the Business Employees, or to Seller's Knowledge, any threatened Actions with respect to any of the Business Employees threatened in writing against Seller or any of its Subsidiaries, in each case that is or would reasonably be expected to be material to the Business.

(e)    Since January 29, 2017, Seller or any of its Subsidiaries have classified or treated all independent contractors or other non-employees in material compliance with all applicable Laws, and the Seller and its Subsidiaries have fully and accurately reported the compensation of these independent contractors and non-employees on IRS Forms 1099 or as otherwise required by any Law.

**Section 3.12**    Employee Benefit Plans.

(a)    Schedule 3.12 sets forth a correct and complete list of all material compensation and benefit plans, contracts or arrangements maintained for the benefit of Business Employees, to which Seller (or any of its Subsidiaries) and any Business Employee is a party or in which Business Employees participate, including "employee benefit plans" within the meaning of Section 3(3) of ERISA and "nonqualified deferred compensation" plans within the meaning of Section 409A of the Code, but excluding the Foreign Plans (the "Benefit Plans"). Correct and complete copies of any Benefit Plans or summaries of such Benefit Plans, including all material amendments thereto, and a copy of the most recent IRS determination letter have been provided or made available to Buyer prior to the date hereof. None of the Business Employees participate in any equity incentive plan maintained by Seller or any of its Affiliates.

(b)    Except as set forth in Schedule 3.12(b):

(i)    None of the Benefit Plans are subject to any Encumbrance arising under ERISA or Section 430(k) of the Code, and neither Seller nor any of its Subsidiaries have been required to post any security under ERISA or Section 436(f) of the Code with respect to any Benefit Plan.

(ii)    Neither Seller nor any other Person that is, or was at any time during the six (6) preceding calendar years, together with Seller, treated as a "single employer"

WEIL:\96692952\39\73219.0008

under Sections 414(b), 414(c) or 414(m) of the Code of Seller has incurred any material unsatisfied Liability that is due and owing (other than Pension Benefit Guaranty Corporation (the "PBGC") premiums) to the PBGC, the IRS or any other individual or entity under Title IV of ERISA, Sections 412 or 4980B of the Code or Part 6 of Title I of ERISA that would reasonably be expected to result in any Liability to Buyer or any of its Subsidiaries following the consummation of the transactions contemplated by this Agreement.

(c)    Each of the Benefit Plans that is intended to be qualified under Section 401(a) of the Code has received a favorable determination, advisory, or prototype opinion letter from the Internal Revenue Service and, to Seller's Knowledge, there are no facts or circumstances that would be reasonably likely to adversely affect the qualified status of any such Benefit Plan.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, each Benefit Plan and Foreign Plan has been maintained, funded and administered in compliance with its terms and all applicable Laws and no non-exempt prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code has occurred.

(d)    The consummation of the transactions contemplated by this Agreement will not (either alone or in combination with another event) (i) result in any payment (including severance) to a Business Employee becoming due or payable, (ii) accelerate the time of funding, payment or vesting or increase the amount or value of compensation or benefits due or required to be provided to any Business Employee under any Seller Plan, (iii) result in any new material obligation pursuant to any Seller Plan or (iv) result in any amount failing to be deductible by reason of Section 280G of the Code.

(e)    Except as set forth in Schedule 3.12(e), no Benefit Plan provides for or promises, or has ever provided for or promised, post-retirement or post-termination medical, disability or life insurance benefits to any Business Employee or any dependent or beneficiary thereof, except as required under Section 4980B of the Code, Part 6 of Subtitle B of Title I of ERISA or any other similar applicable Law.

(f)    All material compensation and benefit plans, contracts or arrangements presently covering Business Employees, which would be described in Section 3.12(a), but for the fact that such plans are maintained outside the jurisdiction of the United States (but excluding plans maintained by a Governmental Authority), are listed in Schedule Section 3.12(f) (the "Foreign Plans"), and a correct and complete copy of each Foreign Plan or summaries of such Foreign Plans (other than those required by applicable Law) has been provided or made available to Buyer.  Except as would not, either individually or in the aggregate, have a Material Adverse Effect, each of the Foreign Plans has obtained from the Governmental Authority having jurisdiction with respect to such plan any required determinations that such plans are in compliance with Law.

(g)    Except as set forth in Section 3.12(g), there are no pending audits or investigations by any Governmental Authority involving the Benefit Plans or Foreign Plans, no claims pending or, to Seller's Knowledge, threatened (except for claims for benefits payable in the normal operation of the Benefit Plans or the Foreign Plans), suits or proceedings against any Benefit Plan or Foreign Plan or asserting any rights or claims to benefits under any Benefit Plan

**24**

or Foreign Plan, other than benefits payable in the ordinary course of the operations of the Benefit Plans or the Foreign Plans, except for such investigations or claims which would not be reasonably expected to result in a Material Adverse Effect.

**Section 3.13**    Intellectual Property.

(a)    Set forth in Schedule 3.13(a) is a correct and complete list of all issued patents, registered Trademarks, material unregistered Trademarks, registered copyrights and Internet domain names and, as applicable, all applications for each of the foregoing, which are owned by Seller or any of its Subsidiaries and exclusively related to, used exclusively in or held exclusively for use in the Business, including: (1) the registered owner of the item; (2) the jurisdiction in which the item is issued or registered or which any application for issuance or registration has been filed; (3) the respective issuance, registration or application number of such item; (4) the date of application and issuance or registration of the item; and (5) with respect to Internet domain names, the relevant domain name registrar and paid-until date. With respect to each of the SHIP Marks and each material item of Transferred IP, including each item identified in Schedule 3.13(a):

(i)    Seller or one of its Subsidiaries exclusively owns all right, title, and interest in and to the item, free and clear of any Encumbrance, except Permitted Encumbrances, and subject to the entry of the Sale Order, Buyer will be vested to the fullest extent permissible under Section 363(f) of the Bankruptcy Code with good and valid title to the item;

(ii)    the item is not subject to any outstanding material Order; and

(iii)    each such item that is a registered Trademark and, to Seller's Knowledge, each other applied-for Trademark, is valid, subsisting and enforceable and duly registered or issued, if applicable, in the name of Seller or one of its Subsidiaries, as applicable.

(b)    Schedule 3.13(b) sets forth a correct and complete list of all Contracts with respect to which annual payments or consideration furnished by or to Seller or its Subsidiaries with respect to the Business is in excess of $500,000 in fiscal year 2018 (including licenses, sublicenses, consents and other agreements (including covenants not to sue)), by which Seller or any of its Subsidiaries (i) is granted any rights to use any material Intellectual Property used in the Business (other than (A) off-the-shelf, uncustomized computer programs available on commercial terms and (B) non-exclusive licenses granted by suppliers and other service providers of Seller and its Subsidiaries, in each case, to the extent necessary for use of the products and services of such Person and entered into in the ordinary course of business), or (ii) has granted any rights in any Transferred IP to any Person (other than non-exclusive licenses entered into in the ordinary course of business) ((i) and (ii) collectively, the "IP Contracts").

(c)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, to Seller's Knowledge, (i) neither the operation of the Business, nor any of the products or services of the Business, are infringing, misappropriating, diluting or violating any Intellectual Property of any other Person or have, since January 29, 2017

25

infringed upon, misappropriated, diluted or otherwise violated any Intellectual Property of any other Person, (ii) since January 29, 2017, neither Seller nor any of its Subsidiaries has received any written charge, complaint, claim, demand, or notice (including in the form of "cease and desist" letters, indemnification claims or "invitation to license" offers) alleging any such infringement, misappropriation, dilution or violation, nor is there any Action pending or threatened relating to the same, and (iii) no Person has initiated in writing or threatened in writing any Action challenging the validity, enforceability or ownership of any Transferred IP or any of the SHIP Marks.  To Seller's Knowledge, no Person has infringed upon, misappropriated, diluted or otherwise violated any of the Transferred IP or SHIP Marks.

(d)     Except for the SEARS Marks and the rights granted to Buyer pursuant to this Agreement and the Ancillary Agreements, the Transferred IP is all of the material Intellectual Property necessary and sufficient to conduct the Business immediately after the Closing in the same manner in all material respects as the Business is conducted as of the Closing Date.

(e)     To the extent any current or former officers, directors, employees, contractors and consultants of Seller or any of its Subsidiaries have made contributions for or on behalf of the Business to the creation or development of any Transferred IP, Seller or one of its Subsidiaries owns the entire right, title and interest in such contributions.  No such Person owns or has any right to any Transferred IP, nor to Seller's Knowledge has any such Person made any assertions with respect to any alleged ownership or rights in any Transferred IP.

(f)     Since January 29, 2017, there has been no material failure or other material substandard performance of any servers, computer hardware, networks, Software, databases, telecommunications systems, interfaces, and related systems (collectively, "IT Systems") of Seller or its Subsidiaries, which has caused any material disruption to the Business.  Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the IT Systems of Seller and its Subsidiaries are adequate for the operation of the Business immediately after the Closing in the same manner in all material respects as the Business is conducted as of the Closing Date. Since January 29, 2017, to Seller's Knowledge, there has been no material unauthorized intrusions or breaches of the security of the IT Systems (including any ransomware attack), nor has there been any material loss or breach of, or unauthorized access to, any data, in each case with respect to IT Systems or data of Seller or its Subsidiaries that relate to the Business.

(g)     Seller has taken commercially reasonable steps to protect and preserve the secrecy and confidentiality of (i) all information and materials that derive independent economic value from not being generally known to the public and that are material to the Business and (ii) all Know-How of Third Parties which was provided to Seller or its Subsidiaries in connection with the Business under confidentiality obligations.  Neither Seller nor any of its Subsidiaries has deposited or agreed to deposit any source code of Software, the rights to which are included in the Transferred Assets, into a source code escrow or disclosed or agreed to disclose or delivered or agreed to deliver such source code to any Person, other than disclosures to Persons who are subject to confidentiality obligations which restrict their use and disclosure of such source code to other Persons not bound by confidentiality restrictions.

(h)     Since January 29, 2017, Seller and its Subsidiaries have posted a privacy policy, or a link thereto, in a clear and conspicuous location on all user-facing pages on the

Business' websites governing Seller's and its Subsidiaries' use of personally identifiable information and customer and user data used by the Business. Seller and its Subsidiaries have materially complied with all such privacy policies. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, since January 29, 2017 (i) Seller and its Subsidiaries have, with respect to the Business, complied with all applicable Laws and contractual obligations relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information, and (ii) to Seller's Knowledge, there have been no losses or thefts of the personally identifiable information held by or on behalf of Seller, its Subsidiaries or the Business. Since January 29, 2017, Seller and its Subsidiaries have not received any unresolved written notice or written claim from any Person, including any Governmental Authority, concerning the violation of any Laws relating to the collection, transfer, storage, disposal, use, processing or disclosure of personally identifiable information, and, to the Knowledge of Seller, no investigation by any Governmental Authority regarding a violation of such Laws is pending or threatened, in each case solely as related to the Business.

(i)      Except for the representations and warranties made in the Ancillary Agreements attached as Exhibits to this Agreement, Section 3.10 and this Section 3.13 contain the sole and exclusive representations and warranties made regarding Intellectual Property and Customer Data.

**Section 3.14**   Taxes.

(a)      Seller and its Subsidiaries have filed or caused to be filed in a timely manner (within any applicable extension periods) all Tax Returns required to be filed with respect to the Transferred Assets and the Business and have paid or caused to be paid all Taxes with respect thereto (whether or not shown to be due on such Tax Returns). Such Tax Returns are accurate and complete in all material respects, insofar as they relate to the Business or the Transferred Assets. There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the Transferred Assets.

(b)      There is no pending or threatened audit, examination, dispute or claim concerning any Liability for Taxes with respect to the Transferred Assets or the Business.

(c)      No Governmental Authority has notified Seller or any of its Subsidiaries, in writing, that it believes a particular Tax Return should be filed, or a particular Tax paid, with respect to the Business or the Transferred Assets in a jurisdiction where Seller or its applicable Subsidiary does not currently file such a Tax Return or pay such Tax, as the case may be.

(d)      There are no outstanding written requests, agreements, consents or waivers of the statutory period of limitations applicable to the assessment of any Taxes or deficiencies relating to the Transferred Assets or the Business.

(e)      All monies required to be withheld by Seller or its Subsidiaries (including from employees of the Business for income Taxes and social security and other payroll Taxes) with respect to the Transferred Assets or the Business have been collected or withheld and, to the extent required by Law, paid to the relevant Governmental Authorities.

27

(f)     None of the Transferred Assets is properly treated as owned by persons other than Seller or its Subsidiaries for U.S. federal income tax purposes.

**Section 3.15**    Environmental Matters.  Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, and solely with respect to Environmental Laws which are applicable to the conduct of the Business:

(a)     Seller and its Subsidiaries have obtained and are (and since January 29, 2017 have been) in compliance with all Business Permits issued pursuant to Environmental Laws ("Environmental Permits") required to entitle Seller and its Subsidiaries to operate, carry on and conduct the Business as now conducted, and true and complete copies of all such Environmental Permits and all modifications thereto have been made available to Buyer before the date hereof and are set forth on Schedule 3.15, and no Action is pending or, to the Knowledge of Seller, threatened to revoke, suspend, cancel or adversely modify any such Environmental Permits;

(b)     neither Seller nor any of its Subsidiaries has received any written notice from any Person of any unresolved violation of any Environmental Law or Environmental Permit related to the Business, the Transferred Assets or the Assumed Liabilities, or of any unresolved obligation to undertake or bear any liabilities arising under any Environmental Law or Environmental Permit with respect to the conduct of the Business or the Transferred Assets or Assumed Liabilities;

(c)     there are no information requests made pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act or its analogs or Actions pending or, to Seller's Knowledge, threatened against Seller or any of its Subsidiaries related to the Business, the Transferred Assets or the Assumed Liabilities alleging a violation of Environmental Laws nor any liabilities under any Environmental Law related to the Business, the Transferred Assets and the Assumed Liabilities which are outstanding or which have not been remediated;

(d)     Seller and its Subsidiaries are (and since January 29, 2017 have at all times been) in compliance with all Environmental Laws and all Orders issued under Environmental Laws, in each case applicable to the Business;

(e)     Seller and its Subsidiaries are (and since January 29, 2017 have at all times been) in compliance with the Consent Decree in *U.S.* v. *Sears Home Improvement Products, Inc.*, Case No. 1:16-cv-09302 (N.D. Ill.);

(f)     Seller and its Subsidiaries are (and since January 29, 2017 have been) in compliance in all material respects with the Settlement Agreement in Commonwealth of *Massachusetts v. Sears, Roebuck & Co.*, Case No. 08-3676 (Commonwealth of Mass.);

(g)     Seller has made available to Buyer all material environmental reports, including Phase I environmental site assessments or compliance assessments, prepared by or for the Seller in the past three (3) years, relating to the Owned Real Property or the Real Property Leases.

WEIL:\96692952\39\73219.0008

**Section 3.16**    <u>Intercompany Arrangements</u>.    Neither Seller nor any of its Subsidiaries (a) owns any asset, or has any right, title or interest in any asset that is material to the operation of the Business and is not a Transferred Asset or will not be made available to Buyer or its designee following the Closing pursuant to an Ancillary Agreement or (b) provides any service that is material to the operation of the Business that will not continue to be provided to Buyer or its designee following the Closing pursuant to an Ancillary Agreement.

**Section 3.17**    <u>Insurance</u>.    Schedule 3.17 sets forth a correct and complete list of each insurance policy covering the Transferred Assets, Assumed Liabilities or maintained by, or for the benefit of the Business (including any insurance policies of Seller or its Subsidiaries maintained for the benefit of the Business pursuant to which Buyer will not continue to be insured after the Closing).    There is no claim pending under any such insurance policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies other than customary reservation of rights.    Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, Seller and its Subsidiaries maintain insurance coverage with respect to the Business in such amounts and covering such material risks as are consistent with customary industry practice.    Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, Seller and its Subsidiaries have paid all premiums due and have otherwise performed all of its obligations under each applicable insurance policy with respect to the operations or assets of the Business.

**Section 3.18**    <u>Brokers and Finders</u>.    Except for the retention of the Financial Advisor, the fees and expenses of which will be paid by Seller in accordance with <u>Section 10.03</u>, neither Seller nor any of its Subsidiaries has employed, and neither Seller nor any of its Subsidiaries is obligated or has agreed to pay, any investment banker, broker or finder or incurred any liability for any investment banking fees, brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement and the Ancillary Agreements.

**Section 3.19**    <u>Books and Records</u>.    The Books and Records accurately record all transactions relating to the Business, and have been maintained consistent with good business practice.

**Section 3.20**    <u>Contractors and Vendors</u>.    Schedule 3.20 sets forth a complete and correct list of the top ten (10) (a) contractors of the Business based on annual sales and the approximate total sales in dollars by the Business to each such contractor during the period from February 4, 2018 through October 6, 2018 and (ii) vendors to the Business during the period from February 4, 2018 through October 6, 2018, showing the approximate total of purchases in dollars by the Business from each such supplier during such fiscal year.    Since May 5, 2018, there has been no material change to the business relationship of Seller with, and Seller has not received any written communication of any intention to terminate or materially reduce transactions with the Business from, any contractor or vendor named on <u>Schedule 3.20</u>.

**Section 3.21**    <u>Product Warranty</u>.    Since January 29, 2017, neither Seller nor its Subsidiaries have (a) sold any product or service in connection with the Business that was, at the time of such sale, not in compliance in all material respects with all applicable Laws or not in conformity in all material respects with all specifications and warranties made or deemed made with respect to such product or service or (b) experienced warranty claims, in any 12-

29

month period, with respect to any products sold by Seller or its Subsidiaries in connection with the Business that were materially in excess of the amounts reserved for such warranty claims in the Business Financial Statements.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

**Section 4.01** <u>Organization and Authority of Buyer</u>. Buyer has been duly incorporated or formed, is validly existing and is in good standing under the Laws of its jurisdiction of incorporation or formation, with the requisite power (corporate or otherwise) and authority required to own or lease its property and to carry on its business as now being conducted. Buyer has the full power (corporate or otherwise) and authority to enter into this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. This Agreement, and the consummation of the transaction contemplated hereby, has been duly authorized, executed and delivered by Buyer and (assuming due authorization, execution and delivery by Seller) constitutes a legal, valid and binding obligation of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles. No other action or proceeding on the part of Buyer or its stockholders is necessary to authorize this Agreement or any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby and thereby. Upon execution and delivery by Buyer, each Ancillary Agreement will have been duly authorized, executed and delivered by Buyer and (assuming due authorization, execution and delivery by Seller) will constitute a legal, valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

**Section 4.02** <u>No Conflict; Consents and Approvals</u>. The execution, delivery and performance by Buyer of this Agreement does not, and the execution, delivery and performance by Buyer of the Ancillary Agreements will not, and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and the compliance by Buyer with the terms hereof and thereof does not and will not:

(a)    violate any provision of the certificate of incorporation or by-laws or other similar organizational document of Buyer;

(b)    violate any Law or Order to which Buyer is subject; or

(c)    require any Consent of, notice to or filing with any Governmental Authority (other than (i) expiration or termination of any applicable waiting periods under the HSR Act and (ii) those that, if not obtained, made or given, would not reasonably be expected to be, individually or in the aggregate, material to Buyer).

**Section 4.03** <u>Brokers and Finders</u>. Except for the retention of such Persons, the fees and expenses of which will be paid by Buyer pursuant to <u>Section 10.03</u>, neither Buyer nor any of its Affiliates have employed any investment banker, broker or finder or incurred any liability for any

WEIL:\96692952\39\73219.0008

investment banking fees, brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement and the Ancillary Agreements.

Section 4.04    Financial Capability.

(a)    Buyer will have at the Closing the resources and capabilities (financial and otherwise) available to it (i) to perform its obligations under this Agreement and the Ancillary Agreements (including all payments to be made by it in connection herewith) and (ii) to undertake its other obligations at Closing upon the terms contemplated by this Agreement.  Buyer has not incurred any obligation, commitment, restriction or other Liability of any kind, and is not contemplating or aware of any obligation, commitment, restriction or other Liability of any kind, in either case which would impair or adversely affect such resources, funds or capabilities.

(b)    In no event shall the receipt or availability of any funds or financing by Buyer or any Affiliate or any other financing or other transactions be a condition to any of Buyer's obligations hereunder.

(c)    Immediately after giving effect to the consummation of the transactions contemplated hereby:  (A) the fair saleable value (determined on a going concern basis) of the assets of Buyer will be greater than the total amount of their Liabilities; (B) Buyer will be solvent and able to pay its respective debts and obligations in the ordinary course of business as they become due; (C) no transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer in connection with the transactions contemplated; (D) Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured; and (E) Buyer will have adequate capital to carry on this business and all businesses in which it is about to engage.

Section 4.05    Litigation.    There are no Orders or any Action pending or, to Buyer's Knowledge, threatened before any Governmental Authority, against Buyer or any of its Subsidiaries or to which Buyer or any of its Subsidiaries are otherwise a party, which would materially restrict or limit the ability of Buyer to perform its obligations under this Agreement or the Ancillary Agreements or which seeks to prevent the consummation of the transactions contemplated herein or therein.

Section 4.06    Independent Investigation; No Other Representations and Warranties.

(a)    Buyer has conducted its own independent investigation, review and analysis of, and reached its own independent conclusions regarding, the Business and its operations, assets, condition (financial or otherwise) and prospects, and is sufficiently experienced to make an informed judgment with respect thereto.  Buyer acknowledges that it and its Representatives have been provided adequate access to the personnel, properties, premises, records and other documents and information of and relating to the Business for such purpose.  In entering into this Agreement, Buyer acknowledges that it has relied solely upon its own investigation, review and analysis and has not relied on and is not relying on any representation, warranty or other statement (whether written or oral) made by, on behalf of or relating to Seller, its Subsidiaries or the Business except

31

for the representations and warranties expressly set forth in this Agreement, including ARTICLE III, and any Ancillary Agreement.

(b)    Buyer acknowledges and agrees that (i) other than the representations and warranties expressly set forth in this Agreement, including ARTICLE III, and any Ancillary Agreement, none of Seller, any of its Subsidiaries or any other Person has made or makes any other representation or warranty, written or oral, express or implied, at law or in equity, with respect to the Business, the Transferred Assets or the Assumed Liabilities, including any representation or warranty as to (A) value, merchantability or fitness for a particular use or purpose or for ordinary purposes (it being understood and acknowledged by Buyer that, without limiting the representations and warranties expressly set forth in this Agreement, including ARTICLE III, and any Ancillary Agreement, the Business, the Transferred Assets and the Assumed Liabilities are being transferred on an "as is", "where is" basis), (B) the operation or probable success or profitability of the Business following the Closing or (C) the accuracy or completeness of any information regarding the Business made available or otherwise provided to Buyer and its Representatives in connection with this Agreement or their investigation of the Business (including any estimates, forecasts, budgets, projections or other financial information with respect to the Business, any management presentation materials delivered to Buyer, as subsequently updated, supplemented or amended, and any information, documents or material made available to Buyer in the due diligence materials (formal or informal) provided to Buyer, including in the Data Room or in any other form in connection with the transactions contemplated by this Agreement and the Ancillary Agreements), and (ii) Buyer hereby waives any right or remedy (and Seller will have no liability whatsoever) arising out of, and Buyer expressly disclaims any reliance upon, any representation, warranty or other statement (whether written or oral) made by, on behalf of or relating to Seller, any of its Subsidiaries or the Business, including in any information regarding the Business made available or otherwise provided to Buyer and its Representatives in connection with this Agreement or their investigation of the Business (including any estimates, forecasts, budgets, projections or other financial information with respect to the Business, any management presentation materials delivered to Buyer, as subsequently updated, supplemented or amended, and any information, documents or material made available to Buyer in the due diligence materials (formal or informal) provided to Buyer, including in the Data Room or in any other form in connection with the transactions contemplated by this Agreement and the Ancillary Agreements), or any errors therein or omissions therefrom, in each case, other than the representations and warranties expressly set forth in this Agreement, including ARTICLE III, or any Ancillary Agreement or in case of fraud.  Notwithstanding anything to the contrary in this Agreement, Buyer further acknowledges and agrees that none of Seller nor any other Person acting on behalf of Seller has made or makes any representation or warranty, express or implied, in respect of the Excluded Assets or the Excluded Liabilities.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

**Section 5.01**    Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids solely in respect of all or any part of the Transferred Assets (or any other assets primarily used in the operation of the Business) and not in combination of any other assets of Seller or its Affiliates in accordance with the terms of the Sale Procedures Order (each, a "Competing Bid").  Subject to

WEIL:\96692952\39\73219.0008

Section 5.02(a), from the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Seller is permitted to and to cause its Representatives and Subsidiaries to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Transferred Assets.  In addition, Seller shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets, including, subject to Section 5.02(a), in connection with any subsequent sale of other assets of Seller or its Subsidiaries or otherwise, and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Order or other applicable Law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.

**Section 5.02**   Bankruptcy Court Filings.

(a)      Subject to its right to pursue a Competing Bid in accordance with the Sales Procedure Order, Seller shall diligently (i) pursue the entry by the Bankruptcy Court of the Sale Procedures Order by November 30, 2018 and the Sale Order by December 21, 2018, and (ii) take such actions reasonably necessary for the Sale Order to become final and non-appealable on or before January 4, 2019.

(b)      The Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Buyer free from all successor or transferee liability to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(c)      Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order.  Seller further covenants and agrees that, after entry by the Bankruptcy Court of the Sale Order, and provided, that the Sale Order becomes final and non-appealable, the terms of any other proposed order submitted by Seller to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Procedures Order and Sale Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Procedures Order shall be appealed, each of Seller and Buyer shall use its respective commercially reasonable efforts to defend such appeal.

(d)      Seller and Buyer agree that, in the event that Buyer is not the winning bidder at the auction undertaken pursuant to the Sale Procedures Order (the "Auction"), if and only if (i) Buyer submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Seller gives written notice (the "Back-up Notice") to Buyer on or before the Back-up Termination Date, stating that Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer and Seller shall promptly consummate the transactions

WEIL:\96692952\39\73219.0008

contemplated hereby upon the terms and conditions as set forth herein, including the payment of Purchase Price, as the same may be increased by Buyer at the Auction.

**Section 5.03** <u>Assumption of Assigned Contracts</u>.

(a)    On or before the date that is five (5) Business Days following the date on which the Sales Procedures Order is entered by the Bankruptcy Court, Seller shall file a notice of assumption (the "<u>Assumption Notice</u>") with the Bankruptcy Court and serve such notice on each counterparty to a Business Contract or Real Property Lease listed thereon.  The Assumption Notice shall identify all Business Contracts and Real Property Leases that Seller believes may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Business Contract or Real Property Lease (and if no cure cost is estimated to be applicable with respect to any particular Business Contract or Real Property Lease, the amount of such Cure Cost designated for such Business Contract or Real Property Lease shall be "$0.00").  In accordance with the Sale Procedures Order, Seller reserves the right to supplement such list of Business Contracts and Real Property Leases and provide additional notice of assumption, and to remove a Business Contract or Real Property Lease from the list of Business Contracts and Real Property Leases, up to eight (8) Business Days prior to the date of the Sale Hearing.

(b)    On or before the date that is four (4) Business Days before the date of the Sale Hearing (the "<u>Designation Deadline</u>"), Buyer shall provide to Seller a list of those Business Contracts and Real Property Leases that it elects to have assumed and assigned to Buyer on the Closing Date (the "<u>Designated Contracts</u>").  Buyer shall be entitled to remove certain Business Contracts or Real Property Leases from the list of Designated Contracts at any time prior to the Designation Deadline.  In the event that Buyer removes any of such Business Contracts or Real Property Leases from such list, Seller will provide, on or before the date that is three (3) Business Days before the date of the Sale Hearing, the relevant counterparty written notice that the applicable Business Contract or Real Property Lease is no longer identified as a Designated Contract.  For the avoidance of doubt, only those executory Business Contracts and Real Property Leases that remain identified as Designated Contracts as of the date of the Sale Hearing will constitute Assumed Contracts and will be assumed by Seller and assigned to Buyer pursuant to the Sale Order.  Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Business Contracts and Real Property Leases and to determine the amount of the Cure Costs; <u>provided</u>, that nothing herein shall preclude Seller from filing one or more motions to reject any Contracts that are not Business Contracts or Real Property Leases.

(c)    Subject to the terms of <u>Section 2.05</u>, <u>Section 2.07(b)(i)</u>, <u>Section 2.10</u> and <u>Sections 5.03(a)</u> and <u>(b)</u>, Buyer shall make provision for the payment of the Determined Cure Costs in cash at Closing, or the provision of adequate assurance that the Determined Cure Costs will be promptly paid on or after Closing, in accordance with the Sale Order.  For the avoidance of doubt, any Cure Costs in excess of the Determined Cure Costs shall be borne by Seller.

(d)    On or prior to the date that is eight (8) Business Days prior to the date of the Sale Hearing, Seller shall have delivered to Buyer true and complete copies of all Business Contracts and Real Property Leases identified on the Assumption Notice, or otherwise provided

WEIL:\96692952\39\73219.0008

Buyer with access to such true and complete copies of such Business Contracts and Real Property Leases.

(e)    Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, withdraw, repudiate or disclaim any Business Contract or Real Property Lease without the prior written consent of Buyer.

## ARTICLE VI
## CERTAIN COVENANTS OF SELLER AND BUYER

Section 6.01    Registrations, Filings and Consents.

(a)    Subject to the Parties' additional obligations under this Section 6.01, each Party shall use its respective reasonable best efforts and, as applicable, cooperate with the other Party, to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as reasonably practicable and in no event later than the Outside Date, including using its respective reasonable best efforts (i) to fulfill all conditions to the other Party's obligation to effect the Closing in ARTICLE VII, (ii) to execute, acknowledge and deliver in proper form any further documents, certificates, agreements and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of this Agreement and the Ancillary Agreements, including any actions to transfer or modify Environmental Permits for use by Buyer or to assist Buyer in obtaining new Environmental Permits to replace any Environmental Permits that cannot be transferred, (iii) to make all registrations, filings, notifications, submissions and applications with, to give all notices to and to obtain any consents, governmental transfers, approvals, orders, qualifications and waivers from any Governmental Authority or other Person necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, including the valid transfer of the Transferred Assets at the Closing, (iv) to not take any action that could reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any such consents, approvals or waivers and (v) to comply at the earliest practicable and advisable date with any request under or with respect to the HSR Act or any other applicable Consents required by any Governmental Authority, including any requests for additional information, documents or other materials received by Buyer or Seller or any of their respective Affiliates from the FTC or the Antitrust Division in connection with the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    The Parties shall duly file with the FTC and the Antitrust Division any notification and report form (the "HSR Filing") that may be required under the HSR Act with respect to the transactions contemplated hereby, as promptly as possible and in no event later than the tenth (10th) Business Day following the date hereof.  If an HSR Filing is required, each Party shall cooperate with the other Party to the extent necessary to assist the other Party in the preparation of its HSR Filing, to request early termination of the waiting period required by the HSR Act with respect to the HSR Filing and, if requested, to promptly amend or furnish additional information under its HSR Filing.  Each Party shall as promptly as practicable comply with any

35

Laws that are applicable to any of the transactions contemplated by this Agreement and the Ancillary Agreements and pursuant to which any consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority is necessary.  Subject to applicable Laws and the preservation of any applicable attorney-client privilege, the Parties shall promptly furnish to each other all such information as is necessary to prepare any such registration, declaration or filing.  The Parties shall have joint decision-making authority with respect to the strategy for obtaining any necessary consents, approvals, orders or authorizations from any Governmental Authority, including under any Antitrust Laws.  Neither Buyer nor Seller, nor their respective counsel, shall independently participate in any substantive call or meeting with any Governmental Authority regarding the transactions contemplated by this Agreement and the Ancillary Agreements without giving the other Party or its counsel prior notice of such call or meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate.  In furtherance of the foregoing and to the extent permitted by applicable Law, (i) each Party shall notify the other, as far in advance as practicable, of any filing or material or substantive communication or inquiry it or any of its Affiliates or Subsidiaries intends to make with any Governmental Authority relating to the matters that are the subject of this Section 6.01; (ii) prior to submitting any such filing or making any such communication or inquiry, such Party shall provide the other Party and its counsel a reasonable opportunity to review, and shall consider in good faith the comments of the other Party in connection with, any such filing, communication or inquiry; (iii) promptly following the submission of such filing or making such communication or inquiry, provide the other Party with a copy of any such filing or, if in written form, communication or inquiry; and (iv) consult with the other Party in connection with any inquiry, hearing, investigation or litigation by, or negotiations with, any Governmental Authority relating to the transactions contemplated by this Agreement and the Ancillary Agreements, including the scheduling of, and strategic planning for, any meetings with any Governmental Authority relating thereto. In exercising the foregoing cooperation rights, Buyer and Seller each shall act reasonably and as promptly as reasonably practicable. Notwithstanding the foregoing, materials provided pursuant to this Section 6.01 may be reasonably redacted (A) to remove references concerning the valuation of the transaction, (B) as necessary to comply with contractual arrangements, (C) as necessary to address reasonable privilege concerns or (D) as otherwise required by Law. The Parties shall bear their own costs and expenses incurred with respect to the preparation of their respective filings contemplated in this Section 6.01(b); provided, however, that the filing fees in connection therewith shall be borne by Buyer.

(c)       Each of Seller and Buyer agrees that it will (and will cause its Affiliates to), if necessary to enable the Parties to consummate the transactions contemplated by this Agreement and the Ancillary Agreements, use reasonable best efforts to defend against any Actions that would prevent, delay or challenge this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, including by seeking to vacate or reverse any temporary restraining order, preliminary injunction or other legal restraint or prohibition entered or imposed (or which becomes reasonably foreseeable to be entered or imposed) by any court or other Governmental Authority that is not yet final and nonappealable, in order that the transactions contemplated by this Agreement and the Ancillary Agreements shall occur as promptly as reasonably practicable and in any event no later than the Outside Date.

(d)       Buyer shall, at Buyer's sole cost, take, or cause to be taken, any and all actions and do, or cause to be done, any and all things necessary, proper or advisable to avoid,

WEIL:\96692952\39\73219.0008

eliminate and resolve each and every impediment and obtain all Consents required to permit the satisfaction of the conditions in <u>Section 7.01(f)</u> and <u>Section 7.02(e)</u> as promptly as reasonably practicable and in any event no later than the Outside Date, including by offering and causing its Affiliates to offer to, (i) sell or otherwise dispose of, or hold separate and agree to sell or otherwise dispose of specific assets or categories of assets or businesses constituting the Business or any of the Transferred Assets or any other assets or businesses owned by Buyer or its Affiliates; (ii) terminate any existing relationships and contractual rights and obligations of Buyer or its Affiliates including, after the Closing, the Business or any of the Transferred Assets; (iii) amend or terminate such existing licenses or other intellectual property agreements and to enter into such new licenses or other intellectual property agreements of Buyer or its Affiliates including, after the Closing, the Business or any of the Transferred Assets; (iv) take any and all actions and make any and all behavioral commitments, whether or not they limit or modify Buyer's or its Affiliates' rights of ownership in, or ability to conduct the business of, one or more of its or their operations, divisions, businesses, product lines, customers or assets, including, after the Closing, the Business or any of the Transferred Assets; and (v) enter into agreements, including with the relevant Governmental Authority, giving effect to the foregoing clauses (i) through (iv) (such actions in clauses (i) through (v), "<u>Antitrust Actions</u>"); <u>provided</u>, that such Antitrust Actions are conditioned upon and become effective only from and after the Closing.

(e)    Notwithstanding anything herein to the contrary, neither Buyer nor Seller, without the other Party's prior written consent, shall (i) enter into any timing, settlement or similar agreement, or otherwise agree or commit to any arrangement that would have the effect of extending, suspending, lengthening or otherwise tolling the expiration or termination of the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act or any Antitrust Laws, or (ii) enter into any timing or similar agreement, or otherwise agree or commit to any arrangement, that would bind or commit the Parties not to complete the transactions contemplated by this Agreement (or that would otherwise prevent or prohibit the Parties from completing the transactions contemplated by this Agreement).

**Section 6.02**    <u>Conduct of Business</u>.

(a)    Prior to the Closing, and except as (A) expressly permitted by this Agreement, (B) consented to or approved by Buyer in writing, which such consent or approval shall not be unreasonably withheld, conditioned or delayed, (C) set forth in <u>Schedule 6.02</u> or (D) required by any Law or Order applicable to the operation of the Business, the Transferred Assets or the Assumed Liabilities or by order of the Bankruptcy Court, Seller covenants and agrees that it shall and shall cause its Subsidiaries to (i) operate the Business in the ordinary course of business, (ii) use commercially reasonable efforts to (A) maintain and preserve the present business, assets, rights and properties of the Business, including the Transferred IP and (B) maintain the tangible Transferred Assets in good operating condition and repair, ordinary wear and tear excepted, and, and (iii) use commercially reasonable efforts to preserve the goodwill associated with the Business and the beneficial relationships between Seller and its employees, lessors, suppliers, contractors and customers, in each case, with respect to the Business.

(b)    Prior to the Closing, except as (A) expressly permitted by this Agreement, (B) consented to or approved by Buyer in writing, which such consent or approval shall not be unreasonably withheld, conditioned or delayed, (C) set forth in <u>Schedule 6.02</u> or (D) required by

WEIL:\96692952\39\73219.0008

any Law or Order applicable to the operation of the Business, the Transferred Assets or the Assumed Liabilities, Seller covenants and agrees that it shall not, and it shall cause its Subsidiaries not to, undertake any of the following with respect to the Business:

(i)    acquire, directly or indirectly, any other Person or a material portion of the assets of any other Person, in each case, if such Person or such assets as of the Closing would constitute Transferred Assets, or dispose of any Transferred Assets, in each case, other than inventory in the ordinary course of business (but subject, in the case of inventory, to the further restrictions set forth in clause (viii));

(ii)    pledge, lease, license or create any Encumbrance (other than a Permitted Encumbrance) on or authorize the pledge, lease, license or granting of any Encumbrance (other than a Permitted Encumbrance) of or on any of the Transferred Assets, other than any Encumbrance that will be released at or prior to the Closing;

(iii)    (A) amend in any material respects or renew the terms of any Material Contract other than in the ordinary course of the business, or terminate or cancel (or allow a renewal option to lapse with respect to) any Material Contract, (B) waive any material rights under, fail to use reasonable efforts to enforce or knowingly violate the terms of any Material Contract, or (C) enter into any contract that would constitute a Material Contract if it were in effect on the date hereof;

(iv)    enter into any lease of real or personal property or any renewals thereof involving a rental obligation exceeding $150,000 (other than in the ordinary course of business) per annum per lease or enter into any agreement permitting occupancy of any portion of the Owned Real Property or Leased Real Property by any Person other than Seller and its Subsidiaries, employees, agents and invitees, other than as set forth in Schedule 6.02(b)(iv);

(v)    except to the extent required by applicable Law or the terms and conditions of a Benefit Plan in effect as of the date hereof, as to the Business Employees (A) increase the base salary, hourly wage rate or target short-term bonus opportunity (including any sales commission opportunity), (B) (1) enter into, adopt or amend any Benefit Plan, or any plan, program, agreement or arrangement that would have been a Benefit Plan if in effect as of the date hereof, other than in connection with an action that applies generally to all employees of Seller and its Subsidiaries generally, or make any award under any of the foregoing or (2) enter into, amend or terminate any collective bargaining agreement, union contract, works council agreement or similar labor arrangement;

(vi)    (A) change the duties, responsibilities or authority of (1) any employees of Seller in a manner that would cause such individual to qualify as a Business Employee or (2) any Business Employee in a manner that would cause such individual to no longer qualify as a Business Employee or otherwise transfer the individual out of the Business, (B) hire any employee who would become a Business Employee, other than, in the ordinary course of business, to fill a position that opens following the date hereof as a result of the termination of employment of a Business Employee, or (C) terminate the

38

employment of any Business Employee other than for cause or in the ordinary course of business;

(vii)    make any new commitment or increase any previous commitment for capital expenditures for the Business exceeding $100,000;

(viii)    accelerate or delay collection or payment of accounts receivable or accounts payable, the generation of unearned revenue or the sale of products, inventory or services of the Business, other than by providing or offering discounts or incentives to customers in the ordinary course of business;

(ix)    sell, assign, transfer, allow to lapse, abandon, cancel, fail to renew, fail to continue to prosecute, protect or defend, or otherwise dispose of or convey any Trademark or Internet domain name included in the Transferred IP or the SHIP Marks, or any other material Transferred IP (other than in the ordinary course of business);

(x)    license or grant any Third Party rights to any Transferred IP (other than non-exclusive licenses entered into in the ordinary course of business) or any of the SHIP Marks;

(xi)    make any change in any accounting methods, principles or practices or working capital policies in connection with the Business;

(xii)    terminate, let lapse, materially amend or materially modify any insurance policy maintained by Seller or any of its Subsidiaries in connection with the Business or the Transferred Assets unless such policy is replaced by a reasonably comparable policy (or the subject matter covered by the relevant policy is otherwise reasonably protected);

(xiii)    settle, pay, discharge or satisfy any Action in respect of the Business or any Transferred Asset or Assumed Liability, including where such settlement, payment, discharge or satisfaction would impose any restrictions or limitations upon the operations of the Business after the Closing;

(xiv)    open, close or relocate any material office or facility of the Business; or

(xv)    enter into any Contract or otherwise commit to take any actions with respect to any of the foregoing.

**Section 6.03**    Post-Closing Obligations of the Business to Certain Employees.

(a)    Schedule 6.03(a) reflects a true and accurate list of each Business Employee as of the date hereof, which, prior to the Closing Date, Seller shall update to reflect any terminations in accordance with this Agreement and Business Employees who became Disabled Employees following the date hereof.  Subject to this Section 6.03(a) and Section 6.03(i), Buyer shall, or shall cause any of its Subsidiaries to, no later than five (5) days prior to the Closing Date, provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local

time, on the Closing Date, each Business Employee (including any Disabled Employees). Notwithstanding anything to the contrary in this Section 6.03(a), in Buyer's sole discretion, such offers of employment shall be made contingent on the Closing and may be made contingent on the Business Employee satisfying Buyer's generally applicable background checks, drug screens, work authorization verification and similar requirements. Each Business Employee (for the avoidance of doubt, including any Disabled Employees) who accepts such offer of employment and commences employment with Buyer or any of its Subsidiaries, shall be referred to as "Transferred Employees." None of Seller nor any of its Subsidiaries shall induce or otherwise attempt to influence any Business Employee to not accept his or her offer of employment from Buyer, its Subsidiaries or Buyer's third party designee (as applicable).

(b)     Except as otherwise expressly provided in this Section 6.03, with respect to each Transferred Employee who remains employed by Buyer, any of its Subsidiaries or Buyer's third party designee, Buyer shall, or shall cause any of its Subsidiaries or its third party designee to, provide for the period commencing on the Closing Date and ending on the last day of the calendar year in which the first (1st) anniversary of the Closing Date occurs (such period, the "Benefit Comparability Period"), subject to such Transferred Employee's continued employment with Buyer, any of its Subsidiaries or Buyer's third party designee (as applicable) **(i)** (A) base salary or hourly wage rate (as applicable) and (B) target short-term cash incentive opportunity, in each of (A) and (B), that is no less favorable than the base salary or hourly wage rate (as applicable) and target short-term cash incentive opportunity, respectively, provided to such Transferred Employee immediately prior to the Closing Date and **(ii)** benefit plans, programs and policies that are comparable in the aggregate to the benefits (without taking into account coverage under or participation in any defined benefit pension, defined benefit and defined contribution nonqualified plan, retiree medical plan, retiree life insurance, equity compensation plan and any plan covering solely those Business Employees who are members of the management of the Business) provided to such Transferred Employee pursuant to the Benefit Plans as in effect on the date hereof and to the extent listed on Schedule 3.12(a). Notwithstanding the foregoing, (1) the obligations of Section 6.03(b)(ii) shall not apply to Transferred Employees in any country where there are less than ten (10) Transferred Employees and (2) Buyer shall be permitted to amend and modify its U.S. health plans during the Benefit Comparability Period (x) to the extent required by applicable Law or (y) in respect of U.S. health benefits to be provided on or following the first (1st) anniversary of the Closing Date, in the event Buyer determines in good faith that the cost of providing such U.S. health benefits has materially increased or the continued provision of such U.S. health benefits is unduly burdensome due to regulatory changes or circumstances beyond its control, in the case of each of (x) and (y), without any requirement to provide to Transferred Employees alternative compensation or benefits to make up for any reduction in benefit comparability as a result of any such amendment or modification; provided, that Buyer agrees to act in good faith and to use commercially reasonable efforts to mitigate the negative impact any such amendment or modification may have on the benefit comparability requirements provided for herein.

(c)     Each Transferred Employee shall be given credit for all service with Seller or its Subsidiaries (or service credited by Seller under the Benefit Plans and the Foreign Plans) under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer, any of its Subsidiaries or Buyer's third party designee in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with

**40**

respect to any vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits, in each of (i) and (ii), to the same extent such Transferred Employee's service was credited under comparable Benefit Plans and Foreign Plans of the applicable Seller and except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)     Except as required by Law or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Transferred Employee terminated by Buyer or any of its Subsidiaries within the Benefit Comparability Period that are at least equal to the severance and other separation benefits (excluding any defined benefit pension or retiree welfare and life insurance benefits) provided by Seller and its Subsidiaries to such Transferred Employee, as in effect on the date of this Agreement and as set forth in Schedule 6.03(d).  From and after the Closing, Buyer shall indemnify, defend and hold harmless Seller and its Subsidiaries and their respective Representatives, successors and permitted assigns (collectively, the "Seller Indemnitees") from any claims made by any Transferred Employee for severance or other separation benefits (excluding any defined benefit pension or retiree welfare and life insurance benefits) arising out of the termination of employment of any Transferred Employee by Buyer or any of its Subsidiaries following the Closing.

(e)     On the Closing Date or promptly thereafter to the extent permissible under applicable Law, Seller shall pay to each Transferring Employee all accrued unpaid wages or other accrued compensation through the Closing Date.  Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Closing Date, in accordance with their terms as of the date hereof.  To the extent that a Transferred Employee is entitled under any applicable Law or any policy of Seller or any of its Subsidiaries to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Closing Date, Seller shall (or shall cause its applicable Subsidiary to) pay each Transferred Employee for such vacation days and other paid time off accrued but not yet taken and with respect to such Transferred Employee, Buyer shall not be required to assume such vacation days or other paid time off accrued but not taken to the extent paid by Seller or its applicable Subsidiary.

(f)     Subject to the last sentence of Section 6.03(g) and the continued employment by Buyer of a Transferred Employee on the applicable payment date, Buyer shall pay to such Transferred Employees any and all unpaid fiscal year or quarterly bonus (including any applicable payroll Taxes) under Seller's Annual Incentive Plan or other applicable bonus plan for services performed by such Transferred Employee through the Closing Date in accordance with the terms and conditions of such plan had such employee continued to be employed by Seller or its Subsidiaries through the date the bonus is deemed earned under such plan (collectively, the "Employee Bonuses").  The amount of the Employee Bonuses due to a Transferred Employee shall be reasonably determined by Seller (and a schedule of such amounts shall be provided in writing to Buyer at least fifteen (15) days prior the applicable payment date) in accordance with the terms and conditions of such plan and consistent with past practice, and shall be paid by Buyer at the time such bonuses would otherwise have been paid had such employee continued to be employed by Seller or its Subsidiaries through the applicable payment date.

WEIL:\96692952\39\73219.0008

(g)    Buyer shall assume and honor all Liabilities in respect of payments to Transferred Employees listed on Schedule 6.03(g) under Seller's key employee incentive plan or key employee retention plan when due post-Closing.  Each Party hereby acknowledges and agrees that in no event shall the aggregate amount of the Employee Bonuses and Buyer's obligations under this Section 6.03(g), collectively, exceed (and Buyer shall have no obligation to pay any such amounts in excess of) $2,000,000.

(h)    On or prior to the Closing Date, Seller agrees (i) to vest each Transferred Employee in his or her benefits under any Seller Plan and (ii) to contribute to the account of any Transferred Employee an amount equal to any employer contributions that would have been made by Seller or its Subsidiaries to any accounts held by a Transferred Employee under any Seller Plans in respect of the plan year during which the Closing Date occurs but for the termination of employment with Seller and its Subsidiaries at the Closing, pro-rated based on the number of days that have elapsed during the period of the applicable plan year prior to the Closing Date.

(i)    Disabled Employees shall remain employees of Seller and its Subsidiaries and, for the avoidance of doubt, any Liability in respect of such Business Employees until the date the Disabled Employee becomes a Transferred Employee, subject to and in accordance with this Section 6.03(i), shall be an Excluded Liability.  Seller shall and shall cause its Subsidiaries to continue to pay the applicable disability benefits to such Disabled Employee and provide such other benefits as are provided to similarly-situated disabled employees of Seller or its Subsidiaries until any such Disabled Employee ceases to be disabled within the meaning of both the applicable short-term disability plan or policy and the long-term disability plan of Seller or its Subsidiaries. If within a period of six (6) months after the Closing Date (the "Hiring Transition Period") a Disabled Employee ceases to be disabled within the meaning of both the applicable short-term disability plan or policy and the long-term disability plan of Seller or its Subsidiaries, (i) Seller shall notify Buyer as soon practicable and (ii) Buyer or any of its Subsidiaries shall offer employment in a comparable position to such Disabled Employee in accordance with the provisions of this Section 6.03 as soon as practicable following such notification, and if during the Hiring Transition Period any such Disabled Employee accepts employment with Buyer or any of its Subsidiaries he or she shall be a Transferred Employee for all purposes hereunder effective as of the Business Day on which such Disabled Employee (x) is scheduled, expected or permitted to work following the Disabled Employee's release to return to work from leave, and (y) actually performs work for Buyer or any of its Subsidiaries on such date; provided, that if during the Hiring Transition Period such Disabled Employee's disability coverage ceases due to death, retirement or other termination of employment by the Disabled Employee, Buyer or any of its Subsidiaries shall have no obligation to offer employment to such Disabled Employee, and provided further that if the Disabled Employee does not perform work for Buyer or any of its Subsidiaries on the date on which the Disabled Employee is scheduled, expected or permitted to work following the Disabled Employee's release to return to work from leave, such Disabled Employee will not become a Transferred Employee.

(j)    Seller and its Subsidiaries shall retain responsibility for providing Business Employees who terminated employment on or prior to the Closing Date and Business Employees who do not become Transferred Employees and, in each case, who elected group health coverage required by Section 4980B of the Code ("Continuation Coverage") under the terms of the health and welfare Benefit Plan maintained by Seller or its Subsidiaries, with such Continuation

42

Coverage.  Effective as of the Closing Date, Buyer or one of its Subsidiaries shall provide the Transferred Employees who elect Continuation Coverage following their termination of employment with Buyer or any of its Subsidiaries after the Closing Date, to the extent required by Law.

(k)    Seller and its Subsidiaries shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Seller or its Subsidiaries.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Closing.  For purposes of this Section 6.03(k), a claim shall be deemed to have been incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; provided, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing.  Notwithstanding anything herein to the contrary, with respect to any Business Employee who becomes a Transferred Employee following the Closing, any reference in this Section 6.03(k) to the Closing will be deemed to be references to the date such Business Employee becomes a Transferred Employee.

(l)    Buyer shall be responsible for payment of long-term and short-term disability claims that are incurred on or after the Closing Date, in accordance with the terms of the short-term or long-term disability plans, programs or policies of Buyer and its Subsidiaries, if any, whether they arise from disabilities that occur before, on or after the Closing Date, for any Transferred Employee, provided, that for Disabled Employees, Buyer and its Subsidiaries shall only be liable for claims of a Disabled Employee who becomes a Transferred Employee after the Transferred Employee has returned to work with Buyer, on an unrestricted basis and at substantially the same hours basis for at least thirty (30) days.  Notwithstanding anything herein to the contrary, with respect to any Business Employee who becomes a Transferred Employee following the Closing, any reference in this Section 6.03(l) to the Closing will be deemed to be references to the date such Business Employee becomes a Transferred Employee.

(m)    If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of Seller or its Subsidiaries as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs.  Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such waivers and credits contemplated by the first sentence of this Section 6.03(m).  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred

**43**

Employee had under the life insurance plan of Seller or its Subsidiaries (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

        (n)        <u>U.S. Savings Plan Account Transfer</u>.

        (i)        As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("<u>Buyer's Savings Plan</u>") that will permit participation by all Transferred Employees who are participating in Seller's or its Subsidiaries' 401(k) Plan, qualified under Sections 401(a) and 401(k) of the Code ("<u>Seller's Savings Plan</u>") as of the Closing Date.

        (ii)        No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan. Following the Closing Date, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)) to the extent permitted by the terms of the Buyer's Savings Plan and administratively feasible as determined by Buyer in good faith. Effective as of the Closing, Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

        (o)        The Parties will reasonably cooperate in good faith with respect to any communications to Business Employees regarding the transactions contemplated by this Agreement. Seller will provide Buyer with a reasonable opportunity to review and comment on any communications intended for the Business Employees that it desires or has to send to Business Employees prior to the Closing Date. To the extent practicable, Buyer will provide Seller with a reasonable opportunity to review and comment on any communications regarding these transactions intended for the Business Employees (including regarding its offers of employment) that it desires or has to send to Business Employees prior to the Closing Date. Following the date hereof, Seller will provide Buyer with reasonable access to meet and communicate with the Business Employees, including access to the sites of employment of the Business Employees.

        (p)        The Parties hereto acknowledge and agree that all provisions contained in this <u>Section 6.03</u> are included for the sole benefit of the respective Parties hereto and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of Seller, any participant in any Seller Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries. Notwithstanding any provision in <u>Section 6.03</u> to the contrary, (i) neither Buyer, nor any of its Subsidiaries or third party designees, shall be obligated to continue to employ any Transferred Employee for any specific period of time following the Closing Date, subject to applicable Requirements of Law. The

provisions of this Section 6.03 shall not constitute an amendment to any Seller Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(q)     Seller and Buyer hereby agree to follow the "alternate procedure" for employment tax withholding as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee; provided, that Seller provides Buyer with all necessary complete and accurate payroll records as soon as practicable, but in any event, within fifteen (15) Business Days after the end of each calendar year for the calendar year which includes the date on which the Transferred Employee commences employment with Buyer, and Seller shall indemnify Buyer and its Affiliates for any Losses arising out of, or related to, the payroll records to be provided by Seller pursuant to this Section 6.03(q). Buyer shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom, in which case Buyer and not Seller shall file the Form W-2 for the applicable taxable year.

Section 6.04    Access to Information.

(a)     Prior to the Closing, Seller shall, and shall cause its relevant Subsidiaries to, provide Buyer and its Representatives with reasonable access to (i) the Transferred Assets; (ii) senior management of the Business; and (iii) any information to the extent relating to the Business as Buyer or any of its Representatives may reasonably request; provided, however, that Buyer and its Representatives shall not have the right to conduct any intrusive environmental sampling without Seller's written consent.  All access and investigation pursuant to this Section 6.04(a) shall be (A) conducted during normal business hours upon reasonable advance notice to Seller, (B) conducted in such a manner as not to interfere with the normal operations of the Business, (C) coordinated through Seller's general counsel or designee thereof and (D) conducted at Buyer's sole cost and expense, and Seller shall have the right to have one or more of its Representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.04(a).  Notwithstanding anything to the contrary contained herein, prior to the Closing, Seller shall not be required to provide access or disclose information where such access or disclosure would, in Seller's reasonable judgment, after consultation with legal counsel, (1) jeopardize the attorney-client privilege or other immunity or protection from disclosure of Seller, (2) conflict with any (x) Law or Order applicable to Seller or any of its Subsidiaries or the assets, or operation of the Business, (y) Contract to which Seller or any of its Subsidiaries is party or by which any of the assets or properties of Seller are bound or (z) other obligation of confidentiality (including, in each case of (x), (y) and (z), any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information), or (3) result in the disclosure of competitively sensitive information; provided, however, that, in such instances, Seller shall inform Buyer of the general nature of the information being withheld and, upon Buyer's request and at Buyer's sole cost and expense, reasonably cooperate with Buyer to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing clauses (1)–(3), including by entering into additional agreements to the extent required to render the access to any personally identifiable information permissible under any applicable Law or contractual obligations.

(b)    Buyer will hold any information obtained pursuant to Section 6.04(a) in confidence in accordance with the Confidentiality Agreement.

**Section 6.05**    Consents.    Prior to the Closing, each of Buyer and Seller shall, and Seller shall cause its relevant Subsidiaries to, use commercially reasonable efforts to give all notices to, and obtain all Consents from, all Persons required, necessary or advisable pursuant to any Contract or other document included on Schedule 3.02(d) and any other Material Contract; provided, however, that neither of the Parties nor any of their respective Subsidiaries shall have any obligation to (a) relinquish or forbear any rights, (b) pay any consideration to any Third Party for the purpose of obtaining any such Consent, or (c) pay any costs or expenses of any Person resulting from the process of obtaining any such Consent (other than any costs incurred by such Party's legal counsel in connection therewith).

**Section 6.06**    Books and Records.    Until the first to occur of (x) the closing of the Chapter 11 Cases under the Bankruptcy Code or (y) the fifth (5th) anniversary of the Closing (or, to the extent relevant to a Tax audit or other Tax proceeding in progress at the conclusion of such five (5) year period, until the final resolution of such audit or proceeding), each of Buyer and Seller shall use commercially reasonable efforts to (a) give Buyer or Seller, as the case may be, and their Representatives, as applicable, reasonable access during normal business hours to its Representatives, including employees, books and records and other information with respect to the Business relating to periods prior to the Closing for any reasonable purpose, including as may be necessary for (i) the preparation of Tax returns and financial statements or (ii) complying with any audit request, subpoena or other investigative demand by any Governmental Authority or for any Action, subject in all cases to reasonable restrictions imposed from time to time upon advice of counsel in respect of applicable Laws relating to the confidentiality of information, and (b) maintain all such books and records, and other information in the same or a similar accessible format as currently existing, and Buyer and Seller, as applicable, shall be entitled to receive copies of such books and records at such requesting Party's cost.    The access provided pursuant to this Section 6.06 shall be conducted in such a manner so as not to interfere unreasonably with the operation of the business of Buyer or Seller, as the case may be, and in no event will Buyer or Seller be required to furnish any documents or information pursuant to this Section 6.06 that are required by any applicable Law, Order or contractual obligation to be kept confidential (including any Law, Order or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information), or if furnishing such documents or information would reasonably be expected to jeopardize the status of such documents or information as privileged; provided, however, that Seller shall, and shall cause its Subsidiaries to, cooperate with Buyer to furnish such documents or information to the extent permitted by applicable Law, Order or contractual obligations, including by entering into additional agreements to the extent required to render the access to any personally identifiable information permissible under any applicable Law.    Notwithstanding the foregoing, if the Parties are in an adversarial relationship in any Action, the furnishing of information, documents or records in accordance with this Section 6.06 shall be subject to any applicable rules relating to discovery.

**Section 6.07**    Confidentiality.

(a)    The confidentiality provisions of the Confidentiality Agreement to the extent they relate to the Business, the Transferred Assets and the Assumed Liabilities shall be

46

deemed incorporated herein by reference as if set forth herein and shall continue in full force and effect until the Closing, unless this Agreement is terminated prior to the Closing, in which case the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms.

(b)    From and after the Closing, Seller shall, and shall cause its Subsidiaries and Representatives to, keep confidential and not disclose or use in any manner any and all non-public information, whether written or oral, relating to the Business, the Transferred Assets, the Assumed Liabilities or Buyer, including the terms and conditions of this Agreement; provided, however, that, subject to Seller's compliance with the immediately following sentence, Seller shall not be liable hereunder with respect to any disclosure to the extent such disclosure is determined by Seller (with the advice of counsel) to be required by any applicable Law or Order, including applicable rules of any securities exchange.    In the event that Seller or any of its Subsidiaries or Representatives are requested or required by any applicable Law or Order to disclose any such non-public information, Seller shall, (i) to the extent permissible by such applicable Law or Order, provide Buyer with prompt written notice of such requirement, (ii) disclose only that information that Seller determines (with the advice of counsel) is required by such applicable Law or Order to be disclosed and (iii) use reasonable efforts to preserve the confidentiality of such non-public information, including by, at Buyer's request, reasonably cooperating with Buyer to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such non-public information (at Buyer's sole cost and expense).    Notwithstanding the foregoing, such non-public information shall not include information that (A) is or becomes available to the public after the Closing other than as a result of a disclosure by Seller or its Subsidiaries or Representatives in breach of this Section 6.07(b) or (B) becomes available to Seller or its Subsidiaries or Representatives after the Closing from a source other than Buyer or its Affiliates or Representatives if the source of such information is not known by Seller or its Subsidiaries or Representatives to be bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, Buyer or its Affiliates with respect to such information.

**Section 6.08**    Intellectual Property Matters.

(a)    Seller hereby acknowledges that Buyer and its Affiliates shall, until the one year (1) anniversary of the Closing Date, be entitled to use the Trademark "SEARS HOME SERVICES" and any other SEARS Marks that are currently used by the Business, solely in connection with the operation of the Business as conducted in substantially the same manner as used by the Business as of the Closing Date (including with respect to size, color and trademark symbols), after which period, except as expressly permitted under the Trademark License Agreement or as otherwise agreed upon by the Parties in writing, Buyer shall, and shall cause its Affiliates to, cease using the SEARS Marks and cease selling, offering for sale, providing and distributing products, services and materials that display the SEARS Marks.    Buyer shall ensure that all uses of the SEARS Marks by Buyer and its Affiliates as provided in this Section 6.08(a) shall be only with respect to goods and services of a level of quality equal to or greater than the quality of goods and services with respect to which Seller and its Subsidiaries used the SEARS Marks prior to the Closing.    Notwithstanding anything to the contrary set forth herein, Buyer and its Subsidiaries may not use any Trademark owned by Seller or any of its Subsidiaries and not included in the Transferred IP in the sale, installation or repair of garage doors or garage door openers.    Any and all goodwill generated by the use of the SEARS Marks under this

WEIL:\96692952\39\73219.0008

Section 6.08(a) shall inure solely to the benefit of Seller and its Subsidiaries.  In any event, Buyer shall not, and shall cause its Affiliates not to, use the SEARS Marks in any manner that would reasonably be expected to damage or tarnish the reputation of Seller or the goodwill associated with the SEARS Marks.

(b)     Buyer agrees that Seller shall have no responsibility for claims by Third Parties arising out of, or relating to, the sale, offer for sale, distribution, provision or promotion by or on behalf Buyer or its Affiliates of products or services using the SEARS Marks after the Closing Date.  In addition to any and all other available remedies, from and after the Closing, Buyer shall indemnify, defend and hold harmless Seller Indemnitees from and against any and all Third Party claims that may arise out of the use of the SEARS Marks by Buyer or any of its Affiliates (i) in accordance with the terms and conditions of this Section 6.08, other than such claims that the SEARS Marks infringe the Intellectual Property rights of any Third Party; or (ii) in violation of or outside the scope permitted by this Section 6.08.

(c)     As soon as reasonably practicable after the Closing and in any event no later than thirty (30) days following the Closing Date, Seller shall deliver to Buyer correct and complete copies of all trademark and patent prosecution files and dockets, registration certificates, litigation files and related opinions of counsel and correspondence relating thereto for those registered and applied-for items of Transferred IP and registered and applied for SHIP Marks.  Seller shall, prior to the Closing Date, pay any renewal or maintenance amounts that are then due (or that may become due within 30 days after the Closing Date) in connection with any Internet domain names or registered or applied-for Trademarks included in the Transferred IP or the SHIP Marks or any material issued, registered or applied-for Transferred IP, in each case other than the items set forth in Schedule 6.08(c); provided, however, that Buyer shall reimburse Seller no later than sixty (60) days after Closing for any such payments by Seller that became due during the 30-day period after the Closing Date.

(d)     As of and following the Closing Date, Seller will not, and will cause its Subsidiaries not to, exploit, disclose, or use all or any part of the Transferred IP; and Seller will not, and will cause its Subsidiaries not to, interfere with Buyer's efforts to apply for, register, defend or enforce registrations for, and rights in any Transferred IP worldwide.  As of the Closing Date, all licenses and other grants of rights under any Transferred IP to Seller or its Subsidiaries pursuant to any intracompany agreement and all sublicenses to any Person thereunder are hereby terminated or Seller shall immediately after the Closing cause such licenses, grants or sublicenses that are not terminated by virtue of the foregoing sentence to be terminated.

(e)     Effective as of the Closing Date, Seller hereby grants to Buyer (and shall cause its Subsidiaries to grant to Buyer), a royalty-free, fully paid-up, perpetual, irrevocable, worldwide, non-sublicensable (except to Buyer's Affiliates and, through multiple tiers, its and its Affiliates' customers, end users and contractors, in each case, to the extent necessary to be sublicensed in connection with products or services provided by Buyer or its Affiliates), non-transferable (except to an Affiliate of Buyer or to any Person in connection with a sale of all or substantially all of the Business (whether in the same transaction or different transactions to different Persons, in which case Buyer may transfer the foregoing license in part to each such Person), including such subsequent sales by permitted assignees, and, following any such assignment, the assignee will be deemed to be "Buyer" for the purposes of the license granted

**48**

herein), non-exclusive license under any Intellectual Property (other than Trademarks and Internet domain names) that is (i) owned by Seller or its Subsidiaries as of the Closing Date, (ii) not included in Transferred IP and (iii) used in the Business as of the Closing Date (such Intellectual Property, the "Non-Transferred Intellectual Property"), to use (including reproduce, create derivative works, display, and perform tangible embodiments of and make, sell, offer for sale, provide and import products and services using) such Non-Transferred Intellectual Property in connection with the field of the Business and its natural evolutions (and subject to the same confidentiality restrictions applied by the Business as of the date hereof with respect to the use and disclosure of such Non-Transferred Intellectual Property). Buyer agrees that (i) Seller shall have no responsibility for claims by Third Parties arising out of, or relating to, Buyer's use of the Non-Transferred Intellectual Property in any manner and (ii) in addition to any and all remedies, from and after the Closing, Buyer shall indemnify, defend and hold harmless Seller Indemnitees from and against any and all Third Party claims that may arise out of use of such Intellectual Property by or on behalf of Buyer or any of its Affiliates, except in each case of (i) and (ii), if such claim arises out of, or relates to, any actual or alleged Intellectual Property infringement, dilution, misappropriation or other violation resulting from the use of the Non-Transferred Intellectual Property in connection with the Business (but not the natural evolutions thereof) as permitted under this Section 6.08(e). All Intellectual Property licensed under this Section 6.08(e) is licensed "as-is" with all faults, without warranty of any kind (whether express, implied, statutory or otherwise.)

**Section 6.09**    Further Assurances; Cooperation.  From time to time after the Closing and without further consideration, subject to the terms and conditions of this Agreement (including Section 2.10), (a) Seller shall, and shall cause its Subsidiaries to, upon the written request of Buyer, execute and deliver such documents and instruments of conveyance and transfer as Buyer may reasonably request in order to consummate more effectively the purchase and sale of the Transferred Assets as contemplated hereby and to vest in Buyer title to the Transferred Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement and the Ancillary Agreements, and (b) Buyer shall, and shall cause its Affiliates to, upon the written request of Seller, execute and deliver such documents and instruments of conveyance and transfer or contract or lease assumption as Seller may reasonably request in order to confirm Buyer's liability for the Assumed Liabilities or otherwise to more fully consummate the transactions contemplated by this Agreement and the Ancillary Agreements. Without limiting the generality of the foregoing, and subject to the other terms and conditions of this Agreement, in the event that Buyer, Seller or any of their respective Subsidiaries discovers following the Closing that (i) any Transferred Asset was not sold, conveyed, transferred, assigned and delivered to Buyer or its designee at the Closing, Seller shall, or shall cause its Subsidiaries, as applicable, to, promptly sell, convey, transfer, assign and deliver such Transferred Asset to Buyer or its designee, (ii) any Assumed Liability was not assumed by Buyer or a designee thereof at the Closing, Buyer or its designee shall promptly assume such Assumed Liability from Seller, (iii) any Excluded Asset was sold, conveyed, transferred, assigned and delivered to Buyer or its designee at the Closing, Buyer or its designee shall promptly convey, transfer, assign and deliver such Excluded Asset back to Seller or its designee, and (iv) any Excluded Liability was assumed by Buyer at the Closing, Seller shall promptly assume such Excluded Liability back from Buyer, in each case in accordance with the terms of this Agreement.

**Section 6.10**    Compliance with WARN.  On the Closing Date, Seller shall notify Buyer of any layoffs of Business Employees in the 90-day period prior to the Closing Date. Buyer shall be

liable for any and all Losses arising under Law, including WARN, by reason of any layoff of the Transferred Employees which occurs after the Closing.  Seller shall be liable for any and all Losses arising under Law, including WARN, by reason of Seller's layoff of employees which occurs or has occurred before the Closing.

Section 6.11    Taxes.

(a)    After the Closing, Seller, on the one hand, and Buyer, on the other hand, (i) will promptly inform the other Party in writing of any notice that it receives of any Action, request for documents or information related to Taxes relating to the Transferred Assets or the Business that could reasonably affect the Tax liability of the other Party (provided, that failure to give such notice shall not constitute a breach of this Agreement unless the ability to contest such Action is actually prejudiced by such failure), (ii) will each provide the other Party, at the other Party's reasonable expense, with such assistance as may reasonably be requested in connection with the preparation of any Tax Return, Action or determination by any taxing authority or judicial or administrative Action relating to liability for Taxes relating to the Transferred Assets, the Assumed Liabilities or the Business, (iii) will each retain and, at the other Party's reasonable expense, provide to the other Party all records and other information that may be relevant to any such Tax Return, Action or determination relating to the Transferred Assets, the Assumed Liabilities or the Business and (iv) will each provide the other Party with any final determination of any such Tax Return, Action or determination relating to the Transferred Assets, the Assumed Liabilities or the Business that affects any amount required to be shown on any Tax Return of the other Party for any period.

(b)    For all purposes under this Agreement involving the determination of Taxes (including the determination of Taxes that constitute Excluded Liabilities), in the case of Taxes that are payable with respect to any period that includes but does not end on the Closing Date, and as a result thereof, imposes a Tax for which Seller is responsible under the provisions of Section 2.04, the portion of any such Tax that is allocable to the portion of the period ending on the close of the Closing Date shall be (i) in the case of Taxes that are (A) based upon or related to income or receipts, (B) imposed in connection with the sale or other transfer or assignment of property (real or personal, tangible or intangible) or (C) employment, social security or other similar Taxes, deemed equal to the amount which would be payable if the taxable year ended at the close of business on the Closing Date; and (ii) in the case of Taxes imposed on a periodic basis with respect to any assets or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction the numerator of which is the number of calendar days in the period ending at the close of business on the Closing Date and the denominator of which is the number of calendar days in the entire period.

(c)    To the extent that any obligation or responsibility pursuant to this Section 6.11 may overlap with ARTICLE IX, the provisions of this Section 6.11 shall govern.

Section 6.12    Notification of Certain Matters.

Prior to the Closing, Seller shall promptly notify Buyer or Buyer shall promptly notify Seller, as the case may be, of (a) any notice or communication from any Governmental Authority

WEIL:\96692952\39\73219.0008

in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements; (b) any notice from any Person alleging that the Consent of such Person is or may be required in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements; (c) any Action commenced or threatened against Seller or any of its Subsidiaries or against Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements; (d) the occurrence of any event that would reasonably be expected to cause any representation or warranty of Seller or Buyer contained in this Agreement to be untrue or inaccurate at or prior to the Closing; (e) any failure of Seller or Buyer to comply with any of its covenants or agreements hereunder as and when required by this Agreement or (f) the occurrence of any event that could result in any of the conditions set forth in ARTICLE VII becoming incapable of being satisfied or that is otherwise materially adverse to the Business; provided, however, that the delivery of any notice by Seller or Buyer and the information or knowledge obtained by Buyer pursuant to this Section 6.12 shall not (i) affect or be deemed to affect or modify any representation, warranty, covenant or agreement contained herein, the conditions to the obligations of Seller or Buyer to consummate the Closing in ARTICLE VII or otherwise prejudice in any way the rights and remedies of Seller or Buyer hereunder, including pursuant to ARTICLE IX, (ii) be deemed to affect or modify Buyer's reliance on the representations, warranties, covenants and agreements made by Seller and Seller's reliance on the representations, warranties, covenants and agreements made by Buyer in this Agreement or (iii) be deemed to amend or supplement the Schedules of Seller or Buyer respectively, or prevent or cure any misrepresentation, breach of warranty or breach of covenant by Seller or Buyer, respectively.

**Section 6.13**  Receivables.  From and after the Closing, if either Party receives any **(a)** funds intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any of the Ancillary Agreements, the receiving Party shall promptly notify and forward such funds to, the other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such funds, whether in connection with a dispute under this Agreement or any of the Ancillary Agreements or otherwise), or **(b)** mail, courier package, facsimile transmission, purchase order, invoice, service request or other document intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any of the Ancillary Agreements, the receiving Party shall promptly notify and forward such document to the other Party.  From and after the Closing, Buyer shall have the right and authority to collect for its own account all receivables and other related items that are included in the Transferred Assets and to endorse with the name of Seller or any applicable Subsidiary of Seller any checks or drafts receive with respect to any such receivables or other related items.

**Section 6.14**  Credit Support for the Business.  On or as promptly as reasonably practicable after the Closing Date, Buyer shall use its reasonable best efforts to procure, at its sole expense, and Seller shall cooperate with Buyer in procuring, the return or release by the applicable counterparty of each guarantee or credit support, letter of credit or letter of comfort, surety or performance bond or any other similar instrument, in each case provided, furnished or posted, as applicable, by Seller or any of its Subsidiaries or any third party on behalf thereof with respect to the Business, any Transferred Asset or any Assumed Liability and listed in Schedule 6.14 (as updated, pursuant to the following sentence, the "Financial Assurances"), or posting surety or performance bonds with terms that are at least as favorable to the counterparty as the terms of the applicable Financial Assurance; provided, that (i) Seller shall not terminate, reduce or otherwise

amend any Financial Assurance until the earlier of ninety (90) days following the Closing Date and the time such Financial Assurance is replaced by Seller, and (ii) from and after the ninetieth (90th) day following the Closing Date, Seller and its Subsidiaries shall have no obligation to keep any Financial Assurance in place.  At least five (5) Business Days prior to the Closing Date, Seller shall (a) provide Buyer with an updated Schedule 6.14 setting forth each outstanding guarantee, credit support, letter of credit, letter of comfort, surety, performance bond and other similar instrument, in each case provided, furnished or posted, as applicable, by Seller or any of its Subsidiaries or any third party on behalf thereof with respect to the Business, any Transferred Asset or any Assumed Liability and (b) make available to Buyer a correct and complete copy thereof.

        **Section 6.15**    Insurance Matters.  Except to the extent provided in this Section 6.15, from and after the Closing, the Business, Transferred Assets, Assumed Liabilities or Transferred Employees shall cease to be insured by, have access or availability to, or be entitled to make claims on, claim benefits from or seek coverage under any insurance policy or program of Seller.  To the extent that there is any insurable claim related to the Business, any Transferred Asset, Assumed Liability or Transferred Employee based on any act, omission or circumstance existing or occurring at or prior to the Closing (an "Insurable Claim") under any occurrence based insurance policy or program of Seller that was issued by any third-party insurance carrier that was in effect as of the Closing (a "Third-Party Insurance Policy") then, from and after the Closing, Seller shall, at Buyer's expense, reasonably cooperate with Buyer to make a claim on Buyer's behalf, after the Closing Date, under such Third-Party Insurance Policy with respect to such Insurable Claim and shall use commercially reasonable efforts to pursue such claim (which shall not include commencement or prosecution of litigation by Seller or any Affiliate against an insurer or any other Person).  Seller shall, at Buyer's expense, use commercially reasonable efforts to promptly file such claims with the applicable insurance carriers.  Buyer and Seller shall keep each other advised of the status of (and any developments regarding) any such claims, and cooperate with each other and any insurance carrier in connection with the investigation, prosecution and resolution of any such claims.  Seller shall as soon as reasonably practicable, and no later than five (5) Business Days following receipt thereof by Seller or any of its Affiliates, deliver to Buyer all proceeds received under the Third-Party Insurance Policies with respect to such Insurable Claim. Buyer shall exclusively bear and be responsible for (and neither Seller nor any of its Affiliates shall have any obligation to repay or reimburse the Buyer for) (A) the amount of any and all deductibles, retentions or self-insurance associated with claims under the foregoing Third Party Insurance Policies, and (B) all uninsured, uncovered, unavailable or uncollectible amounts of such claims.  Notwithstanding anything to the contrary in this Agreement, (i) Buyer acknowledges that Seller retains exclusive control over all of the Third-Party Insurance Policies, including the right to exhaust, lapse, renew, alter, amend, settle, release, waive, commute or otherwise modify any such policies notwithstanding any actual or potential impact such actions have or could have on the coverage and rights provided under this Section 6.15 and (ii) regardless of whether a Third-Party Insurance Policy is available to cover a claim or whether proceeds are received with respect to any such claim, nothing in this Section 6.15 shall be deemed to alter, modify or affect in any manner the Seller's sole retention of, and liability with respect to, any Excluded Liabilities.  This Agreement shall not be considered as an attempted assignment of any policy of insurance or as a contract of insurance, and nothing in this Agreement is intended to waive or abrogate in any way Seller's own rights to insurance coverage for any liability, whether relating to Seller or any of its Affiliates or otherwise.

WEIL:\96692952\39\73219.0008

**Section 6.16**  Real Property.  Buyer acknowledges and agrees that the Owned Real Property is the only owned real property of Seller or its Subsidiaries that is transferring to Buyer.

**Section 6.17**  Critical Vendors.  Following the execution of this Agreement, Buyer shall deliver to Seller a list of critical vendors and suppliers.  Seller agrees that within three (3) Business Days following the delivery of such list, (i) the vendors and suppliers on such list shall be treated as Critical Vendors and the associated Critical Vendor Claims for each vendor and supplier on the list delivered by Buyer shall be satisfied in accordance with the Critical Vendor Payment Protocol, subject to an aggregate cap of $3,000,000 for all such Critical Vendor Claims, and (ii) Seller shall use commercially reasonable efforts to cause such vendors and suppliers to agree to continue providing goods and/or services with respect to the Business on a postpetition basis.  Seller shall pay all amounts owed to vendors and or suppliers for postpetition goods and/or services provided with respect to the Business in the ordinary course, consistent with the DIP Budget (as defined in the Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief).

**Section 6.18**  Continued Occupancy.  Buyer and Seller acknowledge and agree that the right to occupy space in the properties listed on Item 4 on Schedule 3.06 in connection with the Business will be terminated on or prior to Closing.  Notwithstanding the preceding sentence, Buyer and Seller agree to negotiate in good faith license agreements to be entered into at Closing which will provide for continued occupancy of that portion of the properties identified in Items 4(c)-(g) on Schedule 3.06, in each case, currently occupied in connection with the Business in a manner substantially similar to the manner in which it has been occupied and used in connection with the Business in the past but taking into account the fact that such property will no longer be under common control. The term of the license agreements will terminate upon the earliest to occur of (i) (A) in the case of the properties identified in Items 4(c)-(e) on Schedule 3.06, no more than six (6) months after the Closing and (B) in the case of the properties identified in Items 4(f) and 4(g) on Schedule 3.06, one (1) year after the Closing, (ii) sale of the property or termination of the lease of the property, and (iii) Seller ceasing to occupy the property for the conduct of business; provided, however, that Seller will provide Buyer with at least thirty (30) days advance written notice if any termination under clause (ii) or (iii).

**ARTICLE VII**
**CONDITIONS TO THE PURCHASE AND SALE**

**Section 7.01**  Conditions of Buyer to the Purchase and Sale.  The obligation of Buyer at the Closing to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver by Buyer (in its sole discretion) on the Closing Date of each of the following conditions:

(a)    (i) Each of the representations and warranties of Seller contained in Section 3.04(a) shall be true and correct in all respects, both on and as of the date hereof and on and as of the Closing Date, (ii) each of the representations and warranties of Seller contained in Section 3.01, Section 3.02(a), Section 3.02(b), the first sentence of Section 3.05(a), the third sentence of Section 3.05(b), the first sentence of Section 3.06, the first sentence of Section 3.13(a) and Section 3.18 (without giving effect to any "materiality" or "Material Adverse Effect"

qualification or exception contained therein) shall be true and correct in all material respects, both on and as of the date hereof and on and as of the Closing Date, and (iii) each of the representations and warranties of Seller contained in ARTICLE III other than those listed in clauses (i) or (ii) of this Section 7.01(a) (without giving effect to any "materiality" or Material Adverse Effect qualification or exception contained therein) shall be true and correct in all respects, both on and as of the date hereof and on and as of the Closing Date, except for such failures to be so true and correct that would not, individually or in the aggregate, have a Material Adverse Effect; provided, however, that representations or warranties made as of a specified date shall be true and correct (in the manner specified in clauses (i), (ii) or (iii), as applicable), only as of such specified date.

(b)     The covenants of Seller to be performed on or prior to the Closing Date shall have been duly performed in all material respects.

(c)     Since the date of this Agreement, there shall not have been any Effect that, individually or in the aggregate, has had a Material Adverse Effect.

(d)     Buyer shall have been furnished with (i) a certificate executed by an authorized officer of Seller, dated as of the Closing Date, certifying that the conditions contained in Sections 7.01(a), 7.01(b) and 7.01(c) have been fulfilled and (ii) the other documents and instruments required to be delivered by Seller or its Subsidiaries pursuant to Section 2.07.

(e)     No court of competent jurisdiction or other competent Governmental Authority shall have issued a Law or Order or taken any other action for the purpose of (i) restraining, enjoining or otherwise prohibiting or making illegal the transactions contemplated by this Agreement or (ii) which could reasonably be expected to result in an enforceable criminal liability for Buyer or any of its respective Affiliates, directors, officers or employees.

(f)     If an HSR Filing is required, the waiting period required by the HSR Act, and any extensions thereof, or any timing agreements, understandings or commitments obtained by request or other action of the FTC and/or the Antitrust Division, as applicable, shall have expired or been terminated by the FTC and the Antitrust Division.

(g)     Buyer shall have been furnished with certificates executed by an authorized officer of Seller and, to the extent any of the Transferred Assets are being sold by a Subsidiary of Seller, an officer of such Subsidiary, certifying (i) if Seller or such Subsidiary is a "United States person" within the meaning of Section 7701(a)(30) of the Code, that Seller or such Subsidiary is not a "foreign person" within the meaning of Section 897(c) of the Code and applicable Treasury Regulations or (ii) if Seller or such Subsidiary is not a "United States person," that the Transferred Assets being sold by Seller or such Subsidiary do not constitute interests in United States real property as defined in Section 897(c) of the Code and applicable Treasury Regulations.

(h)     Seller shall have taken such actions as may be necessary to secure the release as of the Closing of any and all Encumbrances (other than Permitted Encumbrances).

(i)     Receipt of the Required Notices.

WEIL:\96692952\39\73219.0008

**Section 7.02**    Conditions of Seller to the Purchase and Sale.  The obligation of Seller at the Closing to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver by Seller (in its sole discretion) on the Closing Date of each of the following conditions:

(a)    (i) Each of the representations and warranties of Buyer contained in Section 4.01, Section 4.02(a), Section 4.02(b) and Section 4.03 (without giving effect to any "materiality" or Buyer Material Adverse Effect qualification or exception contained therein) shall be true and correct in all respects, both on and as of the date hereof and on and as of the Closing Date, and (ii) each of the representations and warranties of Buyer contained in ARTICLE IV other than those listed in clause (i) of this Section 7.02(a) (without giving effect to any "materiality" or Buyer Material Adverse Effect qualification or exception contained therein) shall be true and correct in all respects, both on and as of the date hereof and on and as of the Closing Date, except for such failures to be true and correct that would not, individually or in the aggregate, have a Buyer Material Adverse Effect; provided, however, that representations or warranties made as of a specified date, shall be so true and correct in the manner specified in clauses (i) or (ii) as applicable) only as of such specified date.

(b)    The covenants of Buyer to be performed on or prior to the Closing Date shall have been duly performed in all material respects.

(c)    Seller shall have been furnished with (i) a certificate executed by an authorized officer of Buyer, dated as of the Closing Date, certifying to the effect that the conditions contained in Sections 7.02(a) and 7.02(b) have been fulfilled and (ii) the other documents and instruments required to be delivered by Buyer or its designees pursuant to Section 2.07.

(d)    No court of competent jurisdiction or other competent Governmental Authority shall have issued a Law or Order or taken any other action for the purpose of (i) restraining, enjoining or otherwise prohibiting or making illegal the transactions contemplated by this Agreement or (ii) which could reasonably be expected to result in an enforceable criminal liability for Seller or any of its Subsidiaries, directors, officers or employees.

(e)    If an HSR Filing is required, the waiting period required by the HSR Act, and any extensions thereof, or any timing agreements, understandings or commitments obtained by request or other action of the FTC and/or the Antitrust Division, as applicable, shall have expired or been terminated by the FTC and the Antitrust Division.

## ARTICLE VIII
## AMENDMENT AND WAIVER

**Section 8.01**    Amendment and Modification.  This Agreement may only be amended or modified by a written instrument signed by each of the Parties.

**Section 8.02**    Waiver.  At any time prior to the Closing, either Party may, in its sole discretion, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto, or (iii) waive compliance with any of the agreements or conditions of the other Party contained herein.  Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument

WEIL:\96692952\39\73219.0008

executed by the Party and granting such extension or waiver.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

## ARTICLE IX
## SURVIVAL

Section 9.01    Survival.    Subject to Section 10.02, the representations, warranties, covenants and agreements in this Agreement and in any schedule, exhibit, instrument or other document pursuant to this Agreement, including any certificate delivered pursuant to Section 7.01(d) or Section 7.02(c), shall terminate at, and shall not survive, the earlier of the Closing and the time of termination of this Agreement pursuant to Section 10.02, and thereafter no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto against Seller, its Affiliates and each of their respective current and former officers, directors, employees, partners, managers, members, advisors, consultants, agents or representatives, or their respective successors and assigns. Notwithstanding the foregoing, any covenants and agreements of Seller and Buyer that by their terms contemplate performance following Closing shall survive the Closing in accordance with their respective terms (but not to exceed the applicable statute of limitations in the event of a breach of such covenant) and the provisions of Section 6.07(a), this Article IX and the Confidentiality Agreement shall survive the Closing.

Section 9.02    No Waiver for Fraud. Notwithstanding anything to the contrary contained in this Agreement, none of the provisions set forth in this Agreement, including the provisions set forth in Section 9.01, shall be deemed a waiver by any Party of any right or remedy (including the amounts of recovery or the recourse which any such Party may seek) that such Party may have at law or in equity based on any other Person's fraud.

## ARTICLE X
## MISCELLANEOUS

Section 10.01    Termination.    This Agreement shall terminate automatically without any action required by any other Person or Party at any time prior to the Closing if the Closing shall not have occurred on or prior to January 22, 2019 (the "Outside Date"); provided, that (x) the Parties may mutually agree (each at their respective discretion) to extend the Outside Date and (y) if the conditions set forth in Section 7.01(e), Section 7.01(f), Section 7.02(d), or Section 7.02(e) have not been satisfied as of the Outside Date, but all other conditions shall have been satisfied or shall be capable of being satisfied at such time, the Outside Date will automatically extend without any action by either Buyer or Seller, as the case may be, to February 7, 2019. This Agreement may also be terminated at any time prior to the Closing:

(a)    by written agreement of Buyer and Seller;

(b)    by Buyer or Seller, if any court of competent jurisdiction or other competent Governmental Authority shall have issued a Law or Order or taken any other action permanently

restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Law or Order or other action shall have become final and nonappealable;

(c)      by Buyer, if (i) Seller shall have breached any covenant or agreement required to be performed by Seller pursuant to this Agreement, or any representation or warranty contained in ARTICLE III shall be or have become inaccurate, in either case such that any of the conditions set forth in Section 7.01(a) or Section 7.01(b) would not be satisfied, and (ii) such breach or inaccuracy shall not have been cured on or prior to the earlier of (A) thirty (30) days following delivery to Seller of written notice of such breach or inaccuracy from Buyer and (B) five (5) Business Days prior to the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 10.01(c) shall not be available to Buyer if Buyer has failed to perform any of its covenants, obligations or agreements contained in this Agreement or if there is any inaccuracy in any of its representations or warranties contained in ARTICLE IV such that any of the conditions set forth in Section 7.02(a) or Section 7.02(b), as applicable, would not then be satisfied;

(d)      by Seller, if (i) Buyer shall have breached any covenant or agreement required to be performed by Buyer pursuant to this Agreement, or any representation or warranty of Buyer shall be or have become inaccurate, in either case such that any of the conditions set forth in Section 7.02(a) or Section 7.02(b) would not be satisfied, and (ii) such breach or inaccuracy shall not have been cured on or prior to the earlier of (A) thirty (30) days following delivery to Buyer of written notice of such breach or inaccuracy from Seller and (B) five (5) Business Days prior to the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 10.01(d) shall not be available to Seller if Seller has failed to perform any of its covenants, obligations or agreements contained in this Agreement or if there is any inaccuracy in any of its representations or warranties contained in ARTICLE III such that any of the conditions set forth in Section 7.01(a) or Section 7.01(b), as applicable, would not then be satisfied;

(e)      by Buyer or Seller, if the Sale Procedures Order has not been entered by the Bankruptcy Court on or before November 30, 2018; provided that the Party exercising such termination right is in compliance with Section 5.02;

(f)      by Buyer or Seller, if the Sale Order has not been entered by the Bankruptcy Court on or before December 21, 2018; provided that the Party exercising such termination right is in compliance with Section 5.02;

(g)      by Buyer or Seller, if the Sale Order has not been entered by the Bankruptcy Court and become final and non-appealable on or before January 4, 2019; provided that the Party exercising such termination right is in compliance with Section 5.02;

(h)      by Buyer or Seller if the Bankruptcy Court shall enter an order approving a Competing Bid or any sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Buyer, or Seller publicly announces the selection of a Person other than Buyer as the successful bidder for all or substantially all of the Transferred Assets in the Auction (each, an "Alternate Transaction") and Buyer is not the back-up bidder in accordance with the Sale Procedures;

WEIL:\96692952\39\73219.0008

(i)      by Buyer, if the Bankruptcy Court issues an Order (i) converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, or (ii) dismissing the Chapter 11 Cases;

(j)      by Buyer, if Buyer is selected as the back-up bidder and does not receive a Back-up Notice from the Seller by the Back-up Termination Date; or

(k)      by Buyer, (i) if the conditions set forth in Section 6.17 with respect to the Critical Vendors identified therein have not been satisfied within the time period set forth therein, or (ii) if vendors and/or suppliers are not paid for postpetition goods and/or services provided with respect to the Business in the ordinary course by the date when any such payments are due; provided, however, that the termination right in this Section 10.01(k)(ii) shall only apply in the event that the failure to pay the vendors and/or suppliers is, individually or in the aggregate, material to the Business.

The Party seeking to terminate this Agreement pursuant to this Section 10.01 (other than Section 10.01(a)) shall give prompt written notice of such termination to the other Party.

Section 10.02   Effect of Termination.

(a)      Other than as set forth in Section 10.02(b), in the event of the termination of this Agreement pursuant to Section 10.01, this Agreement shall thereafter become void and have no effect, and no Party shall have any liability to the other Party or their respective Affiliates, directors, officers or employees, except for the obligations of the Parties contained in Section 6.07 and this ARTICLE X, and except that nothing in this Section 10.02 will relieve any Party from liability for any breach of this Agreement prior to such termination; provided, that Seller's Liability hereunder for any and all such breaches shall be capped at an amount equal to $6,000,000 (except in the case of fraud); provided, further, the Buyer's Liability hereunder for any and all such breaches (including if this Agreement is terminated by Seller pursuant to Section 10.01(d)) shall be capped at the amount of the Deposit Escrow Amount (except in the case of fraud) and such amount shall be paid out of the Deposit Escrow Amount pursuant to Section 2.05(c)(ii).  Except in the case of fraud, upon payment of the amount in the proviso in the immediately preceding sentence to Buyer in accordance with this Section 10.02(a), Seller and its respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any liability resulting from the termination of this Agreement and neither Seller, its Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.

(b)      To the extent the Sale Procedures Order is entered and in the event that an Alternate Transaction is closed, then Seller shall promptly pay to Buyer concurrently with the closing of such Alternate Transaction by wire transfer of immediately available funds, a breakup fee in cash in an amount equal to one-and-a-half percent (1.5%) of the Base Purchase Price (the "Breakup Fee").  Except in the case of fraud, upon payment of Deposit Escrow Amount to Seller in accordance with Section 10.02(a) or upon payment of the Breakup Fee to Buyer in accordance with this Section 10.02(b), Seller and its respective Representatives and Affiliates, on the one hand,

WEIL:\96692952\39\73219.0008

and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Seller, its Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.

Section 10.03    Expenses.  Unless otherwise expressly indicated herein or in the Ancillary Agreements, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and accountants and other Representatives) incurred in connection with the preparation and execution of this Agreement, the Ancillary Agreements and consummation of the transactions contemplated hereby and thereby.

Section 10.04    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this Section 10.04 shall be null and void and of no force and effect. Notwithstanding the preceding sentence, Buyer may, without the prior written consent of Seller, assign its rights under this Agreement, in whole or in part, to one or more of its Subsidiaries or its lenders for credit support purposes; provided, however, that no such assignment shall relieve Buyer of its obligations hereunder.  Subject to the preceding sentences of this Section 10.04, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

Section 10.05    Entire Agreement; Interpretation.

(a)    Except as otherwise contemplated herein, this Agreement and the Ancillary Agreements and the Schedules and Exhibits attached hereto and thereto constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties, with respect to the subject matter hereof (other than the Confidentiality Agreement). The Parties acknowledge that all Parties participated in the drafting of this Agreement and the Ancillary Agreements with the involvement of their respective counsel and agree that any rule of Law or any legal decision that may or would require interpretation of any alleged ambiguities in this Agreement or the Ancillary Agreements against the Party that drafted it has no application and is expressly waived.  In the event of a conflict or inconsistency between the terms of this Agreement (including the representations, warranties, covenants and indemnification provisions hereof) and the terms of any other documents delivered or required to be delivered in connection with the consummation of the transactions contemplated by this Agreement, the Parties acknowledge and agree that the terms of this Agreement shall supersede such conflicting or inconsistent terms in such other documents and the terms of this Agreement shall define the rights and obligations of the Parties and their respective officers, directors, employees, stockholders and Affiliates with respect to the subject matter of such conflict or inconsistency.

Section 10.06    Schedules.  All Schedules attached hereto are incorporated herein and expressly made a part of this Agreement as though completely set forth herein.  All references to this Agreement herein or in any of the schedules shall be deemed to refer to this entire Agreement, including all Schedules.  The inclusion of any matter in any Schedule to this Agreement shall

expressly not be deemed to constitute an admission by either Party or otherwise imply that any such matter is material, has a Material Adverse Effect or creates a measure for, or further defines the meaning of, materiality or Material Adverse Effect and their correlative terms for the purposes of this Agreement.  Any capitalized terms used but not defined in any Schedule shall have the same meaning assigned to such term herein.

Section 10.07 Counterparts.  This Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall be considered one and the same instrument.

Section 10.08 Section Headings.  The article, section and paragraph headings contained in this Agreement are for reference purposes only and shall not in any, way affect the meaning or interpretation of this Agreement.

Section 10.09 Notices.  All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via facsimile or email during normal business hours of the recipient (receipt acknowledged) during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day.  Such notices or other communications must be sent to each respective Party at the address, email address or facsimile number set forth below (or at such other address, email address or facsimile number as shall be specified by a Party in a notice given in accordance with this Section 10.09):

(a)      if to Seller, to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention:  General Counsel
Facsimile:  (847) 286-2741
E-mail:  counsel@searshc.com

With a copy (which shall not constitute notice hereunder) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Ray C. Schrock, Ellen J. Odoner, Jacqueline Marcus and Gavin Westerman
Facsimile:  (212) 310-8007
E-mail:  Ray.Schrock@weil.com; Ellen.Odoner@weil.com; Jacqueline.Marcus@weil.com; Gavin.Westerman@weil.com

(b)      if to Buyer, to:

Service.com, Inc.
30840 Northwestern Highway, Suite 250
Farmington Hills, Michigan 48334
Attention: Sandy Kronenberg, CEO
Facsimile: (724) 255-8921
E-mail: Sandy@service.com

With a copy (which shall not constitute notice hereunder) to:

Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Attention: Aaron Rigby
Facsimile: (214) 981-3400
E-mail: arigby@sidley.com

**Section 10.10** <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Ancillary Agreement, any breach or default hereunder or thereunder, or the transactions contemplated hereunder or thereunder, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10.09</u>; <u>provided</u>, <u>however</u>, that if the Chapter 11 Cases have closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof by personal delivery, prepaid overnight courier or certified mail in accordance with the provisions of <u>Section 10.09</u>.

(c)    EACH PARTY (I) ACKNOWLEDGES AND AGREES THAT ANY ACTION THAT MAY ARISE UNDER OR RELATE TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND (II) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.    EACH PARTY (A) CERTIFIES AND

ACKNOWLEDGES THAT NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) CERTIFIES AND ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION OF THIS AGREEMENT, (C) UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER AND (D) MAKES THIS WAIVER VOLUNTARILY.

(d)    THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**Section 10.11**  Illegality.  In case any provision of this Agreement, shall be invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect, unless the severance of such provision would be in opposition to the Parties' intent with respect to such provision or the economic or legal substance of the transactions contemplated hereby would be affected in any manner materially adverse to any Party.  Upon determination by a court of competent jurisdiction that any provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are consummated and the obligations and agreements of the Parties hereunder are fulfilled to the greatest extent possible.  For the avoidance of doubt, it is the intention of the Parties that the remedies and limitations on remedies contained in this Agreement (including all of the provisions set forth in Section 10.14) are an integral part of this Agreement.

**Section 10.12**  Public Announcements.  The Parties agree to issue a joint press release with respect to the execution and delivery of this Agreement and the transactions contemplated hereby, which press release shall be substantially in the form of the draft previously approved by both Parties on the date hereof.  The Parties shall agree on the time and manner of distribution of the press release, and neither Party shall make the press release public prior to such time.  The Parties agree (a) not to make any formal public written announcements, press releases or statements to the media, financial community or customers or suppliers of the Business with respect to the Business or the terms of the transactions contemplated hereby without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed and (b) to consult with each other regarding any other proposed written public announcements or statements with respect

62

to this Agreement and the transactions contemplated hereby to the extent practicable; provided, however, that (A) the Parties may make any such announcements or statements which such Party has been advised by counsel may be required by applicable Law (including stock exchange regulations) or, in the case of clause (b), where such consultation is impracticable under the circumstances, (B) the Parties shall agree on the content of the first announcement made to the employees of the Business regarding the execution of this Agreement and the transactions contemplated hereby and (C) following the Closing, a Party may make a public disclosure of the fact that the transactions contemplated hereunder have closed and the identities of the Parties hereto.

Section 10.13    No Third Party Beneficiaries.    No provision of this Agreement is intended to confer upon any Person (other than the Parties) any rights or remedies hereunder.

Section 10.14    Specific Performance.    The Parties acknowledge and agree that, prior to the Closing, except as provided in Section 10.02, the sole and exclusive remedy available to (a) Seller in the event of Buyer's breach and (b) Buyer in the event of Seller's breach, in each case, of any representation, warranty, covenant and agreement of such Party in this Agreement shall be to terminate this Agreement pursuant to and in accordance with Section 10.01.    Following the Closing, (i) the Parties agree that time is of the essence, irreparable damage would occur in the event that any of the terms or provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached (including the Parties' obligation to close the transactions), and that money damages or other legal remedies would not be an adequate remedy for any such damages, and (ii) it is accordingly agreed that, without posting a bond or other undertaking, prior to the termination of this Agreement, each of the Parties shall be entitled to injunctive or other equitable relief to prevent or cure breaches of this Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof (including the Parties' obligation to close the transactions) before and after the Closing, such remedy being in addition to any other remedy to which any Party may be entitled at Law or in equity.    In the event that any Action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law.

Section 10.15    No Recourse.    All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of or related in any manner to this Agreement may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto with respect to provisions and terms of this Agreement applicable to such Persons (such Persons, collectively, the "Contracting Parties"), other than in the case of fraud.    In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other Contracting Party.    Other than in the case of fraud, no Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor to, any of the foregoing, shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the negotiation, execution, performance or breach of this Agreement, and, to the

maximum extent permitted by Law, each Contracting Party waives and releases all such liabilities, claims and obligations.

**Section 10.16** <u>Bulk Sales</u>.   The Parties hereby (a) waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Transferred Assets to Buyer and (b) acknowledge and agree that, for the avoidance of doubt, any Liabilities arising out of the failure of Seller or any of its Affiliates to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that would not otherwise constitute Assumed Liabilities shall continue to be treated as Excluded Liabilities.

[Signatures on Following Page]

64

IN WITNESS WHEREOF, this Agreement has been signed on behalf of each of the parties hereto as of the date first written above.

SEARS HOLDINGS CORPORATION

By: _____

Name:   Robert A. Riecker

Title:    Chief Financial Officer

**SERVICE.COM, INC.**

By

Name: Sandy Kronenberg

Title: President, Chief Executive Officer &
     Secretary

**EXHIBIT A**

DEFINITIONS

The following terms shall have the meanings set forth or as referred to below (references to specific Articles and Sections are to the Articles and Sections of the Agreement, unless specifically stated otherwise):

"Action" shall mean any action, claim, suit (whether civil, criminal, administrative, judicial or investigative), audit, hearing, arbitration, mediation, subpoena, discovery request, proceeding or investigation by or before any court or grand jury, any Governmental Authority, arbitration tribunal or mediator.

"Adjustment Escrow Account" shall have the meaning set forth in Section 2.07(b)(ii).

"Adjustment Escrow Amount" means an amount equal to a mutually-agreed estimate of the Adjustment Payment Amount that may be payable by Seller pursuant to Section 2.06(f)(ii).

"Adjustment Payment Amount" shall mean an amount (which may be positive or negative), equal to (a) the Final Net Working Capital Adjustment Amount minus (b) the Estimated Net Working Capital Adjustment Amount.

"Affiliate" shall mean, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person at any time during the period for which the determination of affiliation is being made.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" shall mean this Agreement and all Exhibits and Schedules attached hereto.

"Allocation Schedule" shall have the meaning set forth in Section 2.09.

"Alternate Transaction" has the meaning set forth in Section 10.01(h).

"Ancillary Agreements" shall mean the Services Agreement, the IP Assignment Agreement, the Trademark License Agreement, the Deeds, the Assignment and Assumption of Lease, the Bill of Sale and Assignment, Assumption Agreement, the Escrow Agreement and the any license agreements to be entered into by Buyer and Seller at Closing pursuant to Section 6.18.

"Antitrust Actions" shall have the meaning set forth in Section 6.01(d).

"Antitrust Division" shall mean the Antitrust Division of the United States Department of Justice.

A-1

"Antitrust Laws" shall mean the Sherman Antitrust Act, the Clayton Antitrust Act of 1914, the HSR Act and all other federal, state and foreign statutes, rules, regulations, orders, decrees and other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or competition.

"Assignment and Assumption of Lease" shall mean an assignment and assumption of lease between Buyer or its designee, on the one hand, and Seller or its applicable Subsidiary, on the other hand, with respect to the Real Property Leases, in form and substance appropriate for recording in the public real estate records of the relevant jurisdiction and otherwise mutually agreeable to the Parties.

"Assumed Contracts" shall mean the Business Contracts and Real Property Leases that Buyer has designated for assumption pursuant to and in accordance with the terms of this Agreement.

"Assumed Liabilities" shall have the meaning set forth in Section 2.03.

"Assumed Vehicles" shall have the meaning set forth in Section 2.01(m).

"Assumption Notice" shall have the meaning set forth in Section 5.03(a).

"Auction" shall have the meaning set forth in Section 5.02(d).

"Audited Financial Statements" shall have the meaning set forth in Section 3.03(a)(i).

"Back-up Notice" shall have the meaning set forth in Section 5.02(d).

"Back-up Termination Date" means the first to occur of (a) consummation of the transaction with the winning bidder at the Auction, (b) Buyer's receipt of notice from Seller of the release by Seller of Buyer's obligations under Section 5.02(d), and (d) January 31, 2019.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Base Purchase Price" shall mean $60,000,000.

"Benefit Comparability Period" shall have the meaning set forth in Section 6.03(b).

"Benefit Plans" shall have the meaning set forth in Section 3.12(a).

"Bill of Sale and Assignment and Assumption Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit G, to be entered into by and among Seller and its applicable Subsidiaries, on the one hand, and Buyer or its applicable Affiliates, on the other hand.

"Books and Records" shall mean the books, Records and other information in the possession or control of Seller or its Subsidiaries that are exclusively related to, used exclusively

A-2

in or held exclusively for use in the Business (in each case, wherever located) as of the Closing Date, market research reports, research and development files, engineering documentation, quality control, vigilance and regulatory records, sales data, litigation files, financial information relating to the Business, the Transferred Assets and the Assumed Liabilities, including any human resources, benefits, medical or other employee Records of the employees of Seller and its Subsidiaries, except (i) to the extent prohibited by applicable Law, (ii) to which consent from a Transferred Employee to transfer any such records is required by applicable Law but has not been obtained prior to the Closing, provided Seller and its Subsidiaries have used commercially reasonable efforts to obtain such consent or (iii) to the extent that Buyer has notified Seller that it does not want to take possessions of such employee or personnel information, but excluding any Tax records of Seller or its Subsidiaries and other financial source documents (e.g., invoices to customers, maintenance records on assets, etc.), including Seller's Tax Returns, of Seller or its Subsidiaries which Seller determines are necessary to retain in order to maintain adequate documentation for the support of Tax Returns.

"Breakup Fee" shall have the meaning set forth in Section 10.02(b).

"Business" shall mean the business of (i) providing home improvement services and related products to consumers in connection with the installation of windows, roofing, siding, entry, patio and garage doors, non-metal doors, cabinets (including cabinet re-facing), kitchens (including kitchen remodeling), baths (including bath remodeling), countertops and flooring, (ii) providing heating, ventilation and air conditioning installation, replacement and repair services in the SHIP districts listed in Schedule A-1 and (iii) marketing and selling California Protection Agreements, in the case of each of clauses (i)-(iii), as such Business is engaged in by Seller and its Subsidiaries as of the date hereof and as of the Closing.

"Business Contracts" shall mean all Contracts to which Seller or any of its Subsidiaries is a party and which exclusively relate to, are exclusively used in, or are held exclusively for use in the Business, including all California Protection Agreements but excluding Real Property Leases and, subject to Section 6.02, those Contracts that expire or are terminated prior to the Closing.

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by Law or executive order to not open or remain closed.

"Business Employees" shall mean each employee that is and has been since the later of January 1, 2018 or such individual's date of hire primarily engaged in providing services in connection with the Business and who spends a majority of his or her work time in the operation of the Business, as determined by Seller or any of its Subsidiaries in good faith and listed in Schedule 6.03(a), including each Disabled Employee.

"Business Financial Statements" shall have the meaning set forth in Section 3.03(a).

"Business Permits" shall have the meaning set forth in Section 3.09(b).

"Buyer" shall have the meaning set forth in the Preamble.

A-3

"Buyer Adjustment Payment Excess Amount" shall have the meaning set forth in Section 2.06(f)(ii).

"Buyer Material Adverse Effect" shall mean any change, effect, event, occurrence, state of facts or development that prevents in any material respect the ability of Buyer and its Affiliates to consummate the transactions contemplated by this Agreement or the Ancillary Agreements.

"Buyer's Savings Plan" shall have the meaning set forth in Section 6.03(n)(i).

"California Protection Agreements" shall mean protection agreements under which Sears Home Improvement Products, Inc., a Pennsylvania corporation, is the obligor, in connection with providing heating, ventilation and air conditioning installation and repair services in California.

"Chapter 11 Cases" shall have the meaning set forth in the Recitals.

"Closing" shall have the meaning set forth in Section 2.07(a).

"Closing Date" shall have the meaning set forth in Section 2.07(a).

"Closing Date Payment" shall mean (i) the Base Purchase Price, plus (ii) the Estimated Net Working Capital Adjustment Amount (which may be a positive or negative number).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Competing Bid" shall have the meaning set forth in Section 5.01.

"Confidentiality Agreement" shall mean the Confidentiality Agreement, dated as of May 19, 2017, by and between Service.com, Inc. and Seller, as amended by Addendum 1 to the Confidentiality Agreement, dated September 28, 2017.

"Consent" shall mean any approval, authorization, consent, ratification, permission, exemption or waiver or the expiration, lapse or termination of any waiting period.

"Continuation Coverage" shall have the meaning set forth in Section 6.03(j).

"Contract" shall mean all contracts, agreements, leases, subleases, licenses or other purportedly legally binding arrangements, whether written or oral, including open purchase orders.

"Contracting Parties" shall have the meaning set forth in Section 10.15.

"CPA Firm" shall mean PricewaterhouseCoopers LLP or another national firm of independent public accountants as to which the Parties mutually agree.

"Critical Vendor" has the meaning set forth in the Critical Vendor Motion.

"Critical Vendor Claim" has the meaning set forth in the Critical Vendor Motion.

A-4

"<u>Critical Vendor Motion</u>" means that certain motion filed by the Seller and its affiliated debtors in the Chapter 11 Cases requesting authority from the Bankruptcy Court for Seller and its affiliated debtors to, among other things, pay the prepetition claims of certain critical counterparties, See Docket No. 18, as approved by the Bankruptcy Court on an interim basis, See Docket No. 137.

"<u>Critical Vendor Payment Protocol</u>" has the meaning set forth in the Critical Vendor Motion.

"<u>Cure Costs</u>" means any and all costs, expenses or actions that Buyer would be required to pay or perform to assume any of the Assumed Contracts pursuant to section 365(f) of the Bankruptcy Code.

"<u>Customer Data</u>" shall mean all data (including personally identifiable information) to the extent relating to the customers or consumers of the Business and collected in the context of such Persons acting in their capacity as customers or consumers of the Business, including customer lists, customer information and all installation, repair or other servicing history. The Parties acknowledge that the customers and consumers of the Business may also be customers and consumers of the retained businesses of Seller or its Subsidiaries and, thus, the same or similar information may be contained in Customer Data (to the extent collected in the context of such Persons acting in their capacity as customers or consumers of the Business) and the data retained by Seller or its Subsidiaries (to the extent collected in the context of such Persons acting in their capacity as customers or consumers of Seller's or its Subsidiaries' retained businesses).

"<u>Data Room</u>" shall mean the virtual data room established and maintained by Intralinks on behalf of Seller with respect to the transactions contemplated hereby to the extent Buyer and its Representatives have been given access thereto.

"<u>Deeds</u>" shall have the meaning set forth in <u>Section 2.07(b)(iii)</u>.

"<u>Deposit Escrow Account</u>" shall have the meaning set forth in <u>Section 2.05(c)</u>.

"<u>Deposit Escrow Amount</u>" shall mean $6,000,000.

"<u>Designated Contracts</u>" shall have the meaning set forth in <u>Section 5.03(b)</u>.

"<u>Designation Deadline</u>" shall have the meaning set forth in <u>Section 5.03(b)</u>.

"<u>Determined Cure Costs</u>" shall mean, in the aggregate, all Cure Costs payable in respect of the Assumed Contracts as determined pursuant to the Sale Order, up to a maximum aggregate amount equal to $5,000,000.

"<u>Disabled Employee</u>" shall mean any Business Employee who is on short-term or long-term disability or other approved paid or unpaid leave of absence, such as military, maternity or medical leave of absence or leave under the Family and Medical Leave Act of 1993, in each case, as of the Closing Date.

"<u>Draft Closing Statement</u>" shall have the meaning set forth in <u>Section 2.06(c)</u>.

"Draft Net Working Capital Value" shall have the meaning set forth in Section 2.06(c).

"Employee Bonuses" shall have the meaning set forth in Section 6.03(f).

"Encumbrances" shall mean any liens, charges, easements, title defects, encumbrances, encroachments, hypothecations, security interests, pledges, options to purchase or lease or otherwise acquire any interest, rights of first refusal and of first offer, conditional sales agreements, mortgages, restriction on title or transfer or adverse claims of ownership or use and adverse monetary claims of any kind.

"Environmental Laws" shall mean all Laws relating to:  (i) pollution or protection or cleanup of the environment or natural resources; (ii) the management, manufacture, processing, use, treatment, handling, storage, disposal, transportation, re-use, recycling, actual or threatened Releases or reclamation of any Hazardous Substance; or (iii) health and safety to the extent related to exposure to Hazardous Substances.

"Environmental Permits" shall have the meaning set forth in Section 3.15(a).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" shall have the meaning set forth in Section 2.05(c).

"Escrow Agreement" shall have the meaning set forth in Section 2.05(c).

"Estimated Closing Statement" shall have the meaning set forth in Section 2.06(a).

"Estimated Net Working Capital Adjustment Amount" shall mean an amount (which may be a positive or negative number) equal to (a) the Estimated Net Working Capital Value minus (b) the Target Net Working Capital Value.

"Estimated Net Working Capital Value" shall have the meaning set forth in Section 2.06(a).

"Excluded Assets" shall have the meaning set forth in Section 2.02.

"Excluded Contract" shall have the meaning set forth in Section 2.10.

"Excluded Liabilities" shall have the meaning set forth in Section 2.04.

"FCPA" shall have the meaning set forth in Section 3.09(d).

"Final Closing Statement" shall have the meaning set forth in Section 2.06(e).

"Final Net Working Capital Adjustment Amount" shall mean an amount (which may be a positive or negative number) equal to (a) the Final Net Working Capital Value minus (b) the Target Net Working Capital Value.

WEIL:\96692952\39\73219.0008

"Final Net Working Capital Value" shall have the meaning set forth in Section 2.06(e).

"Final Order" shall mean an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect and is no longer subject to appeal.

"Financial Advisor" shall mean Lazard Frères & Co. LLC.

"Financial Assurances" shall have the meaning set forth in Section 6.14.

"Foreign Plans" shall have the meaning set forth in Section 3.12(f).

"FTC" shall mean the Federal Trade Commission.

"GAAP" shall mean U.S. generally accepted accounting principles, consistently applied.

"Governmental Authority" shall mean any United States or foreign supranational (including the European Union), national, federal, state, county, provincial or municipal authority or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any tribunal or court or arbitrator(s) of competent jurisdiction, including the Bankruptcy Court.

"Guarantor" shall mean Peter Karmanos, Jr.

"Guarantee" shall have the meaning set forth in the Recitals.

"Hazardous Substances" shall mean any substances, material or waste that is classified or categorized in or regulated under any applicable Environmental Law as "hazardous," "toxic," "dangerous," a "pollutant," a "contaminant," or words of similar meaning, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls, radioactive materials, lead-based paint and toxic mold or fungus.

"Hiring Transition Period" shall have the meaning set forth in Section 6.03(i).

"HSR Act" shall mean the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended.

"HSR Filing" shall have the meaning set forth in Section 6.01(b).

"Improvements" shall have the meaning set forth in Section 3.05(c).

"Indebtedness" shall mean (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, notes, debentures, letters of credit or similar instruments or secured by an Encumbrance on any asset, (iii) obligations for the deferred purchase price of property or services (including any potential future earn-out, purchase price adjustment, releases of "holdbacks" or

A-7

similar payments, but excluding accounts payable that are included as such on the Final Closing Statement), (iv) interest rate and currency obligation swaps, hedges or similar arrangements, (v) obligations for the reimbursement for amounts drawn on any letter of credit, (vi) all obligations as lessee that would be required to be capitalized in accordance with GAAP, and (vii) all obligations of any kind to guarantee any of the foregoing types of obligations on behalf of any other Person, in each case including the aggregate principal amount thereof, the aggregate amount of any accrued but unpaid interest thereon and any prepayment penalties or other similar amounts payable in connection with the repayment thereof.

"Insurable Claim" shall have the meaning set forth in Section 6.15.

"Intellectual Property" shall mean all intellectual property and other similar proprietary rights, anywhere in the world, whether registered or unregistered, including all rights in and to: (i) copyrights, copyrightable works, moral rights, designs and drawings (ii) patents, patent applications and utility models (including provisionals, continuations, divisionals, continuations-in-part, renewals, reissues, re-examinations, substitutions and extensions thereof); (iii) inventions and invention disclosures, whether or not patentable; (iv) Know-How, (v) registered, applied-for and unregistered trademarks, service marks, trade names, corporate names, logos, trade dress and all other source identifiers and commercial indicia of origin, together with the all goodwill associated with, connected to or symbolized by any of the foregoing (collectively, "Trademarks"); (vi) Software; (vii) Internet domain names, URLs and IP addresses; (viii) social media accounts, identifiers and handles; (ix) database rights and (x) all registrations and applications relating to any of the foregoing, as applicable, and any foreign counterparts thereof.

"IP Assignment Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit D, to be entered into by and among Seller and its applicable Subsidiaries, on the one hand, and Buyer or its applicable Affiliates, on the other hand.

"IP Contracts" shall have the meaning set forth in Section 3.13(b).

"IT Systems" shall have the meaning set forth in Section 3.13(f).

"Know-How" shall mean trade secrets, know-how and confidential information, including proprietary rights in and to processes, methods, formulae, marketing and technical information, blueprints, quality assurance and control procedures, design tools and simulation capabilities.

"Knowledge" shall mean, as to a particular matter, (i) in the case of Seller, the actual knowledge of the senior executives of Seller listed in Schedule A-2 after reasonable inquiry, and (ii) in the case of Buyer, the actual knowledge of the senior executives of Buyer listed in Schedule A-3, after reasonable inquiry.

"Labeling and Marketing Materials" shall mean all product labeling, product advertising, marketing and promotional materials, training materials, website content and other similar materials in each case exclusively related to, used exclusively in or held exclusively for use in the Business.

"Law" shall mean any applicable federal, state, local or foreign statute, law, treaty, ordinance, regulation, rule, code, order, judicial decision or rule of common law.

"Leased Real Property" shall have the meaning set forth in Section 3.05(b).

"Liabilities" shall mean debts, liabilities, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"Losses" shall mean actual, out-of-pocket losses, damages, costs and expenses, including reasonable attorneys' fees, without duplication.

"Material Adverse Effect" shall mean any change, effect, event, occurrence, state of facts or development (each, an "Effect"), either alone or in combination with any other Effect, that is or would reasonably be expected to be, materially adverse to (i) the Transferred Assets, Assumed Liabilities, financial condition or results of operations of the Business, individually or taken as a whole, or (ii) Seller's ability to perform its obligations under, and consummate the transactions contemplated by, this Agreement or the Ancillary Agreements; provided, however, that, in the case of clause (i) above, none of the following shall be deemed, either alone or in combination with any other Effect, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect:  (A) any conditions (or changes therein) in the industries in which the Business operates; (B) political, economic, financial or capital market conditions (including interest rates); (C) any act of civil unrest, war or terrorism, including an outbreak or escalation of hostilities involving the United States or any other country or the declaration by the United States or any other country of a national emergency or war; (D) any conditions resulting from natural or manmade disasters or other acts of God; (E) changes or proposed changes in any applicable Law or GAAP or other applicable accounting principles or standard or any interpretations or implementations thereof; (F) the failure of the financial or operating performance of Seller or any of its Subsidiaries or the Business to meet internal, Buyer or analyst projections, forecasts or budgets for any period (it being understood that any Effect underlying such failure may be deemed to constitute, or be taken into account in determining whether there has been or will be, a Material Adverse Effect unless otherwise excluded hereby); (G) any action taken or omitted to be taken by or at the written request or with the written consent of Buyer, or compliance with applicable Laws or the covenants and agreements contained in this Agreement; (H) the execution, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby in compliance herewith, or the identity of Buyer or any of its Affiliates (including the impact of such announcement on the relationships, contractual or otherwise, of the Business with employees, customers, suppliers or partners, and including any Action with respect to the transactions contemplated by this Agreement and the Ancillary Agreements); (I) any change in operations, decline in performance, or discontinuance of operations of some or all of the businesses of Seller or its Subsidiaries (other than with respect to the Business); (J) the sale of any assets, other than the Transferred Assets, to any third parties by Seller or any of its Affiliates; and (K) any effect to the extent solely resulting from the filing of the Chapter 11 Cases; provided, further, that, with respect to any matter described in any of the foregoing clauses (A)–(E) of this definition, such matter will be excluded only to the extent such

WEIL:\96692952\39\73219.0008

matter does not have a materially disproportionate effect on the Business taken as a whole relative to other participants in the industries or markets in which the Business operates.

"Material Contracts" shall have the meaning set forth in Section 3.10(a).

"Net Working Capital" shall mean, as of immediately prior to the Closing, (i) Transferred Assets that constitute current assets (excluding Tax assets and deferred acquisition costs), less (ii) Assumed Liabilities that constitute current liabilities (excluding Taxes and any uncleared checks, wires-in-transit or drafts issued by the Seller or its Subsidiaries but including the amount of unearned or deferred revenue and customer deposits), in each case determined in accordance with GAAP and consistent with the illustrative calculation of Net Working Capital set forth in Exhibit C.

"Non-Transferred Intellectual Property" shall have the meaning set forth in Section 6.08(e).

"Order" shall mean, with respect to any Person, all judgments, injunctions, writs, decrees, and orders of, or settlement agreements with, any Governmental Authority binding on such Person.

"Outside Date" shall have the meaning set forth in Section 10.01.

"Owned Real Property" shall have the meaning set forth in Section 2.01(c).

"Party" shall mean Buyer or Seller, as the case may be, and "Parties" shall mean Buyer and Seller collectively.

"PBGC" shall have the meaning set forth in Section 3.12(b)(ii).

"Permits" shall mean any permit, license, qualification, approval, authorization, registration, franchise, consent, variance, exemption, waiver, notification, or certificate of any Governmental Authority.

"Permitted Encumbrances" shall mean (i) statutory liens for Taxes not yet due and payable or being contested in good faith by appropriate proceedings in accordance with applicable Law but only to the extent, in the case of any such contest, that adequate reserves with respect thereto have specifically been established in the Business Financial Statements for the fiscal year ended February 3, 2018 to the extent required in accordance with GAAP; (ii) statutory liens of landlords, associations, liens of carriers, warehousemen, mechanics and materialmen and other similar liens imposed by Law incurred in the ordinary course of business for sums not yet due and payable or being contested in good faith by appropriate proceedings but only to the extent, in the case of any such contest, that adequate reserves with respect thereto have specifically been established in the Business Financial Statements for the fiscal year ended February 3, 2018 to the extent required in accordance with GAAP and that, in all instances, are not, individually or in the aggregate, material to the Business or the Transferred Assets; (iii) liens incurred or deposits made in the ordinary course of business in connection with securing the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return of money bonds and similar obligations, in each case, in the ordinary course of business; (iv) non-

A-10

exclusive licenses to Intellectual Property granted to customers, suppliers and other service providers of Seller and its Subsidiaries to the extent necessary for use of the products and services of the Business or for the provision of services to Seller and its Subsidiaries in connection therewith and entered into in the ordinary course of business; (v) easements, rights-of-way, and other similar restrictions on real property, in each case which are of record or do not materially interfere with the ordinary conduct of the Business or the use, occupancy, value or marketability of title of the property subject thereto and which, in all instances, do not secure an obligation to pay money and (vi) as to any Owned Real Property, any matters disclosed in any title insurance policy or commitment delivered to Buyer by Seller or otherwise obtained by Buyer, in each case in this clause (vi), prior to the date hereof.

"Person" shall mean an individual, corporation, partnership, limited liability company, association, trust or unincorporated organization, a Governmental Authority or any other entity or organization.

"Protest Notice" shall have the meaning set forth in Section 2.06(e).

"Purchase Price" shall have the meaning set forth in Section 2.05(a).

"Real Property" shall mean the land, buildings and improvements owned or leased by Seller or any of its Subsidiaries and used in the Business (including all leasehold interests, easements and any other rights and interests appurtenant thereto), including Leased Real Property and Owned Real Property.

"Real Property Leases" shall have the meaning set forth in Section 3.05(b).

"Records" shall mean any books, records, data and other information of any kind (whether in paper, electronic or any other form), including relating to the purchase of materials and supplies, sales or processing of products, invoices, inventories, supplier lists and personnel records.

"Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, or other release at, in, on, into or onto the environment, including the migration of any Hazardous Substances through or in the environment.

"Representatives" shall mean, with respect to a Person, the managers, directors, officers, employees, accountants, legal counsel, financial advisors, agents, and other representatives of such Person.

"Required Notices" shall mean those notices listed on Schedule A-4.

"Restructuring Committee" shall mean the restructuring committee of the Board of Directors of Seller established by resolutions adopted on October 10, 2018.

"Retained Data" shall mean any data relating to customers or consumers of Seller or its Subsidiaries (including personally identifiable information) to the extent collected by or on behalf of Seller or any of its Subsidiaries in the context of such Persons acting in their capacity as

A-11

customers or consumers of Seller's or its Subsidiaries' retained businesses (and, for the avoidance of doubt, not of the Business).

"Sale Hearing" shall mean the hearing by the Bankruptcy Court with respect to the Sale Motion.

"Sale Motion" means the motion of Seller seeking approval and entry of the Sale Procedures Order and the Sale Order, to be filed on or about November 1, 2018 in the Chapter 11 Cases.

"Sale Order" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably acceptable to Buyer and Seller approving this Agreement and all of the terms and conditions hereof and approving and authorizing Seller to consummate the transactions contemplated hereby free and clear of all Encumbrances and containing a finding that Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"Sale Procedures Order" means a Final Order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Seller, which, among other things establishes a date by which Competing Bids must be submitted, as requested under the Sale Motion.

"SEARS Marks" shall mean the name and Trademark, whether registered or unregistered, "SEARS", in each case, (i) together with all variations thereof and all Trademarks consisting of, containing or incorporating the name "SEARS" (other than the SHIP Marks) and (ii) to the extent owned by Seller or its Subsidiaries as of the Closing, including, for the avoidance of doubt, "SEARS HOME SERVICES".  For the avoidance of doubt, "SEARS Marks" shall not include Internet domain names consisting of, containing or incorporating the name "SEARS" or any variation thereof.

"Seller" shall have the meaning set forth in the Preamble.

"Seller Adjustment Payment Excess Amount" shall have the meaning set forth in Section 2.06(f)(i).

"Seller Adjustment Payment Remainder Amount" shall have the meaning set forth in Section 2.06(f)(ii).

"Seller Indemnitees" shall have the meaning set forth in Section 6.03(d).

"Seller Plans" shall mean each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not subject to ERISA, and each other employee benefit plan, program, policy, or arrangement (including each stock purchase, stock option, restricted stock or other equity-based, severance, retention, employment, consulting, change-of-control, bonus, incentive, deferred compensation, fringe benefit and other similar benefit plan, program, policy, or arrangement), in each case, that provides any kind of compensation or benefits to Business Employees or former employees of the Business or their dependents or beneficiaries or with respect to which Seller would reasonably be expected to have any obligation or liability in respect of the Business Employee or former employees of the Business.

A-**12**

"Seller Taxes" shall mean (i) any Taxes relating to the Business or the Transferred Assets for all periods (or portions of periods) ending on or before the Closing Date, apportioned in the case of periods that begin before and end after the Closing Date, as provided in Section 6.11(b) and (ii) (A) any income Tax liabilities of Seller or its Subsidiaries and (B) any Taxes of Seller or its Subsidiaries for any period that are not imposed with respect to the Transferred Assets or Business, in each case of (i) and (ii) including any Taxes that may be imposed under the principles of transferee or successor liability, by assumption or otherwise, and in each case of (i) and (ii) excluding any Transfer Taxes that are borne by Buyer pursuant to Section 2.08.

"Seller Transaction Expenses" means (i) all of the fees and expenses incurred by Seller or any of its Subsidiaries or other Affiliates in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, including all fees, expenses, disbursements and other similar amounts paid to attorneys (including Weil, Gotshal & Manges LLP), financial advisors (including the Financial Advisor) or accountants but excluding any Transfer Taxes that are borne by Buyer pursuant to Section 2.08, and (ii) all stay, change of control, severance, bonus or deferred compensation payments payable by Seller or any of its Subsidiaries to any Person (excluding any amounts that become payable only in combination with other events undertaken by Buyer or the passage of time), which obligation, in each case, either (x) arises at or prior to the Closing or (y) is payable or becomes due in whole or in part as a result of the consummation of the transactions contemplated by this Agreement, including all Taxes that are payable by Seller or its Subsidiaries in connection with or as a result of the payment of such obligations.

"Seller's Savings Plan" shall have the meaning set forth in Section 6.03(n)(i).

"Services Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit B, to be entered into by and among Seller and its applicable Subsidiaries, on the one hand, and Buyer or its applicable Affiliates, on the other hand.

"SHIP Mark" shall mean the name and Trademark, whether registered or unregistered, "SEARS HOME IMPROVEMENT", and all designs and logos associated therewith, in each case, to the extent owned by Seller or its Subsidiaries as of the date hereof or as of or prior to the Closing and set forth on Schedule 3.13(a), including United States Trademark serial numbers 87/648261, 87/648245, 87/648219 and 87/648226. For the avoidance of doubt, "SHIP Mark" shall not include any Internet domain names consisting of, containing or incorporating the SHIP Name or any variation thereof.

"SHIP Name" shall mean the name "SEARS HOME IMPROVEMENT" and any name consisting of, containing or incorporating "SEARS HOME IMPROVEMENT".

"Software" shall mean all (i) computer programs and any other software (regardless of the stage of development or completion), including libraries, subroutines, protocols, toolsets, compilers, schematics, plugins, APIs and other components thereof, whether in source code, object code or other form; (ii) computerized databases and other computerized compilations and collections of data or information; (iii) user interfaces, command structures, report formats, templates, menus, buttons and icons, in each case, relating to computer programs or other software;

A-13

(iv) descriptions, flow charts, architectures, development tools and other materials used to design, plan, organize and develop any of the foregoing; and (v) all related specifications and documentation.

"Subsidiary" shall mean, with respect to any Person ("Parent"), any corporation, association, business entity, partnership, limited liability company or other Person of which such Parent, either alone or together with one or more Subsidiaries or by one or more other Subsidiaries (i) directly or indirectly owns or controls securities or other interests representing more than fifty percent (50%) of the voting power of such Person, or (ii) is entitled, by Contract or otherwise, to elect, appoint or designate directors or managers constituting a majority of the members of such Person's board of directors or managers or other governing body.

"Target Net Working Capital Value" shall mean negative twenty-five million two hundred seven thousand dollars (-$25,207,000).

"Tax Returns" shall mean any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes" shall mean all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments by any Governmental Authority, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, real property transfer, deed, recording, documentary, registration, franchise, profits, windfall profits, inventory, capital stock, alternative or add-on minimum, transaction, license, lease, service, service use, withholding, payroll, employment, energy, social security, unemployment, worker's compensation, disability, excise, severance, stamp, occupation, property, capital, premium and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority.

"Third Party" shall mean any Person who is not a Party or an Affiliate of a Party.

"Third-Party Insurance Policy" shall have the meaning set forth in Section 6.15.

"Trademark License Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit E, to be entered into by and among Seller and its applicable Subsidiaries, on the one hand and Buyer or its applicable Affiliates, on the other hand.

"Trademarks" shall have the meaning set forth in the definition of "Intellectual Property".

"Transfer Taxes" shall have the meaning set forth in Section 2.08.

"Transferred Assets" shall have the meaning set forth in Section 2.01.

"Transferred Employees" shall have the meaning set forth in Section 6.03(a).

"Transferred IP" shall have the meaning set forth in Section 2.01(a).

WEIL:\96692952\39\73219.0008

"Unaudited Financial Statements" shall have the meaning set forth in Section 3.03(a)(ii).

"WARN" shall mean the Worker Adjustment and Retraining Notification Act (or any successor provision) and any applicable state or local equivalent.