AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Joseph L. Sorkin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Proposed Counsel to the Official Committee of
Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEARS HOLDINGS CORPORATION, *et al.*,[1] | ) | Case No. 18-23538 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SEARS HOLDINGS CORPORATION, *ET AL.*, FOR THE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTION 105 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004, 9006, AND 9016 AUTHORIZING EXPEDITED DISCOVERY OF THE DEBTORS AND THIRD PARTIES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................................1

JURISDICTION AND VENUE ..............................................................................................5

RELEVANT BACKGROUND.................................................................................................5
    A.     General Background ................................................................................5
    B.     The Insider Transactions and Other Events that May Give Rise to Claims.............7

RELIEF REQUESTED...........................................................................................................13

BASIS FOR RELIEF .............................................................................................................15
    A.     The Committee Is Entitled to this Discovery under Bankruptcy Rule 2004. ........15
    B.     The Committee Is Entitled to Receive this Discovery on an Expedited
          Basis. ..................................................................................................18

MOTION PRACTICE ...........................................................................................................20

NOTICE.................................................................................................................................20

NO PRIOR REQUEST ..........................................................................................................20

RESERVATION OF RIGHTS ...............................................................................................20

CONCLUSION......................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Drexel Burnham Lambert Grp., Inc.*,
   123 B.R. 702 (Bankr. S.D.N.Y. 1991) ....................................................................16

*In re Ecam Publ'ns, Inc.*,
   131 B.R. 556 (Bankr. S.D.N.Y. 1991) ....................................................................16

*In re Enron Corp.*,
   281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ...........................................................16

*In re Hughes*,
   281 B.R. 224 (Bankr. S.D.N.Y. 2002) ....................................................................16

*Keene-Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
   42 B.R. 362, 364 (S.D.N.Y. 1984) ..........................................................................16

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991) ......................................................................................7

*In re Madison Williams & Co., LLC*,
   No. 11-15896, 2014 WL 56070 (Bankr. S.D.N.Y. Jan. 7, 2014) ......................15, 16

*In re Metiom, Inc.*,
   318 B.R. 263 (S.D.N.Y. 2004) .................................................................................17

*Pan Am Corp. v. Delta Air Lines, Inc.*,
   175 B.R. 438 (S.D.N.Y. 1994) .................................................................................19

*In re Recoton Corp.*,
   307 B.R. 751 (Bankr. S.D.N.Y. 2004) ..........................................................15, 16, 17

*In re Riding*,
   44 B.R. 846 (Bankr. D. Utah 1984) .........................................................................19

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re: Bernard L. Madoff)*,No. 09-11893, 2014 WL 5486279 (Bankr. S.D.N.Y. Oct. 30, 2014) ......................16

*In re Wilcher*,
   56 B.R. 428, 433 (Bankr. N.D. Ill. 1985) ...............................................................16

**Statutes**

28 U.S.C. § 105 .......................................................................................................1, 5, 18

28 U.S.C. § 157 ................................................................................................................5

28 U.S.C. § 1102 .............................................................................................................6

28 U.S.C. § 1103 ...........................................................................................................17

28 U.S.C. § 1107 .............................................................................................................6

28 U.S.C. § 1108 .............................................................................................................6

28 U.S.C. § 1334 .............................................................................................................5

28 U.S.C. § 1408 .............................................................................................................5

28 U.S.C. § 1409 .............................................................................................................5

**Other Authorities**

Bankruptcy Rule 2004 ............................................................................................ passim

Bankruptcy Rule 9006 ....................................................................................1, 5, 18, 19

Bankruptcy Rule 9014 .....................................................................................................1

Bankruptcy Rule 9016 .................................................................................................5, 18

Fed. R. Evid. 201(b)(2) ...................................................................................................7

Local Bankruptcy Rule 9013-1(a) ................................................................................20

The Official Committee of Unsecured Creditors (the "Committee") of Sears Holdings Corporation ("Sears Holdings") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-Debtor affiliates, the "Company") by and through its undersigned proposed counsel, hereby submits this motion (the "Motion") for entry of an order authorizing it to conduct an examination of and seek discovery from the Debtors, their advisors and controlling shareholders, and other third parties pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Committee also moves for entry of an order pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 9006 and 9014 expediting the time for the Debtors and other parties to respond to the discovery requests.  In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Committee seeks to take discovery, pursuant to Bankruptcy Rule 2004, of the Debtors' controlling shareholders ESL Investments, Inc. (together with its affiliates, "ESL"), Edward Lampert ("Lampert"), the Company's Chairman and former CEO, who is also the current Chairman and CEO of ESL, and certain additional parties in connection with a series of prepetition transactions that the Committee (and the Debtors) believe may give rise to material claims and causes of action in favor of the Debtors' estates.  Indeed, the Debtors made clear on the first day of these cases that potential causes of action arising from affiliate transactions involving ESL and Lampert consummated prior to the Petition Date (as defined below) may exist. *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for the Southern District of New York* [ECF No. 3] ("First Day Decl.") ¶ 12.[2]

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Decl.

2.      In the week prior to filing these chapter 11 cases, the Debtors formed a subcommittee (the "Subcommittee") of the Board's Restructuring Committee (the "Restructuring Committee") to evaluate prepetition transactions and potential causes of action against ESL and Lampert.  Immediately after the Committee's formation and retention of professionals, the Committee's attorneys contacted counsel to the Subcommittee and ESL in order to coordinate discovery in connection with the independent investigation that the Committee must undertake of the subject transactions in accordance with its fiduciary duties to the Debtors' unsecured creditors.

3.      Based on its limited investigation in the short time since its formation, the Committee is convinced that there exist potential estate claims and causes of action (collectively "Claims") arising from the Debtors' various attempts to finance the Company's operations, often involving related-party transactions with controlling shareholders ESL and Lampert. Some of these transactions also involved Fairholme Capital Management LLC (along with its affiliates, "Fairholme"), another significant stockholder of the Company, and other third parties.

4.      The circumstances surrounding the various transactions raise the possibility that ESL and other insiders may have exercised undue influence to siphon value away from the Company on favorable terms.  In addition, these parties may have used their insider status to obtain an ever-increasing percentage of the Debtors' senior debt, positioning them to exert undue influence over, and obtain beneficial positions in connection with, the events leading up to, and the trajectory of, these chapter 11 cases.  Indeed, through an escalating series of transactions in the years and months leading up to the Petition Date (as defined below), ESL has managed to obtain $2.6 billion, or 46%, of the Debtors' funded prepetition debt, including approximately 73% of the second lien debt.

5.      Among others, one of the most concerning transactions is the July 2015 rights offering and sale-leaseback with Seritage Growth Properties, a newly-formed, publicly-traded real estate investment trust controlled by ESL (the "Seritage Transaction").  The Seritage Transaction involved the sale of over 200 of Debtors' most valuable real estate assets—at what appears to be discounted prices—and a leaseback of those assets on unfavorable and burdensome terms.  Indeed, while shares of the newly formed REIT jumped after the Seritage Transaction, the share price of Sears Holdings fell dramatically.

6.      The Seritage Transaction is just one of numerous potentially problematic transactions including but not limited to: (i) the October 2012 separation of Sears Hometown and Outlet businesses (the "SHO Transactions"); (ii) the October 2012 spin-off of the Debtors' 45% interest in Sears Canada and the November 2014 rights offering for additional shares (the "Sears Canada Transactions"); (iii) the April 2014 spin-off of the Lands' End business (the "Lands' End Transactions"); and (iv) various financing transactions, pursuant to which previously unencumbered assets became subject to liens, including certain intellectual and real property, and various Company entities appear to have incurred material debt obligations to satisfy other debt for which they were not obligated or for which they did not receive the benefit of the related proceeds (the "Financing Transactions," and collectively with the Seritage Transaction, the SHO Transactions, the Sears Canada Transactions, and the Lands' End Transactions, the "Insider Transactions").  In addition, other actions taken by the Company, and Lampert and ESL, since the time of the Kmart acquisition in 2005 suggest that the Insider Transactions may be part of an extended pattern of conduct that served to benefit certain (insider) equity holders at the expense of creditors and the Debtors' estates.

7.     The discovery the Committee is seeking under Bankruptcy Rule 2004 is necessary in order for the Committee to fulfill its statutory duty to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.  Prior to filing this Motion, the Committee proceeded informally with its investigation, and met with the Subcommittee and ESL.  Although both the Subcommittee and ESL have indicated their intent to cooperate, the Committee has received limited to no information to date.  Thus, it has become clear that without a Court order setting forth an expedited discovery schedule, the Committee will have inadequate time to investigate the Insider Transactions as a result of the speed with which these cases are proceeding.  Specifically, an expedited discovery schedule is required because of the Debtors' desire to designate a stalking horse bidder for certain assets by December 15, 2018.  *See Motion for Approval Of Global Bidding Procedures* [ECF No. 429] (the "Bidding Procedures Motion") ¶ 25.

8.     The Bidding Procedures Motion was filed on just 14 days' notice, providing the Committee with only 8 days to evaluate the propriety of the relief requested therein.[3]  Based on its initial review of the Bidding Procedures Motion and the procedures contemplated thereby, the Committee believes there are material deficiencies with the process contemplated by the Bidding Procedures Motion and intends to file an objection thereto.  Indeed, the Bidding Procedures Motion and related procedures appear geared toward a process to facilitate ESL's acquisition of material assets of the Company at deflated prices (potentially by an inappropriate credit bid) as opposed to ensuring a full and fair opportunity for a true value-maximizing market test of the Debtors' assets.  *See* First Day Decl. ¶ 15 ("The Debtors are in discussions with ESL regarding a stalking-horse bid

---

[3] Despite requesting a four-day extension of the objection deadline to evaluate (x) the propriety of the Bidding Procedures Motion that will impact materially the trajectory of these cases and (y) whether the procedures contemplated thereby are reasonably designed to maximize the value of the Debtors' estates, the Debtors agreed to provide the Committee with only one extra day beyond the objection deadline provided by the Case Management Order in these cases.

for the purchase of the Company's viable store base, which would be a right-sized version of the Company that would be operated as a going concern."). Therefore, the Committee must have a sufficient opportunity to receive and evaluate the discovery requested by this Motion in advance of the December 15 hearing date on the Bidding Procedures Motion. The Committee will need to be in a position to evaluate the strength and value of the Claims, including determining the propriety of any potential credit bid that may be submitted by ESL, as contemplated by the Bidding Procedures Motion. *See* Bidding Procedures Motion ¶ 19(e)(1).

9.      Notwithstanding the shortcomings of the Bidding Procedures Motion, the Committee agrees with the Debtors that time is of the essence. Accordingly, the Committee files this Motion to further investigate and better understand the Insider Transactions and other potentially problematic transactions in the timeframe made necessary by the exigencies of the Debtors' financial condition and proposed chapter 11 process.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

11.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

12.      The bases for the relief requested herein are Bankruptcy Code section 105 and Bankruptcy Rules 2004, 9006, and 9016.

## RELEVANT BACKGROUND

**A.      General Background**

13.      The Company operates 687 retail stores under the Sears® and Kmart® brands throughout the United States. First Day Decl. ¶ 25. The Company sells products under its own brands, including *Jaclyn Smith*®, *Joe Boxer*®, and *Route 66*®, and also sells products under certain proprietary brands, including *Kenmore*® appliances and *DieHard*® automotive batteries.

*Id.* ¶ 26.   In addition to its retail stores, the Company operates various businesses, including specialty automotive repair and maintenance services, home appliance repair and other home improvement services, and online shopping portals under the sears.com and kmart.com domains. *Id.* ¶ 27-29.  Debtor Sears Holdings is the ultimate parent company, and the remaining Debtors are all wholly-owned direct or indirect subsidiaries of Sears Holdings. *Id.* ¶¶ 1, 31; Ex. A.

14.     On October 15, 2018 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been appointed in these chapter 11 cases.

15.     On October 24, 2018, the United States Trustee for Region 2 appointed the Committee pursuant to Bankruptcy Code section 1102(a).  *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 276].  The Committee is composed of the following members:  (a) Pension Benefit Guaranty Corporation;  (b) Oswaldo Cruz;  (c) Winiadaewoo Electronics America, Inc.; (d) Apex Tool Group, LLC; (e) Computershare Trust Company, N.A.; (f) The Bank of New York Mellon Trust Co.; (g) Basil Vasiliou; (h) Simon Property Group, L.P.; and (i) Brixmor Operating Partnership, L.P.  *Id*.  The Committee members hold unsecured claims against, and/or serve as indenture trustee for holders of unsecured claims against, the Debtors' estates.  The Committee represents a broad cross-section of the Debtors' unsecured creditor constituencies and is thus well suited to investigate potential Claims.

**B.    The Insider Transactions and Other Events that May Give Rise to Claims[4]**

16.    On March 24, 2005, Sears Holdings completed its merger with and into Sears, Roebuck and Co. and Kmart Holding Corporation, making both the wholly owned subsidiaries of Sears Holdings.  *See* Sears Holding Corp., Current Report (Form 8-K) (Mar. 24, 2005).[5]  As a result of the merger transaction, ESL and Lampert became controlling shareholders of Sears Holdings, with each owning nearly 40% of its outstanding shares.  *See* Sears Holding Corp., Amendment No. 10 to Schedule 13D (Form SC 13D/A) (Apr. 1, 2005).  Today, ESL remains the largest stockholder of Sears Holdings and "beneficially owns approximately 49.7% of Sears Holdings' outstanding stock."  First Day Decl. ¶ 8 & n.3.  ESL and Lampert effectively have controlled the Company since the 2005 merger.

17.    According to the Debtors, because of recent adverse economic forces and shifts in consumer behavior, the Company's fortunes have suffered dramatically, leading to the commencement of these cases.  *Id.* ¶¶ 8-9.  To meet its ongoing liquidity needs, the Company has relied on ESL to provide financing, extend debt maturities, and otherwise attempt to increase its runway.  *Id.*  The circumstances surrounding these Insider Transactions suggest that insiders, including ESL, Lampert, and Fairholme, may have received transfers of substantial excess value to the detriment of the Debtors, and further suggest a pattern of then-profitable assets being removed from the Debtors and their creditors' reach and transferred to the Company's equity holders.  Thus, the transactions raise the potential for various Claims, including but not limited to claims for fraudulent transfer, breach of fiduciary duty, equitable subordination, and debt

---

[4] The Committee's professionals are still in the early stages of their investigation into potential estate causes of action. The facts presented here are those that the Committee has been able to develop based on publicly available information during its investigation thus far, and remain subject to additional investigation.

[5] The Court "may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (citing Fed. R. Evid. 201(b)(2)).

recharacterization.  Based on the limited information currently available, the Committee describes certain of these potentially problematic transactions below.

18.    <u>The Seritage Transaction</u>.    The Seritage Transaction involved several interconnected steps, and operated to remove the most valuable real estate properties from the Debtors' estates (at what appears to have been substantially less the fair value) while burdening them with unfavorable leases of those same properties.  In April 2015, Sears Holdings formed three distinct real estate joint ventures (the "<u>JVs</u>") with General Growth Properties, Inc., Simon Property Group, Inc. and The Macerich Company.  *See* Sears Holding Corp., Quarterly Report (Form 10-Q) (Aug. 20, 2015) at 18-20.  Sears Holdings contributed 31 properties to the JVs in exchange for 50% interest in the JVs and $429 million in cash.  *Id.*  In July 2015, Sears Holdings formed a new, publicly traded real estate investment trust, Seritage Growth Properties, and an affiliated operating partnership, Seritage Growth Properties, LP (collectively, "<u>Seritage</u>").  *Id.* Sears Holdings then entered into a sale-leaseback transaction with Seritage:  First, it sold 235 properties to Seritage along with its 50% interest in the JVs for aggregate gross proceeds of $2.7 billion.  *Id.*  Following the sale, Sears Holdings entered into lease agreements (the "<u>Master Leases</u>") with Seritage and the JVs to lease 255 of the properties, with the remaining properties being leased by Seritage to third parties.  *Id.*  Under the Master Leases, Seritage and the JVs had the right to recapture 50-100% of the space within certain stores, meaning they could literally evict Sears and re-let the space to tenants capable of paying higher rents.  *See id.*

19.    Several aspects of the Seritage Transaction raise concerns for the Committee.  To begin, the Seritage Transaction bears the hallmarks of a transaction to benefit insiders ESL and Fairholme.  To fund its acquisition of the properties, Seritage entered into agreements with both ESL and Fairholme for certain private placements in connection with its initial rights offering.  *See*

Seritage Growth Props., Prospectus, Amendment No. 4 to Form S-11 (Form S-11/A) (June 8, 2015) at 2-5. Lampert also served on the Seritage Board of Trustees following its acquisition of the properties. *Id.* at 112-13. The Committee is concerned that the interested nature of the transaction undermined its fairness. In particular, the Committee doubts that Sears Holdings received adequate consideration for the sale of its properties. Indeed, a derivative shareholder complaint filed in the Court of Chancery in Delaware alleged that Sears Holdings disregarded a March 2014 appraisal that valued the properties at hundreds of millions of dollars more than the price paid by Seritage, and that the Sears Holdings board was generally conflicted with respect to the entire transaction. *See generally* Verified Consolidated Amended Stockholder Derivative Complaint, *In re Sears Holdings Corp. Stockholder & Derivative Litig.*, C.A. No. 11081-VCL (Del. Ch. July 12, 2016).[6] And, in fact, shares of Seritage traded substantially up following the announcement of the transaction, while shares of Sears Holdings plummeted. Further, the Master Leases appear to contain several unusual and burdensome obligations, including the recapture provisions, without providing for any additional consideration to Sears Holdings.

20.    The SHO Transactions. Sears Hometown and Outlet ("SHO"), a retailer selling home appliances, hardware, and garden equipment, was sold by Sears Holdings in October 2012 via a rights offering transaction to existing shareholders. *See* Sears Holding Corp., Annual Report (Form 10-K) (Mar. 18, 2014) at 4. In exchange for the sale of SHO common stock, Sears Holdings received $346.5 million in cash as well as a $100 million dividend from SHO prior to the

---

[6] While that litigation was eventually settled, neither the Court nor the parties to that litigation appeared to consider that the Company may have been insolvent at the time of, or rendered insolvent by, the Seritage Transaction. Accordingly, the Court did not discuss the interests of creditors in its order approving the settlement, which was focused primarily on the fact that the transaction appeared to move money from one of ESL's pockets to the other. *See* Settlement Hearing and Rulings of the Court, *In re Sears Holdings Corp. Stockholder & Derivative Litig.*, C.A. No. 11081-VCL (Del. Ch. May 9, 2017) at 25-30 ("The transaction appears to have been structured to provide Lampert with the same ownership interest in Seritage as he had in Sears. . . . So what we really have here is a situation where, again, there's only this very small -- ballpark, 3 percent, 2.7 percent -- divergence between the equity ownership in the two entities.").

separation, resulting in aggregate gross proceeds of $446.5 million. *Id.* Following the spinoff, ESL and Lampert owned a majority of both Sears Holdings and SHO. *Id.* Because of the separation, SHO, at the time a profitable company, was now isolated from Sears Holdings, which could no longer access SHO's assets or cash flow. The Committee believes that the market value of SHO at the time of the SHO Transactions, evidenced by its trading price immediately after the closing of the rights offering, was significantly higher than the value received by Sears Holdings.

21.     The Sears Canada Transactions.  Sears Canada ("Canada"), the Canadian retail subsidiary of Sears Holdings, was spun off to shareholders gradually via various interconnected transactions from 2012 to 2014. *See* Sears Holding Corp., Annual Report (Form 10-K) (Mar. 17, 2015) at 4-5. In November 2012, Sears Holdings reduced its 96% interest in Canada to 51% by distributing, pro rata, approximately 45 million common shares of Canada to the holders of its common stock. *Id.* at 5. In November 2014, Sears Holdings further reduced its 51% interest in Canada to 12% through a rights offering of Canada's shares to its common stock-holders. *Id.* at 4. Sears Holdings received total aggregate proceeds of $380 million for the Canada rights offering. *Id.* ESL and Lampert continued to hold a controlling stake in Sears Holdings and Canada after the Sears Canada Transactions. *Id.*

22.     The Lands' End Transactions.  In April 2014, Sears Holdings spun off the Lands' End business via a stock distribution to its shareholders. *See id.* Prior to its separation, Lands' End secured two debt facilities, an asset-based senior secured revolving credit facility providing for up to approximately $175 million and a senior secured term loan facility of approximately $515 million. *Id.* Lands' End then used the proceeds of the term loan to finance a $500 million cash dividend to Sears Holdings. *Id.* Following the spinoff, ESL and Lampert owned a majority of both Sears Holdings and Lands' End. *Id.* Because of the separation, Lands' End, at the time a

profitable company, was now isolated from Sears Holdings, which could no longer access Lands'

End's assets or cash flow.

23.    <u>The Financing Transactions</u>.  In 2017, Sears Holdings announced that its "historical

operating results indicate substantial doubt exists related to the Company's ability to continue as

a going concern."  *See* Sears Holding Corp., Annual Report (Form 10-K) (Mar. 21, 2017) at 48.

Since 2017, Sears Holdings engaged in several debt transactions to ensure ongoing liquidity, often

contracting with ESL and its affiliates, including incurring significant debt obligations at Company

entities that did not have material indebtedness and granting liens on previously unencumbered

assets.  *See* First Day Decl. ¶ 34 (detailing prepetition capital structure, with approximately $5.07

billion in current outstanding debt).  Despite substantial doubt as to its ability to continue as a

going concern, Sears Holdings increased its debt by nearly $1.7 billion since April 2017 through

the following debt instruments and amendments thereto: (i) the Sparrow Term Loan,[7] (ii) the

Sparrow Mezzanine Loan,[8] (iii) the IP/Ground Lease Term Loan Facility[9] and the amendments

thereto,[10] (iv) the Second Lien PIK Notes,[11] (v) the Consolidated Secured Loan Facility[12] and

amendment thereto, (vi) the Holdings Unsecured PIK Notes,[13] (vii) the SRAC Unsecured PIK

Notes,[14] (viii) the Second Lien Credit Facility[15] and amendments thereto, (ix) the FILO Term

---

[7] *See* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 18.

[8] *See id.*

[9] *See* First Day Decl. ¶ 34 (defining "IP/Ground Lease Term Loan Facility").

[10] *See* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 19.

[11] *See* First Day Decl. ¶ 34 (defining "Second Lien PIK Notes").

[12] *See id.* (defining "Consolidated Secured Loan Facility").

[13] *See id.* (defining "Holdings Unsecured PIK Notes").

[14] *See id.* (defining "SRAC Unsecured PIK Notes").

[15] *See id.* (defining "Second Lien Credit Facility").

Loan,[16] (x) the New Senior Secured Notes,[17] (xi) the New Senior Unsecured Notes,[18] (xii)

Unsecured Commercial Paper held by ESL and its affiliates,[19] (xiii) the Stand-Alone L/C Facility[20]

and amendments thereto, (xiv) the 2016 Term Loan,[21] (xv) the Revolving Credit Facility,[22] (xvi)

the Holdings Unsecured Notes,[23] (xvii) the SRAC Unsecured Notes,[24] and (xviii) the Second Lien

Notes.[25]  ESL and its affiliates were lenders and/or noteholders for all of the financings listed

above, and Fairholme was also involved in a considerable number of these financings.  In fact,

ESL and its affiliates, and Fairholme, were also involved in the pre-2017 financing of other debt

burdening the Debtors, including the Old Senior Secured Notes[26] and the Old Senior Unsecured

Notes, both of which were subject to exchange offers made in February 2018.[27] The Financing

Transactions do not appear to have provided the obligors thereunder with reasonably equivalent

value in exchange for the debt incurred and liens granted in connection therewith.

24.    The Committee is concerned that, in addition to the transactions described above,

other transactions undertaken by the Debtors over the past several years, as well as the historical

actions approved by certain insiders since the acquisition of Kmart, give rise to additional estate

---

[16] *See id*. (defining "FILO Term Loan"); *see also* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 24.

[17] *See* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 26-28.

[18] *See id.* at 28-29.

[19] *See id.* at 49.

[20] *See* First Day Decl. ¶ 34 (defining "Stand-Alone L/C Facility").

[21] *See* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 23-25; *see also* First Day Decl. ¶ 34 (defining the 2016 Term Loan as the "First Lien Term Loan B").

[22] *See* First Day Decl. ¶ 34 (defining "Revolving Credit Facility"); *see also* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 23-25.

[23] *See* First Day Decl. ¶ 34 (defining "Holdings Unsecured Notes").

[24] *See id.* (defining "SRAC Unsecured Notes").

[25] *See id*. (defining "Second Lien Notes").

[26] *See* Sears Holding Corp., Quarterly Report (Form 10-Q) (Sept. 13, 2018) at 26-28.

[27] *See id.* at 28-29.

claims and causes of action, which the Committee needs to investigate with the aid of the requested discovery.

25.      In sum, the Insider Transactions, and various other potentially problematic transactions, left the Debtors heavily levered, with far more debt (and substantially fewer valuable assets, particularly their real estate assets) than prior to such transactions.  All or substantially all of these transactions appear to have been undertaken at a time when the subject entities were insolvent or rendered insolvent thereby.  The circumstances surrounding the Insider Transactions also suggest that the Debtors received significantly less than reasonably equivalent value for certain of their profitable and most highly valued assets and were left with far fewer unencumbered assets.    In the Committee's view, these Insider Transactions (and others) warrant a full investigation to ensure that the Debtors pursue all available Claims for the benefit of all unsecured creditors and ensure that ESL and Lampert are not provided with unfair leverage in their effort to acquire the Company's valuable assets at deflated prices or through an inappropriate credit bid of avoidable debt. That investigation must proceed swiftly in light of the critical timing considerations the Company faces.

## **RELIEF REQUESTED**

26.      The Committee respectfully requests that the Court enter an order pursuant to Bankruptcy Rule 2004, substantially in the form of the Proposed Order attached to this Motion as Exhibit A, authorizing the Committee to (i) serve documents requests/subpoenas (the "Requests") on, and (ii) take depositions of representatives of, the Debtors, ESL, Seritage, Fairholme, and other

entities involved in or having knowledge of the Insider Transactions and other potentially problematic transactions, including, but not limited to, the entities listed below:[28]

    a.     Centerview Partners LLC ("Centerview"):   Centerview served as the financial advisor to the board of directors of Sears Holdings and/or a committee thereof in connection with recent asset transfers.

    b.     Wachtell, Lipton, Rosen & Katz ("Wachtell"):  Wachtell has a longstanding relationship with the Debtors, having served as general corporate counsel for many transactions over the past decade, including several of the Insider Transactions and other potentially problematic transactions.  *See also Declaration Of Amy R. Wolf In Support Of Application Of Debtors For Authority To Retain And Employ Wachtell, Lipton, Rosen & Katz As Special Counsel For The Debtors* Nunc Pro Tunc *To The Commencement Date* ¶ 4 [ECF No. 357 Ex. B].

    c.     Duff & Phelps, LLC ("Duff & Phelps"):  Duff & Phelps prepared fairness opinions in connection with the SHO Transactions, the Seritage Transactions, and potentially other of the Insider Transactions and potentially problematic transactions.

    d.     Cushman & Wakefield ("Cushman"): Cushman prepared appraisals of the properties Sears Holdings sold in connection with the Seritage Transaction, which appraisals were used by Duff & Phelps in connection with its fairness opinion.

    e.     Deloitte Touche Tohmatsu Ltd. ("Deloitte"):  Deloitte served, at certain relevant times, as Sears Holdings's independent auditor.

    f.     Debevoise & Plimpton LLP  ("Debevoise"): Debevoise represented Sears Holdings in the sale of its SHO stores.

27.    Since its recent appointment, the Committee has acted diligently in fulfilling its duties to unsecured creditors under the time constraints mandated by the Debtors.  To that end, the Committee has met with counsel to the Debtors' Subcommittee to discuss these topics on several

---

[28] As explained above, the Committee is in the early stages of its investigation and bases its requests on the information currently available to it.  The Committee is not suggesting that the entities listed in subparagraphs a through f of this paragraph necessarily are targets of its investigation; rather, the Committee believes that they are likely to have relevant information.  The Committee reserves all of its rights to serve additional requests in the course of its investigation and to propound discovery in connection with any other matter that may arise in these cases.

occasions and has been working closely with the Subcommittee to avoid duplication of efforts and conserve estate resources.[29] The Committee has also met with counsel to ESL and worked cooperatively to obtain relevant information. Despite this, the Committee has not yet received access to material discovery outside of public information in connection with the Insider Transactions. Accordingly, the Committee believes it must obtain the relief requested herein in order to conduct its own investigation adequately, satisfy its fiduciary duties, and ensure a fair process and recovery for unsecured creditors.

## **BASIS FOR RELIEF**

### A.    The Committee Is Entitled to this Discovery under Bankruptcy Rule 2004.

28.    Bankruptcy Rule 2004(a) provides, in relevant part, that "[o]n motion of any party in interest, the court may order examination of any entity." Under Bankruptcy Rule 2004, a party-in-interest like the Committee may request discovery related to "acts, conduct, or property, or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b).

29.    The purpose of Bankruptcy Rule 2004 is to "assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004). Rule 2004 permits discovery "to determine the extent of the estate's assets and recover those assets for the benefit of creditors." *In re Madison Williams & Co., LLC*, No. 11-

---

[29] The Committee understands that each of the Debtors, ESL, Seritage, Fairholme, Centerview, Wachtell, Duff & Phelps, Cushman, Deloitte, and Debevoise has received document requests from the Subcommittee and has indicated its intent to cooperate. Given the fast-moving nature of the investigation and the discovery requests already served on these parties, the Committee has not attached proposed discovery requests to the Motion. The Committee intends to seek documents in connection with the Insider Transactions and other prepetition transactions, consistent with the requests already served by the Subcommittee. The Committee will work with the parties to determine the appropriate scope of the discovery.

15896, 2014 WL 56070, at *3 (Bankr. S.D.N.Y. Jan. 7, 2014); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re: Bernard L. Madoff)*, No. 09-11893 (SMB), 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) ("The underlying purpose of Rule 2004 is to 'allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate.'" (quoting *Keene Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 42 B.R. 362, 364 (S.D.N.Y. 1984))).

30.     The scope of discovery allowed under Bankruptcy Rule 2004 is "'very broad and great latitude of inquiry is ordinarily permitted.'"  *In re Madison Williams*, 2014 WL 56070, at *3 (quoting *In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985)).   Courts repeatedly have recognized that discovery provided for under Rule 2004 encompasses "broader discovery than is available under the Federal Rules of Civil Procedure."  *In re: Bernard L. Madoff*, 2014 WL 5486279, at *2 (citing *In re Recoton Corp.*, 307 B.R. at 755); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[T]he scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a "'fishing expedition.'"); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (same).

31.     Bankruptcy Rule 2004 permits discovery of any party, including third parties, "if they have knowledge of the debtor's affairs."  *In re Ecam Publ'ns, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991); *see also In re Recoton Corp.*, 307 B.R. at 755 ("Any third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation"); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("[T]he Court may authorize the examination of third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate.").

32.    Bankruptcy Code section 1103 expressly authorizes the Committee "to investigate the acts, conduct, assets, liabilities and financial condition of the Debtors." *In re Recoton Corp.*, 307 B.R. at 755.  The Committee requires the discovery requested in this Motion, which "may affect the administration of the debtor[s'] estate[s]," in order to investigate potential Claims.  Fed. R. Bankr. P. 2004(b).  With the requested discovery, the Committee can investigate whether the Debtors' estates may hold valuable claims in connection with, among other things, the Insider Transactions outlined above, including but not limited to intentional and constructive fraudulent conveyance and breach of fiduciary duty claims, as well as claims for debt recharacterization and/or equitable subordination.  The information sought through this Motion relates directly to the "acts, conduct, or property or to the liabilities and financial condition" of the Debtors and bears directly on the potential estate claims as well as ESL's and Lampert's rights to credit bid in connection with the Bidding Procedures Motion and other forthcoming asset sales.  *See* Fed. R. Bankr. P. 2004(b).  Thus, the discovery requested in this Motion is "*prima facie* consistent with the Rule's . . . purposes of allowing the Committee to obtain information necessary to determine whether claims beneficial to the estates exist and whether to pursue such claims."  *See In re Recoton Corp.*, 307 B.R. at 756.

33.    Given the complexity of the Insider Transactions as well as the controlling influence of ESL and Lampert—who stood on both sides of each of the Insider Transactions—it is plain that an investigation into these related-party transactions is appropriate.  Because an "examination is necessary to establish the claim[s]" that the estate could pursue to benefit its creditors, good cause exists to grant this Motion.  *See In re Metiom, Inc.*, 318 B.R. 263, 268-270 (S.D.N.Y. 2004) (internal citations and quotations omitted) (affirming bankruptcy court's order granting Bankruptcy Rule 2004 examination).

**B.      The Committee Is Entitled To Receive this Discovery on an Expedited Basis.**

34.      The subjects of the Bankruptcy Rule 2004 examinations sought herein should also be required to produce documents on an expedited basis.  Bankruptcy Rule 9006(c)(1) provides that "when an act is required or allowed to be done at or within a specified time by [the Bankruptcy Rules] or by a notice given thereunder or by order of court, the court for cause shown may in its discretion with or without motion or notice order the period reduced."  As explained below, good cause exists here to expedite the requested discovery.  The Committee thus requests that the Court shorten the time set forth in Bankruptcy Rule 9016 to require responses to the Committee's discovery requests within seven (7) calendar days of service, and further order—pursuant to its power under section 105 of the Bankruptcy Code—that the Debtors and third parties be required to have substantially completed document production no later than ten (10) calendar days from the date of service.

35.      Since its formation on October 24, 2018, the Committee has, in connection with and through its proposed professionals, worked with the Subcommittee to obtain Company documents to begin its investigation.  Yet, despite the Subcommittee's creation of a data room and its intention to share documents, that data room to date contains few documents that shed light on the transactions that are the subject of the Committee's investigation.  Indeed, the Committee still does not have access to basic documents like Sears Holdings's board minutes.

36.      Similarly, despite reaching an agreement with counsel to ESL to share certain documents, negotiations over the confidentiality of any produced documents have taken the better part of a week—and no documents have yet been produced to the Committee.  Although the Committee believes counsel to the Subcommittee and ESL are operating in good faith, the expedited timeline compels the Committee to seek relief from this Court to begin and expedite the document production process.

37.    The Debtors' insistence on selecting a stalking horse bidder for its remaining stores capable of continuing as a going concern by December 15, 2018 further demonstrates the need for the Committee to begin its investigation immediately.  *See* Bidding Procedures Motion ¶ 25.  In light of the Debtors' stated doubt about their ability to continue as a going concern, the Committee must be in a position to evaluate the propriety of any bids and the proposed consideration of any such sale prior to that date.  The Committee shares the Debtors' concern about their ability to reorganize at all—and, with the requested discovery, intends to examine whether an immediate liquidation during the rapidly-approaching holiday season would instead maximize value for all creditors.

38.    This extremely expedited timeline establishes good cause for this Court to order prompt discovery to ensure the Committee has adequate time to investigate the business and affairs of the Debtors and any potential causes of action.  *See In re Riding*, 44 B.R. 846, 858 (Bankr. D. Utah 1984) (noting that the exigent nature of bankruptcy proceedings "will usually warrant reduction of time under Bankruptcy Rule 9006(c)" and that the Court "will also give special consideration to requests to reduce the time for responses to discovery").

39.    "An official committee of creditors plays a pivotal role in the bankruptcy process. The function of an official creditors committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994) (internal citations omitted). Absent the expedited discovery requested in this Motion, the Committee will be hamstrung and unable to fulfill its pivotal role in this bankruptcy process.  Therefore, the Committee respectfully requests that the subjects of this Bankruptcy Rule 2004 examination be required to substantially

complete the production of documents by no later than ten (10) calendar days from the date of service of the Rule 2004 subpoenas.

## MOTION PRACTICE

40.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. The Committee submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## NOTICE

41.     The Committee has provided notice of this Motion to all Rule 2002 Parties.  *See Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405] (the "CMO") ¶ 6.  Further, pursuant to CMO ¶ 24, counsel for the Committee has notified counsel for the entities identified as subject to discovery in connection with this Motion that the Committee seeks to have this Motion be considered on an expedited basis on November 15, 2018.  As of the filing of this Motion, counsel for certain parties have indicated that, once they have had an opportunity to review the filed Motion, they will respond to the Committee's request to have the Motion heard on an expedited basis.  The Committee will provide an update to the Court, pursuant to CMO ¶ 24, once informed whether such parties consent to or oppose the request for an expedited hearing.

## NO PRIOR REQUEST

42.     No prior request for the relief sought in this Motion has been made.

## RESERVATION OF RIGHTS

43.     The Committee and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement

this Motion, to seek additional discovery, add additional parties, or to raise additional grounds for granting this Motion during any hearing on the Motion.

## **CONCLUSION**

44.    The Committee respectfully requests that the Court enter an order, substantially in the form of Exhibit A, that (1) authorizes the Committee to serve discovery on the Debtors and certain third parties, (2) requires the Debtors and the third parties to respond to the Requests within seven (7) calendar days of service and to substantially complete their document productions no later than ten (10) calendar days from the date of service, and (3) authorizes the Committee to take depositions of representatives of the Debtors and the third parties set forth above.

New York, New York                          AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  November 5, 2018

By: /s/ *Ira S. Dizengoff*

Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Joseph L. Sorkin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
pdublin@akingump.com
aqureshi@akingump.com
jsorkin@akingump.com


*Proposed Counsel to the Official Committee of Unsecured Creditors of Sears Holding Corporation, et al.*