MORRIS JAMES LLP
Stephen M. Miller (Admitted Pro Hac Vice)
Douglas N. Candeub
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750

*Attorneys for Greensboro Lease
Management, L.L.C., through its Liquidating
Trustee, John H. Newcomer, Jr.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
|                                                        | :  | Chapter 11 |
| **In re:**                                             | :  |            |
|                                                        | :  | Case No. 18-23538 (RDD) |
| **SEARS HOLDINGS CORPORATION,** *et al.,*              | :  |            |
|                                                        | :  | **(Jointly Administered)** |
|                                                        | :  |            |
|                                                        | :  | <u>Hearing Date and Time:</u> |
| **Debtors.**                                           | :  | **November 15, 2018 at 10:00 a.m. ET** |
|                                                        | :  | <u>Objection Deadline:</u> |
|                                                        | :  | **November 8, 2018 at 4:00 p.m. ET** |
|                                                        | :  |            |
---------------------------------------------------------x  Re: ECF No. 429

**OBJECTION OF GREENSBORO LEASE MANAGEMENT, L.L.C.
TO THE DEBTORS' MOTION FOR APPROVAL OF GLOBAL
<u>BIDDING PROCEDURES [ECF No. 429]</u>**

Greensboro Lease Management, L.L.C., through its Liquidating Trustee, John H. Newcomer, Jr.[1] ("<u>Greensboro</u>"), the landlord of a lease with debtor Kmart Corporation ("<u>Kmart</u>") as tenant, located in Greensboro, North Carolina, hereby files this objection (the "<u>Objection</u>") to the Debtors' Motion for Approval of Global Bidding Procedures (ECF No. 429) (the "<u>Bid Procedures Motion</u>" or the "<u>Motion</u>"),[2] and respectfully represents as follows:

---

[1] John H. Newcomer, Jr., Esq., not in his individual capacity but solely as Liquidating Trustee under the Amended and Supplemented Order Appointing Liquidating Trustee dated August 29, 2017 in the Matter of Arbitration between Holtzman Family Partnership and Net Lease Management Partners, L.L.C. ("NLMP"), *et al.*, American Arbitration Association, Case No. 01-14-0001-6795 SL.

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Motion.

I.    **BACKGROUND AND SUMMARY OF OBJECTIONS**

1.    Sears Holdings Corporation, and it affiliated co-debtors, including Kmart (together, the "Debtors"), filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 15, 2018, and they have continued to operate their business and manage their properties as debtors-in-possession, pursuant to 11 U.S.C. §§ 1107(a) and 1108.[3]

2.    Greensboro is a landlord of premises leased by debtor Kmart. Kmart leases property from Greensboro pursuant to an unexpired lease of nonresidential real property (the "Lease") at 300 Penry Road, Greensboro, NC (the "Premises"). The Lease is "triple-net." The Premises consist of a warehouse, not a retail store. Further, Kmart has sub-leased the Premises to a subtenant that uses the Premises for the operation of general office and warehousing; storage and distribution; third-party logistics; outside storage of trailers; and related and other uses permitted without a variance under the local zoning ordinance.

3.    To date, the Debtors have filed neither a motion proposing to assume and assign the Lease; nor a motion to reject the Lease. The Debtors have not apprised Greensboro of their intentions with respect to the Lease.

4.    The Debtors have, however, filed their Bid Procedures Motion, which stands to affect substantially the rights of Greensboro and its ability to respond to a prospective assumption, sale and assignment of the Lease.

5.    Through the Bid Procedures Motion, the Debtors are seeking a Court order that would, *inter alia*: (1) approve procedures for the assumption of leases and executory contracts and for their assignment to designated stalking horse bidders or other prospective bidders; (2) schedule auctions of assets and sale hearings; (3) approve limits on the timing and manner of notice given of

---

[3]    Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2

10565795

any asset sales, auctions and sale hearings, and setting tight deadlines for objections thereto; (4) approve the form of notice to each counterparty to a lease (or executory contract) that the Debtors propose to assume and assign, including the Debtors' calculation of the cost to cure any defaults, and information regarding the purported ability of the prospective assignee to perform under the lease or contract; and (5) limit the remedies available to landlords or other contract counterparties in the event of a dispute regarding cure costs.

6. Any expedited sale process must ensure that landlords such as Greensboro promptly receive adequate information to respond to the Debtors' assertion of the cure amount, to vet potential assignees as required by the Bankruptcy Code and assess their assurances of future performance under their leases, and must ensure that they receive the information in sufficient time to review it and prepare objections prior to any objection deadline. At the same time, an expedited sale process should not substantively limit landlords' rights under their leases and the Bankruptcy Code.

7. The proposed Bidding Procedures would deny Greensboro and other landlords essential protections afforded by the Bankruptcy Code and their leases because, among other things,

- The schedule proposed by the Debtors is in part unduly vague and inadequate as to the time allowed for landlords to receive, review, and object to information on cure amounts and assurances of future performance;

- The manner of notice to landlords is inadequate, especially for a landlord represented by counsel that has already entered an appearance in the case;

- The process for handling disputed cure amounts is inadequate, leaving undue discretion to the Debtors; and

- The requirements on across-the-board confidential treatment of a bidder's information are unduly excessive.

8. Greensboro objects to the Bid Procedures Motion insofar as it falls short on these necessities for a fair process. The Court should modify the proposed timing and adequately protect all parties' rights under the Bankruptcy Code, as proposed herein.

**II.    ARGUMENT**

**A.    If a Warehouse Lease May Be Treated in the Category of "Go Forward Stores," then Immediate Clarification Is Needed.**

9.    The Bid Procedures Motion creates a distinct set of deadlines where the assets being assumed and assigned are "Go Forward Stores," defined in the Motion as "*stores* that are capable of continuing as a going concern." [*see* Motion, p. 3] (Emphasis added.)  The Motion distinguishes between those sales and the sale of any other leases or other assets.

10.    Since the Premises leased from Greensboro include a warehouse but not a store, it appears that the Lease with Greensboro is excluded from the category of "Go Forward Stores," even though, to Greensboro's knowledge, Kmart's sublease of the Premises has been profitable for Kmart.

11.    Based on this understanding of the Debtors' intent, this Objection does not address the deadlines applicable to "Go Forward Store" sales.   If the Debtors believe that the Lease *could* be assumed and assigned in the category of "Go Forward Stores," then immediate clarification is required.

**B.    The Schedule Set Forth In the Motion Is Unjustified and Inadequate for Landlords.**

12.    The Debtors' Motion includes two proposed schedules: one, a schedule with a set of specific calendar dates, for the deadlines and events in the sale of the "Go Forward Stores;" the other, a relative schedule (*i.e.*, with no dates certain) to govern sales of assets and the assumption and assignment of the Debtors' other leases and executory contracts.

13.    The time frame described for both sets of schedules is expedited, relative to what is required under Fed. R. Bankr. P. 2002(a), 6004, 6006, and Local Bankruptcy Rules 6006-1(a) and 9006-1(b).  With respect to the sale of the Go Forward Stores, the Debtors argue that speed is necessary for a smooth transition to new ownership of the stores and their retail business to succeed. *See* Motion, ¶¶1 & 2 (asserting that a successful sale of the Debtors' viable Go Forward Stores "as a

4

going concern … will save Sears and Kmart" as well as the jobs of tens of thousands of employees, and that "time is of the essence").

14. But as to the general schedule for the sale, assumption and assignment of other leases and property,[4] the Debtors furnish no reasonable justification for expediting the time frame for landlords to receive notice of, and file objections to, any proposed assumption and assignment.

15. Bankruptcy Rule 2002(a)(2) generally requires 21 days' notice for any proposed sale or use of estate property outside the ordinary course of business ("unless the court for cause shortens the time"). Local Bankruptcy Rule 6006-1(a) generally requires at least 14 days' notice in advance of the return date, for motions to assume, reject, or assign executory contract or unexpired lease.[5]

16. But the Debtors are asking for a fixed schedule with abbreviated periods for notices and objections, as follows [*see* Motion, ¶24]:

- The starting point for the proposed schedule is the Debtors' service of a Sale Notice and/or an Assumption and Assignment Notice;[6]

- The Debtors set a deadline of ten (10) days after service (not receipt) of an Assumption and Assignment Notice for a landlord or other contract counterparty to file objections to the Debtors' proposed assumption and assignment of its lease to a Stalking Horse Bidder, *including* leases that might later be designated by a Stalking Horse Bidder for assumption and assignment; and to file objections to their proposed Cure Costs, as set forth in the Notice;[7]

- Under their schedule, the Debtors are not required to serve the Stalking Horse Bidder's "Adequate Assurance Information" (intended to demonstrate their ability to perform under the lease in the future) contemporaneously with their

---

[4] The Debtors' proposed procedures set forth time frames for serving and responding both to "Sale Notices" and to "Assumption and Assignment Notices." As Greensboro understands it, as between the two types of Notice, only the Assumption and Assignment Notice is likely to be applicable to Greensboro and its Lease. Accordingly, this Objection will principally focus on the Assumption and Assignment Notice and not the Sale Notice.

[5] Federal Bankruptcy Rule 6006 provides that Bankruptcy Rule 9014, governing contested matters, applies to the assumption, rejection, or assignment of an unexpired lease; but it is otherwise not specific as to the length of time required for notice thereof; Local Bankruptcy Rule 6006-1 fills in this gap.

[6] The Debtors' proposed forms for the Sale Notice and the Assumption and Assignment Notice are attached, respectively, as Exhibits 2 and 3 to their proposed Bidding Procedures Order, which is Exhibit A to their Motion.

[7] The Debtors set the same deadline as to Sales Notices, except that if the proposed stalking horse bidder is an insider, the Debtors propose giving an extra 4 days (14 days total) from service of a Sale Notice for filing of objections to the sale [no equivalent treatment is indicated if an insider is to be the assignee of an assumed lease].

service of the Assumption and Assignment Notice. Rather, they are merely obligated to "use commercially reasonable efforts" to provide that Information to the relevant landlords on the date of service of the Sale Notice, "or as soon as reasonably practicable thereafter." Motion, ¶ 28d.1;

- Nonetheless, the Debtors indicate that the same 10-day deadline applies with respect to a landlord's objections to a Stalking Horse Bidder's "Adequate Assurance Information" [8] -- thus potentially whittling in half a landlord's time to object;

- If the Debtors decide to auction off a lease *without* first designating a Stalking Horse Bidder, then the Debtors' schedule says they can withhold their proposed Cure Costs from landlords until *after* the Auction;

- The Auction would occur on or after 25 days past the date of service of the Sale Notice;

- The Debtors set, as a "target date," a date that is "within two (2) days after the conclusion of the Auction" for them to (a) file a Notice of Auction Results, and (b) serve landlords and other contract counterparties with the Cure Costs and the "Adequate Assurance Information" of the Successful Bidders of their leases, if they are different than the Stalking Horse Bidders;

- The Debtors again accord themselves flexibility in the service of the other Successful Bidders' "Adequate Assurance Information." *See* Motion, ¶ 28d.2. The Debtors would only be obligated to "use commercially reasonable efforts" to provide the Adequate Assurance Information to the relevant landlords two business days after the Auction, "or as soon as reasonably practicable thereafter" – a lax and imprecise time frame;

- Yet their schedule sets a fixed deadline of just "eight (8) days following the filing of Notice of Auction Results and service of the Adequate Assurance Information" for landlords to file objections to the proposed assumption and assignment, the proposed Cure Costs, and the adequacy of the assurances of future performance – even though the Adequate Assurance Information might only be served a few days after the Notice of Auction Results was filed;[9] and

- The proposed Sale Hearing would be held within five days thereafter.

17. These deadlines are woefully inadequate and, with respect to the Debtors' obligations to serve information on landlords, unduly vague.

---

[8] It is arguably ambiguous as to whether the 10-day deadline represents a single fixed deadline, or whether a separate 10-day deadline is triggered when the Debtors serve the Adequate Assurance Information, if it is served later than the Assumption and Assignment Notice.

[9] This eight-day deadline is also arguably ambiguous. *See* fn. 8 *supra*.

6

10565795

18. The timetable proposed by the Debtors does not provide adequate time for Greensboro to make an informed decision as to the ability of any successful bidder to perform under the Lease (much less to file any meaningful objection or conduct discovery). This is especially the case as to Successful Bidders who are not Stalking Horse Bidders.

19. The proposed schedule unnecessarily prejudices landlords' rights and interests under Section 365(b)(1) and (f)(2), and is inconsistent with the notice requirements under Fed. R. Bankr. P. 2002(a), 6004, 6006, and Local Bankruptcy Rules 6006-1(a) and 9006-1(b). It should be modified to require that landlords receive proposed cure cost and adequate assurance information in sufficient time to review and prepare a meaningful objection, if necessary, to any proposed assignee.

20. In *The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 15-23007 ("*A&P*"), this Court entered an Order on August 11, 2015 (at ECF No. 495) (the "*A&P* Order") on a similar motion, which order provided for significantly more time for landlords to file objections after receiving required notices.[10] The *A&P* Order, which granted a specified, expedited schedule, included as an attachment the Debtors' lists of the leases to be included in two stalking horse bids, and the other leases to be auctioned that were not part of the stalking horse bids.

21. The *A&P* Order directed that:

- no later than three (3) calendar days after the entry of the Order, the Debtors were to serve their Assumption and Assignment Procedures, which included their notice of Cure Costs "by email, mail, facsimile or overnight delivery," upon all interested notice parties, including the lease-counterparty landlords, as well as "their counsel of record, if any." *A&P* Order, ¶ 4(a). Thus, such service was required by not later than August 14, 2015.

- Within 10 days after entry of the *A&P* Order, the Debtors were required to provide the lease and contract counterparties and their counsel with the Adequate

---

[10] In *A&P*, the motion of the Debtors that this Court granted (ECF No. 26) included the Debtors' lists of the leases they proposed to seek to assume and assign. Specifically, in Schedules 1 and 2 to the *A&P* Debtors' global procedures motion the Debtors listed the leases that were included in two stalking horse bids, and the other leases not included in those two bids.

In the *A&P* Order, a "Summary of Important Dates" appears at p. 2 of the Global Bidding Procedures, attached as Exhibit 1 to the Order.

7

10565795

        Assurance Information of the Stalking Horse Bidder applicable to their lease or contract, on a confidential basis. *Id*. at ¶ 18. Thus, the Debtors' service of the Adequate Assurance Information of the Stalking Horse Bidder was required by not later than August 21, 2015.

- The *A&P* Order's deadline for objections to the proposed assumption and assignment, cure costs, and adequacy of assurances of future performance by the Stalking Horse Bidder (*so long as* the Stalking Horse Bidder was the successful bidder) – was September 11, 2015 – a date that was 28 days after the date on which the service by email or overnight delivery of the Cure Costs was required, and 21 days after the date on which the service in the same manner of the Stocking Horse Bidder's Adequate Assurance Information. *Id*. at ¶ 22.

- If the successful bidder at the auction were a different bidder, then the Debtors would need to serve the Adequate Assurance Information of that successful bidder and a new Cure Notice by not later than September 21, 2015. *Id*. at ¶ 23.

- The deadline for the lease or contract counterparty to file a Cure Objection and/or an Adequate Assurance Objection was then extended to October 2, 2015 [*Id*. at ¶ 24], to allow time for landlords and other counterparties to receive, evaluate and object to that successful bidder's information. In that scenario, a landlord would have had 49 days to prepare objections to the proposed cure costs, albeit only 11 days to file objections to the other bidder's Adequate Assurance Information. And that was a case where the deadlines were premised on an affirmative showing by the Debtors of the exigencies supporting them.

      22.    In this case, instead of offering landlords four weeks to receive, review and object to a Cure Notice and the Adequate Assurance Information of a Stalking Horse Bidder (as in *A&P*), the Debtors propose a mere ten days – or less, depending on how or when they accomplish service of the Notices and Information.

      23.    Instead of offering a comparable amount of time for a landlord to receive, review and object to a Cure Notice and the Adequate Assurance Information of a different Successful Bidder, the Debtors propose a mere eight days – or less, again, depending on how or when they accomplish service of the Notices and Information.

      24.    The Debtors' Motion offers some explanation for seeking expedited timing with respect to the proposed assumption and assignment of the Go Forward Stores. But the Lease with Greensboro is not a lease for one of the "Go Forward Stores." The Debtors have provided no

8

explanation and no evidence with respect to the Debtors' other leases and contracts to justify not complying with the time frames provided for under the applicable rules to allow lease and contract counterparties to review and respond to any such proposed sales.

25. As movant, the burden is on the Debtors to justify the shortened time frame. They have not done so here.

26. Greensboro urges the Court that, if the notice periods to landlords are to be shortened at all, deadlines to file objections to proposed Cure Amounts should not be any less than fourteen (14) days after prompt (email or overnight) service of the Debtors' proposed Cure Amounts.

27. Similarly, Greensboro urges the Court to direct that landlords be accorded nothing less than fourteen (14) days after prompt (email or overnight) service by the Debtors of the Adequate Assurance Information of either a Stalking Horse Bidder or other Successful Bidder, such as is required to satisfy Sections 365(b)(1) and (f)(2).

28. As it stands, the procedures barely would allow time for landlords to investigate even informally whether the information furnished is adequate, or to seek additional information if warranted from the successful bidder. With inadequate time for landlords to review proposed cure amounts and adequate assurance, any adequate assurance objection becomes simply a generalized objection requesting more time to investigate prior to any substantive hearing.

C. **The Debtors' Proposed Procedure for Them to Provide Notice to Landlords Cuts Unfairly Into the Time Needed to Review and Evaluate the Notices and Prepare Potential Objections.**

29. As alluded to, *supra*, the Motion provides that, when the Debtors are required to serve their Assumption and Assignment Notice, including the Cure Costs and the Adequate Assurance Information of the Stalking Horse or other successful bidder, the Debtors "shall use *commercially reasonable efforts* to, *as soon as reasonably practicable after* the Debtors' designation of a Stalking Horse Bidder, . . . serve on . . . each relevant Counterparty, . . . the Assumption and

9

Assignment Notice"; and the Debtors "will use *commercially reasonable efforts* to, within two (2) business days after the conclusion of the Auction, *or as soon as reasonably practicable thereafter*, . . . serve on . . . each Counterparty . . . a Notice of Auction Results . . .. Motion, ¶ 28 a. and b (emphasis added).

30. Arguably, "commercially reasonable" could include sending out the notice by regular U.S. Mail on a Friday so that it is not received until the middle of the following week, leaving merely two or three business days to respond and file objections.

31. Furthermore, it is not clear that such notices will even include the Adequate Assurance Information, insofar as there is no deadline specified for arranging agreements for handling any asserted confidentiality of a bidder's financial information.

32. The deadlines set by the Court should be a fixed number of days after the Debtors' designation of a Stalking Horse and after completion of an auction (*e.g.*, one or two), so that there will not be any question about when the service of the required information must be accomplished.

33. The *manner* of service of these Notices should not be left vaguely described as "commercially reasonable" – especially with respect to landlords whose counsel are known to the Debtors.

34. Rather, the Court should require that such service of the cure cost and adequate assurance notices (or similar notices) be made by email, hand delivery or overnight delivery, both to the lease counterparty and to its counsel of record in this case, as known to the Debtors – as this Court did in its Order in the *A&P* case. This is imperative, especially given that the Debtors are seeking shorter time frames than otherwise required under the Bankruptcy Rules.

35. To the extent that the Debtors have email addresses for the landlords or other counterparties, they should be served by both email and U.S. Mail. Landlords have no way of

10

knowing what address the Debtors have for service, and in many instances, a debtor simply sends notices to the address they use for payments – typically a lockbox at a bank. In the case of such service, landlords either never receive notices, or only receive them after a lengthy delay. By serving the notices on counsel, where known, this process issue does not materialize.

36.    The schedule for these as-yet unknown sale transactions can certainly be structured to afford landlords at least 14 days between the date on which the Debtors effectuate service of proposed cure amounts, adequate assurance information, and other notices and the date by which landlords must file objections.

37.    If there is less than 14 days provided for objections before a Sale Hearing, the Sale Hearing should serve as a status conference to set a schedule for obtaining adequate assurance information, and setting a further sale hearing.

### D.    The Debtors Carry the Burden On Adequate Assurance of Future Performance.

38.    Greensboro objects to the Debtors' implied request that the Court accept, without evidence, that there is adequate assurance of future performance for any lease that the Debtors seek to assume and assign.

39.    The Debtors may not assume and assign the Lease unless there is adequate assurance of future performance under the Lease. 11 U.S.C. § 365(b)(1)(C); *see also* 11 U.S.C. § 365(f)(2). The provision of adequate assurance of future performance is an affirmative duty of the Debtors, and the Debtors bear the ultimate burden of persuasion as to issues under Section 365. *See, e.g., In re Rachels Industries, Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990). This obligation to comply with Section 365(b) and Section 365(f) is unaffected by maneuvering the assumption and assignment process through a sale under Section 363.

40.    Courts require a specific factual showing through competent evidence to determine

11

whether adequate assurance of future performance has been provided. *See e.g., Matter of Haute Cuisine, Inc.,* 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even though experts presented cash flow projections, the court found that insufficient documentary evidence had been presented); *In re Bygaph, Inc.*, 56 B.R. 596 (Bankr. S.D.N.Y. 1986) (court granted motion to assume and assign based on assignee's capital contribution, personal financial resources, and expressed willingness to devote sufficient funding which gave new restaurant a strong likelihood of succeeding, coupled with assignee's experience as an owner/operator of a successful restaurant and his family's planned involvement in the day-to-day management).

    **E.**    **The Debtors Should Provide Landlords with a Stalking Horse Bidder's or Successful Bidder's Information on Adequate Assurance of Future Performance Promptly When It Is Available.**

41. The Bid Procedures Motion would require any Stalking Horse Bidder or other potential bidder to provide the Debtors with general information on their "financial wherewithal" such as would constitute the adequate assurance of future performance required under Section 365(b) and (f).

42. But it is not clear in the Motion as to when that information is to be conveyed to the affected landlord or contract counterparty.

43. Any order of this Court to govern general procedures on assumption and assignment of leases needs to ensure that Greensboro and other landlords will receive, on a timely basis, a bidder's financial data, with sufficient time to review it and assess its adequacy. The shortened deadlines proposed by the Debtors threaten to deny landlords adequate time for such evaluation.

44. Debtors can provide landlords the adequate assurance information for the Stalking Horse Bidders at the same time they serve the Assumption and Assignment and Cure Notices. Similarly, they should provide any affected landlord the adequate assurance information of any other Successful Bidder as soon as their status as Successful Bidder has been determined. The Global

Procedures already require that any bidder must include in their bid package such information as would satisfy the adequate assurance requirements of Section 365.

45. To the extent that any Successful Bidder will request that some of its financial data be kept confidential, the Procedures Order should ensure that issues about confidentiality, including any appropriate, limited agreement on confidentiality, should be addressed by the Debtors as early as possible, and amply in advance of when the Adequate Assurance Information is to be furnished.

46. There is no justification for withholding that information until the veritable "last minute" before furnishing it to the landlords. Landlords should be allowed time to conduct a meaningful analysis of such information, and due diligence of the proposed assignee of their lease.

47. The Motion does not describe the nature of the information to be furnished. To satisfy their burden of providing adequate assurance of future performance, the Debtors should provide, as to any Stalking Horse or Successful Bidder, at a minimum, the following information:

    (i) the name of the proposed bidder, and the name or entity under which the potential assignee intends to operate the Premises;

    (ii) the potential assignee's intended use for the space (if at any variance from current use);

    (iii) audited financial statements and annual reports for the past three (3) years, including all supplements or amendments thereto; and

    (iv) a contact person for the proposed assignee that Landlord may directly contact in connection with the adequate assurance of future performance.

48. Greensboro reserves the right to request further information as it may deem necessary to make an informed decision on the ability of a potential assignee to perform under the Lease.

**F.   The Debtors' Proposed Limitation of the Remedies Available to Landlords in the Event of a Dispute Regarding Cure Costs Is Unjustified and Contrary to This Court's Prior Practice.**

49. The Debtors' Motion allows for the possibility that a landlord may lodge a cure objection which the Debtors will dispute, and the parties may not be able to resolve their dispute as

13

to the proper cure amount prior to the Sale Hearing when the lease is to be assumed assigned.

50. In that event, the normal and fair manner of handling such a dispute is to require that the Debtors set aside a cash reserve to cover in full the disputed portion of the Cure Costs. That is what this Court ordered in the *A&P* case. There, this Court directed that, if a Cure Objection is not resolved at the applicable Sale Hearing, the hearing with respect to the objection may be adjourned to a later date, provided that "the Debtors maintain <u>a cash reserve equal to the cure cost the objecting party believes is required</u>, as set forth in the Cure Objection (the 'Cure Cost Reserve')" and continue to maintain the Cure Cost Reserve until the adjourned Cure Objection is resolved. *A&P* Order at ¶ 25 (emphasis added).

51. Instead of proceeding in that manner, the Debtors here essentially propose – most unfairly – that they have the right unilaterally to decide about the amount of the reserve. Specifically, their proposed order would provide that, as to any disputed portion of the Cure Amount, the Debtors "<u>reserve cash</u> in an amount sufficient <u>to pay the disputed portion</u> of the Cure Cost <u>reasonably asserted</u> by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court . . .." Motion, ¶ 28 (emphasis added). Implied is the Debtors' authority to decide what portion of the amount claimed by the Counterparty was asserted "reasonably."

52. The Court should not grant such unilateral authority to the Debtors to reduce any Cure Amount asserted in good faith by a landlord. To the extent that any reduction is in order, it should be decided by the Court based on the evidence needed to determine the cure amount; not based on unsupported requests by the Debtors for an "estimation."

**G.    Any Assumption and Assignment Must Comply With the Terms of the Lease.**

53. Greensboro expects that any Stalking Horse Bidder or other bidder will continue to operate the Premises as a warehouse, so there should be little, if any, issues with respect to the

14

continuing use of the Premises.

54.     This Court should not be rendering any ruling that addresses and determines the enforceability of any terms contained in Greensboro's Lease, or any other lease, without consideration of the leases in question.  Accordingly, it is inappropriate for the Debtors to request that the Court "find that all anti-assignment provisions in the Proposed Assumed Contracts … to be unenforceable."  Motion, ¶54.

55.     There is no pending contested hearing concerning the Lease, and no pending dispute with respect to the language of the Lease; accordingly, this Court's order on Bid Procedures should not impact upon the enforceability of any lease provision at this time.

**H.     Any Sale Must *Not* Be Free and Clear Of Obligations to Pay All Charges Due Under the Lease, Including Unbilled Year-End Adjustments and Reconciliations.**

56.     There is no pending motion for authority for the assumption and assignment of the Lease.  But in the event that the Debtors seek to transfer the Lease free and clear of liens, claims and encumbrances, Greensboro objects to any such sale free and clear of the obligations to satisfy unbilled taxes, reconciliations, or unbilled charges that may have accrued under the Lease prior to the assignment of the Lease, but which have not yet been billed.

57.     Debtor Kmart continues to be responsible for all such unbilled charges as they come due under the Lease, and the Debtor or any successful bidder must continue to satisfy all charges due under the Lease, including charges which have not yet been billed, reconciled and/or adjusted from pre-petition (or even post-petition) periods.  Any assumption and assignment of the Lease cannot cut off Greensboro's right to recover unbilled charges that have accrued, or are accruing, under the Lease.  If the sale is not subject to these claims for accruing but unbilled charges, there is a risk that these legitimate lease charges will not get paid to Greensboro.  Similarly, the Debtor or a successful bidder for the Lease will remain responsible for claims which may not become known until after the

15

assumption and assignment of the Lease, for which the Debtors currently maintain insurance.

58.     Any sale and/or assignment order should specify that these charges and obligations will survive the assumption and assignment of any of the Lease.

### I.     The Debtors' Seal Request Based on Confidentiality Is Overbroad.

59.     The Motion seeks to give prospective authority to file under seal Adequate Assurance Objections that contain confidential non-public information, without further order of the Court. *See* Motion, ¶ 28(d)(3).

60.     While certain portions of an Adequate Assurance Objection may arguably contain confidential commercial information, the Debtors (and prospective bidders) have not specifically demonstrated which portions of a bidder's documents fall within the parameters set forth in section 107(b) of the Bankruptcy Code.

61.     Because the scope of what the Debtors seek to have treated as confidential has not yet been precisely defined, Greensboro objects to this request for prospective authority to seal as overbroad.

62.     The burden is on the moving party to show that a request to place documents under seal falls within the parameters of Bankruptcy Code §107(b) by demonstrating: "...that the interest in secrecy outweighs the presumption in favor of access." *See In re Continental Airlines*, 150 B.R. 334 (D. Del. 1993). The inquiry then is whether or not the matter sought to be placed under seal fits within any of the categories included within either of section 107(b) or Fed. R. Bankr. P. 9018.

63.     Section 107 places the burden squarely on the Debtors to show a compelling need to seal or mark such information as confidential. The Debtors seek to seal certain evidence to the extent they believe it is confidential. It is the Debtors' burden to allege with particularity the information sought to be protected.

64.     Any relief granted should be narrowly tailored. *See In re Lomas Financial Corporation*,

1991 WL 21231, at *2 (S.D.N.Y. 1991).  Only those portions of the documents that comport with the requirements of section 107(b) should be redacted and sealed.  Otherwise, objectors should not be unduly burdened with filing, and presenting argument to the Court about the lack of adequate assurance, if that is the case, and objectors should be able to see what caused concern to other objectors.

### III.   RESERVATION OF RIGHTS TO RAISE FURTHER OBJECTIONS

65. Greensboro reserves all rights to: (i) raise additional objections in connection with any sale hearing and assumption and assignment of the Lease; (ii) raise further objections to an assignment of Lease to any successful bidder upon receipt of adequate assurance of future performance information; (iii) require any proposed assumption and assignment to comply with all lease terms; and (iv) to object to any designation procedure that affects the Lease.

66. Greensboro reserves its right to assert a Cure Objection, an Adequate Assurance Objection, and/or any and all claims it may have for the Debtors' prepetition and continuing obligations under the Lease, including, without limitation, Debtors' obligations to pay any tax obligations or adjustments; obligations that have accrued prior to entry of any order approving an assumption and assignment of the Lease but are not yet fixed, liquidated or payable; indemnity and defense obligations incurred prior to any hearing on any proposed assumption and assignment of the Lease; and the ability to assert any additional amounts or pecuniary losses that may accrue (including attorneys' fees) prior to entry of any order approving any such assumption and assignment.

### IV.   JOINDER IN OBJECTIONS RAISED BY OTHER LANDLORDS

67. To the extent not inconsistent with the Objections herein, Greensboro also joins in the objections of other lessors to the Debtors' proposed relief.

10565795

## V. CONCLUSION

**WHEREFORE,** Greensboro respectfully requests that the Court modify the sale procedures, assumption and assignment procedures, and auction procedures to incorporate the objections raised above and adequately protect the rights of Greensboro, and grant such further relief as the Court deems proper.

Dated:  November 8, 2018

**MORRIS JAMES LLP**

By: _/s/ Stephen M. Miller_
Stephen M. Miller (*Admitted Pro Hac Vice*)
Douglas N. Candeub
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email:  smiller@morrisjames.com

*Attorneys for Greensboro Lease Management, L.L.C., through its Liquidating Trustee, John H. Newcomer, Jr.*