# EXHIBIT 1

THIS LEASE made and entered into as of this 20th day of
December, 1991, between FARMINGVILLE ASSOCIATES, a New York
general partnership, having its principal office at c/o Midwood
Management Corporation, 60 East 42nd Street, Suite 1814, New
York, New York 10165 (herein referred to as "Landlord"), and
KMART CORPORATION, a Michigan corporation, having its principal
office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein
referred to as "Tenant").

<u>W I T N E S S E T H</u>:

In consideration of the rents, covenants, agreements and
conditions herein reserved and contained, Landlord and Tenant do
hereby covenant, promise and agree as follows:

1.   <u>Demised Premises and Common Area</u>.

Landlord does hereby demise and lease to Tenant, and Tenant
does hereby lease and take from Landlord, for the term
hereinafter set forth, all that certain plot or parcel of land
located in Farmingville, Suffolk County, New York, more
particularly described in Exhibit A annexed hereto and made a
part hereof, and as shown on the Plot Plan attached as Exhibit B
hereto (hereinafter referred to as the "Demised Premises").  As
hereinafter set forth in this Lease, subject to the fulfillment
of certain covenants, warranties and obligations of Landlord,
Tenant intends to construct certain improvements on the Demised
Premises, including a one-story building containing approximately
107,831 square feet (sometimes hereinafter referred to as the
"Kmart Building"), a garden shop (the "Garden Shop") of
approximately 11,040 square feet (3,600 square feet of which are
expected to be enclosed and included within the Kmart Building),
a loading dock, and an outside compactor.  All of the foregoing
are sometimes hereinafter referred to as "Tenant's Improvements."
The Demised Premises also include any and all easements,
licenses, rights, appurtenances and privileges now or hereafter
belonging thereto (including any such belonging or relating to
the Shopping Center hereinafter described.  The Demised Premises
are a part of a shopping center (the "Shopping Center") more
particularly described in Exhibit A-1 attached hereto and made a
part hereof; said Shopping Center consisting of the land (and all
improvements that may from time to time be thereon) represented
by the area outlined by a bold line upon a certain plan (the
"Plot Plan") attached hereto and made a part hereof as Exhibit B.
Landlord hereby grants to Tenant the non-exclusive right to use,
in common with other tenants of the Shopping Center, the portions
of the Shopping Center intended to be for common use, existing
and/or to be hereinafter constructed by Landlord or Tenant,
including, but not limited to, any parking areas, roads,
curb-cuts, streets, drives, passageways, landscaped areas, open
and enclosed malls, exterior ramps, walks and arcades (herein-
after collectively called "Common Area").

2.   <u>Term</u>.

The term of this Lease shall commence on the date
("Commencement Date") of execution of this Lease as above set
forth; and shall continue to and shall include the date (such
date, or if the term of this Lease be extended, the date of
expiration of the latest extension period, as hereinafter
defined, for which Tenant shall have exercised its option to
extend, being hereinafter called the "Expiration Date"), which is
(1) twenty (20) years from the day before the Rent Commencement
Date (as hereinafter defined) if the Rent Commencement Date is
the  first day of a month, or (2) twenty (20) years from the last
day of the month in which the Rent Commencement Date occurs if
the Rent Commencement Date is not the first day of a month.  The
aforesaid 20 year period is sometimes hereinafter referred to as

-2-

the "Initial Term." As used herein, the Rent Commencement Date shall mean the date which is the first to occur of (i) the date Tenant first opens its Kmart store on the Demised Premises for business with the public in the normal course (the "Opening Date") and (ii) three (3) years following the Commencement Date. Within ten (10) days after request of either party after the Rent Commencement Date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an agreement in the form provided in Exhibit C, setting forth the Rent Commencement Date, the date of expiration of the Initial Term of this Lease and the commencement dates of the extended periods. The term "Lease Year" shall mean the following: the first Lease Year shall be the 12-month period commencing (i) on the Rent Commencement Date if the Rent Commencement Date is the first day of a month; or (ii) on the first day of the month immediately following the month in which the Rent Commencement Date occurs if the Rent Commencement Date is not the first day of a month; and each succeeding 12-month period thereafter shall be a Lease Year.

Notwithstanding anything to the contrary contained in this Lease:

(i)   if the Approval Date (as hereinafter defined) has not occurred by July 1, 1993, or if at any time prior to such date any permit or approval required to cause the Approval Date to occur is denied and all administrative appeals of such denial (short of litigation) are exhausted, then in either such case Tenant, in addition to and not in limitation of any other rights and remedies, may cancel this Lease on notice to Landlord given at any time prior to the occurrence of the Approval Date, and upon the giving of such notice this Lease will terminate and neither party will have any further rights or liabilities hereunder;

(ii)   if the Tenant Building Permit Date (as hereinafter defined) has not occurred by November 1, 1993, Tenant, in addition to and not in limitation of any other rights and remedies, may cancel this Lease on notice to Landlord given at any time prior to the occurrence of the Tenant Building Permit Date, and upon the giving of such notice this Lease will terminate and neither party will have any further rights or liabilities hereunder (except that, subject to the relevant provisions of Article 9C, Landlord's or Tenant's potential liability for wrongful acts or omissions causing such non-occurrence will continue);

(iii)   if the Rent Commencement Date has not occurred by the third anniversary of the Commencement Date, this Lease shall <u>ipso facto</u> be and be deemed terminated and cancelled (except that Landlord's or Tenant's potential liability for wrongful acts or omissions causing such non-commencement will continue); and

(iv)   Tenant's obligations to pay minimum rent under Article 3, real estate taxes under Article 5, and Common Area charges under the Rider hereto will commence and/or accrue as of the Rent Commencement Date (<u>i.e.</u>, Tenant may use, possess and occupy the Demised Premises rent free until the Rent Commencement Date), but all other terms, conditions and provisions of this Lease shall (unless expressly otherwise provided or unless the context clearly requires otherwise) be effective as of and from and after the Commencement Date.

3.   <u>Annual Minimum Rental.</u>

Tenant shall, from and after the Rent Commencement Date, pay to Landlord, at such place as Landlord shall designate in writing from time to time, annual minimum rental as follows:

From and after the Rent Commencement Date and throughout the remainder of the Initial Term, the sum of FIVE HUNDRED THIRTY-NINE THOUSAND ONE HUNDRED FIFTY-FIVE DOLLARS ($539,155) per annum; and, should Tenant exercise one or more of the renewal options set forth in Article 14;

For the 21st through the 25th Lease Years, inclusive, a sum per annum equal to one hundred twenty percent (120%) of the sum of (i) annual minimum rent payable during the 20th lease Year <u>plus</u> (ii) Percentage Rent (as defined in Article 4 payable for (<u>i.e.</u>, attributable to gross sales made during) the 20th Lease Year;

For the 26th through 30th Lease Years, inclusive, a sum per annum equal to one hundred twenty percent (120%) of the sum of (i) annual minimum rent payable during the 25th Lease Year <u>plus</u> (ii) Percentage Rent payable for the 25th Lease Year;

For the 31st through 35th Lease Years, inclusive, a sum per annum equal to one hundred twenty percent (120%) of the sum of (i) annual minimum rent payable during the 30th Lease Year <u>plus</u> (ii) Percentage Rent payable for the 30th Lease Year; and

For the 36th through 40th Lease Years, inclusive, a sum per annum equal to one hundred twenty percent (120%) of the sum of (i) annual minimum rent payable during the 35th Lease Year <u>plus</u> (ii) Percentage Rent payable for the 35th Lease Year;

unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the Lease term; provided, however, in the event the Rent Commencement Date shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

By way of illustration of the foregoing computation of annual minimum rent, assume that 5th Year Sales (as defined in Article 4) were $25,000,000 and gross sales for the 20th Lease Year were $35,000,000.  In such event, there would be Percentage Rent payable for the 20th Lease Year of $100,000 (1% of the difference between $35,000,000 and $25,000,000), and annual minimum rent for the 21st through 25th Lease Year would be 120% of ($539,155 + $100,000), or $766,986.

If (by reason of final Percentage Rent figures for the preceding Lease Year not yet being available) the new annual minimum rent for any period in which same increases in accordance with the foregoing cannot be computed with certainty as of the first day of a Lease Year, then until such time as such Percentage Rent figure is available (at which point there shall be a retroactive adjustment), the new annual minimum rent shall be 120% of the annual minimum rent for the immediately preceding Lease Year.

3.   <u>Additional Rental.</u>

In addition to the aforesaid annual minimum rental, with respect to any Lease Year during the Lease term from and after the 6th Lease Year in which Tenant's "gross sales", as hereinafter defined, shall exceed the gross sales during the 5th Lease Year (said dollar amount of gross sales during the 5th

Lease Year being hereinafter referred to, throughout the Initial Term, as the "Breakpoint Amount"), for such Lease Year, Tenant shall pay to Landlord, as additional rental ("Percentage Rent"), a sum equal to one percent (1%) of the amount by which gross sales for such Lease Year exceed the Breakpoint Amount for such Lease Year.

Should Tenant exercise one or more of the renewal options set forth in Article 14, the Breakpoint Amount for any such Lease Year shall be increased as follows:

For the 21st through 25th Lease Years, inclusive, the Breakpoint Amount shall be the sum of (i) gross sales made during the 5th Lease Year (hereinafter "5th Year Sales") plus (ii) 100 times the amount by which annual minimum rent for the 21st Lease Year exceeds annual minimum rent for the 20th Lease Year;

For the 26th through 30th Lease Years, inclusive, the Breakpoint Amount shall be the sum of (i) the Breakpoint Amount for the 25th Lease Year plus (ii) 100 times the amount by which annual minimum rent for the 26th Lease Year exceeds annual minimum rent for the 25th Lease Year;

For the 31st through 35th Lease Years, inclusive, the Breakpoint Amount shall be the sum of (i) the Breakpoint Amount for the 30th Lease Year plus (ii) 100 times the amount by which annual minimum rent for the 31st Lease Year exceeds annual minimum rent for the 30th Lease Year; and

For the 36th through 40th Lease Years, inclusive, the Breakpoint Amount shall be the sum of (i) the Breakpoint Amount for the 35th Lease Year plus (ii) 100 times the amount by which annual minimum rent for the 36th Lease Year exceeds annual minimum rent for the 35th Lease Year.

By way of illustration of the computation of Breakpoint Amount increases, using the same assumptions as in the example at the end of Article 3, the Breakpoint Amount for the 21st through 25th Lease Years would be equal to $25,000,000 (5th Year Sales) plus $22,783,100 (100 times the $227,831 increase in annual minimum rent of the 21st Lease Year over the 20th Lease Year); a total of $47,783,100.

Notwithstanding the foregoing, if by reason of casualty or condemnation or other matters set forth in Article 32 Tenant's store on the Demised Premises does not operate for an aggregate period of 10 days or more during the entire 5th Lease Year, then in such event, for all purposes of this Article 4, 5th Year Sales shall be deemed to be the greater of (i) gross sales made during the 12 month period immediately preceding the first such day of discontinued operation during the 5th Lease Year and (ii) actual sales made during the 5th Lease Year.

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each Lease Year from and after the 6th Lease Year. Tenant shall, on or before the 30th day following the end of each Lease Year (including the 1st through 4th Lease Years) or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such Lease Year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any Lease Year and ending, by reason of the termination of this Lease, prior to the end of such Lease Year. The additional rental due under this Article 4 for any such "lesser period" at the end of this Lease shall be the product of (i) the amount, if any, by which one percent (1%) of sales for the 12 month period immediately preceding the Expiration Date exceed the Breakpoint Amount, multiplied by (ii)

-5-

a fraction whose numerator is the number of days in such lesser
period and whose denominator is 365.

Landlord or its agent may inspect Tenant's record of gross
sales annually, provided such inspection shall be made at
Tenant's principal office within twelve (12) months after the
statement of sales shall be delivered to Landlord and shall be
limited to the period covered by such statement.  Except to the
extent that disclosure shall be required for any bona fide sale
or mortgage of the Demised Premises or for legal proceedings in
any court, at law or in equity, Landlord shall hold in confidence
sales figures or other information obtained from Tenant's
records.

The term "gross sales", as used herein, shall be the total
sales of merchandise or services made by Tenant or any occupant
of the Demised Premises, whether wholesale or retail, cash or
credit (including merchandise ordered on the Demised Premises and
delivered from another place) and shall include sales made from
trucks, trailers, vans or other temporary facilities used by
Tenant on any part of the land described in Exhibit A, except
that the following shall be excluded:

(a)  sales of merchandise subsequently returned for
refund or credit, merchandise transferred to a warehouse or
another store of Tenant, discounts on merchandise which shall be
allowed to employees of Tenant, or merchandise which shall be
issued in redemption of trading stamps, if any, which shall have
been issued free of charge to Tenant's customers at the time of
sale of other merchandise or services;

(b)  any and all taxes levied upon, assessed against or
measured by the receipt or purchase of merchandise from any
occupant of said Demised Premises, and any and all sales taxes
and other taxes levied upon, assessed against, based upon, or
measured by (i) such occupant's gross receipts, or any part
thereof, or (ii) the sale or sales price of merchandise and
services, or either, and which shall be payable by such occupant,
whether or not collected by such occupant from its customers as
reimbursement or as agent of the taxing authority, and whether or
not the same shall be commonly known as a sales tax, use tax,
retailer's occupational tax, gross receipts tax or excise tax;
provided, however, said taxes to be excluded from gross sales
shall not include any net income tax, franchise, or any other tax
not levied upon or computed upon gross sales or gross receipts,
or any portion thereof; provided, further, said taxes to be
excluded from gross sales shall be excludable regardless of
whether imposed under any existing or future orders, regulations,
laws, statutes or ordinances.

(c)  receipts from any of the following:  (i) the sale
of policies of insurance, mutual funds, stocks, bonds and other
securities, travelers checks, money orders, and similar items;
(ii) the sale or rendition of financial services of all types,
including, without limitation, the operation of checking and
savings accounts, the issuance or cashing of checks, the
furnishing of bill paying, custodial, investment and fiduciary
services, the making of secured and unsecured loans, the
operation of facilities for the electronic transfer of funds and
use of credit cards, the preparation of income tax returns, and
real estate or loan brokerage; (iii) the sale of postage stamps,
fishing and hunting licenses and tickets (including but not
limited to, those customarily sold by travel and theatre
agencies); (iv) professional services (including, without
limitation, legal, medical and dental); (v) travel agency and
other services rendered to increase customer traffic, and (vi)
provided the same do not occupy more than 500 square feet of the
demised premises, vending machines, video and/or amusement games,

lockers, stamp machines, public telephones, and "kiddie rides";
and.

> (d)   service and interest charges for time payment
accounts and charge accounts.

4.   <u>Real Estate Taxes</u>.

A.   Landlord warrants and represents that it will use its
best efforts to cause the Demised Premises to be assessed and
maintained as, an entirely separate tax parcel or lot which does
not include any other portions of the Shopping Center or any
property not a part of the Shopping Center.  Landlord further
agrees to cause the remainder of the Shopping Center (<u>i.e.,</u>
exclusive of the Demised Premises, hereinafter referred to as
"Landlord's Tax Parcel") to be maintained entirely within a tax
parcel(s) or lot(s) which do not include any property not part of
the Shopping Center.

Landlord further warrants and represents that if
despite the use of such best efforts it can not obtain a separate
assessment of the Demised Premises, the Demised Premises will be
maintained within a tax parcel or lot which does not include any
property not a part of the Shopping Center.

B.   Landlord agrees to pay and discharge before delinquent
all Real Estate Taxes (as hereinafter defined) which become due
on the Landlord's Tax Parcel (including Phase II as hereinafter
referred to) during the term of this Lease.  If there shall not
be a separate assessment of the Demised Premises, the Landlord's
Tax Parcel shall be deemed to include the Demised Premises for
all purposes under this Article 5.

C.   If there shall be a separate assessment of the Demised
Premises, from and after the Rent Commencement Date, Tenant
agrees to pay and discharge, before delinquent, all Real Estate
Taxes which become due on the Demised Premises (including any
buildings and other improvements built by Tenant thereon) during
the term of this Lease.  In addition, Tenant agrees to pay, from
and after the Rent Commencement Date, Tenant's portion of Real
Estate Taxes on the Common Areas (the "Tax Portion") as
hereinafter defined.

D.   For the purposes of this Article 5, Real Estate Taxes
shall mean all ad valorem real estate taxes and assessments,
extraordinary as well as ordinary, levied or assessed by the
lawful taxing authorities upon either the Demised Premises,
Landlord's Tax Parcel, or the Common Areas (as the usage may
require) (including all land, buildings, and improvements thereon
(except as otherwise expressly set forth in this Article 5D).
Real Estate Taxes shall not include (a) any income, franchise,
gross receipts, corporation, capital levy, excess profits,
revenue, inheritance, devolution, gift, estate, payroll or stamp
tax, by whatsoever authority imposed or howsoever designated, (b)
any tax upon the sale, transfer and/or assignment of the title or
estate of Landlord which at any time may be assessed against or
become a lien upon the Shopping Center, this leasehold or the
rent accruing therefrom, (c) any interest, charge or other
penalty for untimely payment, (d) any assessments for
improvements in the Shopping Center or assessments for public
streets, public sidewalks, sewers, water and other installations
made at governmental expense before or in connection with the
initial construction and overall development of the entire
Shopping Center or any part thereof, (e) any tax upon any land
and/or improvements which are separately assessed and payable by
other tenants (<u>i.e.,</u> other than Tenant) pursuant to their leases
("Separately Assessed Premises"), and (f) any tax upon any land
(and/or improvements that may be hereinafter constructed),
constituting the "Phase II" area of the Shopping Center as shown

on Exhibit B, which is currently undeveloped.  Landlord agrees to
use diligent efforts to have Phase II assessed as a separate tax
lot or parcel distinct from the balance of the Shopping Center.
If such efforts are unsuccessful and Phase II remains assessed as
part of Landlord's Tax Parcel, then for the purposes of computing
Tenant's Tax Portion there shall be a fair and equitable
proration of land (and building, should Phase II be hereafter
developed) assessments between Phase II and the balance of the
Landlord's Tax Parcel (which proration shall give due
consideration to any notes or letters regarding same from the
local assessor).

E.    (1)  For each Real Estate Calendar (Fiscal) Tax Year
during the term hereof from and after the Rent Commencement Date
Tenant shall pay to Landlord Tenant's Tax Portion as hereinafter
set forth.  Tenant's Tax Portion for any Real Estate Calendar
(Fiscal) Tax Year in which there shall be a separate assessment
of the Demised Premises shall mean the following: the product of
(i) Real Estate Taxes for such Real Estate Calendar (Fiscal) Tax
Year attributable solely to the Common Area of the Shopping
Center (excluding Phase II, as aforesaid, and also excluding Real
Estate Taxes on any buildings and the land under any buildings),
and (ii) the fraction (hereinafter called "Fraction"), the
numerator of which shall be the number of square feet of ground
floor area of the Tenant's building (excluding unenclosed
portions of the garden area and any mezzanines) at the end of
such Real Estate Calendar (Fiscal) Tax Year, and the denominator
of which shall be the number of square feet of floor area of all
the buildings in the Shopping Center other than Phase II
(including the Tenant's building but excluding any Separately
Assessed Premises) at the end of such Real Estate Calendar
(Fiscal) Tax Year.  Notwithstanding the formula above set forth,
if there shall not be a separate assessment of the land
comprising the Common Area (i.e., the assessment of same shall
include land underlying buildings), there shall be an appropriate
proration of said aggregate assessment (based on the ratio
between land underlying buildings and the Common Area) to arrive
at the amount of Real Estate Taxes for the Common Area for
computation of Tenant's Tax Portion.  Tenant's Tax Portion for
any Real Estate Calendar (Fiscal) Tax Year in which there shall
not be a separate assessment of the Demised Premises shall mean
the following:  the product of (i) Real Estate Taxes for such
Real Estate Calendar (Fiscal) Tax Year attributable to the land
and improvements comprising the Shopping Center (excluding Phase
II, as aforesaid), and (ii) the Fraction.

(2)  Where bills are rendered for different Real Estate
Taxes (i.e., county, school, city or the like) the measurement of
Tenant's liability under the provision shall be separately made,
according to the tax liability stated on each bill.

F.    Where the applicable tax bill is not available prior to
the end of the term hereof, then the aforesaid adjustment shall
be made, tentatively, on the basis of the last year's taxes, and
the amount due shall be treated as an addition to the minimum
rent for the last month of the term of this Lease; and final
adjustment shall be made between Landlord and Tenant promptly
after Landlord shall have received the tax bill for such period.

G.    Landlord shall not pay any Real Estate Taxes before
they are due (unless Landlord receives a discount for such early
payment and passes the benefit of the discount through to
Tenant).

H.    Landlord shall submit to Tenant a bill for Tenant's Tax
Portion, together with true copies of the receipted tax bill and
a statement of the facts and information needed to calculate the
Tenant's Tax Portion, as soon as practicable after the end of
each Real Estate Calendar (Fiscal) Tax Year, and if the same is

-8-

correct, Tenant shall pay Tenant's Tax Portion to Landlord as additional rent within thirty (30) days after Tenant receives said bill and statement.  Notwithstanding the foregoing, Landlord shall have the right to submit a separate bill for Tenant's Tax Portion with respect to any installment of Real Estate Taxes following Landlord's payment of such installment, and Tenant shall pay its appropriate Tax Portion of such installment within 30 days after it receives such bill and statement.  Further notwithstanding the foregoing, if during any Lease Year Tenant's Portion of Real Estate Taxes should exceed the of amount minimum rental payable under Article 3, then for each succeeding Lease Year Tenant shall initially pay its Tax Portion in monthly estimates on the first day of each month (each to be one-twelfth of the amount of the actual Tax Portion for the previous Lease Year), with an annual reconciliation within 30 days following the end of the Lease Year (i.e., in the same manner as Paragraph D of the Common Area Charge Rider).

     I.   If, by law, any Real Estate Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise the option to pay the same in installments and shall pay the installments as the same respectively become due and before any fine, penalty, interest or cost may be added for non-payment thereof, but Landlord shall not pay any installment before it is due (except as set forth in subparagraph G above).  Only installments becoming due during the term of this Lease from and after the Rent Commencement Date shall be included in Real Estate Taxes for the computation of Tenant's Tax Portion and for Tenant's liability regarding payment of Real Estate Taxes on the Demised Premises (if same are separately assessed), and any installments for a Real Estate Calendar (Fiscal) Tax Year, a part of which is included within the term of this Lease after the Rent Commencement Date and a part of which is included in a period of time before the Rent Commencement Date or after the Expiration Date (or sooner expiration or termination date), shall be equitably adjusted and apportioned between Landlord and Tenant as of the Rent Commencement Date or the Expiration Date (or sooner expiration or termination date), as the case may be, for the purpose of computing Tenant's Tax Portion and Tenant's obligations (if there is such separate assessment of the Demised Premises) under Article 5C.

     J.   (1)  If Landlord shall fail or refuse, upon the request of Tenant, to take any necessary steps to contest the validity or amount of the assessed valuation or of the Real Estate Taxes for any Real Estate Calendar (Fiscal) Tax Year, Tenant may undertake, by appropriate proceeding in the name of Landlord or Tenant, to contest the same.  Within a reasonable time after demand therefor, Landlord shall execute and deliver to Tenant any documents required to enable Tenant to prosecute any such proceedings.  Landlord shall inform Tenant, in time to permit Tenant to undertake such contest, of all pertinent data required to undertake such contest.  In amplification and not in limitation of the foregoing, Landlord agrees upon request from Tenant to execute and submit any applications, forms, documents and supporting data and information to obtain any abatements or reductions in Real Estate Taxes that may be available or obtainable (including, without limitation, any such abatements or reductions available by reason of the presence of Tenant's operation or by way of inducement of Tenant to execute this Lease).

     (2)  If Tenant shall obtain for Landlord a remission or a refund of all or any part of the Real Estate Taxes for any Real Estate Calendar (Fiscal) Tax Year, Landlord shall promptly reimburse Tenant out of such remission or refund for all of Tenant's costs and expenses in connection therewith, including, but not limited to, attorneys' fees.  If Landlord or Tenant shall

obtain a remission or a refund of all or any part of the Real Estate Taxes on Landlord's Tax Parcel for any Real Estate Calendar (Fiscal) Tax Year, Landlord shall promptly refund to Tenant (or credit Tenant with) a proportionate share (based upon the Fraction) of the remission or refund, such proportionate share to be calculated after deduction of actual costs and expenses incurred in obtaining such remission or refund. Notwithstanding the foregoing, all of any refund attributable to Real Estate Taxes on the Demised Premises shall belong solely to Tenant.

6.   <u>Landlord's Work</u>.

A.   Landlord agrees, at its sole cost and expense and in a good and workmanlike manner, in full compliance with all Requirements (as hereinafter defined), to perform all Landlord's Work (as such term is hereinafter defined) in accordance with the timetables for same hereinafter set forth.

B.   For the purposes of this Article 6 and elsewhere in this Lease, the following terms shall have the following meanings:

(i)   <u>Building Areas</u>.  The areas designated on Exhibit B as "Kmart," "Garden Shop," "Retail," "Existing Building," or otherwise designated thereon for buildings and related improvements.

(ii)   <u>Off-Site Improvements</u>.  All off-site improvements, including without limitation driveways, street improvements, street extensions and/or widenings, median divider strips, stacking and deceleration lanes, gutters, curbs, sidewalks, separate automatic sprinkler systems if required by governmental authorities, storm drains, retention basins, water lines, street lights, traffic signals, and installation of necessary utilities to the property line of the Shopping Center, as well as all other off-site improvements required by governmental agencies to permit the improvements to be constructed by Landlord and/or Tenant hereunder.

(iii)   <u>New Common Area Improvements</u>.  Any work Tenant, in its sole judgment, deems necessary or appropriate to construct New Common Areas as shown in Parcel A of Exhibit B to Tenant's desired specifications, including, without limitation, any of the following that Tenant deems necessary or appropriate: on-site excavation, filling, soil compaction, fine and rough grading, drainage, including necessary engineering that may be required, surveys, soil and other tests, retaining walls, on-site water lines, separate automatic sprinkler systems if required by governmental authorities, storm drains and retention basins and provision of building utilities including sewers and fire protection lines with backflow prevention devices, natural gas, transformer and transformer pad, and water and electricity from the exterior boundary of the Shopping Center to a point within three feet (3') from the building line of the Kmart Building, necessary perimeter walls or screening as required, parking lot paving, striping, heavy-duty service drive around the perimeter of the Kmart Building and Shopping Center as shown on Exhibit B, lighting, bumpers, traffic control signs, landscaping, including separate automatic irrigation systems.

By way of additional clarification, it is understood and agreed that all surface improvements to the back of curbs surrounding the Kmart Building is part of, and shall be included within, the New Common Area Improvements.  Notwithstanding the foregoing, nothing in this Article 6 or elsewhere in this Lease shall require Tenant to conduct any environmental surveys or to remove or remediate any toxic or hazardous waste or substances not placed on the Demised Premises by Tenant.

-10-

(iv)    Existing Common Area Improvements.  With
regard to existing Common Areas as shown on Exhibit B (in other
than Parcel A):  resurface all paved areas, provide new light
fixtures and bulbs (and new stanchions as and where reasonably
required), resurface curb and gutter access road from Shopping
Center to Horse Block Road, make any necessary modifications to
on-site sewage treatment plant to increase capacity to handle all
new construction (including the Kmart Building), and construct
new Shopping Center sign pylon in accordance with Tenant's
specifications.  All of such work is to be done by Landlord (as
hereinafter set forth) in a first class manner so that the
existing Common Areas will, upon completion, be compatible with
the New Common Areas to be constructed by Tenant.

(v)    Initial Utility Work.  Relocation of any
electric, water, sewer or other utility lines running through the
Demised Premises (other than existing easement for maintenance of
electric transmission towers (the "Power Easement", which the
parties acknowledge is impracticable to relocate)) to points at
least five feet distant from boundaries of the Demised Premises,
and record any necessary amendments of easements in connection
therewith.  In amplification and not in limitation of the
foregoing, the Initial Utility Work includes relocation of any
elements of the sewage treatment system in or on the Demised
Premises, and modification and/or reconfiguration and/or partial
filling of recharge basin to allow construction of service drive
behind the Demised Premises.

(vi)    Landlord's Work.  Collectively, all the work
required to fully perform and complete the Off-Site Improvements,
the Existing Common Area Improvements, and the Initial Utility
Work.

(vii)    Tenant's Common Area Work.  Collectively, all
work required or appropriate in Tenant's sole judgment to fully
perform and complete the Pad Preparation Work and the New Common
Area Improvements.

(viii)    Tenant's Common Area Reimbursements.  The
sums to be paid by Landlord to Tenant as provided in Article 7 as
reimbursement for Tenant's Common Area Work.

(ix)    Development Funds.  The sum to be determined
as provided in Article 7, payable by Tenant to Landlord for
Tenant's share of the Off-Site Improvements and pylon
construction costs.

(x)    Kmart Pad.  The building pad for Tenant's
Improvements (which is the land constituting the Demised
Premises).

(xi)    Kmart Building Plans.  The detailed
architectural plans for the Kmart Building prepared by Kmart's
architect pursuant to the Typical Criteria Drawings and Outline
Specifications, Set No. K0973, issued by J.M. Bachoe, A.I.A.,
Manager, Design Division, Construction Department, Kmart
Corporation to Farmingville Associates on April 12, 1991.

(xii)    Pad Preparation Work.  The demolition of
approximately 20,000 square feet of existing buildings as shown
on Exhibit B (including removal of existing foundations of same),
any patching or other work to other buildings required by reason
of such demolition, and any other work necessary or appropriate
in Tenant's judgment to prepare the Kmart Pad for the building of
Tenant's Improvements, including, without limitation, the
following:  (a) stake the boundaries for the Kmart Pad on the
Demised Premises; (b) excavate, fill (with clean, suitable fill),
and rough grade the Kmart Pad; (c) provide an all weather access
road to the Kmart Pad; and (d) provide a staging area not less
than two acres in size adjacent to the Kmart Pad (as shown on
Exhibit B) suitable for the storing of equipment and materials
during the time Tenant is constructing the Tenant's Improvements
on the Demised Premises (and for Tenant's exclusive use during

-11-

such period);  (e) establish and clearly mark an overall site
benchmark;  (f) cause the corners of the Kmart Pad to be staked by
a licensed surveyor or engineer with a ten foot 10' offset from
the building line;  (g) prepare an as-built site plan certified by
a licensed surveyor or engineer indicating the final elevation
and location of the Kmart Pad and any buildings adjacent to the
Tenant Improvements; and (h) provide temporary utilities
(including electric and water service) to the Tenant staging area
for use by Tenant during the time the Tenant's Improvements are
under construction.  If the Demised Premises are relocated to the
north as set forth in Article 9C, the Pad Preparation Work shall
also include the demolition of the existing buildings in the
"Possible Relocation Area" as shown on Exhibit B (including
removal of foundations of same and all other work set forth
above, as if the "Possible Relocation Area" originally was
included as part of the Kmart Pad).

        (xiii)  Requirements.  Any law, ordinance, order,
rule or regulation relating in any way to any item required to be
performed by either party under this Lease issued by the United
States, the State of New York and/or any political subdivision
thereof, and/or any agency, department, commission, board, bureau
or instrumentality of any of them.

        C.  (i)  On or before the 90th day following the
Commencement Date, and prior to submission for governmental
approval and prior to preparation of construction documents,
Landlord shall submit to Tenant for approval five copies of the
final site design plans, which shall include plans for utilities,
grading, landscaping and parking and driveway layout and building
location.  Approval shall be in accordance with the procedures
set forth in Article 6J hereof.

        (ii)  On or prior to the 360th day following the
date set forth in Section C(i) above, Landlord shall obtain all
required local, state and federal governmental approvals and
permits including, without limitation:  (x) any approval required
from Long Island Lighting Company for construction of the Garden
Shop in the Power Easement Area (the "Lilco Approval"); and
(y) final unappealable site plan approvals, traffic studies, and
any others required by state and federal environmental laws, for
the construction of all of Landlord's Work and Tenant's Improve-
ments and the balance of Tenant's Initial Work, as hereinafter
defined (other than actual building permit for Tenant's Improve-
ments which is to be obtained by Tenant, subject to all relevant
provisions of this Lease); and all such permits and approvals
shall have become final and unappealable.  The date when the last
of such required permits and approvals shall have been obtained
in final, unappealable form (including the design and signage
approvals hereafter referred to in this paragraph) is hereinafter
referred to as the "Approval Date."  Such approvals shall
include, without limitation, permission to connect the Tenant's
Improvements to on-site private sewage treatment plant and any
other health department or board of health approvals, as well as
permission for an additional curb cut to Ocean Avenue in the
approximate location shown on Exhibit B.  Landlord shall also
obtain, on or prior to the Approval Date, all required Tenant
building design and signage approvals required by local
governmental authorities associated with the approval of the New
and Existing Common Area Improvements or Tenant's Improvements.
Such approval of signage shall include, without limitation,
Shopping Center pylon to be located as shown on Exhibit B with
Tenant's sign panel thereon, as well as Tenant's exterior
building signs, all in accordance with Tenant's sign criteria and
design.  Notwithstanding the foregoing, Landlord shall only be
required to use its best efforts to obtain such approval for a
pylon sign and does not warrant same is obtainable.

        (iii)  Landlord shall commence construction of
Landlord's Work not later than 10 days following the Tenant
Building Permit Date, as hereinafter defined (except that the
Initial Utility Work shall be sooner commenced as set forth in
the following paragraph).  All construction will be diligently

and continuously pursued to substantial completion in a good and
workmanlike manner and in accordance with the Requirements, with
the plans referred to in the second paragraph of E below (to the
extent relevant), and in accordance with said timetable set forth
in Article 6D.  The construction of any Landlord's Work around
the Kmart Pad shall be done in a manner as to minimize disruption
of and to coordinate with the construction schedule for Tenant's
Initial Work.

D.    Landlord shall commence and complete the
construction of Landlord's Work in accordance with the following
timetable:

(i)  Commencement of Initial Utility Work - within
30 days of the Commencement Date.

(ii)  Completion of Initial Utility Work - on or
prior to the Tenant Building Permit Date.

(iii)  Completion of parking and driveway areas of
Existing Common Area Improvements - within 180 days
following the Tenant Building Permit Date.

(iv)  Completion of all remaining on-site and
off-site Landlord's Work necessary for Tenant to obtain
a certificate of occupancy for purposes of fixturing
and preparing the Tenant Improvements for opening -
within 210 days following the Tenant Building Permit
Date.

(v)  Final completion of all Existing Common Area
Improvements - within 240 days following the Tenant
Building Permit Date.

(vi)  Final completion of any Off-Site Improvements
required to be completed at dates different than (iv)
and (v) above - within any timetable required by
municipal authorities, provided that if completion of
same is necessary to obtain a Tenant certificate of
occupancy as set forth in (iv) above, same shall be
completed within 210 days following the Tenant Building
Permit Date.

E.    Landlord will permit representatives of Tenant to
enter upon all portions of the Shopping Center at reasonable
times during construction to inspect the Landlord's Work and all
materials to be used in the construction thereof and will
cooperate and cause its contractor to cooperate with
representatives of Tenant during such inspections.

Prior to the installation of the following
components of Landlord's Work, Landlord shall have submitted to
Tenant five copies of the shop drawings relating to the following
and such shop drawings shall have been approved by Tenant (such
approval not to be unreasonably withheld):  (a) upgrading of
parking lot lighting fixture and standards; (b) site signage; and
(c) any modifications of sewage treatment plant.  Tenant shall
review such shop drawings and furnish Landlord with requested
modifications thereto within 14 days of Tenant's receipt of such
shop drawings.  Landlord will incorporate such requested
modifications (as long as same are reasonable) into such
components at the time of installation in the Shopping Center.

F.    Landlord will promptly correct all defects in
Landlord's Work, or any significant departure from any plans
referred to in E above not previously approved by Tenant, if such
defects or departures are identified in writing in a notice to
Landlord given prior to the expiration of the warranty period
stated in Article 8 hereof.  The cost of any such correction

-13-

shall not be deemed a Common Area charge, as hereinafter defined.
Landlord agrees that the release of any Development Funds by
Tenant, as provided in Article 7 hereof, whether before or after
such defects or departures are discovered by or brought to the
attention of Tenant, shall not constitute a waiver of Tenant's
right to require compliance with this covenant.

G.    The Landlord shall obtain or cause to be obtained
the insurance coverage required under Article 10 hereof.

H.    Landlord does hereby establish, give, grant and
convey to Tenant, its successors, successors-in-title, and
assigns, employees, contractors and subcontractors, such rights,
easements and licenses as are necessary to go on and across the
Shopping Center to perform the work necessary to perform and/or
construct Tenant's Common Area Work, the Pad Preparation Work,
and the Tenant Improvements.  Landlord shall coordinate the
installation of Landlord's Work so as to not interfere with the
progress of Tenant's construction of Tenant's Improvements and
Tenant's Common Area Work.  Without limiting the foregoing,
Tenant's contractors and subcontractors shall have priority with
respect to scheduling work within a ten foot (10') wide area
around the Kmart Pad and/or Parcel A.

I.    Unless otherwise specified in this Lease, upon
receipt by a party hereto of a request for approval pursuant to
Articles 6 or 9 hereof, the other party shall, within thirty (30)
days after receipt of such request for approval, notify in
writing the party making such request of any objections thereto
(such objections to be specifically stated) and such party may
within fifteen (15) days thereafter submit its request for
approval rectifying any such objections.  The other party shall
then have an additional fifteen (15) days after receipt of said
revisions to approve or disapprove same.  Failure to give any
written notice of disapproval within the periods provided for
above shall constitute approval thereof by the party from whom
approval is sought.

7.    <u>Landlord Reimbursement</u>

A.    Landlord shall be solely responsible for the
construction and payment in full of the cost of all Landlord's
Work; provided, however, Tenant shall reimburse Landlord as
hereinafter provided for Tenant's share of the cost of the pylon
and Off-Site Improvements in an amount (herein referred to as the
"Development Funds") equal to the sum of (x) the cost of
constructing the new Shopping Center pylon (exclusive of any sign
panels thereon and exclusive of the costs of bringing utilities
thereto) to Tenant's specifications, multiplied by the Fraction,
<u>plus</u> (y) an amount equal to the lesser of (i) the cost of the
Off-Site Improvements as certified by the Landlord, multiplied by
the Fraction and (ii) $300,000.00.

B.    The Development Funds shall be paid to Landlord
within 10 days following satisfaction of all of the following
conditions:

(i)  the Rent Commencement Date shall have
occurred and this lease shall be in full force and effect;

(ii)  Landlord shall have completed all Landlord's
Work in accordance with all Requirements, the plans referred
to in Article 6E, Tenant's pylon specifications, and all
relevant provisions of this Lease;

(iii)  Landlord shall complete, execute and deliver
to Tenant a written certificate (together with such back-up
and supporting files and other documentation as Tenant may
reasonably request) which (a) certifies as to the total

-14-

costs paid by Landlord to the general contractor or others for the cost of Off-Site Improvement and the pylon, (b) states that the work which has been paid for and for which reimbursement is sought has been performed in accordance with plans approved by Tenant and/or pylon specifications, (c) itemizes by category and amount all work, and (d) states the amount of funds requested from Tenant.

C.    Except for Tenant's obligation to pay over the Development Funds as herein provided, all costs associated with the construction and installation of Landlord's Work shall be paid for by the Landlord.

D.    Tenant shall initially perform and pay for all Tenant's Common Area Work. All of such work (including any labor, materials and supplies) shall be contracted and/or ordered from bona fide third party contractors, materialmen, suppliers and/or professionals such as engineers, surveyors, architects, lawyers, etc. (all of the foregoing being hereinafter collectively referred to as "Contractors") at prices which in Tenant's business judgment (reasonably exercised) are reasonable and not substantially greater than market prices of reputable, established and experienced parties for similar goods and services. The foregoing, however, shall not give or be deemed to give Landlord any express or implied right to approve or consent to any Contractor or the price to Tenant for any of the foregoing goods or services or require Tenant to "bid out" any such services or accept the lowest bid if it does; it being understood and agreed that Tenant shall have the sole right to choose all Contractors and the prices charged thereby, subject only to the relevant provisions of the preceding sentence. Notwithstanding the foregoing, however, Tenant agrees to give Landlord's Affiliate, Midwood Management Corporation ("Midwood"), the right to bid on such job, and if Midwood's bid is at least 5% less than the next lowest bid received by Landlord, Midwood is licensed and qualified to do the job, furnishes full payment and performance bonds, and Midwood agrees to meet any and all conditions and specifications attached to such bid (including, without limitation, entering into a fixed-price contract in form acceptable to Tenant), Tenant shall agree to let Midwood do the work. Notwithstanding the foregoing, however, Midwood shall agree to perform any change orders requested by Tenant on a straight cost basis (i.e., without profit or markup). All bona fide costs and expenses incurred by Tenant in performing Tenant's Common Area Work, including, without limitation, all costs of labor, materials, supplies, equipment, contractor fees, permits, architectural and engineering, surveying, and legal fees and costs, and insurance, are hereinafter referred to as "Reimbursable Costs." Reimbursable Costs shall not, however, include any costs of constructing Tenant's Improvements, or any amounts paid or attributable to full time employees of Tenant (such as members of Tenant's in-house construction department; but travel expenses of Tenant's employees, including airfare, hotels and meals, for trips to supervise or inspect Tenant's Common Area Work shall be Reimbursable Costs).

E.    Landlord covenants and agrees to fully reimburse and pay to Tenant all Reimbursable Costs in the manner hereinafter set forth. Tenant shall have the right to make a request for reimbursement (a "Request") to Landlord at any time and from time to time (but not more frequently than monthly) following the Tenant Building Permit Date. Each Request shall certify the total amount of previously unreimbursed Reimbursable Costs theretofore incurred by Tenant, and include invoices or other reasonably satisfactory documentation evidencing same. Landlord shall pay to Tenant the amount of Reimbursable Costs set forth in the Request within 10 days of receipt of any Request. Such payments are herein referred to as "Tenant's Common Area Reimbursements." If Landlord shall fail to make any Tenant's

-15-

Common Area Reimbursement when due (i.e., not later than 10 days following receipt of the Request to which it relates), said Tenant's Common Area Reimbursement shall thereupon (until paid in full) accrue interest (which Landlord hereby agrees to pay on demand) at the Lease Interest Rate (as hereinafter defined), and, in addition to and not in limitation of any other remedies, Tenant shall have the right to deduct and offset any such amount(s) (together with accrued interest thereon as aforesaid) from any rent or other payments next due Landlord under this Lease until all such unpaid amounts have been fully recovered.

8.   Landlord's Warranty.

Landlord shall and hereby does unconditionally guarantee, for the warranty period as hereinafter defined, all labor and materials furnished, or caused to be furnished, and work performed, or caused to be performed, by Landlord in accordance with requirements of Article 6 of this Lease for all of Landlord's Work. Should any defect develop during the warranty period, as hereinafter defined, due to improper materials or workmanship, the same shall, upon written notice, be corrected by Landlord without expense to Tenant (and any such expenses shall not be a Common Area charge), and any damage done in connection with such remedial work shall also be repaired. The "warranty period" shall be (a) two (2) years for paving and (b) one (1) year for other matters, and it shall be effective beginning on the Rent Commencement Date.

9.   Tenant's Initial Construction.

A.   Following the Tenant Building Permit Date (as hereinafter defined), Tenant shall have the right and privilege (rent free, as aforesaid) to enter upon the Demised Premises to construct Tenant's Improvements and to enter upon the balance of the Shopping Center to perform the Pad Preparation Work and construct the New Common Area Improvements. Such entry shall not be construed as an acceptance of the Demised Premises by Tenant, an acknowledgement that all or any of Landlord's Work has been completed, or a waiver by Tenant of any of the provisions of this Lease.

B.   Within sixty (60) days after the completion of the Initial Utility Work or within sixty (60) days after the Tenant Building Permit Date, whichever shall last occur, Tenant shall commence or cause to be commenced the construction of (i) Tenant's Common Area Work and (ii) the Tenant Improvements in accordance with the Kmart Building Plans (hereinafter collectively "Tenant's Initial Work"), provided Tenant may delay commencement of construction for not more than ninety (90) days if, but for such delay, the Kmart store would otherwise have been ready to open for business between October 15 and February 28. Such construction shall be at Tenant's sole cost and expense except for those matters set forth in Article 6 hereof, and subject to Landlord's reimbursement obligations under Article 7. Following commencement of construction of Tenant's Initial Work, Tenant will diligently and continuously (subject to matters set forth in Article 32) pursue same to completion. Tenant may make such changes to the Tenant Improvements as it deems necessary, provided any changes which substantially affect the external appearance of the Tenant Improvements shall be subject to the prior approval of Landlord, such approval not to be unreasonably withheld.

C.   Tenant agrees (subject to the accuracy of all relevant representations and warranties and the fulfillment of all relevant covenants and obligations of Landlord in this Lease) to use diligent efforts (including compliance with all codes and ordinances in submission of the Kmart Building Plans) to obtain (i) a building permit or permits or other required approvals for

-16-

the Tenant Improvements and any other Tenant's Initial Work (including, without limitation, the Garden Shop and approval of Tenant's signs), and (ii) all required permits, approvals and service commitments for the construction and provision of electric, water and other utilities for the New Common Area Improvements and Tenant's Improvements, all in accordance with Tenant's requirements (collectively the "Utility Approvals"), by a date which is not later than 120 days following receipt of notice from Landlord that the Approval Date has occurred. The date upon which all such building permits and approvals required for such construction and all Utility Approvals shall have been obtained and delivered to Tenant and shall have become final and unappealable is herein referred to as the "Tenant Building Permit Date." If Tenant is unable to obtain such final, unappealable building permit(s) and all Utility Approvals within such time period (for reasons other than financial costs, except that Tenant will in no event be required to make any changes from its standard plans and specifications to obtain same if the resulting costs of such changes would, in Tenant's reasonable business judgment, render this transaction economically impracticable), Tenant shall have the right to notify Landlord that it desires to cancel this Lease. Landlord shall thereupon have a reasonable period of time, not to exceed 30 days, to cause the Tenant Building Permit Date to occur without any additional cost to Tenant or any changes in Tenant's submitted plans and specifications. If the Tenant Building Permit Date has not occurred by the end of such additional 30 day period, Tenant shall have the right to terminate this Lease by written notice to Landlord given at any time thereafter, in which event neither party shall have any further rights or obligations hereunder.

Notwithstanding the foregoing provisions of Article 9C or anything else contained in this Lease, if either (i) Landlord does not obtain the Lilco Approval within one year of the Commencement Date, or (ii) local authorities require (as a condition to granting site approval or granting Tenant a building permit) that more than 3,600 square feet of the Garden Shop be enclosed, and such additional enclosed area may not be constructed where originally intended due to provisions of the Power Easement; then in either such case the entire Demised Premises shall be and be deemed shifted to the north into so much of the "Possible Relocation Area" as shown on Exhibit B as is required to accommodate construction of the Garden Shop. In such event, Landlord, at its cost, will promptly provide a revised survey and legal description of the Demised Premises, and the parties shall enter into an appropriate modification of this Lease (i.e., Exhibit A hereto) and the recorded memorandum of lease to reflect same.

10.   Indemnification, Insurance, Mechanic's Liens.

A.   Landlord agrees to hold Tenant and its successors and assigns harmless and fully indemnified against any and all claims, demands, losses, liabilities, damages, and costs or expenses (including actual attorney's fees, reasonable investigative and discovery costs, court costs and other sums) incident to the defense of any claim or liability, including but not limited to claims or liabilities arising from personal injury and worker's compensation claims and liens, that may be incurred (i) as a result of, or in connection with, or in any way arising out of work performed hereunder by Landlord and its agents, employees, contractors, subcontractors, successors and assigns, and (ii) in connection with demolition by Tenant of any existing buildings (including any buildings in the Possible Relocation Area) as part of the Pad Preparation Work, including, without limitation, any claims by tenants or other actual or purported occupants of any such buildings.

-17-

Landlord shall during the continuance of Landlord's Work maintain, or cause to be maintained, with companies reasonably acceptable to Tenant the following insurance coverages and Tenant shall be named as an additional insured on each such policy:

(a)  Worker's compensation insurance as required by all applicable federal, state or other laws, including Employer's Liability with a limit of at least $500,000.

(b)  Comprehensive General Liability on an occurrence basis with personal injury coverage and broad form property damage.  Said policy shall be endorsed to remove the XCU Exclusion relating to explosion collapse and underground property damage.  Limits shall be at least in the following amounts:

Bodily Injury including Personal Injury:

| each person | $2,000,000 |
| each occurrence | $5,000,000 |

Property Damage:

| each accident | $1,000,000 |
| aggregate | $2,000,000 |

(c)  Comprehensive Automobile Liability, including Non-Ownership and Hired Car Coverage as well as owned vehicles with at least the following limits:

Bodily Injury:

| each person | $ 250,000 |
| each occurrence | $1,000,000 |

Property Damage:

| each occurrence | $ 100,000 |

Landlord shall not make any change or cancellation in the foregoing insurance coverage  without Tenant's prior written approval thereof, which approval shall not be unreasonably withheld.  Each policy shall provide that it shall not be cancellable without at least 15 days' prior written notice to Tenant and Tenant shall be furnished with a copy of each policy prior to commencement of construction.

Tenant agrees to hold Landlord and its successors and assigns harmless and fully indemnified against any and all claims, demands, losses, liabilities, damages, and expenses incident to the defense of any claim or liability, including but not limited to claims or liabilities arising from personal injury, that may be incurred as a result of, or in connection with, or in any way arising out of, any work to construct Tenant's Improvements or the other Tenant's Initial Work (but the foregoing is subject to Landlord's demolition indemnity set forth above and to any other relevant covenants, representations and obligations of Landlord in this Lease), performed hereunder by Tenant and its agents, employees, contractors, subcontractors, successors and assigns.

B.   Mechanic's Liens.  If because of any act or omission (or alleged act or omission) of Landlord or Landlord's employees, agents, contractors or subcontractors under this Lease, any mechanic's or other lien, charge or order for the payment of money or other encumbrance shall be filed against Tenant and/or any portion of the Demised Premises (whether or not such lien, charge, order or encumbrance is valid or enforceable as such), Landlord shall at its own cost and expense cause the same to be discharged of record or bonded within 60 days after

-18-

notice to Landlord of the filing thereof; and Landlord shall indemnify and save harmless Tenant against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable counsel fees resulting therefrom.  If Landlord fails to comply with the foregoing provisions, Tenant shall have the option of discharging or bonding any such lien, charge, order or encumbrance, and Landlord agrees to reimburse Tenant for all costs, expenses and other sums of money in connection therewith with interest thereon promptly upon demand.

If because of any act or omission (or alleged act or omission) of Tenant or Tenant's employees, agents, contractors or subcontractors under this Lease, any mechanic's or other lien, charge or order for the payment of money or other encumbrance shall be filed against Landlord and/or any portion of the Shopping Center (whether or not such lien, charge, order or encumbrance is valid or enforceable as such), Tenant shall at its own cost and expense cause the same to be discharged of record or bonded within 60 days after notice to Tenant of the filing thereof; and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable counsel fees resulting therefrom (but the foregoing is subject to Landlord's reimbursement obligations under Article 9).  If Tenant fails to comply with the foregoing provisions, Landlord shall have the option of discharging or bonding any such lien, charge, order or encumbrance, and Tenant agrees to reimburse Landlord for all costs, expenses and other sums of money in connection therewith with interest thereon promptly upon demand.

11.   Intentionally Omitted.

12.   Parking and Other Common Areas.

A.   The aggregate area for the parking of automobiles in the Common Areas, exclusive of any Common Areas that may hereafter be constructed on Phase II, shall, following completion of the New Common Area Improvements and of Landlord's Work and throughout the Lease term, contain a ratio of not less than the greater of (i) 5.5 parking spaces for standard size American automobiles for each 1,000 square feet of leasable area in the Shopping Center (exclusive of improvements that may hereafter be constructed on Phase II); and (ii) such greater ratio as may be required by applicable law.  The foregoing minimum parking ratio requirement (i.e., the greater of (i) or (ii)) is hereinafter referred to as the "Parking Ratio."  Tenant agrees to provide for not less than 610 parking spaces in the construction of the New Common Area Improvements.  Tenant shall have the right to choose striping of Parcel A as long as it provides, upon completion of the New Common Area Improvements, not less than 610 parking spaces as aforesaid.

B.   In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the lands described in Exhibit A and depicted on Exhibit B, utilize the Common Area located on said lands for parking or other purposes to an extent which shall be reasonably objectionable to Tenant, Landlord, at its sole expense, upon written request of Tenant, shall take whatever action as shall be so reasonably requested to prevent said unauthorized utilization.  The costs of any such actions shall be Common Area costs.

C.   Landlord shall keep and maintain, at Landlord's cost and expense, the Common Area in good condition and repair, including, but not limited to, repairing and replacing paving; keeping the Common Area properly cleaned, drained, free of snow, ice, water, rubbish and other obstructions, and in a safe, secure, neat, clean, orderly and sanitary condition; maintaining

detention basin and other components of the storm sewer system; maintaining private sewage treatment plant with capacity adequate to service the Demised Premises and balance of Shopping Center, and in odor-free condition; keeping the Common Area and such other areas suitably lighted during, and for appropriate periods before and after, Tenant's business hours; maintaining signs, markers, painted lines (painting lines as may be necessary) and other means and methods of pedestrian and vehicular traffic control; maintaining adequate roadways, entrances and exits; appropriate security services; and maintaining any plantings and landscaped areas; and also, if required by appropriate governmental authority having jurisdiction thereof, maintaining traffic signals or lights, as the case may be, which are presently installed or may be installed hereafter, servicing tenants' businesses conducted in the Shopping Center.

D.   Except as otherwise hereinafter expressly provided for the conduct of seasonal sales made by Tenant, the parking spaces in the Common Area shall be used non-exclusively for the parking of private automobiles of the respective tenants of the Shopping Center and their respective customers, licensees, subtenants, employees, agents, concessionaires, guests and invitees, and for no other purpose, and the access, perimeter and through roads, streets and drives shall be used for pedestrian and vehicular traffic and no other purpose. The layout of, and striping in, the Common Area, as depicted on Exhibit B, but subject to Tenant's right to stripe Parcel A as set forth in Article 12A (following completion of the New Common Area Improvements and Landlord's Work), shall not be changed without Tenant's prior written consent. Notwithstanding the foregoing, Tenant will not unreasonably withhold its consent to such changes in other than the "Protected Area" as shown on Exhibit B; provided that no such changes may result in a violation of the Parking Ratio. If so designated on Exhibit B, employees of the tenants of the Shopping Center shall not park their automobiles in the Common Area, except in the area designated as "Employee Parking" on Exhibit B, and Landlord shall use its best efforts (the cost of which shall be a Common Area cost) to prevent any violation of this provision. SEE RIDER: TENANT'S COMMON AREA CHARGE.

E.   Landlord shall not exact any charge or permit others to exact any charge for use of the Common Area from customers, invitees, licensees, subtenants or employees of Tenant or any other tenant in the Shopping Center.

F.   There will be no advertisements or signs in the Common Area except the pylon sign or signs hereinafter provided for and the traffic control signs. No merchandise shall be sold or displayed, and no loudspeakers shall be operated in the Common Area, except as otherwise set forth in this Lease.

G.   Notwithstanding any provision to the contrary, in making any replacement, change, restoration, alteration, improvement, enlargement or repair of or to the Tenant's building, Tenant and its contractors and suppliers may use the portion of the Common Area adjacent to the Tenant's building for the parking of trucks and delivery vehicles, storage of materials, temporary structures and other matters incidental to such work; provided, however, that no such use shall unreasonably interfere with the operation of the Shopping Center or with the business of any tenant in the Shopping Center. In making any permitted or required replacement, change, restoration, alteration, improvement or repair of or to any portion of the Shopping Center, Landlord, any tenant in the Shopping Center and their or Landlord's contractors and suppliers may use such portions of the Common Area as are not directly adjacent to the Tenant's building for the parking of trucks and delivery vehicles, storage of materials, temporary structures and other matters incidental to such work; provided, however, that no such use shall unreasonably

-20-

interfere with the operation of the Shopping Center or of the
business of Tenant or any subtenant or licensee of Tenant. The
foregoing shall be deemed to apply after completion of Landlord's
Work and Tenant's Improvements; during such construction, the
relevant provisions hereinbefore set forth in this Lease shall
remain applicable.

H.    During the Lease term, Landlord shall keep Tenant
insured (as a named party) against all statutory and common law
liabilities for damages on account of damage to property or
injuries and loss of life sustained by any person or persons
within said Common Area, in a policy or policies in the combined
single limit amount of Two Million Dollars ($2,000,000) with
respect to any one accident or disaster, and in the amount of
Five Hundred Thousand Dollars ($500,000) with respect to damage
to property. Each of the foregoing amounts shall increase by 25%
at the end of the 5th Lease Year and at the end of every 5 Lease
Years thereafter. Landlord shall and hereby does indemnify
Tenant from and defend and hold Tenant harmless against any and
all claims, including without limitation legal fees and expenses,
for personal injury, death and property damage occurring on the
Common Area. Any such policies shall bear endorsements to the
effect that Tenant shall be notified not less than ten (10) days
in advance of any modification or cancellation thereof. Copies
of such policies, so endorsed, or certificates evidencing the
existence thereof, shall be promptly delivered to Tenant.

I.    Tenant may, at any time and from time to time, subject
to the provisions of Article 29 hereof, utilize portions of the
sidewalks and the Common Area for seasonal sales made from
trucks, trailers, vans or other temporary facilities used by
Tenant in the area outlined in black designated "Truck Sales"
depicted on Exhibit B, and on sidewalks adjacent to Tenant's
building, provided the same do not unreasonably impede pedestrian
traffic. Sales, if any, from such use shall be included as part
of "gross sales" under Article 4 hereof. Notwithstanding the
foregoing, any such seasonal sales in the Truck Sales area shall
be conducted not more than four times per year, and for not more
than five consecutive days at any time.

13.    <u>Landlord's Representations and Warranties</u>.

A.    Landlord represents, warrants and covenants that it
will not erect hereafter (or suffer, permit, or allow any
Shopping Center tenant, subtenant or other occupant to erect) any
buildings or other structures on the lands described in Exhibit
A, except as shown on Exhibit B (including any future
construction in "Permissible Building Areas" as shown on Exhibit
B; it being understood that Landlord may construct additional
buildings in such "Permissible Building Areas" provided that any
such buildings (i) do not exceed one-story or 22 feet in height
and (ii) do not result in or cause a violation of the Parking
Ratio), and neither at this time nor at any time hereafter will
any part of the Shopping Center be used for industrial or
warehouse purposes, except that an occupant of retail space may
utilize a portion of its space for incidental storage of
merchandise or other items in conjunction with the conduct of
business thereat.

Notwithstanding the foregoing, however, Landlord may
hereinafter construct additional buildings and improvements on
Phase II as shown on Exhibit B, provided that all of the
following conditions are met with regard to such future
construction:

(i)    Landlord shall maintain within Phase II: (x) if
same is used for retail purposes, a parking ratio of spaces
for standard size American cars to square feet of building
area that is not less than the Parking Ratio (<u>i.e.</u>, 5.5

-21-

spaces per 1,000 square feet or such greater amount as
required by law); or (y) if same is used for a non-retail
purpose permitted by this Lease, a parking ratio of either
5.5 cars per 1,000 square feet as aforesaid or such lower
minimum ratio as local zoning and parking ordinances require
for such non-retail use (as a matter of right and without
any variance);

(ii)    the location of all buildings and the layout and
striping of all parking, driveway and other common areas
shall be subject to Tenant's prior written consent, which
Tenant agrees not to unreasonably withhold or delay (it
being understood that a withholding of consent based on
Tenant's good faith belief that such construction would
result in traffic flow and/or parking impact and/or
decreased visibility that would adversely affect its
business will be deemed a reasonable basis (but not the only
possible reasonable basis) upon which to withhold consent);
and

(iii)    the use of such improvements shall not violate the
provisions of Article 40.

B.    Landlord further represents, warrants and covenants
that:

(i)    Existing building, zoning, planning and all other
applicable municipal or other laws, ordinances and
regulations permit as of right the construction of
Landlord's Work, Tenant's Improvements, and the balance of
Tenant's Initial Work, and maintenance of Tenant's building,
without necessity for any variances or appeals (subject only
to (x) Landlord's obtaining final site plan approval and (y)
compliance by Tenant with local building codes in such
construction), and Tenant (subject only to compliance with
such building codes) will be able to obtain as of right and
in the ordinary course a building permit for the
construction of Tenant's Improvements (except that the
Garden Shop may require a special use permit) and a final
certificate of occupancy therefor upon completion, and any
required permits or approvals to permit construction of the
remainder of Tenant's Initial Work.

(ii)    No tenant or other occupant under any existing
lease in the Shopping Center has any right to prohibit or
restrict the construction or use of Tenant's Improvements;
or the construction of any other element of Tenant's Initial
Work, including, without limitation, demolition of existing
buildings as shown on Exhibit B or in the Possible
Relocation Area (hereinafter collectively "Demolition
Work").  In amplification and not in limitation of the
foregoing, Landlord represents and warrants that, not later
than the Tenant Building Permit Date, it will terminate all
leases, licenses or other occupancy rights of any occupant
of any building in the area covered by the Demolition Work,
and cause all such buildings to be vacant and free of any
property of any former tenant or occupant.

(iii)    No covenants, restrictions, easements or other
matters of record against the Shopping Center, whether or
not listed on Exhibit D, would prohibit or restrict or
interfere with the construction of Tenant's Improvements or
the remainder of Tenant's Initial Work.  In amplification
and not in limitation of the foregoing, Landlord represents
and warrants that it can and will perform the Initial
Utility Work as set forth in Article 6.  The foregoing,
however, is subject to the relevant provisions of this Lease
regarding the Lilco Approval and the relocation of the
Demised Premises if same is not obtained.

-22-

C.    Landlord further represents, warrants and covenants
that:   (i) the Shopping Center described in Exhibit A and the
Demised Premises are and will be at the time of the Rent
Commencement Date, properly zoned for the operation, use and
maintenance of a general merchandise discount department store
similar to other Kmart stores operated elsewhere by Tenant
(including delicatessen area and outside garden area), and
parking areas in connection therewith, and that at or prior to
such Rent Commencement Date all necessary governmental consents,
permits and approvals for such use shall have been obtained
(including, without limitation, permits for exterior building and
pylon signs in accordance with Kmart sign criteria); and (ii) no
other lease of space in the Shopping Center, nor any other
instrument encumbering the Shopping Center, whether or not set
forth in Exhibit D, would prohibit, restrict, or be violated by
the use of the Demised Premises (including, without limitation,
the Garden Shop, delicatessen area and pharmacy) by Tenant as
permitted under this Lease.

D.    Landlord covenants that it will not hereafter grant or
execute any easements or licenses permitting parking or other use
of Common Areas by persons not Shopping Center tenants or their
invitees, including without limitation any parking and/or access
easements in favor of properties adjoining the Shopping Center.
Landlord further covenants that it will not hereafter terminate
or amend any existing easements or covenants relating to the
Shopping Center or adjoining property in a manner that would
adversely affect Tenant; and Landlord covenants to enforce any
such existing easements or covenants for Tenant's benefit.

Notwithstanding anything to the contrary herein contained,
if (x) prior to the Opening Date and the granting to Tenant of a
final certificate of occupancy any of the representations,
warranties, and covenants of Landlord set forth in Article
13B(i), (ii), or (iii), or in 13C(i) should be breached; or
(y) at any time during this Lease any of the representations,
warranties and covenants of Landlord in Article 13C(ii) or 13D,
should be breached; and Landlord shall not correct any such
breach within 30 days following notice from Tenant (or if same is
not capable of being corrected within said 30 day period, if
Landlord shall not commence to cure same within said period and
thereafter diligently and continuously pursues said cure to
completion); then in any such event Tenant, in addition to and
not in limitation of any other legal or equitable remedies it may
have under law or this Lease by reason of such Landlord default,
may cancel and terminate this Lease on notice to Landlord given
at any time prior to the full cure by Landlord of any such
default.   Notwithstanding the foregoing, however, in the event of
any such termination (or any other termination of this Lease for
any reason whatsoever), Landlord shall be and remain liable to
pay to Tenant all unpaid Tenant's Common Area Reimbursements.

In amplification of the foregoing, and without limiting any
other rights or remedies of Tenant, in the event of any breach or
threatened breach by Landlord of any representation, warranty or
covenant of Landlord contained in Articles 12, 13 or elsewhere in
this Lease, Tenant shall have and is hereby granted the right and
option to injunctive and other equitable relief to halt or
rectify such breach.

14.    Options to Extend Lease.

(a)    Tenant shall have four (4) successive options to extend
the term of this Lease for an additional period of five (5) years
on each such option, such extended term to begin respectively
upon the expiration of the term of this Lease or of this Lease as
extended, and the same terms and conditions as herein set forth
shall apply to each such extended term (except that minimum rent
and Breakpoint Amount shall be increased as set forth in Articles
3 and 4, respectively).   If Tenant shall elect to exercise any of

-23-

the aforesaid options, it shall do so by giving notice to Landlord not less than one (1) year prior to the expiration of the term of this Lease or of this Lease as extended.

(b)   Regardless of the exercise or non-exercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the Lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this Lease for such period of time as shall cause the last day of the term of this Lease to be the January 31 next succeeding the date upon which the term of this Lease would expire but for the exercise of this option.  This option shall be exercised by notice to Landlord not less than one (1) year prior to the expiration of the term of this Lease or any extension thereof.  Tenant's rental during the option period shall be the same rental payable under the terms of this Lease at the time Tenant notifies Landlord of its intention to exercise this option.

15.   Repairs and Maintenance.

A.   Landlord shall make any repairs and/or replacements to the Demised Premises (including, without limitation, the building and all systems and fixtures thereof), the necessity for which is caused by any of (i) the negligence of Landlord or its employees or agents, (ii) any breach by Landlord of any provision of this Lease, (iii) any negligent, wrongful or other act of, or any use or occupancy by, any tenant or other party (or their invitees, agents and/or employees) occupying or using any portion of the Shopping Center not leased to Tenant.  Landlord shall cause all such repairs and changes to be made without unreasonable interference with the operation of the Shopping Center or the business of Tenant or any subtenant or licensee of Tenant. Landlord shall reimburse Tenant promptly upon demand for any cost and expense of Tenant for the temporary moving of any merchandise and trade fixtures to enable Landlord to make such repairs and changes.

B.   Except as expressly set forth under subparagraph A of this Article 15, Tenant agrees, throughout the term of this Lease, to keep the entire Demised Premises in good and tenantable condition and repair, including any necessary maintenance, repairs and replacements to roof, structural and non-structural, interior and exterior portions of the Demised Premises, and plumbing, electrical, HVAC and other systems located in and servicing the Demised Premises.  The foregoing repair obligations of Tenant shall not, however, be deemed to waive or impair any relevant warranties, covenants or representations of Landlord in this Lease.

16.   Alterations.

Tenant may, at its own expense, from time to time, make such interior or exterior alterations or changes, structural or otherwise, in and to the Demised Premises (including the Garden Shop and other outside areas) as it may deem necessary or suitable, and may erect and maintain upon the roof antenna for electronic telecommunications equipment and HVAC equipment; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for any such material exterior or structural alterations or changes; provided, further, Landlord shall not withhold or delay its consent thereto if the structural integrity or the economic value of the building will not be materially impaired or decreased by such work.  Should Landlord's fire insurance premiums be increased due to any such alterations or changes made by Tenant, Tenant shall reimburse Landlord for such increase in premiums.  Any such interior changes or alterations so made by Tenant shall become the property of Landlord, but shall be deemed included in the demise

-24-

hereunder.  The term "structural changes", as used herein, shall
not include moving of non-loadbearing partitions, plumbing and
electrical work, relocation of or additional entry doors,
modification and rearrangement of fixtures or other minor
changes.  Landlord, at Tenant's cost (subject to the relevant
provisions of Articles 7 and 9), shall cooperate with Tenant in
securing the Utility Approvals, and all building and other
permits or authorizations required from time to time for the
construction of the Pad Preparation Work, the New Common Area
Improvements, Tenant Improvements, and for any other work
permitted under this Lease or installations by Tenant.

17.  <u>Utilities</u>.

Landlord covenants and agrees that the Tenant's building
shall be properly serviced with (i) gas, if available, electric,
telephone, water and other public utilities, and (ii) an on-site
private sewage treatment plant and on-site storm sewer and
detention basis; all sufficient to meet Tenant's requirements as
provided for in this Lease as of the commencement of and
throughout the Lease term.  Tenant shall pay all charges for
public utility services rendered or furnished to the Tenant's
building during the Lease term.  There shall be no charge for
sewage treatment, except that Tenant may be required to pay a
prorata share of operating the plant as set forth in the Common
Area Rider.

18.  <u>Governmental Regulations</u>.

Tenant shall observe and comply with all requirements of
rules, orders and regulations of the federal, state and municipal
governments or other duly constituted public authority affecting
said Demised Premises, including the making of alterations;
provided, however, in the event such rules, orders and
regulations shall require the removal of asbestos or other toxic
or hazardous wastes or materials not placed on Demised Premises
by Tenant, then, in any such event, the same shall be complied
with by Landlord at its sole expense.  Tenant shall have the
right, however, to contest, without cost to Landlord, the
validity or application of any such rule, order or regulation
required to be complied with by Tenant in accordance with the
foregoing, and may postpone compliance therewith until the final
determination of any such proceeding.

19.  <u>Exculpation</u>.

Notwithstanding anything to the contrary set forth in this
Lease, Tenant shall (except to the extent expressly set forth in
this Article, in Article 28, or in the Existing Mortgage
Guaranty, as hereinafter defined) look solely to Landlord's
interest in the Shopping Center for the recovery of any judgment
against Landlord.  Landlord, or if Landlord is a partnership, its
partners whether general or limited, or if Landlord is a
corporation, its directors, officers and shareholders, or any and
all successors and assigns and mortgagees of Landlord shall have
absolutely no personal liability for any judgment, except that
Landlord shall be personally liable, however, (i) for
misappropriation of proceeds of destruction and/or condemnation
and (ii) under Article 28 or the Existing Mortgage Guaranty.  If
by reason of the subsequent creation of a ground lease the
Landlord does not own the fee title to the Shopping Center, the
equity interest (but not the personal liability of any successor
in ownership) in such fee title, together with Landlord's
leasehold interest, shall remain liable for any judgment against
Landlord.  Nothing herein shall bar Tenant seeking and enforcing
any equitable remedy of Tenant against Landlord or any successor
or assign, including without limitation suit for injunctive
relief, specific performance or a declaratory judgment.

20.  <u>Damage to Demised Premises</u>.

A.    From and after the commencement of construction of
Tenant's Improvements, Tenant, at its own cost and expense, shall
promptly insure, and during the term of the Lease, shall maintain
insurance (subject to the provisions of Article 20B) covering the
Demised Premises (or so much thereof as shall have been
constructed) against damage or destruction by fire or other
casualties, insurable under a standard New York fire insurance
policy, with an extended coverage endorsement in an amount equal
to the full replacement value (with agreed amount clause) of the
insurable repair and replacement value of the portions of the
building and other of Tenant's structures, if any, in or on the
Demised Premises (exclusive of foundation, foundation walls and
excavation costs and costs of underground flues, pipes and
drains).  All such policies shall be carried by the Tenant in
solvent and responsible companies rated A or better and licensed
to do business in New York and bear endorsements to the effect
that Landlord shall be notified not less than thirty (30) days in
advance of modification or cancellation thereof.  Copies of such
insurance policies or certificates evidencing the existence
thereof so endorsed, shall be promptly delivered to Landlord.
Irrespective of the cause thereof, Tenant shall not at any time
be liable (except if Tenant self insures as set forth in Article
20B) for any loss or damage to said buildings resulting from
fire, explosion or any other casualty. .

B.    Notwithstanding the foregoing provisions of Article
20A, so long as Tenant maintains a net worth of not less than ONE
HUNDRED MILLION DOLLARS ($100,000,000) and has not assigned or
sublet all or substantially all of the Demised Premises, in lieu
of providing insurance policies as set forth above, Tenant may
elect on notice to Landlord to self-insure its obligation to
restore as hereinafter set forth.  Tenant, from and after the
commencement of construction of Tenant's Improvements and until
further notice, hereby elects to so self-insure (it being agreed
that Tenant may at any time and from time to time, subject to the
foregoing requirements, on notice to Landlord, revoke or
reinstate the self-insurance election).  In the event of casualty
to the Demised Premises by fire or other casualty insurable under
a standard New York fire insurance policy occurring during any
period when Tenant's self-insurance election is in effect, Tenant
shall, at its sole cost and expense, without unnecessary delay,
commence and continue diligently to repair, rebuild and restore
Tenant's building or structures within the Demised Premises as
nearly as practicable to at least the same condition existing
immediately prior to such casualty (subject to Tenant's right to
make alterations as set forth in Article 16.

C.    In the event that at any time after the Commencement
Date when Tenant's self insurance election is not in effect the
Tenant's building or structures within the Demised Premises shall
be damaged or destroyed (partially or totally) by fire or other
casualty, Tenant shall, at its expense, without unnecessary
delay, commence and continue diligently to repair, rebuild and
restore Tenant's building or structures within the Demised
Premises as nearly as practicable to at least the same condition
existing immediately prior to such damage or destruction (subject
to Tenant's right to make alterations as set forth in Article
16).  All insurance proceeds shall be applied to such restoration
work (but Tenant shall be obligated to complete same regardless
of the adequacy of such proceeds).  Landlord agrees to (i) not
settle any insurance claim involving such casualty without
Tenant's consent, which shall not be unreasonably withheld; and
(ii) forthwith pay over to Tenant any insurance proceeds for such
casualty coming into the possession or control of Landlord, to be
used by Tenant for such completion of such restoration as
aforesaid (and any unexpended balance upon completion of such
restoration to be retained by Tenant).

Notwithstanding any provisions of this Article 20, if, as a result of any such damage or destruction (1) during the last two (2) years of the Lease term, Tenant's building and/or structures with the Demised Premises should be destroyed or damaged by fire or casualty (a) to the extent of twenty-five percent (25%) or more of the cost of replacement thereof, or (b) so that twenty-five percent (25%) or more of the gross floor area thereof shall be rendered untenantable; or (2) if during the last two (2) years of the Lease term Tenant's merchandise, trade fixtures or other equipment which Tenant is authorized by this Lease to remove from Tenant's building from time to time and at the end of the Lease term (and as to which Tenant had not theretofore abandoned its property rights) shall be damaged or destroyed in an amount exceeding One Hundred Fifty Thousand Dollars ($150,000) replacement cost, then Landlord or Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter, and Tenant shall have an additional sixty (60) days, rent free, within which to remove such property and its personal property from Tenant's building.  Tenant shall be required to perform the restoration work set forth in Article 20B (or 20C, as the case may be) notwithstanding any such termination.  Notwithstanding any such termination of this Lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 14, within thirty (30) days after the date of the receipt of Landlord's notice of termination, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 14) by Tenant, then this Lease shall continue in full force and effect despite such notice of termination by Landlord, and Tenant shall repair, rebuild and restore the improvements as above provided.  In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

D.   During any period commencing upon the date of any damage or destruction by fire, the elements or any other casualty whatsoever (except if a self-insurance election by Tenant is in effect on the date of any such damage or destruction, in which event Tenant shall not be entitled to any abatement set forth below), and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this Lease shall abate (but only to the extent of any rent insurance proceeds received by Landlord).  The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates:  (a) the date upon which Tenant shall reopen for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that at any time during the Lease term, except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit B, other than Tenant's building, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, there shall be no abatement of rent hereunder and Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Article 12 hereof for other parking areas in the Shopping Center (or alternatively Landlord may landscape said areas and maintain same in a presentable manner not detracting from the appearance of the Shopping Center).

-27-

E.   Tenant shall not at any time be liable (a) for any loss or damage to the improvements (expressly as expressly set forth in Article 20B), including the buildings and structures located on the balance of the Shopping Center as aforesaid, resulting from fire, explosion or any other casualty, or (b) for any loss or damage to the property of Landlord or the other tenants or occupants of the Shopping Center, except as specifically set forth in this Lease.  All insurance carried by Landlord on the respective buildings or structures erected within the Shopping Center, or by Landlord on any of its property, shall require Landlord to waive right of recovery against Tenant, shall contain a clause whereby the insurer agrees to waive any right of subrogation against Tenant on any claim covered by said insurance, and shall also bear standard New york first mortgagee fee or leasehold endorsements, as may be required.

In the event that any such damage or destruction is caused by an uninsurable casualty, which for the purposes hereof shall be deemed to be any casualty other than that for such insurance is required to be carried pursuant to the provisions of Article 20A, Tenant shall have no obligation to restore, and may, within sixty (60) days of such damage or destruction, terminate this Lease by giving notice hereof to Tenant.  However, upon failure to so notify Tenant, Landlord shall have been deemed to obligate itself to repair, rebuild or restore such damage or destruction. If Landlord shall so be obligated to restore the Demised Premises in accordance with this paragraph, Tenant may elect on notice to Landlord to perform such work at Landlord's expense; in which event Landlord shall reimburse Tenant on demand for all such restoration expenses paid by Tenant.  However, if this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant. Notwithstanding the foregoing, if Landlord so elects to terminate this Lease, Tenant shall have the right, within thirty (30) days of such election, to give notice to Landlord that Tenant elects to restore Tenant's buildings and structures within the Demised Premises as set forth in Article 20B, in which event Tenant shall be so obligated (at Tenant's expense) and this Lease shall continue in full force and effect notwithstanding such notice of termination.

Except for the obligations of Landlord or Tenant under this Article 20 and/or otherwise set forth in this Lease, each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party, of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty to its respective property covered by the insurance hereinbefore more specifically set forth in this Article 20, irrespective of the negligence of such party or any officer, agent, employee or representative of such party.

Tenant hereby waives the provisions of Section 227 of the New York Real Property Law and agrees that the provisions of this Article 20 shall govern in lieu thereof.

21.  Eminent Domain.

In the event all of Tenant's building shall be expropriated (the term "expropriated" to include any transfer of the property by an eminent domain or similar proceeding or the giving of a deed in lieu thereof) or the points of ingress and egress to the public roadways substantially as depicted on Exhibit B be materially impaired by a public or quasi-public authority (subject to the relevant provisions of Article 24), this Lease shall terminate as of the date Tenant shall be deprived thereof (provided that in the event of such access impairment this Lease will not terminate unless Tenant so elects such termination in writing within 90 days of such impairment).

In the event that less than the whole but more than ten
percent (10%) of Tenant's building or more than twenty percent
(20%) of the Garden Shop or other outside areas within the
Demised Premises (hereinafter collectively referred to as the
"Outside Areas") shall be expropriated by public or quasi-public
authority, Tenant shall have the option to terminate this Lease
as of the date Tenant shall be dispossessed from the part so
expropriated, by giving notice to Landlord of such election so to
terminate within ninety (90) days from the date of such
dispossession.

In the event of an expropriation of any portion of Tenant's
building or Outside Areas and if this Lease shall not be ter-
minated as hereinabove provided, it shall continue as to that
portion of the Demised Premises which shall not have been
expropriated or taken, in which event Landlord shall, at its sole
cost and expense, promptly and with due diligence restore said
building as nearly as practicable to complete units of like
quality and character as existed just prior to such expropria-
tion.  Expropriation proceeds from the taking authority shall be
applied to such restoration work (but Landlord shall be obligated
to complete same regardless of the adequacy of such proceeds).
The annual minimum rental and other charges shall abate during
the period of demolition and restoration, and thereafter the
annual minimum rental and the Breakpoint Amounts set forth in
Article 4 shall be reduced in the proportion the ground floor
area of the part of Tenant's building so expropriated shall bear
to the total ground floor area of said building prior to such
expropriation.

If one or more expropriations shall in total deprive Tenant
of the use of more than ten percent (10%) of the Common Area in
other than Phase II, then, in such event, Tenant shall have the
option to terminate this Lease at any time within twelve (12)
months after such deprivation becomes effective by giving notice
to Landlord.

In the event this Lease shall be terminated pursuant to this
Article, any annual minimum rental and other charges paid in
advance shall be refunded to Tenant, and Tenant shall have an
additional sixty (60) days, rent free, within which to remove its
property from the Demised Premises.

In the event of a taking referred to in this Article 21
resulting in the termination or cancellation of this Lease, the
aggregate net award, after deducting the reasonable costs of
Landlord and Tenant, including attorneys' fees incurred in
connection with obtaining such award, shall be distributed as
follows and in the following order of priority:

First, Landlord shall receive that portion of the award
representing the value, as of the date of the taking, of the fee
title to the Demised Premises as the same is encumbered by this
Lease, including the reversionary interest of Landlord therein.

Second, Tenant shall receive that portion of the award
representing the value, as of the date of the taking, of the
greater of (i) the unamortized portion (as reflected on Tenant's
books) of any expenditures by Tenant for the construction of
Tenant's Improvements and any other leasehold improvements made
by Tenant, and (ii) the outstanding balance (including all
principal and interest, and other amounts due thereunder) of any
leasehold mortgage on Tenant's interest; provided such amount in
(ii) shall not exceed the amount that would be due if all
payments due under such mortgage had been made based upon a
20-year self-liquidating schedule (from the date placed) for any
such mortgage.

-29-

Third, the remainder of such award shall be payable to Landlord.

Tenant shall also have the right to prosecute any claim directly and recover any compensation from the public or quasi-public authority (expropriating authority) as may be separately awarded and recoverable by Tenant in its own right for loss of business, or depreciation to, damage to, or cost of removal of, or for the value of stock, trade fixtures, furniture and other personal property belonging to Tenant, and also relocation expenses and other damages of or to Tenant.

22. <u>Use, Assignment and Subletting.</u>

A.   The premises hereby demised may be used for any lawful purpose. Tenant shall not be obligated to conduct or to remain open for the conduct of any business in the Demised Premises. Tenant may assign this Lease or sublet the whole or any portion of the Demised Premises, but if it does so, it shall remain liable and responsible under this Lease.

B.   Notwithstanding anything to the contrary contained in Article 22A:

(i)   If Tenant shall have "gone dark" (which for the purposes of this Article 22 shall mean not conducting business in the normal course in at least 50,000 square feet of Tenant's Building) for a continuous period of one hundred twenty (120) days or more for reasons other than casualty, condemnation or remodeling, then at any time thereafter prior to the resumption of operations Landlord may give written notice to Tenant terminating this Lease as of a date specified in such notice (such date to be 20-60 days after the date of such notice). Notwithstanding the foregoing, however, upon receipt of such notice Tenant may nullify same by giving notice to Landlord within 15 days after such receipt that either (x) Tenant is engaged in negotiations with an assignee or sublessee for all or a substantial portion of the Demised Premises; provided in such event such assignment or sublease must be executed within 60 days of Tenant's nullification notice, and the proposed assignee or sublessee must commence business within 150 days of execution of the assignment or sublease (subject to delays by reason of events in Article 32); or (y) Tenant intends to resume operations within 60 days, in which event Tenant shall be required to do so within such period (subject to delays by reason of events in Article 32). Furthermore, if the proposed assignment or sublease would not be a Permitted Transfer, as defined in subsection (ii) below, Landlord shall have the rights regarding same set forth in said subsection (ii). If any such deadline set forth in (x) or (y) is not met, Landlord, as its sole remedy, may again terminate this Lease on 30 days' written notice. Notwithstanding the foregoing, Landlord's cancellation shall not be effective unless not later than 10 days prior to the specified termination date it pays to Tenant an amount (payable by bank or certified check) equal to the Termination Payment. The Termination Payment shall be the greater of (a) the unamortized cost of Tenant's leasehold improvements (exclusive of merchandise and trade fixtures) as carried on Tenant's books and (ii) the then outstanding aggregate balance of any principal, accrued interest, and other amounts then due under (<u>i.e.</u>, secured by) any leasehold mortgage on Tenant's interest hereunder. Within 15 days following any written request from Landlord (but not more than twice annually) Tenant will inform Landlord of the then current amount of the Termination Payment.

(ii)   Tenant shall not make any assignment of this Lease or sublet all or any portion of the Demised Premises, if such proposed assignment or subletting is other than a Permitted Transfer, as hereinafter defined (it being understood that Tenant

may freely enter into any assignment or sublease which is a
Permitted Transfer without any requirement of Landlord's consent)
without obtaining the prior written consent of Landlord, which
Landlord hereby covenants and agrees not to unreasonably
withhold.  If Tenant desires to enter into any assignment or
sublease ("Transfer") which does not constitute a Permitted
Transfer, it shall so notify Landlord (including with such
notice, hereinafter referred to as the "Transfer Notice," the
name and proposed primary use of the proposed assignee or
sublessee.  Landlord shall have a period of 15 days after receipt
of the Transfer Notice to notify Tenant in writing whether or not
it consents to same.  Any refusal shall specify the reason(s) for
same.  If Landlord does not give such written notice refusing
consent to such assignment or sublease (and so specifying
reasons) within 15 days of receipt of the Transfer Notice, it
shall be deemed to have consented to same.  If Landlord consents
(or is deemed to have consented) to any Transfer, Tenant may
effectuate same, but such consent shall not be deemed a waiver of
Landlord's right to consent to any future Transfers which are not
Permitted Transfers.  If Landlord reasonably refuses consent to
any such Transfer, then Tenant, for a period of 15 days following
such refusal, shall have the right to give notice to Landlord
terminating this Lease as of a date specified in such notice
(which shall be not less than 30 nor more than 90 days following
the date of such notice), and upon such specified date (the
"Termination Date") this Lease shall terminate and Tenant shall
have no further obligations hereunder; provided that in such
event Landlord shall be obligated, and hereby agrees, to pay to
Tenant an amount equal to the Termination Payment not later than
15 days prior to such specified Termination Date.  If Landlord
does not make the Termination Payment, by bank or certified
check, on or prior to such date, then in addition to any other
remedies (it being understood that, notwithstanding anything to
the contrary contained in this Lease, Landlord's obligations to
Tenant to make such Termination Payment will survive the
termination of this Lease), Tenant may suspend its termination of
this Lease on notice to Landlord and thereafter occupy the
Demised Premises rent-free until such Termination Payment is
made.  If Landlord unreasonably refuses consent to any such
Transfer, Tenant may, at its option: (a) treat such refusal as
having been reasonable and exercise the termination right above
set forth, and/or (b) effectuate such assignment or sublease
and/or (c) exercise any other legal or equitable right or remedy
available to it by reason of such unreasonable withholding.  As
used in this subsection (ii), a "Permitted Transfer" shall mean:
(x) any sublease which, together with any previous subleases
which were not Permitted Transfers, contains in the aggregate
less than 60,000 square feet of the Demised Premises, or (y) any
assignment or sublease to an entity which controls, is controlled
by, or is under common control with Tenant (an "Affiliate"), or
(z) any assignment or sublease which is part of a package
transaction involving at least three (3) Long Island stores of
Tenant and/or its Affiliates.

23.  <u>Signs</u>.

Landlord expressly recognizes that the service mark and
trademark "Kmart" is the valid and exclusive property of Tenant,
and Landlord agrees that it shall not either during the term of
this Lease or thereafter, directly or indirectly, contest the
validity of said mark "Kmart", or any of Tenant's registrations
pertaining thereto in the United States or elsewhere, nor adopt
or use said mark or any term, word, mark or designation which is
in any aspect similar to the mark of Tenant.  Landlord further
agrees that it will not at any time do or cause to be done any
act or thing, directly or indirectly, contesting or in any way
impairing or tending to impair any part of Tenant's right, title
and interest in the aforesaid mark, and Landlord shall not in any
manner represent that it has ownership interest in the aforesaid

-31-

mark or registrations therefor, and specifically acknowledges
that any use thereof pursuant to this Lease shall not create in
Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect, at its sole cost and
expense, upon any portion of Tenant's building, signs of such
height and other dimensions as Tenant shall determine, bearing
such legend or inscription as Tenant shall determine.
Notwithstanding the foregoing, if such signs are not standard
signs of Kmart Corporation or another chain tenant, same shall be
subject to the prior approval of Landlord, which Landlord agrees
not to unreasonably withhold or delay.

Landlord shall not permit any other signs, billboards or
posters to be displayed on any portion of Tenant's building.

No flashing or animated sign, or roof or free-standing sign
is presently erected or hereafter will be permitted to be erected
for any occupant of the Shopping Center.

A so-called pylon structure is to be constructed (as part of
the Common Area Improvements) in the location depicted on Exhibit
B.  Tenant shall be entitled to install and maintain the primary
identification panel thereon, which shall be of such height and
other dimensions as may be approved pursuant to applicable
governmental law, and shall bear such legend and description as
Tenant shall determine.  The pylon structure may not contain an
identification or advertising panel of any other occupant of
space within the Shopping Center or any other person, without the
written consent of Tenant (Tenant agrees not to unreasonably
withhold or delay such consent for up to three additional panels
of other Shopping Center tenants, provided such panels are below
Tenant's and none of same exceeds 50% of Tenant panel in area.
The aforementioned Tenant's panel shall be maintained in good
repair and in an attractive appearance and shall be lighted by
Tenant, at its sole cost and expense.  Tenant shall have the
right to change or replace its panel at any time or from time to
time during the term of this Lease.  The pylon structure shall be
maintained in good repair by Landlord and the cost thereof and
the cost of lighting the same (other than Tenant's panel) shall
be borne by Landlord (but shall be a Common Area cost).

    24.  Ingress and Egress.

Landlord warrants as a consideration for Tenant entering
into this Lease that it will initially provide and will maintain,
for the period of this Lease and any extension thereof, ingress
and egress facilities to the adjoining public streets and
highways in the number and substantially in the locations
depicted on Exhibit B, subject to unavoidable temporary closings
or temporary relocations necessitated by public authority or
other circumstances beyond Landlord's control, and subject to
permanent relocations (i.e., replacement of such access with
substantially equivalent access) necessitated by public authority
as long as such relocations will not, in Tenant's reasonable
opinion, materially adversely affect Tenant's operations.

    25.  Landlord's Remedies.

    A.    Events of Default, for which Landlord shall have the
rights specified in Article 25B, are as follows:

        (i)  Tenant shall fail to pay any installment of
        minimum rent, percentage rent, or Common Area Charges
        or Tenant's Tax Portion, or any other sums or charges
        which Tenant may be required to pay Landlord pursuant
        to this Lease and such failure continues for 15 days
        after written notice of Tenant's delinquency;

(ii)  (a) if the estate hereby created shall be taken on execution or by other process of law, or (b) if Tenant shall be judicially declared bankrupt or insolvent according to law, or (c) if any assignment shall be made of the property of Tenant for the benefit of creditors, or (d) if a receiver, guardian, conservator, trustee or other similar officer shall be appointed to take charge of all or any substantial part of Tenant's property by a court of competent jurisdiction and not dismissed within 90 days, or (e) if a petition shall be filed by anyone other than Tenant respecting the bankruptcy or insolvency of Tenant under any provisions of any bankruptcy or insolvency act now or hereafter enacted, and such proceeding is not dismissed within 90 days after it is begun, or (f) if Tenant shall file such a petition (it being agreed that for the foregoing purposes "Tenant" shall mean only the then current tenant in possession, not any predecessor);

(iii)  if (a) Tenant shall fail to perform or observe any other covenant on Tenant's part to be performed or observed under this Lease and (b) such failure has continued for 30 days after written notice of such failure from Landlord to Tenant except where such failure is governed by clause (iv) below; or

(iv)  if Tenant shall fail to perform or observe any other covenant on Tenant's part to be performed or observed under this Lease, and more than 30 days would be reasonably required to cure such failure, and (a) Tenant has failed to commence to cure such failure within 30 days after such notice of failure from Landlord to Tenant or (b) having so commenced to cure such failure, Tenant shall fail diligently to prosecute the curing of such failure to completion.

B.    Upon the occurrence of an Event of Default, Landlord shall thereafter have and is hereby given the right to serve upon Tenant a notice of cancellation of this Lease at the end of 10 days from the date such notice is given, and upon the expiration of such 10 day period this Lease shall wholly cease and expire (without the delivery of any further notice) in the same manner as if it were the expiration of the term, and thereupon Landlord lawfully may:

(i)  without further notice enter into and upon the Demised Premises, or any part thereof, and repossess the Demised Premises and dispossess Tenant, and those claiming by, through or under it or any other occupant, and remove its or their effects (provided such entry is pursuant to summary or other judicial proceedings to obtain possession of the Demised Premises except no judicial proceedings will be required if Tenant abandons same) without being deemed liable for any manner of trespass, and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant or condition.  Provided Landlord's entry is made pursuant to judicial proceedings (or after abandonment), Tenant hereby expressly waives for itself and all persons claiming under it any notice of intention to reenter and repossess and any claim for damages against Landlord or Landlord's agents, servants or employees, for reentering and repossessing said Premises for any damage caused to Tenant's property by such reentry or repossession.  It is distinctly understood that Tenant's liability as provided in Article 25(C) shall survive and continue after such termination, dispossession, reentry or repossession; and

-33-

(ii)   relet the whole or any part or parts of the Demised Premises from time to time, either in the name of Landlord or on account of Tenant or otherwise, to such person or persons, for such terms ending before, on or after the expiration date, at such rental and upon such other conditions, which may include concessions and free rent periods, as Landlord in its sole discretion may determine.   Landlord will make a good faith effort to relet the Demised Premises or any part thereof (but shall not be required to expend any monies in connection therewith) and shall in no event be liable for refusal or failure to relet the Demised Premises and any part thereof, or, in the event of such reletting, for refusal or failure to collect any rent upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. Landlord, at Landlord's option, may make such repairs, improvements, alterations, additions, decorations and other physical changes in and to the Demised Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

C.   In case of reentry, repossession or termination of this Lease prior to the expiration date thereof pursuant to this Article 25, whether or not the same is the result of the institution of summary or other judicial proceedings to obtain possession of the Demised Premises, then, in any of said events, Tenant shall remain liable, at the option of the Landlord, for the minimum and additional rent for the period subsequent to reentry, repossession or termination, for the period which otherwise would have constituted the balance of said term, and for the expenses to which Landlord may be put in reentering the Demised Premises, repossessing itself thereof, making good any default committed by Tenant, putting the same in proper repair, making reasonable improvements, and protecting and preserving the same by placing therein watchmen and caretakers, reletting the same (including reasonable attorney's fees and disbursements, marshal's fees, customary brokerage fees, etc., in so doing) less the net avails of reletting.   Tenant agrees to pay any deficiency to Landlord at the end of each and every month.   Any suit brought by Landlord to enforce collection of such deficiency for any one month (or months, it being agreed that Landlord need not bring suit every month) shall not prejudice Landlord's right to enforce the collection of any further deficiency for any subsequent month.

D.   Tenant hereby expressly waives, for itself and all persons claiming under it: any right of redemption under any present or future law in case Tenant shall be dispossessed for any cause or in case Landlord shall obtain possession of the Demised Premises as herein provided, and Tenant agrees not to exercise such right.

E.   If Landlord shall relet the Demised Premises there shall be no determination of any surplus resulting from such reletting, and Landlord can keep and shall in no event be required to account to or pay to Tenant any claim for payment of any such surplus.

F.   In the event of any breach hereunder by Tenant, Landlord may, following the aforesaid notice period for Tenant's curing of the same (provided no notice will be required in the event of an emergency) elect, in the alternative to terminating this Lease, to cure such breach for the account and at the expense of Tenant.   Any sums so expended by Landlord shall be

-34-

deemed additional rent hereunder and shall be reimbursed by Tenant upon demand, together with interest per annum thereon at the rate of the 18% per annum or such lesser rate as shall be the highest rate legally permissible (the "Lease Interest Rate") which interest shall accrue from the date of such expenditure by Landlord until the date of payment by Tenant. If Landlord, at any time, by reason of such breach, is compelled to incur any expense, including reasonable attorneys' fees, in instituting or prosecuting any action or proceeding to enforce Landlord's rights hereunder, the sum or sums so paid by Landlord, with interest thereon at the Lease Interest Rate, shall be deemed to be additional rent hereunder and shall be due from Tenant to Landlord on the first day of the month following the payment of such respective sums or expenses.

26.   <u>Covenant of Title</u>.

Landlord covenants, represents and warrants that as of the date of execution hereof and upon the Rent Commencement Date, it has and will have unrestricted full right, power and lawful authority to execute and perform this Lease for the term hereof and to grant the estate demised herein and that it is seized of an indefeasible estate in fee simple of, or has a valid leasehold title to, the land described in Exhibit A, vacant and free and clear of any leases, tenancies, occupancies, assignments, contracts, agreements, restrictions, violations, mortgages and other liens and encumbrances, except as set forth in Exhibit D, and that Tenant on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Demised Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the Lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised subject only to such matters set forth in Exhibit D, Tenant shall have the option at Landlord's expense, to correct such defect or to annul and void this Lease with full reservation of its right to damages, if any.

Landlord shall, without expense to Tenant, and concurrently with the execution of this Lease, furnish agreements wherein each holder of any lien against the Shopping Center or the Demised Premises shall consent to this Lease and warrant that Tenant's possession and right of use under this Lease in and to the Demised Premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this Lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this Lease. The foregoing, however, is subject to the relevant provisions of Article 28.

27.   <u>Leasehold Mortgages</u>.

Notwithstanding anything contained in this Lease to the contrary, Tenant and its assignees shall have the right to mortgage this Lease and to assign, pledge or hypothecate this Lease and Tenant's interest herein (including, without limitation, Tenant's interest in and to Tenant's Improvements) as security for any such mortgage without the consent of Landlord; provided only that Tenant shall, prior to or simultaneously with the placement of such leasehold mortgage, deliver to Landlord a certification that the amount secured thereby does not exceed the total aggregate amounts (<u>i.e.</u>, all hard and soft costs) thereto-fore expended by Tenant to construct, alter, improve, fixture and stock its store on the Demised Premises. Upon execution of a leasehold mortgage upon Tenant's leasehold or the granting of a security interest in Tenant's estate in this Lease:

(a)   Tenant shall give notice to the Landlord specifying the name and address of any such leasehold mortgagee;

(b)   Landlord shall, upon serving Tenant with any notice of default, simultaneously serve a copy of such notice upon the holder of such leasehold mortgage;

(c)   The leasehold mortgagee shall have an additional thirty (30) days (or such longer period as may be necessary if the default is not susceptible of being cured within the thirty (30) day period provided that mortgagee shall commence the cure during the thirty (30) day period and thereafter diligently prosecute same to completion and further provided that if possession of the premises shall be necessary for mortgagee to commence to cure such default the thirty (30) days shall be measured from the date that mortgagee shall acquire possession) beyond the period to cure the default provided to Tenant, after service of notice upon it, to cure the default, and Landlord shall accept such performance by or on behalf of such leasehold mortgagee as if the same had been done by Tenant (provided that the leasehold mortgagee shall have no obligation to cure any such default);

(d)   Landlord agrees that in the event of termination of this Lease by reason of any default by Tenant (or in the event of the rejection of this Lease in any bankruptcy proceeding), provided any such leasehold mortgagee shall cure or cause to be cured all monetary defaults, pay all basic rent and other charges then due without acceleration of the Lease, and except to the extent enjoined by law or order commence to cure any other then existing default which is susceptible of being cured by the mortgage (it being understood that such defaults which are not susceptible of being cured by mortgagee, and which need not be cured by mortgagee, include, without limitation, defaults under Article 25A(ii) hereof) within thirty (30) days after the termination of this Lease, or if possession of the leasehold estate is necessary to cure such default then within thirty (30) days of possession, that Landlord will (upon written request from the leasehold mortgagee) enter into a new lease of the Demised Premises with the leasehold mortgagee or its nominee, for the remainder of the term, effective as of the date of such termination, at the same basic net rent and upon the same terms and conditions as are contained herein and subject only to the rights, if any, of any parties then in possession of any part of the Demised premises, provided:

(1)   the mortgagee or its nominee shall pay to Landlord at the time of the execution and delivery of such new lease, any expenses, including reasonable attorneys' fees, to which Landlord shall have been subjected by reason of such default;

(2)   the mortgagee or its nominee shall perform and observe all covenants herein contained on Tenant's part to be performed on their account from and after the date mortgagee shall obtain a new lease; and

(3)   the tenant under such new lease shall have the same right, title and interest in and to the buildings and improvements on the Demised Premises as Tenant had under the terminated lease.

Notwithstanding the foregoing provisions of subparagraph (d), however, in lieu of entering into such new lease upon written request of said leasehold mortgagee, Landlord shall have the right, within twenty (20) days of

receipt of such request, to pay to leasehold mortgagee the entire amount (*i.e.*, all principal, interest, late charges, fees, advances and any other sums) then secured by such leasehold mortgage. Any written request from a leasehold mortgagee to enter into a new lease shall include a statement of such total amount due. If Landlord does not make such payment in good funds within such twenty (20) day period, this right of Landlord shall lapse.

(e)  Landlord agrees to execute any documents reasonably required by any such leasehold mortgagee in order to effectuate the terms of such mortgage.

(f)  Landlord agrees that the name of the leasehold mortgagee may be added to the "Loss Payable Endorsement" of any and all insurance policies required to be carried by Tenant hereunder.

(g)  There shall be no cancellation, surrender or modification of this Lease by joint action of the Landlord and Tenant without the prior written consent of any such leasehold mortgagee.

(h)  Landlord shall give the leasehold mortgagee notice of any condemnation proceedings affecting the Demised Premises, and the leasehold mortgagee shall have the right to intervene and be made a party to any such condemnation proceedings but only to the extent of any rights afforded Tenant pursuant to the terms of this Lease, including, but not limited to Article 21 hereof. Tenant's interest in any award or damages for such taking is hereby set over, transferred and assigned to the leasehold mortgagee to the extent such transfer and assignment is provided for by the terms of any such leasehold mortgage.

(i)  Landlord shall give the leasehold mortgagee notice of any fire or other casualty affecting the Demised Premises, and the leasehold mortgagee shall have the right to intervene and be made a party to any proceedings related thereto. Tenant's interest in any insurance proceeds or damages arising out of such fire or other casualty is hereby set over, transferred and assigned to the leasehold mortgagee to the extent such transfer and assignment is provided for by the terms of any such leasehold mortgage.

(j)  No leasehold mortgagee or successor or assignee thereof shall become personally liable under any agreements, terms, covenants or conditions of this Lease unless and until it becomes the owner of the leasehold estate and then only to the extent of any rents, taxes and other financial obligations accruing while it is the owner of the leasehold estate. Upon any assignment of this Lease by any owner of the leasehold estate whose interest shall have been acquired by, through or under or purchase from any leasehold mortgagee, the assignor shall be relieved of any further liability which may accrue hereunder from and after the date of such assignment, provided that the assignee shall execute and deliver to Landlord a recordable instrument of assumption wherein such assignee shall assume and agree to perform and observe the covenants and conditions in this Lease contained on Tenant's part to be performed and observed, it being the intention of the parties that once the leasehold mortgagee or assignee shall succeed to Tenant's interest hereunder, any and all subsequent assignments (whether by such leasehold mortgagee, any purchaser at foreclosure sale or other transferee or assignee) shall effect a release of the assignor's liability hereunder.

(k)   There shall be no merger of this Lease, nor of the leasehold estate created hereby, with the fee estate in the Demised Premises by reason of the fact that the same person, firm, corporation or other entity may acquire or own or hold, directly or indirectly, this Lease or the leasehold estate created by this Lease or any interest therein and the fee estate in the Demised Premises or any interest in such fee estate unless any and all entities, including any leasehold mortgagee, having any interest in this Lease or the leasehold estate in the Demised Premises or any part thereof or any interest in such fee estate, shall join in a written instrument effecting such merger and shall duly record same.

(l)   Landlord shall, upon request, execute, acknowledge and deliver to a leasehold mortgagee making such request, an agreement prepared at the sole cost and expense of Tenant, including reasonable attorneys' fees of Landlord, in form satisfactory to such leasehold mortgagee, between Landlord, Tenant and such leasehold mortgagee, confirming each of the provisions of this Article 27.

(m)   In no event shall the right granted herein to Tenant to mortgage or otherwise encumber Tenant's leasehold estate, created by and pursuant to this Lease, be deemed or interpreted as a subordination by Landlord of Landlord's interest in the fee estate in the Demised Premises or this Lease to the lien of such mortgage or encumbrance; it being expressly agreed that, under no circumstance, shall Tenant have any right to mortgage or encumber Landlord's fee estate in the Demised Premises subject to this Lease or subordinate such interest to the lien of any mortgage or encumbrance which Tenant may place upon its leasehold estate created by and pursuant to this Lease.  Tenant shall give Landlord notice of the mortgaging of this Lease within ten days following the execution and delivery of such mortgage, together with the name, address and telephone number of the mortgagee, as well as copies of all recorded documents executed in connection with such mortgage.

(n)   Landlord agrees that in the event that a proposed leasehold mortgagee shall request that this Lease be modified as a condition precedent to its acceptance by such leasehold mortgage, Landlord shall consent to the making of such reasonable modifications as such leasehold mortgagee shall reasonably request, provided those modifications do not reduce the basic rent or additional rent, do not change the term, and do not materially and adversely affect any of the rights of Landlord hereunder.  All expenses in connection with the consummation of any such modifications (or of any other consents or agreements required by any leasehold mortgagee), including reasonable fees of counsel for Landlord, shall be borne by Tenant.

28.   Mortgage Subordination.

If there be a first mortgage lien affecting the fee interest of the Shopping Center and/or the Landlord's interest in and to any ground lease, Landlord shall obtain and shall deliver to Tenant concurrently with the execution of this Lease, a non-disturbance agreement, and this Lease shall become subject and subordinate thereto and to any renewals, modifications, replacements or extensions thereof (provided the holder of any such renewed, modified, replaced or extended first mortgage is an institution, which for the purpose hereof shall mean a federal or state chartered bank or trust company, insurance company, or pension fund of a publicly-traded corporation, labor union, or governmental or municipal entity), if and when such a non-disturbance agreement in accordance with the provisions of

this Article (a "Non-Disturbance Agreement") is entered into in respect of such mortgage.

Such Non-Disturbance Agreement shall be an agreement in recordable form between Tenant and the holder of such mortgage binding on such holder and on future holders of such mortgage in form and substance reasonably satisfactory to Tenant or its counsel, or an agreement by such holder expressed in such mortgage, which shall provide in substance as follows:  (a) all condemnation awards and proceeds of insurance shall be applied in the manner provided for in this Lease, (b) the rights of any holder of any leasehold mortgage that may then or thereafter be placed as set forth in Article 27 shall be acknowledged and protected, and (c) neither such holder nor any other holder of such mortgage shall name or join Tenant (or any leasehold mortgagee) as a party-defendant or otherwise in any suit, action or proceeding to enforce, nor will this Lease or the term hereof be terminated (except as permitted by the provisions of this Lease) or otherwise affected by the enforcement of any rights given to any holder of said mortgage, pursuant to the terms, covenants or conditions contained in such mortgage or any other documents held by any holder or any rights given to any holder as a matter of law.  Upon request of the holder of a mortgage to which this Lease becomes subordinate, Tenant shall (i) execute, acknowledge and deliver to such holder an agreement to attorn to such holder as Landlord if such holder becomes Landlord hereunder, and/or (ii) execute, acknowledge and deliver to such holder an agreement not to make any payment of fixed annual rent for a period of more than one (1) month in advance.  If the holder of any institutional first mortgage of the fee interest of the Shopping Center requires that this Lease have priority over such mortgage, Tenant shall, upon request of such holder, execute, acknowledge and deliver to such holder an agreement acknowledging such priority.

Notwithstanding the foregoing provisions of Article 28, the parties acknowledge that upon the Commencement Date no such Non-Disturbance Agreement has been obtained from Mutual Benefit Life Insurance Company, holder of the existing first mortgage on the Shopping Center (the "Existing First Mortgage").  Landlord hereby covenants, warrants and represents as follows with regard to the Existing First Mortgage (it being acknowledged and agreed that (a) Tenant would not have entered into this Lease unless Landlord was willing to make such covenants, warranties and representations (hereinafter collectively referred to as the "Mortgage Covenants"), (b) Landlord shall be personally liable for any breach of the Mortgage Covenants, notwithstanding the provisions of Article 19, and any such personal liability shall survive the termination of this Lease, and (c) to induce Tenant to enter into this Lease, Leonard Marx and John Usdan, the general partners of Landlord, have simultaneously with the execution of this Lease executed and delivered to Tenant their joint and several personal guaranty and indemnity regarding the Mortgage Covenants, herein referred to as the "Existing Mortgage Guaranty"):

(i)   Landlord will timely pay all amounts due under the Existing First Mortgage and timely perform all other obligations thereunder so as to prevent an event of default from occurring thereunder.

(ii)  The amount secured by the Existing First Mortgage does not exceed $1,600,000, and Landlord will not increase such amount secured by the Existing First Mortgage or increase the monthly payments due thereunder.

(iii) Tenant may freely exercise and enjoy all of its rights under this Lease (including, without limitation, those relating to construction, alterations, insurance

-39-

proceeds, assignment and subletting), without any hindrance,
restriction, impairment or molestation from, or any
requirement of consent or approval from, the holder of the
Existing First Mortgage, notwithstanding that the execution
of this Lease and/or the exercise by Tenant of certain of
such rights without the consent of such holder may
constitute a default under such Existing First Mortgage.

(iv)   On or prior to the first to occur of (x) the
Approval Date and (y) one year from the Commencement Date,
Landlord will either (a) cause the Existing First Mortgage
(and all other instruments securing the debt secured
thereby) to be paid, released and discharged of record, or
(b) cause the holder of such Existing First Mortgage to
enter into and deliver to Tenant a Non-Disturbance
Agreement, in recordable form, in the form of Exhibit E
(with only such immaterial modifications thereto as shall be
reasonably acceptable to Tenant).

In the event of any breach of any of the Mortgage Covenants,
Tenant, in addition to any other rights and remedies, may:  (i)
cancel this Lease on notice to Landlord, in which event Landlord
shall remain liable to Tenant, notwithstanding any such
termination, for any damages caused by such breach; or (ii) in
accordance with the provisions of Article 30, Tenant may (but
shall not be obligated to) pay any amount due under said Existing
First Mortgage (including, at Tenant's option, all principal,
interest and other charges secured thereby) and the amount of
same (together with interest thereon at the Lease Interest Rate)
shall be immediately paid by Landlord to Tenant (and Landlord
shall be personally liable to make such payment), and Tenant may
at its option deduct such payment, if not made, from rent as set
forth in Article 30.

29.   Tenant Indemnifies Landlord.

During the term of this Lease from and after the Tenant
Building Permit Date, Tenant shall and does hereby indemnify and
save Landlord and Landlord's ground lessor, if any, harmless of,
from and against all costs, liabilities, damages, expenses,
penalties, claims or demands of whatsoever nature, including all
costs of defense and reasonable counsel fees, for personal
injury, death and/or property damage occurring in or about
Tenant's building or the Outside Areas or the Common Area located
on lands described in Exhibit A, only if occasioned by the
conduct of truck sales or sidewalk sales by Tenant as permitted
hereunder, including all statutory and common law liability for
damage to property or injuries or loss of life sustained by any
person or in or about the Tenant's building or said Outside Areas
or Common Area (under aforesaid circumstances), except those
which shall result, in whole or in part, directly or indirectly,
from the default, negligence or tortious acts of Landlord.  The
foregoing sentence is intended to afford to Landlord the same
protection and coverage as would be provided if Tenant furnished
general comprehensive liability insurance, naming Landlord and
Landlord's ground lessor, if any, as additional insureds under
such a policy.

30.   Tenant's Right to Cure Landlord's Defaults.

In the event Landlord shall neglect to pay when due any
obligations on any mortgage or encumbrance affecting title to the
Shopping Center and to which this Lease shall be subordinate
unless the mortgagee shall have granted Tenant non-disturbance,
or shall fail to perform any obligation specified in this Lease
(including without limitation causing the Approval Date to occur
or performance of any item of Landlord's Work as required by
Article 6 hereof), or if any representation or warranty of
Landlord in this Lease shall be breached, then Tenant (in

addition to and not in limitation of any other remedies) may (but shall not be obligated to), after the continuance of any such default for seven (7) days after notice thereof by Tenant with respect to a monetary default, pay said principal, interest or other charges or cure such default with respect to any default which does not involve payment of money after continuance of such default for fifteen (15) days after notice thereof by Tenant (provided that emergency repairs which are Landlord's responsibility under this Lease, and which are necessary in Tenant's reasonable judgment to protect the Demised Premises or contents thereof and/or to keep the Demised Premises and/or Common Area in a neat, clean, safe and orderly condition, may be made without any notice to Landlord), all on behalf of and at the expense of Landlord (including without limitation performance of any item of Landlord's Work within the time periods set forth in Article 6; it being understood that Tenant shall have such self-help option regarding Landlord's Work and causing the Approval Date to occur in addition to and not in limitation of any rights or remedies of Tenant set forth elsewhere in this Lease), and enter upon other portions of the Shopping Center and do all necessary work and make all necessary payments in connection therewith, and execute applications and file documents on behalf of and/or in the name of Landlord (and Landlord hereby appoints Tenant its attorney-in-fact solely for such limited purpose; such power of attorney to expire upon the Approval Date), and Landlord shall, on demand, pay Tenant forthwith the amount so paid by Tenant, together with interest thereon at the Lease Interest Rate, and Tenant may, to the extent necessary, deduct the same from any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness. The foregoing provisions are in addition to and not in limitation of Tenant's rights under Article 7E in the event Landlord fails to make any Tenant's Common Area Reimbursement when due.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted thirty (30) days after receipt thereof to correct or remedy such default.

In amplification and not in limitation of the foregoing, in the event of a default by Landlord under Article 6 hereof, Tenant shall have the authority (but not the obligation) to complete the construction of that portion of Landlord's Work necessary for the completion and operation of the Tenant Improvements. In such event, Landlord shall deliver to Tenant such plans, specifications, drawings and other materials as are necessary to enable Tenant to complete construction of Landlord's Work and shall assign to Tenant any contracts necessary for the completion of Landlord's Work. Landlord hereby grants to Tenant the license and right to enter upon the Common Area for the purpose of completing the construction of Landlord's Work.

31. <u>Waiver of Distraint</u>.

Landlord hereby expressly waives any and all rights granted by or under any present or future laws to levy or distrain for rent, in arrears, in advance, or both, upon all goods, merchandise, equipment, fixtures, furniture and other personal property of Tenant or any subtenant or licensee of Tenant in the Demised Premises, delivered or to be delivered thereto.

32. <u>Unavoidable Delays</u>.

If either party shall be prevented or delayed from punctually performing any obligation or satisfying any condition

-41-

under this Lease by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, governmental restriction, regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party (other than inability to provide or obtain financing), then the time to perform such obligation or satisfy such condition shall be extended by the delay caused by such event, except for the payment of rent or other charges. If either party shall, as a result of any such event, be unable to exercise any right or option within any time limit provided therefor in this Lease, such time limit shall be deemed extended for a period equal to the duration of the delay caused by such event. Notwithstanding the foregoing, the provisions of this Article 32 shall not apply to the dates and time periods set forth in Articles 2, 6C and 6D.

33.  Adjoining or Adjacent Property.

Landlord shall use diligent efforts to promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or governmental authority in connection with any hearing or other administrative procedure relating to the use thereof or any adjoining or adjacent property, the outcome of which might adversely affect Tenant.

34.  Rent Notices.

If the ownership of the Shopping Center (or a lease of the entire Shopping Center) or the name or address of the party entitled to receive the rent shall be changed, Tenant may, until receipt of proper notice of such change from the grantor, assignor or party entitled to receive the rent immediately preceding such change, continue to pay the rent and additional rent to the party to which, and in the manner in which, the last preceding installment of rent was paid.

35.  Notices.

Notices required under this Lease shall be in writing and deemed to be properly served if personally delivered with a receipt obtained or sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office as set forth on the first page of this Lease, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be two days following the date on which such notice is deposited in a post office of the United States Postal Service, or date delivered if personally delivered.

36.  Condition of Premises at Termination.

At the expiration or earlier termination of the Lease term, Tenant shall surrender the Demised Premises, together with all building alterations and improvements then a part thereof, in good order and condition, except for the following:  ordinary wear and tear, repairs required to be made by Landlord pursuant to the provisions of this Lease, and loss or damage by fire, the elements and other casualty (unless, with regard to such casualty damage, a self-insurance election is in effect and Tenant is required to repair same pursuant to Article 20B). All furniture and trade fixtures installed in said building at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the Lease term, have the option to relinquish its property rights with respect to such trade fix- tures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the

exercise of such option the property specified in said notice
shall be the property of Landlord (but Tenant agrees to remove
same on Landlord's written request).

37.  <u>Holding Over</u>.

In the absence of any written agreement to the contrary, if
Tenant should remain in occupancy of the Demised Premises after
the expiration of the Lease term, it shall so remain as a tenant
from month to month, and all provisions of this Lease applicable
to such tenancy shall remain in full force and effect.

38.  <u>No Waiver</u>.

The failure of either party to seek redress for violation
of, or to insist upon the strict performance of any term,
covenant or condition contained in this Lease shall not prevent a
similar subsequent act from constituting a default under this
Lease.

39.  <u>Waiver of Trial by Jury</u>.

It is mutually agreed by and between Landlord and Tenant
that the respective parties hereto shall and they hereby do waive
trial by jury in any action, proceeding or counterclaim brought
by either of the parties hereto against the other on any matters
whatsoever arising out of or in any way connected with this
Lease, the relationship of Landlord and Tenant, Tenant's use or
occupancy of the Demised Premises and/or any claim of injury or
damage.

40.  <u>Shopping Center Standards</u>.

For the purpose of enhancing the overall appeal of the
Shopping Center, Landlord acknowledges that the selection of
tenants shall be consistent with maintaining a balanced and
diversified grouping of retail stores.  Landlord warrants,
covenants and agrees that no building now or hereafter erected
within the lands described in Exhibit A shall be leased or
permitted to be used or occupied by Landlord or its tenants or
any successors or assigns of either Landlord or its tenants, or
by any subtenant, licensee or concessionaire of a tenant, for an
establishment selling or exhibiting pornographic materials,
massage parlor, funeral parlor, automobile show room, auto
service center, body and fender shop, car wash, amusement
gallery, health spa or exercise facility, theatre or cinema,
office space, off-track betting parlor, bowling alley, billiard
parlor, so-called "head shop", so called "flea market" or
"odd-lot" sales type operation, discotheque, roller skating rink,
discount department store over 50,000 square feet in size, such
as, by way of example and not limitation, Wal-Mart, Target,
Caldor, or Jamesway (provided that such prohibition on discount
department stores will expire at the end of the 10th Lease Year),
or for industrial or warehouse purposes, or for any illegal use.

Notwithstanding the foregoing, Landlord may use portions of
Phase II for (i) cinema, health spa or OTB facility, providing
that any of such uses are in a building not closer than 500 feet
from any portion of the Demised Premises; and (ii) office space
or light industrial use, provided any such light industrial use
is compatible with being adjacent to a neighborhood shopping
center, including, without limitation, no odors or fumes and no
unsightly appearance.

41.  <u>Hazardous Waste</u>.

Landlord represents that it has made a thorough investiga-
tion of the physical condition of the Shopping Center, that it is
fully familiar with the present and prior uses of the Shopping
Center and that there are not now nor have there ever been any
asbestos or any other toxic or hazardous wastes or substances

incorporated in, used, generated, stored, treated or disposed on
the Demised Premises or the Common Area.  Landlord hereby indemni-
fies Tenant from and against any loss, liability, claim or
expense, including, without limitation, removal, cleanup,
engineering and attorneys fees and expenses that Tenant may incur
by reason of the above representation being false or by reason of
any investigation or claim of any governmental agency in connec-
tion therewith.  Landlord's representations and indemnity to
Tenant under this paragraph shall survive the cancellation or
termination of this Lease.  In amplification and not in
limitation of the foregoing, Landlord shall be solely liable to
pay all expenses and costs in connection with removal (if same is
required by any applicable law or regulation or is appropriate in
Tenant's reasonable judgment) of any asbestos or other toxic or
hazardous waste or substances on or in the Demised Premises or
Common Area not placed by Tenant.

Tenant agrees not to place or incorporate any asbestos or
other hazardous waste or substances on or in the Demised Premises
in violation of any applicable law, ordinance or regulation; and
Tenant hereby indemnifies Landlord from and against any loss,
liability, claim or expense, including, without limitation,
removal, cleanup, engineering and attorneys' fees and expenses
that Landlord may incur by reason of breach of the foregoing
covenant by Tenant.

At any time from the date of this Lease until the Rent
Commencement Date, Tenant (or Tenant's contractor) may inspect
the Demised Premises and Common Area for the presence of such
wastes or substances.  If toxic or hazardous wastes or substances
are discovered in the Demised Premises or Common Area, Tenant may
cancel this Lease by giving notice to Landlord and returning
possession of the premises to the Landlord prior to the Rent
Commencement Date, if Tenant has taken possession.

42.   <u>Invalidity of Certain Provisions</u>.

If any provision of this Lease shall be invalid or
unenforceable, the remainder of the provisions of this Lease
shall not be affected thereby and each and every provision of
this Lease shall be enforceable to the fullest extent permitted
by law.

43.   <u>Choice of Law</u>.

This Lease, and the rights and obligations of the parties
hereto, shall be interpreted and construed in accordance with the
laws of the State in which the Shopping Center is located.

44.   <u>Memorandum of Lease</u>.

The parties hereto have simultaneously with the execution
and delivery of this Lease executed and delivered a Memorandum of
Lease setting forth such information as may be necessary to
constitute a "short form lease", which Landlord shall, at its
sole expense, cause to be recorded within thirty (30) days
following delivery of this Lease and returned to Tenant by
Landlord within thirty (30) days thereafter.  Landlord agrees
that it will comply with the requirements of the applicable
recording office wherein said Memorandum of Lease is to be
recorded, so that the plan to be attached to the Memorandum of
Lease will be accepted for recording.

45.   <u>Entire Agreement</u>.

This Lease contains the entire agreement between the parties
and cannot be changed, modified or amended unless such change,
modification or amendment is in writing and executed by the party
against which the enforcement of the change, modification or
amendment is sought.

-44-

46.  <u>Definition of Landlord</u>.

The term "Landlord", as used in this Lease, means only the owner for the time being of the Shopping Center or a lease of the entire Shopping Center, and in the event of any sale or sales of the Shopping Center or assignment or assignments of such lease of the Shopping Center thereof after the Commencement Date, the seller or assignor shall be, and hereby is, freed and relieved of all covenants and obligations of Landlord under this Lease arising or to be performed after the date of such sale or sales or assignment or assignments, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser or assignee at any such sale or sales, or assignment or assignments, that the purchaser or assignee has assumed and agreed to carry out any and all covenants and obligations of Landlord arising or to be performed under this Lease after the date of such sale or sales or assignment or assignments (and before such date if not performed by the seller or assignor), except that no sale or assignment shall free any party from its obligation to complete all work that Landlord is required to complete hereunder or from its obligation to pay to Tenant any amount due to Tenant immediately prior to such sale or assignment (including, without limitation, the Termination Payment).

47.  <u>Successors and Assigns</u>.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this Lease shall run with the land.

48.  <u>Captions and Gender</u>.

The captions of this Lease are solely for convenience of reference and shall not in any way define, describe, limit or amplify the scope, terms, provisions and intent of this Lease. The necessary grammatical changes which shall be required to make the provisions of this Lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, a trust, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this Lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder, except as to acts, omissions or defaults occurring prior to such termination.

49.  <u>Estoppel Certificates</u>.

Either party shall, without charge, at any time and from time to time within ten (10) days after request by the other, certify by written instrument, duly executed, acknowledged and delivered to such other party, or to any actual or proposed mortgagee, purchaser, assignee, or sublessee:

(a)  whether or not such other party is, to the best knowledge of the party giving the certificate, in default in any way, in the performance of any of the covenants, conditions and agreements to be performed by such party in accordance with this Lease and if there is any such default, specifying the nature of same;

(b)  what the amount of annual rental is pursuant to the terms hereof;

(c)  whether or not this Lease is unmodified and in full force and effect, or in the event that there have been

modifications, whether the same is in full force and effect as modified and setting forth the modifications;

(d)  whether or not there have been any prepayments of rent; and

(e)  any other information reasonably required by any actual or proposed mortgagee.

50.  <u>Independent Operation</u>.

Nothing in this Lease shall cause Landlord in any way to be construed as a partner, joint venturer, or an associate of Tenant in the operation of the Demised Premises.

51.  <u>Effectiveness of Lease</u>.

This Lease becomes effective as a lease only upon execution and delivery thereof by both Landlord and Tenant and the execution of and delivery to Tenant of any other agreement or document required in connection with this lease.

52.  <u>Intentionally Omitted</u>.

53.  <u>Broker</u>.

Landlord and Tenant each represents and warrants that it has not dealt with any real estate agent or broker in connection with this Lease (other than Marx Realty and Improvement Corp. whose commission shall be paid by Landlord), and each shall and hereby agrees to defend, indemnify and hold the other party harmless, including reasonable attorney's fees, from and against all claims for commissions and/or other compensation made by any broker or agents (other than Marx Realty and Improvement Corp.) or other damage for breach of the foregoing representations by the indemnifying party.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

LANDLORD:

WITNESS:

FARMINGVILLE ASSOCIATES

By: _____

_____

TENANT:

KMART CORPORATION

By: _____
Vice-President
M. L. SKILES, VICE PRESIDENT

Attest: _____
Assistant Secretary
C. E. LOTZAR, JR., ASST. SECRETARY

STATE OF NEW YORK   )
                    )  ss.:
COUNTY OF NEW YORK  )

On this __5th__ day of __December__, 1991, before me personally came __John Usdan__, to me known who, being by me duly sworn, did depose and say that he is a general partner of FARMINGVILLE ASSOCIATES, the partnership described in and who executed the foregoing instrument and acknowledged to me that he executed the foregoing instrument for and in behalf of said partnership.

_____
Notary Public

ISABELLE W. CLARK
Notary Public, State of New York
No. 41-4600162
Qualified in Queens County
Commission Expires 5/31/93

STATE OF Michigan )
                  )  ss.:
COUNTY OF Oakland )


Before me, the undersigned authority, on this day personally appeared __M. L. Skiles__, Vice President of KMART CORPORATION, a Michigan corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated and as the act and deed of said corporation.

Given under my hand and seal of office on this 17th day of Dec., 1991.

M. L. SKILES, VICE PRESIDENT

_____
Notary Public

MARY A. SCHNITZLER
Notary Public, Oakland County, Michigan
My Commission Expires May 15, 1995

02/KMA45A
12/03/91

## EXHIBITS

A.    Demised Premises

A-1. Shopping Center

B.    Plot Plan

C.    Commencement Agreement

D.    Title Exceptions

03/KMAR45
11/21/91

## RIDER

## TENANT'S COMMON AREA CHARGE

A.     Tenant's "Common Area charge" shall mean, for any
period from and after the Rent Commencement Date, the product of
(a) the actual cost and expense to Landlord for the maintenance
and operation (including, without limitation, lighting,
landscaping and repaving not included in Landlord's Work) and
public liability insurance of the Common Area exclusive of any
Common Area that may hereafter be constructed on Phase II
(hereinafter called "Common Area costs") for such period, and (b)
the Fraction.  The Common Area costs shall be limited to amounts
paid by Landlord in respect of the Common Area (other than Phase
II) for the work Landlord is required to do and the items
Landlord is required to furnish under subdivision B of Article 12
and liability insurance Landlord is required to furnish pursuant
to subdivision G of Article 12.  The Common Area costs shall not
include amounts expended for any of the following:  (i) removal
of rubbish of individual tenants of the Shopping Center; (ii) any
costs of Landlord's Work; (iii) any amounts expended for parking
lot patching, repairing or replacement or any other repairs or
replacements to items of Landlord's Work performed, the need for
which arose at any time prior to the expiration of the relevant
warranty period for same set forth in Article 8; (iv) any costs
of removing or remediating any toxic or hazardous waste or
substances; (v) any casualty or liability or personal property
insurance covering any buildings or any premises or property of
Shopping Center tenants; (vi) Real Estate Taxes; (vii) interest
or depreciation (other than depreciation in accordance with
generally accepted accounting principles on major maintenance
equipment purchased by Landlord and used solely for the Shopping
Center); (viii) office overhead or salaries of persons employed
by Landlord whose functions extend beyond the care of the Common
Area; (ix) profit for Landlord on any Common Area costs; (x) any
costs attributable to periods prior to the Rent Commencement
Date; (xi) any costs of enlarging the size or capacity of the
sewage treatment plant and/or the detention basin, and any major
refurbishing, upgrading or replacement of same or other work
regarding same that would be deemed a "capital expenditure" under
generally accepted accounting principles (i.e., only routine
maintenance and ordinary operating costs of such systems shall be
chargeable as a Common Area cost); and (xii) any work or costs
regarding or performed upon any portion of Phase II.  The Common
Area costs shall be allocated to each Lease Year (or period less
than a Lease Year at the end of the term of this Lease), without
any duplication, all in accordance with generally accepted
accounting principles.

B.     For each Lease Year during the term hereof, Tenant
shall pay to Landlord as additional rent, for maintenance and
operation of the Common Area, Tenant's Common Area charge for
such year.  If the term of this Lease ends on a day other than
the last day of a Lease Year, Tenant shall pay for the period
less than a year at the end of the term of this Lease the
Tenant's Common Area charge prorated for such period, by the
fraction, the numerator of which shall be the number of days in
such period, and the denominator of which shall be 365.

C.     In determining the amount of Tenant's Common Area
charge for any Lease Year (or period) in which any enlargement or
contraction in ground floor area shall occur (other than
regarding Phase II), such enlargement or contraction shall be
deemed effective as of the first day of the month next following
(a) the month in which the area first becomes ready for its
intended use by the occupant or intended occupant, or (b) the
month in which the same first becomes unusable by reason of
condemnation or otherwise.

D.    On the first day of each month from and after the Rent Commencement Date, Tenant shall pay to Landlord (as estimated payments on account of the annual Common Area charge) one-twelfth (1/12th) of the actual computed Common Area charge for the immediately preceding Lease Year (provided that for the first Lease Year each such monthly payment shall be the sum of $9,000). As soon as is practicable after the end of each Lease Year Landlord shall submit to Tenant a bill for the amount required to be paid by Tenant under this Rider (and, accordingly, the new current monthly estimated amounts), setting forth in reasonable detail the items and amounts included in, and setting forth the method of calculating, Tenant's Common Area charge.  If the aggregate monthly estimated payments as aforesaid for such Lease Year are less than the actual charge, Tenant shall pay the difference to Landlord as additional rent within 30 days after receipt thereof.  If such aggregate estimated payments exceed the actual charge, Tenant may credit and offset the difference against the next payment(s) of rent due under this Lease.

Landlord shall keep, for a period of one (1) year following the end of each Lease Year (or period), complete and accurate books and records in respect of the Common Area costs for such Lease Year (or period), and Tenant, upon two (2) days' notice at any time during such period, shall have the right to have such books and records audited by a certified public accountant, and in the event that such audit discloses that Tenant paid an amount in excess of the proper Tenant's Common Area charge, Landlord shall refund the excess to Tenant promptly upon demand, and, in additon, if said excess is greater than 10% of the proper amount, Landlord shall pay to Tenant promptly upon demand the reasonable cost of such audit.

E.    Notwithstanding anything contained herein to the contrary, and in addition to and not in limitation of Tenant's rights under Article 30 in the event of Landlord default regarding maintenance of the Common Area, Tenant reserves the right, for any reason whatsoever, at any time and from time to time, upon thirty (30) days prior written notice to Landlord, to assume the duties of Landlord to maintain the Common Areas located within Parcel A as shown on Exhibit "B".  If Tenant shall elect to maintain the Common Areas located within Parcel A of Exhibit "B", then, and in such event, Tenant shall not during such period be required to make any contributions on account of the Common Area costs as hereinabove defined, however, Landlord shall continue to maintain the remaining portions of the Common Areas described in Exhibit "B".

*    *    *    *    *    *

Attached to and forming part of Lease dated as of by and between Farmingville Assocaites, as Landlord, and KMART CORPORATION, as Tenant, covering certain premises situated at Farmingville, New York.

Initialled by Landlord:        Initialled by Tenant:

EXHIBIT A

DESCRIPTION OF LEASE PARCEL
AS SHOWN ON SURVEY PREPARED FOR
MIDWOOD MANAGEMENT CORPORATION

ALL that certain plot, piece, or parcel of land lying, being
and situate at Farmingville, Town of Brookhaven, County of Suffolk
State of New York, being bounded and described as follows:

BEGINNING at point at the southeasterly corner of said lease
parcel said point being the following four (4) courses and
distances from the southerly terminus of a straight line connecting
the southerly side of Horseblock Road (C.R. 16) with the westerly
side of North Ocean Avenue (C.R. 83):

1) Along the westerly side of North Ocean Avenue South
   03' 56' 30" West 179.76' to a point.
2) Continuing along the westerly side of North Ocean Avenue
   South 01° 48' 29" west 161.18' to a point.
3) Continuing along the westerly side of North Ocean Avenue
   South 03° 56' 30" west 1,137.09' to a point.
4) North 52' 17' 10' West 698.22' to the point of beginning:

RUNNING THENCE from said point of beginning the following
Twelve (12) courses and distances:

1) North 85° 55' 46" West 184.00' to a point.
2) North 04° 04' 14" East 60.00' to a point.
3) North 85° 55' 46" West 86.33' to a point.
4) North 04° 04' 14" East 426.33' to a point.
5) South 85° 55' 46" East 70.00' to a point.
6) South 04° 04' 14" West 45.00' to a point.
7) South 85° 55' 46" East 203.33' to a point.
8) South 04' 04' 14" West 50.00' to a point.
9) South 85' 55' 46" East 12.33' to a point.
10) South 04° 04' 14" West 50.67' to a point.
11) North 85° 55' 46" West 12.33' to a point.
12) South 04° 04' 14" West 340.66' to the point and place of
    beginning.

The southerly 22' ± of said lease parcel lies within the Long
Island Lighting Company right of way.

CONTAINING within said bounds 119,044 square feet or 2.733 acres.

Dated: Patchogue, New York
       November 22, 1991
Revised December 6, 1991

TOTAL P.02

*EXHIBIT A-1*

OVERALL

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING AT MEDFORD, TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK AND STATE OF NEW YORK, BEING MORE PARTICULARLY BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) WHERE THE SAME IS INTERSECTED BY THE WESTERLY SIDE OF LAND NOW OR FORMERLY OF LONG ISLAND TRUST CO., SAID POINT BEING DISTANT 158.25 FEET NORTHWESTERLY AS MEASURED ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) FROM THE NORTHWESTERLY END OF A TIE LINE HAVING A RADIUS OF 81.54 FEET CONNECTING THE WESTERLY SIDE OF OCEAN AVENUE (C. R. 38, PATCHOGUE-MT. SINAI ROAD) WITH THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE FROM SAID POINT OR PLACE OF BEGINNING ALONG LAND NOW OR FORMERLY OF LONG ISLAND TRUST CO. THE FOLLOWING TWO COURSES AND DISTANCES:

1. SOUTH  03 DEGREES, 56 MINUTES, 30 SECONDS WEST 178.19 FEET;

2. SOUTH  52 DEGREES, 11 MINUTES, 18 SECONDS EAST 216.28 FEET THE THE WESTERLY SIDE OF OCEAN AVENUE (C. R. 83, PATCHOGUE-MT. SINAI ROAD);

RUNNING THENCE ALONG THE WESTERLY SIDE OF OCEAN AVENUE (C. R. 83, PATCHOGUE-MT. SINAI ROAD) THE FOLLOWING THREE COURSES AND DISTANCES:

1. SOUTH  03 DEGREES, 56 MINUTES, 30 SECONDS WEST 24.88 FEET;

2. SOUTH  01 DEGREES, 48 MINUTES, 29 SECONDS WEST 161.18 FEET;

3. SOUTH  03 DEGREES, 56 MINUTES, 30 SECONDS WEST 1,137.09 FEET TO LAND NOW OR FORMERLY OF ALAN AND HELENE FORTUNOFF;

RUNNING THENCE ALONG SAID LAND NORTH  86 DEGREES, 03 MINUTES, 30 SECONDS WEST 1372.46 FEET (ACTUAL) 1372.79 (DEED) TO LAND NOW OR FORMERLY OF "MAP OF NATURES GARDENS-EVERGREEN PARK SECTION" MAP NO. 1093;

RUNNING THENCE ALONG SAID LAND ON SAID MAP NORTH  03 DEGREES, 58 MINUTES, 30 SECONDS EAST 587.89 FEET TO LAND NOW OR FORMERLY OF MARIE STROM;

RUNNING THENCE ALONG SAID LAND SOUTH  86 DEGREES, 01 MINUTES, 30 SECONDS EAST 477.96 FEET (ACTUAL) 478.29 FEET (DEED);

RUNNING THENCE STILL ALONG SAID LAND AND ALONG THE EASTERLY TERMINUS OF OAKLAWN AVENUE, LAND NOW OR FORMERLY OF JAMES AND AMELIA ROIG, LAND NOW OR FORMERLY OF HENRY C. BAHNMULLER NORTH  03 DEGREES, 28 MINUTES, 44

SECONDS EAST 772.47 FEET TO LAND NOW OR FORMERLY OF FRANK AND PETER COLUMBO;

RUNNING THENCE ALONG SAID LAND NORTH 03 DEGREES, 56 MINUTES, 04 SECONDS EAST 434.40 FEET TO THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 100.01 FEET TO LAND NOW OR FORMERLY OF CHRISTIAN AND DAVID NIELSEN;

RUNNING THENCE ALONG SAID LAND THE FOLLOWING TWO COURSES AND DISTANCES:

1. SOUTH 03 DEGREES, 54 MINUTES, 04 SECONDS WEST 209.39 FEET;

2. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 142.60 FEET;

3. NORTH 03 DEGREES, 54 MINUTES, 04 SECONDS EAST 209.39 FEET TO THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 182.07 FEET TO LAND NOW OR FORMERLY OF GUISEPPE AND STEFANO CARUSO;

RUNNING THENCE ALONG SAID LAND THE FOLLOWING THREE COURSES AND DISTANCES:

1. SOUTH 03 DEGREES, 54 MINUTES, 04 SECONDS WEST 384.39 FEET;

2. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 100.00 FEET;

3. NORTH 03 DEGREES, 54 MINUTES, 04 SECONDS EAST 384.39 FEET TO THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) THE FOLLOWING THREE COURSES AND DISTANCES:

1. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 16.58 FEET;

2. SOUTH 67 DEGREES, 56 MINUTES, 36 SECONDS EAST 161.16 FEET;

3. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 24.00 FEET TO THE POINT OR PLACE OF BEGINNING.

85/KMA45A
05/06/91

EXHIBIT C

COMMENCEMENT OF TERM AGREEMENT

THIS AGREEMENT, made effective as of the _____ day of _____, 1992, between FARMINGVILLE ASSOCIATES, a New York general partnership, having its principal office at c/o Midwood Management Corp., 60 East 42nd Street, New York, New York 10165 (hereinafter called "Landlord") and KMART CORPORATION, a Michigan corporation, having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (hereinafter called "Tenant").

W I T N E S S E T H :

WHEREAS, Landlord is the owner of that certain real property described in Exhibit A annexed hereto and made a part hereof; and

WHEREAS, by a certain lease (hereinafter called "Lease"), dated the _____ day of _____, 19__, Landlord demised to Tenant the premises constituting a portion of said real property more particularly described in said Lease; and

WHEREAS, Tenant is now in possession of the premises demised under the Lease; and

WHEREAS, under Article 2 of the Lease, Landlord and Tenant agreed to execute, acknowledge and deliver to each other duplicate originals of an agreement setting forth the Rent Commencement Date (as such term is defined in the Lease) and certain other information;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.   The Rent Commencement Date is the _____ day of _____, 19__.

2.   The Initial Term of the Lease expires on _____.

3.   The Commencement Dates of each extended term and the dates when each such option to renew is to be exercised are as follows:

| EXTENDED TERM | COMMENCEMENT DATE | LAST DATE TO EXERCISE OPTION |
|---|---|---|
| 1st | | |
| 2nd | | |
| etc. | | |

IN WITNESS WHEREOF, Landlord and Tenant have caused this agreement to be executed as of the day and year first above written.

FARMINGVILLE ASSOCIATES

_____     By: _____

                                          LANDLORD

Attest:                           KMART CORPORATION

                                  By:_____
_____          Vice President
Assistant Secretary

                                          TENANT

[add acknowledgements]

Exhibit "D"

Permitted Title Exceptions

1.  Electric easement in Liber 6645 Cp 535, repeated in Liber 8439
    Cp 80.

2.  Easement to the Suffolk County Water Authority in Liber 11015
    Cp 54.

3.  Mortgage made by Nineteen Wilshire Realty Corp. to Industrial
    National Bank of Rhode Island, to secure the amount of
    $1,900,000.00, dated 12/15/77, recorded 1/31/78 in Liber 8102
    Mp 01, assigned by Industrial National Bank of Rhode Island to
    The Mutual Benefit Life Insurance Company, dated 1/17/79,
    recorded 1/23/79 in Liber 8374 Mp 403, as extended and
    modified in Liber 8374 Mp 372.

4.  State of facts shown on survey by Norton Brothers, dated
    November 22, 1991 and revised December 6, 1991.

5.  Non-exclusive rights of other shopping center tenants to use
    the common areas of the shopping center.

6.  1991/92 Town and School Taxes not yet delinquent.

DESCRIPTION OF LEASE PARCEL
AS SHOWN ON SURVEY PREPARED FOR
MIDWOOD MANAGEMENT CORPORATION

ALL that certain plot, piece, or parcel of land lying, being
and situate at Farmingville, Town of Brookhaven, County of Suffolk
State of New York, being bounded and described as follows:

BEGINNING at point at the southeasterly corner of said lease
parcel said point being the following four (4) courses and
distances from the southerly terminus of a straight line connecting
the southerly side of Horseblock Road (C.R. 16) with the westerly
side of North Ocean Avenue (C.R. 83):

1) Along the westerly side of North Ocean Avenue South
   03' 56' 30" West 179.76' to a point.
2) Continuing along the westerly side of North Ocean Avenue
   South 01° 48' 29" West 161.18' to a point.
3) Continuing along the westerly side of North Ocean Avenue
   South 03° 56' 30" West 1,137.09' to a point.
4) North 52' 17' 10' West 698.22' to the point of beginning;

RUNNING THENCE from said point of beginning the following
Twelve   (12) courses and distances:

1) North 85° 55' 46" West 184.00' to a point.
2) North 04° 04' 14" East 60.00' to a point.
3) North 85° 55' 46" West 89.33' to a point.
4) North 04° 04' 14" East 426.33' to a point.
5) South 85° 55' 46" East  70.00' to a point.
6) South 04° 04' 14" West  45.00' to a point.
7) South 85° 55' 46" East 203.33' to a point.
8) South 04° 04' 14" West  50.00' to a point.
9) South 85° 55' 46" East  12.33' to a point.
10) South 04° 04' 14" West  50.67' to a point.
11) North 85° 55' 46" West  12.33' to a point.
12) South 04° 04' 14" West 340.66' to the point and place of
    beginning.

The southerly 22'± of said lease parcel lies within the Long
Island Lighting Company right of way.

CONTAINING within said bounds 119,044 square feet or 2.733 acres.

Dated: Patchogue, New York
       November 22, 1991
Revised December 6, 1991

_2/02/91

## LEASE

-between-

FARMINGVILLE ASSOCIATES,

Landlord,

-and-

KMART CORPORATION,

Tenant.

Dated: December 20, 1991

Shopping Center

Location:

Farmingville, New York