**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Sears Holdings Corporation *et al.*,[1] | : | Case No. 18-23538-rdd |
| Debtors. | : | (Jointly Administered) |
| | : | **Re: Docket No. 484** |

---------------------------------------------------------------- x

**ESL'S PRELIMINARY RESPONSE TO THE MOTION OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

ESL Investments, Inc. and its affiliates (including JPP, LLC and JPP II, LLC (collectively, "ESL")), in their capacity as prepetition lenders to Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" and with respect to its chapter 11 affiliates, the "Debtors"), hereby submit this preliminary response (the "Preliminary Response") to the *Motion of the Official Committee of Unsecured Creditors of Sears Holdings Corporation,* Et Al.*, for the Entry of an Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SRC Sparrow 1 LLC (None); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); SRC Sparrow 2 LLC (None); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); SRC O.P. LLC (None); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); SRC Facilities LLC (None); and SRC Real Estate (TX), LLC (None). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

*2004, 9006, and 9016 Authorizing Expedited Discovery of the Debtors and Third Parties* filed on November 6, 2018 (the "Motion") by the Official Committee of Unsecured Creditors (the "UCC") [Docket No. 484].

1. ESL submits this Preliminary Response to promptly correct the record with respect to the various unfounded allegations raised against ESL by the UCC in its Motion, and reserves its right to raise further objections to the specific relief requested, including the proposed discovery schedule, on or before the requested objection deadline of November 14, 2018 at 12:00 p.m.

2. ESL is Sears' largest creditor and has been its most significant source of financing in recent years. ESL is also Sears' largest shareholder. ESL is committed to cooperating with any investigation and is already providing information to the Restructuring Subcommittee (the "Subcommittee") of the Sears Board of Directors (the "Sears Board" or the "Board") and the UCC. ESL will not, however, leave unanswered baseless allegations levied against it by other creditors— or any party—that are completely divorced from the facts, and deliberately ignore that ESL's actions have always been taken in good faith, on fair terms, alongside third parties, regularly reviewed by independent and experienced advisors, and beneficial to all Sears stakeholders.

**BACKGROUND**

3. Since Sears' merger with Kmart in 2005, ESL has supported Sears' initiatives to create and preserve value. As Sears faced the very same increasing challenges that have confronted and continue to confront the entire retail industry—and, in particular, mall-based department stores—ESL remained optimistic for Sears' future and provided financing to permit Sears the opportunity to transform its business. ESL did so alongside other stockholders and third parties, with the review and approval of the majority independent Sears Board and, when appropriate, additional review by committees of independent directors counseled by independent, experienced

financial and legal advisors. ESL's efforts benefited Sears and its stakeholders by providing Sears with liquidity and runway to implement solutions to the challenges it faced, which had the added benefit of allowing Sears to continue meeting its obligations to its creditors (including pensioners) for years. Throughout the period of ESL's involvement, Sears employed tens of thousands of Americans and continued to employ approximately 68,000 individuals as of the petition date.

4. ESL <u>never</u> acquired any assets from Sears to the exclusion of other stockholders. ESL did participate—on a *pro rata* basis along with other stockholders of Sears—in transactions in which Sears rationalized its business through publicly announced spin-offs or rights offerings. These transactions were made available on the same economic terms to all Sears stockholders, terms blessed by independent directors. These transactions generated billions of dollars of liquidity for Sears. Sears also engaged in material transactions with numerous third parties apart from ESL. For example, during the 2017-2018 period, Sears sold substantial real estate assets as well as the Craftsman brand. The transactions, all with non-ESL third parties, generated well north of $1.0 billion in liquidity.

5. ESL also made loans or provided other financing to Sears, in many cases together with third-party lenders. These financing transactions were documented fully, on fair and reasonable terms (including as to collateral, interest rates and maturity dates), and approved in each case by directors unaffiliated with ESL counseled by independent legal and financial advisors. ESL has not acquired any assets from Sears as a result of these financing transactions, whether by foreclosure on collateral or otherwise.

6. ESL has also always been committed to appropriate corporate governance. During all relevant times, the Sears Board has followed prudent corporate governance practices and procedures, based on the recommendations of experts in corporate governance, including Sears'

3

long-time counsel Wachtell, Lipton, Rosen & Katz. Among other things, the majority of the membership of the Sears Board has always been independent both from Sears management and from ESL. Related party transactions were reviewed by the majority independent Board and by subcommittees of the Board comprised entirely of independent directors. The Board and subcommittees were advised by independent third-party advisors, including Centerview Partners, Duff & Phelps and Cushman & Wakefield.

7.  ESL's investments in Sears, and its participation in financing transactions, provided a runway for Sears to implement its strategic turnaround plan and did not result in any "windfall" for ESL. To the contrary, ESL's equity investment in Sears, which was worth more than $12 billion in 2007 and more than $5 billion in 2012, now has a market value of less than $20 million. The value of the equity interests that ESL and other shareholders received by participating on a *pro rata* basis in Sears' spin-offs and rights offerings have also significantly decreased in value. ESL is now Sears' largest creditor with over $2.6 billion in claims. All of this demonstrates ESL's long-term commitment to Sears. On the other hand, ESL's actions have benefitted many of Sears' creditors by enabling them to substantially reduce their exposure to Sears credit risk. For example, in recent years Sears has made substantial contributions to its defined-benefit pension plan (obligations under which are guaranteed in part by UCC member, the Pension Benefit Guaranty Corporation), a plan that has over 90,000 participants today.[2] Moreover, the aggregate exposure of Sears' vendors has been reduced from approximately $2.5 billion in 2014 to approximately $487 million on the date of the filing.[3]

---

[2] In addition, in recent years, Sears has been able to purchase insurance-type products to provide pension benefits as well as provide pensioners with the opportunity to receive lump sum payments. As a result of these efforts, the total number of participants in the Sears pension plan has decreased from approximately 330,000 in 2009 to 90,000 today.

[3] *See* Sears Holdings Corp., Annual Report (Form 10-K) at 45 (Mar. 18, 2014); *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, No. 18-23538-rdd at 79 [Docket No. 3].

4

**RESPONSE**

8.  The UCC was formed just two weeks ago and it acknowledges in the Motion that it has not yet taken any significant investigative steps. Motion at ¶ 3. Nevertheless, the UCC has apparently already prejudged the outcome of its investigation, stating its belief there may be claims against ESL for "siphon[ing]" value from the company in breach of its fiduciary duties and to the detriment of other creditors. *Id.* at ¶ 4. Nothing could be further from reality, and it is irresponsible for the UCC to make such unfounded allegations in a transparent attempt to poison the well against ESL. ESL is confident that any fair investigation will establish that there is no merit to any allegation against ESL. ESL is already cooperating with the investigation and, as the UCC acknowledges, has pledged to cooperate in it. The Motion implies that ESL has been less than forthcoming in its communications with the UCC, resulting in their having received "limited to no information to date." *Id.* at ¶ 7. This is false. On the contrary, ESL engaged with the UCC's counsel as soon as it was appointed, the parties began negotiating a confidentiality agreement shortly thereafter, and the parties held an in-person meeting just hours before the UCC filed its Motion. The only reason the UCC has limited information is that it was appointed only two weeks ago.

9.  Moreover, ESL has been cooperating with the Subcommittee since before the petition date. The Subcommittee has received an initial production of documents from ESL and additional productions will be made in the coming days. While the UCC no doubt has a role in these proceedings, it is critical that any investigation—of any party or of any transaction—be conducted in a manner that is efficient, cost-effective and non-duplicative. Estate resources should not be expended by the UCC without regard to the already existing and more advanced efforts of the Subcommittee. Careful and consistent coordination and cooperation by the UCC with the

5

Subcommittee is both appropriate and necessary. Anything less is a waste of precious estate resources.

10. The principal transaction that the UCC highlights for potential claims against ESL is the July 2015 transaction under which Sears sold 235 Sears and Kmart properties and interests in three joint ventures (including a joint venture involving one of the members of the UCC) to Seritage, a newly formed publicly traded REIT, for approximately $2.7 billion (the "Seritage Transaction"). A review of the undisputed public facts and circumstances of the Seritage Transaction demonstrates that any suggestion that ESL somehow used its status to the detriment of other stakeholders is not only wrong but implausible.

11. The Seritage Transaction was approved by the Sears majority independent Board *and* reviewed by a special committee comprised solely of independent directors known as the Related Party Transaction Subcommittee ("RPTS").[4] In connection with the sale of properties to Seritage, Sears distributed to *all* holders of its common stock a transferable, registered right to subscribe for shares of Seritage. Ninety-seven percent of the rights issued to Sears' stockholders were exercised and therefore participated in the transaction. ESL received subscription rights on a *pro rata* basis with other stockholders. ESL was not treated any better than other stockholders. In fact, ESL agreed to exchange its rights for non-economic shares and partnership units because of Seritage's REIT structure. ESL's agreement to do so resulted in significantly lower voting power at Seritage than ESL had at Sears at the time. Furthermore, the Seritage partnership units held by ESL were significantly less liquid than the shares held by other stockholders. Because ESL was treated differently—but not better—than other stockholders, this portion of the

---

[4] Because the transaction as a whole treated ESL no differently than any other participating Sears shareholder, the RPTS's review and approval was focused on ESL's exchange of common shares for partnership units, as described below, which was the only aspect of the transaction that treated ESL differently (but not better) than other third parties.

6

transaction was reviewed and approved by the RPTS as well as by the majority independent Board.[5]

12.     The UCC's suggestions that Sears did not receive a fair price in the Seritage transaction and that the terms of the Master Lease are unfair to Sears are similarly meritless. The purchase price for the properties was their appraised value (as determined in an extensive exercise by independent experts at Cushman & Wakefield). Duff & Phelps also separately provided to Sears a fairness opinion for the approximately $2.7 billion purchase price and the base rent to be charged by Seritage to Sears.

13.     The UCC also suggests the terms of the Seritage Master Lease were unfair to Sears because it allowed Seritage to "literally evict Sears and re-let the space to tenants capable of paying higher rents." Motion at ¶ 18. This is a gross mischaracterization. The lease structure allowed Seritage to recapture 50% of the space within 202 stores (and 100% of space within 21 stores) for redevelopment. However, the UCC ignores the very public facts that (a) Seritage was required to make a specified lease termination payment to Sears upon each 100% recapture and for less than 100% recaptures, as well as pay expenses relating to repositioning the store into a smaller footprint, and (b) the Master Lease granted Sears its own right to exit unfavorable leases under a "non-profitable property termination" clause, providing Sears with the flexibility to exit unprofitable stores and allowing it to reduce rent by up to 20% per annum. Reflecting this balanced approach, as of September 30, 2018, Seritage had exercised its recapture rights at 70 properties, whereas Sears had terminated, or had notified Seritage that it intended to terminate, the Master Lease with respect to 87 stores. Most importantly, these key terms of the lease structure were fully disclosed

---

[5]   In addition, over $1.1 billion of the Seritage Transaction was financed by third party lenders that provided mortgage and mezzanine financing on standard commercial terms.

7

and accounted for in the independent Cushman & Wakefield appraisals and the Duff & Phelps fairness opinion.

14. The UCC makes reference to a prior derivative shareholder action challenging the Seritage Transaction without explaining that the resolution to the litigation vindicated the fairness of the transaction. The stockholder plaintiffs in this "strike suit" alleged that the Seritage Transaction constituted self-dealing because ESL effectively stood on "both sides of the deal" and, as a result, the court should review the transaction for "entire fairness" and that the transaction was not entirely fair to Sears Holdings because the purchase price for its stores should have been $300 million higher.[6]

15. After the plaintiffs obtained discovery from Sears, the parties settled the case with no admission of wrongdoing by the defendants. During the settlement hearing, Vice Chancellor Laster characterized the claims against ESL and others as a "strike suit."[7] The court went on to observe that it was "quite likely that there is none or minimal harm here," observing that 97% of stockholders participated in the transaction, but noted that it was nonetheless "entirely rational for the defendants to settle this case as they did, because . . . [w]e're talking about litigation that would

---

[6] In fact, the transaction was properly subject to "business judgment" scrutiny. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (1977); *see also Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) (business judgment rule creates "powerful presumption" that "courts will not second-guess [a board's] business judgments"). A heightened "entire fairness" analysis is triggered only where a party allegedly stands "on both sides" of a transaction, dictates the transaction's terms *and* obtains a special benefit "to the exclusion of, and detriment to, the minority stockholders." *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *see also id.* at 721-22 (no self-dealing even though controller stood on both sides of dividend issuance because minority received "proportionate share" of dividends); *Gilbert v. El Paso Co.*, 1988 WL 124325, at *8 (Del. Ch. Nov. 21, 1988) ("To engage in self-dealing . . . the directors must have stood on both sides of the transaction, dictated its terms, and derived a benefit to the exclusion of the shareholders." (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). Any allegation of self-dealing would be defeated by the undisputed circumstances surrounding the transaction, including: (1) the purchase price was set by a third-party appraiser and approved without alteration by the Sears Board (and thus not "dictated" by ESL); and (2) the rights offering was on a *pro rata* basis, such that no unique benefit was enjoyed by ESL at all, much less to the detriment of Sears' other shareholders. In any event, even if the transaction were subject to entire fairness, it would easily survive such scrutiny particularly given the independent appraisals and fairness opinion delivered in support of the transaction.

[7] *In re Sears Holdings Corp. Stockholder Deriv. Litig.*, C.A. No. 11081-VCL, Tr. of May 9, 2017 Hr'g at 31:11 (attached hereto as Ex. A).

8

cost far more to defend than settle."[8] On this basis, the court reduced plaintiffs' requested counsel fee award by 33%, emphasizing the "strike suit" nature of the very allegations that the UCC suggests it will attempt to resurrect in this proceeding.[9]

16.     The Committee's conclusory allegations related to the Sears Hometown and Outlet ("SHO"), Sears Canada and Lands' End transactions, and the transactions in which ESL provided financing to Sears (the "Financing Transactions") are no more persuasive. The Motion does not specifically identify any questionable aspect of these transactions, let alone than any resulted from unfair dealing or involved an unfair exchange of value. Just as with the Seritage Transaction, ESL participated in the other spin-off and rights offering transactions alongside other stockholders on a *pro rata* basis and was not treated any better than any other shareholder. While the Motion asserts, without any basis, that the spin-offs and rights offerings of SHO, Sears Canada, and Lands' End undervalued those companies, these transactions brought hundreds of millions of dollars in liquidity to Sears allowing it to focus on transforming its business. Nor does the Motion plausibly suggest that SHO, Sears Canada or Lands' End would have benefitted from continuing to be affiliated with Sears, or that their continued affiliation with Sears would have benefitted Sears or somehow prevented these bankruptcy proceedings.

17.     As to the Financing Transactions referenced the Motion, the UCC lists certain transactions in which ESL participated and makes the conclusory assertion that they "do not appear to have provided the obligors thereunder with reasonably equivalent value in exchange for the debt incurred and liens granted in connection therewith." Motion at ¶ 23. No basis is provided for this allegation. While ESL will not refute each of these allegations in detail at this time, suffice it to say the UCC's bare assertions ignore that each of the financing transactions was fully documented

---

[8]    *Id.* at 30:1-2, 31:1-5.
[9]    *Id.* at 31:11.

9

and conducted on fair and reasonable terms, with market-standard collateral, interest rates, and maturity dates.  Any allegation that ESL received "sweetheart" deals is plainly wrongheaded and intended to inflame opinion against ESL.  Indeed, third parties frequently participated in Financing Transactions alongside ESL, demonstrating their market terms.  The transactions were approved by the RPTS, counseled by independent legal and financial advisors.  Sears always received appropriate consideration from ESL and its co-lenders.  Thus, just as with respect to the spin-off and rights offerings, ESL is confident that any fair investigation of the Financing Transactions will establish that no claims exist against ESL.

Dated:  November 8, 2018

        CLEARY GOTTLIEB STEEN & HAMILTON LLP

        *James L. Bromley*_____

        James L. Bromley
        Sean A. O'Neal
        Jennifer Kennedy Park
        Andrew Weaver
        Rahul Mukhi
        One Liberty Plaza
        New York, New York 10006
        Telephone: (212) 225-2000
        Facsimile: (212) 225-3999

        *Attorneys for ESL*

# EXHIBIT A

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE SEARS HOLDINGS CORPORATION  :  Consolidated
STOCKHOLDER AND DERIVATIVE        :  Civil Action
LITIGATION                        :  No. 11081-VCL

- - - -

Chancery Courtroom No. 12B
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Tuesday, May 9, 2017
2:00 p.m.

- - - -

BEFORE: HON. J. TRAVIS LASTER, Vice Chancellor.

- - - -

SETTLEMENT HEARING AND RULINGS OF THE COURT

_____

CHANCERY COURT REPORTERS
Kent County Courthouse
414 Federal Street
Dover, Delaware 19901
(302) 735-2113

1  range of reasonableness, as I think it is quite likely
2  that there is none or minimal harm here.  And so I am
3  approving the settlement on that basis.
4             Where I think this factor enters in
5  quite heavily, however, is in the assessment of the
6  benefit for purposes of the attorneys' fee award.  The
7  attorneys' fee has been requested as if the benefit was
8  the full 40 million.  As I said, only in a truly
9  formalistic sense is that the real benefit here, because
10 certainly for the Lampert folks, with their ballpark
11 50 percent, 53 percent interest, this is transferring
12 money from one pocket to another.  I think that's also
13 true for the large stockholder.  Really, the only people
14 for whom this transfer has any potential differential
15 impact is the unaffiliated equity.  And the vast majority
16 of them, 97 percent, are participating in the new entity.
17            So let's assume that I take the 40
18 million and think of it in terms of who is actually
19 benefiting by excluding the people where money is just
20 moving from one pocket to another.  If I take the
21 25 percent measure as the unaffiliated, this is really a
22 $10 million benefit.  If I take the more realistic
23 2.7 percent benefit, this is really a $1,080,000 benefit.
24 As I suggested in my discussions with counsel, I think

31

1   that's why it is entirely rational for the defendants to
2   settle this case as they did, because what we are talking
3   about here is negative value litigation.  We're talking
4   about litigation that would cost far more to defend than
5   settle.  And if one can settle it by moving money from
6   one pocket to another and taking off an amount for an
7   attorneys' fee that is less than what it would cost to
8   get to trial or summary judgment or something meaningful,
9   that is coming out ahead for the defendants.  The problem
10  with that, in my view, is negative value litigation is
11  the definition of a strike suit.  It's something where it
12  has settlement value only because it costs more to
13  litigate than the benefit you will ultimately confer on
14  stockholders or, here, on the company indirectly for the
15  benefit of its investors.
16                    So what do I do with that?  Well, the
17  $6 million request is based on this $40 million benefit,
18  which, again, I think is only there in the most
19  formalistic of senses.  I also think that granting a fee
20  that large incentivizes the bringing of this type of
21  litigation.  I can understand where you might originally
22  have said, "Oh, my goodness, this is an interested
23  transaction."  But once people are participating at the
24  level of 97 percent, even if that doesn't immediately