Peter M. Gilhuly, Esq.
Jeffrey E. Bjork, Esq.
Ted A. Dillman, Esq.
355 South Grand Ave, Ste. 100
Los Angeles, CA 90071-1560
and
Marc A. Zelina, Esq.
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Tel:    (212) 906-1200
Fax:    (212) 751-4864

*Attorneys for Simon Property Group, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **SEARS HOLDINGS CORPORATION.,** *et al.,* | : | **Case No. 18-23538 (RDD)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF SIMON PROPERTY GROUP, L.P. TO THE DEBTORS' MOTIONS FOR APPROVAL OF BIDDING PROCEDURES AND LEASE REJECTION PROCEDURES**

Simon Property Group, L.P., as landlord and/or managing agent ("**Simon**"), by and through its undersigned counsel, submits this limited objection and reservation of rights (this "**Limited Objection**") to the *Debtors' Motion for Approval of Global Bidding Procedures* [Docket No. 429] (the "**Motion**")[2] filed by the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), and the Debtors' motions for approval of *de minimis* asset sale and abandonment procedures [Docket No. 427], bidding procedures related to the Sears Home Improvement business sale [Docket No. 450], and procedures for rejection of leases [Docket No. 24], in each case, to the extent the objections raised herein or joined hereby apply to such motions. In support of this Limited Objection, Simon respectfully states as follows:

**PRELIMINARY STATEMENT**

1.  Through the Motion, the Debtors seek approval of the terms that will govern the timing and substance of an expedited sale of, among other assets, approximately 400 of the Debtors' stores that have not been publicly identified, but are, according to the Debtors, "four-wall EBITDA positive," as well as certain "other viable stores" (the "**Go Forward Stores**") in a "going concern" transaction. In fact, more than three weeks have transpired, no substantial detail have been provided, and the feasibility of the Debtors' proposal is an unknown. Simon does not oppose the effort to sell the Go Forward Stores as a going concern as one possible outcome of these Chapter 11 Cases (as hereinafter defined). However, the Debtors' commitment to this path to the

---

[2] Capitalized terms used, but not otherwise defined, in this Limited Objection shall have the meaning set forth in the Motion or the *Interim Order (I) Authorizing the Debtors to (a) Obtain Post-Petition Financing, (b) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (c) Utilize Cash Collateral; (ii) Granting Adequate Protection to the Prepetition Secured Parties; (iii) Modifying the Automatic Stay; (iv) Scheduling Final Hearing; and (v) Granting Related Relief* [Docket No. 101] (the "**Interim ABL DIP Order**"), as applicable.

2

exclusion of soliciting bids for any or all of their assets that may provide greater value, while simultaneously providing no detail as to how the Go Forward Stores will be operated on a profitable basis, is misplaced.

2.   The Debtors' exclusive focus on a going concern transaction ignores their fundamental duty to maximize the value of their estates. The Debtors' proposed bidding process should be expanded to encourage and consider any viable bids for their assets and to promote a robust competitive bidding environment that will enable the Debtors and other stakeholders to more fully assess the value maximizing path for these cases. This path may or may not be a going concern sale for the Go Forward Stores. Indeed, many major retailers that have recently conducted sale processes under section 363 of the Bankruptcy Code have done so by selling pieces of their business to different interested parties to maximize the price obtained for each piece.[3]

3.   The Debtors are no exception. There are natural buyers for different components of their businesses, including the Go Forward Stores (whether in one package or many). Indeed, Simon and a group of other landlords recently delivered a non-binding proposal to the Debtors and the creditors' committee to express interest in acquiring certain of the Debtors' and their affiliates' real estate assets located in or appurtenant to the landlords' shopping centers, some of which are among the Go Forward Stores, and a willingness to provide debtor-in-possession financing to support such a process if needed.

4.   The Debtors' apparent intent to exclude proper vetting of alternatives to the largely undefined Go Forward Stores sale is even more troubling in light of their rapidly deteriorating liquidity.[4] This approach creates a substantial risk that the Debtors may attract few bids at the end

---

[3] For supporting cases, see the citations in ¶ 13.

[4] Per the Approved Budget for the Interim ABL DIP Order, during the fourth quarter of 2018 (which should be a strong quarter for a retailer), net availability is projected to decline by over $193 million from $278.4 million to $85.1 million in the week of January 12, 2019. See Interim ABL DIP Order, Ex. A.

3

of this process (and quite possibly only a single bid from insider ESL Partners, L.P. ("**ESL**") and/or its chairman and chief executive officer Edward Lampert ("**Lampert**") who is also chairman of the Debtors and until very recently, their chief executive officer as well); and, when faced with declining liquidity and no other sale options properly vetted through a competitive bidding process, the Court and the other stakeholders may be pressed into a Hobson's choice—to accept a sub-optimal sale (possibly to an insider) or face the risk of administrative insolvency and potentially chapter 7 conversion.[5]  This Court should not countenance such a process particularly here where there is no reasonable justification for a disjointed and myopic approach.

5.    Further, the liquidity and other fundamental challenges that the Debtors have admitted they are facing raise substantial questions about the Debtors' ability (or the ability of any buyer not committing vast additional capital at closing) to provide adequate assurance of future performance in connection with the assumption and assignment of the Debtors' unexpired leases and executory contracts.  This is not a simple matter of a restructuring predicated on a broken balance sheet.  As evidenced by the Approved Budget annexed to the Interim ABL DIP Order, the Debtors' substantially deteriorating liquidity during what should be a key selling season heightens concern about the go-forward viability of any proposed going concern.  Accordingly, Simon requests that any stalking horse or successful bidder for any store be required to deliver specific information, outlined in detail below, to satisfy the Debtors' burden to provide adequate assurance.

6.    In sum, for the reasons set forth herein, Simon respectfully requests that the Court deny the relief requested by the Debtors unless and until all bidding and lease rejection procedures

---

[5] In this regard, Simon shares the Committee's (as hereinafter defined) concern, as stated in its motion for a Rule 2004 examination, that "the Bidding Procedures Motion and related procedures appear geared toward a process to facilitate ESL's acquisition of material assets of the Company at deflated prices (potentially by an inappropriate credit bid) as opposed to ensuring a full and fair opportunity for a true value-maximizing market test of the Debtors' assets." *See Motion of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, Et Al., for the Entry of an Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004, 9006, 9016 Authorizing Expedited Discovery of the Debtors and Third Parties* [Docket No. 484] at ¶ 8.

are appropriately modified to address these concerns and the others set forth below. Simon further notes its confidence that the Committee and its professionals will vet and address these issues, and fully supports the Committee's efforts to establish a fair and robust sale process.

## BACKGROUND

A.  **The Debtors' Chapter 11 Cases**

7.  On October 15, 2018 (the "**Petition Date**"), the Debtors commenced the above-captioned cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"). The Debtors are continuing in possession of their property and are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 24, 2018, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "**Committee**"), of which Simon is a member and co-chair.[6] *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 276]. No trustee or examiner has been appointed in the Chapter 11 Cases.

B.  **Simon and Its Relationship to the Debtors**

8.  As noted above, Simon (through its wholly-owned or partially owned subsidiaries) owns or operates numerous shopping centers located throughout the United States at which the Debtors lease space pursuant to written leases or operate in Simon's properties under various reciprocal easement agreements (each a "**Lease**" or "**Reciprocal Easement Agreement**") for the stores listed on the attached **Exhibit A** (collectively, "**Premises**").

9.  As set forth on Exhibit A, the Debtors currently lease space for 25[7] of their retail

---

[6] Simon submits this Limited Objection in its capacity as a landlord and creditor of the Debtors, and not in its capacity as a member or co-chair of the Committee.

[7] This figure does not include (i) three Simon-owned spaces (Burlington Mall, Midland Park Mall and Ocean County Mall) formerly leased to the Debtors, which leases were terminated effective September 1, 2018, or (ii) six Simon-owned spaces in Mills Malls (Arizona, Grapevine, Great Mall, Philadelphia, Potomac and Sugarloaf) currently leased to Sears Hometown and Outlet Stores, Inc., a subsidiary of the Debtors that is not a Debtor in these Chapter 11 Cases.

5

and service locations from Simon, including space operated by Sears Auto Centers, which are generally subject to the same applicable Lease and/or Reciprocal Easement Agreements as the main stores.  In addition, the Debtors own, or lease from a third party, the space for another 22 retail and service locations identified on Exhibit A, which operate within Simon shopping centers subject to Reciprocal Easement Agreements.

10. Further, Simon, through a wholly-owned affiliate (i.e., SPS Portfolio Holdings LLC) is party to a newly formed joint venture (the "**JV**") with Seritage Growth Properties, Inc. ("**Seritage**"), a non-debtor publicly traded real estate investment trust.  As discussed in the First Day Declaration,[8] the JV was formed in April 2015 when certain Debtor-entities contributed certain owned properties located at Simon shopping centers to the JV in exchange for a 50% noncontrolling interest in the JV; the Debtors simultaneously leased back the properties held by the JV and transferred their interests in the JV to Seritage.  *See* First Day Declaration, ¶ 46.  The purpose of the JV was to facilitate redevelopment of these properties or portions thereof that were not fully utilized.  Subsequently, in November 2017, Simon and its affiliates acquired additional interests in certain real estate assets and/or rights to terminate leases related to 12 Sears stores located at Simon malls (including 5 retail and service locations previously held in the JV), in order to redevelop these properties or portions thereof.  The JV with Seritage now covers the former Sears properties located at 5 Simon malls, which are included on Exhibit A.  As further noted in the First Day Declaration, similar real estate joint ventures were entered into with other shopping center landlords (General Growth Properties (now part of Brookfield Properties Retail Group) and The Macerich Company).  *See id.*

11. Seritage owns the space for 13 retail and service locations identified on Exhibit A

---

[8] The "**First Day Declaration**" refers to the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* [Docket No. 3].

in which the Debtors are tenants, which operate within Simon shopping centers subject to Reciprocal Easement Agreements.

## OBJECTION

**A.    The proposed global bidding procedures should be modified to concurrently solicit any and all available bids to maximize value.**

12.    The Debtors' proposed global bidding procedures and procedures for the sale of the Go Forward Stores must be modified to allow for submission and fair consideration of bids involving the Go Forward Stores of any structure, whether going-concern bids or otherwise. It is axiomatic that a debtor-in-possession bears a fiduciary duty to its bankruptcy estate to maximize the value of the estate's assets. *See In re Signature Apparel Grp. LLC*, 577 B.R. 54, 98 (Bankr. S.D.N.Y. 2017) ("The fiduciary obligations of a debtor in possession include, among others, the duty of loyalty, which includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate." (internal quotation marks omitted)). Moreover, directors and officers of any business are obliged, in keeping with their state law fiduciary duties to their company, to obtain the highest price for the company's assets once they are placed up for sale. *See Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173 (Del. 1986) ("[C]oncern for non-stockholder interests is inappropriate when an auction among active bidders is in progress, and the object no longer is to protect or maintain the corporate enterprise but to sell it to the highest bidder.").

13.    Although not a model of clarity, the proposed global bidding procedures appear to exclude bids other than going concern bids for the Go Forward Stores. The duty to obtain the highest available price demands that the Debtors actively solicit (and be open to considering) any and all bids that will maximize value. While it is often the case that going concern bids provide maximum value, that is not universal, particularly in retail chapter 11 cases like these. Rather, a

7

"sum of the parts" may maximize value when unwedded to a nominal "going concern" sale, a strategy that has been deployed in other major retail section 363 sales over recent years. *See, e.g.*, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va.) (real estate, intellectual property, certain going concern businesses, and de minimis assets sold separately); *In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn. Mar. 30, 2017) (approving bid procedures permitting "partial" bids for individual assets; inventory, intellectual property, store leases, and certain going concern assets sold separately); *In re The Great Atlantic & Pacific Tea Co., Inc.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (approving bid procedures permitting bids for individual stores already subject to "going concern" stalking horse bids; store leases, intellectual property, and certain going concern assets sold separately).

14.     Moreover, it is vital that all forms of bids involving the Go Forward Stores be subject to the same timeline. The Debtors have proposed a process focused on an immediate disposition of the Go Forward Stores, on their own, followed by a delayed marketing and sale of their other assets in their discretion. By doing so, the Debtors will exclude bidders that may provide greater value than a bid from insider ESL or another bidder for the Go Forward Stores. Such a process creates a significant risk that the Debtors will have few bids (and quite possibly only a single bid from insider ESL) at the end of this process. With declining liquidity and no other sale options properly vetted through a competitive bidding and auction process, the Court and the other constituents in these cases may be pressured to accept a sub-optimal sale rather than risk administrative insolvency and chapter 7 conversion. There is no reason for this Court to allow a process to be put in place of which such a Hobson's choice is a predictable result when there is no reasonable justification not to seek the broadest and most robust auction possible.

15.     The Debtors are no exception. Their assets encompass distinct components—*e.g.*, valuable brands and other intellectual property, inventory and receivables, and owned and leased

8

real estate (including the Go Forward Stores)—and these pieces are readily divisible and have different natural buyers. Indeed, as noted above, Simon and a group of other landlords recently delivered a non-binding proposal to the Debtors and the Committee to express interest in acquiring certain of the Debtors' and their affiliates' real estate assets located in or appurtenant to the landlords' shopping centers (some of which Simon expects are among the Go Forward Stores, although the list of these stores has not been made public) and a willingness to provide debtor-in-possession financing to support such a process if needed. Other bidders will likely be interested in intellectual property assets or inventory or receivables, but may not be interested in bidding on real estate assets. Thus, at a minimum, the Debtors should be expressly required to solicit and consider all bids for any combination of their assets, including the Go Forward Stores, and to justify the selection of the successful bidder at the end of the process as against all such bids. *See In re Claire's Stores, Inc.*, Hr'g Tr. at 216:25-217:2 (June 15, 2018) (Walrath, J.) ("The major problem that I have with the process is that bidders were not specifically told that they can submit bids in any format. The fact that the RSA was attached to the notice and given to bidders and that the debtors specifically asked for an amount in excess of the first liens or necessary to pay off the first liens under the RSA I think discourages other bids.... If other bids are considered or if others are told that they can present a bid in whatever format they have, both the debtor and the Court can evaluate whether it is better than what the RSA is.... For the debtor not to proceed in this manner I think is not in accordance with Section 363 and is not the debtor acting in its fiduciary duty.").

16. In fact, the rapidly declining liquidity supposedly justifying the accelerated sale process actually militates strongly in favor of a one-step process rather than a two-step process, for which there may not be sufficient resources. While the Debtors' debtor-in-possession financing facility (which remains subject to final approval) requires the Go Forward Stores to be

9

sold by February 8, 2019, there is no reason that the Debtors could not concurrently solicit and consider alternatively-structured bids on the same timeline.[9]

17. In short, the Debtors should actively solicit and give due consideration to any and all bids for their assets in parallel, in keeping with the fiduciary duties of the Debtors and their directors and officers.

> **B.    The requirements for adequate assurance in all sale and bidding procedures should be clarified and expanded with details in light of the particular issues facing the Debtors' business.**

18. With the Debtors' business continuing to struggle, the adequate assurance requirements should carry heightened importance, especially in the context of any going-concern transaction. A buyer that plans to continue to operate Sears and Kmart stores (or similar retail businesses) must demonstrate that they, unlike the Debtors, can do so on a profitable basis, including the ability to justify selling, general and administrative costs, for assumption and assignment of any store lease to be permitted.

19. Section 365(b)(1)(C) of the Bankruptcy Code requires that for a debtor to assume or assume and assign any unexpired lease, it must provide adequate assurance of future performance under the lease. 11 U.S.C. § 365(b)(1)(C). Courts have held that a debtor's history of financial losses, if not contradicted with evidence of future profitability, may preclude a finding of adequate assurance. *See, e.g.*, *In re DWE Screw Prods., Inc.*, 157 B.R. 326, 332 (Bankr. N.D. Ohio 1993) (denying assumption of lease where debtor's "collective disbursements [exceeded]

---

[9] While Simon does not object to the length of the sale process in and of itself, Simon does note that the process is highly abbreviated, particularly for a process playing out over the holiday season (the Debtors seek to have bids be due three days after Christmas). This proposed timeline is not a design which would likely maximize bidders and therefore value. Further, as the Go Forward Stores are presumably the most valuable and best performing stores, one would expect that such assets should be best positioned for the longest, rather than the shortest, sale process.

receipts" and "monthly expenses extrapolated over an annual basis exceed Debtor's gross [annual] sales").

20. Here, the Debtors' recent history of flagging financial performance is irrefutable, and it appears to be continuing during the Chapter 11 Cases. Per the Approved Budget for the ABL DIP Facility, during the fourth quarter (which should be one of if not the strongest period for a national retailer), net availability is projected to decline by over $193 million, from $278.4 million to $85.1 million in the week of January 12, 2019. *See* Interim ABL DIP Order, Ex. A. The Go Forward Stores will not be immune to these struggles (although it is impossible to know, given the lack of disclosure by the Debtors as to the stores included in the Go Forward Stores or the plan for structuring a sustainable going concern). Accordingly, Simon requests that any non-current landlord stalking horse or successful bidder for any Go Forward Stores that intends to operate a Sears, Kmart, or similar business as a continued going concern be required to deliver with its adequate assurance information: (a) historical financial statements for the buyer's previous three fiscal years and any available subsequent financials; (b) a five-year business plan for the Go Forward Stores to be acquired, including expressly addressing how the buyer's projected overhead and selling, general, and administrative costs will be reduced; (c) five years of pro forma financial statements; (d) a description of the buyer's experience operating a retail business; and (e) evidence of committed financing sufficient to fund the business plan. For stalking horses or buyers of any other stores, the buyer should be required to deliver: (x) two years of historical financial statements; (y) three years of pro forma financial statements; and (z) a description of the buyer's intended use for the store and the buyer's experience operating the type of business to be run in the store.

21. Finally, all of the Premises are located in "shopping centers" as that term is used in section 365(b)(3) of the Bankruptcy Code. *See, e.g., Androse Assocs. of Allaire, LLC v. A&P (In*

11

*re A&P)*, 472 B.R. 666, 677 (Bankr. S.D.N.Y. 2012) ("[C]ourts have interpreted the term [shopping center] on a case-by-case basis and generally consider, among other criteria, combination of leases, whether all leases are held by single landlord, presence of common parking area, existence of master lease, and contiguity of stores."); *In re Joshua Slocum, Ltd.,* 922 F.2d 1081 (3d Cir. 1990). Accordingly, any adequate assurance information underlying a proposed assignment of any store lease must address all requirements of section 365(b)(3) of the Bankruptcy Code, and this requirement should be written directly into all of the Debtors' proposed bidding procedures.

    **C.**    **All sale and bidding procedures should require the Debtors to file a separate motion or adversary proceeding to seek to sell any asset free and clear of, or otherwise impair, any easements or similar interests.**

22.    Last, as noted above, many (if not all) of the Debtors' real estate assets or rights will be subject to interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property, such as easements, reciprocal easement agreements, operating or redevelopment agreements, ground leases, covenants, licenses, or permits, supplements or rights or interests applicable to such real estate assets or rights (collectively, "**Restrictive Covenants**") that are not executory or that run with the land. The Debtors cannot sell real estate assets free and clear of these Restrictive Covenants or otherwise impair them. Moreover, the Restrictive Covenants are often highly complex and have varying specific terms and characteristics based on differences in conveyance documents, recording status, or applicable state law. Thus, a compressed timeframe is not tenable for parties to properly evaluate any such proposed sale free and clear of Restrictive Covenants.

23.    Yet, the various sale and bidding procedures would arguably give the Debtors an ability to seek to sell such real estate rights or assets free and clear of these interests, without giving parties proper notice and a fair opportunity to protect their rights—for instance, by selling assets

12

free and clear of easements and similar interests on just ten days' notice of the deadline to object (or thirteen days over Christmas as to the Go Forward Stores), with no further legal support required on the Debtors' part. *See, e.g.*, Motion ¶¶ 24–25.

24. Moreover, the Debtors bear the burden of proving that they are permitted to sell free and clear of any interest. *See In re Flour City Bagels, LLC*, 557 B.R. 53, 88 (Bankr. W.D.N.Y. 2016) (denying debtor's motion to sell property free and clear "[b]ecause [debtor] has not carried its burden of proof" to demonstrate compliance with section 363(f) of the Bankruptcy Code). As a general matter, the Debtors cannot sell free and clear of Restrictive Covenants under applicable law as such rights have been found to be non-executory (and therefore not subject to rejection) and/or to run with the land. Accordingly, Simon does not believe that such Restrictive Covenants can generally be stripped as part of the sale process, but to the extent the Debtors seek such relief, they should be required to prove, with specific reference to the particular Restrictive Covenants at issue, that applicable law permits a sale free and clear of them. The general mechanism of selling "free and clear" if a party does not object is not sufficient to provide landlords and other parties with interests in such Restrictive Covenants an appropriate opportunity to (i) understand exactly which Restrictive Covenants, if any, the Debtors seek to sell free and clear of, and (ii) provide interested parties adequate opportunity to address these issues. The Debtors' proposed procedures effectively flip the burden of proof on its head. Accordingly, Simon submits that the procedures should be modified to make clear that, should the Debtors seek to sell free and clear of any Restrictive Covenants, the Debtors must address each particular interest on its merits and the strictures of section 363(f) of the Bankruptcy Code by seeking such relief by motion or adversary proceeding.

25. While Simon endeavored to address this issue consensually, the parties have not yet reached an acceptable resolution. Accordingly, Simon objects to all sale and bidding

13

procedures that do not require a motion or adversary proceeding and hearing and a longer timeline for any "free and clear" sale request applicable to the Restrictive Covenants.

### D. No assumption or rejection procedures should permit severing integrated leases absent a separate motion and full and fair notice.

26. Similarly, in connection with any lease rejection, assumption and assignment processes, Simon requested that similar language to that included with respect to master leases in the *Interim Order Approving (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement* [Docket No. 337] be included in the applicable orders to make clear that the generic rejection, assumption and assignment process cannot be used to seek to sever a master lease, but rather that such a proceeding would require separate motion or adversary proceeding. Severing a master lease requires the Debtors to make an extensive factual and legal showing, and the procedures should allow for adequate time to litigate these issues. However, acceptable language has not been reached. Accordingly, Simon submits that the applicable procedures should be appropriately modified to ensure that should the Debtors seek to sever a master lease, counterparties will be provided appropriate notice and opportunity to object.

### JOINDER AND RESERVATION OF RIGHTS

27. Simon reserves the right to supplement and amend this Limited Objection and introduce evidence at the hearing on approval of the Motion and this Limited Objection. Further, Simon reserves the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the Motion.[10]

28. To the extent consistent with the objections expressed herein, Simon also joins in

---

[10] Simon has also raised certain other issues with and proposed language to the Debtors' counsel related to the proposed global bidding procedures [Docket No. 429], the *de minimis* asset sale procedures [Docket No. 427], the bidding procedures related to the Sears Home Improvement business sale [Docket No. 450], and the procedures for rejection of leases [Docket No. 24]. While Simon believes that these issues will be resolved consensually, language has not yet been agreed, so Simon reserves all rights with respect thereto, including the right to file supplemental objections as needed.

14

the objections of the Committee and other shopping center lessors to the relief sought by the Debtors in these Chapter 11 Cases.

## CONCLUSION

Fundamentally, while Simon does not oppose the effort to sell the Go Forward Stores as part of a "go forward plan," Simon believes that it is critical that the Debtors' sale process also concurrently solicit bids for smaller subsets of the assets. This will allow the Debtors and their stakeholders to fully vet alternative sale possibilities and avoid a scenario where the Debtors have only a sub-optimal "go forward" sale, but are rapidly running into a liquidity wall and no longer have a viable path to effectuate value-maximizing alternatives. Such risks can be mitigated by appropriate planning at this juncture, and Simon urges the Court to require an open and robust sale process.

[*Remainder of page intentionally left blank.*]

WHEREFORE, Simon respectfully requests that this Court deny the Motion unless the bidding procedures and the order approving them (a) clearly and unequivocally invite the submission of and require equal consideration of any and all potential bids for the Debtors' assets that include any Go Forward Stores on a single timeline, (b) incorporate the adequate assurance requirements requested above, (c) require that any sale proposed to be free and clear of easements and similar interests be sought by separate motion on regular notice, and (d) grant such other relief as the court deems just and proper.

Dated:  November 9, 2018
        New York, New York

/s/ Marc A. Zelina
Peter M. Gilhuly (*pro hac vice* admission pending)
Jeffrey E. Bjork (*pro hac vice* admission pending)
Ted A. Dillman (*pro hac vice* admission pending)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:        peter.gilhuly@lw.com
              jeff.bjork@lw.com
              ted.dillman@lw.com

Marc A. Zelina
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:        marc.zelina@lw.com

*Attorneys for Simon Property Group, L.P.*