# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Richard L. Levine**
+1 (212) 310-8286
richard.levine@weil.com

November 14, 2018

<u>Via ECF and Email</u>
Honorable Shelley C. Chapman
United States Bankruptcy Judge
Southern District of New York
One Bowling Green, Rm. 623
New York, NY 10004-1408
scc.chambers@nysb.uscourts.gov

Re: *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (SCC)(<u>Maverick Claims</u>)

Dear Judge Chapman:

We are counsel for Lehman Brothers Holdings Inc. ("<u>LBHI</u>").  We have conferred with Shearman & Sterling LLP, counsel for claimants Maverick Long Enhanced Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Neutral Fund, Ltd., Maverick Fund USA, Ltd., Maverick Fund II, Ltd. and Maverick Fund, L.D.C. (collectively, "<u>Maverick</u>" and, together with LBHI, the "<u>Parties</u>").

As Your Honor may be aware, by Opinion and Order dated September 30, 2018 (copy enclosed), District Judge Ronnie Abrams reversed Your Honor's May 12, 2017 Order granting LBHI's Five Hundred Nineteenth Omnibus Objection to Claims (No Liability Claims) [*see* Docket No. 55346] and remanded the case for further proceedings (the "<u>District Court Order</u>").  Among other things, the District Court ruled that Section 562 of the Bankruptcy Code did not apply to the Maverick claims.  The Conclusion of the District Court Order included the following language:

> On appeal, Lehman has continued to assert a variety of arguments related
> to its liability in the event Section 562 does not apply.  The bankruptcy
> court did not rule on these issues, nor has this Court expressed any opinion
> as to their merit.  These matters are most appropriately considered in the
> first instance by the bankruptcy court.  (District Court Order at 17.)

Counsel for the Parties have conferred and agree that the District Court Order is interlocutory and not a final decision, judgment, order, or decree within the meaning of 28 U.S.C. § 158(d)(1). The Parties, therefore, have entered into the enclosed stipulation memorializing that agreement and providing

Honorable Judge Chapman
November 14, 2018
Page 2

**Weil, Gotshal & Manges LLP**

that neither party waives any rights whatsoever with respect to a future appeal of the District Court Order by waiting until there is a final judgment in the case to appeal.

The Parties now jointly request, consistent with their desire to move the case forward, that this Court schedule a conference to discuss next steps so this Court is best positioned to address the issues before it on remand.

Respectfully submitted,

Richard L. Levine

cc:     William J.F. Roll, III, Esq. (Shearman)
        Solomon J. Noh, Esq. (Shearman)
        Randall Martin, Esq. (Shearman)
        Garrett A. Fail, Esq. (Weil)

Enclosures:

        District Court Order
        Stipulation Regarding Appeal of District Court Order, dated November 14, 2018.

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: SEP 3 0 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: LEHMAN BROTHERS HOLDINGS
INC.

Chapter 11 Case No. 08-13555 (SCC)

MAVERICK LONG ENHANCED FUND,
LTD., MAVERICK NEUTRAL LEVERED
FUND, LTD., MAVERICK NEUTRAL
FUND, LTD., MAVERICK FUND USA,
LTD., MAVERICK FUND II, LTD., AND
MAVERICK FUND, L.D.C.,

                    Appellants,

v.

LEHMAN BROTHERS HOLDINGS INC.,

                    Appellee.

No. 17-CV-4203 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Appellants, a collection of Maverick funds (collectively, "Maverick"), appeal from an order of the United States Bankruptcy Court for the Southern District of New York (Chapman, *J.*) disallowing and expunging Maverick's claims against Lehman Brothers Holding Inc. ("LBHI"), a Chapter 11 debtor. For the reasons set forth below, the order of the bankruptcy court is reversed and this matter is remanded for further proceedings.

## BACKGROUND

In 2005, each of the Appellant Maverick entities separately entered into a prime brokerage agreement ("Prime Brokerage Agreements") with Lehman Brothers Inc., which signed on behalf of itself and certain affiliates, one of which was Lehman Brothers International (Europe) ("LBIE," collectively with LBHI, "Lehman"). *See* App. 584. Pursuant to these agreements, LBIE was

Case 1:17-cv-04250-RA   Document 15   Filed 04/30/18   Page 2 of 1

required, among other things, to maintain custody of Maverick's cash and securities, execute trades, and return Maverick's property, held as collateral, upon request. App. 574–80. The Prime Brokerage Agreements also contained provisions granting LBIE certain contractual rights in the event of a Maverick default. App. 575–76. At the same time, the Maverick entities were parties to a separate set of contracts with LBIE relating to the borrowing of securities to facilitate "short" trades and the provision of margin loans. Under the terms of these agreements, Maverick periodically owed LBIE various amounts.

Meanwhile, Maverick entered into a guarantee with LBHI (the "Guarantee") regarding all of the Maverick property custodied with LBIE. App. 646–49. Governed by New York law, the Guarantee was "absolute and unconditional." App. 647. The Guarantee also was for payment rather than collection, meaning that Maverick was under no obligation to pursue collection efforts against LBIE in the event of a default and could proceed directly against LBHI. App. 647. The purpose of the Guarantee was to protect Maverick if its property became trapped by virtue of an LBIE bankruptcy.

On September 15, 2008, LBIE commenced administration proceedings pursuant to the English Insolvency Act 1986. The same day, LBHI commenced Chapter 11 bankruptcy proceedings in the United States. App. 39. On September 22, 2009, Maverick timely filed claims against LBHI seeking to enforce the Guarantee in that entity's chapter 11 proceedings. App. 535. The bankruptcy court confirmed the Modified Third Amended Joint Chapter 11 Plan of LBHI and its affiliated debtors. App. 35–95. The Plan provides for partial payments to be made to holders of guarantee claims such as Maverick's, provided that the bankruptcy court allows them.

During this period, Maverick and LBIE engaged in negotiations concerning the resolution of their respective claims against one another in connection with LBIE's administration

2

proceedings. On March 30, 2012, LBIE and Maverick entered into a Deed of Settlement

("Settlement Agreement"), which provided for a netting of certain amounts owed to Maverick on

the basis of its property custodied by LBIE against amounts owed by Maverick on account of its

margin loans and short positions. App. 249–281. The Settlement Agreement provided for

Maverick to pay a net amount of $30 million to LBIE. App. 252.

On the basis of United Kingdom bankruptcy laws invoked by LBIE, the Settlement

Agreement credited Maverick with the market value of its property at the time the agreement

became effective, which was $101.9 million. This stands in contrast to the $118.1 million market

value when both Lehman entities entered bankruptcy proceedings, the default date for assessing

damages under Chapter 11. Therefore, Maverick contends, it has a claim against LBHI, the

guarantor, for the difference between the amount with which it was credited under the Settlement

Agreement and the market value of its securities on the day bankruptcy proceedings began.

## PROCEDURAL HISTORY

On June 22, 2016, LBHI filed its objection to Maverick's claims. ECF No. 282. The

bankruptcy court heard argument on March 24, 2017, at which point it issued an oral ruling,

followed by a supplemental written order, disallowing and expunging Maverick's claims. ECF

No. 1. Maverick timely filed its notice of appeal with this Court. ECF No. 1. After briefing was

complete, the Court held oral argument. ECF No. 15.

## LEGAL STANDARD

District courts have appellate jurisdiction over "final judgments, orders, and decrees" of

bankruptcy courts under 28 U.S.C. § 158(a)(1). "A district court reviews a bankruptcy court's

findings of fact for clear error and reviews its legal conclusions *de novo*." *Davidson v. AMR Corp.*

(*In re AMR Corp.*), 566 B.R. 657, 663 (S.D.N.Y. 2017) (citation omitted). "A finding of fact is

3

clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 469 (2d Cir. 2017) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). By contrast, "[h]armless error, meaning an error not inconsistent with substantial justice or that does not affect the parties' substantial rights, is not grounds for reversal." *McNerney v. ResCap Borrower Claims Trust (In re Residential Capital, LLC)*, 563 B.R. 477, 485 (S.D.N.Y. 2016). "A district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Margulies v. Hough (In re Margulies)*, 566 B.R. 318, 328 (S.D.N.Y. 2017) (citation omitted).

## DISCUSSION

The bankruptcy court relied on two independent bases for concluding that Maverick's claims against LBHI should be disallowed and expunged: (1) Section 562 of the Bankruptcy Code applies to any damages sustained by Maverick thereby extinguishing, directly or indirectly, the claims asserted against LBHI and (2) even if Section 562 does not apply, Maverick's claims fail because Lehman avoided liability by virtue of two exculpation clauses contained in the Prime Brokerage Agreements. The bankruptcy court further denied Maverick leave to amend in order to assert claims for lost profits.[1] The Court addresses each of these issues in turn.

## I.      Section 562

Enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Act, Section 562 is related to a number of preceding provisions, colloquially termed safe harbors because they exempt certain actions from aspects of the Bankruptcy Code, primarily the automatic stay and the

---

[1] The bankruptcy court also denied leave to amend with respect to two other types of damages, which Maverick does not contest on appeal.

4

ban on *ipso facto* clauses. *See* 11 U.S.C. §§ 555–56, 559–61. The rationale underpinning these

provisions is that parties may be irreparably harmed if certain contractual rights, such as

termination, cannot be exercised because one of the signatories has entered bankruptcy

proceedings. Indeed, contractual rights of this sort are often meant to be exercised precisely

because a counterparty has defaulted. Section 562(a) specifies the relevant date for purposes of

assessing damages:

> If the trustee rejects a swap agreement, securities contract (as defined in section
> 741), forward contract, commodity contract (as defined in section 761), repurchase
> agreement, or master netting agreement pursuant to section 365(a), *or if a forward
> contract merchant, stockbroker, financial institution, securities clearing agency,
> repo participant, financial participant, master netting agreement participant, or
> swap participant liquidates, terminates, or accelerates such contract or agreement,
> damages shall be measured as of the earlier of—*
>
> (1) the date of such rejection; or
>
> (2) the date or dates of such liquidation, termination, or acceleration.

11 U.S.C. § 562(a) (emphasis added).

Relying on this language, Lehman argues that damages should be measured as of the date

the Settlement Agreement became effective, which operated, it contends, to terminate all of the

relevant agreements, including the Guarantee. This argument runs contrary to a well-established

principle of bankruptcy law—Section 562 being a codified exception—that damages should be

measured as of the date on which bankruptcy proceedings began. *See* 11 U.S.C. § 502(b). The

answer is of great import because, as previously noted, from the commencement of Chapter 11

proceedings to the date the Settlement Agreement became effective, Maverick's property declined

in value by approximately $16.2 million.

Lehman asserts, in essence, two theories under which Section 562 applies: (1) any liability

of LBHI was directly extinguished because the Guarantee was terminated by the Settlement

5

Agreement and (2) any liability was indirectly extinguished because Section 562 similarly applies to the termination of the Prime Brokerage Agreements, which had the practical effect of negating any claims against LBHI on the basis that a guarantor has no liability once all claims against a primary obligor have been satisfied. The Court will assess these theories in tandem because, as it will explain, they suffer from the same flaw.[2]

As an initial matter, Lehman rightly notes that in issuing its ruling the bankruptcy court did not have the benefit of considering certain arguments now advanced by Maverick on appeal. The Court will consider these arguments, however, because waiver is a prudential, rather than jurisdictional, doctrine and they "present[] a question of law [with] no need for additional fact-finding." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (citation omitted); *accord Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 421–22 (2d Cir. 2015). Indeed, the application of Section 562 was the primary issue before the bankruptcy court. The parties' focus, however, was whether the agreements at issue are of the type enumerated in the statute. The bankruptcy court concluded that the relevant agreements, including the Guarantee, are "securities contracts" and "netting agreements" and were terminated, as set forth in the Settlement Agreement.[3] It was on this basis that the bankruptcy court rested its holding, apparently concluding that Section 562 applies whenever one of the listed agreement types is terminated, no matter the context. The Court is persuaded, however, that Section 562 is more narrowly drawn.

Distilled to its core, the fundamental problem with applying Section 562 to the present facts—due to the termination of either the Prime Brokerage Agreements or the Guarantee—is that

---

[2] Maverick also asserts arguments that pertain only to LBIE, namely that Section 562 does not apply extraterritorially or in situations in which neither party is a Chapter 11 debtor. Whatever merit these arguments may have, resolving the instant appeal does not require the Court to address them.

[3] With respect to these findings, Maverick continues to dispute only whether the Guarantee failed to survive the Settlement Agreement.

Maverick's purported damages fall outside the reach of the statute because the termination that occurred was not of the sort contemplated. Section 562 calculates damages resulting from one of the actions enumerated therein. But the termination here, under either of Lehman's theories, did not cause harm. Any damages instead flowed from the purported breaches of the Prime Brokerage Agreements and Guarantee. Indeed, the Settlement Agreement represented a consensus between LBIE and Maverick to settle the claims against one another then pending in UK administration proceedings. Admittedly, and as Lehman is apt to remind the Court, Section 562 does not explicitly compel this conclusion, nor does any other controlling authority. This lack of clarity stems, in part, from the Bankruptcy Code's failure to set forth a definition of termination, in contrast to the other terms used in the statute. But drawing upon a variety of sources, the Court is nonetheless convinced that a good faith, common sense reading of Section 562 in context leads to this result.

The Court begins its inquiry with the text of Section 562. *See King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018). The statute provides that "if a . . . financial participant . . . terminates" a "securities contract" or "master netting agreement" "damages shall be measured as of" "the date . . . of such . . . termination." The most natural interpretation of this plain language is that the statute calculates damages resulting from termination as opposed to a situation such as the one here, where the termination represents an amicable settlement of damages pertaining to an earlier breach. This reasoning is bolstered by the statute's apparent failure to contemplate a termination that comes about by mutual agreement. The language is clear that the statute applies when one of the specified participants elects to take one of the enumerated actions in a unilateral fashion. This focus is further consistent with action that causes, rather than resolves, damages.

7

The Court's interpretation finds additional support when Section 562 is construed in context. *See id.* ("The words to be interpreted are not considered in isolation; rather, we look to the statutory scheme as a whole and place the particular provision within the context of the statute." (citation and alteration omitted)). As previously noted, Section 562 is the last provision in Subchapter III of Chapter 5, following the safe harbor provisions meant to exempt certain actions from various aspects of the Bankruptcy Code. Unsurprisingly, those sections concern precisely the types of agreements and actions that are referenced in Section 562. Section 555, entitled "contractual right to liquidate, terminate, or accelerate a securities contract," for instance, specifies the following:

> The *exercise of a contractual right* of a stockbroker, financial institution, financial participant, or securities clearing agency *to cause the liquidation, termination, or acceleration of a securities contract*, as defined in Section 741 of this title, because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by order of court or administrative agency in any proceeding under this title unless such order is authorized under the provisions of the Securities Investor Protection Act of 1970 or any statute administered by the Securities and Exchange Commission.

11 U.S.C. § 555 (emphasis added).

The other safe harbors preceding Section 562 provide similar protection for the other types of contracts enumerated in that provision, such as master netting agreements. *See* 11 U.S.C. §§ 555–56, 559–61. As Section 555 makes explicit, termination in this context refers to a very specific act: the exercise of a contractual right belonging to one of the signatories, often bestowed by the contract being terminated in the event that the counterparty defaults. And if the language of the safe harbors was not clear enough, one of their primary effects is to exempt the specified actions from the bar on *ipso facto* clauses codified at Section 365(e)(1), which provides:

> *Notwithstanding a provision in an executory contract* or unexpired lease, or in applicable law, *an executory contract* or unexpired lease of the debtor *may not be*

8

*terminated or modified*, and any right or obligation under such contract or lease
may not be terminated or modified, at any time after the commencement of the case
solely because of a provision in such contract or lease that is conditioned on--
**(A)** the insolvency or financial condition of the debtor at any time before the closing
of the case;
**(B)** the commencement of a case under this title; or
**(C)** the appointment of or taking possession by a trustee in a case under this title or
a custodian before such commencement.

11 U.S.C. § 365(e)(1) (emphasis added).

It is thus abundantly clear what termination means when used in Subchapter III of Chapter

5 of the Bankruptcy Code.  Construing Section 562 in context compels the conclusion that when

that statute specifies the method for calculating damages in the event of contract termination, it is

not a reference to a mutual agreement settling purported breaches but instead to a right of one of

the contract signatories to terminate it under certain conditions.  Any other conclusion would

render Section 562 inconsistent with the provisions with which it was codified and fail to effect

the policy scheme apparently contemplated by Congress.[4]

Indeed, policy considerations counsel strongly against applying Section 562 in the present

instance.  The rationale underpinning the safe harbors and the accompanying method of calculating

damages is that large scale harm could befall financial markets should a major institution file for

bankruptcy and such clauses in contracts to which it was a party be effectively rendered void.  The

report authored by the Judiciary Committee of the House of Representatives that accompanied the

---

[4] The entire thrust of Lehman's policy argument rests on a discussion from *In re American Home Mortgage Holdings, Inc.* relating to the purported moral hazard that would exist absent Section 562. 411 B.R. 181 (Bankr. D. Del. 2009), *aff'd but criticized on other grounds*, 637 F.3d 246 (3d Cir. 2011). Whatever merit this analysis has in that context, it does not apply here. In *American Home Mortgage*, the non-defaulting party accelerated a re-purchase agreement, requiring the defaulting party to purchase certain property. 411 B.R. at 191. The parties disputed whether, pursuant to Section 562(b), damages were to be assessed as of a date after the acceleration because on that day there was no "commercially reasonable determinant[] of value." *Id.* at 185–86. The moral hazard was that if damages were measured on a future date, the non-defaulting party "could hold the asset at little or no risk" because it would capture any resulting increase in value up to the full amount owed under the agreement, while a decrease would result in heightened deficiency damages. *Id.* at 191. Here, by contrast, the alternative is not that the damages be calculated as of a date subsequent to termination but rather on the day Lehman entered bankruptcy in 2008, in accordance with Section 502(b).

9

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which, as previously noted,

enacted Section 562, explicitly identified this concern in amending certain of the safe harbors:

> These provisions are intended to reduce "systemic risk" in the banking system and
> financial marketplace.  To minimize the risk of disruption when parties to these
> transactions become bankrupt or insolvent, the bill amends provisions of the
> banking and investment laws, as well as the Bankruptcy Code, to allow the
> expeditious termination or netting of certain types of financial transactions.  Many
> of these provisions are derived from recommendations issued by the President's
> Working Group on Financial Markets and revisions espoused by the financial
> industry.

H.R. Rep. No. 109-31, at 20 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 105–06 (footnotes

omitted).  The President's Working Group on Financial Markets further expounded upon the

attendant risks when a large institution becomes insolvent, emphasizing the need to provide

certainty to the non-defaulting party as expeditiously as possible, including with respect to the

value of any contract being terminated:

> Closeout, or termination, refers to the right under a master agreement to terminate
> one or more contracts immediately upon certain specified events and to compute a
> termination amount due to, or due from, the defaulting party.  The termination
> amount is generally based on the value of the contract at the time of closeout.  The
> ability to terminate most financial market contracts upon an event of default is
> central to the effective management of market risk by financial market participants
> like the trading counterparties of [an insolvent corporation].  Without these rights,
> parties are left with uncertainty as to whether the contracts will be performed,
> resulting in uncontrollable market risk.  By providing for termination of a contract
> upon the default of a counterparty, a participant can remove uncertainty as to
> whether a contract will be performed, fix the value of the contract at that point, and
> attempt to re-hedge itself against its market risk.

The President's Working Group on Financial Markets, *Hedge Funds, Leverage, and the Lessons*

*of Long-Term Capital Management*, at 19–20 (April 1999).[5]

---

[5] These justifications for the relevant provisions of the Bankruptcy Code are echoed by commentators and
experts on bankruptcy law.  *See* Talcott J. Franklin & Thomas F. Nealon III, *Mortgage and Asset Backed Securities
Litigation Handbook*, 7:59 (ed. Jill L. Nicholson Nov. 2017) ("One of bankruptcy's fundamental tenets is that a party
cannot terminate a contractual arrangement, declare a default, or exercise remedies because of a debtor's bankruptcy.
Consequently, *ipso facto* clauses—which purport to automatically terminate a contract upon a bankruptcy filing or a
change in the debtor's financial condition—are generally not enforceable. However, the Bankruptcy Code creates
certain exceptions to this general prohibition to ensure that the financial markets operate smoothly following a major

10

Bearing these considerations in mind, the exception codified at Section 562 makes a great deal of sense. As previously noted, it is a foundational principle of bankruptcy law that damages are typically assessed as of the date on which proceedings are commenced. But in an effort to limit the systemic impact of the collapse of a major institution, the Bankruptcy Code permits counterparties to contracts with insolvent firms to exercise any termination rights contained therein, mandating that damages be assessed as they stand at the precise moment of termination. This immediate certainty, of which Section 562 is an integral component, is designed to prevent catastrophic ripple effects throughout financial markets.

The rationale underlying these aspects of the Bankruptcy Code further illustrates why Section 562 does not apply here. Maverick did not have the ability to exercise termination rights under any of the relevant agreements. Instead, on March 30, 2012—nearly four years after Lehman's September 2008 bankruptcy—the parties reached an amicable settlement in the context of UK administration proceedings. The termination thus in no way achieved the sort of immediate certainty for Maverick that is intended by Section 562, especially when a major institution such as Lehman Brothers goes bankrupt. Applying this codified exception to the usual manner in which damages are calculated under the Bankruptcy Code, therefore, is inconsistent with the policy rationale underpinning Section 562 and its accompanying safe harbors.[6]

Finally, although the Court has not identified any controlling authority that definitively resolves this question, its interpretation is in harmony with the universe of relevant cases. Indeed,

---

institution's bankruptcy filing. The safe harbors found in 11 U.S.C.A. §§ 555 and 559 for securities contracts and repos play a prominent role in mortgage lender bankruptcies."); *see also* Honorable William L. Norton Jr., 1 Norton Bankruptcy Law and Practice 3d Section 3:11 (July 2018); Ji Hun Kim, *Countering Systemic Risk: An Analysis of the Bankruptcy Code's Safe Harbor Provisions*, at 5 n.48, *in* Norton Annual Survey of Bankruptcy Law, Part I (Sept. 2010).

[6] In its bench ruling, the bankruptcy court rested its conclusion, in part, on policy concerns related to a "tiered" system of recovery that would result if it held that Section 562 did not apply with respect to the Guarantee. *See* Tr. 74:1–11, ECF No. 1-1. This argument assumes, however, that Section 562 did apply to the termination of the Prime Brokerage Agreements, which, in this Court's view, is not the case.

11

while this issue has not been addressed by the Second Circuit, one other court of appeal, as well

as two courts in this district, have applied Section 562 in a manner consistent with the Court's

interpretation. *See Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 341, 343

(S.D.N.Y. 2015) (applying Section 562 where "LBSF's bankruptcy qualified as an 'Event of

Default' pursuant to Section 6.1(e) of the 1998 Agreement. As a result, Conway could terminate

the contract and recover damages from LBSF."); *Sec. Investor Prot. Corp. v. Lehman Bros. Inc.*,

433 B.R. 127, 134 (Bankr. S.D.N.Y. 2010) (declining to apply Section 562 where creditor lacked

authority, prior to settlement agreement, to unilaterally close out positions); *In re Am. Home

Mortg. Holdings, Inc.*, 637 F.3d 246, 256 (3d Cir. 2011) ("On the other hand, § 562 which covers,

inter alia, repurchase agreements, applies when the contract is liquidated, terminated, or

accelerated, *and results in damages* rather than excess proceeds." (emphasis added)); *In re

HomeBanc Mortg. Corp.*, No. 17-797 (RGA), 2018 WL 3869889, at *4 (D. Del. Aug. 14, 2018)

("Section 562 applies *only* in the event that a repo default results in a claim for deficiency

damages." (emphasis added)). The Court, however, has been unable to identify, nor has Lehman

provided, a single case in which Section 562 was interpreted in the manner advanced by Lehman

or applied to facts analogous to the present situation.

One need only look to the Prime Brokerage Agreements themselves for an example of

precisely the sort of contractual rights that are the subject of Section 562. These documents granted

Lehman the right to accelerate or terminate in the event of a Maverick default, without providing

Maverick reciprocal rights. *See* App. 576. They even seem to set the stage for the invocation of

precisely the statutory provisions at issue here by specifying that the agreements shall be deemed

securities contracts within the meaning of Sections 555 and 741(7) of the Bankruptcy Code. App

578. Indeed, there is little question that had Maverick defaulted and Lehman terminated the

12

contract while invoking Section 555 in the course of Chapter 11 proceedings, Section 562 would

apply. But, as the Court has gone to great lengths to make clear, that is not what happened.

Accordingly, Section 562 does not apply to the termination of any of the relevant agreements and

thus is not a valid basis on which to disallow and expunge Maverick's claims.

## II.    Exculpation Clauses

The bankruptcy court also concluded that Maverick's claims fail because of two

exculpation clauses contained in the Prime Brokerage Agreements, which explicitly cover Lehman

Brothers and therefore apply to both LBIE and LBHI. App. 582. The first specified that no

Lehman entity would be liable for losses caused by extraordinary events:

> **28. EXTRAORDINARY EVENTS**. You agree that Lehman Brothers will not be
> liable for any loss caused, directly or indirectly, by government restrictions,
> exchange or market rulings, suspension of trading, war (whether declared or
> undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of
> utility services, accidents, adverse weather or other events of nature, including but
> not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond
> Lehman Brothers' control.

App. 582. The second provided a shield from liability for losses related to Lehman's trading

activities, so long as the firm's conduct did not amount to gross recklessness or willful misconduct:

> **29. LIMITATION OF LIABILITY**. Lehman Brothers shall not be liable in
> connection with the execution, clearing, handling, purchasing or selling of
> securities, commodities or other property, or other action, except for gross
> negligence or willful misconduct on Lehman Brothers' part. . . . In no event will
> Lehman Brothers be liable for any special, indirect, incidental or consequential
> damages arising out of this Agreement.

App. 582.

Looking to these provisions, and relying on *In re MF Global Inc.*, 515 B.R. 434 (Bankr.

S.D.N.Y. 2014), the bankruptcy court reasoned as follows:

> In addition, for reasons that I will elaborate further in a more complete written
> opinion, I do believe that Judge Glenn was correct in *MF Global*, I do believe that
> under the principles that he articulated and the terms of the documents here that the

exculpation provisions would themselves preclude the allowance of, in essence, what is the diminution claim being asserted by the Maverick entities.

Tr. 75:9–16. The Court respectfully disagrees. It does so, principally, for two reasons: (1) the bankruptcy proceedings here are not covered by the extraordinary events paragraph and (2) any damages sustained by Maverick were not caused by activity on the part of Lehman that is within the reach of the limitation of liability clause.

First, the Court fails to discern how the extraordinary events provision applies to the present facts. It is of course true that the provision references "government regulation" and "suspension of trading" and that such a suspension here was in fact mandated by government regulation. But when read in context, it is evident that this language does not apply to the events at hand. Indeed, the plain language of the clause makes it abundantly clear that it is only triggered when there is an "extraordinary event" "beyond Lehman Brothers' control," such as natural disasters or terrorist attacks. Bankruptcy proceedings are not mentioned. Looking just to the plain language of the provision, therefore, the Court fails to see how voluntary entry into proceedings, either Chapter 11 or UK administration, can constitute an "extraordinary event" "beyond Lehman Brothers' control," thereby operating to extinguish liability.[8]

Contrary to Lehman's position, *MF Global* does not support its position. In that case, once the SIPA proceeding commenced, the broker's trading was suspended and it could not return the claimants' securities, during which time they declined in value. 515 B.R. at 440. Under SIPA, the claimants were not entitled to damages for any decline in value from the filing date to liquidation. *Id.* The Court held that contractual exculpation clauses absolved the broker of any liability for the diminution in value. *Id.* at 441. Those clauses provided that the broker could not

---

[8] Persuasive, though non-binding, authorities are consistent with this interpretation of suspension of trading. *See* Black's Law Dictionary (10th ed. 2014) (defining "suspension of trading" as "the temporary cessation of all trading of a particular stock on a stock exchange because of some abnormal market condition").

14

be liable "for any loss, damage, liability, cost, charge, expense, penalty, fine or tax caused directly or indirectly by, *inter alia,* (1) any Applicable Law, or any order of any court; (2) suspension or termination of trading, and (3) any other causes beyond MFGI's control." *Id.* at 440–41 (alterations and internal quotations omitted).

Unlike in *MF Global*, however, Maverick is not seeking damages beyond that to which it is entitled under the law, but rather in accordance with a well-established bankruptcy principle. Furthermore, the exculpation provisions in *MF Global* were much broader than those here, absolving the broker of liability for any loss resulting from "any applicable law, or any order of a court." *Id.* at 441. This is of particular consequence because the suspension of trading in that case ensued as a result of a court order issued upon the filing of a complaint by, and application of, the Securities Investor Protection Corporation—not the insolvent broker dealer. *See* 11-CV-7750, ECF No. 3 (S.D.N.Y. Oct. 31, 2011). Indeed, the court explicitly noted that the cause was "beyond [the broker's] control." *Id.* at 441. Here, by contrast, the Lehman entities voluntarily commenced the proceedings that resulted in the suspension of trading.

With respect to the limitation of liability paragraph, Maverick does not seek damages resulting from any of the conduct specified therein. Maverick instead complains of a very specific and different harm: the failure to return its property or provide it with the market value equivalent. This harm was caused by the suspension of trading that resulted from the bankruptcy proceedings. It was not, however, in "connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action." Indeed, the damages here were in no way caused by Lehman's trading of securities or commodities, or any other conduct related to such activity. As Lehman has acknowledged, both at argument and in its papers, the property at issue was not the subject of trading activity by LBIE but was instead being held merely as collateral

15

to ensure Maverick's performance pursuant to the various agreements. No reasonable interpretation of this provision, therefore, could absolve Lehman of liability in the present instance.

The lack of any reference to bankruptcy proceedings is all the more glaring when the exculpation clauses are construed in context. As Maverick rightly notes, the Prime Brokerage Agreements explicitly reference the United States Bankruptcy Code in other sections but not this one, cutting against the notion that such proceedings, in the United States or elsewhere, would permit Lehman to properly invoke either of these clauses. Moreover, if such proceedings were intended to fall within their reach, the parties could have said so, particularly in light of the specificity with which the triggering conditions were enumerated. It is a well-settled principle that the absence in one context of particular language used elsewhere by the same parties is intentional. *See, e.g.*, *Cent. Bank of Denver. v. First Interstate Bank of Denver*, 511 U.S. 164, 176–77 (1994) (statute did not provide for aiding and abetting liability because Congress elsewhere used the words "aid" and "abet" to accomplish that result).

Finally, this construction of the exculpation clauses comports with the Guarantee, which is further probative of the parties' intent, particularly given its nexus to the Prime Brokerage Agreements. The Guarantee was intended as one form of protection in the event of an LBIE default, which is precisely what transpired. The Guarantee even explicitly identifies the invocation of provisions of "the Federal Bankruptcy Code, or any similar applicable state or foreign law" as circumstances in which it would be fully enforceable. App. 647. It would thus betray common sense for the initiation of bankruptcy proceedings by either LBIE, the primary obligor, or LBHI to shield Lehman from liability under these circumstances.

**III.    Leave to Amend**

The final issue is whether the bankruptcy court abused its discretion in denying Maverick

leave to amend.  At argument, however, Maverick withdrew its appeal on this point.  Tr. 16:21–

22, Sept. 14, 2018.  Accordingly, this issue is now moot.

## CONCLUSION

For the foregoing reasons, the bankruptcy court's decision is reversed and this matter is

remanded for further proceedings.  On appeal, Lehman has continued to assert a variety of

arguments related to its liability in the event that Section 562 does not apply.  The bankruptcy

court did not rule on these issues, nor has this Court expressed any opinion as to their merit.  These

matters are most appropriately considered in the first instance by the bankruptcy court.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated:      September 30, 2018
            New York, New York

                                        Ronnie Abrams
                                        United States District Judge

17

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                            :        Chapter 11 Case No.
                                                 :
LEHMAN BROTHERS HOLDINGS INC., ET AL., :        08-13555 (SCC)
                                                 :
                        DEBTORS.                 :        (JOINTLY ADMINISTERED)

---------------------------------------------------------------x

## STIPULATION REGARDING JUDGE RONNIE ABRAMS' SEPTEMBER 30, 2018 OPINION AND ORDER

This stipulation ("Stipulation") is entered into by and among Lehman Brothers Holdings

Inc. ("LBHI") and Maverick Long Enhanced Fund, Ltd., Maverick Neutral Levered Fund, Ltd.,

Maverick Neutral Fund, Ltd., Maverick Fund USA, Ltd., Maverick Fund II, Ltd. and Maverick

Fund, L.D.C. (collectively, "Maverick" and, together with LBHI, the "Parties") through their

undersigned counsel.

WHEREAS, on June 22, 2016, LBHI filed the Plan Administrator's Five Hundred

Nineteenth Omnibus Objection to Claims (No Liability Claims) [Docket No. 53107] (the

"Objection").

WHEREAS, by order dated May 12, 2017, the Bankruptcy Court granted LBHI's

Objection (the "Bankruptcy Court Order").

WHEREAS, by order dated September 30, 2018, the District Court reversed the

Bankruptcy Court Order and remanded the matter for further proceedings in the Bankruptcy

Court (the "District Court Order").

WHEREAS, the Parties wish to move the matter forward without further delay.

NOW, THEREFORE, the Parties hereby stipulate and agree as follows:

1.    The District Court Order is interlocutory and not a final decision, judgment, order, or decree within the meaning of 28 U.S.C. § 158(d)(1).

2.    The Parties may appeal the District Court Order, or the subject matter addressed therein, as of right when there is a final decision, judgment, order, or decree in the case (subject to all applicable rules and deadlines governing any such appeal).

3.    The Parties do not waive any rights whatsoever with respect to a future appeal of the District Court Order, or the subject matter addressed therein, by waiting until there is a final decision, judgment, order, or decree in the case.

4.    If either Party chooses to appeal the District Court Order, or the subject matter addressed therein,  when there is a final decision, judgment, order, or decree in the case, Maverick or LBHI will not object to, or in any way seek to dismiss, such appeal on the grounds that the District Court Order was a final order subject to immediate appeal as of right.

Dated: New York, New York
       November __14__, 2018

_____
Richard L. Levine
Garrett A. Fail

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.*

2

William J.F. Roll, III
Solomon J. Noh
Randall Martin

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-7174

*Attorneys for Maverick Long Enhanced Fund,
Ltd., Maverick Neutral Levered Fund, Ltd.,
Maverick Neutral Fund, Ltd., Maverick Fund
USA, Ltd., Maverick Fund II, Ltd. and
Maverick Fund, L.D.C..*

3