**Hearing Date and Time: December 20, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: November 29, 2018 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                                                    :

                                                         :          **Chapter 11**

**SEARS HOLDINGS CORPORATION, et al.,**                  :

                                                         :          **Case No. 18-23538 (RDD)**

                                                         :

Debtors.[1]                                              :          **(Jointly Administered)**

-------------------------------------------------------------x

# NOTICE OF HEARING ON
## MOTION OF DEBTORS FOR ENTRY OF AN ORDER
## (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
## FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**"), of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to sections 105(a), 363(b), and 503(c) of title 11 of the United States Code (the "**Bankruptcy Code**"), (i) approving of the Debtors' incentive and retention programs for certain key employees and (ii) granting related relief, all as more fully set forth in the Motion, will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **December 20, 2018 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be filed and received no later than **November 29, 2018 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

     **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

     **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: November 15, 2018
     New York, New York

                _/s/ Ray C. Schrock, P.C._____
                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York  10153
                Telephone:  (212) 310-8000
                Facsimile:  (212) 310-8007
                Ray C. Schrock, P.C.
                Jacqueline Marcus
                Garrett A. Fail
                Sunny Singh

                _Attorneys for Debtors_
                _and Debtors in Possession_

**Hearing Date and Time: December 20, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: November 29, 2018 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
|                                            |   |                           |
| In re                                      | : |                           |
|                                            | : | **Chapter 11**            |
| **SEARS HOLDINGS CORPORATION,** *et al.*,  | : |                           |
|                                            | : | **Case No. 18-23538 (RDD)** |
|                                            | : |                           |
| **Debtors.**[1]                            | : | **(Jointly Administered)** |
------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER
## (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
## FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"

and, together with their non-debtor affiliates, the "**Company**"), respectfully represent as follows

in support of this motion (the "**Motion**"):[2]

### Relief Requested[3]

1.     By this Motion, the Debtors request, pursuant to sections 105(a), 363(b),

and 503(c) of the Bankruptcy Code, entry of an order (the "**Proposed Order**"):  (i) approving the

Debtors' proposed (a) KEIP for 18 key employees who are "insiders" as that term is defined by

the Bankruptcy Code, which program provides a total, incentive-based award opportunity ranging

from approximately $1.06 million per quarter in the aggregate at threshold performance, to

approximately $2.12 million per quarter in the aggregate at maximum performance, based on the

achievement of targeted Net Cash Flow for the quarterly periods ended January 15, 2019, and

April 15, 2019, respectively, and upon an Acceleration Event, a total potential award opportunity

of up to approximately $8.50 million in aggregate for KEIP Participants,[4] and (b) KERP for

---

[2]     In support of this Motion, the Debtors submit the declarations of (i) Douglas Friske, Managing Director of Willis Towers Watson PLC, attached hereto as **Exhibit B** (the "**Friske Declaration**"), and (ii) Mohsin Meghji, the Debtors' Chief Restructuring Officer, attached hereto as **Exhibit C** (the "**Meghji Declaration**").

[3]     Capitalized terms used in this section and the Preliminary Statement but not defined herein shall have the meanings set forth in the Motion.

[4]     At threshold performance per quarter, for two quarterly periods, the total KEIP opportunity will be approximately $2.12 million in the aggregate for all participants; at maximum performance for two quarterly periods, the total KEIP opportunity will be approximately $4.25 million in the aggregate for all participants.  And as discussed below, upon the occurrence of an Acceleration Event, an amount up to $8.50 million in the aggregate will become

322 non-insider employees providing a total award pool of approximately $16.9 million payable

on a quarterly basis over 12 months; *provided that* no KERP Participant shall be eligible to receive

one or more KERP Awards in excess of $150,000 in the aggregate; and (ii) granting related relief.

## **Preliminary Statement**

2.      It is a truism, but for good reason, that employees are the lifeblood of a

company.  This rule applies with full force to these chapter 11 cases, given the complexity of this

restructuring and the enormity of the task facing the Debtors in their efforts to maximize

stakeholder value.  Simply put, the Debtors' senior management and key employees are critical to

their ability to maximize stakeholder value through this restructuring process.  Key employees

include those individuals responsible for determining the Debtors' strategic direction and ensuring

that the Debtors achieve their overall performance goals, as well as hard-to-replace employees

with valuable institutional knowledge and skills.  These individuals hold institutional knowledge

critical to the Debtors' operations, and many have longstanding relationships with the Debtors'

vendors and suppliers that would be difficult and expensive, if not impossible, to replace—

assuming the Debtors could even attract or retain new executive hires while these chapter 11 cases

are underway.

3.      The Debtors' efforts to reorganize are already subject to intense scrutiny

and, indeed, uncertainty regarding their ultimate fate.  And it is no secret that the track record for

retailers in chapter 11 is at best mixed.  The Debtors' key employees are not immune to such

pressures, and key stakeholders have already questioned the Debtors' basic viability in a public

---

due become payable.  For the avoidance of doubt, the maximum aggregate amount available to be paid to the
KEIP Participants on account of the KEIP shall be $8.5 million.

and highly visible manner—even though these chapter 11 cases are less than 5 weeks' old.[5]  Many key employees have also seen their workloads materially expand as a result of the commencement of these chapter 11 cases, thereby compounding the already-material stresses for employees and their families that are inherent to the chapter 11 process.  And, as set forth more fully in the Friske Declaration, the compensation opportunities currently available to key employees falls significantly short when compared to their peers, including peers that are not required to operate amidst challenges even remotely comparable to those facing the Debtors here.  Under these circumstances, it would be understandable if many key employees are asking themselves whether they should be seeking other opportunities.  But the Debtors cannot afford this uncertainty— however understandable it may be.

4.      The Debtors have determined that incentivizing outperformance for senior executives, and providing appropriate award opportunities for less-senior key employees to 'stay with the business' is a critical business need at this time.  To address this need, the Debtors, together with their restructuring advisors and Willis Towers Watson, their compensation consultant, have developed two narrowly-tailored programs for certain Key Employees (as defined below):  (i) a key employee incentive plan (the "**KEIP**"), providing for, over six months (a) two quarterly cash payments to 18 members of the Debtors' senior leadership team identified below, payable if and only if the Debtors achieve certain hard-to-reach cash flow-based performance metrics, and (b) upon an Acceleration Event, the payment of the maximum remaining KEIP awards through the quarter ending October 15, 2019, and (ii) a key employee retention plan (the "**KERP**")

---

[5]     *See, e.g.*, *Preliminary Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al. to Debtors' Motion for Approval of Global Bidding Procedures*, filed November 9, 2018 (ECF No. 640) ¶ 4 ("[T]he Go Forward Store 'business plan' appears to be nothing more than wishful thinking . . . .").

for less-senior Key Employees providing for quarterly, time-based cash awards over a projected twelve-month period.

5.    The Debtors respectfully submit that the KEIP and KERP are each reasonable, market-based approaches to appropriately incentivize and, as applicable, retain key employees during these chapter 11 cases. *First*, Key Employees have deep industry expertise and knowledge of the Debtors' businesses, assets, liabilities, counterparties, and operations and are vital to the Debtors' ongoing restructuring efforts. *Second*, and as set forth more fully in the Friske Declaration, the Debtors' respectfully submit that each of the KEIP and the KERP are both within the range of reasonableness in terms of both overall opportunities and when measured against comparable programs. The Debtors are further engaged with the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "**UCC**") and their advisors to obtain the UCC's support for this critical program.

6.    Accordingly, the Debtors respectfully request that the Court approve the terms of the KEIP and KERP as requested herein.

## Jurisdiction

7.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

8.    Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are

5

authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On October 24, 2018, the United States Trustee for Region 2 appointed the UCC.  No trustee or examiner has been appointed in these chapter 11 cases.

10.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

11.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[6]

### The Debtors' Key Employees & Compensation Practices

12.     Recognizing that implementing appropriate incentives for driving outperformance and maintaining operational integrity during this restructuring process is critical to their overall success, the Debtors, under the leadership of their independent Chief Restructuring Officer,[7] identified key individuals whose ongoing participation and outperformance will likely be critical to driving stakeholder value here.  As a general matter, and like many companies, the Debtors historically utilized a combination of (i) base salaries, (ii) an annual, performance-based incentive opportunity (or "**AIP**"), (iii) long-term, time based awards (or "**LTIP**"),[8] and

---

[6]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

[7]     For the avoidance of doubt, the Debtors' Chief Restructuring Officer is not a KEIP Participant.

[8]     For the avoidance of doubt, the Debtors do not seek by this Motion to make any payments under the AIP or LTIP to the KEIP Participants or KERP Participants (as defined below).

(iv) discretionary bonuses to drive outperformance.[9]  Of course, these historic programs did not and could not account for either the Debtors' changing business goals and challenges or the specific legal requirements arising upon the commencement of these chapter 11 cases.  *See, e.g.*, 11 U.S.C. § 503(c).  But the Debtors, now more than ever, must ensure that they have the personnel necessary to drive value and achieve outperformance—regardless of the ultimate disposition or restructuring path adopted in these chapter 11 cases.

13.     As a preliminary measure, the Debtors elected to raise base salaries for certain key executives following the commencement of these chapter 11 cases, including their three senior-most executives following formation of their Office of the Chief Executive[10] (*i.e.*, their Chief Digital Officer, Chief Financial Officer, and President – Softlines).  These individuals have undertaken the combined role of the Office of the Chief Executive following the departure of the Debtors' then-current Chief Executive Officer on October 14, 2018.  Of course, these additional duties have been undertaken in addition to those individuals' existing responsibilities, and these executives still remain materially undercompensated versus their peers at similarly-sized retail companies.  Base salaries by themselves do not provide adequate incentives for outperformance, and the Debtors' business need to drive outperformance from senior executives, and to retain key employees, remains a critical need.

14.     The Debtors' Chief Restructuring Officer therefore undertook a review to identify those employees most critical to the success of these chapter 11 cases here.  In this process, the Debtors identified: (i) 18 senior members of the Debtors' management team (collectively, the

---

[9]     *See, e.g.* Sears Holding Corp. Sch. 14A, pp. 20–27 (March 29, 2018) (discussing compensation and incentive programs).

[10]    *See* Sears Holding Corp. Form 8-K, Item 5.02 (Oct. 15, 2018) (announcing formation of Office of the Chief Executive).

7

"**KEIP Participants**"), who the Debtors submit are "insiders" as that term is defined by section 101(31) of the Bankruptcy Code; and (ii) 322 critical, but less senior and non-insider executives (collectively the "**KERP Participants**")[11] that play critical roles in the Debtors' operations and ongoing restructuring efforts, for inclusion in incentive and retention based programs tailored to the Debtors' business needs.

15.     That the Debtors have a real business need in this regard cannot be reasonably disputed. Nearly every large company historically provided both long term and near term incentive-based compensation to their key employees, and the Debtors did precisely that on a prepetition basis through the AIP and LTIP. This practice recognizes that incentive-based opportunities are an appropriate and necessary tool to drive outperformance from personnel. And, absent such opportunities, the Key Employees will be materially undercompensated when compared with their peers at similarly-sized retail companies. Indeed, the Debtors' key employees were already undercompensated versus peers on a prepetition basis; base salary for employees otherwise participating in the AIP is 51% *below* the 25th percentile of target total direct compensation for the Debtors' retail peers.[12]

16.     Thus, the Debtors sought to implement appropriate incentive- and retention-based programs that would align their key employees' interest with goals all parties to these chapter 11 cases may support.

---

[11]     Although certain KERP Participants hold the title of "Vice President" or similar, as set forth more fully in the Meghji Declaration, such individuals do not exercise control over material aspects of the Debtors' operations, nor are such individuals responsible for setting compensation or performance targets at issue here.

[12]     With the KEIP in place, KEIP Participants' total direct compensation is projected to fall within 11% *below* the 25th percentile of the Debtors' retail peers if *maximum* performance is achieved.

## Key Employee Incentive Program

### A.    KEIP Participants & Performance Targets

17.    The KEIP Participants are broadly responsible for determining the Debtors' strategic direction and ensuring that the Debtors achieve their overall performance goals.    In addition to their substantial day-to-day responsibilities, many KEIP Participants have seen their workloads expand significantly as a result of the commencement of these chapter 11 cases as, among other things, the Debtors have sought to transition their operations, address the ongoing concerns of vendors and employees, and respond quickly and efficiently to the substantial diligence requests submitted by various parties—all while driving towards the Debtors' ultimate emergence from chapter 11.

18.    While the Debtors acknowledge that such responsibilities are inherent to the KEIP Participants' duties as leaders of a debtor in possession, such incremental challenges could create a disparity between historic compensation and the performance required under the circumstances.    To this end, the Debtors believe that incentive-based compensation opportunities remain an important and necessary tool to drive business performance.    Incentivizing the KEIP Participants and leveraging their talents and corporate knowledge at a reasonable cost is value maximizing and will benefit all stakeholders and parties in interest.    Accordingly, the Debtors alongside their advisors sought at the very outset of these chapter 11 cases to implement a KEIP to properly compensate the KEIP Participants.

19.    The KEIP is an incentive-based program, with performance goals set at the achievement of at least 110% of budgeted net cash flow ("**Net Cash Flow**") projected by the Debtors' debtor-in-possession financing budget[13] (the "**Cash Flow Targets**") on a quarterly basis

---

[13]    The Cash Flow Targets shall be measured on the updated debtor-in-possession budget (the "**Updated DIP Budget**") filed in accordance with the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition*

for (i) the quarterly period ended January 15, 2019, and (ii) the quarterly period ended April 15, 2019, respectively, with maximum award opportunities available for the achievement of at least 120% of budgeted Net Cash Flow or above.[14]  Due to the timing of this Motion's filing, for the first quarterly period ended January 15, 2019, the Debtors shall measure performance commencing on the filing date of the Updated DIP Budget and ending January 31, 2019.[15]  And in the event the Company should experience a material change in circumstance, the Debtors will work with the UCC's advisors, in good faith, to revise the Updated DIP Budget for purposes of KEIP performance measurement to align with the material change in circumstance as soon as practicable, but in no event later than 10 days after such material change in circumstance, if any.[16]

20.     The Debtors selected the Cash Flow Target because it provides a recognized measure of business performance in a restructuring context and a goal that all stakeholders should support—namely, enhanced operating performance that materially exceeds near- and mid-term projections.  The Debtors believe the Cash Flow Targets are not easily achievable, based on, among other things:

- challenges in retaining customers due to the negative publicity attendant to the chapter 11 filings;

- pressure on operating costs caused by contraction of trade terms; and

- the Debtors' historical challenges in maintaining and achieving positive cash flow over a sustained period.

---

Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claim, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Grating Related Relief.

[14]  KEIP performance will be measured net of the cost of the KEIP—i.e., the KEIP will be self-funding.

[15]  For the avoidance of doubt, the available quarterly KEIP payment amount for the period October 15, 2018 to January 15, 2019 shall remain unaffected by the reduced measurement period.

[16]  Consent shall not be unreasonably withheld; provided that the revised budget is otherwise consistent with the prior budgets, other than accounting for the material change in circumstance.

Put another way, the Debtors' Cash Flow Targets are neither "lay ups" nor "slam dunks"; rather, achievement of the Cash Flow Targets will require substantial outperformance from the KEIP Participants, and all stakeholders will benefit if these targets are achieved—particularly in light of the modest cost associated with the KEIP's quarterly award opportunities.

## B.    KEIP Overview

21.    The KEIP is a six-month program consisting of two quarterly performance periods and an acceleration of the payment of KEIP Awards, with a maximum aggregate award opportunity of $8.50 million in the aggregate through the quarter ending October 15, 2019 upon an Acceleration Event.[17]  The key terms of the KEIP are as follows:

(a)    Eligible Participants:   KEIP Participants are those 18 senior executives identified in the table below.  As noted above, these individuals are "insiders" as that term is defined by section 101(31) of the Bankruptcy Code.

(b)    KEIP Awards: an incentive cash award earned upon the achievement of the Cash Flow Target during each Performance Period (as defined below) (the "**KEIP Awards**"), net of KEIP cost; *provided* the applicable KEIP Award will be interpolated on a linear basis as between threshold and target, and target and maximum, respectively, if performance falls within milestones.

(c)    Performance Periods:   The performance periods shall be: (i) 3 months ending January 15, 2019; and (ii) 3 months ending April 15, 2019 (the "**Performance Periods**"), except with respect to award opportunities arising from an Acceleration Event.

(d)    Payment Timing:   KEIP Awards shall be paid at the conclusion of each Performance Period and Acceleration Event as soon as administratively possible to gather and evaluate performance outcomes after the conclusion of each Performance Period, but in no event later than the first business day that is 21 days from the end of the Performance Period and upon an Acceleration Event (as defined below); *provided that* all vested KEIP Awards shall be payable upon a KEIP Participant's termination by the Debtors other than for "cause" (subject to proration as provided in the KEIP) or the consummation of a chapter 11 plan.

---

[17]    The Debtors reserve all rights to seek approval for a separate KEIP program for post-April 15, 2019 periods at a later date.

The maximum KEIP Award to any KEIP Participant is $243,750 on a quarterly basis other than on account of an Acceleration Event.

(e)   KEIP Payout Ranges:  Participants will be paid a KEIP Award based on the performance relative to the Cash Flow Targets (a "**KEIP Award Opportunity**").  KEIP Award Opportunity means a KEIP Participant's KEIP Award opportunity, equal to a percentage of the annual base salary for the KEIP Participant, as follows:

| Participant's Title | Annual Salary[18] | Maximum KEIP Quarterly Award Opportunity | Quarterly Threshold 50% Award (Achievement of 110% Net Cash Flow Metric) | Quarterly Target 85% Award (Achievement of 115% Net Cash Flow Metric) | Quarterly Maximum 100% Award Amount (Achievement of 120% Cash Flow Metric) |
|---|---|---|---|---|---|
| President, Real Estate | $600,000 | $112,500 | $56,250 | $95,625 | $112,500 |
| President & CMO KCD/ Chief Brand Officer SHC | $500,000 | $93,750 | $46,875 | $79,688 | $93,750 |
| Chief Executive Officer – Home Services | $750,000 | $187,500 | $93,750 | $159,375 | $187,500 |
| President, Grocery, Drug, Rx | $400,000 | $75,000 | $37,500 | $63,750 | $75,000 |
| President, Softlines/ Office of the CEO | $975,000 | $243,750 | $121,875 | $207,188 | $243,750 |
| Chief Digital Officer/ Office of CEO | $975,000 | $243,750 | $121,875 | $207,188 | $243,750 |
| Chief Commercial Officer – Shop Your Way | $550,000 | $137,500 | $68,750 | $116,875 | $137,500 |
| SVP, Finance - Controller, Risk, APP | $500,000 | $125,000 | $62,500 | $106,250 | $125,000 |
| Chief Financial Officer/ Office of the CEO | $975,000 | $243,750 | $121,875 | $207,188 | $243,750 |
| Chief Information Officer | $500,000 | $93,750 | $46,875 | $79,688 | $93,750 |
| President, Hardlines | $425,000 | $79,688 | $39,844 | $67,734 | $79,688 |
| SVP, Corp. Planning & Bus. Fin. | $450,000 | $84,375 | $42,188 | $71,719 | $84,375 |
| General Counsel & CCO | $425,000 | $79,688 | $39,844 | $67,734 | $79,688 |

---

[18]   Prior to the raises noted above, annual salaries for affected KEIP Participants were:  President, Softlines, $600,000; Chief Digital Officer, $700,000; SVP/Financial Controller, $475,000; Chief Financial Officer, $650,000; SVP/Corporate Planning, $420,000; Chief Human Resources Officer, $340,000.

| Participant's Title | Annual Salary[18] | Maximum KEIP Quarterly Award Opportunity | Quarterly Threshold 50% Award (Achievement of 110% Net Cash Flow Metric) | Quarterly Target 85% Award (Achievement of 115% Net Cash Flow Metric) | Quarterly Maximum 100% Award Amount (Achievement of 120% Cash Flow Metric) |
|---|---|---|---|---|---|
| Chief Human Resources Officer | $375,000 | $70,313 | $35,156 | $59,766 | $70,313 |
| Chief Online Officer | $633,000 | $63,300 | $31,650 | $53,805 | $63,300 |
| Head of Stores | $525,000 | $52,500 | $26,250 | $44,625 | $52,500 |
| COO - Home Services | $500,000 | $93,750 | $46,875 | $79,688 | $93,750 |
| Lead, Enterprise Inventory Optimization | $450,000 | $45,000 | $22,500 | $38,250 | $45,000 |
| **Total** | **$2,124,863** | **$1,062,431** | **$1,806,133** | **$2,124,863** |

(f)     Acceleration Event: Upon the (i) consummation of a chapter 11 plan or (ii) sale of all or substantially of the Debtors' assets (each an "**Acceleration Event**"), within 12 months from the Petition Date, each KEIP Participant, still in the Debtors' employ as of the Acceleration Event, shall have earned the maximum KEIP Award amount for (x) the quarter in which Acceleration Event has occurred and (y) any remaining quarters through October 15, 2019; *provided* that KEIP Award shall be subject to the Clawback (as defined below) if the KEIP Participant does not remain in the Company's employ for the 30 days following any Acceleration Event.

(g)     Employment Termination without "Cause" (Including by Asset Acquisition):  If a KEIP Participant's employment is terminated by the Debtors without "cause" (including, without limitation, termination due to an acquisition of all or any portion of the assets, properties or businesses of Sears Holdings or any of its subsidiaries by way of a direct or indirect acquisition, purchase, exchange, etc.) or upon death or disability, such KEIP Participant shall remain eligible to earn the KEIP Award for all periods prior to, and the period in which his or her employment with the Debtors was terminated, prorated to account for the partial period of employment.

(h)     Other Employment Termination: If a KEIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for cause, etc.):  (i) any remaining unpaid portion of the KEIP Award will be forfeited, and prior awards shall be subject to the Clawback; and (ii) any remaining unpaid portion of the Holdback (as defined below) will be forfeited.

(i)     Clawback:  If a KEIP Participant terminates employment voluntarily within the earlier of (i) 12 months from the Commencement Date or

13

(ii) consummation of a chapter 11 plan, any paid KEIP Award will be subject to claw-back by the Debtors (a "**Clawback**").

(j) <u>Holdback</u>: 20% of each KEIP Participant's earned quarterly KEIP Award, shall be subject to a "holdback" (a "**Holdback**") which shall become due and payable upon the earlier of: (i) termination without "cause", (ii) 12 months from the Petition Date, (iii) an Acceleration Event, (iv) entry of an order for the orderly liquidation of the Debtors' estates; *provided,* that the Debtors are not administratively insolvent.

(k) <u>Waiver</u>: KEIP Awards will be subject to the KEIP Participant executing a waiver of severance and of any benefits under the AIP and LTIP, on terms acceptable to the Debtors *provided that* if an employee declines to participate in the KEIP to avoid executing such waiver, such employee will have no claim or entitlement to any KEIP benefit.

## C.    The KEIP Is Market-Based and Reasonable In Terms of Cost

22.    In assisting in the formulation and design of the KEIP, Willis Towers Watson defined a set of relevant metrics, programs, and companies, and benchmarked (a) 15 comparable incentive plans from chapter 11 cases of companies that filed petitions from 2011–2018 with annual revenues of greater than $2 billion (the "**Size-Based KEIPs**") and (b) 26 incentive plans from chapter 11 cases of companies that filed petitions from 2011–2018 in the retail industry (the "**Retail KEIPs**" and together with the Size-Based KEIPs, the "**Comparable KEIPs**").    Willis Towers Watson also reviewed and benchmarked compensation levels with respect to 20 similarly-sized retail industry companies and industry survey data.    Based on its review, Willis Towers Watson found the design and the cost of the KEIP to be within the range of market practice both in terms of cost, level of payout, and structure.

23.    Absent the KEIP opportunity, the KEIP Participants' target compensation falls significantly below opportunities within the retail industry, as set forth in the Friske Declaration, and peer analysis undertaken by Willis Towers Watson (the "**Industry TDC**").    The KEIP is, in part, designed to address some of this shortfall.    Again absent the KEIP, adjusted base salary for the KEIP Participants in aggregate is 51% below the 25th percentile target Industry

14

TDC. Even with the KEIP implemented, at the maximum (100% payout) level, total direct compensation for the KEIP Participants in aggregate would still fall 11% below the 25th percentile Industry TDC. At the threshold 50% payout level, the KEIP Participants would be 31% below the 25th percentile target Industry TDC. The aggregate maximum of total direct compensation opportunities available to the KEIP Participants is more than 20% lower than the KEIP Participants' aggregate targeted total direct compensation opportunities in fiscal 2018. Moreover, the aggregate costs of the KEIP are capped and fall below comparable programs. As discussed above, for the first six-month interval, absent an Acceleration Event, the requested KEIP is capped at approximately $4.25 million in aggregate, and no KEIP Participant will be eligible for a KEIP Award in excess of $243,750 per quarter. Even at maximum performance, KEIP Participants' total direct compensation will (a) remain significantly below that of similarly sized retail industry companies and (b) lag the historical targeted compensation opportunities available to the KEIP Participants prior to the commencement of these cases. In view of the foregoing, the Debtors respectfully submit the KEIP is well within the range of reasonableness.

### Key Employee Retention Program

A.    **The KERP Participants**

24.    In addition to the KEIP, the Debtors seek to implement the KERP to increase the likelihood that valuable, non-senior management personnel are motivated to remain employed with the Debtors during the chapter 11 process and to ensure that the Debtors do not suffer significant and costly Key Employee attrition and turnover. The KERP Participants comprise a wide and diverse range of roles, with job titles such as "Manager," "Director," "Vice President," and "Head," and the KERP Participants have an average salary of approximately $172,000. At this critical juncture, KERP Participants may be understandably concerned with

15

their employment prospects and ability to provide for themselves and their families at this juncture, and the Debtors cannot afford attrition among such individuals this time.

25.    Additionally, as part of the Debtors' ongoing restructuring efforts, many of the KERP Participants have been called upon to undertake additional responsibilities and expend significantly more working hours than contemplated by the normal terms of their employment. The KERP Participants' additional responsibilities include, among other things, negotiating with suppliers and vendors to ensure compliance with the Bankruptcy Code and the Court's orders, participating in contract assumption and rejection analyses, preparing business plans, cash flow projections, and related requirements to comply with the budget under the Debtors' current debtor-in-possession financing, and complying with the various reporting requirements for debtors operating in chapter 11. Consequently, the Debtors believe that, absent the implementation of an appropriate retention program, they will lose KERP Participants, with the attendant detrimental impact on their operations and revenue generation. Accordingly, the Debtors have determined that implementation of the KERP, as described below, is necessary to motivate and retain the KERP Participants and ensure that the Debtors' anticipated business needs will be met during the restructuring process.

26.    The Debtors, together with their advisors, painstakingly analyzed their 68,000 employee base to determine which non-insider employees are the most critical to both operations and a successful restructuring process, and should therefore be included in the KERP. This was not an easy decision. The Debtors selected KERP Participants based on their status as critical, non-insider, hard-to-replace employees with valuable institutional knowledge and skills. Many of the KERP Participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations, and many have longstanding relationships with the Debtors'

16

vendors and suppliers that would be difficult and expensive—if not impossible—to replace.  The average tenure of the KERP Participants' employment is approximately 16.5 years.  Preserving this experience, institutional knowledge, and these relationships is crucial to the successful conclusion and efficient administration of the Debtors' chapter 11 cases.  Moreover, the KERP Participants work across a variety of disciplines and are responsible for facilitating a range of tasks critical to the Debtors' operations, including matters relating to store operations, inventory management, real estate, legal, marketing, finance, human resources, and information technology.  Finally, none of the KERP Participants are "insiders" as such term is defined in section 101(31) of the Bankruptcy Code.

**B.    KERP Overview**

27.    The KERP is a twelve-month program with four payment periods and purely time-based awards.  The key terms of the KERP are as follows:

(a)    Eligible Participants:  KERP Participants are 322 non-insider, non-union employees.

(b)    KERP Awards:  The KERP shall pay to the KERP Participants a cash retention award, equal to the percentage (ranging from 30–40%) of the KERP Participant's annual salary (each, a "**KERP Award**").[19]  All KERP Awards shall be subject to a clawback as provided herein.

(c)    Maximum Cost of KERP:  The maximum aggregate cost of the KERP shall be $16,930,000 (the "**KERP Award Pool**"); *provided that* no KERP Participant shall be eligible for a total KERP Award in excess of $150,000 in the aggregate.

(d)    Payment Dates:  KERP Awards shall be paid at the conclusion of each period as specified below (each, a "**Timing Event**"):

| Percentage of KERP Award | Timing Event |
| --- | --- |
| 25% | 3 months from the Commencement Date |
| 25% | 6 months from the Commencement Date |
| 25% | 9 months from the Commencement Date |
| 25% | 12 months from the Commencement Date |

---

[19]    No KERP Participant earns an annual base salary in excess of $425,000.

17

KERP Awards shall be paid at the conclusion of each Timing Event as soon as administratively possible after the conclusion of each Timing Event, but in no event later than the first business day that is 21 days from the end of the Timing Event (each, a "**Scheduled Payment Date**").

(e)    Termination of Employment:  A KERP Participant must be employed by the Debtors and in good standing on any Scheduled Payment Date to be eligible to receive a KERP Award.

(f)    Termination without "Cause" (Including by Asset Acquisition):  If a KERP Participant's employment is terminated by the Debtors without "cause" (including, without limitation, termination due to an acquisition of all or any portion of the assets, properties or businesses of Sears Holdings or any of its subsidiaries by way of a direct or indirect acquisition, purchase, exchange, etc.) or upon death or disability, such KERP Participant shall remain eligible to receive a KERP Award for all periods prior to, and the period in which his or her employment with the Debtors was terminated, prorated to account for the partial period of employment.

(g)    Clawback:   If a KERP Participant terminates employment voluntarily within the earlier of 12 months from the Commencement Date or consummation of a chapter 11 plan, any paid KERP Award will be subject to claw-back by the Debtors.

(h)    Waiver:  KERP Awards will be subject to the KERP Participant executing a waiver of severance, if applicable, and of any benefits under the AIP or LTIP on terms acceptable to the Debtors; *provided that* if an employee declines to participate in the KERP to avoid executing such waiver, such employee will have no claim or entitlement to any KERP benefit.

(i)    Discretionary Surplus Award: The Restructuring Committee of the Board of Directors of Sears Holdings (the "**Restructuring Committee**"), upon the recommendation of the Chief Restructuring Officer, may reallocate any remaining amounts of the KERP Award Pool as one-time cash retention payments to any KERP Participants or to employees in good standing who are not KERP Participants (each such allocation, a "**Discretionary Award**").[20]  For the avoidance of doubt, in no event will a Discretionary Award made to a KERP Participant exceed the lesser of 100% of their aggregate KERP Award or $150,000.

---

[20]    KEIP Participants shall not be eligible to receive a Discretionary Award.

C.    **The KERP's Cost Is Reasonable**

28.    Willis Towers Watson defined a set of relevant market comparable metrics, programs, and companies, and benchmarked: (a) 14 comparable retention plans from chapter 11 cases of companies that filed petitions from 2011–2018 with annual revenues of greater than $2 billion (the "**Size-Based KERPs**") and (b) 32 comparable retention plans from chapter 11 cases of companies that filed petitions from 2011–2018 in the retail industry (the "**Retail KERPs**" and together with the Size-Based KERPs, the "**Comparable KERPs**").    Based on its analysis, Willis Towers Watson found the design and the cost of the KERP to be within the parameters and designs of the Comparable KERPs in the installment payment feature, the Clawback, and the termination provisions. The Discretionary Award was found to provide the Restructuring Committee with the ability to address unforeseen circumstances over the next year.  The maximum of $150,000 per KERP Participant does not constitute windfall payments and the total cost of the KERP as a percentage of revenues (approximately 0.14%) is positioned between the 50th and 75th percentiles of the retention programs utilized by the Comparable KERPs.    Under these circumstances, the KERP is reasonable and an appropriate exercise of the Debtors' business judgment.

### Relief Requested Should Be Granted

29.    The Court should grant the relief requested herein because (a) the KEIP and KERP both satisfy section 503(c) of the Bankruptcy Code in that (i) the KEIP and KERP are justified by the facts and circumstances of these chapter 11 cases, (ii) the KEIP is neither a retention bonus nor severance due to its incentive-based structure, and (iii) the proposed KERP does not provide for payments to "insiders" as that term is used in section 101(31) of the Bankruptcy Code, and because (b) implementing the proposed KEIP and KERP reflects a reasonable exercise of the

Debtors' business judgment and, therefore, is appropriate under section 363(b) of the Bankruptcy Code.

## A.    The KEIP and KERP Satisfy Section 503(c) of the Bankruptcy Code

30.    Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  In this and other districts, courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business judgment rule.  *See In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("[The] 'facts and circumstances' language of 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Grp. Inc.*, 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' KERP under business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code).  Accordingly, the determination of whether an incentive or retention plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment is the same.

31.    Courts within the Second Circuit have generally utilized the factors identified in *In re Dana Corp.* when determining if the structure of a compensation proposal and the process for its development meet the business judgment test.  *See, e.g.*, *In re Residential Capital, LLC*, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment); *In re Borders Grp. Inc.*, 453 B.R. at 473–74 (same).  In *In re Dana Corp.*, the

20

Bankruptcy Court set forth the following six factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576–77. As set forth below, these factors are satisfied as to the KEIP and KERP.

### 1.    The KEIP and KERP Are Each Reasonable In Cost and Scope

32.    As noted above, KEIP Awards are tied to the Debtors' ability to successfully achieve the Cash Flow Targets materially in excess of budgeted levels or the achievement of an Acceleration Event. The KEIP therefore benefits all parties because awards are realized if, and only if, the Debtors outperform their liquidity projections net of the KEIP's own cost or upon the consummation of a chapter 11 plan or sale of all or substantially all of the Debtors assets, which, as set forth in the Friske Declaration, is reasonable when compared to market peers. The KEIP includes the 18 key members of senior management who have influence and control over the Debtors' business and, therefore, will be the persons driving performance and guiding the Debtors through their chapter 11 cases.

21

33. The Debtors submit that the KERP similarly justified by the record here. First, the Debtors, in consultation with Willis Towers Watson, designed the KERP to mitigate against the cost, and risk, of losing key personnel at this critical juncture. The KERP is designed to maintain operational continuity for the benefit of all stakeholders. Failure to retain the KERP Participants would likely cause the Debtors' financial performance during the chapter 11 cases to suffer. It would also cause the Debtors to incur significant time and expense to hire and train replacement employees, which would, in turn, be detrimental to their reorganization efforts.

34. And, as with the KEIP, the cost of the KERP is reasonable under the circumstances here. The KERP's proposed cost is consistent with, and within the range of reasonableness of, similar programs implemented in chapter 11 cases with debtors of similar size. As stated above, Willis Towers Watson engaged in an extensive benchmarking analysis to assist the Debtors with the design of the KERP and concluded that the costs associated with the KERP are within the range comparable programs. Specifically, the total cost of the KERP as a percentage of revenue is positioned between the 50th and 75th percentiles of the Comparable KERPs.

**2.      The KEIP and KERP Are Designed For A Sound Business Purpose**

35. As detailed above, the KEIP and KERP are designed to achieve vital business goals, namely, incentivizing outperformance from senior executives tasked with the overall direction and success of this reorganization and ensuring operational integrity among less senior, but still-critical employees. It cannot seriously be disputed that these goals reflect a sound business purpose. Practically all businesses of comparable size scope utilize incentive-based awards to drive outperformance. And, as noted above, the Debtors routinely used such tools prior to the commencement of these chapter 11 cases. Nor can the Debtors' business judgment to use the KERP to maintain stability among less-senior key employees be credibly challenged given the

uncertainty inherent to these chapter 11 cases and the troubled record of so many retailers in chapter 11.

### 3. The Debtors Obtained Independent Counsel in Developing the KEIP and KERP Plans Following Substantial Diligence and Analysis

36.    The KEIP and KERP each result from independent analysis and oversight. As noted above, the KEIP and KERP were each developed at the direction of the Debtors' independent Chief Restructuring Officer, who is not a KEIP or KERP Participant, and under the supervision of the Restructuring Committee. This process was also aided by independent analysis from Willis Towers Watson, as well as the Debtors' restructuring advisors, and reflected a realistic analysis of both the Debtors' business needs, the type of performance the Debtors sought to incentivize, and the costs that might be fairly borne by these chapter 11 estates in light of the competing demands on the Debtors' resources. This independent and diligence review therefore strongly supports approval of the Debtors' proposed programs here.

### B. Sections 503(c)(1) and 503(c)(2) Do Not Apply to the KEIP or KERP Plans

37.    Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code govern retention and severance payments to insiders. These sections, however, are not applicable in evaluating the KEIP because the KEIP is a pure incentive plan (not a severance plan), and are inapplicable to the KERP because none of the KERP Participants are insiders.

38.    By its plain language, section 503(c)(1) of the Bankruptcy Code applies solely to retention payments to insiders, and section 503(c)(2) of the Bankruptcy Code applies only to severance payments for insiders. Neither provision, however, applies to performance-based incentive plans such as the KEIP. *See, e.g.*, *In re Dana Corp.*, 358 B.R. at 576 (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 503(c)(2)); *In re Alpha Natural Resources, Inc.*, 546 B.R.

23

348, 355–56 (Bankr. E.D. Va. 2016) ("[T]he analysis under § 503(c) changes when a debtor purports to make a payment not to retain an insider, but primarily to incentivize the insider to achieve certain goals[, and] [o]n its face, § 503(c)(1) does not apply to the KEIP because the payments thereunder are incentive and not purely retentive.").

39.     The primary characteristic of the KEIP is to incentivize the performance of a narrowly-defined group of senior management to maximize the value of the Debtors' estates. Put simply, the KEIP is an incentive-based compensation program without any retention-based components. KEIP Awards are earned and payable, if and only if, the hard-to-reach Cash Flow Targets are achieved. The fact that the KEIP may indirectly encourage the KEIP Participants to remain employed with the Debtors throughout the chapter 11 cases should not bar implementation of the KEIP. Indeed, all successful incentive programs have the indirect benefit of incentivizing an employee to remain with the company. *See, e.g.*, *In re Alpha Natural Resources, Inc.*, 546 B.R. at 357 ("[A] KEIP that merely has some retentive effect should not be analyzed under § 503(c)(1)."); *In re Dana Corp.*, 358 B.R. at 572 (noting that "some components that arguably have a retentive effect do not necessarily violate section 503(c)").

1.     **503(c)(1) Does not Apply to the KEIP: There Are No Lay-Ups Here.**

40.     The Debtors' proposed KEIP performance metrics are not easily achievable or a "lay-up." *Cf. In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). The financial performance metrics are based upon Cash Flow Targets which will be based upon the budget under the Debtors' current debtor-in-possession financing. Such performance is by no means certain. Rather, the Debtors face a substantial number of challenges which will not be easily overcome. For example:

- The Debtors operate in a highly challenging environment, as demonstrated by the troubled record experienced by so many retailers in chapter 11;

- The negative press and public overhang of these chapter 11 cases may have caused many stakeholders to question the Debtors' viability as a going concern;

- Many KEIP Participants have been required to undertake substantial, additional duties following the commencement of these chapter 11 cases, thereby increasing the difficulties of their 'day jobs';

- KEIP Participants are tasked with ongoing pressure to maintain the integrity and stability of their supply base; and

- The Debtors have historically faced challenges maintaining positive operating cashflow over a sustained period.

41.     As a result, payouts under the KEIP require substantial outperformance to be achieved and, to be clear, if the minimum Cash Flow Target is not achieved or an Acceleration Event does not occur, no KEIP Participant will be paid a KEIP Award.  In light of the foregoing, the Debtors submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KEIP.

**2.     Section 503(c)(1) Does Not Apply to the KERP:  KERP Participants Are Not Insiders**

42.     As noted above, sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code restrict the ability of "insiders" to receive payments as part of a retention or severance plan.  The Bankruptcy Code defines an "insider" to include, among other things, an "officer of the debtor" and a "person in control of the debtor."  11 U.S.C. § 101(31).  Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."  *In re Velo Holdings, Inc.*, 472 B.R. at 208 (citations omitted).  It is well-established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.  *See In re Borders Grp. Inc.*, 453 B.R. at 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or

25

'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

43.     No KERP Participant is an "insider," as such term is defined by section 101(31) of the Bankruptcy Code.  First, none of the KERP Participants have discretionary control over any material corporate transaction or the ability to dictate company policy.  Second, although certain of the KERP Participants hold titles such as "Manager," "Director," "Vice President," and "Head," and such employees must obtain approval from senior management before taking any action with respect to the disposition of significant assets.  Third, none of the KERP Participants are executives, a member of the Debtors' board of directors, or participates in the Debtors' corporate governance.  Rather, the KERP Participants' scope of authority is limited and subject to review and oversight by KEIP Participants.  Accordingly, the Debtors respectfully submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KERP.

## C.     Implementing the KEIP and the KERP is a Sound Exercise of the Debtors' Business Judgment

44.     The KEIP and KERP should also be approved under section 363(b)(1) of the Bankruptcy Code as an exercise of the Debtors' sound business judgment.  *See In re Alpha Natural Resources, Inc*., 546 B.R. at 356 ("Incentive payments under a KEIP are governed by the more general provisions of § 363(b)(1) . . . .").  Section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business is entrusted to the sound business judgment of a debtor.  *See, e.g.*, *Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay)*, 973 F.2d 141, 143 (2d Cir. 1992) (affirming the bankruptcy court's approval of debtors' asset sale pursuant to section 363(b) as a reasonable exercise of business judgment); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,

722 F.2d 1063, 1070 (2d Cir. 1983) (holding that the application of section 363(b) must be supported by "some articulated business justification, other than appeasement of major creditors"); *In re Global Crossing Ltd*., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (emphasizing the business judgment rule); *In re Borders Grp., Inc*., 453 B.R. at 473 ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.").

45.     The proposed KEIP and KERP each result from analysis undertaken by the Debtors' independent Chief Restructuring Officer, with the assistance of Willis Towers Watson and the Debtors' restructuring advisors.  This program was further subject to review by the independent Restructuring Committee, and the Debtors have continued to engage on these programs with their UCC and its professionals.

46.     The KEIP, for its part, addresses the Debtors' business need to properly incentivize performance from KEIP Participants: the Debtors' business performance remains a critically important factor in maximizing estate value, and the Debtors believe that creating proper incentives to achieve this goal is an appropriate and necessary means to this end.  The KEIP seeks to not only drive outperformance but to also provide the KEIP Participants with competitive compensation. Without the implementation of the KEIP, adjusted base salaries for the KEIP Participants in aggregate are 51% below the 25th percentile target Industry TDC.  Even with implementation of the KEIP, at the maximum (100% payout) level, total direct compensation for the KEIP Participants in aggregate would fall 11% below the 25th percentile target Industry TDC. At the threshold (50% payout) level, the KEIP Participants would be 31% below the 25th percentile target Industry TDC.  As such, the KEIP is an appropriate and market-based tool to drive performance.  The KERP is a similar, market based approach to address a valid business need:

27

namely, retaining key employees during what is unquestionably a time of uncertainty for employees and their families alike.

47.     Accordingly, the Debtors believe the KEIP and KERP reflect a reasonable exercise of business judgment and should be approved.

### **Bankruptcy Rule 6004(h)**

48.     For the reasons set forth herein and in the Meghji Declaration, to implement the foregoing successfully, the Debtors request that the Court waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### **Notice**

49.     Notice of this Motion will be provided in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 139) (the "**Case Management Order**").  The Debtors respectfully submit that no further notice is required.

### **No Prior Request**

50.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

*[Remainder of page intentionally left blank]*

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:    November 15, 2018
          New York, New York

                                    /s/ Ray C. Schrock, P.C.
                                WEIL, GOTSHAL & MANGES LLP
                                767 Fifth Avenue
                                New York, New York  10153
                                Telephone:   (212) 310-8000
                                Facsimile:   (212) 310-8007
                                Ray C. Schrock, P.C.
                                Jacqueline Marcus
                                Garrett A. Fail
                                Sunny Singh

                                *Attorneys for Debtors*
                                *and Debtors in Possession*

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                                    :

                                                         :          **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,                :

                                                         :          **Case No. 18-23538 (RDD)**

                                                         :

                    Debtors.[1]                          :          **(Jointly Administered)**

-------------------------------------------------------------x

### ORDER (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

Upon the motion, dated November 15, 2018 (ECF No. [___]) (the "**Motion**")[2] of

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a),

363(b), and 503(c)(3) of title 11 of the United States Code (the "**Bankruptcy Code**") and in

accordance with the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), for entry

of an order (i) approving of the Debtors' incentive and retention programs for certain key

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

employees and (ii) granting related relief, all as more fully set forth in the Motion; and upon the
Meghji Declaration and the Friske Declaration; the Court having jurisdiction to decide the Motion
and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended
Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of
the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and
venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper
notice of the relief sought in the Motion and the Final Hearing (defined below) having been
provided in accordance with the Amended Case Management Order and as set forth in the affidavit
of service filed with respect thereto (ECF No. [___]), such notice having been adequate and
appropriate under the circumstances, and it appearing that no other or further notice need be
provided; and the Court having held a hearing to consider the relief requested in the Motion (the
"**Hearing**"); and upon the record of and representations made at the Hearing; and the Court having
determined that the legal and factual bases set forth in the Motion establish just cause for the relief
granted herein; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors' key employee incentive program (the "**KEIP**") as set forth in
the Motion is hereby approved.

3.      The Debtors are authorized to take all actions necessary to implement the
KEIP on the terms and conditions set forth in the Motion, including making any payments that
become due pursuant to the terms of the KEIP.

4.      The Debtors' key employee retention program (the "**KERP**") as set forth in
the Motion is hereby approved.

5.      The Debtors are authorized to take all actions necessary to implement the KERP on the terms and conditions set forth in the Motion, including making any payments that become due pursuant to the terms of the KERP.

6.      To the extent there is any inconsistency between the terms of any of the DIP Orders and this Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

7.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

8.      Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

10.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated:  _____, 2018
        White Plains, New York


                                        _____
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Friske Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                                :

                                                     :         Chapter 11

SEARS HOLDINGS CORPORATION, *et al.*,                :

                                                     :         Case No. 18-23538 (RDD)

                                                     :

         Debtors.[1]                                 :         (Jointly Administered)

---------------------------------------------------------------x

## DECLARATION OF DOUGLAS FRISKE
## IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER
## (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
## FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

I, Douglas J. Friske, hereby declare under penalty of perjury to the best of my

knowledge, information, and belief:

1.      I am a Managing Director at Willis Towers Watson PLC ("**Willis Towers**

**Watson**").  Willis Towers Watson has been retained by Weil, Gosthal & Manges LLP on behalf

of Sears Holdings Corporation, one of the debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), to provide compensation consulting services to the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Debtors.  I am familiar with the pre- and post-petition structure of the Debtors' compensation programs, including the Debtors' proposed key employee incentive plan (the "**KEIP**") and key employee retention plan (the "**KERP**") as they are set forth in the *Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* (the "**Motion**").[2]

2.      I submit this declaration on behalf of Willis Towers Watson in support of the Motion.  Except as otherwise indicated, I have personal knowledge of all facts in this declaration, based on my and my team's review of the Debtors' business and compensation practices, research into compensation practices for companies in the retail industry broadly, research into the designs of incentive-based plans approved in recent chapter 11 proceedings and my significant experience in developing such programs.  In addition, I reviewed information supplied to me by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it is my opinion that the KEIP and KERP are reasonable and generally consistent with market practice both for comparable retail companies as well as similarly-sized and retail companies that have sought relief under chapter 11.  Additionally, with respect to the KEIP, its implementation will enable the participants to potentially earn (if performance metrics are met) compensation levels more aligned but still well below comparable retail industry levels.  If called upon to testify, I could and would testify competently to the facts and opinions set forth in this declaration.

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion.

WEIL:\96783769\7\73217.0004

## Background and Qualifications

3.      I received my Bachelor's degree in Finance from the University of Illinois in 1986.  After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University, where I received a Master's degree in Management from Northwestern University's J.L. Kellogg Graduate School of Management in 1990.  Since that time, I have been employed by Willis Towers Watson or its predecessor firms.

4.      Willis Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  Willis Towers Watson designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals.  Willis Towers Watson focuses on four key business segments: corporate risk and brokering, human capital and benefits, exchange solutions, and investment, risk, and reinsurance.

5.      My responsibilities at Willis Towers Watson have primarily involved consulting to large companies, specifically with regard to executive compensation.  I have worked with numerous Fortune 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy.  I am frequently retained by large companies to advise them on their employee compensation strategies, program and pay levels.

6.      I am highly experienced in executive, management, and employee compensation matters with more than 28 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in approximately 50 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of post-petition compensation

3

arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in the chapter 11 cases of, among many, American Airlines, Avaya, Breitburn Energy Partners, Claire's Stores, Inc., Energy Future Holdings, GenOn, The Great Atlantic & Pacific Tea Company, Longview Power, Midstates, Orchard Brands, Orexigen, Penn Virginia, RadioShack, Reader's Digest Association, Round Table Pizza, Sabine Oil & Gas, Samson Resources, Sbarro, Southeastern Grocers, and VER Technologies.

### Willis Towers Watson's Involvement with the Debtors

7.     Since Willis Towers Watson was retained by Weil in October 2018, my team and I have familiarized ourselves with the Debtors' operations and business goals. At the start of our engagement, Willis Towers Watson discussed with the Debtors and their advisors the Debtors' operational history, financial performance, restructuring process, and various issues regarding the Debtors' workforce and employee programs. Willis Towers Watson reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

8.     The Debtors performed significant due diligence in developing the KEIP and KERP, and my team and I collaborated closely with the Debtors' management and other outside advisors in reviewing and advising on the KEIP and KERP. Among other things, my team and I provided input and advice on the design, structure, total cost, and award opportunities of the KEIP and KERP for reasonableness. My analysis of the reasonableness of the KEIP and KERP was presented to the Debtors' senior management, including the Debtors' Chief Restructuring Officer, under the supervision of the independent Restructuring Committee. The primary goal in

4

the course of these interactions with the Debtors and senior management was to develop an

independent assessment of the Debtors' KEIP and KERP that drew directly upon relevant market

data and my experience in designing comparable programs for similarly-situated companies.

### KEIP and KERP Overview

9.       Pursuant to the Motion, the Debtors seek approval of the KEIP and KERP.

The KEIP provides 18 members of the Debtors' senior management team (the "**KEIP**

**Participants**") with the opportunity to earn (i) two quarterly cash payments if, and only if, the

Debtors achieve certain incentive-based performance goals linked to budgeted net cash flow ("**Net**

**Cash Flow**") projected by the Debtors' current debtor-in-possession financing budget (the "**Cash**

**Flow Targets**"), and (ii) upon the achievement of an acceleration event (as defined in the Motion)

(an "**Acceleration Event**"), a total potential award opportunity of up to $8.50 million.[3]   The

aggregate maximum potential award opportunity under the KEIP for the two quarterly periods

ended January 15, 2019, and April 15, 2019, respectively, is approximately $4.25 million in the

aggregate for all KEIP Participants, or approximately $2.12 million per quarterly period.   The

KERP provides 322 employees (the "**KERP Participants**") with fixed cash amounts in four

quarterly installments, subject to those KERP Participants' continued employment with the

Debtors as of the respective payment date.   The KERP contemplates cash awards for all KERP

Participants totaling approximately $16.9 million in the aggregate, and the maximum award

available to any KERP Participant is $150,000.

---

[3]    For the avoidance of doubt, the maximum amount available to be paid to the KEIP Participants on account of the
KEIP shall be $8.5 million in the aggregate.

### Analysis of Total Direct Compensation for KEIP Participants

10.    In assessing the reasonableness of the KEIP, I worked with my team to analyze competitive target total direct compensation, a standard benchmark that includes base salary, short term incentives, and long term incentives, for all KEIP Participants.

11.    As my primary reference point for the competitiveness of compensation of all KEIP participants, my team and I analyzed the compensation levels of executives at relevant market comparators in the retail industry.  This analysis was completed using two reference sources.  For the Debtors' five highest compensated KEIP Participants, we selected a set of 20 comparable companies operating in the retail industry (collectively, the "**Retail Peers**") in light of a number of factors, including scope of operations and industry relevance.  The Retail Peers include:  Macy's, Inc., Kohl's Corporation, Genuine Parts Company, The Gap, Inc., Nordstrom, Inc., Ross Stores, Inc., L Brands, Inc., Bed Bath & Beyond Inc., J. C. Penney Company, Inc., AutoZone, Inc., Office Depot, Inc., Advance Auto Parts, Inc., O'Reilly Automotive, Inc., GameStop Corp., Dick's Sporting Goods, Inc. Foot Locker, Inc. Ascena Retail Group, Inc., Dillard's, Inc., Burlington Stores, Inc., and Ulta Beauty, Inc.  The data for these companies was derived from annual proxy statements. Based on my extensive experience in general, and my familiarity with the Debtors' operations in particular, I believe the Retail Peers are similarly situated entities in terms of operations and activities, and may also compete with the Debtors for executive talent.

12.    Next, my team and I developed competitive target total direct compensation benchmarks based on the most recent proxy disclosures from each Retail Peer, where available. Then, my team and I matched the Debtors' five highest compensated KEIP Participants to executives at the Retail Peers with similar ordinal pay ranking (e.g., 4th highest

6

paid executive), as compensation data is only disclosed in proxy statements for the Chief Executive Officer, Chief Financial Officer and the next three highest paid executive officers..

13.    For positions not covered by proxy disclosure, my team and I matched the Debtors' remaining KEIP Participants to survey benchmarks at companies in the 2018 Willis Towers Watson U.S. Retail/Wholesale Executive Compensation Survey Report, based on my understanding of each participant's job duties and responsibilities within the Debtors' organization.  For each survey benchmark, my team and I developed revenue adjusted retail industry survey data for target total direct compensation (the "**Industry Survey Data**", together with the Retail Peer data, the "**Retail Industry**").  I compared the Debtors' threshold and maximum total direct compensation opportunities (reflecting adjusted base salary and the threshold and maximum KEIP opportunities) for the KEIP Participants to target total direct compensation data for equivalent positions from the Retail Industry.

14.    If the Debtors do not receive approval from the Court to implement the KEIP, total direct compensation (representing *only* adjusted base salaries) for the KEIP Participants in aggregate would fall 51% *below the 25th percentile* of target total direct compensation of the Retail Industry and 65% *below the median* of target total direct compensation of the Retail Industry.  In other words, KEIP Participants will be materially undercompensated versus comparable executives at similarly sized organizations in the retail industry.  These circumstances could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives.  It is also my experience that it would be highly uncommon for an entity comparable to the Debtors' size and scope to fail to provide some form of short term, cash-based incentive opportunity.

WEIL:\96783769\7\73217.0004

15.     The KEIP is, in part, designed to address some of this shortfall.  Even with implementation of the KEIP: (i) at the *threshold* payout level, total direct compensation for the KEIP Participants would fall 31% below the 25th percentile of the Retail Industry; and (ii) at the *maximum* payout level, total direct compensation for the KEIP Participants would fall 11% below the 25th percentile.  To be clear, the maximum level outcome reflects a scenario where the Debtors significantly outperform the Cash Flow Targets and thereby earn the maximum amount of potential incentive compensation under a KEIP Award, or receive an award upon achieving an Acceleration Event.  Further, the aggregate *maximum* total direct compensation opportunities available to the KEIP Participants is more than 20% lower than the KEIP Participants' aggregate *targeted* total direct compensation opportunities in fiscal 2018.

16.     Based on the results of these benchmarking analyses, and my experience in other incentive compensation arrangements implemented in chapter 11 cases, I believe the KEIP and the KEIP Participants' potential total direct compensation levels are reasonable in light of competitive market practice for companies like the Debtors that operate in the retail industry.  Even at maximum performance, KEIP Participants' total direct compensation will (a) remain significantly below that of other similarly sized retail industry companies and (b) lag the historical targeted compensation opportunities available to the KEIP Participants prior to the commencement of these cases.  Critically, the absence of an incentive opportunity for the KEIP Participants significantly undermines the current competitiveness of the Debtors' compensation structure, which in turn could negatively impact the Debtors' ability to motivate current management to achieve desired business objectives.

WEIL:\96783769\7\73217.0004

## Analysis of the KEIP Structure

17.　　Based upon my recommendation to link incentives to financial metrics that would serve the interests of the Debtors' economic stakeholders, the Debtors selected the Cash Flow Targets as the financial performance metrics under the KEIP.  In other words, the payout of KEIP awards are tied to the Debtors' ability to successfully achieve the Cash Flow Targets and the achievement of an Acceleration Event.

18.　　To assess the reasonableness of the design of the KEIP, I analyzed the annual incentive plans of the aforementioned Retail Peers, as well as (a) 15 comparable incentive plans from chapter 11 cases of companies that filed petitions from 2011–2018 with annual revenues of greater than $2 billion (the "**Size-Based KEIPs**")[4] and (b) 26 incentive plans from chapter 11 cases of companies that filed petitions from 2011–2018 in the retail industry (the "**Retail KEIPs**"[5] and together with the Size-Based KEIPs, the "**Comparable KEIPs**").  In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of post-petition incentive plans generally at dozens of other companies.

---

[4]　The Size-Based KEIPs are from the following chapter 11 cases: Alpha Natural Resources, Avaya Inc., Borders Group, Eastman Kodak, Energy Future Holdings Corp., Exide Technologies, FirstEnergy Solutions Corp., iHeartMedia, Inc., NewPage Corp., NII Holdings, Inc., Peabody Energy Corporation, RadioShack (RS Legacy Corporation), SunEdison, Toys "R" Us Inc., and Westinghouse Electric Company LLC.

[5]　The Retail KEIPs are from the following chapter 11 cases: Adinath Corp., ALCO Stores, Inc., American Apparel, Inc. (2016), Ashley Stewart Holdings, Inc., BICOM NY, LLC, Borders Group, Brookstone Inc. (2014), Brookstone Inc. (2018), Claire's Inc., Coldwater Creek, dELiA*s, Inc., Gander Mountain Company Inc., hhgregg, Inc., LHI Liquidation Co. Inc., Marsh Supermarkets, Michigan Sporting Goods Distributors, New Dots, LLC, Orchard Supply Hardware Stores, Pacific Sunwear of California, LLC, Quiksilver Inc., RadioShack (General Wireless Operations), RadioShack (RS Legacy Corporation), Sports Authority Holdings, Inc., The Wet Seal, LLC, Toys "R" Us Inc., and True Religion Apparel, Inc.

19.    The general structure of the KEIP comports with the findings of my review of incentive plans of the Comparable KEIPs and Retail Peers.  I would note the following key observations:

- 75% of Retail Peers used cash flow metrics and/or proxies for cash flow (*e.g.*, EBIDTA/EBIT) within their annual incentive plans;

- cash flow metrics (or proxies for cash flow) were commonly used within the Comparable KEIPs;

- participants are usually limited to senior management with a median number of participants being 15 for the Size-Based KEIPs;

- the proposed number of KEIP Participants fits within the observed range of market practice;

- the concept of threshold and maximum payout levels are reasonable and common design features;

- most restructuring companies use non-annual performance metrics in an incentive plan and quarterly performance periods are common; and

- with respect to the Size-Based KEIPs, 50%–150% of target was the median payout range for threshold to maximum performance; for Retail KEIPs, 37%–110% of target was the median payout range for threshold to maximum performance; and for Retail Peers, 25%–200% of target was the median payout range for threshold to maximum performance.

20.    With respect to the full acceleration of all remaining KEIP awards through the quarter ending October 15, 2019 upon the occurrence of an Acceleration Event, the inclusion of this provision is not as common although acceleration provisions in general are not uncommon either.

21.    To assess the reasonableness of the cost of the KEIP, my team and I reviewed the proposed maximum cost of the KEIP expressed as a percentage of the Debtors' revenue relative to the maximum costs of approved Comparable KEIPs.  In doing so, I observed

that the maximum cost of the Debtors' proposed KEIP as a percentage of revenues was positioned below the 25th percentile of both the Size-Based KEIPs and the Retail KEIPs.

22.    For these reasons, and based on my experience with incentive-based compensation programs employed by companies in chapter 11, I believe the design, structure, cost and individual opportunities available under the Debtors' KEIP is reasonable and consistent with market practice.

### **Analysis of the KERP**

23.    In assessing the reasonableness of the KERP, I worked with my team to analyze (a) 14 comparable retention plans from chapter 11 cases of companies that filed petitions from 2011–2018 with annual revenues of greater than $2 billion (the "**Size-Based KERPs**")[6] and (b) 32 comparable retention plans from chapter 11 cases of companies that filed petitions from 2011–2018 in the retail industry (the "**Retail KERPs**"[7] and together with the Size-Based KERPs, the "**Comparable KERPs**").    In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of post-petition retention plans generally at dozens of other companies.

---

[6]    The Size-Based KERPs were from the following chapter 11 cases: Alpha Natural Resources, Inc., Borders Group, Caesars Entertainment Operating Company, Inc., Eastman Kodak, Energy Future Holdings Corp. (2016 KERPs), Exide Technologies, NII Holdings, Inc., Patriot Coal Corporation, Peabody Energy Corporation, RadioShack (RS Legacy Corporation), SunEdison, Takata Corporation, The Great Atlantic & Pacific Tea Company (2015), and Westinghouse Electric Company LLC.

[7]    The Retail KERPs were from the following chapter 11 cases: Aéropostale, Inc., American Apparel, Inc. (2015), American Apparel, Inc. (2016), Anna's Linens, Inc., BICOM NY, LLC, Borders Group, Brookstone Inc. (2014), Brookstone Inc. (2018), Claire's Inc., Coldwater Creek Inc., Dahl's Foods Inc., Fresh & Easy, LLC, Gander Mountain Company Inc., Golfsmith International Holdings Inc., Gordmans Stores, Inc., Haggen Holdings, LLC, hhgregg, Inc., Marbles Holdings, LLC, Marsh Supermarkets, Michigan Sporting Goods Distributors, Inc., Naartjie Custom Kids, Inc., Nasty Gal Inc., NewZoom, Inc., Pacific Sunwear of California, LLC, Quiksilver Inc., RadioShack (General Wireless Operations), RadioShack (RS Legacy Corporation), Shiekh Shoes, LLC, Sports Authority Holdings, Inc., The Great Atlantic & Pacific Tea Company (2015), The Wet Seal, LLC, and USA Discounters, Ltd.

24.     The general structure of the KERP comports with the findings of my review of retention plans of the Comparable KERPs and my experience.  I would note the following observations:

- most Comparable KERPs do not contain performance metrics;

- there is a wide variety in practices, but most Comparable KERPs provide for award opportunities under 50% of salary;

- installment-based payouts are common market practice;

- the Debtors' clawback feature reinforces long-term retention of critical staff; and

- the maximum cost as a percentage of revenue for Size-Based KERPs and Retail KERPs ranges from 0.05% and 0.04% of revenue at the 25th percentile to 0.21% and 0.17% of revenue at the 75th percentile, respectively.

25.     The total cost of the proposed KERP when expressed as a percentage of the Debtors' revenues is 0.14%, which is between the 50th and 75th percentiles of the observed market data.

26.     The absolute maximum cost of the proposed KERP is among the highest of the Comparable KERPs. However, the Debtor is larger than all the companies in the comparator set, and over *twenty times as large* as the median company revenues of the Retail KERPs. As such, I believe it is reasonable to expect the absolute cost of the Debtors' KERP to be high relative to the available comparison set.

27.     I also believe, and the data shows, programs such as the Debtors' proposed KERP are regularly utilized by similarly situated companies to retain personnel such as the KERP Participants.

12

28.     For these reasons, and based on my experience with retention-based compensation programs employed by companies in chapter 11, I believe the design, structure, cost and award opportunities of the Debtors' KERP is reasonable and consistent with market practice.

## Conclusion

29.     Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, cost, and award opportunities available under the KEIP and KERP are reasonable given the facts and circumstances of these chapter 11 cases.

[*Remainder of page left intentionally blank*]

13

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 15, 2018    By: /s/ Douglas Friske
   Chicago, Illinois       Douglas Friske
             Managing Director
             Willis Towers Watson PLC

14

**<u>Exhibit C</u>**

**Meghji Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                          :
                                               :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,      :
                                               :        **Case No. 18-23538 (RDD)**
                                               :
              **Debtors.** [1]                 :        **(Jointly Administered)**
------------------------------------------------------------x

## DECLARATION OF MOHSIN MEGHJI
## IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER
## (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
## FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

I, Mohsin Meghji, hereby declare under penalty of perjury to the best of my
knowledge, information, and belief:

1.       I am the Chief Restructuring Officer ("**CRO**") of Sears Holdings
Corporation ("**Sears Holdings**") and its debtor affiliates (collectively, the "**Debtors**") in the
above-captioned chapter 11 cases. I am a Managing Partner with M-III Advisory Partners, LP
("**M-III**"). In October 2018, M-III was retained by Sears Holdings to provide the Debtors with a

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart
Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc.
(6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC
(0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537);
Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022);
Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business
Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C.
(7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company
(PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW
Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida
Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc.
(9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington
LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531);
Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears
Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest,
LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034);
Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands
Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road,
Hoffman Estates, Illinois 60179.

CRO and to provide the Debtors and their other professionals with financial advisory services in connection with the Company's evaluation and development of strategic alternatives. In connection with the M-III engagement and prior to October 15, 2018 (the "**Commencement Date**"), I was appointed CRO of Sears Holdings with the contemplated commencement of the chapter 11 cases. As CRO, I report and provide strategic business advice to the Restructuring Committee of the Board of Directors of Sears Holdings in connection with the Debtors' chapter 11 cases, and I am responsible for carrying out the Debtors' chapter 11 strategy and objectives. I am knowledgeable about and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. I have more than 25 years of financial restructuring, interim management, turnaround, and management consulting experience.

2.      I submit this declaration in support of the *Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* (the "**Motion**").[2] Except as otherwise indicated, all statements in this declaration are based on my personal experience and knowledge, my opinion, my discussions with the Debtors' management and professionals, and my review of relevant documents. If called to testify, I could and would testify to each of the facts and opinions set forth herein. I am generally familiar with the pre- and post-petition structure of the Debtors' compensation programs, the Debtors' business goals, and with the Debtors' proposed key employee incentive plan (the "**KEIP**") and key employee retention plan (the "**KERP**") as they are set forth in the Motion.

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion.

3.      I have reviewed the Motion and the documents identified therein, including the benchmarking analyses of the KEIP and KERP performed by Willis Towers Watson PLC ("**Willis Towers Watson**"), the Debtors' independent compensation consultant, as well as the terms and provisions of the KEIP and KERP.  I believe that approval of the KEIP and KERP is essential to the Debtors' reorganization efforts and maximizing the value of the Debtors' estates for the benefit of all of the Debtors' economic stakeholders.

## The KEIP and KERP

4.      The Debtors' senior management and key employees (collectively, the "**Key Employees**") are critical to the Debtors' ability to maximize stakeholder value through this restructuring process.  Key Employees include those individuals responsible for determining the Debtors' strategic direction and ensuring that the Debtors achieve their overall performance goals, as well as hard-to-replace employees with valuable institutional knowledge and skills. These individuals hold institutional knowledge critical to the Debtors' operations, and many have longstanding relationships with the Debtors' vendors and suppliers that I believe would be difficult and expensive, if not impossible, to replace.

5.      However, prior to and since the Commencement Date, there has been a high degree of uncertainty among the Debtors' Key Employees as to their job security, the future of the Debtors' business enterprise and, in view of these circumstances, whether they should be seeking other opportunities.  The Debtors cannot afford such distractions or to lose their Key Employees at this stage of their chapter 11 cases.  I believe maintaining and promoting Key Employee morale and providing appropriate incentives is essential not only to the general welfare of the business enterprise, but to the entire reorganization effort.

WEIL:\96784071\4\73217.0004

6.      Recognizing that implementing appropriate incentives for driving outperformance and maintaining operational integrity during this restructuring process is critical to their overall success, M-III, under my direction, helped the Debtors to identify key individuals whose ongoing participation and outperformance will likely be critical to driving stakeholder value.

7.      Like many companies, the Debtors historically utilized a combination of, among other things, (i) base salaries, (ii) an annual, performance-based incentive opportunity (or "**AIP**"), (iii) long-term, time based awards (or "**LTIP**"), and (iv) discretionary bonuses to drive outperformance.  Based on my experience, nearly every large company historically has provided both long term and near term incentive-based compensation to their key employees, and the Debtors did precisely that on a prepetition basis through the AIP and LTIP.  I believe these historic programs, however, did not and could not account for the changing business goals rising upon the commencement of these chapter 11 cases.  I believe the Debtors, now more than ever, must ensure that they have the personnel necessary to drive value and achieve outperformance—regardless of the ultimate disposition or restructuring path adopted in these chapter 11 cases.

8.      As a preliminary measure, the Debtors elected to raise base salaries for certain key executives following the commencement of these chapter 11 cases, including their three senior-most executives (*i.e.*, their Chief Digital Officer, Chief Financial Officer, and President – Softlines).  These individuals have undertaken the combined role of the Office of the Chief Executive following the departure of the Debtors' then-current Chief Executive Officer on October 14, 2018.[3]  These additional duties have been undertaken in addition to those individuals' existing responsibilities.

---

[3]      *See* Sears Holding Corp. Form 8-K, Item 5.02 (Oct. 15, 2018) (announcing formation of Office of the Chief Executive).

WEIL:\96784071\4\73217.0004

9.      To address these circumstances and properly incentivize the Debtors' employees and senior management to work toward a value-maximizing restructuring, beginning on or around October 2018, I, along with M-III, and the Debtors' senior management team, with the assistance of (a) Weil, Gotshal & Manges LLP, the Debtors' restructuring counsel, and (b) Willis Towers Watson, undertook a deliberative process to design two narrowly-tailored programs for the Key Employees:  (i) a KEIP, providing for, over six months (a) two quarterly cash payments to 18 members of the Debtors' senior leadership team, payable if and only if the Debtors achieve certain hard-to-reach cash flow-based performance metrics, and (b) upon the achievement of an acceleration event (as defined in the Motion) (an "**Acceleration Event**"), the payment of the maximum remaining KEIP awards through the quarter ending October 15, 2019, and (ii) a KERP for less-senior Key Employees providing for quarterly, time-based cash awards over a projected twelve-month period.

10.     I and my team assisted the Debtors to identify those employees most critical to the success of these chapter 11 cases here.  In this process, the Debtors identified: (i) 18 senior members of the Debtors' management team (collectively, the "**KEIP Participants**"), who the Debtors submit are "insiders" as that term is defined by section 101(31) of the Bankruptcy Code; and (ii) 322 critical, but less senior and non-insider executives (collectively the "**KERP Participants**") that play critical roles in the Debtors' operations and ongoing restructuring efforts, for inclusion in incentive and retention based programs tailored to the Debtors' business needs. I am neither a KEIP Participant nor a KERP Participant.

11.     I believe that the KEIP and KERP are reasonable, essential to maintaining or appropriately incentivizing the Debtors' workforce during these chapter 11 cases, as applicable, and a sound and appropriate exercise of the Debtors' business judgment.

WEIL:\96784071\4\73217.0004

- First, to ensure reasonableness, the Debtors retained Willis Towers Watson to perform a thorough benchmarking analysis of the Employee Programs. As set forth in the Friske Declaration, Willis Towers Watson benchmarked the KEIP and KERP against incentive and retention plans implemented in the recent chapter 11 cases of numerous retail as well as similarly-sized companies and benchmarked the compensation levels of the KEIP Participants against the compensation levels of retail industry companies. Willis Towers Watson concluded that the design and cost of the Employee Programs were within the range of reasonableness and that the implementation of the KEIP will enable the KEIP Participants to achieve compensation levels, assuming performance, more in line with companies in the retail industry. I believe that the costs of the KERP and KEIP are reasonable.

- Second, the Debtors, in consultation with their advisors, carefully crafted the Employee Programs to appropriately incentivize (through the KEIP) and retain (through the KERP) a narrowly-defined group of Key Employees, including, with respect to the KEIP, through the achievement of performance goals linked to Cash Flow Targets (as defined in the Motion)—performance metrics that I believe will inure to the benefit of all of the Debtors' economic stakeholders.

- Third, the Key Employees have in-depth industry expertise and knowledge of the Debtors' businesses, assets, liabilities, counterparties, and operations and are vital to the success of the Debtors' reorganization effort; and, moreover, as part of the Debtors' ongoing restructuring efforts, many of the Key Employees have been called upon to undertake additional responsibilities and to expend significantly more working hours than contemplated by the normal terms of their employment.

- Fourth, as discussed below, it is my understanding that none of the KERP Participants is an "insider," as such term is defined in the Bankruptcy Code.

### Necessity and Development of the KEIP

12.     The KEIP Participants are responsible for leading and managing the Debtors' business operations and employees, and guiding and implementing the Debtors' overall business strategy. The KEIP Participants also have the added responsibility of fulfilling chapter 11 related obligations, including, additional reporting, implementing the reorganization strategy, participating in court hearings and meetings with stakeholders, and other administrative and

6

operational obligations.    Accordingly, I believe incentivizing the KEIP Participants and leveraging their talents and corporate knowledge is value maximizing and will benefit all stakeholders and parties in interest.

13.    The KEIP is an incentive-based program, with performance goals set at the achievement of at least 110% of budgeted net cash flow ("**Net Cash Flow**") projected by the Debtors' current debtor-in-possession financing (the "**Cash Flow Targets**") on a quarterly basis for (i) the quarterly period ended January 15, 2019, and (ii) the quarterly period ended April 15, 2019, respectively, with maximum award opportunities available for the achievement of at least 120% of budgeted Net Cash Flow or above. I believe the Cash Flow Target provides a recognized measure of business performance in a restructuring context. I believe the Cash Flow Targets are not easily achievable, based on among other things:

- the highly challenging retail environment in which the Debtors operate;

- challenges in retaining customers due to the negative publicity attendant to the chapter 11 filings;

- the substantial, additional duties undertaken by the KEIP Participants following the commencement of these chapter 11 cases;

- the necessity of maintaining the integrity and stability of the Debtors' supply base; and

- the Debtors' historical challenges in maintaining and achieving positive cash flow over a sustained period.

14.    I believe the Debtors' Cash Flow Targets are neither "lay ups" nor "slam dunks"; rather, achievement of the Cash Flow Targets will require substantial outperformance from the KEIP Participants, and all stakeholders will benefit if these targets are achieved.  Under these circumstances, I believe that the KEIP is incentive-based and is designed to motivate the KEIP Participants to maximize the enterprise value of the Debtors.  The KEIP Participants will

WEIL:\96784071\4\73217.0004

not be eligible for any other bonuses except those under the KEIP and only to the extent the performance metrics are met or an Acceleration Event is acheived.

### **Necessity and Development of the KERP**

15.    In addition to the KEIP, the Debtors seek to implement the KERP to increase the likelihood that valuable, non-senior management personnel are motivated to remain employed with the Debtors during the chapter 11 process and to ensure that the Debtors do not suffer significant and costly Key Employee attrition and turnover, which I believe could happen absent the KERP. The KERP Participants comprise a wide and diverse range of roles, with job titles such as "Manager," "Director," "Vice President," and "Head," and the KERP Participants have an average salary of approximately $172,000. I believe KERP Participants may be concerned with their employment prospects at this juncture, and that the Debtors cannot afford attrition among such individuals this time.

16.    Additionally, as part of the Debtors' ongoing restructuring efforts, many of the KERP Participants have been called upon to undertake additional responsibilities and expend significantly more working hours than contemplated by the normal terms of their employment. The KERP Participants' additional responsibilities include, among other things, negotiating with suppliers and vendors to ensure compliance with the Bankruptcy Code and the Court's orders, participating in contract assumption and rejection analyses, preparing business plans, cash flow projections, and related requirements to comply with the budget under the Debtors' current debtor-in-possession financing, and complying with the various reporting requirements for debtors operating in chapter 11. Consequently, I believe that, absent the implementation of an appropriate retention program, the Debtors will lose KERP Participants, with the attendant detrimental impact on their operations. Accordingly, I believe that

WEIL:\96784071\4\73217.0004

implementation of the KERP is necessary to motivate and retain the KERP Participants and ensure that the Debtors' anticipated business needs will be met during the restructuring process.

17.    The Debtors, with my and my team's assistance, analyzed the Debtors' 68,000 employee base to determine which non-insider employees are the most critical to both operations and a successful restructuring process, and should therefore be included in the KERP. Debtors selected the 322 KERP Participants out of an initial submission of 900 nominees. The Debtors selected KERP Participants based on their status as critical, non-insider, hard-to-replace employees with valuable institutional knowledge and skills.   Many of the KERP Participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations, and many have longstanding relationships with the Debtors' vendors and suppliers that I believe would be difficult and expensive—if not impossible—to replace.   The average tenure of the KERP Participants' employment is approximately 16.5 years.   I believe that preserving this experience, institutional knowledge, and these relationships is crucial to the successful conclusion and efficient administration of the Debtors' chapter 11 cases.   Moreover, the KERP Participants work across a variety of disciplines and are responsible for facilitating a range of tasks critical to the Debtors' operations, including matters relating to store operations, inventory management, real estate, legal, marketing, finance, human resources, and information technology.

18.    It is my understanding that none of the KERP Participants is an "insider," as such term is defined in the Bankruptcy Code.   First, none of the KERP Participants has discretionary control over any material corporate transaction or the ability to dictate company policy.   Second, although certain KERP Participants hold the title of "Vice President" or similar,

9

such individuals do not exercise control over material aspects of the Debtors' operations. Third, none of the KERP Participants is an executive, member of the Debtors' board of directors, or participates in the Debtors' corporate governance.

## Conclusion

19.    Based on the foregoing, my experience, and the information presented in the Friske Declaration, Willis Towers Watson's benchmarking analyses, and the terms and provisions of the KEIP and KERP, I believe that the KEIP and KERP are reasonable, appropriately designed, and narrowly-tailored to incentivize the KEIP Participants and to retain the KERP Participants for the benefit of the Debtors, their economic stakeholders, and the successful administration of these chapter 11 cases.

*[Remainder of page intentionally left blank]*

10

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 15, 2018          By:    /s/ Mohsin Meghji
      New York, New York              Mohsin Meghji
                                    Chief Restructuring Officer
                                    Debtors and Debtors in Possession

WEIL:\96784071\4\73217.0004