WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                                       :
                                                            :     **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,                   :
                                                            :     **Case No. 18-23538 (RDD)**
                                                            :
          Debtors.[1]                                       :     **(Jointly Administered)**
------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DECLARATION OF BRANDON AEBERSOLD IN SUPPORT OF DEBTORS'
OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION FOR AUTHORITY TO
(A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C)
GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES AND (D)
GRANT RELATED RELIEF AND IN SUPPORT OF DEBTORS' SUPPLEMENTAL
MOTION FOR AUTHORITY TO (I) OBTAIN JUNIOR POSTPETITION FINANCING,
AND (II) SCHEDULE FINAL HEARING**

I, Brandon Aebersold, make this declaration under 28 U.S.C. § 1746:

1. My name is Brandon Aebersold. I am over the age of 18 and competent to testify.

2. I am a Managing Director at Lazard Frères & Co. LLC. ("**Lazard**"), the investment banker to Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**").

3. I submit this Declaration in support of the *Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) For Related Relief*, and in support of the *Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing and (II) Schedule Final Hearing* (the "**DIP Motion**") and proposed junior financing package (the "**Junior DIP Financing**").[2]

4. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management, other members of the Lazard team, and the Debtors' other advisors, and my review of relevant

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the DIP Motion.

2

documents and/or my opinion based upon my experience. If called to testify, I would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, and/or opinion.

### Background and Qualifications

5.  As noted above, I am a Managing Director with Lazard, a financial advisory and investment banking firm. I joined Lazard in 2007. I have approximately 15 years of investment banking and restructuring experience. Prior to joining Lazard, I practiced law at the firm of Simpson Thatcher & Bartlett LLP, where I focused on mergers and acquisitions and leveraged finance transactions. I have advised corporate clients and creditor groups in a broad range of restructuring, reorganization and capital raising transactions, in traditional and distressed situations, across a diverse variety of industries. In addition, I have substantial experience marketing, structuring, and evaluating debtor-in-possession financings, secured debt facilities, and exit financings.

6.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years. Lazard has dedicated professionals who provide restructuring services to its clients. The current managing directors, directors, vice presidents, associates and analysts of Lazard have extensive experience working with financially troubled companies and creditors thereof in complex financial restructurings out-of-court and in chapter 11 proceedings. Lazard and its professionals have been involved as advisors to debtors, creditors, equity constituencies and government agencies in numerous reorganization cases. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing well over $1 trillion in debtor liabilities.

3

**Lazard's Retention**

7. Prior to the Commencement Date, the Debtors engaged Lazard to act as the Debtors' exclusive investment banker in connection with the Debtors' review of strategic alternatives to address their capital structure. The Lazard team under my supervision has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to this case and has become acquainted with the Debtors' capital structure, liquidity needs, and business operations.

**Debtors' Efforts to Obtain Senior Postpetition Financing**

8. As discussed in my declaration of October 15, 2018 titled *Declaration of Brandon Aebersold in Support of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) Schedule Second Interim Hearing and Final Hearing* ("**First Day Declaration**"), due to a number of factors (which are detailed therein), the Company focused its prepetition efforts to obtain senior postpetition financing on negotiating a debtor-in-possession financing facility with its Prepetition First Lien Lenders. The Debtors and their advisors engaged in extensive and exhaustive negotiations with the Prepetition First Lien Lenders, which ultimately culminated in the terms of the proposed DIP ABL Facility. Based on my involvement in these negotiations, I observed the negotiations with the DIP ABL lenders to be conducted at arm's length and in good faith.

9. The Debtors sought authority to obtain the DIP ABL financing on an interim basis only so that they could market-test the financing on a postpetition basis. Beginning on the afternoon of the Commencement Date, Debtors reached out to nine potential third-party lenders who frequently provide senior asset-backed debtor-in-possession financing to discuss alternative

Senior DIP financing. Following the initial outreach, during which time my team set up a data room, offered calls with management, and otherwise responded to diligence requests, each of the nine potential alternative Senior DIP lenders declined to provide terms. Based on feedback I received from those parties, this was due to the fact that they were not willing to (a) provide similar financing on terms that would be competitive from a cost of capital perspective and/or (b) engage in a non-consensual priming dispute with the Pre-Petition First Lien Lenders and/or Pre-Petition Second Lien Lenders.

10. In an effort to obtain the best possible financing for the Debtors, the Debtors and their advisors contemporaneously explored whether alternative financing providers classified as potential Junior DIP lenders would be willing to provide the DIP ABL facility or would be willing to pursue potential alternative financing structures that would obviate the need for the DIP ABL Facility. One such alternative structure contemplated raising up to $600 million on a junior basis. Although the Debtors did receive two such proposals for an upsized, $600 million Junior DIP facility, the terms were less advantageous from the Debtor's perspective due to the fact that such financing was materially more expensive than the combined DIP ABL facility and Junior DIP Facility and included structural impediments (*e.g.*, priming liens on certain prepetition collateral).

11. In light of the above and based on my experience and knowledge of the market, the terms and conditions (including the fees and expenses) of the proposed DIP ABL Facility are fair and reasonable under the circumstances.

12. Moreover, based on my experience and involvement in negotiations with the DIP ABL Lenders, the proposed "roll-up" of prepetition claims, when viewed in the context of the totality of the DIP ABL Facility and in light of the circumstances, is reasonable. The Debtors

5

and their advisors engaged in extensive negotiations with the DIP ABL Lenders in connection with the proposed "roll-up," but the DIP ABL Lenders indicated to the Debtors (on numerous occasions) that they were not willing to provide new-money commitments without the roll-up of the pre-petition term loan and prepetition ABL revolving facility. Notably, no prepetition loans will roll into DIP ABL obligations unless the holder of those prepetition obligations provides its pro rata share of new money DIP ABL (such opportunity to provide commitments to provide the DIP ABL to be offered to prepetition ABL Revolver and ABL Term Loan lenders).

### Debtors' Efforts to Obtain Junior Postpetition Financing

13. Because additional financing in excess of the DIP ABL Facility was not needed on an interim basis, the Debtors did not seek approval of the Junior DIP Financing at their first-day hearing. Instead, the Debtors previewed their intention to seek interim relief for the Junior DIP Financing at a later time. The Debtors used this additional time to seek proposals with more attractive terms. The Debtors continued their prepetition marketing efforts, reaching out to approximately 90 parties, including third-party lenders who frequently seek to provide debtor-in-possession financing. Following its outreach to potential lenders, the Debtors executed more than 30 confidentiality agreements.

14. Based on market feedback and conversations with interested parties, input from the DIP ABL lenders and refined views of liquidity needs, the Debtors narrowed the universe of proposed financing structures down to three preferred structures, which were outlined in a process letter distributed to the parties under confidentiality agreement on November 1, 2018. The process letter also outlined the requirements for submission of an indicative proposal and proposed timeline for approval and execution of an incremental financing. My team and I contacted parties under NDA to provide information and explanation of the proposed structures. Lazard and the

6

Debtors also responded to the diligence requests of potential lenders and conducted phone calls and provided hundreds of responsive documents via a virtual data room in order to ensure potential lenders were in a position to make a proposal under the required timeframe. Ultimately, the Debtors received four proposals. The three potentially actionable proposals included (a) one proposal from a consortium; and (b) two different proposals from another consortium. The Debtors also received a fourth proposal, but it was ultimately rescinded. Under the auspices of their Independent Restructuring Committee, and with the assistance of their advisors, the Debtors reviewed and analyzed each of the proposals, and engaged the remaining potential financing parties in rounds of negotiations.

15.     Following negotiations, the Debtors chose a $350 million, delayed-draw term loan offered by a consortium led by Great American Capital Partners, to be secured by: (a) a junior lien on encumbered collateral, (b) a *pari passu* senior lien on certain Specified Collateral, (c) a lien junior only to the Carve-Out and DIP ABL Liens on other previously unencumbered assets, and (d) a lien junior only to the Carve-Out, Other Prepetition Liens, and DIP ABL Liens on collateral with other prepetition liens. Based on my experience as a restructuring professional, the pricing associated with the proposed Junior DIP Financing is reasonable under the circumstances.

### Junior DIP Financing Has Been Negotiated at Arms-Length and in Good Faith

16.     As stated above, after the Commencement Date, the Debtors and their advisors have engaged in exhaustive, iterative negotiations with potential financing parties and the DIP ABL Lenders regarding the proposed junior debtor-in-possession financings. Lazard contacted approximately 90 parties classified as potential Junior DIP lenders. The Debtors exchanged multiple drafts of the term sheets, debtor-in-possession documents, and diligence with

7

the potential financing parties. The Debtors continued to engage with multiple parties until the end of the diligence period, materially improving the terms of the financing as compared to those originally offered, and utilizing the competitive tension to further negotiate terms to the benefit of these chapter 11 estates. The negotiations culminated in the terms of the proposed Junior DIP Financing, the approval of which is sought on an interim basis in the DIP Motion. Based upon my observations and involvement in the negotiation of the DIP financing in this matter, I believe that the negotiations with potential lenders were conducted at arm's length and in good faith.

17. In addition, due to the extended interplay between the DIP ABL Facility and the Junior DIP Financing, the Debtors also engaged the DIP ABL Lenders in substantial discussions with the Junior ABL Lenders and their respective advisors. The Debtors sought DIP ABL Lender comments to the junior DIP termsheets and directly connected the two groups to discuss and finalize the intercreditor documents. The DIP ABL Lenders are supportive of the Junior DIP Financing and, as discussed above, have made concessions, including consenting to senior liens on Specified Collateral and marshalling other collateral to allow for the Junior DIP Financing and the benefits thereunder. Specifically, the DIP ABL Lenders have agreed to look first to the proceeds of the Prepetition ABL Collateral to repay the obligations under the DIP ABL Facility. The DIP ABL Lenders will seek repayment from the proceeds of the previously unencumbered collateral only to the extent that the proceeds of the Prepetition ABL Collateral will be insufficient to repay the entire DIP ABL Facility outstanding at the time when it has to be repaid. In effect, the DIP ABL Lenders will use the proceeds of the previously unencumbered assets only to the extent of the diminution of the aggregate value of their prepetition collateral. Finally, in an effort to maintain ongoing dialogue and transparency with the Creditors' Committee,

the Debtors and their advisors provided ongoing updates and responded to any inquiries and diligence requests.

18. Based on my experience and knowledge of the market, the Junior DIP Financing is the best option currently available to the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  November 23, 2018
        New York, New York

*/s/ Brandon Aebersold*
Brandon Aebersold
Managing Director
Lazard Frères & Co.  LLC