WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                                            :
                                                                 :          **Chapter 11**
**SEARS HOLDINGS CORPORATION, *et al*.,**                        :
                                                                 :          **Case No. 18-23538 (RDD)**
                                                                 :
              Debtors.[1]                                        :          **(Jointly Administered)**
-----------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DECLARATION OF ROBERT A. RIECKER IN SUPPORT OF DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION FOR AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES AND (D) GRANT RELATED RELIEF AND IN SUPPORT OF DEBTORS' SUPPLEMENTAL MOTION FOR AUTHORITY TO (I) OBTAIN JUNIOR POSTPETITION FINANCING, AND (II) SCHEDULE FINAL HEARING**

I, Robert A. Riecker, make this declaration under 28 U.S.C. § 1746:

1. My name is Robert A. Riecker. I am over the age of 18 and competent to testify.

2. I am the Chief Financial Officer ("**CFO**") of Sears Holdings Corporation ("**Sears Holdings**") and have held this role since April 2017. The other debtors in the above-captioned cases are all wholly owned, direct or indirect subsidiaries of Sears Holdings (collectively with Sears Holdings, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"). On October 15, 2018, the Company's Board of Directors created an Office of the CEO, of which I am a member, and I report to the Board of Directors. Previously, I served as Controller and Head of Capital Markets Activities for the Company. I have been employed by the Company since October 2005.

3. I submit this Declaration in support of the *Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) For Related Relief* (the "**Committee's Objection**" and the motion objected to thereby, the "**Senior DIP Motion**") and in support of the *Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing and (II) Schedule Final Hearing* (the "**DIP Motion**") and the proposed

junior financing package (the "**Junior DIP Financing**").[2] On October 15, 2018, I submitted a *Declaration Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* in support of the motions and applications the Debtors filed with the Court, including the "first-day motions."

4. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or information provided to me by employees of the Company or the Company's advisors, or my opinion, which itself would be based upon my experience, knowledge, and information concerning the Company's operations. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, and/or opinion.

### The Debtor's Need for the DIP ABL Financing

5. I have reviewed the Senior DIP Motion and the Committee's Objection. I understand the Committee's desire to obtain more favorable terms for senior DIP financing, but, based on my experience as CFO of Sears Holdings and my participation in the negotiations for senior DIP financing and on advice from Debtors' advisors, I do not believe that any of the alternative proposals reviewed by me and described to me by the Debtors' advisors provide terms which, when viewed as a whole, are more beneficial to the Debtors than the terms of the DIP ABL Facility. Indeed, it is my understanding that the Committee has not identified any potential sources of senior DIP financing that would provide more favorable terms.

6. Sears needs breathing room to determine the best and most value-maximizing path forward. As discussed in the *Declaration of Mohsin Y. Meghji in Support of*

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the DIP Motion.

3

*Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) Schedule Second Interim Hearing and Final Hearing* [Docket No. 10], the DIP ABL Facility provides this breathing room on terms which are adequate, fair, and reasonable under the circumstances, and ensures the uninterrupted operation of the Debtors' business. Indeed, if the proposed DIP ABL Facility and the Junior DIP Financing (as discussed below) are not approved, I believe the Debtors will be forced to immediately liquidate at fire sale prices and tens of thousands of jobs will be lost.

7. Based on my involvement in the negotiations for senior DIP financing, the terms of the DIP ABL Facility represent the best terms on which the Debtors are able to obtain senior postpetition financing, and the DIP ABL Lenders made significant and meaningful concessions throughout the negotiation process. Further, the DIP ABL Facility was negotiated between the Debtors and the DIP ABL Credit Parties in good faith and at arms' length.

8. Based on my involvement in the negotiations for senior DIP financing, the Rollup of the ABL Lenders' prepetition claims was a necessary condition to secure the DIP ABL Facility, and I do not believe it will prejudice unsecured creditors. Further, the DIP ABL Lenders negotiated for several concessions that were meaningful to the Company in exchange for the Rollup. In addition, the Prepetition ABL Facility was secured by the Debtors' most liquid assets, including cash, inventory, credit card receivables, and pharmacy receivables. Around the Commencement Date, the Prepetition ABL Facility collateral was valued at approximately $2.8 billion (of which the net orderly liquidation value ("**NOLV**") of the Debtors' inventory was valued at about $2.74 billion) with approximately $1.53 billion borrowed against it under the Prepetition ABL Facility. Accordingly, absent some unforeseen circumstance, the Debtors should be able to satisfy the DIP ABL Facility from the proceeds of the original Prepetition ABL Collateral without

4

resorting to the proceeds of previously unencumbered collateral so long as the Debtors have the time and liquidity to run an orderly and value-maximizing process.

9.   Separately, prior to the commencement of these chapter 11 cases and continuing today, the Debtors are in cash dominion.  In the event that an alternative financing were extended, as part of the adequate protection package for an ABL facility, the Prepetition ABL Lenders would have sought, and would have been entitled to remain in formula under their borrowing base, and the ability to exercise cash dominion to maintain such formula.  In that case, even without the Rollup, the Prepetition ABL Agent would sweep all cash, and subsequent re-borrowings would create new postpetition obligations.  During the first five weeks of the chapter 11 cases, the Debtors have realized approximately $210 million in weekly receipts.  Based on that schedule, the Prepetition Revolver should be repaid in approximately four to six weeks.  Therefore, even without the Rollup, at least with respect to the Prepetition Revolver, a rollup would "creep-up" naturally and substitute $836 million in prepetition obligations with postpetition obligations.  At the same time, the Prepetition ABL Facility Agent could not extend the Rollup to only the prepetition revolver lenders and exclude the prepetition term loan lenders or the letters of credit providers under the terms of the Prepetition ABL Credit Agreement.

10.   In addition, in the ordinary course, the Debtors regularly sell off their inventory and replace it with new inventory in the non-going out of business stores.  The rate at which specific inventory turns over varies by item—appliances, for example, turn over much more quickly than jewelry—but on average, the Debtors turn over their inventory once every 26 weeks.  This means that by approximately mid-March, almost the entire Prepetition ABL Facility will have been fully secured by postpetition collateral.

5

11. Based on my experience as CFO of Sears Holdings, the Debtors operate a complex and interconnected enterprise wherein each component of the business is operationally and financially interdependent. Those Debtors that were prepetition obligors do not operate in separate silos from those that were not. The non-obligors benefit from the Prepetition ABL Lenders' willingness to provide postpetition financing to the same extent as the prepetition obligors. For example, Innovel Solutions, Inc. ("**Innovel**"), a debtor entity that was not an obligor under the Prepetition ABL Facility, operates a separate logistics business that provides delivery and distribution services to third-party vendors, such as Amazon, Costco, Home Depot, and others. Innovel depends on the operational support and cash management systems of the obligors under the Prepetition ABL Facility in its everyday operations. Innovel also uses distribution centers owned and/or operated by other Sears entities. Without the funding made available under the DIP ABL Facility and the DIP ABL Facilities, Innovel would be unable to conduct its day-to-day operations. Similarly, certain Debtor entities that own real estate and were not obligated under the Prepetition ABL Facility, rely on the obligors to pay maintenance and taxes used in Sears' operations. Such entities, too, would be unable to continue without access to the funds under the DIP ABL Facility or the Prepetition ABL Credit Parties' cash collateral. In sum, the non-obligors' estates would face difficulties, if not certain liquidation, if they were to be left to fend for themselves without the financial support from the DIP ABL Financing, including the provision of $300 million in new money financing, an increase of the advance rate under the borrowing base formula to 87.5%, and consent to use cash collateral.

### The Debtor's Need for Junior DIP Financing

12. I have reviewed the Junior DIP Motion, and the relief sought therein as it relates to the Junior DIP Financing is essential to ensure the uninterrupted operation of Debtors' business and these chapter 11 cases and is necessary to avoid immediate and irreparable harm to

6

the Debtors' estates. It is critical for the Debtors to send a clear message to their vendors, customers, employees, trade counterparties, and potential acquirers, that the Debtors will be sufficiently capitalized during these chapter 11 cases.

13. The Debtors are in need of an immediate infusion of liquidity. The $350 million in incremental liquidity to be provided by the Junior DIP Financing will allow the Debtors to continue operating in the ordinary course with a larger number of stores while they try to secure a buyer for a substantial part of their business as a going concern. Based on my experience as CFO of Sears Holdings and particularly my knowledge of the Company's projected cash needs, the $250 million interim draw is the minimum amount necessary to get the Debtors through to the proposed final hearing date of December 20, 2018. Absent authority to enter into and access the Junior DIP Financing, the Debtors will be unable to continue operating their businesses, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates. Put differently, with the proposed additional financing, Debtors will be in the best position to maximize value for all stakeholders.

14. The Debtors also are contingency planning if they do not receive a value-maximizing bid for a going concern sale on December 15, 2018. Based on my knowledge of the Company's projected cash needs, even if the Debtors pivot to a liquidation, the $350 million in incremental liquidity to be provided by the Junior DIP Financing is critical to see the Debtors through liquidation, fund going out of business sales, and send a message to the market that Debtors have sufficient capital.

15. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 23, 2018
      New York, New York

*/s/ Robert A. Riecker*
Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation and
its Affiliated Debtors