WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                          :
                                               :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,       :
                                               :        **Case No. 18-23538 (RDD)**
                                               :
              **Debtors.**[1]                   :        **(Jointly Administered)**
-----------------------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING ENTRY INTO ADMINISTRATION AGREEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Background

1.      Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

2

*Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[2]

## Jurisdiction

5.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

6.       By this Motion, the Debtors, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, request entry of a proposed order authorizing the Debtors to enter into the Administration Agreement (as defined below) attached hereto as **Exhibit A** with Assurant Service Protection, Inc., Federal Warranty Service Corporation, and United Service Protection Inc. (collectively, "**Assurant**"), and granting related relief.

7.       A proposed form of order granting the relief requested in the Motion is attached hereto as **Exhibit B** (the "**Proposed Order**").

## The Administration Agreement

8.       Prior to the Commencement Date, the Debtors offered their customers an opportunity to purchase protection agreements or extended warranties (each a "**Service Contract**") under a number of in-house programs that cover the repair or replacement of certain products (collectively, the "**Warranty Programs**").  The Warranty Programs were underwritten by the Debtors and their affiliates under a variety of different names, including but not limited to:

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

Master Protection Agreement, Repair Protection Agreement, Value Protection Agreement, Service Smart Protection Agreement, Basic Protection Agreement, Kmart Smart Plan, Kmart Smart Jewelry Care, Sears Jewelry Care, Sears Maintenance Advantage, and Kenmore Service Plan. Pursuant to the Court's *Order Authorizing Debtors to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations* (ECF No. 135), the Debtors continue to honor their obligations related to the Warranty Programs.

9.      The Warranty Programs offered a stable source of liquidity and revenue and were integral to driving sales of the Debtors' key products and high-margin items.  Further, the Warranty Programs were important to the Debtors' Home Services business unit, which generated additional revenue for the Debtors by, among other things, administering and providing services under the Service Contracts.  The services provided under the Service Contracts can often lead to other streams of revenue for the Debtors, as customers will often purchase additional services, parts, and warranties from the Home Services unit that are not covered by an existing Service Contract.  The Warranty Programs were also important for maintaining the Debtors' workforce, as they provided an opportunity to earn a commission upon a sale of a Service Contract.

10.      Following the Commencement Date, based on, among other reasons various regulatory requirements and declining consumer confidence, the Debtors stopped selling Service Contracts in many jurisdictions under the Warranty Programs where the Debtors were servicing as underwriter and obligor.  At the same time, as announced at a previous hearing before the Court, the Debtors quickly moved to identify alternative third-party underwriters of Service Contracts for the Debtors' customers.

4

11.     After contacting numerous potential providers, the Debtors determined that Assurant offered the most favorable option, considering pricing, terms, and the speed at which the Debtors could restart the sale of new Service Contracts for Warranty Programs underwritten by a third party.  After arm's-length negotiations over the last four (4) weeks, the Debtors reached an agreement with Assurant to underwrite the sale of Service Contracts for an initial three-year term (the "**Administration Agreement**").   The Administration Agreement allows the Debtors to continue offering Service Contracts for many of the Debtors' key product lines including: major appliances, consumer electronics, lawn and garden tools, power tools and garage doors, jewelry, tires, fitness equipment, certain heating, ventilation, and air conditioning products, water heaters, and water softeners.  The Debtors have agreed that Assurant will be the Debtors' exclusive third-party provider of Service Contracts with additional rights of first refusal, and subject to preexisting agreements with other third-party providers.

12.     Pursuant to the Administration Agreement, the Debtors will sell Service Contracts; however, Assurant will be responsible for any claims made under the Service Contracts. The Debtors will retain a significant portion of the amount generated by a sale of a Service Contract as their commission and will remit an amount equal to the balance to Assurant.  The Debtors have agreed to provide Assurant with an initial payment that will, essentially, secure the Debtors' obligations to remit amounts owed to Assurant following sales.  The Debtors will earn a fee and be reimbursed for certain administrative duties such as repair work.  The Administration Agreement includes mutual indemnification provisions and permits the use of certain licenses in connection with the terms of the agreement.  The Debtors negotiated the Administration Agreement with an emphasis on minimizing potential postpetition administrative expense claims while maximizing liquidity.

5

13.     The Debtors executed the Administration Agreement on November 21, 2018 and have begun selling Service Contracts and performing in accordance with the Administration Agreement.   However, Assurant has insisted on Court approval of the Administration Agreement and negotiated for a termination right in the event the Court has not entered the Proposed Order by December 7, 2018.

14.     The Debtors believe that entry into the Administration Agreement is an ordinary course transaction that does not require Court approval.   Neither the Creditors' Committee nor the Debtors' postpetition lenders objected to the Debtors' entry into the Administration Agreement in the ordinary course of business.   Out of abundance of caution and because Assurant has a termination right under the Administration Agreement if it is not approved by December 7, 2018, the Debtors seek explicit approval to enter into and perform under the Administration Agreement.

15.     The Proposed Order contains, among other things, the following provisions related to the Administration Agreement: (i) the Debtors are authorized to execute and perform under the Administration Agreements; (ii) the Debtors and Assurant are authorized to terminate the Administration Agreement in accordance with its terms; and (iii) Assurant is authorized to exercise any rights of setoff and/or recoupment that may exist without the necessity of seeking relief from this Court, including need to seek relief from automatic stay.

16.     The Debtors have consulted with the Creditors' Committee and have been advised that the Creditors' Commitee supports the relief requested herein.

## The Relief Requested Should Be Granted

17.     Although the Debtors do not believe that Court approval is necessary, to the extent entry into the Warranty Service Contract is outside the ordinary course of business, ample

authority exists for approval of the Debtors' entry into the Administration Agreement Contract. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Gen. Motors*, 407 B.R. at 493-94; *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Del. and Hudson Ry. Co.*, 124 B.R. at 166; *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *3 (Bankr. D. Del. May 20, 2002).

18.    Entry into the Administration Agreement is supported by the Debtors' sound business judgment. The Debtors' inability to offer Service Contracts in many jurisdictions following the commencement of these chapter 11 cases has adversely impacted weekly cash flows by several million dollars. The agreement with Assurant allows the Debtors to stem those losses by permitting the Debtors to offer Service Contracts on many of their high value and high margin products. Furthermore, by continuing to sell Service Contracts and maintaining the Warranty Programs, the Debtors are cementing their longstanding commitment to offer a full array of

7

products and services to their members, and ensuring that the onset of these chapter 11 cases is not impacting the customer's experience. The terms of the Service Contracts offered under the Administration Agreement and underwritten by Assurant will be substantially similar to the Debtors' in-house Service Contracts offered prior to the Commence Date. Importantly, because the Debtors will have the responsibility to sell and administer the Service Contracts sold under the Administration Agreement, the Debtors will maintain ownership and responsibility for the customer relationship. Finally, continuing the Warranty Programs and minimizing disruption will maintain the going-concern value of the Debtors and their various business segments during the Debtors' ongoing sale process,

19.     Entry into the Administration Agreement is supported by the Creditors' Committee and will not adversely impact any creditor constituency. The Administration Agreement allows the Debtors to continue to capture revenue from Services Contracts without having to assume the liabilities of underwriting the Service Contracts. There will be limited overhead and operational costs from selling the Service Contracts because the Debtors will continue using their existing programs and systems that were in place prior to the Commencement Date.

20.     Time is of the essence, with peak sales anticipated for retail's holiday season.

21.     Failure to approve entry into the Administration Agreement could adversely impact the Debtors' financial performance during this critical holiday season because Assurant will have the right to immediately terminate the Administration Agreement. In addition to contacting several potential providers of third-party warranty services, the Debtors have engaged in good faith discussions and considerable arm's length negotiations with Assurant related to the

8

provisions of the Administration Agreement.  Assurant has made the Court's approval of the Administration Agreement a condition precedent to the continuation of the agreement and the sale of Service Contracts.  The Debtors have limited financial liability under the Administration Agreement because the Services Contracts will be underwritten by Assurant and existing infrastructure, systems, and employee-training are already in place.  To maximize revenue and increase liquidity, the Debtors have started selling the Service Contracts; however, due to the upcoming December 7, 2018 deadline, the Debtors have sought expedited approval of the Motion.

## **Bankruptcy Rule 6004(h)**

22.    For the reasons set forth herein, to implement the foregoing successfully, the Debtors request that the Court waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As described herein, the Debtors must maximize revenues during the critical holiday season, and Assurant can terminate the Administration Agreement without the Court's approval prior to December 7, 2018.  Accordingly, ample cause exists to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## **Reservation of Rights**

23.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or, validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made

9

pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

24.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**").  The Debtors respectfully submit that no further notice is required.

25.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:  November 23, 2018
         New York, New York

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

10

### Exhibit A

**Administration Agreement**

# ADMINISTRATION AGREEMENT

THIS ADMINISTRATION AGREEMENT ("Agreement"), effective this ___ day of
_____, 2018, is entered into by and among **Sears Holdings Management
Corporation**, located at 3333 Beverly Road, Hoffman Estates, IL 60179 ("Client"), **Federal
Warranty Service Corporation**, located at 260 Interstate North Circle, SE, Atlanta, Georgia
30339 ("Federal"), **United Service Protection, Inc.** ("USPI"), **Assurant Service Protection,
Inc.** ("ASPI"), and **United Service Protection Corporation** ("USPC"), USPI, USPC and ASPI
being located at 11222 Quail Roost Drive, Miami, Florida 33157 (Federal, USPI and ASPI
collectively referred to as "Company").

WHEREAS, on October 15, 2018, Client and certain of its affiliates filed voluntary
petitions for relief under chapter 11 of title 11 of the United States Code in the United States
Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and the cases
are being jointly administered under Case No. 18-23538, styled as *In re Sears Holdings
Corporation, et al.* (the "Chapter 11 Cases");

WHEREAS, Client is a vendor of merchandise that may be covered by a service contract
and an administrator of service contracts for other distribution channels;

WHEREAS, Company provides, markets, and administers service contracts and provides
claims adjudication for products covered under service contracts; and

WHEREAS, Company desires to assist Client in implementing, maintaining and
administering a service contract program for merchandise sold by Client for the benefit of Client,
its distribution channels and its customers.

NOW THEREFORE, in consideration of the promises and mutual covenants contained
herein, the sufficiency of which is acknowledged, the parties agree as follows:

1. **DEFINITIONS.**  Capitalized terms used in this Agreement have the meanings reflected
   below or as otherwise defined in the context of the provision.

   (a) **"Administrator"** means the party responsible for providing the administrative services
   set forth in Section 8.

   (b) **"Administration Fee"** means the amount Company will pay to Client for performance
   by Client of the administrative duties set forth in Section 8. The initial Administration
   Fee amounts will be added to Exhibit A to this Agreement after the actuarial analysis is
   performed by Company in accordance with Section 6(a).

   (c) **"Administrative Reserve"** means the reserve (in an amount mutually agreed between
   Company and Client that is actuarially justified) established to cover administrative
   expenses incurred by the Administrator which shall be retained by Company and paid to
   the Administrator in accordance with Section 8.

DocuSign Envelope ID: B3CA3E60-0141-4853-A79D-9288A0851935

(d) **"Advertising Materials"** means any and all marketing material prepared for dissemination to the public with respect to Service Contracts including, but not limited to, direct mail solicitations, brochures, inserts, snap packs, bangtails, pull-tabs, advertising packages, letters, applications, telemarketing scripts (outbound and inbound), Point of Sale materials, Aftermarket Sales materials, posters, screen wraps, web-site advertising, e-mail solicitations, radio scripts, television scripts, newspaper ads, magazine ads, and training materials used by Company and/or Client.

(e) **"Aftermarket Sale(s)"** means a Service Contract entered into by a Customer not in conjunction with the sale of an Eligible Product. Aftermarket Sales can be, but are not limited to, Service Contract renewals, missed retail opportunities, or resulting from a completed service event. Eligible Products for Aftermarket Sales are indicated on Exhibit A.

(f) **"Claims Reserve"** means an amount determined by Company, in accordance with actuarial principles and based upon relevant historical experience as required and necessary for Service Contract incurred claims.

(g) **"Client Commission"** means the difference between the Retail Selling Price and the Net Price. This amount retained by Client as its compensation is more fully set forth in Section 6. Client's compensation for Point of Sale Service Contracts will be separately identified from Client's Compensation for Aftermarket Sales

(h) **"Commercial Application"** means (i) any use of a Eligible Product that is inconsistent with either the design of the product or the way the manufacturer intended the product to be used; (ii) any installation in a way that prevents normal service; (iii) use of any Eligible Product for business, government, educational, institutional, or any other commercial and/or public application; or (iv) any and all cases in which the manufacturer of the Eligible Product would not honor any warranty regarding the Eligible Product.

(i) **"Company Fee"** means the amount due Company as its compensation for the services provided under this Agreement as more fully set forth in Section 6. The amount of the initial Company Fee shall be equal to six and one-half percent (6.5%) of the Claims Reserve of each Service Contract.

(j) **"Contract Holder"** means a Customer who has purchased a Service Contract to cover one or more specified Eligible Products or, as applicable, the recognized assignee of such Contract Holder.

(k) **"Customer"** means an individual who purchases one or more Eligible Products from Client or through any other distribution channels used by Client as of the Effective Date. Any new distribution channels that Client requests to be added under this Agreement to sell to "Customers" after the Effective Date will be subject to the prior written agreement of the parties.

(l) **"Eligible Product(s)"** means a product or products purchased from Client eligible to be covered by a Service Contract. Any product purchased with the intent to be used, or which is actually used, in a Commercial Application is not an Eligible Product unless the Service Contract specifically provides for such use. For Point of Sale Service Contracts, all Eligible Products shall have coverage remaining under an underlying manufacturer's or other warranty for parts and labor at the time the Service Contract is sold. Eligible Products shall not include items having functional defects.

2

DocuSign Envelope ID: B9D13E6D-0141-4853-879D-9288A0851B35

(m) **"Insurance"** means the contractual liability insurance covering the obligations of the Obligor as more fully set forth in <u>Section 11</u>.

(n) **"Net Price"** means the amount consisting of the Administrative Reserve, the Claims Reserve, and the Company Fee remitted by Client to Company in accordance with <u>Section 6</u>. The initial Net Price amounts will be added to <u>Exhibit A</u> to this Agreement after the actuarial analysis is performed by Company in accordance with Section 6(a).

(o) **"Obligor"** means the entity legally liable to the Contract Holder under the terms of the Service Contract, varying by jurisdiction as set forth in <u>Exhibit B</u>.

(a) **"Point of Sale"** means a Service Contract sold to a Customer at the time of purchase of the Eligible Product(s).

(b) **"Retail Selling Price"** means the price at which a Service Contract is sold to a Customer.

(c) **"Service Contract"** means a contract solely between the Obligor and Contract Holder, which promises to provide diagnostic, repair and/or replacement of a specific Eligible Product in the event of specified failures, with or without additional provision for maintenance of such Eligible Product. Service Contracts include Point of Sale and Aftermarket Sale Service Contracts.

(d) **"State/Legal Requirements"** means requirements arising from prevailing laws, including statutes, ordinances, rules, rulings, orders, or regulations, or the interpretation thereof, or any regulatory action or litigation.

(e) **"Term"** means the Initial Period and any Renewal Period(s), collectively, as more fully described below in <u>Section 2</u>.

(f) **"Territory"** means the jurisdictions set forth in <u>Exhibit B</u>.

2. <u>**EFFECTIVE DATE; TERM.**</u>   This Agreement shall become effective once (i) all parties have signed, and (ii) Company has received from the Official Committee of Unsecured Creditors and debtor-in-possession financing lenders in the Chapter 11 Cases written acknowledgement that such persons will not object to the Client entering into the Agreement in the ordinary course of the Client's business (the "<u>Effective Date</u>"). Client acknowledges and agrees that Company shall have the right to terminate the Agreement immediately, and exercise all rights and remedies associated with termination, if the Bankruptcy Court fails to issue an order, in form and substance reasonably satisfactory to Company, authorizing Client to enter into this Agreement by December 7, 2018. The initial period of this Agreement ("<u>Initial Period</u>") shall begin on the Effective Date and shall end three (3) years from the Effective Date unless otherwise terminated as provided herein.  Upon expiration of the Initial Period, this Agreement shall automatically renew for successive one (1) year periods (each a "<u>Renewal Period</u>") unless written notice is given by either party at least one hundred and twenty (120) days prior to the effective date of any Renewal Period, except as otherwise specified by applicable law.

3. <u>**EXCLUSIVITY.**</u>

(a) During the Term, except as set forth in <u>Section 3(b)</u> below, Client agrees that Company will be Client's exclusive provider of all service contracts and other similar agreements and services under the Agreement for the Service Contract program for Eligible Products in the Territory.  Client will not, directly or indirectly, offer, sell, administer, underwrite,

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B90135E0-0141-4852-979D-9288A0851935

operate or otherwise make available or engage in any program similar to the Service Contract program for Eligible Products in the Territory without the Company's written consent. Client agrees that Company will have the right of first refusal to provide service contract or similar coverage on other products offered by Client to Customers, on competitive market-based rates, that are not included as Eligible Products under this Agreement.

(b) The Company agrees that notwithstanding the foregoing, under certain circumstances, including change of control of Client, sale of some or all of Client's assets, Client's emergence from bankruptcy protection, or general improvement of financial health of Client, Client may move certain product category's Service Contact businesses into a Sears entity with thirty (30) days prior written notice to Company, and in accordance with applicable law.  Such categories will be limited to fitness equipment, jewelry, connected home, and auto.

(c) The Company accepts and acknowledges that there are existing relationships for service contract programs, including Cross Country Home Services (home warranty), UTS Inc., a subsidiary of ICON Health & Fitness, Inc. (NordicTrack fitness), and Centricity (multi-device and parts), that are excluded from <u>Section 3(a)</u> above.  Client agrees that if there are any other existing relationships inadvertently omitted from this provision, Client will promptly notify Company and such relationships will be added to the exclusions under Section 3(a).

(d) Client acknowledges and agrees that monetary damages for any breach of Section 3(a) may be inadequate and that, without intending to limit any additional remedies that may be available, Company is entitled to seek temporary and permanent injunctive and other equitable relief in the case of any breach or threatened breach of Section 3(a) without posting a bond or other security.

4. **<u>CLIENT'S OBLIGATIONS.</u>**   In addition to any other obligations set forth in this Agreement, Client agrees:

(a) To comply with all applicable laws relating to the sale of Service Contracts to the public (and to act as Administrator for the program subject to <u>Section 8</u>), and obtain and maintain all necessary licenses, registrations or other authorizations required by any state or federal authority to carry out its duties under this Agreement, including but not limited to, any State/Legal Requirements, as communicated in writing to Client by Company in accordance with <u>Section 5(b)</u>.  Without limiting the foregoing, Client will be deemed to be aware of any applicable law or requirement thereof which is communicated in writing to Client by Company or by any regulatory agency.  Client will reimburse Company for registration, licensing, and associated costs paid by Company in those states in which Client is required to be licensed, registered or appointed to sell Service Contracts or act as Administrator within thirty (30) days of Company billing Client for such charges. Company will advise Client of estimated costs prior to incurring them, if the costs can be reasonably estimated.  Client further agrees to cooperate in good faith as necessary to assist with Company's compliance with applicable laws.

(b) To submit a copy of all Advertising Materials proposed or produced by Client for Company's prior written approval. All costs associated with the production of such Advertising Materials will be at Client's sole cost and expense.  Client may only produce and disseminate materials approved by Company in writing. Company will provide approval (or disapproval with guidance) of Advertising Materials within ten (10) days,

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B30D35E0-0141-4852-A79D-9288A0851835

provided that (i) all required documentation underlying the Advertising Materials that is necessary to perform the review accompanies the request, and (ii) the number of pages submitted for review is less than fifteen (15). Client must maintain retrievable records of all Advertising Materials produced by Client, including links, web pages, and scripts, in accordance with applicable requirements. Client must provide Company with samples of the final copy of the Advertising Material as soon as practicable after it is made available to the public. Client will not engage in any other marketing efforts, including telemarketing, or post, disseminate, publish, market, solicit, cyberlink, hyperlink or otherwise reference or advertise the program on its web site, if any, the public Internet, or any other public communication system, without the prior written approval of Company. Client will be solely responsible for the cost of production and destruction of any Advertising Materials produced by Client without Company's approval and for which Company ultimately does not provide approval.

(c) To not change, alter, modify, waive, or discharge any terms or conditions of the Service Contract or any performance thereunder. Client must not incur any liability on Company's behalf, nor make representations about Service Contract coverage, except those liabilities and representations that are expressly stated in the Service Contract. Client acknowledges that Company is not obligated to honor claims or perform other acts except in accordance with the terms of the Service Contract. Client agrees to be bound by Company's adjudication of claims and other requests for performance under Service Contracts. Client reserves the right to make exceptions for its customers at its own expense in accordance with Section 13(b).

(d) To undertake Point of Sale and Aftermarket Sales efforts on Eligible Products for which Client shall be entitled to the Client Commission.

(e) To perform the administrative duties in accordance with Section 8.

(f) To maintain and manage its service network and provide parts for repair services under the Service Contracts in accordance with Section 9.

(g) To keep true and complete records and accounts of all transactions contemplated in this Agreement and any other records or data that Company reasonably requires. Client will maintain such records for at least seven (7) years or longer if required by State/Legal Requirements. Upon Company's written request, Client will provide to Company such records and any other information reasonably requested by Company as promptly as practicable and in any event within the timeframe required for Company to comply with State/Legal Requirements.

(h) Not advertise Company's claims telephone number in any manner, except to the extent such telephone number is included within the terms and conditions of a Service Contract provided to a Contract Holder.

(i) To provide a Service Contract to each Contract Holder that purchases a Service Contract from Client and for which Client receives payment of the Retail Selling Price from Contract Holder.

(j) Client will be solely responsible for all telemarketing activities it chooses to engage in. Company shall have no control over the manner or means of any telemarketing activities undertaken or initiated by Client. Client will perform, and will ensure that its third party vendors perform, all activities in compliance with all legal obligations including but not

DocuSign Envelope ID: B39D13E60-0141-4B53-970D-9788A0851925

limited to the Telephone Consumer Protection Act ("TCPA"), Do Not Call requirements and any state or local requirements. Client will provide all necessary and proper supervision of any third party engaged in telemarketing on its behalf to ensure such compliance, including but not limited to review and approval of all telemarketing scripts used by such third parties, and perform periodic audits of such third parties to monitor compliance with all legal and contractual obligations.

(k) Notwithstanding anything to the contrary set forth in this Agreement, any obligations of the Client under this Agreement may be performed by any affiliate of Client set forth on Exhibit C performing such obligations as of the Effective Date; provided that, Client shall ensure that its affiliates abide by the Client obligations set forth in this Agreement and Client shall remain liable for such obligations hereunder.

5. **COMPANY'S OBLIGATIONS.** In addition to any other obligations set forth in this Agreement, Company agrees:

(a) To act as the Obligor and Administrator (subject to Section 8) for all Service Contracts sold in those jurisdictions listed on Exhibit B hereto, as amended by Company from time to time. Company will investigate, process, adjudicate and fulfill the duties of the Obligor arising from Service Contracts and will perform its administrative duties in accordance with Section 8.

(b) To maintain all licenses, registrations or other governmental authorizations required to act as Obligor including, as required by applicable insurance and service contract laws, the securing and maintaining of Insurance, as defined in Section 11, covering its obligations under the Service Contracts sold hereunder. Costs associated with licensing of Company and Insurance shall be borne by Company. Additionally, Company will determine and provide Client with guidance in writing as to compliance requirements relating to the sale of Service Contracts to the public and acting as Administrator (if Client becomes the Administrator) and any material changes in such compliance requirements.

(c) To provide for the repair or replacement an Eligible Product under the terms of the Service Contract, or, in lieu of replacement, provide the Contract Holder with an amount equal to the replacement cost (excluding sales tax, other taxes and fees) of a similar product, in accordance with the Service Contract.

(d) To communicate to Client any modifications to the Service Contract program.

(e) To assist in designing and developing Advertising Materials.

(f) To advise, direct and assist Client in obtaining any necessary approvals, licenses or permits, if any, in connection with the marketing, offering and selling of Service Contracts and Administrator licenses if Client becomes the Administrator.

(g) To provide regulatory compliance guidance and support with respect to sales and, in accordance with Section 8(b), administration of Service Contracts and any applicable insurance laws for the Service Contract program.

(h) To manage repair centers and service providers for the Service Contract program.

(i) To facilitate periodic business reviews to optimize the Service Contract program.

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B39D13E60-0141-4852-A79D-9288A0851935

(j)   To abide by the information security standards set forth in <u>Exhibit D</u> when handling or processing Contract Holder data and any other data shared by Client with Company under this Agreement.

(k)   Company and Client will enter into a mutually agreed upon and separate written service agreement to cover business-to-business repair services.  Company will designate "Select Servicer" status to Client in those markets where Client provides repair services (indicated in a zip code list provided by Client) and meets or exceeds price requirements and service quality agreed to by the parties in advance. Select Servicer status will provide Client with a competitive advantage to receive priority Company service calls in its markets, provided Company is not otherwise obligated with any third party to first provide such repair services or Company is obligated by other client relationships to restrict the use of Client repair services on such client's line of business. Additionally, upon obtaining sufficient historical claims data from Client repair service claims, Company will systematically use such data to rank Client performance and use this ranking to determine future eligibility.  Company and Client shall endeavor to execute a separate written service agreement within thirty (30) days after execution of this Agreement.

6.   **DATA SUBMISSION AND COMPENSATION.**

(a)   The initial amount of the Client Commission for Point of Sale Services Contracts shall be equal to 50% of the Retail Selling Price of each Service Contract ("<u>Initial Commission for Point of Sale Contracts</u>").   However, Company may modify the Initial Client Commission for Point of Sale Contracts based upon the actuarial analysis that will be performed by the Company ("<u>Modified Commission for Point of Sale Contracts</u>").  The Modified Commission for Point of Sale Contracts will serve as the Client Commission as of the date of modification.  The initial amount of the Client Commission for Aftermarket Sales shall be determined based upon an actuarial analysis to be performed by the Company and will serve as the Client Commission as of the date established by Company.  Client shall not be permitted to conduct any Aftermarket Sales unless and until the initial Client Commission for Aftermarket Sales has been set by Company.

(b)   Client will bill and collect the Retail Selling Price from Customers for all sales of Service Contracts and shall be solely liable for billing, collecting, reporting and remitting to the appropriate authorities any and all applicable taxes.

(c)   Beginning on the first date that Service Contracts are sold to Customers (the "<u>First Sale Date</u>"), on a daily basis, Client will provide Company with a report of all Service Contracts sold and those canceled during the previous day in substantially the format set forth in <u>Exhibit E</u>.

(d)   <u>Client's Payment Obligations</u>. On the day prior to the First Sale Date, Client will remit payment to Company in the amount of $1,000,000 ("<u>Initial Payment</u>"), plus one initial daily estimate amount of $180,000 ("Daily Estimate", together with the Initial Payment, the "Initial Amount"). If sales volume begins to exceed the initial Daily Estimate, or states in addition to those for which Company is Obligor as of the Effective Date and/or additional types of business, such as Aftermarket Sales, are added to the Agreement, the Initial Amount and the ensuing Daily Estimate payments will be adjusted (in addition to the original Initial Amount and Daily Estimate amounts) in proparation to the new states/business to mutually agreed amounts and aligned with sales projections to ensure

7

Company has cash equivalent to the greater of the adjusted Initial Amount or four (4) days sales projections for the additional corresponding states/business. At no time will the Initial Amount fall below $1,180,000. Ensuing Daily Estimate payments or an increased Initial Payment for additonal states/business will occur and shall be trued-up on a weekly basis based on the prior week's actual Service Contract sales, less the Client Commission, and less cancellations.  When the Client's bank is closed due to holidays, weekends or for any other publicly scheduled purpose, Client will fund the Daily Estimate for the number of days the bank is closed.  An example of the funding is set forth in <u>Exhibit F</u>. If Client does not remit the Daily Estimate payment each day for the next day's projected sales, Company shall notify Client in writing and Client shall have one (1) day to cure.  If Client is unable to cure within such time, Company shall have the right to notify Client to immediately cease selling Company's Service Contract program and Client shall comply with the notice and cease all sales immediately upon receipt.  All funds remitted are Company funds. Upon termination of this Agreement by Company or Client in accordance with <u>Section 16(c)</u>, Client shall be deemed to have irrevocably waived and forfeited any right to receive the funds remitted under this provision to allow Company to administer and continue to pay claims and fees owed to Company until all Service Contracts are canceled or expire.

(e)  On a daily basis, Company shall be entitled the prior days Net Price remittance for each Service Contract sold the day prior. From the Net Price, Company shall be entitled to the Company Fee as its compensation. Client shall be entitled to retain the Client Commission prior to each remittance.

(f)  Any additional services requested by Client, including, but not limited to, marketing materials, channel optimization, launch kits, training etc. are not currently contemplated under this Agreement and are not part of the pricing structure. Any such services will be reviewed, proposed and charged separately and documented in an amendment to this Agreement.  Company shall not perform any of the foregoing activities unless mutually agreed to by the parties.

(g)  Once Client exits any and all bankruptcy, Company will put in place new payment procedures such that the initial prepayment funding and any subsequent modifications to accommodate additional states or types of business will be retained by Company and moved to the Claims Reserve.

7.  **<u>PRICE CHANGES</u>.**

(a)  When actuarially justified, Company may amend the Net Price and Client Commission then set forth on <u>Exhibit A</u> attributable to any Service Contract. Net Price changes for prospective sales (not for those Services Contracts already sold) can occur twice annually, with thirty (30) days' advance written notice to Client prior to either February 1 or August 1 or, if Company determines that the projected losses for the program will exceed a ninety-five percent (95%) loss ratio, Net Price changes can occur quarterly, with thirty (30) days' advance written notice to Client.

8

(b) The Company Fee is based upon a forecasted annual retail revenue (based on Retail Selling Price) of $250,000,000 for the First Sale Date through June 30, 2019. Beginning July 1, 2019, the Company Fee will be adjusted on a semi-annually based on forecasted revenue to be calculated by annualizing the prior six (6) months of actual sales, net cancellation refunds. For clarity, the first potential adjustment will take place on July 1, 2019 and forecasted revenue will be calculated based on actual sales, net cancellation refunds, for the period January 1, 2019 through June 30, 2019. The following sliding scale sets forth the Company Fee amounts based on annual Service Contract sales revenue:

| Annual Service Contract Sales Revenue | Company Fee (Percent of Claims Reserve) |
|---|---|
| $250M + | 6.50% |
| $200M to $250M | 7.00% |
| $100M to $200M | 7.50% |
| $50M to $100M | 8.00% |
| $10M to $50M | 8.50% |
| <$10M | Stop Writing |

8. **ADMINISTRATION; CANCELLATIONS.**

(a) <u>Administrative Reserve</u>. During the Term of this Agreement, upon remittance of the Net Price by Client in accordance with <u>Section 6</u>, Company shall reserve the Administrative Reserve. Client shall submit invoices to Company on a monthly basis for payment by Company of the Administration Fee for Client's administrative services set forth in Section 8(b) at the agreed upon rates which shall be determined after completion of the actuarial analysis and based on Eligible Product type. Company shall remit the Administration Fee to Client within fifteen (15) days of receipt of each invoice.

(b) Company will be the Administrator for the program. Company hereby subcontracts certain of its administrative duties to Client and Client hereby accepts responsibility for such administrative duties in those states in which Client is properly licensed, at such time as Client is properly licensed, and in those states where no license is required in order for Client to perform such administrative duties. The administrative duties shall include, but not be limited to, providing call center services for Contract Holders seeking assistance with Service Contract claims, dispatching service technicians and/or providing replacement products in instances in which Eligible Products are not repairable, and processing invoices from and payments to service technicians who perform services under the Service Contracts. Client shall provide all administrative services in accordance with the terms and conditions of the Service Contracts. Company may assume call-taking and service network responsibilities for the Service Contracts and related administrative obligations of Client under this Agreement only in accordance with <u>Section 17(b)</u>. In accordance with <u>Section 13</u>, Company shall have final claims determination. Company recognizes Client's desire to become the Administrator of record and hereby agrees that under certain circumstances, including change of control of Client, sale of some or all of Client's assets, Client's emergence from bankruptcy protection or general improvement of financial health of Client, or through a successful filing for Administrative License or designation by state, Client may become Administrator of record. Company will support refiling of any necessary forms in required states in order to assist in effectuating such change.

WEIL:\96808411\6\73217.0004

(c) Client shall maintain a toll-free telephone number for Contract Holders filing claims or seeking assistance with respect to services provided under the terms of Service Contracts. Client must staff such telephone numbers with a sufficient number of trained personnel to properly provide service for Contract Holders. Client will provide such administrative services in accordance with the terms and conditions of the Service Contracts.

(d) Client will dispatch service to Client's service network for Contract Holder claims. Client will provide Company with a file layout for all Service Contract tickets dispatched to Client's service network substantially in the format set forth in <u>Exhibit E</u>. Client will provide services to such Contract Holders in accordance with service levels attached as <u>Exhibit G</u> and the terms and conditions of the Service Contracts.

(e) Client shall process all Contract Holder cancellations. Client will pay the applicable refund to a Contract Holder within thirty (30) days after a Contract Holder requests cancellation of an un-expired Service Contract. All such refunds must be made in accordance with the terms and conditions of the Service Contract, or as otherwise required by State/Legal Requirements. The parties shall each be responsible for their proportionate share of each Contract Holder refund based on the proportion of the total amounts received by each party with respect to the cancelled Service Contract.

9.  **<u>SERVICE NETWORK; PARTS.</u>**

(a) Client shall use commercially reasonable efforts to maintain a service network of qualified technicians and shall use commercially reasonable efforts to ensure that each technician conducts business in an ethical, professional, courteous, safe and expeditious manner and that it shall only use technicians that are knowledgeable and competent to perform the required service diagnostic and repair functions. Company shall reimburse Client for payment by Client of the Service Fees in accordance with the fee structure in <u>Exhibit H</u>.

(b) Client shall use commercially reasonable efforts to ensure that technicians within its service network who enter a Customer's home on behalf of Company shall have successfully passed a background check.

(c) Client shall use commercially reasonable efforts to ensure that the authorized service centers within its service network maintain the following insurance coverage with an insurer having an AM Best rating of A or higher, unless otherwise approved in writing in advance by Company:

    (i) Commercial General Liability Insurance with a combined single limit of not less than $5,000,000 per occurrence/aggregate;

    (ii) Workers' Compensation Insurance to the extent required by applicable laws and employer's liability coverage of at least $1,000,000 per occurrence;

    (iii) Comprehensive Automobile Liability Insurance, in the event a motor vehicle is to be used in the performance of services, covering liability arising out of any auto (owned, hired and non-owned) with a combined single limit of not less than $5,000,000;

DocuSign Envelope ID: B90435E0-0141-4853-A79D-9288A0851935

> (iv)  Property insurance covering loss or damage by fire and all other perils covered by "all risk" insurance, in an amount not less than one hundred percent (100%) replacement cost.
>
> (v)   Employee Dishonesty (Crime) insurance, with a $1,000,000 limit of coverage (on a discovery basis).

The insurance coverage specified in (i) and (iii) above shall include Assurant, Inc., its affiliates and subsidiaries and its employees and agents as additional insureds, shall provide cross-liability coverage, and shall apply on a primary basis and without any right of contribution from any insurance carried by Company.  The insurance coverage specified in (i), (ii) and (iii) above shall include appropriate clauses and/or endorsements pursuant to which the insurance companies shall waive their rights of subrogation against Company. Client shall provide proof of such insurance to Company prior to the commencement of this Agreement and at each subsequent policy renewal date.  The certificate shall provide for not less than thirty (30) days written notice to Company prior to policy cancellation, non-renewal or material change.

Failure of Company to request such certificates of insurance or other evidence of full compliance with the insurance requirements or failure of Company to identify a deficiency from evidence that is provided, shall not be construed as a waiver of obligation to maintain such insurance.

Notwithstanding anything to the contrary herein, Company's ability to collect under these insurance policies outlined in this Section shall not be limited by the other provisions set forth in this Agreement.

In the event that Client uses subcontractors for repair work, Client shall require its subcontractors to maintain the following coverage: (a) Commercial General Liability Insurance with a combined single limit of not less than $1,000,000 per occurrence/aggregate; (b) Workers' Compensation Insurance to the extent required by applicable laws and employer's liability coverage of at least $500,000 per occurrence; and Comprehensive Automobile Liability Insurance, in the event a motor vehicle is to be used in the performance of services, covering liability arising out of any auto (owned, hired and non-owned) with a combined single limit of not less than $1,000,000.

(d) <u>Parts</u>.  Client shall provide the parts necessary for covered repairs under the Service Contracts. Parts costs shall conform to the listing on <u>Exhibit H</u>.

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B9013E60-0141-4853-979D-9288A0851935

10. **PROFIT SHARE.**  During the Term of this Agreement and provided the Agreement has not been terminated in accordance with <u>Section 16</u>, Client shall be entitled to receive payment of profit ("<u>Profit Share</u>") in accordance with the following terms and conditions: (i) Client shall not be entitled to receive any Profit Share payment unless excess funds exist after the Claims Reserve has been fully funded with respect to fully expired Service Contracts, (ii) on each anniversary date of the Effective Date of this Agreement, Client shall be entitled to receive a payment from Company that is equal to eighty percent (80%) of the profit, as calculated by Company in its sole discretion, on fully expired Service Contracts, (iii) in the event that the Profit Share on any such anniversary date is a negative amount, such amount shall carry forward to the subsequent anniverary date and shall be included in the calculation of the Proft Share as of such date, (iv) Client shall not be entitled to receive any payment if the Profit Share on any anniversary date is a negative amount, and (v) Company shall have the right to offset any Profit Share payment to Client for any obligations due and payable to Company under this Agreement, or otherwise.

11. **INSURANCE.**  To the extent required by applicable service contract and insurance laws, Company will obtain and maintain Insurance in effect to cover the contractual obligations of the Obligor to the Contract Holders.  Notwithstanding the foregoing, the Insurance must cover only Service Contracts for which Company has been paid the Net Price related to each Service Contract.  Neither Company nor the insurer shall be responsible for any claim not covered under the terms of a Service Contract.

12. **PRODUCT CHANGES/DEFECTS.**  Company may (i) amend the form of Service Contract for prospective sales only (not for those Service Contracts already sold) upon ninety (90) days advance written notice or such shorter period required by applicable law; and (ii) cease offering coverage on any Eligible Product upon sixty (60) days' advance written notice; provided, <u>however</u>, in the case of (<u>i</u>) or (<u>ii</u>), any written notice must include a statement of the reason(s) for amendment or cease of coverage.  Company will not be responsible for any breach of implied or express warranty of merchantability or fitness of the Eligible Product from the manufacturer or Client.  Client will provide written notice to Company as soon as practicable and in any event within thirty (30) days of Client's receipt of a written manufacturer's notice, or, in the case of Eligible Products for which Client holds the risk under the manufacturer's warranty, within thirty (30) days of Client's knowledge, that:

(a) an Eligible Product has a defect(s) that materially affects the Eligible Product's performance;

(b) the manufacturer has announced a recall for an Eligible Product;

(c) an extension of a manufacturer's limited warranty has been granted on the Eligible Product;

(d) parts are no longer available for an Eligible Product; or

(e) there has been any other special treatment of the Eligible Product concerning its function or maintenance (e.g., manufacturer fix which does not rise to the level of a product recall).

Client will use its reasonable efforts to assist Company in negotiating with a manufacturer whose Eligible Product is subject to subsections (<u>a</u>) through (<u>e</u>) above to seek compensation and/or corrective action from the manufacturer.  Client will not make Service Contracts available on Eligible Products known by Client to contain manufacturer's defects that

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B30A3E60-0141-4853-A79D-9288A085E935

materially affect performance of the Product thereby necessitating service under the Service Contracts. Client is deemed to know that an Eligible Product is subject to subsections (<u>a</u>) through (<u>e</u>) above where the manufacturer has notified Client in writing of such events.

13. **<u>CLAIMS DETERMINATION.</u>**

   (a) Client must abide by and be bound by Company's commercially reasonable determination as to any obligation contained within the terms of the Service Contract; provided, however, Client reserves the right to make other claims determination at its own expense in accordance with subsection (b) below.

   (b) Client may elect to fund concession payments for Contract Holder issues that are not covered under the terms and conditions of the Service Contract. Client acknowledges and agrees that it shall be solely responsible for any such payments and that Company shall have no financial obligation to reimburse Client or to participate in any manner whatsoever for any reason whatsoever in such concession payments.

14. **<u>RIGHT TO OFFSET.</u>** Each party reserves the right to offset any amounts due from the other party under this Agreement (inclusive of all Exhibits) against any amounts due to the other party under this Agreement (inclusive of all Exhibits).

15. **<u>USE OF MARKS.</u>** The parties acknowledge that each party owns all right, title, and interest in any copyright, trademark, service mark, trade name, patent, or other proprietary right created in the respective parties' performance of its obligation under this Agreement ("<u>IPR</u>"). During the Term of this Agreement, each party grants to the other party a non-exclusive, paid-up, royalty-free, non-transferable license (without right to sublicense except to the extent reasonably required for the licensed party to exercise the benefit of its license) under the IPR owned by that party, in or in connection with the licensed party's products or services for the sole purpose of performing its obligations under this Agreement. Each party agrees that the nature and quality of the services provided by or on behalf of the other party under such other party's IPR and all related advertising, promotional and other uses of such party's IPR shall at no time be any less in any material respect than the quality of similar services provided by the IPR owner in connection with the IPR prior to the Effective Date. Each party agrees to cooperate with the IPR owner in facilitating the IPR owner's control of such nature and quality and supply the IPR owner with specimens of all uses of the IPR upon the IPR owner's reasonable advance written request. All use of the IPR shall inure to the benefit of and be on behalf of the IPR owner.

16. **<u>TERMINATION.</u>**

   (a) <u>Breach of Contract</u>. If a party to the Agreement discovers a material breach of the Agreement, other than non-payment, (including documents incorporated by reference into this Agreement) by the other party, its agents or employees, the non-breaching party will send written notice to demand the problem be cured within thirty (30) days. If the default is not cured within thirty (30) days following receipt of written notice, the non-breaching party may terminate this Agreement immediately by giving written notice.

   (b) <u>Non-Payment</u>. Either party may terminate this Agreement immediately following written notice for non-payment of undisputed amounts if the other party fails to pay such amounts owed under this Agreement, and with respect to Client, Client is unable to cure as set forth in <u>Section 6(d)</u>.

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B30135E0-0141-4852-97BD-9288A0851B2F

(c) <u>Cessation of Business Operations</u>.    Either party may terminate this Agreement immediately following written notice upon Client's cessation of business operations, including in connection with a sale of all or substantially all of its assets as part of the Chapter 11 Cases.

(d) <u>Unprofitability</u>.    Company may terminate this Agreement, due to Company's determination of unprofitability, by giving Client thirty (30) days' notice, in writing, of its intention to terminate. "Unprofitability" means (i) if the projected ultimate loss ratio is 105% or greater as determined by Company, or (ii) if Client does not meet the service levels set forth in <u>Exhibit G</u> by fifteen percent (15%) or greater during a seven (7) day period and Client is unable to materially cure such deficiency in service levels during the fourteen (14) day period after receiving notice from Company of such deficiency.

(e) <u>Breach of Confidentiality</u>. Company may terminate this Agreement upon two (2) days' prior written notice, in the event Client discloses to a third party Company's Net Price Information (as defined below) except as required in order to obtain Bankruptcy Court approval, without Company's prior written permission, provided that if Client inadvertently does so, the parties will discuss in good faith whether Client can remediate the breach and if Client can satisfactorily remediate the breach, Company shall not terminate under this <u>Section 16(d)</u>.

(f) <u>Conversion</u>. Either party may terminate this Agreement immediately following written notice that the Chapter 11 Cases have been converted to cases under Chapter 7 of the Bankruptcy Code.

(g) <u>Insolvency</u>.    In the event this Agreement is lawfully assigned to a third party ("<u>Assignee</u>") or Client reorganizes (the "<u>Reorganized Debtor</u>") in the Chapter 11 Cases, Company may terminate this Agreement as to the Assignee or Reorganized Debtor, immediately following written notice to the Assignee or Reorganized Debtor, in the event of (i) the Assignee or Reorganized Debtor's liquidation or insolvency, (ii) appointment of a receiver or similar officer for the Assignee or Reorganized Debtor, (iii) an assignment by the Assignee or Reorganized Debtor for the benefit of its creditors, or (iv) the filing of a petition in bankruptcy by or against the Assignee or Reorganized Debtor.

(h) <u>State/Legal Requirements</u>.  Either party may terminate this Agreement, only with respect to affected states, upon thirty (30) days' prior written notice due to new State/Legal Requirements making compliance with this Agreement impossible in such state.  The cancellation of, suspension of, or failure to renew any license, certificate or other regulatory authorization required by a regulatory authority that materially affects the ability of a party to perform its duties under the Agreement in such state shall result in an immediate termination of Services in the affected jurisdiction upon written notice.

17. **POST TERMINATION RIGHTS AND RESPONSIBILITIES.**   Upon termination by either party, all obligations hereunder, except those that expressly survive in accordance with <u>Section 23</u>, will cease.

(a) Notwithstanding the previous sentence, so long as termination is not pursuant to <u>Sections 16(c)</u> or (f):

(i) Client will: (i) continue to pay the Net Price for all Service Contract issued prior to the termination date; (ii) be responsible for all Contract Holder cancellation refunds; (iii) continue to support the program through its service network and provision of parts; (iv) continue to provide its administrative functions for all Service Contracts sold prior to

14

DocuSign Envelope ID: B3081356D-0141-4852-A79D-9288A0851935

termination, unless Company exercises its right to assume administration as set forth in subsection (c) below; and (v) return all property of Company provided to Client; and

(ii) Company will: (i) continue to refund pro-rated Net Price to Client on canceled Service Contracts as required by this Agreement; and (ii) reimburse Client for service and administrative services, subject to subsection (c) below.

(b) <u>Assumption by Company of Administration</u>. (i) Upon or after termination or expiration of this Agreement, or (ii) at any time that Client does not meet the service levels set forth in <u>Exhibit G</u> by fifteen percent (15%) or greater during a seven (7) day period and Client is unable to materially cure such deficiency in service levels during the fourteen (14) day period after receiving notice from Company of such deficiency, or (ii) in the event that actuarially justified losses as calculated by Company exceed a projected target loss ratio of 105%, in each case (i) – (iii), Company shall have the right, but not the obligation, to assume call-taking and service network responsibilities for the Service Contracts and all related rights and obligations of Client under this Agreement.

(c) Termination of this Agreement will in no way alter or invalidate (i) Insurance coverage with respect to Service Contracts issued prior to the termination date, and (ii) Company's rights as owner of the Net Price remitted by Client in accordance with <u>Section 6</u>. Further, all representations, warranties, and indemnities of Client and Company will survive the termination or expiration of this Agreement.

18. **<u>ARBITRATION.</u>** If any dispute shall arise between Company and Client with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, while the Chapter 11 Cases are open, the parties agree to submit to the exclusive jurisdiction of Bankruptcy Court. If Bankruptcy Court declines to hear the dispute or the Chapter 11 Cases are no longer open, the dispute shall be settled by arbitration in accordance with the rules of the American Arbitration Association. The dispute shall be referred to three (3) arbitrators, two (2) of which shall have expert knowledge of the extended service contract industry and are unaffiliated with Company and Client. One (1) arbitrator shall be chosen by each party and the two chosen shall promptly select a third (3rd) arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after the receipt of written notice from the other party requesting arbitration and naming its arbitrator, the requesting party may name an arbitrator for the other party. Each party shall submit its case to the three (3) arbitrators within thirty (30) days of the appointment of the third (3rd) arbitrator unless such time is extended by the arbitrators or a majority of them or by agreement between the parties. The decision of a majority of the arbitrators shall be final and binding on both Company and Client. Company and Client will each bear the expense of its own arbitrator, or one-half (1/2) of the expense of two (2) arbitrators if both are appointed by the requesting party as provided above, and shall jointly bear and equally bear with the other the expense of the third (3rd) arbitrator and of the arbitration. Any such arbitration shall take place in Atlanta, Georgia.

19. **<u>CONFIDENTIAL INFORMATION</u>.**

(a) <u>Nondisclosure to Third Parties</u>. To the extent necessary to perform the obligations related to this Agreement, a party (the "<u>Disclosing Party</u>") may share with the other party (the "<u>Receiving Party</u>") certain documents and information (oral or written) including, but not limited to, information pertaining to products, business practices, schedules, services, methods, data, processes, advertising plans, sales, market research, financial information and operating procedures which the Disclosing Party considers to be, and treats as, confidential ("<u>Confidential Information</u>") in any form whatsoever. Confidential

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B39D13E60-0141-4852-979D-9789A0851925

Information also includes any information described above which the Disclosing Party has obtained in confidence from another party who treats it as proprietary or designates it as Confidential Information, whether owned or developed by the Disclosing Party. Confidential Information also includes information categorized as "trade secrets" that (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Receiving Party shall maintain the Disclosing Party's Confidential Information, in confidence, shall protect it with the same degree of care which it uses to protect its own Confidential Information (which shall be not less than reasonable care), and shall use it for the sole purpose of performing under this Agreement.  Confidential Information shall only be disclosed to those persons who have a need to know the information.  Receiving Party agrees not to communicate, or permit any other persons to communicate, Confidential Information to anyone else or to buy, sell, trade or otherwise take any position in any of the securities of Disclosing Party, or any derivatives thereof, in reliance upon such information or to take any action to affect the trading prices of the securities of Disclosing Party or Disclosing Party's ultimate parent company, which Disclosing Party agrees and acknowledges would be in violation of federal and state securities laws restricting the use or disclosure of inside information.   At the conclusion of this Agreement, the Receiving Party shall at the request of the Disclosing Party return the Disclosing Party's Confidential Information in its possession (including all copies) or shall, at the option of the Receiving Party, destroy the Disclosing Party's Confidential Information (including all copies) and certify its destruction to the Disclosing Party.   For purposes of this paragraph "Confidential Information" shall not include information which (a) is or becomes part of the public domain other than as a result of a disclosure to the Receiving Party in breach of this Agreement; (b) is rightfully known by the Receiving Party prior to disclosure by the Disclosing Party; (c) is furnished to others by the Disclosing Party without restriction on disclosure, (d) is independently developed by the Receiving Party at any time, without any breach of this Agreement, provided the Receiving Party can clearly demonstrate such independent development through contemporaneous records showing such development; (e) is rightfully obtained by the Receiving Party from a source other than the Disclosing Party who the Receiving Party reasonably believes is not bound by a contractual, legal or fiduciary obligation of confidentiality to the Disclosing Party; (f) the Disclosing Party expressly agrees in writing does not constitute Confidential Information; or (g) is required to be disclosed by the Receiving Party by judicial or government action or the Bankruptcy Court. The Receiving Party may disclose the Disclosing Party's Confidential Information upon the order of any court of competent jurisdiction or as otherwise required by law or legal process, provided that prior to such disclosure the Receiving Party shall inform the Disclosing Party of such order if permitted by law, in order to provide the Disclosing Party with an opportunity to contest such order or to seek such other protective action as the Disclosing Party may elect. Notwithstanding any of the above, Client may disclose the terms of this Agreement without Company's prior written consent, including any information received by Company in connection with or relating to the Net Price information then set forth on Exhibit A (the "Net Price Information"), to potential purchasers of any line of Client's business to which this Agreement relates, provided that such potential purchasers agree to be bound by confidentiality restrictions no less restrictive than the terms contained herein.

(b) <u>Contract Holder Data</u>.  The parties acknowledge and agree that Contract Holder data associated with the Service Contract program shall be jointly owned by Client and Company. The loss rates associated with the Service Contract program shall be owned by

WEIL:\96808411\6\73217.0004

Company and Client shall receive and maintain a copy of such data. The parties acknowledge and agree that Customer acquisition data associated with the sale and servicing of the Service Contract and associated marketing rights to such Customers shall be owned by Client. Client retains the marketing rights with respect to Contract Holder data and Company may not market a competing service contract holder program with respect to Contract Holder data, except that Company may market its products and services to Customers if Client ceases conducting business.

(c) <u>Injunctive Relief</u>. Each Party agrees that the confidentiality covenants in this section apply to all Confidential Information disclosed to it during the Term of this Agreement and for a period of two (2) years after termination. If any of these covenants are violated, each party agrees that the Disclosing Party would be irreparably injured and shall be entitled to seek any temporary or permanent injunctive relief or restraining order, in addition to all other remedies available at law or in equity (including costs and reasonable attorneys' fees, without posting of a bond), necessary to prevent such unauthorized disclosure or use, or threat of disclosure or use.

(d) <u>Agreement</u>. Notwithstanding anything else in this Agreement, this Agreement may be disclosed to any party in interest in connection with the chapter 11 cases jointly administered for procedural purposes under case number 18-23538 in the United States Bankruptcy Court for the Southern District of New York; provided however, that in accordance with <u>Section 19(a)</u>, the Net Price Information then set forth in <u>Exhibit A</u> shall not be disclosed to any other party without Company's prior written consent.

20. **INDEMNIFICATION.**

(a) Company will defend and indemnify Client and its affiliates against all claims, costs and expenses (including reasonable attorneys' fees) arising from any breach of this Agreement by Company and from any negligent act or omission or willful misconduct of Company, its employees, agents or representatives (other than Client, its employees, agents or representatives). Additionally, Company will indemnify Client, its affiliates, and those third parties who sell Service Contracts to Customers for any claims arising from Company's or Company's employees' failure to perform any of its or their duties in accordance with this Agreement.

(b) Client will defend and indemnify Company and its affiliates against all claims, costs and expenses (including reasonable attorneys' fees) arising from any breach of this Agreement by Client and from any negligent act or omission or willful misconduct of Client its affiliates, and its agents, technicians, employees or representatives. Additionally, Client will indemnify Company for any claims arising from Client's or Client's employees' failure to perform any of its or their duties in accordance with this Agreement. Further, in the event that any Client affiliate performs any obligations of Client under this Agreement in accordance with <u>Section 4(k)</u>, Client will indemnify Company for any claim arising from such affiliate's failure to abide by the Client obligations under this Agreement.

21. **LIMITATION OF LIABILITY**.

(a) EXCEPT FOR (A) LIABILITIES THAT ARE PAYABLE IN CONNECTION WITH A THIRD PARTY CLAIM UNDER <u>SECTION 20</u> OR (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER <u>SECTION 19</u>, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES OR ITS OR THEIR RESPECTIVE DIRECTORS,

OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS AGREEMENT THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INDIRECT DAMAGES, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)  EXCEPT FOR (A) LIABILITIES THAT ARE PAYABLE IN CONNECTION WITH A THIRD PARTY CLAIM UNDER <u>SECTION 20</u> OR (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER <u>SECTION 19,</u> IN NO EVENT SHALL A PARTY'S LIABILITY UNDER THIS AGREEMENT EXCEED THE AGGREGATE OF ALL FEES RECEIVED BY SUCH PARTY DURING THE TERM OF THIS AGREEMENT.

22.  **<u>NOTICE.</u>**  Any and all notices required to be given under the terms of this Agreement must be in writing and shall be served by personal delivery, by registered or certified mail, return receipt requested, or by first class mail to the addresses provided above the preamble to this Agreement, as amended from time to time by the parties.  All mailed notices will be effective the later of five (5) days after the notice is deposited in the United States mail or the date noted on the return receipt for the registered or certified mail.  All personally delivered notices will be effective when received at the address of the party to whom the notice was sent.

23.  **<u>SURVIVAL.</u>**  In addition to this <u>Section 23</u>, the terms of Section 4 (Client Obligations), subsections (a), (b), (e), (f), (g) (solely with respect to Client's obligations in connection with administration, service and maintenance of records); Section 5 (Company Obligations), subsections (a), (b), (c), (h), (j), (k); Section 6 (Data Submission and Compensation); Section 8 (Administration); Section 9 (Service Network; Parts); Section 14 (Right to Offset); Section 17 (Post Termination Rights and Responsibilities); Section 18 (Arbitration); Section 19 (Confidential Information); Section 20 (Indemnification); Section 21 (Limitation of Liability); Section 22 (Notice); Section 24 (Assignment); Section 26 (Entire Agreement); Section 27 (Invalidity); Section 28 (Waiver); Section 29 (Right to Inspect); Section 30 (Choice of Law); Section 31 (No-Hire); and Section 32 (Relationship of the Parties) will survive the expiration or termination of this Agreement.

24.  **<u>ASSIGNMENT.</u>**  Except as provided in this Agreement, neither party may assign, transfer or sell all or any of its rights under this Agreement (or delegate any of its obligations under this Agreement) including, but not limited to, in connection with a sale or disposition of any assets or lines of business to which this Agreement relates, to a purchaser of any portion of such business, without the prior written consent of the other party. Notwithstanding the foregoing, Company's consent to assignment by Client in connection with a sale or disposition to a purchaser (a) shall be deemed given if the purchaser is approved by the Bankruptcy Court for so long as Bankruptcy Court has jurisdiction over this Agreement (such approval may include, among other things, the considerations set forth in (b)(i) and (ii)) or (b) shall not be unreasonably withheld by Company if (i) the proposed purchaser is financially and operationally capable of performing in accordance with the obligations of this Agreement, and (ii) Company is not otherwise restricted by a written contract with a third party from consenting to assignment to such purchaser. Pursuant to a restructuring in bankruptcy, this Agreement may be assigned by Client without the consent of Company to a parent or subsidiary of Client or any other entity under common control with Client. This Agreement may be assigned by Company without consent to a parent or subsidiary of

DocuSign Envelope ID: B30A3EE0-0141-4853-879D-9288A0851925

Company or any other entity under common control with Company, provided that Company remains liable hereunder. This Agreement is binding upon and inures to the benefit of, and is enforceable by the successors and/or proper assigns of the respective parties hereto.

25. **FORCE MAJEURE.**  Any delay or failure of a party hereto to perform its obligations under this Agreement will be excused and not deemed a breach of this Agreement if, and to the extent that the delay or failure is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, such as, by way of example only and not by way of limitation, acts of God, action by any governmental or regulatory authority, natural disasters, sabotage, power failures or court injunction or order, provided that written notice of delay (including the estimated duration of delay) is given by the affected party to the other party promptly and provided that, notwithstanding anything to the contrary contained in this paragraph, any failure to pay any amount when due will not be excused and will be a breach of this Agreement.  The parties acknowledge that this Agreement provides for the provision of service on a regular basis and that the interruption of such service constitutes a breach of this Agreement unless all reasonable remedial action is undertaken by the affected party.

26. **ENTIRE AGREEMENT.**    This Agreement, including all Exhibits attached hereto, constitutes and incorporates all negotiations, understandings and agreements by and between Company and Client regarding the subject matter hereof.  No prior stipulation, agreement, or arrangement of either party, of their respective employees or agents or subsequent amendment of this Agreement is valid or enforceable unless such agreement is in writing and executed by the duly authorized officials of Company and Client.

27. **INVALIDITY.**   If any provision of this Agreement is held invalid under any laws or regulations, that provision will be deemed not to be a part of this Agreement in such jurisdiction.  However all other provisions of this Agreement will remain in effect.

28. **WAIVER.**  The failure by either party to enforce any provision of this Agreement does not constitute a waiver of that provision.  Waiver by Company or Client of any specific term or condition of this Agreement will be in writing and does not waive any other term or condition hereof.

29. **RIGHT TO INSPECT.**  During the Term of this Agreement and for one (1) year after the expiration of all Service Contracts issued under the terms of this Agreement, each party may, upon five (5) business days prior notice to the other party, have reasonable access during ordinary business hours at the office(s) or place where records are kept to inspect books, records, and files relating to the specific business covered by the Service Contract program and this Agreement.

30. **CHOICE OF LAW.**  THIS AGREEMENT IS DEEMED TO BE MADE UNDER AND IS CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICT OF LAW PROVISIONS.  The rights and remedies of each party provided in this Agreement will not be exclusive and are in addition to any other rights and remedies provided by law.

31. **NO-HIRE.**  Each party agrees not to hire or enter into a contractual relationship with each other's existing employees during the Term and within one (1) year after the expiration or termination of this Agreement, unless otherwise agreed-upon in writing.  Nothing in this section shall prohibit either party from hiring an employee of the other party in the event such hiring is in response to a general posting or advertising for employment.

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B30C13E60-0141-4853-A79D-9288A0851B25

32. **RELATIONSHIP OF PARTIES.** This Agreement will not be construed as constituting either party as partner, joint venturer or fiduciary of the other or to create any other form of legal association that would impose liability on one party for the act or failure to act of the other or as providing either party with the right, power or authority (express or implied) to create any duty or obligation of the other. Except as otherwise expressly provided in this Agreement, each party has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed all work to be performed by it pursuant to this Agreement.

33. **WARRANTY INFORMATION.** Client will provide to Company all original manufacturer warranty information in its possession as it may reasonably request in writing from time to time.

34. **ELECTRONIC SIGNATURES.** This Agreement may be executed by electronic signature. The parties agree that such electronic signature shall (i) have the same evidentiary value and legal enforceability as would a manually signed original, and (ii) signify confirmation that the authorized signer reviewed and approved the terms and conditions of the Agreement.

35. **EXHIBITS.** The following Exhibits are attached to and made a part of this Agreement at its inception:

| | |
|---|---|
| Exhibit A | List of Eligible Products |
| Exhibit B | Obligor States and Territory |
| Exhibit C | Client Affiliates |
| Exhibit D | Information Security Standards |
| Exhibit E | Sample Standard File Layout for Enrollments and Cancellations; Sample Standard File Layout for Claims |
| Exhibit F | Example of Funding |
| Exhibit G | Service Level Agreements |
| Exhibit H | Service Fees and Parts Costs |

IN WITNESS WHEREOF, the parties have executed this Agreement, by their duly authorized officers or representatives.

**SEARS HOLDINGS MANAGEMENT CORPORATION**

By: _____
DocuSigned by:
CE4BC37F2CFC4CA...

Name: Mitch Bowling
_____

Title: CEO - Sears Home Services
_____

Date: 11/21/2018
_____

**FEDERAL WARRANTY SERVICE CORPORATION**

By: _____
DocuSigned by: Jeff Unterreiner
321ACB44DED4490...

Name: Jeff Unterreiner
_____

Title: President and CEO
_____

Date: 11/21/2018
_____

**UNITED SERVICE PROTECTION, INC.**

**UNITED SERVICE PROTECTION CORPORATION**

20

DocuSign Envelope ID: B30A3E50-0141-4852-A73D-9788A0851835

By: _Jeff Unterreiner_

Name: __Jeff Unterreiner__

Title: __Vice President__

Date: __11/21/2018__

By: _Jeff Unterreiner_

Name: __Jeff Unterreiner__

Title: __Vice President__

Date: __11/21/2018__

**ASSURANT SERVICE PROTECTION, INC.**

By: _Jeff Unterreiner_

Name: __Jeff Unterreiner__

Title: __President and CEO__

Date: __11/21/2018__

21

DocuSign Envelope ID: B39D13E60-0141-4852-A75D-9288A0851935

**Exhibit A**
**List of Eligible Products**

Major Appliances*
Consumer Electronics*
Lawn & Garden*
Power Tools & Garage Door Openers*
Jewelry
Tires
Fitness Equipment*
HVAC*
Water Heaters/Water Softeners*
*Eligible for Aftermarket Sales

**Client Service Contract**

| Division No. | Description | Covered Products |
|---|---|---|
| 003 | Home Office | AC ADAPTER |
| 003 | | ACCESSORY |
| 003 | | ADAPTER |
| 003 | | ALARM |
| 003 | | ANSWERING MACHINE |
| 003 | | BLUETOOTH |
| 003 | | BOOMBOX |
| 003 | | CALCULATOR |
| 003 | | CALLER ID |
| 003 | | CAMCORD |
| 003 | | CAMERA |
| 003 | | CAMERA DOCK |
| 003 | | CD DRIVE |
| 003 | | CELL PHONE |
| 003 | | COMPUTER |
| 003 | | CONVERTER |
| 003 | | DIGITAL CAMERA |
| 003 | | DIGITAL FRAME |
| 003 | | DVD |
| 003 | | E READER |
| 003 | | FAX |
| 003 | | GAME CONSOLE |
| 003 | | HANDHELD DEVICE |
| 003 | | HEADPHONES |
| 003 | | HEADSET |
| 003 | | KEYBOARD |
| 003 | | LABEL MAKER |
| 003 | | LABEL PRINTER |
| 003 | | LANGUAGE REF |

DocuSign Envelope ID: B3013E60-0141-4853-A73D-9288A0851B2F

| | | |
|---|---|---|
| 003 | | LAPTOP |
| 003 | | MEDIA |
| 003 | | MICROPHONE |
| 003 | | MISC HOME OFFICE PRODUCT |
| 003 | | MODEM |
| 003 | | MONITOR |
| 003 | | MOUSE |
| 003 | | MP3 PLAYER |
| 003 | | MP4 |
| 003 | | NETWORKING |
| 003 | | PC ACCESSORY |
| 003 | | PC CAMERA |
| 003 | | PC COMPONENT |
| 003 | | PDA |
| 003 | | PDA DOCK |
| 003 | | PHONE |
| 003 | | PHOTO PRINTER |
| 003 | | PRINTER |
| 003 | | RADIO |
| 003 | | SCANNER |
| 003 | | SECURITY SYSTEM |
| 003 | | SHREDDER |
| 003 | | SPEAKERS |
| 003 | | STEREO |
| 003 | | TABLET |
| 003 | | TRANSLATOR |
| 003 | | TYPEWRITER |
| 003 | | VID GAME ACCESSORY |
| 003 | | VIDEO GAMES |
| 003 | | VIDEO MAKER |
| 003 | | WALKIE TALKIE |
| 003 | | WEBTV |
| 006 | Sporting Goods | BIKE |
| 006 | | FITNESS TRACKER |
| 006 | | FITNESS ACCESSORIES |
| 006 | | FITNESS ELECTRONIC DEVICE |
| 006 | | HEART RATE MONITOR |
| 006 | | MISC FITNESS |
| 006 | | STEPPER |
| 006 | | INFLATABLE FITNESS |
| 006 | | MISC CAMPING |
| 006 | | INFLATABLE MATTRESS |

2

| | | |
|---|---|---|
| 006 | | OUTDOOR SHELTER |
| 006 | | OUTDOOR CANOPY |
| 006 | | SLEEPING BAG |
| 006 | | Stationary Bike |
| 008 | Housewares | BLENDER |
| 008 | | BREADMAKER |
| 008 | | BUFFET |
| 008 | | BURNER |
| 008 | | CAN OPENER |
| 008 | | CLOCK RADIO |
| 008 | | COFFEE MAKER |
| 008 | | CONVECTION OVEN |
| 008 | | CURLING IRON |
| 008 | | ELECTRIC GROOMING |
| 008 | | ELECTRIC SHAVER |
| 008 | | ELECTRIC KNIFE SHARPENER |
| 008 | | FOOD PROCESSOR |
| 008 | | FOOD STORAGE |
| 008 | | FRYER |
| 008 | | GARMENT STEAMER |
| 008 | | GRIDDLE |
| 008 | | GRILL |
| 008 | | GRINDER |
| 008 | | HAIR DRYER |
| 008 | | HAIR STRAIGHTENER |
| 008 | | HEALTH & BEAUTY |
| 008 | | ICE CREAM MAKER |
| 008 | | ICE CRUSHER |
| 008 | | ICE SHAVER |
| 008 | | INDOOR GARDEN |
| 008 | | INDOOR GRILL |
| 008 | | IRON |
| 008 | | KITCHEN DEVICE |
| 008 | | MASSAGER |
| 008 | | MINI CHOPPER |
| 008 | | MISC HOUSEWARES |
| 008 | | MIXER |
| 008 | | PERSONAL CARE |
| 008 | | POPPER |
| 008 | | PRESSURE COOKER |
| 008 | | RADIO |
| 008 | | RICE COOKER |
| 008 | | ROASTER |

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B30134E60-0141-4853-A73D-9288A0851B2F

| | | |
|---|---|---|
| 008 | | ROTISSERIE OVEN |
| 008 | | SANDWICH MAKER |
| 008 | | SCALE |
| 008 | | SHOE POLISHER |
| 008 | | SLICER |
| 008 | | SLOW COOKER |
| 008 | | SMOKER |
| 008 | | SPA BATH |
| 008 | | TEA POT |
| 008 | | TOASTER |
| 008 | | TOASTER OVEN |
| 008 | | TOOTH BRUSH |
| 008 | | TRIMMER |
| 008 | | WAFFLE MAKER |
| 008 | | WINE CHILLER |
| 009 | Power Tools | DRILL |
| 009 | | BUFFER |
| 009 | | CHARGER |
| 009 | | CLEANING TOOL |
| 009 | | COMBO KIT |
| 009 | | COMPRESSOR |
| 009 | | CORDLESS DRILL |
| 009 | | ELECTRICAL |
| 009 | | FLASHLIGHT |
| 009 | | GLUE GUN |
| 009 | | IMPACT WRENCH |
| 009 | | JOINER KIT |
| 009 | | LIGHTING |
| 009 | | MISC TOOLS |
| 009 | | NAIL GUN |
| 009 | | POLISHER |
| 009 | | POWER TOOL |
| 009 | | RATCHET |
| 009 | | RECHARGEABLE BATTERY |
| 009 | | ROTARY TOOL |
| 009 | | ROUTER |
| 009 | | SANDER |
| 009 | | SAW |
| 009 | | SCREWDRIVER |
| 009 | | STAPLER |
| 009 | | TOOL KIT |
| 009 | | WAXER |
| 009 | | WET VAC |
| 009 | | WRENCH |
| 009 | | SHOP VAC |

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B90D3E60-0141-4853-A79D-9288A0851B25

| | | |
|---|---|---|
| 014 | Luggage | LUGGAGE SET |
| 014 | | MISC LUGGAGE |
| 014 | | SUITCASE |
| 014 | | BACKPACK |
| 014 | | ROLLING DUFFLE |
| 014 | | CARRY ON ROLLING |
| 014 | | BRIEFCASE |
| 020 | Floorcare, Sewing, Microwave | STICK VAC |
| 020 | | CANNISTER VAC |
| 020 | | FLOOR CLEANER |
| 020 | | STEAM CLEANER |
| 020 | | SEWING MACHINE |
| 020 | | EMBROIDARY MACHINE |
| 020 | | COUNTERTOP MICROWAVE |
| 020 | | MISC FLOORCARE |
| 020 | | HAND VAC |
| 020 | | UPRIGHT VAC |
| 020 | | CARPET CLEANER |
| 020 | | MISC SEWING |
| 032 | Home Environment | AIR PURIFIER |
| 032 | | HEATER |
| 032 | | FAN |
| 032 | | AIR CLEANER |
| 032 | | HUMIDIFIER |
| 032 | | DEHUMIDIFIER |
| 032 | | Misc Home Environment |
| 032 | | WATER COOLER |
| 042 | Air & Water Appl | ROOM AIR CONDITIONER |
| 042 | | ELECTRIC FIREPLACES |
| 042 | | MISC AIR & WATER APPL |
| 046 | Refrigeration | PORTABLE REFRIGERATOR |
| 046 | | MISC REFRIGERATION |
| 046 | | WINE CHILLER |
| 052 | Toys | ELECTRONIC TOYS |
| 052 | | HANDHELD GAMES |
| 052 | | MUSICAL INSTRUMENTS LIGHTS & SOUND TOYS |
| 052 | | MISC TOYS |
| 052 | | REMOTE CONTROL TOYS |
| 052 | | BATTERY POWERED TOYS & GAMES |
| 052 | | MECHANICAL TOYS |
| 052 | | INFLATABLE TOYS |

5

DocuSign Envelope ID: B30A3E60-0141-4852-A73D-9288A0851B25

| 052 | | TRAMPOLINES |
| 052 | | SWIMMING POOLS |
| 057 | Home Electronics | ANTENNA |
| 057 | | CAR STARTER |
| 057 | | CAR STEREO |
| 057 | | CAR VIDEO |
| 057 | | CASSETTE PLAYER |
| 057 | | CASSETTE RECORDER |
| 057 | | CD PLAYER |
| 057 | | CD RECORDER |
| 057 | | CLARINET |
| 057 | | CLOCK |
| 057 | | DOCK |
| 057 | | DRUM |
| 057 | | DVD PLAYER |
| 057 | | DVD VCR COMBO |
| 057 | | DVD VCR PLAYER |
| 057 | | DVR |
| 057 | | EARBUDS |
| 057 | | EARPHONES |
| 057 | | FLUTE |
| 057 | | GPS |
| 057 | | HEADPHONE |
| 057 | | MISC HOME ELECTRONICS |
| 057 | | JUKEBOX |
| 057 | | KARAOKE |
| 057 | | KEYBOARD |
| 057 | | KIT SATELLITE |
| 057 | | LCD |
| 057 | | MICROPHONE |
| 057 | | MINI SYSTEM |
| 057 | | MP3 ACCESSORY |
| 057 | | MUSIC KEYBOARD |
| 057 | | NAVIGATION |
| 057 | | PORTABLE DVD |
| 057 | | RADAR DETECTOR |
| 057 | | RECORDER |
| 057 | | REMOTE CONTROL |
| 057 | | SATELLITE RADIO |
| 057 | | SATELLITE RECEIVER |
| 057 | | TELEVISION |
| 057 | | TOY |
| 057 | | TRUMPET |

WEIL:\96808411\6\73217.0004

DocuSign Envelope ID: B9D13E60-0141-4852-A73D-9288A0851D35

| | | |
|---|---|---|
| 057 | | TV |
| 057 | | TV ACCESSORY |
| 057 | | TV DVD COMBO |
| 057 | | TV STAND |
| 057 | | VCR |
| 057 | | VIOLIN |
| 057 | | VOICE RECORDER |
| 057 | | WALKMAN |
| 057 | | WEATHER DEVICE |
| 057 | | GAME CONSOLE |
| 058 | Gaming | GAME CONTROLLER |
| 058 | | GAME ACCESSORIES |
| 058 | | POLE SAW |
| 071 | Lawn & Garden | CHAIN SAW |
| 071 | | PATIO HEATER |
| 071 | | PRUNER |
| 071 | | BLOWER VACUUM |
| 071 | | LEAF BLOWER |
| 071 | | WEEDWACKER |
| 071 | | LINE TRIMMER |
| 071 | | HEDGE TRIMMER |
| 071 | | POWER WASHER |
| 071 | | PRESSURE WASHER |
| 071 | | GRASS SHEAR |
| 071 | | SNOW BLOWER |
| 071 | | MISC LAWN & GARDENT |

Service Purchase Protect

| | | |
|---|---|---|
| 082 | Mattress | ADJUSTABLE BED FRAME |
| | | MISC MATTRESS |
| | | MISC BED FRAME |

7

WEIL:\96808411\6\73217.0004

**Exhibit B**
**Obligor States and Territory**

<u>For all Eligible Products except Tires</u>:

Obligor in all states except Florida, and Oklahoma: Federal Warranty Service Corporation
Obligor in Florida: United Service Protection, Inc.
Obligor in Oklahoma: Assurant Service Protection, Inc.

<u>For Tires</u>:
Obligor in all states except Florida, Massachusetts*, New York*, and Oklahoma: United Service Protection Corporation
Obligor in Florida: United Service Protection, Inc.
Obligor in Oklahoma: Assurant Service Protection, Inc.
*In Massachusetts and New York, Company will not be Obligor.

<u>Territory</u>: United States and Puerto Rico

**Exhibit C**
**Client Affiliates**

Kmart Operations LLC

Sears Operations LLC

Sears, Roebuck and Co.

Sears, Roebuck de Puerto Rico, Inc.

Kmart Corporation

Kmart of Michigan, Inc.

Kmart of Washington LLC

Kmart Stores of Illinois LLC

Kmart Stores of Texas LLC

ServiceLive Inc.

A&E Factory Service, LLC

Sears Home & Business Franchises, Inc.

Sears Home Improvement Products, Inc.

DocuSign Envelope ID: B90B3E60-0141-4853-A79D-9288A0851825

**Exhibit D**
**Information Security Requirements**

At a minimum and as specified herein, in connection with the Company's access, storage, transmittal (send/receive/pass-through) or processing of Contract Holder data and any other customer data shared by Client with Company under this Agreement (collectively, "CHD") or other actions that could affect the security of CHD, the Company shall provide a valid and current Attestation of Compliance ("AoC") issued and signed by a third-party PCI Qualified Security Assessor ("QSA"), upon request by Client.

For the purpose of this document Client's Confidential Information ("Client Information") includes CHD.   Examples of other Client Information which Company may receive from Client are listed on Appendix A hereto.

Company's security efforts will include, without limitation (where applicable):

1. **Logical Access Controls**: Company shall employ effective logical  access control measures over all systems used to access, create, transmit, or process Client Information, including but not limited to:

   a) User authentication must use unique identifiers ("User IDs") consistent with individual accountability; shared User IDs do not provide the level of accountability required by Client;
   b) A complex password policy, including the prohibition of clear-text credentials must be enforced;
   c) User access rights/privileges to information resources containing Client Information must be granted on a need-to-know basis consistent with role-based authorization.
   d) User access must be removed immediately upon user separation or role transfer eliminating valid business need for continued access.
   e) Default passwords and security parameters must be changed in third-party products/applications used to support Client Information in scope of this agreement.
   f) Two-factor authentication such as token devices, smart cards, biometrics, or public keys shall be used to secure all remote administrative access.

2. **Network Security Architecture:** Company shall employ effective network security control measures over all systems used to create, transmit, or process Client Information including but not limited to:
   a) Firewalls shall be operational at all times and shall be installed at the network perimeter between Company's internal (private) and public (Internet) networks.

   b) Properly configured and monitored IDS/IPS (Intrusion Detection/Prevention Systems) must be used on Company's network.

   c) All information systems, repositories, etc. used in connection with this Agreement by Company or its business partners must be physically located in a controlled data center environment used for the purpose of protecting information systems.

DocuSign Envelope ID: B9C13E60-0141-4853-A79D-9288A0851B25

    d)  Secure channels (e.g., SSL, SFTP, SSH, IPSEC, etc.) must be used at all times.

**3.**       **Physical Access Controls:** Company shall maintain servers, databases, and other hardware and/or software components that store information related to Client's business activities in an access controlled and consistently monitored Data Center secured by appropriate alarm systems, which will not be commingled with another unrelated party's software or information. The facility storing Client Information must follow best practices for infrastructure systems to include fire extinguishing, temperature control and employee safety.

**4.**  **Risk Assessment/Audit:**

    a)  In connection with the Company's access, storage, transmittal (send/receive/pass-through) or processing of CHD or other actions that could affect the security of CHD, the Company shall perform regular security vulnerability assessments that satisfy the requirement of Payment Card Industry Data Security Standard ("PCI DSS") that Client is held to as Merchant - level-1 and is required to demonstrate annual compliance, and shall provide Client with a current AoC issued and signed by a third party PCI QSA.

    b)  Company shall participate in vulnerability scans of its network (upon Client's request) and provide Client with results of a current security assessment by an accredited third party (e.g., SSAE 16-Type II reports, ISO 27001 certification, pen test report etc.).

**5.**  **Security Policy:** Company shall maintain and enforce security policies consistent with all legal and privacy requirements applicable to Company as an Obligor and as an Administrator of the Service Contracts.

**6.**  **Training and Awareness:** Company shall provide necessary training to ensure security awareness in Company personnel that are directly or indirectly engaged in handling Client Information and systems, onsite or remotely.

**7.**  **Protection of Client Information**: In addition to what may be described in the Agreement, where applicable, Company agrees to protect Client Information as it would its own. For purposes of clarity, additionally, Company agrees to adhere to the following controls surrounding the use and protection of Client Information:

    a)  Client Information stored at rest must be encrypted with key sizes of 256-bit for symmetric and 2048-bit for asymmetric encryption.

    b)  Clear text (ftp, telnet, etc.) protocols may not be used to access or transfer Client Information. Client Information must be encrypted when stored on portable media, which by way of example shall include USB sticks, portable hard drives, laptops, DVD/CDs, and when transmitted on wireless networks or across public networks.

DocuSign Envelope ID: B3C13E60-0141-4853-A79D-9288A0851935

c) Client Information may not be copied, sold or used for solicitation purposes by the Company or its business partners.  Client Information may only be used in conjunction with and within the scope of the Agreement.

d) Client Information (data) must be logically or physically segregated from other Company customers, systems, or applications unrelated to Client.

e) Where applicable, payment card information must be masked on display rendering in a manner consistent with PCI-DSS, the Fair and Accurate Credit Transaction Act ("<u>FACTA</u>") and all other applicable laws and regulations.

f) Company must disclose to Client where Client Information will be stored and processed.   Storage and processing of Client Information shall take place within the United States.

**8. <u>System Monitoring</u>:** Company shall regularly audit and monitor information systems processing Client's business activities to ensure the protection of Client's information. Monitoring includes, but is not limited to, potential breaches or hacking activity and access to devices.  Company must have defined processes for security alerting, escalation and remediation that are consistent with the services procured pursuant to the Agreement. Company must ensure that event logs with Client Information are not provided to other subscribers.

**9. <u>Vulnerability Management Controls</u>:** Company shall employ effective vulnerability management control measures over all of its systems used to create, transmit, or process Client Information, including; but, not limited to:

a) Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices.

b) Deploy and maintain currency of up-to-date commercially available anti-virus, anti-spam, anti-malware software on all information system components including personal computers, laptops, and interconnecting networks, where applicable, used for the purpose of managing Client Information. Additionally, provide for regular scanning for viral infections and update virus signature files frequently.

c) Maintain a standard patch management process and practice to ensure the protection of any devices used to access, process or store Client Information. Company agrees to provide Client with a summary of patch management program upon request.

d) Regularly auditing and monitoring to ensure the protection of Client Information.

e) Any security breach that involves Client Information must be reported to Client in accordance with <u>Section 22</u> of the Agreement without unreasonable delay.  Company shall immediately perform a root cause analysis as well as provide detailed information about measures taken by the Company to prevent future breaches.  All efforts to rectify or resolve the situation must include subsequent and regular notification for the reported incident.

f) Within seventy-two (72) hours of suspected fraudulent or malicious activity occurring on the Company site, Company will notify the Client by an e-mail addressed to

DocuSign Envelope ID: B3C913E60-0141-4852-A79D-9288A0B5193F5

Securityops@searshc.com to inform the Client team about the activity. Any request by the Client team for such information will be provided to Client within two (2) hours.

g) Company agrees to provide full cooperation with Client and in the event of a data breach involving  Client Information including, but not limited to: server log information showing network and application traffic.

10. **<u>Data Recovery and Availability</u>**: Company shall provide detailed disaster recovery and business continuity plans that support the pre-defined recovery time objective (RTO) / recovery point objective (RPO) requirements defined by Client.

a) Company must utilize industry best practices for data, services, and communications recoverability. Data and applications must be replicated across multiple independent sites and alternate communication channels must be available.

b) Company is expected to validate and verify their existing capabilities through realistic scenario testing. Company must agree to participate in periodic recovery testing with Client. Proof of successful testing of the Company plan must be provided to Client upon request.

c) Company systems must be device (computer machine) and provider independent in order to ensure portability and successful recovery of applications and backup or restoration services, or both.

- Company shall provide Client name, address, and contact information on all third-party relationships as well as services provided by each wherever those services create, transmit or process Client Information.

11. **<u>Data Destruction:</u>** Company shall ensure that residual magnetic, optical, or electrical representation of Client Information that has been deleted may not be retrieved or reconstructed when storage media is transferred, become obsolete or is no longer usable or required by Client.

- Company data retention and destruction must comply with applicable laws or regulations.

- Client Information stored on Company media (e.g., hard drive, optical discs, digital media, tapes, paper, etc.) must be rendered unreadable or unattainable using the NIST Guidelines for Media Sanitization (Special Pub 800-88), prior to the media being recycled, disposed of, or moved off-site.

DocuSign Envelope ID: B3D13EF0-0115-4353-A79D-9258A0B519Z5

**Appendix A to Exhibit D**

Client Information may include, but is not limited to, the following:

- Customer or Employee Names, in whole or in part
- Customer or Employee Postal Address
- Customer or Employee e-mail address
- Personal Telephone Number (when used with a customer/employee name or address)

**Exhibit E**
**Sample Standard File Layout for Enrollments and Cancellations**

**Enrollment & Cancellation File Layout**

**Fixed width, no delimiters**

| Field # | | Field Name | Field Size | Type | Description | Required | Comments |
|---|---|---|---|---|---|---|---|
| 1 | | Record Type | 1 | A | A=add or enrollment record<br>C= Cancellation<br>T = Trailer | Y | Other record types can be negotiated as requirements are defined, such as 'U' for update |
| 2 | | Dealer ID | 5 | A | Identifier for the client file | N | Assigned by Assurant |
| | | **Record Type  'A' and 'C'** | | | | | |
| 3 | | Unique Identifier | up to 75 | A | Unique identifier for each Warranty sold.  For cancels, it is the unique identifier of the original Warranty sold | Y | If multiple Warranties can be sold on same receipt, they must have different Unique Identifiers. |
| 4 | | Store Number | 4 | N | Store number where Warranty was sold | Y | |
| 5 | | State/province of sale | 2 | A | State where Warranty was sold.  Used for tax, reporting and compliance | Y | |
| 6 | | Zip Code/Postal Code of sale | 6 | A | Zip Code where Warranty was sold.  Used for tax, reporting and compliance . US zip -Left Justified pos 1-5 | Y | |
| 7 | Warranty Level Information | Country of sale | 2 | A | US | N | |
| 8 | | Warranty Sold Date | 8 | N | Sold date of the Protection Plan  -  Format  MMDDYYYY | Y | |
| 9 | | Mfg Warranty OEM (in months) | 4 | N | Expressed in months with leading zeroes. eg. 012 | Y | |
| 10 | | Start date of the coverage | 8 | N | Start Date of Warranty Coverage - Format MMDDYYYY | Y | For Extended plans start date should equal Sold date plus OEM; For DOP, Start should equal to Sold date. |
| 11 | | End Date of Warranty | 8 | N | End Date of Warranty Coverage - Format MMDDYYYY | Y | If not provided, End date will be calculated as Start Date plus Term of Warranty |
| 12 | | Warranty Term | 3 | N | Expressed in months with leading zeroes. eg. 024 | Y | |
| 13 | | Cancellation Date | 8 | N | The date the warranty is cancelled with the client (typically within 30 days of sale) - Format MMDDYYYY | N | Required only on cancellation type records |
| 14 | | Warranty SKU | 9 | A | SKU/Item # of Protection Plan | Y | Must be valid warranty SKU on plan code pricing sheet |
| 15 | | Warranty Retail Price | 7 | N | Retail amount paid for the Protection Plan  (excluding tax). | Y | Two decimal places assumed 1234567 = $12,345.67 |
| 16 | | Warranty Dealer Net | 7 | N | Cost of the protection plan sold (due to Assurant) | Y | Two decimal places assumed 1234567 = $12,345.67 |
| 17 | | Warranty Sales Tax Amount | 7 | N | Sales tax amount on warranty retail price. | Y | Two decimal places assumed 1234567 = $12,345.67 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 18 | | Sequence Number | 3 | N | Sequence number of product within Warranty sold.   000 is Warranty level, 001 is first product, 002 second product, etc. | Y | Needed only if the contract (Warranty SKU) can cover multiple products. Also known as groups or bundles |
| 19 | | Product SKU | 9 | N | Unique identifier for the covered product | Y | |
| 20 | | Product UPC Code | 12 | N | Barcode Number of the covered product | Y | |
| 21 | Product Level | Mfg Name/Code of Product | 20 | A | Manufacturer Name of covered product | Y | |
| 22 | | Model Number | 20 | A | Model number for the product | Y | |
| 23 | | Serial Number | 20 | A | Serial Number of the covered product | N | |
| 24 | | Product Retail Price | 7 | N | Retail price of covered product in whole dollars (including tax) | Y | |
| 25 | | Product Description | 30 | A | Lowest level description of covered product | Y | |
| 26 | | Product Category/Department | 30 | A | Description of the covered product Category or Department | N | This is a higher level description the type of product covered. Optionally additional fields can be added to further describe the product.  For example,  Refrigerator, Side-by-side |
| 27 | | Customer Last Name | 15 | A | | N | |
| 28 | | Customer First Name | 15 | A | | N | |
| 29 | | Customer Street Address 1 | 30 | A | | N | |
| 30 | | Customer Street Address 2 | 30 | A | | N | |
| 31 | Customer Level | Customer City | 20 | A | | N | |
| 32 | | Customer State | 2 | A | | N | |
| 33 | | Customer Country | 2 | A | US | N | |
| 34 | | Customer Zip Code/Postal Code | 6 | A | US-Left Justified pos 1-5 | N | |
| 35 | | Customer Area Code 1 | 3 | N | Omit parenthesis or dashes | N | |
| 36 | | Customer Phone Number 1 | 7 | N | Omit parenthesis or dashes | N | |
| 37 | | Customer Area Code 2 | 3 | N | Omit parenthesis or dashes | N | |
| 38 | | Customer Phone Number 2 | 7 | N | Omit parenthesis or dashes | N | |
| 39 | | Customer Email Address | 40 | A | Standard email format | N | |
| | | **Record Type 'T'** | | | Trailer record at end of file | N | |
| 40 | | Record Count | 10 | N | Total number of records including trailer record | Y | |
| 41 | | Warranty dealer net total | 9 | N | Total dealer net dollar amount in file | N | Two decimal places assumed 123456789 = $1,234,567.89 |

**Sample Standard File Layout for Claims**

**Claims File**

**Fixed width, no delimiters**

| Field # | | Field Name | Field Size | Type | Description | Required | Comments |
|---|---|---|---|---|---|---|---|
| 1 | | Record Type | 1 | A | L= Claim<br>T = Trailer | Y | |
| 2 | | Dealer ID | 5 | A | Identifier for the client file | N | Assigned by Assurant |
| | | | | | | | |
| | | **Record Type 'L'** | | | | | |
| 3 | | Unique Identifier | up to 75 | A | Unique identifier for the Warranty sold. | Y | Must be the same Unique Identifier as the Enrollment |
| 4 | | Servicer ID/Vendor # | 15 | A | Assurant Servicer ID for accounting purposes | N | Assigned by Assurant |
| 5 | | Loss Date | 8 | N | Date the loss was reported - Format MMDDYYYY | Y | Must be between Start Date and End Date of warranty |
| 6 | Claim Level Information | Invoice Number | 20 | A | Unique identifier for the invoice on a claim | Y | Must be unique, or will be rejected as duplicate claim.  If a rework of previous claim, append a letter/number to ensure it is unique |
| 7 | | Invoice Date | 8 | N | Date of the invoice - Format MMDDYYYY | Y | Must be prior to the current date |
| 8 | | Invoice Amount | 7 | N | Total dollar amount of the claim | Y | Two decimal places assumed 1234567 = $12,345.67 |
| 9 | | Labor Amount | 7 | N | Labor portion of claim amount | N | Two decimal places assumed 1234567 = $12,345.67 |
| 10 | | Parts Amount | 7 | N | Parts portion of claim amount | N | Two decimal places assumed 1234567 = $12,345.67 |
| 11 | | Other Amount | 7 | N | Other  portion of claim amount. Could include shipping or transportation costs | N | Two decimal places assumed 1234567 = $12,345.67 |
| 12 | | Sales Tax Amount | 7 | N | Sales Tax portion of claim amount | Y | Two decimal places assumed 1234567 = $12,345.67 |
| 13 | | Currency Type | 2 | A | US | Y | |
| 14 | | Service Level | 2 | A | 1 = Standard - Basic Repair<br>A = Replacement New | Y | |
| 15 | | Reason/Complaint Description | 30 | A | Optional – can be used for analysis if provided | N | |
| 16 | Product Level | Sequence Number | 3 | N | Sequence number of product within Warranty sold. | Y | Needed only if the contract (Warranty SKU) can cover multiple products. Also known as groups or bundles |
| 17 | | Product SKU | 9 | A | Unique identifier for the product on the claim | Y | |

| 18 | | Product Category/Department | 30 | A | Description of the covered product Category or Department | Y | This is a higher level description the type of product covered. Optionally, additional fields can be added to further describe the product. For example, Refrigerator, Side-by-side |
| 19 | | Mfg Name/Code of Product | 20 | A | Manufacturer Name for product on the claim | Y | |
| 20 | | Model | 20 | A | Model number for the product | Y | |
| 21 | | Serial Number | 20 | A | Serial Number of the covered product | N | |
| | | **Record Type 'T'** | | | Trailer record at end of file | | |
| 22 | | Record Count | 10 | N | Total number of records including trailer record | Y | |
| 23 | | Claim Amount total | 9 | N | Total dollar amount of claims in file | N | Two decimal places assumed 123456789 = $1,234,567.89 |

SWDOCIDLOCATION

DocuSign Envelope ID: B3D135F0-0141-4353-A79D-9EB6A0F5B975

**Exhibit F**
**Example of Funding**

| Sunday | Monday | *Tuesday | Wednesday | Thursday | Friday | Saturday | Total |
|---|---|---|---|---|---|---|---|
| Normal Week | | | | | | | |
| $        - | $   180,000 | $   180,000 | $  180,000 | $   180,000 | $   540,000 | $        - | $ 1,260,000 |
| Holiday Week - Bank Closed on Thursday | | | | | | | |
| Sunday | Monday | *Tuesday | Wednesday | Thursday - Thanksgiving | Friday | Saturday | Total |
| $        - | $   180,000 | $   180,000 | $  360,000 | $        - | $   540,000 | $        - | $ 1,260,000 |
| Holiday Week - Bank Closed on Friday | | | | | | | |
| Sunday | Monday | *Tuesday | Wednesday | Thursday | Friday - Bank Closed | Saturday | Total |
| $        - | $   180,000 | $   180,000 | $  180,000 | $   720,000 | $        - | $        - | $ 1,260,000 |
| Holiday Week - Bank Closed on following Monday, i.e. Memorial Day | | | | | | | |
| Sunday | Monday | *Tuesday | Wednesday | Thursday | Friday | Saturday | Total |
| $        - | $   180,000 | $   180,000 | $  180,000 | $   180,000 | $   720,000 | $        - | $ 1,440,000 |

*Each Tuesday the parties will true up for the previous seven (7) days and transfer funds in a separate transaction.

DocuSign Envelope ID: B3D135E0-0145-4853-A79D-9284A0F51975

**Exhibit G**
**Service Level Agreements**

**Call Center**

1.  Staff the call center accordingly to maintain an answer time service level of eighty percent (80%) within sixty (60) seconds as measured and reported on a monthly basis.

2.  Staff the call center accordingly to maintain a call abandon rate of five percent (5%) or less as measured and reported on a monthly basis.

**Service:**

1.  Shall authorize payment for replacement plans ninety percent (90%) of claims within three (3) business days of receipt of the product or proof of disablement as measured and reported on a monthly basis.

2.  Shall complete and ship ninety percent (90%) of carry-in or shop repairs within three (3) business days of receipt of the product in the repair facility as measured and reported on a monthly basis.

3.  Shall complete sixty percent (60%) of all on-site repairs within ten (10) business days of approving the initial service request as measured and reported on a monthly basis.

DocuSign Envelope ID: B3DA35E0-0115-4952-A79D-98BA0F519775

**Exhibit H**
**Service Fees and Parts Costs**

| National Labor Rates – In Home Repair | | | |
|---|---|---|---|
| Parts Pricing | Cost plus 10% | | |
| | | Repairs | Preventive Maintenance Checks |
| Service Attempts | Defined as: Customer Instruction, Customer Declined Service, No Problem Found, Estimate Refused, Parts Unavailable, Product Inaccessible, Product Uneconomical to Repair | $65.00 | |
| | | | |
| | Repair rates are inclusive of product replacement costs and food loss | | |
| Appliances | Washer | $165.00 | $80.00 |
| | Dryer | $105.00 | $80.00 |
| | Trash Compactor | $165.00 | $80.00 |
| | Garbage Disposal | $165.00 | $80.00 |
| | Water Heaters - (All Types) | $165.00 | $80.00 |
| | Water Softener | $165.00 | $80.00 |
| | Dishwasher | $135.00 | $80.00 |
| | Cooktop | $155.00 | $80.00 |
| | Oven/Range | $165.00 | $80.00 |
| | Microwave: Built-in | $165.00 | $80.00 |
| | Refrigerator: Non-Sealed | $165.00 | $80.00 |
| | Refrigerator: Sealed | $260.00 | |
| | Freezer | $165.00 | $80.00 |
| | Other Division 22 | $165.00 | $80.00 |
| | Other Division 26 | $165.00 | $80.00 |
| | Other Division 46 | $165.00 | $80.00 |
| | | | |
| Fitness Equipment | Treadmills/Ellipticals | $215.00 | $80.00 |
| | Other Division 6 | $165.00 | $80.00 |
| | | | $0.00 |
| Lawn & Garden | Tractors/Riding Mowers | $165.00 | N/A |
| | Grills | $165.00 | N/A |
| | Snowthrowers | $105.00 | N/A |
| | Other Division 71 | $165.00 | N/A |
| | | | $0.00 |
| Electronics | Televisions | $265.00 | $80.00 |
| | Other Division 57 | $105.00 | $80.00 |
| | | | $0.00 |
| HVAC | A/C Non-Sealed | $139.00 | $89.00 |
| | A/C Sealed | $225.00 | $0.00 |
| | Furnace | $219.00 | $89.00 |
| | Boiler or Oil Furnace | $300.00 | $89.00 |
| | | | $0.00 |
| Garage/Tools | Garage Door Opener | $120.00 | $80.00 |
| | Other Division 9 | $250.00 | $80.00 |

| National Labor Rates – Carry In Repair | | | |
|---|---|---|---|
| Parts Pricing | Cost plus 10% | | |
| | | Repairs | Preventive Maintenance Checks |
| | Administration Fee | $20.00 | $20.00 |
| | Repair rates are inclusive of product replacement costs | | |
| Appliances | Vacuums | $150.00 | $50.00 |
| | Window A/C | $120.00 | $50.00 |
| | Other Division 42 | $100.00 | $50.00 |
| | | | |
| Lawn & Garden | Mowers | $100.00 | N/A |
| | Snowthrower | $100.00 | N/A |

| | Other Division 71 | $120.00 | N/A |
| | | | |
| Electronics | Television | $200.00 | $50.00 |
| | Other Division 57 | $180.00 | $50.00 |
| | | | |
| Garage/Tools | Tools | $200.00 | $50.00 |

DocuSign Envelope ID: B3C13E50-0141-4353-A79D-9358A0F5197E

**<u>Exhibit B</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                              :
                                                   :      **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,          :
                                                   :      **Case No. 18-23538 (RDD)**
                                                   :
          Debtors.[1]                              :      **(Jointly Administered)**
---------------------------------------------------------------x

## ORDER AUTHORIZING ENTRY INTO ADMINISTRATION AGREEMENT

Upon the motion, dated November 23, 2018 (ECF No. [___]) (the "**Motion**")[2] of

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a) and

363(b) of the Bankruptcy Code request entry of a proposed order authorizing but not directing the

Debtors to enter into the Administration Agreement with Assurant, all as more fully set forth in

the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein

pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided in accordance with the Amended Case Management Order; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on [_____], 2018 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors are authorized to enter into and perform under the Administration Agreement, to execute and deliver all documents, agreements, or amendments related thereto, and to perform thereunder pursuant to section 363(b) of the Bankruptcy Code.

3.      All of the Debtors' actions taken in accordance with the Administration Agreement, including any payments to Assurance thereunder, prior to the entry of this Order are hereby approved and ratified.

4.      Upon execution of the Administration Agreement and entry of this Order the terms and conditions contained in the Administration Agreement are approved and binding and enforceable against the parties thereto.

2

5.      The Debtors and Assurant are authorized to terminate the Administration Agreement in accordance with its terms and exercise any rights of setoff and/or recoupment that may exist without the necessity of seeking relief from this Court including, without limitation, the need to seek relief from the Bankruptcy Code's automatic stay.

6.      Notwithstanding anything in the Motion or this Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable: (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

7.      To the extent there is any inconsistency between the terms of any of the DIP Orders and this Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

8.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceability upon its entry.

9.      Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

11.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

3

Dated: _____, 2018
      White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

4