**Hearing Date and Time: November 27, 2018 at 1:30 p.m. (Eastern Time)**
**Objection Deadline: November 27, 2018 at 1:30 p.m. (Eastern Time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Alexis Freeman

*Proposed Counsel to the Official Committee of*
*Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

| | | |
|---|---|---|
| **In re** | : | Chapter 11 |
| | : | |
| **SEARS HOLDINGS CORPORATION, *et al.*,** | : | Case No. 18-23538 (RDD) |
| | : | |
| **Debtors.[1]** | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------------

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS OF SEARS HOLDINGS CORPORATION, *ET AL.* TO THE DEBTORS'**
**DIP FINANCING MOTION AND CASH MANAGEMENT MOTION AND OBJECTION**
**TO THE DEBTORS' SUPPLEMENTAL MOTION FOR AUTHORITY TO (I) OBTAIN**
**JUNIOR POSTPETITION FINANCING, AND (II) SCHEDULE FINAL HEARING**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears

Holdings Corporation and its affiliated debtors and debtors in possession (collectively, the

"Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the

"Supplemental Objection") to (i) the entry of a final order (the "Final DIP Order") granting the

Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C)

Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing

and Final Hearing [ECF. No. 7] (the "DIP Financing Motion"), (ii) the entry of a final order (the

"Final Cash Management Order") granting the Motion of the Debtors for Authority to (I) Continue

Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement

Ordinary Course Changes to Cash Management System, (III) Continue Intercompany

Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany

Claims and Related Relief [ECF. No. 5] (the "Cash Management Motion"), and (iii) the entry of

an interim order granting the Debtors' Supplemental Motion for Authority to (I) Obtain Junior

Postpetition Financing, and (II) Schedule Final Hearing [ECF. No. 872] (the "Junior DIP Motion").

In support of this Supplemental Objection, the Creditors' Committee respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.    The Creditors' Committee does not dispute the Debtors' need for postpetition

financing.  What the Creditors' Committee opposes are the efforts by the Debtors and their

current and proposed lenders to run roughshod over the law on the basis that there are no

financing alternatives available to the Debtors other than those contemplated by the DIP ABL

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the *Omnibus Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, Et Al. to the Debtors' DIP Financing Motion and Cash Management Motion* (the "Objection"), the GACP Term Sheet, or the *Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) Grant Related Relief* [ECF No. 864] (the "Reply"), as applicable.

Facility and Junior DIP Facility. By the Debtors' reply to the Objection, the Debtors did address

a number of the concerns raised by the Creditors' Committee in the Objection.[2] However, a

number of the Creditors' Committee's primary objections remain including, without limitation,

(i) the Debtors' request to impose on their estates and their unsecured creditors a 5:1 Roll Up of

prepetition secured debt to maximum incremental financing under the DIP ABL Facility at

Debtors that are not obligated on the Prepetition ABL Obligations (the "Non-Obligor Debtors")

and (ii) the granting of adequate protection claims and liens to the Prepetition Credit Parties

(including the Second Lien Lenders) at Non-Obligor Debtors and on previously unencumbered

assets (the "Previously Unencumbered Assets"), which is contemplated by both the Final DIP

Order and Junior DIP order (the "Interim Junior DIP Order" and, together with the Final DIP

Order, the "DIP Orders").

2.    The Debtors' only justifications for providing the unlawful Roll Up and

extensions of adequate protection are that the DIP ABL Facility and Junior DIP Facility are the

best financing options available and have no material impact on unsecured creditors. Reply ¶¶ 1,

10, 13. However, approval of lender protections that violate the Bankruptcy Code and applicable

law cannot be sanctioned under the guise that such terms are the best available.

3.    In addition, the Debtors purport to mitigate any harm to unsecured creditors by

providing for marshalling (the "Reverse Marshalling") "so that the proceeds of Previously

Unencumbered Collateral will be placed in a cash account and applied to DIP ABL Obligations

*only in the event that substantially all of the Prepetition ABL Collateral has been liquidated and*

*proves to be insufficient to satisfy the ABL Lenders.*" Reply ¶ 5 (emphasis added). The Debtors'

---

[2]    The Creditors' Committee is engaged in ongoing discussions with the Debtors and the DIP ABL Lenders to
resolve the Creditors' Committee's outstanding objections and believes that a resolution may be possible in
advance of the hearing. The Creditors' Committee does not anticipate reaching resolution with the Junior DIP
Lenders.

statement in this regard is materially misleading to the Court. Indeed, the Reverse Marshalling concept is nothing more than an agreement between the DIP ABL Agent and the Junior DIP Agent with respect to the sharing of proceeds of collateral. In fact, (i) the Final ABL DIP Order and Interim Junior DIP Order seek express waivers of the doctrine of marshalling for the benefit of the DIP ABL Lenders and Junior DIP Lenders and (ii) the proposed DIP Intercreditor Agreement expressly provides that (x) the Reverse Marshalling is solely for the benefit of the Senior DIP Agents (as defined in the DIP Intercreditor Agreement) and the Junior DIP Agent, (y) the Reverse Marshalling waterfall can be amended at any time with the consent of the Senior DIP Agents and the Junior DIP Agent and (z) the Debtors and their estates are not third party beneficiaries of the Reverse Marshalling. Accordingly, the DIP ABL Facility cannot be approved unless the inappropriately broad grant of claims and liens against the Debtors in connection with the Roll Up and adequate protection is eliminated and the Reverse Marshalling provisions are incorporated into the DIP Orders, cannot be amended without Court order and provide express enforcement rights in favor of the Debtors and their estates.

4.      By the Junior DIP Motion, the Debtors seek approval of the Junior DIP Facility. Based on the Creditors' Committee's review of the GACP Term Sheet and proposed Interim Junior DIP Order, many of the Creditors' Committee's continuing objections to the DIP ABL Facility are applicable equally to the Junior DIP Facility, including the proposed grants of adequate protection for the benefit of the Prepetition Creditor Parties (including the Second Lien Lenders) at Non-Obligor Debtors and on Previously Unencumbered Assets. In addition, the Junior DIP Facility matures prior to the DIP ABL Facility, thereby shortening the term of the DIP ABL Facility (and effectively increasing the cost thereof). Alternatively, the Junior DIP Facility permits the Debtors to extend the Junior DIP Maturity Date to be coterminous with the DIP ABL Facility so long as

the Debtors pay the Junior DIP Lenders an additional fee of approximately $4.4 million. The Junior DIP Maturity Date should be modified to be consistent with the DIP ABL Maturity Date without the incurrence of a significant incremental extension fee. Without these modifications, and as discussed in more detail below, the Debtors have failed to demonstrate that the Junior DIP Facility is fair, reasonable and adequate in accordance with applicable law.

## SUPPLEMENTAL BACKGROUND

### A.    The Proposed Junior DIP Facility

5.    On November 14, 2018, the Debtors filed a *Notice of Filing of Term Sheet Regarding Junior Secured Debtor-in-Possession Multiple Draw Term Loan Facility* [ECF. No. 735] which provided a revised Junior DIP term sheet (the "GACP Term Sheet") for a junior secured debtor-in-possession multiple draw term loan facility (the "Junior DIP Facility") to be provided by GACP Finance Co., LLC, as agent for the Junior DIP Lenders (in such capacity, the "Junior DIP Agent").

6.    The obligations under the Junior DIP Facility are to be: (i) joint and several superpriority administrative expense claims against every Debtor (the "Junior DIP Facility Superpriority Claims"), which will be of equal priority to the DIP ABL Superpriority Claims; (ii) secured by liens on all unencumbered assets, and all proceeds thereof (other than the Specified Collateral), including liens on Avoidance Action Proceeds (collectively, the "Unencumbered Assets"), which liens will be junior only to the DIP ABL Liens; (iii) secured by a first priority lien on all of the rights, title and interests of any Obligor in the Specified Collateral,[3] which security

---

[3]    Specified Collateral means (i) all of the rights, title, and interests of any Obligor in the Specified Store Assets (specifically store numbers 7777, 7749 and 9423), and (ii) all of the rights, title, and interests of any Obligor in that certain Specified Litigation Claim (specifically anti-trust claims or other claims against any of Visa Inc., Mastercard Inc., JPMorgan Chase & Co, Citigroup N.A., Bank of America N.A., or any of their respective affiliates in relation to certain practices with respect to merchant processing fees and merchant processing agreements, and the proceeds thereof, and any settlement with respect to the foregoing.

interests and liens shall be *pari passu* with the DIP ABL Liens without giving regard to the Roll Up portion thereof; (iv) secured by liens on all assets, and all proceeds thereof that are subject to valid and perfected liens existing on the Petition Date securing indebtedness and other obligations other than the Prepetition First Lien Indebtedness, the Pre-Petition L/C Indebtedness or the Pre-Petition Second Lien Indebtedness, junior only to such other Prepetition Liens and the DIP ABL Liens; and (v) secured by liens on the Prepetition ABL Collateral and all proceeds thereof, which liens will be junior only to (a) the Permitted Prior Liens, (b) the DIP ABL Liens, (c) the Prepetition Revolving Facilities and Prepetition 2016 Term Loan Facility Adequate Protection Liens, (d) the Prepetition 2018 FILO Facility Adequate Protection Liens, (e) the Prepetition LC Facility Agreement Adequate Protection Liens, (f) the Prepetition Facilities Prepetition Liens and Prepetition LC Facility Agreement Prepetition Liens, (g) the Prepetition Second Lien Facilities Adequate Protection Liens, and (h) the Prepetition Second Lien Facilities Pre-Petition Liens (all such liens discussed in this paragraph 6, collectively, the "Junior DIP Facility Liens" and the property subject to such Junior DIP Facility Liens, the "Junior DIP Facility Collateral").

7.      The adequate protection provided under the Junior DIP Facility is substantially the same as provided in connection with the DIP ABL Facility.  GACP Term Sheet at p. 6.

8.      On November 23, 2018, the Debtors filed the Reply which resolved certain of the Creditors' Committee's Objections.

9.      On November 25, 2018, the Debtors filed the Junior DIP Motion, including a revised GACP Term Sheet.

## SUPPLEMENTAL OBJECTION

### A.    There is No Basis in the Law for Granting Claims and Liens on Assets at Prepetition Non-Obligor Debtors

10.    By the Debtors' logic, because the Prepetition ABL Lenders want claims and liens on assets at Non-Obligor Debtors, they should get them because, without the DIP ABL Facility, the Debtors will be forced to liquidate.  Reply ¶ 1.  This reasoning is flawed for a number of reasons.  First, the Debtors have failed to provide any legal support for the grant of claims and liens against Non-Obligor Debtors.  Second, the Prepetition ABL Lenders are oversecured by a substantial equity cushion in the Prepetition ABL Collateral.  Third, the intercompany claims language proposed by the Creditors' Committee in the Objection protects the Prepetition ABL Lenders against use of their collateral in intercompany transactions without the need for grants of claims and liens against Non-Obligor Debtors.  Lastly, the Prepetition ABL Lenders want the additional grant of claims and liens in Non-Obligor Debtors simply because they want it—the Prepetition ABL Lenders cannot articulate why they want such additional protections because they do not have any information about what additional value they would be getting from the grant of such claims and liens.

11.    In support of the Roll Up, the Debtors state that there is "ample evidence" in this district that supports approving postpetition financing on similar terms—terms that provide claims against, and liens on assets of, debtors that were not prepetition obligors on the prepetition debt facilities.  Reply ¶ 8.  The Debtors further state that the Roll Up complies with applicable law.  *Id*. ¶¶ 9-11.  Remarkably, notwithstanding such "ample evidence", the Debtors cite to only two cases, *In re Rockport Co., LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. June 29, 2018) and *In re The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Apr. 16, 2015) (ECF. No. 290), *Id*. ¶ 11, as examples of final postpetition financing orders approving the grant of

interests in non-obligor debtors, neither of which is binding on this Court nor relevant to the present facts and circumstances. Moreover, based on a read of the pleadings filed and the relevant hearing transcripts in *Rockport* and *Standard Register* (copies of such transcripts are attached hereto as Exhibit A), it does not appear that the issue regarding the grant of claims against, and liens on assets of, non-obligor debtors was addressed by the Court. The law simply does not support the grant of such claims and liens against Non-Obligor Debtors in connection with a roll up or adequate protection. Thus, the Debtors have failed to demonstrate that the grant of such claims and liens against Non-Obligor Debtors is fair and reasonable

12.     Significantly, the Court's denial of claims and liens against Non-Obligor Debtors in connection with the Roll Up and adequate protection will not impair the Prepetition ABL Lenders' protections because by the Debtors' own admission the Prepetition ABL Obligations were oversecured on the Petition Date by an equity cushion in their collateral of over $1 billion. *Id*. ¶¶ 5, 14 ("Prepetition ABL Collateral was valued at approximately $2.8 billion (of which the net orderly liquidation value  ("NOLV") of the Debtors' inventory was valued at about $2.74 billion) with approximately $1.53 billion borrowed against it under the Prepetition ABL Facility.") (citing Supplemental Riecker Declaration). There simply is no basis for approving the 5:1 Roll Up and the grant of the claims and liens on account of adequate protection against Non-Obligor Debtors where the Prepetition ABL Lenders are oversecured substantially by the Prepetition ABL Collateral. The Prepetition ABL Lenders' desire for the Roll Up and the inappropriate grants of claims and liens against Non-Obligor Debtors in connection therewith and as adequate protection is not a sufficient basis for such relief where the law does not allow for such protections even if such postpetition financing were the only financing available to the Debtors.

13.    Further, the intercompany transfer language proposed by the Creditors'
Committee's Proposed Final Order attached to the Objection serves to protect the Prepetition ABL
Lenders without the need to grant claims and liens against Non-Obligor Debtors.  Specifically, the
Creditors' Committee's proposed language provides that, in connection with a postpetition
intercompany transaction, the transferring Debtor would have a superpriority claim (the
"Postpetition Superpriority Claim") and lien (the "Postpetition Intercompany Lien") against the
beneficiary Debtor (the "Beneficiary Debtor") in an amount equal to the amount by which the fair
value of the property or benefit transferred exceeds the aggregate fair value of the property or
benefit received.  Such Postpetition Superpriority Claims would be senior to all other superpriority
claims, subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, and the
Postpetition Intercompany Liens would be senior to all other liens on the applicable Beneficiary
Debtor's property other than the Carve-Out and DIP ABL Liens.

14.    This construct protects all parties involved without granting the Roll Up or adequate
protection claims and liens against Non-Obligor Debtors.  For example, if Kmart Holding
Corporation ("Kmart"), which is an obligor on the Prepetition ABL Obligations, transfers $1
million of Prepetition ABL Collateral to Sears Buying Services, Inc. ("Sears Buying Services"), a
Non-Obligor Debtor, Kmart would have a Postpetition Superpriority Claim and a Postpetition
Intercompany Lien against Sears Buying Services.  Kmart's Postpetition Superpriority Claim and
Postpetition Intercompany Lien against Sears Buying Services would be subordinate only to the
Carve-Out, DIP ABL Lenders' Superpriority Claims and the DIP ABL Liens.    Kmart's
Postpetition Superpriority Claim and Postpetition Intercompany Lien against Sears Buying
Services would ensure that Kmart receives back the value of the $1 million transferred to Sears
Buying Services and the proceeds of Kmart's Postpetition Superpriority Claim and Postpetition

Intercompany Lien would be collateral for the Prepetition ABL Lenders ensuring they are not adversely impacted by the postpetition intercompany transfer.

15.     Finally, the Prepetition ABL Lenders are unable to articulate the benefit the grant of claims and liens against Non-Obligor Debtors provides them, particularly where they are oversecured by the Prepetition ABL Collateral. The Creditors' Committee is working with the Debtors on a Statement of Stipulated Facts in connection with the hearing on the DIP Financing Motion that, on information and belief, the Creditors' Committee expects to reflect the following: Historical, current and estimated future operating cash flows on a Debtor-entity by Debtor-entity basis do not exist. In addition, a comprehensive schedule or other statement regarding the identity of which Debtor entity owns the Previously Unencumbered Assets that would become encumbered by the DIP ABL Facility do not exist. Moreover, there does not exist any information regarding the estimated cash each Debtor will receive from the DIP ABL Facility, or a budget for the uses of funds each Debtor entity will receive from the proposed DIP ABL Facility. Without this fundamental information, the Prepetition ABL Lenders cannot explain why they require claims and liens against Non-Obligor Debtors to which they are not legally entitled. They just want it. Neither the Bankruptcy Code nor applicable law supports the grant of claims and liens against Non-Obligor Debtors merely to satisfy a lender's desire for more protection. Accordingly, the DIP ABL Facility should be modified to eliminate the grant of claims and liens in favor of the Prepetition ABL Lenders and other Prepetition Credit Parties against Non-Obligor Debtors either under the Roll Up or as adequate protection.

**B.     Additional Objections to the DIP ABL Facility**

16.     In connection with the Reply, the Debtors included a proposed Final DIP Order that contains provisions that were not included in the Interim DIP ABL Order. Based on the

Creditors' Committee's review thereof, the Creditors' Committee has the following additional

objections and remaining objections in addition to those addressed herein and as listed in Section

B of the Committee Objection Issues Chart attached to the Reply as Annex A ("Annex A"):

- Winddown Account (Final DIP Order ¶ 23): Based on the Creditors' Committee's diligence to date, the cost of the Debtors' winddown of their operations will exceed the proposed Winddown Account budget of $200 million. As such, the Creditors' Committee submits that the proceeds of the sale of the medium term notes recently approved by this Court, which notes and proceeds were not Prepetition ABL Collateral or part of the asset base considered by the DIP ABL Lenders, should be added to the Winddown Account;

- Definition of ESL (Final DIP Order ¶ H(g)): The Creditors' Committee submits that the definition of ESL should be expanded, as set forth in the Objection, to include affiliates of the ESL Affiliates;

- Definition of Acceptable Plan of Reorganization (Annex A at p. 4): The modified definition of Acceptable Plan of Reorganization continues to require releases for the Prepetition Credit Parties, which includes ESL. The definition of Acceptable Plan of Reorganization should be modified further to eliminate any requirement that ESL, as a Prepetition Credit Party or otherwise, is provided a release;

- 506(c) waivers and 552 provisions (Final DIP Order ¶¶ O(j), 44): These provisions should be revised to make clear that the 506(c) waivers and benefits of 552 apply only to the Prepetition ABL Obligations (i.e., the DIP ABL Facility, the Prepetition ABL Obligations, the Prepetition ABL 2018 FILO Facility and the Stand-Alone L/C Facility) but do not extend to benefit ESL;

- Syndication of DIP ABL Facility (Final DIP Order ¶ 6): The proposed Final DIP Order added a new paragraph regarding the syndication of the DIP ABL Facility. In light of the fact that the Final DIP Order permits the DIP ABL Lenders to credit bid their allowed claims under section 363(k) of the Bankruptcy Code and the Creditors' Committee is continuing to investigate claims and causes of action against ESL, there should be a prohibition in the Final DIP Order with respect to ESL participating in the DIP ABL Facility, whether directly, indirectly, through participations or otherwise;

- Carve-Out (Final DIP Order ¶ 21): The Final DIP Order should be (i) modified to increase the amount of the Carve-Out to include the out of pocket expenses incurred by Creditors' Committee members in connection with their service on the Creditors' Committee and (ii) clarified to provide that the Permitted Carve-Out Consummation Fees will include any consummation or deferred fee that will be payable to Houlihan Lokey Inc. ("Houlihan"), the Creditors' Committee's proposed investment banker, subject to this Court's approval of the Creditors'

Committee's forthcoming application to retain Houlihan. The Creditors' Committee expects Houlihan's proposed deferred fee to be $7.5 million less crediting of monthly fees after six months;

- Budget and Borrowing Base Reporting; Budget Compliance (Final DIP Order ¶ 22): The DIP ABL Facility should be modified (x) to eliminate the Permitted Variance Test and, instead, provide for a gross disbursements test or a flat net variance permitted amount of over $50 million instead of the current Permitted Variance Test and (y) to exclude professional fees. The Permitted Variance Test is on a rolling basis with a static budget where timing differences can cause the Debtors to trip this covenant easily.[4] Favorable variances should be allowed to be carried over from prior four-week periods;

- Selection of Liquidation Agent (DIP ABL Credit Agreement section 6.01(s)): The DIP ABL Credit Agreement should be modified to limit the DIP ABL Lenders' control in their sole and absolute discretion over the appointment of a liquidation consultant and liquidation agent; and

- Prepetition Consolidated Loan Lenders (Final DIP Order ¶ 60): The proposed Final DIP Order added a new paragraph granting adequate protection, including the payment of postpetition interest, to the Prepetition Consolidated Loan Lenders. This provision should not be approved in connection with the proposed Final DIP Order but rather should be proposed on appropriate notice to ensure that parties in interest are given sufficient opportunity to analyze whether the Prepetition Consolidated Loan Lenders are entitled to such adequate protection and be heard on such issues.

### C.    The Proposed Reverse Marshalling Concept is Misleading and Fails to Mitigate Harm to Unsecured Creditors

17.    The Debtors purport to mitigate the harm to unsecured creditors resulting from the grant of claims and liens against Non-Obligor Debtors by implementing the Reverse Marshalling concept whereby the DIP ABL Lenders "have agreed to look first to the proceeds of the Prepetition ABL Collateral to repay the obligations under the DIP ABL Facility." Reply ¶ 19. The Reply specifies that the DIP ABL Lenders "will seek repayment from the proceeds of the previously unencumbered collateral only to the extent that the proceeds of the Prepetition ABL

---

[4]    For example, if there is a favorable timing variance in week 1 of $50 million and this variance reverses in week 2 (i.e., an unfavorable variance of $50 million), then in week 5, one would need a favorable variance of $50 million to stay compliant (i.e., the $50 million favorable variance in week 1 is gone, but the $50 million unfavorable variance in week 2 is still there). These types of variances are not unusual.

Collateral will be insufficient to repay the entire DIP ABL Facility outstanding at the time when it has to be repaid." *Id*. This, however, is misleading and does not provide the Court with any ability to ensure that the proceeds of Previously Unencumbered Assets only will be used to repay the DIP ABL Facility in the event the proceeds of the Prepetition ABL Collateral are insufficient as the proposed Final DIP Order does not require that the DIP ABL Lenders first seek repayment from the proceeds of Prepetition ABL Collateral.[5]

18.     Instead, the proposed Final DIP Order merely references the DIP Intercreditor Agreement which is an agreement solely between the DIP ABL Agents and the Junior DIP Agent, which may be amended at any time by such parties without seeking Court approval. Proposed Final DIP Order ¶ 34(e). Significantly, the Debtors are not party to the DIP Intercreditor Agreement, and section 7.10 of the DIP Intercreditor Agreement provides for no third party beneficiaries, which should include the Debtors and the Debtors' unsecured creditors. Moreover, the DIP Intercreditor Agreement provides that the proceeds of Previously Unencumbered Assets may be used to repay the DIP ABL Facility only after all but a "de minimus" amount of Prepetition ABL Collateral of the type that is eligible for the Borrowing Base has been liquidated, but what constitutes a "de minimus" amount is not defined. In addition, the requirement that proceeds of Previously Unencumbered Assets may be used to repay the DIP ABL Facility only after all but a "de minimus" amount of Prepetition ABL Collateral that is eligible for the Borrowing Base has been liquidated is too limited. The proceeds of Previously Unencumbered Assets should be permitted to be used to repay the DIP ABL Facility only after all Prepetition ABL Collateral is liquidated or, at a minimum, only after all but a "de minimus" amount of all Prepetition ABL Collateral has been liquidated. Thus, in

---

[5]     The Reverse Marshalling is also inherently inconsistent with the Debtors', the DIP ABL Lenders' and the Junior DIP Lenders' request for a waiver of the doctrine of marshalling.

light of the DIP ABL Agent's and the Junior DIP Agent's unfettered ability to modify the DIP

Intercreditor Agreement, and the DIP Intercreditor Agreement's failure to define what is

considered a "de minimus amount" of Prepetition ABL Collateral, the harm to unsecured

creditors has not been mitigated.  Accordingly, to the extent the concept of Reverse Marshalling

was intended to provide the Creditors' Committee and the Court with comfort that the proceeds

of Previously Unencumbered Assets will be preserved for the benefit of unsecured creditors and

the DIP ABL Lenders will seek repayment from such Previously Unencumbered Assets only in

the event the proceeds of the Prepetition ABL Collateral are insufficient to pay the entire DIP

ABL Facility, the proposed Final DIP Order must be modified to provide expressly for such

protections and modify the marshalling waiver to be consistent therewith.

**D.    The Proposed Adequate Protection, Case Milestones and Events of Default in the Junior DIP Facility Raise Duplicative Objections to those Raised in Connection with the DIP ABL Facility**

19.    As with the DIP ABL Facility, the terms of the Junior DIP Facility violate

applicable law in several respects.  First, the proposed adequate protection for the Prepetition

Credit Parties provided under the Junior DIP Facility is overbroad and inappropriately provides

such lenders with adequate protection claims at, and liens on the assets of, all of the Debtors,

including Unencumbered Assets and Avoidance Action Proceeds.  GACP Term Sheet at pp. 6-8;

Objection ¶ D.

20.    Liens on Avoidance Action Proceeds should be preserved for the benefit of

unsecured creditors and should not be pledged either as collateral for the Junior DIP Facility or as

adequate protection for the Prepetition Credit Parties.  *See* Objection ¶¶ 46-48.  In addition, the

covenants, events of default and Case Milestones provided in the Junior DIP Facility—all of which

are substantially similar to those provided in the DIP ABL Facility—will hinder the Debtors'

reorganization by (i) providing the Junior DIP Lenders with undue control and (ii) dictating the course of these chapter 11 cases in contravention of the Debtors' fiduciary duties to maximize value for all creditors.  GACP Term Sheet at pp. 9-15; Objection ¶ G.  Accordingly, these inappropriate provisions should be stricken or modified from both the DIP ABL Facility and the Junior DIP Facility.

21.    Finally, the Junior DIP Facility also provides for a Permitted Variance Test that, similar to the Permitted Variance Test in the DIP ABL Facility could be tripped easily.  As with the DIP ABL Facility, the Junior DIP Facility should be modified to provide for a gross disbursements test or a flat net variance permitted amount of over $50 million instead of the current Permitted Variance Test and to exclude professional fees.[6]

### E.    The Junior DIP Facility Maturity Date Should Be Extended and the Extension Fee Should Be Stricken

22.    In addition to the objections raised in connection with the DIP ABL Facility which are equally applicable to the Junior DIP Facility, the Junior DIP Facility improperly shortens the maturity of the DIP ABL Facility and contains a hidden fee that increases the cost of the Junior DIP Facility by approximately $4.4 million.  The Junior DIP Facility provides a maturity date that is the *earliest* of (i) eight months after the Petition Date (the "Junior DIP Maturity Date"), (ii) twelve months if the Debtors exercise the option to extend the maturity by four months (the "Extension Option"), and (iii) the maturity date under the DIP ABL Facility (which is the earliest of, among other things, (x) twelve months after the Petition Date, (y) the Junior DIP Maturity Date, and (z) the sale of substantially all of the Prepetition ABL Collateral) (the "DIP ABL Maturity

---

[6]    The proposed Final DIP Order modifies the Permitted Variance Test to make it more difficult for the Debtors to satisfy this covenant.  Specifically, the revised Permitted Variance Test is on a rolling basis with a static budget where timing differences can cause the Debtors to trip this covenant easily.  Thus, as further discussed in the Objection, the Permitted Variance Test should be modified to provide for a gross disbursements test or a flat net variance permitted amount of over $50 million, and this calculation should exclude professional fees.

Date"). The Junior DIP Maturity Date should be modified to be coterminous with the DIP ABL Maturity Date. In its current form, the Junior DIP Maturity Date is four months earlier than the DIP ABL Maturity Date. GACP Term Sheet at p. 2. Thus, in the event the Debtors do not exercise the Extension Option, the DIP ABL Maturity Date by its terms will be reduced to eight months from the Petition Date, even though the Debtors paid fees for a one-year DIP ABL Facility (and effectively increasing the cost thereof). The Debtors should not be forced to reduce the DIP ABL Maturity Date based on a costly extension of the Junior DIP Facility.

23.     Moreover, in the event the Debtors exercise the Extension Option to align the Junior DIP Maturity Date with the DIP ABL Maturity Date, under the Junior DIP Facility, the Debtors are required to pay an extension fee of 1.25% (the "Extension Fee"). The Extension Fee is, in effect, a hidden fee which increases the cost of the Junior DIP Facility from 3.0% to 4.25%— an increase of approximately $4.4 million. Thus, the overall cost of the Junior DIP Facility is significantly greater than it appears because the near term Junior DIP Maturity Date effectively requires the Debtors either to pay an overly expensive Extension Fee or shorten the term of the DIP ABL Facility by four months. In light of the significant challenges in these cases, the Debtors should not be hamstrung by the Junior DIP Maturity Date's threat of shortening the DIP ABL Maturity Date or paying an additional approximate $4.4 million. Accordingly, the Junior DIP Maturity Date should be modified to be coterminous with the DIP ABL Maturity Date, and the Extension Fee should be stricken.

## RESERVATION OF RIGHTS

24.     The Creditors' Committee reserves its rights to raise additional objections to the Junior DIP Facility and the DIP ABL Facility and any and all other documents arising from or relating to the DIP Financing Motion up until and during the Final Hearing on the DIP ABL Facility and the interim hearing on the Junior DIP Facility.

## CONCLUSION

WHEREFORE, the Creditors' Committee respectfully requests that the Court (i) deny the

entry of final orders approving the DIP Financing Motion and the Cash Management Motion

without requiring the material modifications set forth in the Objection and herein that have not

been addressed by the Debtors' proposed Final DIP Order, (ii) deny the entry of an interim order

approving the Junior DIP Motion without requiring the material modifications set forth herein, and

(ii) grant the Creditors' Committee such other and further relief as is just, proper and equitable.


New York, New York                                AKIN GUMP STRAUSS HAUER & FELD LLP
Dated:  November 26, 2018


                                                  By: */s/ Ira S. Dizengoff*
                                                       Ira S. Dizengoff
                                                       Philip C. Dublin
                                                       Abid Qureshi
                                                       Alexis Freeman
                                                       One Bryant Park
                                                       New York, New York 10036
                                                       Telephone: (212) 872-1000
                                                       Facsimile: (212) 872-1002
                                                       idizengoff@akingump.com
                                                       pdublin@akingump.com
                                                       aqureshi@akingump.com
                                                       afreeman@akingump.com

                                                       *Proposed Counsel to the Official Committee of
                                                       Unsecured Creditors of Sears Holdings
                                                       Corporation, et al.*

# EXHIBIT A

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3                                      .  Chapter 11
     IN RE:                             .
 4                                      .  Case No. 18-11145 (LSS)
     THE ROCKPORT COMPANY, LLC,         .
 5                                      .
                                        .  Courtroom No. 2
 6                                      .  824 N. Market St
                                        .  Wilmington, Delaware 19801
 7                                      .
                       Debtors.         .  June 13, 2018
 8     . . . . . . . . . . . . . . . . .   11:00 A.M.

 9                       TRANSCRIPT OF HEARING
            BEFORE HONORABLE LAURIE SELBER SILVERSTEIN
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:            Mark Collins, Esquire
                                 Brendan Schlauch, Esquire
13                               Michael Merchant, Esquire
                                 Cory Kandestin, Esquire
14                               RICHARDS LAYTON & FINGER
                                 920 North King Street
15                               Wilmington, Delaware 19801

16   For the Committee:          Robert Winning, Esquire
                                 Jay Indyke, Esquire
17                               COOLEY
                                 1114 Avenue of the Americas
18                               New York, New York 10036

19   Audio Operator:             MICHAEL MILLER

20   Transcription Service:      Reliable
                                 1007 N. Orange Street
21                               Wilmington, Delaware 19801
                                 Telephone: (302) 654-8080
22                               E-Mail: gmatthews@reliable-co.com

23   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
24

25
```

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-BP145-LSS    Doc 844    Filed 06/26/18    Page 2 of 160
Pg 20 of 309

2

```
 1   APEARANCES (Cont'd):

 2   For the Committee:            Katherine Good, Esquire
                                   WHITEFORD TAYLOR PRESTON
 3                                 405 North King Street
                                   Wilmington, Delaware 19801
 4
     For DIP Lenders/Noteholders: Mi Chi To, Esquire
 5                                 DEBEVOISE & PLIMPTON
                                   919 Third Avenue
 6                                 New York, New York 10022

 7                                 - and -

 8                                 James O'Neill, Esquire
                                   Colin Robinson, Esquire
 9                                 PACHULSKI STANG ZIEHL & JONES
                                   919 North Market Street
10                                 Wilmington, Delaware 19801

11
     For U.S. Trustee:            Brya Keilson, Esquire
12                                 OFFICE OF U.S. TRUSTEE
                                   844 King Street
13                                 Wilmington, Delaware 19801

14   For Information Officer:     Elizabeth Pillon, Esquire
                                   STIKEMAN ELLIOTT
15                                 199 Bay Street
                                   Toronto, Canada M5L 1B9
16

17

18

19

20

21

22

23

24

25
```

Case 18-11145-LSS Doc 244 Filed 06/14/18 Page 3 of 169



INDEX

PAGE

Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Pay (A) Certain Prepetition Claims of Shippers and Warehousemen and (B) Import Charges and (II) Financial Institutions to Honor and Process Related Checks and Transfers [Docket No. 8 - filed May 14, 2018].

Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Conduct Store Closing Sales at Their North American Retail Locations and (B) Pay Store Closing Bonuses to Employees at the Closing Stores and (II) Granting Related Relief [Docket No. 47 - filed May 15, 2018].

Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Its Objection of the Official Committee of Unsecured Creditors to Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 169 - filed June 8, 2018].

RULING: 50

Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 15 - filed May 14, 2018].

Application of the Debtors for the Entry of an Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code (A) Authorizing the Employment and Retention of Houlihan Lokey Capital, Inc. as Financial Advisor and Investment Banker to the Debtors, Nunc Pro Tunc to the Petition Date, (B) Waiving Certain Time-Keeping Requirements Pursuant to Local Rule 2016-2(h) and (C) Granting Related Relief [Docket No. 105 - filed May 23, 2018].

4

1  | RULING:                                                      48

2  | Motion of Debtors for Entry of an Order Approving Key Employee
3  | Incentive Plan [Docket No. 107 - filed May 23, 2018].

4  | DEBTORS' WITNESS(s)

5  |       **PAUL KOSTUROS**

6  |       Direct examination by Mr. Kandestin                   85

7  |       Cross-examination by Ms. Pillon                      103

8  |       Redirect Examination by Mr. Kandestin               113

9  |
10 |       **NATHAN COURT**

11 |       Direct Examination by Mr. Kandestin                 116

12 |
13 | EXHIBITS:                                          ID    REC'D

14 | D1   Prepetition ABL Facility Agreements

15 | D2   Borrowing Base Certificates

16 | D3   Summary of Allocation Method

17 |      Richter Advisory Group Objection

18 |      Declaration of Kosturos

19 |
20 |
21 |
22 |
23 |
24 |
25 |

1          (Proceedings commence at 11:06 a.m.)

2                THE COURT:  Please be seated.

3                MR. COLLINS:  Good morning, Your Honor.

4                THE COURT:  Good morning.

5                MR. COLLINS:  For the record, Mark Collins of

6    Richards, Layton & Finger, on behalf of the Rockport group of

7    debtors.

8                Your Honor, we have a full agenda today, although

9    I think we have made substantial progress in resolving

10   various of the substantive contested matters on today's

11   agenda.  Your Honor, what I'd like to do is briefly walk

12   through what we're going to do today, what is resolved, and

13   how we might move the agenda around a little bit, to make it

14   more efficient.

15               THE COURT:  Okay.

16               MR. COLLINS:  Your Honor, I would first start with

17   Agenda Item Number 1, which is our motion to withdraw our --

18   we have withdrawn our motion to file the fee letter under

19   seal.  We have agreed, in lieu of that, to simply put on the

20   record the ABL fees, which is a commitment fee of $150,000

21   and a DIP agent fee of $300,000, for a total of $450,000.

22   And with that --

23               THE COURT:  For the ABL.

24               MR. COLLINS:  Correct, just for the ABL.  The

25   noteholder DIP facility, the fees were disclosed in the

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-BK-145-LSS   Doc 244   Filed 06/26/18   Page 26 of 169
Pg 24 of 309

6

1  motion itself.  So, with that, I think that resolves the

2  issue.  And we appreciate working with the U.S. Trustee on

3  resolving that.

4        Your Honor, what we then do is turn first, very

5  briefly, to Agenda Item Number 14.  This is the retention

6  application for HYPERAMS.  We do have a -- I believe, a

7  corrected order that we would like to submit on that; an

8  error on our side, so we apologize for that.

9        We would then turn to Agenda Item 15.  We would

10  then go to Agenda Item 18, which is the A&M retention

11  application.  And then we would go to Mr. Merchant, who will

12  be presenting the store closing motion, which is at Agenda

13  Item Number 17.

14      (Participants confer)

15        MR. COLLINS:  And Agenda Item Number 22, which is

16  the key employee incentive plan.  Both the store closing

17  motion and the key employee incentive plan motion are

18  uncontested.

19        Following that, Your Honor, we would turn to the

20  DIP, our final DIP hearing.  We're pleased to report that we

21  have resolved, entirely, the unsecured creditors' committee

22  objection to the final DIP, to both the noteholder DIP and

23  the ABL DIP.  We do have the remaining issue with the

24  information officer, with respect to the allocation of the

25  ABL debt --

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23538-LSS    Doc 844    Filed 01/24/18    Page 2 of 169
Pg 25 of 309

7

1              THE COURT:  Yes.

2              MR. COLLINS:  -- amongst the debtor entities.

3              Finally, Your Honor, we would turn to the Houlihan

4    retention application because the settlement in the DIP --

5    with respect to the DIP motion resolves the committee's

6    objection to the Houlihan retention application.

7              THE COURT:  Okay.

8              MR. COLLINS:  So we'll take that last.

9              So with that, I guess I'll turn it first over to

10   Mr. Merchant for a presentation on the HYPERAMS corrective

11   order.

12             THE COURT:  Okay.

13             MR. COLLINS:  Thank you, Your Honor.

14             MR. MERCHANT:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. MERCHANT:  Michael Merchant of Richards,

17   Layton & Finger, on behalf of the debtors.

18             Your Honor, our apologies for this.  There were a

19   lot of certificates filed, trying to clear up things for this

20   hearing.  And with regards to Agenda Item Number 14, it's the

21   retention application of HYPERAMS, LLC.  They are our

22   consultant in -- with respect to the store closing sales --

23             THE COURT:  Uh-huh.

24             MR. MERCHANT:  -- that Your Honor will hear a

25   little bit about later.

18-23538-shl   Case 18-23145-LSS   Doc 804-1   Filed 11/26/18   Entered 06/26/18 20:52:28   Page 8 of 100   Main Document
Pg 26 of 309

8

1           The certificate that was filed actually attached a

2    correct black-line, but the clean was a prior version, and it

3    did not reflect the agreed changes that we had negotiated

4    with the --

5           THE COURT:  Okay.

6           MR. MERCHANT:  -- Office of the United States

7    Trustee.  So I have a corrected clean version, if I may

8    approach.

9           THE COURT:  Yes.

10          MR. MERCHANT:  And to the extent Your Honor would

11   like to walk through the differences in the order that we

12   agreed to, I'm happy to do that, as well.

13          THE COURT:  I read the black-line.

14          MR. MERCHANT:  Okay.

15          THE COURT:  I just signed the clean, assuming it

16   was correct.

17      (Laughter)

18          MR. MERCHANT:  Perfect.  Thank you, Your Honor.

19          THE COURT:  Okay.

20      (Pause in proceedings)

21          THE COURT:  Okay.  That corrected order is signed.

22          MR. MERCHANT:  Thank you, Your Honor.

23          I'm going to cede the podium to Brendan Schlauch

24   to handle Agenda Item 15.

25          MR. SCHLAUCH:  Good morning, Your Honor.  For the

1  record --

2         THE COURT:  Good morning.

3         MR. SCHLAUCH:  -- Brendan Schlauch, Richards,

4  Layton & Finger, on behalf of the debtors.

5         The next item this morning is the final shippers

6  and warehousemen order, which is Agenda Number 15 on the

7  agenda.  I have a clean and black-line version of the final

8  order, if I may approach.

9         THE COURT:  Yes.

10     (Participants confer)

11         MR. SCHLAUCH:  So, pursuant to this motion, the

12  debtors seek to pay pre-petition claims of shippers and

13  warehousemen, as well as pre-petition import duties, tariffs,

14  and other charges.  The debtors did not receive any comments

15  or responses to this order; however, the debtors did file a

16  supplement to the motion.  And so we thought it was best to

17  just give the Court an opportunity to review the supplement

18  and be available if you had any questions.

19         The supplement to the motion was really to alert

20  the Court and other parties-in-interest of certain changes

21  that would be made to the final order, related to the import

22  and custom charges.

23         As explained in the supplement, the debtors

24  inadvertently exceeded the three-hundred-thousand-dollar

25  import charges cap set forth in the interim order.  This

1  occurred when the U.S. Customs Department swept the debtors'

2  operating account for import charges equal to approximately

3  $435,000.  Although the debtors do not dispute the amount of

4  the charges, the sweep did occur without the debtors' consent

5  and without notice to the debtors.

6          Typically, U.S. Customs would provide the debtors

7  with two days' notice, and the debtors would deposit the

8  funds into the operating account, and then Customs would

9  sweep it.  If we had advanced notice, we would have, ideally,

10  altered the Court and filed a motion to increase the cap;

11  however, Customs swept it, swept our accounts.  So the

12  revised order adds clarifying language, authorizing that

13  specific import charges payment.

14          Also, as explained in the supplement, the final

15  order was modified to seek authority to pay other U.S.

16  Customs import charges, which are related to the debtors'

17  reconciliation program.  These reconciliation payments are on

18  account of import charges incurred in 2017, so pre-petition

19  charges, and are consisted with the debtors' ordinary course

20  business practice.

21          We understand that, because the weights of the

22  goods shipped are hard to estimate ahead of time, the debtors

23  opt to sort of estimate their payments, to maintain a

24  consistency throughout the year.  The debtors then reconcile

25  what they actually paid, versus what they should have paid to

1  Customs, and pay it around this time every year.  We

2  understand that the debtors are in the process of finalizing

3  those reconciliations, and estimate that the reconciliation

4  amount should be about $270,000.

5          The debtors believe the final order, as modified,

6  is critical to ensuring the uninterrupted flow of merchandise

7  that the debtors rely on in the ordinary course of their

8  business.  Without the relief in the final order, debtors'

9  supply chain may be disrupted, and such disruption,

10  particularly a disruption caused by the import charges or

11  nonpayment of the import charges could result in additional

12  expense and detriment to the debtors' estates.

13          Accordingly, unless Your Honor has any questions

14  or concerns, we respectfully request that the Court enter a

15  final order.

16          THE COURT:  Okay.  It wasn't clear to me from the

17  supplement, but I think I'm understanding from your

18  presentation that this additional $435,000 that was swept

19  from the account was on account of proper charges --

20          MR. SCHLAUCH:  Correct.

21          THE COURT:  -- but just lack of notification.

22          MR. SCHLAUCH:  Correct.  There's an --

23          THE COURT:  Okay.

24          MR. SCHLAUCH:  -- agreement between the parties

25  that would have provided for two days' notice.

1              THE COURT:  Okay.  Does anyone wish to be heard

2    with respect to the supplemental request or the final order?

3         (No verbal response)

4              THE COURT:  Okay.  I hear no one.

5              I will approve it, the final order, as modified by

6    the supplemental request, again, finding that it's necessary

7    for these payments to be made, in order to obtain the goods

8    that are being shipped into the States, so I will sign it.

9              MR. SCHLAUCH:  Thank you, Your Honor.

10             I will now turn the podium over to Mrs. Steele --

11   or Ms. Steele.

12        (Participants confer)

13             MS. STEELE:  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MS. STEELE:  Amanda Steele, Richards, Layton &

16   Finger, on behalf of the debtors.

17             Your Honor, I'm here to present Agenda Item Number

18   18, which is the debtors' motion to retain Alvarez & Marsal

19   as Interim Chief Financial Officer, Interim Chief Operating

20   Officer, and for additional personnel.  It would also

21   designate Paul Kosturos as Interim Chief Financial Officer,

22   and Josh Jacobs as Interim Chief Operating Officer.

23             We did resolve all the informal comments to this

24   motion.  We received two informal comments, one from the

25   Office of the United States Trustee and one from the

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   Filed 11/20/14   Entered 04/14/18   Page 43 of 109
Pg 31 of 309

13

 1  committee.  I can hand up your order -- or Your Honor and

 2  order and black-line to walk you through those changes.

 3              THE COURT:  Thank you.

 4              MS. STEELE:  Your Honor, turning to the black-

 5  line, in Paragraph 4, (h), (i), and (j) are requests of the

 6  Office of the United States Trustee.  These are typical

 7  requests with respect to A&M's retention.

 8              The first one is that none of the success fees are

 9  pre-approved by the Court, or any back-end fees.

10              The second change is the debtors are permitted to

11  indemnify the executive personnel on the same terms as their

12  D&O policies.

13              THE COURT:  Uh-huh.

14              MS. STEELE:  And (j) provides, subject to the

15  foregoing, during the Chapter 11 cases, there's no other

16  indemnification of A&M or its affiliates.

17              Paragraph 5 was a requested addition of the

18  committee, and it provides that, at the time of the sale

19  closing, it would be the understanding that most -- that Mr.

20  Kosturos and Mr. Jacobs would no longer be officers of the

21  company; and so they would, at that time, be just charged

22  hourly rates, and not the flat rates that A&M gets for those

23  officers.

24              THE COURT:  Okay.

25              MS. STEELE:  And with those changes, we are

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 18-23145    Doc 184    Filed 06/12/18    Page 43 of 109
Pg 32 of 309

14

1    resolved, and we request entry of the order approving the

2    motion.

3         (Pause in proceedings)

4             THE COURT:  Okay.  Does anyone wish to be heard

5    with respect to the motion to retain Alvarez & Marsal?

6         (No verbal response)

7             THE COURT:  Okay.  Hearing no one.

8             I reviewed it.  Based on the resolution of the

9    issues with the committee and the Office of the United States

10   Trustee, I will approve it as revised.

11            MS. STEELE:  Thank you, Your Honor.

12            I now turn the podium back over to Mr. Merchant.

13            MR. MERCHANT:  Thank you, Your Honor.  Mike

14   Merchant again for the record.

15            Your Honor, the next item I'd like to handle is

16   Agenda Item Number 17, which is the store closing sale

17   motion.  I think what's often referred to in the pleadings as

18   the "North American Retail Assets," and what those are are

19   retail store locations in the U.S. and Canada and the related

20   inventory.  The debtors have 27 stores in the U.S. and 33

21   retail stores in Canada, and these consist mostly of full-

22   price and outlet retail locations.

23            As detailed at the last hearing in connection with

24   the bid procedures, after a robust pre-petition marketing

25   process, the debtors have selected a stalking horse agreement

```
 1   with CB Marathon OpCo, LLC, which is an affiliate of Charles

 2   Bank.  The stalking horse bidder is currently not taking any

 3   of the North American assets.  And based on diligence with

 4   other prospective bidders, both before and after the petition

 5   date, it does not appear that any bidder will have a

 6   significant interest in the North American retail assets.

 7          Accordingly, the debtors determined, in the

 8   exercise of their business judgment, that it's in the best

 9   interest of the estates to conduct store closing sales at

10   each of the North American retail locations, and to commence

11   such sales as soon as possible, so as -- in the hopes of

12   completing such sales by July 31st, and avoiding the

13   incurrence of August rent.

14          THE COURT:  Are we past the twenty-five-day period

15   in the agreement?

16          MR. MERCHANT:  We are past the twenty-five-day

17   period, Your Honor.  And in addition to that, this motion was

18   originally noticed for the hearing on June 5th.  We agreed to

19   continue the motion to this hearing at the request of the

20   committee, to allow some additional time for discussions

21   between the stalking horse bidder and the landlord

22   constituency.  I understand that some of those conversations

23   are ongoing.  But as of this time, the stalking horse bidder

24   has not committed to take any of the North American retail

25   assets.
```

1          Now the relief requested in the motion, it's

2    authorization; it's not direction --

3          THE COURT:  Uh-huh.

4          MR. MERCHANT:  -- to conduct those sales.  We have

5    the ability to start them -- well, the order is drafted, so

6    that we'd have the ability to start them when we deem

7    appropriate.  And in the event that we started them, and

8    circumstances were to change, and it being in the best

9    interest of the estates to stop them at that point in time,

10   based on the interest we're receiving from bidders or the

11   stalking horse bidder, we would have the ability to do that,

12   as well.  So that is built into the relief that we're

13   seeking.

14         THE COURT:  Okay.

15         MR. MERCHANT:  The sales would be -- as is typical

16   with this type of motion, would be conducted in accordance

17   with the standard sale guidelines.  Paragraph 3 of the order,

18   however, expressly gives the debtors authority to enter into

19   side letters with landlords to amend the guidelines with

20   respect to specific stores.

21         We have entered into a number of side letters with

22   the U.S. landlords, relating to the sale guidelines.

23   Additionally, with regards to the Canadian landlords, there

24   is a -- I'll call it a "global side letter" that amends the

25   guidelines with regards to all of the Canadian retail

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-23145   Filed 11/26/18   Entered 04/12/18   Page 15 of 169
Pg 35 of 309

17

1  locations.  And that will be part of, I guess what would be

2  submitted in connection with the recognition hearing later --

3          THE COURT:  Okay.

4          MR. MERCHANT:  -- this week.

5          As Your Honor is already aware, HYPERAMS will be

6  the company's consultant in connection with the sales.  They

7  are truly a consultant, as the company has determined that

8  they have the internal wherewithal and sort of institutional

9  knowledge to conduct these sales on their own.  This is not

10 the type of situation where it's a flat-fee deal, with a

11 liquidator coming in and purchasing the inventory up front.

12         We also seek authority to provide stay or shrink

13 bonuses to retail employees.  These are managers, assistant

14 managers, and sale associates that works scheduled hours,

15 maintain the store to establish standards, and adhere to loss

16 prevention guidelines.  We seek -- as of now, absent further

17 order of the Court, we seek a three-hundred-thousand-dollar

18 cap on any such payments, and they are discretionary bonuses.

19         The amounts paid to different employees would be

20 determined by a collection of HYPERAMS, Mr. Kosturos as the

21 Chief Financial Officer of the company, and Jason Israel, who

22 is in charge of North American retail sales.  They've come up

23 with a number of plans relating to that, and will make a

24 determination based on what they think is in the best

25 interests of the debtors and how to maximize the stores and

1  retaining employees through the duration of the sales.  There

2  will be no bonus amounts paid to any insiders; we can confirm

3  that for the Court.

4          The motion was noticed on all landlords, state

5  AGs, and the National Association of Attorney Generals.

6  There are currently no objections that I am aware of to the

7  relief requested in the motion.

8          We do, however, have an amended form of order.  We

9  have amended the order to address some comments from some

10 landlords.  It amends the -- both the order.  It also amends

11 the guidelines.  If I may approach?

12          THE COURT:  You may.

13     (Pause in proceedings)

14          MR. MERCHANT:  I'm going to hand up the clean and

15 the black-line, Your Honor.

16          THE COURT:  Thank you.

17          MR. MERCHANT:  The comments are pretty limited

18 because most of the landlord concerns are addressed in the

19 actual side letters.  I can walk Your Honor through the

20 changes, they're brief.

21          The first is to Paragraph 3 of the order, which,

22 basically, this is the provision authorizing the relief, and

23 it says "except as otherwise provided in this order."

24          With regard -- the next change I would note is in

25 Paragraph 9.  This is the paragraph which provides that the

1  debtors will be deemed to be in compliance with liquidation

2  state laws.  They have added the -- so will the affected

3  landlord, with regards to the applicable closing stores.

4          The next change, Your Honor, is in Paragraph 10.

5  This relates to notice, in the event of any disputes

6  regarding the conduct of the sales, and simply adds the

7  affected landlord as a notice party with regards to any such

8  disputes.

9          Paragraph 14 is an additional paragraph, and this

10 is obviously always the intent and what is required by the

11 Bankruptcy Code.  But it says nothing in this order releases

12 the debtors of complying with their obligations under Section

13 365(d)(3) of the Code.

14          And then Paragraph 18, the change there is this is

15 -- this relates to the abandonment relief that we've sought.

16          THE COURT:  Uh-huh.

17          MR. MERCHANT:  And this simply clarifies that any

18 rejection of the leases will be subject to a further notice

19 and motion.  We are not seeking any relief with regard -- in

20 this motion, with regards to rejection of the leases.

21          If Your Honor turns to the attached guidelines,

22 Paragraph 6, again, addresses that concern regarding the

23 rejection of the leases and further notice and a hearing.

24          Paragraph 7, this just relates to the types of

25 language that can used in signage related -- signage or

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   Filed 11/26/18   Entered 04/12/18   Page 20 of 199
Pg 38 of 309

20

1   advertising related to the sale.  The term "liquidation sale"

2   shall not be used.

3            And I believe that is all of the changes, Your

4   Honor.  I'm happy to address any questions that the Court may

5   have.

6            THE COURT:  Okay.  No, you've addressed the one

7   question I have, which is that there is going to be a hearing

8   before the Canadian Court with respect to the sales that are

9   happening in Canada --

10           MR. MERCHANT:  That is correct, Your Honor.

11           THE COURT:  -- to ensure that that Court is

12   satisfied that the sales can proceed as requested.

13           MR. MERCHANT:  That's correct, Your Honor.

14           THE COURT:  Okay.

15           MR. INDYKE:  Jay Indyke of Cooley, proposed

16   counsel for the creditors' committee.

17           I just am -- as Mr. Merchant said, the motion was

18   adjourned to this week at the committee's request.  Since

19   that time, a couple of things have happened:

20           First, the committee has had full access to the

21   data room, and has had discussions with the debtor and its

22   professionals with respect to the sale process and interested

23   parties.

24           Our initial concern was that store closing sales

25   were going to start before the bid deadline.  The bid

1   deadline in the case is set for June 29th; store closing

2   sales would start earlier.  We were concerned that that might

3   prejudge things, and might chill bidding, potentially.

4            But since that time, aside from being in the data

5   room, having those discussions with the debtor, the committee

6   had an in-person meeting with the stalking horse in Boston

7   last week, to walk through things.  And as a result of that,

8   it appeared that the stalking horse may be interested, and is

9   still in discussions with certain landlords, with respect to

10  taking on leases, potentially, in the United States and

11  Canada, retail leases.  We understand that that's a longshot,

12  but it may happen.  I understand that, to my knowledge, even

13  today, there were discussions that are going on.

14           Notwithstanding that, the committee understands

15  the economics of the situation.  We don't want to push sales

16  into August, creating additional rent.  We understand that

17  this is being set up, so that the inventory can be moved out

18  by the end of July, and we wouldn't have to get into --

19           THE COURT:  Uh-huh.

20           MR. INDYKE:  -- paying August rent.

21           But that, to the extent that there are any

22  agreements cut with the stalking horse, whereby, under their

23  agreement, they would assume any of those leases, as

24  modified, that it might have some impact on what happens with

25  the store closing sales.  But that would be something that

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 18-33145    Filed 11/20/18    Entered 06/12/19    Page 22 of 109
Pg 40 of 309

22

1    would have to be negotiated between the stalking horse, the

2    debtor, and the applicable landlord.

3                THE COURT:  Uh-huh.

4                MR. INDYKE:  Thank you.

5                THE COURT:  Thank you.

6                Does anyone else wish to be heard?

7           (No verbal response)

8                THE COURT:  Okay.  I've reviewed the store closing

9    sales motion, which has been preset since the beginning of

10   the case.  I am prepared to approve it on the terms that have

11   been requested, recognizing that there are and may be more

12   side agreements with landlords, with respect to their

13   particular stores, which is, of course, not unusual in these

14   cases; and also appreciate the comments from both the debtor

15   and committee counsel with respect to the possibility, no

16   matter how remote it might be, that the stalking horse bidder

17   or some other party might be interested in these leases.

18                But as things stand at this moment, no one is.

19   And I do think it is appropriate the debtor is appropriately

20   exercising its business judgment to commence these sales.

21   And in the event we're lucky enough to have someone

22   interested, we'll deal with that as it unfolds.  So I will

23   approve the store closing sales as modified.

24                MR. MERCHANT:  Thank you, Your Honor.

25                THE COURT:  That order is signed.

1          MR. MERCHANT:  Thank you, Your Honor.

2          The last item on the -- that I will be handling

3     today is actually the last item on the agenda.  It's Agenda

4     Item Number 22.  And this was styled as the debtors' motion

5     for entry of an order approving a key incentive plan, and

6     that has changed a little bit.

7          THE COURT:  Uh-huh.

8          MR. MERCHANT:  We received comments to the motion

9     from the committee, and the United States Trustee also filed

10    a formal objection to the motion.  We've been in

11    communications with the committee and the United States

12    Trustee over the past week regarding their concerns and

13    objections and discussing some proposed changes to the plan,

14    intended to address these concerns.  And much of the U.S.

15    Trustee's objection related to the debtor satisfying their

16    evidentiary burden with regards to the motion.

17         Yesterday, we filed the declaration of Paul

18    Kosturos; he's the Interim Chief Financial Officer of the

19    debtors.  He is in the courtroom today, Your Honor, to the

20    extent that you have any questions or anyone would like to

21    cross-examine him.  We filed it in support of the motion and

22    in an effort to address a lot of the concerns raised by the

23    committee or raised by the Office of the United States

24    Trustee.

25         In connection with the declaration, the debtors

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 18-23145    Filed 11/26/14    Entered 04/12/18    Page 24 of 169
Pg 42 of 309

24

1 set forth a number of modifications with regards to the

2 plans.  The most significant modification, Your Honor, is

3 that the KEIP will be limited to the nine tier one employees

4 that are likely "insiders" of that debtors, as that term is

5 defined in the Bankruptcy Code.

6           With regards to the other 20 "tier two employees,"

7 as we refer to them, we believe they are non-insiders, and

8 Mr. Kosturos' declaration goes as to -- goes into why we

9 believe they are not insiders.  The debtors intend to

10 implement a more traditional key employee retention plan; we

11 refer to that as the "KERP," and I can get back to the terms,

12 the proposed terms of the KERP in a moment.

13           With regards to the KEIP itself, and as it would

14 continue, if approved by the Court, with regards to the nine

15 employees, there were some changes that were made in response

16 to the comments and objections that we received:

17           First, with regards to the calculation of

18 aggregate gross consideration under the KEIP, we've agreed

19 that that calculation will not include assumed liabilities

20 under any qualifying transaction.

21           Bonus amounts under the KEIP will be capped at the

22 two-hundred-and-ten-million threshold.  Of course, the target

23 bonus was set at the one-hundred-and-seventy-million

24 threshold.

25           THE COURT:  Uh-huh.

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   Doc 884   Filed 11/26/18   Entered 06/12/18   Page 26 of 169
Pg 43 of 309

25

1          MR. MERCHANT:  But the KEIP, as originally

2   drafted, referenced, I believe in a footnote, the possibility

3   of additional bonus amounts, if the sale proceeds would go

4   above two ten.

5          THE COURT:  Yes.

6          MR. MERCHANT:  We've capped it at two ten.  That

7   would be a great problem to have, Your Honor.  But we have

8   agreed to that, in response to the objection we received.

9          We've agreed that the committee will have consent

10  rights with regard to the calculation of aggregate gross

11  consideration.  In the event that we're unable to reach

12  agreement as to the calculation of that amount with the

13  committee, I think all the parties agree that we can bring

14  that issue before the Court.

15         In response to a comment from the committee, in

16  order to receive a bonus amount -- and this would apply to

17  both the KEIP and the KERP.  Participants will be required to

18  first waive any claims that they may have to severance or any

19  other incentive bonus amounts.  The economics of the proposed

20  KERP, Your Honor, otherwise remain the same.  Assuming the

21  aggregate gross consideration level reaches 170 million, such

22  that the target bonus amount would be paid, the aggregate

23  cost of the KEIP would be $1,741,600.

24         With regards to the KERP, KERP bonus payments

25  would be subject to participants remaining employed by the

1  debtors through the closing of a sale -- and it doesn't

2  necessarily need to be a qualifying transaction, as was the

3  case with the KEIP -- and the completion of the store closing

4  sales.  But to be clear, if participants transition to the

5  buyer at closing or are terminated without cause, post-

6  closing, because they are no longer needed in the final

7  stages of the store closing sales, they would still be

8  entitled to their KERP bonus.

9        The KERP bonus amounts are set what is the target

10  bonus amounts under the original KEIP.  So the KERP bonus for

11  each of the 20 participants is actually set at what would

12  have been the total bonus amount, with an aggregate gross

13  consideration level of 170 million, so that's how the amounts

14  were determined.

15        The total cost of the KERP is $748,313, with an

16  average KERP bonus of $37,416 per participant.  The detailed

17  terms of the KEIP, as revised, and the KERP are attached to

18  the Kosturos declaration, and they will also be attached to

19  the revised form of order that I will hand up.

20        Before addressing any questions that Your Honor

21  may have, or walking Your Honor through the black-line,

22  however, I would like to move the Kosturos declaration into

23  evidence in support of the motion.

24        THE COURT:  Does anyone object?

25      (No verbal response)

18-23538-shl Doc 884-45 Filed 11/26/18 Entered 11/26/18 20:52:29 Main Document
Case 18-33145 Doc 1844 Entered 06/12/18 Page 27 of 109
Pg 45 of 309

27

1          THE COURT:  I hear no objections.  Mr. Kosturos'

2   declaration is admitted without objection, and I did review

3   it.

4          (Kosturos Declaration received in evidence)

5          MR. MERCHANT:  Thank you, Your Honor.

6          If I may approach, I can hand up a clean and a

7   black-line of the form of order.

8          THE COURT:  You may.

9          MR. MERCHANT:  The changes, Your Honor, look a

10  little heavy in the front of the order, and these are just

11  simply recitals to reflect the filing of the U.S. Trustee's

12  objection, the receipt of comments from the committee, and

13  the filing of the Kosturos declaration, and then to introduce

14  the fact that the KEIP was -- has been amended to be limited

15  to the nine employees, and that there is now a proposed KERP.

16         The other changes, Your Honor, probably go to the

17  so-ordered paragraphs, and simply reflect that the form of

18  the KEIP is now attached as Exhibit A.  And to implement the

19  KERP and approval of the KERP, which is also detailed in the

20  attached Exhibit A, which is the same exact -- Exhibit A that

21  was attached to the Kosturos declaration.

22         Paragraph 5, Your Honor, is the paragraph I talked

23  about with regards to the committee comment, which simply

24  makes clear that any payments under the KEIP or the KERP

25  shall be in lieu of and subsume any severance payment or

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 18-23145-rdd Doc 144 Filed 04/13/18 Page 28 of 109
Pg 46 of 309

28

1  other incentive or retentive-based bonus payment to the

2  participants, and that they'll be required to waive such

3  amounts in order to receive their bonuses under the KEIP or

4  the KERP.

5       And Paragraph 6, Your Honor, this relates to the

6  committee's role in determining the aggregate gross

7  consideration level with regards to the KEIP.

8       I'm happy to address any questions that Your Honor

9  may have.

10      THE COURT:  I do not have any questions.

11      Does anybody wish to be heard with respect to the

12  employee KERP and KEIP motion?

13      (No verbal response)

14      THE COURT:  Okay.  As I indicated, I reviewed the

15  Kosturos declaration, which was quite thorough with respect

16  to how these programs were developed, and the professionals

17  that were consulted with respect to appropriate amounts of

18  these types of programs, both pre- and post-bankruptcy, as

19  well as the amendments that have been made to the program,

20  particularly the separation of the program into a KEIP and a

21  KERP.  And based on the declaration, the resolution of the

22  objections to the -- made by the Office of the United States

23  Trustee and the comments received from the committee, I find

24  that these programs are appropriate, and I will approve the

25  order.

18-23538-shl  Doc 884  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 18-33145  Doc 1844  Filed 04/12/19  Page 29 of 109
Pg 47 of 309

29

1            To the extent necessary, they meet the

2    requirements of Section 503 and 363, and I find that they are

3    incentive-based programs, properly incentive-based.  And to

4    the extent they have retentive effects, they are collateral

5    to the purpose of the programs, and I will sign the revised

6    order.

7            MR. MERCHANT:  Thank you, Your Honor.

8            This concludes the matters that I'm handling

9    today.  If acceptable to the Court, may I be excused?

10            THE COURT:  You may.

11            MR. MERCHANT:  Thank you, Your Honor.  I believe

12    Mr. Collins will handle the next matter and get back to the

13    DIP.

14        (Participants confer)

15            MR. COLLINS:  Your Honor, turning to the final

16    hearing on our motion to approve debtor-in-possession

17    financing.  Your Honor, we did receive two objections:  One

18    filed by Richter's Advisory Group, which is acting as the

19    information officer in the ancillary proceeding for Rockport

20    Canada ULC --

21            THE COURT:  Uh-huh.

22            MR. COLLINS:  -- as well as a -- what I would call

23    a "fairly comprehensive objection" from the creditors'

24    committee to approval of the final DIP facilities.

25            I'm very pleased to report, as I noted at the

1   outset, that the committee has reached a global compromise,

2   related -- I view it as a case compromise, on how we move

3   forward with the noteholders, as well as, to some extent, the

4   ABL lenders.

5           And I do, you know, want to thank counsel for the

6   committee, as well as the noteholders, for working very

7   diligently over the weekend and prior to that, to see if we

8   could reach a deal that was helpful to the estates, and to

9   facilitate these cases moving forward on a consensual basis,

10  as much as possible.

11          Your Honor, the form of our reply did note some

12  unilateral concessions that the noteholders had agreed to,

13  including limiting the go-forward roll-up to dollar-for-

14  dollar, so only any new one dollar of DIP lending they make,

15  there is a one-dollar roll-up.  That one-dollar roll-up does

16  not take liens on unencumbered assets; however, obviously,

17  the new money one dollar would.  And again, that's only for

18  the amount of dollars actually lent.  So, if we only borrow

19  an additional $5 million out of the 10 million committed, if

20  there were to be a five-million-dollar new money loan on the

21  unencumbered assets, five-million-dollar roll-up, but that

22  would not attach to unencumbered property.

23          The noteholders and the ABL have agreed to

24  eliminate liens as superpriority administrative claims on

25  avoidance actions and commercial tort claims, except for

1  Section 549 actions, and only for reimbursement of carveout

2  monies actually used to pursue recoveries.

3         The parties have agreed to increase the

4  investigation budget of the creditors' committee from 50,000

5  to 100,0000.  And there has also been an increase in the

6  budget of professional fees for the creditors' committee

7  professionals that accrue prior to the closing of a

8  transaction.

9         Your Honor, what I would like to do is turn the

10 podium over to Mr. Indyke to walk Your Honor through the

11 additional terms that have been agreed to.

12        We certainly -- if Your Honor does ultimately

13 approve the facility, we will need to spend time revising the

14 form of order, attaching the terms of this agreement.  The

15 terms would be an exhibit to the DIP order, as I'm

16 contemplating it, as it would leave money behind from the

17 lenders in the estate upon the closing, for us to accomplish

18 an appropriate plan process and wind-down of the debtors'

19 entities.

20        THE COURT:  Okay.

21        MR. INDYKE:  So, with that, Your Honor, if I could

22 turn the podium over to Mr. Indyke.

23        THE COURT:  Yes.

24        MR. INDYKE:  Thank you, Your Honor.

25        We were very concerned that the relief the debtor

1  was seeking under the financing order was going to, not only

2  preclude the unsecured creditors from any recovery, but would

3  also potentially lead us down the road of administrative

4  insolvency.  And so our goals in negotiating with the debtor

5  were to solve those issues, recognizing the other economics

6  of the case.

7          And starting last week, we engaged in discussions

8  with counsel for the debtor and counsel for the noteholders

9  in what we viewed as something comprehensive, given the

10 relief that was requested; for example, the request for no

11 marshaling, the complete roll-up, all of those issues that

12 would precluded us from any recovery.

13         So what I'm pleased to report is that, after

14 several days of intensive negotiations, we have reached an

15 agreement on a compromise that really does resolve case

16 issues, as Mr. Collins says.  And we want to thank Mr.

17 Collins' for his participation, Ms. To, and Mr. Sandler --

18 who can't be here today; I understand his father is

19 undergoing surgery -- were all very helpful in getting us to

20 where we are now.  The only thing that we weren't able to do

21 is put it all down in writing, so I could present it to you.

22 So we worked on a termsheet.

23         So, Your Honor, I have a -- my iPhone up here, but

24 this is not to make a call.  It's because I have the outline

25 of the termsheet.  And what I'm going to do is kind of read

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Filed 11/26/18    Entered 04/12/18    Page 33 of 169
Pg 51 of 309

33

 1  from the termsheet, but also editorialize a little bit, to

 2  explain why we did various things.  And also, there were a

 3  couple of things that needed to be added to this email that

 4  we were doing.  And as Mr. Collins said, the intent is to

 5  reduce this termsheet to an exhibit that would be attached to

 6  the financing order.

 7           So the first thing is that, with respect to any of

 8  the terms that I describe, they're all subject to either the

 9  stalking horse deal closing on its terms, or some higher or

10  otherwise better bid obtained through the sale process

11  closing; and with the understanding that, in the event that

12  there is a total meltdown, the stalking horse walks away, and

13  we have no other bidder, we're back to the drawing board.

14           Critically for us, especially in light of -- we

15  looked at the asset purchase agreement, and we were very

16  concerned in seeing what's going on in the Toys 'R Us case in

17  Virginia.  And in that case -- and we're not involved in

18  that, representing any of the major parties.  We understand

19  it was a very robust critical vendor program.  Vendors

20  shipped in hundreds of millions of dollars of inventory post-

21  petition.  And then a decision was made in the early part of

22  this year, before there was repayment on the post-petition

23  debt, in part or in full, to liquidate the company.

24           And the Court actually entered an order

25  bifurcating the payment of administrative claims between

1   wind-down and pre- a certain period.  So there was a real

2   risk in that case, as we understand it, of hundreds of

3   millions of dollars of post-petition debt that will be

4   unpaid, and not otherwise satisfied.

5         And we were concerned, especially in light of the

6   fact we understand the critical vendor program and the

7   foreign vendor program were very important to the debtor in

8   this case, to keep continuity, to maintain going concern

9   value.  These critical vendor programs that have been

10  approved, and that we support, provided for up to $22

11  million, I believe, in total going out.  But in exchange for

12  that, the vendors were committed to shipping the company

13  going forward on regular terms; not on shortened terms, but

14  on regular terms going forward, with many of those terms

15  expiring beyond the anticipated closing date of any sale

16  transaction.

17        And we looked at the budget, and we said, well,

18  okay, let's look at the budget and let's look at the stalking

19  horse agreement.  The stalking horse agreement is excellent,

20  in that it says that, aside from cash consideration that is

21  being paid by the stalking horse, they're also assuming a

22  substantial number of liabilities, including all of these

23  post-petition trade payables, which, under the budget, is --

24  could be as high as $25 million.

25        However, what we were concerned is that, what

1   happens if there's an alternative bid that came around, and

2   the bidder did not want to pick up these liabilities.  Then

3   we might have a situation where the secured debt would be

4   paid, we wouldn't have enough funds, we'd be administratively

5   insolvent.  We'd have these creditors in exactly the same

6   situation as the creditors were left with in the Toys 'R Us

7   situation.  And these are vendors that have been supporting

8   this business, providing inventory that's collateral for the

9   lenders going forward, but yet, wouldn't be paid for it post-

10  petition.

11       So what we've -- part one of the key items of the

12  agreement that we have is that, on the closing of the sale

13  transaction, there are going to be funds left in the estate

14  to pay ordinary course administrative claims that accrued

15  prior to closing, for whatever reason, that are not assumed

16  by the stalking horse or any successful bidder.  And this

17  should be within the budgeted amounts.  We think the debtors

18  provided budgeted numbers to the committee, to the

19  noteholders that they believe are pretty accurate.

20       This is also intended to pick up 503(b)(9) claims,

21  which may be very limited in this case, non-critical vendor

22  503(b)(9)'s or 503(b)(9)'s that, for some reason, haven't

23  been paid under critical vendor.  It would pick that up, as

24  well.  So that was a critical part of what we negotiated.

25       Sorry, while I bring up the rest of this, Your

1  Honor.

2          The -- in addition, other terms are that the

3  noteholders agree to fund a wind-down reserve, with sale

4  proceeds in the amount of $2.5 million.  The reserve will be

5  used to pay professional fees and other administrative costs

6  incurred after the sale closing, to prepare and confirm a

7  plan of liquidation consistent with the proposed settlement,

8  and also administrative and priority claims that have not

9  been paid in the ordinary course, or not assumed by the

10  buyer.

11          The unused amount of the reserve will go into a

12  trust for unsecured creditors, referred to the acronym "GUC

13  Trust," meaning general unsecured creditor trust.  So, if I

14  refer to "GUC" going forward, that's what I mean by that.

15          In addition, I think Mr. Collins noted that the

16  creditors' committee professional fee budget is being

17  increased during the pre-closing period, up to $750,000.  I

18  don't think he set forth a number, but that's the number.  I

19  think that's from a number that was less than $400,000 in the

20  original budget.  Any unused amount of the budgeted

21  creditors' committee professional fees will go into the GUC

22  Trust.

23          The GUC Trust is also going to be funded with

24  commercial tort claims and avoidance actions and other claims

25  that are not taken by any purchaser, except claims arising

1    under Section 549 of the Bankruptcy Code.  Any unused amount

2    of the wind-down reserve and budgeted professional fees will

3    also be -- go into that trust.

4            If the auction -- this is another important

5    feature, especially in light of what we've seen recently in

6    another footwear-related case, Nine West, where there was a

7    stalking horse bid of $220 million.  They just concluded an

8    auction over the weekend.  I understand the winning bid was

9    $350 million.  We wanted to ensure that, to the extent that

10   this bidding was that robust, that there would be something

11   that would be made available and put into this GUC Trust, as

12   well.

13           So, if the auction produces a net increase in cash

14   consideration received by the debtors, meaning after payment

15   of any breakup and expense reimbursement to the stalking

16   horse in excess of $10 million above the current stalking

17   horse price, the -- there would be provided to the GUC Trust

18   5 percent of any increased value -- I'm sorry -- 2.5 percent.

19   I skipped something.  It would be 2.5 percent between ten and

20   $20 million, would be put into the GUC Trust.  And if the

21   number ends up being in excess of $20 million, anything in

22   excess of $20 million, it would be 5 percent.

23           And this is in recognition -- there was back-and-

24   forth, as in all negotiations.  We asked for more.  But we

25   understand that the noteholders are significantly under water

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   Filed 11/26/18   Entered 04/12/18   Page 38 of 169
Pg 56 of 309

38

 1   in this case, at least under the present stalking horse

 2   proposal.

 3          In addition, the noteholders, given the fact that

 4   they are going to be presumably, at least under the --

 5   certainly under the stalking horse bid, substantially

 6   undersecured, they're going to have a significant deficiency

 7   claim.  That's probably going to dwarf the rest of the

 8   unsecured debt in this case.  We wanted to ensure that, as

 9   part of the settlement, we weren't just getting money in,

10   just to pay them all back.

11          So the agreement provides that the deficiency

12   claim -- any deficiency claim that the noteholders file will

13   not receive any distribution under the GUC Trust, until the

14   aggregate distributions by the GUC Trust exceed $2 million.

15   So there would first be the first $2 million goes to all

16   other GUC before any distribution is made to the noteholders.

17   And thereafter, the deficiency claim can participate with

18   respect to any other distributions that are made.  And I am

19   noting there are causes of action that were transferred to

20   the trust.  We don't know, we're not putting any kind of

21   value on that right now, but we know that that is an area of

22   potential recovery.

23          The committee is agreeing to support a liquidating

24   plan that is consistent with the terms of this proposed

25   settlement.  The plan is going to include broad releases in

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   Filed 11/26/14   Entered 06/12/18   Page 39 of 109
Pg 57 of 309

39

 1  favor of the noteholders and related parties in all

 2  capacities.

 3          The committee will further support any request by

 4  the debtor for an expedited combined plan and disclosure

 5  statement process.  I feel like Mr. Collins didn't mention it

 6  yet, but I assume he will at some point.

 7          Also, to the extent that our objection can be read

 8  as one to the debtors' proposed allocation on the ABL with

 9  the Canadian entity, we withdraw that objection and support

10  the debtor.

11          And in addition, the -- as part of this, as part

12  of what I've described, the noteholders' concessions,

13  including, I think as described by Mr. Collins previously, no

14  lien or superpriority claim on commercial tort claims and

15  avoidance actions and other claims that are not going to any

16  purchaser, except claims arising under 549, and for -- and

17  with respect to the roll-up.

18          One additional item, Your Honor, is that the

19  committee had filed an object to -- a limited objection to

20  the Houlihan retention.  As part of the universal deal that

21  we've reached, we have agreed to withdraw that objection, the

22  limited objection.

23          And Your Honor, with that, that is -- that, in

24  toto -- and again, this is subject to any -- there have been

25  other people -- I'm just reading from a termsheet.  There may

1   be other people here in court today that may want to clarify;

2   Ms. To may want to say something.  But this is our

3   understanding of what it is.

4              THE COURT:  Thank you.

5              MR. INDYKE:  Thank you, Your Honor.

6              THE COURT:  Ms. To.

7              MS. TO:  Your Honor, good morning.  My Chi To with

8   Debevoise & Plimpton for the noteholders.

9              So I agree with Mr. Indyke's summary.  I only had

10  a few clarifications to add.

11             With respect to the comment that, if the sale

12  doesn't close, we're back to the drawing board, we certainly

13  hope not to be there.  But I wanted to clarify that the final

14  DIP order that would be entered into today would be final.

15  So we're back to the drawing board, in terms of resolving the

16  ultimate case, in terms of distributing value among the

17  stakeholders.  That's the first clarification; the second one

18  relating to the DIP.

19             Mr. Indyke summarized accurately the concessions

20  the noteholders are willing to do with respect to the

21  incremental funding and related roll-up.  But with respect to

22  the $30 million of DIP notes that exist today, the ten-

23  million-dollar new value plus the twenty-million roll-up,

24  those notes would benefit from the protections we baked in

25  the interim order that would become final.

1          The only exception is that we agree that, as Mr.

2    Indyke explained, there would be no lien on avoidance

3    actions, except under 549, and no lien on commercial tort

4    claims.  But the initial 30 million would benefit from a lien

5    on the unencumbered foreign stock, to the extent there is any

6    value there.

7          And last, I'm not sure that Mr. Indyke clarified

8    this, but with respect to the committee's professional fees,

9    we agree, obviously, with the increase of the budgeted amount

10   to seven hundred fifty.  The investigation budget of 100,000

11   would be included in that seven fifty.

12          THE COURT:  Okay.

13          MS. TO:  Thank you.

14          THE COURT:  Thank you.

15          Anyone else, with respect to that particular deal?

16      (No verbal response)

17          THE COURT:  Okay.

18          MR. COLLINS:  So, with that, Your Honor, I think

19   we can confirm that the committee's objection is withdrawn,

20   obviously subject to submission of an agreed-upon form of

21   order.

22          Your Honor, before turning to the sole remaining

23   objection of the information officer, we did, yesterday, file

24   a black-line of our proposed final DIP order.

25          THE COURT:  Yes.

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:29 Main Document
Case 18-23145 Doc 1844 Filed 04/10/18 Page 42 of 169
Pg 60 of 309

42

1        MR. COLLINS:  I'm happy to walk Your Honor through

2   some of the material changes, if Your Honor would like, if

3   Your Honor had any questions.

4        I would also note that Your Honor raised some

5   questions at the interim hearing on certain provisions of the

6   DIP that you wanted us to bring back to Your Honor's

7   attention at today's hearing.  So, if I could Your Honor, it

8   might be helpful to simply hand up a copy of the black-line,

9   and maybe spin through it very quickly.

10        THE COURT:  I've got the black-line.

11        MR. COLLINS:  Okay.

12        THE COURT:  I have not had a chance to take a look

13   at it.

14        MR. COLLINS:  Okay.  Great.  So, if I could, Your

15   Honor, just maybe walk you through some of the key

16   provisions.  Obviously, a lot of the changes simply conform

17   this order from an interim order to a final order.

18        Your Honor, the first change that I'd like to

19   point out to Your Honor is starting on Page 25 and 26.  And

20   I'm hoping Your Honor has the same pagination that I do on my

21   order.

22        THE COURT:  Okay.

23        MR. COLLINS:  So this -- it's really -- in my

24   version, it's at the bottom of Page 25, going over to 26.

25   This is where we talk about these additional new money notes,

1   you know, the dollar-for-dollar --

2          THE COURT:  Uh-huh.

3          MR. COLLINS:  -- that would be approved going

4   forward for any borrowings after the final hearing.

5          You will note, Your Honor, on Page 27, we have

6   excised commercial tort claims from the liens being granted

7   to the ABL lender in that circumstance.

8          Page 29, similar concept with respect to

9   commercial tort claims and avoidance actions -- I'm sorry --

10  and also to note that the additional roll-up notes shall

11  extend -- let me make sure I have this right.  Right.  So

12  this is to clarify that the additional roll-up notes do not

13  take liens on unencumbered assets.  And again, that's the

14  dollar -- that dollar roll-up.

15         We've clarified, on Page 30, that there were not

16  liens on avoidance actions, only -- but only to the extent of

17  Section 549, and to the extent there have been funds lent by

18  the lenders out of the carveout that were used to seek to

19  recover preference actions.  I don't believe that will happen

20  in this circumstance, Your Honor.

21         Your Honor, the first provision that Your Honor

22  wanted to take a look at again is Page 32, Paragraph 9.  This

23  is in, you know, the litany of claims that a DIP

24  superpriority claim would be senior to, and we had Section

25  365 in there.  Your Honor questioned, is that appropriate.

1   So what we did is we put it out on notice.  There have been

2   no objections.  And so I wanted to point that out for Your

3   Honor's consideration for entry of the final order.

4           THE COURT:  Thank you.  Okay.

5           MR. COLLINS:  Turning to Page 34, similar issues,

6   Your Honor, with respect to these, the litany of claims that

7   will be subordinated to the superpriority claim of the ABL

8   secured parties.  We have 546(c) in there and 546(d), both of

9   which Your Honor asked us to put out on notice, subject to

10  entry of the final order.

11          THE COURT:  Okay.

12          MR. COLLINS:  Identical issue, Your Honor, Page

13  36, with respect to the secured notes superpriority, again,

14  noting 546(c) and 546(d) as being subordinate to that

15  superpriority admin claim.

16          Turning to Page 51, we have deleted Paragraph 34.

17  We did -- Your Honor, also at the interim hearing, raised

18  some concerns about potential inconsistencies between this

19  paragraph and a later paragraph, I want to say it's paragraph

20  forty -- 47, so -- and we also received some comments from

21  landlords.  So we've deleted this paragraph in its entirety

22  to --

23          THE COURT:  Okay.

24          MR. COLLINS:  -- to streamline and make it more

25  clear.

1          Page 52 reflects the hundred-thousand-dollar

2     number for the committee, for investigation.

3          Turning to Page 54, the proscribed actions.  Your

4     Honor had concern about the breadth of this provision.  I do

5     note that I think this will be part of the discussion that we

6     have in submitting the final order, to make sure everybody

7     understands kind of the rules of the road with respect to the

8     intent and terms of this paragraph.  So I know that's

9     something that the committee wanted to speak with the lenders

10    about.  So my guess is we'll have some changes to this that

11    we'll submit to Your Honor with a black-line reflecting those

12    changes.

13          THE COURT:  Okay.

14       (Pause in proceedings)

15          MR. COLLINS:  Finally, Your Honor, I think, is the

16    survival paragraph, Page 49.  Your Honor raised concerns

17    about this.  I don't remember in what context, but I wanted

18    to make sure that we flagged it for Your Honor's, you know,

19    review, once again.

20          THE COURT:  What page is that on?

21          MR. COLLINS:  Page 65 of my version.

22          THE COURT:  65.  Okay.

23       (Pause in proceedings)

24          THE COURT:  Okay.

25          MR. COLLINS:  Your Honor, since the filing of that

1  black-line on the docket, we have had some limited

2  communications with the information officer on their comments

3  to the form of order, not that it resolves their objection.

4  But regardless of the outcome of that objection, they wanted

5  certain provisions put into the order, which we certainly

6  considered.

7          What I would like to do, Your Honor, is to hand to

8  you the same version of the revised changes to the inserts

9  that the information officer provided because I think it will

10  provide you with some understanding as to what we have done,

11  not that it has been agreed to, but I want to show Your Honor

12  what we have sent to them.  It's kind of the baseline of

13  where we are right now.

14          THE COURT:  Okay.  Thank you.

15      (Participants confer)

16          MR. COLLINS:  So, Your Honor, what we've done in

17  paragraph 39 is to clarify what we believe the allocation --

18  ABL liability allocation should be, and that is 18.4 percent

19  of the ABL obligations, which we currently estimate to be

20  R10.48 million-dollars.

21          That number has moved -- the 18.4 percent is

22  fixed.  That comes out of the most recent borrowing base

23  certificate prior to the petition date.  I would note that

24  the most recent borrowing base certificate, as of the day

25  after the petition date, is actually higher than 18.4

1  percent.  It's like 19.8 percent.  But because we have

2  noticed the pleading at 18.4 that is what we're going to stay

3  with as our proposal.

4          The ABL debt itself or the numbers moving on a

5  little bit, there is, obviously, the principal that I think

6  we can agree to.  There is a letter of credit that was issued

7  under the prepetition ABL facility of $3.55 million dollars.

8          Expeditors was the beneficiary of that letter of

9  credit.  They, in fact, drew down $2.5 million-dollars of

10 that letter or credit, so we think that should be additive to

11 the ABL number.  And there's that remaining one million

12 dollars of LC out there as well.

13         MR. COLLINS:  One of the comments that I believe

14 that the information officer had was to ensure that the

15 charges, the administrative charges, on account of the

16 Canadian ancillary proceeding, would be senior to the ABL

17 allocation.  So, that would have to be paid and that's what

18 we've agreed to in this language.

19         So, really, what it accomplishes is, if the sale

20 proceeds allocation at the end of the day is insufficient to

21 pay the charge, as well as the $10.4 million --

22         THE COURT:  Uh-huh.

23         MR. COLLINS:  -- then that allocation basically

24 gets reduced, and so there's more funds to pay the

25 administrative charge.

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Pg 66 of 309
Case 18-33145   Filed 11/26/18   Entered 11/26/18   Page 48 of 169

48

1          I would also note, Your Honor, because I think

2     it's important, the Canadian entity is a Chapter 11 debtor in

3     these cases.

4          THE COURT:  Uh-huh.

5          MR. COLLINS:  We've filed an ancillary proceeding

6     up in Canada.  The Court recognized that proceeding -- I

7     believe, recognized this as the main proceeding; the center

8     of main interests were identified as being in the United

9     States.

10         As a result, counsel, who represents all of the

11    debtors' estates, including the Canadian entity that is my

12    client, that is also true for the creditors' committee.

13         Their constituency also includes the Canadian

14    unsecured creditors.  So, this is not a situation where it

15    is, in essence, the committee and the debtor against the IO.

16    We have fiduciary duties to the Canadian estate, just like we

17    do to the U.S. estates.

18         And that is why when we proposed the ABL

19    allocation, we want to be very clear about the methodology in

20    which we went about doing it, why we're doing it, put it

21    before the Court for consideration and approval.  We would be

22    asking the Court, if Your Honor approves it, to be brought to

23    the Canadian Court for recognition.

24         And, obviously, all this does -- and we'll get

25    into argument later -- what this does is simply apportion the

1  liability of the ABL debt amongst the borrower's liable

2  entities, which are the U.S. entities and the Canadian entity

3  on that say, $57 million of ABL debt, so that each entity

4  pays its fair share and no unsecured creditors of those

5  entities are treated inequitably with one paying more than

6  the other for their allocable portion of that joint and

7  several liability.

8         THE COURT:  How does the resolution, the

9  committee's resolution that was just put on the record,

10  address the unsecured creditors of the Canadian entity?

11         MR. COLLINS:  Fair question, Your Honor.  We spoke

12  about this yesterday and had communications with both, the

13  information officer and the creditors' committee about this.

14         How I view it is that the Canadian creditors would

15  at least participate pro rata in any distributions to

16  unsecured creditors in these cases.  I believe that would be

17  their floor.  Recall that the noteholders do not have liens

18  or claims --

19         THE COURT:  Uh-huh.

20         MR. COLLINS:  -- against the Canadian entity.  So,

21  it's possible that once we get -- once we understand the

22  sale, understand the assets that are being sold and then

23  reach, hopefully, a compromise on how you allocate amongst

24  the various estates, that the Canadian creditors might very

25  well do better than the creditors that are subordinated to

1   the noteholder debt.  And that is a process that we will

2   undertake as we -- I think we'll have informal dialogue

3   before we get to the sale.  Once it's come in, then we'll

4   also, I think, we'll have communications about that, but the

5   goal is to come up with a share allocation and then leave

6   open how we then move forward with the debtors' estates.  It

7   very well could be that the funds up in Canada are

8   significant enough that it makes sense to simply file any

9   bankruptcy case entirely in Canada, dismiss the Chapter 11

10  case here, and allow the distribution of proceeds to be done

11  in accordance with Canadian law, if that makes economic sense

12  to incur those expenses to file a plenary proceeding, rather

13  than have it simply ride along with our larger plan process

14  for all of the other debtor obligors.

15          As I noted, Your Honor, you know, the noteholders,

16  as the new-money DIP lenders -- and clearly they have an

17  incentive to make sure that this allocation is done fairly --

18  they're putting new money in.  They want to know that the

19  Canadian entity that they don't have liens on or claims

20  against will pay its fair share of the ABL debt that it's

21  liable for.  And that's been a condition by them of money --

22  new-money lending, post entry of a final order.

23          They initially -- I think, initially, it was first

24  discussed that, well, we need to have this decided before we

25  lend dollar one on the DIP and we knew that couldn't be

1   accomplished with appropriate due process and the like.  So,

2   they agreed to put in the 10 million of new money without

3   this issue being resolved, but it was with the agreement

4   that, all right, but we'll at least get this resolved at the

5   final hearing before we put additional monies in, because as

6   Your Honor will recall, we needed new money -- 10 million of

7   new money that, in fact, had been utilized during the interim

8   period.

9            So, with that, Your Honor, unless Your Honor has

10  any preliminary questions, what I would do is turn to

11  testimony.  We submitted the declaration of Paul Kosturos.

12  He's in the courtroom.  We plan on putting him on direct,

13  along with Nathan Court of Houlihan to walk Your Honor

14  through the process of where we are today and then, I think,

15  turn to argument.

16           I think there was full briefing in our reply as to

17  the manner and the reasoning for why we have proposed this

18  allocation, why we think it's appropriate, why we think it's

19  fair, why we think it's necessary.  And so with that, Your

20  Honor, unless anybody has any preliminary comments, I would

21  turn to testimony if that's acceptable to Your Honor.

22           THE COURT:  Normally, I would say put the

23  testimony on, but I think I want to hear the testimony in

24  some context, here.

25           MR. COLLINS:  Okay.

18-23538-shl   Doc 884-5   Filed 11/26/18   Entered 11/26/18 20:52:22   Main Document
Case 18-23145   Doc 18   Filed 06/12/18   Page 52 of 109
Pg 70 of 309

52

1          THE COURT:  Because I do have a lot of questions

2     and it starts with, what's the standard?  Who has the burden?

3     What -- because this an unusual request --

4          MR. COLLINS:  Uh-huh.

5          THE COURT:  -- and I want to make sure I really

6     understand -- apart from the calculations, which I assume are

7     all correct -- I want to understand what we're doing here

8     because it's -- it strikes me that the -- you know, the ABL

9     lender is not giving anything up, so are we establishing a

10    floor?  Are we establishing a ceiling?  What if the assets

11    don't come in at enough to cover the 18.4 percent, is the ABL

12    lender giving that up?

13         MR. COLLINS:  Sure.

14         THE COURT:  I want to understand the things that I

15    don't understand from the papers.

16         MR. COLLINS:  Okay.  And I'm happy to answer those

17    questions, Your Honor.

18         THE COURT:  And this isn't the argument part, but

19    I need to understand that, I think, before I hear the

20    testimony.

21         MR. COLLINS:  Okay.  So, with respect to how -- I

22    think from the ABL perspective, respectfully, they're

23    somewhat agnostic to this.

24         THE COURT:  Uh-huh.

25         MR. COLLINS:  They are going to get paid in full.

1   They have the right to look to any of these borrowers for

2   every penny in order -- until they get paid.  So, I think

3   they looked back and said, Okay, you can allocate it however

4   you want, whatever you think is fair, but I have a first lien

5   and I'm getting paid at closing in full.  And that's where it

6   stands.

7        If the Canadian proceeding at the allocation and

8   of the day is less than an amount sufficient to pay the ABL -

9   - their portion of the ABL debt, then the U.S. entities pick

10  up that portion, because they're totally and severally

11  liable.  So, I think that answers that question.

12        THE COURT:  So, they don't forego it by the

13  allocation, so the purpose of the allocation is what?

14        MR. COLLINS:  So, the purpose of the allocation is

15  that you have the noteholders putting in new money into the

16  U.S. borrowers.  The Canadian entity is not even a DIP

17  borrower.  They're not liable on the DIP.  They're not liable

18  on the prepetition notes.

19        So, they're looking at their borrower, the U.S.

20  borrowers --

21        THE COURT:  Uh-huh.

22        MR. COLLINS:  -- and saying, okay, what is the

23  capital structure?  What are their liability that I'm lending

24  in subordinate to --

25        THE COURT:  Right.  They're structurally

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:22 Main Document
Case 18-33145 Filed 11/26/18 Doc 1844 Entered 06/12/18 Page 54 of 109
Pg 72 of 309

54

 1  subordinated to the unsecured creditors of the Canadian

 2  entity.  The pre -- on the pre --

 3          MR. COLLINS:  True.  On the pre, I guess --

 4          THE COURT:  The noteholders --

 5          MR. COLLINS:  Do not have a recovery --

 6          THE COURT:  -- are structurally subordinated to

 7  the unsecured creditors of the Canadian entities.

 8          MR. COLLINS:  Yeah, the Canadian sits down below

 9  with Rockport company; you're absolutely right.

10          THE COURT:  And they have to get paid in full

11  before anything would go up and be payable.

12          MR. COLLINS:  We agree.  We agree.

13          THE COURT:  Okay.

14          MR. COLLINS:  One caveat to that is there is an

15  intercompany claim that the U.S. entities have against Canada

16  --

17          THE COURT:  An unsecured claim, as I understand

18  it.

19          MR. COLLINS:  And that we'll share, we assume, *pro*

20  *rata* --

21          THE COURT:  Yes.

22          MR. COLLINS:  -- with all the other unsecured

23  creditors.  We do believe the valid claim was for goods sold

24  to Canada that the Canadian entity did not repay by the full

25  time we filed.

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Doc 884    Filed 11/26/14    Entered 04/12/18    Page 55 of 109
Pg 73 of 309

55

1    So, as the noteholders both, from their new money

2    perspective, as well as their adequate protection, right --

3    because they're using -- we're also using our cash collateral

4    to fund these cases -- they're looking at their borrower and

5    saying, How am I going to get repaid on my new-money DIP and

6    my adequate protection and, really, where's the prepetition

7    debt simply stand?

8    And we're looking at $57 million of ABL priority

9    debt on the ABL priority collateral which counts receivable

10   inventory.

11   THE COURT:  Uh-huh.

12   MR. COLLINS:  And they see Canada jointly and

13   severally liable for that.  They're looking at it and saying,

14   Okay, of this 57 million, how much of this is my borrower

15   paying on it and how much is Canada paying on it?  Because if

16   the U.S. is paying all of it, then I have a problem and I may

17   not make this loan because my adequate protection is at risk,

18   my payment on the prepetition secured -- everything falls --

19   every dollar that the U.S. pays more than its share is a

20   dollar necessarily out of the pocket of the noteholders.

21   THE COURT:  Uh-huh.

22   MR. COLLINS:  So, we looked at that and said, That

23   is a fair ask by a learn who's making loans and cash

24   collateral available to a borrower.  How much of the debt is

25   my borrower going to pay and how much are the other co-

1  borrowers -- co-liable obligors going to pay?

2           And what we did -- it's very simple, Your Honor --

3  and we looked at every dollar, net dollar that Citizens lent.

4  There was a net-borrowing based calculation.  The Canadian

5  inventory, Canadian receivables are part of that base, just

6  like the U.S. inventory and they are.  And you needed both

7  pools of collateral to generate up to $60 million of

8  availability.

9           THE COURT:  Uh-huh.

10          MR. COLLINS:  When we looked at the most recent

11  borrowing base, prior to the petition date, 18.4 percent of

12  the net borrowing base was attributable to Canada and the

13  other 86.6 -- whatever it is 17.7 -- whatever it is.

14          THE COURT:  Whatever the number is.

15          MR. COLLINS:  Whatever it is, it's a lot --

16      (Laughter)

17          MR. COLLINS:  -- is attributable to the U.S.  And,

18  again, that's -- that is looking at a liquidation scenario

19  from the Citizens perspective.  If I have to get out of this

20  debt, out of this facility, how am I protected?

21          And in order -- their number said I'm going to get

22  18.4, percent, basically, of my needed recoveries to pay me

23  in full from the Canadian collateral and I'll get the balance

24  from the U.S.

25          And we looked at it and we said, It seems

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Pg 75 of 309
Case 18-33145    Filed 11/26/14    Entered 04/12/18    Page 57 of 169

57

1    logically sound.  It was objective.  It was based upon

2    formulas negotiated by represented parties.  We looked at it

3    from the fact that was Canada a net user of the DIP facility

4    or did it never really need the money on the DIP and then

5    that might change your opinion, but we have testimony to show

6    that they certainly were a net user of the DIP facility; in

7    fact, we believe, based upon the intercompany, that they

8    really borrowed, if you look at it from a different

9    perspective, about $18 million is left unpaid as a result of

10   inventory purchases by Canada that will be used as part of

11   this process to allocate sale proceeds and then ultimately

12   disburse out to unsecured creditors.

13   And the allocation that we're looking at is for 10.4 million

14   based upon the net borrowing-based calculation --

15            THE COURT:  Uh-huh.

16            MR. COLLINS:  -- and the reason for the

17   difference, really, is that Canada did not cash flow.  It was

18   negative cash flow.  So, the U.S. would send inventory to

19   Canada on the same terms of which the U.S. was buying it.  We

20   view the U.S. as kind of the general purchaser of the

21   inventory for the global enterprise, would send, as needed

22   to, the warehouse in Canada and to the stores what Canada

23   needed, and we would wait.  The U.S. entities would wait

24   until the Canada had enough money to maybe make a payment

25   back on the intercompany claim.

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Filed 11/26/18    Entered 11/26/18    Page 58 of 169
Pg 76 of 309

58

1          And that is why it has grown over $18 million and

2     a substantial majority of it is past due.  So, we were

3     comfortable that the Canadian entity and its value certainly

4     benefited and derived from access, indirectly, from the DIP

5     facility, although it is a primary borrower, it's just the

6     borrower that actually made the borrowings was the U.S. and

7     then did the intercompany transfers to Canada.

8          THE COURT:  Are the other foreign subsidiaries in

9     the same posture as the Canadian company, but for the fact

10    that they are not named borrowers?

11         MR. COLLINS:  In that we sent them inventory?

12         THE COURT:  You buy the inventory, send it to

13    them, and it's -- and there's an intercompany receivable,

14    unsecured receivable?

15         MR. COLLINS:  I believe that's correct.

16         Is that correct, Paul?

17         MR. KOSTUROS:  Yes.

18         MR. COLLINS:  Yes.

19         THE COURT:  Are those numbers in here, in these

20    calculations?

21         MR. COLLINS:  No, they weren't part -- because

22    they're not part of the -- they're not obligors on that, we

23    didn't look to their liabilities to say, Okay, what is your

24    portion of it, because you're not liable on that debt.

25         THE COURT:  Your allocable share.

1           MR. COLLINS:  I also think -- they were -- most of

2     them were current --

3           UNIDENTIFIED:  Yeah, I was going to say that.

4           MR. COLLINS:  -- on their intercompany.  They were

5     at least cash flow neutral in that they were paying back the

6     U.S. regularly as goods were sold.  The Canadian operation,

7     which is really primarily just a distribution channel -- we

8     have retail stores and some e-commerce operations -- that

9     forewall [sic] profitability, if that's the right kind of

10    terminology, was negative and, therefore, they could not even

11    pay the inventory that they were receiving.

12          While, again, I would note that all issues of the

13    allocation of the ultimate purchase price, how much Canada

14    gets, how much the United States gets, is all subject to a

15    fulsome process later.  We are not predetermining anybody's

16    recovery.  We are simply looking at what is the debt that is

17    on these entities and then you would look at it and say,

18    Okay, this is their proceeds allocation.  That ultimately

19    will determine the recovery.

20          But what we believe is happening with --

21          THE COURT:  Or a deal gets struck, as we just had

22    a deal get struck here.

23          MR. COLLINS:  Correct.  But you -- it's hard to

24    ask somebody to lend money into a debt structure where you

25    don't know what the capital structure is and that is a gating

1  item or a gating issue here and when we look at all of the

2  objective, potentially objective calculations one could

3  utilize to apportion this debt, this is what we zeroed in on.

4          And nobody could really -- I don't think anybody

5  has, in fact, disputed it as being appropriate.  They would

6  just rather not have it be --

7          THE COURT:  They'd rather know more information

8  before agreeing to it.

9          MR. COLLINS:  They would rather -- it's result-

10  oriented-type analysis.  I would really like to know the debt

11  -- I'd really like to know what my sale proceeds are before I

12  agree to what the debt allocation is.  We get that.  That's

13  not -- we don't think that's -- while it's a desire and a "I

14  would like to have," debt is debt and assets are assets.  One

15  does not necessarily have to do with the other, as we have

16  seen in this court for years.

17          So, it's in that, you know, scenario, Your Honor,

18  that we thought this matter should be brought to Your Honor's

19  attention on full notice to move forward.

20          THE COURT:  Uh-huh.

21          MR. COLLINS:  I sure I have more lien notes, Your

22  Honor, but that is --

23          THE COURT:  I'm sure you do and I'm sure I have

24  more questions, but I wanted to make sure, quite frankly,

25  that I'm not missing something in terms of the motivations

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   Filed 11/26/18   Entered 06/12/18   Page 63 of 189
Pg 79 of 309

61

1  and what's bringing us here today.  And that's why the first

2  question I asked was about the ABL lender and how they're

3  getting compensated if this is wrong.

4           MR. COLLINS:  And --

5           THE COURT:  And the proceeds don't end up being as

6  much.  I assumed they were not taking less than 100 cents on

7  the dollar.

8           MR. COLLINS:  No, not at all.

9           And I knew Your Honor would have those concerns.

10 Is this a leverage play?

11          THE COURT:  Uh-huh.

12          MR. COLLINS:  Is this to, you know, put leverage

13 on Canada because you kind of can right now?

14          THE COURT:  Uh-huh.

15          MR. COLLINS:  I will tell you that I don't believe

16 that that is the case and I think our testimony bears that

17 out in great detail, I think.

18          And this is a fairly simple issue at the end of

19 the day, but the process, the analysis, the discussions, I

20 think, all go to the good faith nature of our proposal.

21          THE COURT:  Okay.  I will let the information

22 officer have a chance to say something.

23          MR. COLLINS:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MS. JOHNSON:  Good morning, Your Honor.  Erica

1  Johnson from Womble Bond Dickinson, on behalf of the

2  information officer.  I do rise to introduce Elizabeth Pillon

3  from Stikeman Elliott, who also represents the information

4  officer.

5       I do also want to introduce Adam Sherman and

6  Pritesh Patel of Richter Advisory Group, who is here on

7  behalf of the information officer, as well.

8            THE COURT:  Okay.  Thank you.

9            MS. PILLON:  Good afternoon, Your Honor.  Liz

10 Pillon, Stikeman Elliott, for the information officer.  Thank

11 you very much for the opportunity to speak before the Court

12 today.

13 I was going to start -- I understood my role was to be first,

14 a preliminarily statement and then I had some arguments.

15           THE COURT:  Yes, let's save the arguments, but I

16 want to hear whatever you have preliminary thoughts.

17           MS. PILLON:  Okay.  Just so it's clear, the only

18 ancillary proceedings, as I understand it, for Rockport, are

19 in Canada.

20           THE COURT:  Uh-huh.

21           MS. PILLON:  And so by that, by virtue of having

22 started those, the U.S. debtor must believe that there is

23 value in Canada necessary for it to protect it by way of

24 those additional proceedings.

25           The effect or the -- one of the results of having

Case 18-33145   Filed 11/20/18   Doc 1844   Entered 06/12/18   Page 63 of 109

63

1    an ancillary proceeding is the Canadian Court likes to have

2    some eyes and ears and that's who we are, the information

3    officer.  So -- and this Court has had numerous experiences

4    with the Canadians, either by way of a full CCAA where the

5    court officer is the monitor --

6                   THE COURT:  Uh-huh.

7                   MS. PILLON:  -- or in these types of ancillary

8    roles, the information officer.  And in that role, we are the

9    eyes and ears of our court in Canada.  They will want to know

10   and hear from us -- and they have telegraphed that already to

11   us:  We'd like to know what's happening in the U.S. and also,

12   we'd like to understand how that may affect the Canadian

13   creditors versus others.  And so, they will want to know that

14   from us.

15                  We hope that in addition to being of assistance to

16   our Canadian Court, we can also -- you can look to us as well

17   and see the assistance if you have any questions with respect

18   to what's happening on the Canadian side.

19                  When we came into this scene on the petition date,

20   May 14th, to be clear, we came into it and we inherited the

21   corporate structure.  We inherited the debt structure that

22   existed between these companies.  We inherited the manner in

23   which they had chose -- decisions had been made for

24   financing, security taken, intercompany financing.  We're not

25   changing that.  We inherited it and we're trying to deal with

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-33145   Document 844   Filed 06/12/18   Page 64 of 109
Pg 82 of 309

64

1   it.

2          We've tried to learn about this company.  We've

3   tried to ask questions and understand the debt structure and

4   also the allocation agreement that's being put before you and

5   ultimately before the Canadian Court so we could understand

6   what factors went into it, what alternatives might have been

7   available and what evidence really should be before this

8   Court and the Canadian Court before the approval they're

9   seeking is made.

10         In this role and with our obligations to the

11  Canadian Court, we felt it was necessary to file an

12  objection.  And I can tell you I've been doing this longer

13  than I wish to admit, and even as a monitor, where we had the

14  more fulsome role, I have never filed an objection into the

15  U.S. and as an information officer, I've never filed an

16  objection into the U.S.  So, we did it with a lot of

17  consideration and understanding that we may be going beyond

18  the normal role.  And we did it because we thought it was

19  necessary for you to hear from us and we thought that it was

20  necessary for the Canadian Court.

21         And so, I just wanted to let you know, you know,

22  this is not something that's normal.  It's not every day that

23  we file these objections.  So, that's important to keep in

24  context.  I would ask you to, please.

25         The noteholders have outlined a number of

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-33145   Filed 11/20/18   Doc 1844   Filed 04/13/18   Page 66 of 199
Pg 83 of 309

65

 1  requirements that they say they need in order to provide the

 2  second tranche of the DIP.  And we appreciate the U.S.

 3  debtors are in a difficult situation because in order to get

 4  this financing, they have to find a way to get through these

 5  conditions.

 6       The requirements that have been made, though, the

 7  initial demands or requirements that were put before this

 8  Court had two times roll-up.  It has encumbering previously

 9  unencumbered assets.  It had caps on fees.  It had a

10  confirmation, with respect to how much the Canadian estate

11  and its creditors were going to be funding, effectively, the

12  noteholders' recovery.

13       Let's call it what it is.  The ABL is getting paid

14  off the top.  The ABL doesn't care where the money is coming

15  from.  The noteholders care where the money is coming from,

16  so they're piggybacking through the ABL.  I respect that, but

17  let's call it what it is, though.  And so that's what they're

18  doing.

19       The manner in which that that last requirement has

20  evolved in terms of what it looks like and whether it needs

21  to be an allocation of proceeds or debt or when it needs to

22  be determined, so that's been evolving.

23       But it's interesting that each of the other

24  requirements or demands of the noteholders, in order for it

25  to submit and provide that second tranche of the DIP, have

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Doc 1    Filed 06/12/14    Pg 84 of 309    Page 66 of 169
Pg 84 of 309

66

1   now been resolved or addressed or limited, including, what

2   I've heard for the first time today, by the UCC.  So, the

3   roll-up is no longer two times the roll-up; it's one time.

4        We're leaving behind -- they're not encumbering

5   all previously unencumbered assets.  They're leaving some

6   behind, which will go into this GUC.  There's an increase on

7   the cap on the fees.

8        So, at the end of the day, the only condition that

9   seems to still be a fixation of the noteholders and a

10  requirement seems to be the Canadian estate for some reason

11  and that's difficult to understand why that's required and

12  why that's required now.  We're not here to stop the DIP.

13       We're not here to say, Put an end to it if this is

14  what is truly, truly what is required.  It's difficult to

15  understand how it is when every other requirement, either

16  there's concessions before we even get here or there's deals

17  that have been struck.

18       THE COURT:  What do you think is being set in

19  stone today that can't be undone or corrected?

20       MS. PILLON:  Well, a couple things.  So, I think -

21  - well, you asked a question, with respect to what are we

22  doing.  Are we setting the floor?  We're setting the floor.

23       So, when the 18.4 percent, which is number based

24  on the borrowing base -- other alternatives could have been

25  put before you, but let's call it 18.4 percent; that number

1   seems to be the base amount of what is the debt -- it seems

2   to be moving a bit -- but that 18.4 percent sets the floor.

3   And we say, Okay, for us to assess whether 18.4 is

4   reasonable, we need to understand what you say you're leaving

5   behind for the rest of the creditors.

6          And, interestingly, UCC's counsel, apparently had

7   the same concerns and had concerns with respect to what are

8   you leaving behind?  What kind of reserves?  Are we

9   prematurely determining the use of the funds?  All ripe

10  concerns.  And it happens to have gotten the U.S. debtor's

11  attention in order to get that resolution.

12         So, we also have those concerns and we said, Tell

13  us what you say you're leaving behind.  And what I find

14  difficult -- I don't understand why we can't determine that.

15         We have a valuation that's put before you.  The

16  borrowing base conclusion that my friends ask you to use as a

17  basis for the allocation agreement, what is that?  That's a

18  liquidation valuation by the ABL.  That's the ABL saying,

19  What do we think we get if we monetize this collateral?

20         So -- and I'm sorry, I'm going to launch into my -

21  - some more of my submissions there.  But that -- what is

22  that?  That's the valuation.  My friends say it's not okay

23  for the information officer to throw ultimate proceeds before

24  the Court -- premature; let's not deal with that.

25         But I'm just saying to the Court and to the

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-33145    Filed 11/20/18    Doc 101/18    Page 68 of 109
Pg 86 of 309

68

1 parties, Let's look at what the most current valuation and

2 the most current information is, and based on that, what can

3 you say you're leaving behind for Canada?  Because if by

4 asking you to approve this 18.6 means if at the end of the

5 day, what's allocated to Canada is 10 million plus a dollar,

6 well, sorry, Canadian creditors, you're out of luck.

7             I think this Court, my submission would be this

8 Court and the Canadian Court needs to understand the

9 ramifications of that to the Canadian creditors before they

10 say, Yes, 18.6 is reasonable.

11             THE COURT:  Well, I can understand why you'd want

12 that in the negotiation, but I guess the question is, I do

13 need that for this to be in a position to determine this

14 issue?

15             MS. PILLON:  Well, I think if you're looking at

16 the borrowing base valuations, based on that, I would request

17 why we can't put something before you.  But based on that,

18 there are other figures that are already in the record in the

19 information officer's report with respect to what other

20 values are out there in terms of what we think already -- or

21 continues to exist in Canada.

22             And the alarm bells are going off if we think, for

23 example, in February, 2018, there was Canadian $24 million in

24 inventory that was sitting in the Canadian estate.  How do I

25 get to, on their numbers, 18.6 percent?  So, $10 million

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23445    Filed 11/26/18    Entered 04/12/18    Page 69 of 169
Pg 87 of 309

69

1  coming off the top?  Why can't I say that there's something

2  left behind for the Canadian estate from the $24 million or

3  its current values to be left behind?

4           THE COURT:  Obviously, the creditors' committee

5  and the noteholders had some intense negotiations over their

6  positions and came to a resolution, as the information

7  officer had the opportunity to have discussions directly with

8  noteholders to see if a resolution could be fashioned.

9           MS. PILLON:  Stop me from going too far here, but

10  a proposal has been made and I believe my friends have been

11  probably busy chatting with each other, as opposed to with

12  the information officer --

13           THE COURT:  So, you haven't had a direct

14  discussion?

15           MS. PILLON:  We have had some, but, yes, it seems

16  that the more intense discussions were with the UCC.

17           THE COURT:  Have been elsewhere.  Yeah, I don't

18  want to know the details, but that's fine.

19           MS. PILLON:  Right.

20           THE COURT:  Okay.

21           MS. PILLON:  I guess one last -- may I leave one

22  last point?

23           THE COURT:  Uh-huh.

24           MS. PILLON:  When my friends say -- when I started

25  this saying we inherited the debt structure, let's keep in

1   mind what everybody was looking to Canada to before we

2   started this.  The ABL, although we're a joint borrower, had

3   reduced the availability for the Canadians to zero.  I don't

4   know why, but it was reduced to zero.

5        So, as a co-borrower, the Canadians didn't have a

6   right to borrow.  We're a guarantor, but they didn't have a

7   right to borrow.  How that factors into what -- how they

8   looked at the borrowing-base calculations, I don't know.  I

9   don't know Mr. Kosturos knows, but the ABL would.  But why it

10  went to zero is potentially an important factor.

11        But what that tells you is they weren't looking to

12  the Canadian assets, the ABL in that sense.  The DIP, for the

13  ABL, is not -- we're not a borrower -- Canada is not -- and

14  they're not entitled to receive any benefit from the DIP.

15        And let's look at, more importantly, what the

16  noteholders --

17        THE COURT:  So, you will not receive any of the 20

18  million new money?

19        MS. PILLON:  Right.

20        THE COURT:  Or at least, not directly.

21        MS. PILLON:  That's --

22        THE COURT:  You can't draw on it directly on the

23  pre -- on the noteholders, you can -- can you benefit from

24  the ABL?

25        MS. PILLON:  Neither.  So, the DIP ABL -- sorry,

1   ABL DIP, we're not a borrower to.  We're not the beneficiary

2   of.  We're not entitled to it.

3          That zero-borrowing capability that was in the ABL

4   continues in the DIP ABL.  So, we're not getting anything

5   directly from that.

6          We have ring-fenced -- to be clear, we have ring-

7   fenced the money that we do have in Canada.  There's no more

8   sweeps coming down to the U.S., and so in this sense, we're

9   able to continue our own operations in Canada with cash on

10  hand.  Then the noteholders' new money, whatever it ends up

11  being, we're not a borrower.

12         So, when the noteholders say, Well, it's fair to

13  look at what we looked to Canada for, well, what did they

14  look to Canada beforehand?  They didn't take security when

15  think first came in, in 2015.  I don't know why, but they

16  chose not to.  There's three amendments to the notes.  They

17  never took security in Canada.  They have a DIP for the

18  notes.  They're not seeking to put security over Canada

19  directly.

20         What does that tell you, what the value they

21  suggest is coming direct from Canada?  They didn't put --

22  they didn't have expectations before we filed and so it's

23  difficult to understand why they're expectations now are

24  driving, potentially, an adverse effect on the Canadian

25  creditors.

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-83145    Doc 18    Filed 06/14/18    Page 72 of 109
Pg 90 of 309

72

1          The intercompany amount is also important to keep

2    in mind and you touched on this with one of the questions to

3    Mr. Collins.  So, in the intercompany, keep in mind -- so the

4    borrowers of The Rockport Group chose how they were going to

5    be financing its Canada subsidiary.

6          THE COURT:  Uh-huh.

7          MS. PILLON:  They had an ability to take it

8    straight -- well, before the (indiscernible) went to zero,

9    they had an ability to take it from the ABL -- they didn't --

10   so they borrowed -- Rockport U.S. borrowed under the ABL and

11   it came through intercompany.  They could have secured that

12   intercompany.  They didn't.  It came through intercompany

13   unsecured financing.

14         But it's not as if the U.S. estate is going to see

15   zero from Canada.  They will see recovery in respect to

16   financings provided when the -- when their share of the

17   intercompany financing claims comes back.  So, it's not a

18   zero recovery.  We're not saying, Hey, you're going to have

19   to wait.  You're going to get zero from Canada.

20         We understand they financed the Canadian estate.

21   And they're going to be recovering it in the same way in

22   which they financed it, intercompany.

23         THE COURT:  What are the claims against the

24   Canadian estate, do you have an aggregate -- a sense of the

25   aggregate amount of claims against the Canadian debtors?

1          MS. PILLON:  We have categories.  So, because

2    right now I don't think we have a number, but we have

3    landlords would be the significant claim.  Employee severance

4    claims may be significant, unsecured, anyway -- both of

5    those.  And there may be some tax claims, but those would be

6    your buckets:  Intercompany and some trade, but it seems like

7    everything was coming primarily through the U.S., anyway, so

8    there's a small amount there.

9          THE COURT:  Thank you.  Are you going to be

10   putting on a witness today?

11         MS. PILLON:  We have the information officer here

12   if you wish to hear anything from them, with respect to

13   potential claims or you have our report, which was filed with

14   the Court in Canada, is also attached to our objection and

15   that offers -- that's the manner in which the information

16   officer puts evidence in before its Court, and so you have

17   that available as well, with some information.

18         THE COURT:  And, unfortunately, I didn't have a

19   chance to read that.  Okay.  I'm just trying to get a sense

20   of how the hearing's going today and who plans to put on

21   witnesses.

22         MS. PILLON:  They're available if you have any

23   questions for them.

24         THE COURT:  Thank you.  Mr. Collins, how many

25   witnesses do you plan to put on?

1          Thank you.

2          MS. PILLON:  Thank you.

3          MR. COLLINS:  Your Honor, we have two witnesses to

4  put on.  My understanding is that it would take less than

5  hour, 45 minutes or so, for both witnesses, subject,

6  obviously --

7          THE COURT:  On direct.

8          MR. COLLINS:  -- to cross.  And I -- in many

9  respects, the testimony would bolster most of my argument, so

10  I'm not -- my -- I think my argument at the end might be

11  pretty short because so much of the detail of our

12  justifications will be going through the witnesses.

13          If I could just try the Court's patience, I wanted

14  to correct, at least in our view, some of the statements made

15  by Ms. Pillon in respect to why looking at Canada now.  The

16  fact of the matter is Canada is a borrower under the ABL

17  facilities, jointly and severally liable, for the full $57

18  million.

19          THE COURT:  Uh-huh.

20          MR. COLLINS:  They clearly benefitted from the ABL

21  borrowings because, as we've noted, both in the first-day

22  affidavit and elsewhere, Canada has no corporate office.

23  It's all housed -- all of the backroom office and management,

24  human resources, tax, accounting is all done in the United

25  States.  The -- and all of those -- the ABL funds were used

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Filed 11/26/14    Entered 04/16/18    Page 76 of 109
Pg 93 of 309

75

1    as -- obviously, as part -- to fund the enterprise.  Canada

2    could not operate without the corporate headquarters in

3    Canada.  And they clearly could not have operated without the

4    U.S. borrowing monies off the ABL to send over to Canada --

5    in her words -- "$20 million of inventory," and not pay for

6    it.  So the testimony will be clear on that point.

7            I think there's also a misconception.  We're not

8    seeking to allocate noteholder debt to Canada.  We know

9    Canada is ring-fenced from the noteholder debt and the DIP.

10   We made very clear, we thought about should Canada be a

11   borrower on the noteholder DIP here, and we later on said,

12   no, we're not going to go there, they are ring-fenced, and

13   let's leave it at that, to make sure that there's no issues

14   there.

15           All we are doing is talking about allocating the

16   preexisting ABL debt that Canada is entirely liable for.

17   They entered into the credit agreement back in 2015.  I'm not

18   certain we all know why, instead of doing direct borrowings,

19   which they -- which they've recently set up to do, that we

20   stopped, and it just went to the U.S. borrowing it and then

21   doing it.  I assume it's for efficiency purposes, rather than

22   having ordering go through one channel, and then bringing it

23   in, and then sending it off to the various enterprises,

24   including the foreign subsidiaries, but that is what it is.

25           So I want to be clear, we're not seeking to foist

1   onto the Canadian assets the noteholder debt here.  This is

2   simply to allocate preexisting ABL debt that was there on the

3   petition date.

4           MR. INDYKE:  May I be heard, Your Honor?

5           THE COURT:  Briefly.

6           MR. INDYKE:  Briefly.  This is not argument, just

7   a couple of notes.

8           That -- we -- as Mr. Collins stated before, we're

9   fiduciaries, the committee is fiduciaries for the Canadian

10  creditors and the U.S. creditors.  In fact, two of the three

11  members of our committee have debt in both Canada and the

12  United States.  So we're looking at this carefully.  We don't

13  think, certainly on our end, that we're prepared to negotiate

14  some final deal today with the IO about what happens; we

15  think that's what a plan is about.  We're not doing the plan

16  today.

17          THE COURT:  Well, you negotiated some deal today.

18          MR. INDYKE:  But it's to set aside money that

19  otherwise -- if we had -- if we didn't negotiate this deal

20  and had prosecuted our objection, and if we had lost on the

21  roll-up, on the marshaling, on 506(c), on equities of the

22  case, we have nothing to distribute to the creditors.  We'd

23  be doing a tremendous disservice to the unsecured creditors

24  in the United States and other creditors, priority creditors

25  that were previously unsecured creditors.  But also, I would

1   say to the Canadian creditors, as well, because it's likely

2   that they're going to participate in the recoveries that we

3   get here in the United States case.

4         But we just can't -- the IO has never reached out

5   to us in this case to discuss anything.  I mean, we're -- we

6   understood that this was just a battle on allocation for the

7   ABL.  There's been no discussion with us.  And we don't want

8   to see this fall apart today, go forward, and then, all of a

9   sudden, we're just totally wiped out.  So we think that we've

10  cut a deal that the IO should actually support, with further

11  negotiations to continue, with the financing in place, in the

12  context of the sale process and negotiation of a plan.  Thank

13  you.

14        THE COURT:  Thank you.

15        MS. TO:  Your Honor, I'd like to add a few points

16  to the presentations.

17        Ms. Pillon asked why the noteholders are so

18  focused on Canada now.  I think the answer is obvious.  We

19  are asked, and we have provided funding for the sale process,

20  making an additional twenty-million-dollar commitment, ten of

21  which has been advanced to date, to complete the run and

22  complete the sale process.

23        It was a critical term, from day one, for the

24  noteholders to understand what portion the Canadian debtor

25  would bear of the ABL debt.  And the math is pretty simple.

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23445    Filed 11/20/14    Entered 06/12/18    Page 78 of 109
Pg 96 of 309

78

1  If you take $10 million as the allocated share of the ABL to

2  Canada, and you compare that to a twenty-million-dollar DIP,

3  it's a significant portion of the DIP.

4           I think, to understand the situation -- I mean,

5  this is a condition of the noteholders' commitment.  If the

6  Canadian assets were sold now, today, before the Charles Bank

7  transaction closes, I am certain that our friends, the ABL

8  lenders, would be taking every dollar of those proceeds to

9  repay them, themselves.

10          THE COURT:  And wouldn't you have a marshaling

11 argument?

12          MS. TO:  At that point, they have a first lien on

13 those assets, as Mr. Collins explained.  The Canadian debtor

14 is jointly and severally liable for the --

15          THE COURT:  And wouldn't you have a marshaling

16 argument, or am I wrong?

17          MR. COLLINS:  It might be a contribution argument.

18          THE COURT:  No.  A marshaling argument between the

19 two of you, with respect to the fact that you say, no, you

20 need to look to other assets first.

21          MS. TO:  So, Your Honor, we understand that the

22 privilege of having a secured lien on an asset is that one

23 can be repaid from the proceeds when they are realized.  In

24 this case, we have Canadian assets or Canadian collateral and

25 U.S. collateral that's being sold at the same time.  We

1  believe -- and this is -- we think that would be an

2  inequitable result, and also is not the condition of our

3  commitment to fund -- that, if all the U.S. assets were used

4  -- or U.S. proceeds were used first to repay the ABL debt,

5  that would effectively create a windfall for the Canadian

6  estate.  We don't think that's a fair result.

7        What the noteholders' position has been, from day

8  one, is that they wanted assurances that the Canadian debtor

9  would be bearing its fair share of the ABL debt, not paying

10  it all first, just its fair share, and such that the

11  noteholders are lending into this process, are funding the

12  process, understanding what the ultimate recovery will be.

13  As Mr. Collins explained, this really affects the ultimate

14  recovery of the noteholders; it's a ten-million-dollar issue,

15  more or less.

16        And so the reason we're focused on it is because

17  it's -- it matters, it really affects the bottom line.  And

18  we have made the allocation, this allocation issue, a

19  condition to the commitment.  We are not prejudging what it

20  is.  We want a fair allocation.  Mr. Collins explained the

21  allocation the debtors have supported, the UCC has supported.

22  There were allocations that were actually more favorable,

23  ultimately, to the noteholders, but we understand it has to

24  be a reasonable outcome.

25        THE COURT:  But why is this -- I guess, other than

1   the fact that you're making it a condition to the DIP

2   financing, why is this an issue for the Court, and not just

3   an intercreditor issue between you and the ABL lenders?

4           MS. TO: It is an intercreditor issue, you are

5   correct. It is an issue for the Court because it is tied to

6   the financing that is in front of you, and that is necessary

7   for these cases to proceed.

8           THE COURT: But if you had a commitment from the

9   ABL lenders that this was going to be the allocation, why do

10  I need to bless it?

11          MS. TO: Your Honor, I think the ABL is agnostic

12  on this issue, and I understand. They will get paid, no

13  matter what, on the -- at the closing of the sale. We

14  believed it was more appropriate for this issue to be in

15  front of you because it ultimately affects the recoveries of

16  creditors. As we can see, there are some strong views on

17  this issue. I think that's why the issue is in front of you.

18  But the proposed allocation that's been presented and

19  accepted by two fiduciaries here, and supported by the

20  noteholders, is, we believe, a fair allocation.

21          THE COURT: Let me ask you the same question I

22  asked somebody else. What's being baked into this today that

23  I can't undo? What is the consequence, the logical

24  consequence, of approving this today? What other effect does

25  it have on -- I mean, you say there's no allocation --

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-33145   Filed 11/20/14   Entered 04/24/18   Page 83 of 109
Pg 99 of 309

81

1 there's no effect, or I've heard there's no effect on asset

2 allocation.  But don't people have in their minds what is

3 happening today when they look at the proceeds that come in?

4 What is being baked in today to this decision?

5         MS. TO:  My understanding of what's being agreed

6 to today is that, to the extent that there are -- we know

7 that there are proceeds -- Canadian assets being sold to

8 Charles Bank.  The question is:  What is the value allocated

9 to them?  It might be more than the $10 million or so that we

10 are asking you to approve today; it might be less.  It might

11 be just 10 million.

12         If it's 10 million, the result of the agreement

13 today is that the 10 million would go to the ABL, minus what

14 is necessary to pay the administrative costs, the charge in

15 Canada.  That's the agreement today.  If the proceeds are

16 determined to be more than 10 million, then the 10 million --

17 using that as a round number --

18         THE COURT:  Uh-huh.

19         MS. TO:  -- the 10 million goes to the ABL, the

20 balance would go to pay the administrative costs in Canada.

21 And if there is an excess, that would be distributed among

22 creditors.  But it is possible -- depending on what the

23 ultimate valuation of the Canadian assets is, it's possible

24 that there would be nothing left, mathematically, after the

25 ABL is paid, and the administrative charge.

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-33145   Doc 1844   Doc 1844   Filed 04/12/18   Page 82 of 169
Pg 100 of 309

82

1          The only thing I would add, which is very

2   important, as you heard, we have reached a settlement with

3   the official unsecured creditors' committee, which we would

4   expect would benefit all unsecured creditors.  And so it's

5   not true to say there would be nothing.  There might be

6   nothing from the excess collateral proceeds in Canada,

7   depending on what the ultimate valuation is.

8          (Pause in proceedings)

9          THE COURT:  We're going to go forward with the

10  hearing, and I want to hear the evidence.  It just strikes me

11  that, absent this unusual request, this is a premature

12  determination, and it's something that would be negotiated as

13  part of an entire resolution of a case, and what we're doing

14  is we're taking one piece out of that.

15         And it may be necessary here to do that because of

16  the request that's being made by the noteholders, but that's

17  why I've asked the question that I've asked twice now, is:

18  What am I really doing here, and how does it impact the rest

19  of the case, and how it gets resolved ultimately?

20         MR. COLLINS:  If I could just add to that, Your

21  Honor.

22         THE COURT:  Uh-huh.

23         MR. COLLINS:  How I look at this is we are

24  identifying, in essence, the capital structure of Canada.  We

25  are saying, first will be paid the administrative charge;

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:23   Main Document
Case 18-23445   Doc 114   Filed 04/12/18   Page 83 of 109
Pg 101 of 309

83

1    second will be paid the ABL apportioned debt; third,

2    everything else goes to Canada -- I'm sorry -- to the

3    Canadian creditors, of which the intercompany is part of.

4                THE COURT:  Uh-huh.

5                MR. COLLINS:  That is what we're setting today.

6    That -- it's no different than coming into court on any other

7    debtor and saying, we believe the amount of the secured debt

8    is $65 million, this is the second lien debt of $100 million.

9    Assuming that debt is valid, that has to get paid in full

10   before anything else goes down.  That's what we're doing here

11   today.  We're simply apportioning the ABL debt of what the

12   Canadian hurdle is of the proceeds of sale for recoveries to

13   unsecured creditors.

14               THE COURT:  Thank you.

15               We're going to take lunch before we start.  And I

16   would also encourage, during lunch, for people to talk.  I

17   don't know that there's much that can be done, but I always

18   encourage people to talk during lunch.  We'll be back at two

19   o'clock, and we'll take our witnesses.

20               MR. COLLINS:  All right.  Thank you, Your Honor.

21               THE COURT:  Thank you very much.  We're in recess.

22        (Luncheon recess taken at 1:01 p.m.)

23               THE COURT:  Please be seated.

24               Mr. Collins.

25               MR. COLLINS:  Yes.  Good afternoon, Your Honor.

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 18-33145    Doc 1811    Filed 04/12/18    Page 84 of 159
Pg 102 of 309

84

 1              Thank you for the lunch break.  That certainly was

 2    helpful just to be able to sit down and talk a little bit.

 3    Unfortunately, we don't have resolution of the issue before

 4    Your Honor today.  So, we would like to move forward.

 5              So, unless Your Honor has any follow-up questions

 6    I will turn the podium over to my colleague, Mr. Kandestin,

 7    for the presentation of our witnesses.

 8              THE COURT:  I don't have any follow-up questions.

 9    I did take advantage of the break and read the report of the

10    information officer and the orders entered by the Canadian

11    Court.  So, it helped me as well.

12              MR. COLLINS:  Okay.  Thank you, Your Honor.

13              MR. KANDESTIN:  May I please the court, Cory

14    Kandestin for the debtors.

15              Your Honor, before we call our witness, may I

16    approach the bench with a copy of the exhibit binder?

17              THE COURT:  Yes.

18              MR. KANDESTIN:  The debtors call Paul Kosturos to

19    the stand.

20              PAUL KOSTUROS, WITNESS, SWORN

21              THE CLERK:  Would you please state your full name

22    and spell your last name for the record.

23              THE WITNESS:  Paul Kosturos, K-O-S-T-U-R-O-S.

24              THE CLERK:  Thank you.  You may be seated.

25              MR. KANDESTIN:  May I proceed?

```
1            THE COURT:  Yes.
2                        DIRECT EXAMINATION
3    BY MR. KANDESTIN:
4    Q    Good afternoon, Mr. Kosturos.
5    A    Hi.
6    Q    By whom are you employed?
7    A    I'm a senior director with Alvarez & Marsal.  I am also
8    the interim chief financial officer of the Rockport Company.
9    Q    What does your practice at Alvarez & Marsal focus on?
10   A    I am part of the private equity operations group.  We
11   specialize in dealing with private equities, mergers,
12   acquisitions, carve-outs, performance improvements; I
13   personally specialize in interim CFO work.
14   Q    You mentioned that you are the interim CFO of the
15   debtors, is that correct?
16   A    That's correct.
17   Q    How long have you held that position?
18   A    Since August 1st, 2017.
19   Q    And, briefly, what are your duties and responsibilities
20   as interim CFO?
21   A    I oversee all finance and accounting activities, along
22   with human resources and legal as well.
23   Q    In your capacity as interim CFO are you familiar with
24   the debtors' financial affairs and operations?
25   A    Yes, I am.
```

86

1  Q     And does your knowledge include the debtors' recent

2  efforts to secure post-petition financing?

3  A     Yes, it does.

4  Q     Can you please turn to Tab 1 of the exhibit binder?

5  You'll see an exhibit pre-marked E-1.  Are you familiar with

6  this document?

7  A     Yes, I am.

8  Q     What is it?

9  A     This is the revolving credit agreement between Rockport

10 and Citizen's.  We basically call this the ABL agreement.

11 Q     And for purposes of testimony today is it okay if refer

12 to this as the ABL facility or the ABL agreement?

13 A     Yes.

14 Q     Have you referred to this agreement over the course of

15 your duties as interim CFO?

16 A     Many times including certifying on a monthly basis that

17 the financial statements are in agreement with this document.

18 Q     I know this is a long document, but does the document

19 before you appear to be a true and correct copy of the ABL

20 facility agreement?

21 A     Yes, it does.

22 Q     Can you generally describe what the ABL facility is?

23 A     This provides Rockport with the funding necessary to

24 complete their day to day operations.

25 Q     And who are the borrowers under the ABL facility?

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 18-23145    Doc 194    Doc/1844    Filed 04/26/18    Page 87 of 109
Pg 105 of 309

87

1  A     The Rockport Group, the Rockport Company which is the

2  operating company and Rockport Canada.

3  Q     So, those three entities?

4  A     That's right.

5  Q     Were there guarantors of the facility?

6  A     Yes, the Rockport Group, the Rockport Company and

7  Rockport Canada.

8  Q     And with the exception of Rockport Canada or perhaps

9  its parents, are any foreign entities other than Canada

10  parties to the ABL facility?

11  A     No, they are not.

12  Q     And with the exception of Rockport Canada or its parent

13  have any foreign or Rockport entities pledged assets to

14  secure the ABL facility?

15  A     No, they have not.

16  Q     Did the borrowers pledge assets to secure the facility?

17  A     Yes, they did.

18  Q     Generally speaking, what types of assets did the

19  borrowers pledge?

20  A     Generally, it's the accounts receivable and inventory

21  of each entity.

22  Q     Does the ABL facility divide liability among the three

23  borrowers?

24  A     No, they do not.

25  Q     So, how does it deal with liability?

1   A      They're both jointly responsible for all of the ABL

2   agreements.

3   Q      And by both you're referring to Canada and the US?

4   A      Canada and the US, yes.

5   Q      I'd like to ask you about how the debtors use the funds

6   that they drew from the ABL facility.

7          Did each of the three borrowers draw directly or was

8   there one debtor that drew?

9   A      No.  Only the Rockport Company.  The operating company

10  is drawing funds on the ABL.

11  Q      So, by the Rockport Company you're referring to the

12  Rockport Company, LLC?

13  A      That's correct.

14  Q      And for short-hand is it okay if I refer to that just

15  as Rockport?

16  A      Sure.

17  Q      Generally speaking, how did Rockport use the funds that

18  it drew under the ABL facility?

19  A      We used the funds for day to day operations.

20  Q      Does that include purchasing inventory?

21  A      Yes, it does.

22  Q      Did Rockport Canada draw on the ABL facility?

23  A      No.

24  Q      If Rockport Canada wasn't directly drawing on the ABL

25  facility how did Rockport Canada procure inventory?

1  A    Rockport Canada buys the inventory from Rockport

2  Company, the US company.  The US company buys inventory for

3  all of our foreign assets and foreign entities.  We pay

4  through that and then we intercompany and sell those to the

5  foreign entities.

6  Q    What type of pricing does Rockport sell inventory to

7  its subsidiaries?

8  A    We use landed costs plus 8.25 percent for the foreign

9  entities.

10  Q    So, for the laymen in the room what does cost mean?

11  A    The full cost that we pay the factories for the goods.

12  Q    Okay.  And the 8.25 percent that you mentioned, what

13  does that consist of?

14  A    Since none of the foreign entities have any product

15  groups or sourcing groups this represents the US entities

16  product and sourcing groups.  Product are the ones that are

17  designing all of the shoes, working through them and

18  everything.  The sourcing group helps procure it, works with

19  the manufacturer for quality and things like that.

20  Q    When Rockport received money and payment for this

21  inventory from Rockport Canada what would happen to that

22  money?

23  A    That money would come into the US and then currently

24  under the ABL agreement all receipts coming in are swept on a

25  daily basis to cover the ABL.

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Doc 1844    Filed 06/14/18    Page 90 of 189
Pg 108 of 309

90

1  Q      Were funds from the ABL facility needed to get

2  inventory to Rockport Canada?

3  A      Yes.

4  Q      Did Rockport Canada have the cash to do that on its

5  own?

6  A      No.

7  Q      Did Rockport Canada have the cash to operate without

8  the debtors drawing on the ABL facility?

9  A      No.  Rockport Canada loses cash.

10  Q      Does Rockport Canada have its own back-office

11  operations?

12  A      No.  They have no back-office.  The only thing they

13  have are a few sales people and one small sew room.

14  Everything else is done by the US entity including treasury,

15  accounting, finance, HR; all back-office support is done by

16  the US company.

17  Q      How about management of the company, where is that

18  located?

19  A      It's all at our headquarters in the US.

20  Q      Who pays the salaries and expenses of the people

21  providing those corporate services?

22  A      The US company.

23  Q      What is the source of the funds that the US company

24  uses to pay those salaries?

25  A      It comes from the daily operations on the ABL.

1    Q     Now you mentioned a little earlier that Rockport Canada

2    loses money?

3    A     That's correct.

4    Q     Can you explain that a little more?

5    A     So, for 2017 Rockport Canada, from an EBITDA basis,

6    earns before interest taxes lost $8 million dollars for 2017.

7    The consolidated company for 2017 lost $1 million dollars.

8    Q     And you mentioned that Rockport sold inventory to

9    Rockport Canada?

10   A     That's correct.

11   Q     Has Rockport Canada paid for all the inventory that it

12   has received?

13   A     No.  At the data filing there was an intercompany for

14   about $18 million dollars of which 80 percent of that was

15   past due, and of that 40 percent of that amount was past due

16   over 120 days.

17   Q     So, what does that past due nature tell you about the -

18   - tell you about Rockport Canada's operations?

19   A     They don't have the cash-flow to pay us -- to pay the

20   Rockport Company on an ongoing basis.

21   Q     Okay.  Let's turn to the allocation that the debtors

22   are proposing.

23         Can you briefly explain what it would mean to allocate

24   the ABL debt?

25   A     Well, what it's trying to do is be fair and, basically,

1   allocate the debt between the two companies because they're

2   both jointly liable for the ABL.

3   Q      So, when you say the two companies to which entities

4   are the debtors proposing to allocate the debt?

5   A      To the US companies and to Canada.

6   Q      Do the debtors propose to allocate debt to any of their

7   foreign entities other than Rockport Canada?

8   A      No.

9   Q      Why not?

10  A      They're not part of the agreement.

11  Q      Under the DIP credit agreement are the DIP noteholders

12  -- DIP note-lenders making new money available to the

13  debtors?

14  A      Yes, they are; a total of $20 million dollars.

15  Q      And does the DIP credit agreement contain any

16  provisions about allocating the ABL debt?

17  A      Yes, it does.  It's a requirement.

18  Q      Is it important for the debtors to get final approval

19  of the DIP today?

20  A      It is very important to get the agreement.

21  Q      Can you explain why?

22  A      Well, you know, for one thing it's part of the ABL

23  agreement, but more than that we've made agreements with all

24  of our factories to keep goods flowing in.  There were some

25  at the beginning that were starting to rumble about

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Filed 11/26/18    Entered 06/12/18    Page: 93 of 169
Pg 111 of 309

93

 1   potentially not sending us the goods on time.  So, we have

 2   agreements with them to continue shipping on time.  Part of

 3   that was because the ABL and we had enough funding to

 4   continually pay them.  So, we are paying all of their

 5   prepetition notice through critical vendors and foreigns.

 6        If it comes to be that the DIP is not approved I am

 7   concerned that the factories could see that as a sign of

 8   weakness and potentially start trying to re-negotiate deals

 9   with us.

10   Q    Could you turn to Tab 2 of your exhibit binder, please?

11   It's a document pre-marked as Exhibit D-2.  Are you familiar

12   with that document?

13   A    Yes, I am.

14   Q    Can you identify what Exhibit D-2 is?

15   A    This is the borrowing base certificate for the Rockport

16   Group as of April 15th, 2018.

17   Q    2018?

18   A    Mm hmm.

19   Q    Are you familiar with this document in the course of

20   your employment as interim CFO?

21   A    Yes, I am.  We're required to file this every 15 days

22   with the ABL holders.

23   Q    And do you intend to see this document before it is

24   approved?  What is your role in this document?

25   A    I see this document before it's approved.  I get final

18-23538-shl   Doc 884-45   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-23145   Doc 1844   Doc 12/14   Entered 06/14/18   Page 94 of 109
Pg 112 of 309

94

1   approval for it.  It's created by our treasurer and are

2   corporate controller, but nothing gets filed until I see it

3   and I give approval for it.

4   Q     Do the debtors prepare this document regularly?

5   A     Yes.  Every 15 days is now required.

6   Q     Is it the regular course of business for the debtors to

7   prepare borrowing base certificates for the ABL facility?

8   A     Yes.

9   Q     Timing wise when the debtors prepare a borrowing base

10  certificate for a given period do they prepare the

11  certificate within 15 days of that period?

12  A     They do.

13  Q     So, what is the ultimate purpose of a borrowing base

14  certificate?

15  A     This sets the maximum that we can borrow under the ABL

16  agreement even though the ABL agreement allows us to borrow

17  up to $60 million dollars.  If we do not have the borrowing

18  base to support a $60 million-dollar availability this sets

19  the tone of what we can borrow to.

20  Q     So, how does it do that?  How does this set the amount

21  you can borrow?

22  A     Well, there's two main items of the borrowing base; one

23  is the accounts receivable and, one, is based on the

24  inventory.  It starts with the gross amount of inventory

25  and/or gross amount of accounts receivable that we have at

18-23538-shl    Doc 884-45    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145    Pg 113 of 309    Filed 06/14/18    Page 95 of 169

95

 1  the time of filing.  It then subtracts different in-eligible

 2  per the agreement or different types of reserves associated

 3  with it. Then it calculates a net eligible inventory; that

 4  then is then subject to an advance rate that is not 100

 5  percent.  The ABL then reduces it and then they also take for

 6  the inventory a net orderly liquidation value percentage of

 7  it.  It basically sets the floor if we add those together and

 8  then that determines our full borrowing base available.

 9  Q    So, what is the net value of the inventory represent --

10  excuse me, the net value of the collateral represent?

11  A    It is an estimation of what it would be from a

12  liquidation standpoint of the ABL needed to liquidate the

13  inventory.

14  Q    Can you explain the method by which the debtors, today,

15  are proposing to allocate the ABL debt?

16  A    We are basing the allocation on the borrowing base

17  through the difference between the US, what the US has and

18  the Canadian company has.

19  Q    And what does that proportion work out to be?

20  A    18 -- I believe its 18 percent.

21  Q    Why do the debtors believe that method is appropriate

22  for allocating the ABL debt?

23  A    Well, the borrowing base is what's really used to set

24  what we can borrow to.  It's really the only thing that sets

25  what we're able to borrow to.  We are allowed to borrow both

18-23538-shl   Doc 884-5   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145   ECF 1294   Doc 814   Filed 04/19/18   Page 96 of 169
Pg 114 of 309

96

1   on the US and Canadian on a consolidated basis.

2   Q    Why do the debtors use the net amount of the borrowing

3   base as opposed to, day, the gross amount?

4   A    Net is ultimately what we're allowed to borrow on where

5   the gross is not.

6   Q    Can you please turn to Tab 3 of your exhibit binder?

7   Before you is an Exhibit marked D-3.  It was also attached as

8   Exhibit D to the DIP motion and Exhibit 3 to the reply in

9   support of the DIP motion.

10       Can you turn the page to the charts?  Are you familiar

11  with this document?

12  A    Yes, I am.

13  Q    What is it?

14  A    This is the allocation that we proposed for the

15  allocation and debt.  It's basically just a summary of

16  everything that's on the borrowing base that we just went

17  over on Exhibit 2.  It just breaks down between US Canada,

18  the total and then how much of it is apportioned to Canada.

19  Q    So, the numbers here come from the borrowing base

20  certificates?

21  A    Yes, they do.

22  Q    And you'll see there are a number of rows.  Can you

23  just briefly walk us through those rows?

24  A    This, again, starts with accounts receivable up in item

25  number B.  This starts with the gross amount and then as

1   we've talked about it takes out some of the adjustments to

2   get to the net amount.  Then it does the same thing for the

3   inventory amounts.  Then you can see the other reserves that

4   are included.  Getting down to the net consolidated value --

5   collateral value for both the United States and Canada.

6   Q    And what are those adjustments that your referring to

7   again?

8   A    These are different types of in-eligible that the bank

9   doesn't allow us to borrow on or other types of reserves.

10  Q    And you'll see towards the bottom of the charts there's

11  a row called total collateral value, do you see where I am?

12  A    That's right.

13  Q    Can you walk us through that row?

14  A    So, the US shows that the total collateral value for

15  the accounts receivable of inventory based on the borrowing

16  base is $50.5 million dollars and Canada is 11.4.  So, the

17  total is almost $62 million dollars.  The last column 18.4

18  represents the portion associated with Canada.

19  Q    So, the $11 million-dollar figure is 18.4 percent of

20  the total $61 million-dollar figure?

21  A    That's right.

22  Q    Let me ask you about the row at the very bottom of

23  Exhibit D-3, its entitled ABL revolver balance allocation.

24  Do you see where I am?

25  A    Yes.

1  Q     You'll see the ABL revolver balance is listed as 53.45

2  million.  Has that number changed at all?

3  A     Currently it changes on a daily basis.

4  Q     Why is that?

5  A     Per the ABL agreement that was modified in November the

6  ABL now sweeps the US cash that comes in.  So, all receipts

7  that come in modifies that balance on a daily basis.  Then

8  we're in, what's called, cash dominion.  So, they're sweeping

9  everything and then as we need to make payments we have to

10  then draw back down on the ABL.  So, it changes on a daily

11  basis.

12  Q     My question was a little bit different.  As of the

13  petition date -- let me refer you to note one that is on the

14  bottom of Exhibit D-3.  Can you please explain that note?

15  A     So, that is the balance that the ABL is outstanding at

16  the time $53.4 million dollars, but at the same time we also

17  have two LC's out there for $3.55 million dollars.  We

18  consider that part of the ABL balance because we're not

19  allowed to borrow on those two amounts combined.  Recently

20  what the draw-down for $2.5 million dollars immediately went

21  to the line of credit anyway.

22  Q     So, has that letter of credit been drawn?

23  A     One of them has.

24  Q     And for how much was that?

25  A     $2.5 million dollars.

1  Q    And that letter of credit is supported by the ABL

2  assets?

3  A    yes.  They immediately -- when the ABL just took the

4  money right from our accounts to fund that amount of money.

5  Q    Can you turn to Tab 4 of the exhibit binder, please?

6       And for the record this is a copy of the information

7  officer's objection that was filed at docket number 165.

8       And I'll refer you to Page 16 of that objection.  Let

9  me know when you're there?

10 A    Okay.

11 Q    And you'll see towards the top of Page 16 of the

12 objection, Subparagraph (d).  I'd like to ask you about that

13 paragraph, but before I do I'd like to read part of the first

14 sentence in for context.  The first sentence reads:

15      "There are alternative methods that could have been

16      used by the debtors and DIP note agents to frame the

17      initial allocation of debt such as."

18       Then it lists four proposed methods.  I'd like to

19 ask you about those four methods.

20      So, starting with the first method, which is allocation

21 based on the actual manner in which financing was provided to

22 the Canadian estate.  You mentioned earlier that it was only

23 Rockport that directly drew from the ABL facility, right?

24 A    That's correct.

25 Q    Did the debtors believe that allocating ABL debt based

1  on the various debtors direct drawing from the facility was a

2  fair method?

3  A    No.  We don't consider that fair since Canadian -- the

4  company is definitely losing money from the ABL to fund the

5  operations?

6  Q    And how about the second proposed method in Paragraph

7  37(d) which is a comparison of the Canadian estate's revenue

8  versus global revenues.  Did the debtors consider a

9  comparison of the Canadian estates revenues against global

10 revenues to be a reasonable method to allocate the ABL debt?

11 A    No.  We didn't think it was reasonable because, again,

12 the foreign companies are part of the ABL agreement.  So, it

13 didn't make sense to us to include it based on global revenue

14 when they weren't part of the agreement to begin with.

15 Q    Has any foreign company other than Canada pledged

16 assets to secure the ABL facility?

17 A    No.

18 Q    Let's take a look at the third proposed method in

19 Paragraph 37(d), estimated liquidation valuations.  How does

20 that method compare to the borrowing base approach that the

21 debtors are proposing?

22 A    That's basically the same.

23 Q    How so?

24 A    The borrowing base is trying to get to the liquidation

25 values that the ABL could get to if they needed to liquidate

1  it.  So, it's reasonably close.

2  Q    Let's take a look at the final proposed method in

3  Paragraph 37(d) which is Canadian assets versus global

4  assets.  Did the debtors consider that to be a reasonable

5  method to allocate the ABL debt?

6  A    We see this as the same as using the revenue as well

7  since the global assets aren't part of the ABL.  We don't see

8  why that would be a reasonable way of doing it.

9  Q    To allocate the ABL debt do the debtors believe that it

10 is necessary to know in advance the amount of sale proceeds

11 that will come into any particular debtor?

12 A    No, because the balance is known at the date of filing.

13 Q    The balance of?

14 A    Of the ABL.

15 Q    Do the debtors believe that it was necessary to know in

16 advance the size of unsecured claims at any particular entity

17 to fix the secured claims?

18 A    No.  Again, that doesn't really relate to the size of

19 the ABL balance at the date of petition.

20 Q    Is there some other debt allocation method that the

21 debtors are aware of that they believe is more reasonable

22 then the one that they are proposing today?

23 A    We are not aware of any other way of doing this.

24      MR. KANDESTIN:  Your Honor, before I cede the

25 podium I would move into evidence the exhibits under Tabs 1,

```
 1   2 and 3.  Tab 1 is the prepetition ABL facility agreements.

 2   Tab 2 is the borrowing base certificates.  Tab 3 is the

 3   summary of the allocation method that was attached as Exhibit

 4   D to the DIP motion.

 5           THE COURT:  Is there any objection?

 6           MS. PILLON:  I don't object, but -- Liz Pillon for

 7   the record.  If we're going to be including exhibits you

 8   referenced him to Exhibit 4 which is the objection; most

 9   importantly the report.  So, if we're bringing in the

10   evidence then the evidence in the report can also be brought

11   in.  I think there was an understanding before we started

12   that that would be the arrangement.

13           MR. KANDESTIN:  We don't object to having the

14   exhibits that were attached to the information officer's

15   objection being admitted into evidence.

16           THE COURT:  Okay.  So, then Debtors' Exhibits 1, 2

17   and 3 are admitted without objection and the exhibits to the

18   objection reservation of rights of Richter Advisory Group are

19   admitted without objection.

20       (Debtors' Exhibits 1, 2 and 3 admitted)

21       (Richter Advisory Group Objection admitted)

22           MR. KANDESTIN:  No further questions for the

23   witness, Your Honor.

24           THE COURT:  Thank you.

25           Cross?
```

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23545-RSS   Doc 184   Filed 01/26/18   Page 203 of 309
Pg 121 of 309

103

1          MS. PILLON:  Liz Pillon, Stikemon Elliot, for the

2    information officer for the record.

3                         CROSS EXAMINATION

4    BY MS. PILLON:

5    Q     Just a few questions, please, Mr. Kosturos.

6          Just to be clear, you've referenced the ABL, Exhibit D-

7    1.  To be clear for the record that's the only secured debt

8    of Rockport Canada, correct?

9    A     That's correct.

10   Q     And the noteholders' prepetition notes are not secured

11   against Rockport Canada, correct?

12   A     That's correct.

13   Q     And the intercompany financing that Rockport Group

14   provided to Rockport Canada for inventory or other services,

15   again, not on a secured basis, correct?

16   A     That's correct.

17   Q     On the borrowing base certificate I believe it was

18   Exhibit D-1 -- pardon me, D-3.  Can you pull that up?

19   A     Okay.

20   Q     And you said you were involved in the preparation of

21   the underlying borrowing base certificates and then this

22   document to try to determine a fair allocation, correct?

23   A     Yes, I was involved. I didn't prepare it, but I was

24   involved.

25   Q     And would you agree with me that a borrowing base

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FSS   Doc 284   Filed 06/14/18   Page 204 of 209
Pg 122 of 309

104

1   certificate is simply another form of a liquidation analysis?

2   I think those, in fact, were your words.

3   A     Well, the borrowing base certificate provides much more

4   than that in this case though.   The borrowing base

5   certificate sets what we can borrow to.

6   Q     Right.

7   A     So, although it estimates the liquidated value, but

8   that's agreed upon with no negotiations with the ABL

9   providers.

10  Q     Right.   And in that sense, in terms of using it as a

11  determination of the value of potential Canadian collateral,

12  would you agree with me it's quite a conservative approach

13  because a borrowing base, by its nature is conservative,

14  fair?

15  A     It depends on how you look at it as to what is

16  conservative, but it sets the pace of what we can borrow to.

17  So, that's all we can borrow to; whether it's conservative or

18  not that's all we can borrow to.

19  Q     In your experience as a financial advisor all these

20  years and in your experience in the Rockport Group did you

21  think the borrowing base certificate was quite conservative

22  in terms of the adjustments that were being taken to reach

23  the underlying value of the collateral?

24  A     Well, I mean if you look at the borrowing base

25  certificate everything that you see is normal course.   So,

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:20 Main Document
Case 18-23538-rdd Doc 0045 Filed 11/26/184 Entered 11/26/18 Page 205 of 209 Document
Pg 123 of 309

105

1  for accounts receivable everything that's aging in all of

2  those reserves that's pretty normal.  An advance rate of 85

3  percent on the accounts receivable is pretty standard.  The

4  same thing with the inventory, you have all the reserves and

5  what not that's normal course.  They always have an advance

6  rate that's less than 100 percent and then they always have

7  some sort of liquidation, net orderly liquidation value, one

8  could argue one way or another.  It's always -- this is all

9  standard practice.

10  Q    In preparing for today did you take a look at the

11  Rockport Canada most recent balance sheet for Rockport Canada

12  separately?

13  A    Most recent -- what period would that be?

14  Q    Balance sheet for Rockport Canada.

15  A    At what period of time?

16  Q    What is the most recent that's available?  Would it be

17  May 31st that's available, April 30th?

18  A    April 30th is the most recent.

19  Q    Okay.  And in that balance sheet can you help the court

20  with respect to what valuations were available, were values

21  were attributed to wholesale inventory?

22  A    It would have been standard cost.

23  Q    Do you have a number?

24  A    No, I don't have a number.

25  Q    Okay.  You don't have a balance sheet here with you?

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-23545-FSS Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Pg 124 of 309

106

1  A     No.  It's not something I walk around with.

2  Q     No, that's fine. I thought maybe in preparation for

3  today you brought it with you so the court had an

4  understanding of what the current values are of the

5  collateral before it.

6       In terms of -- if we go back to Exhibit 3 that we just

7  were talking about, the Rockport allocation agreement -- do

8  you have that, sir?

9  A     Yes.

10 Q     In the column Canada, at the bottom -- and my friend

11 took you to this to ask you a question about total collateral

12 value.  So, the estimated total collateral value for Canada

13 is 11,403,000, correct?

14 A     Yes.

15 Q     And my understanding now, based on your updated ABL

16 figures, is your now at -- if you apply your 18.4 percent

17 allocation my understanding is you are now at $10,483,480

18 dollars being the 18.4 percent figure of prepetition debt.  I

19 get that number, Your Honor, from the revised order that my

20 friend, Mr. Collins, passed up to you.

21      So, sir, we have based on your revised ABL you now are

22 at 10,483,000 that you say would be available under your deal

23 to pay down the ABL, correct?

24 A     Okay.

25 Q     And based on the total collateral value then of

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:26   Main Document
Case 18-22145-FSS   Doc 184   Filed 11/26/18   Page 207 of 309
Pg 125 of 309

107

1  11,403,000 with cost associated and liquidated you are,

2  essentially, nothing behind for the Canadians.  Is that the

3  way I am to read this document?

4  A    Well, if that's how the numbers work out, but I can't

5  speak to how you're interpreting it because I don't have

6  those numbers in front of me.

7  Q    No, these are the numbers I have; we both have them.

8  A    The ABL changes every -- the borrowing base changes

9  every 15 minutes.

10  Q    Right.  So, the value of actually what the proceeds

11  could be we don't know.  It would be beneficial if we could

12  wait and know what the actual proceeds are, but as of the

13  numbers that you're putting in front of the court today and

14  asking for approval from what we know we have total

15  collateral value of 11 million 403, do you see that, sir?

16  A    Yes.

17  Q    And of that you're asking the ABL to be permitted,

18  under your allocation agreement, to take 10,483,000 of that,

19  correct?

20  A    Okay.

21  Q    Under the post-filing post-petition cash-flows for

22  Rockport Canada, as I understand it Rockport Canada is not a

23  borrower and does not have availability under the ABL DIP,

24  correct?  Pardon me, it's a borrower, it doesn't have

25  availability under the ABL DIP.

18-23538-shl  Doc 0045  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 18-22145-FSS  Doc 00144  Filed 11/26/18  Page 208 of 209
Pg 126 of 309

108

1  A     What do you mean not available?  What do you mean

2  availability?

3  Q     We're not getting any of the DIP.

4  A     Indirectly Canada is, sure, because the US company is

5  buying all the inventory and then selling it.  The US company

6  is using that money to pay for it, but indirectly yes.

7  Q     Directly?

8  A     No.

9  Q     And noteholder DIP, the Rockport Canada is not entitled

10 to any of the amounts of the noteholders directly or

11 indirectly, correct?

12 A     Not directly, no.

13 Q     Okay.  And in the post-filing cash-flows for Rockport

14 Canada because of the ring-fencing that's now occurring where

15 money continues to remain in Canada, am I right that Canada

16 is, effectively, self-financing and does not, in fact,

17 require money from either of the DIP's?

18 A     That's true because they're not paying for the

19 inventory that's in Canada as of today.  So, they're selling

20 inventory that they didn't pay for.

21 Q     The US debtors might be doing the same thing, correct?

22 A     No.

23 Q     Okay.

24 A     All prepetition factories we're paying 100 percent for

25 the agreement of the DIP and for this case.  So, we're paying

1   for all of that inventory, but we are not collecting -- and I

2   don't want to say we, but from a company perspective the US

3   is not getting paid for Canada for the prepetition amounts

4   that they paid for.  So, although Canada is cash-flow

5   positive now it doesn't seem fair that that's how it's

6   working.

7   Q     But from the post-petition point of view Canada is not,

8   in fact, required at this point to look to either of the

9   DIP's, including the note DIP, for ongoing operations,

10  correct?

11  A     Yes, but, again, because they're not paying for the

12  inventory that they're currently selling.

13  Q     Okay.  The stalking horse arrangement that's been

14  before this court, as I understand it the Canadian wholesale

15  inventory and accounts receivable are included as a purchased

16  asset, correct?

17  A     That's correct.

18  Q     And can you help me with the -- is the price that's

19  being paid for that inventory and accounts receivable, is

20  that at cost?

21  A     What do you mean the price being paid?

22  Q     Purchase price.

23  A     I don't know how Charles Bank came up with their

24  purchase price.  So, I can't speak to how they're allocating

25  it between the entities.

18-23538-shl  Doc 8945  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 18-23145-ESS  Doc 284  Entered 11/26/18 Page 110 of 309
Pg 128 of 309

110

1  Q      And if retail --

2  A      I would think, though, since Canada is losing money

3  that there's -- I don't know how they did it, but I would

4  assume they based some profitability or something.  Canada is

5  one of the entities that loses money, but I don't know how

6  they did that allocation.

7  Q      They're purchasing inventory and accounts receivable,

8  right?

9  A      Right, but they did put some sort of value into that as

10  they came up with their purchase price.  I'm assuming.

11  Again, I had nothing to do with how they came up with their

12  purchase price.

13  Q      One of your earlier declarations, as I understand it,

14  if the retail inventory and the retail stores were being put

15  into the stalking horse it would have been done on the basis

16  of cost of that inventory, correct?

17  A      That's correct.

18  Q      So, is it a fair assumption that maybe that's the exact

19  same way they're valuing the wholesale inventory that's

20  included in the stalking horse?

21  A      I can't answer that question.  I don't know.

22  Q      If the allocation agreement of 18.4 percent is accepted

23  by the court am I right that therefore the ABL has agreed

24  that it's not looking to anything further from Canada if it

25  receives the 18.4 percent of the prepetition amount?

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-CSS   Doc 184   Entered 11/26/18   Page 131 of 309
Pg 129 of 309

111

1  A      I can't speak to what the ABL agreed to.

2  Q      Well, what do you think is the agreement, sir, that

3  you've put before the court?

4  A      The ABL will get 100 percent based on all of the assets

5  of both the US and Canadian companies.

6  Q      So, is there a chance we're going above the 18.4

7  percent if, somehow, they didn't earn enough out of the US

8  estate?

9  A      They're entitled to 100 percent based on all of the

10 assets of both the US and Canadian companies.

11 Q      Do you believe there's a lingering claim into the

12 Canadian estate should this 18.4 percent allocation agreement

13 be approved in respect of the ABL?

14 A      I haven't really looked at it from that perspective.  I

15 focus, basically, on day to day in keeping this company

16 going.  I'm not looking at what it's going to look like in a

17 month from now right now.

18 Q      You explained to my friend the manner in which -- and I

19 think it's in your declaration, the manner in which

20 intercompany, the financing for inventory for Rockport Canada

21 would come intercompany.  Then as payments were made back the

22 ABL would sweep it and take the funds for the ABL and reduce

23 the ABL, correct?

24 A      Essentially, yes.

25 Q      And, correspondingly, there would be a reduction in the

18-23538-shl    Doc 0045    Filed 11/26/18    Entered 11/26/18 20:52:20    Main Document
Case 18-23145-rdd    Doc 184    Entered 01/14/16    Page 112 of 309
Pg 130 of 309

112

1  intercompany amount that was owing because Canada had repaid

2  it via the intercompany financing, correct?

3  A    Yes.

4  Q    So, if this ABL allocation is accepted and a dollar

5  leaves Canada with respect to ABL satisfying the ABL would

6  you agree with me that it's fair that there's a corresponding

7  reduction in the intercompany claims that came from the

8  Rockport Company?

9  A    It's possible, yes.  It's reasonable, yes.

10  Q    Okay.  Last question.

11     Based on -- you had some discussions with my friend

12  about need for the DIP.  So, based on the cash-flows that

13  you've seen when do you see the first time that the second

14  tranche of the DIP will be required?

15  A    It just depends.  We have some assumptions within the

16  DIP for some payments.  If we don't have to make those

17  payments the first tranche of the DIP could be pushed out,

18  but at the same time if our receipts aren't coming in at the

19  same level we think it could be earlier.

20     So, it's hard to tell.  I believe the original DIP said

21  we were going to be drawing it down next week.  We won't be

22  doing that next week, but at the same time it serves as a

23  backstop to show our vendors that we have plenty of liquidity

24  to keep the estate running until the auction.

25  Q    So, the earliest date you could be drawing down on the

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FSS   Doc 184   Filed 01/14/18   Page 113 of 209
Pg 131 of 309

113

1  second tranche of the DIP would be drawing down on the second

2  tranche of the DIP would be?

3  A     I don't think it's going to be next week.  So, it's

4  probably, at least, a week out from that.

5             MS. PILLON:  Okay.  Thank you very much.

6             THE COURT:  Redirect?

7                    REDIRECT EXAMINATION

8  BY MR. KANDESTIN:

9  Q     Mr. Kosturos, how much money did Canada lose last year?

10  A     From just an EBITDA perspective $8 million dollars.

11  They might have lost more cash-flow, but we haven't looked at

12  it from that perspective.

13  Q     And for every dollar of cash that Canada is short who

14  made that up?

15  A     The other entities.

16  Q     Now, you talked a little bit on cross about Rockport

17  Canada owing Rockport for prepetition inventory.  How much

18  inventory has Rockport Canada received that it hasn't paid

19  for?

20  A     I don't know the exact amounts, but fundamentally if

21  the intercompany says its $18 million dollars, its $18

22  million dollars of inventory because that's really the only

23  thing that's in the intercompany balance.

24  Q     You were questioned a bit about how the borrowing base

25  certificate might be conservative and that's because it might

 1  apply an extra percentage to net liquidating -- to estimate a

 2  liquidation value.  Is that percentage applied across the

 3  board?

 4  A    Yes.

 5  Q    Would that percentage alter the proportion of assets

 6  attributable between US and Canada?

 7  A    No.  It would change that.  It just would change maybe

 8  we'd have more availability, but as you can see on the one

 9  borrowing base from April 15th we were already over the limit

10  anyway.

11  Q    You were asked a bit about Exhibit 3 on cross.  Does

12  Exhibit 3 address incoming sale proceeds at all?

13  A    No.

14  Q    Does it address --

15       THE COURT:  I'm sorry.  Can you ask that question

16  again, does it address what?

17       MR. KANDESTIN:  Incoming same proceeds.

18       THE COURT:  Okay.

19  BY MR. KANDESTIN:

20  Q    Does Exhibit 3 address in any way what the debtors

21  anticipate will be left behind at Rockport Canada?

22  A    No.

23  Q    The ABL facilities are over-secured, right, in the US?

24  A    Yes.

25  Q    Presently or as of the petition date are there enough

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-23145-TSS   Doc 284   Entered 11/26/18   Page 115 of 209
Pg 133 of 309

115

1   assets in the US such that if the ABL lenders wanted to

2   foreclose on US assets only there would be enough to satisfy

3   their claim?

4   A    Based on the borrowing certificate?

5   Q    Based on your knowledge as interim CFO?

6   A    I would say no.

7   Q    I'm sorry.

8   A    I can't -- can you ask again.

9   Q    So, you were asked on cross about whether if the ABL

10  lenders -- whether the ABL lenders would have a claim that

11  trickles into Canada.  Do you recall that testimony?

12       (No verbal response)

13  Q    Is there any reason to anticipate that there would be a

14  claim that trickles into Canada above and beyond its

15  allocated 18.4 percent allocation?

16  A    No.

17  Q    Is it important to the debtors to have a cushion

18  provided by DIP financing?

19  A    Yes, absolutely.

20  Q    How so?

21  A    I personally fought hard for it.  Originally when we

22  looked at and looked at the sizing it probably could have

23  been lower, but we needed enough to go to our vendors and say

24  we have plenty of financing, there would be no issues, there

25  would be no shortfalls because, again, we needed the

1  factories to continue on.

2      So, it was important to have excess availability so

3  that we could continue going.  Plus, if it dragged out, which

4  happened prepetition as well -- if it dragged out we would

5  have excess cash to get through the transaction.

6          MR. KANDESTIN:  I have no further questions, Your

7  Honor.

8          THE COURT:  Mr. Kosturos, you may step down.

9          THE WITNESS:  Thank you.

10     (Witness excused)

11         THE COURT:  Your Honor, the debtors call Nathan

12 Court.

13                 NATHAN COURT, WITNESS, SWORN

14         THE CLERK:  Would you please state your first name

15 and spell your last name for the record?

16         THE WITNESS:  Nathan Court, C-O-U-R-T.

17         THE CLERK:  Thank you.  You may be seated.

18         MR. KANDESTIN:  May I proceed?

19         THE COURT:  Yes.

20                   DIRECT EXAMINATION

21 BY MR. KANDESTIN:

22 Q    Good afternoon, Mr. Court.

23 A    Good afternoon.

24 Q    By whom are you employed?

25 A    Houlihan Lokey.

18-23538-shl   Doc 8945   Filed 11/26/24   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FSS   Doc 14-6   Filed 01/14/18   Page 137 of 309
Pg 135 of 309

117

1  Q     And what is Houlihan Lokey?

2  A     An investment bank financial advisor.

3  Q     What is Houlihan's role in this case?

4  A     We are the financial advisor to the debtors.

5  Q     And what is your current position with Houlihan?

6  A     I'm a director in the financial restructuring group.

7  Q     How long have you been doing that type of work?

8  A     Thirteen years approximately.

9  Q     Have you had experience before with DIP financing?

10 A     I have.

11 Q     What is that experience?

12 A     On the debtors' side I've worked on Powerwave and

13 Advanced Marketing Services which were both Delaware cases

14 and on the creditor's side, among others, TerreStar,

15 LightSquared, VeraSun.

16 Q     I have a few questions for you about allocation.  Is

17 the exhibit binder up there still?

18 A     Yes.

19 Q     Will you please turn to Tab 3 of the exhibit binder?

20 A     Are you familiar with Exhibit 3?

21 A     Yes.

22 Q     What is it?

23 A     It is the analysis that shows the allocation of the DIP

24 between US and Canada as 18.4 percent.

25 Q     Was Houlihan involved in preparing this document?

1    A     Yes.

2    Q     And are you familiar with this document?

3    A     Yes.

4    Q     Can you briefly explain how Exhibit 3 arrives at the

5    18.4 percent allocation?

6    A     So, you know, the way this works is it, obviously, has

7    US and Canada and then it has categories of working capital.

8    The gross numbers come from the company's balance sheet; it's

9    basically an accounting entry.  The adjustments reflect, as

10   Mr. Kosturos said, various reserves and then, in particular,

11   with respect to the inventory there is net orderly

12   liquidation value applied which the ABL lenders received from

13   a third-party appraisal company which they employ when

14   they're doing this work.  You know, you back those out and

15   you get the net.  The net is what they used to calculate what

16   they're willing to lend to the company.  Then, when you break

17   it up between US and Canada the Canadian portion at this

18   point in time was 18.4 percent.

19   Q     Why did the debtors not use gross value?

20   A     Gross value isn't what's lent against.

21   Q     Did you run an analysis to see what the proportion

22   would be had you used gross value?

23   A     We didn't.  I believe it was higher. It was like 20.9

24   percent.

25   Q     Can you turn to Tab 4 of the Exhibit binder, please,

1   and to Page 16?

2   A     Excuse me; what page?

3   Q     16.  I'll offer you the same paragraph that I referred

4   Mr. Kosturos to, Paragraph 37(d).

5   A     Okay.

6   Q     I'd like to ask you about the format that's proposed

7   there.  Did the debtors consider it reasonable to allocate

8   debt based on the proportion of which debtors drew directly

9   from the ABL facility?

10  A     No, because the debt is -- Canada and the US are

11  jointly responsible for the debt and Canada benefited from

12  the ABL.

13  Q     The second proposed method is Paragraph 37(d) is

14  comparison between the estates revenue between global

15  revenue.  Did that form part of the debtors' allocation

16  method?

17  A     It did not.  You know, we looked at it, but, again,

18  this isn't a global ABL.  It refers just to US and Canadian

19  collateral.

20  Q     How about the third proposed method there, estimated

21  liquidation evaluations.  How does that compare to the

22  borrowing base method?

23  A     That is very similar to the borrowing case.  That is

24  basically what the borrowing base does.

25  Q     How so?

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-22145-FSS Doc 1104 Filed 01/26/18 Page 220 of 209
Pg 138 of 309

120

1  A    Because it applies a net orderly liquidation value to

2  the various components of inventory.  It applies a discount

3  to the accounts receivable to account for, you know, trying

4  to recover on those receivables in a liquidation.

5  Q    And the final method in Paragraph 37(d) is Canadian

6  assets versus global assets.  Did that form part of the

7  debtors' allocation method?

8  A    It did not, but we looked at it and same issue with

9  revenues.  This is a US and Canadian ABL.

10  Q    To allocate the ABL debt do the debtors believe that

11  it's necessary to know in advance the incoming sale proceeds

12  to any particular entity?

13  A    No.

14  Q    Why not?

15  A    Because, frankly, those proceeds are unknowable.  At

16  this point they could change, but the debtor, itself, is a

17  historical number that we can calculate today.

18  Q    Is there some other debt allocation method that the

19  debtors know of that they believe is more reasonable then the

20  one they're proposing today?

21  A    No.

22  Q    Is it important for the debtors to get final approval

23  of the DIP financing facility today?

24  A    Yes.

25  Q    Why is that?

18-23538-shl    Doc 0045   Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-22145-FSS    Doc 284    Filed 04/14/18    Page 221 of 309
Pg 139 of 309

121

1   A      Because we need a final DIP order or we face an event

2   of default.  We need the DIP financing for operating

3   purposes.

4              MR. KANDESTIN:  No further questions, Your Honor.

5              THE COURT:  Cross?

6              MS. PILLON:  No questions.  Thank you.

7              MR. KANDESTIN:  The debtors have no further

8   witnesses.

9              THE COURT:  You may step down.

10        (Witness excused)

11             THE COURT:  Does the information officer wish to

12  put forward any witnesses?

13             MS. PILLON:  Elizabeth Pillon, Stikeman Elliot,

14  for the record.

15             I don't on the basis that the report is in and I

16  may be referring to a couple of numbers out of the report.

17             THE COURT:  The report is in.

18             MS. PILLON:  Thank you.

19             THE COURT:  Okay.  Let's take five minutes and

20  then we'll go to argument.

21        (Recess at 3:35 p.m.)

22        (Proceedings resume at 3:43 p.m.)

23        (Call to order of the Court)

24             THE COURT:  Please be seated.  Mr. Collins.

25             MR. COLLINS:  Yes, Your Honor, thank you.

18-23538-shl    Doc 0045    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145-rss    Doc 184    Entered 11/26/18    Page 222 of 309
Pg 140 of 309

122

1          Your Honor, I think we had quite a bit of dialogue

2     before the testimony, so I will do my best to be brief and to

3     summarize what I think was uncontroverted testimony from our

4     witnesses, and why we think it's --

5          THE COURT:  Can we start out with what's the

6     standard and what am I supposed to be ruling on here?

7          MR. COLLINS:  Okay.  Sure.

8          I will -- Your Honor, I'm fine with thinking that

9     this is our burden. We are seeking to -- we are the movant.

10    We are seeking to allocate debt amongst the various debtor

11    parties.  And we think we have met that burden by having

12    really uncontroverted testimony as to the fair method of

13    allocation.

14          THE COURT:  But we're in a context, right?

15          MR. COLLINS:  Yes.

16          THE COURT:  So, but what's the standard that I'm

17    judging this by?  This is adequate protection?  This is --

18    what is this?  And, yeah, what's the standard?  Not just did

19    I prove by the preponderance of the evidence I'm assume

20    you're going to say --

21          MR. COLLINS:  Yes.

22          THE COURT:  -- that this is a reasonable

23    methodology.  Do you have to prove it's the best?  It's the

24    reasonable?  But we're here in a DIP context, so how am I

25    supposed to judge this?

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-22145-CSS Doc 0045 Filed 11/26/184 Entered 11/26/18 Page 223 of 309
Pg 141 of 309

123

1    Do I judge this like a request for a 506(c)

2 waiver?  Do I just this like a request?  What do I judge this

3 like?

4    MR. COLLINS:  I think you would judge this based

5 upon when you have joint and several obligors before you with

6 a valid, for all intents and purposes, appears to be a valid,

7 first priority secured claim.  And for purposes, one of, not

8 necessarily adequate protection, but certainly a condition to

9 borrowing in that it's appropriate for a lender to know what

10 the capital structure of a company it's lending to, to

11 understand what its liabilities are and what it's going in

12 subordinate to.

13    THE COURT:  Well, it knows that.

14    MR. COLLINS:  Not necessarily, Your Honor.

15    It could be all from the United States goes to pay

16 down the ABL.  That's a very different credit decision.

17    THE COURT:  But that's not the -- it knows the

18 capital structure.  It knows what it lent into.  Okay, right?

19 The seconds or the noteholders know they lent into a

20 situation where they got a first on certain collateral, a

21 second on other collateral, and nothing -- no lien on other

22 collateral of the global entity, right?

23    MR. COLLINS:  Correct.

24    THE COURT:  So, they knew that.  They know what

25 they lent into.

18-23538-shl Doc 8945 Filed 11/26/24 Entered 1/26/18 20:52:28 Main Document
Case 18-22445-FSS Doc 184 Entered 11/26/18 Page 224 of 209
Pg 142 of 309

124

1     MR. COLLINS:  True, but they lent in junior on the

2   EBL priority collateral which is a significant portion of the

3   value of the business in, you would think AR and in

4   inventory.  And then, obviously, the other components of the

5   debtors' business.  And they are going in subordinate to

6   citizens on that EBL priority collateral for their new money,

7   as well as their adequate protections is also subordinate to

8   citizens on the ABL collateral.

9     And I think it's fair to say what is my borrower

10  obligated to pay on account of that senior secured ABL

11  facility?  And in many respects, I view this as akin to

12  determining contribution amongst jointly liable parties.  And

13  you're trying to do in a fair and equitable way in order to

14  allow the case to move forward.

15     This is a threshold issue for purposes of new

16  money coming into the company.  This methodology, we believe,

17  is fair.  We think it's really not subject to attack.  We

18  heard only in papers.  The other theories are methodologies

19  that the information officer thought might be considered.  We

20  went through them in detail, each one.

21     And, in my view, and I think the testimony was

22  clear, none of those are even close to being fair or

23  appropriate for allocating this type of liability.

24     THE COURT:  And why is that?  I heard the

25  testimony, but why is the testimony correct?  Why is that

1  judgment correct?

2         I heard I'm allocating and among the borrowers.

3  The Canadian debtors, the Canadian debtor benefitted

4  indirectly and they benefitted.

5         MR. COLLINS:  Yes.

6         THE COURT:  But don't I have other entities in

7  this corporate group that benefitted from the ABL that are

8  not being included in the allocation?

9         MR. COLLINS:  They are not liable on that secured

10  debt.

11         THE COURT:  They're not, but they benefitted from

12  it.

13         MR. COLLINS:  Very different situation, Your

14  Honor, where you've got a debtor entity that is a primary

15  borrower and guarantor.  That is what it is.  That is a valid

16  secured claim and recognizable under the law.

17         THE COURT:  It is, but I heard that they also

18  benefitted from it, so should I be looking at benefit?

19         MR. COLLINS:  No.  I think you look at benefit to

20  ensure that there's not unfairness in how you allocate.  And

21  that is why we went through that analysis to show it's not

22  just that they are contractually obligated as a

23  borrower/obligor/guarantor.  It's that they received real

24  actual benefits to that estate.  And, as a result, it's fair

25  to apportion a portion of the liability to that estate.

1          And when we hear the testimony that $18 million

2     dollars appears of inventory sales from the United States

3     went to Canada, that was not paid for, that in and of itself

4     shows that Canada benefitted from this ABL facility.

5          And we have uncontroverted testimony that the

6     borrowing base certificate shows that citizens relied upon

7     the Canadian collateral to make dollar for dollar loans.  And

8     all we're seeking to do today is to set the amount of the

9     secured claim against these debtor entities.

10         THE COURT:  Are we doing that because Mr. Kosturos

11    wasn't clear on that.  In fact, his testimony was I don't

12    know if there's some other liability out there.

13         MR. COLLINS:  No, I think the -- maybe that was

14    more of a legal question and how this order is the legal

15    effect of this order.  But this order is setting in stone the

16    18.4 percent allocation.

17         THE COURT:  And what does that mean?

18         MR. COLLINS:  That means out of the Canadian

19    proceeds of sale that will be determined in the future, after

20    the administration charge, in accordance with Canadian law,

21    the first monies then out pay this senior secured claim.

22         THE COURT:  Up to the amount of a certain dollar

23    amount.

24         MR. COLLINS:  $10.4 million; right.  Assuming --

25    it's no different than under 506(b) is what is the value of

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23145-FBS   Doc 184   Filed 06/14/18   Page 227 of 309
Pg 145 of 309

127

1  the collateral securing your secured claim?  Is that, is this

2  now allocated portion of secured debtor undersecured or

3  oversecured.  We will know when we complete the sale and we

4  determine what the appropriate sale proceeds allocation is.

5       Clearly, through the questioning of Ms. Pillon,

6  they believe strongly that just on the collateral values, the

7  cost value of the inventory, value of the accounts

8  receivable, they're in the money by quite a bit.  But that's

9  not being decided today.

10      It would not be fair to decide sale proceeds

11  allocation in the context of a DIP financing order.  It is

12  appropriate in the context of a DIP financing order to

13  determine what your prepetition secured debt is amongst your

14  borrowers, so that your lender is willing to lend to that

15  estate.

16      We do that all the time in DIP orders where the

17  debtor stipulate that this is the value of the secured debt

18  and then we have an investigation period.  And no one knows

19  at the end of the day are they oversecured, undersecured.  We

20  all have a view, we think, going in, but we don't decide

21  value of secured debt.  We don't make 506(c) decisions based

22  upon an allowance of secured claims, the principal amount of

23  the secured claim, in a DIP, but you certainly set what the

24  amount of the secured claim is.

25      THE COURT:  Is this all subject to challenge in

18-23538-shl   Doc 8945   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-11145-CSS   Doc 284   Filed 04/14/16   Page 228 of 269
Pg 146 of 309

128

1  terms of the underlying validity extent, priority, et cetera?

2          MR. COLLINS:  Yes, it is.

3          THE COURT:  So, if it were to be determined that,

4  in fact -- well what --

5          MR. COLLINS:  Yes.  If a committee does a

6  challenge and it's found out that the ABL entity does not

7  have valid liens and claims, then it's not a secured claim.

8  This is assuming it is a valid secured claim.  We certainly

9  have stipulated that it's a valid secured claim.  It's

10  subject to the investigation period, and this is how we

11  believe you allocated amongst these debtor borrowers.

12          And this has gone out, you know, on notice.  We

13  served every Canadian creditor with a DIP motion, as well as

14  a notice saying part of this DIP, we're seeking to allocate

15  the secured debt.  We have the testimony.  We have

16  declarations.

17          I mean we have gone about this in the best way

18  possible so that if anybody had an issue with what it is we

19  are doing, they can stand up here today and either oppose it

20  or propose alternative that you think is more appropriate or

21  fair.  And we have no alternative methods that come close to

22  that.

23          The uncontroverted testimony revenue doesn't make

24  sense.  You're looking at revenue from foreign entities that

25  aren't even borrowers on the ABL vet.  That doesn't make

1  sense.  Asset values on the global enterprise.  The ABL can't

2  look to Korean assets to foreclose upon, but they can

3  foreclose upon this entirety the ABL collateral up in Canada.

4  So, is this a gating item?  Yes.  Does it in any

5  way determine the amount of distributions to Canadian

6  creditors?  No.  Does it determine who our -- what are the

7  amount of the Canadian creditors?  No.

8  That is all left like any Chapter 11 case to the

9  process that unfolds through your 363-sale transaction and

10  then plan confirmation.

11  And on some level, Your Honor, when you look at

12  contribution allocation, I think you have to look to

13  fairness.  What is equitable under the circumstances?  And I

14  know that's squishy, but that, ultimately, is what it is.  I

15  mean I really believe that is the test.

16  When looking at this situation with these unique

17  facts, is it appropriate to allocate across the borrowing

18  base certificate, because that's what the lender relied upon

19  in making the loan and would look to in order to be repair.

20  We think so, especially where that entity is a net user of

21  that DIP facility.

22  And the testimony is uncontroverted that while

23  they did not borrow directly, that was not the debtors'

24  custom, it was, again, potentially for efficiency sake.

25  Maybe Citizens didn't want to deal with Canadian dollars in

 1  making direct loans.  I don't really know.

 2          But it was clearly done so that it all funneled

 3  through Rockport Company.  They were the primary borrower.

 4  They then distributed the inventory.  That doesn't mean,

 5  however, that those other entities are not liable as secured

 6  obligors for that debt.

 7          THE COURT:  Well, they are --

 8          MR. COLLINS:  They are.

 9          THE COURT:  -- at least, that's what it looks like

10  they are, and they're certainly the parties to the loan

11  documents.

12          MR. COLLINS:  But, certainly, the IO has challenge

13  rights, I assume, as a party in interest, which we certainly

14  would agree they're a party in interest, to look at the

15  validity of the liens and claims of the ABL lender.

16          This allocation assumes that those liens and

17  claims are valid.  That investigation period has not expired.

18  So, that can be undone.

19          We did our own analysis.  We think they are

20  perfected.  We don't believe there are any tort claims or

21  other type of underlying liability claims.  This is a

22  straightforward ABL facility.  And we are -- we are trying to

23  do this in the open.

24          We have now the support of our unsecured creditors

25  committee and that should not -- I don't think that should be

18-23538-shl  Doc 0945  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 18-23538-rss  11/26/184  Entered 11/26/18  Page 131 of 309
Pg 149 of 309

131

1  -- I think there's some material importance to this estate or

2  to this issue.  Because you have fiduciaries to all of these

3  estates who believe that this is an inappropriate way for

4  these cases to efficiently move forward.

5          THE COURT:  Well, they believe that because

6  there's been a demand put on them by the noteholders to

7  obtain this ruling upon penalty of the DIP.  That's why

8  (indiscernible) thinks so.

9          You would not be in front of me today if it were

10  not a condition of the DIP for this to be resolved.

11          MR. COLLINS:  I guess, I would say, it depends on

12  if that's a reasonable demand or not.

13          THE COURT:  Well, I think that's exactly right.

14  And we've been debating that in chambers.  Is this a --

15  again, what's the standard, what's the rubric in which I a

16  taking at this?

17          This is a DIP hearing where the DIP lenders have

18  made multiple requests for what they want and what they

19  require as a condition to lending.  They required a roll-up,

20  which they got; at least, in part.

21          They got some liens on unencumbered assets.

22          They got some significant fees.

23          They got a whole bunch of things and here's

24  another request.  So, how do I -- that's what I'm saying.

25  How do I view this and do I view this in the context of all

18-23538-shl   Doc 0045   Filed 11/26/184   Entered 11/26/18 20:52:28   Main Document
Case 18-23538-rss   Doc 0045   Filed 11/26/184   Entered 11/26/18 20:52:28   Main Document
Pg 150 of 309

132

1   the requests?  And do I say are all of these requests

2   reasonable or do they tie the hands of the debtor or not?

3          That's what I'm saying.  How do I look at this and

4   is this a reasonable request?

5          MR. COLLINS:  I think you can look at in many of

6   those situations.  They probably all apply to some degree to

7   this analysis.  Is that -- is it part of the total package of

8   the financing?  Yes.  Okay.  It doesn't mean, though, that

9   simply because it's part of the total package that it has to

10  be approved.  But Your Honor could look at it and say I'm not

11  going to approve it and, therefore, the facility would not be

12  approved.

13        But what happened with the roll-up, the liens on

14  unencumbered assets, the carve-out?  Your Honor determined

15  that the interim hearing, and I'm hoping at the end of today

16  that the terms of the financing themselves are fair and

17  reasonable and appropriate.

18         And we certainly have the testimony that these

19  were the best terms available.  It provides the company with

20  a runway to do a going concern sale.  This going concern sale

21  does not just benefit the noteholders.  This, likely, will

22  employ upwards of 70 percent of the corporate employees.

23  We're paying a substantial amount of foreign vendors claims,

24  upward of $25 million dollars that were outstanding as of the

25  petition date.  We're assuming executory contracts.

18-23538-shl   Doc 0045   Filed 11/26/184   Entered 11/26/18 20:52:28   Main Document
Case 18-23745-rdd   Doc 11-6   Filed 04/14/18   Page 233 of 309
Pg 151 of 309

133

1          This is a going concern sale.  They are not the

2    sole beneficiary of this.  Well, just put that on a shelf.

3          And then you look at and say, okay, well now

4    they're asking about this allocation.  And is it appropriate?

5    Is it fair?  And I think Your Honor should look at it from

6    that perspective.

7          Is the allocation that's being proposed fair and

8    reasonable?  Is it equitable?  Has it been put out on notice?

9    Has there been an opportunity to have a contested hearing?

10   Have people make their arguments as to what is appropriate or

11   not.  And that has all happened.

12         And what you have before you, I believe, is a

13   methodology that no one has credibly attacked.  What you did

14   see from the information officer was, well maybe how about

15   this or how about that or how about this.  But I didn't hear

16   any cross-examination that went to the unfairness of the

17   allocation of the ABL debt.

18         What I did hear were questions that really went

19   more to how one allocates sale proceeds. And doesn't this

20   make sense that if these collateral values that are set forth

21   in a borrowing base certificate must be very conservative.  I

22   think that means she believes that that $11.4 million that's

23   there as the net collateral value and you have $10.4 million,

24   she must believe that value is much more than 11.4 if she

25   wasn't arguing why it was so conservative.  Right?

18-23538-shl    Doc 0045    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145-LSS    Doc 184    Entered 01/26/18 20:52:28    Page 234 of 269
Pg 152 of 309

134

1          So, you that is what was argued.  Not the merit of

2     the ABL allocation methodology itself.  And I think that is

3     critical to look at the overall nature of this request.

4     Especially when you look at the benefits to the estate of

5     having the financing and the issues that are left for another

6     day including the allocation of the sale proceeds itself, the

7     plan process, who gets what.  Those issues -- none of those

8     issues, those are plan issues are not being determined today.

9          THE COURT:  The store closing sales that may go

10    forward soon.

11         MR. COLLINS:  Yes.

12         THE COURT:  Am I correct in assuming that the

13    liquidation sales in Canada, that money would stay in Canada?

14         MR. COLLINS:  Yes.  Until further order of the

15    court.

16         As was mentioned, we agreed to ringfencing.  It

17    seems appropriate because this is -- the capital structure in

18    Canada is different than the United States, and we get that.

19    And it is appropriate, at this point, to put a noose around

20    it and let things move forward.

21         Some day there will need to be, you know, a

22    reconciliation of all of that.  But all we're doing is

23    allocating a secured debt at this point.  No money is leaving

24    Canada.  All they are doing at this point, Your Honor, is

25    paying the U.S. for any current goods that are acquired post-

 1 petition. Everything else is frozen, as requested by the

 2 buyout and was set forth in our cash management order and

 3 will continue to be that way pending further order of the

 4 court.

 5      That's all I have, Your Honor.  I think anything

 6 else I say will just be repeating myself, so.

 7      THE COURT:  Thank you.

 8      MR. COLLINS:  Yes.

 9      THE COURT:  I'd rather, actually have everybody,

10 who's in support go first.  And then I'll let Ms. Pillon

11 respond.

12      MR. WINNING:  Thank you, Your Honor, of Cooley

13 LLP, proposed counsel for the committee.

14      I don't have much to add and think that covered

15 everything.  But Your Honor did sort of ask if we agreed to

16 this because there was a gun to our head or if we thought it

17 was reasonable.

18      At the end of the day, we negotiate these things

19 with a lot of guns to our head.  But some allocation has to b

20 made and when we agreed to this, as part of the settlement we

21 reached, it was because we did think it was reasonable for

22 the reasons you heard on the stand today and from Mr.

23 Collins.

24      THE COURT:  Thank you.

25      THE COURT:  What else?  Ms. Pillon.

1    MS. PILLON:  Liz Pillon, Stikeman Elliott, for the

2  information officer.

3    Your Honor, you're being put in a tough spot being

4  asked to deal with a matter potentially prematurely.  You're

5  being told a lot of things will happen if the DIP is not

6  approved today.  We, as a court officer, understand that as

7  well.

8    We understand that, as my friend says, we're not

9  the sole beneficiary of the entire sales process. But what

10  we're trying to do here is make sure we're not

11  disproportionately held responsible for it.

12    And from the debt structure that is already in

13  place, and we walked through that earlier when I had my

14  initial submissions, the debt structure that's already in

15  place, what people thought about Canada and looked to the

16  Canadian assets for including these noteholders and three

17  amendments, they weren't looking to Canada.

18    And --

19    THE COURT:  Well, they didn't give up Canada.

20  They didn't say don't be a borrower.  Don't be a guarantor.

21  They weren't letting Canada draw, but they weren't saying we

22  don't want you obligated to pay this debt.

23    MS. PILLON:  For the ABL, fair enough.

24    For the ABL, we were --  Rockport Canada was a

25  zero borrower and a guarantor.  For the notes, in terms of

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-RDD   Doc 1184   Filed 01/14/18   Page 237 of 309
Pg 155 of 309

137

1   what the notes' expectations and requirements and valuations

2   for them to now being saying it is critical for us to have

3   this as a term of our DIP on the last tranche of the money to

4   get us to the finish line of the closing is to no look to a

5   Canadian bunch of assets that we didn't look to before, three

6   amendments and a DIP.  And we didn't look to it before seems

7   like there's a little bit of extra focus on Canada that's not

8   necessary.

9           And we are trying to find a way to either leave

10  this issue to another day when this court has all of the

11  information before it with respect to proceeds.  I'm

12  realistic that you're being told the sky will fall if you

13  don't approve this today.

14          THE COURT:  But why do I need the information

15  about proceeds to make this allocation decision?

16          MS. PILLON:  I think it helps you look at whether

17  it's actually fair.  So, there's two issues.

18          On Exhibit 3, it was put to Mr. Kosturos on those

19  numbers, so they're either stripping out too much or they're

20  not willing to set a floor for the other creditors.  That's

21  the problem with the 18.4

22          So, on the Exhibit 3, if you have that in front of

23  you, the Canadian assets total collateral value is $11.4

24  million --

25          THE COURT:  Let me get that.

1          MS. PILLON:  Sure.

2          THE COURT:  I don't know what I just did with it,

3     but I. . .

4          UNIDENTIFIED SPEAKER:  We have an extra copy if

5     you --

6          THE COURT:  No, I got enough paper.  Here, we go.

7     On Exhibit 3, gotcha.

8          MS. PILLON:  So, on Exhibit 3 the Canadian

9     collateral was $11.4 million dollars.  If you approve the

10    allocation agreement my friends put to you and the DIP lender

11    says is necessary, you will be agreeing to $10.483 million

12    dollars' worth of debt coming out of Canada.

13         And, to be clear, the other priority payables that

14    we say the Canadian estate should first pay before any other

15    lender gets paid would be -- it's not -- everybody keeps

16    saying the charge.  It's actually priority payables.

17         It could be taxes.  It could be liens.  There's

18    some construction liens.  There's some debate about who else

19    would be in priority.  So, it's not just a $300,000-dollar

20    charge.  There could be others ahead.

21         So, the effect of this ABL allocation on their

22    numbers, you should just recognize that you maybe basically

23    signing over all of the Canadian assets to the noteholder on

24    their figures.

25         The other valuation --

18-23538-shl  Doc 9945  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 18-23145-FSS  Doc 284  Filed 01/14/18  Page 239 of 269
Pg 157 of 309

139

1          THE COURT:  It's a million dollars difference.

2          MS. PILLON:  Right.  Of which you've the charge.

3  You've got potentially some other priorities. And you have

4  the cost of running it down in Canada.

5          THE COURT:  And I have a $60 million-dollar ABL.

6          MS. PILLON:  Yes.

7          On the other side, other figures that we see,

8  including in their reports, which I have a reference for you,

9  but in their reports at paragraph 37, when I look at what do

10  I know about the Canadian assets, paragraph 37 of the

11  information officer's report, February 2018, there was $40.9

12  million Canadian assets and of which $24.3 million dollars of

13  inventory on the books.

14          Well, that seems to me like there could be a fair

15  bit left over for the Canadians.  And, so when we ask for

16  things like what do you know and what do you think will be

17  left for the Canadians and no one can just say don't worry.

18  We'll leave aside. We can earmark money for you.  Everything

19  will be fine.  Everybody says Canadians don't worry.  You

20  wait.

21          THE COURT:  Well, what's also interesting, though,

22  in that section of the report is that 90 percent of the -- if

23  my numbers right.  Ninety percent of the 40 point -- no, of

24  the $36.5 million dollars in liability is intercompany debt

25  to the American debtors.

1          MS. PILLON:  Right.

2          THE COURT:  To the debtors.  So, 90 percent of

3  Rockport Canadian's indebtedness is to the other debtors.

4          MS. PILLON:  Eighteen of which is based on what

5  we've heard is inventory related or supply related.  The rest

6  is with respect to a previous transaction.

7          THE COURT:  Okay.  But does that leave, at least

8  my math, that's about four million dollars in unrelated pre-

9  bankruptcy debt to non-affiliated entities.  About four

10  million of --

11          MS. PILLON:  Unsecured, yes.

12          THE COURT:  -- unsecured debt --

13          MS. PILLON:  Yes.

14          THE COURT:  -- to unaffiliated entities.

15          MS. PILLON:  Yes.  The validity of which is still

16  subject to debate, but yes.

17          THE COURT:  I guess the validity of all of that is

18  subject to debate.

19          MS. PILLON:  Yes.

20          THE COURT:  But is what I'm looking at here, at

21  least, based on what the information officer has been able to

22  review, and recognize it's unaudited, I'm sure, from his

23  standpoint, is a universe of four million dollars of

24  prepetition unsecured debt.

25          MS. PILLON:  Well, you don't have the ABL listed

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-23145-FSS Doc 11/26/184 Entered 11/26/18 Page 141 of 209
Pg 159 of 309

141

 1  in the balance sheet at all.

 2          THE COURT:  Putting the ABL aside.

 3          MS. PILLON:  That is our best guess on February

 4  2018 of which the intercompany, there may be a chunk of it

 5  which is subject to debate.

 6          THE COURT:  Okay.

 7          MS. PILLON:  Which, again, because we're dealing

 8  with it today, as you said, we've got an investigation

 9  period.  We've got to determine things.  Claims would put

10  forward.

11          But what that does, from the information officer's

12  point of view, is it either says this allocation takes

13  everything out of Canada or somebody can't admit that there's

14  a lot of money left or, potentially, a lot of money left for

15  Canada that we could then ringfence and protect our

16  creditors, in which case, we all walk over to the Canadian

17  court, hand-in-hand together, and say, yes, with this ability

18  and with these added protections, all right, we both get what

19  we want.

20          The noteholders get their ability to take 18.4

21  percent out.  The Canadian creditors have their own

22  ringfencing and its protected. And if there's something left

23  after that, then, you know, we'll be continuing. We'll go out

24  and sell the retail sales, the stores, and we will ringfence

25  for the rest.

18-23538-shl Doc 8944 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-23545-RSS Doc 8944 Filed 11/26/184 Entered 11/26/18 Page 242 of 309
Pg 160 of 309

142

1          Then, we know each side is getting something out

2     of Canadian, as opposed to take it out of Canadian for the

3     noteholders.  Canadians wait and see.

4          THE COURT:  So, you think the fairness that I need

5     to look at, Mr. Collins says this is fair, and that's what I

6     should be looking at.  How do we make a fair allocation?

7     Your argument is I can't make a fair allocation of the debt

8     if I don't know what's left for Canadian creditors?

9          MS. PILLON:  Or ringfence something for the

10    Canadians so that they know that they're being protected.

11    So, if nine million dollars comes out for the ABL and five

12    million dollars gets held for the Canadians, and then we can

13    all share it kumbaya in the future, so be it.

14          But, at least, then there is a carve-out.  And the

15    Canadian creditors don't need to worry about I'm only relying

16    on what the UCC might get in its GUC in the future.

17          THE COURT:  But hasn't the Canadian court in its

18    order, its supplemental order, it's already told us certain

19    things about the priority and charges of claims against the

20    Canadian entity.  First, there's an administrative charge to

21    the maximum amount of $300,000 dollars.  And, second, is the

22    DIP lender's charge to the maximum amount of $60 million

23    dollars.

24          So, at this moment, Canadian unsecured creditors

25    have nothing because it's all taken up by either the

18-23538-shl    Doc 0045    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-22145-FSS    Doc 184    Filed 01/14/18    Page 243 of 309
Pg 161 of 309

143

1  administrative charge or the DIP lender's charge. Or am I

2  wrong?

3          MS. PILLON:  Well, it's a charge, but how much is

4  actually come out to pay and satisfy that charge is subject

5  to further discussion.

6          The ABL needs to know that the entire $60 million

7  is there and covered, as it did, in the U.S. when it asked to

8  roll up its DIP. So, the charge is there.  And,

9  understandably, how much needs to be allocated to each estate

10  would normally be something that we deal at the end of the

11  piece when we know where all the proceeds are.

12          It's just that we're dealing with today

13  prematurely because of it's a new condition of the DIP.  But,

14  otherwise, it's not unusual to say, of course, I've got to

15  have a charge over everything in case I need it.  The

16  determination of the split would then be later on.

17          THE COURT:  What kind of hearing is the Canadian

18  Court going to have?  Let's just say, for sake of argument,

19  that I were -- we'll do both ways.

20          Let's say, first, for sake of argument, I were to

21  approve the allocation as requested.  What type of hearing

22  would the Canadian court have on this subsequently?

23          MS. PILLON:  They would look to us and, again, and

24  I think it would be basically just the objection that we'd

25  walk them through, just (indiscernible) through it, but they

18-23538-shl    Doc 8945-4    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 09-11445-CSS    Doc 884    Filed 11/26/18    Page 244 of 269
Pg 162 of 309

144

1  would look and ask what does this mean for the Canadian

2  creditors.

3          They have a tremendous amount of respect for this

4  court, obviously, and deal with it quite often and, so there

5  would be a high level of comity that would be paid.  But they

6  have, in the past, and I strong believe he will do it again

7  in this proceeding to determine what, even with that level of

8  comity, what does that mean still.  I've got my Canadian

9  creditors to also worry about.

10          THE COURT:  What kind of hearing would the

11  Canadian court have on an allocation of debt issue, even if

12  it were done further on at the proceeding or at the

13  conclusion of a proceeding?

14          MS. PILLON:  Normally, it would be done

15  consensually and it would need to.  But, otherwise, you could

16  go all the way from the information officer providing some

17  estimates, the debtor providing some estimates, all the way

18  to a three-week trial in Nortel on the allocation between

19  estates.

20          THE COURT:  Right.  So, I was thinking of Nortel

21  and not relishing any of that kind of thought.  But I just

22  had a couple of hour hearing where there's been evidence put

23  on as to proper allocation.  So, why shouldn't I accept that

24  evidence?  And, I guess, the question is, again, and maybe

25  you've answered it, what further do I need for due process or

18-23538-shl   Doc 8945   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23538-rdd   Doc 224   Filed 01/14/18   Pg 245 of 809
Pg 163 of 309

145

1   other purposes?

2            MS. PILLON:  I think it comes by way of

3   reservation of rights with respect to the future.  So, new

4   information come forward, should the issue with respect to

5   allocation of proceeds is a huge one.  The issue with respect

6   to allocation of cost is a huge one.

7            The Canadian estate could get out of here on

8   hundreds of thousands of dollars versus millions.  And, so the

9   proper determination of all of that is necessary for us to

10  continue to reserve.

11           I think that those determinations should be in

12  front of the courts as opposed to if we deal with them just

13  in a plan unless you want to carve-out the Canadian creditors

14  as their own class.

15           There may be a very unfortunate situation where

16  I'm just swamped in a class, right. And I don't really have

17  the full voice I want with respect to allocation of proceeds.

18  But if it comes back before the courts to determine that

19  issue, and I think we've already telegraphed to you that we

20  have some concerns with respect to how creative we can be in

21  terms of what eventually gets to Canadian.

22           If all the inventory, $24 million dollars of

23  inventory and accounts receivable -- well, forty million

24  dollars of assets somehow only become $10.1 million dollars

25  of proceeds allocated to Canada, I think the information

18-23538-shl    Doc 8045    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-22145-JSS    Doc 184    Entered 11/26/18 20:52:28    Page 246 of 309
Pg 164 of 309

146

1  officer is going to have something very loud to say about
2  that.

3        And the preference would be that it's being a
4  voice that can come to this court and to the Canadian court
5  as opposed to just being one provision of a larger plan.

6        THE COURT:  Well that seems to me an important
7  issue, but somewhat of an aside issue as to whether it would
8  be appropriate to resolve that issue, in what context it
9  would be appropriate to resolve that issue, which his sort of
10 what I'm asking here as well.

11       But, you know, the questions you're talking about
12 is would that be problematic for Canada to receive x amount
13 of proceeds based on y amount of inventory, I suppose depends
14 on what the other assets are and the magnitude and relative
15 scale of recoveries related to other issues.  Again, an issue
16 I don't have in front of me.

17       So, whether that's on an absolute scale a problem
18 or not, I don't know.

19       MS. PILLON:  Can I pass up a draft of some of the
20 terms that we had proposed to the debtors yesterday?  Because
21 this may be -- I appreciate the position you've been put in.
22 So, this may be an ability, a way to -- may I come?

23       THE COURT:  Yes.

24       MS. PILLON:  And Mr. Collins passed you up, or
25 someone did this morning -- pardon me.  I'm not going to give

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-23145-RDD Doc 11860-84 Filed 01/14/18 Page 247 of 309
Pg 165 of 309

147

1  it Mark.  I'm just going to hand it to the judge.  And,

2  surprise.

3            Someone handed up this morning the debtors'

4  version.

5            THE COURT:  Okay. That's what I was going to say.

6  What's the difference?

7            MS. PILLON:  Right.

8            THE COURT:  So, what I got earlier was a debtor

9  version?

10           MS. PILLON:  Right.

11           So, here's what we asked for and what we said.

12 Look, even if, at the end of the day, you're put in this

13 difficult position and you say I have to pick a number.  It's

14 $18.4, it's ten percent, whatever it is, how can you help

15 protect the Canadian creditors?

16           There's a couple of ways of doing that.  So, and

17 that's in paragraph 39 of our changes.

18           So, paragraph 39 the changes, first we asked for,

19 were to ensure that all priority payables, including the

20 charge, but all priority payables came off the top before the

21 allocation of any -- the ABL allocation.

22           Slightly different language over on the debtors'

23 version which would water that down a bit, but it should be

24 all priority payables.  There could be liens.  There could be

25 taxes.  Those need to come off the top.

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-22145-FSS Doc 184 Entered 11/26/18 Page 248 of 309
Pg 166 of 309

148

1          The number is specific.  It shouldn't be moving of

2     10.8, 10.48.  The condition before you in the interim order

3     of what the noteholders needed was the amount as at

4     prepetition. So, the numbers shouldn't be fluctuating.  If

5     they'd like to pay it down some, it can go down, but it

6     shouldn't, in any way, be going up.

7          With respect to every dollar that ends up being --

8     the Canadian estate pays down the ABL, and I think Mr.

9     Kosturos in his testimony agreed with this flow of funds.

10    For every dollar that comes out of the Canadian estate, the

11    intercompany should be reduced accordingly.  It should be

12    reduced by the economic value of that.

13          It could be dollar for dollar.  It could be more.

14    But that's how we framed it as on an economic value.  And

15    that only makes sense because it flowed in by intercompany.

16    It's getting paid.  The ABL goes down, so does the

17    intercompany.

18          And that helps the Canadian creditors because then

19    if I have ten million dollars at the end of the day, I'm

20    sharing it with less people because the intercompany,

21    rightfully so, have been reduced.

22          The other mechanism of protecting the Canadians

23    would be to have its own allocations so a reserve with

24    respect to the Canadian creditors.  So, set aside so that we

25    have, at least, a ringfencing.  So, basically, first, or we

1  set aside the liquidation proceeds for the retail sales, some

2  other pool of cash that we know no matter what happens before

3  the 18.4 gets paid, at least, I have something that I can

4  turn to the Canadian court and the Canadian creditors and say

5  something is reserved for you as well.

6       And the final part is paragraph 51 of the

7  blackline, Your Honor.  These are the reservation of rights

8  that we believe are appropriate and will keep this in check

9  in the future.  And that includes allocation of proceeds of

10 the sale, allocation of the costs, and both of those should

11 come back before the courts.  Any claims that the Canadian

12 estate has by way of right of subrogation.

13      So, if, at the end of the day, I, Canadian estate,

14 have to pay down the ABL, presumably, I'm paying it down qua

15 guarantor, since I had a zero borrowing; if I then pay down

16 the ABL, there may be an argument with respect to rights of

17 subrogation.  I step into the ABL shoes into the U.S. Estate.

18      That issue is not completely briefed before you.

19 It was actually an issue that was raised as a reservation of

20 rights in our objection.  The U.S. debtor then filed some

21 materials, 24-hours before the hearing, and is now, based on

22 their version of the order that they've put before you,

23 suggesting the rights of subrogation issue are, in fact, off

24 the table.  So, if you approve the 18.4, the rights of

25 subrogation are off the table.  That goes to your question,

1  throughout the day, of what am I doing if I agree to 18.4.

2          But doesn't the right to subrogation undercut the

3  relief that's being requested?

4          MS. PILLON:  No, but it keeps people honest later.

5  So, if --

6          THE COURT:  How does it not undercut it?

7          MS. PILLON:  Well, they originally -- if they are

8  confident that the rights of subrogation don't apply, but I

9  am giving them what they want on the 18.4 in this case.  What

10 did they ask for? What was a condition of their notes of the

11 DIP?  It was the ability to force the Canadians to pay.

12         Okay.  I'm paying, but what does that eventually

13 mean.  It could eventually mean that I'm stepping into the

14 shoes of the ABL.  I don't know. That's not an issue that is

15 entirely briefed and before you.  So, at least, it should be

16 a reservation of rights.

17         The change in the debtors' version of the order to

18 suggest that that now is completely off the table scares me.

19 That should be left for another day, and I think that does

20 have a way of keeping people considering what is the

21 potential claim back with the Canadians over.

22         And, finally, just in terms of having --

23         THE COURT:  Would it --

24         MS. PILLON:  Pardon me.

25         THE COURT:  Would it come back as a -- it would

18-23538-shl   Doc 8045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FSS   Doc 184   Filed 01/14/18   Page 251 of 269
Pg 169 of 309

151

1   come back as a prior claim, a prior secured claim?

2            MS. PILLON:  Yes.

3            THE COURT:  You're stepping into the shoes of the

4   ABL.  It would come back as a prior secured claim.  So, how

5   does that give the noteholders what they are looking for in

6   terms of some certainty about how much debt has to be paid

7   off ahead of them and/or from the U.S. assets?

8            MS. PILLON:  Well, I don't know that they fully

9   required it as a condition of the DIP that the right of

10  subrogation was off the table.  That was not made known in

11  the papers that were before us and notified on.  So, that

12  issue -- if the U.S. debtors and the noteholders believe they

13  have the winning argument, then so be it.  But I think there

14  is a future argument to be had with respect to the rights of

15  subrogation.

16           And those fulsome reservation of rights as opposed

17  to the version that you have from the U.S. debtor then, at

18  least, leaves us in a position of I'll be back to discuss,

19  and I hope we can discuss altogether the allocation of

20  proceeds, the fair allocation and a fair allocation of costs.

21  And maybe that means, at the end of the day, we're no worse

22  for wear in Canada.  And, if not, then we have an opportunity

23  to come back and you will have heard my concerns already with

24  respect to what step two in this may be.

25           THE COURT:  Okay.

1    MS. PILLON:  Thank you.  Unless you have any

2  questions.

3    THE COURT:  Thank you.

4    MS. CHI TO:  Your Honor, My Chi To for Debevoise &

5  Plimpton and the noteholders, for the record.

6    So, to be clear, an order that would include the

7  reservation of rights that were just described would not

8  satisfy the requirements of the noteholders, as I believe

9  your last questions indicated.

10    THE COURT:  Well that specifically dealt with the

11  subrogation issue.

12    MS. CHI TO:  Yes.

13    THE COURT:  But what about the other reservations?

14  Why does the --

15    MS. CHI TO:  The others were fine, yes.  I'm

16  sorry.  The last one.  I think the subrogation reservation of

17  rights is just a backdoor way of undoing the agreement we are

18  looking for and, as you put it, the comfort we are looking

19  for that there is a minimum, a fair amount of proceeds coming

20  out of Canada to satisfy the ABL debtor.

21    THE COURT:  But it's not a minimum, right?

22    MS. CHI TO:  Yes.

23    THE COURT:  It's a finite number that comes out,

24  that gets used in a certain fashion, right, which pays the

25  priorities and then pays the ABL?

18-23538-shl    Doc 8945    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-23145-rss    Doc 184    Filed 11/26/18    Page 153 of 209
Pg 171 of 309

153

1          MS. CHI TO:  In fact, I should have said the 18.4

2    operates more like a cap in terms of the maximum amount that

3    the ABL could look to Canada to repay itself.  So, I wanted

4    to clarify that.

5          Also, maybe going back in history.  The comments

6    that were made a moment ago about the noteholders' sudden

7    interest in the Canadian assets.

8          We are in front of you today in connection with

9    the DIP that is provided by the noteholders.  It's a new

10   credit decision that is made by them or decision to extend

11   money.  It's obviously based on the impact of that DIP and

12   the process on their existing investment.  If we were not

13   prepetition creditors, we would not be providing the DIP, to

14   be sure.

15         Our starting point was that all the value in

16   Canada should go to pay down the ABL, because the ABL has a

17   first lien on all of those assets.  And, in fact, I believe

18   Stikeman has reviewed the validity of the ABL lien and has

19   concluded that it's enforceable and valid under Canadian law.

20   So, that was our starting point.  But debtors' counsel

21   quickly told us we can't do that because that's not fair.

22   And, so that was actually this allocation request is the

23   result of a negotiation.

24         And, so we said we understand the full amount of

25   liability of the Canadian debtor is sixty million, or

18-23538-shl Doc 8945 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 16-11445-CSS Doc 1466-1 Filed 11/26/18 Page 254 of 309
Pg 172 of 309

154

1    whatever that is, but we understand that's not a fair result.

2    But we still want comfort that there will be some amount, a

3    fair amount, that ends up being paid or borne by the Canadian

4    assets estates, and so that's the history of this negotiated

5    point which has, as I said earlier, I'm repeating myself, but

6    has a very meaningful economic impact on the noteholders,

7    which is why we are, you know, repeating our request that it

8    be approved by the court as a condition to any further

9    borrowings under the DIP.

10            THE COURT:  And what do you think the standard is

11   and I'm supposed to use in taking a look at this issue?

12            MS. CHI TO:  I agree with what Mr. Collins said

13   earlier.  Thank you.

14            THE COURT:  Thank you.

15            Mr. Collins.

16            MR. COLLINS:  Very briefly, Your Honor.

17            The point of contention that we've had with the

18   information officers is one that is unresolvable in this way.

19            They're looking for a charge for unsecured

20   creditors as part of this allocation. They want an absolute

21   recovery to unsecured creditors in Canadian, regardless of

22   whatever the ultimate outcome is on the allocation of

23   proceeds.  We think it's inappropriate and, likely, takes the

24   Bankruptcy Code upside down, to some extent, to say in order

25   to determine an amount of a secured claim, you first must set

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-23538-rdd   Doc 184   Filed 01/26/18   Page 155 of 309
Pg 173 of 309

155

1  aside monies for unsecured creditors.

2          THE COURT:  Didn't the committee get that?

3          MR. COLLINS:  Your Honor, what the committee

4  negotiated was, I think, a fairly standard case resolution.

5          THE COURT:  But isn't that what that is?  I mean

6  it has become maybe standard.  I don't know if it should be

7  or it shouldn't be or it's appropriate or it's not, but we

8  certainly do see it.

9          MR. COLLINS:  We certainly do it and let's

10 remember that the Canadian creditors are part of that trust.

11         THE COURT:  Yeah, I'm still a little --

12         MR. COLLINS:  And it only goes up from there.

13         THE COURT:  Still giving that thought.

14         MR. COLLINS:  And, like anything, there's

15 reasonableness in the dynamics of negotiations over, over

16 those issues, right.

17         THE COURT:  But in this very context, in this very

18 context, in fact, the debtor, with imperfect information,

19 incomplete information, determined, and the committee

20 determined and the debtor is supporting, I assume, that there

21 should be a carve-out for unsecured creditors.  How is this

22 different?

23         MR. COLLINS:  It's different in that the items

24 that were part of that agreement were to resolve disputes, to

25 create efficiencies within the case.  The note debt is on top

1    of the unsecured creditors, so we'd look at it as they are

2    out of the money unsecured creditors.  And this is a way to

3    allow them to participate.

4              That book has not been written with respect to the

5    Canadian entity.  In fact, it's very possible that there are

6    sums of monies above the amount of this allocated debt

7    allocation for unsecured creditors of Canada.  And there will

8    be a negotiation at an appropriate point in time if they are

9    not.

10             THE COURT:  Am I in approving or maybe in not

11   approving this, am I changing the leverage?  Is that all this

12   is?

13             MR. COLLINS:  No, because I think the leverage

14   that the IO has is to argue that any allocation of sale

15   proceeds that leaves unsecured creditors in Canada without

16   any money is an unfair allocation, and they will oppose any

17   allocation in front of the Canadian court, and their

18   allocation will be result oriented to drive a recovery.  And

19   their likely will be a negotiations part of that.

20             THE COURT:  What happens if I approve this and you

21   go to the Canadian court and the Canadian court says, sorry,

22   Judge Silverstein got it wrong.  I'm not going to recognize

23   this.  Then what happens?

24             MR. COLLINS:  Then we would talk to the lenders.

25   I think we would have problems because it's a condition under

1   both credit facilities that we obtain both a final order from

2   Your Honor and have that order recognized by the court in

3   Canada.

4   I think the process that we have engaged upon here

5   was one that was designed to put a full record before this

6   court. I think that will give Justice McKeown comfort in

7   reviewing the proceedings here. Ultimately, he will make his

8   own decision as to whether or not he believed this unfairly

9   impairs unsecured creditors in Canada based upon the record

10  that you have before you. I don't believe it does.

11  With respect to the subrogation issues, Your

12  Honor, we do think that would simply would be a collateral

13  attack. We note in our brief that 509, I think, (b)(2),

14  there are no subrogation rights when you are, each entity is

15  primarily liable on the debt. By having one pay the other

16  those considerations, so you don't have subrogation rights.

17  We put that in our document.

18  THE COURT: Yeah, that's not my strongest topic,

19  so I'm not so up on subrogation.

20  MR. COLLINS: But the other part of the

21  subrogation argument is we don't want to -- the point of this

22  is that we believe this is a fair and equitable allocation.

23  This, to me, is more, if it's not a subrogation issue, it

24  would be can they come back and seek additional contribution

25  later if they just think it's unfair. And I think that's

18-23538-shl   Doc 8045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FSS   Doc 194   Filed 11/26/18   Page 158 of 209
Pg 176 of 309

158

1   what we're doing here today.  This is the point of this is to

2   set this allocation, give some certainty to the lenders as to

3   how we are going to deal with this jointly and obligated

4   senior secured ABL debt.

5           So, for that reason, we would not agree on that

6   language. We certainly agree on reserving a cost allocation

7   and a sale proceeds allocation.

8           On the dollar-for-dollar issue if, and I'm

9   speaking out of turn here, but if this is what it takes for

10  us to get past this, I would like to have a short break to

11  speak to my client about that.

12          You heard Mr. Kosturos' testimony.  The

13  intercompany claim is built upon the transfer of inventory.

14  And we have certainly talked, on our side, about should we

15  just do that now or should that just be part of a later

16  process, and I'm happy to have that conversation if that

17  moves the ball in any way on this issue.

18          THE COURT:  Well, I think you should turn to Ms.

19  Pillon and see if it moves the ball, but this whole hearing

20  is sort of an unusual posture where I feel like I'm sort of

21  part of a negotiation.

22          MR. COLLINS:  No, and I apologize.

23          THE COURT:  I'm not, I'm not wanting to be part

24  of.

25          MR. COLLINS:  And I understand that.  It's just

1  that she mentioned these asks that she wanted and I want to

2  respond to the ask, if it helps. And I understand it's

3  inappropriately negotiated at the podium, although we

4  probably do it way too often as bankruptcy lawyers.

5          THE COURT: I think it was appropriate, quite

6  frankly, to cede the back and forth, in this sense, that in a

7  more traditional DIP hearing, the court certainly takes a

8  look at whether the asks are appropriate and reasonable by

9  the lender, and then can say yes or no, or, you know, here's

10  how I would -- here's something I would approve. And then,

11  of course, it's up to the lender to decide what the lender is

12  doing. But I think from that standpoint, it's helpful to

13  understand what could make the debtors' request more

14  reasonable or more fair.

15          MR. COLLINS: We agree.

16          THE COURT: Okay. Well, I hear the request and

17  the testimony that there be a decision today, but there's not

18  going to be. It's quarter to five. I think this is a very

19  important issue for this case. I need to give it some

20  thought. And I have first days tomorrow in a new case, and I

21  haven't read the page. As I said, I want to give this some

22  thought.

23          I will rule from the bench. And I will either do

24  it tomorrow or Friday. My understanding of the testimony is

25  that there is money currently. We're not in a money tight

18-23538-shl Doc 0045 Filed 11/26/184 Entered 11/26/18 20:52:28 Main Document
Case 18-23745-rss 1 Doc 284 Entered 01/26/18 Page 260 of 309
Pg 178 of 309

160

1   situation that there's not going to be a draw next week.  So,

2   I understand the condition and maybe there's a milestone in

3   the DIP, but I'm not going to rule on this today.  I'm not in

4   a position to rule on this today.  I want to give some very

5   considered thoughts to this, I will say, unusual request in

6   the context of a DIP motion, although, clearly, the issue

7   will have to be decided at some point in time in this case.

8           Yes.

9           MS. KEILSON:  Good afternoon, Your Honor, Brya

10  Keilson on behalf of the United States Trustee.

11          THE COURT:  Yes.

12          MS. KEILSON:  As I think you might have hinted on

13  a little bit, today is the first time that we've heard about

14  the settlement with the creditors committee.  It raises our

15  intent a little bit in terms of potential issues with regard

16  to the GUC trust and being rolled into the DIP order.

17          The parties have agreed to provide us with a copy

18  of the updated order before submitting it to Your Honor. To

19  the extent there are any issues that are raised, from our

20  perspective, we reserve the right to ask to consult with the

21  court in a conference if we're not able to resolve it with

22  the other parties.

23          THE COURT:  Okay.

24          MS. KEILSON:  Thank you.

25          THE COURT:  Yes.

18-23538-shl Doc 0045 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 18-23145-LSS Doc 184 Entered 11/26/18 Page 261 of 309
Pg 179 of 309

161

1    MR. O'NEILL:  Excuse me, Your Honor.  May I have

2  just a minute with Mr. Collins.  Thank you.

3    MR. SCHLAUCH:  Good afternoon, Your Honor.  For

4  the record Brendan Schlauch, Richards Layton & Finger on

5  behalf of the debtors.

6    We have a couple of other items remaining on the

7  agenda today.  Sorry.

8    (Laughter)

9    MR. SCHLAUCH:  Hopefully, they will be less

10  interesting and controversial.

11    The first one is its item number 21 on the agenda.

12  It is Houlihan Lokey's retention application.  I have a clean

13  and blackline, if I may approach.

14    THE COURT:  Yes.

15    MR. SCHLAUCH:  So, Your Honor, as discussed

16  earlier this morning, the committee, I guess, the debtors did

17  receive informal comments from the United States Trustee, and

18  the committee filed a limited objection to Houlihan's

19  retention.

20    The settlement with the committee, which will be

21  embodied in the DIP order is -- they withdraw that rejection.

22  As a result, this is an uncontested item.  I can walk Your

23  Honor through the blackline.  The UST has signed off on this

24  form of order.  These changes were just things that the UST

25  requested, some clarifying comments and, you know, Houlihan

1  did sign off on it.

2          THE COURT:  I did not look at this.  I didn't get

3  to it.  Can you give me the highlights of what the

4  commentation structure is?

5          MR. SCHLAUCH:  Sure.  So, Houlihan will receive a

6  -- or the sale -- excuse me.  Their engagement letter

7  incorporates a sale transaction fee that incorporates

8  escalators incentivizing Houlihan's maximization value for

9  the estates.  That's pretty common in most investment banking

10  engagement letters.

11          If certain aggregate thresholds are met

12  incremental fees can be earned.  I understand that Houlihan

13  Lokey will earn for aggregate gross consideration of up to

14  $150 million dollars.  It will be a fee of $1.7 million

15  dollars, so that's sort of the floor.

16          If the aggregate gross consideration is between

17  $150 and $170 million dollars, then it will be $1.7 million,

18  plus a three percent on that incremental increase.

19          And then it continues to sort of ramp up from

20  there; a 170 to 200 would be a four percent incremental

21  increase.  And anything above two hundred million, excuse me,

22  will be a five percent of the aggregate gross consideration.

23          THE COURT:  Okay.  And is there a monthly and is

24  there any crediting?

25          MR. SCHLAUCH:  Just checking the application.

18-23538-shl Doc 8045 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 18-22145-FSS Doc 8045 Filed 11/26/18 Entered 11/26/18 20:52:28 Page 163 of 209 Document
Pg 181 of 309

163

 1            THE COURT:  What docket item are we are, anybody
 2  know?

 3            MR. SCHLAUCH:  This is docket item 105.  This is
 4  the application.

 5            THE COURT:  I'm sorry.  Which tab number are we
 6  on?

 7            MR. SCHLAUCH:  Oh, it's item number 21.  Sorry, I
 8  know there are many volumes.

 9            Yes, there is a monthly fee structure of $125,000
10  dollars per month.  And there are other fees, restructuring
11  transaction fee, financing transaction fee, other amounts
12  owed during a termination tail fee.  And those are all set
13  forth on pages 7 through 9 of Houlihan's retention
14  application.

15            Unless Your Honor has any questions or concerns,
16  we respectfully request the order be entered.

17            THE COURT:  Okay.  And what was the resolution of
18  whatever objections were filed?

19            MR. SCHLAUCH:  Yes.

20       (Participants conferring)

21            MR. SCHLAUCH:  I'm sorry, Your Honor.  Counsel for
22  committee caught my ear and I didn't hear your question.   To
23  walk through the --

24            THE COURT:  I asked what the resolution of
25  outstanding issues were.

18-23538-shl   Doc 0045   Filed 11/26/184   Entered 11/26/18 20:52:28   Main Document
Case 18-23538-rss   Doc 0045   Filed 11/26/184   Entered 11/26/18 20:52:28   Main Document
Pg 182 of 309

164

 1          MR. SCHLAUCH:  Yes.  I apologize, Your Honor.  I

 2   misplaced my blackline.

 3          The UST had asked for some clarifying language in

 4   paragraph 4 and 5, which Houlihan was comfortable accepting.

 5   There was some additional changes to the United Artist

 6   language that the UST requested. That is in paragraph 7(b) of

 7   the order.

 8          And then in paragraph 10 and 11, these are new

 9   paragraphs.  Paragraph 10 is related to Asarco, so that is --

10   they're not going to get fees on fees for defending their fee

11   applications.

12          THE COURT:  Okay.

13          MR. SCHLAUCH:  And 11 has to deal with if the case

14   were to convert that the Chapter 7 trustee would not be bound

15   to sort of payment of certain fees by Houlihan Lokey.

16          THE COURT:  Okay.  Anyone wish to be heard with

17   respect to Houlihan Lokey's application?

18          MR. INDYKE:  Your Honor, Jay Indyke for the

19   committee again.

20          As part of the terms of the settlement that we

21   reached on the financing, as I stated this morning, our

22   withdrawal of, our limited objection to the Houlihan

23   retention was part of that term sheet; however, Your Honor,

24   hasn't proved that yet.  So, we will withdraw our objection

25   and are fine with the order as long as the financing order

 1   with our terms is approved.

 2              THE COURT:  Okay.

 3              MR. INDYKE:  Thank you.

 4              THE COURT:  Okay.  So, I'll hold this and it will

 5   give me a chance to review it as well.

 6              MR. SCHLAUCH:  Thank you, Your Honor.

 7              THE COURT:  But my understanding then is that

 8   assuming the financing is approved, then there are no

 9   objections?

10              MR. SCHLAUCH:  Your Honor, we do have some more

11   housekeeping items today.  We have the debtors' order

12   granting leave to file the late reply, and I know the notes

13   also have a similar motion or order, excuse me.  I have the

14   form of the debtors' order I can hand up.

15              So, unless Your Honor has any questions, ask you

16   to enter the order.

17              THE COURT:  And that's signed.

18              MR. SCHLAUCH:  Thank you, Your Honor.  And I

19   believe the committee has one item as well.

20              THE COURT:  That's good.

21              MS. GOOD:  Good afternoon, Your Honor, Katie Good

22   on behalf of the committee.  We do have one item on the

23   agenda, number 19, which was our motion to file under seal

24   our objection to the DIP.

25              The objections are due at the hearing today.  We

1    did receive informal comments from the office of the United

2    States Trustee.  And after discussions with the U.S. Trustee

3    and with the debtors, I'm able to report that we can file a

4    revised redacted version.  It removes certain of the

5    redactions, and I can hand up a copy to Your Honor that is

6    tabbed in highlights in an unredacted form what we will file,

7    what redactions have been removed essentially.

8            THE COURT:  Okay.  So, this is now agreed?

9            MS. GOOD:  Yes.  And we will file that after the

10   hearing today as objections were due at the hearing.  We

11   didn't file the revised redacted version in advance. That as

12   soon as this hearing is over and, assuming there are no other

13   objections from any parties, we will file this revised

14   redacted version.

15           THE COURT:  Okay.  So, the highlighting is what's

16   going to now --

17           MS. GOOD:  Be on the docket.

18           THE COURT:  -- be on the docket.  Okay.

19           Does anyone wish to be heard with respect to the

20   committee's motion?

21       (No verbal motion)

22           THE COURT:  I hear no one.  I will sign the order.

23           MS. GOOD:  May I approach?

24           THE COURT:  Yes.

25           MS. GOOD:  Thank you, Your Honor.

18-23538-shl   Doc 0045   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FGS   Doc 0184   Filed 11/26/18   Page 267 of 309
Pg 185 of 309

167

1          MR. ROBINSON:  Your Honor.

2          THE COURT:  Mr. Robinson.

3          MR. ROBINSON:  Colin Robinson, Pachulski Stang

4   Ziehl & Jones on behalf of the noteholders.

5          Your Honor, as debtors' counsel indicated, we

6   filed a leave to file a reply.  I don't have a proposed order

7   with me.  I don't believe there are any objections, Your

8   Honor, unless Your Honor has one.  We'll submit a certificate

9   --

10          THE COURT:  Do I have to do that?

11      (Laughter)

12          THE COURT:  Can I retroactively --

13          MR. ROBINSON:  I'll submit a certificate of --

14          THE COURT:  -- deny all of those.

15          MR. ROBINSON:  -- certificate of no objection, Your

16   Honor, and we'll send over the order.

17          THE COURT:  That's fine.

18          MR. ROBINSON:  Thanks, Your Honor.

19          THE COURT:  Anything else?

20      (No verbal response)

21          THE COURT:  Okay.  I will have Ms. Johnson reach

22   out to let parties know when I'm going to rule.

23          MR. COLLINS:  Your Honor, would that be a

24   telephonic hearing or would you like local counsel, at least,

25   to be in court?

18-23538-shl   Doc 0004-5   Filed 11/26/184   Entered 11/26/18 20:52:28   Main Document
Case 18-22145-FSS   Doc 2434   Filed 11/14/18   Page 186 of 309
Pg 186 of 309

168

1           THE COURT:  It might be helpful to have local

2    people here, if you can be here.  If you can't, I understand

3    that because it's going to be on tight notice.  And I do need

4    to check with Mrs. Johnson.  And, certainly, people from out

5    of town can be on the phone.  But I'll have her reach out and

6    let parties know what's going to work.

7           This is Wednesday, isn't it?

8           UNIDENTIFIED SPEAKER:  Yes.

9           THE COURT:  Okay.

10          MR. COLLINS:  Okay.

11          THE COURT:  I don't anticipate it tomorrow, just

12   looking at my schedule.  But I'll have her reach out.

13          MR. COLLINS:  Thank you, Your Honor.  Thank you

14   for all your time today.

15          THE COURT:  Thank you.

16          We're adjourned.

17      (Proceedings conclude at 4:54 p.m.)

18

19

20

21                         CERTIFICATE

22

23   I certify that the foregoing is a correct transcript from the

24   electronic sound recording of the proceedings in the above-

25   entitled matter.

```
 1    /s/Mary Zajaczkowski                    June 14, 2018
 2    Mary Zajaczkowski, CET**D-531

 3    /s/William J. Garling                   June 14, 2018
 4    William J. Garling, CE/T 543

 5    /s/ Coleen Rand                         June 14, 2018
 6    Coleen Rand

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                          )  Case No. 15-10541 (BLS)
                                     )  Chapter 11
 4   THE STANDARD REGISTER COMPANY,  )
     INC., et al.,                   )
 5                                   )
                      Debtors.       )  Courtroom No. 1
 6                                   )  824 Market Street
                                     )  Wilmington, Delaware 19801
 7                                   )
                                     )  April 13, 2015
 8                                   )  10:00 A.M.

 9                      TRANSCRIPT OF HEARING
            BEFORE HONORABLE BRENDAN L. SHANNON
10              UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtors:          Young Conaway Stargatt & Taylor, LLP
13                             By:  MICHAEL NESTOR, ESQUIRE
                               1000 North King Street
14                             Wilmington, Delaware 19801

15                             Gibson, Dunn & Crutcher LLP
                               By:  MICHAEL ROSENTHAL, ESQUIRE
16                                  BRIAN LUTZ, ESQUIRE
                                    JEREMY GRAVES, EQUIRE
17                                  SAMUEL NEWMAN
                               333 South Grand Avenue
18                             Los Angeles, California 90071

19   ECRO:                     DANA MOORE

20   Transcription Service:    Reliable
                               1007 N. Orange Street
21                             Wilmington, Delaware 19801
                               Telephone:  (302) 654-8080
22                             E-Mail:  gmatthews@reliable-co.com

23
     Proceedings recorded by electronic sound recording:
24   transcript produced by transcription service.

25
</pre>

```
 1  For Silver Point:        Skadden Arps Slate Meagher & Flom
                             By:  RON MEISLER, ESQUIRE
 2                           155 North Wacker Drive
                             Chicago, Illinois 60606
 3
    For the Committee:       Lowenstein Sandler
 4                           By:  SHARON LEVINE, ESQUIRE
                                  ANDREW BELLMANN, ESQUIRE
 5                           65 Livingston Avenue & 6 Becker
                             Farm Road
 6                           Roseland, New Jersey 07068

 7  For U.S. Trustee:        Office of United States Trustee
                             By:  MARK KENNEY, ESQUIRE
 8                           844 King Street
                             Wilmington, Delaware 19801
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

18-23538-shl Doc 804 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 1:18-cv-11541-RLS Document 1-11 Filed 04/20/18 Page 3 of 122
Pg 190 of 309

3

1                              INDEX

2                                                               Page

3   NOTICE OF AGENDA MATTERS:
    For the Debtors, by Mr. Rosenthal                          4
4   For Creditors Committee, by Ms. Levine                    14
    For U.S. Trustee, by Mr. Kenney                           26
5   For the Debtors, by Mr. Lutz                              36
    For the Creditors Committee, by Mr. Bellmann              42
6   For Silverpoint, by Mr. Meisler                           93
    For the Debtors, by Mr. Graves                           110
7   For the Debtors, by Mr. Newman                           114

8                                                          Further
    WITNESS FOR THE        Direct Cross Redirect Recross Redirect
9   DEBTORS:
    Andrew Torgove           38     39

10                                                         Further
11  WITNESS FOR THE        Direct Cross Redirect Recross Redirect
    COMMITTEE:
12  David MacGreevey         48     57     61       62       63
    Leon Szlezinger                 68     77       78

13
    EXHIBITS:
14  Torgove & Carmody Affidavits                             38
    DIP Amendment

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Good morning.  Mr.

3   Rosenthal.

4          MR. ROSENTHAL:  These are always too high for me,

5   Your Honor.  I need to get taller.  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. ROSENTHAL:  Michael Rosenthal on behalf of the

8   Debtors.  I'm from Gibson Dunn & Crutcher.  And in the

9   Courtroom with me today since this is the first time that

10  some of the officers have appeared, it is Kevin Carmody from

11  McKinsey who is the Debtors' chief restructuring officer.

12         THE COURT:  Welcome.

13         MR. ROSENTHAL:  And Andrew Torgove of Lazard who is

14  the Debtors' chief investment banker.

15         THE COURT:  Welcome.

16         MR. ROSENTHAL:  Also with me are my colleagues Brian

17  Lutz, Jeremy Graves and Sam Newman.

18         THE COURT:  Very good.

19         MR. ROSENTHAL:  We have a full docket this morning,

20  Your Honor, so we appreciate your time.  As an overview, I'd

21  like to make a recommendation about how to handle the

22  hearing.  We'd like to take up the most contentious issues

23  first, the sale and financing issues.  And we'd like to take

24  them up at the same time because we think that there will be

25  the same witnesses on these.

1          THE COURT:  A lot of the points travel together.

2          MR. ROSENTHAL:  Correct.  Then after we are

3    completed, have completed the sale and DIP hearings and we'll

4    present a few final orders on first day motions and finally

5    some argument on lift stay motion.

6          There have been a number of CNO's filed.

7          THE COURT:  I think that I've signed all the orders

8    that relate to the CNO's and they should be on the docket or

9    they should be headed for the docket this morning.  If

10   they're not there today then give me a call.  But I don't

11   have any issues with the matters that were presented under

12   CNO.

13         MR. ROSENTHAL:  Right; thank you, Your Honor.

14   Returning to the sale of financing issues let me give you a

15   little background and then I'm going to turn it over to my

16   partner Mr. Lutz to introduce some evidence.

17         As you know, the Debtors engaged Lazard, McKinsey

18   and Gibson Dunn to evaluate their restructuring alternatives

19   prior to the filing.  They determined they didn't have

20   sufficient financial wherewithal to effectuate an internal

21   reorganization even if they could manage to accomplish a debt

22   to equity conversion or trying to use the cram down

23   provisions of Chapter 11.  They were simply going to run out

24   of cash and couldn't pay the PBGC the annual amounts due

25   them.

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 15-10541-BLS   Doc 811   Filed 11/26/18   Page 6 of 122
Pg 193 of 309

6

1          So they engaged in a targeted or an extensive pre-

2    filing marketing and diligence effort.  Now when we were the

3    first time I appeared before you, the Court observed that you

4    didn't think that there had been much marketing done.  I

5    think the declarations will show Your Honor that there was a

6    pretty extensive effort.  It was targeted.  And it was

7    targeted to what the Debtors thought was the most likely

8    buyer and we got near deal right to the break and we didn't

9    get a deal.

10         When that buyer fell through the Debtors began in

11   earnest completing negotiations with Silver Point because

12   they concluded that it would be incredibly destabilizing to a

13   business to enter Chapter 11 in a free fall.  They needed to

14   give their customers and their vendors and their employees

15   the comfort of knowing that there was an exit from this case

16   and it wasn't going to languish forever and ever.  That's one

17   of the reasons, Your Honor, that the Debtors negotiated not

18   just the stalking horse APA but an amply sized debtor-in-

19   possession financing.

20         There has been some discussion in the papers the

21   Court will know about how perhaps this financing is

22   oversized.  I suggest to the Court it is definitely not

23   oversized.  It was sized based on a worst case situation that

24   vendors would put the Debtor on COD.  The fact that we could

25   headline to the vendors and the customers that we had ample

1   financing during the case is actually what I think has led;

2   at least, in the early phases of the case to a reduced use of

3   cash.  But we expect a lot of that to be taken up as we make

4   the critical vendor payments that the Court has already

5   approved.

6        Both of these items gave a lot of comfort, we think,

7   to the customers and our vendors.  And that's why we've been

8   able, for the most part, to keep our business stabilized.

9   Everyone has an expectation that this June auction will occur

10  on time.  Your Honor, just a little bit about each of the DIP

11  and sale motion.

12       On the DIP, I think the declarations and the memos

13  demonstrate we need financing to continue operations.  And

14  the reality is that the DIP lenders at the table here are the

15  only game in town.  Do we have the most ideal DIP that's ever

16  been negotiated by a Debtor?  No.  Do we have the most ideal

17  terms?  Could we have, would we have been happy with

18  additional concessions?  Absolutely.  But we didn't have that

19  option.

20       What we had was one party at the table.  We

21  approached pre-filing, six or seven lenders about whether

22  they would be willing to extend debtor-in-possession

23  financing.  No lender was willing to be a party to a priming

24  fight.  And no lender was willing to extend financing behind

25  $315 million dollars of debt.

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 1:18-cv-10541-RJS   Document 1   Filed 04/20/18   Page 8 of 122
Pg 195 of 309

8

1        So we did what Debtors in our situation always do.

2    They negotiate as hard as they can with as much leverage as

3    they have, which sometimes isn't much, and you arrive at the

4    best deal that you can.  And our best deal in this case

5    included not just the financing package, but which was a

6    bridge, but it was a bridge to an exit which is the stalking

7    horse APA.

8        With respect to the sale process, we think the

9    issues are very straightforward there as well.  We have a

10   stalking horse bid.  Again, it was the only party that we

11   were able to bring to the table before we filed.  The bid is

12   for approximately $273 million dollars when you take into

13   consideration cash, assumption of liabilities, and credit bid

14   rights.

15       And, again, if we had been able to get there with

16   someone else, perhaps we would have been standing before you

17   with a third party buyer instead of the secured lenders as

18   the buyer.  But we were unable to do that.  So there have

19   been two basic objections that have been raised.  One is the

20   timeline and the second is that the business would be, that a

21   longer sale process is in the best interest.

22       We propose a 90 day timeline, Your Honor, because we

23   think that's more than adequate.  Our investment banker at

24   Lazard believes that 90 days is more than enough time to

25   conduct a robust auction; particularly given that we started

18-23538-shl Doc 804 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 1:18-cv-11541-RJS Document 11 Filed 04/20/18 Page 9 of 122
Pg 196 of 309

9

1  this process before filing.  We have a complete data room.

2  We have we think already in the data room and signed NDA's

3  with the most likely candidates.  The Jeffries gave us a few

4  additional names.  The Lazard team is tracking that down.

5        In fact, Your Honor, we think that this timeline

6  which is basically from filing about 90 days to auction and

7  95 days; 90 days to bid and 94, 95 days to auction is

8  significantly more than what has been the case in Delaware

9  over the past three years.  We sort of looked at some of the

10 cases.  We looked at 75 cases.

11       THE COURT:  I know you've got a chart.

12       MR. ROSENTHAL:  We found the average time from the

13 petition date the sale was less than 60 days.

14       THE COURT:  [inaudible].

15       MR. ROSENTHAL:  There you go.  With respect to

16 whether an extended timeframe would be helpful or maximize

17 value, you will hear from Mr. Carmody that, in fact, a delay

18 in the sale -- you'll hear from Mr. Torgove that a delay in

19 the sale process is not necessary to induce the appropriate

20 buyers.  You'll hear from Mr. Carmody that a delay in the

21 sale process, in fact, will damage the business because of

22 the customer's expectation that this is going to come to an

23 end.  And because of the fact that every single day we spend

24 in bankruptcy more and more customers leave; more and more

25 vendors have questions; more and more employees leave.

18-23538-shl  Doc 804  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 15-10541-BLS  Doc 181  Filed 04/20/15  Page 10 of 122
Pg 197 of 309

10

 1          That's one of the reasons you're going to see,

 2  incidentally, any day now a management incentive plan motion

 3  because we are concerned some of our employees have left and

 4  some of our employees are being poached as we stand here.

 5          THE COURT:  Well there are two elements to the

 6  Committee objection and, frankly, the other players as well,

 7  but particularly the Committee.  The first is obviously the

 8  timeline and the sufficiency of the marketing and sale

 9  process.  And the second were specific elements of the

10  proposal that include a breakup fee or a secured lender that

11  include a substantial expense reimbursement, the mechanics,

12  who ought to credit bid.  So there are obviously -- I mean I

13  understand the timeline issues, but there are those elements

14  as well.  And I expect the Debtors' presentation will deal

15  with them as well.

16          MR. ROSENTHAL:  It will, Your Honor, that's what I'm

17  getting to next.  So another significant part of the attack

18  are the bid protections.  And here, again, the Debtors find

19  themselves in a not unusual situation where they have a

20  bidder at the table.  They want to keep the bidder at the

21  table.  They want to induce that bidder to put a stalking

22  horse bid on the table.  And the bidder wants our

23  protections.

24          We attempted to the extent that we had leverage to

25  do so.  We attempted to reduce the breakup fee request and to

1  reduce the expense reimbursement.  What you see is the result

2  of those negotiations.  And what I would caution the Court is

3  that it's very easy to say that breakup fee should be less

4  and non-existent.  Expense reimbursement should be less or

5  non-existent.  But if that causes the stalking horse to walk

6  we're back to a freefall and back to a liquidation.  And the

7  stalking horse sale, the sales procedure order is tied to the

8  DIP until we run out of money.

9      One of the things that has come up throughout the

10 papers, Your Honor, is have the Debtors and their management

11 team comply with their fiduciary duties.  And we have talked

12 about what the standard is.  We've talked about business

13 judgment.  The Committee has talked about inherent fairness.

14 Frankly, I think this is a red herring.  I don't care what

15 the standard is.  I think that the company has complied with

16 that standard.

17     The company's board is not an interested board --

18     THE COURT:  Yeah I think and I will hear from the

19 Committee on this.  But I don't necessarily regard the

20 fiduciary duty element of this; at least, in the context that

21 we're in to be a productive inquiry for a couple of reasons.

22 First, as a practical matter the application of fiduciary

23 duties and the business judgment rule at a minimum occupy a

24 very different functional role than they do three blocks down

25 the street at the Chancery.

1       So when a Debtor proposes in a Bankruptcy Court I'm

2   not certain if that has the same in a typical scenario

3   implication of fiduciary duties as it does outside of

4   bankruptcy.  It is a complicated inquiry and I think it

5   unnecessarily complicates the discussion that we're in about

6   whether or not this is consistent with fiduciary duties or

7   not.  The issue is more of a bankruptcy question I think than

8   a traditional corporate governance and corporate law

9   question, and I think that; so I'll be happy to hear from the

10  Committee on that.

11      I've had this inquiry, this concept before, but you

12  know one of the challenges that I have with at least some of

13  this, and you can point to prepetition conduct and we can

14  debate about whether or not that in a different case or in a

15  typical case might implicate fiduciary duties.  But in a case

16  such as this for example if the Debtor were to make a

17  proposal and come in and say Judge we want you to approve

18  this sale, this financing arrangement, etcetera, one or two

19  things will happen.

20      I will approve it by final order reflecting that I

21  found that it is consistent with their best business

22  judgment, etcetera; end of inquiry about fiduciary duties,

23  absent an appeal or I will deny it.  And while the denial

24  might -- I'm not sure that my denial on a full record means

25  that the party that asked for something and it got denied has

18-23538-shl  Doc 884  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 18-10541-BLS  Doc 181  Filed 04/26/18  Page 43 of 122
Pg 200 of 309

13

1  breached their fiduciary duties.  So I don't want to spend

2  too much time on this, but I have seen that.

3         I understand the issue and there may be nuances

4  where it has particular application, but as a general

5  proposition I understand the dynamic as you've described it.

6  It's not unfamiliar to, you know, your colleagues on the

7  other side for the Committee.  It's not, you know, unfamiliar

8  to the lender, etcetera.  I'm not certain that this is a

9  fiduciary duty issue; at least at this stage.

10         But, again, I'm happy to hear from the Committee on

11  that point.  But most of the issues, I think, are the

12  traditional concepts that we're discussing now.

13         MR. ROSENTHAL:  Thank you, Your Honor.  I mean I

14  think the reality is, is that the company was presented, was

15  in financial straits and presented with the option of filing

16  a freefall liquidating or filing with a stalking horse.  And

17  this is the stalking horse we had and that stalking horse was

18  willing to bring the other lenders along with DIP financing

19  to get to the end of the game.

20         Your Honor, with that background we'd like to put on

21  our case in chief and I'd like to turn it over to my partner

22  Brian Lutz.

23         THE COURT:  Ms. Levine, did you wish to be heard?

24         MS. LEVINE:  Your Honor, can we open a little

25  [indiscernible]?

1          THE COURT:  Briefly, yes.

2          MS. LEVINE:  Your Honor, just to set the table a

3    little bit also and it may streamline the testimony.  The

4    Committee's concern is that we believe the DIP is

5    inappropriate and obviously Your Honor has the right to

6    either approve it or not approve it.  But we're going to talk

7    to you a little bit about why we think it shouldn't be

8    approved under its present terms.

9          We think the issues with regard to the sale may be a

10    little bit different.  Your Honor, has the right to approve

11    it or not approve it, but I think Your Honor also has the

12    right to modify it if you deem it appropriate and approve it

13    as modified.  And one of the things we'll note and one of the

14    things you'll hear from us is that in both the DIP and the

15    sale the outside deadline is actually September 8th.  So there

16    is room here to potentially run a fair more open process.

17          With regard to the specifics that we were talking

18    about with regard to the DIP, Your Honor, the Committee's

19    primary concern is that it appears to be granting liens on

20    assets that were not previously encumbered. We're looking at

21    the avoidance actions, the foreign stock, and the Mexican

22    assets.  If under the existing sale process which is what we

23    seem to have today, there's no recovery for general unsecured

24    creditors, then unsecured creditors through this Chapter 11

25    process are actually being put in a worse position not even

1  a neutral position in order to let this DIP and the sale

2  process go forward.

3         In addition to that, Your Honor, the marshalling

4  arguments seem to be a red herring because what that does is

5  that lets the secured creditor take away what we argued

6  should be unencumbered assets to pay those first with regard

7  to the DIP.

8         THE COURT:  In a liquidation scenario or otherwise.

9         MS. LEVINE:  No it's in a; in other words they will

10  -- the way we read the papers they're going to use the

11  unencumbered assets as collateral for the DIP and then credit

12  bid the DIP and take those assets and take that value.  And

13  then if you read the assets purchase agreement, Your Honor,

14  there's a cap on 503(b)(9) claims, lease claims, cure claims,

15  and our administration, and I'll get to the Committee

16  professionals in a minute which is a separate issue but tied

17  into this.  So it looks like we're not only giving nothing to

18  unsecured creditors, but we're creating a scenario that

19  likely creates an administratively insolvent estate.

20         So if we had done this out of Court we'd have

21  foreclosures and it would be whatever it would be.  But by

22  taking it to bankruptcy we're not maximizing asset values for

23  the benefit of the parties and paying the cost of that

24  maximizing.  What we're doing here is giving nothing to the

25  general unsecured creditors and potentially creating a worst

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 15-10541-BLS   Doc 1811   Filed 04/20/18   Page 16 of 122
Pg 203 of 309

16

1  administrative insolvency than we had on day one when the

2  petition was filed.

3      Your Honor, we would also note that the DIP order

4  prevents a credit bid what we would call [indiscernible]

5  protections.  In other words, if in fact they credit bid we

6  lose the challenge period.  So we heard Your Honor with

7  regard to the DNO and the breach of fiduciary duty, equitable

8  subordination and all those things, and we agree that that's

9  not necessarily an issue for today.  The Committee is doing

10  its investigation.  It's looking at what it would normally

11  look at in connection with its challenge rights.  But we

12  don't think that procedurally any of that should go away

13  today.

14      And we think it's interesting that the sale

15  objection deadline for the Silver Point bid is May 21 when

16  currently even if we don't ask for any extensions, May 23 is

17  the challenge deadline.  So, in essence, they've already

18  shortened our challenge by two days.  In addition to that

19  they haven't granted the Committee standing under either of

20  the order which means that basically we should be filing

21  something in a week or so if we're going to have it heard

22  with an ample opportunity for Your Honor to actually consider

23  it.

24      In addition to that, there's no tolling of the

25  challenge period while a standing motion is pending.  In

1    addition to that, June 10 is the deadline for sale objections

2    relating to things that happened at the auction and other

3    bids.  But it's unclear to us why June 10 shouldn't just be

4    the Committee's deadline as well with regard to the Silver

5    Point bid.  A challenge is a default under the DIP and it

6    also triggers the right for Civil Court to withdraw the APA

7    or the stalking horse bid.

8              In addition to that, Your Honor, the carve out is a

9    little bit illusory because it does come junior to the ABL

10   loan.  And we think it's interesting also that just last

11   night the ABL loan got two points more expensive.

12             THE COURT:  What?

13             MS. LEVINE:  The asset base DIP loan apparently

14   there was a typo it said in the papers so the filing last

15   night increased the interest rate on the asset base loan by

16   two points.

17             THE COURT:  Is that in the Debtors' reply?

18             MS. LEVINE:  I believe it was, Your Honor.

19             THE COURT:  Okay.  I didn't see that in the reply.

20   I read the reply this morning.  Where is that?

21             MR. ROSENTHAL:  No, Your Honor, I don't think it was

22   in the reply.  This was something that was raised to us last,

23   what's today Monday, Wednesday or Thursday that the intent

24   had been to have the default rate of interest for the ABL

25   loan and it was a two point differential from where it was;

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-30541-JES    Doc 181    Entered 04/20/18    Page 48 of 122
Pg 205 of 309

18

1  two point differential.  The Debtors pushed back on it.

2  There was one reference in a long series of documents related

3  to the DIP that had a reference that maybe it was two points

4  higher.  But I think we would have had an argument with the

5  Court, but our dilemma was we needed an amendment to the DIP

6  loan on Friday that there's a sale hearing was supposed; the

7  sale procedures order was supposed to have been entered by

8  the 10th.

9          So we needed an amendment.  And we thought that even

10  if we didn't need that amendment at some point, we were going

11  to need amendments.  And we were going to get to have to give

12  this two points.  There was a legitimate dispute about what

13  the parties intended.  So rather than face a default which

14  would have to have been, you know, which people would have

15  found out about and it would have created negative

16  repercussions, we did agree to an amendment which increased

17  the ABL interest rate by two percent.

18          THE COURT:  I understand.  Okay thank you.  Ms.

19  Levine.

20          MS. LEVINE:  Your Honor, the cap on investigating on

21  leads of $25,000.00 seems a little bit slight in this case.

22  The history is convoluted; even the hearings are convoluted.

23          Your Honor, with regard to the budgeted amounts for

24  the Committee's professionals even aside from the fact that

25  the carve out seems to come after the asset base loan, the

1    proposed amount is a $100,000.00 for Committee counsel and

2    Delaware co-counsel, a $100,000.00 a month for both the

3    Committee's investment banker and financial advisor.  Whereas

4    if you take a look at the Debtors' numbers McKinsey is at

5    $750 a month, Gibson Dunn Crutcher $750 to a million, Lazard

6    is a $110 a month with a likely backend fee of about $5

7    million; take it or leave it.  The Debtors' corporate counsel

8    is at a $125 a month and the Debtors' Delaware counsel is at

9    a $150 a month and that's over and above $3.2 million dollars

10   paid the week before the filing for retainers to these

11   various professionals.  And even Silver Point's

12   professionals, Your Honor, were paid legal fees of $1.6

13   million or paid legal fees of $1.6 million in a budget for

14   May, June and July and received $1.5 million during the 75

15   days prior to the bankruptcy with a million of that coming

16   right before the bankruptcy filing.

17          Other things, Your Honor, they give us news of an

18   amendment, but they don't give us an opportunity to be heard

19   or to toll the amendment while Your Honor considers it if

20   there is an objection.  We don't get simultaneous notice of

21   notices that are required to be given to the lenders and the

22   Debtors.  And the variance is overly restrictive.  For most

23   of the variances in the DIP credit agreement, it appears that

24   the variance is 10% which if you do the chart is within

25   market.  But for two which are a little bit confusing to us,

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 20-10541-BLS   Doc 18-1   Filed 04/20/18   Page 20 of 122
Pg 207 of 309

20

1  the variance is 5%.  And the two where the variance is 5% is

2  postage and payroll.

3       So what the Debtor is really saying or what the DIP

4  lender is really saying is if you do really well we're going

5  to [indiscernible] a default which in our mind causes us

6  concern about suppressing value.

7       THE COURT:  Your point with me that if the business

8  is going toll tilt and they're paying overtime and --

9       MS. LEVINE:  It's more than that, Your Honor.  In

10 the payroll line is commission.  So if they're selling then

11 they're going to blow the budget.  And the other thing is

12 postage.  So if they're shipping then they're going to blow

13 the budget.  And it's ironic because if they're selling then

14 they should have ample more receivables to cover that.  And

15 if they're shipping postage, Your Honor, is actually a pass

16 through.  So it's really nothing more than a timing issue.

17      With regard to just a couple more issues on the

18 sale.  The breakup fee of 2% is $5.14 million.  Even the

19 Debtors in their opening have referred this is sort of a

20 protective credit bid, so they're going to do this with or

21 without the breakup fee and with or without the expense

22 reimbursement.  Also it's unclear to us how much of the

23 expense reimbursement may be double counted in the $1.6

24 million that Silver Point received in the three months prior

25 to the bankruptcy filing.

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 2:15-30541-BES Doc 181 Entered 04/26/18 Page 23 of 122
Pg 208 of 309

21

1      The cash deposit required by Silver Point is $2

2  million.  Other qualified bids are required to bid 10% which

3  brings them up to $28.5 million. We think substantially less

4  than that is good faith enough to open up the bidding

5  process.  We also think they can drop the over bids from $500

6  to $275.  That's really going to make a, if it's going to

7  make a difference.  They also require that competing bids

8  designate all of the executory contracts and leases to be

9  assumed and rejected.  But the stalking horse bid currently

10  doesn't have those designations.

11      The backup bidders are not required to stay in place

12  pending a closing which seems a little bit unusual.  With

13  regard to the timeline we discussed it briefly, but we would

14  ask for 60 days to the extent Your Honor approves this for

15  everything.  Including switching the objection to the

16  Committee to object to the bid to the same day everybody else

17  is objecting.  So take May 21 and make it two days before the

18  sale hearing.  Take the June 1 bid deadline and make it July

19  31.  Take the June 4 sale hearing and push it to August 3.

20  Take the June 8 auction and push it to August 7th.  And then

21  take the June 10 objection deadline and put it two days prior

22  to the sale hearing.  And then take the auction and perhaps

23  push it to August 11th which would allow the sale order to get

24  entered by August 14th and allow a closing well in advance of

25  the September [indiscernible] date under both the DIP and the

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 19-10541-BLS   Doc 181-1   Filed 04/26/19   Page 22 of 122
Pg 209 of 309

22

1  existing asset purchase agreement.

2       Your Honor, it's unclear from the bid procedures

3  order, but we would obviously also ask that the Committee and

4  its members and their professionals be permitted to attend

5  the auction.  We don't really want to debate whether we're

6  targeted or not targeted prepetition marketing process was

7  appropriate or not appropriate.  The fact is we understand

8  that the Debtor did try hard to get to closure with one

9  bidder.  It didn't work.

10      We think that we need to run a robust sale process

11 post-bankruptcy so we can bring other people to the table.

12 And we've already gotten calls as we indicated at the first

13 day of the case, Your Honor, from several other bidders who

14 were interested in getting into the process.  There was no

15 teaser or SIM until after the filing of the case.  And the

16 business plan, Your Honor, as we understand it is still not

17 complete which is very important; particularly, for a

18 financial bearer to understand what the numbers are.

19      Importantly, similar with the DIP we don't believe

20 that the credit bid should be permitted to pay down

21 unencumbered assets.  Again, we want a reservation of rights

22 with regard to all the Radnor issues.  We think it's

23 interesting that in the form of order --

24      THE COURT:  Let me ask you a question.  I've been

25 trying to noodle through on the mechanics of that issue your

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-10541-BLS   Doc 181   Filed 04/20/18   Page 23 of 122
Pg 210 of 309

23

1   point is that Silver Point as of the petition date or as of

2   today does not have liens on certain assets there or

3   otherwise unencumbered and, therefore, presumably available

4   to unsecured creditors for distribution.  The DIP

5   contemplates a collateral package that would be on all

6   existing collateral as well as new collateral, previously

7   unencumbered.

8       Now it's not unusual that a DIP be included for

9   purposes of a credit bid.  Can you walk me through because I

10  think that this implicates the marshalling argument.

11      MS. LEVINE:  Yes that's exactly correct, Your Honor.

12  So our concern is I'll give you a simple example.  Assets

13  here are covered by the prepetition liens and assets here are

14  not.  So if we get a DIP which the Committee is positing is

15  not necessarily benefitting unsecured creditors.  They now

16  have a lien on this group of assets and this group of assets.

17  If they credit bid they're taking all the assets.

18      Our argument is that they should only get a post-

19  petition lien on the prepetition collateral package because

20  they're not really bidding anything to the unsecured

21  creditors.

22      THE COURT:  You'd agree with me though that's not a

23  typical DIP financing arrangement that somebody takes a lien

24  on the assets that they --

25      MS. LEVINE:  Correct, Your Honor, but that's not,

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-10541-BLS   Doc 131-1   Filed 04/26/18   Page 24 of 122
Pg 211 of 309

24

1  but in a typical DIP financing arrangement even in a case

2  where there's not a substantial recovery to unsecured

3  creditors, there is generally some benefit to the unsecured

4  creditors by virtue of that DIP financing.  Here, we're

5  leaving behind probably as far as we can tell it's at least

6  $400 million dollars in claims.  In addition to that, we're

7  potentially creating an administratively insolvent estate.

8       And, Your Honor, we would submit that based upon the

9  form of order that was submitted last night it didn't address

10 any of the Committee's concerns.  But it does allow the asset

11 base lender now to credit bid at the auction which wasn't

12 previously part of their rights and to announce at the

13 auction.  So what that says is they too like us are afraid

14 that Silver Point has the absolute right to call in event of

15 default under the DIP and withdraw its bid.

16      The other thing we found unusual, Your Honor, is

17 there is some environmental issues here.  We're not sure

18 whether or to what extent they're material.  But there seems

19 to be an express prohibition against any bidder performing a

20 phase two and we're not exactly sure why that would be

21 something that we would want, if we want to encourage people

22 to do whatever they need to do to bid.

23      Your Honor, so just briefly in conclusion we think

24 that -- we understand that Your Honor probably doesn't have

25 the ability to modify the DIP so, therefore, we are asking

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 1:18-cv-10541    DCS 11/26/18.1    Filed 04/26/18    Page 26 of 122
Pg 212 of 309

25

 1  that it be denied.  We think that Your Honor does have the

 2  ability to modify the sale procedures.  To the extent you

 3  don't think it's appropriate to deny, then we would ask that

 4  you modify them.  What the Committee really wants here is a

 5  fair and open process and an opportunity not only to promote

 6  the highest and best offer for the assets, but to conduct its

 7  investigation to the extent appropriate, bring appropriate

 8  causes of action, and appropriate time.  Thank you.

 9        THE COURT:  Mr. Kenney.  Actually before I hear from

10  Mr. Kenney, Mr. Rosenthal, can you just give me a little bit

11  of context on one issue -- and this will only take a second -

12  - between the proposed timeline the Debtors have for an

13  auction and the sale hearing and the closing date.  Can you

14  give me some reason why that process, why there's that

15  anticipated [indiscernible] --

16        MR. ROSENTHAL:  I think the thought, Your Honor, if

17  a third party bidder comes in I think the thought is that if

18  a third party bidder comes in, it might take a little longer

19  to get all the documents finalized and everything done.  And

20  in addition we've got an HSR period that will not have run.

21        THE COURT:  Okay.

22        MR. ROSENTHAL:  So you take those two -- can I take

23  a couple things off the table because I wish Ms. Levine would

24  have called me because some of these things --

25        THE COURT:  Why don't we do this.  Mr. Kenney can

1    infer.  Hang on just a second.  I've just been advised that

2    we have a problem with CourtCall.  We're going to take a 60

3    second break and we'll CourtCall back in.  And then, Mr.

4    Kenney, we'll begin with you.  I apologize for the

5    interruption.  Stand in recess.

6        [10:36:56 - 10:40:38]

7            THE CLERK:  All rise.

8            THE COURT:  Please be seated.  Mr. Kenney, good

9    morning.

10           MR. KENNEY:  Good morning, Your Honor, Mark Kenney

11   for the United States Trustee.  Your Honor, my objection on

12   the bidding procedures [indiscernible] Committees I'm solely

13   looking at the breakup fee and the expense reimbursement.

14   And I think this is something that they touched on a little

15   bit in that the whole concept of a breakup fee is that's for

16   someone who absolutely needs that as an inducement to get

17   them to the table to sign a stalking horse agreement or

18   somebody to put the Debtor in a sales mode.

19           And what we have here essentially, Your Honor, is a

20   friendly foreclosure.  And Silver Point is going to foreclose

21   on these assets whether it's friendly or whether it's

22   adversarial.  And coming into the Bankruptcy Court they're

23   saving a lot of money instead of having to go into a number

24   of different counties and a number of different states where

25   they could have hundreds of separate asset foreclosure

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 19-10541-BLS    Doc 131-1    Filed 04/26/19    Page 29 of 122
Pg 214 of 309

27

1  actions, so this saves them a lot of money.  They don't need

2  a breakup fee to induce them to come to the table and to sign

3  an agreement.

4          The Debtors have --

5          THE COURT:  The Committee has made certain

6  observations with respect to whether Silver Point is either a

7  statutory or a non-statutory insider.  Do I need to get to

8  that inquiry or is the question more does this particular

9  bidder need the incentive of a breakup fee?

10          MR. KENNEY:  Your Honor, I think anytime you have a

11  lender, a breakup fee to the lender is suspect if they are an

12  insider.  And I know there seems to be an open question on

13  that.  And I didn't go there because from what I saw in the

14  first day papers they weren't.  But the Committee has brought

15  up they looked at the SEC filings.  And I don't know if

16  Silver Point is an insider.  I would say that if they are an

17  insider we don't even need to consider whether it's necessary

18  to induce them.  I think the breakup fee should come off the

19  table immediately if they're an insider.

20          THE COURT:  From your office's point of view, is

21  there a difference as a matter of law or as a practical

22  matter between a breakup fee and an expense reimbursement?

23          MR. KENNEY:  Your Honor, a very limited expense

24  reimbursement is something we might look at a little bit

25  differently because a breakup fee is something that it's

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-10541-BLS   Doc 1811   Filed 04/26/19   Page 28 of 122
Pg 215 of 309

28

1   supposedly to induce and to come to the table in the first

2   place.  An expense reimbursement is something that is

3   supposed to be for specific documents and expenses incurred

4   in getting to a transaction.  Of course, here, as a secured

5   lender who is looking at having to take possession of its

6   collateral anyway, I think they're incurring a lot of those

7   costs anyway.

8           And I think what's missing is and I understand the

9   Debtors negotiate the best that they can.  They're not

10  exactly in a position holding the upper hand.  You know the

11  secured creditor basically is holding all the cards and

12  saying you know we're going to liquidate our collateral

13  whether it's friendly or not.  But it seems to me, Your

14  Honor, once they establish a floor price, the floor price is

15  basically the amount of money they're going to need to let go

16  of their collateral and let some other party take it away

17  from them.

18          And I think that in most cases, Your Honor, the

19  secured creditor wants other people to come in.  If somebody

20  comes in with more money, they're going to do something --

21  well for lack of a better term, Your Honor, I think the word

22  is they're going to salivate.  You know they're going to

23  welcome any higher bids.  And, therefore, they don't need the

24  inducement of a breakup fee to get them to the table.  And

25  they don't need a breakup fee to consult them for the risk of

1  not getting their collateral.  If somebody else makes a bid

2  that they don't like they can simply bid more on their credit

3  bid up to the point that they cover their debt in full.

4       I think if there's some risk to them if they're not

5  going to cover their debt in full, they should be happy to do

6  it.  If we have an estate that might be solvent, again

7  they're already in there.  You know their inducement is to

8  make sure the assets don't go for too little money.  So

9  essentially all that their stalking horse bid does is kind of

10  ring fence the assets and say we're not going to let them go

11  for anything less than this amount.

12       It seems to me once you get above that they have

13  every reason in the world to want other people to come in and

14  bid on them.  And even the expense reimbursement, Your Honor,

15  I said at 20% of what they're seeking is probably generous

16  because every dollar of expense reimbursement that they're

17  requiring somebody to reserve for is an additional dollar

18  somebody has to bid for.  If you made somebody put up $4

19  million dollars as an expense reimbursement and then it turns

20  out that their reimbursable expenses that they haven't

21  already extracted from the Debtor elsewhere are only a

22  $100,000.00, then you may have discouraged people and kept

23  them away from the bidding in the first place.

24       And the goal here is to attract bidders not to repel

25  them.  And the difficulty is that when you set it up with a

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 19-10541-BLS   Doc 181-1   Filed 04/26/19   Page 30 of 122
Pg 217 of 309

30

 1  breakup fee to a stalking horse who is already the lender and

 2  has every incentive to want other people to bid and then

 3  layer onto that an expense reimbursement of an amount that,

 4  you know, I don't know how the lender could spend that much

 5  money short of having all of those professionals turn their

 6  files to death then why are you trying to repel other bidders

 7  and chill the bid.

 8          THE COURT:  Thank you.

 9          MR. ROSENTHAL:  Let me try to take a couple issues

10  off the table.

11          THE COURT:  Then we'll turn to witnesses.

12          MR. ROSENTHAL:  I don't think we're creating

13  administrative insolvency.  The APA provides for either the

14  assumption of post-petition liabilities or the funding of

15  those liabilities with a significant wind down payment at the

16  closing somewhere in the $8.5 million dollar range.

17          On the statutory insider questions so it's not quite

18  as simple as looking at the 13(d)'s or Silver Point's

19  ownership of the common stock is 20%.  But we have two

20  classes of voting stock at both.  We have a Class A stock

21  that holds five votes as compared to each vote as a common.

22  They have none of the Class A stocks.  So their actual

23  percentage on an aggregate basis is 13%.

24          Ms. Levine complained about the March 23 objection

25  deadline.  We were actually going to tell the Court Silver

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 1:18-cv-10541-DLC    Doc 131    Filed 04/26/18    Page 39 of 122
Pg 218 of 309

31

1  Point pointed this out to us that because we have now

2  extended the bid deadline to the 11th and the auction to the

3  15th we think that June 1 for an objection deadline on the

4  sale.  There's a subsequent objection deadline for June 16th

5  for whoever we end up choosing at the auction, so basically

6  two bites of the apple.

7      The June 1 date is after the expiration of the

8  Committee's period.  The Court did raise a good question, I

9  think, about the procedure of what happens if the Committee

10 does file a claim complaint trying to object to the ability

11 of the lenders to credit bid or to the validity leading prior

12 to the liens.  We'll have to address that down the road.

13 Right now, there is no such complaint filed.  And whether the

14 Committee would have standing to bring that is, again,

15 another issue down the road.  We've done our own analysis of

16 that as well of the strength of the clients.

17     Ms. Levine said that the, was talking about the

18 budget for the Committee.  It is true.  It is $200,000.00 a

19 month for basically five months, so it's a million dollars.

20 She wasn't right; she was talking about other professionals

21 have higher budgets plus they have their retainers.  The

22 retainers are a decrease from the budget so those budgets are

23 complete whether they're paid from new funds or retainer

24 funds.

25     Ms. Levine said we have no provision for backup

 1   bidders to remain in place.  It's no true.  The backup

 2   bidder, the number two bidder is obligated to keep its bid

 3   open for 60 days so we know if the first bidder is going to

 4   close.  The Committee was unclear she said whether the

 5   Committee can attend the auction.  Of course the Committee

 6   can attend the auction.

 7        We can talk more if the Court wants about the

 8   unencumbered, giving the unencumbered property.  I think it's

 9   absolutely standard for a DIP lender to get essentially all

10   the assets including unencumbered assets as collateral for

11   their loan.  And we all believe that there's not sufficient

12   value to cover all of the secured debt.  So to give that as a

13   replacement lien for the secured creditors is covered for

14   diminution.

15        THE COURT:  I don't disagree with that as a general

16   proposition.  The issue is, to be blunt, you know is this a

17   grab.  And I'm not sure you can answer that from the podium

18   right now.  I'll certainly hear from parties with respect to

19   that, but that's kind of the issue that a similar concept

20   arises in the context of a roll-up sometimes.  You know so

21   we're rolling up and we're just, and normally roll-ups while

22   they're disliked by the Office of the United States Trustee

23   and Committees, etcetera, often a roll-up in a different case

24   is not economically neutral, but it's not as significant as

25   it might be because it's typically not grasping wide fields

 1  of additional collateral.  It's just prepetition debt, post-

 2  petition debt.

 3       We'll deal with everything post-petition.  The DIP

 4  order will cover everything.  Again, this is not a pitch for

 5  roll-ups.  But you know often they're not that controversial.

 6  And I've dealt with them a few times where you know the

 7  problem with a roll-up is that it becomes objectionable when

 8  it's really valuable.  When the roll-up will extend to

 9  additional collateral and give you additional rights that you

10  didn't have; not you but a lender that changes the economic

11  structure of the case on a go forward basis.

12       And so the concern I have here is that there's a DIP

13  loan that's being made.  And I've seen the Committee

14  objection with respect to the we decide the terms, but first

15  whether it's necessary and, more specifically, whether it's

16  too much and too expensive.  But the extension to

17  unencumbered assets is again not an unusual situation for a

18  DIP lender lending into a Chapter 11 case.  But the question

19  is whether or not there is demonstrable and maybe unfair

20  improvement in a lender/bidder's position by the assertion of

21  these kind of claims for purposes of very promptly credit

22  bidding them, you know, just a couple of months later.

23       Again, I don't think I need an answer on that

24  question as long as we understand what the question is.  Part

25  of it is a legal or a philosophical question of what works.

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 25-10541-BLS   Doc 131   Filed 04/20/25   Page 34 of 122
Pg 221 of 309

34

1   And then the question that I was asking Ms. Levine and I

2   would go to you guys on as well is exactly how will that

3   work.  How will the assertion of that credit bid as it

4   relates to DIP collateral work so that it just means that the

5   credit bid can then extend to everything and everywhere that

6   the Debtor may have.  And again what are the consequences of

7   that as an economic and practical matter.

8          So I haven't directly addressed this issue before;

9   certainly have seen plenty of credit bids that have different

10  swirly components to them.

11         MR. ROSENTHAL:  I think the contemplation, Your

12  Honor, is that the DIP portion would be paid in cash.  So

13  that if there's and it wouldn't be done for a credit bid.  So

14  the thought is that at the time of the closing --

15         THE COURT:  Just forgive them.

16         MR. ROSENTHAL:  Well it's not exactly that because

17  the first lien holders are effectively the stalking horse.

18  And the vast majority of the DIP is going to be owed to the

19  ABL lenders which are entirely different parties.  So they're

20  going to get paid in cash.  So it's estimated that at the

21  time there will be about a $122 million is what I've heard

22  most recently from the McKinsey folks; a $122 million in

23  outstanding DIP.

24         Now the ABL loan facility is a $125 million dollar

25  facility.  There's a question of whether the original

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 15-10541-BLS    Doc 131-1    Filed 04/20/15    Page 36 of 122
Pg 222 of 309

35

1  borrowing base would allow it to go to $125 but with this new

2  borrowing perhaps it can.  So let's say it's all from the ABL

3  loan because that's within the limit of the ABL loan, so that

4  would all get repaid.  And in addition to that, there would

5  be a cash infusion to the Debtor for the wind down budget

6  another $8 or $9 million dollars.  So that's not really

7  involved in the credit bid.  And the DIP loan is whatever the

8  DIP loan is.  So it's entitled to be repaid.  It's a post-

9  petition administrative expense anyway.

10          MS. LEVINE:  Your Honor, just a [indiscernible]

11  point not responding.

12          THE COURT:  Yeah sure.

13          MS. LEVINE:  I just want to confirm that Your Honor

14  is not making a ruling today with regard to the insider

15  status because then that will substantially limit --

16          THE COURT:  I'm not; no I'm not.  I just asked the

17  question particularly for Mr. Kenney.  I think the insider

18  inquiry has application well beyond the breakup fee, expense

19  reimbursement issue.  And that really was what I focused on.

20  To me I think pretty consistent with Mr. Kenney's

21  observations the insider status might be dispositive if it

22  were obvious and agreed to.  As a general proposition

23  insiders don't get expense reimbursements and breakup fees,

24  or at least breakup fees.

25          On the theory that they're typically not needed to

1  be incentivized, a management team would almost never get a

2  breakup fee in this Court anyway as a matter of principle.

3  So when Mr. Kenney was going through is concerns with respect

4  to it, I think that his analysis and his objection is not

5  based on the insider issue.  I don't think I need to

6  necessarily reach that.  I certainly don't think that I have

7  sufficient record to address that one way or the other today.

8          My point was just to ask him whether or not the U.S.

9  Trustee's objection was predicated upon an insider theory and

10 clearly it's not.  His point is just as a matter again of

11 economics or business.  His point is does not seem under this

12 record that Silver Point needs to be incentivized to step out

13 onto the dance floor, so I understand that.  Okay.  Mr. Lutz.

14         MR. LUTZ:  Thank you, Your Honor, Brian Lutz from

15 Gibson Dunn on behalf of the Debtors.  We're going to attempt

16 to streamline and move things along.  We're going to submit

17 as evidence the declarations that had been provided already;

18 four declarations: two from Mr. Carmody and two from Mr.

19 Torgove.  All of them except one are in the binders that have

20 been provided to Your Honor.

21         THE COURT:  I have them.

22         MR. LUTZ:  Can I submit the fourth one that happens

23 not to be in the binder?

24         THE COURT:  That would be great.  Thank you.

25         MR. LUTZ:  The one that I just submitted to you is

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 1:19-cv-10541-DLC   Document 8-1   Filed 04/26/19   Page 37 of 122
Pg 224 of 309

37

1  Mr. Carmody's first day declaration which is docket number

2  two.  I just have a very short direct examination of Mr.

3  Torgove just to address two very, very narrow issues that are

4  from his declarations.

5          THE COURT:  Let me do two things.  First, my

6  understanding is the Debtor has two witnesses today, is that

7  correct?

8          MR. LUTZ:  Yes.

9          THE COURT:  Is that Mr. Torgove and Mr. Carmody?

10          MR. LUTZ:  Yes.  And I'm sorry I should have

11  clarified.  We're submitting the declarations, of course,

12  subject to cross examination.

13          THE COURT:  Of course.  Does the Committee have any

14  witnesses today?

15          MS. LEVINE:  Your Honor, [indiscernible] on what

16  comes in on direct, we have Leon Szlezinger from Jeffries

17  with us.

18          THE COURT:  Your financial advisor?

19          MS. LEVINE:  Yes.  And he can agree [indiscernible].

20          THE COURT:  Okay.  All right well we'll see how that

21  plays out.  I just want to know for purposes of managing.

22  Does any other party expect to call a witness for purposes of

23  today's matters?  Very well; second, I would ask are there

24  any objections to the admission of the Torgove and Carmody

25  affidavits?  Both of those gentlemen are here today and will

 1   be put on the stand.  Okay they're both admitted.

 2       [Torgove & Carmody Affidavits received into evidence]

 3           And then --

 4           MR. LUTZ:  Mr. Torgove I was going to call.

 5           THE COURT:  Okay we'll call Mr. Torgove.

 6             ANDREW TORGOVE, DEBTORS' WITNESS, SWORN

 7           THE CLERK:  Please state and spell your name for the

 8   record.

 9           MR. TORGOVE:  Andrew Torgove; T-o-r-g-o-v as in

10   Victor - e.

11           THE COURT:  Welcome.  Do you have a binder up there

12   for him?

13           MR. LUTZ:  I'm not sure he's going to need it.

14           THE COURT:  Okay.

15           MR. LUTZ:  If he does we can --

16           THE COURT:  He probably will for cross.

17           MR. LUTZ:  We'll get it to him.

18                      DIRECT EXAMINATION

19   BY MR. LUTZ:

20   Q.  Thank you, Mr. Torgove, for being here.  Mr. Torgove, you

21   submitted a declaration, two declarations in support of the

22   DIP financing motion and the sales procedures motion, is that

23   right?

24   A.  That's correct.

25   Q.  And one of the topics that was generally addressed in

Torgove - Cross                    39

 1  your declarations is The Standard Register DIP financing

 2  motion, is that right?

 3  A.   That's correct.

 4  Q.   I just have two clarifying questions from your

 5  declarations.  First, did the Debtors seek DIP financing in

 6  light of the Debtors' projected cash shortfall?

 7  A.   Yes.

 8  Q.   And, second, were the terms of the DIP financing the most

 9  favorable terms that the Debtors were able to negotiate?

10  A.   Yes.

11          MR. LUTZ:  I have no further questions.

12          THE COURT:  Ms. Levine.

13          MS. LEVINE:  Your Honor, brief cross examination.

14          THE COURT:  Sure.

15                      CROSS EXAMINATION

16  BY MS. LEVINE:

17  Q.   Good morning, Mr. Torgove; Sharon Levine, Lowenstein

18  Sandler for the Committee, how are you?

19  A.   Fine.

20  Q.   Mr. Torgove, prepetition where you started to look at

21  whether or not you needed DIP financing, the DIP financing

22  became [indiscernible] discussing because there was an

23  impending default under the prepetition financing facility,

24  is that correct or at least one of the factors?

25  A.   It was one of the factors, yes.

 1  Q.   The default, however, was what we call a little

 2  [indiscernible] and not a big DR payment default, correct?

 3  A.   It was a leverage default, leverage test default from the

 4  order of 2014.

 5  Q.   Thank you.

 6          MS. LEVINE:  No further questions, Your Honor.

 7          THE COURT:  Any redirect?

 8          MR. LUTZ:  Not from me.

 9          THE COURT:  I wish all my hearings were like this.

10  I may regret that statement in a little while.  Mr. Lutz.

11          MR. LUTZ:  We have nothing further.

12          THE COURT:  Well I think you need to tender Mr.

13  Carmody.

14          MR. LUTZ:  Oh I'm sorry.

15          THE COURT:  If the Committee wishes to examine.

16          MR. LUTZ:  I'm sorry; my apologies.  You intend to

17  have [indiscernible]?

18          MS. LEVINE:  Yes.

19          THE COURT:  Please remain standing.  We'll swear the

20  witness.

21           ANDREW BELLMANN, DEBTORS' WITNESS, SWORN

22          THE CLERK:  Please state and spell your full name.

23          MS. LEVINE:  Actually, Your Honor, we don't need to

24  cross examine Mr. Carmody.  We're just going to put on Mr.

25  MacGreevey.

18-23538-shl    Case 25-10541-BLS    Doc 804    Filed 11/26/18    Doc 181    Entered 04/20/18    11/26/18 20:52:28    Page 49    of 127    Main Document
Pg 228 of 309

41

1          THE COURT:  Very well, you may step down.  The

2    witness was so intimidating.

3          MS. LEVINE:  We just have one --

4          THE COURT:  Well let me just ask as a matter of

5    process because typically we would call Committee witnesses

6    after the Debtor has rested with respect to both motions.

7    And I think I'd like to make sure we're all on the same page.

8    I'm happy to be flexible about it and it may be an

9    appropriate time.

10          MS. LEVINE:  I'm not sure what other witnesses.

11          MR. LUTZ:  Yeah of course subject to cross

12    examination of the Committee's witnesses.

13          THE COURT:  Okay, fine.  You may call your witness.

14          MS. LEVINE:  Your Honor, we'd like to offer --

15          MR. LUTZ:  In rebuttal to the extent that

16    [indiscernible].

17          MS. LEVINE:  Your Honor, we'd like to offer a

18    proffer from Mr. MacGreevey and from Mr. Szlezinger.  And

19    with the Court's permission I'll turn the podium over to

20    Andrew Bellmann to read into the record.

21          THE COURT:  Okay any objection to proceeding by way

22    of proffer?

23          MR. LUTZ:  No.

24          THE COURT:  Very well.

25          MR. BELLMANN:  Good morning, Your Honor, Andrew

18-23538-shl    Doc 884    Filed 11/26/19    Entered 11/26/18 20:52:29    Main Document
Case 15-10541-BLS    Doc 1811    Filed 04/20/15    Page 42 of 122
Pg 229 of 309

42

1   Bellmann on behalf of the Committee.  As Ms. Levine noted, we

2   have two proffers.  The first is of Mr. David MacGreevey of

3   Zolfo Cooper, the Committee's financial advisor.  Mr.

4   MacGreevey is in the Courtroom today and available for cross

5   examination.

6           If called to the stand, Mr. MacGreevey would testify

7   that he is a managing director at Zolfo Cooper LLC, a

8   financial advisory firm with principle offices located at

9   1114 Avenue of the Americas, 41st Floor, New York, New York

10  10036 as well as at other locations.  Mr. MacGreevey would

11  further testify that [indiscernible] he has been advised in

12  more than 30 Chapter 11 cases most involving --

13          THE COURT:  [indiscernible].

14          MR. BELLMANN:  Pardon me?

15          THE COURT:  Let's do the merits.

16          MR. BELLMANN:  Understood.  Mr. MacGreevey would

17  testify that on March 24th, 2015 the Committee appointed in

18  these cases retained Zolfo and that he's reviewed the motion

19  for post-petition financing, the credit agreement, and the

20  declarations submitted by the Debtors in connection with the

21  motion.  Based upon the review of those documents, the record

22  in these cases, and discussions with the Debtors'

23  professionals Mr. MacGreevey would testify that in his view

24  the proposed financing as currently structured is overly

25  burdensome and to an extent may not be necessary.

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:23   Main Document
Case 15-10541-BLS   Doc 181   Filed 04/20/15   Page 43 of 122
Pg 230 of 309

43

1        Mr. MacGreevey would testify that first the value of

2   the prepetition ABL collateral, the Debtors' cash, accounts

3   receivable, inventory, and the program property plant

4   equipment is sufficient to provide the DIP ABL lenders with

5   adequate collateral.  The Debtors admit in the DIP motion

6   that the ABL DIP lenders primary collateral "heavy value

7   substantially greater than the value of their claims."  In

8   fact, as of February 28th, 2015 the Debtors' balance sheet

9   reflects more than $200 million dollars of cash, accounts

10  receivable and inventory.

11       In comparison, the maximum amount to be drawn in the

12  DIP ABL during latest projection period is a $116.1 million

13  dollars.  As such, there's no need to extend the ABL under

14  its collateral by granting liens on previously unencumbered

15  assets including avoidance actions, 35% of the Debtors'

16  equity interest in foreign subsidiaries, and the assets of

17  the Debtors who were not previously parties to the

18  prepetition ABL facility.

19       Mr. MacGreevey would further testify that the

20  Debtors request for $30 million dollars in the form of a DIP

21  term loan appears to be excessive.  During the first 17 weeks

22  of the Chapter 11 cases the budget reflects a maximum

23  principle balance under the DIP term loan of approximately

24  $13.9 million dollars with the first draw of $800,000.00

25  coming two months into the process.  The projected need for

1  this DIP appears to be the product of a budget that was built

2  on a number of flawed assumptions that exaggerate or front

3  load the Debtors' projected cash needs.

4        For example, the original DIP budget assumes that

5  all creditors of the Debtor immediately demand

6  [indiscernible] COD payment terms.  The Debtors would expend

7  $20 million dollars on critical vendor obligations during the

8  first weeks of the bankruptcy.  And the customers with

9  prepaid postage deposits would demand refunds totaling $3

10  million dollars in the early stages of the Chapter 11 cases.

11       Based on these assumptions the Debtor assumes net

12  cash flow for the first four weeks of the case negative $16

13  million dollars.  In reality through the fourth week of the

14  case, the Debtors' net cash flow was positive $27.8 million

15  dollars; for variance, a favorable variance of $43.8 million

16  dollars.  To put this significant variance into context is

17  equivalent to 65% of the Debtors' average total revenue for a

18  four week period.

19       The effective [indiscernible] assumptions on the DIP

20  borrowing need is also significant.  While the Debtors

21  originally projected to draw approximately a $119 million

22  dollars on the DIP through the first four weeks of the case

23  ended April 5th, the actual borrowings as of that date were

24  approximately $72 million dollars; a favorable variance of

25  $47 million dollars or nearly 40% in just four weeks.

 1          Importantly, while the Debtors may contend these

 2    variances are temporary in nature is becoming increasingly

 3    unlikely that these assumptions will ever become a reality,

 4    unlikely that these assumptions will ever become reality as

 5    customers and vendors gain a level of comfort with the

 6    Debtors' Chapter 11 prospects.  For these reasons, the budget

 7    appears overly conservative.

 8          Mr. MacGreevey would further testify that the DIP

 9    loans also impose overly restricted covenants including with

10    restrictive permitted variances under the budget.  Line item

11    expenditure variances generally 5% are unnecessarily

12    stringent and create the potential for default even roll over

13    on cash flows on [indiscernible] are even favorable to

14    budget.  In Mr. MacGreevey's experience permitted variances

15    and DIP budgets generally range from 10 to 15% and often are

16    measured only a total net cash variances as opposed to

17    individual line items.

18          Mr. MacGreevey would further testify that the DIP

19    term loan is expensive given the [indiscernible] for the DIP

20    term loan particularly the size of the closing fee, the

21    commitment fee and the interest rate.  Zolfo's analysis of

22    the proposed DIP term loan indicates that the lenders will

23    earn approximately a 63% in term rate of return if the

24    Debtors perform as projected under the revised budget.  If

25    Zolfo's analysis is correct and the DIP budget is overly

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 1:18-cv-10541-UA   Doc 1   Filed 04/26/18   Page: 46 of 122
Pg 233 of 309

46

1   conservative, the [indiscernible] rate of return that the DIP

2   term loan lenders earn could, in fact, be much higher.

3       Mr. MacGreevey would further testify that as with

4   the ABL loan the value of the prepetition term loan

5   collateral is sufficient to provide the DIP term lenders with

6   adequate collateral.  [indiscernible] the DIP term loan is

7   secured by all the property plant and equipment of the

8   company including nine owned facilities, as well as a second

9   lien on the more than $200 million dollars of cash, accounts

10  receivable, and inventory.

11      In comparison, the maximum amount to be drawn on the

12  DIP term loan during the projection period is just $13.9

13  million dollars.  And the maximum amount to be drawn under

14  the DIP ABL and the DIP term loan on a combined basis is

15  $122.8 million dollars.  Further, the DIP lenders enjoy the

16  comfort of an executed asset purchase agreement whereby the

17  buyer who's also an affiliate of the DIP term loan lenders

18  has agreed to a purchase price that is far in excess of the

19  DIP lender's loan exposure by at least a $145 million

20  dollars.  As such, the extension of the term lenders

21  collateral package to include previously unencumbered

22  collateral is not warranted under the circumstances.

23      Mr. MacGreevey would further testify that in his

24  view the previously unencumbered collateral proposed to

25  secure the DIP loans and, in particular, the DIP term loan is

18-23538-shl  Doc 884  Filed 11/26/18  Entered 11/26/18 20:52:29  Main Document
Case 18-30541  Doc 81  Doc 81-1  Filed 04/26/19  Page 47 of 122
Pg 234 of 309

47

1   an attempt by the lenders to envelope these previously

2   unencumbered assets into their credit bid through the

3   Debtors' assets through a Section 363 process.

4        In sum, Mr. MacGreevey would testify that for these

5   and other reasons set forth in the Committee's objection to

6   the DIP motion, the DIP motion should not be approved as

7   proposed.  That completes the proffer of Mr. MacGreevey who

8   is available for cross examination.

9        UNIDENTIFIED SPEAKER:  Could we just take a minute

10  to confer?

11       THE COURT:  Yeah why don't we do this, two things.

12  We'll just take a five minute break and if you need more time

13  then I'm happy to accommodate.  I'll accept the proffer.  And

14  it's obviously not just the Debtor.  Any party that wishes to

15  cross may do so.  Second, I kind of fast forwarded you

16  through the witnesses' background which is kind of my

17  practice but I did not necessarily anticipate whether the

18  Debtor has any issues with the witnesses' qualification or

19  background.  And if you wish, you're welcome to examine on

20  that or expand the proffer to readdress that issue.  Then

21  we'll move on to the meat of the matter, but I didn't want to

22  cut anybody off.

23       So why don't we do this, we'll take five minutes and

24  we'll reconvene for cross.  Stand in recess.

25       [Recess 11:09:40 - 11:26:52]

 1          THE CLERK:  All rise.

 2          THE COURT:  Please be seated.  Ready to proceed.

 3  Welcome.  Please swear the witness.

 4       ANDREW MACGREEVEY, COMMITTEE'S WITNESS, SWORN

 5          THE CLERK:  Please state and spell your full name.

 6          MR. MACGREEVEY:  It's David MacGreevey; M-a-c-G-r-e-

 7  e-v like victor, e-y.

 8          THE COURT:  Welcome.  Mr. Lutz.

 9          MR. LUTZ:  Thanks.

10                    CROSS EXAMINATION

11  BY MR. LUTZ:

12  Q.  Hi, Mr. MacGreevey, how are you?

13  A.  Good morning.

14  Q.  Thanks for being here.  I just have a couple of questions

15  based on your proffer read by your counsel.  Your proffer

16  addresses, part of your proffer addresses the DIP budget that

17  supported the DIP financing in this case, is that right?

18  A.  Correct.

19  Q.  And your understanding is that McKinsey was responsible

20  for putting together that DIP budget, is that right?

21  A.  That's my understanding.

22  Q.  And your understanding of that is based on reviewing the

23  filings in this case?

24  A.  Discussions with McKinsey.

25  Q.  And you've reviewed Mr. Carmody's declaration submitted

MacGreevey - Cross                         49

1   in this case, is that right?

2   A.   Correct.

3   Q.   So you're familiar generally with the contents of those

4   declarations?

5   A.   Yes, generally.

6   Q.   Your understanding is that McKinsey spent several weeks,

7   six weeks putting together the DIP budget, is that right?

8   A.   It may have been.  I know they were retained in January

9   at some point.

10  Q.   And you understand that McKinsey, among other things,

11  spoke with management in putting together the DIP budget, is

12  that right?

13  A.   Yes.

14  Q.   They spent a lot of time putting together the DIP budget?

15  A.   Yes.

16  Q.   Part of your proffer, I think, it went quickly, but I

17  think one of the things that was said was that you believe

18  that the DIP budget contained overly aggressive assumptions,

19  is that right?

20  A.   Overly conservative.

21  Q.   Overly, excuse me, overly conservative assumptions, is

22  that right?

23  A.   Correct.

24  Q.   And you had a chance, obviously, to dig into the DIP

25  budget, right?

MacGreevey - Cross                 50

1   A.  We looked at the DIP budget filed at the time of the

2   bankruptcy to reforecast as of March 27th, as well as the

3   reforecast as of April 10th that came out Friday night.

4   Q.  Have you been on site in Dayton?

5   A.  No.

6   Q.  Have you met with Joe Morgan, the company's CEO?

7   A.  No.

8   Q.  Have you met with Ben Cutting the company's CFO?

9   A.  No.

10  Q.  Have you met with Bob Ganan [*phonetic*], the company's

11  former CFO?

12  A.  We have not.

13  Q.  Have you met with Jim Vaughn, the company's treasurer?

14  A.  No.

15  Q.  Have you met with Greg Greve, the company's head of

16  operations?

17  A.  No.

18  Q.  Have you met with anybody at management in connection

19  with your analysis of the DIP budget?

20  A.  We haven't been out to Dayton.  We've had telephone calls

21  with the professionals McKinsey and Lazard.  There may have

22  been members of management on those calls.  I can't recall.

23  Q.  Have you personally had a conversation with a member of

24  management about the contents of the DIP budget?

25  A.  No, not directly.

MacGreevey - Cross                    51

1   Q.   Have you met with customers of Standard Register

2   concerning the DIP budget?

3   A.   No.

4   Q.   Or the assumptions in the DIP budget?

5   A.   No.

6   Q.   Or the company's performance over time after the DIP

7   budget was put in place?

8   A.   No.

9   Q.   Part of your proffer, I believe, addresses what you call

10  variance of the company's performance relative to the budget,

11  is that right?

12  A.   That's correct.  Their actual performance in the first

13  four weeks relative to their projections.

14  Q.   Right and you recognize in your proffer that the company

15  has performed in a positive variance relative to budget in

16  that limited period of time?

17  A.   In that four week period, correct.

18  Q.   Have you conducted any analysis as to how the company

19  would have performed had it not had a DIP budget in place

20  during those four weeks?

21  A.   No.

22  Q.   Any analysis of how customers would have reacted had a

23  DIP budget not been in place?

24  A.   I'm not sure you can do an analysis on that.  It sounds

25  like speculation.  You can speculate how customers and

1  vendors would react in one situation versus another.

2  Q.  And have you done that?

3  A.  Have we speculated on that, no.

4  Q.  Have you conducted any kind of analysis as to how the

5  company would have performed in this four week period if it

6  had not had a DIP budget?

7  A.  No.

8  Q.  Are you aware that the company has certain critical

9  vendor payments that have not been paid but the company

10 expects to pay during the bankruptcy period?

11 A.  I understand the company has a $20 million dollar maximum

12 critical vendor payment program and it projects to make those

13 payments originally projected in the first four weeks of the

14 case, now projected beginning April 19th and for the four

15 weeks thereafter.

16 Q.  Do you know approximately how much of those critical

17 vendor payments to date have not been paid?

18 A.  I believe the majority have not been paid yet.

19 Q.  The majority of the $20 million.

20 A.  Have not been paid.

21 Q.  And you understand that the company, in fact, intends to

22 make those payments during the bankruptcy period?

23 A.  I understand that the company is entertaining critical

24 vendor status with their foreign vendors.  I don't know how

25 much they actually intend to make of those $20 million.

 1  They've budgeted for all $20 million.

 2  Q.  And your understanding is that the vast majority of that

 3  $20 million has not been paid in that four weeks that

 4  commenced since the -- that lapsed since the commencement of

 5  the bankruptcy?

 6  A.  Correct.

 7  Q.  I also heard your proffer you made some statements about

 8  Silver Point using a lien on the unencumbered assets of the

 9  DIP as part of the credit bid, did I get that right?

10  A.  Correct.

11  Q.  Can you explain your understanding of that portion of

12  your proffer just so we have it clear?

13  A.  Yeah I think the thought process is to the extent that

14  these unencumbered assets are now part of the DIP, the

15  debtor-in-possession financing package, that they can be

16  rolled into the purchase of the company as opposed to the

17  ultimate buyer of the company paying for those assets

18  separately.

19  Q.  What's the basis for your understanding that the lien on

20  the unencumbered assets is going to be rolled over and used

21  as current and can't be rolled over and used as part of the

22  credit bid?

23  A.  I think it's a concern of ours.

24  Q.  Which the basis of your understanding that that's the way

25  it works because I think it's not how it works.

1  A.  Basic understanding is looking at the purchase agreement,

2  the sale motion.

3  Q.  Have you looked at all the papers that were filed on that

4  issue in this case?

5  A.  I read the sale motion.

6  Q.  Your proffer addresses this issue -- your proffer

7  addresses the issue of the use of unencumbered assets as part

8  of the DIP collateral.

9  A.  Yes.

10  Q.  And my understanding is that -- or let me ask you this.

11  Have you worked on a case where a DIP loan is collateralized

12  by, not collateralized by unencumbered assets?

13  A.  So we're currently representing the Committee

14  [indiscernible] and the avoidance actions remain unencumbered

15  there.  We're wrapping up the Committee's representation for

16  Exide and the preferences and avoidance actions remain

17  unencumbered there and [indiscernible] general unsecured

18  creditors trust.  We're wrapping up the Committee's

19  representation on debt stores where the preferences remain

20  available for unsecured creditors.

21  Q.  Is it your understanding that it's generally the case

22  that a DIP loan will be secured by previously unencumbered

23  assets, generally?

24  A.  I think in some circumstances you could have security of

25  a previously encumbered.  In some circumstances it leaves

1   them unencumbered.

2   Q.  Have you done any analysis of the number of cases in

3   which DIP loans were secured, were not secured by

4   unencumbered assets; assets that previously were

5   unencumbered?

6   A.  Well it's a lot of DIP loans, so no we haven't looked

7   back at that.  But what we've done is we've looked at a

8   recent exposure in Committee cases in this district and

9   thought about that meaning how I divided that

10  [indiscernible].

11  Q.  Well anything broader than the cases that you've worked

12  on?  Did you look at, canvass the market?

13  A.  Yeah we did database.  And we've looked at for debtor-in-

14  possession financing provider in 2014.  And, again, certain

15  of those cases the unencumbered will remain unencumbered.

16  And certain of them the unencumbered or portions thereof will

17  be become [indiscernible] of the DIP.

18  Q.  What basic portion, what do you mean?  How many of the

19  cases that you looked at in your database involve cases where

20  the DIP loans included previously unencumbered assets as

21  collateral?

22  A.  I can't recall.

23  Q.  I think you also mentioned in your proffer and correct me

24  if I'm wrong because it went very quickly.  But you believe

25  the rate of return on the DIP is about 64%?

1   A.   In what way?  I'm sorry. My understanding is that the

2   company draws it as they require it.

3   Q.   Sixty-four percent internal rate of return is pretty

4   good, right?

5   A.   Terrific.

6   Q.   Are you aware of any other lenders who said hey, this is

7   a 64 percent internal rate of return, what a jump on us?

8   A.   My understanding from attending Mr. Torgrove's deposition

9   is that they talked to six other potential lenders.  I

10  assumed that they outlined to them their potential need for

11  DIP financing.  I don't know if they ever entertained term

12  sheets from those lenders or expressly stated this is going

13  to be a 64 percent return case.  So I don't know.

14  Q.   What you do know is that no other lenders, other than the

15  existing secured lenders, were willing to provide DIP

16  financing?

17  A.   Yeah, my understanding is under the circumstances where

18  there would have been a priming issue that the other six

19  lenders were not interested in participating.

20          MR. LUTZ:  Okay.  No further questions.

21          THE COURT:  Further cross.

22          MR. MEISLER:  Your Honor, Ron Meisler of Skadden

23  Arps on behalf of Silver Point Finance, LLC.

24          THE COURT:  Welcome.

25                    CROSS-EXAMINATION

1  BY MR. MEISLER:

2  Q.  Mr. McGreevy, I want to go back on the question with

3  respect to DIP's and encumbering previously unencumbered

4  assets.

5  A.  Okay.

6  Q.  Mr. McGreevy, have you been involved in DIP financing in

7  many different cases?

8  A.  Yes.

9  Q.  In your experience, have you seen a DIP loan that is

10 limited solely to prepetition previously encumbered assets?

11 A.  I can't recall.

12 Q.  Do you think --

13 A.  There is certainly significant experiences or a number of

14 experiences where they leave the avoidance actions as

15 unencumbered.

16 Q.  Are the avoidance actions all the unencumbered assets or

17 do you think that avoidance actions are --

18 A.  So, and I didn't mean to cut you off there, but the DIP

19 lender also left 35 percent of the equity in the foreign subs

20 as unencumbered.

21 Q.  Do you think it's typical for 35 percent of equity in

22 foreign subsidiaries to be unencumbered in a prepetition

23 loan?

24 A.  It's something that we have seen before.  I can't

25 handicap whether we have seen it more often than not.

MacGreevey - Cross                                    58

 1          THE COURT:  I'd like some clarity.  Mr. Meisler, you

 2   are welcome to provide it if you want.  I'm not trying to

 3   intrude or step on the examination of the witness, but there

 4   are a couple different things that I am trying to get my head

 5   around.  The first is, I think your last question was is it

 6   unusual for 35 percent of the equity in a foreign subsidiary

 7   to be left out of a prepetition loan.  I think that's

 8   something I have certainly seen before.  It's often driven by

 9   regulations in foreign countries about ownership, etc.  Leave

10   that aside.

11          The inquiry about situations where a Debtor comes in

12   and, I guess I am trying to draw a distinction between a

13   situation that we commonly see where you got a lead lender or

14   lead lender group that has a first lien on everything and

15   they are making the DIP loan.  That is somebody with a lien

16   on everything who is, effectively, priming themselves with a

17   DIP.  It's not unusual, but in that situation, typically,

18   other than avoidance actions, there are no unencumbered

19   assets.  So the argument comes down to a question about

20   avoidance actions, do I have that right?

21          MR. MEISLER:  That's correct.

22          THE COURT:  Okay.  So in this situation we have a

23   Debtor that has assets other than avoidance actions.  I

24   understand avoidance actions and we have this discussion all

25   the time, but these are unencumbered assets of value that I

 1  am not in a position to determine.  The DIP lender is making

 2  a loan saying I want a first lien on unencumbered assets, the

 3  equity of the subsidiaries plus, obviously, the avoidance

 4  actions.  I think that's what we are looking at here, right?

 5        MR. MEISLER:  That's right, Your Honor.

 6        THE COURT:  Okay.  Then, the witness's testimony is

 7  a concern that these are liens, leave avoidance actions out

 8  of it for a minute, but the liens that will attach to the

 9  unencumbered prepetition assets are advantaging Silver Point

10  or the bidder/lender for insufficient value or that there is

11  not much of a return.  I guess there are two different

12  theories.  It's not necessary and that it's too much value.

13        MR. MEISLER:  I think that is correct.

14        THE COURT:  I think I understand the testimony.  I'm

15  just trying to keep up with you guys.

16        MR. MEISLER:  Understood, Your Honor.  If I could

17  unpack it because I actually think it's not that difficult

18  and also to put in nuance, it's not always the case that a

19  lender has blanket liens on all assets.

20        THE COURT:  Sure.

21        MR. MEISLER:  In fact, in complicated financing

22  transactions there are many instances where there are certain

23  pools of collateral that are outside the security package,

24  outside of the collateral package.  This is an instance

25  that's consistent with that approach.  In this instance,

1  there is a handful of assets that are outside of the

2  collateral pool.  As can be noted in our adequate protection

3  package, the second lien lenders don't get cash interest on

4  their second liens and there is a reason for that.  The

5  reason is that we are uncertain that the collateral pool for

6  the prepetition lenders is sufficient to satisfy the

7  principal amount and accrued interest on their loan.

8          So, Your Honor, as we were asked to provide DIP

9  financing, which is new money financing, and as we were doing

10 the credit underwriting to make that loan, and Your Honor to

11 be clear, we are making that loan because when Bank of

12 America and Wells Fargo were asked to make that loan and they

13 were making it pursuant to an asset based loan --

14         MS. LEVINE:  Your Honor.

15         THE COURT:  He's testifying, but I asked.

16         MS. LEVINE:  Okay.

17         MR. MEISLER:  They weren't able to extend the amount

18 of debt that the Debtors were seeking.  So we were approached

19 to ask if we could fill the gap between where the formula,

20 under the ABL reached, which at its max was approximately

21 $116 million dollars, to where the Debtors needed as far as

22 they were projecting for cash needs.  We were there for the

23 Debtors with respect to that amount.

24         When we did the credit underwriting, we believed

25 that there was significant uncertainty as to the value of the

1  prepetition collateral pool being able to satisfy our

2  prepetition loans; therefore, when we agreed to extend new

3  money loans, we needed that extra collateral pool to support

4  the credit extension.

5         THE COURT:  I understand the issue.  So you are

6  welcome to examine the witness further if you had any other

7  questions, but I think you responded to my --

8         MR. MEISLER:  Your Honor, I don't have any further

9  questions.

10        MS. LEVINE:  Your Honor, brief re-direct.

11        THE COURT:  Sure.

12                    RE-DIRECT EXAMINATION

13  BY MS. LEVINE:

14  Q.  Good morning, Mr. McGreevy.

15  A.  Good morning.

16  Q.  You just heard counsel talk about the adequately

17  protecting new money loans, did you hear that testimony or

18  that oral argument?

19  A.  I did.

20  Q.  Currently, with regard to the term loan, how much has

21  been drawn on the term loan?

22  A.  The DIP term loan?

23  Q.  Yes, the Silver Point term loan.

24  A.  $1.05 million.

25  Q.  And what was that money used for?

 1  A.   To pay the closing fee.

 2  Q.   And under the term loan, is there also an unused line

 3  facility fee?

 4  A.   I believe its 1 percent.

 5  Q.   In addition to that, is there a collateral monitoring

 6  fee?

 7  A.   I believe its $10,000.00 a month.

 8  Q.   What is the source of the funds to pay for all of those

 9  fees?

10  A.   Extensively, it would be from the DIP term loan.

11          MS. LEVINE:   Thank you.

12          THE COURT:   Okay.

13                       RE-CROSS EXAMINATION

14  BY UNIDENTIFIED SPEAKER:

15  Q.   Mr. McGreevy, you mentioned that there is a closing fee

16  on the DIP?

17  A.   It is.

18  Q.   Mr. McGreevy, is it unusual for a DIP lender to have a

19  closing fee?

20  A.   It is not.

21  Q.   Mr. McGreevy, is it unusual to have a collateral

22  monitoring fee in a DIP?

23  A.   It's not.

24  Q.   Mr. McGreevy, is it unusual to have an unused line fee in

25  a DIP?

 1  A.  No, it's not.

 2       UNIDENTIFIED SPEAKER:  Thank you, no further

 3  questions.

 4                    RE-DIRECT EXAMINATION

 5  BY MS. LEVINE:

 6  Q.  Other than these fees, has any money been drawn on this

 7  term loan?

 8  A.  No.

 9  Q.  So we are paying for the full amount of the term loan?

10  We are paying a fee on the full amount of the term loan?

11  A.  You pay a closing fee of $1.05 million.

12  Q.  Sorry, the unused line fee, we are paying the unused line

13  fee on the full amount of the term loan?

14  A.  On the $29 million approximately.

15  Q.  Under the budget, as it currently reads, when does the

16  Debtor anticipate it's going to draw on the term loan?

17  A.  I believe there is another $800,000.00 or so drawn, I

18  believe the week of May 17th.

19  Q.  When was it originally budgeted that they would draw on

20  the term loan?

21  A.  I thought it was the fourth or fifth week of the case.

22  Q.  And how much was supposed to be drawn then?

23  A.  Something like $3 or $4 million.  I just can't recall off

24  hand.

25            MS. LEVINE:  Thank you.

18-23538-shl Doc 804 Filed 11/26/18 Entered 11/26/18 20:52:29 Main Document
Pg 251 of 309
Case 25-10541-BLS Doc 1311-1 Filed 04/20/25 Page 64 of 122

64

1          THE COURT:  Anything further?  Very well.  You may

2    step down.  Thank you, Mr. McGreevy.

3          MR. MCGREEVY:  Thank you.

4          THE COURT:  Ms. Levine, did the Committee intend to

5    call another witness?

6          MS. LEVINE:  Yes, Your Honor, from Jefferies Leon

7    Szlezinger and if Mr. Bellman could read the proffer.

8          THE COURT:  Do you have a copy that you can give to

9    these guys?  I'm not asking for any breach of

10   attorney/client, but if you are going to read it into the

11   record, he's trying to do this on the fly.  You may proceed.

12         MR. BELLMAN:  Thank you, Your Honor.  Pursuant to

13   Your Honor's preference, we will bypass the introductory

14   background stuff, subject to, you know, reserving the right

15   to supplement.  Your Honor, this is the proffer of Leon

16   Szlezinger who is a managing director and joint global head

17   of restructuring and recapitalization at Jefferies, LLC.

18   Jefferies has been retained or proposed to be retained as the

19   Committee's investment banker in this case.

20         Mr. Szlezinger would testify that he and Jefferies

21   professionals have extensive experience in knowledge,

22   analyzing, restricting, negotiating and effecting mergers,

23   acquisitions and divestitures, and providing other financial

24   support related to asset sales both in and out of Chapter 11.

25   Mr. Szlezinger would further testify that in his six year

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 1:18-cv-10541-UA    Doc 13-1    Filed 04/26/18    Page 66 of 122
Pg 252 of 309

65

1  tenure at Jefferies he has been involved in at least 13 M&A

2  transactions, both in and outside of Chapter 11.  Prior to

3  his tenure at Jefferies, Mr. Jefferies was involved in

4  numerous M&A transactions.

5       Mr. Szlezinger would further testify that on March

6  24th, 2015 the Official Committee of Unsecured Creditors

7  appointed in these cases, subject to Court approval, retained

8  Jefferies as its investment banker.  Mr. Szlezinger leads

9  that engagement.  Since its retention, Mr. Szlezinger would

10  testify that Jefferies has reviewed the Debtors' sale motion,

11  the stalking horse APA and the declaration submitted by the

12  Debtors in connection with their sale motion.

13       Based upon his review of the record and documents

14  filed in these cases, as well as discussions with the Debtors

15  retained professionals and prospective purchasers, Mr.

16  Szlezinger would testify that in his view the proposed sale

17  process is not structured in such a way as to maximize the

18  value of the Debtors' businesses.  In particular, Mr.

19  Szlezinger would testify that certain changes to the proposed

20  sale procedures would increase the likelihood of a spirited

21  auction process.  For example, Mr. Szlezinger would testify

22  that potential bidders may disinclined to submit a competing

23  bid or be involved in the process if the secured lenders were

24  permitted to credit bid the large outstanding amounts under

25  their prepetition facilities, together with potentially

1   amounts provided as bid protections.  Placing [indiscernible]

2   rights is likely to encourage auction participation and

3   competitive bidding.

4        Mr. Szlezinger would further testify that the

5   estates would likely benefit from a reasonable extension of

6   the sale deadlines of 60 days given the Debtors' very limited

7   prepetition marketing, the limited progress made with the

8   potential acquirer universe on a post-petition basis and the

9   continued lack of forward looking projections or business

10  plan, which are important elements that bidders ordinary

11  consider in the evaluation process.

12       Mr. Szlezinger would further testify that potential

13  bidders may want to purchase certain components of the

14  Debtors' business, not necessarily the entire business; thus,

15  there is no additional time to conduct due diligence and to

16  [indiscernible] and strategies for any separate businesses.

17  Mr. Szlezinger would testify that the required deposit

18  amount, 10 percent of the purchase price or approximately $28

19  million dollars, is high right over to the stalking horse

20  deposit of just $2 million dollars.

21       In addition, the Debtors may hold onto the deposit

22  for 60 days after entry of a sale order.  These factors may

23  show bidding.  Mr. Szlezinger would further testify that the

24  bid protections, both the break-up fee and the expense

25  reimbursement, which could total approximately $9 million

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 15-10541-BLS    Doc 1811-1    Filed 04/26/19    Page 67 of 122
Pg 254 of 309

67

1    dollars are unnecessary in light of Silver Point's

2    prepetition involvement with Standard Register and pre-

3    existing knowledge of the Debtors' businesses.  Further, Mr.

4    Szlezinger would state that there is strong, that the

5    stalking horse bidder would have been willing to bid for the

6    Debtors' assets without these protections.  In addition, bid

7    protections are particularly inappropriate given the

8    existence of serious interest from other potential buyers of

9    the Debtors' assets who expressed an interest in being the

10    stalking horse bidder.

11        The bid protections are more likely to chill bidding

12    rather than encourage it and often are not provided in cases

13    in which a stalking horse bidder credit bids its prepetition

14    secured claims.  Mr. Szlezinger would testify that for these

15    reasons the bid procedures should not be approved as

16    proposed.  That concludes the proffer of Mr. Szlezinger, who

17    is available for cross.

18        THE COURT:  Do you need a minute.  Sure.  We will

19    break for five minutes.  Stand in recess.

20      [Recess 11:54:25 to 12:02:29]

21        THE COURT:  Please be seated.

22        MS. LEVINE:  Your Honor, Mr. Szlezinger.

23        THE COURT:  Very good.  Swear the witness.  Please,

24    remain standing.

25                    LEON SZLEZINGER, SWORN

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Pg 255 of 309
Case 15-10541-BLS   Doc 131   Filed 04/20/15   Page 68 of 122

Szlezinger - Cross                     68

 1          THE CLERK:  Please state your full name for the

 2   record.

 3          MR. SZLEZINGER:  Leon Szlezinger, S-z-l-e-z-i-n-g-e-

 4   r.

 5          THE COURT:  Welcome, sir.

 6                    CROSS-EXAMINATION

 7   BY MR. LUTZ:

 8   Q.  Mr. Szlezinger, thank you for being here.  I just wanted

 9   to touch on a couple of points from your proffer, starting

10   with the bid protections.  Did Standard Register, to your

11   knowledge, have any alternative stalking horse bidders who

12   were willing to provide terms without a breakup fee and

13   expense reimbursement?

14   A.  No.

15   Q.  You're familiar with the declaration submitted by Mr.

16   Torgove in this case?

17   A.  Yes.

18   Q.  Did you review Mr. Torgove's deposition in this case?

19   A.  I did.

20   Q.  You understand from his testimony, don't you, that

21   Standard Register pushed back as fast as it could on the

22   request for the inclusion of an expense reimbursement and

23   breakup fee?

24   A.  I believe it says that, correct.

25   Q.  You understand from Mr. Torgove, his testimony in his

1  declaration that he was told by the stalking horse bidders

2  that a bid wouldn't be accepted without those provisions, is

3  that your understanding?

4  A.    That he was told?

5  Q.    Yeah.

6  A.    I think he might have testified to that.

7  Q.    Your testimony or your proffer about the 10 percent that

8  was a required deposit for bidders, correct?

9  A.    Yes.

10  Q.    It's your understanding, isn't it, that a 10 percent

11  deposit is standard in 363 sales processes?

12  A.    Ten percent is relatively standard, but I don't think

13  that's the point that I was making in my proffer.  The

14  proffer, I think as it was read, says 10 percent is high in

15  comparison to the deposit by the stalking horse.

16  Q.    I understand what your proffer says.  I understand from

17  your testimony right now that it is your testimony that 10

18  percent is generally standard in 363 sales processes?

19  A.    I think it's relatively standard.

20  Q.    I want to go to the 60 days.  You say in your proffer

21  that an additional 60 days would be helpful for the sales

22  process, is that right?

23  A.    I think that's what I said, yes.

24  Q.    So what you are suggesting here is rather than

25  approximately a 90 day sales process, you think it should be

1  approximately a 150 day sale process, is that right?

2  A.  I think that within the outside date of September 8th, the

3  deadline should be pushed back within that time scale, yes.

4  Q.  Are you aware of something from a bidder that would

5  happen after 90 days that couldn't happen within a 90 day

6  sale process?

7  A.  Well, I think the point I'm making is that you would

8  foster more auction activity if you had a longer time line

9  because it would enable what is generally to be able to do

10  more diligence, have financing discussions and management to

11  give fulsome presentations as bidders, hopefully, become

12  interested.

13  Q.  Have you spoken to bidders who say that they are unable

14  or unwilling to provide a bid in the 90 day period, but that

15  they would provide a bid and they would be willing to do so

16  if it were extended another 60 days?

17  A.  I was talking to a bidder who said that they would prefer

18  to see a longer time line.

19  Q.  Did they tell you that they wouldn't provide a bid in the

20  90 day period?

21  A.  They did not.

22  Q.  Did they tell you that they were unable to provide a bid

23  in the 90 day period?

24  A.  No, they said they would prefer a longer time line.

25  Q.  Did they say that they were going to, you know, up root

 1 | and abandon the process if it were limited to a 90 day
 2 | period?
 3 | A.   They didn't, they said more time would be better.
 4 | Q.   You also said that one of the reasons why you think 60
 5 | days would be preferable is the "limited progress made with
 6 | the potential acquirer universe on a post-petition basis."
 7 | A.   I think I, prepetition and post-petition, yes.
 8 | Q.   I'm just reading the proffer.  It says on a post-petition
 9 | basis.
10 | A.   Yeah.
11 | Q.   What is the basis of your knowledge of the post-petition
12 | sales process?
13 | A.   Regular update conversations that I have had with Lazard
14 | and documents being posted to the data room, which show
15 | progress through contacting bidders.
16 | Q.   Your aware from your investigation or your research that
17 | the company has entered into 15 NDA's with potential
18 | acquirers, is that right?
19 | A.   I think that's right, yes.
20 | Q.   And the company has reached out to over 100 potential
21 | acquirers to inform them of the process and to start the
22 | process of engaging their interests, do you understand that?
23 | A.   I think that's 115, I'm not sure that they have reached
24 | out to all 115.
25 | Q.   Over 100, let's just say.

Szlezinger - Cross                    72

1   A.   I'm not sure that's necessarily right because in

2   conversation on Thursday of last week I was told by Mr.

3   Torgove that the company was, that Lazard was just making a

4   start on the 40 names that Jefferies had given to Lazard,

5   which would mean that they have reached out to some like 70

6   or 80.

7   Q.   Okay.  Are you aware that of the 15 companies who had

8   entered into NDA's, that they had commenced their diligence

9   process?

10  A.   It depends what you mean by commence their diligence

11  process, but I believe that they had at least all been send a

12  confidential information memorandum.

13  Q.   Is it your understanding that they have also been given

14  access to the data room that's been set up?

15  A.   I think that's right, yes.

16  Q.   Many of them have had meetings with management, do you

17  understand that?

18  A.   Some have had meetings with management.

19  Q.   And you also understand, don't you, that some of the

20  companies who have entered into NDA's are companies who had

21  expressed interest and pursued a potential transaction

22  prepetition, is that right?

23  A.   A few of them, yes.

24  Q.   Including one who almost got to the finish line

25  prepetition, right?

1  A.  I don't want to characterize it that they almost got

2  there or not; they didn't get there.

3  Q.  Let me clarify and thank you. Including one of the

4  companies who is continuing to investigate a potential

5  transaction post-petition is a company with whom the Debtor

6  engaged in substantial negotiations about a potential

7  stalking horse bid prepetition, is that your understanding?

8  A.  That is my understanding.

9          MR. LUTZ:  I have no further questions.

10         THE COURT:  Any re-direct or cross?  Very good.

11         MR. MEISLER:  Thank you, Your Honor, Ron Meisler on

12 behalf of Silver Point Finance, LLC.

13                  CROSS-EXAMINATION

14 BY MR. MEISLER:

15 Q.  Good afternoon, Mr. Szlezinger.

16 A.  Mr. Meisler.

17 Q.  Nice to see you.

18 A.  You to.

19 Q.  Mr. Szlezinger, with respect to the credit bid and the

20 bid protections, you're not saying it's never possible in the

21 context of the credit bid to have bid protections, are you?

22 A.  I mean it's always possible to have something.  I am

23 saying that in this context, I don't feel it's appropriate.

24 Q.  Thank you, but it's true that it is possible, that is

25 your testimony, and it's possible that there could be a

 1  circumstance where you could have bid protections with

 2  respect to a credit bid?

 3  A.   I mean, I suppose it's possible.  I think the real

 4  analysis goes to how invested the credit bidder has been in

 5  the company, how involved it's been in the company and an

 6  analysis of whether or not absent those bid protections, it

 7  would be putting forward its stalking horse bid.

 8  Q.   Thank you.  Mr. Szlezinger, do you think Standard

 9  Register would be better served without Silver Point's

10  stalking horse bid?

11  A.   No, I don't.

12  Q.   Thank you, Mr. Szlezinger.  My last question --

13  A.   Unless, sorry, I was just going to say unless there was,

14  you know, an alternative stalking horse bidder, but in the

15  circumstances we are in now, no, I don't.

16  Q.   Thank you.  Mr. Szlezinger, have you reviewed the DIP

17  credit agreements, the DIP ABL in particular?

18  A.   I wouldn't say I have done an extensive review of them at

19  all, no because the Committee has people looking at those

20  issues.

21  Q.   So Mr. Szlezinger, when you say that September 8th is

22  really the outside date, from where do you get that date that

23  you think the sale procedures should go until September 8th or

24  that you should match the sale procedure to a September 8th

25  date?

Szlezinger - Cross                         75

1   A.   I think that's a deadline that came from the DIP.

2   Q.   Thank you.  Are you aware that in the DIP ABL credit

3   agreement, there is a covenant that on or prior to June 19th,

4   2015 an order must be entered approving the Debtors' sale of

5   substantially all their assets?

6        MS. LEVINE:  Your Honor, this is outside the scope

7   of the direct.

8        THE COURT:  I'll allow it.

9        THE WITNESS:  I'm sorry, could you repeat the

10  question?

11  BY MR. MEISLER:

12  Q.   Are you aware that there is a covenant in the DIP credit

13  agreement and the ABL in particular that on or prior to June

14  19th, 2015 there must be an order approving the Debtors'

15  motion to sell substantially all of their assets?

16  A.   Yes, I believe.

17  Q.   Are you also aware, Mr. Szlezinger, that the DIP credit

18  agreement has a covenant that says, sorry, this is in the ABL

19  in particular, that says 30 days, the covenant says 30 days

20  after entry of the sale order, if the sale and Debtors'

21  assets pursuant to such an order has not been closed for any

22  reason other than the issuance or the stay pending appeal

23  from the sale order, are you aware of that covenant?

24  A.   Could you just read it again?

25  Q.   That if the buyer and the seller don't close on the

1   transaction 30 days after the sale order has been entered

2   approving the sale, are you aware that that covenant exists?

3   A.   I think I am generally aware.

4   Q.   And if you take June 19th and you add 30 days, Mr.

5   Szlezinger, approximately what date do you get?

6   A.   July 19th.

7   Q.   Terrific and, Mr. Szlezinger, in that context if we took

8   your approach and the sale procedures last until September

9   8th, do you believe that we would have a default under the DIP

10  ABL?

11  A.   Again, I haven't analyzed those defaults.  I think, you

12  know, my testimony has been that you would get more auction

13  activity if you had a longer time line in which they are

14  running the sales process.

15  Q.   Terrific, but, Mr. Szlezinger, do you believe that the

16  sale process would be harmed in the face of a DIP default?

17  A.   I think generally a DIP default would not be a good

18  thing.

19  Q.   Mr. Szlezinger, if I told you that if you went all the

20  way to September you, in fact, would have a DIP default.

21  Would you agree that going to September 8th is, in fact, a bad

22  idea?

23  A.   Again, I think that a DIP default wouldn't be a good

24  thing in the context of a sale.  I agree with that.

25          MR. MEISLER:  Thank you.  That's it, Your Honor.

1          THE COURT:  Re-direct?

2                    RE-DIRECT EXAMINATION

3  BY MS. LEVINE:

4  Q.  Mr. Szlezinger, just a couple of questions on re-direct.

5  In the cross-examination by Debtors' counsel, they kept

6  talking about a 90 day time period.  I am assuming that that

7  90 day time period ran from the filing of the petition

8  through the current sale time line.  Isn't it true that the

9  sim was first posted to the data room on April 2nd?

10 A.  Yes, I think that is correct and the sim did not contain

11 projections, which buyers would undoubtedly want to see.  So

12 I would say a possible sim almost.

13 Q.  And has a business plan been posted to the data room as

14 we sit here today to your knowledge?

15 A.  It hasn't.  My understanding is that it's not complete.

16 So buyers that want to look at the future for the business

17 are unable to do so.

18 Q.  Did you request any meetings with management as part of

19 your diligence?

20 A.  Yes, we did a couple of days after we were hired by the

21 Creditors Committee, we requested management presentations

22 and we have not been afforded that opportunity.

23 Q.  In your review of the asset purchase agreement that's

24 currently the credit bid asset purchase agreement or the

25 stalking horse bid, is there any distribution contemplated to

 1  unsecured creditors?

 2  A.  There is not.

 3          MS. LEVINE:  Thank you.

 4          MR. LUTZ:  Just one quick question.

 5                    RE-CROSS EXAMINATION

 6  BY MR. LUTZ:

 7  Q.  Is it your understanding that the business plan is going

 8  to be available on April 15th?

 9  A.  I think it was not specifically said April 15th.  At some

10  point this week I was told that there would be some sort of

11  business plan.

12  Q.  April 15th is this week.

13  A.  Well, April 15th is Wednesday, but I wasn't told it would

14  be on Wednesday.

15  Q.  Is it your understanding that on April 2nd, the date that

16  you testified about, there were approximately 1,100 other

17  documents available to folks who had access to the data room?

18  A.  I'm not sure if 1,100 is --

19  Q.  Is it your understanding there are a lot of documents

20  that were available to bidders or potential bidders who had

21  access to the data room?

22  A.  There is a lot of documents in the data room.

23  Q.  And that was also true on April 2nd, right?

24  A.  Yeah, none of them are financial projections.

25          MR. LUTZ:  Thank you.  No further questions.

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 15-30541-bjh    Doc 1811    Filed 04/26/19    Page 79 of 122
Pg 266 of 309

79

1          THE COURT:  Thank you, sir, you may step down.  Why

2     don't we do this; this is a good time to break for lunch.  We

3     will reconvene at 1:30 and I would like to, at least, given

4     that I haven't had argument and I am not sure whether the

5     evidence is closed, but I at least have some observations

6     that I would share with you and perhaps you might discuss

7     during the lunch break and maybe parse some of these issues

8     down.

9          I want to be clear that many, many issues have been

10    raised in the various objections of the U.S. Trustee,

11    particularly the Committee and we haven't touched on the PBGC

12    as well.  I think it would be appropriate for me, at least at

13    this point, to share what my observations are, subject,

14    obviously, to being convinced otherwise.

15         First, with respect to the issue of time line, I am

16    not particularly troubled by the time line that the Debtors

17    have proposed that puts us into June.  The fact of the matter

18    is that more time, I think, is generally better if you are

19    looking to get a buyer, but the fact of the matter is that

20    also that we have to evaluate this within the context of a

21    bankruptcy proceeding.  There is a substantial amount of time

22    that has begun.  I give relatively limited significance to

23    the prepetition marketing effort.  I take it at face value,

24    but, frankly, every case presents a prepetition marketing

25    effort of one form or another.  It hadn't occurred under my

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 15-10541-BLS    Doc 131    Filed 04/20/15    Page 80 of 122
Pg 267 of 309

80

1  review, so I am not really going to attribute that much

2  significance to it.  That becomes a much more significant

3  issue when a Debtor is looking to move on more of a

4  lightening pace.

5         This is, obviously, a large business being sold in a

6  hurry, but this is something that we have seen before.  So at

7  least my instincts are that while I understand the

8  Committees' request that the process be extended out, I am

9  not satisfied on the record before me today that that is

10  necessary or appropriate.  I take it, again, the Debtors'

11  concerns with respect to the risk to the process.  I will

12  note that I don't attribute that much significance to the

13  prospect of a DIP default associated with that.  Milestones

14  and tying the bid procedures together with the DIP order,

15  that is, I guess the state of the art, but it is not the

16  prospect of a DIP default that is leaving me to side with the

17  Debtor on the issue of timing. I am satisfied, at least on

18  the record before, that timing is sufficient.

19         At a later point, and I have done this on a number

20  of occasions, if the record develops that there is interest

21  or that the time line is not sufficient, then I would hear

22  from the Committee or any other party in interest that would

23  seek to push that process out, but at least at this point, it

24  would seem to me that the time line is not inappropriate.  I

25  would also observe that, at least on the record developed

18-23538-shl  Doc 884  Filed 11/26/18  Entered 11/26/18 20:52:28  Main Document
Case 15-10541-BLS  Doc 1811  Filed 04/20/18  Page 69 of 127
Pg 268 of 309

81

1  before me, it is highly unlikely that I would approve a

2  breakup fee for Silver Point in this situation.

3       For reasons largely stated by the United States

4  Trustee, that I won't necessarily repeat, breakup fees are

5  cautiously given.  We approve them with some regularity, but

6  I think the case law in this jurisdiction and in the Third

7  Circuit require that I make a specific finding that that

8  breakup fee is necessary to preserve property of the estate

9  and I am not, at least, satisfied on the record that I have

10  before me that this is, in fact, necessary.

11       The record does reflect that Silver Point is

12  substantially invested on an equity and a secured creditor

13  basis.  While I think the witness testified without, frankly,

14  much contradiction that the stalking horse opportunity

15  provided by Silver Point in this case is helpful to the

16  Debtor and I think Mr. Szlezinger testified that this would

17  be worse if we didn't have a stalking horse.  The fact of the

18  matter is that under these circumstances, I would not be

19  prepared to approve a breakup fee on the record thus

20  developed before me.

21       With respect to the expense reimbursement, the

22  expense reimbursement is in excess of what I would be

23  prepared to approve. The reason is that it's a lot of money.

24  I recognize that there are costs associated with doing these

25  transactions, but the record also reflects that substantial

18-23538-shl  Doc 884  Filed 11/26/18  Entered 11/26/18 20:52:29  Main Document
Case 18-10541-BLS  Doc 131  Filed 04/20/18  Page 82 of 127
Pg 269 of 309

82

1  expenses were reimbursed or paid in connection with the DIP

2  financing and as this hearing has reflected, the DIP

3  financing and the sale transaction in many ways conquer the

4  same ground.

5       So it seems to me that a breakup fee north of $2

6  million, as currently described, you know, $1.5 or actually

7  approaching $4 million dollars, a $1.5 percent amount is

8  beyond what is necessary, beyond what is appropriate.  I

9  realize it's subject to documentation, but that's a larger

10  number then I would be prepared to approve.  The fact that

11  it's subject to documentation does not mean that it won't

12  necessarily have a chilling effect on bidding.  If it comes

13  in lower, the fact of the matter is any competing bidder has

14  to assume it's the full nut.

15       With respect to credit bidding, again, there is

16  nothing, at least in the record before me, that would require

17  me to preclude or impair Silver Point's request to credit

18  bid, but I note that the Committee is doing its investigation

19  and that process will play out.  Clearly, we will be past the

20  expiry of the challenge period, presumably by the time that

21  we get to the auction and sale process unless that period is

22  extended.  I will not entertain extending it today, nor will

23  I entertain a request for standing today, but we have dealt

24  with this issue before.  We dealt with it by agreements

25  between the parties and a number of different structures that

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:23   Main Document
Case 15-10541-BLS   Doc 1811   Filed 04/26/18   Page 83 of 122
Pg 270 of 309

83

1   I don't think I need to explain to you.

2         The fact of the matter is that the response or the

3   issue that I would be focused on in this context about the

4   Committee investigation and where we go from here is that I

5   am unlikely to be enthusiastic about being placed in a

6   position of considering emergency motion practice on the eve

7   of a Committee deadline. How we deal with that is really up

8   to you, but I am not going to grant standing today and I am

9   not going to extend that period today.

10         Second, with respect to the credit bidding, I leave

11   to the financial advisors and folks that will be running this

12   auction, at least the observation that it may be that there

13   are issues with respect to the validity, extent and priority

14   of Silver Point liens when you get to an auction.  I

15   understand that that is, at least, currently a default

16   element under the DIP as well as withdrawal right of the

17   stalking horse.  I think I need to understand that a little

18   bit more.  So I am not really able to give you comment on

19   that at this point.

20         The fact of the matter is that a Committee is doing

21   its investigation and our local rules, I think good policy

22   require that they be afforded the opportunity to do that.

23   With respect to the liens on previously unencumbered assets,

24   we have talked a good deal about that and I would certainly

25   welcome further guidance from the parties, but to be clear on

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-23541-RDD   Doc 181   Filed 04/26/19   Page 84 of 122
Pg 271 of 309

84

1  at least one point, in the face of a Committee objection, I

2  am very unlikely to approve a lien on avoidance actions.  I

3  don't know that I have done so over a Committee objection in

4  the past, but in the context of this case, I would be

5  unlikely to do so today.

6        There is an interplay between that lien on avoidance

7  actions in the sale process, which is whether or not the

8  buyer of a company wants their customers and vendors to be

9  subject to the possibility of Chapter 5 litigation.  That is

10  a separate issue to me, to the inquiry about whether or not

11  the lender is entitled or can be granted liens on avoidance

12  actions.  So, again, my practice in that area is that I would

13  be unlikely to approve or authorize that with respect to at

14  least that category of unencumbered assets.

15        With respect to, I guess, two separate areas, the

16  cap on the investigating liens, which is $25,000.00, which I

17  regard as a plug number, certainly not realistic in the

18  context of this case and the UCC professional budget.  It is

19  generally my practice not to dictate what numbers I would

20  like or what I think is out there.  In the absence of

21  consensus with respect to those elements, especially, and at

22  least some issue with respect to wind down, I am unlikely to

23  approve a 506(c) waiver, particularly over a Committee

24  objection.

25        I do believe that the UCC budget is light.  I know

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 15-10541-BLS   Doc 181   Filed 04/20/15   Page 86 of 122
Pg 272 of 309

85

1   nobody likes giving the UCC funding, but that is you call

2   your congressman, they are a part of the process.  But,

3   again, my practice is that I do not plug in those numbers

4   because I just don't believe that I have any basis to do so.

5   I would also observe that in other situations and in this

6   situation today, if need be, I will reserve to myself the

7   right to allocate amounts that are provided for under the DIP

8   financing budget in order to ensure that the Committee is

9   fairly compensated.  That may be a fee application issue.

10          With respect to a couple little specific issues,

11   it's my expectation that the standard arrangements for

12   attendance at an auction and consultation opportunities and

13   privileges for a Committee will be accorded here.  I expect

14   that the parties will be able to work out objection deadlines

15   in the filing and briefing submissions.  Most of this is

16   ground that parties have plowed before.  I do think that a

17   deposit of 10 percent, while it's a typical number, not

18   unusual, I think that it is high in this context given the

19   amount of the overall transaction.  So I do have some

20   concerns that having to post a deposit of up to $30 million

21   dollars and leave it sitting can have a negative effect on

22   somebody's willingness to even go down that path, but I leave

23   that, again, to the financial advisors and others.  To me,

24   again, on my instincts, that does seem a bit of concern.

25          There was colloquia with respect to budget variance

18-23538-shl    Doc 804-1    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 15-10541-BLS    Doc 181-1    Filed 04/26/15    Page 86 of 122
Pg 273 of 309

86

1   items and a 5 percent versus 10 percent, again, in my

2   experience 10 percent is a relatively common figure, 5

3   percent if there is a reason for it.  I think someone needs

4   to explain it to me, but the concern I have is, at least

5   initially as articulated by the Committee, that this may

6   trigger a default.  Again, where a lender is lending into a

7   post-petition situation that can identify the defaults, the

8   exercise of their remedies is subject to, obviously, motion

9   practice and authority by this Court.  I think I need some

10  guidance on exactly what that issue is.  That may be a

11  smaller issue.

12          I also realize that in my comments I haven't covered

13  everything that everybody has laid out, but, again, it's been

14  difficult to follow with the way that the, and I mean no

15  criticism, but the way that the evidence has kind of come in.

16  We haven't necessarily walked through all of these items, but

17  Mr. Rosenthal, at the beginning of the hearing, I think you

18  had tried to point out a number of issues that were taken off

19  the table.  My goal with my now extended comments today

20  would, at least, be to give the parties something they can

21  confer upon and those issues that remain in material dispute,

22  I would be happy to address, but, hopefully, again, this is

23  nobody's first rodeo in this room.

24          We have seen sales.  This is a sale case.  I accept

25  that.  It will proceed on a schedule and it will proceed in

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 15-10541-BLS   Doc 181-1   Filed 04/26/18   Page 87 of 122
Pg 274 of 309

87

1  an effort to maximize value for all parties in interest.

2  With those observations I would leave you to lunch and I will

3  see you at 1:30.  We stand in recess.

4    [Recess 12:35:11 to 1:54:40]

5          THE COURT:  Please be seated.  Mr. Rosenthal.

6          MR. ROSENTHAL:  Your Honor, we did have an

7  opportunity visit, right before Court began, with Silver

8  Point.  I think they are prepared to make a proposal.  I can

9  tell it to you, but I think it's better coming from them.

10          THE COURT:  Okay.

11          MR. ROSENTHAL:  Do you want me to hand it up?

12          UNIDENTIFIED SPEAKER:  I think we probably first

13  want to hear all the issues before, unless that's all the

14  issues that are on the table, in this case, yes.

15          THE COURT:  Well, have you conferred with the

16  Committee?

17          UNIDENTIFIED SPEAKER:  We have not.

18          THE COURT:  Here is the thing; that's fine and I

19  appreciate the effort into formulating a proposal.  There are

20  obviously a number of moving parts.  I shared with you the

21  observations I had as to a number of them.  There was

22  obviously, I'm not sure who put the pavlovian reflex line

23  into their brief, but there were a lot of issues that were

24  raised by the Committee, that none of which were terribly

25  surprising.  Whether we respond to each of those is anybody's

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 18-10541-BLS Doc 131-1 Filed 04/26/19 Page 88 of 122
Pg 275 of 309

88

1  guess at this point.

2       My goal was to sort of formulae the dynamic and to

3  make it clear to all parties that we were moving forward from

4  today, that there will be a sale process on a particular time

5  line and, at least, some observations about what I thought

6  were fair and appropriate elements of that sale process and

7  the issues in the DIP. I think what I would rather do is

8  give you 20 minutes to confer with the Committee because I

9  don't feel uncomfortable about putting them in awkward

10  position, but it puts me in an awkward position because I am

11  not necessarily going to negotiate this with you in the way

12  that I think I would be about to start in about five minutes.

13       There are a number of issues. I don't know

14  precisely what ones have traction, what ones I am obliged to

15  address and rule upon, what ones are susceptible to

16  resolution. The one thing that I do know is that the

17  Committee and the stakeholders know a lot more about this

18  business and about the process that needs to move forward

19  then I do. While there may not be consensus about that,

20  where consensus can be achieved right and where it can't,

21  then I will provide either ruling or guidance. I think you

22  ought to have that discussion with the Committee. Let's find

23  out where the rubber meets the road and then I can, at least,

24  provide some further guidance to the parties if you need it.

25  Does that sound fair? All right, 20 minutes. Stand in

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 2:15-30541-BES Doc 1811 Filed 04/26/15 Page 89 of 122
Pg 276 of 309

89

1  recess.  Thank you.

2    [Recess 2:01:15 to 3:04:14]

3        THE COURT:  Please be seated.

4        MR. ROSENTHAL:  Your Honor, thank you for the time

5  for the parties to meet.  There have been discussions going

6  on during the break.  Unfortunately, we don't have a deal to

7  report to you.  There were discussions about every aspect of

8  the points that you raised in addition to a couple other

9  issues.  The parties reached an impasse.

10        THE COURT:  Okay.

11        MR. ROSENTHAL:  I think we need your help on,

12  particularly on the issues that you raised.  There are two

13  other issues that I want to throw into this; one related to a

14  notice of amendment of DIP documents.  I think there have

15  been some productive discussions about that.  The documents

16  already provide for notice of amendments of material changes.

17  The question has arisen about notices of immaterial changes,

18  particularly as they relate to the ABL lender, which has

19  borrowing based determinations all the time and everything.

20  I think the Committee and the ABL DIP lenders are working

21  through those issues.

22        Then there was an issue raised by Ms. Levine by the

23  no phase II's.  So we had a discussion about that.  So let me

24  just report on that.  So the discussion on the environmental

25  phase II's was everyone is permitted to phase I's.  People

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 19-10541-BLS Doc 181-1 Filed 04/26/19 Page 80 of 112
Pg 277 of 309

90

1  are permitting to do phase II's, but the Debtors don't want

2  it to be uncontrolled.  So we said to them if you want to do

3  phase II's, come to us with a program for which you want to

4  do.  I put them in touch with one of my environmental

5  partners that they work out a protocol.  We are not paying

6  for the phase II's and everybody seems to be okay with that.

7  So there is a light at the end of that tunnel.  I wish I

8  could report a deal, but we weren't able to get there.

9        THE COURT:  Okay.  What do you want me to do?

10        MR. ROSENTHAL:  Well, I think we should make final

11  arguments and then ask the Court to rule.

12        THE COURT:  Well, I think I'm at a point where I

13  would be prepared to hear what Silver Point has to say, if

14  they are prepared to relate that.  When I asked you to go

15  into the hall with the Committee, it was not necessarily what

16  I expected.  I certainly would have welcomed a resolution,

17  but I'm not going to fault anybody one way or the other at

18  this stage for not reaching consensus.

19        A couple folks stood at the podium today and said

20  well, Your Honor, is binary.  You can approve the DIP or you

21  can't or you can approve the sale or you can't.  This job

22  would be a lot easier if it worked out that way.  I have told

23  you that there are elements of the DIP that I am not

24  comfortable with.  There are elements of the sale process I

25  am not comfortable with.  It doesn't advance the ball for

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 05-30541-BLS    Doc 181    Filed 04/20/18    Page 91 of 122
Pg 278 of 309

91

 1  anybody for me to say denied, good luck, try to think of

 2  whatever it is I'm thinking of in the future.

 3       So I think I am at a point where I would be prepared

 4  to hear what, frankly, where the parties are.  There are a

 5  lot of moving parts, most of which are susceptible to either

 6  disposition or resolution.  I think I have said,

 7  unequivocally, it's my expectation this case will move

 8  forward from today, but it has to proceed in a way that it is

 9  fair and responsive to the issues that have been raised, not

10  just by the Committee, but by the U.S. Trustee and by the

11  PBGC.  I shared with you at least some concepts that I

12  thought would be helpful to the parties to understand.  I

13  would be ready to be further advised from the parties.  Ms.

14  Levine, do you wish to be heard?

15       MS. LEVINE:  Yes, Your Honor.  First, Your Honor,

16  thank you for the break.  It was productive and we

17  appreciated that.  We also under that, at least the last

18  round of the order that we sort of did include the language

19  that was requested by the PBGC.  So if that stays, that issue

20  is resolved as well.

21       With regard to the issues that Your Honor talked

22  about right before the break, we heard Your Honor loud and

23  clear with regard to the time line and the Committee will

24  live with that.  With regard to the breakup and the expense

25  reimbursement, we still believe that in this particular

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 25-10541-BLS    Doc 13-1    Filed 04/26/25    Page 92 of 122
Pg 279 of 309

92

1    circumstance it's not really warranted.  I don't know whether

2    or not the U.S. Trustee has changed their position on that as

3    well, but right now I think we need Your Honor's help with

4    that.

5            With regard to the unencumbered assets, we heard

6    Your Honor with regard to the avoidance power actions.  I

7    think we need Your Honor's help with regard to the 35 percent

8    of the stock and with regard to the Mexican assets.  With

9    regard to the lien challenge, we think at one point during

10   the discussions, and we understand it was all or nothing, so

11   it may not still be on the table, but we thought we heard

12   Silver Point say that they would be willing to go to 75. If

13   that is the number, we would be willing to accept it.

14           THE COURT:  In terms of days?

15           MS. LEVINE:  No, $25,000.00 for the carve out to $75

16   for the carve out for the lien investigation.  The dates

17   were, I had thought that the dates were revised to June 1st,

18   June 11th, June 15th, 16th and 17th.  We appreciated the

19   additional timing and also that the objection deadline now

20   falls after the lien challenge.

21           There was a concept that was talked about with

22   regard to the deposit, taking it down from 10 percent to a

23   flat $10 million, but if whoever is the either highest or

24   second highest bidder at the auction is not Silver Point,

25   they post or agree to a total of $15 as a liquidated damage

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 15-10541-BLS    Doc 1811    Filed 04/26/19    Page 93 of 122
Pg 280 of 309

93

1    clause for the estate.  We thought that was creative and we

2    appreciated that, Your Honor.

3         With regard to the lien items and the budget, the

4    payroll, health and benefit and postage reimbursement, the

5    proposal was made to go to $7 and a half.  We still really

6    don't understand why it shouldn't be $10 and we think $10 is

7    market.  So we would ask for Your Honor's ruling there.  With

8    regard to standing and tolling with regard to a challenge,

9    there is nothing on the table.  We think we also heard Your

10   Honor say that that's for another day so we understand that.

11        With regard to amendments to the DIP, we had some

12   conversations, as Debtors' counsel indicated, with the ABL

13   lender.  So long as the amendment is favorable to the Debtor

14   and they give us notice, you know, as soon as practical with

15   regard to that that makes sense.  We know they are talking to

16   their lender every day with regard to the asset based loan.

17   We do think that with regard to the term loan there should

18   be, if allowed amendments, there should be some ability for

19   us to come into Court and be heard even if it's on an

20   expedited basis, but that hasn't been resolved yet.  With

21   regard to the professional fee budget, Your Honor, there

22   doesn't seem to have been any resolution with regard to the

23   Committees' fees.  So that is still an open issue.

24        THE COURT:  Okay.  Mr. Meisler.

25        MR. MEISLER:  Thank you, Your Honor.  Your Honor, we

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:29    Main Document
Case 1:19-cv-10141-RES    Doc 13-1    Filed 04/26/19    Page 94 of 122
Pg 281 of 309

94

1   did make a package proposal that we discussed with the

2   Debtors and we discussed with the Committee, and I will try

3   to do this in an expedited fashion.  The time line, Your

4   Honor, you said that was fine and that a breakup fee and

5   expense reimbursement, we reduced our breakup fee from 2

6   percent to 1 percent.  On the expense reimbursement, we

7   reduced our ask from 1 and a half percent, which is

8   approximately $3.7 million dollars to $1.5 million dollars,

9   which is about a half a percent, which is a cap.  We do have

10  to show documentation on our fees and expenses.

11       With respect to credit bidding, Your Honor, we are

12  fine with the way that you mentioned or communicated your

13  observation.  With respect to liens on previously

14  unencumbered assets, Your Honor, this one is a very important

15  one to us.  With respect to avoidance actions, Your Honor, we

16  were fine with your observation with the caveat that you had

17  recognized, which is the buyer/seller may have views about

18  the avoidance actions on vendors or customers.  In our

19  stalking horse bid, we do require any avoidance actions on

20  customers and vendors.

21       You understand the rational for that and so while we

22  are willing to live as the lender without liens on the

23  avoidance actions or the proceeds there of, we would insist

24  upon a standstill with respect to pursuing avoidance actions.

25  This really goes to the Debtors because the avoidance actions

1  are really in their [indiscernible] at this time.  We would

2  insist upon a standstill so that no avoidance actions could

3  be brought during a sale process.  We would also insist that

4  a buyer have the right to require those as our proposal does.

5      With respect to the investigation budget, Ms. Levine

6  did report accurately that we proposed to increase the budget

7  from $25,000.00 to $75,000.00.  There are plenty of examples

8  to support a $75,000.00 investigation budget in case it's

9  much larger than the one --

10     THE COURT:  You can live with that?

11     MR. MEISLER:  Correct, Your Honor.  On the

12 professional fee budget, Ms. Levine did report correctly that

13 we were not willing to change the allocation to the

14 Committee.  We were willing to live with your observation or

15 comment that you would not a 506(c) waiver with respect to

16 the Committees' fees and we would live with that.  We also

17 understand your reservation of rights that you are not bound

18 to the professional fee budget and that you would look at

19 that professional fee budget and you might allocate

20 differently.  We understand that.

21     With respect to attendance at auction, we don't see

22 that as something in dispute.  The same with deposit.  We

23 don't see that as something in dispute.  On the budget

24 variance we did go from a 5 percent on those three line

25 items, payroll, health and benefits and postage.  We moved by

18-23538-shl    Doc 804    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 1:18-cv-10541-UA    Doc 18-1    Filed 04/26/19    Page 96 of 122
Pg 283 of 309

96

1   50 percent.

2        THE COURT:  I am deeply religious about the

3   proposition one way or the other.  I mean, I said a 10

4   percent variance is typical.  I have certainly seen five.  I

5   have also seen 15.  The issue is less a legal issue and a

6   more practical business issue.  If the business is operating,

7   as a general proposition when we tie these things into a

8   budget, neither the Debtor nor, frankly, I want a structure

9   that is created for what I would call non-material defaults

10  to be triggered with some regularity.  So what is the

11  relationship between these two particular line items that

12  requires them to be treated differently from all others?

13       MR. MEISLER:  Sure.  So we think that those items,

14  in particular, should be very easy to forecast.  They should

15  be fairly fixed numbers and, therefore, we think that there

16  should be tighter governments on those particular line items.

17  Now, unlike what Ms. Levine articulated, if the business is

18  going gang busters, we are going to be thrilled.  We would

19  absolutely be thrilled if payroll increases because people

20  are being paid overtime because there is more product being

21  sold.  That is not our concern.  Our concern would be that

22  for whatever reason, money is going out the door to pay

23  employees that has not been approved.  So people are getting

24  bonuses, they are getting stay bonuses that have not been

25  approved by Your Honor.

18-23538-shl   Doc 884   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 15-30541-BES   Doc 181   Entered 04/20/18   Page 89 of 122
Pg 284 of 309

97

1        THE COURT:  Well, that's not going to happen.  I

2   mean, Mr. Rosenthal is going to leave in handcuffs if that

3   sort of thing happens.  That was a joke.  It will be Nestor.

4   It would be Mr. Nestor.  All right, I understand.  That is

5   the kind of thing I am reluctant to get, sort of, into the

6   weeds on, but I have to say that that's not that compelling

7   an explanation.  The reason is this, again, while I think

8   everybody and your plan has as much of a reason as anybody to

9   hope that the business is doing great and going gang busters,

10  but nobody has explained to me, we are not going to see a

11  bonus program that is going to send material dollars out the

12  door unless Mr. Kenny sees it, Ms. Levine sees it and I see

13  it.  If we have got people working over time because we have

14  got lots of work, then that is something that seems like a

15  high class problem.

16        The issue is this, I understand the Committees'

17  point.  I don't want to set the Debtor up for some sort of

18  default issue here and the fact that it's been sort of

19  focused on is what's got my attention to it.  The idea that

20  money, well, money goes out the door all the time; that's

21  what a budget is.  So I am not understanding why this would

22  be a different issue than any number of other items, you

23  know, taxes or other stuff that, you know, again, we budget

24  with a high level of confidence, but one of the reasons I

25  have a job is because not all budgeting is perfect and so

18-23538-shl    Doc 804-1    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-10541-BLS    Doc 1811    Filed 04/26/19    Page 98 of 122
Pg 285 of 309

98

1   here we are.

2          I need a little more guidance on that.  That seems

3   to me like a small issue.  We are two and a half points apart

4   on this issue.  I don't really feel strongly about it one way

5   or the other, but if it's becoming this sticking issue, it

6   seems to me that would give me a bell going off that this is

7   going to turn into an issue.  In front of me, either with the

8   default practice or something else.  So I guess I need

9   comfort or guidance on where we are going with this part.

10         MR. MEISLER:  Your Honor, I think we have a

11  heightened sensitivity as the lender because we are the money

12  lender.  We have concern about how our money is being used.

13  We seek credit risk.  So every dollar that gets spent on this

14  DIP is another dollar that's ahead of our prepetition loans.

15  That also goes to the issue, it fits nicely with the

16  unencumbered asset issue.

17         Your Honor, we don't believe that the value of the

18  unencumbered assets is going to be sufficient to cover the

19  DIP loans.  We don't believe it.  Let me parse that even

20  finer.  We don't believe that the value of the unencumbered

21  assets is going to be sufficient to cover the new money

22  portion of the DIP loans.  So, Your Honor, we have heightened

23  sensitivity with respect to the Debtors spending money and we

24  are supportive of the Debtors in the way they are operating,

25  but that's the reason for our ask that there be certain

18-23538-shl   Doc 804   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 25-10541-BLS   Doc 181-1   Filed 04/20/25   Page 99 of 122
Pg 286 of 309

99

```
1    governors and there was heightened sensitivity, as mentioned,

2    to certain of these three line items.

3           THE COURT:  Can you remind me, I thought its

4    postage, its employee wages.

5           MR. MEISLER:  And health and benefits.

6           THE COURT:  Health and benefits.  Can you remind me

7    of the default mechanism here, what is the notice period?  Is

8    it three days?  Is it five?

9           MR. MEISLER:  There are five days.

10          THE COURT:  I know there is a revised version of the

11   order.

12          MR. MEISLER:  That has not changed.

13          THE COURT:  That has not changed, okay.  All right,

14   I understand.

15          UNIDENTIFIED SPEAKER:  I have a couple comments on

16   it.

17          THE COURT:  Okay.

18          MR. MEISLER:  Your Honor, do I need to add any more

19   clarification?  I know Ms. Levine mentioned the assets of

20   Mexico and maybe there was certain other.

21          THE COURT:  I understand.

22          MR. MEISLER:  You do understand, terrific.

23          MS. LEVINE:  Your Honor, there are two comments.  I

24   just wanted an opportunity to respond to them.

25          THE COURT:  Sure and then Mr. Rosenthal can respond.
```

1      MR. MEISLER:  Your Honor, my colleague just

2   mentioned to me that for clarity, also, I realized I skipped

3   a notice.  The Committee does get notice of amendments.  We

4   are not offering an opportunity to object because with

5   respect to non-material modifications, well, they are just

6   that, they are non-material modifications.  For example, we

7   just amended the DIP creditor agreements because we had a

8   milestone of April 10th as the date that the sale procedures

9   order must be entered and April 12th that the final DIP

10  financing order must be approved and entered.

11      THE COURT:  But didn't I just hear from Mr.

12  Rosenthal that that modification also contemplated then a two

13  point bump in the terms of the --

14      MR. MEISLER:  Your Honor, that's a material

15  modification and that's not the term lenders; that's the ABL

16  lenders amendment.  That is a material modification and I put

17  that in a completely different bucket then non-material

18  amendments.  Thank you, Your Honor.

19      THE COURT:  Ms. Levine.

20      MS. LEVINE:  Your Honor, just two points.  With

21  regard to the lien on avoidance actions, it sounds very

22  reasonable to say just toll them.  Frankly, the Committee

23  really has no intention to be suing vendors or customers

24  during any point in time prior to the sale, but the challenge

25  period expires in advance of the sale and avoidance,

18-23538-shl Doc 0841 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 18-10841-BLS Doc 1 Filed 11/26/18 Entered 11/26/18 20:52:28 Page 291 of 302
Pg 288 of 309

101

1 technically, Chapter 5 causes of action might be the kinds of

2 causes of action that would come into play there as well. So

3 we really truly believe that avoidance actions have no place

4 as part of the lenders collateral and we have had

5 conversations with the Debtor about we are not contending to

6 do anything --

7        THE COURT: I think your comparing apples and

8 oranges. I don't believe that what Mr. Meisler just

9 described as a limitation on the Committee's ability to

10 pursue its investigation and to file whatever it believes is

11 appropriate in the context as a result of that investigation

12 prior to your expert. I think, what I understood as comments

13 to be was he does not want Chapter 5 causes of action filed

14 against parties that are likely to be the sorts of vendors or

15 customers that are a sensitivity issue. I think that's a

16 fair clarification. I mean, otherwise, the idea that a

17 Chapter 5 tolling would somehow impair your ability to move

18 forward, that doesn't seem consistent with what we are

19 talking about. Mr. Meisler, have I fairly characterized your

20 comments?

21        MR. MEISLER: Yes, Your Honor.

22        THE COURT: Okay.

23        MS. LEVINE: We agree that we have no intention of

24 brining any of the case type, the actions during this period

25 of time as well. So that is not really an issue.

18-23538-shl Doc 8841 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 15-10541-BLS Doc 381 Entered 4/12/16 20:52:28 Page 202 of 202
Pg 289 of 309

102

1          THE COURT:  I think it's a fair point though.

2          MS. LEVINE:  The 506(c) waiver, if I heard counsel

3 correctly, what he is saying is that he understands that

4 there is not going to be any 506(c) waiver with regard to

5 Committee counsel fees.  We are not asking for that.  We are

6 asking that there be no 506(c) waiver.

7          THE COURT:  That was my understanding and that was

8 my observation.  Mr. Rosenthal.

9          MR. ROSENTHAL:  A couple points.  We just clarified

10 one on the avoidance actions.  I think the way it was said is

11 exactly how the Debtor believed it would transpire and not

12 intended to be any limitation on the Committees' challenge

13 right.  I do want the Court to know that this amendment to

14 add the 2 percent, I did talk to Ms. Levine about it as soon

15 as it came up on Wednesday or Thursday, but we did have to

16 get this done before Friday.

17          The last point, Your Honor that you had had some

18 discussion about was the increase in the variance from 5 to 7

19 and a half percent.  So, I just spoke a little bit with Mr.

20 Carmody.  We thought 5 percent was very tight, but we think

21 we could have lived with.  Seven and a half percent gives us

22 a little more variation.  We do not think that as a business

23 matter, given where we are now and for the next months until

24 the closing that this is likely to be an issue on these

25 particular line items.  The business is doing well, but it's

18-23538-shl   Doc 0844   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-10541-BLS   Doc 381   Entered 4/12/2018 Page:203 of 222
Pg 290 of 309

103

1   not flourishing, if you will, it's not increasing

2   substantially.  We don't think that there will be a

3   significant deviation.

4            THE COURT:  Independent of Mr. Carmody going on a

5   frolic and detour and starting to hand out money and giving

6   this to people.

7            MR. ROSENTHAL:  Mr. Carmody is not going to be

8   leading me to jail or visiting me in jail.  We are not going

9   to be making any payments to employees other then as approved

10   in the wage order or any subsequent, you know, bonus.

11           MS. LEVINE:  Our point is slightly different and

12   maybe this will resolve it, but --

13           THE COURT:  We need you on the transcript.

14           MS. LEVINE:  Sorry.  The concern that we have is

15   that we understood that under payroll also comes commission

16   salesman.  The commission salesman are not operating under

17   non-competes.  So they can take their relationships and go,

18   and if there is a concern that the commissions are not going

19   to be paid or paid timely, that was what caught our interest

20   with regard to this particular variance limitation.

21           THE COURT:  I would be hard-pressed, and Mr. Meisler

22   is going to stand up and agree with me, I would be hard

23   pressed to believe that an outfit that wasn't to purchase

24   this company wants to put those relationships at risk.

25   Again, I am trying to figure out exactly what it is about

1  this that makes it fall into a different category then all

2  other budget line items.  Again, to the extent that there

3  were a default, as it's currently described, even if the

4  default were called, right, the Debtor would be in here in 24

5  hours and I would tell Silver Point that they have a high

6  class problem.  That, you now, business is good and we are

7  paying our employees.

8         MS. LEVINE:  Your Honor, this horse may be dead.

9         THE COURT:  Also, aren't the commissions presumably

10  factored into the budget?

11         MR. MEISLER:  Yes.

12         THE COURT:  They should be.

13         MS. LEVINE:  Right, our point was that if they had a

14  really good week, then there was going to be more of a

15  variance on the upside, in a good way, and they were going to

16  have to pay more commissions then we would be within the line

17  item.  Your Honor, this horse may be way dead.  Our concern

18  was that it looked to us like it was going to discourage

19  people from selling and depressed value.  We didn't want

20  that, but I think that we have clarified that that's not

21  going to happen.

22         THE COURT:  Yeah, if that's not going to happen, all

23  right, a couple of things.  First, with respect to the 7 and

24  a half percent, what I have heard from the Debtor is that

25  they believe they can live with it.  It doesn't not seem to

18-23538-shl   Doc 0841   Filed 11/26/18   Entered 11/26/18 20:52:29   Main Document
Case 18-10541-BLS   Doc 1301   Filed 12/26/18   Page 105 of 202
Pg 292 of 309

105

1   me that it is likely to create a default because the

2   variance, it seems to me, would be typically associated with,

3   frankly, positive business developments.  If not, and a

4   default is called associated with this, you know, I will be

5   here, but I am not going to micromanage the mechanics of the

6   budget on that line item.

7          With respect to the points raised, again, I really

8   appreciate everybody's colloquia on this in order to try to

9   reach as much of a business resolution as possible.  We are

10  down to a series of short strokes.  With respect to the issue

11  of the liens on previously unencumbered assets, I will

12  authorize that.  We have answered the question with respect

13  to avoidance actions.  It's not my expectation that routine

14  or typical Chapter 5 avoidance actions would be commenced, so

15  I think that there is an understanding that there is

16  stability to the business; that's what we are talking about.

17         Any sort of standstill, I don't think it's tolling

18  because we're not looking at the statute of limitations or

19  anything else at this point, but to the extent that there is

20  a standstill or an agreement that Chapter 5 causes of action

21  are not going to be commenced, I think that's consistent with

22  how I would expect this case would be proceeding anyway.

23  With respect to the Committees' investigation and whatever it

24  is they are going to do, the concept of a standstill has no

25  effect on a Committees' ability to perform its investigation

1   and to act as it deems proper.

2          With respect to the breakup fee, I will not approve

3   a breakup fee.  I understand and I appreciate the

4   accommodation and the reduction, but I am not prepared to

5   approve a breakup fee in the context of these proceedings.

6   For reasons largely stated by the Office of the United States

7   Trustee, I am not satisfied that it's either appropriate or

8   necessary to incentivize Silver Point to take this initial

9   step.  I am sensitive to the issue. It is clearly well within

10  the range of what this Court has previously approved as a

11  breakup fee, but, again, these percentage amounts are

12  significant sums in large cases.

13         We have held and observed in other cases that the

14  percentage, while we typically have a cap of 3 percent, when

15  we look at this as a percentage, that percentage is of less

16  utility in a larger, larger case.  An amount of the better

17  part of $3 million dollars as a breakup fee, here, to me is

18  both chilling and, again, on the record before me not

19  sufficiently warranted to approve for an entity in the

20  position of Silver Point.

21         With respect to the expense reimbursement, I will

22  approve an expense reimbursement of $1.5 million dollars.  I

23  have generally treated expense reimbursements as being

24  different from breakup fees.  Again, the tradition or the

25  practice is that they are subject to documentation and are

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 15-10541-BLS    Doc 881    Entered 4/12/2018 20:52:28    Page 207 of 202
Pg 294 of 309

107

1   capped, in this case, at $1.5 million dollars.  It's clear to

2   me that even with an incentive to participate and engage in

3   this exercise, sufficient that a breakup fee is not

4   warranted, there are material expenses that have been

5   incurred by Silver Point and are being incurred.  So an

6   expense reimbursement of $1.5 million dollars, I'd be

7   prepared to approve and authorize.

8        As I said with respect to the liens on previously

9   unencumbered assets, I will allow them. I understand the

10   Committees' concern with respect to them, but it is not

11   unusual for a DIP finance lender to require or look to

12   unencumbered assets in order to secure its post-petition DIP

13   financing extensions.

14        With respect to the professional fee budget,

15   consistent with my practice, I'm not going to plug a number.

16   I will observe that I think in comparison with the amounts

17   that are being charged and budgeted for by the estate

18   professionals that these numbers are clearly light and based

19   upon that I will not approve or authorize a Section 506(c)

20   waiver.  That waiver does not extend simply to fees, but it

21   does extend to simply a right to pursue a Section 506(c)

22   surcharge if circumstances warrant at the appropriate time.

23        It's my belief that the parties have agreed on an

24   investigation budget of $75,000.00; that seems fair to me and

25   appropriate.  As I said, I will allow the budget with the 7.5

1  percent variance as it relates to postage, payroll and health

2  benefits.  I do share the concerns that have been expressed

3  by the Committee and, frankly, by the Debtor that on a week

4  to week basis that much of a swing is still pretty tight, but

5  I am going to assume that the intention is to allow the

6  process to play itself out and to provide, frankly, a lender

7  a measure of comfort and control over moneys that are going

8  out.

9       The interplay of things like commissions, which are

10  different from bonuses; commissions I regard as more routine.

11  So those commissions could swing one way or the other.  What

12  I expect is that the Debtor will have a handle on their

13  financial forecasting and they will be as good and accurate

14  as they can be.  If there are issues with respect to that, I

15  am not difficult to find.  I think that that covers the

16  various items that remained in dispute. I know that we had a

17  discussion about the time line, which I think I have approved

18  and authorized.  It's my expectation that counsel will be

19  able to reach agreement with respect to the dates going

20  forward and I think you have already done so with respect to

21  objections and otherwise.  Mr. Rosenthal.

22       MR. ROSENTHAL:  Just to make sure we have covered

23  everything, so, Your Honor, avoidance actions are not subject

24  to the DIP liens that --

25       THE COURT:  Avoidance actions are not subject to the

18-23538-shl Doc 8841 Filed 11/26/18 Entered 11/26/18 20:52:20 Main Document
Case 18-10541-BLS Doc 11236-1 Entered 4/12/65 18 Page 209 of 202
Pg 296 of 309

109

1  DIP lien.

2      MR. ROSENTHAL:  Correct, but the other unencumbered

3  assets are.  Got that.  We talked about the deposit, the $10

4  million, plus the $5 is fine, I assume.

5      THE COURT:  I am fine with that.  You know, the

6  testimony, I don't think was really controverted. The issue

7  is this and, again, I would largely defer to the financial

8  advisors.  They seem to be a little bit at logger heads.  Ten

9  percent is a typical number, but these percentages become

10  material, but I think that, again, what has been proposed as

11  a smart and elegant way to deal with that issue in order to

12  maximize the ability for parties to step up without having to

13  pony up and tie up $38 million dollars.

14      MR. ROSENTHAL:  We believe it's large enough to

15  represent a sizeable investment that no one would want to

16  walk away from.  If they are chosen as the stalking horse, I

17  mean as the successful bidder or the backup that goes to $15.

18  Of course, one of the factors that we will be evaluating with

19  any bid is credit worthiness.  I believe we have all of the

20  issues that were raised by the Court and, frankly, that are

21  still open.  What we would need to do is put these changes

22  through the --

23      THE COURT:  If parties want an opportunity to

24  confer, obviously, we would need to deal with the form of the

25  order and close the loop on that.  There are other items and,

18-23538-shl   Doc 8841   Filed 11/26/18   Entered 11/26/18 20:52:20   Main Document
Case 15-10541-BLS   Doc 1062-1   Filed 04/26/18   Page 210 of 212
Pg 297 of 309

110

1  obviously, certain of these issues are not necessarily agreed

2  to by Silver Point and I understand, [indiscernible], it's

3  good to see you again.  So, I understand that we may need a

4  moment on that, but I do, as I said, have a 4:00 stop and we

5  have a couple other items.

6        MR. ROSENTHAL:  Why don't we just go to the other

7  items now and while that's occurring, I think the discussions

8  can take place.  Different folks are handling those.

9        THE COURT:  Okay.

10        MR. ROSENTHAL:  Your Honor, we do want to, as part

11  of the record, introduce the DIP amendment, which revises

12  some of the dates and also increases that 2 percent.

13        THE COURT:  Okay.

14        MR. ROSENTHAL:  May I approach?

15        THE COURT:  Yes.  Thank you.  Any objection to the

16  admission of the amendment?  It's admitted.

17        MR. ROSENTHAL:  All right, Your Honor, I'll turn it

18  over to Jeremy Graves.

19        MR. GRAVES:  Good afternoon, Your Honor, Jeremy

20  Graves, Gibson Dunn & Crutcher on behalf of the Debtors.  I'm

21  here in support of entry of final orders on three of the

22  Debtors' first day motions.  These are going to be agenda

23  items 4, 5 and 6 in your binder.  That's the cash management,

24  critical vendors and the Debtors' NOL preservation motion.

25        In connection with our reply on Friday, we filed

18-23538-shl   Doc 8841   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-10541-BLS   Doc 1186-1   Filed 11/26/18   Page 231 of 262
Pg 298 of 309

111

 1  revised versions of the final orders approving each of these

 2  motions.  For each, the Committee had objected.  My

 3  understanding from Ms. Levine is that they are no longer

 4  intending to prosecute those objections.

 5      MS. LEVINE:  Your Honor, with regard to the NOL

 6  motion, the critical vendor motion, we are not sure why they

 7  don't want to give us notice, but we are withdrawing those

 8  objections and we will just confer with the Debtor on an

 9  ongoing basis.  With regard to the cash management issue,

10  because of the issues with regard to the DIP, we do want

11  reporting with regard to what cash is going between the

12  Debtors and to non-Debtors, the back and forth between the

13  various entities.

14      THE COURT:  I saw the Debtors response on that and I

15  guess I would like some closure in whether we can achieve it

16  right now or otherwise.  The Debtors response was along the

17  lines of this disclosure would be stuff that we are not

18  typically creating or sharing and that will be a substantial

19  burden.  Do I grasp that?

20      MR. GRAVES:  That's correct. If you read the

21  Committees' objection, they ask for a litany of items,

22  reporting on this and that.  If the question relates to a

23  reporting of cash transfers as between the U.S. Debtors and

24  the Mexico Debtors, which I believe is probably the crux of

25  the issue, I don't think that we would have a problem

18-23538-shl   Doc 0841   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 18-10541-BLS   Doc 1081   Filed 12/26/18   Page 112 of 122
Pg 299 of 309

112

1   providing the reports of those cash transfers.  We could work

2   with language.

3           MS. LEVINE:  That would be fine, Your Honor.

4           THE COURT:  Okay. I think, again, my approach to

5   this sort of thing typically is that a Committee is entitled

6   to, you know, information, but as a general proposition the

7   goal is to have it be information that the Debtor is

8   typically preparing so that we are not creating a chore for

9   some guy in the treasury department who already has enough to

10  do.  If that works, that's fine.

11          Another observation that I would make is, and again,

12  I don't think I need to tell anybody this, but if there are

13  issues with respect to discovery, sharing of information,

14  process going forward, that sort of thing, I strongly

15  discourage motion practice and letter practice relating to

16  that stuff.  If you have issues with respect to who is

17  getting what, who is being frozen out of the process, what

18  the schedule for different items are, you ought to get me on

19  the phone.  We can usually cut through things.  As we have

20  said, you know, the Committee has observed that this is a

21  large transaction with a fairly tight time line.  I am not

22  interested in a lot of handling back and forth about, you

23  know, who did what, but keep the ball moving.

24          MR. GRAVES:  Thank you, Your Honor. I think that

25  works. I think, to be fair, our disagreement is really to

18-23538-shl    Doc 884    Filed 11/26/18    Entered 11/26/18 20:52:20    Main Document
Case 18-10541-BLS    Doc 381    Entered 11/26/18    Page 213 of 222
Pg 300 of 309

113

1   objection rights and not notice rights.  I think that we do

2   intend to provide substantial notice on each of these matters

3   to the Committee.  So they will, I'm sure, get you on the

4   phone if necessary.

5          THE COURT:  I think that's fine, but I think with

6   that resolution on the record, then, it sounds like those

7   three items should be resolved, am I correct?

8          MR. GRAVES:  I believe that is correct.

9          THE COURT:  All right, does anyone else wish to be

10  heard to each of those items 4, 5 and 6 on the agenda?  Very

11  well.  Do you have clean amended orders?

12         MR. GRAVES:  Your Honor, I have clean orders on the

13  critical vendors and the NOL.  I will be happy to hand those

14  up. I may need to work just a little on the language of the

15  reporting and the cash transfers with the Committee and the

16  cash management just to make sure it's agreed on.

17         THE COURT:  That sounds fine.  I will take that

18  under certification at your convenience.

19         MR. GRAVES:  May I approach?

20         THE COURT:  Sure.  Thank you.  Very good.

21         MR. GRAVES:  Thank you, Your Honor.  I will cede the

22  podium to Mr. Newman.

23         THE COURT:  Very good.

24         MR. NEWMAN:  First time I am going to stand up and

25  say something.

18-23538-shl Doc 0841 Filed 11/26/18 Entered 4/26/18 20:52:28 Main Document
Case 18-10541-BLS Doc 1106/381 Entered 4/26/18 Page 114 of 302
Pg 301 of 309

114

1        THE COURT:  Yes, sir.

2        MR. NEWMAN:  I want to tell you how much we

3   appreciate the fact that you are available all the time.  You

4   made that speech to us at the first hearing and you have made

5   it again to us.  We had, as you can expect, a fairly

6   extensive discovery regime going over the past 10 days and I

7   don't believe you got a call.

8        THE COURT:  I did not and you get full credit for

9   that.  You don't need to call me just to tell me your

10   working.

11        MS. LEVINE:  Your Honor, one housekeeping matter

12   that's on the record because we don't want to be in violation

13   of anything.  The Committee filed a motion to seal only

14   because some of the information that was produced to us was -

15   -

16        THE COURT:  I signed that.

17        MS. LEVINE:  Okay.  Thank you.

18        THE COURT:  Mr. Nestor, I would ask tomorrow, if you

19   would have somebody just audit the docket and make sure. I

20   believe I have signed the CNO's.  I know that I have signed

21   the sealing issue.  So if there is anything missing, just

22   give us a call and we will get it on the docket.  Yes, sir.

23        MR. NEWMAN:  Your Honor, thank you.  A couple of

24   things.  A housekeeping matter, number 19 on the docket was

25   the order, the motion seeking leave to file on those replies.

18-23538-shl  Doc 0841  Filed 11/26/18  Entered 12/05/18 20:52:29  Main Document
Case 18-10841-BLS  Doc 381  Filed 11/26/18  Entered 11/26/18 20:52:29  Page 115 of 202
Pg 302 of 309

115

1        THE COURT:  Okay.

2        MR. NEWMAN:  May I approach?

3        THE COURT:  Sure.

4        MR. NEWMAN:  Sam Newman with Gibson Dunn on behalf

5  of the Debtor.  A couple other items.  One is number 14, which

6  is the order seeking, an application seeking to employ

7  Lazard.  There were substantial negotiations over the terms

8  of that, if I may approach with a revised order.

9        THE COURT:  Great.

10        MR. NEWMAN:  Just quickly paragraph 4 on page 2,

11  change relating to the payment expectations with respect to

12  financing transactions and the revised agreement agreed that

13  no transaction fee would be approved under the DIP and then

14  certain other modifications were made, which were run by the

15  Committee. I think everyone is in agreement.  Similar change

16  in paragraph 7.

17        THE COURT:  I see it.

18        MR. NEWMAN:  And 9.

19        THE COURT:  Okay.  All right, does anyone else wish

20  to be heard with respect to the Lazard retention?  Very well.

21  I have had an opportunity to review the revised version and I

22  will approve and authorize the relief.

23        MR. NEWMAN:  Great.  Then I would like to next call

24  number 7, which is the final order regarding employee wages.

25  There is one objection from Volt and I'll leave that to call

1 the matter with respect to Volt's objection and request for

2 consent.

3          THE COURT:  Sure.  Yes, sir.

4          MR. SWEENEY:  Peter Sweeney with Blakeley LLP for

5 Volt Consulting.  We had reached a resolution on number 7 to

6 reserve our rights to argue the amount of the claim and to

7 reserve our rights whether to require payment.  So we will

8 reserve those rights for later so that they can go forward

9 with the rest of the motions.

10          THE COURT:  Okay.

11          MR. NEWMAN:  So we would ask that the Court approve

12 the order as blacklined and just note the stipulation on the

13 record that Mr. Sweeney can appear at the next omnibus or

14 thereafter to request any relief he deems appropriate with

15 respect to his client.

16          THE COURT:  That sounds fine.  Does anyone else wish

17 to be heard with respect to the final order regarding

18 employee wages?  Very well.  With the stipulation noted on

19 the record, I will approve and authorize the relief.  The

20 order will issue.

21          MR. NEWMAN:  Then we would also ask Your Honor to

22 call number 18, which is Mr. Sweeney's application for relief

23 from stay, which I will let him speak to and I believe we are

24 continued to the 12th.

25          MR. SWEENEY:  That's right, Your Honor.  We have

18-23538-shl   Doc 0841   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 16-10541-BLS   Doc 1221   Filed 04/12/2018   Page 217 of 222
Pg 304 of 309

117

1   agreed to continue to the 12th.  We have been working with the

2   Debtors on this motion and since the 30th we were under the

3   understanding that we were going to get some sort of payment

4   plan on the prepetition debt.  We have been having e-mails

5   back and forth through the 6th, but we didn't really realize

6   that we were going to go forward today until the notice of

7   agenda came out.  We have agreed to the continuance until the

8   5th.  Then we also heard today about the lack of liquidity

9   about the prepayment.  So we are still learning about that

10  and we will see if we can reach some of resolution.  If we

11  need to, we will go forward on the 12th.

12        THE COURT:  Very good.  Thank you.

13        MR. NEWMAN:  Your Honor, that's all that I have.

14  Thank you.

15        THE COURT:  That's all the items that we have on the

16  agenda.  Mr. Rosenthal, where do we stand?

17        MR. ROSENTHAL:  Well, how would you like to do this,

18  Your Honor?  We, obviously, have to go back and markup the

19  various orders; however, we do have some changes that I could

20  walk you through now.  Mr. Nestor, does the judge have the

21  last blackline?

22        THE COURT:  I don't know that I have the last

23  blackline.  I got a lot of paper from you all.

24        MR. ROSENTHAL: Would you like me to walk through

25  the changes to this point or would you like us to go back and

18-23538-shl Doc 884 Filed 11/26/18 Entered 11/26/18 20:52:28 Main Document
Case 18-10641-BLS Doc 881 Filed 4/26/18 Page 118 of 202
Pg 305 of 309

118

1  give you a consolidated markup?

2         THE COURT:  Why don't we do this; why don't you give

3  me the blacklines.  So, I don't think there is a reason to

4  walk, I think we can more efficiently use our time.  I will

5  review these in chambers.  I would encourage the parties to

6  go back and confer on final forms of the order, consistent

7  with the rulings and agreements that have been made.  Then I

8  would entertain them under certification.  If issues remain

9  with respect to them, I will not be easy to get on the phone

10  tomorrow, but I would, if it boils down to it and if you need

11  me, I would find time.

12         MR. ROSENTHAL:  We do need an order by the 15th.

13         THE COURT:  Right, you will get me on the phone at

14  some point tomorrow if you are at logger heads on the forms

15  of the order, but I have a couple different matters, I have

16  RadioShack and I am not sure what is coming with them.  They

17  tend to show up and they just don't leave.

18         MR. ROSENTHAL:  I think there is a commercial about

19  that.

20         THE COURT:  Well, their back.  So I think I will

21  take these under advisement.  The blacklines will give me a

22  sense of at least where the parties stand right now.  If

23  issues arise, you can get me on the phone, but, otherwise --

24         MR. ROSENTHAL:  May I give you one more blackline,

25  the sale procedures blackline.

18-23538-shl   Doc 0841   Filed 11/26/18   Entered 4/26/18 20:52:29   Main Document
Case 18-10541-BLS   Doc 11/26/18   Entered 4/26/18   Page 119 of 202
Pg 306 of 309

119

1        MR. MEISLER:  Mr. Rosenthal, before you go to the

2   sale procedures, Your Honor, if I could just flag that the

3   Debtors and Silver Point are still working on the carve out.

4   I would classify that as more of a company change because we

5   are just trying to make sure that the numbers works with the

6   budget.  So you will see that number fluctuate.

7        MR. ROSENTHAL:  There are concepts of wind down

8   amount and carve out cap.  They are mathematical and tied to

9   the budget.

10       THE COURT:  I will leave that where it is.  I will

11  let the parties have that discussion and, again, if we need

12  to confer, we can.  You mentioned, Mr. Rosenthal, and I did

13  see that there is $8 plus million on a post-sale basis to

14  move this process forward. Let me at least share with you,

15  this is not a today issue, but I think it is worth

16  understanding now.  I think some of my colleagues have rules

17  about or practices relating to sale cases that are hard and

18  fast about where we go from the sale.  I don't know how this

19  process plays out in this case and I don't have a firm rule.

20       I will tell you this that I strongly prefer plans in

21  Chapter 11 cases where possible.  Certainly, sale cases that

22  lead promptly to a 7, sort of as freefall or to a structured

23  dismissal or even just a dismissal are typically less than

24  ideal for reasons you don't need me to go through. What I

25  would share with the parties and I don't think this is

18-23538-shl   Doc 884-1   Filed 11/26/18   Entered 11/26/18 20:52:28   Main Document
Case 15-10541-BLS   Doc 1831-1   Filed 04/26/18   Page 220 of 222
Pg 307 of 309

120

1   inconsistent with what my colleague downstairs, Judge Carey,

2   mentioned the other day is that to the extent that the sale

3   process plays itself out and the Debtor is basically then,

4   promptly, in a liquidation scenario, proceeds are in or

5   litigation needs to be pursued or something else.

6        Having expressed that my preference is for a plan,

7   in many cases I have encouraged parties to get there as

8   cheaply and as promptly as possible.  I have encouraged and

9   approved combined plan and disclosure proceedings.  The

10  mechanism to get to that stage can seem daunting from where

11  you stand.  You know a lot more than I do, particularly even

12  in a post-sale scenario.  So it may seem simple to me and if

13  it doesn't I will be driven by your judgement, but I would

14  ask that the parties, as you figure out where this case is

15  going, and where that process plays out and what the end game

16  is, I would at least share with you what my preference is.

17       Again, to me, I have seen a number of cases where

18  it's been, I think, better for the administration of justice

19  and for the interest of stakeholders that we have done these

20  just relatively simple structures, under liquidating plan

21  scenarios that, you know, the associates in this room right

22  now have a drawer about this big filled with them that they

23  could turn in by 4:00 today.  To me, that, again, is

24  something that is not just better, doesn't necessarily help

25  my numbers at all, but I do think that it's an appropriate

18-23538-shl    Doc 0841    Filed 11/26/18    Entered 11/26/18 20:52:28    Main Document
Case 18-10541-BLS    Doc 381    Entered 11/26/18 20:52:28    Page 221 of 202
Pg 308 of 309

121

1  way to try to wrap up these cases.

2      When you talk about a wind down budget and that sort

3  of thing, that does seem to me to be consistent with an

4  understanding that there needs to be a path forward from the

5  sale other then,  you know, just lighting a match to it.  So

6  I leave that as just an observation.  It's the kind of thing

7  also that may factor into some of the discussions that will

8  be leading up to the sale process.

9      MR. ROSENTHAL:  Thank you, Your Honor.  We

10 appreciate that.  We had actually been discussing that with

11 the Young Conaway folks.

12     THE COURT:  You just got to tell me you're ahead of

13 me, right?

14     MR. ROSENTHAL:  I'm not ahead of you. They had head

15 that this was coming down from the Delaware Courts.  I think

16 that is our sense right now. I don't really see a benefit to

17 a conversion.  I don't really want to go to dismissal.  It

18 seems like a simple plan might be the way to go.  We

19 definitely are taking that under consideration.

20     THE COURT:  Very good.  All right, then I will look

21 for orders under certification and if need be, I will take

22 the other blackline and if need be, I would be available at

23 some point tomorrow if the parties do, in fact, reach an

24 impasse.  We will stand in recess and I appreciate everyone's

25 time.

18-23538-shl  Case 15-10541-BLS  Doc 8841  Filed 11/26/18  Entered 4/20/15  Entered 11/26/18 20:52:28  Main Document
Pg 309 of 309

122

1          MR. ROSENTHAL:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3      (Court Adjourned)

4

5

6                          CERTIFICATE

7

8  I certify that the foregoing is a correct transcript from the

9  electronic sound recording of the proceedings in the above-

10  entitled matter.

11  /s/Mary Zajaczkowski                    April 13, 2015

12  Mary Zajaczkowski, CET**D-531                    Date

13

14

15

16

17

18

19

20

21

22

23

24

25