WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
In re                                                        :
                                                             :    **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,                    :
                                                             :    **Case No. 18-23538 (RDD)**
                                                             :
Debtors.[1]                                                  :    **(Jointly Administered)**
-------------------------------------------------------------x

## NOTICE OF FILING OF AMENDED SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION ASSET-BASED CREDIT AGREEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that beginning on October 15, 2018, (the "**Commencement Date**") and continuing thereafter, each of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

**PLEASE TAKE FURTHER NOTICE** that on the Commencement Date, the Debtors filed with the Court the *Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing* [ECF No. 7] (the "**DIP Motion**").

PLEASE TAKE FURTHER NOTICE that on November 15, 2018, the Debtors filed the *Notice of Filing of Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement* (ECF No. 744).

**PLEASE TAKE FURTHER NOTICE** that annexed hereto as **Exhibit 1** is the Amended Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement.

**PLEASE TAKE FURTHER NOTICE** that annexed hereto as **Exhibit 2** is a redline of the Amended Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement marked against the previously filed version.

*The remainder of this page has been left intentionally blank.*

2

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider approval of the

DIP Motion on a final basis will be held on **November 27, 2018, at 1:30 p.m. (ET)** before the

Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court

for the Southern District of New York, 300 Quarropas St., White Plains, New York 10061.

Dated: November 26, 2018
      New York, New York

                                    /s/ Sunny Singh
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York  10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007
                                    Ray C. Schrock, P.C.
                                    Jacqueline Marcus
                                    Garrett A. Fail
                                    Sunny Singh

                                    *Attorneys for Debtors*
                                    *and Debtors in Possession*

WEIL:\96800423\2\73217.00044

## Exhibit 1

## Credit Agreement

**SASMF Draft 11/25/2018**

# SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION ASSET-BASED CREDIT AGREEMENT

Dated as of November [___], 2018

among

**SEARS HOLDINGS CORPORATION,**
a debtor and a debtor-in-possession,
as Holdings,

**SEARS ROEBUCK ACCEPTANCE CORP.**
**and**
**KMART CORPORATION,**
each debtors and debtors-in-possession,
as Borrowers,

**THE LENDERS NAMED HEREIN,**

**THE ISSUING LENDERS NAMED HEREIN,**

**BANK OF AMERICA, N.A.,**
as Administrative Agent, Co-Collateral Agent and Swingline Lender

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Co-Collateral Agent,

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

as Syndication Agent,

**CITIGROUP GLOBAL MARKETS INC.,**

as Documentation Agent,

and

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**

**CITIBANK, N.A., and WELLS FARGO BANK, NATIONAL ASSOCIATION,**

As Joint Lead Arrangers and Bookrunners

# TABLE OF CONTENTS

Page

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   Certain Defined Terms ..................................................................3
Section 1.02   Computation of Time Periods .......................................................57
Section 1.03   Accounting Terms ........................................................................57
Section 1.04   Other Interpretive Provisions .......................................................57

## ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES AND THE TERM LOAN

Section 2.01   The Revolving Advances and the Term Loan. ...............................58
Section 2.02   Making the Revolving Advances ..................................................59
Section 2.03   The Swingline Advances ..............................................................60
Section 2.04   Making the Swingline Advances ..................................................61
Section 2.05   Commitment Fee; Other Fees .......................................................62
Section 2.06   Optional Termination or Reduction of the Revolving Commitments ...............62
Section 2.07   Repayment of Extensions of Credit ..............................................63
Section 2.08   Interest .........................................................................................63
Section 2.09   Interest Rate Determination ........................................................65
Section 2.10   Optional Conversion of Revolving Advances, Term Loan Borrowings ............66
Section 2.11   Optional and Mandatory Prepayments of Revolving Advances and Term Loan; Mandatory Reduction of the Revolving Commitments ...........................66
Section 2.12   Increased Costs ...........................................................................68
Section 2.13   Illegality ......................................................................................69
Section 2.14   Payments and Computations ........................................................69
Section 2.15   Taxes ...........................................................................................71
Section 2.16   Sharing of Payments, Etc ............................................................75
Section 2.17   Use of Proceeds of Advances and Term Loan ..............................75
Section 2.18   Permitted Overadvances ..............................................................75
Section 2.19   Superpriority Claims; Security and Priority of Liens .......................76
Section 2.20   MIRE Event. ................................................................................77

## ARTICLE III

## AMOUNT AND TERMS OF THE LETTERS OF CREDIT

Section 3.01   L/C Commitment ..........................................................................77
Section 3.02   Procedure for Issuance of Letter of Credit ....................................78
Section 3.03   Fees and Other Charges ...............................................................78
Section 3.04   Letter of Credit Participations ......................................................79

i

Section 3.05    Reimbursement Obligation of the Borrowers ...................................................80
Section 3.06    Obligations Absolute ..........................................................................................80
Section 3.07    Letter of Credit Payments ..................................................................................80
Section 3.08    Applications ........................................................................................................81
Section 3.09    Use of Letters of Credit .....................................................................................81

## ARTICLE IV

## CONDITIONS TO EFFECTIVENESS

Section 4.01    Conditions Precedent to Effectiveness ...............................................................81
Section 4.02    Conditions Precedent to Each Extension of Credit ...........................................84

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Representations and Warranties of Holdings and the Borrowers. ......................85

## ARTICLE VI

## COVENANTS

Section 6.01    Affirmative Covenants ........................................................................................94
Section 6.02    Negative Covenants ..........................................................................................112
Section 6.03    Approved Budget. ..............................................................................................115

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01    Events of Default ..............................................................................................117
Section 7.02    Remedies ............................................................................................................122
Section 7.03    Application of Proceeds. ...................................................................................124
Section 7.04    Lift of Automatic Stay. .....................................................................................125
Section 7.05    License; Cooperation. .......................................................................................125

## ARTICLE VIII

## THE AGENT AND CO-COLLATERAL AGENTS

Section 8.01    Appointment .....................................................................................................126
Section 8.02    Delegation of Duties; Agent Advisors .............................................................126
Section 8.03    Exculpatory Provisions .....................................................................................127
Section 8.04    Reliance by Agent .............................................................................................127
Section 8.05    Notice of Default ...............................................................................................128
Section 8.06    Non-Reliance on Agents and Other Lenders ....................................................128
Section 8.07    Reports and Financial Statements .....................................................................128

1030946.08A-CHISR01A - MSW

Section 8.08    Indemnification of Agent Indemnitees. .........................................130
Section 8.09    Agent in Its Individual Capacity ..................................................131
Section 8.10    Successor Agent...........................................................................131
Section 8.11    Documentation Agent and Syndication Agent; Bank Product and Cash
                Management Services Providers....................................................131
Section 8.12    Defaulting Lenders.......................................................................132
Section 8.13    Certain ERISA Matters .................................................................135
Section 8.14    Credit Bidding..............................................................................136

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Amendments, Etc.........................................................................137
Section 9.02    Notices, Etc. ...............................................................................138
Section 9.03    No Waiver; Remedies ...................................................................140
Section 9.04    Costs and Expenses......................................................................140
Section 9.05    Right of Set-off ............................................................................142
Section 9.06    Binding Effect; Effectiveness .......................................................143
Section 9.07    Assignments and Participations ....................................................143
Section 9.08    Confidentiality .............................................................................146
Section 9.09    Governing Law .............................................................................147
Section 9.10    Execution in Counterparts............................................................147
Section 9.11    Jurisdiction, Etc. ..........................................................................147
**Section 9.12    WAIVER OF JURY TRIAL** ........................................................148
Section 9.13    Release of Collateral or Guarantee Obligation ...............................148
Section 9.14    PATRIOT Act Notice ...................................................................148
Section 9.15    Integration....................................................................................149
Section 9.16    Replacement of Lenders ...............................................................149
Section 9.17    No Advisory or Fiduciary Capacity...............................................150
Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......150
Section 9.19    Interim DIP Term Sheet Amended and Restated.............................151
Section 9.20    Keepwell ......................................................................................151
Section 9.21    DIP Intercreditor Agreement; Financing Orders. ...........................151

SCHEDULES

| | |
|---|---|
| Schedule I | Bank Products/Cash Management Services |
| Schedule 1.01 | Revolving Lenders; Revolving Commitments |
| Schedule 1.02 | Existing Letters of Credit |
| Schedule 1.04 | Existing Debt |
| Schedule 1.05 | Existing Investments |
| Schedule 1.06 | Existing Liens |
| Schedule 1.07 | Initial Specified Store Closing Locations |
| Schedule 1.08 | Secondary Specified Store Closing Locations |
| Schedule 1.09 | Go Forward Stores |
| Schedule 4.01 | Effective Date Loan Documents |
| Schedule 5.01(l)(A) | Owned and Ground Leased Unencumbered Real Property |
| Schedule 5.01(l)(B) | Leased Unencumbered Real Property |
| Schedule 5.01(n) | Pension Plan Issues |
| Schedule 5.01(p) | UCC Filing Jurisdictions |
| Schedule 5.01(s) | Equity Interests in Subsidiaries |
| Schedule 5.01(t) | Labor Matters |
| Schedule 6.01(q) | Post-Effective Date Requirements |
| Schedule 6.01(r)(i) | Case Milestones |
| Schedule 6.01(r)(ii) | Go Forward Plan |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Notice of Borrowing |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Base Certificate |
| Exhibit D | Form of Debtor-in-Possession Guarantee and Collateral Agreement |

Exhibit E          Form of Credit Card Notification

Exhibit F          Form of DIP Intercreditor Agreement

Exhibit G          Form of Customs Broker Agreement

Exhibit H          Form of Third Party Payor Notification

Exhibit I          Form of Compliance Certificate

Exhibit J          Form of Approved Budget

Exhibit K          Form of Final Financing Order

Exhibit M          Form of Budget Certificate

v

SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION ASSET-BASED CREDIT AGREEMENT (this "**Agreement**"), dated as of November [__], 2018, among SEARS HOLDINGS CORPORATION, a Delaware corporation and a debtor and debtor-in-possession ("**Holdings**"), SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation and a debtor and debtor-in-possession ("**SRAC**"), KMART CORPORATION, a Michigan corporation and a debtor and debtor-in-possession ("**Kmart Corp.**"; Kmart Corp. together with SRAC, the "**Borrowers**"), the banks, financial institutions and other institutional lenders listed on the signature pages hereof or through an assignment as provided in <u>Section 9.07</u> hereof, as Revolving Lenders or Term Lenders, as applicable (collectively, the "**Lenders**"), the ISSUING LENDERS party hereto, BANK OF AMERICA, N.A. ("**Bank of America**"), as administrative agent (in such capacity, the "**Agent**"), co-collateral agent, and Swingline Lender, WELLS FARGO BANK, NATIONAL ASSOCIATION, as co-collateral agent (collectively with Bank of America in such capacity, the "**Co-Collateral Agents**") WELLS FARGO BANK, NATIONAL ASSOCIATION, as syndication agent (in such capacity, the "**Syndication Agent**"), CITIGROUP GLOBAL MARKETS INC., as documentation agent (in such capacity, the" Documentation Agent"), and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("**MLPFS**"), CITIBANK, N.A. and WELLS FARGO BANK, NATIONAL ASSOCIATION, as joint lead arrangers and bookrunners (in such capacities, the "**Joint Lead Arrangers**").

W I T N E S S E T H:

WHEREAS, on October 15, 2018 (the "**Petition Date**"), Holdings, SRAC, Kmart Corp. and certain of the Borrowers' Subsidiaries (including all of the Subsidiary Guarantors) (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "**Bankruptcy Court**");

WHEREAS, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Lenders provided loans and other financial accommodations to the Borrowers pursuant to the Prepetition First Lien ABL Credit Agreement (as defined herein);

WHEREAS, on the Petition Date, the outstanding principal amount of the Prepetition 2016 Term Loan Facility (as defined herein) was $570,776,250 and the outstanding principal amount of the Prepetition Revolving Facility (as defined herein), including outstanding Prepetition L/C Obligations (as defined herein) was $959,602,130;

WHEREAS, on October 16, 2018, pursuant to the Interim DIP Term Sheet and the Interim Financing Order, the Initial Lenders provided to the Borrowers a senior secured superpriority priming post-petition debtor-in-possession asset-based credit facility (the "**Interim DIP Facility**") consisting of (a) a new money asset-based term loan in an aggregate principal amount of $111,889,241 (the "**Incremental DIP Term Loan**") and (b) a new money asset-based

revolving credit facility with aggregate revolving commitments of $188,110,759 (the "**Incremental DIP Revolving Commitments**"); and the revolving loans made thereunder, (the "**Incremental DIP Revolving Loans**") for operating, working capital and general corporate purposes of the Loan Parties, in each case consistent with, subject to and within the limitations contained in, the Approved Initial Budget (as defined in the Interim DIP Term Sheet), including to pay fees, costs and expenses incurred in connection with the transactions contemplated thereby and other administration costs incurred in connection with the Chapter 11 Cases;

WHEREAS, the Borrowers have requested, and the Lenders have agreed, on the terms set forth herein, that the Interim DIP Facility be amended and restated in its entirety to (a) refinance the Interim DIP Facility, (b) increase the facility size to refinance certain amounts under the Prepetition 2016 Term Loan Facility and the Prepetition Revolving Facility, as well as to refinance certain Prepetition L/C Obligations, and (c) more fully set forth the terms of the Total Extensions of Credit hereunder;

WHEREAS, each Borrower and each other Loan Party has agreed to secure all of its Obligations under the Loan Documents by granting to the Control Co-Collateral Agent, for the benefit of the Co-Collateral Agents and the other Credit Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property;

WHEREAS, the business of the Borrowers and the other Loan Parties is a mutual and collective enterprise and the Borrower and the other Loan Parties believe that the Total Extensions of Credit and other financial accommodations provided to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Agent, the Co-Collateral Agents and the Lenders, all to the mutual advantage of the Borrowers and the other Loan Parties;

WHEREAS, each Borrower and each other Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of Extensions of Credit and other financial accommodations to the Borrowers as provided in this Agreement and the Financing Orders; and

WHEREAS, the willingness of the Agent, the Co-Collateral Agents and the Lenders to extend financial accommodations to the Borrowers, as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the other Loan Parties and at the request of the Borrowers and the other Loan Parties and in furtherance of the mutual and collective enterprise of the Borrowers and the other Loan Parties.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"**Acceptable Plan of Reorganization**" means a plan of reorganization for each of the Chapter 11 Cases that (i) provides for the termination of the Revolving Commitments and the payment in full in cash and full discharge of the Obligations (including L/C Obligations and Obligations related to Bank Products and Cash Management Services) and Prepetition ABL Obligations at emergence, (ii) contains releases and other exculpatory provisions for the Credit Parties, Prepetition Credit Parties, the Joint Lead Arrangers and each of their respective affiliates in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion and (iii) is otherwise in form and substance reasonably satisfactory to the Agent with respect to any provision related to the payment of Prepetition ABL Obligations or that may adversely affect the DIP Credit Parties and/or the Prepetition Credit Parties.

"**ACH**" means automated clearing house transfers.

"**Acquisition**" means, with respect to any Person (a) a purchase or other acquisition of more than 50% of, or other controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets of any Person, or more than 50% of, or other controlling interest in, the Equity Interests of any Person, in each case in any single transaction or series of related transactions.

"**Adequate Protection Liens**" has the meaning assigned to the term "Adequate Protection Liens" in the Final Financing Order.

"**Adequate Protection Superpriority Claims**" has the meaning assigned to the term "Adequate Protection Claims" in the Final Financing Order.

"**Adjusted Revolving Exposure**" means, at any time of determination, an amount equal to the lesser of (i) the then-outstanding Aggregate Revolving Commitments and (ii) the sum of (A) $50,000,000 plus (B) the Borrowing Base minus (C) the principal amount of Term Loan outstanding as of such time of determination.

"**Advance**" means any advance by a Revolving Lender to any Borrower as part of a Borrowing.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, any Borrower, and Subsidiary Guarantor or any Subsidiary of the foregoing), at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of Holding, any Borrower or any Subsidiary Guarantor, threatened

against Holdings, any Borrower, any Subsidiary Guarantor or any Subsidiary of the foregoing or any property thereof.

"**Affiliate**" means, as to any Person, any other Person, (a) that directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person, (b) that beneficially owns 10% or more of the Voting Stock or any class of Equity Interests of such first Person; (c) at least 10% of whose Voting Stock or any class of Equity Interests is beneficially owned, directly or indirectly, by such first Person; or (d) who is an officer, director, partner or managing member of such first Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"**Agent**" has the meaning specified in the Preamble.

"**Agent Indemnitees**"  means the Agent, each Co-Collateral Agent and their respective Related Parties.

"**Agent Professionals**" means attorneys, accountants, appraisers (including real estate appraisers), auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by the Agent or the Co-Collateral Agents, including, for the avoidance of doubt, the Agent Advisors.

"**Agent's Account**" means the account of the Agent maintained by the Agent at Bank of America, N.A., designated by the Agent in writing to the Borrowers, the Co-Collateral Agents and the Lenders.

"**Agent Advisors**" has the meaning specified in Section 8.02(b).

"**Agreement**" has the meaning specified in the Preamble.

"**Aggregate Revolving Commitments**" means the Revolving Commitments of all the Revolving Lenders.

"**AML Laws**" means (i) the Currency and Foreign Transactions Reporting Act, its amendments, and other statutes relating to the subject matter of that Act (which have come to be collectively referred to as the Bank Secrecy Act), including applicable provisions of the PATRIOT Act, and regulations promulgated under any of the foregoing, including 31 C.F.R. Chapter X; and (ii) similar laws, regulations, directives adopted by the European Union, any European Union Member State, the United Kingdom, and any jurisdiction where any Group Member operates.

"**Applicable Lending Office**" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance, and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"**Applicable Margin**" means (a) 4.50% per annum for Eurodollar Rate Advances and (b) 3.50% per annum for Base Rate Advances.

"**Application**" means an application, in such form as the applicable Issuing Lender may specify from time to time, requesting such Issuing Lender to open a Letter of Credit.

"**Approved Budget**" means the budget prepared by the Borrowers in the form of Exhibit J and which is approved by, and in form and substance satisfactory to, the Co-Collateral Agents, each in its sole discretion, as the same may be updated, modified or supplemented from time to time as provided in Section 6.03.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignment and Acceptance**" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit B hereto.

"**Authorized Officer**" means, as to Holdings, any Borrower or any other Loan Party, its Chief Restructuring Officer, president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance or executive vice president, finance. Any document delivered hereunder that is signed by an Authorized Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Automatic Stay**" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"**Availability Reserves**" means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as any Co-Collateral Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Co-Collateral Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that such Co-Collateral Agent determines may need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in any Co-Collateral Agent's Permitted Discretion (but are not limited to) reserves based on: (i) customs duties, and other costs to release Inventory which is being imported into the United States, (ii) accrued and unpaid Taxes and other governmental charges, including, but not limited to, ad valorem, real property, excise, personal property sales, use and other Taxes and claims of the PBGC that any Co-Collateral Agent determines rank senior to or pari passu with (in payment or Lien priority) the Obligations or the Prepetition ABL Obligations, (iii) salaries, wages and benefits due to employees of any Loan Party, (iv) reasonably anticipated changes in the Net Orderly Liquidation Value and/or Store Closing Net Orderly Liquidation Value between appraisals, (v) warehousemen's or bailees'

charges and other Permitted Encumbrances, (vi) Cash Management Reserves, (vii) Bank Product Reserves, (viii) amounts due to vendors on account of consigned goods, (ix) rent expense at leased Stores and DC locations, (x) royalties payable to non-Loan Parties in respect of licensed merchandise, (xi) the Gift Card Liability Reserve, (xii) Customer Deposits Reserve, (xiii) PACA Liability Reserves, (xiv) PASA Liability Reserves, (xv) amounts due to any state's lottery commission or other equivalent agency, authority or entity, or to any other Governmental Authority involved in the administration or regulation of lotteries, (xvi) Credit Card Receivables owed to Sears Protection Company (PR), Inc. and its Subsidiaries, (xvii) amounts due to Sears Authorized Hometown Stores, LLC, Sears Home Appliance Showrooms, LLC, Sears Outlet Stores, LLC and their subsidiaries, (xviii) amounts of any court-ordered charges or other liabilities that any Co-Collateral Agent determines rank senior to or pari passu with (in payment or Lien priority) the Obligations or Prepetition ABL Obligations, (xix) amounts in respect of any reclamation, setoff, recoupment or similar claims as may relate to or arise during the Chapter 11 Cases that are or that any Co-Collateral Agent reasonably believes may become senior to the Liens securing the Obligations, (xx) accrued and unpaid interest or fees on the Obligations, (xxi) the Credit Card Accounts Receivable Reserve and (xxii) amounts due with respect to fees of any professional for any liquidation, going out of business or similar sale.  Upon the determination by any Co-Collateral Agent that an Availability Reserve should be established or modified, such Co-Collateral Agent shall notify the Agent in writing and the Agent shall thereupon establish or modify such Availability Reserve and, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Availability Reserve.

"**Available Commitment**" means as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Revolving Lender's Revolving Commitment then in effect over (b) such Revolving Lender's Revolving Extensions of Credit then outstanding; provided, that in calculating any Revolving Lender's Revolving Extensions of Credit for the purpose of determining such Revolving Lender's Available Commitment pursuant to Section 2.05(a), the aggregate principal amount of Swingline Advances then outstanding shall be deemed to be zero.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank of America**" has the meaning specified in the Preamble.

"**Bank Products**" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates on account of (a) each Swap Contract that is entered into after the date hereof with any counterparty that is a Credit Party at the time such Swap Contract is entered into, (b) leasing facilities, and (c) other banking products or services (other than Letters of Credit and excluding Cash Management Services) to or for the benefit of any Loan Party agreed by the Agent and the Borrowers as being a "**Bank Product**" for purposes of this Agreement, provided that in each case, such Bank Product is added to Schedule I by the Borrowers (which addition

6

may be made by the Borrowers by notice to the Agent in writing); provided further, that such notice shall be deemed given with respect to any Bank Products provided by the Agent or its Affiliates.

"**Bank Product Reserves**" means such reserves as any Co-Collateral Agent may from time to time determine in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"**Banker's Acceptance**" means a time draft or bill of exchange or other deferred payment obligation relating to a Commercial L/C which has been accepted by the applicable Issuing Lender.

"**Bankruptcy Code**" has the meaning specified in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning specified in the recitals to this Agreement.

"**Base Rate**" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month Interest Period) plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate." The "**prime rate**" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Advance**" means an Advance or a Term Loan Borrowing that bears interest as provided in Section 2.08(a)(i) or Section 2.08(b)(i), as applicable.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Blocked Accounts**" means any deposit accounts that become subject to Blocked Account Agreements pursuant to Section 6.01(i)(iii).

"**Blocked Account Agreement**" means with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Co-Collateral Agents, establishing control (as defined in the UCC) of such account by the Agent (as "**Control Co-Collateral Agent**") and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent (or any other Co-Collateral Agent which shall

succeed the Agent as "Control Co-Collateral Agent" thereunder), without the further consent of any other Person.

"**Blocked Account Bank**" means Bank of America, N.A. and each other bank with whom deposit accounts are maintained in which funds of any of the Loan Parties are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System.

"**Borrower Information**" has the meaning specified in Section 9.08.

"**Borrower Materials**" has the meaning specified in Section 9.02(d).

"**Borrowers**" has the meaning specified in the Preamble.

"**Borrowing**" means a borrowing consisting of simultaneous Advances of the same Type made by each of the applicable Lenders pursuant to Section 2.01 or Section 2.03 provided that no more than six (6) Interest Periods in the aggregate for Borrowings and Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

"**Borrowing Base**" means, at any time, an amount equal to (a) 87.5% of the aggregate outstanding Eligible Credit Card Accounts Receivable at such time, plus (b) 87.5% of the Eligible Pharmacy Receivables at such time plus (c) (i) 87.5% of the Net Orderly Liquidation Value of Net Eligible Inventory (other than Eligible Inventory at a Store being closed) at such time and (ii) 87.5% of the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at Stores being closed, minus (d) 100% of the then Availability Reserves, minus (e) the Borrowing Base Carve-Out Reserve, minus (f) Prepetition Revolver/Term Exposure, minus (g) the Prepetition FILO Reserve; it being understood that the Agent may, in its Permitted Discretion, adjust Availability Reserves and Inventory Reserves and any other reserves used in computing the Borrowing Base.

"**Borrowing Base Carve-Out Reserve**" means, at any time, (a) the Carve-Out Reserve Amount (as defined in paragraph 21(e)] of the Final Financing Order) minus (b) the then current balance of the Carve-Out Reserve Account (as defined in paragraph 21(f) of the Final Financing Order).

"**Borrowing Base Certificate**" means a certificate, signed by an Authorized Officer of Holdings, substantially in the form of Exhibit C or another form which is reasonably acceptable to the Co-Collateral Agents in their Permitted Discretion.

"**Borrowing Base Loan Party**" means each Borrower and each guarantor of the Obligations under the Guarantee and Collateral Agreement that is also a "Subsidiary Guarantor" under and as defined in the Prepetition First Lien ABL Credit Agreement.

"**BRG**" means Berkeley Research Group, LLC, in its capacity as an Agent Advisor.

"**Budget Certificate**" mean a certificate, substantially in the form of Exhibit M hereto, by which Holdings certifies, among other things, compliance with the covenants contained in Section 6.03(b).

"**Budget Variance Report**" means a weekly report certified by an Authorized Officer of Holdings to the Agent and the Co-Collateral Agents (a) showing, in each case, by line item the actual cash receipts, disbursements, inventory receipts and consignment receipts for each week, in a comparable form to the Approved Budget, noting therein the variance of the Borrower's Net Cash Flow, on a cumulative basis, for the Cumulative Four-Week Period, from the projected Net Cash Flow set forth for the Cumulative Four-Week Period in the Approved Budget, (b) including explanations for all material variances (including whether such variance is permanent in nature or timing related) and (b) for any report delivered on the Wednesday following a Budget Testing Date, containing an analysis demonstrating the Borrowers are in compliance with the budget covenant set forth in Section 6.03(b), all in a form, and containing such supporting information, as is satisfactory to the Agent and the Co-Collateral Agents in their sole discretion.

"**Budget Testing Date**" has the meaning assigned to such term in Section 6.03(b).

"**Business Day**" means a day of the year on which banks are not required or authorized by law to close in New York, New York or Boston, Massachusetts and, if the applicable Business Day relates to any Eurodollar Rate Advances, a day of the year on which dealings are carried on in the London interbank market.

"**Capital Lease Obligations**" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" has the meaning specified in paragraph 21(a) of the Final Financing Order.

"**Carve-Out Reserve**" has the meaning specified in paragraph 21(e) of the Final Financing Order.

"**Case Milestones**" has the meaning specified in Section 6.01(r)(i).

"**Cash Collateral**" means cash delivered to Agent to Cash Collateralize any Obligations, and all interest, dividends, earnings and other proceeds relating thereto.

"**Cash Collateralize**" means the delivery of cash to Agent, as security for the payment of Obligations, in an amount equal to 105% of the aggregate L/C Obligations. "**Cash Collateralization**" has a correlative meaning.

"**Cash Equivalents**" means (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the U.S. government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits,

in each case which are issued by Bank of America or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by Bank of America or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; and (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P.

"**Cash Management Order**" means that certain *Interim Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims and Granting Related Relief*, (Docket No. 102) entered by the Bankruptcy Court on October 16, 2018 and any similar final order entered by the Bankruptcy Court.

"**Cash Management Reserves**" means such reserves as any Co-Collateral Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"**Cash Management Services**" means any one or more of the following types of services or facilities provided to any Loan Party by any Lender or any of its Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit card processing services and private label letters of credit, (e) credit or debit cards, and (f) purchase cards; provided that in each case, such Cash Management Service is added to Schedule I by the Borrowers (which addition may be made by the Borrowers by notice to the Agent in writing); provided further, that such notice shall be deemed given with respect to any Bank Products provided by the Agent or its Affiliates.

"**Class**" means (a) the class consisting of Revolving Lenders and (b) the class consisting of Term Lenders. For clarity, except as expressly provided herein, each Lender shall have the same rights and obligations under this Agreement and the other Loan Documents.

"**Change in Law**" means the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"**Chapter 11 Cases**" means the chapter 11 cases of the Debtors pending in the Bankruptcy Court.

"**Co-Collateral Agents**" has the meaning specified in the Preamble.

"**Collateral**" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, including the Prepetition ABL Collateral and all other assets of the Loan Parties, whether now owned or hereafter acquired, and all proceeds thereof, including, without limitation, any claims and causes of action of the Loan Parties of any kind or nature (including proceeds of any actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code); it being understood that "Collateral" shall include all such property irrespective of whether any such property was excluded pursuant to the Prepetition Loan Documents.

"**Commercial L/C**" means a commercial documentary Letter of Credit under which an Issuing Lender agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member, in respect of obligations of such Group Member in connection with the purchase of goods or services in the ordinary course of business.

"**Commitments**" means, collectively, the Revolving Commitments and the Term Commitments.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Commonly Controlled Entity**" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"**Convert**", "**Conversion**" and "**Converted**" each refers to a conversion of Advances or a Term Loan Borrowing of one Type into Advances or a Term Loan Borrowing of the other Type pursuant to Section 2.09 or 2.10.

"**Control Co-Collateral Agent**" has the meaning specified in the Guarantee and Collateral Agreement.

"**Credit Card Accounts Receivable**" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Loan Party resulting from charges by a customer of a Loan Party on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Loan Party or services performed by a Loan Party, in each case in the ordinary course of its business.

"**Credit Card Accounts Receivable Reserve**" means reserves, established by the Agent in its Permitted Discretion, to reflect factors that may negatively impact the value of Credit Card Accounts Receivable (including, without limitation, for chargeback or other accrued liabilities or

11

offsets by Credit Card Processors and amounts to adjust for material claims, offsets, defenses or counterclaims or other material disputes with an account debtor).

"**Credit Card Notification**" has the meaning specified in <u>Section 6.01(m)(iii)</u>.

"**Credit Card Processors**" means the credit card clearinghouses and processors used by the Loan Parties and listed in the Perfection Certificate as of the date of this Agreement, or otherwise disclosed in writing to the Agent by the Loan Parties from time to time following the date of this Agreement.

"**Credit Party**" or "**Credit Parties**" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each Co-Collateral Agent, (iv) each Issuing Lender, and (v) each Joint Lead Arranger and (b) collectively, all of the foregoing.

"**Cumulative Four-Week Period**" means the four-week period up to and through the Saturday of the most recent week then ended.

"**Customer Deposits Reserve**" means, at any time, a reserve calculated in a manner consistent with past practice under the Prepetition First Lien ABL Credit Agreement.

"**Customs Broker Agreement**" means an agreement in substantially the form attached hereto as <u>Exhibit G</u>, or such other form as the Co-Collateral Agents may reasonably agree, among a Loan Party, a customs broker or other carrier, and the Co-Collateral Agents, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Co-Collateral Agents and agrees, upon notice from the Co-Collateral Agents, to hold and dispose of the subject Inventory solely as directed by the Co-Collateral Agents.

"**DC**" means any distribution center owned or leased and operated by any Loan Party.

"**DDA**" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.

"**De Minimis Asset Sale Order**" means the *(CORRECTED) Order Signed on 11/21/2018 Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* (Docket No. 856) entered by the Bankruptcy Court on November 21, 2018.

"**Debt**" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred and being paid in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all direct and contingent obligations of such Person arising under banker's acceptances, letters of credit (including standby and commercial), bank guaranties, surety bonds and similar instruments, (e) all obligations of such Person created or arising under any conditional sale or other title retention agreement (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all obligations of such Person as lessee under leases that have been or

should be, in accordance with GAAP, recorded as Capital Lease Obligations, (g) all direct recourse payment obligations of such Person in respect of any accounts receivable sold by such Person, (h) all net obligations of such Person under any Swap Obligations, (i) all obligations of such Person in respect of Disqualified Equity Interests, (j) all Debt of others referred to in clauses (a) through (i) above or clause (k) below and other payment obligations guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss, and (k) all Debt referred to in clauses (a) through (i) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"**Debtor Advisors**" has the meaning assigned to such term in <u>Section 6.01(s)</u>.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning specified in the recitals to this Agreement.

"**Default**" means any Event of Default or any event or condition that, with the lapse of time or giving of notice or both, would constitute an Event of Default.

"**Defaulting Lender**" means any Lender (as reasonably determined by the Agent) that (a) has failed to fund any portion of the Advances, participations in Letters of Credit or participations in Swingline Advances required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (c) has failed, within three Business Days after request by the Agent, to confirm in writing that it will comply with the terms of this Agreement relating to its Commitments, provided that such Lender shall cease to be a Defaulting Lender under this clause (c) upon the Agent's receipt of such confirmation, (d) has notified the Borrowers, the Agent, the Issuing Banks or the Swingline Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or Bail-In Action, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity;

13

underline{provided} that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**DIP ABL Facility**" means the superpriority senior secured debtor-in-possession asset-based credit facility provided by the Credit Parties to the Borrowers hereunder.

"**DIP Intercreditor Agreement**" means the DIP Intercreditor Agreement dated [the date hereof] among the Agent and the Co-Collateral Agents, as Senior DIP Agents, the Junior DIP Term Loan Agent, as Junior DIP Agent, and the Loan Parties, substantially in the form of Exhibit F hereto and as amended, restated, supplemented or otherwise modified from time to time.

"**DIP Motion**" means the *Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing* (Docket No. 7) filed by the Debtors on October 15, 2018.

"**DIP Superpriority Claims**" has the meaning specified in Section 2.19(a).

"**Disposition**" means any sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, the issuance or sale, transfer or other disposition of any Equity Interests).

"**Disqualified Equity Interests**" of any Person means any class of Equity Interests of such Person that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by such Person, whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, in each case on or prior to the date that is 91 days after the Scheduled Termination Date.

"**Dollars**" and "**$**" refers to lawful money of the United States.

"**Documentation Agent**" has the meaning specified in the Preamble.

"**Domestic Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

14

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in an EEA Member Country that is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) above; or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in the foregoing clauses and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of an EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the first day on which all of the conditions precedent set forth in <u>Section 4.01</u> are satisfied or waived in accordance with the terms hereof.

"**Eligible Assignee**" means (a) a commercial bank or any other Person (other than a natural Person) engaged in the business of making asset based or commercial loans, or (other than in the case of a Revolving Commitment) any fund or other Person (other than a natural Person) that invests in loans, which bank, Person or fund, together with its Affiliates, has a combined capital and surplus in excess of $1,000,000,000 and which bank, Person or fund is approved by the Agent in its discretion, (b) an existing Lender or an Affiliate of an existing Lender or an Approved Fund; <u>provided</u> that neither the Borrowers nor any Affiliate of the Borrowers, nor any Permitted Holder Lender, nor any holder of any Debt under the Prepetition Second Lien Facilities or the Junior DIP Term Loan Facility, nor any other Loan Party, nor any Subsidiary of any of the foregoing, shall qualify as an Eligible Assignee under clauses (a) or (b) of this definition and (c) during any Event of Default, any other Person (other than a natural Person) acceptable to Agent in its discretion.

"**Eligible Credit Card Accounts Receivable**" means at the time of any determination thereof, each Credit Card Account Receivable that satisfies the following criteria at the time of its creation and continues to meet the same at the time of such determination: such Credit Card Account Receivable (i) has been earned and represents the bona fide amounts due to a Borrowing Base Loan Party from a Credit Card Processor and/or credit card issuer, and in each case originated in the ordinary course of business of the applicable Borrowing Base Loan Party and (ii) is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (k) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Account Receivable, a Credit Card Account Receivable shall indicate no person other than a Borrowing Base Loan Party as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Account Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price

15

adjustments, finance charges, credit card processor fees or other allowances (including any amount that the applicable Borrowing Base Loan Party may be obligated to rebate to a customer, a Credit Card Processor, or credit card issuer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Account Receivable but not yet applied by the applicable Borrowing Base Loan Party to reduce the amount of such Credit Card Account Receivable. Unless otherwise approved from time to time in writing by the Co-Collateral Agents in their Permitted Discretion, no Credit Card Account Receivable shall be Eligible Credit Card Account Receivable if, without duplication:

(a)    such Credit Card Account Receivable is not owned by a Borrowing Base Loan Party and such Borrowing Base Loan Party does not have good or marketable title to such Credit Card Account Receivable;

(b)    such Credit Card Account Receivable does not constitute a "payment intangible" or "account" (as defined in the UCC) or such Credit Card Account Receivable has been outstanding for more than five (5) Business Days from the date of sale;

(c)    the issuer or payment processor of the applicable credit card with respect to such Credit Card Account Receivable is the subject of any bankruptcy or insolvency proceedings;

(d)    such Credit Card Account Receivable is not the valid, legally enforceable obligation of the applicable issuer with respect thereto;

(e)    such Credit Card Account Receivable is subject to any Lien whatsoever other than Liens in favor of the Co-Collateral Agents and Liens of the types specified in clauses (a), (g), (h), (m), (s), (t) and (u) of the definition of Permitted Liens;

(f)    such Credit Card Account Receivable is not subject to a valid and perfected Lien in favor of the Co-Collateral Agents, for the benefit of the Credit Parties, senior in priority to all other Liens other than Liens of the types specified in clauses (a), (g), (h) and (t) of the definition of Permitted Liens;

(g)    the Credit Card Account Receivable does not conform to all representations, warranties, covenants or other provisions in the Loan Documents relating to Credit Card Account Receivable;

(h)    such Credit Card Account Receivable is subject to a right to repurchase or risk of set-off, non-collection or not being processed due to unpaid and/or accrued credit card processor fee balances, limited to the lesser of the balance of Credit Card Account Receivable or unpaid credit card processor fees;

(i)    such Credit Card Account Receivable is evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is subject to the perfected security interest of the Co-Collateral Agents;

16

(j)    such Credit Card Account Receivable does not meet such other reasonable eligibility criteria for Credit Card Account Receivable as the Agent (or any Co-Collateral Agent upon written notice to the Agent) may determine from time to time in its Permitted Discretion; or

(k)    such Credit Card Account Receivable is disputed between a Borrower and a Credit Card Processor, or with respect to which a claim, counterclaim, offset or chargeback has been asserted by the related Credit Card Processor (but only to the extent of such dispute, claim, counterclaim, offset or chargeback).

Notwithstanding the above, the Agent reserves the right, at any time and from time to time after the Effective Date, to adjust the criteria set forth above, to establish new criteria and to adjust the applicable advance rate with respect to Eligible Credit Card Accounts Receivable, in its Permitted Discretion, subject to the approval of the Supermajority Lenders in the case of adjustments of criteria or establishment of new criteria which have the effect of making more credit available, and subject to the approval of all Lenders in the case of adjustments to the advance rate.

"**Eligible In-Transit Inventory**" means, as of any date of determination thereof, without duplication of other Eligible Inventory, finished goods Inventory:

(a)    for which full payment has been delivered to the vendor of such Inventory and evidence of such payment has been received by the Agent; provided that in transit Inventory purchased under "private label" letters of credit issued by SRAC or Letters of Credit issued hereunder shall be deemed Eligible In-Transit Inventory, subject to (x) an Inventory Reserve equal to (i) such percentage as the Agent may determine in its Permitted Discretion, *multiplied by* (ii) the Inventory Value of such Inventory, and (y) satisfaction of all of the other conditions of this definition;

(b)    which has been shipped from a location outside of the United States, Puerto Rico or the U.S. Virgin Islands for receipt by any Borrowing Base Loan Party, but which has not yet been delivered to such Borrowing Base Loan Party, which Inventory has been in transit for sixty (60) days or less from the date of shipment of such Inventory;

(c)    for which the purchase order is in the name of any Borrowing Base Loan Party and title has passed to such Borrowing Base Loan Party;

(d)    for which the document of title reflects a Borrowing Base Loan Party as consignee or, if requested by a Co-Collateral Agent, names the Co-Collateral Agents as consignee, and in each case as to which a Co-Collateral Agent has control over the documents of title which evidence ownership of the subject Inventory (such as, if requested by a Co-Collateral Agent, by the delivery of a Customs Broker Agreement);

(e)    which is insured as required pursuant to Section 6.01(c) hereof; and

(f)    which would not be excluded from the definition of "Eligible Inventory" by any of clauses (a), (c) through (g) or (i) through (s) of the definition thereof;

provided that the Agent, or any Co-Collateral Agent upon written notice to the Agent, may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent or such Co-Collateral Agent determines that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or *pari passu* with, the Lien of the Co-Collateral Agents (such as, without limitation, a right of stoppage in transit) or may otherwise adversely impact the ability of the Co-Collateral Agents to realize upon such Inventory.   The Agent or any Co-Collateral Agent upon written notice to the Agent, shall have the right (without limiting any of its other rights as provided herein) to exclude Eligible In-Transit Inventory described in clause (b) above (in whole or in part) from the determination of the Borrowing Base in the event that the Agent, or any Co-Collateral Agent upon written notice to the Agent, determines in its Permitted Discretion that the Borrowers have commenced, or have determined to commence, a full-chain liquidation, including a Specified Full-Chain Liquidation.

"**Eligible Inventory**" means at any time, without duplication (i) Eligible In-Transit Inventory, and (ii) items of Inventory of any Borrowing Base Loan Party that are held for retail sale to the public in the ordinary course of business, merchantable, and readily saleable to the public in the ordinary course of business, that is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (s) below. Without limiting the foregoing, to qualify as "Eligible Inventory" no Person other than the Borrowing Base Loan Parties shall have any direct or indirect ownership, interest or title to such Inventory and no Person other than the Borrowing Base Loan Parties shall be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein. Unless otherwise from time to time approved in writing by the Agent (or any Co-Collateral Agent upon written notice to the Agent) in its Permitted Discretion, no Inventory shall be deemed Eligible Inventory if, without duplication:

(a)     the Borrowing Base Loan Parties do not have sole and good, valid and unencumbered title thereto (except for Liens of the types described in clauses (a), (b), (c), (e), (g), (m), (s), (t) or (u) of the definition of Permitted Liens); or

(b)     it is not located in the United States, Puerto Rico, Guam or U.S. Virgin Islands; or

(c)     it is not located at property owned or leased by the Borrowing Base Loan Parties (except to the extent such Inventory is (i) in transit between such locations, or (ii) is at a customer location and is deemed eligible pursuant to clause (g) below) or is located at a third party warehouse or is located at a closed Store or is located at a closed DC; or

(d)     it is not subject to a valid and perfected Lien in favor of the Co-Collateral Agents for the benefit of the Credit Parties, senior in priority to all other Liens other than Liens of the types described in clauses (a), (b), (c), (g) and (t) of the definition of Permitted Liens; or

(e)     it is subject to any Lien whatsoever other than Liens in favor of the Co-Collateral Agents and Permitted Liens of the types described in clauses (a), (b), (c), (e), (g), (m), (s), (t) or (u) of the definition thereof; or

18

(f)    it is Inventory located at a Store which is being closed; provided however that such Inventory will be deemed eligible for the first ten (10) weeks after commencement of the Specified Store Closing Sale for such Store unless extended by the Co-Collateral Agents in their sole and absolute discretion;

(g)    it is consigned from a vendor or is at a customer location but still accounted for in the applicable Borrowing Base Loan Party's inventory balance; or

(h)    it is in-transit (other than Eligible In-Transit Inventory) from a vendor and has not yet been received into a DC or Store; or

(i)    it is identified in the stock ledger of the applicable Borrowing Base Loan Party as any of the following departments or consists of Inventory which is ordinarily classified by such Borrowing Base Loan Party consistent with its historical practices as the following: floral; gasoline; live plants; miscellaneous or other as classified on the Borrowing Base Loan Party's stock ledger; produce; books; magazines; restaurant operations; or seafood; or it is identified per the applicable Borrowing Base Loan Party's stock ledger as candy; or

(j)    it is Inventory that has been packed-away and stored for more than 12 months at a DC or a Store for future sale, including merchandise of Sears and its Subsidiaries that has been carried over for more than 12 months as currently reported as "**XOM**" status per the RIM merchandising system; or

(k)    it is identified as wholesaler freight fees; or

(l)    it is Inventory on layaway or is Inventory which has been sold but not delivered or as to which any Borrowing Base Loan Party has accepted a deposit from a third party; or

(m)    it is identified per the Borrowing Base Loan Parties' stock ledger as Inventory that is in a leased department, including Lands' End, digital imaging, photofinishing and 1 hour lab; or

(n)    it is otherwise deemed ineligible by the Co-Collateral Agents in their Permitted Discretion; or

(o)    it is (i) operating supplies, packaging or shipping materials, cartons, labels or other such materials not considered used for sale in the ordinary course of business by the Agent in its Permitted Discretion (ii) work-in-process, raw materials, (iii) not in material compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (iv) bill and hold goods; or

(p)    it is Inventory which exhibits, includes or is identified by any trademark, tradename or other Intellectual Property right which trademark, tradename or other Intellectual Property right (i) is subject to a restriction that could reasonably be expected to adversely affect the Agent's ability to liquidate such Inventory or (ii) the relevant Borrowing Base Loan Party does not have the right to use in connection with the sale of such Inventory, either through direct ownership or through a written license or sublicense; or

19

(q)    it is Inventory that is not insured in compliance with the provisions of Section 6.01(c);

(r)    it is Inventory that does not conform to all representations, warranties, covenants or other provisions in the Loan Documents relating to Inventory; or

(s)    it is Inventory acquired outside of the ordinary course of business and the Co-Collateral Agents have not completed their diligence with respect thereto.

"**Eligible Pharmacy Receivables**" means each Pharmacy Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Pharmacy Receivable (i) has been earned and represents the bona fide amounts due to a Borrowing Base Loan Party from Third Party Payors, and other Persons reasonably acceptable to the Co-Collateral Agents, and in each case originated in the ordinary course of business of the applicable Borrowing Base Loan Party (ii) is non-recourse to the Borrowing Base Loan Parties and has been adjudicated or is otherwise due to a Borrowing Base Loan Party for pharmacy related services, and (iii) is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (m) below. Without limiting the foregoing, to qualify as an Eligible Pharmacy Receivable, an Account shall indicate no person other than a Borrowing Base Loan Party as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges, processing fees or other allowances (including any amount that the applicable Borrowing Base Loan Party may be obligated to rebate to a customer, or to pay to the Third Party Payors, direct customers or other Persons pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the applicable Borrowing Base Loan Party to reduce the amount of such Pharmacy Receivable. Unless otherwise approved from time to time in writing by the Co-Collateral Agents in their Permitted Discretion, none of the following Pharmacy Receivables shall be an Eligible Pharmacy Receivable:

(a)    Pharmacy Receivables that have been outstanding for more than ninety (90) days past the invoice date or that are more than sixty (60) days past due;

(b)    Pharmacy Receivables due from any Third Party Payor to the extent that fifty percent (50%) or more of all Pharmacy Receivables from such Third Party Payor are not Eligible Pharmacy Receivables under clause (a), above;

(c)    Pharmacy Receivables which do not constitute an "Account" (as defined in the UCC);

(d)    Pharmacy Receivables with respect to which a Borrowing Base Loan Party does not have good, valid and marketable title thereto;

(e)    Pharmacy Receivables that are not subject to a valid and perfected Lien in favor of the Co-Collateral Agents, for the benefit of the Credit Parties, senior in priority

to all other Liens other than Liens of the types described in clauses (a), (g) and (t) of the definition of Permitted Liens;

(f)     Pharmacy Receivables that are subject to any Lien whatsoever other than Liens in favor of the Co-Collateral Agents for the benefit of the Credit Parties and Liens of the types described in clauses (a), (e), (m), (s), (t) and (u) of the definition of Permitted Liens;

(g)     Pharmacy Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(h)     Pharmacy Receivables due from Medicare, Medicaid and other Governmental Authorities;

(i)     Pharmacy Receivables due from a Third Party Payor who is not duly authorized to conduct business in the United States of America, Puerto Rico, United States Virgin Islands or Guam, as applicable;

(j)     Pharmacy Receivables which are acquired outside of the ordinary course of business unless and until the Co-Collateral Agents have completed an appraisal and audit of such Pharmacy Receivables and otherwise agree that such Pharmacy Receivables shall be deemed Eligible Pharmacy Receivables;

(k)     Pharmacy Receivables as to which (i) the Borrowing Base Loan Party making the sale giving rise to such Pharmacy Receivables does not have a valid and enforceable agreement with the Third Party Payor providing for payment to such Borrowing Base Loan Party or there is a default thereunder that could be a basis for such Third Party Payor ceasing or suspending any payments to such Borrowing Base Loan Party, or (ii) the prescription drugs sold giving rise to such Pharmacy Receivables are not of the type that are covered under the agreement with the Third Party Payor or the party receiving such goods is not entitled to coverage under such agreement, (iii) the Borrowing Base Loan Party making the sale giving rise to such Pharmacy Receivables has not received confirmation from such Third Party Payor that the party receiving the prescription drugs is entitled to coverage under the terms of the agreement with such Third Party Payor and the Borrowing Base Loan Party is entitled to reimbursement for such Pharmacy Receivables, (iv) the amount of such Pharmacy Receivables exceeds the amounts to which the Borrowing Base Loan Party making such sale is entitled to reimbursement for the prescription drugs sold under the terms of such agreements (but solely to the extent of such excess), (v) there are contractual or statutory limitations or restrictions on the rights of the Borrowing Base Loan Party making such sale to assign its rights to payment arising as a result thereof or to grant any security interest therein which limitations or restrictions have not been satisfied or waived, (vi) all authorization and billing procedures and documentation required in order for the Borrowing Base Loan Party making such sale to be reimbursed and paid on such Pharmacy Receivables by the Third Party Payor have not been properly completed and satisfied to the extent required for such Borrowing Base Loan Party to be so reimbursed and paid, and (vii) the terms of the sale giving rise to such Pharmacy Receivables and all practices of such Borrowing Base Loan Party with respect to such Pharmacy Receivables do not comply in all material respects with applicable federal, state, and local laws and regulations;

(l)    Pharmacy Receivables which do not conform to all representations, warranties, covenants, or other provisions in the Loan Documents relating to Pharmacy Receivables; or

(m)    Pharmacy Receivables which the Co-Collateral Agents determine in their Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Pharmacy Receivables as the Agent (or any Co-Collateral Agent upon written notice to the Agent) may determine in its Permitted Discretion.

"**Employee Wage Order**" means the *Final Order (I) Authorizing But Not Directing the Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs, and (II) Granting Related Relief* (Docket No. 798) entered by the Bankruptcy Court on November 16, 2018.

"**Enforcement Action**" means any rightful action to enforce any Obligations or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of account debtors, exercise of setoff or recoupment, or otherwise).

"**Environmental Action**" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation or remediation, fines, penalties or indemnities), of Holdings, the Borrowers, or any of their Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the presence, generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and issued thereunder.

"**ERISA Affiliate**" means any Person that for purposes of Title IV of ERISA is a member of any Borrower's controlled group, or under common control with such Borrower, within the meaning of Section 414 of the Internal Revenue Code.

"**ERISA Event**" means (a) (i) the occurrence of a Reportable Event, as defined herein, or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to Section 4043(b)(2)) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Sections 303(k) or 4068(a) of ERISA shall have been met with respect to any Plan; (g) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan, or (h) the Borrowers or any ERISA Affiliate incur liabilities under Section 4069 of ERISA.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association, as in effect from time to time.

"**Eurocurrency Liabilities**" has the meaning assigned to that term in Regulation D of the Board of Governors, as in effect from time to time.

"**Eurodollar Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Eurodollar Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"**Eurodollar Rate**" means,

(a)    for any Interest Period with respect to a Eurodollar Rate Advance, the rate per annum equal to the London Interbank Offered Rate ("**LIBOR**") or a comparable or

23

successor rate, which rate is chosen by the Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)    for any interest calculation with respect to a Base Rate Advance on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day; and

provided that (i) to the extent a comparable or successor rate is selected by the Agent in connection herewith, the approved rate shall be applied in a manner consistent with market practice; provided, further that to the extent such market practice is not administratively feasible for the Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Agent and (ii) in the event that the Eurodollar Rate as determined above would otherwise be less than 0.00%, such Eurodollar Rate shall be deemed to be 0.00%.

"**Eurodollar Rate Advance**" means an Advance or Term Loan Borrowing that bears interest as provided in Section 2.08(a)(ii) or Section 2.08(b)(ii), as applicable.

"**Eurodollar Rate Reserve Percentage**" for any Interest Period for a Eurodollar Rate Advance by any Lender means the reserve percentage applicable to such Lender two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors for determining the minimum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"**Events of Default**" has the meaning specified in Section 7.01.

"**Excess Availability**" means, at any time, an amount equal to the (A) the Line Cap, minus (B) the Total Extensions of Credit.

"**Excluded Accounts**" means payroll, trust and Tax withholding accounts funded in the ordinary course of business.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Guarantee and Collateral Agreement of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 9.20 hereof and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a

24

security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such guaranty or security interest becomes illegal.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated and including any Taxes imposed in lieu of income Taxes), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in any Extension of Credit or Commitment pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in such Extension of Credit or Commitment (other than pursuant to an assignment request by the Borrower under <u>Section 9.16</u>) or (ii) in the case of a Lender, such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to <u>Section 2.15</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 2.15(e)</u> or <u>Section 2.15(f)</u> and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"**Existing Letters of Credit**" means each of the Letters of Credit described on <u>Schedule 1.02</u> issued and outstanding under the Prepetition First Lien ABL Credit Agreement or the Interim DIP Term Sheet immediately prior to the Effective Date.

"**Extensions of Credit**" means as to any Lender at any time, an amount equal to the sum of (a) the aggregate Revolving Extensions of Credit of such Lender and (b) the outstanding principal amount of the Term Loan held by such Lender.

"**Extraordinary Expenses**" means all reasonable and documented out-of-pocket costs, expenses or advances that the Agent or any Co-Collateral Agent may incur, whether prior to or after the occurrence or continuance of a Default or Event of Default, and whether prior to, after or during the pendency of the Chapter 11 Cases or any other Insolvency Proceeding of any Loan Party, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against the Agent, the Co-Collateral Agents, any Lender, any Loan Party, any representative of creditors of a Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Control Co-Collateral Agent's Liens with respect to any Collateral), Loan Documents or Obligations, including any lender liability or other claims; (c) the exercise, protection or enforcement of any rights or remedies of Agent or the Co-Collateral Agents in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or

25

Obligations; or (g) Overadvances.  Such costs, expenses and advances include transfer fees, taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, financial advisor fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Loan Party or independent contractors in liquidating any Collateral (including the Liquidation Agent), and travel expenses.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing such sections of the Internal Revenue Code.

"**Fee Letter**" means the Fee Letter, dated October 15, 2018, among Holdings, the Borrowers, and each Joint Lead Arranger.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing reasonably selected by it; provided, that if such rate shall be less than zero, the Federal Funds Rate shall be deemed to be zero for the purposes of this Agreement and the other Loan Documents.

"**Final Financing Order**" means an order of the Bankruptcy Court, in the form of Exhibit K, with any changes thereto that are satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, which order shall have been entered not later than November 20, 2018, authorizing and approving the DIP ABL Facility on a final basis in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion.

"**Financing Orders**" means, collectively, the Interim Financing Order and the Final Financing Order.

"**Flood Documentation**" means, for any Real Property, (i) evidence as to whether the applicable Real Property is located in a Special Flood Hazard Area pursuant to a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination form ordered and received by Agent (and if the flood hazard determination states that such Real Property is located in a Special Flood Hazard Area, the applicable Loan Party's written acknowledgment of receipt of written notification from the Co-Collateral Agents), (ii) in the event such Real Property is located in a Special Flood Hazard Area with respect to which flood insurance has been made available under the Flood Insurance Laws, evidence of flood insurance in an amount and otherwise sufficient to comply with the applicable rules and regulations

promulgated pursuant to the Flood Insurance Laws, in form and substance reasonably acceptable to Agent, and (iii) any other reasonable documents or information reasonably requested by any Lender (through the Agent) to enable such Lender to comply, in the determination of the Co-Collateral Agents, with any applicable Flood Insurance Laws.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973, (iii) the National Flood Insurance Reform Act of 1994, (iv) the Flood Insurance Reform Act of 2004 and (v) the Biggert-Waters Flood Insurance Reform Act of 2012.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, (a) with respect to the Issuing Lenders, such Defaulting Lender's Revolving Commitment Percentage of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swingline Lender, such Defaulting Lender's Revolving Commitment Percentage of Swingline Advances other than Swingline Advances as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" has the meaning specified in Section 1.03.

"**Gift Card Liability Reserve**" means, at any time, and without duplication of any other Availability Reserves or Inventory Reserves, a reserve equal to the aggregate remaining value at such time of (i) outstanding gift certificates and gift cards of the Borrowing Base Loan Parties entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory and (ii) outstanding merchandise credits.

"**Global Bidding Procedures Order**" means that certain *Order Signed on 11/19/2018 Approving Global Bidding Procedures and Granting Related Relief* (Docket No. 816) entered by the Bankruptcy Court.

"**Go Forward Plan**" means that certain Go Forward Plan of the Debtors attached hereto as Schedule 6.01(r)(ii).

"**Go Forward Stores**" means the stores identified on Schedule 1.09.

"**Go Forward Stores Qualified Bid**" means (i) a Qualified Stalking Horse Bid, (ii) any subsequently submitted non-contingent and fully-financed (with committed financing containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provisions)) qualified bid or bids accepted by the Debtors as the highest or best bid or bids for the Go Forward Stores in accordance with the Global Bidding Procedures Order and otherwise reasonably acceptable to the Administrative Agent and Co-Collateral Agents, and (iii) any bid accepted by Debtors as a replacement or substitute bid for any of the foregoing, so long as it meets the requirements of a Qualified Stalking Horse Bid or

the requirements set forth in clause (ii) above; in each case of clauses (i), (ii) and (iii), that will result, individually or in the aggregate, in Net Proceeds to satisfy in full, in cash, all Obligations (after taking into account the funding in full of the Winddown Account with the proceeds of any Prepetition Unencumbered Assets included in such bids).

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank), any group or body charged with setting regulatory capital rules or standards (including the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing) and any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Group Members**" means, collectively, Holdings, the Borrowers and their respective Subsidiaries.

"**Guarantee and Collateral Agreement**" means a Debtor-in-Possession Guarantee and Collateral Agreement in the form of Exhibit D.

"**Hazardous Materials**" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous, toxic; a pollutant, contaminant or words of a similar import under any Environmental Law.

"**Holdings**" has the meaning specified in the Preamble.

"**Incremental DIP Revolving Commitments**" has the meaning specified in the recitals to this Agreement.

"**Incremental DIP Revolving Loans**" has the meaning specified in the recitals to this Agreement.

"**Incremental DIP Term Loan**" has the meaning specified in the recitals to this Agreement.

"**Indemnified Taxes**" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Indemnified Party**" has the meaning specified in Section 9.04(b).

"**Initial Lenders**" means Bank of America, N.A., Wells Fargo Bank, National Association and Citibank, N.A.

"**Initial Term Loan**" means the term loan made by the Term Lenders pursuant to <u>Section 2.01</u>(b) in an aggregate principal amount of $111,889,241.

"**Insolvency**" means with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"**Insolvency Proceeding**" means any case or proceeding (other than the Chapter 11 Cases) commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

"**Insolvent**" means pertaining to a condition of Insolvency.

"**Intellectual Property**" has the meaning specified in the Guarantee and Collateral Agreement.

"**Interest Period**" means, for each Eurodollar Rate Advance comprising part of the same Borrowing or Term Loan Borrowing, the period commencing on the date of such Eurodollar Rate Advance or the date of the Conversion of any Base Rate Advance into such Eurodollar Rate Advance and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below. The duration of each such Interest Period shall be two weeks or one month, as the applicable Borrower may, upon notice received by the Agent not later than 12:00 noon on the third Business Day prior to the first day of such Interest Period, select; <u>provided</u>, <u>however</u>, that:

(a) a Borrower may not select any Interest Period with respect to a Revolving Advance or Term Loan Borrowing that ends after the Scheduled Termination Date;

(b) Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Borrowing shall be of the same duration;

(c) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, <u>provided</u>, <u>however</u>, that, if such extension would cause the last day of such Interest Period of one month or longer to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(d) whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

29

"**Interim DIP Facility**" has the meaning specified in the recitals to this Agreement.

"**Interim DIP Term Sheet**" means the $1,830,000,000 Senior Secured Superpriority Priming Debtor-in-Possession Asset Based Credit Facility Summary of Terms and Conditions, dated October 15, 2018, by and among Holdings, the Borrowers, the other Loan Parties, and the Initial Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Interim Financing Order**" means that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (Docket No. 101), entered by the Bankruptcy Court on October 16, 2018.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Inventory**" as defined in the UCC.

"**Inventory Reserves**" means the following:

 (a) a reserve for shrink, or discrepancies that arise between Inventory quantities on hand per the Borrowing Base Loan Parties' unit inventory system, and physical counts of the Inventory which will be equal to the greater of (i) the mathematical average of the historical shrink results expressed as a percent of sales, multiplied by sales for the relevant year-to-date period and adjusted for the cost complement for the relevant year-to-date period, but only to the extent such amount exceeds reserves already netted out of the Inventory Value per the stock ledger; or (ii) an amount determined by the Agent in its Permitted Discretion or any Co-Collateral Agent in its Permitted Discretion upon written notice to the Agent, and the Agent shall, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Inventory Reserve;

 (b) a reserve for intracompany profit, equal to the most recent three (3) fiscal months of capitalized cost of the foreign buying offices owned and operated by any Borrowing Base Loan Party, with the time frame subject to change based on Inventory performance, or the Agent's (or any Co-Collateral Agent's upon written notice to the Agent) Permitted Discretion;

 (c) to the extent not already netted out of the Inventory Value per the stock ledger or not treated as ineligible pursuant to the definition of Eligible Inventory, a reserve determined in the Agent's (or any Co-Collateral Agent upon written notice to the Agent) Permitted Discretion for (i) hard (permanent) markdowns, (ii) seasonal merchandise (including, without limitation, seasonal apparel which is more than four weeks past a specified selling season, and Inventory for sale during a specified holiday or event (other than seasonal apparel), after the specified holiday or event has occurred), (iii) discontinued and clearance merchandise, (iv) change in product mix of merchandise, (v) change in pricing strategy or markon percentages, (vi) damaged merchandise, (vii) price changes, or (viii) other adjustments as deemed appropriate;

(d)     a reserve established in the Agent's (or any Co-Collateral Agent's upon written notice to the Agent) Permitted Discretion for Inventory returned (other than as a result of reclamations) to either the return goods center ("**RGC**"), the vendor, given to charity, or otherwise considered non-saleable, whether defective or non-defective, and the Agent shall, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Inventory Reserve.  This reserve is to be calculated as the monthly average for the most recent rolling 12 fiscal month period of return (other than as a result of reclamations) activity to the vendors, the RGC, given to charity, or otherwise considered non-saleable, whether defective or non-defective, both from the Stores and DCs, and is subject to change at the Agent's (or any Co-Collateral Agent's upon written notice to the Agent) Permitted Discretion; and such reserve is to be recalculated on the Thursday after each Prior Week and to be reflected on each Borrowing Base Certificate delivered by Holdings on such date;

(e)     without duplication of any Reserve imposed under clause (a) of the definition of "Eligible In-Transit Inventory", a reserve for that in transit Inventory purchased under "private label" letters of credit issued by SRAC or Letters of Credit issued hereunder; and

(f)     a reserve for Inventory ordinarily classified as repair services.

"**Inventory Value**" means, with respect to any Inventory of the Borrowing Base Loan Parties, the value of such Inventory valued at the lower of cost or market value on a basis consistent with the Borrowing Base Loan Parties' current and historical accounting practice in effect on the date of this Agreement, per the stock ledger (without giving effect to LIFO reserves and general ledger reserves for discontinued inventory, markdowns, intercompany profit, rebates and discounts, any cut off adjustments, revaluation adjustments, purchase price adjustments or adjustments with respect to the capitalization of buying, occupancy, distribution and other overhead costs reflected on the balance sheet of the Borrowing Base Loan Parties in respect of Inventory).  The value of the Inventory as set forth above will be calculated net of the reserve established by the Borrowing Base Loan Parties on a basis consistent with the Borrowing Base Loan Parties' current and historical practices, in effect on the date of this Agreement, in respect of lost, misplaced or stolen Inventory (but the establishment of such reserves by the Borrowers shall not preclude the Co-Collateral Agents, in their Permitted Discretion, from establishing other or larger Inventory Reserves with respect to such Inventory as otherwise provided herein).

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.

"**Issuing Lender**" means, collectively, Bank of America, N.A. and Wells Fargo Bank, National Association, it being understood that with the consent of the requesting Borrower (not to be unreasonably withheld) the Issuing Lender may arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Lender, in which case the term "Issuing Lender" shall include any such affiliate with respect to Letters of Credit issued by such Affiliate. Each

reference herein to "**the Issuing Lender**" shall be deemed to be a reference to the relevant Issuing Lender with respect to the relevant Letter of Credit.

"**Joint Lead Arrangers**" has the meaning specified in the Preamble.

"**Junior DIP Final Financing Order**" means an order of the Bankruptcy Court, satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, which order shall have been entered not later than December 28, 2018, authorizing and approving the Junior DIP Term Loan Facility on a final basis in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion.

"**Junior DIP Financing Orders**" means the Junior DIP Interim Financing Order and the Junior DIP Final Financing Order.

"**Junior DIP Interim Financing Order**" means that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain  Post-Petition Financing, (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition  Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* entered by the Bankruptcy Court on [November 27, 2018].

"**Junior DIP Term Loan Facility**" means the secured debtor-in-possession multiple draw term loan facility provided pursuant to and evidenced by the Junior DIP Term Loan Agreement and the other Junior DIP Term Loan Documents.

"**Junior DIP Term Loans**" means the loans or other extensions of credit made by or on behalf of any lender under the Junior DIP Term Loan Agreement or by the Junior DIP Term Loan Agent pursuant to the Junior DIP Term Loan Agreement.

"**Junior DIP Term Loan Agent**" means GACP Finance Co., LLC.

"**Junior DIP Term Loan Agreement**" means that certain Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement dated the date hereof among the Junior DIP Term Loan Agent and the Loan Parties, as amended, restated, supplemented or otherwise modified from time to time as permitted herein.

"**Junior DIP Term Loan Documents**" means the Junior DIP Term Loan Agreement, any note issued thereunder, the Junior DIP Financing Orders, and the other "Loan Documents" under and as defined in the Junior DIP Term Loan Agreement, as each may be amended, restated, supplemented or otherwise modified from time to time as permitted herein.

"**Junior DIP Term Loan Obligations**" means the "Obligations" as defined in the Junior DIP Term Loan Agreement.

"**Kmart**" means Kmart Holding Corporation, a Delaware corporation.

"**Kmart Corp**." has the meaning specified in the Preamble.

"**L/C Commitment**" means $50,000,000 plus the amount of Prepetition L/C Obligations refinanced hereunder pursuant to Section 2.01(d)(iii).

"**L/C Obligations**" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed or discharged pursuant to Section 3.05.

"**Lease**" means any agreement, whether written or oral, no matter how styled or structured, and all amendments, guaranties and other agreements relating thereto, pursuant to which a Loan Party is entitled to the use or occupancy of any Real Property for any period of time.

"**Lenders**" has the meaning specified in the Preamble.

"**Letters of Credit**" means the collective reference to Commercial L/Cs, Banker's Acceptances, and Standby L/Cs; individually, a "**Letter of Credit**". Without limiting the foregoing, the Existing Letters of Credit shall be deemed Letters of Credit issued under this Agreement.

"**Lien**" means any lien, security interest, mortgage or other charge or encumbrance of any kind or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor, and any easement, right of way or other encumbrance on title to real property, but excluding consignments or bailments of goods of third parties and the interests of lessors under operating leases.

"**Line Cap**" means, at any time of determination, the lesser of (i) the Aggregate Revolving Commitments plus the principal amount of the Term Loan outstanding at such time and (ii) the Borrowing Base.

"**Liquidation**" means the exercise by the Agent or the Co-Collateral Agents of those rights and remedies accorded to the Agent and/or the Co-Collateral Agents under the Loan Documents and applicable law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent and the Co-Collateral Agents, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other Disposition of the Collateral for the purpose of liquidating the Collateral.

"**Liquidation Agent**" has the meaning assigned to such term in Section 6.01(s).

"**Loan Documents**" means this Agreement, the Security Documents, the DIP Intercreditor Agreement, the Notes, the Fee Letter, the Financing Orders, any Application, each Borrowing Base Certificate, each Approved Budget, each Rolling Budget, any other document or instrument now or hereafter designated by the Borrowers and the Agent as a "**Loan Document**" and any amendment, waiver, supplement or other modification to any of the foregoing.

"**Loan Parties**" means each Group Member that is a party to a Loan Document.

33

"**LTV Formula Amount**" means, at any time, (a) the aggregate outstanding Eligible Credit Card Accounts Receivable at such time, plus (b) the Eligible Pharmacy Receivables at such time plus (c) (i) the Net Orderly Liquidation Value of Net Eligible Inventory (other than Eligible Inventory at Stores to be closed pursuant to Specified Store Closing Sales) at such time and (ii) the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at Stores to be closed pursuant to Specified Store Closing Sales at such time.

"**LTV Provisions**" means the ratios set forth in Section 6.02(n).

"**Material Adverse Effect**" means the effect of any event, condition, circumstance or contingency that, taken alone or in conjunction with other events, conditions, circumstances or contingencies (in each case, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases), has or could reasonably be expected to have a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of Holdings and its Subsidiaries taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform their obligations under the Loan Documents or (c) the validity or enforceability of the Loan Documents or the rights and remedies of the Agent, the Co-Collateral Agents or the Lenders thereunder (including, but not limited to, the enforceability or priority of any Liens granted to the Co-Collateral Agents under the Loan Documents).

"**Material Documents**" means all pleadings, documents, proposed forms of order, or other items filed by the Debtors in the Chapter 11 Cases that relate to the following: (a) any plan of reorganization or liquidation, (b) any debtor-in-possession financing or use of cash collateral that does not result in payment in full in cash of all Obligations and Prepetition First Lien ABL Obligations upon consummation of such financing or use of cash collateral, (c) any sale or other disposition of Collateral outside of the ordinary course of business, (d) any other item that would materially and adversely affect the Credit Parties' or Prepetition Credit Parties' claims or (e) the Junior DIP Term Loan Facility.

"**MLPFS**" has the meaning specified in the Preamble.

"**Mortgaged Properties**" means each Real Property that, upon request of the Co-Collateral Agents, shall be encumbered by a Mortgage pursuant to Section 6.01(i)(v).

"**Mortgages**" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, debentures, and other security documents securing the Obligations (including amendments to any of the foregoing) executed and delivered by a Loan Party to the Co-Collateral Agents with respect to Mortgaged Properties (either as stand-alone documents or forming part of other Security Documents), each in form and substance satisfactory to the Co-Collateral Agents and the Borrowers, in each case, as amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Holdings or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"**Multiple Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Holdings or any ERISA Affiliate and at least one Person other than Holdings and the ERISA Affiliates or (b) was so maintained and in respect of which Holdings or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"**Net Cash Flow**" means, for any Cumulative Four-Week Period, the Borrowers' total net cash flow, excluding (i) proceeds from Dispositions, except for proceeds from the sale of Inventory, and (ii) financing related items.

"**Net Eligible Inventory**" means, at any time, an amount equal to the Inventory Value of Eligible Inventory less Inventory Reserves.

"**Net Proceeds**" means, (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries of any property (other than property disposed of pursuant to clauses (a), (b), (c), (e), (f), (h) or (j) of the definition of Permitted Dispositions) or any casualty or condemnation of such property, the excess, if any, of (i) the sum of cash and cash equivalents received in such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Debt (other than Debt owed to Holdings or any of its Subsidiaries, the payment of which in connection with any Permitted Disposition or other transaction shall not, for the avoidance of doubt, be deemed to reduce the amount of Net Proceeds for any purposes under this Agreement) that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Co-Collateral Agents' Lien, if any, on such asset and that is required, and permitted under this Agreement, to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction, (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, reasonable and customary attorneys' fees, accountants' fees, investment banking fees, appraisals, and brokerage, legal, title and recording or transfer Tax expenses and commissions) paid by any Loan Party or any of its Subsidiaries to third parties (other than Affiliates), (C) transfer Taxes paid as a result thereof and (D) amounts required to be paid by any Loan Party or any of its Subsidiaries pursuant to the Financing Orders or other applicable order of the Bankruptcy Court in order to consummate such transaction, and (b) with respect to any issuance of Equity Interests of any Loan Party or capital contribution made to any Loan Party (other than an issuance of Equity Interests to a Loan Party or a capital contribution made by a Loan Party) or any incurrence of Debt other than Permitted Debt, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party in connection therewith.

"**Net Orderly Liquidation Value**" means the product of (x) clause (i) of Net Recovery Rate and (y) the Net Eligible Inventory.

"**Net Recovery Rate**" means (i) with respect to Eligible Inventory located at Stores not subject to a Store closing (the "**Appraised Go Forward Stores**"), the appraised blended net orderly liquidation value (the "**Go Forward Stores Net Recovery Rate**") (on an "as is, where

is" basis) of each Borrowing Base Loan Party's Eligible Inventory that is to be sold through Appraised Go Forward Stores on a wholesale basis, net of costs and expenses estimated to be incurred in connection with such liquidation, which value is expressed as a percentage of the Inventory Value of Eligible Inventory located at the Appraised Go Forward Stores and shall be determined by the Co-Collateral Agents from time to time based on the most recent appraisal provided by an independent third-party appraiser retained by the Co-Collateral Agents in accordance with Section 6.01(k), and (ii) with respect to Eligible Inventory located at Stores that are closing (including Stores closing pursuant to the Initial Store Rationalization (as defined on Schedule 6.01(r)(ii)), the Secondary Store Rationalization (as defined on Schedule 6.01(r)(ii)) any Specified Store Closing Sale or Specified Full Chain Liquidation), the lesser of (x) the Go Forward Stores Net Recovery Rate for such Eligible Inventory determined as if such store was a Go Forward Store and (y) the appraised orderly liquidation value (on an "as is, where is" basis) for the applicable week of the scheduled Store closing events of each Borrowing Base Loan Party's Eligible Inventory located at such closing Stores, net of costs and expenses estimated to be incurred in connection with such liquidation, which value is expressed as a percentage of the Inventory Value of Eligible Inventory located at such Stores that are closing and shall be determined by the Co-Collateral Agents from time to time in consultation with BRG and an independent third-party appraiser based on the most recent appraisal provided by an independent third-party appraiser retained by the Co-Collateral Agents in accordance with Section 6.01(k).

"**Non-Consenting Lender**" has the meaning specified in Section 9.16.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Note**" means a promissory note of any Borrower payable to any Lender evidencing the Revolving Commitment or Term Loan of such Lender, as applicable.

"**Notice of Borrowing**" has the meaning specified in Section 2.02(a).

"**Obligations**" has the meaning set forth in the Guarantee and Collateral Agreement.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Extension of Credit or Loan Document pursuant to an assignment request by the Borrowers under Section 9.16).

"**Other Taxes**" has the meaning specified in Section 2.15(b).

"**Overadvance**" means any Advance to the extent that, immediately after its having been made, Excess Availability is less than zero.

"**PACA**" means the Perishable Agricultural Commodities Act of 1930, as amended.

"**PACA Liability Reserve**" means an amount calculated on a monthly basis by the Agent to provide for vendor liabilities pursuant to PACA.

"**Participant Register**" has the meaning specified in Section 9.07(f).

"**Participating Prepetition Lender**" has the meaning specified in Section 2.01(d).

"**PASA**" means the Packers and Stockyards Act of 1921, as amended.

"**PASA Liability Reserve**" means the liability for vendor liabilities pursuant to PASA.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Holdings or any ERISA Affiliate or to which Holdings or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Perfection Certificate**" means a certificate dated as of the Effective Date with respect to the Borrowers and the other Loan Parties in form reasonably satisfactory to the Co-Collateral Agents.

"**Permitted Debt**" means each of the following as long as no Default or Event of Default exists at the time of incurrence thereof or would arise from the incurrence thereof:

(a)    Debt outstanding on the date of this Agreement and listed on Schedule 1.04;

(b)    Debt of any Loan Party to any other Loan Party;

(c)    Debt of any Group Member to any Subsidiary of Holdings which is not a Loan Party; provided, that (1) at the time of incurrence of any such Debt and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing and (2) such Debt is by its terms subordinated or junior in right of payment or security to the Obligations on terms acceptable to the Agent in its reasonable discretion;

(d)    the Obligations;

(e)    Debt under the Junior DIP Term Loan Agreement as in effect on the date hereof and subject at all times to the Financing Orders and the DIP Intercreditor Agreement;

1030946.08A-CHISR01A - MSW

(f)    Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations (including, in each case, letters of credit issued to provide such bonds, guaranties and similar obligations), in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(g)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, that (x) such Debt is extinguished within ten Business Days of notification to the applicable Loan Party of its incurrence and (y) such Debt is subject to the Cash Management Order;

(h)    Debt arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with any Specified Store Closing Sales or any Specified Sale Transaction, in each case on terms and pursuant to documentation (including documentation regarding subordination) acceptable to the Agent and the Co-Collateral Agents in their sole and absolute discretion; and

(i)    any other Debt in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding.

Notwithstanding the foregoing, and except for the Carve-Out and except for the Junior DIP Superiority Claims (as defined in the Final Financing Order), no Permitted Debt shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of (i) the Credit Parties in respect of the Obligations and (ii) the Prepetition Credit Parties in respect of the Prepetition ABL Obligations, in each case as set forth in the Financing Orders, as applicable.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of commercially reasonable business judgment (from the perspective of a secured, asset-based lender).

"**Permitted Dispositions**" means any of the following, as long as, if so required pursuant to Section 2.11 or Section 6.01(m), as applicable, all Net Proceeds are remitted to Agent for application to the Obligations:

(a)    transfers and Dispositions of Inventory in the ordinary course of business (it being agreed and understood that bulk sales, "going-out-of-business sales," store closing sales and similar sales are not in the ordinary course of business);

(b)    transfers and Dispositions among the Loan Parties;

(c)    transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to any Loan Party;

(d)    the sale of surplus, obsolete or worn out equipment or other property (other than Inventory) in the ordinary course of business by the Borrowers or any Subsidiary;

38

(e)    transfers and Dispositions which constitute Permitted Investments that are otherwise permitted hereunder;

(f)    subleases of real property existing as of the Petition Date and entered into in the ordinary course of business of any Loan Party;

(g)    the sale or Disposition of defaulted receivables and the compromise, settlement and collection of receivables in the ordinary course of business or in bankruptcy or other proceedings concerning the other account party thereon and not as part of an accounts receivable financing transaction;

(h)    any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind (other than, in each case, with respect to rights to license Intellectual Property, unless the limited license granted to the Co-Collateral Agents in such Intellectual Property pursuant to the Loan Documents remains in effect and is acknowledged by the licensee) to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect;

(i)    sales of Inventory (other than Eligible Inventory) determined by the management of the applicable Loan Party not to be saleable in the ordinary course of business of such Loan Party or any of the Loan Parties;

(j)    non-exclusive licenses to Intellectual Property granted to third parties in the ordinary course of business or in connection with a Disposition permitted under Section 6.02(i), and which do not materially interfere with the ordinary conduct of business of the Loan Parties;

(k)    dispositions in the ordinary course of business consisting of the abandonment of Intellectual Property rights which, in the reasonable good faith determination of the Borrowers, are no longer economically practicable to maintain or useful in the conduct of the business of the Loan Parties;

(l)    the Specified Store Closing Sales; and

(m)    any Specified Sale Transaction.

"**Permitted Encumbrances**" means Permitted Liens of the types described in clauses (a), (b), (e), (g), (j) or (t) of the definition thereof.

"**Permitted Holder**" means ESL Investments, Inc. and any of its Affiliates other than a Group Member.

"**Permitted Holder Lender**" means (x) any Permitted Holder and/or (y) any Significant Holder, provided, that, the Permitted Holder Lenders shall not (taken as a whole) at any time hold more than the amount of the Aggregate Revolving Commitments and the principal amount of the Term Loans held by such Permitted Holder Lenders on the Effective Date; provided, further, that, such Permitted Holder Lender shall execute a waiver in form and substance reasonably satisfactory to the Agent that it shall have no right whatsoever with respect to that

39

portion of the Aggregate Revolving Commitments, the Advances or the Term Loan which it holds (a) to consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of any Loan Document, (b) otherwise to vote on any matter related to any Loan Document, (c) to require Agents or any Lender to undertake any action (or refrain from taking any action) with respect to any Loan Document, (d) to attend any meeting with the Agent or any Lender or receive any information from the Agent or any Lender, (e) to the benefit of any advice provided by counsel to the Agents or the other Lenders or to challenge the attorney-client privilege of the communications between the Agents, such other Lenders and such counsel, or (f) make or bring any claim, in its capacity as Lender, against any Agent with respect to the fiduciary duties of such Agent or Lender and the other duties and obligations of the Agents hereunder; except that no amendment, modification or waiver to any Loan Document shall, without such Permitted Holder Lender's consent, deprive any Permitted Holder Lender of its pro rata share of any payments to which the Lenders as a group (or any Class thereof) are otherwise entitled hereunder or otherwise single out, or intentionally discriminate against the Permitted Holder Lender, as such.  For purposes of this definition, plural references to "**Agents**" contained in clauses (c) through (f) shall have the meaning set forth in Section 8.03, and references to "**such Agent**" or "**any Agent**" shall have corresponding meanings, as the context shall require.

"**Permitted Investments**" means each of the following as long as no Default or Event of Default exists at the time of the making such of Investment or would arise from the making of such Investment:

(a)    Investments existing on the date of this Agreement and listed on Schedule 1.05;

(b)    (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the date of this Agreement and described in the Perfection Certificate, (ii) Investments by any Loan Party and its Subsidiaries in Loan Parties, and (iii) Investments by Subsidiaries that are not Loan Parties in Holdings or any Subsidiary provided that in the case of this clause (iii), if such Investment is a loan it is subordinated to the Obligations on subordination terms satisfactory to the Agent in its reasonable discretion;

(c)    Investments in connection with Specified Sale Transactions and any Specified Store Closing Sales; provided that such Investments are made pursuant to agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion;

(d)    Investments arising out of the receipt of non-cash consideration for the sale of assets otherwise permitted under this Agreement;

(e)    Cash Equivalents that are subject to Agent's Lien and control, pursuant to documentation in form and substance satisfactory to Agent;

(f)    to the extent not prohibited by applicable law, (1) advances to officers, directors and employees and consultants of the Loan Parties made for travel, entertainment, relocation and other ordinary business purposes and (2) advances to officers, directors and employees and consultants of non-Loan Parties made for travel, entertainment,

40

relocation and other ordinary business purposes, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder; <u>provided</u> that such Investments shall not exceed $1,000,000 in the aggregate at any one time outstanding;

(g)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by any Group Member as a result of a foreclosure by any Loan Party with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(h)    accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business;

(i)    Guarantees by Holdings or any Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Debt, in each case entered into by Holdings or any Subsidiary in the ordinary course of business;

(j)    (1) advances in the form of a prepayment of expenses of any Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable Loan Party and (2) advances in the form of a prepayment of expenses of any non-Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable non-Loan Party, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder; and

(k)    other Investments in an amount not to exceed $1,000,000 in the aggregate outstanding at any time; <u>provided</u> that any cash returns on such Investments shall be applied to the Obligations in accordance with <u>Section 2.11(c)(i)</u>.

"**Permitted Liens**" means:

(a)    Liens for Taxes, assessments and governmental charges or levies to the extent such Taxes, assessments or governmental charges are being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained;

(b)    Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(c)    Landlords' Liens arising in the ordinary course of business securing (i) rents not yet due and payable, (ii) rent for Stores in an amount not to exceed the monthly base rent due for the immediately preceding calendar month and (iii) rents for Stores in excess of the amount set forth in the preceding clause (ii) so long as such amounts are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

41

(d)     any attachment or judgment lien not constituting an Event of Default under Section 7.01(e);

(e)     Liens presently existing or hereafter created in favor of the Co-Collateral Agents, on behalf of the Credit Parties;

(f)     Liens arising by the terms of commercial letters of credit, entered into in the ordinary course of business to secure reimbursement obligations thereunder, provided that such Liens only encumber the title documents and underlying goods relating to such letters of credit or cash;

(g)     claims under PACA and PASA;

(h)     Liens in favor of issuers of credit cards arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(i)     Liens incurred or deposits made by any Group Member in the ordinary course of business in connection with workers' compensation and other casualty insurance lines, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(j)     easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business, or in respect of any Real Property over which the Co-Collateral Agents have a Mortgage, any title defects, liens, charges or encumbrances (other than monetary Liens) which the title company is prepared to endorse or insure by exclusion or affirmative endorsement reasonably acceptable to the Agent and which is included in any Title Policy;

(k)     any interest or title of a lessor or sublessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Agreement;

(l)     normal and customary rights of setoff upon deposits of cash or other Liens originating solely by virtue of any statutory or common law provision, or ordinary course contractual obligation, relating to bankers' liens, rights of setoff or similar rights  in favor of banks or other depository institutions;

(m)     Liens existing on the Effective Date and set forth on Schedule 1.06;

(n)     Liens granted to consignors who have properly perfected on consigned Inventory owned by such consignors and created in the ordinary course of business;

(o)     [reserved];

(p)      deposits (including retainers or other similar deposits provided to professionals retained by any Group Member in connection with providing services in the ordinary course of business) and other customary Liens to secure the performance of bids, trade contracts (other than for Debt), leases (other than Capital Lease Obligations), statutory and regulatory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, agreements with utilities, and other obligations of a like nature incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(q)      Liens that are contractual rights of set-off relating to the establishment of depository relations with banks not given in connection with the issuance of Debt;

(r)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)      the Adequate Protection Liens and the Adequate Protection Superpriority Claims;

(t)      the Carve-Out;

(u)      Liens securing the obligations under the Junior DIP Term Loan Agreement; provided that such Liens shall be subject at all times to the Financing Orders and the DIP Intercreditor Agreement; and

(v)      non-exclusive licenses to Intellectual Property granted to third parties in the ordinary course of business or in connection with a Disposition permitted under Section 6.02(i), and which do not materially interfere with the ordinary conduct of business of the Loan Parties.

"**Permitted Overadvance**" means an Overadvance made by the Agent, in its Permitted Discretion, or at the direction of any Co-Collateral Agent, which:

(a)      (i)      is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(ii)      is made to enhance the likelihood of, or to maximize the amount of, repayment of the Obligations; or

(iii)      is made to pay any other amount chargeable to any Loan Party hereunder; and

(b)      together with all other Permitted Overadvances then outstanding, shall not (i) exceed five percent (5%) of the Borrowing Base (calculated without giving effect to clauses (f) or (g) thereof) at any time or (ii) unless a Liquidation is occurring, remain outstanding for more than thirty (30) consecutive Business Days, unless in each case, the Required Lenders otherwise agree;

43

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Article III regarding any Revolving Lender's obligations with respect to Letters of Credit, or (ii) result in any claim or liability against the Agent or the Co-Collateral Agents (regardless of the amount of any Overadvance) for "**inadvertent Overadvances**" (i.e. where an Overadvance results from changed circumstances beyond the control of the Agent or the Co-Collateral Agents (such as a reduction in the collateral value)), and such "inadvertent Overadvances" shall not reduce the amount of Permitted Overadvances allowed hereunder, and further, provided, that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Revolving Extensions of Credit would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"**Permitted Prior Liens**" means valid, perfected and unavoidable liens (other than Primed Liens) in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition First Lien ABL Credit Agreement.

"**Permitted Variance**" means, for any Prior Four-Week Period, the Borrowers' actual Net Cash Flow shall not be less than the Net Cash Flow set forth in the Approved Budget minus 15% of the absolute value of the Net Cash Flow set forth in the Approved Budget.

"**Person**" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"**Petition Date**" has the meaning specified in the recitals to this Agreement.

"**Pharmacy Receivables**" means Accounts arising from the sale of prescription drugs or other Inventory which can be dispensed only through an order of a licensed professional.

"**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

"**Prepetition**" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"**Prepetition 2016 Term Loans**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition 2016 Term Loan Facility**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition ABL Agent**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition ABL Collateral**" means the "Collateral" as defined in the Prepetition First Lien ABL Credit Agreement including any "cash collateral" as defined in Section 363 of the Bankruptcy Code.

"**Prepetition ABL Guarantee and Collateral Agreement**" means the Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, among Holdings, the Borrowers, the other grantors party thereto, the Prepetition ABL Agent and the Prepetition ABL Co-Collateral Agents, as the same has been amended, restated, supplemented or otherwise modified prior to the date of this Agreement.

"**Prepetition ABL Lenders**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition ABL Obligations**" means "Obligations" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Credit Parties**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition Facilities**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition FILO Loan Cap**" means the sum of (i) 10% of the Net Orderly Liquidation Value of Net Eligible Inventory at Stores other than closing Stores plus (ii) 10% of the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at closing Stores <u>minus</u> (iii) liabilities and obligations of the Loan Parties with respect to Bank Products and Cash Management Services at such time to the extent not already implemented and maintained as an Availability Reserve.

"**Prepetition FILO Reserve**" means a reserve in an amount equal to the excess of $125,000,000 over the Prepetition FILO Loan Cap (but no event less than zero). The Borrowers shall include reporting on the Prepetition FILO Reserve in each Borrowing Base Certificate.

"**Prepetition First Lien ABL Credit Agreement**" means the certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition First Lien ABL Credit Agreement**"), by and among Holdings, the Borrowers, the banks, financial institutions and other institutional lenders from time to time party thereto (collectively, the "**Prepetition ABL Lenders**"), the Issuing Lenders (as defined therein) from time to time party thereto (the "**Prepetition Issuing Lenders**"), and Bank of America, as administrative agent (in such capacity, the "**Prepetition ABL Agent**"), as a co-collateral agent, and as swingline lender, Wells Fargo Bank, National Association, as a co-collateral agent (together with Bank of America in such capacity, the "**Prepetition Co-Collateral Agents**," and together with the Prepetition ABL Lenders, the Prepetition Administrative Agent, and the Prepetition Issuing Lenders, the "**Prepetition Credit Parties**"), and the other parties from time to time party thereto, providing for a $1,500,000,000 asset-based revolving credit facility (the "**Prepetition Revolving Facility**"; and the revolving loans thereunder, the "**Prepetition Revolving Advances**"), a term loan facility in an aggregate original principal amount of $750,000,000 (the "**Prepetition 2016 Term Loan Facility**"; and the term loans thereunder, the "**Prepetition 2016 Term Loans**"), and a "first-in, last-out" facility in an original principal amount of $125,000,000 (the "**Prepetition FILO**

45

**Facility**," and collectively with the Prepetition Revolving Facility and the Prepetition 2016 Term Loan Facility, the "**Prepetition Facilities**").

"**Prepetition First Lien ABL Credit Agreement Primed Parties**" has the meaning specified in <u>Section 2.19(d)</u>.

"**Prepetition L/C Obligations**" means "L/C Obligations" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Loan Documents**" means "Loan Documents" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Revolver/Term Exposure**" means the sum of (a) the outstanding principal amount of Advances (under and as defined in the Prepetition First Lien ABL Credit Agreement), <u>plus</u> (b) the outstanding principal amount of Swingline Advances (under and as defined in the Prepetition First Lien ABL Credit Agreement), <u>plus</u> (c) the amount of Prepetition L/C Obligations <u>plus</u> (d) the outstanding principal amount of outstanding Prepetition 2016 Term Loans.

"**Prepetition Revolving Advances**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition Revolving Facility**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition Second Lien Cash Notes Indenture**" means that certain Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified from time to time), by and among Holdings, certain guarantors from time to time party thereto, and Wilmington Trust, National Association, as successor trustee and collateral agent thereunder.

"**Prepetition Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented or otherwise modified from time to time) by and among Holdings, the Borrowers, as borrowers, and the lenders from time to time party thereto.

"**Prepetition Second Lien Collateral**" means, collectively, Collateral (as defined in the Prepetition Second Lien Security Agreement).

"**Prepetition Second Lien Facilities**" means the Prepetition Second Lien Credit Agreement,  the Prepetition Second Lien Cash Notes Indenture, and the Prepetition Second Lien PIK Notes Indenture.

"**Prepetition Second Lien PIK Notes Indenture**" means that certain Indenture, dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time) by and among Holdings, certain guarantors from time to time party thereto, and Computershare Trust Company, N.A., as trustee thereunder.

"**Prepetition Second Lien Primed Parties**" has the meaning specified in <u>Section 2.19(d)</u>.

"**Prepetition Second Lien Secured Parties**" means the secured parties under the Prepetition Second Lien Facilities.

"**Prepetition Second Lien Security Agreement**" means that certain Amended and Restated Security Agreement, dated as of March 20, 2018, by and among Holdings, certain guarantors from time to time party thereto, in favor of Wilmington Trust, National Association, in its capacity as collateral agent for the Prepetition Second Lien Secured Parties, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Prepetition Total Extensions of Credit**" means the "Total Extensions of Credit" as defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Unencumbered Assets**" has the meaning specified in <u>Section 2.19(b)</u>.

"**Prepetition Unencumbered Assets Proceeds Account**" means a fully blocked segregated account established with Bank of America for the benefit of the Lenders and otherwise on terms and conditions satisfactory to the Co-Collateral Agents in their sole discretion, for the purpose of holding the Net Proceeds of Prepetition Unencumbered Assets.

"**Primed Liens**" has the meaning specified in <u>Section 2.19(d)</u>.

"**Priming Liens**" has the meaning specified in <u>Section 2.19(d)</u>.

"**Prior Week**" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"**Pro Rata Basis**" means, with respect to any prepayment of the Term Loan pursuant to <u>Section 2.11(a)(ii)</u>, and corresponding reduction in the Aggregate Revolving Commitments pursuant to the proviso thereto, that (i) the principal amount of such prepayment as a percentage of the aggregate outstanding principal amount of the Term Loan immediately prior to such prepayment is equal to (ii) the aggregate amount of such reduction as a percentage of the Aggregate Revolving Commitments  immediately prior to such reduction.

"**Pro Rata Share**" means, as to any Lender as of any date of determination, a percentage equal to (i) the sum of such Lender's Revolving Commitment and/or share of the outstanding principal amount of the Term Loan divided by (ii) the Aggregate Revolving Commitments and the aggregate outstanding principal amount of the Term Loan as of such date or, following termination of the Revolving Commitments, a percentage equal to (x) the Extensions of Credit of such Lender divided by the Total Extensions of Credit of all Lenders then outstanding.

"**Public Lender**" has the meaning specified in <u>Section 9.02(d)</u>.

"**Qualified ECP Guarantor**" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under

the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Stalking Horse Bid**" has the meaning specified in Schedule 6.01(r)(ii).

"**Rebalancing Date**" means every other Friday, (i) beginning on Friday, December 21, 2018, if no Go Forward Stores Qualified Bid is obtained and found acceptable by the Debtors on or prior to December 15, 2018 or (ii) if a Go Forward Stores Qualified Bid is obtained and found acceptable by the Debtors on such date, beginning on the second Friday following the date on which there ceases to be in full force and effect a Go Forward Stores Qualified Bid.

"**Recipient**" means the Agent, the Co-Collateral Agents, any Lender, any Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee simple or leased by any Loan Party, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"**Refunded Swingline Advances**" has the meaning specified in Section 2.04(b).

"**Register**" has the meaning specified in Section 9.07(e).

"**Reimbursement Obligation**" means the obligation of the Borrowers to reimburse the Issuing Lenders pursuant to Section 3.05 for amounts drawn under Letters of Credit.

"**Related Parties**" - with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, attorneys and advisors of such Person and of such Person's Affiliates.

"**Remedies Notice Period**" has the meaning set forth in paragraph 34(b) of the Final Financing Order.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"**Required Lenders**" means, at any time, the holders of more than 50% of the sum of the Aggregate Revolving Commitments then in effect and the principal amount of the Term Loan then outstanding (other than the portion of the Term Loan held by Permitted Holder Lenders) or, if the Aggregate Revolving Commitments have been terminated, the holders of more than 50% of the Total Extensions of Credit then outstanding (other than Extensions of Credit held by Permitted Holder Lenders), provided, that the Extensions of Credit of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"**Requirements of Law**" means as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Restricted Payment**" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings or any Subsidiary of Holdings, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings or any Subsidiary of Holdings or (c) any option, warrant or other right to acquire any such Equity Interests in Holdings or any Subsidiary of Holdings.

"**Revolving Advance**" has the meaning specified in Section 2.01.  A Revolving Advance may be a Base Rate Advance or a Eurodollar Rate Advance (each of which shall be a "**Type**" of Revolving Advance).

"**Revolving Availability Date**" means any date after the Effective Date and prior to the Termination Date on which the balance in the Term Loan Proceeds Account is zero.

"**Revolving Commitment**" means, as to any Revolving Lender, the obligation of such Revolving Lender to make Revolving Advances and participate in Swingline Advances and Letters of Credit in an aggregate principal amount and/or face amount up to (a) the amount set forth opposite such Revolving Lender's name on Schedule 1.01 or (b) if such Revolving Lender has entered into any Assignment and Acceptance, the amount set forth for such Revolving Lender in the Register maintained by the Agent pursuant to Section 9.07(d), as such amount may be reduced pursuant to Section 2.06.

"**Revolving Commitment Percentage**" means, as to any Revolving Lender at any time, the percentage which such Revolving Lender's Revolving Commitment then constitutes of the Aggregate Revolving Commitments or, at any time after the Aggregate Revolving Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Revolving Lender's Advances then outstanding plus such Revolving Lender's participation in Swingline Advances and L/C Obligations constitutes of the aggregate principal amount of the Advances, Swingline Advances and L/C Obligations then outstanding.

"**Revolving Extensions of Credit**" means as to any Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Advances held by such Revolving Lender then outstanding, (b) such Revolving Lender's Revolving Commitment Percentage of the aggregate principal amount of Swingline Advances then outstanding and (c) such Revolving Lender's Revolving Commitment Percentage of the L/C Obligations then outstanding.

"**Revolving Lenders**" means, collectively, any Persons signatory hereto as a Revolving Lender, and each Person that shall become a party hereto as a revolving lender pursuant to Section 9.07.

49

"**Rolling Budget**" means a 13-week cash flow forecast delivered pursuant to <u>Section 6.03</u>.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union Member State, Her Majesty's Treasury of the United Kingdom, or any jurisdiction where any Group Member operates.

"**Sanctioned Country**" means at any time, a country or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of sanctioned Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, any European Union Member State, Her Majesty's Treasury of the United Kingdom, or by any jurisdiction where any Group Member operates; (b) any Person located, organized or resident in a Sanctioned Country; or (c) any Person directly or indirectly owned fifty percent or more or otherwise controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

"**Scheduled Termination Date**" has the meaning specified in the definition of "Termination Date."

"**Sears**" means Sears, Roebuck and Co., a New York corporation.

"**Sears Holdings Pension Plan**" means collective reference to the Sears Holdings Pension Plan 1, as amended and restated effective January 1, 2014, and the Sears Holdings Pension Plan 2, as amended and restated effective December 1, 2016.

"**SEC**" means the United States Securities and Exchange Commission.

"**Security Documents**" means the collective reference to the Guarantee and Collateral Agreement, each of the Mortgages, any short-form intellectual property security agreement entered into in connection with the Guarantee and Collateral Agreement, the Financing Orders and all other documents hereafter delivered to the Co-Collateral Agents purporting to grant or granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"**Senior Permitted Liens**" means all Permitted Prior Liens, Permitted Liens to the extent such liens are required to be senior pursuant to applicable law, and Permitted Liens described in clauses (j) and (t) in the definition thereof.

"**Significant Holder**" means (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as

trustee, agent or other fiduciary or administrator of any such plan), which is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) of 10% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right), and (ii) any Affiliate of any such Person described in clause (i) above.

"**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Borrower or any ERISA Affiliate and no Person other than such Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which any Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"**Special Flood Hazard Area**" has the meaning assigned to such term in Section 6.01(c)(vi).

"**Specified Full-Chain Liquidation**" means a liquidation on an equity basis (or, if approved by the Agent and the Co-Collateral Agents in their sole and absolute discretion, on a fee basis) of the entire chain of Stores (or the entire chain of Stores remaining after completion of, or not contemplated to be included in, the Specified Going Concern Sale) of the Debtors and all of the assets relating thereto under Section 363 of the Bankruptcy Code.  The Specified Full-Chain Liquidation shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Going Concern Sale**" means a sale, in one or a series of related transactions, of all or substantially all of (or, if approved in writing by the Agent, certain of) the assets of the Debtors as a going concern under Section 363 of the Bankruptcy Code in accordance with the section of the Go Forward Plan entitled "Go Forward Stores Sale Process." The Specified Going Concern Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Loan Party**" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 9.20).

"**Specified IP Sale**" means a sale, in one or a series of related transactions, of all of the Intellectual Property of the Debtors under Section 363 of the Bankruptcy Code to the extent such assets are not otherwise included in any Specified Going Concern Sale or Specified Full-Chain Liquidation required to be consummated pursuant to the Go Forward Plan.  The Specified IP Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as

51

applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Other Assets Sale**" means the sale of any or all remaining assets of the Debtors under Section 363 of the Bankruptcy Code (including mortgaged Real Property interests and leasehold Real Property interests) to the extent such assets are not otherwise included in any Specified Going Concern Sale or Specified Full-Chain Liquidation required to be consummated pursuant to the Go Forward Plan. The Specified Other Assets Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Sale Transaction**" means any or all of a Specified Going Concern Sale, a Specified Full-Chain Liquidation, a Specified IP Sale, or a Specified Other Assets Sale.

"**Specified Store Closing Sale**" means (a) certain store closures listed on <u>Schedule 1.07</u> in accordance with the Initial Store Rationalization described in the Go Forward Plan and (b) certain store closures listed on <u>Schedule 1.08</u> in accordance with the Secondary Store Rationalization described in the Go Forward Plan, and (c) the closure of any additional Stores approved in writing by the Co-Collateral Agents in their discretion (subject to the performance of a desktop appraisal in form and substance acceptable to the Co-Collateral Agents), and the liquidation of assets related thereto by the Liquidation Agent, pursuant to a liquidation agreement approved by the Agent and the Co-Collateral Agents (including with respect to any augmentation arrangements) and any Specified Store Closing Sales shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Subsidiaries**" mean SRC Sparrow 1 LLC, a Delaware limited liability company, SRC Sparrow 2 LLC, a Delaware limited liability company, SRC O.P. LLC, a Delaware limited liability company, SRC Facilities LLC, a Delaware limited liability company, SRC Real Estate (TX) LLC, a Delaware limited liability company, and KCD IP, LLC, a Delaware limited liability company.

"**SRAC**" has the meaning specified in the Preamble.

"**Standby L/C**" means an irrevocable letter of credit or similar instrument under which the Issuing Lender agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member in respect of obligations of such Group Member incurred pursuant to contracts made or performances undertaken or to be undertaken or like matters relating to contracts to which such Group Member is or proposes to become a party, including, without

limiting the foregoing, for insurance purposes or in respect of advance payments or as bid or performance bonds or for any other purpose for which a standby letter of credit might be issued.

"**Store**" means any store owned or leased and operated by any Loan Party.

"**Store Closing Net Orderly Liquidation Value**" means the product of (x) clause (ii) of Net Recovery Rate and (y) the Net Eligible Inventory.

"**Store Footprint Plan**" means, collectively, Schedule 1.07, Schedule 1.08, and Schedule 1.09.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other business entity (a) of which a majority of the shares of Voting Stock is at the time beneficially owned by such Person, (b) over which such Person has the ability to direct the management, or (c) whose financial results are consolidated into the financial statements of such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means each direct or indirect wholly owned Domestic Subsidiaries of Holdings that have commenced Chapter 11 Cases, except for Specified Subsidiaries.

"**Supermajority Lenders**" means, at any time, the holders of 66-2/3% or more of the sum of the Aggregate Revolving Commitments then in effect and the principal amount of the Term Loan then outstanding or, if the Aggregate Revolving Commitments have been terminated, the holders of 66-2/3% or more of the Total Extensions of Credit then outstanding, provided, that the Extensions of Credit of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"**Survey**" has the meaning assigned to such term in Section 6.01(i)(v)(3)(B).

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligations**" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, the termination value thereof.

"**Swingline Advances**" has the meaning specified in Section 2.03.

"**Swingline Commitment**" means the obligation of the Swingline Lender to make Swingline Advances pursuant to Section 2.03 in an aggregate principal amount at any one time outstanding not to exceed $25,000,000.

"**Swingline Lender**" means Bank of America, in its capacity as the lender of Swingline Advances.

"**Swingline Participation Amount**" has the meaning specified in Section 2.04(c).

"**Syndication Agent**" has the meaning specified in the Preamble.

"**Target Sharing Ratio**" means (i) if no Go Forward Stores Qualified Bid is obtained and found acceptable on or prior to December 15, 2018, the ratio of the Adjusted Revolving Exposure to the principal amount of Term Loan outstanding, calculated by the Co-Collateral Agents as of 5 p.m. on December 15, 2018, and (ii) if a Go Forward Stores Qualified Bid is obtained and found acceptable on or prior to December 15, 2018, but thereafter on any date there ceases to be in full force and effect a Go Forward Stores Qualified Bid, the ratio of the Adjusted Revolving Exposure to the principal amount of Term Loan outstanding, calculated by the Co-Collateral Agents as of 5 p.m. on the date such Go Forward Stores Qualified Bid ceases to be in full force and effect.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Commitment**" means, as to any Term Lender, the obligation of such Term Lender to make its portion of the Term Loan on the Effective Date.

"**Term Lenders**" means, collectively, any Persons party hereto as a Term Lender (whether by a signature page hereto or by a joinder agreement hereto), and each Person that shall become a party hereto as a Term Lender pursuant to Section 9.07.

"**Term Loan**" means, collectively, (i) the Initial Term Loan, (ii) the term loans outstanding hereunder pursuant to Section 2.01(d)(ii) and (ii) as used in the definitions of "Required Lenders" and "Supermajority Lenders", the sum of (x) the term loans of all the Term Lenders.

54

"**Term Loan Borrowing**" means a portion of the Term Loan of a particular Type; provided that no Term Loan Borrowing shall be in an aggregate principal amount of less than $5,000,000 and each Term Loan Borrowing constituting a Eurodollar Rate Advance shall be in a principal amount that is an integral multiple of $1,000,000 (unless no portion of the Term Loan constitutes a Base Rate Advance), and no more than six (6) Interest Periods in the aggregate for Borrowings and Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

"**Term Loan Margin**" means (a) with respect to any outstanding portion of the Term Loan that is a Eurodollar Rate Advance, 8.00% per annum, and (b) with respect to any outstanding portion of the Term Loan that is a Base Rate Advance, 7.00% per annum.

"**Term Loan Proceeds Account**" means the escrow account of the Borrowers maintained at the Agent and designated by the Borrowers and the Agent as the Term Loan Proceeds Account.

"**Termination Date**" means the earliest of (a) October 16, 2019 (such date, the "**Scheduled Termination Date**"), (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (c) the consummation of a sale of all or substantially all of the Collateral of a type that is included in the Borrowing Base, (d) the date of termination in whole of the Aggregate Revolving Commitments and the acceleration of the Total Extensions of Credit pursuant to Section 2.06 or Section 7.02 and (e) the occurrence of the "termination date" or "maturity date" (or any similar term having the same meaning) under the Junior DIP Term Loan Agreement.

"**Third Party Payor Notification**" has the meaning specified in Section 6.01(m)(iii).

"**Third Party Payors**" means any private health insurance company that is obligated to reimburse or otherwise make payments to pharmacies which sell prescription drugs to eligible patients under any insurance contract with such private health insurer.

"**Title Insurer**" has the meaning assigned to such term in Section 6.01(i)(v)(3)(A).

"**Title Policy**" has the meaning assigned to such term in Section 6.01(i)(v)(3)(A).

"**Total Extensions of Credit**" means at any time, the aggregate amount of the Extensions of Credit of the Lenders outstanding at such time.

"**Total Revolving Extensions of Credit**" means at any time, the aggregate amount of the Revolving Extensions of Credit of the Lenders outstanding at such time.

"**Trading With the Enemy Act**" means 50 U.S.C. § 1 et seq., as amended.

"**Type**" means either a Base Rate Advance or a Eurodollar Rate Advance.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York, provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 thereof; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Internal Revenue Code for the applicable plan year.

"**Utility Deposit Adequate Assurance Accounts**" mean collectively, the deposit accounts of any Loan Party and any cash deposited therein solely to the extent such cash is deposited for the benefit of certain utilities pursuant to and consistent with that certain *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures For Determining Adequate Assurance of Payment For Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discounting Utility Service (Docket No. 461).*

"**Voting Stock**" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"**Weekly Flash Reporting Package**" means reports detailing operating and financial performance, which shall include cash flow performance compared to the Approved Budget for the Prior Week together with accompanying schedules supporting line items included in the weekly cash flow results (such as rollforward of inventory sales and receipts, rollforward of merchandise and other payables of each Loan Party as of the end of the Prior Week, in each case, in reasonable detail).

"**Winddown Account**" means a cash collateral account at Bank of America that, prior to the discharge in full of all obligations under the DIP ABL Facility, may only be used to pay winddown costs of the Loan Parties at the discretion of the Borrowers following entry of the Final Financing Order.

"**Write-Down and Conversion Powers**" means the write-down and conversion powers of the applicable EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    <u>Computation of Time Periods</u>.  In this Agreement, unless otherwise specified, (a) in the computation of periods of time from a specified date to a later specified date, the word "from" means "<u>from and including</u>" and the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>" (b) "<u>including</u>" means "<u>including without limitation</u>"; and (c) any reference to a time of day means Eastern time.

Section 1.03    <u>Accounting Terms</u>.  All accounting terms not specifically defined herein or in the other Loan Documents shall be construed in accordance with U.S. generally accepted accounting principles ("**GAAP**") which shall be consistently applied.  If at any time any change in U.S. generally accepted accounting principles would affect the computation of any financial ratio or requirement set forth herein, and either the Borrowers or the Required Lenders shall so request, the Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders which shall not be unreasonably withheld), provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change in principles, and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  For the avoidance of doubt, no retroactive change in GAAP shall apply to the construction of accounting terms under this Agreement in the absence of an amendment hereto in accordance with the terms of this <u>Section 1.03</u>.

Section 1.04    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document, the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

57

# ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES AND THE TERM LOAN

Section 2.01    The Revolving Advances and the Term Loan.

(a)    The Revolving Advances. Each Revolving Lender severally agrees, on the terms and conditions hereinafter set forth, to make revolving advances (the "**Revolving Advances**") to the Borrowers from time to time on any Business Day during the period from the Effective Date until the Termination Date, in an aggregate amount at any one time outstanding which, when added to such Lender's Revolving Commitment Percentage of the sum of (i) the aggregate principal amount of the Swingline Advances then outstanding and (ii) the L/C Obligations then outstanding, equals the amount of such Lender's Revolving Commitment; provided, that the aggregate principal amount of any Borrowing made at any time, when aggregated with all other then outstanding Extensions of Credit, shall not exceed the Line Cap at such time. Each Borrowing under this Section 2.01 shall be in an aggregate amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof (provided, that the Swingline Lender may request, on behalf of the applicable Borrower, Borrowings that are Base Rate Advances in other amounts pursuant to Section 2.04(b)) and shall consist of Revolving Advances of the same Type made on the same day by the Revolving Lenders ratably according to their respective Revolving Commitments.  Within the limits set forth in this Section 2.01, the Borrowers may borrow under this Section 2.01, prepay pursuant to Section 2.11 and reborrow under this Section 2.01.

(b)    The Initial Term Loan. Each Term Lender severally agrees to make the Initial Term Loan available to the Borrowers on the Effective Date in a principal amount not to exceed its Term Commitment and the Term Commitments of each Lender shall be subsequently reduced to zero. The Initial Term Loan Borrowing shall consist of a Base Rate Advance requested by the Borrowers in a Notice of Borrowing delivered not later than 1:00 p.m. on the second Business Day prior to the Effective Date.

(c)    Refinancing of the Interim DIP Facility. Subject to the terms of this Agreement and the Final Financing Order:

(i)    from and after the Effective Date, the Incremental DIP Revolving Commitments shall be refinanced as Revolving Commitments hereunder and shall be allocated to the Revolving Lenders as set forth on Schedule 1.01; and

(ii)    on the Effective Date, the Incremental DIP Term Loans shall be refinanced with the proceeds of the Initial Term Loan made to the Borrowers under this Agreement.

(d)    Refinancing of Certain Prepetition Facilities on the Effective Date. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, on the Effective Date for each Lender with Incremental DIP Revolving Commitments or an Initial Term Loan hereunder (each, a "**Participating Prepetition Lender**"):

(i) the aggregate principal amount of such Participating Prepetition Lender's Prepetition Revolving Advances shall be refinanced as and constitute Revolving Advances under this Agreement on the Effective Date;

(ii) the aggregate principal amount of such Participating Prepetition Lender's Prepetition 2016 Term Loans shall be refinanced as and constitute part of the Term Loan under this Agreement on the Effective Date; and

(iii) the outstanding amount of such Participating Prepetition Lender's Prepetition L/C Obligations shall be refinanced as and constitute L/C Obligations under this Agreement on the Effective Date (including all Existing Letters of Credit issued under the Prepetition First Lien ABL Credit Agreement being deemed issued under this Agreement on the Effective Date).

(e)    <u>Cashless Settlement</u>.  The refinancing of the Interim DIP Facility, the Prepetition Revolving Advances and the Prepetition 2016 Term Loan Facility as described in <u>Section 2.01(c)</u> and <u>Section 2.01(d)</u> may be made pursuant to a cashless settlement mechanism approved by the Agent.

(f)    <u>Outstandings on the Effective Date</u>. After the refinancings described in <u>Section 2.01(c)</u> and <u>Section 2.01(d)</u> above, (i) all Revolving Loans shall constitute one Class, (ii) the Term Loan shall constitute one Class, (iii) the Aggregate Revolving Commitments are as set forth on <u>Schedule 1.01</u>; (iv) the Outstanding Revolving Advances are $[●], (v) the aggregate L/C Obligations outstanding are $[●] and (vi) the aggregate outstanding amount of the Term Loan is $[●]. Any portion of the Term Loan that is prepaid or repaid may not be reborrowed.

Section 2.02    <u>Making the Revolving Advances</u>.

(a)    Each Borrowing under <u>Section 2.01</u> shall be made on notice, given not later than (x) 12:00 noon on the third Business Day prior to the date of the proposed Borrowing in the case of a Borrowing consisting of Eurodollar Rate Advances or (y) 1:00 p.m. on the date of the proposed Borrowing in the case of a Borrowing consisting of Base Rate Advances, by the applicable Borrower to the Agent, which shall give to each Revolving Lender prompt notice thereof by email attachment or telecopier.  Each such notice of a Borrowing (a "**Notice of Borrowing**") shall be by telephone, confirmed immediately in writing, by email attachment or by telecopier, in substantially the form of <u>Exhibit A</u> hereto, specifying therein the requested (i) date of such Borrowing, (ii) Type of Revolving Advances comprising such Borrowing, (iii) aggregate amount of such Borrowing, and (iv) in the case of a Borrowing consisting of Eurodollar Rate Advances, initial Interest Period for each such Revolving Advance. Each Notice of Borrowing shall be irrevocable and binding on the applicable Borrower.  Each Revolving Lender shall, before 2:00 p.m. on the date of such Borrowing make available for the account of its Applicable Lending Office to the Agent at the Agent's Account, in same day funds, such Revolving Lender's ratable (in accordance with its Revolving Commitment Percentage) portion of such Borrowing.  After the Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in <u>Article IV</u>, the Agent will make such funds available to the Borrower requesting such Borrowing at the Agent's address for Revolving Advances referred to in <u>Section 9.02</u>.

(b)     Anything in subsection (a) above to the contrary notwithstanding, (i) a Borrower may not select Eurodollar Rate Advances for any Borrowing if the aggregate amount of such Borrowing is less than $5,000,000 or if the obligation of the Lenders to make Eurodollar Rate Advances shall then be suspended pursuant to Section 2.09 or 2.13 and (ii) the Eurodollar Rate Advances may not be outstanding as part of more than six (6) separate Borrowings and Term Loan Borrowings.

(c)     Unless the Agent shall have received notice from a Revolving Lender prior to the time of any Borrowing that such Revolving Lender will not make available to the Agent such Revolving Lender's ratable portion of such Borrowing, the Agent may assume that such Revolving Lender has made such portion available to the Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Agent may, in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount.  If and to the extent that such Revolving Lender shall not have so made such ratable portion available to the Agent, such Revolving Lender and the applicable Borrower severally agree to repay to the Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to such Borrower until the date such amount is repaid to the Agent, at (i) in the case of such Borrower, the interest rate applicable at the time to Revolving Advances comprising such Borrowing and (ii) in the case of such Revolving Lender, the Federal Funds Rate.  If such Revolving Lender shall repay to the Agent such corresponding amount, such amount so repaid shall be made available to the applicable Borrower and shall constitute such Revolving Lender's Revolving Advance as part of such Borrowing for purposes of this Agreement.

(d)     The failure of any Revolving Lender to make the Revolving Advance to be made by it as part of any Borrowing shall not relieve any other Revolving Lender of its obligation, if any, hereunder to make its Revolving Advance on the date of such Borrowing, but no Revolving Lender shall be responsible for the failure of any other Revolving Lender to make the Revolving Advance to be made by such other Revolving Lender on the date of any Borrowing.

Section 2.03    The Swingline Advances.

(a)     Subject to the terms and conditions hereof, the Swingline Lender may, in its sole and absolute discretion, make a portion of the credit otherwise available to the Borrowers under the Revolving Commitments from time to time during the period from the Effective Date until the Termination Date by making swing line advances ("**Swingline Advances**") to the Borrowers; provided that (i) the aggregate principal amount of Swingline Advances outstanding at any time shall not exceed the Swingline Commitment then in effect (notwithstanding that the Swingline Advances outstanding at any time, when aggregated with the Swingline Lender's other outstanding Revolving Advances, may exceed the Swingline Commitment then in effect) and (ii) the amount of any Swingline Advance made at any time, when aggregated with all other then outstanding Extensions of Credit, shall not exceed the Line Cap at such time; provided that the Swingline Lender shall not be obligated to make any Swingline Advance at any time when any Revolving Lender is at such time a Defaulting Lender hereunder, and the Swingline Lender has, or after giving effect to such Swingline Advance, may have Fronting Exposure.  During the period from the Effective Date until the Termination Date,

the Borrowers may use the Swingline Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  Swingline Advances shall only be available as Base Rate Advances.

(b)    Each Borrower shall repay to the Swingline Lender the then unpaid principal amount of each Swingline Advance made to it weekly, on Wednesday of each week; provided that on each date that a Revolving Advance is borrowed by a Borrower, such Borrower shall repay all Swingline Advances then outstanding, if any, and may use all or a portion of such Revolving Advance to fund such repayment. In all events the unpaid principal balance of all Swingline Advances shall be repaid in full on the Termination Date.

Section 2.04    Making the Swingline Advances.

(a)    Each Borrowing under Section 2.03 shall be made on notice, given not later than 1:00 p.m. on the date of the proposed Borrowing, by the applicable Borrower to the Agent and Swingline Lender. Each such Notice of a Borrowing shall be by telephone, confirmed immediately in writing, by email attachment or by telecopier, in substantially the form of Exhibit A hereto, specifying therein the requested (i) date of such Borrowing and (ii) aggregate amount of such Borrowing.  Each Borrowing under the Swingline Commitment shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof.  Subject to Section 2.03(a), not later than 3:00 p.m. on the date of the proposed Borrowing, the Swingline Lender shall make available to the Agent at the Agent's Account an amount in immediately available funds equal to the amount of the Swingline Advance to be made by the Swingline Lender.  Upon fulfillment of the applicable conditions set forth in Article IV, the Agent shall make the proceeds of such Swingline Advance available to the Borrower requesting such Borrowing at the Agent's address referred to in Section 9.02.

(b)    The Swingline Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrowers (which hereby irrevocably direct the Swingline Lender to act on their behalf), by notice given by the Swingline Lender no later than 1:00 p.m., request each Revolving Lender to make, and each Revolving Lender hereby agrees to make, a Revolving Advance, in an amount equal to such Lender's Revolving Commitment Percentage of the aggregate amount of the Swingline Advances (the "**Refunded Swingline Advances**") outstanding on the date of such notice, to repay the Swingline Lender. Each Revolving Lender shall make the amount of such Revolving Advance available to the Agent at the Agent's Account in same day funds, not later than 2:00 p.m. on the date of such notice.  The proceeds of such Revolving Advances shall be immediately made available by the Agent to the Swingline Lender for application by the Swingline Lender to the repayment of the Refunded Swingline Advances.  Each Borrower irrevocably authorizes the Swingline Lender to charge such Borrower's accounts with the Agent (up to the amount available in each such account) in order to immediately pay the amount of such Refunded Swingline Advances to the extent amounts received from the Revolving Lenders are not sufficient to repay in full such Refunded Swingline Advances.

(c)    If prior to the time a Revolving Advance would have otherwise been made pursuant to Section 2.04(b), one of the events described in Section 7.01 shall have occurred and be continuing or if for any other reason, as determined by the Swingline Lender in its sole

61

discretion, Revolving Advances may not be made as contemplated by <u>Section 2.04(b)</u>, each Revolving Lender shall, on the date such Revolving Advance was to have been made pursuant to the notice referred to in <u>Section 2.04(b)</u>, purchase for cash an undivided participating interest in the then outstanding Swingline Advances by paying to the Swingline Lender an amount (the "**Swingline Participation Amount**") equal to (i) such Revolving Lender's Revolving Commitment Percentage <u>multiplied by</u> (ii) the sum of the aggregate principal amount of Swingline Advances then outstanding that were to have been repaid with such Revolving Advances.

(d)    Whenever, at any time after the Swingline Lender has received from any Revolving Lender such Revolving Lender's Swingline Participation Amount, the Swingline Lender receives any payment on account of the Swingline Advances, the Swingline Lender will distribute to such Revolving Lender its Swingline Participation Amount to reflect the period of time during which such Revolving Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Revolving Lender's <u>pro rata</u> portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swingline Advances then due; <u>provided</u>, <u>however</u>, that in the event that such payment received by the Swingline Lender is required to be returned, such Revolving Lender will return to the Swingline Lender any portion thereof previously distributed to it by the Swingline Lender.

(e)    Each Revolving Lender's obligation to make the Advances referred to in <u>Section 2.04(b)</u> and to purchase participating interests pursuant to <u>Section 2.04(c)</u> shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right that such Revolving Lender or any Borrower may have against the Swingline Lender, any Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in <u>Article IV</u>, (iii) any adverse change in the condition (financial or otherwise) of any Borrower or any other Loan Party, (iv) any breach of this Agreement or any other Loan Document by any Borrower, any other Loan Party or any other Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

Section 2.05    <u>Commitment Fee; Other Fees</u>.

(a)    The Borrowers jointly and severally agree to pay to the Agent for the account of each Revolving Lender a commitment fee on the average daily amount of the Available Commitment of such Lender during the period for which payment is made at a rate per annum equal to 0.75%, payable in arrears monthly on the 5th day subsequent to the last day of each month and on the Termination Date.

(b)    <u>Other Fees</u>.  Holdings and the Borrowers shall pay to the Agent, the Co-Collateral Agents and the Joint Lead Arrangers, as applicable, the fees set forth in the Fee Letter in the amounts and at the times specified therein.

Section 2.06    <u>Optional Termination or Reduction of the Revolving Commitments</u>.

1030946.08A-CHISR01A - MSW

(a)     The Borrowers shall have the right, without penalty or premium and upon at least three Business Days' irrevocable notice to the Agent, to permanently terminate in whole or permanently reduce in part the unused portions of the respective Revolving Commitments of the Revolving Lenders, <u>provided</u> that no such termination or reduction of the Revolving Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Advances made on the effective date thereof, the Total Extensions of Credit would exceed the aggregate amount of the Revolving Commitments as so reduced.  Any partial reduction of the Revolving Commitments shall be in the aggregate amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)     If, after giving effect to any reduction of the Aggregate Revolving Commitments, the L/C Commitment or the Swingline Commitment exceeds the amount of the Aggregate Revolving Commitments, such L/C Commitment or Swingline Commitment shall be automatically reduced by the amount of such excess.

(c)     The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Aggregate Revolving Commitments under <u>Section 2.06(a)</u>.  Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Revolving Commitment Percentage of such reduction amount.

Section 2.07    <u>Repayment of Extensions of Credit</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, upon the Termination Date (whether by acceleration or otherwise), (i) each Borrower shall repay to the Agent, for the ratable account of the Lenders on the Termination Date, the aggregate principal amount then outstanding of the Total Extensions of Credit made to it by the Lenders and (ii) the Agent, the Co-Collateral Agents, the Issuing Lenders and the Lenders shall be entitled to immediate payment of all Obligations and, subject to the Remedies Notice Period, as applicable, to enforce the remedies provided for under this Agreement and the other Loan Documents or under applicable law, in each case, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

Section 2.08    <u>Interest</u>.

(a)     <u>Scheduled Interest Owed to Revolving Lenders and Swingline Lender</u>.  Each Borrower shall pay interest on the unpaid principal amount of each Advance made to it and owing to each Revolving Lender and Swingline Lender from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(i)     <u>Base Rate Advances</u>.  During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the sum of (x) the Base Rate in effect from time to time <u>plus</u> (y) the Applicable Margin for Base Rate Advances, payable (I) in the case of any Base Rate Advance (other than a Swingline Advance), in arrears monthly on the 5th day subsequent to the last day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full and (II) in the case of any Swingline Advance, on the date that such Swingline Advance is required to be repaid.

(ii) <u>Eurodollar Rate Advances</u>.  During such periods as such Advance is a Eurodollar Rate Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of (x) the Eurodollar Rate for such Interest Period for such Advance, <u>plus</u> (y) the Applicable Margin for Eurodollar Rate Advances, payable in arrears on the last day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(b) <u>Term Loan</u>.  Each Borrower shall pay interest on the unpaid principal amount of the Term Loan made to it and owing to each Term Lender from the Effective Date until such principal amount shall be paid in full, at the following rates per annum:

(i) <u>Base Rate Advances</u>.  During such periods as any outstanding portion of the Term Loan is a Base Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times to the sum of (x) the Base Rate in effect from time to time <u>plus</u> (y) the Term Loan Margin for Base Rate Advances, payable in arrears monthly on the 5th day subsequent to the last day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full.

(ii) <u>Eurodollar Rate Advances</u>.  During such periods as any outstanding portion of the Term Loan is a Eurodollar Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times during each Interest Period for such Eurodollar Rate Advance to the greater of (A) 1.00% or (B) the Eurodollar Rate for such Interest Period for such outstanding portion of the Term Loan <u>plus</u>, in either case, the Term Loan Margin for Eurodollar Rate Advances, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(c) <u>Default Interest</u>.  Upon the occurrence and during the continuance of an Event of Default, and notwithstanding the Automatic Stay, the Borrowers shall pay interest on the unpaid principal amount of each Revolving Advance and Reimbursement Obligation owing to each Revolving Lender, and on the principal amount of the Term Loan, payable in arrears on the dates referred to in <u>Section 2.08(a)</u> or <u>Section 2.08(b)</u> above, as applicable (or, if earlier, at the time payment thereof is demanded by the Agent), at a rate per annum equal to 2% per annum above the rate per annum required to be paid on such Advance or Reimbursement Obligation pursuant to <u>Section 2.08(a)(i)</u> or <u>Section 2.08(b)(i)</u> above, as applicable.  Further, the Borrowers shall pay interest, to the fullest extent permitted by law, on the amount of any interest, fee or other amount (other than principal) payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on Base Rate Advances pursuant to <u>Section 2.08(a)(i)</u> or <u>Section 2.08(b)(i)</u> above, as applicable.

1030946.08A-CHISR01A - MSW

(d)    Regulation D Compensation.  Each Lender that is subject to reserve requirements of the Board of Governors may require the Borrowers to pay, contemporaneously with each payment of interest on the Eurodollar Rate Advances, additional interest on the related Eurodollar Rate Advances of such Lender at the rate per annum equal to the excess of (i) (A) the applicable Eurodollar Rate divided by (B) one minus the Eurodollar Rate Reserve Percentage over (ii) the applicable Eurodollar Rate. Any Lender wishing to require payment of such additional interest (x) shall so notify the Agent and the Borrowers, in which case such additional interest on the Eurodollar Rate Advances of such Lender shall be payable to such Lender at the place indicated in such notice with respect to each Interest Period commencing at least five Business Days after the giving of such notice and (y) shall notify the Agent and the Borrowers at least five Business Days prior to each date on which interest is payable on the amount then due it under this Section.  Each such notification shall be accompanied by such information as the Borrowers may reasonably request.

Section 2.09    Interest Rate Determination.  (a)  [Reserved].

(b)    If, with respect to any Eurodollar Rate Advances,

(i)  the Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such proposed Eurodollar Rate Advance for the applicable Interest Period; or

(ii)  the Required Lenders notify the Agent prior to the commencement of any Interest Period for a proposed Eurodollar Rate Advance that the Eurodollar Rate for any Interest Period for such Eurodollar Rate Advances will not adequately reflect the cost to such Required Lenders of making, funding or maintaining their respective Eurodollar Rate Advances for such Interest Period, then

the Agent shall forthwith so notify the Borrowers and the Lenders, whereupon (x) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance, and (y`) the obligation of the Lenders to make, or to Convert Advances into, Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

(c)    If any Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, such Eurodollar Rate Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

(d)    On the date on which the aggregate unpaid principal amount of Eurodollar Rate Advances comprising any Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $5,000,000, such Eurodollar Rate Advances shall automatically Convert into Base Rate Advances.

(e)    Upon the occurrence and during the continuance of any Event of Default, (i) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance and (ii) the obligation of the Lenders to make, or to Convert Revolving Advances or any outstanding portion of the Term Loan, into, Eurodollar Rate Advances shall be suspended.

Section 2.10    Optional Conversion of Revolving Advances, Term Loan Borrowings.  The Borrowers may on any Business Day, upon notice given to the Agent not later than 12:00 noon on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Sections 2.09 and 2.13, Convert all Revolving Advances of one Type comprising the same Borrowing into Revolving Advances of the other Type; and/or Convert any Term Loan Borrowing, of one Type into a Term Loan Borrowing, of the other Type; provided, however, that any Conversion of Eurodollar Rate Advances into Base Rate Advances shall be made only on the last day of an Interest Period for such Eurodollar Rate Advances, any Conversion of Base Rate Advances into Eurodollar Rate Advances shall be in an amount not less than the minimum amount specified in Section 2.02(b) and no Conversion of any Revolving Advances or Term Loan Borrowings shall result in more separate Borrowings than permitted under Section 2.02(b).  Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Revolving Advances or Term Loan Borrowings to be Converted, and (iii) if such Conversion is into Eurodollar Rate Advances, the duration of the initial Interest Period for each such Revolving Advance or Term Loan Borrowing.  Each notice of Conversion shall be irrevocable and binding on the applicable Borrower.

Section 2.11    Optional and Mandatory Prepayments of Revolving Advances and Term Loan; Mandatory Reduction of the Revolving Commitments.

(a)    (i) Any Borrower may, without penalty or premium and upon notice given not later than 12:00 noon three Business Days prior to the date of such prepayment (or, in the case of a Base Rate Advance, one Business Day prior to the date of such prepayment) to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given such Borrower shall, prepay the outstanding principal amount of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that (x) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof (or, in the case of partial prepayments of Swingline Advances, $100,000 or a whole multiple thereof) and (y) in the event of any such prepayment of a Eurodollar Rate Advance, the applicable Borrower shall be obligated to reimburse the Lenders in respect thereof pursuant to Section 9.04(c).

(ii) Any Borrower may, subject to the terms of this Section 2.11(a)(ii) and upon notice given not later than 12:00 noon three Business Days prior to the date of such prepayment (or, in the case of a Base Rate Advance, one Business Day prior to the date of such prepayment) to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given such Borrower shall, prepay the outstanding principal amount of the Term Loan in whole or ratably in part, together with accrued

66

interest to the date of such prepayment on the principal amount prepaid; _provided_, _however_, that (w) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof, (x) in connection with any such prepayment of the Term Loan, the Aggregate Revolving Commitments shall be reduced on a Pro Rata Basis (and make any necessary prepayment of Advances so that the reduction in Aggregate Revolving Commitments does not result in an Overadvance), and (y) in the event of any prepayment of a Eurodollar Rate Advance, the applicable Borrower shall be obligated to reimburse the Lenders in respect thereof pursuant to Section 9.04(c).

(b)    On the date of delivery of any Borrowing Base Certificate, if the Total Extensions of Credit exceed the Line Cap, the Borrowers shall prepay Advances in an amount equal to such excess, _provided_ that if the aggregate principal amount of Advances then outstanding is less than the amount of such excess, the Borrowers shall, to the extent of such excess, Cash Collateralize outstanding L/C Obligations; _provided_ _further_ that if, after the prepayment of any Advances and the Cash Collateralization of L/C Obligations under this clause (b), the Total Extensions of Credit exceed the Line Cap, the Borrowers shall prepay the Term Loan in an amount equal to such excess (with a Pro Rata reduction in the Revolving Commitments).

(c)    Subject to the Financing Orders, (i) the Borrowers shall repay the Advances (without a requirement to reduce the Revolving Commitments) in an amount equal to any Net Proceeds (other than Net Proceeds of the sale of Prepetition Unencumbered Assets and other than Net Proceeds received upon the consummation of a Go Forward Stores Qualified Bid), _provided_ that if the aggregate principal amount of Advances then outstanding is less than the amount of such Net Proceeds, the Borrowers shall, to the extent of such excess, Cash Collateralize L/C Obligations; _provided_ _further_ that if the aggregate principal amount of Advances then outstanding plus the amount of outstanding and non-Cash Collateralized L/C Obligations is less than the amount of such Net Proceeds, the Borrowers shall, to the extent of such excess, deposit such Net Proceeds into the Term Loan Proceeds Account; _provided_ _further_ that if, after the prepayment of any Revolving Advances and any Cash Collateralization of L/C Obligations as set forth above under this clause (c)(i), an Event of Default shall have occurred and be continuing, the Borrowers shall prepay the Term Loan to the extent of such excess and (y) so long as no Event of Default shall have occurred and be continuing, the Borrowers may use the Net Proceeds deposited in the Term Loan Proceeds Account in accordance with the Approved Budget and (ii) in the case of Net Proceeds received upon the consummation of a Go Forward Stores Qualified Bid, the Borrowers shall repay the Obligations in full in cash.

(d)    The Borrowers shall prepay the Advances in accordance with the provisions of Section 6.01(m) hereof, and upon the occurrence and during the continuance of an Event of Default, the Borrowers shall Cash Collateralize outstanding L/C Obligations; _provided_ that if, after the prepayment of any Revolving Advances and any Cash Collateralization of L/C Obligations as set forth above under this clause (d), an Event of Default exists, the Borrowers shall prepay the Term Loan; _provided_ _further_ that upon acceleration of the Obligations or the commencement of a Liquidation, all proceeds of Collateral shall be applied to the Obligations in accordance with Section 7.03.

(e)    If on any day the Borrowers are not in compliance with the LTV Provisions, then, until the Borrowers are in compliance therewith, the Borrowers shall prepay Advances in an amount required to comply with such provisions, provided that if the aggregate principal amount of Advances then outstanding is less than the amount required, the Borrowers shall, to the extent of the balance, Cash Collateralize L/C Obligations; provided further that if, after the prepayment of any Advances and the Cash Collateralization of L/C Obligations under this clause (e), the Borrowers are not in compliance therewith, the Borrowers shall prepay the Term Loan in an amount equal to the amount required to cause compliance therewith (with a Pro Rata reduction in the Revolving Commitments).

(f)    On each Rebalancing Date, (i) the Aggregate Revolving Commitments shall be automatically reduced, if necessary, to an amount equal to the Adjusted Revolving Exposure as of such Rebalancing Date (with the Revolving Commitment of each Revolving Lender being reduced by such Revolving Lender's Revolving Commitment Percentage of such reduction amount), and (ii) Borrowers shall prepay the Term Loan in an amount necessary to cause the ratio of the Adjusted Revolving Exposure as of such Rebalancing Date to the Term Loan outstanding on such Rebalancing Date to equal the Target Sharing Ratio. Notwithstanding anything in this Agreement to the contrary, if the Borrowers fail to make such prepayment of the Term Loan on any Rebalancing Date, whether or not any Borrower submits a Notice of Borrowing in order to fund such prepayment, Borrowers shall be deemed to have requested a Borrowing of Base Rate Advances in an amount necessary to pay all amounts due pursuant to this Section 2.11(f) on any Rebalancing Date, and each Lender shall fund its pro rata share of such Borrowing whether or not the Commitments have terminated, an Overadvance exists or is created thereby, or the conditions in Article IV are satisfied.

(g)    The Borrowers shall deliver to the Administrative Agent, in connection with each prepayment required under Section 2.11(c), a certificate signed by an Authorized Officer of the Borrowers setting forth in reasonable detail the calculation of the amount of such prepayment.

(h)    Any prepayment of Revolving Advances pursuant to this Section 2.11 shall be applied, first, to any Base Rate Advances then outstanding and the balance of such prepayment, if any, to the Eurodollar Rate Advances then outstanding.

Section 2.12    Increased Costs. (a) If, due to a Change in Law, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Advances or issuing or participating in Letters of Credit (excluding for purposes of this Section 2.12 any such increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.15 shall govern) and (ii) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided that a Lender claiming additional amounts under this Section 2.12(a) agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office and/or take other commercially reasonable action if the making of

68

such a designation or the taking of such actions would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.  A certificate as to the amount of such increased cost, submitted to the Borrowers and the Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error.  If any Borrower so notifies the Agent after any Lender notifies the Borrowers of any increased cost pursuant to the foregoing provisions of this Section 2.12(a), such Borrower may, upon payment of such increased cost to such Lender, replace such Lender with a Person that is an Eligible Assignee in accordance with the terms of Section 9.07 (and the Lender being so replaced shall take all action as may be necessary to assign its rights and obligations under this Agreement to such Eligible Assignee).

(b)    If any Lender determines that any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender or any entity controlling such Lender and that the amount of such capital or liquidity is increased by or based upon the existence of such Lender's commitment to lend hereunder and other commitments of this type, then, upon demand by such Lender (with a copy of such demand to the Agent), the Borrowers shall pay to the Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender or such entity in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender's commitment to lend hereunder.  A certificate as to such amounts submitted to the Borrowers and the Agent by such Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)    The Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or capital, liquidity or reserve requirement or pursuant to Section 2.15 for any Taxes incurred more than nine months prior to the date that such Lender notifies the Borrowers of the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax and of such Lender's intention to claim compensation therefor; provided that if the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13    Illegality.  Notwithstanding any other provision of this Agreement, if any Lender shall notify the Agent that any Change in Law has made it unlawful for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Advances or to fund or maintain Eurodollar Rate Advances hereunder, (a) each Eurodollar Rate Advance will automatically, upon such demand, Convert into a Base Rate Advance or an Advance that bears interest at the rate set forth in Sections 2.08(a)(i) or 2.08(b)(i), as the case may be and (b) the obligation of the Lenders to make Eurodollar Rate Advances or to Convert Advances or Term Loan Borrowings into Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

Section 2.14    Payments and Computations.  (a) The Borrowers shall make each payment hereunder and under the other Loan Documents, without any right of counterclaim or set-off, not later than 1:00 p.m. on the day when due in U.S. dollars to the Agent at the Agent's Account in same day funds.  The Agent will promptly thereafter cause to be distributed like

funds relating to the payment of principal or interest or commitment fees ratably (other than amounts payable pursuant to Section 2.12, 2.15 or 9.04(c)) to the Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(e), from and after the effective date specified in such Assignment and Acceptance, the Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)    Unless payment is otherwise made by Borrowers, the becoming due of any Obligation (whether principal, interest, fees or other charges, including Extraordinary Expenses, L/C Obligations, Cash Collateral or Obligations relating to Bank Products and Cash Management Services) shall be deemed to be a request for a Base Rate Advance on the due date in the amount due and the proceeds of such Advance shall be disbursed as direct payment of such Obligation, without further application to or order of the Bankruptcy Court and notwithstanding that an Overadvance may result thereby.  In addition, Agent may, at its option, charge such amount against any operating, investment or other account of a Borrower maintained with Agent or any of its Affiliates, without further application to or order of the Bankruptcy Court and notwithstanding that an Overadvance may result thereby.

(c)    All computations of interest based on the Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of letter of credit fees, commitment fees and other fees shall be made by the Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or commitment fees are payable.  Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee, as the case may be; provided, however, that, if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)    Unless the Agent shall have received notice from any Borrower prior to the date on which any payment is due by it to the Lenders hereunder that such Borrower will not make such payment in full, the Agent may assume that the applicable Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent such Borrower shall not have so made such payment in full to the Agent, each Lender shall repay to the Agent forthwith on demand such

amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Agent, at the Federal Funds Rate.

Section 2.15    Taxes.    (a) Any and all payments by the Borrowers to or for the account of any Lender, the Agent or any Co-Collateral Agent hereunder or under the other Loan Documents or any other documents to be delivered hereunder shall be made, in accordance with Section 2.14 or the applicable provisions of such other documents, free and clear of and without deduction for any and all present or future Taxes (excluding any Excluded Taxes).  If the Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document or any other documents to be delivered hereunder to any Lender, the Agent or any Co-Collateral Agent, (i) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable shall be increased as may be necessary so that after making all required deductions for Indemnified Taxes (including deductions for Indemnified Taxes applicable to additional sums payable under this Section 2.15) such Lender, the Agent and the Co-Collateral Agents (as the case may be) receive an amount equal to the sum each would have received had no such deductions of Indemnified Taxes been made, (ii) the Borrowers shall make such deductions as are determined by such Borrowers to be required based upon the information and documentation it has received pursuant to Sections 2.15(e) and (f)(i) and (iii) the Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    In addition, the Borrowers shall pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under the other Loan Documents or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the other Loan Documents or any other documents to be delivered hereunder, but excluding (i) any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 9.16), and (ii) all other United States federal taxes other than withholding Taxes (hereinafter referred to as "**Other Taxes**").  Other Taxes shall not include any Taxes imposed on, or measured by reference to, gross income, net income or gain.

(c)    Without duplication of any additional amounts paid pursuant to Section 2.15(a), the Borrowers shall indemnify each Lender, the Agent and each Co-Collateral Agent for and hold it harmless against the full amount of Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.15) imposed on or paid by such Lender, the Agent or any Co-Collateral Agent (as the case may be) and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 10 days from the date such Lender, the Agent or any Co-Collateral Agent (as the case may be) makes written demand therefor.

(d)    As soon as practicable after the date of any payment of Indemnified Taxes, the Borrowers shall furnish to the Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

71

(e)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(f)    Without limiting the generality of the foregoing:

(i) Each Lender that is a United States person, on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers or the Agent, shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax on payments pursuant to this Agreement or the other Loan Documents; and

(ii) Each Lender organized under the laws of a jurisdiction outside the United States, and each other Lender that is not a domestic corporation within the meaning of Section 7701(a)(30) of the Internal Revenue Code:

(1)    represents that all payments to be made to it under this Agreement or any other Loan Document are exempt from United States withholding Tax (including backup withholding Tax) under an applicable statute or tax treaty;

(2)    on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Forms W-8BEN, W-8BEN-E or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding Tax on payments pursuant to this Agreement or the other Loan Documents; and

(3)    on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the

72

Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made.

If the form provided by a Lender at the time such Lender first becomes a party to this Agreement indicates a United States interest withholding Tax rate in excess of zero, withholding Tax at such rate shall be considered excluded from Indemnified Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding Tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such form; provided, however, that, if at the date of the Assignment and Acceptance pursuant to which a Lender assignee becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) in respect of United States withholding Tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding Taxes that may be imposed in the future or other amounts otherwise includable in Indemnified Taxes) United States withholding Tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this subsection (f) requires the disclosure of information, other than information necessary to compute the Tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN, W-8BEN-E, or W-8ECI, that the Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrowers and shall not be obligated to include in such form or document such confidential information. For purposes of this subsection (f), the terms "**United States**" and "**United States person**" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(g)     For any period with respect to which a Lender has failed to provide the Borrowers with the appropriate form, certificate or other document described in Section 2.15(e) (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring subsequent to the date on which a form, certificate or other document originally was required to be provided, or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under Section 2.15(a) or (c) with respect to Indemnified Taxes imposed by the United States by reason of such failure; provided, however, that should a Lender become subject to Indemnified Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrowers shall take such steps as the Lender shall reasonably request to assist the Lender to recover such Indemnified Taxes. Further, if a payment made to the Agent or any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), the Agent or such Lender, as applicable, shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by

73

the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this paragraph (g), "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

(h)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.15 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(i)    Any Lender claiming any additional amounts payable pursuant to this Section 2.15 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Eurodollar Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(j)    If any Lender determines, in its sole discretion exercised in good faith, that it has actually and finally realized, by reason of a refund, deduction or credit of any Indemnified Taxes paid or reimbursed by the Borrowers pursuant to subsection (a) or (c) above in respect of payments under this Agreement or the other Loan Documents, a current monetary benefit that it would otherwise not have obtained, and that would result in the total payments under this Section 2.15 exceeding the amount needed to make such Lender whole, such Lender shall pay to the Borrowers, with reasonable promptness following the date on which it actually realizes such benefit, an amount equal to the amount of such excess, net of all out-of-pocket expenses incurred by such Lender reasonably allocable in securing such refund, deduction or credit, provided that the Borrowers, upon the request of such Lender, agree to repay the amount paid over to the Borrowers to such Lender in the event such Lender is required to repay such refund to such jurisdiction.   Nothing in this subsection (j) shall be construed to require any Lender to make available to the Borrowers or any other Person its tax returns or any confidential tax information.

(k)    If the Agent, any Co-Collateral Agent or any Lender, as the case may be, shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by Borrower pursuant to this Section 2.15, including Indemnified Taxes or Other Taxes as to which it has been indemnified by Borrower, or with respect to which Borrower or a Group Member that is a signatory hereto has paid additional amounts pursuant to this Section 2.15, it shall notify Borrower of the availability of such refund claim and, if the Agent, any Co-Collateral Agent or any Lender, as the case may be, determines in good faith that making a claim for refund will not have any adverse consequence to its Taxes or business operations, shall, after receipt of a request by Borrower, make a claim to such Governmental Authority for such refund at Borrower's expense.

Section 2.16    <u>Sharing of Payments, Etc</u>.  If any Lender shall obtain any payment from any Group Member (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances, or the Term Loan or other amounts owing to it (other than pursuant to <u>Section 2.12</u>, <u>2.15</u> or <u>9.04(c)</u>) in excess of its ratable share, such Lender shall forthwith purchase from the other Lenders such participations in the Advances, the Term Loan  or other amounts owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this <u>Section 2.16</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 2.17    <u>Use of Proceeds of Advances and Term Loan</u>.  The proceeds of the Advances and the Term Loan shall be available (and each Borrower agrees that it shall use such proceeds) for operating, working capital and general corporate purposes of the Loan Parties, in each case consistent with, subject to and within the limitations contained in, the Approved Budget, including to refinance the Incremental DIP Term Loans outstanding on the Effective Date (in the case of the Term Loan), fund the Carve-Out Reserve and to pay other fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that no proceeds of the Advances or the Term Loans or cash collateral shall be used to, among other things, (x) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under or the liens and security interests granted under the Loan Documents or in connection with the Prepetition First Lien ABL Credit Agreement and any Debt thereunder or (y) investigate, initiate or prosecute any claims and defenses or commence causes of action against any Credit Party under or relating to the Loan Documents or any Prepetition Credit Parties under the Prepetition First Lien ABL Credit Agreement; and <u>provided</u> <u>further</u>, that the official creditors' committee or its counsel may use up to $100,000 to investigate, for a sixty (60) day period from the date of entry of the Final Financing Order, the validity, perfection, priority, extent or enforceability of the liens securing the obligations under the Prepetition First Lien ABL Credit Agreement (but not to litigate any of the foregoing).

Section 2.18    <u>Permitted Overadvances</u>.  The Agent may, in its discretion, make Permitted Overadvances without the consent of the Lenders, the Swingline Lender and the Issuing Lenders, and each Lender shall be bound thereby.  Any Permitted Overadvance may constitute a Swingline Advance.  A Permitted Overadvance is for the account of the Borrowers and shall constitute a Base Rate Advance and an Obligation secured by the Collateral, shall be treated for all purposes an Extraordinary Expense, and shall be repaid by the Borrowers in accordance with the provisions of <u>Section 2.03(b)</u> or <u>2.11(c)</u>(i), as applicable.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted

Overadvances to remain outstanding. The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of <u>Article III</u> regarding the Lenders' obligations to purchase participations with respect to Letters of Credit or of <u>Section 2.04</u> regarding the Lenders' obligations to purchase participations with respect to Swingline Advances.  The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to "**inadvertent Overadvances**" (i.e. where an Overadvance results from changed circumstances beyond the control of the Agent (such as a reduction in the collateral value)) regardless of the amount of any such Overadvance(s).

Section 2.19    <u>Superpriority Claims; Security and Priority of Liens</u>.  The Obligations, including all obligations of Holdings and each Subsidiary Guarantor in respect of its guarantee of the Obligations, shall, subject to the Carve-Out, at all times:

(a)    pursuant to Sections 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Case of each Loan Party, with priority over all other allowed chapter 11 and chapter 7 administrative expense claims now existing or hereinafter arising, of any kind whatsoever, including expenses of a chapter 11 and chapter 7 trustee (the "**DIP Superpriority Claims**");

(b)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by an automatically perfected security interest and lien on all assets of the Loan Parties that were not subject to a valid and perfected lien on the Petition Date (the "**Prepetition Unencumbered Assets**") and, upon entry of the Final Financing Order, the Avoidance Action Proceeds (as defined in the Final Financing Order) with lien priorities set forth in the Final Financing Order and the DIP Intercreditor Agreement;

(c)    pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by an automatically perfected junior security interest and lien on all assets of each Loan Party (other than Prepetition ABL Collateral) that is subject to valid and perfected security interests in favor of third parties as of the Petition Date and any Senior Permitted Liens; and

(d)    pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming security interest and lien on the Prepetition ABL Collateral of each Loan Party on which the Prepetition ABL Lenders held a first priority security interest and lien and the Prepetition Second Lien Secured Parties held a second priority security interest and lien (such liens and security interests, the "**Priming Liens**"), in each case to the extent that such Prepetition ABL Collateral is subject to existing liens that secure the obligations of the applicable Loan Party, including under the Prepetition First Lien ABL Credit Agreement and the Prepetition Second Lien Facilities (collectively, the "**Primed Liens**") and such Priming Liens (x) shall be senior in all respects to the interests in such property of the Prepetition ABL Lenders under the Prepetition First Lien ABL Credit Agreement and the other "secured parties" referred to therein (collectively, the "**Prepetition First Lien ABL Credit Agreement Primed Parties**"), and of the Prepetition Second Lien Secured Parties under the Prepetition Second Lien Facilities (collectively, the "**Prepetition Second Lien Primed Parties**"), (y) shall also be senior to any

liens granted to provide adequate protection in respect of any of the Primed Liens, and (z) shall be subject to Senior Permitted Liens.

Section 2.20    MIRE Event.    Notwithstanding anything to the contrary herein, the making, increasing, extension or renewal of any Advances pursuant to this Agreement (excluding any continuation or conversion of Borrowings) after the Effective Date shall be subject to flood insurance due diligence in accordance with Section 6.01(i)(v)(1) and flood insurance compliance in accordance with Section 6.01(c) hereto.

# ARTICLE III

## AMOUNT AND TERMS OF THE LETTERS OF CREDIT

Section 3.01    L/C Commitment.

(a)    Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Revolving Lenders set forth in Section 3.04(a), agrees to issue Letters of Credit for the account of any Borrower (on behalf of such Borrower or on behalf of any other Group Member) on any Business Day during the period from the Effective Date until the Termination Date in such form as may be approved from time to time by such Issuing Lender; provided that no Issuing Lender shall have any obligation to issue any Letter of Credit if (i) after giving effect to such issuance, the L/C Obligations would exceed the L/C Commitment or (ii) the face amount of the requested Letter of Credit, when aggregated with all other then outstanding Extensions of Credit, shall exceed the Line Cap at such time; provided further that each Issuing Lender may, but shall not be required to, issue Letters of Credit such that the aggregate L/C Obligations attributable to all such outstanding Letters of Credit issued by such Issuing Lender exceed $[●]. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance, or (y) subject to the provisions of Section 6.01(p), the date that is thirty (30) day prior to the Scheduled Termination Date. Each Application and each Letter of Credit shall be subject to the International Standby Practices (ISP 98) of the International Chamber of Commerce (in the case of Standby L/Cs) or the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce (in the case of Commercial L/Cs) and, to the extent not inconsistent therewith, the laws of the State of New York.

(b)    No Issuing Lender shall at any time be obligated to issue any Letter of Credit if (i) such issuance would conflict with, or cause such Issuing Lender or any Revolving Lender to exceed any limits imposed by, any applicable Requirement of Law, (ii) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Lender from issuing such Letter of Credit, or any law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Lender shall prohibit, or request that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Lender any unreimbursed loss, cost or expense which was not applicable on the Effective

Date and which such Issuing Lender in good faith deems material to it; (iii) such issuance would violate one or more policies of such Issuing Lender applicable to letters of credit generally, or (iv) any Revolving Lender is at such time a Defaulting Lender hereunder, unless such Issuing Lender has entered into arrangements, including the delivery of cash collateral, satisfactory to such Issuing Lender (in its sole discretion) with the Borrowers or such Defaulting Lender to eliminate such Issuing Lender's actual or potential Fronting Exposure (after giving effect to Section 8.12(a)(iv)) with respect to the Defaulting Lender arising from either (x) the Letter of Credit then proposed to be issued or (y) that Letter of Credit and all other L/C Obligations as to which such Issuing Lender has actual or potential Fronting Exposure, as it may elect in its sole discretion.

Section 3.02    Procedure for Issuance of Letter of Credit.  Any Borrower may from time to time request that an Issuing Lender issue a Commercial L/C or Standby L/C for its account (on behalf of such Borrower or on behalf of any other Group Member) by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may reasonably request.  Upon receipt of any Application, such Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall such Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the applicable Borrower.  Such Issuing Lender shall furnish a copy of such Letter of Credit to the applicable Borrower promptly following the issuance thereof.  Such Issuing Lender shall promptly notify the Agent of the issuance, extension or amendment of Letters of Credit and any drawings or other payments under Letters of Credit.

Section 3.03    Fees and Other Charges.  (a)  The Borrowers will pay a fee on the face amount of all outstanding Letters of Credit (provided, however, that with respect to any Letter of Credit that, by its terms provides for one or more automatic increases in the amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is in effect at such time) at a per annum rate equal to (i) in the case of each Standby L/C and Banker's Acceptance, the Applicable Margin with respect to Eurodollar Rate Advances and (ii) in the case of each Commercial L/C, 50% of the Applicable Margin with respect to Eurodollar Rate Advances, in each case payable monthly in arrears on the 5th day subsequent to the last day of each month after the issuance date.  In addition, the Borrowers shall pay to each applicable Issuing Lender for its own account a fronting fee of 0.125% per annum on the undrawn and unexpired amount of each Letter of Credit, payable monthly in arrears on the 5th day subsequent to the last day of each month after the issuance date.

(b)    In addition to the foregoing fees, the Borrowers shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit, unless otherwise agreed.

Section 3.04    Letter of Credit Participations.  (a)  Each Issuing Lender irrevocably agrees to grant and hereby grants to each Revolving Lender, and, to induce each Issuing Lender to issue Letters of Credit, each Revolving Lender irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions set forth below, for such Revolving Lender's own account and risk an undivided interest equal to such Revolving Lender's Revolving Commitment Percentage in such Issuing Lender's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by such Issuing Lender thereunder.  Each Revolving Lender agrees with each Issuing Lender that, if a draft is paid under any Letter of Credit for which such Issuing Lender is not reimbursed in full by the Borrowers in accordance with the terms of this Agreement, such Revolving Lender shall pay to such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein an amount equal to such Revolving Lender's Revolving Commitment Percentage of the amount of such draft, or any part thereof, that is not so reimbursed.  Each Revolving Lender's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right that such Revolving Lender may have against such Issuing Lender, the Borrowers or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Article IV, (iii) any adverse change in the condition (financial or otherwise) of the Borrowers or any other Loan Party, (iv) any breach of this Agreement or any other Loan Document by the Borrowers, any other Loan Party or any other Revolving Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)    If any amount required to be paid by any Revolving Lender to any Issuing Lender pursuant to Section 3.04(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is paid to such Issuing Lender within three Business Days after the date such payment is due, such Revolving Lender shall pay to such Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360.  If any such amount required to be paid by any Revolving Lender pursuant to Section 3.04(a) is not made available to such Issuing Lender by such Revolving Lender within three Business Days after the date such payment is due, such Issuing Lender shall be entitled to recover from such Revolving Lender, on demand, such amount with interest thereon calculated from such due date at the rate per annum set forth in Section 2.08(a)(i) applicable to Base Rate Advances.  A certificate of such Issuing Lender submitted to any Revolving Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)    Whenever, at any time after any Issuing Lender has made payment under any Letter of Credit and has received from any Revolving Lender its pro rata share of such payment in accordance with Section 3.04(a), such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the applicable Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to such Revolving Lender its pro rata share

79

thereof; <u>provided</u>, <u>however</u>, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such Revolving Lender shall return to such Issuing Lender the portion thereof previously distributed by such Issuing Lender to it.

Section 3.05    <u>Reimbursement Obligation of the Borrowers</u>.  If any draft is paid under any Letter of Credit, the Borrowers shall reimburse the applicable Issuing Lender for the amount of (a) the draft so paid and (b) any Taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment (i) not later than 12:00 Noon on the Business Day that the applicable Borrower receives notice of such draft, if such notice is received on such day prior to 10:00 A.M. or (ii) if clause (i) above does not apply, the Business Day immediately following the day that the applicable Borrower receives such notice (such date, the "**Reimbursement Date**").  To the extent that  the applicable Borrower fails to so reimburse the applicable Issuing Bank, whether or not any Borrower submits a Notice of Borrowing, Borrowers shall be deemed to have requested a Borrowing of Base Rate Advances in an amount necessary to pay all amounts due Issuing Bank on any Reimbursement Date and each Lender shall fund its pro rata share of such Borrowing whether or not the Commitments have terminated, an Overadvance exists or is created thereby, or the conditions in <u>Article IV</u> are satisfied.

Section 3.06    <u>Obligations Absolute</u>.  Each Borrower's obligations under this <u>Article III</u> shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that any Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person.  Each Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and such Borrower's Reimbursement Obligations under <u>Section 3.05</u> shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among such Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of such Borrower against any beneficiary of such Letter of Credit or any such transferee.  No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Issuing Lender.  Each Borrower agrees that any action taken or omitted by any Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct, shall be binding on such Borrower and shall not result in any liability of such Issuing Lender to such Borrower.

Section 3.07    <u>Letter of Credit Payments</u>.  If any draft shall be presented for payment under any Letter of Credit, the applicable Issuing Lender shall promptly notify the applicable Borrower of the date and amount thereof.  The responsibility of such Issuing Lender to the Borrowers in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

Section 3.08    Applications.  To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Article III, the provisions of this Article III shall apply.

Section 3.09    Use of Letters of Credit.  The Letters of Credit shall be available (and each Borrower agrees that it shall use such Letters of Credit) for general corporate purposes of Holdings and its Subsidiaries.

## ARTICLE IV

## CONDITIONS TO EFFECTIVENESS

Section 4.01    Conditions Precedent to Effectiveness.  The effectiveness of this Agreement and the obligation of the Lenders to extend credit hereunder is conditioned upon satisfaction (or waiver) of each of the following conditions precedent:

(a)    The Agent shall have received each of the following, each of which shall be originals or telecopies or other electronically transmitted copies (followed promptly by originals) unless otherwise specified, each properly executed by an Authorized Officer of the signing Loan Party and each in form and substance satisfactory to the Agent and the Co-Collateral Agents:

(i)  this Agreement duly executed by each of Holdings, the Borrowers, the Agent, the Co-Collateral Agents, and the Lenders;

(ii)  the Guarantee and Collateral Agreement duly executed by the applicable Loan Parties;

(iii)  each other Loan Document set forth on Schedule 4.01, each duly executed by the applicable Loan Parties;

(iv)  such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Loan Party as the Agent may reasonably require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party and (B) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(v)  copies of each Loan Party's organization or other governing documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where failure to so qualify could reasonably be expected to have a Material Adverse Effect;

81

(vi)  an opinion of in-house counsel to Holdings and of one or more special or local counsel to Holdings, the Borrowers and the other Loan Parties, addressed to the Agent, the Co-Collateral Agents and each Lender as to such matters as the Agent and Co-Collateral Agents may reasonably request;

(vii)  a certificate signed by an Authorized Officer of Holdings and the Borrowers certifying (A) that the conditions specified in Section 4.02 have been satisfied and (B) that the Perfection Certificate is true and correct in all material respects;

(viii)  evidence that all insurance (including endorsements) required to be maintained pursuant to Section 6.01(c) has been obtained and is in effect, including all flood hazard insurance policies and related endorsements for each Real Property that is located in a Special Flood Hazard Area;

(ix)  a Borrowing Base Certificate, duly completed and executed by an Authorized Officer of Holdings, together with supporting information satisfactory to the Co-Collateral Agents in their Permitted Discretion for the most recent prior week ended at least three Business Days before the Effective Date;

(x)  results of searches or other evidence reasonably satisfactory to the Co-Collateral Agents (in each case dated as of a date reasonably satisfactory to the Co-Collateral Agents) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Liens;

(xi)  the DIP Intercreditor Agreement duly executed by the Junior DIP Term Loan Agent, the Agent, the Co-Collateral Agents and the Loan Parties;

(xii)  [reserved]; and

(xiii)  such other customary certificates, documents or consents as the Agent and the Co-Collateral Agents reasonably may require.

(b)    All actions required by law or reasonably requested by the Co-Collateral Agents to be undertaken, and all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Co-Collateral Agents to be filed, registered, or recorded to create or perfect the Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Co-Collateral Agents.

(c)    The conditions set forth in Section 4.02 shall be satisfied.

(d)    There shall have been no event or circumstance since the Petition Date, that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect (other than as customarily occurs as a result of events

82

leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code).

(e)    All fees required to be paid (to the extent invoiced) to the Agent, the Co-Collateral Agents, the Joint Lead Arrangers or the Lenders on or before the Effective Date shall have been paid in full.

(f)    The Borrowers shall have paid all costs and expenses of the Agent and the Co-Collateral Agents (to the extent set forth in Section 9.04(a) and invoiced) incurred in connection with or relating to this Agreement and the other Loan Documents, including reasonable fees, charges and disbursements of counsel to the Agent and each Co-Collateral Agent (provided that such payment shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent and the Co-Collateral Agents).

(g)    (i) Each Loan Party shall have provided the documentation and other information requested by the Lenders at least three (3) Business Days prior to the Effective Date that is required by authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act, and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Borrower shall have provided a Beneficial Ownership Certification in relation to the Borrower at least two (2) Business Days prior to the Effective Date.

(h)    The Borrowers shall have paid (i) all accrued and unpaid interest, commitment fees, letter of credit fees and other fees to the Initial Lenders under the Interim DIP Facility and (ii) all accrued and unpaid interest, commitment fees, letter of credit fees and other fees owed to Participating Prepetition Lenders under the Prepetition Credit Agreement, in each case accrued to (but not including) the Effective Date.

(i)    The Agent shall have received a signed copy of the Final Financing Order, which Final Financing Order shall not have been vacated, reversed, modified, amended or stayed in any respect.

(j)    The Agent shall have received signed copies of all orders granting the relief requested in the Loan Parties "first day motions" on a final basis, including (i) authorizing the Loan Parties to continue the use of their cash management system on a final basis, and (ii) authorizing the Loan Parties to reimburse certain employee expenses on a final basis, which orders shall be in form and substance acceptable to the Agent in its sole and absolute discretion.

(k)    No trustee, responsible officer or examiner having powers related to the operation of the business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) shall have been appointed or elected with respect to the Loan Parties, any of their subsidiaries, or any of their respective properties, or any Loan Party or its subsidiaries shall have applied for, consented to, or acquiesced in, any such appointment, with respect to the Loan Parties, any of their subsidiaries or their respective properties.

(l)    The Joint Lead Arrangers shall have received and be satisfied, in their sole and absolute discretion, with the Approved Budget and the Store Footprint Plan, in each case at least 1 (one) Business Day prior to the Effective Date.

(m)    There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect.

(n)    Upon entry of the Final Financing Order, the entry into this Agreement shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

(o)    [Reserved].

(p)    [Reserved].

(q)    The Junior DIP Term Loan Agreement shall have been executed and delivered by all parties thereto (the execution and delivery of which by the Debtors shall have been authorized by the Bankruptcy Court in the Junior DIP Interim Financing Order), all Junior DIP Term Loan Documents shall be in form and substance satisfactory to the Agent in its sole and absolute discretion, and the Debtors shall have deposited the net proceeds of the initial drawing of the Junior DIP Term Loans in an aggregate initial principal amount of $75,000,000 into the Term Loan Proceeds Account.

(r)    All other conditions precedent in this <u>Section 4.01</u> shall have been satisfied or waived on or before November 30, 2018.

Section 4.02    <u>Conditions Precedent to Each Extension of Credit</u>.  The obligation of each Lender to make an Extension of Credit on any date shall be subject to the conditions precedent that the effectiveness of this Agreement shall have occurred and on the date of such Extension of Credit the following statements shall be true (and each of the giving of the applicable Notice of Borrowing or Application for a Letter of Credit, as the case may be, and the acceptance by the applicable Borrower of the proceeds of such Borrowing or the issuance of such Letter of Credit, as applicable, shall constitute a representation and warranty by the applicable Borrower that on the date of such Borrowing or Letter of Credit issuance such statements are true):

(i)    the representations and warranties made by each Loan Party in or pursuant to the Loan Documents are true and correct on and as of such date in all material respects, before and after giving effect to such Extension of Credit and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, and (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(ii)   no event has occurred and is continuing, or would result from such Extension of Credit or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default;

(iii)   after giving effect to such Extension of Credit, the Total Extensions of Credit will not exceed the Line Cap;

(iv)   after giving effect to such Extension of Credit, the Borrowers will be in compliance with the LTV Provisions;

(v)   such Extension of Credit shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

(vi)   such Extension of Credit shall not result in the Total Extensions of Credit exceeding the amount authorized for the DIP ABL Facility by the Final Financing Order;

(vii)   (i) the Final Financing Order shall be in full force and effect and shall not have been vacated, reversed, stayed, amended or modified in any respect, (ii) no motion for reconsideration of the Final Financing Order shall have been timely filed by any of the Debtors or their Subsidiaries, and (iii) no appeal of the Final Financing Order shall have been timely filed; and

(viii)   in the case of a Revolving Advance, the date of such Advance is a Revolving Availability Date.

The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Extensions of Credit, the Revolving Lenders will fund their Revolving Commitment Percentage of all Advances and participate in all Swingline Advances and Letters of Credit whenever made or issued, which are requested by a Borrower or are otherwise Permitted Overadvances and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Agent acting in the interests of the Credit Parties, provided, however, that the making of any such Extensions of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01   Representations and Warranties of Holdings and the Borrowers.

Holdings and the Borrowers hereby jointly and severally represent and warrant as follows:

(a)   Organization; Power and Authority; EEA Financial Institution; EEA Financing Institutions. Each Loan Party (i) is duly organized, validly existing and in good

85

standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Loan Party is an EEA Financial Institution.

(b)    Due Authorization; No Conflict. Upon entry of the Final Financing Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Loan Party's powers, have been duly authorized by all necessary organizational action, and do not contravene (i) the charter or by-laws or other organizational or governing documents of such Loan Party or (ii) law or any contractual restriction binding on or affecting any Loan Party.

(c)    Government Approvals; Consents. Upon entry of the Final Financing Order, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by any Loan Party of any Loan Document to which it is a party that has not already been obtained.

(d)    Due Execution. Each Loan Document has been duly executed and delivered by each Loan Party party thereto. Upon entry of the Final Financing Order, this Agreement constitutes, and each other Loan Document will constitute upon execution, the legal, valid and binding obligation of each Loan Party party thereto enforceable against such Loan Party in accordance with its respective terms and the Final Financing Order, subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(e)    Financial Statements. The consolidated and consolidating balance sheets of Holdings and its Subsidiaries and the related consolidated statements of income and cash flows and shareholders' equity of Holdings and its Subsidiaries, that have been and are hereafter delivered to Agent and Lenders fairly present the consolidated financial condition and results of operations of Holdings and its Subsidiaries as at the dates and for the periods indicated, all in accordance with GAAP consistently applied.

(f)    Absence of Material Adverse Effect. Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(g)    Litigation. Other than the Chapter 11 Cases, there are no material unstayed Adverse Proceedings now pending or threatened or affecting Holdings, the Borrowers or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator.

(h)    Margin Stock. Following application of the proceeds of each Advance and the Term Loan and the issuance of each Letter of Credit, not more than five (5%) percent of the value of the assets of the Borrowers and their respective Subsidiaries on a consolidated basis will be "Margin Stock" (within the meaning of Regulation U issued by the

Board of Governors. No proceeds of any Extension of Credit or Letters of Credit will be used by Borrowers to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

(i)  Investment Company Act. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(j)  Taxes. All United States Federal income tax returns and all other material tax returns which are required to be filed have been filed by or on behalf of Holdings, the Borrowers and their respective Subsidiaries, and all Taxes due with respect to Holdings, the Borrowers and their respective Subsidiaries pursuant to such returns or pursuant to any assessment received by Holdings, the Borrowers or any Subsidiary have been paid except to the extent permitted in Section 6.01(b).  The charges, accruals and reserves on the books of Holdings, the Borrowers and their Subsidiaries in respect of Taxes or other governmental charges have been made in accordance with, and to the extent required by, GAAP.

(k)  Information; Accuracy. All written information (including the Approved Budget and each Rolling Budget) heretofore furnished by Holdings, the Borrowers or their Subsidiaries to the Agent, any Co-Collateral Agent or any Lender (including the Perfection Certificate) for purposes of or in connection with this Agreement or any other Loan Document, taken as a whole, was true and correct in all material respects on the date as of which such information was stated or certified, provided that with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  As of the Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

(l)  Collateral. No Collateral is subject to any Lien except the Permitted Liens existing on the Effective Date. Each Loan Party and Subsidiary has good and marketable title to (or valid leasehold interests in) all of its Real Property, and good title to all of its personal property, including all property reflected in any financial statements delivered to the Agent or the Lenders, in each case free of Liens except Permitted Liens.  Each Loan Party and Subsidiary has paid and discharged all lawful claims that, if unpaid, could become a Lien on its properties, other than Permitted Liens.  All Liens of the Agent in the Collateral are duly perfected Liens with lien priorities set forth in the Final Financing Order and the DIP Intercreditor Agreement and subject to Permitted Liens entitled to priority under applicable law.  Schedule 5.01(l)(A) sets forth the address (including street address, county and state) of all previously unencumbered Real Property that is owned or ground leased by the Loan Parties as of the Effective Date (specifying whether each parcel of Real Property is either owned or ground leased).  Schedule 5.01(l)(B) sets forth the address (including street address, county and state) of all previously unencumbered Real Property that is leased by the Loan Parties as of the Effective Date, together with the name of each lessor and such lessor's contact information. Each Lease of Real Property by the Loan Parties is enforceable (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and by general principles of equity) against the lessor thereof in accordance with its terms and is in full

87

force and effect and, other than for defaults arising solely as a result of the commencement of the Chapter 11 Cases, the Loan Parties are not in default of the terms of any such Lease; <u>provided</u> that the representation set forth in this sentence shall not apply to any Lease for a Store location that is subject to the Specified Store Closing Sales if the failure of such representation to be true and correct would not impair the applicable Loan Party's ability to continue to occupy such Store location. The Agent has received the Flood Documentation with respect to all Real Property.

(m)    <u>Intellectual Property</u>.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (i) each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted; (ii) no material claim has been asserted and is pending by any Person challenging the use of any Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that the conduct of the business of any Loan Party infringes, misappropriates, or otherwise violates in any material respect any Intellectual Property of any Person, nor do Holdings or the Borrowers know of any valid basis for any such claim; and (iii) to the best knowledge of Holdings and the Borrowers, neither the use of Intellectual Property by each Group Member nor the operation of their respective businesses infringes, misappropriates or otherwise violates the rights of any Person in any material respect.

(n)    <u>ERISA</u>.

(i)    Except as set forth on <u>Schedule 5.01(n)</u> or as would not reasonably be expected to result in a Material Adverse Effect, (a) neither a Reportable Event nor a failure to meet minimum required contributions (in accordance with Section 430 or any prior applicable section of the Internal Revenue Code or Section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, (b) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other applicable federal or state laws, and (c) no termination of a Single Employer Plan has occurred.  Except as set forth on <u>Schedule 5.01(n)</u>, no Lien imposed under the Internal Revenue Code or ERISA exists on account of any Plan, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period.  Each Single Employer Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the United States Internal Revenue Service (the "**IRS**") and, to the best knowledge of Holdings and the Borrowers, nothing has occurred which would cause the loss of, such qualification.  Except as set forth on <u>Schedule 5.01(n)</u> or as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 430 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 430 of the Internal Revenue Code has been made with respect to any Plan.

(ii)    There are no pending or, to the best knowledge of Holdings and the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be

expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary duty rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur, in each case that would reasonably be expected to result in a Material Adverse Effect. Neither any Loan Party nor any ERISA Affiliate has incurred, or would reasonably be expected to incur, any liability under Title IV of ERISA with respect to any Pension Plan, other than premiums due and not delinquent under Section 4007 of ERISA or as would not reasonably be expected to have a Material Adverse Effect; neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and, to the knowledge of the Borrowers, no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan except as would not reasonably be expected to have a Material Adverse Effect; and neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA.  Except as would not reasonably be expected to have a Material Adverse Effect, neither Holdings, the Borrowers nor any Commonly Controlled Entity has had a complete or partial withdrawal (as such terms are defined in Sections 4203 and 4205 of ERISA, respectively) from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA.  No such Multiemployer Plan is Insolvent except as would not reasonably be expected to result in aggregate liability to Holdings and its Subsidiaries of $100,000,000 or more.

(iii)  Each Loan Party represents and warrants that it is not and will not be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Advances, the Letters of Credit or the Revolving Commitments;

(o)  Environmental Matters. Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Group Member (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has any Environmental Liabilities, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(p)  Security Interest. (i) The Guarantee and Collateral Agreement is effective to create in favor of the Control Co-Collateral Agent, for the benefit of the Credit Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.

(ii)  When financing statements and other filings specified on Schedule 5.01(p) in appropriate form are filed in the offices specified on Schedule 5.01(p), the Guarantee and Collateral Agreement shall, to the extent a security interest therein can be perfected by filing a UCC financing statement,

constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to the Lien or claim of any other Person (except for Senior Permitted Liens).

(iii)   The Mortgages shall be effective to create in favor of the Control Co-Collateral Agent (for the benefit of the Credit Parties) or, if so contemplated by the respective Mortgage, the Control Co-Collateral Agent and the other Credit Parties, legal, valid and enforceable Liens on all of the Loan Parties' rights, titles and interests in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are validly filed, registered or recorded in the proper real estate filing, registration or recording offices, and all required mortgage Taxes and recording and registration charges are duly paid, the Control Co-Collateral Agent (for the benefit of the Credit Parties) shall have valid Liens with record or registered notice to third parties on all rights, titles and interests of the Loan Parties in such Mortgaged Property.

(q)   <u>Payables Practices</u>. Except for managing payments of certain payables to conserve cash in the period immediately preceding the commencement of the Chapter 11 Cases, each Loan Party has not made any material change in the historical accounts payable practices from those in effect immediately prior to the date hereof.

(r)   <u>Insurance Matters</u>. The properties of the Loan Parties are insured as required pursuant to <u>Section 6.01(c)</u> hereof.  Each insurance policy required to be maintained by the Loan Parties pursuant to <u>Section 6.01(c)</u> is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

(s)   <u>Equity Interests</u>. Each Loan Party has good title to the Equity Interests in its Subsidiaries and all such Equity Interests are duly issued, fully paid and non-assessable. There are no outstanding options to purchase, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to any capital stock of any Loan Party (other than Holdings) or Subsidiary, except as set forth on <u>Schedule 5.01(s)</u>. The copies of the organization and governing documents of each Loan Party provided pursuant to <u>Section 4.01</u> are true and correct copies of each such document, each of which is valid and in full force and effect.

(t)   <u>Labor Matters; Certain Employment Matters</u>. As of the date of this Agreement, except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of Holdings or any Borrower, threatened, (b) the hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign law dealing with such matters, (c) all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on <u>Schedule 5.01(t)</u> (as updated by the Borrowers from time to time) (i)

no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or any material bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (excluding in each case individual employment agreements) and (ii) no employee of a Loan Party is also an employee of any Permitted Holder. There are no representation proceedings pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, in each case which would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries which would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)     <u>WARN Act</u>. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law that remains unpaid or unsatisfied and is in excess of $100,000 individually or $750,000 in the aggregate for all such liabilities.

(v)     <u>Brokerage Fees</u>. No broker or finder brought about the obtaining, making or closing of the Advances or the Term Loan or transactions contemplated by the Loan Documents, and, other than amounts payable pursuant to the Fee Letter, no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

(w)     <u>Limitation on Certain Transactions</u>. No Loan Party has any obligation to any Permitted Holder with respect to any consulting, management or similar fee; <u>provided</u>, that, for the avoidance of doubt, the foregoing shall not apply to (i) any arrangement disclosed in Holdings' annual report on form 10-K for the fiscal year ended February 3, 2018; (ii) any employment arrangement between any Loan Party and an individual  Person who is also an employee of a Permitted Holder, so long as such employment arrangements are (x) on terms that are fair and reasonable and comparable to terms provided to employees in comparable positions for companies of a comparable size and no less favorable to such Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not an employee of a Permitted Holder and (y)  in the case of any officer (as defined in Rule 16a-1 under the Securities Exchange Act of 1934) or director of Holdings, any beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of more than 10.0% of Holdings' Equity Interests or any Person that ranks in the top five in compensation among all employees of the Loan Parties, approved by a majority of disinterested members of the board of directors of Holdings in good faith; or (iii) any obligation arising from any financial advisory, financing or underwriting

services or other investment banking activities provided by a Permitted Holder so long as (x) such services directly relate to and are provided in conjunction with an acquisition or divestiture or other specific transaction conducted outside the ordinary course of business, (y) such services are on terms that are fair and reasonable and comparable to terms provided by independent financial advisory, financing or underwriting service provider or other investment banking service providers and (z) compensation for such services are approved by a majority of disinterested members of the board of directors of Holdings in good faith.

(x)    PATRIOT Act; Anti-Corruption. To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) AML Laws, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), and (iv) the Corruption of Foreign Public Officials Act, as amended. No part of the proceeds of any credit extensions will be used, directly or, to the Loan Parties' knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(y)    Pension Plan Matters. None of Holdings, the Borrowers, any of their respective Subsidiaries, nor any Permitted Holder or Significant Holder is an Affiliate of the Sears Holdings Pension Plan. The Sears Holdings Pension Plan qualifies as an Eligible Assignee pursuant to the definition thereof.

(z)    Sanctions; OFAC. No Group Member, nor any of their respective directors, officers, employees, agents or Affiliates, is a Sanctioned Person. Each Group Member has implemented and maintains in effect policies and procedures designed to ensure compliance by each Group Member and their respective directors, officers, employees, agents, and Affiliates, with applicable Sanctions. Each Group Member and their respective directors, officers, and employees to the extent of their activities in those capacities, and, to the knowledge of each Group Member, their respective agents and Affiliates, to the extent of their activities in those capacities, is in compliance with applicable Sanctions. No Group Member will, directly or, to their knowledge, indirectly, use the proceeds of any credit extensions, or lend, contribute or otherwise make available such proceeds to any Person in any manner that would directly or indirectly result in a violation of applicable Sanctions by any Person.

(aa)    Final Financing Order.

(i)    The Final Financing Order is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the written consent of the Agent and the Co-Collateral Agents.

(ii)    Upon the occurrence of the Termination Date (whether by acceleration or otherwise), the Agent shall, subject to Article VII and the applicable provisions of the Final Financing Order, be entitled to immediate payment of the Obligations and to enforce the remedies provided for under this Agreement and the other Loan Documents in accordance with the terms hereof,

thereof and the Final Financing Order, in each case without further application to or order by the Bankruptcy Court.

(iii)    If the Final Financing Order is the subject of a pending appeal in any respect, none of the Final Financing Order, the extension of credit or the performance by any Loan Party of any of its obligations under this Agreement or any of the other Loan Documents shall be the subject of a presently effective stay pending appeal.  The Debtors, the Agent, the Co-Collateral Agents and the Lenders shall be entitled to rely in good faith upon the Final Financing Order, notwithstanding objection thereto or appeal therefrom by any interested party.  The Debtors, the Agent, the Co-Collateral Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with the Loan Documents notwithstanding any such objection or appeal, unless the Final Financing Order has been stayed by a court of competent jurisdiction.

(bb)    <u>Security Interest</u>. Upon entry of each of the Interim Financing Order and the Final Financing Order, each such Financing Order was or shall be effective to create in favor of the Co-Collateral Agents, for the benefit of the Lenders, a legal, valid enforceable and perfected security interest in the Collateral and proceeds thereof, as and to the extent contemplated by each such Financing Order, as described in this Agreement and the other Loan Documents.

(cc)    <u>Appointment of Trustee or Examiner; Liquidation</u>. No order has been entered in any of the Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (c) to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases.

(dd)    <u>No Other Insolvency Proceeding</u>. None of the Loan Parties is a debtor in any Insolvency Proceeding.

(ee)    <u>Superpriority Claims; Liens</u>. Upon the entry of each of the Interim Financing Order and the Final Financing Order, each such Financing Order and the Loan Documents are sufficient to provide the superpriority claims and security interests and Liens on Collateral of the Loan Parties described in, and with the priority provided in, the Interim DIP Term Sheet and the Loan Documents, as applicable.

(ff)    <u>Non-Subsidiary Guarantor Entities</u>. Since August 4, 2018, no Loan Party has transferred any assets to any Specified Subsidiary other than as reported in filings with the SEC made prior to the Petition Date.

(gg)    <u>Approved Budget</u>. The Borrowers have heretofore furnished to the Agent the Approved Budget and such Approved Budget was prepared in good faith upon assumptions that the Borrowers believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.

(hh)  <u>Reorganization Matters</u>.

(i)  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order. The Debtors have given, on a timely basis as specified in the Interim Financing Order, all notices required to be given to all parties specified in the Interim Financing Order.

(ii)  After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims specified in any provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Carve-Out and the priorities set forth in the Interim Financing Order or Final Financing Order, as applicable.

(iii)  After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, only to the Carve-Out to the extent set forth in the Interim Financing Order and the Final Financing Order and with the lien priority set forth in the Final Financing Order and the DIP Intercreditor Agreement.

(iv)  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or the Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## ARTICLE VI

## <u>COVENANTS</u>

Section 6.01  <u>Affirmative Covenants</u>.  So long as any Advance or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid, any Letter of Credit shall remain outstanding (unless the same has been Cash Collateralized or back-to-back letters of credit from an issuer and on terms

94

acceptable to the Issuing Lenders have been provided in respect of such Letters of Credit) or any Lender shall have any Commitment hereunder, each of Holdings and the Borrowers will, and will cause each of their Subsidiaries to:

(a)    Compliance with Laws, Etc.    (i) Comply in all respects with all applicable Requirements of Law, such compliance to include compliance with ERISA and Environmental Laws (which compliance includes taking any required actions with respect to the release or threatened release of Hazardous Materials), except for such non-compliance as would not reasonably be expected to have a Material Adverse Effect, and (ii) comply in all material respects with the Bankruptcy Code and any order of the Bankruptcy Court.

(b)    Payment of Taxes, Etc.    Pay and discharge before the same shall become delinquent, (i) all Taxes, assessments and governmental charges or levies imposed upon it or upon its property (ii) all payments required to be made to any Pension Plan, and (iii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided that neither Holdings, the Borrowers nor any of their Subsidiaries shall be required to pay or discharge any such Tax, assessment, charge or claim (x) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors, (y) if such non-payments, either individually or in the aggregate, would not be reasonably be expected to have a Material Adverse Effect or (z) for which payment is excused under the Bankruptcy Code.

(c)    Maintenance of Insurance.    (i)  Maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is consistent with prudent business practice; provided that Holdings, the Borrowers and their Subsidiaries may self-insure to the extent consistent with prudent business practice; provided further that policies maintained with respect to any Collateral located at a warehouse or DC shall provide coverage for Inventory at (x) the retail selling price of such Inventory less any permanent markdowns, consistent with the Loan Parties' past practices, or (y) another selling price permitted by the Co-Collateral Agents in their Permitted Discretion.

(ii)   None of the Credit Parties shall be a co-insurer with any Loan Party or any other Person with respect to any fire and extended coverage policies maintained with respect to any Collateral without the prior written consent of the Co-Collateral Agents. Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include a non-contributing lenders' loss payable clause, in form and substance reasonably satisfactory to the Co-Collateral Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Control Co-Collateral Agent, as its interests may appear.

(iii)   Within thirty (30) days following delivery of written notice from the Agent to Holdings, Holdings shall notify the insurers and use commercially reasonable efforts to have such policies amended to include such other provisions as the Co-Collateral Agents may reasonably require from time to

95

time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Co-Collateral Agents as additional insureds, as their interests may appear. Each certificate delivered by the Loan Parties' insurance broker with respect to each property and liability insurance policy referred to in this Section 6.01(c) shall also provide that such policy shall not be canceled, modified or not renewed other than upon not less than ten (10) days' prior written notice thereof by the insurance broker to the Co-Collateral Agents.

(iv) The Borrowers shall deliver to the Co-Collateral Agents, prior to the cancellation, modification or non-renewal of any such policy of insurance, evidence of renewal or replacement of a policy previously delivered to the Co-Collateral Agents, including an insurance binder therefor, together with evidence satisfactory to the Co-Collateral Agents of payment of the premium therefor and, upon request of the Agent, a copy of such renewal or replacement policy. In the event that the Borrowers fail to maintain any such insurance as required pursuant to this Section 6.01(c), the Agent may obtain such insurance on behalf of the Borrowers and the Loan Parties shall reimburse the Agent as provided herein for all costs and expenses in connection therewith; the Agent's obtaining of such insurance shall not be deemed a cure or waiver of any Default or Event of Default arising from the Loan Parties' failure to comply with the provisions of this Section 6.01(c).

(v) The Borrowers shall cause each property insurance policy with respect to any Real Property to be endorsed or otherwise amended to include a "standard" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Co-Collateral Agents; deliver a certificate of insurance with respect to such Real Property to the Co-Collateral Agent; and deliver to the Co-Collateral Agents, prior to or concurrently with the cancellation or nonrenewal of any such policy of insurance covered by this clause (v), a copy of a renewal or replacement (or other evidence of renewal of a policy previously delivered to the Agent) insurance certificate with respect thereto.

(vi) If any building or mobile home on any improved Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "**Special Flood Hazard Area**") with respect to which flood insurance has been made available under the Flood Insurance Laws, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Agent evidence of such compliance in form and substance reasonably acceptable to the Agent.

(d)    Preservation of Corporate Existence, Etc.  Preserve and maintain its corporate existence, material rights (charter and statutory) and franchises unless otherwise consented to by the Agent and the Co-Collateral Agents in their sole and absolute discretion.

1030946.08A-CHISR01A - MSW

(e)    Inspection Rights.  In addition to the Agent's and the Co-Collateral Agents' rights under Section 6.01(k) and Section 8.02(b) hereof, subject to reasonable confidentiality limitations, at any reasonable time and from time to time but not more frequently than once per month (or at any time if an Event of Default has occurred and is continuing), permit the Agent, the Co-Collateral Agents or any Agent Professionals, at the Loan Parties' expense, to (i) visit, enter onto, and inspect any of the Real Property (subject to the rights of tenants under their leases and provided that, except after the occurrence of an Event of Default, such visits and inspections shall not include any intrusive or invasive environmental sampling, testing or investigation); provided such Persons shall use good faith efforts to coordinate such visits and inspections so as to minimize the interference with and disruption to the normal business operations of tenants under their lease, and (ii) examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Holdings, the Borrowers and any of their Subsidiaries, and to discuss the affairs, finances and accounts of Holdings, the Borrowers and any of their Subsidiaries, as the case may be, with any of their officers or directors and with their independent certified public accountants.

(f)    Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Holdings, the Borrowers and each Subsidiary in accordance with GAAP in effect from time to time, and each Loan Party shall promptly furnish to the Agent or any Co-Collateral Agent, such copies of such books and records or extracts therefrom as the Agent or such Co-Collateral Agent, as applicable, may reasonably request, and the Agent, any Co-Collateral Agent or any Agent Professional may use any of such Loan Party's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing, during normal business hours and, if an Event of Default exists or has occurred and is continuing, for the collection of Credit Card Accounts Receivable, Pharmacy Receivables and realization of other Collateral.

(g)    Maintenance of Properties, Etc.  Except as otherwise permitted pursuant to Section 6.02(b), or where the failure to do so, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect, maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(h)    Transactions with Affiliates.  Conduct all transactions otherwise permitted under this Agreement with any of their Affiliates on terms that are fair and reasonable and no less favorable to Holdings, the applicable Borrower or their respective Subsidiaries than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate other than transactions solely between or among the Loan Parties; provided, that the foregoing shall not prohibit (i) any Loan Party or any Subsidiary thereof from entering into employment arrangements with its officers and retention and other agreements with officers and directors pursuant to the reasonable requirements of its business or (ii) any transactions set forth on Schedule 6.01(h) hereto.

(i)    Further Assurances.

(i)    With respect to any Inventory, Credit Card Accounts Receivable, Pharmacy Receivables and other Collateral acquired after the

Effective Date by any Group Member that is or is required to become a Loan Party hereunder, promptly (i) execute and deliver to the Co-Collateral Agents such amendments to the Guarantee and Collateral Agreement or such other documents as the Co-Collateral Agents may reasonably request in order to grant to the Co-Collateral Agents, for the benefit of the Credit Parties, a security interest in such property and (ii) take all actions as the Co-Collateral Agents may reasonably request to grant to the Co-Collateral Agents, for the benefit of the Credit Parties, a perfected security interest in such property with the priority required herein, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Co-Collateral Agents and the delivery of Blocked Account and other control agreements as may be reasonably requested by the Co-Collateral Agents.

(ii)    With respect to any new Domestic Subsidiary which is created or acquired after the Effective Date by any Group Member and which owns any Inventory, Credit Card Accounts Receivable, Pharmacy Receivables and other Collateral, promptly (and in any event within 10 Business Days of the date such Person becomes a Subsidiary) cause such new Domestic Subsidiary to (i) become a party to the Guarantee and Collateral Agreement, (ii) take such actions as the Co-Collateral Agents may reasonably request to grant to the Co-Collateral Agents for the benefit of the Credit Parties a security interest, with the priority and perfection required herein, in the Collateral described in the Guarantee and Collateral Agreement held by such new Domestic Subsidiary, including, to the extent applicable, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Co-Collateral Agents and the delivery of Blocked Account and other control agreements, (iii) if requested by the Co-Collateral Agents, deliver to the Co-Collateral Agents an officer's certificate with respect to such Domestic Subsidiary in form and substance reasonably satisfactory to the Co-Collateral Agents, and (iv) if requested by Co-Collateral Agents, deliver to the Co-Collateral Agents legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Co-Collateral Agents.

(iii)    The Borrowers shall notify the Co-Collateral Agents ten (10) Business Days prior to the opening of any new deposit account in which funds of any of the Loan Parties are concentrated, or the commencement of concentrating funds in an existing deposit account that is not subject to a Blocked Account Agreement, and, if requested by the Co-Collateral Agents, the Borrowers shall deliver or cause to be delivered a Blocked Account Agreement reasonably satisfactory in form and substance to the Co-Collateral Agents upon the opening of, or commencement of concentrating funds in, such account (unless such account is a Utility Deposit Adequate Assurance Account).

(iv)    [Reserved].

98

(v)  With respect to any Real Property upon which the Co-Collateral Agents request a Mortgage (which requests shall be limited such that there will be no more than twenty (20) Mortgages in effect at any time, unless an Event of Default has occurred and is continuing, in which case there shall be no such limit on such requests by the Co-Collateral Agents) within ninety (90) days after such request (but in no event prior to the Borrower receiving confirmation from the Agent that flood insurance due diligence and compliance in accordance with Section 6.01(i)(v)(1) has been completed) or such longer period as may be agreed by the Co-Collateral Agents in their sole and absolute discretion, the Borrower shall, or shall cause the applicable Loan Party to, grant to the Control Co-Collateral Agent a Mortgage on such Real Property, subject to no Liens except Permitted Liens, and record such Mortgage in the land records of the county in which such Real Property is located, and cause each such Loan Party to pay, in full, all mortgage recording taxes, fees and other charges required to be paid in connection with such recording, registration or filing of the Mortgage. Unless otherwise waived by the Co-Collateral Agents or the applicable Lender (solely with respect to clause (i)(v)(2) below), with respect to each such Mortgaged Property, the Borrowers shall cause the following requirements to be satisfied with respect to the applicable Mortgaged Property:

(1)  the Co-Collateral Agents shall have received, with respect to each Mortgaged Property, the Flood Documentation;

(2)  the Co-Collateral Agents shall have received:

(A)  counterparts of each Mortgage to be entered into with respect to each such Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property and suitable for recording, registering or filing (together with any other forms or undertakings that are required or customary to effect such recording, registration or filing) in the land records of the county in which such Mortgaged Property is located; and

(B) with respect to the Mortgage encumbering each such Mortgaged Property, opinions of local counsel regarding the enforceability of such Mortgage and such other matters customarily covered in real estate mortgage counsel opinions as the Agent may reasonably request, if and to the extent, and in such form, as local counsel customarily provides such opinions as to such other matters; and

(3)  the Agent shall have received:

(A)  a policy or policies or marked up unconditional binder of title insurance ("**Title Policy**"), in the amount of the fair market value of the respective Mortgaged

Property, issued by a nationally recognized title insurance company ("**Title Insurer**") insuring the Lien of each Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Liens, and with lien priority as set forth in the Final Financing Order and the DIP Intercreditor Agreement together with such customary endorsements, coinsurance and reinsurance as the Agent may reasonably request and which are available at commercially reasonable rates in the jurisdiction where the applicable Mortgaged Property is located, and

(B) a survey of each Mortgaged Property (including all improvements, easements and other customary matters thereon reasonably required by the Agent), as applicable, for which all necessary fees (where applicable) have been paid, which (A) complies in all material respects with the minimum detail requirements of the American Land Title Association and American Congress of Surveying and Mapping as such requirements are in effect on the date of preparation of such survey and (B) is sufficient for such Title Insurer to remove all standard survey exceptions from the title insurance policy relating to such Mortgaged Property or otherwise reasonably acceptable to the Agent; provided, however, that so long as the Title Insurer shall accept the same to eliminate the standard survey exceptions from such policy or policies, in lieu of a new or revised survey Borrowers may provide a "no material change" affidavit with respect to any prior survey for the respective Mortgaged Property (which prior survey otherwise substantially complies with the foregoing survey requirements) (a "**Survey**").

(j)    Reporting Requirements.  Furnish to the Agent, for delivery to the Lenders:

(i)    as soon as available and in any event within 30 days (or, in the case of a fiscal month that ends on the same day as the end of a fiscal quarter, 45 days) after the end of each fiscal month of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such month and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such month, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I;

(ii)   as soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such quarter and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I (the Borrowers being permitted to satisfy the requirements of clause (ii)(a) by delivery, in the manner provided in Section 9.02(b), of its quarterly report on form 10-Q (or any successor form), as filed with the SEC so long as the financial statements contained therein satisfy the requirement of this clause (ii));

(iii)   as soon as available and in any event within 90 days after the end of each fiscal year of Holdings, (a) a copy of the annual audit report for such year for Holdings and its Subsidiaries, containing the consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its Subsidiaries for such fiscal year, in each case reported on without a "going concern" or like qualification or exception (other than a "going concern" qualification, exception or paragraph of emphasis solely as a result of the Chapter 11 Cases and Debt maturing thereafter), or qualification arising out of the scope of the audit, by its Board-appointed auditor of national standing, (b) a consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for such fiscal year duly certified by an Authorized Officer of Holdings as having been prepared in accordance with GAAP, and (c) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I (the Borrowers being permitted to satisfy the requirements of clause (iii)(a) by delivery, in the manner provided in Section 9.02(b), of its annual report on form 10-K (or any successor form), as filed with the SEC, so long as the financial statements contained therein satisfy the requirement of this clause (iii));

(iv)   as soon as available and in any event by 5:00 p.m. Central Time Thursday of each week (or, if Thursday is not a Business Day, on the next succeeding Business Day), and with a draft being delivered by 5:00 p.m. Central Time on Wednesday of each week, a Borrowing Base Certificate as of the close of business on the immediately preceding Saturday and supporting information satisfactory to the Agent and the Co-Collateral Agents in their Permitted Discretion (including (i) a list of accounts payable to vendors of consigned inventory and of Inventory consisting of Lands' End merchandise and

merchandise in other leased departments, (ii) calculations of Inventory itemizing separately consigned inventory by vendor, in-transit Inventory, Inventory located at Stores to be closed pursuant to Specified Store Closing Sales, Inventory located at non-closing Stores, and Inventory located in warehouse locations, together with back-up information for each in-transit Inventory category and (iii) a breakdown of Stores being closed or proposed to be closed, which information with respect to such Stores shall be limited to pro rata collections of such Stores collected from the point of sale systems during the relevant period which correspond to cash collections described in, and determined in a manner consistent with, the Approved Budget), certified to be complete and correct in all material respects by an Authorized Officer of Holdings;

(v)  not later than the 10th day of every month (or such later day as the Co-Collateral Agents may agree in their Permitted Discretion), an updated inventory appraisal;

(vi)  promptly and in any event within five days after any Authorized Officer of Holdings or any Borrower has knowledge of the occurrence and continuance of a Default or Event of Default, a statement of an Authorized Officer of Holdings or such Borrower setting forth details of such Default or Event of Default and the action that Holdings or such Borrower has taken and proposes to take with respect thereto;

(vii)  promptly after the sending or filing thereof, copies of all quarterly and annual reports and proxy solicitations that Holdings sends to its public security holders generally, and copies of all reports on form 8-K (or its equivalent) and registration statements for the public offering (other than pursuant to employee Plans) of securities that Holdings or any of its Subsidiaries files with the SEC or any national securities exchange;

(viii)  promptly after the commencement thereof, notice of all actions and proceedings before any court, governmental agency or arbitrator affecting Holdings, the Borrowers or any of their Subsidiaries of the type described in Section 5.01(g);

(ix)  as soon as available, but in any event no later than 60 days after the end of each fiscal year of Holdings, forecasts prepared by management of Holdings for Holdings and its domestic Subsidiaries in form satisfactory to the Agent and containing information reasonably required by the Agent;

(x) (A) contemporaneously with the delivery of the reports required pursuant to clauses (ii) and (iii) above, a report (which may take the form of a footnote to Holdings' quarterly and annual reports filed with the SEC and delivered to the Agent) setting forth the estimated Unfunded Pension Liability of Holdings and its Subsidiaries, and (B) promptly after receipt thereof by the Loan Parties, a copy of the funded status report received from the Loan

Parties' actuaries with respect to amounts to be funded under the Loan Parties' Pension Plan;

(xi)  promptly, notice of any event that the Loan Parties reasonably believes has resulted in or could reasonably be expected to result in a Material Adverse Effect;

(xii)  [reserved];

(xiii)  [reserved];

(xiv)  promptly following any request therefor, information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation;

(xv)  promptly, notice of (i) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any Adverse Proceeding not previously disclosed in writing by a Borrower to the Agent, or (ii) any material development in any Adverse Proceeding that would reasonably be expected to have a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

(xvi)  concurrently with the delivery to the Junior DIP Term Loan Agent or the lenders under the Junior DIP Term Loan Agreement, copies of any report or other information required to be delivered thereto pursuant to the terms of the Junior DIP Term Loan Agreement to the extent such report or information is not otherwise required to be delivered to the Agent or Lenders hereunder;

(xvii)  promptly, but in any event no later than five (5) Business Days of such change, notice of any change in the board of directors (or similar governing body) of Holdings, the Borrowers or Sears;

(xviii)  as soon as practicable and, in any event, at least three (3) Business Days or such shorter period as agreed to by the Agent and the Co-Collateral Agents in their sole and absolute discretion in advance of filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Chapter 11 Cases (or the professionals to such committee) or to the U.S. Trustee, as the case may be, copies of all Material Documents, and engage in good faith consultation with the Agent, the Co-Collateral Agents and their respective advisors prior to filing such documents to the extent reasonably possible under the circumstances;

(xix)  as soon as available, copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed

definitive documentation for the sale of any or all of the Loan Parties' assets (other than sales of inventory in the ordinary course of business) or for any investment pursuant to which additional capital is to be received by the Loan Parties;

(xx)  promptly upon request by any Co-Collateral Agent, a status report and updated information relating to any sale permitted under the Loan Documents, in form and substance acceptable to the Co-Collateral Agents in their reasonable discretion;

(xxi)  at least one (1) Business Day prior to the consummation by any Loan Party or any of its Subsidiaries of any Disposition or series of related Dispositions of any Collateral of a type that is included in the Borrowing Base with a value in excess of $7,500,000 in the aggregate (other than inventory in the ordinary course of business and intercompany transfers among Loan Parties), whether pursuant to section 363 of the Bankruptcy Code or otherwise, a roll forward of the Borrowing Base Loan Parties' Eligible Inventory together with an updated Borrowing Base Certificate, in each case giving pro forma effect to such Disposition;

(xxii)  on each Business Day, a certificate of the Borrowers demonstrating compliance with the LTV Provisions; and

(xxiii)  such other information respecting Holdings, the Borrowers or any of their Subsidiaries, or the Borrowing Base, as the Agent, the Co-Collateral or any Lender through the Agent may from time to time request.

Reports and financial statements required to be delivered by the Borrowers pursuant to clauses (ii)(a), (iii)(a) and (vii) of this subsection (j) shall be deemed to have been delivered on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a notice to the Agent and the Lenders and that is accessible by the Lenders without charge.

(k)    Collateral Monitoring and Review.  Upon the request of the Agent, any Co-Collateral Agent, or the Required Lenders, after reasonable notice and during normal business hours, permit the Agent, the Co-Collateral Agents or any Agent Professionals to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) Holdings' and the Borrowers' practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, related to the calculation of the Borrowing Base and (iii) an Real Estate included in the Collateral.  The Borrowers shall pay the reasonable out-of-pocket fees and expenses of the Agent, the Co-Collateral Agents and any Agent Professionals in connection with monthly inventory appraisals,  discretionary real estate appraisals, and three commercial finance examinations each fiscal year (which the Agent and Co-Collateral Agents shall be obligated to undertake for the benefit of the Credit Parties). Notwithstanding the foregoing, the Agent and the Co-Collateral Agents may cause (i) additional appraisals and commercial finance examinations to be undertaken (A) as each in its Permitted

Discretion deems necessary or appropriate, at its own expense, and (B) if required by applicable law or if a Default or an Event of Default has occurred and is continuing, in each case, at the expense of the Borrowers. In connection with any inventory appraisal and commercial finance examination relating to the computation of the Borrowing Base, Holdings shall make such adjustments to the calculation of the Borrowing Base as the Agent shall reasonably require in its Permitted Discretion based upon the terms of this Agreement and the results of such inventory appraisal and commercial finance examination. Any inventory appraisal or commercial finance examination requested by the Agent or any Co-Collateral Agent shall be scheduled at such time as the Co-Collateral Agents, in consultation with the Borrowers, may agree in order to minimize any disruption to the conduct of the Borrowers' business.

(l)     Landlord Waivers, Access Agreements and Customs Broker Agreements.  Upon the request of the Agent or any Co-Collateral Agent, (i) obtain from each lessor that is a Group Member, and use commercially reasonable efforts to obtain from each lessor that is not a Group Member, leasing a DC at which Collateral is located to a Loan Party, consents, approvals, Lien waivers and rights to access and occupy each such DC (including, without limitation, to take possession and dispose of any Collateral from each such DC upon the occurrence and during the continuance of an Event of Default) reasonably satisfactory to the Co-Collateral Agents; (ii) obtain from each Subsidiary of Holdings owning a DC at which Collateral is located, consents, approvals, Lien waivers and rights to access and occupy each such DC (including, without limitation, to take possession and dispose of the Collateral from each such DC upon the occurrence and during the continuance of an Event of Default) reasonably satisfactory to the Co-Collateral Agents; (iii) use commercially reasonable efforts to cause each Loan Party's customs brokers to deliver an agreement (including, without limitation, a Customs Broker Agreement) to the Co-Collateral Agents covering such matters and in such form as the Co-Collateral Agents may reasonably require; and (iv) with respect to any  property or assets subject to the Lien of a third party use commercially reasonable efforts to cause the holder of such Lien to enter into an agreement reasonably satisfactory to the Agent, permitting the Co-Collateral Agents to use such property and assets, at no cost or expense to the Co-Collateral Agents, in connection with the disposition of any of the Collateral by the Co-Collateral Agents during the continuance of an Event of Default.

(m)     Cash Management.

(i)     [Reserved].

(ii)     The Loan Parties shall ACH or wire transfer daily (or with respect to DDAs that have historically not been swept daily (and other DDAs with the consent of the Co-Collateral Agents, not to be unreasonably withheld), periodically, consistent with past practices) (and whether or not there are then any outstanding Obligations) to a Blocked Account all amounts on deposit in each DDA of such Loan Party, other than Excluded Accounts, the Utility Deposit Adequate Assurance Accounts and the Term Loan Proceeds Account; provided that such covenant shall not apply to any minimum balance as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained.  The Loan Parties shall ACH or wire transfer daily to a Blocked Account all payments due from Credit Card Processors and other proceeds of any

of the Collateral except as provided in Section 6.01(n). All swept funds shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent, Co-Collateral Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA or Blocked Account.

(iii)    Upon the request of the Agent, deliver to the Agent copies of credit card notifications (each, a "**Credit Card Notification**") substantially in the form attached hereto as Exhibit E and Third Party Payor Notifications (each, a "**Third Party Payor Notification**") substantially in the form attached hereto as Exhibit H, in each case executed on behalf of such Loan Party and addressed to such Loan Party's Credit Card Processors and Third Party Payors, as applicable, listed in the Perfection Certificate. To the extent that any Loan Party hereafter engages a Credit Card Processor other than the Credit Card Processors listed in the Perfection Certificate, or a Third Party Payor other than the Third Party Payors listed in the Perfection Certificate, such Loan Party shall promptly furnish written notice thereof to the Agent and, upon the request of the Agent, shall deliver to the Agent an executed Credit Card Notification or Third Party Payor Notification, as applicable, with respect to such Credit Card Processor or Third Party Payor. The Agent may deliver such Credit Card Notifications and Third Party Payor Notifications to the applicable Credit Card Processors and Third Party Payors at any time.

(iv)    Each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the Agent's Account, of all cash receipts and collections held in each applicable Blocked Account (net of any minimum balance, not to exceed $25,000 (or such greater amount with the consent of the Co-Collateral Agents, not to be unreasonably withheld), as may be required to be kept in the subject Blocked Account by the Blocked Account Bank), including, without limitation, the following:

(A)    all available cash receipts from the sale of Inventory and other Collateral other than as set forth in Section 6.01(n);

(B)    all proceeds of collections of Pharmacy Receivables and Credit Card Accounts Receivable;

(C)    all proceeds from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of any Collateral other than as set forth in Section 6.01(n); and

(D)    all Net Proceeds from any equity issuance by or capital contribution to any Loan Party or its Subsidiaries.

106

The Borrowers shall be deemed to have complied with the provisions of this clause (iv) if they cause the ACH or wire transfer daily of all funds which an Authorized Representative of the Borrowers in good faith believes to be the amount deposited in the Blocked Accounts in excess of $25,000 (or such greater amount as permitted above in this clause (iv)).

(v)    The Agent's Account shall at all times be under the sole dominion and control of the Co-Collateral Agents.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Agent's Account, (ii) the funds on deposit in the Agent's Account shall at all times be collateral security for all of the Obligations, and (iii) the funds on deposit in the Agent's Account shall be applied as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section 6.01(m), any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Co-Collateral Agents, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Agent's Account or dealt with in such other fashion as such Loan Party may be instructed by the Co-Collateral Agents.  The amounts deposited into the Agent's Account shall be applied to the prepayment of the Advances and other Obligations then outstanding; provided that upon payment in full of such outstanding Advances or Obligations, as applicable, any remaining amounts will be released and transferred to a deposit account of the Loan Parties as the Borrowers shall direct.

(vi)  The Prepetition Unencumbered Assets Proceeds Account shall at all times be under the sole dominion and control of the Control Co-Collateral Agent. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Prepetition Unencumbered Assets Proceeds Account, (ii) the funds on deposit in the Prepetition Unencumbered Assets Proceeds Account shall at all times be collateral security for all of the Obligations, and (iii) so long as the Junior DIP Term Loan Facility is outstanding, the funds on deposit in the Prepetition Unencumbered Assets Proceeds Account shall be applied to the Obligations only after (x) all but a *de minimis* amount of Prepetition ABL Collateral of the type that is eligible to be included in the Borrowing Base has been sold, transferred or otherwise been disposed of and the proceeds thereof applied to the Obligations or (y) all but a *de minimis* amount of Prepetition ABL Collateral of the type that is eligible to be included in the Borrowing Base is otherwise no longer available to be used to apply to and satisfy the Obligations. In the event that, notwithstanding the provisions of Section 6.01(m), any Loan Party receives or otherwise has dominion and control of any proceeds of Prepetition Unencumbered Assets (other than proceeds contained in the Windown Account), such proceeds and collections shall be held in trust by such Loan Party for the Co-Collateral Agents, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Prepetition Unencumbered Assets Proceeds Account

or dealt with in such other fashion as such Loan Party may be instructed by the Co-Collateral Agents.

(vii)   Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(n)   <u>Disposition of Prepetition Unencumbered Assets</u>. (i) Subject to the Financing Orders and the DIP Intercreditor Agreement, the Borrowers shall apply any Net Proceeds of the sale of Prepetition Unencumbered Assets to fund the Winddown Account, <u>provided</u> that if the balance in the Winddown Account is equal to or greater than $200,000,000, the Borrowers shall, to the extent of such excess, deposit such Net Proceeds into the Prepetition Unencumbered Assets Proceeds Account; <u>provided</u>, <u>further</u> that the Loan Parties waive their right to seek to use the funds in the Prepetition Unencumbered Assets Proceeds Account as "cash collateral" as defined in Section 363 of the Bankruptcy Code or otherwise.

(o)   <u>Physical Inventories</u>.  Cause physical inventories and periodic cycle counts to be undertaken, at the expense of the Loan Parties, conducted by such inventory takers and following such methodology as may be satisfactory to the Co-Collateral Agents in their Permitted Discretion.  The Co-Collateral Agents (or their designated Agent Professionals), at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.   The Loan Parties, within five (5) days following the completion of any such inventory, shall provide the Co-Collateral Agents with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(p)   <u>Letters of Credit</u>.  In the event that the Loan Parties request that any Letter of Credit have an expiry after the Termination Date and the Issuing Lenders, in their discretion, issue such Letter of Credit, the Borrowers shall on or before the date that is thirty (30) days prior to the Scheduled Termination Date, Cash Collateralize the L/C Obligations with respect to any such Letter of Credit.

(q)   <u>Post-Effective Date Requirements.</u>  The Borrowers shall, and shall cause each of the applicable Loan Parties to, satisfy the requirements set forth on Schedule 6.01(q) on or before the date specified in such schedule for such requirement or, in each case, on such later date agreed by Agent in its sole and absolute discretion.

(r)   <u>Case Milestones; Go Forward Plan</u>.  Holdings and the Borrowers shall:

(i)  comply with each of the covenants set forth on Schedule 6.01(r)(i) (the "**Case Milestones**") upon the terms and at the times set forth therein; and

(ii)  (A) comply with the Borrowers' Go Forward Plan attached hereto as Schedule 6.01(r)(ii), including the material terms of any

binding agreement for a Specified Sale Transaction or Specified Store Closing Sales or any of the documents or agreements executed in connection therewith in all material respects and (B) consummate each Specified Sale Transaction and or the Specified Store Closing Sale strictly in accordance with the material terms of the documents or agreements executed in connection therewith; in each case in accordance with the applicable timing referred to thereon (or such later dates as approved in writing by the Agent and the Co-Collateral Agents) and subject to documentation (including, without limitation, motions and orders) in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (without any waiver or amendment to such documents or agreements unless consented to in writing by the Agent), in each case, other than as a result of a consummation of a higher or better transaction as contemplated by the applicable bid procedures.

(s)    <u>Debtor Advisors; Cooperation; Status Calls</u>.  (i) The Debtors shall continuously retain during the term of this Agreement (A) a chief restructuring officer (the "**Chief Restructuring Officer**"), (B) a restructuring advisor (the "**Restructuring Advisor**"), and (C) a financial advisor (the "**Financial Advisor**"). The retention of the Financial Advisor, the Restructuring Advisor and the Chief Restructuring Officer shall be on terms and conditions (including as to scope of engagement) satisfactory to the Agent and each Co-Collateral Agent in their sole and absolute discretion. The Agent and each Co-Collateral Agent hereby confirm that (1) Mohsin Y. Meghji is an acceptable Chief Restructuring Officer, (2) M-III Partners, LP is an acceptable Restructuring Advisor, (3) Lazard Freres & Co. LLC is an acceptable Financial Advisor and (4) the terms of each of their engagements as filed with the Bankruptcy Court prior to the date hereof are acceptable. In addition, in connection with the closure of any additional Stores referred to in clause (c) of the definition of "Specified Store Closing Sale" the Debtors shall retain, on a competitive basis, subject to their fiduciary duty to the bankruptcy estate to maximize value, an independent, nationally recognized, professional retail inventory liquidation firm that provides full liquidation services acceptable to the Agent and the Co-Collateral Agents in their Permitted Discretion (the "**Liquidation Agent**"; the Liquidation Agent, together with the Financial Advisor, the Restructuring Advisor and the Chief Restructuring Officer, each a "**Debtor Advisor**" and collectively, the "**Debtor Advisors**").  If any Debtor Advisor in any of the above roles ceases to be retained, the Debtors will retain a new Debtor Advisor in such role, which new Debtor Advisor (other than the Liquidation Agent) shall be satisfactory to the Co-Collateral Agents in their sole and absolute discretion and, in the case of the Liquidation Agent, satisfactory to the Co-Collateral Agents in their Permitted Discretion, within 5 Business Days (which period may be extended with the approval of the Agent and the Co-Collateral Agents in their sole and absolute discretion) of such cessation.  The Debtors shall provide the Agent and the Co-Collateral Agents and their respective advisors with reasonable access to the Debtor Advisors.

(ii)    The Loan Parties shall fully cooperate with the Debtor Advisors, including, without limitation, in connection with the preparation of the Approved Budget and other reporting or information required to be delivered pursuant to this Agreement, and shall grant them full and complete access to the books and records of the Loan Parties.  The Loan Parties hereby (i) authorize the Agent and each Co-Collateral Agent (or their respective agents or

advisors, including any Agent Professionals) to communicate directly with the Debtor Advisors regarding any and all matters related to the Debtors and their Affiliates, including all financial reports and projections developed, reviewed or verified by any Debtor Advisor, Store closing information and all additional information, reports and statements reasonably requested by the Agent or any Co-Collateral Agent, and (ii) authorize and direct each Debtor Advisor to provide the Agent and each Co-Collateral Agent (or their respective agents or advisors, including any Agent Professionals) with copies of reports and other information or materials prepared or reviewed by such Debtor Advisor as the Agent or any Co-Collateral Agent may reasonably request.

(iii) The Borrowers shall arrange for weekly (unless waived by the Co-Collateral Agents in their sole and absolute discretion) status calls with the Agent, each Co-Collateral Agent and any Agent Professionals, and shall cause the Debtor Advisors (or other appropriate agents or advisors to the Loan Parties) to participate, together with financial officers of the Loan Parties, to discuss (A) the Approved Budget or the Budget Variance Reports and/or any other reports or information delivered pursuant to clause (j) above or Section 6.03 hereof or otherwise, (B) the financial operations and performance of the Loan Parties' business, (C) the status of landlord negotiations, (D) the status of any Specified Store Closing Sales, (E) the status of the Chapter 11 Cases generally, (F) progress in achieving compliance with the Case Milestones and the Go Forward Plan or (G) such other matters relating to the Debtors as the Agent or any Co-Collateral Agent (or their respective agents or advisors, including any Agent Professionals) shall reasonably request.

(t)     Leases.

(i) Make all payments and otherwise perform all obligations, in all material respects, other than to the extent permitted by the Bankruptcy Code, in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party and otherwise in accordance with the Approved Budget, (ii) keep all Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, and (iii) promptly notify the Co-Collateral Agents of any material default by any party with respect to any Leases and cooperate with the Co-Collateral Agent in all respects to cure any such default, except, in each case, with respect to Leases relating to Store locations subject to Specified Store Closing Sales after the date of the effectiveness of the rejection of the applicable Leases.

(ii) Other than with respect to Leases relating to any Specified Store Closing Sale, consult with the Agent and Co-Collateral Agents regarding any plans to assume or reject Leases.

(u)     Certain Other Bankruptcy Matters.

110

(i)   Holdings, the Borrowers and their Subsidiaries shall comply (i) in all respects, after entry thereof, with all of the requirements and obligations set forth in the Financing Orders, the Cash Management Order and the Employee Wage Order, and each order of the Bankruptcy Court, as each such order may be amended with the consent of the Agent and the Co-Collateral Agents , and (ii) all other obligations and responsibilities as debtors-in-possession under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

(ii)   Holdings and the Borrowers shall provide as soon as reasonably practicable but in any event no later than three (3) Business Days' (or such shorter notice acceptable to the Agent and the Co-Collateral Agents in their sole and absolute discretion) prior written notice to the Agent and its advisors prior to filing any motion or notice to assume or reject any of Holdings', any Borrower's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or DIP Superpriority Claims) if the Agent informs Holdings and the Borrowers in writing within two (2) Business Days of receipt of the notice from Holdings and the Borrowers referenced above that it objects to such assumption or rejection, as applicable.

(iii)   Holdings, the Borrowers and each of the Subsidiaries hereby irrevocably waive any right, pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the DIP Superpriority Claims, other than as expressly set forth in a Financing Order.

(iv)   Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the automatic stay on Collateral with a fair market value in excess of $1,000,000 (other than motions filed by the Agent relating to the DIP ABL Facility or by the Prepetition ABL Agent relating to the Prepetition First Lien ABL Credit Agreement or by the Junior DIP Term Loan Agent relating to the Junior DIP Term Loan), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a chapter 11 plan, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Agent or any Lender or any Collateral.

(v)   Any and all Material Documents filed by the Debtors in the Chapter 11 Cases shall be in form and substance satisfactory to the Agent.

(v)   Certain Sanctions and AML Matters.

111

(i)  Each Group Member will use the proceeds of the Advances and Term Loan only for the purposes described in <u>Section 2.17</u>, and ensure that no proceeds of the Advances and Term Loan will be advanced or otherwise made available, directly or indirectly, by any Group Member (i) for the purposes of funding any activity, business, or transaction with a Sanctioned Person or in a Sanctioned Country, except as authorized by applicable Sanctions, or (ii) that would result in the violation of applicable Sanctions or AML Laws.

(ii)  Each Group Member will (a) maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by each Group Member and each of their respective directors, officers, employees, and agents with applicable Sanctions and AML Laws, and (b) conducts the business of such Group Member in compliance with applicable Sanctions and AML Laws.

Section 6.02   <u>Negative Covenants</u>.  So long as any Advance or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid, any Letter of Credit shall remain outstanding (unless the same has been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lender have been provided in respect of such Letters of Credit) or any Lender shall have any Commitment hereunder, each of Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to:

(a)  <u>Liens, Etc</u>.  Create or suffer to exist any Lien upon property of Holdings, the Borrowers or any Domestic Subsidiary other than Permitted Liens.

(b)  <u>Fundamental Changes</u>.  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that any Subsidiary of Holdings may sell, transfer, lease or otherwise dispose of its assets pursuant to a Specified Store Closing Sale or a Specified Sale Transaction; <u>provided</u> that at least three (3) Business Days prior to the occurrence thereof, the Borrowers shall furnish to the Co-Collateral Agents an updated Borrowing Base Certificate to the extent required pursuant to <u>Section 6.01(j)(xxi)</u>.

(c)  <u>Acquisitions</u>.  Make any Acquisition.

(d)  <u>Restricted Payments</u>.  Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that, if at the time thereof no Event of Default shall exist and be continuing, Subsidiaries of Holdings may declare and pay dividends to Holdings, the Borrowers or any Subsidiary Guarantor.

(e)  <u>Negative Pledge Clauses</u>.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Holdings or any Subsidiary of Holdings to create, incur, assume or suffer to exist any Lien in favor of the Co-Collateral Agents upon the Collateral (as defined in the Guarantee and Collateral Agreement and other Security

112

Documents in effect from time to time, and including assets which become Collateral pursuant to Section 6.01(n)), whether now owned or hereafter acquired.

(f)    Clauses Restricting Subsidiary Distributions.   Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of Holdings to (a) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Debt owed to, Holdings or any other Subsidiary of Holdings, (b) make loans or advances to, or other investments in, Holdings or any other Subsidiary of Holdings, (c) transfer any of its assets to Holdings or any other Subsidiary of Holdings or (d) grant Liens upon any of its properties or assets, whether now owned or hereafter acquired, and allow for the pledge of its capital stock to secure the Obligations; except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under this Agreement and the other Loan Documents; (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or any portion of the Equity Interests or assets of such Subsidiary; (iii) the provisions contained in any agreement governing Postpetition Debt existing as of the date of this Agreement; (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or a Subsidiary of any Borrower entered into in the ordinary course of business, (v) customary restrictions and conditions contained in the documents relating to any Lien, so long as such Lien is not prohibited hereunder and such restrictions or conditions relate only to the specific asset subject to such Lien; (vi) customary provisions restricting assignment of any contract entered into by any Borrower or any Subsidiary of any Borrower in the ordinary course of business, (vii) customary provisions restricting the assignment of licensing agreements, management agreements or franchise agreements entered into by any Borrower or any of its Subsidiaries in the ordinary course of business; (viii) restrictions on the transfer of assets securing purchase money obligations and capitalized lease obligations; (ix) customary net worth provisions contained in real property leases entered into by Subsidiaries of any Borrower, so long as the applicable Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations, (x) restrictions in respect of the Intellectual Property held by KCD IP, LLC and any proceeds of the foregoing, and (xi) such other restrictions as the Co-Collateral Agents may agree in their sole and absolute discretion.

(g)    Accounting Changes.   Make or permit any change in accounting policies or reporting practices, except as required by GAAP.

(h)    [Reserved].

(i)    Dispositions.

(i)    Make any Disposition except Permitted Dispositions.

(ii)    Make any Permitted Dispositions pursuant to the De Minimis Asset Sale Order which result in aggregate sale proceeds in excess of $7,500,000 without the prior written consent of the Co-Collateral Agents in their sole and absolute discretion (it being understood that this clause (ii) shall not have the effect of waiving any condition, restriction or qualification to the ability of

Holdings, the Borrowers or any of their Subsidiaries to make any Disposition set forth in the definition of "Permitted Dispositions" or the defined terms used therein).

(j)    Debt; Prepayment of Debt.

(i)    Create, incur, assume, suffer to exist or otherwise become or remain liable with respect to any Debt, except Permitted Debt.

(ii)    Purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Debt (other than any prepayment of the Obligations, which prepayment shall be governed by Section 2.11, and other than any prepayment by any Specified Subsidiary or any Subsidiary that is not a Domestic Subsidiary of any Debt of a Specified Subsidiary or any Subsidiary that is not a Domestic Subsidiary; provided that such prepayment is not made with the proceeds of any Investments made by any Loan Party in such Specified Subsidiary or such Subsidiary that is not a Domestic Subsidiary) prior to its scheduled maturity.

(k)    Investments.  Make any Investments, except Permitted Investments.

(l)    [Reserved].

(m)    Amendments to Certain Documents. (a) Amend or modify, or grant any waiver or release under or terminate in any manner, the articles or certificate of incorporation or formation, by laws, limited liability company operating agreement, partnership agreement or other organizational documents of such Loan Party or Subsidiary (other than any Specified Subsidiary, so long as the Loan Parties provide prior written notice of such amendment, modification, waiver, release or termination with respect to any organizational document of any Specified Subsidiary); (b) amend or modify, or permit the amendment or modification of, any provision of the Prepetition First Lien ABL Credit Agreement, the Prepetition Second Lien Facilities or any agreement, document or instrument evidencing or relating thereto, except to the extent expressly permitted by any Financing Order then in effect or (c) amend, modify or waive any provision of the Junior DIP Term Loan Documents unless as agreed by the Required Lenders.

(n)    LTV Provisions.

(i)    Maximum Loan to Value Ratio (Prepetition ABL Term/Revolver). Permit at any time (v) the Prepetition Revolver/Term Exposure plus (w) Total Extensions of Credit plus (x) the Availability Reserves plus (y) the Borrowing Base Carve-Out Reserve plus (z) the Prepetition FILO Reserve, in each case at such time, to exceed 87.5% of the LTV Formula Amount at such time.

(ii)    Maximum Loan to Value Ratio (Total Prepetition ABL) Ratio. Permit at any time (v) the Prepetition Total Extensions of Credit plus (w) Total Extensions of Credit plus (x) the Availability Reserves plus (y) the

114

Borrowing Base Carve-Out Reserve plus (z) the Prepetition FILO Reserve, in each case at such time, to exceed 97.5% of the LTV Formula Amount at such time.

(o)    Financing Orders. Notwithstanding anything to the contrary herein, use any portion or proceeds of the Extensions of Credit or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of paragraph 39 *(Prohibited Use of DIP ABL Facility, DIP ABL Collateral, Cash Collateral, Carve-Out, etc.)* of the Interim Financing Order or paragraph 40 *(Prohibited Use of DIP ABL Facility, DIP ABL Collateral, Cash Collateral, Carve-Out, etc.)* of the Final Financing Order.

(p)    Reclamation Claims. Enter into any agreement to return any of its Inventory to any of its creditors for application against any Prepetition Debt, Prepetition trade payables or other Prepetition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Debt, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Prepetition Debt, Prepetition trade payables and other Prepetition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $7,500,000.

(q)    Insolvency Proceeding Claims. Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Agent or the Lenders against the Debtors, except as set forth in the applicable Financing Order.

(r)    Bankruptcy Actions. Seek, consent to, or permit to exist, without the prior written consent of the Agent and the Co-Collateral Agents, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Financing Orders or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Financing Orders or any of the other Loan Documents.

(s)    Sanctions-Compliant Repayment of Obligations.  Use, directly or, to Borrowers' knowledge, indirectly, any funds or assets derived from or used in any activity, business, or transaction with a Sanctioned Person, in a Sanctioned Country, except as authorized by applicable Sanctions, or that otherwise violates applicable Sanctions, to repay or discharge any obligated under this Agreement.

Section 6.03    Approved Budget.

(a)    The use of Extensions of Credit by the Loan Parties under this Agreement and the other Loan Documents and the use of cash collateral shall be limited in accordance with the Approved Budget (subject to the Permitted Variance) and Section 2.17. The Approved Budget shall depict, on a weekly and line item basis, (i) (A) projected cash receipts (including from asset sales), (B) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtor's professionals and advisors), and any other fees and expenses relating to the Loan Documents), (C) projected

Net Cash Flow, (D) projected inventory receipts and levels, and (E) the projected Borrowing Base and Excess Availability, (ii) a report listing the Stores subject to Specified Store Closing Sales and the other remaining Stores, and (iii) such other information requested by the Agent or any Co-Collateral Agent for the first thirteen (13) week period from the Effective Date, and such Approved Budget shall be approved by, and in form and substance satisfactory to, the Agent and the Co-Collateral Agents in their sole discretion (it being acknowledged and agreed that the Approved Budget attached hereto as <u>Exhibit J</u> is approved by and satisfactory to the Agent and each Co-Collateral Agent).  The Approved Budget shall be updated, modified or supplemented by the Borrowers (x) with the written consent of the Agent and each Co-Collateral Agent in their sole and absolute discretion and (y) upon the request of Agent or any Co-Collateral Agent from time to time (which request may, without limitation, be made in connection with any Specified Transaction or the commencement, or during the continuation, of the Specified Stores Closing Sales); <u>provided</u>, <u>however</u>, that in the event the Agent, the Co-Collateral Agents and the Loan Parties cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect, with weekly details for any periods after the initial 13-period to be derived in a manner reasonably satisfactory to the Agent and the Co-Collateral Agents from the monthly budget prepared by the Loan Parties (and approved by the Agent and the Co-Collateral Agents in their sole discretion prior to the Effective Date) for the Chapter 11 Cases, and such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated.  Each Approved Budget delivered to the Agent and the Co-Collateral Agents shall be accompanied by such supporting documentation as reasonably requested by the Agent or any Co-Collateral Agent.  Each Approved Budget shall be prepared in good faith, with due care and based upon assumptions which the Loan Parties believe to be reasonable.

(b)    The Borrowers shall comply with the Approved Budget (subject to the Permitted Variance), which compliance shall be tested on the Saturday of every second week (each, a "**Budget Testing Date**") commencing on November 24, 2018 for the Cumulative Four-Week Period then ending pursuant to the Budget Variance Report delivered by the Borrowers to the Administrative Agents and the Co-Collateral Agents.

(c)    The Borrowers shall deliver to the Agent and the Co-Collateral Agents, not later than 5:00 p.m. on the Wednesday of each week (commencing with the first Wednesday following the Effective Date) a Budget Certificate, and such Budget Certificate shall include such detail as is reasonably satisfactory to the Agent and the Co-Collateral Agents, signed by an Authorized Officer of the Holdings and, in the case of certificates delivered on a Wednesday following a Budget Testing Date, certifying that the Loan Parties are in compliance with the covenant contained in <u>Section 6.03(b)</u>, together with (A) a Rolling Budget, (B) a Weekly Flash Reporting Package and (C) a Budget Variance Report, each of which shall be prepared by the Borrower through the last day of the Prior Week and the Cumulative Four Week Period.

(d)    The Agent, the Co-Collateral Agents and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other

116

amounts to the Agent, the Co-Collateral Agents and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Financing Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01    Events of Default.  If any of the following events ("**Events of Default**") shall occur and be continuing:

(a)    Any Borrower shall fail to pay (i) any principal of any Advance, Term Loan or Reimbursement Obligation when the same becomes due and payable, or (ii) any interest on any Advance, Term Loan or Reimbursement Obligation or any fees, or (iii) any other amounts payable under this Agreement or any other Loan Document, in each case under this clause (iii), within three (3) days after the same becomes due and payable; or

(b)    Any representation or warranty made by any Loan Party herein or in any other Loan Document or in any other written statement furnished in connection with to this Agreement or any other Loan Document or the transactions contemplated thereby shall prove to have been incorrect in any material respect when made or deemed made; or

(c)    (i)    Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01(c), (d), (e), (h), (j), (k), (m), (p), (r), (s) or (u), 6.02, or 6.03 of this Agreement, (ii) any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01(n) and such failure continues for more than one Business Day or (iii) any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, if such failure shall remain unremedied for thirty (30) days; or

(d)    Any Loan Party shall fail to pay any principal amount on any postpetition or unstayed Debt in an aggregate principal amount in excess of $25,000,000 that is outstanding (but excluding Debt outstanding hereunder) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to such postpetition or unstayed Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the "agent," "trustee" or other representative or required percentage of holders thereof to accelerate, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid or redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made and is accepted (in each case other than (i) a

117

scheduled prepayment, redemption or purchase, or (ii) a mandatory prepayment, redemption or purchase, or a required offer to prepay, redeem or purchase, that results from the voluntary sale or transfer of property or assets, unless such prepayment, redemption or purchase is not made on the date such prepayment, redemption or purchase is due), in each case prior to the stated maturity thereof; or there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from any event of default under such Swap Contract as to which any Loan Party is the Defaulting Party (as defined in such Swap Contract) and the Swap Termination Value owed by such Loan Party as a result thereof is greater than $25,000,000; or

(e)    A judgment or order for the payment of money (excluding any "first day" or "second day" orders or any order fixing the amount of any claim in the Chapter 11 Cases, in each case to the extent such orders are in form and substance acceptable to the Agent in its sole and absolute discretion) in excess of $25,000,000 (net of any portion of such judgment to be paid by a third-party insurer as to which coverage has not been disputed) shall be rendered after the Petition Date against any Group Member, which order or judgment is not automatically stayed or stayed pursuant to an order of the Bankruptcy Court, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(f)    (i) Any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "**option right**"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 35% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right) and such "person" or "group" shall beneficially own (as such term is used herein) a greater percentage of the equity Securities of Holdings entitled to vote for members of the Board of Directors than the Permitted Holders shall, collectively, beneficially own; or (ii) during any period of 12 consecutive months, a majority of the members of the Board of Directors or other equivalent governing body of Holdings cease to be composed of individuals (x) who were members of that board or equivalent governing body on the first day of such period, (y) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (x) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (z) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (x) and (y) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (iii) Holdings shall cease for any reason to own, directly or indirectly, 100% of the Voting Stock of Sears and Kmart; or

(g)    (i) Any Borrower or any of its ERISA Affiliates shall incur, or shall be reasonably likely to incur administrative expense claims in excess of $25,000,000 in the

aggregate (subject to Section 7.01(p)) as a result of one or more of the following:  (a) the occurrence of any ERISA Event; (b) the partial or complete withdrawal of such Borrower or any of its ERISA Affiliates from a Multiemployer Plan; or (c) the termination of a Multiemployer Plan; or (ii) the PBGC shall have obtained a valid and perfected Lien on assets of any of the Loan Parties; or

(h)    Any of the Loan Documents or Prepetition Loan Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate thereof shall so state in writing, or any Lien created by any of the Security Documents or Prepetition Loan Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby, including as a result of the failure to comply with Section 5.4 of the Guarantee and Collateral Agreement or Section 5.4 of the Prepetition Guarantee and Collateral Agreement; or

(i)    The guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so state in writing; or

(j)    The entry of an order dismissing any of the Chapter 11 Cases of any Loan Party or converting any of the Chapter 11 Cases of any Loan Party to a case under chapter 7 of the Bankruptcy Code, or any filing by a Loan Party or an affiliate thereof of a motion or other pleading seeking entry of such an order; or

(k)    A trustee, responsible officer or an examiner having powers related to the operation of the business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Chapter 11 Cases, a Debtor applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Administrative Agent and the Co-Collateral Agents in their sole and absolute discretion; or

(l)    The entry of an order (I) staying, reversing or vacating (a) the Interim Financing Order, (b) the Final Financing Order, (c) the Cash Management Order, (d) the Employee Expense Order or (e) the Junior DIP Financing Orders, (II) modifying or amending (a) – (c) or (e) other than in form and substance satisfactory to the Administrative Agent and the Co-Collateral Agents in their sole and absolute discretion, or (III) modifying or amending (d) in a manner adverse to the Administrative Agent, the Co-Collateral Agents or the other Credit Parties; or the filing by a Debtor of an application, motion or other pleading seeking entry of any order of the types described in clauses (I)-(III) without the prior written consent of the Administrative Agent and the Co-Collateral Agents in their sole and absolute discretion; or

(m)    The entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Loan Parties; or

(n)    The entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the Automatic Stay) so as to allow a

third party to proceed with foreclosure against any assets of the Loan Parties in excess of $25,000,000; or

(o)    The entry of an order in the Chapter 11 Cases charging any of the Collateral or Prepetition ABL Collateral under Section 506(c) of the Bankruptcy Code against the Credit Parties or the Prepetition Credit Parties or the commencement of other actions by any Loan Party or any affiliate thereof that challenges the rights and remedies of any of the Credit Parties hereunder or under any of the other Loan Documents or any of the Prepetition Credit Parties under the Prepetition First Lien ABL Credit Agreement or any of the Loan Documents (as defined in the Prepetition First Lien ABL Credit Agreement) in any of the Chapter 11 Cases or in a manner inconsistent with the Loan Documents; or

(p)    Without the prior written consent of the Agent and other than in respect of the DIP ABL Facility and the Carve-Out or as permitted pursuant to the Loan Documents, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (v) granting superpriority administrative expense status to any claim pari passu with or senior to the claims of the Credit Parties hereunder and under the other Loan Documents, (w) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (x) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (y) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (z) authorizing the Debtors to take other actions adverse to any Credit Party or any Prepetition Credit Party or their rights and remedies under the Loan Documents, the Prepetition First Lien ABL Credit Agreement or their interest in Prepetition ABL Collateral or the Collateral under Section 364 of the Bankruptcy Code; or

(q)    The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization without the prior written consent of the Administrative Agent and Co-Collateral Agents in their sole and absolute discretion; or

(r)    There shall arise any superpriority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the DIP Superpriority Claims, except with respect to the Carve-Out and as set forth in the Financing Orders; or

(s)    The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's prepetition creditors, contrary to the terms and conditions of any Financing Order or the Loan Documents; or

(t)    The making of any payments in respect of prepetition obligations other than (i) as permitted by the Interim Financing Order and the Final Financing Order, (ii) as permitted by the Cash Management Order or any other substantive order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, (iii) as permitted by any administrative "first day order," "second day order" or other administrative order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Administrative

Agent and Co-Collateral Agents in their sole and absolute discretion, or (iv) as otherwise agreed to in writing by the Administrative Agent and Co-Collateral Agents; or

(u)    Other than with respect to the Carve-Out, the Liens securing the DIP ABL Facility and other than as provided in the Financing Orders, the Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any claim or lien which is pari passu with or senior to any Liens securing the "Obligations" under the Prepetition First Lien ABL Credit Agreement, or the Adequate Protection Liens and adequate protection obligations granted under the Financing Orders; or

(v)    Noncompliance by any Loan Party or any of its affiliates with the terms of the Interim Financing Order, the Final Financing Order, the Cash Management Order or the Employee Wage Order in any material respect or in a manner adverse to the Credit Parties; or

(w)    The Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, acquiesce to, or otherwise participate as an adverse party in any suit or other proceeding against the Agent, any Co-Collateral Agent or any of the Lenders regarding the DIP ABL Facility or the Prepetition Credit Parties regarding the Prepetition Facilities; or

(x)    The Debtors, any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to contest in good faith the filing or confirmation of a chapter 11 plan that is not an Acceptable Plan of Reorganization or the entry of a confirmation order approving such plan; or

(y)    Any order shall be entered which dismisses any of the Chapter 11 Cases and which order (i) does not provide for termination of the unused commitments under the DIP ABL Facility and payment in full in cash of the Loan Parties' obligations under the DIP ABL Facility, (ii) does not provide for release and exculpatory provisions relating to the Agent, the Co-Collateral Agents, the Joint Lead Arrangers and the Lenders that are satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion and (iii) is not otherwise satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents), shall file, propose, support, or fail to contest in good faith the filing of a the filing of a motion or other pleading seeking to dismiss any of the Chapter 11 Cases not in accordance with this provision (y); or

(z)    The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors or its subsidiaries, other than pursuant to any Specified Sale Transaction or the Specified Store Closing Sales, unless such order contemplates repayment in full in cash of the DIP ABL Facility and the Prepetition Facilities upon consummation of the sale; or

(aa)    The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP ABL Facility, the Loan Documents, any Prepetition Facility or the Prepetition First Lien ABL Credit

Agreement or related documents, or the taking of any action by any Loan Party to challenge, support or encourage a challenge of any such payments; or

(bb)    The Final Financing Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the Collateral; or

(cc)    If the Final Financing Order does not include a waiver, in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, of (A) the right to surcharge the Prepetition ABL Collateral and/or the Collateral under Section 506(c) of the Bankruptcy Code, (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition ABL Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Loan Party after the Petition Date and (C) the doctrine of marshaling; or

(dd)    An order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral or Prepetition ABL Collateral under Section 506(c) of the Bankruptcy Code against the Agent, the Credit Parties, the Prepetition ABL Agent or the Prepetition Credit Parties, or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition ABL Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Loan Party after the Petition Date,

(ee)    The commencement by any Debtor or any Loan Party of other actions that are materially adverse to Agent, the Credit Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(ff)    The filing or support of any pleading by any Loan Party (or any affiliate thereof) seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default.

Section 7.02    <u>Remedies.</u> Upon the occurrence of any Event of Default, in each case without further order or application of the Bankruptcy Court, the Agent may, on behalf of the Lenders, or, at the direction of the Required Lenders shall, take any or all of the following actions:

(a)    declare the Revolving Commitment of each Revolving Lender to be terminated, whereupon the same shall forthwith terminate <u>provided</u> that upon the occurrence of any Event of Default described in <u>clauses (j) – (ff)</u> of <u>Section 7.01</u>, the Revolving Commitments shall automatically terminate; <u>provided</u> that such termination shall be deemed rescinded to the extent it is determined by the Bankruptcy Court during the Remedies Notice Period that no Event of Default has occurred and is continuing;

(b)    declare the Advances, the Term Loan, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents (including all amounts of the L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be forthwith due and payable, whereupon the Advances, the Term Loan, all such interest and all such amounts shall

122

become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; provided that upon the occurrence of any Event of Default described in clauses (j) – (ff) of Section 7.01, all such amounts and interest shall automatically become due and payable, without presentment, demand protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers. With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph or for which the outstanding amount of any drawing under any Letters of Credit (including any Taxes, fees, charges and other costs and expenses incurred by the Issuing Lender in connection therewith) have not then been fully reimbursed or discharged, the Borrowers shall Cash Collateralize such Letters of Credit and all other Reimbursement Obligations;

(c)    declare interest on the Obligations to accrue at the default rate set forth herein, whereupon the interest on the Obligations shall automatically accrue at the default rate;

(d)    subject to the Remedies Notice Period, (i) enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral and complete processing, manufacturing and repair of all or any portion of the Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (iii) remove any Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding Obligations (including any accrued interest) in any sale of the Collateral (or any part thereof), which credit bid may incorporate a credit bid of the Prepetition ABL Facilities (including any accrued interest), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise;

(e)    take whatever other commercially reasonable action the Agent or the Required Lenders may deem necessary or desirable for the protection of the interests of the Credit Parties (including, subject to the Remedies Notice Period, in respect of the Collateral);

(f)    exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP ABL Facility, this Agreement, the other Loan Documents, the Financing Orders or applicable law (including, subject to the Remedies Notice Period, in respect of the Collateral);

(g)    declare the termination of the Loan Documents as to any future liability or obligation of the Agent, the Co-Collateral Agents, the Issuing Lenders and the Lenders, but without affecting any of the Collateral or the liabilities or obligations of any Loan Party;

(h)    declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral; and/or

1030946.08A-CHISR01A - MSW

(i)    subject to the Remedies Notice Period, with respect to any Event of Default arising out of the failure of the Loan Parties to complete any material step in the Go Forward Stores Sale Process, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code).

All rights, remedies and powers granted to the Agent or Co-Collateral Agents hereunder and under the Loan Documents or Financing Orders, as applicable, are cumulative, not exclusive and enforceable, in the Agent's or such Co-Collateral Agent's discretion, alternatively, successively, or concurrently.

Section 7.03    Application of Proceeds.

If an Event of Default shall have occurred and be continuing and the Obligations shall have been accelerated, except as otherwise agreed by all Lenders, the Agent shall apply, subject to the DIP Intercreditor Agreement, all or any part of Proceeds constituting Collateral, whether or not held in the Agent's Account, and any proceeds of the guarantee set forth in Guarantee and Collateral Agreement, in payment of the Obligations in the following order:

*First*, to pay all incurred and unpaid fees, expenses, including Extraordinary Expenses, indemnities, and other amounts (including and fees, charges and disbursements of counsel to the Agent and the Co-Collateral Agents) payable to the Agent and the Co-Collateral Agents (each in its capacity as such) under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Second*, to pay all incurred and unpaid expenses, indemnities, and other amounts (other than principal, interest and fees, and Obligations relating to Cash Management Services and Bank Products) payable to the Lenders, the Swingline Lender and the Issuing Lenders (including fees, charges and disbursements of counsel to the respective Lenders, the Swingline Lender and the Issuing Lenders), under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Third*, to pay all accrued and unpaid interest on all Permitted Overadvances, to the Agent or pro rata among the Lenders, as applicable, according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Fourth*, to pay all the unpaid principal on all Permitted Overadvances, to the Agent or pro rata among the Lenders, as applicable, according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Fifth*, to pay all accrued and unpaid interest on the Swingline Advances (to the extent that Swingline Advances have not been refinanced by a Revolving Advance);

*Sixth*, to pay all the unpaid principal of the Swingline Advances (to the extent that Swingline Advances have not been refinanced by a Revolving Advance);

124

*Seventh*, to pay all accrued and unpaid interest on all Advances, Reimbursement Obligations and the Term Loan, and fees, payable to the Lenders and the Issuing Lenders under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Eighth*, to pay all the unpaid principal on all Advances and the Term Loan and to pay Reimbursement Obligations and to Cash Collateralize all other L/C Obligations, pro rata among the Lenders according to the amounts of such Obligations then due and owing and remaining unpaid to the Lenders;

*Ninth*, to pay all other amounts then due and owing and remaining unpaid in respect of the Obligations (other than Obligations relating to Cash Management Services and Bank Products), pro rata among the Lenders according to the amounts of the Obligations (other than Obligations relating to Cash Management Services and Bank Products) then due and owing and remaining unpaid to the Lenders;

*Tenth*, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Cash Management Services and the prepayment, settlement and termination of Cash Management Services, pro rata among the applicable Lenders and Affiliates thereof according to the amounts then due and owing and remaining unpaid in respect of Cash Management Services;

*Eleventh*, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Bank Products, pro rata among the applicable Lenders and Affiliates thereof according to the amounts that would become due and owing upon the prepayment, settlement and termination of such Bank Products;

*Twelfth*, any balance remaining after the Obligations shall have been paid in full, no Letters of Credit shall be outstanding (unless the same has been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lender have been provided in respect of such Letters of Credit) and the Commitments shall have terminated, shall be paid over to the Borrowers or to whomsoever may be lawfully entitled to receive the same.

Section 7.04    <u>Lift of Automatic Stay.</u> Subject to the Order and the terms thereof, if any Event of Default then exists, the Automatic Stay shall be modified or vacated to permit the Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without notice, application or motion, hearing before, or order of the Bankruptcy Court.

Section 7.05    <u>License; Cooperation.</u> The Agent and the Co-Collateral Agents are hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property owned by any Loan Party, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral in each case after the occurrence, and solely during the continuance, of an Event of Default.  To the extent the Loan

Parties may lawfully do so, the Agent and the Co-Collateral Agents (together with their respective agents, representatives and designees) are hereby granted a non-exclusive right to have access to, and a rent-free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and Store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that the Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral). Upon the occurrence and the continuance of an Event of Default and the exercise by the Agent, either Co-Collateral Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, the Loan Parties shall assist the Agent, the Co-Collateral Agents and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Agent.

## ARTICLE VIII

## THE AGENT AND CO-COLLATERAL AGENTS

Section 8.01    Appointment.  Each Lender hereby irrevocably designates and appoints (i) Bank of America as Agent, and (ii) Bank of America and Wells Fargo Bank, National Association as Co-Collateral Agents, under this Agreement, the DIP Intercreditor Agreement and the other Loan Documents and the Financing Orders, and each such Lender irrevocably authorizes the Agent and the Co-Collateral Agents, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent and the Co-Collateral Agents, as applicable, by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  For clarity, and notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, no consent of the Lenders shall be required to amend this Agreement or the Loan Documents to (i) cause additional assets to become Collateral or to add additional Subsidiaries as guarantors of the Obligations, or (ii) implement the provisions of Section 8.12, and the Agent and the Loan Parties shall be entitled to execute any and all amendments necessary or desirable to accomplish any of the foregoing and such amendments shall be binding on the other parties hereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Agent nor the Co-Collateral Agents shall have any duties or responsibilities, except those expressly set forth in this Agreement and the other Loan Documents to which it is a party, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent or the Co-Collateral Agents.

Section 8.02    Delegation of Duties; Agent Advisors.  (a) Each of the Agent and the Co-Collateral Agents may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither the Agent nor the Co-Collateral Agents shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(b)    Each of the Agent and the Co-Collateral Agents, on behalf of each of them and the Lenders, shall be entitled to retain (either directly or through counsel) any financial advisor, auditor or any other consultant the Agent and the Co-Collateral Agents may deem necessary (collectively, the "**Agent Advisors**") to provide advice, analysis and reporting for the benefit of the Agent, the Co-Collateral Agents and the Lenders.  The Loan Parties and their advisors shall grant access to, and cooperate in all respects with, the Agent, the Co-Collateral Agents, the Lenders, the Agent Advisors and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner.  The Borrowers shall promptly pay upon demand all fees and expenses of each Agent Advisor, and all such fees and expenses shall constitute Obligations and be secured by the Collateral.

Section 8.03    Exculpatory Provisions.  No Agent (for purposes of this Article VIII, "**Agent**" and "**Agents**" shall mean the collective reference to the Agent, the Co-Collateral Agents and any other Lender designated as an "Agent" for purposes of this Agreement, including the Joint Lead Arrangers, the Syndication Agent and the Documentation Agent) nor any of their respective Related Parties shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party that is a party hereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

Section 8.04    Reliance by Agent.  The Agent and Co-Collateral Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by them to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by the Agent.  The Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Agent.  The Agent and Co-Collateral Agents shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders or all Lenders) as they deem appropriate or they shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by them by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from

127

acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders, affected Lenders or all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Advances and the Term Loan.

Section 8.05    Notice of Default.  The Agent and the Co-Collateral Agents shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent or the applicable Co-Collateral Agent has received notice from a Lender, Holdings or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders.  The Agent and the Co-Collateral Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders, affected Lenders or all Lenders); provided that unless and until the Agent or the Co-Collateral Agents shall have received such directions, the Agent, in consultation with the Co-Collateral Agents, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06    Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agent, the Co-Collateral Agents nor any of their respective Related Parties have made any representations or warranties to it and that no act by the Agent or any Co-Collateral Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Agent or any Co-Collateral Agent to any Lender.  Each Lender represents to the Agent and the Co-Collateral Agents that it has, independently and without reliance upon the Agent, any Co-Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Advances and the Term Loan hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Agent, any Co-Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent or the Co-Collateral Agents hereunder, the Agent and the Co-Collateral Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Agent or any Co-Collateral Agent or any of their respective Related Parties.

Section 8.07    Reports and Financial Statements.  By signing this Agreement, each Lender:

1030946.08A-CHISR01A - MSW

(a)    agrees to furnish the Agent, with such frequency as the Agent may reasonably request, a summary of all Bank Products and Cash Management Services provided by, and amounts due or to become due on account thereof to, such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of any such Bank Products or Cash Management Services unless the Agent has received written notice thereof from such Lender;

(b)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements and reports required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Co-Collateral Agents (collectively, the "**Reports**") (which the Agent and the Co-Collateral Agents agree to so deliver);

(c)    expressly agrees and acknowledges that the Agent and the Co-Collateral Agents make no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent, the Co-Collateral Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)    agrees to keep all Reports confidential in accordance with the provisions of this Agreement;

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent, the Co-Collateral Agents, the Agent Professionals and any such other Lender or Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any credit extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in any Letter of Credit or Swingline Advance, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent, the Co-Collateral Agents, the Agent Professionals and any such other Lender or Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agent, Co-Collateral Agents and any such other Lender or Person preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender; and

(g)    agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under this Agreement or any other Loan Documents or the Financing Orders, as applicable (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to the guaranties or any Collateral or any other property of any such Loan Party, without the prior written consent of the Agent. The provisions of this paragraph are for the sole

129

benefit of the Lenders and the Agent and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 8.08    Indemnification of Agent Indemnitees.

(a)    Indemnification. The Lenders agree to indemnify Agent Indemnitees (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), ratably according to their respective Pro Rata Shares in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Revolving Commitments of any Lender shall have terminated and the Advances and the Term Loan shall have been paid in full, in accordance with such Pro Rata Shares immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Advances and the Term Loan) be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to an Agent Indemnitee that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Advances, the Term Loan and all other amounts payable hereunder. If any Agent Indemnitee is sued by any receiver, trustee in bankruptcy, debtor-in-possession, the official committee of unsecured creditors, or other Person for any alleged preference from a Loan Party or fraudulent transfer, then any monies paid by such Agent Indemnitee in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to such Agent Indemnitee by Lenders to the extent of each Lender's Pro Rata share.

(b)    Proceedings.  Without limiting the generality of the foregoing, if at any time (whether prior to or after the Termination Date) any proceeding is brought against any Agent Indemnitees by a Loan Party, or any Person claiming through a Loan Party, to recover damages for any act taken or omitted by Agent in connection with any Obligations, Collateral, Loan Documents or matters relating thereto, or otherwise to obtain any other relief of any kind on account of any transaction relating to any Loan Documents, each Lender agrees to indemnify and hold harmless the Agent Indemnitees with respect thereto and to pay to the Agent Indemnitees such Lender's Pro Rata share of any amount that any Agent Indemnitee is required to pay under any judgment or other order entered in such proceeding or by reason of any settlement, including all interest, costs and expenses (including attorneys' fees) incurred in defending same; provided that no Lender shall be liable for payment of any such amount to the extent that it is determined in a final, non-appealable judgment by a court of competent jurisdiction that such judgment, order or settlement resulted from such Agent Indemnitees' gross negligence or willful misconduct.  In Agent's discretion, Agent may reserve for any such proceeding, and may satisfy any judgment, order or settlement, from proceeds of Collateral prior to making any distributions of Collateral proceeds to Lenders provided that it has not been

determined in a final, non-appealable judgment by a court of competent jurisdiction that such judgment, order or settlement resulted from any Agent Indemnitees' gross negligence or willful misconduct.

Section 8.09    Agent in Its Individual Capacity.    Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Advances made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "**Lender**" and "**Lenders**" shall include each Agent in its individual capacity.

Section 8.10    Successor Agent.

(a)    The Agent may resign as Agent upon 30 days' notice to the Lenders and the Borrowers.  If the Agent shall resign as Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Agent, and the term "**Agent**" shall mean such successor agent effective upon such appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Advances or the Term Loan.  If no successor agent has accepted appointment as Agent by the date that is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Agent hereunder, until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(b)    Any Co-Collateral Agent may resign as Co-Collateral Agent upon 30 days' notice to the Lenders and the Borrowers.  The rights, duties and responsibilities of the Co-Collateral Agents hereunder are specific to each of Bank of America, N.A. and Wells Fargo Bank, National Association, and upon (i) the resignation of any such Person as a Co-Collateral Agent hereunder, or (ii) except as otherwise agreed by the Borrowers and the Agent (whose agreement shall not be unreasonably withheld), the assignment of all of the rights, duties and obligations under this Agreement in respect of its Revolving Commitment, the Advances, the Term Loan and other amounts owing to it and any Note or Notes held by it by any such Person, then such rights, duties and responsibilities of such Person as a Co-Collateral Agent shall automatically terminate and be of no further force and effect; provided that the provisions of this Article VIII shall inure to such Person's benefit as to any actions taken or omitted to be taken by it while it was Co-Collateral Agent under this Agreement and the other Loan Documents. Without limiting the foregoing, no additional Co-Collateral Agents shall be appointed hereunder without the prior written consent of the Agent and the Borrowers.

Section 8.11    Documentation Agent and Syndication Agent; Bank Product and Cash Management Services Providers.  (a) Neither the Documentation Agent, the Syndication

Agent nor any other Lender designated as an "**Agent**" for purposes of this Agreement (other than Bank of America in its capacity as Agent and Co-Collateral Agent, and Wells Fargo Bank, National Association in its capacity as Co-Collateral Agent) shall have any duties or responsibilities hereunder in its capacity as such.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

Section 8.12    <u>Defaulting Lenders</u>.

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders", "Supermajority Lenders" and this <u>Section 8.12</u>.

(ii)    <u>Defaulting Lender Waterfall</u>.    Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VII</u> or otherwise) or received by the Agent from a Defaulting Lender pursuant to <u>Section 9.05</u> shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Lenders or Swingline Lender hereunder; third, to Cash Collateralize the Issuing Lenders' Fronting Exposure with respect to such Defaulting Lender; fourth, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Extension of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; fifth, if so determined by the Agent and the Borrowers, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Extensions of Credit under this Agreement and (y) Cash Collateralize the Issuing Lenders' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement; sixth, to the payment of any amounts owing to the Non-Defaulting Lenders, the Issuing Lenders or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the Issuing Lenders or the Swingline Lender against such

1030946.08A-CHISR01A - MSW

Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Extension of Credit in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Advances or Term Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Extensions of Credit owed to all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Obligations owed to, such Defaulting Lender until such time as all Advances, Term Loans and funded and unfunded participations in Letters of Credit and Swingline Advances are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.16. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 8.12 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any fee payable under Section 2.05 for any period during which that Lender is a Defaulting Lender (and, except as provided in clause (iii)(C) below, the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    Each Defaulting Lender shall be entitled to receive Letter of Credit fees pursuant to Section 3.03 for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Revolving Commitment Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral.

(C)    With respect to any fee payable under Section 2.05 or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letters of Credit or Swingline Advances that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y)

133

pay to the Issuing Lenders and Swingline Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Lender's or Swingline Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)    <u>Reallocation of Applicable Percentages to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in Letters of Credit and Swingline Advances shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Revolving Commitment Percentages (calculated without regard to such Defaulting Lender's Revolving Commitment) but only to the extent that (x) the conditions set forth in <u>Section 4.02</u> are satisfied at the time of such reallocation (and, unless the Borrowers shall have otherwise notified the Agent at such time, the Borrowers shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate outstanding amount of Obligations of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    <u>Cash Collateral, Repayment of Swingline Advances</u>. If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under applicable law, (x) first, prepay Swingline Advances in an amount equal to the Swingline Lenders' Fronting Exposure and (y) second, Cash Collateralize the Issuing Lenders' Fronting Exposure in accordance with the procedures set forth in <u>Section 3.01(b)</u>.

(b)    <u>Consents</u>.  If a Lender becomes a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not in limitation thereof, except as set forth in the last sentence hereof, such Defaulting Lender's right to participate in decision-making rights related to the Obligations in respect of Required Lender and Supermajority Lender votes, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal. Notwithstanding anything else provided herein, any amendment, waiver determination, consent or notification under <u>Section 9.01</u> that would (i) increase or extend the term of the Revolving Commitment of a Defaulting Lender, (ii) reduce the principal amount of the Advances or the Term Loan made by such Defaulting Lender, (iii) alter the terms and conditions of this sentence or (iv) otherwise disproportionately affect a Defaulting Lender, will require the consent of such Defaulting Lender.

(c)    <u>Defaulting Lender Cure</u>.  If the Borrowers, the Agent, the Swingline Lender and the Issuing Lenders agree in writing that a Lender is no longer a Defaulting Lender,

134

the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Advances of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Advances and funded and unfunded participations in Letters of Credit and Swingline Advances to be held on a pro rata basis by the Revolving Lenders in accordance with their Revolving Commitment Percentages (without giving effect to Section 2.16), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 8.13    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, each Agent (as defined in Section 8.03) and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans in connection with the Extensions of Credit, the Letters of Credit or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement,

(iii)    or (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Extensions of Credit, the Letters of Credit, the Commitments

135

and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that  none of the Agents or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

Section 8.14    Credit Bidding.  The Credit Parties hereby irrevocably authorize the Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Credit Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase); provided, however, that none of the Credit Parties shall be allowed to credit bid any of the Obligations independently and all such credit bids shall have to be submitted through, and administered by, the Agent, as set forth herein.  In connection with any such bid (i) the Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.01 of this Agreement), and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of

136

debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Credit Party or any acquisition vehicle to take any further action.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Fee Letter, which may be amended by the parties thereto (or in the case of fees payable solely to the Agent, by the Borrowers and the Agent)), nor consent to any departure by any Borrower or any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders or by the Agent at the direction of the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(a)    unless in writing and also signed by each Lender directly affected thereby, do any of the following:  (i) increase the amount or extend the expiration date of any Lender's Commitment, (ii) subject to clause (h) below, reduce the principal of, or interest on, the Advances, the Term Loan or any fees or other amounts payable hereunder; provided, however, that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay interest, fees or other amounts at the default rate; or (iii) postpone any date fixed for any payment of principal of, or interest on, the Advances, the Term Loan or any fees or other amounts payable hereunder (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment shall not constitute a postponement of any date scheduled for the payment of principal or interest);

(b)    unless in writing and signed by all of the Lenders, do any of the following: (i) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Advances, the Term Loan or the number of Lenders, that shall be required for the Lenders or any of them to take any action hereunder, (ii) other than in accordance with Section 9.13, release all or substantially all of the Collateral or release all or substantially all of the guarantors from their obligations under the Guarantee and Collateral Agreement, (iii) except as expressly permitted herein or in any other Loan Document, subordinate the Liens granted hereunder or under the other Loan Documents, to any other Lien, (iv) amend this Section 9.01, (v) amend the definitions of "Required Lenders" or "Supermajority Lenders," (vi) release either Borrower from all of its obligations hereunder or amend Section 9.07(j), (vii) increase the advance rates constituting part of the Borrowing Base or (viii) amend Section 7.03;

(c)    unless in writing and signed by the Supermajority Lenders, (i) amend Section 6.02(n) (or the defined terms used in such section or any component thereof) the definition of "LTV Provisions", the definitions "Line Cap", "Borrowing Base" and the other defined terms used in such definitions or any component thereof (other than the advance rates))

137

in a manner that would result in more credit being made available to the Borrowers and (ii) increase the Swingline Commitment;

(d)    unless in writing and signed by the Agent and the Co-Collateral Agents (in addition to the Lenders required above to take such action), as applicable, amend, modify or waive any provision of Article VIII or affect the rights or duties of the Agent and the Co-Collateral Agents, as applicable, under this Agreement or any other Loan Document;

(e)    unless in writing and signed by the Swingline Lender (in addition to the Lenders required above to take such action), amend, modify or waive any provision of Section 2.03 or 2.04;

(f)    unless in writing and signed by each Issuing Lender (in addition to the Lenders required above to take such action), amend, modify or waive any provision of Article III;

(g)    unless in writing and signed by each affected member of any Class, have a materially disproportionate adverse effect on such Class; or

(h)    unless in writing and signed by (i) the holders of more than 50% of the sum of the Aggregate Revolving Commitments then in effect or, if the Aggregate Revolving Commitments have been terminated, the holders of more than 50% of the Total Revolving Extensions of Credit then outstanding (other than Extensions of Credit held by Permitted Holder Lenders) and (ii) holders of more than 50% of the principal amount of the Term Loans then outstanding (other than the portion of the Term Loan held by any Permitted Holder Lenders), (x) waive any payment otherwise required under Section 2.11(b)-(f) or (y) amend Section 2.11(f) (or the defined terms used in such section or any components thereof).

Section 9.02    Notices, Etc.

(a)    All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied or delivered, (i) if to Holdings, any Borrower or any Subsidiary Guarantor, at its address at 3333 Beverly Road, Hoffman Estates, Illinois 60179, Attention:  General Counsel, with a copy to Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Douglas Urquhart, Esq.; (ii) if to any Lender, at its address set forth in its completed administrative questionnaire delivered to the Agent; (iii) if to Bank of America, (x) in its capacity as Agent, a Co-Collateral Agent, the Swingline Lender or an Issuing Lender, at its address at 100 Federal Street, 9th Floor, Boston, Massachusetts 02110, Attention: Stephen J. Garvin and Brian P. Lindblom, and (y) in its capacity as Agent with respect to financial and other reporting sent pursuant to Section 6.01(j) hereof, at its address set forth in clause (x) above and also at 1455 Market Street, San Francisco, CA 94103, Attention: Aamir Saleem, in each case with a copy to Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 3400, Chicago, Illinois 60527, Attention: Seth E. Jacobson, Esq.; (iv) if to Wells Fargo Bank, National Association or its Affiliates, in its capacity as a Co-Collateral Agent or as an Issuing Lender, at its address at One Boston Place, 19th Floor, Boston, Massachusetts 02108, Attention: Joseph Burt, with a copy to Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110, Attention: Kevin J. Simard, Esq.,

138

or (v), if to any other Issuing Lender, at such address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrowers and the Agent; <u>provided</u> that notices required to be delivered pursuant to <u>Section 6.01(j)(i)</u>, <u>(iii)</u>, <u>(iv)</u>, and <u>(vii)</u> shall be delivered to the Agent and the Lenders as specified in <u>Section 9.02(b)</u>.  All such notices and communications shall, when mailed, telecopied, telegraphed or emailed, be effective when deposited in the mails, telecopied, delivered to the telegraph company or confirmed by email, respectively, except that notices and communications to the Agent pursuant to <u>Article II</u>, <u>III</u> or <u>VIII</u> shall not be effective until received by the Agent.  Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any exhibit hereto or thereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof.

(b)    Holdings and the Borrowers agree that materials required to be delivered pursuant to <u>Sections 6.01(j)(ii)6.01(j)(i)</u>, <u>(iii)</u> and <u>(vii)</u>, shall be deemed delivered to the Agent on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a written notice to the Agent and the Lenders and that is accessible by the Lenders without charge or if not so posted, may be delivered to the Agent in an electronic medium in a format acceptable to the Agent by email to brian.p.lindblom@baml.com and to aamir.saleem@baml.com.  Holdings and the Borrowers agree that the Agent may make such materials, as well as any other written information, documents, instruments and other material relating to Holdings, the Borrowers, any of their Subsidiaries or any other materials or matters relating to this Agreement, the Loan Documents or any of the transactions contemplated hereby (collectively, the "**Communications**") available to the Lenders by posting such notices on Intralinks or a substantially similar electronic system (the "**Platform**").  Holdings and the Borrowers acknowledge that (i) the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, (ii) the Platform is provided "as is" and "as available" and (iii) neither the Agent nor any of its Affiliates warrants the accuracy, adequacy or completeness of the Communications or the Platform and each expressly disclaims liability for errors or omissions in the Communications or the Platform.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent or any of its Affiliates in connection with the Platform. No Agent Indemnitee shall have any liability to Borrowers, Credit Parties or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform, including any unintended recipient, nor for delivery of Communications and other information via the Platform, internet, e-mail, or any other electronic platform or messaging system.

(c)    Each Lender agrees that notice to it (as provided in the next sentence) (a "**Notice**") specifying that any Communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; <u>provided</u> that if requested by any Lender the Agent shall deliver a copy of the Communications to such Lender by email or telecopier.  Each Lender agrees (i) to notify the Agent in writing of such Lender's e-mail address to which a Notice may be sent by electronic transmission (including by electronic communication) on or before the date

such Lender becomes a party to this Agreement (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

(d)    The Loan Parties hereby acknowledge that certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.    The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Communications provided by or on behalf of any Loan Party hereunder (collectively, "**Borrower Materials**") that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Credit Parties to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to any Loan Party or its securities for purposes of United States Federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Agents and the Joint Lead Arrangers shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  The Loan Parties and the Credit Parties acknowledge that, notwithstanding the foregoing, "public" information may not be segregated from material non-public information on the Platform.    The Credit Parties acknowledge that Communications may include Loan Parties' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to a Loan Party's securities.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any Loan Party or its securities for purposes of United States Federal or state securities laws.

Section 9.03    No Waiver; Remedies.  No failure on the part of any Lender or the Agent to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.    The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.04    Costs and Expenses. (a)  The Loan Parties shall reimburse the Agent and each Co-Collateral Agent for all Extraordinary Expenses. The Loan Parties jointly and severally agree to pay promptly all reasonable costs and expenses of the Agent, the Co-Collateral Agent, and the Joint Lead Arrangers including the reasonable fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP, Choate Hall & Stewart LLP, BRG and the other Agent

Professionals, (i) in connection with the preparation, execution, delivery, distribution (including via the internet or through a service such as Intralinks), administration, modification and amendment of this Agreement, the other Loan Documents and the other documents to be delivered hereunder (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements hereto or thereto); (ii) all due diligence, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, consultant, and audit expenses; (iii) the syndication and funding of the Extensions of Credit and any issuance of Letters of Credit; (iv) the creation, perfection or protection of the liens under the Loan Documents (including all search, filing and recording fees); (v) subject to <u>Section 6.01(k)</u>, all expenses incurred in connection with inspections, verifications, examinations and appraisals relating to the Borrowing Base and the Collateral, and (vi) the fees and expenses set forth in the Fee Letter.  The Loan Parties further jointly and severally agree to pay on demand all costs and expenses of the Agent, the Co-Collateral Agents and the Lenders, if any (including reasonable counsel fees and expenses of counsel to the Agent, counsel to the Co-Collateral Agents and counsel to the Lenders (in the case of the Lenders, limited to one counsel for the Lenders in connection with the enforcement of or protection of its rights hereunder)), in connection with (i) the enforcement of the Loan Documents, the Financing Orders and the Cash Management Order; (ii) any refinancing or restructuring of the DIP ABL Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP ABL Facility or the other transactions contemplated by the Loan Documents, the Financing Orders or the Cash Management Order.  The Loan Parties acknowledge that counsel to the Agent or any Co-Collateral Agent may provide the Agent or such Co-Collateral Agent, as applicable, a benefit (such as a discount, credit or accommodation for other matters) based on counsel's overall relationship with the Agent or such Co-Collateral Agent, as applicable, including fees paid hereunder.

(b)     Holdings and the Borrowers jointly and severally agree to indemnify and hold harmless the Agent, each Co-Collateral Agent, each Issuing Lender, each Lender, the Agent Advisors and each of their Related Parties (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) this Agreement, the Prepetition First Lien ABL Credit Agreement, the other Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the Letters of Credit or the proceeds of the Advances, and (ii) the actual or alleged presence of Hazardous Materials on, under, at or from any property of Holdings, the Borrowers or any of their Subsidiaries or any Environmental Liability or Environmental Action relating in any way to Holdings, the Borrowers or any of their Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.   In the case of an investigation, litigation or other proceeding to which the indemnity in this <u>Section 9.04(b)</u> applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Holdings, any Borrower, its directors, equityholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  Holdings and the Borrowers also agree not to, and not to permit any

of the their Subsidiaries to, assert any claim for special, indirect, consequential or punitive damages against the Agent, any Co-Collateral Agent, any Lender, any of their Affiliates, or any of their respective Related Parties, on any theory of liability, arising out of or otherwise relating to this Agreement, the other Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the Letters of Credit or the proceeds of the Advances or the Term Loan.

(c)    If (i) any payment of principal of, or Conversion of, any Eurodollar Rate Advance is made by any Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Advance, as a result of a payment or Conversion pursuant to Section 2.09(d) or (e), 2.11 or 2.13, acceleration of the maturity of the Advances pursuant to Section 7.02 or for any other reason, or by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Advance upon an assignment of rights and obligations under this Agreement pursuant to Section 9.07 as a result of a demand by any Borrower pursuant to Section 9.07(a), or (ii) any Borrower fails to prepay, borrow, continue or convert any Eurodollar Rate Advance on the date or in the amount notified by any Borrower; the applicable Borrower shall, promptly after notice by such Lender setting forth in reasonable detail the calculations used to quantify such amount (with a copy of such notice to the Agent), pay to the Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion, including any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance. For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 9.04(c), each Lender shall be deemed to have funded each Eurodollar Rate Advance made by it at the Eurodollar Rate for such Advance by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Advance was in fact so funded.

(d)    Without prejudice to the survival of any other agreement of Holdings or any Borrower hereunder, the agreements and obligations of Holdings and the Borrowers contained in Sections 2.12, 2.15 and 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 9.05    Right of Set-off. Subject to the Financing Orders and Section 7.02, upon (i) the occurrence and during the continuance of any Event of Default and (ii) the making of the request or the granting of the consent specified by Section 7.02 to authorize the Agent to declare the Extensions of Credit due and payable pursuant to the provisions of Section 7.02, each Lender and each of its Affiliates is hereby authorized at any time and from time to time (notwithstanding the provisions of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Bankruptcy Court), to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of Holdings or any Loan Party against any and all of the obligations of Holdings and the Loan Parties now or hereafter existing under this Agreement, the other Loan Documents and the Extensions of Credit of such Lender, whether or not such Lender shall have made any demand under this Agreement or the other Loan Documents. Each Lender agrees promptly to notify Holdings or the applicable Loan Party (with a copy to the Agent) after any

142

such set-off and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Lender and its Affiliate under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender and its Affiliate may have.

Section 9.06    <u>Binding Effect; Effectiveness</u>.  When this Agreement has been executed by Holdings, the Borrowers, the Agent and the Co-Collateral Agents, and the Lenders, this Agreement shall thereafter be binding upon and inure to the benefit of Holdings, the Borrowers, the Agent, the Co-Collateral Agents, each Issuing Lender, each Lender and their respective successors and assigns.

Section 9.07    <u>Assignments and Participations</u>.  (a)  Each Lender may, upon notice to the Borrowers and the Agent and with the consent, not to be unreasonably withheld or delayed, of the Agent, assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment, the Advances, the Term Loan and other amounts owing to it and any Note or Notes held by it); <u>provided</u>, <u>however</u>, that (i) [Reserved]; (ii) [Reserved], (iii) each such assignment with respect to any Class of rights and obligations shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement with respect to such Class, (iv) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of all of a Lender's rights and obligations under this Agreement, (x) the amount of the Revolving Commitment of the assigning Revolving Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $10,000,000 (unless an Event of Default has occurred and is continuing, in which case not less than $5,000,000) or an integral multiple of $1,000,000 in excess thereof unless the Borrowers and the Agent otherwise agree and (y) the amount of the Term Loan of the assigning Term Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000 or an integral multiple of $1,000,000 in excess thereof (or, if less, the entire outstanding amount of the Term Loan held by such Term Lender) unless the Agent otherwise agrees, (v) each such assignment shall be to an Eligible Assignee, (vi) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, and the parties to such assignment (other than the Agent) shall deliver together therewith any Note subject to such assignment and a processing and recordation fee of $3,500 (except no such fee shall be payable for assignments to a Lender, an Affiliate of a Lender or an Approved Fund), and (vii) any Lender may, without the approval of the Borrowers, but with notice to the Borrowers, assign all or a portion of its rights and obligations to any of its Affiliates or to another Lender (provided no assignment of Revolving Commitments or any Revolving Advances or other Revolving Extensions of Credit may be made by a Revolving Lender to a Term Lender pursuant to this clause unless such Term Lender is already also a Revolving Lender hereunder).  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and

Acceptance, relinquish its rights (other than its rights under Section 2.12, 2.15 and 9.04 to the extent any claim thereunder relates to an event arising prior such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent, the Issuing Lender or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swingline Advances in accordance with its Revolving Commitment Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)    By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:   (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or the performance or observance by the Borrowers of any of their obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 5.01(e) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance

with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with any Note or Notes subject to such assignment, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of <u>Exhibit B</u> hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrowers.

(e)    The Agent shall maintain at its address referred to in <u>Section 9.02</u> a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Revolving Commitment of, and principal amount (and stated interest) of the Advances and L/C Obligations owing to, each Revolving Lender from time to time, the principal amount (and stated interest) of the Term Loan owing to each Term Lender from time to time, (the "**Register**").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f)    Each Lender may, without the consent of the Agent or any Loan Party, sell participations to one or more banks or other entities (other than the Borrowers or any of their Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment, the Advances owing to it, the portion of the Term Loan owing to it, and any Note or Notes held by it); <u>provided</u>, <u>however</u>, that (i) such Lender's obligations under this Agreement (including its Revolving Commitment to the Borrowers and its obligations to the Swingline Lender and the Issuing Lender hereunder) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrowers, the Agent, the Co-Collateral Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Loan Document, or consent to any departure by any Borrower therefrom, except to the extent that such amendment, waiver or consent would require the affirmative vote of the Lender from which it purchased its participation pursuant to <u>Section 9.01(a)</u>.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Extensions of Credit or other obligations under the Loan Documents (the "**Participant Register**"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information related to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-

145

1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(g)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant, any information relating to Holdings, the Borrowers or their Subsidiaries furnished to such Lender by or on behalf of the Borrowers; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Borrower Information relating to Holdings, the Borrowers or their Subsidiaries received by it from such Lender in accordance with Section 9.08.

(h)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time (i) create a security interest in all or any portion of its rights under this Agreement (including the Advances owing to it, the portion of the Term Loan owing to it and any Notes held by it), including, without limitation, in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors and (ii) assign to one or more special purpose funding vehicles (each, an "**SPV**") all or any portion of its funded Advances (without the corresponding Revolving Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Advances that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights which a Revolving Lender making or holding such Advances would have under this Agreement, but no obligations; provided, that no SPV shall be entitled to compensation pursuant to Section 2.12 or 2.15 in excess of that to which the applicable Revolving Lender would otherwise have been entitled.  The Lender shall remain liable for all its original obligations under this Agreement, including its Revolving Commitment (although the unused portion thereof shall be reduced by the principal amount of any Advances held by an SPV).  Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the Lender (as agent for the SPV) and not separately to the SPV unless the Agent and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.  The Borrowers shall, at the request of any Revolving Lender, execute and deliver to such Person as such Revolving Lender may designate, a Note in the amount of such Lender's Revolving Commitment to evidence the Advances of such Revolving Lender and related SPV.

(i)    The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender to facilitate transactions of the type described in paragraph (h) above.

(j)    Neither Holdings nor any Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each of the Lenders.

Section 9.08    Confidentiality.  Neither the Agent, any Co-Collateral Agent, any Issuing Lender, nor any Lender may disclose to any Person any confidential, proprietary or non-

public information of Holdings or the Borrowers furnished to the Agent or the Lenders by Holdings or the Borrowers (such information being referred to collectively herein as the "**Borrower Information**"), except that each of the Agent, each of the Co-Collateral Agents, each of the Issuing Lenders and each of the Lenders may disclose Borrower Information (i) to its and its Related Parties to whom disclosure is required to enable the Agent, the Co-Collateral Agents, the Issuing Lenders or such Lender to perform its obligations under this Agreement and the other Loan Documents or in connection with the administration or monitoring of this Agreement and the other Loan Documents by the Agent, the Co-Collateral Agents, Issuing Lenders, or such Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Borrower Information and instructed to keep such Borrower Information confidential on substantially the same terms as provided herein), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (including in connection with the Chapter 11 Cases), (iv) to any other party to this Agreement and the other Loan Documents, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement and the other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 9.08, to any assignee or participant, or any prospective assignee or participant, (vii) to the extent such Borrower Information (A) is or becomes generally available to the public on a non-confidential basis other than as a result of a breach of this Section 9.08 by the Agent, any Co-Collateral Agent or such Lender, as the case may be, or (B) is or becomes available to the Agent, any Co-Collateral Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrowers or any of their Subsidiaries and (viii) with the consent of the Borrowers.

Section 9.09    Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of laws principles thereof but including Section 5-1401 and 5-1402 of the New York General Obligations Law and, to the extent applicable, the Bankruptcy Code.

Section 9.10    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.11    Jurisdiction, Etc.  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not have or abstains from jurisdiction, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court.  Holdings and each of the Borrowers hereby irrevocably consents to the

147

service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to Holdings or such Borrower at its address specified pursuant to <u>Section 9.02</u>. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents in the courts of any jurisdiction. Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**Section 9.12   <u>WAIVER OF JURY TRIAL</u>.   EACH OF HOLDINGS, THE BORROWERS, THE AGENT, THE CO-COLLATERAL AGENTS, THE ISSUING LENDERS AND THE LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE ACTIONS OF THE AGENT, THE CO-COLLATERAL AGENTS, THE ISSUING LENDERS OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.**

Section 9.13   <u>Release of Collateral or Guarantee Obligation</u>.
(a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Co-Collateral Agents are hereby irrevocably authorized by each Lender (without requirement of consent of or notice to any Lender) to take, and hereby agree to take, any action requested by the Borrowers having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any Permitted Disposition; <u>provided that</u> the guarantee obligations of Sears may not be released without the consent of the Required Lenders, or (ii) under the circumstances described in paragraph (b) below.

(b)   At such time as the Advances, the Term Loan, the Reimbursement Obligations and all other Obligations shall have been paid in full in cash, the Commitments have been terminated and no Letters of Credit shall be outstanding (or any outstanding L/C Obligations shall have been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lenders have been provided in respect of such Letters of Credit), the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Co-Collateral Agents and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

Section 9.14   <u>PATRIOT Act Notice</u>. Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and

address of such Borrower and other information that will allow such Lender or the Agent, as applicable, to identify such Borrower in accordance with the PATRIOT Act.  Each Borrower hereby agrees to provide such information promptly upon the request of any Lender or the Agent.

Section 9.15    <u>Integration</u>.  This Agreement and the other Loan Documents represent the agreement of Holdings, the Borrowers, the Agent, the Co-Collateral Agents and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Agent, any Co-Collateral Agent or any Lender relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.16    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 2.12</u> or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, if any Lender does not consent (a "**Non-Consenting Lender**") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders or any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 9.07</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)    the Borrowers shall have paid to the Agent the assignment fee specified in <u>Section 9.07</u>;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, its ratable share of the Term Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.15</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    with respect to the replacement of any Non-Consenting Lender, such amendment, waiver or consent can be effected as a result of such  assignment (together with all other assignments required by the Agent to be made pursuant to this paragraph); and

(e)    such assignment does not conflict with applicable laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

1030946.08A-CHISR01A - MSW

Section 9.17    <u>No Advisory or Fiduciary Capacity</u>.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

Section 9.18    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Credit Party) acknowledges that any liability arising under a Loan Document of any Credit Party that is an EEA Financial Institution, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority, and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under any Loan Documents which may be payable to it by any Credit Party that is an EEA Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document; or (iii) the

150

variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.19    <u>Interim DIP Term Sheet Amended and Restated.</u>  Upon satisfaction of the conditions precedent to the effectiveness of this Agreement, (a) this Agreement shall amend and restate the Interim DIP Term Sheet in its entirety, (b) the rights and obligations of the parties under the Interim DIP Term Sheet shall be subsumed within and be governed by this Agreement; <u>provided</u>, that Holdings and the Borrowers hereby agree that all obligations and other liabilities of the Loan Parties under the Interim Term Sheet shall remain outstanding, shall constitute continuing Obligations secured by the Collateral, and this Agreement shall not be deemed to evidence or result in a novation or repayment and reborrowing of such obligations and other liabilities.

Section 9.20    <u>Keepwell</u>.  Each Loan Party that is a Qualified ECP Guarantor at the time the Guarantee and Collateral Agreement or the grant of a security interest under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under the Guarantee and Collateral Agreement voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been paid and performed in full.  Each Loan Party intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

Section 9.21    <u>DIP Intercreditor Agreement; Financing Orders.</u>  This Agreement is subject to the terms and provisions of the DIP Intercreditor Agreement and the Final Financing Order.  In the event of a conflict between the terms hereof and the terms of the DIP Intercreditor Agreement or the Final Financing Order, the terms of the DIP Intercreditor Agreement or the Final Financing Order, as applicable, shall govern and control.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

SEARS HOLDINGS CORPORATION

By: _____
Name: _____
Title: _____


SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
Name: _____


KMART CORPORATION

By: _____
Name: _____
Title: _____

BANK OF AMERICA, N.A.,
as Agent, a Co-Collateral Agent, a Lender,
Swingline Lender and an Issuing Lender


By: _____
Name: _____
Title: _____


WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as a Co-Collateral Agent, an Issuing Lender
and a Lender


By: _____
Name: _____
Title: _____

[Other Lenders]


By:    _____

Name:    _____

Title:    _____

SCHEDULE 1.01

Revolving Lenders; Revolving Commitments

| Lender | Incremental Revolving Commitment | Rolled Up Revolving Loans | Total Revolving Commitments |
|---|---|---|---|
| Bank of America, N.A. | $35,789,718 | $182,572,704 | $218,362,422 |
| Wells Fargo Bank, National Association | $76,351,399 | $389,488,435 | $465,839,834 |
| Citibank, N.A. | $19,087,850 | $97,372,109 | $116,459,958 |
| PNC Bank, National Asscociation | $19,087,850 | $97,372,109 | $116,459,958 |
| Ally Bank | $9,543,925 | $48,686,054 | $58,229,979 |
| Siemens Financial Services | $9,543,925 | $48,686,054 | $58,229,979 |
| Citizens Business Capital | $6,680,747 | $34,080,238 | $40,760,985 |
| TD Bank, N.A. | $5,821,794 | $29,698,493 | $35,520,287 |
| Regions Bank | $2,385,981 | $12,171,514 | $14,557,495 |
| SPCP Group, LLC | $3,817,570 | $19,474,422 | $23,291,992 |
| **Total** | **$959,602,131** | **$188,110,759** | **$1,147,712,890** |

SCHEDULE 4.01

Effective Date Loan Documents

- Trademark Security Agreement

- Patent Security Agreement

- Copyright Security Agreement

- Letter Agreement re: Co-Collateral Agents

SCHEDULE 6.01(r)(i)

Case Milestones

**DIP Loan**

(i)       [Reserved]

(ii)      [Reserved]

(iii)     [Reserved]

(iv)     Not later than November 28, 2018, the Bankruptcy Court shall have entered the Final Financing Order.

(v)      Not later than November 30, 2018, the Effective Date shall have occurred.

**Lease Assumption / Rejection**

(vi)     Not later than 30 days following the Petition Date, the Debtors shall have filed a motion requesting, and not later than 45 days following the Petition Date, shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall extend 210 days after the Petition Date.

**Inventory Appraisals**

(viii)    Not later than the 10th day of every month commencing with the first full month immediately following the Petition Date (or such later date as the Co-Collateral Agents may agree in their Permitted Discretion), an updated inventory appraisal shall be delivered to the Agent.

**Budget**

(ix)     On or before November 21, 2018, the Joint Lead Arrangers have (i) reaffirmed their approval, based on then current information, of the Approved Initial Budget or (ii) the Loan Parties have adopted a revised budget acceptable to the Joint Lead Arrangers in their sole and absolute discretion.

**Plan and Disclosure Statement**

(x)      Not later than February 18, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan of Reorganization and a disclosure statement with respect thereto.

(xi)     Not later than March 25, 2019, the Bankruptcy Court shall enter an order approving a disclosure statement with respect to an Acceptable Plan of Reorganization.

(xii)    Not later than April 29, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan of Reorganization.

(xiii)   Not later than May 14, 2019, such Acceptable Plan of Reorganization shall become effective.

SCHEDULE 6.01(r)(ii)

Go Forward Plan

Store Rationalization and Sale Process.   To save as many of their stores and preserve as many jobs as possible, the Debtors have developed the following detailed plan to guide their path forward in these Chapter 11 Cases.   Pursuant to this Go Forward Plan, the Debtors have determined to quickly rationalize their store footprint in accordance with a detailed plan while also implementing the following key actions:

*Initial Store Rationalization*

- On the Petition Date, the Debtors will file a motion to approve procedures (the "**GOB Procedures**") to complete certain store closings in accordance with the Store Footprint Plan (the "**Initial Store Rationalization**") and will seek an order approving the GOB Procedures for the Initial Store Rationalization by October 25, 2018.

- The Initial Store Rationalization will start no later than October 25, 2018 and a material portion of the Initial Store Rationalization will be underway within 21 days of the Commencement Date.

- The Debtors will file a motion no later than seven (7) days after the Petition Date and will obtain an order from the Bankruptcy Court no later than thirty (30) days after the Petition Date authorizing the rejection of any leases associated with stores included in the Initial Store Rationalization.

*Secondary Store Rationalization*

- The Debtors will undertake a detailed review and analysis of the profitability of a further group of stores identified in the Store Footprint Plan.

- No later than November 8, 2018, the Debtors will file a notice, pursuant to the GOB Procedures, to commence a second round of store rationalizations in accordance with the Store Footprint Plan (the "**Secondary Store Rationalization**" and, together with the Initial Store Rationalization, the "**Store Rationalizations**").

- The Debtors will obtain court approval of, and commence a material portion of, the Secondary Store Rationalization no later than November 20, 2018.

- The Debtors will file a motion no later than November 20, 2018 and will obtain an order from the Bankruptcy Court no later than December 15, 2018 authorizing the rejection of any leases associated with stores included in the Secondary Store Rationalization.

*Go Forward Stores Sale Process*

▪ Pursuant to the Go Forward Plan, while the Store Rationalizations are in process the Debtors will pursue the sale (the "**Go Forward Stores Sale Process**") of the Go Forward Stores.

▪ Given the cash-burn associated with the continued operation of the Debtors' businesses, the Debtors must, by December 15, 2018, obtain and find acceptable a non-contingent and fully-financed (with committed financing containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provisions)) stalking horse bid for the sale of the Go Forward Stores (which may be either on a going-concern or liquidation basis) that is reasonably acceptable to the Administrative Agent and Co-Collateral Agents (a "**Qualified Stalking Horse Bid**"); provided that failure to obtain and find acceptable a Qualified Stalking Horse Bid by December 15, 2018 shall not constitute a Default or Event of Default under the Credit Agreement so long as the Debtors are diligently pursuing a process reasonably acceptable to the Co-Collateral Agents that is designed to enable the Debtors to meet the Go Forward Stores Sale Process milestones set forth below.

▪ The Debtors will file a motion requesting approval of bidding procedures and the selection of a stalking horse bid for the sale of the Go Forward Stores (which may be either on a going-concern or liquidation basis) pursuant to section 363 of the Bankruptcy Code no later than December 27, 2018, and will obtain an order of the Bankruptcy Court approving such motion no later than January 14, 2019.

▪ An auction for the sale of the Go Forward Stores (and potentially certain other assets) will be conducted, or the stalking horse bidder, if any, will be named as the winning bidder to the extent no other higher and better offers for the Go Forward Stores are received, no later than February 2, 2019.

▪ The Debtors will obtain an order approving the sale of the Go Forward Stores pursuant to section 363 of the Bankruptcy Code no later than February 4, 2019, and will close the sale of the Go Forward Stores by no later than February 8, 2019.

**<u>Exhibit 2</u>**

**Redline**

SKADDEN DRAFT 11/14/18SASMF Draft 11/25/2018

# SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION ASSET-BASED CREDIT AGREEMENT

Dated as of November [__], 2018

among

**SEARS HOLDINGS CORPORATION,**
a debtor and a debtor-in-possession,
as Holdings,

**SEARS ROEBUCK ACCEPTANCE CORP.**
**and**
**KMART CORPORATION,**
each debtors and debtors-in-possession,
as Borrowers,

**THE LENDERS NAMED HEREIN,**

**THE ISSUING LENDERS NAMED HEREIN,**

**BANK OF AMERICA, N.A.,**
as Administrative Agent, Co-Collateral Agent and Swingline Lender

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Co-Collateral Agent,

[[_____],

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

as Syndication Agent,]

**CITIGROUP GLOBAL MARKETS INC.,**

as Documentation Agent,

[[_____] and [_____],

as Co-Documentation Agents,]

and

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**

**CITIBANK, N.A., and WELLS FARGO BANK, NATIONAL ASSOCIATION,**

As Joint Lead Arrangers and Bookrunners

-

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Certain Defined Terms | 3 |
| Section 1.02 | Computation of Time Periods | 55̶56 |
| Section 1.03 | Accounting Terms | 55̶56 |
| Section 1.04 | Other Interpretive Provisions | 56 |

## ARTICLE II

### AMOUNTS AND TERMS OF THE ADVANCES AND THE TERM LOAN

| | | |
|---|---|---|
| Section 2.01 | The Revolving Advances and the Term Loan. | 56̶57 |
| Section 2.02 | Making the Revolving Advances | 58 |
| Section 2.03 | The Swingline Advances | 59 |
| Section 2.04 | Making the Swingline Advances | 59̶60 |
| Section 2.05 | Commitment Fee; Other Fees | 61 |
| Section 2.06 | Optional Termination or Reduction of the Revolving Commitments | 61 |
| Section 2.07 | Repayment of Extensions of Credit | 62 |
| Section 2.08 | Interest | 62 |
| Section 2.09 | Interest Rate Determination | 63̶64 |
| Section 2.10 | Optional Conversion of Revolving Advances, Term Loan Borrowings | 64̶65 |
| Section 2.11 | Optional and Mandatory Prepayments of Revolving Advances and Term Loan; Mandatory Reduction of the Revolving Commitments. | 65 |
| Section 2.12 | Increased Costs | 67 |
| Section 2.13 | Illegality | 68 |
| Section 2.14 | Payments and Computations | 68 |
| Section 2.15 | Taxes | 69̶70 |
| Section 2.16 | Sharing of Payments, Etc | 73̶74 |
| Section 2.17 | Use of Proceeds of Advances and Term Loan | 74 |
| Section 2.18 | Permitted Overadvances | 74 |
| Section 2.19 | Superpriority Claims; Security and Priority of Liens | 74̶75 |
| Section 2.20 | MIRE Event. | 75̶76 |

## ARTICLE III

### AMOUNT AND TERMS OF THE LETTERS OF CREDIT

| | | |
|---|---|---|
| Section 3.01 | L/C Commitment | 75̶76 |
| Section 3.02 | Procedure for Issuance of Letter of Credit | 76̶77 |
| Section 3.03 | Fees and Other Charges | 77 |

i

1030946.06̶8̶C̶A̶-CHISR01A - MSW
C̶:̶\̶U̶S̶E̶R̶S̶\̶W̶O̶O̶D̶F̶O̶R̶D̶\̶A̶P̶P̶D̶A̶T̶A̶\̶L̶O̶C̶A̶L̶\̶M̶I̶C̶R̶O̶S̶O̶F̶T̶\̶W̶I̶N̶D̶O̶W̶S̶\̶I̶N̶E̶T̶C̶A̶C̶H̶E̶\̶C̶O̶N̶T̶E̶N̶T̶.̶O̶U̶T̶L̶O̶O̶K̶\̶J̶E̶K̶F̶X̶0̶9̶Q̶\̶S̶E̶A̶R̶S̶_̶D̶I̶P̶ ̶A̶B̶L̶ ̶C̶R̶E̶D̶I̶T̶
A̶G̶R̶E̶E̶M̶E̶N̶T̶ ̶2̶0̶1̶8̶-̶1̶1̶-̶1̶4̶ ̶(̶A̶S̶ ̶F̶I̶L̶E̶D̶)̶_̶W̶E̶I̶L̶_̶9̶6̶8̶0̶0̶7̶7̶9̶_̶1̶.̶D̶O̶C̶X̶

Section 3.04     Letter of Credit Participations                                          7778
Section 3.05     Reimbursement Obligation of the Borrowers                                7879
Section 3.06     Obligations Absolute                                                     79
Section 3.07     Letter of Credit Payments                                               79
Section 3.08     Applications                                                             7980
Section 3.09     Use of Letters of Credit                                                 7980

ARTICLE IV

CONDITIONS TO EFFECTIVENESS

Section 4.01     Conditions Precedent to Effectiveness                                    80
Section 4.02     Conditions Precedent to Each Extension of Credit                         83

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Section 5.01     Representations and Warranties of Holdings and the Borrowers.            8485

ARTICLE VI

COVENANTS

Section 6.01     Affirmative Covenants                                                    9394
Section 6.02     Negative Covenants                                                       1101
Section 6.03     Approved Budget.                                                         1135

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01     Events of Default                                                        1156
Section 7.02     Remedies.                                                                1202
Section 7.03     Application of Proceeds.                                                 1223
Section 7.04     Lift of Automatic Stay.                                                  1235
Section 7.05     License; Cooperation.                                                    1235

ARTICLE VIII

THE AGENT AND CO-COLLATERAL AGENTS

Section 8.01     Appointment                                                              1245
Section 8.02     Delegation of Duties; Agent Advisors                                     1246
Section 8.03     Exculpatory Provisions                                                   1256
Section 8.04     Reliance by Agent                                                        1257
Section 8.05     Notice of Default                                                        1267

ii

| Section 8.06 | Non-Reliance on Agents and Other Lenders | 126~~7~~ |
| Section 8.07 | Reports and Financial Statements | 126~~8~~ |
| Section 8.08 | Indemnification of Agent Indemnitees. | 127~~9~~ |
| Section 8.09 | Agent in Its Individual Capacity | ~~129~~130 |
| Section 8.10 | Successor Agent | ~~129~~130 |
| Section 8.11 | ~~Co-~~Documentation Agent~~s~~ and Syndication Agent; Bank Product and Cash Management Services Providers | ~~129~~131 |
| Section 8.12 | Defaulting Lenders | 13~~0~~1 |
| Section 8.13 | Certain ERISA Matters | 133~~4~~ |
| Section 8.14 | Credit Bidding | 134~~5~~ |

## ARTICLE IX

## MISCELLANEOUS

| Section 9.01 | Amendments, Etc. | 135~~6~~ |
| Section 9.02 | Notices, Etc. | 136~~7~~ |
| Section 9.03 | No Waiver; Remedies | ~~138~~140 |
| Section 9.04 | Costs and Expenses | ~~138~~140 |
| Section 9.05 | Right of Set-off | 140~~2~~ |
| Section 9.06 | Binding Effect; Effectiveness | 140~~2~~ |
| Section 9.07 | Assignments and Participations | 140~~2~~ |
| Section 9.08 | Confidentiality | 144~~6~~ |
| Section 9.09 | Governing Law | 145~~6~~ |
| Section 9.10 | Execution in Counterparts | 145~~7~~ |
| Section 9.11 | Jurisdiction, Etc. | 145~~7~~ |
| **Section 9.12** | **WAIVER OF JURY TRIAL** | 146~~7~~ |
| Section 9.13 | Release of Collateral or Guarantee Obligation | 146~~7~~ |
| Section 9.14 | PATRIOT Act Notice | 146~~8~~ |
| Section 9.15 | Integration | 146~~8~~ |
| Section 9.16 | Replacement of Lenders | 146~~8~~ |
| Section 9.17 | No Advisory or Fiduciary Capacity | 147~~9~~ |
| Section 9.18 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | ~~148~~150 |
| Section 9.19 | Interim DIP Term Sheet Amended and Restated. | ~~148~~150 |
| Section 9.20 | Keepwell | ~~149~~150 |
| Section 9.21 | DIP Intercreditor Agreement; Financing Orders. | ~~149~~151 |

1030946.0~~68~~CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

SCHEDULES

| | |
|---|---|
| Schedule I | Bank Products/Cash Management Services |
| Schedule 1.01 | Revolving Lenders; Revolving Commitments |
| Schedule 1.02 | Existing Letters of Credit |
| Schedule 1.04 | Existing Debt |
| Schedule 1.05 | Existing Investments |
| Schedule 1.06 | Existing Liens |
| Schedule 1.07 | Initial Specified Store Closing Locations |
| Schedule 1.08 | Secondary Specified Store Closing Locations |
| Schedule 1.09 | Go Forward Stores |
| Schedule 4.01 | Effective Date Loan Documents |
| Schedule 5.01(l)(A) | Owned and Ground Leased Unencumbered Real Property |
| Schedule 5.01(l)(B) | Leased Unencumbered Real Property |
| Schedule 5.01(n) | Pension Plan Issues |
| Schedule 5.01(p) | UCC Filing Jurisdictions |
| Schedule 5.01(s) | Equity Interests in Subsidiaries |
| Schedule 5.01(t) | Labor Matters |
| Schedule 6.01(q) | Post-Effective Date Requirements |
| Schedule 6.01(r)(i) | Case Milestones |
| Schedule 6.01(r)(ii) | Go Forward Plan |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Notice of Borrowing |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Base Certificate |

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Exhibit D            Form of Debtor-in-Possession Guarantee and Collateral Agreement

Exhibit E            Form of Credit Card Notification

Exhibit F            Form of DIP Intercreditor Agreement

Exhibit G            Form of Customs Broker Agreement

Exhibit H            Form of Third Party Payor Notification

Exhibit I            Form of Compliance Certificate

Exhibit J            Form of Approved Budget

Exhibit K            Form of Final Financing Order

Exhibit M            Form of Budget Certificate

SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION ASSET-BASED CREDIT AGREEMENT (this "**Agreement**"), dated as of November [__], 2018, among SEARS HOLDINGS CORPORATION, a Delaware corporation and a debtor and debtor-in-possession ("**Holdings**"), SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation and a debtor and debtor-in-possession ("**SRAC**"), KMART CORPORATION, a Michigan corporation and a debtor and debtor-in-possession ("**Kmart Corp**."; Kmart Corp. together with SRAC, the "**Borrowers**"), the banks, financial institutions and other institutional lenders listed on the signature pages hereof or through an assignment as provided in <u>Section 9.07</u> hereof, as Revolving Lenders or Term Lenders, as applicable (collectively, the "**Lenders**"), the ISSUING LENDERS party hereto, BANK OF AMERICA, N.A. ("**Bank of America**"), as administrative agent (in such capacity, the "**Agent**"), co-collateral agent, and Swingline Lender, WELLS FARGO BANK, NATIONAL ASSOCIATION, as co-collateral agent (collectively with Bank of America in such capacity, the "**Co-Collateral Agents**"), ~~[[_____]~~ WELLS FARGO BANK, NATIONAL ASSOCIATION, as syndication agent (in such capacity, the "**Syndication Agent**"),~~] [[_____] and [_____]~~ CITIGROUP GLOBAL MARKETS INC., as ~~co-~~documentation agent~~s~~ (in such capacity, the ~~"" Co-~~Documentation Agent~~s~~"),~~]~~ and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("**MLPFS**"), CITIBANK, N.A. and WELLS FARGO BANK, NATIONAL ASSOCIATION, as joint lead arrangers and bookrunners (in such capacities, the "**Joint Lead Arrangers**").

<u>W I T N E S S E T H</u>:

WHEREAS, on October 15, 2018 (the "**Petition Date**"), Holdings, SRAC, Kmart Corp. and certain of the Borrowers' Subsidiaries (including all of the Subsidiary Guarantors) (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "**Bankruptcy Court**");

WHEREAS, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Lenders provided loans and other financial accommodations to the Borrowers pursuant to the Prepetition First Lien ABL Credit Agreement (as defined herein);

WHEREAS, on the Petition Date, the outstanding principal amount of the Prepetition 2016 Term Loan Facility (as defined herein) was $570,776,250 and the outstanding principal amount of the Prepetition Revolving Facility (as defined herein), including outstanding Prepetition L/C Obligations (as defined herein) was $959,602,130;

WHEREAS, on October 16, 2018, pursuant to the Interim DIP Term Sheet and the Interim Financing Order, the Initial Lenders provided to the Borrowers a senior secured superpriority priming post-petition debtor-in-possession asset-based credit facility (the "**Interim DIP Facility**") consisting of (a) a new money asset-based term loan in an aggregate principal

amount of $111,889,241 (the "**Incremental DIP Term Loan**") and (b) a new money asset-based revolving credit facility with aggregate revolving commitments of $188,110,759 (the "**Incremental DIP Revolving Commitments**"); and the revolving loans made thereunder, (the "**Incremental DIP Revolving Loans**") for operating, working capital and general corporate purposes of the Loan Parties, in each case consistent with, subject to and within the limitations contained in, the Approved Initial Budget (as defined in the Interim DIP Term Sheet), including to pay fees, costs and expenses incurred in connection with the transactions contemplated thereby and other administration costs incurred in connection with the Chapter 11 Cases;

WHEREAS, the Borrowers have requested, and the Lenders have agreed, on the terms set forth herein, that the Interim DIP Facility be amended and restated in its entirety to (a) refinance the Interim DIP Facility, (b) increase the facility size to refinance certain amounts under the Prepetition 2016 Term Loan Facility and the Prepetition Revolving Facility, as well as to refinance certain Prepetition L/C Obligations, and (c) more fully set forth the terms of the Total Extensions of Credit hereunder;

WHEREAS, each Borrower and each other Loan Party has agreed to secure all of its Obligations under the Loan Documents by granting to the Control Co-Collateral Agent, for the benefit of the Co-Collateral Agents and the other Credit Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property;

WHEREAS, the business of the Borrowers and the other Loan Parties is a mutual and collective enterprise and the Borrower and the other Loan Parties believe that the Total Extensions of Credit and other financial accommodations provided to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Agent, the Co-Collateral Agents and the Lenders, all to the mutual advantage of the Borrowers and the other Loan Parties;

WHEREAS, each Borrower and each other Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of Extensions of Credit and other financial accommodations to the Borrowers as provided in this Agreement and the Financing Orders; and

WHEREAS, the willingness of the Agent, the Co-Collateral Agents and the Lenders to extend financial accommodations to the Borrowers, as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the other Loan Parties and at the request of the Borrowers and the other Loan Parties and in furtherance of the mutual and collective enterprise of the Borrowers and the other Loan Parties.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"**Acceptable Plan of Reorganization**" means a plan of reorganization for each of the Chapter 11 Cases that (i) provides for the termination of the Revolving Commitments and the payment in full in cash and full discharge of the Obligations (including L/C Obligations and Obligations related to Bank Products and Cash Management Services) and Prepetition ABL Obligations at emergence, (ii) contains releases and other exculpatory provisions for the Credit Parties, Prepetition Credit Parties, the Joint Lead Arrangers and each of their respective affiliates in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion and (iii) is otherwise in form and substance reasonably satisfactory to the Agent with respect to any provision related to the payment of Prepetition ABL Obligations or that may adversely affect the DIP Credit Parties and/or the Prepetition Credit Parties.

"**ACH**" means automated clearing house transfers.

"**Acquisition**" means, with respect to any Person (a) a purchase or other acquisition of more than 50% of, or other controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets of any Person, or more than 50% of, or other controlling interest in, the Equity Interests of any Person, in each case in any single transaction or series of related transactions.

"**Adequate Protection Liens**" has the meaning assigned to the term "Adequate Protection Liens" in the Final Financing Order.

"**Adequate Protection Superpriority Claims**" has the meaning assigned to the term "Adequate Protection Claims" in the Final Financing Order.

"**Adjusted Revolving Exposure**" means, at any time of determination, an amount equal to the lesser of (i) the then-outstanding Aggregate Revolving Commitments and (ii) the sum of (A) $50,000,000 plus (B) the Borrowing Base minus (C) the principal amount of Term Loan outstanding as of such time of determination.

"**Advance**" means any advance by a Revolving Lender to any Borrower as part of a Borrowing.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, any Borrower, and Subsidiary Guarantor or any Subsidiary of the foregoing),

at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of Holding, any Borrower or any Subsidiary Guarantor, threatened against Holdings, any Borrower, any Subsidiary Guarantor or any Subsidiary of the foregoing or any property thereof.

"**Affiliate**" means, as to any Person, any other Person, (a) that directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person, (b) that beneficially owns 10% or more of the Voting Stock or any class of Equity Interests of such first Person; (c) at least 10% of whose Voting Stock or any class of Equity Interests is beneficially owned, directly or indirectly, by such first Person; or (d) who is an officer, director, partner or managing member of such first Person.   For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"**Agent**" has the meaning specified in the Preamble.

"**Agent Indemnitees**"   means the Agent, each Co-Collateral Agent and their respective Related Parties.

"**Agent Professionals**" means attorneys, accountants, appraisers (including real estate appraisers), auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by the Agent or the Co-Collateral Agents, including, for the avoidance of doubt, the Agent Advisors.

"**Agent's Account**" means the account of the Agent maintained by the Agent at Bank of America, N.A., designated by the Agent in writing to the Borrowers, the Co-Collateral Agents and the Lenders.

"**Agent Advisors**" has the meaning specified in <u>Section 8.02(b)</u>.

"**Agreement**" has the meaning specified in the Preamble.

"**Aggregate Revolving Commitments**" means the Revolving Commitments of all the Revolving Lenders.

"**AML Laws**" means (i) the Currency and Foreign Transactions Reporting Act, its amendments, and other statutes relating to the subject matter of that Act (which have come to be collectively referred to as the Bank Secrecy Act), including applicable provisions of the PATRIOT Act, and regulations promulgated under any of the foregoing, including 31 C.F.R. Chapter X; and (ii) similar laws, regulations, directives adopted by the European Union, any European Union Member State, the United Kingdom, and any jurisdiction where any Group Member operates.

1030946.06 8CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Applicable Lending Office**" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance, and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"**Applicable Margin**" means (a) 4.50% per annum for Eurodollar Rate Advances and (b) 3.50% per annum for Base Rate Advances.

"**Application**" means an application, in such form as the applicable Issuing Lender may specify from time to time, requesting such Issuing Lender to open a Letter of Credit.

"**Approved Budget**" means the budget prepared by the Borrowers in the form of Exhibit J and which is approved by, and in form and substance satisfactory to, the Co-Collateral Agents, each in its sole discretion, as the same may be updated, modified or supplemented from time to time as provided in Section 6.03.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignment and Acceptance**" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit B hereto.

"**Authorized Officer**" means, as to Holdings, any Borrower or any other Loan Party, its Chief Restructuring Officer, president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance or executive vice president, finance. Any document delivered hereunder that is signed by an Authorized Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Automatic Stay**" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"**Availability Reserves**" means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as any Co-Collateral Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Co-Collateral Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that such Co-Collateral Agent determines may need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in any Co-Collateral Agent's Permitted Discretion (but are not limited to) reserves based on: (i) customs duties, and other costs to release Inventory which is being imported into the United States, (ii) accrued and unpaid Taxes and other governmental charges, including, but not limited to, ad valorem, real property, excise, personal

1030946.0~~68~~CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS -DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

property sales, use and other Taxes and claims of the PBGC that any Co-Collateral Agent determines rank senior to or pari passu with (in payment or Lien priority) the Obligations or the Prepetition ABL Obligations, (iii) salaries, wages and benefits due to employees of any Loan Party, (iv) reasonably anticipated changes in the Net Orderly Liquidation Value and/or Store Closing Net Orderly Liquidation Value between appraisals, (v) warehousemen's or bailees' charges and other Permitted Encumbrances, (vi) Cash Management Reserves, (vii) Bank Product Reserves, (viii) amounts due to vendors on account of consigned goods, (ix) rent expense at leased Stores and DC locations, (x) royalties payable to non-Loan Parties in respect of licensed merchandise, (xi) the Gift Card Liability Reserve, (xii) Customer Deposits Reserve, (xiii) PACA Liability Reserves, (xiv) PASA Liability Reserves, (xv) amounts due to any state's lottery commission or other equivalent agency, authority or entity, or to any other Governmental Authority involved in the administration or regulation of lotteries, (xvi) Credit Card Receivables owed to Sears Protection Company (PR), Inc. and its Subsidiaries, (xvii) amounts due to Sears Authorized Hometown Stores, LLC, Sears Home Appliance Showrooms, LLC, Sears Outlet Stores, LLC and their subsidiaries, (xviii) amounts of any court-ordered charges or other liabilities that any Co-Collateral Agent determines rank senior to or pari passu with (in payment or Lien priority) the Obligations or Prepetition ABL Obligations, (xix) amounts in respect of any reclamation, setoff, recoupment or similar claims as may relate to or arise during the Chapter 11 Cases that are or that any Co-Collateral Agent reasonably believes may become senior to the Liens securing the Obligations, (xx) accrued and unpaid interest or fees on the Obligations, (xxi) the Credit Card Accounts Receivable Reserve and (xxii) amounts due with respect to fees of any professional for any liquidation, going out of business or similar sale.  Upon the determination by any Co-Collateral Agent that an Availability Reserve should be established or modified, such Co-Collateral Agent shall notify the Agent in writing and the Agent shall thereupon establish or modify such Availability Reserve and, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Availability Reserve.

"**Available Commitment**" means as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Revolving Lender's Revolving Commitment then in effect over (b) such Revolving Lender's Revolving Extensions of Credit then outstanding; provided, that in calculating any Revolving Lender's Revolving Extensions of Credit for the purpose of determining such Revolving Lender's Available Commitment pursuant to Section 2.05(a), the aggregate principal amount of Swingline Advances then outstanding shall be deemed to be zero.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank of America**" has the meaning specified in the Preamble.

"**Bank Products**" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates on account of (a) each Swap Contract that is entered into after the

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

date hereof with any counterparty that is a Credit Party at the time such Swap Contract is entered into, (b) leasing facilities, and (c) other banking products or services (other than Letters of Credit and excluding Cash Management Services) to or for the benefit of any Loan Party agreed by the Agent and the Borrowers as being a "**Bank Product**" for purposes of this Agreement, provided that in each case, such Bank Product is added to Schedule I by the Borrowers (which addition may be made by the Borrowers by notice to the Agent in writing); provided further, that such notice shall be deemed given with respect to any Bank Products provided by the Agent or its Affiliates.

"**Bank Product Reserves**" means such reserves as any Co-Collateral Agent may from time to time determine in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"**Banker's Acceptance**" means a time draft or bill of exchange or other deferred payment obligation relating to a Commercial L/C which has been accepted by the applicable Issuing Lender.

"**Bankruptcy Code**" has the meaning specified in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning specified in the recitals to this Agreement.

"**Base Rate**" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month Interest Period) plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate." The "**prime rate**" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Advance**" means an Advance or a Term Loan Borrowing that bears interest as provided in Section 2.08(a)(i) or Section 2.08(b)(i), as applicable.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Blocked Accounts**" means any deposit accounts that become subject to Blocked Account Agreements pursuant to Section 6.01(i)(iii).

"**Blocked Account Agreement**" means with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Co-Collateral Agents, establishing control (as defined in the UCC) of such account by the Agent (as "**Control Co-Collateral Agent**") and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent (or any other Co-Collateral Agent which shall succeed the Agent as "Control Co-Collateral Agent" thereunder), without the further consent of any other Person.

"**Blocked Account Bank**" means Bank of America, N.A. and each other bank with whom deposit accounts are maintained in which funds of any of the Loan Parties are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System.

"**Borrower Information**" has the meaning specified in Section 9.08.

"**Borrower Materials**" has the meaning specified in Section 9.02(d).

"**Borrowers**" has the meaning specified in the Preamble.

"**Borrowing**" means a borrowing consisting of simultaneous Advances of the same Type made by each of the applicable Lenders pursuant to Section 2.01 or Section 2.03 provided that no more than six (6) Interest Periods in the aggregate for Borrowings and Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

"**Borrowing Base**" means, at any time, an amount equal to (a) 87.5% of the aggregate outstanding Eligible Credit Card Accounts Receivable at such time, plus (b) 87.5% of the Eligible Pharmacy Receivables at such time plus (c) (i) 87.5% of the Net Orderly Liquidation Value of Net Eligible Inventory (other than Eligible Inventory at a Store being closed) at such time and (ii) 87.5% of the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at Stores being closed, minus (d) 100% of the then Availability Reserves, minus (e) the Borrowing Base Carve-Out Reserve, minus (f) Prepetition Revolver/Term Exposure, minus (g) the Prepetition FILO Reserve; it being understood that the Agent may, in its Permitted Discretion, adjust Availability Reserves and Inventory Reserves and any other reserves used in computing the Borrowing Base.

"**Borrowing Base Carve-Out Reserve**" means, at any time, (a) the Carve-Out Reserve Amount (as defined in paragraph 21(e)] of the Final Financing Order) minus (b) the then current balance of the Carve-Out Reserve Account (as defined in paragraph 21(f) of the Final Financing Order).

"**Borrowing Base Certificate**" means a certificate, signed by an Authorized Officer of Holdings, substantially in the form of Exhibit C or another form which is reasonably acceptable to the Co-Collateral Agents in their Permitted Discretion.

1030946.06 8CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Borrowing Base Loan Party**" means each Borrower and each guarantor of the Obligations under the Guarantee and Collateral Agreement that is also a "Subsidiary Guarantor" under and as defined in the Prepetition First Lien ABL Credit Agreement.

"**BRG**" means Berkeley Research Group, LLC, in its capacity as an Agent Advisor.

"**Budget Certificate**" mean a certificate, substantially in the form of Exhibit M hereto, by which Holdings certifies, among other things, compliance with the covenants contained in Section 6.03(b).

"**Budget Variance Report**" means a weekly report certified by an Authorized Officer of Holdings to the Agent and the Co-Collateral Agents (a) showing, in each case, by line item the actual cash receipts, disbursements, inventory receipts and consignment receipts for each week, in a comparable form to the Approved Budget, noting therein the variance of the Borrower's Net Cash Flow, on a cumulative basis, for the Cumulative Four-Week Period, from the projected Net Cash Flow set forth for the Cumulative Four-Week Period in the Approved Budget, (b) including explanations for all material variances (including whether such variance is permanent in nature or timing related) and (b) for any report delivered on the Wednesday following a Budget Testing Date, containing an analysis demonstrating the Borrowers are in compliance with the budget covenant set forth in Section 6.03(b), all in a form, and containing such supporting information, as is satisfactory to the Agent and the Co-Collateral Agents in their sole discretion.

"**Budget Testing Date**" has the meaning assigned to such term in Section 6.03(b).

"**Business Day**" means a day of the year on which banks are not required or authorized by law to close in New York, New York or Boston, Massachusetts and, if the applicable Business Day relates to any Eurodollar Rate Advances, a day of the year on which dealings are carried on in the London interbank market.

"**Capital Lease Obligations**" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" has the meaning specified in paragraph 21(a) of the Final Financing Order.

"**Carve-Out Reserve**" has the meaning specified in paragraph 21(e) of the Final Financing Order.

"**Case Milestones**" has the meaning specified in Section 6.01(r)(i).

"**Cash Collateral**" means cash delivered to Agent to Cash Collateralize any Obligations, and all interest, dividends, earnings and other proceeds relating thereto.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Cash Collateralize**" means the delivery of cash to Agent, as security for the payment of Obligations, in an amount equal to 105% of the aggregate L/C Obligations. "**Cash Collateralization**" has a correlative meaning.

"**Cash Equivalents**" means (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the U.S. government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by Bank of America or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by Bank of America or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; and (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P.

"**Cash Management Order**" means that certain *Interim Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims and Granting Related Relief*, (Docket No. 102) entered by the Bankruptcy Court on October 16, 2018 and any similar final order entered by the Bankruptcy Court.

"**Cash Management Reserves**" means such reserves as any Co-Collateral Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"**Cash Management Services**" means any one or more of the following types of services or facilities provided to any Loan Party by any Lender or any of its Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit card processing services and private label letters of credit, (e) credit or debit cards, and (f) purchase cards; provided that in each case, such Cash Management Service is added to Schedule I by the Borrowers (which addition may be made by the Borrowers by notice to the Agent in writing); provided further, that such notice shall be deemed given with respect to any Bank Products provided by the Agent or its Affiliates.

"**Class**" means (a) the class consisting of Revolving Lenders and (b) the class consisting of Term Lenders.  For clarity, except as expressly provided herein, each Lender shall have the same rights and obligations under this Agreement and the other Loan Documents.

1030946.06 CA-CHISR01A - MSW

C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

76 10

"**Change in Law**" means the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"**Chapter 11 Cases**" means the chapter 11 cases of the Debtors pending in the Bankruptcy Court.

"**Co-Collateral Agents**" has the meaning specified in the Preamble.

["**Co-Documentation Agents**" has the meaning specified in the Preamble.]

"**Collateral**" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, including the Prepetition ABL Collateral and all other assets of the Loan Parties, whether now owned or hereafter acquired, and all proceeds thereof, including, without limitation, any claims and causes of action of the Loan Parties of any kind or nature (including proceeds of any actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code); it being understood that "Collateral" shall include all such property irrespective of whether any such property was excluded pursuant to the Prepetition Loan Documents.

"**Commercial L/C**" means a commercial documentary Letter of Credit under which an Issuing Lender agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member, in respect of obligations of such Group Member in connection with the purchase of goods or services in the ordinary course of business.

"**Commitments**" means, collectively, the Revolving Commitments and the Term Commitments.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Commonly Controlled Entity**" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Internal Revenue Code.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Convert**", "**Conversion**" and "**Converted**" each refers to a conversion of Advances or a Term Loan Borrowing of one Type into Advances or a Term Loan Borrowing of the other Type pursuant to Section 2.09 or 2.10.

"**Control Co-Collateral Agent**" has the meaning specified in the Guarantee and Collateral Agreement.

"**Credit Card Accounts Receivable**" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Loan Party resulting from charges by a customer of a Loan Party on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Loan Party or services performed by a Loan Party, in each case in the ordinary course of its business.

"**Credit Card Accounts Receivable Reserve**" means reserves, established by the Agent in its Permitted Discretion, to reflect factors that may negatively impact the value of Credit Card Accounts Receivable (including, without limitation, for chargeback or other accrued liabilities or offsets by Credit Card Processors and amounts to adjust for material claims, offsets, defenses or counterclaims or other material disputes with an account debtor).

"**Credit Card Notification**" has the meaning specified in Section 6.01(m)(iii).

"**Credit Card Processors**" means the credit card clearinghouses and processors used by the Loan Parties and listed in the Perfection Certificate as of the date of this Agreement, or otherwise disclosed in writing to the Agent by the Loan Parties from time to time following the date of this Agreement.

"**Credit Party**" or "**Credit Parties**" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each Co-Collateral Agent, (iv) each Issuing Lender, and (v) each Joint Lead Arranger and (b) collectively, all of the foregoing.

"**Cumulative Four-Week Period**" means the four-week period up to and through the Saturday of the most recent week then ended.

"**Customer Deposits Reserve**" means, at any time, a reserve calculated in a manner consistent with past practice under the Prepetition First Lien ABL Credit Agreement.

"**Customs Broker Agreement**" means an agreement in substantially the form attached hereto as Exhibit G, or such other form as the Co-Collateral Agents may reasonably agree, among a Loan Party, a customs broker or other carrier, and the Co-Collateral Agents, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Co-Collateral Agents and agrees, upon notice from the Co-Collateral Agents, to hold and dispose of the subject Inventory solely as directed by the Co-Collateral Agents.

"**DC**" means any distribution center owned or leased and operated by any Loan Party.

76 12

"**DDA**" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.

"**De Minimis Asset Sale Order**" means ~~an order granting *Motion of Debtors for Entry of an Order*~~*the (CORRECTED) Order Signed on 11/21/2018* Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments (Docket No. ~~427) which is in form and substance acceptable to the Agent in its sole and absolute discretion~~856) entered by the Bankruptcy Court on November 21, 2018.

"**Debt**" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred and being paid in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all direct and contingent obligations of such Person arising under banker's acceptances, letters of credit (including standby and commercial), bank guaranties, surety bonds and similar instruments, (e) all obligations of such Person created or arising under any conditional sale or other title retention agreement (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as Capital Lease Obligations, (g) all direct recourse payment obligations of such Person in respect of any accounts receivable sold by such Person, (h) all net obligations of such Person under any Swap Obligations, (i) all obligations of such Person in respect of Disqualified Equity Interests, (j) all Debt of others referred to in clauses (a) through (i) above or clause (k) below and other payment obligations guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss, and (k) all Debt referred to in clauses (a) through (i) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"**Debtor Advisors**" has the meaning assigned to such term in Section 6.01(s).

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning specified in the recitals to this Agreement.

1030946.0~~08~~CA-CHISR01A - MSW
~~C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX~~

"**Default**" means any Event of Default or any event or condition that, with the lapse of time or giving of notice or both, would constitute an Event of Default.

"**Defaulting Lender**" means any Lender (as reasonably determined by the Agent) that (a) has failed to fund any portion of the Advances, participations in Letters of Credit or participations in Swingline Advances required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (c) has failed, within three Business Days after request by the Agent, to confirm in writing that it will comply with the terms of this Agreement relating to its Commitments, <u>provided</u> that such Lender shall cease to be a Defaulting Lender under this clause (c) upon the Agent's receipt of such confirmation, (d) has notified the Borrowers, the Agent, the Issuing Banks or the Swingline Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or Bail-In Action, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**DIP ABL Facility**" means the superpriority senior secured debtor-in-possession asset-based credit facility provided by the Credit Parties to the Borrowers hereunder.

"**DIP Intercreditor Agreement**" means the DIP Intercreditor Agreement dated [the date hereof] among the Agent and the Co-Collateral Agents, as Senior DIP Agents, the Junior DIP Term Loan Agent, as Junior DIP Agent, and the Loan Parties, substantially in the form of Exhibit F hereto and as amended, restated, supplemented or otherwise modified from time to time.

"**DIP Motion**" means the *Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing* (Docket No. 7) filed by the Debtors on October 15, 2018.

"**DIP Superpriority Claims**" has the meaning specified in <u>Section 2.19(a)</u>.

"**Disposition**" means any sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, the issuance or sale, transfer or other disposition of any Equity Interests).

<span style="color:red">76</span>14

"**Disqualified Equity Interests**" of any Person means any class of Equity Interests of such Person that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by such Person, whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, in each case on or prior to the date that is 91 days after the Scheduled Termination Date.

"**Dollars**" and "**$**" refers to lawful money of the United States.

"**Documentation Agent**" has the meaning specified in the Preamble.

"**Domestic Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in an EEA Member Country that is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) above; or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in the foregoing clauses and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of an EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the first day on which all of the conditions precedent set forth in Section 4.01 are satisfied or waived in accordance with the terms hereof.

"**Eligible Assignee**" means (a) a commercial bank or any other Person (other than a natural Person) engaged in the business of making asset based or commercial loans, or (other than in the case of a Revolving Commitment) any fund or other Person (other than a natural Person) that invests in loans, which bank, Person or fund, together with its Affiliates, has a combined capital and surplus in excess of $1,000,000,000 and which bank, Person or fund is approved by the Agent in its discretion, (b) an existing Lender or an Affiliate of an existing Lender or an Approved Fund; provided that neither the Borrowers nor any Affiliate of the Borrowers, nor any Permitted Holder Lender, nor any holder of any Debt under the Prepetition

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Second Lien Facilities or the Junior DIP Term Loan Facility, nor any other Loan Party, nor any Subsidiary of any of the foregoing, shall qualify as an Eligible Assignee under clauses (a) or (b) of this definition and (c) during any Event of Default, any other Person (other than a natural Person) acceptable to Agent in its discretion.

"**Eligible Credit Card Accounts Receivable**" means at the time of any determination thereof, each Credit Card Account Receivable that satisfies the following criteria at the time of its creation and continues to meet the same at the time of such determination: such Credit Card Account Receivable (i) has been earned and represents the bona fide amounts due to a Borrowing Base Loan Party from a Credit Card Processor and/or credit card issuer, and in each case originated in the ordinary course of business of the applicable Borrowing Base Loan Party and (ii) is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (k) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Account Receivable, a Credit Card Account Receivable shall indicate no person other than a Borrowing Base Loan Party as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Account Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges, credit card processor fees or other allowances (including any amount that the applicable Borrowing Base Loan Party may be obligated to rebate to a customer, a Credit Card Processor, or credit card issuer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Account Receivable but not yet applied by the applicable Borrowing Base Loan Party to reduce the amount of such Credit Card Account Receivable. Unless otherwise approved from time to time in writing by the Co-Collateral Agents in their Permitted Discretion, no Credit Card Account Receivable shall be Eligible Credit Card Account Receivable if, without duplication:

(a)    such Credit Card Account Receivable is not owned by a Borrowing Base Loan Party and such Borrowing Base Loan Party does not have good or marketable title to such Credit Card Account Receivable;

(b)    such Credit Card Account Receivable does not constitute a "payment intangible" or "account" (as defined in the UCC) or such Credit Card Account Receivable has been outstanding for more than five (5) Business Days from the date of sale;

(c)    the issuer or payment processor of the applicable credit card with respect to such Credit Card Account Receivable is the subject of any bankruptcy or insolvency proceedings;

(d)    such Credit Card Account Receivable is not the valid, legally enforceable obligation of the applicable issuer with respect thereto;

(e)    such Credit Card Account Receivable is subject to any Lien whatsoever other than Liens in favor of the Co-Collateral Agents and Liens of the types specified in clauses (a), (g), (h), (m), (s), (t) and (u) of the definition of Permitted Liens;

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(f)    such Credit Card Account Receivable is not subject to a valid and perfected Lien in favor of the Co-Collateral Agents, for the benefit of the Credit Parties, senior in priority to all other Liens other than Liens of the types specified in clauses (a), (g), (h) and (t) of the definition of Permitted Liens;

(g)    the Credit Card Account Receivable does not conform to all representations, warranties, covenants or other provisions in the Loan Documents relating to Credit Card Account Receivable;

(h)    such Credit Card Account Receivable is subject to a right to repurchase or risk of set-off, non-collection or not being processed due to unpaid and/or accrued credit card processor fee balances, limited to the lesser of the balance of Credit Card Account Receivable or unpaid credit card processor fees;

(i)    such Credit Card Account Receivable is evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is subject to the perfected security interest of the Co-Collateral Agents;

(j)    such Credit Card Account Receivable does not meet such other reasonable eligibility criteria for Credit Card Account Receivable as the Agent (or any Co-Collateral Agent upon written notice to the Agent) may determine from time to time in its Permitted Discretion; or

(k)    such Credit Card Account Receivable is disputed between a Borrower and a Credit Card Processor, or with respect to which a claim, counterclaim, offset or chargeback has been asserted by the related Credit Card Processor (but only to the extent of such dispute, claim, counterclaim, offset or chargeback).

Notwithstanding the above, the Agent reserves the right, at any time and from time to time after the Effective Date, to adjust the criteria set forth above, to establish new criteria and to adjust the applicable advance rate with respect to Eligible Credit Card Accounts Receivable, in its Permitted Discretion, subject to the approval of the Supermajority Lenders in the case of adjustments of criteria or establishment of new criteria which have the effect of making more credit available, and subject to the approval of all Lenders in the case of adjustments to the advance rate.

"**Eligible In-Transit Inventory**" means, as of any date of determination thereof, without duplication of other Eligible Inventory, finished goods Inventory:

(a)    for which full payment has been delivered to the vendor of such Inventory and evidence of such payment has been received by the Agent; provided that in transit Inventory purchased under "private label" letters of credit issued by SRAC or Letters of Credit issued hereunder shall be deemed Eligible In-Transit Inventory, subject to (x) an Inventory Reserve equal to (i) such percentage as the Agent may determine in its Permitted Discretion, *multiplied by* (ii) the Inventory Value of such Inventory, and (y) satisfaction of all of the other conditions of this definition;

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(b)    which has been shipped from a location outside of the United States, Puerto Rico or the U.S. Virgin Islands for receipt by any Borrowing Base Loan Party, but which has not yet been delivered to such Borrowing Base Loan Party, which Inventory has been in transit for sixty (60) days or less from the date of shipment of such Inventory;

(c)    for which the purchase order is in the name of any Borrowing Base Loan Party and title has passed to such Borrowing Base Loan Party;

(d)    for which the document of title reflects a Borrowing Base Loan Party as consignee or, if requested by a Co-Collateral Agent, names the Co-Collateral Agents as consignee, and in each case as to which a Co-Collateral Agent has control over the documents of title which evidence ownership of the subject Inventory (such as, if requested by a Co-Collateral Agent, by the delivery of a Customs Broker Agreement);

(e)    which is insured as required pursuant to Section 6.01(c) hereof; and

(f)    which would not be excluded from the definition of "Eligible Inventory" by any of clauses (a), (c) through (g) or (i) through (s) of the definition thereof;

provided that the Agent, or any Co-Collateral Agent upon written notice to the Agent, may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent or such Co-Collateral Agent determines that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or *pari passu* with, the Lien of the Co-Collateral Agents (such as, without limitation, a right of stoppage in transit) or may otherwise adversely impact the ability of the Co-Collateral Agents to realize upon such Inventory.  The Agent or any Co-Collateral Agent upon written notice to the Agent, shall have the right (without limiting any of its other rights as provided herein) to exclude Eligible In-Transit Inventory described in clause (b) above (in whole or in part) from the determination of the Borrowing Base in the event that the Agent, or any Co-Collateral Agent upon written notice to the Agent, determines in its Permitted Discretion that the Borrowers have commenced, or have determined to commence, a full-chain liquidation, including a Specified Full-Chain Liquidation.

"**Eligible Inventory**" means at any time, without duplication (i) Eligible In-Transit Inventory, and (ii) items of Inventory of any Borrowing Base Loan Party that are held for retail sale to the public in the ordinary course of business, merchantable, and readily saleable to the public in the ordinary course of business, that is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (s) below. Without limiting the foregoing, to qualify as "Eligible Inventory" no Person other than the Borrowing Base Loan Parties shall have any direct or indirect ownership, interest or title to such Inventory and no Person other than the Borrowing Base Loan Parties shall be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein. Unless otherwise from time to time approved in writing by the Agent (or any Co-Collateral Agent upon written notice to the Agent) in its Permitted Discretion, no Inventory shall be deemed Eligible Inventory if, without duplication:

1030946.06<del>8</del>CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(a)    the Borrowing Base Loan Parties do not have sole and good, valid and unencumbered title thereto (except for Liens of the types described in clauses (a), (b), (c), (e), (g), (m), (s), (t) or (u) of the definition of Permitted Liens); or

(b)    it is not located in the United States, Puerto Rico, Guam or U.S. Virgin Islands; or

(c)    it is not located at property owned or leased by the Borrowing Base Loan Parties (except to the extent such Inventory is (i) in transit between such locations, or (ii) is at a customer location and is deemed eligible pursuant to clause (g) below) or is located at a third party warehouse or is located at a closed Store or is located at a closed DC; or

(d)    it is not subject to a valid and perfected Lien in favor of the Co-Collateral Agents for the benefit of the Credit Parties, senior in priority to all other Liens other than Liens of the types described in clauses (a), (b), (c), (g) and (t) of the definition of Permitted Liens; or

(e)    it is subject to any Lien whatsoever other than Liens in favor of the Co-Collateral Agents and Permitted Liens of the types described in clauses (a), (b), (c), (e), (g), (m), (s), (t) or (u) of the definition thereof; or

(f)    it is Inventory located at a Store which is being closed; <u>provided however</u> that such Inventory will be deemed eligible for the first ten (10) weeks after commencement of the Specified Store Closing Sale for such Store unless extended by the Co-Collateral Agents in their sole and absolute discretion; or

(g)    it is consigned from a vendor or is at a customer location but still accounted for in the applicable Borrowing Base Loan Party's inventory balance; or

(h)    it is in-transit (other than Eligible In-Transit Inventory) from a vendor and has not yet been received into a DC or Store; or

(i)    it is identified in the stock ledger of the applicable Borrowing Base Loan Party as any of the following departments or consists of Inventory which is ordinarily classified by such Borrowing Base Loan Party consistent with its historical practices as the following: floral; gasoline; live plants; miscellaneous or other as classified on the Borrowing Base Loan Party's stock ledger; produce; books; magazines; restaurant operations; or seafood; or it is identified per the applicable Borrowing Base Loan Party's stock ledger as candy; or

(j)    it is Inventory that has been packed-away and stored for more than 12 months at a DC or a Store for future sale, including merchandise of Sears and its Subsidiaries that has been carried over for more than 12 months as currently reported as "**XOM**" status per the RIM merchandising system; or

(k)    it is identified as wholesaler freight fees; or

(l)    it is Inventory on layaway or is Inventory which has been sold but not delivered or as to which any Borrowing Base Loan Party has accepted a deposit from a third party; or

(m)    it is identified per the Borrowing Base Loan Parties' stock ledger as Inventory that is in a leased department, including Lands' End, digital imaging, photofinishing and 1 hour lab; or

(n)    it is otherwise deemed ineligible by the Co-Collateral Agents in their Permitted Discretion; or

(o)    it is (i) operating supplies, packaging or shipping materials, cartons, labels or other such materials not considered used for sale in the ordinary course of business by the Agent in its Permitted Discretion (ii) work-in-process, raw materials, (iii) not in material compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (iv) bill and hold goods; or

(p)    it is Inventory which exhibits, includes or is identified by any trademark, tradename or other Intellectual Property right which trademark, tradename or other Intellectual Property right (i) is subject to a restriction that could reasonably be expected to adversely affect the Agent's ability to liquidate such Inventory or (ii) the relevant Borrowing Base Loan Party does not have the right to use in connection with the sale of such Inventory, either through direct ownership or through a written license or sublicense; or

(q)    it is Inventory that is not insured in compliance with the provisions of Section 6.01(c); or

(r)    it is Inventory that does not conform to all representations, warranties, covenants or other provisions in the Loan Documents relating to Inventory; or

(s)    it is Inventory acquired outside of the ordinary course of business and the Co-Collateral Agents have not completed their diligence with respect thereto.

"**Eligible Pharmacy Receivables**" means each Pharmacy Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Pharmacy Receivable (i) has been earned and represents the bona fide amounts due to a Borrowing Base Loan Party from Third Party Payors, and other Persons reasonably acceptable to the Co-Collateral Agents, and in each case originated in the ordinary course of business of the applicable Borrowing Base Loan Party (ii) is non-recourse to the Borrowing Base Loan Parties and has been adjudicated or is otherwise due to a Borrowing Base Loan Party for pharmacy related services, and (iii) is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (m) below. Without limiting the foregoing, to qualify as an Eligible Pharmacy Receivable, an Account shall indicate no person other than a Borrowing Base Loan Party as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts,

1030946.06 8CA -CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

claims, credits or credits pending, promotional program allowances, price adjustments, finance charges, processing fees or other allowances (including any amount that the applicable Borrowing Base Loan Party may be obligated to rebate to a customer, or to pay to the Third Party Payors, direct customers or other Persons pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the applicable Borrowing Base Loan Party to reduce the amount of such Pharmacy Receivable. Unless otherwise approved from time to time in writing by the Co-Collateral Agents in their Permitted Discretion, none of the following Pharmacy Receivables shall be an Eligible Pharmacy Receivable:

(a)    Pharmacy Receivables that have been outstanding for more than ninety (90) days past the invoice date or that are more than sixty (60) days past due;

(b)    Pharmacy Receivables due from any Third Party Payor to the extent that fifty percent (50%) or more of all Pharmacy Receivables from such Third Party Payor are not Eligible Pharmacy Receivables under clause (a), above;

(c)    Pharmacy Receivables which do not constitute an "Account" (as defined in the UCC);

(d)    Pharmacy Receivables with respect to which a Borrowing Base Loan Party does not have good, valid and marketable title thereto;

(e)    Pharmacy Receivables that are not subject to a valid and perfected Lien in favor of the Co-Collateral Agents, for the benefit of the Credit Parties, senior in priority to all other Liens other than Liens of the types described in clauses (a), (g) and (t) of the definition of Permitted Liens;

(f)    Pharmacy Receivables that are subject to any Lien whatsoever other than Liens in favor of the Co-Collateral Agents for the benefit of the Credit Parties and Liens of the types described in clauses (a), (e), (m), (s), (t) and (u) of the definition of Permitted Liens;

(g)    Pharmacy Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(h)    Pharmacy Receivables due from Medicare, Medicaid and other Governmental Authorities;

(i)    Pharmacy Receivables due from a Third Party Payor who is not duly authorized to conduct business in the United States of America, Puerto Rico, United States Virgin Islands or Guam, as applicable;

(j)    Pharmacy Receivables which are acquired outside of the ordinary course of business unless and until the Co-Collateral Agents have completed an appraisal and audit of such Pharmacy Receivables and otherwise agree that such Pharmacy Receivables shall be deemed Eligible Pharmacy Receivables;

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(k)   Pharmacy Receivables as to which (i) the Borrowing Base Loan Party making the sale giving rise to such Pharmacy Receivables does not have a valid and enforceable agreement with the Third Party Payor providing for payment to such Borrowing Base Loan Party or there is a default thereunder that could be a basis for such Third Party Payor ceasing or suspending any payments to such Borrowing Base Loan Party, or (ii) the prescription drugs sold giving rise to such Pharmacy Receivables are not of the type that are covered under the agreement with the Third Party Payor or the party receiving such goods is not entitled to coverage under such agreement, (iii) the Borrowing Base Loan Party making the sale giving rise to such Pharmacy Receivables has not received confirmation from such Third Party Payor that the party receiving the prescription drugs is entitled to coverage under the terms of the agreement with such Third Party Payor and the Borrowing Base Loan Party is entitled to reimbursement for such Pharmacy Receivables, (iv) the amount of such Pharmacy Receivables exceeds the amounts to which the Borrowing Base Loan Party making such sale is entitled to reimbursement for the prescription drugs sold under the terms of such agreements (but solely to the extent of such excess), (v) there are contractual or statutory limitations or restrictions on the rights of the Borrowing Base Loan Party making such sale to assign its rights to payment arising as a result thereof or to grant any security interest therein which limitations or restrictions have not been satisfied or waived, (vi) all authorization and billing procedures and documentation required in order for the Borrowing Base Loan Party making such sale to be reimbursed and paid on such Pharmacy Receivables by the Third Party Payor have not been properly completed and satisfied to the extent required for such Borrowing Base Loan Party to be so reimbursed and paid, and (vii) the terms of the sale giving rise to such Pharmacy Receivables and all practices of such Borrowing Base Loan Party with respect to such Pharmacy Receivables do not comply in all material respects with applicable federal, state, and local laws and regulations;

(l)   Pharmacy Receivables which do not conform to all representations, warranties, covenants, or other provisions in the Loan Documents relating to Pharmacy Receivables; or

(m)   Pharmacy Receivables which the Co-Collateral Agents determine in their Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Pharmacy Receivables as the Agent (or any Co-Collateral Agent upon written notice to the Agent) may determine in its Permitted Discretion.

"**Employee Wage Order**" means ~~an order granting *Motion of Debtors for Entry of*~~the *Final Order (I) Authorizing* b~~B~~*ut Not Directing the Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs, and (II) Granting Related Relief* (Docket No. ~~31) which is in form and substance acceptable to the Agent in its sole and absolute discretion~~798) entered by the Bankruptcy Court on November 16, 2018.

"**Enforcement Action**" means any rightful action to enforce any Obligations or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of account debtors, exercise of setoff or recoupment, or otherwise).

"**Environmental Action**" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation or remediation, fines, penalties or indemnities), of Holdings, the Borrowers, or any of their Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the presence, generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and issued thereunder.

"**ERISA Affiliate**" means any Person that for purposes of Title IV of ERISA is a member of any Borrower's controlled group, or under common control with such Borrower, within the meaning of Section 414 of the Internal Revenue Code.

"**ERISA Event**" means (a) (i) the occurrence of a Reportable Event, as defined herein, or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to Section 4043(b)(2)) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following

1030946.0~~68~~CA CHISR01A - MSW
~~C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX~~

30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Sections 303(k) or 4068(a) of ERISA shall have been met with respect to any Plan; (g) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan, or (h) the Borrowers or any ERISA Affiliate incur liabilities under Section 4069 of ERISA.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association, as in effect from time to time.

"**Eurocurrency Liabilities**" has the meaning assigned to that term in Regulation D of the Board of Governors, as in effect from time to time.

"**Eurodollar Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Eurodollar Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"**Eurodollar Rate**" means,

(a)    for any Interest Period with respect to a Eurodollar Rate Advance, the rate per annum equal to the London Interbank Offered Rate ("**LIBOR**") or a comparable or successor rate, which rate is chosen by the Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)    for any interest calculation with respect to a Base Rate Advance on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day; and

provided that (i) to the extent a comparable or successor rate is selected by the Agent in connection herewith, the approved rate shall be applied in a manner consistent with market practice; provided, further that to the extent such market practice is not administratively feasible for the Agent, such approved rate shall be applied in a manner as otherwise reasonably

1030946.06~~8CA~~-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS  DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

determined by the Agent and (ii) in the event that the Eurodollar Rate as determined above would otherwise be less than 0.00%, such Eurodollar Rate shall be deemed to be 0.00%.

"**Eurodollar Rate Advance**" means an Advance or Term Loan Borrowing that bears interest as provided in Section 2.08(a)(ii) or Section 2.08(b)(ii), as applicable.

"**Eurodollar Rate Reserve Percentage**" for any Interest Period for a Eurodollar Rate Advance by any Lender means the reserve percentage applicable to such Lender two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors for determining the minimum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"**Events of Default**" has the meaning specified in Section 7.01.

"**Excess Availability**" means, at any time, an amount equal to the (A) the Line Cap, minus (B) the Total Extensions of Credit.

"**Excluded Accounts**" means payroll, trust and Tax withholding accounts funded in the ordinary course of business.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Guarantee and Collateral Agreement of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 9.20 hereof and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such guaranty or security interest becomes illegal.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated and including any Taxes imposed in lieu of income Taxes), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in any Extension of Credit or Commitment pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in such Extension of Credit

1030946.06<del>8CA</del>-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.16) or (ii) in the case of a Lender, such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.15(e) or Section 2.15(f) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"**Existing Letters of Credit**" means each of the Letters of Credit described on Schedule 1.02 issued and outstanding under the Prepetition First Lien ABL Credit Agreement or the Interim DIP Term Sheet immediately prior to the Effective Date.

"**Extensions of Credit**" means as to any Lender at any time, an amount equal to the sum of (a) the aggregate Revolving Extensions of Credit of such Lender and (b) the outstanding principal amount of the Term Loan held by such Lender.

"**Extraordinary Expenses**" means all reasonable and documented out-of-pocket costs, expenses or advances that the Agent or any Co-Collateral Agent may incur, whether prior to or after the occurrence and continuance of a Default or Event of Default, and whether prior to, after or during the pendency of the Chapter 11 Cases or any other Insolvency Proceeding of any Loan Party, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against the Agent, the Co-Collateral Agents, any Lender, any Loan Party, any representative of creditors of a Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Control Co-Collateral Agent's Liens with respect to any Collateral), Loan Documents or Obligations, including any lender liability or other claims; (c) the exercise, protection or enforcement of any rights or remedies of Agent or the Co-Collateral Agents in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations; or (g) Overadvances. Such costs, expenses and advances include transfer fees, taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, financial advisor fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Loan Party or independent contractors in liquidating any Collateral (including the Liquidation Agent), and travel expenses.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing such sections of the Internal Revenue Code.

1030946.068CA -CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Fee Letter**" means the Fee Letter, dated October 15, 2018, among Holdings, the Borrowers, and each Joint Lead Arranger.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing reasonably selected by it; provided, that if such rate shall be less than zero, the Federal Funds Rate shall be deemed to be zero for the purposes of this Agreement and the other Loan Documents.

"**Final Financing Order**" means an order of the Bankruptcy Court, in the form of Exhibit K, with any changes thereto that are satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, which order shall have been entered not later than November 20, 2018, authorizing and approving the DIP ABL Facility on a final basis in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion.

"**Financing Orders**" means, collectively, the Interim Financing Order and the Final Financing Order.

"**Flood Documentation**" means, for any Real Property, (i) evidence as to whether the applicable Real Property is located in a Special Flood Hazard Area pursuant to a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination form ordered and received by Agent (and if the flood hazard determination states that such Real Property is located in a Special Flood Hazard Area, the applicable Loan Party's written acknowledgment of receipt of written notification from the Co-Collateral Agents), (ii) in the event such Real Property is located in a Special Flood Hazard Area with respect to which flood insurance has been made available under the Flood Insurance Laws, evidence of flood insurance in an amount and otherwise sufficient to comply with the applicable rules and regulations promulgated pursuant to the Flood Insurance Laws, in form and substance reasonably acceptable to Agent, and (iii) any other reasonable documents or information reasonably requested by any Lender (through the Agent) to enable such Lender to comply, in the determination of the Co-Collateral Agents, with any applicable Flood Insurance Laws.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973, (iii) the National Flood Insurance Reform Act of 1994, (iv) the Flood Insurance Reform Act of 2004 and (v) the Biggert-Waters Flood Insurance Reform Act of 2012.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, (a) with respect to the Issuing Lenders, such Defaulting Lender's Revolving Commitment Percentage of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders or Cash Collateralized

1030946.06CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

in accordance with the terms hereof, and (b) with respect to the Swingline Lender, such Defaulting Lender's Revolving Commitment Percentage of Swingline Advances other than Swingline Advances as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" has the meaning specified in Section 1.03.

"**Gift Card Liability Reserve**" means, at any time, and without duplication of any other Availability Reserves or Inventory Reserves, a reserve equal to the aggregate remaining value at such time of (i) outstanding gift certificates and gift cards of the Borrowing Base Loan Parties entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory and (ii) outstanding merchandise credits.

"**Global Bidding Procedures Order**" means that certain *Order Signed on 11/19/2018 Approving Global Bidding Procedures and Granting Related Relief* (Docket No. 816) entered by the Bankruptcy Court.

"**Go Forward Plan**" means that certain Go Forward Plan of the Debtors attached hereto as Schedule 6.01(r)(ii).

"**Go Forward Stores**" means the stores identified on Schedule 1.09.

"**Go Forward Stores Qualified Bid**" means (i) a Qualified Stalking Horse Bid, (ii) any subsequently submitted non-contingent and fully-financed (with committed financing containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provisions)) qualified bid or bids accepted by the Debtors as the highest or best bid or bids for the Go Forward Stores in accordance with the Global Bidding Procedures Order and otherwise reasonably acceptable to the Administrative Agent and Co-Collateral Agents, and (iii) any bid accepted by Debtors as a replacement or substitute bid for any of the foregoing, so long as it meets the requirements of a Qualified Stalking Horse Bid or the requirements set forth in clause (ii) above; in each case of clauses (i), (ii) and (iii), that will result, individually or in the aggregate, in Net Proceeds to satisfy in full, in cash, all Obligations (after taking into account the funding in full of the Winddown Account with the proceeds of any Prepetition Unencumbered Assets included in such bids).

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank), any group or body charged with setting regulatory capital rules or standards (including the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the

1030946.06<del>8CA</del>-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

foregoing) and any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Group Members**" means, collectively, Holdings, the Borrowers and their respective Subsidiaries.

"**Guarantee and Collateral Agreement**" means a Debtor-in-Possession Guarantee and Collateral Agreement in the form of Exhibit D.

"**Hazardous Materials**" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous, toxic; a pollutant, contaminant or words of a similar import under any Environmental Law.

"**Holdings**" has the meaning specified in the Preamble.

"**Incremental DIP Revolving Commitments**" has the meaning specified in the recitals to this Agreement.

"**Incremental DIP Revolving Loans**" has the meaning specified in the recitals to this Agreement.

"**Incremental DIP Term Loan**" has the meaning specified in the recitals to this Agreement.

"**Indemnified Taxes**" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Indemnified Party**" has the meaning specified in Section 9.04(b).

"**Initial Lenders**" means Bank of America, N.A., Wells Fargo Bank, National Association and Citibank, N.A.

"**Initial Term Loan**" means the term loan made by the Term Lenders pursuant to Section 2.01(b) in an aggregate principal amount of $111,889,241.

"**Insolvency**" means with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"**Insolvency Proceeding**" means any case or proceeding (other than the Chapter 11 Cases) commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT
AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Insolvent**" means pertaining to a condition of Insolvency.

"**Intellectual Property**" has the meaning specified in the Guarantee and Collateral Agreement.

"**Interest Period**" means, for each Eurodollar Rate Advance comprising part of the same Borrowing or Term Loan Borrowing, the period commencing on the date of such Eurodollar Rate Advance or the date of the Conversion of any Base Rate Advance into such Eurodollar Rate Advance and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below.  The duration of each such Interest Period shall be two weeks or one month, as the applicable Borrower may, upon notice received by the Agent not later than 12:00 noon on the third Business Day prior to the first day of such Interest Period, select; provided, however, that:

(a)    a Borrower may not select any Interest Period with respect to a Revolving Advance or Term Loan Borrowing that ends after the Scheduled Termination Date;

(b)    Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Borrowing shall be of the same duration;

(c)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period of one month or longer to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(d)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"**Interim DIP Facility**" has the meaning specified in the recitals to this Agreement.

"**Interim DIP Term Sheet**" means the $1,830,000,000 Senior Secured Superpriority Priming Debtor-in-Possession Asset Based Credit Facility Summary of Terms and Conditions, dated October 15, 2018, by and among Holdings, the Borrowers, the other Loan Parties, and the Initial Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Interim Financing Order**" means that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV)*

*Scheduling Final Hearing; and (V) Granting Related Relief* (Docket No. 101), entered by the Bankruptcy Court on October 16, 2018.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Inventory**" as defined in the UCC.

"**Inventory Reserves**" means the following:

(a)    a reserve for shrink, or discrepancies that arise between Inventory quantities on hand per the Borrowing Base Loan Parties' unit inventory system, and physical counts of the Inventory which will be equal to the greater of (i) the mathematical average of the historical shrink results expressed as a percent of sales, multiplied by sales for the relevant year-to-date period and adjusted for the cost complement for the relevant year-to-date period, but only to the extent such amount exceeds reserves already netted out of the Inventory Value per the stock ledger; or (ii) an amount determined by the Agent in its Permitted Discretion or any Co-Collateral Agent in its Permitted Discretion upon written notice to the Agent, and the Agent shall, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Inventory Reserve;

(b)    a reserve for intracompany profit, equal to the most recent three (3) fiscal months of capitalized cost of the foreign buying offices owned and operated by any Borrowing Base Loan Party, with the time frame subject to change based on Inventory performance, or the Agent's (or any Co-Collateral Agent's upon written notice to the Agent) Permitted Discretion;

(c)    to the extent not already netted out of the Inventory Value per the stock ledger or not treated as ineligible pursuant to the definition of Eligible Inventory, a reserve determined in the Agent's (or any Co-Collateral Agent upon written notice to the Agent) Permitted Discretion for (i) hard (permanent) markdowns, (ii) seasonal merchandise (including, without limitation, seasonal apparel which is more than four weeks past a specified selling season, and Inventory for sale during a specified holiday or event (other than seasonal apparel), after the specified holiday or event has occurred), (iii) discontinued and clearance merchandise, (iv) change in product mix of merchandise, (v) change in pricing strategy or markon percentages, (vi) damaged merchandise, (vii) price changes, or (viii) other adjustments as deemed appropriate;

(d)    a reserve established in the Agent's (or any Co-Collateral Agent's upon written notice to the Agent) Permitted Discretion for Inventory returned (other than as a result of reclamations) to either the return goods center ("**RGC**"), the vendor, given to charity, or otherwise considered non-saleable, whether defective or non-defective, and the Agent shall, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Inventory Reserve. This reserve is to be calculated as the monthly average for the most recent rolling 12 fiscal month period of return (other than as a result of reclamations) activity to the vendors, the RGC, given to charity, or otherwise considered non-saleable, whether defective or non-defective, both from the Stores and DCs, and is subject to change at the Agent's (or any Co-Collateral Agent's upon written

C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

notice to the Agent) Permitted Discretion; and such reserve is to be recalculated on the Thursday after each Prior Week and to be reflected on each Borrowing Base Certificate delivered by Holdings on such date;

(e)     without duplication of any Reserve imposed under clause (a) of the definition of "Eligible In-Transit Inventory", a reserve for that in transit Inventory purchased under "private label" letters of credit issued by SRAC or Letters of Credit issued hereunder; and

(f)     a reserve for Inventory ordinarily classified as repair services.

"**Inventory Value**" means, with respect to any Inventory of the Borrowing Base Loan Parties, the value of such Inventory valued at the lower of cost or market value on a basis consistent with the Borrowing Base Loan Parties' current and historical accounting practice in effect on the date of this Agreement, per the stock ledger (without giving effect to LIFO reserves and general ledger reserves for discontinued inventory, markdowns, intercompany profit, rebates and discounts, any cut off adjustments, revaluation adjustments, purchase price adjustments or adjustments with respect to the capitalization of buying, occupancy, distribution and other overhead costs reflected on the balance sheet of the Borrowing Base Loan Parties in respect of Inventory). The value of the Inventory as set forth above will be calculated net of the reserve established by the Borrowing Base Loan Parties on a basis consistent with the Borrowing Base Loan Parties' current and historical practices, in effect on the date of this Agreement, in respect of lost, misplaced or stolen Inventory (but the establishment of such reserves by the Borrowers shall not preclude the Co-Collateral Agents, in their Permitted Discretion, from establishing other or larger Inventory Reserves with respect to such Inventory as otherwise provided herein).

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.

"**Issuing Lender**" means, collectively, Bank of America, N.A. and Wells Fargo Bank, National Association, it being understood that with the consent of the requesting Borrower (not to be unreasonably withheld) the Issuing Lender may arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Lender, in which case the term "Issuing Lender" shall include any such affiliate with respect to Letters of Credit issued by such Affiliate. Each reference herein to "**the Issuing Lender**" shall be deemed to be a reference to the relevant Issuing Lender with respect to the relevant Letter of Credit.

"**Joint Lead Arrangers**" has the meaning specified in the Preamble.

"**Junior DIP Final Financing Order**"  means an order of the Bankruptcy Court, satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, which order shall have been entered not later than December 28, 2018, authorizing and approving the Junior DIP Term Loan Facility on a final basis in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Junior DIP Financing Orders**" means the Junior DIP Interim Financing Order and the Junior DIP Final Financing Order.

"**Junior DIP Interim Financing Order**" *means that certain Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* entered by the Bankruptcy Court on [November 27, 2018].

"**Junior DIP Term Loan Facility**" means the secured debtor-in-possession multiple draw term loan facility provided pursuant to and evidenced by the Junior DIP Term Loan Agreement and the other Junior DIP Term Loan Documents.

"**Junior DIP Term Loans**" means the loans or other extensions of credit made by or on behalf of any lender under the Junior DIP Term Loan Agreement or by the Junior DIP Term Loan Agent pursuant to the Junior DIP Term Loan Agreement.

"**Junior DIP Term Loan Agent**" means GACP Finance Co., LLC.

["**Junior DIP Term Loan Agreement**" means that certain [_____]Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement dated [the date hereof] among the Junior DIP Term Loan Agent and the Loan Parties, as amended, restated, supplemented or otherwise modified from time to time.] as permitted herein.

"**Junior DIP Term Loan Documents**" means the Junior DIP Term Loan Agreement, any note issued thereunder, the Junior DIP Financing Orders, and the other "[DIP ]Loan] Documents" under and as defined in the Junior DIP Term Loan Agreement, as each may be amended, restated, supplemented or otherwise modified from time to time as permitted herein.

"**Junior DIP Term Loan Obligations**" means the ["Obligations"] as defined in the Junior DIP Term Loan Agreement.

"**Kmart**" means Kmart Holding Corporation, a Delaware corporation.

"**Kmart Corp.**" has the meaning specified in the Preamble.

"**L/C Commitment**" means $50,000,000 plus the amount of Prepetition L/C Obligations refinanced hereunder pursuant to Section 2.01(d)(iii).

"**L/C Obligations**" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed or discharged pursuant to Section 3.05.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Lease**" means any agreement, whether written or oral, no matter how styled or structured, and all amendments, guaranties and other agreements relating thereto, pursuant to which a Loan Party is entitled to the use or occupancy of any Real Property for any period of time.

"**Lenders**" has the meaning specified in the Preamble.

"**Letters of Credit**" means the collective reference to Commercial L/Cs, Banker's Acceptances, and Standby L/Cs; individually, a "**Letter of Credit**". Without limiting the foregoing, the Existing Letters of Credit shall be deemed Letters of Credit issued under this Agreement.

"**Lien**" means any lien, security interest, mortgage or other charge or encumbrance of any kind or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor, and any easement, right of way or other encumbrance on title to real property, but excluding consignments or bailments of goods of third parties and the interests of lessors under operating leases.

"**Line Cap**" means, at any time of determination, the lesser of (i) the Aggregate Revolving Commitments plus the principal amount of the Term Loan outstanding at such time and (ii) the Borrowing Base.

"**Liquidation**" means the exercise by the Agent or the Co-Collateral Agents of those rights and remedies accorded to the Agent and/or the Co-Collateral Agents under the Loan Documents and applicable law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent and the Co-Collateral Agents, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other Disposition of the Collateral for the purpose of liquidating the Collateral.

"**Liquidation Agent**" has the meaning assigned to such term in Section 6.01(s).

"**Loan Documents**" means this Agreement, the Security Documents, the DIP Intercreditor Agreement, the Notes, the Fee Letter, the Financing Orders, any Application, each Borrowing Base Certificate, each Approved Budget, each Rolling Budget, any other document or instrument now or hereafter designated by the Borrowers and the Agent as a "**Loan Document**" and any amendment, waiver, supplement or other modification to any of the foregoing.

"**Loan Parties**" means each Group Member that is a party to a Loan Document.

"**LTV Formula Amount**" means, at any time, (a) the aggregate outstanding Eligible Credit Card Accounts Receivable at such time, plus (b) the Eligible Pharmacy Receivables at such time plus (c) (i) the Net Orderly Liquidation Value of Net Eligible Inventory (other than Eligible Inventory at Stores to be closed pursuant to Specified Store Closing Sales) at such time

1030946.06~~8CA~~-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

and (ii) the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at Stores to be closed pursuant to Specified Store Closing Sales at such time.

"**LTV Provisions**" means the ratios set forth in Section 6.02(n).

"**Material Adverse Effect**" means the effect of any event, condition, circumstance or contingency that, taken alone or in conjunction with other events, conditions, circumstances or contingencies (in each case, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases), has or could reasonably be expected to have a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of Holdings and its Subsidiaries taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform their obligations under the Loan Documents or (c) the validity or enforceability of the Loan Documents or the rights and remedies of the Agent, the Co-Collateral Agents or the Lenders thereunder (including, but not limited to, the enforceability or priority of any Liens granted to the Co-Collateral Agents under the Loan Documents).

"**Material Documents**" means all pleadings, documents, proposed forms of order, or other items filed by the Debtors in the Chapter 11 Cases that relate to the following: (a) ~~rejection or assumption of material executory contracts, (b)~~ any plan of reorganization or liquidation, (~~c~~b) any debtor-in-possession financing or use of cash collateral that does not result in payment in full in cash of all Obligations and Prepetition First Lien ABL Obligations upon consummation of such financing or use of cash collateral, (~~d~~c) any sale or other disposition of Collateral outside of the ordinary course of business ~~or~~, (~~e~~d) any other item that would materially and adversely affect the Credit Parties' or Prepetition Credit Parties' claims or (e) the Junior DIP Term Loan Facility.

"**MLPFS**" has the meaning specified in the Preamble.

"**Mortgaged Properties**" means each Real Property that, upon request of the Co-Collateral Agents, shall be encumbered by a Mortgage pursuant to Section 6.01(i)(v).

"**Mortgages**" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, debentures, and other security documents securing the Obligations (including amendments to any of the foregoing) executed and delivered by a Loan Party to the Co-Collateral Agents with respect to Mortgaged Properties (either as stand-alone documents or forming part of other Security Documents), each in form and substance satisfactory to the Co-Collateral Agents and the Borrowers, in each case, as amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Holdings or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"**Multiple Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Holdings or any ERISA Affiliate and at least one Person other than Holdings and the ERISA Affiliates or (b) was so

1030946.0~~68~~CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

maintained and in respect of which Holdings or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"**Net Cash Flow**" means, for any Cumulative Four-Week Period, the Borrowers' total net cash flow, excluding (i) proceeds from Dispositions, except for proceeds from the sale of Inventory, and (ii) financing related items.

"**Net Eligible Inventory**" means, at any time, an amount equal to the Inventory Value of Eligible Inventory less Inventory Reserves.

"**Net Proceeds**" means, (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries of any property (other than property disposed of pursuant to clauses (a), (b), (c), (e), (f), (h) or (j) of the definition of Permitted Dispositions) or any casualty or condemnation of such property, the excess, if any, of (i) the sum of cash and cash equivalents received in such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Debt (other than Debt owed to Holdings or any of its Subsidiaries, the payment of which in connection with any Permitted Disposition or other transaction shall not, for the avoidance of doubt, be deemed to reduce the amount of Net Proceeds for any purposes under this Agreement) that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Co-Collateral Agents' Lien, if any, on such asset and that is required, and permitted under this Agreement, to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction, (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, reasonable and customary attorneys' fees, accountants' fees, investment banking fees, appraisals, and brokerage, legal, title and recording or transfer Tax expenses and commissions) paid by any Loan Party or any of its Subsidiaries to third parties (other than Affiliates), (C) transfer Taxes paid as a result thereof and (D) amounts required to be paid by any Loan Party or any of its Subsidiaries pursuant to the Financing Orders or other applicable order of the Bankruptcy Court in order to consummate such transaction, and (b) with respect to any issuance of Equity Interests of any Loan Party or capital contribution made to any Loan Party (other than an issuance of Equity Interests to a Loan Party or a capital contribution made by a Loan Party) or any incurrence of Debt other than Permitted Debt, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party in connection therewith.

"**Net Orderly Liquidation Value**" means the product of (x) clause (i) of Net Recovery Rate and (y) the Net Eligible Inventory.

"**Net Recovery Rate**" means (i) with respect to Eligible Inventory located at Stores not subject to a Store closing (the "**Appraised Go Forward Stores**"), the appraised blended net orderly liquidation value (the "**Go Forward Stores Net Recovery Rate**") (on an "as is, where is" basis) of each Borrowing Base Loan Party's Eligible Inventory that is to be sold through Appraised Go Forward Stores on a wholesale basis, net of costs and expenses estimated to be incurred in connection with such liquidation, which value is expressed as a percentage of the Inventory Value of Eligible Inventory located at the Appraised Go Forward Stores and shall be

determined by the Co-Collateral Agents from time to time based on the most recent appraisal provided by an independent third-party appraiser retained by the Co-Collateral Agents in accordance with Section 6.01(k), and (ii) with respect to Eligible Inventory located at Stores that are closing, the (including Stores closing pursuant to the Initial Store Rationalization (as defined on Schedule 6.01(r)(ii)), the Secondary Store Rationalization (as defined on Schedule 6.01(r)(ii)) any Specified Store Closing Sale or Specified Full Chain Liquidation), the lesser of (x) the Go Forward Stores Net Recovery Rate for such Eligible Inventory determined as if such store was a Go Forward Store and (y) the appraised orderly liquidation value (on an "as is, where is" basis) for the applicable week of the scheduled Store closing events of each Borrowing Base Loan Party's Eligible Inventory located at such closing Stores, net of costs and expenses estimated to be incurred in connection with such liquidation, which value is expressed as a percentage of the Inventory Value of Eligible Inventory located at such Stores that are closing and shall be determined by the Co-Collateral Agents from time to time in consultanttion with BRG and an independent third-party appraiser based on the most recent appraisal provided by an independent third-party appraiser retained by the Co-Collateral Agents in accordance with Section 6.01(k).

"**Non-Consenting Lender**" has the meaning specified in Section 9.16.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Note**" means a promissory note of any Borrower payable to any Lender evidencing the Revolving Commitment or Term Loan of such Lender, as applicable.

"**Notice of Borrowing**" has the meaning specified in Section 2.02(a).

"**Obligations**" has the meaning set forth in the Guarantee and Collateral Agreement.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Extension of Credit or Loan Document pursuant to an assignment request by the Borrowers under Section 9.16).

"**Other Taxes**" has the meaning specified in Section 2.15(b).

"**Overadvance**" means any Advance to the extent that, immediately after its having been made, Excess Availability is less than zero.

"**PACA**" means the Perishable Agricultural Commodities Act of 1930, as amended.

"**PACA Liability Reserve**" means an amount calculated on a monthly basis by the Agent to provide for vendor liabilities pursuant to PACA.

"**Participant Register**" has the meaning specified in Section 9.07(f).

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Participating Prepetition Lender**" has the meaning specified in Section 2.01(d).

"**PASA**" means the Packers and Stockyards Act of 1921, as amended.

"**PASA Liability Reserve**" means the liability for vendor liabilities pursuant to PASA.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Holdings or any ERISA Affiliate or to which Holdings or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Perfection Certificate**" means a certificate dated as of the Effective Date with respect to the Borrowers and the other Loan Parties in form reasonably satisfactory to the Co-Collateral Agents.

"**Permitted Debt**" means each of the following as long as no Default or Event of Default exists at the time of incurrence thereof or would arise from the incurrence thereof:

(a)     Debt outstanding on the date of this Agreement and listed on Schedule 1.04; provided that such Debt was permitted under the Prepetition First Lien ABL Credit Agreement;

(b)     Debt of any Loan Party to any other Loan Party;

(c)     Debt of any Group Member to any Subsidiary of Holdings which is not a Loan Party; provided, that (1) at the time of incurrence of any such Debt and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing and (2) such Debt is by its terms subordinated or junior in right of payment or security to the Obligations on terms acceptable to the Agent in its reasonable discretion;

(d)     the Obligations;

(e)     Debt under the Junior DIP Term Loan Agreement as in effect on the date hereof and subject at all times to the Financing Orders and the DIP Intercreditor Agreement;

(f)     Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations (including, in each case, letters of credit issued to provide such bonds, guaranties and similar obligations), in each case provided in

the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(g)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, that (x) such Debt is extinguished within ten Business Days of notification to the applicable Loan Party of its incurrence and (y) such Debt is subject to the Cash Management Order;

(h)    Debt arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with any Specified Store Closing Sales or any Specified Sale Transaction, in each case on terms and pursuant to documentation (including documentation regarding subordination) acceptable to the Agent and the Co-Collateral Agents in their sole and absolute discretion; and

(i)    any other Debt in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding.

Notwithstanding the foregoing, and except for the Carve-Out and except for the Junior DIP Superpriority Claims (as defined in the Final Financing Order), no Permitted Debt shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of (i) the Credit Parties in respect of the Obligations and (ii) the Prepetition Credit Parties in respect of the Prepetition ABL Obligations, in each case as set forth in the Financing Orders, as applicable.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of commercially reasonable business judgment (from the perspective of a secured, asset-based lender).

"**Permitted Dispositions**" means any of the following, as long as, if so required pursuant to Section 2.11 or Section 6.01(m), as applicable, all Net Proceeds are remitted to Agent for application to the Obligations:

(a)    transfers and Dispositions of Inventory in the ordinary course of business (it being agreed and understood that bulk sales, "going-out-of-business sales," store closing sales and similar sales are not in the ordinary course of business);

(b)    transfers and Dispositions among the Loan Parties;

(c)    transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to any Loan Party;

(d)    the sale of surplus, obsolete or worn out equipment or other property (other than Inventory) in the ordinary course of business by the Borrowers or any Subsidiary;

(e)    transfers and Dispositions which constitute Permitted Investments that are otherwise permitted hereunder;

(f)    subleases of real property existing as of the Petition Date and entered into in the ordinary course of business of any Loan Party;

(g)    the sale or Disposition of defaulted receivables and the compromise, settlement and collection of receivables in the ordinary course of business or in bankruptcy or other proceedings concerning the other account party thereon and not as part of an accounts receivable financing transaction;

(h)    any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind (other than, in each case, with respect to rights to license Intellectual Property, unless the limited license granted to the Co-Collateral Agents in such Intellectual Property pursuant to the Loan Documents remains in effect and is acknowledged by the licensee) to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect;

(i)    sales of Inventory (other than Eligible Inventory) determined by the management of the applicable Loan Party not to be saleable in the ordinary course of business of such Loan Party or any of the Loan Parties;

(j)    non-exclusive licenses to Intellectual Property granted to third parties in the ordinary course of business or in connection with a Disposition permitted under Section 6.02(i), and which do not materially interfere with the ordinary conduct of business of the Loan Parties;

(k)    dispositions in the ordinary course of business consisting of the abandonment of Intellectual Property rights which, in the reasonable good faith determination of the Borrowers, are no longer economically practicable to maintain or useful in the conduct of the business of the Loan Parties;

(l)    the Specified Store Closing Sales; and

(m)    any Specified Sale Transaction.

"**Permitted Encumbrances**" means Permitted Liens of the types described in clauses (a), (b), (e), (g), (j) or (t) of the definition thereof.

"**Permitted Holder**" means ESL Investments, Inc. and any of its Affiliates other than a Group Member.

"**Permitted Holder Lender**" means (x) any Permitted Holder and/or (y) any Significant Holder, provided, that, the Permitted Holder Lenders shall not (taken as a whole) at any time hold more than the amount of the Aggregate Revolving Commitments and the principal amount of the Term Loans held by such Permitted Holder Lenders on the Effective Date; provided, further, that, such Permitted Holder Lender shall execute a waiver in form and substance

1030946.0̶6̶8CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

reasonably satisfactory to the Agent that it shall have no right whatsoever with respect to that portion of the Aggregate Revolving Commitments, the Advances or the Term Loan which it holds (a) to consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of any Loan Document, (b) otherwise to vote on any matter related to any Loan Document, (c) to require Agents or any Lender to undertake any action (or refrain from taking any action) with respect to any Loan Document, (d) to attend any meeting with the Agent or any Lender or receive any information from the Agent or any Lender, (e) to the benefit of any advice provided by counsel to the Agents or the other Lenders or to challenge the attorney-client privilege of the communications between the Agents, such other Lenders and such counsel, or (f) make or bring any claim, in its capacity as Lender, against any Agent with respect to the fiduciary duties of such Agent or Lender and the other duties and obligations of the Agents hereunder; except that no amendment, modification or waiver to any Loan Document shall, without such Permitted Holder Lender's consent, deprive any Permitted Holder Lender of its pro rata share of any payments to which the Lenders as a group (or any Class thereof) are otherwise entitled hereunder or otherwise single out, or intentionally discriminate against the Permitted Holder Lender, as such.  For purposes of this definition, plural references to "**Agents**" contained in clauses (c) through (f) shall have the meaning set forth in <u>Section 8.03</u>, and references to "**such Agent**" or "**any Agent**" shall have corresponding meanings, as the context shall require.

"**Permitted Investments**" means each of the following as long as no Default or Event of Default exists at the time of the making such of Investment or would arise from the making of such Investment:

(a)    Investments existing on the date of this Agreement and listed on <u>Schedule 1.05</u>;

(b)    (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the date of this Agreement and described in the Perfection Certificate, (ii) Investments by any Loan Party and its Subsidiaries in Loan Parties, and (iii) Investments by Subsidiaries that are not Loan Parties in Holdings or any Subsidiary <u>provided</u> that in the case of this clause (iii), if such Investment is a loan it is subordinated to the Obligations on subordination terms satisfactory to the Agent in its reasonable discretion;

(c)    Investments in connection with Specified Sale Transactions and ~~a~~any Specified Store Closing Sale~~s~~; provided that such Investments are made pursuant to agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion;

(d)    Investments arising out of the receipt of non-cash consideration for the sale of assets otherwise permitted under this Agreement;

(e)    Cash Equivalents that are subject to Agent's Lien and control, pursuant to documentation in form and substance satisfactory to Agent;

(f)    to the extent not prohibited by applicable law, (1) advances to officers, directors and employees and consultants of the Loan Parties made for travel, entertainment, relocation and other ordinary business purposes and (2) advances to officers,

1030946.06~~8~~~~CA~~-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

directors and employees and consultants of non-Loan Parties made for travel, entertainment, relocation and other ordinary business purposes, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder; provided that such Investments shall not exceed $1,000,000 in the aggregate at any one time outstanding;

(g)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by any Group Member as a result of a foreclosure by any Loan Party with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(h)    accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business;

(i)    Guarantees by Holdings or any Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Debt, in each case entered into by Holdings or any Subsidiary in the ordinary course of business;

(j)    (1) advances in the form of a prepayment of expenses of any Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable Loan Party and (2) advances in the form of a prepayment of expenses of any non-Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable non-Loan Party, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder; and

(k)    other Investments in an amount not to exceed $1,000,000 in the aggregate outstanding at any time; provided that any cash returns on such Investments shall be applied to the Obligations in accordance with Section 2.11(c)(i).

"**Permitted Liens**" means:

(a)    Liens for Taxes, assessments and governmental charges or levies to the extent such Taxes, assessments or governmental charges are being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained;

(b)    Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(c)    Landlords' Liens arising in the ordinary course of business securing (i) rents not yet due and payable, (ii) rent for Stores in an amount not to exceed the monthly base rent due for the immediately preceding calendar month and (iii) rents for Stores in excess of the

1030946.0668CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

amount set forth in the preceding clause (ii) so long as such amounts are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(d)    any attachment or judgment lien not constituting an Event of Default under Section 7.01(e);

(e)    Liens presently existing or hereafter created in favor of the Co-Collateral Agents, on behalf of the Credit Parties;

(f)    Liens arising by the terms of commercial letters of credit, entered into in the ordinary course of business to secure reimbursement obligations thereunder, provided that such Liens only encumber the title documents and underlying goods relating to such letters of credit or cash;

(g)    claims under PACA and PASA;

(h)    Liens in favor of issuers of credit cards arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(i)    Liens incurred or deposits made by any Group Member in the ordinary course of business in connection with workers' compensation and other casualty insurance lines, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(j)    easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business, or in respect of any Real Property over which the Co-Collateral Agents have a Mortgage, any title defects, liens, charges or encumbrances (other than monetary Liens) which the title company is prepared to endorse or insure by exclusion or affirmative endorsement reasonably acceptable to the Agent and which is included in any Title Policy;

(k)    any interest or title of a lessor or sublessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Agreement;

(l)    normal and customary rights of setoff upon deposits of cash or other Liens originating solely by virtue of any statutory or common law provision, or ordinary course contractual obligation, relating to bankers' liens, rights of setoff or similar rights  in favor of banks or other depository institutions;

(m)    Liens existing on the Effective Date and set forth on Schedule 1.06;

(n)    Liens granted to consignors who have properly perfected on consigned Inventory owned by such consignors and created in the ordinary course of business;

(o)    [reserved];

(p)    deposits (including retainers or other similar deposits provided to professionals retained by any Group Member in connection with providing services in the ordinary course of business) and other customary Liens to secure the performance of bids, trade contracts (other than for Debt), leases (other than Capital Lease Obligations), statutory and regulatory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, agreements with utilities, and other obligations of a like nature incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(q)    Liens that are contractual rights of set-off relating to the establishment of depository relations with banks not given in connection with the issuance of Debt;

(r)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)    the Adequate Protection Liens and the Adequate Protection Superpriority Claims;

(t)    the Carve-Out;

(u)    Liens securing the obligations under the Junior DIP Term Loan Agreement; provided that such Liens shall be subject at all times to the Financing Orders and the DIP Intercreditor Agreement; and

(v)    non-exclusive licenses to Intellectual Property granted to third parties in the ordinary course of business or in connection with a Disposition permitted under Section 6.02(i), and which do not materially interfere with the ordinary conduct of business of the Loan Parties.

"**Permitted Overadvance**" means an Overadvance made by the Agent, in its Permitted Discretion, or at the direction of any Co-Collateral Agent, which:

(a)    (i)    is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(ii)    is made to enhance the likelihood of, or to maximize the amount of, repayment of the Obligations; or

(iii)    is made to pay any other amount chargeable to any Loan Party hereunder; and

1030946.0685CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(b)    together with all other Permitted Overadvances then outstanding, shall not (i) exceed five percent (5%) of the Borrowing Base (calculated without giving effect to clauses (f) or (g) thereof) at any time or (ii) unless a Liquidation is occurring, remain outstanding for more than thirty (30) consecutive Business Days, unless in each case, the Required Lenders otherwise agree;

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Article III regarding any Revolving Lender's obligations with respect to Letters of Credit, or (ii) result in any claim or liability against the Agent or the Co-Collateral Agents (regardless of the amount of any Overadvance) for "**inadvertent Overadvances**" (i.e. where an Overadvance results from changed circumstances beyond the control of the Agent or the Co-Collateral Agents (such as a reduction in the collateral value)), and such "inadvertent Overadvances" shall not reduce the amount of Permitted Overadvances allowed hereunder, and further, provided, that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Revolving Extensions of Credit would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"**Permitted Prior Liens**" ~~has the meaning specified in Section 2.19(d).~~means valid, perfected and unavoidable liens (other than Primed Liens) in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition First Lien ABL Credit Agreement.

"**Permitted Variance**" means, for any Prior Four-Week Period, the Borrowers' actual Net Cash Flow shall not be less than the Net Cash Flow set forth in the Approved Budget minus 15% of the absolute value of the Net Cash Flow set forth in the Approved Budget.

"**Person**" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"**Petition Date**" has the meaning specified in the recitals to this Agreement.

"**Pharmacy Receivables**" means Accounts arising from the sale of prescription drugs or other Inventory which can be dispensed only through an order of a licensed professional.

"**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

"**Prepetition**" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"**Prepetition 2016 Term Loans**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition 2016 Term Loan Facility**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

1030946.0~~68~~CA-CHISR01A - MSW
~~C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX~~

"**Prepetition ABL Agent**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition ABL Collateral**" means the "Collateral" as defined in the Prepetition First Lien ABL Credit Agreement including any "cash collateral" as defined in Section 363 of the Bankruptcy Code.

"**Prepetition ABL Guarantee and Collateral Agreement**" means the Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, among Holdings, the Borrowers, the other grantors party thereto, the Prepetition ABL Agent and the Prepetition ABL Co-Collateral Agents, as the same has been amended, restated, supplemented or otherwise modified prior to the date of this Agreement.

"**Prepetition ABL Lenders**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition ABL Obligations**" means "Obligations" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Credit Parties**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition Facilities**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition FILO Loan Cap**" means the sum of (i) 10% of the Net Orderly Liquidation Value of Net Eligible Inventory at Stores other than closing Stores plus (ii) 10% of the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at closing Stores minus (iii) liabilities and obligations of the Loan Parties with respect to Bank Products and Cash Management Services at such time to the extent not already implemented and maintained as an Availability Reserve.

"**Prepetition FILO Reserve**" means a reserve in an amount equal to the excess of $125,000,000 over the Prepetition FILO Loan Cap (but no event less than zero). The Borrowers shall include reporting on the Prepetition FILO Reserve in each Borrowing Base Certificate.

"**Prepetition First Lien ABL Credit Agreement**" means the certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition First Lien ABL Credit Agreement**"), by and among Holdings, the Borrowers, the banks, financial institutions and other institutional lenders from time to time party thereto (collectively, the "**Prepetition ABL Lenders**"), the Issuing Lenders (as defined therein) from time to time party thereto (the "**Prepetition Issuing Lenders**"), and Bank of America, as administrative agent (in such capacity, the "**Prepetition ABL Agent**"), as a co-collateral agent, and as swingline lender, Wells Fargo Bank, National Association, as a co-collateral agent (together with Bank of America in such capacity, the "**Prepetition Co-Collateral Agents**," and together with the Prepetition

1030946.06~~8CA~~-CHISR01A - MSW
<span style="color:red">C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX</span>

<span style="color:red">~~76~~46</span>

ABL Lenders, the Prepetition Administrative Agent, and the Prepetition Issuing Lenders, the "**Prepetition Credit Parties**"), and the other parties from time to time party thereto, providing for a $1,500,000,000 asset-based revolving credit facility (the "**Prepetition Revolving Facility**"; and the revolving loans thereunder, the "**Prepetition Revolving Advances**"), a term loan facility in an aggregate original principal amount of $750,000,000 (the "**Prepetition 2016 Term Loan Facility**"; and the term loans thereunder, the "**Prepetition 2016 Term Loans**"), and a "first-in, last-out" facility in an original principal amount of $125,000,000 (the "**Prepetition FILO Facility**," and collectively with the Prepetition Revolving Facility and the Prepetition 2016 Term Loan Facility, the "**Prepetition Facilities**").

"**Prepetition First Lien ABL Credit Agreement Primed Parties**" has the meaning specified in Section 2.19(d).

"**Prepetition L/C Obligations**" means "L/C Obligations" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Loan Documents**" means "Loan Documents" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Revolver/Term Exposure**" means the sum of (a) the outstanding principal amount of Advances (under and as defined in the Prepetition First Lien ABL Credit Agreement), plus (b) the outstanding principal amount of Swingline Advances (under and as defined in the Prepetition First Lien ABL Credit Agreement), plus (c) the amount of Prepetition L/C Obligations plus (d) the outstanding principal amount of outstanding Prepetition 2016 Term Loans.

"**Prepetition Revolving Advances**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition Revolving Facility**" has the meaning specified in the definition of "Prepetition First Lien ABL Credit Agreement."

"**Prepetition Second Lien Cash Notes Indenture**" means that certain Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified from time to time), by and among Holdings, certain guarantors from time to time party thereto, and Wilmington Trust, National Association, as successor trustee and collateral agent thereunder.

"**Prepetition Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented or otherwise modified from time to time) by and among Holdings, the Borrowers, as borrowers, and the lenders from time to time party thereto.

"**Prepetition Second Lien Collateral**" means, collectively, Collateral (as defined in the Prepetition Second Lien Security Agreement).

1030946.0~~68CA~~-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Prepetition Second Lien Facilities**" means the Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Cash Notes Indenture, and the Prepetition Second Lien PIK Notes Indenture.

"**Prepetition Second Lien PIK Notes Indenture**" means that certain Indenture, dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time) by and among Holdings, certain guarantors from time to time party thereto, and Computershare Trust Company, N.A., as trustee thereunder.

"**Prepetition Second Lien Primed Parties**" has the meaning specified in Section 2.19(d).

"**Prepetition Second Lien Secured Parties**" means the secured parties under the Prepetition Second Lien Facilities.

"**Prepetition Second Lien Security Agreement**" means that certain Amended and Restated Security Agreement, dated as of March 20, 2018, by and among Holdings, certain guarantors from time to time party thereto, in favor of Wilmington Trust, National Association, in its capacity as collateral agent for the Prepetition Second Lien Secured Parties, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Prepetition Total Extensions of Credit**" means the "Total Extensions of Credit" as defined in the Prepetition First Lien ABL Credit Agreement.

"**Prepetition Unencumbered Assets**" has the meaning specified in Section 2.19(b).

"**Prepetition Unencumbered Assets Proceeds Account**" means a fully blocked segregated account established with Bank of America for the benefit of the Lenders and otherwise on terms and conditions satisfactory to the Co-Collateral Agents in their sole discretion, for the purpose of holding the Net Proceeds of Prepetition Unencumbered Assets.

"**Primed Liens**" has the meaning specified in Section 2.19(d).

"**Priming Liens**" has the meaning specified in Section 2.19(d).

"**Prior Week**" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"**Pro Rata Basis**" means, with respect to any prepayment of the Term Loan pursuant to Section 2.11(a)(ii), and corresponding reduction in the Aggregate Revolving Commitments pursuant to the proviso thereto, that (i) the principal amount of such prepayment as a percentage of the aggregate outstanding principal amount of the Term Loan immediately prior to such prepayment is equal to (ii) the aggregate amount of such reduction as a percentage of the Aggregate Revolving Commitments immediately prior to such reduction.

"**Pro Rata Share**" means, as to any Lender as of any date of determination, a percentage equal to (i) the sum of such Lender's Revolving Commitment and/or share of the outstanding

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

principal amount of the Term Loan divided by (ii) the Aggregate Revolving Commitments and the aggregate outstanding principal amount of the Term Loan as of such date or, following termination of the Revolving Commitments, a percentage equal to (x) the Extensions of Credit of such Lender divided by the Total Extensions of Credit of all Lenders then outstanding.

"**Public Lender**" has the meaning specified in <u>Section 9.02(d)</u>.

"~~**Qualified Bid**~~" ~~has the meaning specified in~~ ~~Schedule 6.01(r)(ii).~~

"**Qualified ECP Guarantor**" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Stalking Horse Bid**" has the meaning specified in Schedule 6.01(r)(ii).

"**Rebalancing Date**" means every other Friday, (i) beginning on Friday, December 21, 2018, if no Go Forward Stores Qualified Bid is obtained and found acceptable by the Debtors on or prior to December 15, 2018~~,~~ or (ii) if a Go Forward Stores Qualified Bid is obtained and found acceptable by the Debtors on such date, beginning on the second Friday following the date on which there ceases to be in full force and effect a Go Forward Stores Qualified Bid.

"**Recipient**" means the Agent, the Co-Collateral Agents, any Lender, any Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee simple or leased by any Loan Party, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"**Refunded Swingline Advances**" has the meaning specified in <u>Section 2.04(b)</u>.

"**Register**" has the meaning specified in <u>Section 9.07(e)</u>.

"**Reimbursement Obligation**" means the obligation of the Borrowers to reimburse the Issuing Lenders pursuant to <u>Section 3.05</u> for amounts drawn under Letters of Credit.

"**Related Parties**" - with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, attorneys and advisors of such Person and of such Person's Affiliates.

"**Remedies Notice Period**" has the meaning set forth in paragraph 34(b) of the Final Financing Order.

"~~**REMIC Certificates**~~" ~~means the SRC Commercial Mortgage Trust 2003-1 Mortgage Pass-Through Certificates in the aggregate face amount of [$1,312,416,000.]~~

76~~49~~

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"**Required Lenders**" means, at any time, the holders of more than 50% of the sum of the Aggregate Revolving Commitments then in effect and the principal amount of the Term Loan then outstanding (other than the portion of the Term Loan held by Permitted Holder Lenders) or, if the Aggregate Revolving Commitments have been terminated, the holders of more than 50% of the Total Extensions of Credit then outstanding (other than Extensions of Credit held by Permitted Holder Lenders), provided, that the Extensions of Credit of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"**Requirements of Law**" means as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Restricted Payment**" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings or any Subsidiary of Holdings, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings or any Subsidiary of Holdings or (c) any option, warrant or other right to acquire any such Equity Interests in Holdings or any Subsidiary of Holdings.

"**Revolving Advance**" has the meaning specified in Section 2.01. A Revolving Advance may be a Base Rate Advance or a Eurodollar Rate Advance (each of which shall be a "**Type**" of Revolving Advance).

"**Revolving Availability Date**" means any date after the Effective Date and prior to the Termination Date on which the balance in the Term Loan Proceeds Account is zero.

"**Revolving Commitment**" means, as to any Revolving Lender, the obligation of such Revolving Lender to make Revolving Advances and participate in Swingline Advances and Letters of Credit in an aggregate principal amount and/or face amount up to (a) the amount set forth opposite such Revolving Lender's name on Schedule 1.01 or (b) if such Revolving Lender has entered into any Assignment and Acceptance, the amount set forth for such Revolving Lender in the Register maintained by the Agent pursuant to Section 9.07(d), as such amount may be reduced pursuant to Section 2.06.

"**Revolving Commitment Percentage**" means, as to any Revolving Lender at any time, the percentage which such Revolving Lender's Revolving Commitment then constitutes of the Aggregate Revolving Commitments or, at any time after the Aggregate Revolving Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Revolving Lender's Advances then outstanding plus such Revolving Lender's participation in

1030946.0~~68~~CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS- DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Swingline Advances and L/C Obligations constitutes of the aggregate principal amount of the Advances, Swingline Advances and L/C Obligations then outstanding.

"**Revolving Extensions of Credit**" means as to any Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Advances held by such Revolving Lender then outstanding, (b) such Revolving Lender's Revolving Commitment Percentage of the aggregate principal amount of Swingline Advances then outstanding and (c) such Revolving Lender's Revolving Commitment Percentage of the L/C Obligations then outstanding.

"**Revolving Lenders**" means, collectively, any Persons signatory hereto as a Revolving Lender, and each Person that shall become a party hereto as a revolving lender pursuant to Section 9.07.

 "**Rolling Budget**" means a 13-week cash flow forecast delivered pursuant to Section 6.03.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union Member State, Her Majesty's Treasury of the United Kingdom, or any jurisdiction where any Group Member operates.

"**Sanctioned Country**" means at any time, a country or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of sanctioned Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, any European Union Member State, Her Majesty's Treasury of the United Kingdom, or by any jurisdiction where any Group Member operates; (b) any Person located, organized or resident in a Sanctioned Country; or (c) any Person directly or indirectly owned fifty percent or more or otherwise controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

"**Scheduled Termination Date**" has the meaning specified in the definition of "Termination Date."

"**Sears**" means Sears, Roebuck and Co., a New York corporation.

"**Sears Holdings Pension Plan**" means collective reference to the Sears Holdings Pension Plan 1, as amended and restated effective January 1, 2014, and the Sears Holdings Pension Plan 2, as amended and restated effective December 1, 2016.

"**SEC**" means the United States Securities and Exchange Commission.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

"**Security Documents**" means the collective reference to the Guarantee and Collateral Agreement, each of the Mortgages, any short-form intellectual property security agreement entered into in connection with the Guarantee and Collateral Agreement, the Financing Orders and all other documents hereafter delivered to the Co-Collateral Agents purporting to grant or granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"**Senior Permitted Liens**" means all Permitted Prior Liens, Permitted Liens to the extent such liens are required to be senior pursuant to applicable law, and Permitted Liens described in clauses (j) and (t) in the definition thereof.

"**Significant Holder**" means (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), which is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) of 10% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right), and (ii) any Affiliate of any such Person described in clause (i) above.

"**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Borrower or any  ERISA Affiliate and no Person other than such Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which any Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"**Special Flood Hazard Area**" has the meaning assigned to such term in Section 6.01(c)(vi).

"**Specified Full-Chain Liquidation**" means a liquidation on an equity basis (or, if approved by the Agent and the Co-Collateral Agents in their sole and absolute discretion, on a fee basis) of the entire chain of Stores (or the entire chain of Stores remaining after completion of, or not contemplated to be included in, the Specified Going Concern Sale) of the Debtors and all of the assets relating thereto under Section 363 of the Bankruptcy Code.  The Specified Full-Chain Liquidation shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Going Concern Sale**" means a sale, in one or a series of related transactions, of all or substantially all of (or, if approved in writing by the Agent, certain of) the assets of the Debtors as a going concern under Section 363 of the Bankruptcy Code in accordance with the section of the Go Forward Plan entitled "~~Going Concern~~Go Forward Stores Sale Process."~~-~~ The Specified Going Concern Sale shall be conducted pursuant to bidding procedures, sales

procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

~~"**Specified Liquidation Agreement**" means an agreement by and among Holdings and the Liquidation Agent, which, among other things shall provide for the Specified Store Closing Sales referenced in [clauses (a) and] (b) of such definition on terms satisfactory to the Co-Collateral Agents (including with respect to any augmentation arrangements), and which agreement, together with (x) all material documents relating thereto and (y) all exhibits, annex and schedules thereto, shall be approved by the Co-Collateral Agents prior to execution, as further amended, supplemented and modified with the consent of the Co-Collateral Agents.~~

"**Specified Loan Party**" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 9.20).

"**Specified IP Sale**" means a sale, in one or a series of related transactions, of all of the Intellectual Property of the Debtors under Section 363 of the Bankruptcy Code to the extent such assets are not otherwise included in any Specified Going Concern Sale or Specified Full-Chain Liquidation required to be consummated pursuant to the Go Forward Plan. The Specified IP Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Other Assets Sale**" means the sale of any or all remaining assets of the Debtors under Section 363 of the Bankruptcy Code (including mortgaged Real Property interests and leasehold Real Property interests) to the extent such assets are not otherwise included in any Specified Going Concern Sale or Specified Full-Chain Liquidation required to be consummated pursuant to the Go Forward Plan. The Specified Other Assets Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Sale Transaction**" means any or all of a Specified Going Concern Sale, a Specified Full-Chain Liquidation, a Specified IP Sale, or a Specified Other Assets Sale.

"**Specified Store Closing Sale**" means (a) certain store closures listed on Schedule 1.07 in accordance with the Initial Store Rationalization described in the Go Forward Plan, ~~conducted by the Liquidation Agent pursuant to the Specified Liquidation Agreement~~ and (b) certain store closures listed on Schedule 1.08 in accordance with the Secondary Store Rationalization described in the Go Forward Plan, ~~conducted by the Liquidation Agent pursuant to the Specified Liquidation Agreement~~ and (c) the closure of any additional Stores approved in writing by the

Co-Collateral Agents in their discretion (subject to the performance of a desktop appraisal in form and substance acceptable to the Co-Collateral Agents), and the liquidation of assets related thereto by the Liquidation Agent, pursuant to a liquidation agreement approved by the Agent and the Co-Collateral Agents (including with respect to any augmentation arrangements) and all other relevant documents executed in connection therewith, each any Specified Store Closing Sales shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, to be in form and substance and on terms satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (or, with respect to price, satisfactory to the Agent and the Co-Collateral Agents in their reasonable discretion).

"**Specified Subsidiaries**" mean SRC Sparrow 1 LLC, a Delaware limited liability company, SRC Sparrow 2 LLC, a Delaware limited liability company, SRC O.P. LLC, a Delaware limited liability company, SRC Facilities LLC, a Delaware limited liability company, SRC Real Estate (TX) LLC, a Delaware limited liability company, and KCD IP, LLC, a Delaware limited liability company.

"**SRAC**" has the meaning specified in the Preamble.

"**Standby L/C**" means an irrevocable letter of credit or similar instrument under which the Issuing Lender agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member in respect of obligations of such Group Member incurred pursuant to contracts made or performances undertaken or to be undertaken or like matters relating to contracts to which such Group Member is or proposes to become a party, including, without limiting the foregoing, for insurance purposes or in respect of advance payments or as bid or performance bonds or for any other purpose for which a standby letter of credit might be issued.

"**Store**" means any store owned or leased and operated by any Loan Party.

"**Store Closing Net Orderly Liquidation Value**" means the product of (x) clause (ii) of Net Recovery Rate and (y) the Net Eligible Inventory.

[["**Store Footprint Plan**" means a schedule of store footprint changes prepared by the Borrowers including, without limitation, dates of commencement and completion of sales and store closings.], collectively, Schedule 1.07, Schedule 1.08, and Schedule 1.09.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other business entity (a) of which a majority of the shares of Voting Stock is at the time beneficially owned by such Person, (b) over which such Person has the ability to direct the management, or (c) whose financial results are consolidated into the financial statements of such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means each direct or indirect wholly owned Domestic Subsidiaries of Holdings that have commenced Chapter 11 Cases, except for Specified Subsidiaries.

"**Supermajority Lenders**" means, at any time, the holders of 66-2/3% or more of the sum of the Aggregate Revolving Commitments then in effect and the principal amount of the Term Loan then outstanding or, if the Aggregate Revolving Commitments have been terminated, the holders of 66-2/3% or more of the Total Extensions of Credit then outstanding, provided, that the Extensions of Credit of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"**Survey**" has the meaning assigned to such term in Section 6.01(i)(v)(3)(B).

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligations**" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, the termination value thereof.

"**Swingline Advances**" has the meaning specified in Section 2.03.

"**Swingline Commitment**" means the obligation of the Swingline Lender to make Swingline Advances pursuant to Section 2.03 in an aggregate principal amount at any one time outstanding not to exceed $25,000,000.

"**Swingline Lender**" means Bank of America, in its capacity as the lender of Swingline Advances.

"**Swingline Participation Amount**" has the meaning specified in Section 2.04(c).

["**Syndication Agent**" has the meaning specified in the Preamble.]

"**Target Sharing Ratio**" means (i) if no Go Forward Stores Qualified Bid is obtained and found acceptable on or prior to December 15, 2018, the ratio of the Adjusted Revolving Exposure to the principal amount of Term Loan outstanding, calculated by the Co-Collateral Agents as of 5 p.m. on December 15, 2018, and (ii) if a Go Forward Stores Qualified Bid is obtained and found acceptable on or prior to December 15, 2018, but thereafter on any date there ceases to be in full force and effect a Go Forward Stores Qualified Bid, the ratio of the Adjusted Revolving Exposure as of such time to the principal amount of Term Loan outstanding as of such time, calculated by the Co-Collateral Agents as of 5 p.m. on the date such Go Forward Stores Qualified Bid ceases to be in full force and effect.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Commitment**" means, as to any Term Lender, the obligation of such Term Lender to make its portion of the Term Loan on the Effective Date.

"**Term Lenders**" means, collectively, any Persons party hereto as a Term Lender (whether by a signature page hereto or by a joinder agreement hereto), and each Person that shall become a party hereto as a Term Lender pursuant to Section 9.07.

"**Term Loan**" means, collectively, (i) the Initial Term Loan, (ii) the term loans outstanding hereunder pursuant to Section 2.01(d)(ii) and (ii) as used in the definitions of "Required Lenders" and "Supermajority Lenders", the sum of (x) the term loans of all the Term Lenders.

"**Term Loan Borrowing**" means a portion of the Term Loan of a particular Type; provided that no Term Loan Borrowing shall be in an aggregate principal amount of less than $5,000,000 and each Term Loan Borrowing constituting a Eurodollar Rate Advance shall be in a principal amount that is an integral multiple of $1,000,000 (unless no portion of the Term Loan constitutes a Base Rate Advance), and no more than six (6) Interest Periods in the aggregate for Borrowings and Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

"**Term Loan Margin**" means (a) with respect to any outstanding portion of the Term Loan that is a Eurodollar Rate Advance, 8.00% per annum, and (b) with respect to any outstanding portion of the Term Loan that is a Base Rate Advance, 7.00% per annum.

"**Term Loan Proceeds Account**" means the escrow account of the Borrowers maintained at the Agent and designated by the Borrowers and the Agent as the Term Loan Proceeds Account.

"**Termination Date**" means the earliest of (a) October 16, 2019 (such date, the "**Scheduled Termination Date**"), (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an

order entered by the Bankruptcy Court, (c) the consummation of a sale of all or substantially all of the Collateral of a type that is included in the Borrowing Base, (d) the date of termination in whole of the Aggregate Revolving Commitments and the acceleration of the Total Extensions of Credit pursuant to Section 2.06 or Section 7.02 and (e) the occurrence of the [“termination date”]{{ or “maturity date”}] (or any similar term having the same meaning) under the Junior DIP Term Loan Agreement.

"**Third Party Payor Notification**" has the meaning specified in Section 6.01(m)(iii).

"**Third Party Payors**" means any private health insurance company that is obligated to reimburse or otherwise make payments to pharmacies which sell prescription drugs to eligible patients under any insurance contract with such private health insurer.

"**Title Insurer**" has the meaning assigned to such term in Section 6.01(i)(v)(3)(A).

"**Title Policy**" has the meaning assigned to such term in Section 6.01(i)(v)(3)(A).

"**Total Extensions of Credit**" means at any time, the aggregate amount of the Extensions of Credit of the Lenders outstanding at such time.

"**Total Revolving Extensions of Credit**" means at any time, the aggregate amount of the Revolving Extensions of Credit of the Lenders outstanding at such time.

"**Trading With the Enemy Act**" means 50 U.S.C. § 1 et seq., as amended.

"**Type**" means either a Base Rate Advance or a Eurodollar Rate Advance.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York, provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 thereof; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Internal Revenue Code for the applicable plan year.

"**Utility Deposit Adequate Assurance Accounts**" mean collectively, the deposit accounts of any Loan Party and any cash deposited therein solely to the extent such cash is deposited for the benefit of certain utilities pursuant to and consistent with that certain *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II)*

1030946.06CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

*Establishing Procedures For Determining Adequate Assurance of Payment For Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discounting Utility Service (Docket No. 461).*

"**Voting Stock**" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"**Weekly Flash Reporting Package**" means reports detailing operating and financial performance, which shall include cash flow performance compared to the Approved Budget for the Prior Week together with accompanying schedules supporting line items included in the weekly cash flow results (such as rollforward of inventory sales and receipts, rollforward of merchandise and other payables of each Loan Party as of the end of the Prior Week, in each case, in reasonable detail).

"**Winddown Account**" means a cash collateral account at Bank of America that, prior to the discharge in full of all obligations under the DIP ABL Facility, may only be used to pay winddown costs of the Loan Parties at the discretion of the Borrowers following entry of the Final Financing Order.

"**Write-Down and Conversion Powers**" means the write-down and conversion powers of the applicable EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Computation of Time Periods.  In this Agreement, unless otherwise specified, (a) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" (b) "including" means "including without limitation"; and (c) any reference to a time of day means Eastern time.

Section 1.03    Accounting Terms.  All accounting terms not specifically defined herein or in the other Loan Documents shall be construed in accordance with U.S. generally accepted accounting principles ("**GAAP**") which shall be consistently applied.  If at any time any change in U.S. generally accepted accounting principles would affect the computation of any financial ratio or requirement set forth herein, and either the Borrowers or the Required Lenders shall so request, the Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders which shall not be unreasonably withheld), provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change in principles, and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  For the avoidance of doubt, no retroactive change in GAAP shall apply to the

construction of accounting terms under this Agreement in the absence of an amendment hereto in accordance with the terms of this <u>Section 1.03</u>.

Section 1.04    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document, the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

# ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES AND THE TERM LOAN

Section 2.01    <u>The Revolving Advances and the Term Loan.</u>

(a)    <u>The Revolving Advances.</u> Each Revolving Lender severally agrees, on the terms and conditions hereinafter set forth, to make revolving advances (the "**Revolving Advances**") to the Borrowers from time to time on any Business Day during the period from the Effective Date until the Termination Date, in an aggregate amount at any one time outstanding which, when added to such Lender's Revolving Commitment Percentage of the sum of (i) the aggregate principal amount of the Swingline Advances then outstanding and (ii) the L/C Obligations then outstanding, equals the amount of such Lender's Revolving Commitment; provided, that the aggregate principal amount of any Borrowing made at any time, when aggregated with all other then outstanding Extensions of Credit, shall not exceed the Line Cap at such time. Each Borrowing under this <u>Section 2.01</u> shall be in an aggregate amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof (<u>provided</u>, that the Swingline Lender may request, on behalf of the applicable Borrower, Borrowings that are Base Rate Advances in other amounts pursuant to <u>Section 2.04(b)</u>) and shall consist of Revolving Advances of the same Type made on the same day by the Revolving Lenders ratably according to their respective Revolving Commitments.  Within the limits set forth in this <u>Section 2.01</u>, the Borrowers may borrow under this <u>Section 2.01</u>, prepay pursuant to <u>Section 2.11</u> and reborrow under this <u>Section 2.01</u>.

<u>76</u><u>59</u>

(b)    The Initial Term Loan. Each Term Lender severally agrees to make the Initial Term Loan available to the Borrowers on the Effective Date in a principal amount not to exceed its Term Commitment and the Term Commitments of each Lender shall be subsequently reduced to zero. The Initial Term Loan Borrowing shall consist of a Base Rate Advance requested by the Borrowers in a Notice of Borrowing delivered not later than 1:00 p.m. on the second Business Day prior to the Effective Date.

(c)    Refinancing of the Interim DIP Facility. Subject to the terms of this Agreement and the Final Financing Order:

(i)    from and after the Effective Date, the Incremental DIP Revolving Commitments shall be refinanced as Revolving Commitments hereunder and shall be allocated to the Revolving Lenders as set forth on Schedule 1.01; and

(ii)    on the Effective Date, the Incremental DIP Term Loans shall be refinanced with the proceeds of the Initial Term Loan made to the Borrowers under this Agreement.

(d)    Refinancing of Certain Prepetition Facilities on the Effective Date. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, on the Effective Date for each Lender with Incremental DIP Revolving Commitments or an Initial Term Loan hereunder (each, a "**Participating Prepetition Lender**"):

(i)    the aggregate principal amount of such Participating Prepetition Lender's Prepetition Revolving Advances shall be refinanced as and constitute Revolving Advances under this Agreement on the Effective Date;

(ii)    the aggregate principal amount of such Participating Prepetition Lender's Prepetition 2016 Term Loans shall be refinanced as and constitute part of the Term Loan under this Agreement on the Effective Date; and

(iii)    the outstanding amount of such Participating Prepetition Lender's Prepetition L/C Obligations shall be refinanced as and constitute L/C Obligations under this Agreement on the Effective Date (including all Existing Letters of Credit issued under the Prepetition First Lien ABL Credit Agreement being deemed issued under this Agreement on the Effective Date).

(e)    Cashless Settlement.  The refinancing of the Interim DIP Facility, the Prepetition Revolving Advances and the Prepetition 2016 Term Loan Facility as described in Section 2.01(c) and Section 2.01(d) may be made pursuant to a cashless settlement mechanism approved by the Agent.

(f)    Outstandings on the Effective Date. After the refinancings described in Section 2.01(c) and Section 2.01(d) above, (i) all Revolving Loans shall constitute one Class, (ii) the Term Loan shall constitute one Class, (iii) the Aggregate Revolving Commitments are as

set forth on Schedule 1.01; (iv) the Outstanding Revolving Advances are $[●], (v) the aggregate L/C Obligations outstanding are $[●] and (vi) the aggregate outstanding amount of the Term Loan is $[●]. Any portion of the Term Loan that is prepaid or repaid may not be reborrowed.

Section 2.02    Making the Revolving Advances.

(a)    Each Borrowing under Section 2.01 shall be made on notice, given not later than (x) 12:00 noon on the third Business Day prior to the date of the proposed Borrowing in the case of a Borrowing consisting of Eurodollar Rate Advances or (y) 1:00 p.m. on the date of the proposed Borrowing in the case of a Borrowing consisting of Base Rate Advances, by the applicable Borrower to the Agent, which shall give to each Revolving Lender prompt notice thereof by email attachment or telecopier.  Each such notice of a Borrowing (a "**Notice of Borrowing**") shall be by telephone, confirmed immediately in writing, by email attachment or by telecopier, in substantially the form of Exhibit A hereto, specifying therein the requested  (i) date of such Borrowing, (ii) Type of Revolving Advances comprising such Borrowing, (iii) aggregate amount of such Borrowing, and (iv) in the case of a Borrowing consisting of Eurodollar Rate Advances, initial Interest Period for each such Revolving Advance. Each Notice of Borrowing shall be irrevocable and binding on the applicable Borrower.  Each Revolving Lender shall, before 2:00 p.m. on the date of such Borrowing make available for the account of its Applicable Lending Office to the Agent at the Agent's Account, in same day funds, such Revolving Lender's ratable (in accordance with its Revolving Commitment Percentage) portion of such Borrowing.  After the Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article IV, the Agent will make such funds available to the Borrower requesting such Borrowing at the Agent's address for Revolving Advances referred to in Section 9.02.

(b)    Anything in subsection (a) above to the contrary notwithstanding, (i) a Borrower may not select Eurodollar Rate Advances for any Borrowing if the aggregate amount of such Borrowing is less than $5,000,000 or if the obligation of the Lenders to make Eurodollar Rate Advances shall then be suspended pursuant to Section 2.09 or 2.13 and (ii) the Eurodollar Rate Advances may not be outstanding as part of more than six (6) separate Borrowings and Term Loan Borrowings.

(c)    Unless the Agent shall have received notice from a Revolving Lender prior to the time of any Borrowing that such Revolving Lender will not make available to the Agent such Revolving Lender's ratable portion of such Borrowing, the Agent may assume that such Revolving Lender has made such portion available to the Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Agent may, in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount.  If and to the extent that such Revolving Lender shall not have so made such ratable portion available to the Agent, such Revolving Lender and the applicable Borrower severally agree to repay to the Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to such Borrower until the date such amount is repaid to the Agent, at (i) in the case of such Borrower, the interest rate applicable at the time to Revolving Advances comprising such Borrowing and (ii) in the case of such Revolving Lender, the Federal Funds Rate.  If such Revolving Lender shall repay to the

1030946.0685CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Agent such corresponding amount, such amount so repaid shall be made available to the applicable Borrower and shall constitute such Revolving Lender's Revolving Advance as part of such Borrowing for purposes of this Agreement.

(d)    The failure of any Revolving Lender to make the Revolving Advance to be made by it as part of any Borrowing shall not relieve any other Revolving Lender of its obligation, if any, hereunder to make its Revolving Advance on the date of such Borrowing, but no Revolving Lender shall be responsible for the failure of any other Revolving Lender to make the Revolving Advance to be made by such other Revolving Lender on the date of any Borrowing.

Section 2.03    The Swingline Advances.

(a)    Subject to the terms and conditions hereof, the Swingline Lender may, in its sole and absolute discretion, make a portion of the credit otherwise available to the Borrowers under the Revolving Commitments from time to time during the period from the Effective Date until the Termination Date by making swing line advances ("**Swingline Advances**") to the Borrowers; provided that (i) the aggregate principal amount of Swingline Advances outstanding at any time shall not exceed the Swingline Commitment then in effect (notwithstanding that the Swingline Advances outstanding at any time, when aggregated with the Swingline Lender's other outstanding Revolving Advances, may exceed the Swingline Commitment then in effect) and (ii) the amount of any Swingline Advance made at any time, when aggregated with all other then outstanding Extensions of Credit, shall not exceed the Line Cap at such time; provided that the Swingline Lender shall not be obligated to make any Swingline Advance at any time when any Revolving Lender is at such time a Defaulting Lender hereunder, and the Swingline Lender has, or after giving effect to such Swingline Advance, may have Fronting Exposure.  During the period from the Effective Date until the Termination Date, the Borrowers may use the Swingline Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  Swingline Advances shall only be available as Base Rate Advances.

(b)    Each Borrower shall repay to the Swingline Lender the then unpaid principal amount of each Swingline Advance made to it weekly, on Wednesday of each week; provided that on each date that a Revolving Advance is borrowed by a Borrower, such Borrower shall repay all Swingline Advances then outstanding, if any, and may use all or a portion of such Revolving Advance to fund such repayment. In all events the unpaid principal balance of all Swingline Advances shall be repaid in full on the Termination Date.

Section 2.04    Making the Swingline Advances.

(a)    Each Borrowing under Section 2.03 shall be made on notice, given not later than 1:00 p.m. on the date of the proposed Borrowing, by the applicable Borrower to the Agent and Swingline Lender. Each such Notice of a Borrowing shall be by telephone, confirmed immediately in writing, by email attachment or by telecopier, in substantially the form of Exhibit A hereto, specifying therein the requested (i) date of such Borrowing and (ii) aggregate amount of such Borrowing.  Each Borrowing under the Swingline Commitment shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof.  Subject to

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Section 2.03(a), not later than 3:00 p.m. on the date of the proposed Borrowing, the Swingline Lender shall make available to the Agent at the Agent's Account an amount in immediately available funds equal to the amount of the Swingline Advance to be made by the Swingline Lender.  Upon fulfillment of the applicable conditions set forth in Article IV, the Agent shall make the proceeds of such Swingline Advance available to the Borrower requesting such Borrowing at the Agent's address referred to in Section 9.02.

(b)    The Swingline Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrowers (which hereby irrevocably direct the Swingline Lender to act on their behalf), by notice given by the Swingline Lender no later than 1:00 p.m., request each Revolving Lender to make, and each Revolving Lender hereby agrees to make, a Revolving Advance, in an amount equal to such Lender's Revolving Commitment Percentage of the aggregate amount of the Swingline Advances (the "**Refunded Swingline Advances**") outstanding on the date of such notice, to repay the Swingline Lender.  Each Revolving Lender shall make the amount of such Revolving Advance available to the Agent at the Agent's Account in same day funds, not later than 2:00 p.m. on the date of such notice.  The proceeds of such Revolving Advances shall be immediately made available by the Agent to the Swingline Lender for application by the Swingline Lender to the repayment of the Refunded Swingline Advances.  Each Borrower irrevocably authorizes the Swingline Lender to charge such Borrower's accounts with the Agent (up to the amount available in each such account) in order to immediately pay the amount of such Refunded Swingline Advances to the extent amounts received from the Revolving Lenders are not sufficient to repay in full such Refunded Swingline Advances.

(c)    If prior to the time a Revolving Advance would have otherwise been made pursuant to Section 2.04(b), one of the events described in Section 7.01 shall have occurred and be continuing or if for any other reason, as determined by the Swingline Lender in its sole discretion, Revolving Advances may not be made as contemplated by Section 2.04(b), each Revolving Lender shall, on the date such Revolving Advance was to have been made pursuant to the notice referred to in Section 2.04(b), purchase for cash an undivided participating interest in the then outstanding Swingline Advances by paying to the Swingline Lender an amount (the "**Swingline Participation Amount**") equal to (i) such Revolving Lender's Revolving Commitment Percentage multiplied by (ii) the sum of the aggregate principal amount of Swingline Advances then outstanding that were to have been repaid with such Revolving Advances.

(d)    Whenever, at any time after the Swingline Lender has received from any Revolving Lender such Revolving Lender's Swingline Participation Amount, the Swingline Lender receives any payment on account of the Swingline Advances, the Swingline Lender will distribute to such Revolving Lender its Swingline Participation Amount to reflect the period of time during which such Revolving Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Revolving Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swingline Advances then due; provided, however, that in the event that such payment received by the Swingline Lender is required to be returned, such Revolving Lender will return to the Swingline Lender any portion thereof previously distributed to it by the Swingline Lender.

1030946.0~~68~~CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(e)    Each Revolving Lender's obligation to make the Advances referred to in Section 2.04(b) and to purchase participating interests pursuant to Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right that such Revolving Lender or any Borrower may have against the Swingline Lender, any Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Article IV, (iii) any adverse change in the condition (financial or otherwise) of any Borrower or any other Loan Party, (iv) any breach of this Agreement or any other Loan Document by any Borrower, any other Loan Party or any other Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

Section 2.05    Commitment Fee; Other Fees.

(a)    The Borrowers jointly and severally agree to pay to the Agent for the account of each Revolving Lender a commitment fee on the average daily amount of the Available Commitment of such Lender during the period for which payment is made at a rate per annum equal to 0.75%, payable in arrears monthly on the 5th day subsequent to the last day of each month and on the Termination Date.

(b)    Other Fees.  Holdings and the Borrowers shall pay to the Agent, the Co-Collateral Agents and the Joint Lead Arrangers, as applicable, the fees set forth in the Fee Letter in the amounts and at the times specified therein.

Section 2.06    Optional Termination or Reduction of the Revolving Commitments.

(a)    The Borrowers shall have the right, without penalty or premium and upon at least three Business Days' irrevocable notice to the Agent, to permanently terminate in whole or permanently reduce in part the unused portions of the respective Revolving Commitments of the Revolving Lenders, provided that no such termination or reduction of the Revolving Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Advances made on the effective date thereof, the Total Extensions of Credit would exceed the aggregate amount of the Revolving Commitments as so reduced.  Any partial reduction of the Revolving Commitments shall be in the aggregate amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)    If, after giving effect to any reduction of the Aggregate Revolving Commitments, the L/C Commitment or the Swingline Commitment exceeds the amount of the Aggregate Revolving Commitments, such L/C Commitment or Swingline Commitment shall be automatically reduced by the amount of such excess.

(c)    The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Aggregate Revolving Commitments under Section 2.06(a).  Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each

1030946.06̶8̶CA̶-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS - DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Revolving Lender shall be reduced by such Revolving Lender's Revolving Commitment Percentage of such reduction amount.

Section 2.07    Repayment of Extensions of Credit. Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, upon the Termination Date (whether by acceleration or otherwise), (i) each Borrower shall repay to the Agent, for the ratable account of the Lenders on the Termination Date, the aggregate principal amount then outstanding of the Total Extensions of Credit made to it by the Lenders and (ii) the Agent, the Co-Collateral Agents, the Issuing Lenders and the Lenders shall be entitled to immediate payment of all Obligations and, subject to the Remedies Notice Period, as applicable, to enforce the remedies provided for under this Agreement and the other Loan Documents or under applicable law, in each case, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

Section 2.08    Interest.

(a)    Scheduled Interest Owed to Revolving Lenders and Swingline Lender.  Each Borrower shall pay interest on the unpaid principal amount of each Advance made to it and owing to each Revolving Lender and Swingline Lender from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(i)    Base Rate Advances.  During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the sum of (x) the Base Rate in effect from time to time plus (y) the Applicable Margin for Base Rate Advances, payable (I) in the case of any Base Rate Advance (other than a Swingline Advance), in arrears monthly on the 5th day subsequent to the last day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full and (II) in the case of any Swingline Advance, on the date that such Swingline Advance is required to be repaid.

(ii)    Eurodollar Rate Advances.  During such periods as such Advance is a Eurodollar Rate Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of (x)  the Eurodollar Rate for such Interest Period for such Advance, plus (y) the Applicable Margin for Eurodollar Rate Advances, payable in arrears on the last day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(b)    Term Loan.  Each Borrower shall pay interest on the unpaid principal amount of the Term Loan made to it and owing to each Term Lender from the Effective Date until such principal amount shall be paid in full, at the following rates per annum:

(i)    Base Rate Advances.  During such periods as any outstanding portion of the Term Loan is a Base Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times to the sum of (x) the Base Rate in effect from time to time plus (y) the Term Loan Margin for Base Rate Advances, payable in arrears monthly on the 5th day

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

subsequent to the last day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full.

(ii)    Eurodollar Rate Advances.  During such periods as any outstanding portion of the Term Loan is a Eurodollar Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times during each Interest Period for such Eurodollar Rate Advance to the greater of (A) 1.00% or (B) the Eurodollar Rate for such Interest Period for such outstanding portion of the Term Loan plus, in either case, the Term Loan Margin for Eurodollar Rate Advances, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(c)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, and notwithstanding the Automatic Stay, the Borrowers shall pay interest on the unpaid principal amount of each Revolving Advance and Reimbursement Obligation owing to each Revolving Lender, and on the principal amount of the Term Loan, payable in arrears on the dates referred to in Section 2.08(a) or Section 2.08(b) above, as applicable (or, if earlier, at the time payment thereof is demanded by the Agent), at a rate per annum equal to 2% per annum above the rate per annum required to be paid on such Advance or Reimbursement Obligation pursuant to Section 2.08(a)(i) or Section 2.08(b)(i) above, as applicable.  Further, the Borrowers shall pay interest, to the fullest extent permitted by law, on the amount of any interest, fee or other amount (other than principal) payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on Base Rate Advances pursuant to Section 2.08(a)(i) or Section 2.08(b)(i) above, as applicable.

(d)    Regulation D Compensation.  Each Lender that is subject to reserve requirements of the Board of Governors may require the Borrowers to pay, contemporaneously with each payment of interest on the Eurodollar Rate Advances, additional interest on the related Eurodollar Rate Advances of such Lender at the rate per annum equal to the excess of (i) (A) the applicable Eurodollar Rate divided by (B) one minus the Eurodollar Rate Reserve Percentage over (ii) the applicable Eurodollar Rate. Any Lender wishing to require payment of such additional interest (x) shall so notify the Agent and the Borrowers, in which case such additional interest on the Eurodollar Rate Advances of such Lender shall be payable to such Lender at the place indicated in such notice with respect to each Interest Period commencing at least five Business Days after the giving of such notice and (y) shall notify the Agent and the Borrowers at least five Business Days prior to each date on which interest is payable on the amount then due under this Section.  Each such notification shall be accompanied by such information as the Borrowers may reasonably request.

Section 2.09    Interest Rate Determination.  (a)  [Reserved].

(b)    If, with respect to any Eurodollar Rate Advances,

(i)    the Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such proposed Eurodollar Rate Advance for the applicable Interest Period; or

(ii)    the Required Lenders notify the Agent prior to the commencement of any Interest Period for a proposed Eurodollar Rate Advance that the Eurodollar Rate for any Interest Period for such Eurodollar Rate Advances will not adequately reflect the cost to such Required Lenders of making, funding or maintaining their respective Eurodollar Rate Advances for such Interest Period, then

the Agent shall forthwith so notify the Borrowers and the Lenders, whereupon (x) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance, and (y`) the obligation of the Lenders to make, or to Convert Advances into, Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

(c)    If any Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, such Eurodollar Rate Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

(d)    On the date on which the aggregate unpaid principal amount of Eurodollar Rate Advances comprising any Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $5,000,000, such Eurodollar Rate Advances shall automatically Convert into Base Rate Advances.

(e)    Upon the occurrence and during the continuance of any Event of Default, (i) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance and (ii) the obligation of the Lenders to make, or to Convert Revolving Advances or any outstanding portion of the Term Loan, into, Eurodollar Rate Advances shall be suspended.

Section 2.10    Optional Conversion of Revolving Advances, Term Loan Borrowings.  The Borrowers may on any Business Day, upon notice given to the Agent not later than 12:00 noon on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Sections 2.09 and 2.13, Convert all Revolving Advances of one Type comprising the same Borrowing into Revolving Advances of the other Type; and/or Convert any Term Loan Borrowing, of one Type into a Term Loan Borrowing, of the other Type; provided, however, that any Conversion of Eurodollar Rate Advances into Base Rate Advances shall be made only on the last day of an Interest Period for such Eurodollar Rate Advances, any Conversion of Base Rate Advances into Eurodollar Rate Advances shall be in an amount not less than the minimum amount specified in Section 2.02(b) and no Conversion of any Revolving Advances or Term Loan Borrowings shall result in more separate Borrowings than permitted under Section 2.02(b).  Each such notice of a Conversion shall, within the restrictions specified

above, specify (i) the date of such Conversion, (ii) the Revolving Advances or Term Loan Borrowings to be Converted, and (iii) if such Conversion is into Eurodollar Rate Advances, the duration of the initial Interest Period for each such Revolving Advance or Term Loan Borrowing.  Each notice of Conversion shall be irrevocable and binding on the applicable Borrower.

Section 2.11    Optional and Mandatory Prepayments of Revolving Advances and Term Loan; Mandatory Reduction of the Revolving Commitments.

(a)    (i) Any Borrower may, without penalty or premium and upon notice given not later than 12:00 noon three Business Days prior to the date of such prepayment (or, in the case of a Base Rate Advance, one Business Day prior to the date of such prepayment) to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given such Borrower shall, prepay the outstanding principal amount of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that (x) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof (or, in the case of partial prepayments of Swingline Advances, $100,000 or a whole multiple thereof) and (y) in the event of any such prepayment of a Eurodollar Rate Advance, the applicable Borrower shall be obligated to reimburse the Lenders in respect thereof pursuant to Section 9.04(c).

(ii)    Any Borrower may, subject to the terms of this Section 2.11(a)(ii) and upon notice given not later than 12:00 noon three Business Days prior to the date of such prepayment (or, in the case of a Base Rate Advance, one Business Day prior to the date of such prepayment) to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given such Borrower shall, prepay the outstanding principal amount of the Term Loan in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that (w) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof, (x) in connection with any such prepayment of the Term Loan, the Aggregate Revolving Commitments shall be reduced on a Pro Rata Basis (and make any necessary prepayment of Advances so that the reduction in Aggregate Revolving Commitments does not result in an Overadvance), and (y) in the event of any prepayment of a Eurodollar Rate Advance, the applicable Borrower shall be obligated to reimburse the Lenders in respect thereof pursuant to Section 9.04(c).

(b)    On the date of delivery of any Borrowing Base Certificate, if the Total Extensions of Credit exceed the Line Cap, the Borrowers shall prepay Advances in an amount equal to such excess, provided that if the aggregate principal amount of Advances then outstanding is less than the amount of such excess, the Borrowers shall, to the extent of such excess, Cash Collateralize outstanding L/C Obligations; provided further that if, after the prepayment of any Advances and the Cash Collateralization of L/C Obligations under this clause (b), the Total Extensions of Credit exceed the Line Cap, the Borrowers shall prepay the Term

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT
AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

7668

Loan in an amount equal to such excess (with a Pro Rata reduction in the Revolving Commitments).

(c)    ~~(i)~~ Subject to the Financing Orders, (i) the Borrowers shall repay the Advances (without a requirement to reduce the Revolving Commitments) in an amount equal to any Net Proceeds (other than Net Proceeds of the sale of Prepetition Unencumbered Assets and other than Net Proceeds received upon the consummation of a Go Forward Stores Qualified Bid), provided that if the aggregate principal amount of Advances then outstanding is less than the amount of such Net Proceeds, the Borrowers shall, to the extent of such excess, Cash Collateralize L/C Obligations; provided further that if the aggregate principal amount of Advances then outstanding plus the amount of outstanding and non-Cash Collateralized L/C Obligations is less than the amount of such Net Proceeds, the Borrowers shall, to the extent of such excess, deposit such Net Proceeds into the Term Loan Proceeds Account; provided further that if, after the prepayment of any Revolving Advances and any Cash Collateralization of L/C Obligations as set forth above under this clause (c)(i), an Event of Default shall have occurred and be continuing, the Borrowers shall prepay the Term Loan to the extent of such excess and (y) so long as no Event of Default shall have occurred and be continuing, the Borrowers may use the Net Proceeds deposited in the Term Loan Proceeds Account in accordance with the Approved Budget and (ii) in the case of Net Proceeds received upon the consummation of a Go Forward Stores Qualified Bid, the Borrowers shall repay the Obligations in full in cash.

(d)    The Borrowers shall prepay the Advances in accordance with the provisions of Section 6.01(m) hereof, and upon the occurrence and during the continuance of an Event of Default, the Borrowers shall Cash Collateralize outstanding L/C Obligations; provided that if, after the prepayment of any Revolving Advances and any Cash Collateralization of L/C Obligations as set forth above under this clause ~~(c)~~(d), an Event of Default exists, the Borrowers shall prepay the Term Loan; provided further that upon acceleration of the Obligations or the commencement of a Liquidation, all proceeds of Collateral shall be applied to the Obligations in accordance with Section 7.03.

(e)    If on any day the Borrowers are not in compliance with the LTV Provisions, then, until the Borrowers are in compliance therewith, the Borrowers shall prepay Advances in an amount required to comply with such provisions, provided that if the aggregate principal amount of Advances then outstanding is less than the amount required, the Borrowers shall, to the extent of the balance, Cash Collateralize L/C Obligations; provided further that if, after the prepayment of any Advances and the Cash Collateralization of L/C Obligations under this clause (e), the Borrowers are not in compliance therewith, the Borrowers shall prepay the Term Loan in an amount equal to the amount required to cause compliance therewith (with a Pro Rata reduction in the Revolving Commitments).

(f)    ~~If the Debtors have not obtained a Qualified Bid by December 15, 2018, then on~~On each Rebalancing Date, (i) the Aggregate Revolving Commitments shall be automatically reduced, if necessary, to an amount equal to the Adjusted Revolving Exposure as of such Rebalancing Date (with the Revolving Commitment of each Revolving Lender being reduced by such Revolving Lender's Revolving Commitment Percentage of such reduction amount), and (ii) Borrowers shall prepay the Term Loan in an amount necessary to cause the

~~76~~69

ratio of the Adjusted Revolving Exposure as of such Rebalancing Date to the Term Loan outstanding on such Rebalancing Date to equal the Target Sharing Ratio. Notwithstanding anything in this Agreement to the contrary, if the Borrowers fail to make such prepayment of the Term Loan on any Rebalancing Date, whether or not any Borrower submits a Notice of Borrowing in order to fund such prepayment, Borrowers shall be deemed to have requested a Borrowing of Base Rate Advances in an amount necessary to pay all amounts due pursuant to this Section 2.11(f) on any Rebalancing Date, and each Lender shall fund its pro rata share of such Borrowing whether or not the Commitments have terminated, an Overadvance exists or is created thereby, or the conditions in Article IV are satisfied.

(g)    The Borrowers shall deliver to the Administrative Agent, in connection with each prepayment required under Section 2.11(c), a certificate signed by an Authorized Officer of the Borrowers setting forth in reasonable detail the calculation of the amount of such prepayment.

(h)    Any prepayment of Revolving Advances pursuant to this Section 2.11 shall be applied, first, to any Base Rate Advances then outstanding and the balance of such prepayment, if any, to the Eurodollar Rate Advances then outstanding.

Section 2.12    Increased Costs. (a) If, due to a Change in Law, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Advances or issuing or participating in Letters of Credit (excluding for purposes of this Section 2.12 any such increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.15 shall govern) and (ii) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided that a Lender claiming additional amounts under this Section 2.12(a) agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office and/or take other commercially reasonable action if the making of such a designation or the taking of such actions would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. A certificate as to the amount of such increased cost, submitted to the Borrowers and the Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error. If any Borrower so notifies the Agent after any Lender notifies the Borrowers of any increased cost pursuant to the foregoing provisions of this Section 2.12(a), such Borrower may, upon payment of such increased cost to such Lender, replace such Lender with a Person that is an Eligible Assignee in accordance with the terms of Section 9.07 (and the Lender being so replaced shall take all action as may be necessary to assign its rights and obligations under this Agreement to such Eligible Assignee).

(b)    If any Lender determines that any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender or any entity controlling such Lender and that the amount of such capital or liquidity is increased by

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

or based upon the existence of such Lender's commitment to lend hereunder and other commitments of this type, then, upon demand by such Lender (with a copy of such demand to the Agent), the Borrowers shall pay to the Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender or such entity in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender's commitment to lend hereunder.  A certificate as to such amounts submitted to the Borrowers and the Agent by such Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)    The Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or capital, liquidity or reserve requirement or pursuant to Section 2.15 for any Taxes incurred more than nine months prior to the date that such Lender notifies the Borrowers of the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax and of such Lender's intention to claim compensation therefor; provided that if the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13    Illegality.  Notwithstanding any other provision of this Agreement, if any Lender shall notify the Agent that any Change in Law has made it unlawful for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Advances or to fund or maintain Eurodollar Rate Advances hereunder, (a) each Eurodollar Rate Advance will automatically, upon such demand, Convert into a Base Rate Advance or an Advance that bears interest at the rate set forth in Sections 2.08(a)(i) or 2.08(b)(i), as the case may be and (b) the obligation of the Lenders to make Eurodollar Rate Advances or to Convert Advances or Term Loan Borrowings into Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

Section 2.14    Payments and Computations.  (a) The Borrowers shall make each payment hereunder and under the other Loan Documents, without any right of counterclaim or set-off, not later than 1:00 p.m. on the day when due in U.S. dollars to the Agent at the Agent's Account in same day funds.  The Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or commitment fees ratably (other than amounts payable pursuant to Section 2.12, 2.15 or 9.04(c)) to the Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(e), from and after the effective date specified in such Assignment and Acceptance, the Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

1030946.0668CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(b)     Unless payment is otherwise made by Borrowers, the becoming due of any Obligation (whether principal, interest, fees or other charges, including Extraordinary Expenses, L/C Obligations, Cash Collateral or Obligations relating to Bank Products and Cash Management Services) shall be deemed to be a request for a Base Rate Advance on the due date in the amount due and the proceeds of such Advance shall be disbursed as direct payment of such Obligation, without further application to or order of the Bankruptcy Court and notwithstanding that an Overadvance may result thereby.  In addition, Agent may, at its option, charge such amount against any operating, investment or other account of a Borrower maintained with Agent or any of its Affiliates, without further application to or order of the Bankruptcy Court and notwithstanding that an Overadvance may result thereby.

(c)     All computations of interest based on the Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of letter of credit fees, commitment fees and other fees shall be made by the Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or commitment fees are payable.  Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee, as the case may be; provided, however, that, if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)     Unless the Agent shall have received notice from any Borrower prior to the date on which any payment is due by it to the Lenders hereunder that such Borrower will not make such payment in full, the Agent may assume that the applicable Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent such Borrower shall not have so made such payment in full to the Agent, each Lender shall repay to the Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Agent, at the Federal Funds Rate.

Section 2.15   Taxes.  (a) Any and all payments by the Borrowers to or for the account of any Lender, the Agent or any Co-Collateral Agent hereunder or under the other Loan Documents or any other documents to be delivered hereunder shall be made, in accordance with Section 2.14 or the applicable provisions of such other documents, free and clear of and without deduction for any and all present or future Taxes (excluding any Excluded Taxes).  If the Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document or any other documents to be delivered hereunder

1030946.06CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

to any Lender, the Agent or any Co-Collateral Agent, (i) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable shall be increased as may be necessary so that after making all required deductions for Indemnified Taxes (including deductions for Indemnified Taxes applicable to additional sums payable under this Section 2.15) such Lender, the Agent and the Co-Collateral Agents (as the case may be) receive an amount equal to the sum each would have received had no such deductions of Indemnified Taxes been made, (ii) the Borrowers shall make such deductions as are determined by such Borrowers to be required based upon the information and documentation it has received pursuant to Sections 2.15(e) and (f)(i) and (iii) the Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    In addition, the Borrowers shall pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under the other Loan Documents or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the other Loan Documents or any other documents to be delivered hereunder, but excluding (i) any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 9.16), and (ii) all other United States federal taxes other than withholding Taxes (hereinafter referred to as "**Other Taxes**").  Other Taxes shall not include any Taxes imposed on, or measured by reference to, gross income, net income or gain.

(c)    Without duplication of any additional amounts paid pursuant to Section 2.15(a), the Borrowers shall indemnify each Lender, the Agent and each Co-Collateral Agent for and hold it harmless against the full amount of Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.15) imposed on or paid by such Lender, the Agent or any Co-Collateral Agent (as the case may be) and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 10 days from the date such Lender, the Agent or any Co-Collateral Agent (as the case may be) makes written demand therefor.

(d)    As soon as practicable after the date of any payment of Indemnified Taxes, the Borrowers shall furnish to the Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

(e)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS -DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

whether or not such Lender is subject to backup withholding or information reporting requirements.

(f)    Without limiting the generality of the foregoing:

(i)    Each Lender that is a United States person, on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers or the Agent, shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax on payments pursuant to this Agreement or the other Loan Documents; and

(ii)    Each Lender organized under the laws of a jurisdiction outside the United States, and each other Lender that is not a domestic corporation within the meaning of Section 7701(a)(30) of the Internal Revenue Code:

(1)    represents that all payments to be made to it under this Agreement or any other Loan Document are exempt from United States withholding Tax (including backup withholding Tax) under an applicable statute or tax treaty;

(2)    on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Forms W-8BEN, W-8BEN-E or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding Tax on payments pursuant to this Agreement or the other Loan Documents; and

(3)    on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with supplementary documentation as may be prescribed by applicable

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made.

If the form provided by a Lender at the time such Lender first becomes a party to this Agreement indicates a United States interest withholding Tax rate in excess of zero, withholding Tax at such rate shall be considered excluded from Indemnified Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding Tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such form; provided, however, that, if at the date of the Assignment and Acceptance pursuant to which a Lender assignee becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) in respect of United States withholding Tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding Taxes that may be imposed in the future or other amounts otherwise includable in Indemnified Taxes) United States withholding Tax, if any, applicable with respect to the Lender assignee on such date.  If any form or document referred to in this subsection (f) requires the disclosure of information, other than information necessary to compute the Tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN, W-8BEN-E, or W-8ECI, that the Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrowers and shall not be obligated to include in such form or document such confidential information. For purposes of this subsection (f), the terms "**United States**" and "**United States person**" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(g)     For any period with respect to which a Lender has failed to provide the Borrowers with the appropriate form, certificate or other document described in Section 2.15(e) (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring subsequent to the date on which a form, certificate or other document originally was required to be provided, or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under Section 2.15(a) or (c) with respect to Indemnified Taxes imposed by the United States by reason of such failure; provided, however, that should a Lender become subject to Indemnified Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrowers shall take such steps as the Lender shall reasonably request to assist the Lender to recover such Indemnified Taxes. Further, if a payment made to the Agent or any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), the Agent or such Lender, as applicable, shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the

1030946.06~~8CA~~-CHISR01A - MSW
~~C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX~~

amount to deduct and withhold from such payment.  Solely for purposes of this paragraph (g), "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

(h)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.15 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(i)    Any Lender claiming any additional amounts payable pursuant to this Section 2.15 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Eurodollar Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(j)    If any Lender determines, in its sole discretion exercised in good faith, that it has actually and finally realized, by reason of a refund, deduction or credit of any Indemnified Taxes paid or reimbursed by the Borrowers pursuant to subsection (a) or (c) above in respect of payments under this Agreement or the other Loan Documents, a current monetary benefit that it would otherwise not have obtained, and that would result in the total payments under this Section 2.15 exceeding the amount needed to make such Lender whole, such Lender shall pay to the Borrowers, with reasonable promptness following the date on which it actually realizes such benefit, an amount equal to the amount of such excess, net of all out-of-pocket expenses incurred by such Lender reasonably allocable in securing such refund, deduction or credit, provided that the Borrowers, upon the request of such Lender, agree to repay the amount paid over to the Borrowers to such Lender in the event such Lender is required to repay such refund to such jurisdiction.  Nothing in this subsection (j) shall be construed to require any Lender to make available to the Borrowers or any other Person its tax returns or any confidential tax information.

(k)    If the Agent, any Co-Collateral Agent or any Lender, as the case may be, shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by Borrower pursuant to this Section 2.15, including Indemnified Taxes or Other Taxes as to which it has been indemnified by Borrower, or with respect to which Borrower or a Group Member that is a signatory hereto has paid additional amounts pursuant to this Section 2.15, it shall notify Borrower of the availability of such refund claim and, if the Agent, any Co-Collateral Agent or any Lender, as the case may be, determines in good faith that making a claim for refund will not have any adverse consequence to its Taxes or business operations, shall, after receipt of a request by Borrower, make a claim to such Governmental Authority for such refund at Borrower's expense.

Section 2.16    Sharing of Payments, Etc.  If any Lender shall obtain any payment from any Group Member (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances, or the Term Loan or other amounts owing to it (other than pursuant to Section 2.12, 2.15 or 9.04(c)) in excess of its ratable share, such Lender shall forthwith purchase from the other Lenders such participations in the Advances, the Term Loan  or other amounts owing to them as shall be necessary to cause such purchasing

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 2.16 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 2.17    Use of Proceeds of Advances and Term Loan.  The proceeds of the Advances and the Term Loan shall be available (and each Borrower agrees that it shall use such proceeds) for operating, working capital and general corporate purposes of the Loan Parties, in each case consistent with, subject to and within the limitations contained in, the Approved Budget, including to refinance the Incremental DIP Term Loans outstanding on the Effective Date (in the case of the Term Loan), fund the Carve-Out Reserve and to pay other fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Chapter 11 Cases; provided, however, that no proceeds of the Advances or the Term Loans or cash collateral shall be used to, among other things, (x) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under or the liens and security interests granted under the Loan Documents or in connection with the Prepetition First Lien ABL Credit Agreement and any Debt thereunder or (y) investigate, initiate or prosecute any claims and defenses or commence causes of action against any Credit Party under or relating to the Loan Documents or any Prepetition Credit Parties under the Prepetition First Lien ABL Credit Agreement; and provided further, that if an~~the~~ official creditors' committee ~~is appointed, then it~~ or its counsel may use up to $100,000 to investigate, for a sixty (60) day period from the date of entry of the Final Financing Order, the validity, perfection, priority, extent or enforceability of the liens securing the obligations under the Prepetition First Lien ABL Credit Agreement (but not to litigate any of the foregoing).

Section 2.18    Permitted Overadvances.  The Agent may, in its discretion, make Permitted Overadvances without the consent of the Lenders, the Swingline Lender and the Issuing Lenders, and each Lender shall be bound thereby.  Any Permitted Overadvance may constitute a Swingline Advance.  A Permitted Overadvance is for the account of the Borrowers and shall constitute a Base Rate Advance and an Obligation secured by the Collateral, shall be treated for all purposes an Extraordinary Expense, and shall be repaid by the Borrowers in accordance with the provisions of Section 2.03(b) or 2.11(c)(i), as applicable.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Article III regarding the Lenders' obligations to purchase participations with respect to Letters of Credit or of Section 2.04 regarding the Lenders' obligations to purchase participations with respect to Swingline Advances.  The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring

1030946.06~~8~~9CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

any claim of any kind whatsoever against the Agent with respect to "**inadvertent Overadvances**" (i.e. where an Overadvance results from changed circumstances beyond the control of the Agent (such as a reduction in the collateral value)) regardless of the amount of any such Overadvance(s).

Section 2.19    Superpriority Claims; Security and Priority of Liens.[+]_ The Obligations, including all obligations of Holdings and each Subsidiary Guarantor in respect of its guarantee of the Obligations, shall, subject to the Carve-Out, at all times:

(a)    pursuant to Sections 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Case of each Loan Party, with priority over all other allowed chapter 11 and chapter 7 administrative expense claims now existing or hereinafter arising, of any kind whatsoever, including expenses of a chapter 11 and chapter 7 trustee (the "**DIP Superpriority Claims**");

(b)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by an automatically perfected security interest and lien on all assets of the Loan Parties that were not subject to a valid and perfected lien on the Petition Date (the "**Prepetition Unencumbered Assets**") and, upon entry of the Final Financing Order, the Avoidance Action Proceeds (as defined in the Final Financing Order) with lien priorities set forth in the Final Financing Order and the DIP Intercreditor Agreement;

(c)    pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by an automatically perfected junior security interest and lien on all assets of each Loan Party (other than Prepetition ABL Collateral) that is subject to valid and perfected security interests in favor of third parties as of the Petition Date and any Senior Permitted Liens; and

(d)    pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming security interest and lien on the Prepetition ABL Collateral of each Loan Party on which the Prepetition ABL Lenders held a first priority security interest and lien and the Prepetition Second Lien Secured Parties held a second priority security interest and lien (such liens and security interests, the "**Priming Liens**"), in each case to the extent that such Prepetition ABL Collateral is subject to existing liens that secure the obligations of the applicable Loan Party, including under the Prepetition First Lien ABL Credit Agreement and the Prepetition Second Lien Facilities (collectively, the "**Primed Liens**") and such Priming Liens (x) shall be senior in all respects to the interests in such property of the Prepetition ABL Lenders under the Prepetition First Lien ABL Credit Agreement and the other "secured parties" referred to therein (collectively, the "**Prepetition First Lien ABL Credit Agreement Primed Parties**"), and of the Prepetition Second Lien Secured Parties under the Prepetition Second Lien Facilities (collectively, the "**Prepetition Second Lien Primed Parties**"), (y) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens, and (z)

---

[+] NTD: To be conformed to final order

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

~~subject to valid, perfected and unavoidable liens (other than Primed Liens) in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition First Lien ABL Credit Agreement ("**Permitted Prior Liens**").~~shall be subject to Senior Permitted Liens.

Section 2.20    MIRE Event.  Notwithstanding anything to the contrary herein, the making, increasing, extension or renewal of any Advances pursuant to this Agreement (excluding any continuation or conversion of Borrowings) after the Effective Date shall be subject to flood insurance due diligence in accordance with Section 6.01(i)(v)(1) and flood insurance compliance in accordance with Section 6.01(c) hereto.

## ARTICLE III

## AMOUNT AND TERMS OF THE LETTERS OF CREDIT

Section 3.01    L/C Commitment.

(a)    Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Revolving Lenders set forth in Section 3.04(a), agrees to issue Letters of Credit for the account of any Borrower (on behalf of such Borrower or on behalf of any other Group Member) on any Business Day during the period from the Effective Date until the Termination Date in such form as may be approved from time to time by such Issuing Lender; provided that no Issuing Lender shall have any obligation to issue any Letter of Credit if (i) after giving effect to such issuance, the L/C Obligations would exceed the L/C Commitment or (ii) the face amount of the requested Letter of Credit, when aggregated with all other then outstanding Extensions of Credit, shall exceed the Line Cap at such time; provided further that each Issuing Lender may, but shall not be required to, issue Letters of Credit such that the aggregate L/C Obligations attributable to all such outstanding Letters of Credit issued by such Issuing Lender exceed $[●]. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance, or (y) subject to the provisions of Section 6.01(p), the date that is thirty (30) day prior to the Scheduled Termination Date. Each Application and each Letter of Credit shall be subject to the International Standby Practices (ISP 98) of the International Chamber of Commerce (in the case of Standby L/Cs) or the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce (in the case of Commercial L/Cs) and, to the extent not inconsistent therewith, the laws of the State of New York.

(b)    No Issuing Lender shall at any time be obligated to issue any Letter of Credit if (i) such issuance would conflict with, or cause such Issuing Lender or any Revolving Lender to exceed any limits imposed by, any applicable Requirement of Law, (ii) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Lender from issuing such Letter of Credit, or any law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Lender shall prohibit, or request that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Lender is not

otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Lender any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which such Issuing Lender in good faith deems material to it; (iii) such issuance would violate one or more policies of such Issuing Lender applicable to letters of credit generally, or (iv) any Revolving Lender is at such time a Defaulting Lender hereunder, unless such Issuing Lender has entered into arrangements, including the delivery of cash collateral, satisfactory to such Issuing Lender (in its sole discretion) with the Borrowers or such Defaulting Lender to eliminate such Issuing Lender's actual or potential Fronting Exposure (after giving effect to Section 8.12(a)(iv)) with respect to the Defaulting Lender arising from either (x) the Letter of Credit then proposed to be issued or (y) that Letter of Credit and all other L/C Obligations as to which such Issuing Lender has actual or potential Fronting Exposure, as it may elect in its sole discretion.

Section 3.02    Procedure for Issuance of Letter of Credit.  Any Borrower may from time to time request that an Issuing Lender issue a Commercial L/C or Standby L/C for its account (on behalf of such Borrower or on behalf of any other Group Member) by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may reasonably request.  Upon receipt of any Application, such Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall such Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the applicable Borrower.  Such Issuing Lender shall furnish a copy of such Letter of Credit to the applicable Borrower promptly following the issuance thereof.  Such Issuing Lender shall promptly notify the Agent of the issuance, extension or amendment of Letters of Credit and any drawings or other payments under Letters of Credit.

Section 3.03    Fees and Other Charges.  (a)  The Borrowers will pay a fee on the face amount of all outstanding Letters of Credit (provided, however, that with respect to any Letter of Credit that, by its terms provides for one or more automatic increases in the amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is in effect at such time) at a per annum rate equal to (i) in the case of each Standby L/C and Banker's Acceptance, the Applicable Margin with respect to Eurodollar Rate Advances and (ii) in the case of each Commercial L/C, 50% of the Applicable Margin with respect to Eurodollar Rate Advances, in each case payable monthly in arrears on the 5th day subsequent to the last day of each month after the issuance date.  In addition, the Borrowers shall pay to each applicable Issuing Lender for its own account a fronting fee of 0.125% per annum on the undrawn and unexpired amount of each Letter of Credit, payable monthly in arrears on the 5th day subsequent to the last day of each month after the issuance date.

1030946.06 8CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(b)    In addition to the foregoing fees, the Borrowers shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit, unless otherwise agreed.

Section 3.04    Letter of Credit Participations.  (a)  Each Issuing Lender irrevocably agrees to grant and hereby grants to each Revolving Lender, and, to induce each Issuing Lender to issue Letters of Credit, each Revolving Lender irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions set forth below, for such Revolving Lender's own account and risk an undivided interest equal to such Revolving Lender's Revolving Commitment Percentage in such Issuing Lender's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by such Issuing Lender thereunder.  Each Revolving Lender agrees with each Issuing Lender that, if a draft is paid under any Letter of Credit for which such Issuing Lender is not reimbursed in full by the Borrowers in accordance with the terms of this Agreement, such Revolving Lender shall pay to such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein an amount equal to such Revolving Lender's Revolving Commitment Percentage of the amount of such draft, or any part thereof, that is not so reimbursed.  Each Revolving Lender's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right that such Revolving Lender may have against such Issuing Lender, the Borrowers or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Article IV, (iii) any adverse change in the condition (financial or otherwise) of the Borrowers or any other Loan Party, (iv) any breach of this Agreement or any other Loan Document by the Borrowers, any other Loan Party or any other Revolving Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)    If any amount required to be paid by any Revolving Lender to any Issuing Lender pursuant to Section 3.04(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is paid to such Issuing Lender within three Business Days after the date such payment is due, such Revolving Lender shall pay to such Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360.  If any such amount required to be paid by any Revolving Lender pursuant to Section 3.04(a) is not made available to such Issuing Lender by such Revolving Lender within three Business Days after the date such payment is due, such Issuing Lender shall be entitled to recover from such Revolving Lender, on demand, such amount with interest thereon calculated from such due date at the rate per annum set forth in Section 2.08(a)(i) applicable to Base Rate Advances.  A certificate of such Issuing Lender submitted to any Revolving Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

1030946.06CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(c)     Whenever, at any time after any Issuing Lender has made payment under any Letter of Credit and has received from any Revolving Lender its pro rata share of such payment in accordance with Section 3.04(a), such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the applicable Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to such Revolving Lender its pro rata share thereof; provided, however, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such Revolving Lender shall return to such Issuing Lender the portion thereof previously distributed by such Issuing Lender to it.

Section 3.05    Reimbursement Obligation of the Borrowers.  If any draft is paid under any Letter of Credit, the Borrowers shall reimburse the applicable Issuing Lender for the amount of (a) the draft so paid and (b) any Taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment (i) not later than 12:00 Noon on the Business Day that the applicable Borrower receives notice of such draft, if such notice is received on such day prior to 10:00 A.M. or (ii) if clause (i) above does not apply, the Business Day immediately following the day that the applicable Borrower receives such notice (such date, the "**Reimbursement Date**").  To the extent that  the applicable Borrower fails to so reimburse the applicable Issuing Bank, whether or not any Borrower submits a Notice of Borrowing, Borrowers shall be deemed to have requested a Borrowing of Base Rate Advances in an amount necessary to pay all amounts due Issuing Bank on any Reimbursement Date and each Lender shall fund its pro rata share of such Borrowing whether or not the Commitments have terminated, an Overadvance exists or is created thereby, or the conditions in Article IV are satisfied.

Section 3.06    Obligations Absolute.  Each Borrower's obligations under this Article III shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that any Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person.  Each Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and such Borrower's Reimbursement Obligations under Section 3.05 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among such Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of such Borrower against any beneficiary of such Letter of Credit or any such transferee.  No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Issuing Lender.  Each Borrower agrees that any action taken or omitted by any Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence

of gross negligence or willful misconduct, shall be binding on such Borrower and shall not result in any liability of such Issuing Lender to such Borrower.

Section 3.07   <u>Letter of Credit Payments</u>.  If any draft shall be presented for payment under any Letter of Credit, the applicable Issuing Lender shall promptly notify the applicable Borrower of the date and amount thereof.  The responsibility of such Issuing Lender to the Borrowers in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

Section 3.08   <u>Applications</u>.  To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this <u>Article III</u>, the provisions of this <u>Article III</u> shall apply.

Section 3.09   <u>Use of Letters of Credit</u>.  The Letters of Credit shall be available (and each Borrower agrees that it shall use such Letters of Credit) for general corporate purposes of Holdings and its Subsidiaries.

# ARTICLE IV

# CONDITIONS TO EFFECTIVENESS

Section 4.01   <u>Conditions Precedent to Effectiveness</u>.  The effectiveness of this Agreement and the obligation of the Lenders to extend credit hereunder is conditioned upon satisfaction (or waiver) of each of the following conditions precedent:

(a)    The Agent shall have received each of the following, each of which shall be originals or telecopies or other electronically transmitted copies (followed promptly by originals) unless otherwise specified, each properly executed by an Authorized Officer of the signing Loan Party and each in form and substance satisfactory to the Agent and the Co-Collateral Agents:

(i)   this Agreement duly executed by each of Holdings, the Borrowers, the Agent, the Co-Collateral Agents, and the Lenders;

(ii)   the Guarantee and Collateral Agreement duly executed by the applicable Loan Parties;

(iii)   each other Loan Document set forth on <u>Schedule 4.01</u>, each duly executed by the applicable Loan Parties;

(iv)   such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Loan Party as the Agent may reasonably require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to

which such Loan Party is a party or is to be a party and (B) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(v)    copies of each Loan Party's organization or other governing documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where failure to so qualify could reasonably be expected to have a Material Adverse Effect;

(vi)    an opinion of in-house counsel to Holdings and of one or more special or local counsel to Holdings, the Borrowers and the other Loan Parties, addressed to the Agent, the Co-Collateral Agents and each Lender as to such matters as the Agent and Co-Collateral Agents may reasonably request;

(vii)    a certificate signed by an Authorized Officer of Holdings and the Borrowers certifying (A) that the conditions specified in Section 4.02 have been satisfied and (B) that the Perfection Certificate is true and correct in all material respects;

(viii)    evidence that all insurance (including endorsements) required to be maintained pursuant to Section 6.01(c) has been obtained and is in effect, including all flood hazard insurance policies and related endorsements for each Real Property that is located in a Special Flood Hazard Area;

(ix)    a Borrowing Base Certificate, duly completed and executed by an Authorized Officer of Holdings, together with supporting information satisfactory to the Co-Collateral Agents in their Permitted Discretion for the most recent prior week ended at least three Business Days before the Effective Date;

(x)    results of searches or other evidence reasonably satisfactory to the Co-Collateral Agents (in each case dated as of a date reasonably satisfactory to the Co-Collateral Agents) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Liens;

(xi)    the DIP Intercreditor Agreement duly executed by the Junior DIP Term Loan Agent, the Agent, the Co-Collateral Agents and the Loan Parties;

(xii)    [reserved]; and

(xiii)    such other customary certificates, documents or consents as the Agent and the Co-Collateral Agents reasonably may require.

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(b)    All actions required by law or reasonably requested by the Co-Collateral Agents to be undertaken, and all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Co-Collateral Agents to be filed, registered, or recorded to create or perfect the Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Co-Collateral Agents.

(c)    The conditions set forth in Section 4.02 shall be satisfied.

(d)    There shall have been no event or circumstance since the Petition Date, that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code).

(e)    All fees required to be paid (to the extent invoiced) to the Agent, the Co-Collateral Agents, the Joint Lead Arrangers or the Lenders on or before the Effective Date shall have been paid in full.

(f)    The Borrowers shall have paid all costs and expenses of the Agent and the Co-Collateral Agents (to the extent set forth in Section 9.04(a) and invoiced) incurred in connection with or relating to this Agreement and the other Loan Documents, including reasonable fees, charges and disbursements of counsel to the Agent and each Co-Collateral Agent (provided that such payment shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent and the Co-Collateral Agents).

(g)    (i) Each Loan Party shall have provided the documentation and other information requested by the Lenders at least three (3) Business Days prior to the Effective Date that is required by authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act, and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Borrower shall have provided a Beneficial Ownership Certification in relation to the Borrower at least two (2) Business Days prior to the Effective Date.

(h)    [Reserved].The Borrowers shall have paid (i) all accrued and unpaid interest, commitment fees, letter of credit fees and other fees to the Initial Lenders under the Interim DIP Facility and (ii) all accrued and unpaid interest, commitment fees, letter of credit fees and other fees owed to Participating Prepetition Lenders under the Prepetition Credit Agreement, in each case accrued to (but not including) the Effective Date.

(i)    The Agent shall have received a signed copy of the Final Financing Order, which Final Financing Order shall not have been vacated, reversed, modified, amended or stayed in any respect.

(j)    The Agent shall have received signed copies of all orders granting the relief requested in the Loan Parties "first day motions" on a final basis, including (i)

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

authorizing the Loan Parties to continue the use of their cash management system on a final basis, and (ii) authorizing the Loan Parties to reimburse certain employee expenses on a final basis, which orders shall be in form and substance acceptable to the Agent in its sole and absolute discretion.

(k)    No trustee, responsible officer or examiner having powers related to the operation of the business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) shall have been appointed or elected with respect to the Loan Parties, any of their subsidiaries, or any of their respective properties, or any Loan Party or its subsidiaries shall have applied for, consented to, or acquiesced in, any such appointment, with respect to the Loan Parties, any of their subsidiaries or their respective properties.

(l)    The Joint Lead Arrangers shall have received and be satisfied, in their sole and absolute discretion, with (i) the Approved Budget, (ii) a winddown budget and (iii) the Store Footprint Plan, in each case at least [●]1 (one) Business Days prior to the Effective Date.

(m)    There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect.

(n)    Upon entry of the Final Financing Order, the entry into this Agreement shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

(o)    [Reserved].

(p)    The Co-Collateral Agents shall be satisfied in their sole and absolute discretion with the retention by Holdings and the Borrowers of the Debtor Advisors[Reserved].

(q)    The Junior DIP Term Loan Agreement shall have been executed and delivered by all parties thereto (the execution and delivery of which by the Debtors shall have been authorized by the Bankruptcy Court in [the Junior DIP Interim Financing Order]), all Junior DIP Term Loan Documents shall be in form and substance satisfactory to the Agent in its sole and absolute discretion, and the Debtors shall have deposited the net proceeds of the initial drawing of the Junior DIP Term Loans in an aggregate initial principal amount of $75,000,000 into the Term Loan Proceeds Account.

(r)    All other conditions precedent in this Section 4.01 shall have been satisfied or waived on or before November 30, 2018.

Section 4.02    Conditions Precedent to Each Extension of Credit.  The obligation of each Lender to make an Extension of Credit on any date shall be subject to the conditions precedent that the effectiveness of this Agreement shall have occurred and on the date of such Extension of Credit the following statements shall be true (and each of the giving of the

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

applicable Notice of Borrowing or Application for a Letter of Credit, as the case may be, and the acceptance by the applicable Borrower of the proceeds of such Borrowing or the issuance of such Letter of Credit, as applicable, shall constitute a representation and warranty by the applicable Borrower that on the date of such Borrowing or Letter of Credit issuance such statements are true):

(i)    the representations and warranties made by each Loan Party in or pursuant to the Loan Documents are true and correct on and as of such date in all material respects, before and after giving effect to such Extension of Credit and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, and (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(ii)    no event has occurred and is continuing, or would result from such Extension of Credit or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default;

(iii)    after giving effect to such Extension of Credit, the Total Extensions of Credit will not exceed the Line Cap;

(iv)    after giving effect to such Extension of Credit, the Borrowers will be in compliance with the LTV Provisions;

(v)    such Extension of Credit shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

(vi)    such Extension of Credit shall not result in the Total Extensions of Credit exceeding the amount authorized for the DIP ABL Facility by the Final Financing Order;

(vii)    (i) the Final Financing Order shall be in full force and effect and shall not have been vacated, reversed, stayed, amended or modified in any respect, (ii) no motion for reconsideration of the Final Financing Order shall have been timely filed by any of the Debtors or their Subsidiaries, and (iii) no appeal of the Final Financing Order shall have been timely filed; and

(viii)    in the case of a Revolving Advance, the date of such Advance is a Revolving Availability Date.

The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Extensions of Credit, the Revolving Lenders will fund their Revolving Commitment Percentage of all Advances and participate in all Swingline Advances and Letters of Credit whenever made or issued, which are

requested by a Borrower or are otherwise Permitted Overadvances and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this <u>Article IV</u>, are agreed to by the Agent acting in the interests of the Credit Parties, <u>provided</u>, <u>however</u>, that the making of any such Extensions of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this <u>Article IV</u> on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

# ARTICLE V

# REPRESENTATIONS AND WARRANTIES

Section 5.01    <u>Representations and Warranties of Holdings and the Borrowers.</u>

Holdings and the Borrowers hereby jointly and severally represent and warrant as follows:

(a)    <u>Organization; Power and Authority; EEA Financial Institution; EEA Financing Institutions</u>. Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Loan Party is an EEA Financial Institution.

(b)    <u>Due Authorization; No Conflict</u>. Upon entry of the Final Financing Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Loan Party's powers, have been duly authorized by all necessary organizational action, and do not contravene (i) the charter or by-laws or other organizational or governing documents of such Loan Party or (ii) law or any contractual restriction binding on or affecting any Loan Party.

(c)    <u>Government Approvals; Consents</u>. Upon entry of the Final Financing Order, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by any Loan Party of any Loan Document to which it is a party that has not already been obtained.

(d)    <u>Due Execution</u>. Each Loan Document has been duly executed and delivered by each Loan Party party thereto. Upon entry of the Final Financing Order, this Agreement constitutes, and each other Loan Document will constitute upon execution, the legal, valid and binding obligation of each Loan Party party thereto enforceable against such Loan Party in accordance with its respective terms and the Final Financing Order, subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(e)    <u>Financial Statements</u>. The consolidated and consolidating balance sheets of Holdings and its Subsidiaries and the related consolidated statements of income and

1030946.06<s>8CA</s>-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

cash flows and shareholders' equity of Holdings and its Subsidiaries, that have been and are hereafter delivered to Agent and Lenders fairly present the consolidated financial condition and results of operations of Holdings and its Subsidiaries as at the dates and for the periods indicated, all in accordance with GAAP consistently applied.

(f)    Absence of Material Adverse Effect. Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(g)    Litigation. Other than the Chapter 11 Cases, there are no material unstayed Adverse Proceedings now pending or threatened or affecting Holdings, the Borrowers or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator.

(h)    Margin Stock. Following application of the proceeds of each Advance and the Term Loan and the issuance of each Letter of Credit, not more than five (5%) percent of the value of the assets of the Borrowers and their respective Subsidiaries on a consolidated basis will be "Margin Stock" (within the meaning of Regulation U issued by the Board of Governors. No proceeds of any Extension of Credit or Letters of Credit will be used by Borrowers to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

(i)    Investment Company Act. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(j)    Taxes. All United States Federal income tax returns and all other material tax returns which are required to be filed have been filed by or on behalf of Holdings, the Borrowers and their respective Subsidiaries, and all Taxes due with respect to Holdings, the Borrowers and their respective Subsidiaries pursuant to such returns or pursuant to any assessment received by Holdings, the Borrowers or any Subsidiary have been paid except to the extent permitted in Section 6.01(b).   The charges, accruals and reserves on the books of Holdings, the Borrowers and their Subsidiaries in respect of Taxes or other governmental charges have been made in accordance with, and to the extent required by, GAAP.

(k)    Information; Accuracy. All written information (including the Approved Budget and each Rolling Budget) heretofore furnished by Holdings, the Borrowers or their Subsidiaries to the Agent, any Co-Collateral Agent or any Lender (including the Perfection Certificate) for purposes of or in connection with this Agreement or any other Loan Document, taken as a whole, was true and correct in all material respects on the date as of which such information was stated or certified, provided that with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  As of the Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(l)    Collateral. No Collateral is subject to any Lien except the Permitted Liens existing on the Effective Date. Each Loan Party and Subsidiary has good and marketable title to (or valid leasehold interests in) all of its Real Property, and good title to all of its personal property, including all property reflected in any financial statements delivered to the Agent or the Lenders, in each case free of Liens except Permitted Liens. Each Loan Party and Subsidiary has paid and discharged all lawful claims that, if unpaid, could become a Lien on its properties, other than Permitted Liens.  All Liens of the Agent in the Collateral are duly perfected Liens with lien priorities set forth in the Final Financing Order and the DIP Intercreditor Agreement and subject to Permitted Liens entitled to priority under applicable law.  Schedule 5.01(l)(A) sets forth the address (including street address, county and state) of all previously unencumbered Real Property that is owned or ground leased by the Loan Parties as of the Effective Date (specifying whether each parcel of Real Property is either owned or ground leased).  Schedule 5.01(l)(B) sets forth the address (including street address, county and state) of all previously unencumbered Real Property that is leased by the Loan Parties as of the Effective Date, together with the name of each lessor and such lessor's contact information. Each Lease of Real Property by the Loan Parties is enforceable (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and by general principles of equity) against the lessor thereof in accordance with its terms and is in full force and effect and, other than for defaults arising solely as a result of the commencement of the Chapter 11 Cases, the Loan Parties are not in default of the terms of any such Lease; provided that the representation set forth in this sentence shall not apply to any Lease for a Store location that is subject to the Specified Store Closing Sales if the failure of such representation to be true and correct would not impair the applicable Loan Party's ability to continue to occupy such Store location. The Agent has received the Flood Documentation with respect to all Real Property.

(m)    Intellectual Property. Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (i) each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted; (ii) no material claim has been asserted and is pending by any Person challenging the use of any Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that the conduct of the business of any Loan Party infringes, misappropriates, or otherwise violates in any material respect any Intellectual Property of any Person, nor do Holdings or the Borrowers know of any valid basis for any such claim; and (iii) to the best knowledge of Holdings and the Borrowers, neither the use of Intellectual Property by each Group Member nor the operation of their respective businesses infringes, misappropriates or otherwise violates the rights of any Person in any material respect.

(n)    ERISA.

(i)    Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, (a) neither a Reportable Event nor a failure to meet minimum required contributions (in accordance with Section 430 or any prior applicable section of the Internal Revenue Code or Section 302 of ERISA) has occurred during the five year period

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

prior to the date on which this representation is made or deemed made with respect to any Plan, (b) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other applicable federal or state laws, and (c) no termination of a Single Employer Plan has occurred.  Except as set forth on Schedule 5.01(n), no Lien imposed under the Internal Revenue Code or ERISA exists on account of any Plan, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period.  Each Single Employer Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the United States Internal Revenue Service (the "**IRS**") and, to the best knowledge of Holdings and the Borrowers, nothing has occurred which would cause the loss of, such qualification.  Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 430 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 430 of the Internal Revenue Code has been made with respect to any Plan.

(ii)    There are no pending or, to the best knowledge of Holdings and the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary duty rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur, in each case that would reasonably be expected to result in a Material Adverse Effect. Neither any Loan Party nor any ERISA Affiliate has incurred, or would reasonably be expected to incur, any liability under Title IV of ERISA with respect to any Pension Plan, other than premiums due and not delinquent under Section 4007 of ERISA or as would not reasonably be expected to have a Material Adverse Effect; neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and, to the knowledge of the Borrowers, no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan except as would not reasonably be expected to have a Material Adverse Effect; and neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA.  Except as would not reasonably be expected to have a Material Adverse Effect, neither Holdings, the Borrowers nor any Commonly Controlled Entity has had a complete or partial withdrawal (as such terms are defined in Sections 4203 and 4205 of ERISA, respectively) from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA.  No such Multiemployer Plan is Insolvent except as would not reasonably be expected to result in aggregate liability to Holdings and its Subsidiaries of $100,000,000 or more.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(iii)    Each Loan Party represents and warrants that it is not and will not be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Advances, the Letters of Credit or the Revolving Commitments;

(o)    Environmental Matters. Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Group Member (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has any Environmental Liabilities, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(p)    Security Interest. (i) The Guarantee and Collateral Agreement is effective to create in favor of the Control Co-Collateral Agent, for the benefit of the Credit Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.

(ii)    When financing statements and other filings specified on Schedule 5.01(p) in appropriate form are filed in the offices specified on Schedule 5.01(p), the Guarantee and Collateral Agreement shall, to the extent a security interest therein can be perfected by filing a UCC financing statement, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to the Lien or claim of any other Person (except for Senior Permitted ~~Prior~~ Liens).

(iii)    The Mortgages shall be effective to create in favor of the Control Co-Collateral Agent (for the benefit of the Credit Parties) or, if so contemplated by the respective Mortgage, the Control Co-Collateral Agent and the other Credit Parties, legal, valid and enforceable Liens on all of the Loan Parties' rights, titles and interests in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are validly filed, registered or recorded in the proper real estate filing, registration or recording offices, and all required mortgage Taxes and recording and registration charges are duly paid, the Control Co-Collateral Agent (for the benefit of the Credit Parties) shall have valid Liens with record or registered notice to third parties on all rights, titles and interests of the Loan Parties in such Mortgaged Property.

(q)    Payables Practices. Except for managing payments of certain payables to conserve cash in the period immediately preceding the commencement of the Chapter 11 Cases, each Loan Party has not made any material change in the historical accounts payable practices from those in effect immediately prior to the date hereof.

(r)    Insurance Matters. The properties of the Loan Parties are insured as required pursuant to Section 6.01(c) hereof.  Each insurance policy required to be maintained by

1030946.06~~8CA~~-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

the Loan Parties pursuant to Section 6.01(c) is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

(s)    Equity Interests. Each Loan Party has good title to the Equity Interests in its Subsidiaries and all such Equity Interests are duly issued, fully paid and non-assessable. There are no outstanding options to purchase, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to any capital stock of any Loan Party (other than Holdings) or Subsidiary, except as set forth on Schedule 5.01(s). The copies of the organization and governing documents of each Loan Party provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

(t)    Labor Matters; Certain Employment Matters. As of the date of this Agreement, except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of Holdings or any Borrower, threatened, (b) the hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign law dealing with such matters, (c) all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.01(t) (as updated by the Borrowers from time to time) (i) no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or any material bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (excluding in each case individual employment agreements) and (ii) no employee of a Loan Party is also an employee of any Permitted Holder. There are no representation proceedings pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, in each case which would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries which would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)    WARN Act. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law

1030946.0608CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

that remains unpaid or unsatisfied and is in excess of $100,000 individually or $750,000 in the aggregate for all such liabilities.

(v)    Brokerage Fees. No broker or finder brought about the obtaining, making or closing of the Advances or the Term Loan or transactions contemplated by the Loan Documents, and, other than amounts payable pursuant to the Fee Letter, no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

(w)    Limitation on Certain Transactions. No Loan Party has any obligation to any Permitted Holder with respect to any consulting, management or similar fee; provided, that, for the avoidance of doubt, the foregoing shall not apply to (i) any arrangement disclosed in Holdings' annual report on form 10-K for the fiscal year ended February 3, 2018; (ii) any employment arrangement between any Loan Party and an individual Person who is also an employee of a Permitted Holder, so long as such employment arrangements are (x) on terms that are fair and reasonable and comparable to terms provided to employees in comparable positions for companies of a comparable size and no less favorable to such Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not an employee of a Permitted Holder and (y) in the case of any officer (as defined in Rule 16a-1 under the Securities Exchange Act of 1934) or director of Holdings, any beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of more than 10.0% of Holdings' Equity Interests or any Person that ranks in the top five in compensation among all employees of the Loan Parties, approved by a majority of disinterested members of the board of directors of Holdings in good faith; or (iii) any obligation arising from any financial advisory, financing or underwriting services or other investment banking activities provided by a Permitted Holder so long as (x) such services directly relate to and are provided in conjunction with an acquisition or divestiture or other specific transaction conducted outside the ordinary course of business, (y) such services are on terms that are fair and reasonable and comparable to terms provided by independent financial advisory, financing or underwriting service provider or other investment banking service providers and (z) compensation for such services are approved by a majority of disinterested members of the board of directors of Holdings in good faith.

(x)    PATRIOT Act; Anti-Corruption. To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) AML Laws, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), and (iv) the Corruption of Foreign Public Officials Act, as amended. No part of the proceeds of any credit extensions will be used, directly or, to the Loan Parties' knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(y)    Pension Plan Matters. None of Holdings, the Borrowers, any of their respective Subsidiaries, nor any Permitted Holder or Significant Holder is an Affiliate of the Sears Holdings Pension Plan. The Sears Holdings Pension Plan qualifies as an Eligible Assignee pursuant to the definition thereof.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(z)    <u>Sanctions; OFAC</u>. No Group Member, nor any of their respective directors, officers, employees, agents or Affiliates, is a Sanctioned Person. Each Group Member has implemented and maintains in effect policies and procedures designed to ensure compliance by each Group Member and their respective directors, officers, employees, agents, and Affiliates, with applicable Sanctions. Each Group Member and their respective directors, officers, and employees to the extent of their activities in those capacities, and, to the knowledge of each Group Member, their respective agents and Affiliates, to the extent of their activities in those capacities, is in compliance with applicable Sanctions. No Group Member will, directly or, to their knowledge, indirectly, use the proceeds of any credit extensions, or lend, contribute or otherwise make available such proceeds to any Person in any manner that would directly or indirectly result in a violation of applicable Sanctions by any Person.

(aa)    <u>Final Financing Order</u>.

(i)    The Final Financing Order is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the written consent of the Agent and the Co-Collateral Agents.

(ii)    Upon the occurrence of the Termination Date (whether by acceleration or otherwise), the Agent shall, subject to <u>Article VII</u> and the applicable provisions of the Final Financing Order, be entitled to immediate payment of the Obligations and to enforce the remedies provided for under this Agreement and the other Loan Documents in accordance with the terms hereof, thereof and the Final Financing Order, in each case without further application to or order by the Bankruptcy Court.

(iii)    If the Final Financing Order is the subject of a pending appeal in any respect, none of the Final Financing Order, the extension of credit or the performance by any Loan Party of any of its obligations under this Agreement or any of the other Loan Documents shall be the subject of a presently effective stay pending appeal. The Debtors, the Agent, the Co-Collateral Agents and the Lenders shall be entitled to rely in good faith upon the Final Financing Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Debtors, the Agent, the Co-Collateral Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with the Loan Documents notwithstanding any such objection or appeal, unless the Final Financing Order has been stayed by a court of competent jurisdiction.

(bb)    <u>Security Interest</u>. Upon entry of each of the Interim Financing Order and the Final Financing Order, each such Financing Order was or shall be effective to create in favor of the Co-Collateral Agents, for the benefit of the Lenders, a legal, valid enforceable and perfected security interest in the Collateral and proceeds thereof, as and to the extent contemplated by each such Financing Order, as described in this Agreement and the other Loan Documents.

(cc)  Appointment of Trustee or Examiner; Liquidation. No order has been entered in any of the Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (c) to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases.

(dd)  No Other Insolvency Proceeding. None of the Loan Parties is a debtor in any Insolvency Proceeding.

(ee)  Superpriority Claims; Liens. Upon the entry of each of the Interim Financing Order and the Final Financing Order, each such Financing Order and the Loan Documents are sufficient to provide the superpriority claims and security interests and Liens on Collateral of the Loan Parties described in, and with the priority provided in, the Interim DIP Term Sheet and the Loan Documents, as applicable.

(ff)  Non-Subsidiary Guarantor Entities. Since August 4, 2018, no Loan Party has transferred any assets to any Specified Subsidiary other than as reported in filings with the SEC made prior to the Petition Date.

(gg)  Approved Budget. The Borrowers have heretofore furnished to the Agent the Approved Budget and such Approved Budget was prepared in good faith upon assumptions that the Borrowers believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.

(hh)  Reorganization Matters.

(i)  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order. The Debtors have given, on a timely basis as specified in the Interim Financing Order, all notices required to be given to all parties specified in the Interim Financing Order.

(ii)  After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims specified in any provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Carve-

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Out and the priorities set forth in the Interim Financing Order or Final Financing Order, as applicable.

(iii)    After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, only to the Carve-Out to the extent set forth in the Interim Financing Order and the Final Financing Order and with the lien priority set forth in the Final Financing Order and the DIP Intercreditor Agreement.

(iv)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or the Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## ARTICLE VI

## COVENANTS

Section 6.01    Affirmative Covenants.  So long as any Advance or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid, any Letter of Credit shall remain outstanding (unless the same has been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lenders have been provided in respect of such Letters of Credit) or any Lender shall have any Commitment hereunder, each of Holdings and the Borrowers will, and will cause each of their Subsidiaries to:

(a)    Compliance with Laws, Etc.  (i) Comply in all respects with all applicable Requirements of Law, such compliance to include compliance with ERISA and Environmental Laws (which compliance includes taking any required actions with respect to the release or threatened release of Hazardous Materials), except for such non-compliance as would not reasonably be expected to have a Material Adverse Effect, and (ii) comply in all material respects with the Bankruptcy Code and any order of the Bankruptcy Court.

(b)    Payment of Taxes, Etc.  Pay and discharge before the same shall become delinquent, (i) all Taxes, assessments and governmental charges or levies imposed upon it or upon its property (ii) all payments required to be made to any Pension Plan, and (iii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided that neither Holdings, the Borrowers nor any of their Subsidiaries shall be required to pay or discharge any such Tax, assessment, charge or claim (x) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors,

1030946.06<del>8CA</del>-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS  DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(y) if such non-payments, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect or (z) for which payment is excused under the Bankruptcy Code.

(c)   Maintenance of Insurance. (i)  Maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is consistent with prudent business practice; provided that Holdings, the Borrowers and their Subsidiaries may self-insure to the extent consistent with prudent business practice; provided further that policies maintained with respect to any Collateral located at a warehouse or DC shall provide coverage for Inventory at (x) the retail selling price of such Inventory less any permanent markdowns, consistent with the Loan Parties' past practices, or (y) another selling price permitted by the Co-Collateral Agents in their Permitted Discretion.

(ii)   None of the Credit Parties shall be a co-insurer with any Loan Party or any other Person with respect to any fire and extended coverage policies maintained with respect to any Collateral without the prior written consent of the Co-Collateral Agents. Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include a non-contributing lenders' loss payable clause, in form and substance reasonably satisfactory to the Co-Collateral Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Control Co-Collateral Agent, as its interests may appear.

(iii)   Within thirty (30) days following delivery of written notice from the Agent to Holdings, Holdings shall notify the insurers and use commercially reasonable efforts to have such policies amended to include such other provisions as the Co-Collateral Agents may reasonably require from time to time to protect the interests of the Credit Parties.  Commercial general liability policies shall be endorsed to name the Co-Collateral Agents as additional insureds, as their interests may appear.  Each certificate delivered by the Loan Parties' insurance broker with respect to each property and liability insurance policy referred to in this Section 6.01(c) shall also provide that such policy shall not be canceled, modified or not renewed other than upon not less than ten (10) days' prior written notice thereof by the insurance broker to the Co-Collateral Agents.

(iv)   The Borrowers shall deliver to the Co-Collateral Agents, prior to the cancellation, modification or non-renewal of any such policy of insurance, evidence of renewal or replacement of a policy previously delivered to the Co-Collateral Agents, including an insurance binder therefor, together with evidence satisfactory to the Co-Collateral Agents of payment of the premium therefor and, upon request of the Agent, a copy of such renewal or replacement policy.  In the event that the Borrowers fail to maintain any such insurance as required pursuant to this Section 6.01(c), the Agent may obtain such insurance on behalf of the Borrowers and the Loan Parties shall reimburse the Agent as

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

provided herein for all costs and expenses in connection therewith; the Agent's obtaining of such insurance shall not be deemed a cure or waiver of any Default or Event of Default arising from the Loan Parties' failure to comply with the provisions of this Section 6.01(c).

(v) The Borrowers shall cause each property insurance policy with respect to any Real Property to be endorsed or otherwise amended to include a "standard" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Co-Collateral Agents; deliver a certificate of insurance with respect to such Real Property to the Co-Collateral Agent; and deliver to the Co-Collateral Agents, prior to or concurrently with the cancellation or nonrenewal of any such policy of insurance covered by this clause (v), a copy of a renewal or replacement (or other evidence of renewal of a policy previously delivered to the Agent) insurance certificate with respect thereto.

(vi)   If any building or mobile home on any improved Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "**Special Flood Hazard Area**") with respect to which flood insurance has been made available under the Flood Insurance Laws, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Agent evidence of such compliance in form and substance reasonably acceptable to the Agent.

(d)    Preservation of Corporate Existence, Etc.  Preserve and maintain its corporate existence, material rights (charter and statutory) and franchises unless otherwise consented to by the Agent and the Co-Collateral Agents in their sole and absolute discretion.

(e)    Inspection Rights.  In addition to the Agent's and the Co-Collateral Agents' rights under Section 6.01(k) and Section 8.02(b) hereof, subject to reasonable confidentiality limitations, at any reasonable time and from time to time but not more frequently than once per month (or at any time if an Event of Default has occurred and is continuing), permit the Agent, the Co-Collateral Agents or any Agent Professionals, at the Loan Parties' expense, to (i) visit, enter onto, and inspect any of the Real Property (subject to the rights of tenants under their leases and provided that, except after the occurrence of an Event of Default, such visits and inspections shall not include any intrusive or invasive environmental sampling, testing or investigation); provided such Persons shall use good faith efforts to coordinate such visits and inspections so as to minimize the interference with and disruption to the normal business operations of tenants under their lease, and (ii) examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Holdings, the Borrowers and any of their Subsidiaries, and to discuss the affairs, finances and accounts of Holdings, the Borrowers and any of their Subsidiaries, as the case may be, with any of their officers or directors and with their independent certified public accountants.

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(f)    Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Holdings, the Borrowers and each Subsidiary in accordance with GAAP in effect from time to time, and each Loan Party shall promptly furnish to the Agent or any Co-Collateral Agent, such copies of such books and records or extracts therefrom as the Agent or such Co-Collateral Agent, as applicable, may reasonably request, and the Agent, any Co-Collateral Agent or any Agent Professional may use any of such Loan Party's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing, during normal business hours and, if an Event of Default exists or has occurred and is continuing, for the collection of Credit Card Accounts Receivable, Pharmacy Receivables and realization of other Collateral.

(g)    Maintenance of Properties, Etc.  Except as otherwise permitted pursuant to Section 6.02(b), or where the failure to do so, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect, maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(h)    Transactions with Affiliates.  Conduct all transactions otherwise permitted under this Agreement with any of their Affiliates on terms that are fair and reasonable and no less favorable to Holdings, the applicable Borrower or their respective Subsidiaries than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate other than transactions solely between or among the Loan Parties; provided, that the foregoing shall not prohibit (i) any Loan Party or any Subsidiary thereof from entering into employment arrangements with its officers and retention and other agreements with officers and directors pursuant to the reasonable requirements of its business or (ii) any transactions set forth on Schedule 6.01(h) hereto.

(i)    Further Assurances.

(i)    With respect to any Inventory, Credit Card Accounts Receivable, Pharmacy Receivables and other Collateral acquired after the Effective Date by any Group Member that is or is required to become a Loan Party hereunder, promptly (i) execute and deliver to the Co-Collateral Agents such amendments to the Guarantee and Collateral Agreement or such other documents as the Co-Collateral Agents may reasonably request in order to grant to the Co-Collateral Agents, for the benefit of the Credit Parties, a security interest in such property and (ii) take all actions as the Co-Collateral Agents may reasonably request to grant to the Co-Collateral Agents, for the benefit of the Credit Parties, a perfected security interest in such property with the priority required herein, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Co-Collateral Agents and the delivery of Blocked Account and other control agreements as may be reasonably requested by the Co-Collateral Agents.

(ii)    With respect to any new Domestic Subsidiary which is created or acquired after the Effective Date by any Group Member and which owns any Inventory, Credit Card Accounts Receivable, Pharmacy Receivables and other Collateral, promptly (and in any event within 10 Business Days of the date such Person becomes a Subsidiary) cause such new Domestic Subsidiary to (i) become a party to the Guarantee and Collateral Agreement, (ii) take such actions as the Co-Collateral Agents may reasonably request to grant to the Co-Collateral Agents for the benefit of the Credit Parties a security interest, with the priority and perfection required herein, in the Collateral described in the Guarantee and Collateral Agreement held by such new Domestic Subsidiary, including, to the extent applicable, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Co-Collateral Agents and the delivery of Blocked Account and other control agreements, (iii) if requested by the Co-Collateral Agents, deliver to the Co-Collateral Agents an officer's certificate with respect to such Domestic Subsidiary in form and substance reasonably satisfactory to the Co-Collateral Agents, and (iv) if requested by Co-Collateral Agents, deliver to the Co-Collateral Agents legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Co-Collateral Agents.

(iii)    The Borrowers shall notify the Co-Collateral Agents ten (10) Business Days prior to the opening of any new deposit account in which funds of any of the Loan Parties are concentrated, or the commencement of concentrating funds in an existing deposit account that is not subject to a Blocked Account Agreement, and, if requested by the Co-Collateral Agents, the Borrowers shall deliver or cause to be delivered a Blocked Account Agreement reasonably satisfactory in form and substance to the Co-Collateral Agents upon the opening of, or commencement of concentrating funds in, such account (unless such account is a Utility Deposit Adequate Assurance Account).

(iv)    [Reserved].

(v)    With respect to any Real Property upon which the Co-Collateral Agents request a Mortgage (which requests shall be limited such that there will be no more than twenty (20) Mortgages in effect at any time, unless an Event of Default has occurred and is continuing, in which case there shall be no such limit on such requests by the Co-Collateral Agents) within ninety (90) days after such request (but in no event prior to the Borrower receiving confirmation from the Agent that flood insurance due diligence and compliance in accordance with Section 6.01(i)(v)(1) has been completed) or such longer period as may be agreed by the Co-Collateral Agents in their sole and absolute discretion, the Borrower shall, or shall cause the applicable Loan Party to, grant to the Control Co-Collateral Agent a Mortgage on such Real Property, subject to no Liens except Permitted Liens, and record such Mortgage in the land records of the

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

76101

county in which such Real Property is located, and cause each such Loan Party to pay, in full, all mortgage recording taxes, fees and other charges required to be paid in connection with such recording, registration or filing of the Mortgage. Unless otherwise waived by the Co-Collateral Agents or the applicable Lender (solely with respect to clause (i)(v)(2) below), with respect to each such Mortgaged Property, the Borrowers shall cause the following requirements to be satisfied with respect to the applicable Mortgaged Property:

(1)    the Co-Collateral Agents shall have received, with respect to each Mortgaged Property, the Flood Documentation;

(2)    the Co-Collateral Agents shall have received:

(A)    counterparts of each Mortgage to be entered into with respect to each such Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property and suitable for recording, registering or filing (together with any other forms or undertakings that are required or customary to effect such recording, registration or filing) in the land records of the county in which such Mortgaged Property is located; and

(B)    with respect to the Mortgage encumbering each such Mortgaged Property, opinions of local counsel regarding the enforceability of such Mortgage and such other matters customarily covered in real estate mortgage counsel opinions as the Agent may reasonably request, if and to the extent, and in such form, as local counsel customarily provides such opinions as to such other matters; and

(3)    the Agent shall have received:

(A)    a policy or policies or marked up unconditional binder of title insurance ("**Title Policy**"), in the amount of the fair market value of the respective Mortgaged Property, issued by a nationally recognized title insurance company ("**Title Insurer**") insuring the Lien of each Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Liens, and with lien priority as set forth in the Final Financing Order and the DIP Intercreditor Agreement together with such customary endorsements, coinsurance and reinsurance as the Agent may reasonably request and which are available at commercially reasonable rates in the jurisdiction where the applicable Mortgaged Property is located, and

1030946.0~~68~~CA-CHISR01A - MSW
~~C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX~~

(B) a survey of each Mortgaged Property (including all improvements, easements and other customary matters thereon reasonably required by the Agent), as applicable, for which all necessary fees (where applicable) have been paid, which (A) complies in all material respects with the minimum detail requirements of the American Land Title Association and American Congress of Surveying and Mapping as such requirements are in effect on the date of preparation of such survey and (B) is sufficient for such Title Insurer to remove all standard survey exceptions from the title insurance policy relating to such Mortgaged Property or otherwise reasonably acceptable to the Agent; provided, however, that so long as the Title Insurer shall accept the same to eliminate the standard survey exceptions from such policy or policies, in lieu of a new or revised survey Borrowers may provide a "no material change" affidavit with respect to any prior survey for the respective Mortgaged Property (which prior survey otherwise substantially complies with the foregoing survey requirements) (a "**Survey**").

(j)    Reporting Requirements.  Furnish to the Agent, for delivery to the Lenders:

(i)    as soon as available and in any event within 30 days (or, in the case of a fiscal month that ends on the same day as the end of a fiscal quarter, 45 days) after the end of each fiscal month of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such month and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such month, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I;

(ii)    as soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such quarter and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, duly certified (subject to year-end audit adjustments) by an Authorized Officer of

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS  DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Holdings as having been prepared in accordance with GAAP and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I (the Borrowers being permitted to satisfy the requirements of clause (ii)(a) by delivery, in the manner provided in Section 9.02(b), of its quarterly report on form 10-Q (or any successor form), as filed with the SEC so long as the financial statements contained therein satisfy the requirement of this clause (ii));

(iii)    as soon as available and in any event within 90 days after the end of each fiscal year of Holdings, (a) a copy of the annual audit report for such year for Holdings and its Subsidiaries, containing the consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its Subsidiaries for such fiscal year, in each case reported on without a "going concern" or like qualification or exception (other than a "going concern" qualification, exception or paragraph of emphasis solely as a result of the Chapter 11 Cases and Debt maturing thereafter), or qualification arising out of the scope of the audit, by its Board-appointed auditor of national standing, (b) a consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for such fiscal year duly certified by an Authorized Officer of Holdings as having been prepared in accordance with GAAP, and (c) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I (the Borrowers being permitted to satisfy the requirements of clause (iii)(a) by delivery, in the manner provided in Section 9.02(b), of its annual report on form 10-K (or any successor form), as filed with the SEC, so long as the financial statements contained therein satisfy the requirement of this clause (iii));

(iv)    as soon as available and in any event by 5:00 p.m. Central Time Thursday of each week (or, if Thursday is not a Business Day, on the next succeeding Business Day), and with a draft being delivered by 5:00 p.m. Central Time on Wednesday of each week, a Borrowing Base Certificate as of the close of business on the immediately preceding Saturday and supporting information satisfactory to the Agent and the Co-Collateral Agents in their Permitted Discretion (including (i) a list of accounts payable to vendors of consigned inventory and of Inventory consisting of Lands' End merchandise and merchandise in other leased departments, (ii) calculations of Inventory itemizing separately consigned inventory by vendor, in-transit Inventory, Inventory located at Stores to be closed pursuant to Specified Store Closing Sales, Inventory located at non-closing Stores, and Inventory located in warehouse locations, together with back-up information for each in-transit Inventory category and (iii) a breakdown of Stores being closed or proposed to be closed, which information with respect to such Stores shall be limited to pro rata collections of such Stores collected from the point of sale systems during the relevant period which correspond to cash collections described in, and determined in a manner

76104

consistent with, the Approved Budget), certified to be complete and correct in all material respects by an Authorized Officer of Holdings;

(v)    not later than the 10th day of every month (or such later day as the Co-Collateral Agents may agree in their Permitted Discretion), an updated inventory appraisal;

(vi)    promptly and in any event within five days after any Authorized Officer of Holdings or any Borrower has knowledge of the occurrence and continuance of a Default or Event of Default, a statement of an Authorized Officer of Holdings or such Borrower setting forth details of such Default or Event of Default and the action that Holdings or such Borrower has taken and proposes to take with respect thereto;

(vii)    promptly after the sending or filing thereof, copies of all quarterly and annual reports and proxy solicitations that Holdings sends to its public security holders generally, and copies of all reports on form 8-K (or its equivalent) and registration statements for the public offering (other than pursuant to employee Plans) of securities that Holdings or any of its Subsidiaries files with the SEC or any national securities exchange;

(viii)    promptly after the commencement thereof, notice of all actions and proceedings before any court, governmental agency or arbitrator affecting Holdings, the Borrowers or any of their Subsidiaries of the type described in Section 5.01(g);

(ix)    as soon as available, but in any event no later than 60 days after the end of each fiscal year of Holdings, forecasts prepared by management of Holdings for Holdings and its domestic Subsidiaries in form satisfactory to the Agent and containing information reasonably required by the Agent;

(x)    (A) contemporaneously with the delivery of the reports required pursuant to clauses (ii) and (iii) above, a report (which may take the form of a footnote to Holdings' quarterly and annual reports filed with the SEC and delivered to the Agent) setting forth the estimated Unfunded Pension Liability of Holdings and its Subsidiaries, and (B) promptly after receipt thereof by the Loan Parties, a copy of the funded status report received from the Loan Parties' actuaries with respect to amounts to be funded under the Loan Parties' Pension Plan;

(xi)    promptly, notice of any event that the Loan Parties reasonably believes has resulted in or could reasonably be expected to result in a Material Adverse Effect;

(xii)    [reserved];

76105

(xiii)    [reserved];

(xiv)    promptly following any request therefor, information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation;

(xv)    promptly, notice of (i) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any Adverse Proceeding not previously disclosed in writing by a Borrower to the Agent, or (ii) any material development in any Adverse Proceeding that would reasonably be expected to have a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

(xvi)    concurrently with the delivery to the Junior DIP Term Loan Agent or the lenders under the Junior DIP Term Loan Agreement, copies of any report or other information required to be delivered thereto pursuant to the terms of the Junior DIP Term Loan Agreement to the extent such report or information is not otherwise required to be delivered to the Agent or Lenders hereunder;

(xvii)    promptly, but in any event no later than five (5) Business Days of such change, notice of any change in the board of directors (or similar governing body) of Holdings, the Borrowers or Sears;

(xviii)    as soon as practicable and, in any event, at least three (3) Business Days or such shorter period as agreed to by the Agent and the Co-Collateral Agents in their sole and absolute discretion in advance of filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Chapter 11 Cases (or the professionals to such committee) or to the U.S. Trustee, as the case may be, copies of all Material Documents, and engage in good faith consultation with the Agent, the Co-Collateral Agents and their respective advisors prior to filing such documents to the extent reasonably possible under the circumstances;

(xix)    as soon as available, copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed definitive documentation for the sale of any or all of the Loan Parties' assets (other than sales of inventory in the ordinary course of business) or for any investment pursuant to which additional capital is to be received by the Loan Parties;

(xx)    promptly upon request by any Co-Collateral Agent, a status report and updated information relating to any sale permitted under the

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Loan Documents, in form and substance acceptable to the Co-Collateral Agents in their reasonable discretion;

(xxi) at least one (1) Business Day prior to the consummation by any Loan Party or any of its Subsidiaries of any Disposition or series of related Dispositions of any Collateral of a type that is included in the Borrowing Base with a value in excess of $7,500,000 in the aggregate (other than inventory in the ordinary course of business and intercompany transfers among Loan Parties), whether pursuant to section 363 of the Bankruptcy Code or otherwise, a roll forward of the Borrowing Base Loan Parties' Eligible Inventory together with an updated Borrowing Base Certificate, in each case giving pro forma effect to such Disposition;

(xxii) on each Business Day, a certificate of the Borrowers demonstrating compliance with the LTV Provisions; and

(xxiii) such other information respecting Holdings, the Borrowers or any of their Subsidiaries, or the Borrowing Base, as the Agent, the Co-Collateral or any Lender through the Agent may from time to time request.

Reports and financial statements required to be delivered by the Borrowers pursuant to clauses (ii)(a), (iii)(a) and (vii) of this subsection (j) shall be deemed to have been delivered on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a notice to the Agent and the Lenders and that is accessible by the Lenders without charge.

(k)    Collateral Monitoring and Review.  Upon the request of the Agent, any Co-Collateral Agent, or the Required Lenders, after reasonable notice and during normal business hours, permit the Agent, the Co-Collateral Agents or any Agent Professionals to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) Holdings' and the Borrowers' practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, related to the calculation of the Borrowing Base and (iii) an Real Estate included in the Collateral.  The Borrowers shall pay the reasonable out-of-pocket fees and expenses of the Agent, the Co-Collateral Agents and any Agent Professionals in connection with monthly inventory appraisals,  discretionary real estate appraisals, and three commercial finance examinations each fiscal year (which the Agent and Co-Collateral Agents shall be obligated to undertake for the benefit of the Credit Parties). Notwithstanding the foregoing, the Agent and the Co-Collateral Agents may cause (i) additional appraisals and commercial finance examinations to be undertaken (A) as each in its Permitted Discretion deems necessary or appropriate, at its own expense, and (B) if required by applicable law or if a Default or an Event of Default has occurred and is continuing, in each case, at the expense of the Borrowers. In connection with any inventory appraisal and commercial finance examination relating to the computation of the Borrowing Base, Holdings shall make such adjustments to the calculation of the Borrowing Base as the Agent shall reasonably require in its Permitted Discretion based upon the terms of this Agreement and the results of such inventory appraisal and commercial finance examination. Any inventory appraisal or commercial finance

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

examination requested by the Agent or any Co-Collateral Agent shall be scheduled at such time as the Co-Collateral Agents, in consultation with the Borrowers, may agree in order to minimize any disruption to the conduct of the Borrowers' business.

(l)    Landlord Waivers, Access Agreements and Customs Broker Agreements.  Upon the request of the Agent or any Co-Collateral Agent, (i) obtain from each lessor that is a Group Member, and use commercially reasonable efforts to obtain from each lessor that is not a Group Member, leasing a DC at which Collateral is located to a Loan Party, consents, approvals, Lien waivers and rights to access and occupy each such DC (including, without limitation, to take possession and dispose of any Collateral from each such DC upon the occurrence and during the continuance of an Event of Default) reasonably satisfactory to the Co-Collateral Agents; (ii) obtain from each Subsidiary of Holdings owning a DC at which Collateral is located, consents, approvals, Lien waivers and rights to access and occupy each such DC (including, without limitation, to take possession and dispose of the Collateral from each such DC upon the occurrence and during the continuance of an Event of Default) reasonably satisfactory to the Co-Collateral Agents; (iii) use commercially reasonable efforts to cause each Loan Party's customs brokers to deliver an agreement (including, without limitation, a Customs Broker Agreement) to the Co-Collateral Agents covering such matters and in such form as the Co-Collateral Agents may reasonably require; and (iv) with respect to any property or assets subject to the Lien of a third party use commercially reasonable efforts to cause the holder of such Lien to enter into an agreement reasonably satisfactory to the Agent, permitting the Co-Collateral Agents to use such property and assets, at no cost or expense to the Co-Collateral Agents, in connection with the disposition of any of the Collateral by the Co-Collateral Agents during the continuance of an Event of Default.

(m)    Cash Management.

(i)    [Reserved].

(ii)    The Loan Parties shall ACH or wire transfer daily (or with respect to DDAs that have historically not been swept daily (and other DDAs with the consent of the Co-Collateral Agents, not to be unreasonably withheld), periodically, consistent with past practices) (and whether or not there are then any outstanding Obligations) to a Blocked Account all amounts on deposit in each DDA of such Loan Party, other than Excluded Accounts, the Utility Deposit Adequate Assurance Accounts and the Term Loan Proceeds Account; provided that such covenant shall not apply to any minimum balance as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained.  The Loan Parties shall ACH or wire transfer daily to a Blocked Account all payments due from Credit Card Processors and other proceeds of any of the Collateral except as provided in Section 6.01(n).  All swept funds shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent, Co-Collateral Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA or Blocked Account.

(iii)    Upon the request of the Agent, deliver to the Agent copies of credit card notifications (each, a "**Credit Card Notification**")

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS  DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

substantially in the form attached hereto as <u>Exhibit E</u> and Third Party Payor Notifications (each, a "**Third Party Payor Notification**") substantially in the form attached hereto as <u>Exhibit H</u>, in each case executed on behalf of such Loan Party and addressed to such Loan Party's Credit Card Processors and Third Party Payors, as applicable, listed in the Perfection Certificate. To the extent that any Loan Party hereafter engages a Credit Card Processor other than the Credit Card Processors listed in the Perfection Certificate, or a Third Party Payor other than the Third Party Payors listed in the Perfection Certificate, such Loan Party shall promptly furnish written notice thereof to the Agent and, upon the request of the Agent, shall deliver to the Agent an executed Credit Card Notification or Third Party Payor Notification, as applicable, with respect to such Credit Card Processor or Third Party Payor. The Agent may deliver such Credit Card Notifications and Third Party Payor Notifications to the applicable Credit Card Processors and Third Party Payors at any time.

(iv)    Each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the Agent's Account, of all cash receipts and collections held in each applicable Blocked Account (net of any minimum balance, not to exceed $25,000 (or such greater amount with the consent of the Co-Collateral Agents, not to be unreasonably withheld), as may be required to be kept in the subject Blocked Account by the Blocked Account Bank), including, without limitation, the following:

(A)    all available cash receipts from the sale of Inventory and other Collateral other than as set forth in <u>Section 6.01(n)</u>;

(B)    all proceeds of collections of Pharmacy Receivables and Credit Card Accounts Receivable;

(C)    all proceeds from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of any Collateral other than as set forth in <u>Section 6.01(n)</u>; and

(D)    all Net Proceeds from any equity issuance by or capital contribution to any Loan Party or its Subsidiaries.

The Borrowers shall be deemed to have complied with the provisions of this clause (iv) if they cause the ACH or wire transfer daily of all funds which an Authorized Representative of the Borrowers in good faith believes to be the amount deposited in the Blocked Accounts in excess of $25,000 (or such greater amount as permitted above in this clause (iv)).

(v)    The Agent's Account shall at all times be under the sole dominion and control of the Co-Collateral Agents. The Loan Parties hereby

acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Agent's Account, (ii) the funds on deposit in the Agent's Account shall at all times be collateral security for all of the Obligations, and (iii) the funds on deposit in the Agent's Account shall be applied as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section 6.01(m), any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Co-Collateral Agents, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Agent's Account or dealt with in such other fashion as such Loan Party may be instructed by the Co-Collateral Agents.  The amounts deposited into the Agent's Account shall be applied to the prepayment of the Advances and other Obligations then outstanding; provided that upon payment in full of such outstanding Advances or Obligations, as applicable, any remaining amounts will be released and transferred to a deposit account of the Loan Parties as the Borrowers shall direct.

(vi)    The Prepetition Unencumbered Assets Proceeds Account shall at all times be under the sole dominion and control of the Control Co-Collateral Agent. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Prepetition Unencumbered Assets Proceeds Account, (ii) the funds on deposit in the Prepetition Unencumbered Assets Proceeds Account shall at all times be collateral security for all of the Obligations, and (iii) so long as the Junior DIP Term Loan Facility is outstanding, the funds on deposit in the Prepetition Unencumbered Assets Proceeds Account shall be applied to the Obligations only after (x) all but a *de minimis* amount of Prepetition ABL Collateral of the type that is eligible to be included in the Borrowing Base has been sold, transferred or otherwise been disposed of and the proceeds thereof applied to the Obligations or (y) all but a *de minimis* amount of Prepetition ABL Collateral of the type that is eligible to be included in the Borrowing Base is otherwise no longer available to be used to apply to and satisfy the Obligations. In the event that, notwithstanding the provisions of Section 6.01(m), any Loan Party receives or otherwise has dominion and control of any proceeds of Prepetition Unencumbered Assets (other than proceeds contained in the Winddown Account), such proceeds and collections shall be held in trust by such Loan Party for the Co-Collateral Agents, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Prepetition Unencumbered Assets Proceeds Account or dealt with in such other fashion as such Loan Party may be instructed by the Co-Collateral Agents.

(vii)    (vi) Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(n)    <u>Disposition of Prepetition Unencumbered Assets</u>. (i) Subject to the Financing Orders <u>and the DIP Intercreditor Agreement</u>, the Borrowers shall apply any Net Proceeds of the sale of Prepetition Unencumbered Assets to fund the Winddown Account, <u>provided</u> that if the balance in the Winddown Account is equal to or greater than $200,000,000, the Borrowers shall, to the extent of such excess, deposit such Net Proceeds into the Prepetition Unencumbered Assets Proceeds Account; <u>provided</u>, <u>further</u> that the Loan Parties waive their right to seek to use the funds in the Prepetition Unencumbered Assets Proceeds Account as "cash collateral" as defined in Section 363 of the Bankruptcy Code or otherwise.

(o)    <u>Physical Inventories</u>.  Cause physical inventories and periodic cycle counts to be undertaken, at the expense of the Loan Parties, conducted by such inventory takers and following such methodology as may be satisfactory to the Co-Collateral Agents in their Permitted Discretion.  The Co-Collateral Agents (or their designated Agent Professionals), at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.   The Loan Parties, within five (5) days following the completion of any such inventory, shall provide the Co-Collateral Agents with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(p)    <u>Letters of Credit</u>.  In the event that the Loan Parties request that any Letter of Credit have an expiry after the Termination Date and the Issuing Lenders, in their discretion, issue such Letter of Credit, the Borrowers shall on or before the date that is thirty (30) days prior to the Scheduled Termination Date, Cash Collateralize the L/C Obligations with respect to any such Letter of Credit.

(q)    [Reserved]<u>Post-Effective Date Requirements. The Borrowers shall, and shall cause each of the applicable Loan Parties to, satisfy the requirements set forth on Schedule 6.01(q) on or before the date specified in such schedule for such requirement or, in each case, on such later date agreed by</u> Agent in its sole and absolute discretion.

(r)    <u>Case Milestones; Go Forward Plan</u>.  Holdings and the Borrowers shall:

(i)    comply with each of the covenants set forth on Schedule 6.01(r)(i) (the "**Case Milestones**") upon the terms and at the times set forth therein; and

(ii)    (A) comply with the Borrowers' Go Forward Plan attached hereto as Schedule 6.01(r)(ii), including the material terms of any binding agreement for a Specified Sale Transaction or Specified Store Closing Sales or any of the documents or agreements executed in connection therewith in all material respects and (B) consummate each Specified Sale Transaction and or the Specified Store Closing Sale strictly in accordance with the material terms of the documents or agreements executed in connection therewith; in each case in accordance with the applicable timing referred to thereon (or such later dates as

1030946.06<u>8</u><u>CA</u>-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

approved in writing by the Agent and the Co-Collateral Agents) and subject to documentation (including, without limitation, motions and orders) in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion (without any waiver or amendment to such documents or agreements unless consented to in writing by the Agent), in each case, other than as a result of a consummation of a higher or better transaction as contemplated by the applicable bid procedures.

(s)     Debtor Advisors; Cooperation; Status Calls.  (i) The Debtors shall continuously retain during the term of this Agreement (A) a chief restructuring officer (the "**Chief Restructuring Officer**"), (B) a restructuring advisor (the "**Restructuring Advisor**"), and (C) a financial advisor (the "**Financial Advisor**") ~~, (D) one or more liquidation consultants (the "Liquidation Consultants") and (E) an independent, nationally recognized, professional retail inventory liquidation firm that provides full liquidation services on a fee basis (the "Liquidation Agent"; the Liquidation Agent, together with the Liquidation Consultants, the~~. The retention of the Financial Advisor, the Restructuring Advisor and the Chief Restructuring Officer ~~, each a "Debtor Advisor" and collectively, the "Debtor Advisors")~~, ~~in each case which is satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion. The retention of each Debtor Advisor~~ shall be on terms and conditions (including as to scope of engagement) satisfactory to the Agent and each Co-Collateral Agent in their sole and absolute discretion. The Agent and each Co-Collateral Agent hereby confirm that (1) Mos~~h~~sin Y. Meghji is an acceptable Chief Restructuring Officer, (2) M-III Partners, LP is an acceptable Restructuring Advisor, (3) Lazard Freres & Co. LLC is an acceptable Financial Advisor and (4) the terms of each of their engagements as filed with the Bankruptcy Court prior to the date hereof are acceptable. In addition, in connection with the closure of any additional Stores referred to in clause (c) of the definition of "Specified Store Closing Sale" the Debtors shall retain, on a competitive basis, subject to their fiduciary duty to the bankruptcy estate to maximize value, an independent, nationally recognized, professional retail inventory liquidation firm that provides full liquidation services acceptable to the Agent and the Co-Collateral Agents in their Permitted Discretion (the "**Liquidation Agent**"; the Liquidation Agent, together with the Financial Advisor, the Restructuring Advisor and the Chief Restructuring Officer, each a "**Debtor Advisor**" and collectively, the "**Debtor Advisors**"). If any Debtor Advisor in any of the above roles ceases to be retained, the Debtors will retain a new Debtor Advisor in such role, which new Debtor Advisor (other than the Liquidation Agent) shall be satisfactory to the Co-Collateral Agents in their sole and absolute discretion and, in the case of the Liquidation Agent, satisfactory to the Co-Collateral Agents in their Permitted Discretion, within 5 Business Days (which period may be extended with the approval of the Agent and the Co-Collateral Agents in their sole and absolute discretion) of such cessation.  The Debtors shall provide the Agent and the Co-Collateral Agents and their respective advisors with reasonable access to the Debtor Advisors.

(ii)     The Loan Parties shall fully cooperate with the Debtor Advisors, including, without limitation, in connection with the preparation of the Approved Budget and other reporting or information required to be delivered pursuant to this Agreement, and shall grant them full and complete access to the books and records of the Loan Parties.  The Loan Parties hereby (i)

C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

authorize the Agent and each Co-Collateral Agent (or their respective agents or advisors, including any Agent Professionals) to communicate directly with the Debtor Advisors regarding any and all matters related to the Debtors and their Affiliates, including all financial reports and projections developed, reviewed or verified by any Debtor Advisor, Store closing information and all additional information, reports and statements reasonably requested by the Agent or any Co-Collateral Agent, and (ii) authorize and direct each Debtor Advisor to provide the Agent and each Co-Collateral Agent (or their respective agents or advisors, including any Agent Professionals) with copies of reports and other information or materials prepared or reviewed by such Debtor Advisor as the Agent or any Co-Collateral Agent may reasonably request.

(iii)    The Borrowers shall arrange for weekly (unless waived by the Co-Collateral Agents in their sole and absolute discretion) status calls with the Agent, each Co-Collateral Agent and any Agent Professionals, and shall cause the Debtor Advisors (or other appropriate agents or advisors to the Loan Parties) to participate, together with financial officers of the Loan Parties, to discuss (A) the Approved Budget or the Budget Variance Reports and/or any other reports or information delivered pursuant to clause (j) above or Section 6.03 hereof or otherwise, (B) the financial operations and performance of the Loan Parties' business, (C) the status of landlord negotiations, (D) the status of any Specified Store Closing Sales, (E) the status of the Chapter 11 Cases generally, (F) progress in achieving compliance with the Case Milestones and the Go Forward Plan or (FG) such other matters relating to the Debtors as the Agent or any Co-Collateral Agent (or their respective agents or advisors, including any Agent Professionals) shall reasonably request.

(t)    Leases.

(i)    Make all payments and otherwise perform all obligations, in all material respects, other than to the extent permitted by the Bankruptcy Code, in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party and otherwise in accordance with the Approved Budget, (ii) keep all Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, and (iii) promptly notify the Co-Collateral Agents of any material default by any party with respect to any Leases and cooperate with the Co-Collateral Agent in all respects to cure any such default, except, in each case, with respect to Leases relating to Store locations subject to Specified Store Closing Sales after the date of the effectiveness of the rejection of the applicable Leases.

(ii)    Other than with respect to Leases relating to any Specified Store Closing Sale, consult with the Agent and Co-Collateral Agents regarding any plans to assume or reject Leases.

(u)    Certain Other Bankruptcy Matters.

76113

(i)    Holdings, the Borrowers and their Subsidiaries shall comply (i) in all respects, after entry thereof, with all of the requirements and obligations set forth in the Financing Orders, the Cash Management Order and the Employee Wage Order, and each order of the Bankruptcy Court, as each such order may be amended with the consent of the Agent and the Co-Collateral Agents , and (ii) all other obligations and responsibilities as debtors-in-possession under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

(ii)    Holdings and the Borrowers shall provide as soon as reasonably practicable but in any event no later than three (3) Business Days' (or such shorter notice acceptable to the Agent and the Co-Collateral Agents in their sole and absolute discretion) prior written notice to the Agent and its advisors prior to filing any motion or notice to assume or reject any of Holdings', any Borrower's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or DIP Superpriority Claims) if the Agent informs Holdings and the Borrowers in writing within two (2) Business Days of receipt of the notice from Holdings and the Borrowers referenced above that it objects to such assumption or rejection, as applicable.

(iii)    Holdings, the Borrowers and each of the Subsidiaries hereby irrevocably waive any right, pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the DIP Superpriority Claims, other than as expressly set forth in a Financing Order.

(iv)    Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the automatic stay on Collateral with a fair market value in excess of $1,000,000 (other than motions filed by the Agent relating to the DIP ABL Facility or by the Prepetition ABL Agent relating to the Prepetition First Lien ABL Credit Agreement or by the Junior DIP Term Loan Agent relating to the Junior DIP Term Loan), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a chapter 11 plan, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Agent or any Lender or any Collateral.

(v)    Any and all Material Documents filed by the Debtors in the Chapter 11 Cases shall be in form and substance satisfactory to the Agent.

(v)    Certain Sanctions and AML Matters.

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(i)    Each Group Member will use the proceeds of the Advances and Term Loan only for the purposes described in Section 2.17, and ensure that no proceeds of the Advances and Term Loan will be advanced or otherwise made available, directly or indirectly, by any Group Member (i) for the purposes of funding any activity, business, or transaction with a Sanctioned Person or in a Sanctioned Country, except as authorized by applicable Sanctions, or (ii) that would result in the violation of applicable Sanctions or AML Laws.

(ii)    Each Group Member will (a) maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by each Group Member and each of their respective directors, officers, employees, and agents with applicable Sanctions and AML Laws, and (b) conducts the business of such Group Member in compliance with applicable Sanctions and AML Laws.

Section 6.02    Negative Covenants.  So long as any Advance or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid, any Letter of Credit shall remain outstanding (unless the same has been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lender have been provided in respect of such Letters of Credit) or any Lender shall have any Commitment hereunder, each of Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to:

(a)    Liens, Etc.  Create or suffer to exist any Lien upon property of Holdings, the Borrowers or any Domestic Subsidiary other than Permitted Liens.

(b)    Fundamental Changes.  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that any Subsidiary of Holdings may sell, transfer, lease or otherwise dispose of its assets pursuant to a Specified Store Closing Sale or a Specified Sale Transaction; provided that at least three (3) Business Days prior to the occurrence thereof, the Borrowers shall furnish to the Co-Collateral Agents an updated Borrowing Base Certificate to the extent required pursuant to Section 6.01(j)(xxi).

(c)    Acquisitions.  Make any Acquisition.

(d)    Restricted Payments.  Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that, if at the time thereof no Event of Default shall exist and be continuing, Subsidiaries of Holdings may declare and pay dividends to Holdings, the Borrowers or any Subsidiary Guarantor.

(e)    Negative Pledge Clauses.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Holdings or any Subsidiary of Holdings to create, incur, assume or suffer to exist any Lien in favor of the Co-Collateral Agents

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

upon the Collateral (as defined in the Guarantee and Collateral Agreement and other Security Documents in effect from time to time, and including assets which become Collateral pursuant to Section 6.01(n)), whether now owned or hereafter acquired.

(f)    Clauses Restricting Subsidiary Distributions.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of Holdings to (a) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Debt owed to, Holdings or any other Subsidiary of Holdings, (b) make loans or advances to, or other investments in, Holdings or any other Subsidiary of Holdings, (c) transfer any of its assets to Holdings or any other Subsidiary of Holdings or (d) grant Liens upon any of its properties or assets, whether now owned or hereafter acquired, and allow for the pledge of its capital stock to secure the Obligations; except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under this Agreement and the other Loan Documents; (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or any portion of the Equity Interests or assets of such Subsidiary; (iii) the provisions contained in any agreement governing Postpetition Debt existing as of the date of this Agreement; (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or a Subsidiary of any Borrower entered into in the ordinary course of business, (v) customary restrictions and conditions contained in the documents relating to any Lien, so long as such Lien is not prohibited hereunder and such restrictions or conditions relate only to the specific asset subject to such Lien; (vi) customary provisions restricting assignment of any contract entered into by any Borrower or any Subsidiary of any Borrower in the ordinary course of business, (vii) customary provisions restricting the assignment of licensing agreements, management agreements or franchise agreements entered into by any Borrower or any of its Subsidiaries in the ordinary course of business; (viii) restrictions on the transfer of assets securing purchase money obligations and capitalized lease obligations; (ix) customary net worth provisions contained in real property leases entered into by Subsidiaries of any Borrower, so long as the applicable Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations, (x) restrictions in respect of the ~~REMIC Certificates and the real property assets related thereto, the~~ Intellectual Property held by KCD IP, LLC and any proceeds of the foregoing, and (xi) such other restrictions as the Co-Collateral Agents may agree in their sole and absolute discretion.

(g)    Accounting Changes.  Make or permit any change in accounting policies or reporting practices, except as required by GAAP.

(h)    [Reserved].

(i)    Dispositions.

(i)    Make any Disposition except Permitted Dispositions.

(ii)    Make any Permitted Dispositions pursuant to the De Minimis Asset Sale Order which result in aggregate sale proceeds in excess of $7,500,000 without the prior written consent of the Co-Collateral Agents in their

1030946.0~~68~~CA-CHISR01A - MSW
~~C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX~~

sole and absolute discretion (it being understood that this clause (ii) shall not have the effect of waiving any condition, restriction or qualification to the ability of Holdings, the Borrowers or any of their Subsidiaries to make any Disposition set forth in the definition of "Permitted Dispositions" or the defined terms used therein).

(j)    Debt; Prepayment of Debt.

(i)    Create, incur, assume, suffer to exist or otherwise become or remain liable with respect to any Debt, except Permitted Debt.

(ii)    Purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Debt (other than any prepayment of the Obligations, which prepayment shall be governed by Section 2.11, and other than any prepayment by any Specified Subsidiary or any Subsidiary that is not a Domestic Subsidiary of any Debt of a Specified Subsidiary or any Subsidiary that is not a Domestic Subsidiary; provided that such prepayment is not made with the proceeds of any Investments made by any Loan Party in such Specified Subsidiary or such Subsidiary that is not a Domestic Subsidiary) prior to its scheduled maturity.

(k)    Investments.  Make any Investments, except Permitted Investments.

(l)    [Reserved].

(m)    Amendments to Certain Documents. (a) Amend or modify, or grant any waiver or release under or terminate in any manner, the articles or certificate of incorporation or formation, by laws, limited liability company operating agreement, partnership agreement or other organizational documents of such Loan Party or Subsidiary (other than any Specified Subsidiary, so long as the Loan Parties provide prior written notice of such amendment, modification, waiver, release or termination with respect to any organizational document of any Specified Subsidiary); (b) amend or modify, or permit the amendment or modification of, any provision of the Prepetition First Lien ABL Credit Agreement, the Prepetition Second Lien Facilities or any agreement, document or instrument evidencing or relating thereto, except to the extent expressly permitted by any Financing Order then in effect or (c) amend, modify or waive any provision of the Junior DIP Term Loan ~~Facility~~Documents unless as agreed by the Required Lenders.

(n)    LTV Provisions.

(i)    Maximum Loan to Value Ratio (Prepetition ABL Term/Revolver). Permit at any time (v) the Prepetition Revolver/Term Exposure plus (w) Total Extensions of Credit plus (x) the Availability Reserves plus (y) the Borrowing Base Carve-Out Reserve plus (z) the Prepetition FILO Reserve, in each case at such time, to exceed 87.5% of the LTV Formula Amount at such time.

1030946.0~~68~~CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(ii)   Maximum Loan to Value Ratio (Total Prepetition ABL) Ratio. Permit at any time (v) the Prepetition Total Extensions of Credit plus (w) Total Extensions of Credit plus (x) the Availability Reserves plus (y) the Borrowing Base Carve-Out Reserve plus (z) the Prepetition FILO Reserve, in each case at such time, to exceed 97.5% of the LTV Formula Amount at such time.

(o)   Financing Orders. Notwithstanding anything to the contrary herein, use any portion or proceeds of the Extensions of Credit or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of paragraph 39 *(Prohibited Use of DIP ABL Facility, DIP ABL Collateral, Cash Collateral, Carve-Out, etc.)* of the Interim Financing Order or paragraph [39] [40 *(Prohibited Use of DIP ABL Facility, DIP ABL Collateral, Cash Collateral, Carve-Out, etc.)]* of the Final Financing Order.

(p)   Reclamation Claims. Enter into any agreement to return any of its Inventory to any of its creditors for application against any Prepetition Debt, Prepetition trade payables or other Prepetition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Debt, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Prepetition Debt, Prepetition trade payables and other Prepetition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $7,500,000.

(q)   Insolvency Proceeding Claims. Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Agent or the Lenders against the Debtors, except as set forth in the applicable Financing Order.

(r)   Bankruptcy Actions. Seek, consent to, or permit to exist, without the prior written consent of the Agent and the Co-Collateral Agents, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Financing Orders or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Financing Orders or any of the other Loan Documents.

(s)   Sanctions-Compliant Repayment of Obligations. Use, directly or, to Borrowers' knowledge, indirectly, any funds or assets derived from or used in any activity, business, or transaction with a Sanctioned Person, in a Sanctioned Country, except as authorized by applicable Sanctions, or that otherwise violates applicable Sanctions, to repay or discharge any obligated under this Agreement.

Section 6.03   Approved Budget.

(a)   The use of Extensions of Credit by the Loan Parties under this Agreement and the other Loan Documents and the use of cash collateral shall be limited in

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

accordance with the Approved Budget (subject to the Permitted Variance) and <u>Section 2.17</u>. The Approved Budget shall depict, on a weekly and line item basis, (i) (A) projected cash receipts (including from asset sales), (B) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtor's professionals and advisors), and any other fees and expenses relating to the Loan Documents), (C) projected Net Cash Flow, (D) projected inventory receipts and levels, and (E) the projected Borrowing Base and Excess Availability, (ii) a report listing the Stores subject to Specified Store Closing Sales and the other remaining Stores, and (iii) such other information requested by the Agent or any Co-Collateral Agent for the first thirteen (13) week period from the Effective Date, and such Approved Budget shall be approved by, and in form and substance satisfactory to, the Agent and the Co-Collateral Agents in their sole discretion (it being acknowledged and agreed that the Approved Budget attached hereto as <u>Exhibit J</u> is approved by and satisfactory to the Agent and each Co-Collateral Agent). The Approved Budget shall be updated, modified or supplemented by the Borrowers (x) with the written consent of the Agent and each Co-Collateral Agent in their sole and absolute discretion and (y) upon the request of Agent or any Co-Collateral Agent from time to time (which request may, without limitation, be made in connection with any Specified Transaction or the commencement, or during the continuation, of the Specified Stores Closing Sales); <u>provided</u>, <u>however</u>, that in the event the Agent, the Co-Collateral Agents and the Loan Parties cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect, with weekly details for any periods after the initial 13-period to be derived in a manner reasonably satisfactory to the Agent and the Co-Collateral Agents from the monthly budget prepared by the Loan Parties (and approved by the Agent and the Co-Collateral Agents in their sole discretion prior to the Effective Date) for the Chapter 11 Cases, and such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated. Each Approved Budget delivered to the Agent and the Co-Collateral Agents shall be accompanied by such supporting documentation as reasonably requested by the Agent or any Co-Collateral Agent. Each Approved Budget shall be prepared in good faith, with due care and based upon assumptions which the Loan Parties believe to be reasonable.

(b)    The Borrowers shall comply with the Approved Budget (subject to the Permitted Variance), which compliance shall be tested on the Saturday of every second week (each, a "**Budget Testing Date**") commencing on November 24, 2018 for the Cumulative Four-Week Period then ending pursuant to the Budget Variance Report delivered by the Borrowers to the Administrative Agents and the Co-Collateral Agents.

(c)    The Borrowers shall deliver to the Agent and the Co-Collateral Agents, not later than 5:00 p.m. on the Wednesday of each week (commencing with the first Wednesday following the Effective Date) a Budget Certificate, and such Budget Certificate shall include such detail as is reasonably satisfactory to the Agent and the Co-Collateral Agents, signed by an Authorized Officer of the Holdings and, in the case of certificates delivered ~~for the end of a~~<u>on a Wednesday following a Budget</u> Test~~ing Period~~<u>Date</u>, certifying that the Loan Parties are in compliance with the covenant contained in <u>Section 6.03(b)</u>, together with (A) a Rolling Budget, (B) a Weekly Flash Reporting Package and (C) ~~an Approved~~<u>a</u> Budget Variance Report, each of which shall be prepared by the Borrower through the last day of the Prior Week and the Cumulative Four Week Period.

~~76~~<u>119</u>

(d)    The Agent, the Co-Collateral Agents and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent, the Co-Collateral Agents and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Financing Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01    Events of Default.  If any of the following events ("**Events of Default**") shall occur and be continuing:

(a)    Any Borrower shall fail to pay (i) any principal of any Advance, Term Loan or Reimbursement Obligation when the same becomes due and payable, or (ii) any interest on any Advance, Term Loan or Reimbursement Obligation or any fees, or (iii) any other amounts payable under this Agreement or any other Loan Document, in each case under this clause (iii), within three (3) days after the same becomes due and payable; or

(b)    Any representation or warranty made by any Loan Party herein or in any other Loan Document or in any other written statement furnished in connection with to this Agreement or any other Loan Document or the transactions contemplated thereby shall prove to have been incorrect in any material respect when made or deemed made; or

(c)    (i)    Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01(c), (d), (e), (h), (j), (k), (m), (p), (r), (s) or (u), 6.02, or 6.03 of this Agreement, (ii) any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01(n) and such failure continues for more than one Business Day or (iii) any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, if such failure shall remain unremedied for thirty (30) days; or

(d)    Any Loan Party shall fail to pay any principal amount on any postpetition or unstayed Debt in an aggregate principal amount in excess of $25,000,000 that is outstanding (but excluding Debt outstanding hereunder) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to such postpetition or unstayed Debt and shall continue after

1030946.06 8CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS  DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the "agent," "trustee" or other representative or required percentage of holders thereof to accelerate, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid or redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made and is accepted (in each case other than (i) a scheduled prepayment, redemption or purchase, or (ii) a mandatory prepayment, redemption or purchase, or a required offer to prepay, redeem or purchase, that results from the voluntary sale or transfer of property or assets, unless such prepayment, redemption or purchase is not made on the date such prepayment, redemption or purchase is due), in each case prior to the stated maturity thereof; or there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from any event of default under such Swap Contract as to which any Loan Party is the Defaulting Party (as defined in such Swap Contract) and the Swap Termination Value owed by such Loan Party as a result thereof is greater than $25,000,000; or

(e)    A judgment or order for the payment of money (excluding any "first day" or "second day" orders or any order fixing the amount of any claim in the Chapter 11 Cases, in each case to the extent such orders are in form and substance acceptable to the Agent in its sole and absolute discretion) in excess of $25,000,000 (net of any portion of such judgment to be paid by a third-party insurer as to which coverage has not been disputed) shall be rendered after the Petition Date against any Group Member, which order or judgment is not automatically stayed or stayed pursuant to an order of the Bankruptcy Court, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(f)    (i) Any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "**option right**"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 35% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right) and such "person" or "group" shall beneficially own (as such term is used herein) a greater percentage of the equity Securities of Holdings entitled to vote for members of the Board of Directors than the Permitted Holders shall, collectively, beneficially own; or (ii) during any period of 12 consecutive months, a majority of the members of the Board of Directors or other equivalent governing body of Holdings cease to be composed of individuals (x) who were members of that board or equivalent governing body on the first day of such period, (y) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (x) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (z) whose election or nomination to that

1030946.06**8CA**-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

board or other equivalent governing body was approved by individuals referred to in clauses (x) and (y) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (iii) Holdings shall cease for any reason to own, directly or indirectly, 100% of the Voting Stock of Sears and Kmart; or

(g)    (i) Any Borrower or any of its ERISA Affiliates shall incur, or shall be reasonably likely to incur administrative expense claims in excess of $25,000,000 in the aggregate (subject to Section 7.01(p)) as a result of one or more of the following:  (a) the occurrence of any ERISA Event; (b) the partial or complete withdrawal of such Borrower or any of its ERISA Affiliates from a Multiemployer Plan; or (c) the termination of a Multiemployer Plan; or (ii) the PBGC shall have obtained a valid and perfected Lien on assets of any of the Loan Parties; or

(h)    Any of the Loan Documents or Prepetition Loan Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate thereof shall so state in writing, or any Lien created by any of the Security Documents or Prepetition Loan Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby, including as a result of the failure to comply with Section 5.4 of the Guarantee and Collateral Agreement or Section 5.4 of the Prepetition Guarantee and Collateral Agreement; or

(i)    The guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so state in writing; or

(j)    The entry of an order dismissing any of the Chapter 11 Cases of any Loan Party or converting any of the Chapter 11 Cases of any Loan Party to a case under chapter 7 of the Bankruptcy Code, or any filing by a Loan Party or an affiliate thereof of a motion or other pleading seeking entry of such an order; or

(k)    A trustee, responsible officer or an examiner having powers related to the operation of the business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Chapter 11 Cases, a Debtor applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Administrative Agent and the Co-Collateral Agents in their sole and absolute discretion; or

(l)    The entry of an order (I) staying, reversing or vacating (a) the Interim Financing Order, (b) the Final Financing Order, (c) the Cash Management Order or, (d) the Employee Expense Order, or (e) the Junior DIP Financing Orders, (II) modifying or amending (a) – (c) or (e) other than in form and substance satisfactory to the Administrative Agent and the Co-Collateral Agents in their sole and absolute discretion, or (III) modifying or amending (d) in a manner adverse to the Administrative Agent, the Co-Collateral Agents or the other Credit Parties; or the filing by a Debtor of an application, motion or other pleading seeking entry of such any order of the types described in clauses (I)-(III) without the prior written

76122

consent of the Administrative Agent and the Co-Collateral Agents in their sole and absolute discretion; or

(m)    The entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Loan Parties; or

(n)    The entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the Automatic Stay) so as to allow a third party to proceed with foreclosure against any assets of the Loan Parties in excess of $25,000,000; or

(o)    The entry of an order in the Chapter 11 Cases charging any of the Collateral or Prepetition ABL Collateral under Section 506(c) of the Bankruptcy Code against the Credit Parties or the Prepetition Credit Parties or the commencement of other actions by any Loan Party or any affiliate thereof that challenges the rights and remedies of any of the Credit Parties hereunder or under any of the other Loan Documents or any of the Prepetition Credit Parties under the Prepetition First Lien ABL Credit Agreement or any of the Loan Documents (as defined in the Prepetition First Lien ABL Credit Agreement) in any of the Chapter 11 Cases or in a manner inconsistent with the Loan Documents; or

(p)    Without the prior written consent of the Agent and other than in respect of the DIP ABL Facility and the Carve-Out or as permitted pursuant to the Loan Documents, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (v) granting superpriority administrative expense status to any claim pari passu with or senior to the claims of the Credit Parties hereunder and under the other Loan Documents, (w) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (x) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (y) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (z) authorizing the Debtors to take other actions adverse to any Credit Party or any Prepetition Credit Party or their rights and remedies under the Loan Documents, the Prepetition First Lien ABL Credit Agreement or their interest in Prepetition ABL Collateral or the Collateral under Section 364 of the Bankruptcy Code; or

(q)    The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization without the prior written consent of the Administrative Agent and Co-Collateral Agents in their sole and absolute discretion; or

(r)    There shall arise any superpriority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the DIP Superpriority Claims, except with respect to the Carve-Out and as set forth in the Financing Orders; or

(s)    The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's prepetition creditors, contrary to the terms and conditions of any Financing Order or the Loan Documents; or

1030946.0~~68~~<ins>CA</ins>-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(t)     The making of any payments in respect of prepetition obligations other than (i) as permitted by the Interim Financing Order and the Final Financing Order, (ii) as permitted by the Cash Management Order or any other substantive order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, (iii) as permitted by any administrative "first day order," "second day order" or other administrative order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Administrative Agent and Co-Collateral Agents in their sole and absolute discretion, or (iv) as otherwise agreed to in writing by the Administrative Agent and Co-Collateral Agents; or

(u)     Other than with respect to the Carve-Out, the Liens securing the DIP ABL Facility and other than as provided in the Financing Orders, the Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any claim or lien which is pari passu with or senior to any Liens securing the "Obligations" under the Prepetition First Lien ABL Credit Agreement, or the Adequate Protection Liens and adequate protection obligations granted under the Financing Orders; or

(v)     Noncompliance by any Loan Party or any of its affiliates with the terms of the Interim Financing Order, the Final Financing Order, the Cash Management Order or the Employee Wage Order in any material respect or in a manner adverse to the Credit Parties; or

(w)     The Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, acquiesce to, or otherwise participate as an adverse party in any suit or other proceeding against the Agent, any Co-Collateral Agent or any of the Lenders regarding the DIP ABL Facility or the Prepetition Credit Parties regarding the Prepetition Facilities; or

(x)     The Debtors, any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to contest in good faith the filing or confirmation of a chapter 11 plan that is not an Acceptable Plan of Reorganization or the entry of a confirmation order approving such plan; or

(y)     Any order shall be entered which dismisses any of the Chapter 11 Cases and which order (i) does not provide for termination of the unused commitments under the DIP ABL Facility and payment in full in cash of the Loan Parties' obligations under the DIP ABL Facility, (ii) does not provide for release and exculpatory provisions relating to the Agent, the Co-Collateral Agents, the Joint Lead Arrangers and the Lenders that are satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion and (iii) is not otherwise satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents), shall file, propose, support, or fail to contest in good faith the filing of a the filing of a motion or other pleading seeking to dismiss any of the Chapter 11 Cases not in accordance with this provision (y); or

(z)    The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors or its subsidiaries, other than pursuant to any Specified Sale Transaction or the Specified Store Closing Sales, unless such order contemplates repayment in full in cash of the DIP ABL Facility and the Prepetition Facilities upon consummation of the sale; or

(aa)    The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP ABL Facility, the Loan Documents, any Prepetition Facility or the Prepetition First Lien ABL Credit Agreement or related documents, or the taking of any action by any Loan Party to challenge, support or encourage a challenge of any such payments; or

(bb)    The Final Financing Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the Collateral; or

(cc)    If the Final Financing Order does not include a waiver, in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion, of (A) the right to surcharge the Prepetition ABL Collateral and/or the Collateral under Section 506(c) of the Bankruptcy Code, (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition ABL Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Loan Party after the Petition Date and (C) the doctrine of marshaling; or

(dd)    An order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral or Prepetition ABL Collateral under Section 506(c) of the Bankruptcy Code against the Agent, the Credit Parties, the Prepetition ABL Agent or the Prepetition Credit Parties, or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition ABL Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Loan Party after the Petition Date,

(ee)    The commencement by any Debtor or any Loan Party of other actions that are materially adverse to Agent, the Credit Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(ff)    The filing or support of any pleading by any Loan Party (or any affiliate thereof) seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default.

Section 7.02    Remedies. Upon the occurrence of any Event of Default, in each case without further order or application of the Bankruptcy Court, the Agent may, on behalf of the Lenders, or, at the direction of the Required Lenders shall, take any or all of the following actions:

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(a)    declare the Revolving Commitment of each Revolving Lender to be terminated, whereupon the same shall forthwith terminate provided that upon the occurrence of any Event of Default described in clauses (j) – (ff) of Section 7.01, the Revolving Commitments shall automatically terminate; provided that such termination shall be deemed rescinded to the extent it is determined by the Bankruptcy Court during the Remedies Notice Period that no Event of Default has occurred and is continuing;

(b)    declare the Advances, the Term Loan, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents (including all amounts of the L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be forthwith due and payable, whereupon the Advances, the Term Loan, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; provided that upon the occurrence of any Event of Default described in clauses (j) – (ff) of Section 7.01, all such amounts and interest shall automatically become due and payable, without presentment, demand protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers. With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph or for which the outstanding amount of any drawing under any Letters of Credit (including any Taxes, fees, charges and other costs and expenses incurred by the Issuing Lender in connection therewith) have not then been fully reimbursed or discharged, the Borrowers shall Cash Collateralize such Letters of Credit and all other Reimbursement Obligations;

(c)    declare interest on the Obligations to accrue at the default rate set forth herein, whereupon the interest on the Obligations shall automatically accrue at the default rate;

(d)    subject to the Remedies Notice Period, (i) enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (iii) remove any Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding Obligations (including any accrued interest) in any sale of the Collateral (or any part thereof), which credit bid may incorporate a credit bid of the Prepetition ABL Facilities (including any accrued interest), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise;

(e)    take whatever other commercially reasonable action the Agent or the Required Lenders may deem necessary or desirable for the protection of the interests of the Credit Parties (including, subject to the Remedies Notice Period, in respect of the Collateral);

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

(f)    exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP ABL Facility, this Agreement, the other Loan Documents, the Financing Orders or applicable law (including, subject to the Remedies Notice Period, in respect of the Collateral);

(g)    declare the termination of the Loan Documents as to any future liability or obligation of the Agent, the Co-Collateral Agents, the Issuing Lenders and the Lenders, but without affecting any of the Collateral or the liabilities or obligations of any Loan Party;

(h)    declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral; and/or

(i)    subject to the Remedies Notice Period, with respect to any Event of Default arising out of the failure of the Loan Parties to complete any material step in the ~~Going ConcernGo Forward Stores~~ Sale Process ~~(as defined in the DIP Motion)~~, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code).

All rights, remedies and powers granted to the Agent or Co-Collateral Agents hereunder and under the Loan Documents or Financing Orders, as applicable, are cumulative, not exclusive and enforceable, in the Agent's or such Co-Collateral Agent's discretion, alternatively, successively, or concurrently.

Section 7.03    Application of Proceeds.

If an Event of Default shall have occurred and be continuing and the Obligations shall have been accelerated, except as otherwise agreed by all Lenders, the Agent shall apply, subject to the DIP Intercreditor Agreement, all or any part of Proceeds constituting Collateral, whether or not held in the Agent's Account, and any proceeds of the guarantee set forth in Guarantee and Collateral Agreement, in payment of the Obligations in the following order:

*First*, to pay all incurred and unpaid fees, expenses, including Extraordinary Expenses, indemnities, and other amounts (including and fees, charges and disbursements of counsel to the Agent and the Co-Collateral Agents) payable to the Agent and the Co-Collateral Agents (each in its capacity as such) under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Second*, to pay all incurred and unpaid expenses, indemnities, and other amounts (other than principal, interest and fees, and Obligations relating to Cash Management Services and Bank Products) payable to the Lenders, the Swingline Lender and the Issuing Lenders (including fees, charges and disbursements of counsel to the respective Lenders, the Swingline Lender and the

1030946.0~~68CA~~CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Issuing Lenders), under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Third*, to pay all accrued and unpaid interest on all Permitted Overadvances, to the Agent or pro rata among the Lenders, as applicable, according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Fourth*, to pay all the unpaid principal on all Permitted Overadvances, to the Agent or pro rata among the Lenders, as applicable, according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Fifth*, to pay all accrued and unpaid interest on the Swingline Advances (to the extent that Swingline Advances have not been refinanced by a Revolving Advance);

*Sixth*, to pay all the unpaid principal of the Swingline Advances (to the extent that Swingline Advances have not been refinanced by a Revolving Advance);

*Seventh*, to pay all accrued and unpaid interest on all Advances, Reimbursement Obligations and the Term Loan, and fees, payable to the Lenders and the Issuing Lenders under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Eighth*, to pay all the unpaid principal on all Advances and the Term Loan and to pay Reimbursement Obligations and to Cash Collateralize all other L/C Obligations, pro rata among the Lenders according to the amounts of such Obligations then due and owing and remaining unpaid to the Lenders;

*Ninth*, to pay all other amounts then due and owing and remaining unpaid in respect of the Obligations (other than Obligations relating to Cash Management Services and Bank Products), pro rata among the Lenders according to the amounts of the Obligations (other than Obligations relating to Cash Management Services and Bank Products) then due and owing and remaining unpaid to the Lenders;

*Tenth*, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Cash Management Services and the prepayment, settlement and termination of Cash Management Services, pro rata among the applicable Lenders and Affiliates thereof according to the amounts then due and owing and remaining unpaid in respect of Cash Management Services;

*Eleventh*, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Bank Products, pro rata among the applicable Lenders and Affiliates thereof according to the amounts that would become due and owing upon the prepayment, settlement and termination of such Bank Products;

*Twelfth*, any balance remaining after the Obligations shall have been paid in full, no Letters of Credit shall be outstanding (unless the same has been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lender have been

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

provided in respect of such Letters of Credit) and the Commitments shall have terminated, shall be paid over to the Borrowers or to whomsoever may be lawfully entitled to receive the same.

Section 7.04    Lift of Automatic Stay. Subject to the Order and the terms thereof, if any Event of Default then exists, the Automatic Stay shall be modified or vacated to permit the Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without notice, application or motion, hearing before, or order of the Bankruptcy Court.

Section 7.05    License; Cooperation. The Agent and the Co-Collateral Agents are hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property owned by any Loan Party, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral in each case after the occurrence, and solely during the continuance, of an Event of Default.  To the extent the Loan Parties may lawfully do so, the Agent and the Co-Collateral Agents (together with their respective agents, representatives and designees) are hereby granted a non-exclusive right to have access to, and a rent-free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and Store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that the Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral).  Upon the occurrence and the continuance of an Event of Default and the exercise by the Agent, either Co-Collateral Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, the Loan Parties shall assist the Agent, the Co-Collateral Agents and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Agent.

## ARTICLE VIII

## THE AGENT AND CO-COLLATERAL AGENTS

Section 8.01    Appointment.  Each Lender hereby irrevocably designates and appoints (i) Bank of America as Agent, and (ii) Bank of America and Wells Fargo Bank, National Association as Co-Collateral Agents, under this Agreement, the DIP Intercreditor Agreement and the other Loan Documents and the Financing Orders, and each such Lender irrevocably authorizes the Agent and the Co-Collateral Agents, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent and the Co-Collateral Agents, as applicable, by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  For clarity, and notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, no consent of the Lenders shall be required to amend this Agreement or the Loan

1030946.0868CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Documents to (i) cause additional assets to become Collateral or to add additional Subsidiaries as guarantors of the Obligations, or (ii) implement the provisions of Section 8.12, and the Agent and the Loan Parties shall be entitled to execute any and all amendments necessary or desirable to accomplish any of the foregoing and such amendments shall be binding on the other parties hereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Agent nor the Co-Collateral Agents shall have any duties or responsibilities, except those expressly set forth in this Agreement and the other Loan Documents to which it is a party, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent or the Co-Collateral Agents.

Section 8.02    Delegation of Duties; Agent Advisors.  (a) Each of the Agent and the Co-Collateral Agents may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither the Agent nor the Co-Collateral Agents shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(b)    Each of the Agent and the Co-Collateral Agents, on behalf of each of them and the Lenders, shall be entitled to retain (either directly or through counsel) any financial advisor, auditor or any other consultant the Agent and the Co-Collateral Agents may deem necessary (collectively, the "**Agent Advisors**") to provide advice, analysis and reporting for the benefit of the Agent, the Co-Collateral Agents and the Lenders.  The Loan Parties and their advisors shall grant access to, and cooperate in all respects with, the Agent, the Co-Collateral Agents, the Lenders, the Agent Advisors and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner.  The Borrowers shall promptly pay upon demand all fees and expenses of each Agent Advisor, and all such fees and expenses shall constitute Obligations and be secured by the Collateral.

Section 8.03    Exculpatory Provisions.  No Agent (for purposes of this Article VIII, "**Agent**" and "**Agents**" shall mean the collective reference to the Agent, the Co-Collateral Agents and any other Lender designated as an "Agent" for purposes of this Agreement, including the Joint Lead Arrangers, the Syndication Agent and the Co-Documentation Agents) nor any of their respective Related Parties shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party that is a party thereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

Section 8.04    Reliance by Agent.  The Agent and Co-Collateral Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by them to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by the Agent.  The Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Agent.  The Agent and Co-Collateral Agents shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders or all Lenders) as they deem appropriate or they shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by them by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders, affected Lenders or all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Advances and the Term Loan.

Section 8.05    Notice of Default.  The Agent and the Co-Collateral Agents shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent or the applicable Co-Collateral Agent has received notice from a Lender, Holdings or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders.  The Agent and the Co-Collateral Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, the Supermajority Lenders, affected Lenders or all Lenders); provided that unless and until the Agent or the Co-Collateral Agents shall have received such directions, the Agent, in consultation with the Co-Collateral Agents, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06    Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agent, the Co-Collateral Agents nor any of their respective Related Parties have made any representations or warranties to it and that no act by the Agent or any Co-Collateral Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Agent or any Co-Collateral Agent to any Lender.  Each Lender represents to the Agent and the Co-Collateral Agents that it has, independently and without reliance upon the Agent, any Co-Collateral Agent or any other Lender, and based on such documents and

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Advances and the Term Loan hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent, any Co-Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent or the Co-Collateral Agents hereunder, the Agent and the Co-Collateral Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Agent or any Co-Collateral Agent or any of their respective Related Parties.

    Section 8.07 <u>Reports and Financial Statements</u>.  By signing this Agreement, each Lender:

    (a) agrees to furnish the Agent, with such frequency as the Agent may reasonably request, a summary of all Bank Products and Cash Management Services provided by, and amounts due or to become due on account thereof to, such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of any such Bank Products or Cash Management Services unless the Agent has received written notice thereof from such Lender;

    (b) is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements and reports required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Co-Collateral Agents (collectively, the "**Reports**") (which the Agent and the Co-Collateral Agents agree to so deliver);

    (c) expressly agrees and acknowledges that the Agent and the Co-Collateral Agents make no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

    (d) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent, the Co-Collateral Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

    (e) agrees to keep all Reports confidential in accordance with the provisions of this Agreement;

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent, the Co-Collateral Agents, the Agent Professionals and any such other Lender or Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any credit extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in any Letter of Credit or Swingline Advance, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent, the Co-Collateral Agents, the Agent Professionals and any such other Lender or Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agent, Co-Collateral Agents and any such other Lender or Person preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender; and

(g)    agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under this Agreement or any other Loan Documents or the Financing Orders, as applicable (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to the guaranties or any Collateral or any other property of any such Loan Party, without the prior written consent of the Agent. The provisions of this paragraph are for the sole benefit of the Lenders and the Agent and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 8.08    Indemnification of Agent Indemnitees.

(a)    Indemnification. The Lenders agree to indemnify Agent Indemnitees (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), ratably according to their respective Pro Rata Shares in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Revolving Commitments of any Lender shall have terminated and the Advances and the Term Loan shall have been paid in full, in accordance with such Pro Rata Shares immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Advances and the Term Loan) be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to an Agent Indemnitee that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Advances, the Term Loan and all other amounts payable

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

hereunder. If any Agent Indemnitee is sued by any receiver, trustee in bankruptcy, debtor-in-possession, the official committee of unsecured creditors, or other Person for any alleged preference from a Loan Party or fraudulent transfer, then any monies paid by such Agent Indemnitee in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to such Agent Indemnitee by Lenders to the extent of each Lender's Pro Rata share.

(b)    Proceedings.  Without limiting the generality of the foregoing, if at any time (whether prior to or after the Termination Date) any proceeding is brought against any Agent Indemnitees by a Loan Party, or any Person claiming through a Loan Party, to recover damages for any act taken or omitted by Agent in connection with any Obligations, Collateral, Loan Documents or matters relating thereto, or otherwise to obtain any other relief of any kind on account of any transaction relating to any Loan Documents, each Lender agrees to indemnify and hold harmless the Agent Indemnitees with respect thereto and to pay to the Agent Indemnitees such Lender's Pro Rata share of any amount that any Agent Indemnitee is required to pay under any judgment or other order entered in such proceeding or by reason of any settlement, including all interest, costs and expenses (including attorneys' fees) incurred in defending same; provided that no Lender shall be liable for payment of any such amount to the extent that it is determined in a final, non-appealable judgment by a court of competent jurisdiction that such judgment, order or settlement resulted from such Agent Indemnitees' gross negligence or willful misconduct.  In Agent's discretion, Agent may reserve for any such proceeding, and may satisfy any judgment, order or settlement, from proceeds of Collateral prior to making any distributions of Collateral proceeds to Lenders provided that it has not been determined in a final, non-appealable judgment by a court of competent jurisdiction that such judgment, order or settlement resulted from any Agent Indemnitees' gross negligence or willful misconduct.

Section 8.09    Agent in Its Individual Capacity.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Advances made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "**Lender**" and "**Lenders**" shall include each Agent in its individual capacity.

Section 8.10    Successor Agent.

(a)    The Agent may resign as Agent upon 30 days' notice to the Lenders and the Borrowers.  If the Agent shall resign as Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Agent, and the term "**Agent**" shall mean such successor agent effective upon such appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Advances or the Term Loan.  If no successor agent has accepted appointment as Agent by the date that is 30 days following a retiring Agent's notice of

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT
AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Agent hereunder, until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Agent's resignation as Agent, the provisions of this <u>Article VIII</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(b)    Any Co-Collateral Agent may resign as Co-Collateral Agent upon 30 days' notice to the Lenders and the Borrowers.  The rights, duties and responsibilities of the Co-Collateral Agents hereunder are specific to each of Bank of America, N.A. and Wells Fargo Bank, National Association, and upon (i) the resignation of any such Person as a Co-Collateral Agent hereunder, or (ii) except as otherwise agreed by the Borrowers and the Agent (whose agreement shall not be unreasonably withheld), the assignment of all of the rights, duties and obligations under this Agreement in respect of its Revolving Commitment, the Advances, the Term Loan and other amounts owing to it and any Note or Notes held by it by any such Person, then such rights, duties and responsibilities of such Person as a Co-Collateral Agent shall automatically terminate and be of no further force and effect; <u>provided</u> that the provisions of this <u>Article VIII</u> shall inure to such Person's benefit as to any actions taken or omitted to be taken by it while it was Co-Collateral Agent under this Agreement and the other Loan Documents. Without limiting the foregoing, no additional Co-Collateral Agents shall be appointed hereunder without the prior written consent of the Agent and the Borrowers.

Section 8.11    <s>Co-</s>Documentation Agent<s>s</s> and Syndication Agent; Bank Product and Cash Management Services Providers.  (a) Neither the <s>Co-</s>Documentation Agent<s>s</s>, the Syndication Agent nor any other Lender designated as an "**Agent**" for purposes of this Agreement (other than Bank of America in its capacity as Agent and Co-Collateral Agent, and Wells Fargo Bank, National Association in its capacity as Co-Collateral Agent) shall have any duties or responsibilities hereunder in its capacity as such.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

Section 8.12    <u>Defaulting Lenders</u>.

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to

this Agreement shall be restricted as set forth in the definition of "Required Lenders", "Supermajority Lenders" and this Section 8.12.

               (ii)    Defaulting Lender Waterfall.    Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 9.05 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Lenders or Swingline Lender hereunder; third, to Cash Collateralize the Issuing Lenders' Fronting Exposure with respect to such Defaulting Lender; fourth, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Extension of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; fifth, if so determined by the Agent and the Borrowers, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Extensions of Credit under this Agreement and (y) Cash Collateralize the Issuing Lenders' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement; sixth, to the payment of any amounts owing to the Non-Defaulting Lenders, the Issuing Lenders or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the Issuing Lenders or the Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Extension of Credit in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Advances or Term Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Extensions of Credit owed to all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Obligations owed to, such Defaulting Lender until such time as all Advances, Term Loans and funded and unfunded participations in Letters of Credit and Swingline Advances are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.16. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 8.12 shall be deemed

1030946.06 SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)   Certain Fees.

(A)   No Defaulting Lender shall be entitled to receive any fee payable under Section 2.05 for any period during which that Lender is a Defaulting Lender (and, except as provided in clause (iii)(C) below, the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)   Each Defaulting Lender shall be entitled to receive Letter of Credit fees pursuant to Section 3.03 for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Revolving Commitment Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral.

(C)   With respect to any fee payable under Section 2.05 or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letters of Credit or Swingline Advances that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the Issuing Lenders and Swingline Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Lender's or Swingline Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)   Reallocation of Applicable Percentages to Reduce Fronting Exposure.  All or any part of such Defaulting Lender's participation in Letters of Credit and Swingline Advances shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Revolving Commitment Percentages (calculated without regard to such Defaulting Lender's Revolving Commitment) but only to the extent that (x) the conditions set forth in Section 4.02 are satisfied at the time of such reallocation (and, unless the Borrowers shall have otherwise notified the Agent at such time, the Borrowers shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate outstanding amount of Obligations of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    <u>Cash Collateral, Repayment of Swingline Advances</u>. If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under applicable law, (x) first, prepay Swingline Advances in an amount equal to the Swingline Lenders' Fronting Exposure and (y) second, Cash Collateralize the Issuing Lenders' Fronting Exposure in accordance with the procedures set forth in <u>Section 3.01(b)</u>.

(b)    <u>Consents</u>.    If a Lender becomes a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not in limitation thereof, except as set forth in the last sentence hereof, such Defaulting Lender's right to participate in decision-making rights related to the Obligations in respect of Required Lender and Supermajority Lender votes, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal. Notwithstanding anything else provided herein, any amendment, waiver determination, consent or notification under <u>Section 9.01</u> that would (i) increase or extend the term of the Revolving Commitment of a Defaulting Lender, (ii) reduce the principal amount of the Advances or the Term Loan made by such Defaulting Lender, (iii) alter the terms and conditions of this sentence or (iv) otherwise disproportionately affect a Defaulting Lender, will require the consent of such Defaulting Lender.

(c)    <u>Defaulting Lender Cure</u>.    If the Borrowers, the Agent, the Swingline Lender and the Issuing Lenders agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Advances of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Advances and funded and unfunded participations in Letters of Credit and Swingline Advances to be held on a pro rata basis by the Revolving Lenders in accordance with their Revolving Commitment Percentages (without giving effect to <u>Section 2.16</u>), whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 8.13    <u>Certain ERISA Matters</u>.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, each Agent (as defined in <u>Section 8.03</u>) and their respective Affiliates, and not, for the avoidance of

1030946.06<s>8CA</s>-CHISR01A - MSW
<s>C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX</s>

doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans in connection with the Extensions of Credit, the Letters of Credit or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement,

(iii)    or (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that  none of the Agents or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Extensions of Credit, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

Section 8.14    Credit Bidding.  The Credit Parties hereby irrevocably authorize the Agent, at the direction of the Required Lenders, to credit bid all or any portion of the

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Credit Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase); provided, however, that none of the Credit Parties shall be allowed to credit bid any of the Obligations independently and all such credit bids shall have to be submitted through, and administered by, the Agent, as set forth herein.  In connection with any such bid (i) the Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.01 of this Agreement), and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Credit Party or any acquisition vehicle to take any further action.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Fee Letter, which may be amended by the parties thereto (or in the case of fees payable solely to the Agent, by the Borrowers and the Agent)), nor consent to any departure by any Borrower or any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders or by the Agent at the direction of the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(a)    unless in writing and also signed by each Lender directly affected thereby, do any of the following:  (i) increase the amount or extend the expiration date of any Lender's Commitment, (ii) subject to clause (h) below, reduce the principal of, or interest on, the Advances, the Term Loan or any fees or other amounts payable hereunder; provided, however, that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay interest, fees or other amounts at the default rate; or (iii) postpone any date fixed for any payment of principal of, or interest on, the Advances, the Term Loan or any fees or other amounts payable hereunder (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment shall not constitute a postponement of any date scheduled for the payment of principal or interest);

(b)    unless in writing and signed by all of the Lenders, do any of the following: (i) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Advances, the Term Loan or the number of Lenders, that shall be required for the Lenders or any of them to take any action hereunder, (ii) other than in accordance with Section 9.13, release all or substantially all of the Collateral or release all or substantially all of the guarantors from their obligations under the Guarantee and Collateral Agreement, (iii) except as expressly permitted herein or in any other Loan Document, subordinate the Liens granted hereunder or under the other Loan Documents, to any other Lien, (iv) amend this Section 9.01, (v) amend the definitions of "Required Lenders" or "Supermajority Lenders," (vi) release either Borrower from all of its obligations hereunder or amend Section 9.07(j) or, (vii) increase the advance rates constituting part of the Borrowing Base or (viii) amend Section 7.03;

(c)    unless in writing and signed by the Supermajority Lenders, (i) amend Section 6.02(n) (or the defined terms used in such section or any component thereof) the definition of "LTV Provisions", the definitions "Line Cap", "Borrowing Base" and the other defined terms used in such definitions or any component thereof (other than the advance rates)) in a manner that would result in more credit being made available to the Borrowers and (ii) increase the Swingline Commitment;

(d)    unless in writing and signed by the Agent and the Co-Collateral Agents (in addition to the Lenders required above to take such action), as applicable, amend, modify or waive any provision of Article VIII or affect the rights or duties of the Agent and the Co-Collateral Agents, as applicable, under this Agreement or any other Loan Document;

(e)    unless in writing and signed by the Swingline Lender (in addition to the Lenders required above to take such action), amend, modify or waive any provision of Section 2.03 or 2.04; or

(f)    unless in writing and signed by each Issuing Lender (in addition to the Lenders required above to take such action), amend, modify or waive any provision of Article III; or

(g)    unless in writing and signed by each affected member of any Class, have a materially disproportionate adverse effect on such Class.; or

76141

(h)    unless in writing and signed by (i) the holders of more than 50% of the sum of the Aggregate Revolving Commitments then in effect or, if the Aggregate Revolving Commitments have been terminated, the holders of more than 50% of the Total Revolving Extensions of Credit then outstanding (other than Extensions of Credit held by Permitted Holder Lenders) and (ii) holders of more than 50% of the principal amount of the Term Loans then outstanding (other than the portion of the Term Loan held by any Permitted Holder Lenders), (x) waive any payment otherwise required under Section 2.11(b)-(f) or (y) amend Section 2.11(f) (or the defined terms used in such section or any components thereof).

Section 9.02    Notices, Etc.

(a)    All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied or delivered, (i) if to Holdings, any Borrower or any Subsidiary Guarantor, at its address at 3333 Beverly Road, Hoffman Estates, Illinois 60179, Attention:  General Counsel, with a copy to Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Douglas Urquhart, Esq.; (ii) if to any Lender, at its address set forth in its completed administrative questionnaire delivered to the Agent; (iii) if to Bank of America, (x) in its capacity as Agent, a Co-Collateral Agent, the Swingline Lender or an Issuing Lender, at its address at 100 Federal Street, 9th Floor, Boston, Massachusetts 02110, Attention: Stephen J. Garvin and Brian P. Lindblom, and (y) in its capacity as Agent with respect to financial and other reporting sent pursuant to Section 6.01(j) hereof, at its address set forth in clause (x) above and also at 1455 Market Street, San Francisco, CA 94103, Attention: Aamir Saleem, in each case with a copy to Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 3400, Chicago, Illinois 60527, Attention: Seth E. Jacobson, Esq.; (iv) if to Wells Fargo Bank, National Association or its Affiliates, in its capacity as a Co-Collateral Agent or as an Issuing Lender, at its address at One Boston Place, 19th Floor, Boston, Massachusetts 02108, Attention: Joseph Burt, with a copy to Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110, Attention: Kevin J. Simard, Esq., or (v), if to any other Issuing Lender, at such address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrowers and the Agent; provided that notices required to be delivered pursuant to ~~Section 6.01(j)(i)~~Section 6.01(j)(ii), (iii), (iv), and (vii) shall be delivered to the Agent and the Lenders as specified in Section 9.02(b).  All such notices and communications shall, when mailed, telecopied, telegraphed or emailed, be effective when deposited in the mails, telecopied, delivered to the telegraph company or confirmed by email, respectively, except that notices and communications to the Agent pursuant to Article II, III or VIII shall not be effective until received by the Agent.  Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any exhibit hereto or thereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof.

(b)    Holdings and the Borrowers agree that materials required to be delivered pursuant to Sections ~~6.01(j)(i)~~6.01(j)(ii), (iii)~~, (iv)~~ and (vii), shall be deemed delivered to the Agent on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website

identified by the Borrowers in a written notice to the Agent and the Lenders and that is accessible by the Lenders without charge or if not so posted, may be delivered to the Agent in an electronic medium in a format acceptable to the Agent by email to brian.p.lindblom@baml.com and to aamir.saleem@baml.com.  Holdings and the Borrowers agree that the Agent may make such materials, as well as any other written information, documents, instruments and other material relating to Holdings, the Borrowers, any of their Subsidiaries or any other materials or matters relating to this Agreement, the Loan Documents or any of the transactions contemplated hereby (collectively, the "**Communications**") available to the Lenders by posting such notices on Intralinks or a substantially similar electronic system (the "**Platform**").  Holdings and the Borrowers acknowledge that (i) the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, (ii) the Platform is provided "as is" and "as available" and (iii) neither the Agent nor any of its Affiliates warrants the accuracy, adequacy or completeness of the Communications or the Platform and each expressly disclaims liability for errors or omissions in the Communications or the Platform.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent or any of its Affiliates in connection with the Platform. No Agent Indemnitee shall have any liability to Borrowers, Credit Parties or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform, including any unintended recipient, nor for delivery of Communications and other information via the Platform, internet, e-mail, or any other electronic platform or messaging system.

(c)    Each Lender agrees that notice to it (as provided in the next sentence) (a "**Notice**") specifying that any Communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; provided that if requested by any Lender the Agent shall deliver a copy of the Communications to such Lender by email or telecopier.  Each Lender agrees (i) to notify the Agent in writing of such Lender's e-mail address to which a Notice may be sent by electronic transmission (including by electronic communication) on or before the date such Lender becomes a party to this Agreement (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

(d)    The Loan Parties hereby acknowledge that certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Communications provided by or on behalf of any Loan Party hereunder (collectively, "**Borrower Materials**") that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Credit Parties to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary)

with respect to any Loan Party or its securities for purposes of United States Federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Agents and the Joint Lead Arrangers shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  The Loan Parties and the Credit Parties acknowledge that, notwithstanding the foregoing, "public" information may not be segregated from material non-public information on the Platform.  The Credit Parties acknowledge that Communications may include Loan Parties' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to a Loan Party's securities.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any Loan Party or its securities for purposes of United States Federal or state securities laws.

Section 9.03    No Waiver; Remedies.  No failure on the part of any Lender or the Agent to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.04    Costs and Expenses. (a)  The Loan Parties shall reimburse the Agent and each Co-Collateral Agent for all Extraordinary Expenses. The Loan Parties jointly and severally agree to pay promptly all reasonable costs and expenses of the Agent, the Co-Collateral Agent, and the Joint Lead Arrangers including the reasonable fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP, Choate Hall & Stewart LLP, BRG and the other Agent Professionals, (i) in connection with the preparation, execution, delivery, distribution (including via the internet or through a service such as Intralinks), administration, modification and amendment of this Agreement, the other Loan Documents and the other documents to be delivered hereunder (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements hereto or thereto); (ii) all due diligence, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, consultant, and audit expenses; (iii) the syndication and funding of the Extensions of Credit and any issuance of Letters of Credit; (iv) the creation, perfection or protection of the liens under the Loan Documents (including all search, filing and recording fees); (v) subject to Section 6.01(k), all expenses incurred in connection with inspections, verifications, examinations and appraisals relating to the Borrowing Base and the Collateral, and (vi) the fees and expenses set forth in the Fee Letter.  The Loan Parties further jointly and severally agree to pay on demand all costs and expenses of the Agent, the Co-Collateral Agents and the Lenders, if any (including reasonable counsel fees and expenses of counsel to the Agent, counsel to the Co-Collateral Agents and counsel to the Lenders (in the case of the Lenders, limited to one counsel

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

for the Lenders in connection with the enforcement of or protection of its rights hereunder)), in connection with (i) the enforcement of the Loan Documents, the Financing Orders and the Cash Management Order; (ii) any refinancing or restructuring of the DIP ABL Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP ABL Facility or the other transactions contemplated by the Loan Documents, the Financing Orders or the Cash Management Order.  The Loan Parties acknowledge that counsel to the Agent or any Co-Collateral Agent may provide the Agent or such Co-Collateral Agent, as applicable, a benefit (such as a discount, credit or accommodation for other matters) based on counsel's overall relationship with the Agent or such Co-Collateral Agent, as applicable, including fees paid hereunder.

(b)    Holdings and the Borrowers jointly and severally agree to indemnify and hold harmless the Agent, each Co-Collateral Agent, each Issuing Lender, each Lender, the Agent Advisors and each of their Related Parties (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) this Agreement, the Prepetition First Lien ABL Credit Agreement, the other Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the Letters of Credit or the proceeds of the Advances, and (ii) the actual or alleged presence of Hazardous Materials on, under, at or from any property of Holdings, the Borrowers or any of their Subsidiaries or any Environmental Liability or Environmental Action relating in any way to Holdings, the Borrowers or any of their Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Holdings, any Borrower, its directors, equityholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  Holdings and the Borrowers also agree not to, and not to permit any of the their Subsidiaries to, assert any claim for special, indirect, consequential or punitive damages against the Agent, any Co-Collateral Agent, any Lender, any of their Affiliates, or any of their respective Related Parties, on any theory of liability, arising out of or otherwise relating to this Agreement, the other Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the Letters of Credit or the proceeds of the Advances or the Term Loan.

(c)    If (i) any payment of principal of, or Conversion of, any Eurodollar Rate Advance is made by any Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Advance, as a result of a payment or Conversion pursuant to Section 2.09(d) or (e), 2.11 or 2.13, acceleration of the maturity of the Advances pursuant to Section 7.02 or for any other reason, or by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Advance upon an assignment of rights and obligations under this Agreement pursuant to Section 9.07 as a result of a demand by any Borrower pursuant to

Section 9.07(a), or (ii) any Borrower fails to prepay, borrow, continue or convert any Eurodollar Rate Advance on the date or in the amount notified by any Borrower; the applicable Borrower shall, promptly after notice by such Lender setting forth in reasonable detail the calculations used to quantify such amount (with a copy of such notice to the Agent), pay to the Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion, including any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance. For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 9.04(c), each Lender shall be deemed to have funded each Eurodollar Rate Advance made by it at the Eurodollar Rate for such Advance by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Advance was in fact so funded.

(d)    Without prejudice to the survival of any other agreement of Holdings or any Borrower hereunder, the agreements and obligations of Holdings and the Borrowers contained in Sections 2.12, 2.15 and 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 9.05    Right of Set-off.  Subject to the Financing Orders and Section 7.02, upon (i) the occurrence and during the continuance of any Event of Default and (ii) the making of the request or the granting of the consent specified by Section 7.02 to authorize the Agent to declare the Extensions of Credit due and payable pursuant to the provisions of Section 7.02, each Lender and each of its Affiliates is hereby authorized at any time and from time to time (notwithstanding the provisions of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Bankruptcy Court), to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of Holdings or any Loan Party against any and all of the obligations of Holdings and the Loan Parties now or hereafter existing under this Agreement, the other Loan Documents and the Extensions of Credit of such Lender, whether or not such Lender shall have made any demand under this Agreement or the other Loan Documents.  Each Lender agrees promptly to notify Holdings or the applicable Loan Party (with a copy to the Agent) after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Lender and its Affiliate under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender and its Affiliate may have.

Section 9.06    Binding Effect; Effectiveness.  When this Agreement has been executed by Holdings, the Borrowers, the Agent and the Co-Collateral Agents, and the Lenders, this Agreement shall thereafter be binding upon and inure to the benefit of Holdings, the Borrowers, the Agent, the Co-Collateral Agents, each Issuing Lender, each Lender and their respective successors and assigns.

Section 9.07    Assignments and Participations.  (a)  Each Lender may, upon notice to the Borrowers and the Agent and with the consent, not to be unreasonably withheld or

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

delayed, of the Agent, assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment, the Advances, the Term Loan and other amounts owing to it and any Note or Notes held by it); provided, however, that (i) [Reserved]; ii) [Reserved], (iii) each such assignment with respect to any Class of rights and obligations shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement with respect to such Class, (iv) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of all of a Lender's rights and obligations under this Agreement, (x) the amount of the Revolving Commitment of the assigning Revolving Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $10,000,000 (unless an Event of Default has occurred and is continuing, in which case not less than $5,000,000) or an integral multiple of $1,000,000 in excess thereof unless the Borrowers and the Agent otherwise agree and (y) the amount of the Term Loan of the assigning Term Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000 or an integral multiple of $1,000,000 in excess thereof (or, if less, the entire outstanding amount of the Term Loan held by such Term Lender) unless the Agent otherwise agrees, (v) each such assignment shall be to an Eligible Assignee, (vi) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, and the parties to such assignment (other than the Agent) shall deliver together therewith any Note subject to such assignment and a processing and recordation fee of $3,500 (except no such fee shall be payable for assignments to a Lender, an Affiliate of a Lender or an Approved Fund), and (vii) any Lender may, without the approval of the Borrowers, but with notice to the Borrowers, assign all or a portion of its rights and obligations to any of its Affiliates or to another Lender (provided no assignment of Revolving Commitments or any Revolving Advances or other Revolving Extensions of Credit may be made by a Revolving Lender to a Term Lender pursuant to this clause unless such Term Lender is already also a Revolving Lender hereunder).  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.12, 2.15 and 9.04 to the extent any claim thereunder relates to an event arising prior such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Agent,

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent, the Issuing Lender or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swingline Advances in accordance with its Revolving Commitment Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or the performance or observance by the Borrowers of any of their obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 5.01(e) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with any Note or Notes subject to such assignment, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit B hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrowers.

(e)     The Agent shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the

recordation of the names and addresses of the Lenders and the Revolving Commitment of, and principal amount (and stated interest) of the Advances and L/C Obligations owing to, each Revolving Lender from time to time, the principal amount (and stated interest) of the Term Loan owing to each Term Lender from time to time, (the "**Register**").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f)     Each Lender may, without the consent of the Agent or any Loan Party, sell participations to one or more banks or other entities (other than the Borrowers or any of their Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment, the Advances owing to it, the portion of the Term Loan owing to it, and any Note or Notes held by it); provided, however, that (i) such Lender's obligations under this Agreement (including its Revolving Commitment to the Borrowers and its obligations to the Swingline Lender and the Issuing Lender hereunder) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrowers, the Agent, the Co-Collateral Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Loan Document, or consent to any departure by any Borrower therefrom, except to the extent that such amendment, waiver or consent would require the affirmative vote of the Lender from which it purchased its participation pursuant to Section 9.01(a).  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Extensions of Credit or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information related to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(g)     Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant, any information relating to Holdings, the Borrowers or their Subsidiaries furnished to such Lender by or on behalf of the Borrowers; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Borrower Information relating to

1030946.06 8CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

Holdings, the Borrowers or their Subsidiaries received by it from such Lender in accordance with Section 9.08.

(h)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time (i) create a security interest in all or any portion of its rights under this Agreement (including the Advances owing to it, the portion of the Term Loan owing to it and any Notes held by it), including, without limitation, in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors and (ii) assign to one or more special purpose funding vehicles (each, an "**SPV**") all or any portion of its funded Advances (without the corresponding Revolving Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Advances that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights which a Revolving Lender making or holding such Advances would have under this Agreement, but no obligations; provided, that no SPV shall be entitled to compensation pursuant to Section 2.12 or 2.15 in excess of that to which the applicable Revolving Lender would otherwise have been entitled.  The Lender shall remain liable for all its original obligations under this Agreement, including its Revolving Commitment (although the unused portion thereof shall be reduced by the principal amount of any Advances held by an SPV).  Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the Lender (as agent for the SPV) and not separately to the SPV unless the Agent and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.  The Borrowers shall, at the request of any Revolving Lender, execute and deliver to such Person as such Revolving Lender may designate, a Note in the amount of such Lender's Revolving Commitment to evidence the Advances of such Revolving Lender and related SPV.

(i)    The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender to facilitate transactions of the type described in paragraph (h) above.

(j)    Neither Holdings nor any Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each of the Lenders.

Section 9.08    Confidentiality.  Neither the Agent, any Co-Collateral Agent, any Issuing Lender, nor any Lender may disclose to any Person any confidential, proprietary or non-public information of Holdings or the Borrowers furnished to the Agent or the Lenders by Holdings or the Borrowers (such information being referred to collectively herein as the "**Borrower Information**"), except that each of the Agent, each of the Co-Collateral Agents, each of the Issuing Lenders and each of the Lenders may disclose Borrower Information (i) to its and its Related Parties to whom disclosure is required to enable the Agent, the Co-Collateral Agents, the Issuing Lenders or such Lender to perform its obligations under this Agreement and the other Loan Documents or in connection with the administration or monitoring of this Agreement and the other Loan Documents by the Agent, the Co-Collateral Agents, Issuing Lenders, or such Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Borrower Information and instructed to keep

such Borrower Information confidential on substantially the same terms as provided herein), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (including in connection with the Chapter 11 Cases), (iv) to any other party to this Agreement and the other Loan Documents, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement and the other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 9.08, to any assignee or participant, or any prospective assignee or participant, (vii) to the extent such Borrower Information (A) is or becomes generally available to the public on a non-confidential basis other than as a result of a breach of this Section 9.08 by the Agent, any Co-Collateral Agent or such Lender, as the case may be, or (B) is or becomes available to the Agent, any Co-Collateral Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrowers or any of their Subsidiaries and (viii) with the consent of the Borrowers.

Section 9.09    Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of laws principles thereof but including Section 5-1401 and 5-1402 of the New York General Obligations Law and, to the extent applicable, the Bankruptcy Code.

Section 9.10    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.11    Jurisdiction, Etc.  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not have or abstains from jurisdiction, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court.  Holdings and each of the Borrowers hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to Holdings or such Borrower at its address specified pursuant to Section 9.02.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents in the courts of any jurisdiction. Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action

1030946.06CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**Section 9.12   WAIVER OF JURY TRIAL.  EACH OF HOLDINGS, THE BORROWERS, THE AGENT, THE CO-COLLATERAL AGENTS, THE ISSUING LENDERS AND THE LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE ACTIONS OF THE AGENT, THE CO-COLLATERAL AGENTS, THE ISSUING LENDERS OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.**

Section 9.13   <u>Release of Collateral or Guarantee Obligation</u>.
(a)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Co-Collateral Agents are hereby irrevocably authorized by each Lender (without requirement of consent of or notice to any Lender) to take, and hereby agree to take, any action requested by the Borrowers having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any Permitted Disposition; <u>provided that</u> the guarantee obligations of Sears may not be released without the consent of the Required Lenders, or (ii) under the circumstances described in paragraph (b) below.

(b)    At such time as the Advances, the Term Loan, the Reimbursement Obligations and all other Obligations shall have been paid in full in cash, the Commitments have been terminated and no Letters of Credit shall be outstanding (or any outstanding L/C Obligations shall have been Cash Collateralized or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lenders have been provided in respect of such Letters of Credit), the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Co-Collateral Agents and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

Section 9.14   <u>PATRIOT Act Notice</u>.  Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or the Agent, as applicable, to identify such Borrower in accordance with the PATRIOT Act.  Each Borrower hereby agrees to provide such information promptly upon the request of any Lender or the Agent.

Section 9.15   <u>Integration</u>.  This Agreement and the other Loan Documents represent the agreement of Holdings, the Borrowers, the Agent, the Co-Collateral Agents and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Agent, any Co-Collateral Agent or any Lender

1030946.06CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.16    Replacement of Lenders.  If any Lender requests compensation under Section 2.12 or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, if any Lender does not consent (a "**Non-Consenting Lender**") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders or any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.07), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrowers shall have paid to the Agent the assignment fee specified in Section 9.07;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, its ratable share of the Term Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    with respect to the replacement of any Non-Consenting Lender, such amendment, waiver or consent can be effected as a result of such  assignment (together with all other assignments required by the Agent to be made pursuant to this paragraph); and

(e)    such assignment does not conflict with applicable laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Section 9.17    No Advisory or Fiduciary Capacity.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents

76153

(including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Credit Party) acknowledges that any liability arising under a Loan Document of any Credit Party that is an EEA Financial Institution, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority, and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under any Loan Documents which may be payable to it by any Credit Party that is an EEA Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.19    Interim DIP Term Sheet Amended and Restated.  Upon satisfaction of the conditions precedent to the effectiveness of this Agreement, (a) this Agreement shall amend and restate the Interim DIP Term Sheet in its entirety, (b) the rights and obligations of the parties under the Interim DIP Term Sheet shall be subsumed within and be governed by this Agreement; provided, that Holdings and the Borrowers hereby agree that all

1030946.06SCA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

obligations and other liabilities of the Loan Parties under the Interim Term Sheet shall remain outstanding, shall constitute continuing Obligations secured by the Collateral, and this Agreement shall not be deemed to evidence or result in a novation or repayment and reborrowing of such obligations and other liabilities.

Section 9.20   Keepwell.  Each Loan Party that is a Qualified ECP Guarantor at the time the Guarantee and Collateral Agreement or the grant of a security interest under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under the Guarantee and Collateral Agreement voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been paid and performed in full.  Each Loan Party intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

Section 9.21   DIP Intercreditor Agreement; Financing Orders.  This Agreement is subject to the terms and provisions of the DIP Intercreditor Agreement and the Final Financing Order.  In the event of a conflict between the terms hereof and the terms of the DIP Intercreditor Agreement or the Final Financing Order, the terms of the DIP Intercreditor Agreement or the Final Financing Order, as applicable, shall govern and control.

[Remainder of page intentionally left blank]

1030946.068CA-CHISR01A - MSW
C:\USERS\WOODFORD\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\JEKFX09Q\SEARS_DIP ABL CREDIT AGREEMENT 2018-11-14 (AS FILED)_WEIL_96800779_1.DOCX

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

SEARS HOLDINGS CORPORATION

By:  _____

Name:  _____

Title:  _____

SEARS ROEBUCK ACCEPTANCE CORP.

By:  _____

Name:  _____

KMART CORPORATION

By:  _____

Name:  _____

Title:  _____

BANK OF AMERICA, N.A.,
as Agent, a Co-Collateral Agent, a Lender,
Swingline Lender and an Issuing Lender

By: _____
Name: _____
Title: _____

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as a Co-Collateral Agent, an Issuing Lender
and a Lender

By: _____
Name: _____
Title: _____

[Other Lenders]

By: _____

Name: _____

Title: _____

SCHEDULE 1.01

Revolving Lenders; Revolving Commitments

| Lender | Incremental Revolving Commitment | Rolled Up Revolving Loans | Total Revolving Commitments |
|---|---|---|---|
| Bank of America, N.A. | $35,789,718 | $182,572,704 | $218,362,422 |
| Wells Fargo Bank, National Association | $76,351,399 | $389,488,435 | $465,839,834 |
| Citibank, N.A. | $19,087,850 | $97,372,109 | $116,459,958 |
| PNC  Bank, National Asscociation | $19,087,850 | $97,372,109 | $116,459,958 |
| Ally Bank | $9,543,925 | $48,686,054 | $58,229,979 |
| Siemens Financial Services | $9,543,925 | $48,686,054 | $58,229,979 |
| Citizens Business Capital | $6,680,747 | $34,080,238 | $40,760,985 |
| TD Bank, N.A. | $5,821,794 | $29,698,493 | $35,520,287 |
| Regions Bank | $2,385,981 | $12,171,514 | $14,557,495 |
| SPCP Group, LLC | $3,817,570 | $19,474,422 | $23,291,992 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **Total** | **$959,602,131** | **$188,110,759** | **$1,147,712,890** |

## SCHEDULE 4.01

Effective Date Loan Documents

- Trademark Security Agreement

- Patent Security Agreement

- Copyright Security Agreement

- Letter Agreement re: Co-Collateral Agents

- [TBD]

<u>SCHEDULE 6.01(r)(i)</u>

Case Milestones

**DIP Loan**

(i)      [Reserved]

(ii)     [Reserved]

(iii)    ~~Not later than November [], 2018, finalize DIP Credit Agreement and authorize posting to Prepetition ABL Lenders.~~[Reserved]

(iv)     Not later than November ~~[]~~28, 2018, the Bankruptcy Court shall have entered the Final <u>Financing</u> Order.

(v)      Not later than ~~[]~~<u>November 30</u>, 2018, the Effective Date shall have occurred.

**Lease Assumption / Rejection**

(vi)     Not later than 30 days following the Petition Date, the Debtors shall have filed a motion requesting, and not later than 45 days following the Petition Date, shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall extend 210 days after the Petition Date.

**Inventory Appraisals**

(viii)   Not later than the 10th day of every month commencing with the first full month immediately following the Petition Date <u>(or such later date as the Co-Collateral Agents may agree in their Permitted Discretion)</u>, an updated inventory appraisal shall be delivered to the Agent.

**Budget**

(ix)     On or before November 21, 2018, the Joint Lead Arrangers have (i) reaffirmed their approval, based on then current information, of the Approved Initial Budget or (ii) the Loan Parties have adopted a revised budget acceptable to the Joint Lead Arrangers in their sole and absolute discretion.

**Plan and Disclosure Statement**

(x)      Not later than February 18, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan of Reorganization and a disclosure statement with respect thereto.

(xi)     Not later than March 25, 2019, the Bankruptcy Court shall enter an order approving a disclosure statement with respect to an Acceptable Plan of Reorganization.

(xii)    Not later than April 29, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan of Reorganization.

(xiii)   Not later than May 14, 2019, such Acceptable Plan of Reorganization shall become effective.

<u>SCHEDULE 6.01(r)(ii)</u>

Go Forward Plan

<u>Store Rationalization and Sale Process</u>.    To save as many of their stores and preserve as many jobs as possible, the Debtors have developed the following detailed plan to guide their path forward in these Chapter 11 Cases.    Pursuant to this Go Forward Plan, the Debtors have determined to quickly rationalize their store footprint in accordance with a detailed plan (the "**Store Footprint Plan**") while also implementing the following key actions:

*Initial Store Rationalization*

- On the Petition Date, the Debtors will file a motion to approve procedures (the "**GOB Procedures**") to complete certain store closings in accordance with the Store Footprint Plan (the "**Initial Store Rationalization**") and will seek an order approving the GOB Procedures for the Initial Store Rationalization by October 25, 2018.

- The Initial Store Rationalization will start no later than October 25, 2018 and a material portion of the Initial Store Rationalization will be underway within 21 days of the Commencement Date.

- The Debtors will file a motion no later than seven (7) days after the Petition Date and will obtain an order from the Bankruptcy Court no later than thirty (30) days after the Petition Date authorizing the rejection of any leases associated with stores included in the Initial Store Rationalization.

*Secondary Store Rationalization*

- The Debtors will undertake a detailed review and analysis of the profitability of a further group of stores identified in the Store Footprint Plan over the next several weeks.

- No later than November 8, 2018, the Debtors will file a notice, pursuant to the GOB Procedures, to commence a second round of store rationalizations in accordance with the Store Footprint Plan (the "**Secondary Store Rationalization**" and, together with the Initial Store Rationalization, the "**Store Rationalizations**").

- The Debtors will obtain court approval of, and commence a material portion of, the Secondary Store Rationalization no later than November 20, 2018.

- The Debtors will file a motion no later than November 20, 2018 and will obtain an order from the Bankruptcy Court no later than December 15, 2018 authorizing the rejection of any leases associated with stores included in the Secondary Store Rationalization.

*~~Going Concern~~Go Forward Stores Sale Process*

- Pursuant to the Go Forward Plan, while the Store Rationalizations are in process the Debtors will pursue the sale (the "**~~Going Concern~~Go Forward Stores Sale Process**") of ~~a group of stores identified in the Store Footprint Plan (the "~~the Go Forward Stores~~").~~

- Given the cash-burn associated with the continued operation of the Debtors' businesses, the Debtors must, by December 15, 2018, obtain and find acceptable a non-contingent and fully-financed (with committed financing containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provisions)) stalking horse bid for the sale of the Go Forward Stores (which may be either on a going-concern or liquidation basis) that is reasonably acceptable to the Administrative Agent and Co-Collateral Agents (a "**Qualified ~~Bid~~**)**,Stalking Horse Bid**"); provided that failure to obtain and find acceptable a Qualified Stalking Horse Bid by December 15, 2018 shall not constitute a Default or Event of Default under the Credit Agreement so long as the Debtors are diligently pursuing a process reasonably acceptable to the Co-Collateral Agents that is designed to enable the Debtors to meet the Go Forward Stores Sale Process milestones set forth below.

- The Debtors will file a motion requesting approval of bidding procedures and the selection of a stalking horse bid for the sale of the Go Forward Stores (which may be either on a going-concern or liquidation basis) pursuant to section 363 of the Bankruptcy Code no later than December 27, 2018, and will obtain an order of the Bankruptcy Court approving such motion no later than January 14, 2019.

- An auction for the sale of the Go Forward Stores (and potentially certain other assets) will be conducted, or the stalking horse bidder, if any, will be named as the winning bidder to the extent no other higher and better offers for the Go Forward Stores are received, no later than February 2, 2019.

- The Debtors will obtain an order approving the sale of the Go Forward Stores pursuant to section 363 of the Bankruptcy Code no later than February 4, 2019, and will close the sale of the Go Forward Stores by no later than February 8, 2019.