# Exhibit B

## **Brown Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                              :          Chapter 11
                                                    :
SEARS HOLDINGS CORPORATION, *et al.*,               :          Case No. 18-23538 (RDD)
                                                    :          (Jointly Administered)
                        Debtors.                    :
-----------------------------------------------------------------x

## DECLARATION OF STEVEN BROWN IN SUPPORT OF
## MOTION FOR ORDER DECLARING AUTOMATIC STAY
## INAPPLICABLE TO NON-RESIDENTIAL REAL PROPERTY LEASE

Steven Brown, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1.      I am the Senior Vice President, Portfolio Management of Midwood Management Corp. ("Landlord") and have been acting in such role since 2017. From 2001 to 2017 I was the Director of Operations for Landlord.   Consequently, I am fully familiar with the facts and circumstances stated herein.

2.      I respectfully submit this Declaration in Support of Landlord's *Motion for Order Declaring Automatic Stay Inapplicable to Non-Residential Real Property Lease.*

3.      Landlord, as assignee of Farmingville Associates, a New York general partnership, and Kmart Corporation are parties to a lease (as amended and extended, the "Lease"), dated December 20, 1991, under which Kmart leased from Landlord premises located at 2280 North Ocean Avenue, Farmingville, New York (the "Premises").   The Premises is located within a shopping center known as Expressway Plaza. A copy of the Lease is annexed hereto as Exhibit "1".

4.      On October 10, 2012, Kmart sent to the Landlord a letter of agreement to acknowledge that, pursuant to Article 30 of the Lease, Kmart had exercised its option to perform

the Common Area (as defined in the Lease) maintenance on the Premises. A copy of the letter dated October 10, 2012 is annexed hereto as Exhibit "2".

5.        Kmart failed to comply with its maintenance obligations under the Lease with respect to the Common Area parking lot and drive lanes. As a result, by Notice dated November 8, 2017, Landlord exercised its rights under Article 25(F) to perform emergency repair work to the parking lot and drive lanes (the "Emergency Work") at Kmart's cost and expense.  A copy of the November 2017 Notice is attached hereto as Exhibit "3".

6.        Kmart's proportionate share of the sums expended by Landlord to perform the Emergency Work is $215,426.88 and such sums are treated as additional rent under the Lease. On or about April 4, 2018, Landlord invoiced Kmart for the Additional Rent, together with interest at eighteen (18%) per annum. Copies of the invoices are attached hereto as Exhibit "4".

7.        Kmart failed to pay the invoices sent by Landlord for the Additional Rent.  As such, $215,426.88 as Additional Rent under Article 25(F) of the Lease plus interest on and after April 4, 2018 at eighteen (18%) per annum is currently due and owing to Landlord for the Emergency Work.

8.        I am aware that Landlord's counsel sent Kmart a Notice of Default on account of Kmart's failure to pay the Additional Rent and then a Lease Termination Notice on account of Kmart's failure to timely cure the default.  Landlord received no response to the Notice of Default and the default arising from Kmart's failure to pay the Additional Rent was not cured.

9.    Kmart remains in possession of the Premises without the Landlord's consent. Kmart remitted rent to the Landlord for the month of November 2018, which the Landlord has not accepted.

Dated:  November 28, 2018

STEVEN BROWN

FF\7931913.2

# EXHIBIT 1

THIS LEASE made and entered into as of this 20TH day of
December, 1991, between FARMINGVILLE ASSOCIATES, a New York
general partnership, having its principal office at c/o Midwood
Management Corporation, 60 East 42nd Street, Suite 1814, New
York, New York 10165 (herein referred to as "Landlord"), and
KMART CORPORATION, a Michigan corporation, having its principal
office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein
referred to as "Tenant").

<u>W I T N E S S E T H</u>:

In consideration of the rents, covenants, agreements and
conditions herein reserved and contained, Landlord and Tenant do
hereby covenant, promise and agree as follows:

1.    <u>Demised Premises and Common Area</u>.

Landlord does hereby demise and lease to Tenant, and Tenant
does hereby lease and take from Landlord, for the term
hereinafter set forth, all that certain plot or parcel of land
located in Farmingville, Suffolk County, New York, more
particularly described in Exhibit A annexed hereto and made a
part hereof, and as shown on the Plot Plan attached as Exhibit B
hereto (hereinafter referred to as the "Demised Premises"). As
hereinafter set forth in this Lease, subject to the fulfillment
of certain covenants, warranties and obligations of Landlord,
Tenant intends to construct certain improvements on the Demised
Premises, including a one-story building containing approximately
107,831 square feet (sometimes hereinafter referred to as the
"Kmart Building"), a garden shop (the "Garden Shop") of
approximately 11,040 square feet (3,600 square feet of which are
expected to be enclosed and included within the Kmart Building),
a loading dock, and an outside compactor. All of the foregoing
are sometimes hereinafter referred to as "Tenant's Improvements."
The Demised Premises also include any and all easements,
licenses, rights, appurtenances and privileges now or hereafter
belonging thereto (including any such belonging or relating to
the Shopping Center hereinafter described. The Demised Premises
are a part of a shopping center (the "Shopping Center") more
particularly described in Exhibit A-1 attached hereto and made a
part hereof; said Shopping Center consisting of the land (and all
improvements that may from time to time be thereon) represented
by the area outlined by a bold line upon a certain plan (the
"Plot Plan") attached hereto and made a part hereof as Exhibit B.
Landlord hereby grants to Tenant the non-exclusive right to use,
in common with other tenants of the Shopping Center, the portions
of the Shopping Center intended to be for common use, existing
and/or to be hereinafter constructed by Landlord or Tenant,
including, but not limited to, any parking areas, roads,
curb-cuts, streets, drives, passageways, landscaped areas, open
and enclosed malls, exterior ramps, walks and arcades (herein-
after collectively called "Common Area").

2.    <u>Term</u>.

The term of this Lease shall commence on the date
("Commencement Date") of execution of this Lease as above set
forth; and shall continue to and shall include the date (such
date, or if the term of this Lease be extended, the date of
expiration of the latest extension period, as hereinafter
defined, for which Tenant shall have exercised its option to
extend, being hereinafter called the "Expiration Date"), which is
(1) twenty (20) years from the day before the Rent Commencement
Date (as hereinafter defined) if the Rent Commencement Date is
the first day of a month, or (2) twenty (20) years from the last
day of the month in which the Rent Commencement Date occurs if
the Rent Commencement Date is not the first day of a month. The
aforesaid 20 year period is sometimes hereinafter referred to as

-2-

the "Initial Term." As used herein, the Rent Commencement Date shall mean the date which is the first to occur of (i) the date Tenant first opens its Kmart store on the Demised Premises for business with the public in the normal course (the "Opening Date") and (ii) three (3) years following the Commencement Date. Within ten (10) days after request of either party after the Rent Commencement Date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an agreement in the form provided in Exhibit C, setting forth the Rent Commencement Date, the date of expiration of the Initial Term of this Lease and the commencement dates of the extended periods. The term "Lease Year" shall mean the following: the first Lease Year shall be the 12-month period commencing (i) on the Rent Commencement Date if the Rent Commencement Date is the first day of a month, or (ii) on the first day of the month immediately following the month in which the Rent Commencement Date occurs if the Rent Commencement Date is not the first day of a month; and each succeeding 12-month period thereafter shall be a Lease Year.

Notwithstanding anything to the contrary contained in this Lease:

(i) if the Approval Date (as hereinafter defined) has not occurred by July 1, 1993, or if at any time prior to such date any permit or approval required to cause the Approval Date to occur is denied and all administrative appeals of such denial (short of litigation) are exhausted, then in either such case Tenant, in addition to and not in limitation of any other rights and remedies, may cancel this Lease on notice to Landlord given at any time prior to the occurrence of the Approval Date, and upon the giving of such notice this Lease will terminate and neither party will have any further rights or liabilities hereunder;

(ii) if the Tenant Building Permit Date (as hereinafter defined) has not occurred by November 1, 1993, Tenant, in addition to and not in limitation of any other rights and remedies, may cancel this Lease on notice to Landlord given at any time prior to the occurrence of the Tenant Building Permit Date, and upon the giving of such notice this Lease will terminate and neither party will have any further rights or liabilities hereunder (except that, subject to the relevant provisions of Article 9C, Landlord's or Tenant's potential liability for wrongful acts or omissions causing such non-occurrence will continue);

(iii) if the Rent Commencement Date has not occurred by the third anniversary of the Commencement Date, this Lease shall ipso facto be and be deemed terminated and cancelled (except that Landlord's or Tenant's potential liability for wrongful acts or omissions causing such non-commencement will continue); and

(iv) Tenant's obligations to pay minimum rent under Article 3, real estate taxes under Article 5, and Common Area charges under the Rider hereto will commence and/or accrue as of the Rent Commencement Date (i.e., Tenant may use, possess and occupy the Demised Premises rent free until the Rent Commencement Date), but all other terms, conditions and provisions of this Lease shall (unless expressly otherwise provided or unless the context clearly requires otherwise) be effective as of and from and after the Commencement Date.

3.   Annual Minimum Rental.

Tenant shall, from and after the Rent Commencement Date, pay
to Landlord, at such place as Landlord shall designate in writing
from time to time, annual minimum rental as follows:

From and after the Rent Commencement Date and throughout the
remainder of the Initial Term, the sum of FIVE HUNDRED
THIRTY-NINE THOUSAND ONE HUNDRED FIFTY-FIVE DOLLARS
($539,155) per annum; and, should Tenant exercise one or
more of the renewal options set forth in Article 14;

For the 21st through the 25th Lease Years, inclusive, a sum
per annum equal to one hundred twenty percent (120%) of the
sum of (i) annual minimum rent payable during the 20th lease
Year plus (ii) Percentage Rent (as defined in Article 4
payable for (i.e., attributable to gross sales made during)
the 20th Lease Year;

For the 26th through 30th Lease Years, inclusive, a sum per
annum equal to one hundred twenty percent (120%) of the sum
of (i) annual minimum rent payable during the 25th Lease
Year plus (ii) Percentage Rent payable for the 25th Lease
Year;

For the 31st through 35th Lease Years, inclusive, a sum per
annum equal to one hundred twenty percent (120%) of the sum
of (i) annual minimum rent payable during the 30th Lease
Year plus (ii) Percentage Rent payable for the 30th Lease
Year; and

For the 36th through 40th Lease Years, inclusive, a sum per
annum equal to one hundred twenty percent (120%) of the sum
of (i) annual minimum rent payable during the 35th Lease
Year plus (ii) Percentage Rent payable for the 35th Lease
Year;

unless abated or diminished as hereinafter provided, in equal
monthly installments on the first day of each month, in advance,
commencing upon the first day of the Lease term; provided,
however, in the event the Rent Commencement Date shall not be the
first day of a calendar month, then the rental for such month
shall be prorated upon a daily basis.

By way of illustration of the foregoing computation of
annual minimum rent, assume that 5th Year Sales (as defined in
Article 4) were $25,000,000 and gross sales for the 20th Lease
Year were $35,000,000. In such event, there would be Percentage
Rent payable for the 20th Lease Year of $100,000 (1% of the
difference between $35,000,000 and $25,000,000), and annual
minimum rent for the 21st through 25th Lease Year would be 120%
of ($539,155 + $100,000), or $766,986.

If (by reason of final Percentage Rent figures for the
preceding Lease Year not yet being available) the new annual
minimum rent for any period in which same increases in accordance
with the foregoing cannot be computed with certainty as of the
first day of a Lease Year, then until such time as such
Percentage Rent figure is available (at which point there shall
be a retroactive adjustment), the new annual minimum rent shall
be 120% of the annual minimum rent for the immediately preceding
Lease Year.

3.   Additional Rental.

In addition to the aforesaid annual minimum rental, with
respect to any Lease Year during the Lease term from and after
the 6th Lease Year in which Tenant's "gross sales," as
hereinafter defined, shall exceed the gross sales during the 5th
Lease Year (said dollar amount of gross sales during the 5th

-4-

Lease Year being hereinafter referred to, throughout the Initial
Term,  as the "Breakpoint Amount"), for such Lease Year, Tenant
shall pay to Landlord, as additional rental ("Percentage Rent"),
a sum equal to one percent (1%) of the amount by which gross
sales for such Lease Year exceed the Breakpoint Amount for such
Lease Year.

Should Tenant exercise one or more of the renewal options
set forth in Article 14, the Breakpoint Amount for any such Lease
Year shall be increased as follows:

For the 21st through 25th Lease Years, inclusive, the
Breakpoint Amount shall be the sum of (i) gross sales made
during the 5th Lease Year (hereinafter "5th Year Sales")
plus (ii) 100 times the amount by which annual minimum rent
for the 21st Lease Year exceeds annual minimum rent for the
20th Lease Year;

For the 26th through 30th Lease Years, inclusive, the
Breakpoint Amount shall be the sum of (i) the Breakpoint
Amount for the 25th Lease Year plus (ii) 100 times the
amount by which annual minimum rent for the 26th Lease Year
exceeds annual minimum rent for the 25th Lease Year;

For the 31st through 35th Lease Years, inclusive, the
Breakpoint Amount shall be the sum of (i) the Breakpoint
Amount for the 30th Lease Year plus (ii) 100 times the
amount by which annual minimum rent for the 31st Lease Year
exceeds annual minimum rent for the 30th Lease Year; and

For the 36th through 40th Lease Years, inclusive, the
Breakpoint Amount shall be the sum of (i) the Breakpoint
Amount for the 35th Lease Year plus (ii) 100 times the
amount by which annual minimum rent for the 36th Lease Year
exceeds annual minimum rent for the 35th Lease Year.

By way of illustration of the computation of Breakpoint
Amount increases, using the same assumptions as in the example at
the end of Article 3, the Breakpoint Amount for the 21st through
25th Lease Years would be equal to $25,000,000 (5th Year Sales)
plus $22,783,100 (100 times the $227,831 increase in annual
minimum rent of the 21st Lease Year over the 20th Lease Year); a
total of $47,783,100.

Notwithstanding the foregoing, if by reason of casualty or
condemnation or other matters set forth in Article 32 Tenant's
store on the Demised Premises does not operate for an aggregate
period of 10 days or more during the entire 5th Lease Year, then
in such event, for all purposes of this Article 4, 5th Year Sales
shall be deemed to be the greater of (i) gross sales made during
the 12 month period immediately preceding the first such day of
discontinued operation during the 5th Lease Year and (ii) actual
sales made during the 5th Lease Year.

Said additional rental shall be paid on or before the
thirtieth (30th) day following the end of each Lease Year from
and after the 6th Lease Year.  Tenant shall, on or before the
30th day following the end of each Lease Year (including the 1st
through 4th Lease Years) or lesser period, deliver to Landlord a
statement signed by an officer of Tenant certifying the true
amount of the gross sales for such Lease Year or lesser period.
The term "lesser period", as used herein, shall be any period
beginning on the first (1st) day of any Lease Year and ending, by
reason of the termination of this Lease, prior to the end of such
Lease Year.  The additional rental due under this Article 4 for
any such "lesser period" at the end of this Lease shall be the
product of (i) the amount, if any, by which one percent (1%) of
sales for the 12 month period immediately preceding the
Expiration Date exceed the Breakpoint Amount, multiplied by (ii)

-5-

a fraction whose numerator is the number of days in such lesser
period and whose denominator is 365.

Landlord or its agent may inspect Tenant's record of gross
sales annually, provided such inspection shall be made at
Tenant's principal office within twelve (12) months after the
statement of sales shall be delivered to Landlord and shall be
limited to the period covered by such statement.  Except to the
extent that disclosure shall be required for any bona fide sale
or mortgage of the Demised Premises or for legal proceedings in
any court, at law or in equity, Landlord shall hold in confidence
sales figures or other information obtained from Tenant's
records.

The term "gross sales", as used herein, shall be the total
sales of merchandise or services made by Tenant or any occupant
of the Demised Premises, whether wholesale or retail, cash or
credit (including merchandise ordered on the Demised Premises and
delivered from another place) and shall include sales made from
trucks, trailers, vans or other temporary facilities used by
Tenant on any part of the land described in Exhibit A, except
that the following shall be excluded:

(a)  sales of merchandise subsequently returned for
refund or credit, merchandise transferred to a warehouse or
another store of Tenant, discounts on merchandise which shall be
allowed to employees of Tenant, or merchandise which shall be
issued in redemption of trading stamps, if any, which shall have
been issued free of charge to Tenant's customers at the time of
sale of other merchandise or services;

(b)  any and all taxes levied upon, assessed against or
measured by the receipt or purchase of merchandise from any
occupant of said Demised Premises, and any and all sales taxes
and other taxes levied upon, assessed against, based upon, or
measured by (i) such occupant's gross receipts, or any part
thereof, or (ii) the sale or sales price of merchandise and
services, or either, and which shall be payable by such occupant,
whether or not collected by such occupant from its customers as
reimbursement or as agent of the taxing authority, and whether or
not the same shall be commonly known as a sales tax, use tax,
retailer's occupational tax, gross receipts tax or excise tax;
provided, however, said taxes to be excluded from gross sales
shall not include any net income tax, franchise, or any other tax
not levied upon or computed upon gross sales or gross receipts,
or any portion thereof; provided, further, said taxes to be
excluded from gross sales shall be excludable regardless of
whether imposed under any existing or future orders, regulations,
laws, statutes or ordinances.

(c)  receipts from any of the following:  (i) the sale
of policies of insurance, mutual funds, stocks, bonds and other
securities, travelers checks, money orders, and similar items;
(ii) the sale or rendition of financial services of all types,
including, without limitation, the operation of checking and
savings accounts, the issuance or cashing of checks, the
furnishing of bill paying, custodial, investment and fiduciary
services, the making of secured and unsecured loans, the
operation of facilities for the electronic transfer of funds and
use of credit cards, the preparation of income tax returns, and
real estate or loan brokerage; (iii) the sale of postage stamps,
fishing and hunting licenses and tickets (including but not
limited to, those customarily sold by travel and theatre
agencies); (iv) professional services (including, without
limitation, legal, medical and dental); (v) travel agency and
other services rendered to increase customer traffic, and (vi)
provided the same do not occupy more than 500 square feet of the
demised premises, vending machines, video and/or amusement games,

lockers, stamp machines, public telephones, and "kiddie rides"; and.

(d)   service and interest charges for time payment accounts and charge accounts.

4.   Real Estate Taxes.

A.   Landlord warrants and represents that it will use its best efforts to cause the Demised Premises to be assessed and maintained as, an entirely separate tax parcel or lot which does not include any other portions of the Shopping Center or any property not a part of the Shopping Center.  Landlord further agrees to cause the remainder of the Shopping Center (i.e., exclusive of the Demised Premises, hereinafter referred to as "Landlord's Tax Parcel") to be maintained entirely within a tax parcel(s) or lot(s) which do not include any property not part of the Shopping Center.

Landlord further warrants and represents that if despite the use of such best efforts it can not obtain a separate assessment of the Demised Premises, the Demised Premises will be maintained within a tax parcel or lot which does not include any property not a part of the Shopping Center.

B.   Landlord agrees to pay and discharge before delinquent all Real Estate Taxes (as hereinafter defined) which become due on the Landlord's Tax Parcel (including Phase II as hereinafter referred to) during the term of this Lease.  If there shall not be a separate assessment of the Demised Premises, the Landlord's Tax Parcel shall be deemed to include the Demised Premises for all purposes under this Article 5.

C.   If there shall be a separate assessment of the Demised Premises, from and after the Rent Commencement Date, Tenant agrees to pay and discharge, before delinquent, all Real Estate Taxes which become due on the Demised Premises (including any buildings and other improvements built by Tenant thereon) during the term of this Lease.  In addition, Tenant agrees to pay, from and after the Rent Commencement Date, Tenant's portion of Real Estate Taxes on the Common Areas (the "Tax Portion") as hereinafter defined.

D.   For the purposes of this Article 5, Real Estate Taxes shall mean all ad valorem real estate taxes and assessments, extraordinary as well as ordinary, levied or assessed by the lawful taxing authorities upon either the Demised Premises, Landlord's Tax Parcel, or the Common Areas (as the usage may require) (including all land, buildings, and improvements thereon (except as otherwise expressly set forth in this Article 5D).  Real Estate Taxes shall not include (a) any income, franchise, gross receipts, corporation, capital levy, excess profits, revenue, inheritance, devolution, gift, estate, payroll or stamp tax, by whatsoever authority imposed or howsoever designated, (b) any tax upon the sale, transfer and/or assignment of the title or estate of Landlord which at any time may be assessed against or become a lien upon the Shopping Center, this leasehold or the rent accruing therefrom, (c) any interest, charge or other penalty for untimely payment, (d) any assessments for improvements in the Shopping Center or assessments for public streets, public sidewalks, sewers, water and other installations made at governmental expense before or in connection with the initial construction and overall development of the entire Shopping Center or any part thereof, (e) any tax upon any land and/or improvements which are separately assessed and payable by other tenants (i.e., other than Tenant) pursuant to their leases ("Separately Assessed Premises"), and (f) any tax upon any land (and/or improvements that may be hereinafter constructed), constituting the "Phase II" area of the Shopping Center as shown

on Exhibit B, which is currently undeveloped.  Landlord agrees to
use diligent efforts to have Phase II assessed as a separate tax
lot or parcel distinct from the balance of the Shopping Center.
If such efforts are unsuccessful and Phase II remains assessed as
part of Landlord's Tax Parcel, then for the purposes of computing
Tenant's Tax Portion there shall be a fair and equitable
proration of land (and building, should Phase II be hereafter
developed) assessments between Phase II and the balance of the
Landlord's Tax Parcel (which proration shall give due
consideration to any notes or letters regarding same from the
local assessor).

E.   (1)  For each Real Estate Calendar (Fiscal) Tax Year
during the term hereof from and after the Rent Commencement Date
Tenant shall pay to Landlord Tenant's Tax Portion as hereinafter
set forth.  Tenant's Tax Portion for any Real Estate Calendar
(Fiscal) Tax Year in which there shall be a separate assessment
of the Demised Premises shall mean the following: the product of
(i) Real Estate Taxes for such Real Estate Calendar (Fiscal) Tax
Year attributable solely to the Common Area of the Shopping
Center (excluding Phase II, as aforesaid, and also excluding Real
Estate Taxes on any buildings and the land under any buildings),
and (ii) the fraction (hereinafter called "Fraction"), the
numerator of which shall be the number of square feet of ground
floor area of the Tenant's building (excluding unenclosed
portions of the garden area and any mezzanines) at the end of
such Real Estate Calendar (Fiscal) Tax Year, and the denominator
of which shall be the number of square feet of floor area of all
the buildings in the Shopping Center other than Phase II
(including the Tenant's building but excluding any Separately
Assessed Premises) at the end of such Real Estate Calendar
(Fiscal) Tax Year.  Notwithstanding the formula above set forth,
if there shall not be a separate assessment of the land
comprising the Common Area (_i.e._, the assessment of same shall
include land underlying buildings), there shall be an appropriate
proration of said aggregate assessment (based on the ratio
between land underlying buildings and the Common Area) to arrive
at the amount of Real Estate Taxes for the Common Area for
computation of Tenant's Tax Portion.  Tenant's Tax Portion for
any Real Estate Calendar (Fiscal) Tax Year in which there shall
not be a separate assessment of the Demised Premises shall mean
the following:  the product of (i) Real Estate Taxes for such
Real Estate Calendar (Fiscal) Tax Year attributable to the land
and improvements comprising the Shopping Center (excluding Phase
II, as aforesaid), and (ii) the Fraction.

(2)  Where bills are rendered for different Real Estate
Taxes (_i.e._, county, school, city or the like) the measurement of
Tenant's liability under the provision shall be separately made,
according to the tax liability stated on each bill.

F.   Where the applicable tax bill is not available prior to
the end of the term hereof, then the aforesaid adjustment shall
be made, tentatively, on the basis of the last year's taxes, and
the amount due shall be treated as an addition to the minimum
rent for the last month of the term of this Lease; and final
adjustment shall be made between Landlord and Tenant promptly
after Landlord shall have received the tax bill for such period.

G.   Landlord shall not pay any Real Estate Taxes before
they are due (unless Landlord receives a discount for such early
payment and passes the benefit of the discount through to
Tenant).

H.   Landlord shall submit to Tenant a bill for Tenant's Tax
Portion, together with true copies of the receipted tax bill and
a statement of the facts and information needed to calculate the
Tenant's Tax Portion, as soon as practicable after the end of
each Real Estate Calendar (Fiscal) Tax Year, and if the same is

-8-

correct, Tenant shall pay Tenant's Tax Portion to Landlord as
additional rent within thirty (30) days after Tenant receives
said bill and statement.  Notwithstanding the foregoing, Landlord
shall have the right to submit a separate bill for Tenant's Tax
Portion with respect to any installment of Real Estate Taxes
following Landlord's payment of such installment, and Tenant
shall pay its appropriate Tax Portion of such installment within
30 days after it receives such bill and statement.  Further
notwithstanding the foregoing, if during any Lease Year Tenant's
Portion of Real Estate Taxes should exceed the of amount minimum
rental payable under Article 3, then for each succeeding Lease
Year Tenant shall initially pay its Tax Portion in monthly
estimates on the first day of each month (each to be one-twelfth
of the amount of the actual Tax Portion for the previous Lease
Year), with an annual reconciliation within 30 days following the
end of the Lease Year (i.e., in the same manner as Paragraph D of
the Common Area Charge Rider).

I.   If, by law, any Real Estate Taxes may, at the option of
the taxpayer, be paid in installments (whether or not interest
shall accrue on the unpaid balance thereof), Landlord shall
exercise the option to pay the same in installments and shall pay
the installments as the same respectively become due and before
any fine, penalty, interest or cost may be added for non-payment
thereof, but Landlord shall not pay any installment before it is
due (except as set forth in subparagraph G above).  Only
installments becoming due during the term of this Lease from and
after the Rent Commencement Date shall be included in Real Estate
Taxes for the computation of Tenant's Tax Portion and for
Tenant's liability regarding payment of Real Estate Taxes on the
Demised Premises (if same are separately assessed), and any
installments for a Real Estate Calendar (Fiscal) Tax Year, a part
of which is included within the term of this Lease after the Rent
Commencement Date and a part of which is included in a period of
time before the Rent Commencement Date or after the Expiration
Date (or sooner expiration or termination date), shall be
equitably adjusted and apportioned between Landlord and Tenant as
of the Rent Commencement Date or the Expiration Date (or sooner
expiration or termination date), as the case may be, for the
purpose of computing Tenant's Tax Portion and Tenant's
obligations (if there is such separate assessment of the Demised
Premises) under Article 5C.

J.   (1)  If Landlord shall fail or refuse, upon the request
of Tenant, to take any necessary steps to contest the validity or
amount of the assessed valuation or of the Real Estate Taxes for
any Real Estate Calendar (Fiscal) Tax Year, Tenant may undertake,
by appropriate proceeding in the name of Landlord or Tenant, to
contest the same.  Within a reasonable time after demand
therefor, Landlord shall execute and deliver to Tenant any
documents required to enable Tenant to prosecute any such
proceedings.  Landlord shall inform Tenant, in time to permit
Tenant to undertake such contest, of all pertinent data required
to undertake such contest.  In amplification and not in
limitation of the foregoing, Landlord agrees upon request from
Tenant to execute and submit any applications, forms, documents
and supporting data and information to obtain any abatements or
reductions in Real Estate Taxes that may be available or
obtainable (including, without limitation, any such abatements or
reductions available by reason of the presence of Tenant's
operation or by way of inducement of Tenant to execute this
Lease).

(2)  If Tenant shall obtain for Landlord a remission or
a refund of all or any part of the Real Estate Taxes for any Real
Estate Calendar (Fiscal) Tax Year, Landlord shall promptly
reimburse Tenant out of such remission or refund for all of
Tenant's costs and expenses in connection therewith, including,
but not limited to, attorneys' fees.  If Landlord or Tenant shall

-9-

obtain a remission or a refund of all or any part of the Real
Estate Taxes on Landlord's Tax Parcel for any Real Estate
Calendar (Fiscal) Tax Year, Landlord shall promptly refund to
Tenant (or credit Tenant with) a proportionate share (based upon
the Fraction) of the remission or refund, such proportionate
share to be calculated after deduction of actual costs and
expenses incurred in obtaining such remission or refund.
Notwithstanding the foregoing, all of any refund attributable to
Real Estate Taxes on the Demised Premises shall belong solely to
Tenant.

6.   Landlord's Work.

A.   Landlord agrees, at its sole cost and expense and
in a good and workmanlike manner, in full compliance with all
Requirements (as hereinafter defined), to perform all Landlord's
Work (as such term is hereinafter defined) in accordance with the
timetables for same hereinafter set forth.

B.   For the purposes of this Article 6 and elsewhere
in this Lease, the following terms shall have the following
meanings:

(i)   Building Areas.   The areas designated on
Exhibit B as "Kmart," "Garden Shop," "Retail," "Existing
Building," or otherwise designated thereon for buildings and
related improvements.

(ii)   Off-Site Improvements.   All off-site
improvements, including without limitation driveways, street
improvements, street extensions and/or widenings, median divider
strips, stacking and deceleration lanes, gutters, curbs,
sidewalks, separate automatic sprinkler systems if required by
governmental authorities, storm drains, retention basins, water
lines, street lights, traffic signals, and installation of
necessary utilities to the property line of the Shopping Center,
as well as all other off-site improvements required by
governmental agencies to permit the improvements to be
constructed by Landlord and/or Tenant hereunder.

(iii)   New Common Area Improvements.   Any work
Tenant, in its sole judgment, deems necessary or appropriate to
construct New Common Areas as shown in Parcel A of Exhibit B to
Tenant's desired specifications, including, without limitation,
any of the following that Tenant deems necessary or appropriate:
on-site excavation, filling, soil compaction, fine and rough
grading, drainage, including necessary engineering that may be
required, surveys, soil and other tests, retaining walls, on-site
water lines, separate automatic sprinkler systems if required by
governmental authorities, storm drains and retention basins and
provision of building utilities including sewers and fire
protection lines with backflow prevention devices, natural gas,
transformer and transformer pad, and water and electricity from
the exterior boundary of the Shopping Center to a point within
three feet (3') from the building line of the Kmart Building,
necessary perimeter walls or screening as required, parking lot
paving, striping, heavy-duty service drive around the perimeter
of the Kmart Building and Shopping Center as shown on Exhibit B,
lighting, bumpers, traffic control signs, landscaping, including
separate automatic irrigation systems.

By way of additional clarification, it is understood and agreed
that all surface improvements to the back of curbs surrounding
the Kmart Building is part of, and shall be included within, the
New Common Area Improvements.   Notwithstanding the foregoing,
nothing in this Article 6 or elsewhere in this Lease shall
require Tenant to conduct any environmental surveys or to remove
or remediate any toxic or hazardous waste or substances not
placed on the Demised Premises by Tenant.

(iv)   Existing Common Area Improvements.  With
regard to existing Common Areas as shown on Exhibit B (in other
than Parcel A):  resurface all paved areas, provide new light
fixtures and bulbs (and new stanchions as and where reasonably
required), resurface curb and gutter access road from Shopping
Center to Horse Block Road, make any necessary modifications to
on-site sewage treatment plant to increase capacity to handle all
new construction (including the Kmart Building), and construct
new Shopping Center sign pylon in accordance with Tenant's
specifications.  All of such work is to be done by Landlord (as
hereinafter set forth) in a first class manner so that the
existing Common Areas will, upon completion, be compatible with
the New Common Areas to be constructed by Tenant.

(v)   Initial Utility Work.  Relocation of any
electric, water, sewer or other utility lines running through the
Demised Premises (other than existing easement for maintenance of
electric transmission towers (the "Power Easement", which the
parties acknowledge is impracticable to relocate)) to points at
least five feet distant from boundaries of the Demised Premises,
and record any necessary amendments of easements in connection
therewith.  In amplification and not in limitation of the
foregoing, the Initial Utility Work includes relocation of any
elements of the sewage treatment system in or on the Demised
Premises, and modification and/or reconfiguration and/or partial
filling of recharge basin to allow construction of service drive
behind the Demised Premises.

(vi)   Landlord's Work.  Collectively, all the work
required to fully perform and complete the Off-Site Improvements,
the Existing Common Area Improvements, and the Initial Utility
Work.

(vii)   Tenant's Common Area Work.  Collectively, all
work required or appropriate in Tenant's sole judgment to fully
perform and complete the Pad Preparation Work and the New Common
Area Improvements.

(viii)   Tenant's Common Area Reimbursements.  The
sums to be paid by Landlord to Tenant as provided in Article 7 as
reimbursement for Tenant's Common Area Work.

(ix)   Development Funds.  The sum to be determined
as provided in Article 7, payable by Tenant to Landlord for
Tenant's share of the Off-Site Improvements and pylon
construction costs.

(x)   Kmart Pad.  The building pad for Tenant's
Improvements (which is the land constituting the Demised
Premises).

(xi)   Kmart Building Plans.  The detailed
architectural plans for the Kmart Building prepared by Kmart's
architect pursuant to the Typical Criteria Drawings and Outline
Specifications, Set No. K0973, issued by J.M. Bachoe, A.I.A.,
Manager, Design Division, Construction Department, Kmart
Corporation to Farmingville Associates on April 12, 1991.

(xii)   Pad Preparation Work.  The demolition of
approximately 20,000 square feet of existing buildings as shown
on Exhibit B (including removal of existing foundations of same),
any patching or other work to other buildings required by reason
of such demolition, and any other work necessary or appropriate
in Tenant's judgment to prepare the Kmart Pad for the building of
Tenant's Improvements, including, without limitation, the
following:  (a) stake the boundaries for the Kmart Pad on the
Demised Premises; (b) excavate, fill (with clean, suitable fill),
and rough grade the Kmart Pad; (c) provide an all weather access
road to the Kmart Pad; and (d) provide a staging area not less
than two acres in size adjacent to the Kmart Pad (as shown on
Exhibit B) suitable for the storing of equipment and materials
during the time Tenant is constructing the Tenant's Improvements
on the Demised Premises (and for Tenant's exclusive use during

-11-

such period); (e) establish and clearly mark an overall site
benchmark; (f) cause the corners of the Kmart Pad to be staked by
a licensed surveyor or engineer with a ten foot 10' offset from
the building line; (g) prepare an as-built site plan certified by
a licensed surveyor or engineer indicating the final elevation
and location of the Kmart Pad and any buildings adjacent to the
Tenant Improvements; and (h) provide temporary utilities
(including electric and water service) to the Tenant staging area
for use by Tenant during the time the Tenant's Improvements are
under construction.  If the Demised Premises are relocated to the
north as set forth in Article 9C, the Pad Preparation Work shall
also include the demolition of the existing buildings in the
"Possible Relocation Area" as shown on Exhibit B (including
removal of foundations of same and all other work set forth
above, as if the "Possible Relocation Area" originally was
included as part of the Kmart Pad).

          (xiii)  _Requirements_.  Any law, ordinance, order,
rule or regulation relating in any way to any item required to be
performed by either party under this Lease issued by the United
States, the State of New York and/or any political subdivision
thereof, and/or any agency, department, commission, board, bureau
or instrumentality of any of them.

          C.  (i)  On or before the 90th day following the
Commencement Date, and prior to submission for governmental
approval and prior to preparation of construction documents,
Landlord shall submit to Tenant for approval five copies of the
final site design plans, which shall include plans for utilities,
grading, landscaping and parking and driveway layout and building
location.  Approval shall be in accordance with the procedures
set forth in Article 6J hereof.

          (ii)  On or prior to the 360th day following the
date set forth in Section C(i) above, Landlord shall obtain all
required local, state and federal governmental approvals and
permits including, without limitation:  (x) any approval required
from Long Island Lighting Company for construction of the Garden
Shop in the Power Easement Area (the "Lilco Approval"); and
(y) final unappealable site plan approvals, traffic studies, and
any others required by state and federal environmental laws, for
the construction of all of Landlord's Work and Tenant's Improve-
ments and the balance of Tenant's Initial Work, as hereinafter
defined (other than actual building permit for Tenant's Improve-
ments which is to be obtained by Tenant, subject to all relevant
provisions of this Lease); and all such permits and approvals
shall have become final and unappealable.  The date when the last
of such required permits and approvals shall have been obtained
in final, unappealable form (including the design and signage
approvals hereafter referred to in this paragraph) is hereinafter
referred to as the "Approval Date."  Such approvals shall
include, without limitation, permission to connect the Tenant's
Improvements to on-site private sewage treatment plant and any
other health department or board of health approvals, as well as
permission for an additional curb cut to Ocean Avenue in the
approximate location shown on Exhibit B.  Landlord shall also
obtain, on or prior to the Approval Date, all required Tenant
building design and signage approvals required by local
governmental authorities associated with the approval of the New
and Existing Common Area Improvements or Tenant's Improvements.
Such approval of signage shall include, without limitation,
Shopping Center pylon to be located as shown on Exhibit B with
Tenant's sign panel thereon, as well as Tenant's exterior
building signs, all in accordance with Tenant's sign criteria and
design.  Notwithstanding the foregoing, Landlord shall only be
required to use its best efforts to obtain such approval for a
pylon sign and does not warrant same is obtainable.

          (iii)  Landlord shall commence construction of
Landlord's Work not later than 10 days following the Tenant
Building Permit Date, as hereinafter defined (except that the
Initial Utility Work shall be sooner commenced as set forth in
the following paragraph).  All construction will be diligently

-12-

and continuously pursued to substantial completion in a good and
workmanlike manner and in accordance with the Requirements, with
the plans referred to in the second paragraph of E below (to the
extent relevant), and in accordance with said timetable set forth
in Article 6D.  The construction of any Landlord's Work around
the Kmart Pad shall be done in a manner as to minimize disruption
of and to coordinate with the construction schedule for Tenant's
Initial Work.

D.    Landlord shall commence and complete the
construction of Landlord's Work in accordance with the following
timetable:

(i)  Commencement of Initial Utility Work - within
30 days of the Commencement Date.

(ii)  Completion of Initial Utility Work - on or
prior to the Tenant Building Permit Date.

(iii)  Completion of parking and driveway areas of
Existing Common Area Improvements - within 180 days
following the Tenant Building Permit Date.

(iv)  Completion of all remaining on-site and
off-site Landlord's Work necessary for Tenant to obtain
a certificate of occupancy for purposes of fixturing
and preparing the Tenant Improvements for opening -
within 210 days following the Tenant Building Permit
Date.

(v)  Final completion of all Existing Common Area
Improvements - within 240 days following the Tenant
Building Permit Date.

(vi)  Final completion of any Off-Site Improvements
required to be completed at dates different than (iv)
and (v) above - within any timetable required by
municipal authorities, provided that if completion of
same is necessary to obtain a Tenant certificate of
occupancy as set forth in (iv) above, same shall be
completed within 210 days following the Tenant Building
Permit Date.

E.    Landlord will permit representatives of Tenant to
enter upon all portions of the Shopping Center at reasonable
times during construction to inspect the Landlord's Work and all
materials to be used in the construction thereof and will
cooperate and cause its contractor to cooperate with
representatives of Tenant during such inspections.

Prior to the installation of the following
components of Landlord's Work, Landlord shall have submitted to
Tenant five copies of the shop drawings relating to the following
and such shop drawings shall have been approved by Tenant (such
approval not to be unreasonably withheld):  (a) upgrading of
parking lot lighting fixture and standards; (b) site signage; and
(c) any modifications of sewage treatment plant.  Tenant shall
review such shop drawings and furnish Landlord with requested
modifications thereto within 14 days of Tenant's receipt of such
shop drawings.  Landlord will incorporate such requested
modifications (as long as same are reasonable) into such
components at the time of installation in the Shopping Center.

F.    Landlord will promptly correct all defects in
Landlord's Work, or any significant departure from any plans
referred to in E above not previously approved by Tenant, if such
defects or departures are identified in writing in a notice to
Landlord given prior to the expiration of the warranty period
stated in Article 8 hereof.  The cost of any such correction

-13-

shall not be deemed a Common Area charge, as hereinafter defined.
Landlord agrees that the release of any Development Funds by
Tenant, as provided in Article 7 hereof, whether before or after
such defects or departures are discovered by or brought to the
attention of Tenant, shall not constitute a waiver of Tenant's
right to require compliance with this covenant.

G.    The Landlord shall obtain or cause to be obtained
the insurance coverage required under Article 10 hereof.

H.    Landlord does hereby establish, give, grant and
convey to Tenant, its successors, successors-in-title, and
assigns, employees, contractors and subcontractors, such rights,
easements and licenses as are necessary to go on and across the
Shopping Center to perform the work necessary to perform and/or
construct Tenant's Common Area Work, the Pad Preparation Work,
and the Tenant Improvements.  Landlord shall coordinate the
installation of Landlord's Work so as to not interfere with the
progress of Tenant's construction of Tenant's Improvements and
Tenant's Common Area Work.  Without limiting the foregoing,
Tenant's contractors and subcontractors shall have priority with
respect to scheduling work within a ten foot (10') wide area
around the Kmart Pad and/or Parcel A.

I.    Unless otherwise specified in this Lease, upon
receipt by a party hereto of a request for approval pursuant to
Articles 6 or 9 hereof, the other party shall, within thirty (30)
days after receipt of such request for approval, notify in
writing the party making such request of any objections thereto
(such objections to be specifically stated) and such party may
within fifteen (15) days thereafter submit its request for
approval rectifying any such objections.  The other party shall
then have an additional fifteen (15) days after receipt of said
revisions to approve or disapprove same.  Failure to give any
written notice of disapproval within the periods provided for
above shall constitute approval thereof by the party from whom
approval is sought.

7.    Landlord Reimbursement

A.    Landlord shall be solely responsible for the
construction and payment in full of the cost of all Landlord's
Work; provided, however, Tenant shall reimburse Landlord as
hereinafter provided for Tenant's share of the cost of the pylon
and Off-Site Improvements in an amount (herein referred to as the
"Development Funds") equal to the sum of (x) the cost of
constructing the new Shopping Center pylon (exclusive of any sign
panels thereon and exclusive of the costs of bringing utilities
thereto) to Tenant's specifications, multiplied by the Fraction,
plus (y) an amount equal to the lesser of (i) the cost of the
Off-Site Improvements as certified by the Landlord, multiplied by
the Fraction and (ii) $300,000.00.

B.    The Development Funds shall be paid to Landlord
within 10 days following satisfaction of all of the following
conditions:

(i)   the Rent Commencement Date shall have
occurred and this lease shall be in full force and effect;

(ii)  Landlord shall have completed all Landlord's
Work in accordance with all Requirements, the plans referred
to in Article 6E, Tenant's pylon specifications, and all
relevant provisions of this Lease;

(iii) Landlord shall complete, execute and deliver
to Tenant a written certificate (together with such back-up
and supporting files and other documentation as Tenant may
reasonably request) which (a) certifies as to the total

-14-

costs paid by Landlord to the general contractor or others for the cost of Off-Site Improvement and the pylon, (b) states that the work which has been paid for and for which reimbursement is sought has been performed in accordance with plans approved by Tenant and/or pylon specifications, (c) itemizes by category and amount all work, and (d) states the amount of funds requested from Tenant.

C.   Except for Tenant's obligation to pay over the Development Funds as herein provided, all costs associated with the construction and installation of Landlord's Work shall be paid for by the Landlord.

D.   Tenant shall initially perform and pay for all Tenant's Common Area Work.  All of such work (including any labor, materials and supplies) shall be contracted and/or ordered from bona fide third party contractors, materialmen, suppliers and/or professionals such as engineers, surveyors, architects, lawyers, etc. (all of the foregoing being hereinafter collectively referred to as "Contractors") at prices which in Tenant's business judgment (reasonably exercised) are reasonable and not substantially greater than market prices of reputable, established and experienced parties for similar goods and services.  The foregoing, however, shall not give or be deemed to give Landlord any express or implied right to approve or consent to any Contractor or the price to Tenant for any of the foregoing goods or services or require Tenant to "bid out" any such services or accept the lowest bid if it does; it being understood and agreed that Tenant shall have the sole right to choose all Contractors and the prices charged thereby, subject only to the relevant provisions of the preceding sentence.  Notwithstanding the foregoing, however, Tenant agrees to give Landlord's Affiliate, Midwood Management Corporation ("Midwood"), the right to bid on such job, and if Midwood's bid is at least 5% less than the next lowest bid received by Landlord, Midwood is licensed and qualified to do the job, furnishes full payment and performance bonds, and Midwood agrees to meet any and all conditions and specifications attached to such bid (including, without limitation, entering into a fixed-price contract in form acceptable to Tenant), Tenant shall agree to let Midwood do the work.  Notwithstanding the foregoing, however, Midwood shall agree to perform any change orders requested by Tenant on a straight cost basis (i.e., without profit or markup).  All bona fide costs and expenses incurred by Tenant in performing Tenant's Common Area Work, including, without limitation, all costs of labor, materials, supplies, equipment, contractor fees, permits, architectural and engineering, surveying, and legal fees and costs, and insurance, are hereinafter referred to as "Reimbursable Costs."  Reimbursable Costs shall not, however, include any costs of constructing Tenant's Improvements, or any amounts paid or attributable to full time employees of Tenant (such as members of Tenant's in-house construction department; but travel expenses of Tenant's employees, including airfare, hotels and meals, for trips to supervise or inspect Tenant's Common Area Work shall be Reimbursable Costs).

E.   Landlord covenants and agrees to fully reimburse and pay to Tenant all Reimbursable Costs in the manner hereinafter set forth.  Tenant shall have the right to make a request for reimbursement (a "Request") to Landlord at any time and from time to time (but not more frequently than monthly) following the Tenant Building Permit Date.  Each Request shall certify the total amount of previously unreimbursed Reimbursable Costs theretofore incurred by Tenant, and include invoices or other reasonably satisfactory documentation evidencing same. Landlord shall pay to Tenant the amount of Reimbursable Costs set forth in the Request within 10 days of receipt of any Request. Such payments are herein referred to as "Tenant's Common Area Reimbursements."  If Landlord shall fail to make any Tenant's

-15-

Common Area Reimbursement when due (i.e., not later than 10 days
following receipt of the Request to which it relates), said
Tenant's Common Area Reimbursement shall thereupon (until paid in
full) accrue interest (which Landlord hereby agrees to pay on
demand) at the Lease Interest Rate (as hereinafter defined), and,
in addition to and not in limitation of any other remedies,
Tenant shall have the right to deduct and offset any such
amount(s) (together with accrued interest thereon as aforesaid)
from any rent or other payments next due Landlord under this
Lease until all such unpaid amounts have been fully recovered.

    8.   Landlord's Warranty.

        Landlord shall and hereby does unconditionally
guarantee, for the warranty period as hereinafter defined, all
labor and materials furnished, or caused to be furnished, and
work performed, or caused to be performed, by Landlord in accor-
dance with requirements of Article 6 of this Lease for all of
Landlord's Work.  Should any defect develop during the warranty
period, as hereinafter defined, due to improper materials or
workmanship, the same shall, upon written notice, be corrected by
Landlord without expense to Tenant (and any such expenses shall
not be a Common Area charge), and any damage done in connection
with such remedial work shall also be repaired.  The "warranty
period" shall be (a) two (2) years for paving and (b) one (1)
year for other matters, and it shall be effective beginning on
the Rent Commencement Date.

    9.   Tenant's Initial Construction.

        A.   Following the Tenant Building Permit Date (as
hereinafter defined), Tenant shall have the right and privilege
(rent free, as aforesaid) to enter upon the Demised Premises to
construct Tenant's Improvements and to enter upon the balance of
the Shopping Center to perform the Pad Preparation Work and
construct the New Common Area Improvements.  Such entry shall not
be construed as an acceptance of the Demised Premises by Tenant,
an acknowledgement that all or any of Landlord's Work has been
completed, or a waiver by Tenant of any of the provisions of this
Lease.

        B.   Within sixty (60) days after the completion of the
Initial Utility Work or within sixty (60) days after the Tenant
Building Permit Date, whichever shall last occur, Tenant shall
commence or cause to be commenced the construction of (i)
Tenant's Common Area Work and (ii) the Tenant Improvements in
accordance with the Kmart Building Plans (hereinafter
collectively "Tenant's Initial Work"), provided Tenant may delay
commencement of construction for not more than ninety (90) days
if, but for such delay, the Kmart store would otherwise have been
ready to open for business between October 15 and February 28.
Such construction shall be at Tenant's sole cost and expense
except for those matters set forth in Article 6 hereof, and
subject to Landlord's reimbursement obligations under Article 7.
Following commencement of construction of Tenant's Initial Work,
Tenant will diligently and continuously (subject to matters set
forth in Article 32) pursue same to completion.  Tenant may make
such changes to the Tenant Improvements as it deems necessary,
provided any changes which substantially affect the external
appearance of the Tenant Improvements shall be subject to the
prior approval of Landlord, such approval not to be unreasonably
withheld.

        C.   Tenant agrees (subject to the accuracy of all
relevant representations and warranties and the fulfillment of
all relevant covenants and obligations of Landlord in this Lease)
to use diligent efforts (including compliance with all codes and
ordinances in submission of the Kmart Building Plans) to obtain
(i) a building permit or permits or other required approvals for

-16-

the Tenant Improvements and any other Tenant's Initial Work (including, without limitation, the Garden Shop and approval of Tenant's signs), and (ii) all required permits, approvals and service commitments for the construction and provision of electric, water and other utilities for the New Common Area Improvements and Tenant's Improvements, all in accordance with Tenant's requirements (collectively the "Utility Approvals"), by a date which is not later than 120 days following receipt of notice from Landlord that the Approval Date has occurred. The date upon which all such building permits and approvals required for such construction and all Utility Approvals shall have been obtained and delivered to Tenant and shall have become final and unappealable is herein referred to as the "Tenant Building Permit Date." If Tenant is unable to obtain such final, unappealable building permit(s) and all Utility Approvals within such time period (for reasons other than financial costs, except that Tenant will in no event be required to make any changes from its standard plans and specifications to obtain same if the resulting costs of such changes would, in Tenant's reasonable business judgment, render this transaction economically impracticable), Tenant shall have the right to notify Landlord that it desires to cancel this Lease. Landlord shall thereupon have a reasonable period of time, not to exceed 30 days, to cause the Tenant Building Permit Date to occur without any additional cost to Tenant or any changes in Tenant's submitted plans and specifications. If the Tenant Building Permit Date has not occurred by the end of such additional 30 day period, Tenant shall have the right to terminate this Lease by written notice to Landlord given at any time thereafter, in which event neither party shall have any further rights or obligations hereunder.

Notwithstanding the foregoing provisions of Article 9C or anything else contained in this Lease, if either (i) Landlord does not obtain the Lilco Approval within one year of the Commencement Date, or (ii) local authorities require (as a condition to granting site approval or granting Tenant a building permit) that more than 3,600 square feet of the Garden Shop be enclosed, and such additional enclosed area may not be constructed where originally intended due to provisions of the Power Easement; then in either such case the entire Demised Premises shall be and be deemed shifted to the north into so much of the "Possible Relocation Area" as shown on Exhibit B as is required to accommodate construction of the Garden Shop. In such event, Landlord, at its cost, will promptly provide a revised survey and legal description of the Demised Premises, and the parties shall enter into an appropriate modification of this Lease (i.e., Exhibit A hereto) and the recorded memorandum of lease to reflect same.

10.  Indemnification, Insurance, Mechanic's Liens.

A.  Landlord agrees to hold Tenant and its successors and assigns harmless and fully indemnified against any and all claims, demands, losses, liabilities, damages, and costs or expenses (including actual attorney's fees, reasonable investigative and discovery costs, court costs and other sums) incident to the defense of any claim or liability, including but not limited to claims or liabilities arising from personal injury and worker's compensation claims and liens, that may be incurred (i) as a result of, or in connection with, or in any way arising out of work performed hereunder by Landlord and its agents, employees, contractors, subcontractors, successors and assigns, and (ii) in connection with demolition by Tenant of any existing buildings (including any buildings in the Possible Relocation Area) as part of the Pad Preparation Work, including, without limitation, any claims by tenants or other actual or purported occupants of any such buildings.

Landlord shall during the continuance of Landlord's Work maintain, or cause to be maintained, with companies reasonably acceptable to Tenant  the following insurance coverages and Tenant shall be named as an additional insured on each such policy:

(a)  Worker's compensation insurance as required by all applicable federal, state or other laws, including Employer's Liability with a limit of at least $500,000.

(b)  Comprehensive General Liability on an occurrence basis with personal injury coverage and broad form property damage.  Said policy shall be endorsed to remove the XCU Exclusion relating to explosion collapse and underground property damage.  Limits shall be at least in the following amounts:

Bodily Injury including Personal Injury:

|  |  |
|---|---|
| each person | $2,000,000 |
| each occurrence | $5,000,000 |

Property Damage:

|  |  |
|---|---|
| each accident | $1,000,000 |
| aggregate | $2,000,000 |

(c)  Comprehensive Automobile Liability, including Non-Ownership and Hired Car Coverage as well as owned vehicles with at least the following limits:

Bodily Injury:

|  |  |
|---|---|
| each person | $  250,000 |
| each occurrence | $1,000,000 |

Property Damage:

|  |  |
|---|---|
| each occurrence | $  100,000 |

Landlord shall not make any change or cancellation in the foregoing insurance coverage  without Tenant's prior written approval thereof, which approval shall not be unreasonably withheld.  Each policy shall provide that it shall not be cancellable without at least 15 days' prior written notice to Tenant and Tenant shall be furnished with a copy of each policy prior to commencement of construction.

Tenant agrees to hold Landlord and its successors and assigns harmless and fully indemnified against any and all claims, demands, losses, liabilities, damages, and expenses incident to the defense of any claim or liability, including but not limited to claims or liabilities arising from personal injury, that may be incurred as a result of, or in connection with, or in any way arising out of, any work to construct Tenant's Improvements or the other Tenant's Initial Work (but the foregoing is subject to Landlord's demolition indemnity set forth above and to any other relevant covenants, representations and obligations of Landlord in this Lease), performed hereunder by Tenant and its agents, employees, contractors, subcontractors, successors and assigns.

B.   Mechanic's Liens.  If because of any act or omission (or alleged act or omission) of Landlord or Landlord's employees, agents, contractors or subcontractors under this Lease, any mechanic's or other lien, charge or order for the payment of money or other encumbrance shall be filed against Tenant and/or any portion of the Demised Premises (whether or not such lien, charge, order or encumbrance is valid or enforceable as such), Landlord shall at its own cost and expense cause the same to be discharged of record or bonded within 60 days after

-18-

notice to Landlord of the filing thereof; and Landlord shall
indemnify and save harmless Tenant against and from all costs,
liabilities, suits, penalties, claims and demands, including
reasonable counsel fees resulting therefrom.  If Landlord fails
to comply with the foregoing provisions, Tenant shall have the
option of discharging or bonding any such lien, charge, order or
encumbrance, and Landlord agrees to reimburse Tenant for all
costs, expenses and other sums of money in connection therewith
with interest thereon promptly upon demand.

If because of any act or omission (or alleged act or
omission) of Tenant or Tenant's employees, agents, contractors or
subcontractors under this Lease, any mechanic's or other lien,
charge or order for the payment of money or other encumbrance
shall be filed against Landlord and/or any portion of the
Shopping Center (whether or not such lien, charge, order or
encumbrance is valid or enforceable as such), Tenant shall at its
own cost and expense cause the same to be discharged of record or
bonded within 60 days after notice to Tenant of the filing
thereof; and Tenant shall indemnify and save harmless Landlord
against and from all costs, liabilities, suits, penalties, claims
and demands, including reasonable counsel fees resulting
therefrom (but the foregoing is subject to Landlord's
reimbursement obligations under Article 9).  If Tenant fails to
comply with the foregoing provisions, Landlord shall have the
option of discharging or bonding any such lien, charge, order or
encumbrance, and Tenant agrees to reimburse Landlord for all
costs, expenses and other sums of money in connection therewith
with interest thereon promptly upon demand.

11.    Intentionally Omitted.

12.    Parking and Other Common Areas.

A.    The aggregate area for the parking of automobiles in
the Common Areas, exclusive of any Common Areas that may
hereafter be constructed on Phase II, shall, following completion
of the New Common Area Improvements and of Landlord's Work and
throughout the Lease term, contain a ratio of not less than the
greater of (i) 5.5 parking spaces for standard size American
automobiles for each 1,000 square feet of leasable area in the
Shopping Center (exclusive of improvements that may hereafter be
constructed on Phase II); and (ii) such greater ratio as may be
required by applicable law.  The foregoing minimum parking ratio
requirement (i.e., the greater of (i) or (ii)) is hereinafter
referred to as the "Parking Ratio."  Tenant agrees to provide for
not less than 610 parking spaces in the construction of the New
Common Area Improvements.  Tenant shall have the right to choose
striping of Parcel A as long as it provides, upon completion of
the New Common Area Improvements, not less than 610 parking
spaces as aforesaid.

B.    In the event that unauthorized persons, including
tenants or invitees of tenants occupying buildings now or at any
future time located beyond the limits of the lands described in
Exhibit A and depicted on Exhibit B, utilize the Common Area
located on said lands for parking or other purposes to an extent
which shall be reasonably objectionable to Tenant, Landlord, at
its sole expense, upon written request of Tenant, shall take
whatever action as shall be so reasonably requested to prevent
said unauthorized utilization.  The costs of any such actions
shall be Common Area costs.

C.    Landlord shall keep and maintain, at Landlord's cost
and expense, the Common Area in good condition and repair,
including, but not limited to, repairing and replacing paving;
keeping the Common Area properly cleaned, drained, free of snow,
ice, water, rubbish and other obstructions, and in a safe,
secure, neat, clean, orderly and sanitary condition; maintaining

-19-

detention basin and other components of the storm sewer system;
maintaining private sewage treatment plant with capacity adequate
to service the Demised Premises and balance of Shopping Center,
and in odor-free condition; keeping the Common Area and such
other areas suitably lighted during, and for appropriate periods
before and after, Tenant's business hours; maintaining signs,
markers, painted lines (painting lines as may be necessary) and
other means and methods of pedestrian and vehicular traffic
control; maintaining adequate roadways, entrances and exits;
appropriate security services; and maintaining any plantings and
landscaped areas; and also, if required by appropriate
governmental authority having jurisdiction thereof, maintaining
traffic signals or lights, as the case may be, which are
presently installed or may be installed hereafter, servicing
tenants' businesses conducted in the Shopping Center.

D.   Except as otherwise hereinafter expressly provided for
the conduct of seasonal sales made by Tenant, the parking spaces
in the Common Area shall be used non-exclusively for the parking
of private automobiles of the respective tenants of the Shopping
Center and their respective customers, licensees, subtenants,
employees, agents, concessionaires, guests and invitees, and for
no other purpose, and the access, perimeter and through roads,
streets and drives shall be used for pedestrian and vehicular
traffic and no other purpose.  The layout of, and striping in,
the Common Area, as depicted on Exhibit B, but subject to
Tenant's right to stripe Parcel A as set forth in Article 12A
(following completion of the New Common Area Improvements and
Landlord's Work), shall not be changed without Tenant's prior
written consent.  Notwithstanding the foregoing, Tenant will not
unreasonably withhold its consent to such changes in other than
the "Protected Area" as shown on Exhibit B; provided that no such
changes may result in a violation of the Parking Ratio.  If so
designated on Exhibit B, employees of the tenants of the Shopping
Center shall not park their automobiles in the Common Area,
except in the area designated as "Employee Parking" on Exhibit B,
and Landlord shall use its best efforts (the cost of which shall
be a Common Area cost) to prevent any violation of this
provision.  SEE RIDER:  TENANT'S COMMON AREA CHARGE.

E.   Landlord shall not exact any charge or permit others to
exact any charge for use of the Common Area from customers,
invitees, licensees, subtenants or employees of Tenant or any
other tenant in the Shopping Center.

F.   There will be no advertisements or signs in the Common
Area except the pylon sign or signs hereinafter provided for and
the traffic control signs.  No merchandise shall be sold or
displayed, and no loudspeakers shall be operated in the Common
Area, except as otherwise set forth in this Lease.

G.   Notwithstanding any provision to the contrary, in
making any replacement, change, restoration, alteration, improve-
ment, enlargement or repair of or to the Tenant's building,
Tenant and its contractors and suppliers may use the portion of
the Common Area adjacent to the Tenant's building for the parking
of trucks and delivery vehicles, storage of materials, temporary
structures and other matters incidental to such work; provided,
however, that no such use shall unreasonably interfere with the
operation of the Shopping Center or with the business of any
tenant in the Shopping Center.  In making any permitted or
required replacement, change, restoration, alteration, improve-
ment or repair of or to any portion of the Shopping Center,
Landlord, any tenant in the Shopping Center and their or
Landlord's contractors and suppliers may use such portions of the
Common Area as are not directly adjacent to the Tenant's building
for the parking of trucks and delivery vehicles, storage of
materials, temporary structures and other matters incidental to
such work; provided, however, that no such use shall unreasonably

-20-

interfere with the operation of the Shopping Center or of the business of Tenant or any subtenant or licensee of Tenant. The foregoing shall be deemed to apply after completion of Landlord's Work and Tenant's Improvements; during such construction, the relevant provisions hereinbefore set forth in this Lease shall remain applicable.

H.    During the Lease term, Landlord shall keep Tenant insured (as a named party) against all statutory and common law liabilities for damages for damages on account of damage to property or injuries and loss of life sustained by any person or persons within said Common Area, in a policy or policies in the combined single limit amount of Two Million Dollars ($2,000,000) with respect to any one accident or disaster, and in the amount of Five Hundred Thousand Dollars ($500,000) with respect to damage to property. Each of the foregoing amounts shall increase by 25% at the end of the 5th Lease Year and at the end of every 5 Lease Years thereafter. Landlord shall and hereby does indemnify Tenant from and defend and hold Tenant harmless against any and all claims, including without limitation legal fees and expenses, for personal injury, death and property damage occurring on the Common Area. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than ten (10) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant.

I.    Tenant may, at any time and from time to time, subject to the provisions of Article 29 hereof, utilize portions of the sidewalks and the Common Area for seasonal sales made from trucks, trailers, vans or other temporary facilities used by Tenant in the area outlined in black designated "Truck Sales" depicted on Exhibit B, and on sidewalks adjacent to Tenant's building, provided the same do not unreasonably impede pedestrian traffic. Sales, if any, from such use shall be included as part of "gross sales" under Article 4 hereof. Notwithstanding the foregoing, any such seasonal sales in the Truck Sales area shall be conducted not more than four times per year, and for not more than five consecutive days at any time.

13.    Landlord's Representations and Warranties.

A.    Landlord represents, warrants and covenants that it will not erect hereafter (or suffer, permit, or allow any Shopping Center tenant, subtenant or other occupant to erect) any buildings or other structures on the lands described in Exhibit A, except as shown on Exhibit B (including any future construction in "Permissible Building Areas" as shown on Exhibit B; it being understood that Landlord may construct additional buildings in such "Permissible Building Areas" provided that any such buildings (i) do not exceed one-story or 22 feet in height and (ii) do not result in or cause a violation of the Parking Ratio), and neither at this time nor at any time hereafter will any part of the Shopping Center be used for industrial or warehouse purposes, except that an occupant of retail space may utilize a portion of its space for incidental storage of merchandise or other items in conjunction with the conduct of business thereat.

Notwithstanding the foregoing, however, Landlord may hereinafter construct additional buildings and improvements on Phase II as shown on Exhibit B, provided that all of the following conditions are met with regard to such future construction:

(i)    Landlord shall maintain within Phase II: (x) if same is used for retail purposes, a parking ratio of spaces for standard size American cars to square feet of building area that is not less than the Parking Ratio (i.e., 5.5

-21-

spaces per 1,000 square feet or such greater amount as required by law); or (y) if same is used for a non-retail purpose permitted by this Lease, a parking ratio of either 5.5 cars per 1,000 square feet as aforesaid or such lower minimum ratio as local zoning and parking ordinances require for such non-retail use (as a matter of right and without any variance);

(ii)   the location of all buildings and the layout and striping of all parking, driveway and other common areas shall be subject to Tenant's prior written consent, which Tenant agrees not to unreasonably withhold or delay (it being understood that a withholding of consent based on Tenant's good faith belief that such construction would result in traffic flow and/or parking impact and/or decreased visibility that would adversely affect its business will be deemed a reasonable basis (but not the only possible reasonable basis) upon which to withhold consent); and

(iii)   the use of such improvements shall not violate the provisions of Article 40.

B.   Landlord further represents, warrants and covenants that:

(i)   Existing building, zoning, planning and all other applicable municipal or other laws, ordinances and regulations permit as of right the construction of Landlord's Work, Tenant's Improvements, and the balance of Tenant's Initial Work, and maintenance of Tenant's building, without necessity for any variances or appeals (subject only to (x) Landlord's obtaining final site plan approval and (y) compliance by Tenant with local building codes in such construction), and Tenant (subject only to compliance with such building codes) will be able to obtain as of right and in the ordinary course a building permit for the construction of Tenant's Improvements (except that the Garden Shop may require a special use permit) and a final certificate of occupancy therefor upon completion, and any required permits or approvals to permit construction of the remainder of Tenant's Initial Work.

(ii)   No tenant or other occupant under any existing lease in the Shopping Center has any right to prohibit or restrict the construction or use of Tenant's Improvements; or the construction of any other element of Tenant's Initial Work, including, without limitation, demolition of existing buildings as shown on Exhibit B or in the Possible Relocation Area (hereinafter collectively "Demolition Work").   In amplification and not in limitation of the foregoing, Landlord represents and warrants that, not later than the Tenant Building Permit Date, it will terminate all leases, licenses or other occupancy rights of any occupant of any building in the area covered by the Demolition Work, and cause all such buildings to be vacant and free of any property of any former tenant or occupant.

(iii)   No covenants, restrictions, easements or other matters of record against the Shopping Center, whether or not listed on Exhibit D, would prohibit or restrict or interfere with the construction of Tenant's Improvements or the remainder of Tenant's Initial Work.   In amplification and not in limitation of the foregoing, Landlord represents and warrants that it can and will perform the Initial Utility Work as set forth in Article 6.   The foregoing, however, is subject to the relevant provisions of this Lease regarding the Lilco Approval and the relocation of the Demised Premises if same is not obtained.

-22-

C.    Landlord further represents, warrants and covenants that: (i) the Shopping Center described in Exhibit A and the Demised Premises are and will be at the time of the Rent Commencement Date, properly zoned for the operation, use and maintenance of a general merchandise discount department store similar to other Kmart stores operated elsewhere by Tenant (including delicatessen area and outside garden area), and parking areas in connection therewith, and that at or prior to such Rent Commencement Date all necessary governmental consents, permits and approvals for such use shall have been obtained (including, without limitation, permits for exterior building and pylon signs in accordance with Kmart sign criteria); and (ii) no other lease of space in the Shopping Center, nor any other instrument encumbering the Shopping Center, whether or not set forth in Exhibit D, would prohibit, restrict, or be violated by the use of the Demised Premises (including, without limitation, the Garden Shop, delicatessen area and pharmacy) by Tenant as permitted under this Lease.

D.    Landlord covenants that it will not hereafter grant or execute any easements or licenses permitting parking or other use of Common Areas by persons not Shopping Center tenants or their invitees, including without limitation any parking and/or access easements in favor of properties adjoining the Shopping Center. Landlord further covenants that it will not hereafter terminate or amend any existing easements or covenants relating to the Shopping Center or adjoining property in a manner that would adversely affect Tenant; and Landlord covenants to enforce any such existing easements or covenants for Tenant's benefit.

Notwithstanding anything to the contrary herein contained, if (x) prior to the Opening Date and the granting to Tenant of a final certificate of occupancy any of the representations, warranties, and covenants of Landlord set forth in Article 13B(i), (ii), or (iii), or in 13C(i) should be breached; or (y) at any time during this Lease any of the representations, warranties and covenants of Landlord in Article 13C(ii) or 13D, should be breached; and Landlord shall not correct any such breach within 30 days following notice from Tenant (or if same is not capable of being corrected within said 30 day period, if Landlord shall not commence to cure same within said period and thereafter diligently and continuously pursues said cure to completion); then in any such event Tenant, in addition to and not in limitation of any other legal or equitable remedies it may have under law or this Lease by reason of such Landlord default, may cancel and terminate this Lease on notice to Landlord given at any time prior to the full cure by Landlord of any such default. Notwithstanding the foregoing, however, in the event of any such termination (or any other termination of this Lease for any reason whatsoever), Landlord shall be and remain liable to pay to Tenant all unpaid Tenant's Common Area Reimbursements.

In amplification of the foregoing, and without limiting any other rights or remedies of Tenant, in the event of any breach or threatened breach by Landlord of any representation, warranty or covenant of Landlord contained in Articles 12, 13 or elsewhere in this Lease, Tenant shall have and is hereby granted the right and option to injunctive and other equitable relief to halt or rectify such breach.

14.    Options to Extend Lease.

(a)    Tenant shall have four (4) successive options to extend the term of this Lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this Lease or of this Lease as extended, and the same terms and conditions as herein set forth shall apply to each such extended term (except that minimum rent and Breakpoint Amount shall be increased as set forth in Articles 3 and 4, respectively). If Tenant shall elect to exercise any of

-23-

the aforesaid options, it shall do so by giving notice to
Landlord not less than one (1) year prior to the expiration of
the term of this Lease or of this Lease as extended.

(b)   Regardless of the exercise or non-exercise by Tenant of
any or all of the foregoing options, Tenant shall have, unless
the last day of the Lease term shall be January 31 of any year,
the option to extend (or further extend, as the case may be) the
term of this Lease for such period of time as shall cause the
last day of the term of this Lease to be the January 31 next
succeeding the date upon which the term of this Lease would
expire but for the exercise of this option.   This option shall be
exercised by notice to Landlord not less than one (1) year prior
to the expiration of the term of this Lease or any extension
thereof.   Tenant's rental during the option period shall be the
same rental payable under the terms of this Lease at the time
Tenant notifies Landlord of its intention to exercise this
option.

15.   <u>Repairs and Maintenance</u>.

A.   Landlord shall make any repairs and/or replacements to
the Demised Premises (including, without limitation, the building
and all systems and fixtures thereof), the necessity for which is
caused by any of (i) the negligence of Landlord or its employees
or agents, (ii) any breach by Landlord of any provision of this
Lease, (iii) any negligent, wrongful or other act of, or any use
or occupancy by, any tenant or other party (or their invitees,
agents and/or employees) occupying or using any portion of the
Shopping Center not leased to Tenant.   Landlord shall cause all
such repairs and changes to be made without unreasonable
interference with the operation of the Shopping Center or the
business of Tenant or any subtenant or licensee of Tenant.
Landlord shall reimburse Tenant promptly upon demand for any cost
and expense of Tenant for the temporary moving of any merchandise
and trade fixtures to enable Landlord to make such repairs and
changes.

B.   Except as expressly set forth under subparagraph A of
this Article 15, Tenant agrees, throughout the term of this
Lease, to keep the entire Demised Premises in good and tenantable
condition and repair, including any necessary maintenance,
repairs and replacements to roof, structural and non-structural,
interior and exterior portions of the Demised Premises, and
plumbing, electrical, HVAC and other systems located in and
servicing the Demised Premises.   The foregoing repair obligations
of Tenant shall not, however, be deemed to waive or impair any
relevant warranties, covenants or representations of Landlord in
this Lease.

16.   <u>Alterations</u>.

Tenant may, at its own expense, from time to time, make such
interior or exterior alterations or changes, structural or
otherwise, in and to the Demised Premises (including the Garden
Shop and other outside areas) as it may deem necessary or
suitable, and may erect and maintain upon the roof antenna for
electronic telecommunications equipment and HVAC equipment;
provided, however, Tenant shall obtain Landlord's prior written
consent to drawings and specifications for any such material
exterior or structural alterations or changes; provided, further,
Landlord shall not withhold or delay its consent thereto if the
structural integrity or the economic value of the building will
not be materially impaired or decreased by such work.   Should
Landlord's fire insurance premiums be increased due to any such
alterations or changes made by Tenant, Tenant shall reimburse
Landlord for such increase in premiums.   Any such interior
changes or alterations so made by Tenant shall become the
property of Landlord, but shall be deemed included in the demise

hereunder.  The term "structural changes", as used herein, shall
not include moving of non-loadbearing partitions, plumbing and
electrical work, relocation of or additional entry doors,
modification and rearrangement of fixtures or other minor
changes.  Landlord, at Tenant's cost (subject to the relevant
provisions of Articles 7 and 9), shall cooperate with Tenant in
securing the Utility Approvals, and all building and other
permits or authorizations required from time to time for the
construction of the Pad Preparation Work, the New Common Area
Improvements, Tenant Improvements, and for any other work
permitted under this Lease or installations by Tenant.

17.  <u>Utilities</u>.

Landlord covenants and agrees that the Tenant's building
shall be properly serviced with (i) gas, if available, electric,
telephone, water and other public utilities, and (ii) an on-site
private sewage treatment plant and on-site storm sewer and
detention basis; all sufficient to meet Tenant's requirements as
provided for in this Lease as of the commencement of and
throughout the Lease term.  Tenant shall pay all charges for
public utility services rendered or furnished to the Tenant's
building during the Lease term.  There shall be no charge for
sewage treatment, except that Tenant may be required to pay a
prorata share of operating the plant as set forth in the Common
Area Rider.

18.  <u>Governmental Regulations</u>.

Tenant shall observe and comply with all requirements of
rules, orders and regulations of the federal, state and municipal
governments or other duly constituted public authority affecting
said Demised Premises, including the making of alterations;
provided, however, in the event such rules, orders and
regulations shall require the removal of asbestos or other toxic
or hazardous wastes or materials not placed on Demised Premises
by Tenant, then, in any such event, the same shall be complied
with by Landlord at its sole expense.  Tenant shall have the
right, however, to contest, without cost to Landlord, the
validity or application of any such rule, order or regulation
required to be complied with by Tenant in accordance with the
foregoing, and may postpone compliance therewith until the final
determination of any such proceeding.

19.  <u>Exculpation</u>.

Notwithstanding anything to the contrary set forth in this
Lease, Tenant shall (except to the extent expressly set forth in
this Article, in Article 28, or in the Existing Mortgage
Guaranty, as hereinafter defined) look solely to Landlord's
interest in the Shopping Center for the recovery of any judgment
against Landlord.  Landlord, or if Landlord is a partnership, its
partners whether general or limited, or if Landlord is a
corporation, its directors, officers and shareholders, or any and
all successors and assigns and mortgagees of Landlord shall have
absolutely no personal liability for any judgment, except that
Landlord shall be personally liable, however, (i) for
misappropriation of proceeds of destruction and/or condemnation
and (ii) under Article 28 or the Existing Mortgage Guaranty.  If
by reason of the subsequent creation of a ground lease the
Landlord does not own the fee title to the Shopping Center, the
equity interest (but not the personal liability of any successor
in ownership) in such fee title, together with Landlord's
leasehold interest, shall remain liable for any judgment against
Landlord.  Nothing herein shall bar Tenant seeking and enforcing
any equitable remedy of Tenant against Landlord or any successor
or assign, including without limitation suit for injunctive
relief, specific performance or a declaratory judgment.

20.  <u>Damage to Demised Premises</u>.

A.   From and after the commencement of construction of
Tenant's Improvements, Tenant, at its own cost and expense, shall
promptly insure, and during the term of the Lease, shall maintain
insurance (subject to the provisions of Article 20B) covering the
Demised Premises (or so much thereof as shall have been
constructed) against damage or destruction by fire or other
casualties, insurable under a standard New York fire insurance
policy, with an extended coverage endorsement in an amount equal
to the full replacement value (with agreed amount clause) of the
insurable repair and replacement value of the portions of the
building and other of Tenant's structures, if any, in or on the
Demised Premises (exclusive of foundation, foundation walls and
excavation costs and costs of underground flues, pipes and
drains).  All such policies shall be carried by the Tenant in
solvent and responsible companies rated A or better and licensed
to do business in New York and bear endorsements to the effect
that Landlord shall be notified not less than thirty (30) days in
advance of modification or cancellation thereof.  Copies of such
insurance policies or certificates evidencing the existence
thereof so endorsed, shall be promptly delivered to Landlord.
Irrespective of the cause thereof, Tenant shall not at any time
be liable (except if Tenant self insures as set forth in Article
20B) for any loss or damage to said buildings resulting from
fire, explosion or any other casualty. .

B.   Notwithstanding the foregoing provisions of Article
20A, so long as Tenant maintains a net worth of not less than ONE
HUNDRED MILLION DOLLARS ($100,000,000) and has not assigned or
sublet all or substantially all of the Demised Premises, in lieu
of providing insurance policies as set forth above, Tenant may
elect on notice to Landlord to self-insure its obligation to
restore as hereinafter set forth.  Tenant, from and after the
commencement of construction of Tenant's Improvements and until
further notice, hereby elects to so self-insure (it being agreed
that Tenant may at any time and from time to time, subject to the
foregoing requirements, on notice to Landlord, revoke or
reinstate the self-insurance election).  In the event of casualty
to the Demised Premises by fire or other casualty insurable under
a standard New York fire insurance policy occurring during any
period when Tenant's self-insurance election is in effect, Tenant
shall, at its sole cost and expense, without unnecessary delay,
commence and continue diligently to repair, rebuild and restore
Tenant's building or structures within the Demised Premises as
nearly as practicable to at least the same condition existing
immediately prior to such casualty (subject to Tenant's right to
make alterations as set forth in Article 16.

C.   In the event that at any time after the Commencement
Date when Tenant's self insurance election is not in effect the
Tenant's building or structures within the Demised Premises shall
be damaged or destroyed (partially or totally) by fire or other
casualty, Tenant shall, at its expense, without unnecessary
delay, commence and continue diligently to repair, rebuild and
restore Tenant's building or structures within the Demised
Premises as nearly as practicable to at least the same condition
existing immediately prior to such damage or destruction (subject
to Tenant's right to make alterations as set forth in Article
16).  All insurance proceeds shall be applied to such restoration
work (but Tenant shall be obligated to complete same regardless
of the adequacy of such proceeds).  Landlord agrees to (i) not
settle any insurance claim involving such casualty without
Tenant's consent, which shall not be unreasonably withheld; and
(ii) forthwith pay over to Tenant any insurance proceeds for such
casualty coming into the possession or control of Landlord, to be
used by Tenant for such completion of such restoration as
aforesaid (and any unexpended balance upon completion of such
restoration to be retained by Tenant).

Notwithstanding any provisions of this Article 20, if, as a result of any such damage or destruction (1) during the last two (2) years of the Lease term, Tenant's building and/or structures with the Demised Premises should be destroyed or damaged by fire or casualty (a) to the extent of twenty-five percent (25%) or more of the cost of replacement thereof, or (b) so that twenty-five percent (25%) or more of the gross floor area thereof shall be rendered untenantable; or (2) if during the last two (2) years of the Lease term Tenant's merchandise, trade fixtures or other equipment which Tenant is authorized by this Lease to remove from Tenant's building from time to time and at the end of the Lease term (and as to which Tenant had not theretofore abandoned its property rights) shall be damaged or destroyed in an amount exceeding One Hundred Fifty Thousand Dollars ($150,000) replacement cost, then Landlord or Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter, and Tenant shall have an additional sixty (60) days, rent free, within which to remove such property and its personal property from Tenant's building. Tenant shall be required to perform the restoration work set forth in Article 20B (or 20C, as the case may be) notwithstanding any such termination. Notwithstanding any such termination of this Lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 14, within thirty (30) days after the date of the receipt of Landlord's notice of termination, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 14) by Tenant, then this Lease shall continue in full force and effect despite such notice of termination by Landlord, and Tenant shall repair, rebuild and restore the improvements as above provided. In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

D.   During any period commencing upon the date of any damage or destruction by fire, the elements or any other casualty whatsoever (except if a self-insurance election by Tenant is in effect on the date of any such damage or destruction, in which event Tenant shall not be entitled to any abatement set forth below), and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this Lease shall abate (but only to the extent of any rent insurance proceeds received by Landlord). The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall reopen for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that at any time during the Lease term, except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit B, other than Tenant's building, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, there shall be no abatement of rent hereunder and Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Article 12 hereof for other parking areas in the Shopping Center (or alternatively Landlord may landscape said areas and maintain same in a presentable manner not detracting from the appearance of the Shopping Center).

-27-

E.   Tenant shall not at any time be liable (a) for any loss or damage to the improvements (expressly as expressly set forth in Article 20B), including the buildings and structures located on the balance of the Shopping Center as aforesaid, resulting from fire, explosion or any other casualty, or (b) for any loss or damage to the property of Landlord or the other tenants or occupants of the Shopping Center, except as specifically set forth in this Lease.  All insurance carried by Landlord on the respective buildings or structures erected within the Shopping Center, or by Landlord on any of its property, shall require Landlord to waive right of recovery against Tenant, shall contain a clause whereby the insurer agrees to waive any right of subrogation against Tenant on any claim covered by said insurance, and shall also bear standard New york first mortgagee fee or leasehold endorsements, as may be required.

In the event that any such damage or destruction is caused by an uninsurable casualty, which for the purposes hereof shall be deemed to be any casualty other than that for such insurance is required to be carried pursuant to the provisions of Article 20A, Tenant shall have no obligation to restore, and may, within sixty (60) days of such damage or destruction, terminate this Lease by giving notice hereof to Tenant.  However, upon failure to so notify Tenant, Landlord shall have been deemed to obligate itself to repair, rebuild or restore such damage or destruction. If Landlord shall so be obligated to restore the Demised Premises in accordance with this paragraph, Tenant may elect on notice to Landlord to perform such work at Landlord's expense; in which event Landlord shall reimburse Tenant on demand for all such restoration expenses paid by Tenant.  However, if this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant. Notwithstanding the foregoing, if Landlord so elects to terminate this Lease, Tenant shall have the right, within thirty (30) days of such election, to give notice to Landlord that Tenant elects to restore Tenant's buildings and structures within the Demised Premises as set forth in Article 20B, in which event Tenant shall be so obligated (at Tenant's expense) and this Lease shall continue in full force and effect notwithstanding such notice of termination.

Except for the obligations of Landlord or Tenant under this Article 20 and/or otherwise set forth in this Lease, each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party, of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty to its respective property covered by the insurance hereinbefore more specifically set forth in this Article 20, irrespective of the negligence of such party or any officer, agent, employee or representative of such party.

Tenant hereby waives the provisions of Section 227 of the New York Real Property Law and agrees that the provisions of this Article 20 shall govern in lieu thereof.

21.   Eminent Domain.

In the event all of Tenant's building shall be expropriated (the term "expropriated" to include any transfer of the property by an eminent domain or similar proceeding or the giving of a deed in lieu thereof) or the points of ingress and egress to the public roadways substantially as depicted on Exhibit B be materially impaired by a public or quasi-public authority (subject to the relevant provisions of Article 24), this Lease shall terminate as of the date Tenant shall be deprived thereof (provided that in the event of such access impairment this Lease will not terminate unless Tenant so elects such termination in writing within 90 days of such impairment).

-28-

In the event that less than the whole but more than ten percent (10%) of Tenant's building or more than twenty percent (20%) of the Garden Shop or other outside areas within the Demised Premises (hereinafter collectively referred to as the "Outside Areas") shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this Lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's building or Outside Areas and if this Lease shall not be ter-minated as hereinabove provided, it shall continue as to that portion of the Demised Premises which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said building as nearly as practicable to complete units of like quality and character as existed just prior to such expropria-tion. Expropriation proceeds from the taking authority shall be applied to such restoration work (but Landlord shall be obligated to complete same regardless of the adequacy of such proceeds). The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the Breakpoint Amounts set forth in Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's building so expropriated shall bear to the total ground floor area of said building prior to such expropriation.

If one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the Common Area in other than Phase II, then, in such event, Tenant shall have the option to terminate this Lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this Lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the Demised Premises.

In the event of a taking referred to in this Article 21 resulting in the termination or cancellation of this Lease, the aggregate net award, after deducting the reasonable costs of Landlord and Tenant, including attorneys' fees incurred in connection with obtaining such award, shall be distributed as follows and in the following order of priority:

First, Landlord shall receive that portion of the award representing the value, as of the date of the taking, of the fee title to the Demised Premises as the same is encumbered by this Lease, including the reversionary interest of Landlord therein.

Second, Tenant shall receive that portion of the award representing the value, as of the date of the taking, of the greater of (i) the unamortized portion (as reflected on Tenant's books) of any expenditures by Tenant for the construction of Tenant's Improvements and any other leasehold improvements made by Tenant, and (ii) the outstanding balance (including all principal and interest, and other amounts due thereunder) of any leasehold mortgage on Tenant's interest; provided such amount in (ii) shall not exceed the amount that would be due if all payments due under such mortgage had been made based upon a 20-year self-liquidating schedule (from the date placed) for any such mortgage.

-29-

Third, the remainder of such award shall be payable to
Landlord.

Tenant shall also have the right to prosecute any claim
directly and recover any compensation from the public or
quasi-public authority (expropriating authority) as may be
separately awarded and recoverable by Tenant in its own right for
loss of business, or depreciation to, damage to, or cost of
removal of, or for the value of stock, trade fixtures, furniture
and other personal property belonging to Tenant, and also
relocation expenses and other damages of or to Tenant.

22.   Use, Assignment and Subletting.

A.   The premises hereby demised may be used for any lawful
purpose.   Tenant shall not be obligated to conduct or to remain
open for the conduct of any business in the Demised Premises.
Tenant may assign this Lease or sublet the whole or any portion
of the Demised Premises, but if it does so, it shall remain
liable and responsible under this Lease.

B.   Notwithstanding anything to the contrary contained in
Article 22A:

(i)   If Tenant shall have "gone dark" (which for the
purposes of this Article 22 shall mean not conducting business in
the normal course in at least 50,000 square feet of Tenant's
Building) for a continuous period of one hundred twenty (120)
days or more for reasons other than casualty, condemnation or
remodeling, then at any time thereafter prior to the resumption
of operations Landlord may give written notice to Tenant
terminating this Lease as of a date specified in such notice
(such date to be 20-60 days after the date of such notice).
Notwithstanding the foregoing, however, upon receipt of such
notice Tenant may nullify same by giving notice to Landlord
within 15 days after such receipt that either (x) Tenant is
engaged in negotiations with an assignee or sublessee for all or
a substantial portion of the Demised Premises; provided in such
event such assignment or sublease must be executed within 60 days
of Tenant's nullification notice, and the proposed assignee or
sublessee must commence business within 150 days of execution of
the assignment or sublease (subject to delays by reason of events
in Article 32); or (y) Tenant intends to resume operations within
60 days, in which event Tenant shall be required to do so within
such period (subject to delays by reason of events in Article
32).   Furthermore, if the proposed assignment or sublease would
not be a Permitted Transfer, as defined in subsection (ii) below,
Landlord shall have the rights regarding same set forth in said
subsection (ii).   If any such deadline set forth in (x) or (y) is
not met, Landlord, as its sole remedy, may again terminate this
Lease on 30 days' written notice.   Notwithstanding the foregoing,
Landlord's cancellation shall not be effective unless not later
than 10 days prior to the specified termination date it pays to
Tenant an amount (payable by bank or certified check) equal to
the Termination Payment.   The Termination Payment shall be the
greater of (a) the unamortized cost of Tenant's leasehold
improvements (exclusive of merchandise and trade fixtures) as
carried on Tenant's books and (ii) the then outstanding aggregate
balance of any principal, accrued interest, and other amounts
then due under (i.e., secured by) any leasehold mortgage on
Tenant's interest hereunder.   Within 15 days following any
written request from Landlord (but not more than twice annually)
Tenant will inform Landlord of the then current amount of the
Termination Payment.

(ii)   Tenant shall not make any assignment of this Lease
or sublet all or any portion of the Demised Premises, if such
proposed assignment or subletting is other than a Permitted
Transfer, as hereinafter defined (it being understood that Tenant

-30-

may freely enter into any assignment or sublease which is a Permitted Transfer without any requirement of Landlord's consent) without obtaining the prior written consent of Landlord, which Landlord hereby covenants and agrees not to unreasonably withhold.  If Tenant desires to enter into any assignment or sublease ("Transfer") which does not constitute a Permitted Transfer, it shall so notify Landlord (including with such notice, hereinafter referred to as the "Transfer Notice," the name and proposed primary use of the proposed assignee or sublessee.  Landlord shall have a period of 15 days after receipt of the Transfer Notice to notify Tenant in writing whether or not it consents to same.  Any refusal shall specify the reason(s) for same.  If Landlord does not give such written notice refusing consent to such assignment or sublease (and so specifying reasons) within 15 days of receipt of the Transfer Notice, it shall be deemed to have consented to same.  If Landlord consents (or is deemed to have consented) to any Transfer, Tenant may effectuate same, but such consent shall not be deemed a waiver of Landlord's right to consent to any future Transfers which are not Permitted Transfers.  If Landlord reasonably refuses consent to any such Transfer, then Tenant, for a period of 15 days following such refusal, shall have the right to give notice to Landlord terminating this Lease as of a date specified in such notice (which shall be not less than 30 nor more than 90 days following the date of such notice), and upon such specified date (the "Termination Date") this Lease shall terminate and Tenant shall have no further obligations hereunder; provided that in such event Landlord shall be obligated, and hereby agrees, to pay to Tenant an amount equal to the Termination Payment not later than 15 days prior to such specified Termination Date.  If Landlord does not make the Termination Payment, by bank or certified check, on or prior to such date, then in addition to any other remedies (it being understood that, notwithstanding anything to the contrary contained in this Lease, Landlord's obligations to Tenant to make such Termination Payment will survive the termination of this Lease), Tenant may suspend its termination of this Lease on notice to Landlord and thereafter occupy the Demised Premises rent-free until such Termination Payment is made.  If Landlord unreasonably refuses consent to any such Transfer, Tenant may, at its option: (a) treat such refusal as having been reasonable and exercise the termination right above set forth, and/or (b) effectuate such assignment or sublease and/or (c) exercise any other legal or equitable right or remedy available to it by reason of such unreasonable withholding.  As used in this subsection (ii), a "Permitted Transfer" shall mean: (x) any sublease which, together with any previous subleases which were not Permitted Transfers, contains in the aggregate less than 60,000 square feet of the Demised Premises, or (y) any assignment or sublease to an entity which controls, is controlled by, or is under common control with Tenant (an "Affiliate"), or (z) any assignment or sublease which is part of a package transaction involving at least three (3) Long Island stores of Tenant and/or its Affiliates.

    23.  Signs.

        Landlord expressly recognizes that the service mark and trademark "Kmart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this Lease or thereafter, directly or indirectly, contest the validity of said mark "Kmart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant.  Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly, contesting or in any way impairing or tending to impair any part of Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid

mark or registrations therefor, and specifically acknowledges
that any use thereof pursuant to this Lease shall not create in
Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect, at its sole cost and
expense, upon any portion of Tenant's building, signs of such
height and other dimensions as Tenant shall determine, bearing
such legend or inscription as Tenant shall determine.
Notwithstanding the foregoing, if such signs are not standard
signs of Kmart Corporation or another chain tenant, same shall be
subject to the prior approval of Landlord, which Landlord agrees
not to unreasonably withhold or delay.

Landlord shall not permit any other signs, billboards or
posters to be displayed on any portion of Tenant's building.

No flashing or animated sign, or roof or free-standing sign
is presently erected or hereafter will be permitted to be erected
for any occupant of the Shopping Center.

A so-called pylon structure is to be constructed (as part of
the Common Area Improvements) in the location depicted on Exhibit
B.  Tenant shall be entitled to install and maintain the primary
identification panel thereon, which shall be of such height and
other dimensions as may be approved pursuant to applicable
governmental law, and shall bear such legend and description as
Tenant shall determine.  The pylon structure may not contain an
identification or advertising panel of any other occupant of
space within the Shopping Center or any other person, without the
written consent of Tenant (Tenant agrees not to unreasonably
withhold or delay such consent for up to three additional panels
of other Shopping Center tenants, provided such panels are below
Tenant's and none of same exceeds 50% of Tenant panel in area.
The aforementioned Tenant's panel shall be maintained in good
repair and in an attractive appearance and shall be lighted by
Tenant, at its sole cost and expense.  Tenant shall have the
right to change or replace its panel at any time or from time to
time during the term of this Lease.  The pylon structure shall be
maintained in good repair by Landlord and the cost thereof and
the cost of lighting the same (other than Tenant's panel) shall
be borne by Landlord (but shall be a Common Area cost).

24.   Ingress and Egress.

Landlord warrants as a consideration for Tenant entering
into this Lease that it will initially provide and will maintain,
for the period of this Lease and any extension thereof, ingress
and egress facilities to the adjoining public streets and
highways in the number and substantially in the locations
depicted on Exhibit B, subject to unavoidable temporary closings
or temporary relocations necessitated by public authority or
other circumstances beyond Landlord's control, and subject to
permanent relocations (i.e., replacement of such access with
substantially equivalent access) necessitated by public authority
as long as such relocations will not, in Tenant's reasonable
opinion, materially adversely affect Tenant's operations.

25.   Landlord's Remedies.

A.   Events of Default, for which Landlord shall have the
rights specified in Article 25B, are as follows:

(i)   Tenant shall fail to pay any installment of
minimum rent, percentage rent, or Common Area Charges
or Tenant's Tax Portion, or any other sums or charges
which Tenant may be required to pay Landlord pursuant
to this Lease and such failure continues for 15 days
after written notice of Tenant's delinquency;

(ii)   (a) if the estate hereby created shall be taken on execution or by other process of law, or (b) if Tenant shall be judicially declared bankrupt or insolvent according to law, or (c) if any assignment shall be made of the property of Tenant for the benefit of creditors, or (d) if a receiver, guardian, conservator, trustee or other similar officer shall be appointed to take charge of all or any substantial part of Tenant's property by a court of competent jurisdiction and not dismissed within 90 days, or (e) if a petition shall be filed by anyone other than Tenant respecting the bankruptcy or insolvency of Tenant under any provisions of any bankruptcy or insolvency act now or hereafter enacted, and such proceeding is not dismissed within 90 days after it is begun, or (f) if Tenant shall file such a petition (it being agreed that for the foregoing purposes "Tenant" shall mean only the then current tenant in possession, not any predecessor);

(iii)   if (a) Tenant shall fail to perform or observe any other covenant on Tenant's part to be performed or observed under this Lease and (b) such failure has continued for 30 days after written notice of such failure from Landlord to Tenant except where such failure is governed by clause (iv) below; or

(iv)   if Tenant shall fail to perform or observe any other covenant on Tenant's part to be performed or observed under this Lease, and more than 30 days would be reasonably required to cure such failure, and (a) Tenant has failed to commence to cure such failure within 30 days after such notice of failure from Landlord to Tenant or (b) having so commenced to cure such failure, Tenant shall fail diligently to prosecute the curing of such failure to completion.

B.   Upon the occurrence of an Event of Default, Landlord shall thereafter have and is hereby given the right to serve upon Tenant a notice of cancellation of this Lease at the end of 10 days from the date such notice is given, and upon the expiration of such 10 day period this Lease shall wholly cease and expire (without the delivery of any further notice) in the same manner as if it were the expiration of the term, and thereupon Landlord lawfully may:

(i)   without further notice enter into and upon the Demised Premises, or any part thereof, and repossess the Demised Premises and dispossess Tenant, and those claiming by, through or under it or any other occupant, and remove its or their effects (provided such entry is pursuant to summary or other judicial proceedings to obtain possession of the Demised Premises except no judicial proceedings will be required if Tenant abandons same) without being deemed liable for any manner of trespass, and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant or condition.  Provided Landlord's entry is made pursuant to judicial proceedings (or after abandonment), Tenant hereby expressly waives for itself and all persons claiming under it any notice of intention to reenter and repossess and any claim for damages against Landlord or Landlord's agents, servants or employees, for reentering and repossessing said Premises for any damage caused to Tenant's property by such reentry or repossession.  It is distinctly understood that Tenant's liability as provided in Article 25(C) shall survive and continue after such termination, dispossession, reentry or repossession; and

-33-

(ii)   relet the whole or any part or parts of the Demised Premises from time to time, either in the name of Landlord or on account of Tenant or otherwise, to such person or persons, for such terms ending before, on or after the expiration date, at such rental and upon such other conditions, which may include concessions and free rent periods, as Landlord in its sole discretion may determine.  Landlord will make a good faith effort to relet the Demised Premises or any part thereof (but shall not be required to expend any monies in connection therewith) and shall in no event be liable for refusal or failure to relet the Demised Premises and any part thereof, or, in the event of such reletting, for refusal or failure to collect any rent upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. Landlord, at Landlord's option, may make such repairs, improvements, alterations, additions, decorations and other physical changes in and to the Demised Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

C.    In case of reentry, repossession or termination of this Lease prior to the expiration date thereof pursuant to this Article 25, whether or not the same is the result of the institution of summary or other judicial proceedings to obtain possession of the Demised Premises, then, in any of said events, Tenant shall remain liable, at the option of the Landlord, for the minimum and additional rent for the period subsequent to reentry, repossession or termination, for the period which otherwise would have constituted the balance of said term, and for the expenses to which Landlord may be put in reentering the Demised Premises, repossessing itself thereof, making good any default committed by Tenant, putting the same in proper repair, making reasonable improvements, and protecting and preserving the same by placing therein watchmen and caretakers, reletting the same (including reasonable attorney's fees and disbursements, marshal's fees, customary brokerage fees, etc., in so doing) less the net avails of reletting.  Tenant agrees to pay any deficiency to Landlord at the end of each and every month.  Any suit brought by Landlord to enforce collection of such deficiency for any one month (or months, it being agreed that Landlord need not bring suit every month) shall not prejudice Landlord's right to enforce the collection of any further deficiency for any subsequent month.

D.    Tenant hereby expressly waives, for itself and all persons claiming under it: any right of redemption under any present or future law in case Tenant shall be dispossessed for any cause or in case Landlord shall obtain possession of the Demised Premises as herein provided, and Tenant agrees not to exercise such right.

E.    If Landlord shall relet the Demised Premises there shall be no determination of any surplus resulting from such reletting, and Landlord can keep and shall in no event be required to account to or pay to Tenant any claim for payment of any such surplus.

F.    In the event of any breach hereunder by Tenant, Landlord may, following the aforesaid notice period for Tenant's curing of the same (provided no notice will be required in the event of an emergency) elect, in the alternative to terminating this Lease, to cure such breach for the account and at the expense of Tenant.  Any sums so expended by Landlord shall be

-34-

deemed additional rent hereunder and shall be reimbursed by Tenant upon demand, together with interest per annum thereon at the rate of the 18% per annum or such lesser rate as shall be the highest rate legally permissible (the "Lease Interest Rate") which interest shall accrue from the date of such expenditure by Landlord until the date of payment by Tenant. If Landlord, at any time, by reason of such breach, is compelled to incur any expense, including reasonable attorneys' fees, in instituting or prosecuting any action or proceeding to enforce Landlord's rights hereunder, the sum or sums so paid by Landlord, with interest thereon at the Lease Interest Rate, shall be deemed to be additional rent hereunder and shall be due from Tenant to Landlord on the first day of the month following the payment of such respective sums or expenses.

26.    Covenant of Title.

Landlord covenants, represents and warrants that as of the date of execution hereof and upon the Rent Commencement Date, it has and will have unrestricted full right, power and lawful authority to execute and perform this Lease for the term hereof and to grant the estate demised herein and that it is seized of an indefeasible estate in fee simple of, or has a valid leasehold title to, the land described in Exhibit A, vacant and free and clear of any leases, tenancies, occupancies, assignments, contracts, agreements, restrictions, violations, mortgages and other liens and encumbrances, except as set forth in Exhibit D, and that Tenant on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Demised Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the Lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised subject only to such matters set forth in Exhibit D, Tenant shall have the option at Landlord's expense, to correct such defect or to annul and void this Lease with full reservation of its right to damages, if any.

Landlord shall, without expense to Tenant, and concurrently with the execution of this Lease, furnish agreements wherein each holder of any lien against the Shopping Center or the Demised Premises shall consent to this Lease and warrant that Tenant's possession and right of use under this Lease in and to the Demised Premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this Lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this Lease. The foregoing, however, is subject to the relevant provisions of Article 28.

27.    Leasehold Mortgages.

Notwithstanding anything contained in this Lease to the contrary, Tenant and its assignees shall have the right to mortgage this Lease and to assign, pledge or hypothecate this Lease and Tenant's interest herein (including, without limitation, Tenant's interest in and to Tenant's Improvements) as security for any such mortgage without the consent of Landlord; provided only that Tenant shall, prior to or simultaneously with the placement of such leasehold mortgage, deliver to Landlord a certification that the amount secured thereby does not exceed the total aggregate amounts (i.e., all hard and soft costs) thereto-fore expended by Tenant to construct, alter, improve, fixture and stock its store on the Demised Premises. Upon execution of a leasehold mortgage upon Tenant's leasehold or the granting of a security interest in Tenant's estate in this Lease:

-35-

(a)  Tenant shall give notice to the Landlord specifying the name and address of any such leasehold mortgagee;

(b)  Landlord shall, upon serving Tenant with any notice of default, simultaneously serve a copy of such notice upon the holder of such leasehold mortgage;

(c)  The leasehold mortgagee shall have an additional thirty (30) days (or such longer period as may be necessary if the default is not susceptible of being cured within the thirty (30) day period provided that mortgagee shall commence the cure during the thirty (30) day period and thereafter diligently prosecute same to completion and further provided that if possession of the premises shall be necessary for mortgagee to commence to cure such default the thirty (30) days shall be measured from the date that mortgagee shall acquire possession) beyond the period to cure the default provided to Tenant, after service of notice upon it, to cure the default, and Landlord shall accept such performance by or on behalf of such leasehold mortgagee as if the same had been done by Tenant (provided that the leasehold mortgagee shall have no obligation to cure any such default);

(d)  Landlord agrees that in the event of termination of this Lease by reason of any default by Tenant (or in the event of the rejection of this Lease in any bankruptcy proceeding), provided any such leasehold mortgagee shall cure or cause to be cured all monetary defaults, pay all basic rent and other charges then due without acceleration of the Lease, and except to the extent enjoined by law or order commence to cure any other then existing default which is susceptible of being cured by the mortgage (it being understood that such defaults which are not susceptible of being cured by mortgagee, and which need not be cured by mortgagee, include, without limitation, defaults under Article 25A(ii) hereof) within thirty (30) days after the termination of this Lease, or if possession of the leasehold estate is necessary to cure such default then within thirty (30) days of possession, that Landlord will (upon written request from the leasehold mortgagee) enter into a new lease of the Demised Premises with the leasehold mortgagee or its nominee, for the remainder of the term, effective as of the date of such termination, at the same basic net rent and upon the same terms and conditions as are contained herein and subject only to the rights, if any, of any parties then in possession of any part of the Demised premises, provided:

(1)  the mortgagee or its nominee shall pay to Landlord at the time of the execution and delivery of such new lease, any expenses, including reasonable attorneys' fees, to which Landlord shall have been subjected by reason of such default;

(2)  the mortgagee or its nominee shall perform and observe all covenants herein contained on Tenant's part to be performed on their account from and after the date mortgagee shall obtain a new lease; and

(3)  the tenant under such new lease shall have the same right, title and interest in and to the buildings and improvements on the Demised Premises as Tenant had under the terminated lease.

Notwithstanding the foregoing provisions of subparagraph (d), however, in lieu of entering into such new lease upon written request of said leasehold mortgagee, Landlord shall have the right, within twenty (20) days of

receipt of such request, to pay to leasehold mortgagee the entire amount (i.e., all principal, interest, late charges, fees, advances and any other sums) then secured by such leasehold mortgage. Any written request from a leasehold mortgagee to enter into a new lease shall include a statement of such total amount due. If Landlord does not make such payment in good funds within such twenty (20) day period, this right of Landlord shall lapse.

(e) Landlord agrees to execute any documents reasonably required by any such leasehold mortgagee in order to effectuate the terms of such mortgage.

(f) Landlord agrees that the name of the leasehold mortgagee may be added to the "Loss Payable Endorsement" of any and all insurance policies required to be carried by Tenant hereunder.

(g) There shall be no cancellation, surrender or modification of this Lease by joint action of the Landlord and Tenant without the prior written consent of any such leasehold mortgagee.

(h) Landlord shall give the leasehold mortgagee notice of any condemnation proceedings affecting the Demised Premises, and the leasehold mortgagee shall have the right to intervene and be made a party to any such condemnation proceedings but only to the extent of any rights afforded Tenant pursuant to the terms of this Lease, including, but not limited to Article 21 hereof. Tenant's interest in any award or damages for such taking is hereby set over, transferred and assigned to the leasehold mortgagee to the extent such transfer and assignment is provided for by the terms of any such leasehold mortgage.

(i) Landlord shall give the leasehold mortgagee notice of any fire or other casualty affecting the Demised Premises, and the leasehold mortgagee shall have the right to intervene and be made a party to any proceedings related thereto. Tenant's interest in any insurance proceeds or damages arising out of such fire or other casualty is hereby set over, transferred and assigned to the leasehold mortgagee to the extent such transfer and assignment is provided for by the terms of any such leasehold mortgage.

(j) No leasehold mortgagee or successor or assignee thereof shall become personally liable under any agreements, terms, covenants or conditions of this Lease unless and until it becomes the owner of the leasehold estate and then only to the extent of any rents, taxes and other financial obligations accruing while it is the owner of the leasehold estate. Upon any assignment of this Lease by any owner of the leasehold estate whose interest shall have been acquired by, through or under or purchase from any leasehold mortgagee, the assignor shall be relieved of any further liability which may accrue hereunder from and after the date of such assignment, provided that the assignee shall execute and deliver to Landlord a recordable instrument of assumption wherein such assignee shall assume and agree to perform and observe the covenants and conditions in this Lease contained on Tenant's part to be performed and observed, it being the intention of the parties that once the leasehold mortgagee or assignee shall succeed to Tenant's interest hereunder, any and all subsequent assignments (whether by such leasehold mortgagee, any purchaser at foreclosure sale or other transferee or assignee) shall effect a release of the assignor's liability hereunder.

-37-

(k)  There shall be no merger of this Lease, nor of the leasehold estate created hereby, with the fee estate in the Demised Premises by reason of the fact that the same person, firm, corporation or other entity may acquire or own or hold, directly or indirectly, this Lease or the leasehold estate created by this Lease or any interest therein and the fee estate in the Demised Premises or any interest in such fee estate unless any and all entities, including any leasehold mortgagee, having any interest in this Lease or the leasehold estate in the Demised Premises or any part thereof or any interest in such fee estate, shall join in a written instrument effecting such merger and shall duly record same.

(l)  Landlord shall, upon request, execute, acknowledge and deliver to a leasehold mortgagee making such request, an agreement prepared at the sole cost and expense of Tenant, including reasonable attorneys' fees of Landlord, in form satisfactory to such leasehold mortgagee, between Landlord, Tenant and such leasehold mortgagee, confirming each of the provisions of this Article 27.

(m)  In no event shall the right granted herein to Tenant to mortgage or otherwise encumber Tenant's leasehold estate, created by and pursuant to this Lease, be deemed or interpreted as a subordination by Landlord of Landlord's interest in the fee estate in the Demised Premises or this Lease to the lien of such mortgage or encumbrance; it being expressly agreed that, under no circumstance, shall Tenant have any right to mortgage or encumber Landlord's fee estate in the Demised Premises subject to this Lease or subordinate such interest to the lien of any mortgage or encumbrance which Tenant may place upon its leasehold estate created by and pursuant to this Lease.  Tenant shall give Landlord notice of the mortgaging of this Lease within ten days following the execution and delivery of such mortgage, together with the name, address and telephone number of the mortgagee, as well as copies of all recorded documents executed in connection with such mortgage.

(n)  Landlord agrees that in the event that a proposed leasehold mortgagee shall request that this Lease be modified as a condition precedent to its acceptance by such leasehold mortgage, Landlord shall consent to the making of such reasonable modifications as such leasehold mortgagee shall reasonably request, provided those modifications do not reduce the basic rent or additional rent, do not change the term, and do not materially and adversely affect any of the rights of Landlord hereunder.  All expenses in connection with the consummation of any such modifications (or of any other consents or agreements required by any leasehold mortgagee), including reasonable fees of counsel for Landlord, shall be borne by Tenant.

28.  Mortgage Subordination.

If there be a first mortgage lien affecting the fee interest of the Shopping Center and/or the Landlord's interest in and to any ground lease, Landlord shall obtain and shall deliver to Tenant concurrently with the execution of this Lease, a non-disturbance agreement, and this Lease shall become subject and subordinate thereto and to any renewals, modifications, replacements or extensions thereof (provided the holder of any such renewed, modified, replaced or extended first mortgage is an institution, which for the purpose hereof shall mean a federal or state chartered bank or trust company, insurance company, or pension fund of a publicly-traded corporation, labor union, or governmental or municipal entity), if and when such a non-disturbance agreement in accordance with the provisions of

this Article (a "Non-Disturbance Agreement") is entered into in
respect of such mortgage.

Such Non-Disturbance Agreement shall be an agreement in
recordable form between Tenant and the holder of such mortgage
binding on such holder and on future holders of such mortgage in
form and substance reasonably satisfactory to Tenant or its
counsel, or an agreement by such holder expressed in such
mortgage, which shall provide in substance as follows: (a) all
condemnation awards and proceeds of insurance shall be applied in
the manner provided for in this Lease, (b) the rights of any
holder of any leasehold mortgage that may then or thereafter be
placed as set forth in Article 27 shall be acknowledged and
protected, and (c) neither such holder nor any other holder of
such mortgage shall name or join Tenant (or any leasehold
mortgagee) as a party-defendant or otherwise in any suit, action
or proceeding to enforce, nor will this Lease or the term hereof
be terminated (except as permitted by the provisions of this
Lease) or otherwise affected by the enforcement of any rights
given to any holder of said mortgage, pursuant to the terms,
covenants or conditions contained in such mortgage or any other
documents held by any holder or any rights given to any holder as
a matter of law. Upon request of the holder of a mortgage to
which this Lease becomes subordinate, Tenant shall (i) execute,
acknowledge and deliver to such holder an agreement to attorn to
such holder as Landlord if such holder becomes Landlord
hereunder, and/or (ii) execute, acknowledge and deliver to such
holder an agreement not to make any payment of fixed annual rent
for a period of more than one (1) month in advance. If the
holder of any institutional first mortgage of the fee interest of
the Shopping Center requires that this Lease have priority over
such mortgage, Tenant shall, upon request of such holder,
execute, acknowledge and deliver to such holder an agreement
acknowledging such priority.

Notwithstanding the foregoing provisions of Article 28, the
parties acknowledge that upon the Commencement Date no such
Non-Disturbance Agreement has been obtained from Mutual Benefit
Life Insurance Company, holder of the existing first mortgage on
the Shopping Center (the "Existing First Mortgage"). Landlord
hereby covenants, warrants and represents as follows with regard
to the Existing First Mortgage (it being acknowledged and agreed
that (a) Tenant would not have entered into this Lease unless
Landlord was willing to make such covenants, warranties and
representations (hereinafter collectively referred to as the
"Mortgage Covenants"), (b) Landlord shall be personally liable
for any breach of the Mortgage Covenants, notwithstanding the
provisions of Article 19, and any such personal liability shall
survive the termination of this Lease, and (c) to induce Tenant
to enter into this Lease, Leonard Marx and John Usdan, the
general partners of Landlord, have simultaneously with the
execution of this Lease executed and delivered to Tenant their
joint and several personal guaranty and indemnity regarding the
Mortgage Covenants, herein referred to as the "Existing Mortgage
Guaranty"):

(i)   Landlord will timely pay all amounts due under the
Existing First Mortgage and timely perform all other
obligations thereunder so as to prevent an event of default
from occurring thereunder.

(ii)  The amount secured by the Existing First Mortgage
does not exceed $1,600,000, and Landlord will not increase
such amount secured by the Existing First Mortgage or
increase the monthly payments due thereunder.

(iii) Tenant may freely exercise and enjoy all of its
rights under this Lease (including, without limitation,
those relating to construction, alterations, insurance

-39-

proceeds, assignment and subletting), without any hindrance,
restriction, impairment or molestation from, or any
requirement of consent or approval from, the holder of the
Existing First Mortgage, notwithstanding that the execution
of this Lease and/or the exercise by Tenant of certain of
such rights without the consent of such holder may
constitute a default under such Existing First Mortgage.

(iv)   On or prior to the first to occur of (x) the
Approval Date and (y) one year from the Commencement Date,
Landlord will either (a) cause the Existing First Mortgage
(and all other instruments securing the debt secured
thereby) to be paid, released and discharged of record, or
(b) cause the holder of such Existing First Mortgage to
enter into and deliver to Tenant a Non-Disturbance
Agreement, in recordable form, in the form of Exhibit E
(with only such immaterial modifications thereto as shall be
reasonably acceptable to Tenant).

In the event of any breach of any of the Mortgage Covenants,
Tenant, in addition to any other rights and remedies, may:  (i)
cancel this Lease on notice to Landlord, in which event Landlord
shall remain liable to Tenant, notwithstanding any such
termination, for any damages caused by such breach; or (ii) in
accordance with the provisions of Article 30, Tenant may (but
shall not be obligated to) pay any amount due under said Existing
First Mortgage (including, at Tenant's option, all principal,
interest and other charges secured thereby) and the amount of
same (together with interest thereon at the Lease Interest Rate)
shall be immediately paid by Landlord to Tenant (and Landlord
shall be personally liable to make such payment), and Tenant may
at its option deduct such payment, if not made, from rent as set
forth in Article 30.

29.   <u>Tenant Indemnifies Landlord</u>.

During the term of this Lease from and after the Tenant
Building Permit Date, Tenant shall and does hereby indemnify and
save Landlord and Landlord's ground lessor, if any, harmless of,
from and against all costs, liabilities, damages, expenses,
penalties, claims or demands of whatsoever nature, including all
costs of defense and reasonable counsel fees, for personal
injury, death and/or property damage occurring in or about
Tenant's building or the Outside Areas or the Common Area located
on lands described in Exhibit A, only if occasioned by the
conduct of truck sales or sidewalk sales by Tenant as permitted
hereunder, including all statutory and common law liability for
damage to property or injuries or loss of life sustained by any
person or in or about the Tenant's building or said Outside Areas
or Common Area (under aforesaid circumstances), except those
which shall result, in whole or in part, directly or indirectly,
from the default, negligence or tortious acts of Landlord.  The
foregoing sentence is intended to afford to Landlord the same
protection and coverage as would be provided if Tenant furnished
general comprehensive liability insurance, naming Landlord and
Landlord's ground lessor, if any, as additional insureds under
such a policy.

30.   <u>Tenant's Right to Cure Landlord's Defaults</u>.

In the event Landlord shall neglect to pay when due any
obligations on any mortgage or encumbrance affecting title to the
Shopping Center and to which this Lease shall be subordinate
unless the mortgagee shall have granted Tenant non-disturbance,
or shall fail to perform any obligation specified in this Lease
(including without limitation causing the Approval Date to occur
or performance of any item of Landlord's Work as required by
Article 6 hereof), or if any representation or warranty of
Landlord in this Lease shall be breached, then Tenant (in

addition to and not in limitation of any other remedies) may (but
shall not be obligated to), after the continuance of any such
default for seven (7) days after notice thereof by Tenant with
respect to a monetary default, pay said principal, interest or
other charges or cure such default with respect to any default
which does not involve payment of money after continuance of such
default for fifteen (15) days after notice thereof by Tenant
(provided that emergency repairs which are Landlord's
responsibility under this Lease, and which are necessary in
Tenant's reasonable judgment to protect the Demised Premises or
contents thereof and/or to keep the Demised Premises and/or
Common Area in a neat, clean, safe and orderly condition, may be
made without any notice to Landlord), all on behalf of and at the
expense of Landlord (including without limitation performance of
any item of Landlord's Work within the time periods set forth in
Article 6; it being understood that Tenant will have such
self-help option regarding Landlord's Work and causing the
Approval Date to occur in addition to and not in limitation of
any rights or remedies of Tenant set forth elsewhere in this
Lease), and enter upon other portions of the Shopping Center and
do all necessary work and make all necessary payments in
connection therewith, and execute applications and file documents
on behalf of and/or in the name of Landlord (and Landlord hereby
appoints Tenant its attorney-in-fact solely for such limited
purpose; such power of attorney to expire upon the Approval
Date), and Landlord shall, on demand, pay Tenant forthwith the
amount so paid by Tenant, together with interest thereon at the
Lease Interest Rate, and Tenant may, to the extent necessary,
deduct the same from any and all rental payments and other
payments thereafter due to Landlord and apply the same to the
payment of such indebtedness.  The foregoing provisions are in
addition to and not in limitation of Tenant's rights under
Article 7E in the event Landlord fails to make any Tenant's
Common Area Reimbursement when due.

Provided the holder of a properly recorded first mortgage
shall have notified Tenant in writing that it is the holder of
such lien on the Shopping Center and shall so request, Tenant
shall provide such holder with a duplicate copy of any notice
sent to Landlord covering a default hereunder, and such holder
shall be granted thirty (30) days after receipt thereof to
correct or remedy such default.

In amplification and not in limitation of the foregoing, in
the event of a default by Landlord under Article 6 hereof, Tenant
shall have the authority (but not the obligation) to complete the
construction of that portion of Landlord's Work necessary for the
completion and operation of the Tenant Improvements.  In such
event, Landlord shall deliver to Tenant such plans,
specifications, drawings and other materials as are necessary to
enable Tenant to complete construction of Landlord's Work and
shall assign to Tenant any contracts necessary for the completion
of Landlord's Work.  Landlord hereby grants to Tenant the license
and right to enter upon the Common Area for the purpose of
completing the construction of Landlord's Work.

31.  <u>Waiver of Distraint</u>.

Landlord hereby expressly waives any and all rights granted
by or under any present or future laws to levy or distrain for
rent, in arrears, in advance, or both, upon all goods,
merchandise, equipment, fixtures, furniture and other personal
property of Tenant or any subtenant or licensee of Tenant in the
Demised Premises, delivered or to be delivered thereto.

32.  <u>Unavoidable Delays</u>.

If either party shall be prevented or delayed from
punctually performing any obligation or satisfying any condition

-41-

under this Lease by any strike, lockout, labor dispute, inability
to obtain labor or materials or reasonable substitutes therefor,
act of God, governmental restriction, regulation or control,
enemy or hostile governmental action, civil commotion,
insurrection, sabotage, fire or other casualty, or any other
condition beyond the reasonable control of such party (other than
inability to provide or obtain financing), then the time to
perform such obligation or satisfy such condition shall be
extended by the delay caused by such event, except for the
payment of rent or other charges. If either party shall, as a
result of any such event, be unable to exercise any right or
option within any time limit provided therefor in this Lease,
such time limit shall be deemed extended for a period equal to
the duration of the delay caused by such event. Notwithstanding
the foregoing, the provisions of this Article 32 shall not apply
to the dates and time periods set forth in Articles 2, 6C and 6D.

33.  Adjoining or Adjacent Property.

Landlord shall use diligent efforts to promptly forward to
Tenant any notice or other communication received by Landlord
from any owner of property adjoining or adjacent to the Shopping
Center or from any municipal or governmental authority in
connection with any hearing or other administrative procedure
relating to the use thereof or any adjoining or adjacent
property, the outcome of which might adversely affect Tenant.

34.  Rent Notices.

If the ownership of the Shopping Center (or a lease of the
entire Shopping Center) or the name or address of the party
entitled to receive the rent shall be changed, Tenant may, until
receipt of proper notice of such change from the grantor,
assignor or party entitled to receive the rent immediately
preceding such change, continue to pay the rent and additional
rent to the party to which, and in the manner in which, the last
preceding installment of rent was paid.

35.  Notices.

Notices required under this Lease shall be in writing and
deemed to be properly served if personally delivered with a
receipt obtained or sent by certified or registered mail to
Landlord at the last address where rent was paid or to Tenant at
its principal office as set forth on the first page of this
Lease, or to any subsequent address which Tenant shall designate
for such purpose. Date of notice shall be two days following the
date on which such notice is deposited in a post office of the
United States Postal Service, or date delivered if personally
delivered.

36.  Condition of Premises at Termination.

At the expiration or earlier termination of the Lease term,
Tenant shall surrender the Demised Premises, together with all
building alterations and improvements then a part thereof, in
good order and condition, except for the following: ordinary
wear and tear, repairs required to be made by Landlord pursuant
to the provisions of this Lease, and loss or damage by fire, the
elements and other casualty (unless, with regard to such casualty
damage, a self-insurance election is in effect and Tenant is
required to repair same pursuant to Article 20B). All furniture
and trade fixtures installed in said building at the expense of
Tenant or other occupant shall remain the property of Tenant or
such other occupant; provided, however, Tenant shall, at any time
and from time to time during the Lease term, have the option to
relinquish its property rights with respect to such trade fix-
tures (including, but not limited to, air conditioning machinery
and lighting fixtures), which option shall be exercised by notice
of such relinquishment to Landlord, and from and after the

-42-

exercise of such option the property specified in said notice
shall be the property of Landlord (but Tenant agrees to remove
same on Landlord's written request).

37.  Holding Over.

In the absence of any written agreement to the contrary, if
Tenant should remain in occupancy of the Demised Premises after
the expiration of the Lease term, it shall so remain as a tenant
from month to month, and all provisions of this Lease applicable
to such tenancy shall remain in full force and effect.

38.  No Waiver.

The failure of either party to seek redress for violation
of, or to insist upon the strict performance of any term,
covenant or condition contained in this Lease shall not prevent a
similar subsequent act from constituting a default under this
Lease.

39.  Waiver of Trial by Jury.

It is mutually agreed by and between Landlord and Tenant
that the respective parties hereto shall and they hereby do waive
trial by jury in any action, proceeding or counterclaim brought
by either of the parties hereto against the other on any matters
whatsoever arising out of or in any way connected with this
Lease, the relationship of Landlord and Tenant, Tenant's use or
occupancy of the Demised Premises and/or any claim of injury or
damage.

40.  Shopping Center Standards.

For the purpose of enhancing the overall appeal of the
Shopping Center, Landlord acknowledges that the selection of
tenants shall be consistent with maintaining a balanced and
diversified grouping of retail stores.  Landlord warrants,
covenants and agrees that no building now or hereafter erected
within the lands described in Exhibit A shall be leased or
permitted to be used or occupied by Landlord or its tenants or
any successors or assigns of either Landlord or its tenants, or
by any subtenant, licensee or concessionaire of a tenant, for an
establishment selling or exhibiting pornographic materials,
massage parlor, funeral parlor, automobile show room, auto
service center, body and fender shop, car wash, amusement
gallery, health spa or exercise facility, theatre or cinema,
office space, off-track betting parlor, bowling alley, billiard
parlor, so-called "head shop", so called "flea market" or
"odd-lot" sales type operation, discotheque, roller skating rink,
discount department store over 50,000 square feet in size, such
as, by way of example and not limitation, Wal-Mart, Target,
Caldor, or Jamesway (provided that such prohibition on discount
department stores will expire at the end of the 10th Lease Year),
or for industrial or warehouse purposes, or for any illegal use.

Notwithstanding the foregoing, Landlord may use portions of
Phase II for (i) cinema, health spa or OTB facility, providing
that any of such uses are in a building not closer than 500 feet
from any portion of the Demised Premises; and (ii) office space
or light industrial use, provided any such light industrial use
is compatible with being adjacent to a neighborhood shopping
center, including, without limitation, no odors or fumes and no
unsightly appearance.

41.  Hazardous Waste.

Landlord represents that it has made a thorough investiga-
tion of the physical condition of the Shopping Center, that it is
fully familiar with the present and prior uses of the Shopping
Center and that there are not now nor have there ever been any
asbestos or any other toxic or hazardous wastes or substances

-43-

incorporated in, used, generated, stored, treated or disposed on
the Demised Premises or the Common Area.  Landlord hereby indemni-
fies Tenant from and against any loss, liability, claim or
expense, including, without limitation, removal, cleanup,
engineering and attorneys fees and expenses that Tenant may incur
by reason of the above representation being false or by reason of
any investigation or claim of any governmental agency in connec-
tion therewith.  Landlord's representations and indemnity to
Tenant under this paragraph shall survive the cancellation or
termination of this Lease.  In amplification and not in
limitation of the foregoing, Landlord shall be solely liable to
pay all expenses and costs in connection with removal (if same is
required by any applicable law or regulation or is appropriate in
Tenant's reasonable judgment) of any asbestos or other toxic or
hazardous waste or substances on or in the Demised Premises or
Common Area not placed by Tenant.

Tenant agrees not to place or incorporate any asbestos or
other hazardous waste or substances on or in the Demised Premises
in violation of any applicable law, ordinance or regulation; and
Tenant hereby indemnifies Landlord from and against any loss,
liability, claim or expense, including, without limitation,
removal, cleanup, engineering and attorneys' fees and expenses
that Landlord may incur by reason of breach of the foregoing
covenant by Tenant.

At any time from the date of this Lease until the Rent
Commencement Date, Tenant (or Tenant's contractor) may inspect
the Demised Premises and Common Area for the presence of such
wastes or substances.  If toxic or hazardous wastes or substances
are discovered in the Demised Premises or Common Area, Tenant may
cancel this Lease by giving notice to Landlord and returning
possession of the premises to the Landlord prior to the Rent
Commencement Date, if Tenant has taken possession.

42.  <u>Invalidity of Certain Provisions</u>.

If any provision of this Lease shall be invalid or
unenforceable, the remainder of the provisions of this Lease
shall not be affected thereby and each and every provision of
this Lease shall be enforceable to the fullest extent permitted
by law.

43.  <u>Choice of Law</u>.

This Lease, and the rights and obligations of the parties
hereto, shall be interpreted and construed in accordance with the
laws of the State in which the Shopping Center is located.

44.  <u>Memorandum of Lease</u>.

The parties hereto have simultaneously with the execution
and delivery of this Lease executed and delivered a Memorandum of
Lease setting forth such information as may be necessary to
constitute a "short form lease", which Landlord shall, at its
sole expense, cause to be recorded within thirty (30) days
following delivery of this Lease and returned to Tenant by
Landlord within thirty (30) days thereafter.  Landlord agrees
that it will comply with the requirements of the applicable
recording office wherein said Memorandum of Lease is to be
recorded, so that the plan to be attached to the Memorandum of
Lease will be accepted for recording.

45.  <u>Entire Agreement</u>.

This Lease contains the entire agreement between the parties
and cannot be changed, modified or amended unless such change,
modification or amendment is in writing and executed by the party
against which the enforcement of the change, modification or
amendment is sought.

-44-

46.   Definition of Landlord.

The term "Landlord", as used in this Lease, means only the owner for the time being of the Shopping Center or a lease of the entire Shopping Center, and in the event of any sale or sales of the Shopping Center or assignment or assignments of such lease of the Shopping Center thereof after the Commencement Date, the seller or assignor shall be, and hereby is, freed and relieved of all covenants and obligations of Landlord under this Lease arising or to be performed after the date of such sale or sales or assignment or assignments, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser or assignee at any such sale or sales, or assignment or assignments, that the purchaser or assignee has assumed and agreed to carry out any and all covenants and obligations of Landlord arising or to be performed under this Lease after the date of such sale or sales or assignment or assignments (and before such date if not performed by the seller or assignor), except that no sale or assignment shall free any party from its obligation to complete all work that Landlord is required to complete hereunder or from its obligation to pay to Tenant any amount due to Tenant immediately prior to such sale or assignment (including, without limitation, the Termination Payment).

47.   Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this Lease shall run with the land.

48.   Captions and Gender.

The captions of this Lease are solely for convenience of reference and shall not in any way define, describe, limit or amplify the scope, terms, provisions and intent of this Lease. The necessary grammatical changes which shall be required to make the provisions of this Lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, a trust, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this Lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder, except as to acts, omissions or defaults occurring prior to such termination.

49.   Estoppel Certificates.

Either party shall, without charge, at any time and from time to time within ten (10) days after request by the other, certify by written instrument, duly executed, acknowledged and delivered to such other party, or to any actual or proposed mortgagee, purchaser, assignee, or sublessee:

(a)   whether or not such other party is, to the best knowledge of the party giving the certificate, in default in any way, in the performance of any of the covenants, conditions and agreements to be performed by such party in accordance with this Lease and if there is any such default, specifying the nature of same;

(b)   what the amount of annual rental is pursuant to the terms hereof;

(c)   whether or not this Lease is unmodified and in full force and effect, or in the event that there have been

-45-

modifications, whether the same is in full force and effect as modified and setting forth the modifications;

    (d)   whether or not there have been any prepayments of rent; and

    (e)   any other information reasonably required by any actual or proposed mortgagee.

    50.   <u>Independent Operation</u>.

    Nothing in this Lease shall cause Landlord in any way to be construed as a partner, joint venturer, or an associate of Tenant in the operation of the Demised Premises.

    51.   <u>Effectiveness of Lease</u>.

    This Lease becomes effective as a lease only upon execution and delivery thereof by both Landlord and Tenant and the execution of and delivery to Tenant of any other agreement or document required in connection with this lease.

    52.   <u>Intentionally Omitted</u>.

    53.   <u>Broker</u>.

    Landlord and Tenant each represents and warrants that it has not dealt with any real estate agent or broker in connection with this Lease (other than Marx Realty and Improvement Corp. whose commission shall be paid by Landlord), and each shall and hereby agrees to defend, indemnify and hold the other party harmless, including reasonable attorney's fees, from and against all claims for commissions and/or other compensation made by any broker or agents (other than Marx Realty and Improvement Corp.) or other damage for breach of the foregoing representations by the indemnifying party.

    IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

LANDLORD:

WITNESS:

FARMINGVILLE ASSOCIATES

*Barbara Christopoulos*   By: _____


TENANT:

KMART CORPORATION

By: _____
Vice President
M. L. SKILES, VICE PRESIDENT

Attest: _____

Assistant Secretary
C. E. LOTZAR, JR., ASST. SECRETARY

-46-

STATE OF NEW YORK   )
                     ) ss.:
COUNTY OF NEW YORK )

    On this _5th_ day of _December_ , 1991, before me
personally came _John Usdan_ , to me known who, being by me
duly sworn, did depose and say that he is a general partner of
FARMINGVILLE ASSOCIATES, the partnership described in and who
executed the foregoing instrument and acknowledged to me that he
executed the foregoing instrument for and in behalf of said
partnership.

                                   _Isabelle W Clark_
                                    Notary Public

                             ISABELLE W. CLARK
                     Notary Public, State of New York
                         No. 41-4600162
                    Qualified in Queens County
                   Commission Expires _5/31/93_

STATE OF _Michigan_ )
                     ) ss.:
COUNTY OF _Oakland_ )


    Before me, the undersigned authority, on this day personally
appeared _M. L. Skiles_ , Vice President of KMART
CORPORATION, a Michigan corporation, known to me to be the person
whose name is subscribed to the foregoing instrument, and
acknowledged to me that he executed the same for the purposes and
consideration therein expressed, in the capacity therein stated
and as the act and deed of said corporation.

    Given under my hand and seal of office on this _17th_ day of
_Dec._, 1991.

M. L. SKILES, VICE PRESIDENT

                             _Mary A. Schnitzler_
                                Notary Public

                           MARY A. SCHNITZLER
                     Notary Public, Oakland County, Michigan
                     My Commission Expires May 15, 1995

02/KMA45A
12/03/91

<u>EXHIBITS</u>

A.    Demised Premises

A-1. Shopping Center

B.    Plot Plan

C.    Commencement Agreement

D.    Title Exceptions

03/KMAR45
11/21/91

<u>RIDER</u>

<u>TENANT'S COMMON AREA CHARGE</u>

A.   Tenant's "Common Area charge" shall mean, for any
period from and after the Rent Commencement Date, the product of
(a) the actual cost and expense to Landlord for the maintenance
and operation (including, without limitation, lighting,
landscaping and repaving not included in Landlord's Work) and
public liability insurance of the Common Area exclusive of any
Common Area that may hereafter be constructed on Phase II
(hereinafter called "Common Area costs") for such period, and (b)
the Fraction.  The Common Area costs shall be limited to amounts
paid by Landlord in respect of the Common Area (other than Phase
II) for the work Landlord is required to do and the items
Landlord is required to furnish under subdivision B of Article 12
and liability insurance Landlord is required to furnish pursuant
to subdivision G of Article 12.  The Common Area costs shall not
include amounts expended for any of the following:  (i) removal
of rubbish of individual tenants of the Shopping Center; (ii) any
costs of Landlord's Work; (iii) any amounts expended for parking
lot patching, repairing or replacement or any other repairs or
replacements to items of Landlord's Work performed, the need for
which arose at any time prior to the expiration of the relevant
warranty period for same set forth in Article 8; (iv) any costs
of removing or remediating any toxic or hazardous waste or
substances; (v) any casualty or liability or personal property
insurance covering any buildings or any premises or property of
Shopping Center tenants; (vi) Real Estate Taxes; (vii) interest
or depreciation (other than depreciation in accordance with
generally accepted accounting principles on major maintenance
equipment purchased by Landlord and used solely for the Shopping
Center); (viii) office overhead or salaries of persons employed
by Landlord whose functions extend beyond the care of the Common
Area; (ix) profit for Landlord on any Common Area costs; (x) any
costs attributable to periods prior to the Rent Commencement
Date; (xi) any costs of enlarging the size or capacity of the
sewage treatment plant and/or the detention basin, and any major
refurbishing, upgrading or replacement of same or other work
regarding same that would be deemed a "capital expenditure" under
generally accepted accounting principles (i.e., only routine
maintenance and ordinary operating costs of such systems shall be
chargeable as a Common Area cost); and (xii) any work or costs
regarding or performed upon any portion of Phase II.  The Common
Area costs shall be allocated to each Lease Year (or period less
than a Lease Year at the end of the term of this Lease), without
any duplication, all in accordance with generally accepted
accounting principles.

B.   For each Lease Year during the term hereof, Tenant
shall pay to Landlord as additional rent, for maintenance and
operation of the Common Area, Tenant's Common Area charge for
such year.  If the term of this Lease ends on a day other than
the last day of a Lease Year, Tenant shall pay for the period
less than a year at the end of the term of this Lease the
Tenant's Common Area charge prorated for such period, by the
fraction, the numerator of which shall be the number of days in
such period, and the denominator of which shall be 365.

C.   In determining the amount of Tenant's Common Area
charge for any Lease Year (or period) in which any enlargement or
contraction in ground floor area shall occur (other than
regarding Phase II), such enlargement or contraction shall be
deemed effective as of the first day of the month next following
(a) the month in which the area first becomes ready for its
intended use by the occupant or intended occupant, or (b) the
month in which the same first becomes unusable by reason of
condemnation or otherwise.

D.   On the first day of each month from and after the Rent Commencement Date, Tenant shall pay to Landlord (as estimated payments on account of the annual Common Area charge) one-twelfth (1/12th) of the actual computed Common Area charge for the immediately preceding Lease Year (provided that for the first Lease Year each such monthly payment shall be the sum of $9,000). As soon as is practicable after the end of each Lease Year Landlord shall submit to Tenant a bill for the amount required to be paid by Tenant under this Rider (and, accordingly, the new current monthly estimated amounts), setting forth in reasonable detail the items and amounts included in, and setting forth the method of calculating, Tenant's Common Area charge.  If the aggregate monthly estimated payments as aforesaid for such Lease Year are less than the actual charge, Tenant shall pay the difference to Landlord as additional rent within 30 days after receipt thereof.  If such aggregate estimated payments exceed the actual charge, Tenant may credit and offset the difference against the next payment(s) of rent due under this Lease.

Landlord shall keep, for a period of one (1) year following the end of each Lease Year (or period), complete and accurate books and records in respect of the Common Area costs for such Lease Year (or period), and Tenant, upon two (2) days' notice at any time during such period, shall have the right to have such books and records audited by a certified public accountant, and in the event that such audit discloses that Tenant paid an amount in excess of the proper Tenant's Common Area charge, Landlord shall refund the excess to Tenant promptly upon demand, and, in additon, if said excess is greater than 10% of the proper amount, Landlord shall pay to Tenant promptly upon demand the reasonable cost of such audit.

E.   Notwithstanding anything contained herein to the contrary, and in addition to and not in limitation of Tenant's rights under Article 30 in the event of Landlord default regarding maintenance of the Common Area, Tenant reserves the right, for any reason whatsoever, at any time and from time to time, upon thirty (30) days prior written notice to Landlord, to assume the duties of Landlord to maintain the Common Areas located within Parcel A as shown on Exhibit "B".  If Tenant shall elect to maintain the Common Areas located within Parcel A of Exhibit "B", then, and in such event, Tenant shall not during such period be required to make any contributions on account of the Common Area costs as hereinabove defined, however, Landlord shall continue to maintain the remaining portions of the Common Areas described in Exhibit "B".

*    *    *    *    *    *

Attached to and forming part of Lease dated as of by and between Farmingville Assocaites, as Landlord, and KMART CORPORATION, as Tenant, covering certain premises situated at Farmingville, New York.

Initialled by Landlord:        Initialled by Tenant:

-2-

EXHIBIT A

DESCRIPTION OF LEASE PARCEL
AS SHOWN ON SURVEY PREPARED FOR
MIDWOOD MANAGEMENT CORPORATION

ALL that certain plot, piece, or parcel of land lying, being and situate at Farmingville, Town of Brookhaven, County of Suffolk State of New York, being bounded and described as follows:

BEGINNING at point at the southeasterly corner of said lease parcel said point being the following four (4) courses and distances from the southerly terminus of a straight line connecting the southerly side of Horseblock Road (C.R. 16) with the westerly side of North Ocean Avenue (C.R. 83):

1) Along the westerly side of North Ocean Avenue South 03° 56' 30" West 179.76' to a point.

2) Continuing along the westerly side of North Ocean Avenue South 01° 48' 29" West 161.18' to a point.

3) Continuing along the westerly side of North Ocean Avenue South 03° 56' 30" West 1,137.09' to a point.

4) North 52' 17' 10" West 698.22' to the point of beginning:

RUNNING THENCE from said point of beginning the following Twelve (12) courses and distances:

1) North 85° 55' 46" West 184.00' to a point.

2) North 04° 04' 14" East 60.00' to a point.

3) North 85° 55' 46" West 86.33' to a point.

4) North 04° 04' 14" East 426.33' to a point.

5) South 85° 55' 46" East 70.00' to a point.

6) South 04° 04' 14" West 45.00' to a point.

7) South 85° 55' 46" East 203.33' to a point.

8) South 04° 04' 14" West 50.00' to a point.

9) South 85° 55' 46" East 12.33' to a point.

10) South 04° 04' 14" West 50.67' to a point.

11) North 85° 55' 46" West 12.33' to a point.

12) South 04° 04' 14" West 340.66' to the point and place of beginning.

The southerly 22' ± of said lease parcel lies within the Long Island Lighting Company right of way.

CONTAINING within said bounds 119,044 square feet or 2.733 acres.

Dated: Patchogue, New York

November 22, 1991

*Revised December 6, 1991*

TOTAL P.02

*EXHIBIT A-1*

OVERALL

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING AT MEDFORD, TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK AND STATE OF NEW YORK, BEING MORE PARTICULARLY BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) WHERE THE SAME IS INTERSECTED BY THE WESTERLY SIDE OF LAND NOW OR FORMERLY OF LONG ISLAND TRUST CO. SAID POINT BEING DISTANT 158.25 FEET NORTHWESTERLY AS MEASURED ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) FROM THE NORTHWESTERLY END OF A TIE LINE HAVING A RADIUS OF 81.54 FEET CONNECTING THE WESTERLY SIDE OF OCEAN AVENUE (C. R. 38, PATCHOGUE-MT. SINAI ROAD) WITH THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE FROM SAID POINT OR PLACE OF BEGINNING ALONG LAND NOW OR FORMERLY OF LONG ISLAND TRUST CO. THE FOLLOWING TWO COURSES AND DISTANCES:

1. SOUTH  03 DEGREES, 56 MINUTES, 30 SECONDS WEST 178.19 FEET;

2. SOUTH  52 DEGREES, 11 MINUTES, 18 SECONDS EAST 216.28 FEET THE THE WESTERLY SIDE OF OCEAN AVENUE (C. R. 83, PATCHOGUE-MT. SINAI ROAD);

RUNNING THENCE ALONG THE WESTERLY SIDE OF OCEAN AVENUE (C. R. 83, PATCHOGUE-MT. SINAI ROAD) THE FOLLOWING THREE COURSES AND DISTANCES:

1. SOUTH  03 DEGREES, 56 MINUTES, 30 SECONDS WEST 24.88 FEET;

2. SOUTH  01 DEGREES, 48 MINUTES, 29 SECONDS WEST 161.18 FEET;

3. SOUTH  03 DEGREES, 56 MINUTES, 30 SECONDS WEST 1,137.09 FEET TO LAND NOW OR FORMERLY OF ALAN AND HELENE FORTUNOFF;

RUNNING THENCE ALONG SAID LAND NORTH  86 DEGREES, 03 MINUTES, 30 SECONDS WEST 1372.46 FEET (ACTUAL) 1372.79 (DEED) TO LAND NOW OR FORMERLY OF "MAP OF NATURES GARDENS-EVERGREEN PARK SECTION" MAP NO. 1093;

RUNNING THENCE ALONG SAID LAND ON SAID MAP NORTH  03 DEGREES, 58 MINUTES, 30 SECONDS EAST 587.89 FEET TO LAND NOW OR FORMERLY OF MARIE STROM;

RUNNING THENCE ALONG SAID LAND SOUTH  86 DEGREES, 01 MINUTES, 30 SECONDS EAST 477.96 FEET (ACTUAL) 478.29 FEET (DEED);

RUNNING THENCE STILL ALONG SAID LAND AND ALONG THE EASTERLY TERMINUS OF OAKLAWN AVENUE, LAND NOW OR FORMERLY OF JAMES AND AMELIA ROIG, LAND NOW OR FORMERLY OF HENRY C. BAHNMULLER NORTH  03 DEGREES, 28 MINUTES, 44

SECONDS EAST 772.47 FEET TO LAND NOW OR FORMERLY OF FRANK AND PETER COLUMBO;

RUNNING THENCE ALONG SAID LAND NORTH 03 DEGREES, 56 MINUTES, 04 SECONDS EAST 434.40 FEET TO THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 100.01 FEET TO LAND NOW OR FORMERLY OF CHRISTIAN AND DAVID NIELSEN;

RUNNING THENCE ALONG SAID LAND THE FOLLOWING TWO COURSES AND DISTANCES:

1. SOUTH 03 DEGREES, 54 MINUTES, 04 SECONDS WEST 209.39 FEET;

2. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 142.60 FEET;

3. NORTH 03 DEGREES, 54 MINUTES, 04 SECONDS EAST 209.39 FEET TO THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 182.07 FEET TO LAND NOW OR FORMERLY OF GUISEPPE AND STEFANO CARUSO;

RUNNING THENCE ALONG SAID LAND THE FOLLOWING THREE COURSES AND DISTANCES:

1. SOUTH 03 DEGREES, 54 MINUTES, 04 SECONDS WEST 384.39 FEET;

2. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 100.00 FEET;

3. NORTH 03 DEGREES, 54 MINUTES, 04 SECONDS EAST 384.39 FEET TO THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16);

RUNNING THENCE ALONG THE SOUTHWESTERLY SIDE OF HORSEBLOCK ROAD (C. R. 16) THE FOLLOWING THREE COURSES AND DISTANCES:

1. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 16.58 FEET;

2. SOUTH 67 DEGREES, 56 MINUTES, 36 SECONDS EAST 161.16 FEET;

3. SOUTH 70 DEGREES, 04 MINUTES, 46 SECONDS EAST 24.00 FEET TO THE POINT OR PLACE OF BEGINNING.

RS/KMA45A
05/06/91

EXHIBIT C

COMMENCEMENT OF TERM AGREEMENT

THIS AGREEMENT, made effective as of the _____ day of _____, 1992, between FARMINGVILLE ASSOCIATES, a New York general partnership, having its principal office at c/o Midwood Management Corp., 60 East 42nd Street, New York, New York 10165 (hereinafter called "Landlord") and KMART CORPORATION, a Michigan corporation, having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (hereinafter called "Tenant").

W I T N E S S E T H :

WHEREAS, Landlord is the owner of that certain real property described in Exhibit A annexed hereto and made a part hereof; and

WHEREAS, by a certain lease (hereinafter called "Lease"), dated the _____ day of _____, 19__, Landlord demised to Tenant the premises constituting a portion of said real property more particularly described in said Lease; and

WHEREAS, Tenant is now in possession of the premises demised under the Lease; and

WHEREAS, under Article 2 of the Lease, Landlord and Tenant agreed to execute, acknowledge and deliver to each other duplicate originals of an agreement setting forth the Rent Commencement Date (as such term is defined in the Lease) and certain other information;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date is the _____ day of _____, 19__.

2.    The Initial Term of the Lease expires on _____.

3.    The Commencement Dates of each extended term and the dates when each such option to renew is to be exercised are as follows:

| EXTENDED TERM | COMMENCEMENT DATE | LAST DATE TO EXERCISE OPTION |
|---|---|---|
| 1st | | |
| 2nd | | |
| etc. | | |

IN WITNESS WHEREOF, Landlord and Tenant have caused this agreement to be executed as of the day and year first above written.

FARMINGVILLE ASSOCIATES

_____    By: _____

LANDLORD

Attest:                          KMART CORPORATION

_____    By: _____
Assistant Secretary                            Vice President

TENANT

[add acknowledgements]

Exhibit "D"

Permitted Title Exceptions

1.   Electric easement in Liber 6645 Cp 535, repeated in Liber 8439 Cp 80.

2.   Easement to the Suffolk County Water Authority in Liber 11015 Cp 54.

3.   Mortgage made by Nineteen Wilshire Realty Corp. to Industrial National Bank of Rhode Island, to secure the amount of $1,900,000.00, dated 12/15/77, recorded 1/31/78 in Liber 8102 Mp 01, assigned by Industrial National Bank of Rhode Island to The Mutual Benefit Life Insurance Company, dated 1/17/79, recorded 1/23/79 in Liber 8374 Mp 403, as extended and modified in Liber 8374 Mp 372.

4.   State of facts shown on survey by Norton Brothers, dated November 22, 1991 and revised December 6, 1991.

5.   Non-exclusive rights of other shopping center tenants to use the common areas of the shopping center.

6.   1991/92 Town and School Taxes not yet delinquent.

DESCRIPTION OF LEASE PARCEL
AS SHOWN ON SURVEY PREPARED FOR
MIDWOOD MANAGEMENT CORPORATION

ALL that certain plot, piece, or parcel of land lying, being and situate at Farmingville, Town of Brookhaven, County of Suffolk State of New York, being bounded and described as follows:

BEGINNING at point at the southeasterly corner of said lease parcel said point being the following four (4) courses and distances from the southerly terminus of a straight line connecting the southerly side of Horseblock Road (C.R. 16) with the westerly side of North Ocean Avenue (C.R. 83):

1) Along the westerly side of North Ocean Avenue South 03' 56' 30" West 179.76' to a point.

2) Continuing along the westerly side of North Ocean Avenue South 01° 48' 29" west 161.18' to a point.

3) Continuing along the westerly side of North Ocean Avenue South 03° 56' 30" west 1,137.09' to a point.

4) North 52' 17' 10' West 698.22' to the point of beginning:

RUNNING THENCE from said point of beginning the following Twelve    (12) courses and distances:

1) North 85° 55' 46" West 184.00' to a point.

2) North 04° 04' 14" East 60.00' to a point.

3) North 85° 55' 46" West 89.33' to a point.

4) North 04° 04' 14" East 426.33' to a point.

5) South 85° 55' 46" East  70.00' to a point.

6) South 04° 04' 14" West  45.00' to a point.

7) South 85° 55' 46" East 203.33' to a point.

8) South 04° 04' 14" West  50.00' to a point.

9) South 85° 55' 46" East  12.33' to a point.

10) South 04° 04' 14" West  50.67' to a point.

11) North 85° 55' 46" West  12.33' to a point.

12) South 04° 04' 14" West 340.66' to the point and place of beginning.

The southerly 22'± of said lease parcel lies within the Long Island Lighting Company right of way.

CONTAINING within said bounds 119,044 square feet or 2.733 acres.

Dated: Patchogue, New York
November 22, 1991
Revised December 6, 1991

2/02/91

## LEASE

-between-

FARMINGVILLE ASSOCIATES,

Landlord,

-and-

KMART CORPORATION,

Tenant.

Dated: December 20, 1991

Shopping Center

Location:

Farmingville, New York

# EXHIBIT 2

# SEARS HOLDINGS CORPORATION

**James B. Terrell**
**Vice President Real Estate**

Sears Holdings Management Corporation
3333 Beverly Rd. BC-104B
Hoffman Estates, IL 60179

October 10, 2012

*Via Certified Mail Return*
*Receipt Requested and E-mail*

Mr. Steven P. Brown
Farmingville Associates
C/O Midwood Investment & Development
430 Park Avenue – Suite 505
New York, NY 10022

RE:    Kmart #4871 – 2280 North Ocean Ave. – Expressway Plaza – Farmingville, NY
11738

Lease dated December 20, 1991 by and between Farmingville Associates
("Landlord"), and Kmart Corporation ("Tenant"), as amended and assigned (the
"Lease").

Dear Mr. Brown:

This letter of agreement is to acknowledge that Landlord and Tenant agree that Tenant,
pursuant to Article 30 of the Lease, has exercised the option to perform the Common Area
maintenance on the Demised Premises, as defined in the Lease, since the commencement of
the Lease and intends to continue to perform said Common Area maintenance on the
Demised Premises, unless otherwise notified by Tenant in writing to Landlord.

Thank you for your cooperation.

Sincerely,

James B. Terrell
Vice President Real Estate

# EXHIBIT 3

**FARMINGVILLE ASSOCIATES PHASE I, LLC and
EXPRESSWAY PLAZA I LLC**
c/o Midwood Management Corp.
430 Park Avenue, Suite 505
New York, New York 10022

November 8, 2017

<u>VIA Certified Mail – Return Receipt Requested</u>
Kmart Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn:    Divisional Vice President - Real Estate Department 824RE

Re:    Lease dated December 20, 1991 (as amended and extended, the "**Lease**") between
Farmingville Associates Phase 1 LLC and Expressway Plaza I LLC, as tenants-in-
common, (collectively, "**Landlord**") and KMART Corporation., (the "**Tenant**")
for space at the premises located at 2280-2350 North Ocean Avenue,
Farmingville, New York (the "**Premises**")

Ladies and Gentlemen:

Reference is made to the Lease; capitalized terms used, but not otherwise defined in
this notice (the "**Notice**"), shall have the meanings given to such terms in the Lease.

**PLEASE TAKE NOTICE** that Tenant is in breach of Tenant's obligation to maintain
the Common Area parking lot and drive lanes, which obligation Tenant assumed (in accordance
with Article 30 of the Lease) by notice to Landlord dated October 10, 2012. The work required
to be performed on the drive lanes as a result of said breach (the "**Work**") is set forth on Exhibit
A to this Notice and you can reach out to Landlord's portfolio manager Peter Pollani (516) 732-
8977; ppollani@midwoodid.com) if you have any questions regarding the Work or the
maintenance required to be performed by Tenant to the rest of the parking lot Common Area.

**PLEASE TAKE FURTHER NOTICE** that after a recent inspection by the town of
Brookhaven, Landlord was informed that due to weather conditions. the Work must   be
completed by November 21, 2017. As a result of Tenant's failure to perform the required
maintenance, Landlord hereby exercises its right pursuant to Section 25(F) of the Lease to
perform Tenant's obligations at the cost and expense of Tenant and, given the timing imposed by
the Town of Brookhaven, this constitutes an emergency under Section 25(F) which does not
permit Tenant the cure period provided by the Lease.   Note that the Work only addresses the
drive lane issues, which constitute an emergency, and does not include standard parking lot
maintenance and repair which remains the responsibility of Tenant and must be performed
within thirty (30) days of this notice to avoid an Event of Default under the Lease.

**PLEASE BE ADVISED** that Landlord has not waived any of its rights or remedies
under the Lease or any requirement of Tenant's compliance with any provision of the Lease and
expects Tenant to honor all of its obligations thereunder, including. without limitation, the
maintenance obligations that are the subject of this Notice. Landlord expressly reserves all of its

rights and remedies, whether pursuant to the Lease, at law or in equity on account of Tenant's failure to comply with the covenants and obligations contained in the Lease.

Very Truly Yours,

FARMINGVILLE ASSOCIATES PHASE 1 LLC
and EXPRESSWAY PLAZA I LLC

By:     Midwood Management Corp., as
agent

By:
Name:  John Usdan
       Title:  Chief Executive Officer

cc:   *(via Certified Mail – Return Receipt Requested)*
       Kmart Corporation
       3333 Beverly Road
       Hoffman Estates, Illinois 60179
       Attn:    Associate General Counsel, Real Estate Department 824RE

cc:   *(via E-MAIL ONLY)*
       Bradley.Pukas@searshc.com
       Real Estate Manager, Sears Holdings Corporation

EXHIBIT A

The Work

**Rebrick Drywell:**

1. REBRICK DRAIN COVER: Five Covers (5)
2. Saw cut & remove asphalt around drywell cover and dispose of asphalt.
3. Excavate area and remove casting
4. Remove and replace bricks as necessary
5. Backfill.
6. Install RCA base blend and compact

**Remove and Replace:**

1. PATCH: Remove and replace 10200 sf in 14 areas.
2. Saw cut asphalt
3. Add recycled crushed concrete base blend as needed and compact.
4. Patch areas with 2 1/2" of NY State Type 6F asphalt compacted to an average depth of 2".
5. Apply hot tar to seams of patches to prevent water infiltration.
6. Remove and replace sidewalk in 2 areas approximately 10 sf Curbs
7. Remove and replace curbing approximately 26 lf in 2 areas.

**Reconstruct Parking Area:**

1. RECONSTRUCT PARKING AREA: Drive Lane 2 area approximately 54500sf
2. Job to include:
3. Mill existing pavement and dispose of offsite.
4. Add RCA as necessary.
5. Regrade base blend and compact.
6. Adjust steel manhole covers and drains as necessary to new grade.
7. Pave area with:
   a. 2" of binder asphalt after compaction
   b. 1 & 1/2" of NY State Top asphalt after compaction
8. Restripe parking area.

# EXHIBIT 4

MIDWOOD MANAGEMENT CORP.
430 PARK AVENUE 2ND FLOOR

NEW YORK, NY  10022
(212) 682-9595


C/O SEARS ROEBUCK & CO
K MART # 4871
ATTN: LEASE ADM.
333 BEVERLY ROAD
HOFFMAN ESTATES, IL  60179


| Tenant Name: | K MART # 4871 |
|---|---|
| Space Number: | 16 |
| Invoice Date: | April 4, 2018 |


| | |
|---|---:|
| 2018 MISC INCOME Expense | 184,468.75 |
| Prior Year Expense w/ % Increase | |
| Prior Year Expense w/ % Increase | |
| | |
| Total Recoverable Expense for Current Year | 184,468.75 |
| Less Stop Amount | |
| Total Recoverable MISC INCOME Expense | 184,468.75 |
| | |
| Tenant Share | 100.00% |
| | |
| Total Amount Due for 2018 Before Cap | 184,468.75 |
| Cap for Year | |
| | |
| Total Due for Expense Period | 184,468.75 |
| Occupancy Percentage for Year | 100.00% |
| **Total Amount Due** | **184,468.75** |

# DuMOR Construction Inc.

42 Grant Avenue
Bay Shore, NY 11706.
631 586-7200 631 586-7208

## INVOICE

| DATE | INVOICE # |
| --- | --- |
| 11/28/2017 | 16703 |

### BILL TO

Midwood Management
430 Park Avenue
Suite 505
New York, NY 10022
Attn: Mr. Peter Pollani

### JOB NAME

Paving completed 11/27/17

| P.O. NO. | TERMS | REP |
| --- | --- | --- |
|  | Upon Receipt | D J |

| ITEM | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| Reconstruct Parkin... | RECONSTRUCT PARKING AREA: Drive Lane 2 area approximately 54500 sf SEE Diagram. Job to include: | 184,468.75 |
|  | 1) Mill existing pavement and dispose of off site. |  |
|  | 2) Add RCA as necessary. |  |
|  | 3) Regrade base blend and compact. |  |
|  | 4) Adjust steel manhole covers and drains as necessary to new grade. |  |
|  | 5) Pave area with: |  |
|  | 2" of binder asphalt after compaction |  |
|  | 1 1/2" of NY State Top asphalt after compaction |  |
|  | 6) Restripe parking areas |  |
|  | NOTE: Price based on existing asphalt being no more than 2" thick |  |
|  | Please sign date and return certificate of capital improvement. Thank you!! |  |
|  | Sales Tax - Suffolk County | 0.00. |

Retain this copy for your records.

Good Service and quality work deserves quick
payment.

| | Total | $184,468.75 |
| --- | --- | --- |



New York State Department of Taxation and Finance
New York State and Local Sales and Use Tax

**ST-124**
(2/12)

# Certificate of Capital Improvement

After this certificate is completed and signed by both the customer and the contractor performing the capital improvement, it must be kept by the contractor.

**Read this form completely before making any entries.**

**This certificate may not be used to purchase building materials exempt from tax.**

| Name of customer (print or type) | Name of contractor (print or type) |
|---|---|
| Midwood Mgmt Corp | DUMOR Construction Inc |
| Address (number and street) | Address (number and street) |
| 430 Park Ave Suite 505 | 42 Grant Ave |
| City / State / ZIP code | City / State / ZIP code |
| New York NY 10022 | Bay Shore NY 11706 |
| Sales tax Certificate of Authority number (if any) | Sales tax Certificate of Authority number (if any) |
|  | 11-2607031 |

## To be completed by the customer

Describe capital improvement to be performed:

Pave - Reconstruct Drive Lane 2 area

Project name: Expressway Plaza

Street address North Ocean Ave    City Farmingville    State NY    ZIP code 11738

I certify that:

* I am the *(mark one)* ☐ owner ☐ tenant of the real property identified on this form; and
* the work described above will result in a capital improvement to the real property within the guidelines of this form; and
* this contract *(mark one)* ☐ includes ☐ does not include the sale of any tangible personal property that, when installed, does not become a permanent part of the real property (for example, a free-standing microwave or washing machine).

I understand that:

* I will be responsible for any sales tax, interest, and penalty due on the contractor's total charge for tangible personal property and for labor if it is determined that this work does not qualify as a capital improvement; and
* I will be required to pay the contractor the appropriate sales tax on tangible personal property (and any associated services) transferred to me pursuant to this contract when the property installed by the contractor does not become a permanent part of the real property; and
* I will be subject to civil or criminal penalties (or both) under the Tax Law if I issue a false or fraudulent certificate.

| Signature of customer | Title | Date |
|---|---|---|
|  |  |  |

## To be completed by the contractor

I, the contractor, certify that I have entered into a contract to perform the work described by the customer named above, and that I accept this form in good faith. (A copy of the written contract, if any, is attached.) I understand that my failure to collect tax as a result of accepting an improperly completed certificate will make me personally liable for the tax otherwise due, plus penalties and interest.

| Signature of contractor | Title | Date |
|---|---|---|
| Christina B Doniele | Office Mgr. | 11/28/17 |

**This certificate is not valid unless all entries are completed.**

MIDWOOD MANAGEMENT CORP.
430 PARK AVENUE 2ND FLOOR

NEW YORK, NY  10022
(212) 682-9595


C/O SEARS ROEBUCK & CO
K MART # 4871
ATTN: LEASE ADM.
333 BEVERLY ROAD
HOFFMAN ESTATES, IL  60179


| Tenant Name: | K MART # 4871 |
| Space Number: | 16 |
| Invoice Date: | April 26, 2018 |


| | |
|---|---:|
| 2017 MISC INCOME Expense | 18,411.94 |
| Prior Year Expense w/ % Increase | |
| Prior Year Expense w/ % Increase | |
| | |
| Total Recoverable Expense for Current Year | 18,411.94 |
| Less Stop Amount | |
| Total Recoverable MISC INCOME Expense | 18,411.94 |
| | |
| Tenant Share | 40.00% |
| | |
| | |
| Total Due for Expense Period | 7,364.78 |
| Occupancy Percentage for Year | 100.00% |
| Total Amount Due | 7,364.78 |

# DuMOR Construction Inc.

# INVOICE

42 Grant Avenue
Bay Shore, NY 11706
631 586-7200  631 586-7208

| DATE | INVOICE # |
|------|-----------|
| 12/6/2017 | 16720 |

### BILL TO

Midwood Management
430 Park Avenue
Suite 505
New York, NY 10022
Attn: Mr. Peter Pollani

### JOB NAME

Completed 12/6/17

| P.O. NO. | TERMS | REP |
|----------|-------|-----|
|  | Upon Receipt | D J |

| ITEM | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| Restripe | RESTRIPE: Front lot and drive lanes<br>1) Repaint all traffic lines and markings the same as before with<br>latex traffic paint, which meets all EPA laws regarding VOC to<br>include:<br>3 Speed Bumps<br>500 LF of double yellow lines<br>100 LF 2' thick yellow lines at entrance<br>7 Stop Bars<br>9 No Parking/Fire Zone stencils<br>2000 lf yellow hash lines<br>20 Handicap stalls<br>4 Crosswalks<br>2 large arrows. | 0.00T |
| Total | Total price for job, not including NYS sales tax<br>Sales Tax – Nassau County | 16,950.00T<br>1,461.94 |

Please return one copy with payment. Thank You!!!

| **Total** | $18,411.94 |
|-----------|-----------|

Good Service and quality work deserves quick
payment.

# DuMOR Construction Inc.

# INVOICE

42 Grant Avenue
Bay Shore, NY 11706
631 586-7200  631 586-7208

| DATE | INVOICE # |
|------|-----------|
| 12/6/2017 | 16720 |

### BILL TO

Midwood Management
430 Park Avenue
Suite 505
New York, NY 10022
Attn: Mr. Peter Pollani

### JOB NAME

Completed 12/6/17

| P.O. NO. | TERMS | REP |
|----------|-------|-----|
| | Upon Receipt | D J |

| ITEM | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| | JOB: Express Plaza | |
| | 2302 -2390 North Ocean Avenue | |
| | 910 - 950 Horseblock Road (AKA 2280 North Ocean Avenue) | |
| | Farmingville, NY | |
| Rebrick drywell | REBRICK WATER COVER: | 0.00T |
| | 1) Saw cut & remove asphalt around drywell cover and dispose of asphalt. | |
| | 2) Excavate area and remove casting. | |
| | 3) Remove and replace bricks as necessary. | |
| | 4) Backfill. Install RCA base blend and compact. | |
| | 5) Patch area affected with NYS Type 6F asphalt approximately 2" thick. | |
| | 6) Hot tar seams of patch to prevent water infiltration. | |
| PATCH - R & R | PATCH: Remove and replace approximately 2850 sf in 32 areas. | 0.00T |
| | 1) Saw cut asphalt and remove or mill area down. | |
| | 2) Add recycled crushed concrete base blend as needed and compact. | |
| | 3) Patch areas with 2 1/2" of NY State Type 6F asphalt compacted to | |
| | an average depth of 2". | |
| | 4) Apply hot tar to seams of patches to prevent water infiltration. | |

Please return one copy with payment. Thank You!!!

| Total | |
|-------|--|

MIDWOOD MANAGEMENT CORP.
430 PARK AVENUE 2ND FLOOR

NEW YORK, NY 10022
(212) 682-9595


C/O SEARS ROEBUCK & CO
K MART # 4871
ATTN: LEASE ADM.
333 BEVERLY ROAD
HOFFMAN ESTATES, IL 60179


| | |
|---|---|
| Tenant Name: | K MART # 4871 |
| Space Number: | 16 |
| Invoice Date: | April 4, 2018 |


| | |
|---|---|
| 2018 MISC INCOME Expense | 58,983.38 |
| Prior Year Expense w/ % Increase | |
| Prior Year Expense w/ % Increase | |
| Total Recoverable Expense for Current Year | 58,983.38 |
| Less Stop Amount | |
| Total Recoverable MISC INCOME Expense | 58,983.38 |
| Tenant Share | 40.00% |
| Total Amount Due for 2018 Before Cap | 23,593.35 |
| Cap for Year | |
| Total Due for Expense Period | 23,593.35 |
| Occupancy Percentage for Year | 100.00% |
| **Total Amount Due** | **23,593.35** |

# DuMOR Construction Inc.

# INVOICE

42 Grant Avenue
Bay Shore, NY 11706
631 586-7200 631 586-7208

| DATE | INVOICE # |
|---|---|
| 12/6/2017 | 16719 |

**BILL TO**

Midwood Management
430 Park Avenue
Suite 505
New York, NY 10022
Attn: Mr. Peter Pollani

**JOB NAME**

Completed 12/6/17

| P.O. NO. | TERMS | REP |
|---|---|---|
| | Upon Receipt | D J |

| ITEM | DESCRIPTION | AMOUNT |
|---|---|---|
| | JOB: Express Plaza | |
| | 2302 -2390 North Ocean Avenue | |
| | 910 - 990 Horseblock Road (AKA 2280 North Ocean Avenue) | |
| | Farmingville, NY | |
| Rebrick drywell | REBRICK DRAIN COVER: Five Covers (5) | |
| | 1) Saw cut & remove asphalt around drywell cover and dispose of asphalt. | |
| | 2) Excavate area and remove casting. | |
| | 3) Remove and replace bricks as necessary. | |
| | 4) Backfill. Install RCA base blend and compact. | |
| PATCH - R & R | PATCH: Remove and replace 10,200 sf in 14 areas. | |
| | 1) Saw cut asphalt and remove as mill area down: | |
| | 2) Add recycled crushed concrete base blend as needed and compact. | |
| | 3) Patch areas with 2 1/2" of NY State Type 6F asphalt compacted to | |
| | an average depth of 2". | |
| | 4) Apply hot tar to seams of patches to prevent water infiltration. | |
| Walk | 1) Remove and replace sidewalk in 2 areas approximately 10 sf | |
| Curbs | 2) Remove and replace curbing approximately 26 lf in 2 areas. | |
| Total | Total price for taxable portion of job, not including NYS sales tax | 54,300.00T |
| Reconstruct Parkin... | RECONSTRUCT PARKING AREA: Drive Lane 2 area approximately 54500 sf | |
| | SEE Diagram | |
| | Job to include: | |
| | 1) Mill existing pavement and dispose of off site. | |
| | 2) Add RCA as necessary. | |
| | 3) Regrade base blend and compact. | |
| | 4) Adjust steel manhole covers and drains as necessary to | |
| | new grade. | |
| | 5) Pave area with: | |

Please return one copy with payment. Thank You!!!

| Total | |
|---|---|

## DuMOR Construction Inc.

42 Grant Avenue
Bay Shore, NY 15706
631 586-7200  631 586-7208

# INVOICE

| DATE | INVOICE # |
|------|-----------|
| 12/6/2017 | 16719 |

**BILL TO**

Midwood Management
430 Park Avenue
Suite 505
New York, NY 10022
Attn: Mr. Peter Pollani

**JOB NAME**

Completed 12/6/17

| | P.O. NO. | TERMS | REP |
|---|----------|-------|-----|
| | | Upon Receipt | D J |

| ITEM | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| | 2" of binder asphalt after compaction | |
| | 1 1/2" of NY State Top asphalt after compaction | |
| | 6) Restripe parking area. | |
| | NOTE: Price based on existing asphalt being no more | |
| | than 2" thick | |
| | Dumor Construction Inc will call for a utility mark out as required | |
| | by law. There may be utilities consumer owned (not owned by | |
| | utility company, owned by property owner) that may not be | |
| | marked out. If deemed necessary, a private markout company | |
| | can be hired and the cost passed along to our customer, | |
| | usually about $500.00 for a smaller job. | |
| | There may be permits required (depending on Towns requirements) | |
| | for a total restripe of lot. Site plan may be needed as well. | |
| | DuMOR Construction Inc and any of our subcontractors will not | |
| | be responsible for any underground wiring, pipes or utilities and | |
| | or any other conditions buried under the existing pavement. | |
| | Including, but not limited to sprinklers, site lighting, electric gate | |
| | wires or traffic light actuator (traffic light loops). | |
| | There may also be concrete covers buried under pavement due | |
| | to improper abandoned cesspools, etc. Additional cost to repair | |
| | any under pavement damage will be the responsibility of the owner | |
| | of property, not the contractor or subcontractor. | |
| | Sales Tax - Suffolk County | 4,683.38 |

Please return one copy with payment. Thank You!!!

| Total | $58,983.38 |
|-------|-----------|

Good Service and quality work deserves quick
payment.

Page 2