**Hearing Date and Time: December 20, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: December 13, 2018 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re                                                        :
                                                             :    **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,                    :
                                                             :    **Case No. 18-23538 (RDD)**
                                                             :
               Debtors.[1]                                   :    **(Jointly Administered)**
------------------------------------------------------------ x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**NOTICE OF HEARING ON MOTION OF DEBTORS
FOR ENTRY OF AN ORDER (I) APPROVING THE SALE OF
CERTAIN REAL PROPERTY, (II) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN CONNECTION
THEREWITH, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**"),

of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in

the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order

pursuant to sections 105(a), 363, and 365 of chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**"), Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District

of New York (the "**Local Rules**"), (i) approving the sale of certain non-residential real property

of the Debtors, (ii) authorizing the assumption and assignment of certain unexpired non-

residential leases of the Debtors in connection therewith, and (iii) granting related relief, all as

more fully set forth in the Motion, will be held before the Honorable Robert D. Drain, United

States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New

York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the

"**Bankruptcy Court**") on **December 20, 2018 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"),

or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the

"**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of

Bankruptcy Procedure and the Local Rules, shall be filed with the Bankruptcy Court (a) by

attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*,

electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-

WEIL:\96810968\8\73217.0004

searchable portable document format (PDF) (with a hard copy delivered directly to Chambers),

in accordance with the customary practices of the Bankruptcy Court and General Order M-399,

to the extent applicable, and shall be served in accordance with the *Amended Order*

*Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018

(ECF No. 405), so as to be filed and received no later than **December 13, 2018 at 4:00 p.m.**

**(Eastern Time)** (the "**Objection Deadline**").

      **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and

served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered without further notice or opportunity to be heard.

      **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted upon default.


Dated: November 29, 2018
      New York, New York

           /s/ Jacqueline Marcus
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York  10153
           Telephone:  (212) 310-8000
           Facsimile:  (212) 310-8007
           Ray C. Schrock, P.C.
           Jacqueline Marcus
           Garrett A. Fail
           Sunny Singh

           *Attorneys for Debtors*
           *and Debtors in Possession*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

--------------------------------------------------------- x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER
(I) APPROVING THE SALE OF CERTAIN REAL PROPERTY, (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN
CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Background**

1.      Beginning on October 15, 2018 (the "**Commencement Date**") and

continuing thereafter, each of the Debtors commenced with this Court a voluntary case under

chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 24, 2018, the United States Trustee for Region 2 appointed an

official committee of unsecured creditors (the "**Creditors' Committee**").   No trustee or

examiner has been appointed in these chapter 11 cases.

3.      The Debtors' chapter 11 cases are being jointly administered for

procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

4.      Additional information regarding the Debtors' business, capital structure,

and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for*

*Southern District of New York*, sworn on October 15, 2018 (ECF No. 3) (the "**Riecker**

2

**Declaration**").

<div align="center">

**Jurisdiction**

</div>

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

<div align="center">

**Relief Requested**

</div>

6.     The Debtors request entry of an order, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 6004 and 6006, and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), (i) approving the sale of thirteen (13) parcels of non-residential real property of the Debtors (the "**Real Property**"), (ii) authorizing the assumption and assignment of certain unexpired leases of the Debtors in connection therewith (the "**Assumed Leases**" and, together with the Real Property, the "**Acquired Assets**"), and (iii) granting related relief.

7.     A proposed form of order granting the relief requested in the Motion is attached hereto as **Exhibit A** (the "**Proposed Order**").

<div align="center">

**The Transaction**

</div>

8.     Debtors Sears, Roebuck and Co., Kmart Corporation, and Kmart Stores of Illinois, together with non-Debtor affiliate SRC Facilities LLC (collectively, the "**Sellers**") have been actively seeking to monetize their respective fee interests in the Real Property since January 2017.  After making considerable efforts at in-house and external marketing, retaining real estate brokers, and engaging in significant negotiations with various third parties regarding the Acquired Assets, the Sellers determined, prior to the Commencement Date, to sell the Acquired Assets to Amerco Real Estate Company ("**Purchaser**").  As of the Commencement Date, the

<div align="center">

3

</div>

Sellers had agreed on the principal terms of the transaction, but had not executed a purchase agreement. As a result of continuing negotiations since the Commencement Date, the Sellers and the Purchaser have entered into the Real Property Sale Contract, dated November 29, 2018 (the "**Purchase Agreement**"),[2] providing for the sale of the Acquired Assets. A copy of the Purchase Agreement is attached hereto as **Exhibit B**.

9.    The Purchase Agreement provides, in pertinent part, for the sale of the Acquired Assets for an aggregate purchase price of $62 million. As more fully described in the Purchase Agreement, the Acquired Assets consists of:

- Real Property: twelve parcels of real property that currently or in the past were operating as Kmart® stores and one parcel of real property that is a currently operating Sears® store, together with all Improvements and Personal Property thereon.

- Assumed Leases: six unexpired non-residential real property leases, all of which are leases as to which a Debtor is the lessor.

Each of the Acquired Assets is a non-essential asset that is not material to the Debtors' ongoing operations or revenue-generating capacity. Indeed, three locations are "dark" and six locations have negative EBITDA. Although the remaining four locations are generating positive EBITDA, the purchase price being paid by the Purchaser warrants proceeding with the sale.

10.    To facilitate the Debtors' orderly wind-down of operations at the Real Property locations, the parties have agreed to enter into post-closing occupancy agreements (the "**Occupancy Agreements**") for ten of the thirteen locations. Each Occupancy Agreement, a form of which is annexed to the Purchase Agreement as Exhibit E, is for a term of 120 days and provides that the Sellers will pay real estate taxes and water and sewer charges until the Sellers deliver possession of the ten locations. The Occupancy Agreements provide the Debtors with

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Purchase Agreement.

sufficient time to conduct store closings without significant disruption to their businesses and, given their relatively short term, do not present an unnecessary burden to the Debtors' estates.

11.     The Debtors believe that the contemplated sale of the Acquired Assets on the terms set forth in the Purchase Agreement (the "**Transaction**") is the result of a robust marketing process and reflects the highest and best value they can obtain for such assets. All of the Acquired Assets have been on the market for varying periods since early 2018 (and in many instances, much earlier). Further, the Debtors marketing efforts included utilizing multiple listing websites, numerous retail and broker email blasts, and direct marketing to large real estate owners and developers. Although the Debtors received offers for certain of the Acquired Assets, after careful consideration the Debtors determined that the terms of the final offer presented by the Purchaser were the most favorable terms available, and that there would not be any incremental benefit to conducting an auction for the Acquired Assets.

12.     The Transaction is the culmination of several months of arms' length negotiations between the Sellers and the Purchaser and the Debtors submit that consummating the Transaction on the terms and conditions set forth in the Purchase Agreement is in the best interests of their estates and creditors.

## The Relief Requested Should Be Granted

**A.      The Sale of the Acquired Assets and Assumption and Assignment of the Assumed Leases is an Exercise of the Debtors' Sound Business Judgment and Should Be Approved**

13.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In order to approve the sale of property outside the ordinary course of business, a Bankruptcy Court must "find from the

5

evidence presented before him at the hearing a good business reason to grant such an application." *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also In re MF Glob. Ltd.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to great deference."); *In re Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) ("a debtor often satisfies the business judgment standard if 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'") (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)); *In re Chateaugay Corp.*, 973 F.2d 141, 144–45 (2d Cir. 1992) (affirming that the Bankruptcy Court correctly approved an asset sale under 363(b) using the "good business reason" standard).

14.     The business judgment rule protects a debtor's management decisions from judicial second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct once a reasonable basis has been set forth). Once a debtor articulates a valid business purpose, a debtor's decision to sell property out of the ordinary course enjoys a strong presumption that in making its business decision the debtor "acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (citation and internal quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

15.     Furthermore, section 365 of the Bankruptcy Code authorizes a debtor to assume an unexpired lease provided that, among other things, any defaults under the subject

lease have been cured. *See* 11 U.S.C. § 365(a) and (b). The standard governing whether to approve a debtor's assumption of an unexpired lease is also the business judgment rule. *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996).

16. The Debtors' decision to sell the Acquired Assets, and assume and assign the Assumed Leases to the Purchaser represents a sound exercise of business judgment. As stated above, the Acquired Assets are not necessary for the Debtors' current operations or restructuring goals, and despite having been exposed to the market for a considerable amount of time, there is a dearth of offers that match or exceed the final terms presented by the Purchaser for the Acquired Assets. Furthermore, assumption and assignment of the Assumed Leases will not impose any obligation on the Debtors to pay cure amounts because a Debtor is the lessor under each Assumed Lease. The Debtors have been engaged in good-faith, arms' length negotiations with the Purchaser since July 2018, and after exchanging several offers and counter-offers, the parties agreed on the terms of the Transaction as set forth in the Purchase Agreement.

17. Importantly, if the Sellers consummate the Transaction they will be able to take advantage of a favorable transaction that will generate cash proceeds for the benefit of their estates and creditors. Two of the parcels of real property are Prepetition Unencumbered Assets (as defined in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "**Interim DIP Order**")) and, therefore, approximately $7.2 million

7

will be available for deposit into the Winddown Account (as defined in the Interim DIP Order). The balance of the Real Property is encumbered and the liens of the respective secured creditors will attach to the sale proceeds. Specifically, seven of the parcels of Real Property constitute collateral for the Debtors' obligations under the certain Third Amended and Restated Loan Agreement, dated as of June 4, 2018, between the Consolidated Secured Loan Borrowers (as defined in the Riecker Declaration), Sears Holdings, as guarantor, JPP, LLC, as agent, and JPP, LLC, JPP II, LLC, and Cascade Investment, L.L.C., as lenders (the "**Cascade Real Estate Loan**") and four of the properties constitute collateral for the obligations of certain non-debtor subsidiaries of Sears Roebuck & Co. under the Term Loan Agreement, dated as of March 14, 2018, pursuant to which UBS AG, Stamford Branch, as administrative agent, and the lenders party thereto provided a term loan facility.

18.    Because a sound business reason exists for the Transaction, fair and reasonable consideration will be provided, the Transaction has been proposed and negotiated in good faith, and adequate and reasonable notice to parties-in-interest will have been provided, entry into the Purchase Agreement and consummation of the proposed Transaction is a sound exercise of the Debtors' business judgment and should be approved. *See Lionel*, 772 F.2d at 1071 (setting forth the "sound business purpose" test).

**B.    The Sale of the Acquired Assets Free and Clear of Liens, Claims, and Encumbrances is Appropriate**

19.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of liens, claims, interests, and encumbrances if:

> (i)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (ii)    such entity consents;
>
> (iii)    such interest is a lien and the price at which such property is to be

8

sold is greater than the aggregate value of all liens on such property;

(iv)     such interest is in bona fide dispute; or

(v)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  These requirements are listed in the disjunctive, and therefore the Debtors need only satisfy one of the five requirements to permit the Properties to be sold "free and clear" of liens and interests.  *In re Dundee Equity Corp.*, Case No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *see also In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) is met).

20.     The secured lenders that have a lien or interest on the Acquired Assets may be compelled to accept a money satisfaction of such interest, thereby satisfying section 363(f)(5) of the Bankruptcy Code.

## C.    The Private Sale of the Acquired Assets Is Warranted Under the Circumstances

21.     Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bank. P. 6004(f)(1). Courts allow chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re Dewey & Leboeuf LLP*, No. 12-12321 MG, 2012 WL 5386276, at *6 (Bankr. S.D.N.Y. Nov. 1, 2012) (holding that "the Debtor has established a good

9

business reason," pursuant to section 363(b), to sell its artwork through a private auction to save costs, reduce delay, and maximize the sale price); *In re MF Glob. Ltd.*, 535 B.R. at 605-06, 608 (approving the private sale to a buyer already familiar with the debtors' assets as an exercise of "sound business judgment" under section 363(b)).

22.      The Debtors have determined that the private sale of the Acquired Assets to the Purchaser is in the best interest of their estates and their stakeholders.  The Debtor have already expended money and resources to market the Real Property and a public auction would require the estates to incur substantial additional costs with the attendant risk of securing significantly less value.  Further, given the results of the prepetition marketing of the Real Property, the Debtors do not believe an auction would result in an offer higher and better than the terms agreed upon by the Purchaser in the Purchase Agreement.  The Debtors have previewed the terms of the Transaction with counsel for the Creditors' Committee, the agent under the Cascade Real Estate Loan, and the lenders under the DIP ABL Facility (as defined in the Interim DIP Order), and it is the Debtors' understanding that none of such parties object to the private sale of the Acquired Assets.  Accordingly, the Debtors submit that the private sale of the Acquired Assets to the Purchaser is appropriate under the circumstances.

**D.      The Purchaser Is a Good-Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code**

23.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  The Second Circuit has observed, "[a]lthough the Bankruptcy Code does

10

not define the meaning of 'good-faith purchaser,' . . . most courts have adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (internal citations omitted).  Moreover, "[a] purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id.*

24.     The Debtors believe that the Purchaser is a good faith purchaser for value and, as such, is entitled to the protections afforded to such purchaser under section 363(m) of the Bankruptcy Code and has otherwise acted in good faith in connection with the Transaction. Specifically, (a) the Purchaser is not an "insider" or an "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, (b) the Purchase Agreement was negotiated at arm's length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing, (c) the Purchaser did not in any way induce or cause the filing of the Debtors' chapter 11 cases, (d) the consideration to be paid by the Purchaser pursuant to the Purchase Agreement is fair and reasonable, and (e) the Purchase Agreement is not the result of fraud or collusion.  Neither the Debtors, the non-Debtor Seller, nor the Purchaser have engaged in any conduct that would cause or permit the Transaction to be avoided or result in the imposition of any costs or damages under section 363(n) of the Bankruptcy Code.  Accordingly, the Debtors believe the Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code.

### E.     Request for Relief Under Bankruptcy Rule 6004(h)

25.     To implement the requested relief successfully, the Debtors seek a waiver of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and that the Proposed Order, if and when entered, be effective

11

immediately.   Promptly closing the Transaction is critical to the Debtors' efforts to preserve and maximize the value of their estates through disposing of the Acquired Assets which the Debtors have deemed are unnecessary to their operations going forward.   To obtain maximum value for the Acquired Assets, the Debtors must be able to proceed quickly and close the Transaction to the Purchaser pursuant to the terms of the Purchase Agreement, which indicates that time is of the essence.   Accordingly, if the Motion is approved, the Debtors submit that a waiver of the 14-day stay period is appropriate under Bankruptcy Rule 6004(h).

### Notice

26.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**").  The Debtors respectfully submit that no further notice is required.

12

27.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: November 29, 2018
    New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

13

## **Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
In re                                    :
                                         :              **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*  :
                                         :              **Case No. 18-23538 (RDD)**
                                         :
              Debtors.[1]                :              **(Jointly Administered)**
-------------------------------------------------------------- x

## ORDER (I) APPROVING THE SALE OF CERTAIN REAL PROPERTY, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated November 29, 2018 (ECF No. [__]) (the "**Motion**")[2] of

Sears, Roebuck and Co. and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 363,

and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6004 and 6006 of

the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and Rule 6004-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), sseeking the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

entry of an order (i) authorizing and approving the sale of certain real and personal property of the Debtors (the "**Properties**") free and clear of all liens, claims, interests, and encumbrances, (ii) authorizing and approving the assumption and assignment of certain unexpired leases of nonresidential real property of the Debtors in connection therewith (the "**Assumed Leases**" and, together with the Properties, the "**Acquired Assets**"), and (iii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**"), and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on December 20, 2018 (the "**Hearing**"); and the Court having reviewed and considered (i) the Motion, including the Real Estate Sale Contract by and between Sears, Roebuck and Co. and certain of its affiliates as sellers (collectively, the "**Sellers**") and Amerco Real Estate Company as the purchaser (the "**Purchaser**"), dated as of November [29], 2018 (the "**Purchase Agreement**"), attached thereto as **<u>Exhibit A</u>**, and (ii) the Declaration of Roger Puerto, filed on November [●], 2018; and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their

2

creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

<div align="center">IT IS HEREBY FOUND AND DETERMINED THAT:</div>

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Hearing.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

C.    **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 6006, and Local Rule 6004-1.

D.    **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  In the absence of a stay pending appeal, Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Purchase Agreement at any time after entry of this Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

<div align="center">3</div>

E.    **Notice and Opportunity to Object**.    As evidenced by the affidavit of service filed with the Court, a fair and reasonable opportunity to object to and to be heard with respect to the Motion, including the proposed assumption and assignment of the Assumed Leases to Purchaser, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Amended Case Management Order has been provided to all Persons entitled to notice, including, but not limited to, the following: (i) counterparties to the Assumed Leases, (ii) Purchaser, (iii) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the Acquired Assets, and (iv) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.    Such notice was good, sufficient, and appropriate under the circumstances.    No other or further notice of the Motion is required.

F.    **Title to the Acquired Assets**.    The Acquired Assets that are subject to the Purchase Agreement constitute the property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

G.    **Sound Business Purpose**.    The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Motion, the Purchase Agreement, and ancillary agreements thereto including, without limitation, the Occupancy Agreements (as defined herein) (the "**Related Agreements**").    The Debtors' entry into and performance under the Purchase Agreement and the Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their stakeholders; and (iii) are reasonable and appropriate under the circumstances.

4

H.      **Fair Consideration**.  The consideration to be paid by Purchaser under the Purchase Agreement constitutes reasonably equivalent value, and fair and reasonable consideration for the Acquired Assets.

I.      **No Successor or Derivative Liability**.  The sale and transfer of the Acquired Assets to the Purchaser and the Purchaser's occupation and use of the Acquired Assets will not subject the Purchaser to any liability (including any successor liability) with respect to the operation of any of the Debtors' businesses before Closing or by reason of such transfer. Purchaser shall have no obligations with respect to any liabilities of the Debtors or the Debtors' estates arising out of or related to the Acquired Assets, except as expressly provided in the Purchase Agreement.  The transaction contemplated under the Purchase Agreement (the "**Transaction**") does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates.

J.      **No Fraudulent Transfer**.  The Transaction is not made for the purpose of hindering, delaying, or defrauding creditors.

K.      **Good Faith; No Collusion**.   The Purchase Agreement, the Related Agreements, and the Transaction contemplated therein were negotiated, proposed and entered into by Sellers and Purchaser in good faith, without collusion or fraud and from arm's-length bargaining positions.  Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Sellers nor Purchaser have engaged in collusion or any conduct that would cause or permit the Purchase Agreement to be avoided, or costs, fees or damages to be imposed under section 363(n) of the Bankruptcy Code.  Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common

5

identity of incorporators, directors, or controlling stockholders exists between Purchaser and any of the Debtors.

L.        **Satisfaction of 363(f) Standards**.  The Debtors may sell the Acquired Assets free and clear of all encumbrances, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), interests, and liens, rights, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, possessory interests (including those under section 365(h) of the Bankruptcy Code), other interests, leases, licenses, options, deeds of trust, security interests, condition, sale or other title retention agreements, pledges, other liens (including mechanics', materialmen's and other consensual and non-consensual liens and statutory liens), judgments, demands, rights of first refusal, offsets, set-offs, recoupment, contracts, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, tax liabilities, and other interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets, including, without limitations, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors and any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising before or after the Commencement Date, whether known or unknown, contingent or matured, liquidated or unliquidated, and whether imposed by

6

agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the effective time of Closing pursuant to the Purchase Agreement, or the transfer of any of the Debtors' interests in the Acquired Assets to the Purchaser (other than the Permitted Exceptions (as defined in the Purchase Agreement), collectively, the "**Claims**"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims who did not timely object (or who ultimately withdrew their objections, if any) to the Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Transaction, subject to any defenses of the Debtors. All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Claims against Purchaser or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

M.    **Assumption and Assignment of Leases**. The assumption and assignment of the Assumed Leases is integral to the Purchase Agreement, is in the best interests of the Debtors and their estates, and represents the reasonable exercise of the Debtors' sound business judgment. Specifically, the assumption and assignment of the Assumed Leases (i) is necessary

7

to sell the Acquired Assets to Purchaser, (ii) limits the losses suffered by counterparties to the Assumed Leases, and (iii) maximizes value for all of the Debtors' stakeholders by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Leases.

N.    **Validity of the Transfer**.  As of the Closing (as defined in the Purchase Agreement), the transfer of Acquired Assets to Purchaser will be a legal, valid, and effective transfer of such Assets, and will vest Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims.  The consummation of the Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, section 105(a), 363(b), 363(f), 363(h), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transaction.

O.    **Corporate Power and Authority.**  The Debtors have full corporate power and authority to execute and deliver the Purchase Agreement and to perform all of their respective obligations thereunder, and the Transaction and conveyance of the Acquired Assets have been duly and validly authorized by all corporate authority necessary to consummate the Transaction.  No consents or approvals, other than as expressly provided for in the Purchase Agreement and the entry of this Order, are required by the Debtors to consummate the Transaction.

P.    **Valid and Binding Contract**.  The Purchase Agreement is a valid and binding contract between the Debtors and Purchaser and shall be enforceable pursuant to its terms.   The Purchase Agreement, the Related Agreements, the Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these chapter

8

11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Q.      **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.   The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Transaction, and the Sellers and Purchaser intend to close the Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Transaction as contemplated by the Purchase Agreement.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the Transaction.

R.      **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and herein establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      **Motion is Granted**.   The Motion and the relief requested therein is granted and approved, as set forth herein.

2.      **Objections Overruled**.  All objections, if any, to the Motion or the relief requested therein that have not been withdrawn with prejudice, waived or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice.

3.      **Notice**.  Notice of the Motion and the Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of

9

the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Amended Case Management Order.

4.      **Fair Purchase Price**.  The consideration provided by Purchaser under the Purchase Agreement (a) is fair and reasonable, and (b) constitutes reasonably equivalent value, fair consideration, and fair value for the Acquired Assets.

5.      **Approval of the Purchase Agreement**.  The Purchase Agreement, the Transaction contemplated therein, the Related Agreements, and all of the terms and conditions thereof are hereby approved.  The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

6.      **Authorization of Performance by the Debtors**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized and empowered, without further order of the Court, to take any and all actions necessary or appropriate to (a) consummate and close the Transaction pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) transfer and assign all right, title, and interest in and to all Acquired Assets to be conveyed pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (c) execute and deliver, perform under, consummate, and implement the Purchase Agreement and the Related Agreements and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Transaction, including any Related Agreements, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and the Related Agreements; and (d) take all further action as may be reasonably requested by

10

Purchaser for the purposes of assigning, transferring, granting, conveying, or conferring to Purchaser, or reducing to Purchaser's possession, the Acquired Assets and the Assumed Leases.

7.      The Debtors are authorized to enter into occupancy agreements between Purchaser, as licensor, and the Sellers, as licensee, for certain of the Properties, in substantially the form attached to Exhibit E of the Purchase Agreement (collectively, the "**Occupancy Agreements**").

8.      **Direction to Creditors and Parties in Interest**.  On the Closing Date (as defined in the Purchase Agreement), each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

9.      **Direction to Government Agencies**.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction contemplated by the Purchase Agreement and approved by this Order.

10.     **Transfer of the Acquired Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Purchase Agreement.  The Acquired Assets shall be transferred to Purchaser, and upon Closing, such transfer shall: (a) be valid, legal,

11

binding and effective; (b) vest Purchaser with all right, title and interest of the Debtors in the Acquired Assets; and (c) be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Transaction, in the same amount and order of their priority, with the same validity, force and effect which they have against the Acquired Assets, and subject to any claims and defenses the Debtors may possess with respect thereto.

11.    Except as otherwise provided in the Purchase Agreement, all Persons (and their respective successors and assigns) including, without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, current and former employees, pension plans, labor unions, trade creditors and any other creditors holding Claims against the Debtors or the Acquired Assets, or any of the Debtors' businesses (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, any of the Debtors, the Acquired Assets, or any of the Debtors' businesses before the Closing Date or the transfer of the Acquired Assets to Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against the Purchaser, its affiliates, successors, or assigns, its property or the Acquired Assets, including taking any of the following actions with respect to or based on a Claim:  (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its affiliates, or their respective successors or assigns, assets, or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its affiliates, or their respective successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Claims against the Purchaser, its affiliates, or their respective successors or assigns, assets, or properties;

12

(d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, its affiliates, or their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof, including the Purchase Agreement. No such Persons shall assert or pursue against the Purchaser or its affiliates, successors, or assigns any such Claim.

12.    This Order shall be effective as a determination that, as of the Closing, all Claims have been unconditionally released, discharged and terminated as to Purchaser and the Acquired Assets, and that the conveyances and transfers described herein have been effected. Following the Closing of the Transaction, no holder of any Claim shall interfere with Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

13.    Except as expressly set forth in the Purchase Agreement, Purchaser and its successors and assigns shall have no liability for any Claim, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego or otherwise, of any kind, nature or character whatsoever, including Claims arising under, without limitation: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; and (e) any employee, workers' compensation, occupational disease or

13

unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws or (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xx) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

14.     Nothing in this Order or the Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory or environmental liability to a governmental unit that any entity would be subject to as the owner or operator of property after

14

the date of entry of this Order. Nothing in this Order or the Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15.    If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims in or against the Acquired Assets shall not have delivered to the Debtors before Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims against or in the Acquired Assets (collectively, the "**Release Documents**") that the Person holds, then with regard to the Acquired Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Order, (a) the Debtors are hereby authorized and directed to, and the Purchaser is hereby authorized to, execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to the Acquired Assets; and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets; provided that, notwithstanding anything in this Order or the Purchase Agreement to the contrary, the provisions of this Order shall be self-executing, and neither the Sellers nor Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

15

This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

16.    **No Successor or Other Derivative Liability**.    Except to the extent expressly set forth in the Purchase Agreement, by virtue of the Transaction, Purchaser shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.

17.    **Assumption and Assignment of Leases**.    Subject to and conditioned upon the occurrence of the Closing Date, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Leases to Purchaser free and clear of all Claims, and to execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Leases to Purchaser as provided in the Purchase Agreement.    Upon the Closing, Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Leases and, pursuant to section 365(k) of the Bankruptcy Code, except as expressly set forth in the Purchase Agreement, the Debtors shall be relieved from any further liability with respect to the Assumed Leases.    Upon the Closing, Purchaser shall have no liability or obligation with respect to any Claim or matter accruing or arising under the Assumed Leases before the Closing.    Purchaser acknowledges and agrees that from and after the Closing, subject to and in accordance with the Purchase Agreement, it shall comply with the obligations of the landlord accruing and arising from and after the Closing under each Assumed Lease in its entirety, including any indemnification obligations expressly contained in such Assumed Lease that could arise as a

16

result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Order.

18.  **Ipso Facto Clauses Ineffective**.  The Assumed Leases shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, including all obligations of Purchaser as the assignee of the Assumed Leases, notwithstanding any provision in such Assumed Leases (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent accelerations, escalations, assignment fees, increases or any other fees charged to Purchaser or the Debtors as a result of the assumption or assignment of the Assumed Leases.

19.  Upon the Debtors' assignment of the Assumed Leases to Purchaser under the provisions of this Order, no default shall exist under any Assumed Leases, and no counterparty to any Assumed Leases shall be permitted to declare a default by any Debtor or Purchaser or otherwise take action against Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Lease.  Any provision in an Assumed Lease that prohibits or conditions the assignment or sublease of such Assumed Lease (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.  The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assumed Lease shall not be a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition of such Assumed Lease.

<center>17</center>

20. **Statutory Mootness**. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. The Transaction contemplated by the Purchase Agreement are undertaken by Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Transaction shall neither affect the validity of the Transaction nor the transfer of the Acquired Assets to Purchaser, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Transaction pending such appeal.

21. **No Avoidance of Purchase Agreement**. Neither the Sellers nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement or Related Agreements to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreement, the Related Agreements, and the Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement, the Related Agreements, or the Transaction.

22. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

23. **Binding Effect of this Order**. The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of,

18

each of the Debtors, their estates, their creditors, and non-Debtor affiliates, Purchaser, and each of their respective affiliates, successors and assigns, and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

24.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Order and the terms of the Purchase Agreement, the terms of this Order shall control.

25.    **Modification of Purchase Agreement**.  The Purchase Agreement, the Related Agreements, and any other documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or any Related Agreements, or any other documents or other instruments.

26.    **Bulk Sales**.  No bulk sales law or similar law of any state or other jurisdiction (including those relating to taxes other than transfer taxes) shall apply in any way to the Transaction contemplated by the Purchase Agreement, the Motion, and this Order.

27.    **Distribution of Proceeds**.  On the Closing Date, Purchaser shall pay to the Debtors (in accordance with the terms of the Purchase Agreement), the balance of the purchase price remaining due and owing under the Purchase Agreement.

WEIL:\96808226\9\73217.0004

28.    **Automatic Stay**.    If and to the extent that section 362(a) may be applicable to a particular action in connection with the Purchase Agreement, the Related Agreements, and the Transaction, the automatic stay pursuant to section 362(a) of the Bankruptcy Code is hereby vacated with respect to the Debtor to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Purchase Agreement and allow the Purchaser to take any and all actions including, without limitation, exercising any rights and remedies permitted under the Purchase Agreement and the Related Agreements in accordance with the terms and conditions thereof.

29.    **Retention of Jurisdiction**.    This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Order or the Purchase Agreement (and the Related Agreements or such other documents or other instruments) and to enforce the injunctions set forth herein.

Dated: _____, 2018
      White Plains, New York

                              _____
                              THE HONORABLE ROBERT D. DRAIN
                              UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Purchase Agreement**

# REAL ESTATE SALE CONTRACT

by and between

## SEARS, ROEBUCK AND CO. AND OTHER SELLER PARTIES NAMED HEREIN

as Seller

and

## AMERCO REAL ESTATE COMPANY,
### a Nevada corporation

as Purchaser

Date:  November 29, 2018

# REAL ESTATE SALE CONTRACT

**THIS REAL ESTATE SALE CONTRACT** (**"Contract"**) is made as of the 29th day of November, 2018 (the **"Effective Date"**), by and between the seller parties set forth on **Exhibit A** attached hereto (individually and collectively, (**"Seller"**) and **AMERCO REAL ESTATE COMPANY**, a Nevada corporation, (**"Purchaser"**) (Seller and Purchaser are also collectively referred to in this Contract as the **"Parties"** and individually referred to in this Contract as a **"Party"**). Seller and Purchaser agree as follows:

1.   **PURCHASE AND SALE**

Seller is the owner of those certain parcels of land described on **Exhibit "B"** attached hereto and made a part hereof, including any interests of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes (collectively, the **"Real Properties"**) together with all improvements, structures and fixtures located on the Real Properties, and all rights and appurtenances pertaining to the Real Properties (collectively, the **"Improvements"**) and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Seller and associated with the ownership, operation or maintenance of the Real Properties and Improvements, if any, and situated on or at the Real Properties and Improvements on the Closing Date set forth in Section 7 of this Contract (collectively, the **"Personal Property"**). The Real Properties, the Improvements and the Personal Property are sometimes collectively called the **"Properties"**. Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Properties at the Purchase Price set forth in **Section 2** of this Contract. On the Closing Date set forth in **Section 7** of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Real Properties and the Improvements by recordable Deed (as that term is defined in this Contract) and title to the Personal Property by Bill of Sale (as that term is defined in this Contract).

2.   **PURCHASE PRICE**

(a)   The Purchase Price of the Properties shall be Sixty Two Million and No/100 Dollars ($62,000,000.00) (the "Purchase Price") and payable by Purchaser in United States currency in good and certifiable funds at Closing. The Purchase Price shall be allocated entirely to the Real Properties and Improvements as set forth on Schedule 1 attached hereto and made a part hereof.

(b)   Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract. This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

3.    **EARNEST MONEY DEPOSIT**

Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company (**"Title Insurer"**) the sum of Three Million One Hundred Thousand and No/100 Dollars ($3,100,000.00) United States currency (together with any interest thereon, the **"Earnest Money Deposit"**) by means of a certified check, cashier's check or wire transfer, to be held by the Title Insurer in accordance with the terms of a strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "C"** and incorporated into this Contract by this reference (the **"Earnest Money Escrow Instructions"**) and also the terms and conditions of this Contract. Any escrow fees as set forth in the Earnest Money Escrow Instructions will be paid by Purchaser. Purchaser may elect to direct the Title Insurer to invest the Earnest Money on its behalf in an interest bearing account(s) using Purchaser's tax identification number, and in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer. Except as otherwise provided elsewhere in this Contract, the Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, at the time of Closing by wire transfer of immediately available funds. If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.    **TITLE AND SURVEY REVIEW**

Purchaser has received and reviewed the title commitments for an ALTA Standard Form of Owner Policy of Title Insurance for each of the Real Properties and the Improvements (collectively, the "**Title Commitment**"). At Closing, each Seller shall convey good and marketable title to the Real Properties and the Improvements, free and clear of all liens, claims, encumbrances, interests, mortgages, deeds of trust, leases, ground leases, judgments, mechanics' liens or other monetary encumbrances (collectively, "**Liens and Encumbrances**") (and for each Seller that is a debtor in the Bankruptcy Case (as defined below) pursuant to Section 363(f) of the United States Bankruptcy Code, 11 U.S.C. §363(f)), except for those Liens and Encumbrances set forth on **Schedule 2** attached hereto, which **Schedule 2** will be modified to include any Liens and Encumbrances which first encumber the Real Properties and Improvements after the Effective Date and before Closing which are approved by Purchaser pursuant to Section 38 of this Contract (collectively, the "**Permitted Exceptions**", and the condition of title subject only to the Permitted Exceptions is hereinafter referred to as "**Acceptable Title**"). Notwithstanding anything to the contrary contained in this Contract, and except for Seller's efforts to obtain the Approval Order (as hereinafter defined), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from any Title Commitment or insured over by Title Insurer. From time-to-time prior to the Closing Date during normal hours and upon

reasonable prior written notice to Seller, Seller agrees to grant Purchaser's surveyors access to inspect, survey and obtain a current or updated ALTA/NSPS land title survey for the Real Properties and the Improvements (collectively, "**Purchaser Surveys**"). Purchaser, at its sole cost, shall pay for all Purchaser Surveys.  At no time will any contractors, surveyors or consultants with access to the Real Properties and Improvements unreasonably disturb any occupants of the Real Properties and Improvements. Before any such entry, Purchaser shall provide Seller with a certificate of insurance naming Seller as an additional insured and with an insurer and insurance limits and coverage reasonably satisfactory to Seller.  Inspections by Purchaser shall not unreasonably interfere with Seller's operation of the Real Properties and Improvements. If any inspection or test damages the Real Properties and Improvements, Purchaser will restore the Real Properties and Improvements to substantially the same condition as existed before the inspection or test.  Purchaser shall defend, indemnify Seller and hold Seller, Seller's trustees, officers, tenants, agents, contractors and employees (collectively, the "Seller Parties") and the Real Properties and Improvements harmless from and against any and all losses, costs, damages, claims, or liabilities, including but not limited to, mechanics' and materialmens' liens and Seller's reasonable attorneys' fees, arising out of or in connection with Purchaser's, or its agents', contractors', employees', or invitees' entry upon or inspection of the Real Properties and Improvements (but expressly excluding any such loss, cost, damages, claim, or liability arising from (i) the mere discovery of pre-existing conditions, (ii) the negligence or willful misconduct of Seller or the Seller Parties) or (iii) any disclosure which is required by law; provided, however, that prior to making any disclosure which Purchaser reasonably believes is legally required, Purchaser shall provide Seller written notice thereof so that Seller may elect to seek an appropriate protective order or such other waiver as Seller may elect to pursue. The license to access the Real Properties and Improvements shall be deemed revoked upon termination of this Agreement.  The provisions of this Section 4 shall survive the Closing or the earlier termination of this Contract.

5.    **PRORATIONS AND EXPENSES**

(a)    The following prorations, except as specifically set forth in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    **Taxes.** All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Real Properties and the Improvements not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel numbers that are attributable to the Properties.  All prorations shall be final.  Any general real estate taxes and other similar items and any installments of special or other assessments affecting the Real Properties and the Improvements which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any general real estate taxes and other similar items

and any installments of special or other assessments affecting the Properties which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this **Section 5(a)(i)** includes general assessments, including, without limitation, any payments in lieu of taxes in connection with the Real Properties and the Improvements pursuant to any governmental abatement or exemption program, and any regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)     **REA Obligations**. All payments and charges due and payable by Seller under any reciprocal easement agreements encumbering the Real Properties and the Improvements (collectively, the "REAs"), including without limitation the Reciprocal Easement and Development Agreement among Gratiot/Frazho Associates L.L.C., Roseperry Associates L.L.C., and Kmart Corporation dated as of September 23, 1998, encumbering the Real Property and the Improvements located at 17850 Frazho Rd., Roseville, Michigan.

(iii)    **Miscellaneous.** All of the following: (A) utilities; (B) water and sewer charges; (C) rents, profits and other payments on account of financial obligations (collectively, "**Rents**") of any persons or entities leasing or occupying any portion of any of the Real Properties and the Improvements for the month in which the Closing Date occurs, which have been actually received by Seller as of the Closing Date and any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Real Properties and the Improvements, shall be prorated at the Closing. All prorations shall be final.

(b)     At Closing, Seller shall pay one-half (1/2) of the cost of the Closing Escrow (as defined in **Section 8** of this Contract), and agrees that Purchaser shall be entitled to a credit against the Purchase Price equal to the amount of the security deposits under the leases set forth on Schedule 4 attached hereto that are in Seller's possession as of the Closing Date, if any (collectively, the "**Security Deposits**"). At least five (5) days before the Closing, Seller shall deliver to Purchaser a schedule setting forth for each Real Property and Improvement, and by tenant, the amount of any Security Deposit in Seller's possession. At Closing, Purchaser shall pay: (i) one half (1/2) of the cost of the Closing Escrow; (ii) the cost of obtaining Purchaser Surveys, if any; (iii) the cost of any updated Title Commitment and any related title searches and exam fees, investigations and tests (excluding the cost of any Title Commitments that Seller obtained prior to November 1, 2018); (iv) owner's title policies and the cost of any endorsements to such title policies; and (v) all recording charges for the Deeds and all documents pertaining to any purchase money financing. Seller and Purchaser shall pay the following in accordance with customary practice in the jurisdiction

in which each Real Property and Improvements is located: the amount of any documentary stamps, recordation taxes, or transfer tax imposed by the city in which each Real Property is located (the **"City"**) and any county ordinance, and the state in which each Real Property is located (the **"State"**) and shall meet any other requirements as established by any City ordinance with regard to the City transfer tax and the amount of any stamp or transfer tax imposed by county ordinance or State statute on the transfer of title; all financing related fees. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable equally by the Parties at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.   **CONDITIONS TO CLOSING**

(a)   In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to close on Purchaser's purchase of the Properties is subject to each and all of the following conditions precedent:

(i)   All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of the Purchaser's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Purchaser shall thereupon have a reasonable period to cure any purported breach of its representations and warranties; and

(ii)   All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed.  If any condition precedent to Closing of Purchaser as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Seller may, after notice to Purchaser and Purchaser's failure to cure within the time period(s) set forth in this Contract, elect at any time thereafter, to terminate this Contract, provided that Seller is not itself in default beyond any applicable notice and cure period, and exercise such remedies as provided in **Section 11** of this Contract.

(iii)   Entry by the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) in the Chapter 11 bankruptcy case of In re Sears Holdings Corporation, et al., Case No. 18-23538 (RDD) (Jointly Administered)(the **"Bankruptcy Case"**), of an order approving this Contract and authorizing Seller to carry out this Contract, substantially in the form attached hereto as **Exhibit "D"** (the **"Approval Order"**), which Approval Order has not been stayed at the time of the Closing.

(b)      In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Properties is subject to each and all of the following conditions precedent:

    (i)      All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Seller shall thereupon have a reasonable period to cure any purported breach of its representations and warranties;

    (ii)      All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Seller as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Purchaser may, after notice to Seller and Seller's failure to cure within the time period(s) set forth in this Contract, provided that Purchaser is not itself in default beyond any applicable notice and cure period, elect at any time thereafter, to terminate this Contract and exercise such remedies as provided in **Section 12** of this Contract; and

    (iii)      Entry by the Bankruptcy Court of the Approval Order in the Bankruptcy Case which Approval Order has not been stayed at the time of the Closing.

    (iv)      At the Closing, Title Insurer delivers to Purchaser signed commitments to insure under an ALTA Standard Form of Owner Policy of Title Insurance Purchaser's title to each of the Real Properties and the Improvements, without exception for any Liens and Encumbrances excluding the Permitted Exceptions (collectively, "**Required Title Insurance**"). In the event that that Title Insurer is unable to deliver to Purchaser the Required Title Insurance for any Real Property together with its Improvements (the "**Uninsured Property**"), Purchaser shall have the right to withdraw such Uninsured Property from this Contract by written notice to Seller, in which event the Real Properties and the Improvements shall thereafter exclude such Uninsured Property and the Purchase Price shall be reduced by an amount equal to the purchase price allocated to such Uninsured Property on Schedule 1 attached hereto.

(c)      In the event that (i) the Bankruptcy Court does not grant the Approval Order on or before January 31, 2019, (ii) the Approval Order is entered on or before January 31, 2019 but stayed before the time of the Closing or (iii) the Approval Order is entered on the docket in the Bankruptcy Case but the Title Insurer does not provide the Required Title Insurance on or before January 31, 2019, as a result of any appeal, motion for reconsideration or other motion to set aside, vacate or otherwise challenge the Approval Order , either Party will have the right to terminate this Contract by written notice to the other Party, in which event (i) this

Contract shall immediately terminate, (ii) the Parties shall jointly direct the Title Insurer to return the Earnest Money Deposit to Purchaser, and (iii) the Parties shall have no further obligations other than those that by their terms specifically survive termination of this Agreement.

7.    **CLOSING**

(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the **"Closing"**) shall take place in escrow at the offices of the Title Insurer on the date that is ten (10) business days after the entry of the Approval Order, or such other date mutually agreed to by Purchaser and Seller (the **"Closing Date"**).

(b)    As of the Closing Date, the Parties shall enter into an occupancy agreement between Purchaser, as licensor, and Seller, as licensee in substantially the form attached hereto as **Exhibit "E"** (the "**Occupancy Agreement**") for each of the Real Properties and the Improvements listed on **Schedule 3** attached hereto (collectively, the "**Occupied Properties**").

(c)    On or before the Closing Date, Seller shall deliver or cause to be delivered to the Title Insurer the following Closing documents:

(i)    A certified copy of the Approval Order;

(ii)    An original Special Warranty Deed or the local law equivalent, executed by Seller for each of the Real Properties and the Improvements, in proper form for recording under applicable state or local law so as to convey Acceptable Title to Purchaser and as reasonably requested by the Title Insurer to issue the Required Title Insurance (the "**Deed**");

(iii)    A settlement statement executed by Seller;

(iv)    An original FIRPTA Affidavit in accordance with the Foreign Investment in Real Property Tax Act, 26 U.S.C. § 1445, duly executed by Seller and in a form reasonably acceptable to Seller and Purchaser;

(v)    an original Bill of Sale executed by Seller, in form and substance reasonably acceptable to the Parties, conveying and transferring to Purchaser all of Seller's right, title and interest in the Personal Property ("**Bill of Sale**");

(vi)    Two counterpart originals of the Occupancy Agreement executed by Seller for each of the Occupied Properties;

(vii)    An original general assignment executed by Seller, in form and substance reasonably acceptable to the Parties, assigning and transferring to Purchaser all of Seller's right, title and interest in all certificates, licenses,

approvals, permits, warranties and other rights relating to the Real Properties and the Improvements, to the extent the same are assignable ("**General Assignment**");

(viii)  An original assignment and assumption of lease executed by Seller, in form and substance reasonably acceptable to the Parties ("**Assignment and Assumption of Lease**"), assigning and transferring to Purchaser all of Seller's right, title and interest in each Lease (as hereinafter defined in this Contract);

(ix)  Copies of each Lease, to the extent such copies are in the possession or control of Seller;

(x)  Copies of any certificates, licenses, approvals, permits and warranties relating to the Real Properties and the Improvements, to the extent the same are assignable and are in the possession or control of Seller;

(xi)  All keys, access, security, and alarm codes for each of the Real Properties and Improvements except those set forth on Schedule 1;

(xii)  A seller's title affidavit in favor of the Title Insurer, executed by each Seller that is not a debtor in the Bankruptcy Case (collectively, the "**Non-Debtor Sellers**") in a form reasonably requested by the Title Insurer to issue the Required Title Insurance;

(xiii)  Resolutions authorizing Non-Debtor Sellers to carry out the terms of this Contract and to deliver the Deed, as applicable to the Real Properties and the Improvements owned by the Non-Debtor Sellers, in form and substance reasonably requested by the Title Insurer to issue the Required Title Insurance; provided however, such resolutions shall not be required in the event such authority is granted to Non-Debtor Sellers pursuant to the Approval Order or the existing resolutions of Non-Debtor Sellers that are in the possession of the Title Insurer; and

(xiv)  Such other instruments, certificates, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Properties under applicable state or local law, or as reasonably requested by the Title Insurer to issue the Required Title Insurance; provided, however, that Seller, other than the Non-Debtor Sellers, will not be required to execute a customary seller's title affidavit in favor of the Title Insurer.

(d)  On the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

(i)  Balance of the Purchase Price, plus or minus prorations;

(ii)  An original counterpart to the Bill of Sale executed by Purchaser;

(iii)    An original counterpart to the General Assignment executed by Purchaser;

(iv)    An original counterpart to the Assignment and Assumption of Lease executed by Purchaser;

(v)    Two counterpart originals of the Occupancy Agreement executed by Purchaser for each of the Occupied Properties; and

(vi)    Such other documents, certificates, instruments, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Properties under applicable state or local law, or as reasonably requested by the Title Insurer to issue the Required Title Insurance.

(e)    On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and state, county and municipal transfer tax declarations and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

## 8.    <u>CLOSING ESCROW</u>

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**<u>Closing Escrow</u>**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control.  All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing.  Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 9.    <u>REPRESENTATIONS AND WARRANTIES</u>

(a)    Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Provided that the Approval Order is entered and has become final and non-appealable, Seller will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all

documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to entry of the Approval Order.

(ii) To Seller's actual knowledge, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Properties, other than those disclosed on the Title Commitment or as set forth on Schedule 4 attached hereto.

(iii) Seller has title to the Real Properties and the Improvements.

(iv) As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of Roger Puerto on behalf of Seller and shall not be construed to refer to the knowledge of any other officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b) Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i) Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii) Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii) This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors (**"Bankruptcy Law"**) a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a **"Custodian"**) of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(iv)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Real Properties and the Improvements.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this **Section 9** shall merge with the transfer of title and shall not survive Closing. Upon consummation of Closing, Seller and Purchaser shall have no further liability with respect to any claim which Purchaser or Seller may have against the other party for a breach of any such representation or warranty, whether such breach is known or unknown.

## 10.    <u>AS IS/NO WARRANTIES</u>

(a)    Purchaser expressly acknowledges that Purchaser is buying the Properties in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Properties without warranty or representation of any kind by Seller or any of Seller's employees, agents or contractors (the "**Seller's Related Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Contract, the term "**Hazardous Material**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation. Purchaser, hereby agrees to hold harmless and indemnify Seller and Seller's Related Parties (collectively, the "**Indemnitees**"), from and against any

demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, but excluding any punitive, exemplary, consequential or incidental damages, (collectively, "**Losses**") incurred in connection with any claim, proceeding or judgment, up to a maximum Losses with respect to each of the Real Properties and the Improvements which is subject to an indemnity claim, in the amount equal to thirty five percent (35%) of the purchase price allocated to such Real Property and Improvement on Schedule 1 attached hereto (the "**Cap**"), net of any recovery actually received by the Indemnitees from any third party including without limitation any insurer, for Losses incurred by any Indemnitee from (x) any Hazardous Materials currently located or which come to be located upon the Real Properties and the Improvements or the release of any Hazardous Materials into, from or through the Real Properties and the Improvements (except to the extent the presence or release thereof was caused by Seller or its current or former affiliates, officers, employees, agents and contractors) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Real Properties and the Improvements, from any source (except to the extent any such migration, leach or travel thereof was caused by Seller or its current or former affiliates, officers, employees, agents and contractors). If any claim, action or proceeding is made or brought against any Indemnitee that may result in any Losses (an "**Asserted Claim**"), then such Indemnitee shall provide written notice thereof to Purchaser. Purchaser, in its sole discretion, may, but will not be required to, defend such Asserted Claim by attorneys selected by Purchaser. If Purchaser elects to defend an Asserted Claim, Purchaser shall control the defense thereof and may settle or compromise such Asserted Claim without the consent of Indemnitee only if, as part of such settlement or compromise, (i) the Indemnitee shall receive a full and unconditional release from such Asserted Claim, (ii) any payments to be made on behalf of the Indemnitee pursuant to such settlement or compromise shall be paid by Indemnitor up to the Cap, and (iii) such settlement or compromise shall not require the Indemnitee to admit any liability or wrongdoing.

(b)     Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Properties in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller, except as otherwise provided for in the representations and warranties in Section 9 of this Contract. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Properties in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in **Section 9** of this Contract:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Properties, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)   Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Properties, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Properties, the environmental condition of the Properties, the condition of repair of the Properties, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Properties are located; and

(iv)    Purchaser shall acquire the Properties in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING **SUBSECTIONS 10(A) AND 10(B)**, PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTIES, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTIES, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTIES, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTIES, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTIES, OR (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTIES, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTIES.

(d)      Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Seller's Related Parties as to the condition or repair of the Properties or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Properties or the condition, repair, value, expense of operation or income potential of the Properties or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Properties fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

11.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the **"Code"**), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

12.    **DEFAULT AND REMEDIES**

If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of notice of such default (the "**Seller Cure Period**"), for any reason other than Purchaser's default hereunder and failure to diligently complete or cure Purchaser shall have as its sole and exclusive remedies the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract or (b) in the event that the Approval Order has been entered and not stayed, the right to specific performance of this Contract by the Bankruptcy Court; provided, however, Purchaser will seek this right of specific performance if at all within no more than thirty (30) days from the expiration of the Seller Cure Period. If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default, for any reason other than Seller's default hereunder, Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest

Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall become null and void with neither Party having any further rights or liabilities hereunder, except as provided for in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money Deposit is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money Deposit upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

13.   **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

|  |  |
|---|---|
| **To Seller:** | **SEARS ROEBUCK & CO.** |
|  | c/o Sears Holdings Corporation |
|  | 3333 Beverly Road, Dept. 824RE |
|  | Hoffman Estates, IL 60179 |
|  | Attention:  Jane Borden |
|  | Telephone:  (847) 286-5303 |
|  | Email: jane.borden@searshc.com |

with copies thereof to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  W. Michael Bond, Esq.
Telephone: (212) 310-8035
Email: Michael.Bond@Weil.com

and

c/o Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention:  Associate General Counsel – Real Estate
Telephone:  (847) 286-1719
Email: Elizabeth.Williams@searshc.com

| To Purchaser: | **AMERCO REAL ESTATE COMPANY**<br>Attn: Jason Berg<br>2727 N. Central Avenue<br>Phoenix, AZ 85004<br>Phone: 602.263.6928<br>Email: jason@uhaul.com |
| --- | --- |
| With copies to: | **U-HAUL INTERNATIONAL, INC.**<br>Legal Department<br>Attn: Josh Goldberg<br>2727 N. Central Avenue<br>Phoenix, AZ 85004<br>Phone: 602.735.6677<br>Email: josh_goldberg@uhaul.com |
| | **WHITE & WILLIAMS LLP**<br>7 Times Square, Suite 2900<br>New York, New York 10036<br>Attn: Steven E. Ostrow, Esq.<br>Phone: 212.714.3068<br>Email: ostrows@whiteandwilliams.com |

Notice of change of address for receipt of notices shall be sent in the manner set forth in this **Section 13**.

14.    **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

15.    **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

16.    **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing. Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and

WEIL:\96776096\12\73217.0004

obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

## 17.    **CONFIDENTIALITY**

Purchaser agrees that all terms of this Contract as well as any information provided to Purchaser pertaining to Seller (the "**Confidential Information**") will remain confidential and will not be divulged by Purchaser without the written consent of Seller, except that Purchaser may disclose the Confidential Information without Seller's consent to the Title Insurer and Purchaser's respective directors, officers, employees, affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) and to any agency (governmental or public) in connection with Purchaser's pursuit of any entitlements and/or approvals deemed by Purchaser to be necessary for construction of the Properties, so long as the confidentiality obligations of Purchaser are binding upon all of the foregoing and Purchaser informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this **Section 17**. Notwithstanding anything contained in this Contract to the contrary, the obligation of confidentiality does not apply to (a) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this **Section 17** or breach of confidentiality by anyone bound under like terms of confidentiality to the Party making such public disclosure, (b) Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. If Purchaser seeks Seller's consent to the disclosure of the Confidential Information, Seller shall not unreasonably withhold its consent. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Contract or its terms will be provided to any third party not subject to the same confidentiality obligation as Purchaser. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this **Section 17**, in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Contract to the contrary, Purchaser may divulge Confidential Information without Seller's consent to any existing lenders or proposed lenders in connection with any financing by Purchaser of the Properties (who, in turn, may disclose the Confidential Information to their officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing).

## 18.    **BROKERAGE**

Seller hereby indemnifies, protects and defends and holds Purchaser harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of the Seller. Purchaser hereby indemnifies, protects and defends and holds Seller harmless from and against all losses, claims, costs,

expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (other than any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of the Purchaser. Any commission or other compensation due any broker representing Seller shall be the sole responsibility of Seller, and any broker representing Seller shall be paid at the Closing in accordance with separate agreements between such broker and Seller.

19.    **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has a majority ownership interest or has at least co-control over provided that written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing. No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

20.    **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

21.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an **"Action"**), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used in this Section 21 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action. It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

22.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

23.    **GOVERNING LAW**

This Contract shall be construed and governed in accordance with the laws of the State of New York without regard to its conflicts of laws principles.

24.    **COUNTERPARTS**

This Contract may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument. Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Contract. The parties agree that the Purchaser shall be the first to execute this Contract. Any counterpart of this Contract executed by a Party may be delivered via facsimile, email or other electronic transmission, and shall be legally binding upon the Parties to the same extent as delivery of an original counterpart of this Contract executed by a Party.

25.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of **Section 19** of this Contract.

26.    **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

27.    **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed.

28.    **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

29.    **SECTION 1031 EXCHANGE**

At Seller's option, Purchaser agrees to cooperate with Seller in closing the sale of the Properties as a like-kind exchange under Section 1031 of the Internal Revenue Code (the "**Code**"). Such cooperation shall include, without limitation, the substitution by Seller of an intermediary (the "**Intermediary**") to act in place of Seller as the Seller of the Properties. If Seller so elects, Purchaser agrees to accept the Properties and all other required performance from the Intermediary and to render Purchaser's performance of all of its obligations hereunder to the Intermediary. Purchaser agrees that performance by the Intermediary shall be deemed performance by Seller and Seller agrees that Purchaser's performance to the Intermediary shall be deemed as performance to Seller. Notwithstanding the foregoing, Seller shall remain liable to Purchaser for each and every one of the representations, warranties, indemnities and obligations of Seller under this Contract and Purchaser may proceed directly against Seller without the need to join the Intermediary as a party to any action against Seller.

At Purchaser's option, Seller agrees to cooperate with Purchaser in closing the sale of the Properties as a like-kind exchange under Section 1031 of the Code. Such cooperation shall include, without limitation, the substitution by Purchaser of an Intermediary to act in place of Purchaser as the Purchaser of the Real Properties. If Purchaser so elects, Seller agrees to accept the Properties and all other required performance from the Intermediary and to render Seller's performance of all of its obligations hereunder to the Intermediary. Seller agrees that performance by the Intermediary shall be deemed performance by Purchaser and Purchaser agrees that Seller's performance to the Intermediary shall be deemed as performance to Purchaser. Notwithstanding the foregoing, Purchaser shall remain liable to Seller for each and every one of the representations, warranties, indemnities and obligations of Purchaser under this Contract and Seller may proceed directly against Purchaser without the need to join the Intermediary as a party to any action against Purchaser.

30.    **CONDEMNATION AND CASUALTY**

In the event of any taking, or notice is given of the intention to take any of the Real Properties and the Improvements by the exercise of the power of eminent domain of all or a substantial portion of any Real Properties and the Improvements prior to the Closing Date, such portion as would materially impair or otherwise materially affect Purchaser's intended use of any such Real Properties and the Improvements will be deemed "substantial," Purchaser shall have the right to terminate this Contract by giving written notice to Seller within five (5) business days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Earnest Money Deposit, plus any interest accrued thereon, shall be promptly

returned to Purchaser. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said five (5) business day period, said right to terminate shall be deemed waived and Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Properties with no reduction in the Purchase Price.

If any of the Real Properties and the Improvements suffer damage as a result of any casualty prior to the Closing Date (each a "**Damaged Property**"), Seller shall give Purchaser prompt written notice thereof. If the cost to repair such damage to a Damaged Property is greater than Five Hundred Thousand and No/100 Dollars ($500,000.00), Purchaser may elect, by written notice delivered to Seller prior to the scheduled Closing Date, to:

(a)     Withdraw such Damaged Property from this Contract by written notice to Seller, in which event the Real Properties and the Improvements shall thereafter automatically exclude such Damaged Property, the Purchase Price shall be reduced by an amount equal to the purchase price allocated to such Damaged Property on Schedule 1 attached hereto and neither Party shall have any liability or obligation to the other with respect to such Damaged Property; or

(a)     (b)     Notify Seller that it desires to take title to such Damaged Property in its damaged condition, without abatement of the Purchase Price, in which event Purchaser shall be entitled to the proceeds of any insurance carried by Seller with respect to such Damaged Property and Seller shall assign such insurance proceeds and related insurance claim to Purchaser at the Closing. All risks of loss to the Properties are borne by Seller prior to Closing.

31.     **SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

32.     **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

33.     **JURY TRIAL**

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

34.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto. However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

35.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

36.    **PATRIOT ACT**

Seller certifies that its names are accurately reflected in Exhibit A attached hereto and to Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is **AMERCO REAL ESTATE COMPANY**, a Nevada corporation, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

37.    **EXCULPATION; LIMITATION OF LIABILITY.**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this **Section 37** shall survive the expiration of the term or any earlier termination of this Contract.

38.    <u>General Covenants</u>.  Except as Purchaser may otherwise consent in writing, such consent to be in Purchaser's sole discretion, until the Closing Date, unless this Agreement is sooner terminated, Seller shall (a) use commercially reasonable efforts to maintain the Real Properties and the Improvements substantially in their present condition and repair, ordinary wear and tear excepted and subject to the terms of Article 30 hereof; (b) maintain the existing insurance policies (or reasonably equivalent policies) for the Real Properties and Improvements (and any replacements thereof) in full force and effect; (c) not sell, transfer, encumber, mortgage or place any monetary lien upon the Real Properties and the Improvements, except for any debtor- in-possession liens in connection with the Bankruptcy Case that will be discharged as liens against the Real Properties and the Improvements at Closing; (d) not enter into any new service contracts relating to the Property that would be binding on Purchaser unless they are terminable upon Closing or cancelable upon thirty (30) days or less notice; (e) not enter into any new license, lease or occupancy agreement or concession that will survive Closing other than licenses, leases, occupancy agreements and concessions for use of the Real Properties and the Improvements to be leased pursuant to the Occupancy Agreement, provided they are terminable at or prior to expiration or sooner termination of the Occupancy Agreement; (f) file a motion in the Bankruptcy Case requesting entry of the Approval Order and serve such motion on all parties required by the Amended Case Management Order entered by the Bankruptcy Court, and on all parties which hold any Liens and Encumbrances against the Properties, (g) not accept payment of rent more than one month in advance from any tenant or occupant or grant any free rent, concession, rebate, allowance or other consideration to any tenant or occupant under any Lease, (h) not amend, modify or renew any Lease or waive any material breaches or defaults on the part of any tenant, or waive any material rights or options of the landlord, under any Lease; and (i) not make any material changes, improvements or alterations to any portion of the Real Properties and the Improvements.

39    <u>Rents</u>: With respect to any Rents received by any Seller or Purchaser after the Closing, within fifteen (15) days after such receipt: (a) the Party receiving such Rents shall provide written notice to the other Party of the receipt of such Rents, together with copies of any checks, electronic transfers or other documents related to such Rents; (b) such Rents received by any Seller, to the extent that they are due and payable for periods after the Closing Date, shall be paid by Seller to Purchaser; and (c) such rents received by Purchaser, to the extent that they were due and payable for periods prior to the Closing Date, shall be paid by Purchaser to the applicable Seller.  The terms of this Section 39 shall survive the Closing for one hundred twenty (120) days after the Closing Date.

40.    <u>**Tax Appeals**</u>.  In the event that any Seller has, prior to the Closing Date, protested or appealed any general real estate taxes or assessments with respect to the Real Properties and the Improvements for any tax years on or before 2018 (collectively, the "<u>**Tax Appeals**</u>"), from and after the Effective Date Seller shall maintain and control the Tax Appeals; provided, however, Seller agrees that no settlement or resolution of the Tax Appeals shall occur or be made without the prior written approval of Purchaser, such approval not to be unreasonably withheld, conditioned or delayed. Any refunds or savings in the payment of taxes resulting from such Tax Appeals applicable to taxes payable during the period prior to the date of the Closing shall belong to and be the sole property/obligation of Seller and any refunds or savings in the payment of taxes applicable to taxes payable from and after the date of the Closing shall, to the extent

such refunds or savings apply to taxes paid by Seller pursuant to any Occupancy Agreement, belong to and be the property of Seller, and otherwise shall belong to and be the property of Purchaser. All attorneys' fees and other expenses incurred in obtaining such refunds or savings shall be apportioned between Seller and Purchaser in proportion to the gross amount of such refunds or savings payable to Seller and Purchaser, respectively. The terms of this Section 40 shall survive the Closing for one hundred twenty (120) days after the Closing Date.

41.     **REA Estoppels**: Within seven (7) business days after Purchaser's written request, Seller shall send an Estoppel Certificate in form and substance reasonably acceptable to Purchaser (collectively, the "Estoppels"; each an "Estoppel") to the other parties to the REAs (each an "**REA Party**"), and thereafter use commercially reasonable efforts to obtain and deliver to Purchaser before the Closing the Estoppels executed by any REA Party. Purchaser agrees and acknowledges that Purchaser's receipt of the Estoppels shall not be a condition to Closing and Purchaser shall have no right to terminate the Contract or extend the Closing Date, regardless of (x) whether or not Purchaser receives some or all of the Estoppels executed by an REA Party, or (y) the certifications, qualifications and/or limitations set forth in the Estoppels executed by any REA Party.

42.     **Local Law Provisions**: The parties agree to amend this Contract after the Effective Date but prior to Closing to provide any applicable local law provisions and/or requirements.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**SEARS ROEBUCK & CO.,**
a New York corporation

By: _____
Name: Jane Borden
Title: President, Real Estate

**SRC FACILITIES LLC,**
a Delaware limited liability company

By: _____
Name: Jane Borden
Title: Vice President

**KMART CORPORATION,**
a Michigan corporation

By: _____
Name: Jane Borden
Title: President, Real Estate

**KMART STORES OF ILLINIOIS, LLC,**
an Illinois limited liability company

By:    Kmart Corporation,
       a Michigan corporation,
       its manager

By: _____
Name: Jane Borden
Title: President, Real Estate

**[Signature Page to Real Estate Sale Contract]**

PURCHASER:

**AMERCO REAL ESTATE COMPANY,**
a Nevada corporation

By: _____
Name:  *Josm  Berg*
Title:  *Treasurer*

**EXHIBITS**

Exhibit "A"  Seller Parties
Exhibit "B"  Real Properties
Exhibit "C"  Earnest Money Escrow Instructions
Exhibit "D"  Approval Order
Exhibit "E"  Form of Occupancy Agreement
Schedule 1 Price Allocations
Schedule 2 Permitted Exceptions
Schedule 3 Properties Subject to an Occupancy Agreement
Schedule 4 Leases

## EXHIBIT "A"

## SELLER PARTIES

| | |
|---|---|
| AK – Fairbanks – Site 2819 | SRC Facilities LLC, a Delaware limited liability company |
| CA – Apple Valley – Site 3699 | Kmart Corporation, a Michigan corporation |
| CA – Santa Maria – Site 4371 | SRC Facilities LLC, a Delaware limited liability company |
| FL – Fort Walton Beach – Site 3223 | Kmart Corporation, a Michigan corporation |
| IL – Rockford – Site 4423 | Kmart Stores of Illinois, LLC, an Illinois limited liability company |
| IL – Springfield – Site 4048 | Sears Roebuck and Co., a New York corporation |
| MI – Roseville – Site 4998 | Kmart Corporation, a Michigan corporation |
| NM – Roswell – Site 7017 | Kmart Corporation, a Michigan corporation |
| NY – Queensbury – Site 4928 | SRC Facilities LLC, a Delaware limited liability company |
| PA – Pittsburgh – Site 3529 | Kmart Corporation, a Michigan corporation |
| TN – Kingsport – Site 3147 | Kmart Corporation, a Michigan corporation |
| WA – Spokane – Site 4147 | SRC Facilities LLC, a Delaware limited liability company |
| WI – Fort Atkinson – Site 31903 | Kmart Corporation, a Michigan corporation |

A-1

## EXHIBIT "B"

## REAL PROPERTIES

3115 Airport Way, Fairbanks, AK

308 Dix Avenue, Queensbury, NY

2875 Santa Maria Way, Santa Maria, CA

4110 E. Sprague Avenue, Spokane, WA

5909 E. State Street, Rockford, IL

20777 Bear Valley Road, Apple Valley, CA

200 Irwin Avenue, Fort Walton Beach, FL

1805 E. Stone Drive, Kingsport, TN

3250 Clear Lake Road, Springfield, IL

996 W. View Park Drive, Pittsburgh, PA

1309 N. High Street, Fort Atkinson, WI

17850 Frazho Road, Roseville, MI

1705 S. Main Street, Roswell, NM

WEIL:\96776096\12\73217.0004

**EXHIBIT "C"**

**EARNEST MONEY ESCROW INSTRUCTIONS**

(see attached)



# CHICAGO TITLE AND TRUST COMPANY
**10 SOUTH LASALLE ST. #3100, CHICAGO, ILLINOIS 60603**

Refer to:
Phone no.:
Fax no:

### STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO.:                          DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

Customer Identification:

Seller:

Purchaser:

Property Address:

Project Reference:

Proposed Disbursement Date:

Deposits:

1. The sum of $              by          CHECK/WIRE          Representing:  EARNEST MONEY

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

Funds:

( ) WILL     ( ) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

Delivery of Deposits:

1. The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

2. In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

3. Notwithstanding anything contained in this agreement to the contrary, including paragraphs 1 and 2 immediately preceding this one, in the event Escrow Trustee receives, on or before the close of business on_____( the expiration of the inspection/due diligence period), a notice from the purchaser that it elects to terminate the sales contract for the above-referenced property for which the funds on held herein represent the earnest money deposit, Escrow Trustee is directed to  return said earnest money, at purchaser's sole request without the need to obtain seller's consent or permission.  After the funds are returned to the purchaser, the escrow shall be closed and Escrow Trustee shall have no further responsibilities with regard to this matter.

4. In the event purchaser agrees to proceed with the transaction, an additional sum of $_____may be received on or before _____.  Said funds shall be considered an Additional Earnest Money Deposit and shall be combined and disbursed with the initial deposit subject to paragraphs 1 & 2 above.

Page 1

Billing Instructions:
Escrow trust fee will be deducted as follows: $_____escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement. Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the
undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions

contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person. Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

| For Seller: | For Purchaser: |
|---|---|
| Name: | Name: |
| By: | By: |
| Address: | Address: |
| | |
| Phone: | Phone: |
| Fax: | Fax: |
| Email: | Email: |
| Signature: | Signature: |

| Legal Representative: | Legal Representative: |
|---|---|
| Name: | Name: |
| By:. | By: |
| Address: | Address: |
| | |
| Phone: | Phone: |
| Fax: | Fax: |
| Email: | Email: |
| Signature: | Signature: |

Accepted: Chicago Title and Trust Company, as Escrow Trustee

By:                                                     Date:

**<u>EXHIBIT "D"</u>**

**<u>APPROVAL ORDER</u>**

(See attached)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

In re                                        :
                                             :          **Chapter 11**
SEARS HOLDINGS CORPORATION, *et al.*,        :
                                             :          **Case No. 18-23538 (RDD)**
                                             :
Debtors.[1]                                  :          **(Jointly Administered)**
------------------------------------------------------- x

## ORDER (I) APPROVING THE SALE OF
## CERTAIN REAL PROPERTY, (II) AUTHORIZING THE
## ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES
## IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated November 29, 2018 (ECF No. [__]) (the "**Motion**")[2] of

Sears, Roebuck and Co. and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 363,

and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6004 and 6006 of

the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and Rule 6004-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), sseeking the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

entry of an order (i) authorizing and approving the sale of certain real and personal property of the Debtors (the "**Properties**") free and clear of all liens, claims, interests, and encumbrances, (ii) authorizing and approving the assumption and assignment of certain unexpired leases of nonresidential real property of the Debtors in connection therewith (the "**Assumed Leases**" and, together with the Properties, the "**Acquired Assets**"), and (iii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**"), and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on December 20, 2018 (the "**Hearing**"); and the Court having reviewed and considered (i) the Motion, including the Real Estate Sale Contract by and between Sears, Roebuck and Co. and certain of its affiliates as sellers (collectively, the "**Sellers**") and Amerco Real Estate Company as the purchaser (the "**Purchaser**"), dated as of November [29], 2018 (the "**Purchase Agreement**"), attached thereto as **Exhibit A**, and (ii) the Declaration of Roger Puerto, filed on November [●], 2018; and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their

2

creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Hearing.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 6006, and Local Rule 6004-1.

D.    **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  In the absence of a stay pending appeal, Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Purchase Agreement at any time after entry of this Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

3

E.  **Notice and Opportunity to Object**.  As evidenced by the affidavit of service filed with the Court, a fair and reasonable opportunity to object to and to be heard with respect to the Motion, including the proposed assumption and assignment of the Assumed Leases to Purchaser, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Amended Case Management Order has been provided to all Persons entitled to notice, including, but not limited to, the following: (i) counterparties to the Assumed Leases, (ii) Purchaser, (iii) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the Acquired Assets, and (iv) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  Such notice was good, sufficient, and appropriate under the circumstances.  No other or further notice of the Motion is required.

F.  **Title to the Acquired Assets**.  The Acquired Assets that are subject to the Purchase Agreement constitute the property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

G.  **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Motion, the Purchase Agreement, and ancillary agreements thereto including, without limitation, the Occupancy Agreements (as defined herein) (the "**Related Agreements**").  The Debtors' entry into and performance under the Purchase Agreement and the Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their stakeholders; and (iii) are reasonable and appropriate under the circumstances.

4

H.     **Fair Consideration**. The consideration to be paid by Purchaser under the Purchase Agreement constitutes reasonably equivalent value, and fair and reasonable consideration for the Acquired Assets.

I.     **No Successor or Derivative Liability**. The sale and transfer of the Acquired Assets to the Purchaser and the Purchaser's occupation and use of the Acquired Assets will not subject the Purchaser to any liability (including any successor liability) with respect to the operation of any of the Debtors' businesses before Closing or by reason of such transfer. Purchaser shall have no obligations with respect to any liabilities of the Debtors or the Debtors' estates arising out of or related to the Acquired Assets, except as expressly provided in the Purchase Agreement. The transaction contemplated under the Purchase Agreement (the "**Transaction**") does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates.

J.     **No Fraudulent Transfer**. The Transaction is not made for the purpose of hindering, delaying, or defrauding creditors.

K.     **Good Faith; No Collusion**. The Purchase Agreement, the Related Agreements, and the Transaction contemplated therein were negotiated, proposed and entered into by Sellers and Purchaser in good faith, without collusion or fraud and from arm's-length bargaining positions. Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Sellers nor Purchaser have engaged in collusion or any conduct that would cause or permit the Purchase Agreement to be avoided, or costs, fees or damages to be imposed under section 363(n) of the Bankruptcy Code. Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common

5

identity of incorporators, directors, or controlling stockholders exists between Purchaser and any of the Debtors.

L. **Satisfaction of 363(f) Standards**. The Debtors may sell the Acquired Assets free and clear of all encumbrances, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), interests, and liens, rights, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, possessory interests (including those under section 365(h) of the Bankruptcy Code), other interests, leases, licenses, options, deeds of trust, security interests, condition, sale or other title retention agreements, pledges, other liens (including mechanics', materialmen's and other consensual and non-consensual liens and statutory liens), judgments, demands, rights of first refusal, offsets, set-offs, recoupment, contracts, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, tax liabilities, and other interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets, including, without limitations, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors and any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising before or after the Commencement Date, whether known or unknown, contingent or matured, liquidated or unliquidated, and whether imposed by

6

agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the effective time of Closing pursuant to the Purchase Agreement, or the transfer of any of the Debtors' interests in the Acquired Assets to the Purchaser (other than the Permitted Exceptions (as defined in the Purchase Agreement), collectively, the "**Claims**"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims who did not timely object (or who ultimately withdrew their objections, if any) to the Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Transaction, subject to any defenses of the Debtors. All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Claims against Purchaser or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

M.    **Assumption and Assignment of Leases**. The assumption and assignment of the Assumed Leases is integral to the Purchase Agreement, is in the best interests of the Debtors and their estates, and represents the reasonable exercise of the Debtors' sound business judgment. Specifically, the assumption and assignment of the Assumed Leases (i) is necessary

7

to sell the Acquired Assets to Purchaser, (ii) limits the losses suffered by counterparties to the Assumed Leases, and (iii) maximizes value for all of the Debtors' stakeholders by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Leases.

N.    **Validity of the Transfer**.  As of the Closing (as defined in the Purchase Agreement), the transfer of Acquired Assets to Purchaser will be a legal, valid, and effective transfer of such Assets, and will vest Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims.  The consummation of the Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, section 105(a), 363(b), 363(f), 363(h), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transaction.

O.    **Corporate Power and Authority.**  The Debtors have full corporate power and authority to execute and deliver the Purchase Agreement and to perform all of their respective obligations thereunder, and the Transaction and conveyance of the Acquired Assets have been duly and validly authorized by all corporate authority necessary to consummate the Transaction.  No consents or approvals, other than as expressly provided for in the Purchase Agreement and the entry of this Order, are required by the Debtors to consummate the Transaction.

P.    **Valid and Binding Contract**.  The Purchase Agreement is a valid and binding contract between the Debtors and Purchaser and shall be enforceable pursuant to its terms.    The Purchase Agreement, the Related Agreements, the Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these chapter

8

11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Q.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Transaction, and the Sellers and Purchaser intend to close the Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Transaction as contemplated by the Purchase Agreement.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the Transaction.

R.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and herein establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    **Motion is Granted**.  The Motion and the relief requested therein is granted and approved, as set forth herein.

2.    **Objections Overruled**.  All objections, if any, to the Motion or the relief requested therein that have not been withdrawn with prejudice, waived or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice.

3.    **Notice**. Notice of the Motion and the Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of

9

the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Amended Case Management Order.

4.  **Fair Purchase Price**. The consideration provided by Purchaser under the Purchase Agreement (a) is fair and reasonable, and (b) constitutes reasonably equivalent value, fair consideration, and fair value for the Acquired Assets.

5.  **Approval of the Purchase Agreement**. The Purchase Agreement, the Transaction contemplated therein, the Related Agreements, and all of the terms and conditions thereof are hereby approved. The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

6.  **Authorization of Performance by the Debtors**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized and empowered, without further order of the Court, to take any and all actions necessary or appropriate to (a) consummate and close the Transaction pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) transfer and assign all right, title, and interest in and to all Acquired Assets to be conveyed pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (c) execute and deliver, perform under, consummate, and implement the Purchase Agreement and the Related Agreements and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Transaction, including any Related Agreements, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and the Related Agreements; and (d) take all further action as may be reasonably requested by

10

Purchaser for the purposes of assigning, transferring, granting, conveying, or conferring to Purchaser, or reducing to Purchaser's possession, the Acquired Assets and the Assumed Leases.

7.      The Debtors are authorized to enter into occupancy agreements between Purchaser, as licensor, and the Sellers, as licensee, for certain of the Properties, in substantially the form attached to Exhibit E of the Purchase Agreement (collectively, the "**Occupancy Agreements**").

8.      **Direction to Creditors and Parties in Interest**.  On the Closing Date (as defined in the Purchase Agreement), each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

9.      **Direction to Government Agencies**.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction contemplated by the Purchase Agreement and approved by this Order.

10.      **Transfer of the Acquired Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Purchase Agreement.  The Acquired Assets shall be transferred to Purchaser, and upon Closing, such transfer shall: (a) be valid, legal,

11

binding and effective; (b) vest Purchaser with all right, title and interest of the Debtors in the Acquired Assets; and (c) be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Transaction, in the same amount and order of their priority, with the same validity, force and effect which they have against the Acquired Assets, and subject to any claims and defenses the Debtors may possess with respect thereto.

11.    Except as otherwise provided in the Purchase Agreement, all Persons (and their respective successors and assigns) including, without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, current and former employees, pension plans, labor unions, trade creditors and any other creditors holding Claims against the Debtors or the Acquired Assets, or any of the Debtors' businesses (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, any of the Debtors, the Acquired Assets, or any of the Debtors' businesses before the Closing Date or the transfer of the Acquired Assets to Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against the Purchaser, its affiliates, successors, or assigns, its property or the Acquired Assets, including taking any of the following actions with respect to or based on a Claim:  (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its affiliates, or their respective successors or assigns, assets, or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its affiliates, or their respective successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Claims against the Purchaser, its affiliates, or their respective successors or assigns, assets, or properties;

12

(d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, its affiliates, or their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof, including the Purchase Agreement. No such Persons shall assert or pursue against the Purchaser or its affiliates, successors, or assigns any such Claim.

12.    This Order shall be effective as a determination that, as of the Closing, all Claims have been unconditionally released, discharged and terminated as to Purchaser and the Acquired Assets, and that the conveyances and transfers described herein have been effected. Following the Closing of the Transaction, no holder of any Claim shall interfere with Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

13.    Except as expressly set forth in the Purchase Agreement, Purchaser and its successors and assigns shall have no liability for any Claim, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego or otherwise, of any kind, nature or character whatsoever, including Claims arising under, without limitation: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; and (e) any employee, workers' compensation, occupational disease or

13

unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws or (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xx) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

14.    Nothing in this Order or the Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory or environmental liability to a governmental unit that any entity would be subject to as the owner or operator of property after

14

the date of entry of this Order. Nothing in this Order or the Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15.    If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims in or against the Acquired Assets shall not have delivered to the Debtors before Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims against or in the Acquired Assets (collectively, the "**Release Documents**") that the Person holds, then with regard to the Acquired Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Order, (a) the Debtors are hereby authorized and directed to, and the Purchaser is hereby authorized to, execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to the Acquired Assets; and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets; provided that, notwithstanding anything in this Order or the Purchase Agreement to the contrary, the provisions of this Order shall be self-executing, and neither the Sellers nor Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

15

This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

16. **No Successor or Other Derivative Liability**. Except to the extent expressly set forth in the Purchase Agreement, by virtue of the Transaction, Purchaser shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.

17. **Assumption and Assignment of Leases**. Subject to and conditioned upon the occurrence of the Closing Date, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Leases to Purchaser free and clear of all Claims, and to execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Leases to Purchaser as provided in the Purchase Agreement. Upon the Closing, Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Leases and, pursuant to section 365(k) of the Bankruptcy Code, except as expressly set forth in the Purchase Agreement, the Debtors shall be relieved from any further liability with respect to the Assumed Leases. Upon the Closing, Purchaser shall have no liability or obligation with respect to any Claim or matter accruing or arising under the Assumed Leases before the Closing. Purchaser acknowledges and agrees that from and after the Closing, subject to and in accordance with the Purchase Agreement, it shall comply with the obligations of the landlord accruing and arising from and after the Closing under each Assumed Lease in its entirety, including any indemnification obligations expressly contained in such Assumed Lease that could arise as a

16

result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Order.

18.    **Ipso Facto Clauses Ineffective**.  The Assumed Leases shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, including all obligations of Purchaser as the assignee of the Assumed Leases, notwithstanding any provision in such Assumed Leases (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent accelerations, escalations, assignment fees, increases or any other fees charged to Purchaser or the Debtors as a result of the assumption or assignment of the Assumed Leases.

19.    Upon the Debtors' assignment of the Assumed Leases to Purchaser under the provisions of this Order, no default shall exist under any Assumed Leases, and no counterparty to any Assumed Leases shall be permitted to declare a default by any Debtor or Purchaser or otherwise take action against Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Lease.  Any provision in an Assumed Lease that prohibits or conditions the assignment or sublease of such Assumed Lease (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.  The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assumed Lease shall not be a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition of such Assumed Lease.

17

20.    **Statutory Mootness**.  The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.  The Transaction contemplated by the Purchase Agreement are undertaken by Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Transaction shall neither affect the validity of the Transaction nor the transfer of the Acquired Assets to Purchaser, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Transaction pending such appeal.

21.    **No Avoidance of Purchase Agreement**.  Neither the Sellers nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement or Related Agreements to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, the Purchase Agreement, the Related Agreements, and the Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement, the Related Agreements, or the Transaction.

22.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

23.    **Binding Effect of this Order**.  The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of,

18

each of the Debtors, their estates, their creditors, and non-Debtor affiliates, Purchaser, and each of their respective affiliates, successors and assigns, and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

24.     **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Order and the terms of the Purchase Agreement, the terms of this Order shall control.

25.     **Modification of Purchase Agreement**.  The Purchase Agreement, the Related Agreements, and any other documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or any Related Agreements, or any other documents or other instruments.

26.     **Bulk Sales**.  No bulk sales law or similar law of any state or other jurisdiction (including those relating to taxes other than transfer taxes) shall apply in any way to the Transaction contemplated by the Purchase Agreement, the Motion, and this Order.

27.     **Distribution of Proceeds**.  On the Closing Date, Purchaser shall pay to the Debtors (in accordance with the terms of the Purchase Agreement), the balance of the purchase price remaining due and owing under the Purchase Agreement.

19

28.  **Automatic Stay**.  If and to the extent that section 362(a) may be applicable to a particular action in connection with the Purchase Agreement, the Related Agreements, and the Transaction, the automatic stay pursuant to section 362(a) of the Bankruptcy Code is hereby vacated with respect to the Debtor to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Purchase Agreement and allow the Purchaser to take any and all actions including, without limitation, exercising any rights and remedies permitted under the Purchase Agreement and the Related Agreements in accordance with the terms and conditions thereof.

29.  **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Order or the Purchase Agreement (and the Related Agreements or such other documents or other instruments) and to enforce the injunctions set forth herein.

Dated: _____, 2018
        White Plains, New York

                                    _____
                                    THE HONORABLE ROBERT D. DRAIN
                                    UNITED STATES BANKRUPTCY JUDGE

20

WEIL:\96808226\9\73217.0004

**EXHIBIT "E"**

**FORM OF OCCUPANCY AGREEMENT**

(see attached)

## OCCUPANCY LICENSE AGREEMENT
*([City, State] [Sears][Kmart] [Store Number])*

THIS OCCUPANCY LICENSE AGREEMENT ("**Occupancy Agreement**") is effective as of the ____ day of _____, 2018 ("**Effective Date**"), by and between AMERCO REAL ESTATE COMPANY, a Nevada corporation ("**Licensor**") and [SEARS, ROEBUCK AND CO., a New York corporation][KMART CORPORATION, a Michigan corporation] ("**Licensee**").

### RECITALS:

A.    Licensor and Licensee were parties to that certain Real Estate Sale Contract dated [Date of Agreement] (the "**PSA**") for various properties, including without limitation the land more particularly described on **Exhibit A** attached hereto with the improvements thereon (collectively, the "**Property**").

B.    Licensor and Licensee closed on the sale of the Property in accordance with the PSA on [Date of Closing] ("**Closing Date**").

C.    The PSA provided that the parties would enter into this Occupancy Agreement in order to allow Licensee to cease its store operations, conduct "going out of business" sales and promotions and remove product, equipment and personal property from the Property on and after the Closing Date.

**NOW THEREFORE,** in consideration of the foregoing recitals, the mutual covenants and agreements set forth in this Occupancy Agreement, Licensor and Licensee do hereby agree as follows:

1.    **Grant of License**
Licensor hereby grants to Licensee an exclusive license to use and/or occupy the Property (the "**License**") during the Term (as hereinafter defined). This Occupancy Agreement and the License granted hereunder shall not be construed as creating a landlord-tenant relationship between the parties. It is hereby specifically acknowledged and agreed to by both Licensor and Licensee that this Occupancy Agreement is not intended to negate or supersede the terms of the PSA nor are the terms of the PSA intended to negate or supersede the terms of this Occupancy Agreement.

2.    **Use**
The Property may be used by Licensee solely for the operation of a [Sears][Kmart] store. Licensee shall pay all permit and inspection fees, if any, imposed by any governmental authority with respect to the use and/or occupancy of the Property by Licensee during the Term. Licensee shall comply with all federal, state and local governmental laws, rules, regulations and ordinances, including any environmental laws relating to Hazardous Substances (as defined in the PSA) applicable to Licensee's use and/or occupancy of the Property during the Term (collectively, the "**Applicable Laws**"), in accordance with the terms and conditions of this Occupancy Agreement.

3.    **Term**
The term of this Occupancy Agreement (the "**Term**") shall commence on the Closing Date and terminate on the earlier of (a) the date Licensee ceases its use and/or occupancy of the Property and surrenders the Property to Licensor in accordance with the terms and conditions of this Occupancy Agreement or (b) the one hundred twentieth (120th) day following the Closing Date or (c) the date on which this Occupancy Agreement is terminated by Licensor pursuant to the provisions of Section 17(b) hereof (as applicable, the "**Termination Date**").

4.    **Fees and Security Deposit**

1

(a)    Except as otherwise herein provided, Licensee shall not have any obligation to pay a fee to Licensor for the use and/or occupancy of the Property during the Term.    Notwithstanding the foregoing, (1) Licensee shall pay to Licensor on a per diem basis the amount of all real estate taxes, water and sewer charges payable in connection with the Property until Licensee delivers possession of the Property to Licensor in accordance with the provisions of Section 9; and (2) in the event that Licensee shall retain possession of the Property or a portion thereof after the Termination Date, Licensee shall pay to Licensor a fee in the amount set forth on **Schedule 1** for each day or part thereof until Licensee delivers possession of such Property to Licensor in accordance with the provisions of Section 9 (the "**Holdover Charges**"). The Holdover Charges shall be payable in addition to any other fees and costs payable by Licensee hereunder. Licensor and Licensee acknowledge and agree that it would be extremely difficult to accurately determine the amount of damages suffered by Licensor as a result of Licensee's failure to deliver possession of the Property to Licensor, that the Holdover Charges are a fair and reasonable amount and constitute liquidated damages for such failure and are not a penalty or forfeiture.

(b)    Upon execution of this Occupancy Agreement, Licensee shall deposit with Licensor a security deposit in the amount of Fifty Thousand ($50,000.) Dollars (the "**Security Deposit**") per Property to secure the full and faithful performance of Licensor's obligations hereunder. Upon the occurrence of an Event of Default (as defined below), Licensor may deduct from the Security Deposit and retain any charges, fees or other sums payable by Licensee to Licensor pursuant to any provision of this Occupancy Agreement. In the event the Security Deposit for a Property is not sufficient to satisfy such charges, fees or other sums payable by Licensee to Licensor for that Property, Licensor shall have the right to use the Security Deposit for any other Property to satisfy such amount. The amount of the Security Deposit shall not be deemed a limitation of Licensor's obligations hereunder. Within thirty (30) days after Licensee's delivery of possession of the Property to Licensor in accordance with the provisions of Section 9 below, Licensor shall return to Licensee the balance of the Security Deposit which has not been retained by Licensor. The terms of Section 4(a) and (b) shall survive the Termination Date.

5.    **Repairs, Maintenance, Utilities, Access**
(a)    Subject to the terms and conditions set forth in this Occupancy Agreement, Licensee agrees, at its sole cost and expense, to repair any damage to the Property specifically caused by, or directly resulting from Licensee's use and occupancy of the Property during the Term and to maintain the Property during the Term in as good of a condition as existed as of the Closing Date, reasonable wear and tear, casualty (subject to the provisions of Section 12) and restoration and repairs required to be made by Licensor excepted. Such repair and maintenance obligation shall not extend to damage to the Property caused by Licensor or its parent, subsidiary and affiliated companies and their respective officers, directors, shareholders, agents, employees, invitees, customers, guests, contractors or subcontractors (collectively, "**Licensor Parties**") on the Property during the Term. Notwithstanding the foregoing, Licensee shall not be responsible for the costs of any Extraordinary Maintenance Costs, it being understood that Licensor is accepting the Property in the condition described in Section 9 below. For the purposes hereof, "Extraordinary Maintenance Costs" shall mean maintenance costs above and beyond those costs Licensee would have incurred in its normal course of maintenance for a "going dark" retail store.

(b)    Licensee shall maintain its existing accounts with utility providers for the Property, shall cause all utility meters to be read as close to the date of delivery of possession of the Property to Licensor as is feasible, and Licensee shall pay when due all charges for utilities provided to and serving the Property which are incurred as a result of Licensee's use and occupancy of the Property. Licensee shall pay when due all charges for telephone services rendered or used on or about the Property by Licensee. If Licensor pays any bill(s) for utilities applicable to the period of time preceding the date of delivery of possession of the Property to Licensor, Licensee shall reimburse Licensor therefor upon presentation of applicable invoice(s) and proof of payment of same.  If Licensee pays any bill(s) for utilities applicable to

2

the period of time following the delivery of possession of the Property to Licensor, Licensor shall reimburse Licensee therefor upon presentation of applicable invoice(s) and proof of payment of same.

(c)    Licensor shall at all times have reasonable access to the Property upon twenty-four (24) hours prior notice to Licensee (whether verbal or written). Notwithstanding the foregoing, in the event of emergency or exigent circumstances, Licensor shall only be required to provide as much prior notice as may be practicable under such emergency or exigent circumstances. Licensor hereby acknowledges that in connection with its access to the Property during the Term, Licensor shall use commercially reasonably efforts not to disturb or disrupt the business operations of Licensee on the Property.

(d) The terms of Section 5(a)-5(c) above shall not terminate until the date that Licensee surrenders the Property to Licensor in accordance with the terms and conditions of this Occupancy Agreement.

6.    **Alterations**.
Except for Licensee's removal of Licensee's Property (as hereinafter defined) from the Property as permitted by this Occupancy Agreement, Licensee shall not make any alterations to or complete any construction on the Property, including modifications to the exterior of the building and signage, without the prior written approval of Licensor, which approval may be withheld or conditioned in Licensor's sole discretion.

7.    **Liens.**
Licensee shall keep the Property and appurtenant easements free from any liens for any labor or material furnished to Licensee in connection with any construction/maintenance work on the Property by Licensee between the Closing Date and the date that Licensee delivers possession of the Property to Licensor in accordance with the terms of Section 9 below, except that Licensee shall have the right to contest the validity or amount of any such lien provided that Licensee shall furnish such security (in the form of a bond or cash security) as may be reasonably required by Licensor to discharge such lien of record.

8.    **Licensee's Property**.
Licensee's merchandise, inventory, moveable trade fixtures, racking and other retail sales equipment, service equipment, stock room merchandise handling equipment and any baler system, cash registers, signs (interior and exterior), and all other personal property of Licensee not specifically conveyed and/or assigned to Licensor in connection with the closing under the PSA (collectively, "**Licensee's Property**"), shall remain the property of Licensee and Licensee shall have the right to remove Licensee's Property (subject to the provisions of Section 9) at any time during the Term; provided, however, that Licensee shall promptly repair any and all damage caused by such removal.

9.    **Surrender**
On or before the Termination Date, Licensee shall remove Licensee's Property, repair any damage caused by Licensee Parties in accordance with Section 5 of this Occupancy Agreement and shall deliver possession of the Property to Licensor in "AS IS," "WHERE IS" condition as of the Closing Date, (subject to normal wear and tear and the provisions of Section 12) with all faults, whether known or unknown. Licensor hereby acknowledges it has performed and is relying solely on its own investigation or independent inquires as to the condition of the Property or Licensor has elected to waive any right to perform its own investigation or independent inquiries as to the condition of the Property and agrees that Licensor is not relying on any representation of Licensee regarding the physical condition of the Property, any environmental matters affecting the Property or regarding the suitability of the Property for any particular purpose. Licensor agrees to accept the Property from Licensee in such condition. Notwithstanding anything to the contrary set forth in this Section 9, any of Licensee's Property left on the

3

Property after possession of the Property has been delivered to Licensor shall be deemed abandoned by Licensee and conveyed to Licensor hereunder; Licensor shall have no liability with respect thereto and Licensor may sell, dispose of and/or demolish any such Licensee's Property without compensation to Licensee.

10.    **Risk of Loss**

Licensee shall use the Property at its own risk.  Except to the extent caused by the willful misconduct or grossly negligent acts or omissions of any Licensor Parties, Licensor shall have no responsibility or liability for any loss of or damage to any of Licensee's Property, or any other personal property of Licensee, its employees, agents, contractors, customers, liquidators or invitees (collectively, "**Licensee Parties**") as the same is located on the Property.  Except to the extent caused by the willful misconduct or grossly negligent acts or omissions of any Licensor Parties, Licensor shall not be responsible or liable to Licensee or to anyone claiming by, through, or under Licensee for any loss or damage that may be occasioned during the Term.  Licensee agrees that it will not do or permit anything to be done in or about the Property during the Term, or bring anything onto the Property or keep anything on the Property during the Term, which shall increase the rate of any Licensor's insurance on the Property or any portion thereof outside of the ordinary course of Licensee's business operations at the Property.

11.    **Insurance, Indemnity**

(a)    Licensor shall maintain all risk property damage and liability insurance coverage with respect to the Property (including without limitation contractual indemnity coverage) in such amounts and with such limitations as maintained by Licensee immediately prior to the Closing Date, and shall obtain as of the Effective Date and deliver to Licensor within three (3) days of the Effective Date, an endorsement or certificate of insurance naming Licensor as an additional insured thereunder. Each party hereto, and anyone claiming by through or under such party, hereby waives any claim such party may have against the other party (its officers, directors, employees, agents or invitees) from any and all liability for any loss or damage to property, whether caused by the negligence or fault of the other party, to the extent of any recovery made by such party for such loss or damage under the all-risk property damage insurance policy maintained by such party in connection with the Property. Subject to the terms and conditions of this Occupancy Agreement, Licensee shall defend Licensor and Licensor Parties against all claims, actions, proceedings and suits arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Property, caused by Licensee Parties, including the person or property of any Licensor Parties arising from the specific acts or omissions of any of any Licensee Party during the possession of the Property by Licensee or any Licensee Party.

(b)    Subject to the terms and conditions of this Occupancy Agreement, Licensee shall indemnify and hold Licensor Parties harmless from and against all claims, actions, losses, damages, costs and expenses (including without limitation all reasonable attorney's fees and court costs), and liabilities (except those caused by the willful misconduct or grossly negligent acts or omissions of Licensor or any Licensor Parties), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or on the Property during the Term, including the person and property of Licensor or any Licensor Parties arising from the specific acts or omissions of Licensee or any Licensee Parties during the Term. The terms of Section 11(a) and (b) shall survive the Termination Date.

12.    **Destruction--Fire or Other Cause.**

In the event the Property is damaged or destroyed as a result of fire or other casualty (including, without limitation, natural disaster or threat to public health or safety), Licensee shall promptly give notice to Licensor of such fire or other casualty, and this Occupancy Agreement shall terminate on the earlier of (i) fifteen (15) days after receipt of a termination notice by a party hereunder from the other party or (ii) the date upon which possession of the Property is delivered to Licensor, and any insurance proceeds received for the replacement cost of the Property shall be assigned and paid to Licensor;

4

provided, however, that Licensee shall have the right to any insurance proceeds paid by Licensee's insurance company in connection with the loss of or damage to Licensee's Property.

13. **Eminent Domain.**
    If all or any part of the Property is taken under the power of eminent domain during the Term, this Occupancy Agreement shall terminate on the date Licensee is deprived of possession pursuant to such taking. Licensor shall be entitled to claim an award for the Property and for damages as compensation for the diminution of value of the land and the loss of its use. For purposes of this Section, a taking under the power of eminent domain shall include conveyances or dedications made in settlement of or in lieu of condemnation proceedings. The terms of Section 13 shall survive the Termination Date.

14. **Assignment**
    Licensee shall not assign this Occupancy Agreement or sublet or further license the use and/or occupancy of all or any part of the Property without Licensor's consent which may be withheld in Licensor's sole and absolute discretion. Any assignment, sublet or sublicense shall without approval of Licensor shall be void ab initio. The terms of Section 14 shall survive the Termination Date.

15. **Notices**
    Any notice, demand, request or other instrument which is required to be given under this Occupancy Agreement shall be delivered in person or sent by United States Certified, Registered Mail, return receipt requested, postage prepaid, Express Mail or Federal Express. Notices shall be addressed as follows:

|  |  |
|---|---|
| If to Licensee: | [Kmart Corporation]<br>c/o Sears Holdings Corporation<br>3333 Beverly Road, Dept. 824RE<br>Hoffman Estates, Illinois 60179<br>Attn: Senior Vice President and President, Real Estate |
| Copy to: | [Kmart Corporation]<br>c/o Sears Holdings Corporation<br>3333 Beverly Road, Dept. 824RE<br>Hoffman Estates, Illinois 60179<br>Attn: Associate General Counsel, Real Estate |
| If to Licensor: | Amerco Real Estate Company<br>c/o U-HAUL INTERNATIONAL, INC.<br>Legal Department<br>Attn: Josh Goldberg<br>2727 N. Central Avenue<br>Phoenix, AZ 85004 |

or to any other address furnished in writing by either of the respective parties. However, any change of address furnished shall comply with the notice requirements of this Section 15 and shall include a complete outline of all current notice addresses to be used for the party requesting the change.

16.    Licensor Access.

5

Licensor shall have the right to enter upon the Property to inspect the same or to make repairs, additions or alterations to the Property. Notwithstanding the foregoing, Licensor shall use commercially reasonable efforts not to unreasonably interfere with Licensee's business on the Property. The terms of this Section 16 shall not terminate until the date that Licensee surrenders the Property to Licensor in accordance with the terms and conditions of this Occupancy Agreement.

17.    Miscellaneous.

(a)    Voluntary Agreement.  The parties have read this Occupancy Agreement, and on advice of counsel they have freely and voluntarily entered into this Occupancy Agreement.

(b)    Governing Law and Remedies. This Occupancy Agreement will be construed and enforceable in accordance with the laws of the state where the Property is located.  Any lawsuit brought by Licensor or Licensee against the other must be filed in a court of general jurisdiction where the rules of civil procedure for the state where the Property is located will apply. In the event of any default by Licensee in performance of its obligations hereunder, Licensor shall give written notice to Licensee regarding such default. If Licensee shall fail to cure such default within (i) ten days in the case of a monetary default, or (ii) twenty (20) days in the case of any other default (each such failure is herein an "**Event of Default**"), Licensor shall be entitled to all rights and remedies available pursuant to applicable law and this Occupancy Agreement, including but not limited to the right to summary eviction proceedings or other applicable legal process to obtain possession of the Property, specific performance of this Occupancy Agreement by Licensee and the right to terminate this License and the Term thereof immediately upon delivery of written notice of termination to Licensee.

(c)    Attorneys' Fees.  In the event of any legal action or other proceeding between the parties regarding this Occupancy Agreement (an "Action"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.  The term "prevailing party" as used herein includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled.  In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.  It is the intent of the parties that the provisions of this Section be distinct and severable from the other rights of the parties under this Occupancy Agreement, shall survive the entry of judgment in any Action, and shall not be merged into such judgment. The phrase "reasonable attorneys' fees actually incurred" or phrases of similar meanings regarding attorneys' fees used in this Occupancy Agreement relating to the attorneys' fees the prevailing party in any Action is permitted to recover under the terms of this Occupancy Agreement shall be deemed to mean reasonable attorney's fees, and shall be deemed to include the cost of enforcing any term or condition of this Occupancy Agreement, the cost of proving all damages and the cost of proving the amount of and the reasonableness of all attorneys' fees, including, but not limited to, the cost of any experts to prove same. In addition, "attorneys' fees" as used throughout this Occupancy Agreement shall include the fees of third party attorneys and the fees of "in house" legal counsel of Licensor and Licensee, as appropriate.

(d)    WAIVER OF TRIAL BY JURY; INJUNCTION.  LICENSOR AND LICENSEE EACH HEREBY WAIVE TRIAL BY JURY OF ANY DISPUTE ARISING UNDER THIS

6

OCCUPANCY AGREEMENT. IN ADDITION TO ALL OTHER REMEDIES, LICENSOR IS ENTITLED TO THE RESTRAINT BY INJUNCTION OF ALL DEFAULTS AND VIOLATIONS BY LICENSEE, WHETHER ACTUAL, ATTEMPTED OR THREATENED, OF ANY COVENANT, CONDITION OR PROVISION OF THIS OCCUPANCY AGREEMENT.

(e) <u>Confidentiality.</u> Licensor agrees that all terms of this Occupancy Agreement as well as any information provided to Licensor pertaining to Licensee (the "Confidential Information") will remain confidential and will not be divulged by Licensor or permitted by Licensor to be divulged to any person, firm or entity, including, without limitation, to any employee, tenant, servicer, special servicer, investor, partner or agent for the Property without the prior written consent of Licensee, except that Licensor may disclose the Confidential Information without Licensee's consent to Licensor's respective officers, affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) and to any agency (governmental or public) in connection with Licensor's pursuit of any entitlements and/or approvals deemed by Licensor to be necessary for construction of the Property, so long as the confidentiality obligations of Licensor are binding upon all of the foregoing and Licensor informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this Section 17(e). Notwithstanding anything contained herein to the contrary, the obligation of confidentiality does not apply to (i) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 17(e) or breach of confidentiality by anyone bound under like terms of confidentiality to the party making such public disclosure, (ii) Confidential Information lawfully obtained from independent sources, and (iii) disclosure specifically authorized by Licensee in writing. If Licensor seeks Licensee's consent to the disclosure of the Confidential Information, Licensee shall not unreasonably withhold its consent. Without limiting the foregoing, Licensor agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Occupancy Agreement or its terms will be provided to any third party not subject to the same confidentiality obligation as Licensor. In the event Licensor breaches the terms of this Paragraph, Licensor acknowledges and agrees that Licensee will be irreparably harmed, but that Licensee's damages are difficult to calculate and, therefore, Licensee shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 17(e), in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Occupancy Agreement to the contrary, Licensor may divulge Confidential Information without Licensee's consent to a proposed institutional mortgagee in connection with any financing by Licensor of the Property (who, in turn, may disclose the Confidential Information to its officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing) and any potential tenants in connection with the leasing by Licensor of the Property.

(f) <u>Agreements.</u> This Occupancy Agreement constitutes the entire agreement between Licensee and Licensor, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the Property other than those in the PSA, the Sale Approval Order (as defined in the PSA) and herein set forth. No subsequent alteration, amendment, change, deletion or addition to this Occupancy Agreement shall be binding upon Licensee or Licensor unless in writing and signed by both Licensee and Licensor.

(g) <u>Headings.</u> The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may under no circumstances be considered in interpreting the provisions of this Occupancy Agreement.

7

(h)  <u>Binding Effect</u>.  All of the provisions of this Occupancy Agreement are hereby made binding upon and shall inure to the benefit of the personal representatives, heirs, successors, and assigns of both parties hereto.

(i)  <u>Unenforceable or Inapplicable Provisions</u>.  If any provision hereof is for any reason unenforceable or inapplicable, the other provisions hereof will remain in full force and effect in the same manner as if such unenforceable or inapplicable provision had never been contained herein.

(j)  <u>Counterparts</u>.  This Occupancy Agreement may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, and all of which are identical. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart and any e-mail, telecopy, PDF or other facsimile transmission of any signature shall be deemed an original.

(k)  <u>Construction</u>.  This Occupancy Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that the Occupancy Agreement may have been prepared primarily by counsel for one of the parties, it being recognized that both Licensor and Licensee have contributed substantially and materially to the preparation to this Occupancy Agreement.

(l)  <u>Time is of the Essence</u>. Time is of the essence with respect to the timeliness of all obligations of Licensor and Licensee under this Occupancy Agreement.

(m)  <u>No Recording</u>.  Neither Licensor nor Licensee shall record this Occupancy Agreement.

(n)  <u>SDN List</u>.  Licensee certifies that its name is [Sears, Roebuck and Co., a New York corporation][Kmart Corporation, a Michigan corporation], and to Licensee's knowledge, neither Licensee nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.  Licensor certifies that its name is Amerco Real Estate Company, a Nevada corporation, and to Licensor's knowledge, neither Licensor nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

(o)  <u>Authority</u>. The undersigned person executing this Occupancy Agreement on behalf of Licensor, represents and certifies that he/she has been fully empowered to execute and deliver this Occupancy Agreement; that Licensor has the full capacity to enter into this Occupancy Agreement; and that all necessary action for the execution of this Occupancy Agreement has been taken and done.  The undersigned person executing this Occupancy Agreement on behalf of Licensee represents and certifies that he/she has been fully empowered to execute and deliver this Occupancy Agreement, that Licensee has the full capacity to enter into this Occupancy Agreement, and that all necessary action for the execution of this Occupancy Agreement has been taken and done.

(p)  <u>Exculpation</u>. Notwithstanding anything to the contrary contained herein, no officer, director, shareholder, employee, agent, manager, member or partner of Licensor and Licensee shall have

8

any personal liability with respect to any of the obligations contained herein. Under no circumstances shall Licensor or Licensee be responsible for consequential, special or punitive damages, and Licensor and Licensee, each respectively hereby waive any and all such claims against the other for such consequential, special or punitive damages against the other party. The provisions of this Section 17(p) shall survive the expiration of the Term or any earlier termination of this Occupancy Agreement.

(q)    Further Assurances. Licensee agrees to cooperate, at no cost or expense to Licensee, with Licensor in any rezoning or other land use application to the City of [____], including, without limitation, the execution of any applications, certificates, agreements or other documents as may reasonably be requested by Licensor during the Term hereof.

(r)    Survival. The terms and conditions of Section 17(a)-(r) shall survive the Termination Date.

*[Signatures Appear on Following Page.]*

9

**LICENSOR**:

Amerco Real Estate Company, a Nevada corporation

**LICENSEE**:

[Kmart Corporation][Sears, Roebuck and Co.,] a [Michigan corporation][New York Corporation]

By:_____

Name: _____

Title:_____

By:_____

Name: _____

Title:_____

10

**<ins>EXHIBIT A</ins>**

**<ins>LEGAL DESCRIPTION</ins>**

## EXHIBIT A

## HOLDOVER RENTS

Fairbanks - $950
Queensbury - $1,600
Santa Maria - $1,450
Spokane - $900
Apple Valley - $1,350
Fort Walton Beach - $1,000
Kingsport - $1,300
Springfield - $1,250
Pittsburgh - $1,250
Roswell - $300

## SCHEDULE 1

## PRICE ALLOCATIONS

| Count | # | Format | City | State | Uhaul Offer |
|---|---|---|---|---|---|
| 1 | 2819 | S | Fairbanks | AK | $4,250,000 |
| 2 | 4928 | K | Queensbury | NY | $7,100,000 |
| 3 | 4371 | K | Santa Maria | CA | $6,500,000 |
| 4 | 4147 | K | Spokane | WA | $4,000,000 |
| 5 | 4423 | K | Rockford | IL | $4,750,000 |
| 6 | 3223 | K | Ft Walton Beach | FL | $4,400,000 |
| 7 | 3147 | K | Kingsport | TN | $5,750,000 |
| 8 | 4048 | K | Springfield | IL | $5,500,000 |
| 9 | 3529 | K | Pittsburgh | PA | $5,500,000 |
| 10 | 7017 | K | Roswell | NM | $1,300,000 |
| 11 | 4998 | K | Roseville | MI | $5,750,000 |
| 12 | 3699 | K | Apple Valley | CA | $5,900,000 |
| 13 | 31903 | K | Fort Atkinson | WI | $1,300,000 |
| Total | | | | | $62,000,000 |

**SCHEDULE 2**
**PERMITTED EXCEPTIONS**

**For all Real Properties and the Improvements:**

a.    Except with respect to the leases set forth in Exhibit A attached hereto, the rights and interests of all persons or entities in possession of the Real Properties and the Improvements (as such terms are defined in the Contract), not shown by the public record.

b.    Real estate taxes for the current year that are a lien but are not due and payable on the Closing Date (as such term is defined in the Contract). Taxes or special assessments which are not shown as existing liens by the public records.

c.    Liens for municipal improvements assessed after Closing Date.

d.    Existing laws, ordinances, codes, orders, restrictions and regulations (Including, without limitation, zoning, building, and environmental laws, ordinances, codes, restrictions, regulations and approvals) of the City, County, and State where each of the respective Real Properties and Improvements are located.

e.    Survey-related exceptions from title insurance coverage for the Real Properties as set forth herein.

f.    Rights of the public and others in and to the use of any portions of the Real Property within the bounds of any roads dedicated for public use.

g.    Oil, gas or other mineral interests and all rights incident thereto now or previously conveyed, transferred, leased, excepted or reserved pursuant to instruments or documents filed of record against the Real Properties.

h.    The Occupancy Agreement for the Occupied Properties (as such terms are defined in the Contract).

i.    Easements, or claims of easements, not shown by the public records.

## PROPERTY-SPECIFIC PERMITTED EXCEPTIONS

1.  **3115 Airport Way, Fairbanks, AK**

    i.  Easements, including terms and provisions thereof, for the purpose set out therein, to the record of which reference is hereby made:

    | | |
    |---|---|
    | Granted To: | City of Fairbanks |
    | For: | Installation and maintenance of underground utilities and appurtenances |
    | Recorded: | April 17, 1975 |
    | Book: | 6 Page: 422 |
    | Affects: | The South 33 feet, as shown on that survey dated March 15, 2018, as prepared by Eugene Mound of Stutzmarm Engineering Associates, Inc., coordinated by Smith-Roberts National Corporation, and designated as Project #5692 |

    The Interest of the City of Fairbanks in the electric utilities portion has been assigned to Golden Valley Electric Association, Inc., by instrument recorded October 6, 1997 in Book 1028 at Page 703; the telecommunications utilities portion has been assigned to PRI Communications of Alaska, Inc. by instrument recorded October 7, 1997 in book 1028 at Page 852 and the sewer and water utility portion to Golden Heart Utilities, Inc., by instrument recorded October 30, 1997 in Book 1033 at Page 225. The city of Fairbanks has reserved any rights needed for storm drains and other road and utility services they still perform.

    ii.  Easements, including terms and provisions thereof, for the purpose set out therein, to the record of which reference is hereby made:

    | | |
    |---|---|
    | Granted To: | Gateway Enterprises, a partnership |
    | For: | To construct, operate and maintain water, sewer, electricity and telephone utilities |
    | Recorded: | August 8, 1975 |
    | Book: | 16 Page: 979 |
    | Affects: | 15 feet in width, see instrument for area affected and as shown on that survey dated March 15, 2018, as prepared by Eugene Mound of Stutzmarm Engineering Associates, Inc., coordinated by Smith-Roberts National Corporation, and designated as Project #5692 |

    iii.  Easements, including terms and provisions thereof, for the purpose set out therein, to the record of which reference is hereby made:

    | | |
    |---|---|
    | Granted To: | The Nerland Corporation |
    | For: | To construct, operate and maintain water, sewer, electricity and telephone utilities |
    | Recorded: | September 22, 1976 |
    | Book: | 51 Page: 921 |
    | Affects: | 15 feet in width, see instrument for area affected and as shown on that survey dated March 15, 2018, |

<div style="margin-left:auto">

as prepared by Eugene Mound of Stutzmarm
Engineering Associates, Inc., coordinated by Smith-
Roberts National Corporation, and designated as
Project #5692

</div>

iv.    Easements, including terms an provisions thereof, for the purpose set out therein,
to the record of which reference is hereby made:

| | |
|---|---|
| Granted To: | Fairbanks Associates, a Washington general partnership |
| For: | Construction, use, occupancy and maintenance of sanitary sewer line, storm water sewer line and utilities and appurtenances thereto |
| Recorded: | September 24, 1992 |
| Book: | 764 Page: 225 |
| Affects: | From the Northwest corner of the East 200.00 feet of the North 544.5 feet of TL 838, proceed S 0° 08" E, parallel with the East line thereof, a distance of 39.57 feet to the True Point of Beginning;  Thence N 82' 04' 52" W along the centerline of this 15 foot wide strip of land a distance of 256.97 feet to the terminus of this strip of land, as shown on that survey dated March 15, 2018, as prepared by Eugene Mound of Stutzmarm Engineering Associates, Inc., coordinated by Smith-Roberts National Corporation, and designated as Project #5692 |

v.    Cross Access Agreement, 30 feet in width for vehicular traffic between the Kmart
Parcel and the Sears Parcel, including terms an provisions thereof, for the purpose
set out therein, to the record of which reference is hereby made:

| | |
|---|---|
| Recorded: | October 19, 1993 |
| Book: | 818 at Page 871 |
| Affects: | See instrument for area affected and as shown on that survey dated March 15, 2018, as prepared by Eugene Mound of Stutzmarm Engineering Associates, Inc., coordinated by Smith-Roberts National Corporation, and designated as Project #5692 |

vi.    Easement(s) as delineated on Section Line Easement Vacation, Plat No. 98-31, to
the record of which reference is hereby made, as shown on that survey dated
March 15, 2018, as prepared by Eugene Mound of Stutzmarm Engineering
Associates, Inc., coordinated by Smith-Roberts National Corporation, and
designated as Project #5692.

vii.    Contribution in Aid of Construction Agreement and easement, including the terms
and provisions thereof, executed by and between the parties indicated, to the
record of which reference is hereby made, for the purposes set out therein::

| | |
|---|---|
| Among: | Sears, Roebuck and Co. and Golden Heart Utilities |
| Regarding: | Water and sewage facilities |

Recorded:           April 9, 1999
Book:                 1134 Page: 38
For:                   Continued easement consisting of IO feet extending
at right angles from each side of center of all mains
laid by GHU and for ingress and egress on all
property at all reasonable times for the installation,
maintenance, use and operation, re pair and
renewal, and the final removal of any pipe or other
facilities of GHU.

viii.   Matters as shown on that certain ALTA/NSPS Land Title Survey dated March 15, 2018, as prepared by Eugene Mound of Stutzmann Engineering Associates, Inc., coordinated by Smith-Roberts National Corporation, and designated as Project #5692, as follows:

1. Asphalt encroaches 2' ± onto Tax Lot 832 (former Kmart Site).

2. Lots 1A and 2A of Value Village Subdivision both have shared access points with the subject parcel with no apparent easement or agreement presented within the current title commitment.

3. The Sears Warehouse Building encroaches into easement by several tenths of a foot, as shown.

4. Intentionally deleted.

5. The garage portion of the Sears retail building may encroach into the storm drain  easement reserved by Plat No. 98-31 as shown. The location of the storm drain easement is "centered on existing storm drain" as per Plat No. 98-31. The location of the storm  drain pipe shown on this survey is approximate and is based on a combination of above        ground evidence and prior records. Those prior records indicate that both the building and this storm drain realignment were present several years prior to the expression of the  easement on Plat No. 98- 31.

6. A storm drain extending from the subject parcel across the southwest corner of Lot 2A, Value Village Subdivision does not appear to be addressed by any document within the  current title commitment. It can be observed that this storm drain line, and, in particular, the catch basin at its terminus, provide necessary and beneficial service to both of the affected properties, Lot 2A and Sears.

7. A segment of a buried water main, situated between the Sears Retail Store and the Sears Warehouse may lie outside of the specifically described easement. However, it may be shielded by the blanket protection of the GHU easement cited in Schedule B Exception No. 11. The position shown hereon is based on the design location, not from the field locates by the utility company.

ix.    (a) Unpatented mining claims; or (b) water rights, claims or title to water, whether or not the matter excepted under (a) or (b) are shown by the public records.

x.     Rights of the State or federal government and/or public in and to any portion of the land for right of way as established by federal statute RS2477 (AKA 43 USC 932) whether or not such rights are shown by recordings of easements and/or maps in the public records by the State of Alaska showing the general location of these rights of way.

2. **308 Dix Avenue, Queensbury, NY**

    i.    Easement made by John Suprenant and Alice Suprenant to American Telephone and Telegraph Company dated January 21, 1930 recorded February 7, 1930 in Book 183 page 315.

    ii.    Easement made by Claude Chartebois to New York Telephone Company dated May 11, 1993 recorded October 6, 1993 in Liber 895 page 283.

    iii.    Easement made by Queensbury Retail Limited partnership to Niagara Mohawk Power Corporation dated September 13, 1994 recorded July 12, 1995 in Liber 951 page 298.

    iv.    Easement by Queensbury Retail Limited Partnership to New York Telephone Company dated October 24, 1994 recorded January 18, 1995 in Liber 937 cp. 247.

    v.    Easement made by Niagara Mohawk Power Corporation to Queensbury Retail Limited Partnership dated November 30, 1993 recorded December 3, 1993 in Liber 901 cp. 236.

    vi.    Restrictions and Reservation contained in deed made by New York Power and Light Corporation to Patrick A. Sullivan and John H. Sullivan dated July 16, 1946 recorded January 3, 1946 in Liber 246 page 429.

    vii.    Access easement made by Queensbury Retail Limited Partnership to Willston Realty Company, Inc. dated as of November 30, 1993 recorded December 3, 1993 in Liber 901 page 196.

    viii.    Survey made by Lehr Land Surveyors dated September 21, 2017, lasted revised on December 28, 2017, Job No. 17-1-39, (hereinafter the "Survey"), shows Land described herein improved by a one story Masonry Building and parking area within bounds and subject to the following which are exceptions from coverage:

        a) Detention Area Mitigation Site (To remain undeveloped) as set forth in Instrument recorded in Liber 901 pg 198.

        b) Niagara Mohawk Power Corporation Reservation area for purposes of maintain of any present or future utilities as set forth in Instrument recorded in Liber 910 page 51.

        Policy excepts any state of facts an accurate survey may disclose made subsequent to December 28, 2017.

    ix.    Water and Sewer Rents, not included in the regular Town, City, or Village Real Estate Tax Bill, are not searched for unless expressly stated, and are not insured against.

    x.    Tax search indicates that the premises are benefited by a tax abatement and/or exemption. Policy excepts all loss or damage sustained or incurred by reason of the restoration of real property taxes on the premises and/or the termination, revocation or rescission of said abatement and/or exemption.

    xi.    The exact acreage of the Land is not insured.

    xii.    No title is insured to any land lying in the bed of any street, road or avenue, abutting adjoining, passing through or crossing the premises herein.

    xiii.    Together with and subject to terms conditions and reservations set forth in deed recorded in Liber 157 page 556.

    xiv.    Together with and subject to terms conditions and reservations set forth in deed recorded in Liber 910 page 51.

     xv.    Together with and subject to terms and conditions set forth in Declaration of Covenants of Queensbury Retail Limited Partnership recorded in Liber 901 page 198.

    xvi.    Easement in favor of American Telephone and Telegraph Company dated January 21, 1930 recorded February 7, 1930 in Book 182 page 315.

3.    **2875 Santa Maria Way, Santa Maria, CA**

      i.    An oil and gas lease for the term therein provided with certain covenants, conditions and provisions, together with easements, if any, as set forth therein

            Recorded:          May 21, 1943, Instrument No. 3759 in Book 570, Page 488. Official Records

            Matters contained in a document entitled "Partial Surface Quitclaim and Pipeline Relocation Agreement", executed by Sun Oil Company et al., recorded October 1, 1969 as Instrument No. 28144 in Book 2285, Page 1142 of Official Records, Records of said County.

      ii.    An easement for the purpose shown below and rights incidental thereto as set forth in a document

            Recorded:          May 2, 1948 as Instrument No.15194 in Book 818, Page 391. Official Records

     iii.    An easement for the purpose shown below and rights incidental thereto as reserved in a document

            Recorded:          October 1, 1969 as Instrument No. 28143 in Book 2285, Page 1135 Official Records

     iv.    An agreement, affecting the premises herein stated, for the purposes stated herein, upon the terms, covenants and conditions referred to therein, between the parties named herein.

            Recorded:          October 1, 1969 as Instrument No. 28144 in Book 2285, Page 1142. Official Records

            The effect of a document entitled "Supplementary Pipeline Relocation Agreement", executed by Santa Maria Mart Company, recorded November 26, 1969 as Instrument No. 33451 in Book 2291, Page 529. Official Records.

      v.    An easement for the purpose shown below and rights incidental thereto as set forth in a document

            Recorded:          June 5, 1970 as Instrument No. 14619 in Book 2310, Page 1353. Official Records

     vi.    The fact that the ownership of said Land does not include rights of access to or from the street or highway abutting said Land, such rights having been severed from said Land by the document

            Recorded:          September 11, 1970 as Instrument No. 24579 in Book 2320, Page 642 Official Records

    vii.    An easement for the purpose shown below and rights incidental thereto as set forth in a document

            Recorded:          August 14, 1990 as Instrument No. 90-53848. Official Records

viii.   The lien of supplemental or escaped assessments of property taxes, if any, made
pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2,
Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of
the State of California as a result of the transfer of title to the vestee named in
Schedule A or as a result of changes in ownership or new construction occurring
prior to Date of Policy. None due and payable as of date of policy.

ix.   Water Rights, claims or title to water, whether or not the matters are shown by the
Public Records.

x.   Any rights, interests, or claims which may exist or arise by reason of the
following matters disclosed by survey, Job No.: 16179/17297, Dated: December
22, 2017 Prepared by: Delta Surveying and Mapping.
Matters shown:
A. The fact that the fence along the southerly and westerly boundary is not
coincidental with the property line.
B. The fact that guy wires, fire hydrants, a transformer and water vault are located
on said land without a corresponding recorded easement.


4.   **4110 E. Sprague Avenue, Spokane, WA**
i.   (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts
authorizing the issuance thereof; (c) water rights, claims or title to water, whether
or not the matters excepted under (a), (b) or (c) are shown by the public records.

ii.   Easement, and the terms and conditions thereof:
       Recorded:          August 21, 1945
       Recording No:       662859A

iii.   Easement, and the terms and conditions thereof:
       Recorded:          September 3, 1953
       Recording No.:      192659B

iv.   Easement, and the terms and conditions thereof:
       Recorded:          September 3, 1953
       Recording No.:      192660B

v.   Easement, and the terms and conditions thereof:
       Recorded:          January 11, 1958
       Recording No.:      513272B

vi.   Easement, and the terms and conditions thereof:
       Recorded:          August 15, 1966
       Recording No.:      225055C

vii.   Easement, and the terms and conditions thereof:
       Recorded:          April 8, 1974
       Recording No.:      7404080156

viii.   Easement, and the terms and conditions thereof:
       Recorded:          October 15, 1984
       Recording No.:      8410150313

ix.   Ingress and Egress Easement and Reciprocal Parking Agreement and the terms
and conditions thereof:
       Recorded:          December 29, 1965

Recording No.:        167147C
Amendment recorded on August 24, 1989 under Recording No. 4146334.
Second Amendment Recorded on September 29, 1997 under recording No. 4146334.

x.     Declaration of Restrictions Imposed by Instrument Recorded on March 23, 1994, under Recording No. 9403230092.

xi.     Easement, and the terms and conditions thereof:
           Recorded:                 August 24, 1989
           Recording No.:         8908240229

xii.     Matters disclosed by ALTA/SNPS Land Title Survey prepared by Michael A. Hoffman On January 25, 2018, under Project K-Mart.
Discloses Possible Encroachments:
      1. Overhead sign encroaches up to 0.8' Easterly into the Subject Property
      2. Building encroaches over an easement listed as Schedule B Item 13. (192659B)

xiii.     Any adverse ownership claim by right of sovereignty to any portion of the lands insured hereunder, including tidelands, submerged, filled and artificially exposed lands and lands accreted to such lands or dispute as to the boundaries purportedly caused by a change in the location of any water body within or adjacent to the land.

xiv.     Water rights, and claims or title to water, whether or not shown by the Public Records.

xv.     City, or construction or similar charges for sewer, water, electricity, natural gas or other utilities, or for garbage collection and disposal not shown by the Public Records.

xvi.     Ingress and Egress Easement and Reciprocal Parking Agreement and the terms and provisions thereof, recorded as 167147C, of Official Records.
And amendment(s) thereof:
Recorded: August 24, 1989
Recording No(s).: 8908240227, of Official Records.
And amendment(s) thereof:
Recorded: September 9, 1997
Recording No(s): 4146334, of Official Records.

5.     **5909 E. State Street, Rockford, IL**

i.     Grant of easement to Commonwealth Edison Company, by grant recorded June 9, 1971 as Document No. 1256937 in Micro Film 71 10 1368.

ii.     Grant of easement for ingress and egress as created by grant recorded October 26, 1971 as Document No. 1267836 in Micro Film 71 21 1849.

iii.     Grant of easement for right of way for ingress and egress and parking as created by grant recorded December 3, 1971 as Document No. 1270951 in Micro Film 71 25 0006.

iv.     Ground Lease, dated September 15, 1988, by and between Kmart Corporation, as successor-in-interest to Illnet Partners and Company, Ltd., as landlord, and Bartlett Management Services, Inc., as successor-in-interest to Valenti Midwest,

Inc., as tenant, as amended, assigned and/or otherwise modified, a Memorandum of which was recorded as Document No. 1830016 in Micro Film 89 07 1685; as affected by that certain Assignment of Lease recorded July 1, 1994 as Document No. 9435093.

v.    Covenants, restrictions and easements contained in Special Warranty Deed recorded October 3, 1970 as Document 1243599 No. in Micro Film 70 17 1729 and the terms and provisions contained therein, as shown on survey prepared by Roland F. Sarko and dated November 22, 2016 as Project No. 5792, Site No. 22209.

vi.    Matters as shown on survey prepared by Roland F. Sarko and dated March 22, 2018 as Project No. 130975.18R000, Site No. 063.220:

> A. Intentionally Omitted
> B. The traffic signal light pole encroaches 4.4 feet West of the West right of way line of South Mulford Road onto subject property.
> C. A bank sign encroaches from 24.9 feet to 25.2 feet South of the North property line onto the subject property.
> D. A row of 5 bank parking stalls encroaches from 41.7 to 42.8 feet South of the North property line onto the subject property.
> E. An Ingress and Egress Easement recorded December 3, 1971 as Document Number 1270951 does not connect with a dedicated public right of way and can only be accessed by crossing the subject property.
>
> F. An Automated Teller Machine encroaches from 1.6 to 5.8 feet West of the East property line onto the subject property.
> G. A roof overhang encroaches from 0.9 to 10.9 feet West of the East property line onto the subject property.
> H. A row of 4 parking stalls encroaches from 17.3 to 19.2 feet West of the West property line onto the adjacent property to the West.
> I. A concrete retaining wall encroaches from 06. to 0.7 feet East of the West property line onto the subject property.
> J. A concrete curb encroaches from 1.0 to 1.1 feet East of the West property line onto the subject property.
> K. A handicap parking stall encroaches 8.7 feet East of the West property line onto the subject property.
> L. The rows of head to head parking stalls encroach 8.9 feet East of the West property line onto the subject property line.
> M. A diagonal parking stall encroaches 8.2 feet East of the West property line onto the subject property.
> N. Review of the site layout on the adjacent privately owned lands to the West, currently occupied by a restaurant, indicates said privately owned lands to the West cannot be accessed from a dedicated public right of way without crossing the subject property.

6.    **20777 Bear Valley Road, Apple Valley, CA**

i.    Easement(s) for the purpose(s) shown below, and rights incidental thereto as delineated or as offered for dedication, on the map of said Parcel Map No. 11552.
> Purpose: Access and private road purpose (as shown on said Map)
> Recording No.: Book 130, Pages 57 and 58, of Parcel Maps

ii.    Easements for ingress and egress of delivery vehicles, recorded November 22, 1988 at Recording No. 88-395758, Official Records.

iii.    Covenants, conditions, and restrictions, if any, including but not limited to those based upon race, color, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, gender, gender identity, gender expression,

medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted aby applicable law, as set forth in the document recorded November 22, 1988, at Recording No. 88-395760, Official Records.

iv. Covenants, conditions, and restrictions, if any, including but not limited to those based upon race, color, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted aby applicable law, as set forth in the document recorded November 22, 1988, at Recording No. 88-395763, Official Records. Among other things, said document provides for building areas, common area, easements for ingress, egress, parking, utilities, signs and encroachments.

Modifications of said covenants and restrictions set forth in the document recorded June 25, 2002, at Recording No. 2002-0327126, Official Records.

v. Common Area Maintenance Agreement, recorded November 22, 1988 at Recording No. 88-395764, Official Records.

A Correction and Modification Agreement recorded in reference to the above on October 16, 1989, as Instrument No. 89-388234, Official Records.

vi. Development Agreement, recorded November 22, 1988 at Recording No. 88-395765, Official Records.

A modification of said Development Agreement was recorded November 3, 1989, Instrument No. 89-415963, Official Records.

vii. Covenants, conditions, and restrictions, if any, including but not limited to those based upon race, color, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted aby applicable law, as set forth in the document recorded November 22, 1988, at Recording No. 88-395767 of Official Records. Said document provides for easements for ingress and egress by vehicular and pedestrian traffic, liens.

viii. Easement recorded May 17, 1990 at Recording No. 90-193882, Official Records.

ix. Easement recorded July 11, 1990 at Recording No. 90-270281, Official Records.

x. Development Agreement dated April 19, 1990, and recorded August 7, 1990 at Recording No. 90-312360, Official Records.

xi. Sewer Construction Advance Reimbursement Agreement dated July 25, 1991, and recorded September 4, 1991 at Recording No. 91-335767, Official Records.

xii. The following Leases (as such term is defined in the Contract):

1. Lease, dated September 30, 1994, by and between Kmart Corporation, as landlord, and Diem Hong Ngo d/b/a Blessing Nails, as successor-in-interest to Nam Nguyen and Chan Nguyen, as tenant, as amended, assigned and/or otherwise modified.

2. Lease, dated February 26, 2007, by and between Kmart Corporation, as landlord, and Mina Patel d/b/a Apple Valley Smoke Shop, as tenant, as amended, assigned and/or otherwise modified.

3. Lease, dated April 11, 2007, by and between Kmart Corporation, as landlord, and Virginia Barnicoat and David Barnicoat, as tenant, as amended, assigned and/or otherwise modified.

xiii.   The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

xiv.   Water rights, claims or title to water, whether or not disclosed by the public records.

xv.   The ownership of said Land does not include rights of access to or from the street, highway, or freeway abutting said Land, such rights having been relinquished by said Parcel Map No. 11552.

7.   **200 Irwin Avenue, Fort Walton Beach, FL**

i.   Easements and the terms, conditions, and provisions of Declaration of Mutual Parking Easement, recorded in Official Records Book 637, Page 358.

ii.   Terms, covenants, conditions and easements for the purposes of constructing, maintaining and servicing a force main and other utilities underground as described and set forth in that certain Easement to Town of Cinco Bayou, Florida, recorded in Official Records Book 833, Page 642.

iii.   Terms, covenants, conditions and easements for the purposes of operating, maintaining, digging up, expanding, replacing and removing underground utilities and all related facilities as described and set forth in that certain Utility Easement recorded in Official Records Book 2951, Page 816.

iv.   The following matters shown on the survey prepared by Accuright Surveyors of Orlando, Inc., dated March 9, 2018, last revised _____, under Job No. 48657:

a. Concrete encroaches into subject property along East-West centerline of Blocks 16 and 17.

b. Concrete encroaches into subject property along East line of Lot 17, Block 16.

c. Fence encroaches into subject property at the East 23.15 ' of Lot 3, Block 15.

d. 6' wooden fence encroaches into subject property along Southwest boundary line.

8.   **1805 E. Stone Drive, Kingsport, TN**

    i.    Subject to the following matters shown on the Plat Book 14, Page 8. Register's Office for Sullivan County, Tennessee
- a. 12-foot power line easement along the south property line;
- b. 12-foot power line easement running north/South at the South property line;
- c. 12-foot power line easement running North/South near the Southeast corner of the property; and
- d. 15-foot non-exclusive easement along East line.

    ii.   Reservation of Easement in deed of record in Deed Book 392A, Page 570. Register's Office for Sullivan County, Tennessee.

   iii.   General Easements for utilities of record in Deed Book 127C, Page 148. Register's Office for Sullivan County, Tennessee.

   iv.   The following matters as shown on the ALTA/NSPS Land Title Survey prepared by R. Scott Barrett, TN RLS # 2473, dated June 12, 2018:

        a. overhead pole sign protrudes onto the 50' East-West private access easement a distance of 6.8 feet;

        b. light pole protrudes onto the adjoiner a distance of 8.5 feet in two locations;

        c. curb and asphalt surface protrudes onto the adjoiner a distance of 6.8 feet and 6.4 feet in two locations;

        d. the end of the adjoiner's concrete curb protrudes onto the subject property a distance of 3.2 feet near the westernmost Northwest corner of the property;

        e. the adjoiner's concrete patio/outdoor dining area protrudes onto the subject property a distance of 24.4 feet near the northernmost Northwest corner of the property.

9.    **3250 Clear Lake Road, Springfield, IL**

    i.    Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| In favor of: | City of Springfield, a municipal corporation |
| Purpose: | Water Main |
| Recording Date: | November 5, 1980 |
| Recording No.: | 864559 |

    ii.   Terms and Provisions of an Access Easement Agreement by and between Speedway Partnership, an Illinois general partnership and K-M Springfield Co., a New York general partnership recorded May 14, 1990 as Document No. 90J012237.

   iii.   Terms and Provisions of Easement and Restricted Use Agreement by and between SSS Development, Inc., an Illinois Partnership and K-M Springfield Co., a partnership recorded January 24, 1995 as Document Number 95-02060

   iv.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| In favor of: | Springfield Metro Sanitary District, an Illinois municipal corporation |
| Purpose: | Sewer |

<div style="margin-left:2em">

| | | |
|---|---|---|
| Recording Date: | June 23, 1995 |
| Recording No.: | 95-19633 |

Subordination of Surface Rights for Public Road Purposes recorded October 9, 2007 as Document Number 2007R42855.

</div>

v.    Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| In favor of: | SSS Development, Inc., an Illinois Corporation |
| Purpose: | Footings and Overhang encroachment |
| Recording Date: | October 5, 1995 |
| Recording No.: | 95-34399 |

vi.    Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| In favor of: | Central Illinois Light Company |
| Purpose: | Gas Main |
| Recording Date: | October 10, 1995 |
| Recording No.: | 95-34768 |

vii.    Permanent easement for roadway purposes and Temporary easement shown in condemnation Case No.: 2009-ED-000011 a Stipulation for Final Judgement being entered on January 3, 2017. See Order Vesting Title and Final Judgment Order, both recorded January 31, 2017 as Document Number 2017R02421 and Document Number 2017R02422, respectively.

viii.    Shopping Center Lease, dated May 15, 2007, by and between Sears, Roebuck and Co., as successor-in-interest to K.M. Springfield Co., as landlord, and Rent-A-Center East, Inc., as successor-in-interest to Rent-Way, Inc., as tenant, as amended, assigned and/or otherwise modified.

ix.    Matters disclosed on survey prepared by Gregory S. McVicar of Sherrill Associates, Inc. dated March 9, 2018 and last revised June 17, 2018 depicting:

         a) encroachment of concrete located mainly on the adjoining land and onto the West line of the insured land by a range of 25.05 feet and 21.10 feet;

         b) encroachment of concrete located mainly on the adjoining land onto the West line of the insured land by a range of 30.24 feet by 18.54 feet.


10.    **996 W. View Park Drive, Pittsburgh, PA**

i.    Coal and coal bed methane gas and mining rights and all rights incident to the extraction or development of coal or coal bed methane gas heretofore conveyed, excepted and reserved by instruments of record, the right of surface, lateral or subjacent support; or any surface subsidence.

ii.    The following rights of way:

     a.    Right of way from West View Park Company to Township of Ross, dated October 2, 1975 and recorded in Deed Book Volume 5544, page 453.

     b.    Right of way from Frank Zappala, Jr., et al., trading and doing business as West View Associates to Municipal Authority of Borough of West View, dated January 27, 1981 and recorded in Deed book Volume 6344, page 224.

       c. Right of way from Allegheny County Industrial Development Authority to Duquesne Light Company, dated June 10, 1981 and recorded in Deed Book Volume 6384, page 925.

       d. Right of way from Allegheny County Industrial Development authority to Duquesne Light Company, dated June 10, 1981 and recorded in Deed Book Volume 6384, page 928.

iii.    Cross Easement Declaration by Allegheny County Industrial Development Authority, dated February 27, 1981 and recorded in Deed Book Volume 6350, page 1227.

iv.    Operating Agreement between West View Associates and Danceland KM Associates, dated December 23, 1981 and recorded in Deed Book Volume 6429, page 636; as affected by Assignment and Assumption of Operating Agreements, Leases and Intangible Personal Property between Danceland KM Associates and Kmart Corporation, dated March 26, 2007, effective March 30, 2007 and recorded in Deed Book Volume 13196, page 524; as amended by First Amendment to Operating Agreement between Kmart Corporation and West Vue Associates, dated August 207, 2007 and recorded in Deed Book Volume 13397, page 466.

v.    The following matters shown on Revised West View Associates & G.P.F. Associates Plan of Lots recorded in Plan book Volume 191, pages 83 to 85:

       a. Pond easement.

       b. 25 foot waterline easements.

       c. Electric line right of way.

vi.    Subject to matters as disclosed by municipal searches.

vii.    Oil and gas and minerals and all rights incident to the extraction or development of oil and gas or minerals heretofore conveyed, leased, excepted or reserved by instruments of record.

viii.    The following matters shown on ALTA/NSPS Land Title Survey made by McIlvried, DiDiano & Mox, LLC, dated January 19, 2017, last revised February 9, 2017, Project No. 7076:

       a. Encroachment of chain link fence by 2.4 feet into adjoining property now or formerly of West View Associates.

11.    **1309 N. High Street, Fort Atkinson, WI**

i.    Easements, if any, of the public or any school district, utility, municipality or person, as provided in Section 66.1005(2) of the Wisconsin Statutes, for the continued use and right of entrance, maintenance, construction and repair of underground or overground structures, improvements or service in that portion of the insured premises which were formerly a part of streets and alleys which are now vacated. Access restrictions to State Trunk Highway 26 as noted in Award of Damages recorded on May 5, 1961, in Volume 325 of Deeds, Page 585 as Document No. 589431.

ii.    Limited Highway Easement, as noted in Award of Damages recorded on May 5, 1961, in Volume 325 of Deeds, Page 587 recorded as Document No. 589432.

iii.    Reservation of the City of Fort Atkinson at the time of vacating part of Jefferson Street and Riverwood Court of a utility easement to maintain, repair and replace

all existing utility installations in said street, as noted in Notice of Pendency of Application to vacate street, recorded on October 10, 1977, in Volume 559 of Deeds, Page 364 as Document No. 745610 and re-recorded on October 28, 1977 in Volume 560 of Deeds, Page 347 as Document No. 746216.

iv. Access Restriction to Woodland Drive and Greenbriar Lane, as noted in Deed recorded on August 21, 1978, in Volume 574, Page 660, as Document No. 754445 and Deed recorded August 21, 1978, in Volume 574, Page 661, as Document No. 754446.

v. Utility Easement granted to Wisconsin Electric Power Company and Wisconsin Natural Gas Company by an instrument recorded on November 21, 1978, in Volume 579 of Records, Page 338, as Document No. 757099.

vi. Declaration of Easement recorded on January 5, 1979, in Volume 581 of Records, on Page 428, as Document No. 758247.

vii. Definition of Easement recorded on May 5, 1979, in Volume 585 of Records, Page 928, as Document No. 760965.

viii. Party Wall Agreement recorded on May 8, 1979, in Volume 585 of Records, Page 936, as Document No. 760966.

ix. Sanitary Sewer Easement recorded on May 9, 1981, in Volume 608 of Records, Page 633, as Document No. 774948.

x. Easement recorded on July 22, 1929, in Volume 132 of Deeds, Page 605.

xi. Covenants, Conditions, Restrictions, Easements and Building Walls, all as noted on the plat of Certified Survey Map No. 1849, recorded as Document No. 806243.

xii. Lease, dated April 12, 1993, by and between Kmart Express LLC, as successor-in-interest to Fort Atkinson Partners and Company, as landlord, and Neim Bekiri d/b/a River Front Restaurant, as tenant, assigned and/or otherwise modified.

xiii. Any right, interest or claim that may exist, arise or be asserted against the Title under or pursuant to the Perishable Agricultural Commodities Act of 1930, as amended (7 USC Section 499a et seq.), the Packers and Stockyard Act of 1921, as amended (7 USC Section 181 et seq.), or any similar state laws.

12. **17850 Frazho Road, Roseville, MI**

i. Covenants, conditions, restrictions and easements but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document
Recording No.:          Liber 531, Page 607

i. Terms, provisions and conditions of Reciprocal Easement and Development Agreement
Recording Date:         October 21, 1998
Recording No.:          Liber 8357, Page 353

ii. Agreement Acknowledging Encroachments
Recording Date:         March 22, 2000
Recording No.:          Liber 9443, Page 639

       iii.    Right(s) of Way and/or Easement(s) and rights incidental thereto, as granted in a document:
           Recording No.:      Liber 8863, Page 181

13. **1705 S. Main Street, Roswell, NM**

     i.    Reservations, exceptions and provisions contained in the Patent from the United States of America, and in the acts authorizing the issuance thereof, recorded in Book B, Page 15, Official records of Chaves County, New Mexico.

     ii.    Covenants, conditions and restrictions (deleting therefrom any restrictions indicating any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin) as set forth in the document filed November 12, 1974, and recorded in Book 151, Page 347. Amended Covenants filed March 13, 1989, and recorded in Book 51, Page 611, Official Records of Chaves County, New Mexico.

     iii.   Roadway affecting the West boundary of insured premises, as described in Commissioners' Proceedings, dated April 27, 1901, and recorded in Book A, Page 392.

     iv.   Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document
           Recording Date:     October 10, 1952 in Book 48, Page 56, Miscellaneous Records of Chaves County, New Mexico

     v.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document
           Recording Date:     March 22, 1974 in Book 147, Page 730, Miscellaneous Records of Chaves County, New Mexico

     vi.   Any right, interest or claim that may exist, arise or be asserted against the Title under or pursuant to the Perishable Agricultural Commodities Act of 1930, as amended (7 USC Section 499a et seq.), the Packers and Stockyard Act of 1921, as amended (7 USC Section 181 et seq.), or any similar state laws.

     vii.  Water rights, claims or title to water.

**EXHIBIT A TO SCHEDULE 2**

**LEASES**

### CA – Apple Valley – Site 3699

1.　　Lease, dated September 30, 1994, by and between Kmart Corporation, as landlord, and Diem Hong Ngo d/b/a Blessing Nails, as successor-in-interest to Nam Nguyen and Chan Nguyen, as tenant, as amended, assigned and/or otherwise modified.

2.　　Lease, dated February 26, 2007, by and between Kmart Corporation, as landlord, and Mina Patel d/b/a Apple Valley Smoke Shop, as tenant, as amended, assigned and/or otherwise modified.

3.　　Lease, dated April 11, 2007, by and between Kmart Corporation, as landlord, and Virginia Barnicoat and David Barnicoat, as tenant, as amended, assigned and/or otherwise modified.

### IL – Rockford – Site 4423

1.　　Ground Lease, dated September 15, 1988, by and between Kmart Corporation, as successor-in-interest to Illnet Partners and Company, Ltd., as landlord, and Bartlett Management Services, Inc., as successor-in-interest to Valenti Midwest, Inc., as tenant, as amended, assigned and/or otherwise modified.

### IL – Springfield – Site 4048

1.　　Shopping Center Lease, dated May 15, 2007, by and between Sears, Roebuck and Co., as successor-in-interest to K.M. Springfield Co., as landlord, and Rent-A-Center East, Inc., as successor-in-interest to Rent-Way, Inc., as tenant, as amended, assigned and/or otherwise modified.

### WI – Fort Atkinson – Site 31903

1.　　Lease, dated April 12, 1993, by and between Kmart Express LLC, as successor-in-interest to Fort Atkinson Partners and Company, as landlord, and Neim Bekiri d/b/a River Front Restaurant, as tenant, assigned and/or otherwise modified.

## SCHEDULE 2

## PERMITTED EXCEPTIONS

### For all Real Properties and the Improvements:

a.      Except with respect to the leases set forth in Exhibit A attached hereto, the rights and interests of all persons or entities in possession of the Real Properties and the Improvements (as such terms are defined in the Contract), not shown by the public record.

b.      Real estate taxes for the current year that are a lien but are not due and payable on the Closing Date (as such term is defined in the Contract). Taxes or special assessments which are not shown as existing liens by the public records.

c.      Liens for municipal improvements assessed after Closing Date.

d.      Existing laws, ordinances, codes, orders, restrictions and regulations (Including, without limitation, zoning, building, and environmental laws, ordinances, codes, restrictions, regulations and approvals) of the City, County, and State where each of the respective Real Properties and Improvements are located.

e.      Survey-related exceptions from title insurance coverage for the Real Properties as set forth herein.

f.      Rights of the public and others in and to the use of any portions of the Real Property within the bounds of any roads dedicated for public use.

g.      Oil, gas or other mineral interests and all rights incident thereto now or previously conveyed, transferred, leased, excepted or reserved pursuant to instruments or documents filed of record against the Real Properties.

h.      The Occupancy Agreement for the Occupied Properties (as such terms are defined in the Contract).

i.      Easements, or claims of easements, not shown by the public records.

**EXHIBIT A TO SCHEDULE 2**

**LEASES**

### CA – Apple Valley – Site 3699

1.      Lease, dated September 30, 1994, by and between Kmart Corporation, as landlord, and Diem Hong Ngo d/b/a Blessing Nails, as successor-in-interest to Nam Nguyen and Chan Nguyen, as tenant, as amended, assigned and/or otherwise modified.

2.      Lease, dated February 26, 2007, by and between Kmart Corporation, as landlord, and Mina Patel d/b/a Apple Valley Smoke Shop, as tenant, as amended, assigned and/or otherwise modified.

3.      Lease, dated April 11, 2007, by and between Kmart Corporation, as landlord, and Virginia Barnicoat and David Barnicoat, as tenant, as amended, assigned and/or otherwise modified.

### IL – Rockford – Site 4423

1.      Ground Lease, dated September 15, 1988, by and between Kmart Corporation, as successor-in-interest to Illnet Partners and Company, Ltd., as landlord, and Bartlett Management Services, Inc., as successor-in-interest to Valenti Midwest, Inc., as tenant, as amended, assigned and/or otherwise modified.

### IL – Springfield – Site 4048

1.      Shopping Center Lease, dated May 15, 2007, by and between Sears, Roebuck and Co., as successor-in-interest to K.M. Springfield Co., as landlord, and Rent-A-Center East, Inc., as successor-in-interest to Rent-Way, Inc., as tenant, as amended, assigned and/or otherwise modified.

### WI – Fort Atkinson – Site 31903

1.      Lease, dated April 12, 1993, by and between Kmart Express LLC, as successor-in-interest to Fort Atkinson Partners and Company, as landlord, and Neim Bekiri d/b/a River Front Restaurant, as tenant, assigned and/or otherwise modified.

**EXHIBIT A TO SCHEDULE 2**

**LEASES**

<u>CA – Apple Valley – Site 3699</u>

1.    Lease, dated September 30, 1994, by and between Kmart Corporation, as landlord, and Diem Hong Ngo d/b/a Blessing Nails, as successor-in-interest to Nam Nguyen and Chan Nguyen, as tenant, as amended, assigned and/or otherwise modified.

2.    Lease, dated February 26, 2007, by and between Kmart Corporation, as landlord, and Mina Patel d/b/a Apple Valley Smoke Shop, as tenant, as amended, assigned and/or otherwise modified.

3.    Lease, dated April 11, 2007, by and between Kmart Corporation, as landlord, and Virginia Barnicoat and David Barnicoat, as tenant, as amended, assigned and/or otherwise modified.

<u>IL – Rockford – Site 4423</u>

1.    Ground Lease, dated September 15, 1988, by and between Kmart Corporation, as successor-in-interest to Illnet Partners and Company, Ltd., as landlord, and Bartlett Management Services, Inc., as successor-in-interest to Valenti Midwest, Inc., as tenant, as amended, assigned and/or otherwise modified.

<u>IL – Springfield – Site 4048</u>

1.    Shopping Center Lease, dated May 15, 2007, by and between Sears, Roebuck and Co., as successor-in-interest to K.M. Springfield Co., as landlord, and Rent-A-Center East, Inc., as successor-in-interest to Rent-Way, Inc., as tenant, as amended, assigned and/or otherwise modified.

WI – Fort Atkinson – Site 31903

1.    Lease, dated April 12, 1993, by and between Kmart Express LLC, as successor-in-interest to Fort Atkinson Partners and Company, as landlord, and Neim Bekiri d/b/a River Front Restaurant, as tenant, as assigned and/or otherwise modified.

**SCHEDULE 3**

**PROPERTIES SUBJECT TO AN OCCUPANCY AGREEMENT**

3115 Airport Way, Fairbanks, AK

308 Dix Avenue, Queensbury, NY

2875 Santa Maria Way, Santa Maria, CA

4110 E. Sprague Avenue, Spokane, WA

20777 Bear Valley Road, Apple Valley, CA

200 Irwin Avenue, Fort Walton Beach, FL

1805 E. Stone Drive, Kingsport, TN

3250 Clear Lake Road, Springfield, IL

996 W. View Park Drive, Pittsburgh, PA

1705 S. Main Street, Roswell, NM

# SCHEDULE 4

## LEASES

### CA – Apple Valley – Site 3699

1.      Lease, dated September 30, 1994, by and between Kmart Corporation, as landlord, and Diem Hong Ngo d/b/a Blessing Nails, as successor-in-interest to Nam Nguyen and Chan Nguyen, as tenant, as amended, assigned and/or otherwise modified.

2.      Lease, dated February 26, 2007, by and between Kmart Corporation, as landlord, and Mina Patel d/b/a Apple Valley Smoke Shop, as tenant, as amended, assigned and/or otherwise modified.

3.      Lease, dated April 11, 2007, by and between Kmart Corporation, as landlord, and Virginia Barnicoat and David Barnicoat, as tenant, as amended, assigned and/or otherwise modified.

### IL – Rockford – Site 4423

1.      Ground Lease, dated September 15, 1988, by and between Kmart Corporation, as successor-in-interest to Illnet Partners and Company, Ltd., as landlord, and Bartlett Management Services, Inc., as successor-in-interest to Valenti Midwest, Inc., as tenant, as amended, assigned and/or otherwise modified.

### IL – Springfield – Site 4048

1.      Shopping Center Lease, dated May 15, 2007, by and between Sears, Roebuck and Co., as successor-in-interest to K.M. Springfield Co., as landlord, and Rent-A-Center East, Inc., as successor-in-interest to Rent-Way, Inc., as tenant, as amended, assigned and/or otherwise modified.

### WI – Fort Atkinson – Site 31903

1.      Lease, dated April 12, 1993, by and between Kmart Express LLC, as successor-in-interest to Fort Atkinson Partners and Company, as landlord, and Neim Bekiri d/b/a River Front Restaurant, as tenant, as assigned and/or otherwise modified.