*WEIL DRAFT 11/29/18*

**SUPERPRIORITY JUNIOR LIEN SECURED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

Dated as of November [29], 2018

among

**SEARS HOLDINGS CORPORATION**,
a debtor and a debtor-in-possession,
as Holdings,

**SEARS ROEBUCK ACCEPTANCE CORP.
and
KMART CORPORATION**,
each debtors and debtors-in-possession,
as Borrowers,

**THE LENDERS NAMED HEREIN**,

and

**CANTOR FITZGERALD SECURITIES**,
as Agent and Collateral Agent

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Certain Defined Terms.................................................................................2
Section 1.02    Computation of Time Periods.................................................................32
Section 1.03    Accounting Terms........................................................................................32
Section 1.04    Other Interpretive Provisions..................................................................33

## ARTICLE II

### AMOUNTS AND TERMS OF THE TERM LOANS

Section 2.01    Term Loan Commitments.........................................................................33
Section 2.02    Making the Term Loans............................................................................34
Section 2.03    Commitment Fee; Other Fees..................................................................35
Section 2.04    Repayment of Extensions of Credit.......................................................35
Section 2.05    Interest...........................................................................................................36
Section 2.06    Interest Rate Determination....................................................................37
Section 2.07    Optional Conversion of Term Loan Borrowings................................37
Section 2.08    Optional and Mandatory Prepayments of Term Loan......................37
Section 2.09    Increased Costs............................................................................................38
Section 2.10    Illegality........................................................................................................39
Section 2.11    Payments and Computations...................................................................39
Section 2.12    Taxes..............................................................................................................40
Section 2.13    Sharing of Payments, Etc.........................................................................43
Section 2.14    Use of Proceeds of Term Loan...............................................................44
Section 2.15    Superpriority Claims; Security and Priority of Liens.......................44
Section 2.16    Extension Option........................................................................................47

## ARTICLE III

[Reserved]    47

## ARTICLE IV

### CONDITIONS TO EFFECTIVENESS

Section 4.01    Conditions Precedent to Effectiveness..................................................47
Section 4.02    Conditions Precedent to Each Extension of Credit............................50
Section 4.03    Conditions Precedent to Subsequent DIP Loans...............................51

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Representations and Warranties of Holdings and the Borrowers. ......................52

# ARTICLE VI

## COVENANTS

Section 6.01    Affirmative Covenants .........................................................................................59
Section 6.02    Negative Covenants .............................................................................................73
Section 6.03    Approved Budget. ................................................................................................75

# ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01    Events of Default .................................................................................................77
Section 7.02    Remedies. .............................................................................................................81
Section 7.03    Application of Proceeds. ......................................................................................83
Section 7.04    Lift of Automatic Stay. .......................................................................................83
Section 7.05    License; Cooperation. .........................................................................................84

# ARTICLE VIII

## THE AGENT AND COLLATERAL AGENT

Section 8.01    Appointment ........................................................................................................84
Section 8.02    Delegation of Duties; Lender Advisors ..............................................................84
Section 8.03    Exculpatory Provisions .......................................................................................85
Section 8.04    Reliance by Agent ...............................................................................................85
Section 8.05    Notice of Default .................................................................................................86
Section 8.06    Non-Reliance on Agents and Other Lenders ......................................................86
Section 8.07    Reports and Financial Statements .......................................................................86
Section 8.08    Indemnification of Agent Indemnitees. ..............................................................87
Section 8.09    Agent in Its Individual Capacity ........................................................................88
Section 8.10    Successor Agent ..................................................................................................88
Section 8.11    Defaulting Lenders ..............................................................................................89
Section 8.12    Certain ERISA Matters .......................................................................................90
Section 8.13    Credit Bidding .....................................................................................................91

# ARTICLE IX

## MISCELLANEOUS

Section 9.01    Amendments, Etc. ................................................................................................93
Section 9.02    Notices, Etc. ........................................................................................................94

Section 9.03    No Waiver; Remedies ........................................................................95
Section 9.04    Costs and Expenses............................................................................95
Section 9.05    Right of Set-off ..................................................................................97
Section 9.06    Binding Effect; Effectiveness ............................................................97
Section 9.07    Assignments and Participations .........................................................97
Section 9.08    Confidentiality ................................................................................100
Section 9.09    Governing Law .................................................................................101
Section 9.10    Execution in Counterparts.................................................................101
Section 9.11    Jurisdiction, Etc................................................................................101
**Section 9.12    WAIVER OF JURY TRIAL**...............................................................101
Section 9.13    Release of Collateral or Guarantee Obligation ................................101
Section 9.14    PATRIOT Act Notice ......................................................................102
Section 9.15    Integration .......................................................................................102
Section 9.16    Replacement of Lenders ..................................................................102
Section 9.17    No Advisory or Fiduciary Capacity..................................................103
Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......103
Section 9.19    DIP Intercreditor Agreement; Financing Orders. ...........................104

**SCHEDULES**

| | |
|---|---|
| Schedule 1.03 | Designated Real Estate |
| Schedule 1.04 | Existing Debt |
| Schedule 1.05 | Existing Investments |
| Schedule 1.06 | Existing Liens |
| Schedule 1.07 | Initial Specified Store Closing Locations |
| Schedule 1.08 | Secondary Specified Store Closing Locations |
| Schedule 1.09 | Go Forward Store |
| Schedule 4.01 | Loan Documents |
| Schedule 5.01(l)(A) | Owned and Ground Leased Unencumbered Real Property |
| Schedule 5.01(l)(B) | Leased Unencumbered Real Property |
| Schedule 5.01(n) | Pension Plan Issues |
| Schedule 5.01(p) | UCC Filing Jurisdictions |
| Schedule 5.01(s) | Equity Interests in Subsidiaries |
| Schedule 5.01(t) | Labor Matters |
| Schedule 6.01(m) | Blocked Accounts |
| Schedule 6.01(q)(i) | Case Milestones |
| Schedule 6.01(q)(ii) | Go Forward Plan |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Notice of Borrowing |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Form of Approved Budget |
| Exhibit E | Form of Final Financing Order |
| Exhibit F | Form of Budget Certificate |
| Exhibit G-1 through G-4 | Forms of U.S. Tax Compliance Certificates |

Exhibit H                          Form of Credit Card Notification

Exhibit I                          Form of Compliance Certificate

## SUPERPRIORITY JUNIOR LIEN SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SUPERPRIORITY JUNIOR LIEN SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "*Agreement*"), dated as of November [29], 2018, by and among **SEARS HOLDINGS CORPORATION**, a Delaware corporation and a debtor and debtor-in-possession ("*Holdings*"), **SEARS ROEBUCK ACCEPTANCE CORP.**, a Delaware corporation and a debtor and debtor-in-possession ("*SRAC*"), **KMART CORPORATION**, a Michigan corporation and a debtor and debtor-in-possession ("*Kmart Corp.*"; Kmart Corp. together with SRAC, the "*Borrowers*"), the several banks, financial institutions or entities from time to time party hereto as Term Lenders hereunder (each a "*Lender*" and collectively, the "*Lenders*"), and **CANTOR FITZGERALD SECURITIES**, as administrative agent (in such capacity, together with any of its successors and permitted assigns, the "*Agent*") and collateral agent (in such capacity, together with any of its successors and permitted assigns, "*Collateral Agent*").

## RECITALS

**WHEREAS**, on October 15, 2018 (the "*Petition Date*"), Holdings, SRAC, Kmart Corp. and certain of the Borrowers' Subsidiaries (together with any Subsidiary joining in the Chapter 11 Cases after the Petition Date, collectively, the "*Debtors*") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "*Bankruptcy Court*");

**WHEREAS**, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers have requested that the Lenders provide a superpriority junior secured debtor-in-possession multiple draw term loan facility in an aggregate principal amount up to $350,000,000 (the "*DIP Junior Facility*"), and the Lenders have indicated their willingness to lend on the terms and conditions set forth herein;

**WHEREAS**, each Borrower and each other Loan Party has agreed to secure all of its Obligations under the Loan Documents by granting to the Collateral Agent, for the benefit of the Collateral Agent and the other Credit Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property;

**WHEREAS**, the business of the Borrowers and the other Loan Parties is a mutual and collective enterprise and the Borrower and the other Loan Parties believe that the Total Extensions of Credit and other financial accommodations provided to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Agent, the Collateral Agent and the Lenders, all to the mutual advantage of the Borrowers and the other Loan Parties;

**WHEREAS**, each Borrower and each other Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of Extensions of Credit and other financial accommodations to the Borrowers as provided in this Agreement and the Financing Orders; and

**WHEREAS**, the willingness of the Agent, the Collateral Agent, and the Lenders to extend financial accommodations to the Borrowers, as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the other Loan Parties and at the

1

request of the Borrowers and the other Loan Parties and in furtherance of the mutual and collective enterprise of the Borrowers and the other Loan Parties.

**NOW, THEREFORE**, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

 "*Acceptable Plan of Reorganization*" means a plan of reorganization for each of the Chapter 11 Cases that provides for the termination of the Term Commitments and the payment in full in cash and full discharge of the Obligations at emergence.

"*ACH*" means automated clearing house transfers.

"*Acquisition*" means, with respect to any Person (a) a purchase or other acquisition of more than 50% of, or other controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets of any Person, or more than 50% of, or other controlling interest in, the Equity Interests of any Person, in each case in any single transaction or series of related transactions.

"*Adequate Protection Liens*" has the meaning assigned to the term "Adequate Protection Liens" in the Final ABL Financing Order.

"*Adequate Protection Superpriority Claims*" has the meaning assigned to the term "Adequate Protection Claims" in the Final ABL Financing Order.

 "*Adverse Proceeding*" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, any Borrower, and Subsidiary Guarantor or any Subsidiary of the foregoing), at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of Holding, any Borrower or any Subsidiary Guarantor, threatened against Holdings, any Borrower, any Subsidiary Guarantor or any Subsidiary of the foregoing or any property thereof.

"*Affiliate*" means, as to any Person, any other Person, (a) that directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person, (b) that beneficially owns 10% or more of the Voting Stock or any class of Equity Interests of such first Person; (c) at least 10% of whose Voting Stock or any class of Equity Interests is beneficially owned, directly or indirectly, by such first Person; or (d) who is an officer, director, partner or managing member of such first Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"*Agent*" has the meaning specified therefor in the preamble hereto.

2

"*Agent's Account*" shall mean the Term Loan Collateral Account".

"*Agent Fee Letter*" means the fee letter, dated the date hereof, among Holdings, the Borrowers, and the Agent.

"*Agent Indemnitees*" means the Agent, the Collateral Agent and their respective Related Parties.

"*Agreement*" has the meaning specified therefor in the preamble hereto.

"*AML Laws*" means (i) the Currency and Foreign Transactions Reporting Act, its amendments, and other statutes relating to the subject matter of that Act (which have come to be collectively referred to as the Bank Secrecy Act), including applicable provisions of the PATRIOT Act, and regulations promulgated under any of the foregoing, including 31 C.F.R. Chapter X; and (ii) similar laws, regulations, directives adopted by the European Union, any European Union Member State, the United Kingdom, and any jurisdiction where any Group Member operates.

"*Applicable Lending Office*" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance, and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"*Applicable Variance Percentage*" means (i) from and after the Effective Date until December 1, 2018, 20%; and (ii) thereafter and until the Termination Date, 15%.

"*Approved Budget*" means the Approved Initial Budget, as the same may be updated, modified or supplemented from time to time as provided in Section 6.03.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Approved Initial Budget*" means budget prepared by the Borrowers in the form of **Exhibit D** and which is approved by, and in form and substance satisfactory to the Agent in its sole and absolute discretion.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of **Exhibit B** hereto.

"*Authorized Officer*" means, as to Holdings, any Borrower or any other Loan Party, its Chief Restructuring Officer, president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance or executive vice president, finance. Any document delivered hereunder that is signed by an Authorized Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"*Automatic Stay*" means the automatic stay provided under section 362 of the Bankruptcy Code.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the

3

implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" has the meaning specified therefor in the recitals hereto.

"***Bankruptcy Court***" has the meaning specified therefor in the recitals hereto.

"***Base Rate***" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month Interest Period) plus one percent (1.00%), or (c) the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the "prime rate," as in effect from time to time. The "***prime rate***" is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"***Base Rate Advance***" means a Term Loan Borrowing that bears interest as provided in Section 2.05(a)(i).

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Benefit Plan***" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in section 4975 of the Internal Revenue Code or (c) any Person whose assets include (for purposes of ERISA section 3(42) or otherwise for purposes of Title I of ERISA or section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan."

"***Blocked Accounts***" means the deposit accounts set forth on Schedule 6.01(m) and any deposit accounts that become subject to Blocked Account Agreements pursuant to Section 6.01(i)(iii).

"***Blocked Account Agreement***" means with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, establishing control (as defined in the UCC) of such account by the Collateral Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Collateral Agent (or any other agent which shall succeed the Collateral Agent thereunder), without the further consent of any other Person in all respects subject to the DIP Intercreditor Agreement and the Financing Orders.

"***Blocked Account Bank***" means Bank of America, N.A. and each other bank with whom deposit accounts are maintained in which funds of any of the Loan Parties are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"***Board of Governors***" means the Board of Governors of the Federal Reserve System.

"***Borrower Information***" has the meaning specified therefor in Section 9.08.

"***Borrower Materials***" has the meaning specified therefor in Section 9.02(d).

"***Borrowers***" has the meaning specified therefor in the preamble hereto.

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

"***Budget Certificate***" mean a certificate, substantially in the form of **Exhibit F** hereto, by which Holdings certifies, among other things, compliance with the covenants contained in Section 6.03(b).

"***Budget Variance Report***" means a weekly report certified by an Authorized Officer of Holdings to the Agent (a) showing, in each case, by line item the actual cash receipts, disbursements, inventory receipts and consignment receipts for each week, in a comparable form to the Approved Budget, noting therein the variance of the Borrower's Net Cash Flow, on a cumulative basis, for the Cumulative Four-Week Period, from the projected Net Cash Flow set forth for the Cumulative Four-Week Period in the Approved Budget, (b) including explanations for all material variances (including whether such variance is permanent in nature or timing related) and (b) for any report delivered on the Wednesday following a Budget Testing Date, containing an analysis demonstrating the Borrowers are in compliance with the budget covenant set forth in Section 6.03(b), all in a form, and containing such supporting information, as is satisfactory to the Agent in its sole discretion.

"***Budget Testing Date***" has the meaning specified therefor in Section 6.03(b).

"***Business Day***" means a day of the year on which banks are not required or authorized by law to close in New York, New York and, if the applicable Business Day relates to any Eurodollar Rate Advances, a day of the year on which dealings are carried on in the London interbank market.

"***Capital Lease Obligations***" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"***Carve-Out***" has the meaning specified therefor in paragraph 21(a) of the Final ABL Financing Order.

"***Carve-Out Account***" has the meaning specified therefor in paragraph 21(f) of the Final ABL Financing Order or paragraph 20(b) of the Interim Financing Order, as applicable.

"***Carve-Out Reserve***" has the meaning specified therefor in paragraph 21(e) of the Final ABL Financing Order.

"***Case Milestones***" has the meaning specified therefor in Section 6.01(q)(i).

"***Cash Equivalents***" means (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the U.S. government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by Bank of America or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by Bank of America or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; and (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P.

5

"***Cash Management Order***" means that certain *Interim Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims and Granting Related Relief* (Docket No. 102), entered by the Bankruptcy Court on October 16, 2018, and any similar final order entered by the Bankruptcy Court.

"***Class***" means the class consisting of Term Lenders. For clarity, except as expressly provided herein, each Lender shall have the same rights and obligations under this Agreement and the other Loan Documents.

"***Change in Law***" means the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; underlined provided, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"***Chapter 11 Cases***" means the chapter 11 cases of the Debtors pending in the Bankruptcy Court.

"***Collateral Agent***" has the meaning specified therefor in the preamble hereto.

"***Collateral***" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, including the Prepetition ABL Collateral and all other assets of the Loan Parties, whether now owned or hereafter acquired, and all proceeds thereof, and any claims and causes of action of the Loan Parties of any kind or nature (including proceeds of any actions for preferences, fraudulent conveyances and other avoidance power claims under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code); it being understood that "Collateral" shall include all such property irrespective of whether any such property was excluded pursuant to the Prepetition Loan Documents.

"***Compliance Certificate***" means a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of **Exhibit C**.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"***Commonly Controlled Entity***" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under section 414 of the Internal Revenue Code.

"***Convert***", "***Conversion***" and "***Converted***" each refers to a conversion of a Term Loan Borrowing of one Type into a Term Loan Borrowing of the other Type pursuant to underlined Section 2.07.

"***Credit Card Accounts Receivable***" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Loan Party resulting from charges by a customer of a Loan Party

6

on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Loan Party or services performed by a Loan Party, in each case in the ordinary course of its business.

"*Credit Card Notification*" has the meaning specified in <u>Section 6.01(m)(iii)</u>.

"*Credit Card Processors*" means the credit card clearinghouses and processors used by the Loan Parties and listed in the Perfection Certificate as of the date of this Agreement, or otherwise disclosed in writing to the Agent by the Loan Parties from time to time following the date of this Agreement.

"*Credit Party*" or "*Credit Parties*" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent and (iii) the Collateral Agent and (b) collectively, all of the foregoing.

"*Cumulative Four-Week Period*" means the four-week period up to and through the Saturday of the most recent week then ended.

"*Customs Broker Agreement*" means an agreement, in form and substance acceptable to the Agent in its discretion, or such other form as the Agent may reasonably agree, by and among a Loan Party, a customs broker or other carrier, and the Collateral Agent, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Collateral Agent and agrees, upon notice from the Collateral Agent, to hold and dispose of the subject Inventory solely as directed by the Collateral Agent in all respects subject to the DIP Intercreditor Agreement and the Financing Orders.

"*DC*" means any distribution center owned or leased and operated by any Loan Party.

"*DDA*" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.

"*De Minimis Asset Sale Order*" means the *(CORRECTED) Order Signed on 11/21/2018 Authorizing and Establishing Procedures for De Minimis Asset Abandonments* (Docket No. 856), as entered by the Bankruptcy Court on November 21, 2018.

"*Debt*" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred and being paid in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all direct and contingent obligations of such Person arising under banker's acceptances, letters of credit (including standby and commercial), bank guaranties, surety bonds and similar instruments, (e) all obligations of such Person created or arising under any conditional sale or other title retention agreement (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as Capital Lease Obligations, (g) all direct recourse payment obligations of such Person in respect of any accounts receivable sold by such Person, (h) all net obligations of such Person under any Swap Obligations, (i) all obligations of such Person in respect of Disqualified Equity Interests, (j) all Debt of others referred to in clauses (a) through (i) above or clause (k) below and other payment obligations guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective

7

of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss, and (k) all Debt referred to in clauses (a) through (i) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"***Debtor Advisors***" has the meaning specified therefor in <u>Section</u> 6.01(r).

"***Debtor Relief Laws***" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"***Debtors***" has the meaning specified therefor in the recitals hereto.

"***Default***" means any Event of Default or any event or condition that, with the lapse of time or giving of notice or both, would constitute an Event of Default.

"***Defaulting Lender***" means any Lender (as reasonably determined by the Agent) that (a) has failed to fund any portion of the Term Loans required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (c) has failed, within three Business Days after request by the Agent, to confirm in writing that it will comply with the terms of this Agreement relating to its Term Commitments, <u>provided</u>, that such Lender shall cease to be a Defaulting Lender under this clause (c) upon the Agent's receipt of such confirmation, (d) has notified the Borrowers or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or Bail-In Action, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; <u>provided</u>, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"***Designated Real Estate***" means Real Estate constituting Prepetition Unencumbered Assets and set forth on Schedule 1.03.

"***DIP ABL Loan Agent***" means (i) Bank of America, N.A., in its capacity as administrative agent and co-collateral agent for the DIP ABL Facility and (ii) Wells Fargo Bank, National Association, in its capacity as co-collateral agent for the DIP ABL Facility.

"***DIP ABL Credit Agreement***" means that certain Superpriority Senior Secured Debtor-in-Possession Asset Based Credit Agreement, dated as of the date hereof, among Holdings, the Borrowers, the DIP ABL Loan Agent and the lenders named therein, as in effect on the date hereof.

"***DIP ABL Loan Obligations***" means the "Obligations" as defined in the DIP ABL Credit Agreement.

8

"***DIP ABL Facility***" means the superpriority senior secured debtor-in-possession asset-based credit facility provided by the Credit Parties to the Borrowers under the DIP ABL Credit Agreement, as in effect on the date hereof.

"***DIP Junior Facility***" has the meaning specified therefor in the preamble hereto.

"***DIP Intercreditor Agreement***" means that certain DIP Intercreditor Agreement, dated as of the date hereof, by and among the Agent, the Collateral Agent, the DIP ABL Loan Agent and the Loan Parties, as amended, restated, supplemented or otherwise modified from time to time.

"***DIP Motion***" means the Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing (Docket No. 7) filed by the Debtors on October 15, 2018.

"***Disposition***" means any sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, the issuance or sale, transfer or other disposition of any Equity Interests).

"***Disqualified Equity Interests***" of any Person means any class of Equity Interests of such Person that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by such Person, whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, in each case on or prior to the date that is 91 days after the Scheduled Termination Date.

"***Dollars***" and "**$**" refers to lawful money of the United States.

"***Domestic Lending Office***" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"***Domestic Subsidiary***" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico).

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in an EEA Member Country that is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) above; or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in the foregoing clauses and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any Person entrusted with public administrative authority of an EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Effective Date***" means the first day on which all of the conditions precedent set forth in Section 4.01 are satisfied or waived in accordance with the terms hereof.

9

"***Eligible Assignee***" means (a) a commercial bank or any other Person (other than a natural Person) engaged in the business of making commercial loans, or any fund or other Person (other than a natural Person) that invests in loans, which bank, Person or fund, together with its Affiliates, has a combined capital and surplus in excess of $1,000,000,000 and which bank, Person or fund is approved by the Agent in its discretion, (b) an existing Lender or an Affiliate of an existing Lender or an Approved Fund, and (c) during any Event of Default, any other Person (other than a natural Person) acceptable to Agent in its discretion; provided, that notwithstanding the foregoing, neither the Borrowers nor any Affiliate of the Borrowers, nor any Permitted Holder, nor any holder of any Debt under the Prepetition Second Lien Facilities, nor any other Loan Party, nor any Subsidiary of any of the foregoing, shall qualify as an Eligible Assignee.

"***Employee Wage Order***" means the *Final Order (I) Authorizing But Not Directing the Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs, and (II) Granting Related Relief* (Docket No. 798), entered by the Bankruptcy Court on November 16, 2018.

"***Enforcement Action***" means any rightful action to enforce any Obligations or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of account debtors, exercise of setoff or recoupment, or otherwise).

"***Environmental Action***" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"***Environmental Law***" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"***Environmental Liability***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation or remediation, fines, penalties or indemnities), of Holdings, the Borrowers, or any of their Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the presence, generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Environmental Permit***" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

10

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of any Borrower's controlled group, or under common control with such Borrower, within the meaning of section 414 of the Internal Revenue Code.

"*ERISA Event*" means (a) (i) the occurrence of a Reportable Event, as defined herein, or (ii) the requirements of subsection (1) of section 4043(b) of ERISA (without regard to section 4043(b)(2)) are met with respect to a contributing sponsor, as defined in section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to section 4041(a)(2) of ERISA (including any without limitation any such notice with respect to a plan amendment referred to in section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Borrower or any ERISA Affiliate in the circumstances described in section 4062(e) of ERISA; (e) the withdrawal by any Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under section 430 of the Internal Revenue Code, sections 303(k) or 4068(a) of ERISA shall have been met with respect to any Plan; (g) the institution by the PBGC of proceedings to terminate a Plan pursuant to section 4042 of ERISA, or the occurrence of any event or condition described in section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan, (h) the Borrowers or any ERISA Affiliate incur any liability under Title IV of ERISA (other than premiums due and not delinquent under section 4007 of ERISA) with respect to the termination of any Plan or by application of section 4069 of ERISA; (i) the incurrence by any Borrower or any ERISA Affiliate of any liability with respect to the "complete withdrawal" or "partial withdrawal" (as defined under ERISA section 4203 and 4205, respectively) from any Multiemployer Plan  or notification that a Multiemployer Plan is insolvent (within the meaning of section 4245 of ERISA) or in "endangered", "critical" or "critical and declining" status (within the meaning of section 432 of the Internal Revenue Code or section 305 of ERISA); or (j) a failure by any Borrower or any ERISA Affiliate to make a required contribution to a Multiemployer Plan.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association, as in effect from time to time.

"*Eurocurrency Liabilities*" has the meaning assigned to that term in Regulation D of the Board of Governors, as in effect from time to time.

"*Eurodollar Lending Office*" means, with respect to any Lender, the office of such Lender specified as its "Eurodollar Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"*Eurodollar Rate*" means,

(a)    for any Interest Period with respect to a Eurodollar Rate Advance, the rate per annum equal to the London Interbank Offered Rate ("*LIBOR*") or a comparable or successor rate, which rate is chosen by the Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such

11

Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)    for any interest calculation with respect to a Base Rate Advance on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day; and

provided, that (i) to the extent a comparable or successor rate is selected by the Agent in connection herewith, the approved rate shall be applied in a manner consistent with market practice; provided, further, that to the extent such market practice is not administratively feasible for the Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Agent and (ii) in the event that the Eurodollar Rate as determined above would otherwise be less than 0.00%, such Eurodollar Rate shall be deemed to be 0.00%.

"*Eurodollar Rate Advance*" means a Term Loan Borrowing that bears interest as provided in Section 2.05(a)(ii).

"*Eurodollar Rate Reserve Percentage*" for any Interest Period for a Eurodollar Rate Advance by any Lender means the reserve percentage applicable to such Lender two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors for determining the minimum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"*Events of Default*" has the meaning specified therefor in Section 7.01.

"*Excess Availability*" has the meaning specified therefor in the DIP ABL Credit Agreement.

"*Excluded Accounts*" means payroll, trust and Tax withholding accounts funded in the ordinary course of business.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated and including any Taxes imposed in lieu of income Taxes), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in any Extension of Credit or Term Commitment pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in such Extension of Credit or Term Commitment (other than pursuant to an assignment request by the Borrower under Section 9.16) or (ii) in the case of a Lender, such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 2.12, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.12(e) or Section 2.12(f) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"*Extensions of Credit*" means the outstanding principal amount of the Term Loans.

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

"*Extension Option*" has the meaning specified therefor in <u>Section 2.16</u>.

"*Extraordinary Expenses*" means all reasonable and documented out-of-pocket costs, expenses or advances that the Agent, the Collateral Agent or Lead Lender may incur, whether prior to or after the occurrence and continuance of a Default or Event of Default, and whether prior to, after or during the pendency of the Chapter 11 Cases or any other Insolvency Proceeding of any Loan Party, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against the Agent, the Collateral Agent, any Lender, any Loan Party, any representative of creditors of a Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Collateral Agent's Liens with respect to any Collateral), Loan Documents or Obligations, including any lender liability or other claims; (c) the exercise, protection or enforcement of any rights or remedies of Agent, the Collateral Agent or Lead Lender in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; or (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations.  Such costs, expenses and advances include transfer fees, taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, financial advisor fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Loan Party or independent contractors in liquidating any Collateral (including the Liquidation Agent), and travel expenses.

"*FATCA*" means sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing such sections of the Internal Revenue Code.

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing reasonably selected by it; <u>provided</u>, that if such rate shall be less than zero, the Federal Funds Rate shall be deemed to be zero for the purposes of this Agreement and the other Loan Documents.

"*Final ABL Financing Order*" mean the Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (Docket No. [•], entered by the Bankruptcy Court on [November 27], 2018).

"*Final Closing Date*" has the meaning specified therefor in <u>Section 4.03</u>.

"*Final Financing Order*" means an order of the Bankruptcy Court, in the form and substance satisfactory to the Agent and the Debtors, with any changes thereto that are satisfactory to the Agent in its sole and absolute discretion, which order shall have been entered not later than December 28, 2018,

13

authorizing and approving the DIP Junior Facility on a final basis in form and substance satisfactory to the Agent in its sole and absolute discretion.

"*Financing Orders*" means, collectively, the Interim Financing Order, Final ABL Financing Order and the Final Financing Order.

"*Flood Documentation*" means, for any Real Property, (i) evidence as to whether the applicable Real Property is located in a Special Flood Hazard Area pursuant to a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination form ordered and received by Agent (and if the flood hazard determination states that such Real Property is located in a Special Flood Hazard Area, the applicable Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent), (ii) in the event such Real Property is located in a Special Flood Hazard Area with respect to which flood insurance has been made available under the Flood Insurance Laws, evidence of flood insurance in an amount and otherwise sufficient to comply with the applicable rules and regulations promulgated pursuant to the Flood Insurance Laws, in form and substance reasonably acceptable to Agent, and (iii) any other reasonable documents or information reasonably requested by any Lender (through the Agent) to enable such Lender to comply, in the determination of the Collateral Agent, with any applicable Flood Insurance Laws.

"*Flood Insurance Laws*" means, collectively, (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973, (iii) the National Flood Insurance Reform Act of 1994, (iv) the Flood Insurance Reform Act of 2004 and (v) the Biggert-Waters Flood Insurance Reform Act of 2012.

"*Fund*" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*GAAP*" has the meaning specified therefor in <u>Section 1.03</u>.

"*Go Forward Plan*" means that certain Go Forward Plan of the Debtors attached hereto as <u>Schedule 6.01(q)(ii)</u>.

"**Go Forward Stores**" means the stores identified on Schedule 1.09.

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank), any group or body charged with setting regulatory capital rules or standards (including the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing) and any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"*Group Members*" means, collectively, Holdings, the Borrowers and their respective Subsidiaries.

"*Guarantee and Collateral Agreement*" means a that certain junior Debtor-in-Possession Guarantee and Collateral Agreement, dated as of the date hereof, by and among the entities on the signature pages thereof and Collateral Agent.

"*Hazardous Materials*" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and

14

(b) any other chemicals, materials or substances designated, classified or regulated as hazardous, toxic; a pollutant, contaminant or words of a similar import under any Environmental Law.

"***Holdings***" has the meaning specified therefor in the preamble hereto.

"***Indemnified Taxes***" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"***Indemnified Party***" has the meaning specified therefor in Section 9.04(b).

"***Insolvency***" means with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of section 4245 of ERISA.

"***Insolvency Proceeding***" means any case or proceeding (other than the Chapter 11 Cases) commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

"***Insolvent***" means pertaining to a condition of Insolvency.

"***Intellectual Property***" has the meaning specified therefor in the Guarantee and Collateral Agreement.

"***Interest Period***" means, for each Eurodollar Rate Advance comprising part of the same Term Loan Borrowing, the period commencing on the date of such Eurodollar Rate Advance or the date of Conversion of any Base Rate Advance into such Eurodollar Rate Advance and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below. The duration of each such Interest Period shall be two weeks or one month, as the applicable Borrower may, upon notice received by the Agent not later than 12:00 noon on the third Business Day prior to the first day of such Interest Period, select; provided, that:

(a) a Borrower may not select any Interest Period with respect to a Term Loan Borrowing that ends after the Scheduled Termination Date;

(b) Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Term Loan Borrowing shall be of the same duration;

(c) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, that if such extension would cause the last day of such Interest Period of one month or longer to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(d) whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

"***Interim Financing Order***" means that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; (III) Scheduling Final Hearing; and (IV) Granting Related Relief* (Docket No. [__]), entered by the Bankruptcy Court on November 28, 2018.

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***Inventory***" as defined in the UCC.

"***Investment***" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.

"***Junior DIP Facility Superpriority Claims***" has the meaning specified therefor in Section 2.15(a).

"***Kmart***" means Kmart Holding Corporation, a Delaware corporation.

"***Kmart Corp.***" has the meaning specified therefor in the preamble hereto.

"***Lease***" means any agreement, whether written or oral, no matter how styled or structured, and all amendments, guaranties and other agreements relating thereto, pursuant to which a Loan Party is entitled to the use or occupancy of any Real Property for any period of time.

"***Lead Lender***" means Cyrus Capital Partners, G.P. or any of its Affiliates in a capacity as a Lender hereunder.

"***Lenders***" has the meaning specified therefor in the preamble hereto.

"***Lender Advisors***" has the meaning specified therefor in Section 8.02(b).

"***Lender Professionals***" means attorneys, accountants, appraisers (including real estate appraisers), auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by the Lead Lender, including, for the avoidance of doubt, the Lender Advisors.

"***Lien***" means any lien, security interest, mortgage or other charge or encumbrance of any kind or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor, and any easement, right of way or other encumbrance on title to real property, but excluding consignments or bailments of goods of third parties and the interests of lessors under operating leases.

"***Liquidation***" means the exercise by the Agent or the Collateral Agent of those rights and remedies accorded to the Agent and/or the Collateral Agent under the Loan Documents and applicable law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent and the Collateral Agent, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other Disposition of the Collateral for the purpose of liquidating the Collateral.

"***Liquidation Agent***" has the meaning specified therefor in Section 6.01(r).

"***Loan Documents***" means this Agreement, the Security Documents, the DIP Intercreditor Agreement, the Agent Fee Letter, the Notes, each Financing Order, each Approved Budget, each Rolling Budget, any other document or instrument now or hereafter designated by the Borrowers and the Agent as a "***Loan Document***" and any amendment, waiver, supplement or other modification to any of the foregoing.

"***Loan Parties***" means each Group Member that is a party to a Loan Document.

"***Luxottica Reserve Account***" has the meaning specified therefor in paragraph 66(b) of the Interim Financing Order.

"***Material Adverse Effect***" means the effect of any event, condition, circumstance or contingency that, taken alone or in conjunction with other events, conditions, circumstances or contingencies (in each case, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases), has or could reasonably be expected to have a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of Holdings and its Subsidiaries taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform their obligations under the Loan Documents or (c) the validity or enforceability of the Loan Documents or the rights and remedies of the Agent, the Collateral Agent or the Lenders thereunder (including, but not limited to, the enforceability or priority of any Liens granted to the Collateral Agent under the Loan Documents).

"***Material Assets***" means property (including, without limitation, the issuance or sale, transfer or other disposition of any Equity Interests) with a value and/or cost, in the aggregate, in excess of $2,500,000.

"***Material Documents***" means all pleadings, documents, proposed forms of order, or other items filed by the Debtors in the Chapter 11 Cases that relate to the following: (a) rejection or assumption of material leases, (b) any plan of reorganization or liquidation, (c) any debtor-in-possession financing or use of cash collateral that does not result in payment in full in cash of all Obligations, DIP ABL Loan Obligations and Prepetition First Lien ABL Obligations upon consummation of such financing or use of cash collateral, (d) any sale or other disposition of Collateral outside of the ordinary course of business or (e) any other item that would materially and adversely affect the Credit Parties' or Prepetition Credit Parties' claims.

"***Mortgaged Properties***" means each Real Property that, upon request of the Collateral Agent, shall be encumbered by a Mortgage pursuant to Section 6.01(i)(v).

"***Mortgages***" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, debentures, and other security documents securing the Obligations (including amendments to any of the foregoing) executed and delivered by a Loan Party to the Collateral Agent with respect to Mortgaged Properties (either as stand-alone documents or forming part of other Security Documents), each in form and substance satisfactory to the Collateral Agent and the Borrowers, in each case, as amended, supplemented or otherwise modified from time to time.

"***Multiemployer Plan***" means a multiemployer plan, as defined in section 4001(a)(3) of ERISA, to which Holdings or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions or may otherwise have any liability or obligation.

"***Multiple Employer Plan***" means a single employer plan, as defined in section 4001(a)(15) of ERISA, that (a) is maintained for current and/or former employees of Holdings or any ERISA Affiliate and at least one Person other than Holdings and the ERISA Affiliates or (b) was so maintained and in respect

17

of which Holdings or any ERISA Affiliate could have liability under section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"***Net Cash Flow***" means, for any Cumulative Four-Week Period, the Borrowers' total net cash flow, excluding (i) proceeds from Dispositions, except for proceeds from the sale of Inventory, and (ii) financing related items.

"***Net Proceeds***" means, (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries of any property (other than property disposed of pursuant to clauses (a), (b), (c), (e), or (j) of the definition of Permitted Dispositions) or any casualty or condemnation of such property, the excess, if any, of (i) the sum of cash and cash equivalents received in such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Debt (other than Debt owed to Holdings or any of its Subsidiaries, the payment of which in connection with any Permitted Disposition or other transaction shall not, for the avoidance of doubt, be deemed to reduce the amount of Net Proceeds for any purposes under this Agreement) that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Collateral Agent's Lien, if any, on such asset and that is required, and permitted under this Agreement, to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction, (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, reasonable and customary attorneys' fees, accountants' fees, investment banking fees, appraisals, and brokerage, legal, title and recording or transfer Tax expenses and commissions) paid by any Loan Party or any of its Subsidiaries to third parties (other than Affiliates), (C) transfer Taxes paid as a result thereof and (D) amounts required to be paid by any Loan Party or any of its Subsidiaries pursuant to the Financing Orders or other applicable order of the Bankruptcy Court in order to consummate such transaction, (b) with respect to any loss or damage to any property or assets of any Loan Party, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such event over (ii) cash and cash equivalents that are applied to restoration of a property or are applied to repayment of the principal amount of any Debt that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Collateral Agent's Lien, if any, on such asset and that is required, and permitted under this Agreement, to be repaid and (c) with respect to any issuance of Equity Interests of any Loan Party or capital contribution made to any Loan Party (other than an issuance of Equity Interests to a Loan Party or a capital contribution made by a Loan Party) or any incurrence of Debt other than Permitted Debt, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party in connection therewith.

"***Non-Consenting Lender***" has the meaning specified therefor in <u>Section 9.16</u>.

"***Non-Defaulting Lender***" means, at any time, each Lender that is not a Defaulting Lender at such time.

"***Non-Loan Party***" means each Group Member that is not a Loan Party.

"***Note***" means a promissory note of any Borrower payable to any Lender evidencing the Term Loan of such Lender.

"***Notice of Borrowing***" has the meaning specified therefor in <u>Section 2.02(a)</u>.

"***Obligations***" has the meaning set forth in the Guarantee and Collateral Agreement.

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

"***Other Connection Taxes***" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Extension of Credit or Loan Document pursuant to an assignment request by the Borrowers under Section 9.16).

"***Other Taxes***" has the meaning specified therefor in Section 2.12(b).

"***PACA***" means the Perishable Agricultural Commodities Act of 1930, as amended.

"***Participant Register***" has the meaning specified therefor in Section 9.07(f).

"***PASA***" means the Packers and Stockyards Act of 1921, as amended.

"***PATRIOT Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"***PBGC***" means the Pension Benefit Guaranty Corporation (or any successor).

"***Pension Plan***" means any "employee pension benefit plan" (as such term is defined in section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Holdings or any ERISA Affiliate or to which Holdings or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"***Perfection Certificate***" means a certificate dated as of the Effective Date with respect to the Borrowers and the other Loan Parties in form reasonably satisfactory to the Collateral Agent.

"***Permitted Debt***" means each of the following as long as no Default or Event of Default exists at the time of incurrence thereof or would arise from the incurrence thereof:

(a)     Debt outstanding on the date of this Agreement and listed on Schedule 1.04;

(b)     Debt of any Loan Party to any other Loan Party;

(c)     Debt of any Group Member to any Subsidiary of Holdings which is not a Loan Party; provided, that (i) at the time of incurrence of any such Debt and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing and (ii) such Debt is by its terms subordinated or junior in right of payment or security to the Obligations on terms acceptable to the Agent in its reasonable discretion.

(d)     the Obligations;

(e)     Debt under the DIP ABL Credit Agreement as in effect on the date hereof and subject at all times to the Financing Orders and the DIP Intercreditor Agreement;

(f)     Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations (including, in each case, letters of credit issued to

19

provide such bonds, guaranties and similar obligations), in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(g)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, that (x) such Debt is extinguished within ten Business Days of notification to the applicable Loan Party of its incurrence and (y) such Debt is subject to the Cash Management Order;

(h)    Debt arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with any Specified Store Closing Sales or any Specified Sale Transaction, in each case on terms and pursuant to documentation (including documentation regarding subordination) acceptable to the Agent in its sole and absolute discretion; and

(i)    any other Debt in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding.

Notwithstanding the foregoing, and except for the Carve-Out, no Permitted Debt shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of (i) the Credit Parties in respect of the Obligations and (ii) the DIP ABL Credit Parties (as defined in the Final ABL Financing Order) in respect of the DIP ABL Loan Obligations, in each case as set forth in the Financing Orders, as applicable.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of commercially reasonable business judgment (from the perspective of a secured lender).

"**Permitted Dispositions**" means any of the following, as long as, if so required pursuant to Section 2.08, as applicable, all Net Proceeds are remitted to Agent for application to the Obligations:

(a)    transfers and Dispositions of Inventory in the ordinary course of business (it being agreed and understood that bulk sales, "going-out-of-business sales," store closing sales and similar sales are not in the ordinary course of business);

(b)    transfers and Dispositions among the Loan Parties;

(c)    transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to any Loan Party;

(d)    the sale of surplus, obsolete or worn out equipment or other property (other than Inventory) in the ordinary course of business by the Borrowers or any Subsidiary; provided, that it is understood and agreed that "going out of business sales", store closing sales, bulk sales with respect to furniture, fixtures and equipment, and, in each case,  similar sales, are in not in the ordinary course of business;

(e)    transfers and Dispositions which constitute Permitted Investments that are otherwise permitted hereunder;

(f)    [reserved];

(g)    the sale or Disposition of defaulted receivables and the compromise, settlement and collection of receivables in the ordinary course of business or in bankruptcy or other

20

proceedings concerning the other account party thereon and not as part of an accounts receivable financing transaction; provided that no Disposition shall be made under this clause (g) to any Permitted Holder, unless such Disposition is made pursuant to an order of the Bankruptcy Court and consented to by the Agent (such consent not to be unreasonably withheld);

(h)    any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind (other than, in each case, with respect to rights to license Intellectual Property, unless the limited license granted to the Collateral Agent in such Intellectual Property pursuant to the Loan Documents remains in effect and is acknowledged by the licensee) to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect and provided that no such surrender, waiver, settlement, release or recovery shall be made in respect of any contract, tort or other claim with or in respect of any Permitted Holder, unless such surrender, waiver release, or recovery is made pursuant to an order of the Bankruptcy Court and consented to by the Agent(such consent not to be unreasonably withheld);

(i)    sales of Inventory determined by the management of the applicable Loan Party not to be saleable in the ordinary course of business of such Loan Party or any of the Loan Parties with such sales to be consistent with prior practices;

(j)    non-exclusive licenses to Intellectual Property granted to third parties in the ordinary course of business or in connection with a Disposition permitted under Section 6.02(i), and which do not materially interfere with the ordinary conduct of business of the Loan Parties;

(k)    dispositions in the ordinary course of business consisting of the abandonment of Intellectual Property rights which, in the reasonable good faith determination of the Borrowers, are no longer economically practicable to maintain or useful in the conduct of the business of the Loan Parties;

(l)    the Specified Store Closing Sales; and

(m)    any Specified Sale Transaction;

"**Permitted Holder**" means ESL Investments, Inc. and any of its Affiliates other than a Group Member.

"**Permitted Investments**" means each of the following as long as no Default or Event of Default exists at the time of the making such of Investment or would arise from the making of such Investment:

(a)    Investments existing on the date of this Agreement and listed on Schedule 1.05;

(b)    (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the date of this Agreement and described in the Perfection Certificate, (ii) Investments by any Loan Party and its Subsidiaries in Loan Parties, and (iii) Investments by Subsidiaries that are not Loan Parties in Holdings or any Subsidiary; provided, that in the case of clause (iii), if such Investment is a loan it is subordinated to the Obligations on subordination terms satisfactory to the Agent in its reasonable discretion;

(c)    Investments in connection with Specified Sale Transactions and a Specified Store Closing Sale;

21

(d)    Investments arising out of the receipt of non-cash consideration for the sale of assets otherwise permitted under this Agreement in an amount not to exceed $1,000,000 in the aggregate outstanding at any time;

(e)    Cash Equivalents that are subject to Agent's Lien and control, pursuant to documentation in form and substance satisfactory to Agent;

(f)    to the extent not prohibited by applicable law, (i) advances to officers, directors and employees and consultants of the Loan Parties made for travel, entertainment, relocation and other ordinary business purposes to extent provided for in the Approved Budget, and (ii) advances to officers, directors and employees and consultants of non-Loan Parties made for travel, entertainment, relocation and other ordinary business purposes, <u>provided</u>, in the case of this clause (ii), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such Non-Loan Party unless otherwise permitted hereunder; provided that such Investments shall not exceed $1,000,000 in the aggregate at any one time outstanding;

(g)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by any Group Member as a result of a foreclosure by any Loan Party with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(h)    accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business;

(i)    Guarantees by Holdings or any Subsidiary of (i) operating leases (other than Capital Lease Obligations) in the ordinary course of business and consistent with past practice, or (ii) other obligations that do not constitute Debt in the ordinary course of business;

(j)    (i) to the extent provided for in the Approved Budget, advances in the form of a prepayment of expenses of any Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable Loan Party; and (ii) advances in the form of a prepayment of expenses of any Non-Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable Non-Loan Party; provided, that in the case of clause (ii), any such advances are made solely with respect to non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such Non-Loan Party; provided, further, for the avoidance of doubt, clause (ii) shall only apply in respect of Investments of a Non-Loan Party to another Non-Loan Party; and

(k)    other Investments in an amount not to exceed $1,500,000 in the aggregate outstanding at any time; provided, that any cash returns on such Investments shall be applied to the Obligations in accordance with Section 2.08(b).

"***Permitted Liens***" means:

(a)    Liens for Taxes, assessments and governmental charges or levies to the extent such Taxes, assessments or governmental charges are being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained;

(b)    Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business

22

securing obligations that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(c)     Landlords' Liens arising in the ordinary course of business securing (i) rents not yet due and payable, (ii) rent for Stores in an amount not to exceed the monthly base rent due for the immediately preceding calendar month and (iii) rents for Stores in excess of the amount set forth in the preceding clause (ii) so long as such amounts are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(d)     any attachment or judgment lien not constituting an Event of Default under Section 7.01(e);

(e)     Liens presently existing or hereafter created in favor of the Collateral Agent, on behalf of the Credit Parties;

(f)     Liens arising by the terms of commercial letters of credit, entered into in the ordinary course of business to secure reimbursement obligations thereunder, provided, that such Liens only encumber the title documents and underlying goods relating to such letters of credit or cash;

(g)     claims under PACA and PASA;

(h)     Liens in favor of issuers of credit cards arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(i)     Liens incurred or deposits made by any Group Member in the ordinary course of business in connection with workers' compensation and other casualty insurance lines, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(j)     easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business, or in respect of any Real Property over which the Collateral Agent have a Mortgage, any title defects, liens, charges or encumbrances (other than monetary Liens) which the title company is prepared to endorse or insure by exclusion or affirmative endorsement reasonably acceptable to the Agent and which is included in any Title Policy;

(k)     any interest or title of a lessor or sublessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Agreement;

(l)     normal and customary rights of setoff upon deposits of cash or other Liens originating solely by virtue of any statutory or common law provision, or ordinary course contractual obligation, relating to bankers' liens, rights of setoff or similar rights  in favor of banks or other depository institutions;

(m)     Liens existing on the Effective Date and set forth on Schedule 1.06;

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

(n)    Liens granted to consignors who have properly perfected on consigned Inventory owned by such consignors and created in the ordinary course of business;

(o)    deposits (including retainers or other similar deposits provided to professionals retained by any Group Member in connection with providing services in the ordinary course of business) and other customary Liens to secure the performance of bids, trade contracts (other than for Debt), leases (other than Capital Lease Obligations), statutory and regulatory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, agreements with utilities, and other obligations of a like nature incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(p)    Liens that are contractual rights of set-off relating to the establishment of depository relations with banks not given in connection with the issuance of Debt;

(q)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(r)    the Adequate Protection Liens and the Adequate Protection Superpriority Claims, provided, that such Liens shall be subject at all times to the Financing Orders and the DIP Intercreditor Agreement;

(s)    the Carve-Out, provided, that such Liens shall be subject at all times to the Financing Orders and the DIP Intercreditor Agreement;

(t)    Liens securing the obligations under the DIP ABL Credit Agreement; provided, that such Liens shall be subject at all times to the Financing Orders and the DIP Intercreditor Agreement; and

(u)    non-exclusive licenses to Intellectual Property granted to third parties in the ordinary course of business or in connection with a Disposition permitted under Section 6.02(i), and which do not materially interfere with the ordinary conduct of business of the Loan Parties.

 "*Permitted Prior Liens*" means valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition First Lien ABL Credit Agreement.

"*Permitted Variance*" means, for any Cumulative Four-Week Period, the Borrowers' actual Net Cash Flow for such period shall be not less than the Net Cash Flow for such period set forth in the Approved Budget *minus* $42,000,000.

"*Person*" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"*Petition Date*" has the meaning specified therefor in the recitals hereto.

"*Pharmacy Receivables*": Accounts arising from the sale of prescription drugs or other Inventory which can be dispensed only through an order of a licensed professional.

"*Plan*" means a Single Employer Plan or a Multiple Employer Plan.

"*Prepetition*" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"*Prepetition 2016 Term Loan Facility*" means that certain term loan facility in an aggregate original principal amount of $750,000,000 provided under the Prepetition First Lien ABL Credit Agreement.

"*Prepetition ABL Collateral*" means the "Collateral" as defined in the Prepetition First Lien ABL Credit Agreement including any "cash collateral" as defined in section 363 of the Bankruptcy Code.

"*Prepetition ABL Documents*" means the Prepetition First Lien ABL Credit Agreement, together with all Loan Documents (as defined in the Prepetition First Lien ABL Credit Agreement), in each case, as such has been or may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date.

"*Prepetition ABL L/C Subfacility*" means that certain $1,000,000,000 letter of credit subfacility provided under the Prepetition First Lien ABL Credit Agreement.

"*Prepetition ABL Obligations*" means "Obligations" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"*Prepetition Facilities*" means, collectively the Prepetition 2018 FILO Facility, the Prepetition Revolving Facility and the Prepetition 2016 Term Loan Facility.

"*Prepetition 2018 FILO Facility*" means that certain "first-in, last-out" facility in an original principal amount of $125,000,000 provided under the Prepetition First Lien ABL Credit Agreement.

"*Prepetition First Lien ABL Credit Agreement*" means the certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date), by and among Holdings, the Borrowers, the banks, financial institutions and other institutional lenders from time to time party thereto (collectively, the "*Prepetition ABL Lenders*"), the Issuing Lenders (as defined therein) from time to time party thereto (the "*Prepetition Issuing Lenders*"), and Bank of America, as administrative agent (in such capacity, the "*Prepetition ABL Agent*"), as a co-collateral agent, and a swingline lender, Wells Fargo Bank, National Association, as a co-collateral agent (together with Bank of America in such capacity, the "*Prepetition Co-Collateral Agents*" and together with the Prepetition ABL Lenders, the Prepetition Administrative Agent, and the Prepetition Issuing Lenders, the "*Prepetition Credit Parties*"), and the other parties from time to time party thereto.

"*Prepetition First Lien ABL Facilities*" means Prepetition First Lien ABL Credit Agreement, Prepetition 2016 Term Loan Facility, Prepetition Revolving Facility, and Prepetition ABL L/C Subfacility.

"*Prepetition First Lien ABL Liens*" means for the benefit of each Prepetition Co-Collateral Agent and all of the other Prepetition ABL Credit Parties, a first priority security interest in and continuing lien on all of the collateral identified in the Prepetition ABL Documents.

"*Prepetition L/C Obligations*" means "L/C Obligations" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

"*Prepetition Loan Documents*" means "Loan Documents" as such term is defined in the Prepetition First Lien ABL Credit Agreement.

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

"***Prepetition Revolving Facility***" means that certain $1,500,000,000 asset-based revolving credit facility provided under the Prepetition First Lien ABL Credit Agreement.

"***Prepetition Second Lien Prepetition ABL Liens***" means, for the benefit of the prepetition second lien collateral agent, and all other prepetition second lien credit parties, a first priority security interest in and continuing lien on all of the collateral identified in the Prepetition Second Lien Facilities.

"***Prepetition Second Lien Cash Notes Indenture***" means that certain Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified from time to time), by and among Holdings, certain guarantors from time to time party thereto, and Wilmington Trust, National Association, as successor trustee and collateral agent thereunder.

"***Prepetition Second Lien Credit Agreement***" means that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented or otherwise modified from time to time) by and among Holdings, the Borrowers, as borrowers, and the lenders from time to time party thereto.

"***Prepetition Second Lien Facilities***" means the Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Cash Notes Indenture, and the Prepetition Second Lien PIK Notes Indenture.

"***Prepetition Second Lien PIK Notes Indenture***" means that certain Indenture, dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time) by and among Holdings, certain guarantors from time to time party thereto, and Computershare Trust Company, N.A., as trustee thereunder.

"***Prepetition Second Lien Secured Parties***" means the secured parties under the Prepetition Second Lien Facilities.

"***Prepetition Stand-Alone L/C Facility***" shall mean that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date), by and among Holdings, the Borrowers, as borrowers, JPP, LLC, JPP II, LLC, Crescent 1, L.P., Canary SC Fund, L.P., CYR Fund, L.P., CMH VI, L.P., and Cyrus Heartland, L.P., as L/C lenders (the "***Prepetition L/C Lenders***"), and Citibank, N.A., as administrative agent and as issuing bank (in such capacity, the "Prepetition LC Facility Administrative Agent" and together with the Prepetition L/C Lenders, the "***Prepetition L/C Facility Credit Parties***").

"***Prepetition Unencumbered Assets***" has the meaning specified therefor in Section 2.15(b).

"***Prepetition Unencumbered Assets Proceeds Account***" means a Prepetition Unencumbered Assets Proceeds Account (as such term is defined in the DIP ABL Credit Agreement).

"***Prior Week***" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"***Pro Rata Share***" means, as to any Lender as of any date of determination, a percentage equal to (i) the sum of such Lender's Term Commitment and such Lender's share of the outstanding principal amount of the Term Loan divided by (ii) the sum of the aggregate outstanding principal amount of the Term Loan and the aggregate amount of the Lenders' Term Commitments as of such date.

"***Public Lender***" has the meaning specified therefor in Section 9.02(d).

"***Qualified Bid***" has the meaning specified therefor in Schedule 6.01(q)(ii).

26

"***Recipient***" means the Agent, the Collateral Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"***Real Property***" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee simple or leased by any Loan Party, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"***Register***" has the meaning specified therefor in Section 9.07(e).

"***Related Parties***" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, attorneys and advisors of such Person and of such Person's Affiliates.

"***Remedies Notice Period***" has the meaning specified therefor in paragraph [33(b)] of the Final Financing Order.

"***Reportable Event***" means any of the events set forth in section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"***Required Lenders***" means, at any time, the holders of more than 50% of the sum of the aggregate Term Commitments then in effect and the principal amount of the Term Loan then outstanding; provided, that the Extensions of Credit of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"***Requirements of Law***" means as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"***Restricted Payment***" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings or any Subsidiary of Holdings, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings or any Subsidiary of Holdings or (c) any option, warrant or other right to acquire any such Equity Interests in Holdings or any Subsidiary of Holdings.

"***Rolling Budget***" means a 13-week cash flow forecast delivered pursuant to Section 6.03 which is approved by the Agent in its reasonable discretion.

"***Sanctions***" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union Member State, Her Majesty's Treasury of the United Kingdom, or any jurisdiction where any Group Member operates.

"***Sanctioned Country***" means at any time, a country or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the Crimea of Ukraine, Cuba, Iran, North Korea and Syria).

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

"*Sanctioned Person*" means, at any time, (a) any Person listed in any Sanctions-related list of sanctioned Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, any European Union Member State, Her Majesty's Treasury of the United Kingdom, or by any jurisdiction where any Group Member operates; (b) any Person located, organized or resident in a Sanctioned Country; or (c) any Person directly or indirectly owned fifty percent or more or otherwise controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

"*Scheduled Termination Date*" has the meaning specified therefor in the definition of "Termination Date."

"*Sears*" means Sears, Roebuck and Co., a New York corporation.

"*Sears Holdings Pension Plan*" means collective reference to the Sears Holdings Pension Plan 1, as amended and restated effective January 1, 2014, and the Sears Holdings Pension Plan 2, as amended and restated effective December 1, 2016.

"*SEC*" means the United States Securities and Exchange Commission.

"*Security Documents*" means the collective reference to the Guarantee and Collateral Agreement, each of the Mortgages, any short-form intellectual property security agreement entered into in connection with the Guarantee and Collateral Agreement, the Financing Orders and all other documents hereafter delivered to the Collateral Agent purporting to grant or granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"*Senior Permitted Liens*" means all Permitted Prior Liens, Permitted Liens to the extent such liens are required to be senior pursuant to applicable law, and Permitted Liens described in clauses (j) and (t) in the definition thereof.

"*Significant Holder*" means (i) any "person" or "group" (as such terms are used in sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), which is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) of 10% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right), and (ii) any Affiliate of any such Person described in clause (i) above.

"*Single Employer Plan*" means a single employer plan, as defined in section 4001(a)(15) of ERISA, that (a) is maintained for current and/or former employees of any Borrower or any ERISA Affiliate and no Person other than such Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which any Borrower or any ERISA Affiliate could have liability under section 4069 of ERISA in the event such plan has been or were to be terminated.

"*Special Flood Hazard Area*" has the meaning specified therefor in Section 6.01(c)(vi).

"*Specified Collateral*" has the meaning specified therefor in Section 2.15(d).

"*Specified Full-Chain Liquidation*" means a liquidation on an equity basis (or, if approved by the Agent in its sole and absolute discretion, on a fee basis) of the entire chain of Stores (or the entire chain of Stores remaining after completion of, or not contemplated to be included in, the Specified Going Concern

Sale) of the Debtors and all of the assets relating thereto under section 363 of the Bankruptcy Code. The Specified Full-Chain Liquidation shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent in its sole and absolute discretion (or, with respect to price, satisfactory to the Agent in its reasonable discretion).

"*Specified Going Concern Sale*" means a sale, in one or a series of related transactions, of all or substantially all of (or, if approved in writing by the Agent, certain of) the assets of the Debtors as a going concern under section 363 of the Bankruptcy Code in accordance with the section of the Go Forward Plan entitled "Go forward Stores Sale Process." The Specified Going Concern Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent in its sole and absolute discretion (or, with respect to price, satisfactory to the Agent in its reasonable discretion); provided, for purposes of this definition, "price" shall not be deemed reasonably satisfactory if the Specified Going Concern Sale will not result, individually or in the aggregate, in Net Proceeds to satisfy in full, in cash, all Obligations and all obligations under the DIP ABL Credit Agreement (after taking into account the funding in full of the Winddown Account with the proceeds of any Prepetition Unencumbered Assets included in such sale).

"*Specified IP Sale*" means a sale, in one or a series of related transactions, of all of the Intellectual Property of the Debtors under section 363 of the Bankruptcy Code to the extent such assets are not otherwise included in any Specified Going Concern Sale or Specified Full-Chain Liquidation required to be consummated pursuant to the Go Forward Plan. The Specified IP Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent in its sole and absolute discretion (or, with respect to price, satisfactory to the Agent in its reasonable discretion).

"*Specified Other Assets Sale*" means the sale of any or all remaining assets of the Debtors under section 363 of the Bankruptcy Code (including mortgaged Real Property interests and leasehold Real Property interests) to the extent such assets are not otherwise included in any Specified Going Concern Sale or Specified Full-Chain Liquidation required to be consummated pursuant to the Go Forward Plan. The Specified Other Assets Sale shall be conducted pursuant to bidding procedures, sales procedures, approval orders, purchase agreements, agency documents or other agreements, documents or instruments, as applicable, in form and substance and on terms satisfactory to the Agent in its sole and absolute discretion (or, with respect to price, satisfactory to the Agent in its reasonable discretion).

"*Specified Sale Transaction*" means any or all of a Specified Going Concern Sale, a Specified Full-Chain Liquidation, a Specified IP Sale, or a Specified Other Assets Sale.

"*Specified Store Closing Sale*" means (a) certain store closures listed on Schedule 1.07 in accordance with the Initial Store Rationalization described in the Go Forward Plan and (b) certain store closures listed on Schedule 1.08 in accordance with the Secondary Store Rationalization described in the Go Forward Plan and (c) the closure of any additional Stores approved in writing by the Collateral Agent in its discretion (subject to the performance of a desktop appraisal in form and substance acceptable to the Collateral Agent); provided that the liquidation of assets pursuant to the foregoing clause (c) shall be conducted by the Liquidation Agent pursuant to a liquidation agreement approved by the Agent (including with respect to any augmentation arrangements) and all other relevant documents executed in connection therewith, each, as applicable, to be in form and substance and on terms satisfactory to the Agent in its sole and absolute discretion (or, with respect to price, satisfactory to the Agent in its reasonable discretion).

29

"***Specified Subsidiaries***" mean SRC Sparrow 1 LLC, a Delaware limited liability company, SRC Sparrow 2 LLC, a Delaware limited liability company, SRC O.P. LLC, a Delaware limited liability company, SRC Facilities LLC, a Delaware limited liability company, SRC Real Estate (TX) LLC, a Delaware limited liability company, and KCD IP, LLC, a Delaware limited liability company.

"***SRAC***" has the meaning specified therefor in the preamble hereto.

"***Store***" means any store owned or leased and operated by any Loan Party.

"***Store Footprint Plan***" means, collectively, Schedule 1.07, Schedule 1.08 and Schedule 1.09.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other business entity (a) of which a majority of the shares of Voting Stock is at the time beneficially owned by such Person, (b) over which such Person has the ability to direct the management, or (c) whose financial results are consolidated into the financial statements of such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"***Subsidiary Guarantor***" means each direct or indirect wholly owned Domestic Subsidiaries of Holdings that have commenced Chapter 11 Cases, except for Specified Subsidiaries.

"***Survey***" has the meaning specified therefor in Section 6.01(i)(v)(3)(B).

"***Swap Contract***" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "***Master Agreement***"), including any such obligations or liabilities under any Master Agreement.

"***Swap Obligations***" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"***Swap Termination Value***" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, the termination value thereof.

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"***Term Commitment***" "means, as to any Lender, the obligation of such Lender to make Term Loans in an aggregate principal amount up to (a) the amount set forth opposite such Lender's name on Schedule

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

1.01 or (b) if such Lender has entered into any Assignment and Acceptance, the amount set forth for such Lender in the Register maintained by the Agent pursuant to Section 9.07(d), as such amount may be reduced pursuant to Section 2.06.

"*Term Lenders*" means, collectively, any Persons party hereto as a Term Lender (whether by a signature page hereto or by a joinder agreement hereto), and each Person that shall become a party hereto as a Term Lender pursuant to Section 9.07.

"*Term Loan*" means, collectively, (i) the term loans made by the Term Lenders pursuant to Section 2.01(a) and (ii) as used in the definitions of "Required Lenders", the sum of (x) term loans of all the Term Lenders.

"*Term Loan Borrowing*" means a borrowing consisting of simultaneous Term Loans of the same Type made by each of the applicable Lenders pursuant to Section 2.01.

"*Term Loan Collateral* **Account"** has the meaning specified in Section 6.01(n)(C).

"*Term Loan Margin*" means (a) with respect to any outstanding portion of the Term Loan that is a Eurodollar Rate Advance, 10.50% per annum, and (b) with respect to any outstanding portion of the Term Loan that is a Base Rate Advance, 9.50% per annum.

"*Termination Date*" means the earliest of (a) eight (8) months after the date of this Agreement (such date, the "*Scheduled Termination Date*"), (b) twelve (12) months after the date of this Agreement if the Borrowers shall exercise the Extension Option, and (c) the Termination Date (as defined in the DIP ABL Facility) under the DIP ABL Facility.

"*Third Party Payor Notification*" has the meaning specified in Section 6.01(m)(iii).

"*Third Party Payors*" means any private health insurance company that is obligated to reimburse or otherwise make payments to pharmacies which sell prescription drugs to eligible patients under any insurance contract with such private health insurer.

"*Title Insurer*" has the meaning specified therefor in Section 6.01(i)(v)(3)(A).

"*Title Policy*" has the meaning specified therefor in Section 6.01(i)(v)(3)(A).

"*Total Extensions of Credit*" means at any time, the aggregate amount of the Extensions of Credit of the Lenders outstanding at such time.

"*Trading With the Enemy Act*" means 50 U.S.C. § 1 et seq., as amended.

"*Type*" means either a Base Rate Advance or a Eurodollar Rate Advance.

"*UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York, provided, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 thereof; provided, further, that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "*Uniform Commercial Code*" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"***Unfunded Pension Liability***" means the excess of a Pension Plan's benefit liabilities under section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to section 412 of the Internal Revenue Code for the applicable plan year.

"***Utility Deposit Adequate Assurance Accounts***" mean collectively, the deposit accounts of any Loan Party and any cash deposited therein solely to the extent such cash is deposited for the benefit of certain utilities pursuant to and consistent with that certain Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures For Determining Adequate Assurance of Payment For Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discounting Utility Service (Docket No. 461).

"***Voting Stock***" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"***Weekly Flash Reporting Package***" means reports detailing operating and financial performance, which shall include cash flow performance compared to the Approved Budget for the Prior Week together with accompanying schedules supporting line items included in the weekly cash flow results (such as rollforward of inventory sales and receipts, rollforward of merchandise and other payables of each Loan Party as of the end of the Prior Week, in each case, in reasonable detail).

"***Winddown Account***" means a deposit account at Bank of America that, prior to the discharge in full of all Obligations under the Junior DIP Facility, may only be used to pay winddown costs of the Loan Parties at the discretion of the Borrowers following entry of the Final Financing Order.

"***Winddown Account Funding Condition***" the aggregate amount of cash deposited into the Winddown Account, which amount shall be equal to $240,000,000.

"***Write-Down and Conversion Powers***" means the write-down and conversion powers of the applicable EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Computation of Time Periods.  In this Agreement, unless otherwise specified, (i) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" (ii) "including" means "including without limitation"; and (iii) any reference to a time of day means Eastern time.

Section 1.03    Accounting Terms.  All accounting terms not specifically defined herein or in the other Loan Documents shall be construed in accordance with U.S. generally accepted accounting principles ("***GAAP***") which shall be consistently applied.  If at any time any change in U.S. generally accepted accounting principles would affect the computation of any financial ratio or requirement set forth herein, and either the Borrowers or the Required Lenders shall so request, the Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders which shall not be unreasonably withheld), provided, that until so amended, (i) such ratio or requirement

32

shall continue to be computed in accordance with GAAP prior to such change in principles, and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. For the avoidance of doubt, no retroactive change in GAAP shall apply to the construction of accounting terms under this Agreement in the absence of an amendment hereto in accordance with the terms of this <u>Section 1.03</u>.

Section 1.04    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document, the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II

## AMOUNTS AND TERMS OF THE TERM LOANS

Section 2.01    <u>Term Loan Commitments.</u>

(a)    Each Lender, severally and not jointly, agrees:

(i)    Subject to the terms and conditions set forth herein (including, without limitation the conditions required under <u>Section 4.01</u> and <u>Section 4.02</u>), to make Term Loans in an aggregate principal amount not to exceed $250,000,000 ("***Interim DIP Loan Amount***"), which shall be funded by the Lenders in three draws (each an "***Interim DIP Loan***" and collectively the "***Interim DIP Loans***") on or after the Effective Date and prior to the Final Closing Date in the following amounts and in the following order: (x) first, an Interim DIP Loan in an aggregate principal amount of up to $75,000,000, (y) second, an Interim DIP Loan in an aggregate principal amount of up to $75,000,000 and (z) third, an Interim DIP Loan in an aggregate principal amount of up to $100,000,000; <u>provided</u>, that with respect to clauses (y) and (z) above, such Interim DIP Loans shall only be made available on the dates when Excess Availability is less than $50,000,000; <u>provided</u>, <u>however</u>, that any portion of the Term Commitments not used prior to the Final Closing Date shall be available for draws after the Final Closing Date (the "***Carryover Term Commitments***"); and

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

(ii)   Subject to the terms and conditions set forth herein (including, without limitation the conditions required under Section 4.01 and Section 4.02 and Section 4.03), to make Term Loans in an aggregate principal amount not to exceed $100,000,000 plus the Carryover Term Commitments, which shall be funded by the Lenders in multiple draws, (each a "*Subsequent DIP Loan*" and collectively the "*Subsequent DIP Loans*") on or after the Final Closing Date, but in no event shall any such Subsequent DIP Loan be in an aggregate principal amount of lesser of (x) $50,000,000 and (y) the remaining Term Commitments; provided, that each Subsequent DIP Loan shall only be made available on the dates when the sum of Excess Availability and the aggregate amount of cash available to the Loan Parties is less than $50,000,000.

(b)   The Interim DIP Loans and the Subsequent DIP Loans shall constitute a single class of Loans for all Purposes of this Agreement and the other Loan Documents. Term Loans that are repaid or prepaid may not be re-borrowed. For the avoidance of doubt, it is understood and agreed that proceeds of all funded Term Loans shall be placed into the Term Loan Collateral Account.

Section 2.02    Making the Term Loans.

(a)   Each Term Loan Borrowing under Section 2.01 shall be made on notice, given not later than (x) 12:00 noon on the third Business Day prior to the date of the proposed Term Loan Borrowing in the case of a Term Loan Borrowing consisting of Eurodollar Rate Advances or (y) 1:00 p.m. on the second Business Day prior to the date of the proposed Term Loan Borrowing in the case of a Term Loan Borrowing consisting of Base Rate Advances, by the applicable Borrower to the Agent, which shall give to each Lender prompt notice thereof by email attachment or telecopier. Each such notice of a Term Loan Borrowing (a "*Notice of Borrowing*") shall be by telephone, confirmed immediately in writing, by email attachment or by telecopier, in substantially the form of **Exhibit A** hereto, specifying therein the requested (i) date of such Term Loan Borrowing, (ii) Type of Term Loans comprising such Term Loan Borrowing, (iii) aggregate amount of such Term Loan Borrowing, and (iv) in the case of a Term Loan Borrowing consisting of Eurodollar Rate Advances, initial Interest Period for each such Term Loan Borrowing. Each Notice of Borrowing shall be irrevocable and binding on the applicable Borrower. Each Term Lender shall, before 2:00 p.m. on the date of such Term Loan Borrowing make available for the account of its Applicable Lending Office to the Agent, in same day funds, such Term Lender's ratable (in accordance with its Term Commitment) portion of such Term Loan Borrowing. After the Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article IV, the Agent will make such funds available to the Borrower requesting such Term Loan Borrowing at the Agent's address for Term Loan Borrowings referred to in **Section 9.02**.

(b)   Anything in subsection (a) above to the contrary notwithstanding, (i) a Borrower may not select Eurodollar Rate Advances for any Term Loan Borrowing if the obligation of the Lenders to make Eurodollar Rate Advances shall then be suspended pursuant to Section 2.06 or 2.10 and (ii) the Eurodollar Rate Advances may not be outstanding as part of more than six (6) separate Term Loan Borrowings.

(c)   Unless the Agent shall have received notice from a Lender prior to the time of any Borrowing that such Lender will not make available to the Agent such Lender's ratable portion of such Term Loan Borrowing, the Agent may assume that such Lender has made such portion available to the Agent on the date of such Term Loan Borrowing in accordance with subsection (a) of this Section 2.02 and the Agent may, in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Agent, such Lender and the applicable Borrower severally agree to repay to the Agent forthwith on demand such corresponding amount together with interest thereon, for each day from

34

the date such amount is made available to such Borrower until the date such amount is repaid to the Agent, at (i) in the case of such Borrower, the interest rate applicable at the time to the Term Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate. If such Lender shall repay to the Agent such corresponding amount, such amount so repaid shall be made available to the applicable Borrower and shall constitute such Lender's Term Loans as part of such Borrowing for purposes of this Agreement.

Section 2.03    Commitment Fee; Other Fees.

(a)    Closing Fee. The Borrowers jointly and severally agree to pay to the Agent for the account of each Lender a closing fee equal to 3.00% (i) due and payable with respect to the $250,000,000 aggregate principal amount of the Interim DIP Loan Amount (whether or not all or any portion Interim DIP Loan Amount is funded on the Effective Date) on the Effective Date, and (ii) due and payable with respect to the $100,000,000 aggregate principal amount of Subsequent DIP Loans, in each case, on the date of the borrowing thereof; provided that, in any event (but without duplication), such fee shall be paid in respect of the aggregate principal amount of unused Term Commitments upon the earliest to occur of (x) December 31, 2018 and (y) the Final Closing Date.

(b)    Commitment Fee. The Borrowers jointly and severally agree to pay to the Agent for the account of each Lender a commitment fee on the average daily amount of the available Term Commitment of such Lender during the period for which payment is made at a rate per annum equal to 0.75%, payable in arrears monthly on the 5th day subsequent to the last day of each month and on the Termination Date; provided that, with respect to the period from and including the Effective Date to and including November 30, 2018, the commitment fee for such period shall be payable on January 5, 2019.

(c)    Extension Fee. Subject to the Borrower's valid election of the Extension Option, the Borrowers jointly and severally agree to pay to the Agent for the account of each Lender that is a Lender on the Scheduled Termination Date an extension fee equal to 1.25% of the aggregate principal amount of such Lender's then outstanding Term Loans, which fee shall be earned on the first day after the Scheduled Termination Date but shall be due and payable on the Termination Date.

(d)    Agent's Fee; Other Fees. (i) Holdings and the Borrowers jointly and severally agree to pay to the Agent the fees set forth in the Agent Fee Letter in the amounts and at the times specified therein and (ii) the Borrowers jointly and severally agree to pay to the Agent, for its own account, a monitoring fee of $175,000, due and payable in advance on the Effective Date, which monitoring fee shall be fully earned and due and payable in advance on the Effective Date.

(e)    The fees described in this Section 2.03 shall be fully earned on the Effective Date, shall be due and payable on the dates described herein, and will not be refundable under any circumstances. All fees payable hereunder will be paid in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim. All or any portion of the fees received by the Agent or any Lender hereunder may be allocated to, or shared among, any of their respective Affiliates.

Section 2.04    Repayment of Extensions of Credit. Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, upon the Termination Date (whether by acceleration or otherwise), (i) each Borrower shall repay to the Agent, for the ratable account of the Lenders on the Termination Date, the aggregate principal amount then outstanding of the Total Extensions of Credit made to it by the Lenders and (ii) the Agent, the Collateral Agent and the Lenders shall be entitled to immediate payment of all Obligations and, subject to the Remedies Notice Period, as applicable, to enforce the remedies provided for under this Agreement

35

and the other Loan Documents or under applicable law, in each case, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

Section 2.05    Interest.

(a)    Term Loan.  Each Borrower shall pay interest on the unpaid principal amount of the Term Loan made to it and owing to each Term Lender from the Effective Date until such principal amount shall be paid in full, at the following rates per annum:

(i)    Base Rate Advances.  During such periods as any outstanding portion of the Term Loan is a Base Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times to the sum of (x) the Base Rate in effect from time to time, plus (y) the Term Loan Margin for Base Rate Advances, payable in arrears monthly on the 5th day subsequent to the last day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full; provided that, with respect to the period from and including the Effective Date to and including November 30, 2018, the interest for such period shall be payable on January 5, 2019.

(ii)    Eurodollar Rate Advances.  During such periods as any outstanding portion of the Term Loan is a Eurodollar Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times during each Interest Period for such Eurodollar Rate Advance to the greater of (A) 1.00% or (B) the Eurodollar Rate for such Interest Period for such outstanding portion of the Term Loan plus, in either case, the Term Loan Margin for Eurodollar Rate Advances, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than one month, on each day that occurs during such Interest Period every month from the first day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, and notwithstanding the Automatic Stay, the Borrowers shall automatically pay interest on the unpaid principal amount of the Term Loan, payable in arrears on the dates referred to in Section 2.05(a)(i) or Section 2.05(a)(ii), as applicable, (or, if earlier, at the time payment thereof is demanded by the Agent), at a rate per annum equal to 2% per annum above the rate per annum required to be paid on such Term Loan pursuant to Section 2.05(a)(i) or Section 2.05(a)(ii), as applicable.  Further, the Borrowers shall pay interest, to the fullest extent permitted by law, on the amount of any interest, fee or other amount (other than principal) payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on Base Rate Advances pursuant to Section 2.05(a)(i).

(c)    Regulation D Compensation.  Each Lender that is subject to reserve requirements of the Board of Governors may require the Borrowers to pay, contemporaneously with each payment of interest on the Eurodollar Rate Advances, additional interest on the related Eurodollar Rate Advances of such Lender at the rate per annum equal to the excess of (i) (A) the applicable Eurodollar Rate divided by (B) one minus the Eurodollar Rate Reserve Percentage over (ii) the applicable Eurodollar Rate. Any Lender wishing to require payment of such additional interest (x) shall so notify the Agent and the Borrowers, in which case such additional interest on the Eurodollar Rate Advances of such Lender shall be payable to such Lender at the place indicated in such notice with respect to each Interest Period commencing at least five Business Days after the giving of such notice and (y) shall notify the Agent and the Borrowers

36

at least five Business Days prior to each date on which interest is payable on the amount then due it under this Section.  Each such notification shall be accompanied by such information as the Borrowers may reasonably request.

Section 2.06    Interest Rate Determination.

(a)    If, with respect to any Eurodollar Rate Advances,

(i) the Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such proposed Eurodollar Rate Advance for the applicable Interest Period; or

(ii) the Required Lenders notify the Agent prior to the commencement of any Interest Period for a proposed Eurodollar Rate Advance that the Eurodollar Rate for any Interest Period for such Eurodollar Rate Advances will not adequately reflect the cost to such Required Lenders of making, funding or maintaining their respective Eurodollar Rate Advances for such Interest Period, then

the Agent shall forthwith so notify the Borrowers and the Lenders, whereupon (x) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance, and (y) the obligation of the Lenders to make, or to Convert Term Loans into, Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

(b)    If any Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, such Eurodollar Rate Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

Section 2.07    Optional Conversion of Term Loan Borrowings.  The Borrowers may on any Business Day, upon notice given to the Agent not later than 12:00 noon on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Sections 2.06 and 2.10, Convert any Term Loan Borrowing, of one Type into a Term Loan Borrowing, of the other Type; provided, that any Conversion of Eurodollar Rate Advances into Base Rate Advances shall be made only on the last day of an Interest Period for such Eurodollar Rate Advances, any Conversion of Base Rate Advances into Eurodollar Rate Advances shall be in an amount not less than the minimum amount specified in Section 2.02(b).  Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) Term Loan Borrowings to be Converted, and (iii) if such Conversion is into Eurodollar Rate Advances, the duration of the initial Interest Period for each such Term Loan Borrowing.  Each notice of Conversion shall be irrevocable and binding on the applicable Borrower.

Section 2.08    Optional and Mandatory Prepayments of Term Loan.

(a)    Any Borrower may, without penalty or premium and upon notice given not later than 12:00 noon two (2) Business Days prior to the date of such prepayment (or, in the case of a Base Rate Advance, one Business Day prior to the date of such prepayment) to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given such Borrower shall, prepay the outstanding principal amount of the Term Loans comprising part of the same Term Loan Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the

37

principal amount prepaid; <u>provided</u>, that (x) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof and (y) in the event of any such prepayment of a Eurodollar Rate Advance, the applicable Borrower shall be obligated to reimburse the Lenders in respect thereof pursuant to <u>Section 9.04(c)</u>.

(b)    Subject to the Financing Orders and the DIP Intercreditor Agreement, the Borrowers shall repay the Term Loans in an amount equal to (i) any Net Proceeds subject to <u>Sections 6.01 (n)</u> and (ii) any Net Proceeds of insurance paid on account of any loss or damage of any property or assets of any Loan Party; <u>provided</u>, that 100% of the Net Proceeds of insurance paid on account of any loss or damage of any Prepetition Unencumbered Assets shall be applied in accordance with <u>Sections 6.01 (m) and (n)</u>.

(c)    Subject to the Financing Orders and the DIP Intercreditor Agreement, the Borrowers shall prepay the Term Loans in accordance with the provisions of Section 6.01(m) hereof; <u>provided that</u> upon acceleration of the Obligations or the commencement of a Liquidation, all proceeds of Collateral shall be applied to the Obligations in accordance with Section 7.03.

(d)    The Borrowers shall deliver to the Agent, in connection with each prepayment required under <u>Section 2.08(b)</u> or <u>Section 2.08(d)</u>, a certificate signed by an Authorized Officer of the Borrowers setting forth in reasonable detail the calculation of the amount of such prepayment.

Section 2.09    <u>Increased Costs</u>.

(a) If, due to a Change in Law, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Advances (excluding for purposes of this <u>Section 2.09</u> any such increased costs resulting from (i) Indemnified Taxes or Other Taxes (as to which Section 2.12 shall govern) and (ii) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; <u>provided</u>, that a Lender claiming additional amounts under this <u>Section 2.09(a)</u> agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office and/or take other commercially reasonable action if the making of such a designation or the taking of such actions would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.  A certificate as to the amount of such increased cost, submitted to the Borrowers and the Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error.  If any Borrower so notifies the Agent after any Lender notifies the Borrowers of any increased cost pursuant to the foregoing provisions of this <u>Section 2.09(a)</u>, such Borrower may, upon payment of such increased cost to such Lender, replace such Lender with a Person that is an Eligible Assignee in accordance with the terms of <u>Section 9.07</u> (and the Lender being so replaced shall take all action as may be necessary to assign its rights and obligations under this Agreement to such Eligible Assignee).

(b)    If any Lender determines that any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender or any entity controlling such Lender and that the amount of such capital or liquidity is increased by or based upon the existence of such Lender's commitment to lend hereunder and other commitments of this type, then, upon demand by such Lender (with a copy of such demand to the Agent), the Borrowers shall pay to the Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to

38

compensate such Lender or such entity in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender's commitment to lend hereunder.  A certificate as to such amounts submitted to the Borrowers and the Agent by such Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)    The Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or capital, liquidity or reserve requirement or pursuant to Section 2.12 for any Taxes incurred more than nine months prior to the date that such Lender notifies the Borrowers of the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax and of such Lender's intention to claim compensation therefor; provided, that if the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.10    Illegality.  Notwithstanding any other provision of this Agreement, if any Lender shall notify the Agent that any Change in Law has made it unlawful for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Advances or to fund or maintain Eurodollar Rate Advances hereunder, (a) each Eurodollar Rate Term Loan will automatically, upon such demand, Convert into a Base Rate Advance or an Term Loan that bears interest at the rate set forth in Section 2.05(a)(i), and (b) the obligation of the Lenders to make Eurodollar Rate Advances or to Convert Term Loans or Term Loan Borrowings into Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

Section 2.11    Payments and Computations.  (a) The Borrowers shall make each payment hereunder and under the other Loan Documents, without any right of counterclaim or set-off, not later than 1:00 p.m. on the day when due in U.S. dollars to the Agent at the Agent's Account in same day funds.  The Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or commitment fees ratably (other than amounts payable pursuant to Section 2.09, 2.12 or 9.04(c)) to the Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(e), from and after the effective date specified in such Assignment and Acceptance, the Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)    In addition, Agent may, at its option, charge such amount against any operating, investment or other account of a Borrower maintained with Agent or any of its Affiliates, without further application to or order of the Bankruptcy Court.

(c)    All computations of interest based on the Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of letter of credit fees, commitment fees and other fees shall be made by the Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or commitment fees are payable.  Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)      Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee, as the case may be; provided, that if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)      Unless the Agent shall have received notice from any Borrower prior to the date on which any payment is due by it to the Lenders hereunder that such Borrower will not make such payment in full, the Agent may assume that the applicable Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent such Borrower shall not have so made such payment in full to the Agent, each Lender shall repay to the Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Agent, at the Federal Funds Rate.

Section 2.12    Taxes.  (a) Any and all payments by the Borrowers to or for the account of any Lender, the Agent or the Collateral Agent hereunder or under the other Loan Documents or any other documents to be delivered hereunder shall be made, in accordance with Section 2.11 or the applicable provisions of such other documents, free and clear of and without deduction for any and all present or future Taxes except as required by applicable law.  If the Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document or any other documents to be delivered hereunder  to any Lender, the Agent or the Collateral Agent, (i) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable shall be increased as may be necessary so that after making all required deductions for Indemnified Taxes (including deductions for Indemnified Taxes applicable to additional sums payable under this Section 2.12) such Lender, the Agent and the Collateral Agent (as the case may be) receive an amount equal to the sum each would have received had no such deductions of Indemnified Taxes been made, (ii) the Borrowers shall make such deductions as are determined by such Borrowers to be required based upon the information and documentation it has received pursuant to Sections 2.12(e) and (f)(i) and (iii) the Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)      In addition, the Borrowers shall pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under the other Loan Documents or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the other Loan Documents or any other documents to be delivered hereunder, but excluding any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 9.16) (hereinafter referred to as "*Other Taxes*").  Other Taxes shall not include any Taxes imposed on, or measured by reference to, gross income, net income or gain.

(c)      Without duplication of any additional amounts paid pursuant to Section 2.12(a), the Borrowers shall indemnify each Lender, the Agent and the Collateral Agent for and hold it harmless against the full amount of Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.12) imposed on or paid by such Lender, the Agent or the Collateral Agent (as the case may be) and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  This

40

indemnification shall be made within 10 days from the date such Lender, the Agent or the Collateral Agent (as the case may be) makes written demand therefor.

(d)    As soon as practicable after the date of any payment of Taxes pursuant to this Section, the Borrowers shall furnish to the Agent, at its address referred to in <u>Section 9.02</u>, the original or a certified copy of a receipt evidencing such payment to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

(e)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(f)    Without limiting the generality of the foregoing:

(i)    Each Lender that is a United States person, on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers or the Agent, shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax on payments pursuant to this Agreement or the other Loan Documents; and

(ii)    Each Lender organized under the laws of a jurisdiction outside the United States, and each other Lender that is not a domestic corporation within the meaning of Section 7701(a)(30) of the Internal Revenue Code:

(1)    on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall, to the extent it is legally entitled to do so, provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Forms W-8BEN, W-8BEN-E or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding Tax on payments pursuant to this Agreement or the other Loan Documents; and

(2)    on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall, to the extent it is legally entitled to do so, provide each of the Agent and the Borrowers with executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a

41

reduction in U.S. federal withholding Tax (including, if applicable, a certificate substantially in the form of Exhibit G-1 establishing such Lender's entitlement to the exemption for portfolio interest under Section 881(c) of the Code), duly completed, together with supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made.

If the form provided by a Lender at the time such Lender first becomes a party to this Agreement indicates a United States interest withholding Tax rate in excess of zero, withholding Tax at such rate shall be considered excluded from Indemnified Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding Tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such form; provided, however, that, if at the date of the Assignment and Acceptance pursuant to which a Lender assignee becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) in respect of United States withholding Tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding Taxes that may be imposed in the future or other amounts otherwise includable in Indemnified Taxes) United States withholding Tax, if any, applicable with respect to the Lender assignee on such date.  If any form or document referred to in this subsection (f) requires the disclosure of information, other than information necessary to compute the Tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN, W-8BEN-E, or W-8ECI, that the Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrowers and shall not be obligated to include in such form or document such confidential information.  For purposes of this subsection (f), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(g)     For any period with respect to which a Lender has failed to provide the Borrowers with the appropriate form, certificate or other document described in Section 2.12(e) (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring subsequent to the date on which a form, certificate or other document originally was required to be provided, or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under Section 2.12(a) or (c) with respect to Indemnified Taxes imposed by the United States by reason of such failure; provided, however, that should a Lender become subject to Indemnified Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrowers shall take such steps as the Lender shall reasonably request to assist the Lender to recover such Indemnified Taxes. Further, if a payment made to the Agent or any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), the Agent or such Lender, as applicable, shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this paragraph (g), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.12 expires or becomes obsolete or inaccurate in any respect, it shall update such

42

form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(i)    Any Lender claiming any additional amounts payable pursuant to this Section 2.12 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Eurodollar Lending Office if, in the reasonable judgment of such Lender, the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender or subject such Lender to any unreimbursed cost or expense. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such change.

(j)    If any Lender determines, in its sole discretion exercised in good faith, that it has actually and finally realized, by reason of a refund, deduction or credit of any Indemnified Taxes paid or reimbursed by the Borrowers pursuant to subsection (a) or (c) above in respect of payments under this Agreement or the other Loan Documents, a current monetary benefit that it would otherwise not have obtained, and that would result in the total payments under this Section 2.12 exceeding the amount needed to make such Lender whole, such Lender shall pay to the Borrowers, with reasonable promptness following the date on which it actually realizes such benefit, an amount equal to the amount of such excess, net of all out-of-pocket expenses incurred by such Lender reasonably allocable in securing such refund, deduction or credit, provided that the Borrowers, upon the request of such Lender, agree to repay the amount paid over to the Borrowers to such Lender in the event such Lender is required to repay such refund to such jurisdiction. Nothing in this subsection (j) shall be construed to require any Lender to make available to the Borrowers or any other Person its tax returns or any confidential tax information..

(k)    If the Agent, the Collateral Agent or any Lender, as the case may be, shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by Borrower pursuant to this Section 2.12, including Indemnified Taxes or Other Taxes as to which it has been indemnified by Borrower, or with respect to which Borrower or a Group Member that is a signatory hereto has paid additional amounts pursuant to this Section 2.12, it shall notify Borrower of the availability of such refund claim and, if the Agent, the Collateral Agent or any Lender, as the case may be, determines in good faith that making a claim for refund will not have any adverse consequence to its Taxes or business operations, shall, after receipt of a request by Borrower, make a claim to such Governmental Authority for such refund at Borrower's expense.

Section 2.13    Sharing of Payments, Etc. If any Lender shall obtain any payment from any Group Member (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Term Loans, or other amounts owing to it (other than pursuant to Section 2.09, 2.12 or 9.04(c)) in excess of its ratable share, such Lender shall forthwith purchase from the other Lenders such participations in the Term Loan or other amounts owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 2.13 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

43

Section 2.14    Use of Proceeds of Term Loan.  The proceeds of the Term Loan shall be available (and each Borrower agrees that it shall use such proceeds) for operating, working capital and general corporate purposes of the Loan Parties, in each case, consistent with, subject to and within the limitations contained in, the Approved Budget (including to fund the Carve-Out Reserve and to pay other fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administrative costs incurred in connection with the transactions contemplated with the Chapter 11 Cases); provided, that no proceeds of the Term Loans or cash collateral shall be used to, among other things, (x) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under or the liens and security interests granted under the Loan Documents or (y) investigate, initiate or prosecute any claims and defenses or commence causes of action against any Credit Party under or relating to the Loan Documents; provided, further, that not more than $100,000 in the aggregate of proceeds of the Carve-Out, any Cash Collateral, or any proceeds of the Junior DIP Facility, DIP ABL Facility or the Junior DIP Collateral and DIP ABL Collateral may be used by the Creditors' Committee for purposes of investigating such claims, liens, or interests of the Prepetition ABL Credit Parties (but not to litigate any of the foregoing).

Section 2.15    Superpriority Claims; Security and Priority of Liens. The Obligations, including all obligations of Holdings and each Subsidiary Guarantor in respect of its guarantee of the Obligations, shall, subject to the Carve-Out and the Senior Permitted Liens, at all times[1]:

(a)    pursuant to sections 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party and any Successor Cases (as defined in the Financing Orders) (the "*Junior DIP Facility Superpriority Claims*"); provided, however, that the Junior DIP Facility Superpriority Claims will be of equal priority to the DIP ABL Superpriority Claims (as defined in the Final ABL Financing Order) awarded to the DIP ABL Control Co-Collateral Agent (as defined in the Final ABL Financing Order) under the Final ABL Financing Order;

(b)    pursuant to section 364(c)(3) of the Bankruptcy Code, an automatically perfected junior security interest in and lien on all Prepetition ABL Collateral, subject to the relative priorities for Prepetition ABL Collateral set forth in the table included as part of this Section 2.15 below;

(c)    pursuant to sections 364(d) and 364(c)(3) of the Bankruptcy Code,  an automatically perfected junior security interest in and lien on all Junior DIP Collateral (other than Prepetition ABL Collateral) that is subject to valid and perfected liens and security interests in favor of third parties as of the Petition Date, junior only to (i) such liens and security interests in favor of such third parties as of the Petition Date, (ii) the Senior Permitted Liens, and (iii) the DIP ABL Liens;

(d)    pursuant to section 364(d) of the Bankruptcy Code, an automatically perfected security interest in and lien on all Junior DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date (other than Specified Collateral, as defined below, but specifically including those assets described on Schedule 3 hereto, collectively, the "*Prepetition Unencumbered Collateral*"), which, for the avoidance of doubt shall be junior only to the Senior Permitted Liens and the DIP ABL Liens; and

(e)    pursuant to section 364(d) of the Bankruptcy Code,  an automatically perfected first priority security interest in and lien on (i) all of the rights, title and interests of any Junior

---

[1] It being understood and agreed that for purposes of this Section 2.15 all capitalized terms used but not defined herein shall have the meanings set forth in the Interim Financing Order unless otherwise defined in this Section 2.15

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

DIP Obligor in that certain cause of action identified on Schedule 1 to the Interim Financing Order and (ii) all of the rights, title and interests of any Junior DIP Obligor in the assets set forth on Schedule 2 of the Interim Financing Order and all books, records, documents and data related thereto and all proceeds thereof (such collateral and proceeds, collectively, the "***Specified Collateral***") which security interest and lien shall be pari passu with the DIP ABL Liens; provided, that the proceeds of such Specified Collateral shall be shared by the Junior DIP Lenders and the DIP ABL Lenders pro rata based on the aggregate commitment amount under the Junior DIP Facility (i.e., $350,000,000) and aggregate incremental commitments and extensions of credit under the DIP ABL Facility (i.e., $300,000,000) without giving regard to the roll-up portion thereof, respectively;

(f)    Notwithstanding anything to the contrary herein, the following table sets forth (i) the relative priorities of the Carve-Out, the Senior Permitted Liens, DIP ABL Liens, Junior DIP Liens, Adequate Protection Liens, and the Prepetition Liens on the Junior DIP Collateral upon effectiveness of this Interim Junior DIP Order:

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

| Prepetition ABL Collateral | Prepetition Encumbered Collateral[2] | Prepetition Unencumbered Collateral (Other than Specified Collateral) | Specified Collateral |
|---|---|---|---|
| Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| Senior Permitted Liens | All valid and perfected security interests in favor of third parties as of the Petition Date and any Senior Permitted Liens | Senior Permitted Liens | Senior Permitted Liens |
| DIP ABL Liens | DIP ABL Liens | DIP ABL Liens | DIP ABL Liens, *pari passu* with Junior DIP Liens |
| Prepetition ABL Facilities Adequate Protection Liens | Junior DIP Liens | Junior DIP Liens | Prepetition ABL Facilities Adequate Protection Liens |
| 2018 FILO Adequate Protection Liens | Prepetition ABL Facilities Adequate Protection Liens | Prepetition ABL Facilities Adequate Protection Liens | 2018 FILO Adequate Protection Liens |
| Prepetition LC Facility Adequate Protection Liens | 2018 FILO Adequate Protection Liens | 2018 FILO Adequate Protection Liens | Prepetition LC Facility Adequate Protection Liens |
| Prepetition ABL Liens | Prepetition LC Facility Adequate Protection Liens | Prepetition LC Facility Adequate Protection Liens | Postpetition Intercompany Liens |
| Prepetition Second Lien Adequate Protection Liens | Postpetition Intercompany Liens | Postpetition Intercompany Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) |

---

[2]   The priorities set forth in this column are subject to paragraph 63 of the Interim Financing Order.

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

| | | | |
|---|---|---|---|
| Prepetition Second Lien Facilities Liens (except on Specified Non-Prepetition Second Lien Collateral) | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | |
| Junior DIP Liens | | | |
| Postpetition Intercompany Liens | | | |

Section 2.16    Extension Option.  At any time prior to the Scheduled Termination Date, the Borrowers may, upon three Business Days' notice to the Agent (or such lesser notice as agreed to by the Agent) and payment of any fees required to be paid in connection therewith pursuant to Section 2.03(c), exercise the option to extend the maturity of this Agreement for an additional four months following the Scheduled Termination Date (the "**Extension Option**") provided that no Event of Default shall exist immediately prior to or after giving effect to the Extension Option.

## ARTICLE III

[Reserved].

## ARTICLE IV

## CONDITIONS TO EFFECTIVENESS

Section 4.01    Conditions Precedent to Effectiveness.    The effectiveness of this Agreement and the obligation of the Lenders to make each Interim DIP Loan is conditioned upon satisfaction (or waiver) of each of the following conditions precedent:

(a)    Loan Documents. The Agent shall have received each of the following, each of which shall be originals or telecopies or other electronically transmitted copies (followed promptly by originals) unless otherwise specified, each in form and substance satisfactory to the Agent in its reasonable discretion:

(i)    this Agreement, executed and delivered by an Authorized Officer of Holdings and the Borrowers, each of the Lenders, the Collateral Agent, and the Agent;

(ii)    the Guarantee and Collateral Agreement, executed and delivered by an Authorized Officer of the applicable Loan Parties party thereto, the Collateral Agent, and the Agent;

(iii)    DIP Intercreditor Agreement, executed and delivered by an Authorized Officer of the applicable Loan Parties party thereto, the DIP ABL Loan Agent, Collateral Agent and the Agent;

47

(iv)   each other Loan Document set forth on <u>Schedule 4.01</u>, each executed and delivered by an Authorized Officer of the applicable Loan Parties party thereto;

(b)    <u>Secretary's Certificate; Organizational Documents; Good Standing Certificates</u>. The Agent shall have received (i) copies of each Loan Party's organization or other governing documents and such other documents, (ii) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party, (iii) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Loan Party as the Agent may reasonably require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party and (B) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party, and (iv) a good standing certificate from the applicable governmental authority of each Loan Party's jurisdiction of incorporation, organization or formation (to the extent such concept exists in the relevant jurisdictions), in each case, in form and substance reasonably satisfactory to the Agent.

(c)    <u>Interim Financing Order</u>. The Effective Date shall have occurred not later than three (3) Business Days after the entry of the Interim Financing Order.

(d)    <u>Legal Opinions</u>. Agent shall have received a copy of a customary opinion of counsel for the Loan Parties addressed to Agent, the Collateral Agent and the Lenders  and as to such matters as the Agent may reasonably request, and otherwise in form and substance reasonably satisfactory to the Agent.

(e)    <u>Extension of Credit Certificate</u>. Agent shall have received a certificate signed by an Authorized Officer of Holdings and the Borrowers certifying (A) that the conditions specified in <u>Section 4.02</u> have been satisfied and (B) that the Perfection Certificate is true and correct in all material respects, in each case, in form and substance reasonably satisfactory to the Agent.

(f)    <u>Lien Searches</u>. Agent shall have received results of searches or other evidence reasonably satisfactory to the Collateral Agent (in each case dated as of a date reasonably satisfactory to the Collateral Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Liens;

(g)    [Reserved][3]

(h)    <u>Uniform Commercial Code Filings</u>. All actions required by law or reasonably requested by the Collateral Agent to be undertaken, and all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral Agent to be filed, registered, or recorded to create or perfect the Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Collateral Agent.

---

[3] NTD: covered by clause (s) below.

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

(i)    <u>Material Adverse Effect</u>. There shall have been no event or circumstance since the date of the Entry of the Interim Financing Order that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(j)    <u>Fees and Expenses</u>. (i) All fees required to be paid to the Agent, the Collateral Agent, the Lead Lender or the Lenders on or before the Effective Date shall have been paid in full, (ii) the Borrowers shall have paid all costs and expenses of the Agent, the Collateral Agent and the Lead Lender (to the extent set forth in <u>Section 9.04(a)</u> and invoiced) incurred in connection with or relating to this Agreement and the other Loan Documents, including reasonable fees, charges and disbursements of counsel to the Agent, the Collateral Agent the Lead Lender (provided that such payment shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent, the Collateral Agent and the Lead Lender).

(k)    <u>KYC; Patriot Act</u>. (i) Each Loan Party shall have provided the documentation and other information requested by the Lenders at least three (3) Business Days prior to the Effective Date that is required by authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act, and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Borrower shall have provided a Beneficial Ownership Certification in relation to the Borrower at least two (2) Business Days prior to the Effective Date.

(l)    <u>Interim Financing Order</u>. The Agent shall have received a signed copy of the Interim Financing Order, which such Interim Financing Order shall not have been vacated, reversed, modified, amended or stayed in any respect.

(m)    <u>Trustee Appointment or Election</u>. No trustee, responsible officer or examiner having powers related to the operation of the business (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) shall have been appointed or elected with respect to the Loan Parties, any of their subsidiaries, or any of their respective properties, or any Loan Party or its subsidiaries shall have applied for, consented to, or acquiesced in, any such appointment, with respect to the Loan Parties, any of their subsidiaries or their respective properties.

(n)    <u>Approved Initial Budget</u>. The Agent shall have received the Approved Initial Budget in form and substance satisfactory to the Agent in its reasonable discretion.

(o)    <u>Litigation or other action</u>. There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect.

(p)    <u>Requirements of law</u>. Upon entry of the Interim Financing Order, the entry into this Agreement shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

(q)    <u>Monthly Projections; Store Footprint Plan</u>. The Agent and the Lead Lender shall have received and be satisfied, in their respective reasonable discretion, with: (i) monthly projections (which shall consist of an income statement only) through Holdings' fiscal year end dated as of a date not more than 1 Business Days prior to the Effective Date; (ii) a cash flow forecast for the 13-week period ending after the Effective Date dated as of a date not more than 1 Business Day prior to the Effective Date; (iii) the Store Footprint Plan dated as of a date not more than 1 Business Day prior to the Effective Date.

49

(r)    Environmental Reports. The Agent shall have received any requested environmental review reports to the extent previously prepared and readily available to the Loan Parties.

(s)    Designated Real Estate. The Agent shall have received a copy of the leases and subleases, as applicable, for substantially all leased Designated Real Estate and any existing title policies or title commitments in the possession of Debtors for Designated Real Estate owned in fee.

(t)    Liens.  The Agent, for the benefit of the Agent and the Lenders upon entry of the Interim Order shall have the valid and perfected liens on the security interests in the Collateral of the Loan Parties contemplated by the Loan Documents.

(u)    No material adverse effect shall have occurred to the Agent's rights and remedies under the Loan Documents and the Financing Orders (other than for the Chapter 11 Cases and events or circumstances resulting from the commencement of the Chapter 11 Cases) as of the Petition Date.

(v)    The Agent shall have received copies of the DIP ABL Credit Agreement and the Guarantee and Collateral Agreement (as defined in the DIP ABL Credit Agreement) in form and substance reasonably satisfactory to it.

(w)    The Effective Date shall have occurred not later than three business days after the entry of the Interim Order.

Section 4.02    Conditions Precedent to Each Extension of Credit.  The obligation of each Lender to make an Extension of Credit on any date shall be subject to the conditions precedent that the effectiveness of this Agreement shall have occurred and on the date of such Extension of Credit the following statements shall be true (and each of the giving of the applicable Notice of Borrowing, and the acceptance by the applicable Borrower of the proceeds of such Term Loan Borrowing shall constitute a representation and warranty by the applicable Borrower that on the date of such Term Loan Borrowing such statements are true):

(a)    Representation and Warranties. The representations and warranties made by each Loan Party in or pursuant to the Loan Documents are true and correct on and as of such date in all material respects, before and after giving effect to such Extension of Credit and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, and (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(b)    Events of Default. No event has occurred and is continuing, or would result from such Extension of Credit or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default;

(c)    Notice of Borrowing. A Notice of Borrowing, executed and delivered by the Borrowers to the Agent three (3) Business Days prior to funding;

(d)    Dismiss or Convert. The Chapter 11 Cases shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

(e)    Enlarged Powers. No trustee under Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Loan Parties Chapter 11 Case;

(f)    Total Extensions of Credit. Such Extension of Credit shall not result in the Total Extensions of Credit exceeding the amount authorized for the DIP Junior Facility by the Final Financing Order;

(g)    Financing Orders. (i) The applicable Financing Order shall be in full force and effect and shall not have been vacated, reversed, stayed, amended or modified in any respect or subject to a stay pending appeal, (ii) no motion for reconsideration of such Financing Order shall have been timely filed by any of the Debtors or their Subsidiaries, (iii) no appeal of such Financing Order shall have been timely filed, and (iv) Loan Parties shall be in compliance in all material respects with the Financing Orders;

(h)    The Loan Parties shall be in compliance in all material respects with the Financing Orders; and

(i)    The Loan Parties shall have paid, without duplication, all fees due and payable to the Agent and the Lenders hereunder on such date.

Section 4.03    Conditions Precedent to Subsequent DIP Loans.    The obligation of the Lenders to advance each Subsequent DIP Loan (other than with respect to any Interim DIP Loan) shall be subject to the satisfaction (or waiver by the Agent) of the following conditions (the "**Subsequent Funding Conditions**") and the date when such conditions are satisfied or waived, the "**Final Closing Date**"):

(a)    Final Financing Order. (i) The Agent shall have received a copy of the Final Financing Order, and (ii) the Final Financing Order, in form and substance reasonably satisfactory to the Agent in its reasonable discretion, shall have been entered and be in full force and effect and shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by the Agent in its reasonable discretion;

(b)    Fees and Expenses. The Agent shall have received payment from the Term Loan proceeds of all reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the Loan Documents or otherwise required to be paid or reimbursed to the Agent and the Lenders on or before such date shall have been paid;

(c)    Insurance. The Agent shall have received, in form and substance reasonably satisfactory to the Agent, (i) reasonably requested insurance certificates, and (ii) endorsements naming the Agent, on behalf of the Lenders, as an additional insured and lender loss payee , as applicable, under all insurance policies required to be maintained with respect to the Collateral pursuant to the terms of the Loan Documents;

(d)    Beneficial Ownership Regulation. The Agent and each Lender shall have received "know your customer" and similar information (including the Beneficial Ownership Regulation);

(e)    Budget Variance Report. The Agent shall have received a pro forma Budget Variance Report prepared as of the date of such drawing, which shall not show any variance other than a Permitted Variance;

(f)    Approved Budget. The Agent shall have received the Approved Budget; and

51

(g)    Liquidation Agent. The Loan Parties shall have retained the Liquidation Agent.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Representations and Warranties of Holdings and the Borrowers.

Holdings and the Borrowers hereby jointly and severally represent and warrant as follows:

(a)    Organization; Power and Authority; EEA Financial Institution; EEA Financing Institutions. Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Loan Party is an EEA Financial Institution.

(b)    Due Authorization; No Conflict. Upon entry of the Final Financing Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Loan Party's powers, have been duly authorized by all necessary organizational action, and do not contravene (i) the charter or by-laws or other organizational or governing documents of such Loan Party or (ii) law or any contractual restriction binding on or affecting any Loan Party.

(c)    Government Approvals; Consents. Upon entry of the Final Financing Order, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by any Loan Party of any Loan Document to which it is a party that has not already been obtained.

(d)    Due Execution. Each Loan Document has been duly executed and delivered by each Loan Party party thereto. Upon entry of the Final Financing Order, this Agreement constitutes, and each other Loan Document will constitute upon execution, the legal, valid and binding obligation of each Loan Party party thereto enforceable against such Loan Party in accordance with its respective terms and the Final Financing Order, subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(e)    Financial Statements. The consolidated and consolidating balance sheets of Holdings and its Subsidiaries and the related consolidated statements of income and cash flows and shareholders' equity of Holdings and its Subsidiaries, that have been and are hereafter delivered to Agent and Lenders fairly present the consolidated financial condition and results of operations of Holdings and its Subsidiaries as at the dates and for the periods indicated, all in accordance with GAAP consistently applied.

(f)    Absence of Material Adverse Effect. Since the date of the entry of the Interim Financing Order, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(g)    Litigation. Other than the Chapter 11 Cases, there are no material unstayed Adverse Proceedings now pending or threatened or affecting Holdings, the Borrowers or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator.

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

(h)    Margin Stock. No assets of the Borrowers and their respective Subsidiaries on a consolidated basis will be "Margin Stock" (within the meaning of Regulation U issued by the Board of Governors). No proceeds of any Extension of Credit or Letters of Credit will be used by Borrowers to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

(i)    Investment Company Act. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(j)    Taxes. All United States Federal income tax returns and all other material tax returns which are required to be filed have been filed by or on behalf of Holdings, the Borrowers and their respective Subsidiaries, and all Taxes due with respect to Holdings, the Borrowers and their respective Subsidiaries pursuant to such returns or otherwise, or pursuant to any assessment received by Holdings, the Borrowers or any Subsidiary have been paid except to the extent permitted in Section 6.01(b). The charges, accruals and reserves on the books of Holdings, the Borrowers and their Subsidiaries in respect of Taxes or other governmental charges have been made in accordance with, and to the extent required by, GAAP.

(k)    Information; Accuracy. All written information (including the Approved Budget and each Rolling Budget) heretofore furnished by Holdings, the Borrowers or their Subsidiaries to the Agent, the Collateral Agent or any Lender (including the Perfection Certificate) for purposes of or in connection with this Agreement or any other Loan Document, taken as a whole, was true and correct in all material respects on the date as of which such information was stated or certified; provided, that with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. As of the Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

(l)    Collateral. No Collateral is subject to any Lien except the Permitted Liens existing on the Effective Date. Each Loan Party and Subsidiary has good and marketable title to (or valid leasehold interests in) all of its Real Property, and good title to all of its personal property, including all property reflected in any financial statements delivered to the Agent or the Lenders, in each case free of Liens except Permitted Liens. Each Loan Party and Subsidiary has paid and discharged all lawful claims that, if unpaid, could become a Lien on its properties, other than Permitted Liens. All Liens of the Agent in the Collateral are duly perfected Liens with the priority set forth in the DIP Intercreditor Agreement (subject to Permitted Liens entitled to priority under applicable law). Schedule 5.01(l)(A) sets forth the address (including street address, county and state) of all previously unencumbered Real Property that is owned or ground leased by the Loan Parties as of the Effective Date (specifying whether each parcel of Real Property is either owned or ground leased). Schedule 5.01(l)(B) sets forth the address (including street address, county and state) of all previously unencumbered Real Property that is leased by the Loan Parties as of the Effective Date, together with the name of each lessor and such lessor's contact information. Each Lease of Real Property by the Loan Parties is enforceable (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and by general principles of equity) against the lessor thereof in accordance with its terms and is in full force and effect and, other than for defaults arising solely as a result of the commencement of the Chapter 11 Cases, the Loan Parties are not in default of the terms of any such Lease; provided, that the representation set forth in this sentence shall not apply to any Lease for a Store location that is subject to the Specified Store Closing Sales if the failure of such representation to be true and correct would not impair the applicable Loan Party's ability to continue to occupy such Store location. The Agent has received the Flood Documentation with respect to all Real Property.

(m)    Intellectual Property. Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (i) each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted; (ii) no material claim has been asserted and is pending by any Person challenging the use of any Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that the conduct of the business of any Loan Party infringes, misappropriates, or otherwise violates in any material respect any Intellectual Property of any Person, nor do Holdings or the Borrowers know of any valid basis for any such claim; and (iii) to the best knowledge of Holdings and the Borrowers, neither the use of Intellectual Property by each Group Member nor the operation of their respective businesses infringes, misappropriates or otherwise violates the rights of any Person in any material respect.

(n)    ERISA.

(i)    Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, (a) neither a Reportable Event nor a failure to meet minimum required contributions (in accordance with section 430 or any prior applicable section of the Internal Revenue Code or section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, (b) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other applicable federal or state laws, and (c) no termination of a Single Employer Plan has occurred. Except as set forth on Schedule 5.01(n), no Lien imposed under the Internal Revenue Code or ERISA exists on account of any Plan, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Each Single Employer Plan that is intended to qualify under section 401(a) of the Internal Revenue Code has received a favorable determination letter from the United States Internal Revenue Service (the "**_IRS_**") and, to the best knowledge of Holdings and the Borrowers, nothing has occurred which would cause the loss of, such qualification. Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to section 430 of the Internal Revenue Code or section 302 of ERISA, and no application for a funding waiver or an extension of any amortization period pursuant to section 302 of ERISA or section 430 of the Internal Revenue Code has been made with respect to any Plan.

(ii)    There are no pending or, to the best knowledge of Holdings and the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary duty rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur, in each case that would reasonably be expected to result in a Material Adverse Effect.

(o)    Environmental Matters. Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Group Member (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has any Environmental Liabilities, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

(p)    Security Interest. (i) The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Credit Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.

(ii)    When financing statements and other filings specified on Schedule 5.01(p) in appropriate form are filed in the offices specified on Schedule 5.01(p), the Guarantee and Collateral Agreement shall, to the extent a security interest therein can be perfected by filing a UCC financing statement, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case with the priority set forth in the DIP Intercreditor Agreement and subject to the Permitted Prior Liens.

(iii)    The Mortgages shall be effective to create in favor of the Collateral Agent (for the benefit of the Credit Parties) or, if so contemplated by the respective Mortgage, the Collateral Agent and the other Credit Parties, legal, valid and enforceable Liens on all of the Loan Parties' rights, titles and interests in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are validly filed, registered or recorded in the proper real estate filing, registration or recording offices, and all required mortgage Taxes and recording and registration charges are duly paid, the Collateral Agent (for the benefit of the Credit Parties) shall have valid Liens with record or registered notice to third parties on all rights, titles and interests of the Loan Parties in such Mortgaged Property.

(q)    Payables Practices. Except for managing payments of certain payables to conserve cash in the period immediately preceding the commencement of the Chapter 11 Cases, each Loan Party has not made any material change in the historical accounts payable practices from those in effect immediately prior to the date hereof.

(r)    Insurance Matters. The properties of the Loan Parties are insured as required pursuant to Section 6.01(c) hereof.  Each insurance policy required to be maintained by the Loan Parties pursuant to Section 6.01(c) is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

(s)    Equity Interests. Each Loan has good title to the Equity Interests in its Subsidiaries and all such Equity Interests are duly issued, fully paid and non-assessable. There are no outstanding options to purchase, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to any capital stock of any Loan Party (other than Holdings) or Subsidiary, except as set forth on Schedule 5.01(s). The copies of the organization and governing documents of each Loan Party provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

(t)    Labor Matters; Certain Employment Matters. As of the date of this Agreement, except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of Holdings or any Borrower, threatened, (b) the hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign law dealing with such matters, (c) all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.01(t) (as updated by the Borrowers from time to time) (i) no Loan Party or any

55

Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or any material bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (excluding in each case individual employment agreements) and (ii) no employee of a Loan Party is also an employee of any Permitted Holder. There are no representation proceedings pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, in each case which would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries which would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not require the consent of any union or other labor organization or give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)    WARN Act. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law that remains unpaid or unsatisfied and is in excess of $100,000 individually or $750,000 in the aggregate for all such liabilities.

(v)    Brokerage Fees. No broker or finder brought about the obtaining, making or closing of the Term Loan or transactions contemplated by the Loan Documents, and other than amounts payable pursuant to the Agent Fee Letter, no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

(w)    Limitation on Certain Transactions. No Loan Party has any obligation to any Permitted Holder with respect to any consulting, management or similar fee; provided, that for the avoidance of doubt, the foregoing shall not apply to (i) any arrangement disclosed in Holdings' annual report on form 10-K for the fiscal year ended February 3, 2018 or (ii) any employment arrangement between any Loan Party and an individual  Person who is also an employee of a Permitted Holder, so long as such employment arrangements are (x) on terms that are fair and reasonable and comparable to terms provided to employees in comparable positions for companies of a comparable size and no less favorable to such Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not an employee of a Permitted Holder, (y) in the case of any officer (as defined in Rule 16a-1 under the Securities Exchange Act of 1934) or director of Holdings, any beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of more than 10.0% of Holdings' Equity Interests or any Person that ranks in the top five in compensation among all employees of the Loan Parties, approved by a majority of disinterested members of the board of directors of Holdings in good faith and (z) arrangements fully disclosed in writing to the Agent on or before the Effective Date.

(x)    PATRIOT Act; Anti-Corruption. To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) AML Laws, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977 (the "*FCPA*"), and (iv) the Corruption of Foreign Public Officials Act, as amended. No part of the proceeds of any credit extensions will be used, directly or, to the Loan Parties' knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

56

(y)    Pension Plan Matters. None of Holdings, the Borrowers, any of their respective Subsidiaries, nor any Permitted Holder or Significant Holder is an Affiliate of the Sears Holdings Pension Plan. The Sears Holdings Pension Plan qualifies as an Eligible Assignee pursuant to the definition thereof.

(z)    Sanctions; OFAC. No Group Member, nor any of their respective directors, officers, employees, agents or Affiliates, is a Sanctioned Person. Each Group Member has implemented and maintains in effect policies and procedures designed to ensure compliance by each Group Member and their respective directors, officers, employees, agents, and Affiliates, with applicable Sanctions. Each Group Member and their respective directors, officers, and employees to the extent of their activities in those capacities, and, to the knowledge of each Group Member, their respective agents and Affiliates, to the extent of their activities in those capacities, is and at all times during the past five (5) years has been in compliance with applicable Sanctions.  No Group Member will, directly or, to their knowledge after due inquiry, indirectly, use the proceeds of any credit extensions, or lend, contribute or otherwise make available such proceeds to any Person in any manner that would directly or indirectly result in a violation of applicable Sanctions by any Person.

(aa)    Financing Orders.

(i)    The applicable Financing Order is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the written consent of the Agent, acting reasonably.

(ii)    Upon the occurrence of the Termination Date (whether by acceleration or otherwise), the Agent shall, subject to Article VII and the applicable provisions of the applicable Financing Order, be entitled to immediate payment of the Obligations and to enforce the remedies provided for under this Agreement and the other Loan Documents in accordance with the terms hereof, thereof and the applicable Financing Order, in each case without further application to or order by the Bankruptcy Court.

(iii)    If the applicable Financing Order is the subject of a pending appeal in any respect, none of the applicable Financing Order, the extension of credit or the performance by any Loan Party of any of its obligations under this Agreement or any of the other Loan Documents shall be the subject of a presently effective stay pending appeal.  The Debtors, the Agent, the Collateral Agent and the Lenders shall be entitled to rely in good faith upon the Final Financing Order, notwithstanding any objection thereto or appeal therefrom by any interested party.  The Debtors, the Agent, the Collateral Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with the Loan Documents notwithstanding any such objection or appeal, unless the Final Financing Order has been stayed by a court of competent jurisdiction.

(bb)    Security Interest. Upon entry of each of the Interim Financing Order and the Final Financing Order, and subject to the DIP Intercreditor Agreement, each such Financing Order was or shall be effective to create in favor of the Collateral Agent, for the benefit of the Lenders, a legal, valid enforceable and perfected security interest in the Collateral and proceeds thereof, as and to the extent contemplated by each such Financing Order, as described in this Agreement and the other Loan Documents.

(cc)    Appointment of Trustee or Examiner; Liquidation. No order has been entered in any of the Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of

57

the Bankruptcy Code or (c) to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases.

(dd) <u>No Other Insolvency Proceeding</u>. None of the Loan Parties is a debtor in any Insolvency Proceeding.

(ee) <u>Superpriority Claims; Liens</u>. Upon the entry of each of the Interim Financing Order and the Final Financing Order, each such Financing Order and the Loan Documents are sufficient to provide the superpriority claims and security interests and Liens on Collateral of the Loan Parties described in, and with the priority provided in, the Financing Orders and the Loan Documents, as applicable.

(ff) <u>Non-Subsidiary Guarantor Entities</u>. Since August 4, 2018, no Loan Party has transferred any assets to any Specified Subsidiary other than as reported in filings with the SEC made prior to the Petition Date.

(gg) <u>Approved Budget</u>. The Borrowers have heretofore furnished to the Agent the Approved Budget and such Approved Budget was prepared in good faith upon assumptions that the Borrowers believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.

(hh) <u>Reorganization Matters</u>.

(i) The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order. The Debtors have given, on a timely basis as specified in the Interim Financing Order, all notices required to be given to all parties specified in the Interim Financing Order.

(ii) After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims specified in any provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to the Carve-Out and the priorities set forth in the Interim Financing Order or Final Financing Order, as applicable.

(iii) After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, only to the Carve-Out to the extent set forth in the Interim Financing Order and the Final Financing Order and with the lien priority set forth in the Final Financing Order and the DIP Intercreditor Agreement.

(iv) Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order

58

or the Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## ARTICLE VI

## COVENANTS

Section 6.01    Affirmative Covenants.  So long as any Term Loans or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid, or any Lender shall have any Term Commitment hereunder, each of Holdings and the Borrowers will, and will cause each of their Subsidiaries to:

(a)    Compliance with Laws, Etc.  (i) Comply in all respects with all applicable Requirements of Law, such compliance to include compliance with ERISA and Environmental Laws (which compliance includes taking any required actions with respect to the release or threatened release of Hazardous Materials), except for such non-compliance as would not reasonably be expected to have a Material Adverse Effect, and (ii) comply in all material respects with the Bankruptcy Code and any order of the Bankruptcy Court.

(b)    Payment of Taxes, Etc.  Except as excused by the Bankruptcy Code, file all Tax returns required in accordance with applicable law, pay and discharge before the same shall become delinquent, (i) all Taxes, assessments and governmental charges or levies imposed upon it or upon its property (ii) all payments required to be made to any Pension Plan, and (iii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided, that neither Holdings, the Borrowers nor any of their Subsidiaries shall be required to file any Tax return if such non-filing would not be reasonably expected to have a Material Adverse Effect or pay or discharge any such Tax, assessment, charge or claim (x) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors, (y) if such non-payments, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect or (z) for which payment is excused under the Bankruptcy Code.

(c)    Maintenance of Insurance.  (i)  Maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is consistent with prudent business practice; provided, that Holdings, the Borrowers and their Subsidiaries may self-insure to the extent consistent with prudent business practice; provided, further, that policies maintained with respect to any Collateral located at a warehouse or DC shall provide coverage for Inventory at (x) the retail selling price of such Inventory less any permanent markdowns, consistent with the Loan Parties' past practices, or (y) another selling price permitted by the Collateral Agent in its Permitted Discretion.

(ii)    None of the Credit Parties shall be a co-insurer with any Loan Party or any other Person with respect to any fire and extended coverage policies maintained with respect to any Collateral without the prior written consent of the Collateral Agent. Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include a non-contributing lenders' loss payable clause, in form and substance reasonably satisfactory to the Collateral Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise

59

payable to the Loan Parties under the policies directly to the Collateral Agent, as its interests may appear.

(iii)    Within thirty (30) days following delivery of written notice from the Agent to Holdings, Holdings shall notify the insurers and use commercially reasonable efforts to have such policies amended to include such other provisions as the Collateral Agent may reasonably require from time to time to protect the interests of the Credit Parties.    Commercial general liability policies shall be endorsed to name the Collateral Agent as additional insureds, as their interests may appear.    Each certificate delivered by the Loan Parties' insurance broker with respect to each property and liability insurance policy referred to in this Section 6.01(c) shall also provide that such policy shall not be canceled, modified or not renewed other than upon not less than ten (10) days' prior written notice thereof by the insurance broker to the Collateral Agent.

(iv)    The Borrowers shall deliver to the Collateral Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, evidence of renewal or replacement of a policy previously delivered to the Collateral Agent, including an insurance binder therefor, together with evidence satisfactory to the Collateral Agent of payment of the premium therefor and, upon request of the Agent, a copy of such renewal or replacement policy.    In the event that the Borrowers fail to maintain any such insurance as required pursuant to this Section 6.01(c), the Agent may obtain such insurance on behalf of the Borrowers and the Loan Parties shall reimburse the Agent as provided herein for all costs and expenses in connection therewith; the Agent's obtaining of such insurance shall not be deemed a cure or waiver of any Default or Event of Default arising from the Loan Parties' failure to comply with the provisions of this Section 6.01(c).

(v)    The Borrowers shall cause each property insurance policy with respect to any Real Property to be endorsed or otherwise amended to include a "standard" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Collateral Agent; deliver a certificate of insurance with respect to such Real Property to the Collateral Agent; and deliver to the Collateral Agent, prior to or concurrently with the cancellation or nonrenewal of any such policy of insurance covered by this clause (v), a copy of a renewal or replacement (or other evidence of renewal of a policy previously delivered to the Agent) insurance certificate with respect thereto.

(vi)    If any building or mobile home on any improved Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "**_Special Flood Hazard Area_**") with respect to which flood insurance has been made available under the Flood Insurance Laws, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Agent evidence of such compliance in form and substance reasonably acceptable to the Agent.

(d)    <u>Preservation of Corporate Existence, Etc.</u>    Preserve and maintain its corporate existence, material rights (charter and statutory) and franchises unless otherwise consented to by the Agent in its reasonable discretion.

(e)    <u>Inspection Rights</u>.    In addition to the Agent's and the Collateral Agent's rights under Section 6.01(k) and Section 8.02(b) hereof, subject to reasonable confidentiality limitations, at

any reasonable time and from time to time but not more frequently than once per month (or at any time if an Event of Default has occurred and is continuing), permit the Agent, the Collateral Agent, the Lead Lender or any Lender Professionals, at the Loan Parties' expense, to (i) visit, enter onto, and inspect any of the Real Property (subject to the rights of tenants under their leases and provided that, except after the occurrence of an Event of Default, such visits and inspections may include access to any Real Estate included in the Collateral to conduct non-intrusive and non-invasive environmental assessments to the satisfaction of the Agent, and environmental sampling, testing or investigation); provided, such Persons shall use good faith efforts to coordinate such visits and inspections so as to minimize the interference with and disruption to the normal business operations of tenants under their lease, and (ii) examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Holdings, the Borrowers and any of their Subsidiaries, and to discuss the affairs, finances and accounts of Holdings, the Borrowers and any of their Subsidiaries, as the case may be, with any of their officers or directors and with their independent certified public accountants.

(f)    Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Holdings, the Borrowers and each Subsidiary in accordance with GAAP in effect from time to time, and each Loan Party shall promptly furnish to the Agent, the Collateral Agent, the Lead Lender or any Lender Professional such copies of such books and records or extracts therefrom as the Agent, such Collateral Agent, the Lead Lender or such Lender Professional as applicable, may reasonably request, and the Agent, the Collateral Agent or any Lender Professional may use any of such Loan Party's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing, during normal business hours and, if an Event of Default exists or has occurred and is continuing, for the collection and realization of Collateral.

(g)    Maintenance of Properties, Etc.  Except as otherwise permitted pursuant to Section 6.02(b), or where the failure to do so, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect, maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(h)    Transactions with Affiliates.  Conduct all transactions otherwise permitted under this Agreement with any of their Affiliates on terms that are fair and reasonable and no less favorable to Holdings, the applicable Borrower or their respective Subsidiaries than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate other than transactions solely between or among the Loan Parties; provided, that the foregoing shall not prohibit (i) any Loan Party or any Subsidiary thereof from entering into employment arrangements with its officers and retention and other agreements with officers and directors pursuant to the reasonable requirements of its business or (ii) any transactions set forth on Schedule 6.01(h) hereto.

(i)    Further Assurances.

(i)    Subject to the DIP Intercreditor Agreement, with respect to any Collateral acquired after the Effective Date by any Group Member that is or is required to become a Loan Party hereunder, promptly (i) execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Collateral Agent may reasonably request in order to grant to the Collateral Agent, for the benefit of the Credit Parties, a security interest in such property and (ii) take all actions as the Collateral Agent may reasonably request to grant to the Collateral Agent, for the benefit of the Credit Parties, a perfected security interest in such property with the priority required herein, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law

61

or as may be requested by the Collateral Agent and the delivery of Blocked Account and other control agreements as may be reasonably requested by the Collateral Agent.

(ii)    With respect to any new Domestic Subsidiary which is created or acquired after the Effective Date by any Group Member and which owns any Collateral, subject to the DIP Intercreditor Agreement, promptly (and in any event within 10 Business Days of the date such Person becomes a Subsidiary) cause such new Domestic Subsidiary to (i) become a party to the Guarantee and Collateral Agreement, (ii) take such actions as the Collateral Agent may reasonably request to grant to the Collateral Agent for the benefit of the Credit Parties a security interest, with the priority and perfection required herein, in the Collateral described in the Guarantee and Collateral Agreement held by such new Domestic Subsidiary, including, to the extent applicable, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Collateral Agent and the delivery of Blocked Account and other control agreements, (iii) if requested by the Collateral Agent, deliver to the Collateral Agent an officer's certificate with respect to such Domestic Subsidiary in form and substance reasonably satisfactory to the Collateral Agent, and (iv) if requested by Collateral Agent, deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent.

(iii)    The Borrowers shall notify the Collateral Agent ten (10) Business Days prior to the opening of any new deposit account in which funds of any of the Loan Parties are concentrated, or the commencement of  concentrating funds in an existing deposit account that is not subject to a Blocked Account Agreement, and, subject to the DIP Intercreditor Agreement, if requested by the Collateral Agent, the Borrowers shall deliver or cause to be delivered a Blocked Account Agreement reasonably satisfactory in form and substance to the Collateral Agent upon the opening of, or commencement of concentrating funds in, such account (unless such account is a Utility Deposit Adequate Assurance Account).

(iv)    [reserved].

(v)    Subject to the DIP Intercreditor Agreement, with respect to any Real Property upon which the Collateral Agent request a Mortgage (which requests shall be limited such that there will be no more than twenty (20) Mortgages in effect at any time, unless an Event of Default has occurred and is continuing, in which case there shall be no such limit on such requests by the Collateral Agent) within ninety (90) days after such request (but in no event prior to the Borrower receiving confirmation from the Agent that flood insurance due diligence and compliance in accordance with Section 6.01(i)(v)(1) has been completed) or such longer period as may be agreed by the Collateral Agent in its reasonable discretion, the Borrower shall, or shall cause the applicable Loan Party to, grant to the Collateral Agent a Mortgage on such Real Property, subject to no Liens except Permitted Liens, and record such Mortgage in the land records of the county in which such Real Property is located, and cause each such Loan Party to pay, in full, all mortgage recording taxes, fees and other charges required to be paid in connection with such recording, registration or filing of the Mortgage.  Unless otherwise waived by the Collateral Agent or the applicable Lender (solely with respect to clause (i)(v)(2) below), with respect to each such Mortgaged Property, the Borrowers shall cause the following requirements to be satisfied with respect to the applicable Mortgaged Property:

62

(1)    the Collateral Agent shall have received, with respect to each Mortgaged Property, the Flood Documentation;

(2)    the Collateral Agent shall have received:

(A)    counterparts of each Mortgage to be entered into with respect to each such Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property and suitable for recording, registering or filing (together with any other forms or undertakings that are required or customary to effect such recording, registration or filing) in the land records of the county in which such Mortgaged Property is located; and

(B)    with respect to the Mortgage encumbering each such Mortgaged Property, opinions of local counsel regarding the enforceability of such Mortgage and such other matters customarily covered in real estate mortgage counsel opinions as the Agent may reasonably request, if and to the extent, and in such form, as local counsel customarily provides such opinions as to such other matters; and

(3)    the Agent shall have received:

(A)    a policy or policies or marked up unconditional binder of title insurance ("*Title Policy*"), in the amount of the fair market value of the respective Mortgaged Property, issued by a nationally recognized title insurance company ("*Title Insurer*") insuring the Lien of each Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Liens and with the lien priority as set forth in the Final Financing Order and the DIP Intercreditor Agreement, together with such customary endorsements, coinsurance and reinsurance as the Agent may reasonably request and which are available at commercially reasonable rates in the jurisdiction where the applicable Mortgaged Property is located, and

(B)    a survey of each Mortgaged Property (including all improvements, easements and other customary matters thereon reasonably required by the Agent), as applicable, for which all necessary fees (where applicable) have been paid, which (A) complies in all material respects with the minimum detail requirements of the American Land Title Association and American Congress of Surveying and Mapping as such requirements are in effect on the date of preparation of such survey and (B) is sufficient for such Title Insurer to remove all standard survey exceptions from the title insurance policy relating to such Mortgaged Property or otherwise reasonably acceptable to the Agent; provided, that so long as the Title Insurer shall accept the same to eliminate the standard survey exceptions from such policy or policies, in lieu of a new or revised survey Borrowers may provide a "no material change" affidavit with respect to any prior survey for the respective Mortgaged Property (which prior survey otherwise substantially complies with the foregoing survey requirements) (a "*Survey*").

63

(j)    <u>Reporting Requirements</u>.  Furnish to the Agent, for delivery to the Lenders:

(i)    as soon as available and in any event within 30 days (or, in the case of a fiscal month that ends on the same day as the end of a fiscal quarter, 45 days) after the end of each fiscal month of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its Domestic Subsidiaries as of the end of such month and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its Domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such month, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a Compliance Certificate;

(ii)    as soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its Domestic Subsidiaries as of the end of such quarter and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its Domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a Compliance Certificate (the Borrowers being permitted to satisfy the requirements of clause (ii)(a) by delivery, in the manner provided in <u>Section 9.02(b)</u>, of its quarterly report on form 10-Q (or any successor form), as filed with the SEC so long as the financial statements contained therein satisfy the requirement of this clause (ii));

(iii)    as soon as available and in any event within 90 days after the end of each fiscal year of Holdings, (a) a copy of the annual audit report for such year for Holdings and its Subsidiaries, containing the consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its Subsidiaries for such fiscal year, in each case reported on without a "going concern" or like qualification or exception (other than a "going concern" qualification, exception or paragraph of emphasis solely as a result of the Chapter 11 Cases and Debt maturing thereafter), or qualification arising out of the scope of the audit, by its Board-appointed auditor of national standing, (b) a consolidated balance sheet of Holdings and its Domestic Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its Domestic Subsidiaries for such fiscal year duly certified by an Authorized Officer of Holdings as having been prepared in accordance with GAAP, and (c) a Compliance Certificate (the Borrowers being permitted to satisfy the requirements of clause (iii)(a) by delivery, in the manner provided in <u>Section 9.02(b)</u>, of its annual report on form 10-K (or any successor form), as filed with the SEC, so long as the financial statements contained therein satisfy the requirement of this clause (iii));

(iv)    not later than the 10th day of every month (or such later date in such month as the DIP ABL Loan Agent may agree pursuant to the DIP ABL Facility), an updated inventory appraisal;

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

(v)   promptly and in any event within five days after any Authorized Officer of Holdings or any Borrower has knowledge of the occurrence and continuance of a Default or Event of Default, a statement of an Authorized Officer of Holdings or such Borrower setting forth details of such Default or Event of Default and the action that Holdings or such Borrower has taken and proposes to take with respect thereto;

(vi)   promptly after the sending or filing thereof, copies of all quarterly and annual reports and proxy solicitations that Holdings sends to its public security holders generally, and copies of all reports on form 8-K (or its equivalent) and registration statements for the public offering (other than pursuant to employee Plans) of securities that Holdings or any of its Subsidiaries files with the SEC or any national securities exchange;

(vii)   promptly after the commencement thereof, notice of all actions and proceedings before any court, governmental agency or arbitrator affecting Holdings, the Borrowers or any of their Subsidiaries of the type described in Section 5.01(g);

(viii)   as soon as available, but in any event no later than 60 days after the end of each fiscal year of Holdings, forecasts prepared by management of Holdings for Holdings and its Domestic Subsidiaries in form satisfactory to the Agent and containing information reasonably required by the Agent;

(ix)   (A) contemporaneously with the delivery of the reports required pursuant to clauses (ii) and (iii) above, a report (which may take the form of a footnote to Holdings' quarterly and annual reports filed with the SEC and delivered to the Agent) setting forth the estimated Unfunded Pension Liability of Holdings and its Subsidiaries, and (B) promptly after receipt thereof by the Loan Parties, a copy of the funded status report received from the Loan Parties' actuaries with respect to amounts to be funded under the Loan Parties' Pension Plan;

(x)   promptly, notice of any event that the Loan Parties reasonably believes has resulted in or could reasonably be expected to result in a Material Adverse Effect;

(xi)   [reserved];

(xii)   within twenty (20) days (or such later date as the Agent may reasonably agree in its sole discretion) of any request by the Agent, new title commitments for any owned Designated Real Estate (which requests shall be limited to Designated Real Estate that constitutes top 90% of owned real estate by value);

(xiii)   promptly following any request therefor, information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation;

(xiv)   promptly, notice of (i) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any Adverse Proceeding not previously disclosed in writing by a Borrower to the Agent, or (ii) any

65

material development in any Adverse Proceeding that would reasonably be expected to have a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

(xv)    concurrently with the delivery to the DIP ABL Loan Agent or the lenders under the DIP ABL Credit Agreement, copies of any report or other information required to be delivered thereto pursuant to the terms of the DIP ABL Credit Agreement to the extent such report or information is not otherwise required to be delivered to the Agent or Lenders hereunder (including, without limitation, any borrowing base certificate and supporting information related thereto);

(xvi)    promptly, but in any event no later than five (5) Business Days of such change, notice of any change in the board of directors (or similar governing body) of Holdings, the Borrowers or Sears, Roebuck and Co.;

(xvii)    as soon as practicable and, in any event, at least three (3) Business Days or such shorter period as agreed to by the Agent in its reasonable discretion in advance of filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Chapter 11 Cases (or the professionals to such committee) or to the U.S. Trustee, as the case may be, copies of all Material Documents, and engage in good faith consultation with the Agent, the Collateral Agent and their respective advisors prior to filing such documents to the extent reasonably possible under the circumstances;

(xviii)    as soon as available, copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed definitive documentation for the sale of any or all of the Loan Parties' assets (other than sales of inventory in the ordinary course of business) or for any investment pursuant to which additional capital is to be received by the Loan Parties;

(xix)    promptly upon request by the Collateral Agent, a status report and updated information relating to any sale permitted under the Loan Documents, in form and substance acceptable to the Collateral Agent in its reasonable discretion.

(xx)    such other information respecting Holdings, the Borrowers or any of their Subsidiaries, as the Agent, the Collateral Agent or any Lender through the Agent may from time to time request.

Reports and financial statements required to be delivered by the Borrowers pursuant to clauses (ii)(a), (iii)(a) and (vii) of this subsection (j) shall be deemed to have been delivered on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a notice to the Agent and the Lenders and that is accessible by the Lenders without charge.

(k)    Collateral Monitoring and Review.  Upon the request of the Agent, the Collateral Agent, or the Required Lenders, after reasonable notice and during normal business hours, permit the Agent, the Collateral Agent, the Lead Lender or any Lender Professional to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of any Real Estate included in the Collateral.  The Borrowers shall pay the reasonable out-of-pocket fees and expenses of the Agent, the Collateral Agent, the Lead Lender or any Lender Professional in connection with three commercial finance examinations each fiscal year (which the Agent, the Collateral Agent, the Lead Lender

66

or such Lender Professional shall be obligated to undertake for the benefit of the Credit Parties). Notwithstanding the foregoing, the Agent, the Collateral Agent or any Lender Professional, in each case, upon request from the Lead lender or the Lead Lender may cause additional commercial finance examinations to be undertaken (A) as each in its Permitted Discretion deems necessary or appropriate, at its own expense, and (B) if required by applicable law or if a Default or an Event of Default has occurred and is continuing, in each case, at the expense of the Borrowers. Any inventory appraisal or commercial finance examination requested by the Agent, Collateral Agent, the Lead Lender or any Lender Professional shall be scheduled at such time as the Collateral Agent, in consultation with the Borrowers, may agree in order to minimize any disruption to the conduct of the Borrowers' business.

(l)    <u>Landlord Waivers, Access Agreements and Customs Broker Agreements</u>. Unless otherwise provided for in the Financing Orders to Agent's reasonable satisfaction and subject in all respect to the DIP Intercreditor Agreement, (i) obtain from each lessor that is a Group Member, and use commercially reasonable efforts to obtain from each lessor that is not a Group Member, leasing a DC at which Collateral is located to a Loan Party, consents, approvals, Lien waivers and rights to access and occupy each such DC (including, without limitation, to take possession and dispose of any Collateral from each such DC upon the occurrence and during the continuance of an Event of Default) reasonably satisfactory to Agent; (ii) obtain from each Subsidiary of Holdings owning a DC at which Collateral is located, consents, approvals, Lien waivers and rights to access and occupy each such DC (including, without limitation, to take possession and dispose of the Collateral from each such DC upon the occurrence and during the continuance of an Event of Default) reasonably satisfactory to the Agent; (iii) use commercially reasonable efforts to cause each Loan Party's customs brokers to deliver an agreement (including, without limitation, a Customs Broker Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require; and (iv) with respect to any property or assets subject to the Lien of a third party use commercially reasonable efforts to cause the holder of such Lien to enter into an agreement reasonably satisfactory to the Agent, permitting the Agent to use such property and assets, at no cost or expense to the Agent, in connection with the disposition of any of the Collateral by the Agent during the continuance of an Event of Default.

(m)    <u>Cash Management</u>.

(i)    With respect to any existing account control agreement, the Agent shall rely on the Financing Orders for purposes of establishing control with respect to the deposit accounts set forth on <u>Schedule 6.01(m)</u> and within 60 days after opening any additional deposit account (other than any Excluded Account, the Carve-Out Account, the Luxottica Reserve Account, the Winddwon Account and the Utility Deposit Adequate Assurance Accounts), the applicable Loan Party shall enter into a Blocked Account Agreement, subject to the DIP Intercreditor Agreement.

(ii)    Subject to the DIP Intercreditor Agreement, and after the discharge of the Senior DIP Obligations, the Loan Parties shall ACH or wire transfer daily to a Blocked Account all amounts on deposit in each DDA of such Loan Party, other than Excluded Accounts, the Carve-Out Account, the Luxottica Reserve Account, the Winddown Account and the Utility Deposit Adequate Assurance Accounts; provided that such covenant shall not apply to any minimum balance as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained. Subject to the DIP Intercreditor Agreement, and after the discharge of the Senior DIP Obligations, the Loan Parties shall ACH or wire transfer daily to a Blocked Account all proceeds of any of the Collateral except as provided in Section 6.01(n). All swept funds shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent, the

67

Collateral Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA or Blocked Account.

(iii)    Subject to the DIP Intercreditor Agreement, and after the discharge of the Senior DIP Obligations, upon the request of the Agent, deliver to the Agent copies of credit card notifications (each, a "**Credit Card Notification**") substantially in the form attached hereto as <u>Exhibit H</u> and Third Party Payor Notifications (each, a "**Third Party Payor Notification**") substantially in the form attached hereto as <u>Exhibit I</u>, in each case executed on behalf of such Loan Party and addressed to such Loan Party's Credit Card Processors and Third Party Payors, as applicable, listed in the Perfection Certificate. To the extent that any Loan Party hereafter engages a Credit Card Processor other than the Credit Card Processors listed in the Perfection Certificate, or a Third Party Payor other than the Third Party Payors listed in the Perfection Certificate, such Loan Party shall promptly furnish written notice thereof to the Agent and, upon the request of the Agent, subject to the DIP Intercreditor Agreement, and after the discharge of the Senior DIP Obligations, shall deliver to the Agent an executed Credit Card Notification or Third Party Payor Notification, as applicable, with respect to such Credit Card Processor or Third Party Payor.  Subject to the DIP Intercreditor Agreement, and after the discharge of the Senior DIP Obligations, the Agent may deliver such Credit Card Notifications and Third Party Payor Notifications to the applicable Credit Card Processors and Third Party Payors at any time.

(iv)    Subject to the DIP Intercreditor Agreement, and after the discharge of the Senior DIP Obligations, each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than daily to  the Term Loan Collateral Account, of all cash receipts and collections held in each applicable Blocked Account (net of any minimum balance, not to exceed $25,000 (or such greater amount with the consent of the Agents not to be unreasonably withheld), as may be required to be kept in the subject Blocked Account by the Blocked Account Bank), including, without limitation, the following:

(1)    all available cash receipts from the sale of Inventory and other Collateral other than as set forth in <u>Section 6.01(n)</u>;

(2)    all proceeds of any of the Collateral, including all payments due from Credit Card Processors and the collections of receivables, including Pharmacy Receivables and Credit Card Accounts Receivable;

(3)    all proceeds from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of any Collateral other than as set forth in <u>Section 6.01(n)</u>; and

(4)    all Net Proceeds from any equity issuance by or capital contribution to any Loan Party or its Subsidiaries.

The Borrowers shall be deemed to have complied with the provisions of this clause (iv) if they cause the ACH or wire transfer daily of all funds which an Authorized Representative of the Borrowers in good faith believes to be the amount deposited in the Blocked Accounts in excess of $25,000 (or such greater amount as permitted above in this clause (iv)).

(v)    The Term Loan Collateral Account shall at all times be under the sole dominion and control of the Agent. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Term Loan Collateral Account, (ii) the funds on deposit in the Term Loan Collateral Account shall at all times be collateral security for all of the Obligations, and (iii) the funds on deposit in the Term Loan Collateral Account shall be applied as provided in this Agreement. In the event that, notwithstanding the provisions of this Section 6.01(m), any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Term Loan Collateral Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent. The amounts deposited into the Term Loan Collateral Account which consist of Net Proceeds shall be applied to the prepayment of the Term Loans and other Obligations then outstanding; and any remaining amounts will be released and transferred to a deposit account of the Loan Parties as the Borrowers shall direct.

(vi)    Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(n)    Disposition of Prepetition Unencumbered Assets. Subject to the Financing Orders, the Borrowers shall apply any Net Proceeds of the sale of Prepetition Unencumbered Assets (A) first, to fund the Winddown Account, until the Winddown Account Funding Condition has been satisfied, (B) second, to fund the Prepetition Unencumbered Assets Proceeds Account; provided that upon Discharge of Senior DIP Obligations (as defined in the DIP Intercreditor Agreement), such Prepetition Unencumbered Assets Proceeds Account shall be subject to the control of the Agent; and (C) third, upon Discharge of Senior DIP Obligations, to an account of the Agent (the "*Term Loan Collateral Account*") to be designated by the Agent in writing, with an amount equal to the amount required to repay the Obligations to be held as cash collateral for the exclusive benefit of the Agent and the Lenders as security for the Obligations and applied by Agent to repay the Obligations; provided, that, notwithstanding the foregoing, after the Winddown Account Funding Condition has been satisfied all Net Proceeds of the Specified Collateral shall be distributed to fund the Prepetition Unencumbered Assets Proceeds Account and to fund the Term Loan Collateral Account, shared on a 46.15%/53.85% basis between the Prepetition Unencumbered Assets Proceeds Account and the Term Loan Collateral Account, respectively; provided, further, that in no event shall the Loan Parties permit the Winddown Account to hold cash or any other property in excess of the amount required to satisfy the Winddown Account Funding Condition.

(o)    Physical Inventories. Cause physical inventories and periodic cycle counts to be undertaken, at the expense of the Loan Parties, conducted by such inventory takers and following such methodology as may be satisfactory to the Collateral Agent in its Permitted Discretion.  The Collateral Agent, the Lead Lender or any Lender Professional designated by the Lead Lender, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.  The Loan Parties, within five (5) days following the completion of any such inventory, shall provide the Collateral Agent, the Lead Lender or any Lender Professional, as applicable, with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

69

(p)    Winddown Budget. The Borrowers shall make  available to the Agent a winddown budget in form and substance reasonably satisfactory to the Agent not later than November 30, 2018 (or such later date as the Agent may agree in its reasonable discretion).

(q)    Case Milestones; Go Forward Plan.  Holdings and the Borrowers shall:

(i)    comply with each of the covenants set forth on Schedule 6.01(q)(i) (the "*Case Milestones*") upon the terms and at the times set forth therein; and

(ii)    (A) comply with the Borrowers' Go Forward Plan attached hereto as Schedule 6.01(q)(ii), including the material terms of any binding agreement for a Specified Sale Transaction or Specified Store Closing Sales or any of the documents or agreements executed in connection therewith in all material respects and (B) consummate each Specified Sale Transaction and or the Specified Store Closing Sale strictly in accordance with the material terms of the documents or agreements executed in connection therewith; in each case in accordance with the applicable timing referred to thereon (or such later dates as approved in writing by the Agent and the Collateral Agent) and subject to documentation (including, without limitation, motions and orders) in form and substance satisfactory to the Agent in its reasonable discretion (without any waiver or amendment to such documents or agreements unless consented to in writing by the Agent), in each case, other than as a result of a consummation of a higher or better transaction as contemplated by the applicable bid procedures.

(r)    Debtor Advisors; Cooperation; Status Calls.

(i)    The Debtors shall continuously retain during the term of this Agreement (i) a chief restructuring officer (the "*Chief Restructuring Officer*"), (ii) a restructuring advisor (the "*Restructuring Advisor*"), (iii) a financial advisor (the "*Financial Advisor*"), and (iv) Jones Lang LaSalle Americas, Inc ., a consultant with respect to Dispositions of Real Property (the "*Real Estate Consultant*"). The retention of the Financial Advisor, the Restructuring Advisor, the Chief Restructuring Officer and the Real Estate Consultant shall be on terms and conditions (including as to scope of engagement) satisfactory to the Agent in its discretion. The Agent and the Collateral Agent hereby confirm that (i) Mohsin Y. Meghji is an acceptable Chief Restructuring Officer, (ii) M-III Partners, LP is an acceptable Restructuring Advisor, (iii) Lazard Freres & Co. LLC is an acceptable Financial Advisor, (iv) Jones Lang LaSalle Americas, Inc. is an acceptable Real Estate Consultant and (v) the terms of each of their engagements as filed with the Bankruptcy Court prior to the date hereof are acceptable. In addition, in connection with the closure of any additional Stores referred to in clause (c) of the definition of "Specified Store Closing Sale" the Debtors, on a competitive basis after the solicitation of reasonably detailed proposals from potential Liquidation Agents to be submitted to the Debtors (subject to maintenance of "Chinese walls" between any Affiliate of the Agent submitting such proposal as a potential Liquidation Agent and the Agent) no later than December 10, 2018, shall retain, no later than December 14, 2018, subject to their fiduciary duty to the bankruptcy estate to maximize value, an independent, nationally recognized, professional retail inventory liquidation firm that provides full liquidation services in consultation with the Agent (the "*Liquidation Agent*"; the Liquidation Agent, together with the Financial Advisor, the Restructuring Advisor, the Real Estate Consultant and the Chief Restructuring Officer, each a "*Debtor Advisor*" and collectively, the "*Debtor Advisors*"). If any Debtor Advisor in any of the above roles ceases to be retained, the Debtors will retain a new Debtor Advisor in such role, which new Debtor Advisor (other than the Liquidation Agent) shall

70

be satisfactory to the Collateral Agent in its discretion and, in the case of the Liquidation Agent, such Liquidation Agent shall be retained in consultation with the Agent, within 5 Business Days (which period may be extended with the approval of the Agent and the Collateral Agent in its discretion) of such cessation. The Debtors shall provide the Agent and the Collateral Agent and their respective advisors with reasonable access to the Debtor Advisors.

(ii)    The Loan Parties shall fully cooperate with the Debtor Advisors, including, without limitation, in connection with the preparation of the Approved Budget and other reporting or information required to be delivered pursuant to this Agreement, and shall grant them full and complete access to the books and records of the Loan Parties. The Loan Parties hereby (i) authorize the Agent, the Collateral Agent, the Lead Lender or any Lender Professional to communicate directly with the Debtor Advisors regarding any and all matters related to the Debtors and their Affiliates, including all financial reports and projections developed, reviewed or verified by any Debtor Advisor, Store closing information and all additional information, reports and statements reasonably requested by the Agent, the Collateral Agent, the Lead Lender or such Lender Professional and (ii) authorize and direct each Debtor Advisor to provide the Agent, the Collateral Agent, the Lead Lender or any Lender Professional with copies of reports and other information or materials prepared or reviewed by such Debtor Advisor as the Agent, the Collateral Agent, the Lead Lender or such Lender Professional  may reasonably request.

(iii)    The Borrowers shall arrange for weekly (unless waived by the Lead Lender in its reasonable discretion) status calls with the Agent, the Collateral Agent, the Lead Lender and any Lender Professional, and shall cause the Debtor Advisors (or other appropriate agents or advisors to the Loan Parties) to participate, together with financial officers of the Loan Parties, to discuss (A) the Approved Budget or the Budget Variance Reports and/or any other reports or information delivered pursuant to clause (j) above or Section 6.03 hereof or otherwise, (B) the financial operations and performance of the Loan Parties' business, (C) the status of landlord negotiations, (D) the status of any Specified Store Closing Sales, (E) the status of the Chapter 11 Cases generally, (F) progress in achieving compliance with the Case Milestones and the Go Forward Plan, (G) updates with respect to Dispositions of Real Property (including a roll forward of leases) or (H) such other matters relating to the Debtors as the Agent, the Collateral Agent, the Lead Lender or any Lender Professional shall reasonably request.

(s)    Leases.

(i)    Make all payments and otherwise perform all obligations, in all material respects, other than to the extent permitted by the Bankruptcy Code, in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party and otherwise in accordance with the Approved Budget, (ii) keep all Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, and (iii) promptly notify the Collateral Agent of any material default by any party with respect to any Leases and cooperate with the Collateral Agent in all respects to cure any such default, except, in each case, with respect to Leases relating to Store locations subject to Specified Store Closing Sales after the date of the effectiveness of the rejection of the applicable Leases.

(ii)    Other than with respect to Leases relating to any Specified Store Closing Sale, obtain the prior express consent of the Agent, in connection with (A)

71

commencing a marketing and sales process with respect to any Leases or (B) assuming, assuming and assigning, or rejecting Leases. Furthermore, any notice, motion, bidding and auction procedures, sale order, sale agreement and/or any other related documents that are prepared in connection with the Agent granting consent under clause (A) or (B) above shall be in form and substance reasonably satisfactory to the Agent.

(t)    Certain Other Bankruptcy Matters.

(i)    Holdings, the Borrowers and their Subsidiaries shall comply (i) in all respects, after entry thereof, with all of the requirements and obligations set forth in the Financing Orders, the Cash Management Order and the Employee Wage Order, and each order of the Bankruptcy Court, as each such order may be amended with the consent of the Agent, and (ii) all other obligations and responsibilities as debtors-in-possession under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

(ii)    Holdings and the Borrowers shall provide as soon as reasonably practicable but in any event no later than three (3) Business Days' (or such shorter notice acceptable to the Agent in its discretion) prior written notice to the Agent and its advisors of its intent to file any motion or notice to assume or reject any of Holdings', any Borrower's or any Subsidiary's material contracts or material non-residential real property leases pursuant to section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Junior DIP Facility Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Junior DIP Facility Superpriority Claims) if the Agent informs Holdings and the Borrowers in writing within two (2) Business Days of receipt of the notice from Holdings and the Borrowers referenced above that it objects to such assumption or rejection, as applicable.

(iii)    Holdings, the Borrowers and each of the Subsidiaries hereby irrevocably waive any right, pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Junior DIP Facility Superpriority Claims, other than as expressly set forth in a Financing Order.

(iv)    Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the Automatic Stay on Collateral with a fair market value in excess of $1,000,000 (other than motions filed by the Agent relating to the DIP Junior Facility or filed by the DIP ABL Loan Agent relating to the DIP ABL Facility or by the Prepetition ABL Agent relating to the Prepetition First Lien ABL Credit Agreement), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a chapter 11 plan, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Agent or any Lender or any Collateral.

(v)    Any and all Material Documents filed by the Debtors in the Chapter 11 Cases shall be in form and substance satisfactory to the Agent.

(u)    Certain Sanctions and AML Matters.

72

(i)     Each Group Member will use the proceeds of the Term Loan only for the purposes described in <u>Section 2.14</u>, and ensure that no proceeds of the Term Loan will be advanced or otherwise made available, directly or indirectly, by any Group Member (i) for the purposes of funding any activity, business, or transaction with a Sanctioned Person or in a Sanctioned Country, except as authorized by applicable Sanctions, or (ii) that would result in the violation of applicable Sanctions or AML Laws by any Person.

(ii)     Each Group Member will (a) maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by each Group Member and each of their respective directors, officers, employees, and agents with applicable Sanctions and AML Laws, and (b) conduct the business of such Group Member in compliance with applicable Sanctions and AML Laws.

Section 6.02     <u>Negative Covenants</u>.  So long as any Term Loan or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid, or any Lender shall have any Term Commitment hereunder, each of Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to:

(a)     <u>Liens, Etc</u>.  Create or suffer to exist any Lien upon property of Holdings, the Borrowers or any Subsidiary other than Permitted Liens.

(b)     <u>Fundamental Changes</u>.  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that any Subsidiary of Holdings may sell, transfer, lease or otherwise dispose of its assets pursuant to a Specified Store Closing Sale or a Specified Sale Transaction.

(c)     <u>Acquisitions</u>.  Make any Acquisition.

(d)     <u>Restricted Payments</u>.  Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that, if at the time thereof no Event of Default shall exist and be continuing, Subsidiaries of Holdings may declare and pay dividends to Holdings, the Borrowers or any Subsidiary Guarantor.

(e)     <u>Negative Pledge Clauses</u>.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Holdings or any Subsidiary of Holdings to create, incur, assume or suffer to exist any Lien in favor of the Collateral Agent upon the Collateral (as defined in the Guarantee and Collateral Agreement and other Security Documents in effect from time to time, and including assets which become Collateral pursuant to <u>Section 6.01(n)</u>), whether now owned or hereafter acquired.

(f)     <u>Clauses Restricting Subsidiary Distributions</u>.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of Holdings to (a) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Debt owed to, Holdings or any other Subsidiary of Holdings, (b) make loans or advances to, or other investments in, Holdings or any other Subsidiary of Holdings, (c) transfer any of its assets to Holdings or any other Subsidiary of Holdings or (d) grant Liens upon any of its properties or assets, whether now owned or hereafter acquired, and allow for the pledge of its capital stock to secure the Obligations; except for such encumbrances or restrictions existing as of the date hereof under or by reason of (i) any restrictions existing

73

under this Agreement and the other Loan Documents as of the date hereof; (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or any portion of the Equity Interests or assets of such Subsidiary so long as such disposition is permitted by this Agreement; (iii) the provisions contained in any agreement governing Postpetition Debt existing as of the date of this Agreement; (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or a Subsidiary of any Borrower entered into in the ordinary course of business, (v) customary restrictions and conditions contained in the documents relating to any Lien, so long as such Lien is not prohibited hereunder and such restrictions or conditions relate only to the specific asset subject to such Lien; (vi) customary provisions restricting assignment of any contract entered into by any Borrower or any Subsidiary of any Borrower in the ordinary course of business, (vii) customary provisions restricting the assignment of licensing agreements, management agreements or franchise agreements entered into by any Borrower or any of its Subsidiaries in the ordinary course of business; (viii) restrictions on the transfer of assets securing purchase money obligations and capitalized lease obligations so long as such obligations are permitted by this Agreement; (ix) customary net worth provisions contained in real property leases entered into by Subsidiaries of any Borrower, so long as the applicable Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations, (x) restrictions in respect of the Intellectual Property held by KCD IP, LLC and any proceeds of the foregoing, and (xi) such other restrictions as the Agent may agree in its sole and absolute discretion.

      (g)    <u>Accounting Changes</u>.  Make or permit any change in accounting policies or reporting practices, except as required by GAAP.

      (h)    [reserved].

      (i)    <u>Dispositions</u>.

      (i)    Make any Disposition except Permitted Dispositions.

      (ii)    Make any Permitted Dispositions pursuant to the De Minimis Asset Sale Order which result in aggregate sale proceeds in excess of $5,000,000 without the prior written consent of the Collateral Agent in its sole and absolute discretion (it being understood that this clause (ii) shall not have the effect of waiving any condition, restriction or qualification to the ability of Holdings, the Borrowers or any of their Subsidiaries to make any Disposition set forth in the definition of "Permitted Dispositions" or the defined terms used therein).

      (j)    <u>Debt; Prepayment of Debt</u>.

      (i)    Create, incur, assume, suffer to exist or otherwise become or remain liable with respect to any Debt, except Permitted Debt.

      (ii)    Purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Debt (other than any prepayment of the Obligations, which prepayment shall be governed by <u>Section 2.08</u>, and other than any prepayment by any Specified Subsidiary or any Subsidiary that is not a Domestic Subsidiary of any Debt of a Specified Subsidiary or any Subsidiary that is not a Domestic Subsidiary; <u>provided</u>, that such prepayment is not made with the proceeds of any Investments made by any Loan Party in such Specified Subsidiary or such Subsidiary that is not a Domestic Subsidiary) prior to its scheduled maturity.

74

(k)    <u>Investments</u>.  Make any Investments, except Permitted Investments.

(l)    [reserved].

(m)    <u>Amendments to Certain Documents.</u> (a) Amend or modify, or grant any waiver or release under or terminate in any manner, the articles or certificate of incorporation or formation, by laws, limited liability company operating agreement, partnership agreement or other organizational documents of such Loan Party or Subsidiary (other than any Specified Subsidiary, so long as the Loan Parties provide prior written notice of such amendment, modification, waiver, release or termination with respect to any organizational document of any Specified Subsidiary); (b) amend or modify, or permit the amendment or modification of, any provision of the Prepetition First Lien ABL Credit Agreement, the Prepetition Second Lien Facilities or any agreement, document or instrument evidencing or relating thereto, except to the extent expressly permitted by the DIP Intercreditor Agreement or Financing Order then in effect; or (c) amend, modify or waive any provision of the DIP ABL Credit Agreement in a manner adverse to the Agent and the Credit Parties unless as agreed by the Agent and the Required Lenders.

(n)    <u>Financing Orders</u>. Notwithstanding anything to the contrary herein, use any portion or proceeds of the Extensions of Credit or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of any of the Financing Orders.

(o)    <u>Reclamation Claims</u>. Enter into any agreement to return any of its Inventory to any of its creditors for application against any Prepetition Debt, Prepetition trade payables or other Prepetition claims under section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Debt, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Prepetition Debt, Prepetition trade payables and other Prepetition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $7,500,000.

(p)    <u>Insolvency Proceeding Claims</u>. Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Agent or the Lenders against the Debtors, except as set forth in the applicable Financing Order.

(q)    <u>Bankruptcy Actions</u>. Seek, consent to, or permit to exist, without the prior written consent of the Agent and the Collateral Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Financing Orders or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Financing Orders or any of the other Loan Documents.

(r)    <u>Sanctions-Compliant Repayment of Obligations</u>.  Use, directly or, to Borrowers' knowledge after due inquiry, indirectly, any funds or assets derived from or used in any activity, business, or transaction with a Sanctioned Person, in a Sanctioned Country, or that otherwise violates applicable Sanctions, to repay or discharge any obligation under this Agreement.

Section 6.03    <u>Approved Budget</u>.

(a)    The use of Extensions of Credit by the Loan Parties under this Agreement and the other Loan Documents and the use of cash collateral shall be limited in accordance with the Approved Budget (subject to the Permitted Variance) and <u>Section 2.14</u>.  The Approved Budget shall depict, on a weekly and line item basis, (i) (A) projected cash receipts (including from asset sales), (B) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including

professional fees of the Debtor's professionals and advisors), and any other fees and expenses relating to the Loan Documents), (C) projected Net Cash Flow, and (D) projected inventory receipts and levels, and (E) the projected Excess Availability (ii) a report listing the Stores subject to Specified Store Closing Sales and the other remaining Stores, and (iii) such other information requested by the Agent for the first thirteen (13) week period from the Effective Date, and such Approved Budget shall be approved by, and in form and substance satisfactory to, the Agent in its reasonable discretion (it being acknowledged and agreed that the Approved Budget is approved by and satisfactory to the Agent in its reasonable discretion).  The Approved Budget shall be updated, modified or supplemented by the Borrowers (x) with the written consent of the Agent in its reasonable discretion and (y) upon the request of Agent or the Collateral Agent from time to time (which request may, without limitation, be made in connection with any Specified Transaction or the commencement, or during the continuation, of the Specified Stores Closing Sales); provided, that in the event the Agent and the Loan Parties cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect, with weekly details for any periods after the initial 13-period to be derived in a manner reasonably satisfactory to the Agent in its reasonable discretion from the monthly budget prepared by the Loan Parties (and approved by the Agent in its reasonable discretion prior to the Effective Date) for the Chapter 11 Cases, and such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated.  Each Approved Budget delivered to the Agent and the Collateral Agent shall be accompanied by such supporting documentation as reasonably requested by the Agent or the Collateral Agent.  Each Approved Budget shall be prepared in good faith, with due care and based upon assumptions which the Loan Parties believe to be reasonable.

(b)     The Borrowers shall comply with the Approved Budget, (subject to the Permitted Variance), which compliance shall be tested on the Saturday of every second week (each, a "**Budget Testing Date**") commencing on December 1, 2018  for the Cumulative Four-Week Period then ending pursuant to the Budget Variance Report delivered by the Borrowers to the Agent and the Collateral Agent; provided, to the extent any amounts owed to professionals and vendors are permitted to be paid in accordance with the foregoing covenant but are not actually paid during the subject period, such amounts may be paid during a subsequent period.

(c)     The Borrowers shall deliver to the Agent and the Collateral Agent, not later than 5:00 p.m. on the Wednesday of each week (commencing with the first Wednesday following the Effective Date) a Budget Certificate, and such Budget Certificate shall include such detail as is reasonably satisfactory to the Agent, signed by an Authorized Officer of the Holdings and, in the case of certificates delivered for the end of a Test Period, certifying that the Loan Parties are in compliance with the covenant contained in Section 6.03(b), together with (A) a Rolling Budget, (B) a Weekly Flash Reporting Package and (C) an Approved Budget Variance Report, each of which shall be prepared by the Borrower through the last day of the Prior Week and the Cumulative Four Week Period, together with such other information as may be reasonably requested by the Agent.  The Borrowers shall supplement the Weekly Flash Reporting Package and the Approved Budget Variance Report from time to time upon the request of the Agent. For the avoidance of doubt, as part of the Weekly Flash Reporting Package, the Borrowers shall provide updated information with respect to the Winddown Account including the aggregate (i) amount of cash contributed to such account since it was established, (ii) disbursements that have been made from such account, if any, since it was established, and (iii)  any disbursements for the preceding week.  The foregoing reporting requirements with respect to the Winddown Account may be supplemented from time to time upon the request of the Agent.

(d)     The Agent, the Collateral Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent, the Collateral Agent and the

76

Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Financing Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or any of the other lending limits set forth therein.

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01    Events of Default. If any of the following events ("*Events of Default*") shall occur and be continuing:

(a)    Any Borrower shall fail to pay (i) any principal of any Term Loan when the same becomes due and payable, or (ii) any interest or any fees on any Term Loan or Term Loan Commitment, as applicable, or (iii) any other amounts payable under this Agreement or any other Loan Document, in each case under this clause (iii), within three (3) days after the same becomes due and payable; or

(b)    Any representation or warranty made by any Loan Party under this Agreement or in any other Loan Document, or in any other written statement furnished in connection with to this Agreement or any other Loan Document, or the transactions contemplated thereby shall prove to have been incorrect in any material respect when made or deemed made; or

(c)    (i)    Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01(c), (d), (e), (h), (j), (k), (n), (q), (r), (s), or (t), 6.02, or 6.03 of this Agreement, (ii) any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01(n) and such failure continues for more than one Business Day or (iii) any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, if such failure shall remain unremedied for thirty (30) days; or

(d)    Any Loan Party shall fail to pay any principal amount on any postpetition or unstayed Debt in an aggregate principal amount in excess of $25,000,000 that is outstanding (excluding Debt outstanding hereunder) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to such postpetition or unstayed Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the "agent," "trustee" or other representative or required percentage of holders thereof to accelerate, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid or redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made and is accepted, in each case, other than (i) a scheduled prepayment, redemption or purchase, or (ii) a mandatory prepayment, redemption or purchase, or a required offer to prepay, redeem or purchase, that results from the voluntary sale or transfer of property or assets, unless such prepayment, redemption or purchase is not made on the date such prepayment, redemption or purchase is due), in each case, prior to the stated maturity thereof; or there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from any event of default under such Swap Contract as to which any Loan Party is the Defaulting Party (as defined in such Swap Contract) and the Swap Termination Value owed by such Loan Party as a result thereof is greater than $25,000,000; or

(e)    A judgment or order for the payment of money (excluding (i) any "first day" or "second day" orders or (ii) any other order fixing the amount of any claim in the Chapter 11 Cases, in

77

each case, to the extent such orders are in form and substance acceptable to the Agent in its sole and absolute discretion) in excess of $25,000,000 (net of any portion of such judgment to be paid by a third-party insurer as to which coverage has not been disputed) shall be rendered after the Petition Date against any Group Member, which judgment or order is not automatically stayed or otherwise stayed pursuant to an order of the Bankruptcy Court, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(f)    (i) Any Borrower or any of its ERISA Affiliates shall incur, or shall be reasonably likely to incur administrative expense claims in excess of $25,000,000 in the aggregate (subject to Section 7.01(p)) as a result of one or more of the following:  (a) the occurrence of any ERISA Event; (b) the partial or complete withdrawal of such Borrower or any of its ERISA Affiliates from a Multiemployer Plan; or (c) the termination of a Multiemployer Plan; or (ii) the PBGC shall have obtained a valid and perfected Lien on assets of any of the Loan Parties.

(g)    Any of the Loan Documents or Prepetition Loan Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any its Affiliate shall so state in writing, or any Lien created by any of the Security Documents or Prepetition Loan Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby, including as a result of the failure to comply with Section 5.4 of the Guarantee and Collateral Agreement; or

(h)    Any acceleration of, or Event of Default (as defined in the DIP ABL Facility) has occurred and is continuing under the DIP ABL Credit Agreement; or

(i)    The entry of an order dismissing any of the Chapter 11 Cases of any Loan Party with Material Assets or converting any of the Chapter 11 Cases of any Loan Party with Material Assets to a case under chapter 7 of the Bankruptcy Code, or any filing by a Group Member of a motion or other pleading seeking entry of such an order; or

(j)    A trustee, responsible officer or an examiner having powers related to the operation of the business (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Chapter 11 Cases, a Debtor applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case, without the prior written consent of the Agent in its sole and absolute discretion; or

(k)    (i) The entry of an order staying, reversing or vacating any Financing Order, or (ii) modifying or amending the Financing Orders other than in form and substance satisfactory to the Agent in its sole and absolute discretion, or (iii) modifying or amending the Financing Orders in a manner adverse to the Credit Parties or (iv) the filing by a Debtor of an application, motion or other pleading seeking entry of such an order without the prior written consent of the Agent in its sole and absolute discretion; or

(l)    The entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Loan Parties; or

(m)    The entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the Automatic Stay) so as to allow a third party to proceed with foreclosure against any assets of the Loan Parties in excess of $25,000,000; or

78

(n)     The entry of an order in the Chapter 11 Cases charging any of the Collateral or Prepetition ABL Collateral, in each case, under section 506(c) of the Bankruptcy Code against the Credit Parties or the Prepetition Credit Parties or the commencement of other actions by any Group Member that challenges the rights and remedies of any of the Credit Parties hereunder or under any of the other Loan Documents or any of the Prepetition Credit Parties under the Prepetition First Lien ABL Credit Agreement or any of the Loan Documents (as defined in the Prepetition First Lien ABL Credit Agreement) in any of the Chapter 11 Cases or in a manner inconsistent with the Loan Documents; or

(o)     Without the prior written consent of the Agent, and other than in respect of the DIP Junior Facility and the Carve-Out or as permitted pursuant to the Loan Documents, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (i) granting superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the Credit Parties hereunder and under the other Loan Documents, (ii) permitting the Debtors to obtain financing under section 364 of the Bankruptcy Code, (iii) permitting the Debtors to grant security interests or liens under section 364 of the Bankruptcy Code, (iv) permitting the Debtors to use cash collateral under section 364 of the Bankruptcy Code, or (v) authorizing the Debtors to take other actions adverse to any Credit Party or any Prepetition Credit Party or their rights and remedies under the Loan Documents, the Prepetition First Lien ABL Credit Agreement or their interest in Prepetition ABL Collateral or the Collateral under section 364 of the Bankruptcy Code; or

(p)     The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization without the prior written consent of the Agent in its sole and absolute discretion; or

(q)     There shall arise any superpriority claim in the Chapter 11 Case which is *pari passu* with or senior to the priority of the Junior DIP Facility Superpriority Claims, except with respect to the Carve-Out and as set forth in the Financing Orders; or

(r)     The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by Debtor of similar relief in favor of any one or more of a Debtor's prepetition creditors, contrary to the terms and conditions of any Financing Order or the Loan Documents; or

(s)     The making of any payments in respect of prepetition obligations other than (i) as permitted by the Interim Financing Order and the Final Financing Order, (ii) as permitted by the Cash Management Order or any other substantive order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agent in its sole and absolute discretion acting in good faith, (iii) as permitted by any administrative "first day order," "second day order" or other administrative order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the Agent in its sole and absolute discretion acting in good faith, or (iv) as otherwise agreed to in writing by the Agent; or

(t)     Other than with respect to the Carve-Out, the Liens securing the DIP Junior Facility and other than as provided in the Financing Orders, the Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any claim or lien which is *pari passu* with or senior to any Liens securing the "Obligations" under the DIP ABL Facility, or the Adequate Protection Liens and adequate protection obligations granted under the Financing Orders; or

(u)     Noncompliance by any Loan Parties or any of their Subsidiaries (or any direct or indirect parent of any Loan Party) with the terms of the Financing Orders, as applicable, the Cash Management Order or the Employee Wage Order in any material respect or in a manner adverse to the Credit Parties; or

79

(v)  The Loan Parties or any of their Subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, acquiesce to, or otherwise participate as an adverse party in any suit or other proceeding (including any adversary proceeding) against the Agent, the Collateral Agent or any of the Lenders regarding the DIP Junior Facility; or

(w)  The Loan Parties or any of their Subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to contest in good faith the filing or confirmation of a chapter 11 plan that is not an Acceptable Plan of Reorganization or the entry of a confirmation order approving such plan, or any order shall be entered that does not provide for release and exculpatory provisions relating to the Credit Parties that are satisfactory to the Agent in its sole and absolute discretion; or

(x)  The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors or its Subsidiaries, other than pursuant to any Specified Sale Transaction or the Specified Store Closing Sales, unless (i) such order contemplates repayment in full in cash of the DIP Junior Facility upon consummation of the sale or (ii) consummated as part of an Acceptable Plan of Reorganization; or

(y)  The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP Junior Facility, the Loan Documents, or related documents, or the taking of any action by any Debtor to challenge, support or encourage a challenge of any such payments; or

(z)  The Final Financing Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the Collateral; or

(aa)  If the Final Financing Order does not include a waiver, in form and substance satisfactory to the Agent in its sole and absolute discretion, of (A) the right to surcharge the Collateral under section 506(c) of the Bankruptcy Code solely as to the Obligations, (B) any ability to limit the extension under section 552(b) of the Bankruptcy Code of the liens of the Prepetition ABL Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Debtor after the Petition Date and (C) the doctrine of marshaling; or

(bb)  An order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Credit Parties (in their capacity as Credit Parties), or (ii) limiting the extension under section 552(b) of the Bankruptcy Code of the Liens of the Prepetition ABL Agent on the Prepetition ABL Collateral to any proceeds, products, offspring, or profits of the Prepetition ABL Collateral acquired by any Debtor after the Petition Date;

(cc)  The commencement by any Debtor of actions challenging the respective rights and remedies of the Credit Parties under the Loan Documents in any of the Chapter 11 Cases or in a manner inconsistent with any of the Loan Documents;

(dd)  The filing or support of any pleading by any Group Member seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default;

(ee)  (i) Any "person" or "group" (as such terms are used in sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or

80

administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 35% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right) and such "person" or "group" shall beneficially own (as such term is used herein) a greater percentage of the equity Securities of Holdings entitled to vote for members of the Board of Directors than the Permitted Holders shall, collectively, beneficially own; or (ii) during any period of 12 consecutive months, a majority of the members of the Board of Directors or other equivalent governing body of Holdings cease to be composed of individuals (x) who were members of that board or equivalent governing body on the first day of such period, (y) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (x) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (z) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (x) and (y) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (iii) Holdings shall cease for any reason to own, directly or indirectly, 100% of the Voting Stock of Sears and Kmart;

(ff)    The guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so state in writing; or

(gg)    A plan of reorganization shall be filed by the Obligors, or confirmed in any of the Chapter 11 Cases, that is not the Acceptable Plan of Reorganization.

Section 7.02    Remedies. Upon the occurrence of any Event of Default, in each case without further order or application of the Bankruptcy Court, the Agent may, and at the direction of the Required Lenders, shall, take any and all of the following actions:

(a)    declare the Term Commitment of each Lender to be terminated, whereupon the same shall forthwith terminate provided that upon the occurrence of any Event of Default described in clauses (k) – (gg) of Section 7.01, the Term Commitments shall automatically terminate; provided that such termination shall be deemed rescinded to the extent it is determined by the Bankruptcy Court during the Remedies Notice Period that no Event of Default has occurred and is continuing;

(b)    declare the Term Loan, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Term Loan, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; provided, that upon the occurrence of any Event of Default, all such amounts and interest shall automatically become due and payable, without presentment, demand protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers;

(c)    the termination of the Loan Documents as to any future liability or obligation of the Agent and the Lenders, but without affecting any of the Collateral or the liability or obligations of any Loan Party; subject to the Remedies Notice Period;

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

(d)    exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP ABL Facility, this Agreement, the other Loan Documents, the Financing Orders or applicable law (including, subject to the Remedies Notice Period, in respect of the Collateral);

(e)    [reserved];

(f)    subject to the Remedies Notice Period, (i) enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (iii) remove any Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding Obligations (including any accrued interest) in any sale of the Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise;

(g)    take whatever other commercially reasonable action the Agent or the Required Lenders may deem necessary or desirable for the protection of the interests of the Credit Parties (including, subject to the Remedies Notice Period, in respect of the Collateral);

(h)    declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral; and/or

(i)    subject to the Remedies Notice Period, with respect to any Event of Default arising out of the failure of the Loan Parties to complete any material step in the Going Concern Sale Process (as defined in the DIP Motion), direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent pursuant to section 363, section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code).

provided, that (a) above shall be deemed rescinded to the extent it is determined by the Bankruptcy Court during the Remedies Notice Period that no Event of Default has occurred and is continuing; provided, further, that with respect to the enforcement of the Agent's Liens or exercise of any other rights or remedies with respect to the Collateral (including rights to set off or apply any amounts in any bank accounts that are a part of the Collateral), the Agent shall provide the Loan Parties with at least seven (7) Business Days' written notice prior to taking the action contemplated thereby; provided, further, that no Remedies Notice Period shall be required for any exercise of rights or remedies (i) to block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement, subject to the proviso below) and (ii) in the event the Obligations have not been repaid in full in cash on the Scheduled Termination Date.

All rights, remedies and powers granted to the Agent or Collateral Agent hereunder and under the Loan Documents or the applicable Financing Orders, as applicable, are cumulative, not exclusive and enforceable, in the Agent's or such Collateral Agent's discretion, alternatively, successively, or concurrently. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under this Agreement or any other Loan Documents, as applicable (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to the guaranties or any Collateral or any other property

82

of any such Loan Party, without the prior written consent of the Agent. The provisions of this paragraph are for the sole benefit of the Lenders and the Agent and shall not afford any right to, or constitute a defense available to, any Loan Party.

The exercise of the foregoing rights and remedies shall be subject to the terms of the DIP Intercreditor Agreement.

Notwithstanding anything contained in the Loan Documents to the contrary, (x) in no event shall the Lenders or the Agent be prevented from making any filing that may be required to toll the running of any applicable statute of limitations or to preserve its rights to make a claim against any Loan Party and (y) subject to the Carve Out, nothing hereunder shall obligate the Lenders to fund Term Loans upon the occurrence or continuation of an Event of Default.

All rights, remedies and powers granted to the Agent hereunder, under the other Loan Documents or under any Financing Order, as applicable, are cumulative, not exclusive and enforceable, in the Agent's discretion, alternatively, successively, or concurrently.

Section 7.03    Application of Proceeds. If an Event of Default shall have occurred and be continuing and the Obligations shall have been accelerated, except as otherwise agreed by all Lenders, the Agent shall apply all or any part of Proceeds constituting Collateral, whether or not held in the Term Loan Collateral Account, and any proceeds of the guarantee set forth in Guarantee and Collateral Agreement, in payment of the Obligations in the following order:

*First*, to pay all incurred and unpaid fees, expenses, including Extraordinary Expenses, indemnities, and other amounts (including and fees, charges and disbursements of counsel to the Agent and the Collateral Agent) payable to the Agent and the Collateral Agent (each in its capacity as such) under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Second*, to pay all incurred and unpaid expenses, indemnities, and other amounts payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders) under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Third*, to pay all accrued and unpaid interest on the Term Loan, and fees, payable to the Lenders under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

*Fourth*, to pay all the unpaid principal on the Term Loan pro rata among the Lenders according to the amounts of such Obligations then due and owing and remaining unpaid to the Lenders;

*Fifth*, to pay all other amounts then due and owing and remaining unpaid in respect of the Obligations, pro rata among the Lenders according to the amounts of the Obligations then due and owing and remaining unpaid to the Lenders; and

*Sixth*, any balance remaining after the Obligations shall have been paid in full, and the Term Commitments shall have terminated, shall be paid over to the Borrowers or to whomsoever may be lawfully entitled to receive the same.

Section 7.04    Lift of Automatic Stay. Subject to the Order and the terms thereof, if any Event of Default then exists, the Automatic Stay shall be modified or vacated to permit the Agent and the

Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without notice, application or motion, hearing before, or order of the Bankruptcy Court.

Section 7.05    License; Cooperation. The Agent and the Collateral Agent are hereby granted an irrevocable, non-exclusive, worldwide, fully assignable and sublicensable license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property owned by any Loan Party, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral, including rights to commercialize and exploit any Intellectual Property included in the Collateral for the purpose of enabling the Agent to exercise all rights and remedies provided for in the Loan Documents, in each case after the occurrence, and solely during the continuance, of an Event of Default.  To the extent the Loan Parties may lawfully do so, the Agent and the Collateral Agent (together with their respective agents, representatives and designees) are hereby granted a non-exclusive right to have access to, and a rent-free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and Store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that the Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral).  Upon the occurrence and the continuance of an Event of Default and the exercise by the Agent, Collateral Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, the Loan Parties shall assist the Agent, the Collateral Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Agent.

**ARTICLE VIII**

**THE AGENT AND COLLATERAL AGENT**

Section 8.01    Appointment.  Each Lender hereby irrevocably designates and appoints Cantor Fitzgerald Securities as Agent and Collateral Agent under this Agreement and the other Loan Documents and the Financing Orders, and each such Lender irrevocably authorizes the Agent and the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent and the Collateral Agent, as applicable, by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  For clarity, and notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, no consent of the Lenders shall be required to amend this Agreement or the Loan Documents to (i) cause additional assets to become Collateral or to add additional Subsidiaries as guarantors of the Obligations, or (ii) implement the provisions of Section 8.12, and the Agent and the Loan Parties shall be entitled to execute any and all amendments necessary or desirable to accomplish any of the foregoing and such amendments shall be binding on the other parties hereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Agent nor the Collateral Agent shall have any duties or responsibilities, except those expressly set forth in this Agreement and the other Loan Documents to which it is a party, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent or the Collateral Agent.

Section 8.02    Delegation of Duties; Lender Advisors.

84

(a) Each of the Agent and the Collateral Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither the Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(b)    Each of the Agent and the Collateral Agent, on behalf of each of them and the Lenders, shall be entitled to retain (either directly or through counsel) upon request from the Lead Lender any financial advisor, auditor or any other consultant the Agent and the Collateral Agent may deem necessary (collectively, the "**Lender Advisors**") to provide advice, analysis and reporting for the benefit of the Agent, the Collateral Agent and the Lenders.  The Loan Parties and their advisors shall grant access to, and cooperate in all respects with, the Agent, the Collateral Agent, the Lenders, the Lender Advisors and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner.  The Borrowers shall promptly pay upon demand all fees and expenses of each Lender Advisor, and all such fees and expenses shall constitute Obligations and be secured by the Collateral.  All reports, determinations and other written and verbal information provided by the Lender Advisors shall be confidential and no Loan Party shall be entitled to have access to same; provided, that the Loan Parties shall be provided with a reasonable opportunity to review and respond to any written reports prepared by the Lender Advisors to the extent that disclosure of any such written reports to the Loan Parties will not be prejudicial to the Agent and the Lenders, as reasonably determined by each party

Section 8.03    Exculpatory Provisions.  No Agent (for purposes of this Article VIII, "**Agent**" and "**Agents**" shall mean the collective reference to the Agent, the Collateral Agent and any other Lender designated as an "Agent" for purposes of this Agreement) nor any of their respective Related Parties shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party that is a party thereto to perform its obligations hereunder or thereunder, or (iii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

Section 8.04    Reliance by Agent.  The Agent and Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by them to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by the Agent.  The Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

assignment, negotiation or transfer thereof shall have been filed with the Agent. The Agent and Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as they deem appropriate and notwithstanding the instructions of Required Lenders (or, if so specified by this Agreement, all Lenders), they shall have no obligation to any Lender to take any action unless they shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by them by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, affected Lenders or all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Term Loan.

Section 8.05    Notice of Default.  The Agent and the Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent or the Collateral Agent has received notice from a Lender, Holdings or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders.  The Agent and the Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, affected Lenders or all Lenders); provided, that unless and until the Agent or the Collateral Agent shall have received such directions, the Agent, in consultation with the Collateral Agent, may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06    Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agent, the Collateral Agent nor any of their respective Related Parties have made any representations or warranties to it and that no act by the Agent or the Collateral Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Agent or the Collateral Agent to any Lender. Each Lender represents to the Agent and the Collateral Agent that it has, independently and without reliance upon the Agent, the Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make the Term Loan hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent, the Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent or the Collateral Agent hereunder, the Agent and the Collateral Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Agent or the Collateral Agent or any of their respective Related Parties.

Section 8.07    Reports and Financial Statements.  By signing this Agreement, each Lender:

(a)      is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements and reports required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Collateral Agent (collectively, the "***Reports***") (which the Agent and the Collateral Agent agree to so deliver);

(b)      expressly agrees and acknowledges that the Agent and the Collateral Agent make no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent, the Collateral Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d)      agrees to keep all Reports confidential in accordance with the provisions of this Agreement;

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent, the Collateral Agent, the Lender Professionals and any such other Lender or Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any credit extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent, the Collateral Agent, the Lender Professionals and any such other Lender or Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agent, Collateral Agent and any such other Lender or Person preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender; and

(f)      agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under this Agreement or any other Loan Documents or the Financing Orders, as applicable (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to the guaranties or any Collateral or any other property of any such Loan Party, without the prior written consent of the Agent. The provisions of this paragraph are for the sole benefit of the Lenders and the Agent and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 8.08      Indemnification of Agent Indemnitees.

(a)      Indemnification. The Lenders agree to indemnify Agent Indemnitees (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), ratably according to their respective Pro Rata Shares in effect on the date on which indemnification is sought under this Section 8.08(a), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loan) be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of, the Term Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; <u>provided</u>, that no

87

Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to an Agent Indemnitee that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Term Loan and all other amounts payable hereunder. If any Agent Indemnitee is sued by any receiver, trustee in bankruptcy, debtor-in-possession, the official committee of unsecured creditors, or other Person for any alleged preference from a Loan Party or fraudulent transfer, then any monies paid by such Agent Indemnitee in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to such Agent Indemnitee by Lenders to the extent of each Lender's Pro Rata share.

(b)    Proceedings.  Without limiting the generality of the foregoing, if at any time (whether prior to or after the Termination Date) any proceeding is brought against any Agent Indemnitees by a Loan Party, or any Person claiming through a Loan Party, to recover damages for any act taken or omitted by Agent in connection with any Obligations, Collateral, Loan Documents or matters relating thereto, or otherwise to obtain any other relief of any kind on account of any transaction relating to any Loan Documents, each Lender agrees to indemnify and hold harmless the Agent Indemnitees with respect thereto and to pay to the Agent Indemnitees such Lender's Pro Rata share of any amount that any Agent Indemnitee is required to pay under any judgment or other order entered in such proceeding or by reason of any settlement, including all interest, costs and expenses (including attorneys' fees) incurred in defending same; provided, that no Lender shall be liable for payment of any such amount to the extent that it is determined in a final, non-appealable judgment by a court of competent jurisdiction that such judgment, order or settlement resulted from such Agent Indemnitees' gross negligence or willful misconduct.  In Agent's discretion, Agent may reserve for any such proceeding, and may satisfy any judgment, order or settlement, from proceeds of Collateral prior to making any distributions of Collateral proceeds to Lenders provided that it has not been determined in a final, non-appealable judgment by a court of competent jurisdiction that such judgment, order or settlement resulted from any Agent Indemnitees' gross negligence or willful misconduct.

Section 8.09    Agent in Its Individual Capacity.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Term Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "**Lender**" and "**Lenders**" shall include each Agent in its individual capacity.

Section 8.10    Successor Agent.

(a)    The Agent may resign as Agent upon 30 days' notice to the Lenders and the Borrowers.  If the Agent shall resign as Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Agent, and the term "**Agent**" shall mean such successor agent effective upon such appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Term Loan.  If no successor agent has accepted appointment as Agent by the date that is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Agent hereunder, until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

88

(b)     The Collateral Agent may resign as Collateral Agent upon 30 days' notice to the Lenders and the Borrowers. The rights, duties and responsibilities of the Collateral Agent hereunder are specific to Cantor Fitzgerald Securities, and upon (i) the resignation of any such Person as Collateral Agent hereunder, or (ii) except as otherwise agreed by the Borrowers and the Agent (whose agreement shall not be unreasonably withheld), the assignment of all of the rights, duties and obligations under this Agreement in respect of its Term Commitment, the Term Loan and other amounts owing to it and any Note or Notes held by it by any such Person, then such rights, duties and responsibilities of such Person as Collateral Agent shall automatically terminate and be of no further force and effect; provided, that the provisions of this Article VIII shall inure to such Person's benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement and the other Loan Documents. Without limiting the foregoing, no additional Collateral Agent shall be appointed hereunder without the prior written consent of the Agent and the Borrowers.

Section 8.11     Defaulting Lenders.

(a)     Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and this Section 8.12.

(ii)     Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 9.05 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to Lenders hereunder; third, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Extension of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; fourth, if so determined by the Agent and the Borrowers, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Extensions of Credit under this Agreement; fifth, to the payment of any amounts owing to the Non-Defaulting Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; sixth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and seventh, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if (x) such payment is a payment of the principal amount of any Extension of Credit in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Term Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Extensions of Credit owed to all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Obligations owed to, such Defaulting Lender until such time as all Term

89

Loans are held by the Lenders pro rata in accordance with the Term Commitments hereunder without giving effect to <u>Section 2.13</u>.

(iii)   <u>Certain Fees</u>. No Defaulting Lender shall be entitled to receive any fee payable under <u>Section 2.03</u> for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)   <u>Consents</u>. If a Lender becomes a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not in limitation thereof, except as set forth in the last sentence hereof, such Defaulting Lender's right to participate in decision-making rights related to the Obligations in respect of Required Lender votes, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal. Notwithstanding anything else provided herein, any amendment, waiver determination, consent or notification under <u>Section 9.01</u> that would (i) increase or extend the term of the Term Commitment of a Defaulting Lender, (ii) reduce the principal amount of the Term Loan made by such Defaulting Lender, (iii) alter the terms and conditions of this sentence or (iv) otherwise disproportionately affect a Defaulting Lender, will require the consent of such Defaulting Lender.

(c)   <u>Defaulting Lender Cure</u>. If the Borrowers, the Agent, and the Lenders agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Term Loans of the other Lenders or take such other actions as the Agent may determine to be necessary, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u>, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 8.12   <u>Certain ERISA Matters</u>.

(a)   Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, each Agent (as defined in <u>Section 8.03</u>) and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)   such Lender is not using "plan assets" (within the meaning of section 3(42) of ERISA or otherwise) of one or more Benefit Plans in connection with the Extensions of Credit or the Term Commitments,

(ii)   the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in,

90

administration of and performance of the Extensions of Credit, the Term Commitments and this Agreement,

(iii)    or (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Extensions of Credit, the Letters of Credit, the Term Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Extensions of Credit, the Term Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Extensions of Credit, the Term Commitments and this Agreement.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that  none of the Agents or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Extensions of Credit, the Term Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

Section 8.13    Credit Bidding.  The Credit Parties hereby irrevocably authorize the Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Credit Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase); provided, that none of the Credit Parties shall be allowed to credit bid any of the Obligations independently and all such credit bids shall have to be submitted through, and administered by, the Agent, as set forth herein; provided, further, that any such credit bid shall provide for payment in full in cash of all obligations secured by a senior lien.  In connection with any such bid and at the direction of the Required Lenders (i) the Agent shall be authorized to form one or more acquisition vehicles to make a bid, and (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.01 of this Agreement). To the extent that Obligations that are assigned to

91

an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Credit Party or any acquisition vehicle to take any further action.

Section 8.14    Collateral Matters.

(a)    Each Lender authorizes and directs the Agent and the Collateral Agent to enter into, at the direction of the Required Lenders, the Security Documents and the DIP Intercreditor Agreement for the benefit of the Credit Parties. Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by the Agent, Collateral Agent or the Required Lenders in accordance with the provisions of this Agreement, the Security Documents, the DIP Intercreditor Agreement or any agreement required in connection with the exercise by the Agent, the Collateral Agent or the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any applicable Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents, though the Collateral Agent shall have no obligation to take such actions. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Term Loans unless instructed to do so by the Collateral Agent, it being understood and agreed that such rights and remedies may be exercised only by the Collateral Agent acting at the direction of the Required Lenders. The Collateral Agent, at the direction of the Required Lenders, may grant extensions of time for the creation and perfection of security interests in the Collateral or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

(b)    The Lenders hereby authorize the Agent and the Collateral Agent to release any Lien granted to or held by the Agent or the Collateral Agent, as applicable, on any Collateral (i) if approved, authorized or ratified in writing by the Required Lenders (or such greater amount, to the extent required by Section 9.01) or (ii) as otherwise may be expressly provided in the relevant Loan Documents. Upon request by the Agent or the Collateral Agent, at any time, the Lenders will confirm in writing the Agent's or the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 8.14. The Borrowers shall deliver to the Agent, the Collateral Agent and the Lenders a certificate of an Authorized Officer certifying that the execution and delivery of any such release documents are authorized and permitted under the Loan Documents, and the Agent and the Collateral Agent may conclusively rely on such certification without further inquiry.

(c)    Neither the Agent nor the Collateral Agent shall have any obligation whatsoever to the Lenders to assure that the Collateral exists or is owned by any Borrower or any other Loan Party or is cared for, protected or insured or that the Liens granted to the Agent or the Collateral Agent, as applicable, herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights,

92

authorities and powers granted or available to the Agent and the Collateral Agent in this Section 8.14 or in any of the Loan Documents.

(d)     Notwithstanding any provision herein to the contrary, any Security Document may be amended (or amended and restated), restated, waived, supplemented or modified as contemplated by and in accordance with Section 9.01 with the written consent of the Agent or the Collateral Agent, as applicable, party thereto, at the direction of the Required Lenders, and the Loan Party party thereto.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01     Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Agent Fee Letter, which may be amended by the parties thereto), nor consent to any departure by any Borrower or any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders or by the Agent at the direction of the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that no amendment, waiver or consent shall:

(a)     unless in writing and also signed by each Lender directly affected thereby, do any of the following:  (i) increase the amount or extend the expiration date of any Lender's Term Commitment, (ii) reduce the principal of, or interest on, the Term Loan or any fees or other amounts payable hereunder; provided, that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay interest, fees or other amounts at the default rate; or (iii) postpone any date fixed for any payment of principal of, or interest on, the Term Loan or any fees or other amounts payable hereunder (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment shall not constitute a postponement of any date scheduled for the payment of principal or interest);

(b)     unless in writing and signed by all of the Lenders, do any of the following: (i) change the percentage of the Term Commitments or of the aggregate unpaid principal amount of the Term Loan or the number of Lenders, that shall be required for the Lenders or any of them to take any action hereunder, (ii) other than in accordance with Section 9.13, release all or substantially all of the Collateral or release all or substantially all of the guarantors from their obligations under the Guarantee and Collateral Agreement, (iii) except as expressly permitted herein or in any other Loan Document, subordinate the Liens granted hereunder or under the other Loan Documents, to any other Lien, (iv) amend this Section 9.01, (v) amend the definitions of "Required Lenders" or (vi) release either Borrower from all of its obligations hereunder or amend Section 9.07(j);

(c)     unless in writing and signed by the Agent and the Collateral Agent (in addition to the Lenders required above to take such action), as applicable, amend, modify or waive any provision of Article VIII or affect the rights or duties of the Agent and the Collateral Agent, as applicable, under this Agreement or any other Loan Document;

(d)     unless in writing and signed by the Agent and the Borrowers (but without requiring the consent of any Lender), amend, waive or modify the provisions of Section 2.03(d).

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

Section 9.02    Notices, Etc.

(a)    All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied or delivered, (i) if to Holdings, any Borrower or any Subsidiary Guarantor, at its address at 3333 Beverly Road, Hoffman Estates, Illinois 60179, Attention: General Counsel, with a copy to Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Douglas Urquhart, Esq.; (ii) if to any Lender, at its address set forth in its completed administrative questionnaire delivered to the Agent; (iii) if to Cantor Fitzgerald Securities in its capacity as Agent or Collateral Agent, at its address at at 1801 N. Military Trail, Suite 202, Boca Raton, FL 33431, Attention: N. Horning (Sears), Telecopier: (646) 219-1180, e-mail: NHorning@cantor.com, and at 900 West Trade Street, Suite 725, Charlotte, NC 28202, Attention: Bobbie Young (Sears), Telephone: (704) 374-0574, Telecopier: (646) 390-1764, e-mail: BYoung@cantor.com, with a copy (which shall not constitute notice) to Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attention: H. Stephen Castro, Telecopier: (212) 318-3400, Telephone: (212) 318-3147, e-mail: stephen.castro@nortonrosefulbright.com or (iv), if to any other Lender, at such address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrowers and the Agent; provided, that notices required to be delivered pursuant to Section 6.01(j)(i), (iii), (iv), and (vi) shall be delivered to the Agent and the Lenders as specified in Section 9.02(b).  All such notices and communications shall, when mailed, telecopied, telegraphed or emailed, be effective when deposited in the mails, telecopied, delivered to the telegraph company or confirmed by email, respectively, except that notices and communications to the Agent pursuant to Article II, III or VIII shall not be effective until received by the Agent.  Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any exhibit hereto or thereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof.

(b)    Holdings and the Borrowers agree that materials required to be delivered pursuant to Sections 6.01(j)(i), (iii), (iv) and (vi), shall be deemed delivered to the Agent on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a written notice to the Agent and the Lenders and that is accessible by the Lenders without charge or if not so posted, may be delivered to the Agent in an electronic medium in a format acceptable to the Agent by email to mshields@gacapitalpartners.com.  Holdings and the Borrowers agree that the Agent may make such materials, as well as any other written information, documents, instruments and other material relating to Holdings, the Borrowers, any of their Subsidiaries or any other materials or matters relating to this Agreement, the Loan Documents or any of the transactions contemplated hereby (collectively, the "**Communications**") available to the Lenders by posting such notices on Intralinks or a substantially similar electronic system (the "**Platform**").  Holdings and the Borrowers acknowledge that (i) the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, (ii) the Platform is provided "as is" and "as available" and (iii) neither the Agent nor any of its Affiliates warrants the accuracy, adequacy or completeness of the Communications or the Platform and each expressly disclaims liability for errors or omissions in the Communications or the Platform. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent or any of its Affiliates in connection with the Platform. No Agent Indemnitee shall have any liability to Borrowers, Credit Parties or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform, including any unintended recipient, nor for delivery of

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

Communications and other information via the Platform, internet, e-mail, or any other electronic platform or messaging system.

(c)    Each Lender agrees that notice to it (as provided in the next sentence) (a "**Notice**") specifying that any Communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; provided, that if requested by any Lender the Agent shall deliver a copy of the Communications to such Lender by email or telecopier. Each Lender agrees (i) to notify the Agent in writing of such Lender's e-mail address to which a Notice may be sent by electronic transmission (including by electronic communication) on or before the date such Lender becomes a party to this Agreement (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

(d)    The Loan Parties hereby acknowledge that certain of the Lenders (each, a "***Public Lender***") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Communications provided by or on behalf of any Loan Party hereunder (collectively, "***Borrower Materials***") that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Credit Parties to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to any Loan Party or its securities for purposes of United States Federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Agents shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." The Loan Parties and the Credit Parties acknowledge that, notwithstanding the foregoing, "public" information may not be segregated from material non-public information on the Platform. The Credit Parties acknowledge that Communications may include Loan Parties' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to a Loan Party's securities. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any Loan Party or its securities for purposes of United States Federal or state securities laws.

Section 9.03    No Waiver; Remedies.    No failure on the part of any Lender or the Agent to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.04    Costs and Expenses. (a) The Loan Parties shall reimburse the Agent, the Collateral Agent and the Lead Lender for all Extraordinary Expenses. The Loan Parties jointly and severally agree to pay promptly all reasonable costs and expenses of the Agent and the Collateral Agent,

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

including the reasonable fees and expenses of Norton Rose Fulbright US LLP, the Lead Lender, the Lender Professionals, including the reasonable fees and expenses of Milbank, Tweed, Hadley & McCloy LLP as counsel to the Lenders (i) in connection with the preparation, execution, delivery, distribution (including via the internet or through a service such as Intralinks), administration, modification and amendment of this Agreement, the other Loan Documents and the other documents to be delivered hereunder (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements hereto or thereto); (ii) all due diligence, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, consultant, and audit expenses; (iii) the syndication and funding of the Extensions of Credit; (iv) the creation, perfection or protection of the liens under the Loan Documents (including all search, filing and recording fees), (v) subject to Section 6.01(k), all expenses incurred in connection with inspections, verifications, examinations and appraisals relating to the Collateral and (vi) the fees and expenses set forth in the Agent Fee Letter.  The Loan Parties further jointly and severally agree to pay on demand all costs and expenses of the Agent, the Collateral Agent and the Lenders, if any (including reasonable counsel fees and expenses of counsel to the Agent, counsel to the Collateral Agent and counsel to the Lenders (in the case of the Lenders, limited to one counsel for the Lenders in connection with the enforcement of or protection of its rights hereunder)), in connection with (i) the enforcement of the Loan Documents, the Financing Orders and the Cash Management Order; (ii) any refinancing or restructuring of the DIP Junior Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Junior Facility or the other transactions contemplated by the Loan Documents, the Financing Orders or the Cash Management Order.  The Loan Parties acknowledge that counsel to the Agent or the Collateral Agent may provide the Agent or such Collateral Agent, as applicable, a benefit (such as a discount, credit or accommodation for other matters) based on counsel's overall relationship with the Agent or such Collateral Agent, as applicable, including fees paid hereunder.

(b)    Loan Parties jointly and severally agree to indemnify and hold harmless the Agent, the Collateral Agent, each Lender, the Lender Advisors and each of their Related Parties (each, an "*Indemnified Party*") from and against any and all claims, damages, losses, liabilities and expense (including reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) this Agreement, the other Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the proceeds of the Term Loans, and (ii) the actual or alleged presence of Hazardous Materials on, under, at or from any property of Holdings, the Borrowers or any of their Subsidiaries or any Environmental Liability or Environmental Action relating in any way to Holdings, the Borrowers or any of their Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Holdings, any Borrower, its directors, equityholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  Holdings and the Borrowers also agree not to, and not to permit any of the their Subsidiaries to, assert any claim for special, indirect, consequential or punitive damages against the Agent, the Collateral Agent, any Lender, any of their Affiliates, or any of their respective Related Parties, on any theory of liability, arising out of or otherwise relating to this Agreement, the other Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Term Loan.

(c)    If (i) any payment of principal of, or Conversion of, any Eurodollar Rate Advance is made by any Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Term Loan, as a result of a payment or Conversion pursuant to Section 2.07, 2.08 or 2.10,

96

acceleration of the maturity of the Term Loans pursuant to Section 7.02 or for any other reason, or by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Term Loan upon an assignment of rights and obligations under this Agreement pursuant to Section 9.07 as a result of a demand by any Borrower pursuant to Section 9.07(a), or (ii) any Borrower fails to prepay, borrow, continue or convert any Eurodollar Rate Advance on the date or in the amount notified by any Borrower; the applicable Borrower shall, promptly after notice by such Lender setting forth in reasonable detail the calculations used to quantify such amount (with a copy of such notice to the Agent), pay to the Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion, including any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Term Loan. For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 9.04(c), each Lender shall be deemed to have funded each Eurodollar Rate Advance made by it at the Eurodollar Rate for such Term Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Advance was in fact so funded.

(d)     Without prejudice to the survival of any other agreement of Holdings or any Borrower hereunder, the agreements and obligations of Holdings and the Borrowers contained in Sections 2.09, 2.12 and 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 9.05     Right of Set-off.  Subject to the Financing Orders, the DIP Intercreditor Agreement and Section 7.02, upon (i) the occurrence and during the continuance of any Event of Default and (ii) the making of the request or the granting of the consent specified by Section 7.02 to authorize the Agent to declare the Extensions of Credit due and payable pursuant to the provisions of Section 7.02, each Lender and each of its Affiliates is hereby authorized at any time and from time to time (notwithstanding the provisions of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Bankruptcy Court), to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of Holdings or any Loan Party against any and all of the obligations of Holdings and the Loan Parties now or hereafter existing under this Agreement, the other Loan Documents and the Extensions of Credit of such Lender, whether or not such Lender shall have made any demand under this Agreement or the other Loan Documents. Each Lender agrees promptly to notify Holdings or the applicable Loan Party (with a copy to the Agent) after any such set-off and application, provided, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender and its Affiliate under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender and its Affiliate may have.

Section 9.06     Binding Effect; Effectiveness.  When this Agreement has been executed by Holdings, the Borrowers, the Agent and the Collateral Agent, and the Lenders, this Agreement shall thereafter be binding upon and inure to the benefit of Holdings, the Borrowers, the Agent, the Collateral Agent, each Lender and their respective successors and assigns.

Section 9.07     Assignments and Participations.  (a)  Each Lender may, upon notice to the Borrowers and the Agent and with the consent, not to be unreasonably withheld or delayed, of the Agent, assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment, the Term Loan and other amounts owing to it and any Note or Notes held by it); provided, that (i)  the Borrowers' consent shall be required for any assignment to a customer or operating competitor of any Loan Party (so long as, in the case of any such competitor, the Borrowers have notified the Agent in writing that such proposed assignee is an operating

97

competitor of a Loan Party), and such Lender shall give the Borrowers advance written notice of such proposed assignment no less than three (3) days prior to the closing of such assignment, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of all of a Lender's rights and obligations under this Agreement, the amount of the Term Loan and Term Commitments of the assigning Term Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000 or an integral multiple of $1,000,000 in excess thereof (or, if less, the entire outstanding amount of the Term Loan held by such Term Lender) unless the Agent otherwise agrees, (iv) each such assignment shall be to an Eligible Assignee, (v) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, and the parties to such assignment (other than the Agent) shall deliver together therewith any Note subject to such assignment and a processing and recordation fee of $3,500 (except no such fee shall be payable for assignments to a Lender, an Affiliate of a Lender or an Approved Fund), and (vii) any Lender may, without the approval of the Borrowers, but with notice to the Borrowers, assign all or a portion of its rights and obligations to any of its Affiliates (other than a natural person) or to another Lender.  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.09, 2.12 and 9.04 to the extent any claim thereunder relates to an event arising prior such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent, or any Lender hereunder (and interest accrued thereon).  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)    By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or the performance or observance by the Borrowers of any of their obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the

98

financial statements referred to in <u>Section 5.01(e)</u> and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with any Note or Notes subject to such assignment, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of **Exhibit B** hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrowers.

(e)    The Agent shall maintain at its address referred to in <u>Section 9.02</u> a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Term Commitment of, and principal amount (and stated interest) of the Term Loan owing to, each Term Lender from time to time, (the "***Register***").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f)    Each Lender may, without the consent of the Agent or any Loan Party, sell participations to one or more banks or other entities (other than the Borrowers or any of their Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment and the Term Loans owing to it, the portion of the Term Loan owing to it, and any Note or Notes held by it); <u>provided</u>, that (i) such Lender's obligations under this Agreement (including its Term Commitment) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrowers, the Agent, the Collateral Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Loan Document, or consent to any departure by any Borrower therefrom, except to the extent that such amendment, waiver or consent would require the affirmative vote of the Lender from which it purchased its participation pursuant to <u>Section 9.01(a)</u>. The Borrowers agree that each Participant shall be entitled to the benefits of Section 2.09 and Section 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(e) and (f) (it being understood that the documentation required under Section 2.12(e) and (f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this Section 9.07. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Extensions of Credit or other obligations under the Loan Documents (the "***Participant Register***"); <u>provided</u>, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information related to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to

99

any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(g)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant, any information relating to Holdings, the Borrowers or their Subsidiaries furnished to such Lender by or on behalf of the Borrowers; provided, that prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Borrower Information relating to Holdings, the Borrowers or their Subsidiaries received by it from such Lender in accordance with Section 9.08.

(h)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time (i) create a security interest in all or any portion of its rights under this Agreement (including the portion of the Term Loan owing to it and any Notes held by it), including, without limitation, in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors and (ii) assign to one or more special purpose funding vehicles (each, an "*SPV*") all or any portion of its funded Term Loans, without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Term Loans that such Lender would otherwise be obligated to make pursuant to this Agreement. The Lender shall remain liable for all its original obligations under this Agreement.  Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the Lender (as agent for the SPV) and not separately to the SPV unless the Agent and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.

(i)    The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender to facilitate transactions of the type described in paragraph (h) above.

(j)    Neither Holdings nor any Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each of the Lenders.

Section 9.08    Confidentiality.  Neither the Agent, the Collateral Agent, nor any Lender may disclose to any Person any confidential, proprietary or non-public information of Holdings or the Borrowers furnished to the Agent or the Lenders by Holdings or the Borrowers (such information being referred to collectively herein as the "***Borrower Information***"), except that each of the Agent, each of the Collateral Agent, each of the Lenders may disclose Borrower Information (i) to its and its Related Parties to whom disclosure is required to enable the Agent, the Collateral Agent or such Lender to perform its obligations under this Agreement and the other Loan Documents or in connection with the administration or monitoring of this Agreement and the other Loan Documents by the Agent, the Collateral Agent or such Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Borrower Information and instructed to keep such Borrower Information confidential on substantially the same terms as provided herein), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (including in connection with the Chapter 11 Cases), (iv) to any other party to this Agreement and the other Loan Documents, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement and the other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 9.08, to any assignee or participant, or any prospective assignee or participant, (vii) to the extent such Borrower Information (A) is or becomes generally

100

available to the public on a non-confidential basis other than as a result of a breach of this <u>Section 9.08</u> by the Agent, the Collateral Agent or such Lender, as the case may be, or (B) is or becomes available to the Agent, the Collateral Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrowers or any of their Subsidiaries and (viii) with the consent of the Borrowers.

Section 9.09    <u>Governing Law</u>.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of laws principles thereof but including section 5-1401 and 5-1402 of the New York General Obligations Law and, to the extent applicable, the Bankruptcy Code.

Section 9.10    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.11    <u>Jurisdiction, Etc.</u>  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not have or abstains from jurisdiction, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court.  Holdings and each of the Borrowers hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to Holdings or such Borrower at its address specified pursuant to <u>Section 9.02</u>.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents in the courts of any jurisdiction. Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**Section 9.12    <u>WAIVER OF JURY TRIAL</u>.    EACH OF HOLDINGS, THE BORROWERS, THE AGENT, THE COLLATERAL AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE ACTIONS OF THE AGENT, THE COLLATERAL AGENT OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.**

Section 9.13    <u>Release of Collateral or Guarantee Obligation</u>.  (a)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Collateral Agent is hereby irrevocably authorized by each Lender (without requirement of consent of or notice to any Lender) to take, and hereby agree to take, any action requested by the Borrowers having the effect of releasing any

101

Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any Permitted Disposition; provided, that the guarantee obligations of Sears may not be released without the consent of the Required Lenders, or (ii) under the circumstances described in paragraph (b) below.

(b)     At such time as the Term Loan and all other Obligations shall have been paid in full in cash and the Term Commitments have been terminated, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

Section 9.14     PATRIOT Act Notice.  Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or the Agent, as applicable, to identify such Borrower in accordance with the PATRIOT Act.  Each Borrower hereby agrees to provide such information promptly upon the request of any Lender or the Agent.

Section 9.15     Integration.  This Agreement and the other Loan Documents represent the agreement of Holdings, the Borrowers, the Agent, the Collateral Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Agent, the Collateral Agent or any Lender relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.16     Replacement of Lenders.  If any Lender requests compensation under Section 2.09 or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, if any Lender does not consent (a "**Non-Consenting Lender**") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders or any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.07), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided, that:

(a)     the Borrowers shall have paid to the Agent the assignment fee specified in Section 9.07;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, its ratable share of the Term Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 2.09 or payments required to be made pursuant to Section 2.12, such assignment will result in a reduction in such compensation or payments thereafter;

LEGAL_US_E # 138653214.10

WEIL:\96817762\13\73217.0004

(d)    with respect to the replacement of any Non-Consenting Lender, such amendment, waiver or consent can be effected as a result of such  assignment (together with all other assignments required by the Agent to be made pursuant to this paragraph); and

(e)    such assignment does not conflict with applicable laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Section 9.17    No Advisory or Fiduciary Capacity.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Credit Party) acknowledges that any liability arising under a Loan Document of any Credit Party that is an EEA Financial Institution, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority, and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under any Loan Documents which may be payable to it by any Credit Party that is an EEA Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such

103

shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

       Section 9.19    <u>DIP Intercreditor Agreement; Financing Orders.</u>    This Agreement is subject to the terms and provisions of the DIP Intercreditor Agreement and the applicable Financing Order.  In the event of a conflict between the terms hereof and the terms of the DIP Intercreditor Agreement or the applicable Financing Order, the terms of the DIP Intercreditor Agreement or the applicable Financing Order, as applicable, shall govern and control.

[<em>Signature Pages Follow.</em>]

LEGAL_US_E # 138653214.10
WEIL:\96817762\13\73217.0004

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**SEARS HOLDINGS CORPORATION**, as Holdings

By: _____
Name:
Title:

**SEARS ROEBUCK ACCEPTANCE CORP.**, as a Borrower

By: _____
Name:
Title:

**KMART CORPORATION**, as a Borrower

By: _____
Name:
Title:

**CANTOR FITZGERALD SECURITIES**, as
Agent and Collateral Agent


By: _____
Name:
Title:

[Other Lenders]

By: _____
Name:
Title:

## SCHEDULE 6.01(q)(i)

### *Case Milestones*

*DIP Loans*

    a.  Not later than December 28, 2018, the Bankruptcy Court shall have entered the Final Financing Order.

    b.  Not later than January 5, 2019, the Final Closing Date shall have occurred.

*Lease Assumption / Rejection*

    a.  Not later than 30 days following the Petition Date, the Debtors shall have filed a motion requesting, and not later than 45 days following the Petition Date, shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall extend 210 days after the Petition Date.

*Inventory Appraisals*

    a.  Not later than the 10th day of every month commencing with the first full month immediately following the Petition Date (or such later date as the Collateral Agent may agree in its reasonable discretion), an updated inventory appraisal shall be delivered to the Agent.

*Budget*

    a.  On or before December 28, 2018, the Agent has (i) reaffirmed its approval, based on then current information, of the Approved Initial Budget or (ii) the Loan Parties have adopted a revised budget acceptable to the Agent in its sole and absolute discretion.

*Plan and Disclosure Statement*

    a.  Not later than February 18, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan of Reorganization and a disclosure statement with respect thereto.

    b.  Not later than March 25, 2019, the Bankruptcy Court shall enter an order approving a disclosure statement with respect to an Acceptable Plan of Reorganization.

    c.  Not later than April 29, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan of Reorganization.

    d.  Not later than May 14, 2019, such Acceptable Plan of Reorganization shall become effective.

**SCHEDULE 6.01(q)(ii)**

*Go Forward Plan*

Store Rationalization and Sale Process.  To save as many of their stores and preserve as many jobs as possible, the Debtors have developed the following detailed plan to guide their path forward in these Chapter 11 Cases.  Pursuant to this Go Forward Plan, the Debtors have determined to quickly rationalize their store footprint in accordance with a detailed plan while also implementing the following key actions:

*Initial Store Rationalization*

- On the Petition Date, the Debtors will file a motion to approve procedures (the "**GOB Procedures**") to complete certain store closings in accordance with the Store Footprint Plan (the "**Initial Store Rationalization**") and will seek an order approving the GOB Procedures for the Initial Store Rationalization by October 25, 2018.

- The Initial Store Rationalization will start no later than October 25, 2018 and a material portion of the Initial Store Rationalization will be underway within 21 days of the Commencement Date.

- The Debtors will file a motion no later than seven (7) days after the Petition Date and will obtain an order from the Bankruptcy Court no later than thirty (30) days after the Petition Date authorizing the rejection of any leases associated with stores included in the Initial Store Rationalization.

- *Secondary Store Rationalization*

- The Debtors will undertake a detailed review and analysis of the profitability of a further group of stores identified in the Store Footprint Plan.

- No later than November 8, 2018, the Debtors will file a notice, pursuant to the GOB Procedures, to commence a second round of store rationalizations in accordance with the Store Footprint Plan (the "**Secondary Store Rationalization**" and, together with the Initial Store Rationalization, the "**Store Rationalizations**").

- The Debtors will obtain court approval of, and commence a material portion of, the Secondary Store Rationalization no later than November 20, 2018.

- The Debtors will file a motion no later than November 20, 2018 and will obtain an order from the Bankruptcy Court no later than December 15, 2018 authorizing the rejection of any leases associated with stores included in the Secondary Store Rationalization.

- *Go Forward Stores Sale Process*

- Pursuant to the Go Forward Plan, while the Store Rationalizations are in process the Debtors will pursue the sale (the "**Go Forward Stores Sale Process**") of the Go Forward Stores.

- Given the cash-burn associated with the continued operation of the Debtors' businesses, the Debtors must, by December 15, 2018, obtain and find acceptable a non-contingent and fully-financed (with committed financing containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provisions)) stalking horse bid for the sale of the Go Forward Stores (which may be either on a going-concern or liquidation basis) that is reasonably acceptable to the Agent (a "**Qualified Stalking Horse Bid**"); provided that failure to obtain and find acceptable a Qualified Stalking Horse Bid by December 15, 2018 shall not constitute a Default or Event of Default under the Credit Agreement so long as the Debtors are diligently pursuing a process reasonably acceptable to the Collateral Agent that is designed to enable the Debtors to meet the Go Forward Stores Sale Process milestones set forth below.

- The Debtors will file a motion requesting approval of bidding procedures and the selection of a stalking horse bid for the sale of the Go Forward Stores (which may be either on a going-concern or liquidation basis) pursuant to section 363 of the Bankruptcy Code no later than December 27, 2018, and will obtain an order of the Bankruptcy Court approving such motion no later than January 14, 2019.

- An auction for the sale of the Go Forward Stores (and potentially certain other assets) will be conducted, or the stalking horse bidder will be named as the winning bidder to the extent no other higher and better offers for the Go Forward Stores are received, no later than February 2, 2019.

- The Debtors will obtain an order approving the sale of the Go Forward Stores pursuant to section 363 of the Bankruptcy Code no later than February 4, 2019, and will close the sale of the Go Forward Stores by no later than February 8, 2019.

- Any bid pursuant to the Go Forward Stores Sales Process above must include non-contingent financing commitments containing customary limited conditionality consistent with acquisition financing commitments (e.g., SunGard-style certain funds provisions)  that are reasonably acceptable to the Agent and Collateral Agent, to bridge any gap in the Budget through the anticipated date of closing.