*court copy*

BRIAN COKE NG
40 Ann Street
New York, N.Y. 10038

**Mailing Address:**
Church Street Station
P.O. Box 2723
New York, N.Y 10008
Phone: (646) 820.9238
Fax:    (646) 820.9238
Email: Brianeng38@gmail.com

FILED
U.S. BANKRUPTCY COURT
2018 NOV 30  P 4: 06
S.D.N.Y.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SEARS HOLDINGS CORPORATION, et al., | : | Case No. 18-23538 (RDD) |
| | : | |
| Debtors.: | : | (Jointly Administered) |
| | : | |
| | : | JUDGE:  Hon. Robert D. Drain |
| | : | |
| | : | |
| | : | |
| | : | |

------------------------------------------------------------x

### MOTION FOR RELIEF FROM STAY TO ALLOW CIVIL LITIGATION IN ACTION (1) AND  FOR ACTION (2) TO PROCEED, AND FOR THE PARTIES TO PROCEED WITH ALTERNATIVE DISPUTE RESOLUTION (ADR) <u>AND SETTLEMENT NEGOITIONS TO WHICH HAD BEGUN SINCE JULY 27, 2018</u>

Under 11 U.S.C §362(d) and local rule 4001-1, derived from Former Local Bankruptcy

Rule 44(a) Brian Coke Ng ("Movant") pro-se, moves this Court for relief from the automatic

stay impose by §362(d) of Bankruptcy Code.

In support of this motion, the movant states as follows:

### <u>MEMORANDUM IN SUPPORT</u>

## I. BACKGROUND

1.    That the Movant Brian Coke Ng, is the Plaintiff in a civil action filed against the

Debtor(s), Sears Holdings Corporation, and Kmart Holding Corporation, et. al, Case No.

100386/2018, which complaint is currently pending in the SUPREME COURT OF THE STATE

OF NEW YORK, COUNTY OF NEW YORK, and is attached hereto as **Exhibit #1** and is

incorporated herein by reference. **(Action #1)**. Plaintiff alleges in his Complaint of (Action #1)

that the disputes involved neglect, and failure by Defendant/Debtor to safeguard the

Plaintiff/Movant's medical records and confidential health information. Plaintiff new Complaint

of (Action #2) has not yet been filed and served. Plaintiff alleges in his Complaint (Action # 2)

that the Defendant/Debtor engaged in tortuous conduct, or acts that is specifically **(a)** Breach of

Fiduciary Duty, **(b)** Violation of New York General Business Law    §349, **(c)** Intentional

Misrepresentation/Fraud/Constructive Fraud, and **(d)** Intentional Infliction of Emotional Distress.

Plaintiff new Complaint (Action #2) is attached hereto as **Exhibit #2**.

2.    Plaintiff Complaint (Action #1) is currently pending before Hon. David B. Cohen,

and a conference was adjourned and rescheduled to December 19, 2018, at 9:30am. The Order of

the Court is attached hereto as **Exhibit #3**.

3.    On July 27, 2018, the Defendant/Debtors, by their counsel and Plaintiff/Movant

both had engaged with good faith efforts to facilitate both sides interests for a settlement, and did

in fact initiated efforts for monetary negotiations. On September 12, 2018, the Defendant/Debtor,

by their counsel sent an email to the Plaintiff in order to facilitate and expedite settlement of all

claims, known and unknown, by specifically stating, in separate parts, "Please provide a

numerical settlement demand after which we will be in a position to discuss same with our client

and engage in settlement discussions with you". The Defendant/Debtor had advised in writing

that they are "open to alternative dispute resolution". Their email is attached hereto as **Exhibit #4**. The Supreme Court office of alternative dispute resolution (ADR) handles settlements of various kinds, and all parties open and had expressed agreements to participate in the ADR.

4.    The sole and only reason the Plaintiff submitted a settlement demand, as requested by the Defendant/Debtors, was for both side to continue negotiations and reached an early settlement resolution by participating in the ADR. However, the Defendants/Debtors not long ago attempted to remove the case to United States District Court Southern District of New York. A copy of an Order from Hon. Barbara Moses is attached hereto as **Exhibit #5**. To date of this Motion, the Defendants/Debtors has not make any contact or reach out to proceed with the Plaintiff/Movant with respect to further engage in the settlement discussion and ADR interests as was planned/promised, and the Defendants/Debtors has not yet place any amounts, to counter the offer amounts placed by Plaintiff. Defendants/Debtors did in fact receive the Plaintiff's demand as requested. A copy of the Plaintiff offer attached hereto as **Exhibit #6**.

5.    That on or around October 15, 2018, the Debtors Sears Holdings Corporation and each of its affiliated companies, (including Kmart Corporation) filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code, which case was assigned Bankruptcy Case no. 18-23538 and Case no. 18-23539, after it was filed in this Court, the Southern District of New York.

6.    That upon information and belief, the Debtors has available insurance coverage against liability for the claims in the Civil Court actions referenced above and the Plaintiff new Complaint (Action #2) also reference above. The Movant herein seeks to proceed with the civil litigation in the Supreme Court of the State of New York, County of New York, for discovery purposes and/or to recover any insurance coverage by settlement or trial.

7.    That based on the foregoing, the Movant seeks relief from the automatic stay "for cause" under §362(d)(1) to proceed to recover from Debtor's insurance coverage.

8.    That upon information and belief, there is available insurance coverage by which to cover the claims of the Movant against the Debtors, and allowing the civil actions litigation and/or alternative dispute resolution to proceed will cause no harm to the Debtors or the bankruptcy estate. Movant is not seeking to recover anything directly from the Debtors or their bankruptcy estates, but instead will rely entirely on the proceeds from the Debtor's applicable insurance policies to satisfy any judgment obtained against them. Movant's sole recourse is against the insurer/insurance. Thus, there is no legitimate reason to continue the automatic stay over the New York State Supreme Court claims.

## II. ARGUMENT

9.    Under Section 362(d) of the Bankruptcy Code, a Court may grant relief from the automatic stay for cause upon request of a party in interest.    See 11 U.S.C. § 362(d)(1). "Although cause is not defined... Congress did intend that the automatic stay be lifted to allow litigation involving the Debtor to continue in nonbankruptcy forums..." In United Imports, Inc., 203 B.R. 162, 166 (Bankr. D. Neb. 1996) (citing legislative history); see also Robbins v. Robbins, 964 F.2d 342, 345 (4th Cir. 1992) (citing legislative history); see also In re Lamberjack, 149 B.R. 467,470 (Bankr. N.D. Ohio 1992) citing Senate report No., 989, 95th Cong., 2d Sess., 50) (emphasis added). As the legislative history of §362 shows: ("It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the Bankruptcy Court from any duties that may be handled elsewhere.").

10.    The determination of whether cause exists to permit the Movant to proceed with his State Court litigation is left to the Court's discretion and is to be made based on the facts of the case. Laguna Assocs. Ltd v. Aetna Cas. & Sur. Co., 30 F.3d 734.737 (6th Cir. 1994). The party opposing relief from the stay bears the burden of proof on all issues except the Debtor's equity in real property. 11 U.S.C. §362(g)(2); In re Ramsey, 2011 Bankr. Lexis 2657 at *4 (Bankr. N.D. Ohio July 7, 2011) (memorandum opinion). In determining whether cause exists, most Courts "balance the hardship to the creditor, if he is not allowed to proceed with his lawsuit against potential prejudice to the debtor; debtor's estate and other creditors." In re R.J. Groover Constr. LLC, 411 B.R. 460, 463-64 (Bankr. N.D. Ga. 2008). In carrying out this balancing test, Court have considered numerous factors, including:

(1) Whether relief would result in a partial or complete resolution of the issues;

(2) The lack of any connection with or interference with the bankruptcy cases;
(3) Whether the other proceeding involves the debtors as a fiduciary;

(4) Whether a specialized tribunal with the necessary expertise has been established to ear the cause of action;

(5) Whether the debtor's insurer has assumed full responsibility for defending it;

(6) Whether the action primarily involves third parties;
(7) Whether litigation in another forum would prejudice the interests of other creditors;

(8) Whether the judgment claim arising from the other action is subject to equitable subordination;

(9) Whether movant's success in the other proceeding would result in a judicial lien available by the debtor;

(10) The interests of judicial economy and the expeditious and economical resolution of the litigation;

(11) Whether the parties are ready for trial in the other proceedings;

(12) The impact o the stay on the parties and the balance of harm.

11.    In re New York Medical Group, P.C., 265 B.R.408, 413 (Bankr. S.D. N.Y. 2001); see also Sonnax Industries Inc. v. Tri Component Production Corp. (In re Sonnax Industries Inc.) 907 F.2d 1280, 1286 (2d. Cir. 1990); Goya foods, Inc. v. Unanue-Casal  (In re Unanue-Casal) 159 B.R. 90, 96 (D.P.R. 1993) aff'd 23 F.3d 395 (1st Cir. 1994); In re Busch, 294 B.R. 137, 141 n.4 (10th Cir. B.A.P. 2003); In re Curtis, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984). In weighing these factors, Courts only consider those factors that are relevant to the particular case at hand and do not assign equal weight to each factor. In re Mazzeo, 167 F.3d 139, 143 (2d Cir. 1999). In this case, several of the factors are relevant and all weigh heavily in favor of lifting the stay so that the Movant can proceed with his tortuous claims in the Supreme Court of the State of New York, County of New York.

12.    In that determining whether "cause" exists to permit the Movant to proceed with his Supreme Court claims/litigation is whether "the interests of the estate" are outweighed "by the hardships incurred by the creditor-plaintiff." In re Indian River Estate, 293 B.R. 429 (Bankr. N.D. Ohio 2003). Because no harm will befall the Debtors and Movant may effectively be prejudiced by delaying his Supreme Court claims and as well as interests in the Alternative Dispute Resolution (ADR) and settlement negotiations, a lifting of the stay is appropriate.

## A. LIFTING THE STAY TO ALLOW THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK AND THE SUPREME COURT OFFICE OF ALTERNATIVE DISPUTE RESOLUTION TO PROCEED WILL COMPLETELY RESOLVE THE ISSUES BETWEEN THE DEBTOR AND THE MOVANT  (Factor one)

13.    This Court can "completely resolve the issues between the parties by lifting the automatic stay. The only issues that exist between the Movant and the Debtors are the underlying tort actions (Action #1 and new Complaint for Action #2). If the Court lifts the stay and allows the Movant to proceed and litigate and/or proceed with Alternative Dispute Resolution of his tort

claims to conclusion, the relationship between the Movant and the Debtors will be over. Thus the first factor favors lifting the stay.

## B. LIFTING THE STAY WILL NOT INTERFERE WITH THE BANKRUPTCY ESTATE (Factor two)

14.    Whether the State Court proceedings, and Alternative Dispute Resolution interests are connected with or will interfere with the bankruptcy case/estate also supports lifting the stay. Movant seeks to liquidate his claims in the Supreme Court of the State of New York, County of New York, and/or the Supreme Court Office of Alternative Dispute Resolution (ADR) in order to recovering under applicable insurance policies. "Numerous Courts have permitted the stay to be lifted when the Movant is simply seeking to establish the fact and amount of the Debtor's liability and, as in these cases, the Movant has stipulated that any recovery will be sought from the Debtor's insurer or codefendant." In re Peterson, 116 B.R. 247, 250-51 (D. Colo. 1990). In such cases, "there can be no legitimate complaint that the estates will be dissipated by allowing the litigation to go forward." In re 15375 Memorial Corp., 382 B.R. 652, 689 (Bankr. D. Del. 2008). "Where, as here, the Plaintiffs have agreed that they will not seek any recovery from estate assets, there is no basis for continuing the automatic stay"; In re Grace Indus, Inc., 341 B.R. 399, 405 (Bankr. E.D.N.Y. 2006); see also, In re Todd Shipyards Corp., 92 B.R. 600 (Bankr. D. N.J. 1988) ("Since the Movants only seek to litigate their claims to the point of judgment and obtain proceeds through the Debtor's available insurance coverage and do not seek relief from the stay in order to attach the property of the Debtor, such relief does not interfere with the Bankruptcy proceedings.").

## C. THE DEBTORS HAS AVAILABLE INSURANCE COVERAGE THROUGH ITS INSURANCE CARRIER FOR DEFENDING THE STATE COURT CLAIMS (Factor Five)

15.    The next relevant factor is whether the Debtors has applicable insurance coverage and if an insurance carrier has assumed responsibility for defending the State Court litigation or to participated in the Alternative Dispute Resolution process. If so, then lifting the stay to allow the State Court litigation or to participate in the Alternative Dispute Resolution process to proceed will not prejudice the debtors. That upon information and belief, the Debtor has liability insurance coverage for the periods in which the claims filed by Brian Coke Ng took place. The Debtors will not suffer any financial burden from continuing to defend the cases or to participate in the Alternative Dispute Resolution. Thus Factor Five also strongly favors lifting the stay. Holtkamp v. Little Field (In re Holtkamp), 669 F.2d 505, 508 (7th Cir. 1982) (Stay lifted to allow civil action to go forward since insurer assumed full responsibility for defending litigation). Elliott v. Hardison, 25 B.R. 305, 308 (E.D. Va. 1982) ("Where the claim is one covered by insurance or indemnity, continuation of the action should be permitted since hardship to the debtor is likely to be outweighed by hardship to the plaintiff." (quoting 2 collier on Bankruptcy ¶ 362.07[3] (15th ed. 1980).

### D. THE DEBTORS IS STILL OPERATING STORES FOR PROFIT
### (Additional Factor)

16.    Another factor that supports a grant of the Motion is the consideration that the Debtor, upon information and belief, has secured at least $300 million in financing to help keep the company operational during bankruptcy. If so, lifting the stay to allow the State Court litigation to proceed or to participate in the Alternative Dispute Resolution will not prejudice the Debtor, especially where current insurance will need to be in place to continue operations.

### E. LIFTING THE STAY WILL NOT PREJUDICE OTHER CREDITORS
### (Factor Seven)

17.    Another factor that supports granting the Motion to lift the stay is that the Supreme Court in the State of New York, County of New York, litigation pertaining ("Complaint

for Action #1 and Complaint for Action #2") and any process/participation in the Alternative
Dispute Resolution will not prejudice the interest of other Creditors. Movant will collect any
judgment against the Debtors solely from the applicable insurance proceeds and/or other non-
debtor sources. Thus, the other Creditors in the bankruptcy will not be harmed by granting the
Motion because the Movant will not be able to enforce any judgment directly against the Debtors
or its estate. See R.J. Groover Construction. 411 B.R. at 465; In re Loudon, 284 B.R. 106, 108
(8th Cir. B.A.P. 2002); In re G.S. Distribution Inc., 331 B.R. 552, 562-68 (Bankr. S.D.N.Y.
2005) (finding no prejudice to creditors from lifting stay because movant would not be able to
enforce judgment without permission of Bankruptcy Court); In re 15375 Memorial Corp., 382
B.R. at 690 (lifting stay because movant's "recovery against available insurance proceeds will in
no way negatively impact the rights of the handful of other creditors in these cases").

### F. LIFTING THE STAY WILL BENEFIT THE INTERESTS OF JUDICIAL ECONOMY AND THE EXPEDITIOUS AND ECONOMICAL RESOLUTION OF THE LITIGATION
### (Factor Ten)

18.     Another Factor that supports granting the Motion to lift the stay is that, since July
27, 2018, the Debtors has engaged in numerous informal discussions, communications and
negotiations with Movant-Plaintiff. Both parties has been participating in good faith efforts and
consistent with the goals of achieving a settlement and resolution of the lawsuits (all claims,
known and unknown). All parties relying on the mutual trust that have been established during
the parties discussions, communication and negotiations to which for the sole purpose of leading
both parties towards formal and binding negotiations at the New York State Supreme Court
Office of the Alternative Dispute Resolution. Both Debtors and Movant have been open to
participate in the Alternative Dispute Resolution for the expeditious and economical resolution

of the case and all claims known and unknown. Lifting the stay would certainly bring about a resolution of the issues. Both the Debtors and Movant has been very active in discovery, much of which had been accomplished but not final, there has been also some Motion practices addressing the sufficiency of the pleadings or of the evidence supporting the claims, there are already conferences currently on schedule for December 19, 2018 at 9:30am sharp, with Hon. David B. Cohen, and the parties interests in Alternative Dispute Resolution and settlement all remain to be done, and where lifting the stay will absolutely  and certainly bring complete resolution of the issues, this Factor weighs in full support.

### G. CONTINUING THE AUTOMATIC STAY WILL IMPOSE SUBSTANTIAL HARDSHIP ON MOVANTS THAT FAR OUTWEIGH ANY HARDSHIPS ON THE DEBTORS (Factor Twelve)

19.     The final Factor looks to whether maintaining the automatic stay will cause Movant a greater hardship than the Debtors would suffer if the Court lifted the stay. In re Pro Football Weekly, Inc., 60 B.R. 824, 826, N.D. III. 1986; In re Peterson, 116 B.R. at 250. Here the automatic stay is causing significant hardship to the Movant with no corresponding benefit to the Debtors. The Movant's State Court claims and all the parties interests to participate in the New York State Supreme Court Office of Alternative Dispute Resolution for a peaceful settlement resolution are in limbo because of the automatic stay. Movant may effectively be harmed by delaying the Civil Court actions and interests for Alternative Dispute Resolution. The mere existence of a bankruptcy action does not deny the Movant the opportunity to prosecute his case and/or to participate in Alternative Dispute Resolution for a peaceful settlement resolution. If the automatic stay is not lifted, Movant will have to wait an inordinately long time to resolve his claims pending in the Supreme Court of the State of New York, County of New York and/or participate in the Supreme Court Office of the Alternative Dispute Resolution and to recover

under the insurance policy's provision. In fact, Courts have found that making a Plaintiff wait to prosecute a claim puts them at a considerable disadvantage due to the preservation of evidence and loss of witness, as well as the length of time to receive a final award. Id. Therefore, Courts lift the stay under §362 (d) and allow Movant/Plaintiff to recover under any applicable insurance policy coverage. Id. In addition, the indefinite delay creates enormous hardship for the Movant, particularly of a financial nature. "A number of Courts have attributed a considerable weight to the fact that a Plaintiff by having to wait, may effectively be denied an opportunity to litigate. The aging of evidence, loss of witnesses, and crowded Court dockets are factors which contribute to these hardships." In re Bock Laundry Machine Co., 37 B.R. 564,566 (Bankr. N.D. Ohio 1984); In re 15375 Memorial Corp., 382 B.R. at 690 (Lifting stay because among other reasons, Movant was "prejudiced by the lapse of time in terms of its ability to effectively prosecute its claims"); See also In re Roberson, 244 B.R. 880, 883 (Bankr. N.D. Ga. 2000) ("Movant['s] claim for damages will evaporate if the stay is not lifted"). If the stay is lifted the Debtors will not suffer at all. Their insurance carrier has already assumed the defense of these cases and any judgment or settlement Movant obtains can only be against the insurance carrier and not against the Debtors. Therefore any recover the Movant will be paid out of insurance proceeds and not by the Debtors or the bankruptcy estates. Indeed, "the only party that stands to benefit financially if the stay is not lifted is [the Debtor's insurance company]." In re Robertson, 244 B.R. at 883. As one bankruptcy Judge said in lifting the stay under similar circumstances: "[I]t would be grossly unfair for [the insurance company] to benefit at Movant's expense." Id; see also Awashi v Jet Floria System Inc., 883 F. 2d 970 (11th Cir. 1980) ("The 'fresh start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.").

**Previous Delay and Harm and Piecemeal Records**

20.    Also, Movant-Plaintiff have been requesting, and waiting, since January 13, 2015

for the Debtors-Defendants to provide detail information pertaining to third party payers and

billing information concerning all the Movant-Plaintiff prescriptions that were filled and

purchased, for the purpose of workers' compensation matters reflecting reimbursement claims.

As a result of the Debtors-Defendants concealment, fraudulent conduct, misrepresentations,

alterations, falsification and reckless or negligent behavior, only just recently, on November 6,

2018, the Debtors-Defendants had decided to release some of the information regarding third

party payers, and billing information by fax. Therefore, Movant may effectively be harmed by

further delaying the Supreme Court Civil Court actions and/or Alternative Dispute Resolution.

## CONCLUSION

"The automatic stay was never intended to preclude a determination of Tort liability and the

attendant damages. It was merely intended to prevent a prejudicial dissipation of a debtor's

assets. A lifting of the stay to allow a Plaintiff-Creditor to determine liability will not affect the

estate. It will only allow the Movants to establish the amounts of [their] claim…In this respect, a

relief from the stay will not violate the purpose for which it was imposed". In re Bock Laundry

Machine Co., 37 B.R. at 567. On the other hand, Movant believes the interest of judicial

economy will be served by lifting the stay to permit the tortuous conduct case to continue, and

for a process of the Alternative Dispute Resolution, and, if successful, proceed against the

Debtor's insurance liability carrier for an award of damages, if any. For the reasons stated above,

the Movant herein respectfully requests that this Court grant his Motion; and granting such other

and further relief as the Court deems just and proper.

WHEREFORE, Movant hereby respectfully requests that this Court enter an Order granting relief from the automatic stay imposed by 11 U.S.C. §362 and permit the Movant to proceed in the Supreme Court of the State of New York, County of New York, and the Supreme Court Office of Alternative Dispute Resolution and to proceed against any insurance coverage afforded under the policies issued to or of the Debtors Sears Holdings Corporation and/or Kmart Corporation/Kmart Holding Corporation et al.

Dated: November 30, 2018

Respectfully Submitted,

Brian Coke Ng
40 Ann Street,
New York, N.Y. 10038

**Mailing Address:**
Church Street Station
P.O. Box 2723
New York, N.Y. 10008
Tel: 646-820-9238

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2018 a true and correct copy of the foregoing documents has been served upon the following parties listed on the annexed **Exhibit A** via email, and on the parties listed on the annexed **Exhibit B** in the manner indicated thereon.

New York, New York

Dated: November 30, 2018

Brian Coke Ng

## EXHIBIT A

| NAME | NOTICE NAME | EMAIL |
|---|---|---|
| Alston & Bird LLP | Attn: James J. Vincequerra | James.Vincequerra@alston.com |
| Alston & Bird LLP | Attn: Leib M. Lerner | leib.lerner@alston.com |
| Ansell Grimm & Aaron, P.C. | Attn: Anthony J. D'Artiglio, Esq. | ajd@ansellgrimm.com |
| ASK LLP | Attn: Edward E. Neiger, Jennifer A. Christian | eneiger@askllp.com<br>jchristian@askllp.com |
| Ballard Spahr LLP | Attn: Dustin P. Branch | branchd@ballardspahr.com |
| Ballard Spahr LLP | Attn: Paul E. Harner, Alyssa E. Kutner | harnerp@ballardspahr.com<br>kutnera@ballardspahr.com |
| Ballard Spahr LLP | Attn: Leslie C. Heilman, Matthew G. Summers | heilmanl@ballardspahr.com<br>summersm@ballardspahr.com |
| Ballard Spahr LLP | Attn: David L. Pollack | pollack@ballardspahr.com |
| Barclay Damon LLP | Attn: Kevin M. Newman | knewman@barclaydamon.com |
| Bayard, P.A. | Attn: Evan T. Miller | emiller@bayardlaw.com |
| Bell Nunnally & Martin LLP | Attn: Russell W. Mills, R. Kent Love | rmills@bellnunnally.com<br>klove@bellnunnally.com |
| Bialson, Bergen & Schwab | Attn: Lawrence M. Schwab, Thomas M. Gaa | Tgaa@bbslaw.com |
| Blank Rome LLP | Attn: Jeffrey Rhodes | JRhodes@BlankRome.com |
| Blank Rome LLP | Attn: Stanley B. Tarr, Evan J. Zucker | Tarr@BlankRome.com<br>EZucker@BlankRome.com |
| Borges & Associates, LLC | Attn: Wanda Borges, Esq., Sue L. Chin, Esq. | bankruptcy@borgeslawllc.com<br>wborges@borgeslawllc.com<br>schin@borgeslawllc.com |
| Brach Eichler LLC | Attn: Anthony M. Rainone | arainone@bracheichler.com |
| Buchalter, A Professional Corporation | Attn: Shawn M. Christianson | schristianson@buchalter.com |

1

| NAME | NOTICE NAME | EMAIL |
|------|-------------|-------|
| Cafaro Management Company | Attn: Richard T. Davis | rdavis@cafarocompany.com |
| Cahill Gordon & Reindel LLP | Attn: Joel H. Levitin, Richard A. Stieglitz Jr. | jlevitin@cahill.com<br>rstieglitz@cahill.com |
| Carter Conboy Case Blackmore Maloney & Lalrd, P.C. | Attn: Michael J. Catalfimo, Esq., John R. Canney, IV, Esq. | mcatalfimo@carterconboy.com |
| Carter Ledyard & Milburn LLP | Attn: James Gadsden, Esq. | gadsden@clm.com<br>bankruptcy@clm.com<br>Dennis.roemlein@bnymellon.com |
| Certilman Balin Adler & Hyman, LLP | Attn: Richard J. McCord, Esq., Robert D. Nosek, Esq. | rmccord@certilmanbalin.com<br>rnosek@certilmanbalin.com |
| Chapman and Cutler LLP | Attn: Laura E. Appleby, Steven Wilamowsky | appleby@chapman.com<br>wilamowsky@chapman.com |
| Chiesa Shahinian & Giantomasi PC | Attn: Beth J. Rotenberg, Scott A. Zuber | brotenberg@csglaw.com<br>szuber@csglaw.com |
| Choate, Hall & Stewart LLP | Attn: Kevin J. Simard, Jonathan D. Marshall | ksimard@choate.com<br>jmarshall@choate.com |
| Choi & Park, LLC | Attn: Hyun Suk Choi, Chull S. Park | hchoi@choiandpark.com<br>cpark@choiandpark.com<br>lkleist@choiandpark.com |
| Chuhak & Tecson, P.C. | Attn: Miriam R. Stein | mstein@chuhak.com |
| CKR Law LLP | Attn: Edward L. Schnitzer | eschnitzer@ckrlaw.com |
| Clark Hill Strasburger | Attn: Duane J. Brescia | duane.brescia@clarkhillstrasburger.com |
| Clark Hill, PLC | Attn: David M. Blau | dblau@clarkhill.com |
| Cleary, Gottlieb, Steen & Hamilton LLP | Attn: Sean A. O'Neal, James L. Bromley, Andrew Weaver | soneal@cgsh.com<br>jbromley@cgsh.com<br>aweaver@cgsh.com |
| Computershare Trust Company, N.A. | Attn: Michael A. Smith, Vice President – Corporate Trust | Michael.smith2@computershare.com |

2

| NAME | NOTICE NAME | EMAIL |
|---|---|---|
| Connolly Gallagher LLP | Attn: Karen C. Bifferato, Kelly M. Conlan, N. Christopher Griffiths | kbifferato@connollygallagher.com<br>kconlan@connollygallagher.com<br>cgriffiths@connollygallagher.com |
| Cozen O'Connor | Attn: Marl E. Felger | mfelger@cozen.com |
| Cravath, Swaine & Moore LLP | Attn: Paul H. Zumbro | pzumbro@cravath.com |
| Davidoff Hutcher & Citron LLP | Attn: David H. Wander, Esq. | dhw@dhclegal.com |
| Davis Polk & Wardwell LLP | Attn: Marshall S. Huebner, Esq, Eli J. Vonnegut, Esq. | marshall.huebner@davispolk.com<br>eli.vonnegut@davispolk.com<br>sears.service@davispolk.com |
| Debevoise & Plimpton LLP | Attn: Erica S. Weisgerber, My Chi To | mcto@debevoise.com<br>eweisgerber@debevoise.com |
| Environmental Protection Agency | Attn: Matthew Leopold, General Counsel | Leopold.matt@Epa.gov |
| Epicor Software Corporation | Attn: Larry Bercovich | lbercovich@epicor.com |
| Felderstein Fitzgerald Willoughby & Pascuzzi LLP | Attn: Paul J. Pascuzzi | ppascuzzi@ffwplaw.com |
| FisherBroyles, LLP | Attn: Mark E. Wilson | mark.wilson@fisherbroyles.com |
| FisherBroyles, LLP | Attn: Patricia B. Fugée | patricia.fugee@fisherbroyles.com |
| Foley & Lardner LLP | Attn: Derek L. Wright | dlwright@foley.com |
| Foley & Lardner LLP | Attn: Michael Small | msmall@foley.com |
| Fox Rothschild LLP | Attn: Paul J. Labov | plabov@foxrothschild.com |
| Fox Rothschild LLP | Attn: Thomas M. Horan | thoran@foxrothschild.com |
| Fox Rothschild, LLP | Attn: Mark E. Hall, Michael R. Herz | mhall@foxrothschild.com<br>mherz@foxrothschild.com |
| Fried, Frank, Harris, Shriver & Jacobson LLP | Attn: Brad Eric Scheler, Scott B. Luftglass, Peter B. Siroka | brad.eric.scheler@friedfrank.com<br>scott.luftglass@friedfrank.com<br>peter.siroka@friedfrank.com |
| Frost Brown Todd LLC | Attn: Ronald E. Gold & AJ Webb | rgold@fbtlaw.com<br>awebb@fbtlaw.com |

| NAME | NOTICE NAME | EMAIL |
|------|-------------|-------|
| Frost Brown Todd LLC | Attn: Edward M. King | tking@fbtlaw.com |
| Fultz Maddox Dickens PLC | Attn: Phillip A. Martin, Laura M. Brymer | pmartin@fmdlegal.com<br>lbrymer@fmdlegal.com |
| Gellert Scali Busenkell & Brown LLC | Attn: Gary F. Seitz | gseitz@gsbblaw.com |
| Gibbons P.C. | Attn: Brett S. Theisen, Natasha M. Songonuga | btheisen@gibbonslaw.com<br>nsongonuga@gibbonslaw.com |
| Gibbons P.C. | Attn: Howard A. Cohen | hcohen@gibbonslaw.com |
| Godfrey & Kahn, S.C. | Attn: Timothy F. Nixon | tnixon@gklaw.com |
| Golenbock Eiseman Assor Bell & Peskoe LLP | Attn: Jonathan L. Flaxer, Esq., Michael S. Weinstein, Esq. | jflaxer@golenbock.com<br>mweinstein@golenbock.com |
| Goodwin Procter LLP | Attn: Barry Z. Bazian | gfox@goodwinlaw.com<br>bbazian@goodwinlaw.com |
| Goulston & Storrs PC | Attn: Douglas B. Rosner | drosner@goulstonstorrs.com |
| Goulston & Storrs PC | Attn: Trevor R. Hoffmann | thoffmann@goulstonstorrs.com |
| Greer, Herz & Adams, LLP | Attn: Frederick Black, Tara B. Annweiler, Marc D. Young | tannweiler@greerherz.com |
| Hahn & Hessen LLP | Attn: Janine M. Figueiredo, Esq. | jfigueiredo@hahnhessen.com |
| Halperin Battaglia Benzija, LLP | Attn: Donna H. Lieberman, Esq. | dlieberman@halperinlaw.net |
| Hanesbrands Inc | Attn: Joia Johnson, Chief Administrative Officer and General Counsel | joia.johnson@hanes.com<br>howard.upchurch@hanes.com |
| Harris Beach PLLC | Attn: Kevin Tompsett, Esq. | ktompsett@harrisbeach.com |
| Herrick, Feinstein LLP | Attn: Stephen B. Selbst | sselbst@herrick.com |
| Higgs Fletcher & Mack LLP | Attn: Martin A. Eliopulos, Esq. | elio@higgslaw.com |
| Holland & Knight LLP | Attn: Barbra R. Parlin | barbra.parlin@hklaw.com |
| Hunton Andrews Kurth LLP | Attn: Brett L. Gross | bgross@HuntonAK.com |

| NAME | NOTICE NAME | EMAIL |
|------|-------------|-------|
| Husch Blackwell LLP | Attn: Lynn H. Butler | lynn.butler@huschblackwell.com |
| Internal Revenue Service | Attn: Centralized Insolvency Operation | Mimi.M.Wong@irscounsel.treas.gov |
| Internal Revenue Service | Attn: Centralized Insolvency Operation | Mimi.M.Wong@irscounsel.treas.gov |
| Judith Elkin PLLC | Attn: Judith Elkin | elkinj@mac.com |
| Kelley Drye & Warren LLP | Attn: Eric R. Wilson, Esq., Benjamin D. Feder, Esq., T. Charlie Liu, Esq. | KDWBankruptcyDepartment@KelleyDrye.com bfeder@kelleydrye.com cliu@kelleydrye.com |
| Klestadt Winters Jureller Southard & Stevens, LLP | Attn: Sean C. Southard, Lauren C. Kiss | ssouthard@klestadt.com lkiss@klestadt.com |
| Kurtzman \| Steady, LLC | Attn: Jeffrey Kurtzman | kurtzman@kurtzmansteady.com |
| Langley & Banack, Incorporated | Attn: David S. Gragg | dgragg@langleybanack.com |
| Lasser Hochman, L.L.C. | Attn: Richard L. Zucker | rzucker@lasserhochman.com |
| Latham & Watkins LLP | Attn: Marc A. Zelina | marc.zelina@lw.com |
| Latham & Watkins LLP | Attn: Peter M. Gilhuly, Ted A. Dillman | peter.gilhuly@lw.com ted.dillman@lw.com |
| Law Office of Gilbert A. Lazarus, PLLC. | Attn: Gilbert A. Lazarus | gillazarus@gmail.com |
| Law Office of Kevin S. Neiman, PC | Attn: Kevin S. Neiman | kevin@ksnpc.com |
| Lazarus & Lazarus, P.C. | Attn: Harlan M. Lazarus | hlazarus@lazarusandlazarus.com harlan.lazarus@gmail.com |
| LeClairRyan, PLLC | Attn: Ilan Markus and Niclas A. Ferland | ilan.markus@leclairryan.com niclas.ferland@leclairryan.com |
| Linebarger Goggan Blair & Sampson, LLP | Attn: Elizabeth Weller | dallas.bankruptcy@publicans.com |
| Linebarger Goggan Blair & Sampson, LLP | Attn: John P. Dillman | houston_bankruptcy@publicans.com |

| NAME | NOTICE NAME | EMAIL |
|---|---|---|
| Linebarger Goggan Blair & Sampson, LLP | Attn: David G. Aelvoet | sanantonio.bankruptcy@publicans.com |
| Linowes and Blocher LLP | Attn: John T. Farnum, Esq. | jfarnum@linowes-law.com |
| Locke Lord LLP | Attn: Brian A. Raynor, Aaron C. Smith,  David W. Wirt | braynor@lockelord.com<br>asmith@lockelord.com<br>dwirt@lockelord.com |
| Lowenstein Sandler LLP | Attn: Bruce Buechler | bbuechler@lowenstein.com |
| McCreary, Veselka, Bragg & Allen, P.C. | Attn: Lee Gordon, Tara LeDay | tleday@mvbalaw.com |
| McGlinchey Stafford, PLLC | Attn: Brian S. McGrath, Kristen D. Romano | bmcgrath@mcglinchey.com<br>kromano@mcglinchey.com |
| McGlinchey Stafford, PLLC | Attn: Mark J. Chaney, Esq., Richard A. Aguilar, Esq., Rudy J. Cerone, Esq. | mchaney@mcglinchey.com<br>raguilar@mcglinchey.com<br>rcerone@mcglinchey.com |
| Missouri Department of Revenue, Bankruptcy Unit | Attn: Steven A. Ginther, Special Assistant Attorney General | sdnyecf@dor.mo.gov |
| Morgan, Lewis & Bockius LLP | Attn: Laura McCarthy | laura.mccarthy@morganlewis.com |
| Morgan, Lewis & Bockius LLP | Attn: Neil E. Herman | neil.herman@morganlewis.com |
| Morris James LLP | Attn: Stephen M. Miller | smiller@morrisjames.com |
| Morris, Nichols, Arsht & Tunnell LLP | Attn: Curtis S. Miller, Joseph C. Barsalona II | cmiller@mnat.com<br>jbarsalona@mnat.com |
| Morrison Cohen LLP | Attn: Joseph T. Moldovan, Robert K. Dakis | bankruptcy@morrisoncohen.com |
| Munsch Hardt Kopf & Harr, P.C. | Attn: Deborah M. Perry | dperry@munsch.com |
| National Association of Attorneys General | Attn: Karen Cordry | kcordry@naag.org |
| Nelson Mullins Riley & Scarborough LLP | Attn: Jody A. Bedenbaugh | jody.bedenbaugh@nelsonmullins.com |
| Nelson Mullins Riley & Scarborough LLP | Attn: Shane G. Ramsey | shane.ramsey@nelsonmullins.com |

| NAME | NOTICE NAME | EMAIL |
|------|-------------|-------|
| Norton Rose Fulbright US LLP | Attn: Howard Seife, Esq., & Christy Rivera, Esq. | howard.seife@nortonrosefulbright.com<br>christy.rivera@nortonrosefulbright.com |
| Office of the Texas Attorney General | Attn: Rachel R. Obaldo, Assistant Attorney General | rachel.obaldo@oag.texas.gov |
| Office of The United States Trustee for Region 2 | Attn: Paul Schwartzberg, Richard Morrissey | richard.morrissey@usdoj.gov<br>paul.schwartzberg@usdoj.gov |
| OKeefe & Associates Law Corporation, P.C. | Attn: Sean A. O'Keefe | sokeefe@okeefelc.com |
| Paco (China) Garment Ltd | Attn: Lily Wang | lily@pacogarment.com |
| Parker Poe Adams & Bernstein LLP | Attn: Kiah T. Ford IV | chipford@parkerpoe.com |
| Paul Hastings LLP | Attn: Leslie A. Plaskon, Esq., Andrew V. Tenzer, Esq., Shlomo Maza, Esq. | leslieplaskon@paulhastings.com<br>andrewtenzer@paulhastings.com<br>shlomomaza@paulhastings.com |
| Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: Ebony Cobb | ecobb@pbfcm.com |
| Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: Laura J. Monroe | lmbkr@pbfcm.com |
| Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: Owen M. Sonik | osonik@pbfcm.com |
| Pick & Zabicki LLP | Attn: Douglas J. Pick | dpick@picklaw.net |
| Pierce McCoy, PLLC | Attn: Jonathan A. Grasso | jon@piercemccoy.com |
| Price Meese Shulman & D'Arminio, P.C. | Attn: Rick A. Steinberg | rsteinberg@pricemeese.com |
| Prime Clerk LLC | Attn: Herb Baer, Richard M. Allen | searsteam@primeclerk.com<br>serviceqa@primeclerk.com |
| Procopio, Cory, Hargreaves & Savitch LLP | Attn: Gerald P. Kennedy | gerald.kennedy@procopio.com |
| Pryor & Mandelup, L.L.P. | Attn: Robert L. Pryor | rlp@pryormandelup.com |
| Reid and Riege, P.C. | Attn: Charles J. Filardi, Jr. | cfilardi@rrlawpc.com |

| NAME | NOTICE NAME | EMAIL |
|---|---|---|
| Reiss+Preuss LLP | Attn: Guy A. Reiss, Erik Tikkanen | greiss@reisspreuss.com<br>etikkanen@reisspreuss.com |
| Robert E. Michael & Associates PLLC | Attn: Robert E. Michael, Aaron Hume | Robert.e.michael.esq@gmail.com<br>Aron.hume@gmail.com |
| Robinson Brog Leinwand Greene Genovese & Gluck P.C. | Attn: Fred B. Ringel, Esq. | fbr@robinsonbrog.com |
| Ropes & Gray LLP | Attn: Gregg M. Galardi, Kimberly J. Kodis, Sam N. Ashuraey | gregg.galardi@ropesgray.com<br>kimberly.kodis@ropesgray.com<br>sam.ashuraey@ropesgray.com |
| Ropes & Gray LLP | Attn: James M. Wilton, Patricia I. Chen | james.wilton@ropesgray.com<br>patricia.chen@ropesgray.com |
| Rosen & Associates, P.C. | Attn: Sanford P. Rosen, Esq. | srosen@rosenpc.com |
| S&D Law | Attn: Steven W. Kelly | skelly@s-d.com |
| Sahn Ward Coschignano, PLLC | Attn: Robert A. Abiuso, Matthew C. McCann | mmccann@swc-law.com<br>rabiuso@swc-law.com |
| Sakar | Attn: Jay Weinblatt | jweinblatt@sakar.com |
| Satterlee Stephens LLP | Attn: Christopher R. Belmonte, Abigail Snow, Pamela Bosswick | cbelmonte@ssbb.com<br>asnow@ssbb.com<br>pbosswick@ssbb.com |
| Saul Ewing Arnstein & Lehr LLP | Attn: Dipesh Patel | dipesh.patel@saul.com |
| Saul Ewing Arnstein & Lehr LLP | Attn: Phillip M. Hudson III, Carmen Contreras-Martinez | phil.hudson@saul.com<br>carmen.contreras-martinez@saul.com |
| Securities & Exchange Commission | Attn: Secretary of the Treasury | secbankruptcy@sec.gov<br>NYROBankruptcy@sec.gov |
| Securities & Exchange Commission – NY Office | Attn: Bankruptcy Department | bankruptcynoticeschr@sec.gov |
| Seyfarth Shaw LLP | Attn: Edward M. Fox | emfox@seyfarth.com |
| Shearman & Sterling LLP | Attn: Fredric Sosnick, Sara Coelho | fsosnick@shearman.com<br>sara.coelho@shearman.com |

8

| NAME | NOTICE NAME | EMAIL |
|------|-------------|-------|
| Sheppard Mullin Richter & Hampton, LLP | Attn: Alan M. Feld, Esq., Ted Cohen, Esq. | afeld@sheppardmullin.com<br>tcohen@sheppardmullin.com |
| Shutts & Bowen LLP | Attn: Ryan C. Reinert, Esq. | rreinert@shutts.com |
| Simon Property Group, L.P. | Attn: Ronald M. Tucker, Esq. | rtucker@simon.com |
| Singer & Levick, P.C. | Attn: Michelle E. Shriro | mshriro@singerlevick.com |
| Skadden, Arps, Slate, Meagher & Flom LLP | Attn: Paul Leake, Esq., Shana Elberg, Esq., and George R. Howard, Esq. | paul.leake@skadden.com<br>shana.elberg@skadden.com<br>george.howard@skadden.com |
| Skadden, Arps, Slate, Meagher & Flom LLP | Attn: Paul Leake, Esq., Shana Elberg, Esq., and George R. Howard, Esq. | Paul.Leake@skadden.com<br>Shana.Elberg@skadden.com<br>George.Howard@skadden.com |
| Skierski Jain PLLC | Attn: Doug Skierski, Kristin H. Jain | enotices@skijain.com |
| Smiley Wang-Ekvall, LLP | Attn: Lei Wang Ekvall, Philip E. Strok | pstrok@swelawfirm.com |
| Sorenson Van Leuven, PLLC | Attn: James E. Sorenson | bk@svllaw.com |
| SRAC Medium Term Notes | Attn: Mary A. Callahan Vice President | mary.callahan@bnymellon.com |
| SRAC Unsecured Notes | Attn: Mary A. Callahan Vice President | mary.callahan@bnymellon.com |
| Stark & Stark, P.C. | Attn: Thomas S. Onder, Joseph H. Lemkin | tonder@stark-stark.com<br>jlemkin@stark-stark.com |
| Stevens & Lee, P.C. | Attn: Constantine D. Pourakis | cp@stevenslee.com |
| Streusand, Landon, Ozburn & Lemon, LLP | Attn: Sabrina L. Streusand | streusand@slollp.com |
| Sullivan & Cromwell LLP | Attn: Andrew G. Dietderich, Brian D. Glueckstein, David R. Zylberberg | dietdericha@sullcrom.com<br>zylbergd@sullcrom.com |
| Tannenbaum Helpern Syracuse & Hirschtritt LLP | Attn: Michael J. Riela | Riela@thsh.com |

| NAME | NOTICE NAME | EMAIL |
|------|-------------|-------|
| Taubman Landlords | Attn: Andrew S. Conway | aconway@taubman.com |
| The Pension Benefit Guaranty Corporation (PBGC) | Attn: Judith Starr, Kartar S. Khalsa, William McCarron, Jr., & Adi Berger, Director | Starr.Judith@pbgc.gov mccarron.william@pbgc.gov efile@pbgc.gov |
| Thompson Hine LLP | Attn: Curtis L. Tuggle | Curtis.Tuggle@ThompsonHine.com |
| TJ Tianxing Kesheng Leather Products Co Ltd | Attn: Power Wang | powerwangtxks@vip.126.com |
| TN Dept of Revenue | Attn: Herbert H. Slatery III, Marvin E. Clements, Jr. | AGBankNewYork@ag.tn.gov |
| U.S. Bank National Association | Attn: Jose A Galarza, Vice President, Global Structured Finance | jose.galarza@usbank.com |
| US Attorney for Southern District of New York | Attn: Bankruptcy Division | David.Jones6@usdoj.gov Jeffrey.Oestericher@usdoj.gov Joseph.Cordaro@usdoj.gov Carina.Schoenberger@usdoj.gov Lawrence.Fogelman@usdoj.gov Peter.Aronoff@usdoj.gov Linda.Riffkin@usdoj.gov |
| Vedder Price P.C. | Attn: Kevin J. Etzel | ketzel@vedderprice.com |
| Vedder Price P.C. | Attn: Michael L. Schein | mschein@vedderprice.com |
| Waldrep LLP | Attn: Thomas W. Waldrep, Jr. | notice@waldrepllp.com |
| Warner Norcross + Judd LLP | Attn: Gordon J. Toering | gtoering@wnj.com |
| Weil, Gotshal & Manges LLP | Attn: Ray C. Schrock, P.C., Jacqueline Marcus, Garrett A. Fail, Sunny Singh | ray.schrock@weil.com garrett.fail@weil.com jacqueline.marcus@weil.com sunny.singh@weil.com JeriLeigh.Miller@weil.com jessica.liou@weil.com Paloma.VanGroll@weil.com |
| Weiss Zarett Brofman Sonnenklar & Levy, P.C. | Attn: Michael D. Brofman, Esq. | mbrofman@weisszarett.com |
| Whiteford, Taylor & Preston LLC | Attn: Stephen B. Gerald | sgerald@wtplaw.com |

| NAME | NOTICE NAME | EMAIL |
|---|---|---|
| Williams Legal Advisory Group, LLC | Attn: Amy M. Williams | awilliams@williamsadvisors.com |
| Willkie Farr & Gallagher LLP | Attn: Alan J. Lipkin, Gabriel Brunswick | alipkin@willkie.com<br>gbrunswick@willkie.com |
| Wilmington Trust, National Association | Attn: Steven Cimalore, Vice President | scimalore@wilmingtontrust.com |
| Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP | Attn: Simon Aron | saron@wrslawyers.com |
| Wyatt, Tarrant & Combs, LLP | Attn: Mary L. Fullington | mfullington@wyattfirm.com |

**EXHIBIT B**

Counsel to Kmart Holding Corporation
Sears Holdings Corporation (Debtors)
Weil Gotshall & Manges, LLP
767 5th Avenue
New York, N.Y. 10153
Attn: Jacqueline Marcus
Ray C Schrock

*__Via Priority Mail__*

Counsel to Kmart Holding Corporation
Sears Holdings Corporation (State Supreme court claims)
SOBEL PEVZNER, LLC
30 Vesey Street, 8th Floor
New York, N.Y. 10007
Attn: Bella Pevzner
        Harshal Jani

*__Via Priority Mail__*

United States Bankruptcy Court for the Southern
District of New York
Chambers of Honorable Robert D. Drain
300 Quarropas Street, Room 248
White Plains, NY 10601

*__Via Priority Mail__*

# EXHIBIT   1

SUPREME COURT OF THE STATE OF NEW YORK          Index No.: 100386/18
COUNTY OF NEW YORK                              Date Purchased: 03/19/2018

----------------------------------------------------------x

BRIAN COKE NG,                                  Plaintiffs designate New York
                                                County as the place of trial
                      Plaintiffs, **F I L E D**

                                                The basis of venue is the Residence
         -against-              MAR 2 8 2018    of plaintiff

KMART PHARMACY                  COUNTY CLERK'S OFFICE
KMART HOLDING CORPORATION          NEW YORK          **AMENDED SUMMONS**
SEARS HOLDINGS CORPORATION
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.
                      Defendants.

----------------------------------------------------------x

To The Above Named Defendants:

         YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy

of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on

the plaintiffs' or their attorney(s) within 20 days after the service of this summons, exclusive of the day

of service (or within 30 days after the service is complete if this summons is not personally delivered to

you within the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Dated: New York, New York                       All Prepare for, upon request of
         March 28, 2018                         BRIAN COKE NG
                                                40 Ann Street
                                                New York, NY 10038

**TO: KMART PHARMACY**
     **KMART HOLDING CORPORATION**             Mailing Address:
     **SEARS HOLDINGS CORPORATION**            Church Street Station, P.O. Box 2723
     **770 Broadway**                          New York, New York, 10008
     **New York, N.Y. 10003**                       Tel: (646) 318-5571
     **(212) 253-0347**
**TO: SEDGWICK CLAIMS MANAGEMENT**
     **SERVICES, INC.**
     **1100 RIDGEWAY LOOP ROAD**
     **MEMPHIS, TN 38120**
     **(901) 415-7400**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                                    Index No.: 100386/18
-------------------------------------------------------------------------------x
BRIAN COKE NG                                              **AMENDED**
                        Plaintiffs,                    **VERIFIED COMPLAINT**

                    -against-
KMART PHARMACY
KMART HOLDING CORPORATION
SEARS HOLDINGS CORPORATION
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.
                        Defendants.
-------------------------------------------------------------------------------x
TO THE SUPREME COURT OF THE STATE OF NEW YORK

Plaintiffs, Brian Coke Ng respectfully shows, alleges and says as follows:

## INTRODUCTION

1.      This is an action for relief to settle ongoing disputes concerning, **(1)** neglect, failure and refusal by Defendant Sedgwick Claims Management Services. Inc. to investigate a latent injury claim, which was filed with them as a result of an exposure to toxic substances in July 2010; **(2)** and the neglect and failure by Defendant Kmart to safeguard the Plaintiff's Medical Records and Confidential Health Information which the Defendants had promised with a pledge to safeguard and protect. Defendants Kmart instead had negligently failed to safeguard Plaintiff's Medical Records and confidential health information given to them. According to Defendants' Kmart security experts, the Kmart data systems were infected with a form of malware that its antivirus systems failed to detect. As such, the volume of data stolen/destroyed was much greater than it would have been had Defendants Kmart maintained adequate antivirus software systems to identify and eliminate the breach at the time it occurred. Kmart data systems was breached several times between January 2013 and May 2017. Kmart data breach includes THEFT, UNAUTHORIZED ACCESS/DISCLOSURE and IMPROPER DISPOSAL. The location of the breach includes ELECTRONIC MEDICAL RECORDS and PAPERS/FLIMS. Individuals affected total **47,842.**

2.    On January 13, 2015, the Plaintiff had respectfully requested a copy of all his medical records, including important and confidential health information, and Defendants Kmart had only provided a single one (1) page document containing a partial and incomplete medical record. There are **(a)** missing medical information and reports of medicine repackaging. **(b)** missing correct dates medical item(s) actually was purchased, **(c)** missing journal entry notes of Plaintiffs' medical conditions that was also reported on September 22, 2010, concerning an incident that involved a Kmart Pharmacist on July 15, 2010. **(d)** missing papers with confidential health information all of which Plaintiff had personally hand delivered and given to the Kmart Pharmacy, **(e)** missing accurate detail of quantity and dosage amounts, **(f)** missing billing information of third party and name of third party who pays certain amounts for Plaintiff medicines. **(g)** missing National Drug Code (NDC) information. On March 24, 2017, the Plaintiff return to Kmart Pharmacy and requested a copy of all his medical records again. Kmart Pharmacy had again provided only a single one (1) page document containing a partial and incomplete medical record. Notably, in latest copy, someone had falsify the Plaintiff medical records and altered and changed the Plaintiff address to something similar to unknown.

3.    On May 26, 2017, the Plaintiff had filed a complaint with THE STATE EDUCATION DEPARTMENT; THE UNIVERSITY OF THE STATE OF NEW YORK; OFFICE OF PROFESSIONAL DISCIPLINE. Plaintiff then received an acknowledgement letter and was advised in separate parts. that the complaint was forwarded for *"proper investigation"* to ***"Director of Pharmacy, Kmart Corporation, 3333 Beverly Road, Suite 389, Hoffman Estates, Illinois 60179"***.

4.    By Fax, Email and by USPS Priority mail the Plaintiff sent a letter dated February 28, 2018, to the Defendants Kmart for a status update. The Defendants had received it on February 28, 2018 and on March 2. 2018. respectively. but sent an email reply to only say. that, the email file was too large and never received via email. To the date of this lawsuit, the Plaintiff have not receive any status update.

## THE PARTIES

5.    At all times hereinafter mentioned, plaintiff Brian Coke Ng was and still is a resident of the State of New York, and presently having an address at 40 Ann Street, New York, N.Y. 10038, County of New York. Plaintiff is disabled and getting ongoing medical treatments and medical care, and still in need of a copy of all his medical records, that was requested from Defendants Kmart Pharmacy.

6.    Upon information and belief, the Defendants Sears Holdings Corporation ("Holdings") is the parent company of Kmart Holding Corporation ("Kmart and/or Kmart Pharmacy") and was formed in 2004 in connection with the merger of Kmart and Sears, Roebuck & Co. Defendants Sears Holdings Corporation is a Delaware corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179.

7.    Upon information and belief Defendants Kmart Holding Corporation is a Michigan corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179. Kmart operates a chain of retail stores that sell a wide variety of merchandise, including home appliances, consumer electronics, home goods, apparel, grocery and household, pharmacy and drugstore items. Kmart operates approximately 1,077 stores in the United States, and transacts business at 770 Broadway, New York, N.Y. 10003.

8.    Upon information and belief Defendants, Sedgwick Claims Management Services, Inc. hereinafter, ("Sedgwick") handles claims management services and is headquartered in Memphis Tennessee, and have offices in Lexington, KY. 40512-4448. Sedgwick Claims Management Services, Inc. is the Third Party claims administrators for Kmart Corporation.

## FACTUAL BACKGROUND

9.     Upon information and belief, IBM in their news release on February 15, 2001, had indicated in separate parts of their news release, that IBM (NYSE: IBM) and Kmart Corporation (NYSE: KM) had announced a purchase agreement worth in excess of $200 million for new Internet-enabled IBM point-of sale systems to be used in more than 2, 100 Kmart stores. Featuring advanced technology, multimedia and internet capabilities. And that, Kmart's new IBM SurePOS 700 systems are designed to dramatically improve the customer checkout experience.

10.    Based upon information and belief, IBM had further stated in separate parts of their news release, that Kmart selected IBM's new SurePOS 700 units as its new POS system due to the system's Universal Serial Bus (USB) connectivity, Internet capabilities and IMB's implementation services and support, as well as IBM's depth and breadth of experience in the retail industry.

11.    Based upon information and belief, IBM had continued by stating in separate parts of their news release that, the IBM SurePOS 700 units will be installed at all Kmart locations, and that, the new units have already been installed in the highest volume Kmart stores, and the remainder to be completed by 2002.

12.    Based upon information and belief, IBM had further stated in separate parts of their news release, that Kmart's overall IT system includes a back-end of more than 8,000 IBM Netfinity servers running both the Windows NT and SCO operating systems, which ran all the technology and applications in the stores environment.

13.    Between May 15, 2010 and September 22, 2010, Plaintiff was a patient  at Kmart Pharmacy 770 and Medical Records was established and was supposed to be properly maintained and protected by Kmart pharmacy for at least six (6) years.

14.    An incident had occurred on July 15, 2010, at Kmart Pharmacy (Kmart Corporation #7777) located at 770 Broadway, New York, N.Y. 10003, which involved one of Kmart's Pharmacist. Plaintiff wrote a detail letter/complaint dated July 23, 2010, and sent it by regular USPS mail to Kmart Corporation #7777 located at 770 Broadway, New York, N.Y. 10003. The letter/complaint dated July 23, 2010 bears Plaintiff medical and confidential health information. Plaintiff made a follow-up on the status of the matter on August 16, 2010 during the Plaintiff return to the Kmart Pharmacy to pick up medicines. Plaintiff was advised there is no records of the letter/complaint dated July 23, 2010, Plaintiff then personally hand delivered to the Pharmacist a copy of the letter/complaint dated July 23, 2010.

15.    Upon not hearing from anyone at Kmart Corporation #7777 or Kmart Pharmacy, the Plaintiff made one more visit to the Kmart Pharmacy on September 22, 2010, to pick medicines and was determined to see what was happening. Plaintiff spoke to the Pharmacist directly about the issues he was experiencing, Plaintiff was again told, that no record of the complaint dated July 23, 2010. Plaintiff was left with no choice, but to hand delivered one more copy of the same letter dated July 23, 2010, to the Pharmacist. The Pharmacist took the plaintiff complaint and walk over to a POS system computer and Plaintiff was told to wait for a moment. When the Pharmacist return, the Plaintiff was advised among other things, that a journal note entry was just made into the system about the complaint dated July 23, 2010, and was further advised that all other fillings would made for the Plaintiff by higher-ups, and that Plaintiff needed to take no further action on his claim. The plaintiff never receive any response or update

16.    On January 13, 2015, the Plaintiff had respectfully requested a copy of all his medical records, including all important and confidential health information that was delivered to Kmart. Plaintiff was expecting all his medical records because it was needed for review, instead, Kmart had only provided a single one (1) page document containing a partial and incomplete medical record, Plaintiff was further advised that is the only record Kmart had maintained and have in their position.

17.   Plaintiff had discovered a latent injury which never manifested upon him until February 2017, during which time a neurologist diagnosed and advised of such latent injury. Shortly thereafter, the Plaintiff had also discovered the cause of the latent injury, and learned that the cause of the latent injury is a result of the toxic exposure from substances ingested during Zoloft overdosed in July 2010 that the Plaintiff received from Kmart Pharmacy.

18.   On February 24, 2017, few days after Plaintiff had left a hospital, the Plaintiff made a telephone contact with Kmart pharmacy (Pharmacist Ms. Jessica Hon) and reported the latent injury claim based on the exposure to toxic substances from the Zoloft overdosed received in 2010. The pharmacist took the information over the phone, and had advised that she will file a claim with the appropriate department. Plaintiff understand from that conversation with the pharmacist, that no further action needed by plaintiff on the latent injury claims, since everything will filed by her on 02/24/2017.

19.   On or about March 3, 2017 or March 9, 2017 a woman called Plaintiff telephone and left a voicemail message, and had identified herself as Sandra Brach from Sedgwick claims management services, Inc. indicating that Plaintiff should give her a call to discuss the claim she had just received, and she had also left a claim number.

20.   A copy of Sedgwick first letter dated March 3, 2017, was emailed to the plaintiff because it was never received due to the fact that Plaintiff medical records was altered and falsified and reflected an incorrect and false and unknown address. At some point, Someone got into the plaintiff medical records at Kmart and change the plaintiff address to something unknown.

21.   To date of this lawsuit, Sedgwick had failed to deny or pay the latent injury claim within a reasonable period of time, or come to a fair and reasonable settlement of the matter.

22.    On March 24, 2017, the Plaintiff return to Kmart Pharmacy and requested a copy of all his medical records again. Plaintiff was given an authorization and was advised by the Pharmacist to "only sign it" and return the empty form. The Pharmacist wrote "resolving claim". Shortly thereafter, Kmart Pharmacy had again provided only a single one (1) page document containing a partial and incomplete medical record. Notably, in the latest copy, someone had falsify the Plaintiff medical records by altered it, and completely changed the Plaintiff address to something similar to unknown.

23.    On May 26, 2017, the Plaintiff filed a complaint with THE STATE EDUCATION DEPARTMENT; THE UNIVERSITY OF THE STATE OF NEW YORK; OFFICE OF PROFESSIONAL DISCIPLINE. Plaintiff then received an acknowledgement letter and was advised in separate parts, that the complaint was forwarded for *"proper investigation"* to *"Director of Pharmacy, Kmart Corporation, 3333 Beverly Road, Suite 389, Hoffman Estates, Illinois 60179"*.

24.    By Fax, Email and by USPS Priority mail the Plaintiff sent a letter dated February 28, 2018, to the Defendants Kmart for a status update. Kmart had received it on February 28, 2018 and on March 2, 2018, respectively, but sent an email reply to only say, that, the email file was too large and never received via email. To the date of this lawsuit, the Plaintiff have not receive any status update.

## SEVERAL DATA BREACHES

25.    On information and belief, Kmart's information technology hardware and personnel are headquartered in Huffman Estates, Illinois. On information and belief, the physical servers on which the malware was inserted are located there, as well as the technologies employed to prevent such attacks. Additionally, on information and belief, the key officers and employees responsible for developing and implementing Kmart's information technology security are located in Huffman Estates, Illinois.

26.    On information and belief, Kmart had a breach submission date of **01/31/2013**. Type of breach was improper disposal. The location of the breached information was **PAPER/FILMS**. Individuals affected **16,988**.

27.    On information and belief, Kmart had a breach submission date of **04/03/2013**. Type of breach was THEFT. The location of the breached information was **ELECTRONIC MEDICAL RECORDS**. Individuals affected **12,542**.

28.    On information and belief, Kmart had a breach submission date of **02/10/2014**. Type of breach was **THEFT**. The location of the breached information was **ELECTRONIC MEDICAL RECORDS**. Individuals affected 16,446.

29.    On information and belief, Kmart had a breach submission date of **09/10/2014**. Type of breach was **UNAUTHORIZED ACCESS/DISCLOSURE**. The location of the breached information was **PAPER/FILMS**. Individuals affected **1,866**.

30.    On October 10. 2014, Kmart had advised members, that there was a Payment System breached.

31.    On May 31, 2017, Kmart had again advised members, that there was a payment Security incident.

## THE KMART DATA BREACHES:
## THE RESULT OF LAX ANTI-VIRUS STANDARDS

32.    As stated before on information, Kmart's information technology hardware and personnel are headquartered in Huffman Estates, Illinois. On information and belief, the physical servers on which the malware was inserted are located there, as well as the technologies employed to prevent such attacks. Additionally, on information and belief, the key officers and employees responsible for developing and implementing Kmart's information technology security are located in Huffman Estates, Illinois.

33.    Hackers infiltrated Kmart's Electronic Medical Records systems, payment data systems with malware that its systems could not detect because its anti-virus system had not been updated to include such threats. Electronic Medical Records systems and POS registers systems at its stores were infected with software that stole the Patients Medical Records, and stole customers credit and debit cards information from the registers. Kmart reported that credit and debit card numbers were compromised in the breach, and it was reported that there were theft of electronic medical records, and papers/films.

34.    The failure to utilize adequate updated anti-virus and anti-malware systems allowed hackers to infiltrate the electronic medical records systems and the POS systems such that Patients electronic medical records, papers, and other confidential health information could be subjected to the theft, and further that customer credit and debit card information could be captured.

35.    Plaintiff believes that Kmart's IT department and executives were aware that the company was vulnerable to the several breach of its Patients electronic medical records, papers/films, and other confidential health information and customers financial information, and they were aware of countermeasures on the market which could reduce or eliminate the ability of hackers to steal Patients electronic medical records, papers, and other confidential health information and customers card data from POS systems. Nevertheless, Defendants Kmart were negligent in that they failed to adequately protect and safeguard Patients electronic medical records, papers, and other confidential health information and customers card data from POS systems and prevent the several Kmart Data Breach.

36.    Defendants Kmart were not only aware of the threat of data breaches generally, but were aware of the specific danger of malware infiltration. Malware has been used to access electronic medical records systems and POS terminal systems since at least 2011, and specific types of malware, including RAM scraper malware, have been used recently to infiltrate several large retailers. As a result, Defendants were aware that malware is a real threat and is a primary tool of infiltration used by hackers.

37.    Defendants Kmart received additional warnings regarding malware infiltrations from the U.S. Computer Emergency Readiness Team, a government unit within the Department of Homeland Security, which alerted retailers to the threats of POS malware on July 31, 2014, and issued a guide for retailers on protecting against the treat of POS malware, which was updated on August 27, 2014.

38.    Additionally, the Homeland Security Department and the Secret Service issued a report warning retailers to check their in-store cash register systems for a set of malware that could evade detection of antivirus products. Kmart should have taken action to protect and safeguard and to ensure that its Patients and its customers information would not continue to be available to hackers and thieves, but Kmart chose not to do so.

39.    Despite the fact that Defendants Kmart were put on notice of the very real possibility of data theft associated with their security practices and despite the fact that Defendants knew or, at the very least should have known about the basic infirmities associated with the Kmart security systems, they still failed to make necessary changes to their security practices and protocols.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the complaint as if set forth at length herein.

40.    Defendants Sedgwick had neglect their investigation and had further failed to deny or pay the latent injury claim within a reasonable period of time, or come to a fair and reasonable settlement.

41.    Defendants Kmart negligently allowed Plaintiff electronic medical records, papers/films, and other confidential health information to be compromised by failing to take reasonable and prudent steps against an obvious threat. Then, neglect and failed to perform a proper investigation, as that has been recommended and called for by THE STATE EDUCATION DEPARTMENT; THE UNIVERSITY OF THE STATE OF NEW YORK; OFFICE OF PROFESSIONAL DISCIPLINE.

42.    As a direct and proximate result of the events detailed herein, Plaintiff rights are denied. Defendants Kmart had failed and refused to respond to several of Plaintiff good faith requests for needed medical records and for explanation of several missing confidential health information, journal notes, medicine repackaging records, third party billing information for the prescriptions filled, complete details of accurate dates of services are not in the Plaintiffs Medical records and for Kmart to further explain the fake or false address that resides in the Plaintiff medical records. Defendants Kmart unable to provide the Plaintiff with a truthful and complete medical records, due to the several breaches.

## DEFENDANTS KMART HAD A DUTY TO PLAINTIFF

43.    Defendants Kmart, at all times relevant to this action, had a duty to Plaintiff, that reads in separate parts, as follows: (a)"Your health information-- which means any written or oral information that we create or receive that describes your health condition, treatments or payments-- is personal. Therefore, the Practice pledges to protect your health information as required by law. We give you this Privacy Notice to tell you (1) how we will use and disclose your "protected" health information, or "PHI" and (2) how you can exercise certain individual rights related to your PHI as a Patient of Kmart Pharmacy. Please note that if any of your PHI qualifies as mental heal records, alcohol and drug treatment records, communicable disease records or genetic test records, we will safeguard these records as "Special PHI" which will be disclosed only with your prior express written authorization, pursuant to a valid court order or as otherwise required by law. We required by law to maintain the privacy of your PHI and to provide you with this notice of our legal duties and privacy practices. HIPAA may preempt certain state laws relating to the privacy of PHI. Therefore, please see additional information at the end of this notice relating to your specific state.".

## PLAINTIFF HAVE BEEN DAMAGED AS A RESULT OF DEFENDANTS WRONGDOINGS

44.    Due to Defendants Kmart failure to safeguard and protect Plaintiffs' electronic medical records and confidential health information, Plaintiff suffered damages as follows:

(a)    The medical records is not in total and completed for any good purpose;

(b)    The little that is left after all the various data breaches and theft at Kmart, is now not worthy, praiseworthy, admirable, creditable, precious, or valuable.

(c)    The remains of the Plaintiff Medical records located at Defendants Kmart Pharmacy is missing important information and not truthful. The records bears a wrong address.

(d)    Furthermore, Sedgwick neglect and fail to investigate, deny or pay the latent injury claim within a reasonable period of time, or come to a fair and reasonable settlement of the matter.

As a result of defendants negligence. the plaintiff have been damaged in an amount which exceeds the jurisdictional limits of all lower courts, the damages to be determined at trial.

### CONCLUSION

WHEREFORE, plaintiffs demand judgment against all defendants in an amounts to be determined at trial, jurisdictional limits of all lower courts which would otherwise have jurisdiction, together with the cost and disbursement of this action.

Dated:  New York, New York
        March 28, 2018

BRIAN COKENG
40 Ann Street
New York, NY 10038
Tel: (646) 318-5571

**Mailing Address:**
Church Street Station,
P.O. Box 2723
New York, NY 10008

Sworn to before me 28 of March 2018

_____
Notary Public

JOSE L FELIPE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FE6152567
Qualified in Queens County
My Commission Expires September 18, 2018

# EXHIBIT  2

SUPREME COURT OF THE STATE OF NEW YORK  Index No.:
COUNTY OF NEW YORK  Date Purchased:

---------------------------------------------------------------------------x

BRIAN COKE NG,  Plaintiffs designate New York
County as the place of trial

              Plaintiffs,

The basis of venue is the
Residence of plaintiff

       -against-

KMART CORPORATION,
KMART HOLDING CORPORATION,  SUMMONS
SEARS HOLDINGS CORPORATION
              Defendants.

---------------------------------------------------------------------------x

To The Above Named Defendants:

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiffs' or their attorney(s) within 20 days after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated: New York, New York  All Prepare for, upon request of
      November 13, 2018       BRIAN COKE NG
                                40 Ann Street
                                New York, NY 10038

TO: KMART CORPORATION
    KMART HOLDING CORPORATION
    SEARS HOLDINGS CORPORATION  Mailing Address:
    3333 Beverly Rd.  Church Street Station, P.O.
    Hoffman Estates, IL 60179  Box 2723, New York,
                                    New York, 10008
                                    Tel: (646) 820-9238

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.:

-------------------------------------------------------------------------x

**BRIAN COKE NG**

Plaintiffs,                              **VERIFIED COMPLAINT**

-against-

**KMART CORPORATION**
**KMART HOLDING CORPORATION**
**SEARS HOLDINGS CORPORATION**
Defendants.

-------------------------------------------------------------------------x

TO THE SUPREME COURT OF THE STATE OF NEW YORK

Plaintiff Brian Coke Ng upon information and belief respectfully shows, alleges and says as follows:

## INTRODUCTION

1.     This case is about **(a)** Breach of fiduciary duty; **(b)** Violation of New York General Business Law §349; **(c)** Intentional misrepresentation/fraud and/or Constructive fraud; and **(d)** Intentional infliction of emotional distress.

2.     As early as May 15, 2010, Plaintiff was established as a pharmacy customer of the Defendant(s) Kmart Corporation, Kmart Holding Corporation/Sears Holding Corporation, in which he became an individual member of the consuming public that purchases pharmaceutical products from the Defendant's pharmacy (**"Kmart Pharmacy"**). As an individual member of the consuming public that purchased pharmaceutical products from the Defendant's pharmacy, Plaintiff, as did the consuming public, had and relied upon his confidential relationship with the Defendant's pharmacy and their employees regarding the purchase of his pharmaceutical products, and, as well as keeping the Plaintiff's confidential information accurate, safe and secure, and out of the hands of unauthorized person(s).

3.    On 05/12/2010, 06/14/2010, 07/16/2010, 08/16/2010, the Defendants through its

pharmacy, sold Plaintiff the generic drug named Sertraline HC, and on 09/17/2010 sold Plaintiff

the generic drug named Bupropn HCL. Each time that the Defendant's pharmacy sold Plaintiff

these drugs, the Defendant's pharmacy provided Plaintiff with an information sheet that

informed him of the risks of the drug(s), but went further to confirmed among other things the

pharmacy address and contact telephone number, the patient's name, address and telephone

number on file, the name and date that the drug was dispensed and the full name and initials of

the pharmacist who filled and did the final check on the prescription, the prescription numbers,

the retail price of the drug(s), the NDC numbers, the name of the doctor who prescribed the

drugs, the insurance reference numbers from each third party payer(s), the copay amounts, and

accompanying copyright notice on three (3) separate information sheets indicating that Wolters

Kluwer Health, Inc. is the copyright owner, and that "all rights reserved". Specifically, the

Defendant's pharmacy, had provided information sheets with representation(s) in separate parts

among other things, as following:

- *Prescription fill date: 05/15/2010: Pharmacist's name: John Hellyer, ("JEH"); Ins. Ref. No# ERX5761501992; Copay: $15.00, Retail Price: $83.79";*

- *Prescription fill date: 06/14/2010: "Pharmacist's name: Marc Speert, ("MLS"); Ins. Ref. No# ERX4601116158; Copay: $15.00, Retail Price: $83.79". Notably, the pharmacist written counseling was not completed on that information sheet;*

- *Prescription fill date: 07/16/2010: "Pharmacist's name: John Hellyer, ("JEH"); Ins. Ref. No# ERX3499824459; Copay: $15.00, Retail Price: $84.79". Notably, the pharmacist written counseling was not completed on that information sheet;*

- *Prescription fill date: 08/16/2010: "Pharmacist's name: Tania Li. ("TRL"); Ins. Ref. No# ERX11311793821; Copay: $15.00, Retail Price: $84.79".*

- *Prescription fill date: 09/17/2010: Pharmacist's name: Darshanie Sankar, ("DVS"); Ins. Ref. No# ERX00006845177701; Copay: $33.63, Retail Price: $159.97".*

4.    Upon information and belief, at all times relevant. Defendant's pharmacy had used a POS system and PDX/NHIN systems to process all prescription purchases by the consuming public, including the Plaintiff purchases.

5.    At all times relevant. Plaintiff relied upon the Defendant's Pharmacy written representations, as stated in each information sheets. in deciding to retain the information sheets that is needed for verification and support of medical expenses document(s) for reimbursements pertaining to all out-of-pocket medical expenses. The plaintiff had also prepared and completed Form C-257 for the reimbursement(s) from the workers' compensation insurance carrier.

6.    On January 13, 2015, March 24, 2017, June 15, 2018, August 22, 2018, August 27, 2018, and November 6, 2018, the Defendant Pharmacy had created and provided written documents to Plaintiff. to which shows conflict and inconsistency. The documents from the Defendant Pharmacy shows or reflects that there are alterations, misrepresentations and falsification of the plaintiff's medical records, deceptive conduct, and fraudulent conduct. Documents received from the Defendant Pharmacy had also shown clearly, that plaintiff confidential information had been shared with certain third parties, but the plaintiff had given no permission and/or consent to share his confidential information with any such third parties.

## THE PARTIES

7.    At all times hereinafter mentioned. Brian Coke Ng. is the Plaintiff Pro Se, was and still is a resident of New York, and having an address at 40 Ann Street, N.Y, N.Y. 10038.

8.    Upon information and belief, the Defendant(s) Sears Holdings Corporation is the parent company of Kmart Holding Corporation. Defendant(s) Sears Holding Corporation is a Delaware Corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179.

9.      Upon information and belief, the Defendant(s) Kmart Holding Corporation/Kmart Corporation is a Michigan Corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179. Kmart operates a chain of retail stores that sell a wide variety of merchandise, including home appliances, consumer electronics, home goods, apparel, grocery and household, pharmacy and drug store items. Kmart operates many stores in the United States, and transacts business at one of them which is located at 770 Broadway, New York, N.Y. 10003.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction to decide this case. This Court has personal jurisdiction over the defendants.

11.     Venue is proper in the county of New York, as the material events and occurrences took place in the County of New York.

## FACTUAL BACKGROUND

12.     At all times relevant, Plaintiff was and still entitled under the New York State Workers' Compensation Law, to any and all reimbursements for his out of pocket "medical expenses pertaining to all causally related medications/medicines based on an accident that occurred on December 17, 2007". The Plaintiff is entitled to reimbursements for his out of pocket "medical expenses" with respect to the Pharmacy Fee Schedule. The Pharmacy Fee Schedule are codified as Parts 440 and 442 of title 12 of the New York Codes, Rules and Regulations. The permanent regulations to establish the fee schedule for pharmacy and the rules for the use of the fee schedules and pharmacy networks was adopted by the chair of the Workers' Compensation Board on 11/06/2012. The emergency regulations began on July 11, 2007.

<u>JANUARY 13, 2015</u>

13.    On January 13, 2015, during the fiduciary relationship between Defendant's

pharmacy and Plaintiff, and after the Plaintiff had left the New York State Workers'

Compensation Board, the Plaintiff made a visit to Defendant's pharmacy located at 770

Broadway, New York, N.Y. 10003, and requested among others, a copy of his "Medical

Expenses" for all the prescription filled. The Plaintiff had explained to the pharmacist, that the

"medical expenses" document is needed specifically for Workers' Compensation

reimbursements claim. Defendant's pharmacy created the medical expenses document, and their

pharmacist attested to such document, which also bears a report date of 01/13/2015. The

"medical expenses document" was hand delivered to the Plaintiff. A copy is attached here:



14.    Upon receipt of this "medical expenses" from Defendant's pharmacy and before

leaving, the Plaintiff had realized that there is falsification and misrepresentations on the medical

expenses document, and the Plaintiff immediately raised a dispute and complaint at the

Defendant's pharmacy. The pharmacist advised the Plaintiff to put his disputes in writing, and

the Plaintiff did exactly so, one dated 01/13/2015, and the other dated 01/14/2015.

**PREVIOUS MEDICAL RECORDS**

15.    Defendant's pharmacy had provided the Plaintiff with information sheets to which includes a notice of copyright, which further indicating that the owner of the copyrights is Wolters Kluwer Health, Inc. At least three (3) separate times the Defendant's pharmacy had provided information sheets to the Plaintiff indicating that Wolters Kluwer Health, Inc. is the copyrights owner. As such, the Plaintiff do not intend to seek any permission from Wolters Kluwer Health, Inc., to use those information sheets. The Plaintiff confidential information is group with everything on the information sheets that created by the copyrights owner (Wolters Kluwer Health, Inc.). Therefore, at all times relevant, the Defendant was and still fully aware of the fact that the information sheet in its entirety is under one copyright notice by Wolters Kluwer Health, Inc. and that "all rights reserved" to every contents thereon.

16.    There are certain data on the original information sheets, to which directly in conflict with certain information on the medical expenses document to which the Defendant's pharmacy had created and attested to on January 13, 2015. There are, misrepresentation and falsification on the "medical expenses document" created on January 13, 2015. In that, such "medical expenses" document reads and reflects in separate parts as follows: "Last fill: 09/22/2010; Rph: JEH". Also, the Defendant's pharmacy had overcharged or inflated costs for the prescription drugs that had been filled. The Defendant's pharmacy charged for a 90 day supply, but it was a 30 day supply. Therefore, the workers' compensation insurance carrier should not be subject to those overcharges shown. Plaintiff should not be forced to submit such medical expenses document from Defendant's pharmacy dated January 13, 2015, the workers' compensation insurance carrier. Defendant's pharmacy gave Plaintiff such a "medical expenses" document, knowing very well, that Plaintiff could be, would be, potentially a subject to aiding and abetting fraud, (their fraudulent conduct).

<u>MARCH 24, 2017</u>

17.    There are no time limit for submitting a claim to the workers' compensation insurance carrier for any reimbursements. Therefore, after the New York State Workers' Compensation Board filed its decision on 06/10/2016, the Plaintiff made a visit to Defendant's pharmacy and requested another copy of the medical expenses document.

18.    On March 24, 2017, the Defendant's pharmacist created a second medical expenses document and attested to such document, for the purposes of submitting and resolving a pending claim for the reimbursements of Plaintiff out-of-pocket medical expenses. The Defendant's pharmacy had provided a "medical expenses" document dated March 24, 2017, to which shows more alterations to the Plaintiff's medical records, in that it now reflects that plaintiff address had been changed/modified, in addition to the previous findings on January 13, 2015, to which there's already a dispute regarding the previous falsification and misrepresentations. The "medical expenses document" dated March 24, 2017, was hand delivered to the Plaintiff. A copy is attached here:



19.    The information sheets that the Plaintiff had received each time prescription was filled, were the only written information that Plaintiff considered helpful so to proved to Defendant's pharmacy, that their "medical expenses document" that they have created on January 13, 2015, and March 24, 2017, respectively, contains explicitly false, and misleading information and cannot submit to the workers' compensation carrier for any reimbursements of Plaintiff out-of-pocket expenses.

20.    Additionally, the plaintiff had repeatedly proved to the Defendant's pharmacy, that the actual name of the pharmacist who had provided pharmacy services, including counseling on September 17, 2010, had been clearly shown on the original information sheets and reflects the Defendant's pharmacist name as **Ms. Darshanie Sankar**. Notwithstanding all requests made by the plaintiff to the Defendant's pharmacy, to correct the problem, the Defendant's pharmacy had failed to do so.

## RECORDS OBTAINED DEFENDANT'S PHARMACY

21.    Subsequently, Defendant's pharmacy had provided a copy of their records and information sheets pertaining to all prescriptions that were filled. However, their records and information sheets in conflict with the plaintiff original records and information sheets and do not match. There are alternation, falsification and misrepresentations reflecting in their records. Defendant's pharmacy records and information sheets reflects among other things that payments for each prescription drugs that were filled and dispensed in 2010 is due or ("RMP Net Due" and "HTR Net Due"), instead of showing being "paid". Furthermore, the Defendant's pharmacy records and information sheets documents provided to the Plaintiff had clearly indicated that 09/22/2010, was the last date prescriptions drugs were filled, and that John Hellyer was the name of the pharmacists who had provided the services to the Plaintiff.

22.    The Defendant's pharmacy records and information sheets had also reflects and shows counseling in writing, to which the Plaintiff had never received from any of Defendant's pharmacists. Notably, details on the Defendant's pharmacy records and information sheets, also indicating and reflecting copyright notice. The copyright notice indicate that CDI, LLC is the copyright owner of all information created on such information sheets.

## N.Y.S. WORKERS' COMPENSATION BOARD LAW PROHIBIT FRAUD

23.    New York State Workers' Compensation Board does not condone fraud. To submit a claim regarding workers' compensation reimbursement for out-of pocket medical expenses, the Plaintiff must state in detail among other things nature of expenses, which must include nature of services furnish; name and address of provider; amount charged, date services was rendered; and provide documentation or receipts in support of the claim.

24.    Workers' Compensation fraud consists of the following elements or acts:

- Knowingly making or causing to be made a false or fraudulent material statement or representation for the benefit of obtaining workers' compensation benefits and/or reimbursements;

- Knowingly representing or causing to be presented a false or fraudulent oral or written material statement in support of, or in opposition to, a claim for workers' compensation benefits, or for any reimbursements;

- Knowingly aiding and abetting or conspiring with another person to commit an act of workers' compensation Fraud;

- Knowingly making or causing to be made a false or fraudulent statement in regard to an entitlement to benefits with the intent to discourage and injured worker from claiming benefits or pursuing a claim.

## POS SYSTEM and PDX/NHIN SYSTEM AT DEFENDANT'S PHARMACY

25.    Based upon information and belief, at all time relevant, the POS System and the PDX/NHIN System are the two software systems used by Defendant's pharmacy to process prescription purchases. The PDX/NHIN application is classified in the industry as a Pharmacy Management System. At its core, the PDX/NHIN system is a database application focused on the transaction of preparing a prescription for dispensing. The PDX System uses numerous databases supplied by other parties to accomplish this task.

26.    Based upon information and belief, the databases that are managed by the PDX/NHIN System include (a) a drug database, (b) a physician database, (c) a patient database, (d) a third party payer database, (e) a drug pricing database, (f) a decision support database, and (g) a patient education leaflet/information sheet databases. With the exception of the patient database which is generated at the Defendant's pharmacy store level when a patient presents a valid prescription to the prescription department, all of the other databases come from an outside source. The patient education leaflet/information sheet focused upon in this case was generated by a Medispan (a Wolters Kluwer Company) created and maintained database and is mostly a "one-size-fits-all" monograph concerning its advisory content it supplies.

27.    Upon information and belief, the PDX/NHIN System allows the end-users to customize the printing of the patient education leaflet/information sheet by adding headers or footers surrounding the education contents. Medispan/Wolter Kluwer may also allow the use of larger fonts when it is desired by the end-user pharmacist for easier patient readability and will allow the insertion into the information sheet/leaflet header the actual drug name being dispensed. Simply put, Defendant's pharmacy able to enter, read, delete, and query data, among other things.

**PATIENTS INFORMATION SHEETS/PATIENTS EDUCATION LEAFLETS**

28.    At all times relevant, in this case, the information sheets/leaflets that were presented to the Plaintiff, shows that Defendant's pharmacy had elected to print header that contains the pharmacy name and address and contact telephone number, the patient's name, address and telephone number on file, the name and date that the drug was dispensed, the full name of the pharmacist as well as initials of that same pharmacist who did the final check on the prescriptions and filled that prescription, third-party payer name/abbreviation, the prescription #, the drug expire date, the NDC #, the doctor name that wrote the prescription, the insurance reference no#, the amount paid, and the days supply/quantity.

29.    All information have been group together on the same patient education leaflet and/or information sheet, to which bears "copyright" notice and indicating "all rights reserved".

30.    It is unknown whether there were any additional participant responsible for the creation, approval, placement, and evaluation of the production of this finished work product. However, PDX/NHIN created the necessary software instructions necessary to complete the transaction of preparing a prescription medication for dispensing.

31.    Additionally, the software selected the patient education leaflet/patient information sheet from the database published by Medispan to match the selected drug as it was typed in by the Defendant's Pharmacy staff. During the printing procedure of the vial label and the patient leaflet information sheet the end-user selected elements that were inserted by Defendant's pharmacy (Kmart Pharmacy) personnel into the Medispan patient education leaflet/information sheets.

32.    Also, it is unknown whether the decision support database also produced by Medispan contain a module that examines all contents of the final leaflet/information sheet, or whether there were direct or indirect agreement(s) to insert such copyright notice to specifically generalized each and every contents on the patient information sheet/patient education leaflet. However, the copyright notice is clearly shown, and indicating that Wolters Kluwer Health, Inc. is the copyright owner, and all rights reserved to all contents, regardless of when it was created.

## WLOTERS KLUWER HEALTH, INC.

33.    Upon information and belief, Wolters Kluwer is a leading multinational publishing and information services company active in many markets, including the sale of health care products. One division, Wolters Kluwer Health, Inc. ("Wolters Kluwer Health") a wholly owned subsidiary of Wolters Kluwer U.S. Corporation, is a primary supplier of information to professionals and students in the fields of medicine, nursing, allied health, and pharmacy, as well as to entities in the pharmaceutical industry. It produces textbooks, reference products, journals, and other informational materials that professionals employ in the knowledge-intensive, rapidly changing practice of medicine.

34.    Upon information and belief, Wolters Kluwer Health, through its wholly owned subsidiary Source Healthcare Analytics, Inc., sells a variety of information products that use "prescriber-identified prescription data", i.e., records that match the details of individual prescriptions to the prescribing professional. To create these information products, Wolters Kluwer Health purchases prescriber-identified data from a pharmacy or other originating entity, then aggregates, analyzes, and packages it for client use.

## CLINICAL DRUG INFORMATION ("CDI") LLC.

35.    Upon information and belief, on or about April 30, 2015, Wolters Kluwer, a leading global provider of information for health care professionals and students, announced the launch of a new website, social media identity, and overall rebrand of its Clinical Drug Information unit positioning it as the single provider of aligned medication decision support solutions from its three industry-leading applications, Lexicomp, Medispan and Facts & Comparison. The Clinical Drug Information mission is designed to support, strengthen, and inform healthcare professionals to help their smart medication decisions become brilliant.

## MEDICAID INSURANCE, RETAIL MAINTENANCE PROGRAM (RMP), ADJUDICATION, THIRD PARTY PAYER(S), and FRAUD

36.    At all relevant times, although Plaintiff had presented his Medicaid card to the Defendant's pharmacists, each and every time his prescription was filled, at no time Medicaid had ever received any claim(s) on the Plaintiff's behalf. In order to understand the way in which Defendant's pharmacy allegedly committed fraud, it is important to understand the process by which prescriptions are dispensed.

37.    Upon information and belief, a patient comes to the Defendant's pharmacy counter with a prescription, the Defendant's pharmacist validates the prescription and submits the prescription claim through Defendant Kmart pharmacy dispensing system (referred to as a "PDX" system). The PDX System enables the entry of patient information, prescriber and prescription information, and insurance or other benefit information. Once the appropriate information is entered, (or verified if the patient is a returning customer), the prescription is submitted for dispensing and adjudication.

38.    At all relevant times, adjudication is the process by which a prescription claim is submitted generally to a third party processor, to check patient eligibility for any insurance benefit, discount card, or other prescription benefit. As part of the adjudication, the processor returns to the Defendant pharmacy the correct pricing for the prescription drug and any patient pay amount (copay or co-insurance). This process of adjudication is unnecessary for cash transactions (i.e. those involving self paying customers that are not using insurance). Specifically, adjudication did not occur in any of Defendant Kmart pharmacy's generic drug programs or Retail Maintenance Program (RMP) because they did not involve insurance.

39.    Upon information and belief, at all relevant times, Defendant had a pharmacy policy that, if a Retail Maintenance Program (RMP) member had a thirty (30) days or sixty (60) days prescription, then Defendant's pharmacist would call the doctor who had prescribed the medicine, and get a new prescription for a ninety (90) days supply, so that the customer could received the Retail Maintenance Program price.

40.    At all times relevant, Plaintiff prescription was process through Defendant's Pharmacy Retail Maintenance Program (RMP) although the Plaintiff had presented his Medicaid card to the Defendant's Pharmacist each and every time the Plaintiff was asked for copayments for each prescription that was filled, and as required by Defendant's Pharmacists. The Plaintiff made all his copayments by paying cash.

41.    Upon information and belief, at all times relevant, in order to participate in the Defendant's Pharmacy Retail Maintenance Program, customers would have to complete an "enrollment process" to actually enrolled in such Retail Maintenance Program. Plaintiff here, did not complete any such "enrollment process" but somehow had found himself involved, directly or indirectly or automatically enrolled into the Defendant's Retail Maintenance Program (RMP).

42.    According to the information sheets that had been provided to Plaintiff, at all times relevant, and on four (4) separate occasion, the Defendant's Pharmacy had processed the Plaintiff prescriptions through their Retail Maintenance Program ("RMP"). Although Defendant's Pharmacy "RMP" have no relations with any "insurance" and have no dealings or involvement with any "adjudication", each of the information sheets provided to the Plaintiff bears separate "Insurance Reference Numbers", and had also indicating that "claim paid" and that, the plaintiff was billed/charged for 90 days supply, instead of a 30 day supply.

43.    According to details on the information sheets to which had been provided to the Plaintiff, and at all times relevant, the date of the most recent entry (September 17, 2010) or on the date the last prescription was filled, the Defendant's Pharmacy had processed the Plaintiff prescription through a third party ("HTR VRI/Vidal & Rodriquez"). The information sheet provided to the Plaintiff bears an "Insurance Reference Number", and some of the third party payer information ("HTR VRI/Vidal & Rodriquez").

44.    According to details on the information sheets to which had been provided to the Plaintiff, and at all times relevant Rx# 6842949, was filled/refilled on three (3) separate times (05/15/2010, 06/14/2010, and 07/16/2010). Details on the information sheets, shows that each time the prescription were filled/refilled, the billing/claim process was been done or completed under Defendant's Retail Maintenance Program ("RMP"), instead of Medicaid.

45.    According to details on the information sheets to which had been provided to the Plaintiff, and at all times relevant Rx# 6845128, was filled once, on (08/16/2010). Details on the information sheets, shows that billing/claim process was been done or completed under Defendant's Retail Maintenance Program ("RMP"), instead of Medicaid.

46.    According to details on the original information sheets to which had been provided to the Plaintiff, and at all times relevant, Rx# 6846142, was filled once, on **09/17/2010**. Details on the information sheets, shows that billing/claim process was been done or completed under under HTR VRI/Vidal & Rodriquez, instead of Medicaid.

## THIRD PARTY PAYERS/BILLING INFORMATION PROVIDED ON NOVEMBER 6, 2018

47.    Defendant's pharmacy records had indicated among other things pertaining to third party payers, and billing information, that, on the **05/15/2010** prescription (Rx#6842949), the total was $15.40; the Carrier: RMP; Group: RMP; Plan Name: **Retail Maintenance Program**; Cardholder ID: **COKEN7777**; Cardholder Information Name on Card: **COKE-NG, BRIAN**; Card Eligible: **Y**; Workers' Comp: **N**. A copy of such document is attached here:

```
11-06-2018 00:58   KMART PHARMACY 7777 2136738845                        PAGE1
Patient: COKE-NG, BRIAN                            Last: 11/06/2018 05/15/2010
                                                   Total #: 2        $:    15.40

Carrier: RMP           Plan:                    Group: RMP
   Plan Name: RETAIL MAINTENANCE PROGRAM
CardholderID: COKEN7777                CanPHN/AltID:
                                       Medicaid ID:
Billing Seq: 2       Effect:            Expires:         Senior Cit:
Patient Elig: Y    Relation: 1 Dependent:      Student:   Pat Sign: 1
   Series:     ADC:    NH:   Clinic:        B/C Home:    Elig Ovr:
   Other Ins:  \ N   Loc:      SB:   Emp:
CMS Facility:      Residence:
Pat NoAssign:
Cardholder Information
   Name on Card: COKE-NG, BRIAN
      COKE-NG                , BRIAN
Card Eligible: Y            Worker's Comp: N
   Effect Date:               Last: 11/06/2018
   Expire Date:               Elig: 05/15/2010
```

48.    At all times relevant, Plaintiff have his Medicaid card. The plaintiff did not give anyone any consent or permission to be enrolled into the Defendant's Retail Maintenance Program (RMP). The plaintiff gave his Medicaid card to the Defendant's Pharmacy each time prescription filled.

49.    Defendant's pharmacy records had indicated among other things pertaining to third party payers, and billing information, that, on 08/16/2010 prescription (Rx#6845128), the total was $15.40; the Carrier: HTR; Plan: VRI; Group: UNA4167; Plan Name: **PLEASE USE HTR-GOODRX**; Cardholder ID: **COKEN7777**; Cardholder Information Name on Card: **COKE-NG, BRIAN**; Card Eligible: Y; Workers' Comp: N. A copy of such document is attached here:

```
11-06-2018 08:56    SMART P-RSP...  ...  2126736045                      PAGE2
Patient: COKE-NG, BRIAN                        Last: 11/06/2018 08/16/2010
                                               Total #: 2        $:      15.40

Carrier: HTR            Plan: VRI           Group: UNA4167
   Plan Name: PLEASE USE HTR-GOODRX
   CardholderID: COKEN7777             CanPHN/AltID:
                                       Medicaid ID:
   Billing Seq: 3      Effect:            Expires:         Senior Cit:
Patient Elig: Y   Relation: 1 Dependent: 01        Student:   Pat Sign: 1
     Series:    ADC:     NH:  Clinic:           B/C Home:   Elig Ovr:
   Other Ins:  N    Loc:      SB:   Emp:
CMS Facility:        Residence:
Pat NoAssign:
Cardholder Information
   Name on Card: COKE-NG, BRIAN
          COKE-NG              , BRIAN
   Card Eligible: Y           Worker's Comp: N
      Effect Date:                  Last: 11/06/2018
      Expire Date:                  Elig: 08/16/2010
```

50.    As shown here, the Defendant's pharmacy did not provide a complete and accurate records of the third party payer(s) and billing information. The plaintiff never ever have a prescription drug card, except his Medicaid card, which was provided to the Defendant's pharmacists each time prescription filled. Third party payer information includes a group number and a subscriber identifier which may be either a numeric or alphanumeric, and the individual's relationship to the cardholder, for example, (cardholder, spouse or dependent). Also, prescription insurance card contain a Bank Identification Number (BIN) number, plan group number, and patient's ID number. Furthermore, the patient's relationship to the cardholder will need to be entered, and many plans use the following relationship holder codes: 01: Cardholder; 02: Spouse; or 03: Dependant. The Defendant's pharmacy records did not show any Medicaid information.

51.     Defendant's pharmacy records had indicated among other things pertaining to third party payers, and billing information, that, on **09/22/2010** prescription (**Rx#6846142**), the total was **$15.40**; the Carrier: Carrier: **RXE**; Plan: 7777; Group: **FDCPPA**; Plan Name: **RX-AMERICAN HEALTHCARE NTWK**; Cardholder ID: 8182807202; Cardholder Information Name on Card: **COKE-NG, BRIAN**; Card Eligible: Y: Workers' Comp: N. A copy of such document is attached here:

```
11-25-2018 09:58    - 19-91 in-mmel -  17 -1 19 -9 -9L        PAGE3
Patient: COKE-NG, BRIAN                        Last: 11/06/2018 09/22/2010
                                               Total #: 2       $:      15.40

Carrier: RXE          Plan: 7777            Group: FDCPPA
     Plan Name: RXE-AMERICAN HEALTHCARE NTWK
     CardholderID: 8182807202               CanPHN/AltID:
                                            Medicaid ID:
Billing Seq: 1        Effect:              Expires:            Senior Cit:
Patient Elig: Y    Relation: 1  Dependent:        Student:    Pat Sign: 1
     Series:     ADC:    NH:   Clinic:            B/C Home:   Elig Ovr:
     Other Ins:  N      Loc:      SB:     Emp:
CMS Facility:          Residence:
Pat NoAssign:
Cardholder Information
     Name on Card: COKE-NG, BRIAN
          COKE-NG                      , BRIAN
Card Eligible: Y                 Worker's Comp: N
     Effect Date:                         Last: 11/06/2018
     Expire Date:                         Elig: 09/22/2010
```

52.     At all times relevant Defendant's pharmacy had filled Plaintiff prescription three (3) times under their Retail Maintenance Program ("RMP") , and on two (2) other occasions, Plaintiff prescription was filled by someone at Defendant's pharmacy under direct and specific instructions in a certain plan had followed, and quote: "PLEASE USE HTR-GOODRX". The Plaintiff has never signed up for GoodRx or anything under any pharmacy discount card and/or coupon. At all times relevant, the Plaintiff has Medicaid as well as Workers' Compensation, and all necessary information that are related to Medicaid and Workers' Compensation was provided to the Defendant's pharmacy.

53.    Based upon information and belief, pharmacy discount cards/prescription drug cards are big business. At pharmacy level, these pharmacy discount card/prescription drug cards are treated just as a prescription insurance is treated, the pharmacy staff input the information off of these pharmacy discount cards/prescription drug cards and the pharmacy staff sent in information to companies, such as HTR-GOODRX, as in this case here, just as if they were Medicaid or Workers' Compensation insurance, and they respond back to the pharmacy how much the discount is, and how much to charge at the register.

54.    Based upon information and belief, the amount of information about you, that need to be sent to these discount cards companies, such as HTR-GOODRX, by the pharmacy, in order to know what your discount is, a pharmacy at a minimum has to sent HTR-GOODRX, **(a)** your name; **(b)** your birth date; **(c)** the name of your doctor; **(d)** the name of the medication; and **(e)** the name of the pharmacy.

55.    So, this company and its third party affiliates now knows who you are, what you take as medication, what disease that you may have, and who your prescriber is, and this data is golden to them because they can re-sell that data, that data is used by companies in order to market to patients and doctor for different products.

56.    Additionally, at all time relevant, Defendant's pharmacy not able to produce a complete and detail results of each claim that they had submitted to the third party payer(s). The Defendant's pharmacy had willfully and deliberately concealed information pertaining to claims submitted to the third party payer(s). No detail results are showing anywhere, whatsoever, that supposed to reflect: **(a)** Date of claim; **(b)** Status of claim; **(c)** Authorization numbers; **(d)** Reference cost; **(e)** Cost paid; **(f)** fee paid; **(g)** Tax; **(h)** Due from; **(i)** Copay; **(j)** Total paid.

## WEST MONROE PARTNERS, LLC PHONE CALLS

57.     As early as October 7, 2010, West Monroe Partners, LLC and their representative(s) started to make contact with Plaintiff by their harassing telephone calls for purposes of survey/research and questioning the Plaintiff's medication and treatments therapy plan, involving the prescription for Sertraline HC and Bupropn HCL 150mg filled at Kmart Pharmacy, and needed to find out how well the Plaintiff has been responding to the Bupropn treatments, whether the Plaintiff had a recent hospital stay, and have asked the Plaintiff to explain any side effect(s) if there was any.

58.     West Monroe Partners, LLC and their Representatives had contacted the Plaintiff with identifiable information, to which including Plaintiff's name, address, telephone number, prescription number, date of birth and the name of Plaintiff's doctor, and had also advised that the Kmart Pharmacy had submitted a claim for third party payments. West Monroe Partners, LLC and their representative did not provided the name of the third party payer(s) that were involved in the prescriptions for Buproph HCL 150mg, and Sertraline HC 50mg that was filled at Defendant Kmart Pharmacy. West Monroe Partners, LLC and their representative had made contact, as if they were doing satisfaction survey for a medication management program. But, the plaintiff did not give any consent to participate in any survey or research.

## HTR/VIDAL & RODRIGUEZ PHONE CALLS

59.     As early as October 26, 2010, Vidal & Rodriguez and their representative had started to make contact with Plaintiff by their harassing telephone calls for purposes of a marketing campaign, advertising and/or promoting pharmaceutical products, and for offers of prescription discounts and/or pharmaceutical discounts. The harassing telephone calls had continued through May 15, 2018.

60.    Vidal & Rodriguez and their representative had advised the Plaintiff, that to join a prescription drug discount program is free, and that no fees attached to any of their pharmacy discount cards, and that the ways that their company make money is to take fees from the discount drug company gave them, and that they have buying power.

### GOODRX PHONE CALLS

61.    As early as March 23, 2011. GoodRx and their representative had started to make contact with Plaintiff by their harassing telephone calls and questioning the Plaintiff about his prescription medications that was filled at Kmart Pharmacy, and for follow-ups to get additional information on Plaintiff and the Plaintiff's treating doctor, and had made offers pertaining to their pharmacy prescription discounts. GoodRx harassing calls had continued through June 26, 2018.

62.    At all time relevant, no permission or consent was given to Defendant's pharmacy or Kmart Pharmacy to use and/or share Plaintiff confidential information, including plaintiff identifiable information in order to get any prescription discounts. The Plaintiff at all times relevant had only provided the Defendant's pharmacy with his Medicaid card.

### PLAINTIFF RELIANCE ON DUTY OF CONFIDENTIALITY

63.    At all times relevant, Plaintiff believe that ethics in healthcare as we know it today generally has its roots in history from the time of Hippocrates, with the keystone being the Hippocratic Oath. This oath served a number of purposes, including binding together healthcare professionals into a cohesive and effective social force with a clearly articulated focus on principles of patient care, privacy and to "do no harm". Also, there is great power in making a promise to serve a greater cause than one's own comfort and well-being. This commitment is the essence of professionalism, and proclaiming that commitment aloud and in public establishes a firmer foundation for accountability than merely being aware of the profession's code of ethics.

64.    At all times relevant, Plaintiff believe that, health data privacy relates not only to expectations about privacy in general but also to norms involving professional practice, privilege, autonomy, paternalism, and protected communication and duty of confidentiality, as well as to requirements for data collection, dissemination and retention.

65.    Pharmacy/pharmacist have duties both to their individual patients and to the health of their communities. At least since the time of the Hippocratic Oath, Societal norms and Common Law have recognized that a healthcare provider duty to patients includes maintaining confidentiality except where protecting the public interest or other individuals may override it.

66.    For example, the World Medical Association's International Code of Ethics makes respecting the right to confidentiality a duty integral to a healthcare provider responsibility to patients. The WMA Declaration of Helsinki-Ethical Principles for Medical Research involving human subjects (revised 2013) places a duty on healthcare providers to protect the life, health, dignity, integrity, right to self-determination, privacy, and confidentiality of personal information of research subjects...even though they may have given consent.

67.    Recognizing that this personal information, whether collected for research or clinical practice, increasingly is held in databases. in 2002, the WMA adopted a Declaration on Ethical Considerations regarding health databases: Confidentiality is at the heart of medical practice and is essential for maintaining trust and integrity in the patient healthcare provider relationship. Knowing that their privacy will be respected, and gives patients the freedom to share sensitive personal information with their healthcare provider(s).

68.    Thus, a key reason for treating health data as requiring special protection is to maintain trust between Defendant's pharmacy and patient in the interest of both social and public order as well as better care for each individual patient. In recognition of this ethical duty, confidentiality is seen worldwide as a health professional's legal duty that protects the professional from giving legal testimony, thereby serving the interests of patient and public by maintaining trust during medical encounters. Nowhere can this private data rightly be passed to a third party without the patient's permission or consent.

69.    For example, in France, the French Criminal Law makes this universal spirit apparent by criminalizing healthcare provider breach of confidentiality even in court testimony, even if the patient would allow it. How people value and respond to concerns about health data privacy is affected by context and common expectations of privacy. Many recognize that healthcare providers need highly personal information in order to care for them, and because of the long-standing history of trust in professional confidentiality. Patients willing share sensitive information with those who treat them.

70.    The Plaintiff believes that, Information that patients provide for their treatment is about very personal and sensitive areas of their lives. Indeed, it relates to their very existence, both physically and symbolically. As such, it is not information that they may be presumed to be prepared to disclose or have used freely. It is their vulnerability, constituted by pain and distress or fears about their health and lives, that leads them to disclose this information to health professionals. At the same time, people are opt to attach great importance to intimate information about themselves and their bodies, and this can be associated with mystical and religious beliefs, which by their very nature can be idiosyncratic.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINIST ALL DEFENDANTS

### Breach Of Fiduciary Duty

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through seventy (70) above.

71.    At all times relevant, Plaintiff was a individual member of the consuming public that purchased pharmaceutical products from the Defendant's pharmacy, Plaintiff, as did the consuming public, had and relied upon his confidential relationship with the Defendant's pharmacy and their employees regarding the purchase of his pharmaceutical products, and as well as keeping the Plaintiff's confidential information accurate, safe and secure and out of the hands of unauthorized person(s). However, Defendant's pharmacy violated that trust and that duty, when it shared Plaintiff prescription information and confidential information with third parties without prior notice or permission or consent from Plaintiff. Between 2010 and 2018, there were at least three (3) separate companies that made telephone contact with Plaintiff with their annoying or harassing survey/research and marketing campaign, all of which, as a result of Defendant's improper conduct.

72.    On November 6, 2018, Defendant's pharmacy had created three (3) documents to which detail and reflect among other things, that, Plaintiff name was created on a Prescription Drug card, or insurance card, and the name(s) of third party payers and billing information. Also, these recent documents, directly in conflict with the actual payments amounts, and/or copayments that were previously paid, and have now developed further issues, if did not already, pertaining to Plaintiff's reimbursements for out-of-pocket expenses for prescription/medication under the New York State Workers' Compensation Law.

73.    At all times relevant, no permission or consent was ever given to Defendant's pharmacy to use and/or share Plaintiff confidential information, including Plaintiff identifiable information in order to get any prescription discounts. The Plaintiff at all times relevant had only provided the Defendant's pharmacy with his Medicaid card and had also informed that there was a pending worker's compensation case. Therefore any other information in the Defendant's pharmacy records pertaining to any other third party payer, other than Medicaid, are for purposes of their fraudulent conduct. According to Defendant's pharmacy records/reports that was created on November 6, 2018, all prescription medications costs $15.40. Such total costs is false. Additionally, the Plaintiff's Medicaid ID information is not shown on such document, and only an "N" has been placed beside workers' comp.

74.    As a result of Defendant's pharmacy improper conduct, West Monroe Partners, LLC and their representative(s) started to make contact with Plaintiff by their harassing telephone calls for purposes of survey/research and questioning the Plaintiff's medication and treatments therapy plan, involving the prescription for Sertraline HC and Bupropn HCL 150mg filled at Kmart Pharmacy, and needed to find out how well the Plaintiff has been responding to the Bupropn treatments, whether the Plaintiff had a recent hospital stay, and have asked the Plaintiff to explain any side effect(s) if there was any. West Monroe Partners, LLC and their Representatives had contacted the Plaintiff with identifiable information, to which including Plaintiff's name, address, telephone number, prescription number, date of birth and the name of Plaintiff's doctor, and had also advised that the Kmart Pharmacy had submitted a claims for third party payments, and that Plaintiff was selected to participate in a survey/research program. Defendant's pharmacy and each of them, had failed to safe keep, safeguard and protect Plaintiff confidentiality, confidential information.

75.    As the direct and proximate result of Defendant's pharmacy conduct, there is a complete breach of trust. Defendant's pharmacy violated their duty to maintained trusted and confidentiality by fraudulently used the Plaintiff name and other information to process and/or create third party dealings that do not represents truthfulness, and had also made input into their business records which were not provided to them by the Plaintiff. None of Defendant's pharmacy fraudulent conduct represents Plaintiff interests in any way shape or form.

76.    At all times relevant, the Defendant's pharmacy have not took careful steps to preserve Plaintiff anonymity. For instance, the entire health care system depends on patients trusting that their information will be kept confidential. But a growing number of companies specialize in gathering longitudinal information from hundreds of millions of hospitals, doctor's records, and pharmacy as well as from prescription and insurance claims, pharmacy/prescription discount cards, and laboratory tests, etc. Pooling all these data turns them into a valuable commodity. Other business are willing to pay for the insights that they can glean from such collections to guide their investments in the pharmaceutical industry, for example, or more precisely tailor an advertising campaign promoting a new drug. However, by law, the identities of everyone found in these commercial data bases are supposed to be kept secret.

77.    Defendant's pharmacy did not took careful steps to safeguard, protect and preserve Plaintiff confidential information. Based on information and belief, the POS system and PDX/NHIN system are the two software systems used by Defendant's pharmacy to process prescription purchases. The PDX/NHIN application is classified in the industry as a pharmacy management system. At its core, the PDX/NHIN system is a database application focused on the transaction of preparing a prescription for dispensing. The PDX/NHIN system uses numerous databases supplied by other parties to accomplish this task.

78.    Once upon a time, simply removing a person's name, address and social security number from a medical record may well have protected anonymity, not so today. Straightforward data-mining tools can easily rummage through multiple databases containing anonymized and nonanonymized data to re-identify the individuals from their ostensibly private medical records. Indeed, computer scientists have repeatedly shown how easy it can be to crack seemingly anonymous data sets. For example, Harvard University professor Latanya Sweeney used such methods when she was a graduate student at the Massachusetts Institute of Technology in 1997 to identify then Massachusetts governor William Weld in publicly available hospital records. All she had to do was compare the supposedly anonymous hospital data about state employees to voter registration rolls for the city of Cambridge, where she knew the governor lived. Soon she was able to zero in on certain records based on age and gender that could have only belonged to Weld and that detailed a recent visit he made to a hospital including his diagnosis and the prescriptions he took home with him.

79.    It is getting easier and easier to identify people from anonymized data. In fact, you may not be identifiable from a particular data set that an entity has collected, but if you are a broker that is assembling a number of sets and looking for ways to link those data, that's where, potentially, the risk becomes greater for identification. In fact, the Defendant's pharmacy, had experience many data breaches between January 2013 and November 2018, but fail to safeguard.

80.    As a result of Defendant's pharmacy improper conduct, Vidal & Rodriguez and their representative had started to make contact with Plaintiff by their harassing telephone calls for purposes of a marketing campaign, advertising and/or promoting pharmaceutical products, and for offers of prescription discounts and/or pharmaceutical discounts. The harassing telephone calls had continued through May 15, 2018.

81.     As early as March 23, 2011, GoodRx and their representative had started to make contact with Plaintiff by their harassing telephone calls and questioning the Plaintiff about his prescription medications that was filled at Kmart Pharmacy, and for follow-ups to get additional information on Plaintiff and the Plaintiff's treating doctor, and had made offers pertaining to their pharmacy prescription discounts. GoodRx harassing calls had continued through June 26, 2018.

## AS FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Violation(s) Of Section 349 Of The New York General Business Law

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through eighty one (81) above.

82.     At all times relevant, Plaintiff was individual member of the consuming public to whom the Defendant directed its services and marketing and sales practices.

83.     New York General Business Law ("GBL") §349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.

84.     On January 13, 2015, after the Plaintiff left a hearing at the New York State Workers' Compensation Board, and after learning that he will need to obtain a detail report of all his out-of-pocket expenses at the Kmart Pharmacy pertaining to all prescription drugs purchased as result of his injury related case, the Plaintiff on that very same day (January 13, 2015) made a visit to the Defendant's pharmacy and requested the services of Defendant Kmart Pharmacy to provide a detail report pertaining to Plaintiff "medical expenses", and any or all third party payer information and billing information concerning the plaintiff prescription purchased.

85.    On January 13, 2015, the Defendant's pharmacy/pharmacist created a "medical expenses" document with various misrepresentation, and falsification and misleading information and further attested to such document. The Plaintiff did raised a dispute about those things, and was advised by the Defendant's pharmacist to put the dispute in writing. On January 13, 2015, and January 14, 2015, the Plaintiff put the dispute in writing and provided it to the Defendant's pharmacy by hand delivery and by mail, respectively.

86.    The Defendant's pharmacy had created and provided a "medical expenses" document that shows last prescription filled date: 09/22/2010; that shows a Defendant's pharmacist who they claimed had provided services to Plaintiff was "JEH" (John Hellyer). Plaintiff raised disputes, because plaintiff did not visit Defendant's pharmacy on 09/22/2010, the Plaintiff visited the Defendant's pharmacy on 09/17/2010, and Mr. John Hellyer did not provide  the Plaintiff with any Kmart Pharmacy services on 09/22/2010 as their medical expenses document had indicated. The Plaintiff has clearly advised orally and written that, Ms. Darshanie Sankar was the name of the Kmart pharmacist who had provided the Kmart services to Plaintiff on 09/17/2010, and requested correction of the falsification and misrepresentation.

87.    The defendant's improper conduct has developed in an effort to evade liability, as a result of an incident that had occurred in July, 2010, to which, Ms. Darshanie Sankar was directly provided, by hand delivery, with a copy of a complaint/notice of claim on 09/17/2010, and to which the Plaintiff was advised, by Ms. Darshanie Sankar that a claim would be filed on the Plaintiff behalf, and that, Plaintiff has no need to do anything else with respect to the claim, as everything would be taken care of her.

88.    The Defendant's pharmacy in an effort to evade liability,  had altered the medical records and had created and provided a "medical expenses document" to which clearly shows their actions of willful deliberate alteration to the date of services to which the last prescription was filled, and further shows alteration and/or change in name of the Kmart Pharmacist who had provided Kmart Pharmacy services to the Plaintiff on the date the last prescription was filled.

89.    On March 24, 2017, the Plaintiff made another visit to Defendant's pharmacy, and again had requested the services of Defendant's Kmart pharmacy to provide a detail report pertaining to all Plaintiff "medical expenses" and any or all third party information and billing information concerning the Plaintiff prescription purchased, as it is needed for his workers' compensation reimbursement claim, and as the first one reflecting various falsification and misrepresentation, and cannot be submitted to the workers' compensation insurance carrier.

90.    The Defendant's pharmacy on March 24, 2017, then created and provided a similar medical expenses document, just like the first one that was created and provided to the Plaintiff on January 13, 2015, except that, medical expenses document of March 24, 2017 has reflect and shows a change of the Plaintiff address by someone. Upon expressing concerns, the Plaintiff was advised by the Defendant's pharmacist that she has no idea who changed the Plaintiff address.

91.    The medical expenses document dated March 24, 2017 was also attested to by the Defendant's pharmacist and bearing her signature. Again, the Defendant's pharmacy/pharmacist was advised that the "medical expenses" document dated March 24, 2017 has not shown any correction, and remain with falsification and misrepresentation. Plaintiff was then advised by the Kmart pharmacist, that the falsification and misrepresentation cannot be fixed at that location, but, that the Plaintiff's request will be forwarded to the Defendant's pharmacy corporate office.

92.    On June 15, 2018, the Plaintiff made another visit to the Defendant's pharmacy and again requested the services of the Defendant's Kmart pharmacy to provide a detail report pertaining to all Plaintiff "medical expenses" and any or all third party payer information and billing information concerning the Plaintiff prescription purchased, as it is needed for his workers' compensation reimbursement claim, as the previous ones reflect various falsification and misrepresentation and cannot be submit to the workers' compensation insurance carrier.

93.    The Defendant's pharmacy on June 15, 2018, then created and provided a similar "medical expenses" document, just as the previous two (2) that was created and provided to the Plaintiff on January 13, 2015, and March 24, 2017. However, the Defendant's pharmacist had advised that he will not sign or attest to the medical expenses document of June 15, 2018. Again, the Defendant's pharmacist was advised that, the medical expenses document dated June 15, 2018, is not showing any correction, and remains with falsification and misrepresentations. See copy of the medical expenses document dated: June 15, 2018, is attached here:



94.    On November 6, 2018, the Defendant's pharmacy sent a three (3) page document by faxed to the Plaintiff which essentially reflects third party payer(s) information and billing information concerning the Plaintiff's prescription purchases. Details of these latest documents provided to the Plaintiff on November 6, 2018, shows total of **$15.40** for prescriptions that was filled at Defendant's pharmacy. There were a total of three (3) separate fills for prescription **#6842949**, the dates were 05/15/2010; 06/14/2010; and 07/16/2010, respectively. Additionally, details of the latest documents provided to the Plaintiff on November 6, 2018, shows a total of **$15.40** to which represents for prescriptions dated 08/16/2010. Only one (1) prescription was filled on 08/16/2010, (prescription number **6845128**). Also, detail of the latest document provided to the Plaintiff on November 6, 2018, shows a total of **$15.40** to which represents for prescription dated 09/17/2010, (prescription number **6846142**).

95.    Defendant's pharmacy have not been able to produce or provide a complete and detail results of each claims that they had submitted to the third party payer(s) as suppose to be noted on the records they had provided pertaining to the prescriptions, no detail results  are showing anywhere, whatsoever, that suppose to reflect, properly and accurately: **(a)** Date of claim; **(b)** Status of claim: **(c)** Authorization numbers: **(d)** Reference cost: **(e)** Cost paid; **(f)** Fee paid; **(g)** Tax; **(h)** Due from; **(i)** Copay; and **(j)** Total paid.  Also, third-party information must include: group number and subscriber identifier and individual relationship to the card holder.

96.    On 05/15/2010, the Plaintiff made copayments totaling $15.00 as demanded by Defendant's pharmacy. On 06/14/2010, the Plaintiff made copayment totaling $15.00 as demanded by Defendant's pharmacy. On 07/16/2010, the Plaintiff made copayments totaling $15.00 as demanded by Defendant's pharmacy. On 08/16/2010, the Plaintiff made copayments totaling $15.00 as demanded by Defendant's pharmacy.

97.    On 09/17/2010, the Plaintiff made copayments totaling $33.63 as demanded by Defendant's pharmacy. Therefore, it is clearly deceptive and misleading business practices by Defendant's pharmacy to create and provide documents on November 6, 2018, stating, showing or indicating different transactions from the original records, and made such misrepresentations.

98.    Defendant's pharmacy and their deceptive practices has not only now came about in 2018. It's an ongoing practice. For example, all times relevant, on multiple occasions, Defendant's pharmacy had charged Plaintiff for 90 days supply, instead of 30 days supply. Notably, none of the Plaintiff's doctor(s) wrote any prescription for plaintiff to last for 90 days period. Every prescription wrote by the doctors were for only 30 days supply each time. At all time relevant, Defendant's pharmacy has a Retail Maintenance Program, to which organized to charge only $5, $10, $15 for 30 days, 60 days, and 90 days, respectively. That is also for customers who paying by cash, and has no insurance. But the Plaintiff here, had Medicaid insurance during the time, and although Plaintiff gave Defendant's pharmacy his Medicaid card each time prescriptions was filled, the Defendant's pharmacy had failed to enter the Medicaid card information in their system for processing. In fact, Medicaid in a written report dated April 21, 2015, to the Plaintiff, had indicated that, they have never received any claim(s) for any prescription drugs on the Plaintiff behalf.

## BROADER IMPACT ON CONSUMERS AND CUSTOMERS

99.    Defendant's pharmacy has repeatedly and persistently engaged in material deceptive or misleading consumer-related business practices and services, i.e. alterations, falsification and misrepresentation of consumers, customers, and purchasers medication profile and medical records in an effort to liability in any event to which a complaint or claim is served or may filed against the Defendant's pharmacy.

100.    Defendant's pharmacy deceptive practices have a broader impact on consumer at large. Defendant's pharmacy conduct at issue potentially affect[s] similarly situation consumers. Other customers and consumers have their prescription/records and medical records including medical expenses records, and the same acts against Plaintiff could potentially affect similarly situated customers and consumers, should any make a complaint or filed a claim against the Defendant's pharmacy. For example, each time customers, consumers and purchasers purchase prescription drugs at Defendant's pharmacy, by law, the Defendant's pharmacy must create/establish a medication profile and medical records which suppose to be properly and accurately maintained. The Defendant's pharmacy, cannot and should not be allowed to feel free to access and make any alteration(s) and falsification to any customer(s), consumer(s) or purchaser(s) medical records or medication profile, in an effort to evade liability or potential liability or as a complaint or claim is filed against the Defendant's pharmacy. That is wrong.

101.    GBL § 349 (h) provides in relevant part that: "... any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice [or] an action to recover his actual damages ... "

102.    Defendant's pharmacy violation of GBL § 349 has caused Plaintiff to suffer injury, including, inter alia, (a) As a result of Defendant's pharmacy violation of GBL § 349, by means of deceptive, falsification, alterations and misrepresentations/fraud in Plaintiff medical records and medical expenses records, Plaintiff cannot with good faith submit his claim to the workers' compensation insurance carrier for reimbursements pertaining to out-of-pocket medical expenses/prescription medicine costs $93.63.

103.    Defendant's pharmacy violation of GBL § 349 has caused Plaintiff to suffer injury, including, inter alia, **(b)** As a result of Defendant's pharmacy violation of GBL § 349, Plaintiff seeks an order so to prohibit and enjoin Defendant's pharmacy from the various alterations, falsification and misrepresentations in medical documents, including the plaintiff's electronic health records/electronic medical records, medication profile, medical expenses, third party payer information, billing information, claims handling and all improper conduct which had also caused it's third party claims administrator ("Sedgwick CMS") to denied a claim involving an exposure to toxic substances, pain and sufferings.

104.    Defendant's pharmacy willfully and knowingly engaged in the conduct alleged herein. Defendant's pharmacy actions made it even impossible for Plaintiff to submit a claim the worker's compensation insurance carrier for reimbursements of out-of pocket expenses for prescription drugs. Defendant's pharmacy acted immorally and unconscionably. Defendant's pharmacy has unclean hands.

105.    Plaintiff is entitled to all applicable damages, including treble, damages, injunctive relief, and attorney fees, if any, pursuant to New York GBL § 349 (h).

## AS FOR A THIRD CAUSE OF ACTION AGAINIST ALL DEFENDANTS

### Intentional Misrepresentation/Fraud/Constructive Fraud

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through one hundred and five (105) above.

106.    On January 13, 2015, Plaintiff made a visit to the Defendant's pharmacy and requested the services of Defendant's pharmacy to provide a detail report pertaining to Plaintiff medical expenses and all third party payer(s) information and billing information concerning the Plaintiff prescription drug purchased. Defendant's pharmacy/pharmacist created and provided a medical expenses document with various misrepresentation and falsification, and had further attested to such medical expenses document. The Plaintiff raised a dispute about such things.

107.    Upon receipt of such medical expenses document, the Plaintiff had specifically advised the Defendant's pharmacist (Ms. Yelena Goldenberg) that such medical expenses document is improper to submit to the workers' compensation insurance carrier. Plaintiff further had advised the Defendant's pharmacy that he did not visit the Defendant's pharmacy on 09/22/2010; and that John Hellyer did not provided him with any Kmart Pharmacy services on 09/22/2010; and that, such misrepresentations, with such false and misleading information intended to possibly and potentially hurt and/or affect the claim that was submitted to Kmart pharmacy on September 17, 2010, during which time, the Plaintiff had personally hand delivered a copy of his written complaint/claim dated July 23, 2010 to Ms. Darshanie Sankar (the Kmart pharmacist) who had took it and made notation/journal notes about the Plaintiff complaint/claim in a computer and further had advised that Plaintiff need not take any further action to file another claim, and that she (" will handle this, everything").

108.    The Plaintiff further had advised, and also requested that the Defendant's pharmacy to take necessary steps as soon as possible to correct their misrepresentation and falsification and warned of possible legal action in Court in the event there were no proper steps taken by the Defendant's pharmacy. Plaintiff verbal warnings was followed by a letter to the Defendant's pharmacy dated January 13, 2015, and January 14, 2015. respectively.

109.    On March 24, 2017, the Plaintiff made another visit to the Defendant's pharmacy and again had requested the services Defendant's pharmacy to provide a detail report pertaining to all plaintiff medical expenses and all third party payer(s) information and billing information concerning the Plaintiff prescription purchased, and has specifically advised that the document was needed for workers' compensation reimbursements claims, and had also advised that the first medical expenses document was reflecting various falsifications and misrepresentation.

110.    The medical expenses document that was created and provided to Plaintiff on March 24, 2017, is similar to the one that was created on January 13, 2015, except that it is showing a changed of the Plaintiff address. Upon inquiry, the Plaintiff was advised by the Defendant's pharmacist that she has no idea who made changes to the Plaintiff address. The medical expenses document dated March 24, 2017, was also attest to by the Defendant's pharmacist (Ms. Jessica Hom). Again, the Defendant's pharmacy/pharmacist was advised that, the medical expenses document dated March 24, 2017, has not been corrected and remaining with falsification and misrepresentation. The Plaintiff was then advised by the Defendant's pharmacy, that if there was falsification and misrepresentation, it cannot be fixed at that location but the Plaintiff's request will be forwarded to the Defendant's pharmacy corporate office. Subsequently, the Plaintiff received medical records and information sheets, to which clearly in conflict with previous records.

111.    Notwithstanding the Plaintiff stern and firm written and verbal warnings to Defendant's pharmacy on January 13, 2015 and January 14, 2015,  respectively, of possible Court action, the Defendant's pharmacy went on to furtherance willfully, and deliberately created additional misrepresentations, false and misleading information on each information sheets. All of which, clearly do not match the prior medical records.

112.    Defendant's pharmacy knew such arguments, statements, documentation and representations to be false, and knew that it was to be used to deceive the Court if the matter went to Court. And also knew it could potentially construed aiding and abetting fraud if Plaintiff was to submit those documents to the workers' compensation insurance carrier for reimbursements. Additionally, the Defendant's pharmacy willfully and deliberately created documents containing falsification and misrepresentation in an effort to evade certain liability.

113.    For example #1, each time that the Defendant's pharmacy sold Plaintiff prescription drugs, the Defendant's pharmacy provided Plaintiff with an information sheet which essentially a written counseling that informed the Plaintiff of the risk of the drugs. Such information sheet was provided to the Plaintiff on May 15, 2010, June 14, 2010, July 16, 2010, August 16, 2010, and September 17, 2010. Currently, the Defendant's pharmacy records are reflecting alterations, and several changes pertaining to counseling on every information sheets, to which, clearly do not match the previous records. In fact, the Plaintiff had never received any counseling, written or oral as the Defendant's pharmacy records had now described and showing.

114.    Defendant's pharmacy knew such arguments, statements, documentations and representations to be false and knew that it was to be used to deceive the Court if the matter went to Court, and that the Plaintiff would be relying on the documents requested to support his claim for workers' compensation reimbursements. The Defendant's pharmacy had "exclusive knowledge" and actual knowledge of the fraudulent representations and further knew that it has no place here or there. Defendant's pharmacy has unclean hands. Upon information and belief, the PDX/NHIN System allows the end-users to customize the printing of the patient education leaflet/information sheet by adding headers or footers surrounding the education contents. Defendant's pharmacy able to enter, read, delete, and query data, among other things.

115.    For **example # 2**, on November 6, 2018, the Defendant's pharmacy had provided Plaintiff with a copy of their records reflecting third party payer(s) and billing information to which involved all Plaintiff prescription drugs that has been filled. The Defendant's pharmacy records shows, that a prescription drug benefit cards was created in the Plaintiff name, that also bears cardholder ID and other information. But the Plaintiff has never created such cards. The Plaintiff had only given his Medicaid card and information to the Defendant's pharmacy. However, Medicaid in its report had advised that they did not receive any claim from Defendant's pharmacy. Based upon information and belief, the Defendant's pharmacy had created those benefit cards without the Plaintiffs express or written consent or permission.

116.    As a result of Defendant's pharmacy improper conduct, there is a complete breach of duty, trust, and confidentiality. Defendant's pharmacy acts are deceitful and fraudulent, and with the proximate causation solely for their own interests and unjust enrichment, at the expense of the Plaintiff. Defendant's pharmacy continued to gain advantage, and for purposes to deceive this Court, and to impede the Plaintiff workers' compensation reimbursements claim for out-of-pocket medication expenses involving prescription drugs dispensed by Defendant's pharmacy.

117.    For **example #3**, on September 17, 2010, the Plaintiff had personally hand delivered a copy of his written complaint/claim dated July 23, 2010 to the Defendant's pharmacist (Ms. Darshanie Sankar). Ms. Sankar took the Plaintiff complaint and assured the Plaintiff after she made an entry notation/journal notes in a computer of the Plaintiff complaint/claim, and that the Plaintiff need not take any further action to file any further claim, and that she "will handle this, everything". Defendant's pharmacy then had created and provided a medical expenses document, showing the Plaintiff visit to their pharmacy was September 22, 2010, and then made alterations to specifically reflect another pharmacist (John Hellyer) instead.

118.    Ultimately, Sedgwick CMS, a third party claims administrator for the Defendant's pharmacy, made contact with Plaintiff and advised that there are no records of any complaint or claim, served or filed with the Defendant's Kmart Pharmacy.

## AS FOR A FOURTH CAUSE OF ACTION AGAINIST ALL DEFENDANTS

### Intentional Infliction Of Emotional Distress

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through one hundred and eighteen (118) above.

119.    At all times relevant, no permission or consent was given to the Defendant's pharmacy to use and/or share the Plaintiff confidential information, including Plaintiff identifiable information in order to get any prescription drugs discounts. The Plaintiff at all times relevant had only provided the Defendant's pharmacy with his Medicaid card, and had also informed Defendant's pharmacy that there was a pending workers' compensation case during the time, therefore any other information in the Defendant's pharmacy records pertaining to any other third party payer(s) are for purposes of Defendant's pharmacy fraud.

120.    As a result of Defendant's pharmacy improper conduct, representative from West Monroe Partners, LLC, HTR/Vidal & Rodriguez, and GoodRx had made telephone calls to the Plaintiff. The Plaintiff has never entered into any business relations with any of these companies. However, these company has access to the Plaintiff identifiable information and confidential information as they made harassing and annoying telephone calls to the Plaintiff and asking questions about personal and private medical interests involving the Plaintiff prescription drugs purchased at the Defendant's pharmacy. Notably, those same annoying and harassing telephone phone calls had continued through June 26, 2018.

121.    As a result of Defendant's pharmacy improper conduct. the Plaintiff has started to have fears and had become insecure about prescriptions filling, health records information and confidentiality, and fearful to see his doctors for follow-up visits and fearful of getting prescriptions because of pharmacy sharing his identifiable and confidential information without permission or consent. As a result of Defendant's pharmacy improper conduct, the Plaintiff has changed, and therefore withholding information from his medical providers so to protect his health information privacy. Plaintiff has turned into a hermit as a result of these fears and have been taking alternative medicines and over-the-counter drugs to avoid usual prescription fillings.

122.    At all times relevant, Plaintiff has a pre-existing conditions including depression, hypertension, asthma, involuntary limb movements, emotional distress, and have been on ongoing medical care and treatments. On June 15. 2018, after the Defendant's pharmacy provided the Plaintiff with the last "medical expenses document" which is needed to submit a claim for reimbursements, pertaining to his out-of-pocket medical expenses, and the Defendant's pharmacy failed to correct their falsification and misrepresentation, the Plaintiff thereafter got upset as a result of the Defendant's pharmacy conduct. The Plaintiff is fed up by Defendant's pharmacy conduct, have nausea and vomited and had experience psychogenic issues and have not been able to sleep properly as a result.

123.    On November 6. 2018. the Defendant's pharmacy ultimately had provided the records to which reflects the third party payer(s) information and billing information pertaining to the Plaintiff prescription purchased. As a result of such documents, and the shocking contents it contain. reflecting the Defendant's pharmacy fraudulent conduct to which the Plaintiff have never gave any permission or consent, the Plaintiff had developed further emotional distress, depression psychogenic vomiting and involuntary limb movements.

124.   As a result of the Defendant's pharmacy improper conduct on June 15, 2018, and November 6, 2018, respectively, the Plaintiff depression, emotional distress and involuntary limb movements has been aggravated and exacerbated.

125.   Defendant's pharmacy knowing that Plaintiff was psychologically and financially vulnerable, and solely for their own personal gain and profit intentionally inflicted egregious emotional trauma and mental trauma upon Plaintiff.

126.   As a result of Defendant's pharmacy actions, Plaintiff suffered extreme emotional trauma and/or mental trauma.

WHEREFORE, Plaintiff prays and respectfully request judgment against Kmart Corporation, Kmart Holding Corporation and Sears Holdings Corporation and awarding as follows:

(a)   On the First through Fourth cause of action, including Breach of Fiduciary Duty; Violation of New York General Business Law § 349, International Misrepresentation/Fraud and/or Constructive Fraud; Intentional Infliction of Emotional Distress, damages in an amount to be determined at trial but in no event less than the insured policy limits;

(b)   Punitive damages in an amount to be determined at trial;

(c)   Attorneys' fees, if any, and costs pursuant to New York GBL § 349(h)

(d)   An injunction restraining Defendant's pharmacy (Kmart Pharmacy) from concealment of documents, alterations, and falsifying medical records information pertaining to a complaint/claim that was submitted to Kmart pharmacist (Ms. Darshine Sankar);

(e)   On all cause of action, prejudgment interest, post judgment interest, attorneys' fee, if any;

(f)   Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 13, 2018

## VERIFICATION

STATE OF NEW YORK          )

                          ) ss.:

COUNTY OF NEW YORK    )


Brian Coke Ng, being duly sworn, deposes and says:

I am the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the

content(s) thereof. The same are true to my knowledge, except as to matters therein stated to be

alleged on the information and belief and as to those matters I believe them to be true.


Dated: New York, New York
       November 13, 2018

_____
BRIAN COKE NG
40 Ann Street
New York, N.Y. 10038
Tel: 646.820.9238

**MAILING ADDRESS:**
Church Street Station
P.O. Box 2723
New York, N.Y. 10008

_____
BRIAN COKE NG

Sworn to before me 13 of November 2018

_____
NOTARY PUBLIC

Kenneth Gardez
Notary Public, State of New York
Reg No. 04CA6351839
Qualified in New York County
Commission Expires December 12, 20___

# EXHIBIT 3

EH
9/21/18
F

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: __HON. DAVID B. COHEN__
                              J.S.C.
                                    *Justice*

PART 58

NG, BRIAN COKE

INDEX NO. _____

100386-18

-v-

K MART Pharmacy

MOTION DATE _____
MOTION SEQ. NO. __4__

The following papers, numbered 1 to _____ , were read on this motion to/for ____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ ‖ No(s). _____
Answering Affidavits — Exhibits _____ ‖ No(s). _____
Replying Affidavits _____ ‖ No(s). _____

Upon the foregoing papers, it is ordered that this motion is DECLINED TO SIGN FOR REASON STATED ON THE RECORD. RECORDS HAVE BEEN PROVIDED, PLAINTIFF'S CLAIM THAT THEY HAVE BEEN ALTERED IS, AT BEST, AN ISSUE FOR THE TRIER OF FACT. ALSO, MOTION FOR CONTEMPT IS NOT IN PROPER FORM.

CONFERENCE IS ADJOURNED TO 12-19-2018 @ 9:30 AM PENDING PLAINTIFF'S MOTION TO AMEND THE CAPTION.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

RECEIVED
SEP 21 2018
NYS SUPREME COURT · CIVIL
CENTRAL CLERK'S OFFICE

FILED
SEP 21 2018
COUNTY CLERK'S OFFICE
NEW YORK

Dated: 9-20-2018

_____ , J.S.C.
HON. DAVID B. COHEN
                              J.S.C.

1. CHECK ONE: ....................................... ☐ CASE DISPOSED          ☒ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ...................MOTION IS: ☐ GRANTED  ☒ DENIED  ☐ GRANTED IN PART  ☐ OTHER
3. CHECK IF APPROPRIATE: ................................. ☐ SETTLE ORDER          ☐ SUBMIT ORDER
                                                                              ☐ DO NOT POST    ☐ FIDUCIARY APPOINTMENT    ☐ REFERENCE

# EXHIBIT   4

Mr. Coke,

Hope all is well. I was out of the office due to the holiday. We have spoken with the custodian of records for Kmart Pharmacy and have been advised that you have been previously provided the documents sought in the Subpoena Duces Tecum from the pharmacist at the Kmart location multiple times in the past. Therefore, the subpoena request has been complied with.

Additionally, as there is a pending motion to amend the Complaint to add additional parties and additional new claims against my client, we suggest amicably working out any issues at the upcoming Preliminary Conference scheduled for September 20, 2018. Lastly, as previously stated our client is open to alternative dispute resolution, however we have yet to receive a proper numerical settlement demand from you. Please provide a numerical settlement demand after which we will be in a position to discuss same with our client and engage in settlement discussions with you.

Best,
Harshal

**Harshal Y. Jani, ESQ.**
SOBEL PEVZNER, LLC.
Attorneys at Law
30 Vesey Street, 8th Floor
New York, New York 10007
P. 212.216.0020
F. 646.688.3646
HJani@sobelpevzner.com

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN COKE NG,

      Plaintiff,

  -against-

KMART PHARMACY et al,

      Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/6/18

18-CV-9373 (AJN) (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

    The Court has received and reviewed the Notice of Bankruptcy Filing and Imposition of Automatic Stay dated November 6, 2018 (Dkt. No. 5), indicating that this action has been automatically stayed as against defendants Kmart Pharmacy, Kmart Holding Corporation, and Sears Holding Corporation pursuant to § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

    Defendants are hereby ORDERED to notify the Court within 30 days of any action or order of the Bankruptcy Court that would affect the automatic stay.

    The Clerk of Court is respectfully directed to mail a copy of this order to the plaintiff.

Dated: New York, New York
      November 6, 2018

SO ORDERED.

BARBARA MOSES
United States Magistrate Judge

# EXHIBIT 6

**Subject:**                         FW: Brian Coke Ng v. Kmart Pharmacy et. al Index No. 100386/2018

**From:** Brian AC Ng ·_____>
**Sent:** Wednesday, September 12, 2018 3:08 PM
**To:** Harshal Y. Jani <hjani@sobelpevzner.com>
**Subject:** Re: Brian Coke Ng v. Kmart Pharmacy et. al Index No. 100386/2018

Mr. Jani,

With all due respect, and as you should know, the Judicial Subpoena Duces Tecum dated June 29, 2018 has not been complied with one way or the other. Whether it's you or the custodian of records for Kmart Pharmacy making such statements that "the documents sought in the Subpoena Duces Tecum" "have been previously provided" by "pharmacist at the Kmart location multiple times in the past." is careless, reckless, dangerous and a complete disregard of the Court issued Ordered Judicial Subpoena Duces Tecum. That's very disrespectful, and you should know better.

You had served an unsworn response to the Notice to Admit, which presented to you the documents from Kmart Pharmacy, which included the altered and falsified medication profile/records that was created on January 13, 2015, and the Kmart Notice of Privacy Practices with effective date September 2, 2014. No one admit to anything.

To be clear, The Court Ordered Judicial Subpoena Duces Tecum dated June 29, 2018, stated that the certified copy of every part of the medication profile/records with the accompanying certification of business records sworn and signed to must be forwarded to the New York County Supreme Court Subpoenaed Records Room 60 Centre Street, Room 145-M, New York, New York 10007. The Kmart Custodian, if any, was careless and reckless and you should have known better not to tell me the things Kmart Custodian had advised your law firm.

With respect to reaching a mutual settlement of all matters and put everything to rest, I previously requested to let us stipulate and invite the Supreme Court office of alternative dispute resolution (ADR) to help us reach a reasonable settlement resolution, that means we would hold off on any and all proceedings or any activities currently pending before the Court in the lawsuit until the end of the ADR. I do not agree for us to first meet with the judge in an initial conference. Certainly, that is not wise to use up Court room time, and the judge very important time, and court room reporters time, and court resources to discuss settlement.

You have insisted that I provide a numerical settlement demand. As we do not engage the ADR yet to help us determine the value of this case, I would like to set forth for a consideration of settlement, and I respectfully says $3.8 million dollars. If this is not acceptable or if you have another offer for settlement please provide such counter offer for consideration as I am still open to a reasonable settlement and alternative dispute resolution. Thank you.

Best Regards,
Brian Coke Ng

On Sep 12, 2018, at 9:43 AM, Harshal Y. Jani <hjani@sobelpevzner.com> wrote:

Mr. Coke,

Hope all is well. I was out of the office due to the holiday. We have spoken with the custodian of records for Kmart Pharmacy and have been advised that you have been previously provided the documents sought in the Subpoena Duces Tecum from the pharmacist at the Kmart location multiple times in the past. Therefore, the subpoena request has been complied with.

Additionally, as there is a pending motion to amend the Complaint to add additional parties and additional new claims against my client, we suggest amicably working out any issues at the upcoming Preliminary Conference scheduled for September 20, 2018. Lastly, as previously stated our client is open to alternative dispute resolution, however we have yet to receive a proper numerical settlement demand from you. Please provide a numerical settlement demand after which we will be in a position to discuss same with our client and engage in settlement discussions with you.

Best,
Harshal

**Harshal Y. Jani, ESQ.**
SOBEL PEVZNER, LLC.
Attorneys at Law
30 Vesey Street, 8th Floor
New York, New York 10007
P. 212.216.0020
F. 646.688.3646
HJani@sobelpevzner.com

BRIAN COKE NG
40 Ann Street
New York, N.Y. 10038

**Mailing Address:**
Church Street Station
P.O. Box 2723
New York, N.Y 10008
Phone: (646) 820.9238
Fax:    (646) 820.9238
Email: Briancng38@gmail.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS HOLDINGS CORPORATION, et al.,      :        Case No. 18-23538 (RDD)
                                         :
        Debtors.:                        :        (Jointly Administered)
                                         :
                                         :        JUDGE:  Hon. Robert D. Drain
                                         :
                                         :
-----------------------------------------------------------x

## ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

THIS MATTER, having been presented to the Court by Brian Coke Ng, on motion for

relief from the automatic stay, due and adequate notice having been given, and the Court having

considered the papers submitted and arguments presented, and for good cause having been

shown,

IT IS HEREBY ORDERED as follows:

1.      The automatic stay is hereby modified solely to the extent necessary to permit the

continuation and/or settlement of the Movants' actions, including complaint in action #1 (Index

No.: 100386/2018) and complaint for action #2 against the Debtors in the Supreme Court of the

State of New York, County of New York, provided, however, that Movant (a) may only recover

damages from the proceeds of applicable insurance policies; and (b) shall not attempt to execute

or enforce against the Debtors or their estates any judgment or settlement that they may obtain.




Dated: _____, 2018
       White Plains, New York


                                  _____
                                  THE HONORABLE ROBERT D. DRAIN
                                  UNITED STATES BANKRUPTCY JUDGE