WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re                                                        :
                                                             :   **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,                    :
                                                             :   **Case No. 18-23538 (RDD)**
                                                             :
            Debtors.[1]                                      :   **(Jointly Administered)**
------------------------------------------------------------ x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DECLARATION OF ROGER A. PUERTO
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE SALE OF CERTAIN REAL PROPERTY, (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN
CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

I, Roger A. Puerto, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Head of Real Estate Transactions ("**Sears Real Estate**") at Sears Holdings Corporation ("**Sears**" and, together with its debtor affiliates, the "**Debtors**", and together with its non-debtor affiliates, the "**Company**").

2. I submit this declaration (the "**Declaration**") in support of the *Motion of Debtors For Entry of Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection Therewith, and (III) Granting Related Relief*, filed on November 29, 2018 (ECF No. 938) (the "**Motion**").[2] I am authorized by the Debtors to submit this Declaration and, unless otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my experience, my review of relevant documents, information provided to me by Sears' employees working under my supervision, or information provided to me by members of the Debtors' management or their advisors. If called upon to testify, I could and would testify to the facts and opinions set forth herein.

**Background and Qualifications**

3. Prior to joining Sears, from October 2010 to August 2017, I was an investment analyst at Fairholme Capital Management ("**Fairholme**"), a registered investment advisor. At the time, Fairholme held certain Sears debt and was the second largest shareholder of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

Sears and Seritage Growth Properties ("**Seritage**"), a publicly-traded real estate investment trust company. From 2012 until my departure from Fairholme, I primarily worked on designing the valuation framework for real estate owned by Sears and eventually Seritage, performing over 200 property tours, and running valuation experiments with brokers, developers, and national appraisers.

4. I joined Sears in August 2017 as a consultant to the former President of Sears Real Estate. In June 2018, I was promoted to my current position. In my role as a consultant at Sears, I designed the sale process with respect to 140 retail and non-retail properties, working with a network of brokers in specific local markets to attract potential buyers. I negotiated directly with potential buyers to help maximize the value of the real property being sold, and coordinated with outside legal counsel to negotiate deal terms and leases associated with the properties. The sale processes I personally implemented or was otherwise involved in resulted in twenty-nine transactions, generating a total of approximately $304 million in gross proceeds, approximately $52 million more than the aggregate appraised value of the real property subject to the transactions. Additionally, transactions were pending as of the Commencement Date with respect to another nineteen properties, including the Real Property described in the Motion, that are expected to generate approximately $140 million in gross proceeds upon consummation, which is approximately $22 million more than the aggregate appraised value for such properties.

5. I am personally familiar with Sears' real estate portfolio and the marketing efforts undertaken to monetize certain of such assets, including with respect to the Real Property that is the subject of the Motion.

**The Acquired Assets and The Prepetition Marketing Process**

6. Since early 2018, the Debtors have sought to monetize their interests in, among others, thirteen parcels of real property located in secondary markets. After considerable efforts to market the assets, including the use of local brokers, and negotiations with various third parties, Debtors Sears, Roebuck and Co., Kmart Corporation, and Kmart Stores of Illinois, together with non-Debtor affiliate SRC Facilities LLC, finalized negotiations with Amerco Real Estate Company ("**Purchaser**") to sell the Acquired Assets for $62 million.

7. As more fully described in the Purchase Agreement, the Acquired Assets consist of:

- Real Property: twelve parcels of real property that currently or in the past were operating as Kmart® stores and one parcel of real property that is a currently operating Sears® store, together with all Improvements and Personal Property thereon; and
- Assumed Leases: six unexpired non-residential real property leases, all of which are leases as to which a Debtor is the lessor.

Eleven of the thirteen properties subject to the Transaction are encumbered by either the Cascade Real Estate Loan or that certain Term Loan Agreement, dated as of March 14, 2018, pursuant to which UBS AG, Stamford Branch, as administrative agent, and the lenders party thereto provided a term loan facility.

8. Each of the Acquired Assets is a non-essential asset that is not material to the Debtors' ongoing operations or revenue-generating capacity. Indeed, three locations are "dark" and six locations have negative EBITDA. Although the remaining four locations are generating positive EBITDA, I believe that the Purchase Price (hereinafter defined) being paid by the Purchaser warrants proceeding with the sale.

9. Based on my prior experience, after the Commencement Date, I conferred with the Debtors' management and concluded, based upon the extensive marketing efforts already undertaken, that additional marketing of the Acquired Assets would likely be futile.

10. Set forth below is a chart of the marketing efforts and indications of interest received with respect to each Real Property site:

| Count | Store No. | Sears / Kmart | City / State | Summary of Marketing Process |
|---|---|---|---|---|
| 1 | 2819 | Sears | Fairbanks, AK | • Property was listed in January 2018 and an offering memorandum distributed to approximately 96 brokers.<br>• Sellers reached out directly to large property owners and redevelopers.<br>• Information on the property was sent out via broker email blast twice a month and presented at semi-monthly broker meetings.<br>• Sellers received an offer, however, it did not crystalize into a final binding offer. |
| 2 | 4928 | Kmart | Queensbury, NY | • Property was listed in February 2018.<br>• Sellers sent retail, broker, and landlord/developer email blasts.<br>• Sellers sent direct emails to over 50 developers.<br>• Sellers received an offer, however, it did not crystalize into a final binding offer. |
| 3 | 4371 | Kmart | Santa Maria, CA | • Property was listed in July 2018 and over 3,500 emails were sent to investors, institutions, REITs, and funds.<br>• 34 parties viewed and/or executed a confidentiality agreement to get access to a diligence data room.<br>• Sellers received one offer, however, it was for a purchase price significantly below the appraised value of the property. |
| 4 | 4147 | Kmart | Spokane, WA | • Property was listed in March 2018.<br>• Emails sent to over 7,000 principals and 5,000 brokers, with additional 7 email blasts.<br>• Received five offers, including from Purchaser, and various expressions of interest from third parties. |
| 5 | 4423 | Kmart | Rockford, IL | • The Sellers' retained a third party real estate advisor to market the property beginning first quarter 2017.<br>• Highest offers/indicated interest received by the retained advisor were 21%, in the aggregate, lower than the aggregate amount to be paid for such properties under the Transaction. |
| 6 | 3223 | Kmart | Ft. Walton Beach, FL | |
| 7 | 3147 | Kmart | Kingsport, TN | |
| 8 | 4048 | Kmart | Springfield, IL | |
| 9 | 3529 | Kmart | Pittsburgh, PA | |
| 10 | 7017 | Kmart | Roswell, NM | |
| 11 | 4998 | Kmart | Roseville, MI | |
| 12 | 3699 | Kmart | Apple Valley, CA | • Property was initially restricted from the sales process due to being pledged as collateral in favor of the Pension Benefit Guaranty Corporation ("**PBGC**"). It was released from the PBGC lien on August 20, 2018. |

|   |   |   |   |   |
|---|---|---|---|---|
|   |   |   |   | • Once property was released, sent multiple email blasts, resulting in 34 signed confidentiality agreements, 4 interested buyers, but no ultimate offers. |
| 13 | 31903 | Kmart | Fort Atkinson, WI | • Store closure announced October 2013 and the store vacated early 2014.<br>• Property was on the market since 2014 with limited interest from third parties. |

11.  As noted in the above summary, with the exception of one location, a dark store that has been on the market since early 2014, all Acquired Assets have been robustly marketed since early 2018 and, in many instances, much earlier.  I have been actively involved in the marketing of the Acquired Assets, since my involvement with sales process beginning in October 2017.  For a majority of the Acquired Assets, local real estate brokers were engaged with specific expertise and knowledge of the area to ensure that the best resources were utilized to market the Acquired Assets.  In many instances, I ran a parallel process on the Sears side by reaching out to known interested buyers to ensure that the two processes together would produce the best offers possible.

12.  Aside from using local brokers, other methods were also utilized during the marketing process to ensure widespread outreach and the best possible bids for the Acquired Asset, including, circulating a property offering memorandum to potential buyers, executing non-disclosure agreements and providing access to a diligence data room, circulating email blasts to brokers, retailers, landlords, developers, and other potentially interested parties such as private investors and various funds, listing the Acquired Assets on various listing websites, and also enlisting large-scale real estate brokers with regional and national expertise and client-base.

**The Transaction**

13.  The Sellers received various offers and varying degrees of interest for the Acquired Assets from potential buyers.  In July 2018, Sears began conversations with the Purchaser regarding a potential sale of a portfolio of Company-owned real property.  A list of

available real property was sent to the Purchaser for review, and after extensive discussions between Sears and the Purchaser, the parties were able narrow the list of properties to the thirteen parcels of Real Property identified in Exhibit B to the Purchase Agreement. The Purchaser submitted an offer in late September 2018 for the Acquired Assets and after additional negotiations submitted a second and final offer of $62 million (the "**Purchase Price**"). The Purchase Prices reflects months of extensive, arm's length negotiation, and an increase from the Purchasers' initial offer.

14. In addition to the Purchase Price, an important aspect of the Transaction involves the Debtors' need to remain in possession of the premises that are currently operating so as to effectuate an orderly wind-down of operations. To facilitate the Debtors' store closures, I negotiated with the Purchaser the terms of post-closing occupancy agreements (the "**Occupancy Agreements**") for ten of the thirteen locations. Each Occupancy Agreement, a form of which is annexed to the Purchase Agreement as Exhibit E, is for a term of 120 days and provides that the Sellers will pay only real estate taxes and water and sewer charges until the Sellers deliver possession of the ten locations. I believe that the Occupancy Agreements provide the Debtors with sufficient time to conduct store closings without significant disruption to their businesses and, given their relatively short term, do not present an unnecessary burden to the Debtors' estates.

15. I believe that the Purchase Price offered by the Purchaser is, in the aggregate, higher or better than any other offers received for the Acquired Assets. The value allocated to a majority of the Acquired Asset is higher than the appraised value of the applicable Acquired Asset. Furthermore, I also believe that, if the Acquired Assets were sold separately, the price received would likely be less than the price allocated for each Acquired Assets in the Purchase Agreement. I believe that the opportunity for the Purchaser to purchase the Acquired

WEIL:\96817739\6\73217.0004

Assets as one portfolio led to the Purchase Price offered by the Purchaser being higher than if each Acquired Asset were sold separately.  As such, I believe the terms of the Transaction set forth in the Purchase Agreement are the most favorable terms available.

### A Timely Sale At This Time Maximizes Value

16.     I believe ample business justifications exist for the sale of the Acquired Assets and assignment of the Assumed Leases to the Purchaser.  An orderly consummation of the Transaction is essential to monetizing the Acquired Assets and maximizing recoveries for the Debtors' stakeholders.  The timely sale of the Acquired Assets to the Purchaser is necessary to avoid the unnecessary cost and expense that would otherwise be incurred if the Transaction is not consummated timely as contemplated by the Purchase Agreement.  In particular, the Debtors would have to continue to pay expenses associated with owning the Real Property.  Moreover, as noted above, the Debtors conducted a thorough and robust prepetition marketing process for the Acquired Assets, and believe the Purchase Price is the best offer the Debtors will likely receive for the group of Acquired Assets.

17.     Furthermore, a private sale of the Acquired Assets is appropriate as the Buyer was not approached with a public auction in mind.  The Debtors have already expended money and resources during the prepetition marketing process, and the limited interest received during that process and the overall lack of higher offers attest to the fact that a prolonged public auction would be unlikely to produce higher or better offers for the Acquired Assets and may very well reduce the price to be paid for the Acquired Assets.  Closing the Transaction in a timely manner will maximize the value of the Acquired Assets and is appropriate under the circumstances.

18. In light of the foregoing, I believe that pursuing the Transaction in a timely manner under the terms of the Purchase Agreement is in the best interest of the Debtors' estates and maximizes value for all of the Debtors' stakeholders.

19. I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5, 2018, in Miami, Florida.

    /s/ Roger A. Puerto
Roger A. Puerto
Head of Sears Real Estate
Transactions,
Sears Holdings Corporation