**Hearing Date and Time: December 20, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: December 13, 2018 at 4:00 p.m. (Eastern Time)**

QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Susheel Kirpalani
Jonathan E. Pickhardt
Andrew S. Corkhill
Matthew Scheck
Ellison Ward Merkel

*Attorneys for Omega Advisors Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

# MOTION OF OMEGA ADVISORS INC. PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE TO ENFORCE THE COURT'S NOVEMBER 19, 2018 SALE ORDER AND INVALIDATE THE ULTRA VIRES SALE AND LOCKUP OF <u>MEDIUM-TERM INTERCOMPANY NOTES</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1

Omega Advisors Inc. ("**Omega**"), a bidder and creditor, respectfully requests entry of an order (i) confirming the scope of the prior order authorizing the sale of property outside the ordinary course of business, (ii) invalidating any portions of the sale that exceeded such scope as ultra vires, and (iii) clarifying that the advance good-faith findings for the purchaser do not extend to unauthorized sales or agreements. Omega submits that the sale disclosed by the Debtors on December 4, 2018, was without proper notice and outside of the fair, transparent, and competitive bidding process authorized by the Court.

## PRELIMINARY STATEMENT

1. By this Motion, Omega asks the Court to invalidate (i) the sale to Cyrus Capital Partners L.P. ("**Cyrus**") of approximately $650 million in medium-term notes ("**MTNs**") issued by Sears Roebuck Acceptance Corp. ("**SRAC**") not offered or noticed for sale to any other bidder and (ii) the clandestine agreement between the Debtors and Cyrus not to sell an additional $1.4 billion in MTNs held by non-Debtor affiliate Sears Reinsurance Company Ltd. ("**Sears Re**"). The auction was not a fair, transparent, and competitive bidding process, as required by the order authorizing it, dated November 19, 2018 (the "**Sale Order**"), and 11 U.S.C. § 363(b), because the bidders (aside from Cyrus) had no notice of what was actually being sold. An SEC Form 8-K disclosure and notice to this Court filed on December 4, 2018, disclosed—for the first time—that, while the Debtors had announced a proposed sale of "*no more than*" $251 million in MTNs in an auction (the "**Auction**") authorized by the Sale Order, and had told the Court that the additional $1.4 billion in MTNs held by Sears Re were not part of the relief being sought, in fact the Debtors *sold all of their nearly $900 million* in MTNs, and *agreed to refrain from selling Sears Re's $1.4 billion* in additional MTNs at the Auction. In effect, the Debtors sold the value of their entire lot of $2.3 billion of MTNs to Cyrus, and no other bidder was aware of the Debtors' efforts because bidders relied upon the record, the notice, and the terms of the Sale Order.

2

2.       When the Debtors sought authorization to sell the MTNs, they represented to the Court that "the sale procedures will be designed to produce a fair, transparent, and competitive bidding process" through an auction with "ground rules set forth for the auction [that] will ensure that any purchaser(s) has proceeded in good faith and without collusion." Emergency Mot. Of Debtors For Order Approving Sale Of Medium Term Notes ¶ 25 (Nov. 9, 2018), ECF No. 642 (the "**Sale Motion**"). The Sale Order authorized the Debtors to sell MTNs pursuant to notice "to the party or parties that provide the highest or best offer" in the Auction. Sale Order ¶ 3. The Debtors never sought the Court's authorization to sell—and expressly represented to the Court that their motion excluded a request for authorization concerning—an additional $1.4 billion of MTNs held by non-Debtor Sears Re (the "**Sears Re MTNs**").

3.       Pursuant to the Sale Order, Debtors issued an auction notice (the "**Auction Notice**") stating that they would "conduct an auction on ***no more than*** [$]251,245,000 SRAC Medium Term Notes" (the "**Listed MTNs**") out of the nearly $900 million of MTNs that they held. *See* Exhibit B (emphasis added). By limiting the Auction to approximately $250 million of MTNs, interested bidders understood that the Debtors specifically reserved approximately $650 million of MTNs that they held (the "**Unlisted MTNs**") from the Auction.

4.       Motivated by a desire to minimize potential losses on credit default swaps ("**CDS**") it sold on SRAC debt, Cyrus had been interfering with the sale of the MTNs since before the Sale Order was entered—potentially violating the automatic stay—and its behavior continued unabashed up through and including the Auction. Initially, Cyrus tried to destroy the value of the MTNs to the Debtors, so that it would not need to try to buy them. As explained in the Sale Motion, the MTNs were (and still are) valued at a temporary premium by holders of CDS referencing SRAC debt because of the need to physically deliver a certain amount of SRAC

3

obligations into a separate auction overseen by the International Swaps and Derivatives Association ("**ISDA**") Determinations Committee ("**DC**"). Prior to the Court entering the Sale Order, Cyrus sought to chill the CDS market participants' interest in the MTNs by "anonymously" raising a challenge to the DC (of which it is a voting member) as to whether the MTNs meet the requirements necessary to be delivered into an ISDA auction. Cyrus was the lone challenger to deliverability.

5. Cyrus was also the lone objector to the Sale Motion. Although Cyrus ultimately capitulated in its objection to the Debtors' Sale Motion, it insisted that new language be added to the Sale Order that was designed specifically to render the MTNs undeliverable in an ISDA auction and therefore destroy their value in the eyes of CDS protection buyers. (The Court was not informed of the near-identical language in ISDA's rules or of the chilling effect such language would have on bidders if included in the Sale Order.) Cyrus then contacted Auction participants to inform them that the MTNs would not be deliverable in the Auction, directly referencing this language in the Sale Order. Cyrus' tactics were specifically designed to depress the price for the MTNs and to chill bidder participation in the Auction. It worked.

6. Despite Cyrus' efforts (which themselves may have violated the stay), Cyrus was outvoted by other members of the ISDA DC, which determined that the MTNs will be deliverable in the ISDA auction. But Cyrus' actions nonetheless had their intended effect—they chilled CDS market participants' interest in the Auction. Cyrus was the winning bidder, agreeing to pay $82.5 million to purchase the Listed MTNs. But unbeknownst to other bidders, Cyrus secretly negotiated additional conditions to its agreement to purchase the Listed MTNs that caused the Auction to be unfair, opaque, and uncompetitive, as well as inconsistent with the notice provided to bidders.

4

7.      *First*, Cyrus negotiated to purchase not only the Listed MTNs that the Debtors made available to all bidders in the Auction, but also the Unlisted MTNs that were expressly excluded by the Debtors from the Auction. This contradicted the clear statement in the Auction Notice that Debtors were offering "***no more than***" the Listed MTNs in the Auction. Cyrus paid no additional consideration beyond its $82.5 million bid to purchase the Unlisted MTNs.

8.      *Second*, Debtors agreed as part of the sale "on behalf of themselves and their Subsidiaries, not to sell, transfer, or assign any MTNs not included as part of this transaction to any non-Debtor entity other than a transfer or assignment pursuant to a non-consensual order of a court of competent jurisdiction with respect thereto." Notice Of Results Of Auction Of Medium Term Notes ¶ 6 (Dec. 4, 2018), ECF No. 1019. This "**Lockup Agreement**" purports to prevent Sears Re—a non-Debtor "subsidiary" of a Debtor—from selling the $1.4 billion of Sears Re MTNs it holds to CDS buyers, abandoning tens of millions of dollars in additional proceeds. Like the sale of the Unlisted MTNs, the Lockup Agreement is entirely outside the scope of the Sale Order and the Auction Notice—which solicited bids for "***not more than***" the Listed MTNs—because it effectively sold the right to monetize the Sears Re MTNs. It also directly contradicts the record before this Court at the hearing on the Sale Motion that the Sears Re MTNs were not part of the Auction.

9.      Unaware that the Auction had actually transferred control of all $2.3 billion in MTNs, instead of the noticed amount of $251 million, Omega and other bidders continued to make offers of significant value to the Debtors and Sears Re to purchase additional MTNs they believed were still available. Had they realized that all $2.3 billion in MTNs were for sale—and that there would thus be no subsequent opportunity to purchase any other MTNs—Omega and other bidders

5

would have been incentivized to bid substantially higher in the Auction and would have provided more value to the Debtors than the $82.5 million that was paid by Cyrus.

10. The Debtors' backroom negotiation to sell the Unlisted MTNs and to lock up the Sears Re MTNs, which they did not disclose to other Auction participants until two full weeks after the Auction was held, renders the Auction as conducted by the Debtors unfair, opaque, and uncompetitive, in violation of the Sale Order and 11 U.S.C. § 363(b), and raises the specter that Cyrus may have used its influence as a significant creditor in the bankruptcy as well as its influence as a member of the ISDA DC to create perhaps the least value-maximizing auction ever conducted in a sale authorized by this Court. Omega therefore respectfully requests that the Court enter an order voiding the portions of the sale that were ultra vires, namely the agreement to sell the Unlisted MTNs and to lock up the Sears Re MTNs.[2]

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

12. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

13. The bases for the relief requested herein are Bankruptcy Code sections 105(a), 362(a), and 363(b), Bankruptcy Rules 6004 and 9014, and the Sale Order (including paragraph 7 thereof).[3]

---

[2] Attached as Exhibit C is a chart comparing the terms of the Sale Order, the Auction Notice, and the now-disclosed terms of the sale.

[3] The relief sought is in this motion is not to alter or vacate this Court's Sale Order, but rather to enforce it. Nonetheless, to the extent Bankruptcy Rule 9024 (incorporating Fed. R. Civ. P. 60(b)) applies to the relief sought in this motion, that standard has been met. Under Rule 60(b), a party may obtain relief from an order or judgment for, among other reasons, mistake or surprise, newly discovered evidence, fraud or misconduct, or for any other reason that justifies relief. *See* Fed. R. Civ. P. 60(b)(1)–(3), (6). Here, the Court entered the Sale Order on the bases set forth in the Sale Motion, including that there would be procedures "designed to produce a fair, transparent, and competitive bidding process." Sale Motion ¶ 25. As described (*infra* pp. 10–13), this fundamental

## BACKGROUND

### A. The Parties' CDS Positions

14. A full understanding of the context in which the Auction was conducted requires a brief discussion of the dynamics of the CDS positions that have created market demand for the MTNs.

15. Omega is an interested bidder for the MTNs and participated in the Auction. This is because Omega purchased CDS referencing debt issued by Debtor SRAC. The Debtors' bankruptcy filing was a Credit Event under the SRAC CDS, entitling Omega and other CDS buyers to a credit-protection payment from CDS sellers. The amount of that credit-protection payment is set by an auction of underlying SRAC debt obligations, referred to under the CDS documentation as "**Deliverable Obligations**." As a CDS buyer, Omega is owed a one-time payment equal to the notional amount of its CDS position less an implied recovery rate on SRAC debt equal to the final price set by the auction (the "**Auction Final Price**"). Thus, the higher the Auction Final Price, the lower the payout to Omega and other buyers of CDS, and the greater the benefit to sellers of CDS.

16. Cyrus is the largest seller of CDS referencing SRAC debt and a member of the ISDA DC that sets the rules for the ISDA auction, and it is also a significant creditor and financing provider in this bankruptcy. Over the past two months, Cyrus has taken steps to corner the market in the available supply of Deliverable Obligations so that it can squeeze the ISDA auction by withholding from that auction the Deliverable Obligations that it has acquired. By withholding Deliverable Obligations, Cyrus will cause the Auction Final Price artificially to rise well above

---

underpinning of the Court's Sale Order did not occur, and thus approval of the sale was based on this false premise. *See In re 310 Assocs.*, 346 F.3d 31, 34–35 (2d Cir. 2003) (holding that mistake of fact by a court is proper grounds for Rule 60(b)(1) relief). Moreover, as described (*infra* pp. 7–13), Cyrus has engaged in misconduct that warrants relief from the findings of good faith set forth in the Sale Order.

intrinsic values and likely to par. An inflated Auction Final Price would minimize, and potentially extinguish, any payout required by Cyrus given Cyrus' position as a CDS seller. Concerned with Cyrus' actions, Omega and other buyers of SRAC CDS have been and remain highly motivated to acquire Deliverable Obligations to prevent any ISDA-auction manipulation.

### B.    The Sale Motion and Sale Order

17.    In an effort to counteract Cyrus' attempt to corner the market for Deliverable Obligations, Omega approached Debtors and educated them on the dynamics of the CDS market and the potential value to the estate to be realized through sale of the MTNs to CDS market participants. Prior to Omega's contact, the Debtors were unaware of the substantial potential value of the MTNs.

18.    On November 9, 2018, in response to Omega's contact, the Debtors appropriately filed the Sale Motion seeking the Court's approval for a sale of certain MTNs held by various Debtors.[4] The Debtors filed the Sale Motion to take advantage of a "unique opportunity to sell the MTNs and maximize their value for the benefit of all creditors … if a sale can be accomplished expeditiously." Sale Motion ¶ 6. The Sale Motion expressly cited the CDS market dynamics as the basis for the expedited sale of the MTNs. *Id.* ¶¶ 9–14. It also specifically represented that "[t]he ground rules set forth for the auction will ensure that any purchaser(s) has proceeded in good faith and without collusion. Further, the sale procedures will be designed to produce a fair, transparent, and competitive bidding process." *Id.* ¶ 25.

---

[4]  The Sale Motion makes clear that "[a]pproximately $1.4 billion of the MTNs are held by Sears Reinsurance Company Ltd., a non-Debtor affiliate of the Company." Sale Motion ¶ 8.

19.     Cyrus was the only party to object to the Sale Motion. It did so without disclosing that it was motivated by a concern that a competitive sale of MTNs would thwart its efforts to manipulate the ISDA auction.[5]

20.     The Court held an initial hearing on the Sale Motion on November 15, 2018. At that time, the Court warned that to the extent Cyrus' objection was motivated by its CDS position, its efforts to frustrate the sale of the MTNs could be a violation of the automatic stay. Hr'g Tr. 92:14–23 (Nov. 15, 2018). The Court postponed the hearing and ordered Cyrus to produce at the rescheduled hearing on November 19, 2018, a witness who could explain Cyrus' motivation for objecting. *Id.*

21.     Uninterested in the prospect of testifying before this Court, on the Sunday before the hearing, Cyrus offered to settle its objection with the Debtors by purchasing the MTNs outright in exchange for the Debtors' agreement not to proceed with the Court-approved Auction sought in the Sale Motion. On information and belief, the Debtors, fulfilling their fiduciary duties, determined that the best way to maximize value for the estate was to hold the Auction, which would capture the true demand for the MTNs from CDS buyers. So the Debtors rejected Cyrus' settlement offer.

22.     Although its settlement offer had been rejected, Cyrus continued to negotiate with the Debtors to withdraw its objection to the Sale Motion. Ultimately, Cyrus agreed to withdraw its objection provided that the Debtors agree to add certain language (the "**Deliverability Language**") to paragraphs 6 and 7 of the Sale Order. Unbeknownst to Debtors, the Deliverability Language, which provided in part that the MTNs were "not being sold free and clear of any Liens

---

[5] Cyrus was also the only party to object to the MTNs being considered Deliverable Obligations in the ISDA auction, which it did almost contemporaneously with its Sale Motion objection, and attempted to do anonymously.

9

or Claims of SRAC," Sale Order ¶¶ 6, 7, was taken *nearly verbatim* from the rules governing the ISDA auction.[6] Cyrus thus clearly designed the Deliverability Language to ensure that the MTNs would not be considered Deliverable Obligations in the ISDA auction, with the result that the value of the MTNs to CDS protection buyers like Omega—and thus also to the estate in any sale—would be significantly lowered or destroyed.

23. The Sale Order authorized the Debtors "to sell the MTNs to the party or parties that provide the highest or best offer" in the Auction. Sale Order ¶ 3.

24. The Debtors expressly represented that certain MTNs held by the non-Debtor affiliate Sears Re were excluded from the Sale Order. Hr'g Tr. 95:24–96:2 (Nov. 15, 2018) ("The Debtors are not seeking authority to sell 2.3 billion of medium-term notes. The 1.4 billion owned by Sears Re is not part of this.").[7]

### C. The Auction

25. Pursuant to the Sale Order, the Debtors issued the Auction Notice informing interested bidders that the Debtors had decided "to conduct an auction on *no more than* [$]251,245,000 SRAC Medium Term Notes" (defined earlier as the "**Listed MTNs**").[8] *See* Exhibit B (emphasis added). In so doing, the Debtors specifically excluded approximately

---

[6] *Compare, e.g.*, Sale Order ¶ 6 (stating that "the MTNs are not being sold free and clear of any Liens or Claims of SRAC, including without limitation, any counterclaim, defense or right of setoff, held or that may be asserted by SRAC or its estate"), *with* 2014 ISDA Credit Derivatives Definitions § 8.12 (requiring Deliverable Obligations to be "free and clear of any and all liens, charges, claims or encumbrances … including, without limitation, any counterclaim, defense … or right of set-off by or of the Reference Entity [*i.e.*, SRAC] ….").

[7] Debtors' counsel added, as an apparent explanation for their exclusion from the auction, that the Sears Re MTNs "haven't been proffered … to ISDA for sale, so that's off the table." *Id.* This statement is now incorrect. The ISDA DC determined that many, if not all, of the Sears Re MTNs are Deliverable Obligations. As a result, ISDA-auction participants continue to highly value the Sears Re MTNs, at least until the ISDA auction.

[8] *See* Sale Motion ¶ 8. The Auction Notice made no reference to MTNs held by non-Debtor affiliates like Sears Re.

10

$650 million of MTNs that they held (defined earlier as the "**Unlisted MTNs**") from that particular sale. The Debtors also told potential bidders in the Auction Notice that the "auction may continue from time to time," suggesting that future auctions could be held for some or all of the Unlisted MTNs. *Id.* At no point during the Auction did the Debtors make the Unlisted MTNs available for sale to anyone other than Cyrus.

26. Meanwhile, in the lead-up to the Auction, Cyrus took full advantage of the Deliverability Language to chill the interest of CDS buyers to bid in the Auction. With its objection to the MTNs as Deliverable Obligations still pending before the ISDA DC, Cyrus—a DC member with a vote on whether the MTNs would be deemed Deliverable Obligations—directly contacted CDS buyers (Cyrus' competitors in the Auction) to inform them that the new language in the Sale Order would disqualify the MTNs as Deliverable Obligations. Because the MTNs were valuable to CDS buyers only if they were Deliverable Obligations, Cyrus' conduct and status as an insider on the ISDA DC introduced substantial confusion in the market for the MTNs and chilled competition for the MTNs from the CDS buyers.

27. Cyrus' efforts to chill interest from CDS buyers in the Auction succeeded. Cyrus caused a dramatic increase in concern among CDS buyers regarding the deliverability of the MTNs, so that CDS buyers were generally reluctant to submit firm bids for MTNs. Omega addressed its own concern through making a significant bid but conditioning it upon the MTNs being determined to be deliverable. Other potential bidders were likely chilled from bidding at all, or bid on a contingent basis or much lower than they would have otherwise. This allowed Cyrus to make the winning bid in the Auction, recently revealed to be $82.5 million. *See* Notice Of Results Of Auction Of Medium Term Notes ¶ 3 (Dec. 4, 2018), ECF No. 1019. Cyrus had better information about the game-changing factor impacting value because it was a DC member and the

lone proponent of the "undeliverable" challenge to the ISDA DC—it therefore had influence and superior knowledge of the ISDA DC's deliberations. On information and belief, prior to the issuance of the Sale Order with the Deliverability Language, CDS buyers were prepared to bid collectively on the $251 million Listed MTNs well more than what Cyrus ultimately paid in the Auction.

28.    Cyrus' bid, moreover, was not just for the Listed MTNs. Unbeknownst to other Auction participants, the Debtors agreed to sell Cyrus not only the $251 million Listed MTNs, but the whole lot—including the remaining $650 million in Unlisted MTNs not offered for sale to anyone else. The Debtors' sale of the Unlisted MTNs directly contravenes the Auction Notice, which states that the Debtors would "conduct an auction *on no more than*" the Listed MTNs. The Debtors never sought the Court's approval for the sale of the Unlisted MTNs through means other than the Auction, and the Auction Notice was defective.

29.    The Debtors further agreed, as a condition of their sale to Cyrus, "on behalf of themselves and their Subsidiaries, not to sell, transfer, or assign any MTNs not included as part of this transaction to any non-Debtor entity other than a transfer or assignment pursuant to a non-consensual order of a court of competent jurisdiction with respect thereto." *Id.* This Lockup Agreement purports to prevent non-Debtor affiliate, Sears Re, from selling approximately $1.4 billion of MTNs (earlier defined as the "**Sears Re MTNs**") held on its books to CDS buyers, abandoning tens of millions of dollars in proceeds that could be obtained through the sale of the Sears Re MTNs for the benefit of Sears Re and the ultimate benefit of the Debtors. The Lockup Agreement directly contradicts Debtors' counsel's representation to this Court when seeking authorization to sell the MTNs that the Sears Re MTNs were not part of the Auction. Hr'g Tr.

95:24–96:2 (Nov. 15, 2018) ("The Debtors are not seeking authority to sell 2.3 billion of medium-term notes.  The 1.4 billion owned by Sears Re is not part of this.").

30.     The Debtors' secret agreement to sell the Unlisted MTNs to Cyrus, after noticing the Auction solely for the Listed MTNs, and to enter into the Lockup Agreement as a condition of those sales, after expressly representing to the Court that those MTNs were "not part of this," violates the Sale Order and 11 U.S.C. § 363(b).  The unauthorized sale of Unlisted MTNs and the Lockup Agreement also deprived the Debtors of an opportunity to monetize tens of millions of dollars more in value for the benefit of the estate, since Omega and, on information and belief, other bidders, collectively could have matched and exceeded the amount Cyrus paid to acquire or lock up the entire $2.3 billion in MTNs had the terms of the Auction been clear.

### D.     Concealing the Auction Results

31.     After the Auction closed, the Debtors did not disclose what had been sold, or the terms on which the sale had taken place, claiming that the results were confidential.  Other than Cyrus, bidders did not know that the Unlisted MTNs had been sold, and had no inkling that the Lockup Agreement had resulted in the effective sale of $1.4 billion in Sears Re MTNs.  Indeed, to the extent that losing bidders were told the results of the Auction, it was only to indicate that a condition of the winning bid was that it not be disclosed to third parties.

32.     Until the ISDA auction process is conducted, which is expected to happen in early January 2019, strong demand continues to exist among CDS buyers to purchase the Unlisted MTNs and the Sears Re MTNs.  Thus, believing that only the $251 million of Listed MTNs had been sold, Omega and, on information and belief, other bidders made firm offers to both the Debtors and Sears Re to acquire the MTNs they believed remained unsold.  These offers would have provided tens of millions of dollars in additional value to the Debtors and Sears Re.  Neither the Debtors nor Sears Re responded at all to any offer.

33.     Frustrated at being kept in the dark regarding the outcome of the Auction, Omega wrote to the Debtors on November 27, 2018, requesting that they disclose the terms of the winning bid and indicating that Omega would file a Rule 2004 motion with this Court seeking discovery on that topic if no disclosure was made.  In response to this pressure, the Debtors indicated that they would file a Form 8-K disclosure to the Securities and Exchange Commission and a notice with the Bankruptcy Court disclosing the terms of the Auction.

34.     Not until December 4, 2018, two full weeks after the Auction was conducted and six days after the sale was completed, did the Debtors finally publicize the terms of the sale through a filing with this Court and a Form 8-K disclosure.  These disclosures finally made clear why neither the Debtors nor Sears Re were responding to the bidders' offers to purchase additional MTNs—those MTNs had already been sold or locked up, in secret and with no notice to the other bidders.

## RELIEF REQUESTED

35.     Omega therefore asks the Court to issue an order (i) confirming the scope of the Sale Order authorizing the sale of MTNs, (ii) invalidating any portions of the sale that exceeded such scope as ultra vires, and (iii) clarifying that the advance good-faith findings for the purchaser do not extend to unauthorized sale of Unlisted MTNs or the Lockup Agreement with respect to the Sears Re MTNs.  Such an order would provide additional value to the Debtors, as Omega and, upon information and belief, other market participants, remain interested bidders.

## BASIS FOR RELIEF

36.     Omega bid in the Auction for the Listed MTNs, but was not given proper notice that the Unlisted MTNs and Sears Re MTNs would be available for bidding through that process. As Omega was not given proper notice and is challenging the "intrinsic structure of the sale" because of "fraud, mistake, or unfairness," Omega has standing to object under 11 U.S.C. § 363.

14

*Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.* (*In re Colony Hill Assocs.*), 111 F.3d 269, 274 (2d Cir. 1997); *see also In re Moran,* 566 F.3d 676, 681 (6th Cir. 2009) (finding that an exception to the general rule that frustrated bidders lack standing to object to a sale "may exist where [the] ... bidder challenges the intrinsic structure of the sale because it is tainted by fraud, mistake, or unfairness" (quotation omitted)). Omega is a creditor of SRAC, having purchased $600,000 in notes issued by SRAC on November 21, 2018, and also has standing for that independent reason. *See In re Fairfield Sentry Ltd.*, 539 B.R. 658, 667 (Bankr. S.D.N.Y. 2015) (holding that even if prospective purchaser lacked standing, its status as creditor gave it standing to be heard on Section 363(b) issues). Finally, the Sale Order makes clear that "nothing contained in this Order shall waive any rights of the Debtors, the Creditors' Committee or any other party or governmental entity to the extent it is determined that a party engaged in inappropriate conduct with respect to the transactions contemplated by this Order." Sale Order ¶ 7.

37. A debtor in possession may sell assets outside the ordinary course of business only "after notice and a hearing." 11 U.S.C. § 363(b). To that end, the court must approve the terms and conditions of the bidding process. *See In re Jon J. Peterson, Inc.*, 411 B.R. 131, 135 (Bankr. W.D.N.Y. 2009); *see also In re C.W. Mining Co.,* 636 F.3d 1257, 1265 (10th Cir. 2011) (noting that the major purpose behind bankruptcy law is "maximizing the value of the estate for its creditors").

38. A sale under Section 363 must be conducted with proper notice of the proposed terms. *In re Weisser Eyecare, Inc.*, 245 B.R. 844, 850 (Bankr. N.D. Ill. 2000) (holding that litigation-fees-and-proceeds-sharing agreement between trustee and debtor's former principal shareholder was an attempted sale and required notice to creditors pursuant to Section 363(b), as the transaction was not entered into in the ordinary course of business, such that failure to give

notice rendered this agreement null and void); *In re Barfield*, 2015 WL 401308, at \*6 (Bankr. C.D. Ill. Jan. 29, 2015) (holding that a court cannot approve a change in sale terms based on an agreement between a trustee and an objector which impacts the rights of other creditors and parties in interest without giving notice to those affected). Here, the Auction Notice indicated that "**no more than** [$]251,245,000 SRAC Medium Term Notes" were put up for sale, *see* Exhibit B, and counsel for the Debtors assured the Court that "[t]he Debtors are not seeking authority to sell 2.3 billion of medium-term notes." Hr'g Tr. 95:24–96:2 (Nov. 15, 2018). Yet what was disclosed in the Debtors' December 4 filings is that $2.3 billion of MTNs were, in fact, sold, through secret negotiations that were not made public until weeks after the fact. This backroom deal is well outside the scope of the notice that was provided to other bidders and potential bidders in the Auction, and outside the authority provided by the Sale Order.

39. Because the Auction violated the notice requirements of Section 363(b) and was consummated on substantially altered terms negotiated with an insider, the offending portions of the sale should be voided. *See In re Lavigne,* 183 B.R. 65, 70–71 (Bankr. S.D.N.Y. 1995), *aff'd*, 199 B.R. 88 (S.D.N.Y. 1996), *aff'd*, 114 F.3d 379 (2nd Cir. 1997) (Chapter 11 debtor-in-possession's attempt to cancel an insurance policy, which constituted property of the estate, without notice to interested parties was null and void as a violation of the notice provisions of § 363(b)(1)); *Walker v. Lee* (*In re Rounds*), 229 B.R. 758, 765 (Bankr. W.D. Ark. 1999) ("The most common remedy, where adequate notice of sale has not been given, is to set the sale aside or to treat it as voidable, typically at the option of the person who failed to receive notice.").

40. A competitive and transparent sale process is the lynchpin of a fair auction process under Section 363(b), and courts have altered the results of auctions that lacked those characteristics. For example, in *Corporate Assets v. Paloian*, 368 F.3d 761, 766 (7th Cir. 2004),

16

the Seventh Circuit concluded that the bankruptcy court did not abuse its discretion in reopening an auction when a bidder, who did not know all of the terms, subsequently wished to submit a higher bid. The Court held that "the first auction did not occur on an entirely level playing field," because not all of the bidders "knew, prior to the first auction, that [seller] had decided to delete from the purchase agreement the provision entitling it to insist on early removal of the purchased assets." *Id.* at 771; *cf. In re Coastal Plains*, 179 F.3d 197, 213 (5th Cir. 1999) ("This, of course, would be to the detriment of creditors who decided not to bid on the debtor's assets at a foreclosure sale because they lacked knowledge about the existence or value of the undisclosed claims."). Likewise, in *In re Family Christian, LLC*, 533 B.R. 600, 622–25 (Bankr. W.D. Mich. 2015), the debtors sought to sell substantially all of their assets to a corporate insider submitting the highest and best bid at auction. The unsuccessful bidder objected and challenged the fairness of the auction process. Although the Court found the auction process acceptable in several respects, the Court found that the debtors' failure to account for the value of certain claims and releases that were being included in the sale to the insider (but had not been valued by other participants), as well as *ex parte* communications with the insider, were enough to find a tainted auction process, and the court rejected the sale.

41. Here, the Auction Notice did not make clear that all of the MTNs—including the Sears Re MTNs—were being made available for sale—indeed, it stated precisely the opposite. Accordingly, there was no "level playing field," particularly given Cyrus' subsequent *ex parte* negotiation as an insider to purchase those undisclosed assets.

42. Furthermore, because of Cyrus' inappropriate conduct in connection with this Auction and its status as an insider, Cyrus should not receive the protection of 11 U.S.C. § 363(m).[9] Where a proposed sale would benefit an insider of a debtor, the court is required to give heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction. *See Rickel & Assocs., Inc. v. Smith* (*In re Rickel & Assocs., Inc.*), 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002); *In re Embrace Sys.*, 178 B.R. 112, 126 (Bankr. W.D. Mich. 1995); *cf. Bayer Corp. v. MascoTech, Inc.* (*In re Autostyle Plastics, Inc.*), 269 F.3d 726, 745 (6th Cir. 2001) ("Insider transactions are more closely scrutinized, not because the insider relationship makes them inherently wrong, but because insiders 'usually have greater opportunities for ... inequitable conduct.'" (citing *Fabricators, Inc. v. Tech. Fabricators, Inc.* (*In re Fabricators, Inc.*), 926 F.2d 1458, 1465 (5th Cir. 1991))).

43. The Sale Motion requested that the Court make a finding "that any purchaser(s) selected by the Debtors is a good faith purchaser and is entitled to the full protections afforded by Section 363(m) of the Bankruptcy Code" on the basis that "[t]he ground rules set forth for the auction will ensure that any purchaser(s) has proceeded in good faith and without collusion" and "the sale procedures will be designed to produce a fair, transparent, and competitive bidding process." Sale Motion ¶ 25. Yet the sale that was consummated purportedly pursuant to this authority included more than $2 billion worth of MTNs that bidders were explicitly told were not being put up for sale, a facially opaque and uncompetitive process. The shift in scope of the Auction was negotiated behind closed doors by the Debtors and with an insider. Moreover, as

---

[9] Given the recent announcement of Cyrus' status as a DIP lender, there is a chance that Cyrus may have had access to material, confidential information about the Debtors when bidding in the Auction. For example, during the November 19 hearing on the Sale Motion, Cyrus indicated its understanding that "the intercompany claim held by SRAC … [is] significant in amount." Hr'g Tr. 11:19–22 (Nov. 19, 2018).

detailed above, Cyrus has not acted in good faith throughout this process, and instead has sought to destroy the value of the MTNs to the Debtors through its "anonymous" objection to the DC, objection to the Sale Motion, insertion of the Deliverability Language in the Sale Order, attempts to chill bidding in the Auction, and ultimate efforts to buy up MTNs that were outside the scope of the Auction, without transparency or competitive bidding. Accordingly, the sale was outside the scope of the Sale Order and bears hallmarks of collusion, and Cyrus should not be afforded the presumption of good faith pursuant to Section 363(m) that would otherwise be provided in paragraph 7 of that Order. The sale of MTNs outside the noticed Auction terms should thus be voided irrespective of whether the transaction has closed.

44.     Finally, if the Court perceives any degree of fraud, unfairness, or mistake with the sale, including any flaws with an Auction process, the court must assess the impact of these factors on the sale when the offer is compared to the Court's finding of valuation of the assets to be sold. *In re Embrace Sys.*, 178 B.R. at 123. Given the flawed notice, the bids put in by participants in the Auction other than Cyrus necessarily did not value MTNs that they did not believe were being sold; moreover, additional parties may have bid in the Auction had they understood the true scope of the sale and existing bidders may have bid higher had they not been chilled by Cyrus' conduct.

## NOTICE

45.     Omega has provided notice of this motion to all Rule 2002 Parties. *See Amended Order Implementing Certain Notice and Case Management Procedures* ¶ 6 (Nov. 1, 2018), ECF No. 405.

## NO PRIOR REQUEST

46.     No prior request for the relief sought in this Motion has been made.

## **RESERVATION OF RIGHTS**

47.     Omega reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this motion, to seek discovery, add additional parties, or to raise additional grounds for granting this motion during any hearing on the motion.

## **CONCLUSION**

48.     Omega respectfully requests that the Court enter an order, substantially in the form of Exhibit A, that invalidates portions of the sale of MTNs that exceeded the scope of the Sale Order and 11 U.S.C. § 363(b) because the notes were sold without proper notice and outside of the fair, transparent, and competitive bidding process authorized by the Court.

Dated: December 6, 2018  
      New York, New York

QUINN EMANUEL URQUHART  
  & SULLIVAN LLP

By: /s/ Susheel Kirpalani  
Susheel Kirpalani  
Jonathan E. Pickhardt  
Andrew S. Corkhill  
Matthew Scheck  
Ellison Ward Merkel  

51 Madison Avenue, 22nd Floor  
New York, New York 10010  
Telephone: (212) 849-7000  
Facsimile: (212) 849-7100  

*Attorneys for Omega Advisors Inc.*