Andrew V. Tenzer, Esq.
Leslie A. Plaskon, Esq.
Shlomo Maza, Esq.
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090
andrewtenzer@paulhastings.com
leslieplaskon@paulhastings.com
shlomomaza@paulhastings.com

*Attorneys for GACP II, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| --------------------------------------------------- x | | Hearing Date: December 20, 2018 at 10:00 am (ET) |
| | : | Objection Date:  December 17, 2018 at 4:00 pm (ET) |
| In re: | : | |
| | : | Chapter 11 |
| SEARS HOLDING CORPORATION, *et al.*, | : | |
| | : | Case No. 18-23538-RDD |
| Debtors.[1] | : | (Jointly Administered) |
| --------------------------------------------------- x | | |

**NOTICE OF HEARING ON APPLICATION OF GA CAPITAL
FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES
PURSUANT TO BANKRUPTCY CODE SECTIONS 503(b)(3)(D) AND 503(b)(4)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that a hearing on the annexed *Application of GA Capital for Allowance and Payment of Fees and Expenses Pursuant to Bankruptcy Code Section 503(b)(3)(D) and 503(b)(4)* (the "Application") filed by the GACP II, L.P. ("GA Capital"), pursuant to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy Code"), will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "Bankruptcy Court"), on **December 20, 2018 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections ("Objections") to the Application shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court, shall be filed with the Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF), to the extent applicable, and shall be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures* (the "Amended Case Management Order"), entered on November 1, 2018 (Docket No. 405), so as to be so filed and received no later than **December 17, 2018 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an Objection to the Application is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing pursuant to the Amended Case Management Order.

- 2 -

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

[*Remainder of page intentionally left blank.*]

Dated:  December 9, 2018
    New York, New York

*/s/ Andrew V. Tenzer*

PAUL HASTINGS LLP
Andrew V. Tenzer, Esq.
Leslie A. Plaskon, Esq.
Shlomo Maza, Esq.
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
andrewtenzer@paulastings.com
leslieplaskon@paulhastings.com
shlomomaza@paulhastings.com

*Counsel to GACP II, L.P.*

Andrew V. Tenzer, Esq.
Leslie A. Plaskon, Esq.
Shlomo Maza, Esq.
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090
andrewtenzer@paulhastings.com
leslieplaskon@paulhastings.com
shlomomaza@paulhastings.com

*Attorneys for GACP II, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                             :

In re:                                                  :

                             :

SEARS HOLDING CORPORATION, *et al.*,                    :

                             :

                     Debtors.[1]               :

------------------------------------------------------- x

Hearing Date: December 20, 2018 at 10:00 am (ET)

Objection Date:  December 17, 2018 at 4:00 pm (ET)

Chapter 11

Case No. 18-23538-RDD

(Jointly Administered)

**APPLICATION OF GA CAPITAL FOR ALLOWANCE AND PAYMENT**
**OF FEES AND EXPENSES PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 503(b)(3)(D) AND 503(b)(4)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 7

 I.  Chapter 11 Cases and Debtors' DIP Motion........................................... 7

 II.  Junior DIP Financing Chapter 11 Cases and Debtors' DIP Motion ..................... 8

 III. GA Capital's Work Towards a Junior DIP Facility................................. 9

 IV. Junior DIP Hearing and Instant Application......................................... 15

JURISDICTION AND VENUE ............................................................................... 18

RELIEF REQUESTED............................................................................................. 18

BASIS FOR RELIEF REQUESTED........................................................................ 18

 I.  Applicable Legal Standard:  Direct Benefit to Administration of the Case
   Is Dispositive ........................................................................................ 18

 II.  GA Capital's Development, Proposal, and Negotiation of GA Capital DIP
   Contributed Directly to Administration of Case .................................. 20

 III. Requested Fees are Reasonable ........................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dept. Stores, Inc.*,
 115 B.R. 34 ...................................................................................................................21

*In re AMR Corp.*,
 No. 11-15463 (SHL), 2014 WL 3855320 (Bankr. S.D.N.Y. Aug. 5, 2014).....................19, 22

*In re Bayou Grp.*,
 LLC, 431 B.R. 549 (Bankr. S.D.N.Y. 2010) ................................................................. *passim*

*In re Dana Corp.*,
 390 B.R. 100 (Bankr. S.D.N.Y. 2008)...................................................................................19

*In re Deval*,
 16-17922-AMC, 2018 WL 6018785 (E.D. Pa. Nov. 15, 2018).............................................20

*In re Ellingsen MacLean Oil Co., Inc.*,
 834 F.2d 599 (6th Cir.1987) ...................................................................................................21

*In re S & Y Enterprises, LLC*,
 480 B.R. 452 (Bankr. E.D.N.Y. 2012)..............................................................................19, 20

*In re Tropicana Entertainment, LLC*,
 498 Fed. Appx. 150 (3d Cir. 2012).......................................................................................20

**Other Authorities**

Lillian Rizzo and Suzanne Kapner, *Sears Entertaining Offers From Liquidators
 as ESL, Cyrus Prepare Takeover Bid*, WSJ (Nov. 28, 2018 5:54 p.m. ET),
 https://www.wsj.com/articles/sears-entertaining-offers-from-liquidators-as-
 esl-cyrus-prepare-takeover-bid-1543445686............................................................................5

Vicki M. Young, *How Important is Cyrus Capital in the Sears Bankruptcy?*,
 WWD (Nov. 28, 2018), https://wwd.com/fashion-news/fashion-scoops/how-
 important-is-cyrus-capital-in-the-sears-holdings-bankruptcy-esl-1202915749/ .......................5

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

GACP II, L.P. ("GA Capital") hereby files this application (the "Application"), pursuant

to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy

Code"), seeking allowance of its actual and necessary expenses in the amount of $6,513.02 and

of compensation for services rendered and expenses incurred by its attorneys, Paul Hastings LLP

("Paul Hastings"), and its advisors, Province, Inc. ("Province"), in the amount of $1,817,266.28

and $149,096.81,[2] respectively, as administrative expenses incurred in making a substantial

contribution in the above-captioned chapter 11 cases (the "Chapter 11 Cases").[3]  In support of its

Application, GA Capital respectfully (i) submits the declaration of Robert Louzan, attached as

**Exhibit B** hereto (the "Louzan Declaration"), and (ii) represents as follows:

## PRELIMINARY STATEMENT[4]

1.      At the Debtors' request, GA Capital developed, arranged, and negotiated two

separate junior postpetition financings that offered the Debtors loans in different amounts and

with different collateral and priority structures.  The Debtors ultimately decided to proceed with

one of those structures; the $350 million postpetition financing described in the GA Capital Term

Sheet[5] (the "GA Capital DIP").  Based on the Debtors' assurances that it would be providing the

junior DIP financing, GA Capital committed to, negotiated, syndicated, and fully documented

the GA Capital DIP and, on the afternoon before and the morning of the Junior DIP Hearing, the

Debtors filed the fully negotiated GA Capital DIP loan documents with the Court for approval.

---

[2]     A copy of Province's invoice is attached hereto as **Exhibit D**.
[3]     Paul Hastings' fees and expenses are through November 29, 2018, and GA Capital and Paul Hastings reserve
        the right to supplement this Application accordingly.
[4]     Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings given to
        such terms below.
[5]     The "GA Capital Term Sheet" is the term sheet filed as Exhibit 1 to the *Notice of Filing of Term Sheet
        Regarding Junior Secured Debtor-in-Possession Multiple Draw Term Loan Facility* [Docket No. 735].

2.      The GA Capital DIP benefitted the Debtors greatly.  On the Petition Date, the

Debtors filed a term sheet, attached as Exhibit C to the DIP Motion[6] (the "ESL/Cyrus Term

Sheet"), for a still-to-be finalized junior DIP financing to be provided by ESL Investments, Inc.

("ESL"), as administrative agent, and JPP, LLC, JPP II, LLC,[7] and Cyrus Capital Partners, LP

("Cyrus").  But shortly after the Petition Date, the Debtors changed course out of a stated desire

to move away from a junior DIP financing provided by ESL and Cyrus. GA Capital was

informed that the Debtors were no longer considering the ESL/Cyrus Term Sheet because (i)

ESL and Cyrus were "all over" the Debtors' capital structure, (ii) ESL was an insider whose

conduct would be investigated by the creditors' committee, raising concerns that a DIP financing

including ESL might prove to be difficult in terms of obtaining Court approval, and (iii) the

Debtors wanted to avoid the additional complication an ESL DIP financing would bring to a 363

sale process.

3.      After the Petition Date, and as part of the Debtors' junior DIP marketing process,

GA Capital engaged directly with the Debtors' and their financial advisor, Lazard Frères & Co.

LLC. ("Lazard"), on the terms, and possible structures, of a junior DIP financing.  Lazard

requested that GA Capital submit a junior DIP financing proposal conforming to one of three

alternative structures set forth in a process letter provided to GA Capital.

4.      The GA Capital DIP allowed the Debtors to move away from the ESL/Cyrus

Term Sheet.  To ensure that any new lenders would not have the same issues as ESL and Cyrus,

the Debtors and their advisors restricted and controlled the third parties with whom GA Capital

---

[6]    The "DIP Motion" is the *Debtors' Motion for Authority to Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing* [Docket No. 7].

[7]    JPP I, LLC and JPP II, LLC are affiliates of ESL.

2

could discuss, and potentially bring into, a junior DIP financing. GA Capital was expressly
informed that it could not discuss the junior DIP financing with ESL or Cyrus.

5.      Agreeing to exclude ESL and Cyrus was a significant concession by GA Capital.
Both GA Capital and ESL were lenders under the Debtors' prepetition 2018 FILO Facility.  Prior
to the Petition Date, ESL had approached GA Capital about participating in a financing modeled
on the ESL/Cyrus Term Sheet.  This meant that GA Capital was banned—as part of the
marketing process and protocol established by the Debtors and Lazard—from discussing the
junior DIP financing with a potential lender (ESL) that is intimately familiar with the Debtors'
business.  A direct consequence of this was that GA Capital could not avail itself of ESL's
extensive knowledge of the Debtors' assets.  As a result, and as discussed below, GA Capital and
its professionals had to start essentially from scratch in reviewing the real estate and related
leases that would comprise the primary senior collateral for the GA Capital DIP.  Additionally,
even though Cyrus would later reach out to GA Capital about the possibility of joining the GA
Capital DIP, GA Capital could not have any discussions with Cyrus.

6.      Nonetheless, in order to meet the Debtors' stated preference for an independent
lender, GA Capital fully complied with the formal junior DIP marketing process and protocol
established by the Debtors and Lazard and began discussions with the Debtors about providing
Junior DIP Financing that did not include ESL or Cyrus.

7.      By developing, committing to, arranging, and fully documenting the GA Capital
DIP—which documents are the same documents the Debtors used to obtain approval of a Junior
DIP Financing provided by Cyrus (the "Cyrus DIP")—GA Capital made a substantial
contribution to these Chapter 11 Cases.  GA Capital and its professionals engaged in substantial
efforts to negotiate, and come to agreement regarding, the terms of the GA Capital DIP within an

3

abbreviated time period, including over the Thanksgiving holiday weekend. As discussed below, the specific nature of the Debtors' capital structure and the interplay between the ABL DIP Facility and the GA Capital DIP required wide-ranging review of the Debtors' assets, including reviewing thousands and thousands of pages of lien searches and thousands of lease documents; this review was intrinsically tied to extensive negotiations between the Debtors, GA Capital, and the ABL DIP Lenders and their respective professionals on the terms of an extremely complex collateral priority and allocation waterfall. Ultimately, and as the result of GA Capital's diligence and these extensive negotiations, GA Capital, the Debtors, and the ABL DIP Lenders reached agreement on the finalized GA Capital DIP Documents.

8.      GA Capital did this work only after receiving express reassurances from the Debtors' advisors that a full DIP marketing process had been completed and GA Capital had been selected to provide the Junior DIP Financing. Indeed, GA Capital was advised, weeks before the scheduled Junior DIP Hearing, that the Debtors had narrowed down the junior DIP proposals to Cyrus and GA Capital and had selected GA Capital because Cyrus was "all over the capital structure." Thus, GA Capital relied on the Debtors' express confirmation that there were no other offers still being considered before incurring its significant expenses.

9.      On the day of the scheduled hearing to approve the GA Capital DIP (the "Junior DIP Hearing"), Lazard informed GA Capital on a phone call that the Debtors were once again considering Cyrus as a potential junior DIP lender. Moreover, while ostensibly giving GA Capital the opportunity (in an informal, impromptu "auction" conducted in the hallway of the courthouse for roughly 90 minutes) to match those economic terms on which Cyrus was purportedly more competitive, the Debtors ultimately opened the Junior DIP Hearing by advising the Court that they had selected Cyrus to provide junior DIP financing on the same terms

4

negotiated by GA Capital.  This selection was made even though GA Capital (i) had matched

each of these terms and (ii) informed that Debtors that, if its terms were not acceptable, it would

consider additional "asks" from the Debtors.[8]

10.    The only term in the Cyrus DIP that GA Capital did not match was Cyrus's

concession to the Committee regarding the adequate protection offered to the second lien

lenders.  Because Cyrus holds second lien debt, it was able to make this concession; GA Capital

does not hold second lien debt.  ESL, who holds over 70% of the second lien debt, also agreed to

this concession; however, there was no explanation at the Junior DIP Hearing why ESL (who is

supposedly precluded from participating in any Junior DIP Financing) agreed to this, or what it

got in exchange for this concession.  Almost immediately after this concession from ESL and

Cyrus, press reports surfaced that ESL is partnering with Cyrus on a bid for certain of the

Debtors' assets.[9]  The Debtors provided no information regarding the actual value of this

concession to GA Capital, or how GA Capital might provide consideration equal to that value, or

why the Debtors did not impose on ESL and Cyrus the same restrictions they had imposed on

GA Capital in developing a junior DIP financing.[10]

---

[8]    Moreover, the fact that the Debtors came to terms with GA Capital on a Junior DIP Financing that exceeded the interest rate of the ESL/Cyrus Term Sheet demonstrates that the conflicts and complications presented by ESL and Cyrus—and not pure economics—was a key consideration driving the Debtors' move away from the ESL/Cyrus Term Sheet.  Indeed, even after GA Capital "bid down" its DIP to a provide for a lower interest rate and a larger Winddown Account, the Debtors ended up selecting a higher interest rate than the ESL/Cyrus Term Sheet.

[9]    *See* Lillian Rizzo and Suzanne Kapner, *Sears Entertaining Offers From Liquidators as ESL, Cyrus Prepare Takeover Bid*, WSJ (Nov. 28, 2018 5:54 p.m. ET), https://www.wsj.com/articles/sears-entertaining-offers-from-liquidators-as-esl-cyrus-prepare-takeover-bid-1543445686; *see also* Vicki M. Young, *How Important is Cyrus Capital in the Sears Bankruptcy?*, WWD (Nov. 28, 2018), https://wwd.com/fashion-news/fashion-scoops/how-important-is-cyrus-capital-in-the-sears-holdings-bankruptcy-esl-1202915749/.

[10]    GA Capital notes that the value of this concession is questionable, as the second lien lenders still obtain new adequate protection liens on assets that their liens did not extend to prepetition.  Further, based on the pervasiveness of the second lien debt throughout the Debtors' capital structure, simply minimizing the cross-collateralization such that adequate protection liens do not attach to assets of entities that were not obligors of the second liens lenders is unlikely to have any actual monetary benefit to the Debtors (or the unsecured creditors).  *See* **Ex. A** to *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* [Docket No. 3] (Capital and Corporate Organization Structure Chart).

11.    Whatever the Debtors' reasons for selecting the Cyrus DIP, the record is clear that the Cyrus DIP approved on an interim basis at the Junior DIP Hearing **is substantively identical to the DIP financing committed to, arranged, and documented by GA Capital**.  GA Capital understands that Cyrus has reached out to virtually all of the members of the syndicate arranged and led by GA Capital to join the Cyrus DIP.  This makes sense, as through the efforts of GA Capital (and its professionals) all of the diligence and collateral documentation has already been validated by the GA Capital-led process, with the result that Cyrus and the Debtors had a ready-made syndicate with which they could "replace" the GA Capital DIP.  It was only GA Capital's extensive work (including its diligence work and its and documentation of the GA Capital DIP) that made it possible for the current lenders (including Cyrus) to be willing to lend and, therefore, for the Debtors to be able to borrow and continue operating their business—especially on the expedited timetable in which the GA Capital DIP was "replaced" by the Cyrus DIP.  Simply put, if not for GA Capital's work, it would have been impossible for the Debtors to walk out of the Junior DIP Hearing with the Cyrus DIP.

12.    It cannot be disputed that GA Capital's work contributed directly and substantially to the approval of junior DIP financing for the Debtors.  This is particularly true under the circumstances of these Chapter 11 Cases, in which the Debtors have admitted that they are literally "stepping into" the documents negotiated and finalized by GA Capital and the lenders arranged by GA Capital and committed to the GA Capital DIP.  This means that the Debtors have not only obtained the benefit of GA Capital's work (which work directly and substantially contributed to the estates), but they are getting this benefit at a greatly reduced cost, as any work Cyrus has done in connection with stepping into the GA Capital DIP will be built upon GA Capital's prior work.  Accordingly, failing to grant the instant Application would allow

the Debtors to unfairly obtain the benefit of GA Capital's extensive, and expensive, work and would result in an unearned windfall to the Debtors.  GA Capital should, therefore, be compensated for its substantial contribution to the entirety of the Debtors' cases, as contemplated by sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

## BACKGROUND

### I.    Chapter 11 Cases and Debtors' DIP Motion

13.    The Debtors commenced the Chapter 11 Cases on October 15, 2018 (the "Petition Date").  The Debtors' cases are being jointly administered for procedural purposes only.

14.    No trustee or examiner has been appointed in the Chapter 11 Cases, and on October 24, 2018, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

15.    The Debtors filed the DIP Motion on the Petition Date, seeking approval of up to $1.83 billion in post-petition financing (the "ABL DIP Facility"); the Court entered an order approving the ABL DIP Facility on a final basis on November 30, 2018.[11]

16.    The ABL DIP Facility was provided by a subset of lenders (the "ABL DIP Lenders") on the Debtors' prepetition, first lien, credit facility, which (among other things) consisted of a separate term loan and a revolving, asset backed, facility (together, the "Prepetition ABL Facility").  The ABL DIP was secured by new, priming, liens on all of the assets securing the Prepetition ABL Facility—essentially, this included all of the Debtors' working capital, including credit card receivables, cash and cash collateral,  inventory, and proceeds of pharmacy assets.[12]  The ABL DIP Lenders also received new, senior liens on assets that were unencumbered prior to the Petition Date (the "Prepetition Unencumbered Collateral")

---

[11]    *See* ABL DIP Facility Final Order [Docket No. 955].

[12]    *See* DIP Mot. ¶ 16.

and on assets that, as of the Petition Date, were subject to liens other than the liens securing the

Prepetition ABL Facility (the "Non-ABL Collateral").

17.    Finally, the ABL DIP Facility provided for the creation of the Winddown

Account, pursuant to which the first $200 million in proceeds from the disposition of previously

unencumbered assets would go to the Debtors' winddown costs.

## II.    Junior DIP Financing Chapter 11 Cases and Debtors' DIP Motion

18.    The DIP Motion also stated that the Debtors would seek approval of a separate

post-petition financing facility pursuant to which the Debtors would borrow, on a secured basis,

up to an additional $300 million (the "Junior DIP Financing").  The ESL/Cyrus Term Sheet, with

ESL as administrative agent and JPP, LLC and JPP II, LLC,[13] and Cyrus as additional lenders.

19.    Notwithstanding the term sheet with ESL and Cyrus, the Debtors stated that they

expected to "continue negotiations" on the Junior DIP Financing.[14]  Consistent with this

statement, on October 24, 2018, the Debtors filed a notice adjourning the previously noticed

hearing on the Junior DIP Financing until a "date to be announced,"[15] and on November 1, 2018,

the Debtors distributed a process letter (the "Process Letter") soliciting junior DIP proposals and

outlining three preferred structures for the Junior DIP Financing.[16]

20.    The Process Letter explained that the three structures the Debtors were

considering were qualitatively and quantitatively different from each other, and from what they

---

[13]    JPP I, LLC and JPP II, LLC are affiliates of ESL.

[14]    *See* DIP Mot., at 5 ("The Debtors expect to continue negotiations on the term sheet and will file an updated version prior to the hearing to consider the Junior DIP Financing.  To the extent the Debtors secure more favorable terms or alternative financing, the Debtors will file documentation with respect to such alternative financing prior to the hearing.").

[15]    *See* Notice of Adjournment of Hr'g [Docket No. 288].

[16]    *See Declaration of Brandon Aebersold in Support of Debtors' Omnibus Reply to Objections to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) Grant Related Relief in Support of Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing, and (II) Schedule Final Hearing* [Docket No. 865] (the "Lazard Junior DIP Declaration"), ¶¶ 13-15 (describing postpetition marketing efforts in connection with Junior DIP Financing).

had agreed to with ESL and Cyrus,[17] with the amount to be financed ranging from the $300

million under the ESL/Cyrus Term Sheet to as much as an additional $600 million, with the

collateral package and priority structure differing between the three structures.

## III.   GA Capital's Work Towards a Junior DIP Facility

21.   GA Capital advised Lazard that it was interested in proposing a DIP facility on

October 25, 2018.  From then through the day of the Junior DIP Hearing, GA Capital and its

professionals worked around the clock with Lazard, the Debtors, the Committee and the ABL

DIP Lenders, and their respective professionals, to negotiate the GA Capital DIP.  Throughout

this process, GA Capital abided by the protocol established and insisted on by the Debtors,

which was both unusual in its terms and which added even more complexity and expense to the

finalization and syndication of the financing.

22.   For example, Lazard informed Paul Hastings that GA Capital could not receive

access to the data room without signing an NDA, and on Friday afternoon, October 26, 2018,

Lazard sent Paul Hastings a form NDA.  Although that alone was not atypical, the form NDA

contained certain unusual and non-negotiable terms, including that the Debtors had to consent, in

writing, to any potential lender in any syndicate.  The NDA also went beyond the customary

prohibition against disclosing confidential information—it specifically prohibited a party that

signed the NDA from discussing even the mere fact that the party was considering a financing

without the Debtors' consent.  GA Capital was advised that these terms were non-negotiable and

that their purpose was to ensure that ESL was excluded from any Junior DIP Financing, in order

to prevent ESL from using its rights under any Junior DIP Financing (and other rights as a lender

or shareholder) in any bid ESL might propose for the Debtors' assets.

---

[17]   One of the three structures was substantially similar to the ESL/Cyrus Term Sheet.

23.     Agreeing to these restrictions and conferring these approval rights on the Debtors was a material concession by GA Capital.  GA Capital had already extended credit to the Debtors on a prepetition basis with ESL under the 2018 FILO Facility, and was open to having ESL participate in its Junior DIP Financing.  In fact, prior to signing the NDA, GA Capital and ESL had preliminary discussions about a potential junior DIP financing.  Moreover, prohibiting GA Capital from having any discussions with ESL meant that GA Capital could not avail itself of ESL's extensive knowledge of the Debtors' assets.  As a result, GA Capital and its professional advisors had to start essentially from scratch in reviewing the real estate and related leases that would comprise the primary senior collateral for the GA Capital DIP, adding both complexity and expense to the process of negotiating and finalizing the GA Capital DIP.

24.     The Debtors, however, were adamant that ESL and Cyrus could not participate in the Junior DIP Financing.  The Debtors stated that they required junior DIP lenders that were truly independent and not "all over the capital structure."  The Debtors also wanted to run a process that minimized complications, including any that could arise in connection with a credit bid for assets by ESL, so as to ensure that the Junior DIP Financing did not adversely impact the Debtors' going concern sale process.  As a result, GA Capital did not discuss the Junior DIP Financing with ESL after it executed an NDA.

25.     The Debtors' insistence on these restrictive and unusual NDA terms resulted in multi-day negotiations over the form of the NDA.[18]  After negotiating the terms of the NDA, GA Capital agreed to the Debtors' requests and it (and the various lenders in its group, each of whom

---

[18]    This was further complicated by the Debtors' insistence that each of the lenders in the GA Capital Group execute an individual NDA and that none of the lenders know the other members of the syndicate, resulting in each NDA being negotiated and customized on a lender by lender basis.

had to be individually approved by Lazard) executed an NDA, and received the Process Letter

and access to the data room.[19]

26.    This allowed GA Capital to begin (i) working on the various documents that

would need to be finalized in connection with the GA Capital DIP while, at the same time (ii)

beginning the process of reviewing the voluminous information regarding the Debtors' assets

and proposed collateral, including real estate assets across the country.

a.    Negotiation of GA Capital DIP and GA Capital DIP Documents

27.    In accordance with the Process Letter, GA Capital (through Paul Hastings), began

developing term sheets for a Junior DIP Financing consistent with the structures described in the

Process Letter.  As mentioned in the Lazard Junior DIP Declaration, GA Capital submitted a

$600 million term sheet that would "obviate the need" for the ABL DIP Facility, as well as a

separate term sheet for a Junior DIP Financing of $300 million.[20]  At the Debtors' request, GA

Capital shifted gears to focus exclusively on the $300 million structure, which (also at the

Debtors' request) was upsized to $350 million.

28.    GA Capital, the Debtors, and the ABL DIP Lenders, together with their various

professionals and advisors, then focused on the diligence and documentation required to

implement the terms of the $350 million structure, including (among other things) an

intercreditor agreement, satisfaction of conditions precedent to the extension of credit, issues of

collateral priority and allocation, the size and structure of the Winddown Account, negotiation of

the DIP order, and certain consent issues, including in connection with the Debtors' sale process.

---

[19]    The difficulties and delays in executing an NDA also delayed GA Capital gaining access to the data room.
Indeed, GA Capital understands that the NDA process was so difficult that other lenders simply dropped out
due to the Debtors' various restrictions and the related delays in obtaining access to the data room.

[20]    GA Capital also offered a $450 million junior DIP facility.

29.    In connection with these various negotiations (which were also impacted by the ongoing diligence and collateral review, discussed below), the parties began exchanging drafts of the necessary credit documents in connection with the GA Capital DIP.  These documents included finalization of the term sheet, the GA Capital DIP Credit Agreement and related security and guaranty documents, the form of GA Capital DIP interim order, DIP intercreditor agreement, and the various schedules and exhibits to each (collectively, the "GA Capital DIP Documents").

30.    During the course of these negotiations, and as the parties' negotiations neared conclusion, GA Capital was advised numerous times that the deal was "theirs" as the Debtors (as well as the ABL DIP Lenders) preferred GA Capital over Cyrus because GA Capital was more "independent" and would not be motivated by its other positions in the Debtors' capital structure. Accordingly, GA Capital and its advisors continued to work to finalize a deal.

31.    The parties' intense negotiations proved successful, and on November 14, 2018, the Debtors filed a term sheet outlining the terms of the Junior DIP Financing agreed to between the Debtors and GA Capital.[21]  As explained in the term sheet, GA Capital (as Junior DIP agent) would receive junior, tenth position, liens on the Prepetition ABL Collateral and liens on the Non-ABL Collateral and the Prepetition Unencumbered Collateral (the "Junior DIP Liens"). With the exception of a specified subset of the Prepetition Unencumbered Assets (the "Specified Collateral"), the liens on the Non-ABL Collateral and the Prepetition Unencumbered Collateral were junior to the ABL DIP Lenders' liens in those assets.  Additionally, all of the Junior DIP Liens were junior to the carve-out, certain "Senior Permitted Liens" described in the credit documents, and the Winddown Account.

---

[21]    *See Notice of Filing of Term Sheet Regarding Junior Secured Debtor-in-Possession Multiple Draw Term Loan Facility* [Docket No. 735] (the "GA Capital Term Sheet").

32.     On or around November 15, 2018, Cyrus reached out to GA Capital regarding the possibility of participating in the GA Capital DIP.  However, the NDA prohibited GA Capital from having any discussions with Cyrus without the Debtors' consent, and when GA Capital advised Lazard that it had received inquiries from Cyrus about joining the GA Capital led DIP, Lazard informed GA Capital that Lazard would "deal with" Cyrus.

33.     On the evening of November 25, 2018, and the afternoon of November 26, 2018 the Debtors filed the Junior DIP Motion[22] and a full copy of the Junior DIP credit agreement,[23] respectively.

34.     The parties continued to finalize the handful of minor open points through the early morning hours of the day of the November 27, 2018 hearing to approve the Junior DIP Financing (the "Junior DIP Hearing") and the filing of the Junior DIP Motion and the related credit agreement was followed by (i) the *Notice of Filing of Amended Superpriority Senior Secured Debtor-in-Possession Asset-Based Credit Agreement* [Docket No. 885], (ii) the *Notice of Filing of Amended Proposed DIP ABL Final Order* [Docket No. 889], (iii) the *Notice of Filing of Amended Proposed Interim Junior DIP Order* [Docket No. 891], and (iv) the *Notice of Filing of DIP Intercreditor Agreement* [Docket No. 892].

35.     These ongoing negotiations were designed to address, among other things, concessions requested by the Committee to ensure its support for the GA Capital DIP.  Each of these documents, as well as the junior DIP credit agreement that had already been filed, was the result of continuous negotiations between GA Capital and its advisors, the Debtors and their

---

[22]    The "Junior DIP Motion" is the *Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing and (II) Schedule Final Hearing* [Docket No. 872]

[23]    *See Notice of Filing of Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement* [Docket No. 881].

advisors, and the lenders under the ABL DIP Facility and their advisors, as well as the

Committee.

        b.      GA Capital's Diligence Work

36.    Concurrently with the parties' negotiation of the GA Capital DIP Documents, GA

was engaged in a near constant review of the collateral being offered in connection with the GA

Capital DIP.  This review was necessitated by the size and scope of the Debtors' business and,

perhaps even more so, by the nature of the Debtors' prepetition capital structure combined with

the structure of the Junior DIP Financing and its relationship to the ABL DIP Facility.

37.    Because the ABL DIP Facility was secured by all of the Debtors' working capital,

GA Capital (or any other potential junior DIP lender) would not recover on a Junior DIP

Financing unless those assets proved sufficient to satisfy the obligations under the ABL DIP

Facility.  Moreover, in addition to the $1.83 billion ABL DIP Facility, any Junior DIP Financing

would be junior to the $200 million Winddown Account.  What this meant was that, from the

perspective of GA Capital (and any potential junior DIP lender) the most important and most

valuable of the collateral offered in connection with a junior DIP was the Debtors' real estate

assets.

38.    Because GA Capital was prohibited from discussing its junior DIP financing with

ESL, it could not itself of ESL's extensive knowledge of the Debtors' assets; instead, to properly

evaluate this collateral, GA Capital (through Paul Hastings and Province) reviewed documents

for hundreds of the Debtors' properties, including leases, subleases, amendments, letters of

intent, reciprocal easement agreements, title insurance documents, property surveys, estoppels,

renewal letters, certifications, and other real estate documents affecting each property.  This

review was complicated by the wide-ranging nature of the specific properties, which include

traditional retail leases, ground leases, owned property, and non-retail facilities (such as storage

and distribution facilities).  Further complicating this review was the fact much of the Debtors'

real estate interests were acquired in the mid-1900's, which meant that the real estate materials to

be reviewed in connection with any individual property often spanned several decades.  Paul

Hastings also prepared memoranda and lease abstracts summarizing its review of the Debtors'

real estate interests and the various legal provisions contained in the underlying documents.

Indeed, this review was so critical to the GA Capital DIP that the parties negotiated that the

details of the real estate review and diligence would be required as a condition precedent to any

funding.[24]

39.     Additionally, GA Capital (through Paul Hastings) reviewed and summarized over

5,000 pages of UCC, litigation, bankruptcy, tax lien, intellectual property, and judgment search

results for 52 debtors in 12 states, including at the federal, state and county level, and compared

public record search results to company disclosure schedules in order to determine accuracy of

disclosure.  As with the real estate review, an understanding of the nature, and extent, of these

liens and their underlying claims was necessitated by the Debtors' preferred structure of the GA

Capital DIP, which called for certain liens to be senior to any other liens across all asset types.

40.     Importantly, this significant, and expensive, review of the Debtors' real estate and

other assets took place almost entirely only after GA Capital asked for, and received, express

assurances from the Debtors' counsel and other advisors that GA Capital would be providing the

junior DIP.

**IV.    Junior DIP Hearing and Instant Application**

41.     Notwithstanding the agreement with GA Capital—and notwithstanding the fact

that key components of the GA Capital DIP were not yet public and were still being negotiated—

on the morning of the Junior DIP Hearing Lazard advised GA Capital that there was another

---

[24]    *See* GA Capital Term Sheet at 17.

potential DIP lender that was ready to "match," and loan, on the terms laid out in the GA Capital

Documents, with a few alleged improvements.[25]  The Debtors did not inform GA Capital until

approximately noon the day of the Junior DIP Hearing that this alleged "new" lender was

Cyrus.[26]

42.    The Debtors advised GA Capital that the Cyrus offer was more attractive than the

agreed-to GA Capital DIP because it (i) increased the Winddown Account, (ii) lowered the

interest rate, (iii) gave the lenders consultation rights, not consent rights, over the selection of a

liquidator, and (iv) includes a fixed $42 million budget variance instead of a percentage variance.

However, during negotiation sessions literally at the courtroom door, GA Capital matched these

terms.

43.    The only term that GA Capital did not (and could not) match was the concession

the Debtors obtained from the second lien lenders regarding their adequate protection liens and

claims.  GA Capital could not match this term for the simple reason that it does not hold any

second lien debt, of which over 70% is held by ESL.[27]  However, at no time prior to the Debtors'

statements to the Court during the Junior DIP Hearing did GA Capital or its advisors hear from

---

[25]    The Junior DIP Hearing was originally scheduled for 1:30 on November 27, 2018, and the Debtors filed the
Junior DIP Motion on November 25 and the credit agreement at approximately 3:30 p.m. on November 26.  The
proposed form of interim order approving the GA Capital DIP was not filed until approximately 11:00 a.m. on
the day of the Junior DIP Hearing, and the DIP Intercreditor Agreement—which Cyrus, in response to the
Court's inquiry, specifically confirmed was acceptable to it—was not filed until after 11:00 a.m. that day.

[26]    As noted above, Cyrus was in no way a new lender: it was a participant in the original ESL/Cyrus Term Sheet,
it had submitted (and had rejected) its own proposal in response to the Process Letter, and it had reached out to
GA Capital about joining the GA Capital DIP.  GA Capital reserves all rights in connection with the Debtors'
(and their advisors) numerous express confirmations that they were no longer in discussions with Cyrus and in
connection with any provision to Cyrus of details regarding the negotiations between the Debtors and GA
Capital that were not otherwise public.

[27]    *See Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition
Financing, (B) Use cash Collateral, (C) Grant Certain Protection to Prepetition Secured Parties and (D) Grant
Related Relief,* at 33 [Docket No. 864] (the "Reply").  It is not clear why ESL, who is ostensibly not part of the
Cyrus DIP, agreed to limit its adequate protection or what it got in exchange for this concession, and GA
Capital reserves all rights in this regard.  Moreover, as noted above, especially in light of the extent to which
Debtor entities are obligors of the second lien parties, the actual value of this "concession," is questionable.

the Debtors or their advisors about the adequate protection concession from Cyrus and ESL, how the Debtors valued it, and what GA Capital might do to provide value in an equal amount.

44.    In short, this was not the case of GA Capital being unable or unwilling to match the allegedly better economic terms offered by Cyrus.  To the contrary, GA Capital offered equal terms, and never received any response from the Debtors to its last offer.  Indeed, GA Capital remains uncertain as to why the Debtors chose the Cyrus DIP (i) at the cost of receiving equal or better terms from GA Capital and (ii) contrary to its stated intention of obtaining a junior DIP that did not have the potential to adversely impact a going concern bid and was provided by an independent party that was not involved with ESL and was not all over the capital structure.

45.    Nonetheless, at the Junior DIP Hearing the Debtors announced that they had elected to proceed with the Cyrus DIP.  The Debtors noted on the record that the Cyrus DIP had improved on the terms reflected in the GA Capital DIP Documents filed with the Court. Importantly, however, GA Capital had matched those terms—indeed, the interest rate and Winddown Account terms recited by the Debtors at the Junior DIP Hearing were the same terms as GA Capital's last offer.

46.    The Debtors also explained that—other than switching the names and signature pages—Cyrus would be stepping into the documents negotiated by GA Capital.  Indeed, the Court confirmed that this was the understanding of all the parties and applied to all of the relevant documents.

47.    The Court approved the Cyrus DIP on an interim basis.[28]  Having expended significant time and resources in connection with the development, proposal, and negotiation of

---

[28]    *See Interim Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; (III) Scheduling Final Hearing; and (IV) Granting Related Relief* [Docket No. 951] (the "Interim Junior DIP Order").

the GA Capital DIP to the benefit of the Debtors' estates, GA Capital files the instant

Application.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

49.     The statutory bases for the relief requested herein are sections 503(b)(3)(D) and

503(b)(4) of the Bankruptcy Code.

## RELIEF REQUESTED

50.     GA Capital respectfully requests entry of an order, substantially in the form

attached as **Exhibit A** hereto (the "Proposed Order"), allowing as administrative expenses its

actual and necessary expenses in the amount of $6,513.02, as well as $1,817,266.28 and

$149,096.81 (collectively, the "Requested Fees") on account of the fees and expenses of Paul

Hastings and Province, respectively, incurred by GA Capital on behalf of the Debtors in

connection with the development, proposal, and negotiation of the GA Capital DIP.

## BASIS FOR RELIEF REQUESTED

**I.      Applicable Legal Standard:  Direct Benefit to Administration of the Case Is
        Dispositive**

51.     Section 503(b)(3)(D) of the Bankruptcy Code provides for the allowance, as an

administrative expense, of the expenses of (among others parties) a creditor that incurred in

connection with "making a substantial contribution in a case under chapter 9 or chapter 11 of this

title."  In connection with section 503(b)(3)(D), section 503(b)(4) provides for the allowance, as

an administrative expenses, of the "reasonable compensation for professional services rendered

by an attorney or an accountant of an entity whose expense is allowable under" section

503(b)(3)(D), as well as the "reimbursement for actual, necessary expenses incurred by such attorney."

52.     The Bankruptcy Code does not define "substantial contribution," and question of whether an applicant for a substantial contribution administrative expense has made a substantial contribution in a Chapter 11 case is case-specific and fact-intensive.  *In re S & Y Enterprises, LLC*, 480 B.R. 452, 462 (Bankr. E.D.N.Y. 2012).

53.     Courts in this district have explained that a "substantial contribution occurs when efforts have led to an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders."  *In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 3855320, at *1 (Bankr. S.D.N.Y. Aug. 5, 2014).  Moreover, "inherent in the 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."  *Id.* (internal references omitted).  To that end, courts have explained that "services calculated primarily to benefit the [creditor] do not justify an award even if they also confer an ***indirect benefit*** on the estate."  *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (emphasis added).  By the same token, however, actions that can be expected to, and do, have a ***direct benefit*** on the estate justify an award even if they also benefit the requesting creditor.  *See In re S & Y Enterprises, LLC*, 480 B.R. 452, 464 (Bankr. E.D.N.Y. 2012) (applicant should show that it provided a "direct and significant contribution").

54.     This Court has specifically addressed the relevance of the motivation of a substantial contribution application, and has explained that it is merely a function of the critical difference between a self-interested tactic that results in an indirect contribution and a direct contribution to the administration of the case as a whole.  In *In re Bayou Grp.*, LLC, 431 B.R.

549, 561 (Bankr. S.D.N.Y. 2010), this Court explained that whether a creditor is acting to advance its own interest "is relevant not because the creditor's mere motive should determine the outcome" of a substantial contribution application. *Id.* To the contrary, this factor simply "recognizes that section 503(b)(3)(D) focuses on process as much as on contribution." Because section 503(b)(3)(D) speaks to the entirety of the chapter 11 case, the contribution of a single creditor to the "proper administration of the case as a whole" is frequently "only indirect[]." *Id.*

55.    However, "an applicant's self-interest is not an insurmountable obstacle to success," *In re S & Y Enterprises, LLC*, 480 B.R. at 464, and a single creditor that directly and substantially contributes to the administration of the case as a whole is certainly not excluded from section 503(b)(3)(D). Accordingly, in *In re Bayou* this Court concluded that the dispositive inquiry is whether the applicant "contribut[ed] directly to the administration of the case." *Id.* at 563.

56.    Courts have also considered whether the actions in question "would have been undertaken absent an expectation of reimbursement from the estate." *In re Tropicana Entertainment, LLC*, 498 Fed. Appx. 150, 152 (3d Cir. 2012) (citing *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (internal references omitted)); see also *In re Deval*, 16-17922-AMC, 2018 WL 6018785 at *10 (E.D. Pa. Nov. 15, 2018) (approving substantial contribution claim of creditor where, inter alia, creditor was "induced" to take "aggressive action […] in reliance upon" future reimbursement).

## II.    GA Capital's Development, Proposal, and Negotiation of GA Capital DIP Contributed Directly to Administration of Case

57.    This Court has held that efforts to "line up" postpetition financing that is approved in the early stages of a chapter 11 case "clearly benefit[] the Debtors' estates and creditors and substantially contribute[] to the chapter 11 cases." *In re Bayou*, 431 B.R. at 564.

20

58.     Indeed, this must be the case for the simple reason that the negotiation and arrangement of a debtor-in-possession financing is qualitatively different than a creditor acting in its self-interest:  the entire purpose of post-petition financing under section 364 of the Bankruptcy Code is to benefit the debtor and enhance its ability to reorganize. *See, e.g.*, *In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 603 (6th Cir.1987) (noting that purpose and policy of postpetition financing provisions is "to encourage creditors to extend additional postpetition credit to debtors").  In fact, bankruptcy courts will not approve postpetition financing whose purpose is to benefit the lender and not the estate.  *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990).

59.     The record of the Junior DIP Hearing is abundantly clear that the Cyrus DIP differs from GA Capital DIP—literally—in name only.  Indeed, at the Junior DIP Hearing counsel for the ABL DIP Lenders noted that the lenders had "spent a lot of time on the documents with respect to the Great American DIP and the inter-creditor relationships, *et. cetera*" and, therefore, specifically requested, and received, reassurance from Cyrus "that they will in fact be stepping into the documents, as negotiated."[29]  As such, approval of the Cyrus DIP is necessarily a finding that the purpose of the GA Capital DIP was to benefit the Debtors.

60.     Additionally, as noted above, GA Capital took on the arduous task of negotiating and finalizing the GA Capital DIP Documents, including the review of thousands upon thousands of lien search results and thousands of real estate documents, only after receiving express, and repeated, reassurance that it had been selected to provide the junior DIP financing.

61.     Moreover, GA Capital now understands that Cyrus is trying to syndicate some of its commitment to the lenders that had committed to the GA Capital DIP.  Accordingly, Cyrus

---

[29]   *See* Nov. 27, 2018 Hr'g Tr. 61:5-21.  A copy of the Junior DIP Hearing transcript is attached hereto as **Exhibit C**.

and the Debtors are continuing to reap the benefits of GA Capital's work to negotiate and

finalize the GA Capital DIP, as it is no coincidence that Cyrus is approaching the set of lenders

for which GA Capital provided substantially all of the work to validate the underlying collateral

and negotiate the final terms of the documentation.

62.    The fact that Cyrus and the Debtors are stepping into the ready-made loan

documents and lender syndicate demonstrates that GA Capital's services were not duplicative of

"the efforts of others involved in the case." *In re AMR Corp.*, 2014 WL 3855320, at *1.

Relatedly, the general policy of construing administrative expenses narrowly and keeping

administrative expenses to a minimum is not implicated here, where the Debtors would have to

pay someone for the work that went into making possible the junior DIP financing obtained by

the Debtors.  While the financing may, ultimately, have been obtained from Cyrus, it is

unquestionable that the work that made this financing possible was performed by GA Capital and

its professionals.  Allowing the Debtors to obtain a junior DIP financing under the circumstances

of these Chapter 11 Cases without paying any of the associated legal and professional fees would

certainly run counter to the policy of section 503(b)(3)(D) of "promoting meaningful creditor

participation in the reorganization process." *In re Bayou*, 431 B.R. at 560.

63.    Accordingly, there can be no doubt that GA Capital's development, proposal, and

negotiation of the GA Capital DIP contributed directly and substantially to the administration of

the Debtors' cases as a whole for the purposes of sections 503(b)(3)(D) and (b)(4).

**III.    Requested Fees are Reasonable**

64.    Section 503(b)(4) requires that fees and expenses awarded for a substantial

contribution must be "reasonable" and "actual and necessary," respectively.  This inquiry is

much the same as the inquiry for any award of professional compensation under section 330 of

the Bankruptcy Code, and one an applicant "has established a substantial contribution, the

22

reasonableness of the professional's services in making that contribution should be measured by looking at what a reasonable professional would have done to achieve such a goal under the circumstances." *In re Bayou*, 431 B.R. at 566, n.18.

65.    The Fees represent reasonable compensation for the professional services rendered to GA Capital in connection with the development, proposal, and negotiation of the GA Capital DIP.  These services included negotiating and preparing a term sheet in connection with the GA Capital DIP, an interim order, the underlying credit agreement and related security and guaranty documents, and the DIP intercreditor agreement.

66.    The Debtors originally requested a proposal for a $600 million facility, which term sheet GA Capital also negotiated and prepared before the Debtors advised GA Capital of their intent to focus on the $350 million option that ultimately was finalized as the GA Capital DIP.

67.    Moreover, the GA Capital DIP (as well as the $600 million term sheet that was ultimately not the course chosen by the Debtors) had to be consistent with the ABL DIP Facility. This meant that all of these negotiations and numerous work streams were tripartite negotiations, involving not only GA Capital and the Debtors, but also the lenders under the ABL DIP Facility.[30]

68.    Finally, the specific nature and circumstances of the GA Capital DIP required a tremendous amount of legal and business work and diligence.

69.    As noted above, the GA Capital DIP (and now the Cyrus DIP) was not simply a deal between GA Capital and the Debtors:  it also had to be fully consistent with the ABL DIP Facility and satisfactory to the ABL DIP Lenders.  This required extensive negotiation over the

---

[30]    *See* Junior DIP Mot. ¶ 19 (describing need for extensive "tripartite negotiations" due to "extensive interplay" between GA Capital DIP and ABL DIP Facility).

liens and rights to be granted under two separate postpetition financing facilities, and how those liens and rights would relate to each other as applied to each of the various types and categories of the Debtors' assets. As counsel for the ABL DIP Lenders noted at the Junior DIP Hearing, this took "a lot of time," and ultimately resulted in the heavily negotiated chart that was included in the proposed interim order filed on the day of the Junior DIP Hearing.[31]

70.     The need to conform the GA Capital DIP to the ABL DIP Facility also necessitated extensive diligence and legal research in connection with the Debtors' assets. As noted above, GA Capital's recovery from the any of the assets securing the GA Capital DIP would be junior both to the Winddown Account and, except for the Specified Collateral, which it shared *parri passu* with the ABL DIP Lenders, the ABL DIP Facility.

71.     In other words, the GA Capital DIP was behind over $2 billion in other obligations. Accordingly, GA Capital (and now Cyrus) could not agree to the deal structure the Debtors and the ABL DIP Lenders were proposing without a comprehensive review of the Debtors' assets and any prior encumbrances and claims with respect thereto. This required review not only of the real estate assets discussed above, but also reviewing the various assets purchase agreements the Debtors entered into in connection with the same sale of various parts of their business as well as resolution of complicated legal issues involving the MTNs[32] and the "springing liens" in favor of the PBGC. This, and related, diligence and legal research resulted in the creation of "Schedule 3" listing the Debtors' unencumbered collateral and filed with the proposed form of order granting the GA Capital DIP—which schedule (and, indeed, which proposed form of order) was drafted by Paul Hastings, negotiated with the other parties, and is now incorporated into the Cyrus DIP.

---

[31]   *See* Interim Junior DIP Order ¶ 14.
[32]   As defined in the *Emergency Motion of Debtors for Order Approving Sale of Medium Term Notes* [Docket No. 642].

72.    Accordingly, Paul Hastings respectfully submits that its fees and expenses were reasonable and that the services provided were the services a "reasonable professional would have [provided] under the circumstances." *In re Bayou*, 431 B.R. at 566, n.18.

*[Remainder of page intentionally left blank.]*

WHEREFORE, GA Capital requests entry of an order, substantially in the form attached

hereto as **Exhibit A**, allowing the Requested Fees as administrative expenses and granting such

other relief as the Court deems just and proper.

Dated:  December 9, 2018                    /s/ Andrew V. Tenzer
       New York, New York

                        PAUL HASTINGS LLP
                        Andrew V. Tenzer, Esq.
                        Leslie A. Plaskon, Esq.
                        Shlomo Maza, Esq.
                        200 Park Avenue
                        New York, New York 10166
                        Telephone:  (212) 318-6000
                        andrewtenzer@paulhastings.com
                        leslieplaskon@paulhastings.com
                        shlomomaza@paulhastings.com

                        *Counsel to GACP II, L.P.*

26