**Exhibit B**
**Louzan Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x
:
In re: :
: Chapter 11
SEARS HOLDING CORPORATION, *et al.*, :
: Case No. 18-23538-RDD
Debtors.[1] : (Jointly Administered)
------------------------------------------------------------------ x

# DECLARATION OF ROBERT LOUZAN IN SUPPORT OF APPLICATION OF GA CAPITAL FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES PURSUANT TO BANKRUPTCY CODE SECTIONS 503(b)(3)(D) AND 503(b)(4)

Pursuant to 28 U.S.C. § 1746, I, Robert Louzan, declare as follows:

1. All of the facts set forth herein are based on my personal knowledge and, if called upon to testify to the contents of this Declaration, I could and would do so.

2. I am a managing director of Great American Capital Partners, L.P., located at 11100 Santa Monica Boulevard, Suite 800, Los Angeles, California, 90025.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

3. I submit this Declaration in support of the *Application of GA Capital for Allowance and Payment of Fees and Expenses Pursuant to Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4)* (the "Application").[2]

4. I participated extensively in the negotiations of the GA Capital DIP described in the Application.

5. During the course of these negotiations, I had numerous conversations with Lazard and the Debtors' other advisors regarding a potential Junior DIP Financing and, ultimately, the GA Capital DIP.

6. In the course of these conversations, the Debtors' advisors informed me that (i) the Debtors absolutely did not want ESL or Cyrus in to be involved in a Junior DIP Financing and (ii) the Debtors wanted to avoid a lender that held debt or equity positions "all over" the Debtors' capital structure.

7. Prior to executing the NDA, GA Capital had been involved in discussions with ESL about potentially participating in the junior DIP financing described in the ESL/Cyrus Term Sheet. After executing the NDA with the Debtors in connection with the Process Letter, GA Capital never had any discussions with ESL about a Junior DIP Financing.

8. In the course of GA Capital's conversations and negotiations with the Debtors and their advisors, Lazard informed me on or around November 7, 2018 that they had narrowed down the list of potential junior DIP lenders to GA Capital and Cyrus. Subsequently, on or around November 14, 2018, Lazard advised me that the Debtors had selected the GA Capital DIP as their junior DIP financing.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Application.

2

9. After being advised by Lazard that it had been selected to provide the junior DIP financing, on or around November 15, 2018, GA Capital received an inquiry from Cyrus in connection with the GA Capital DIP. GA Capital relayed this inquiry to Lazard, who advised GA Capital that it would "deal with" Cyrus. GA Capital had no other communications with Cyrus.

10. As the agent under the GA Capital DIP, GA Capital directed its professional advisors, Paul Hastings and Province, to conduct diligence on the Debtors' assets. This included the review of thousands and thousands of pages of lien searches and thousands of lease documents. This review was intrinsically tied to extensive negotiations between the Debtors, GA Capital, and the ABL DIP Lenders on the terms of an extremely complex collateral priority and allocation waterfall.

11. GA Capital, the Debtors, and the ABL DIP Lenders, together with their various professionals and advisors, then focused on the documentation required to implement the terms of the GA Capital DIP, including (among other things) an intercreditor agreement, satisfaction of conditions precedent to the extension of credit, issues of collateral priority and allocation, the size and structure of the Winddown Account, negotiation of the DIP order, and certain consent issues, including in connection with the Debtors' sale process.

12. In connection with these various negotiations (which also were impacted by the ongoing diligence and collateral review by GA Capital and its professionals), the parties began exchanging drafts of the necessary credit documents for the GA Capital DIP. These documents included finalization of the GA Capital DIP Documents, which include the GA Capital DIP Credit Agreement and related security and guaranty documents, the form of GA Capital DIP interim order, the DIP intercreditor agreement, and the various schedules and exhibits to each.

3

Ultimately, and as the result of its diligence and these extensive negotiations, GA Capital, the Debtors, and the ABL DIP Lenders reached agreement on finalized GA Capital DIP Documents.

13.     The negotiations of the GA Capital DIP Documents included discussions about the possibility of increasing the Winddown Budget and issues related to the calculation of the budget variance. At no point during these negotiations was GA Capital advised that the Debtors had received a proposal that would reduce the adequate protection package provided to the second lien lenders.

14.     Indeed, GA Capital was not advised at all that there was any competing offer until the morning of the Junior DIP Hearing—and GA Capital did not learn that the competing offer was from Cyrus until approximately noon the day of the Junior DIP Hearing.

15.     On the day of the Junior DIP Hearing, GA Capital engaged in negotiations with the Debtors and Lazard on the terms of the GA Capital DIP that GA Capital was advised Cyrus was more competitive. Specifically, GA Capital agreed to a $42 million fixed budget variance and to accept consultation (instead of consent) rights with respect to the selection of a liquidator.

16.     GA Capital also offered to reduce its interest rate to LIBOR + 10.0% and offered to increase the Winddown Account to $240 million. Both of these were improvements on the terms of Cyrus's offer, as it was reported to GA Capital. After improving on the Cyrus offer, GA Capital never received a response from the Debtors or their advisors until approximately 30 seconds prior to the start of the Junior DIP Hearing, when GA Capital learned that Cyrus had matched the improved terms offered by GA Capital and that the Debtors had selected the Cyrus DIP. GA Capital received an acknowledgement at that time from Lazard that GA Capital had agreed to all of the modifications that the Debtors had requested during the "auction" held outside the courtroom prior to the Junior DIP Hearing.

4

17. At no point was GA Capital presented with an offer that exceed (as opposed to matched) the terms it had offered, and at no time did GA Capital indicate to the Debtors or Lazard that it was unwilling or unable to continue negotiating the terms of the GA Capital DIP.

18. At no time prior to the Debtors' statements to the Court during the Junior DIP Hearing did GA Capital or its advisors hear from the Debtors or their advisors about the adequate protection proposal made by Cyrus, how the Debtors valued it, and what GA Capital might do to provide value in an equal amount.

19. Both prior to and after the Junior DIP Hearing, I, as a representative of GA Capital, received a "thank you" from Lazard for all of the valuable work that GA Capital performed that had enabled Cyrus to step into the shoes of the GA Capital DIP. Both prior to and after the Junior DIP Hearing, Lazard informed me that the board of directors of the Debtors (or a subcommittee thereof) had approved the reimbursement of the fees and expenses of GA Capital's professionals, up to a certain amount that was significantly less than the amount sought in the Application.

20. On or around November 28, 2018, GA Capital was advised by certain of the lenders in the syndicate it had arranged in connection with the GA Capital DIP that Cyrus had reached out to them in an attempt to syndicate some of its commitment under the Cyrus DIP.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 9, 2018

                                                                   */s/ Robert Louzan*
                                                                    Robert Louzan