WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Ryan Preston Dahl (*pro hac vice pending*)
Jessica Liou

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                                                    :
                                                         :        **Chapter 11**
**SEARS HOLDINGS CORPORATION, *et al.*,**                :
                                                         :        **Case No. 18-23538 (RDD)**
                                                         :
               Debtors.[1]                               :        **(Jointly Administered)**

-------------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DEBTORS' REPLY TO OBJECTION OF THE UNITED STATES TRUSTEE
TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER
(I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"

and, together with their non-debtor affiliates, the "**Company**"), respectfully submit this reply (this

"**Reply**") (i) in response to the objection[2] (the "**Objection**") of the United States Trustee for

Region 2 (the "**U.S. Trustee**") to, and (ii) in further support of, the *Motion of Debtors for Entry of*

*an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees*

*and (II) Granting Related Relief* [Docket No. 766] (the "**Motion**"),[3] and respectfully state as

follows:[4]

**Preliminary Statement**

1.    There is no real dispute that the Debtors are at a critical juncture in their

chapter 11 cases, or that the Debtors will require both business stability and outperformance for

these chapter 11 cases to succeed.  Nor is there any real dispute incentive based award programs

(for senior leadership) and retention based award programs (for less senior, critical employees) are

an appropriate, if not necessary tool for the Debtors—like practically each one of their peers—to

---

[2]    On December 7, 2018, the U.S. Trustee filed the *Objection of the United States Trustee to Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* [Docket No. 1082].

[3]    Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

[4]    In support of this Reply and in further support of the Motion, the Debtors hereby submit the Supplemental Declaration of Mohsin Meghji, attached hereto as **Exhibit B** (the "**Supplemental Meghji Declaration**") and the Declaration of Robert Weber, attached hereto as **Exhibit C** (the "**Weber Declaration**").

2

achieve this goal.[5]  And there is no real dispute that the Debtors will be at a competitive disadvantage absent the relief requested by their Motion.  Indeed, the Debtors have experienced attrition among key executives, including the loss of one KEIP Participant and 5 KERP Participants in just four (4) weeks since filing the Motion on November 15, 2018.

2.    To be clear, the Debtors, as fiduciaries for all stakeholders, believe that the market-driven incentive and retention based program proposed by their Motion is essential to the overall success of these chapter 11 cases and fully squares with applicable law and practice here. The Debtors' economic stakeholders also agree; and no party other than the U.S. Trustee has objected to the relief requested by the Motion.  For its part, the Official Committee of Unsecured Creditors (the "**Creditor's Committee**") raised certain informal concerns with respect to the Debtors' proposed KEIP and KERP, and the Debtors, with the assistance of their advisors, have engaged in a process of diligence, discussion, deliberation and arm's length negotiation to resolve such concerns.  Through this process, the Debtors believe they have resolved the Creditors' Committee's concerns through among other things, modifications to the KEIP and KERP which are detailed below:

| KEIP Component | Original KEIP | Revised KEIP |
|---|---|---|
| Number of Participants | 18 | 19[6] |

---

[5]    Notably, the U.S. Trustee does not dispute that: (i) absent the award opportunities provided by the Debtors' proposed KEIP and KERP programs, Key Employees will be materially undercompensated compared with their peers at similarly situated companies; or (ii) even if **maximum** performance is achieved, compensation opportunities for both KEIP Participants, in particular, will still fall well below such peers. (*See* Friske Decl. ¶ 15 ("[A]t the **maximum** payout level, total direct compensation for the KEIP Participants would fall 11% below the 25th percentile.") (emphasis added).)

[6]    As stated in greater detail herein and in the Weber Declaration, the COO – Home Services has departed and two (2) previous KERP Participants (VP/GM Automotive Operations and Head, SYW Financial Services) have been moved from the KERP into the KEIP.

3

| | | |
|---|---|---|
| Notice and Objection Deadline for the Acceleration Provision | Not included | No less than seven (7) days in advance of the Company's intention to pay any KEIP Award on account of the Acceleration Event, the Debtors shall provide: (1) the Creditors' Committee with prior written notice and the proposed KEIP bonus payout for each individual Participant and (2) the U.S. Trustee with prior written notice and opportunity to object |
| Notice and Objection Deadline for the Amended Budget and Q2 Budget (each as defined in the order) | Not included | Amended Budget: The Debtors shall provide for ten (10) days' notice to the: (1) Creditors' Committee, (2) the U.S. Trustee, and (3) the DIP Lenders, solely with regard to the updated DIP Budget providing new Cash Flow Targets;[7] and an opportunity to object during this notice period to: (1) Creditors' Committee, and (2) the U.S. Trustee.<br><br>Q2 Budget: The Debtors shall provide for two (2) weeks' notice to the: (1) Creditors' Committee, and (2) the DIP Lenders, solely with regard to the Q2 DIP Budget for the providing new Cash Flow Targets; and an opportunity to object during this notice period to the Creditors' Committee. |
| Performance Periods | First Performance Period: three (3) months' ending January 15, 2019<br>Second Performance Period: three (3) months' ending April 15, 2019 | First Performance Period: November 18, 2018 – February 2, 2019<br>Second Performance Period: February 3, 2019 – April 14, 2019 (the "**Second Performance Period**") |
| Waiver | KEIP Award subject to waiver of severance and of any benefits under the AIP and LTIP | Clarified that KEIP participation is subject to the waiver of all claims and rights to severance, all cash-based incentive compensation including retention bonuses, and payments under AIP or LTIP granted on or prior to December 31, 2019 |
| Additional Terms | N/A | KEIP participation is conditioned on entry into non-competition and non-solicitation covenants only for Participants who had restrictive covenants in their executive severance agreements or other similar arrangements.<br><br>The Debtors may not add new KEIP Participants other than to replace current KEIP Participants whose employment has terminated and who have not received any |

---

[7]     The actual Total Operating Cash Flow calculation in respect of a Performance Period shall be adjusted by the administrator of the KEIP for any timing differences materially inconsistent with the Updated DIP Budget or any other debtor-in-possession financing budget, in consultation with the Creditors' Committee.

WEIL:\96834207\8\73217.0004

| | | payments under the plan, absent separate order of the court |
|---|---|---|
| **Total Plan Cost (Min–Max KEIP Award)** | **$2,124,863 (min); $8,499,452 (max)** | **$2,107,613 (min) – $8,430,452 (max)** |
| **KERP Component** | **Original KERP** | **Revised KERP** |
| Participants | 322 | 315 (with a maximum of 322 KERP Participants) |
| Waiver | KERP Award subject to waiver of severance, applicable AIP or LTIP payments | Clarified that KERP participation is subject to the waiver of all claims and rights to severance, all cash-based incentive compensation including retention bonuses, and payments under AIP or LTIP granted on or prior to December 31, 2019 |
| KERP Participant Review | Not included | Clarified that the Debtors shall provide reasonable advance written notice to Creditors Committee of any proposed additions or reallocations of KERP Participants in accordance with the terms and conditions of the KERP Administrative Guidelines. |
| Additional Terms | N/A | KERP participation is conditioned on entry into non-competition and non-solicitation covenants only for Participants who had restrictive covenants in their executive severance agreements or other similar arrangements. The Debtors will provide reasonable notice to the Creditors' Committee before adding new KERP Participants and in any event will maintain a maximum of 322 KERP Participants |
| Total Max Per-participant KERP Award (4 Quarter Aggregate) | $150,000 | No Change |
| **Total Max Cost of KERP (4 Quarter Aggregate)** | **$16,930,000** | **No Change** |

3.      The Debtors' proposed modifications do not increase the maximum aggregate or per-person awards that may be payable under the KEIP and the KERP.  In fact, these modifications **reduce** the maximum award opportunity provided by the KEIP, which reflects a

5

$69,000 reduction to a total award pool of $8,430,452.[8]   A revised form of order further incorporating these modifications attached hereto as **Exhibit A**.

4.      Through these modifications, the Debtors have also proactively sought to address concerns raised by the U.S. Trustee through its Objection by:

- Implementing a mechanism by which the Debtors will provide the U.S. Trustee and the Creditors' Committee with notice and an opportunity to object to DIP Budget modifications as applied to the KEIP's Cash Flow Targets; and

- Reserving the U.S. Trustee's rights to object to payment of any KEIP Award on account of an Acceleration Event at a later date should such award actually be payable here.

Further, the Debtors have addressed the evidentiary aspects of the U.S. Trustee's objections by providing further evidence supporting, among other things, (i) the critical nature of KEIP and KERP Participants' respective performance to the overall success of these chapter 11 cases (through the Supplemental Meghji Declaration attached hereto as **Exhibit B**); and (ii) the Debtors' determination that the KERP Participants are not "insiders" as that term is defined by section 101(31) and construed by the caselaw (through the Weber Declaration attached hereto as **Exhibit C**).

5.      The Debtors therefore respectfully submit that their proposed KEIP and KERP, as modified on the terms and conditions set forth herein and by their revised form of order, (i) reflects a sound exercise of business judgment, (ii) satisfies the applicable requirements imposed by Section 503(c) of the Bankruptcy Code, and (iii) provides a substantial benefit to these estates and should be approved.

---

[8]      The maximum quarterly KEIP Award opportunity is now $2,107,613, reduced by $17,250 from the amount originally proposed in the Motion.

6

## Modifications to the KEIP and KERP Participants

6.    The Debtors have modified the composition of their proposed KEIP and

KERP Participants in two ways since filing the Motion on November 15, 2018. **First,** with regard

to the KEIP, one of the KEIP Participants, COO – Home Services, has departed employment with

the Debtors, which has resulted in these duties being shifted to other members of management.

The Debtors have also determined that the Head, SYW Financial Services and VP/GM Automotive

Operations, should be moved into the KEIP (previously included in the KERP) and provide them

with incentive compensation, as better fit with their responsibilities.   Accordingly, the Debtors

have modified their proposed universe of KEIP Participants and related award opportunities as

follows:

| No. | Participant's Title | Annual Salary | Maximum KEIP Quarterly Award Opportunity | Quarterly Threshold 50% Award (Achievement of 110% Net Cash Flow Metric) | Quarterly Target 85% Award (Achievement of 115% Net Cash Flow Metric) | Quarterly Maximum 100% Award Amount (Achievement of 120% Cash Flow Metric) |
|---|---|---|---|---|---|---|
| 1 | President, Real Estate | $600,000 | $112,500 | $56,250 | $95,625 | $112,500 |
| 2 | President & CMO KCD/ Chief Brand Officer SHC | $500,000 | $93,750 | $46,875 | $79,688 | $93,750 |
| 3 | Chief Executive Officer – Home Services | $750,000 | $187,500 | $93,750 | $159,375 | $187,500 |
| 4 | President, Grocery, Drug, Rx | $400,000 | $75,000 | $37,500 | $63,750 | $75,000 |
| 5 | President, Softlines/ Office of the CEO | $975,000 | $243,750 | $121,875 | $207,188 | $243,750 |
| 6 | Chief Digital Officer/ Office of CEO | $975,000 | $243,750 | $121,875 | $207,188 | $243,750 |
| 7 | Chief Commercial Officer – Shop Your Way | $550,000 | $137,500 | $68,750 | $116,875 | $137,500 |
| 8 | SVP, Finance - Controller, Risk, APP | $500,000 | $125,000 | $62,500 | $106,250 | $125,000 |
| 9 | Chief Financial Officer/ Office of the CEO | $975,000 | $243,750 | $121,875 | $207,188 | $243,750 |

7

| No. | Participant's Title | Annual Salary | Maximum KEIP Quarterly Award Opportunity | Quarterly Threshold 50% Award (Achievement of 110% Net Cash Flow Metric) | Quarterly Target 85% Award (Achievement of 115% Net Cash Flow Metric) | Quarterly Maximum 100% Award Amount (Achievement of 120% Cash Flow Metric) |
|---|---|---|---|---|---|---|
| 10 | Chief Information Officer | $500,000 | $93,750 | $46,875 | $79,688 | $93,750 |
| 11 | President, Hardlines | $425,000 | $79,688 | $39,844 | $67,734 | $79,688 |
| 12 | SVP, Corp. Planning & Bus. Fin. | $450,000 | $84,375 | $42,188 | $71,719 | $84,375 |
| 13 | General Counsel & CCO | $425,000 | $79,688 | $39,844 | $67,734 | $79,688 |
| 14 | Chief Human Resources Officer | $375,000 | $70,313 | $35,156 | $59,766 | $70,313 |
| 15 | Chief Online Officer | $633,000 | $63,300 | $31,650 | $53,805 | $63,300 |
| 16 | Head of Stores | $525,000 | $52,500 | $26,250 | $44,625 | $52,500 |
| ~~17~~ | ~~COO - Home Services~~ | ~~$500,000~~ | ~~$93,750~~ | ~~$46,875~~ | ~~$79,688~~ | ~~$93,750~~ |
| 17 | Lead, Enterprise Inventory Optimization | $450,000 | $45,000 | $22,500 | $38,250 | $45,000 |
| 18 | Head, SYW Financial Services | $425,000 | $42,500 | $21,250 | $36,125 | $42,500 |
| 19 | VP/GM Automotive Operations | $340,000 | $34,000 | $17,000 | $28,900 | $34,000 |
| | **Total** | | **$2,107,613** | **$1,053,806** | **$1,791,471** | **$2,107,613** |

7.    ***Second***, with regard to the KERP, the Debtors currently intend to offer

participation in the KERP to 315[9] non-insider non-union employees rather than 322 as

contemplated under the Motion, but reserve the right to provide up to 322 KERP Participants with

a KERP Award—with written notice to the Creditors' Committee prior to any new additions; but

---

[9]    The Debtors' revised universe of KERP Participant reflects: (i) five (5) initial KERP Participants departing the Debtors' employment; (ii) two (2) initial KERP Participants being shifted to the Debtors' proposed KEIP (as noted above); (iii) the removal of eight (8) initial KERP Participants for business or administrative reasons; and (iv) the addition of eight (8) individuals as replacements. (In sum, a net loss of seven (7) KERP Participants).

WEIL:\96834207\8\73217.0004

for the avoidance of doubt, in no instance will the KERP exceed $16,930,000 in the aggregate or $150,000 per KERP Participant.[10]

### The Objection Should Be Overruled

8.      The U.S. Trustee objects primarily on two grounds: (i) the KEIP should be denied because it is not adequately incentive-based, and (ii) the KERP should be denied because certain KERP Participants may be "insiders" as that term is defined by section 101(31) of the Bankruptcy Code.  The Debtors respectfully disagree.  As detailed in the Motion and in their supporting Declarations, the KEIP requires substantial outperformance from KEIP Participants if the applicable performance targets are to be achieved—and there is certainly no guaranty that such targets will be achieved.  The "stretch" and value-creative nature of the KEIP's performance targets is further demonstrated by the fact that no economic stakeholder in these chapter 11 cases has objected to the relief requested here.  Similarly, the record amply supports a determination that none of the Debtors' 315 KERP Participants are "insiders"; in fact, not a single KERP Participant reports directly to the Sears Holding's board of directors (the "**Board**") or holds the title of Senior Vice President or above.  In sum, the Objection should be overruled and the KEIP and KERP (as modified herein) should be approved.

A.      **The KEIP Is Primarily Incentive-Based**

9.      The U.S. Trustee asserts that the KEIP's "overall purpose is to persuade senior executives to remain employed" rather than to incentivize.  Objection, at *3.  This is contrary to the facts.  The Debtors' stated goal of the KEIP is to incentivize outperformance during

---

[10]    Any payments of KERP Awards to new KERP Participants added subsequent to the Motion and payments of Discretionary Awards shall come from unallocated amounts of the KERP Award Pool.  For the avoidance of doubt, such payments shall not exceed the lesser of 100% of the KERP Participant's aggregate KERP Award or $150,000.

9

these pressurized chapter 11 cases. (*See, e.g.*, Mot. ¶ 20.) The U.S. Trustee's concerns are misplaced. As detailed in the Meghji Declaration and the Supplemental Meghji Declaration: (i) the achievement of both the Cash Flow Targets and the Acceleration Event (collectively, the "**Performance Targets**") require substantial outperformance by KEIP Participants; (ii) the Performance Targets are linked to the combined efforts of each of the KEIP Participants, working as a team; and (iii) the U.S. Trustee's concerns over a potential ability of the Debtors to unilaterally modify the Performance Targets through DIP Budget amendments have been addressed through the Objection Procedures as reflected in the Debtors' revised form of order.

**2.      The KEIP Is Primarily Incentive-Based Because Achievement of the Performance Targets Require Concerted Effort By KEIP Participants**

10.      The Performance Targets—both the Cash Flow Targets and the Acceleration Event—are difficult to achieve and require the coordinated, concerted effort by the KEIP Participants. The Cash Flow Targets are derived from the Updated DIP Budget,[11] which is vetted and approved by the Debtors' lenders to two debtor-in-possession facilities, and represents the outperformance of the Debtors' projected operations. The Cash Flow Targets are derived from the "Total Operating Cash Flow" line item of the Updated DIP Budget, which is composed of the Debtors' total cash receipts resulting from their operations (realizing the value in cash from sales of goods and services) minus the total operating disbursements (the most significant of these disbursements being merchandise, workforce-related costs, taxes, and real estate occupancy). And as negotiated with the Creditors' Committee, the ultimate Cash Flow Target metric will ensure that the Total Operating Cash Flow is net of the cost of the KEIP.

---

[11]    *See Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 955], **Ex. C** (DIP Budget) (the "**Updated DIP Budget**")

11.     To be clear, simply meeting expectations through the Updated DIP Budget (i.e., 100% performance) will not trigger any award here.  Rather, in order to earn the minimum KEIP Award, the KEIP Participants must achieve the difficult benchmark of 110% of the Cash Flow Target.  For the avoidance of doubt, the achievement of the Updated DIP Budget's expectations (i.e., 100% performance) is insufficient to earn a KEIP Award; if, and only if, the Debtors outperform the current projections by 110%, will any of the KEIP Participants be eligible for a KEIP Award.  (*See* Supp. Meghji Decl. ¶ 8.)

12.     The achievement of an Acceleration Event, under the circumstances of these chapter 11 cases, would also require the combined and concerted effort on behalf of the KEIP Participants.  As with many retailers operating in chapter 11, the Debtors face a variety of challenges including vendor pressure, the need to drive customer traffic, market uncertainty, and overall business pressures within the overhang of this restructuring.  These concerns are amplified here by the sheer enormity of the Debtors' undertaking as it cannot be credibly disputed that these chapter 11 cases entail a substantial degree of complexity entailed by the Debtors' highly complex capital structure and operating base.  The Debtors' ability to consummate a chapter 11 plan or sale of substantially all of the assets of the Debtors' enterprise will be no easy feat—a point underscored by the recent and well-publicized challenges faced by other leading retailers in chapter 11.[12]  And, again, the Debtors' economic stakeholders are in agreement here as no such party has asserted that achievement of an Acceleration Event will require anything less than substantial outperformance.

---

[12]     *See, e.g.*, Joan Verdon and Charisse Jones, *Toys R Us files for liquidation, likely spelling its end in the U.S.*, USA Today, Mar. 15, 2018, https://www.usatoday.com/story/money/business/2018/03/15/toys-r-us-files-bankruptcy-liquidation/427129002/ (discussing events leading up to liquidation filing).

WEIL:\96834207\8\73217.0004

3.      **The Performance Targets are Linked to the Efforts of the KEIP Participants**

13.      The U.S. Trustee argues that "there is no nexus in the [KEIP] between the [KEIP] Participants and the targets." (Obj., at *3.) This argument is incorrect. KEIP Participants are the 19 senior-most executives responsible for leading and managing the Debtors' business operations, developing overall strategy, and guiding the Debtors' business trajectory. No one individual is (or could be) responsible for such an undertaking. But rather, it is the cooperative work of the Debtors' senior management to work together to achieve outperformance, each as a distinct but necessary component. Each KEIP Participant must excel in their individual capacities and within larger working groups for the overall enterprise to succeed. (*See* Weber Decl. ¶ 7.) Each KEIP Participant fills a distinct role and each individual's set of responsibilities is vital to the Debtors' enterprise. (*See* Supp. Meghji Decl. ¶ 11.)

14.      In fact, KEIP Participants are largely responsible for distinct business units or divisions and without such business units and divisions and in order to drive outperformance with respect to revenue from all of its businesses, the leaders of each business unit, who are responsible for such unit's financial performance, will need to outperform. Put differently, outperformance from the Debtors' businesses will require senior leadership and that leadership, in turn, is provided by the KEIP Participants. In short, there is a clear "nexus" between the efforts of the KEIP Participants and the Performance Targets.

4.      **The Performance Targets are Subject to Proper Review**

15.      As noted above, the KEIP requires the Debtors to achieve the reach benchmark of 110% of the Cash Flow Target based on the Cash Flow Targets (derived from the Updated DIP Budget) for a KEIP Participant to be eligible for the lowest KEIP Award. The Updated DIP Budget, in turn, is created and updated by the Debtors and their advisors, and must

12

be vetted and approved by the lenders to both debtor-in-possession financing facilities. To be clear, the Debtors do not have the ability to unilaterally change the Updated DIP Budget and correspondingly, revise the Cash Flow Targets in their favor. But in order to alleviate the U.S. Trustee's concern that the Cash Flow Target is "somewhat illusory"[13] because Debtors may revise the Updated DIP Budget, the Debtors have proposed a notice period and an opportunity to object to the U.S. Trustee and counsel to the Creditors' Committee, solely with regard to the revised Updated DIP Budget providing new Cash Flow Targets.

**B.    KERP Participants are Not Insiders**

**1.    The KERP Participants' Responsibilities and Seniority Reflect Their Non-Insider Status**

16.    It is a well-established principle that an employee's job title, alone, does not make such employee an "insider." *See In re Borders Grp. Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders); *see also In re Global Aviation Holdings Inc.,* 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (noting the statutory definition of an insider "is merely illustrative and the term insider should be flexibly applied on a case by case basis.") (internal quotations omitted). "[I]t is not simply the title 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds." *In re Longview Aluminum, L.L.C.*, 419 B.R. 351, 355 (Bankr. N.D. Ill. 2009).

---

[13]    (*See* Objection, at *3.)

17. Thus, courts will look at a number of factors to determine whether an employee's substantive role within the organization confers with it the sort of broad-based authority such that the heightened scrutiny appropriate to "insiders" should be applied, including:

- Decision-making authority. Whether the individual has authority to "unqualifiably dictate corporate policy and the disposition of corporate assets,"[14] or whether the individual is merely "responsible for running the [debtor's] day-to-day operations."[15]

- To whom the employee reports. Courts have reviewed whether the individual in question reports directly to a debtor's board of directors (or similar decision-making body) for purposes of assessing the individual's corporate authority.[16]

- Board-appointed. Courts have considered whether an individual holds a board-appointed position, with "insiders" generally including individuals that hold their position from direct confirmation by such the board.[17]

- Budget Development & Control. Insiders may "have discretionary control over substantial budgetary amounts,"[18] whereas corporate budgets may or will typically be determined by more senior personnel for non-insiders.

18. Nor is this analysis rigidly applied; rather, consideration of a particular individual's "insider" status should also reflect the particular circumstances of the debtor's enterprise, operations, and management practices. *In re Foothills Tex.*, 408 B.R. 573, 585 (Bankr. D. Del. 2009) (noting that "the type of evidence that might support finding a person to be an officer may vary from case to case based on the facts and circumstances surrounding the debtor's business."). In this regard, the examination ultimately turns on whether the individual in question exercises the material degree of authority necessary for the heightened scrutiny triggered by insider

---

[14] *Borders Grp.*, 453 B.R. at 469 (quoting *In re Babcock Dairy Co.*, 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986)).

[15] *Id.*

[16] *See, e.g.*, *Global Aviation*, 478 B.R. at 149.

[17] *See, e.g.*, *Borders Grp.*, 453 B.R. at 469; *In re Patriot Coal Corp.*, 492 B.R. 518, 535 (Bankr. E.D. Mo. 2013).

[18] *Global Aviation*, 478 B.R. at 149.

14

status under the Bankruptcy Code to apply. *See* S. Rep. No. 95–989, 2d Sess., at 25 (1978) ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor."), reprinted in 4 Collier on Bankruptcy ¶ 503.17 (16th ed. 2016). That is, "[a]n insider must 'exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets.'" *Patriot Coal*, 492 B.R. at 535 (quoting *Borders Grp.*, 453 B.R. at 469).

19.    The KERP Participants are clearly "not insiders" under this analysis. KERP Participants work across a variety of disciplines and are responsible for facilitating a range of tasks critical to the Debtors' operations, including matters relating to store operations, inventory management, real estate, legal, marketing, finance, human resources, and information technology. Because certain of the KERP participants' titles contain words such as "Director" or "Vice President" the U.S. Trustee argues that such individuals are presumed to be insiders, and therefore not eligible for the KERP. (*See* Obj., *15.) However, further to what is stated in the Motion:

- No KERP Participant has discretionary control over any material corporate transaction or the ability to dictate company policy.

- All KERP Participants must obtain approval from senior management before taking any action with respect to the disposition of significant assets.

- No KERP Participant, other than the Corporate Secretary, participates in the Debtors' corporate governance.

- No KERP Participant holds the title of Senior Vice President or above.

- No KERP Participant is a member of the Board or reports directly to the Board. Instead, each either reports to the Office of the Chief Executive or levels below.

- No KERP Participants are "section 16" officers.[19]

---

[19]    As of their most recent determination (occurring in May 2018), the Debtors' current executives subject to Section 16 of the Securities and Exchange Act of 1934, as amended are their:  Chief People Officer (resigned); Chief Executive Officer – Home Services; Chief Digital Officer; Chief Commercial Officer – Shop Your Way; Chief

15

- KERP Participants have no decisionmaking authority over the Debtors' enterprise-level budget, although such individuals may provide business-level inputs or advice with respect to such budget.

20.    Further, as described in the Weber Declaration, all of the KERP Participants are catalogued in the Debtors' internal recordkeeping systems with a level of seniority (a "**Seniority Level**"). (Weber Decl. ¶ 10.)  And the Seniority Level ascribed to the various KERP Participants, rather than their job titles, are better descriptors as to the particular employees' role in the Debtors overall business.  The Debtors' recordkeeping systems follow the following hierarchy, listed in descending order of seniority:

| Seniority Level | Shorthand | Number of Proposed KERP Participants |
|---|---|---|
| Senior Vice President | SVP | 0 |
| Vice President | VP | 33 |
| Divisional Vice President | DVP | 36 |
| Senior Director / Director | DD | 147 |
| Manager | M | 89 |
| Individual Contributor | IC | 10 |
| Total | | 315 |

21.    The categorization and Seniority Level of many of the KERP Participants is easily deduced from their titles, some of which enumerate the Seniority Level such as VP or DVP in the title itself.  Others, which may have a less descriptive title of "Head" or "Assistant" are nonetheless ascribed a Seniority Level in the Debtors' internal systems.  Importantly, as stated above, none of the proposed KERP Participants is ascribed a Seniority Level above VP, regardless of the employee's title.  Indeed, the scope of authority for each of these individuals is limited to a

---

Financial Officer; President, Hardlines; General Counsel and Chief Compliance Officer (the "**Section 16 Officers**").  Each of these Section 16 Officers are included in the KEIP.

business unit or business segment, and is not company-wide.[20]  The company-wide leadership—including the Debtors' Chief Financial Officer who for example, is assigned a Seniority Level of SVP—have been listed in the KEIP.  Providing business unit level Key Employees with titles such as "Head" or "CFO" is common in large enterprises and the Debtors are not unique in this respect.  But, while these KERP Participants are critical to the Debtors because of such leadership across the Debtors' many businesses, they in no way "unqualifiably dictate corporate policy and the disposition of corporate assets" such that an "insider" status should apply here.

22.    Additionally, to avoid any confusion, there are three KERP Participants who were appointed by the Board but do not report to the board: (i) the Manager, Business Finance, (ii) VP Tax, and (iii) DVP, Deputy General Counsel and Corporate Secretary.  To repeat, none of the three KERP Participants who were appointed by the board report to the Board and are not policy-making individuals.  And as discussed, they are not "section 16" officers.  In sum, the Debtors respectfully submit that none of the KERP Participants is an "insider" and that the U.S. Trustee's concerns to the contrary are misplaced.

### 2.    The Discretionary Award is Subject to Restructuring Committee Oversight

23.    Finally, the U.S. Trustee asserts that there is no way to determine that the Discretionary Award (as defined in the Motion) is reasonable under any standard.  (*See* Obj., at *16.)  As discussed in the Motion, the Discretionary Award is subject to oversight by the Restructuring Committee of the Board and will follow the parameters of the proposed KERP program.  (*See* Mot. ¶ 27(i).)  Further, the Restructuring Committee members, as members of the Board, are subject to fiduciary duties arising under state corporation law.  As such, the

---

[20]    *Cf.* S. Rep. No. 95–989, 2d Sess., at 25 (1978) ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny that those dealing at arms [sic] length with the debtor.").

17

Restructuring Committee's decisions, including with respect to the Discretionary Award, are subject to standards that are far from arbitrary. Accordingly, the Debtors respectfully submit that the U.S. Trustee's concern with respect to the Discretionary Award is misplaced.

### Conclusion

24.    The Debtors respectfully submit that the KEIP and KERP are each reasonable, market-based approaches to appropriately incentivize and, as applicable, retain key employees during these chapter 11 cases. The KEIP and KERP have been vetted and approved by the Debtors' major economic stakeholders. Furthermore, the Debtors have shown that the KEIP is primarily incentive-based and that the KERP contains no insiders. Thus, the KEIP and KERP are justified under the facts and circumstances of these cases. Accordingly, the Debtors respectfully submit that this Court should overrule the U.S. Trustee's Objection and grant the Motion.

[*Remainder of Page Intentionally Left Blank*]

WEIL:\96834207\8\73217.0004

WHEREFORE the Debtors respectfully request that the Court grant the Motion and such other and further relief as is just.

Dated:    December 12, 2018
          New York, New York

                              /s/ Ray C. Schrock, P.C.
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York  10153
                              Telephone:   (212) 310-8000
                              Facsimile:   (212) 310-8007
                              Ray C. Schrock, P.C.
                              Jacqueline Marcus
                              Garrett A. Fail
                              Sunny Singh
                              Ryan Preston Dahl (*pro hac vice pending*)
                              Jessica Liou

                              *Attorneys for Debtors*
                              *and Debtors in Possession*

**<u>Exhibit A</u>**

**Revised Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                 :
                                                      :         **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,             :
                                                      :         **Case No. 18-23538 (RDD)**
                                                      :
            Debtors.[1]                               :         **(Jointly Administered)**
-----------------------------------------------------------------x

## ORDER (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

Upon the motion, dated November 15, 2018 (ECF No. 766) (the "**Motion**")[2] of

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a),

363(b), and 503(c)(3) of title 11 of the United States Code (the "**Bankruptcy Code**") and in

accordance with the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), for entry

of an order (i) approving of the Debtors' incentive and retention programs for certain key

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

employees and (ii) granting related relief, all as more fully set forth in the Motion and in the Debtors' reply, filed December 12, 2018 (ECF No. [    ]) (the "**Reply**"); and upon the Meghji Declaration, the Friske Declaration, the Supplemental Meghji Declaration, and the Weber Declaration; the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion and the Final Hearing (defined below) having been provided in accordance with the Amended Case Management Order and as set forth in the affidavit of service filed with respect thereto (ECF No. [__]), such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and upon the record of and representations made at the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and as modified by the Reply establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors' key employee incentive program (the "**KEIP**") as set forth in the Motion and as modified by the Reply is hereby approved.

3.      The Debtors are authorized to take all actions necessary to implement the KEIP on the terms and conditions set forth in the Motion and as modified by the Reply, including

2

making any payments that become due pursuant to the terms of the KEIP; *provided*, that the KEIP shall be subject to the foregoing notice and objection procedures (the "**Objection Procedures**"):

    a.  with regard to any proposed amendment to the debtor-in-possession financing budget (an "**Amended Budget**"):

        i.  the Debtors shall provide the Amended Budget to (1) counsel to the Creditors' Committee, (2) the U.S. Trustee, and (3) counsel to the administrative agent for each of the junior and senior debtor-in-possession financing facilities (the "**DIP Lenders**") as soon as practicable but in event less than ten (10) calendar days in advance (the "**Review Period**") of the effectiveness of such Amended Budget as establishing the Cash Flow Targets;

        ii.  counsel to the Creditors' Committee and U.S. Trustee may serve a written objection on the Debtors during the Review Period solely with respect to the effectiveness of the Amended Budget at establishing the Cash Flow Targets and for no other purpose (an "**Objection**");

        iii.  if no written Objection is received by the Debtors within the Review Period, the Debtors may set the Cash Flow Targets as established by the Amended Budget without further action by any party or order of the Court;

        iv.  if counsel to the Creditors' Committee or the U.S. Trustee serves a timely Objection (the "**Objecting Party**," as applicable) on the Debtors during the Review Period, then the Amended Budget shall be effective at establishing the Cash Flow Targets only upon resolution by the Debtors and the Objecting Party or upon further order of the Court;

    b.  with regard to the debtor-in-possession financing budget as it relates to the Cash Flow Targets for the Second Performance Period (the "**Q2 Budget**"):

        i.  the Debtors shall provide the Q2 Budget to counsel to the Creditors' Committee and counsel to the DIP Lenders no less than two (2) weeks before the start of the Second Performance Period (the "**Q2 Review Period**");

        ii.  counsel to the Creditors' Committee may serve a written objection on the Debtors during the Q2 Review Period solely with respect to the effectiveness of the Q2 Budget at establishing

3

the Cash Flow Targets and for no other purpose (a "**Q2 Objection**");

iii. if counsel to the Creditors' Committee serves a timely Q2 Objection on the Debtors during the Q2 Review Period, then the Q2 Budget shall be effective as establishing the Cash Flow Targets for the Second Performance Period only upon resolution by the Debtors and the Creditors' Committee or upon further order of the Court.

For the avoidance of doubt, the Objection Procedures shall apply solely with regard to any Amended Budget or Q2 Budget setting Cash Flow Targets and any Objection or Q2 Objection shall only apply to the effectiveness of an Amended Budget or Q2 Budget, as applicable, on establishing the Cash Flow Targets under the KEIP, as described in the Motion and as modified by the Reply.

4. The Debtors shall provide the Creditors' Committee, the DIP Lenders, and U.S. Trustee with prior written notice of the Debtors' intent to pay any KEIP Award on account of an Acceleration Event (an "**Acceleration Payment**") no less than seven (7) calendar days in advance of any such Acceleration Payment (the "**Acceleration Payment Notice Period**"); *provided*, that the U.S. Trustee's rights to object to the Acceleration Payment shall be preserved and the U.S. Trustee shall be entitled to object to an Acceleration Payment within the Acceleration Payment Notice Period by serving a written objection on the Debtors (the "**Acceleration Payment Objection**"), solely with respect to the Acceleration Payment. If the U.S. Trustee serves a timely Acceleration Payment Objection on the Debtors, the Debtors shall be able to pay an Acceleration Payment only upon resolution by the Debtors and the U.S. Trustee or upon further order of the Court.

5. The Debtors' key employee retention program (the "**KERP**") as set forth in the Motion and as modified by the Reply is hereby approved.

4

6.      The Debtors are authorized to take all actions necessary to implement the KERP on the terms and conditions set forth in the Motion and as modified by the Reply, including making any payments that become due pursuant to the terms of the KERP; *provided*, that the Debtors shall provide counsel to the Creditors' Committee and counsel to the DIP Lenders with reasonable advance written notice of any reallocations and/or additions of new participants to the KERP.

7.      Notwithstanding anything in the Motion, the Reply, or this Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable: (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP Orders).

8.      To the extent there is any inconsistency between the terms of any of the DIP Orders and this Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

9.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

10.     Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

WEIL:\96825746\6\73217.0004

12.     The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated:    _____, 2018
          White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

6

**<u>Exhibit B</u>**

**Supplemental Meghji Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors. [1] | : | **(Jointly Administered)** |

---------------------------------------------------------------x

### SUPPLEMENTAL DECLARATION OF MOHSIN MEGHJI
### IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER
### (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
### FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

I, Mohsin Meghji, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("**CRO**") of Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases. I am a Managing Partner with M-III Advisory Partners, LP ("**M-III**"). In October 2018, M-III was retained by Sears Holdings to provide the Debtors with a

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

CRO and to provide the Debtors and their other professionals with financial advisory services in connection with the Company's evaluation and development of strategic alternatives. In connection with the M-III engagement and prior to October 15, 2018 (the "**Commencement Date**"), I was appointed CRO of Sears Holdings with the contemplated commencement of the chapter 11 cases. As CRO, I report and provide strategic business advice to the Restructuring Committee of the Board of Directors of Sears Holdings in connection with the Debtors' chapter 11 cases, and I am responsible for carrying out the Debtors' chapter 11 strategy and objectives. I am knowledgeable about and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. I have more than 25 years of financial restructuring, interim management, turnaround, and management consulting experience.

2.      I submit this supplemental declaration in further support of the *Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* [Docket No. 766] (the "**Motion**") and in support of the *Debtors' Reply to Objection of the United States Trustee to Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* (the "**Reply**"), filed contemporaneously herewith.[2] I previously submitted a declaration attached to the Motion as **<u>Exhibit C</u>**, on November 15, 2018 in support of the Motion (the "**Initial Declaration**"), which I incorporate into this supplemental declaration by reference.

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Reply.

3.      Except as otherwise indicated, all statements in this supplemental declaration are based on my personal experience and knowledge, my opinion, my discussions with the Debtors' management and professionals, and my review of relevant documents.  If called to testify, I could and would testify to each of the facts and opinions set forth herein.  I am generally familiar with the pre- and post-petition structure of the Debtors' compensation programs, the Debtors' business goals, and with the Debtors' proposed key employee incentive plan (the "**KEIP**") and key employee retention plan (the "**KERP**") as they are set forth in the Motion and Reply.

4.      I have reviewed the Motion, Reply, and the documents identified therein, as well as the terms and provisions of the KEIP and KERP.  I believe that approval of each of the KEIP and KERP is essential to the Debtors' reorganization efforts and maximizing the value of the Debtors' estates for the benefit of all of the Debtors' economic stakeholders.

## The KEIP and KERP

5.      As discussed in my Initial Declaration, the Debtors' senior management and key employees (collectively, the "**Key Employees**") are critical to the Debtors' ability to maximize stakeholder value through this restructuring process.  And as noted in the Motion, employees are not immune to the pressures of chapter 11—the KEIP and KERP Participants find themselves uncertain of future employment and compensation, all the while responsible for additional chapter 11 related duties.  Moreover, per the Friske Declaration,[3] the Debtors' executives remain materially undercompensated versus their peers at similarly-sized retail companies.  In light of such uncertainty regarding job security and the future of the Debtors' businesses, and their

---

[3]      *Declaration of Douglas Friske in Support of Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief*, filed as **Exhibit B** to the Motion.

3

increased responsibilities, many of the Debtors' employees have sought alternative employment opportunities. Indeed, in the short time since the Debtors filed the Motion, the Debtors have suffered significant employee attrition, including departures by one KEIP Participant and five (5) KERP Participants. In order to maintain a stable employee base and maximize value for all stakeholders, the Debtors have determined that incentivizing outperformance for senior executives and providing retention bonuses for less-senior employees to "stay with the business" at this critical juncture is both appropriate and necessary.

### The KEIP Participant Incentives

6.      The KEIP Participants are comprised of the Debtors' senior-most executives, responsible for leading and managing the Debtors' business operations and employees, and guiding and implementing the Debtors' overall business strategy. As stated in my Initial Declaration, the KEIP is an incentive-based program, with performance goals set at the achievement of at least 110% of budgeted net cash flow ("**Net Cash Flow**") projected by the Debtors' current debtor-in-possession financing (the "**Cash Flow Targets**") on a quarterly basis for (i) the quarterly period ended January 15, 2019, and (ii) the quarterly period ended April 15, 2019, respectively, with maximum award opportunities available for the achievement of at least 120% of budgeted Net Cash Flow or above. Furthermore the KEIP contemplates that the full KEIP Award is earned if the Debtors achieve an Acceleration Event (the "**Acceleration Target**" and, together with the Cash Flow Targets, the "**Performance Targets**"). I have been informed that the United States Trustee for Region 2 (the "**U.S. Trustee**") objects to the KEIP on the basis that it is not primarily incentive-based primarily due to the Acceleration Target component. To be clear, the achievement of the Cash Flow Targets and an Acceleration Target will each require substantial

4

outperformance from the KEIP Participants and the proposed KEIP—inclusive of both components—is primarily incentive based.

7.      The Cash Flow Targets are derived from the Updated DIP Budget[4] and represent the outperformance of the Debtors' projected operations.  The Updated DIP Budget is created and updated by the Debtors and their advisors, and must be vetted and approved by the lenders to both debtor-in-possession financing facilities; put differently, the Updated DIP Budget cannot be changed by the Debtors on a simple whim.  Further, the Cash Flow Targets are derived from the "Total Operating Cash Flow" line item, which is the Debtors' total cash receipts resulting from their operations (realizing the value in cash from sales of goods and services) minus the total operating disbursements (the most significant of these disbursements being merchandise, workforce-related costs, taxes, and real estate occupancy).  And as negotiated with the Creditors' Committee, the ultimate Cash Flow Target metric will ensure that the Total Operating Cash Flow is net of the cost of the KEIP.

8.      Currently, the Debtors' Updated DIP Budget, projects a Total Operating Cash Flow loss for the thirteen-weeks ending February 16, 2019 of approximately $180 million.  And in order to earn the minimum KEIP Award, the KEIP Participants must achieve the difficult benchmark of 110% of the Cash Flow Target, in the face of chapter 11 pressures.  For the avoidance of doubt, the achievement of the Updated DIP Budget's expectations (i.e., 100% performance) is insufficient to earn a KEIP Award; if, and only if, the Debtors outperform the current projections by 110%, will any of the KEIP Participants be eligible for a KEIP Award.

---

[4]    *See* the debtor-in-possession financing budget dated November 21, 2018, as provided to the Company's debtor-in-possession lenders and filed as Exhibit C to the Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [Docket No. 955].

However, in order to alleviate the U.S. Trustee's concern that the Cash Flow Target is "illusory" because Debtors may revise the Updated DIP Budget, the Debtors have proposed to the U.S. Trustee and counsel to the Creditors' Committee a notice period and an opportunity to object solely with regard to the revised Updated DIP Budget providing new Cash Flow Targets.[5]

9.      The achievement of an Acceleration Event under the circumstances of these chapter 11 cases would also require concerted effort on behalf of the KEIP Participants. Recent retailers have not fared well in chapter 11 and the Debtors face similar challenges as a retailer, as end consumers are able to quickly and easily switch their preferred retailers (including online retailers). Moreover, the Debtors suffer from unique challenges arising from the complexity and scale of the Debtors' operations and capital structure. Therefore, the Debtors' ability to consummate a chapter 11 plan or sale of substantially all of the assets of the Debtors' enterprise will not be an easy feat; certainly, no one could say that either Acceleration Event could occur absent the outperformance and hard work of the Debtors' KEIP Participants. Moreover, as detailed in the Friske Declaration, acceleration provisions in general are not uncommon. However, again, in an effort to build consensus with the U.S. Trustee, the Debtors have proposed a notice period and an opportunity to object in the event an Acceleration Event is triggered and the Debtors seek to pay a corresponding KEIP Award.[6]

10.      Finally, although the Clawback has a retentive component, the retentive aspect of the Clawback does not negate the incentive-based character of the KEIP as a whole. In short, despite corollary retentive components, the KEIP as a whole is primarily incentivizing.

---

[5]      *See Reply* ¶ [•].

[6]      *Id.* ¶ [•].

**The KEIP Participants**

11.    As further detailed in the Weber Declaration,[7] the Debtors will be able to achieve the Performance Targets solely through the combined, concerted effort of all of the KEIP Participants.  The KEIP Participants collectively cover a variety of roles and each individual's unique set of responsibilities is vital to the Debtors' enterprise.  As discussed above, the Cash Flow Targets are derived from a combination of revenue generation, cost reduction, and operational efficacy as well as efficiency—essentially all aspects of the financial success of an enterprise.  Although not one individual can be responsible for revenue generation or operational efficiency, both can be achieved if each individual excels in his or her own capacity – creating synergies across the top levels of management.  In order to drive outperformance with respect to revenue from all of its businesses, the leaders of each business unit, who are responsible for such unit's financial performance, will need to outperform.

12.    Thus, to achieve outperformance on a revenue basis, the Debtors will require outperformance from the:

- Chief Commercial Officer – SYW;
- Head of Stores;
- President, Hardlines;
- Chief Executive Officer – Home Services;
- Chief Digital Officer;
- Chief Online Officer;
- President, Grocery, Drug, Rx;
- President & CMO KCD/ Chief Brand Officer SHC;
- Head, SYW Financial Services;
- VP/GM Automotive Operations; and
- President, Softlines.

---

[7]    Filed contemporaneously herewith.

Essentially, each KEIP Participant must drive his or her respective businesses or divisions to achieve the extraordinary sales of goods and services on a consolidated basis. Similarly, outperformance from a revenue perspective will also require the Debtors' operational and measurement structures to expand to meet this outperformance. Thus, roles such as:

- SVP, Corp. Planning & Business Fin.;
- Chief Information Officer;
- President, Real Estate;
- Lead, Enterprise Inventory Optimization;
- Chief Financial Officer;
- and the Chief Human Resources Officer

will themselves need to outperform to accommodate the increased processing and operational demands and not hamper sales performance. And finally, because the Cash Flow Targets are based on a metric that is driven in part by relative costs, achieving such targets would require extraordinary expense and risk management efforts.

13.     Under the compressed timelines attendant to these chapter 11 cases, the operational, financial, and legal risks associated with operating the Debtors' enterprise have been increased. Thus, any KEIP Participants whose responsibilities involve managing risk would need to expend greater than average effort just to achieve the same results—namely to prevent such risks from becoming realized. Thus, the SVP, Fin. – Controller, Risk, APP and General Counsel & Chief Compliance Officer are needed as well to outperform in order to achieve the Cash Flow Targets. In addition, such roles would need to expand their performance to accommodate the increased processing demands from an extraordinary revenue performance. These are just

illustrative examples of how the KEIP Participants must work together to reach collective goals, strive, and outperform for the enterprises' success.

### Conclusion

14.     Based on the foregoing, my experience, and the information presented in the Weber Declaration, and the terms and provisions of the KEIP and KERP as presented in the Motion and Reply, the KEIP and KERP are reasonable, appropriately designed, and narrowly-tailored to incentivize the KEIP Participants and to retain the KERP Participants for the benefit of the Debtors, their economic stakeholders, and the successful administration of these chapter 11 cases.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.


Dated: December 12, 2018                By:    /s/ Mohsin Meghji
       New York, New York                     Mohsin Meghji
                                              Chief Restructuring Officer
                                              Debtors and Debtors in Possession

**<u>Exhibit C</u>**

**Weber Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re                                                                    :

                                                                         :        **Chapter 11**

**SEARS HOLDINGS CORPORATION, et al.,**        :

                                                                         :        **Case No. 18-23538 (RDD)**

                                                                         :

          Debtors.[1]                                           :        **(Jointly Administered)**

------------------------------------------------------------x

### DECLARATION OF ROBERT WEBER
### IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER
### (I) APPROVING DEBTORS' INCENTIVE AND RETENTION PROGRAMS
### FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF

I, Robert Weber, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.       I am the Chief Human Resources Officer ("**CHRO**") of Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases.  I have been serving in the role of CHRO since October 1, 2018 and before that worked as Vice President Human Resources for Sears Holdings for three years.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

As CHRO, I am responsible for creating and executing on the Debtors' human resources strategy, defining talent needs, acquiring, managing, and developing that talent, and driving an organizational culture that pairs the Debtors' goals with workforce engagement. I am knowledgeable about and familiar with the Debtors' day-to-day operations, business affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. I have more than 23 years of human resources, management, and labor relations experience.

2.    I submit this declaration in support of the *Debtors' Reply to the Objection of the United States Trustee to Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* (the "**Reply**") filed contemporaneously herewith,[2] and in response to the objection [Docket No. 1082] by the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") filed in response to the *Motion of Debtors for Entry of an Order (I) Approving Debtors' Incentive and Retention Programs for Certain Key Employees and (II) Granting Related Relief* (the "**Motion**"). Except as otherwise indicated, all statements in this declaration are based on my personal experience and knowledge, my opinion, my discussions with the Debtors' other management and professionals, and my review of relevant documents. If called to testify, I could and would testify to each of the facts and opinions set forth herein. I am generally familiar with the pre- and post-petition structure of the Debtors' compensation programs, the Debtors' business goals, and with the Debtors' proposed key employee incentive plan (the "**KEIP**") and key employee retention plan (the "**KERP**") as they are set forth in the Motion and Reply.

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion.

WEIL:\96834055\3\73217.0004

3.    I have reviewed the Reply, the Motion, and the declarations identified therein.  Approval of the KEIP and KERP is essential to the Debtors' reorganization efforts and maximizing the value of the Debtors' estates for the benefit of all of the Debtors' economic stakeholders.

### The KEIP Participants' Roles

4.    As any retail business knows, the employees are the bedrock of enterprise. Operations rise and fall on the ability of the employees to drive performance, maximize output, and utilize valuable institutional knowledge and expertise to drive collectively towards a common goal.  The Debtors are no exception.  The Debtors' senior management and key employees (collectively, the "**Key Employees**") are critical to the Debtors' ability to not only continue day-to-day operations but to ultimately maximize stakeholder value through this restructuring process. The Debtors' Key Employees range from those responsible for determining the Debtors' strategic direction and ensuring that the Debtors achieve their overall performance goals, to hard-to-replace employees with valuable institutional knowledge and skills.  These individuals hold institutional knowledge critical to the Debtors' operations, and many have longstanding relationships with the Debtors' vendors and suppliers that would be difficult and expensive, if not impossible, to replace. Further, prior to and since the Commencement Date, there has been a high degree of uncertainty among the Debtors' Key Employees as to their job security, the future of the Debtors' business enterprise and, in view of these circumstances, whether they should be seeking other opportunities.

5.    My team and I worked with the Debtors' advisors to identify those employees most critical to the success of these chapter 11 cases and to provide those Key Employees with compensation programs tailored to incentivize those who can exercise control over the Debtors' operations and to retain those non-senior management employees essential to

3

the Debtors' businesses and restructuring efforts.  In this process, the Debtors ultimately identified: (i) 20[3] senior roles of the Debtors' management team (collectively, the "**KEIP Participants**"); and (ii) 315[4] critical, but less senior, non-insider employees (collectively the "**KERP Participants**"). I am a KEIP Participant but not a KERP Participant.

### Roles of the KEIP Participants

6.    The KEIP Participants are the 20 senior-most roles responsible for leading and managing the Debtors' business operations and employees, and guiding and implementing the Debtors' overall business strategy.  To be clear, there is not just one individual responsible for leading the Debtors' businesses, implementing strategy, and driving outperformance.  Rather, it is the cooperative work of the Debtors' senior management—here the KEIP Participants—to work symbiotically towards outperformance, each as a distinct but necessary component.  Akin to how the government has delegated powers and responsibilities to various branches and sectors and requires cooperation across all, the Debtors require that each KEIP Participant excel in their individual capacities and eventually work cooperatively within larger working groups for the overall enterprise to succeed.  In my view, fostering this type of cooperation and team-building environment maximizes value, as opposed to an alternative structure in which compensation is contingent on individual successes.

---

[3]    As further detailed in the Reply, originally only 18 KEIP Participants were contemplated, but upon further review and discussions with the Debtors' management and advisors, the Debtors believe it is appropriate to transition two Key Employees from the KERP into the KEIP.  *See Reply* ¶ 6.

[4]    As further detailed in the Reply, with the filing of the Motion, the Debtors had selected 322 KERP Participants, but due to a variety of reasons, including uncertainty concerning ongoing employment and compensation, the Debtors have suffered from attrition from both KEIP Participants and KERP Participants.  The Debtors will therefore maintain a KERP program with a maximum of 322 KERP Participants in the event that the Debtors determine that appropriate replacements should be made; but for the avoidance of doubt, in no instance will the maximum aggregate cost of the KERP exceed $16,930,000 or $150,000 per KERP Participant.

WEIL:\96834055\3\73217.0004

7.      In these chapter 11 cases, KEIP Awards are tied to the Debtors' ability to successfully achieve the Cash Flow Targets materially in excess of budgeted levels or the achievement of an Acceleration Event.  Neither the Cash Flow Targets nor an Acceleration Event can be achieved without the collective work of the KEIP Participants.  To provide the United States Trustee and all parties in interest with additional information as to why each KEIP Participant is necessary to achieve the Debtors' success (and achievement of the Cash Flow Targets and/or an Acceleration Event), I have provided herein a high level description of each of the KEIP Participants' roles;[5] per the below descriptions, the KEIP Participants are largely responsible for distinct business units or divisions.  Of course, these descriptions do not account for the entirety of the KEIP Participant's responsibilities, including their newfound chapter 11-related responsibilities, but these summaries provide insight as to why each "part" is essential to the "whole":

- Chief Financial Officer / Office of the Chief Executive:  The Chief Financial Officer provides strategic planning and leadership of the Debtors' business enterprise, is responsible for all actions by the Accounting and Finance group as well as reporting for the Debtors' global enterprise.  The Chief Financial Officer is responsible for interfacing with the Board of Directors of Sears Holdings (the "**Board**") and banking community with regard to financing the business.  Following the departure of the Chief Executive Officer on October 14, 2018, the Chief Financial Officer, together with the Chief Digital Officer, and President—Softlines have collectively undertaken the role of the "Office of the Chief Executive."[6]

- Chief Digital Officer / Office of Chief Executive:  The Chief Digital Officer provides the strategic plan and leadership of the online business; leads the marketing, brand, and online business organizations; and leads strategy for

---

[5]    Since filing the Motion, an individual who was proposed to be a KEIP Participant, the Chief Operating Officer – Home Services, has departed from the Debtors' employment. The Chief Operating Officer – Home Services role was responsible for developing and executing the business strategy that drives the desired financial results for the Home Services business unit. The Debtors do not anticipate rehiring for this role.  The Duties will be split primarily across other executives.

[6]    *See* Sears Holding Corp. Form 8-K, Item 5.02 (Oct. 15, 2018) (announcing formation of Office of the Chief Executive).

WEIL:\96834055\3\73217.0004

member-centric, integrated retail programs, physical and online, stores, and member experience. Following the departure of the Chief Executive Officer on October 14, 2018, the Chief Digital Officer, together with the Chief Financial Officer, and President—Softlines have collectively undertaken the role of the "Office of the Chief Executive."

- President, Softlines / Office of the Chief Executive: This role provides strategic planning and leadership of the Softlines business (Apparel, Home, Fine Jewelry, & Footwear); sets strategy for merchandise planning and programs for Softlines businesses; and establishes strategic partnership for the Softlines businesses with key vendors and brands. Following the departure of the Chief Executive Officer on October 14, 2018, the President—Softlines, together with the Chief Digital Officer, and Chief Financial Officer have collectively undertaken the role of the "Office of the Chief Executive."

- President, Hardlines: The President, Hardlines is the top operational leader for the Hardlines businesses; determines strategic direction for Home Appliances, Tools, Lawn & Garden, Outdoor Living, Sporting Goods/Fitness and the Mattress business units; and negotiates key partnerships with vendors and manufacturers.

- Chief Commercial Officer, SYW: The Chief Commercial Officer, SYW leads the Shop Your Way platform, marketplace, and partnerships for the Debtors' business enterprise, drives strategy for the Shop Your Way ecosystem and partnership development, and drives strategic partner acquisition and for the Shop Your Way platform and marketplace.

- Chief Executive Officer, Home Services: The Chief Executive Officer – Home Services is fully responsible for developing and executing the business strategy that drives the desired financial results for the Home Services business unit, which provides repair, improvement, and maintenance services to customers regarding their appliances, heating and cooling systems, kitchen, roofing, and lawn & garden through a team of service technicians.

- President, Grocery, Drug, Rx: The President, Grocery, Drug, Rx establishes strategic partnerships for the grocery, drug, pharmacy, and toy businesses; identifies and builds vendor partnerships for category merchandise; and leads highly regulated pharmacy business across 100+ locations.

- Head, SYW Financial Services: The Head, SYW Financial Services is responsible for leading the Sears Holdings Financial Services Team and oversees an organization consisting of a staff of 30 that represent Sears to over 8,000 Citi associates dedicated to the Sears / Citi partnership. The Financial Services Team is responsible for developing and managing all the branded/co-branded credit and payment vehicles and third party acceptance. The role supports the financial services needs of all formats and businesses including Sears Full-Line Stores, Kmart, Home Services, and Commercial businesses,

WEIL:\96834055\3\73217.0004

and is responsible for positioning the credit and payment products and promotions to drive profitable sales, enable customer purchasing needs, and provide critical customer information to enable customer analysis and identification.

- SVP, Corporate Planning & Business Finance:  The SVP, Corporate Planning and Business Finance leads financial planning and analysis for the Debtors, including the business plan at an enterprise-wide, segment (*e.g.*, Kmart, Sears, SYW.com), and business-unit level; oversees capital and contract review and the approval process of the same for the Debtors' enterprise; provides oversight and leadership for the Business Finance group; and is expected to deliver work product reporting on the business performance to the Board.

- SVP, Finance – Controller, Risk, APP: The SVP Finance – Controller, Risk, APP leads the Treasury department, ensures the liquidity needs of the business are met and strategically addressed; leads the loss prevention function, covering all properties (stores, distribution centers, and all corporate offices); and serves as Controller for the enterprise, establishing compliance to accounting standards and all reporting requirements.

- President & CMO KCD / Chief Brand Officer SHC: The President & CMO KCD/Chief Brand Officer SHC leads the Kenmore and Diehard businesses, setting strategy, product design, and product selection; leads both KCD and enterprise brand strategy, establishing brand value propositions for stores (Kmart and Sears), commerce websites, and services businesses; sets marketing and promotional strategy; and controls media spend.

- President, Real Estate:  The President, Real Estate is responsible for the global, physical footprint of the Debtors' enterprise; ensures the enterprise can acquire, manage, and/or divest from properties as required for business operations; and is a key partner to retail operations, online, and the Office of the Chief Executive in ensuring there is a physical location strategy to meet the Debtors' integrated retail strategy.

- Head of Stores: The Head of Stores is responsible for maximizing the financial performance of all Sears and Kmart retail locations while continuing to enhance the member experience both in stores and through online channels; provides general management and oversight for Sears and Kmart retail locations which includes corporate operations, sales, finance, construction and facilities teams; is responsible for executive-level operational, financial, and strategic leadership through plans, policies, practices and relationships; and provides thought leadership and partners with business leaders throughout the Debtors' enterprise.

- Lead, Enterprise Inventory Optimization: The Lead, Enterprise Inventory Optimization leads strategic inventory allocation across the enterprise, in partnership with merchant leaders; leads vendor management strategy through

centralized prioritization; and partners with the supply chain organization in planning appropriate decisions related to merchandise production.

- **VP/GM Automotive Operations**: The VP/GM Automotive Operations serves as the product and business leader for the Sears business format with regard to automotive operations, creating and executing both short-term and long-term business strategies that fit with the overall brand, key member segments, and company financial goals; is expected to have cross functional leadership responsibility across all segments, including buying, planning, allocation, ecommerce, member strategy, commercial, marketing, pricing, finance, sourcing, stores, and product development and partners closely with a group of cross-functional support partners including the Inventory Management, Marketing, Finance, Shop Your Way, and Retail Services teams to develop and execute business strategies.

- **Chief Human Resources Officer**: The CHRO works with the senior leadership team to design employee programs to best support and achieve the Debtors' goals while creating a work environment that gives the Debtors' workforce the opportunity to excel. The CHRO creates and executes the human resources strategy that defines talent needs, acquires, manages and develops that talent, drives an organizational culture that pairs the Debtors' goals with associate engagement; and effectively manages human resource costs in the context of the Debtors' business model. The CHRO is expected to rely on and use data and technology for better decision-making, the ability to proactively manage human resource matters, and plan for contingencies. The CHRO directly leads the talent management and succession of the senior leadership team.

- **General Counsel & Chief Compliance Officer**: The General Counsel and Chief Compliance Officer acts as General Counsel for global retail and brands and services the global platform (including international subsidiaries); oversees the company's global legal affairs, including retail operations, online, services, logistics, licensing, real estate, employment matters, intellectual property, environmental sustainability, and corporate compliance and governance; and advises on contractual interpretation, negotiations, and litigation (and/or risks associated with it), setting the Debtors' legal positions.

- **Chief Information Officer**:  The Chief Information Officer oversees the development and implementation of technologies that enhance the member experience and the Debtors' ability to serve members through advanced analytics, simplified, real-time processes, and knowledge-sharing across the Debtors' organization; and ensures that technology strategies fit within the framework of the larger enterprise including member experience, member strategies, and company financial goals.

- **Chief Online Officer**: The Chief Online Officer is directly responsible for the operations of the online business for Sears.com and Kmart.com; sets strategy and programming for online and fusion business (*e.g.*, "Buy Online", "Pick Up

in Store"); and is a key partner with the store and merchant leaders in establishing appropriate merchandise availability.

### Roles of the KERP Participants

8.    The Debtors, with my and my team's assistance, analyzed the Debtors' 68,000 employee base to determine which non-insider employees are the most critical to both the Debtors' operations and a successful restructuring process, and should therefore be included in the KERP program. The Debtors initially selected 322 KERP Participants out of an initial submission of 900 nominees. The Debtors carefully selected KERP Participants based on their status as critical, non-insider, hard-to-replace employees with valuable institutional knowledge and skills. Many of the KERP Participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations, and many have longstanding relationships with the Debtors' vendors and suppliers that would be difficult and expensive—if not impossible—to replace. The average tenure of the KERP Participants' employment is approximately 16.8 years.

9.    The KERP Participants serve in a variety of vital roles throughout the organization. However, no KERP Participant is at the highest level of the Debtors' management structure—i.e., no KERP Participant rises to the level of Senior Vice President. Further, none of the KERP Participants reports directly to the Board; instead, each either reports to the Office of the Chief Executive, or to levels below. None of the proposed KERP Participants exert control over material aspects of the Debtors' operations, and none are policy-making individuals. None of the KERP Participants is a "section 16" officer.[7] Instead, the highest-level KERP Participants are generally responsible for unit-level leadership, rather than enterprise-level leadership.

---

[7]    As of May 2018, the Debtors' determined that the persons deemed subject to Section 16 of the Securities and Exchange Act of 1934, as amended are: Chief Executive Officer (resigned); Chief People Officer (resigned); Chief Executive Officer – Home Services; Chief Digital Officer; Chief Commercial Officer – Shop Your Way; Chief Financial Officer; President, Hardlines; General Counsel and Chief Compliance Officer (the "**Section 16 Officers**"). Section 16 Officers, if applicable, are included in the KEIP.

WEIL:\96834055\3\73217.0004

Accordingly, some KERP Participants might be involved in generating a budget for one of the Company's many business units. However, such KERP Participants do not have authority over the enterprise's budget.

10. All of the KERP Participants are catalogued in the Debtors' internal recordkeeping systems with a level of seniority (a "**Seniority Level**"). The Debtors' recordkeeping systems utilize the following hierarchy, listed in descending order of seniority:

| Seniority Level | Shorthand | Number of Proposed KERP Participants |
| --- | --- | --- |
| Senior Vice President | SVP | 0 |
| Vice President | VP | 33 |
| Divisional Vice President | DVP | 36 |
| Senior Director / Director | DD | 147 |
| Manager | M | 89 |
| Individual Contributor | IC | 10 |
| Total | | 315 |

The categorization and Seniority Level of many of the KERP Participants can be deduced from their titles, some of which enumerate the Seniority Level such as VP or DVP in the title itself. Others, which may have a less descriptive title of "Head" or "Assistant" are nonetheless are ascribed a Seniority Level in the Debtors' internal systems. Importantly, none of the proposed KERP Participants is ascribed a Seniority Level above VP, regardless of the employee's title.

11. In particular, there are seven (7) employees that have a "CFO" or "COO" in their title. Of these individuals, three (3) are assigned a VP Seniority Level, three (3) are assigned a DVP Seniority Level and one (1) a Director Seniority Level. Accordingly, six (6) of these employees are at least two (2) managerial levels below the Office of the Chief Executive. The one (1) KERP Participant individual reporting to the Office of the Chief Executive has the responsibility of providing financial tools, advice and analysis to the EVP & President, Chief Merchant—not to the Board. Indeed, the scope of authority for each of these individuals is limited

10

to a business unit or business segment, and is not company-wide.  The company-wide leadership—including the Debtors' Chief Financial Officer who for example, is assigned a Seniority Level of SVP—have been listed as KEIP Participants.

12.    Although several KERP Participants have a title or Seniority Level of VP or DVP, such titles are not necessarily commensurate to a particular level below the Office of the Chief Executive.  A VP, for example, may be anywhere from one (1) to three (3) levels of seniority below the Office of the Chief Executive.  Providing business unit level Key Employees with titles such as "Head" or "CFO" is common in large enterprises and the Debtors are not unique in this respect.  Put simply, the Seniority Level ascribed to the various KERP Participants are better descriptors as to the particular employees' role in the Debtors overall business than their titles alone.  Further, as stated before, each and every KERP Participant has at least one level of management between them and the Board.

13.    There are three KERP Participants who were appointed by the Board.[8]  The individuals' titles and roles are as follows:

- Manager, Business Finance:  The Manager, Business Finance is responsible for planning (both high level and unit), forecasting, analysis, reporting and ensuring controls are in place for a specific category/categories within a specific business within the Sears or Kmart retail formats. The Manager, Business Finance is expected to partner with a particular Business Unit CFO and leadership team in monitoring and addressing any issues related to the financial performance for their supported categories.  The Manager, Business Finance has direct responsibility for financial planning and analysis for a specific business ranging in $100M to $4B in revenue.  The Manager, Business Finance reports to a person holding Director-level seniority—five levels down from the Board.

- VP, Tax:  The VP, Tax reports to the Debtors' Chief Financial Officer (an SVP-level position)—two levels down from the Board, has overall responsibility for all aspects of tax and of leadership for the tax organization. The VP, Tax leads

---

[8]    One individual, Head – Shop Your Way Financial Services, was formerly included as a KERP Participant at the time the Debtors filed the Motion, but has since been determined to be included in the KEIP.  *See Reply* ¶ 6.

the design and implementation of enterprise-wide tax policy and strategies and contribute as a key member of the finance leadership team, and leads the strategy and implementation of tax-related analysis of business activities, structures, transactions, federal, state and local financial tax reporting, financial tax compliance matters, identifies and evaluates alternatives and recommends solutions to executive leadership.

- <u>DVP, Deputy General Counsel and Corporate Secretary</u>: The DVP, Deputy General Counsel and Corporate Secretary reports to the General Counsel—two levels down from the Board, is responsible for organizing meetings of the Board and Committees, maintaining the corporate legal records, including minutes, of Sears Holdings and its subsidiaries and overseeing the Annual Meeting of Stockholders. The DVP, Deputy General Counsel and Corporate Secretary is responsible for providing legal support for Sears' corporate and finance transactions, including assisting with the negotiation, documentation and execution of transactions involving the potential sale of businesses and assets and financing transactions, and advising accounting and senior management teams on reporting and related securities law matters.

14.     To repeat, none of the three KERP Participants who were appointed by the Board report to the Board, and none are policy-making individuals. Further, as discussed, they are not "section 16" officers.

## <u>Conclusion</u>

15.     Based on the foregoing, my experience, and the terms and provisions of the KEIP and KERP, the KEIP and KERP are reasonable, appropriately designed, and narrowly-tailored to incentivize the KEIP Participants and to retain the KERP Participants for the benefit of the Debtors, their economic stakeholders, and the successful administration of these chapter 11 cases. The KEIP Participants are collectively responsible for the Debtors' success and must work together to achieve the Cash Flow Targets or an Acceleration Event. Further, the KERP Participants are not insiders within the meaning of the Bankruptcy Code and are appropriately being provided with retention bonus opportunities.

WEIL:\96834055\3\73217.0004

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 12, 2018           By:   /s/ Robert Weber
      Hoffman Estates, Illinois            Robert Weber
                                         Chief Human Resources Officer
                                         Debtors and Debtors in Possession

WEIL:\96834055\3\73217.0004