**Hearing Date and Time: December 20, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: December 13, 2018 at 4:00 p.m. (Eastern Time)**

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Jonathan D. Canfield
Sayan Bhattacharyya
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel to Och-Ziff Capital Structure Arbitrage Master Fund, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDING CORPORATION, *et al.*,[1] | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**JOINDER OF OCH-ZIFF CAPITAL STRUCTURE ARBITRAGE MASTER FUND, LTD. TO THE MOTION OF OMEGA ADVISORS INC. PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE TO ENFORCE THE COURT'S NOVEMBER 19, 2018 SALE ORDER AND INVALIDATE THE *ULTRA VIRES* SALE AND LOCKUP OF MEDIUM-TERM INTERCOMPANY NOTES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Och-Ziff Capital Structure Arbitrage Master Fund, Ltd. ("**OZ**"), in its capacity as holder of $44,967,000 in Alternative Tranche Line of Credit Loans (the "**2L Alternative Tranche Loans**") issued pursuant to that certain Fifth Amendment to Second Lien Credit Agreement dated as of July 5, 2018 by and among, *inter alios*, Sears Holdings Corporation, as borrower, Sears Roebuck Acceptance Corp. ("**SRAC**") and Kmart Corporation, as guarantors, JPP, LLC as administrative agent and collateral administrator and the lenders party thereto, and, to a lesser extent due to OZ's limited exposure, as a purchaser of certain CDS that references SRAC and a likely participant in the forthcoming SRAC CDS auction, by and through the undersigned counsel, hereby submits this joinder and reservation of rights (the "**Joinder**") to Omega Advisors Inc.'s ("**Omega**") December 6, 2018 *Motion To Enforce The Court's November 19, 2018 Sale Order And Invalidate The Ultra Vires Sale And Lockup Of Medium-Term Intercompany Notes* [Docket No. 1077] (the "**Motion**")[1], and in support hereof, respectfully states as follows:

## PRELIMINARY STATEMENT

1. At the outset of these chapter 11 cases, the CDS marketplace handed the Debtors a gift – the opportunity to monetize certain intercompany medium-term notes (the "**MTNs**") issued by SRAC that were thought to be nearly worthless when the Debtors filed for bankruptcy, simply because those notes would qualify as "deliverable securities" in the SRAC CDS auction to conducted by ISDA at a later date. However, rather than maximize the value of the MTNs being sold at the Court-authorized auction (the "**MTN Auction**"), through a series of missteps, misinformation to bidders about the amount of MTNs actually being sold in the auction and other actions that went well beyond the scope of what this Court authorized the Debtors to

---

[1] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the Motion.

do, the MTN Auction was conducted in an unfair and uncompetitive manner that resulted in possibly the lowest value the Debtors could have received on account of the MTNs, and all but ensured that Cyrus Capital Partners L.P. ("**Cyrus**") would be the winning bidder with its $82,500,000 bid (the "**MTN Sale**"). In fact, while similar deliverable unsecured securities are currently trading at over 70 cents on the dollar, the MTN Auction netted the Debtors only a fraction of that – approximately 3 and half cents on the dollar. Were this Court to invalidate the extrajudicial actions of the Debtors, a subsequent sale of the remaining MTNs (which were never authorized to be sold in the first place) would undoubtedly result in more proceeds being collected by the Debtors and their affiliates.

2. Thus, through this Joinder, OZ joins Omega's Motion and adopts by reference the arguments contained therein and respectfully requests that the offending portions of the MTN Sale be voided.[2]

**JOINDER**

3. Going into the MTN Auction, OZ was led to believe that the Debtors only contemplated a limited sale of the MTNs pursuant to this Court's November 19, 2018 *Order Authorizing Debtors To Sell Medium Term Notes* [Docket No. 826] (the "**Sale Order**"). *See* Sale Order at ¶ 3 (authorizing the Debtors "to sell the MTNs to the party or parties that provide the highest or best offer"). First, as was described in the Motion, on November 20, 2018, the Debtors, through Jefferies LLC, issued an auction notice (the "**Auction Notice**") confirming that the Debtors intended to hold an auction for "no more than [$]251,245,000 SRAC Medium Term Notes" at noon that same day. *See* Exhibit B to the Motion, a substantially similar copy of which was received and reviewed by OZ prior to the MTN Auction. Second, the Auction Notice also

---

[2] As a significant holder of non-insider second lien debt, OZ has standing to challenge the outcome of the MTN Auction. *See In re Fairfield Sentry Ltd.*, 539 B.R. 658, 667 (Bankr. S.D.N.Y. 2015).

2

contained a description of the MTNs being sold at the bottom, including the security name, CUSIP, and notional amount being sold, which similarly indicated that only $251 million of MTNs in total were included in the MTN Auction. *See id.* Additionally, in the Sale Motion and related hearings, the Debtors confirmed that any MTNs held by Sears Reinsurance Company Ltd. ("**Sears Re**"), a non-Debtor captive insurance affiliate organized under the laws of Bermuda, were excluded from the Sale Order, and by extension, the MTN Auction. *See* Motion at ¶¶ 18, 24.

4. Thus, by operation of the Debtors' statements on the record, the Sale Motion and Sale Order, and the Auction Notice, OZ understood that the only MTNs available for purchase at the MTN Auction would be the $251,245,000 MTNs held by the Debtors as referenced in the Auction Notice, and that any excess MTNs held by the Debtors and their affiliates (the "**Remaining MTNs**") would be available for sale at a later date.[3] Likewise, OZ was never contacted by the Debtors or Jefferies LLC and provided any notice that the terms of the MTN Auction would be modified and that MTNs in excess of $251,245,000 would be made available for sale. Because of this, OZ participated in the MTN Auction and bid for a portion of the $251,245,000 Debtor MTNs with the expectation that the Remaining MTNs would be made available for sale in the near future. *See generally* Sale Order at ¶ 3.[4]

5. OZ's understanding was further supported by its belief that the Debtors would do everything in their power to maximize the value that a sale of the MTNs would deliver to the estates given that the MTNs had (and continue to have) significant, albeit temporary, value

---

[3] The Remaining MTNs are comprised of at least approximately $630,000,000 MTNs held by Debtor subsidiaries (the "**Additional Debtor MTNs**", and with the $251,245,000 MTNs referenced in the Auction Notice, the "**Debtor MTNs**") and approximately $1.4 billion MTNs held by Sears Re (the "**Sears Re MTNs**").

[4] OZ believes that had it and other market participants known that no additional MTNs would be made available for sale, the bids at the MTN Auction would have likely been materially higher.

3

solely because they are a deliverable security in the SRAC CDS auction. *See* Sale Motion at ¶ 11. Indeed, the sale of the Remaining MTNs would inject much-needed additional liquidity into these chapter 11 cases and could result in improved recoveries to both secured and unsecured creditors in numerous ways. For example, a sale of the Additional Debtor MTNs would directly increase funds available for distribution to creditors on a dollar-for-dollar basis. In a similar regard, the Debtors would also likely benefit from a sale of the Sears Re MTNs due both to the fact that Sears Re is a wholly owned subsidiary of the Debtors, and the understanding that a sale of the Sears Re MTNs may reduce the amount of collateral that is posted by the Debtors through various letters of credit, which are necessary to support certain insurable risks including workers' compensation and related claims. *See* Form 10-K, Sears Holding Corporation (March 23, 2018), *available at* https://searsholdings.com/docs/investor/SHC_2017_Form_10-K.pdf, at 85-90; *Declaration of Robert A. Reicker* [Docket No. 3] at ¶ 33(ii)-(iii).

6. It is for these reasons that after the conclusion of the MTN Auction, OZ, through counsel, reached out to the Debtors and Sears Re multiple times in an attempt to purchase, or otherwise monetize, a portion of the Remaining MTNs, and was inexplicably rebuffed. It was not until December 4, 2018, when the Debtors first disclosed the terms of the MTN Sale, that OZ fully realized why the Debtors and Sears Re had ignored its repeated overtures: the agreement the Debtors struck with Cyrus, on their behalf and, amazingly, on behalf of their non-Debtor subsidiaries, did not only affect all MTNs, but also subjected the Debtors and their affiliates to the equivalent of a gag order. *See Notice of Results Of Auction Of Medium Term Notes* [Docket No. 1019] (the "**Auction Results Notice**"). Undoubtedly, the

4

agreement the Debtors entered into went far beyond the scope of the Sale Order and by design does not maximize the value of the Debtors' estates or the value of Sears Re.

7.  Indeed, the Auction Results Notice confirmed that, notwithstanding the Debtors' previous representations, through the MTN Sale, the Debtors purported to sell not only the $251,245,000 MTNs reflected in the Auction Notice, but also the Additional Debtor MTNs. *See* Auction Results Notice at ¶ 3.  As set forth in the Auction Results Notice, the Debtors also agreed "not to sell, transfer, or assign any MTNs not included as part of this transaction to any non-Debtor entity," which, OZ understands, purports to restrict Sears Re from selling the approximately $1.4 billion MTNs that it holds.[5]  *Id*. at ¶ 6.  Simply put, the Debtors, through their *ultra vires* act, effectively sold approximately $2.05 billion of *additional* MTNs – nearly *ten times* the amount stated in the Auction Notice – without notice to interested parties and, upon information and belief, without any meaningful attempt to market test and extract additional consideration therefor.  The Debtors' failure to comply with the Sale Order and wholesale disregard for running a fair, transparent, and competitive sale process for the MTNs should not be tolerated.[6]

8.  In addition to lack of disclosure around the amount of MTNs being sold, the day of the MTN Auction was also categorized by extreme market confusion related to the deliverability of the MTNs into the SRAC CDS auction – the only criteria that really mattered to bidders who were willing to pay far in excess of fundamental fair value of the MTNs in the MTN Auction.  This confusion was exacerbated by, among other factors,

---

[5] Notably, the Auction Results Notice makes clear that these value destructive restrictions agreed to by the Debtors can be stripped from the MTN Sale "pursuant to a non-consensual order of a court of competent jurisdiction with respect thereto." *Id*. at ¶ 6.

[6] OZ is also surprised that the official committee of unsecured creditors (the "**Committee**") appointed in these cases would allow this auction process to unfold in the manner that it has.  Given that the Committee is not a party to the Cyrus agreement, OZ hopes that the Committee will support the value maximizing relief proposed by the Motion and this Joinder.

ambiguous language inserted in the Sale Order itself, and an ongoing ISDA DC meeting to determine whether the MTNs would be Deliverable Obligations, which was scheduled for 10 a.m. on the morning on which bids for the MTNs were being solicited by the Debtors. Less than two hours after the MTN Auction results were announced, the ISDA DC made a final determination that the MTNs would, in fact, be deliverable into the SRAC CDS auction, dispelling any uncertainty regarding their value as Deliverable Obligations.

9. OZ believes that, had this uncertainty been removed just eight hours earlier when the bids were being solicited, the MTN Auction would have yielded materially higher value to the Debtors. By monetizing the entire portfolio of $2.3 billion MTNs in the manner in which they did, the Debtors deprived themselves of the option value associated with this favorable ruling by the ISDA DC. Fortunately, because the Debtors failed to run a fair auction process that complied with the terms of the Sale Order, the Court has the ability to invalidate the improper portions of the MTN Sale and allow the Debtors to properly monetize the now-enhanced value of these assets by accepting the sale of the $251,245,000 MTNs to Cyrus, conducting a new sale of the Additional Debtor MTNs, and removing any stated or implied gag order on Sears Re so that Sears Re may explore monetizing the valuable $1.4 billion MTNs that it holds.

10. OZ desires to have a constructive and productive dialogue with the Debtors and Sears Re regarding the Remaining MTNs and remains committed to working with the Debtors and Sears Re in the hopes of developing a mutually beneficial transaction that will maximize value for the Debtors' stakeholders. However, the restrictions placed on the Debtors in the MTN Sale currently make any such dialogue impossible.

## CONCLUSION

WHEREFORE, for the reasons set forth more fully in the Motion and this Joinder, OZ respectfully requests that the Court enter an order invalidating the portions of the MTN Sale that exceeded the scope of the Sale Order and 11 U.S.C. § 363(b), including, without limitation, any provisions that purport to sell, and/or restrict from selling, any portion of the Remaining MTNs, or provide OZ and other aggrieved parties with such other relief as this Court deems fair and just under the circumstances.

## RESERVATION OF RIGHTS

OZ reserves all rights with respect to the Sale Order, the Auction, the Motion, and the MTN Sale, including the right to amend and/or supplement this Joinder, participate in additional briefing, participate in any discovery, and be heard at any hearing or trial related to the Motion. Nothing contained herein shall constitute a waiver of any of the rights or remedies of OZ, each of which is expressly reserved.

Dated: December 12, 2018　　　　　　　　STROOCK & STROOCK & LAVAN LLP
　　　　　New York, New York

By:　*/s/ Kristopher M. Hansen*
　　　Kristopher M. Hansen
　　　Jonathan D. Canfield
　　　Sayan Bhattacharyya
　　　180 Maiden Lane
　　　New York, New York 10038-4982
　　　Telephone: (212) 806-5400
　　　Facsimile: (212) 806-6006
　　　Email:　khansen@stroock.com
　　　　　　　jcanfield@stroock.com
　　　　　　　sbhattacharyya@stroock.com

*Counsel to Och-Ziff Capital Structure Arbitrage Master Fund, Ltd.*