**Objection Deadline: December 13, 2018 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time: December 20, 2018 at 10:00 a.m. (Eastern Time)**

Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
MILBANK, TWEED, HADLEY & McCLOY LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Craig M. Price
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000

*Counsel to Cyrus Capital Partners, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hearing Date: December 20, 2018 |
| | ) | |
| | | Re: Docket No. 1077 |

**OBJECTION OF CYRUS CAPITAL PARTNERS, L.P. TO MOTION OF OMEGA ADVISORS INC. PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE TO ENFORCE THE COURT'S NOVEMBER 19, 2018 SALE ORDER AND INVALIDATE THE ULTRA VIRES SALE AND LOCKUP OF MEDIUM-TERM <u>INTERCOMPANY NOTES</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ............................................................................................................ 6

     A.     Omega Lacks Standing To Challenge The Sale Order As A Frustrated
           Bidder, Nor Can Omega Manufacture Standing By Purchasing Debt After
           The Sale Order Was Entered, The Auction Held, And The Sale Closed ............... 6

     B.     After Claiming To Be The Architect Of The MTN Sale, Omega Cannot Also
           Credibly Complain That It Did Not Have Adequate Notice Of The Sale
           Process It Instigated ............................................................................................. 10

     C.     The Sale Motion Unambiguously Sought Authority For *All* Debtors To Sell
           *Any* MTNs They Held, And The Sale Order Unambiguously Granted That
           Full Authority ...................................................................................................... 11

     D.     The Sale Order Is A Final, Non-Appealable Order That Was Agreed To
           Among The Debtors, The UCC, And Cyrus (As The Sole Objector To The
           Sale Motion) And Should Not Now Be Collaterally Attacked ............................ 13

     E.     Omega's Attacks On Cyrus Are Entirely Unsubstantiated And, In Many
           Instances, Demonstrably False............................................................................. 17

          1.     Cyrus is not an "insider" of the Debtors .................................................... 17

          2.     Cyrus's seat on the DC is irrelevant .......................................................... 18

          3.     Omega's other attacks on Cyrus are baseless ............................................ 19

     F.     The Court Properly Found That Cyrus Acted In Good Faith .............................. 22

CONCLUSION ....................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
   367 B.R. 84 (S.D.N.Y. 2007) ................................................................................16

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
   269 F.3d 726 (6th Cir. 2001) ................................................................................17

*In re Broadmoor Place Invs., L.P.*,
   994 F.2d 744 (10th Cir. 1993) ................................................................................6

*In re Coastal Plains*,
   179 F.3d 197 (5th Cir. 1999) ................................................................................15

*Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*,
   600 F.3d 231 (2d Cir. 2010) ................................................................................14

*Corp. Assets, Inc. v. Paloian*,
   368 F.3d 761 (7th Cir. 2004) ................................................................................14

*In re Cult Awareness Network, Inc.*,
   151 F.3d 605 (7th Cir. 1998) ..................................................................................9

*In re Embrace Sys. Corp.*,
   178 B.R. 112 (Bankr. W.D. Mich. 1995) ..............................................................17

*In re Family Christian, LLC*,
   533 B.R. 600 (Bankr. W.D. Mich. 2015) ..............................................................15

*Furlough v. Cage (In re Technicool Systems Inc.)*,
   896 F.3d 382 (5th Cir. 2018) ..............................................................................8, 9

*Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*,
   445 F.3d 359 (4th Cir. 2006) ................................................................................14

*In re Jewel Terrace Corp.*,
   10 B.R. 1008 (E.D.N.Y. 1981) ................................................................................7

*Kabro Associates, LLC v. Colony Hill Associates (In re Colony Hill Associates)*,
   111 F.3d 269 (2d Cir. 1997) ....................................................................................7

*Licensing by Paolo v. Sinatra (In re Gucci)*,
   105 F.3d 837 (2d Cir. 1997) ..................................................................................14

*Licensing by Paolo v. Sinatra (In re Gucci)*,
    126 F.3d 380 (2d Cir. 1997)...................................................................................14

*In re Motors Liquidation Co.*,
    430 B.R. 65 (S.D.N.Y. 2010)..................................................................................16

*In re NEPSCO, Inc.*,
    36 B.R. 25 (Bankr. D. Me. 1983)..............................................................................6

*In re O'Brien Envtl. Energy, Inc.*,
    181 F.3d 527 (3d Cir. 1999).....................................................................................9

*In re: Pursuit Capital Mgmt., LLC*,
    No. BR 14-10610-LSS, 2016 WL 5402735 (D. Del. Sept. 26, 2016), *appeal
    dismissed sub nom. In re Pursuit Capital Mgmt., LLC*, 874 F.3d 124 (3d Cir.
    2017) .......................................................................................................................15

*Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*,
    272 B.R. 74 (Bankr. S.D.N.Y. 2002) .......................................................................17

*In re Stadium Mgmt. Corp.*,
    895 F.2d 845 (1st Cir. 1990) ...........................................................................14, 15

*Stark v. Moran (In re Moran)*,
    566 F.3d 676 (6th Cir. 2009) ............................................................................7, 8

**Statutes**

11 U.S.C. § 101(31)(B)..............................................................................................3, 17

11 U.S.C. § 363(m) .................................................................................................14, 22

Cyrus Capital Partners, L.P. ("Cyrus") files this objection (the "Objection") to the *Motion of Omega Advisors Inc. Pursuant to Sections 105 and 363 of the Bankruptcy Code to Enforce the Court's November 19, 2018 Sale Order and Invalidate the Ultra Vires Sale and Lockup of Medium-Term Intercompany Notes* (the "Motion") [Dkt. No. 1077].[1]  For the reasons set forth herein, Cyrus respectfully requests that the Court deny the Motion.

## PRELIMINARY STATEMENT

1.       Pursuant to the Motion, Omega Advisors Inc. ("Omega") is improperly attempting to interject itself into these cases after-the-fact to challenge this Court's order dated November 19, 2018 (the "Sale Order") [Dkt. No. 826] that authorized the Debtors to sell the Medium Term Notes owned by various Debtors (the "MTNs") to the highest or otherwise best bidder at an auction.  Pursuant to the Sale Order, the Debtors:  (a) conducted their auction (the "Auction"), selecting Cyrus's bid as highest and best; and (b) on November 28, 2018, consummated the sale of the MTNs to Cyrus (the "Sale"), all with the blessing of the Official Unsecured Creditors Committee (the "UCC").  Thus, Omega's collateral attack on the Sale Order is designed not only to overturn the now-final Sale Order, but also to unwind selective portions of the fully consummated Sale.

2.       While replete with wholly unsubstantiated allegations, at bottom Omega's Motion (and the eleventh-hour Joinder of Och-Ziff Capital Structure Arbitrage Master Fund, Ltd. (the "Joinder" of "OZ") [Dkt. No. 1177]) is nothing more than a request for a "do-over" by a disappointed bidder that lost in a Court-approved Auction because it submitted a bid that the Debtors and the UCC jointly concluded was both insufficient in price and unacceptably conditional.

---

[1]       Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

3.      Recognizing that its status as a losing bidder would not give it standing to mount a challenge to the Sale Order, Omega purchased a $600,000 claim on November 21, 2018 – but not until eleven days after the Sale Motion[2] was filed, two days after the Sale Order was entered, and one day after the Auction had already concluded.  This effort to "turn back the clock" to manufacture standing retroactively does not change the simple fact that Omega did not, and did not have standing to, timely object to the Sale Motion or appeal or otherwise challenge the Sale Order.

4.      Even without standing, however, Omega found ways to work behind-the-scenes to influence and actively participate in the sale process from the outset.  Indeed, Omega credits itself with having initiated the entire MTN sale process by "educat[ing]" the Debtors about the value of an "expedited" auction of MTNs – and even proudly asserts that the Debtors filed the Sale Motion "in response to Omega's contact."  Motion ¶¶ 17–18.  Omega then remained intensely involved in the process, attending both hearings on the Sale Motion, engaging in frequent communications with the Debtors, and ultimately participating in the Auction by submitting a bid that simply came up short.

5.      Given its intimate involvement in the sale process from the very beginning, Omega cannot now credibly assert that it somehow did not understand the relief unambiguously requested in the Sale Motion and granted in the Sale Order – *i.e.*, that *all* Debtors be given authority to sell *any and all* MTNs owned by any such Debtor to the bidder that provided "the highest or best offer," and "to take all actions necessary to effectuate the relief granted in this Order."  Sale Order ¶¶ 3, 10.  Omega also cannot deny that it had access to the full universe of

---

[2]      *See Emergency Motion of Debtors for Order Approving Sale of Medium Term Notes*, filed on November 9, 2018 [Dkt. No. 642] (the "Sale Motion").

2

information made available to all potential bidders, including a website providing (among other information) a schedule listing over $880 million in MTNs.  Omega had the opportunity to make a bid for any or all of those MTNs, with whatever consideration and stipulations it wished to offer.  It made its bid but lost.

6.       Disappointed that its partial, conditional bid failed, Omega now wildly contends that the auction process was tainted by a lack of proper notice, "fraud, mistake, or unfairness," "backroom negotiation[s]," a "secret agreement," and "hallmarks of collusion" between the Debtors (and presumably the UCC) and Cyrus.  Motion ¶¶ 10, 14, 30, 36, 43.  These desperate accusations are baseless.  Suffice it to say that Omega does not (and cannot) challenge the simple reality that the Debtors and the UCC exercised their respective business judgment to conclude that the highest and best offer at the Auction was Cyrus's bid to acquire the MTNs in a transaction whereby the Debtors received $82.5 million in cash (for deposit into the Winddown Reserve) plus provisions designed to protect the SRAC estate from over $2.0 billion in claims that could be asserted against it if the full balance of the MTNs traded into the hands of non-affiliates who were unwilling to waive recovery on those bonds in the same manner agreed to by Cyrus in its bid.

7.       Finally, Omega predictably resorts to attempting to portray Cyrus as a bad actor.  But, like its assaults on the Debtors and the UCC, these attacks equally fail.  As a threshold matter, contrary to Omega's repeated assertions, Cyrus is not an "insider" of the Debtors.  Omega uses that term indiscriminately (presumably so that it can then trot out case citations that almost universally involve insider involvement), but does not (and cannot) point to a single fact that would render Cyrus an insider, under Bankruptcy Code section 101(31)(B) or otherwise.  Stripped of this bald "insider" allegation, Omega's remaining accusations quickly unravel.

3

8.      Unlike Omega, which until November 21 was a complete stranger to the Sears capital structure, Cyrus is a longstanding supporter of the Debtors.  Beginning in 2013, Cyrus has made a variety of debt investments throughout Sears's capital structure that total well over $500 million, composed of:  (i) a first lien facility; (ii) first lien secured debt; (iii) second lien secured debt; and (iv) SRAC unsecured debt.  At multiple points along the way, Cyrus has also voluntarily agreed to accommodations designed to extend Sears's liquidity runway.  In the summer of 2017, Cyrus provided Sears with a short-term, $50 million loan designed to bridge Sears to the holiday revenue season.  In 2018, Cyrus executed two exchange transactions with Sears that allowed Sears to pay interest in-kind on one facility, and extend the maturity date and pay interest in-kind on another.  And most recently, Cyrus agreed to provide Debtors with $350 million in Junior DIP financing.

9.      In light of Cyrus's longstanding financing relationship with and current significant economic stake in the Debtors, Omega's attempt to paint Cyrus as having a singular agenda of trying to control the Sears CDS market falls flat.  Ironically, it is Omega that comes to this Court as a complete stranger to the Sears estates and with no agenda other than to protect *its* own CDS position.  Cyrus, on the other hand, while mindful of its CDS position, also has significant investments in the Debtors to protect and a strong interest in seeing a successful outcome from these cases.  That creditor perspective in significant part prompted Cyrus's initial objection to the Sale Motion – because, among other things, the proposed sale of the MTNs by the Debtors to non-affiliates would potentially have allowed approximately $880 million of claims against SRAC to spring to life and significantly dilute recoveries otherwise available to existing SRAC unsecured creditors like Cyrus.  With the terms of both the Sale Order and the

Sale negotiated at arm's length between the Debtors, the UCC, and Cyrus, that risk has now been averted.[3]

10.     Omega's vague assertions about Cyrus attempting to "chill" other bidders are also unsupported, and Omega cannot point to any specific action Cyrus took with respect to the market that was out of the ordinary for participants in that market.  Cyrus's membership (holding one of 15 seats) on the Determinations Committee ("DC") of the International Swaps and Derivatives Association ("ISDA"), is entirely proper (and far from unique among CDS market participants) and is subject to both the DC's rules and a Cyrus-imposed wall between its DC delegate and its investment personnel.  Cyrus's letter to the DC addressing the question of whether the MTNs were "deliverable" for purposes of CDS was proper and a typical practice for CDS market participants.  Indeed, Omega (through counsel) sent the DC *its own letter* advocating for a deliverability determination that favored *Omega's* CDS positions.  And the Debtors did exactly the same.

11.     The reality is that Omega is asking the Court to re-run the Auction because in the time since the Auction took place, the DC determined that the Debtors' MTNs were deliverable for purposes of an ISDA auction of CDS referencing Sears.  Such a determination was not assured at the time of the Auction.  Indeed, the Debtors chose to sell the MTNs on an expedited basis precisely *because* the deliverability determination was uncertain.  If the determination had been made that the MTNs were *not* deliverable into the CDS auction, the value of the MTNs

---

[3]     Omega's suggestion that Cyrus improperly "designed" the so-called "Deliverability Language" in the Sale Order to somehow further its position with respect to the CDS market is belied by the record of the consensual resolution of Cyrus's objection to the Sale Motion, which was approved by the Court with the observation that excluding SRAC, as issuer of the MTNs, from the "free and clear" components of the Sale Order was "consistent with applicable law, including the New York General Obligations Law and what a buyer of a claim gets."  Hr'g Tr. 12:12–15, Nov. 19, 2018.

would quickly have evaporated and the Debtors would have missed the opportunity to sell at a

time when there was at least a *chance* that the MTNs would be determined to be deliverable.

Like a bettor that, after the game is over, wishes to go back in time and place a bet with perfect

knowledge of the outcome, Omega wants to turn back the clock armed with the knowledge of the

DC's deliverability determination and adjust its bid accordingly.[4]  But all bidders faced the same

uncertainty regarding deliverability that Omega faced, and Omega's hindsight-based

reevaluation of its bid is not a basis to overturn the Auction results.  There is no basis for the

Court to reconsider its Sale Order or the results of the value-maximizing Auction conducted

pursuant to and in compliance with that Sale Order.

## ARGUMENT

### A.    Omega Lacks Standing To Challenge The Sale Order As A Frustrated Bidder, Nor Can Omega Manufacture Standing By Purchasing Debt After The Sale Order Was Entered, The Auction Held, And The Sale Closed

12.    Omega asserts that it has standing: (i) based on an exception to what Omega

concedes is "the general rule that frustrated bidders lack standing to object to a sale," and (ii) as a

creditor, based on its *post-Auction* purchase of debt.  Motion ¶ 36 (citation omitted).  These

arguments fail.

13.    *First*, it is well established that a prospective purchaser of assets from a

bankruptcy estate is not within the "zone of interests" intended to be protected by the Bankruptcy

Code and, therefore, does not typically have standing to challenge a sale of the assets to another

party.  *See In re NEPSCO, Inc.*, 36 B.R. 25, 27 (Bankr. D. Me. 1983) ("The purposes of these

statutes would be hindered, not furthered, by permitting a stranger to the estate to object to a sale

to which no party in interest objected."); *see also In re Broadmoor Place Invs., L.P.*, 994 F.2d

---

[4]    OZ is even more explicit than Omega in terms of its motivations in this regard.  *See*
Joinder ¶ 9.

6

744, 746 n.2 (10th Cir. 1993) (noting that disappointed bidder was not an "aggrieved person" and therefore lacked standing). This rule applies with even more force to a disappointed bidder that (like Omega) did not object to or seek to stay the sale order prior to the court-approved sale. *See In re Jewel Terrace Corp.*, 10 B.R. 1008, 1011 (E.D.N.Y. 1981) (disappointed bidder that did not obtain stay of order approving sale lacked standing to appeal bankruptcy court's rejection of offer).

14.    Omega asserts that an exception to this general rule exists where the bidder challenges the intrinsic structure of the sale based on claimed fraud, mistake, or unfairness. The only case Omega cites in which this purported exception was applied is *Kabro Associates, LLC v. Colony Hill Associates (In re Colony Hill Associates)*, 111 F.3d 269, 274 (2d Cir. 1997), in which there were indications that the seller, buyer, and creditors "completely abandon[ed] the auction process" and "conspir[ed] to exclude [the unsuccessful bidder], the highest bidder at the time, from participating in the sale hearing," such that the challenger was granted "standing to the extent it allege[d] that [the buyer's] actions destroyed the 'intrinsic fairness' of the sale transaction so that it was not a good faith purchaser." 111 F.3d at 274–76. No such facts are presented (or even alleged) here, and unlike the buyer in *In re Colony Hill*, Cyrus *is* a good faith purchaser pursuant to the Sale Order. *See* Sale Order ¶ 7.

15.    In the other case Omega cites, *Stark v. Moran (In re Moran)*, 566 F.3d 676, 682 (6th Cir. 2009), the Sixth Circuit *rejected* a frustrated bidder's argument that it had standing on grounds that such a party "must show that the interest which he seeks to protect through his petition for review is an interest which the Bankruptcy Act seeks to protect or regulate." *Id*. at 681–82 (internal quotation marks and citation omitted). The court added that because the primary objective of bankruptcy law is to minimize injury to creditors, and none of the creditors

7

involved had been "left unsatisfied by the bankruptcy court's judgment," the disgruntled bidder

had no standing to challenge the judgment, even if his allegations of misconduct were taken as

true. *See id*. Similarly, here none of the creditors has objected to the sale, Cyrus's winning bid

brings in significant value to the estate, and Omega seeks only to advance its own business

agenda, which the Bankruptcy Code does not protect.

16.     Nor are Omega's contentions regarding the fairness of the Auction process

credible.  The Debtors conducted the Auction in "accordance with the sale procedures set forth in

the MTN Sale Order."  Notice of Results of Auction of Medium Term Notes ("<u>Notice of Results</u>

<u>of Auction</u>") [Dkt. No. 1019] ¶ 2.  Omega does not identify any irregularity in the sale

procedures and admits that it "participated in the Auction."  Motion ¶ 15.  Omega's bald

conjecture that simply because its own bid was not accepted, there must have been some sort of

"backroom negotiation" resulting in a "secret agreement" between the Debtors and Cyrus

(Motion ¶¶ 10, 30), is not remotely sufficient to show that the Auction process was tainted or

unfair, such that Omega, as a frustrated bidder, would have standing to challenge it retroactively.

17.     *Second*, Omega asserts standing based on its "purchase[] [of] $600,000 in notes

issued by SRAC on November 21, 2018."  Motion ¶ 36.  Omega's purchase of a claim on

November 21 means that all of the events at issue in Omega's Motion occurred *before* Omega

became a creditor—the Sale Motion was filed on November 9 and heard on November 15 and

19; the Sale Order was entered on November 19; and the Auction was held on November 20 "in

accordance with the sale procedures set forth in the . . . Sale Order."  Notice of Results of

Auction, ¶ 2.

18.     An analogous situation was presented in *Furlough v. Cage (In re Technicool*

*Systems Inc.)*, 896 F.3d 382 (5th Cir. 2018), where a party objected to the trustee's retention of

8

special counsel.  The bankruptcy court denied the objection, and the party appealed to the district

court.  While that appeal was pending, the party purchased a claim.  *Id.* at 386.  After the district

court affirmed the denial, the party appealed to the Fifth Circuit, asserting standing as a creditor.

*Id.* at 384.  The Fifth Circuit held that the party could not "belatedly claim creditor status and

establish standing retroactively."  *Id*. at 386.  The Fifth Circuit noted that, "[i]n bankruptcy

litigation, the mishmash of multiple parties and multiple claims can render things labyrinthine,"

and therefore, "[t]o dissuade umpteen appeals raising umpteen issues, courts impose a stringent-

yet-prudent standing requirement: Only those directly, adversely, and financially impacted by a

bankruptcy order may appeal it."  *Id*; *see also In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527,

530-31 (3d Cir. 1999) (party seeking to challenge order denying its proffered contract with

debtor lacked standing as it was not a creditor as of the date of the petition and no other grounds

for standing were present).[5]

19.    Finally, Omega cannot manufacture standing out of thin air simply by styling its

motion as one to "enforce" the Sale Order, when (in substance) Omega is actually seeking to

vacate that Order based on its dissatisfaction with the results of the Auction.  *See infra*, Point D.

The Sale Order authorized the Debtors to conduct an Auction and sell the MTNs to the highest

bidder.  The Debtors have done precisely that.  Omega's labeling of its motion to undo the Sale

---

[5]    While OZ suggests that it owns debt of Sears (in an amount that is a small fraction of
Cyrus's debt investments), it did not object to the Sale Motion or the Sale Order.  Nor did it
move to stay the Sale Order, or file an appeal.  *See* n.8, *infra*.  Accordingly, even if OZ owned
Sears debt at the time the Sale Motion was filed, it sat on its rights and is barred from seeking
relief at this late date.  *See In re Cult Awareness Network, Inc.*, 151 F.3d 605, 610 (7th Cir. 1998)
(creditors, who had standing to object to sale of trademarks, trade name, and service marks as
they had pecuniary stake in the manner in which the estate is liquidated, waived any objection by
failing to raise it to the bankruptcy court in a timely manner).

and re-do the Auction as a request to "enforce" the fully consummated Sale Order is nothing
more than an attempt to dress the wolf in sheep's clothing.

> **B.      After Claiming To Be The Architect Of The MTN Sale, Omega Cannot Also
>           Credibly Complain That It Did Not Have Adequate Notice Of The Sale
>           Process It Instigated**

20.      Omega's complaint that it did not receive adequate notice of the sale process or
the parameters of the Auction is particularly incredible given that, according to Omega's own
papers, the Debtors' sale of the MTN's was Omega's brainchild and Omega worked closely with
the Debtors to orchestrate a process whereby Omega would have a chance to bid for the MTNs.

21.      The Motion openly touts that it was *Omega* that first "approached Debtors" about
the MTNs.  Motion ¶¶ 17–18.  It was *Omega* that "educated [Debtors] on the dynamics of the
CDS market."  *Id.*  And it was *Omega* that informed Debtors of "the potential value to the estate
to be realized through sale of the MTNs to CDS market participants."  *Id.*  Omega even boasts
that Debtors filed the Sale Motion on November 9, 2018 "in response to Omega's contact" (*id.*) –
contact that clearly began well before that date.

22.      After the Debtors filed the Sale Motion, Omega closely monitored the process.
Omega's counsel attended the November 15 and November 19 hearings on the Sale Motion.
Cyrus understands that Omega's representatives were in regular contact with Debtors during the
period in which the Sale Motion was pending.  Indeed, Omega was apparently able to position
itself so close to Debtors' process that Omega was aware of confidential settlement discussions
between the Debtors and Cyrus that took place the day before the November 19 hearing.  *See*
Motion ¶ 21 ("[O]n the Sunday before the hearing, Cyrus offered to settle its objections with the
Debtors by purchasing the MTNs outright . . . .").  Cyrus further understands that on the day of
the Auction itself, Omega's representatives had multiple discussions with Debtors before

ultimately participating in the Auction by submitting a bid (albeit insufficient in price and highly

conditional in nature).[6]

24. Omega is obviously a sophisticated player in the CDS market.  When it came to

the MTNs, Omega was able to exert its knowledge and influence with Debtors from the outset.

At the end of the day, Omega is simply unhappy that it was outbid at the Auction.  Omega's

current claim that the Debtors failed to provide it with sufficient notice about a process that

Omega itself allegedly engineered is disingenuous, to put it mildly.

### C.    The Sale Motion Unambiguously Sought Authority For *All* Debtors To Sell *Any* MTNs They Held, And The Sale Order Unambiguously Granted That Full Authority

24. Omega asserts that the Debtors exceeded the authority granted to them in the Sale

Order when they agreed, when negotiating Cyrus's bid:  (i) to sell approximately $629 million in

notes that Omega refers to as the "Unlisted MTNs"; and (ii) that the Debtors would take steps to

minimize the risk that any MTNs held by non-Debtor Sears Re would be transferred to any non-

affiliated entity.  *See* Motion ¶¶ 1, 35.

25. The plain language of the Sale Order contradicts these arguments.  In the Sale

Motion, *all* "Debtors" (*i.e.*, all of the entities identified in the Sale Motion, n.1) sought "authority

to sell certain SRAC Medium Term Notes Series B (the "MTNs") issued by [SRAC] and

currently owned by various other Debtors."  *See* Sale Motion, n.1; *id.* ¶ 6.  The Sale Motion

stated that "the outstanding principal amount of the MTNs was approximately $2.3 billion," and

that "[a]pproximately $1.4 billion of the MTNs are held by [non-Debtor] Sears Re[]."  *See* Sale

---

[6]    In addition, on information and belief, since the date of the Auction, Omega continues to leverage its position as a sophisticated CDS investor in "off the record" discussions with reporters in an effort to paint the Debtors and Cyrus unfavorably in the press.

Motion ¶ 8.  Thus, the Debtors plainly sought authority in the Sale Motion to sell all of the approximately $880 million in MTNs held by the Debtors.

26.    Adopting the broad definition of the terms "Debtors" and "MTNs" as used in the Sale Motion, the Sale Order gave the Debtors authority "to sell the MTNs to the party or parties that provide the highest or best offer."  *See* Sale Order ¶ 3.  Thus, the Sale Order authorized the Debtors to sell not only the approximately $251 million in notes that Omega calls the "Listed MTNs," *but also* the approximately $650 million of so-called Unlisted MTNs.  *See* Motion ¶¶ 2–3.  The "Listed" and "Unlisted" qualifiers used by Omega exist nowhere in the Sale Motion, Sale Order, or any other relevant pleading or document.  Omega has made those terms up out of whole cloth.

27.    As such, Omega's argument that the sale of those so-called Unlisted MTNs was *ultra vires* is simply incorrect.  Not only did the Sale Order not prohibit the sale of these MTNs, but it *expressly authorized* their sale.  Omega points to what it calls the "Auction Notice," an email chain from Joe Femenia of Jefferies LLC that Omega attaches as Exhibit B to the Motion.  But this email notice from the broker/dealer, which Omega would have the Court believe constituted the entirety of the information provided to bidders, was a relatively minor piece of a much larger universe of information that was made available to parties interested in bidding at the Auction.

28.    Indeed, the email Omega relies upon specifically references a "website for additional information" – https://searsholdings.com/invest/financial-transactions/sears-roebuck-acceptance-corp-medium-term-notes-series-b-documentation.  *See* Motion Ex. B.  That website provides several links, the first of which is a Schedule of Notes, which lists $880,696,000 in MTNs, not just the $251 million subset of so-called Listed MTNs.  Thus, bidders (including

Omega) were on notice that $880,696,000 in MTNs were available for bid at the Auction.

Omega received ample notice and had every opportunity to submit a bid for all of the MTNs

authorized to be sold by the Sale Order, with whatever consideration (and subject to whatever

terms and conditions) it wished to offer.  Moreover, at a minimum, to the extent it was confused

as to what was on offer, Omega (which was in regular contact with the Debtors during the sale

process) could have asked the Debtors for clarification.  It apparently chose not to do so.

29.    Nor did the Sale Order place any restriction on the sale or disposition of the $1.4

billion of notes held by non-Debtor Sears Re.[7]  Nor could it have – Sears Re is not a Debtor and

would not need Court authority to sell its MTNs.  But in any event, Sears Re *did not* sell its

MTNs to Cyrus, and Sears Re was not a party in any other manner to the Sale.  Instead, the terms

of the Sale simply provide that the Debtors will take steps to minimize the chances that the

MTNs held by Sears Re are sold to a non-affiliate and thereby give rise to up to $1.4 billion of

"springing" claims against SRAC and its estate.  The Debtors were fully authorized by Paragraph

10 of the Sale Order to agree to this covenant as a way of obtaining the consideration Cyrus was

offering, and also to protect the Debtors' estates from a potentially harmful sale of the MTNs

owned by Sears Re.

**D.    The Sale Order Is A Final, Non-Appealable Order That Was Agreed To
Among The Debtors, The UCC, And Cyrus (As The Sole Objector To The
Sale Motion) And Should Not Now Be Collaterally Attacked**

30.    Although Omega purports to be asking the Court to "enforce" the Sale Order, in

substance it is asking the Court to *rescind* the Sale Order and issue a *different* order limiting the

Debtors to selling only the "Listed MTNs."  Indeed, in a footnote, Omega cites a case for the

---

[7]    Non-Debtor Sears Reinsurance Company Ltd. ("Sears Re"), is a Bermuda Class 3 insurer
and a wholly-owned insurance subsidiary of the Debtors.

proposition that "mistake of fact by a court" is grounds for granting a party relief from an order, insinuating that this Court made a mistake when it approved the Sale Motion.  Motion at 6 n.3.

31.    Omega's attacks on the Sale Order are untimely and moot.  The Sale Order is a final order, the Auction has been conducted, and the sale has closed.  It is well established that Section 363(m) of the Bankruptcy Code "reflects the salutary policy of affording finality to judgments approving sales in bankruptcy by protecting good faith purchasers" and that "[t]he finality and reliability of the judicial sales enhance the value of the assets sold in bankruptcy." *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847–48 (1st Cir. 1990).[8]  Cyrus is a good faith purchaser under the Sale Order.  *See* Sale Order ¶ 7 ("[a]ny entity that purchases MTNs from the Debtors pursuant to the authority granted in this Order shall be deemed to have purchased the MTNs in good faith and shall be entitled to the protections set forth in section 363(m)").[9]  There is no basis to upset the finality of the Sale Order and the results of the Auction conducted pursuant to the Sale Order.

32.    Omega attempts to support its request for an unraveling of the Sale Order and the Auction results by citing cases in which sales were voided or auctions were reopened.  But all of

---

[8]    *See also Licensing by Paolo v. Sinatra (In re Gucci)*, 105 F.3d 837, 838–40 (2d Cir. 1997) ("[w]e hold that . . . we have no jurisdiction to review an unstayed sale order once the sale occurs, except on the limited issue of whether the sale was made to a good faith purchaser"); *Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 250–54 (2d Cir. 2010) (losing bidder's appeal of sale order was moot because sale order was not stayed pending appeal); *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("We have long recognized the value of finality in judicial sales." (citing *In re Gen. Insecticide Co.*, 403 F.2d 629, 631 (2d Cir. 1968)); *Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359, 363 (4th Cir. 2006) ("Section 363(m) codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved.").

[9]    Similarly, the Court held that the "withdrawal of the objection of [Cyrus] is based upon the provisions in this Order that have been negotiated at arms' length and in good faith between the Debtors and Cyrus to address issues raised in Cyrus's objection to the Motion."  Sale Order at 2.

14

these cases are plainly distinguishable.  *See Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 766 (7th

Cir. 2004) (affirming approval of debtors' request to confirm sale based on bid at second auction

rather than bid at first auction, where all bidders did not have same information at first auction

and debtors had authority under bidding procedures to reject a bid at any time before court

approved such bid); *In re Coastal Plains, Inc.*, 179 F.3d 197, 213 (5th Cir. 1999) (judicial

estoppel prevented debtor from pursuing claims debtor failed to disclose in schedules; holding

otherwise would encourage bankruptcy debtors to conceal claims, write off debts, purchase

debtor assets at bargain prices, and then sue on undisclosed claims and possibly recover

windfalls); *In re Family Christian, LLC*, 533 B.R. 600, 622–25 (Bankr. W.D. Mich. 2015)

(following auction process that "was, at times, nothing short of chaotic," denying motion to

approve sale to "an indisputable insider" where objecting party asserted that debtors withheld

information from prospective bidders and prematurely closed auction, and court found that

debtors' failure to account for value of insider releases was "fatal").

33.     The more on-point authority fully supports respecting the finality of the Sale

Order and the Auction.  *See, e.g.*, *In re Stadium Mgmt. Corp.*, 895 F.2d at 849 ("Both appellants

argue that the relief they seek will not unravel the sale and thus would not implicate the policy of

finality and protection of good faith purchasers because the final bid made provisions for price

adjustments.  But they ignore the terms of the bid. . . .  The sale was completed because the

appellants failed to request a stay pending appeal.  We are powerless to undo the sale."); *In re:*

*Pursuit Capital Mgmt., LLC*, No. BR 14-10610-LSS, 2016 WL 5402735, at *5 (D. Del. Sept. 26,

2016), *appeal dismissed sub nom. In re Pursuit Capital Mgmt., LLC*, 874 F.3d 124 (3d Cir.

2017) (bankruptcy court's exercise of "discretion not to reopen the auction was consistent with

the well-recognized policy concerns of finality and integrity in the auction process" where court found negotiations between parties were at arm's length and no evidence of collusion).

34.     Even if the Court were to consider Omega's untimely and moot attack on the Sale Order, that attack is meritless.  Omega offers no explanation as to why the provision in the Sale Order granting the Debtors authority to sell *all* of the MTNs (and not just the "Listed MTNs") was improper, but instead simply pretends that provision in the Sale Order does not exist.

35.     Moreover, Omega is asking the Court to overturn select portions of the Sale Order by "voiding the portions of the sale that were ultra vires, namely the agreement to sell the Unlisted MTNs and to lock up the Sears Re MTNs." Motion ¶ 10.  Such relief cannot be granted piecemeal.  *See In re Motors Liquidation Co.*, 430 B.R. 65, 82 (S.D.N.Y. 2010) (finding "[t]he only relief available to [the sale objector] is unwinding the sale of assets to New GM in its entirety"); *In re Adelphia Commc'ns Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007) (holding, in analysis of equitable mootness, that suggested remedy of ordering "selective disgorgement from cherry-picked creditors . . . would rewrite the terms of the bargain, which is beyond the power of the Court").

36.     In agreeing to purchase the MTNs, in exchange for the payment of $82.5 million in cash, the waiver of recoveries on $629 million of the MTNs sold by the Debtors and the SRAC estate-protective provisions regarding the MTNs owned by Sears Re (avoiding further substantial dilution to the creditors of the SRAC estate), the Debtors and Cyrus entered into a comprehensive package deal, negotiated in good faith and at arm's length.  To grant piecemeal relief would improperly rewrite the basis of the bargain struck between Cyrus and the Debtors.

### E.    Omega's Attacks On Cyrus Are Entirely Unsubstantiated And, In Many Instances, Demonstrably False

37.    Omega goes out of its way to attempt to paint Cyrus as a market manipulator that, through "insider" status or otherwise, has acted in bad faith.  The resulting picture, which is based largely on innuendo and inaccuracies, is false and misleading.

#### 1.    Cyrus is not an "insider" of the Debtors

38.    Omega incorrectly claims that Cyrus is an "insider" of the Debtors, and bootstraps that notion into a suggestion that the Court should be suspicious of its winning bid.  Motion ¶¶ 39, 42, 43.  But Cyrus is indisputably *not* an insider.  Section 101(31)(B) of the Bankruptcy Code, which Omega tellingly ignores, defines an "insider" of a corporation debtor to include a: "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor."  Omega does not allege a single fact that would support its insider allegation because it cannot – Cyrus is none of these things.[10]

39.    But Cyrus *is* a longstanding supporter of the Debtors, dating back to 2013.  As noted, during the period from 2013 until the day before the Auction, Cyrus has made a variety of debt investments throughout Sears's capital structure that total well over $500 million.  *See* p. 4,

---

[10]    As a result, Omega's citations to cases where transactions were challenged because of actions taken by insiders are inapposite.  *See Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 100–01 (Bankr. S.D.N.Y. 2002) (sale not upheld where debtor's former director, in seeking to purchase debtor's stock warrants, intentionally misrepresented value of the warrants); *In re Embrace Sys. Corp.*, 178 B.R. 112, 126–28 (Bankr. W.D. Mich. 1995) (sale arranged by the Debtor's president who had an interest in the prospective buyer); *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 745–47 (6th Cir. 2001) (insiders obtained participation interests in lead lender's credit facility with debtor).

*supra*.[11]  In addition, during 2017 and 2018 Cyrus repeatedly agreed to accommodations designed to extend Sears's liquidity runway, and most recently agreed to provide Debtors with $350 million in Junior DIP financing.[12]

40.    Cyrus's long history of supporting Sears does not make Cyrus an "insider" of the Debtors, and its winning bid in the Auction should not be treated differently than any other winning third-party bid.  Cyrus's support of Debtors and its years-long investments across Debtors' capital structure do, however, stand in stark contrast to Omega—a CDS-only player that made its first, small investment in the Debtors' securities *a few weeks ago*, and even then only for the apparent purpose of attempting to manufacture standing after it lost the Auction.

### 2.    Cyrus's seat on the DC is irrelevant

41.    Omega suggests that suspicion of Cyrus's winning bid is warranted because Cyrus holds one of the seats on the DC.  *See, e.g.*, Motion ¶ 27.  This too is highly misleading. Omega knows that Cyrus holds only one out of 15 seats of the DC, and that all members of the DC are representatives of either CDS dealers (such as JPMorgan, Citibank, or Goldman Sachs) or "buyside" entities similar to Cyrus (and Omega) that actively participate in the CDS market.[13]

---

[11]    Cyrus held equity positions in Sears for portions of 2013, 2014, 2017 and 2018, all of which positions Cyrus has sold.  Each of those positions amounted to less than one percent of Sears's total shares outstanding.  Cyrus has never held a Sears board seat or any other positions of control.

[12]    Omega theorizes that "[g]iven the recent announcement of Cyrus's status as a DIP lender, there is *a chance* that Cyrus may have had access to material, confidential information about the Debtors when bidding in the Auction."  Motion at 18 n.9 (emphasis added).  This is baseless speculation.  In addition, Cyrus did not become a DIP Lender until November 27 – a week after the Auction occurred.  And even if a party possesses material, confidential information, that does not render such party an "insider."  Finally, it bears noting that the Court specifically held that the terms of the Junior DIP "were entered into at arm's-length, under no duress, and without undue influence, negligence or violation of public policy or law."  *See Interim Junior Dip Order* [Dkt. No. 951] ¶ 3.

[13]    This is why every decision of economic importance that comes before the DC (including whether any obligations of a Reference Entity may be considered deliverable for purposes of a CDS Auction) can only be decided if at least 12 of the 15 members agree on the matter one way

And Omega knows that the DC's rules protect against the dissemination by DC members of any information material to the DC's deliberations unless and until the results of those deliberations are made public pursuant to the DC's rules.[14]  What Omega may *not* know is that, long before the Auction and the related deliverability deliberations of the DC with respect to the MTNs, Cyrus voluntarily put in place, and still maintains, an additional information barrier not called for by the DC's rules, pursuant to which Cyrus's investment personnel responsible for Cyrus's CDS investments related to Sears send no communication whatsoever regarding Cyrus's plans with respect to Sears or its debt obligations or securities to Cyrus's delegate on the DC.  Any suggestion that Cyrus's winning bid is the product of its seat on the DC is therefore baseless.

### 3.    Omega's other attacks on Cyrus are baseless

42.    *Cyrus's Objection to the Sale Motion.*  Omega complains that "Cyrus tried to destroy the value of the MTNs to the Debtors" by initially objecting to the Sale Motion.  Motion ¶ 4.  Not so.  Unlike Omega at the time, Cyrus was a significant creditor of SRAC when the Sale Motion was filed at Omega's instigation.  As noted in Cyrus's Objection to the Sale Motion [Dkt. No. 722], Cyrus had legitimate concerns about the implications of a sale of MTNs for creditors of SRAC, including the potential impact of the broad "sale free and clear" language contained in the initially proposed sale order, the potential dilution of recoveries through the creation of "springing" claims against SRAC that would not otherwise exist,[15] and the wholly

---

or the other.  *See, e.g.*, Section 3.3(e) of the DC Rules.  The DC Rules therefore explicitly acknowledge that the fact that a DC representative may be aware of her institution's economic position with respect to a question before the DC does not prevent such representative from acting as a voting member of the DC.  *See* Schedule 6 to the DC Rules, https://www.cdsdeterminationscommittees.org/wp-content/files_mf/1544459244ISDA_DC_RulesSeptember282018.pdf.

[14]    *See* Section 5.2(a) of the DC Rules.

[15]    As noted, Cyrus's winning bid accounts for this concern to a significant extent by waiving recoveries on $629 million of the MTNs.

undefined nature of the "true up" mechanism referred to in the initially proposed sale order.

These legitimate issues were subsequently addressed, resolved among the Debtors, Cyrus and the

UCC, and reflected in the ultimate Sale Order entered by the Court.

43.    *The Sale Order Language Negotiated Between Cyrus and Debtors.*  Omega

similarly suggests Cyrus acted improperly when, as part of the resolution with Debtors of its

Objection to the Sale Motion, Cyrus negotiated for the inclusion of so-called "Deliverability

Language" in the Sale Order ¶ 6 stating that the MTNs:

> . . . are not being sold free and clear of any Liens or Claims of SRAC, including,
> without limitation, any counterclaim, defense or right of setoff, held or that may
> be asserted by SRAC or its estate, and nothing in this Order shall impair or
> prejudice in any way any rights, claims, or defenses that SRAC or its estate may
> have in connection with the MTNs.

(The "Challenge Rights Language").  The allegation that this language was somehow

inappropriate is meritless.  First, the Challenge Rights Language was designed to protect SRAC,

as a Debtor, from being prejudiced by any overly "free and clear" provisions to be contained in

the Sale Order.  Indeed, this was one of the main issues raised in Cyrus's Objection to the Sale

Motion.  *See* [Dkt. No. 722] at 3–5.

44.    Second, the Challenge Rights Language was the product of negotiations with the

Debtors, and both the Debtors and the UCC agreed with the language.

45.    Third, and perhaps most notably, the Court reviewed the language at the

November 19 hearing and discussed it with the parties, observing that "I believe it's consistent

with applicable law, including the New York General Obligations Law and what a buyer of a

claim gets."  Hr'g Tr. 12:12–15, Nov. 19, 2018.

46.    Finally, Omega fails to inform the Court that the Auction Notice stated that

Debtors "confirm that SRAC is not aware of, and does not intend to pursue, and hereby

quitclaims any counterclaim, defense, lien, claim, charge, encumbrance, or right of setoff with

20

respect to any purchaser or transferee of the Notes." Motion, Ex. B. Thus, to the extent Omega

argues that the language in the Sale Order somehow clouded the MTNs in the Auction, the

Debtors' affirmative representations that they did not believe that SRAC has any such "challenge

rights" served to remove any such cloud.

47.    *Cyrus's Objection Letter to the DC.*  Omega repeatedly suggests there was

something nefarious about the fact that Cyrus sent an "anonymous" letter to the DC challenging

the deliverability of the MTNs. Motion ¶¶ 4, 6, 10, 26, 27, 43. Omega fails to inform the Court,

however, that:  (i) market participants submitting materials to the DC commonly request to have

their names redacted from those submissions, and the DC Secretary regularly honors those

requests; (ii) Omega's counsel at Quinn Emanuel sent the DC its own letter on November 20,

advocating in favor of deliverability; and (iii) the Debtors sent the DC their own letter on

November 20 similarly arguing in favor of deliverability.[16]  There was nothing improper about

the fact that Cyrus advocated in favor of its position, just as Omega and the Debtors did. Indeed,

the advocacy of Cyrus at the DC has been available to the public since the day that it was filed.

48.    *Alleged Discussions With Other Market Participants.*  Omega claims that Cyrus

"contacted Auction participants to inform them that the MTNs would not be deliverable in the

Auction, directly referencing the [Challenge Rights Language.]" Motion ¶ 5; *see also id.* ¶ 26.

Like many of its other allegations against Cyrus, this claim is wholly unsupported. While Cyrus

certainly engages in "market chatter" about potential investments and may well have engaged in

chatter of this type in connection with the Auction, Cyrus never told any Auction participant that

the Challenge Rights Language meant the MTNs would not be deliverable. And again, the

---

[16]    *See generally* Point B, *supra* (describing Omega's extensive knowledge of and influence
upon Debtors' sale process).

Debtors in the Auction Notice "confirm[ed] that SRAC is not aware of, and does not intend to pursue, and hereby quitclaims any counterclaim, defense, lien, claim, charge, encumbrance, or right of setoff with respect to any purchaser or transferee of the Notes." Motion, Ex. B at 2.

### F. The Court Properly Found That Cyrus Acted In Good Faith

49.     The Sale Order holds that "[a]ny entity that purchases MTNs from the Debtors pursuant to the authority granted in this Order shall be deemed to have purchased the MTNs in good faith and shall be entitled to the protections set forth in section 363(m) of the Bankruptcy Code . . ." Sale Order ¶ 7. There is no basis to disturb the Court's finding in the Sale Order.

50.     Omega argues that the protections of section 363(m) should not apply to Cyrus "because of Cyrus's inappropriate conduct in connection with this Auction and its status as an insider." Motion ¶ 42. But as explained in Point E, *supra*, Cyrus is clearly *not* an insider. As for Omega's suggestion of "inappropriate conduct," that claim is based largely upon Cyrus's: (i) Objection to the Sale Motion; (ii) objection letter to the DC; (iii) inclusion of the Challenge Rights Language in the Sale Order; and (iv) supposed "attempts to chill bidding in the Auction," presumably via communication with other bidders. *Id.* ¶ 43. These claims, too, are refuted in Point E, *supra*. Accordingly, they provide no basis for the Court to find that Cyrus acted in a manner other than good faith.

### CONCLUSION

For these reasons, Cyrus respectfully requests that the Court: (i) deny Omega's Motion; and (ii) grant such other relief as required.

Dated: December 13, 2018
      New York, New York

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By:    /s/ Thomas R. Kreller

Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Andrew M. Leblanc
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Craig M. Price
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*