WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
In re                                    :
                                         :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :        Case No. 18-23538 (RDD)
                                         :
Debtors.¹                                :        (Jointly Administered)
                                         :
                                         :
------------------------------------------------------------x
```

**DEBTORS' OBJECTION TO LUXOTTICA RETAIL NORTH
AMERICA INC.'S MOTION FOR ENTRY OF AN ORDER (I) GRANTING
RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, (II)
<u>COMPELLING ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc.

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "**Sears**" or the "**Debtors**"), submit this objection (the "**Objection**") in response to the *Motion of Luxottica Retail North America Inc. for Entry of an Order (I) Granting Relief form the Automatic Stay or, In the Alternative, (II) Compelling Assumption or Rejection of Executory Contract*, dated November 30, 2018 (ECF No. 981) (the "**Motion**").[2]  In support of the Objection, the Debtors respectfully represent as follows:

### Preliminary Statement

1. Luxottica Retail North America Inc. ("**Luxottica**" or the "**Movant**") seeks relief from the automatic stay to terminate a very profitable agreement for the Debtors on the basis of an alleged prepetition breach. Even if there was a prepetition breach under the License Agreement, which the Debtors dispute, that is not a basis to allow Luxottica to terminate the License Agreement and deprive the Debtors of the "breathing spell" provided under the Bankruptcy Code. The Debtors have been timely performing their postpetition obligations to Luxottica, save for one disputed payment.

---

(9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or in the *Final Order Authorizing the Debtors to (A) Obtain Post-Petition Financing (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 955) (the "**Final DIP ABL Order**").

2

2. The Motion is filled with rhetoric and alleged wrongdoings, but it does not actually point to any breach of the License Agreement between the Debtors and Luxottica. Instead, it relies on a generic provision that simply provides that the parties intend to create a trust relationship. Specifically, section 9.3 of the License Agreement (quoted below) does not require that the Debtors create a segregated account for Luxottica or otherwise siphon any funds generated from Luxottica merchandise away from the Debtors' estates. Luxottica was satisfied with the Debtors' performance under the License Agreement for many years, but now, in search for a way to exert leverage against the Debtors is fishing for a technicality under the agreement.

3. The Motion fails to disclose one critical fact: Luxottica has undertaken self-help remedies and unilaterally withheld over $400,000 of commissions from insurance proceeds and off-premises sales due to the Debtors for October and November 2018. These amounts are clearly due to the Debtors. Luxottica's actions are in blatant violation of the automatic stay.

4. The commercial relationship with Luxottica is an important one for the Debtors. Indeed, both parties derive substantial economic benefit from the arrangement pursuant to which Luxottica operates eyewear locations under the banner "Sears Optical." Altogether, Luxottica operates 172 on-premises locations at the Sears stores. Based on the 2018 annualized figures, the Debtors receive approximately $9.3 million per year in commissions from sales at all of the current Sears Optical locations (including 10 off-site locations), in addition to significant indirect benefits through increased foot traffic to the Sears stores. That benefit is mutual and translates to Luxottica's gross annualized sales in 2018 at the Sears Optical locations of approximately $117 million. The arrangement is governed by the License Agreement.[3]

---

[3] Due to confidentiality provision in the License Agreement, the Debtors will provide a copy of the License Agreement to the Court and will make a copy available to the United States Trustee, the DIP ABL Lenders, the Junior DIP Lenders and the Unsecured Creditors' Committee on a confidential basis on request.

5.    The Debtors and Luxottica have been engaged in dialogue since the Debtors commenced these chapter 11 cases. The issue between the parties is two-fold. First, Luxottica asserts a right to receive proceeds of prepetition sales at on-site "Sears Optical" locations. As required under the License Agreement, prepetition, all sales at Sears Optical counters located within Sears stores were (and continue to be) processed through the Debtors' point-of-sale terminals ("**POS Terminals**"). License Agreement § 8.2. The proceeds of such sales then moved through the Debtors' cash management system in the same manner as the proceeds of all other sales. As such, the funds from the Sears Optical POS Terminals were maintained with the rest of the Debtors' cash. Because the relevant accounts were subject to the liens of the Prepetition ABL Credit Parties, the Debtors believe such funds were swept on a daily basis in accordance with the ordinary course operation of the Debtors' cash management system. As of the Petition Date, the amount of unreimbursed proceeds to Luxottica was approximately $2.6 million, reflecting between two and three weeks of sales proceeds from the POS Terminals that were collected by the Debtors and not paid to Luxottica. In addition, as required under the License Agreement, prepetition, the Debtors paid Luxottica certain advances, which as of the Petition Date were equal to approximately $777,000.

6.    From the outset, the Debtors' position with respect to the prepetition proceeds has been consistent—Luxottica's rights to file a claim or try to otherwise recover such proceeds in accordance with law, including the automatic stay, are preserved. But Luxottica cannot withhold performance or terminate the contract based upon an alleged breach that even if true cannot serve as a basis to disregard the automatic stay.

4

7.      With respect to the proceeds of postpetition sales, although not required by law or the License Agreement, the Debtors are willing to provide Luxottica arrangements similar to the ones extended to the consignment vendors as reflected in the GOB Order (paragraphs 36-41) and incorporated by reference into the Final DIP ABL Order (paragraph 62). Specifically, the Debtors are willing to establish a segregated account (similar to the Reserve Account for the consignment vendors), except that the proposed segregated account will only hold Luxottica's funds. The Debtors further propose that such account will hold a balance equal to Luxottica's average unremitted sales between payments, less the Debtors' commissions. In addition, the Debtors have been and will continue to remit the proceeds of postpetition sales, net of the Debtors' commissions, to Luxottica on a weekly basis consistent with the License Agreement.

8.      Finally, the Debtors should not be compelled to assume or reject the License Agreement. The Debtors must be afforded a breathing spell to evaluate their agreements, including the License Agreement. The License Agreement is one of several thousand of the Debtors' executory contracts, and Luxottica is one of several dozen of the Debtors' licensed partners. The Debtors are performing their obligations to Luxottica on a postpetition basis and any potential default, which is hypothetical, can be satisfied from the segregated account or the filing of an administrative claim to the extent of any shortfall. These chapter 11 cases are in their infancy, and a rushed assumption is inconsistent with the objectives of the Bankruptcy Code. Accordingly, the Motion should be denied.

## Argument

### A.    Luxottica's Request to Lift the Automatic Stay Should Be Denied

9.      Contrary to Luxottica's assertion, it cannot unilaterally terminate the License Agreement without violating the automatic stay. As further discussed below, the weight of authority prohibits an executory contract counterparty from terminating an executory contract

5

on the basis of a prepetition breach or bankruptcy filing, which is a classic attempt to enforce an *ipso facto* provision. Indeed, Luxottica has already violated the automatic stay as it has failed to remit to the Debtors commissions due under the License Agreement. The amount of the underpayment is approximately $419,000, all of which came due postpetition (and exceed an alleged underpayment of $198,500 by the Debtors).

10.     Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause . . . ." 11 U.S.C. § 362(d)(1). Courts hold that the automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *See, e.g.*, *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 502 (1986). Moreover, the stay is "designed to give the debtor time to organize its affairs—which includes protection from having to defend claims brought against the estate." *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986). Because "cause" is not defined by section 362(d), the decision whether to modify the stay is left to the discretion of the bankruptcy court. *In re Marketxt Corp.*, 428 B.R. 579, 584 (S.D.N.Y. 2010).

11.     In the Second Circuit, courts consider twelve (12) factors, known as the *Sonnax* factors, in determining whether the automatic stay should be lifted. *See Sonnax Indus., Inc. v. Tri-Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990). The *Sonnax* factors are:

> 1) whether relief would result in partial or complete issue resolution;
>
> 2) lack of connection with or interference with the bankruptcy case;
>
> 3) whether the other proceeding involves the debtor as a fiduciary;

6

4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

5) whether the debtor's insurer has assumed full responsibility for defending it;

6) whether the action primarily involves third parties;

7) whether litigation in another forum would prejudice the interests of other creditors;

8) whether the judgment claim arising from the other action is subject to equitable subordination;

9) whether movant's success in the other proceeding would result in a judicial lien avoidable by debtor;

10) the interests of judicial economy and the expeditious and economical resolution of litigation;

11) whether the parties are ready for trial in the other proceeding; and

12) the impact of the stay on the parties and the balance of harms.

*Id.*

12. Courts in this District have applied the *Sonnax* factors in determining whether to lift the automatic stay for a non-debtor counterparty to terminate the contract on the basis of post-petition defaults. *See, e.g.*, *In re Velo Holdings Inc.*, 475 B.R. 367, 390 (Bankr. S.D.N.Y. 2012) (declining to modify the automatic stay, after the counterparty alleged prepetition default, because the balance of hardships did not favor such a result even if cause for lifting the stay existed). In applying the *Sonnax* factors, the Movant bears the initial burden to show cause and "[i]f the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Abrantes*

7

*Const. Corp. v. U.S. (In re Abrantes Const. Corp.)*, 132 B.R. 234, 247 (N.D.N.Y. 1991) (citing *In re Sonnax*, 907 F.2d at 1285).[4]  Here, the Movant has failed to meet its burden.

13. Not all of these factors will be relevant in a given case, and this Court may disregard irrelevant factors.  *See In re Mazzeo*, 167 F.3d 139, 143 (2d Cir. 1999).  Additionally, courts need not assign equal weight to each factor, and have discretion in weighing the factors against one another.  *In re RCM Glob. Long Term Capital Appreciation Fund*, Ltd., 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996).  The two *Sonnax* factors that are relevant to the instant case are the interference with the Debtors' bankruptcy cases (factor two) and the balance of harms between Luxottica and the Debtors (factor twelve).  Both factors weigh in favor of the Debtors.

**1.   Lifting the Automatic Stay Will Interfere with the Bankruptcy Cases (Factor Two)**

14. Contrary to Movant's assertions, lifting the stay to allow Luxottica to terminate the License Agreement will interfere with the Debtors' chapter 11 cases for several reasons.  First, a termination would result in the loss of a substantial source of revenue at a time when the Debtors are attempting to maximize value through the sale process.  Second, lifting the automatic stay to allow Luxottica to terminate the License Agreement will require the Debtors to devote substantial time, energy and resources to deal with the fallout of such termination.  This would create a burdensome distraction from the important operational and chapter 11 matters facing the Debtors at their most profitable time of the year.

15. The Debtors are subject to several thousand prepetition executory contracts.  Given the size and complexity of the Debtors' operations, allowing the relief sought in the Motion could open the floodgates for similarly situated counterparties to file similar motions and impose

---

[4] The Motion cites *Abrantes*, but fails to note that in that case, the District Court remanded to Bankruptcy Court to analyze the *Sonnax* factors.

8

significant hardship on the Debtors. The Debtors have been in chapter 11 for only two months and have been focused on stabilizing their business. It would be contrary to the purposes of the Bankruptcy Code if Luxottica is allowed to terminate on the basis of an alleged prepetition breach of contract. Therefore, this *Sonnax* factor weights against granting the relief sought in the Motion.

> **2. Continuing the Automatic Stay Will Not Impose Substantial Hardships on Luxottica Relative to the Hardships Borne by the Debtors Should the Stay be Lifted (Factor Twelve)**

16. In *Sonnax*, the Second Circuit denied relief from the automatic stay, finding that although the movant would suffer little harm if the stay was left in place, "lifting the stay might doom [debtors'] attempt to reorganize." *Id.* at 1287. Here, Luxottica is not harmed by the stay remaining in effect. The Debtors have been making all payments to Luxottica in a timely manner as required under the License Agreement, save for a disputed payment of $189,000. Luxottica bases its argument entirely on an alleged breach that does not exist in the contract and a perceived risk of non-payment for postpetition performance, which the Debtors are willing to virtually eliminate through the establishment of a segregated account.

17. The Debtors would suffer clear harm if the automatic stay were lifted, primarily because the Debtors would (i) lose an important revenue stream and (ii) be required to use limited estate resources to address the fallout of Luxottica terminating the License Agreement, including similar motions from their other contract counterparties. All of this will negatively affect the Debtors, their estates and all other creditors in these chapter 11 cases.

18. Therefore, based on the balancing of the applicable *Sonnax* factors, Luxottica has failed to establish a showing of "cause" sufficient to lift the automatic stay.

**B.     Luxottica's Request to Compel Assumption or Rejection of the License Agreement Should Be Denied**

19. Section 365(d)(2) of the Bankruptcy Code provides that a chapter 11 debtor has until the confirmation of a plan to assume or reject an executory contract. 11 U.S.C. § 365(d)(2). A movant must establish a compelling reason to shorten the debtor's time for assumption or rejection. *See generally South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 761 (2d Cir. 1996) (holding that the district court was within its discretion in granting debtor's motion to extend the time period on assumption or rejection of unexpired nonresidential lease); *In re Dana Corp.*, 350 B.R. 144, 149 (Bankr. S.D.N.Y. 2006) (denying request to compel assumption or rejection of supply agreement when the debtors were involved in a large and complex chapter 11 reorganization); *In re Enron Corp.*, 279 B.R. 695, 703 (Bankr. S.D.N.Y. 2002) (denying request to compel assumption or rejection of transportation service agreements). A compelling reason is required because the underlying policy of section 365 is "to provide the debtor with breathing space following the filing of a bankruptcy petition, continuing until the confirmation of a plan, in which to assume or reject an executory contract." *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006) (citations omitted). Moreover, where a movant seeks to shorten the Debtors' statutory period to assume or reject executory contracts, the burden is on the movant to demonstrate cause. *Id.* at 147 (citing *In re Republic Techs. Int'l, LLC*, 267 B.R. 548, 554 (Bankr. S.D. Ohio 2001)).

20. The law in the Second Circuit is clear that a debtor is entitled to a "reasonable" amount of time to decide whether to assume or reject an executory contract. *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982). The Bankruptcy Code does not establish what constitutes a reasonable time in which the Debtors must assume or reject an executory contract. *In re Taber Farm Assocs.*, 115 B.R. 455, 457 (Bankr. S.D.N.Y. 1990). Instead,

18-23538-shl    Doc 1241    Filed 12/14/18    Entered 12/14/18 18:09:30    Main Document
Pg 11 of 15

reasonableness is left to the court's discretion to be determined on a case-by-case basis. *Theatre Holding*, 681 F.2d at 105.

21. Courts in the Southern District of New York consider many factors in determining whether cause exists to shorten the Debtors' statutory period for assumption or rejection of executory contracts. These factors include:

1) the importance of the contracts to the debtor's business and reorganization;

2) the debtor's failure or ability to satisfy postpetition obligations;

3) the nature of the interests at stake;

4) the balance of hurt to the litigants and the good to be achieved;

5) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan;

6) the safeguards afforded the litigants;

7) the damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;

8) whether there is a need for judicial determination as to whether an executory contract exists;

9) whether exclusivity has been terminated;

10) whether the action to be taken is so in derogation of Congress's scheme that the court may be said to be arbitrary; and

11) the purpose of chapter 11, which is to permit successful rehabilitation of *debtors.*

*In re Dana Corp.*, 350 B.R. at 147–48 (citations omitted). The critical factor in this analysis is the effect of compelling assumption or rejection on the likelihood of a successful reorganization by the debtor. *See, e.g.*, *In re Teligent, Inc.*, 268 B.R. 723, 738–39 (Bankr. S.D.N.Y. 2001) ("Above

all, the court should interpret reasonable time consistent with the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors."). Courts consider the effect on the Debtors' chance at a successful reorganization to be critical. *See In re Teligent*, 268 B.R. at 738 (noting that requiring the debtor to assume or reject an executory contract would not aid in the debtor's chance of a successful reorganization); *In re McLean Indus., Inc.*, 96 B.R. 440, 450 (Bankr. S.D.N.Y. 1989) ("Early assumption is often not in the best interests of the estate since it can force premature decisions which could later jeopardize a successful reorganization process.").

22. All of these factors overwhelmingly favor the Debtors. The Debtors are only two months into these chapter 11 cases, which are one of the largest and most complex retail chapter 11 cases in history. At this early, pivotal stage in the cases, the Debtors' resources have been focused on stabilizing their business and maximizing value. Given the magnitude and complexity of the cases, the Debtors simply have not had sufficient time to make critical decisions regarding the assumption or rejection of their numerous executory contracts and should not be prematurely compelled to do so. A forced and hurried decision on whether to assume or reject the License Agreement, while the Debtors are well within their exclusivity period, is contrary to the objectives of chapter 11 and will impede the Debtors' attempts to maximize value.

23. The Debtors cannot and should not be forced into premature assumption or rejection decisions of executory contracts such as the License Agreement. Moreover, there is no prejudice to Luxottica because the Debtors are current on undisputed postpetition payments under the License Agreement. In addition, to further alleviate Luxottica's concerns, the Debtors are willing to establish a segregated account to deposit proceeds of postpetition sales. To the extent the balance in such account will be insufficient to make Luxottica whole on a postpetition basis, Luxottica will have an administrative claim against the applicable Debtors. In addition to the funds

available to the Debtors under their postpetition financing agreements, the Debtors also have a $240 million wind-down account available to satisfy administrative claims. Further, if the Debtors are forced to assume or reject the License Agreement, the Debtors will likely face a swarm of contract counterparties looking for similar relief.

24. For all the foregoing reasons, requiring the Debtors to make premature determinations on assuming or rejecting executory contracts at the infancy of these chapter 11 cases must be denied.

C. **Luxottica Must Perform Under the License Agreement**

25. Luxottica has been demanding the payment of all prepetition proceeds. In its argument, Luxottica relies on the following section of the License Agreement, as amended, which provides as follows:

> Settlement. At the close of each business day, Licensee's representative at each On-Premises Location shall deliver the total of all cash, checks, and credit sales documents for transactions completed that day in the On-Premises Location to the Designated Company Store's HUB office or to such other store location as Company may designate. Company may retain out of such receipts Company Fee due under this Agreement together with any other sums due to Company from Licensee. Company and Licensee agree and intend for the funds reflected in the cash, checks, and credit sales documents, minus the Company Fee, to be held by the Company for the benefit of and in trust for Licensee and that title to such funds shall not pass to the Company.

License Agreement § 9.3; Second Amendment to License Agreement, dated Nov., 2017 § 3.

26. This provision does not obligate the Debtors to establish segregated accounts or take any measures to isolate Luxottica's funds. Even if Luxottica's assertion that the Debtors violated the terms of the License Agreement were true—which it is not—Luxottica is obligated to continue to perform under the License Agreement until the Debtors' assumption or rejection of such contract. Nearly all courts that have considered this issue have held that a

13

counterparty must perform an executory contract pending the debtor's decision to assume or reject the agreement, notwithstanding a debtor's prepetition default. *See, e.g.*, *In re Penn Traffic Co.*, 524 F.3d 373, 382 (2d Cir. 2008); *In re Broadstripe, LLC*, 402 B.R. 646, 650, 656 ¶¶ 18, 78 (Bankr. D. Del. 2009) (compelling a counterparty to perform despite the debtor's prepetition payment default of approximately $3.4 million); *In re Pac. Gas & Elec. Co.*, 2004 U.S. Dist. LEXIS 22023, at *16–18 (N.D. Cal. Sept. 30, 2004) (holding that even a counterparty that ceased prepetition performance of an agreement in accordance with its state law contractual rights was required to resume performance once the debtor filed for bankruptcy); *In re Cont'l Energy Assocs. Ltd. P'ship*, 178 B.R. 405, 408 (Bankr. M.D. Pa. 1995) (Compelling a counterparty to continue to supply natural gas to the debtor until such time as the debtor assumed or rejected the contract); *In re McLean Indus., Inc.*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ("[D]ebtor-in-possession should be permitted to enforce an assumable executory contract prior to formal assumption or rejection.").

27.     Luxottica has violated the automatic stay by failing to remit amounts due to the Debtors. Under section 9.3 of the License Agreement, Luxottica is obligated to make monthly settlements with the Debtors for, among other things, all in-store third-party insurance transactions and all transactions processed at off-premise locations. However, as mentioned above, since the Petition Date, Luxottica has been withholding, and continues to withhold, such payments to the Debtors, in an amount of approximately $419,000. Luxottica cannot terminate or withhold performance based on an alleged prepetition default, even if Luxottica is correct. Accordingly, the Court should require Luxottica to immediately turnover the withheld funds.

## Conclusion

28.     For the foregoing reasons, Luxottica's Motion should be denied, and the Court should enter an order providing that (i) the automatic stay shall remain in effect, (ii) the Debtors shall not be immediately compelled to assume or reject the License Agreement,

(iii) Luxottica must perform under the License Agreement and turn over withheld commissions, and (iv) such other and further relief as the Court deems just and proper.

Dated:  December 14, 2018
       New York, New York

                        /s/ Sunny Singh
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York  10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007
                        Ray C. Schrock, P.C.
                        Jacqueline Marcus
                        Garrett A. Fail
                        Sunny Singh
                        Jessica Liou

                        *Attorneys for Debtors*
                        *and Debtors in Possession*