WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                                :
**In re**                                       :        **Chapter 11**
                                                :
**SEARS HOLDINGS CORPORATION,** *et al.*,       :        **Case No. 18-23538 (RDD)**
                                                :
        **Debtors.**[1]                         :        **(Jointly Administered)**
                                                :
----------------------------------------------------------------x

**DEBTORS' RESPONSE TO APPLICATION OF GA CAPITAL**
**FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES**
**PURSUANT TO BANKRUPTCY CODE SECTIONS 503(B)(3)(D) AND 503(B)(4)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), hereby file this response (the "**Response**") to the *Application of GA Capital for Allowance and Payment of Fees and Expenses Pursuant to Bankruptcy Code Sections 503(b)(3)(d) and 503(b)(4)* [ECF No. 1102] (the "**Application**")[2] filed by GACP II, L.P. ("**GA Capital**"):

### Preliminary Statement

1.      The Debtors do not dispute that GA Capital has contributed to the administration of the Debtors' chapter 11 cases and deserves some compensation for its efforts. For this reason, at the hearing on the Junior DIP Financing, the Debtors, with the support of the Creditors' Committee, volunteered to support payment of a reasonable amount of GA Capital's expenses incurred in the process. GA Capital declined the offer and has not provided a counter to date (other than its demand that 100% of the asserted amount in the Application be immediately paid). Nevertheless, the Debtors are appreciative of GA Capital's contribution and do not dispute that it is entitled to reimbursement of a ***reasonable*** amount of fees and expenses incurred by GA Capital in connection with the Junior DIP Financing process.

2.      The Debtors do not believe, however, that the amounts requested—$2.1 million ("**Requested Fees**")—are reasonable based on the information submitted. At the very least, GA Capital should not be compensated for any fees or expenses incurred prior to November 14, 2018—the date on which, by GA Capital's own admission, it was advised by the Debtors that

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Supplemental Motion for Authority to (i) Obtain Junior Postpetition Financing and (ii) Schedule Final Hearing* [ECF No. 872].

WEIL:\96845369\1\73217.0004

GA Capital was selected as the Junior DIP Lender.  Until that time, GA Capital was simply

participating as a bidder in the Junior DIP Financing process.  Similarly, GA Capital should not

be compensated for any diligence performed in connection with the Junior DIP Financing because

it was acting as a bidder in doing such diligence.  Taken to a logical conclusion, had GA Capital

not been selected as the lead Junior DIP Lender, it would not have been entitled to any

compensation for its efforts as a losing bidder for the Junior DIP Financing.  Moreover, GA

Capital's pleading is unnecessarily filled with allegations of an unfair process and nefarious

intentions that are simply not true and irrelevant to the relief requested in the Application.  The

Debtors are, therefore, compelled to respond and set the record straight.

## I.    THE DEBTORS RAN A FAIR AND TRANSPARENT JUNIOR DIP FINANCING PROCESS

3.    As stated, the Application makes a series of unfounded and speculative

allegations that implicate the integrity of the Debtors' marketing process.[3]  The Debtors believe it

imperative to set the record straight and correct these material misstatements.  ***First,*** the ultimate

selection of the Junior DIP Financing led by Cyrus Capital Partners, LP ("**Cyrus**") was an exercise

of the Debtors' business judgment and the culmination of a competitive and structured process,

absent any nefarious plots.  Contrary to GA Capital's assertion that the Debtors' advisors restricted

and controlled GA Capital's access to other parties (such as Cyrus and ESL) with alleged ulterior

motives, this approach is typical for DIP marketing processes.  *See* Application ¶¶ 4-6, 22.

Competing parties are often kept separate to ensure a competitive and robust process that will yield

the best financing terms for the Debtors.  GA Capital never expressed any concern about how the

restrictions on communication with Cyrus or ESL would impact their due diligence efforts, nor

---

[3]    To the extent the Court deems it necessary or appropriate, the Debtors will be prepared to submit evidence in further support of the statements made in this Response.

WEIL:\96845369\1\73217.0004

did they ever indicate to Lazard at any point during the process its desire to discuss the Junior DIP

Financing with Cyrus or ESL.[4]

        4.      ***Second,*** GA Capital's allegation that the Debtors exploited GA Capital's

due diligence efforts to lay the groundwork for the ultimate benefit of Cyrus is simply not true.

*See* Application ¶¶ 11-12.   Cyrus's reemergence as a potential provider for the Junior DIP

Financing came as much of a surprise to the Debtors as to GA Capital.  In early November, the

Debtors pushed forward multiple DIP term sheets with the parties in interest, including Cyrus.

During this process, the professionals for each potential DIP lender were provided access to

counsel and the financial advisor to the DIP ABL Agents as all parties continued to negotiate and

progress their respective proposals.  Only after evaluating the submitted DIP proposals and

documentation and receiving the recommendation of their advisors did the Debtors inform Cyrus

that the Debtors favored GA Capital's proposal and Cyrus would need to make material

improvements to remain competitive.  At that juncture, the Debtors believed that GA Capital's

proposal provided superior terms when considered as a whole and this decision was not made

because Cyrus was otherwise "all over the capital structure."   Although the Debtors' advisors

continued discussions with Cyrus' professionals, the prospect of Cyrus providing a competing bid

was unforeseen.  In fact, it was not until the evening of November 26—the night before the

scheduled hearing on the Junior DIP Financing—that Cyrus told Lazard about the possibility of a

competing bid.  Lazard immediately relayed the news to GA Capital the following morning, after

Cyrus reiterated its interest in appearing at the scheduled hearing with a competing proposal.

Needless to say, the Debtors were not in "cahoots" with Cyrus and the Debtors ran a fair and

competitive process which produced a reasonable and favorable result.

---

[4]    Notably, neither Cyrus nor ESL was on GA Capital's list reflecting the seven (7) parties it hoped to discuss the Junior DIP Financing with.

WEIL:\96845369\1\73217.0004

5.      ***Third,*** further to the above, the Debtors' ultimate selection of Cyrus as the Junior DIP Lender was based on the proposal's merits and consideration of the proposal as a whole.[5]  As GA Capital acknowledged, Cyrus's last-minute proposal prompted a multi-party, informal discussion in the courthouse lobby, where both Cyrus and GA Capital had the opportunity to compete for the financing.  Cyrus's proposal was selected based on, among other things: better flexibility with regard to the DIP Budget's variance testing and the concessions Cyrus was able to make with respect to adequate protection for the second lien debt.  The second factor was particularly important to the Debtors, because this concession facilitated the support of the Creditors' Committee for the Junior DIP Financing and a global settlement amongst the parties as to the entire DIP financing package, including the DIP ABL Facility to which the Creditors' Committee was objecting.  In contrast, GA Capital was able to match Cyrus's pricing terms and improved on the DIP Budget variances but, as noted in the Application, was unable to provide any concessions with regard to the adequate protection that would resolve the Creditors' Committee's objection.  And contrary to GA Capital's allegation, the Debtors do not recall that GA Capital overmatched the DIP Budget variances proposed by the Debtors and agreed to by Cyrus.  Therefore, the Debtors holistically considered each of Cyrus' and GA Capital's proposals and decided in their business judgment that the Cyrus proposal was more favorable to their estates as it provided the same economic terms as GA Capital's proposal but avoided the litigation costs and risks associated with the Creditors' Committee's objection.  Accordingly, the Debtors acted well within their business judgment in selecting the Cyrus DIP.

---

[5]    A Debtor is not required to consider the pure economic factors of a postpetition financing proposal.  Rather, a court in evaluating whether a debtor has exercised sound business judgment in selecting postpetition financing may consider the non-economic benefits offered by a proposed facility.  *See In re ION Media Networks Inc.*, No. 09-13125, 2009 WL 2902568, at \*4 (Bankr. S.D.N.Y. July 6, 2009).

WEIL:\96845369\1\73217.0004

## II. GA CAPITAL HAS NOT ESTABLISHED ITS BURDEN TO DEMONSTRATE A SUBSTANTIAL CONTRIBUTION OF OVER $2.1 MILLION

6.    Under applicable law, GA Capital must bear the burden to demonstrate that its participation in the Junior DIP Financing process amounted to a "substantial contribution" to the Debtors' estates. Should GA Capital carry its burden in proving to have met the standard of substantial contribution, the Court must next determine that the Requested Fees are reasonable. Based on a preliminary review of GA Capital's invoices, however, the Debtors submit that certain of the fees are not reimbursable under applicable law. Specifically, any fees or expenses incurred by GA Capital prior to November 14, 2018 or related to diligence it would have incurred in evaluating whether to participate in the Junior DIP Financing process should not be reimbursed. As to GA Capital's remaining expenses, the Debtors are unable to determine their reasonableness.

### A.    GA Capital Must Carry the High Burden Under Section 503(b)(3)(D)

7.    To demonstrate that it has made a "substantial contribution" under section 503(b)(3)(D), the petitioning creditor must carry the burden of proof by "a preponderance of the evidence." *In re United States Lines, Inc.*, 103 B.R. 427, 429 (Bankr.S.D.N.Y.1989). The burden is "exceedingly difficult," *In re Villa Luisa, L.L.C.*, 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006), because section 503(b)'s substantial contribution provision "must be narrowly construed" to "discourage mushrooming [administrative] expenses." *In re Granite Partners, L.P.*, 213 B.R. 440, 445 (Bankr.S.D.N.Y.1997). Recovery under the provision is "subject to strict scrutiny by the court," *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989), *aff'd*, No. 90 CIV. 3823 (MGC), 1991 WL 67464 (S.D.N.Y. Apr. 22, 1991), and it "must be preserved for those *rare* occasions when the creditor's involvement truly fosters and enhances the administration of the estate." *In re S & Y Enterprises, LLC*, 480 B.R. 452, 459 (Bankr. E.D.N.Y. 2012) (italics added). Put differently, any such recovery "should be the exception, not the rule." *Id.* And the "general

6

rule remains that attorneys must look to their own clients for payment." *In re Dana Corp.*, 390

B.R. 100, 108 (Bankr. S.D.N.Y. 2008).

    8.  A case previously decided by this Court sheds light on what it takes to make

a substantial contribution claim.  In *In re Bayou Grp., LLC*, this Court held that, in the absence of

a fiduciary who could protect the estate' interest, an unofficial committee of creditors which self-

organized to lay the groundwork for a chapter 11 case, including the means for administering the

case, had made a "substantial contribution" to the debtor's estate and was entitled to

reimbursement of the fees and expenses incurred in connection with its counsel's work for the

case. 431 B.R. 549, 555, 563–64, 567 (Bankr. S.D.N.Y. 2010).  Importantly, this Court noted that

in order to qualify as a "substantial contribution," the direct benefit provided by the petitioning

creditor "cannot be established merely by the movant's extensive participation in the case." *Id.* at

561.  The key is to provide a good or service that "normally would be expected of an estate-

compensated professional but was not so performed," which results in the creditors stepping in the

shoes of the professionals and playing a "leadership role" in the cases. *Id.* at 562.  On the other

hand, creditors who "merely furthered their own or their constituents' interests" cannot rely on

section 503(b)(3)(D) and (b)(4) to be rewarded. *Id.*

**B.  GA Capital's Requested Fees Must Be Reasonable Under Section 503(b)(4)**

    9.  To the extent that GA Capital demonstrates that it has made a substantial

contribution to the Debtors' estates by its participation in the selection for a Junior DIP Facility,

GA Capital's Requested Fees must meet the criteria under section 503(b)(4) that they are

"reasonable . . . based on the time, the nature, the extent, and the value of such services, and the

cost of comparable services other than in a case under this title," and that the Requested Fees be

"actual and necessary." 11 U.S.C. § 503(b)(4).  The reasonableness standard under

section 503(b)(4) should "generally follow the approach used under section 330 [for compensation

7

of officers]," except that courts may not need to "enforce time record requirements as strictly as with requests under section 330" because the professional "may not know that he or she will be submitting a fee and expense request [for review]." *Id.* at 566.

10.    Pursuant to section 330, courts must conduct an "objective inquiry, based upon what services a reasonable lawyer or legal firm would have performed in the same circumstances . . . . The focus is on what a reasonable lawyer would have done at the time; the Court should not invoke perfect hindsight." *In re Cenargo Int'l, PLC*, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003). Time entries should "be disallowed only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive." *Id.* at 595-96. If the professionals charge the "same amount as the applicable market for comparable services," courts would need "good and articulated reasons to reduce their fee request as excessive." *Id.*

11.    However, to the extent that professionals have not exercised billing judgment, courts "should do so when reviewing their fee applications." *Id.* In particular, "[a]ny uncertainties due to poor record keeping are resolved against the applicant." *In re Poseidon Pools of America*, 216 B.R. 98, 100-101 (E.D.N.Y.1997). Common sources of such uncertainties that have resulted in disallowance of time entries include, among other things, lumping and vagueness. *See, e.g.*, *In re 415 W. 150 LLC, 2013 WL 4603162*, at *5 (Bankr. S.D.N.Y. Aug. 28, 2013) (rejecting certain time entries about phone calls and meetings on vagueness grounds.); *In re GSC Grp., Inc.*, 2012 WL 676409, at *3 (Bankr. S.D.N.Y. Feb. 29, 2012) ("Aggregation of multiple tasks into one billing entry, referred to as block billing or lumping, is . . . routinely disallowed as it makes it exceedingly difficult to determine the reasonableness of the time spent on each of the individual tasks performed.").

WEIL:\96845369\1\73217.0004

12.     Courts in this Circuit have also routinely held that expenses incurred by losing bidders do not arise to the level of a "substantial contribution" and cannot be compensated under section 503(b). *See Bedford JV, LLC v. Sky Lofts, LLC*, No. 12-CV-5850 DLI, 2013 WL 4735643, at \*7 (E.D.N.Y. Sept. 3, 2013) (citing *In re Dana Corp.*, 390 B.R. 100, 111 (Bankr. S.D.N.Y. 2008)); *In re S & Y Enterprises, LLC*, 480 B.R. 452, 463 (Bankr. E.D.N.Y. 2012) ("[A] substantial contribution administrative expense for an unsuccessful bidder is not warranted."); *In re Dana Corp.*, 390 B.R. 100, 111 (Bankr. S.D.N.Y. 2008) (holding that actions of a prospective bidder were "hardly extraordinary" and were taken "essentially for its own economic self interest with any incidental benefit to the Debtors' estates from its actions failing, as a matter of law, to rise to the level of a substantial contribution within the meaning of section 503(b) of the Bankruptcy Code"). Based on this authority, the Debtors submit that GA Capital should not be reimbursed for expenses incurred prior to November 14, 2018, or in connection with diligence it would have incurred in evaluating whether to participate in the Junior DIP Financing process.

13.     With respect to the remaining amounts in the Application, the Debtors are not in a position to conclude that the work performed by GA Capital and its advisors as reflected in their invoices are either reasonable or actual and necessary as required by section 503(b)(4). Although Province, Inc.'s invoice was annexed to the Application, the Debtors did not receive Paul Hastings LLP's 60-page invoice in the amount of approximately $1.8 million until such invoice was filed as an exhibit to the *Revised Proposed Order for the Application* [ECF No. 1179] in the evening of December 12, 2018 and just days before the Application's objection deadline. Given the volume of the invoices, the size of reimbursement amounts requested, and the short period of time the Debtors had to address the issues in the invoices, there is not a sufficient basis to determine the reasonableness of the work performed by GA Capital and its advisors. Upon

9

initial review, it appears that Paul Hastings employed a team of approximately 60 people to work on the development of a proposal for the Junior DIP Facility, with time entries stretching back to as early as October 16, 2018—even though GA Capital was not, by its own admission, selected as the Junior DIP Lender until November 14, 2018.[6]    Therefore, the Debtors believe that the Application fails to satisfy the requirements of section 503(b)(4) and GA Capital is not entitled to the full amount of Requested Fees.

## **Conclusion**

14.    The Application should be denied without prejudice to GA Capital's right to submit a modified application for fees and expenses incurred after November 14, 2018 and unrelated to diligence it would have conducted in evaluating whether to pursue the Junior DIP Financing opportunity.

---

[6] Further, upon the Debtors' preliminary review of the time records, certain entries would appear to fail to meet the reasonableness standard under section 330.  For instance, there are entries that record 13.5 hours with a vague narrative of "attention to closing," another 11 hours for "conduct due diligence," and 14.5 hours for a series of tasks ranging from "DIP documentation" to "review and revise issues" to "review global bid procedures letter."

WEIL:\96845369\1\73217.0004

Dated: December 17, 2018
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors
and Debtors in Possession*