**Hearing Date and Time:  December 20, 2018 at 10:00 a.m. (Eastern Time)**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
Susheel Kirpalani
Jonathan E. Pickhardt
Andrew S. Corkhill
Matthew Scheck
Ellison Ward Merkel

*Attorneys for Omega Advisors Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>SEARS HOLDINGS CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

# OMNIBUS REPLY OF OMEGA ADVISORS INC. TO OBJECTIONS TO MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE TO ENFORCE THE COURT'S NOVEMBER 19, 2018 SALE ORDER AND INVALIDATE THE ULTRA VIRES SALE AND LOCKUP OF <u>MEDIUM-TERM INTERCOMPANY NOTES</u>

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Omega Advisors Inc. ("**Omega**"), a bidder and creditor, respectfully submits this omnibus reply (the "**Reply**") to the objections filed by the Debtors, Cyrus Capital Partners, L.P. ("**Cyrus**") and the Official Committee of Unsecured Creditors (the "**UCC**" and, together with the Debtors and Cyrus, the "**Objectors**") to Omega's *Motion Pursuant To Sections 105 And 363 Of The Bankruptcy Code To Enforce The Court's November 19, 2018 Sale Order And Invalidate The* Ultra Vires *Sale And Lockup Of Medium-Term Intercompany Notes*, ECF No. 1077 (the "**Motion**").[2]

## PRELIMINARY STATEMENT

1.      Omega's Motion challenges an auction process that was plagued by a fundamental failure to provide adequate notice of what was actually being sold, as well as bad faith manipulation by Cyrus to chill bidding. The combination of these defects deprived the estates of significant value that was, and remains, available to be realized for property owned by the Debtors' and a wholly owned non-Debtor subsidiary, Sears Re.

2.      Seeking to marginalize the failures of process, and to sweep Cyrus' indefensible behavior under the rug, both the Debtors and Cyrus charge that Omega is seeking only to further its "own selfish interests." That is incorrect. Omega (unlike Cyrus) has been rigorously candid about its CDS position and interest in bidding for MTNs, and brings this Motion to advance those interests and those of other similarly situated bidders—which it has standing to do based on the Auction's intrinsic unfairness. But Omega's interests are entirely aligned with legitimate principles worthy of protection by the Court, and the relief it seeks can serve only to augment the assets of the estates by correcting an auction process that was fundamentally flawed—including by unshackling Sears Re from unauthorized restrictions so it can accept Omega's $60 million cash offer for $150 million in MTNs, which it made shortly after the Auction (based on Omega's

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the Motion.

2

understanding from the record and Auction Notice that Sears Re's MTNs were not part of the Auction).

3. Beyond ignoring the additional value that could be realized through the Motion, the Objectors' defenses of the Auction process are simply not plausible. The Objectors cannot credibly state that interested bidders should have read the Auction Notice's unequivocal statement that "***no more than***" $251 million MTNs would be sold, and then surmised that this express limitation should be disregarded on the basis of a schedule of all of the MTNs owned by Debtors, which was accessible only by clicking through a chain of hyperlinks. In any event, Omega does not contend that this is a case about bidders lacking knowledge of what the Debtors owned (which is all the schedule even purports to show). It is a case about bidders being affirmatively misinformed about which MTNs were being sold, and the Debtors agreeing to lock up Sears Re's MTNs as part of the sale without court approval, and in direct contravention of the record of these proceedings. Every bankruptcy lawyer knows that ensuring notice is proper—especially by conforming it to what is being sold—is much more than a procedural nicety; it is a prerequisite to the "sanctity of bankruptcy sales" rhetoric that the Objectors invoke. That Cyrus chose to negotiate a deal that was not noticed to other bidders is a risk that a sophisticated purchaser may knowingly choose to take, but it is not binding on the Court—and the Objectors' citations to decisions protecting sales that were properly noticed are wholly inapposite.

4. Beyond having no notice of what was actually being sold, because of Cyrus' insertion of "poison pill" language in the Sale Order, bidders' willingness to bid full value (or perhaps bid at all) in the Auction was severely chilled. The Debtors report that Cyrus won the Auction because it had the highest bid that was the least susceptible to execution risk. But that was the very result that Cyrus singlehandedly engineered by creating a cloud over whether the

3

MTNs would be deliverable in an ISDA auction, and then negotiating to put language in the Sale Order that was surreptitiously designed to ensure that deliverability would remain in doubt when other bidders participated in the Auction. This bad-faith manipulation of the Auction process does not deserve protection under the Bankruptcy Code, and Omega respectfully requests that the Court enter an order confirming that the unnoticed and *ultra vires* aspects of the Debtors' transaction with Cyrus were not authorized and are void.

**I.      DEBTORS ALL BUT CONCEDE THE BASIC AUCTION-NOTICE DEFECTS**

5.      While the Objectors maintain that the Auction was "fair, transparent, and competitive," they do not dispute the basic facts that rendered the auction inherently unfair: (1) Debtors' counsel explicitly told the Court that the Sears Re MTNs were "not part of" the proposed auction process—when in fact they bargained them away; and (2) the Auction notice published by the Debtors stated explicitly that "not more than" $251 million in MTNs would be sold—when in fact the Debtors sold their entire $880 million position. It is these fundamental deficiencies in the record and the Auction Notice—combined with Cyrus' successful efforts to chill bidding—that caused the Auction to be value *minimizing* for the Debtors and unfair to the participating bidders.

**A.     Debtors Concede They Neither Sought Nor Obtained Authority To Deal With The MTNs Held By Sears Re**

6.      At the November 15 hearing, counsel to the Debtors represented to the Court that "[t]he 1.4 billion [in MTNs] owned by Sears Re *is not part of* [the relief being sought]." Tr. 95:25–96:2 (Nov. 15, 2018) (emphasis added). Having made this representation, the Debtors then proceeded to lock up the Sears Re MTNs until after the ISDA Auction without notice or authority from the Court. Tellingly, no Objector claims that prospective bidders had actual notice—or even constructive notice—of this Lockup Agreement. Instead, Objectors contend that the Court should

4

pay no mind to the Lockup Agreement because the Sears Re MTNs were not technically sold, and in any event were owned by Sears Re, a non-Debtor. These arguments are meritless.

7. Objectors' repeated argument that the Sears Re MTNs were merely locked up, rather than sold outright, *see* Debt. Ob. ¶ 34; Cyrus Ob. ¶ 29, asks the Court to elevate form over substance. It is furthermore strained beyond credulity by Objectors' own arguments that Cyrus provided Debtors with consideration in exchange for the agreement to impede the sale of MTNs owned by their wholly owned subsidiary, Sears Re. *See* Debt. Ob. ¶ 27 ("agree[ment] not to sell any additional MTNs … was necessary to provide Cyrus with the benefit of its bargain"); Cyrus Ob. ¶ 36 (noting that Cyrus paid $82.5 million in exchange for "the SRAC estate-protective provisions regarding the MTNs owned by Sears Re," among other things).

8. Even if there were a meaningful distinction between the Debtors agreeing to sell the Sears Re MTNs and Debtors agreeing to use their control over Sears Re to effectuate a lockup preventing such a sale, Objectors fail to explain the relevance of that distinction for purposes of needing Court approval, because at minimum the Lockup Agreement constitutes a "use" of property outside the ordinary course of business, requiring approval under section 363(b). *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 383–85 (2d Cir. 1997) (cancellation of an insurance policy was an "extraordinary act" deemed to be "use or abandonment of estate property outside the ordinary course of business" that required notice to creditors, rendering transaction null and void). Whether the Lockup Agreement is characterized as a sale, forfeiture, or as some other "use" of property, the simple fact remains—unbeknownst to every bidder (other than Cyrus), the Auction was their one and only chance to make a bid for the Sears

5

Re MTNs prior to the conclusion of the ISDA Auction. If bidders had been aware of that fact, it would have materially altered their bids.[3]

9.  Objectors further claim that Omega should have divined the Debtors' willingness to defy their own express statements and Auction terms, because Omega was in contact with Debtors' counsel in the run-up to the Auction. *See* Debt. Ob. ¶ 34; Cyrus Ob. ¶ 22. But no Debtor representative ever told Omega that all the MTNs were being put up for sale, contrary to the express terms of the Auction Notice. Nor was Omega informed that the Sears Re MTNs were being locked up through the Auction, contrary to Debtors' counsel's statements at the hearing on the Sale Motion. Indeed, Omega clearly had no such understanding, since it made firm offers to purchase both the Unlisted MTNs and the Sears Re MTNs shortly after the Auction, including an offer to purchase $150 million of MTNs from Sears Re at 40 cents (*i.e.*, for $60 million)—which offer has never been withdrawn. It is not reasonable to expect Omega—or any other bidder—to ask the Debtors to confirm that they were in fact intending to abide by the plain terms of their own Auction Notice.

10. The Debtors also repeatedly argue that Omega's contention that they misinformed the Court is baseless because "it was *Omega itself* that sought to have the Sears Re MTNs listed with ISDA." Debt. Ob. ¶¶ 7, 28, 35; *id.* Ex. A. This argument misses the point entirely. Omega does not suggest the Debtors' statements to the Court about the Sears Re MTNs were incorrect because they had previously been proffered to ISDA. Mot. ¶ 24 n.7 (statement about ISDA is

---

[3] The Debtors' argument that "Sears Re could sell its MTNs after the ISDA Auction," Debt. Ob. ¶ 34, is borderline insulting. The Debtors already informed the Court that the MTNs will have no value after the ISDA Auction occurs. *See* Emergency Mot. Of Debtors For Order Approving Sale Of Medium Term Notes ¶ 11 (Nov. 9, 2018), ECF No. 642 ("[T]here is an opportunity for the Debtors to monetize their interest in the MTNs at a favorable price—an opportunity that likely will be gone after the [ISDA] Auction is concluded.").

6

"now incorrect").[4] Rather, Omega objects because the Debtors told the Court that the Sears Re MTNs were "not part of" the proposed Auction, and then proceeded to make them a part of the Auction.

11. Doubtless aware of the shortcomings in their primary arguments, the Objectors alternatively argue that "this Court does not have the jurisdiction to restrict or mandate the sale of non-debtor Sears Re's MTNs even if it wanted to." Debt. Ob. ¶ 36; Cyrus Ob. ¶ 29. But Omega is not asking the Court to exercise jurisdiction over Sears Re's property and is not challenging any action by Sears Re. Rather, it is challenging the Lockup Agreement regarding Sears Re's MTNs made *by the Debtors*, which falls under the Court's jurisdiction pursuant to section 363(b). *See In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 140–43 (Bankr. D. Me. 1991) (court granted chapter 11 trustee retroactive authority under 11 U.S.C. §§ 105 and 363(b) to vote stock in subsidiary to cause it to file bankruptcy petition); *Official Comm. of Unsecured Creditors v. Raytech Corp.* (*In re Raytech Corp.*), 190 B.R. 149, 150–53 (Bankr. D. Conn. 1995) (granting debtor's request under section 363(b) to authorize non-debtor's subsidiary's entry into an acquisition agreement). The Debtors expressly told the Court on the record—and by extension all bidders—that the Sears Re MTNs were not a part of the Auction process, and then went ahead and made them a component of that process. This is simply outside of the scope of the authority asked for, and granted by, the Court.

**B.    Debtors Sold Substantially More MTNs Than Were Noticed For Sale**

12. The Objectors concede—as they must—that the plain language of the Auction Notice (attached as Exhibit B to Omega's Motion) states that "Sears Holding Corporation intends

---

[4] Any suggestion that Omega specifically approached ISDA about the Sears Re MTNs is unfounded. Omega had no idea what MTNs were owned by Sears Re at the time that it took responsibility to help with the Debtors' submissions to ISDA. It turns out that Sears Re owns MTNs that ISDA determined to be deliverable.

7

to conduct an auction on ***no more than*** 251,245,000 SRAC Medium Term Notes Today at 12PM EST….." Mot. Ex. B (emphasis added); Debt. Ob. ¶ 20; Cyrus Ob. ¶ 28. Cyrus and the Debtors seek to distract from and minimize the import of this explicit cap on the amount of MTNs that would be sold by emphasizing that the Sale Order authorized the Debtors to sell all, some, or none of their approximately $880 million of MTNs. Debt. Ob. ¶ 18; Cyrus Ob. ¶ 26. But that argument too misses the mark. The problem is not that the Court's authorization in the Sale Order limited the Debtors to selling only $251 million MTNs, but rather that the Debtors announced to the market they were exercising their authorization under the Sale Order by selling "no more than" $251 million MTNs—and then instead sold *all* of their MTNs, in direct contravention of their own notice.

13. The Debtors' initial response—that "nothing prevented Omega or any other bidder from offering to purchase more than $251 million of the MTNs," Debt. Ob. ¶ 21—ducks the issue and their responsibility for confusing bidders. Having issued an Auction Notice that explicitly stated that Debtors would sell not more than $251 million of MTNs through the Auction, Debtors cannot now argue that bidders were free to—and should have—completely disregarded that express term.

14. Incredibly, the Debtors attempt to vitiate the impact of this express limitation on the amount of MTNs that would be sold by pointing to the fact that the Auction Notice invited "bids, sizes and any stipulations," and reserved the ability to "sell all, part, or none of the notes." Debt. Ob. ¶ 21. Each of these statements very clearly modified the $251 million in MTNs that were being offered for sale in the Auction Notice. No reasonable person would have read these statements as implicitly contradicting the express size limitation on the face of the Auction Notice.

8

15. The Objectors' argument that the "Auction Notice included a link to a website for additional information that itself linked to a Schedule of Notes listing $880,696,000 in MTNs," is equally far-fetched. Debt. Ob. ¶ 21; Cyrus Ob. ¶ 28. The Auction Notice included on its face a listing of three specific CUSIPs for sale in amounts totaling $251 million. Even if bidders went through the hyperlink gymnastics that the Debtors propose,[5] nothing on the linked websites or schedule indicated that the face of the Auction Notice misstated what was actually for sale. Accordingly, it is unreasonable for the Debtors to contend that "all bidders were aware, or should have been aware, that they could bid on all of the $880 million MTNs that were the subject of the Sale Motion." Debt. Ob. ¶ 21. If it was the Debtors' intent to make all $880 million available, noticing "no more than" $251 million clearly was not the way to accomplish that. Nor did it constitute the fair and transparent process that the Debtors had promised the Court.

16. Taken together, the Debtors' notices caused bidders to believe, quite reasonably, that bids were being accepted for $251 million MTNs, and no more. The corollary to that conclusion was that there were additional MTNs that would remain unsold in the Auction, and thus potentially available for sale at a later date, particularly in light of the Auction Notice's express indication that the "auction may continue from time to time." Mot. Ex. B. This mistaken belief, in combination with Cyrus' bad-faith machinations, significantly lowered the bids that Debtors received in competition with Cyrus.

---

[5] The Debtors and Cyrus argue that bidders should have discerned the true amount of MTNs for sale by: (1) clicking on a link in the Auction Notice that indicated a portal to "the indenture governing the notes as well as the website for additional information," Mot. Ex. B; (2) clicking on the second link to the website for additional information; (3) surmising that all of the MTNs listed on that website were for sale notwithstanding no statement to that effect; and then (4) summing up the face value of all of the MTNs listed on that second website to conclude $880 million in MTNs were being sold.

9

### C.  Failures Of Notice Were Exacerbated By Cyrus' Bad Faith And Successful Efforts To Chill Bidding

17.    Cyrus' objection claims that Omega has "predictably resort[ed] to attempting to portray Cyrus as a bad actor," and cites its long history of financial support for SRAC. Cyrus Ob. ¶¶ 8–9. But this self-aggrandizement is difficult to square with Cyrus' repeated efforts to totally destroy the value of the MTNs to the Debtors and Sears Re. *First*, while market participants including Omega took affirmative steps to ensure the MTNs were included on the list of Deliverable Obligations for the ISDA Auction, Cyrus *challenged* their deliverability (and was the only market participant to do so). But for Cyrus' challenge, the MTNs would have been automatically included on the list of Deliverable Obligations, and there would have been no cloud on deliverability—the single most important driver of value of the MTNs to the Debtors' estate. *Second*, Cyrus objected to the Sale Order for the MTNs without disclosing in its moving papers that its real interest in preventing the sale was as a CDS seller. *Third*, having failed to successfully bypass a competitive auction process, Cyrus negotiated to include language in the Sale Order that—unbeknownst to Debtors, the UCC, and the Court—was designed to act as a poison pill that would increase the chances that the MTNs would be considered not deliverable, prompting panic among bidders and significantly reducing the value of the MTNs in the Auction.

18.    Cyrus asks the Court to look past this cynical conduct, claiming the Deliverability Language could not have been problematic since the Debtors agreed to include it and the Court agreed it was "consistent with applicable law." Cyrus Ob. ¶¶ 9 n.3, 44–45. But Cyrus does not make any effort to explain how this language, if included for innocent purposes, came to mimic exclusionary language in the ISDA Definitions almost word for word. Mot. ¶ 22 n.6. Regardless of whether the words were "consistent with applicable law," the Deliverability Language was clearly inserted for an ulterior purpose—to sow confusion and doubt in the minds of interested

10

bidders about whether the MTNs would in fact be deliverable, and accordingly reduce the value of the MTNs in the Auction. This purpose—which was never disclosed to the Debtors or the Court as the language was being discussed—was ultimately successful, as few bidders submitted bids for the MTNs that were not contingent on a subsequent deliverability finding by the ISDA Determinations Committee ("**DC**").[6]

19. Cyrus also attempts to downplay the significance of its maneuvering with respect to the ISDA DC. Cyrus Ob. ¶¶ 10, 41. Critically, however, Cyrus does not dispute two core facts: (1) its challenge to the deliverability of the MTNs was motivated by its position as a large SRAC CDS seller, and (2) Cyrus' delegate on the DC was fully aware of Cyrus' SRAC CDS position (and therefore the potential commercial impact of the deliverability determination upon Cyrus). Cyrus' argument that its conduct was not "out of the ordinary for participants in [the CDS] market," Cyrus Ob. ¶ 10, is at once incorrect, unsubstantiated, and irrelevant in a sale authorized by a federal bankruptcy court. Cyrus cannot avoid responsibility for the negative impact that its conduct had on the value realized by Debtors in the Auction by claiming that DC members routinely advocate for whatever position will benefit their own proprietary book—an admission that, if true, would come as a complete (and unnerving) surprise to the vast majority of CDS market participants.

20. Cyrus' argument that it is only one out of 15 DC members, and that deliverability may only be decided "if at least 12 of the 15 members agree on the matter one way or the other,"

---

[6] Cyrus' argument that deliverability concerns were adequately resolved by certain corrective statements made by Debtors on the day of the Auction, Cyrus Ob. ¶ 46, is belied by the timing of those statements. The Sale Order including the Deliverability Language was published at 4:45 PM on November 19. The purportedly curative statements made by Debtors were not published until 8:40 AM on November 20, and bidders then had less than four hours to assess the interplay between the Deliverability Language in the Sale Order and the curative statements before having to bid by 12:00 noon.

11

Cyrus Ob. ¶ 41 n.13, similarly fails to absolve Cyrus of responsibility for its manipulative conduct. Prior to the DC's announcement of its decision regarding the deliverability of the MTNs at 5:25 PM on November 20—more than an hour after the Auction had closed—interested bidders who were not members of the DC had no insight into how the DC was likely to rule on this key issue. While CDS market participants could try to anticipate the DC's likely ruling based on other situations, such assessments were thrown into disarray by Cyrus' inclusion of the Deliverability Language in the Sale Order on the evening of November 19. Based on Cyrus' conduct, it was all but impossible for other bidders to have any sense of how the DC would rule, which—upon information and belief—is precisely the situation Cyrus was seeking to engineer in the run-up to the Auction, to depress bidding.

21. Cyrus also added to the mayhem it created with the insertion of the Deliverability Language with what it unabashedly calls "market chatter." While Cyrus proclaims that it "never told any Auction participant that the [Deliverability Language] meant the MTNs would not be deliverable," Cyrus Ob. ¶ 48, it does not explain why it was engaging in "market chatter" regarding the impact of the supposedly innocent Deliverability Language to begin with. Cyrus' careful attempt to parse precisely what it was saying to other market participants only confirms the inescapable fact that Cyrus—whom everyone understood to be a DC member—was talking to other prospective bidders about the negative impact the Deliverability Language had on the value of the MTNs.[7] Whether characterized as "market chatter," "locker-room banter," or any other dismissive phrase employed by those on the defensive, this type of communication leaves no doubt that Cyrus was actively attempting to influence bidder activity.

---

[7] On information and belief, Cyrus' "market chatter" regarding deliverability was captured on the recorded line of another market participant in at least one instance.

22.  Notably, the Debtors make no effort to deny Cyrus' bad conduct, and rather focus on the significant efforts that the Debtors undertook to undo the damage caused by Cyrus' deliberate sabotage. Debt. Ob. ¶ 19. While these efforts were successful in persuading ISDA ultimately to determine the MTNs to be deliverable,[8] they did not undo the dramatic and in many cases fatal damage that Cyrus' insertion of the Deliverability Language had done to curb bidder interest and confidence, and to create turmoil in the market, particularly since the curative language that the Debtors published came out just hours prior to the time when bidders had to submit their bids in the Auction. Moreover, none of these remedial actions by the Debtors would have been necessary but for Cyrus' mischief. Thus, to the extent that the Debtors complain that the bids received by Cyrus' competitors carried execution risk, that risk was directly attributable to Cyrus' actions.

## II. THE RELIEF SOUGHT BY OMEGA WOULD GENERATE SIGNIFICANT ADDITIONAL VALUE FOR THE ESTATE

23.  Objectors argue that invalidating the *ultra vires* sale of the Unlisted MTNs and the Lockup Agreement would not generate any value for the estate because Cyrus outbid the rest of the market in the Auction, and remedying the notice failures would not have changed the final outcome. Debt. Ob. ¶¶ 22–24, 33; Cyrus Ob. ¶¶ 2, 11. There are four flaws in this argument.

24.  *First*, the relevant question is not whether Omega and other bidders could top Cyrus' $82.5 million bid, but rather whether there is still incremental demand for the additional MTNs subject to the *ultra vires* portions of the Cyrus transaction. The answer to that question is a resounding yes. Accordingly, if the Court were to void the *ultra vires* sale of the Unlisted MTNs and/or the Lockup Agreement on the Sears Re MTNs, the Debtors' estates and Sears Re could

---

[8] Attached to this Reply as Exhibit A is the Determinations Committee Decision, dated November 20, 2018, holding that the MTNs satisfy the "Deliverable Obligations Characteristics" and showing that Cyrus was one of only three DC members to vote against deliverability.

13

realize enormous additional value through further sales over the coming weeks. Indeed, Omega's ***$60 million*** offer to Sears Re for $150 million in MTNs was never withdrawn and remains live.

25. Objectors' argument that the Court is powerless to invalidate the *ultra vires* portions of the sale because it would "rewrite" their unauthorized bargain or somehow amount to injunctive relief is also misguided. Debt. Ob. ¶ 29; Cyrus Ob. ¶¶ 35–36. The Motion is clear that it seeks an order to enforce the Sale Order, which by definition, asks the court to interpret the Sale Order. *See In re Motors Liquidation Co.*, 829 F.3d 135, 157 (2d Cir. 2016) ("[W]e do not *modify* the Sale Order. Instead, we merely interpret the Sale Order in accordance with the bankruptcy law. Indeed, by filing a motion to enforce, [the movant] in effect asked for the courts to interpret the Sale Order." (citing *Laun Inv. S.E. v. Franklin 145 Corp.* (*In re Petrie Retail, Inc.*), 304 F.3d 223, 229 (2d Cir. 2002)). A determination that the elements of the sale not noticed to anyone other than Cyrus or otherwise unauthorized by the Court were *ultra vires* and accordingly void is, by definition, an interpretation and enforcement of the Sale Order—a core function of the Court.

26. *Second*, comparing Cyrus' bid in the Auction to the bids of other market participants—which were tainted by lack of notice and Cyrus' misconduct—amounts to comparing apples to poisoned apples. It is not surprising that Cyrus outbid the rest of the market in the botched Auction, because Cyrus was the only bidder that knew what was really on the table and was the sole opponent of deliverability with the ability (which it exercised, albeit unsuccessfully) to influence the outcome of that critical value-driving determination.

27. *Third*, focusing exclusively on the total dollar proceeds from Cyrus versus the total dollar proceeds from the buy-side of the CDS market ignores the fact that Omega actually significantly outbid Cyrus on a cents-on-the-dollar basis. Cyrus's $82.5 million payment represents a price of approximately 3 cents on the dollar for $2.3 billion of MTNs, or 9 cents on

14

the dollar for $880 million of MTNs. Omega made a 40-cent bid for $70 million of MTNs in the Auction and a similar bid for $150 million of Sears Re's MTNs shortly after the Auction—multiples of Cyrus' bid on a bond-price basis. At a minimum, the record shows that, if the Debtors had held a tranche-by-tranche Dutch auction, the total recovery would have far exceeded the Cyrus bid that they accepted as the "highest or best offer."

28.     *Finally*, Objectors are incorrect in intimating the Court may ignore notice failures because the Auction "would have turned out the same anyway." A transaction is a moment in time, and speculation by the Objectors about what bidders would have done had they known the truth about the sale terms is irrelevant. *See In re Motors Liquidation Co.*, 829 F.3d at 164 ("Opportunities to negotiate are difficult if not impossible to recreate…. [And] while we cannot say with any certainty that the outcome would have been different, we can say that the business circumstances at the time were such that plaintiffs could have had some negotiating leverage, and the opportunity to participate in the proceedings would have been meaningful.").

## III.     THE COURT CAN AND SHOULD FIND THAT CYRUS IS NOT A GOOD-FAITH PURCHASER

29.     Section 363(m) of the Bankruptcy Code generally protects the finality of sales under section 363, but limits this protection to sales that are properly noticed. The reason for this is obvious: "[T]he purpose of the finality rule is to obtain the highest price for the debtor's assets, for the benefit of the debtor's estate and ultimately, the creditors. If defects in notice result in debtor's assets being sold for an inadequate price, strict adherence to the finality rule would require a result contrary to the rule's underlying purpose of achieving the highest possible price." *Roadrunner Freight Sys. v. Am. Freight Sys.* (*In re Am. Freight Sys.*), 126 B.R. 800, 805 n.2 (D. Kan. 1991).

30. Moreover, by its own terms, section 363(m) provides protection only to a purchaser that has purchased in good faith. A purchaser's good faith "is shown by the integrity of his conduct during the course of the sale proceedings." *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 390 (2d Cir. 1997) (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (other citations omitted). A good-faith finding is precluded if fraud, collusion or attempts "to take grossly unfair advantage of other bidders" are present. *Id.*

31. The crux of the good-faith analysis is the purchaser's conduct *during the sale*. A purchaser is prohibited from engaging in any fraudulent or collusive actions that are specifically intended to affect the sale price or control the outcome of the sale. *In re GSC, Inc.*, 453 B.R. 132, 180–81 (Bankr. S.D.N.Y. 2011). "Thus, notwithstanding the timing of the questionable conduct, the relevant inquiry [remains] whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders." *Id.* at 181; *see also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d. Cir. 1986) (remanding case to the bankruptcy court to determine whether any impermissible collusion—an offer of employment to an interested party, the timing of petitions in bankruptcy, and a motion for approval of the agreement concerning the sale of inventory and leases—occurred that would negate purchaser's good faith status).

32. Cyrus' bad conduct throughout the sale process—which was specifically targeted at and intended to chill the price offered by bidders in the Auction—is precisely the type of bad-faith activity that section 363(m) excludes from protection.

33. The Sale Order's finding that "[a]ny entity that purchases MTNs from the Debtors pursuant to the authority granted in this Order shall be deemed to have purchased the MTNs in good faith and shall be entitled to the protections set forth in section 363(m) of the Bankruptcy Code" does not change this conclusion. Sale Order ¶ 7. *First*, the sale of the MTNs was outside

16

the scope of the authority granted by the Order, for the reasons set forth above. *Second*, this finding in the Order depends upon the Debtors subsequently having consummated a sale consistent with their Sale Motion, which promised that "[t]he ground rules set forth for the auction will ensure that any purchaser(s) has proceeded in good faith and without collusion," which did not occur here. Sale Motion ¶ 25. *Finally*, the rest of paragraph 7 of the Sale Order makes clear that, notwithstanding the finding of good faith, "nothing contained in this Order shall waive any rights of the Debtors, the Creditors' Committee or any other party or governmental entity to the extent it is determined that a party engaged in inappropriate conduct with respect to the transactions contemplated by this Order."

## IV.    OMEGA'S CHALLENGE IS PROPER

34.    As set forth in the Motion (¶ 36), Omega has standing as a bidder to contest the fairness and transparency of the Auction. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.* (*In re Colony Hill Assocs.*), 111 F.3d 269, 274 (2d Cir. 1997) (holding that unsuccessful bidder has standing to challenge "the 'intrinsic fairness' of the sale transaction"). Here, that is precisely what Omega is challenging. As described above, the Auction did not produce "a fair, transparent, and competitive bidding process" as the Debtors' had promised would occur. *Supra* Section I; Sale Motion ¶ 25.[9]

---

[9] Omega's standing as an aggrieved prospective purchaser is bolstered by the Och-Ziff Joinder (ECF No. 1177). Och-Ziff was a creditor as of the time of the Sale Order and Auction. The filing of a joinder by a party with indisputable standing moots any argument against standing by the Objectors. *See In re AFY, Inc.*, 2011 WL 2313154, at *2 (Bankr. D. Neb. June 8, 2011) (finding it "not necessary" to decide standing of party filing claim objection where party with standing filed joinder to the objection); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 322 n.6 (Bankr. D. Del. 1999) (objection to party's standing mooted by joinder of debtor in motion to strike); *see also In re Bill Heard Enters., Inc.*, 419 B.R. 858, 862 (Bankr. N.D. Ala. 2009) (committee's standing to file motion was "bolstered by the joinders" filed by debtor).

35.     The Debtors argue that Omega lacks standing because "all Omega can show is that it was not the winning bidder." Debt. Ob. ¶ 39. That is incorrect, because Omega has shown material flaws with the Auction, including the *ultra vires* sale and lock up of MTNs in excess of the "no more than" $251 million in MTNs listed for sale in the Auction Notice, as well as the improper insertion of the Deliverability Language into the Sale Order on the eve of the Auction. Indeed, by credibly alleging Cyrus' bad faith, Omega has implicated the intrinsic fairness of the Auction. *See In re Gucci*, 126 F.3d at 389 ("The allegation that the Gucci companies acted in bad faith by usurping Design Studio's assets in the bankruptcy estate implicates the intrinsic fairness of the sale."). Under Second Circuit law, Omega undoubtedly has standing to challenge this intrinsic fairness.[10]

36.     The Debtors ignore these facts, and instead contend that Omega lacks standing because it did not bid for the entirety of the $251 million MTNs that were noticed for Auction and that Omega "bid low" in comparison to Cyrus. Debt. Ob. ¶ 39 n.10. As described above, Omega's bid was in fact the highest submitted on a bond-price basis. In any event, the reason that the bidders other than Cyrus underbid is patently obvious. Each of these bidders was submitting a bid in response to the Debtors' Auction Notice, and with concern over the impact of the Deliverability Language. Cyrus, by contrast, was submitting a bid to buy and/or lock up the entirety of the MTNs owned by the Debtors and their subsidiaries, in accordance with a well-laid plan that began when

---

[10] The Objectors assert that *Colony Hill* is inapposite because the actions in that case were somehow worse than the actions of the Debtors and Cyrus. Debt. Obj. ¶ 39 n.10; Cyrus Obj. ¶ 14. This argument should be rejected. The fact that Omega was not "entirely excluded" from the Auction does not mean that the Auction was intrinsically fair. The principles in *Colony Hill* apply to unsuccessful bidders, not solely to those entirely excluded from bidding. *In re Beck Indus., Inc.*, 605 F.2d 624, 634 n.13 (2d Cir. 1979) (Friendly, J.) (holding that unsuccessful bidder had standing to attack the intrinsic structure of the sale) (cited approvingly in *Colony Hill*).

it submitted an Objection to the Sale Motion and culminated with the inclusion of the Deliverability Language in the Sale Order.[11]

37. Finally, the argument that Omega was required to raise this matter in an adversary proceeding is incorrect. Debt. Ob. ¶ 40. Omega is not seeking new relief, but rather is seeking to enforce the Sale Order that the Court has already entered. That does not require an adversary proceeding. *Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 93 (2d Cir. 2010) (motion to enforce release, discharge, and injunction provisions of the plan involved the enforcement of a pre-existing injunction, permitting resolution of the motion as a contested matter rather than through an adversary proceeding); *In re WorldCorp, Inc.*, 252 B.R. 890, 895 (Bankr. D. Del. 2000) (holding that enforcement of settlement agreement to require party to pay money was properly adjudicated as a contested matter, not an adversary proceeding) (cited approvingly in *Kalikow*); *Texaco Inc. v. Sanders* (*In re Texaco Inc.*), 182 B.R. 937, 945 (Bankr. S.D.N.Y. 1995) ("Rule 7001 simply does not provide that a motion to enforce must be brought by adversary proceeding."); *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 425 (3d Cir. 2013) ("[T]he Bankruptcy Court was only adjudicating a motion … to interpret and enforce its existing prior order. This procedural posture renders many of the requirements of an adversary proceeding (such as a formal complaint and service of process) superfluous."). In fact, often in cases challenging the intrinsic nature and fairness of an auction or sale, the relief requested is not brought by an adversary proceeding. See *Colony Hill*, 11 F.3d at

---

[11] This difference in approach can be observed in the bids attached to the Debtors' Objection. While the other bidders were clearly acting hurriedly to put together bids that incorporated their evaluation of the Deliverability Language, Cyrus' organized bid even attached a legal agreement that would govern the terms of its purchase. Notably, despite their professed commitment to transparency, that agreement was not attached to Debtors' Motion and has never been disclosed.

271–72 (motion to submit higher bid); *Zaccaro v. Bowery Savings Bank* (*In re Jewel*), 10 B.R. 1008, 1010 (E.D.N.Y. 1981) (contested matter started by objection to motion to approve sale).[12]

## CONCLUSION

38. Omega respectfully requests that the Court enter an order, substantially in the form of Exhibit A to the Motion, that invalidates those portions of the sale of MTNs that exceeded the scope of the Sale Order and 11 U.S.C. § 363(b), because property was sold or locked up without proper notice and outside of the fair, transparent, and competitive bidding process authorized by the Court.

Dated: December 18, 2018
      New York, New York

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

By: /s/ *Susheel Kirpalani*
Susheel Kirpalani
Jonathan E. Pickhardt
Andrew S. Corkhill
Matthew Scheck
Ellison Ward Merkel

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Omega Advisors Inc.*

---

[12] Even if Debtors were correct (they are not) that an adversary proceeding is technically required, the Court may still adjudicate the issue as a contested matter. *See In re Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989) (court may consider an issue improperly raised in a contested matter rather than in an adversary proceeding where it determines that no prejudice will result); *In re Swizzlestick, L.L.C.*, 253 B.R. 264, 267 (Bankr. W.D. Mo. 2000) (same).