Andrew V. Tenzer, Esq.
Leslie A. Plaskon, Esq.
Shlomo Maza, Esq.
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090
andrewtenzer@paulhastings.com
leslieplaskon@paulhastings.com
shlomomaza@paulhastings.com

*Attorneys for GACP II, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------- x | <u>Hearing Date</u>: December 20, 2018 at 10:00 am (ET) |
| In re: | |
| SEARS HOLDING CORPORATION, *et al.*, | Chapter 11 |
| Debtors.[1] | Case No. 18-23538-RDD |
| ------------------------------------------------------- x | (Jointly Administered) |

**OMNIBUS REPLY IN SUPPORT OF APPLICATION OF GA CAPITAL FOR
ALLOWANCE AND PAYMENT OF FEES AND EXPENSES PURSUANT
TO BANKRUPTCY CODE SECTIONS 503(b)(3)(D) AND 503(b)(4)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

GACP II, L.P. ("GA Capital") and its undersigned counsel, Paul Hastings LLP ("Paul Hastings"),[2] hereby submit this omnibus reply (the "Reply") (i) in support of the *Application of GA Capital for Allowance and Payment of Fees and Expenses Pursuant to Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4)* [Docket No. 1102] (the "Application")[3] and (ii) to the *Debtors' Response to Application of GA Capital for Allowance and Payment of Fees and Expenses Pursuant to Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4)* [Docket No. 1264] (the "Debtors' Objection") and the *Joinder of the Official Committee of Unsecured Creditors to Debtors' Response to Application of GA Capital for Allowance and Payment of Fees and Expenses Pursuant to Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4)* [Docket No. 1279] (the "Committee's Objection" and, together with the Debtors' Objection, the "Objections"). In support of this Reply, GA Capital respectfully represents as follows:

## **REPLY**

1.      The Debtors and the Committee do not dispute that GA Capital's documentation of the GA Capital DIP was a substantial contribution to the administration of the Debtors' Chapter 11 Cases. The Objections assert primarily that the fees and expenses GA Capital incurred (i) prior to being informed, on November 14, 2018, that it had been selected as the Junior DIP Lender and (ii) relating to the due diligence it conducted in connection with the negotiation and documentation of the GA Capital DIP are not compensable as part of that substantial contribution. Case law, as well as the realities of the process of negotiating and

---

[2]    Paul Hastings, on its own behalf, joins this Reply to the extent necessary to address allegations about the reasonableness of the services rendered and expenses incurred pursuant to its representation of GA Capital in connection with the GA Capital DIP.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Application.

documenting the GA Capital DIP (and, indeed, any DIP financing), contravenes each of these arguments.

## I.     Services Prior to Being Selected Junior DIP Lender Were Part of GA Capital's Substantial Contribution

2.      Courts have approved the substantial contribution application of a potential DIP lender even where the applying entity was **never** selected as a DIP lender.  For example, in approving the substantial contribution application in *In re Nine West Holdings, Inc.*, Judge Chapman noted that a proposed alternative DIP financing required "a lot of work."  The Debtors did not select that alternative DIP proposal, but the Court held that it constituted a substantial contribution because it resulted in "improvement of the DIP" and "was going to be ready to go."[4] In that case, the alternative DIP lenders got involved in "late April," sent an initial DIP proposal to the Debtors on May 8th and a final DIP proposal on May 30th, all of which culminated in the Debtors informing the alternative DIP lenders on June 11th of their decision to stay with the existing DIP lenders.[5]  The court's recognition that the alternative DIP lenders did "a lot of work" applied to all of this work, and the court awarded fees and expenses for the entire period, starting from when the alternative DIP lenders first "got involved" through the date the debtors informed them of their decision to stay with the existing DIP lenders.[6]

3.      Other courts have ruled similarly in favor of the substantial contribution applications of potential lenders that did the work to negotiate a DIP financing proposal that the

---

[4]     Hr'g Tr. 23:8-15, *In re Nine West Holdings, Inc.*, Case No. 18-10947-SCC (Bankr. S.D.N.Y. Aug. 8, 2018).  A copy of the transcript is attached as **Exhibit A** hereto.

[5]     *Id.* 19:10-20:2.

[6]     The time records submitted in support of the substantial contribution application in *Nine West* include time entries related to background discussions with financial advisors, review of the existing DIP pleadings, and discussions with the client regarding possible work on an alternative DIP, all of which predate the submission of the initial alternative DIP proposal.  *See Decl. of Andrew N. Goldman In Support of Appl. of Cross-Sound Management LLC, Paloma Partners Mgmt. Co., Taconic Capital Advisors LP, and Tennenbaum Capital Partners, LLC, Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4), for Allowance and Payment of Prof'l Fees Incurred in Making a Substantial Contribution*, Ex. D, at 2, *In re Nine West Holdings, Inc.*, Case No. 18-10947-SCC (Bankr. S.D.N.Y. July 23, 2018) [Docket No. 524].

debtors ultimately did not use. *See In re FF Holdings Corp.*, 343 B.R. 84, 85-87 (D. Del. 2006) (holding that "although this alternative DIP financing was not used by the estate" that "the Court is persuaded that [applicant] has demonstrated a benefit to the estate by its work to negotiate alternate DIP financing for the Debtors. That another lender was readily available to the Debtors undoubtedly assisted the Debtors in its negotiations with other parties."); *see also In re Philadelphia Newspapers, LLC*, 445 B.R. 450, 465 (Bankr. E.D. Pa. 2010) (insider that proposed alternative DIP provided a substantial contribution even though likelihood of court approving any loan involving this lender was "nearly nonexistent").

4.    Accordingly, the argument that the substantial contribution "clock" only starts running once a potential DIP lender becomes the DIP lender is incorrect. Indeed, arguing that a potential DIP lender only makes a substantial contribution once its proposal has been selected would make it categorically impossible, regardless of the circumstances, for a potential DIP lender that never becomes an actual DIP lender to make a substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code.

5.    This argument also ignores the practical realities of every DIP financing process. A DIP proposal does not spring into existence fully formed at the moment a debtor is ready to select among financing alternatives. Arguing that a potential DIP lender only makes a substantial contribution once its proposal has been selected ignores that a debtor would have no proposals from which to pick if not for the work done by the potential lenders prior to the selection date. This is precisely what happened in *Nine West*: the alternative DIP lenders submitted an initial proposal on May 8th and their final proposal on May 30th, and the debtors did not make a selection until June 11th.

4

6.      This is also what happened with the GA Capital DIP:  As explained in the Application, the Debtors solicited new junior DIP proposals, GA Capital submitted initial term sheets consistent with the Debtors' Process Letter, and these initial term sheets—based on feedback from the Debtors and their advisors[7]—were revised numerous times before November 14, 2018.

## II.      Diligence Efforts Were Part of GA Capital's Substantial Contribution

7.      The Objections' argument that fees or expenses related to the diligence GA Capital conducted in connection with negotiating and documenting the GA Capital DIP fails for the same reasons.  The Debtors and the Committee have not disputed that documentation of the GA Capital DIP (into which Cyrus ultimately stepped) was a substantial contribution.  The Debtors and the Committee, however, ask the Court to ignore the reality of documenting the GA Capital DIP, as it would have been impossible for any of the parties to prepare the GA Capital DIP Documents without doing the underlying diligence.[8]  The Debtors and the Committee would have the Court find that GA Capital—or any other lender—could have been ready to negotiate, document, and ultimately loan under, a $350 million junior facility without first doing diligence on the primary collateral securing the facility.

8.      This could never have happened, as GA Capital could not have documented the GA Capital DIP without doing the related diligence.  Additionally, case law supports the argument that expenses related to such diligence are compensable as a substantial contribution.  In *Philadelphia Newspapers*, for example, the court recognized that a DIP lender needs to conduct due diligence.  While recognizing that it had made a substantial contribution, the court

---

[7]   As well as feedback from the ABL DIP Facility Lenders.
[8]   The majority of GA Capital's due diligence was conducted only after it received express reassurances from the Debtors' that a full marketing process had been completed and GA Capital had been selected as the junior DIP lender.

refused to compensate an alternative DIP lender that was also an insider for due diligence

because, "[a]s an insider Toll also had much of the information at his fingertips or his disposal

that he needed to negotiate and reach agreement regarding the DIP loan." *Philadelphia*

*Newspapers*, 445 B.R. at 464.  Contrasting this to other, non-insider, DIP lenders, the court

explained that "[b]ecause of this, [the insider] had no need to engage in the same type or degree

of due diligence as [the non-insider lenders].  **Therefore, his fees and expenses with regard to**

**the DIP loan should be significantly less than the fees and expenses incurred by [the non-**

**insider lenders].**"  *Id.* (emphasis added).

9.      This distinction between insiders and non-insiders with respect to the type and

degree of due diligence a DIP lender must conduct particularly relevant to GA Capital's due

diligence efforts.  As explained in the Application, the Debtors' insistence that GA Capital not

have any discussions with ESL deprived GA Capital of ESL's extensive knowledge of the

Debtors' businesses and their assets.  As further explained in the Application, this forced GA

Capital to conduct its own diligence.[9]

10.     For this reason, the Debtors' position that the Debtors' and Cyrus never

"exploited GA Capital's due diligence efforts to lay the groundwork for the ultimate benefit of

Cyrus" misses a critical point.[10]  The entire collateral and priority structure set forth in the GA

Capital DIP (and now the Cyrus DIP) was predicated on the value of the underlying assets

supporting the highly negotiated waterfall.  As such, regardless of whether the **Debtors** used GA

Capital to "lay the groundwork" to their and Cyrus's advantage, it cannot be disputed that **GA**

---

[9]     The Debtors assert that this is "typical for DIP marketing processes."  Deb. Obj. ¶ 3.  Typical or not, proper or
not, and regardless of the motivation for doing so, this does not change the simple fact that not being able to
speak to ESL impacted the "type [and] degree" of GA Capital's due diligence.  *In re Philadelphia Newspaper*,
445 B.R. at 464.

[10]    Deb. Obj. ¶ 4.  For the avoidance of doubt, nowhere in the Application does GA Capital assert that the Debtors
or their advisors intentionally "la[id] the groundwork for the ultimate benefit of Cyrus" or otherwise acted in a
premeditated manner.

**Capital**, through its due diligence efforts, did, in fact, lay the groundwork for the Cyrus DIP to the benefit of the Debtors and their Chapter 11 Cases.[11]  Accordingly, failing to grant the Application would allow the Debtors to unfairly obtain the benefit of GA Capital's extensive work and would result in an unearned windfall to the Debtors, as any work Cyrus has done in connection with stepping into the GA Capital DIP will be built upon GA Capital's prior work.[12]

## III.    Requested Fees Are Reasonable

11.    As an initial matter, Paul Hastings' time records should not be subject to the same level of scrutiny as under section 330 of the Bankruptcy Code.  *See In re Bayou Group, LLC*, 431 B.R. 549, 566 (Bankr. S.D.N.Y. 2010) ("because the professional may not know that he or she will be submitting a fee and expense request, the Court need not necessarily enforce time record requirements as strictly as with requests under section 330").

12.    Additionally, Paul Hastings notes that neither of the Objections objects to the reasonableness of any specific time entries or the need for any specific services provided. Nonetheless, Paul Hastings submits that its services were reasonable and necessary.

A.    Fees and Expenses Incurred Prior to November 14, 2018 Were Reasonable

13.    As noted above, fees and expenses incurred prior to November 14, 2018 are part of GA Capital's substantial contribution to the Chapter 11 Cases and, therefore, should be paid in full as long as they were reasonable and necessary—which they were.

---

[11]    Relatedly, the Debtors cite to this Court's opinion in *In re Bayou* to support its argument that substantial contribution is only available for a service that "normally would be expected of an estate-compensated professional but was not so performed."  Deb. Obj. ¶ 8.  All of the fees incurred by GA Capital—including those incurred prior to November 14 and those related to due diligence—are of the type that normally would be borne by the estate in connection with a postpetition financing.  Moreover, such fees are approved by courts precisely because, and only if, the proposed financing—inclusive of its fees— is in the best interests of the estate.

[12]    In light of the questions regarding the reasonableness of its fees, Paul Hastings has requested, but not yet received, information regarding the fees and expenses incurred by Cyrus in connection with the junior DIP.

14.     During this period, Paul Hastings reviewed the filings regarding the ABL DIP

Facility and the ESL Cyrus Term Sheet, discussed deal structures with the Debtors' advisors and

the ABL DIP Facility Lenders, prepared multiple term sheets in connection with the Process

Letter, and conducted legal research regarding adequate protection competing DIP issues.  Paul

Hastings also engaged in negotiations with the Debtors, the ABL DIP Facility Lenders, and their

respective professionals in connection with these services.  Simply put, documentation of the GA

Capital DIP would have been impossible without, and is intertwined with, the services performed

prior to November 14, 2018.

B.     Fees and Expenses Related to Due Diligence Were Reasonable

15.     Fees and expenses related to GA Capital's due diligence efforts are part of its

substantial contribution and, therefore, should be paid in full as long as they were reasonable and

necessary—which they were.

16.     As explained in detail in the Application, the type and degree of due diligence

performed by GA Capital was a direct function of the nature of the GA Capital DIP, including its

size, complexity, priority, and especially its collateral structure due to the fact that the GA

Capital DIP was junior in priority to the ABL Facility DIP, the carveout and the funding of the

Winddown Account.  Documentation of the GA Capital DIP would have been impossible

without, and is intertwined with, GA Capital's due diligence efforts.

17.     Moreover, these diligence efforts were extensive, as the primary collateral for the

GA Capital DIP was (and is) real estate consisting of in excess of 800 leased properties and over

150 owned properties, each of which is subject to complex (sometimes decades worth) of

documentation.  Paul Hastings reviewed thousands of documents in connection with these

properties, prepared lease abstracts and memoranda, and communicated extensively with both

the Debtors and the ABL DIP Facility Lenders regarding the Debtors' real estate assets.

C.      Remainder of Fees and Expenses Were Reasonable

18.      The remainder of Paul Hastings' fees and expenses were incurred in the

negotiation and documentation of the GA Capital DIP.  As noted in the Application, this

included preparing the GA Capital Term Sheet that was ultimately filed by the Debtors, the

junior DIP interim order, the junior DIP credit agreement and the related security and guaranty

documents, and the DIP Intercreditor Agreement.  Paul Hastings also negotiated liens and rights

to be granted under two separate postpetition financing facilities, reviewed the various assets

purchase agreements the Debtors entered into in connection with the same sale of various parts

of their business, and researched complicated legal issues involving the MTNs and the

"springing liens" in favor of the PBGC.  Finally, all of this was done in the context of tripartite

negotiations between GA Capital, the Debtors, and the ABL DIP Facility Lenders, as well as the

Committee.

## CONCLUSION

19.      The Committee emphasizes that substantial contribution "generally takes the form

of constructive contributions in key reorganizational aspects, when **but for** the role of the

creditor, the movement towards final reorganization would have been substantially

diminished."[13]  However, neither the Debtors nor the Committee have identified any workstream

that was not a critical component of documenting and otherwise finalizing the GA Capital DIP

(and therefore the Cyrus DIP).  Indeed, GA Capital notes that neither the Debtors nor the

Committee have disputed GA Capital's critical assertion, made in the Application and repeated

here, that if not for GA Capital's extensive work, including its due diligence and its extensive

work negotiating and documenting the GA Capital DIP prior to November 14, 2018, it would

have been impossible for the Debtors to walk out of the Junior DIP Hearing with the Cyrus DIP.

---

[13]      Comm. Obj. ¶ 2 (as emphasized).

20.    For the foregoing reasons, GA Capital and Paul Hastings respectfully request that the Court overrule the Objections, grant the Application, and grant such other relief as the Court determines is just and proper.

*[Remainder of page intentionally left blank.]*

Dated:  December 19, 2018
        New York, New York

/s/ Andrew A. Tenzer

PAUL HASTINGS LLP
Andrew V. Tenzer, Esq.
Leslie A. Plaskon, Esq.
Shlomo Maza, Esq.
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
andrewtenzer@paulastings.com
leslieplaskon@paulhastings.com
shlomomaza@paulhastings.com

*Counsel to GACP II, L.P.*

**EXHIBIT A**

18-23538-shl   Doc 1347   Filed 12/19/18   Entered 12/19/18 15:02:12   Main Document
Pg 13 of 44
18-10947-scc   Doc 580   Filed 08/09/18   Entered 08/10/18 15:02:06   Main Document
Pg 1 of 32

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 18-10947-scc

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  NINE WEST HOLDINGS, INC., et al.,

9          Debtors.

10

11  - - - - - - - - - - - - - - - - - - - -x

12

13              United States Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              August 8, 2018

18              10:04 AM

19

20

21

22  B E F O R E:

23  HON. SHELLEY C. CHAPMAN

24  U.S. BANKRUPTCY JUDGE

25

1

2    Doc #533 Debtors Motion for Entry of an Order (A) Extending the

3    Debtors' Exclusive Periods to File a Chapter 11 Plan and

4    Solicit Acceptances Thereof Pursuant to Section 1121 of the

5    Bankruptcy Code and (B) Granting Related Relief

6

7    Doc #523 Application of Cross-Sound Management LLC, Paloma

8    Partners Management Company, Taconic Capital Advisors LP, and

9    Tennenbaum Capital Partners, LLC for Allowance and Payment of

10    Professional Fees Incurred in Making a Substantial Contribution

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Penina Wolicki

21    eScribers, LLC

22    352 Seventh Avenue, Suite #604

23    New York, NY 10001

24    (973)406-2250

25    operations@escribers.net

18-23538-scl    Doc 1347    Filed 12/19/18    Entered 12/19/18 16:49:12    Main Document
Pg 15 of 44
18-10947-scc    Doc 580    Filed 08/09/18    Entered 08/10/18 15:02:06    Main Document
Pg 15 of 32

3

```
 1   A P P E A R A N C E S :

 2   KIRKLAND & ELLIS LLP

 3          Attorneys for Debtors

 4          601 Lexington Avenue

 5          New York, NY 10022

 6

 7   BY:   CHRISTOPHER J. MARCUS, P.C.

 8

 9

10   KIRKLAND & ELLIS LLP

11          Attorneys for Debtors

12          300 North LaSalle

13          Chicago, IL 60654

14

15   BY:   JOSEPH M. GRAHAM, ESQ.

16          ANDREW R. MCGAAN, P.C.

17

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20          Office of the United States Trustee

21          201 Varick Street

22          Suite 1006

23          New York, NY 10014

24

25   BY:   SUSAN ARBEIT, ESQ.
```

18-23538-scl   Doc 1347   Filed 12/19/18   Entered 12/19/18 16:49:02   Main Document
Pg 16 of 32
18-10947-scc   Doc 580   Filed 08/09/18   Entered 08/10/18 15:02:06   Main Document
Pg 16 of 44

4

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for Official Creditors' Committee

4        One Bryant Park

5        New York, NY 10036

6

7  BY:   DANIEL H. GOLDEN, ESQ.

8

9

10  MORGAN LEWIS & BOCKIUS LLP

11        Attorneys for Wells Fargo Bank NA, DIP Agent

12        101 Park Avenue

13        New York, NY 10178

14

15  BY:   MATTHEW C. ZIEGLER, ESQ.

16

17

18  FRIEDMAN KAPLAN SEILER & ADELMAN LLP

19        Attorneys for Wilmington Savings Fund Society, FSB,

20        Indenture Trustee

21        7 Times Square

22        New York, NY 10036

23

24  BY:   ROBERT J. LACK, ESQ.

25

18-23538-shl   Doc 1347   Filed 12/19/18   Entered 12/19/18 16:49:12   Main Document
Pg 75 of 32
18-10947-scc   Doc 580   Filed 08/09/18   Entered 08/10/18 15:02:06   Main Document
Pg 17 of 44

5

```
 1   KILPATRICK TOWNSEND & STOCKTON LLP
 2        Attorneys for Wilmington Savings Fund Society, FSB,
 3        as Trustee
 4        1114 Avenue of the Americas
 5        New York, NY 10036
 6
 7   BY:   KELLY E. MOYNIHAN, ESQ.
 8
 9
10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
11        Attorneys for Ad Hoc Group of Unsecured Debtholders
12        1285 Avenue of the Americas
13        New York, NY 10019
14
15   BY:   MICHAEL M. TURKEL, ESQ.
16        ANDREW N. ROSENBERG, ESQ.
17
18
19   KRAMER LEVIN NAFTALIS & FRANKEL LLP
20        Attorneys for Brigade Capital Management LP
21        1177 Avenue of the Americas
22        New York, NY 10036
23
24   BY:   RACHAEL RINGER, ESQ.
25        DOUGLAS MANNAL, ESQ.
```

```
 1  DAVIS POLK & WARDWELL LLP
 2          Attorneys for Ad Hoc Group of Secured Lenders
 3          450 Lexington Avenue
 4          New York, NY 10017
 5
 6  BY:   MARSHALL S. HUEBNER, ESQ.
 7          ADAM L. SHPEEN, ESQ.
 8
 9
10  QUINN EMANUEL URQUHART & SULLIVAN, LLP
11          Attorneys for GLAS, Administrative Agent
12          for Unsecured Term Loan
13          51 Madison Avenue
14          22nd Floor
15          New York, NY 10010
16
17  BY:   BENJAMIN I. FINESTONE, ESQ.
18
19
20  WILMER CUTLER PICKERING HALE AND DORR LLP
21          Attorneys for Paloma Partners Management Co., et al.
22          250 Greenwich Street
23          New York, NY 10007
24
25  BY:   ANDREW N. GOLDMAN, ESQ.
```

18-23538-shl    Doc 1347    Filed 12/19/18    Entered 12/19/18 16:49:12    Main Document
18-10947-scc    Doc 580    Filed 08/09/18    Entered 08/10/18 15:02:06    Main Document
Pg 19 of 32
Pg 19 of 44

7

1

2   SEWARD & KISSEL LLP

3          Attorneys for U.S. Bank Trust NA, Senior Notes Trustee

4          One Battery Park Plaza

5          New York, NY 10004

6

7   BY:    CATHERINE V. LOTEMPIO, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NINE WEST HOLDINGS, INC., ET AL.                                            8

 1                    P R O C E E D I N G S

 2           THE COURT:  Good morning.

 3           MR. GRAHAM:  Good morning, Your Honor.  Joe Graham of

 4   Kirkland & Ellis on behalf of the debtors.  The first item on

 5   today's agenda is the debtors' exclusivity extension motion,

 6   which was filed on July 25th at docket number 533.

 7           Pursuant to the motion, the debtors requested a short

 8   extension of both the filing and the solicitation exclusivity

 9   deadlines by forty-one days.  The extension would take the plan

10   filing exclusivity out to September 14th, which is the next

11   omnibus hearing date in the case.

12           The short extension was requested in line with the

13   standstill agreement we announced in June.  And pursuant to

14   that standstill agreement, as a reminder, the parties agreed

15   that the debtors would not file a plan or a 9019 settlement

16   motion before -- at that time August 15th; it's now August

17   22nd, pursuant to the notice we filed on the docket last week.

18           THE COURT:  Right.

19           MR. GRAHAM:  And that the committee would not file a

20   standing motion or object to a short extension of exclusivity.

21           The motion is unopposed.  Obviously the UCC put in a

22   statement that was filed last week --

23           THE COURT:  Right.

24           MR. GRAHAM:  -- at docket number 543.  We would expect

25   to file another extension, probably seeking a longer period,

NINE WEST HOLDINGS, INC., ET AL.                                              9

1   for the September 14th hearing.  But other than that, I don't

2   believe there's anything -

3              THE COURT:  Okay, so --

4              MR. GRAHAM:  -- controversial in the motion.

5              THE COURT:  -- so let's work this through.  So what

6   are we going to do on September 14th?

7              MR. GRAHAM:  On September 14, we'd expect to have a

8   longer exclusivity extension request.

9              THE COURT:  Okay, so on September --

10             MR. GRAHAM:  Yeah.

11             THE COURT:  I'm not trying to get ahead of everyone.

12  I will infer progress from these extensions, although I could

13  be -- I could be wrong; but I choose to be optimistic.  I'm

14  merely trying to plan.

15             MR. GRAHAM:  Of course.

16             THE COURT:  So right now we have a disclosure

17  statement hearing set for September 14th.  So as a result of

18  the extension now in effect, that will not occur -- the

19  disclosure statement hearing will not occur on September 14th?

20             MR. GRAHAM:  No.  As of now, the disclosure statement

21  hearing, pursuant to our agreement with the committee, could

22  still occur as of that date, as long as we file -- or send out

23  a notice of that disclosure statement hearing twenty-eight days

24  before the objection deadline of September 7th.

25             THE COURT:  Walk me through the timing, because I'm

 1  sorry, I'm just not following you.  So --

 2          MR. GRAHAM:  That's all right.

 3          THE COURT:  -- if there -- to have a disclosure

 4  statement hearing on September 14th, when would be the last day

 5  for the filing of the plan and disclosure statement?

 6          MR. GRAHAM:  As of now, the plan would be, if we're

 7  going to have a hearing on the disclosure statement on

 8  September 14th, we would file an amended plan and amended

 9  disclosure statement on August 22nd.  Obviously there's a plan

10  and disclosure statement on file.  We're working with parties

11  to negotiate amendments to the plan and updating the disclosure

12  statement and the exhibits that would be attached to that

13  disclosure statement.

14          We would file a notice twenty-eight days before the

15  September 7th objection deadline and mail it out pursuant to

16  Rule 2002 to all of our stakeholders so that they're aware of

17  the objection deadline.

18          The committee --

19          THE COURT:  I'm sorry.  I'm just -- you're going to

20  have to --

21          MR. GRAHAM:  No, it's okay.

22          THE COURT:  -- it must be me.  But twenty-eight days

23  before September 7th is Monday?

24          MR. GRAHAM:  Yes.  We'd file a notice setting it for

25  that date as discussed.  Obviously the committee has agreed

 1  that they would not object that that is shortened notice.

 2  Other parties-in-interest could argue that they did not have

 3  enough notice of the actual disclosure statement at that

 4  hearing.

 5          THE COURT:  Okay.  I'm going to keep going until I

 6  understand this.

 7          MR. GRAHAM:  That's okay, Your Honor.

 8          THE COURT:  But you would be noticing the plan -- you

 9  would be noticing a disclosure statement hearing for the plan

10  that is now on file?

11          MR. GRAHAM:  As --

12          THE COURT:  Unamended?

13          MR. GRAHAM:  -- as of now that would be -- that would

14  have to be the disclosure statement that would be going

15  forward.  We'd obviously be planning on amending it.  As in

16  many cases, obviously there are amendments of the disclosure

17  statement and a plan in the lead-up to the -- to a disclosure

18  statement, including in advance of the objection deadline.

19          THE COURT:  Okay.  Does anyone else wish to be heard?

20          MR. GOLDEN:  Good morning, Your Honor.

21          THE COURT:  Good morning.  How are you?

22          MR. GOLDEN:  Great thank you.  Daniel Golden, Akin

23  Gump Strauss Hauer & Feld, counsel to the official creditors'

24  committee.

25          THE COURT:  So do you agree -- notwithstanding my

1  struggles to understand it -- do you agree with the description

2  of the process leading to a September 14th disclosure statement

3  hearing.

4          MR. GOLDEN:  Well, I agree to the timing that Mr.

5  Graham --

6          THE COURT:  Just the factual description?

7          MR. GOLDEN:  -- the factual --

8          THE COURT:  Right.

9          MR. GOLDEN:  Look, I think the debtors are trying to

10  keep their options open.

11          THE COURT:  Sure.

12          MR. GOLDEN:  I frankly would be surprised that we have

13  a new debtor plan and disclosure statement filed by next week,

14  given the current state of discussions.

15          THE COURT:  Okay.

16          MR. GOLDEN:  But they want to keep their option open.

17          THE COURT:  Okay.

18          MR. GOLDEN:  And we don't have an objection, and we

19  agreed to that when we got to the standstill agreement.

20          THE COURT:  Got it.  Okay.

21          MR. GOLDEN:  So Your Honor, the current -- the request

22  on the table right now for the exclusivity extension is

23  consistent --

24          THE COURT:  Just let me -- let me clarify.  I mean, my

25  concern is not to insert myself in the process of negotiations

1    and discussions; it's simply calendar-driven, because I have

2    time blocked out for a confirmation hearing keyed off of a

3    September 14th disclosure statement hearing.  So I'm simply

4    trying to understand the moving parts out of a concern of where

5    we would be pushed, and to ensure that I have calendar time

6    available for you.  That's where I'm coming from.

7          MR. GOLDEN:  And certainly a worthwhile goal for you

8    to protect and understand your calendar.  The debtors are going

9    to have to tell you whether those dates are in stone or not.

10          THE COURT:  Okay.  Got it.  Okay.

11          MR. GOLDEN:  Your Honor, as it relates to the current

12    exclusivity extension, it's consistent with the standstill

13    agreement that the debtors and the committee reached and the

14    Court was informed back in, I think it was, June 18th.

15          Also consistent with the settlement agreement, the

16    committee and its professionals have been hard at work over the

17    last several months; two primary efforts.  One is the ongoing

18    investigation of the potential LBO claims or claims that

19    emanate or accumulate as a result of the 2014 leveraged buyout

20    and the related carve-out transactions.  That has involved a

21    great deal of discovery, both depositions and document

22    discovery.  And the second major goal is to start the plan

23    process, the plan negotiations.

24          There are a variety of creditor groups.  You have -- I

25    think if you take a look at the recent docket filings, there

 1 | have been 2019s filed by an ad hoc 2034 bondholder group, a
 2 | 2019 ad hoc bondholder group.  There's an ad hoc secured term
 3 | lender group.  There's an ad hoc crossover group.  There's
 4 | Brigade.  So there's a lot of parties here for a relatively
 5 | small case.  But there are complicated issues that need to be
 6 | resolved.
 7 |    The committee continues to believe that the path
 8 | forward is to get to a consensual creditor plan where the
 9 | creditors are all onside in terms of what a plan of arrangement
10 | should look like -- plan of arrangement.
11 |    THE COURT:  Where did that come from?
12 |    MR. GOLDEN:  Wow.
13 |    THE COURT:  Wow.
14 |    UNIDENTIFIED SPEAKER:  Is that Canadian.
15 |    MR. GOLDEN:  Only a few people in this audience should
16 | actually even know what a plan of arrangement is.
17 |    THE COURT:  Most of them are too young.
18 |    MR. GOLDEN:  What a plan of reorganization should look
19 | like.  And then it's our view that the creditors, who are the
20 | beneficiaries, or who would be the beneficiaries of any estate
21 | causes of action, should determine whether those should be
22 | settled as part of a plan, or if not settled as part of a plan,
23 | to be implemented and settled or at least to be prosecuted
24 | through a litigation trust.
25 |    So the committee has worked pretty well, actually,

 1  with the debtors and the debtors' professionals.  We've had

 2  frequent meetings.  We've shared our views with them.  They've

 3  shared their views with us.  That process is ongoing.  And I

 4  think it's fair to say that the actual creditor negotiation

 5  should start picking up steam.

 6          People have done a fair amount of due diligence.  And

 7  I think the actual negotiations will actually start in earnest

 8  over the coming weeks.  So whether the deadline --

 9          THE COURT:  You have a challenge -- you personally

10  have a challenge, because of these -- the formation of these ad

11  hoc groups.  I mean, you had a challenge baseline.  It seems to

12  me that your challenge might have become more challenging.

13          MR. GOLDEN:  It's a challenge that we think we're up

14  to the task.  We think that at the end of the day, we are going

15  to come to you with a consensual creditor plan.  That's our

16  expectation and our -- what we're working towards.

17          THE COURT:  It would be unfortunate for the

18  unexpectedly excellent results of the auction to be all --

19  ended up being all allocated to fees.  I do not want that to be

20  the result.

21          MR. GOLDEN:  I think that's a message that everybody

22  in this courtroom hears and understands.  It's not an

23  unexpected message.  And we are trying to avoid that result by

24  try to -- as hard as we can -- to get to a fully consensual

25  creditor plan.

 1          THE COURT:  Okay.

 2          MR. GOLDEN:  Thank you, Your Honor.

 3          THE COURT:  All right.  Anyone else wish to be heard

 4  with respect to the exclusivity extension?

 5          Okay, very good.  So that will be approved.

 6          MR. GRAHAM:  Thank you, Your Honor.  Just I wanted to

 7  just clarify one thing --

 8          THE COURT:  Yes.

 9          MR. GRAHAM:  -- just for purposes of calendaring.  We

10  have a September 17th milestone for --

11          THE COURT:  Yeah.

12          MR. GRAHAM:  -- disclosure statement approval in our

13  DIP.  And so as of now, we'd like to just make sure we're

14  holding that date.  And --

15          THE COURT:  Oh, right.

16          MR. GRAHAM:  -- obviously it will be all triggered off

17  of whether we can get to a deal and dates --

18          THE COURT:  Right.

19          MR. GRAHAM:  -- if they need to, we'll have to

20  negotiate new ones, if --

21          THE COURT:  Yes.

22          MR. GRAHAM:  -- that comes up.

23          THE COURT:  You absolutely have the date.  And the

24  current date for the confirmation hearing, I believe, is

25  October 29th and 30th, right?

1          It's just that if those push, there will be challenges
2    because of things that are on my calendar that I cannot move.
3    So I'm hoping we'll stick with those dates.
4          MR. GRAHAM:  We understand.
5          THE COURT:  Notwithstanding what I just said, you know
6    that I will always make it work one way or the other.  But the
7    sooner we know if things need to move, the better -- the better
8    we'll be.  All right?
9          MR. GRAHAM:  We appreciate that, Your Honor.  Thank
10   you.
11         THE COURT:  Okay, great.  All right.
12         So Mr. Goldman -- hello, Mr. Golden.
13         Mr. Golden?
14         MR. GOLDEN:  Yes.
15         THE COURT:  So besides Mr. Goldman's 2019 and Mr.
16   Huebner's 2019, we don't see any 2019s on the docket.
17         MR. GOLDEN:  There are previous ones filed by the --
18         UNIDENTIFIED SPEAKER:  Yes, Your Honor.  The ad hoc
19   crossover group has filed a 2019.
20         THE COURT:  Right.  Okay.  I thought you were
21   suggesting that there were more recent --
22         MR. GOLDEN:  There's one -- I may have misspoke or
23   anticipated one about to be filed that has -- I'm told, has not
24   yet been filed yet.
25         THE COURT:  Okay.  So we're not crazy.

```
 1              MR. GOLDEN:  You're not crazy.

 2              THE COURT:  Very good.

 3              MR. GOLDEN:  Thank you, Your Honor.

 4              THE COURT:  At least not on that basis.  Okay.

 5              MR. GOLDEN:  I'll defer on that.

 6              THE COURT:  All right, thank you.

 7              Hello, Mr. Goldman.  How are you?

 8              MR. GOLDMAN:  Good morning, Your Honor.  And as noted,

 9    we did file a 2019 last night --

10              THE COURT:  Yes.

11              MR. GOLDMAN:  -- on behalf of a group of holders.

12              For clarification of the record, the motion that we

13    filed which is on for today includes three of the four members

14    of the group that we filed the 2019 on behalf of.

15              THE COURT:  Okay.

16              MR. GOLDMAN:  The work that we did in connection with

17    the DIP was done on behalf of Paloma, Tennenbaum, Taconic, and

18    Cross-Sound.  Once the DIP phase of our engagement concluded,

19    Cross-Sound left the group and Centerbridge joined the group.

20    And that's why the 2019 that was filed includes Centerbridge

21    but not Cross-Sound, whereas the motion includes Cross-Sound

22    but not Centerbridge.  Just to the extent the Court had any

23    questions.

24              THE COURT:  Yes, I did.  And that answers my question.

25    Okay.
```

1           MR. GOLDMAN:  Thank you, Your Honor.  Your Honor, just

2      very briefly, the matter before the Court this morning is

3      unopposed.  I would note for the record that Mr. Huebner's

4      clients, the DIP agent and the ad hoc secured lenders, filed a

5      statement.  Mr. Huebner and I had a brief discussion before

6      court this morning.  I don't believe we take any issue with his

7      comments or reinforcing the notion that his DIP was done arm's

8      length, fair dealing.  That's all fine.  That has no

9      implication with respect to our motion.

10           Your Honor, as I think both Mr. Graham and committee

11     counsel noted at the final DIP hearing, we got involved in late

12     April in dialoging with the committee with respect to providing

13     an alternative DIP for the Court.  Those discussions

14     materialized in the form of an initial DIP proposal, which we

15     sent to the company through the committee in the beginning of

16     May, I believe May 8th, and that began, as Your Honor heard at

17     one of the status conferences, essentially a month-long bakeoff

18     of an informal basis, between the existing DIP loan and the DIP

19     proposal that we were contemplating.

20           We submitted, after lots of discussion with lots of

21     parties -- submitted a final DIP proposal on May 30th, which

22     the company, as good stewards of the estate, then took back to

23     its existing DIP group and said here's what we need in order to

24     go forward with you and not break ranks.

25           And that culminated in the company deciding and

 1  informing us right around June 11th of their desire to stay

 2  with the existing DIP lenders.

 3          At that time, and based on that decision, we chose not

 4  to fight it.  We understood the company's business judgment and

 5  the rationale for doing so.  But we did get confirmation from

 6  both the company and the committee that they did believe that

 7  we brought significant value through a counter -- through a

 8  competing proposal which allowed the estate to negotiate down

 9  pricing, provide more flex, and on that basis, both would be

10  comfortable with the application that we informed them that we

11  intended to file based on the results of the informal bakeoff.

12          And just by way of brief discussion, the final DIP

13  proposal as a result of all of the negotiations, brought the

14  exit fee down from two-and-a-half percent to two percent.

15  There were various reductions made to the payment of

16  professional fees that were in the initial DIP order.

17  Obviously the challenge period was significantly extended from

18  an initial period of seventy-five days through two days before

19  the confirmation hearing.  The investigation budget given to

20  the creditors' committee in connection with investigating the

21  pre-petition transactions was multiplied tenfold from 50,000 to

22  500,000.  There were softening -- soft marshalling, shall we

23  say, with respect to parties' ability to collect on a

24  foreclosure basis.  There was a delinking of the RSA from the

25  DIP loan.

18-23538-scl   Doc 1347   Filed 03/09/18   Entered 03/09/18 16:02:06   Main Document
18-10947-scc   Doc 580   Filed 08/09/18   Entered 08/10/18 15:02:06   Main Document
Pg 33 of 42
Pg 21 of 42

NINE WEST HOLDINGS, INC., ET AL.                        21

1          And importantly, when the decision was made to move in

2     a direction with the existing lenders, we put pens down and are

3     not asking for anything with respect to any time subsequent to

4     the company's informing us and our having one or two final

5     discussions with the committee about that.

6          THE COURT:  What was that date?

7          MR. GOLDMAN:  The last date that we and the company

8     have agreed to with respect to fee entries is June 11th.  So

9     what we  have agreed to is that for all time post-June 11.  So

10    starting on June 12th, we are writing all of that off.

11         THE COURT:  So what does that do to the aggregate

12    amount requested?

13         MR. GOLDMAN:  It drops the total fees by 14,988

14    dollars.

15         I should note, other than with respect to my

16    colleague's participation in the final DIP hearing just to make

17    sure everything concluded in the right way, which again, the

18    debtors have agreed that we would be able to seek reimbursement

19    for and they would not object to -- and so the final number

20    which we would submit in a revised order reflects fees of

21    $383,852.50.  As I said, that's a 14,988-dollar reduction.

22         THE COURT:  Okay.

23         MR. GOLDMAN:  Costs remain the same at 2,351 and

24    change, for a total reduced request of 386,203 dollars.

25         As I would note, no objections were filed.

 1          THE COURT:  Yes.

 2          MR. GOLDMAN:  Both, I think, the debtor and the

 3   committee have noted the substantial contribution they believe

 4   we made.  And as I noted, I don't take -- we don't take issue

 5   with anything that Mr. Huebner and Davis Polk have said in

 6   their pleading --

 7          THE COURT:  Okay.

 8          MR. GOLDMAN:  -- with respect to the bona fides of

 9   their proposal and the process that was run -- no issue

10   whatsoever.

11          THE COURT:  Okay.  All right.  So for good order,

12   should we admit your declaration into the record?

13          MR. GOLDMAN:  Yes, thank you.

14      (Declaration of Mr. Goldman was hereby received into

15   evidence as Paloma Group's Exhibit, as of this date.)

16          THE COURT:  All right, any objection?

17          Anyone wish to cross-examine Mr. Goldman?

18          Okay, very good.  Anyone else wish to be heard on the

19   application for substantial contribution in connection with the

20   DIP hearing?

21          MR. GRAHAM:  Your Honor, just quickly.

22          THE COURT:  Yes.

23          MR. GRAHAM:  The debtors want to stand -- because we

24   are very supportive of this request.  We in fact, as part of

25   getting into the bakeoff, agreed that we thought that they

1  would be bringing a substantial contribution and may ultimately

2  be the DIP lenders through the process.

3          We also appreciate that Mr. Goldman did work with us

4  on the fees post June 11th, and we are fully supportive of the

5  relief requested, and do believe there's a substantial

6  contribution here.

7          THE COURT:  All right, very good.

8          Well, I'm going to approve the application.  I've

9  reviewed the time entries.  It was a brief but intense period

10 of time that required a lot of -- a lot of work, both with

11 respect to the negotiations that ultimately led to the

12 improvement of the DIP; and also what the fee application

13 reflects is that this alternative DIP proposal was going to be

14 ready to go.  And that requires a lot of work by a lot of

15 parties.

16         I also would note that there's no objection from the

17 Office of the United States Trustee.

18         MS. ARBEIT:  That's correct, Your Honor.  The U.S.

19 Trustee fully supports this motion.

20         THE COURT:  Very good.  Which is, I think, significant

21 in and of itself.  So thank you for your contribution to the

22 process; and if you would submit a revised order to chambers,

23 we'll get it entered today.

24         MR. GOLDMAN:  Thank you, Your Honor.

25         THE COURT:  All right, thank you very much.

NINE WEST HOLDINGS, INC., ET AL.                           24

 1          Anything else that we need to talk about?

 2          MR. GRAHAM:  No --

 3          THE COURT:  I'm happy to hear from Mr. Marcus himself.

 4          MR. GRAHAM:  He doesn't like to speak on the record,

 5   Your Honor.

 6          THE COURT:  He's very shy.

 7          MR. GRAHAM:  I don't believe there's anything else.

 8          THE COURT:  Very good.  All right, enjoy the rest of

 9   the summer.  Do let us know if things move in terms of timing

10   and whatnot.  All right?  Thank you.

11          (Whereupon these proceedings were concluded at 10:25 AM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                          I N D E X
 3                      E X H I B I T S
 4   PALOMA GROUP'S DESCRIPTION          MARKED   ADMITTED
 5   --              Declaration of Mr.            22
 6                   Goldman
 7
 8   RULINGS:                                 PAGE   LINE
 9   Debtor's motion to extend exclusivity      16      5
10   period is granted.
11   Application of Cross-Sound Management       23      8
12   LLC, Paloma Partners Management
13   Company, Taconic Capital Advisors LP,
14   and Tennenbaum Capital Partners, LLC
15   for Allowance and Payment of
16   Professional Fees Incurred in Making a
17   Substantial Contribution, approved.
18
19
20
21
22
23
24
25
```

18-23538-scl   Doc 1347   Filed 12/19/18   Entered 12/19/18 16:49:12   Main Document
Pg 38 of 42
18-10947-scc   Doc 580   Filed 08/09/18   Entered 08/10/18 15:02:06   Main Document
Pg 26 of 32

26

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    *Penina Wolicki*

8

9    _____

10   Penina Wolicki (CET-569)

11   AAERT Certified Electronic Transcriber

12

13   eScribers

14   352 Seventh Ave., Suite #604

15   New York, NY 10001

16

17   Date:  August 9, 2018

18

19

20

21

22

23

24

25

NINE WEST HOLDINGS, INC., et al.

Case No. 18-10947-scc

August 8, 2018

---

## $

**$383,852.50 (1)**
21:21

## A

**ability (1)**
20:23
**able (1)**
21:18
**absolutely (1)**
16:23
**accumulate (1)**
13:19
**action (1)**
14:21
**actual (3)**
11:3;15:4,7
**actually (3)**
14:16,25;15:7
**Ad (9)**
5:11;6:2;14:1,2,2,
3;15:10;17:18;19:4
**ADAM (1)**
6:7
**ADELMAN (1)**
4:18
**Administrative (1)**
6:11
**admit (1)**
22:12
**advance (1)**
11:18
**again (1)**
21:17
**agenda (1)**
8:5
**Agent (3)**
4:11;6:11;19:4
**aggregate (1)**
21:11
**agree (1)**
11:25;12:1,4
**agreed (7)**
8:14;10:25;12:19;
21:8,9,18;22:25
**agreement (6)**
8:13,14;9:21;
12:19;13:13,15
**ahead (1)**
9:11
**AKIN (2)**
4:2;11:22
**al (1)**
6:21
**allocated (1)**
15:19
**allowed (1)**
20:8
**alternative (2)**
19:13;23:13

**although (1)**
9:12
**always (1)**
17:6
**amended (2)**
10:8,8
**amending (1)**
11:15
**amendments (2)**
10:11;11:16
**Americas (3)**
5:4,12,21
**amount (2)**
15:6;21:12
**ANDREW (2)**
5:16;6:25
**announced (1)**
8:13
**anticipated (1)**
17:23
**application (4)**
20:10;22:19;23:8,
12
**appreciate (2)**
17:9;23:3
**approval (1)**
16:12
**approve (1)**
23:8
**approved (1)**
16:5
**April (1)**
19:12
**ARBEIT (1)**
23:18
**argue (1)**
11:2
**arm's (1)**
19:7
**around (1)**
20:1
**arrangement (3)**
14:9,10,16
**attached (1)**
10:12
**Attorneys (10)**
4:3,11,19;5:2,11,
20;6:2,11,21;7:3
**auction (1)**
15:18
**audience (1)**
14:15
**August (3)**
8:16,16;10:9
**available (1)**
13:6
**Avenue (6)**
4:12;5:4,12,21;
6:3,13
**avoid (1)**
15:23
**aware (1)**
10:16

## B

**back (2)**
13:14;19:22
**bakeoff (3)**
19:17;20:11;22:25
**Bank (2)**
4:11;7:3
**based (2)**
20:3,11
**baseline (1)**
15:11
**basis (4)**
18:4;19:18;20:9,
24
**Battery (1)**
7:4
**become (1)**
15:12
**began (1)**
19:16
**beginning (1)**
19:15
**behalf (4)**
8:4;18:11,14,17
**beneficiaries (2)**
14:20,20
**BENJAMIN (1)**
6:17
**besides (1)**
17:15
**better (2)**
17:7,7
**blocked (1)**
13:2
**BOCKIUS (1)**
4:10
**bona (1)**
22:8
**bondholder (2)**
14:1,2
**both (7)**
8:8;13:21;19:10;
20:6,9;22:2;23:10
**break (1)**
19:24
**brief (3)**
19:5;20:12;23:9
**briefly (1)**
19:2
**Brigade (2)**
5:20;14:4
**bringing (1)**
23:1
**brought (2)**
20:7,13
**Bryant (1)**
4:4
**budget (1)**
20:19
**business (1)**
20:4

**buyout (1)**
13:19

## C

**calendar (3)**
13:5,8;17:2
**calendar-driven (1)**
13:1
**calendaring (1)**
16:9
**can (2)**
15:24;16:17
**Canadian (1)**
14:14
**Capital (1)**
5:20
**carve-out (1)**
13:20
**case (2)**
8:11;14:5
**cases (1)**
11:16
**CATHERINE (1)**
7:7
**causes (1)**
14:21
**Centerbridge (3)**
18:19,20,22
**certainly (1)**
13:7
**challenge (6)**
15:9,10,11,12,13;
20:17
**challenges (1)**
17:1
**challenging (1)**
15:12
**chambers (1)**
23:22
**change (1)**
21:24
**choose (1)**
9:13
**chose (1)**
20:3
**claims (2)**
13:18,18
**clarification (1)**
18:12
**clarify (2)**
12:24;16:7
**clients (1)**
19:4
**Co (1)**
6:21
**colleague's (1)**
21:16
**collect (1)**
20:23
**comfortable (1)**
20:10
**coming (2)**

**13:6;15:8**
**comments (1)**
19:7
**Committee (17)**
4:3;8:19;9:21;
10:18,25;11:24;
13:13,16;14:7,25;
19:10,12,15;20:6,20;
21:5;22:3
**company (5)**
19:15,22,25;20:6;
21:7
**company's (2)**
20:4;21:4
**competing (1)**
20:8
**complicated (1)**
14:5
**concern (2)**
12:25;13:4
**concluded (1)**
18:18;21:17;24:11
**conferences (1)**
19:17
**confirmation (4)**
13:2;16:24;20:5,
19
**connection (3)**
18:16;20:20;22:19
**consensual (3)**
14:8;15:15,24
**consistent (3)**
12:23;13:12,15
**contemplating (1)**
19:19
**continues (1)**
14:7
**contribution (5)**
22:3,19;23:1,6,21
**controversial (1)**
9:4
**Costs (1)**
21:23
**counsel (2)**
11:23;9:11
**counter (1)**
20:7
**course (1)**
9:15
**COURT (69)**
8:2,18,23;9:3,5,9,
11,16,25;10:3,19,22;
11:5,8,12,19,21,25;
12:6,8,11,15,17,20,
24;13:10,14;14:11,
13,17;15:9,17;16:1,
3,8,11,15,18,21,23;
17:5,11,15,20,25;
18:2,4,6,10,15,22,24;
19:2,6,13;21:6,11,
22;22:1,7,11,16,22;
23:7,20,25;24:3,6,8
**courtroom (1)**

15:22
**crazy (2)**
    17:25;18:1
**creditor (5)**
    13:24;14:8;15:4,
    15,25
**creditors (2)**
    14:9,19
**Creditors' (3)**
    4:3;11:23;20:20
**cross-examine (1)**
    22:17
**crossover (2)**
    14:3;17:19
**Cross-Sound (4)**
    18:18,19,21,21
**culminated (1)**
    19:25
**current (4)**
    12:14,21;13:11;
    16:24
**CUTLER (1)**
    6:20

**D**

**DANIEL (2)**
    4:7;11:22
**date (9)**
    8:11;9:22;10:25;
    16:14,23,24;21:6,7;
    22:15
**dates (3)**
    13:9;16:17;17:3
**DAVIS (2)**
    6:1;22:5
**day (2)**
    10:4;15:14
**days (6)**
    8:9;9:23;10:14,22;
    20:18,18
**deadline (5)**
    9:24;10:15,17;
    11:18;15:8
**deadlines (1)**
    8:9
**deal (2)**
    13:21;16:17
**dealing (1)**
    19:8
**Debtholders (1)**
    5:11
**debtor (2)**
    12:13;22:2
**debtors (9)**
    8:4,7,15;12:9;
    13:8,13;15:1;21:18;
    22:23
**debtors' (2)**
    8:5;15:1
**deciding (1)**
    19:25
**decision (2)**

20:3;21:1
**declaration (2)**
    22:12,14
**defer (1)**
    18:5
**delinking (1)**
    20:24
**depositions (1)**
    13:21
**description (2)**
    12:1,6
**desire (1)**
    20:1
**determine (1)**
    14:21
**dialoguing (1)**
    19:12
**diligence (1)**
    15:6
**DIP (22)**
    4:11;16:13;18:17,
    18;19:4,7,11,13,14,
    18,18,21,23;20:2,12,
    16,25;21:16;22:20;
    23:2,12,13
**direction (1)**
    21:2
**disclosure (20)**
    9:16,19,20,23;
    10:3,5,7,9,10,11,13;
    11:3,9,14,16,17;
    12:2,13;13:3;16:12
**discovery (2)**
    13:21,22
**discussed (1)**
    10:25
**discussion (3)**
    19:5,20;20:12
**discussions (4)**
    12:14;13:1;19:13;
    21:5
**docket (5)**
    8:6,17,24;13:25;
    17:16
**document (1)**
    13:21
**dollars (2)**
    21:14,24
**done (3)**
    15:6;18:17;19:7
**DORR (1)**
    6:20
**DOUGLAS (1)**
    5:25
**down (3)**
    20:8,14;21:2
**drops (1)**
    21:13
**due (1)**
    15:6

**E**

earnest (1)
    15:7
**effect (1)**
    9:18
**efforts (1)**
    13:17
**Ellis (1)**
    8:4
**else (5)**
    11:19;16:3;22:18;
    24:1,7
**emanate (1)**
    13:19
**EMANUEL (1)**
    6:10
**end (1)**
    15:14
**ended (1)**
    15:19
**engagement (1)**
    18:18
**enjoy (1)**
    24:8
**enough (1)**
    11:3
**ensure (1)**
    13:5
**entered (1)**
    23:23
**entries (2)**
    21:8;23:9
**ESQ (13)**
    4:7,15,24;5:7,15,
    16,24,25;6:6,7,17,
    25;7:7
**essentially (1)**
    19:17
**estate (3)**
    14:20;19:22;20:8
**et (1)**
    6:21
**even (1)**
    14:16
**everybody (1)**
    15:21
**everyone (1)**
    9:11
**evidence (1)**
    22:15
**excellent (1)**
    15:18
**exclusivity (8)**
    8:5,8,10,20;9:8;
    12:22;13:12;16:4
**Exhibit (1)**
    22:15
**exhibits (1)**
    10:12
**existing (4)**
    19:18,23;20:2;
    21:2
**exit (1)**
    20:14

**expect (2)**
    8:24;9:7
**expectation (1)**
    15:16
**extended (1)**
    20:17
**extension (11)**
    8:5,8,9,12,20,25;
    9:8,18;12:22;13:12;
    16:4
**extensions (1)**
    9:12
**extent (1)**
    18:22

**F**

**fact (1)**
    22:24
**factual (2)**
    12:6,7
**fair (3)**
    15:4,6;19:8
**Fargo (1)**
    4:11
**fee (3)**
    20:14;21:8;23:12
**fees (5)**
    15:19;20:16;
    21:13,20;23:4
**FELD (2)**
    4:2;11:23
**few (1)**
    14:15
**fides (1)**
    22:8
**fight (1)**
    20:4
**file (11)**
    8:15,19,25;9:22;
    10:8,10,14,24;11:10;
    18:9;20:11
**filed (14)**
    8:6,17,22;12:13;
    14:1;17:17,19,23,24;
    18:13,14,20;19:4;
    21:25
**filing (3)**
    8:8,10;10:5
**filings (1)**
    13:25
**final (6)**
    19:11,21;20:12;
    21:4,16,19
**fine (1)**
    19:8
**FINESTONE (1)**
    6:17
**first (1)**
    8:4
**flex (1)**
    20:9
**Floor (1)**

6:14
**following (1)**
    10:1
**foreclosure (1)**
    20:24
**form (1)**
    19:14
**formation (1)**
    15:10
**forty-one (1)**
    8:9
**forward (3)**
    11:15;14:8;19:24
**four (1)**
    18:13
**FRANKEL (1)**
    5:19
**frankly (1)**
    12:12
**frequent (1)**
    15:2
**FRIEDMAN (1)**
    4:18
**FSB (2)**
    4:19;5:2
**fully (3)**
    15:24;23:4,19
**Fund (2)**
    4:19;5:2

**G**

**GARRISON (1)**
    5:10
**given (2)**
    12:14;20:19
**GLAS (1)**
    6:11
**goal (2)**
    13:7,22
**GOLDEN (27)**
    4:7;11:20,22,22;
    12:4,7,9,12,16,18,21;
    13:7,11;14:12,15,18;
    15:13,21;16:2;17:12,
    13,14,17,22;18:1,3,5
**GOLDMAN (17)**
    6:25;17:12;18:7,8,
    11,16;19:1;21:7,13,
    23;22:2,8,13,14,17;
    23:3,24
**Goldman's (1)**
    17:15
**Good (13)**
    8:2,3;11:20,21;
    16:5;18:2,8;19:22;
    22:11,18;23:7,20;
    24:8
**Graham (31)**
    8:3,3,19,24;9:4,7,
    10,15,20;10:2,6,21,
    24;11:7,11,13;12:5;
    16:6,9,12,16,19,22;

18-23538-shl    Doc 1347    Filed 12/19/18    Entered 12/19/18 16:29:12    Main Document
Pg 129 of 132
NINE WEST HOLDINGS, INC., et al.
Case No. 18-10947-scc

August 8, 2018

17:4,9;19:10;22:21,
23;24:2,4,7
**Great (3)**
  11:22;13:21;17:11
**Greenwich (1)**
  6:22
**Group (12)**
  5:11;6:2;14:1,2,3,
3;17:19;18:11,14,19,
19;19:23
**groups (2)**
  13:24;15:11
**Group's (1)**
  22:15
**GUMP (2)**
  4:2;11:23

## H

**HALE (1)**
  6:20
**happy (1)**
  24:3
**hard (2)**
  13:16;15:24
**HAUER (2)**
  4:2;11:23
**hear (1)**
  24:3
**heard (4)**
  11:19;16:3;19:16;
22:18
**hearing (18)**
  8:11;9:1,17,19,21,
23;10:4,7;11:4,9;
12:3;13:2,3;16:24;
19:11;20:19;21:16;
22:20
**hears (1)**
  15:22
**hello (2)**
  17:12;18:7
**hereby (1)**
  22:14
**here's (1)**
  19:23
**himself (1)**
  24:3
**Hoc (9)**
  5:11;6:2;14:1,2,2,
3;15:11;17:18;19:4
**holders (1)**
  18:11
**holding (1)**
  16:14
**Honor (19)**
  8:3;11:7,20;12:21;
13:11;16:2,6;17:9,
18;18:3,8;19:1,1,10,
16;22:21;23:18,24;
24:5
**hoping (1)**
  17:3

**HUEBNER (3)**
  6:6;19:5;22:5
**Huebner's (2)**
  17:16;19:3

## I

**implemented (1)**
  14:23
**implication (1)**
  19:9
**importantly (1)**
  21:1
**improvement (1)**
  23:12
**includes (3)**
  18:13,20,21
**including (1)**
  11:18
**Indenture (1)**
  4:20
**infer (1)**
  9:12
**informal (2)**
  19:18;20:11
**informed (2)**
  13:14;20:10
**informing (2)**
  20:1;21:4
**initial (3)**
  19:14;20:16,18
**insert (1)**
  12:25
**intended (1)**
  20:11
**intense (1)**
  23:9
**into (3)**
  22:12,14,25
**investigating (1)**
  20:20
**investigation (2)**
  13:18;20:19
**involved (2)**
  13:20;19:11
**issue (3)**
  19:6;22:4,9
**issues (1)**
  14:5
**item (1)**
  8:4

## J

**Joe (1)**
  8:3
**joined (1)**
  18:19
**judgment (1)**
  20:4
**July (1)**
  8:6
**June (6)**

8:13;13:14;20:1;
21:8,10;23:4

## K

**KAPLAN (1)**
  4:18
**keep (3)**
  11:5;12:10,16
**KELLY (1)**
  5:7
**keyed (1)**
  13:2
**KILPATRICK (1)**
  5:1
**Kirkland (1)**
  8:4
**KISSEL (1)**
  7:2
**KRAMER (1)**
  5:19

## L

**LACK (1)**
  4:24
**last (6)**
  8:17,22;10:4;
13:17;18:9;21:7
**late (1)**
  19:11
**LBO (1)**
  13:18
**leading (1)**
  12:2
**lead-up (1)**
  11:17
**least (2)**
  14:23;18:4
**led (1)**
  23:11
**left (1)**
  18:19
**lender (1)**
  14:3
**Lenders (5)**
  6:2;19:4;20:2;
21:2;23:2
**length (1)**
  19:8
**leveraged (1)**
  13:19
**LEVIN (1)**
  5:19
**LEWIS (1)**
  4:10
**Lexington (1)**
  6:3
**line (1)**
  8:12
**litigation (1)**
  14:24
**LLP (10)**

4:2,10,18;5:1,10,
19;6:1,10,20;7:2
**Loan (3)**
  6:12;19:18;20:25
**long (1)**
  9:22
**longer (2)**
  8:25;9:8
**Look (4)**
  12:9;13:25;14:10,
18
**lot (5)**
  14:4;23:10,10,14,
14
**LOTEMPIO (1)**
  7:7
**lots (2)**
  19:20,20
**LP (1)**
  5:20

## M

**Madison (1)**
  6:13
**mail (1)**
  10:15
**major (1)**
  13:22
**Management (2)**
  5:20;6:21
**MANNAL (1)**
  5:25
**many (1)**
  11:16
**Marcus (1)**
  24:3
**MARSHALL (1)**
  6:6
**marshalling (1)**
  20:22
**materialized (1)**
  19:14
**matter (1)**
  19:2
**MATTHEW (1)**
  4:15
**may (5)**
  17:22;19:16,16,
21;23:1
**mean (2)**
  12:24;15:11
**meetings (1)**
  15:2
**members (1)**
  18:13
**merely (1)**
  9:14
**message (2)**
  15:21,23
**MICHAEL (1)**
  5:15
**might (1)**

4:2,10,18;5:1,10,
19;6:1,10,20;7:2
15:12
**milestone (1)**
  16:10
**misspoke (1)**
  17:22
**Monday (1)**
  10:23
**month-long (1)**
  19:17
**months (1)**
  13:17
**more (3)**
  15:12;17:21;20:9
**MORGAN (1)**
  4:10
**morning (7)**
  8:2,3;11:20,21;
18:8;19:2,6
**Most (1)**
  14:17
**motion (10)**
  8:5,7,16,20,21;9:4;
18:12,21;19:9;23:19
**move (4)**
  17:2,7;21:1;24:9
**moving (1)**
  13:4
**MOYNIHAN (1)**
  5:7
**much (1)**
  23:25
**multiplied (1)**
  20:21
**must (1)**
  10:22
**myself (1)**
  12:25

## N

**NA (2)**
  4:11;7:3
**NAFTALIS (1)**
  5:19
**need (5)**
  14:5;16:19;17:7;
19:23;24:1
**negotiate (3)**
  10:11;16:20;20:8
**negotiation (1)**
  15:4
**negotiations (5)**
  12:25;13:23;15:7;
20:13;23:11
**New (12)**
  4:5,13,22;5:5,13,
22;6:4,15,23;7:5;
12:13;16:20
**next (2)**
  8:10;12:13
**night (1)**
  18:9
**note (4)**

18-23538-shl Doc 1347 Filed 12/19/18 Entered 12/19/18 16:49:12 Main Document
Pg 420 of 432

NINE WEST HOLDINGS, INC., et al.
Case No. 18-10947-scc

August 8, 2018

19:3;21:15,25;
23:16
noted (4)
18:8;19:11;22:3,4
Notes (1)
7:3
notice (6)
8:17;9:23;10:14,
24;11:1,3
noticing (2)
11:8,9
notion (1)
19:7
notwithstanding (2)
11:25;17:5
number (3)
8:6,24;21:19
NY (10)
4:5,13,22;5:5,13,
22;6:4,15,23;7:5

**O**

object (3)
8:20;11:1;21:19
objection (7)
9:24;10:15,17;
11:18;12:18;22:16;
23:16
objections (1)
21:25
Obviously (7)
8:21;10:9,25;
11:15,16;16:16;
20:17
occur (3)
9:18,19,22
October (1)
16:25
off (3)
13:2;16:16;21:10
Office (1)
23:17
Official (2)
4:3;11:23
omnibus (1)
8:11
Once (1)
18:18
One (9)
4:4;7:4;13:17;
16:7;17:6,22,23;
19:17;21:4
ones (2)
16:20;17:17
ongoing (2)
13:17;15:3
Only (1)
14:15
onside (1)
14:9
open (2)
12:10,16

optimistic (1)
9:13
option (1)
12:16
options (1)
12:10
order (5)
19:23;20:16;
21:20;22:11;23:22
out (5)
8:10;9:22;10:15;
13:2,4
over (2)
13:16;15:8

**P**

Paloma (3)
6:21;18:17;22:15
Park (3)
4:4,12;7:4
part (3)
14:22,22;22:24
participation (1)
21:16
parties (5)
8:14;10:10;14:4;
19:21;23:15
parties' (1)
20:23
parties-in-interest (1)
11:2
Partners (1)
6:21
parts (1)
13:4
path (1)
14:7
PAUL (1)
5:10
payment (1)
20:15
pens (1)
21:2
people (2)
14:15;15:6
percent (2)
20:14,14
period (4)
8:25;20:17,18;
23:9
personally (1)
15:9
phase (1)
18:18
PICKERING (1)
6:20
picking (1)
15:5
plan (23)
8:9,15;9:14;10:5,
6,8,9,11;11:8,9,17;
12:13;13:22,23;14:8,

9,10,16,18,22,22;
15:15,25
planning (1)
11:15
Plaza (1)
7:4
pleading (1)
22:6
POLK (2)
6:1;22:5
post (1)
23:4
post-June (1)
21:9
potential (1)
13:18
pre-petition (1)
20:21
pretty (1)
14:25
previous (1)
17:17
pricing (1)
20:9
primary (1)
13:17
probably (1)
8:25
proceedings (1)
24:11
process (7)
12:2,25;13:23;
15:3;22:9;23:2,22
professional (1)
20:16
professionals (2)
13:16;15:1
progress (1)
9:12
proposal (7)
19:14,19,21;20:8,
13;22:9;23:13
prosecuted (1)
14:23
protect (1)
13:8
provide (1)
20:9
providing (1)
19:12
purposes (1)
16:9
Pursuant (5)
8:7,13,17;9:21;
10:15
push (1)
17:1
pushed (1)
13:5
put (2)
8:21;21:2

**Q**

quickly (1)
22:21
QUINN (1)
6:10

**R**

RACHAEL (1)
5:24
ranks (1)
19:24
rationale (1)
20:5
reached (1)
13:13
ready (1)
23:14
received (1)
22:14
recent (2)
13:25;17:21
record (4)
18:12;19:3;22:12;
24:4
reduced (1)
21:24
reduction (1)
21:21
reductions (1)
20:15
reflects (2)
21:20;23:13
reimbursement (1)
21:18
reinforcing (1)
19:7
related (1)
13:20
relates (1)
13:11
relatively (1)
14:4
relief (1)
23:5
remain (1)
21:23
reminder (1)
8:14
reorganization (1)
14:18
request (4)
9:8;12:21;21:24;
22:24
requested (4)
8:7,12;21:12;23:5
required (1)
23:10
requires (1)
23:14
resolved (1)

14:6
respect (9)
16:4;19:9,12;
20:23;21:3,8,15;
22:8;23:11
rest (1)
24:8
result (5)
9:17;13:19;15:20,
23;20:13
results (2)
15:18;20:11
reviewed (1)
23:9
revised (2)
21:20;23:22
RIFKIND (1)
5:10
Right (22)
8:18,23;9:16;10:2;
12:8,22;16:3,15,18,
25;17:8,11,20;18:6;
20:1;21:17;22:11,
16;23:7,25;24:8,10
RINGER (1)
5:24
ROBERT (1)
4:24
ROSENBERG (1)
5:16
RSA (1)
20:24
Rule (1)
10:16
run (1)
22:9

**S**

same (1)
21:23
Savings (2)
4:19;5:2
second (1)
13:22
Secured (3)
6:2;14:2;19:4
seek (1)
21:18
seeking (1)
8:25
seems (1)
15:11
SEILER (1)
4:18
send (1)
9:22
Senior (1)
7:3
sent (1)
19:15
September (15)
8:10;9:1,6,7,9,17,

19,24;10:4,8,15,23;
12:2;13:3;16:10
**set (1)**
9:17
**setting (1)**
10:24
**settled (3)**
14:22,22,23
**settlement (2)**
8:15;13:15
**seventy-five (1)**
20:18
**several (1)**
13:17
**SEWARD (1)**
7:2
**shall (1)**
20:22
**shared (2)**
15:2,3
**short (3)**
8:7,12,20
**shortened (1)**
11:1
**SHPEEN (1)**
6:7
**shy (1)**
24:6
**significant (2)**
20:7;23:20
**significantly (1)**
20:17
**simply (2)**
13:1,3
**small (1)**
14:5
**Society (2)**
4:19;5:2
**soft (1)**
20:22
**softening (1)**
20:22
**solicitation (1)**
8:8
**sooner (1)**
17:7
**sorry (2)**
10:1,19
**speak (1)**
24:4
**SPEAKER (2)**
14:14;17:18
**Square (1)**
4:21
**stakeholders (1)**
10:16
**stand (1)**
22:23
**standing (1)**
8:20
**standstill (4)**
8:13,14;12:19;
13:12

**start (3)**
13:22;15:5,7
**starting (1)**
21:10
**state (1)**
12:14
**statement (22)**
8:22;9:17,19,20,
23;10:4,5,7,9,10,12,
13;11:3,9,14,17,18;
12:2,13;13:3;16:12;
19:5
**States (1)**
23:17
**status (1)**
19:17
**stay (1)**
20:1
**steam (1)**
15:5
**stewards (1)**
19:22
**stick (1)**
17:3
**still (1)**
9:22
**STOCKTON (1)**
5:1
**stone (1)**
13:9
**STRAUSS (2)**
4:2;11:23
**Street (1)**
6:22
**struggles (1)**
12:1
**submit (2)**
21:20;23:22
**submitted (2)**
19:20,21
**subsequent (1)**
21:3
**substantial (1)**
22:3,19;23:1,5
**suggesting (1)**
17:21
**SULLIVAN (1)**
6:10
**summer (1)**
24:9
**supportive (2)**
22:24;23:4
**supports (1)**
23:19
**Sure (3)**
12:11;16:13;21:17
**surprised (1)**
12:12

**T**

**table (1)**
12:22

**Taconic (1)**
18:17
**talk (1)**
24:1
**task (1)**
15:14
**tenfold (1)**
20:21
**Tennenbaum (1)**
18:17
**Term (2)**
6:12;14:2
**terms (2)**
14:9;24:9
**thought (2)**
17:20;22:25
**three (1)**
18:13
**Times (1)**
4:21
**timing (3)**
9:25;12:4;24:9
**today (2)**
18:13;23:23
**today's (1)**
8:5
**told (1)**
17:23
**took (1)**
19:22
**total (2)**
21:13,24
**towards (1)**
15:16
**TOWNSEND (1)**
5:1
**transactions (2)**
13:20;20:21
**triggered (1)**
16:16
**Trust (2)**
7:3;14:24
**Trustee (5)**
4:20;5:3;7:3;
23:17,19
**try (1)**
15:24
**trying (5)**
9:11,14;12:9;13:4;
15:23
**TURKEL (1)**
5:15
**twenty-eight (3)**
9:23;10:14,22
**two (4)**
13:17;20:14,18;
21:4
**two-and-a-half (1)**
20:14

**U**

**UCC (1)**

8:21
**ultimately (2)**
23:1,11
**Unamended (1)**
11:12
**understands (1)**
15:22
**understood (1)**
20:4
**unexpected (1)**
15:23
**unexpectedly (1)**
15:18
**unfortunate (1)**
15:17
**UNIDENTIFIED (2)**
14:14;17:18
**United (1)**
23:17
**unopposed (2)**
8:21;19:3
**Unsecured (2)**
5:11;6:12
**up (4)**
15:5,13,19;16:22
**updating (1)**
10:11
**URQUHART (1)**
6:10

**V**

**value (1)**
20:7
**variety (1)**
13:24
**various (1)**
20:15
**view (1)**
14:19
**views (2)**
15:2,3

**W**

**Walk (1)**
9:25
**WARDWELL (1)**
6:1
**way (3)**
17:6;20:12;21:17
**week (3)**
8:17,22;12:13
**weeks (1)**
15:8
**WEISS (1)**
5:10
**Wells (1)**
4:11
**WHARTON (1)**
5:10
**whatnot (1)**
24:10

**whatsoever (1)**
22:10
**whereas (1)**
18:21
**Whereupon (1)**
24:11
**WILMER (1)**
6:20
**Wilmington (2)**
4:19;5:2
**wish (4)**
11:19;16:3;22:17,
18
**work (7)**
9:5;13:16;17:6;
18:16;23:3,10,14
**worked (1)**
14:25
**working (2)**
10:10;15:16
**worthwhile (1)**
13:7
**Wow (2)**
14:12,13
**writing (1)**
21:10
**wrong (1)**
9:13

**Y**

**York (10)**
4:5,13,22;5:5,13,
22;6:4,15,23;7:5
**young (1)**
14:17

**Z**

**ZIEGLER (1)**
4:15

**1**

**10:25 (1)**
24:11
**10004 (1)**
7:5
**10007 (1)**
6:23
**10010 (1)**
6:15
**10017 (1)**
6:4
**10019 (1)**
5:13
**10036 (4)**
4:5,22;5:5,22
**101 (1)**
4:12
**10178 (1)**
4:13
**11 (1)**

18-23538-shl    Doc 1347    Filed 12/19/18    Entered 12/19/18 16:29:12    Main Document
18-10947-scc    Doc 580    Filed 08/09/18    Entered 08/10/18 15:02:06    Main Document
NINE WEST HOLDINGS, INC., et al.    Pg 442 of 442
Case No. 18-10947-scc    Pg 32 of 32                    August 8, 2018

21:9
**1114 (1)**
    5:4
**1177 (1)**
    5:21
**11th (3)**
    20:1;21:8;23:4
**1285 (1)**
    5:12
**12th (1)**
    21:10
**14 (1)**
    9:7
**14,988 (1)**
    21:13
**14,988-dollar (1)**
    21:21
**14th (9)**
    8:10;9:1,6,17,19;
    10:4,8;12:2;13:3
**15th (1)**
    8:16
**17th (1)**
    16:10
**18th (1)**
    13:14

---

**2**

**2,351 (1)**
    21:23
**2002 (1)**
    10:16
**2014 (1)**
    13:19
**2019 (7)**
    14:2;17:15,16,19;
    18:9,14,20
**2019s (2)**
    14:1;17:16
**2034 (1)**
    14:1
**22nd (3)**
    6:14;8:17;10:9
**250 (1)**
    6:22
**25th (1)**
    8:6
**29th (1)**
    16:25

---

**3**

**30th (2)**
    16:25;19:21
**386,203 (1)**
    21:24

---

**4**

**450 (1)**
    6:3

---

**5**

**50,000 (1)**
    20:21
**500,000 (1)**
    20:22
**51 (1)**
    6:13
**533 (1)**
    8:6
**543 (1)**
    8:24

---

**7**

**7 (1)**
    4:21
**7th (3)**
    9:24;10:15,23

---

**8**

**8th (1)**
    19:16

---

**9**

**9019 (1)**
    8:15