**HEARING DATE: January 18, 2019, at 10:00 a.m.**
**OBJECTION DEADLINE: January 11, 2019, at 4:00 p.m.**

**NIXON PEABODY LLP**
Christopher M. Desiderio
55 West 46th Street
New York, NY 10036
Tel.: 212-940-3000
Fax: 212-940-3111
cdesderio@nixonpeabody.com

and

Richard C. Pedone
100 Summer Street
Boston, MA 02110
Tel.: 617- 345-1000
Fax: 617-345-1300
rpedone@nixonpeabody.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------x
|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| In re: | : |  |
|  | : |  |
| SEARS HOLDING CORPORATION., | : | Case No. 18-23538 (RDD) |
|  | : |  |
| Debtors.[1] | : | **(Joint Administration)** |
|  | : |  |
-----------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF THE KCD INDENTURE TRUSTEE FOR AN ORDER (I) GRANTING
RELIEF FROM THE AUTOMATIC STAY AND (II) COMPELLING DEBTOR
PERFORMANCE AS SERVICER AND MANAGER OF KCD IP, LLC**

U.S. Bank National Association, in its capacity as indenture trustee (in such capacity, the

"KCD Indenture Trustee") under the Indenture[2] dated as of May 18, 2006, by and between KCD

IP, LLC ("KCD IP") and the KCD Indenture Trustee (as amended, supplemented or modified

from time to time, the "Indenture," annexed hereto as **Exhibit A**), by and through its attorneys,

hereby moves for entry of an order pursuant to sections 105, 361, 362(d)(1) and 363(e) of title 11

of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District (the "Local Rules") (the

"Motion") granting the KCD Indenture Trustee relief from the automatic stay and compelling

contractual performance by the Debtors. Specifically, with this Motion, the KCD Indenture

Trustee seeks entry of an Order:

a) granting it relief from the automatic stay to remove and replace Sears
   Holdings Management Corporation as Servicer and Sears Brands Business
   Unit Corporation as Manager in accordance with the terms and conditions
   of their respective agreements; and

b) compelling (i) Sears Holdings Management Corporation, as Servicer, and
   (ii) Sears Brands Business Unit Corporation, as Manager, to perform their
   respective obligations pending their removal and replacement.

In support of this Motion, the KCD Indenture Trustee states as follows:

**PRELIMINARY STATEMENT**

As summarized above, and explained in detail below and in the attached proposed Order,

the KCD Indenture Trustee seeks to enforce certain contractual rights and to compel Sears

Holdings Management Corporation and Sears Brands Business Unit Corporation to perform their

contractual obligations pending their replacement. To date, despite demand, they have failed to

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Indenture,
Servicing Agreement (defined below) or Management Agreement (defined below), as applicable.

perform, and this jeopardizes the rights and interests of the KCD Indenture Trustee and the

holder of the notes issues pursuant to the Indenture.

## JURISDICTION AND VENUE

1.        The Court has jurisdiction of the subject matter hereof pursuant to 28 U.S.C.

§1334(a). This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (B), (C), (G) and (O).

2.        The bases for this Motion are sections 105, 361, 362(d) and 363(e) of the

Bankruptcy Code, Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-1.

## BACKGROUND

**A.        Background on Transactions Creating KCD IP and Related Structure**

3.        In May of 2006, KCD IP, a non-debtor affiliate of the Debtors, was assigned

certain rights to the Kenmore, Craftsman and Diehard trademarks and tradenames (collectively,

the "Trademarks") for the purpose of entering into a series of agreements providing for the

issuance of asset-backed securities (the "Notes"). Upon information and belief, the Notes are

owned by Sears Reinsurance Company Ltd. ("Sears Reinsurance" or the "Holder").[3]

4.        In connection with the issuance of the Notes, KCD IP licensed the use of the

Trademarks under certain License Agreements, dated as of May 18, 2006, (collectively, and as

the same may be amended, supplemented or modified from time to time, the "License

Agreements") to Debtors Sears Roebuck and Company ("Sears Roebuck") and KMART

Corporation ("KMART" and, together with Sears Roebuck, the "Debtor Licensees"),

respectively. In addition, to secure its obligations, KCD IP granted the KCD Indenture Trustee a

security interest in, among other things, the Trademarks, the License Agreements, and all

sublicenses with respect to any of the Trademarks ("Sublicenses"), including any sublicense

---

[3]      Sears Reinsurance is a non-debtor affiliate of the Debtors charged with insuring or reimbursing certain of their
         service, protection and warranty obligations to customers and reinsuring certain insurance risks.

3

agreements that either of the Debtor-Licensees may enter into with third parties from time to time.[4]

5.    Upon information and belief, since the commencement of these chapter 11 cases, the Debtor Licensees have failed to make payments due with respect to their continued use of the Trademarks under the License Agreements and any Sublicenses. Likewise, KCD IP, as Issuer, has failed to make required payments on the Notes. KCD IP's failure to make the required payments constitutes an Event of Default under the Indenture.

6.    Contemporaneously with the execution of the Indenture, with respect to protecting and enforcing the integrity of the Trademarks and License Agreements, (i) Sears Holdings Management Corporation was appointed as Servicer[5] and (ii) Sears Brands Business Unit Corporation was appointed as Manager.[6] Ocean Tomo, LLC, a non-debtor, was designated to serve as Back-Up Manager[7] in the event the Manager is removed.

7.    Since the commencement of these chapter 11 cases, the Servicer and Manager have failed to communicate with the KCD Indenture Trustee and, upon information and belief, perform their respective duties under the Servicing Agreement and Management Agreement. Importantly, it appears that the Servicer and Manager have failed, and continue to fail, to enforce the License Agreements or otherwise perform their duties under the Servicing Agreement with

---

[4]    On May 18, 2006, the Issuer and the KCD Indenture Trustee entered into that certain Trademark Security Agreement (amended, supplemented or modified from time to time, the "Trademark Security Agreement," annexed hereto as **Exhibit B**).

[5]    On May 18, 2006, the Issuer, the KCD Indenture Trustee and Sears Holdings Management Corporation, as Servicer (the "Servicer") entered into that certain Servicing Agreement (amended, supplemented or modified from time to time, the "Servicing Agreement," annexed hereto as **Exhibit C**).

[6]    On May 18, 2006, the Issuer and Sears Brands Business Unit Corporation (f/k/a Sears Intellectual Property Management Company), as Manager (the "Manager") entered into that certain Management Agreement, (amended, supplemented or modified from time to time, the "Management Agreement," annexed hereto as **Exhibit D**).

[7]    On May 18, 2006, the Issuer, the KCD Indenture Trustee and Ocean Tomo, LLC, as Back-Up Manager (the "Back-Up Manager") entered into that certain Back-Up Management Agreement, (amended, supplemented or modified from time to time, the "Back Up Management Agreement," annexed hereto as **Exhibit E**).

4831-7220-0834

respect to the License Agreements and any Sublicenses against their affiliates who are licensees or sub-licensees, despite repeated demands.

8.      The commencement of a chapter 11 case by Debtor-Sears Holdings Corporation constituted the occurrence of a "Servicer Removal Event" under Section 5(j) of the Servicing Agreement and the occurrence of a "Manager Removal Event" under clause (ix) of Section 5(b) of the Management Agreement, respectively. Those agreements and the Indenture require that the Issuer and the KCD Indenture Trustee take certain action to remove and replace the Servicer and to remove and replace the Manager with the Back-Up Manager. Debtor-Sears Holdings Corporation (whose chapter 11 filing triggered these removal events) is not a party to either the Servicing Agreement or the Management Agreement.

9.      Accordingly, to ensure that the Trademarks, License Agreements and Sublicenses pledged as collateral under the KCD Indenture are adequately protected, the KCD Indenture Trustee seeks, *first*, relief from the automatic stay to remove and replace each of the Servicer and the Manager as required following the bankruptcy filing of Sears Holdings Corporation *and* on account of the non-performance of their obligations and, *second*, pending their removal and replacement, adequate protection in the form of an order compelling the Servicer and Manager to perform their contractual obligations.[8]

### B.      The Chapter 11 Cases

10.      Beginning on October 15, 2018 (the "Commencement Date"), and continuing thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[8]      The KCD Indenture Trustee reserves all rights to seek a further modification of the automatic stay in the event that it is directed by the Holder to take additional actions under the Indenture or other applicable agreements, or it elects to seek such relief.

5

4831-7220-0834

11.     On October 24, 2018, the United States Trustee for Region 2 appointed an official

committee of unsecured creditors. No trustee or examiner has been appointed in these chapter 11

cases.

12.     The Debtors' chapter 11 cases are jointly administered for procedural purposes

only pursuant to Bankruptcy Rule 1015(b).

### The Sale Process with Respect to Certain Assets of the Debtors

13.     On November 1, 2018, the Debtors filed their Motion for Approval of Global

Bidding Procedures [Docket No. 419]. On November 19, 2018, the Court entered its Order

Approving Global Bidding Procedures and Granting Related Relief [Docket No. 816] (the

"Global Bidding Procedures Order").

14.     The Global Bidding Procedures Order established December 5, 2018, as the

deadline by which interested parties were required to submit Non-Binding Indications of Interest

(defined in the Global Bidding Procedures Order) with respect to certain assets of the Debtors.

*See* Global Bidding Procedures Order, Section IV(B) of Ex. 1.

15.     As set forth in the Global Bidding Procedures Order, the deadline for submitting

Qualified Bids (defined in the Global Bidding Procedures Order) is December 28, 2018, at 4:00

p.m. (Eastern Time) and, thereafter, an auction will take place on January 14, 2019, at 10:00 a.m.

(Eastern Time) with respect to those assets.[9]

16.     In the event the Debtors seek to assume the License Agreements or any other

contracts with the KCD Indenture Trustee or KCD IP, or any Sublicense related thereto, KCD IP

will have until the later of January 24, 2019, or eight (8) days from the filing of the Notice of

Auction Results (defined in the Global Bidding Procedures Order) to object to any proposed cure

costs related to any proposed assumption.

---

[9]     The Debtors did not designate a Stalking Horse Bidder (defined in the Global Bidding Procedures Order) by
the December 15, 2018, deadline.

6

17.    Pursuant to the terms of the Servicing Agreement and the Management

Agreement, the Debtor Servicer and Manager, respectively, are obligated to protect KCD IP's

rights in connection with any such sale. *See, generally,* Indenture, Section 4.17.

*The Servicing Agreement and Defaults Thereunder*

18.    Pursuant to Section 2.1(d) of the Servicing Agreement the Servicer is required to,

among other things:

   a)    Supervise the activities of the Manager and enforce the Manager's obligations under the Management Agreement.

   b)    Notify the Issuer, the Trustee and the Manager, upon the Servicer receiving actual knowledge of any Event of Default under the Indenture, or any event which, with the giving of notice or the passage of time or both, would constitute an Event of Default.

   c)    Undertake and perform all calculations and reports as and when required to be undertaken and performed by the Issuer or the Servicer under and pursuant to the Indenture, and transfer funds from the Collection Account in accordance with the Indenture and Servicer Reports.

19.    Section 2.2 of the Servicing Agreement provides, among other things, that the

Servicer shall:

   a)    Not comingle payments received by it, if any, in respect of the Collateral with any other funds, payments or assets.

   b)    Make reasonable efforts to collect all payments called for under the terms and provisions of the Collateral, and to cause the same to be deposited in the Collection Account.

   c)    Cause to be deposited in the Collection Account on the Business Day of receipt all payments of monies received directly by the Servicer, if any, from any obligated party in respect of the Collateral, unless such payments are received after 4:00 p.m. (Chicago Central time), in which case, such payments will be deposited on the next Business Day.

   d)    Prepare and file with the Trustee and the Noteholders all reports specified in the Indenture as coming from or required of the Issuer or the Servicer, as and when required by the Indenture.

20.    Section 3.1 of the Servicing Agreement provides, among other things, that:

4831-7220-0834

No later than 5:00 p.m. Chicago Time, on each Determination Date, the Servicer shall deliver to … the Trustee … the Servicer Report in the form attached as Exhibit A hereto.

21.    Section 4.1(c) of the Indenture provides, in pertinent part, that:

Notwithstanding anything in this Section 4.1(c) to the contrary, at any time while the Servicer … is an Affiliate of Sears, if … a Servicer Removal Event pursuant to Section 5.1(j) of the Servicing Agreement … occurs as a result of a voluntary bankruptcy event of Sears Holdings Corporation, then unless 100% of the Noteholders vote not to require removal, the Issuer and the Trustee shall remove the current Servicer as Servicer and appoint a successor servicer as Servicer in accordance with the terms of the Servicing Agreement ….

22.    Consistent with the foregoing, Section 5.1(j) of the Servicing Agreement provides that "if the Servicer is an affiliate of Sears Holdings Corporation, the commencement by Sears Holdings Corporation of a voluntary case under the federal bankruptcy laws …" constitutes a Servicer Removal Event. Servicing Agreement, Section 5.1(j).[10]

23.    To date, the KCD Indenture Trustee has not received instruction from the Holder requesting or directing the KCD Indenture Trustee not to remove the Servicer pursuant to the foregoing provisions.

24.    On December 16, 2018, KCD Indenture Trustee sent a letter to counsel for the Servicer demanding that the Servicer perform its obligations under the Servicing Agreement (the "Servicer Compliance Demand Letter," annexed hereto as **Exhibit F**).

25.    To date, the Servicer has neither responded to the Servicer Compliance Demand Letter nor agreed to perform its obligations under the Servicing Agreement. Upon information and belief, since the commencement of these chapter 11 cases, the Servicer has failed, pursuant to applicable terms and requirements of the Servicing Agreement, to:

---

[10]    With respect to the occurrence of a Service Removal Event other than under Section 5.1(j) of the Servicing Agreement, Section 4.1(c) of the Indenture provides that if a "Servicer Removal Event occurs, the Majority Noteholders may by an Act, and evidenced by written notice to the Issuer and the Trustee, instruct the Issuer and the Trustee to remove the current Servicer as Servicer and appoint a successor servicer as Servicer in accordance with the terms of the Servicing Agreement." Indenture, Section 4.1(c). Likewise, Section 5.1 of the Servicing Agreement provides that upon the occurrence of a Servicer Removal Event, other than under Section 5.1(j) of the Servicing Agreement, the Majority Noteholders may instruct the Issuer and the KCD Indenture Trustee to remove the current Servicer pursuant to Section 4.1(c) and Section 4.4(b) of the Indenture.

4831-7220-0834

- Direct the Manager with respect to the Debtor-Licensees' default of the Licensing Agreements;

- Make reasonable efforts to collect payments called for under the terms and provisions of the License Agreements and/or deposit the same into the Collection Account under the Indenture;

- Perform and produce calculations and reports as and when required, under to the Servicing Agreement and the Indenture; and

- Notify the KCD Indenture Trustee and/or Issuer, as applicable, with respect to (i) the Debtor Licensees' default with respect to the Licensing Agreements, (ii) the occurrence of a Servicer Removal Event and (iii) the occurrence of an Event of Default under the Indenture on account of the Issuer's failure to make a payment of interest on the Notes when due.

26.      Contemporaneously with the delivery of Servicer Compliance Demand Letter, the KCD Indenture Trustee sent a letter to counsel for the Servicer requesting information in accordance with Section 3.1 of the Servicing Agreement (the "Servicer Information Request," annexed hereto as **Exhibit G**). To date, the Servicer has not responded to the Servicer Information Request.

### *The Management Agreement and Defaults Thereunder*

27.      On May 18, 2006, the Issuer and the Manager entered into the Management Agreement. Pursuant to the Management Agreement, the Manager is responsible for performing a variety of tasks related to the Trademarks and to supervise the Servicer. *See* Management Agreement, Ex. A.

28.      On the same date, the Issuer, the KCD Indenture Trustee and the Back-Up Manager entered into the Back-Up Management Agreement.

29.      Section 4.1 (c) of the Indenture provides in pertinent part:

Notwithstanding anything in this Section 4.1(c) to the contrary, at any time while the … Manager is an Affiliate of Sears, if … a Manager Removal Event pursuant to clause (ix) of Section 5 (b) of the Management Agreement. occurs as a result of a voluntary bankruptcy event of Sears Holdings Corporation, then unless 100% of the Noteholders vote not to require removal, the Issuer and the Trustee shall … remove the current

9

Manager as Manager and appoint the Back-Up Manager as Manager in accordance with the Management Agreement and Back-Up Management Agreement, as applicable.

30.    Consistent with the foregoing, clause (ix) of Section 5(b) of the Management Agreement provides that "if the Manager is an Affiliate of Sears Holdings Corporation, the commencement by Sears Holdings Corporation of a voluntary case under the federal bankruptcy laws …" constitutes a Manager Removal Event. Management Agreement, Section 5(b)(ix).

31.    To date, the KCD Indenture Trustee has received no instruction from the Holder instructing the KCD Indenture Trustee not to remove the Manager pursuant to the foregoing provisions.

32.    On December 16, 2018, KCD Indenture Trustee sent the letter demanding that the Manager perform its obligations under the Management Agreement (the "Manager Compliance Demand Letter," annexed hereto as **Exhibit H**).

33.    To date, the Manager has neither responded to the Manager Compliance Demand Letter nor provided assurance of its intent to perform its obligations under the Management Agreement.

34.    On December 7, 2018, the KCD Indenture Trustee asked counsel for the Debtors to assent to a request for a grant of relief from the automatic stay. On December 24, 2018, counsel for the Debtors declined to agree to the relief requested.

## **RELIEF REQUESTED**

35.    By this Motion, the KCD Indenture Trustee respectfully requests entry of an Order in the form attached hereto as **Exhibit I** (a) granting relief from the automatic stay to remove and replace Sears Holdings Management Corporation as Servicer and Sears Brands Business Unit Corporation as Manager in accordance with the terms and conditions of their respective agreements; and (b) compelling Sears Holdings Management Corporation, as

Servicer, and Sears Brands Business Unit Corporation, as Manager, to perform their respective

obligations pending their removal and replacement.

## BASIS FOR RELIEF

**A.    Cause Exists to Grant Relief from the Automatic Stay to Permit the KCD Indenture Trustee to Exercise Removal Rights with Respect to the Servicer and/or Manager.**

36.    Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in

interest and after notice and a hearing, the court shall grant relief from the stay … such as by

terminating, annulling, modifying, or conditioning such stay — (1) for cause …" 11 U.S.C. §

362(d)(1). The Bankruptcy Code does not define "cause." *See Spencer v. Bogdanovich (In re*

*Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002). Because the Bankruptcy Code does not define

"cause," courts conduct case-by-case inquiries and look into the totality of the circumstances to

determine whether sufficient cause exists to grant relief from the automatic stay. *See, e.g., In re*

*Balco Equities Ltd., Inc.,* 312 B.R. 734, 738 (Bankr. S.D.N.Y. 2004).

37.    It is well settled that the decision to lift the automatic stay is within the discretion

of the bankruptcy court. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).

38.    Here, where it appears that both the Servicer and Manager have abrogated all of

their duties, "cause" exists to replace them. Specifically, "cause" exists because the KCD

Indenture Trustee's interest in the Trademarks, as collateral under the Indenture, is not

adequately protected. *See In re B-K of Kansas, Inc.,* 69 B.R. 812, 815 (Bankr. D. Kan. 1987)

(finding "cause" to exist pursuant to section 362(d)(1) of the Bankruptcy Code due to a lack of

adequate protection where franchisee continued to use trademarks without making royalty

payments post-petition). Moreover, relief is especially appropriate in this instance, because

performance of the duties at issue — as opposed to the payment of money — is arguably the

only acceptable form of adequate protection. *Id.* at 815 (finding "the property in this case, the use

of trademarks and service marks, is of such a type that money may never adequately protect the

11

movant"); *see also In re Tudor Motor Lodge Assocs., Ltd. P'ship.*, 102 B.R. 936, 957 (Bankr.

D.N.J. 1989) (granting relief from automatic stay where franchisor lacked adequate protection

with regard to the debtor's continued use of trademarks).

39.     Finally, cause exists here where there is an expedited sale process, because a

functioning Servicer and Manager are required to protect KCD IP's rights during that sale

process, such as enforcing cure obligations and evaluating and, if necessary, demanding,

adequate assurance of future performance.

**B.     Pending Removal and Replacement, the Servicer and the Manager Should Be
Compelled to Perform Their Respective Obligations as Adequate Protection of
the Collateral Under the Indenture.**

40.     Section 363(e) of the Bankruptcy Code, in relevant part, provides:

> Notwithstanding any other provision of this section, at any time, on request
> of an entity that has an interest in property used, sold, or leased, or proposed
> to be used, sold, or leased by the trustee, the court, with or without a
> hearing, shall prohibit or condition such use, sale, or lease as is necessary to
> provide adequate protection of such interest.

11 U.S.C. § 363(e). "Adequate protection protects the holder of an interest in property of a

bankruptcy estate from the adverse effects of the imposition of the automatic stay." *See United*

*Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs., Ltd*., 484 U.S. 365, 370 (1988).

41.     The nature of adequate protection is provided by Section 361 of the Bankruptcy

Code, which states that adequate protection may be provided by:

(1) Requiring the trustee to make a cash payment or periodic cash payments to
such entity, to the extent that the stay under section 362 of this title, use,
sale, or lease under section 363 of this title, or any grant of a lien under
section 364 of this title results in a decrease in the value of such entity's
interest in such property;

(2)  Providing to such entity an additional or replacement lien to the extent that
such stay, use, sale, lease or grant results in a decrease in the value of such
entity's interest in such property; or

(3) Granting such other relief, other than entitling such entity to compensation
allowable under section 503(b)(1) of this title as an administrative expense,

as will result in the realization by such entity of the indubitable equivalent
of such entity's interest in such property.

*See* 11 U.S.C. § 361. The list of adequate protection options set forth in section 361 is not

exhaustive, and a court may authorize other forms of adequate protection as may be required by

particular facts and circumstances. *See In re Watkins*, Nos. 05-CV-344 & 05-CV-790, 2005 U.S.

Dist. LEXIS 44754, at *8 (E.D.N.Y. Aug. 23, 2005) (indicating that section 361 lists non-

exclusive means for providing adequate protection); *In re 495 Cent. Park Ave. Corp.*, 136 B.R.

626, 631 (Bankr. S.D.N.Y. 1992) (same); *In re Aurora Cord & Cable Co.*, 2 B.R. 342, 346

(Bankr. N.D. Ill. 1980) ("Section 361 illustrates some forms of adequate protection, but it is by

no means exhaustive or inclusive").

42.    Here, the property rights in question include: (a) the KCD Indenture Trustee's

rights as a contract counter-party on the Servicing Agreement and its indirect beneficial rights

under the Management Agreement, and (b) its rights as a lien holder on the collateral including

the Trademarks. To the knowledge of the KCD Indenture Trustee, the Debtor Licensees have

continuously used the Trademarks, Licenses and Sublicenses during the pendency of these cases

without making any payments to the Issuer. The Servicer and the Manager (also Debtors, in

these cases) are not the parties directly responsible for making those payments, but they are the

parties responsible for policing the use of the Trademarks and enforcing the License Agreements

against the Debtor Licensees and collecting the amounts owing thereunder and remitting the

same to the KCD Indenture Trustee. Their failure to do so, and the daily uncompensated uses of

the Trademarks and Licenses and Sublicenses, threatens and diminishes the value of the

collateral under the Indenture and deprives the KCD Indenture Trustee of the benefits of the

Servicing Agreement. While the KCD Indenture Trustee is not, at this time, seeking to exercise

remedies under the Indenture or to enforce its liens, it is seeking performance by the Servicer of

its contracted rights under the Servicing Agreement and to compel the Servicer and Manager to

meet their contractual obligations to protect the collateral or to stay a sale.

43.    Notably, the Servicer is not even providing Servicer Reports and, to date, has

ignored an information request made pursuant to the Servicing Agreement. *See* Servicer

Document Information Letter, pg. 1. The information requested is crucial to allow the KCD

Indenture Trustee to determine what actions may be appropriate or necessary, if any, with respect

to the Indenture, the Servicing Agreement, the Management Agreement, the Back-Up

Management Agreement and the collateral. Therefore, the KCD Indenture Trustee respectfully

requests that any Order compelling the Servicer to perform its obligations under the Servicing

Agreement, as set forth herein, specifically compel the Servicer to produce any and all Servicer

Reports, whether past due or to become due, for the post-petition period.

## NOTICE

44.    Notice of this Motion will be provided in accordance with the procedures set forth

in the Amended Order Implementing Certain Notice and Case Management Procedures (ECF

No. 405) (the "Case Management Order"). The KCD Indenture Trustee respectfully submits that

no further notice is required.

## NO PRIOR REQUEST

45.    No previous request for the relief sought herein has been made by the KCD

Indenture Trustee to this or any other Court.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

4831-7220-0834

## CONCLUSION

46.     WHEREFORE, the KCD Indenture Trustee respectfully requests that the Court enter an order in the form attached hereto, granting relief as set forth herein and providing such other relief as this Court deems just and proper.

Dated: December 27, 2018

**NIXON PEABODY LLP**

By: */s/Christopher M. Desiderio*
Christopher M. Desiderio
55 West 46th Street
New York, NY 10036
Tel.: 212-940-3000
Fax: 212-940-3111
cdesderio@nixonpeabody.com

and

Richard C. Pedone (*pro hac vice*)
100 Summer Street
Boston, MA 02110
Telephone: 617-345-1000
Facsimile: 617-345-1300
rpedone@nixonpeabody.com

*Counsel to U.S. Bank National Association,
N.A., as Indenture Trustee*

4831-7220-0834

**EXHIBIT A**

**EXECUTION COPY**

**KCD IP, LLC,**
as Issuer

and

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee

**INDENTURE**

Dated as of May 18, 2006

$1,800,000,000
6.90% KCD IP, LLC ASSET-BACKED NOTES

# TABLE OF CONTENTS

**Page**

ARTICLE I     DEFINITIONS AND OTHER PROVISIONS OF GENERAL
APPLICATION ........................................................................................ 3

Section 1.1.   Definitions ........................................................................... 3
Section 1.2.   Acts of Noteholders ............................................................ 3
Section 1.3.   Notices ................................................................................ 4
Section 1.4.   Notices to Noteholders; Waiver .......................................... 5
Section 1.5.   Effect of Headings and Table of Contents .......................... 6
Section 1.6.   Successors and Assigns ....................................................... 6
Section 1.7.   Severability ......................................................................... 6
Section 1.8.   Benefits of Indenture .......................................................... 6
Section 1.9.   GOVERNING LAW ............................................................ 6
Section 1.10.   Counterparts ........................................................................ 6
Section 1.11.   Consents .............................................................................. 6
Section 1.12.   Nondisturbance ................................................................... 6
Section 1.13.   Recording of Indenture and Financing Statements ............. 7
Section 1.14.   No Petition Covenant ........................................................... 7
Section 1.15.   WAIVERS OF JURY TRIAL ............................................. 8
Section 1.16.   SUBMISSION TO JURISDICTION .................................. 8
Section 1.17.   Tax Purposes ....................................................................... 8
Section 1.18.   Confidentiality .................................................................... 8

ARTICLE II     THE NOTES ................................................................. 10

Section 2.1.   Form .................................................................................. 10
Section 2.2.   Designation of Notes; Certain Related Provisions ............. 10
Section 2.3.   Denominations .................................................................. 10
Section 2.4.   Execution, Authentication, Delivery and Dating ............... 10
Section 2.5.   Registration, Registration of Transfer and Exchange ........ 11
Section 2.6.   Limitation on Transfer and Exchange ............................... 12
Section 2.7.   Mutilated, Destroyed, Lost or Stolen Notes ...................... 13
Section 2.8.   Payment of Principal and Interest ..................................... 13
Section 2.9.   Persons Deemed Owners ................................................... 14
Section 2.10.   Cancellation ...................................................................... 14
Section 2.11.   Delivery of the Notes ........................................................ 14
Section 2.12.   Book-Entry Notes ............................................................. 15
Section 2.13.   Notices to Clearing Agency .............................................. 15
Section 2.14.   Definitive Notes ............................................................... 16

ARTICLE III     SATISFACTION AND DISCHARGE ......................... 16

Section 3.1.   Satisfaction and Discharge of Indenture ........................... 16
Section 3.2.   Application of Trust Money ............................................... 17
Section 3.3.   Discharge of Security Interest ........................................... 17

# TABLE OF CONTENTS
(continued)

Page

ARTICLE IV    CERTAIN EVENTS, DEFAULTS AND REMEDIES ................................ 17

Section 4.1.    Cash Trapping, Rapid Amortization and Servicer, Manager and Back-Up Manager Removal Events .................................................. 17
Section 4.2.    Events of Default ............................................................................ 19
Section 4.3.    Acceleration of Maturity, Rescission and Annulment ...................... 21
Section 4.4.    Remedies ......................................................................................... 22
Section 4.5.    Trustee May File Claim .................................................................. 23
Section 4.6.    Trustee May Enforce Claims Without Possession of Notes .............. 23
Section 4.7.    Allocation of Money Collected ....................................................... 24
Section 4.8.    Limitation on Suits ......................................................................... 24
Section 4.9.    Unconditional Right of Noteholders to Receive Principal and Interest ............................................................................................. 25
Section 4.10.    Restoration of Rights and Remedies ................................................ 25
Section 4.11.    Rights and Remedies Cumulative .................................................... 26
Section 4.12.    Delay or Omission Not Waiver ....................................................... 26
Section 4.13.    Control by Noteholders ................................................................... 26
Section 4.14.    Waiver of Past Defaults .................................................................. 26
Section 4.15.    Undertaking for Costs ..................................................................... 27
Section 4.16.    Waiver of Stay or Extension Laws .................................................. 27
Section 4.17.    Sale of Collateral ............................................................................ 27
Section 4.18.    Action on Notes .............................................................................. 28

ARTICLE V    THE TRUSTEE; RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE ....................................................................................... 28

Section 5.1.    Certain Duties and Responsibilities of Trustee ................................ 28
Section 5.2.    Notice of Default, Cure or Waiver ................................................... 30
Section 5.3.    Certain Rights of Trustee ................................................................ 30
Section 5.4.    Not Responsible for Recitals or Issuance of Notes .......................... 31
Section 5.5.    May Hold Notes .............................................................................. 31
Section 5.6.    Money Held in Trust ....................................................................... 31
Section 5.7.    Compensation and Reimbursement ................................................. 32
Section 5.8.    Trustee Eligibility .......................................................................... 32
Section 5.9.    Resignation and Removal; Appointment of Successor ..................... 33
Section 5.10.    Acceptance of Appointment by Successor ....................................... 34
Section 5.11.    Merger, Conversion, Consolidation or Succession to Business of Trustee ....................................................................................... 34
Section 5.12.    Co-trustees and Separate Trustees ................................................... 34
Section 5.13.    Rights of Trustee in Capacity of Paying Agent, Transfer Agent or Registrar ..................................................................................... 35
Section 5.14.    Representations and Warranties of the Trustee ................................ 36

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE VI        SUPPLEMENTAL INDENTURES ............................................................ 36

Section 6.1.        Supplemental Indenture Without Consent of Noteholders ............... 36
Section 6.2.        Supplemental Indentures With Consent of Noteholders ................... 37
Section 6.3.        Execution of Supplemental Indentures ............................................ 38
Section 6.4.        Effect of Supplemental Indentures .................................................. 38
Section 6.5.        Reference in Notes to Supplemental Indenture ............................... 38
Section 6.6.        Solicitation of Noteholders ............................................................ 38

ARTICLE VII       REDEMPTION OF NOTES ........................................................................ 39

Section 7.1.        Redemption at the Option of the Issuer .......................................... 39
Section 7.2.        Redemption in Connection with the Release of an Asset ................ 39
Section 7.3.        Notice of Redemption by the Issuer ............................................... 39
Section 7.4.        Deposit of the Redemption Price or Payoff Amount ...................... 40
Section 7.5.        Notes Payable on Redemption Date; Less than All Notes to be
                    Redeemed ....................................................................................... 40
Section 7.6.        Final Redemption ........................................................................... 41

ARTICLE VIII      REPRESENTATIONS, WARRANTIES AND COVENANTS ................... 41

Section 8.1.        Payment of Principal and Interest ................................................... 41
Section 8.2.        Maintenance of Office or Agency ................................................... 41
Section 8.3.        Money for Note Payments to Be Held in Trust .............................. 41
Section 8.4.        Continued Existence; Observance of Organizational
                    Documents ...................................................................................... 42
Section 8.5.        Protection of Collateral .................................................................. 42
Section 8.6.        Biennial Opinion and Certificates as to Collateral ......................... 43
Section 8.7.        Negative Covenants ........................................................................ 44
Section 8.8.        Statement as to Compliance ........................................................... 45
Section 8.9.        Inspection ....................................................................................... 45
Section 8.10.       Limited Purpose ............................................................................. 46
Section 8.11.       Issuer Ownership ............................................................................ 46
Section 8.12.       Enforcement of Transaction Documents ......................................... 46
Section 8.13.       Representations and Warranties ...................................................... 46
Section 8.14.       Certain Affirmative Covenants ....................................................... 49
Section 8.15.       Representations with Respect to Assets ........................................... 50

ARTICLE IX        ACCOUNTS, ACCOUNTINGS AND RELEASES .................................... 52

Section 9.1.        Accounts ......................................................................................... 52
Section 9.2.        Collection and Distribution of Monies ........................................... 55
Section 9.3.        Release of Assets ............................................................................ 55
Section 9.4.        Monthly Statement of Trustee ........................................................ 56
Section 9.5.        Collateral ........................................................................................ 56

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|

ARTICLE X        APPLICATION OF MONIES ........................................................................ 56

    Section 10.1.        Disbursements of Monies from the Distribution Account ................. 56

    Section 10.2.        Disbursement of Monies out of the Trapping Account and
Reserve Account ....................................................................................... 58

    Section 10.3.        Eligible Investments ................................................................................ 59

    Section 10.4.        Excess Costs .............................................................................................. 59


APPENDIX A        Standard Definitions

EXHIBIT A        Form of Note

EXHIBIT B        Form of Assignment of Note

EXHIBIT C        Form of Servicer's Report

EXHIBIT D        Form of Investment Letter

EXHIBIT E        Substitute Form W-9

EXHIBIT F        Sears Trademarks

EXHIBIT G        Claims

SCHEDULE 1        Fiscal Months

This INDENTURE (as amended from time to time as permitted hereby, the "Indenture") is dated as of May 18, 2006, and is by and between KCD IP, LLC, a Delaware limited liability company (together with its permitted successors and assigns, the "Issuer"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, acting hereunder as indenture trustee and not in its individual capacity (together with its permitted successors and assigns, the "Trustee").

## PRELIMINARY STATEMENT

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of a single class of 6.90% KCD IP, LLC Asset-Backed Notes (as the same may be amended pursuant to the terms hereof, the "Notes").

All covenants and agreements made by the Issuer herein are for the benefit and security of the Noteholders. The Issuer is entering into this Indenture, and the Trustee is accepting the trust created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee for the exclusive benefit of the Secured Parties a Lien upon and a security interest in all of the Issuer's right, title and interest, whether now owned or hereafter created, in and to the following (including, without limitation, all after-acquired property related thereto) (collectively, the "Collateral"):

(a)    the Assets;

(b)    all monies, cash, securities, instruments and other property held from time to time by, or on behalf of, the Trustee under the terms of this Indenture, including amounts set apart and transferred to the Collection Account, the Distribution Account, the Trapping Account or the Reserve Account or otherwise transferred to the Trustee hereunder and all investment earnings on any of the foregoing, subject to disbursements from such accounts in accordance with the provisions of this Indenture;

(c)    the Contribution Agreement, the Management Agreement, the Back-Up Management Agreement, the Servicing Agreement, the Licenses and the Sublicenses, in each case as the same may be modified, amended, supplemented or restated from time to time, including all rights to receive payment of any amounts which may become payable to the Issuer thereunder (directly or as assignee thereof), all payments received by the Issuer thereunder, all rights of the Issuer to serve notices and/or make demands thereunder and/or to take such steps as are required to cause payments due and payable to the Issuer thereunder to become due and payable thereunder, all rights of action of the Issuer in respect of any breach thereof and all rights of the Issuer to indemnification and to receive damages or obtain other relief with respect thereto, together with all instruments, chattel paper or letters of credit evidencing, representing, arising from or existing in respect of, relating to, securing or otherwise supporting the payments of amounts due under such documents;

(d)    all books and records concerning the foregoing property (including, without limitation, all tapes, disks, electronic files and related items containing any such information);

(e)    any and all other property of every kind and nature from time to time which was heretofore or hereafter is, by delivery or by writing of any kind, conveyed, mortgaged, pledged, assigned or transferred by the Issuer or by any other Person, with or without the consent of the Issuer, to the Trustee as security for the Liabilities, and the Trustee is hereby authorized to receive any and all such property at any time and at all times to hold and apply the same subject to the terms hereof; and

(f)    all proceeds of the foregoing of any nature whatsoever, including, without limitation, proceeds from the conversion, voluntary or involuntary, of any thereof,

provided, that, notwithstanding anything to the contrary contained in this Indenture, the Issuer does not hereby grant, and the Trustee and the Noteholders (by acceptance of their Note) hereby acknowledge that the Issuer is not hereby granting, a security interest in the rights related to the Sears Trademarks identified in Section 2(e) of the Contribution Agreement.

Such Grants are only made, however, in trust, solely to secure (i) the Notes equally and ratably without prejudice, priority or distinction among the Notes by reason of difference in time of authentication or delivery or otherwise, (ii) the payment of all other sums payable under this Indenture, and (iii) compliance with the provisions of this Indenture, all as provided in this Indenture.

It is expressly agreed that anything herein contained to the contrary notwithstanding, the Issuer shall not, other than as required by applicable law, be released from any of its obligations under any of the Collateral, and the Trustee and the Noteholders shall have no obligation or liability under any Collateral by reason of or arising out of the assignment hereunder, nor shall the Trustee or the Noteholders be required or obligated in any manner to perform or fulfill any obligations of the Issuer under or pursuant to any of the Collateral or such other documents or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by them, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

The Issuer does hereby warrant and represent that (i) except for Permitted Liens, it has not permitted and hereby covenants that it will not permit the creation of any Lien other than Permitted Liens with respect to any part of the Collateral, so long as this Indenture shall remain in effect, to anyone other than the Trustee, and (ii) the representations and warranties of the Issuer contained in this Indenture are true and correct.

The Trustee acknowledges such Grant, accepts the trusts hereunder in accordance with the provisions of this Indenture and agrees to perform the duties herein required of it. So long as any Note remains Outstanding, the Trustee shall act for the benefit of the Noteholders as their interests may appear to the extent provided herein.

The Trustee agrees to maintain in its possession each item of Collateral constituting a contract or chattel paper under the UCC delivered to it unless and until such item of Collateral is released from the Lien hereof pursuant to Article III or Section 9.3 hereof.

All things necessary to make this Indenture a valid agreement of the Issuer in accordance with its terms have been done.

## ARTICLE I

### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.1.    Definitions

(a)    Except as otherwise expressly provided herein or unless the context otherwise requires, the capitalized terms used in the Indenture shall have the respective meanings specified in the Standard Definitions set forth as Appendix A hereto, which is incorporated herein by reference. The definitions of such terms are equally applicable both to the singular and plural forms of such terms.

(b)    All references in this instrument to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed or if amended or supplemented, as so amended and supplemented. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, Subsection or other subdivision.

(c)    The word "including" and other words of similar import mean "including, without limitation," whether or not so stated.

Section 1.2.    Acts of Noteholders

(a)    If, at any time, there is more than one Noteholder, any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by the Noteholders shall, unless otherwise expressly provided herein, be taken by the Holders of greater than 50% of the Aggregate Note Principal Balance (the "Majority Noteholders") and, whether to be taken by all or less than all of the Noteholders, may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is herein expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 5.1) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee reasonably deems sufficient.

(c)    The ownership of Notes shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by any Noteholder shall bind each subsequent Noteholder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 1.3.    Notices.    Except as otherwise provided, any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other document provided or permitted by this Indenture shall be in writing and shall be effective (a) upon receipt, or (b) on the date personally delivered to an Authorized Officer of the party to which sent, or (c) on the date transmitted by facsimile transmission with a confirmation of receipt, in all cases addressed to the recipient at the address specified below or at such other address provided in writing by the applicable recipient.

| If to the Trustee: | U.S. Bank National Association<br>209 S. LaSalle Street, 3rd Floor<br>Chicago, Illinois 60604-1219<br>Attention:  Corporate Trust/KCD IP<br>Telephone: (312) 325-8902<br>Facsimile:  (312) 325-8905 |
|---|---|
| If to the Issuer: | KCD IP, LLC<br>c/o Sears Holdings Management Corporation<br>3333 Beverly Road<br>Hoffman Estates, IL 60179<br>Attention:    Dawn Eber<br>Telephone:  (847) 286-0440<br>Facsimile:   (847) 286-1699 |
| If to the Manager: | Sears Intellectual Property Management Company<br>3333 Beverly Road<br>Hoffman Estates, IL 60179<br>Attention:    Mary Tortorice<br>Telephone:  (847) 286-2966<br>Facsimile:   (847) 286-0266 |
| If to the Servicer: | Sears Holdings Management Corporation<br>3333 Beverly Road<br>Hoffman Estates, IL 60179<br>Attention:    Dawn Eber<br>Telephone:  (847) 286-0440<br>Facsimile:   (847) 286-1699 |

| If to Moody's: | Moody's Investor Service, Inc.<br>99 Church Street<br>New York, New York 10007<br>Attention:  Jay H. Eisbruck<br>                    Managing Director<br>Telephone:  (212) 553-4377<br>Facsimile:  (212) 553-7820<br><br>Moody's Investor Service, Inc.<br>99 Church Street<br>New York, New York 10007<br>Attention:  Olga Filipenko<br>                Assistant Vice President<br>Telephone:  (212) 553-4624<br>Facsimile:  (212) 553-0573 |
| If to the Back-Up Manager: | Ocean Tomo, LLC<br>200 West Madison, 37th Floor<br>Chicago, IL 60606<br>Attention:   Raymond Millien<br>Telephone:  (312) 327-4407<br>Facsimile:   (312) 327-4401 |

Section 1.4.    Notices to Noteholders; Waiver.  Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and sent by mail, overnight courier or hand delivery, to each Noteholder, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.   Any notice which is mailed in the manner herein provided shall be deemed effective upon receipt or refusal.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by the Noteholders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to the Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be reasonably satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to the Rating Agency, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstances constitute an Event of Default.

Section 1.5.    Effect of Headings and Table of Contents.    The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 1.6.    Successors and Assigns.  All covenants and agreements in this Indenture by the Issuer shall bind its successors and assigns, whether so expressed or not.  All agreements of the Trustee in this Indenture shall bind its successors, Co-Trustees and agents.

Section 1.7.    Severability.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 1.8.    Benefits of Indenture.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto, and any of their successors hereunder and the Noteholders, and any other party secured hereunder, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 1.9.    GOVERNING LAW.  THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS RULES (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Section 1.10.    Counterparts.    This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 1.11.    Consents.  Any consent of any of the parties hereto required pursuant to this Agreement shall not be unreasonably withheld or delayed.

Section 1.12.    Nondisturbance.  Notwithstanding anything to the contrary herein or in any other Transaction Document, the Trustee agrees that, and each Noteholder by its acceptance of a Note agrees that, the exercise of any remedies by the Trustee or Noteholders under Article IV of this Indenture upon the occurrence of an Event of Default shall not (i) operate to terminate or impair the rights of the administrative agent (currently, JPMorgan Chase Bank, N.A.) on behalf of certain lenders, pursuant to the Sears Credit Agreement and the Guarantee and Collateral Agreement (or any restatement, replacement or refinancing thereof), with respect to the Related Intellectual Property (as defined in the Sears Credit Agreement, or any comparable term used in any replacement thereof), and the Trustee and each Noteholder agree they will not disturb or take any action to impair such administrative agent's or lenders' rights in such Related Intellectual Property, (ii) operate to terminate or impair the rights of the administrative agent (currently, JPMorgan Chase Bank, N.A.) on behalf of certain lenders, pursuant to the Orchard Credit Agreement and the Pledge and Security Agreement (or any restatement, replacement or refinancing thereof), with respect to the Sears Tradenames in the Territory as reasonably necessary to permit such agent to enforce its rights in the collateral thereunder (such intellectual property rights, the "Orchard Related Intellectual Property"), and the Trustee and each

Noteholder agree they will not disturb or take any action to impair such administrative agent's or lenders' rights in such Orchard Related Intellectual Property, or (iii) operate to terminate or impair the rights of any sublicensee under any Qualified Sublicense, as long as the sublicensee under such Qualified Sublicense is not in default (beyond any applicable grace or cure period) and the sublicensee thereafter pays royalties due thereunder (at the rates set forth therein) to the Licensor or its successors and assigns, including the Trustee (or the Servicer on their behalf), and the Trustee and each Noteholder by acceptance of its Note agree they will not disturb or take any action to impair such sublicensee's rights under the applicable Qualified Sublicense. Each of the Issuer, the Trustee and each Noteholder by its acceptance of a Note further agrees that (i) it will take no action in conflict with the nondisturbance provisions included in the Contribution Agreement related to the rights of the lenders under the Sears Credit Agreement, the Guarantee and Collateral Agreement, the Orchard Credit Agreement and the Pledge and Security Agreement, (ii) while any License is in effect, it will take no action in conflict with the provisions of Section 2(c) of each License, and (iii) JPMorgan Chase Bank, N.A., as administrative agent on behalf of the lenders under the Sears Credit Agreement, and as administrative and collateral agent on behalf of the lenders under the Orchard Credit Agreement and any sublicensee under a Qualified Sublicense, shall be an express third party beneficiary of this Section 1.12 with rights of enforcement in its own name. Notwithstanding the foregoing, prior to termination of the applicable License, the applicable licensee shall have the right to terminate, amend, modify or restate, or waive any provision of, such Sublicense, without the consent of the Issuer, the Trustee, the Servicer, the Manager or the Back-Up Manager, provided, however, no such amendment, modification, restatement or waiver of a Qualified Sublicense shall be binding upon such person unless either: (i) it is consented to by such person (or in the case of the Trustee, the Servicer on its behalf) or (ii) the Qualified Sublicense as so amended, modified, restated or waived then satisfies the requirements to constitute a Qualified Sublicense unless the proviso to the last sentence of Section 2(c) of the applicable License shall have been satisfied. The Issuer and the Trustee shall promptly cause to be taken, executed, acknowledged or delivered all such further acts, conveyances, documents and assurances as may from time to time be reasonably requested by JPMorgan Chase Bank, N.A. in the above-referenced capacities or any Qualified Sublicensee to confirm, effect or preserve the provisions of, and the rights set forth in, this Section 1.12. The Issuer will provide the Trustee with copies of the Sears Credit Agreement, the Guarantee and Collateral Agreement, the Orchard Credit Agreement, the Pledge and Security Agreement, each Qualified Sublicense and any amendments thereto on the Closing Date, or in the case of any such documents executed after the Closing Date, upon request of the Trustee.

Section 1.13. <u>Recording of Indenture and Financing Statements</u>. If this Indenture is subject to recording in any appropriate public recording office, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel (which may be counsel to the Issuer, the Trustee or any other counsel reasonably acceptable to the Trustee) to the effect that such recording is necessary either for the protection of the Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to the Trustee under this Indenture. Alternatively, if UCC filings or other financing statements are necessary or appropriate, the Issuer will cause their filing in accordance with <u>Section 8.5</u>.

Section 1.14. <u>No Petition Covenant</u>. Notwithstanding any prior termination of this Indenture, the Trustee agrees that it shall not, and each Noteholder by its acceptance of a Note

agrees that it shall not, prior to the date which is one year and one day after the Notes (including all interest and premium, if any, thereon) shall have been paid in full, acquiesce, petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer under any bankruptcy, insolvency, liquidation or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or ordering the winding up or liquidating of the affairs of the Issuer.

Section 1.15. <u>WAIVERS OF JURY TRIAL</u>.  THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS INDENTURE AND FOR ANY COUNTERCLAIM THEREIN.

Section 1.16. <u>SUBMISSION TO JURISDICTION</u>.    THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, AND THE ISSUER, THE TRUSTEE AND BY ACCEPTANCE OF ITS NOTE, EACH NOTEHOLDER, HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH FEDERAL OR NEW YORK STATE COURT. THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.   THE ISSUER AND THE TRUSTEE IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO IT AT ITS OFFICE SET FORTH IN <u>SECTION 1.3 OR IN THE NOTE REGISTER, AS APPLICABLE</u>. THE ISSUER AND THE TRUSTEE AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

Section 1.17. <u>Tax Purposes</u>.  The Issuer and each Noteholder and each holder of a beneficial interest in a Note, by acceptance of its Note, or its interest in a Note, as applicable, shall be deemed to have agreed to treat, and shall treat, such Note as unconditional debt of the Issuer for U.S. income tax purposes.

Section 1.18. <u>Confidentiality</u>

(a)    When the Trustee receives Confidential Information, it shall:

(i)    use the Confidential Information only for purposes of the Transaction;

(ii)    not disclose the Confidential Information to any third parties, except to the Noteholders and the Trustee's directors, partners, employees, agents or advisers,

including attorneys (collectively, the "Representatives"), who need to know it for the purposes of the Transaction, and who have agreed to hold it confidential;

(iii)    copy the Confidential Information only as necessary to carry out the Transaction, and maintain confidentiality in the copying process; and

(iv)    use, and require its Representatives to use, no less than the degree of care the Trustee uses with its own Confidential Information, but in any event no less than reasonable care.

(b)    Information is not considered Confidential Information, even if it otherwise meets the definition thereof, if:

(i)    it was in the Trustee's possession prior to disclosure in connection with the Transaction, free of any confidentiality obligation;

(ii)    it has become publicly available without breach of this Section 1.18 by the Trustee;

(iii)    it was developed by the Trustee independent of the Confidential Information; or

(iv)    it was received by the Trustee from a third party without the Trustee's knowledge of an obligation of confidentiality owed to the Issuer or its Affiliates by that third party.

(c)    The Trustee may disclose Confidential Information in any legal proceeding relating to the Transaction, and in any other legal proceeding if, in its attorney's opinion, the Trustee is legally required to disclose it. In either case, the Trustee shall disclose the information only to the arbitrator, court or other governmental authority, as the case may be, or as otherwise mandated by binding legal process, and the Trustee shall notify the Issuer a reasonable time prior to such disclosure, to the extent that the Trustee may lawfully do so, to allow the Issuer or its Affiliates to seek appropriate protective measures. Furthermore, the Trustee may disclose Confidential Information to its accountants and auditors for required auditing and accounting purposes and to its bank regulators and examiners for required regulatory purposes.

(d)    The Trustee agrees to maintain the confidentiality of Confidential Information in accordance with this Section 1.18 for five (5) years after the termination of this Indenture.

(e)    Within ten Business Days after the termination of this Indenture or receipt of the Issuer's written request, the Trustee shall destroy all Confidential Information, or if requested by the Issuer, return it to the Issuer. If requested, the Trustee shall certify in writing to the Issuer that it has destroyed or returned all Confidential Information as required.

(f)    The Trustee acknowledges that, in the event of any breach of this Section 1.18, the Issuer and its Affiliates would be irreparably and immediately harmed and could not be made whole by money damages alone. Accordingly, in the event the Trustee or any of its Representatives uses, discloses, or is likely to use or disclose Confidential Information in breach

of this Section 1.18, the Issuer, in addition to any other remedy to which it maybe entitled in law or equity, will be entitled to temporary and permanent injunctive relief.

## ARTICLE II

## THE NOTES

Section 2.1.    Form.    The Notes and the Trustee's certificate of authentication shall be in substantially the form set forth as Exhibit A with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be required to comply with the rules of any securities exchange on which the Notes may be listed, or as may, consistently herewith, be determined by the officers executing such Notes, as evidenced by their execution of the Notes.    Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2.    Designation of Notes; Certain Related Provisions.    The Notes shall be designated generally as the "6.90% KCD IP, LLC Asset-Backed Notes" of the Issuer.

The Notes and all accrued interest thereon shall be due and payable on the Legal Maturity Date to the extent not paid before such date.

All calculations of interest on the Notes are to be determined on the basis of a 360-day year of twelve 30-day months.

The Trustee shall, upon receipt of an Issuer Order, authenticate and deliver for original issue, Notes in an aggregate principal amount of $1,800,000,000.    The Aggregate Note Principal Balance at any time may not exceed such amount.    The aggregate principal amount of all Notes may not exceed such amount, except for Notes issued and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes, pursuant to Sections 2.5, 2.7 or 7.5 hereof.

The Notes are limited obligations of the Issuer, payable solely from and to the extent of the Collateral subject to the Lien of the Indenture.

Section 2.3.    Denominations.    On the Closing Date, the Notes are available in a minimum denomination of $1,000,000 and integral multiples of $1,000 in excess thereof.    After the Closing Date, replacement or substitute Notes issued pursuant to this Indenture shall be issued in a like principal amount of the Note or Notes being replaced, provided, that the outstanding principal balance thereof shall be the same as the Note or Notes being replaced.

Section 2.4.    Execution, Authentication, Delivery and Dating.    The Notes shall be executed on behalf of the Issuer by an Authorized Signatory which may be in facsimile form or otherwise reproduced thereon.    The signature of any of these officers on the Notes may be manual or facsimile. The Notes may be printed, lithographed, typewritten, mimeographed or otherwise produced. The Notes need not be sealed.

Notes bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication or delivery of such Notes or did not hold such offices at the date of authentication or delivery of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer together with an Issuer Order authorizing authentication thereof to the Trustee for authentication; and the Trustee shall authenticate and deliver such Notes as provided in this Indenture, provided, that the Aggregate Note Principal Balance shall not be in excess of the amount stated in Section 2.2, and provided, further, that any Notes issued and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Sections 2.5, 2.7 or 7.5 will be issued and authenticated in a like principal amount of the Note or Notes being replaced, provided, that the outstanding principal balance thereof shall be the same as the Note or Notes being replaced.

Each Note shall bear on its face the Issue Date and the Legal Maturity Date and be dated as of the date of its authentication.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein, executed by the Trustee by the manual signature of one of its authorized officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.  Each Noteholder shall provide the Trustee for recordation in the Note Register its mailing address for notices under this Indenture.

Section 2.5.    Registration, Registration of Transfer and Exchange.  The Trustee is hereby appointed as registrar of the Notes (the "Note Registrar"), as agent of the Issuer for transfer of the Notes (the "Transfer Agent") and as the agent of the Issuer for the payment of the Notes (the "Paying Agent") and the Trustee accepts such appointments.  The Trustee in its capacity as the Note Registrar shall cause to be kept a register (the "Note Register") in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Notes and the registration of transfers of Notes.

Upon surrender for registration of transfer of any Note at the office or agency of the Trustee to be maintained as provided in Section 8.2, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and in a like principal amount of the Note or Notes so surrendered.

At the option of any Noteholder, its Notes may be exchanged for other Notes of any authorized denominations and in a like principal amount of the Note or Notes so exchanged, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and deliver, the Notes which the Noteholder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuer, evidencing the same debt, entitled to the same benefits and subject to all the terms and conditions of this Indenture, as the Notes surrendered upon such registration of such transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall (if so required by the Issuer or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form and content satisfactory to the Issuer and the Trustee duly executed, by the Holder thereof or his attorney duly authorized in writing. The form of assignment set forth at Exhibit B hereof shall be deemed to be satisfactory for purposes of the last preceding sentence. Concurrently with any transfer, the transferring Noteholder shall provide the Trustee for recordation in the Note Register the mailing address of such transferee for service of any notices to be delivered pursuant to this Indenture and the payment of amounts due to such transferee.

No service charge shall be made to a Noteholder for any registration of transfer or exchange of Notes, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes, other than exchanges pursuant to Section 7.5 not involving any registration of transfer.

Prior to any sale or other disposition of any Note, the Holder transferring such Note will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such Note to the Trustee in exchange for a new Note or Notes pursuant to this Section.

Section 2.6. _Limitation on Transfer and Exchange_. The Notes have not been registered or qualified under the Securities Act or the securities laws of any state or other jurisdiction. No transfer of any Note shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and registration or qualification under applicable state and other securities laws or is exempt from such registration or qualification. In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and applicable state and other securities laws, the Issuer shall require, in order to assure compliance with the Securities Act, that the prospective transferee certify to the Issuer and the Trustee in writing the facts surrounding the transfer in the form of the investment letter described in Exhibit D hereto or such other form as the Issuer may agree to accept, in its sole discretion (each such letter, an "Investment Letter"). Neither the Issuer nor the Trustee is obligated to register or qualify the Issuer or Notes (or any offering or sale thereof) under the Securities Act or any other securities law.

For purposes of the Investment Company Act, at no time may the Notes, as shown in the Note Register, together with any other securities issued by the Issuer, be owned beneficially by more than 100 persons. In order to ensure compliance with these requirements, the registration of a Note upon the initial issuance or the registration of the transfer of a Note may be refused if as a result of such issuance or transfer, Notes, when taken together with such other securities, if any, will be beneficially owned by more than 100 persons. Such number of owners may be further limited by the doctrine of integration under the Investment Company Act, to the extent

applicable. Offers to purchase, and subsequent transfers, will be subject to the foregoing restrictions, and an investor's ability to resell the Notes (or any interest therein) may therefore be limited. By acceptance of its Note, each Noteholder acknowledges this restriction on issuance and transfer and agrees to abide by the foregoing.

Each purchaser and transferee of a Note will be deemed to represent and warrant that either (i) it is not acquiring the Note with the plan assets of a Benefit Plan or (ii) the acquisition, holding and disposition of the Notes will not give rise to a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or any similar applicable law.

The Issuer and the Trustee shall have no liability to the Noteholders or otherwise arising from a transfer of any Note in reliance upon the Investment Letter delivered in connection therewith.

Section 2.7.   Mutilated, Destroyed, Lost or Stolen Notes.  If (i) any mutilated Note is surrendered to the Trustee, or the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Trustee such security or indemnity as may be required by the Trustee to indemnify and hold the Issuer and the Trustee harmless (which in the case of the Initial Noteholders or any Noteholder (or its guarantor, if applicable) that is, or is a subsidiary of, a bank or other institutional buyer with a net worth of at least the amount of the applicable Note, and whose claims paying ability or long term debt is rated at least investment grade or better by a Rating Agency, need only be such purchaser's unsecured promise of indemnity in form reasonably satisfactory to the Trustee), then, in the absence of notice to the Issuer or the Note Registrar that such Note has been acquired by a bona fide purchaser, the Issuer shall execute and upon its request the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a new Note of the same tenor in a like principal amount of the Note being replaced, bearing a number not contemporaneously outstanding; provided, however, that, if any such mutilated, destroyed, lost or stolen Note shall have become or shall be about to become due and payable, the Issuer in its discretion may, instead of issuing a new Note, pay such Note.

Upon the issuance of any new Note under this Section 2.7, the Issuer or the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto, but no service charge may be imposed in connection therewith.

Every new Note issued pursuant to this Section 2.7 in lieu of any destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.8.   Payment of Principal and Interest.  The principal of and interest on the Notes are payable by wire transfer in immediately available funds to the Person whose name

appears as the Registered Holder of such Note in the Note Register on the relevant Determination Date to the account specified in directions delivered by the Registered Holder at least five (5) Business Days prior to the relevant Payment Date. Such payment shall be in such coin or currency of the United States of America as at the time of tender is legal tender for the payment of public and private debts. Payments pursuant to <u>Section 10.1</u> shall be made to each Noteholder, if there is more than one, based on the Percentage Interests represented by Notes held by such Noteholder. Upon the final payment in full of any Note, the Noteholder shall promptly surrender such Note at the Corporate Trust Office of the Trustee.

To prevent backup withholding on payments made with respect to the Notes, each Noteholder is required to provide the Trustee with (i) the Noteholder's correct taxpayer identification number ("<u>TIN</u>") by completing the form at <u>Exhibit E</u> (Substitute Form W-9), certifying that the TIN provided on the Substitute Form W-9 is correct (or that such Noteholder is awaiting a TIN) and that (A) such Noteholder is exempt from backup withholding, (B) the Noteholder has not been notified by the IRS that the Noteholder is subject to backup withholding as a result of failure to report all interest or dividends or (C) the IRS has notified the Noteholder that the Noteholder is no longer subject to backup withholding, or (ii) if applicable, an adequate basis for exemption. A Foreign Noteholder may qualify as an exempt recipient by submitting to the Trustee a properly completed IRS Form W-8BEN or W-8ECI, as applicable, signed under penalties of perjury, attesting to that Noteholder's exempt status.

Section 2.9.    <u>Persons Deemed Owners</u>. Prior to due presentment for registration of transfer of any Note, the Issuer, the Trustee and any agent of the Issuer or the Trustee, the Note Registrar, any Paying Agent and any of their respective agents may treat the Person in whose name any Note is registered as the owner of such Note for the purpose of receiving payments of principal of and interest on such Note (subject to <u>Section 2.8</u>), delivery of all notices in respect of such Note, determination of matters put to the vote of Noteholders and for all other purposes whatsoever, whether or not such Note be overdue, and neither the Issuer, the Trustee, the Note Registrar, any Paying Agent nor any of their respective agents shall be affected by notice to the contrary.

Section 2.10.    <u>Cancellation</u>. All Notes surrendered to the Trustee following payment or for registration of transfer or exchange (including Notes surrendered to any Person other than the Trustee which shall be delivered to the Trustee) shall be promptly canceled and destroyed by the Trustee in accordance with its customary procedures.

Section 2.11.    <u>Delivery of the Notes</u>. The Notes shall be executed by the Issuer and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order, and upon delivery to the Trustee of the following:

(a)    a certificate of the Issuer, signed by an Authorized Signatory, authorizing the execution and delivery of this Indenture and the Notes;

(b)    a certificate from the Issuer, signed by an Authorized Signatory, stating that, as of the Closing Date, no Default has occurred under this Indenture and that the issuance of the Notes will not result in any material breach of any of the terms, conditions or provisions of, or constitute a default under, the Issuer's organizational documents or any indenture, mortgage,

deed of trust or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the  authentication and delivery of the Notes have been complied with;

      (c)     duly executed copies of all Transaction Documents; and

      (d)     such other documents as the Noteholders may reasonably require.

      Section 2.12.  <u>Book-Entry Notes</u>.  The Notes, upon original issuance, will be issued in the form of typewritten Notes representing definitive, fully registered Book-Entry Notes, to be delivered to The Depository Trust Company (the initial Clearing Agency), or its custodian, by, or on behalf of, the Issuer.  Such Notes shall initially be registered on the Note Register in the name of Cede & Co., the nominee of the initial Clearing Agency, and no Noteholder will receive a Definitive Note representing such Noteholder's interest in such Note, except as provided in <u>Section 2.14</u>.  Unless and until definitive, fully registered Notes (the "<u>Definitive Notes</u>") have been issued to Noteholders:

      (a)     this <u>Section</u> shall be in full force and effect;

      (b)     the Note Registrar and the Trustee may deal with the Clearing Agency for all purposes (including the payment of principal of and interest on the Notes) as the authorized representative of the Noteholders;

      (c)     to the extent that this <u>Section</u> conflicts with any other provisions of this Indenture, this Section shall control;

      (d)     the rights of Noteholders shall be exercised only through the Clearing Agency and shall be limited to those established by law and agreements between such Noteholders and the Clearing Agency and/or the Clearing Agency Participants pursuant to the Note Depository Agreement.  Unless and until Definitive Notes are issued, the Clearing Agency will make book-entry transfers among the Clearing Agency Participants and receive and transmit payments of principal of and interest on the Notes to such Clearing Agency Participants; and

      (e)     whenever this Indenture requires or permits actions to be taken based upon instructions or directions of holders of Notes evidencing a specified percentage of the outstanding principal balance of the Notes, the Clearing Agency shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from Noteholders and/or Clearing Agency Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Trustee.

      Section 2.13.  <u>Notices to Clearing Agency</u>.  Whenever a notice or other communication to the Noteholders is required under this Indenture, unless Definitive Notes are outstanding, the Trustee shall give all such notices and communications to the Clearing Agency.

Section 2.14.  Definitive Notes.  If the Clearing Agency advises the Trustee in writing that the Clearing Agency is no longer willing or able to properly discharge its responsibilities with respect to the Notes, and the Issuer is unable to locate a qualified successor, or after the occurrence of an Event of Default, the Majority Noteholders advise the Clearing Agency in writing that the continuation of a book-entry system through the Clearing Agency is no longer in the best interests of the Noteholders, then the Issuer shall notify the Clearing Agency of the availability of Definitive Notes in accordance with the provisions of the Note Depository Agreement.  Upon surrender to the Trustee of typewritten Notes representing Book-Entry Notes by the Clearing Agency, accompanied by registration instructions, the Issuer shall execute, and the Trustee shall, upon Issuer Order, authenticate, Definitive Notes in accordance with the instructions of the Clearing Agency.  None of the Issuer, the Note Registrar or the Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes, the Trustee shall recognize the holders of the Definitive Notes as Noteholders.

## ARTICLE III

## SATISFACTION AND DISCHARGE

Section 3.1.  Satisfaction and Discharge of Indenture.  This Indenture shall cease to be of further effect (except with respect to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, (iv) Section 5.6, (v) the rights, obligations and immunities of the Trustee hereunder (including the obligations of the Trustee under Section 3.2) and (vi) the rights of Noteholders, as beneficiaries hereof with respect to the property deposited with the Trustee payable to all or any of them) with respect to the Notes, and the Trustee, on demand of and at the expense of the Issuer and upon being supplied by the Issuer with appropriate forms therefor, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes and shall pay, assign, transfer and deliver to the Issuer upon Issuer Order all cash, securities and all other property held by it as part of the Collateral (except for amounts required to pay and discharge the entire indebtedness of the Notes), when:

(a)    either:

(i)    all Notes theretofore authenticated and delivered (other than (i) Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7, and (ii) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 8.3) have been delivered to the Trustee for cancellation and have been paid in full; or

(ii)    all Notes not theretofore delivered to the Trustee for cancellation have become due and payable and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for the purpose, an amount sufficient to pay and discharge the entire indebtedness on such Notes together with all accrued interest thereon;

(b)      the Issuer has paid or caused to be paid all other sums payable hereunder by the Issuer; and

(c)      the Issuer has delivered to the Trustee a certificate signed by an Authorized Signatory stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture with respect to the Notes have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the Issuer's obligations in Sections 2.5, 2.7, 5.7, 8.2 and 8.3, the Trustee's obligations hereunder, the Paying Agent's obligations in Section 3.2 and the rights and immunities of the Trustee under this Indenture shall survive until the Notes are no longer Outstanding. Thereafter, the obligations of the Issuer in Section 5.7 and the Trustee in Section 3.2 and the rights and immunities of the Trustee under this Indenture shall survive the discharge of this Indenture or the earlier resignation or removal of the Trustee.

Section 3.2.    Application of Trust Money.    All monies deposited with the Trustee pursuant to Section 9.1 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent, as the Trustee may determine, to the Noteholders for the payment of all sums due and to become due on the Notes for principal and interest. Such monies shall be segregated from all other funds as required herein or required by law.

Section 3.3.    Discharge of Security Interest.    Upon satisfaction and discharge of the Indenture as specified in Section 3.1, the Trustee shall execute a release of the Collateral provided by, and at the expense of, the Issuer. Further, on demand of and at the expense of the Issuer and upon being supplied with instruments appropriate for the purpose, the Trustee shall execute, if applicable, and authorize and the Issuer shall file all documents (including, without limitation, any UCC termination statements) necessary to discharge all liens, mortgages, chattel mortgages and other security interests filed with any governmental board or body with respect to the Collateral, and the Trustee shall otherwise cooperate in any way reasonably necessary to restore full unencumbered title in the Collateral to the Issuer or its designee.

## ARTICLE IV

## CERTAIN EVENTS, DEFAULTS AND REMEDIES

Section 4.1.    Cash Trapping, Rapid Amortization and Servicer, Manager and Back-Up Manager Removal Events

(a)      If on the third Payment Date or any Payment Date thereafter, the Coverage Ratio as of the preceding Determination Date is less than 275% (a "Trapping Event"), then, a Trapping Event shall occur, without giving of notice or any other action on the part of the Trustee or any Noteholder, immediately upon such Payment Date, provided, however, that a Trapping Event may be cured by (i) subject to Section 4.1(d), delivery to the Trustee for credit to the Distribution Account and pledge under this Indenture of cash not to exceed $10,000,000 on any one occasion, such that the Restated Coverage Ratio as of such Payment Date, after giving effect to such delivery and pledge, would be greater than or equal to 275%, or (ii) if on any Determination Date

after the occurrence of a Trapping Event, and prior to the occurrence of a Rapid Amortization Event, the Coverage Ratio is equal to or greater than 275% (any such event, a "Trapping Event Cure").

(b)    If any one of the following events shall occur:

(1)    on the third Payment Date or any Payment Date thereafter, the Coverage Ratio as of the preceding Determination Date is less than 225%;

(2)    on the third Payment Date or any Payment Date thereafter, the Coverage Ratio as of the preceding Determination Date is less than 275% and the Issuer by Board Resolution elects to declare a Rapid Amortization Event in its sole discretion;

(3)    The Notes are not paid in full on the Scheduled Payoff Date; or

(4)    an Event of Default shall have occurred;

then, a "Rapid Amortization Event" shall occur, without giving of notice or any other action on the part of the Trustee or any Noteholder, immediately upon occurrence of such event; provided, however, that the Majority Noteholders by an Act and evidenced by written notice to the Issuer and the Trustee, may waive such Rapid Amortization Event and any consequences arising therefrom (unless such Rapid Amortization Event is a result of an Event of Default pursuant to clause (5) or clause (6) of Section 4.2 or clause (3) of this Section 4.1(b), which cannot be waived); and provided, further, that a Rapid Amortization Event pursuant to clause (1) of this Section 4.1(b) may be cured by either: (i) subject to Section 4.1(d), delivery to the Trustee for credit to the Distribution Account and pledge under this Indenture of cash not to exceed $10,000,000 on any one occasion, such that the Restated Coverage Ratio as of such Payment Date, after giving effect to such delivery and pledge, would be greater than or equal to 225%, or (ii) the Coverage Ratio exceeding 225% for twelve consecutive Determination Dates (either such event, a "Rapid Amortization Event Cure").    Upon the occurrence of a Rapid Amortization Event Cure, the related Rapid Amortization Event shall cease in all respects and all consequences associated therewith shall terminate.

(c)    The Trustee will promptly notify the Issuer, Servicer, Manager, Back-Up Manager and each Noteholder upon a Responsible Officer of the Trustee having actual knowledge of, or receiving written notice of, the occurrence of a Servicer Removal Event, Manager Removal Event or Back-Up Manager Removal Event under the Servicing Agreement, Management Agreement or Back-Up Management Agreement, respectively.    If a Servicer Removal Event occurs, the Majority Noteholders may by an Act, and evidenced by written notice to the Issuer and the Trustee, instruct the Issuer and Trustee to remove the current Servicer as Servicer and appoint a successor servicer as Servicer in accordance with the terms of the Servicing Agreement. If a Manager Removal Event occurs, the Majority Noteholders may by an Act, and evidenced by written notice to the Issuer and Trustee, instruct the Issuer and the Trustee to remove the applicable Manager as Manager and appoint a successor manager as Manager in accordance with the Management Agreement (and Back-Up Management Agreement, if applicable.) If a Back-Up Manager Removal Event occurs, the Majority Noteholders may by an

Act, and evidenced by written notice to the Issuer and the Trustee, instruct the Issuer and the Trustee to remove the applicable Back-Up Manager as Back-Up Manager and appoint a successor Back-Up Manager as Back-Up Manager in accordance with the Back-Up Management Agreement. For the purposes of any vote of the Noteholders in connection with this Section 4.1(c), (i) if the Noteholders either vote not to require removal or do not elect to exercise their removal rights within 30 days of the date of notice from the Trustee of the Servicer Removal Event, Manager Removal Event or Back-Up Manager Removal Event, as applicable, the removal rights under this Section 4.1(c) in relation to the applicable Servicer Removal Event, Manager Removal Event or Back-Up Manager Removal Event, as applicable, shall be waived and the then current Servicer, Manager or Back-Up Manager, as applicable, shall continue in such role; provided, that such waiver will not impair the Noteholders' removal rights pursuant to this Section 4.1(c) in the event of any subsequent Servicer Removal Event, Manager Removal Event or Back-Up Manager Removal Event. Notwithstanding anything in this Section 4.1(c) to the contrary, at any time while the Servicer or Manager is an Affiliate of Sears, if either a Servicer Removal Event pursuant to Section 5.1(j) of the Servicing Agreement or a Manager Removal Event pursuant to clause (ix) of Section 5(b) of the Management Agreement occurs as a result of a voluntary bankruptcy event of Sears Holdings Corporation, then unless 100% of the Noteholders vote not to require removal, the Issuer and Trustee shall remove the current Servicer as Servicer and appoint a successor servicer as Servicer in accordance with the terms of the Servicing Agreement, or shall remove the current Manager as Manager and appoint the Back-Up Manager as Manager in accordance with the Management Agreement and Back-Up Management Agreement, as applicable.

(d)    Notwithstanding anything in this Indenture to the contrary, a Trapping Event Cure pursuant to Section 4.1(a)(i) and a Rapid Amortization Event Cure pursuant to Section 4.1(b)(i), collectively, may be effectuated not more than five (5) times in total prior to the Scheduled Payoff Date and not more than one (1) time in the twelve calendar months immediately proceeding any date in which cash is delivered to the Trustee to effectuate another such Trapping Event Cure pursuant to Section 4.1(a)(i) or Rapid Amortization Event Cure pursuant to Section 4.1(b)(i), as applicable.

Section 4.2.    Events of Default.  "Event of Default" wherever used herein means any one of the following events (whatever the reason for such Event of Default and without regard to whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and when used with respect to the Notes shall mean the same occurring at any time while there are Notes Outstanding (except that no event of default under the Management Agreement, Back-Up Management Agreement or Servicing Agreement shall, in and of itself, constitute an Event of Default):

(1)    the Issuer shall amend its Organizational Documents in a material manner without the written consent of the Majority Noteholders and receipt of a Rating Agency Response;

(2)    failure by the Issuer to make payments of interest on the Notes as and when due pursuant to the terms and provisions of the Notes and this Indenture, and such failure shall continue for a period of five (5) Business Days, or failure by the Issuer to

pay all remaining amounts due, including but not limited to principal, on the Expected Maturity Date;

(3)    material default in the performance by the Issuer of any of its obligations or covenants in any Transaction Document to which it is a party (not referenced in clause (1) or clause (2) above) and which, if susceptible of being cured, remains uncured after a period of thirty (30) days (or such additional time as may be required if the Issuer demonstrates it is making diligent efforts to cure such default, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) after the earlier of (A) the date on which a Responsible Officer of the Issuer first has actual, personal knowledge of such default and (B) the date on which written notice, specifying in reasonable detail, such default and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to the Issuer;

(4)    a failure of any representation or warranty of the Issuer in this Indenture to be true and correct as and when made, which failure has a material adverse effect on the interests of the Noteholders and which, if susceptible of being cured, remains uncured after thirty (30) days (or such additional time as may be required if the Issuer demonstrates it is making diligent efforts to cure such default, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) after the earlier of (A) the date on which a Responsible Officer of the Issuer first has actual, personal knowledge of such failure and (B) the date on which written notice, specifying in reasonable detail, such breach and requiring it to be remedied and stating that such notice is a "Notice of 'Default" hereunder shall have been given to the Issuer; provided, however, any such failure of a representation or warranty as to an Asset that is set forth in Section 8.15 hereof shall not result in an Event of Default;

(5)    the entry of a decree or order for relief by a court having jurisdiction in respect of the Issuer in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or of any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Issuer and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days;

(6)    the commencement by the Issuer of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or the consent by the Issuer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property or the making by the Issuer of an assignment for the benefit of creditors or the failure by the Issuer generally to pay its debts as such debts become due or the taking of partnership action by the Issuer in furtherance of any of the foregoing;

(7)    on the third Payment Date or any Payment Date thereafter, the Coverage Ratio as of the preceding Determination Date is less than 100%;

(8)     (A) the transfer of the Assets pursuant to the Contribution Agreement shall fail to constitute a valid transfer of ownership of a material portion of such property, and all proceeds thereof, to the Issuer, or (B) the Issuer shall fail to have good title to a material portion of the Collateral, free and clear of all prior Liens, other than Permitted Liens, and such failure, if curable, is not cured within thirty (30) days (or such additional time as may be required if the Issuer demonstrates it is making diligent efforts to cure such failure, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) of the earlier of (1) the date on which a Responsible Officer of the Issuer first has actual, personal knowledge thereof, or (2) the date on which written notice, specifying in reasonable detail such failure and requiring it to be remedied, and stating that such notice is a "Notice of Default" hereunder, shall have been given to the Issuer;

(9)     the Issuer shall fail to have a valid security interest in a material portion of the Collateral conveyed or pledged under the Contribution Agreement, whether existing on the Closing Date or thereafter created, subject only to Permitted Liens, and such failure, if curable, is not cured within ten (10) days of the earlier of (1) the date on which a Responsible Officer of the Issuer first has actual, personal knowledge thereof, or (2) the date on which written notice, specifying in reasonable detail such failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder, shall have been given to the Issuer; or

(10)    the Grant of the security interest in the Collateral pursuant to this Indenture shall cease, for any reason, to be in full force and effect, or the Issuer or any Affiliate shall so assert, or any Lien created by this Indenture shall cease to be enforceable and of the same effect and priority purported to be created thereby, in each case to the extent such event would have a Material Adverse Effect and, if curable, is not cured within ten (10) days of the earlier of (1) the date on which a Responsible Officer of the Issuer first has actual, personal knowledge thereof, or (2) the date on which written notice, specifying in reasonable detail such failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder, shall have been given to the Issuer.

Section 4.3.    Acceleration of Maturity, Rescission and Annulment.    If an Event of Default of the kind specified in clauses (5) or (6) of Section 4.2 occurs, the Trustee shall give the Noteholders and the Rating Agencies notice thereof and the unpaid principal amount of all of the Notes shall automatically become immediately due and payable without notice, presentment or demand of any kind.  If an Event of Default (other than an Event of Default of the kind specified in clauses (5) or (6) of Section 4.2) occurs and is continuing of which a Responsible Officer of the Trustee has actual knowledge or has been notified by any Noteholder, the Trustee shall give the Issuer, the Noteholders and the Rating Agencies notice thereof, and in every such case the Trustee is authorized to and shall, if directed by an Act of the Majority Noteholders, declare the principal of all of the Notes to be immediately due and payable, by a notice in writing to the Issuer, with a copy to each Noteholder, that the Notes shall become immediately due and payable together with accrued and unpaid interest.  No Redemption Premium shall be due upon a partial or full prepayment in connection with an Event of Default.

At any time after such a declaration of acceleration has been made, but before any Sale of the Collateral has been made or a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter in this Article provided, the Majority Noteholders by an Act and evidenced by a written notice delivered to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if all existing Events of Default, other than the non-payment of the principal of the Notes which has become due solely by such declaration of acceleration, have been cured or waived as provided in Section 4.14. No such rescission shall affect any subsequent Event of Default or impair any right consequent thereon.

Section 4.4.    Remedies.  If an Event of Default shall have occurred and be continuing and not be waived by the Majority Noteholders, the Trustee is authorized to and shall, if instructed by an Act of the Majority Noteholders and subject to Article V herein, do one or more of the following:

(a)    institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral securing the Notes (including any amounts in the Trapping Account and Reserve Account) the monies adjudged due;

(b)    implement the remedies available under Section 4.1(c), if applicable;

(c)    sell, or direct the Issuer to sell, the Collateral or any portion thereof or rights or interest therein, at one or more Sales called and conducted in any manner permitted by law, including any such Sale facilitated by the Back-Up Manager;

(d)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to any portion of the Collateral securing the Notes; and

(e)    exercise any remedies of a secured party under the Uniform Commercial Code or other applicable law and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Noteholders hereunder;

provided, however, prior to the Legal Maturity Date, if less than all of the Noteholders have approved a Sale of the Collateral and if the proceeds of any such Sale will be less than the amount required to retire all of the Outstanding Notes in full, including accrued interest, then, in any such event, the Trustee may not sell or otherwise liquidate any of the Collateral unless the Trustee obtains the recommendation of the Manager that such Sale maximizes the value of the Collateral in its professional opinion and the Majority Noteholders consent; provided, further, that, on or after the Legal Maturity Date, there shall be no further extension or delay in liquidating the Collateral unless all of the Noteholders consent and if any Noteholder demands in writing to the Trustee the Sale of the Collateral, the Trustee, with the assistance of the Manager, shall liquidate the Collateral in a commercially reasonable amount of time and distribute the proceeds of such liquidation in accordance with Section 4.7.  The Trustee shall have no liability for any public Sale or private Sale conducted in reliance upon the advice, with respect to the commercial reasonableness of the sale, of the Manager, with respect to the same.  In the event that the Trustee does not sell or otherwise liquidate the Collateral, it shall continue to hold the Collateral and make distributions therefrom pursuant to Article X hereof.  Prior to the Legal

Maturity Date, the Trustee shall take no action pursuant to this <u>Section 4.4</u> absent instruction from the Majority Noteholders pursuant to an Act.

Section 4.5.    <u>Trustee May File Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial Proceeding, relating to the Issuer or any other obligor upon the Notes or the property of the Issuer or of such other obligor or their creditors, the Trustee (irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Issuer for the payment of overdue principal or interest) shall be entitled and empowered, to intervene in such proceeding or otherwise:

> (i)    to file and prove a claim for all amounts owing and unpaid in respect of the Notes and to file such other papers or documents and take such other action, including participating as a member, voting or otherwise, in any committee of creditors appointed in the matter, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Noteholders allowed in such judicial Proceeding;

> (ii)    to petition for lifting of the automatic stay and thereupon to foreclose upon the Collateral as elsewhere provided herein; and

> (iii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any receiver, assignee, trustee, liquidator, or sequestrator (or other similar official) in any such judicial Proceeding is hereby authorized by each Noteholder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Noteholders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under <u>Section 5.7</u>.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding.

Section 4.6.    <u>Trustee May Enforce Claims Without Possession of Notes</u>.  All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the benefit of the Noteholders in respect of which such judgment has been recovered applied to payments on the Notes in the order set forth in <u>Section 4.7</u>.

Section 4.7.    <u>Allocation of Money Collected</u>.  If the Notes have been declared due and payable following an Event of Default and such declaration and its consequences have not been rescinded and annulled, any money collected by the Trustee with respect to the Notes pursuant to this Article (and any funds then held or thereafter received by the Paying Agent) shall be applied in the following order, at the date or dates fixed by the Paying Agent:

FIRST:  To the payment of all amounts due the Trustee, <u>provided</u>, that payments pursuant to this clause FIRST with respect to Trustee Costs shall not exceed the Capped Trustee Costs;

SECOND:  If either the Servicer or the Manager is not the initial Servicer or initial Manager or Sears or an Affiliate of Sears, then to such Servicer or Manager (or to both, <u>pro rata</u>, if applicable), the payment of all amounts due to the Servicer or Manager, as applicable, including all Servicing Fees and Servicer Costs, or Management Fees and Manager Costs, as applicable; <u>provided</u>, that payments pursuant to this <u>clause SECOND</u> with respect to Servicer Costs and Manager Costs shall not exceed the Capped Servicer Costs and Capped Manager Costs, respectively;

THIRD:  To the payment of the Back-Up Manager Standby Fee, to the extent the Back-up Manager is not fully compensated after distributions pursuant to <u>clause SECOND</u> above;

FOURTH:  To the payment of accrued interest on, and the Note Principal Balance of, the Outstanding Notes, including interest at the Default Rate (to the extent such interest has been collected by the Paying Agent or a sum sufficient therefor has been so collected and payment thereof is legally enforceable at the rate prescribed therefor in the Notes or in the Indenture) on overdue installments of principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Outstanding Notes;

FIFTH:  To the payment to the Trustee of the positive difference, if any, between the Trustee Costs and the Capped Trustee Costs;

SIXTH:  If the Servicer or the Manager is the initial Servicer or the initial Manager, Sears or an Affiliate of Sears, to the payment of all amounts due the Servicer or the Manager, including all earned and due but unpaid Servicing Fees and Servicer Costs or Management Fees and Manager Costs, as applicable;

SEVENTH:  To the payment to the Servicer and the Manager, <u>pro rata</u>, if applicable, of the positive difference, if any, between the Servicer Costs and the Capped Servicer Costs and the Manager Costs and the Capped Manager Costs, respectively, if not otherwise paid after distributions pursuant to <u>clause SIXTH</u> above;

EIGHTH:  To the payment to the Back-Up Manager of the Back-Up Manager Incentive Fee, if any; and

NINTH:  Any surplus, to or at the written direction of the Issuer.

Section 4.8.    <u>Limitation on Suits</u>.  No Noteholder shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(1)    such Noteholder has previously given written notice to the Trustee of a continuing Event of Default;

(2)    the Majority Noteholders shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(3)    such Noteholder or Noteholders have offered to the Trustee indemnity satisfactory to it (which in the case of the Initial Noteholders or any Holder (or its guarantor, if applicable) that is, or is a subsidiary of, a bank or other institutional buyer with a net worth of at least $50,000,000, and whose claims paying ability or long term debt is rated at least investment grade or better by a Rating Agency, need only be such purchaser's unsecured promise of indemnity in form reasonably satisfactory to the Trustee), against the costs, expenses and liabilities to be incurred in compliance with such request;

(4)    the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(5)    no direction inconsistent with such written request has been given to the Trustee during such 60 day period by the Majority Noteholders;

it being understood and intended that no one or more Noteholders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Noteholders or to obtain or to seek to obtain priority or preference over any other Noteholder or to enforce any right under this Indenture, except in the manner herein provided.

Section 4.9.    <u>Unconditional Right of Noteholders to Receive Principal and Interest</u>. Notwithstanding any other provision in this Indenture, each Noteholder shall have the right, which is absolute and unconditional, to receive payment of the interest on such Noteholder's Note as such interest becomes due and payable and to receive payment of the principal on such Noteholder's Note on or before the Legal Maturity Date and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder; <u>provided</u>, <u>however</u>, that neither the Noteholder nor the Trustee shall, if requested by the Majority Noteholders, petition or otherwise invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Issuer.

Section 4.10.    <u>Restoration of Rights and Remedies</u>. If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Person who instituted the Proceeding, then and in every such case the Issuer, the Trustee and the Noteholders shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and

remedies of the Trustee and the Noteholders shall continue as though no such Proceeding has been instituted.

Section 4.11.  <u>Rights and Remedies Cumulative</u>.  No right or remedy herein conferred upon or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 4.12.  <u>Delay or Omission Not Waiver</u>.  No delay or omission of the Trustee or of any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Noteholders, or any of them, may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholder or Noteholders, as the case may be.

Section 4.13.  <u>Control by Noteholders</u>.  The Majority Noteholders shall have the right to direct the decision whether to conduct, and the time, method and place of conducting, any remedy available to the Trustee with respect to the Notes or exercising any trust or power conferred on the Trustee with respect to the Notes; <u>provided</u> that:

> (1)    such direction shall not be in conflict with any rule of law or with this Indenture,

> (2)    the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and

> (3)    such direction shall be in writing;

<u>provided</u>, <u>however</u>, that, subject to <u>Section 5.1(c)</u>, the Trustee need not take any action which it determines might involve it in liability or be unjustly prejudicial to the Noteholders not consenting.

Section 4.14.  <u>Waiver of Past Defaults</u>.  The Majority Noteholders may, on behalf of all Noteholders, waive any past Default or Event of Default with respect to the Notes hereunder and its consequences, except a Default:

> (1)    described in <u>clauses (5)</u> or <u>(6)</u> of Section 4.2,

> (2)    in respect of a covenant or provision hereof which under <u>Article VI</u> cannot be modified or amended without the consent of each Noteholder affected thereby, or

> (3)    arising from failure to pay interest or principal due on the Notes on or after the Legal Maturity Date.

Upon any such waiver, such Default or Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture. Upon receipt of notice of such waiver, the Trustee shall transmit by mail to the Rating Agencies, the Issuer and the Servicer notice of such waiver specifying the date on which the Default was waived promptly after the occurrence of such waiver.

Section 4.15.  <u>Undertaking for Costs</u>.  All parties to the Indenture and each Noteholder by its acceptance of a Note shall be deemed to have agreed that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorney's fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this <u>Section 4.15</u> shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or the Majority Noteholders for the enforcement of the payment of principal of or interest on any Notes on or after the Legal Maturity Date (or, in the case of redemption of Notes, on or after the applicable Redemption Date).

Section 4.16.  <u>Waiver of Stay or Extension Laws</u>.  The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance by the Issuer under this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.17.  <u>Sale of Collateral</u>.

(a)    In connection with the consideration of a sale of any portion of the Collateral pursuant to <u>Section 4.4</u>, the Trustee shall request that the Manager in accordance with the Management Agreement, solicit proposals and make a recommendation as to the best course of action with regard to the disposition of the Collateral. Upon receipt of such proposals and recommendation, the Trustee will inform the Noteholders of the same. If so instructed by the Majority Noteholders, the Trustee is authorized to rely on the Manager to facilitate the sale (a "<u>Sale</u>") of the Collateral.

(b)    The power to effect any Sale of any portion of the Collateral pursuant to <u>Section 4.4</u> shall not be exhausted by any one or more Sales as to any portion of the Collateral remaining unsold, but shall continue unimpaired until the entire Collateral securing the Notes shall have been sold or all amounts payable under this Indenture and the Notes shall have been paid. Any Sale conducted hereunder shall be completed in accordance with the applicable terms and provisions of the UCC. The Trustee may from time to time postpone any Sale by public announcement made at the time and place of such Sale. The Trustee shall not be entitled to any additional compensation in connection with any Sale, <u>provided</u>, that the reasonable costs and

expenses incurred by the Trustee in connection with any Sale (including the reasonable cost of internal counsel of the Trustee) shall be reimbursed to the Trustee in accordance with <u>Section 4.7</u>.

(c)     Any Noteholder may bid for and acquire any portion of the Collateral securing the Notes in connection with any Sale thereof.  In lieu of paying cash for the entire purchase price therefor, such Noteholder, after deducting the costs, charges and expenses (including reasonable attorney's fees and expenses) incurred by the Trustee in connection with such Sale may make settlement for any portion of the purchase price remaining by crediting against amounts owing on the Notes held by it or other amounts owing to such Noteholder secured by this Indenture, the portion of the net proceeds of such Sale to which such Noteholder would be entitled hereunder.

(d)     The Issuer covenants and agrees that thirty (30) days prior notice of a Sale of the entirety of the Collateral by a public Sale is a commercially reasonable notice.

(e)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a Sale thereof, which Sale shall be at the expense of the Issuer.  In addition, the Servicer is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to cause the transfer and conveyance of the Issuer's interest in any portion of the Collateral in connection with a Sale thereof pursuant to the terms of this Indenture, and to take all action necessary to effect such Sale.  No purchaser or transferee at such a Sale shall be bound to ascertain the Servicer's or the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

(f)     Any amounts received by the Noteholders in connection with a public or private Sale pursuant this <u>Section 4.17</u> shall be deemed to be conclusive and binding upon the parties hereto and the Noteholders shall have no liability in respect hereto.

Section 4.18.  <u>Action on Notes</u>.  The Noteholders' right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture.  Neither the Lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Noteholders against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer.  Any money or property collected by the Trustee shall be applied in accordance with <u>Section 4.7</u>.

## ARTICLE V

## THE TRUSTEE; RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

Section 5.1.  <u>Certain Duties and Responsibilities of Trustee</u>

(a)     Except during the continuance of an Event of Default, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee.

(b)     In case an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and the Transaction

Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)    this Subsection shall not be construed to limit the effect of <u>Subsection (a)</u> of this Section;

(2)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(3)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Majority Noteholders relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes;

(4)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not reasonably assured to it (which in the case of the Initial Noteholders or any Noteholder (or its guarantor, if applicable) that is, or is a subsidiary of, a bank or other institutional buyer with a net worth of at least $250,000,000 and whose claims paying ability or long term debt is rated at least investment grade or better by a Rating Agency, need only be such purchaser's unsecured promise of indemnity in form reasonably satisfactory to the Trustee), <u>provided</u>, that nothing herein contained shall excuse the Trustee for failure to perform its duties as Trustee under this Indenture;

(5)    the Trustee shall not be charged with knowledge of any Default or Event of Default hereunder unless one of its Responsible Officers has actual knowledge thereof or it has been provided written notice thereof by the Issuer or any Noteholder;

(6)    the Trustee shall have no obligation to ascertain whether any payment of interest on an overdue installment of interest is legally enforceable; and

(7)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(d)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

(e)    The Trustee is hereby authorized to execute each of the Transaction Documents to which it is a party.

Section 5.2.    Notice of Default, Cure or Waiver.  Promptly after the occurrence of any Default or Event of Default actually known to a Responsible Officer of the Trustee or of which the Trustee has been provided written notice of by the Issuer or any Noteholder, the Trustee shall transmit, by mail to all Noteholders, as their names and addresses appear on the Note Register, and the Rating Agencies notice of such Default or Event of Default.

The Trustee shall provide to the Rating Agencies prompt notice of any cure (including waiver) of any Default or Event of Default actually known to a Responsible Officer of the Trustee or of which the Trustee has been provided written notice by the Issuer.

Section 5.3.    Certain Rights of Trustee.  Subject to Section 5.1:

(a)    the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other obligation, paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order;

(c)    whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate signed by an Authorized Signatory of the Issuer;

(d)    the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the written request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee security or indemnity satisfactory to it (which in the case of the Initial Noteholders or any Noteholder (or its guarantor, if applicable) that is, or is a subsidiary of, a bank or other institutional buyer with a net worth of at least $250,000,000, and whose claims paying ability or long term debt is rated at least investment grade or better by a Rating Agency, need only be such purchaser's unsecured promise of indemnity in form reasonably satisfactory to the Trustee), against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent, attorney, custodian or nominee; and

(g)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent, attorney, custodian or nominee appointed and supervised with due care by it.

Section 5.4.    Not Responsible for Recitals or Issuance of Notes

(a)    The recitals contained herein and in the Notes, except the certificates of authentication on the Notes, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity, adequacy or condition of the Collateral or any part thereof, or as to the title of the Issuer thereto or as to the security afforded thereby or hereby, or as to the validity or genuineness of any securities at any time pledged and deposited with the Trustee hereunder or as to the validity or sufficiency of this Indenture or of the Notes. The Trustee shall not be accountable for the use or application by the Issuer of the Notes or the proceeds thereof or of any money paid to the Issuer upon Issuer Order.

(b)    Except as otherwise expressly provided herein and without limiting the generality of the foregoing, the Trustee shall have no responsibility or liability for or with respect to the existence or validity of any Collateral or validity of the assignment of any portion of the Collateral to the Trustee or of any intervening assignment.

(c)    The Trustee shall not have any obligation or liability under any Collateral by reason of or arising out of this Indenture or the granting of a security interest in such Collateral hereunder or the receipt by the Trustee of any payment relating to any Collateral pursuant thereto, nor shall the Trustee be required or obligated in any manner to perform or fulfill any of the obligations of the Issuer under or pursuant to any Collateral, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it, or the sufficiency of any performance by any party, under any Collateral.

Section 5.5.    May Hold Notes. The Trustee, Note Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer with the same rights it would have if it were not Trustee, Note Registrar or such other agent.

Section 5.6.    Money Held in Trust. Money held by the Trustee in trust hereunder shall be segregated from other funds held by the Trustee. Investment earnings on the amounts on deposit in the Collection Account, Distribution Account, Trapping Account and Reserve Account through each Payment Date shall be for the account of the Issuer, and shall be promptly

remitted to the Issuer or credited to the applicable account, as applicable and in each case in accordance with Section 9.1, upon receipt thereof by the Trustee. Investment earnings, if any, for any period after each Payment Date, on the amounts on deposit in the Collection Account, Distribution Account, Trapping Account and Reserve Account as of such Payment Date shall be for the account of the Issuer, and shall be remitted to the Issuer or credited to the applicable account, as applicable and in each case in accordance with Section 9.1, upon receipt thereof by the Trustee, subject to the rights of the Noteholders pursuant to Section 7.5(b).

Section 5.7.    Compensation and Reimbursement.  The Issuer agrees:

(1)    to pay the Trustee the Trustee Fee in accordance with Section 10.1 hereof, as reasonable compensation for all services rendered by it hereunder (which Trustee Fee shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(2)    except as otherwise expressly provided herein, to reimburse the Trustee in accordance with Section 10.1(a) hereof upon its written request for all reasonable out-of-pocket expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of the Trustee's agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence, bad faith or willful misconduct; and

(3)    to indemnify the Trustee and its officers, directors, employees and agents for, and to hold them harmless against, any loss, liability, obligation, damage, penalty, tax, claim, action, investigation, proceeding, cost, disbursement or expense incurred without negligence, bad faith or willful misconduct on their part, arising out of or in connection with the acceptance or administration of this trust and performance hereunder, including the reasonable costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

Notwithstanding anything in this Indenture to the contrary, if an Event of Default has occurred and is continuing, the Trustee is not obligated to take any action that would result in it incurring any Trustee Costs in excess of the Capped Trustee Costs unless the Trustee receives reasonable assurances of repayment.  The provisions of this Section 5.7 shall survive any expiration or termination of this Indenture.

Section 5.8.    Trustee Eligibility.  There shall at all times be a Trustee hereunder which shall (a) be a depository institution, banking corporation or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers and (b) meet the requirements of an Eligible Financial Institution.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

Section 5.9.    Resignation and Removal; Appointment of Successor

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee under Section 5.10.

(b)    The Trustee may resign at any time by giving written notice thereof to the Issuer and the Noteholders.  If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within sixty (60) days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    The Trustee may be removed at any time by Act of the Majority Noteholders, delivered to the Trustee and to the Issuer.

(d)    If at any time:

(1)    the Trustee shall cease to be eligible under Section 5.8 and shall fail to resign after written request therefor by the Issuer or by the Majority Noteholders;

(2)    the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation; or

(3)    the Trustee otherwise becomes incapable of acting as required by this Indenture;

then, in any such case, (i) the Issuer by a Board Resolution may remove the Trustee, or (ii) subject to Section 4.15, any Noteholder who has been a bona fide Noteholder for at least two months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any other cause, the Issuer, by a Board Resolution, shall promptly appoint a successor Trustee that meets the requirements set forth in Section 5.8 and is approved by an Act of the Majority Noteholders.  If no successor Trustee shall have been so appointed and approved within sixty (60) days after such resignation or removal, any Noteholder who has been a bona fide Noteholder for at least two months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)    The Issuer shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to the Noteholders, as their names and addresses appear in the Note Register, and the Rating Agencies.  Each notice shall include the name of the successor Trustee and the address of its corporate trust office.

Section 5.10.  <u>Acceptance of Appointment by Successor</u>.    Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Issuer and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee.    The retiring Trustee shall execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.  Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.  The predecessor Trustee shall not be liable for the actions or the failure to act of any successor Trustee hereunder, but each retiring Trustee shall remain liable for its actions or failure to act during its tenure as Trustee hereunder.

No successor Trustee shall accept its appointment unless at the time of such acceptance, such successor Trustee shall be qualified and eligible under this Article.

Section 5.11.  <u>Merger, Conversion, Consolidation or Succession to Business of Trustee</u>. Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, <u>provided</u>, such Person shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

Section 5.12.  <u>Co-trustees and Separate Trustees</u>.  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any portion of the Collateral may at the time be located, the Issuer and the Trustee shall have power to appoint, and, upon the written request of the Trustee or of the Majority Noteholders, the Issuer shall for such purpose join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint one or more Persons approved by the Trustee either to act as co-trustee, jointly with the Trustee, of all or any part of such Collateral, or to act as separate trustee of any such property, in either case with such powers as may be provided in the instrument of appointment, and to vest in such Person or Persons in the capacity aforesaid, any property, title, right or power deemed necessary or desirable, subject to the other provisions of this Section. If the Issuer does not join in such appointment within 15 days after the receipt by it of a proper request to do so, or in case an Event of Default has occurred and is continuing, the Trustee alone shall have power to make such appointment.  Written notice of any appointment made pursuant to this <u>Section 5.12</u> shall, if requested in writing by any Noteholder, be promptly given by the Trustee to the Rating Agencies.

Should any written instrument from the Issuer be required by any co-trustee or separate trustee so appointed for more fully confirming to such co-trustee or separate trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Issuer.

Every co-trustee or separate trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(1)    The Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee.

(2)    The rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by such appointment shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee or separate trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), as shall be provided in the instrument appointing such co-trustee or separate trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustee or separate trustee.

(3)    The Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Issuer evidenced in writing, may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section, and, in case an Event of Default has occurred and is continuing, the Trustee shall have power to accept the resignation of, or remove, any such co-trustee or separate trustee without the concurrence of the Issuer.  Upon the written request of the Trustee, the Issuer shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate the resignation or removal of any co-trustee or separate trustee.  A successor to any co-trustee or separate trustee that has so resigned or been removed may be appointed in the manner provided in this Section.

(4)    No co-trustee or separate trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other such trustee hereunder nor shall the Trustee be liable by reason of any act or omission of any co-trustee or separate trustee hereunder, so long as such co-trustee or separate trustee has been appointed by the Trustee with due care.

(5)    Any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each such co-trustee and separate trustee, as effectively as if given to each of them.

Section 5.13.  <u>Rights of Trustee in Capacity of Paying Agent, Transfer Agent or Registrar</u>.  In the event that the Trustee is also acting as Paying Agent or Transfer Agent or Registrar hereunder, the rights and protections afforded to the Trustee pursuant to this <u>Article V</u> shall also be afforded to the Paying Agent, Transfer Agent and Registrar and to any successor serving in any such capacity.

Section 5.14. <u>Representations and Warranties of the Trustee</u>.  The Trustee in its individual capacity and as Trustee represents and warrants as follows:

(a)      It is duly organized, validly existing and in good standing under the laws of the United States.  It has full corporate power, authority and legal right to execute, deliver and perform its obligations as Trustee under this Indenture and to authenticate the Notes.

(b)      The execution and delivery of the Indenture, the consummation of the transactions provided for herein and the authentication of the Notes have been duly authorized by all necessary corporate action on its part, either in its individual capacity or as Trustee, as the case may be.

(c)      The Indenture constitutes a legal, valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally and except as such enforceability may be limited by general principles of equity (whether considered in a suit at law or in equity) or by an implied covenant of good faith and fair dealing.

(d)      The Trustee is an Eligible Financial Institution.

## ARTICLE VI

## SUPPLEMENTAL INDENTURES

Section 6.1.    <u>Supplemental Indenture Without Consent of Noteholders</u>.  Without the consent of the Noteholders, the Issuer and the Trustee, when authorized by an Issuer Order and upon written notice to the Rating Agencies, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a)      to correct or amplify the description of any property at any time subject to the Lien of this Indenture, or better to assure, convey and confirm unto the Trustee any property subject or required to be subjected to the Lien created by this Indenture, or to subject additional property to the Lien created by this Indenture;

(b)      to add to the covenants of the Issuer, for the benefit of the Noteholders, or to surrender any right or power herein conferred upon the Issuer;

(c)      to convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(d)      to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture which may be inconsistent with any other provision herein or in any supplemental indenture or to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; <u>provided</u>, such action shall not have a Material Adverse Effect as evidenced by a certificate of the Issuer signed by an

Authorized Signatory and provided to the Trustee prior to the effectiveness of such supplemental indenture; and

(e)    to evidence and provide for the acceptance of the appointment hereunder of a successor Trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Article V.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

Section 6.2.    Supplemental Indentures With Consent of Noteholders.  With the written consent of the Majority Noteholders delivered to the Issuer and the Trustee, the Issuer, when authorized by a Board Resolution, and the Trustee may also enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or modifying in any manner the rights of the Noteholders under this Indenture; provided, however, no such supplemental indenture shall, without the consent of all of the Noteholders of each Outstanding Note:

(1)    reduce the Note Principal Balance of any Note or the Note Interest Rate thereon or change the amount or priority or time of any payment on any Note or any place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment; or

(2)    modify or release the Collateral in any material respect except as otherwise permitted herein without Rating Agency Responses; or

(3)    modify or alter the definition of the term "Outstanding"; or

(4)    modify or alter the provisions of the provisos to Section 4.4; or

(5)    modify any of the provisions of this Section, except to increase any percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Noteholder of each Outstanding Note; or

(6)    permit the creation of any Lien ranking prior to or on a parity with the Lien of this Indenture with respect to any part of the Collateral (other than Permitted Liens), or, except as permitted under this Indenture, terminate the Lien of this Indenture on any property at any time subject hereto or, except as permitted under this Indenture, deprive any Noteholder of the security afforded by the Lien of this Indenture.

Promptly after the execution by the Issuer and the Trustee of any supplemental indenture pursuant to this Section, the Trustee shall, at the expense of the Issuer, mail to the Rating Agencies and each of the Noteholders a notice setting forth in general terms the substance of such supplemental indenture together with a copy of such supplemental indenture. Any failure of the Trustee to mail such notice and copy, or any defect therein, shall not, however, in any way

impair or affect the validity of any such supplemental indenture. The Issuer shall deliver to the Servicer, Manager and Back-Up Manager a copy of each such supplemental indenture.

Section 6.3.    Execution of Supplemental Indentures.    In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article or the modification thereby of the trusts created by this Indenture, the Trustee shall be entitled to be supplied with, and prior to executing any supplemental indenture pursuant to Section 6.1 or 6.2, the Trustee in its discretion may require a certificate from an Authorized Signatory of the Issuer or an Opinion of Counsel of the Issuer to the effect that the execution of such supplemental indenture is authorized or permitted by this Indenture. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own duties, immunities, rights or indemnities under this Indenture or otherwise.

Section 6.4.    Effect of Supplemental Indentures.    Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Note theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

Section 6.5.    Reference in Notes to Supplemental Indenture.    Notes issued and delivered after the execution of any supplemental indenture pursuant to this Article may, and if required by the Issuer shall, bear a notation in form approved by the Issuer as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Notes so modified as to conform, in the opinion of the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

Section 6.6.    Solicitation of Noteholders.    (a) The Issuer shall provide each Noteholder (irrespective of the amount of Notes then owned by it) with sufficient information, at least five (5) Business Days in advance of the date a decision is required, to enable such Noteholder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of the Notes. The Issuer shall deliver to the Trustee executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Indenture, and the Trustee shall deliver copies of the same to each Noteholder promptly following the date on which it is executed and delivered by the Issuer.

(b)    Payment.    The Issuer will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any Noteholder as consideration for, or as an inducement to, the entering into by any Noteholder of any waiver or amendment of any of the terms and provisions hereof or of the Notes, or any consent, unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each Noteholder of then Outstanding Notes even if such Noteholder did not consent to such waiver or amendment or consent to such other matter.

## ARTICLE VII

## REDEMPTION OF NOTES

Section 7.1.    Redemption at the Option of the Issuer.

(a)    Prior to the Scheduled Payoff Date, the Notes are redeemable at the option of the Issuer, in whole, or in part during the term hereof, at the Redemption Price on any Redemption Date, to be exercised by delivery of an Issuer Order to the Trustee; provided, that, the Redemption Date must be the first available Redemption Date for which the Trustee can give a proper Redemption Notice after receipt of such Issuer Order by the Trustee.

(b)    The Notes are redeemable at the option of Issuer (in whole or in part) without premium or penalty on the Scheduled Payoff Date or any Redemption Date thereafter at the Redemption Price, provided, that no Redemption Premium shall be due or payable in connection with a redemption pursuant to this Section 7.1(b).  No Redemption Notice is required for a redemption occurring on the Scheduled Payoff Date pursuant to this Section 7.1(b).  Any redemption of the Notes in whole pursuant to this Section 7.1(b) after the Scheduled Payoff Date shall be exercised by delivery of an Issuer Order to the Trustee; provided, that the Redemption Date must be the first available Redemption Date for which the Trustee can give a proper Redemption Notice after receipt of such Issuer Order by the Trustee.  Payments of principal after the Scheduled Payoff Date in accordance with Section 10.1 shall not constitute payments to redeem Notes, and no Redemption Notice shall be required in connection therewith.

(c)    The Notes are redeemable at the option of Issuer (in whole but not in part) without premium or penalty on any Redemption Date when the Aggregate Note Principal Balance on such Redemption Date is 10% or less of the Initial Note Principal Balance at the Redemption Price, provided, that no Redemption Premium shall be due or payable in connection with a redemption pursuant to this Section 7.1(c).  Any redemption of the Notes pursuant to this Section 7.1(c) shall be exercised by delivery of an Issuer Order to the Trustee; provided, that the Redemption Date must be the first available Redemption Date for which the Trustee can give a proper Redemption Notice after receipt of such Issuer Order by the Trustee.

Section 7.2.    Redemption in Connection with the Release of an Asset.  In the event that there is to be a payment of the Release Price for an Asset as described in Section 9.3 of this Indenture, the Release Price for the affected Asset shall be deposited in the Distribution Account by the Trustee upon receipt and shall be applied to the redemption of Notes on the next ensuing Redemption Date for which a proper Redemption Notice can be given.  Deposit of the Release Price in the Distribution Account shall be deemed to be an exercise of the option to redeem Notes on such Redemption Date in such principal amount and at the Redemption Price.  Notwithstanding anything to the contrary in this Section 7.2 or in Section 9.3, no Redemption Premium will be included in the Redemption Price if the Redemption Date is on or after the Scheduled Payoff Date.

Section 7.3.    Notice of Redemption by the Issuer.  Notice of redemption by Issuer Order pursuant to Section 7.1 or 9.3 shall be delivered by the Issuer to the Trustee by U.S. certified or registered mail, return receipt requested, or by nationally recognized overnight

private delivery service, postage or fee prepaid, sent not less than 15 days nor more than 45 days prior to the applicable Redemption Date. Within five (5) Business Days of receipt of notice of redemption from the Issuer, the Trustee will mail a notice of redemption to the Rating Agencies and to each Noteholder whose Notes are to be redeemed.

All notices of redemption shall state:

(1) the Redemption Date;

(2) the principal amount of Notes to be redeemed;

(3) a Redemption Price for such Notes (if applicable), calculated as of the date of the notice of redemption;

(4) that on the Redemption Date, the Redemption Price shall become due and payable upon each Note called for redemption, and that interest thereon shall cease to accrue on such date; and

(5) if the Notes are being redeemed in full, the place where such Notes are to be surrendered on or within 30 days after the Redemption Date, which shall be the office or agency of the Issuer to be maintained as provided in Section 8.2.

Failure to give notice of redemption, or any defect therein, to any Noteholder of Notes selected for redemption shall not impair or affect the validity of the redemption of any other Note.

Section 7.4.    Deposit of the Redemption Price or Payoff Amount. If the Notes are being redeemed pursuant to Section 7.1 or 7.2, on or before 10:00 A.M. (Chicago time) on the applicable Redemption Date, the Issuer shall remit to the Trustee for deposit into the Distribution Account an amount of monies sufficient to pay the Redemption Price of all Notes which are to be redeemed on such Redemption Date (less any portion of such payment to be set aside from monies in the Distribution Account, the Trapping Account or Reserve Account for the Notes to be redeemed).

Section 7.5.    Notes Payable on Redemption Date; Less than All Notes to be Redeemed

(a) Notice of redemption having been given as provided in Section 7.3, the Notes to be redeemed shall, on the applicable Redemption Date, become due and payable at the applicable Redemption Price, and on such Redemption Date such Notes shall cease to bear interest on the portion of the Notes actually redeemed. On the Redemption Date, the Noteholders shall be paid the Redemption Price by the Trustee from funds available to the Trustee pursuant to Section 7.4 or otherwise. Installments of interest and principal due on or prior to a Redemption Date shall continue to be payable to the Noteholders of Notes called for redemption according to their terms and the provisions of Section 2.8.

(b) If any Note called in whole or in part for redemption shall not be so paid due to a failure of the Trustee to remit funds timely deposited by the Issuer, the Issuer shall have no liability as a result of such failure and the Noteholders shall be entitled to the investment

earnings (and not the Note Interest Rate) on the applicable principal amount thereof, payable by the Trustee, from the Redemption Date until payment of principal is made to the Noteholders.

(c)    If less than the principal amount of all Notes Outstanding is to be redeemed on any Redemption Date, the Notes Outstanding shall be redeemed pro rata from available funds.

Section 7.6.    Final Redemption.  On any Payment Date on or after which (i) the amount on deposit in the Trapping Account, the Distribution Account (including any amounts transferred therein from the Collection Account) and the Reserve Account together with all other applicable funds deposited with the Trustee is equal to or greater than the Aggregate Note Principal Balance plus any other Liabilities outstanding under the Notes that will be due and owing from such Payment Date through the next Redemption Date for which a proper Redemption Notice can be given, and (ii) all payments, if any, to be made on such date pursuant to Section 10.1(a) hereof have been paid or funds for their payment have been reserved and are on deposit with the Trustee, the Trustee shall, in accordance with an Issuer Order, on such date, withdraw all such funds from the Trapping Account, the Distribution Account and the Reserve Account and redeem all of the Notes then Outstanding on such Redemption Date.

At such time as no Notes remain Outstanding and the Lien of this Indenture has been discharged in accordance with Section 3.1 hereof, the Trustee shall withdraw from the Trapping Account, the Distribution Account and the Reserve Account any excess funds remaining after payment of all other amounts required under this Indenture and remit any such excess to or at the direction of the Issuer.

## ARTICLE VIII

## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 8.1.    Payment of Principal and Interest.  The Issuer shall duly and punctually pay the principal of and interest on the Notes, subject to and in accordance with the terms of the Notes and this Indenture.

Section 8.2.    Maintenance of Office or Agency.  The Issuer shall maintain an office or agency within the United States of America where Notes may be presented or surrendered for payment, where Notes may be surrendered for registration of transfer or exchange and where notices in respect of the Notes and this Indenture may be served.  The Issuer hereby initially appoints the Trustee its office or agency for each of said purposes.  The Issuer shall give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders or exchanges may be made or served at the Corporate Trust Office.  As of the date hereof, and at all times since its formation, the chief executive office and place of business of the Issuer is and has been located at 3333 Beverly Road, Hoffman Estates, IL 60179.

Section 8.3.    Money for Note Payments to Be Held in Trust.  All monies received by or on behalf of the Trustee or its agents hereunder shall be segregated by the Trustee or its agents in accordance with the provisions hereof and shall be held in trust for the benefit of the Persons

entitled thereto.  As provided in Article IX, all payments of amounts due and payable with respect to the Notes shall be made on behalf of the Issuer by the Trustee or by the Paying Agent, and no amounts withdrawn from the Distribution Account for payments of Notes shall be paid over to the Issuer except as provided in this Indenture.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by delivery of an Issuer Order, direct any Paying Agent to pay to the Trustee all sums held in trust by such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Subject to any applicable escheat law, any money deposited with the Trustee in trust for payment to the Noteholders on any Payment Date and remaining unclaimed for two (2) years after such payment has become due and payable shall be paid to the Issuer on Issuer Request; and any Noteholder with a right to or interest in such money shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof, and all liability of the Trustee with respect to such trust money, shall thereupon cease; provided, however, that the Trustee, before being required to make any such repayment, shall at the expense of the Issuer send by first class mail to each Noteholder with a right to or interest in monies due and payable but not claimed, at the last address as shown on the Note Register for such Noteholders, and cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in the city in which the Corporate Trust Office is located, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 60 days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Issuer.  The Trustee may also adopt and employ, at the expense of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to each Noteholder whose right to or interest in monies due and payable but not claimed is determinable from the records of the Trustee, at the last address as shown on the Note Register for such Noteholder).

Section 8.4.    Continued Existence; Observance of Organizational Documents.  The Issuer shall keep in full effect its existence, rights and franchises as a limited liability company under the laws of the State of Delaware, shall operate in accordance with, and subject to the limitations set forth in, its Organizational Documents and shall obtain and preserve its qualification to do business as a foreign entity in each jurisdiction in which the failure to be so qualified would have a Material Adverse Effect.

Section 8.5.    Protection of Collateral

(a)    The Issuer covenants to file or cause to be filed all UCC financing statements and any other forms, documents or instruments necessary or as reasonably required by an Act of the Noteholders to be filed with respect to the Collateral in each appropriate office for such filings, including the filing of the Trademark Security Agreement in the United States Patent and Trademark Office, within ten (10) Business Days of the Closing Date.

(b)    The Issuer shall from time to time execute and deliver to the Trustee, the Servicer, the Manager and such other parties as the Issuer shall deem appropriate all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and shall take, or cause to be taken, such other action as is necessary or advisable to:

(i)    ensure a first priority, perfected security interest (subject to Permitted Liens) in all or any portion of the Collateral;

(ii)    maintain or preserve the Lien of this Indenture or carry out the purposes hereof;

(iii)    protect the validity of any Grant made by this Indenture;

(iv)    enforce any of the Collateral or, where appropriate, any security interest in the Collateral and the proceeds thereof;

(v)    preserve and defend the Issuer's title to the Collateral and the rights of the Noteholders therein against the claims of all persons and parties;

(vi)    record or register the Issuer's ownership of all of the Sears Trademarks of record in the Territory,

but in the foregoing cases of items (i) through (v), only to the extent the same can be achieved by recordation or filing under the laws of the Territory.

(c)    Any waiver of any default or other consent of the Issuer or Trustee under any License, or any material amendment thereto, or any related consent or waiver under the Servicing Agreement or Management Agreement, shall require the consent of the Majority Noteholders to be evidenced by an Act delivered to the Trustee.

Section 8.6.    Biennial Opinion and Certificates as to Collateral.    (a)  Upon request of the Majority Noteholders at any time on or after May 18, 2008, the Issuer shall furnish to the Trustee, the Rating Agencies and the Noteholders an Opinion of Counsel (which shall be outside counsel) either (i) stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording and refiling of any requisite documents as is necessary to maintain the Lien and security interest created by this Indenture and the perfection and priority thereof as the same originally existed under and in accordance with this Indenture or (ii) stating that in the opinion of such counsel no such action is necessary to maintain such lien and security interest; but in each of the foregoing cases, only to the extent the same can be achieved under the law of the United States or any state within the United States.  Such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of such requisite documents that shall, in the opinion of such counsel, be required to maintain the Lien and security interest of this Indenture and the perfection and priority thereof until the Legal Maturity Date, based upon the state of the law and facts in existence at the time of delivering the opinion. Notwithstanding anything in this Section 8.6 to the contrary, at no time shall the Issuer be required to deliver an Opinion of Counsel pursuant to this Section 8.6 more than once in any two-year period.

(b)    On October 31, 2010 and every fifth anniversary thereof (or such shorter period of time if a change in the UCC requires continuation statements to be filed more frequently than once every five (5) years), the Issuer will furnish to the Trustee a certificate signed by an Authorized Signatory, either (i) stating that, in the opinion of such Authorized Signatory, such action has been taken with respect to the recording, filing, re-recording and refiling of any requisite documents as is necessary to maintain the Lien and security interest created by this Indenture and the perfection and priority thereof as the same originally existed under and in accordance with this Indenture or (ii) stating that in the opinion of such Authorized Signatory no such action is necessary to maintain such lien and security interest; but in each of the foregoing cases, only to the extent the same can be achieved under the law of the United States or any state within the United States.

Section 8.7.    Negative Covenants.  So long as any Notes are Outstanding, the Issuer shall not:

(i)    sell, transfer, exchange or otherwise dispose of any of the Collateral (except as expressly permitted by the Transaction Documents or this Indenture, including Section 9.3);

(ii)    claim any credit on, or make any deduction from, the principal or interest payable in respect of the Notes (other than amounts properly withheld from such payments under applicable law) by reason of the payment of any taxes levied or assessed upon any of the Collateral;

(iii)    amend in any material manner (a) its Organizational Documents without the written consent of the Majority Noteholders and receipt of a Rating Agency Response, or (b) any Transaction Document without prior receipt of a Rating Agency Response from each Rating Agency and without receiving approval thereof by Act of the Noteholders (which may not be unreasonably withheld), other than as provided for in Article VI hereof;

(iv)    (a) permit the validity or effectiveness of this Indenture to be impaired, or permit this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations of this Indenture, except as may be expressly permitted hereby, (b) permit any lien, charge, security interest, mortgage or other encumbrances, other than the Lien of this Indenture and Permitted Liens, to be created on or extended to or otherwise arise upon or burden the Collateral or any part thereof or any interest therein or the proceeds thereof, or (c) permit this Indenture not to constitute a valid first priority security interest in (subject to Permitted Liens) the Collateral to the extent the same can be achieved by filing financing statements and the filing of the Trademark Security Agreement with the United States Patent and Trademark Office under the laws of the Territory;

(v)    change the state of its organization without 30 days' prior written notice to the Trustee, accompanied by such evidence of actions to be taken as shall be necessary to continue the perfection of the Lien on the Collateral to the extent the same can be achieved by filing under the laws of the Territory;

(vi)    institute, or consent to the institution of, bankruptcy or insolvency proceedings in respect to the Issuer, or file a petition seeking or consenting to reorganization or relief under any applicable federal or state law relating to bankruptcy, or seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Issuer or any substantial part of its assets, or make any assignment for the benefit of creditors, or admit in writing its inability to pay its debts generally as they become due, or take any corporate action in furtherance of any such action;

(vii)    except for Permitted Indebtedness, incur, assume or guaranty any Indebtedness except for such Indebtedness as has been approved by all Noteholders, provided, however, that neither this provision nor any other provision of this Indenture will prohibit or limit the Issuer from making loans to any Affiliate out of: (i) the initial proceeds from the issuance of the Notes, (ii) Retained Collections, or (iii) cash received by the Issuer from time to time pursuant to Section 10.1(a), or from canceling, amending, modifying or refinancing any such loans;

(viii)    except as contemplated in the Management Agreement, enter into any material amendment or supplement to or modification of the Assets or grant any material waiver or consent under the Assets;

(ix)    make any expenditure (by long-term or operating lease or otherwise) for any capital assets (either realty or personalty); or

(x)    for so long as any of the Notes remain Outstanding, (x) merge, dissolve, liquidate or consolidate with or into any other entity or engage in any other business combination with any other entity, (y) sell or transfer all or substantially all of its assets other than in conformity with the Transaction Documents, or (z) form any subsidiaries.

Section 8.8.    Statement as to Compliance.  The Issuer shall deliver to the Trustee, the Servicer, the Manager and the Back-Up Manager, and if requested by any Noteholder, such Noteholder, and the Rating Agencies, within 90 days of the end of each fiscal year of the Issuer, a written statement signed by an Authorized Signatory of the Issuer stating that:

(1)    a review of the activities of the Issuer during the preceding fiscal year (or such lesser period in the case of the first such statement) and of performance under this Indenture has been made under his supervision; and

(2)    the Issuer has fulfilled all its obligations under this Indenture throughout such period in all material respects, or, if there has been a material default in the fulfillment of any such obligation, specifying each such Default known to him and the nature and status thereof.

Section 8.9.    Inspection.  At any time and from time to time, the Issuer shall permit the Trustee, the Servicer, the Manager and the Noteholders, or their respective agents or representatives, during regular business hours and without charge (i) to examine and make copies of and abstracts from the books and records (financial and corporate) of the Issuer, and (ii) to visit the offices and properties of the Issuer for the purpose of reviewing and examining such

books and records and discussing matters relating thereto and to the performance of the Issuer under this Indenture with any of the officers or employees of the Issuer having knowledge of such matters.

Section 8.10.  Limited Purpose.  The Issuer shall not engage in any business other than the transactions permitted by its Organizational Documents, provided, that, notwithstanding anything in this Indenture to the contrary, there is no restriction on the Issuer's ability to: (a) make loans to an Affiliate out of: (i) the initial proceeds from the issuance of the Notes, (ii) Retained Collections, or (iii) cash received by the Issuer from time to time pursuant to Section 10.1(a); or (b) make distributions in accordance with its Organizational Documents.

Section 8.11.  Issuer Ownership.  The Issuer agrees that its books and records will reflect its ownership of the Collateral, subject to the Liens and security interests created by this Indenture and the Permitted Liens.

Section 8.12.  Enforcement of Transaction Documents.  The Issuer shall take all actions necessary, and diligently pursue all remedies available to it, consistent with sound business judgment, to enforce the obligations of each other party to a Transaction Document to secure its and the Noteholders' rights thereunder, provided, that prior to taking any action in the name of the Noteholders, it shall receive the written consent of the Majority Noteholders.

Section 8.13.  Representations and Warranties.  The Issuer, as of the date hereof and as of the Closing Date, hereby represents and warrants the following:

(a)  Except for the interests created by Licenses and Sublicenses, the Issuer is the owner of all of the Collateral free of Liens and encumbrances (other than Permitted Liens), the Issuer has not assigned any interest or participation in any Collateral, and the Issuer has full right to Grant such Collateral to the Trustee for the benefit of the Noteholders.

(b)  The Issuer has Granted a security interest in all of its right, title, and interest in the Collateral to the Trustee for the benefit of the Noteholders.

(c)  The Notes have not been registered under the Securities Act or pursuant to the securities or blue sky laws of any state or other jurisdiction.  Each Noteholder, by its purchase of a Note, will be deemed to have represented that it is not acquiring the Notes with a view to or in connection with any distribution thereof within the meaning of the Securities Act, provided that the disposition of its property shall at all times be and remain within its control.

(d)  The Trustee will, upon proper filing and/or recording of UCC financing statements and trademark documents, as applicable, by the Issuer or the Servicer on the Issuer's behalf, have a perfected first priority security interest (subject to Permitted Liens) in each item of Collateral, free from any Lien, security interest, encumbrance or other right, title or interest of any Person, except for any Permitted Lien, but in all cases only to the extent the same can be achieved by filing under the laws of the Territory.

(e)  The Issuer has its chief executive office at 3333 Beverly Road, Hoffman Estates, IL 60179.

(f)    The Issuer (i) is a limited liability company, duly organized, validly existing in good standing under the laws of Delaware; (ii) has requisite power and authority and all licenses and permits to own and operate its properties to carry on its business as now conducted, and to enter into and perform its obligations under each Transaction Document to which it is a party and the transactions contemplated thereby, including, the issuance and sale of the Notes and the performance of its obligations thereunder; and (iii) has been duly qualified and is authorized to do business and, if applicable, is in good standing as a foreign entity (or is exempt from such requirements) and has obtained all necessary licenses and approvals in each jurisdiction where the failure to be so qualified would have a Material Adverse Effect.

(g)    Each Transaction Document to which the Issuer is a party has been duly authorized and, when executed and delivered by the Issuer, will constitute a valid, binding and enforceable obligation of the Issuer in accordance with its terms, subject, as to the enforcement of remedies, to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally applicable in the event of the bankruptcy, insolvency or reorganization of the Issuer and to general principles of equity.

(h)    No event has occurred and is continuing that constitutes a Default or an Event of Default under, and as defined in, this Indenture or any other Transaction Document.  No event has occurred and is continuing that constitutes a Servicer Removal Event under the Servicing Agreement.  Neither the execution and delivery of any Transaction Document by the Issuer, the consummation of the transactions contemplated thereby nor the satisfaction of the terms and conditions of the Transaction Documents (i) conflicts with or results in any material breach or violation of any provision of the Organizational Documents of the Issuer, or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to the Issuer, or any of its properties, including regulations issued by an administrative agency or other governmental authority having supervisory powers over the Issuer; or (ii) constitutes a material default by the Issuer under or a material breach of any provision of this Indenture or any contract, agreement, mortgage or other instrument to which it is a party or by which it or any of its properties are or may be bound or affected or (iii) results in the creation or imposition of any Lien upon any of the properties or assets of the Issuer pursuant to the terms of any mortgage, deed of trust, contract, agreement, charter instrument, by-law or other instrument.

(i)    The Notes have been duly and validly authorized by the Issuer and, when duly and validly executed in accordance with this Indenture, will be validly issued and outstanding and entitled to the benefits of this Indenture.

(j)    The Issuer had at all relevant times and now has full power and authority to own the Collateral, and has full power and authority to Grant the Collateral, has duly authorized such Grant by all necessary action, and does not require any member approval, or approval or consent of any trustee or holders of any indebtedness or obligations of the Issuer other than such as have been obtained.

(k)    There is no pending action, suit, proceeding or investigation, including, but not limited to, any such proceeding or investigation resulting from the ownership or use of any of the Collateral, against or affecting the Issuer before any administrative agency, arbitrator or

governmental body or, to the best knowledge of the Issuer, any threatened action or proceeding, including but not limited to any such proceeding or investigation resulting from the ownership or use of any of the Collateral, against or affecting the Issuer before any of the foregoing which, if decided adversely to the Issuer, would have a Material Adverse Effect. The Issuer is not subject to any order of any court, governmental authority or agency or arbitration board of tribunal.

(l)     No consent, approval, authorization or order of, or filing, registration or application with any court or other governmental authority in respect of the Issuer is necessary or required under the law of the United States or any state within the United States or Puerto Rico in connection with the authorization, execution, delivery or performance by the Issuer of this Indenture or any other Transaction Document to which it is a party or any of the other documents or transactions contemplated thereby, including without limitation, the pledge of the Collateral to the Trustee for the benefit of the Noteholders, the servicing of the Collateral, or the offer, issue, sale, delivery or performance of the Notes, other than that consent, approval, authorization, order, filing, registration or qualification which has been, or will be promptly, made or obtained in the Territory; provided, that no representation is made with respect to filings or qualifications under the "Blue Sky" laws of the various states within the United States.

(m)     The representations and warranties of the Issuer in each of the Servicing Agreement, the Note Purchase Agreement, this Indenture and the other Transaction Documents to which it is a party are true and correct in all material respects and are hereby incorporated by reference as if each such representation and warranty were specifically made herein.

(n)     The Issuer is not a party to any contract or agreement, or subject to any charter or other legal restriction, which materially and adversely affects its business as contemplated in the Transaction Documents. The Issuer has not agreed to cause or permit in the future (upon the happening of a contingency or otherwise) any of its properties or any of the Collateral, other than as otherwise set forth in this Indenture, whether now owned or hereafter acquired, to be subject to a Lien not permitted by this Indenture.

(o)     For so long as any of the Notes are Outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Issuer will cause to be provided to a Noteholder and any prospective purchaser of Notes designated by a Noteholder, upon the request of such Noteholder or prospective purchaser, the information required to be provided to such Noteholder or prospective purchaser by Rule 144A(d)(4) under the Securities Act.

(p)     The Issuer does not intend to treat the Notes and related transactions as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4). In the event the Issuer determines to take any action inconsistent with such intention, it will promptly notify the Noteholders hereof. If the Issuer so notifies the Noteholders, the Issuer acknowledges that one or more of the Noteholders may treat its Notes as part of a transaction that is subject to Treasury Regulation Section 301.6112-1, and that such Noteholder or Noteholders, as applicable, will maintain the lists and other records required by such Treasury Regulation.

(q)    The Issuer is not (i) engaged in any money laundering scheme or activity in violation of applicable anti-money laundering laws and regulations, including the Patriot Act, or (ii) a Prohibited Person.

Section 8.14.  Certain Affirmative Covenants

(a)    The Issuer agrees that any Person designated in writing by a Noteholder may, upon reasonable prior written notice, consult with proper officials of the Issuer and (subject to consent by the Servicer under the Servicing Agreement) the Servicer at such times during normal business hours (and as often as such Person may reasonably request, subject to the provisos hereto), regarding the information required to be furnished pursuant to the Servicing Agreement or regarding the performance of the Issuer's covenants and agreements contained in this Indenture or any of the Transaction Documents to which it is a party; provided, however, that the Issuer shall not be obligated to permit such consultation more than one time per calendar year with respect to each Noteholder; provided, further, that the one time per calendar year limitation shall not apply if an Event of Default has occurred and is continuing.

(b)    The Issuer will comply in all material respects with all applicable laws, ordinances, rules, regulations and requirements of governmental authorities applicable to the Issuer, except where the compliance therewith is contested in good faith by appropriate proceedings or where the failure to so comply will not have a Material Adverse Effect.

(c)    The Issuer agrees to furnish any Noteholder upon request copies of each of the Transaction Documents, any documents to be furnished pursuant to the terms of the Transaction Documents and such other information and documents relating to the Notes and the Collateral as is reasonably requested, subject to such reasonable assurances of confidentiality as the Issuer may require in its discretion.

(d)    The Issuer will pay or cause to be paid all present and future recording and filing fees, and all legal, financial and miscellaneous out-of-pocket expenses and costs incurred by the Issuer in connection with the negotiation and consummation of the transactions contemplated by this Indenture, the other Transaction Documents and the issuance and sale of the Notes or the making of any associated amendment, release, consent or waiver requested by the Issuer, whether or not consummated, or requested by the Trustee pursuant to Section 1.12 or Section 8.5(b). The obligations of the Issuer under the preceding sentence shall be subject to the priority of distributions set forth in Section 10.1 hereof and shall survive the termination of this Indenture.

(e)    The Issuer will promptly following the release of an Asset pursuant to Section 9.3, update the schedules and exhibits attached to the Transaction Documents, with copies to the Servicer, Trustee, Manager, Back-Up Manager, Noteholders and Rating Agencies.

(f)    The Issuer will comply with, and obey the terms and provisions of, its Organizational Documents in all material respects and will not take any action which it is prohibited from taking under its Organizational Documents.

(g)    The Issuer shall notify the Noteholders, the Servicer, the Manager, the Trustee and the Rating Agencies of any material litigation in which the Issuer is a party, promptly upon

the Issuer's receipt of notice of the filing of such litigation, in writing by delivery by a reputable courier service or by certified or registered mail (return receipt requested), all charges prepaid.

(h)    The Issuer will notify the Trustee in writing of the identities of any Rating Agencies other than Moody's promptly after the appointment of any such Rating Agencies.

Section 8.15.  <u>Representations with Respect to Assets</u>.  On and as of the date of this Indenture, the Issuer represents with respect to the Assets which the Issuer pledges to the Trustee hereunder, that:

(a)    <u>Payments After the Closing Date</u>.  No monies or other contingent compensation shall be payable by the Issuer after the date such Asset became subject to the Lien of this Indenture to any person, firm or corporation with respect to any exploitation of such Asset which occurred prior to the date such Asset became subject to the Lien of this Indenture.

(b)    <u>No Defaults</u>.  The execution and implementation of this Indenture shall not result in a material breach of any conditions or constitute a material default (with or without notice or the lapse of time, or both) under any License or agreement constituting a portion of the Assets pledged hereunder or to which any of the Assets pledged hereunder is subject.  Neither the Issuer nor, to the Issuer's knowledge, any person, firm or corporation associated with or deriving rights through or from the Issuer, is in material breach or default of any agreement constituting a portion of the Assets which the Issuer pledges to the Trustee or to which any of such Assets are subject on the date of execution of this Indenture.

(c)    <u>Advances</u>.  No advances or other charges heretofore received by the Issuer in connection with the Assets which the Issuer pledges to the Trustee remain recoupable at any time from and after the Closing Date from any License Income earned at any time either before or after the date of this Indenture.

(d)    <u>Non-Contravention</u>.  Neither the Issuer's exercise of any of the rights, licenses, privileges and properties regarding the Assets pledged hereunder nor the Issuer's right, title and interest in and to the Assets pledged hereunder will violate or infringe on any common law or statutory rights of any person, firm or corporation, except such violations or infringements as would not have a Material Adverse Effect.

(e)    <u>Exhibits and Schedules Accurate</u>.  All of the information set forth in the exhibits and schedules attached hereto and to the Standard Definitions attached hereto is complete and accurate in all material respects.  No information supplied in writing to the Trustee, the Servicer, the Manager or any Noteholder by, or on behalf of, the Issuer in connection with the transactions contemplated by this Indenture, in each case as of the Closing Date, contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained therein or herein, in light of the circumstances under which they were made, not misleading.

(f)    <u>Ownership of the Sears Trademarks</u>.

(i)    <u>Exhibit F</u> contains a true and complete list of all registrations and pending applications for the Sears Trademarks in the Territory owned by the Issuer, all of which registrations exist, are subsisting and are valid except as provided therein and all of which

applications are validly pending.  All of the Sears Trademarks set forth in <u>Exhibit F</u>, except to the extent otherwise provided therein, are currently in use on the goods set forth in the registrations for Sears Trademarks in the Territory.

(ii)    Notwithstanding anything contained in <u>Exhibit G</u>, (i) the Issuer owns all right, title and interest in and to the registrations of the Sears Trademarks for use in the Territory listed in <u>Exhibit F</u>; (ii) the Issuer has the full and exclusive right, subject to the related Licenses and Sublicenses, to use and to license the use of the Sears Trademarks in the Territory; and (iii) the consummation of the transactions contemplated by the Transaction Documents will not alter or impair any of the foregoing rights.  The use by the Issuer in the Territory of the Sears Trademarks will not infringe on the rights of any Person, except such infringements as would not have a Material Adverse Effect.

(iii)    Except as provided in <u>Exhibit G</u>, no claim has been asserted against the Issuer or any Affiliate thereof by any Person to the use of, and the Issuer has no knowledge of the use by any person (other than the licensees and sublicensees under the Licenses and Sublicenses, respectively), of any of the Sears Trademarks in the Territory that infringes on the rights of the Issuer therein, and to the Issuer's knowledge there is no valid basis for such claim with respect to the Sears Trademarks or for any person (other than the licensees and sublicensees under the Licenses and Sublicenses, respectively) to use any of the Sears Trademarks in the Territory, except such claims or uses as would not have a Material Adverse Effect.

(iv)    Each of the Sears Trademarks is valid, subsisting and enforceable in the Territory.  There is vested in the Issuer title to the registrations of the Sears Trademarks for use in the Territory, free and clear of all Liens (other than Permitted Liens).

(g)    <u>Additional Representations with Respect to the Licenses</u>.

(i)    <u>Exhibit F</u> lists all Sears Trademarks and Licenses.  All of the Licenses are valid and in full force and effect, and except as set forth in <u>Exhibit F</u>, there are no existing material defaults (or events that, with notice or lapse of time or both, would constitute such a default) by any party thereunder.  No claim has been asserted by any Person challenging or questioning the validity or effectiveness of any of the Licenses and to the Issuer's knowledge there is no valid basis for any such claim.  The Issuer has not, other than pursuant to the Licenses and Sublicenses and agreements related to the Permitted Uses, granted any Person any right with respect to the Sears Trademarks.  Except for the Licenses and Sublicenses and agreements related to the Permitted Uses, no agreement to which the Issuer is a party or by which its assets are bound restricts or in any way affects the Sears Trademarks, or the right to use thereof in the Territory.  There is vested in the Issuer title to all of the Licenses free and clear of all Liens (other than Permitted Liens).

(ii)    The Issuer has considered the activities of all of the licensees and sublicenses under the Licenses and Sublicenses and has verified that the products manufactured, sold or offered for sale under the Sears Trademarks by such licensees and sublicenses meet the quality control standards set forth in such Licenses and Sublicenses

and all other such standards promulgated by the Issuer (or the Servicer or Manager on its behalf) in all material respects.

(iii)    No License is a Defaulted Contract Asset.

(iv)    All required material consents, assignment and/or assumption agreements or notices, if any, have been obtained or delivered in the manner required by each License.

## ARTICLE IX

## ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 9.1.    Accounts

(a)    Collection Account.  The Issuer, or the Servicer on its behalf, shall establish and maintain a demand deposit account (the "Collection Account"), which shall be in the name of the Servicer "as servicer on behalf of the Noteholders of the 6.90% KCD IP, LLC Asset-Backed Notes," and which shall be at U.S. Bank National Association or any Eligible Financial Institution, for the receipt of funds to be deposited into the Collection Account pursuant to this Indenture.  The Collection Account shall be controlled by the Servicer up to and until the Trustee assumes control of the Collection Account after an Event of Default that has not been waived by the Majority Noteholders in accordance with the Account Control Agreement.  If the financial institution with which the Collection Account is maintained ceases to be an Eligible Financial Institution, within 20 days of its actual knowledge thereof, the Issuer (unless an Event of Default shall have occurred and not have been waived, in which case such Eligible Financial Institution shall be selected by the Trustee) shall notify the Servicer and the Trustee of a replacement Eligible Financial Institution.  The Servicer shall within five (5) Business Days of obtaining actual knowledge of the identity of the replacement Eligible Financial Institution transfer the Collection Account to such replacement Eligible Financial Institution.  The Collection Account shall relate solely to the transactions contemplated in this Indenture, and funds in such account shall not be commingled with any other monies.  Funds on deposit in the Collection Account shall be invested in Eligible Investments at the written direction of the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer), or in accordance with standing instructions provided by the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) from time to time.  Any interest or other earnings realized on funds on deposit in the Collection Account shall be for the benefit of the Issuer and be credited to the Collection Account for distribution in accordance with the terms hereof.  The maximum permissible maturity or, if applicable, the latest redemption date of any Eligible Investments (other than pursuant to clause (iv) of the definition thereof) made with amounts on deposit in the Collection Account shall be not later than the Business Day immediately preceding next succeeding Payment Date.  The maximum permissible maturity of any Eligible Investment under clause (iv) of the definition thereof shall be the next succeeding Payment Date.  Except as set forth below, all right, title and interest in and to all cash amounts on deposit from time to time in the Collection Account attributable to amounts remitted by Obligors under the Collateral shall constitute part of the Collateral and shall be held for the benefit of the Trustee and the Noteholders until applied as provided herein.  In the event that a successor servicer is appointed

under this Indenture, the Servicer shall transfer the Collection Account and all funds on deposit therein to such successor Servicer on the date of its appointment and take such other and further steps as may be reasonably required to transfer all rights and responsibilities in connection with the Collection Account to such successor Servicer.

(b)    Distribution Account.  The Issuer shall establish with the Trustee and the Trustee shall maintain, for the benefit of the Noteholders, a segregated trust account (the "Distribution Account") which shall be in the name of the Trustee "as trustee on behalf of the Noteholders of the 6.90% KCD IP, LLC Asset-Backed Notes," and which shall be at U.S. Bank National Association or any other Eligible Financial Institution, for the receipt of funds to be deposited into the Distribution Account pursuant to this Indenture.  If the financial institution with which the Distribution Account is maintained ceases to be an Eligible Financial Institution, within 20 days of its actual knowledge thereof, the Issuer (unless an Event of Default shall have occurred and not have been waived, in which case, such Eligible Financial Institution shall be selected by the Trustee) shall notify the Servicer and the Trustee of a replacement Eligible Financial Institution. The Trustee shall within five (5) Business Days of obtaining actual knowledge of the identity of the replacement Eligible Financial Institution transfer the Distribution Account to such replacement Eligible Financial Institution.  The Distribution Account shall relate solely to the transactions contemplated in this Indenture, and funds in such account shall not be commingled with any other monies.  All payments to be made from time to time by the Trustee to the Noteholders out of funds in the Distribution Account pursuant to this Indenture shall be made by the Trustee as Paying Agent.  Funds on deposit in the Distribution Account shall be invested in Eligible Investments at the written direction of the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) or in accordance with standing instructions provided by the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) from time to time.  Any interest or other earnings realized on funds on deposit in the Distribution Account shall be for the benefit of the Issuer and be credited to the Distribution Account upon receipt by the Trustee and distributed in accordance with Section 10.1.  The maximum permissible maturity or, if applicable, the latest redemption date of any Eligible Investments (other than pursuant to clause (iv) of the definition thereof) made with amounts on deposit in the Distribution Account shall be not later than the Business Day immediately preceding the next succeeding Payment Date.  The maximum permissible maturity of any Eligible Investment under clause (iv) of the definition thereof shall be the next succeeding Payment Date.  All monies deposited from time to time in the Distribution Account pursuant to this Indenture shall be held by the Trustee as part of the related Collateral as herein provided.  Monies in the Distribution Account shall be subject to withdrawals pursuant to this Indenture, including Section 10.1, Section 7.2 and Section 7.5 of this Indenture.  The Trustee agrees to make withdrawals from the Distribution Account upon direction from the Servicer as set forth in each Servicer Report.  The Trustee shall have the sole and exclusive right of withdrawal from the Distribution Account after the Closing Date.

(c)    Trapping Account.  The Issuer shall establish with the Trustee and the Trustee shall maintain, for the benefit of the Noteholders, a segregated trust account (the "Trapping Account") which shall be in the name of the Trustee "as trustee on behalf of the Noteholders of the 6.90% KCD IP, LLC Asset-Backed Notes," and which shall be at U.S. Bank National Association or any Eligible Financial Institution, for the receipt of funds to be deposited into the Trapping Account pursuant to Section 10.1(a)(vi) of this Indenture.  If the financial institution

with which the Trapping Account is maintained ceases to be an Eligible Financial Institution, within 20 days of its actual knowledge thereof, the Issuer (unless an Event of Default shall have occurred and not have been waived, in which case, such Eligible Financial Institution shall be selected by the Trustee) shall notify the Servicer and the Trustee of a replacement Eligible Financial Institution. The Trustee shall within five (5) Business Days of obtaining actual knowledge of the identity of the replacement Eligible Financial Institution transfer the Trapping Account to such replacement Eligible Financial Institution. All monies deposited from time to time in the Trapping Account pursuant to this Indenture shall be held by the Trustee as part of the related Collateral as herein provided. Funds on deposit in the Trapping Account shall be invested in Eligible Investments at the written direction of the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer), or in accordance with standing instructions provided by the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) from time to time. Any interest or other earnings realized on funds on deposit in the Trapping Account shall be for the benefit of the Issuer and shall be transferred and credited to the Distribution Account upon receipt by the Trustee. The maximum permissible maturity or, if applicable, the latest redemption date of any Eligible Investments (other than pursuant to clause (iv) of the definition thereof) made with amounts on deposit in the Trapping Account shall be not later than the Business Day immediately preceding next succeeding Payment Date. The maximum permissible maturity of any Eligible Investment under clause (iv) of the definition thereof shall be the next succeeding Payment Date. Investments on deposit in the Trapping Account shall be liquidated and transferred by the Trustee to the Distribution Account on each Payment Date as may be necessary to pay the Issuer's obligations in accordance with Section 10.2.

(d)     Reserve Account. In the event that a Reserve Account Event occurs, the Issuer shall within 10 Business Days of such event establish with the Trustee and the Trustee shall maintain, for the benefit of the Noteholders, a segregated trust account (the "Reserve Account") which shall be in the name of the Trustee "as trustee on behalf of the Noteholders of the 6.90% KCD IP, LLC Asset-Backed Notes," and which shall be at U.S. Bank National Association or any Eligible Financial Institution, for the receipt of funds to be deposited into the Reserve Account pursuant to Section 10.1(a)(v) of this Indenture. If the financial institution with which the Reserve Account is maintained ceases to be an Eligible Financial Institution, within 20 days of its actual knowledge thereof, the Issuer (unless an Event of Default shall have occurred and not have been waived, in which case, such Eligible Financial Institution shall be selected by the Trustee) shall notify the Servicer and the Trustee of a replacement Eligible Financial Institution. The Trustee shall within five (5) Business Days of obtaining actual knowledge of the identity of the replacement Eligible Financial Institution transfer the Reserve Account to such replacement Eligible Financial Institution. All monies deposited from time to time in the Reserve Account pursuant to this Indenture shall be held by the Trustee as part of the related Collateral as herein provided. Funds on deposit in the Reserve Account shall be invested in Eligible Investments at the written direction of the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer), or in accordance with standing instructions provided by the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) from time to time. Any interest or other earnings realized on funds on deposit in the Reserve Account shall be for the benefit of the Issuer and shall be transferred and credited to the Distribution Account upon receipt by the Trustee. The maximum permissible maturity or, if applicable, the latest redemption date of any Eligible Investments (other than pursuant to clause

(iv) of the definition thereof) made with amounts on deposit in the Reserve Account shall be not later than the Business Day immediately preceding next succeeding Payment Date. The maximum permissible maturity of any Eligible Investment under clause (iv) of the definition thereof shall be the next succeeding Payment Date. Investments on deposit in the Reserve Account shall be liquidated and transferred by the Trustee to the Distribution Account on each Payment Date as may be necessary to pay the Issuer's obligations in accordance with Section 10.2.

Section 9.2.    Collection and Distribution of Monies

(a)    After the Closing Date, each Obligor shall be obligated to make payments of all amounts owing under the Licenses directly to the Collection Account, in each case without setoff except for commissions, fees and chargebacks. The Issuer will direct each of the Obligors under the Licenses to make payments of all amounts owing under the Licenses for each Collection Period directly to the Collection Account by 11:00 A.M. New York time on the Business Day one Business Day prior to the next succeeding Payment Date after the end of the Collection Period on such date. In accordance with the Servicer Report for each Determination Date, one Business Day prior to the next succeeding Payment Date, the Servicer (on behalf of the Issuer) will (i) transfer to the Transferor or to an account of the Transferor (or such other party, if applicable) all amounts on deposit in the Collection Account that do not constitute amounts remitted by Obligors under the Collateral, and (ii) transfer, to the extent of the Available Funds, to the Distribution Account by 12:00 P.M. New York time an amount sufficient for the Trustee to pay the amounts due pursuant to clauses (i) through (xi) of Section 10.1(a) on the next succeeding Payment Date.

(b)    Any amounts on deposit in the Collection Account that the Servicer has determined will not be needed to fund the estimated distribution amounts pursuant to clauses (i) through (xi) of Section 10.1(a) on next succeeding Payment Date will not be required to be transferred to the Distribution Account pursuant to Section 9.2(a) and will comprise "Retained Collections." Prior to 12:00 P.M. New York time on the Business Day prior to the next succeeding Payment Date (or the next Business Day if notice is given after 12:00 P.M. New York time), the Servicer may transfer up to 90% of the Retained Collections from the Collection Account in accordance with instructions from the Issuer given in its discretion. On each Payment Date, after the Trustee has distributed the amounts on deposit in the Distribution Account in accordance with Section 10.1(a), the Servicer may by 12:00 P.M. New York time (or the next Business Day if notice is given after 12:00 P.M. New York time) transfer the remaining Retained Collections from the Collection Account in accordance with instructions from the Issuer given in its discretion. Such withdrawals shall be subject to repayment (in whole or in part) by the Issuer to the Distribution Account within two (2) Business Days of request if the Servicer or Trustee notifies the Issuer that all or any part thereof is or was in fact needed to fund the distribution amounts pursuant to clauses (i) through (xi) of Section 10.1(a) on the applicable Payment Date.

(c)    Except as otherwise expressly provided herein, the Trustee shall be forwarded all money and other property payable to or receivable by the Issuer pursuant to the Collateral from the Servicer as provided in the Servicing Agreement and as otherwise provided in this Indenture. The Trustee shall hold all such money and property so received by it as part of the Collateral,

shall deposit the same into the Distribution Account, and shall apply it as provided in this Indenture.

Section 9.3.    Release of Assets. The Issuer may, with the prior written consent of all Noteholders, such consent to be given in the Noteholders' sole discretion, obtain a release of an Asset or Assets from the Lien of this Indenture by providing at least 45 days' prior written notice (the "Issuer's Notice") to the Trustee and the Noteholders setting forth (i) the Asset(s) to be released, (ii) the Redemption Date on which such Asset(s) will be released and (iii) an estimate of the Release Price to be deposited on the Redemption Date specified in such notice. Upon payment to the Distribution Account of the Release Price of such Asset(s) (which shall also be the Redemption Price for the Notes), the Asset(s) specified in the Issuer's Notice shall be released from the Lien of this Indenture. The Release Price for the release of such Asset(s) shall be applied to the redemption of Notes on such Redemption Date in accordance with Section 7.2 of this Indenture.

Section 9.4.    Monthly Statement of Trustee. Within five (5) Business Days following the end of each calendar month, the Trustee shall provide to the Issuer and the Servicer a statement setting forth the following:

(i)    the aggregate funds deposited in the Collection Account, the Distribution Account, the Trapping Account and the Reserve Account (if applicable) at the beginning of such calendar month; and

(ii)    any funds remaining in the Collection Account, Distribution Account, Trapping Account and the Reserve Account (if applicable) at the end of such calendar month.

Section 9.5.    Collateral. The Trustee may, and when required by the provisions of this Indenture shall, execute instruments to release property from the Lien of this Indenture, or convey the Trustee's interest in the same, in a manner and under circumstances which are not in violation of the provisions of this Indenture. No party relying upon an instrument executed by the Trustee as provided in this Article IX shall be bound to ascertain the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

## ARTICLE X

## APPLICATION OF MONIES

Section 10.1.    Disbursements of Monies from the Distribution Account

(a)    On each Payment Date by 11:00 A.M. New York time, the Trustee shall, pursuant to the Servicer's Report, withdraw funds from the Distribution Account, and pay the following amounts in the following order of priority in all cases to the extent of the remaining Available Funds deposited into the Distribution Account on such Payment Date:

(i)    to the Trustee, the Trustee Fee for such Payment Date and, to the extent not previously distributed, the Trustee Fee due on each prior Payment Date, and all outstanding Trustee Costs up to the Capped Trustee Costs;

(ii)    to the Issuer, the Issuer Costs and, to the extent not previously distributed, all outstanding Issuer Costs up to $100,000 during any twelve consecutive Collection Periods (the "Capped Issuer Costs");

(iii)    pro rata, (A) to the Manager, (x) the Management Fee for such Payment Date and, to the extent not previously distributed, the Management Fee due on each prior Payment Date, and (y) all outstanding Manager Costs up to $12,000 during any twelve consecutive Collection Periods (the "Capped Manager Costs"), (B) to the Servicer, (x) the Servicing Fee for such Payment Date and, to the extent not previously distributed, the Servicing Fee due on each prior Payment Date, and (y) all outstanding Servicer Costs up to $12,000 during any twelve consecutive Collection Periods (the "Capped Servicer Costs"), and (C) to the Back-Up Manager (x) the Back-Up Manager Standby Fee for such Payment Date and, to the extent not previously distributed, the Back-Up Manager Standby Fee due on each prior Payment Date, and (y) all outstanding Back-Up Manager Costs up to $12,000 during any twelve consecutive Collection Periods (the "Capped Back-Up Manager Costs");

(iv)    pro rata, to the Noteholders, interest accrued on the Notes for the related Interest Period plus any accrued interest thereon remaining unpaid from any previous Interest Period, and interest on such overdue interest to the date such payment is made, at the Note Interest Rate, but only to the extent that payment of such interest on interest shall be legally enforceable;

(v)    if a Reserve Account Event has occurred and is continuing, to the Reserve Account an amount equal to the lesser of (A) the remaining Available Funds as of such Payment Date, and (B) an amount such that after the deposit thereof the Reserve Account Amount is on deposit in the Reserve Account;

(vi)    if applicable, (X), to the Trapping Account, on each Payment Date during a Trapping Period, an amount equal to the least of (A) the remaining Available Funds as of such Payment Date, (B) the Trapping Amount, and (C) the excess, if any, of (x) the remaining outstanding principal balance on the Notes over (y) the amounts on deposit in the Trapping Account on such Payment Date (before giving effect to an allocation pursuant to this clause (v)), and (Y), pro rata, to the Noteholders, on each Payment Date when a Rapid Amortization Event has occurred and is continuing, an amount equal to the lesser of (A) the remaining Available Funds as of such Payment Date, and (B) the remaining outstanding principal balance on the Notes;

(vii)    to the Trustee, the positive difference, if any, for such Payment Date, between the outstanding Trustee Costs and the Capped Trustee Costs, plus, if any such costs are not paid on the Payment Date when due as a result of a Rapid Amortization Event being in effect, interest on such costs at the Prime Rate from the Payment Date for the Collection Period in which the costs were originally incurred to the date such costs are paid;

(viii)    to the Issuer, the positive difference, if any, for such Payment Date, between the outstanding Issuer Costs and the Capped Issuer Costs, plus, if any such costs

are not paid on the Payment Date when due as a result of a Rapid Amortization Event being in effect, interest on such costs at the Prime Rate from the Payment Date for the Collection Period in which the costs were originally incurred to the date such costs are paid;

(ix)    pro rata, to the Manager, the Servicer, and the Back-Up Manager, the positive difference, if any, for such Payment Date, between the outstanding Manager Costs and the Capped Manager Costs, the outstanding Servicer Costs and the Capped Servicer Costs, and the outstanding Back-Up Manager Costs and the Capped Back-Up Manager Costs, respectively, plus, if any such costs are not paid on the Payment Date when due as a result of a Rapid Amortization Event being in effect, interest on such costs at the Prime Rate from the Payment Date for the Collection Period in which the costs were originally incurred to the date such costs are paid;

(x)    to the Back-Up Manager, the Back-Up Manager Incentive Fee, if any;

(xi)    pro rata, to the parties owed such amounts for additional costs, if any, identified in the Servicer Report as being payable on such Payment Date; and

(xii)    to the Issuer or such party as the Issuer may direct, all remaining amounts in the Distribution Account.

(b)    The foregoing provisions of this Section 10.1 notwithstanding, any monies deposited in the Distribution Account for purposes of redeeming Notes pursuant to Article VII shall, subject to Section 8.3, remain in the Distribution Account until paid for the purpose of such redemption.

Section 10.2.    Disbursement of Monies out of the Trapping Account and Reserve Account.

(a)    In the event that on any Payment Date the Available Funds are not sufficient to make the payments specified in clauses (i) through (iv) of Section 10.1(a), after application of the funds from the Distribution Account pursuant to Section 10.1(a), the Trustee shall, on such Payment Date, (x) withdraw funds from the Trapping Account to the extent of such shortfall (to the extent funds are available therein), and (y) (i) if no Rapid Amortization Event has occurred and is continuing, apply the funds so withdrawn to such payments due on such Payment Date pursuant to and in the order of clauses (i) through (iv) of Section 10.1(a) to the extent of such shortfall, or (ii) if a Rapid Amortization Event has occurred and is continuing, apply the funds so withdrawn to such payments due on such Payment Date in accordance with the priority of payments in Section 10.1(a).

(b)    In the event that on any Payment Date the amount (A) on deposit or pledged to the Trapping Account plus the Rolling Twelve Month Revenue exceeds (B) the product of 275% and the Debt Service Amount, then an amount equal to (A) the Coverage Ratio as of the most recent Determination Date less 275%, times (B) the Debt Service Amount, shall be withdrawn from the Trapping Account and transferred to the Distribution Account for distribution in accordance with Section 10.1(a). In the event that on any Payment Date there are amounts on deposit in the Trapping Account and a Rapid Amortization Event has occurred and is continuing

and such funds are not distributed pursuant to Section 10.2(a), such funds shall be withdrawn from the Trapping Accounts and transferred to the Distribution Account for distribution in accordance with Section 10.1(a).

(c)     In the event that on any Payment Date the Available Funds are not sufficient to make the payments specified in clauses (i) through (iii) of Section 10.1(a), after application of the funds from the Distribution Account pursuant to Section 10.1(a) and the Trapping Account pursuant to Section 10.2(a), the Trustee shall, on such Payment Date, (x) withdraw funds from the Reserve Account to the extent of such shortfall (to the extent funds are available therein), and apply the funds so withdrawn to such payments due on such Payment Date pursuant to and in the order of clauses (i) through (iii) of Section 10.1(a) to the extent of such shortfall.

(d)     In the event that on any Payment Date the amount on deposit or pledged to the Reserve Account is greater than the Reserve Account Amount, then such excess shall be withdrawn from the Reserve Account and transferred to the Distribution Account for distribution in accordance with Section 10.1(a).

Section 10.3.  Eligible Investments.  Upon instruction from the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) or standing instructions as the President of the Issuer (or such other Authorized Signatory as directed by the President of the Issuer) may from time to time provide, the Trustee shall invest the funds in the Distribution Account, the Trapping Account and the Reserve Account in Eligible Investments. In the event, at the close of any Business Day, the Trustee has not received such investment instructions, or is not in possession of such standing investment instructions, the Trustee may invest such funds in the type of Eligible Investment specified in clause (iv) of the definition of Eligible Investments.  No Eligible Investment (other than pursuant to clause (iv) of the definition thereof) shall mature later than the Business Day immediately preceding next following Payment Date, except that the maximum permissible maturity of any Eligible Investment under clause (iv) of the definition thereof shall be the next succeeding Payment Date.  The Trustee agrees that at all times while this Indenture is in effect it or any of its Affiliates shall maintain an account for the type of investments identified in clause (iv) of the definition of Eligible Investments and shall not be entitled to any additional compensation in connection with the investment of funds of the Issuer in such investments in accordance with this Indenture.  The Trustee shall not be liable for any loss incurred on any funds invested in Eligible Investments pursuant to the provisions of this Indenture.  The Trustee shall have no liability in respect of losses incurred as a result of the liquidation of any Eligible Investment prior to its stated maturity or the failure of the Issuer to provide timely written investment directions.

Section 10.4.  Excess Costs.  On any Payment Date when a Rapid Amortization Event has occurred and is continuing, the Issuer may, in its discretion, deposit funds in the Distribution Account for distribution by the Trustee on such Payment Date to make payments in accordance with clauses (vii) thru (ix) of Section 10.1(a) up to the amounts then due and owing, including any accrued interest, if applicable, provided, that any such funds shall not come from Available Funds or constitute Available Funds, and provided, further, that nothing in this Section 10.4 shall require the Issuer to make any payment pursuant to this Section 10.4.

IN WITNESS WHEREOF, the Issuer and Trustee have caused this Indenture to be duly executed by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the day and year first above written.

KCD IP, LLC, as Issuer

By: _____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By: _____
    Name:
    Title:

*Indenture*

IN WITNESS WHEREOF, the Issuer and Trustee have caused this Indenture to be duly executed by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the day and year first above written.

KCD IP, LLC, as Issuer

By:_____

    Name:

    Title:

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By:_____

    Name:  PATRICIA M. CHILD

    Title:  VICE PRESIDENT

*Indenture*

# APPENDIX A

## STANDARD DEFINITIONS

Accounting terms used and not otherwise defined herein or in the Transaction Documents shall be interpreted in accordance with GAAP in effect in the United States from time to time.

"Act" or "Act of Noteholders":  The meaning ascribed thereto in Section 1.2(a) of the Indenture.

"Account Control Agreement":  The account control agreement, in effect from time to time, among the Issuer, the Servicer, the Trustee and the account bank, with respect to the Collection Account.

"Affiliate":  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Note Principal Balance":  With respect to the Notes, on any date of determination thereof, an amount equal to (i) the Initial Note Principal Balance, minus (ii) the aggregate of all principal payments previously made with respect to the Notes.

"Annual Servicer's Report":  The report described as such in Section 3.3 of the Servicing Agreement.

"Assets":  All of the following:

(i)     all Sears Trademarks for use in the Territory;

(ii)     all Licenses and the Issuer's rights under the Sublicenses;

(iii)     all License Income; and

(iv)     any of the foregoing acquired by the Issuer after the Closing Date.

"Authorized Signatory":  With respect to the Issuer, any one of the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary.

"Available Funds":  With respect to any Payment Date, or in the case of a Release of Assets, any Release Date, (a) all monies received in respect of the Collateral and deposited into the Collection Account during the related Collection Period (or as of the Release Date, as the case may be) (plus any investment earnings thereon) and (b) all investment earnings on amounts on deposit in the Trapping Account, the Distribution Account and the Reserve Account during the related Collection Period.

"Back-Up Management Agreement":  That certain Back-Up Management Agreement, dated as of May 18, 2006, entered into by and among the Issuer, the Trustee and the Back-Up Manager, as amended from time to time in accordance with the provisions thereof.

"Back-Up Manager":  Ocean Tomo, LLC, or any other Person appointed by the Issuer and approved in writing by Act of Noteholders, in its capacity as Back-Up Manager under the Back-Up Management Agreement.

"Back-Up Manager Costs":  All costs and expenses of the Back-Up Manager for which the Back-Up Manager is entitled to reimbursement or direct payment in accordance with the Back-Up Management Agreement or any related fee agreement between the Back-Up Manager and the Issuer.

"Back-Up Manager Incentive Fee":  The meaning provided in the Back-Up Management Agreement or any related fee agreement between the Back-Up Manager and the Issuer.

"Back-Up Manager Removal Event":  The meaning ascribed to such term in the Back-Up Management Agreement.

"Back-Up Manager Standby Fee":  With respect to any Payment Date, the periodic compensation specified in the Back-Up Management Agreement, or any related fee agreement between the Back-Up Manager and the Issuer, due the Back-Up Manager for its duties as Back-Up Manager.

"Benefit Plan":  "Benefit Plan": means an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to the provisions of Title I of ERISA, a "plan" described in Section 4975(e)(1) of the Code, an entity whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in such entity or any other plan that is subject to a law that is similar to Title I of ERISA or Section 4975 of the Code.

"Board of Directors":  The board of directors or managers of a Person or any duly authorized committee of that board, or the managing member of such Person.

"Board Resolution":  A copy of a resolution certified by the Secretary or an Assistant Secretary of the Issuer to have been duly adopted by its Board of Directors and to be in full force and effect on the date of such certification.

"Book-Entry Notes" means a beneficial interest in the Notes, ownership and transfers of which shall be made through book entries by a Clearing Agency as described in Section 2.12.

"Business Day":  Any day that is not (i) a Saturday, or Sunday or (ii) any other day on which commercial banking institutions in the State of New York, the State of Delaware, the State of Illinois, the State where the Servicer is located or the State where the Trustee is located are authorized or obligated by law or executive order to be closed.

"Capped Back-Up Manager Costs":  The meaning ascribed thereto in Section 10.1(a)(iii) of the Indenture.

"Capped Issuer Costs":  The meaning ascribed thereto in Section 10.1(a)(ii) of the Indenture.

"Capped Manager Costs":  The meaning ascribed thereto in Section 10.1(a)(iii) of the Indenture.

"Capped Servicer Costs":  The meaning ascribed thereto in Section 10.1(a)(iii) of the Indenture.

"Capped Trustee Costs":  $100,000 during any twelve consecutive Collection Periods; provided, that, in connection with any distributions pursuant to Section 4.7 of the Indenture, the Capped Trustee Costs shall be $250,000 during any twelve consecutive Collection Periods.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act that has been designated as the "Clearing Agency" for purposes of this Indenture.

"Clearing Agency Participant" means a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Closing Date":  May 18, 2006.

"Code":  The Internal Revenue Code of 1986, as amended.

"Collateral":  The meaning ascribed thereto in the granting clauses of the Indenture.

"Collection Account":  The meaning ascribed thereto in Section 9.1(a) of the Indenture.

"Collection Period":  With respect to any Payment Date, the Fiscal Month immediately preceding such Payment Date; provided, that with respect to the first Payment Date, the Collection Period will be the period from the first day of the Fiscal Month in which the Closing Date occurs through the end of the Fiscal Month immediately preceding the Initial Payment Date.

"Confidential Information":  Any and all non-public information, disclosed previously or in the future in connection with the Transaction, whether orally, in writing, visually or otherwise, by or on behalf of the Issuer or its Affiliates in connection with the Transaction.  Confidential Information includes, without the need to mark or identify it as such, the Issuer's or its Affiliates' business plans, strategies, forecasts and analyses; financial information; employee, customer and vendor information; royalty information; product and service specifications; purchasing, logistics, sales, marketing and other business processes and information of the Issuer or its Affiliates.

"Contract":  Any contract, indenture, mortgage, deed of trust, note, instrument, lease, license, arrangement or other agreement, whether oral or written, to which the Issuer may become a party or by which the Issuer or any of its assets or properties may be bound following

the Closing Date including, without limitation, the Licenses and Sublicenses as the same may have been amended, modified, replaced and/or supplemented from time to time.

"Contribution Agreement": That certain Contribution Agreement, dated as of the Closing Date, by and among the Transferor and the Issuer, pursuant to which the Issuer will acquire the Assets from the Transferor, as such agreement may be amended or supplemented pursuant to its terms.

"Corporate Trust Office": U.S. Bank National Association, 209 S. LaSalle Street, 3rd Floor, Chicago, IL 60604-1219, or such other address provided by the Trustee in writing.

"Coverage Ratio": With respect to each Determination Date prior to the Scheduled Payoff Date commencing with the third Determination Date, the quotient, expressed as a percentage, of the Rolling Twelve Month Revenue divided by the Debt Service Amounts for the Payment Date succeeding the applicable Determination Date.

"CRAFTSMAN Licenses": The CRAFTSMAN License Agreements, dated as of May 18, 2006, between the Issuer, as licensor, and Sears, as licensee, and the Issuer, as licensor, and Kmart, as licensee.

"CRAFTSMAN Sublicenses": Each sublicense agreement between Sears or Kmart, as sublicensor, and any third-party, as sublicensee, relating to the CRAFTSMAN Trademarks and related rights.

"CRAFTSMAN Trademarks": The meaning ascribed thereto in the CRAFTSMAN Licenses.

"Debt Service Amount": With respect to any Determination Date, the aggregate amount of interest due on the Notes on the Payment Date immediately succeeding such Determination Date and on the eleven Payment Dates (or such lesser number of Payment Dates since the Closing Date) immediately preceding such Determination Date, whether or not Available Funds are or were sufficient to make such interest payments when due.

"Debt Value": In connection with the release of any Asset pursuant to Section 7.2, (a) in relation to the CRAFTSMAN Licenses and related assets, an amount equal to the product of 50% (0.50) and the aggregate outstanding principal balance of the Notes as of the related Release Date; (b) in relation to the DIEHARD Licenses and related assets, an amount equal to the product of 4% (0.04) and the aggregate outstanding principal balance of the Notes as of the related Release Date; and (c) in relation to the KENMORE Licenses and related assets, an amount equal to the product of 46% (0.46) and the aggregate outstanding principal balance of the Notes as of the related Release Date.

"Default": Any occurrence which is, or with notice or the lapse of time or both would become, an Event of Default.

"Default Rate": The Note Interest Rate plus 2% (to the extent allowed by law).

"Defaulted Contract Asset": As of the date of determination, a License as to which any of the following shall have occurred: (i) the periodic required payments have become over 30 days delinquent, (ii) a default has occurred thereunder and any applicable cure period has expired without such cure having been effected, or (iii) any party or Affiliate of a party to the License is insolvent or has commenced, either voluntarily or involuntarily, a proceeding under the Federal Bankruptcy Code.

"Definitive Notes" has the meaning specified in Section 2.12.

"Determination Date": The 20th day of each calendar month, commencing on June 20, 2006 (or, if such day is not a Business Day, the immediately preceding Business Day).

"DIEHARD Licenses": The DIEHARD License Agreements, dated as of May 18, 2006, between the Issuer, as licensor, and Sears, as licensee, and the Issuer, as licensor, and Kmart as licensee.

"DIEHARD Sublicenses": Each sublicense agreement between Sears or Kmart, as sublicensor, and any third-party, as sublicensee, relating to the DIEHARD Trademarks and related rights.

"DIEHARD Trademarks": The meaning ascribed thereto in the DIEHARD Licenses.

"Distribution Account": The segregated trust account established and maintained by the Trustee as such pursuant to Section 9.1(b) of the Indenture.

"Dollars" or "$": Dollars in lawful currency of the United States of America.

"Eligible Financial Institution": A depository institution that (a) has a combined capital and surplus of at least $250,000,000, (b) is subject to supervision or examination by Federal or state banking authority and subject to regulations substantially similar to 12 C.F.R. Section 9.10(b), (c) has an office within the United States of America, (d) is not affiliated (as such term is defined in Rule 405 under the Securities Act) with the Issuer or with any Person involved in the organization or operation of the Issuer and (e) has a short-term rating of P-1 from Moody's or if no short-term rating exists, has long-term debt with at least an "A2" rating from Moody's or otherwise acceptable to the Rating Agencies and the deposits of which are insured to the full extent permitted by law by the FDIC and which has trust power and is organized under the laws of the United States of America or any state thereof. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this definition, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

"Eligible Investments": Any and all of the following:

(i)     obligations of, or guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof which are backed by the full faith and credit of the United States;

(ii)     certificates of deposit and time and demand deposits and bankers acceptances having original maturities of no more than 365 days of any bank or trust company incorporated under the laws of the United States or any state, provided that the long term debt obligations of such bank or trust company (or parent holding company thereof), at the date of acquisition thereof have received a credit rating in one of the two highest rating categories of the Rating Agency;

(iii)     commercial paper of any corporation incorporated under the laws of the United States or any state thereof having original maturities of not more than 180 days which on the date of acquisition has a credit rating in the highest rating category for commercial paper of the Rating Agency;

(iv)     money market mutual funds registered under the Investment Company Act of 1940, as amended, having a credit rating, at the time of such investment of Aaa or its equivalent (including funds managed by the Trustee or its Affiliates); and

(v)     bonds or other obligations having a short term unsecured debt rating in one of the two the highest rating categories of the Rating Agency and having a long term debt rating in the highest rating category of the Rating Agency issued by, or by authority of, any state of the United States, any territory or possession of the United States, including the agencies thereof, or any political subdivision of any of the foregoing.

So long as the applicable criteria in this definition of Eligible Investments are otherwise satisfied, (a) Eligible Investments may include the obligations of any Person affiliated with the Issuer, and (b) the Trustee may purchase Eligible Investments by or through its Affiliates.

"ERISA":  The Employee Retirement Income Security Act of 1974, as amended.

"Event of Default":  When used in connection with the Indenture, an Event of Default described in Section 4.2 thereof.

"Expected Maturity Date":  The June 2016 Payment Date, provided, that, each time the Scheduled Payoff Date is extended in accordance with the definition thereof for an additional one year period, the Expected Maturity Date shall be correspondingly extended for an additional one year period to the June 2017 and June 2018 Payment Dates, as applicable.

"FDIC":  The Federal Deposit Insurance Corporation, or any successor thereof.

"Federal Bankruptcy Code":  The U.S. Bankruptcy Code of 1978, as amended.

"Fiscal Month":  Each fiscal month employed by Sears for financial reporting purposes, which may change its policy on its fiscal months from time to time. As of the date hereof, each Fiscal Month commences on the Sunday after the end of the prior Fiscal Month (or in the case of the first Fiscal Month, commences on April 30, 2006) and ends on the Saturday which is four calendar weeks (in the case of a Four-Week Fiscal Month) or five calendar weeks (in the case of a Five-Week Fiscal Month) thereafter. The first day of a Fiscal Month may occur in the preceding calendar month, and the last day of a Fiscal Month may occur in the succeeding calendar month. The first Fiscal Month shall be the May 2006 Fiscal Month, which commenced

on April 30, 2006 and will end on May 27, 2006. The Fiscal Months through the end of Fiscal Year 2010 are set forth on Schedule I hereto.

"Fiscal Year": Each 52-week or 53-week fiscal year employed by Sears for financial reporting purposes, which may change its policy on its fiscal years from time to time. Each Fiscal Year begins on the Sunday following the last Wednesday in January and ends on the Saturday preceding the commencement of the next Fiscal Year.

"Five-Week Fiscal Month": Each Fiscal Month occurring principally in March, June, September or December; provided, however, for the last Fiscal Month (i.e., the January Fiscal Month) in each Fiscal Year which is a 53-week Fiscal Year, such Fiscal Month shall constitute a Five-Week Fiscal Month.

"Foreign Noteholder": Any beneficial owner of Notes who is not, for U.S. Federal Income tax purposes, (i) a citizen or resident of the United States, (ii) a corporation or partnership or other entity treated as a corporation or partnership for United States federal income tax purposes created or organized in, or under the laws of, the United States, any State thereof or the District of Columbia (unless in the case of a partnership, Treasury Regulations are promulgated that provide otherwise), (iii) an estate the income of which is includable in gross income for United States tax purposes regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, all as defined in Section 7701(a)(30) of the Code and the Treasury Regulations promulgated thereunder.

"Four-Week Fiscal Month": Each Fiscal Month other than a Five-Week Fiscal Month.

"GAAP": Generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Authority": Any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Government Securities": The securities described in clause (i) of the definition of the term "Eligible Investments".

"Grant": To grant, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm. A Grant of a license or of any other instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including, without limitation, the immediate and continuing right to claim, collect, receive and receipt for payments in respect of a license or any other payment due thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring proceedings in the name of the Granting party or otherwise, and generally to do and receive anything which the Granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Guarantee and Collateral Agreement":    That certain Guarantee and Collateral Agreement, dated as of March 24, 2005, made by Sears Holdings Corporation, Sears, Sears Roebuck Acceptance Corp., Kmart Holding Corporation, Kmart Management Corporation, Kmart and certain of their subsidiaries, in favor of JPMorgan Chase Bank, N.A., as administrative agent for certain lenders, as it may be amended, modified, supplemented, restated or waived from time to time.

"Indebtedness": (i) all items, except items of equity or of membership interests or of surplus, deferred revenue and deferred advances, or of general contingency or deferred tax reserves, which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of a balance sheet, (ii) to the extent not otherwise included, all obligations secured by any Lien to which any property or asset owned or held is subject, whether or not the obligation secured thereby shall have been assumed, (iii) to the extent not otherwise included, all capitalized lease obligations, and (iv) to the extent not otherwise included, all obligations of any third party which are guaranteed.

"Indenture": That certain Indenture, dated May 18, 2006, by and between the Issuer and the Trustee, as the same may be amended, modified, supplemented or restated from time to time.

"Initial Interest Period":    With respect to the Initial Payment Date, the period commencing on the Closing Date to and including the day immediately preceding the Initial Payment Date.

"Initial Note Principal Balance": $1,800,000,000.

"Initial Noteholders": The purchasers under the Note Purchase Agreement.

"Initial Payment Date": June 26, 2006.

"Interest-Only Period": The period of time from the Closing Date until the earlier of a (i) the Scheduled Payoff Date, (ii) the occurrence of a Rapid Amortization Event that is not waived by the Majority Noteholders, or (iii) the occurrence of an Event of Default that is not waived by the Majority Noteholders.

"Interest Period":  With respect to the Notes and as to any Payment Date, the period from and including the immediately preceding Payment Date (or, in the case of the Initial Payment Date, from and including the Closing Date) to and including the day immediately preceding such Payment Date.

"Investment Company Act":  The Investment Company Act of 1940, as amended.

"Investment Letter":  The meaning set forth in Section 2.6 of the Indenture.

"IRS":  The Internal Revenue Service, or any successor thereof.

"Issue Date":  The date any Note issued pursuant to this Indenture executed by the Issuer is authenticated and delivered by the Trustee.

"Issuer": KCD IP, LLC, a Delaware limited liability company.

"Issuer Costs": All costs and expenses of the Issuer incurred in connection with its performance of the transactions contemplated under the Indenture and the Transaction Documents or the Assets, including but not limited to costs associated with the retention of any independent manager or special member, other than the costs and expenses associated with the initial closing of the transaction contemplated hereby.

"Issuer's Notice": The meaning ascribed thereto in Section 9.3 of the Indenture.

"Issuer Order": A written order or request signed in the name of the Issuer by any of its Authorized Signatories and delivered to the Trustee.

"KENMORE Licenses": The KENMORE License Agreements, dated as of May 18, 2006, between the Issuer, as licensor, and Sears, as licensee, and the Issuer, as licensor, and Kmart, as licensee.

"KENMORE Sublicenses": Each sublicense agreement between Sears or Kmart, as sublicensor, and any third-party, as sublicensee, relating to the KENMORE Trademarks and related rights.

"KENMORE Trademarks": The meaning ascribed thereto in the KENMORE Licenses.

"Kmart": Kmart Corporation, a Michigan corporation.

"Legal Maturity Date": The June 2019 Payment Date, provided, that, each time the Scheduled Payoff Date is extended in accordance with the definition thereof for an additional one year period, the Legal Maturity Date shall be correspondingly extended for an additional one year period to the June 2020 and June 2021 Payment Dates, as applicable.

"Liabilities": Collectively, all of the indebtedness, liabilities and obligations owed from time to time by the Issuer to any of the Secured Parties whether for principal, interest, fees, costs, expenses or otherwise (including all amounts which would become due but for the operation of the automatic stay under Section 3629(a) of the Federal Bankruptcy Code and operation of Sections 502(b) and 506(b) thereof or any analogous provisions of any similar laws).

"License Income": Any and all forms of income, proceeds or compensation, exclusive of any advertising cost reimbursement and related designated amounts, whether cash or other compensation, paid on account of or in respect of any of the Licenses and Sublicenses, provided, however, that any compensation received in any form other than cash or negotiable instruments shall not be deemed received until the same has been converted to cash.

"Licenses": At any time and from time to time, the DIEHARD Licenses, the KENMORE Licenses and the CRAFTSMAN Licenses, and any other licenses of Sears Trademarks to which the Issuer shall be a party as licensor, together with any extension, modification, renewal or replacement of any such license.

"Lien":  Any interest in property securing an obligation owed to, or a claim by, any Person other than the owner of the property, whether such interest shall be based on the common law, statute or contract, whether or not such interest shall be recorded or perfected and whether or not such interest shall be contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances, and including the lien or security interest arising from a mortgage, encumbrance, pledge, adverse claim or charge, conditional sale or trust receipt, or from a lease, consignment or bailment for security purposes, all of which Liens affecting the Assets are described in Exhibit B to the Contribution Agreement.

"Majority Noteholders":  The meaning described thereto in Section 1.2(a) of the Indenture.

"Management Agreement":  That certain Management Agreement, dated as of the date hereof, entered into by and between the Issuer and the Manager, as manager, as amended from time to time in accordance with the provisions thereof.

"Management Fee":  An amount equal to $35,000 per Collection Period, payable on each Payment Date in accordance with Section 10.1(a) of the Indenture.

"Manager":  Sears Intellectual Property Management Company, in its capacity as manager under the Management Agreement, and its permitted successors and assigns.

"Manager Costs":  All costs and expenses of the Manager for which the Manager is entitled to reimbursement or direct payment under and in accordance with the Management Agreement.

"Manager Removal Event": The meaning ascribed to such term in Section 5(b) of the Management Agreement.

"Material Adverse Effect": A material adverse effect on: (a) the operations, financial condition, or business of the Issuer taken as a whole; (b) the ability of the Issuer to perform its obligations under the Indenture or any of the other Transaction Documents; or (c) the validity or enforceability of this Indenture, any of the other Transaction Documents, or the rights and remedies of the Trustee and Noteholders hereunder or thereunder taken as a whole.

"Moody's":  Moody's Investors Service, Inc. and its successors.

"Note" or "Notes":  The securities authorized and issued under the Indenture.

"Note Depository Agreement" means the agreement among the Issuer, the Trustee and The Depository Trust Company, as the initial Clearing Agency.

"Noteholder" or "Holder":  Each holder, from time to time, of an interest in a Note.

"Note Interest Rate":  With respect to each Note, 6.90% per annum, plus, if the Scheduled Payoff Date is extended pursuant to the definition thereof, 0.50% per annum from and after the originally scheduled Scheduled Payoff Date, plus, at all times after the Scheduled

Payoff Date (as extended, if applicable), 1.00% per annum, payable in arrears on each Payment Date.

"Note Principal Balance":  With respect to each Note, on any date of determination thereof, an amount equal to (i) the initial principal balance of such Note as specified on the face thereof, minus (ii) the aggregate of all principal payments previously made with respect to such Note.

"Note Purchase Agreement":  That certain Note Purchase Agreement, dated the date hereof, between the Issuer, as seller, and the Initial Noteholders, as purchasers.

"Note Register":  The meaning specified in Section 2.5 of the Indenture.

"Note Registrar":  The meaning specified in Section 2.5 of the Indenture.

"Obligor":  A Person obligated to pay a Receivable.

"Opinion of Counsel":  A written opinion of counsel who may, except as otherwise expressly provided in the Indenture, be in-house counsel employed full-time by the Person (or an Affiliate of such Person) required to deliver the opinion.

"Orchard Credit Agreement":  That certain Senior Secured Credit Agreement, dated as of November 23, 2005, by and among Orchard Supply Hardware LLC, as borrower, Orchard Supply Hardware Stores Corporation and certain other parties, as guarantors, the lenders party thereto, certain other parties, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the lenders, as it may be amended, modified, supplemented, restated or waived from time to time.

"Orchard Related Intellectual Property":  The meaning specified in Section 1.12 of the Indenture.

"Organizational Documents":  In the case of the Issuer, the Certificate of Formation of the Issuer filed on May 3, 2006, and the Operating Agreement of the Issuer dated the date hereof, each as may be amended from time to time, and, in the case of any other entity, its certificate of incorporation, by-laws, certification of formation, operating agreement or other organizational documents, all as amended from time to time.

"Outstanding":  With respect to the Notes, as of the date of determination, all Notes theretofore delivered under the Indenture except:

     (i)    Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

     (ii)    Notes for whose payment money in accordance with Section 7.6 of the Indenture in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the Noteholders of such Notes; and

(iii)    Notes in exchange for or in lieu of which other Notes have been delivered pursuant to the Indenture.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended.

"Paying Agent":  The meaning set forth in Section 2.5 of the Indenture.

"Payment Date":  The 25th day of each calendar month commencing on the Initial Payment Date and ending on the Legal Maturity Date (provided, that if any such date is not a Business Day, the Payment Date shall be the next ensuing Business Day).

"Percentage Interest":  With respect to a Note, the undivided percentage interest in all the Notes evidenced by such Note, which percentage interest shall be equal to the initial Note Principal Balance thereof divided by the aggregate Initial Note Principal Balance of all of the Notes.

"Permitted Indebtedness":  Indebtedness of the Issuer pursuant to the Notes, other liabilities of the Issuer pursuant to the Indenture and the other Transaction Documents, and liabilities of the Issuer incurred in the ordinary course of its business activities as contemplated under the Indenture and the other Transaction Documents.

"Permitted Liens":  The Lien granted by the Issuer to the Trustee pursuant to the Indenture, the Lien granted in favor of JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, pursuant to the Orchard Credit Agreement and the Pledge and Security Agreement, the Lien granted to JPMorgan Chase Bank, N.A., as administrative agent, pursuant to the Sears Credit Agreement and the Guarantee and Collateral Agreement, any Lien granted to the licensees pursuant to the Licenses and any Lien granted to the sublicensees under the Qualified Sublicenses and the continuation of any such Lien or substitution therefor of a substantially equivalent Lien granted in connection with the refinancing of such loan facilities.

"Permitted Uses":  The limited uses of the Sears Trademarks as contemplated in the Sears Credit Agreement, the Orchard Credit Agreement, the Guarantee and Collateral Agreement and the Pledge and Security Agreement and the uses granted to the licensees pursuant to the Licenses and the sublicensees pursuant to the Qualified Sublicenses.

"Person":  Any individual, corporation, partnership, limited liability company, joint venture, joint-stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Pledge and Security Agreement":  That certain Pledge and Security Agreement, dated as of November 23, 2005, by and between Orchard Supply Hardware, LLC, Orchard Supply Hardware Stores Corporation, OSH Finance Corporation, and JPMorgan Chase Bank, N.A., as administrative agent.

"Prime Rate":  The prime rate announced to be in effect from time to time, as published as the average rate in the Wall Street Journal, and the Prime Rate shall change without notice with each change in such prime rate as of the date such change is reported.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds":  All proceeds of, and all other profits, rentals or receipts, in whatever form, arising from the collection, sale, lease, exchange, assignment, licensing or other disposition of, or realization upon, Collateral, including, without limitation, all claims of the Issuer against third parties for loss of, damage to or destruction of, or for proceeds payable under, or unearned premiums with respect to, policies of insurance in respect of, any Collateral, and any condemnation or requisition payments with respect to any Collateral, in each case whether now existing or hereafter arising.

"Prohibited Person":  Any person or entity (a) listed in the Annex to, or that is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (the "Executive Order"), or (b) that is named as a "specifically designated national (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov.ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list.

"Qualified Sublicense":  Any "Qualified Sublicense" under any of the Licenses.

"Rapid Amortization Event":  The meaning provided in Section 4.1(b) of the Indenture.

"Rapid Amortization Event Cure":  The meaning provided in Section 4.1(b) of the Indenture.

"Rating Agencies":  Moody's and/or any other nationally recognized securities rating organizations requested by the Issuer to rate the Notes that has in effect a current rating on the Notes.

"Rating Agency":  Each one of the Rating Agencies.

"Rating Agency Response":  (a) With respect to Moody's, written notice of the proposed action or inaction is given to Moody's and, within 30 days of the date of such notice, Moody's does not give notice to the Issuer of its intent to lower or withdraw its outstanding rating on the Notes by virtue thereof, and (b) with respect to any Rating Agency other than Moody's, a written confirmation from such Rating Agency as to any action or inaction that such action or inaction, in and of itself, will not cause such Rating Agency to lower or withdraw its outstanding rating on the Notes, such ratings in either case being understood not to cover payment of the Redemption Premium, if any, payable as part of a Redemption Price, provided, however, if at any time 100% of the Noteholders consent to a particular action or inaction, Rating Agency Response will be deemed received and satisfied in all respects.

"Rating Agency Responses":  The aggregate of each Rating Agency Response from each Rating Agency.

"Receivables":  Amounts payable under or in respect of any of the Assets.

"Redemption Date":  Any Payment Date.

"Redemption Notice":  The notice of redemption described in Section 7.3.

"Redemption Premium":  An amount equal to the excess, if any, of (i) the sum of the present values of the remaining principal and interest scheduled to have been paid in respect of the Notes (assuming payments of principal are paid in full on the then current Scheduled Payoff Date), discounted to the date fixed for redemption on a monthly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, plus 100 basis points over (ii) the principal amount of the Notes outstanding as of the date the Notes are redeemed.  For purposes of this definition:

   (i)      "Treasury Rate":  With respect any Redemption Date or prepayment date, the rate per annum equal to the monthly equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date or prepayment date, as applicable.

   (ii)     "Comparable Treasury Issue":  The United States treasury security having a maturity equal to the then remaining term of the Notes to be redeemed or prepaid, as applicable, to the Scheduled Payoff Date, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the Notes to the Scheduled Payoff Date.

   (iii)    "Comparable Treasury Price" means, with respect to any Redemption Date or prepayment date, the average of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) on the third Business Day preceding such Redemption Date or prepayment date, as applicable, as set forth in the daily statistical release (or any successor release) published by the Federal Reserve Bank of New York or published on the website of the Federal Reserve Bank of New York at http://www.ny.frb.org and designation "Composite 3:30 p.m. Quotations for the U.S. Government Securities".

"Redemption Price":  With respect to Outstanding Notes to be redeemed, an amount equal to the principal amount of such Notes to be redeemed and accrued interest thereon to the Redemption Date plus the Redemption Premium.

"Registered Holder" or "Noteholder":  The Person whose name appears on the Note Register on the applicable Determination Date or any other applicable date.

"Release Date":  The date on which Assets are released from the Lien of the Indenture in a Release of Assets.

"Release Price":  With respect to Assets being released from the Lien of the Indenture in accordance with Section 9.3 of the Indenture on any Release Date, and calculated as of the related Release Date by the Servicer, the sum of:

(i)    the greater of:  (A) the Debt Value of the Assets released, and (B) the fair market value of the Assets released as determined by the Majority Noteholders, <u>provided</u>, that if the Majority Noteholders are not able to agree on a fair market value, the fair market value will be as determined by the Back-Up Manager;

(ii)    during the Interest-Only Period, the Redemption Premium associated with the Outstanding Notes to be redeemed with the amount described in <u>clause (i)</u> and the ensuing required redemption of Notes with such amount;

(iii)    accrued but unpaid interest, and interest that is scheduled to accrue, on the Outstanding Notes to be redeemed from the Release Date to the ensuing Redemption Date for the required redemption of such Notes; and

(iv)    any other accrued Liabilities attributable to the Notes being redeemed (or portion of Notes, if applicable), as of the Redemption Date.

"<u>Representatives</u>":  The meaning ascribed thereto in <u>Section 1.18</u> of the Indenture.

"<u>Requirement of Law</u>":  As to any Person, the certificate of incorporation and by laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, determination or order of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Reserve Account</u>":  The segregated trust account to be established and maintained by the Trustee as such pursuant to <u>Section 9.1(d)</u> of the Indenture upon the occurrence of a Reserve Account Event.

"<u>Reserve Account Amount</u>":  When a Reserve Account Event has occurred and is continuing, $600,000, and at all other times, $0.

"<u>Reserve Account Event</u>":  Sears Holdings Corporation's senior unsecured debt rating, or to the extent none exists, its corporate family rating, is below "B2" by Moody's (or the equivalent thereof by any other Rating Agency), or is "B2" and is on negative watch or review for possible downgrade by Moody's (or the equivalent thereof by any other Rating Agency).

"<u>Responsible Officer</u>":  With respect to a particular matter, any officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject, who, in each case, is responsible for the administration of this Indenture.

"<u>Restated Coverage Ratio</u>":  For any Payment Date, the Coverage Ratio that would have existed if the Rolling Twelve Month Revenue had included any cash delivered and pledged to the Trustee under the Indenture in furtherance of curing a Trapping Event or Rapid Amortization Event that would have otherwise occurred on such Payment Date.

"<u>Retained Collections</u>":  The meaning ascribed thereto in <u>Section 9.1</u> of the Indenture.

"Rolling Twelve Month Revenue":  With respect to any Determination Date, the aggregate amount of Available Funds on the Payment Dates succeeding the twelve most recently ended Collection Periods (or such lesser number of Collection Periods since the Closing Date), minus the amounts paid or payable to the Trustee, Servicer, Manager, Back-Up Manager and Issuer pursuant to clauses (i), (ii) and (iii) of Section 10.1(a) of the Indenture on such Payment Dates.

"Rule 144A":  The rule of the United States Securities and Exchange Commission so named.

"Rule 144A Representation Letter":  A letter substantially in the form of Exhibit D to the Indenture.

"Sale":  The meaning ascribed thereto in Section 4.17(a) of the Indenture.

"Scheduled Payoff Date":  The June 2010 Payment Date, provided, that the Issuer may extend the Scheduled Payoff Date (A) for an additional one year period to the June 2011 Payment Date, if (i) it provides written notice to the Trustee, Rating Agencies, Servicer, Manager, Back-Up Manager and Noteholders not more than 60 days and not less than 30 days prior to the original Scheduled Payoff Date, and (ii) either (a) the Coverage Ratio as of each of the six (6) Determination Dates immediately preceding the June 2010 Determination Date was greater than or equal to 395%, or (b) the Majority Noteholders consent to the extension, and (B) for a second additional one year period to the June 2012 Payment Date, if (i) it provides written notice to the Trustee, Rating Agencies, Servicer, Manager, Back-Up Manager and Noteholders not more than 60 days and not less than 30 days prior to the then current Scheduled Payoff Date, and (ii) either (a) the Coverage Ratio as of each of the six (6) Determination Dates immediately preceding the June 2011 Determination Date was greater than or equal to 400%, or (b) the Majority Noteholders consent to the extension.

"Sears":  Sears, Roebuck and Co., a New York corporation.

"Sears Credit Agreement":  That certain Five-Year Credit Agreement, dated as of February 22, 2005, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders party thereto, certain other parties, and JPMorgan Chase Bank, N.A., as administrative agent for the lenders, as it has been, and may hereafter be, amended, modified, supplemented, restated or waived from time to time.

"Sears Trademarks": The KENMORE Trademarks, the CRAFTSMAN Trademarks, and the DIEHARD Trademarks and their formatives in the Territory, that the Issuer owns as of the Closing Date, all registrations and applications therefore in the Territory, and all goodwill in the Territory associated therewith, including but not limited to, as set forth on Exhibit A to the Contribution Agreement and Exhibit F to the Indenture.

"Secured Parties":  The Trustee, each Noteholder, the Servicer, the Manager and the Back-Up Manager.

"Securities Act":  The Securities Act of 1933, as amended.

"Servicer":  Sears Holdings Management Corporation, in its capacity as such under the Servicing Agreement until a successor Person shall have been appointed in accordance with the Servicing Agreement and this Indenture, and thereafter such successor Person.

"Servicer Costs":  All costs and expenses of the Servicer for which the Servicer is entitled to reimbursement or direct payment under and in accordance with the Servicing Agreement.

"Servicer Order" and "Servicer Request":  A written order or request signed in the name of the Servicer by its Chairman of the Board, President or a Vice President, and by its Treasurer, an Assistant Treasurer, Controller, an Assistant Controller, Secretary, or an Assistant Secretary and delivered to the Trustee.

"Servicer Removal Event":  The meaning ascribed to such term in Section 5.1 of the Servicing Agreement.

"Servicer Report":  The report prepared and delivered by the Servicer pursuant to Section 3.1 of the Servicing Agreement.

"Servicer's Certificate":  The certificate described in Section 3.2 of the Servicing Agreement.

"Servicing Agreement":  That certain Servicing Agreement, dated as of the date hereof, entered into by and among the Servicer, the Trustee and the Issuer, as amended from time to time.

"Servicing Fee":  An amount equal to $12,500 per Collection Period, payable on each Payment Date in accordance with Section 10.1(a) of the Indenture.

"State":  Any state in the United States.

"Sublicenses":  All DIEHARD Sublicenses, KENMORE Sublicenses and CRAFTSMAN Sublicenses, and any other sublicenses of Sears Trademarks to which Sears or Kmart shall be a party as sublicensor, together with any extension, modification, renewal or replacement of any such sublicense.

"Termination Notice":  The meaning assigned to such term in the Management Agreement.

"Territory":  The United States of America, its possessions and territories, including Puerto Rico.

"TIN":  The meaning ascribed thereto in Section 2.8.

"Trademark Security Agreement":  That certain Trademark Security Interest, dated as of the date hereof, between the Issuer and the Trustee.

"Transaction":  The transaction contemplated by the Transaction Documents.

"Transaction Documents": The collective reference to the Indenture, the Notes, the Management Agreement, the Servicing Agreement, the Contribution Agreement, the Back-Up Management Agreement, the Account Control Agreement, the Licenses, the Sublicenses and the Note Purchase Agreement.

"Transfer Agent": The Trustee or another party designated as such under and in accordance with the Indenture.

"Transferor": Sears Brands, LLC, an Illinois limited liability company, in its capacity as a transferor under the Contribution Agreement.

"Trapping Account": The segregated trust account established and maintained by the Trustee as such pursuant to Section 9.1(c) of the Indenture.

"Trapping Amount": As of any Determination Date, an amount (not less than zero) equal to the excess of: (A) 275% times the Debt Service Amount, over (B) the sum of the Rolling Twelve Month Revenue plus the amounts on deposit in the Trapping Account as of the related Determination Date.

"Trapping Event": The meaning provided in Section 4.1(a) of the Indenture.

"Trapping Event Cure": The meaning provided in Section 4.1(a) of the Indenture.

"Trapping Period": The period commencing upon the occurrence of a Trapping Event and ending on the earlier to occur of: (i) a Trapping Event Cure and (ii) a Rapid Amortization Event.

"Trustee": U.S. Bank National Association, and its successors or assigns hereunder.

"Trustee Costs": All costs and expenses of the Trustee for which the Trustee is entitled to reimbursement or direct payment under and in accordance with the Indenture and the related fee agreement between the Trustee and the Issuer.

"Trustee Fee": An amount equal to $291.67 per Collection Period, payable on each Payment Date in accordance with Section 10.1(a) of the Indenture.

"UCC": The Uniform Commercial Code as in effect from time to time in the State of New York; provided, that if by reason of mandatory provisions of law, the perfection or the effect of non-perfection of the Liens on any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"United States": The United States of America.

EXHIBIT A

FORM OF NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR OTHER SECURITIES LAWS, THE ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), AND THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED WITHOUT REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE OR OTHER SECURITIES LAWS EXCEPT IN A TRANSACTION THAT IS EXEMPTED UNDER THE SECURITIES ACT (INCLUDING TRANSFER MADE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A")) AND APPLICABLE STATE OR OTHER SECURITIES LAWS.

EACH HOLDER OF THIS NOTE MUST BE, AND BY VIRTUE OF HOLDING THIS NOTE SHALL BE DEEMED TO HAVE REPRESENTED THAT IT IS, AN INSTITUTIONAL ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) and (7) UNDER THE SECURITIES ACT AND THAT IT WAS NOT FORMED TO PURCHASE NOTES.

THE PRINCIPAL OF THIS NOTE IS PAYABLE ON THE PAYMENT DATES AND IN THE AMOUNTS DESCRIBED HEREIN. ACCORDINGLY, THE OUTSTANDING NOTE PRINCIPAL BALANCE OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF AND MAY BE ASCERTAINED ONLY BY OBTAINING A CONFIRMATION THEREOF FROM THE TRUSTEE NAMED HEREIN OR ITS SUCCESSOR.

EACH PURCHASER AND TRANSFEREE OF THE NOTES WILL BE DEEMED TO REPRESENT AND WARRANT THAT EITHER (I) IT IS NOT ACQUIRING THE NOTES WITH THE PLAN ASSETS OF AN "EMPLOYEE BENEFIT PLAN", AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), WHICH IS SUBJECT TO THE PROVISIONS OF TITLE I OF ERISA, A "PLAN" DESCRIBED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR OTHER PLAN'S INVESTMENT IN SUCH ENTITY OR ANY OTHER PLAN THAT IS SUBJECT TO A LAW THAT IS SIMILAR TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE OR (II) THE ACQUISITION, HOLDING AND DISPOSITION OF THE NOTES WILL NOT GIVE RISE TO A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA, SECTION 4975 OF THE CODE OR ANY SIMILAR APPLICABLE LAW.

REGISTERED
No. [__]

Initial Note Principal
Balance of the
Notes: $1,800,000,000

Initial Note Principal
Balance of this Note:
$1,800,000,000
CUSIP NO. [_____]

6.90% KCD IP, LLC
ASSET-BACKED NOTES

ISSUE DATE: May 18, 2006

Unless this Note is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to the Issuer or its agent for registration of transfer, exchange or payment, and any Note issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

KCD IP, LLC, a limited liability company duly organized and existing under the laws of the State of Delaware (the "Issuer," which term includes any successor entity under the Indenture referred to below), for value received, hereby promises to pay to CEDE & Co., or registered assigns (the "Payee"), the principal sum of One Billion Eight Hundred Million Dollars ($1,800,000,000) payable on each Payment Date in distributions of principal, if any, and interest as set forth in the Indenture. This Note shall be a limited obligation of the Issuer, payable solely from and to the extent of the Collateral subject to the Lien of the Indenture (defined below). This Note shall bear interest on the outstanding unpaid principal balance at a rate equal to the Note Interest Rate per annum, determined on the basis of a 360 day year of twelve 30-day months; provided, however, that interest on any amount of principal that is not timely paid when due shall accrue interest until paid at a rate per annum equal to 2% per annum in excess of the Note Interest Rate then in effect to the extent allowed by law (the "Default Rate"); and, provided, further, that if a Default shall have occurred under, and as defined in, the Indenture, interest shall accrue from that time forward at the Default Rate, to the extent allowed by law, until such Default is cured. All unpaid principal of and accrued interest on the Notes shall be due and payable on June 25, 2019, as such date may be extended in accordance with the terms of the Indenture. The interest and principal so payable on any Payment Date shall, as provided in the Indenture, be paid to the Person in whose name this Note is registered in the Note Register on the Determination Date for such Payment Date, which shall be the close of business on the 20th day (or, if such day is not a Business Day, the next succeeding Business Day) of each calendar month, commencing on June 20, 2006. All terms used in this Note which are defined in the

Indenture shall have the meanings assigned to them in the Indenture. Certain provisions of the Indenture are described in this Note.

The principal of and interest on this Note payable on each Payment Date as set forth in the Indenture are payable solely by wire transfer to the Person whose name appears as the Registered Holder of this Note on the Note Register on the Determination Date for the Payment Date, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

Unless the certificate of authentication hereon has been executed by the Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture, or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Notes of the Issuer designated as its 6.90% KCD IP, LLC Asset-Backed Notes (herein called the "Notes") issued under an Indenture, dated as of May 18, 2006 (herein called the "Indenture"), by and between the Issuer and U.S. Bank National Association, as trustee (the "Trustee") which term includes any successor Trustee under the Indenture, to which Indenture reference is hereby made for a statement of the respective rights thereunder of the Issuer, the Trustee and the Noteholders, and the terms upon which the Notes are, and are to be, authenticated and delivered.

As provided in the Indenture, the Notes are secured by and payable solely from Assets (the "Assets"), proceeds thereof and other amounts, if any, held by the Trustee as security for the Notes (the "Collateral"), as described in the Indenture. The Notes are equally and ratably secured by the Collateral pledged therefor to the extent provided by the Indenture.

Unless earlier declared due and payable by reason of an Event of Default or otherwise pursuant to the Indenture, the Notes are payable at the time and in the manner provided in the Indenture and are redeemable before such time in whole or in part, on any Payment Date as provided in the Indenture. The Notes shall be redeemed at a Redemption Price equal to the Note Principal Balance or portion thereof to be redeemed, plus accrued interest thereon to the Redemption Date, plus a Redemption Premium in certain circumstances, in the amount established under the Indenture. If an Event of Default (as defined in the Indenture) shall occur and be continuing, the principal of all the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Issuer may remove all or a portion of the Assets from the Lien of the Indenture in accordance with Section 9.3 of the Indenture upon giving notice to the Trustee and delivering the Release Price of the Assets to be removed to the Trustee. Any such election to remove Assets shall be deemed to be an exercise of the option to redeem Notes as provided in the Indenture.

It is the intent of the Issuer and the Noteholders that, for purposes of Federal and State income tax and any other tax measured in whole or in part by income, the Notes will qualify as indebtedness of the Issuer. The Noteholders, by acceptance of a Note, agree to treat, and to take no action inconsistent with the treatment of, the Notes for such tax purposes as indebtedness of the Issuer.

Prior to due presentment for registration of transfer of this Note, the Issuer, the Trustee and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes whether or not this Note be overdue, and neither the Issuer, the Trustee, nor any such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Noteholders under the Indenture at any time by the Issuer subject to procedures and approvals set forth in the Indenture.  The Indenture also contains provisions permitting the Noteholders to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults and their consequences under the Indenture.  Any such consent or waiver shall be conclusive and binding upon the Noteholder and upon all future Noteholders of this Note and of any Note issued upon the registration of transfer hereof or in exchange therefor or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.

The Notes are issuable only in registered form without coupons in such authorized denominations as provided in Section 2.3 of the Indenture and subject to certain limitations therein set forth.  The Notes are exchangeable for Notes with a like principal amount of the exchanged Note, of a different authorized denomination, as requested by the Noteholder surrendering same.

**This Note and the Indenture shall be governed by and construed in accordance with the laws of the State of New York without reference to its conflicts of laws rules (other than Title 14 of Article 5 of the New York General Obligations Law).**

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note in accordance with the Indenture at the times, place and rate, and in the coin or currency, herein prescribed.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be signed, manually or in facsimile, by an Authorized Signatory.

KCD IP, LLC

By:    _____
       Name:
       Title:

[FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION]
This is one of the Notes referred to in the within mentioned Indenture.


Dated: _____, 20__

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely
as Trustee


By    _____
        Authorized Signatory

EXHIBIT B

ASSIGNMENT OF NOTE

For value received the undersigned hereby sells, assigns and transfers unto [_____] whose social security or other tax identifying number is [_____], a note as hereinafter described and hereby irrevocably constitutes and appoints [_____], attorney, to transfer the same on the Note Register of the Issuer with full power of substitution in the premises.

Description of Note:

6.90% KCD IP, LLC Asset-Backed Note, No. [__] with an initial Note Principal Balance of $[_____] issued under that certain Indenture, dated as of May 18, 2006, between KCD IP, LLC (the "Issuer") and U.S. BANK NATIONAL ASSOCIATION, as Trustee.

[SELLER/ASSIGNOR]

By:      _____
         Name:
         Title:

Dated:_____

NOTE: The signature to this assignment must correspond with the name as written on the face of the Note herein described in every particular, without alterations or enlargement or any change whatsoever.

Signature Guaranteed:

_____

NOTE:  Signature(s) must be guaranteed by a participant in a signature medallion program.

EXHIBIT C

FORM OF SERVICER'S REPORT

## IMPORTANT NOTICE

These materials are being provided by J.P. Morgan Securities Inc. ("JPMorgan") to the person requesting these materials and no other party is entitled to view the information included in these materials. JPMorgan shall have no duty or obligations to make any representations, warranties or disclosure of any nature, express or implied, to any party. These materials have been provided to you for informational purposes only and may not be relied upon by you in any way.

*This sample report ("the Report") for the structured transaction identified herein is provided for informational purposes only. No assurance can be given that the cash-flow calculations using this Report will be accurate. This Report relies on certain assumptions about events or conditions that are unlikely to be consistent with, and may differ materially from, actual events or conditions. In addition, not all relevant events or conditions may have been considered in developing such assumptions. Accordingly, actual cash-flows in the transaction or this Report will vary from those projected using the report and such variations may be material.*

THE REPORT IS PROVIDED "AS IS" WITH NO WARRANTIES OF ANY KIND. ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND WITH RESPECT TO THE REPORT ARE HEREBY DISCLAIMED, INCLUDING WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES THAT THIS REPORT IS ERROR-FREE, WARRANTIES AS TO ANY RESULTS TO BE OBTAINED BY USE OF THIS REPORT (OR INFORMATION DERIVED THEREFROM) OR ANY OTHER IMPLIED WARRANTIES. IN NO EVENT SHALL JPMORGAN BE LIABLE FOR ANY USE, INABILITY TO USE, DECISION MADE, ACTION TAKEN OR INACTION BY ANY PARTY IN RELIANCE UPON THIS REPORT, OR FOR ANY INACCURACIES, ERRORS IN OR OMISSIONS FROM THIS REPORT. JPMORGAN SHALL NOT BE LIABLE (IN CONTRACT, TORT OR OTHERWISE) FOR ANY DAMAGES (DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER) IN CONNECTION WITH ANY USE OF OR INABILITY TO USE THIS REPORT, EVEN IF IT HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

DRAFT

Sears Holdings Management Corporation as Servicer
Servicer Report
License and Sublicense Portfolio

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| Licensor | Licensee | Sublicensee | Trademark | License / Sublicense Termination Date | Current Collection Period | | | Prior Eleven Collection Periods | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Royalties | Other Amounts Received | Cash Contribution | Royalties | Other Amounts Received | Cash Contribution |
| KCD IP LLC | Sears, Roebuck and Co. | | Craftsman | 2016 | 18,200,362 | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | | Kenmore | 2016 | 16,639,028 | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | | DieHard | 2016 | 1,002,756 | - | - | - | - | - |
| KCD IP LLC | Kmart | | Craftsman | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Kmart | | Kenmore | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Kmart | | DieHard | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | Johnson Controls Inc. | DieHard | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | Danaher Corp. | Craftsman | 2016 | - | - | - | - | - | - |
| | | | | | $ 35,842,145.85 | $ - | $ - | $ - | $ - | $ - |

DRAFT

## Sears Holdings Management Corporation as Servicer
### Servicer Report
### Input Page

| GENERAL | | NOTES |
|---|---|---|
| Today's date | May-15-2006 | |
| Servicer Report frequency | 12 | |
| Determination Date | May-15-2006 | 20th day of each calendar month (or preceding Business Day) |
| Collection Period - begin | Apr-02-2006 | First day of each Fiscal Month |
| Collection Period - end | Apr-29-2006 | Last day of each Fiscal Month |
| Payment Date | May-15-2006 | 25th day of each calendar month (or succeeding Business Day) |
| Collection Period within original Interest-Only Period? | Yes | First (4) years |
| Was original Interest-Only Period extended? | No | Permitted only if Coverage Ratio < [150]% in 6 Collection Periods prior to exention of Scheduled Payoff Date |
| Collection Period within Interest-Only Period extension? | No | |
| Trapping Event? | No | |
| Rapid Amortization Event? | No | Coverage Ratio < 275% during I/O period |
| Has Scheduled Payoff Date occurred? | No | Coverage Ratio < 225% during I/O period |
| Servicer/Manager Removal Event? | No | |
| Event of Default? | No | Coverage Ratio < 158% |
| Note Principal Balance - Beginning of Collection Period | $ 1,800,000,000.00 | |
| Accrued Note Interest owed for prior Collection Period | $ - | |
| Beginning Trapping Account balance | $ - | |
| Costs owed to other parties | $ - | |
| Interest earned on Trapping Account (Payment Date to Payment Date) | $ - | |
| Interest earned on Distribution Account (Payment Date to Payment Date) | $ - | |
| Days in a month | 30.00 | |
| Days in a year | 360.00 | |
| NOTE INTEREST RATE | | |
| Note Interest Rate | 7.00% | |
| Addition to Note Interest Rate during Interest-Only Period extension | 0.50% | |
| Addition to Note Interest Rate during Rapid Amortization after Scheduled Payoff Date | 1.00% | |
| TRUSTEE | | |
| Trustee Fee - Collection Period | $ 292 | |
| Accrued and unpaid Trustee Fees from prior Collection Period(s) | $ - | |
| Capped Trustee Costs - total permitted over 12 consecutive Collection Periods | $ 100,000 | |
| Accrued and unpaid Trustee Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ - | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| ISSUER | | |
| Capped Issuer Costs - total permitted over 12 consecutive Collection Periods | $ 100,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Issuer Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ - | |
| MANAGER | | |
| Management Fee - Collection Period | $ 35,000 | |
| Accrued and unpaid Management Fees from prior Collection Period(s) | $ - | |
| Capped Manager Costs - total permitted over 12 consecutive Collection Periods | $ 12,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Manager Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ - | |
| SERVICER | | |
| Servicer Fee - Collection Period | $ 12,500 | |
| Accrued and unpaid Servicer Fees from prior Collection Period(s) | $ - | |
| Capped Servicer Costs - total permitted over 12 consecutive Collection Periods | $ 12,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Servicer Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ - | |
| BACK-UP MANAGER | | |
| Backup Manager Standby Fee - Collection Period | $ 1,250 | |
| Accrued and unpaid Back-Up Manager Standby Fees from prior Collection Period | $ - | |
| Capped Back-Up Manager Costs - total permitted over 12 consecutive Collection Periods | $ 12,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Back-Up Manager Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ - | |
| Liquidation? | No | |
| Back-Up Manager Incentive Fee | $ 500,000.00 | |

Indenture 10.1(a)(x)

DRAFT

| Back-UP Manager Incentive Fee II | $ | 2,000,000.00 |
| Back-UP Manager Incentive Fee II | | 0.10% |

**COLLATERAL STATUS**

| | |
|---|---|
| Any material unresolved claims regarding ownership or liens on collateral? | No |
| Any material unresolved litigation threatened or commenced by or against Issuer, Servicer or Manager? | No |
| Any other material event regarding Collateral? | No |
| Any new Licenses or Sublicenses? | No |
| Any new Sears Trademarks? | No |
| Any Licenses or Sublicenses in material default? | No |

**OTHER**

| | | |
|---|---|---|
| Has cash been contributed to the deal in this Collection Period to prevent a Cash Trapping or Rapid Amortization Event? | No | |
| Cash contributed in this Collection Period to prevent a Cash Trapping or Rapid Amortization Event. | $ - | |
| Cash contributed in prior Collection Periods to prevent a Cash Trapping or Rapid Amortization Event. | $ - | May not exceed $[10,000,000] |
| Total cash contributed in this Collection Period to prevent a Cash Trapping Event | $ - | |
| Number of Collection Periods in current calendar year in which cash has been contributed to prevent a Cash Trapping or Rapid Amortization Event, including this Collection Period | 0 | May not exceed 2 in a calendar year |
| Number of Collection Periods in which cash has been contributed to prevent a Cash Trapping or Rapid Amortization Event since the Closing Date | 0 | May not exceed 5 prior to Legal Maturity Date |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Costs & Capped Costs Calculation**

| Determination Date | 15-May-2006 |
| --- | --- |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| 12 Most Recently Ended Collection Periods | Determination Date | Trustee Costs (a) | Issuer Costs (a) | Manager Costs (a) | Servicer Costs (a) | Back-Up Manager Costs (a) |
| --- | --- | --- | --- | --- | --- | --- |
| 1 | 15-May-2006 | $ - | $ - | $ - | $ - | - |
| 2 | 15-Apr-2006 | $ - | $ - | $ - | $ - | - |
| 3 | 16-Mar-2006 | $ - | $ - | $ - | $ - | - |
| 4 | 14-Feb-2006 | $ - | $ - | $ - | $ - | - |
| 5 | 15-Jan-2006 | $ - | $ - | $ - | $ - | - |
| 6 | 16-Dec-2005 | $ - | $ - | $ - | $ - | - |
| 7 | 16-Nov-2005 | $ - | $ - | $ - | $ - | - |
| 8 | 17-Oct-2005 | $ - | $ - | $ - | $ - | - |
| 9 | 17-Sep-2005 | $ - | $ - | $ - | $ - | - |
| 10 | 18-Aug-2005 | $ - | $ - | $ - | $ - | - |
| 11 | 19-Jul-2005 | $ - | $ - | $ - | $ - | - |
| 12 | 19-Jun-2005 | $ - | $ - | $ - | $ - | - |

| | Trustee Costs (a) | Issuer Costs (a) | Manager Costs (a) | Servicer Costs (a) | Back-Up Manager Costs (a) |
| --- | --- | --- | --- | --- | --- |
| Costs paid - last eleven Collection Periods | $ - | $ - | $ - | $ - | - |
| Costs incurred - current Collection Period | $ - | $ - | $ - | $ - | - |
| Costs accrued from prior Collection Periods | $ - | $ - | $ - | $ - | - |
| Capped Costs - 12-month Period | $ 100,000.00 | $ 100,000.00 | $ 12,000.00 | $ 12,000.00 | 12,000.00 |
| | | | | | |
| Costs payable, current Collection Period, subject to cap | $ - | $ - | $ - | $ - | - |
| Costs payable, this Collection Period, above cap | $ - | $ - | $ - | $ - | - |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Priority of Payments & Trapping Account Rollforward**

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| | |
|---|---|
| Monies received in respect of Collateral | $ 35,842,145.85 |
| Interest earned on Distribution Account & Trapping Account - Payment Date to Payment Date | - |
| Release of funds from Trapping Account | - |
| Cash contribution | - |
| Available Funds | $ 35,842,145.85 |

| Distributions (Indenture, Section 10.1(a)) | Distribution Due | Payment Date Distribution | Remaining Available Funds | Accrued Distributions for Next Collection Period | Notes |
|---|---|---|---|---|---|
| (i) Trustee Fee | $ 291.67 | $ 291.67 | $ 35,841,854.18 | | |
| (i) Trustee Costs, not to exceed Capped Trustee Costs | $ - | $ - | $ 35,841,854.18 | $ - | May be paid in (vi) |
| (ii) Issuer Costs, not to exceed Capped Issuer Costs | $ - | $ - | $ 35,841,854.18 | $ - | May be paid in (vii) |
| (iii) Management Fee (pro rata with Servicing Fee, Back-Up Manager Standby Fee) | $ 35,000.00 | $ 35,000.00 | $ 35,806,854.18 | $ - | |
| (iii) Servicing Fee (pro rata with Management Fee, Back-Up Manager Standby Fee) | $ 12,500.00 | $ 12,500.00 | $ 35,794,354.18 | $ - | |
| (iii) Back-Up Manager Standby Fee (pro rata with Management Fee, Servicing Fee) | $ 1,250.00 | $ 1,250.00 | $ 35,793,104.18 | $ - | |
| (iii) Manager Costs, not to exceed Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs) | $ - | $ - | $ 35,793,104.18 | $ - | N/A May be paid in (viii) |
| (iii) Servicer Costs, not to exceed Capped Servicer Costs (pro rata with Manager Costs, Back-Up Manager Costs) | $ - | $ - | $ 35,793,104.18 | $ - | N/A May be paid in (viii) |
| (iii) Back-Up Manager Costs, not to exceed Capped Back-UP Manager Costs (pro rata with Manager Costs, Servicer Costs) | $ - | $ - | $ 35,793,104.18 | $ - | N/A May be paid in (viii) |
| (iv) Accrued Interest for this Collection Period | $ 10,500,000.00 | $ 10,500,000.00 | $ 25,293,104.18 | $ - | |
| (iv) Accrued Interest owed for prior Collection Period(s) | $ - | $ - | $ 25,293,104.18 | $ - | N/A |
| (v) Cash trapped in Trapping Account | $ - | $ - | $ 25,293,104.18 | $ - | N/A |
| (v) Rapid Amortization Principal | $ - | $ - | $ 25,293,104.18 | $ - | N/A |
| (vi) Trustee Costs, if any, in excess of Capped Trustee Costs | $ - | $ - | $ 25,293,104.18 | $ - | |
| (vii) Issuer Costs, if any, in excess of Capped Issuer Costs | $ - | $ - | $ 25,293,104.18 | $ - | |
| (viii) Manager Costs, if any, in excess of Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs, in excess of Capped Servicer and Back-Up Manager Costs) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (viii) Servicer Costs, if any, in excess of Capped Servicer Costs (pro rata with Manager Costs and Back-Up Manager Costs in excess of Capped Manager and Back-Up Manager Costs) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (viii) Back-Up Manager Costs, if any, in excess of Capped Back-Up Manager Costs (pro rata with Manager Costs and Servicer Costs in excess of Capped Manager and Servicer Costs) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (ix) Back-Up Manager Incentive Fee | $ - | $ - | $ 25,293,104.18 | $ - | |
| (x) Costs owed to other parties (pro rata, among parties) | $ - | $ - | $ 25,293,104.18 | $ - | N/A |
| (xi) Distribution to Issuer | $ 25,293,104.18 | $ 25,293,104.18 | | | |

| Trapping Account Rollforward | |
|---|---|
| Beginning Trapping Account balance | $ - |
| Less Trapping Account Cash released | $ - |
| Accumulated Interest - Payment Date to Payment Date | $ - |
| Trapped cash in this Collection Period | $ - |
| Ending Trapping Account balance | $ - |

DRAFT

Sears Holdings Management Corporation as Servicer
Servicer Report
Coverage Ratio

| Determination Date | 15-May-2006 |
|---|---|
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| 12 Most Recently Ended Collection Periods | Determination Date | Monies Received In Respect of Collateral | Interest on Trapping Account | Interest on Distribution Account | Rolling Twelve Month Revenue | | | | | | Debt Service Amount Calculation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Available Funds | Amounts paid to the Trustee (a) | Amounts paid to the Servicer (a) | Amounts paid to the Manager (a) | Amounts paid to the Back-up Manager (a) | Rolling Twelve Month Revenue | Debt Service Amounts |
| 1 | 15-May-2006 | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 2 | 15-Apr-2006 | 35,842,145.85 | - | - | 35,842,145.85 | 291.67 | 12,500.00 | 35,000.00 | 1,250.00 | 35,793,104.18 | 10,500,000.00 |
| 3 | 16-Mar-2006 | - | - | - | - | - | - | - | - | - | - |
| 4 | 14-Feb-2006 | - | - | - | - | - | - | - | - | - | - |
| 5 | 15-Jan-2006 | - | - | - | - | - | - | - | - | - | - |
| 6 | 16-Dec-2005 | - | - | - | - | - | - | - | - | - | - |
| 7 | 16-Nov-2005 | - | - | - | - | - | - | - | - | - | - |
| 8 | 17-Oct-2005 | - | - | - | - | - | - | - | - | - | - |
| 9 | 17-Sep-2005 | - | - | - | - | - | - | - | - | - | - |
| 10 | 18-Aug-2005 | - | - | - | - | - | - | - | - | - | - |
| 11 | 19-Jul-2005 | - | - | - | - | - | - | - | - | - | - |
| 12 | 19-Jul-2005 | - | - | - | - | - | - | - | - | $ 35,793,104.18 | $ 10,500,000.00 |

| Rolling Twelve Month Revenue | $ | 35,793,104.18 | No |
|---|---|---|---|
| Debt Service Amount | $ | 10,500,000.00 | No |

Coverage Ratio    340.89%

Coverage Tests
| Cash Trapping | 275% | No |
|---|---|---|
| Rapid Amortization | 225% | No |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Statement to Noteholders**

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

**INDENTURE WATERFALL**

| | | |
|---|---|---|
| 1. | Amounts paid or distributed in respect of interest with respect to the Noteholders | $ 10,500,000.00 |
| 2. | Amounts paid or distributed in respect of principal on or with respect to the Notes | $ - |
| 3. | Amounts paid to the Trustee | $ 291.67 |
| 4. | Amounts paid on behalf of the Issuer | $ - |
| 5. | Amounts paid to the Servicer | $ 12,500.00 |
| 6. | Amounts paid to the Manager | $ 35,000.00 |
| 7. | Amounts paid to the Back-Up IP Manager | $ 1,250.00 |
| 8. | Amounts paid to the Trapping Account | $ - |
| 9. | Amounts paid to other parties | $ - |
| 10. | Remaining amounts paid at the direction of the Issuer | $ 25,293,104.18 |

**TRADEMARK ROYALTY COLLECTIONS**

| Collection Period Ending | CRAFTSMAN | KENMORE | DIEHARD |
|---|---|---|---|
| 29-Apr-2006 | $ 18,200,361.72 | $ 16,639,028.09 | $ 1,002,756.04 |
| 30-Mar-2006 | $ - | $ - | $ - |
| 28-Feb-2006 | $ - | $ - | $ - |
| 29-Jan-2006 | $ - | $ - | $ - |
| 30-Dec-2005 | $ - | $ - | $ - |
| 30-Nov-2005 | $ - | $ - | $ - |
| 31-Oct-2005 | $ - | $ - | $ - |
| 1-Oct-2005 | $ - | $ - | $ - |
| 1-Sep-2005 | $ - | $ - | $ - |
| 2-Aug-2005 | $ - | $ - | $ - |
| 3-Jul-2005 | $ - | $ - | $ - |
| 3-Jun-2005 | $ - | $ - | $ - |

**TRAPPING ACCOUNT ACTIVITY**

| | |
|---|---|
| Beginning Trapping Account balance | $ - |
| Less Trapping Account cash released | $ - |
| Accumulated interest - Payment Date to Payment Date | $ - |
| Trapped cash in this Collection Period | $ - |
| Ending Trapping Account balance | $ - |

**COVERAGE RATIO TESTS**

| | |
|---|---|
| Cash Trapping Event? | No |
| Rapid Amortization Event? | No |
| Servicer/Manager Removal Event?? | No |
| Event of Default? | No |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Costs & Capped Costs Calculation**

| | |
|---|---|
| **Determination Date** | 0-Jan-1900 |
| **Collection Period - Begin** | 0-Jan-1900 |
| **Collection Period - End** | 0-Jan-1900 |

| 12 Most Recently Ended Collection Periods | Determination Date | Trustee Costs (a) | Issuer Costs (a) | Manager Costs (a) | Servicer Costs (a) | Back-Up Manager Costs (a) |
|---|---|---|---|---|---|---|
| 1 | | $  - | $  - | $  - | $  - | - |
| 2 | | $  - | $  - | $  - | $  - | - |
| 3 | | $  - | $  - | $  - | $  - | - |
| 4 | | $  - | $  - | $  - | $  - | - |
| 5 | | $  - | $  - | $  - | $  - | - |
| 6 | | $  - | $  - | $  - | $  - | - |
| 7 | | $  - | $  - | $  - | $  - | - |
| 8 | | $  - | $  - | $  - | $  - | - |
| 9 | | $  - | $  - | $  - | $  - | - |
| 10 | | $  - | $  - | $  - | $  - | - |
| 11 | | $  - | $  - | $  - | $  - | - |
| 12 | | $  - | $  - | $  - | $  - | - |
| **Costs paid - last eleven Collection Periods** | | $  - | $  - | $  - | $  - | - |
| **Costs incurred - current Collection Period** | | $  - | $  - | $  - | $  - | - |
| **Costs accrued from prior Collection Periods** | | $  - | $  - | $  - | $  - | - |
| **Capped Costs - 12-month Period** | | $  - | $  - | $  - | $  - | - |
| **Costs payable, current Collection Period, subject to cap** | $  - | $  - | $  - | $  - | $  - | - |
| **Costs payable, this Collection Period, above cap** | $  - | $  - | $  - | $  - | $  - | - |

DRAFT

## Sears Holdings Management Corporation as Servicer

### Servicer Report

### Priority of Payments & Trapping Account Rollforward

| Determination Date | 0-Jan-1900 | |
|---|---|---|
| Collection Period - Begin | 0-Jan-1900 | |
| Collection Period - End | 0-Jan-1900 | |

| | | |
|---|---|---|
| Monies received in respect of Collateral | $ | - |
| Interest earned on Distribution Account & Trapping Account - Payment Date to Payment Date | | - |
| Release of funds from Trapping Account | | - |
| Cash contribution | | - |
| Available Funds | $ | - |

| Distributions (Indenture, Section 10.1(a)) | Distribution Due | | Payment Date Distribution | | Remaining Available Funds | | Accrued Distributions for Next Collection Period | Notes |
|---|---|---|---|---|---|---|---|---|
| (i) Trustee Fee | $ | - | $ | - | $ | - | | |
| (i) Trustee Costs, not to exceed Capped Trustee Costs | | - | | - | | - | | |
| (ii) Issuer Costs, not to exceed Capped Issuer Costs | | - | | - | | - | - | May be paid in (vi) |
| (iii) Management Fee (pro rata with Servicing Fee, Back-Up Manager Standby Fee) | | - | | - | | - | N/A | May be paid in (vii) |
| (iii) Servicing Fee (pro rata with Management Fee, Back-Up Manager Standby Fee) | | - | | - | | - | - | |
| (iii) Back-Up Manager Standby Fee (pro rata with Management Fee, Servicing Fee) | | - | | - | | - | - | |
| (iii) Manager Costs, not to exceed Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs) | $ | - | $ | - | $ | - | N/A | May be paid in (viii) |
| (iii) Servicer Costs, not to exceed Capped Servicer Costs (pro rata with Manager Costs, Back-Up Manager Costs) | $ | - | $ | - | $ | - | N/A | May be paid in (viii) |
| (iii) Back-Up Manager Costs, not to exceed Capped Back-Up Manager Costs (pro rata with Manager Costs, Servicer Costs) | $ | - | $ | - | $ | - | N/A | May be paid in (viii) |
| (iv) Accrued Interest for this Collection Period | #VALUE! | | #VALUE! | | #VALUE! | | #VALUE! | |
| (iv) Accrued Interest owed for prior Collection Period(s) | | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (v) Cash trapped in Trapping Account | | - | #VALUE! | | #VALUE! | | N/A | |
| (vi) Rapid Amortization Principal | | - | #VALUE! | | #VALUE! | | N/A | |
| (vi) Trustee Costs, if any, in excess of Capped Trustee Costs | | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (vii) Issuer Costs, if any, in excess of Capped Issuer Costs | | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (viii) Manager Costs, if any, in excess of Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs, in excess of Capped Servicer and Back-Up Manager Costs) | $ | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (viii) Servicer Costs, if any, in excess of Capped Servicer Costs (pro rata with Manager Costs and Back-Up Manager Costs in excess of Capped Manager and Servicer Costs) | $ | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (viii) Back-Up Manager Costs, if any, in excess of Capped Back-Up Manager Costs (pro rata with Manager Costs and Servicer Costs in excess of Capped Manager and Servicer Costs) | $ | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (ix) Back-Up Manager Incentive Fee | #VALUE! | | #VALUE! | | #VALUE! | | #VALUE! | |
| (x) Costs owed to other parties (pro rata, among parties) | | - | #VALUE! | | #VALUE! | | #VALUE! | |
| (xi) Distribution to Issuer | #VALUE! | | #VALUE! | | #VALUE! | | N/A | |

**Trapping Account Rollforward**

| | | |
|---|---|---|
| Beginning Trapping Account balance | $ | - |
| Less Trapping Account Cash released | $ | - |
| Accumulated Interest - Payment Date to Payment Date | $ | - |
| Trapped cash in this Collection Period | | #VALUE! |
| Ending Trapping Account balance | | #VALUE! |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Actual Amortization Schedule**

| | |
|---|---|
| Determination Date | 0-Jan-1900 |
| Collection Period - Begin | 0-Jan-1900 |
| Collection Period - End | 0-Jan-1900 |

| Date | Period | Beginning Bond Balance | Principal Payments | Ending Bond Balance |
|---|---|---|---|---|
| 4/30/2006 | 0 | | | |
| 5/25/2006 | 1 | $ - | $ - | $ - |
| #NAME? | 2 | $ - | $ - | $ - |
| #NAME? | 3 | $ - | $ - | $ - |
| #NAME? | 4 | $ - | $ - | $ - |
| #NAME? | 5 | $ - | $ - | $ - |
| #NAME? | 6 | $ - | $ - | $ - |
| #NAME? | 7 | $ - | $ - | $ - |
| #NAME? | 8 | $ - | $ - | $ - |
| #NAME? | 9 | $ - | $ - | $ - |
| #NAME? | 10 | $ - | $ - | $ - |
| #NAME? | 11 | $ - | $ - | $ - |
| #NAME? | 12 | $ - | $ - | $ - |
| #NAME? | 13 | $ - | $ - | $ - |
| #NAME? | 14 | $ - | $ - | $ - |
| #NAME? | 15 | $ - | $ - | $ - |
| #NAME? | 16 | $ - | $ - | $ - |
| #NAME? | 17 | $ - | $ - | $ - |
| #NAME? | 18 | $ - | $ - | $ - |
| #NAME? | 19 | $ - | $ - | $ - |
| #NAME? | 20 | $ - | $ - | $ - |
| #NAME? | 21 | $ - | $ - | $ - |
| #NAME? | 22 | $ - | $ - | $ - |
| #NAME? | 23 | $ - | $ - | $ - |
| #NAME? | 24 | $ - | $ - | $ - |
| #NAME? | 25 | $ - | $ - | $ - |
| #NAME? | 26 | $ - | $ - | $ - |
| #NAME? | 27 | $ - | $ - | $ - |
| #NAME? | 28 | $ - | $ - | $ - |
| #NAME? | 29 | $ - | $ - | $ - |
| #NAME? | 30 | $ - | $ - | $ - |
| #NAME? | 31 | $ - | $ - | $ - |
| #NAME? | 32 | $ - | $ - | $ - |
| #NAME? | 33 | $ - | $ - | $ - |
| #NAME? | 34 | $ - | $ - | $ - |
| #NAME? | 35 | $ - | $ - | $ - |
| #NAME? | 36 | $ - | $ - | $ - |
| #NAME? | 37 | $ - | $ - | $ - |
| #NAME? | 38 | $ - | $ - | $ - |
| #NAME? | 39 | $ - | $ - | $ - |
| #NAME? | 40 | $ - | $ - | $ - |
| #NAME? | 41 | $ - | $ - | $ - |
| #NAME? | 42 | $ - | $ - | $ - |
| #NAME? | 43 | $ - | $ - | $ - |
| #NAME? | 44 | $ - | $ - | $ - |
| #NAME? | 45 | $ - | $ - | $ - |
| #NAME? | 46 | $ - | $ - | $ - |
| #NAME? | 47 | $ - | $ - | $ - |
| #NAME? | 48 | $ - | $ - | $ - |
| #NAME? | 49 | $ - | $ - | $ - |
| #NAME? | 50 | $ - | $ - | $ - |
| #NAME? | 51 | $ - | $ - | $ - |
| #NAME? | 52 | $ - | $ - | $ - |
| #NAME? | 53 | $ - | $ - | $ - |
| #NAME? | 54 | $ - | $ - | $ - |
| #NAME? | 55 | $ - | $ - | $ - |
| #NAME? | 56 | $ - | $ - | $ - |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Statement to Noteholders**

| | |
|---|---|
| Determination Date | 0-Jan-1900 |
| Collection Period - Begin | 0-Jan-1900 |
| Collection Period - End | 0-Jan-1900 |

**INDENTURE WATERFALL**

| | | |
|---|---|---|
| 1. | Amounts paid or distributed in respect of interest with respect to the Noteholders | #VALUE! |
| 2. | Amounts paid or distributed in respect of principal on or with respect to the Notes | #VALUE! |
| 3. | Amounts paid to the Trustee | #VALUE! |
| 4. | Amounts paid on behalf of the Issuer | #VALUE! |
| 5. | Amounts paid to the Servicer | #VALUE! |
| 6. | Amounts paid to the Manager | #VALUE! |
| 7. | Amounts paid to the Back-Up IP Manager | #VALUE! |
| 8. | Amounts paid to the Trapping Account | #VALUE! |
| 9. | Amounts paid to other parties | #VALUE! |
| 10. | Remaining amounts paid at the direction of the Issuer | #VALUE! |

**TRADEMARK ROYALTY COLLECTIONS**

| Collection Period Ending | CRAFTSMAN | KENMORE | DIEHARD |
|---|---|---|---|
| 29-Apr-2006 | $          - | $          - | $          - |
| 30-Mar-2006 | $          - | $          - | $          - |
| 28-Feb-2006 | $          - | $          - | $          - |
| 29-Jan-2006 | $          - | $          - | $          - |
| 30-Dec-2005 | $          - | $          - | $          - |
| 30-Nov-2005 | $          - | $          - | $          - |
| 31-Oct-2005 | $          - | $          - | $          - |
| 1-Oct-2005 | $          - | $          - | $          - |
| 1-Sep-2005 | $          - | $          - | $          - |
| 2-Aug-2005 | $          - | $          - | $          - |
| 3-Jul-2005 | $          - | $          - | $          - |
| 3-Jun-2005 | $          - | $          - | $          - |

**TRAPPING ACCOUNT ACTIVITY**

| | |
|---|---|
| Beginning Trapping Account balance | $          - |
| Less Trapping Account cash released | $          - |
| Accumulated interest - Payment Date to Payment Date | $          - |
| Trapped cash in this Collection Period | #VALUE! |
| Ending Trapping Account balance | #VALUE! |

**COVERAGE RATIO TESTS**

| | |
|---|---|
| Cash Trapping Event? | N/A |
| Rapid Amortization Event? | N/A |
| Servicer/Manager Removal Event?? | $          - |
| Event of Default? | $          - |

EXHIBIT D

[FORM OF INVESTMENT LETTER]

[DATE]

KCD IP, LLC
3333 Beverly Road
Hoffman Estates, IL 60179

U.S. BANK NATIONAL ASSOCIATION
209 S. LaSalle Street, 3rd Floor
Chicago, IL 60604-1219

Ladies and Gentlemen:

In connection with the purchase by [_____] (the "Purchaser") from [_____] ("Seller") of $[_____] of 6.90% KCD IP, LLC Asset-Backed Notes (the "Notes"), issued by KCD IP, LLC (the "Issuer") pursuant to an Indenture (the "Indenture"), dated as of May 18, 2006, between the Issuer and U.S. BANK NATIONAL ASSOCIATION, as the Trustee (the "Trustee"), we hereby represent and warrant to, and covenant with, you that:

1.    The Purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the purchase of the Notes. The Purchaser is an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), or (7) promulgated under the Securities Act of 1933, as amended (the "Securities Act").

2.    The Purchaser understands that the Notes have not been registered or qualified under the Securities Act, or the securities laws of any state, and therefore cannot be resold unless they are registered or qualified thereunder or unless an exemption from registration or qualification is available. The Purchaser further understands that the Issuer is not registered under the Investment Company Act of 1940, as amended (the "1940 Act") and that no Note may be transferred if doing so would cause the loss to the Issuer of a necessary exemption under the 1940 Act.

3.    The Purchaser's intention is to acquire the Notes for investment for the Purchaser's own account and not in any event with the view to, or for resale in connection with, any distribution thereof. It understands that the Notes have not been registered under the Securities Act, by reason of a specified exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the Purchaser's investment intent as expressed herein.

4.    The Purchaser will not sell or otherwise transfer any Note, except in compliance with the provisions of Section 2.6 of the Indenture.

5.    The Purchaser was not formed for the purpose of acquiring a Note.

6.    The Purchaser understands that the Issuer may rely on the exemption from the provisions of Section 5 of the Securities Act provided by Rule I44A in connection with any resale of the Notes.

7.    The Purchaser acknowledges either (a) that it has not requested from any person the information required to be received by the Purchaser, upon request, pursuant to Rule 144A(d)(4)(i) (the "Required Information"), or (b) that it has requested and received the Required Information from the Issuer or the Servicer.

8.    The Purchaser represents and warrants that either (i) it is not acquiring the Notes with the plan assets of an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which is subject to the provisions of Title I of ERISA, a "plan" described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), an entity whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in such entity or any other plan that is subject to a law that is similar to Title I of ERISA or Section 4975 of the Code or (ii) the acquisition, holding and disposition of the Notes will not give rise to a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or any similar applicable law.

9.    The Purchaser acknowledges that it has not, and agrees that it will not, engage in any public dissemination of information concerning the Notes or general public solicitation with respect to the Notes. The Purchaser further acknowledges that is has not, and agrees that it will not, disclose publicly the fact of the offering of the Notes or any information concerning the Notes.

10.    If the Purchaser sells any of the Notes, the Purchaser will obtain from any subsequent purchaser a fully executed version of this Investor's Letter and will present the same to the Trustee if the same is still serving as such with respect to the Notes.

11.    The Purchaser has been furnished, and has received and reviewed, copies of the transaction documents and the private placement memorandum for the Notes and has made such investigation as the Purchaser deems necessary to evaluate the merits and risks involved in an investment in the Notes.

12.    Prior to the sale the Purchaser was given the opportunity (i) to ask questions of, and receive answers from Sears Brands, LLC (the "Transferor"), Sears, Roebuck and Co. and the Servicer concerning the terms and conditions of the offering and (ii) to obtain any additional information requested concerning the transaction documents regarding the Notes, to the extent the Transferor and the Servicer possess such information. The Purchaser agrees to notify the Issuer immediately if any representation, warranty or information contained in this Agreement becomes untrue at any time. The Purchaser agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Purchaser's representations and warranties herein.

Very truly yours,

[PURCHASER]

By:    _____
        Name:
        Title:

EXHIBIT E

SUBSTITUTE FORM W-9

## Request for Taxpayer Identification Number and Certification
### PAYOR'S NAME:_____

PAYEE INFORMATION

(Please print or type)

Individual or business name (if joint account, list first and circle the name of person or entity whose number you furnish in Part 1 below):

Check appropriate box:    Individual/Sole proprietor  Corporation        Partnership        Other _____

Address (number, street, and apt. or suite no.):_____

City, state, and ZIP code:_____

| PART I Taxpayer Identification Number ("TIN") | Part II Payees Exempt from Backup Withholding |
|---|---|
| Enter your TIN below. For individuals, this is your social security number. For other entities, it is your employer identification number. Refer to the chart on page 1 of the Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9 (the "Guidelines") for further clarification. If you do not have a TIN, see instructions on how to obtain a TIN on page 2 of the Guidelines, check the appropriate box below indicating that you have applied for a TIN and, in addition to the Part III Certification, sign the attached Certification of Awaiting Taxpayer Identification Number. | Check box (See page 2 of the Guidelines for further clarification. Even if you are exempt from backup withholding, you should still complete and sign the certification below): |

Social security number:

_ _ _ _

                              Applied For                    EXEMPT

Employer identification number:

_

### PART III Certification
Certification Instructions:  You must cross out item 2 below if you have been notified by the Internal Revenue Service (the "IRS") that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return (See page 2 of the Guidelines for further clarification).

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, (b) I have not been notified by the IRS that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

Signature_____      Date_____

**NOTE:  FAILURE TO COMPLETE AND RETURN THIS SUBSTITUTE FORM W-9 MAY RESULT IN BACKUP WITHHOLDING OF UP TO 31% OF ANY PAYMENT MADE TO YOU PURSUANT TO THE OFFER.  PLEASE REVIEW THE ENCLOSED "GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9" FOR ADDITIONAL DETAILS.**

**YOU MUST COMPLETE THE FOLLOWING CERTIFICATION IF YOU CHECKED THE BOX "APPLIED FOR" IN PART I OF SUBSTITUTE FORM W-9**

---

**CERTIFICATION OF AWAITING TAXPAYER IDENTIFICATION NUMBER**

I certify, under penalties of perjury, that a TIN has not been issued to me, and either (a) I have mailed or delivered an application to receive a TIN to the appropriate IRS Service Center or Social Security Administration Office, or (b) I intend to mail or deliver an application in the near future.  I understand that I must provide a TIN to the payor within 60 days of submitting this Substitute Form W-9 and that if I do not provide a TIN to the payor within 60 days, the payor is required to withhold 31% of all reportable payments thereafter to me until I furnish the payor with a TIN.

_____

Signature

_____

Date

---

# GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9

**Guidelines for Determining the Proper Identification Number to Give the Payer**. — Social Security numbers have nine digits separated by two hyphens: i.e., 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. Employer identification numbers have nine digits separated by only one hyphen: i.e., 00-0000000. The table below will help determine the number to give the payer.

| For this type account: | Give the SOCIAL SECURITY Number of - | For this type of account: | Give the EMPLOYER IDENTIFICATION Number of - |
|---|---|---|---|
| 1. An individual's account | The individual | 8. Sole proprietorship account | The Owner |
| 2. Two or more individuals (joint) account) | The actual owner of the account or, if combined funds, any one of the individuals[1] | 9. A valid trust, estate, or pension fund | Legal entity (Do not furnish the identifying number of the personal representative or trustee unless the legal entity itself is not designated in the account title) |
| 3. Husband and wife (joint account) | The actual owner of the account or, if joint funds, either person[1] | 10. Corporate account | The corporation |
| 4. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] | 11. Religious, charitable, or educational organization account | The organization |
| 5. Adult and Minor (joint account) | The adult or, if the minor is the only contributor, the minor[1] | 12. Partnership account held in the name of the business | The partnership |
| 6. Account in the name of guardian or committee for a designated ward, minor, or incompetent person | The ward, minor, or incompetent person[3] | 13. Association, club, or other tax-exempt organization | The organization |
| 7. a. The usual revocable savings trust account grantor is also trustee) | The grantor-trustee[1] | 14. A broker or registered nominee | The broker or nominee |

---

[1] List the first and circle the name of the person whose number you furnish.
[2] Circle the minor's name and furnish the minor's social security number.
[3] Circle the ward's, minor's or incompetent person's name and furnish such person's social security number.

| | | | |
|---|---|---|---|
| b.  So-called trust account that is not a legal or valid trust under State law | The actual owner[1] | 15. Account with the Department of Agriculture in the name of a public entity (such as a State or local government, school district, or prison) that receives agricultural program payments | The public entity |

NOTE: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.

## GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9

**Obtaining a Number**

If you don't have a taxpayer identification number ("TIN") or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for Employer Identification Number, at the local office of Social Security Administration or the Internal Revenue Service ("IRS") and apply for a number.

Payees Exempt from Backup Withholding

Payees specifically exempted from backup withholding on ALL payments include the following:

___    A corporation.

___    A financial institution.

___    An organization exempt from tax under section 501(a) or an individual retirement plan.

Certain payments other than interest, dividends, and patronage dividends that are not subject to information reporting are also not subject to backup withholding. For details, see the Treasury regulations under sections 6041, 6041A(a), 6045, 6050A. *(All "section" references herein are to the Internal Revenue Code of 1986)*

**Privacy Act Notice.** Section 6109 requires you to furnish your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, or contributions you made to an IRA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not furnish a TIN to a payer. Certain penalties may also apply.

**Penalties**

**(1) Penalty for Failure to Furnish TIN.**– If you fail to furnish your TIN to a payer, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**(2) Civil Penalty for False Information With Respect to Withholding.** – If you make a false statement with no reasonable basis which results in no imposition of backup withholding, you are subject to a penalty of $500.

**(3) Criminal Penalty for Falsifying Information.** – Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

FOR ADDITIONAL INFORMATION
CONTACT YOUR TAX CONSULTANT OR
THE IRS.

___ The United States or any agency or
instrumentality thereof.

___ A State, the District of Columbia, a possession of
the United States, or any subdivision or
instrumentality thereof.

___ A foreign government, a political subdivision of
a foreign government, or agency or
instrumentality thereof.

___ An international organization or any agency or
instrumentality thereof.

___ A registered dealer in securities or commodities
registered in the U.S. or a possession of the U.S.

___ A real estate investment trust.

___ A common trust fund operated by a bank under
section 584(a).

___ An exempt charitable remainder trust or a non-
exempt trust described in section 4947(a)(1).

___ An entity registered at all times under the
Investment Company Act of 1940.

___ A foreign central bank of issue.

___ Exempt payees described above nevertheless
should file Form W-9 to avoid possible erroneous
backup withholding.

FILE THIS FORM WITH THE PAYER, FURNISH
YOUR TIN, WRITE "EXEMPT" ON THE FACE OF
THE FORM, AND RETURN IT TO THE PAYER. IF
THE PAYMENTS ARE INTEREST, DIVIDENDS,
OR PATRONAGE DIVIDENDS, ALSO SIGN AND
DATE THE FORM.

EXHIBIT F
(Sears Trademarks)

**trademark.com**™

# Trademark Report

**Report created:** 05/11/06
**Reference:** sears securitization
**Database(s) Searched:** US Federal

**Search Criteria:** Combine with Set(s): 6

**Records selected for the report:** 101
**Pages in this report:** 32

**Comments:** Exhibit A to Contribution Agreement - Sears Trademarks; Schedule 1 to Exhibit B to
Assignment of Trademarks

© 2006  MicroPatent, LLC

# US Federal

## Contents

1   **75-669860** CAPTAIN DIEHARD (and Design)
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 7

2   **78-570980** CRAFTSMAN (Block letters)
    Pending, Passed by Examiner - Publication/issue review complete, SEARS BRANDS, LLC ............... 7

3   **73-551425** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 7

4   **73-553768** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 7

5   **73-554435** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 8

6   **73-554436** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 8

7   **73-554673** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 8

8   **73-561124** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 8

9   **73-561127** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 9

10  **73-561130** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 9

11  **73-561140** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 9

12  **73-568162** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 9

13  **73-572130** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 9

14  **73-572131** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 10

15  **73-572132** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 10

16  **73-583707** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 10

17  **73-583724** CRAFTSMAN
    Registered, SEARS, ROEBUCK AND CO. ................................................................... 10

18  **73-583730** CRAFTSMAN

Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 10

19  **73-585671** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 11

20  **73-585946** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 11

21  **73-595387** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 11

22  **73-735766** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 11

23  **74-569778** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 12

24  **74-570235** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 12

25  **74-603014** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 12

26  **75-048509** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 12

27  **75-599889** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 12

28  **76-086056** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 13

29  **76-335657** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 13

30  **78-125416** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 13

31  **78-161856** CRAFTSMAN
Registered, SEARS, ROEBUCK AND CO. ......................................................................................... 13

32  **78-314732** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 13

33  **78-314946** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 14

34  **78-315026** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 14

35  **78-315143** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 14

36  **78-315279** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 14

37  **78-315335** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 15

38  **78-317726** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 15

39  **78-317818** CRAFTSMAN
Registered, SEARS BRANDS, LLC ................................................................................................... 15

40  **71-570647** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ......................................................................................... 15

Reference/Matter: sears securitization

3

41    **71-570648** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    16

42    **71-570655** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    16

43    **71-570657** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    16

44    **71-570658** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    17

45    **71-571096** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    17

46    **71-571099** CRAFTSMAN (Stylized)
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    17

47    **74-052843** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    18

48    **74-145062** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    18

49    **74-194694** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    18

50    **74-194695** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    18

51    **74-199960** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    19

52    **74-200819** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    19

53    **74-211366** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    19

54    **74-214791** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    19

55    **74-302612** CRAFTSMAN
Renewed, SEARS, ROEBUCK AND CO. ..................................................................................................    20

56    **74-396913** CRAFTSMAN
Renewed, SEARS BRANDS, LLC ..................................................................................................    20

57    **75-550390** CRAFTSMAN CLUB
Registered, SEARS, ROEBUCK AND CO. ..................................................................................................    20

58    **75-445888** CRAFTSMAN CONVERTIBLE
Registered, SEARS, ROEBUCK AND CO. ..................................................................................................    20

59    **78-159121** CRAFTSMAN GRIP MASTER
Registered, SEARS BRANDS, LLC ..................................................................................................    20

60    **75-225029** CRAFTSMAN KID'S CLUB
Registered, SEARS BRANDS, LLC ..................................................................................................    21

61    **75-443165** CRAFTSMAN MAKES ANYTHING POSSIBLE
Registered, SEARS BRANDS, LLC ..................................................................................................    21

62    **76-388448** CRAFTSMAN PROFESSIONAL
Registered, SEARS BRANDS, LLC ..................................................................................................    21

63    **78-247622** CRAFTSMAN REFLEX

Registered, SEARS BRANDS, LLC ........................................................................... 21

64  **78-568023** CRAFTSMAN WORKSHOP (Block letters)
Registered, SEARS BRANDS, LLC ........................................................................... 22

65  **75-525906** DIEHARD
Registered, SEARS, ROEBUCK AND CO. .............................................................. 22

66  **76-346448** DIEHARD (Stylized)
Registered, SEARS, ROEBUCK AND CO. .............................................................. 22

67  **76-346449** DIEHARD (Stylized)
Registered, SEARS, ROEBUCK AND CO. .............................................................. 23

68  **78-215609** DIEHARD
Registered, SEARS BRANDS, LLC ........................................................................... 23

69  **78-220359** DIEHARD
Registered, SEARS BRANDS, LLC ........................................................................... 23

70  **78-317692** DIEHARD
Registered, SEARS BRANDS, LLC ........................................................................... 23

71  **78-317729** DIEHARD
Registered, SEARS BRANDS, LLC ........................................................................... 24

72  **78-341275** DIEHARD (Block letters)
Registered, SEARS BRANDS, LLC ........................................................................... 24

73  **74-099621** DIEHARD
Renewed, SEARS, ROEBUCK AND CO. ................................................................ 24

74  **74-333603** DIEHARD
Renewed, SEARS BRANDS, LLC ............................................................................. 24

75  **78-494833** DIEHARD DUTY (Block letters)
Allowed - Statement of Use registration review complete, SEARS BRANDS, LLC .......... 25

76  **78-274510** DIEHARD EXPRESS
Registered, SEARS BRANDS, LLC ........................................................................... 25

77  **78-296152** DIEHARD GOLD
Registered, SEARS BRANDS, LLC ........................................................................... 25

78  **78-298757** DIEHARD GOLD
Registered, SEARS BRANDS, LLC ........................................................................... 25

79  **75-441873** DIEHARD RACING (and Design)
Registered, SEARS BRANDS, LLC ........................................................................... 26

80  **75-810964** DIEHARD SECURITY
Registered, SEARS, ROEBUCK AND CO. .............................................................. 26

81  **78-298700** DIEHARD SILVER
Registered, SEARS BRANDS, LLC ........................................................................... 26

82  **75-336306** KENMORE (and Design)
Registered, SEARS, ROEBUCK AND CO. .............................................................. 27

83  **75-346404** KENMORE (and Design)
Registered, SEARS BRAND, LLC ............................................................................ 27

84  **76-105205** KENMORE
Registered, SEARS, ROEBUCK AND CO. .............................................................. 27

85  **78-314699** KENMORE
Registered, SEARS BRANDS, LLC ........................................................................... 28

86    **78-314709** KENMORE
      Registered, SEARS BRANDS, LLC ................................................................................................ 28
87    **78-317721** KENMORE
      Registered, SEARS BRANDS, LLC ................................................................................................ 28
88    **71-367943** KENMORE (Stylized)
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 28
89    **71-539906** KENMORE
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 29
90    **71-550618** KENMORE (Stylized)
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 29
91    **71-672538** KENMORE (Stylized)
      Renewed, SEARS, ROEBUCK & CO. ........................................................................................... 29
92    **73-158384** KENMORE
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 30
93    **73-414682** KENMORE
      Renewed, SEARS BRANDS, LLC ................................................................................................ 30
94    **73-427663** KENMORE
      Renewed, SEARS BRANDS, LLC ................................................................................................ 30
95    **73-793846** KENMORE
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 30
96    **74-072622** KENMORE
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 31
97    **74-194190** KENMORE
      Renewed, SEARS, ROEBUCK AND CO. ...................................................................................... 31
98    **75-679754** KENMORE ELITE (and Design)
      Registered, SEARS, ROEBUCK AND CO. .................................................................................... 31
99    **78-125361** MY FIRST CRAFTSMAN
      Registered, SEARS, ROEBUCK AND CO. .................................................................................... 31
100   **78-558874** MY FIRST KENMORE (Block letters)
      Allowed - Statement of Use non-final refusal, SEARS BRANDS, LLC ..................................... 32
101   **76-006014** TODO ES POSIBLE CON CRAFTSMAN
      Registered, SEARS, ROEBUCK AND CO. .................................................................................... 32

---

**Record 1**



| | |
|---|---|
| **Mark** | CAPTAIN DIEHARD   (and Design) |
| **Serial/App. No.** | 75-669860 |
| **Registration No.** | 2335553 |
| **Filing Date** | Mar 29, 1999 |
| **Registered** | Mar 28, 2000 |

---

**Record 2**

# CRAFTSMAN

| | |
|---|---|
| **Mark** | CRAFTSMAN   (Block letters) |
| **Serial/App. No.** | 78-570980 |
| **Filing Date** | Feb 18, 2005 |

---

**Record 3**

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-551425 |
| **Registration No.** | 1383981 |
| **Filing Date** | Aug 2, 1985 |
| **Registered** | Feb 25, 1986 |

---

**Record 4**

| | |
|---|---|
| **Mark** | CRAFTSMAN |

Reference/Matter: sears securitization

7

| Serial/App. No. | 73-553768 |
|---|---|
| Registration No. | 1397384 |

| Filing Date | Aug 16, 1985 |
|---|---|
| Registered | Jun 17, 1986 |

## Record 5

| Mark | CRAFTSMAN |
|---|---|

| Serial/App. No. | 73-554435 |
|---|---|
| Registration No. | 1389958 |

| Filing Date | Aug 16, 1985 |
|---|---|
| Registered | Apr 15, 1986 |

## Record 6

| Mark | CRAFTSMAN |
|---|---|

| Serial/App. No. | 73-554436 |
|---|---|
| Registration No. | 1386020 |

| Filing Date | Aug 16, 1985 |
|---|---|
| Registered | Mar 11, 1986 |

## Record 7

| Mark | CRAFTSMAN |
|---|---|

| Serial/App. No. | 73-554673 |
|---|---|
| Registration No. | 1391401 |

| Filing Date | Aug 22, 1985 |
|---|---|
| Registered | Apr 29, 1986 |

## Record 8

| Mark | CRAFTSMAN |
|---|---|

| Serial/App. No. | 73-561124 |
|---|---|
| Registration No. | 1388833 |

| Filing Date | Oct 2, 1985 |
|---|---|
| Registered | Apr 8, 1986 |

## Record 9

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-561127 |
| **Registration No.** | 1388834 |
| **Filing Date** | Oct 2, 1985 |
| **Registered** | Apr 8, 1986 |

## Record 10

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-561130 |
| **Registration No.** | 1388982 |
| **Filing Date** | Oct 2, 1985 |
| **Registered** | Apr 8, 1986 |

## Record 11

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-561140 |
| **Registration No.** | 1388835 |
| **Filing Date** | Oct 2, 1985 |
| **Registered** | Apr 8, 1986 |

## Record 12

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-568162 |
| **Registration No.** | 1397661 |
| **Filing Date** | Nov 12, 1985 |
| **Registered** | Jun 17, 1986 |

## Record 13

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-572130 |
| **Registration No.** | 1418186 |

| | |
|---|---|
| **Filing Date** | Dec 9, 1985 |
| **Registered** | Nov 25, 1986 |

## Record 14

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-572131 |
| **Registration No.** | 1403140 |
| **Filing Date** | Dec 9, 1985 |
| **Registered** | Jul 29, 1986 |

## Record 15

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-572132 |
| **Registration No.** | 1400931 |
| **Filing Date** | Dec 9, 1985 |
| **Registered** | Jul 15, 1986 |

## Record 16

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-583707 |
| **Registration No.** | 1440446 |
| **Filing Date** | Feb 19, 1986 |
| **Registered** | May 26, 1987 |

## Record 17

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 73-583724 |
| **Registration No.** | 1416396 |
| **Filing Date** | Feb 19, 1986 |
| **Registered** | Nov 11, 1986 |

## Record 18

| | |
|---|---|
| **Mark** | CRAFTSMAN |

Reference/Matter: sears securitization

10

| | |
|---|---|
| Serial/App. No. | 73-583730 |
| Registration No. | 1410237 |
| Filing Date | Feb 19, 1986 |
| Registered | Sep 23, 1986 |

## Record 19

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 73-585671 |
| Registration No. | 1409457 |
| Filing Date | Mar 3, 1986 |
| Registered | Sep 16, 1986 |

## Record 20

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 73-585946 |
| Registration No. | 1413049 |
| Filing Date | Mar 3, 1986 |
| Registered | Oct 14, 1986 |

## Record 21

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 73-595387 |
| Registration No. | 1418956 |
| Filing Date | Apr 25, 1986 |
| Registered | Dec 2, 1986 |

## Record 22

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 73-735766 |
| Registration No. | 1546082 |
| Filing Date | Jun 22, 1988 |
| Registered | Jul 4, 1989 |

## Record 23

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-569778 |
| **Registration No.** | 1927755 |
| **Filing Date** | Sep 6, 1994 |
| **Registered** | Oct 17, 1995 |

## Record 24

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-570235 |
| **Registration No.** | 1923340 |
| **Filing Date** | Sep 6, 1994 |
| **Registered** | Oct 3, 1995 |

## Record 25

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-603014 |
| **Registration No.** | 1937119 |
| **Filing Date** | Nov 25, 1994 |
| **Registered** | Nov 21, 1995 |

## Record 26

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 75-048509 |
| **Registration No.** | 2087020 |
| **Filing Date** | Jan 25, 1996 |
| **Registered** | Aug 12, 1997 |

## Record 27

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 75-599889 |
| **Registration No.** | 2564043 |

| | |
|---|---|
| **Filing Date** | Dec 4, 1998 |
| **Registered** | Apr 23, 2002 |

## Record 28

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 76-086056 |
| **Registration No.** | 2569359 |
| **Filing Date** | Jul 10, 2000 |
| **Registered** | May 14, 2002 |

## Record 29

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 76-335657 |
| **Registration No.** | 2727995 |
| **Filing Date** | Nov 8, 2001 |
| **Registered** | Jun 17, 2003 |

## Record 30

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-125416 |
| **Registration No.** | 2760368 |
| **Filing Date** | May 1, 2002 |
| **Registered** | Sep 2, 2003 |

## Record 31

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-161856 |
| **Registration No.** | 2896351 |
| **Filing Date** | Sep 9, 2002 |
| **Registered** | Oct 19, 2004 |

## Record 32

| | |
|---|---|
| **Mark** | CRAFTSMAN |

| | |
|---|---|
| **Serial/App. No.** | 78-314732 |
| **Registration No.** | 2941737 |
| **Filing Date** | Oct 16, 2003 |
| **Registered** | Apr 19, 2005 |

## Record 33

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-314946 |
| **Registration No.** | 2916288 |
| **Filing Date** | Oct 17, 2003 |
| **Registered** | Jan 4, 2005 |

## Record 34

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-315026 |
| **Registration No.** | 2936154 |
| **Filing Date** | Oct 17, 2003 |
| **Registered** | Mar 29, 2005 |

## Record 35

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-315143 |
| **Registration No.** | 2957029 |
| **Filing Date** | Oct 17, 2003 |
| **Registered** | May 31, 2005 |

## Record 36

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-315279 |
| **Registration No.** | 2951463 |
| **Filing Date** | Oct 17, 2003 |
| **Registered** | May 17, 2005 |

**Record 37**

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-315335 |
| **Registration No.** | 2895793 |
| **Filing Date** | Oct 17, 2003 |
| **Registered** | Oct 19, 2004 |

**Record 38**

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-317726 |
| **Registration No.** | 2913074 |
| **Filing Date** | Oct 23, 2003 |
| **Registered** | Dec 21, 2004 |

**Record 39**

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 78-317818 |
| **Registration No.** | 2913075 |
| **Filing Date** | Oct 23, 2003 |
| **Registered** | Dec 21, 2004 |

**Record 40**

# CRAFTSMAN

| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-570647 |
| **Registration No.** | 565462 |
| **Filing Date** | Dec 16, 1948 |
| **Registered** | Oct 21, 1952 |
| **Renewed** | Oct 21, 2002 |

Reference/Matter: sears securitization

15

**Record 41**

# CRAFTSMAN

| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-570648 |
| **Registration No.** | 550390 |
| **Filing Date** | Dec 16, 1948 |
| **Registered** | Nov 6, 1951 |
| **Renewed** | Nov 6, 2001 |

**Record 42**

# CRAFTSMAN

| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-570655 |
| **Registration No.** | 551491 |
| **Filing Date** | Dec 16, 1948 |
| **Registered** | Dec 4, 1951 |
| **Renewed** | Dec 4, 2001 |

**Record 43**

# CRAFTSMAN

| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-570657 |
| **Registration No.** | 576891 |
| **Filing Date** | Dec 16, 1948 |
| **Registered** | Jul 7, 1953 |
| **Renewed** | Jul 7, 2003 |

**Record 44**

**CRAFTSMAN**

| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-570658 |
| **Registration No.** | 525092 |
| **Filing Date** | Dec 16, 1948 |
| **Registered** | May 9, 1950 |
| **Renewed** | May 9, 2000 |

**Record 45**

**CRAFTSMAN**

| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-571096 |
| **Registration No.** | 534259 |
| **Filing Date** | Dec 24, 1948 |
| **Registered** | Dec 5, 1950 |
| **Renewed** | Dec 5, 2000 |

**Record 46**



| | |
|---|---|
| **Mark** | CRAFTSMAN  (Stylized) |
| **Serial/App. No.** | 71-571099 |
| **Registration No.** | 551494 |
| **Filing Date** | Dec 24, 1948 |

| | |
|---|---|
| **Registered** | Dec 4, 1951 |
| **Renewed** | Dec 4, 2001 |

---

## Record 47

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-052843 |
| **Registration No.** | 1631332 |
| **Filing Date** | Apr 25, 1990 |
| **Registered** | Jan 15, 1991 |
| **Renewed** | Jan 15, 2001 |

---

## Record 48

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-145062 |
| **Registration No.** | 1692451 |
| **Filing Date** | Mar 6, 1991 |
| **Registered** | Jun 9, 1992 |
| **Renewed** | Jun 9, 2002 |

---

## Record 49

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-194694 |
| **Registration No.** | 1707786 |
| **Filing Date** | Aug 14, 1991 |
| **Registered** | Aug 18, 1992 |
| **Renewed** | Aug 18, 2002 |

---

## Record 50

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-194695 |
| **Registration No.** | 1707787 |
| **Filing Date** | Aug 14, 1991 |
| **Registered** | Aug 18, 1992 |
| **Renewed** | Aug 18, 2002 |

## Record 51

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-199960 |
| **Registration No.** | 1702866 |
| **Filing Date** | Sep 3, 1991 |
| **Registered** | Jul 28, 1992 |
| **Renewed** | Jul 28, 2002 |

## Record 52

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-200819 |
| **Registration No.** | 1702867 |
| **Filing Date** | Sep 5, 1991 |
| **Registered** | Jul 28, 1992 |
| **Renewed** | Jul 28, 2002 |

## Record 53

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-211366 |
| **Registration No.** | 1702871 |
| **Filing Date** | Oct 11, 1991 |
| **Registered** | Jul 28, 1992 |
| **Renewed** | Jul 28, 2002 |

## Record 54

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-214791 |
| **Registration No.** | 1702873 |
| **Filing Date** | Oct 23, 1991 |
| **Registered** | Jul 28, 1992 |
| **Renewed** | Jul 28, 2002 |

## Record 55

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-302612 |
| **Registration No.** | 1781282 |
| **Filing Date** | Aug 10, 1992 |
| **Registered** | Jul 13, 1993 |
| **Renewed** | Jul 13, 2003 |

## Record 56

| | |
|---|---|
| **Mark** | CRAFTSMAN |
| **Serial/App. No.** | 74-396913 |
| **Registration No.** | 1824278 |
| **Filing Date** | Jun 1, 1993 |
| **Registered** | Mar 1, 1994 |
| **Renewed** | Mar 1, 2004 |

## Record 57

| | |
|---|---|
| **Mark** | CRAFTSMAN CLUB |
| **Serial/App. No.** | 75-550390 |
| **Registration No.** | 2363819 |
| **Filing Date** | Sep 4, 1998 |
| **Registered** | Jul 4, 2000 |

## Record 58

| | |
|---|---|
| **Mark** | CRAFTSMAN CONVERTIBLE |
| **Serial/App. No.** | 75-445888 |
| **Registration No.** | 2355911 |
| **Filing Date** | Mar 6, 1998 |
| **Registered** | Jun 6, 2000 |

## Record 59

| | |
|---|---|
| **Mark** | CRAFTSMAN GRIP MASTER |
| **Serial/App. No.** | 78-159121 |

| | |
|---|---|
| **Registration No.** | 2841671 |
| **Filing Date** | Aug 29, 2002 |
| **Registered** | May 11, 2004 |

## Record 60

| | |
|---|---|
| **Mark** | CRAFTSMAN KID'S CLUB |
| **Serial/App. No.** | 75-225029 |
| **Registration No.** | 2174486 |
| **Filing Date** | Jan 13, 1997 |
| **Registered** | Jul 21, 1998 |

## Record 61

| | |
|---|---|
| **Mark** | CRAFTSMAN MAKES ANYTHING POSSIBLE |
| **Serial/App. No.** | 75-443165 |
| **Registration No.** | 2228621 |
| **Filing Date** | Mar 2, 1998 |
| **Registered** | Mar 2, 1999 |

## Record 62

| | |
|---|---|
| **Mark** | CRAFTSMAN PROFESSIONAL |
| **Serial/App. No.** | 76-388448 |
| **Registration No.** | 3047255 |
| **Filing Date** | Mar 28, 2002 |
| **Registered** | Jan 24, 2006 |

## Record 63

| | |
|---|---|
| **Mark** | CRAFTSMAN REFLEX |
| **Serial/App. No.** | 78-247622 |
| **Registration No.** | 2936957 |
| **Filing Date** | May 9, 2003 |
| **Registered** | Mar 29, 2005 |

---

**Record 64**

# CRAFTSMAN WORKSHOP

| | |
|---|---|
| **Mark** | CRAFTSMAN WORKSHOP   (Block letters) |
| **Serial/App. No.** | 78-568023 |
| **Registration No.** | 3057647 |
| **Filing Date** | Feb 15, 2005 |
| **Registered** | Feb 7, 2006 |

---

**Record 65**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 75-525906 |
| **Registration No.** | 2276072 |
| **Filing Date** | Jul 27, 1998 |
| **Registered** | Sep 7, 1999 |

---

**Record 66**

# DieHard

| | |
|---|---|
| **Mark** | DIEHARD   (Stylized) |
| **Serial/App. No.** | 76-346448 |
| **Registration No.** | 2628203 |
| **Filing Date** | Dec 7, 2001 |
| **Registered** | Oct 1, 2002 |

**Record 67**

# DieHard

| | |
|---|---|
| **Mark** | DIEHARD   (Stylized) |
| **Serial/App. No.** | 76-346449 |
| **Registration No.** | 2677217 |
| **Filing Date** | Dec 7, 2001 |
| **Registered** | Jan 21, 2003 |

**Record 68**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 78-215609 |
| **Registration No.** | 2920623 |
| **Filing Date** | Feb 17, 2003 |
| **Registered** | Jan 25, 2005 |

**Record 69**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 78-220359 |
| **Registration No.** | 2805019 |
| **Filing Date** | Feb 28, 2003 |
| **Registered** | Jan 13, 2004 |

**Record 70**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 78-317692 |
| **Registration No.** | 2922888 |
| **Filing Date** | Oct 23, 2003 |
| **Registered** | Feb 1, 2005 |

Reference/Matter: sears securitization

23

---

**Record 71**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 78-317729 |
| **Registration No.** | 2895818 |
| **Filing Date** | Oct 23, 2003 |
| **Registered** | Oct 19, 2004 |

---

**Record 72**

DIEHARD

| | |
|---|---|
| **Mark** | DIEHARD   (Block letters) |
| **Serial/App. No.** | 78-341275 |
| **Registration No.** | 2911178 |
| **Filing Date** | Dec 16, 2003 |
| **Registered** | Dec 14, 2004 |

---

**Record 73**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 74-099621 |
| **Registration No.** | 1696168 |
| **Filing Date** | Sep 21, 1990 |
| **Registered** | Jun 23, 1992 |
| **Renewed** | Jun 23, 2002 |

---

**Record 74**

| | |
|---|---|
| **Mark** | DIEHARD |
| **Serial/App. No.** | 74-333603 |
| **Registration No.** | 1781544 |
| **Filing Date** | Nov 23, 1992 |

Reference/Matter: sears securitization

24

| | |
|---|---|
| **Registered** | Jul 13, 1993 |
| **Renewed** | Jul 13, 2003 |

---

## Record 75

| | |
|---|---|
| **Mark** | DIEHARD DUTY   (Block letters) |
| **Serial/App. No.** | 78-494833 |
| **Filing Date** | Oct 5, 2004 |

---

## Record 76

| | |
|---|---|
| **Mark** | DIEHARD EXPRESS |
| **Serial/App. No.** | 78-274510 |
| **Registration No.** | 2939673 |
| **Filing Date** | Jul 15, 2003 |
| **Registered** | Apr 12, 2005 |

---

## Record 77

| | |
|---|---|
| **Mark** | DIEHARD GOLD |
| **Serial/App. No.** | 78-296152 |
| **Registration No.** | 2916241 |
| **Filing Date** | Sep 4, 2003 |
| **Registered** | Jan 4, 2005 |

---

## Record 78

| | |
|---|---|
| **Mark** | DIEHARD GOLD |
| **Serial/App. No.** | 78-298757 |
| **Registration No.** | 2881737 |
| **Filing Date** | Sep 10, 2003 |
| **Registered** | Sep 7, 2004 |

## Record 79



| | |
|---|---|
| **Mark** | DIEHARD RACING   (and Design) |
| **Serial/App. No.** | 75-441873 |
| **Registration No.** | 2264494 |
| **Filing Date** | Feb 27, 1998 |
| **Registered** | Jul 27, 1999 |

## Record 80

| | |
|---|---|
| **Mark** | DIEHARD SECURITY |
| **Serial/App. No.** | 75-810964 |
| **Registration No.** | 2458512 |
| **Filing Date** | Sep 29, 1999 |
| **Registered** | Jun 5, 2001 |

## Record 81

| | |
|---|---|
| **Mark** | DIEHARD SILVER |
| **Serial/App. No.** | 78-298700 |
| **Registration No.** | 2881736 |
| **Filing Date** | Sep 10, 2003 |
| **Registered** | Sep 7, 2004 |

## Record 82



| | |
|---|---|
| **Mark** | KENMORE  (and Design) |
| **Serial/App. No.** | 75-336306 |
| **Registration No.** | 2276503 |
| **Filing Date** | Aug 5, 1997 |
| Registered | Sep 7, 1999 |

## Record 83



| | |
|---|---|
| **Mark** | KENMORE  (and Design) |
| **Serial/App. No.** | 75-346404 |
| **Registration No.** | 2227561 |
| **Filing Date** | Aug 25, 1997 |
| **Registered** | Mar 2, 1999 |

## Record 84

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 76-105205 |
| **Registration No.** | 2475811 |
| **Filing Date** | Aug 8, 2000 |
| **Registered** | Aug 7, 2001 |

## Record 85

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 78-314699 |
| **Registration No.** | 2913066 |
| **Filing Date** | Oct 16, 2003 |
| **Registered** | Dec 21, 2004 |

## Record 86

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 78-314709 |
| **Registration No.** | 2893535 |
| **Filing Date** | Oct 16, 2003 |
| **Registered** | Oct 12, 2004 |

## Record 87

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 78-317721 |
| **Registration No.** | 2941746 |
| **Filing Date** | Oct 23, 2003 |
| **Registered** | Apr 19, 2005 |

## Record 88

# KENMORE

| | |
|---|---|
| **Mark** | KENMORE  (Stylized) |
| **Serial/App. No.** | 71-367943 |
| **Registration No.** | 333253 |
| **Filing Date** | Aug 2, 1935 |
| **Registered** | Mar 10, 1936 |
| **Renewed** | Mar 10, 1996 |

Reference/Matter: sears securitization

28

---

**Record 89**

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 71-539906 |
| **Registration No.** | 517739 |
| **Filing Date** | Nov 1, 1947 |
| **Registered** | Nov 22, 1949 |
| **Renewed** | Nov 22, 1999 |

---

**Record 90**

# KENMORE

| | |
|---|---|
| **Mark** | KENMORE  (Stylized) |
| **Serial/App. No.** | 71-550618 |
| **Registration No.** | 522973 |
| **Filing Date** | Feb 26, 1948 |
| **Registered** | Mar 28, 1950 |
| **Renewed** | Mar 28, 2000 |

---

**Record 91**

# KENMORE

| | |
|---|---|
| **Mark** | KENMORE  (Stylized) |
| **Serial/App. No.** | 71-672538 |
| **Registration No.** | 610699 |
| **Filing Date** | Aug 31, 1954 |
| **Registered** | Aug 16, 1955 |
| **Renewed** | Aug 16, 1995 |

## Record 92

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 73-158384 |
| **Registration No.** | 1102052 |
| **Filing Date** | Feb 13, 1978 |
| **Registered** | Sep 12, 1978 |
| **Renewed** | Sep 12, 1998 |

## Record 93

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 73-414682 |
| **Registration No.** | 1275031 |
| **Filing Date** | Feb 23, 1983 |
| **Registered** | Apr 24, 1984 |
| **Renewed** | Apr 24, 2004 |

## Record 94

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 73-427663 |
| **Registration No.** | 1282358 |
| **Filing Date** | May 26, 1983 |
| **Registered** | Jun 19, 1984 |
| **Renewed** | Jun 19, 2004 |

## Record 95

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 73-793846 |
| **Registration No.** | 1569518 |
| **Filing Date** | Apr 17, 1989 |
| **Registered** | Dec 5, 1989 |
| **Renewed** | Dec 5, 1999 |

## Record 96

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 74-072622 |
| **Registration No.** | 1641183 |
| **Filing Date** | Jun 25, 1990 |
| **Registered** | Apr 16, 1991 |
| **Renewed** | Apr 16, 2001 |

## Record 97

| | |
|---|---|
| **Mark** | KENMORE |
| **Serial/App. No.** | 74-194190 |
| **Registration No.** | 1695957 |
| **Filing Date** | Aug 13, 1991 |
| **Registered** | Jun 23, 1992 |
| **Renewed** | Jun 23, 2002 |

## Record 98



| | |
|---|---|
| **Mark** | KENMORE ELITE   (and Design) |
| **Serial/App. No.** | 75-679754 |
| **Registration No.** | 2414684 |
| **Filing Date** | Apr 12, 1999 |
| **Registered** | Dec 19, 2000 |

## Record 99

| | |
|---|---|
| **Mark** | MY FIRST CRAFTSMAN |
| **Serial/App. No.** | 78-125361 |
| **Registration No.** | 2757614 |

| | |
|---|---|
| **Filing Date** | May 1, 2002 |
| **Registered** | Aug 26, 2003 |

---

## Record 100

# MY FIRST KENMORE

| | |
|---|---|
| **Mark** | MY FIRST KENMORE   (Block letters) |
| **Serial/App. No.** | 78-558874 |
| **Filing Date** | Feb 2, 2005 |

---

## Record 101

| | |
|---|---|
| **Mark** | TODO ES POSIBLE CON CRAFTSMAN |
| **Serial/App. No.** | 76-006014 |
| **Registration No.** | 2696206 |
| **Filing Date** | Mar 21, 2000 |
| **Registered** | Mar 11, 2003 |

# Puerto Rico

## Contents

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 13022 |
| Registration No. | 13022 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 13023 |
| Registration No. | 13023 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 13024 |
| Registration No. | 13024 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 13020 |
| Registration No. | 13020 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 13025 |
| Registration No. | 13025 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| | |
|---|---|
| Mark | CRAFTSMAN |
| Serial/App. No. | 13026 |
| Registration No. | 13026 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

3553706_1.DOC

# Puerto Rico

## Contents

| Mark | KENMORE |
|---|---|
| Serial/App. No. | 13038 |
| Registration No. | 13038 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed | May 14, 2005 |

| Mark | KENMORE |
|---|---|
| Serial/App. No. | 13039 |
| Registration No. | 13039 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| Mark | KENMORE |
|---|---|
| Serial/App. No. | 13040 |
| Registration No. | 13040 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| Mark | KENMORE |
|---|---|
| Serial/App. No. | 13041 |
| Registration No. | 13041 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| Mark | KENMORE |
|---|---|
| Serial/App. No. | 13042 |
| Registration No. | 13042 |
| Filing Date | January 29, 1964 |
| Registration Date | May 14, 1965 |
| Renewed: | May 14, 2005 |

| | |
|---|---|
| Mark | KENMORE |
| Serial/App. No. | 52066 |
| Registration No. | 52066 |
| Filing Date | October 24, 2000 |
| Registration Date | October 24, 2000 |

3553714_1.DOC

SCHEDULE I

(Fiscal Month Schedule)

INDENTURE

## SCHEDULE I
(Fiscal Months)

| Loan Period | Fiscal Year | 52-Week or 53-Week FY? | Fiscal Month | 4-Week or 5-Week FM? | Beginning Sunday | Ending Saturday |
|---|---|---|---|---|---|---|
| end of FY2005 | | | January | | | 28-Jan-06 |
| | FY2006 | 53 | February | 4 | 29-Jan-06 | 25-Feb-06 |
| | | | March | 5 | 26-Feb-06 | 1-Apr-06 |
| 1 | | | April | 4 | 2-Apr-06 | 29-Apr-06 |
| 2 | | | May | 4 | 30-Apr-06 | 27-May-06 |
| 3 | | | June | 5 | 28-May-06 | 1-Jul-06 |
| 4 | | | July | 4 | 2-Jul-06 | 29-Jul-06 |
| 5 | | | August | 4 | 30-Jul-06 | 26-Aug-06 |
| 6 | | | September | 5 | 27-Aug-06 | 30-Sep-06 |
| 7 | | | October | 4 | 1-Oct-06 | 28-Oct-06 |
| 8 | | | November | 4 | 29-Oct-06 | 25-Nov-06 |
| 9 | | | December | 5 | 26-Nov-06 | 30-Dec-06 |
| 10 | | | January | 5 | 31-Dec-06 | 3-Feb-07 |
| 11 | FY2007 | 52 | February | 4 | 4-Feb-07 | 3-Mar-07 |
| 12 | | | March | 5 | 4-Mar-07 | 7-Apr-07 |
| 13 | | | April | 4 | 8-Apr-07 | 5-May-07 |
| 14 | | | May | 4 | 6-May-07 | 2-Jun-07 |
| 15 | | | June | 5 | 3-Jun-07 | 7-Jul-07 |
| 16 | | | July | 4 | 8-Jul-07 | 4-Aug-07 |
| 17 | | | August | 4 | 5-Aug-07 | 1-Sep-07 |
| 18 | | | September | 5 | 2-Sep-07 | 6-Oct-07 |
| 19 | | | October | 4 | 7-Oct-07 | 3-Nov-07 |
| 20 | | | November | 4 | 4-Nov-07 | 1-Dec-07 |
| 21 | | | December | 5 | 2-Dec-07 | 5-Jan-08 |
| 22 | | | January | 4 | 6-Jan-08 | 2-Feb-08 |
| 23 | FY2008 | 52 | February | 4 | 3-Feb-08 | 1-Mar-08 |
| 24 | | | March | 5 | 2-Mar-08 | 5-Apr-08 |
| 25 | | | April | 4 | 6-Apr-08 | 3-May-08 |
| 26 | | | May | 4 | 4-May-08 | 31-May-08 |
| 27 | | | June | 5 | 1-Jun-08 | 5-Jul-08 |
| 28 | | | July | 4 | 6-Jul-08 | 2-Aug-08 |
| 29 | | | August | 4 | 3-Aug-08 | 30-Aug-08 |
| 30 | | | September | 5 | 31-Aug-08 | 4-Oct-08 |
| 31 | | | October | 4 | 5-Oct-08 | 1-Nov-08 |
| 32 | | | November | 4 | 2-Nov-08 | 29-Nov-08 |
| 33 | | | December | 5 | 30-Nov-08 | 3-Jan-09 |
| 34 | | | January | 4 | 4-Jan-09 | 31-Jan-09 |
| 35 | FY2009 | 52 | February | 4 | 1-Feb-09 | 28-Feb-09 |
| 36 | | | March | 5 | 1-Mar-09 | 4-Apr-09 |
| 37 | | | April | 4 | 5-Apr-09 | 2-May-09 |
| 38 | | | May | 4 | 3-May-09 | 30-May-09 |
| 39 | | | June | 5 | 31-May-09 | 4-Jul-09 |
| 40 | | | July | 4 | 5-Jul-09 | 1-Aug-09 |
| 41 | | | August | 4 | 2-Aug-09 | 29-Aug-09 |
| 42 | | | September | 5 | 30-Aug-09 | 3-Oct-09 |

INDENTURE

## SCHEDULE I
### (Fiscal Months)

| Loan Period | Fiscal Year | 52-Week or 53-Week FY? | Fiscal Month | 4-Week or 5-Week FM? | Beginning Sunday | Ending Saturday |
|---|---|---|---|---|---|---|
| 43 | | | October | 4 | 4-Oct-09 | 31-Oct-09 |
| 44 | | | November | 4 | 1-Nov-09 | 28-Nov-09 |
| 45 | | | December | 5 | 29-Nov-09 | 2-Jan-10 |
| 46 | | | January | 4 | 3-Jan-10 | 30-Jan-10 |
| 47 | FY2010 | 52 | February | 4 | 31-Jan-10 | 27-Feb-10 |
| 48 | | | March | 5 | 28-Feb-10 | 3-Apr-10 |
| 49 | | | April | 4 | 4-Apr-10 | 1-May-10 |
| 50 | | | May | 4 | 2-May-10 | 29-May-10 |
| 51 | | | June | 5 | 30-May-10 | 3-Jul-10 |
| 52 | | | July | 4 | 4-Jul-10 | 31-Jul-10 |
| 53 | | | August | 4 | 1-Aug-10 | 28-Aug-10 |
| 54 | | | September | 5 | 29-Aug-10 | 2-Oct-10 |
| 55 | | | October | 4 | 3-Oct-10 | 30-Oct-10 |
| 56 | | | November | 4 | 31-Oct-10 | 27-Nov-10 |
| 57 | | | December | 5 | 28-Nov-10 | 1-Jan-11 |
| 58 | | | January | 4 | 2-Jan-11 | 29-Jan-11 |

## WAIVER AND AMENDMENT RE INDENTURE

THIS WAIVER AND AMENDMENT RE INDENTURE (this "Waiver") dated as of January 25, 2012 is made by SEARS REINSURANCE COMPANY LTD., a Bermuda corporation ("Noteholder"), for the benefit of KCD IP, LLC ("Issuer"), as Issuer, and U.S. BANK NATIONAL ASSOCIATION ("Trustee"), as Trustee.

WHEREAS, Issuer and Trustee are parties to that certain Indenture dated as of May 18, 2006 (the "Indenture");

WHEREAS, Noteholder is the holder of all Notes issued under the Indenture;

WHEREAS, under the Indenture, the sole Rating Agency is Moody's; and

WHEREAS, the parties hereto have been informed that a Reserve Account Event has occurred under the Indenture by virtue of Sears Holdings Corporation's senior unsecured debt rating is "B3" which is below "B2" by Moody's;

NOW, THEREFORE, for and in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Noteholder hereby agrees for the benefit of Issuer and Trustee as follows:

I.    Waiver; Notices.

A.    Notwithstanding the definition of Reserve Account Event, Noteholder waives the requirements of Section 9.1(d) by virtue of the occurrence of a Reserve Account Event, and the provisions of the definition of "Reserve Account Event" are hereby amended to delete all references to "B2" and replace such references with "Caa3" in each case. The foregoing waiver shall be effected automatically upon acceptance of this Waiver by Issuer and Trustee; provided, however, that pursuant to Section 4.13 of the Indenture, the Noteholder hereby authorizes and directs the Trustee to take such further action, if any (such as by noting such waiver on its books and records for the Indenture or providing such additional confirmation to Issuer), as Issuer shall reasonably request.

B.    Pursuant to Section 1.4 of the Indenture, the Noteholder hereby waives any notice of the occurrence of a Reserve Account Event or the effects thereof, including any notice thereof required by Section 5.2 of the Indenture.

C.    Pursuant to Section 4.14 of the Indenture, the Noteholder hereby waives any Default or Event of Default heretofore existing by virtue of any existing Reserve Account Event, whether or not described herein.

D.    Pursuant to Section 6.2 of the Indenture, Trustee shall provide notice and a copy of this Waiver to Moody's.

70{047}0{ 05}128}1

II.    <u>General Provisions</u>.

A.    <u>References to Indenture</u>. The parties acknowledge and agree that all references in each Transaction Document to the Indenture shall mean the Indenture, subject to this Waiver. To the extent Section 6.2 of the Indenture is applicable hereto, this Waiver shall constitute an indenture supplemental to the Indenture.

B.    <u>Defined Terms</u>. All capitalized but undefined terms used herein shall have the same respective meanings as in the Indenture.

C.    <u>Counterparts; Electronic Delivery</u>. This Waiver may be executed in any number of counterparts, and by different parties on separate counterparts,, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument. This Waiver may be delivered by pdf or other electronic delivery and shall be fully effective as if originals hereof were delivered.

D.    <u>GOVERNING LAW</u>.    THIS WAIVER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS RULES (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

E.    <u>Effect of Headings</u>. The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

*[SIGNATURE PAGES FOLLOW.]*

2

701047101 05112811

IN WITNESS WHEREOF, the parties hereto have caused this Waiver to be executed and delivered as of the date first above written.

<u>Noteholder</u>

**SEARS REINSURANCE COMPANY LTD.,**
a Bermuda corporation

By: _____
Name: HEATHER OAKLEY
Title: DIRECTOR

ACKNOWLEDGED AND ACCEPTED AS OF THIS 25TH DAY OF JANUARY, 2012 BY:

**KCD IP, LLC,**
a Delaware limited liability company, as Issuer

By: _____
Name: MICHAEL J. WIEST
Title: PRESIDENT

**U.S. BANK NATIONAL ASSOCIATION,**
a national banking association, as Trustee

By: _____
Name: PATRICIA M CHILD
Title: VICE PRESIDENT

701047101 05112811

SUPPLEMENTAL INDENTURE

THIS SUPPLEMENTAL INDENTURE (this "Supplement") dated as of March 7, 2012 is made among:

KCD IP, LLC ("Issuer"), as Issuer,

U.S. BANK NATIONAL ASSOCIATION ("Trustee"), as Trustee,

SEARS BRANDS BUSINESS UNIT CORPORATION, f/k/a Sears Intellectual Property Management Company ("Manager"), as Manager, and

SEARS HOLDINGS MANAGEMENT CORPORATION ("Servicer"), as Servicer,

WHEREAS, Issuer and Trustee are parties to that certain Indenture dated as of May 18, 2006, as amended by that certain Waiver and Amendment re Indenture dated as of January 25, 2012 from Sears Reinsurance Company Ltd. and accepted by Issuer and Trustee (collectively, the "Indenture"), and the parties hereto are parties to the Transaction Documents (defined in the Indenture);

WHEREAS, pursuant to the Indenture, Issuer issued the Notes described therein;

WHEREAS, contemporaneously herewith, the Notes are being canceled and new Notes issued hereunder, as evidenced by four global new Notes,

R-1 in the face principal amount of $500,000,000

R-2 in the face principal amount of $500,000,000

R-3 in the face principal amount of $500,000,000

R-4 in the face principal amount of $300,000,000

each to be registered in the name of CEDE & Co., as nominee for The Depository Trust Company, a New York corporation ("DTC"), for the benefit of the Purchasers under the Note Purchase Agreement, their successors and assigns (collectively, the "New Notes"). As of the date hereof, the Noteholder with respect to 100% of the New Notes is SEARS REINSURANCE COMPANY LTD., and the only Rating Agency that has in effect a rating on the New Notes is Moody's; and

WHEREAS, pursuant to Section 6.2 of the Indenture, the parties hereto desire to supplement the Indenture, in part to effect (i) an extension of the Scheduled Payoff Date and (ii) a change in the Payment Date;

NOW, THEREFORE, for and in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

I.    <u>Indenture</u>. The Indenture is hereby changed and amended as follows:

A.    <u>Definitions</u>. The definitions of the following terms are hereby revised to read as follows, effective as of the date hereof:

1.    "<u>Determination Date</u>":  The 10th day of each calendar month, commencing on March 10, 2012 (or if such day is not a Business Day, the immediately preceding Business Day)."

2.    "<u>Notes</u>":  All references in the Indenture to the Notes shall hereby mean the New Notes.

3.    "<u>Payment Date</u>": The 15th day of each calendar month commencing on the Payment Date occurring in March, 2012, and ending on the Legal Maturity Date (provided, that if any such date is not a Business Day, the Payment Date shall be the next ensuing Business Day).  It is understood that the March, 2012 Payment Date will be for a shortened Interest Period, from February 25, 2012 through March 14, 2012.

4.    "<u>Scheduled Payoff Date</u>": The June 2016 Payment Date, <u>provided</u>, that the Issuer may extend the Scheduled Payoff Date (A) for an additional one-year period to the June 2017 Payment Date, if (i) it provides written notice to the Trustee, Rating Agencies, Servicer, Manager, Back-Up Manager and Noteholders not more than 60 days and not less than 30 days prior to the original Scheduled Payoff Date, and (ii) either (a) the Coverage Ratio as of each of the six (6) Determination Dates immediately preceding the June 2016 Determination Date was greater than or equal to 395%, or (b) the Majority Noteholders consent to the extension, and (B) for a second additional one-year period to the June 2018 Payment Date, if (i) it provides written notice to the Trustee, Rating Agencies, Servicer, Manager, Back-Up Manager and Noteholders not more than 60 days and not less than 30 days prior to the then current Scheduled Payoff Date, and (ii) either (a) the Coverage Ratio as of each of the six (6) Determination Dates immediately preceding the June 2017 Determination Date was greater than or equal to 400%, or (b) the Majority Noteholders consent to the extension.

5.    "<u>Legal Maturity Date</u>":  The June 2025 Payment Date, <u>provided</u>, that, each time the Scheduled Payoff Date is extended in accordance with the definition thereof for an additional one-year period, the Legal Maturity Date shall be correspondingly extended for an additional one-year period to the June 2026 and June 2027 Payment Dates, as applicable.

6.    "<u>Expected Maturity Date</u>":  The June 2022 Payment Date, <u>provided</u>, that, each time the Scheduled Payoff Date is extended in accordance with the definition thereof for an additional one-year period, the Expected Maturity Date shall be correspondingly extended for an additional one-year period to the June 2023 and June 2024 Payment Dates, as applicable.

7.    "<u>Note Interest Rate</u>":  With respect to each Note, currently 7.90% per annum, and effective commencing March 7, 2012, 9.75% per annum, <u>plus</u>, if the Scheduled Payoff Date is extended to the June 2017 Payment Date pursuant to the

701020861 05112811

definition thereof, 0.50% per annum from and after the originally scheduled Scheduled Payoff Date, plus if the Scheduled Payoff Date is further extended to the June 2018 Payment Date pursuant to the definition thereof, an additional 0.50% per annum from and after the June 2017 Payment Date, plus, at all times after the Scheduled Payoff Date (as extended, if applicable), 1.00% per annum, payable in arrears on each Payment Date.

8.    "Sears Credit Agreement": Second Amended and Restated Credit Agreement, dated as of April 8, 2011, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders party thereto, Wells Fargo Bank, National Association and General Electric Capital Corporation, as Co-Collateral Agents, Wells Fargo Capital Finance, LLC and General Electric Capital Corporation, as Co-Syndication Agents, Barclays Bank PLC, JPMorgan Chase Bank, N.A. and Citigroup Global Markets Inc. as Co-Documentation Agents, and Bank of America, N.A. as Agent, Co-Collateral Agent and Swingline Lender, as it has been, and may hereafter be, amended, modified, supplemented, restated or waived from time to time.

9.    "Guarantee and Collateral Agreement": Second Amended and Restated Guarantee and Collateral Agreement, dated as of April 8, 2011, among Sears Holdings Corporation, Sears, Roebuck and Co., Sears Roebuck Acceptance Corp., Kmart Holding Corporation, Kmart Corporation and certain of their respective subsidiaries, as Grantors, and Bank of America, N.A., Wells Fargo Bank, National Association and General Electric Capital Corporation, as Co-Collateral Agents, as it may be amended, modified, supplemented, restated or waived from time to time.

B.    Agent. All references to JPMorgan Chase Bank, N.A. as the administrative agent under the Sears Credit Agreement are hereby changed to be a reference to the agents under the Sears Credit Agreement from time to time. As of the date hereof, the various agents under the Sears Credit Agreement are as specified in the revised definition of "Sears Credit Agreement" set forth above.

C.    Orchard. All references to "Orchard Credit Agreement," "Orchard Related Intellectual Property" and "Pledge and Security Agreement" are hereby deleted.

D.    Notice Addresses. Trustee's Notice Address in Section 1.3 of the Indenture is hereby replaced in its entirety with the following:

> "U.S. Bank National Association
> Global Structured Finance
> Mail Code MK-IL-SL7R
> 190 S. LaSalle Street, 7th Floor
> Chicago, IL 60603
> Attention: Structured Finance/KCD IP, LLC
> Phone: (312) 332-7494
> Fax: (312) 332-7996"

"

701020861 05112811

   E.    Nondisturbance. Section 1.12 of the Indenture is hereby replaced in its entirety
with the following:

   Section 1.12.    Nondisturbance.  Notwithstanding anything to the contrary herein
or in any other Transaction Document, the Trustee agrees that, and each Noteholder by its
acceptance of a Note agrees that, the exercise of any remedies by the Trustee or
Noteholders under Article IV of this Indenture upon the occurrence of an Event of
Default shall not (i) operate to terminate or impair the rights of the agents on behalf of
certain lenders, pursuant to the Sears Credit Agreement and the Guarantee and Collateral
Agreement (or any restatement, replacement or refinancing thereof), with respect to the
intellectual property relating to the Sears Trademarks, and the Trustee and each
Noteholder agree they will not disturb or take any action to impair such administrative
agent's or lenders' rights in such intellectual property, (ii) operate to terminate or impair
the rights of the sublicensees (the "Existing Sublicensees") under the sublicenses
described on Schedule 1 attached hereto and their respective permitted successors and
assigns under such sublicenses, with respect to the Sears Tradenames in the Territory
provided therein (the "Existing Sublicenses"), and the Trustee and each Noteholder agree
they will not disturb or take any action to impair sublicensees and their respective
permitted successors and assigns thereunder, or (iii) operate to terminate or impair the
rights of any sublicensee under any Qualified Sublicense, as long as the sublicensee
under such Qualified Sublicense is not in default (beyond any applicable grace or cure
period) and the sublicensee thereafter pays royalties due thereunder (at the rates set forth
therein) to the Licensor or its successors and assigns, including the Trustee (or the
Servicer on their behalf), and the Trustee and each Noteholder by acceptance of its Note
agree they will not disturb or take any action to impair such sublicensee's rights under the
applicable Qualified Sublicense.  Each of the Issuer, the Trustee and each Noteholder by
its acceptance of a Note further agrees that (i) it will take no action in conflict with the
nondisturbance provisions included in the Contribution Agreement related to the rights of
the lenders under the Sears Credit Agreement and the Guarantee and Collateral
Agreement, (ii) while any License is in effect, it will take no action in conflict with the
provisions of Section 2(c) of each License, and (iii) the agents on behalf of the lenders
under the Sears Credit Agreement, the sublicensees under any Existing Sublicenses and
any sublicensee under a Qualified Sublicense shall be an express third party beneficiary
of this Section 1.12 with rights of enforcement in its own name. Notwithstanding the
foregoing, prior to termination of the applicable License, the applicable licensee shall
have the right to terminate, amend, modify or restate, or waive any provision of, such
Sublicense, without the consent of the Issuer, the Trustee, the Servicer, the Manager or
the Back-Up Manager, provided, however, no such amendment, modification,
restatement or waiver of a Qualified Sublicense shall be binding upon such person unless
either:  (i) it is consented to by such person (or in the case of the Trustee, the Servicer on
its behalf) or (ii) the Existing Sublicense or the Qualified Sublicense, as applicable, as so
amended, modified, restated or waived then satisfies the requirements to constitute a
Qualified Sublicense unless the proviso to the last sentence of Section 2(c) of the
applicable License shall have been satisfied.  The Issuer and the Trustee shall promptly
cause to be taken, executed, acknowledged or delivered all such further acts,
conveyances, documents and assurances as may from time to time be reasonably
requested by the agents under the Sears Credit Agreement and the Guarantee and

4

Collateral Agreement or any Existing Sublicensee or any Qualified Sublicensee to confirm, effect or preserve the provisions of, and the rights set forth in, this <u>Section 1.12</u>. The Issuer will provide the Trustee with copies of the Sears Credit Agreement and the Guarantee and Collateral Agreement, each Existing Sublicense, each Qualified Sublicense and any amendments thereto on the Closing Date, or in the case of any such documents executed after the Closing Date, upon request of the Trustee.

F.    <u>Limitation of Liability of Issuer</u>.  The following is hereby added as Section 4.19 of the Indenture:

"<u>Section 4.19.  Limitation of Liability of Issuer</u>.  Notwithstanding anything to the contrary stated or implied in the Indenture, any Note or any other document or instrument entered into by Issuer in connection with or relating to the Indenture, any Note, the Issuer's business or affairs, or the Collateral, Issuer's liability under or in connection with the Indenture and Notes shall be limited solely to Issuer's rights in the Collateral, and all persons dealing with Issuer under the Indenture and Notes shall look solely to such rights in the Collateral and no other assets of Issuer or Issuer's members, managers, officers, employees, partners or Affiliates for the enforcement of any claim against Issuer."

G.    <u>Exhibit A</u>.  <u>Exhibit A</u> of the Indenture is hereby amended as follows:

1.    All references in Exhibit A  to "June 25, 2016" are hereby amended to read "the June 2025 Payment Date"

2.    All references in Exhibit A to "6.90%" are hereby deleted and replaced with "9.75%".

3.    The following paragraph is hereby added to the end of Exhibit A:

"<u>Limitation of Liability of Issuer</u>.  Notwithstanding anything to the contrary stated or implied in the Indenture, any Note or any other document or instrument entered into by Issuer in connection with or relating to the Indenture, any Note, the Issuer's business or affairs, or the Collateral, Issuer's liability under or in connection with the Indenture and Notes shall be limited solely to Issuer's rights in the Collateral, and all persons dealing with Issuer under the Indenture and Notes shall look solely to such rights in the Collateral and no other assets of Issuer or Issuer's members, managers, officers, employees, partners or Affiliates for the enforcement of any claim against Issuer."

II.    <u>Licenses</u>. The parties hereto hereby acknowledge that each License has been modified by a First Amendment dated as of November 29, 2009 and a Second Amendment dated as of March 7, 2012, and hereby confirms that it has consented to each such First Amendment and Second Amendment.

5

701020861 05112811

III.    <u>Closing Documents</u>.

    A.    <u>Covenants of Issuer</u>. To effect the provisions set forth in this Supplement, Issuer covenants to take the following actions:

        1.    <u>DTC Letter</u>. Cause to be filed with DTC either a new DTC Letter of Representations or an amendment to the existing DTC Letter of Representations, as DTC shall require, relating to the global New Notes delivered through the facilities of DTC.

        2.    <u>CUSIP Numbers</u>. Cause to be issued a new CUSIP number for the New Notes.

        3.    <u>UCC, Tax Lien and Judgment Searches</u>.  Obtain and deliver to the Trustee, the Servicer and the Noteholders UCC, tax lien and judgment searches for Sears Brands (relating to the Assets), the Manager (relating to the Assets) and the Issuer.

        4.    <u>U.S. Patent and Trademark Office Search</u>. Obtain and deliver to the Trustee, the Servicer and the Noteholders a search of the U.S. Patent and Trademark Office relating to the Sears Trademarks.

        5.    <u>Back-Up Manager</u>. Obtain and deliver to the Trustee the acknowledgment of Ocean Tomo, LLC, the Back-Up Manager, to the extension of the Legal Maturity Date and the modification of the Payment Date set forth above.

        6.    <u>New Notes</u>.  Cause the prior global Notes to be canceled and in exchange, the New Notes to be delivered to DTC.

    B.    <u>Covenant of Trustee</u>.  Pursuant to <u>Section 6.2</u> of the Indenture, promptly after the execution and delivery hereof, Trustee shall deliver written notice of this Supplement to Moody's and the Noteholders setting forth in general terms the substance of this Supplement together with a copy of this Supplement.

    C.    <u>Organizational and Authority Documents; Opinions of Counsel</u>.  Each of the parties hereto shall deliver to the other parties hereto certified copies of such organizational and authority documents, including good standing certificates, and legal opinion letters as any party hereto shall reasonably request, but failure to deliver any such documents shall not delay or impede the effectiveness of the provisions contemplated by this Supplement.

    D.    <u>Further Assurances</u>. Each of the parties hereto will cause to be promptly and duly taken, executed, acknowledged or delivered all such further acts, conveyances, documents and assurances which any party hereto may from time to time reasonably request in order more effectively to carry out the intent and purposes of this Supplement.

    E.    <u>Costs and Expenses</u>. The Issuer will pay or cause to be paid all present and future recording and filing fees relating to this Supplement, and all reasonable legal fees and out-of-pocket expenses in connection with the negotiation and consummation of the transactions contemplated by this Supplement and any action undertaken under Section III (D) above.

701020861 05112811

IV.    <u>General Provisions</u>.

A.    <u>References to Notes; Transaction Documents</u>. The parties acknowledge and agree that all references in each Transaction Document to "6.90% KCD IP, LLC Asset-Backed Notes" are intended to indentify such Notes and that the current interest rate on such Notes as of the date hereof, but immediately prior to the effectiveness of Section I(A)(5) above, is 7.90% per annum. All references in all Transaction Documents, whether or not making reference to this Supplement, to the Transaction Documents shall mean those respective documents, each as amended hereby and as it may be further amended or modified from time to time.

B.    <u>Defined Terms</u>. All capitalized but undefined terms used herein shall have the same respective meanings as in the Indenture.

C.    <u>Reaffirmation of Transaction Documents</u>. Except as expressly amended herein, the Indenture and the other Transaction Documents are and shall remain in full force and effect, in accordance with their respective terms, without any waiver, amendment or other modification of any provision thereof.

D.    <u>Counterparts; Electronic Delivery</u>. This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts,, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument. This Agreement may be delivered by pdf or other electronic delivery and shall be fully effective as if originals hereof were delivered.

E.    <u>GOVERNING LAW</u>. THIS SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS RULES (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

F.    <u>Effect of Headings</u>. The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

G.    <u>Authorization of Trustee</u>. By their acknowledgment hereof, the Noteholders hereby authorize and direct the Trustee to execute and deliver this Supplement and to take any other actions provided in Section III (D) hereof or otherwise provided herein.

*[SIGNATURE PAGES FOLLOW.]*

7

701020861 05112811

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed and delivered as of the date first above written.

**KCD IP, LLC,**
a Delaware limited liability company, as Issuer

By: _Michael J. Wiest_____
Name: _Michael J. Wiest_____
Title: _President_____

**U.S. BANK NATIONAL ASSOCIATION,**
a national banking association, not in its individual capacity, but solely as Trustee

By: _____
Name: _____
Title: _____

**SEARS BRANDS BUSINESS UNIT CORPORATION,**
f/k/a Sears Intellectual Property Management Company,
an Illinois corporation, as Manager

By: _William K. Phelan_____
Name: _William K. Phelan_____
Title: _Vice President_____

**SEARS HOLDINGS MANAGEMENT CORPORATION,**
a Delaware corporation, as Servicer

By: _William K. Phelan_____
Name: _William K. Phelan_____
Title: _Senior Vice President_____

701020861 05112811

Supplemental Indenture

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed and delivered as of the date first above written.

**KCD IP, LLC,**
a Delaware limited liability company, as Issuer

By: _____
Name: _____
Title: _____

**U.S. BANK NATIONAL ASSOCIATION,**
a national banking association, not in its individual capacity, but solely as Trustee

By: *Patricia M. Child*
Name: _____Patricia M. Child_____
Title: _____Vice President_____

**SEARS BRANDS BUSINESS UNIT CORPORATION,**
f/k/a Sears Intellectual Property Management Company,
an Illinois corporation, as Manager

By: _____
Name: _____
Title: _____

**SEARS HOLDINGS MANAGEMENT CORPORATION,**
a Delaware corporation, as Servicer

By: _____
Name: _____
Title: _____

701020861 05112811                                    Supplemental Indenture

Acknowledged and agreed to as of the 1ᵗʰ day of March, 2012, by:

**Noteholder**

**SEARS REINSURANCE COMPANY LTD.,**
a Bermuda corporation

By: _____
Name: _Nanette Vason_____
Title: _Vice President  3/7/12_____

**Transferor under Indenture**

**SEARS BRANDS, LLC,**
an Illinois limited liability company

By: _____
Name: _____
Title: _____

Supplemental Indenture

701020861 05112811

Acknowledged and agreed to as of the $1^{th}$ day of March, 2012, by:

**Noteholder**

**SEARS REINSURANCE COMPANY LTD.,**
a Bermuda corporation

By: _____
Name: _____
Title: _____

**Transferor under Indenture**

**SEARS BRANDS, L.L.C.,**
an Illinois limited liability company

By: _____Michael J. Wiest_____
Name: _____Michael J. Wiest_____
Title: _____Vice President_____

Supplemental Indenture

SCHEDULE 1

Existing Sublicenses with Third Parties

1.      License Agreement dated as of December 2, 2011 between Sears Brands Management
Corporation and Orchard Supply Hardware LLC relating to the CRAFTSMAN Trademarks.

2.      License Agreement dated as of December 2, 2011 between Sears Brands Management
Corporation and Orchard Supply Hardware LLC relating to the KENMORE Trademarks.

3.      Brand License Agreement dated as of August 10, 2011 between Sears Brands
management Corporation and East Penn Manufacturing Co. relating to the DIEHARD
Trademarks.

4.      Brand License Agreement dated as of May 9, 2011 between Sears Brands Management
Corporation and Dorcy International, Inc. relating to the DIEHARD Trademarks.

5.      Diehard Brand License Agreement dated on or about December 30, 2009 between Sears
Brands Management Corporation and Schumacher Electric Corporation, as amended by
Amendment dated as of July 21, 2011 relating to the DIEHARD Trademarks.

Supplemental Indenture

EXECUTION COPY

SECOND SUPPLEMENTAL INDENTURE

dated as of March 8, 2017

by and between

KCD IP, LLC, as Issuer

and

U.S. BANK NATIONAL ASSOCIATION, as Trustee

to

the Indenture, dated as of May 18, 2006,
among the Issuer and the Trustee

## SECOND SUPPLEMENTAL INDENTURE

THIS SECOND SUPPLEMENTAL INDENTURE, dated as of March 8, 2017 (this "Second Supplemental Indenture"), by and between KCD IP, LLC, as Issuer (the "Issuer"), and U.S. BANK NATIONAL ASSOCIATION, as Trustee (the "Trustee"), is entered into pursuant to the terms of the Indenture, dated as of May 18, 2006, by and between the Issuer and the Trustee (as amended, supplemented or otherwise modified from time to time, including by (i) that certain Supplemental Indenture, by and among the Issuer, the Trustee, Sears Brands Business Unit Corporation, f/k/a Sears Intellectual Property Management Company and Sears Holdings Management Corporation, dated as of March 7, 2012, and (ii) that certain Waiver and Amendment re Indenture, dated as of January 25, 2012, from Sears Reinsurance Company Ltd. and accepted by the Issuer and the Trustee) (as amended, supplemented or otherwise modified prior to the date hereof, the "Indenture"). Capitalized terms used in this Second Supplemental Indenture that are not otherwise defined herein have the meanings assigned thereto in the Indenture, as amended hereby.

### RECITALS

WHEREAS, the Issuer and the Trustee are parties to the Indenture;

WHEREAS, pursuant to Section 6.2 of the Indenture, with the consent of all of the Noteholders of each Outstanding Note (collectively, the "Required Consents"), the Issuer and the Trustee may enter into one or more supplemental indentures to modify the Indenture, including to modify or release the Collateral in any material respect except as otherwise permitted in the Indenture without Rating Agency Responses;

WHEREAS, pursuant to Section 6.6(a) of the Indenture, the Issuer has provided each Noteholder with sufficient information, at least five (5) Business Days in advance of the date a decision is required with respect to the amendments and consents contemplated hereby, to enable each such Noteholder to make an informed and considered decision with respect to the amendments and consents contemplated by this Second Supplemental Indenture; and

WHEREAS, the holder of a 100% beneficial interest in the Outstanding Notes has provided the Required Consents, and is executing this Supplemental Indenture in acknowledgement and agreement of the same.

NOW THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the Issuer and the Trustee hereby mutually agree as follows:

SECTION 1.   Amendments to the Indenture.

(a)      Section 2.8 of the Indenture shall be amended by inserting the words "(except to the extent expressly provided otherwise in this Indenture)" immediately following the words "payment of public and private debts" therein.

(b)      Section 7.2 of the Indenture shall be amended by deleting such section in its entirety and substituting the following therefor:

"Redemption in Connection with the Release of an Asset. In the event there is to be a payment of the Release Price for an Asset or Assets as described in Section 9.3 of this Indenture, the cash portion of the Release Price for the affected Asset(s) shall be deposited in the Distribution Account by the Trustee promptly after receipt and, solely with respect to a Craftsman Release, the noncash portion of the Release Price for the affected Asset(s) shall be delivered to the beneficial holders of the Notes being redeemed, in each case to be applied to the redemption of the Notes being redeemed on the applicable Redemption Date on which such Asset(s) will be released. Deposit of the cash portion of the Release Price in the Distribution Account and, solely with respect to a Craftsman Release, delivery to the beneficial holders of the Notes being redeemed of the noncash portion of the Release Price shall be deemed to be an exercise of the option to redeem Notes on such Redemption Date in a principal amount equal to the amount set forth in clause (i) of the Release Price and at an aggregate redemption price equal to the Release Price. Notwithstanding anything to the contrary in this Section 7.2 or in Section 9.3, no Redemption Premium will be included in the Redemption Price if the Redemption Date is on or after the Scheduled Payoff Date."

(c)     Section 7.3 of the Indenture shall be amended by (i) inserting the words "prior to the applicable Redemption Date (or, solely with respect to a Craftsman Release, no later than the applicable Redemption Date)" immediately following the words "less than 15 days" therein, (ii) deleting the words "five (5) business days of" and substituting the words "five (5) Business Days following (or, solely with respect to a Craftsman Release, on the same day as)" therefor and (iii) inserting the words "(which Redemption Date may be conditional on the consummation of any other transaction)" immediately following the words "the Redemption Date" in clause (i) thereof.

(d)     Section 7.4 of the Indenture shall be amended by:

(i)     inserting "(i) deliver any noncash portion of the Redemption Price as directed by the Noteholders holding Notes being redeemed on such Redemption Date and (ii)" before the words "remit to the Trustee"; and

(ii)     deleting the words "sufficient to pay" therein and substituting "that, together with any noncash portion of the Redemption Price, have an aggregate value equal to".

(e)     Clause (a) of Section 7.5 of the Indenture shall be amended by inserting "(i) any noncash portion of the Redemption Price by Issuer in accordance with Section 7.4 and (ii) any cash portion of" immediately following the words "the Noteholders shall be paid".

(f)     Clause (c) of Section 7.5 of the Indenture shall be amended by deleting the period after the words "available funds" and substituting the words "unless otherwise directed by the Noteholders holding Notes being redeemed on such Redemption Date"

therefor.

(g)    Article VIII of the Indenture shall be amended by inserting the following new Section 8.16 at the end thereof:

"Section 8.15. Craftsman Transaction.  Notwithstanding anything to the contrary set forth herein, following the consummation of a Craftsman Release, the Issuer shall be permitted to consummate the transactions contemplated by the Craftsman Transaction Agreement."

(h)    Section 9.3 of the Indenture shall be amended by deleting such section and substituting the following therefor:

"Section 9.3.  Release of Assets.  The Issuer may, with at least 45 days' prior written notice (or, solely with respect to a Craftsman Release, same day notice) to the Trustee (such notice, the "Issuer's Notice"), obtain a release of an Asset or Assets from the Lien of this Indenture; provided that the Noteholders have provided to the Issuer their prior written consent to such release (such consent to be given in the Noteholders' sole discretion). Such Issuer's Notice shall set forth (i) the Asset(s) to be released, (ii) the Redemption Date on which such Asset(s) will be released (which Redemption Date may be conditional on the consummation of any other transaction), and (iii) an estimate of the Release Price, including, solely with respect to a Craftsman Release, whether any part (or all) of such Release Price shall be paid in noncash assets and, if so, the identity of such noncash assets. The Release Price for such Asset(s) shall also be the aggregate redemption price for the related redemption of Notes. Upon payment of the Release Price as the aggregate redemption price in accordance with Section 7.2 and Section 7.4, the Asset(s) specified in the Issuer's Notice shall be automatically and irrevocably discharged, terminated and released from the Lien of this Indenture without further action by any Person (and, at the request of the Issuer, the Trustee shall execute and deliver an appropriate instrument evidencing such release). The Release Price for the release of such Asset(s) shall be applied to the redemption of the Notes being redeemed on such Redemption Date in accordance with Section 7.2 and Section 7.4."

(i)    The definition of "Debt Value" in Appendix A of the Indenture shall be amended by deleting clause (a) thereof and substituting "in relation to a Craftsman Release, an amount equal to $900,000,000.00;" therefor.

(j)    The definition of "Redemption Date" in Appendix A of the Indenture shall be amended by deleting the existing text of such definition and substituting the following therefor: "Any Payment Date or, solely with respect to the Redemption Date pertaining to a Craftsman Release, any Business Day."

(k)    The definition of "Release Price" in Appendix A of the Indenture shall be

3

amended by (i) inserting the words "(x) with respect to a Craftsman Release, $900,000,000.00 or (y) with respect to any other release of Assets," at the beginning of clause (i) thereof and (ii) inserting the following new sentence at the end thereof: "Notwithstanding anything to the contrary set forth herein or otherwise, the Release Price with respect to a Craftsman Release may consist of (A) cash, (B) non-cash assets acceptable to the Noteholders in their sole discretion or (C) any combination of the assets set forth in clause (A) and (B), in each case with an aggregate value in the amount set forth above (as reasonably determined by the Noteholders)."

(l)    Appendix A of the Indenture shall be amended by inserting in appropriate alphabetical order the following new definition:

"Craftsman Release": a release of the CRAFTSMAN Trademarks, the CRAFTSMAN Licenses and any related assets.

"Craftsman Transaction Agreement": the Transaction Agreement, dated as of March 8, 2017, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and the Issuer.

SECTION 2.  Indenture to Remain in Effect; Required Consent.

(a)    Except as expressly modified herein, the Indenture shall continue in full force and effect in accordance with its terms.  All references in the Indenture to the Indenture or to "this Indenture" shall apply *mutatis mutandis* to the Indenture as previously supplemented or otherwise amended or modified and as supplemented or otherwise amended or modified by this Second Supplemental Indenture.  The Trustee shall be entitled to all rights, protections, immunities and indemnities set forth in the Indenture as fully as if set forth in this Second Supplemental Indenture.

(b)    By its signature hereto, the holder of a 100% beneficial interest of the Outstanding Notes confirms that it has received sufficient information in advance of the date hereof to enable such holder to make an informed and considered decision with respect to the terms, amendments and consents contemplated hereby, and agrees, acknowledges and consents to all of the same.  Such holder further confirms that it has determined that a promissory note issued by Sears Roebuck Acceptance Corp. in the form attached hereto as Exhibit A shall constitute non-cash assets acceptable to such holder with an aggregate value equal to the Release Price for the CRAFTSMAN Trademarks, the CRAFTSMAN Licenses and any related assets.

SECTION 3.  <u>Miscellaneous</u>.

(a)    THIS SECOND SUPPLEMENTAL INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS RULES (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS SECOND SUPPLEMENTAL INDENTURE AND FOR ANY COUNTERCLAIM THEREIN.

(c)    This Second Supplemental Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument. Delivery of an executed counterpart of this Second Supplemental Indenture by electronic means (including email or telecopy) will be effective as delivery of a manually executed counterpart of this Second Supplemental Indenture.

(d)    The Issuer hereby directs the Trustee to enter into this Second Supplemental Indenture and the Trustee hereby accepts the amendments and consents to the Indenture as set forth in this Second Supplemental Indenture and agrees to perform the duties of the Trustee upon the terms and conditions set forth herein and in the Indenture.  Without limiting the generality of the foregoing, the Trustee assumes no responsibility for the correctness of the Recitals contained herein, which shall be taken as the statements of the Issuer and, except as provided in the Indenture, the Trustee shall not be responsible or accountable in any way whatsoever for or with respect to the validity, execution or sufficiency of this Second Supplemental Indenture and makes no representation with respect thereto.

(e)    The Issuer represents and warrants to the Trustee that this Second Supplemental Indenture has been duly and validly executed and delivered by the Issuer and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

(f)    The Issuer represents and warrants that the Required Consents have been obtained.

(g)    This Second Supplemental Indenture shall become effective as of the date first set forth above and counterparts hereof shall have been executed and delivered by the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(h)    In case any provision of this Second Supplemental Indenture shall be found to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such

provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

[Remainder of page intentionally left blank; signatures follow]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Second Supplemental Indenture as of the date first written above.

KCD IP, LLC, a Delaware limited liability company, as Issuer

By: _____

Name: Robert A. Riecker
Title: Vice President


U.S. BANK NATIONAL ASSOCIATION, a national banking association, not in its individual capacity, but solely as Trustee


By: _____
Name:
Title:

[Signature Page to Second Supplemental Indenture]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Second Supplemental Indenture as of the date first written above.

KCD IP, LLC, a Delaware limited liability company, as Issuer

By:_____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, a national banking association, not in its individual capacity, but solely as Trustee

By:_____
Name:   JOSE A. GALARZA
Title:   VICE PRESIDENT

[Signature Page to Second Supplemental Indenture]

**Certification to the Indenture Trustee:**

The undersigned certifies that it owns a 100% beneficial interest in the Notes as of the date hereof and hereby consents to this Second Supplemental Indenture. Further, the undersigned hereby represents and warrants that it is duly authorized to execute and deliver this Certification to the Trustee as the owner of a 100% beneficial interest in the Notes and that such power has not been granted or assigned to any other Person.

SEARS REINSURANCE COMPANY LTD.,
a Bermuda corporation

By: _____
Name: WARETTE VANN
Title: Vice President

[Signature Page to Second Supplemental Indenture]

**<u>EXHIBIT A</u>**

# TERM PROMISSORY NOTE

$926,522,912.69                                                    March 8, 2017

FOR VALUE RECEIVED, Sears Roebuck Acceptance Corp., a Delaware corporation (the "Borrower") hereby promises to pay to the order of KCD IP, LLC, a Delaware limited liability company (the "Lender"), in lawful money of the United States of America (except as set forth below), the principal amount of this promissory note (this "Note"), which amount the Borrower has borrowed from the Lender on this date pursuant to this Note, together with interest and any additional principal as provided herein.

1.  <u>Principal</u>.  The initial principal amount of this Note is $926,479,349.43.

2.  <u>Interest</u>.  Interest shall accrue from the date of this Note on the unpaid principal balance owing under this Note at a rate equal to 7.7% per annum (the "Interest Rate"), and shall be payable in arrears on the Maturity Date.

3.  <u>Due Date</u>.  The unpaid principal amount of this Note, together with all accrued and unpaid interest, shall be due and payable in full on March 15, 2017 (the "Maturity Date").

4.  <u>Prepayment</u>.  At any time prior to the Maturity Date and without prior notice, the Borrower may pay, without penalty or premium, the outstanding principal amount of this Note in whole or in part, together with accrued and unpaid interest.  Prepayments made pursuant to this Section 4 shall be applied first to the payment of accrued and unpaid interest and then to the payment of unpaid principal amount.

5.  <u>Place of Payment</u>.  Payment of any amount under this Note shall be made to the Lender in lawful money of the United States of America (a) by check, delivered to the Lender's address set forth in Section 11 below or at such other place as the Lender may direct by written notice to the Borrower, (b) by wire transfer to such account or accounts as the Lender may direct by written notice to the Borrower or (c) by delivery to the Lender of non-cash assets acceptable to the Lender in its sole discretion with an aggregate fair market value (as reasonably determined by the Lender) equal to the amount to be paid; provided that the Lender hereby consents to payment through the delivery to the Lender of medium-term notes issued by the Borrower pursuant to that certain Indenture, dated as of October 1, 2002, between the Borrower and BNY Midwest Trust Company, as trustee, with a fair market value (as reasonably determined by the Lender) equal to the amount to be paid .

6.  <u>Waivers</u>.  The Borrower hereby waives diligence, presentment for payment, demand, notice of dishonor, or protest.  No delay or failure by the Lender to exercise any right or remedy shall operate as

W/2872222v5

a waiver thereof, and no single or partial exercise by the Lender of any right or remedy shall preclude any other or further exercise thereof.

7.    <u>Default</u>.  In the event that (a) the Borrower shall fail to pay when due any amount payable hereunder, (b) the Borrower commences a voluntary case under the U.S. Bankruptcy Code or any bankruptcy, insolvency or similar law now or hereafter in effect in the United States or elsewhere, or in the event that an involuntary case is commenced against the Borrower under any such law or (c) the Borrower fails to comply with any other term hereof or any representation and warranty of the Borrower hereunder is untrue at the time when made (any such event described in the foregoing clauses (a) through (c), a "<u>Default</u>"), the Lender may, by notice to the Borrower, declare the outstanding principal amount of the Note, together with all accrued and unpaid interest and all other accrued and unpaid liabilities of the Borrower under the Note, due and payable, whereupon such principal, interest and other liabilities shall forthwith become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower (or, solely in the case of an event described in clause (b), the outstanding principal amount of the Note, together with all accrued and unpaid interest and all other accrued and unpaid liabilities of the Borrower under the Note, shall become due and payable immediately and automatically, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower).  Upon the occurrence and during the continuation of a Default, interest on the unpaid principal balance owing under this Note shall accrue at a rate equal to the Interest Rate *plus* 2.00% per annum and shall be payable in cash on demand.

8.    <u>Expenses</u>.  The Borrower shall promptly reimburse the Lender for all reasonable and documented costs and expenses (including the reasonable fees and expenses of legal counsel) incurred by the Lender in enforcing its rights hereunder.

9.    <u>Binding Effect; Assignment</u>.  The promises, terms, and conditions contained in this Note shall be binding upon the Borrower and the Borrower's successors and assigns.  The Lender may, without consent of the Borrower, assign to any person or entity all or any portion of its rights and obligations under this Note at any time.  The Borrower shall not, without the consent of the Lender, assign any of its rights or obligations hereunder to any other person or entity.

10.    <u>Usury Savings</u>.  Notwithstanding anything to the contrary contained herein, the Lender shall never be entitled to receive as interest on the obligations evidenced hereby any amount in excess of the maximum rate of interest permitted to be charged by applicable law; and in the event that the Lender ever receives any such excess, such amount which would be excessive interest shall be applied to the reduction of the principal amount hereof, and if the principal amount is paid in full, any remaining excess shall forthwith be paid to the Borrower.

11.   <u>Communications</u>.  For purposes of this Note, communications between the parties shall be in writing and served in person or by commercial courier service or certified United States mail addressed as indicated below or to such other address as the party shall designate by written notice to the other party (and the Borrower hereby represents and warrants that the name and address listed below are the true and accurate name of the Borrower and address of the Borrower's principal residence):

<table>
<tr><td align="center">To Borrower:</td><td align="center">To Lender:</td></tr>
<tr><td align="center">Sears Roebuck Acceptance Corp.<br>3711 Kennett Pike<br>Greenville, DE 19807<br>Attn: General Counsel</td><td align="center">KCD IP, LLC<br>3333 Beverly Road<br>Hoffman Estates, IL 60179<br>Attn: General Counsel</td></tr>
</table>

12.   <u>Amendments; Waivers</u>.  No amendment, supplement, modification, termination or waiver of any provision of this Note shall be effective without the written consent of the Lender and the Borrower.

13.   <u>Governing Law</u>.  This Note shall be construed in accordance with and shall be governed by the laws of the State of New York for contracts made and wholly performed within that State.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Borrower hereby executes this Note as of the day and year first written above.

SEARS ROEBUCK ACCEPTANCE CORP.


By: _____
Name:  Robert A. Riecker
Title:  Vice President, Finance

THIRD SUPPLEMENTAL INDENTURE

dated as of June 15, 2018

by and between

KCD IP, LLC, as Issuer

and

U.S. BANK NATIONAL ASSOCIATION, as Trustee

to

the Indenture, dated as of May 18, 2006,
among the Issuer and the Trustee

## THIRD SUPPLEMENTAL INDENTURE

THIS THIRD SUPPLEMENTAL INDENTURE, dated as of June 15, 2018 (this "Third Supplemental Indenture"), by and between KCD IP, LLC, as Issuer (the "Issuer"), and U.S. BANK NATIONAL ASSOCIATION, as Trustee (the "Trustee"), is entered into pursuant to the terms of the Indenture, dated as of May 18, 2006, by and between the Issuer and the Trustee (as amended, supplemented or otherwise modified from time to time, including by (i) that certain Waiver and Amendment re Indenture, dated as of January 25, 2012, from Sears Reinsurance Company Ltd. ("Sears Re") and accepted by the Issuer and the Trustee), (ii) that certain Supplemental Indenture, dated as of March 7, 2012, by and among the Issuer, the Trustee, Sears Brands Business Unit Corporation, f/k/a Sears Intellectual Property Management Company and Sears Holdings Management Corporation and (iii) that certain Second Supplemental Indenture, dated as of March 8, 2017, by and among the Issuer, the Trustee and Sears Re (as amended, supplemented or otherwise modified prior to the date hereof, the "Indenture"). Capitalized terms used in this Third Supplemental Indenture that are not otherwise defined herein have the meanings assigned thereto in the Indenture, as amended hereby.

### RECITALS

WHEREAS, the Issuer and the Trustee are parties to the Indenture;

WHEREAS, pursuant to Section 6.2 of the Indenture, with the consent of all of the Noteholders of each Outstanding Note (collectively, the "Required Consents"), the Issuer and the Trustee may enter into one or more supplemental indentures to modify the Indenture, including to modify or release the Collateral in any material respect except as otherwise permitted in the Indenture without Rating Agency Responses;

WHEREAS, the holder of a 100% beneficial interest in the Outstanding Notes has provided the Required Consents, and is executing this Supplemental Indenture in acknowledgement and agreement of the same.

NOW THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the Issuer and the Trustee hereby mutually agree as follows:

SECTION 1.  Amendments to the Indenture and the Notes.

(a)    Appendix A of the Indenture shall be amended by amending and restating the following defined terms in their entirety:

"Scheduled Payoff Date": the July 2018 Payment Date.

SECTION 2.  Indenture to Remain in Effect; Required Consent.

(a)    Except as expressly modified herein, the Indenture shall continue in full force and effect in accordance with its terms. All references in the Indenture to the Indenture or to "this Indenture" shall apply *mutatis mutandis* to the Indenture as previously supplemented or otherwise amended or modified and as supplemented or otherwise amended or modified by this Third Supplemental Indenture. The Trustee shall

be entitled to all rights, protections, immunities and indemnities set forth in the Indenture as fully as if set forth in this Third Supplemental Indenture.

(b)     By its signature hereto, the holder of a 100% beneficial interest of the Outstanding Notes confirms that it has received sufficient information in advance of the date hereof to enable such holder to make an informed and considered decision with respect to the terms, amendments and consents contemplated hereby, and agrees, acknowledges and consents to all of the same.

SECTION 3. <u>Miscellaneous</u>.

(a)     THIS THIRD SUPPLEMENTAL INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS RULES (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)     THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS THIRD SUPPLEMENTAL INDENTURE AND FOR ANY COUNTERCLAIM THEREIN.

(c)     This Third Supplemental Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument. Delivery of an executed counterpart of this Third Supplemental Indenture by electronic means (including email or telecopy) will be effective as delivery of a manually executed counterpart of this Third Supplemental Indenture.

(d)     The Issuer hereby directs the Trustee to enter into this Third Supplemental Indenture and the Trustee hereby accepts the amendments and consents to the Indenture as set forth in this Third Supplemental Indenture and agrees to perform the duties of the Trustee upon the terms and conditions set forth herein and in the Indenture.  Without limiting the generality of the foregoing, the Trustee assumes no responsibility for the correctness of the Recitals contained herein, which shall be taken as the statements of the Issuer and, except as provided in the Indenture, the Trustee shall not be responsible or accountable in any way whatsoever for or with respect to the validity, execution or sufficiency of this Third Supplemental Indenture and makes no representation with respect thereto.

(e)     The Issuer represents and warrants to the Trustee that this Third Supplemental Indenture has been duly and validly executed and delivered by the Issuer and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

(f)     The Issuer represents and warrants that the Required Consents have been obtained.

2729017107

(g)     This Third Supplemental Indenture shall become effective as of the date first set forth above and counterparts hereof shall have been executed and delivered by the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(h)     In case any provision of this Third Supplemental Indenture shall be found to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

[Remainder of page intentionally left blank; signatures follow]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Third Supplemental Indenture as of the date first written above.

KCD IP, LLC, a Delaware limited liability company, as Issuer

By: _Michael J Brown_

Name: MICHAEL J. BROTHOW

Title: PRESIDENT

U.S. BANK NATIONAL ASSOCIATION, a national banking association, not in its individual capacity, but solely as Trustee

By: _____

Name:

Title:

[Signature Page to Third Supplemental Indenture]

729017107

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Third Supplemental Indenture as of the date first written above.

KCD IP, LLC, a Delaware limited liability company, as Issuer


By:_____
Name:
Title:



U.S. BANK NATIONAL ASSOCIATION, a national banking association, not in its individual capacity, but solely as Trustee


By:_____
Name:   JOSE A. GALARZA
Title:   VICE PRESIDENT


[Signature Page to Third Supplemental Indenture]

729017107

**Certification to the Indenture Trustee:**

The undersigned certifies that it owns a 100% beneficial interest in the Notes as of the date hereof and hereby consents to this Third Supplemental Indenture. Further, the undersigned hereby represents and warrants that it is duly authorized to execute and deliver this Certification to the Trustee as the owner of a 100% beneficial interest in the Notes and that such power has not been granted or assigned to any other Person.

SEARS REINSURANCE COMPANY LTD.,
a Bermuda corporation

By: _____
Name: *Wanette Vann*
Title: *Vice President*

[Signature Page to Third Supplemental Indenture]

729017107

**KCD IP, LLC**
**c/o Sears Holdings Management Corporation**
**3333 Beverly Road**
**Hoffman Estates, Illinois 60179**

July 13, 2018

The Depository Trust Company
55 Water Street
New York, NY 10041

Attention:  General Counsel's Office, 22nd Floor

Re: Indenture, as amended by a Fourth Supplemental Indenture, dated as of July 13, 2018

Dear Sir/Madam:

KCD IP, LLC ("Issuer") is authorized to make the changes detailed below (the "Revisions") under the Indenture, dated as of May 18, 2006, by and between the Issuer and U.S. Bank National Association, as trustee (the "Trustee") (as amended, supplemented or otherwise modified from time to time, including by (i) that certain Waiver and Amendment re Indenture, dated as of January 25, 2012, from Sears Reinsurance Company Ltd. ("Sears Re") and accepted by the Issuer and the Trustee), (ii) that certain Supplemental Indenture, dated as of March 7, 2012, by and among the Issuer, the Trustee, Sears Brands Business Unit Corporation, f/k/a Sears Intellectual Property Management Company and Sears Holdings Management Corporation, (iii) that certain Second Supplemental Indenture, dated as of March 8, 2017, by and among the Issuer, the Trustee and Sears Re and (iv) that certain Third Supplemental Indenture, dated as of June 15, 2018 among the Issuer and the Trustee (the "Governing Documents") with regard to the KCD IP, LLC Asset-Backed Notes (Rule 144A CUSIP: 48242E AB2) (the "Securities"). Issuer hereby represents that it has obtained all necessary consents, authorizations or the like to make the Revisions from the holders of the Securities under the Governing Documents.

Issuer hereby instructs The Depository Trust Company ("DTC") to reflect the Revisions to the Securities on its records with respect to the Securities, as referenced herein. Issuer hereby agrees to indemnify and defend DTC and Cede & Co., the nominee of DTC, and each of their respective subsidiaries and affiliates, officers, directors, employees, agents and attorneys (each an "Indemnitee", collectively the "Indemnitees") against, and hold any Indemnitee harmless from, any Losses[1] and Legal Actions[2] suffered or incurred by any Indemnitee resulting from, relating to, arising out of or in connection with these instructions.  By way of example but not by way of limitation, this indemnity applies to Legal Actions between and/or among the Issuer, agents and/or any Indemnitee and any Legal Action of any third party against or including any of the Indemnitees.

Issuer requests the following changes be reflected on DTC' records:

---

[1] "Losses" means and includes all losses, liabilities, damages, judgments, payments, obligations, costs and expenses (including, without limitation, any costs of investigation and legal fees and expenses incurred in connection with, resulting from, relating to, arising out of or in connection with these instructions), regardless of whether or not any liability, payment, obligation or judgment is ultimately imposed against any Indemnitee.
[2] "Legal Action" means and includes any claim, counterclaim, demand, action, suit, countersuit, arbitration, inquiry, proceeding or investigation before any federal, state or foreign court or other tribunal or authority, or any investigative or regulatory agency or self regulatory organization.

1.  Maturity Date Revision from June 15, 2027 to June 15, 2029

2.  Note Interest Rate from 10.75% to 7.60%

Very truly yours,

KCD IP, LLC, as Issuer

By: _Michael J Brath_____
Name: MICHAEL J. BROTMAN
Title: PRESIDENT

**EXHIBIT B**

## TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT ("Security Agreement") is made and entered into effective as of May 18, 2006 ("the Effective Date"), by and between KCD IP, LLC, a Delaware limited liability company (together with its permitted successors and assigns, the "Issuer"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, acting hereunder as indenture trustee and not in its individual capacity (together with its permitted successors and assigns, the "Trustee").

1.    Grant of Security Interest.  To secure the complete and timely payment and satisfaction of all obligations of Issuer under the Indenture, of even date herewith, between Issuer and Trustee, Issuer hereby grants to Trustee a security interest in and to all right, title and interest of Issuer in and to any Sears Trademarks as set forth on Schedule 1 attached hereto ("Sears Trademarks") as security for Issuer's obligations under the Indenture.  Schedule 1 shall be amended from time to time to include any after-acquired Sears Trademarks.

2.    Warranties and Representations.  Issuer covenants and warrants that:

(a)    The Sears Trademarks are subsisting and have not been adjudged invalid or unenforceable, in whole or in part;

(b)    Issuer is the sole and exclusive owner of the entire and unencumbered right and interest to the Sears Trademarks; and

(c)    Issuer has the unqualified right to enter into this Security Agreement and perform its terms.

3.    Events of Default.  The term Event of Default, as used herein, shall have the same meaning as Event of Default has in the Indenture.

4.    Issuer's Right to Use Trademarks.  Unless and until an Event of Default shall occur and be continuing, Issuer shall retain all of its rights to the Sears Trademarks but shall not be permitted to assign, transfer or otherwise encumber its rights under the Sears Trademarks; provided, however, that nothing herein contained shall prohibit Issuer from assigning or transferring the Sears Trademarks unless such assignment or transfer would have a Material Adverse Effect on the Noteholders.

5.    Trustee's Rights.  If any Event of Default shall have occurred and be continuing, Trustee shall have, in addition to all other rights and remedies given it by this Security Agreement, the Indenture, those allowed by law and the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction in which the Sears Trademarks apply and, without demand of performance and without other notice (except as set forth next below) or demand whatsoever to Issuer, all of which are hereby expressly waived, and without advertisements, the right to realize upon, the whole or from time to time any part of the Sears Trademarks, or any interest which the Issuer may have therein.

6.    Power of Attorney.  If any Event of Default shall have occurred and be continuing, Issuer hereby authorizes and empowers Trustee to make, constitute and

appoint any officer or agent of Trustee as Trustee may select in its exclusive discretion, as Issuer's true and lawful attorney-in-fact, with the power to endorse Issuer's name on all documents, papers and instruments necessary for Trustee to realize upon the Sears Trademarks. Issuer hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney shall be irrevocable for the life of this Security Agreement.

7.    Protection of Rights in the Sears Trademarks.

(a)    Subject to the Indenture, Issuer shall take all actions reasonably necessary to protect, defend and enforce Trustee's rights in the Sears Trademarks. Issuer shall, upon the reasonable request of Trustee (at the direction of the Majority Noteholders), do any and all lawful acts and execute any and all proper documents in aid of such protection, defense and enforcement.

(b)    If an Event of Default shall have occurred and be continuing, Trustee shall have the right but shall in no way be obligated to bring suit in its own name to protect, defend and enforce the Sears Trademarks, in which event Issuer shall at the request of Trustee do any and all lawful acts and execute any and all proper documents required by Trustee in aid of such protection, defense and enforcement.

8.    No Waiver. No course of dealing between Issuer and Trustee nor any failure to exercise, nor any delay in exercising, on the part of Trustee, any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise of the exercise of any other right, power or privilege.

9.    Cumulative Rights. All of Trustee's rights and remedies with respect to the Sears Trademarks, whether established hereby or by the Indenture or by law shall be cumulative and may be exercised singularly or concurrently.

10.    Severability. The provisions of this Security Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Security Agreement in any jurisdiction.

11.    Amendment. This Security Agreement is subject to modification only by a writing signed by the parties, except as provided in Section 4.

12.    Successors and Assigns. The benefits and burdens of this Security Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties.

13.    Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS RULES (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

14.  Forum Selection and Consent to Jurisdiction.  **THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, AND THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH FEDERAL OR NEW YORK STATE COURT.  THE ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.  THE ISSUER AND THE TRUSTEE AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

15.  Waiver of Jury Trial.  **ISSUER AND TRUSTEE HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS SECURITY AGREEMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

WITNESS the execution hereof as of the day and year first above written.

KCD IP, LLC

By: _____

Name: _____

Title: _____


U.S. BANK NATIONAL ASSOCIATION

By: _____

Name: _____

Title: _____

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF ILLINOIS              :
                               :      SS.
COUNTY OF COOK                 :


     Before me, the undersigned, a Notary Public in and for the county aforesaid, on this 18th day of May, 2006, personally appeared _____ to me know personally, and who, being by me duly sworn, deposes and says that (s)he is the _____ of KCD IP, LLC, and said instrument was signed on behalf of said corporation by authority of its Board of Directors, and that (s)he acknowledged said instrument to be the free act and deed of said corporation.

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF ILLINOIS                    :
                                     :        SS.
COUNTY OF COOK                       :


     Before me, the undersigned, a Notary Public in and for the county aforesaid, on this 18th day of May, 2006, personally appeared _____ to me know personally, and who, being by me duly sworn, deposes and says that (s)he is the _____ of U.S.BANK NATIONAL ASSOCIATION, and said instrument was signed on behalf of said corporation by authority of its Board of Directors, and that (s)he acknowledged said instrument to be the free act and deed of said corporation.



                        _____

                        Notary Public

                        My Commission Expires:

## AFFIDAVIT

Sworn and subscribed before me by _____Dawn A. Eber_____

As ___President_____ of _____KCD IP, LLC_____

Who has been duly identified by means of _____

Of legal age, resident of _____, this 18th day of May, 2006.

Seal:

_____

Notary Public

Commission expires _____

Sworn and subscribed before me by _____Patricia M. Child_____

As ___Vice President_____ of___U.S. BANK NATIONAL ASSOCIATION___

Who has been duly identified by means of _____

Of legal age, resident of _____, this 18th day of May, 2006.

Seal:

_____

Notary Public

Commission expires _____

## SCHEDULE 1

Sears Trademarks – U.S.

[ATTACHED]

## <u>SCHEDULE 1</u>

Sears Trademarks – Puerto Rico

[ATTACHED]

**EXHIBIT C**

**EXECUTION COPY**

KCD IP, LLC,

as Issuer,

SEARS HOLDINGS MANAGEMENT CORPORATION,

as Servicer

and

U.S. BANK NATIONAL ASSOCIATION,

as Trustee

## SERVICING AGREEMENT

Dated as of May 18, 2006

# TABLE OF CONTENTS

**Page**

ARTICLE I.       DEFINITIONS ................................................................ 1

    Section 1.1.      Defined Terms ................................................. 1

ARTICLE II.      ADMINISTRATION AND SERVICING OF COLLATERAL .................... 2

    Section 2.1.      The Servicer To Act as Servicer .............................. 2

    Section 2.2.      Collection of Payments; Withdrawals From the Collection Account ................................................. 3

    Section 2.3.      Records and Certain Moneys Held in Bailment ................ 4

    Section 2.4.      Servicer's Accounting ....................................... 4

    Section 2.5.      No Offset .................................................... 4

    Section 2.6.      Realization upon Defaulted Collateral ...................... 5

    Section 2.7.      Servicing Compensation ..................................... 5

ARTICLE III.     ACCOUNTINGS, STATEMENTS AND REPORTS .......................... 5

    Section 3.1.      Servicer Report ............................................. 5

    Section 3.2.      Certification as to Compliance; Notice of Default .......... 5

    Section 3.3.      Annual Servicer's Reports ................................... 6

    Section 3.4.      Annual Accountant's Report .................................. 6

ARTICLE IV.      THE SERVICER ............................................................ 6

    Section 4.1.      Representations and Warranties .............................. 6

    Section 4.2.      Corporate Existence; Merger ................................. 8

    Section 4.3.      Performance of Obligations .................................. 8

    Section 4.4.      The Servicer Not To Resign; No Assignment .................. 9

    Section 4.5.      Limitation on Liability of the Servicer and Others ......... 9

ARTICLE V.       SERVICER REMOVAL EVENTS ............................................ 10

    Section 5.1.      Servicer Removal Events ..................................... 10

    Section 5.2.      Appointment of Successor .................................... 12

    Section 5.3.      Rights Cumulative ........................................... 13

ARTICLE VI.      MISCELLANEOUS .......................................................... 13

    Section 6.1.      Notices ..................................................... 13

    Section 6.2.      Entire Agreement ............................................ 14

    Section 6.3.      Severability ................................................ 14

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 6.4. | CONSENT TO JURISDICTION | 14 |
| Section 6.5. | Termination of Agreement | 15 |
| Section 6.6. | Amendments | 15 |
| Section 6.7. | Inspection and Audit Rights | 15 |
| Section 6.8. | Binding Effect | 16 |
| Section 6.9. | Captions | 16 |
| Section 6.10. | Legal Holidays | 16 |
| Section 6.11. | Third Party Beneficiaries | 16 |
| Section 6.12. | No Bankruptcy Petition | 16 |
| Section 6.13. | Governing Law | 16 |
| Section 6.14. | Counterparts | 17 |
| Section 6.15. | The Trustee | 17 |

EXHIBIT A    –    Form of Servicer Report
EXHIBIT B    –    List of Servicing Officers
EXHIBIT C    –    Agreed Upon Procedures for Independent Accountants

This SERVICING AGREEMENT (this "Agreement"), dated as of May 18, 2006, is by and among KCD IP, LLC, a Delaware limited liability company (the "Issuer"), SEARS HOLDINGS MANAGEMENT CORPORATION, a Delaware corporation, as Servicer (referred to herein, in such capacity, as the "Servicer") and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee").

## PRELIMINARY STATEMENT

The Issuer and Sears Brands, LLC, an Illinois limited liability company (the "Transferor"), have entered into the Contribution Agreement (as such term and other capitalized terms used herein are defined below) providing for, among other things, the contribution by the Transferor to the Issuer of the Assets, as described in the Contribution Agreement. The Issuer and Sears Intellectual Property Management Company, in its capacity as manager (the "Manager"), have entered into the Management Agreement, pursuant to which the Manager has agreed to manage the Assets for the Issuer. The Issuer and the Trustee have entered into an Indenture pursuant to which the Issuer has granted to the Trustee on behalf of the Secured Parties a security interest in and Lien on the Assets and certain other collateral as specified and defined therein (the "Collateral").

Pursuant to the Organizational Documents, the Contribution Agreement and the Indenture (the "Related Agreements"), the Issuer is required to perform certain duties in connection with the Collateral, and the Issuer desires to have the Servicer perform certain of such duties and provide such additional services consistent with the terms of this Agreement and the Related Agreements as the Issuer may from time to time request, and the Servicer has agreed to perform such duties.

The Issuer and the Servicer agree that all covenants and agreements made by the Servicer in its capacity as Servicer herein with respect to the Collateral shall be for the benefit and security of the Trustee and the Noteholders.

## ARTICLE I.
## DEFINITIONS

Section 1.1.    Defined Terms

(a)    Except as otherwise expressly provided herein or unless the context otherwise requires, the capitalized terms used, but not defined, herein shall have the respective meanings specified in the Indenture. The definitions of such terms are equally applicable both to the singular and plural forms of such terms.

(b)    All references in this instrument to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed or if amended or supplemented, as so amended and supplemented. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, Subsection or other subdivision.

## ARTICLE II.
## ADMINISTRATION AND SERVICING OF COLLATERAL

Section 2.1.    The Servicer To Act as Servicer

(a)    Subject to the rights and obligations of the Manager under the Management Agreement, the Servicer shall administer and service all Collateral for the benefit of the Issuer and, to the extent of the Issuer's obligations under the Indenture, for the benefit of the Trustee and the Noteholders in accordance with the terms of this Agreement and, subject to the Indenture, the Servicer shall have full power and authority to do any and all things in connection with such servicing and administration which it may deem necessary or desirable, including enforcement of the Management Agreement and the Contribution Agreement on behalf of the Issuer and the Trustee.

(b)    Without limiting the generality of the foregoing, subject to the Indenture, the Servicer is hereby authorized and empowered by the Issuer, at the expense of the Issuer, to execute and deliver on its behalf in the event the Manager fails to do so, any and all consents, instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Collateral.  The Servicer agrees that servicing of the Collateral shall be carried out prudently in accordance with customary and usual servicing standards for other institutional servicers and applicable law, and to the extent not inconsistent with the foregoing, the Servicer shall exercise that degree of skill and care which is consistent with the degree of skill and care that the Servicer exercises with respect to similar property and property rights owned by the Servicer or serviced by the Servicer for others and shall apply in the servicing and administration of the Collateral standards, policies and procedures consistent with the standards, policies and procedures that the Servicer applies with respect to similar property and property rights owned or serviced by them.  The Servicer shall give prior written notice to the Issuer, the Manager and the Trustee of any material change to its servicing policies and procedures; provided, however, that the Servicer shall not make any such change that is or will be material and adverse to the interests of the Issuer, the Trustee or the Noteholders.

(c)    Promptly after the execution and delivery of this Agreement, the Servicer shall deliver to the Issuer, the Manager and the Trustee a list, substantially in the form of Exhibit B, certified by the Servicer's secretary or one of its assistant secretaries, of the officers and employees of the Servicer involved in, or responsible for, the administration and servicing of the Collateral, which list shall from time to time be updated by the Servicer and which may be relied upon by the Issuer, the Manager and the Trustee until so updated and delivered to the Issuer, the Manager and the Trustee.

(d)    Without limiting the generality of the foregoing, the Servicer shall have the following duties:

(i)    the Servicer shall supervise the activities of the Manager and shall enforce the Manager's obligations under the Management Agreement, including, but not limited to, the following:

(a)    If any obligated party shall be in default under any Collateral, the Servicer shall promptly direct the Manager on behalf of the Issuer to take such actions as are consistent with the Manager's normal and customary actions to require such obligated party to remedy such default, including sending an appropriate notice of such default to such obligated party and to the Issuer and the Trustee.

(b)    The Servicer shall direct the Manager on behalf of the Issuer to take all necessary actions to maintain, enforce or renew any intellectual property rights registrations (including, but not limited to trademark registrations) in respect of any of the Collateral in any part of the Territory where intellectual property rights similar to the intellectual property rights included in the Collateral are generally registered and where the failure to take any such action will have a material adverse effect on the value of the Collateral or the interests of the Issuer and the Trustee therein.  Upon the Manager's failure to do so, the Servicer is hereby authorized and empowered by the Issuer and the Trustee, at the expense of the Issuer, to execute and deliver on behalf of the Issuer and the Trustee, any and all documents or instruments necessary to maintain, enforce or renew such rights and registrations.

(ii)    The Servicer shall promptly notify the Issuer, the Trustee and the Manager, upon the  Servicer receiving actual knowledge of any Event of Default under the Indenture or any event which, with the giving of notice or the passage of time or both, would constitute such an Event of Default.

(iii)    The Servicer shall undertake and perform all calculations and reports as and when required to be undertaken and performed by the Issuer or the Servicer under and pursuant to the Indenture and shall transfer funds from the Collection Account in accordance with the Indenture and Servicer Reports.

(e)    Upon any release of the Trustee's security interest in any Collateral, the Trustee authorizes the Servicer to, and the Servicer shall, effect the release and transfer of documents with respect to such Collateral in accordance with the terms of the Indenture.

Section 2.2.    Collection of Payments; Withdrawals From the Collection Account

(a)    The Servicer shall not commingle payments received by it, if any, in respect of the Collateral with any other funds, payments or assets.

(b)    The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Collateral and to cause the same to be deposited in the Collection Account.

(c)    The Servicer shall cause to be deposited in the Collection Account on the Business Day of receipt all payments of monies received directly by the Servicer, if any, from any obligated party in respect of the Collateral, unless such payments are received after 4:00 P.M. (Chicago time), in which case such payments will be deposited on the next Business Day.

(d)    The Servicer shall prepare and file with the Trustee and the Noteholders all reports specified in the Indenture as coming from or required of the Issuer or the Servicer as and when required by the Indenture.

Section 2.3.    Records and Certain Moneys Held in Bailment

(a)    The Servicer acknowledges that any monies from time to time received by it with respect to the Collateral, if any, have been pledged to the Trustee under the Indenture and that, solely for the purposes of perfection of the Trustee's security interest in such monies, the Servicer shall act as agent and bailee of the Trustee in administering such monies, as well as agent and bailee of the Trustee in holding any documents or other items relating to such monies which from time to time come into the possession of the Servicer.  The Trustee agrees that the Servicer shall be such an agent of and bailee for the Trustee.  The Servicer agrees, for the benefit of the Issuer and the Trustee, to act as such agent and bailee, and to deal with such monies, such documents and such items, and to apply such monies solely in accordance with the Indenture.

(b)    With respect to Collateral serviced by the Servicer, the Servicer shall retain all data relating directly to or maintained in connection with the servicing of such Collateral at the offices of the Servicer, shall give the Issuer, the Manager, the Noteholders and the Trustee access to all such data at all reasonable times, upon reasonable prior written notice, and, where possible, shall mark such data in a manner that readily permits its identification as such by the Issuer, the Manager, the Noteholders and the Trustee.  If the rights of the Servicer shall have been terminated pursuant to Section 5.1, the Servicer shall, promptly at its expense, deliver to the successor servicer appointed pursuant to Section 5.2 all data necessary for the servicing of such Collateral together with all monies, documents and other items in the Servicer's possession relating to the Collateral.

(c)    Upon satisfaction and discharge of the Indenture, and at the written request of the Trustee and the Issuer and upon being supplied by the Issuer with appropriate forms therefor, at such time as there are no obligations outstanding and all amounts due under this Agreement and the Indenture have been paid, the Servicer shall instruct the Trustee to, and the Trustee shall execute and hereby authorizes the Issuer to, and the Issuer shall file, all documents (including without limitation UCC termination statements and any necessary trademark forms) necessary to discharge all Liens and other security interests filed with any governmental board or body with respect to the Trustee's Lien on the Collateral, and the Servicer and the Trustee shall otherwise cooperate in any way reasonably necessary to restore full unencumbered title in the Collateral to the Issuer or its designee.

Section 2.4.    Servicer's Accounting.  The Servicer shall, in addition to the bookkeeping required with respect to the Collateral, maintain, as part of the Collateral servicing data, a separate accounting for the purpose of justifying any payments made to the Servicer from the Distribution Account.  The Servicer agrees to make its accounting hereunder promptly available to the Issuer, the Noteholders and the Trustee upon request.

Section 2.5.    No Offset.  The obligations of the Servicer under this Agreement shall not be subject to any defense, counterclaim or right of offset which the Servicer has or may have

against the Issuer, any Noteholder or the Trustee whether in respect of this Agreement, any Collateral or otherwise.

Section 2.6.   <u>Realization upon Defaulted Collateral</u>.   If the Servicer determines with respect to any element of the Collateral that comes into and continues in default that it is unable to make satisfactory arrangements for collection of delinquent payments thereunder pursuant to <u>Section 2.2(b)</u> after consultation with the Manager with respect thereto, the Servicer and the Issuer may institute legal proceedings for collection of damages or other appropriate remedies as it deems appropriate.   In connection with any such proceeding, the Servicer shall follow such practices and procedures as are normal and consistent with the Servicer's standards and procedures relating to property similar to such element of the Collateral.   Any such action shall be without prejudice to any right of the Trustee to claim a Default or Event of Default under the Management Agreement or the Indenture, if applicable, and to proceed thereafter as provided in the Management Agreement or in Section 4.3 and 4.4 of the Indenture, as applicable.   All liquidation proceeds in respect of any such Collateral received by the Servicer shall be deposited in the Collection Account within one (1) Business Day after receipt.   All costs incurred by the Servicer in connection with the enforcement of Collateral shall be reimbursed to the Servicer from the Distribution Account on each Payment Date in accordance with the priority of payments in Section 10.1(a) of the Indenture.

Section 2.7.   <u>Servicing Compensation</u>.   As compensation for the performance of its servicing obligations under this Agreement, the Servicer shall be entitled, subject to <u>Section 5.1</u> herein, to the Servicing Fee and to be reimbursed for all out-of-pocket costs and expenses, including, without limitation, payments to third party professionals, filing fees, etc. ("<u>Servicer Costs</u>") on each Payment Date in accordance with the priority of payments in Section 10.1(a) of the Indenture.   The Servicer shall have the right, but not the obligation to, advance all Servicer Costs with respect to any Asset provided that the Servicer shall not make any such advance if the Servicer reasonably determines that such advance would not be ultimately recoverable from collections in respect of such Asset.

**ARTICLE III.**
**ACCOUNTINGS, STATEMENTS AND REPORTS**

Section 3.1.   <u>Servicer Report</u>.   No later than 5:00 P.M. Chicago time, on each Determination Date, the Servicer shall deliver to Issuer, the Manager, the Back-Up Manager, the Trustee and the Rating Agencies, the Servicer Report in the form attached as <u>Exhibit A</u> hereto. If the Issuer, the Manager, the Back-Up Manager, the Trustee or the Rating Agencies does not timely receive such Servicer Report, it shall promptly demand delivery thereof from the Servicer and notify the Noteholders and the others of such lack of receipt.   The Servicer, on or before the tenth day prior to the final Payment Date, shall notify the Noteholders and the Trustee in writing of the maturity date for the Notes.   Such notice shall include a statement that following the final payment of all principal and accrued interest on the Notes the Trustee is required to surrender the Notes (to the extent delivered to the Trustee) to the Issuer within thirty (30) days thereafter.

Section 3.2.   <u>Certification as to Compliance; Notice of Default</u>.   The Servicer shall deliver to the Issuer and the Trustee a written certification by the Servicer (a "<u>Servicer's</u>

Certificate") on each Determination Date stating that the information in the Servicer Report is true and correct to the best of its knowledge.

Section 3.3.    Annual Servicer's Reports.  Within 120 days after the end of each fiscal year, the Servicer shall prepare an annual Servicer's report and deliver the same to the Issuer, the Trustee and the Rating Agencies (each, an "Annual Servicer's Report").  Each Annual Servicer's Report shall summarize for the preceding calendar year (i) all material activity of the Issuer of which the Servicer is aware during the preceding calendar year, including activity involving the Assets and the income earned on or in respect of the Assets as reported by the Obligors pursuant to the Licenses, (ii) to the Servicer's knowledge, the state of the Manager's compliance with the Management Agreement during the preceding calendar year, and (iii) the state of the Servicer's compliance with this Servicing Agreement during the preceding calendar year.

Section 3.4.    Annual Accountant's Report.  The Servicer shall cause a firm of nationally recognized independent certified public accountants (the "Independent Accountants") to deliver to the Issuer, the Trustee, the Manager, the Back-Up Manager, the Noteholders and each Rating Agency, within 120 days after the end of each fiscal year, with respect to the preceding fiscal year (or such other period as shall have elapsed from the Closing Date, a statement (the "Accountant's Report") addressed to the Servicer, to the Issuer, to the Manager, to the Back-Up Manager, to the Rating Agencies and the Trustee, to the effect that a review in accordance with agreed upon procedures was made of the Servicer's Report(s) for such period and except as disclosed in the Accountant's Report, no exceptions or errors in the Servicer's Report(s) were found.  The agreed upon procedures are set forth as Exhibit C hereto.  In the event that the Independent Accountants require the Trustee to agree to the procedures performed by the Independent Accountants, the Servicer shall direct the Trustee in writing to so agree.  In such event, the Trustee will deliver such letter of agreement in conclusive reliance upon such direction, and the Trustee shall have no liability to make any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures, other than as a result of its own gross negligence or willful misconduct.  The Servicer shall take such actions, provide such additional information, and execute and deliver to such Independent Accountants such other and further documents and instruments, as shall be necessary or reasonably requested by such Independent Accountants in order to prepare the Accountant's Report.  Notwithstanding anything to the contrary herein, the Independent Accountants selected by the Servicer may perform or render other services for the Servicer or its Affiliates if either (a) the audit committee of the Sears Holdings Corporation's board of directors of Sears approves such assignment, or (b) Sears determines in its discretion that the approval of such audit committee is not required.

## ARTICLE IV.
## THE SERVICER

Section 4.1.    Representations and Warranties.  The Servicer represents and warrants to and in favor of the Issuer, the Trustee and the Noteholders that:

(a)    Organization, Power, Qualification.  The Servicer is a corporation duly organized, validly existing and in good standing under the laws of Illinois, has the power, legal right and authority to own its properties and to carry on its business as now being and hereafter proposed

to be conducted and is duly qualified and is in good standing and authorized to do in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization and the failure to be so qualified would, individually or in the aggregate, have a material adverse effect on the operations, financial condition or business of the Servicer, taken as a whole.

(b)    Authorization, Enforceability.    The Servicer has the power, and has taken all necessary action to authorize it to execute, deliver and perform this Agreement in accordance with its terms and to consummate the transactions contemplated hereby.    Each Transaction Document to which the Servicer is a party has been duly executed and delivered by the Servicer and is a legal, valid and binding obligation of the Servicer, enforceable against the Servicer in accordance with its terms, subject, as to enforcement of remedies, to any applicable bankruptcy, insolvency, reorganization, moratorium, or other similar law affecting the enforcement of creditors' rights and secured parties generally, and subject to the limitation that the availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

(c)    Non-Contravention.    The execution, delivery and performance of this Agreement in accordance with its terms and the consummation of the transactions contemplated hereby by the Servicer do not and will not (i) require any consent or approval of any Person, except for consents and approvals that have already been obtained, (ii) violate any applicable law, (iii) conflict with, result in a breach of, or constitute a default under the articles of incorporation or by-laws, as the same may have been amended or restated, or conflict with, result in a breach of or constitute a default under (with or without notice or lapse of time or both) any indenture, agreement or other instrument, to which the Servicer is a party or by which it or any of its properties or assets may be bound, which conflict, breach or default would have a material adverse effect on the operations, financial condition or business of the Servicer, taken as a whole, or on the ability of the Servicer to perform any of its obligations under this Agreement or (iv) result in or require the creation or imposition of any Lien upon or with respect to any property now owned or hereafter acquired by the Servicer except the Lien in favor of the Trustee under the Indenture.

(d)    Compliance with Law.    The Servicer is in compliance with all applicable laws, non-compliance with which would reasonably be expected to, individually or in the aggregate, have a material adverse effect on its operations, financial condition or business of the Servicer, taken as a whole, or on the ability of the Servicer to perform any of its obligations under this Agreement.

(e)    Litigation.    There is no action, suit or proceeding pending or, to the knowledge of the Servicer, threatened against the Servicer or any of its properties or assets in any court or before any arbitrator of any kind or before or by any Governmental Authority (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) seeking any determination or ruling that, in the reasonable judgment of the Servicer, would materially and adversely affect the performance by the Servicer of its obligations under this Agreement, or (iv) seeking any determination or ruling that would materially and adversely affect the validity or enforceability of this Agreement; and no material

default by it has occurred and is continuing with respect to any order of any court or arbitrator, or with respect to any order of a Governmental Authority.

(f)      Governmental Regulation.  The Servicer is not required to obtain any consent, approval, authorization, permit or license from, or effect any filing or registration with, any Governmental Authority in connection with the execution, delivery and performance, in accordance with its terms, of this Agreement.

(g)      Absence of Default.  The Servicer is in compliance with all of the provisions of its organizational and governing documents, as the same may have been amended or restated and no event has occurred, or failed to occur, which has not been remedied or waived, the occurrence or nonoccurrence of which constitutes, or which with the passage of time or giving of notice or both would constitute, a default or a Servicer Removal Event under, and as defined in, this Agreement.

Section 4.2.    Corporate Existence; Merger

(a)      Corporate Existence.  The Servicer shall keep in full effect its existence and good standing as a corporation in its state of incorporation and shall obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to enable the Servicer to perform its duties under this Agreement.  The Servicer has obtained all necessary licenses and approvals, in all jurisdictions where the failure to be so qualified, have such good standing or have such licenses or approvals would have a material adverse effect on the Servicer's business and operations or in which the servicing of the Collateral as required herein requires or will require such qualification.

(b)      Merger.  The Servicer shall not consolidate with or merge into any other Person (other than an Affiliate) or convey, transfer or lease substantially all of its assets as an entirety to any Person (other than an Affiliate), unless the Person formed by such consolidation or into which the Servicer has merged or the Person which acquires by conveyance, transfer or lease substantially all the assets of the Servicer as an entirety, executes and delivers to the Issuer and the Trustee an agreement (the "Successor Agreement"), in form and substance reasonably satisfactory to the Issuer and the Trustee, which contains an assumption by such successor entity of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Servicer under this Agreement.  Further, the Issuer and the Trustee shall have received an Opinion of Counsel from counsel to such successor entity that the Successor Agreement constitutes the legal, valid and binding agreement of the successor entity, and is enforceable against it in accordance with its terms except as such may be limited by the effect of bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar law affecting the rights of creditors generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.3.    Performance of Obligations

(a)      The Servicer shall, to the extent it is within the Servicer's power, perform and observe all of its obligations and agreements contained in this Agreement.

(b)     The Servicer shall not take any action or, to the extent it is within the Servicer's power, permit any action to be taken by others, which would release any Person from any of its covenants or obligations under any Collateral pledged under the Indenture, or which would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the Collateral or the value thereof or the interests of the Trustee or the Noteholders therein.

(c)     The Servicer shall not take any action to seek any decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer under the Federal Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar Federal or state law, or to appoint a receiver, liquidator, assignee, trustee, or sequester (or other similar official) of the Issuer or of any substantial part of its property, or to order the winding up or liquidation of its affairs.

Section 4.4.    The Servicer Not To Resign; No Assignment

(a)     The Servicer shall not resign from the respective duties and obligations hereby imposed on it except upon a determination by its board of directors that by reason of a change in applicable legal requirements the continued performance by the Servicer of its duties under this Agreement would cause it to be in violation of such legal requirements (i.e., requirements pursuant to law or regulation, rather than contractual), said determination to be evidenced by a resolution of its board of directors to such effect.

(b)     The Servicer may not assign this Agreement or any of its rights, powers, duties or obligations hereunder, provided, that the Servicer may assign this Agreement (i) to an Affiliate, or (ii) in connection with a consolidation, merger, conveyance, transfer or lease made in compliance with Section 4.2(b).

(c)     Except as provided in Sections 4.4(a) and 5.1, the duties and obligations of the Servicer under this Agreement shall continue until this Agreement shall have been terminated as provided in Section 6.5, and shall survive the exercise by the Issuer or the Trustee of any right or remedy under this Agreement, or the enforcement by the Issuer or the Trustee of any provision of the Note, the Indenture or this Agreement and prior to the termination of this Agreement the Servicer shall continue to serve as Servicer hereunder until such time as a successor shall be appointed and assume the duties of Servicer hereunder.  The Servicer shall, in servicing the Collateral after an Event of Default under the Indenture that has occurred and is continuing (i) promptly report to the Trustee any event or circumstance known to it with respect to the Collateral which may materially and adversely affect the Collateral or the interests of the Trustee therein, (ii) furnish to the Trustee such reports and information with respect to the Collateral as the Trustee may deem reasonably necessary for the Trustee to exercise its rights under the Indenture, and (iii) cooperate with the Back-up Manager and with the Trustee in the exercise of the Trustee's rights under the Indenture, including in the sale or other disposition of the Collateral.

Section 4.5.    Limitation on Liability of the Servicer and Others.    None of the shareholders, directors, officers, employees or agents of the Servicer shall be under any liability to the Issuer, the Noteholders, the Manager or the Trustee for any action taken or for refraining

from the taking of any action taken in good faith pursuant to this Agreement; provided, however, that this provision shall not protect the Servicer against any liability which would otherwise be imposed on the Servicer by reason of willful misfeasance, bad faith or negligence in the performance of its duties hereunder. The Servicer and any shareholder, director, officer, employee, member, manager or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person with respect to any matters arising hereunder. The Servicer agrees to indemnify the Issuer, the Noteholders, the Manager and the Trustee and any director, officer, employee or agent thereof against any and all losses, claims, liabilities, suits, damages, proceedings or expenses (including reasonable attorneys' fees and expenses) arising from or as a result of the Servicer's willful misfeasance, bad faith or negligence in the performance of its duties hereunder or any representation or warranty of the Servicer herein proving to be false or materially inaccurate on or as of the date made. The indemnity set forth in the preceding sentence shall survive the termination of this Agreement.

### ARTICLE V.
### SERVICER REMOVAL EVENTS

Section 5.1.    Servicer Removal Events. Each of the following acts or occurrences shall constitute a "Servicer Removal Event":

(a)    any failure by the Servicer to make or remit any payment required to be remitted or paid hereunder which continues unremedied for a period of three (3) Business Days after receipt by the Servicer of such payment;

(b)    (A) any failure by the Servicer to deliver any report (other than a Servicer Report) required to be remitted by it hereunder or under the Indenture within five (5) Business Days after the date of its required delivery and the continuation of such failure for a period of ten (10) Business Days after the earlier of (i) the date on which an officer of the Servicer first has actual, personal knowledge of such failure, and (ii) the date on which written notice, specifying in reasonable detail, such failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to the Servicer, or (B) any failure by the Servicer to deliver any Servicer Report required to be remitted by it hereunder within one (1) Business Day after the date of its required delivery;

(c)    material failure on the part of the Servicer duly to observe or perform any other covenant of the Servicer in this Agreement, the effect of which is a material adverse effect on the Noteholders, and continuance of such default or breach for a period of thirty (30) days (or such additional time as may be required if the Servicer demonstrates it is making diligent efforts to cure such default, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) after the earlier of (i) the date on which an officer of the Servicer first has actual, personal knowledge of such default or breach, and (ii) the date on which written notice, specifying in reasonable detail, such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to the Servicer;

(d)    any material failure of a representation or warranty of the Servicer in this Agreement to be true and correct as and when made, which failure has a material adverse effect on the interests of the Noteholders, and the continuance of such failure for a period of thirty (30)

days (or such additional time as may be required if the Servicer demonstrates it is making diligent efforts to cure such breach, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) after the earlier of (i) the date on which an officer of the Servicer first has actual, personal knowledge of such breach, and (ii) the date on which written notice, specifying in reasonable detail, such breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to the Servicer;

(e)       the entry of a decree or order for relief by a court having jurisdiction in respect of the Servicer in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Servicer and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days;

(f)       the commencement by the Servicer of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its property or the making by the Servicer of an assignment for the benefit of creditors or the failure by the Servicer generally to pay its debts as such debts become due or the taking of corporate action by the Servicer in furtherance of any of the foregoing;

(g)       if the Servicer is an Affiliate of Sears Holdings Corporation, Sears Holdings Corporation's senior unsecured debt rating, or to the extent none exists, its corporate family rating is below "B2" by Moody's (or the equivalent thereof by any other Rating Agency), or is "B2" and is on negative watch or review for possible downgrade by Moody's (or the equivalent thereof by any other Rating Agency);

(h)       at any time when the Servicer and the Manager are Affiliates, a Manager Removal Event occurs and the Majority Noteholders instruct the Issuer and Trustee to remove the Manager as Manager pursuant to Section 4.1(c) or Section 4.4(b) of the Indenture;

(i)       if the Servicer is an Affiliate of the Issuer, if on the third Payment Date or any Payment Date thereafter, the Coverage Ratio as of the preceding Determination Date is less than 150%;

(j)       if the Servicer is an Affiliate of Sears Holdings Corporation, the commencement by Sears Holdings Corporation of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or the consent by Sears Holdings Corporation to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Sears Holdings Corporation or of any substantial part of its property or the making by Sears Holdings Corporation of an assignment for the benefit of creditors or the failure by Sears Holdings Corporation generally to pay its debts as such debts become due or the taking of corporate action by Sears Holdings Corporation in furtherance of any of the foregoing; or

(k)    if the Servicer is an Affiliate of the Issuer, an Event of Default occurs under the Indenture and the Majority Noteholders declare a Servicer Removal Event and instruct the Issuer and Trustee to remove the Servicer as servicer pursuant to Section 4.4(b) of the Indenture.

Upon the occurrence of a Servicer Removal Event, the Servicer will give notice thereof to the Issuer and the Trustee within three (3) Business Days of its actual knowledge thereof. If a Servicer Removal Event shall have occurred and is continuing and the Majority Noteholders instruct the Issuer and the Trustee to remove the Servicer as servicer pursuant to Section 4.1(c) or Section 4.4(b) of the Indenture, or as to the occurrence of a Servicer Removal Event pursuant to Section 5.1(j), if 100% of the Noteholders fail to vote to retain the Servicer, the Issuer, with the approval of the Trustee, or the Trustee shall, by notice given to the Servicer (with a copy to the other parties hereto and the Noteholders), terminate all of the rights and powers of the Servicer under this Agreement and all other Transaction Documents, including, without limitation, all rights of the Servicer to receive the Servicing Fee, except the accrued but unpaid Servicing Fee through the effective date of the succession to the Servicer's rights and obligations by a successor servicer.

Upon the giving of such notice, all rights, powers and duties of the Servicer under this Agreement and all other Transaction Agreements shall vest in a successor servicer appointed pursuant to Section 5.2. The Issuer, the Trustee and such successor servicer are each hereby authorized and empowered to execute and deliver on behalf of the Servicer, as attorney-in-fact or otherwise, all documents and other instruments, and to do or accomplish all other acts or things, necessary or appropriate to effect such vesting. The Servicer agrees to cooperate with the Issuer, the Trustee and the successor servicer in effecting the termination of the Servicer's rights and responsibilities hereunder and shall promptly provide to the successor servicer all documents and records (electronic and otherwise) reasonably requested to enable the successor servicer to assume the servicing functions hereunder, including the transfer to such successor servicer for administration by it of all cash amounts, if any, that shall at the time be held by the predecessor Servicer for deposit, or shall thereafter be received by the predecessor Servicer, with respect to any of the Collateral (including but not limited to the transfer of the Collection Account as described in Section 9.1(a) of the Indenture). Without limiting the foregoing, upon reasonable prior written notice, the Servicer shall permit access to the Servicer's offices by the Issuer, the Trustee or any Noteholder, or any Person appointed pursuant to Section 5.2 hereof for the purpose of effecting any transfer of servicing contemplated by this Section 5.1. The Issuer shall not have any right to waive any Servicer Removal Event under this Agreement.

Section 5.2.    Appointment of Successor. On and after the time specified in a notice of termination pursuant to Section 5.1, a successor servicer appointed by the Issuer and approved by the Trustee shall be the successor in all respects to the Servicer in its capacity as Servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof, provided, that the successor servicer shall have no liability for actions or inactions of the predecessor Servicer.

The successor servicer shall be entitled to receive all reasonable costs incurred by the successor servicer in connection with assuming the duties and obligations of the Servicer hereunder (which shall be included in its "Servicer Costs") pursuant to Section 10.1(a) of the

Indenture.  Notwithstanding the above, if the Servicer shall resign as provided in <u>Section 4.4</u>, the Issuer shall take such actions as may be necessary to cause the appointment of a successor servicer approved by the Trustee.  The successor servicer and the Servicer, as the case may be, shall take such actions, consistent with this Agreement, as shall be necessary to effectuate any such succession.  Such successor servicer shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof.

Section 5.3.    <u>Rights Cumulative</u>.  All rights and remedies from time to time enforced or reserved to the Issuer or the Trustee are cumulative, and none is intended to be exclusive of another.  No delay or omission in insisting upon the strict observance or performance of any provision of this Agreement, or in exercising any right or remedy, shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy.  Every right and remedy may be exercised from time to time and as often as deemed expedient.

## ARTICLE VI.
## MISCELLANEOUS

Section 6.1.    <u>Notices</u>.  All notices from one party to any other party shall be sent to the other party's address by (i) delivery by a reputable courier service or by registered mail (return receipt requested) or (ii) by facsimile transmission (or the equivalent transmission providing written confirmation of receipt at the facsimile number of the addressee) with a copy sent in either manner described in clause (i), all charges prepaid.  The date of receipt shall be the date any such notice is received.

<u>The Issuer</u>
KCD IP, LLC
c/o Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention:  Dawn Eber
Telephone:  (847) 286-0440
Facsimile:  (847) 286-1699

with a copy to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL  60179
Attention:  Senior Vice President and General Counsel

<u>The Servicer</u>
Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention:  Dawn Eber
Telephone:  (847) 286-0440
Facsimile:  (847) 286-1699

with a copy to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL  60179
Attention:  Senior Vice President and General Counsel

The Trustee
U.S. Bank National Association
209 S. LaSalle Street, 3rd Floor
Chicago, Illinois 60604-1219
Attention:  Corporate Trust/KCD IP
Telephone:  (312) 325-8902
Facsimile:  (312) 325-8905

The Rating Agencies
The addresses provided in the Indenture.

Section 6.2.    Entire Agreement.  This Agreement and the other Transaction Documents set forth the entire agreement and understanding among the parties with reference to the transactions contemplated hereby and supersede any and all other oral or written agreements heretofore made.    Insofar as the Servicer's duties hereunder are structured by terms and provisions of the other Transaction Documents, the Servicer shall not be bound to perform any such duty if it changes as a result of a modification to one of the other Transaction Documents that was undertaken without Servicer's consent or approval.

Section 6.3.    Severability.  If any provision of this Agreement or the application of any provision hereof to any person or in any circumstances is held invalid, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected unless the provision held invalid shall substantially impair the benefits of the remaining portions of this Agreement.

Section 6.4.    CONSENT TO JURISDICTION

(a)      EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK CITY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING, OR DELIVERY, OF

**COPIES OF SUCH PROCESS TO SUCH PARTY AT ITS ADDRESS SPECIFIED IN SECTION 6.1. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

(b)    **NOTHING IN THIS SECTION 6.4 SHALL AFFECT THE RIGHT OF THE SERVICER, THE TRUSTEE, THE NOTEHOLDERS OR THE ISSUER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE SERVICER, THE TRUSTEE, THE NOTEHOLDERS OR THE ISSUER TO BRING ANY ACTION OR PROCEEDING AGAINST THE MANAGER OR ITS PROPERTY IN THE COURTS OF OTHER JURISDICTIONS.**

(c)    Waiver of Jury Trial. The parties hereto each waive their respective rights to a trial by jury of any claim or cause of action based upon or arising out of or related to this Agreement, or the transactions contemplated hereby, in any action, proceeding or other litigation of any type brought by any of the parties against any other party or parties, whether with respect to contract claims, tort claims, or otherwise. The parties hereto each agree that any such claim or cause of action shall be tried by a court trial without a jury. Without limiting the foregoing, the parties further agree that their respective right to a trial by jury is waived by operation of this Section 6.4 as to any action, counterclaim or other proceeding which seeks, in whole or in part, to challenge he validity or enforceability of this Agreement or any provision hereof such waiver shall apply to any subsequent amendments, renewals, supplements or modifications to this Agreement.

Section 6.5.    Termination of Agreement. Absent a termination pursuant to Section 4.4 or Section 5.1, the respective duties and obligations of the Servicer (except as hereinafter provided), the Issuer and the Trustee created by this Agreement shall terminate upon the final payment to the Trustee of all amounts due under the Indenture and the Notes and the discharge of the Lien of the Indenture. Upon the termination of this Agreement pursuant to this Section 6.5, the Servicer shall pay moneys with respect to the Collateral held by the Servicer, if any, and to which the Servicer is not entitled, to the Issuer, the Trustee or any other Person entitled thereto. Notwithstanding anything herein to the contrary, the Servicer's covenants set forth in Sections 4.3(c) and 6.12 hereof shall survive for a period of one year and a day from the date on which all the obligations under the Indenture have been satisfied in full and the Note shall have been paid in full.

Section 6.6.    Amendments

(a)    This Agreement may be amended from time to time by the Servicer, the Issuer and the Trustee in a writing signed by each such party to this Agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement.

(b)    Promptly after the execution of any amendment, the Servicer shall send to the Issuer and the Trustee a conformed copy of each such amendment, but the failure to do so shall not impair or affect its validity.

Section 6.7.    <u>Inspection and Audit Rights</u>.  Up to one (1) time per calendar year, the Servicer, on reasonable prior notice, shall permit any representative of the Issuer, a Noteholder or the Trustee (each a "<u>Representative</u>," and collectively, the "<u>Representatives</u>"), upon reasonable notice to the Servicer, during the Servicer's normal business hours, as applicable, to examine all the books of account, records (including computer records), reports and other papers of the Servicer relating to the Collateral, to make copies and extracts therefrom, to cause such books to be audited by independent certified public accountants selected by the Representative, to discuss its affairs, finances and accounts relating to the Collateral with its officers, employees and independent public accountants (and by this provision the Servicer hereby authorizes said accountants to discuss with such representatives such affairs, finances and accounts), and regarding the information including the underlying documentation required to be furnished pursuant to this Agreement or regarding the performance of the Servicer's respective covenants and agreements contained in this Agreement.  Any expense incident to the exercise by the Issuer or the Trustee of any right under this <u>Section 6.7</u> shall be paid by the Issuer pursuant to Section 10.1(a) of the Indenture.

Section 6.8.    <u>Binding Effect</u>.  All provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

Section 6.9.    <u>Captions</u>.  Captions to Articles, Sections and subsections of, and Schedules and Exhibits to, this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or in any way affect the meaning or construction of any provision of this Agreement.

Section 6.10.    <u>Legal Holidays</u>.  In the case where the date on which any action required to be taken, document required to be delivered or payment is required to be made is not a Business Day, such action, delivery or payment need not be made on such date, but may be made on the next succeeding Business Day unless otherwise provided in this Agreement or the Indenture.

Section 6.11.    <u>Third Party Beneficiaries</u>.  This Agreement is for the benefit of the Issuer and the Trustee on behalf of each Noteholder and, if any Event of Default has occurred under the Indenture on account of the Issuer's failure to enforce this Agreement, the Trustee may exercise all rights and remedies of the Issuer under this Agreement and the Issuer shall have no right to exercise such rights and remedies without the prior written consent of the Trustee.  This Agreement shall inure to the benefit of and be enforceable by the Issuer, the Trustee, the Noteholders and their respective successors, transferees and assigns.

Section 6.12.    <u>No Bankruptcy Petition</u>.  By entering into this Agreement, each of the Servicer and the Trustee covenants and agrees that, prior to the date which is one year and one day after the payment in full of the Notes, it will not institute against, or join any other Person in instituting against, the Issuer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law.

Section 6.13.    <u>Governing Law</u>.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW**

**YORK, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN TITLE 14 OF ARTICLE 5 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

Section 6.14.  <u>Counterparts</u>.   This Agreement and any amendment hereof may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 6.15.  <u>The Trustee</u>.  Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank National Association, not individually or personally, but solely as Trustee, in the exercise of the powers and authority conferred and vested in it under the Indenture, (b) each of the representations, undertakings and agreements herein made on the part of the Trustee is made and intended not as personal representations, undertakings and agreements by U.S. Bank National Association, but solely as Trustee, and (c) under no circumstances shall U.S. Bank National Association be personally liable for the payment of any indebtedness or expenses of the Trustee or be liable for the breach or failure of any obligation, representation, warrant or covenant made or undertaken by the Trustee under this Agreement or the other related documents, other than as a result of its gross negligence (or negligence in the handling of funds) or willful misconduct.

IN WITNESS WHEREOF, the Issuer, the Trustee and the Servicer have caused this Agreement to be duly executed by their respective authorized signatories as of the date and year first above written.

SERVICER:

SEARS HOLDINGS MANAGEMENT
CORPORATION

By: _____
    Name:
    Title:


TRUSTEE:

U.S. BANK NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Trustee

By: _____
    Name:
    Title:


ISSUER:

KCD IP, LLC

By: _____
    Name:
    Title:

*Servicing Agreement*

40138354 05112811

IN WITNESS WHEREOF, the Issuer, the Trustee and the Servicer have caused this Agreement to be duly executed by their respective authorized signatories as of the date and year first above written.

SERVICER:

SEARS HOLDINGS MANAGEMENT
CORPORATION

By: _____
    Name:
    Title:

TRUSTEE:

U.S. BANK NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Trustee

By: _____
    Name:  PATRICIA M. CHILD
    Title:  VICE PRESIDENT

ISSUER:

KCD IP, LLC

By: _____
    Name:
    Title:

*Servicing Agreement*

40138354 05112811

IN WITNESS WHEREOF, the Issuer, the Trustee and the Servicer have caused this Agreement to be duly executed by their respective authorized signatories as of the date and year first above written.

SERVICER:

SEARS HOLDINGS MANAGEMENT CORPORATION

By: _____
       Name:
       Title:

TRUSTEE:

U.S. BANK NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Trustee

By: _____
       Name:
       Title:

ISSUER:

KCD IP, LLC

By: _____
       Name:
       Title:

*Servicing Agreement*

40138354 05112811

**EXHIBIT A**
**(Form of Servicer Report)**

## IMPORTANT NOTICE

These materials are being provided by J.P. Morgan Securities Inc. ("JPMorgan") to the person requesting these materials and no other party is entitled to view the information included in these materials. JPMorgan shall have no duty or obligations to make any representations, warranties or disclosure of any nature, express or implied, to any party. These materials have been provided to you for informational purposes only and may not be relied upon by you in any way.

*This sample report ("the Report") for the structured transaction identified herein is provided for informational purposes only. No assurance can be given that the cash-flow calculations using this Report will be accurate. This Report relies on certain assumptions about events or conditions that are unlikely to be consistent with, and may differ materially from, actual events or conditions. In addition, not all relevant events or conditions may have been considered in developing such assumptions. Accordingly, actual cash-flows in the transaction or this Report will vary from those projected using the report and such variations may be material.*

THE REPORT IS PROVIDED "AS IS" WITH NO WARRANTIES OF ANY KIND. ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND WITH RESPECT TO THE REPORT ARE HEREBY DISCLAIMED, INCLUDING WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES THAT THIS REPORT IS ERROR-FREE, WARRANTIES AS TO ANY RESULTS TO BE OBTAINED BY USE OF THIS REPORT (OR INFORMATION DERIVED THEREFROM) OR ANY OTHER IMPLIED WARRANTIES. IN NO EVENT SHALL JPMORGAN BE LIABLE FOR ANY USE, INABILITY TO USE, DECISION MADE, ACTION TAKEN OR INACTION BY ANY PARTY IN RELIANCE UPON THIS REPORT, OR FOR ANY INACCURACIES, ERRORS IN OR OMISSIONS FROM THIS REPORT. JPMORGAN SHALL NOT BE LIABLE (IN CONTRACT, TORT OR OTHERWISE) FOR ANY DAMAGES (DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER) IN CONNECTION WITH ANY USE OF OR INABILITY TO USE THIS REPORT, EVEN IF IT HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

DRAFT

**Sears Holdings Management Corporation as Servicer**
Servicer Report
License and Sublicense Portfolio

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| Licensor | Licensee | Sublicensee | Trademark | License / Sublicense Termination Date | Current Collection Period | | | Prior Eleven Collection Periods | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Royalties | Other Amounts Received | Cash Contribution | Royalties | Other Amounts Received | Cash Contribution |
| KCD IP LLC | Sears, Roebuck and Co. | | Craftsman | 2016 | 18,200,362 | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | | Kenmore | 2016 | 16,639,028 | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | | DieHard | 2016 | 1,002,756 | - | - | - | - | - |
| KCD IP LLC | Kmart | | Craftsman | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Kmart | | Kenmore | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Kmart | | DieHard | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | Johnson Controls Inc. | DieHard | 2016 | - | - | - | - | - | - |
| KCD IP LLC | Sears, Roebuck and Co. | Danaher Corp. | Craftsman | 2016 | - | - | - | - | - | - |
| | | | | | $ 35,842,145.85 | $ - | $ - | $ - | $ - | $ - |

DRAFT

Sears Holdings Management Corporation as Servicer
Servicer Report
Input Page

| GENERAL | | | NOTES |
|---|---|---|---|
| Today's date | | May-15-2006 | |
| Servicer Report frequency | | 12 | |
| Determination Date | | May-15-2006 | 20th day of each calendar month (or preceding Business Day) |
| Collection Period - begin | | Apr-02-2006 | First day of each Fiscal Month |
| Collection Period - end | | Apr-29-2006 | Last day of each Fiscal Month |
| Payment Date | | May-25-2006 | 25th day of each calendar month (or succeeding Business Day) |
| Collection Period within original Interest-Only Period? | | Yes | First [4] years |
| Was original Interest-Only Period extended? | | No | Permitted only if Coverage Ratio < [350]% in 6 Collection Periods prior to exercise of Scheduled Payoff Date |
| Collection Period within Interest-Only Period extension? | | No | |
| Trapping Event? | | No | Coverage Ratio < 275% during I/O period |
| Rapid Amortization Event? | | No | Coverage Ratio < 225% during I/O period |
| Has Scheduled Payoff Date occurred? | | No | |
| Servicer/Manager Removal Event? | | No | Coverage Ratio < 158% |
| Event of Default? | | No | |
| Note Principal Balance - Beginning of Collection Period | $ | 1,800,000,000.00 | |
| Accrued Note Interest owed for prior Collection Period | $ | - | |
| Beginning Trapping Account balance | $ | - | |
| Costs owed to other parties | $ | - | |
| Interest earned on Trapping Account (Payment Date to Payment Date) | $ | - | |
| Interest earned on Distribution Account (Payment Date to Payment Date) | $ | - | |
| Days in a month | | 30.00 | |
| Days in a year | | 360.00 | |
| NOTE INTEREST RATE | | | |
| Note Interest Rate | | 7.00% | |
| Addition to Note Interest Rate during Interest-Only Period extension | | 0.50% | |
| Addition to Note Interest Rate during Rapid Amortization after Scheduled Payoff Date | | 1.00% | |
| TRUSTEE | | | |
| Trustee Fee - Collection Period | $ | 292 | |
| Accrued and unpaid Trustee Fees from prior Collection Period(s) | $ | - | |
| Capped Trustee Costs - total permitted over 12 consecutive Collection Periods | $ | 100,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Trustee Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ | - | |
| ISSUER | | | |
| Capped Issuer Costs - total permitted over 12 consecutive Collection Periods | $ | 100,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Issuer Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ | - | |
| MANAGER | | | |
| Management Fee - Collection Period | $ | 35,000 | |
| Accrued and unpaid Management Fees from prior Collection Period(s) | $ | - | |
| Capped Manager Costs - total permitted over 12 consecutive Collection Periods | $ | 12,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Manager Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ | - | |
| SERVICER | | | |
| Servicer Fee - Collection Period | $ | 12,500 | |
| Accrued and unpaid Servicer Fees from prior Collection Period(s) | $ | - | |
| Capped Servicer Costs - total permitted over 12 consecutive Collection Periods | $ | 12,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Servicer Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ | - | |
| BACK-UP MANAGER | | | |
| Backup Manager Standby Fee - Collection Period | $ | 1,250 | |
| Accrued and unpaid Back-Up Manager Standby Fees from prior Collection Periods | $ | - | |
| Capped Back-Up Manager Costs - total permitted over 12 consecutive Collection Periods | $ | 12,000 | Interest accrues only on costs unpaid as the result of Rapid Amortization; interest accrual on unpaid costs is at the |
| Accrued and unpaid Back-Up Manager Costs, including accrued interest on costs payable - from prior Collection Period(s) | $ | - | |
| Liquidation? | | No | |
| Back-UP Manager Incentive Fee I | $ | 500,000.00 | |

NOTES column: Indenture 10.1(a)(x)

DRAFT

| | |
|---|---|
| Back-UP Manager Incentive Fee II | $ 2,000,000.00 |
| Back-UP Manager Incentive Fee II | 0.10% |

**COLLATERAL STATUS**

| | |
|---|---|
| Any material unresolved claims regarding ownership or liens on collateral? | No |
| Any material unresolved litigation threatened or commenced by or against Issuer, Servicer or Manager? | No |
| Any other material event regarding Collateral? | No |
| Any new Licenses or Sublicenses? | No |
| Any new Sears Trademarks? | No |
| Any Licenses or Sublicenses in material default? | No |

**OTHER**

| | | |
|---|---|---|
| Has cash been contributed to the deal in this Collection Period to prevent a Cash Trapping or Rapid Amortization Event? | No | |
| Cash contributed in this Collection Period to prevent a Cash Trapping or Rapid Amortization Event | $ - | May not exceed $[10,000,000] |
| Cash contributed in prior Collection Periods to prevent a Cash Trapping or Rapid Amortization Event | $ - | |
| Total cash contributed in this Collection Period to prevent a Trapping Event | $ - | |
| Number of Collection Periods in current calendar year in which cash has been contributed to prevent a Cash Trapping or Rapid Amortization Event, including this Collection Period | 0 | May not exceed 2 in a calendar year |
| Number of Collection Periods in which cash has been contributed to prevent a Cash Trapping or Rapid Amortization Event since the Closing Date | 0 | May not exceed 5 prior to Legal Maturity Date |

DRAFT

**Sears Holdings Management Corporation as Servicer**

**Servicer Report**

**Costs & Capped Costs Calculation**

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| 12 Most Recently Ended Collection Periods | Determination Date | Trustee Costs (a) | | Issuer Costs (a) | | Manager Costs (a) | | Servicer Costs (a) | | Back-Up Manager Costs (a) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15-May-2006 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 2 | 15-Apr-2006 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 3 | 16-Mar-2006 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 4 | 14-Feb-2006 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 5 | 15-Jan-2006 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 6 | 16-Dec-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 7 | 16-Nov-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 8 | 17-Oct-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 9 | 17-Sep-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 10 | 18-Aug-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 11 | 19-Jul-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |
| 12 | 19-Jun-2005 | $ | - | $ | - | $ | - | $ | - | $ | - |

| | Trustee Costs (a) | | Issuer Costs (a) | | Manager Costs (a) | | Servicer Costs (a) | | Back-Up Manager Costs (a) |
|---|---|---|---|---|---|---|---|---|---|---|
| Costs paid - last eleven Collection Periods | $ | - | $ | - | $ | - | $ | - | $ | - |
| Costs incurred - current Collection Period | $ | - | $ | - | $ | - | $ | - | $ | - |
| Costs accrued from prior Collection Periods | $ | - | $ | - | $ | - | $ | - | $ | - |
| Capped Costs - 12-month Period | $ | 100,000.00 | $ | 100,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| | | | | | | | | | | |
| Costs payable, current Collection Period, subject to cap | $ | - | $ | - | $ | - | $ | - | $ | - |
| Costs payable, this Collection Period, above cap | $ | - | $ | - | $ | - | $ | - | $ | - |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Priority of Payments & Trapping Account Rollforward**

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| | |
|---|---|
| Monies received in respect of Collateral | $ 35,842,145.85 |
| Interest earned on Distribution Account & Trapping Account - Payment Date to Payment Date | - |
| Release of funds from Trapping Account | - |
| Cash contribution | - |
| Available Funds | $ 35,842,145.85 |

| Distributions (Indenture, Section 10.1(a)) | Distribution Due | Payment Date Distribution | Remaining Available Funds | Accrued Distributions for Next Collection Period | Notes |
|---|---|---|---|---|---|
| (i) Trustee Fee | $ 291.67 | $ 291.67 | $ 35,841,854.18 | $ - | |
| (i) Trustee Costs, not to exceed Capped Trustee Costs | $ - | $ - | $ 35,841,854.18 | N/A | May be paid in (vi) |
| (ii) Issuer Costs, not to exceed Capped Issuer Costs | $ - | $ - | $ 35,841,854.18 | N/A | May be paid in (vii) |
| (iii) Management Fee (pro rata with Servicing Fee, Back-Up Manager Standby Fee) | $ 35,000.00 | $ 35,000.00 | $ 35,806,854.18 | $ - | |
| (iii) Servicing Fee (pro rata with Management Fee, Back-Up Manager Standby Fee) | $ 12,500.00 | $ 12,500.00 | $ 35,794,354.18 | $ - | |
| (iii) Back-Up Manager Standby Fee (pro rata with Management Fee, Servicing Fee) | $ 1,250.00 | $ 1,250.00 | $ 35,793,104.18 | $ - | |
| (iii) Manager Costs, not to exceed Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs) | $ - | $ - | $ 35,793,104.18 | N/A | May be paid in (viii) |
| (iii) Servicer Costs, not to exceed Capped Servicer Costs (pro rata with Manager Costs, Back-Up Manager Costs) | $ - | $ - | $ 35,793,104.18 | N/A | May be paid in (viii) |
| (iii) Back-Up Manager Costs, not to exceed Capped Back-UP Manager Costs (pro rata with Manager Costs, Servicer Costs) | $ - | $ - | $ 35,793,104.18 | N/A | May be paid in (viii) |
| (iv) Accrued Interest for this Collection Period | $ 10,500,000.00 | $ 10,500,000.00 | $ 25,293,104.18 | $ - | |
| (iv) Accrued Interest owed for prior Collection Period(s) | $ - | $ - | $ 25,293,104.18 | N/A | |
| (v) Cash trapped in Trapping Account | $ - | $ - | $ 25,293,104.18 | $ - | |
| (v) Rapid Amortization Principal | $ - | $ - | $ 25,293,104.18 | N/A | |
| (vi) Trustee Costs, if any, in excess of Capped Trustee Costs | $ - | $ - | $ 25,293,104.18 | $ - | |
| (vii) Issuer Costs, if any, in excess of Capped Issuer Costs | $ - | $ - | $ 25,293,104.18 | $ - | |
| (viii) Manager Costs, if any, in excess of Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs, in excess of Capped Servicer and Back-Up Manager Costs) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (viii) Servicer Costs, if any, in excess of Capped Servicer Costs (pro rata with Manager Costs and Back-Up Manager Costs in excess of Capped Manager and Back-Up Manager Costs) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (viii) Back-Up Manager Costs, if any, in excess of Capped Back-Up Manager Costs (pro rata with Manager Costs and Servicer Costs in excess of Capped Manager and Servicer Costs) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (ix) Back-Up Manager Incentive Fee | $ - | $ - | $ 25,293,104.18 | $ - | |
| (x) Costs owed to other parties (pro rata, among parties) | $ - | $ - | $ 25,293,104.18 | $ - | |
| (xi) Distribution to Issuer | $ 25,293,104.18 | $ 25,293,104.18 | $ - | N/A | |

**Trapping Account Rollforward**

| | |
|---|---|
| Beginning Trapping Account balance | $ - |
| Less Trapping Account Cash released | $ - |
| Accumulated Interest - Payment Date to Payment Date | $ - |
| Trapped cash in this Collection Period | $ - |
| Ending Trapping Account balance | $ - |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Coverage Ratio**

| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

| 12 Most Recently Ended Collection Periods | Determination Date | Monies Received in Respect of Collateral | Interest on Trapping Account | Interest on Distribution Account | Rolling Twelve Month Revenue | | | | | | Debt Service Amount Calculation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Available Funds | Amounts paid to the Trustee (a) | Amounts paid to the Servicer (a) | Amounts paid to the Manager (a) | Amounts paid to the Back-Up Manager (a) | Rolling Twelve Month Revenue | Debt Service Amounts |
| 1 | 15-May-2006 | $ 35,842,145.85 | $ - | $ - | $ 35,842,145.85 | $ 291.67 | $ 12,500.00 | $ 35,000.00 | $ 1,250.00 | $ 35,793,104.18 | $ 10,500,000.00 |
| 2 | 15-Apr-2006 | - | - | - | - | - | - | - | - | - | - |
| 3 | 16-Mar-2006 | - | - | - | - | - | - | - | - | - | - |
| 4 | 14-Feb-2006 | - | - | - | - | - | - | - | - | - | - |
| 5 | 15-Jan-2006 | - | - | - | - | - | - | - | - | - | - |
| 6 | 16-Dec-2005 | - | - | - | - | - | - | - | - | - | - |
| 7 | 16-Nov-2005 | - | - | - | - | - | - | - | - | - | - |
| 8 | 17-Oct-2005 | - | - | - | - | - | - | - | - | - | - |
| 9 | 17-Sep-2005 | - | - | - | - | - | - | - | - | - | - |
| 10 | 18-Aug-2005 | - | - | - | - | - | - | - | - | - | - |
| 11 | 19-Jul-2005 | - | - | - | - | - | - | - | - | - | - |
| 12 | 19-Jun-2005 | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | $ 35,793,104.18 | $ 10,500,000.00 |

| | | |
|---|---|---|
| Rolling Twelve Month Revenue | $ | 35,793,104.18 |
| Debt Service Amount | $ | 10,500,000.00 |
| Coverage Ratio | | 340.89% |

**Coverage Tests**

| | | |
|---|---|---|
| Cash Trapping | 275% | No |
| Rapid Amortization | 225% | No |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Statement to Noteholders**

| | |
|---|---|
| Determination Date | 15-May-2006 |
| Collection Period - Begin | 2-Apr-2006 |
| Collection Period - End | 29-Apr-2006 |

**INDENTURE WATERFALL**

| | | |
|---|---|---|
| 1. | Amounts paid or distributed in respect of interest with respect to the Noteholders | $ 10,500,000.00 |
| 2. | Amounts paid or distributed in respect of principal on or with respect to the Notes | $ - |
| 3. | Amounts paid to the Trustee | $ 291.67 |
| 4. | Amounts paid on behalf of the Issuer | $ - |
| 5. | Amounts paid to the Servicer | $ 12,500.00 |
| 6. | Amounts paid to the Manager | $ 35,000.00 |
| 7. | Amounts paid to the Back-Up IP Manager | $ 1,250.00 |
| 8. | Amounts paid to the Trapping Account | $ - |
| 9. | Amounts paid to other parties | $ - |
| 10. | Remaining amounts paid at the direction of the Issuer | $ 25,293,104.18 |

**TRADEMARK ROYALTY COLLECTIONS**

| Collection Period Ending | CRAFTSMAN | KENMORE | DIEHARD |
|---|---|---|---|
| 29-Apr-2006 | $ 18,200,361.72 | $ 16,639,028.09 | $ 1,002,756.04 |
| 30-Mar-2006 | $ - | $ - | $ - |
| 28-Feb-2006 | $ - | $ - | $ - |
| 29-Jan-2006 | $ - | $ - | $ - |
| 30-Dec-2005 | $ - | $ - | $ - |
| 30-Nov-2005 | $ - | $ - | $ - |
| 31-Oct-2005 | $ - | $ - | $ - |
| 1-Oct-2005 | $ - | $ - | $ - |
| 1-Sep-2005 | $ - | $ - | $ - |
| 2-Aug-2005 | $ - | $ - | $ - |
| 3-Jul-2005 | $ - | $ - | $ - |
| 3-Jun-2005 | $ - | $ - | $ - |

**TRAPPING ACCOUNT ACTIVITY**

| | |
|---|---|
| Beginning Trapping Account balance | $ - |
| Less Trapping Account cash released | $ - |
| Accumulated interest - Payment Date to Payment Date | $ - |
| Trapped cash in this Collection Period | $ - |
| Ending Trapping Account balance | $ - |

**COVERAGE RATIO TESTS**

| | |
|---|---|
| Cash Trapping Event? | No |
| Rapid Amortization Event? | No |
| Servicer/Manager Removal Event?? | No |
| Event of Default? | No |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Costs & Capped Costs Calculation**

| | |
|---|---|
| Determination Date | 0-Jan-1900 |
| Collection Period - Begin | 0-Jan-1900 |
| Collection Period - End | 0-Jan-1900 |

| 12 Most Recently Ended Collection Periods | Determination Date | Trustee Costs (a) | Issuer Costs (a) | Manager Costs (a) | Servicer Costs (a) | Back-Up Manager Costs (a) |
|---|---|---|---|---|---|---|
| 1 | | $ - | $ - | $ - | $ - | $ - |
| 2 | | $ - | $ - | $ - | $ - | - |
| 3 | | $ - | $ - | $ - | $ - | - |
| 4 | | $ - | $ - | $ - | $ - | - |
| 5 | | $ - | $ - | $ - | $ - | - |
| 6 | | $ - | $ - | $ - | $ - | - |
| 7 | | $ - | $ - | $ - | $ - | - |
| 8 | | $ - | $ - | $ - | $ - | - |
| 9 | | $ - | $ - | $ - | $ - | - |
| 10 | | $ - | $ - | $ - | $ - | - |
| 11 | | $ - | $ - | $ - | $ - | - |
| 12 | | $ - | $ - | $ - | $ - | - |

| | | | | | | |
|---|---|---|---|---|---|---|
| Costs paid - last eleven Collection Periods | | $ - | $ - | $ - | $ - | $ - |
| Costs incurred - current Collection Period | | $ - | $ - | $ - | $ - | $ - |
| Costs accrued from prior Collection Periods | | $ - | $ - | $ - | $ - | $ - |
| Capped Costs - 12-month Period | | $ - | $ - | $ - | $ - | $ - |

| | | | | | | |
|---|---|---|---|---|---|---|
| Costs payable, current Collection Period, subject to cap | $ - | $ - | $ - | $ - | $ - | $ - |
| Costs payable, this Collection Period, above cap | $ - | $ - | $ - | $ - | $ - | $ - |

DRAFT

# Sears Holdings Management Corporation as Servicer

## Servicer Report

### Priority of Payments & Trapping Account Rollforward

| | |
|---|---|
| Determination Date | 0-Jan-1900 |
| Collection Period - Begin | 0-Jan-1900 |
| Collection Period - End | 0-Jan-1900 |

| | | |
|---|---|---|
| Monies received in respect of Collateral | $ | - |
| Interest earned on Distribution Account & Trapping Account - Payment Date to Payment Date | | - |
| Release of funds from Trapping Account | | - |
| Cash contribution | | - |
| Available Funds | $ | - |

| Distributions (Indenture, Section 10.1(a)) | Distribution Due | Payment Date Distribution | Remaining Available Funds | Accrued Distributions for Next Collection Period | Notes |
|---|---|---|---|---|---|
| (i) Trustee Fee | $ - | $ - | $ - | $ - | |
| (i) Trustee Costs, not to exceed Capped Trustee Costs | $ - | $ - | $ - | N/A | May be paid in (vi) |
| (ii) Issuer Costs, not to exceed Capped Issuer Costs | $ - | $ - | $ - | N/A | May be paid in (vii) |
| (iii) Management Fee (pro rata with Servicing Fee, Back-Up Manager Standby Fee) | $ - | $ - | $ - | $ - | |
| (iii) Servicing Fee (pro rata with Management Fee, Back-Up Manager Standby Fee) | $ - | $ - | $ - | $ - | |
| (iii) Back-Up Manager Standby Fee (pro rata with Management Fee, Servicing Fee) | $ - | $ - | $ - | $ - | |
| (iii) Manager Costs, not to exceed Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs) | $ - | $ - | $ - | N/A | N/A May be paid in (viii) |
| (iii) Servicer Costs, not to exceed Capped Servicer Costs (pro rata with Manager Costs, Back-Up Manager Costs) | | | | | |
| (iii) Back-Up Manager Costs, not to exceed Capped Back-UP Manager Costs (pro rata with Manager Costs, Servicer Costs) | $ - | $ - | $ - | N/A | N/A May be paid in (viii) |
| (iv) Accrued Interest for this Collection Period | #VALUE! | #VALUE! | $ - | N/A | N/A May be paid in (viii) |
| (iv) Accrued Interest owed for prior Collection Period(s) | #VALUE! | #VALUE! | #VALUE! | N/A | |
| (v) Cash trapped in Trapping Account | #VALUE! | #VALUE! | #VALUE! | N/A | |
| (v) Rapid Amortization Principal | #VALUE! | #VALUE! | #VALUE! | N/A | |
| (vi) Trustee Costs, if any, in excess of Capped Trustee Costs | #VALUE! | #VALUE! | #VALUE! | #VALUE! | |
| (vii) Issuer Costs, if any, in excess of Capped Issuer Costs | $ - | #VALUE! | #VALUE! | #VALUE! | |
| (viii) Manager Costs, if any, in excess of Capped Manager Costs (pro rata with Servicer Costs, Back-Up Manager Costs, in excess of Capped Servicer and Back-Up Manager Costs) | $ - | #VALUE! | #VALUE! | #VALUE! | |
| (viii) Servicer Costs, if any, in excess of Capped Servicer Costs (pro rata with Manager Costs and Back-Up Manager Costs) | | #VALUE! | #VALUE! | #VALUE! | |
| (viii) Back-Up Manager Costs, if any, in excess of Capped Back-Up Manager Costs (pro rata with Manager Costs and Servicer Costs in excess of Capped Manager and Servicer Costs) | $ - | #VALUE! | #VALUE! | #VALUE! | |
| (ix) Back-Up Manager Incentive Fee | $ - | #VALUE! | #VALUE! | #VALUE! | |
| (x) Costs owed to other parties (pro rata, among parties) | | #VALUE! | #VALUE! | #VALUE! | |
| (xi) Distribution to Issuer | #VALUE! | #VALUE! | #VALUE! | N/A | |

**Trapping Account Rollforward**

| | | |
|---|---|---|
| Beginning Trapping Account balance | $ | - |
| Less Trapping Account Cash released | $ | - |
| Accumulated Interest - Payment Date to Payment Date | | #VALUE! |
| Trapped cash in this Collection Period | | #VALUE! |
| Ending Trapping Account balance | | |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Actual Amortization Schedule**

| | |
|---|---|
| Determination Date | 0-Jan-1900 |
| Collection Period - Begin | 0-Jan-1900 |
| Collection Period - End | 0-Jan-1900 |

| Date | Period | Beginning Bond Balance | Principal Payments | Ending Bond Balance |
|---|---|---|---|---|
| 4/30/2006 | 0 | | | |
| 5/25/2006 | 1 | $ - | $ - | $ - |
| #NAME? | 2 | $ - | $ - | $ - |
| #NAME? | 3 | $ - | $ - | $ - |
| #NAME? | 4 | $ - | $ - | $ - |
| #NAME? | 5 | $ - | $ - | $ - |
| #NAME? | 6 | $ - | $ - | $ - |
| #NAME? | 7 | $ - | $ - | $ - |
| #NAME? | 8 | $ - | $ - | $ - |
| #NAME? | 9 | $ - | $ - | $ - |
| #NAME? | 10 | $ - | $ - | $ - |
| #NAME? | 11 | $ - | $ - | $ - |
| #NAME? | 12 | $ - | $ - | $ - |
| #NAME? | 13 | $ - | $ - | $ - |
| #NAME? | 14 | $ - | $ - | $ - |
| #NAME? | 15 | $ - | $ - | $ - |
| #NAME? | 16 | $ - | $ - | $ - |
| #NAME? | 17 | $ - | $ - | $ - |
| #NAME? | 18 | $ - | $ - | $ - |
| #NAME? | 19 | $ - | $ - | $ - |
| #NAME? | 20 | $ - | $ - | $ - |
| #NAME? | 21 | $ - | $ - | $ - |
| #NAME? | 22 | $ - | $ - | $ - |
| #NAME? | 23 | $ - | $ - | $ - |
| #NAME? | 24 | $ - | $ - | $ - |
| #NAME? | 25 | $ - | $ - | $ - |
| #NAME? | 26 | $ - | $ - | $ - |
| #NAME? | 27 | $ - | $ - | $ - |
| #NAME? | 28 | $ - | $ - | $ - |
| #NAME? | 29 | $ - | $ - | $ - |
| #NAME? | 30 | $ - | $ - | $ - |
| #NAME? | 31 | $ - | $ - | $ - |
| #NAME? | 32 | $ - | $ - | $ - |
| #NAME? | 33 | $ - | $ - | $ - |
| #NAME? | 34 | $ - | $ - | $ - |
| #NAME? | 35 | $ - | $ - | $ - |
| #NAME? | 36 | $ - | $ - | $ - |
| #NAME? | 37 | $ - | $ - | $ - |
| #NAME? | 38 | $ - | $ - | $ - |
| #NAME? | 39 | $ - | $ - | $ - |
| #NAME? | 40 | $ - | $ - | $ - |
| #NAME? | 41 | $ - | $ - | $ - |
| #NAME? | 42 | $ - | $ - | $ - |
| #NAME? | 43 | $ - | $ - | $ - |
| #NAME? | 44 | $ - | $ - | $ - |
| #NAME? | 45 | $ - | $ - | $ - |
| #NAME? | 46 | $ - | $ - | $ - |
| #NAME? | 47 | $ - | $ - | $ - |
| #NAME? | 48 | $ - | $ - | $ - |
| #NAME? | 49 | $ - | $ - | $ - |
| #NAME? | 50 | $ - | $ - | $ - |
| #NAME? | 51 | $ - | $ - | $ - |
| #NAME? | 52 | $ - | $ - | $ - |
| #NAME? | 53 | $ - | $ - | $ - |
| #NAME? | 54 | $ - | $ - | $ - |
| #NAME? | 55 | $ - | $ - | $ - |
| #NAME? | 56 | $ - | $ - | $ - |

DRAFT

**Sears Holdings Management Corporation as Servicer**
**Servicer Report**
**Statement to Noteholders**

| | |
|---|---|
| Determination Date | 0-Jan-1900 |
| Collection Period - Begin | 0-Jan-1900 |
| Collection Period - End | 0-Jan-1900 |

**INDENTURE WATERFALL**

| | |
|---|---|
| 1. Amounts paid or distributed in respect of interest with respect to the Noteholders | #VALUE! |
| 2. Amounts paid or distributed in respect of principal on or with respect to the Notes | #VALUE! |
| 3. Amounts paid to the Trustee | #VALUE! |
| 4. Amounts paid on behalf of the Issuer | #VALUE! |
| 5. Amounts paid to the Servicer | #VALUE! |
| 6. Amounts paid to the Manager | #VALUE! |
| 7. Amounts paid to the Back-Up IP Manager | #VALUE! |
| 8. Amounts paid to the Trapping Account | #VALUE! |
| 9. Amounts paid to other parties | #VALUE! |
| 10. Remaining amounts paid at the direction of the Issuer | #VALUE! |

**TRADEMARK ROYALTY COLLECTIONS**

| Collection Period Ending | CRAFTSMAN | | KENMORE | | DIEHARD | |
|---|---|---|---|---|---|---|
| 29-Apr-2006 | $ | - | $ | - | $ | - |
| 30-Mar-2006 | $ | - | $ | - | $ | - |
| 28-Feb-2006 | $ | - | $ | - | $ | - |
| 29-Jan-2006 | $ | - | $ | - | $ | - |
| 30-Dec-2005 | $ | - | $ | - | $ | - |
| 30-Nov-2005 | $ | - | $ | - | $ | - |
| 31-Oct-2005 | $ | - | $ | - | $ | - |
| 1-Oct-2005 | $ | - | $ | - | $ | - |
| 1-Sep-2005 | $ | - | $ | - | $ | - |
| 2-Aug-2005 | $ | - | $ | - | $ | - |
| 3-Jul-2005 | $ | - | $ | - | $ | - |
| 3-Jun-2005 | $ | - | $ | - | $ | - |

**TRAPPING ACCOUNT ACTIVITY**

| | | |
|---|---|---|
| Beginning Trapping Account balance | $ | - |
| Less Trapping Account cash released | $ | - |
| Accumulated interest - Payment Date to Payment Date | $ | - |
| Trapped cash in this Collection Period | #VALUE! | |
| Ending Trapping Account balance | #VALUE! | |

**COVERAGE RATIO TESTS**

| | | |
|---|---|---|
| Cash Trapping Event? | N/A | |
| Rapid Amortization Event? | N/A | |
| Servicer/Manager Removal Event?? | $ | - |
| Event of Default? | $ | - |

**EXHIBIT B**
**(List of Servicing Officers)**

Ms. Dawn A. Eber
Mr. Mike Wiest
Mr. Tom Wilczak
Mr. Perry Weine

**EXHIBIT C**
**(Agreed Upon Procedures for Independent Accountants)**

The Servicer shall cause a firm of independent public accountants (which may render other services to the Servicer or its Affiliates) to furnish a report to the Trustee on or before June 1 of each year, beginning in 2007, that they have performed certain procedures and examined documents and records relating to the servicing of the KCD IP, LLC Assets for the preceding fiscal year and, on the basis of such procedures, have noted no instances where the amounts set forth in the Servicer Reports are not in agreement with the Servicer's documents and records, except for such exceptions (defined as greater than $10,000 in value) as shall be set forth in such report.

The agreed upon procedures specified below will be performed on a randomly selected Servicer Report, as selected by the independent public accountants, that was delivered to the Trustee during each of the four fiscal quarters in the Servicer's prior fiscal year. The agreed upon procedures to be performed on each of the four Servicer reports are:

1. Agree net sales (as such term is used in Exhibit B to each License Agreement) for each Trademark with such amounts in the appropriate Sears system-generated reports

2. Agree royalty rate applied to the reported net sales (as such term is used in Exhibit B to each License Agreement) to Exhibit B of the respective Licensing Agreement for each Trademark

3. Recalculate the royalty collections calculation for each Trademark in the appropriate Sears supporting schedules based on net sales (as such term is used in Exhibit B to each License Agreement) multiplied by the royalty rate and agree royalty collections to the respective Servicer Report.

4. Agree with bank statements for the Collection Account that all calculated royalty collections for the Collection Period were fully transferred on or before one business day prior to the [Payment Date].

5. Recalculate and agree to Collection Account and Distribution Account bank statements amounts calculated and transferred from the Collection Account to the Distribution Account as deemed necessary by the Servicer to make payments according to Sections 10.1(a)(i) through 10.1(a)(xi) of the Indenture

6. Recalculate and agree to Collection Account and Distribution Account bank statements the amounts of Retained Collections calculated and transferred at the Issuer's direction after the Servicer's transfer of cash to the Distribution Account to satisfy Sections 10.1(a)(i) through 10.1(a)(xi) of the Indenture

7. Recalculate the remaining Available Funds in the Distribution Account after the application of payments in Sections 10.1(a)(i) through 10.1(a)(xi) of the Indenture and agree to amount transferred at the Issuer's direction to Distribution Account bank statements

8.      Agree the amount of net sales (as such term is used in Exhibit B to each License Agreement) associated with Sublicenses and third party Licenses with reports provided to the Servicer by such Sublicensees or third party Licensees, and document any notable exceptions or unusual items.

9.      Recalculate the mathematical accuracy of Coverage Ratio calculations and verify that any such events are reported:

a.      Trapping Event,
b.      Rapid Amortization Event,
c.      Servicer Removal Event,
d.      Manager Removal Event, or
e.      Event of Default

10.     If a Trapping Period is in effect, recalculate the amount deposited to the Trapping Account.

11.     Agree that:

a.      Amounts paid in <u>Section 10.1.(a)(i)</u> of the Indenture do not exceed the Trustee Fee and Capped Trustee Costs as defined therein

b.      Amounts paid in <u>Section 10.1(a)(ii)</u> of the Indenture do not exceed the Capped Issuer Costs as defined therein

c.      Amounts paid in <u>Section 10.1(a)(iii)</u> of the Indenture do not exceed the Management Fee and Capped Manager Costs as defined therein

d.      Amounts paid in <u>Section 10.1(a)(iii)</u> of the Indenture do not exceed the Servicing Fee and Capped Servicer Costs as defied therein

e.      Amounts paid in <u>Section 10.1(a)(iii)</u> of the Indenture do not exceed the Back-Up Manager Fee and Capped Back-Up Manager Costs as defined therein

12.     Agree the senior unsecured debt rating, or to the extent none exists, the corporate family rating of Sears Holdings Corporation is not below "B2" by Moody's (or the equivalent thereof by any other Rating Agency), and if "B2", is not on negative watch or review for possible downgrade by Moody's (or the equivalent thereof by any other Rating Agency), as of the date of the Servicer Report.

**EXHIBIT D**

**EXECUTION COPY**

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT ("Agreement") is made and entered into effective as of May 18, 2006 (the "Effective Date"), by and between KCD IP, LLC, a Delaware limited liability company ("KCD IP"), and SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY, an Illinois corporation, (herein, together with its successors and assigns, "Manager").

### RECITALS

A.     Sears, Roebuck and Co. ("Sears") is the sole shareholder of Manager.

B.     Sears Brands, LLC, an Illinois limited liability company ("Sears Brands"), is the sole member of KCD IP.

C.     Sears Brands has contributed, effective as of the Effective Date, certain trademarks owned by Sears Brands to KCD IP pursuant to the Contribution Agreement (as defined below), including the Licensed Trademarks (as defined below).

D.     KCD IP desires to obtain from Manager, and Manager is willing to provide for a fee, certain trademark management services with respect to the Licensed Trademarks (as defined below), as set forth in this Agreement.

### AGREEMENTS

NOW, THEREFORE, in consideration of the above Recitals, which are incorporated herein by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.     Certain Definitions.  As used in this Agreement, the capitalized terms not otherwise defined herein shall have the meanings as set forth in the Indenture.  The following additional capitalized terms shall have the following meanings:

**"Affiliate"** has the meaning given in the Indenture.

**"Back-Up Manager"** has the meaning given in the Back-Up Management Agreement.

**"Back-Up Management Agreement"** means that certain Back-Up Management Agreement, of even date herewith, between KCD IP and Ocean Tomo, LLC.

**"Business Day"** has the meaning given in the Indenture.

"**Contribution Agreement**" means that certain Contribution Agreement, of even date herewith, between Sears Brands and KCD IP.

"**Effective Date**" has the meaning given in the preamble.

"**Indenture**" means that certain Indenture, of even date herewith, between KCD IP and U.S. Bank National Association.

"**Initial Term**" has the meaning given in <u>Section 5(a)</u> of this Agreement.

"**KCD IP**" has the meaning given in the Recitals.

"**Legal Maturity Date**" has the meaning given in the Indenture.

"**License Agreements**" means the trademark license agreements, of even date herewith, between KCD IP and Sears and KCD IP and Kmart Corporation with respect to the Licensed Trademarks.

"**Licensed Trademarks**" means (a) the Sears Trademarks (as defined in the Contribution Agreement) and (b) any trademarks created, developed or acquired, by or on behalf of, and owned by, KCD IP after the Effective Date and during the term of this Agreement (and any renewals thereof).

"**Majority Noteholders**" has the meaning given in the Indenture.

"**Management Fee**" has the meaning given in <u>Exhibit B</u> to this Agreement.

"**Manager**" has the meaning given in the Recitals.

"**Manager Costs**" has the meaning given in <u>Exhibit B</u> to this Agreement.

"**Manager Removal Event**" has the meaning given in <u>Section 5</u> of this Agreement.

"**Moody's**" has the meaning given in the Indenture.

"**Noteholder**" has the meaning given in the Indenture.

"**Notes**" has the meaning given in the Indenture.

"**Notice of Default**" has the meaning given in <u>Section 5</u> of this Agreement.

"**Payment Date**" shall have the meaning given in the Servicing Agreement, of even date herewith, between KCD IP, Manager and the Trustee.

"**Party**" means Manager or KCD IP, and "**Parties**" shall mean Manager and KCD IP.

"**Payment Date**" has the meaning given in the Indenture.

"**Proprietary Information**" means any confidential information relating to the Licensed Trademarks, as well as all other confidential or proprietary information or data of a Party, whether financial, operational, marketing, or of a business or economic nature (other than federal income tax treatment or federal income tax structure of this transaction), whether in writing, verbal, recorded, or in some other physical form, which has been supplied by one Party to the other either prior to or after the Effective Date.

"**Rating Agency**" has the meaning given in the Indenture.

"**Rating Agencies**" has the meaning given in the Indenture.

"**Rating Agency Response**" has the meaning given in the Indenture.

"**Recipients**" means the Parties and their respective directors, officers, partners, managers, employees, consultants, agents or representatives, and any or all of them, to the extent such persons receive Proprietary Information.

"**Sears**" has the meaning given in the Recitals.

"**Servicer**" has the meaning given in the Servicing Agreement.

"**Servicing Agreement**" means the Servicing Agreement, of even date herewith, between KCD IP, Manager and the Trustee.

"**Servicer Removal Event**" has the meaning given in the Servicing Agreement.

"**Territory**" means the United States, its possessions and territories, including Puerto Rico.

"**Transaction Documents**" has the meaning given in the Indenture.

"**Trustee**" has the meaning given in the Indenture.

2.    Management Services.

(a)    <u>Engagement</u>.  KCD IP hereby engages Manager, and Manager accepts such engagement, to provide trademark management services for and on behalf of KCD IP in the Territory.  Such engagement shall include all services required to maintain the value and integrity of the Licensed Trademarks in the Territory, including obtaining, prosecuting and maintaining appropriate registrations for the Licensed Trademarks with governmental authorities within the Territory, watching and policing those rights, providing quality control and brand management services, licensing and contract administration services, trademark searching, screening and clearance services, and other trademark counseling and enforcement services.  The services that Manager shall provide to KCD IP pursuant to this Agreement are further described in <u>Exhibit A</u> to this Agreement, which Exhibit may be amended from time to time by mutual agreement between the Parties during the term of this Agreement.  The Manager shall

not take any action pursuant to this Agreement on behalf of KCD IP which is inconsistent with or would cause KCD to violate Section 1.12 of the Indenture and/or Section 2(e) of the Contribution Agreement.

(b)   Right to Act as Authorized Agent.  KCD IP hereby authorizes Manager to act on behalf of KCD IP as an exclusive authorized agent and enter into licenses for the Licensed Trademarks with third parties on behalf of KCD IP.  Manager shall incorporate into the licenses with third parties and enforce substantially similar limitations, obligations, terms and conditions as are set forth in the License Agreements.

(c)   Compensation.  In consideration of the services provided by Manager pursuant to Sections 2(a) and 2(b) above, KCD IP shall pay to Manager the Management Fee determined as set forth on Exhibit B to this Agreement.  Payments owing pursuant to this Section 2(c) shall be made on the Payment Date in accordance with Section 10.1 of the Indenture.  The Parties may adjust in writing the Management Fee on a going-forward basis upon the completion of each 12-month period during the term of this Agreement (or at such other times as the Parties mutually agree in writing) to account for material changes in the duties and responsibilities of, and the services performed by, Manager under this Agreement.  Any adjustment to the Management Fee shall be set forth in a revised Exhibit B, which shall supersede the then current Exhibit B and become a part of this Agreement.  The Management Fee shall not be increased without either (i) written consent of the Trustee pursuant to an Act of Noteholders or (ii) a Rating Agency Response.

3.   Quality Control of the Licensed Trademarks.

(a)   General.  Manager acknowledges the critical importance of exercising quality control over the nature and quality of the goods and services offered under the Licensed Trademarks in the Territory, in order to preserve the continued integrity and validity of the Licensed Trademarks and to protect the goodwill associated with the Licensed Trademarks.  Manager shall exercise quality control over the use of the Licensed Trademarks (including with respect to the use of the Licensed Trademarks by any sublicensee) in the Territory to a degree reasonably necessary to maintain such quality.  Manager acknowledges the quality of the products and services heretofore sold or provided under the Licensed Trademarks and adopts and shall enforce the standards of such quality.

(b)   Compliance with Applicable Law.  Manager shall comply, and shall require all licensees of KCD IP (and any sublicensees) to comply, with all notice and marking requirements of any law or regulation applicable to or necessary for the protection of the Licensed Trademarks in the Territory.

4.   Enforcement of Rights in the Licensed Trademarks.

(a)   Third Party Infringement.  Manager and KCD IP and any assignee (including any collateral assignee) of KCD IP's rights in and to the Licensed

Trademarks shall notify each other promptly after learning of a possible infringement of the Licensed Trademarks or of any imitation, unauthorized possession, knowledge, or use of the Licensed Trademarks or of any claim by a third party that the Licensed Trademarks may be infringing on the rights of a third party in the Territory.

(b)    Enforcement and Defense. KCD IP hereby authorizes Manager to institute legal proceedings against any third party that is reasonably believed to be infringing the Licensed Trademarks in the Territory. Furthermore, Manager shall defend any action brought by a third party against either KCD IP or Manager, or both, seeking to invalidate or otherwise challenging the validity of any of the Licensed Trademarks in the Territory. Manager shall bear all costs related to bringing or defending such action which shall be reimbursed to Manager by KCD IP pursuant to Section 10.1 of the Indenture or reimbursed by the owner of the Licensed Trademarks if the obligations set forth in the Indenture have been fulfilled. Manager shall not settle or compromise any claim or action relating to the Licensed Trademarks rights without the prior consent of KCD IP. As between the Parties, KCD IP shall be entitled to any and all settlement amounts, damages, license fees, and costs recovered or required to be paid relating to the Licensed Trademarks. Upon termination of this Agreement during the Initial Term, any and all rights of Manager in resolving any claims hereunder shall revert to the Back-Up Manager pursuant to the terms of the Back-Up Management Agreement.

(c)    Other Licensees. To the extent that the Licensed Trademarks being infringed or challenged relate to licenses entered into by Manager as authorized agent and on behalf of KCD IP with third party licensees, Manager may require such licensees to join in the relevant actions either as a party plaintiff or as a party defendant. This obligation of such licensees shall survive the expiration or termination of the applicable license agreement.

(d)    Cooperation. The Parties shall cooperate fully in the enforcement or defense of rights pursuant to this Section 4, including releasing information and documents relevant thereto, participating in any litigation, and/or providing witnesses.

5.    Term and Termination.

(a)    Term. This Agreement shall commence as of the Effective Date and shall expire on the Legal Maturity Date ("Initial Term"). Thereafter, the term shall renew automatically for an unlimited number of successive additional terms of one year each; provided, however, that if KCD IP with the consent of the Trustee while the Indenture is still in effect notifies Manager of a desire not to renew the Agreement at least 30 days prior to the end of the then current term, this Agreement shall terminate at the end of such term. No Trustee consent shall be required to terminate when the Indenture is no longer in effect. If Manager notifies KCD IP of a desire not to renew the Agreement at least 30 days prior to the end of then current term, this Agreement shall terminate at the end of such term.

(b)    Manager Removal Events. Each of the following acts or occurrences shall constitute a Manager Removal Event:

(i)    any failure by Manager to provide any and all information requested pursuant to an audit pursuant to Section 6 of this Agreement within thirty (30) Business Days of the date of its required delivery and the continuation of such failure for a period of thirty (30) Business Days after the earlier of (i) the date on which an officer of Manager first has actual, personal knowledge of such failure, and (ii) the date on which written notice, specifying in reasonable detail, such failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to Manager;

(ii)    material failure on the part of Manager duly to observe or perform any other covenant of Manager in this Agreement, the effect of which is a material adverse effect on the Noteholders, and continuance of such default or breach for a period of thirty (30) days (or such additional time as may be required if Manager demonstrates it is making diligent efforts to cure such default, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) after the earlier of (i) the date on which an officer of Manager first has actual, personal knowledge of such default or breach, and (ii) the date on which written notice, specifying in reasonable detail, such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to Manager;

(iii)    any material failure of a representation or warranty of Manager in this Agreement to be true and correct as and when made, which failure has a material adverse effect on the interests of the Noteholders, and the continuance of such failure for a period of thirty (30) days (or such additional time as may be required if Manager demonstrates it is making diligent efforts to cure such breach, such additional time not to exceed the earlier of thirty (30) additional days and the Legal Maturity Date) after the earlier of (i) the date on which an officer of Manager first has actual, personal knowledge of such breach, and (ii) the date on which written notice, specifying in reasonable detail, such breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder shall have been given to Manager;

(iv)    the entry of a decree or order for relief by a court having jurisdiction in respect of Manager in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Manager or of any substantial part of its property, or ordering the winding up or liquidation of the affairs of Manager and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days;

(v)    the commencement by Manager of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or the consent by Manager to the

appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Manager or of any substantial part of its property or the making by Manager of an assignment for the benefit of creditors or the failure by Manager generally to pay its debts as such debts become due or the taking of corporate action by Manager in furtherance of any of the foregoing;

(vi)    if Manager is an Affiliate of Sears Holdings Corporation, Sears Holdings Corporation's senior unsecured debt rating, or to the extent none exists, its corporate family rating is below "B2" by Moody's (or the equivalent thereof by any other Rating Agency), or is "B2" and is on negative watch or review for possible downgrade by Moody's (or the equivalent thereof by any other Rating Agency);

(vii)    at any time when Manager and the Servicer are Affiliates, a Servicer Removal Event occurs and the Majority Noteholders instruct KCD IP and the Trustee to remove the Servicer as Servicer pursuant to Section 4.1(c) of the Indenture;

(viii)    if the Manager is an Affiliate of the Issuer, if on the third Payment Date or any Payment Date thereafter, the Coverage Ratio as of the preceding Determination Date is less than 150%;

(ix)    if the Manager is an Affiliate of Sears Holdings Corporation, the commencement by Sears Holdings Corporation of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or the consent by Sears Holdings Corporation to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Sears Holdings Corporation or of any substantial part of its property or the making by Sears Holdings Corporation of an assignment for the benefit of creditors or the failure by Sears Holdings Corporation generally to pay its debts as such debts become due or the taking of corporate action by Sears Holdings Corporation in furtherance of any of the foregoing; or

(x)    if Manager is an Affiliate of KCD IP, an Event of Default occurs under the Indenture and the Majority Noteholders declare a Manager Removal Event and instruct KCD IP and the Trustee to remove Manager as Manager pursuant to Section 4.1(c) of the Indenture.

If a Manager Removal Event shall have occurred and be continuing and the Majority Noteholders instruct KCD IP and the Trustee to remove Manager as Manager pursuant to Section 4.1(c) of the Indenture, or as to the occurrence of a Manager Removal Event pursuant to Section 5(b)(ix), if 100% of Noteholders fail to vote to retain Manager, KCD IP, with the approval of the Trustee, or the Trustee, shall, by notice given to Manager (with a copy to the other parties hereto and the Noteholders), terminate all of the rights and powers of Manager under this Agreement and all other Transaction Documents, including, without limitation, all rights of Manager to receive the Management Fee, except the accrued but unpaid Management

Fee through the effective date of the assignment of its rights and obligations to the Back-Up Manager.

Upon the giving of such notice, all rights, powers and duties of Manager under this Agreement and all other Transaction Agreements shall vest in the Back-Up Manager pursuant to the terms of the Back-Up Management Agreement. KCD IP, the Trustee and the Back-Up Manager are each hereby authorized and empowered to execute and deliver on behalf of Manager, as attorney-in-fact or otherwise, all documents and other instruments, and to do or accomplish all other acts or things, necessary or appropriate to effect such vesting. Manager agrees to cooperate with KCD IP, the Trustee and the Back-Up Manager in effecting the termination of Manager's rights and responsibilities hereunder and shall promptly provide to the Back-Up Manager all documents and records (electronic and otherwise) reasonably requested to enable the Back-Up Manager to assume the management functions hereunder. Without limiting the foregoing, upon reasonable prior written notice, Manager shall permit access to Manager's offices by KCD IP, the Trustee or any Noteholder, or the Back-Up Manager for the purpose of effecting any transfer of management contemplated by this Section 5. KCD IP shall not have any right to waive any Manager Removal Event under this Agreement.

(c)    Appointment of Back-Up Manager. On and after the time Manager receives a notice of termination pursuant to this Section 5, the Back-Up Manager shall be the successor in all respects to Manager in its capacity as Manager under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on Manager by the terms and provisions hereof, provided, that the Back-Up Manager shall have no liability for actions or inactions of Manager. Any accrued obligations of KCD IP or Manager shall not terminate upon expiration or termination of this Agreement pursuant to this Section 5.

(d)    Rights Cumulative. All rights and remedies from time to time enforced or reserved to KCD IP or the Trustee are cumulative, and none is intended to be exclusive of another. No delay or omission in insisting upon the strict observance or performance of any provision of this Agreement, or in exercising any right or remedy, shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy. Every right and remedy may be exercised from time to time and as often as deemed expedient.

(e)    Effect of Expiration or Termination. In the event of an expiration or termination in accordance with any of the provisions of this Agreement, neither Party shall be liable to the other for compensation, reimbursement or damages because of the loss of prospective profits or anticipated sales or because of expenditures, purchases of inventory, investments, leases or commitments in connection with the business or goodwill of KCD IP or Manager.

6.    Audit. Upon at least thirty (30) days prior written request, which shall not be made more than once during any calendar year, KCD IP may audit Manager's

records in order to verify the management services rendered under this Agreement. Any such audit shall be conducted during Manager's regular business hours in such a manner as not to interfere with Manager's normal business activities. Manager shall provide any and all information requested pursuant to the audit. At KCD IP's discretion, the auditor shall be subject to advance approval by the Audit Committee of the Board of Directors of Sears Holdings Corporation.

7. Warranty; Limitations of Liability.

(a)    Necessary Rights. KCD IP represents and warrants to Manager that, as of the Effective Date, to the best of its knowledge, KCD IP possesses all rights necessary to grant to Manager the right to manage the Licensed Trademarks as set forth in this Agreement.

(b)    Limitation of Liability. NEITHER PARTY SHALL UNDER ANY CIRCUMSTANCE BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN, EVEN IF SUCH PARTY IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

8.    Indemnification.

(a)    Indemnification by KCD IP. KCD IP shall indemnify, defend and hold harmless Manager and its affiliates, partners, officers, directors, shareholders, employees, agents, representatives, successors and assigns (collectively, the "Manager Indemnified Parties"), from and against any and all claims, losses, liabilities, damages, penalties, costs or out-of-pocket expenses (including reasonable attorneys' fees) asserted against or incurred by Manager Indemnified Parties and arising out of or resulting from any breach by KCD IP of this Agreement or any representation or warranty made by KCD IP herein.

(b)    Indemnification by Manager. Manager shall indemnify, defend and hold harmless KCD IP and its affiliates, partners, officers, directors, members, managers, employees, agents, representatives, successors and assigns (collectively, the "KCD IP Indemnified Parties"), from and against any and all claims, losses, liabilities, damages, penalties, costs or out-of-pocket expenses (including reasonable attorneys' fees) asserted against or incurred by KCD IP Indemnified Parties and arising out of or resulting from any breach by Manager of this Agreement or any representation or warranty made by Manager herein.

(c)    Survival. The indemnification obligations contained in this Section 8 shall survive the expiration or termination of this Agreement.

9.    Confidentiality.

(a)    <u>Protection of Proprietary Information</u>. Except as permitted or contemplated by this Agreement, neither Party shall disclose or permit any of its Recipients to disclose any of the other Party's Proprietary Information. Neither Party shall use or permit any of its Recipients to use any of the other Party's Proprietary Information for any purpose other than the purposes of this Agreement. Each of the Parties shall (i) notify the other Party promptly after becoming aware of any unauthorized possession, use, or knowledge of the other Party's Proprietary Information, (ii) promptly furnish full details of such possession, use, or knowledge to the other Party, and (iii) cooperate with the other Party in any litigation against third parties or take any other action as may be deemed necessary by the other Party to protect its proprietary rights in the Proprietary Information. Each of the Parties shall return, and shall cause its Recipients to return, all copies, transcriptions, or other reproductions of, and any notes relating to, the other Party's Proprietary Information to such other Party upon the request of the other Party after the accomplishment of the purpose for which the Proprietary Information was provided. The prior sentence shall survive expiration or termination of this Agreement.

(b)    <u>Permitted Disclosures</u>. Notwithstanding anything herein to the contrary, the obligations of <u>Section 9(a)</u> shall not apply with respect to any Proprietary Information that (A) was in the public domain at the time of disclosure or subsequently entered the public domain other than through a breach of <u>Section 9(a)</u>, (B) was in the possession of the Recipient free of any obligation of confidentiality at the time of disclosure to the Recipient, (C) was rightfully disclosed to the Recipient by a third party free of any obligation of confidentiality subsequent to the time of disclosure to the Recipient hereunder, or (D) was independently developed by the Recipient.

(c)    <u>Survival</u>. The Parties agree that the obligations of each Party with respect to any portion of the other Party's Proprietary Information under this Agreement shall survive the expiration or termination of this Agreement until such time as the portion of the Proprietary Information in question falls within one of the exceptions set forth in <u>Section 9(b)</u> above.

10.    <u>Further Assurances</u>. From and after the Effective Date, each of KCD IP and Manager shall take such actions, provide such additional information, and execute and deliver to the other such other and further documents and instruments, as are expressly required hereunder or as shall be necessary or reasonably requested in order to effect the intent of this Agreement and to consummate the transactions contemplated hereby.

11.    <u>Notices</u>. All notices or other communications that are required to be given or may be given to the Parties pursuant to the terms of this Agreement shall be given in writing and shall be deemed given on the earliest of (i) actual receipt, irrespective of the method of delivery (including delivery by facsimile transmission), (ii) on the delivery day following dispatch if sent by express mail (or similar next day air courier service), or (iii) on the sixth day after mailing by registered or certified United States mail, return receipt requested, first-class postage prepaid and addressed as follows:

if to KCD IP:

KCD IP, LLC
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn: Vanessa Cooper
Fax: 847-286-0266

with a copy to:

Sears Intellectual Property Management Company
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn: Vanessa Cooper
Fax: 847-286-0266

if to Manager:

Sears Intellectual Property Management Company
3333 Beverly Road
Hoffman Estates, IL  60179
Attn:  Mary Tortorice
Fax:   (847) 286-0266

with a copy to:

Sears Intellectual Property Management Company
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn: Vanessa Cooper
Fax: 847-286-0266

or to such other addresses or facsimile numbers as either Party may hereafter specify
for such purpose by notice to the other Party.

    12.    <u>Miscellaneous Provisions</u>.

        (a)    <u>Construction</u>.  For purposes of this Agreement, except as otherwise
expressly provided or unless the context otherwise requires:  (i) the terms defined
herein include the plural as well as the singular and vice-versa; (ii) any reference to an
"Exhibit", a "Section", a "subsection" or a "paragraph" refers to an Exhibit, a Section, a
subsection or a paragraph, as the case may be, of this Agreement; (iii) the Exhibits
hereto form part of this Agreement; (iv) all references to this Agreement and the words
"herein", "hereof", "hereto" and "hereunder" and other words of similar import refer to
this Agreement as a whole and not to any particular Exhibit, Section, subsection,

paragraph or other subdivision; and (v) the words "including," "included" and "includes" means inclusion without limitation.

(b)    <u>Status of Parties</u>. Manager is authorized pursuant to this Agreement to act as the authorized agent of KCD IP for the purposes set forth in this Agreement.

(c)    <u>Limitations on Authority</u>. Except as expressly set forth herein, Manager shall not be authorized to manage the affairs of KCD IP. The management, policies, and operations of KCD IP, shall be the responsibility of Managers and officers of KCD IP, acting pursuant to and in accordance with KCD IP's limited liability company agreement and other applicable documents.

(d)    <u>Compliance with Law</u>. Manager shall fully comply with applicable laws and regulations in performing the services to be provided by it hereunder. Fees and expenses arising out of any acts required by law or regulation to be performed in connection with services to be provided by Manager hereunder shall, without duplication of amounts payable in accordance with the attached <u>Exhibit B</u>, be included in Manager Costs.

(e)    <u>Authorization</u>. The Parties each represent to the other that this Agreement is valid, legal, and binding. KCD IP represents and warrants to Manager that this Agreement does not contravene any other agreement to which KCD IP is a party or its articles of organization or operating agreement. Manager represents and warrants to KCD IP that (i) this Agreement does not contravene any other agreement to which Manager is a party or its articles of incorporation or bylaws, and (ii) it has the resources and experience to perform its obligations under this Agreement.

(f)    <u>Severability</u>. The Parties acknowledge and agree that, should any provision of this Agreement be determined to violate or contravene any law, such provision shall be severed or modified to the extent necessary to comply with the applicable law, and such modified provision and the remainder of the provisions hereof shall continue in full force and effect.

(g)    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective legal representatives, successors and assigns; provided, however, that, KCD IP may assign all or any portion of its rights and obligations under this Agreement with the express written consent of Manager. Manager may not assign all or any portion of its rights and obligations under this Agreement prior to the expiration or termination of the Initial Term unless such assignment is consented to by the Majority Noteholders and KCD IP or the Back-Up Manager.

(h)    <u>Modification</u>. This Agreement shall only be amended or modified by the express written agreement of both Parties.

(i)    <u>No Bankruptcy Petition</u>. By entering into this Agreement, Manager covenants and agrees that, prior to the date which is one year and one day after the

payment in full of the Notes, it will not institute against, or join any other Person in instituting against, KCD IP, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law.

(j)    Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (INCLUDING, WITHOUT LIMITATION, 735 ILCS SECTION 105/5-5 ET SEQ, BUT OTHERWISE WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS.

(k)    Injunctive Relief.  The Parties acknowledges that the Licensed Trademarks and the Proprietary Information possess a special, unique, and extraordinary character that makes difficult the assessment of the monetary damage which would be sustained by the Parties as a result of material breach of this Agreement, and that irreparable injury would be caused by such breach.  Accordingly, each Party shall have the right to seek and obtain immediate and permanent injunctive and other equitable relief, without the necessity of posting a bond, cash or otherwise, in the event of a breach of this Agreement by the other Party, in addition to any and all rights or remedies otherwise available to the Parties at law or in equity.

(l)    Headings and Captions.  The headings or captions in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provisions hereof.

(m)    Entire Agreement.  This Agreement contains the entire understanding and agreement between the Parties with respect to the subject matter hereof, and supersedes all previous communications, proposals, representations, and agreements, whether oral or written.

(n)    Effect of Waiver.  No waiver, whether express or implied, of any breach of any term, condition, or obligation of this Agreement shall be construed as a waiver of any subsequent breach of that term, condition, or obligation, or any other term, condition, or obligation of this Agreement of the same or different nature.

(o)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  Facsimile signatures shall have the same force and effect as original signatures.

### [Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Management Agreement effective as of the Effective Date.

KCD IP:

KCD IP, LLC,
a Delaware limited liability company

By: _____
   Name:
   Title:

MANAGER:

SEARS INTELLECTUAL PROPERTY
MANAGEMENT COMPANY
an Illinois corporation

By: _____
   Name:
   Title:

IN WITNESS WHEREOF, the Parties have executed this Management Agreement effective as of the Effective Date.

KCD IP:                    KCD IP, LLC,
                           a Delaware limited liability company


                           By:_____
                               Name:
                               Title:


MANAGER:                   SEARS INTELLECTUAL PROPERTY
                           MANAGEMENT COMPANY
                           an Illinois corporation

                           By:_____
                               Name:    SUMEET KONWAR
                               Title:

13292925 05112811                                    *Management Agreement*

## EXHIBIT A

## TRADEMARK MANAGEMENT SERVICES

1.    Intellectual Property Quality Control Services, including but not limited to:

    (a)    Monitoring and controlling the nature and quality of products and services offered under the Licensed Trademarks.

    (b)    Modifying when appropriate the standards and requirements of quality and production of products and services offered under the Licensed Trademarks.

    (c)    Monitoring and controlling the use of the Licensed Trademarks.

2.    Trademark Prosecution and Maintenance Services, including but not limited to:

    (a)    Determining what Licensed Trademarks should be registered, and maintaining a docket system of all applications and registrations for Licensed Trademarks.

    (b)    Prosecuting and maintaining applications for the Licensed Trademarks.

    (c)    Recording ownership changes, and other conveyances, in connection with the Licensed Trademarks.

3.    Trademark Enforcement and Third Party Claims and Disputes Services, including but not limited to:

    (a)    Preparing and following up on demand and notice letters, and responses to demand and notice letters, addressing third party infringement of the Licensed Trademarks.

    (b)    Maintaining trademark watch services, and policing third party use of Licensed Trademarks.

4.    Licensing and Contract Administration Services

    (a)    Negotiating, issuing, renewing, extending, terminating or not renewing license agreements, consistent with sound business judgment, for the purposes of maximizing the income generated by the Licensed Trademarks in order to permit KCD IP to satisfy its payment obligations under the Indenture.

## EXHIBIT B

## MANAGEMENT FEE/MANAGER COSTS

$35,000 per calendar month ("Management Fee").

In consideration of the Management Fee, Manager agrees to bear as non-reimbursable costs, all of Manager's general overhead and administrative costs and all of Manager's routine incidental costs incurred by Manager in connection with the services performed under this Agreement.  Necessary and appropriate additional costs, such as "outside" legal fees, U.S. Trademark Office fees, third party collection costs, including "outside" accounting costs, tax services, advertising and promotional costs, and all other non-routine direct out-of-pocket costs payable to third parties (collectively the "Manager Costs") shall be paid by KCD IP upon proof of the amount owed or reimbursed by KCD IP upon proof of payment of Manager Costs by Manager, but solely out of (x) funds available under Section 10.1(a) of the Indenture, paid in accordance with the priority of payments set forth therein, or (y) amounts available under Section 10.4 of the Indenture.

Date of Exhibit: 5/18/06

**EXHIBIT E**

EXECUTION COPY

## BACK-UP MANAGEMENT AGREEMENT

This BACK-UP MANAGEMENT AGREEMENT ("Agreement") is made and entered into as of May 18, 2006 (the "Effective Date") by and among OCEAN TOMO, LLC an Illinois limited liability company ("Back-Up Manager"), KCD IP, LLC, a Delaware limited liability company ("KCD IP"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association (the "Trustee").

### RECITALS

A.      KCD IP has entered into a Management Agreement (as defined below), of even date herewith, with Sears Intellectual Property Management Company ("Sears IP ManageCo") providing for the management of the Licensed Trademarks (as defined in the Management Agreement). The Management Agreement is in the form attached hereto as Exhibit A.

B.      Under certain circumstances specified in the Management Agreement, Sears IP ManageCo may be removed as manager under the Management Agreement.

C.      In any such event of such removal, KCD IP wishes to substitute Back-Up Manager as Manager of the Licensed Trademarks subject to the terms and conditions hereof, and Back-Up Manager is desirous of accepting such appointment.

### AGREEMENTS

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Certain Definitions.  As used in this Agreement, the capitalized terms not otherwise defined herein shall have the meanings as set forth in the Management Agreement or the Indenture.  The following additional capitalized terms shall have the following meanings:

"**Act of the Majority Noteholders**" has the meaning given in the Indenture.

"**Back-Up Entity**" means any entity that is appointed as the new back-up manager to replace Back-Up Manager pursuant to this Agreement.

"**Back-Up Manager**" has the meaning given in the Recitals.

"**Back-Up Manager Costs**" has the meaning given in Section 6 of this Agreement.

"**Back-Up Manager Incentive Fee**" has the meaning given in Exhibit B to this Agreement.

"**Back-Up Manager Removal Event**" has the meaning given in <u>Section 9(b)</u> of this Agreement.

"**Back-Up Manager Standby Fee**" has the meaning given in <u>Exhibit B</u> to this Agreement.

"**Back-Up Management Term**" has the meaning given in <u>Section 9(a)</u> of this Agreement.

"**Confidential Information**" means any and all non-public information, disclosed previously or in the future in connection with this Agreement, whether orally, in writing, visually or otherwise, by or on behalf of KCD IP or its Affiliates to Back-Up Manager in connection with this Agreement. Confidential Information includes, without the need to mark or identify it as such, KCD IP's royalty information; business plans, strategies, forecasts and analyses; financial information; employee, customer and vendor information; product and service specifications; purchasing, logistics, sales, marketing and other business processes and information of KCD IP or its Affiliates.

"**Effective Date**" has the meaning given in the preamble.

"**Event of Default**" has the meaning given in the Indenture.

"**Information**" has the meaning given in <u>Section 4</u> of this Agreement.

"**KCD IP**" has the meaning given in the Recitals.

"**Legal Maturity Date**" has the meaning given in the Indenture.

"**Management Agreement**" means that certain Management Agreement, of even date herewith, between KCD IP and Manager.

"**Manager**" means Sears Intellectual Property Management Company, its successors and assigns.

"**Noteholders**" has the meaning given in the Indenture.

"**Representatives**" means Back-Up Manager's directors, partners, employees, agent or advisers, including attorneys.

"**Successor Manager**" means Back-Up Manager in its new capacity as Manager pursuant to the terms of the Management Agreement, if and when applicable.

"**Transaction Documents**" has the meaning given in the Indenture.

"**Trustee**" has the meaning given in the Indenture.

2.    <u>Effectiveness; Financial Statements</u>.

(a)    <u>Effectiveness</u>.  Back-Up Manager shall be on standby and ready to perform the management services pursuant to <u>Section 3</u> hereof as of the Effective Date of this Agreement.  Upon receipt of written notice from the Trustee to Back-Up Manager to such effect, Back-Up Manager shall, as soon as reasonably practicable after receipt of such notice but in no event later than three (3) business days thereafter, commence to render the management services, in its capacity as the Successor Manager, pursuant to <u>Section 3</u> hereof.

(b)    <u>Financial Statements</u>.  Annually, Back-Up Manager will deliver to KCD IP (i) not later than 120 days after the end of each fiscal year, a certified copy of its annual audited financial statements for such fiscal year, and (ii) upon request of KCD IP, a good standing certificate of the Secretary of State of the state of formation of the Back-Up Manager dated not earlier than thirty days prior thereto.

3.    <u>Back-Up Management Services</u>

(a)    <u>Engagement</u>.  Back-Up Manager hereby agrees to act as Back-Up Manager in accordance with the terms of this Agreement as of the Effective Date.  KCD IP will provide to Back-Up Manager Information setting forth the obligations of Back-Up Manager while on standby.  Back-Up Manager, in its capacity as the Successor Manager, shall agree to undertake, perform and discharge all services and duties on the part of Sears IP ManageCo that are set forth in the Management Agreement (including, without limitation, <u>Exhibit A</u> thereto) upon written notice from the Trustee to the effect that it is to perform those services and duties.

(b)    <u>Right to Act as Authorized Agent</u>.  KCD IP confirms that if Back-Up Manager becomes the Successor Manager, Back-Up Manager, in its capacity as the Successor Manager, will be acting on behalf of KCD IP, as an authorized agent, for the benefit of KCD IP and the Noteholders.  All documents required to be executed as part of the management services shall be executed by Back-Up Manager, in its capacity as the Successor Manager, on behalf of KCD IP in a representative capacity.

4.    <u>Information</u>.  KCD IP warrants that Back-Up Manager, in its standby role pursuant to this Agreement, or in rendering management services pursuant to the Management Agreement as the Successor Manager, shall have the right to rely on the accuracy and factual content of the reports and information that Back-Up Manager may receive from other parties to the Transaction Documents (the "Information"), absent actual knowledge on the part of Back-Up Manager of any inaccuracy.  Information shall include all information KCD IP deems necessary for Back-Up Manager to perform its duties under this Agreement or the Management Agreement, as applicable.

5.    <u>Compensation</u>.  In consideration of the services provided by Back-Up Manager pursuant to this Agreement, KCD IP shall pay to Back-Up Manager the Back-Up Manager Standby Fee determined as set forth on <u>Exhibit B</u> to this Agreement in accordance with the priority of payments set forth in <u>Section 10.1(a)</u> of the Indenture.  In addition, Back-Up Manager shall be paid by KCD IP Back-Up Manager Incentive Fee in accordance with <u>Section 10.1(a)</u> of the Indenture.

6.    Costs. Back-Up Manager agrees to bear as non-reimbursable costs, all of Back-Up Manager's general overhead and administrative costs and all of Back-Up Manager's routine incidental costs incurred by Back-Up Manager in rendering the management services. Necessary and appropriate additional out-of-pocket costs such as "outside" legal fees and all other non-routine direct out-of-pocket costs payable to third parties (collectively the "Back-Up Manager Costs") shall be reimbursed by KCD IP in accordance with the priority of payments set forth in Section 10.1(a) of the Indenture upon proof of payment of Back-Up Manager Costs by Back-Up Manager.

7.    Approvals. KCD IP shall approve the incurrence of any necessary and appropriate Back-Up Manager Costs.

8.    Obligations and Procedures After an Event of Default. If an Event of Default shall have occurred and be continuing and not be waived by the Majority Noteholders, upon written notice from the Trustee pursuant to an Act of the Majority Noteholders, Back-Up Manager, in its capacity as the Successor Manager, shall investigate the prospective proceeds of a sale of one or more of the Licensed Trademarks and the prospective proceeds of entering into new license agreements with respect thereto. Upon completion of such investigation, Back-Up Manager, in its capacity as the Successor Manager, will provide the Trustee and Majority Noteholders of the prospective opportunities and make a recommendation, based on its professional experience and using sound business judgment, as to which opportunity will maximize the value of the Licensed Trademarks for the benefit of the Noteholders. Thereafter, Back-Up Manager, in its capacity as Successor Manager, shall sell and/or license the Licensed Trademarks as directed by the Trustee (at the direction of the Majority Noteholders). If no such notice is received from the Trustee, Back-Up Manager shall continue to perform its obligations under the Management Agreement.

9.    Term and Termination.

(a)    Term. This Agreement shall commence as of the Effective Date and shall expire on the Legal Maturity Date (the "Back-Up Management Term"). Thereafter, the term shall renew automatically for an unlimited number of successive additional terms of one year each. While the Indenture is still in effect, KCD IP, with the consent of the Trustee pursuant to an Act of the Majority Noteholders, may terminate this Agreement at any time upon 30 days written notice to Back-Up Manager so long as (i) Notice is given to the Rating Agencies and (ii) there is no Event of Default continuing under the Indenture at the time of termination of this Agreement. No Trustee consent shall be required in order for KCD IP to terminate this Agreement upon 30 days written notice to Back-Up Manager when the Indenture is no longer in effect. Back-Up Manager may terminate this Agreement at any time upon 30 days written notice to KCD IP. While the Indenture is still in effect, no termination by KCD IP or Back-Up Manager shall become effective under this Agreement until (1) a Back-Up Entity has been approved by the Trustee pursuant to an Act of the Majority Noteholders; (2) a Rating Agency Response; and (3) the Back-Up Entity has accepted the appointment.

(b)    Back-Up Manager Removal Events Each of the following acts or occurrences shall constitute a Back-Up Manager Removal Event:

(i)    the entry of a decree or order for relief by a court having jurisdiction in respect of Back-Up Manager in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Back-Up Manager or of any substantial part of its property, or ordering the winding up or liquidation of the affairs of Back-Up Manager and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days; or

(ii)    the commencement by Back-Up Manager of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future federal or state bankruptcy, insolvency or similar law, or the consent by Back-Up Manager to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Back-Up Manager or of any substantial part of its property or the making by Back-Up Manager of an assignment for the benefit of creditors or the failure by Back-Up Manager generally to pay its debts as such debts become due or the taking of corporate action by Back-Up Manager in furtherance of any of the foregoing.

If a Back-Up Manager Removal Event shall have occurred and be continuing and the Majority Noteholders instruct KCD IP and the Trustee to remove Back-Up Manager pursuant to Section 4.1(c) of the Indenture, KCD IP, or the Trustee, shall, by notice given to Back-Up Manager (with a copy to the other parties hereto and the Noteholders), terminate all of the rights and powers of Back-Up Manager under this Agreement and all other Transaction Documents, including, without limitation, all rights of Back-Up Manager to receive Back-Up Manager Standby Fee, except the accrued but unpaid Back-Up Manager Standby Fee through the effective date of the assignment of its rights and obligations to a replacement entity.

Upon the giving of such notice, all rights, powers and duties of Back-Up Manager under this Agreement and all other Transaction Agreements shall vest in the Back-Up Entity. KCD IP, the Trustee and the Back-Up Entity are each hereby authorized and empowered to execute and deliver on behalf of Back-Up Manager, as attorney-in-fact or otherwise, all documents and other instruments, and to do or accomplish all other acts or things, necessary or appropriate to effect such vesting. Back-Up Manager agrees to cooperate with KCD IP, the Trustee and the Back-Up Entity in effecting the termination of Back-Up Manager's rights and responsibilities hereunder and shall promptly provide to the Back-Up Entity all documents and records (electronic and otherwise) reasonably requested to enable the Back-Up Entity to assume the management functions hereunder. Without limiting the foregoing, upon reasonable prior written notice, Back-Up Manager shall permit access to Back-Up Manager's offices by KCD IP, the Trustee or the Back-Up Entity for the purpose of effecting any transfer of management contemplated by this Section 9. KCD IP shall not have any right to waive any Back-Up Manager Removal Event under this Agreement.

(c)    Appointment of New Back-Up Entity. On and after the time Back-Up Manager receives a notice of termination pursuant to this Section 9, the Back-Up Entity shall be the successor in all respects to Back-Up Manager in its capacity as back-up manager under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on Back-Up Manager by the terms

and provisions hereof, provided, that the Back-Up Entity shall have no liability for actions or inactions of Back-Up Manager. Any accrued obligations of KCD IP or Back-Up Manager shall not terminate upon expiration or termination of this Agreement pursuant to this <u>Section 9</u>.

(d)    <u>Rights Cumulative</u>. All rights and remedies from time to time enforced or reserved to KCD IP or the Trustee are cumulative, and none is intended to be exclusive of another. No delay or omission in insisting upon the strict observance or performance of any provision of this Agreement, or in exercising any right or remedy, shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy. Every right and remedy may be exercised from time to time and as often as deemed expedient.

(e)    <u>Effect of Expiration or Termination</u>. In the event of an expiration or termination in accordance with any of the provisions of this Agreement, neither Party shall be liable to the other for compensation, reimbursement or damages because of the loss of prospective profits or anticipated sales or because of expenditures, purchases of inventory, investments, leases or commitments in connection with the business or goodwill of KCD IP or Back-Up Manager. On the date of any such expiration or termination, Back-Up Manager shall return all Information to KCD IP or the designee of KCD IP.

10.    <u>Warranty; Limitations of Liability</u>.

(a)    <u>Necessary Rights</u>. KCD IP represents and warrants to Back-Up Manager that, as of the Effective Date, to the best of its knowledge, KCD IP possesses all rights necessary to grant to Back-Up Manager the right to manage the Licensed Trademarks as set forth in this Agreement.

(b)    <u>Limitation of Liability</u>. NO PARTY SHALL UNDER ANY CIRCUMSTANCE BE LIABLE TO THE OTHER PARTIES FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN, EVEN IF SUCH PARTY IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

11.    <u>Indemnification</u>.

(a)    <u>Indemnification by KCD IP</u>. KCD IP shall indemnify, defend and hold harmless Back-Up Manager and its affiliates, partners, officers, directors, shareholders, employees, agents, representatives, successors and assigns (collectively, the "Back-Up Manager Indemnified Parties"), from and against any and all claims, losses, liabilities, damages, penalties, costs or out-of-pocket expenses (including reasonable attorneys' fees) asserted against or incurred by Back-Up Manager Indemnified Parties and arising out of or resulting from any breach by KCD IP of this Agreement or any representation or warranty made by KCD IP herein.

(b)    <u>Indemnification by Back-Up Manager</u>. Back-Up Manager shall indemnify, defend and hold harmless KCD IP and its affiliates, partners, officers, directors, members, managers, employees, agents, representatives, successors and assigns (collectively, the "KCD IP Indemnified Parties"), from and against any and all claims, losses, liabilities, damages, penalties, costs or out-of-pocket expenses (including reasonable attorneys' fees) asserted against

or incurred by the KCD IP Indemnified Parties and arising out of or resulting from any breach by Back-Up Manager of this Agreement or any representation or warranty made by Back-Up Manager herein.

(c)    Survival.  The indemnification obligations contained in this Section 11 shall survive the expiration or termination of this Agreement.

12.    Confidentiality.

(a)    Protection of Confidential Information.  When Back-Up Manager receives Confidential Information, it shall (i) use the Confidential Information only for purposes of fulfilling its obligations under this Agreement; (ii) not disclose the Confidential Information to any third parties, except to its Representatives, who need to know it for the purposes of this Agreement, and who have agreed to hold it confidential; (iii) copy the Confidential Information only as necessary to fulfill its obligations under this Agreement, and maintain confidentiality in the copying process; and (iv) use, and require its Representatives to use, no less than the degree of care Back-Up Manager uses with its own confidential information, but in any event no less than reasonable care.  Back-Up Manager shall protect the confidentiality of the Confidential Information received for seven years after its disclosure.  Within ten (10) Business Days after the expiration or termination of this Agreement or receipt of KCD IP's written request, Back-Up Manager shall destroy all Confidential Information, or if requested by KCD IP, return it to Sears. If requested, Back-Up Manager shall certify in writing to KCD IP that it has destroyed or returned all Confidential Information as required.

(b)    Permitted Disclosures.  Information is not considered Confidential Information, even if it otherwise meets the definition of Confidential Information, if: (i) it was in Back-Up Manager's possession prior to disclosure under this Agreement, free of any confidentiality obligation; (ii) it has become publicly available without breach of this Agreement by Back-Up Manager; (iii) it was developed by Back-Up Manager independent of the Confidential Information; or (iv) Back-Up Manager rightfully received it from a third party without an obligation of confidentiality to KCD IP.  Back-Up Manager may disclose Confidential Information in any legal proceeding relating to this Agreement, and in any other legal proceeding if, in its attorney's reasonable opinion, Back-Up Manager is legally required to disclose it.  In either case, Back-Up Manager shall disclose the information only to the arbitrator, court or other governmental authority, as the case may be, and shall notify KCD IP a reasonable time prior to disclosure, to allow KCD IP to seek appropriate protective measures.

(c)    Survival.  The parties to this Agreement agree that the obligations of each party with respect to any portion of the other party's Proprietary Information under this Agreement shall survive the expiration or termination of this Agreement until such time as the portion of the Proprietary Information in question falls within one of the exceptions set forth in Section 12(b) above.

13.    Further Assurances.  From and after the Effective Date, each of KCD IP and Back-Up Manager shall take such actions, provide such additional information, and execute and deliver to the other such other and further documents and instruments, as are expressly required

hereunder or as shall be necessary or reasonably requested in order to effect the intent of this Agreement and to consummate the transactions contemplated hereby.

     14.    <u>Notices</u>.  All notices or other communications that are required to be given or may be given to the Parties pursuant to the terms of this Agreement shall be given in writing and shall be deemed given on the earliest of (i) actual receipt, irrespective of the method of delivery (including delivery by facsimile transmission), (ii) on the delivery day following dispatch if sent by express mail (or similar next day air courier service), or (iii) on the sixth day after mailing by registered or certified United States mail, return receipt requested, first-class postage prepaid and addressed as follows:

        if to KCD IP:

        KCD IP, LLC
        3333 Beverly Road
        Hoffman Estates, Illinois 60179
        Attn: Vanessa Cooper
        Fax: 847-286-0266

        With a copy to:

        Sears Intellectual Property Management Company
        3333 Beverly Road
        Hoffman Estates, Illinois 60179
        Attn: Vanessa Cooper
        Fax: 847-286-0266

        if to Back-Up Manager:

        Ocean Tomo, LLC
        200 West Madison, 37th Floor
        Chicago, Illinois 60606
        Attn:   Raymond Millien
        Fax:    312-327-4401

        if to the Trustee:

        U.S. Bank National Association
        209 S. LaSalle Street, 3rd Floor
        Chicago, Illinois 60604-1219
        Attn:   Corporate Trust/KCD IP
        Fax:    312-325-8905

or to such other addresses or facsimile numbers as either Party may hereafter specify for such purpose by notice to the other Party.

15.    <u>Miscellaneous Provisions</u>.

(a)    <u>Construction</u>. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (i) the terms defined herein include the plural as well as the singular and vice-versa; (ii) any reference to an "Exhibit", a "Section", a "subsection" or a "paragraph" refers to an Exhibit, a Section, a subsection or a paragraph, as the case may be, of this Agreement; (iii) the Exhibits hereto form part of this Agreement; (iv) all references to this Agreement and the words "herein", "hereof", "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Exhibit, Section, subsection, paragraph or other subdivision; and (v) the words "including," "included" and "includes" means inclusion without limitation.

(b)    <u>Status of Parties</u>. Back-Up Manager is, at such time as it becomes the Successor Manager, authorized pursuant to this Agreement to act as the authorized agent of KCD IP for the purposes set forth in this Agreement.

(c)    <u>Limitations on Authority</u>. Except as expressly set forth herein, Back-Up Manager shall not be authorized to manage the affairs of KCD IP. The management, policies, and operations of KCD IP, shall be the responsibility of Managers and officers of KCD IP, acting pursuant to and in accordance with KCD IP's limited liability company agreement and other applicable documents.

(d)    <u>Compliance with Law</u>. Back-Up Manager shall fully comply with applicable laws and regulations in performing the services to be provided by it hereunder. Fees and expenses arising out of any acts required by law or regulation to be performed in connection with services to be provided by Back-Up Manager hereunder shall, without duplication of amounts payable in accordance with the attached <u>Exhibit B</u>, be included in Back-Up Manager Costs.

(e)    <u>Authorization</u>. The Parties each represent to the other that this Agreement is valid, legal, and binding. KCD IP represents and warrants to Back-Up Manager that this Agreement does not contravene any other agreement to which KCD IP is a party or its articles of organization or operating agreement. Back-Up Manager represents and warrants to KCD IP that (i) this Agreement does not contravene any other agreement to which Back-Up Manager is a party or its articles of incorporation or bylaws, and (ii) it has the resources and experience to perform its obligations under this Agreement.

(f)    <u>Severability</u>. The Parties acknowledge and agree that, should any provision of this Agreement be determined to violate or contravene any law, such provision shall be severed or modified to the extent necessary to comply with the applicable law, and such modified provision and the remainder of the provisions hereof shall continue in full force and effect.

(g)    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective legal representatives, successors and assigns. KCD IP may assign all or any portion of its rights and obligations under this Agreement. Back-Up Manager may not assign all or any portion of its rights and obligations

under this Agreement except in connection with a sale of all or substantially all of its assets or stock in connection with a merger or other corporate reorganization which has been approved in advance and writing by KCD IP, LLC, such approval not to be unreasonably withheld.  Any prohibited assignment shall be null and void.

(h)     Modification.  This Agreement shall only be amended or modified by the express written agreement of all Parties.

(i)     No Bankruptcy Petition.  By entering into this Agreement, each of Back-Up Manager and the Trustee covenants and agrees that, prior to the date which is one year and one day after the payment in full of the Notes, it will not institute against, or join any other Person in instituting against, KCD IP, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law.

(j)     Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (INCLUDING, WITHOUT LIMITATION, 735 ILCS SECTION 105/5-5 ET SEQ, BUT OTHERWISE WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS.

(k)     Injunctive Relief.  The Parties acknowledges that the Licensed Trademarks and the Proprietary Information possess a special, unique, and extraordinary character that makes difficult the assessment of the monetary damage which would be sustained by the Parties as a result of material breach of this Agreement, and that irreparable injury would be caused by such breach.  Accordingly, each Party shall have the right to seek and obtain immediate and permanent injunctive and other equitable relief, without the necessity of posting a bond, cash or otherwise, in the event of a breach of this Agreement by the other Party, in addition to any and all rights or remedies otherwise available to the Parties at law or in equity.

(l)     Headings and Captions.  The headings or captions in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provisions hereof.

(m)     Entire Agreement.  This Agreement contains the entire understanding and agreement between the Parties with respect to the subject matter hereof, and supersedes all previous communications, proposals, representations, and agreements, whether oral or written.

(n)     Effect of Waiver.  No waiver, whether express or implied, of any breach of any term, condition, or obligation of this Agreement shall be construed as a waiver of any subsequent breach of that term, condition, or obligation, or any other term, condition, or obligation of this Agreement of the same or different nature.

(o)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  Facsimile signatures shall have the same force and effect as original signatures.

**IN WITNESS WHEREOF**, this Agreement has been executed by the duly authorized signatories of the parties hereto all as of the day and year first above written.

KCD IP

KCD IP, LLC,
a Delaware limited liability company

By: _____
    Name: Dawn A. Eber
    Title: President

BACK-UP MANAGER

OCEAN TOMO, LLC, an Illinois limited liability company

By: _____
    Name:
    Title:

TRUSTEE

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, this Agreement has been executed by the duly authorized signatories of the parties hereto all as of the day and year first above written.

KCD IP

KCD IP, LLC,
a Delaware limited liability company

By: _____
    Name:
    Title:

BACK-UP MANAGER

OCEAN TOMO, LLC, an Illinois limited liability company

By: _____
    Name: Raymond Millien
    Title: General Counsel

TRUSTEE

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, this Agreement has been executed by the duly authorized signatories of the parties hereto all as of the day and year first above written.

KCD IP

KCD IP, LLC,
a Delaware limited liability company

By: _____
      Name:
      Title:

BACK-UP MANAGER

OCEAN TOMO, LLC, an Illinois limited liability company

By: _____
      Name:
      Title:

TRUSTEE

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____
      Name:   PATRICIA M. CHILD
      Title:   VICE PRESIDENT

**EXHIBIT A**

**MANAGEMENT AGREEMENT**

[ATTACHED]

## Exhibit A

## Trademark Management Services

1.    Intellectual Property Quality Control Services, including but not limited to:

(a)    Monitoring and controlling the nature and quality of products and services offered under the Licensed Trademarks.

(b)    Modifying when appropriate the standards and requirements of quality and production of products and services offered under the Licensed Trademarks.

(c)    Monitoring and controlling the use of the Licensed Trademarks.

2.    Trademark Prosecution and Maintenance Services, including but not limited to:

(a)    Determining what Licensed Trademarks should be registered, and maintaining a docket system of all applications and registrations for Licensed Trademarks.

(b)    Prosecuting and maintaining applications for the Licensed Trademarks.

(c)    Recording ownership changes, and other conveyances, in connection with the Licensed Trademarks.

3.    Trademark Enforcement and Third Party Claims and Disputes Services, including but not limited to:

(a)    Preparing and following up on demand and notice letters, and responses to demand and notice letters, addressing third party infringement of the Licensed Trademarks.

(b)    Maintaining trademark watch services, and policing third party use of Licensed Trademarks.

4.    Licensing and Contract Administration Services

(a)    Negotiating, issuing, renewing, extending, terminating or not renewing license agreements, consistent with sound business judgment, for the purposes of maximizing the income generated by the Licensed Trademarks in order to permit KCD IP to satisfy its payment obligations under the Indenture.

5.    Pursuing the business strategy chosen by senior management to maximize the value of the Licensed Trademarks.

Date of Exhibit: 5/18/06

## EXHIBIT B

## MANAGEMENT FEE/MANAGER COSTS

$35,000 per calendar month ("Management Fee").

In consideration of the Management Fee, Manager agrees to bear as non-reimbursable costs, all of Manager's general overhead and administrative costs and all of Manager's routine incidental costs incurred by Manager in connection with the services performed under this Agreement. Necessary and appropriate additional costs, such as "outside" legal fees, U.S. Trademark Office fees, third party collection costs, including "outside" accounting costs, tax services, advertising and promotional costs, and all other non-routine direct out-of-pocket costs payable to third parties (collectively the "Manager Costs") shall be paid by KCD IP upon proof of the amount owed or reimbursed by KCD IP upon proof of payment of Manager Costs by Manager, but solely out of (x) funds available under Section 10.1(a) of the Indenture, paid in accordance with the priority of payments set forth therein, or (y) amounts available under Section 10.4 of the Indenture.

Date of Exhibit: 5/18/06

## EXHIBIT B

## BACK-UP MANAGEMENT FEE

1.      Unless and until Back-Up Manager becomes Manager under the Management Agreement, $ 15,000 per annum ("Back-Up Manager Standby Fee").

2.      While Back-Up Manager is acting as Manager under the Management Agreement, (i) the Management Fee under the Management Agreement and (ii) if Back-Up Manager effects any sale or license of the Licensed Trademarks pursuant to Section 8 of this Agreement, Back-Up Manager Incentive Fee determined as follows:

(a) 0.10% of the net royalty payments from time to time received during the first twelve months of each new license agreement for the licensing of the Licensed Trademarks, which new license agreements are entered into by Back-Up Manager pursuant to Section 8 of this Agreement with licensees which are not Affiliates of KCD IP; and

(b) 0.10% of the net proceeds resulting from the sale of the Licensed Trademarks by Back-Up Manager pursuant to Section 8 of this Agreement;

provided, however, that (x) the aggregate of all fees payable under clauses (a) and (b) above shall not be more than $2,000,000 and (y) upon any sale of the Licensed Trademarks pursuant to Section 8 of this Agreement, the aggregate of all fees payable under clauses (a) and (b) above shall not be less than $500,000.

Payment of Back-Up Manager Incentive Fee is subordinated to the payment in full of principal and interest on the Notes pursuant to Section 10.1 of the Indenture.

**EXHIBIT F**



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard C. Pedone**
*Partner*
T 617-345-1305
rpedone@nixonpeabody.com

100 Summer Street
Boston, MA  02110-2131
617-345-1000

December 16, 2018

**VIA E-Mail**

Jacqueline Marcus
Counsel to Sears Holdings Management Corporation, as Servicer
Weil Gotshal & Manges, LLP
767 5th Avenue
New York, NY 10153
(212) 310-8000
jacqueline.marcus@weil.com

**RE:  Demand for Servicer Compliance with Servicing Agreement**

Dear Ms. Marcus:

As you may recall, we are counsel to U.S. Bank National Association in its capacity as Trustee (in such capacity, the "Trustee") under that certain Indenture, dated as of May 18, 2006 (as amended, supplemented or modified from time to time, the "Indenture"), between KCD IP, LLC, as Issuer (the "Issuer") and the Trustee.  We write to you in your capacity as counsel to the Servicer (as defined below).

We also reference that certain Servicing Agreement, dated as of May 18, 2006 (as amended, supplemented or modified from time to time, the "Servicing Agreement"), by and among the Issuer, the Trustee and Sears Holdings Management Corporation, as Servicer (the "Servicer").  A copy of the Servicing Agreement is attached as **Exhibit A** for your convenience.

### Demand for Compliance with Terms of the Servicing Agreement

As we explained last week, the Servicer, which is a Debtor, has not been communicating in any way with the Trustee and has failed to perform its obligations under the Servicing Agreement.

Demand is hereby made for the Servicer to immediately comply with any and all of its obligations arising under the Servicing Agreement until either the Servicer is replaced or the Servicing Agreement is rejected.  As you are aware, to the extent the Servicer intends on assuming the Servicing Agreement, it will be required to provide adequate assurance that it will continue to perform its obligations for the duration of the Servicing Agreement.

December 16, 2018
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

For the avoidance of doubt, this letter does not, and should not be deemed to, constitute a waiver of any kind by or on behalf of the Trustee or pursuant to any terms of the Indenture, the Servicing Agreement or the related agreements referenced above, or in respect of any applicable rights or remedies that may be available.  The Trustee expressly reserves any and all such rights and remedies.

Please confirm by close of business Monday, December 17, 2018, that the Servicer will honor its obligations arising under the Servicing Agreement.  We look forward to addressing these issues in a cooperative manner.  Should you have any questions or concerns regarding these requests, please do not hesitate to reach out so that we may discuss.

Sincerely,

*/s/ Richard C. Pedone*
Richard C. Pedone
Partner

4813-8936-2050.6

**(Exhibits to the Document Intentionally Omitted)**

**EXHIBIT G**



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard C. Pedone**
*Partner*
T 617-345-1305
rpedone@nixonpeabody.com

100 Summer Street
Boston, MA 02110-2131
617-345-1000

December 16, 2018

<u>**VIA E-Mail**</u>

Jacqueline Marcus
Counsel to Sears Holdings Management Corporation, as Servicer
Weil Gotshal & Manges, LLP
767 5th Avenue
New York, NY 10153
(212) 310-8000
jacqueline.marcus@weil.com

**RE: Demand to Servicer for Audit and Access to Books and Records**

Dear Ms. Marcus:

As you may recall, we are counsel to U.S. Bank National Association in its capacity as Trustee (in such capacity, the "Trustee") under that certain Indenture, dated as of May 18, 2006 (as amended, supplemented or modified from time to time, the "Indenture"), between KCD IP, LLC, as Issuer (the "Issuer") and the Trustee. We write to you in your capacity as counsel to the Servicer (as defined below). We also reference that certain Servicing Agreement, dated as of May 18, 2006 (as amended, supplemented or modified from time to time, the "Servicing Agreement"), by and among the Issuer, the Trustee and Sears Holdings Management Corporation, as Servicer (the "Servicer"). A copy of the Servicing Agreement is attached as **Exhibit A** for your convenience.

**Request for Information Pursuant to Servicing Agreement**

Section 6.7 of the Servicing Agreement requires, among other things, that the Servicer permit the Trustee to examine all of the books of account, records (including computer records), reports and other papers of the Servicer relating to the Collateral and to discuss the Servicer's affairs, finances and accounts relating to the Collateral with the Servicer's officers, employees and independent public accountants.[1]

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Servicing Agreement.

4850-9122-8290.6

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

On behalf of the Trustee we hereby make a formal request to review such records immediately, but in no event later than Thursday, December 20, 2018.  Further, the Trustee requests that after receiving access to such records, it be afforded the opportunity to speak with one or more of the Servicer's officers, employees and independent public accountants to be identified after or in conjunction with the Trustee's review of the records or consultation with you.  Attached as **Exhibit B** to this letter is a preliminary list of the records to which immediate access is requested. We would welcome a cooperative discussion to coordinate the logistics for this review and the efficient delivery of the documents.

For the avoidance of doubt, this letter does not constitute a waiver of any right or remedy of the Trustee, nor it is an exercise of remedies.  These access rights are a normal part of the rights of the parties under the Servicing Agreement.  As you are aware, we have requested that the Debtors assent to the entry of an order granting the Trustee relief from the automatic stay and we await your response.  In addition, under separate cover you will be receiving a request that the Servicer perform all of its obligations under the Servicing Agreement pending its replacement.  It is our hope that such performance will immediately commence without the need for litigation.

Please confirm by close of business Monday, December 17, 2018, that the Servicer will allow the Trustee to examine the Servicer's books and records relating the Collateral.  We look forward to addressing these issues in a cooperative manner.  Should you have any questions or concerns regarding these requests, please do not hesitate to reach out so that we may discuss.

Sincerely,

*/s/ Richard C. Pedone*
Richard C. Pedone
Partner

**(Exhibits to the Document Intentionally Omitted)**

**EXHIBIT H**



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard C. Pedone**
*Partner*
T 617-345-1305
rpedone@nixonpeabody.com

100 Summer Street
Boston, MA  02110-2131
617-345-1000

December 16, 2018

**VIA E-Mail**

Jacqueline Marcus
Counsel to Sears Brands Business Unit Corporation, as Manager
Weil Gotshal & Manges, LLP
767 5th Avenue
New York, NY 10153
(212) 310-8000
jacqueline.marcus@weil.com

**RE:  Demand for Manager Compliance with Management Agreement**

Dear Ms. Marcus:

As you may recall, we are counsel to U.S. Bank National Association in its capacity as Trustee (in such capacity, the "Trustee") under that certain Indenture, dated as of May 18, 2006 (as amended, supplemented or modified from time to time, the "Indenture"), between KCD IP, LLC, as Issuer (the "Issuer") and the Trustee.  We write to you in your capacity as counsel to the Manager (as defined below).

We also reference that certain Management Agreement, dated as of May 18, 2006 (as may be amended, supplemented or modified from time to time, the "Management Agreement"), by and between the Issuer and Sears Brands Business Unit Corporation (f/k/a Sears Intellectual Property Management Company), as Manager (the "Manager").  A copy of the Management Agreement is attached as **Exhibit A** for your convenience.

**Demand for Compliance with Terms of the Management Agreement**

As we explained at the beginning of the week, the Manager, which is a Debtor, has not been communicating in any way with the Trustee.

Demand is hereby made of the Manager for immediate performance, and assurance of continued performance, of any and all of its obligations arising under the Management Agreement until either the Manager is replaced or the Management Agreement is rejected.  As you are aware, to the extent the Manager intends on assuming the Management Agreement, it will be required to

December 16, 2018
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

provide further adequate assurance that it will continue to perform its obligations for the duration of the Management Agreement.

For the avoidance of doubt, this letter does not, and should not be deemed to, constitute a waiver of any kind by or on behalf of the Trustee or pursuant to any terms of the Indenture, the Management Agreement or the related agreements referenced above, or in respect of any applicable rights or remedies that may be available.  The Trustee expressly reserves any and all such rights and remedies.

Please confirm by close of business Monday, December 17, 2018, that the Manager will honor its obligations arising under the Management Agreement.  We look forward to addressing these issues in a cooperative manner.  Should you have any questions or concerns regarding these requests, please do not hesitate to reach out so that we may discuss.

Sincerely,

*/s/ Richard C. Pedone*
Richard C. Pedone
Partner

4812-2316-2754.6

**(Exhibits to the Document Intentionally Omitted)**

**EXHIBIT I**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------x
                                        :    Chapter 11
In re:                                  :
                                        :
SEARS HOLDING CORPORATION.,             :    Case No. 18-23538 (RDD)
                                        :
                Debtors¹.               :    (Joint Administration)
                                        :
--------------------------------------------------x
```

### ORDER GRANTING RELIEF FROM THE
### AUTOMATIC STAY AND COMPELLING PERFORMANCE

Upon the motion (the "Motion") of U.S. Bank National Association, in its capacity as

indenture trustee (in such capacity, the "KCD Indenture Trustee") under the Indenture,[2] for an

order pursuant to section 105, 361, 362(d)(1), 363(e) of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 4001-1 of the Local Bankruptcy Rules for the United States

Bankruptcy Court for the Southern District (the "Local Rules"); and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, LLC (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it

appearing that no other or further notice need be provided; and the Court having reviewed the

Motion; and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and upon all of the proceedings had

before the Court and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the Motion is granted as set forth herein; and it is further

*Relief Related to the Removal and Replacement of the Servicer*

**ORDERED** that relief from the automatic stay pursuant to section 362(d)(1) of the

Bankruptcy Code is granted to allow the KCD Indenture Trustee (in concert with the Issuer

and/or Holder, if necessary) to remove Sears Holdings Management Corporation as Servicer and

appoint a successor servicer in accordance with the applicable provisions of the Indenture and

the Servicing Agreement; and it is further

**ORDERED** that, until such time as Sears Management Corporation is removed as

Servicer, it shall perform any and all of its obligations as Servicer arising under the Servicing

Agreement, including, without limitation, those obligations set forth in Section 2.1(d) and 3.1 of

the Servicing Agreement, including, without limitation, providing any and all Servicer Reports,

whether past due or to become due, during the post-petition period; it is further

**ORDERED** that the Debtors shall cooperate with any successor servicer appointed as

Servicer under the provisions of the Indenture and the Servicing Agreement; and it further

*Relief Related to the Removal and Replacement of the Manager*

**ORDERED** that relief from the automatic stay pursuant to section 362(d)(1) of the

Bankruptcy Code is granted to allow the KCD Indenture Trustee (in concert with the Issuer

and/or Holder, if necessary) to remove the Sears Brands Business Unit Corporation as Manager

and appoint Ocean Tomo, LLC, the Back-Up Manager, as manager in accordance with the

applicable provisions of the Indenture, the Management Agreement, and the Back-Up

Management Agreement; and it is further

**ORDERED** that, until such as the Manager is removed as Manager under the provisions

of the Indenture and the Management Agreement, the Manager shall perform any and all of its

obligations under the Management Agreement, including, without limitation, those set forth on

Exhibit A to the Management Agreement; and it is further

**ORDERED** that the Debtors shall cooperate with the Back Up Manager appointed

manager under the provisions of the Indenture, the Manager Agreement, and the Back-Up

Management Agreement; and it is further

**ORDERED** that, once appointed Manager, the Back Up Manager is authorized to take

any and all action permitted under the Management Agreement and Back Up Management

Agreement, as applicable.

Dated: _____
      White Plains, New York


                                 _____
                                 THE HONORABLE ROBERT D. DRAIN
                                 UNITED STATES BANKRUPTCY JUDGE