**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | |
| | : | **Case No. 18-23538   (RDD)** |
| **Debtors.**[1] | : | |
| | : | **(Jointly Administered)** |

-----------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SHC LICENSED BUSINESS LLC,** | : | |
| | : | |
| **Debtor.** | : | **Case No. 18-23616 (RDD)** |
| | : | |
| | : | |
| **Fed. Tax Id. No. 37-1783718** | : | |

-----------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SHC PROMOTIONS LLC,** | : | |
| | : | |
| **Debtor.** | : | |
| | : | **Case No. 18-23630 (RDD)** |
| | : | |
| **Fed. Tax Id. No. 26-4209626** | : | |

-----------------------------------------------------------x

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).   The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**ACTION TIME, INC.'S MOTION FOR TURNOVER OF FUNDS
BEING HELD IN TRUST BY DEBTOR, SHC LICENSED BUSINESS, LLC**

Action Time, Inc. d/b/a Sears Watch and Jewelry Repair ("Action Time"), a Florida corporation, through its undersigned counsel, files this Motion to Compel the Debtor SHC Licensed Business, LLC (the "Debtor") to Turnover Funds being Held in Trust pursuant to that certain License Agreement, as amended (the "License Agreement"), and in support thereof, states as follows:

1.      On October 15, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code.

2.      Action Time has been doing business with Sears in the State of Florida since 1994.

3.      Prior to the Petition Date Action Time occupied space 16 Sears stores in the State of Florida pursuant to a License Agreement dated May 1, 2012, a copy of which is attached hereto as Exhibit "A".

4.      The License Agreement granted Action Time the non-exclusive privilege of conducting and operating a licensed business to offer and sell only jewelry and watch repair products and services to "Designated Company Stores" as that term is defined therein.

5.      Pursuant to Schedule 3.1 of the License Agreement, Action Time is responsible for payment of 20% of its Net Sales (as defined therein) to the Debtor.

6.      Pursuant to Section 9.2(d) of the License Agreement, the parties agreed to the following settlement/reconciliation terms:

> Settlement. At the end of each Company fiscal month, the parties shall settle for all Licensed Business transactions during that month, in accordance with Company's customary accounting procedures. For Licensed Business transactions that are processed through Company's POS system, Company will make weekly payments for POS receipts processed in the prior calendar week within the same fiscal month and may retain from such receipts the percentage payable for the Company Fee and the Reserve as provided in Schedule 9.28. The month-end settlement will include the weekly payment for the last week in the fiscal

month, along  with  the Company Fee and other month-end deductions and reconciliations.

Licensee shall reimburse Company at each settlement for all invoiced  expenses, including any advertising expense,  that  Company has  incurred at Licensee's request,  and  are outstanding  at the time  of  such  settlement.   If Company is not reimbursed at the settlement, then Company  may, but is not obligated to,  retain  out of Licensee's  sales receipts  the amount of such expenses  with interest,  if any, due Company.

7.      The Debtor collects the sales tax then remits it to Action Time, who in turn, remits the sales tax to the State of Florida.

8.      As of the Petition Date, Debtor was holding **$32,767.00** (which includes $5,991.49 of sales tax that is due to the State of Florida), pursuant to the License Agreement from September 2, 2018 through October 6, 2018 (the "Action Time Funds"), as set forth on the chart attached hereto as Exhibit "B".

9.      The Action Time Funds are not property of the estate pursuant to 11 U.S.C. § 541.

10.     Debtor is merely holding the Action Time Funds in trust.

11.     Debtor should therefore be compelled to turn over the Action Time Funds to Action Time.

**WHEREFORE**, Action Time, Inc. respectfully requests the entry of an order compelling the Debtor to turn over **$32,767.00** of Action Time's funds (including $5,991.49 of sales tax that is due to the State of Florida) due from its sales under the License Agreement from September 2, 2018 through October 6, 2018 and providing for such further relief deemed appropriate under the circumstances.

**LAW OFFICE OF MARK S. ROHER, P.A.**
*Counsel for Action Time, Inc.*
150 S. Pine Island Road, Suite 300
Plantation, Florida 33324
Email:  ecf3@markroherlaw.com
Telephone:  (954) 353-2200
Facsimile:  (877) 654-0090

By:    */s/ Mark S. Roher*
          Mark S. Roher
          Florida Bar No. 178098
          *Pro Hac Vice Admission Pending*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of December, 2018, a true and correct copy of

the foregoing was served by CM/ECF on all parties receiving notice by this method.


/s/ *Mark S. Roher*
Mark S. Roher

## SEARS, ROEBUCK AND CO.

## LICENSE AGREEMENT

## WITH

## ACTION TIME, INC. d/b/a SEARS WATCH AND JEWELRY REPAIR

# EXHIBIT "A"

## TABLE OF CONTENTS

1.    GRANT OF LICENSE ................................................................................................................. 1
      1.1    License ......................................................................................................................... 1
      1.2    Right to Sublicense ...................................................................................................... 1
      1.3    No Representations ....................................................................................................... 1

2.    TERM    ....................................................................................................................................... 1

3.    COMPANY FEES ...................................................................................................................... 1
      3.1    Amount ......................................................................................................................... 1
      3.2    Payment ........................................................................................................................ 1

4.    USE OF COMPANY MARKS .................................................................................................. 1
      4.1    Licensed Business Name ............................................................................................. 1
      4.2    Other Communications ................................................................................................ 1
      4.3    Ownership and Registration of Licensed Business Marks .......................................... 2
      4.4    No Challenge to Company Marks ................................................................................ 2
      4.5    No Rights to Marks ...................................................................................................... 2
      4.6    Injunctive Relief .......................................................................................................... 2
      4.7    Infringing Use .............................................................................................................. 2

5.    OPERATIONAL OBLIGATIONS OF LICENSEE .................................................................. 3
      5.1    Performance Standards ................................................................................................ 3
      5.2    Business Conduct ......................................................................................................... 3
      5.3    Hours of Operation ...................................................................................................... 3
      5.4    Merchandise Inventory and Presentation .................................................................... 3
      5.5    Merchandise and Services Standards ........................................................................... 3
      5.6    Pricing .......................................................................................................................... 3
      5.7    Customer Adjustment/Service ..................................................................................... 3
      5.8    Employee Standards ..................................................................................................... 4
      5.9    Subcontractors ............................................................................................................. 4
      5.10   Licensee's Employees .................................................................................................. 4
      5.11   Employee Compensation ............................................................................................. 5
      5.12   Compliance with Labor Laws ...................................................................................... 5
      5.13   Compliance with Law .................................................................................................. 5
      5.14   Payment of Taxes ......................................................................................................... 5
      5.15   Liens ............................................................................................................................. 6
      5.16   Licensee's Obligations ................................................................................................. 6

6.    LICENSED BUSINESS AREA .................................................................................................. 6
      6.1    Initial Locations ........................................................................................................... 6
      6.2    Initial Location and New Location Build-Out .............................................................. 6
      6.3    Improvements ............................................................................................................... 6
      6.4    Commencement of Operations ..................................................................................... 7
      6.5    Condition of Licensed Business Area .......................................................................... 7
      6.6    Changes of Location/Remodeling ................................................................................ 7
      6.7    Electric/HVAC ............................................................................................................. 7
      6.8    Telephone Service ........................................................................................................ 7
      6.9    Telephone Numbers ...................................................................................................... 7

|       | 6.10 | Telephone Directory Listings | 7 |
|       | 6.11 | Access to Licensed Business Area | 8 |
|       | 6.12 | Effect of Store Leases | 8 |
|       | 6.13 | Waiver of Property Damages | 8 |
| 7.    | PUBLIC COMMUNICATIONS | | 8 |
|       | 7.1 | Advertising | 8 |
|       | 7.2 | Other Publicity | 8 |
|       | 7.3 | Forms | 8 |
| 8.    | LICENSED BUSINESS EQUIPMENT | | 8 |
|       | 8.1 | Licensee's Equipment | 8 |
|       | 8.2 | POS Terminal | 9 |
| 9.    | TRANSACTIONS AND SETTLEMENT | | 9 |
|       | 9.1 | Checks | 9 |
|       | 9.2 | Charge Cards | 9 |
|       | 9.3 | Reports | 10 |
|       | 9.4 | Audit Rights | 10 |
|       | 9.5 | Underreporting | 11 |
|       | 9.6 | Rights of Recoupment and Setoff | 11 |
|       | 9.7 | Cardholder Data Security | 11 |
| 10.   | CONFIDENTIALITY; CUSTOMER INFORMATION | | 13 |
|       | 10.1 | Confidential Business Information | 13 |
|       | 10.2 | Confidential Treatment and Use Restrictions | 14 |
|       | 10.3 | Confidential Customer Information | 14 |
|       | 10.4 | Treatment of Confidential Customer Information | 14 |
| 11.   | RELATIONSHIP OF PARTIES | | 16 |
| 12.   | DEFENSE AND INDEMNITY | | 16 |
|       | 12.1 | Defense | 16 |
|       | 12.2 | Indemnity | 16 |
| 13.   | INSURANCE | | 17 |
|       | 13.1 | Types of Insurance | 17 |
|       | 13.2 | No Cancellation Without Notice | 17 |
|       | 13.3 | Certificates | 18 |
|       | 13.4 | Expiration/Non-Renewal | 18 |
|       | 13.5 | No Waiver | 18 |
| 14.   | TERMINATION | | 18 |
|       | 14.1 | Termination for Convenience | 18 |
|       | 14.2 | Termination by Company on Notice | 18 |
|       | 14.3 | Termination by Company after Opportunity to Cure | 18 |
|       | 14.4 | Termination by Licensee after Opportunity to Cure | 19 |
|       | 14.5 | Termination on Store Closing or Casualty | 19 |
|       | 14.6 | Effect of Termination | 19 |
| 15.   | ASSIGNMENT AND SUBLICENSING | | 19 |

15.1 Assignment by Licensee ................................................................................................ 19
15.2 Assignment by Company ............................................................................................... 20
15.3 Binding Nature............................................................................................................... 20

16. MISCELLANEOUS.................................................................................................................. 20
16.1 Governing Law .............................................................................................................. 20
16.2 Jurisdiction and Venue................................................................................................... 20
16.3 Notices ........................................................................................................................... 20
16.4 Severability .................................................................................................................... 21
16.5 No Waiver....................................................................................................................... 21
16.6 Cumulative Rights ......................................................................................................... 21
16.7 Construction.................................................................................................................... 21
16.8 Survival........................................................................................................................... 21
16.9 Entire Agreement; Modifications .................................................................................. 21

| Schedule 1.1A | Authorized Merchandise/Services |
|---|---|
| Schedule 1.1B | Designated Company Stores |
| Schedule 3.1 | Company Fees |
| Schedule 4.3 | Licensee Marks |
| Schedule 5.13 | Disability Access Guidelines |
| Schedule 6.2 | Initial Location and New Location Build-Out |
| Schedule 7.1 | Marketing Program |
| Schedule 9.2A | Citibank Merchant Agreement Sears Card Conditions |
| Exhibit A to Schedule 9.2A | Merchant Operating Rules and Regulations |
| Exhibit B to Schedule 9.2A | Pricing Schedule |
| Schedule 9.2B | Third Party Credit Card Conditions |

# LICENSE AGREEMENT

This **LICENSE AGREEMENT** (the "Agreement") is entered into as of  May 1, 2012,  (the "Effective Date"), by , **Action Time, Inc. d/b/a Sears Watch and Jewelry Repair**, a  Florida corporation ("Licensee"), and Sears Holdings Management Corp., a Delaware corporation, as agent for **SEARS, ROEBUCK AND CO.**, a New York corporation ("Company").

Company and Licensee hereby agree as follows:

**1.**    **LICENSE**

1.1    License. Company grants Licensee the non-exclusive privilege of conducting and operating, and Licensee shall conduct and operate a licensed business ("Licensed Business") to offer and sell only jewelry and watch repair products and services as listed on Schedule 1.1A ("Authorized Merchandise/Services") to customers at the Company store locations listed on Schedule 1.1B ("Designated Company Stores").

Licensee shall not change or add to the Authorized Merchandise/Services without Company's prior written approval.

1.2    Right to Sublicense. Licensee may not sublicense any rights under this Agreement without Company's prior written approval, which Company may withhold in its sole discretion.

1.3    No Representations. Company makes no promises or representations whatsoever about the potential amount of business Licensee can expect at any time from the operation of the Licensed Business. Licensee is solely responsible for any expenses it incurs related to this Agreement, including expenses for hiring additional employees or for acquiring additional facilities or equipment.

**2.**    **TERM**   The term of this Agreement ("Term") is two years, beginning on the Effective Date and ending at the close of business on April 30, 2014 (the "Expiration Date"), unless terminated earlier under another provision of this Agreement.

**3.**    **COMPANY FEES**

3.1    Amount. Licensee shall pay Company fees based on Net Sales as provided in Schedule 3.1 ("Company Fee").

3.2    Payment.  The Company Fee shall be collected by Company by offset against receipts under Section 9.2(d).

**4.**    **USE OF COMPANY MARKS**

4.1    Licensed Business Name. Licensee shall operate the Licensed Business under the name "Sears Watch and Jewelry Repair" (the "Licensed Business Name"). Licensee shall use the name or trademark of Company only in operating the Licensed Business, as part of the Licensed Business Name in communications to customers and prospective customers of the Licensed Business, to identify the Designated Company Store where the Licensed Business is located, and in advertising specifically approved by Company.

4.2    Other Communications. Except as permitted in Section 4.1 and for disclosure to the U.S. Securities and Exchange Commission, or as otherwise specifically approved by Company, Licensee shall not use the Licensed Business Name or any other trademarks, service marks or

trade names owned by or licensed to Company (collectively the "Company Marks") for any other purpose, either orally or in writing, including use on any letterhead, checks, business cards, or contracts. Licensee will make all communications with anyone other than customers or potential customers of the Licensed Business only in Licensee's own name.

4.3   Ownership and Registration of Licensed Business Marks. Company or its affiliates own and may register in its own name the Licensed Business Name and any trademarks, service marks and trade names used in the Licensed Business (collectively, the "Licensed Business Marks"), except for the trademarks and service marks in which Licensee claims ownership, listed on Schedule 4.3, as amended from time to time by written agreement of the parties (the "Licensee Marks"). Licensee's use of the Licensed Business Marks will inure to Company's benefit. The Licensed Business Marks are included in the term "Marks". Licensee shall reasonably cooperate in Company's efforts to register Licensed Business Marks. Company may not register any Licensee Marks. Company shall bear any extraordinary expenses incurred by Licensee in registering any Company Marks.

4.4   No Challenge to Company Marks. Licensee shall not contest Company's or its affiliates' ownership of Company Marks. Company shall not contest Licensee's ownership of Licensee's Marks listed on Schedule 4.3. Licensee shall not claim any rights in any Company Mark, except the right to use the Company Marks under this Agreement, and Licensee shall not attempt to register any Company Mark. Company shall not claim any rights in any of Licensee's Marks listed on Schedule 4.3, except the right to use Licensee Marks under this Agreement, and Company shall not attempt to register any Licensee Marks.

4.5   No Rights to Marks. Licensee acknowledges that its use of any Mark does not give it any proprietary rights to any Mark and that all use of the Company Marks by Licensee shall inure to the benefit of Sears or its affiliates and will not impair the validity or good will associated with the Company Marks. Upon expiration or termination of this Agreement, Licensee shall immediately stop using all Marks, and execute all documents that Company or its affiliates request to confirm Company's ownership in any Mark, or to transfer to Company or its affiliates any rights Licensee may have acquired from Company or its affiliates in any Mark. Nothing in this Agreement restricts Company or its affiliates from protecting its exclusive ownership of the Marks and the Licensed Business Marks against infringement by any party, including Licensee, or from claiming any intellectual property rights not expressly reserved to Licensee in this Agreement.

4.6   Injunctive Relief. Licensee acknowledges that the Marks possess a special, unique and extraordinary character which makes it difficult to assess the monetary damage Company or its affiliates would sustain in the event of unauthorized use. Company acknowledges that the Licensee Marks possess a special, unique and extraordinary character which makes it difficult to assess the monetary damage Licensee would sustain in the event of unauthorized use. Irreparable injury would be caused to either party by such unauthorized use, for which there would be no adequate remedy at law, and injunctive relief would be appropriate.

4.7   Infringing Use. If Licensee learns of any manufacture or sale by any third party of products or services similar to those offered in the Licensed Business that would be confusingly similar in the minds of the public to those sold by Licensee, that bear or are promoted with the Marks or any names, symbols, emblems, or designs or colors that would be confusingly similar in the minds of the public to the Marks, Licensee shall promptly notify Company. Company or its affiliates may, at their sole expense, take such action as they determine, in their sole discretion, is appropriate. Licensee shall cooperate and assist in such protest or legal action at Company's expense. If requested by Company, Licensee shall join in such protest or legal action at Company's expense. Licensee shall not undertake any protest or legal action regarding any Mark without Company's

prior written permission. If Company permits Licensee to undertake a protest or legal action, Licensee shall pursue the protest or legal action at its sole expense. Company shall cooperate and assist Licensee at Licensee's expense. For the purposes of this <u>Section 4.7</u>, expenses include reasonable attorneys' fees. All recovery of legal damages or settlement belongs to the party bearing the expense of that protest or legal action.

**5.    OPERATIONAL OBLIGATIONS OF LICENSEE**

5.1    <u>Performance Standards</u>. Licensee shall provide Company with copies of its written procedures and policies setting minimum standards of quality, performance and customer service. Licensee shall immediately advise Company of any changes in its standards. Without limiting Licensee's obligations under <u>Section 5.7</u>, Licensee shall observe no less than its minimum standards of quality, performance and customer service. Company may visit the Licensed Business area at any reasonable time during business hours to verify Licensee's compliance with its standards of quality, performance and customer service.

Licensee shall conduct its operations in a safe, professional, courteous and efficient manner and shall present a neat, business-like appearance, including following a reasonable dress code approved by Company.  Licensee shall abide by all safety and security rules and regulations of Company in effect from time to time.

5.2    <u>Business Conduct</u>. Licensee shall also conduct its operations in an honest and ethical manner at all times. In dealing with Company associates and Company customers, Licensee shall adhere to the highest ethical standards.

5.3    <u>Hours of Operation</u>. Licensee shall staff and keep the Licensed Business open for business during the same business hours that the Designated Company Stores is open for business.

5.4    <u>Merchandise Inventory and Presentation</u>. Licensee shall maintain a stock of merchandise listed on <u>Schedule 1.1A</u> adequate to efficiently operate the Licensed Business. Licensee shall maintain merchandise presentation standards consistent with Company's own standards. Licensee shall submit to Company Licensee's merchandising strategy for approval, as part of the regular line review process.

5.5    <u>Merchandise and Services Standards</u>. Licensee shall offer only new, merchantable Authorized Merchandise of the types listed on <u>Schedule 1.1A</u>. Licensee shall perform all Authorized Services in a competent and workmanlike manner in accordance with the level of professional care customarily observed by highly skilled professionals rendering services similar to those offered through the Licensed Business.

5.6    <u>Pricing</u>. Company has no right or power to control the prices at which Licensee offers Authorized Merchandise/Services in the Licensed Business. Such right and power is retained by Licensee. Licensee shall not charge customers for estimates or proposals. Licensee shall participate in Company national store-wide sales and merchandise price off events.

5.7    <u>Customer Adjustment/Service</u>. Licensee shall at all times maintain a general policy of "Satisfaction Guaranteed" to customers and shall promptly adjust all complaints of and controversies with customers arising out of the Licensed Business. If, in any case, Licensee's adjustment is unsatisfactory to the customer, Company may, at Licensee's expense, make such adjustment as Company deems necessary under the circumstances, and Company's adjustment will be conclusive and binding on Licensee. Company may deduct the cost of any such adjustments from the sales receipts held by Company under <u>Section 9.2(d)</u>. Licensee shall maintain files of customer complaints and their adjustment and make the files available to Company. Licensee shall not use the services of a collection agency or undertake any legal

proceeding against any customer without the written approval of Company's Business Development Manager.

5.8    Employee Standards.  Licensee shall employ all management and other personnel needed to efficiently staff and operate the Licensed Business and to comply with all laws and regulations. Licensee shall operate the Licensed Business solely with Licensee's employees, and not by using independent contractors, sub-contractors, sub-licensees or other workers not directly employed by Licensee, except for subcontractors as provided in Section 5.9.

5.9    Subcontractors.  Licensee may engage subcontractors to perform services for customers with the prior written consent of Company, which may be revoked by Company's sole discretion. Licensee represents and warrants that all of its subcontractors will comply with all applicable federal, state, and local laws, ordinances, rules and regulations, and Licensee shall be solely accountable to Company for the failure of its subcontractors to so comply.

Licensee must enter into a written subcontractor agreement ("Subcontractor Agreement") with each subcontractor on a form of agreement approved by Company in writing. Licensee shall submit the names of all proposed subcontractors, together with copies of Licensee's Subcontractor Agreement with such subcontractor and copies of all certificates of insurance required by this Section 5.9 to Company prior to the commencement of any work by any subcontractor. At any time during the Term, Company may, in its discretion, determine that any subcontractor is not acceptable to Company and request that such subcontractor not perform services for the Licensed Business.  Notwithstanding Company's failure to object to any subcontractor, Licensee shall remain responsible for the selection of any subcontractor and for the proper performance of all of its duties and obligations under this Agreement in connection with such services.

Licensee may engage only reputable subcontractors capable of performing the services in a high-quality, timely manner.  Licensee must: (a) ensure that all subcontractors are properly licensed, if applicable, and comply with all applicable laws and regulations; (b) establish a procedure to monitor the performance of its subcontractors on an ongoing basis and to monitor their compliance with all licensing requirements, if any, and laws; and (c) require and ensure that its subcontractors obtain and maintain in force during the Term of the Agreement such insurance coverage as set forth in Section 13.1 of this Agreement and adequate to fully protect Company and Licensee from and against any and all expenses, claims, actions, liabilities, and losses related to the subjects covered by such policies.

5.10    Licensee's Employees.  Licensee has no authority to employ persons on behalf of Company. No employees of Licensee will be deemed to be employees of Company. Licensee has exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, or working conditions of its employees. Licensee shall include in its policies all applicable restrictions and requirements of this Agreement that pertain to Licensee's operations or the conduct of its personnel. Licensee has the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, adjust grievances and discharge its employees. But Company may request at any time, subject to applicable law, that Licensee remove from the Licensed Business any employee of Licensee who is objectionable to Company because of risk of harm or loss to the health, safety or security of Company's customers, employees or merchandise or who fails to follow Licensee's employment policies. If Company objects to any of Licensee's employees, and Licensee decides not to remove such person, Company may terminate any affected location by giving 60 days notice to Licensee.

Licensee shall require that each person working in the Licensed Business pass a criminal background check (covering all counties of residence for the past seven years) and a drug screen

4

consistent with normal practice by retailers similar to Company; provided that Licensee shall have 180 days from the Commencement Date to complete Licensee's criminal background check and drug screening obligations with respect to its existing employees. If Licensee desires to assign a person to work in the Licensed Business in a Designated Company Store despite the appearance of adverse findings on the employee or subcontractor's background check or screen, Licensee shall bring to the attention of the Company Store Manager and Company Licensed Business Director, for decision, the results from any criminal background check and drug screen, without identifying the employee or subcontractor directly or indirectly. If, upon presentation of such adverse findings, Company objects to such person, then the last sentence of the first paragraph of this Section 5.10 shall apply.

Company will request its existing retail screen and background check vendors to extend to Licensee the preferred service terms applicable to Company under its contracts with such vendors for the foregoing purpose, and will provide Licensee with contact information for such vendors.

5.11    Employee Compensation. Licensee shall timely pay and is solely responsible for so paying, for all compensation of its employees and shall make all necessary deductions and withholdings from its employees' compensation. Licensee shall timely pay, and is solely responsible for so paying or contesting in good faith all contributions, taxes and assessments, withholdings and all other requirements of Federal Social Security, Federal and state unemployment compensation, and Federal, state and local income tax laws on all compensation of its employees.

5.12    Compliance with Labor Laws. Licensee shall comply with any other contract and all Federal, state and local laws, ordinances, rules and regulations regarding its employees, including minimum compensation, overtime and equal opportunities for employment, and specifically including the Federal Civil Rights Acts, Age Discrimination in Employment Act, Occupational Safety and Health Act, the Federal Fair Labor Standards Act, and the Americans with Disabilities Act, whether or not Licensee is otherwise exempt from these acts because of its size or the nature of its business or other reason.

5.13    Compliance with Law. Licensee shall obtain all permits and licenses that are required under any Federal, state, or local law, ordinance, rule or regulation for Licensee's operation of the Licensed Business. If the Licensed Business is reviewed or audited by any governmental agency pursuant to applicable law, Licensee shall provide Company with prompt written notice of such review or audit, and, to the extent permitted by law, provide Company with the results of such review or audit.

Licensee shall comply and bear all costs associated with all applicable Federal, state and local laws, ordinances, rules and regulations, including the Americans with Disabilities Act ("ADA") and the rules and regulations of the Federal Trade Commission. These laws and regulations include without limitation the Americans with Disabilities Act, Americans with Disabilities Act Accessibility Guidelines, analogous state and local laws and regulations, and other laws and regulations relating to the accessibility to persons with disabilities of the Licensed Business Area, the areas through and adjacent to the Licensed Business Area at each Company store where Licensee operates and Licensee's products, services and displays. Among other things, Licensee shall comply with the guidelines in Schedule 5.13, which Licensee understands is only a partial list of its obligations to persons with disabilities. Licensee shall cooperate reasonably with all other programs carried out in Designated Company Stores to comply with laws and regulations. Licensee represents and warrants that Licensee and all of its suppliers, subcontractors and agents involved in the production or delivery of Authorized Merchandise or Authorized Services will strictly adhere to all applicable laws, regulations, and prohibitions of the United States and all

countries where the Authorized Services are performed, or where the Authorized Merchandise is produced or delivered regarding the operation of their production facilities and their business and labor practices, including those concerning the working conditions, wages and minimum age of the work force. Licensee represents and warrants that the Authorized Services will not be performed, and the Authorized Merchandise will not be produced or manufactured, in whole or in part, by convict or forced labor.

5.14   Payment of Taxes.  Licensee shall pay all license fees, business, use, sales, gross receipts, income, property or other applicable taxes or assessments that are charged or levied due to any act performed in connection with the Licensed Business, excluding, however, taxes and assessments on Company's income from Company Fees or on Company's property.

5.15   Liens. Licensee shall promptly pay all its obligations, including those for labor and material, and shall not allow any liens, claims or encumbrances ("Liens") to attach to any of Company's property or any Designated Company Stores due to any obligation of Licensee. If any Lien so attaches or is threatened, Licensee shall immediately take all necessary action to have the Lien satisfied and released. If Licensee fails to do so, Company may terminate this Agreement or the affected Designated Company Store, and charge Licensee or withhold from the sales receipts retained under Section 9.2(d) all expenses, including attorneys' fees, that Company incurs in removing or resolving the Lien.

5.16   Licensee's Obligations. Licensee shall not make any purchase or incur any obligation or expense in the name of Company. Before purchasing anything for the Licensed Business, Licensee shall inform its vendors that Company is not responsible for obligations incurred by Licensee.

## 6.   LICENSED BUSINESS AREA

6.1   Initial Locations.  For any Designated Company Stores where the Licensed Business will be located as of the Effective Date (the "Initial Locations"), and subject to Section 6.6 and any other terms of this Agreement, the Initial Locations will be delivered in "as-is, where-is" condition and Licensee shall build-out the Initial Locations as set forth in Section 6.2 hereof.

6.2   Initial Location and New Location Build-Out.  For the Initial Locations and any Designated Company Stores added by amendment to Schedule 1.1B after the Effective Date ("New Locations"), Company shall submit to Licensee a diagram ("Block Plan") showing the defined area of space to be provided by Company for the Licensed Business (the "Licensed Business Area"). For New Locations, the Licensed Business Area will be comparable to the locations occupied by Licensee in existing stores in that particular format. Licensee is solely responsible for providing final plans for the Licensed Business Area in the Initial Locations and New Locations. Licensee shall bear all costs related to such plans, including blueprints. The expense of preparing the initial space assigned to the Licensed Business in the Initial Locations and New Locations will be allocated between the parties as described on Schedule 6.2. All improvements or installations that vary from Company's standard specifications will be at Licensee's sole expense.

6.3   Improvements. All permanent improvements to the Licensed Business Area become the Company's property at the expiration or termination of this Agreement. At the expiration or termination of this Agreement, or if Licensee vacates or abandons the Licensed Business, Licensee shall convey to Company, without charge, good title to such improvements free from all liens, charges, encumbrances and rights of third parties.

6.4    Commencement of Operations. If the Licensed Business is not fully operational at any Designated Company Store within 30 days after Company has made the Licensed Business area ready for Licensee, Company may, at its option, terminate the location from this Agreement and have no further obligation to Licensee, and Licensee shall reimburse Company within ten days after receipt of an invoice for Company's cost of constructing the Licensed Business Area and of restoring the space back to its condition immediately before the start of construction.

6.5    Condition of Licensed Business Area. Licensee shall, at its expense, keep the Licensed Business Area in a thoroughly clean and neat condition and shall maintain Licensee's Equipment (as defined in Section 8.1) in good order and repair. Company shall provide routine janitorial service in the Licensed Business Area, consistent with the janitorial services regularly performed in the Designated Company Store.

6.6    Changes of Location/Remodeling. Company may, in its discretion, change the location, dimensions and amount of area of the Licensed Business from time to time during the Term, according to Company's judgment of what best serves the general good of the Designated Company Stores. If Company decides to relocate the Licensed Business, Company shall move Licensee's Equipment to the new location and prepare the new space for occupancy by Licensee and the expense will be allocated between the parties as described on Schedule 6.2. If Licensee initiates or requests a change in location, dimensions or amount of space, Licensee shall bear all expense of moving Licensee's Equipment and the parties will share the expense of preparing the new space for occupancy as described on Schedule 6.2.

Licensee shall at its sole expense remodel the Licensed Business Area every five years or when Company remodels the Designated Company Store, whichever is sooner.

6.7    Electric/HVAC. Company shall furnish, at reasonable hours, and except as otherwise provided, without expense to Licensee, reasonable heat, light, air conditioning and electric power for the Licensed Business, except when prevented by strikes, accidents, breakdowns, improvements and repairs to the heating, lighting and electric power systems or by other causes beyond Company's control. Company will not be liable for any injury or damage whatsoever that may arise from Company's failure to furnish such heat, light, air conditioning and electric power, regardless of the cause of such failure. Licensee expressly waives all claims for such injury or damage.

6.8    Telephone Service. Company shall provide Licensee a single telephone line in each Designated Company Store connected to the store's in-house telephone system for use in the Licensed Business and Company will bear the cost of outbound local and toll-free calls and store-compatible phone hardware for Licensee. Company shall pay for installation of the telephone equipment for that service. If Licensee requires additional phone lines to be installed in the Licensed Business locations, Licensee shall arrange and pay for their installation and monthly service. Licensee shall have all long distance service billed directly to Licensee.

6.9    Telephone Numbers. All telephone numbers that Licensee uses in the Licensed Business are Company's property and Licensee shall keep those numbers separate from phone numbers that it uses in its other business operations. Upon expiration or termination of this Agreement, Licensee shall immediately stop using such numbers and shall transfer the numbers to Company (or Company's designee), and Licensee shall immediately inform the telephone company of the transfer.

6.10    Telephone Directory Listings. Licensee shall obtain Company's approval before placing any telephone directory listings for the Licensed Business, whether in the white pages, yellow pages or electronic media, except for listings consisting only of the Licensed Business Name and its address at the Designated Company Store. Licensee shall, if requested by Company, direct any

monthly service fees for a telephone number listed in a telephone directory using any Mark to be billed through a Company store or office.

6.11    Access to Licensed Business Area. Licensee may access the Licensed Business Area whenever the Designated Company Store is open to customers for business and at other reasonable times as the Designated Company Store's General Manager approves. Licensee shall give Company keys to the Licensed Business Area and allow Company access to the Licensed Business Area at all times.

6.12    Effect of Store Leases. If any Designated Company Store is leased to Company or is the subject of an easement agreement, this Agreement is subject to all of the terms and conditions of such lease or easement agreement. If any such lease terminates by expiration of time or otherwise, this Agreement will immediately terminate with respect to the Licensed Business area.

6.13    Waiver of Property Damages. Licensee and Company waive all claims that either may have or acquire against the other and its agents, officers and employees for any property damage occurring at the Designated Company Stores that results from any of the perils described in Section 13.1 (d).

## 7.    PUBLIC COMMUNICATIONS

7.1    Advertising. Licensee shall advertise and actively promote the Licensed Business. Licensee shall at all times adhere to Company's Licensed Business Marketing Manual provided to Licensee, as it may be updated from time to time ("Marketing Manual"). Before using them in connection with the Licensed Business, Licensee shall submit to Company's Marketing Manager, Licensed Businesses (a) all signs and advertising copy (including sales brochures, telemarketing scripts, newspaper advertisements, radio and television commercials and internet advertising), and (b) all promotional plans and devices as approved by the Business Development Director as part of the national marketing plan (including coupons, contests, events and giveaways). Licensee shall not use any such advertising material or promotional plan or device without the Company's Marketing Manager's prior written approval. Company may, in its sole discretion, disapprove or require modification of any advertising or other materials. Company may, upon reasonable notice, audit Licensee's advertising and promotional materials and practices to assess Licensee's compliance with this Agreement, the Marketing Manual and legal requirements.

7.2    Other Publicity. Licensee shall not issue any publicity involving or affecting the Company or the Licensed Business, without the Business Development Director's prior consent, except as required by law. Licensee shall not refer to this Agreement, the Licensed Business or Company in any prospectus, annual report or other filing except to the extent required by Federal or state law or by the U.S. Securities and Exchange Commission. Licensee shall always follow Company's written policies in the Marketing Manual regarding interactions with the media.

7.3    Forms. At Company's request at any time Licensee will provide Company copies of any customer contract forms, warranty or guarantee documentation and other materials used in the Licensed Business. Licensee shall modify such forms within 30 days after receiving Company's written request for such modifications.

## 8.    LICENSED BUSINESS EQUIPMENT

8.1    Licensee's Equipment. At its own expense, Licensee shall install all furniture, fixtures and equipment needed to efficiently operate the Licensed Business ("Licensee's Equipment"). Licensee's Equipment, and its size, design and location, is at all times subject to Company's approval.

8.2 <u>POS Terminal</u>. At its expense, Company shall furnish a point of sale terminal ("<u>POS Terminal</u>") for use in the Licensed Business. Such POS Terminal will be of a size and design satisfactory to Company, in its sole discretion, and at all times remains Company's property. The POS Terminal will be comparable to those used by Company in its own merchandise departments and will have the capability of processing a Sears Card (as defined in <u>Section 9.2</u>) and any other credit cards Company may accept from time to time. Licensee shall immediately return such POS Terminal to Company upon demand. Company may take possession of the POS Terminal at any time without prior notice to Licensee.

## 9. TRANSACTIONS AND SETTLEMENT

9.1 <u>Checks</u>. Licensee shall require all checks that it accepts from customers in Sears-branded Designated Company Stores to be made payable to "Sears" or "Sears, Roebuck and Co.". Licensee shall make certain that all checks are filled out correctly and are processed and approved through the POS Terminal in accordance with Company's policies and procedures in effect from time to time. Company shall guarantee the acceptance of all checks that are processed and approved through the POS Terminal. Licensee shall reimburse Company for the face value any check accepted by Licensee that is not processed and approved through the POS Terminal and is not paid upon presentment ("<u>Dishonored Check</u>"). Dishonored Checks will not be returned to Licensee, and Licensee shall not collect or initiate collection proceedings on any Dishonored Checks nor recover any merchandise purchased with a Dishonored Check. Company is entitled to any Company Fee that is lost due to Licensee's failure to properly process and receive approval for a check. Checks on which a Licensed Business customer stops payment because of a customer satisfaction issue are not Dishonored Checks for purposes of this Section, and Licensee shall reimburse Company the face amount of such checks, but Licensee shall resolve the customer satisfaction issues in accordance with <u>Section 5.7</u> and Licensee may collect any amounts due from the customer through any method of payment otherwise authorized under this Agreement.

9.2 <u>Charge Cards</u>.

    (a) *Sears Card.* Subject to the Citibank Merchant Agreement attached in <u>Schedule 9.2A</u>, Licensee shall accept the SearsCard®, Sears Premier Card®, SearsCharge Plus<sup>SM</sup>, Sears MasterCard®, Sears Gold MasterCard®, Sears Premier Gold MasterCard® and The Great Indoors® Gold MasterCard® (each, a "<u>Sears Card</u>") issued by Citibank and any other credit card hereafter issued by Citibank and bearing Sears' name or a Sears affiliate's name for payment for Authorized Merchandise/Services. Licensee shall submit all Sears Card transactions to Company for settlement in the manner that Company designates. All Citibank-issued card transactions processed through Company's POS system will be settled under <u>Section 8b</u> of <u>Schedule 9.2A</u>. Licensee shall also accept Sears-branded credit cards issued by a Sears-authorized card issuer other than Citibank (also called a "<u>Sears Card</u>"), subject to terms and conditions of the issuer's merchant agreement that are substantially equivalent to those of the Citibank Merchant Agreement.

    (b) *Third Party Credit Cards*. Licensee shall also accept such other credit cards issued by third parties as Company may designate from time to time ("<u>Third Party Cards</u>") subject to the terms and conditions in <u>Schedule 9.2B</u>. Licensee shall bear all losses sustained as a result of any non-payment on a Third Party Card account.

    (c) *Transactions*. Subject to Company's rights under <u>Section 9.6</u> and all other provisions of this Agreement, Company shall pay all sums due Licensee on its sales of Authorized Merchandise/Services to cardholders that are charged to a Sears Card or Third Party Card account ("<u>Credit Card Sales</u>") as stated in <u>Section 9.2(d)</u>. Licensee authorizes Company to accept payments and settlements by issuers for Credit Card Sales on Licensee's behalf,

as appropriate. Licensee shall accept the Sears Card and Third Party Cards for purchases of Authorized Merchandise/Services at all Licensed Business locations, and shall require those transactions to be in United States dollars. Licensee shall not suppress or discriminate against the use of any Third Party Card or the Sears Card by any authorized user of the card. Licensee shall promote the Sears Card as the preferred method of payment, and always suggest its use to Licensed Business customers. Licensee may not distribute or solicit any customer applications or referrals for any Third Party Cards through the Licensed Business. Other than the Sears Card or Third Party Cards, Licensee shall not accept payment from customers under any other credit or financing plan without Company's prior written consent.

(d)     *Settlement*. At the end of each Company fiscal month, the parties shall settle for all Licensed Business transactions during that month, in accordance with Company's customary accounting procedures. For Licensed Business transactions that are processed through Company's POS system, Company will make weekly payments for POS receipts processed in the prior calendar week within the same fiscal month and may retain from such receipts the percentage payable for the Company Fee and the Reserve as provided in Schedule 9.2B. The month-end settlement will include the weekly payment for the last week in the fiscal month, along with the Company Fee and other month-end deductions and reconciliations.

Licensee shall reimburse Company at each settlement for all invoiced expenses, including any advertising expense, that Company has incurred at Licensee's request, and are outstanding at the time of such settlement. If Company is not reimbursed at the settlement, then Company may, but is not obligated to, retain out of Licensee's sales receipts the amount of such expenses with interest, if any, due Company.

9.3     Reports. On a monthly basis, Licensee shall provide Company reports of sales of the Licensed Business and Company Fees paid, together with any other information that Company may reasonably require, in the form requested by Company. On an annual basis, Licensee shall submit its financial report to Company promptly after the close of Licensee's fiscal year. Such report must be audited by a certified public accountant and must include Licensee's profit and loss statement for that fiscal year and balance sheet at the end of the fiscal year, prepared in accordance with generally accepted accounting principles. If Licensee is a publicly held corporation, this requirement may be met by submitting Licensee's Annual Report or Form 10-K. Company shall not disclose to any third parties any such information that is not available to the public without Licensee's prior consent.

9.4     Audit Rights. Licensee shall keep and maintain, in accordance with generally accepted accounting principles, books and records that accurately reflect the Gross Sales and Net Sales of the Licensed Business, Licensee's expenses in performing this Agreement, payment of Company Fees, and Licensee's compliance with its obligations under this Agreement. Company may at any reasonable time audit such books and records, as well as Licensee's compliance with the terms and conditions of this Agreement. Licensee shall, at its expense, implement a program to conduct internal audits of the Licensed Business to verify accuracy of sales and Company Fees. Licensee shall provide Company a copy of the audit program, the audit schedule, and any audit results.

In support of Company's exercise of its audit rights above, Licensee shall provide Company copies of records of the sale of merchandise and services, shipping records, appointment logs and such other records as are equally effective in determining facts relevant to the audit, as requested by Company in connection with such audits; provided that Licensee shall not be required to provide any information to the extent its disclosure is restricted by law; provided that if such information is so restricted, Licensee shall, at its own expense, through its own auditors or outside

auditors, undertake such tests as are necessary to provide Company with assurances that the accounting records sought to be tested by Company are in substantial conformity with GAAP. Licensee shall provide access to such records in a prompt and timely manner to facilitate audits consistent with professional accounting standards, but in any event such records will be available to Company for audit purposes within five days of its request for review, notwithstanding where or by whom such records may be kept.

9.5    Underreporting. If an audit reveals that Gross Sales were under-reported by more than three percent of the total Gross Sales reported by Licensee, then Licensee shall reimburse Company for all costs incurred in performing such audit, and Licensee shall pay to Company Licensee's choice of the following two options:

(a)    Estimated reconciliation, comprising:

(i)    Company Fees on all estimated unreported Gross Sales for each year, as calculated by annualizing the rate by which Gross Sales were under-reported in the audit sample, and

(ii)    an administrative fee calculated by multiplying the annualized underpaid Company Fees by the percentage of under-reported Gross Sales; or

(b)    Verified reconciliation, comprising:

(i)    The cost of a complete audit by Company or its designee of Licensee's books and records relating to Gross Sales for the audit sample year and any other years under this Agreement,

(ii)    Company Fees on all actual unreported Gross Sales as revealed through the audit, and

(iii)    an administrative fee for each year audited, calculated by multiplying the amount of unpaid Company Fees for such year by the percentage by which Gross Sales were under-reported in the audit sample year.

If an audit reveals under-reported Gross Sales, Company may conduct a subsequent audit of Licensee's sales at Licensee's expense approximately one year after the initial audit. If the subsequent audit reveals that Gross Sales were under-reported by more than three percent of reported Gross Sales, Licensee shall pay Company Fees on such Gross Sales as stated above except that, due to the increased expenses incurred by Company in continuing to monitor Licensee's future sales reports, the administrative fee will be doubled.

All under-reported sales equal to or less than three percent of reported Gross Sales will be reimbursed to Company, as appropriate, based on the actual amounts of such under-reports. Further, Company may also collect from Licensee interest on all unpaid Company Fees for the period from the close of the year in which the corresponding sales were made until the date of payment of such Company Fees. Interest will be at the prime rate (as published in the *Wall Street Journal* as of the date of the completion of the audit) plus two percent.

9.6    Rights of Recoupment and Setoff. Company may setoff against any payments due Licensee under this Agreement any liability or obligation that Licensee may have to Company. Licensee must object to such setoff in writing within 15 days of notice of Company's setoff. Licensee shall pay Company any Licensee liabilities or obligations that remain unpaid after Company's setoff promptly upon demand.

9.7    Cardholder Data Security.

(a)    *"Association"* means a group of issuers that has established a joint network processing arrangement to facilitate the use of a particular series of credit cards, such as the systems

operated by MasterCard International, Inc., Visa International, Inc., Visa U.S.A., Inc, Discover Financial Services, LLC, American Express and Payment Card Industry Security Standards Council.

(b)     *"Cardholder Information"* is information related to a cardholder or the cardholder's credit card that is obtained by Licensee in connection with cardholder's use of a credit card (for example a security code, a PIN number, or the customer's zip code when provided as part of an address verification system), whether obtained directly or indirectly by Licensee. Without limiting the foregoing, such information may include a the card account number and expiration date, the cardholder's name or date of birth, PIN data, security code data and any data read, scanned, imprinted, or otherwise obtained from the card, whether printed thereon, or magnetically, electronically or otherwise stored thereon.

(c)     *"Sales Data"* means the evidence and electronic record of Credit Card Sales.

(d)     *"Security Standards"* are all rules, regulations, standards or guidelines adopted or required by the Associations relating to privacy, data security and the safeguarding, disclosure and handling of Sales Data and Cardholder Information, including but not limited to the Payment Card Industry Data Security Standards, Visa's Cardholder Information Security Program, Discover's Information Security & Compliance Program, American Express's Data Security Operating Policy, MasterCard's Site Data Protection Program, Visa's Payment Application Best Practices, the Payment Card Industry's Payment Application Data Security Standard, MasterCard's POS Terminal Security program, American Express Data Security Operating Policy and the Payment Card Industry PIN Entry Device Standard, in each case as they may be amended from time to time.

Licensee acknowledges that to the extent it receives Cardholder Information, Licensee is responsible for the security of such Cardholder Information Licensee possesses.

Without limiting the foregoing, Licensee shall exercise reasonable care to prevent disclosure or use of Sales Data and Cardholder Information, other than (i) to its agents and contractors for the purpose of assisting Licensee or Company in completing Card Sales, (ii) to the applicable Associations, or (iii) as specifically required by applicable law. Licensee is allowed by Security Standards to store only certain Sales Data and Cardholder Information and is prohibited from storing certain Sales Data and Cardholder Information, including, without limitation, any security code data, PIN data and magnetic strip track data. Licensee will store all media containing Sales Data and Cardholder Information in an unreadable format wherever it is stored and in an area limited to selected personnel on a "need to know" basis only. Prior to discarding any material containing Sales Data and Cardholder Information, Licensee will destroy it in a manner rendering the account numbers unreadable. If at any time Licensee determines that Sales Data and Cardholder Information has been compromised, Licensee will notify Company immediately and assist in providing notification to such parties as may be required by applicable law or Security Standards, or as Company otherwise deems necessary. Licensee agrees to comply with all Security Standards and Licensee further agrees to provide Company, upon written request, with such tests, scans and assessments of Licensee's compliance with Security Standards as required by the Associations. Licensee must notify Company of its use of any third party service provider and, to the extent required by each Association, such service providers must be (i) compliant with all Security Standards applicable to them, and (ii) registered with and/or recognized by such Association(s) as being so compliant. Licensee agrees to exercise due diligence to ensure that all of its third party service providers, and any other agents, business partners, contractors, or subcontractors with access to Sales Data and Cardholder Information, maintain compliance with

the Security Standards.  To the extent required by each Association, all payment applications, or software involved in processing, storing, receiving or transmitting of Sales Data and Cardholder Information, shall be (i) compliant with all Security Standards applicable to such payment applications or software, and (ii) registered with and/or recognized by such Association(s) as being so compliant.  Failure to comply with the Security Standards, or the compromise of any Sales Data or Cardholder Information, may result in assessments, fines, and/or penalties by the Associations, and you agree to reimburse Company for any such assessment, fine, or penalty imposed on Company, and any related loss, cost or expense incurred by Company in accordance with the terms of this Agreement.  If any Association requires a forensic examination of Licensee, its affiliates or its service providers, agents, business partners, contractors, or subcontractors due to a data security compromise event or suspected event, Licensee agrees to cooperate with such forensic examination (including, without limitation, the engagement of an examiner acceptable to the relevant Association and Company) and agrees to pay for all costs and expenses related to such forensic examination, including all of Company's attorneys' fees and other costs relating to such forensic examination.  By executing this Agreement, Licensee represents that, in the event of its failure, including bankruptcy, insolvency, or other suspension of business operations, Licensee shall not sell, transfer, or disclose any materials that contain Sales Data or Cardholder Information to third parties. Licensee must provide Company with acceptable proof of its destruction or, upon written request of Company, transfer such information to, or as directed by, Company.

## 10.   CONFIDENTIALITY; CUSTOMER INFORMATION

10.1   Confidential Business Information.

(a)   "Company Confidential Business Information" means any information, whether disclosed in oral, written, visual, electronic or other form, that Company discloses or Licensee observes in connection with Licensee's performance under this Agreement. Company Confidential Business Information includes Company's customer lists, business plans, strategies, forecasts and analyses, financial information, employee and vendor information; software (including documentation and code), hardware and system designs and protocols, product and service specifications, purchasing, logistics, sales, marketing and other business processes, and the terms and conditions of this Agreement.

All Company Confidential Business Information is the sole property of Company. Licensee will claim no rights in any Company Confidential Business Information. Nothing in this Agreement bars Company from preventing any misappropriation of any Company Confidential Business Information, including by Licensee.

(b)   "Licensee Confidential Business Information" means any information, whether disclosed in oral, written, visual, electronic or other form, that Licensee discloses or Company observes in connection with this Agreement. Licensee Confidential Business Information includes Licensee's customer lists, business plans, strategies, forecasts and analyses, financial information, employee and vendor information, software (including documentation and code), hardware and system designs, and protocols, product and service specifications, purchasing, logistics, sales, marketing and other business processes, and the terms and conditions of this Agreement.

All Licensee Confidential Business Information is the sole property of Licensee. Company shall claim no rights in any Licensee Confidential Business Information. Nothing in this Agreement bars Licensee from preventing any misappropriation of any Licensee Confidential Business Information, including by Company.

10.2    Confidential Treatment and Use Restrictions. Company Confidential Business Information and Licensee Confidential Business Information are referred to collectively as "Proprietary Information". The party receiving Proprietary Information (the "Recipient") from the other party (the "Disclosing Party") shall hold the Proprietary Information of the Disclosing Party in utmost confidence and shall not disclose it to any third party. Proprietary Information may be disclosed only to the employees, directors, officers, agents and professional advisers (collectively, "Representatives") of the Recipient who have a need to know that Proprietary Information for performing their duties in connection with this Agreement. The Recipient shall use and reproduce such Proprietary Information only as necessary for performing its obligations under this Agreement. But Proprietary Information is not subject to confidential treatment if it:

(a)    is known by the Recipient, before the first disclosure by the Disclosing Party, without any obligation to hold it in confidence;

(b)    is or becomes available to the public without breach of this Section 10; or

(c)    is independently developed by the Recipient without use of the Disclosing Party's Proprietary Information.

If, in the reasonable opinion of its legal counsel, a Recipient is required to disclose any Proprietary Information of the Disclosing Party in response to a subpoena or order of a court or government agency or other valid legal process, the Recipient shall notify the Disclosing Party in writing a reasonable time prior to disclosure and shall use reasonable efforts to cooperate with the Disclosing Party to enable it to obtain an appropriate protective order or other restrictions on disclosure.

10.3    Confidential Customer Information. All personal and demographic information about Company's individual customers gathered by Licensee in the operation of the Licensed Business, including names, addresses, and telephone numbers, ("Confidential Customer Information") are confidential and owned exclusively by Company.

The following individually-identifiable information regarding Company's customers ("Company Confidential Customer Information") is deemed confidential and owned exclusively by Company and any bank who issues a Sears-branded charge card to such customer:

(a)    all information provided by Company to Licensee,

(b)    all information obtained by Company independently of the operation of the Licensed Business, including customer lists, and

(c)    all financial and transaction information, including account numbers, provided by Licensee to Company in connection with the operation of the Licensed Business.

10.4    Treatment of Confidential Customer Information.

(a)    Licensee shall use or disclose Confidential Customer Information and Company Confidential Customer Information only as necessary to perform its obligations under this Agreement and shall not use the Confidential Customer Information or Company Confidential Customer Information for any other purpose. Licensee shall restrict disclosure of Confidential Customer Information and Company Confidential Customer Information to its Representatives who have a need to know such information to perform under this Agreement and who have first agreed to hold it confidential under this Section 10.4. Licensee is liable for any unauthorized disclosure or use of Confidential Customer Information and Company Confidential Customer Information by any of its Representatives.

14

(b)    Unless otherwise prohibited by law, Licensee shall immediately notify Company of any legal process served on Licensee for the purpose of obtaining Company Confidential Customer Information and shall permit Company adequate time to exercise its legal options to limit such disclosure. Licensee shall implement appropriate measures designed to:

    (i)    ensure the security and confidentiality of Company Confidential Customer Information;

    (ii)    protect against any anticipated threats or hazards to the security or integrity of such information; and,

    (iii)    protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to the person about whom the Company Confidential Customer Information refers.

(c)    Within ten days after expiration or termination of this Agreement, Licensee shall, upon Company's request, return the Company Confidential Customer Information to Company or certify in writing to the Company that all Company Confidential Customer Information has been destroyed in such a manner that it cannot be retrieved.

(d)    Licensee shall notify Company promptly upon discovering any loss, unauthorized disclosure, unauthorized access, or unauthorized use of Company Confidential Customer Information, and shall indemnify Company and hold Company harmless for such loss, unauthorized disclosure, unauthorized access, or unauthorized use, including attorney's fees.

(e)    Licensee shall permit Company to audit Licensee's compliance with the provisions of this Section 10.4, as they apply to the Company Confidential Customer Information, at any time during Licensee's regular business hours.

(f)    In addition to any other rights Company may have under this Agreement or in law, since unauthorized use, access, or disclosure of the Company Confidential Customer Information may result in immediate and irreparable injury to Company for which monetary damages may not be adequate, if Licensee or any of its officers, directors, employees, agents or subcontractors uses or discloses or in Company's sole opinion, any such party is likely to use or disclose the Company Confidential Customer Information in breach of Licensee's obligations under this Agreement or, in Company's sole opinion there has been a breach to the security, confidentiality, or integrity of the Company Confidential Customer Information, Company will be entitled to equitable relief, including temporary and permanent injunctive relief and specific performance. Company will also be entitled to recover any pecuniary gain realized by Licensee from the unauthorized use or disclosure of the Company Confidential Customer Information.

(g)    Licensee shall provide a complete set of all Company Confidential Customer Information to Company within ten days of Company's request, at any time during the Term, and regardless of Company's request, at least twice a year, at May 31 and November 30. The information will be provided in format reasonably accessible by Company using a commonly used, commercially available database program, and will include field structure and metadata necessary to retain the data structure and fields information.

**11.**    **RELATIONSHIP OF PARTIES.**    Licensee is an independent contractor. Neither this Agreement nor the parties' actions under this Agreement will be construed as creating a partnership, agency or joint venture; and neither party will become bound by any representation, act or omission of the other party. Licensee shall not file suit using name of any Company entity.

## 12.   DEFENSE AND INDEMNITY

12.1   Defense. Licensee shall defend all allegations asserted by any third party in any claim, action, lawsuit or proceeding (even though such allegations may be false, fraudulent or groundless) against Company, its affiliates and subsidiaries or their respective directors, officers, employees, agents and independent contractors (collectively, the "Indemnified Parties") arising out of any of the following (collectively, the "Claims"), whether actual or alleged and whether or not Licensee's indemnity obligations under Section 12.2 apply:

(a)   personal injury or death of any person, damage to any property or any other damage or loss alleged to result from the operation of the Licensed Business, including goods or services offered or sold through the Licensed Business; equipment, vehicles or supplies used in the Licensed Business; lack of repair or defects in or about the Licensed Business Area or in any of Licensee's equipment or furnishings;

(b)   infringement or misappropriation of any patent or claim of patent, copyright, trademark, service mark, trade name, trade dress, trade secret, right of publicity or other proprietary right used in connection with the Licensed Business or otherwise used by Licensee (including allegations relating to the Licensee Marks but excluding allegations relating to the Company Marks);

(c)   advertising or trade practices done in connection with the Licensed Business, or otherwise engaged in by Licensee, including claims of false advertising, consumer deception, fraud and unfair competition;

(d)   relations between Licensee and any of Licensee's employees, agents or subcontractors or any customer of the Licensed Business, including claims of wrongful termination, discrimination, harassment and refusal of benefits or services;

(e)   any allegations of employment or co-employment relationships involving Licensee, any of Licensee's employees, agents or subcontractors, and Company, or any combination of the foregoing, including claims of wrongful termination, discrimination, harassment including claims of wrongful termination, discrimination, and harassment arising out of an employment or co-employment relationship;

(f)   Licensee's breach of any of its obligations undertaken or warranties made in this Agreement; or

(g)   the omission or commission of any act, lawful or unlawful, by Licensee, its affiliates and subsidiaries or their respective directors, officers, employees, agents or independent contractors, whether or not such act is within the scope of the authority or employment of such persons.

Licensee shall use counsel satisfactory to Company in the defense of all Claims. Company may, at its election, take control of the defense and investigation of any Claims and may engage attorneys of its own choice to manage and defend such Claims, at Licensee's risk and expense, and Company and its counsel shall proceed with diligence and good faith in doing so. Licensee must obtain Company's prior written approval before settling any Claim involving Company.

12.2   Indemnity. Licensee shall hold harmless and indemnify the Indemnified Parties against all claims, demands, actions, lawsuits, proceedings, liabilities, losses, costs and expenses (including fees and disbursements of counsel) incurred by an Indemnified Party in connection with any Claims. This Section 12.2 does not apply to the extent any injury or damage is determined to have been caused solely by Company's negligence or willful misconduct.

## 13.   INSURANCE

13.1    <u>Types of Insurance</u>. Licensee will, at its own expense, obtain and maintain the following insurance:

    (a)    Commercial General Liability, with coverage including, but not limited to, premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of at least $1,000,000 per occurrence for bodily injury and property damage combined and at least $2,000,000 aggregate per location. Company shall be named as an additional insured, with the standard "separation of Insureds" provision or an endorsement for cross-liability coverage. The policy shall be endorsed to state that coverage is primary, and non-contributory with other available coverage. Limits of liability requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

    (b)    Automobile Liability insurance for owned, non-owned and hired vehicles, with limits of at least $1,000,000 per occurrence for bodily injury and property damage combined. If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles in lieu of separate Automobile Liability insurance. Limits of liability requirements may be satisfied by a combination of Automobile Liability and Umbrella Excess Liability policies.

    (c)    Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Licensee, for all states in which the Licensee will perform services for Company, and Employer's Liability insurance with limits of liability of at least $100,000 per accident or disease and $500,000 aggregate by disease. Licensee warrants that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Licensee shall indemnify Company for any loss, cost, liability, expense and/or damage suffered by Company as a result of failure of its subcontractors to maintain such insurance. Licensee further warrants that, if a subcontractor does not maintain Workers' Compensation insurance, Licensee's Workers' Compensation insurance shall insure the subcontractor.    Licensee may self-insure Workers' Compensation only in states where the governing state bureau has issued to the Licensee a qualified self-insurance license for Workers' Compensation.

    (d)    "All Risk" Property Insurance upon all buildings, building improvements, furniture, fixtures and merchandise on the premises, including those perils generally covered on a "Causes of Loss - Special Form," including fire, extended coverage, windstorm, vandalism, malicious mischief, sprinkler leakage, water damage, accidental collapse, flood, and earthquake, in an amount equal to at least 90% of the full replacement cost.

    (e)    Bailee's insurance for customer property in Licensee's care, custody or control, in an amount equal to the maximum value, at any one time, of such property.

Insurance shall be purchased from companies rated A-VII or better in the current *Best's Insurance Reports* published by A.M. Best Company.

13.2    <u>No Cancellation Without Notice</u>. Insurance policies shall not be canceled or materially changed without at least 30 days' prior written notice to Company, Licensed Business Insurance Certificates, 3333 Beverly Road, A2-379B, Hoffman Estates, IL 60179, or other address notified by Company.

13.3    <u>Certificates.</u> Evidence of insurance shall be submitted in advance of or concurrent with the execution of this Agreement, on each insurance policy renewal thereafter, and annually for two (2) years after this Agreement ends. If Licensee does not provide Company with such evidence of insurance or, in Company's opinion, such policies do not afford adequate protection for

Company, Company will so advise Licensee, but Company's failure to do is not a waiver of these insurance requirements. If Licensee does not furnish evidence of acceptable coverage within fifteen (15) days, Company shall have the right, in its sole discretion, to withhold payments from the Licensee until evidence of adequate coverage is provided, or immediately terminate this Agreement.

13.4    Expiration/Non-Renewal. Licensee shall promptly notify Company if any of Licensee's insurance policies expire, are canceled, or are materially modified during the Term. If Licensee's insurance policies are materially modified such that, in Company's opinion, those policies do not afford adequate protection to Company, Company will so advise Licensee. If Licensee does not furnish evidence of acceptable replacement coverage within 30 days after the expiration or cancellation of coverage or Company's notification that modified policies are not sufficient, Company may immediately terminate this Agreement.

13.5    No Waiver. Failure to obtain and maintain required insurance or failure by Company to notify Licensee shall not relieve Licensee of any obligation contained in this Agreement. Additionally, any approval by Company of any of Licensee's insurance shall not relieve Licensee of any obligation contained in this Agreement, including for liability for claims in excess of described limits.

## 14.    TERMINATION

14.1    Termination for Convenience.  Company may terminate this Agreement upon 30 days prior written notice to Licensee.

14.2    Termination by Company on Notice. Company may terminate this Agreement effective upon written notice to Licensee if any of the following defaults occurs:

    (a)    Licensee has experienced a Change in Control (as defined in Section 15.1) to which Company has not consented;

    (b)    a petition is filed either by or against Licensee in any bankruptcy or insolvency proceeding, or any property of Licensee passes into the hands of any receiver, assignee, officer of the law or creditor; or

    (c)    Licensee materially misuses or makes an unauthorized use of any Mark.

Company may also terminate any Licensed Business location effective upon delivery of written notice to Licensee if Licensee abandons, fails to actively operate or fails to commence operation of the License Business at a Designated Company Store as required by Section 6.4.

14.3    Termination by Company after Opportunity to Cure. Company may terminate this Agreement immediately upon written notice to Licensee if Licensee:

    (a)    fails to pay any Company Fees or any other amounts due Company, and does not correct that failure within ten days after receipt of written notice of the failure;

    (b)    breaches any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by Company and does not correct such breach within 30 days after receipt of written notice of the failure;

    (c)    Licensee or any director or officer of Licensee is convicted of or pleads no contest to a felony, or engages in any conduct that is likely to adversely affect the reputation of Licensee, the Licensed Business or Company;

    (d)    Licensee makes any unauthorized use, duplication or disclosure of Company Confidential Business Information or Company Confidential Customer Information; or

    (e)    Licensee fails to carry insurance coverage as required in <u>Section 13</u> and does not correct such failure within ten days after receipt of written notice of such failure.

14.4    <u>Termination by Licensee after Opportunity to Cure</u>.  Licensee may terminate this Agreement immediately upon written notice to Company if Company:

    (a)    fails to pay any amounts due Licensee, and does not correct that failure within 60 days after receipt of written notice of the failure; or

    (b)    breaches any other provision of this Agreement and does not correct such breach within 60 days after receipt of written notice of the failure.

14.5    <u>Termination on Store Closing or Casualty</u>. Company may, in its sole discretion, terminate this Agreement as to any affected Licensed Business location, without notice to Licensee, due to the closing of the Designated Company Store. Licensee is not entitled to any notice of such store closing before a public announcement of the closing. Licensee waives any claim against Company for damages, if any, resulting from the closing.

If any Designated Company Store is damaged by fire or any other casualty that renders the Licensed Business area untenantable, either party may terminate this Agreement as to that Licensed Business location, without penalty and without liability for any damages as a result of such termination, effective as of the date of the casualty, by giving written notice of termination within 20 days after the casualty. If such notice is not given, then this Agreement will not terminate, but will remain in full force and effect and the parties shall cooperate with each other so that Licensee can resume operating the Licensed Business as soon as possible.

14.6    <u>Effect of Termination</u>. Upon expiration or termination of this Agreement,

    (a)    Each party shall promptly pay all amounts owed to the other;

    (b)    Each party shall cease use of all Licensed Business Marks and each other's Marks, and Licensee shall immediately cease use of all Company Proprietary Information;

    (c)    License shall, at its expense, immediately remove all of Licensee's Equipment from Company's premises and promptly repair any damage to Company's premises caused by such removal, and Company shall reasonably cooperate with such removal efforts; and

    (d)    The parties shall return the Licensed Business Area to its condition when Company made it ready for use by Licensee, with costs allocated as stated in <u>Schedule 6.2</u>.

## 15.    ASSIGNMENT AND SUBLICENSING.

15.1    <u>Assignment by Licensee</u>. Regardless of any other provision in this Agreement, Licensee may not assign, transfer, sublicense or convey any of its rights or obligations under this Agreement in whole or in part, without Company's prior written consent. Any Change in Control of Licensee constitutes an assignment of this Agreement, for which Company's prior written consent is required. Any attempted assignment, transfer, sublicense, conveyance or Change in Control without Company's prior written consent is void.

For purposes of this Agreement, a "<u>Change in Control</u>" means an asset sale, merger, consolidation, or any other transaction or arrangement the effect of which is that 50% or more of the total voting power entitled to vote in the election of Licensee's board of directors is held by a person or persons other than the shareholders of Licensee, who, individually or as a group, held 50% or more of such voting power immediately prior to such event.

15.2    <u>Assignment by Company</u>. Company may assign any of its rights and obligations under this Agreement to any other party.

15.3   Binding Nature.  This Agreement is binding upon Licensee and its successors and permitted assigns and will bind and inure to the benefit of Company and its successors and assigns.

## 16.   MISCELLANEOUS.

16.1   Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Illinois without reference or regard to conflict of law provisions or other laws of any jurisdiction that would cause the application of the laws of any jurisdiction other than the State of Illinois.

16.2   Jurisdiction and Venue. Licensee irrevocably submits to venue and exclusive personal jurisdiction in the federal and state courts in Cook County, Illinois for any dispute arising out of this Agreement, and waives all objections to jurisdiction and venue of such courts.

16.3   Notices. Notices under this Agreement are sufficient if given by nationally recognized overnight courier service, certified mail (return receipt requested), facsimile with electronic confirmation or personal delivery to the other party at the address below:

|  |  |
|---|---|
| If to Company: | Sears Holdings Management Corp.<br>3333 Beverly Road, Mail Station: A2-374B<br>Hoffman Estates, Illinois 60179<br>Attn.: Business Development Director<br>Facsimile: (847) 286-0224 |
| With a copy to: | Sears Holdings Management Corp.<br>3333 Beverly Road, Mail Station: B6-350A<br>Hoffman Estates, Illinois 60179<br>Attn.: Senior Counsel, Licensed Businesses<br>Facsimile: (847) 286-3363 |
| If to Licensee: | Mr. Larry Williams<br>Action Time, Inc.<br>20283 SR 7, Suite 300<br>Mission Bay Office Plaza<br>Boca Raton, FL 33498 |

Notice is effective: (i) when delivered personally, (ii) three business days after being sent by certified mail, (iii) on the business day after being sent by a nationally recognized courier service, or (iv) on the next business day after it is sent by facsimile with electronic confirmation to the sender. A party may change its notice address by giving notice in accordance with this Section 16.3.

16.4   Severability. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the extent that they are enforceable.

16.5    No Waiver. A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right hereunder. Any waivers granted under this Agreement are effective only if recorded in a writing signed by the party granting the waiver.

16.6    Cumulative Rights. The rights and remedies of the parties under this Agreement are cumulative, and either party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity.

16.7    Construction. The Section headings of this Agreement are for convenience only and have no interpretive value. This Agreement may be executed in counterparts, which together will constitute one and the same agreement. In this Agreement, "including" and similar words (e.g., "to include") means "including but not limited to".

16.8    Survival. All provisions in this Agreement that must survive its termination or expiration in order to give full effect to their language will so survive, including Sections 4, 9.7, 10, 12, and 16.

16.9    Entire Agreement; Modifications. This Agreement, including all Schedules referred to herein, which are incorporated by this reference, constitute the complete and final agreement of the parties pertaining to the Licensed Business and supersede all of the parties' prior agreements, understandings and discussions relating to the Licensed Business. No modification of this Agreement is binding unless it is in writing and signed by Company and Licensee.

*[Signature page follows]*

Signed, by the parties' duly authorized representatives as of the Effective Date.

**Action Time, Inc.**
**d/b/a Sears Watch and Jewelry Repair**
as Licensee and as Merchant under <u>Schedule 9.2A</u>

By: _____

Its: President          6/12/2012

**SEARS HOLDINGS MANAGEMENT CORP.**, as
agent of Sears, Roebuck and Co. as Company and of
Citibank South Dakota, N.A. as Acquirer under
<u>Schedule 9.2A</u>

By: _____

Its: Vice President, Licensed Businesses

## SCHEDULE 1.1A

### AUTHORIZED MERCHANDISE/SERVICES

The following items, merchandise lines and/or services are authorized for sale by Licensee in the Licensed Business:

**Watches**
1. Battery Replacement, installation and adjustment
2. Band Replacement, installation and adjustment
3. Stem and crown replacement, installation and adjustment
4. Watch crystal replacement, installation and adjustment
5. Cleaning and overhaul
6. Dial refinishing
7. Quartz conversion
8. Any other repair or service relating to watches and other personal time pieces

**Clocks**
1. Clock movement exchange
2. Battery Replacement
3. Cleaning and overhaul
4. Dial refinishing
5. Quartz conversion
6. Any other repair or service relating to clocks

**Fine Jewelry**
1. Ring guards
2. Ring sizing
3. Prong repair
4. Gold chain repair (including soldering)
5. Jewelry cleaning, polishing, restoration and overhaul
6. Remounting of precious stones
7. Restringing of pearls
8. Any other repair or service relating to fine jewelry

**Miscellaneous**
1. Keys and key duplication
2. Engraving and engravable product
3. Bronzing of customer goods
4. Silver-plating of customer goods

**Watch and Clock related**
1. Replacement watch bands (metal, leather, vinyl, and rubber)
2. Replacement batteries (only for watches and clocks)
3. Pocket watch chains and domes
4. Travel clocks
5. Wall clocks
6. Miniature and collectible table clocks
7. Sports/team officially licensed wall and table clocks (NFL, NBA, NHL, MLB, college)
8. Watch/Jewelry related collectibles
9. Grand Father Clocks
10. Table clocks, mantle clocks
11. Alarm Clocks

**Fine Jewelry Related**
1. Jewelry cleaning machines
2. Jewelry care products
3. Non-competing charms, ID bracelets and medical bracelets
4. Estate Jewelry / Trunk Shows
5. 10k/14k Findings
6. Non-competing religious items

**Miscellaneous**
1. Lighters and related accessories
2. Swiss Army knife Gift Sets
3. Mag Light Gift Sets
4. Replacement Batteries (for photo, auto security, remote keyless entry and hearing aids: all of which only when not available in the Sears retail store or Hearing Aid Licensed Business)
5. Writing instruments and accessories
6. Silver Care products
7. Magnifying glasses
8. Non-competing gifts and novelties
9. Keys. Sears will approve Licensee carrying and cutting keys based upon Licensee agreeing to the following terms: Keys may not be carried in any location that has an existing key shop on Sears Store premises. Keys may only be carried in Watch and Jewelry Service locations that reside within a licensed business core or have hard-line department adjacency. Keys may not be carried in any location that sits in or adjacent to the apparel floor, outside of a licensed business core. Operating the key business within a licensed business core is contingent upon the key service not having a negative impact from noise on an adjacent business, such as Hearing Aids or creating a negative image to our customers from noise such as apparel. Keys may not be located on the front sales counter. Key displays and cutting equipment must be positioned on the back wall of a Watch and Jewelry Service location or where available in the work room or repair area of the department. Notwithstanding the foregoing, computer-operated, enclosed key cutting systems such as provided by the Hillman Group may be operated in the selling area, where appropriate, with consent of Designated Sears Store manager and Business Development Manager.
10. Engraving and Engravable Product. Sears will approve Licensee to provide engraving services based upon Licensee agreeing to the following terms: Except as provided below, engraving may only be offered in Watch and Jewelry Service locations that have a separate work room or repair area that is not exposed to the sales floor. Any engraving equipment must be stored and operated within such work room or repair area. Notwithstanding the preceding two sentences, computer-operated, enclosed engraving systems such as the "QuickScribe" system by the Hillman Group may be operated in the selling area. Engravable product to be offered for sale must fall into the authorized merchandise categories listed above.
11. Name plate/Door plates

Exceptions:
1. Licensee may sell jewelry and watches at the Designated Company Store #1555 located in Sanford, FL only but at no other locations.

24

## SCHEDULE 1.1B

## DESIGNATED COMPANY STORES

| Store # | Location |
|---------|----------|
| #1006 | Ocala, FL |
| #1055 | Coral Springs, FL |
| #1075 | Daytona Beach, FL |
| #1077 | Brandon, FL |
| #1125 | Coral Gables, FL |
| #1195 | Ft. Lauderdale, FL |
| #1205 | Pompano Beach, FL |
| #1295 | St. Petersburg, FL |
| #1345 | Hialeah, FL |
| #1365 | Cutler Ridge, FL |
| #1495 | Ft. Myers, FL |
| #1535 | Plantation, FL |
| #1555 | Sanford, FL |
| #1625 | Sarasota, FL |
| #1645 | Boca Raton, FL |
| #1745 | Tampa, FL |
| #1755 | Boynton Beach, FL |
| #1775 | Pembroke Pines, FL |
| #1955 | Lakeland, FL |
| #2695 | Naples, FL |
| #2745 | Leesburg, FL |

**SCHEDULE 3.1**

<u>COMPANY FEES</u>

For any New Locations or in-store relocations, Company Fees shall commence no later than thirty days after the Licensed Business Area is available for use by the Licensee.

The Company Fees shall be calculated as follows:

Licensee shall pay Company a monthly fee of 20% of the Net Sales.

<u>Net Sales</u>. "<u>Net Sales</u>" means Gross Sales from operation of the Licensed Business, less sales taxes, returns, allowances and discounts.

<u>Gross Sales</u>. "<u>Gross Sales</u>" means all of Licensee's direct and indirect sales of merchandise and services from the Licensed Business, including sales from referrals, contacts, or recommendations obtained through the operation of the Licensed Business.

**PAYMENT DUE DATE AND MAILING ADDRESS INFORMATION**:

Licensee shall ensure that payment for the fees set forth above, reimbursement for all invoiced expenses incurred by Company at Licensee's expense, and any other sums due Company from Licensee, arrive at the Company address set forth immediately below on or before the 10th day of each Company fiscal month:

> Sears Holdings Management Corp.
> Licensed Businesses
> Attn: Finance Manager
> 3333 Beverly Road
> A2-384B
> Hoffman Estates, Il 60179
>
> With email copies to:
>
> lbsears@searshc.com
> Ting-Ting.Yu@searshc.com

Company shall provide Licensee a copy of Company's fiscal calendar. For any payment not received by the 10th of each Company fiscal month, Licensee will pay Company an administrative fee equal to five percent (5%) of the payment.

## SCHEDULE 4.3

### LICENSEE MARKS

Licensee claims ownership rights in the following trademarks and/or service marks for the following classes of goods or services:

Mark                                                         Class of Goods/Services

[Licensee to provide list.]

## SCHEDULE 5.13
### Disability Access Guidelines

The Americans with Disabilities Act and its supporting regulations and guidelines ("ADA"), as well as analogous state and local laws, impose affirmative obligations on retailers (including Company and Licensee) to make their products and services equally available to persons with disabilities. Among other things, this means that retailers must avoid erecting physical barriers to access, make reasonable efforts to remove any such barriers, and reasonably modify their practices and procedures if modifications will allow access to persons with disabilities.

**Physical Barriers to Access**

Licensee must meet all of the requirements of the ADA and other disability laws. Some requirements that may arise in the Licensed Business Area include, but are not limited to:

·   Maintain at least 36 inches width in the path of travel to, from and within the Licensed Business Area. This also means that objects placed in the Licensed Business Area should not obstruct a minimum 36-inch path of travel for disabled customers in the portion of the Company store next to the Licensed Business Area.

·   Maintain adequate clear floor space to, from and within the Licensed Business Area to allow for wheelchair maneuvering, including to allow customers using wheelchairs or scooters to roll up to sales and service counters or tables.

·   Maintain a sales counter at which transactions are made that is at least 36 inches long, no more than 34 inches high, and deep enough to allow a disabled customer to sign for a purchase or otherwise transact business on the counter top.

·   Seating at tables at which goods or services are displayed, demonstrated or sold must have knee clearance under the table that is at least 27 inches high, 30 inches wide, and 19 inches deep. Table tops must be from 28 to 34 inches high.

·   Place merchandise and other items for use by disabled customers so that disabled customers can reach them by a forward or side reach from a seated position in their wheelchairs. If there is adequate maneuvering room for merchandise or other items to be approached from the side, the items must be placed no lower than 9 inches and no higher than 48

inches above the floor. If only a forward approach is available, the items must be placed no lower than 15 inches and no higher than 48 inches above the floor.

**Reasonable Modifications of Practices and Procedures**

Licensee may also need to use different practices and procedures from those that it uses with other customers in order to accommodate customers with disabilities. Here is a partial list of examples of modifications that Licensee may need to make under the ADA and analogous laws:

·   Assisting disabled customers in reaching for or demonstrating use of merchandise.

·   Exchanging written notes to allow for dialogue with deaf, hard of hearing or mute customers. In those customer interactions that typically require more extensive dialogue with customers, Licensee may need to provide a certified sign language interpreter at its own expense and without passing on that expense to the disabled customer.

·   Reading aloud from product labels or descriptions for blind or sight-impaired customers.

·   Counting out different denominations of currency when making change for blind or sight-impaired customers.

·   Keeping aisles and other paths of travel free from temporary barriers or merchandise.

*For help in understanding the requirements set forth above and for more details on Licensee's full obligations under the ADA and analogous state and local laws, please consult with counsel or disability access experts.*

**SCHEDULE 6.2**

## INITIAL LOCATION AND NEW LOCATION BUILD-OUT AT DESIGNATED COMPANY STORE

Company shall be responsible for the following in the construction of an On-Premises Location, including Additional Locations, at a Designated Company Store:

        a.   If required by Company, perimeter walls, painted standard store colors;

        b.   Floor covered by standard store carpet/tile;

        c.   Ceiling containing standard store lighting; and

        d.   Standard electrical outlets.

Licensee shall be responsible for all other costs and expenses, including but not limited to furniture, fixtures, equipment, displays, cabinets, counters, shelving,  and other such items. Licensee shall also be responsible for construction and maintenance of any non-standard walls, wall coverings, floor coverings, ceilings, lighting, electrical and data lines within the Licensed Business Area.

## EXPIRED, TERMINATED, VACATED, OR ABANDONED LICENSED BUSINESS LOCATION

If a Licensed Business location expires or is terminated, vacated or abandoned, Licensee shall at its expense within 21 days of expiration, termination, vacation or abandonment, remove all Licensee's Equipment, signs and non-permanent fixtures.  Licensee shall cap all gas, electrical and plumbing lines and disconnect all telephones.  Licensee shall remove all department signs, and repair and repaint all walls and ceiling areas within 21 days of the expiration or termination date, remove its equipment and fixtures (e.g., counters, cabinets, sinks and plumbing, etc.), repair all wall, ceiling, and floor surfaces (including but not limited to carpeting) of holes, cut-outs, and damage, to reasonably match their surrounding finish, and otherwise restore the premises to a usable condition. The Licensed Business Area shall be vacated in a "broom-clean" condition.

## SCHEDULE 7.1
## MARKETING PROGRAM

Marketing.
At least two times per year, Licensee shall prepare for Company's review a high level overview of Licensee's merchandise and strategy.

## SCHEDULE 9.2A

## CITIBANK MERCHANT AGREEMENT
## SEARS CARD CONDITIONS

Dated _____, 20__

_____ ("Merchant") with a place of business at _____, and CITIBANK SOUTH DAKOTA, N.A. ("Citibank"), in consideration of their respective covenants, agree that Merchant will honor certain Sears branded consumer cards ("Sears Cards") in connection with its sales and leases of goods and services, Citibank will render services and extend credit to Merchant in connection with such Sears Card transactions and the proceeds thereof, and Merchant will compensate Citibank therefore, all in accordance with the terms and conditions set forth below and in the annexed Exhibits, Citibank's Rules (as defined below) in effect from time to time, the other related documents referred to herein and any amendments or supplements hereto or thereto (collectively "this Agreement").

1.      Honoring and Advertising Certain Sears Cards.

(a)     Merchant undertakes to honor valid Sears Cards issued by Citibank and its affiliates, in accordance with the other provisions of this Agreement and the Sears Merchant Operating Rules and Regulations ("Rules") as outlined in Exhibit A.  Merchant may honor cards of other issuers in accordance with its agreements with the relevant issuer or the issuer's association not in conflict with this Agreement. In honoring cards, Merchant will not discriminate against Sears Cards and will not charge its customers using a Sears Card a surcharge over its regular price for the goods or service (unless a surcharge is specifically authorized by law).

(b)     If Merchant has physical sales locations where Merchant accepts Sears Cards in payment of purchases, Merchant will display at each sales register as directed by Sears the logo of Sears Cards and promotional materials related to the Sears Cards provided by Citibank or Sears, Roebuck and Co. ("Sears"), or by others with the approval of Citibank or Sears, indicating that such Sears Cards will be honored.  Merchant will also inform the customers, as directed by Sears, that such Sears Cards will be honored in connection with all mail, electronic or telephone sales, by including the logos of the Sears Cards in all catalogues, direct mail solicitations and internet sites, or orally in the case of telephone sales. Merchant will also display logos and materials for Sears Cards at each other place in its premises at which the logos or materials of any other card are displayed.  Merchant will include the name or logo of the Sears Cards in all advertising in any media in which the names or logos of other credit or debit cards are mentioned.  In all of the above situations each such Sears Card logos will be given at least equal prominence with any other card honored, provided that in advertising for which another card issuer pays a substantial portion of the cost, such card issuer may be given greater prominence so long as the above Sears Cards are not excluded.  Merchant's advertising will not indicate or imply that any of the above card associations endorses Merchant's goods or services.

(c)     Merchant authorizes Citibank to include Merchant's name in any listing or advertising of merchants which honor the above Sears Cards or which use Citibank's services, provided that Merchant shall have the right of prior approval of any advertising that features the name or trade name of Merchant exclusively or in a limited group of merchants.

2.      Citibank Services.

(a)      Subject to Merchant arranging for an acquirer mutually agreeable to the parties ("Acquirer"), Citibank will provide the following services:    Merchant authorization, transaction submission and settlement services, for customer transactions with Merchant, as described in this Agreement.  If Merchant does use an Acquirer, Merchant agrees it will not change Acquirers during the term of this Agreement without Citibank's prior written consent.  Unless otherwise agreed by the parties, Merchant is responsible for all Acquirer service fees.

(b)      Subject to Merchant utilizing an Acquirer, Citibank will also provide authorization and transaction submission services for transactions involving the use of other cards if the issuer or its association has consented to such an arrangement in writing and makes available suitable facilities for obtaining authorizations and the submission and receipt of transaction records electronically and otherwise and if the costs to Citibank are comparable to its costs for providing such services for Sears Card transactions.

3.      Transactions.

(a)      A transaction or proposed transaction may be submitted to Citibank or Acquirer for authorization, transmission or settlement only if it is either:

(i)      a payment for a bona fide sale or lease of goods or services or both by Merchant to a customer, which does not involve, directly or indirectly, a cash advance to the customer, or

(ii)      a refund or adjustment of such a transaction, which does not involve, directly or indirectly, a cash payment by the customer to Merchant.

(b)      When entering into each transaction, Merchant shall comply in all respects the Rules then in effect, including the creation of one or more records (each a "Record") relating to customer's account with Citibank, generally representing either:

(i)      an order by the customer to Citibank to make a payment to the Merchant, including an electronic order (a "Sales Draft"), or

(ii)      an order by the Merchant to Citibank to credit the customer's account with Citibank, including an electronic order (a "Credit Slip").  Neither the transaction nor the Record shall create or evidence an account between the customer and the Merchant.  Each Record may be in electronic or paper form, or both, but Merchant shall prepare and deliver to the customer a paper copy or counterpart of each Record to the extent required by law or good business practice.

4.      Authorizations.  Prior to concluding each transaction, Merchant will obtain an authorization for the transaction from Citibank, as provided in the Rules.  Merchant will request such authorizations through Citibank or Acquirer and Citibank will report the authorization or denial to Merchant using the systems as described in the Rules.

5.      Equipment; Software.  Merchant will at its own expense supply and utilize at each of Merchant's locations equipment for electronically requesting, receiving and recording authorizations through Citibank or Acquirer and/or creating Records and/or transmitting Records to Citibank, compatible with Citibank or Acquirer's equipment and systems.  If Citibank or its agents supply to Merchant software for use in connection with the equipment or services provided hereunder, to the extent such software is not separately licensed by the manufacturer or distributor thereof, Citibank hereby grants Merchant a non-exclusive, non-transferable license to use such software pursuant to this Agreement.  Merchant agrees not to reverse-engineer, disassemble or decompile any such software, and to return to Citibank all copies of such software upon the termination of this Agreement.  The parties will negotiate in good faith any changes in the equipment or software which may be appropriate to utilize technological advances or

accommodate to legal changes or marketing developments, and the allocation of the cost of making such changes.

6.      Presentation and Retention of Records.

(a)      Merchant will present to Citibank or Acquirer a Record of each transaction (e.g. a Sales Draft or a Credit Slip) at the close of each business day on which the transaction is made, using the systems described in the Rules. Merchant will or will cause Acquirer to transmit such Record promptly to the Citibank or its affiliate, at the times and in accordance with the procedures detailed in the Rules. Merchant will provide a copy of such Record to the customer.

(b)      Merchant will retain the original or Merchant's copy of the documentation (including but not limited to the Record, which may be in electronic form if the transaction was effected electronically via the world wide web or other electronic medium) for each transaction for six months, and copies thereof for at least three years, and make such available to Citibank on reasonable notice.

7.      Chargebacks.

(a)      Merchant acknowledges that Citibank and its affiliates have reserved the right to reject, refuse to pay and/or return and charge back transactions for various reasons including but not limited to irregularities in the documentation, failure to follow proper procedures for obtaining authorization or avoiding fraudulent or over-limit transactions, merchant-employee fraud and merchant/customer disputes, all as set forth in the Rules. Citibank shall have the right to charge to Merchant immediately the full amount of any transaction (including transactions which Citibank has previously settled with Merchant) as detailed in the Rules (all such actions being collectively called "Chargebacks").

(b)      If Merchant desires to correct any deficiency and resubmit a transaction, or to dispute any Chargeback with the Citibank, it shall follow the procedures set forth in the Rules.

(c)      Citibank has the final decision regarding those Type Three Chargebacks as described in the Rules.

8.      Settlement.  Settlement rules differ by Merchant type as follows:

(a)      For Merchants settling with Citibank or Citibank designate as outlined ("Direct Merchants"):

(i)      Settlement Timing. On the second Business Day after each day on which Citibank receives from Merchant or Acquirer any Records of transactions on Sears Cards, Citibank will credit to the Merchant checking account as specified in the merchant application (the "Account"), the aggregate amount of all Sales Drafts so received and settled by Citibank since the previous settlement, unless otherwise specified in Exhibit B. A separate debit will be posted for any Chargebacks or adjustments received. A separate debit will be posted for all interchange fees charged by Citibank on such transactions, and any discount, fees and/or service charges due to Citibank under the Pricing Schedule as outlined in Exhibit B, will be debited on the second Business Day after month end, if applicable. For purposes of this Agreement, "Business Day" means the days the Federal Reserve Bank is open.

(ii)      Direct Merchant's Designated Bank Account.  Merchant authorizes Citibank and the Merchant's depository institution ("the Bank") to credit to the Account all net payments to Merchant due from Citibank hereunder, and authorizes Citibank and the Bank to debit to the Account all net payments due by Merchant to Citibank hereunder, and instructs the Bank to pay and remit to Citibank all such debits as

instructed by Citibank.  Merchant shall give the Bank written notice of Citibank's rights and authorities hereunder, with a copy to Citibank and Acquirer.

(iii)    Reserve Account. In the event of an occurrence or situation which causes Citibank to reasonably believe that the amount of Credit Slips, Chargebacks and other charges to the Merchant's settlement or Account to be recovered by Citibank during any future period will exceed the amount of Sales Drafts during the same period, Citibank may withhold from its payments pursuant to the previous section, as a "Reserve" against Merchant's future liabilities to Citibank, an amount equal to such anticipated excess, as adjusted from time to time, and may charge or set off against such Reserve any amounts which it is unable to charge against the Account.  In lieu of all or any part of such Reserve, Merchant may supply a Letter of Credit or grant to Citibank a security interest in types and amounts of property satisfactory to Citibank as agreed to by Citibank.

(iv)    For Citibank's services hereunder, Direct Merchant will pay compensation to Citibank at the rates set forth in the Pricing Schedule, Exhibit B, if applicable.

(b)    For Merchants who settle with Sears: If Merchant's license agreement with Sears provides for settlement of consumer credit card transactions through Sears, Citibank will calculate the settlement of Merchant's transactions each day as set forth in Section 8(a)(i) above, and will settle such transactions directly with Sears.  Merchant agrees that Citibank satisfies its settlement obligations to Merchant under this agreement by paying Sears, and that Merchant will hold Citibank harmless from claims, losses or damages of any kind resulting from its payment to Sears of amounts owed to Merchant under this agreement pursuant to this Section 8(b). If the settlement of transactions under this Agreement is insufficient to cover amounts owed to Citibank that day, then Citibank will obtain such amounts from Sears and Sears will be subrogated to Citibank's rights to such amounts from Merchant.

9.    Title; Security Interest.

(a)    Merchant hereby assigns to Citibank, outright and not for purposes of security, all of Merchant's right, title and interest in each Record transmitted or delivered to Citibank under the Agreement for authorization, submission or settlement, and in the transaction it represents and the proceeds thereof.

(b)    In addition, Merchant grants to Citibank a security interest in:

(i)    any Account, pursuant to Section 8 above; and

(ii)    all property or funds in the possession or control of Citibank which is or may be property of or payable to Merchant (including but not limited to any Reserve established pursuant to Section 8); and

(iii)    the proceeds of all of the above, as security for any and all debts or obligations of Merchant to Citibank arising under or in connection with this Agreement.

(c)    Merchant will execute and deliver to Citibank:

(i)    such further assurances or instructions as the Bank may require to effect Citibank's control over the Account; and

(ii)    such Financing Statements or other documents as Citibank reasonably concludes are necessary or desirable for the perfection of such security interest in the Account.

(d)    Merchant agrees that this Agreement is a contract to extend financial accommodations, as that term is used in the U. S. Bankruptcy Code.

10.     LIMITATION OF LIABILITY.  CITIBANK HEREBY DISCLAIMS ALL WARRANTIES OF ANY KIND WITH RESPECT TO THE SERVICES OR PRODUCTS PROVIDED UNDER THIS AGREEMENT INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE FOR ANY PARTICULAR PURPOSE.  CITIBANK WILL CORRECT AT ITS OWN EXPENSE ANY MISTAKES CAUSED BY CITIBANK OR ITS AGENTS.  IN NO EVENT SHALL COMPANY OR ITS AFFILIATES BE LIABLE FOR SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR CLAIMS BY MERCHANT OR ANY THIRD PARTY RELATING TO CITIBANK'S PERFORMANCE UNDER THIS AGREEMENT.

11.     Representations and Warranties of Merchant.  Merchant represents and warrants that on the date hereof and on each date on which it transmits Records to Citibank or Acquirer the following representations are and will be true:

        (a)     If Merchant is not a natural person, that Merchant is a duly organized and validly existing legal entity under the laws of the jurisdiction in which it is organized; is qualified to do business in each jurisdiction in which it maintains a place of business; and has the power and authority to enter into and perform this Agreement.

        (b)     The making and performance of this Agreement by Merchant has been duly authorized by all necessary action, and will not violate any law, regulation, order or award, or any provision of its charter or by-laws, if applicable, or any agreement to which it is a party.

        (c)     This Agreement has been duly executed by Merchant, including by authorized persons where required, and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

        (d)     Merchant operates the locations at which the sales and Sears Card transactions contemplated by this Agreement are made, and each transaction has been entered into in compliance with this Agreement including the Rules.

Merchant does not do business under a trade name or style not previously disclosed to Citibank and there has been no change in the nature of Merchant's business or the goods and/or services that Merchant sells not previously disclosed to Citibank.  Unless approved to do so in writing by Citibank, Merchant will only accept the Sears Card in connection with the goods and/or services.

        (e)     The most recent audited balance sheets of the Merchant and its subsidiaries, if any, and related audited statements of income and cash flow for the fiscal period then ended, and the comparable most recent unaudited financial statements and for the interim period then ended, copies of which have been furnished to Citibank or will be furnished within 10 days after request by Citibank, fairly present the financial condition of the Merchant (and its subsidiaries, if any) as at such dates and the results of operations for the periods then ended, all in accordance with generally accepted accounting principles consistently applied, and since such latter date there has been no material adverse change in such condition or operations.

        (f)     All information provided by Merchant to Citibank prior to the execution of this Agreement and while it is in effect with respect to Merchant's business, operations, condition and results is and will be true, correct, complete and not misleading as of the date on which it is provided.

12.     Representations of Citibank.  Citibank represents and warrants that on the date hereof and on each date on which it receives Records from Merchant hereunder the following representations are and will be true:

        (a)     Citibank is a national banking association duly organized and existing under the laws of the United States of America; is authorized or qualified to do business in each jurisdiction in which it

maintains a place of business; and has the corporate power and authority to enter into and perform this Agreement.

(b)     The making and performance of this Agreement by Citibank has been duly authorized by all necessary corporate action, and will not violate any law, regulation, order or award, or any provision of its charter or by-laws or agreement to which it is a party.

(c)     This Agreement has been executed by duly authorized officers of Citibank and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

13.     Merchant Reporting.

(a)     Merchant will keep Citibank informed, in a manner specified by Citibank from time to time in its sole discretion, currently concerning all material changes or proposed changes in Merchant's business and business plans, including but not limited to openings and closings of locations or other points of sale or operations, addition or elimination of mail, telephone or internet selling, changes in the type or nature of the products or services sold or leased, and any use of agents, subsidiaries or leased departments; and also of all material changes in its financial condition or operations.

(b)     Merchant will furnish to Citibank within 10 days of Citibank's request (i) copies of its Annual Report to its shareholders and its annual, periodic and special reports filed with the Securities and Exchange Commission (if applicable), and (ii) to the extent not so furnished, at the request of Citibank, copies of its most recent audited balance sheet, income and cash flow statements and of comparable interim unaudited financial statements for all periods since such audit, but only where this Agreement includes a Pricing Schedule as outlined in Exhibit B.

14.     Indemnification.

(a)     Merchant will indemnify Citibank and its affiliates and the directors, officers, employees and agents of any of them (the "Citibank Indemnified Party") against, and hold them harmless from any and all claims, damages, liabilities and expenses (including fees and disbursements of counsel) which arise out of:

(i)     any goods or services sold or rendered or purported or promised to be sold or rendered by Merchant or any of its affiliates or the directors, officers, employees or agents of any of them, or

(ii)    any act or omission of Merchant or any of its affiliates or the directors, officers employees or agents of any of them which:

(x) constitutes a breach of this Agreement, or

(y) constitutes a failure to comply with, or causes any Citibank Indemnified Party to fail to comply with, any law or governmental or association rule or regulation governing the transactions and operations contemplated hereby, or which violates, or causes any Citibank Indemnified Party to violate, the personal rights of any third party,

except that this indemnity shall not apply to any failure to perform any duty or function which Citibank has agreed to perform under this Agreement.

(b)     Citibank will indemnify Merchant and its affiliates and the directors, officers, employees and agents of any of them (the "Merchant Indemnified Party") against, and hold them harmless from any and all claims, damages, liabilities and expenses (including fees and disbursements of counsel) which arise out of any act or omission of Citibank or any of its affiliates or the directors, officers, employees or agents of any of them which: (x) constitutes a breach of this Agreement, or (y) constitutes a failure to comply with, or causes any Merchant Indemnified Party to fail to comply with, any law or governmental

or association rule or regulation governing the transactions and operations contemplated hereby, or which violates, or causes any Merchant Indemnified Party to violate, the personal rights of any third party, except that this indemnity shall not apply to any failure to perform any duty or function which Merchant has agreed to perform under this Agreement.

(c)    Each indemnified party shall promptly notify the other with respect to any claim, damage, liability or expense which may be covered by this indemnity and permit the indemnifying party to participate in the defense thereof, and such indemnified party will not settle the matter without the approval of the indemnifying party.

15.    Term; Termination.

(a)    This Agreement shall be in effect from the date first written above unless terminated by Citibank on 90 days' prior written notice.  Citibank will consult with Sears prior to giving such notice of termination. The parties agree that the Rules will continue to apply until all transactions are resolved or finalized.

(b)    This Agreement shall terminate automatically if any case or proceedings in bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding is commenced by Merchant; or is commenced against Merchant or its property and not dismissed within 30 days; or if in such a proceeding an order of adjudication is entered or a receiver, trustee or similar officer is appointed.

(c)    This Agreement may be terminated for default by either party if the other has failed for a period of 10 days to make any payment required hereunder, or failed for a period of 30 days after notice to perform any of its other duties or obligations hereunder and to compensate the non-defaulting party for any losses, costs, liabilities or expenses incurred as a result of such failure.  Notice of failure to perform shall specify the nature of the failure and specify a date, no less than 30 days after such notice, on which this Agreement will terminate if the default is not cured.  During such 30 day period the parties will negotiate in good faith to define the scope of such non-performance, the manner in which it may be remedied and the nature and amount of such compensation, in order to avoid the termination if reasonably possible.

(d)    No failure or delay by either party to terminate the Agreement or take any other action on account of any default by the other party shall constitute a waiver of such party's right to terminate or to recover damages or any other remedy on account of such default or on account of any other similar or different default hereunder.

(e)    This Agreement shall terminate automatically in the event the License Agreement between Merchant and Sears, Roebuck and Co. is terminated for any reason.

16.    Notices.  All notices and other communications pursuant to this Agreement shall be in writing and sent by hand, courier, priority or first class mail (postage prepaid), or telegraph, to the following addresses, and shall be effective when delivered, or three days after mailing by first class mail:

If to Citibank, all notices:

> Citicorp Credit Services, Inc. (USA)
> 5500 Trillium Boulevard
> Hoffman Estates, IL  60192
> Attn:  Vice President – Business Initiatives

With a copy to the following if notice of default or termination:
> Citibank South Dakota, N.A.
> 701 East 60th Street North

Sioux Falls, SD 57108
Attn: General Counsel

If to Merchant, at the address listed above.

With a copy to:            Sears Roebuck and Co.
                           3333 Beverly Road
                           Hoffman Estates, IL 60179
                           Attn: General Counsel

Notwithstanding the foregoing, notices may be sent, in the manner described above, to such other address as either party shall specify in a notice to the other at least 10 days before its effective date.

17.    Amendments.

       (a)    The Rules delivered herewith shall remain in effect until amended. Citibank may amend the Rules by giving written notice thereof at least 90 days prior to the effective date specified in the notice, provided that an earlier effective date may be chosen if Merchant consents thereto or if the change is made necessary by a change in any law, rule or regulation, or in the interpretation thereof, of any government, and provided, further, that if Merchant objects to the amendment within 15 days after the notice is given, Citibank will discuss with Merchant in good faith the need for the change or any suggested alternative, giving consideration to the potential effects on each party's costs, risks, marketing, volume, etc. If after such discussions Merchant is unwilling in good faith to accept the change or any alternative acceptable to Citibank, and if the change is not reasonably required to comply with law, regulation or the rules of Citibank, Merchant may terminate this Agreement by written notice given no later than the effective date of the amendment and at least 30 days prior to the effective date of the termination. If Merchant terminates this Agreement within its rights under this Agreement, it may still be in breach of separate contract obligations to Sears to accept Sears Cards.

       (b)    Merchant recognizes that Citibank may amend or reinterpret the rules or regulations without the consent of Merchant.

       (c)    No other portion of this Agreement may be amended except by written amendment or supplement signed by authorized officers of both parties, and no provision may be waived or consent given unless in writing signed by an authorized officer of the party giving the waiver or consent. No failure to enforce a provision of this Agreement in any instance shall constitute a waiver or consent applicable to any later instance.

18.    Entire Agreement; Assigns.  This Agreement is the entire agreement and understanding between the parties, notwithstanding any prior understanding not expressed therein. This Agreement is binding on the parties and their respective successors and assigns, and for the benefit of them, their successors and permitted assigns. Neither party may assign this Agreement without the written consent of the other, except that Citibank may assign this Agreement to an affiliate of Citibank, which assumes in writing the obligations of Citibank thereunder.

19.    Confidentiality.

       (a)    Each party will keep confidential, during the term of this Agreement and thereafter, all information which is not available to the general public concerning this Agreement and/or the other party, its plans, operations, systems, programs, software, financial condition and results, both with respect to its credit and debit card business and its business generally provided, however, that Citibank may disclose such information to Sears. In addition, each party may disclose information about this Merchant relationship and operational issues relating to it, to Sears. Each party may make such information

DMLIB #365153                                                                                    8

available, to the extent necessary for the performance of this Agreement, to its directors, officers, employees, agents, auditors, attorneys and business consultants (who will be required to preserve the confidentiality of such information) and to any regulatory agency asserting jurisdiction and as otherwise required by law.

(b)     Merchant shall not, without customer's consent, reveal customer's Sears Card or account number, transaction or other personal information to third parties other than Citibank or as specifically required by law, provided, however, that Merchant may disclose such information about card transactions for purposes consistent with its agreement with Sears to provide goods or services to Sears customers and as allowed by law. Merchant shall take all appropriate precautions to ensure that all such information shall remain confidential, and that all records maintained by, or transmitted by or to, Merchant or any service provider utilized by Merchant, shall not be used by, disclosed to or subject to access by unauthorized third parties. Merchant shall keep such information in locations and files which are accessible only to selected personnel. Merchant shall immediately report to Citibank any actual or potential breach of such confidentiality, and assist in notifying the proper parties as required by law or requested by Citibank. After the expiration of the required retention period specified by the Rules, Merchant shall destroy all material containing customer information in a manner that renders the data unreadable. After a sale has been authorized, Merchant shall not retain or store any data read from a Sears Card except data required to record the sale.

20.     Governing Law.  This Agreement shall be governed by federal law and applicable South Dakota laws, without regard to its principles of conflicts of laws.

21.     Attorneys Fees.  In any litigation between the parties, the prevailing party shall be entitled to be reimbursed by the other for the reasonable fees and expenses of its attorneys, except that if a party prevails as to only a part of its claim, its reimbursement shall be reduced in proportion.

22.     Waiver of Jury Trial.  THE PARTIES EACH AGREE THAT IN ANY ACTION BETWEEN THEM WITH RESPECT TO THIS AGREEMENT OR ANY AMOUNT PAYABLE THEREUNDER THE PARTIES WILL (AND HEREBY DO) WAIVE ANY RIGHT TO TRIAL BY JURY.

23.     Survival of Terms.  The following sections will survive termination of this Agreement:  Sections 10, 14, 16, 17, 20, 21 and 22.

Citibank South Dakota, N.A.                          Merchant
By its agent, Sears Holdings
Management Corp.

_____          _____
Its: _____          Its: _____

## EXHIBIT A TO SCHEDULE 9.2A
### Merchant Operating Rules and Regulations

### *Sears Card Merchant Operating*
### *Rules and Regulations*

These Rules and Regulations contain procedures that must be followed in connection with the acceptance of a Sears Card, unless otherwise agreed to in writing by Citibank. These Rules and Regulations are subject to change by Citibank at any time. Citibank will provide you, your Processor and/or Financial Institution with a copy of the new rules at least 30 days prior to implementation. Citibank will assume that Merchant accepts the changed Rules and Regulations by continuing acceptance of the Sears Card. Citibank reserves the right to suspend acceptance of the Sears Card at any Merchant location at any time.

September 2004

Merchant Services
Call your Processor or Financial Institution

Sears Card Authorizations (24 Hours A Day)
1-800-733-2426

Sears Card Customer Service
1-800-917-7700

Table of Contents

| | | |
|---|---|---|
| **1** | **Identifying Sears Card Products** | **5** |
| 1.1.1 | Internet, Telephone or Mail Order Merchants | 5 |
| 1.1.2 | All Other Merchants | 5 |
| **2** | **Transactions** | **7** |
| 2.1 | Obtaining Authorization | 7 |
| 2.1.1 | General rules for Authorizations, unless otherwise agreed upon by Citibank in writing: | 7 |
| 2.1.2 | Telephone, Internet, or Mail Order Merchants (Card Not Present) | 8 |
| 2.1.3 | All Other Merchants | 8 |
| 2.1.4 | Authorization Downtime Procedures | 8 |
| 2.1.5 | Authorization Formats | 8 |
| 2.2 | Returns | 8 |
| 2.3 | Refunds, Adjustments and Credit Slips | 9 |
| 2.3.1 | Merchant Policy | 9 |
| 2.3.2 | Credit Slip | 9 |
| 2.4 | Cash Advances | 9 |
| 2.5 | Surcharges | 9 |
| 2.6 | Split Tickets | 9 |
| 2.7 | Minimum/Maximum Dollar Limits | 9 |
| 2.8 | Transaction Amount Tolerances | 9 |
| 2.9 | Equal Treatment of Sears Card Sales Versus Other Cards | 9 |
| 2.10 | Telephone, Internet, or Mail Order Sales | 10 |
| 2.11 | Suspicious Situations | 10 |
| 2.12 | Prohibited Transactions and Factoring | 10 |
| **3** | **Applications (where applicable)** | **10** |
| 3.1 | Applications at Point-of-Sale | 10 |
| 3.2 | Telephone Applications | 11 |
| 3.3 | Internet Applications | 11 |
| **4** | **Processing and Settlement** | **11** |
| 4.1 | Processing and Settlement for Sears Card Transactions | 11 |
| 4.1.1 | General Rules for Processing and Settlement | 11 |
| 4.2 | Recording A Card Sale | 12 |
| 4.2.1 | Completing a Card Sale record | 12 |
| 4.2.2 | Obtaining the Cardholders' Signature | 12 |
| 4.2.3 | Delivering Card Sale Records to the Cardholder | 12 |
| 4.3 | Submitting Electronic Sales Data | 12 |
| 4.3.1 | General Rules | 12 |
| 4.3.2 | Cardholder Verification | 12 |
| 4.4 | Payments | 13 |

| | | | |
|---|---|---|---|
| 4.5 | | Settlement Downtime Procedures | 13 |
| 5 | | **Special Requirements for Special Services** | **13** |
| 5.1 | | Travel and Entertainment | 13 |
| 5.2 | | Online/Internet Transactions | 14 |
| 5.3 | | Retrievals and Chargebacks | 14 |
| | 5.3.1 | Retrieval Requests | 14 |
| | 5.3.2 | Chargebacks | 14 |
| | 5.3.3 | Representment | 16 |
| | 5.3.4 | Type Three Chargeback | 16 |
| | 5.3.5 | Immediate Payment for Chargebacks | 16 |
| 6 | | **Business Type** | **16** |
| 7 | | **Advertising** | **16** |
| 7.1 | | Telephone, Internet, or Mail Order Merchants | 16 |
| 7.2 | | All Other Merchants | 16 |

## Definitions

Agreement means the Merchant Agreement entered into between Merchant and Citibank.

Arbitration is the process used to determine responsibility for a chargeback-related dispute between Citibank and the processor/merchant.

Authorization(s) means the receipt of a valid authorization code from Citibank when presenting a Card number with respect to a purchase, which includes the indication (i) of availability of credit on a Card at the time of inquiry and (ii) that the Card represents a valid account.

Authorization Center means the Citibank system to be consulted by Merchant for the purpose of obtaining authorization codes and instructions on handling Cards.

Business Day means the days the Federal Reserve Bank is open. Sales Records submitted for processing on a holiday, weekend, or after the cut-off time are treated as received the following Business Day

Card(s) or Sears Card(s) is any Sears brand or Sears owned brand payment instrument issued by Citibank, excluding the HIPS home improvement product and the Sears Charge Plus Account product, and including but not limited to the plastic Sears private label or Sears MasterCard issued to the Cardholder, which Merchant accepts from customers to effect payment for their purchases from Merchant. Where the context so requires, the term "Card" shall also include the Cardholder account relating to the Card. Where MasterCard rules conflict with these rules, MasterCard rules will prevail.

Cardholder is a person to whom a Card is issued or who is authorized by such person to use the Card.

Card Sale is a sale of Goods or Services by Merchant to a valid Cardholder through the use of a Card or Cardholder account. A Card Sale will only be deemed to have occurred after the Merchant has delivered or shipped the Goods and/or performed the Services.

Card Sale Date means the transaction date for any Card Sale.

Chargeback(s) means the reversal of a Card Sale against a sale which Merchant has previously presented.

Credit Slip means documentation or data for a returned item originally sold via a Sears Card.

Code 10 is a term used when a merchant is suspicious of a transaction.

Electronic Card Capture Device means a device intended to electronically transmit Sales Data to Citibank. This can be either a physical or virtual 'Point of Sale' device.

Financial Institution means any bank, credit union, or other financial entity providing Merchant payment transaction processing or services approved by Citibank.

Goods or Services means the goods or services provided by Merchant to a Cardholder.

MasterCard means MasterCard International incorporated (a Delaware corporation).

Merchant/you means an entity that accepts Sears Cards and has been approved by Citibank.

Merchant Settlement Account means an account designated by Merchant through which Citibank will process amounts due Merchant.

Mod 10 Validation means validating that the last position or check digit of an account number is correct by mathematically calculating that digit via running the first 12 digits through an algorithm provided by Citibank or a Processor or Financial Institution.

Processor means any organization processing Merchant payment transactions on behalf of that Merchant and approved to do so by Citibank.

Processing Fees means the fees charged by Citibank for transaction processing connected with the Cards.

Recurring Card Sale is a sale for goods and/or services that are delivered or performed periodically and which results in a charge to Cardholder's account for each performance or delivery.

Refund means any refund, return, or price adjustment of a transaction made through the use of a Card or Cardholders account.

Representment(s) means the resubmission of a transaction by a Merchant to Citibank after a Chargeback.

Return means a Good, which is brought back to the Merchant by a Cardholder for Credit to the Cardholder's account.

Sales Data means data representing Card transactions related to Merchant sales by payment cards, or refunds/credits issued by Merchant.

Sales Record means all documents or data presented to Citibank as evidence of a Card Sale or Credit.

Citibank, We or Us (for the purposes of this document only) means Citibank as issuing authority for the Sears Card.

Transaction means any single Card Sale, payment (if applicable) or Chargeback processed to a Cardholder's account by a Merchant including, but not limited to, an Authorization and ticket capture as a single Transaction.

Transaction Processing means all those functions connected to processing Card Sales.

\* Other capitalized terms used in this document and not otherwise defined shall have the meaning set forth in the Merchant Agreement.

1.   **Identifying Sears Card Products**

    1.1.1   Internet, Telephone or Mail Order Merchants

        Merchants who accept the Card who do not require the physical presentment of the Card or who sell Goods or Services through the Internet, telephone or mail order must perform a Mod 10 Validation .

    1.1.2   All Other Merchants

        Merchants who accept the physical card must verify that any Sears Card presented to you is a valid Card prior to initiating the transaction.  You may verify this by examining the card and confirming that the Card includes the features described below.

### Sears "Blue" Card:
- *13 digit card beginning with any number from 0 – 9.*
- *Standard mod 10 check.*
- *Expiration date in mag stripe but not on the plastic.*
- *Expiration date not required at authorization.*
- *Rule: POS device should not validate expiration dates on 13 digit cards.*



### Sears Premier Card:
- *13 digit card beginning with any number from 0 – 9.*
- *Standard mod 10 check.*
- *Valid Expiration date embossed on the card as well as within the mag stripe.*
- *Expiration date is required at authorization.*
- *Rule: POS device should not validate expiration dates on 13 digit cards.*



### Sears Gold Card
- *Same as Sears Premier Card.*



### Sears Private Label 16 Digit Cards *(Sears "Blue" and Premier):*
- *16 digit ISO standard card.*
- *Bin range = 504994.*

- *Expiration date in mag stripe and embossed on the plastic.*
- *Expiration date is required at authorization.*
- *Rule: POS device should validate expiration dates on 16 digit cards.*
  ***(photo unavailable at this time: appearance identical to 13 digit cards)***

### *Sears MasterCard Products* - *(Sears Gold MasterCard, Sears Premier MasterCard)*

- *16 digit ISO standard card.*
- *Bin range = 512106, 512107, and 512108*
- *Expiration date in mag stripe and embossed on the plastic.*
- *Expiration date required.*
- *Rule: POS device should validate expiration dates on 16 digit cards.*



### *HIPS Cards* – (If Applicable)

- *Home Improvement Accounts, both 13 and 16 Digit will be declined by Citibank for all external transactions unless you have a specific agreement with Citibank to accept these cards.*

#### 13 digit Cards:

- *13 digit card beginning with any number from 0 – 9.*
- *Standard mod 10 check.*
- *Expiration date in mag stripe but not on the plastic.*
- *Expiration date not required at authorization.*
  *Rule: POS device should not validate expiration dates on 13 digit cards*

#### 16-digit Cards.

- *16-digit ISO standard card.*
- *Bin range = 504994.*
- *Expiration date in mag stripe and embossed on the plastic.*
- *Expiration date is required at authorization.*
- *Rule: POS device should validate expiration dates on 16 digit cards.*



### *Sears Charge Plus Cards* – *(If Applicable)*

- *Sears Charge Plus Accounts, both 13 and 16 Digit will be declined by Citibank for all external transactions unless you have a specific agreement with Citibank to accept these cards.*

#### 13 digit Cards:

- *13 digit card beginning with any number from 0 – 9.*
- *Standard mod 10 check.*
- *Expiration date in mag stripe but not on the plastic.*
- *Expiration date not required at authorization.*
    *Rule: POS device should not validate expiration dates on 13 digit cards*

### 16-digit Cards.

- *16-digit ISO standard card.*
- *Bin range = 504994.*
- *Expiration date in mag stripe and embossed on the plastic.*
- *Expiration date is required at authorization.*
- *Rule: POS device should validate expiration dates on 16 digit cards.*



Sears Commercial One Cards - *(See Commercial One Rules & Regulations)*
*If you have an agreement with Citibank to accept Sears Commercial One Cards*

- *16 digit ISO standard card.*
- *Paper or Plastic Card*
- *Bin range = 504553*
- *Expiration date in mag stripe and embossed on the plastic.*
- *Expiration date required.*

*Rule: POS device should validate expiration dates on 16 digit cards*

Sears Canada Cards (Not applicable)
*Citibank will decline Sears Canada Cards for all external transactions.*

- *16 digit ISO standard card.*
- *Bin range = 628181*

Sears Mexico Cards (Not applicable)
*Citibank will decline Sears Mexico Cards for all external transactions.*

2    **Transactions**

2.1    Obtaining Authorization

    2.1.1    General rules for Authorizations, unless otherwise agreed upon by Citibank in writing:

- before completing the Card Sale, you must obtain Authorization for the amount of the purchase following Citibank specified procedures, including obtaining Authorization through electronic processing methods and terminals, authorized by Citibank.
- you must request Authorization on or before submitting the Card Sale Date for payment except as permitted by the Merchant Operating Rules and Regulations for specific types of transactions (such as lodging, when specifically set forth in your Agreement with Citibank).
- if Authorization is granted, you must provide an Authorization code on the Sales Record submitted to Citibank for processing.
- if Authorization is denied, you must not make further attempts to obtain Authorization with that Card on that day, you must not allow the Card Sale.

- if the Card Sale involves suspicious or unusual circumstances, you must request a Code 10 Authorization. You must retain any Card by reasonable and peaceful means if requested to do so by the Authorization provider. {Please refer to section 1.11.}

If you complete a Card Sale without Authorization, you will be responsible for any Chargeback of the Card Sale. However, obtaining Authorization only means that at the time Authorization was requested sufficient credit or funds were available from the Card account and the Card was not on a warning list. Obtaining Authorization does not assure that the person using the Card is its Cardholder and will not prevent a Chargeback to the Merchant for a variety of reasons under the Chargeback Section 3.2.2 including, but not limited to, use of the Card by an unauthorized user, or a Cardholder claim or defense relating to the Card Sale.

If you process Sears Cards through Citibank, We will provide an authorization log upon your request. Otherwise, please contact your processor.

2.1.2   Telephone, Internet, or Mail Order Merchants (Card Not Present)

For Internet, telephone, or mail order Authorization requests, you must electronically transmit the account number, expiration date (if any), and amount of the transaction. If a Card is accepted for a sale without proper Authorization, Citibank is not required to pay for the sale. If We have already paid for the sale, Citibank can Chargeback the unauthorized sale. A Chargeback can still occur even if Authorization is obtained for other reasons described in the Chargeback section. Authorization requests must be presented at a minimum daily, but preferably real-time.

2.1.3   All Other Merchants

You must obtain Authorization prior to completing a Card sale for any transaction. You must obtain Authorization from Citibank by an Electronic Card Capture Device. Unless you have a prior arrangement with Citibank, We will only provide Authorization over the phone for a device malfunction described in 1.1.4. For Card present transactions, you must transmit to Citibank the complete contents of the magnetic stripe. If the magnetic stripe is unreadable, Citibank will accept a manually entered transaction. Authorization requests must be presented at a minimum daily, but preferably in real-time.

2.1.4   Authorization Downtime Procedures

2.1.4.1   Telephone, Internet or Mail Order Merchants

If the Electronic Card Capture Device is not working you must queue the Authorization requests and retry them when the Authorization system is functional, not to exceed 5 days from the return of Authorization system availability.

2.1.4.2   All Other Merchants

If the Electronic Card Capture Device is not working you must call our Authorization Center at 1-800-733-2426 for Authorization on each sale. If a sale is approved you must re-enter the sale in the Electronic Card Capture Device as soon as the Electronic Card Capture Device is working, not to exceed 5 days after the Authorization system is functional. You must provide the following information:

- Card account number
- Unit number assigned by Citibank
- Dollar amount of Sale
- Expiration date (if applicable)

2.1.5   Authorization Formats

All data transmitted must be in a form and format approved in advance by Citibank and must be presorted and organized according to Citibank' acceptance rules.

2.2   Returns

Citibank will honor your return policy as long as it complies with all federal, state, and local laws and is clearly posted or otherwise made known to the Cardholder at the time of the sale. If a Cardholder returns merchandise or cancels the services paid for with a Sears Card you must give credit to that Sears Card. Returns for sales or cancellation of services not paid for by a Sears Card should not be credited to the Sears Card. Sales Data from the return should be included in your daily file.

All data transmitted must be in a form and format approved in advance by Citibank and must be presorted and organized according to Citibank' instructions.

## 2.3 Refunds, Adjustments and Credit Slips

### 2.3.1 Merchant Policy

You may limit returned merchandise or limit price adjustments, to the same extent as for sales not involving a Card, provided you properly disclose the policy to the Cardholder before the sale, the limits are noted on the Card Sale record before the Cardholder signs it, and the purchased Goods or Services are delivered to the Cardholder at the time the Card Sale takes place.

### 2.3.2 Credit Slip

You may not make a refund or adjustment for a Card Sale in cash (except when required by law), but will deliver to Citibank a Credit Slip for a refund or adjustment to the Card account within seven (7) days of the refund or adjustment and deliver to the Cardholder a copy of the Credit Slip at the time the refund or adjustment is made.

You must include the refund date and amount and a brief description of the refund or adjustment on the Credit Slip in sufficient detail to identify the Card used and original Card Sale.

You may not deliver a Credit Slip to Citibank for any refund or adjustment of a purchase not originating as a Card Sale with the same Cardholder requesting the refund or adjustment, or a Card Sale not made with the Merchant.

You may not receive money from a Cardholder and subsequently deliver to Citibank a Credit Slip to make a deposit to the Card account. Citibank may delay, within the legal limit, processing Credit Slips on any day to the extent the valid Credit Slips exceed the total of valid Card Sales presented on that day.

## 2.4 Cash Advances

Unless otherwise agreed to in writing by Citibank, you may not issue a cash advance on any Citibank Card.

## 2.5 Surcharges

Unless otherwise agreed to in writing by Citibank, you may not impose any surcharge, levy, or fee of any kind for the use of a Sears Card product by the Cardholder.

## 2.6 Split Tickets

You may allow a Cardholder to use the Sears Card to pay for a portion of any service or merchandise.

## 2.7 Minimum/Maximum Dollar Limits

You may not require that any Cardholder make a minimum purchase in order to use a Sears Card. You may not set a maximum limit on purchases for a Cardholder using a Sears Card.

## 2.8 Transaction Amount Tolerances

| Industry | Amount Tolerances |
| --- | --- |
| Retail | Authorization amount must equal clearing amount |
| Supermarket | Authorization amount must equal clearing amount |
| Restaurant | Clearing amount variance = +/- 20% from original authorization amount |
| Hotel/Auto Rental | Clearing amount variance = +/- 15 % of the original authorization amount |
| Airlines | Clearing amount variance = +/- $1.00 |
| Card Not Present | Authorization amount must equal clearing amount |

## 2.9 Equal Treatment of Sears Card Sales Versus Other Cards

You may not have any policy that discriminates against users of a Sears Card versus any other credit or charge card that you accept.

2.10    Telephone, Internet, or Mail Order Sales

All telephone, Internet, and mail order sales will need to obtain an electronic Authorization as set forth above in section 2.1.

2.11    Suspicious Situations

Any Merchant employee who is suspicious of the validity of a Sears Card or the presenter of the Sears Card for any reason should notify Citibank immediately.  The procedure is as follows:

- Call the Authorization Center at 1-800-733-2426;
- Ask the Account Manager for a Code 10 Authorization;
- The Account Manager will connect you to the Code 10 Authorization Center;
- The Code 10 Authorization Center will ask your employee a series of questions that will not appear unusual to the customer and will allow them to process the authorization.

2.12    Prohibited Transactions and Factoring

You must not present to Citibank, directly or indirectly, any Sales Record:

- That is not the result of a bona fide Card Sale between the Cardholder and you;
- You knew or should have known to be fraudulent or not authorized by the Cardholder;
- That represents a Card Sale outside your normal course of business;
- Representing the refinancing or transfer of an existing Cardholder obligation;
- Representing a Card Sale arising from the dishonor of a Cardholder's personal check;
- Representing another Sales Record that has already been presented to Citibank.

## 3.    Applications (where applicable)

3.1    Applications at Point-of-Sale

If applicable, applications for Sears Credit Cards can be completed, whether with or without an accompanying sale, and forwarded to Purchaser via telephone or by electronic transmission, inclusive of telephone, terminal or point-of-sale system devices, will be transmitted to Citibank in a mutually acceptable manner and format.   Merchant shall be responsible for the following:

- Providing all information required on the application furnished by Citibank.
- Obtaining and verifying one form of identification to verify the applicant's identity, one of which must consist of a current, official government identification document, such as a passport or driver's license, that bears the applicant's signature.
- Obtaining the signature on the Application of all persons whose names will appear on the Account or who will be responsible for the Account.
- Upon either approval or decline, sending the signed disclosures, including those processed by telephone, to Citibank at the designated address within five (5) days.
- Entering the sale into the Electronic Card Capture Device.  If requested to do so by Citibank's representative, Merchant's employee shall also enter into the Electronic Card Capture Device the approval code provided by Citibank
- Providing to each applicant a copy of the initial disclosures Citibank provides to Merchant expressly for distribution to applicants.

If approved, Citibank's representative will provide the Account number, credit limit and term where applicable to Merchants' employee or representative.  In order to obtain Authorization for the Card Sale, Merchant's employee or representative must enter the Account number and total amount of the Card Sale into the Electronic Card Capture Device.

If Citibank declines an application, Citibank will provide Merchant's employee or representative with an adverse action reference number that Merchant's employee or representative will provide to the applicant and Citibank will send an adverse action letter to the applicant via mail.

If Citibank is unable to render an immediate decision, Citibank will provide the Merchant's employee or representative with an application pending number with phone number, and the Merchant employee or representative will call Citibank  for a final approve or decline decision.  If Citibank declines the application, Merchant will then advise the applicant that Citibank will notify the applicant of the final decision by mail.

If the application is approved, but the total amount of the Card Sale exceeds the line of credit offered to the applicant, Citibank's associate will communicate to the applicant a counteroffer for a lower line of credit or another Sears Credit

Card.  If the applicant declines the counteroffer, Merchant's employee or representative must treat the application as if Citibank declined the application.

3.2   Telephone Applications

If applicable, applications for the Credit Card received by Merchant by telephone, whether with or without an accompanying sale, will be processed by Merchant and forwarded electronically to Citibank in a mutually acceptable manner and format. Such applications will be immediately available for Card Sales only if the Cardholder received the required initial disclosures.  If the consumer applies for an Account by telephone and did not receive the initial disclosures, Citibank will put a tiered watch or block on the Account until a plastic card with disclosures is received by the customer, and the Merchant's employee or representative may not process the Card Sale on the Account until the Cardholder activates the card or uses the card in the Store.

3.3   Internet Applications

Customers of Sears who wish to apply for a Sears Credit Card may do so via Sears' Internet website. All applications received by Citibank via the Internet will be processed only if all of the information requested on the website application form has been completed. For Internet applications, the Citibank Card Agreement shall be transmitted to the consumer by Citibank through the website.  If approved, Accounts opened via the Internet application process are immediately available for Card Sales.

**4.   Processing and Settlement**

Unless otherwise agreed to with Citibank, all Processing and Settlement for Sears Card transactions will be accomplished via your agreement with your Processor or Financial Institution, with and through Citibank.

4.1   Processing and Settlement for Sears Card Transactions

General Rules for Processing and Settlement

Submission of Card Sales for Cardholder Purchases: You must submit to Citibank Card Sales only if the Card Sale is made or approved by the Cardholder who is issued, or is authorized to use, the Card used for the Card Sale. Unless otherwise agreed to in writing by Citibank, you must not submit a Card Sale until you have performed the services or have shipped the merchandise postage prepaid to the customer.  You will not submit:

- A Card Sale involving solicitations from third parties, for example, telemarketing by independent contractors, or a Card Sale involving your franchisees, partners, or joint ventures, except as authorized in writing by Citibank;
- A Card Sale for a purchase from any entity other than you, or Card Sales by any of your owners, partners, officers or employees, other than Card Sales for bona fide purchases from you.

You will not directly bill or accept payment from a Cardholder for any Card sales you submit to Citibank, except that if a Card Sale results in a Chargeback paid by you, you may proceed to collect from the Cardholder as permitted by law but not by submitting a new Card Sale to cover the Chargeback.

Citibank will pay you for each valid Card Sale, which you submit to Citibank by crediting your Merchant Settlement Account according to the payment schedule and method agreed to in your Agreement with Citibank. Citibank is not obligated to pay you for Card Sales submitted that are not valid Card Sales.  Each payment from Citibank to you will be subject to adjustment upon Citibank's further review and verification. Payment to you for a Card Sale disputed by a Cardholder for any reason is not final.

Citibank may deduct from any payment to you the amount of any Credit Slip, Refund or Chargeback to you, and any processing fees or Card Sales due from you, as well as any deductions for a Reserve Account, as provided in your Agreement with Citibank.  You must immediately pay Citibank the amount by which Credit Slips processed on any day exceed valid Card Sales submitted on that day without limiting Citibank remedies, Citibank may obtain the amount due by deducting it from the Merchant Settlement Account, or funds due you.

You must pay Citibank processing fees and Card Sales in the amount specified in the pricing Schedule provided by Citibank in the Merchant Agreement.

You will designate a Merchant Settlement Account in your name at a depository institution under arrangements acceptable to Citibank.  If the Merchant Settlement Account is closed, Citibank may in its sole discretion either hold funds due to you or remit funds to you in a manner of Citibank own choosing such as but not limited to, a check or wire transfer.

All such debits and credits will be made through the Automated Clearing House ("ACH") if possible.  Merchant will comply with all ACH and Bank rules applicable.  All such debits and credits are provisional as between the parties and subject to reversal under your Merchant Agreement with Citibank.

Merchant shall have the right to replace the Bank and/or the Account upon 10 days written notice to Citibank or Acquirer designating the successor Bank and Account, with a copy of its notice to the successor Bank of Citibank or Acquirer's rights and authorities hereunder. Merchant shall not close the old Account until the successor Account has been opened and such a notice has been given.

Citibank reserves the right, at its sole discretion, to terminate a Merchant as an acceptor of Cards, including the ability to suspend for any period of time the ability of Merchant to accept Cards at any of it's locations (including, but not limited to, acceptance via the Internet, telephone or other means of communication).

If you process the Sears Cards with Citibank, We will provide a settlement report and/or file upon your request. Otherwise, please contact your processor.

4.2    Recording A Card Sale

4.2.1    Completing a Card Sale record

You must record each Card Sale and Sales Record by following procedures in a format and manner specified by Citibank and using records such as sales drafts, sales slips or electronic processing records and methods, as applicable. You will complete each sale as a single Card Sale, unless otherwise agreed to in writing by Citibank.

4.2.2    Obtaining the Cardholders' Signature

You will require Cardholders to sign the Card Sale record but not until the final transaction amount is entered into the total column of the Card Sale record. You warrant that the signature on the Card Sale record is that of the Cardholder or a person authorized by the Cardholder to use the Card. If the signature panel in the Card is blank or if signature panel has "See ID", in addition to requesting an Authorization, you must do all of the following:

- Review positive identification to determine that the customer is the Cardholder. The identification must consist of a current, official government identification document, such as a passport or driver's license, that bears the Cardholder's signature;
- Write the positive identification, including any serial number and expiration date on the Card Sale record;
- Require the Cardholder to sign the signature panel of the Card before completing the Card Sale.

4.2.3    Delivering Card Sale Records to the Cardholder

You will deliver to the Cardholder an accurate and complete copy of the Card Sale, no later than the time of delivery of the goods or performance of services, using a format approved by Citibank. You must provide the following information on the Cardholder's copy:

- Card account number
- Merchant name
- Location code or city and state
- Card Sale amount
- Card Sale Date
- Brief description of merchandise or services sold

4.3    Submitting Electronic Sales Data

4.3.1    General Rules

All Card Sale Data will be submitted to Citibank through an electronic terminal, unless otherwise agreed to in writing by Citibank.

You will submit all Card Sales to Citibank using approved Card Sale records, within five days of the Card Sale unless Citibank grants you a longer time in writing. Delay in submitting Card Sales may result in Citibank declining to process the Card Sales, or non-payment of Merchant Card Sales.

All Card Sale Data must be in US dollars.

4.3.2    Cardholder Verification

You will not complete a Card Sale before the "Valid From" date or after the expiration date of a Card, where applicable.

You will complete a Card Sale only if the signature on the sales draft or Card Sale record is the same as the signature appearing on the Card (which signature may, but need not be, the name embossed or printed on the

Card).  If identification is uncertain or if you otherwise question the validity of the Card, you will contact Citibank for instructions.

Nevertheless, conforming to these requirements will not relieve you of your responsibility to verify that the person using the Card is the Cardholder or a person authorized by the Cardholder to use the Card.

Citibank may require you to examine additional Card security features before completing a Card Sale.

You must transmit your Sales Data each business day to your Sears Card Processor, Financial Institution or directly to Citibank (if applicable).  If you fail to send Sales Data to your Processor, Financial Institution, or Citibank on the next business day, Citibank will not be required to reimburse the transactions, as outlined in the Chargeback Rules.  In the event of system availability problems, please see section 2.5.

All data transmitted must be in a form and format approved in advance by Citibank and must be presorted and organized according to Citibank' instructions.

4.4     Payments

You may not receive or process any payment intended for a Cardholder's account.  If you receive a payment from a Cardholder, you must immediately forward it to Citibank at:

> Citibank Payment Center
> PO Box 182149
> Columbus, OH 43218-2149

4.5     Settlement Downtime Procedures

If the Electronic Card Capture Device is not working you must retain and continue to retry transmission when the Electronic Card Capture Device is functional.  In the event of a Processor or Financial Institution system failure, Citibank reserves the right to reject transactions submitted more than 5 days from the date the system becomes operational.  In the event of a Merchant system failure, Citibank reserves the right to reject transactions submitted more than ten days from the transaction date.  If you surpass the timeframes listed, you must re-authorize the transaction before the transaction can be submitted for settlement.

5.     **Special Requirements for Special Services**

5.1     Travel and Entertainment

The following sections set forth additional requirements for travel and entertainment reservation service.

If you provide lodging (hotel, motel, resort or inn) you may guarantee a reservation by obtaining the Card's embossed name, account number and expiration date and by completing the following procedures:

Verbally confirm to the Cardholder the reservation by stating the following information:

- Card's embossed name, account number and expiration date as provided by the Cardholder;
- Name and exact address, including street, city and state of the lodging check-in location;
- Reservation confirmation code;
- Rate and any other details relating to the reservation;
- Provisions of the guaranteed reservation relating to the Cardholder's reservations and any other cancellation details related to the reservation;
- Inform the Cardholder that lodging accommodations will be held until check-out time on the day after the scheduled arrival date unless cancelled by six p.m., local establishment time, on the scheduled arrival date;
- For resort establishments requiring cancellation before six p.m., local establishment time, on the scheduled arrival date, the cancellation time must not exceed 72 hours before the scheduled arrival date.  The Cardholder must be provided with the specific written cancellation policy, including the date and time the cancellation privileges expire.  If a reservation is made less than 72 hours before the scheduled arrival, the cancellation procedure of six p.m., local establishment time, on the scheduled arrival date will apply;
- Provide the Cardholder if requested with a written confirmation including the information specified above;
- Advise the Cardholder of the billing for a no-show Card Sale as specified below.  (A no-show Card Sale is a Card Sale by you resulting from the Cardholder's failure to properly cancel the reservation);
- If the Cardholder has not checked in by check-out time the day following the scheduled arrival date and the reservation was not properly cancelled, the Cardholder may be Charged for one night's lodging including tax;
- Accept a cancellation request from a Cardholder provided the cancellation request is made before the specified cancellation time.  Provide the Cardholder with a cancellation code and advise the Cardholder to retain it in case of a dispute.  If requested, provide the Cardholder with written confirmation of the

cancellation including the Card's embossed name, the cancellation code, and the details relating to the cancelled reservation;

- If the reserved lodging accommodation has not been rented or cancelled by the specified cancellation time, the lodging accommodations must be held available in accordance with the reservation;

5.2   Online/Internet Transactions

All Internet transactions must have 128-bit Secure Socket Layer (SSL) Web encryption at a minimum when any sensitive information is entered or transmitted.

5.3   Retrievals and Chargebacks

Citibank will chargeback to you and you will pay back Citibank, the amount of each Card Sale which you submit to Citibank that is charged back for any reason, or to the extent Citibank has received valid claims regarding the Card Sales from Cardholders under other provisions of law.

5.3.1   Retrieval Requests

A Cardholder may request information regarding a Transaction made at your establishment.  If Citibank requests documentation or a Retrieval Request from you, you must provide us with a copy of the Sales Record within the following timeframes: (i) within twenty (20) days of our request for any information request qualifying as a billing error under Regulation Z/Truth in Lending Act as determined by Citibank in its sole reasonable discretion or, (ii) within thirty (30) days for other requests that do not qualify as a billing error under Regulation Z/Truth in Lending Act as determined by Citibank in its sole reasonable discretion.  If you do not respond in the allotted time, Citibank may issue a chargeback, as described in section 5.3.2.

5.3.2   Chargebacks

A Chargeback may occur for any one or more of several reasons, or through operations of consumer protection laws such as the Truth in Lending Act, Regulation Z and the Fair Credit Billing Act.  Chargebacks must be submitted to the Merchant no later than 120 days after the transaction in question appeared on the customers' bill or after expected or actual date of delivery or installation. Citibank may correspond on behalf of the Cardholder for submission of dispute summaries or chargeback notifications.  Chargeback reasons include, without limitation:

| Definition | Explanation | Support Chargeback | Reverse Chargeback |
|---|---|---|---|
| Transaction without Required Authorization | A valid Authorization was not obtained. | Authorization Report for Sales Data and Cardholder billing statement. | -Within downtime floor limits set forth in Section 1.1.3 of the Rules, or -proof of authorized transaction partial/ full . |
| Transaction without Required Authorization, where Transaction would have been declined by Citibank | A valid Authorization was not obtained. | Authorization Report reflecting that the transaction would have been Declined at the time of sale. | Proof that the transaction was Authorized in part or in full. |
| Declined Authorization | The Card Sale was completed after Merchant received a decline. | Authorization Report showing Decline and Cardholder billing statement. | -proof of authorized transaction partial/ full |
| Invalid Cardholder Account Number | The Card Sale was submitted using an Account number for which no valid Account exists or can be located. | Reject-Re-entry Report or Purged Account Report. | -Provide proof of imprint or swiped card information, and -proof of authorized transaction partial/ full |
| Late Presentation of Transaction | The Card Sale was presented after the five-day limit, and as provided in Section 1.4.1 of the Rules. | Sales Record and Cardholder billing statement with proof of a negative change in the Cardholder status at the time of Chargeback. | -Provide proof that negative change in the Cardholder status is false or occurred prior to the additional five day period. |
| Cardholder Asserts a Billing Error | The Cardholder disputes a billing error that qualifies as a billing error under Regulation Z/Truth in Lending Act and Merchant has not resolved such dispute within 20 days receipt of notice thereof. | Completed written dispute form from Citibank stating the claim by the Cardholder | Resolution of dispute by Merchant within the timeframe, provide proof that a partial/full credit has been posted to the Account, or prove that written dispute is invalid. |
| Cardholder Disputes Merchandise/Service | The Cardholder disputes the delivery (other than a billing error that qualifies as a billing error | Completed written dispute form from Citibank stating the claim by the Cardholder. | Resolution of dispute by Merchant within the timeframe, provide proof that a partial/full credit has been |

| Definition | Explanation | Support Chargeback | Reverse Chargeback |
|---|---|---|---|
| | under Regulation Z/Truth in Lending Act), quality or performance of Merchandise/Service and Merchant has not resolved such dispute within 30 days, and Cardholder claims to have made a good faith attempt to resolve with Merchant. | | posted to the Account, or prove that written dispute is invalid. |
| Transaction Amount Differs | The Cardholder claims that the purchase amount for which the Cardholder signed was altered after the Cardholder signed the Sales Record and without the Cardholder's consent or direction, with the exception of travel and entertainment transactions. Only the difference will be charged back to Merchant. | Cardholder's Receipt does not match copy of Sales Record received from Merchant or the Account Itemization or Statement | - POS Transaction Log proving Cardholder altered the amount, or - Merchant Policy at T&E Merchants as outlined in section 3.1.1 of these Rules. |
| Duplicate Processing | Cardholder claims they have been charged twice for a Card Sale. | Cardholder billing statement(s) or itemization | Production of two Sales Records with different authorization codes or POS Transaction Log or proof that a credit/refund was granted. |
| Non-Receipt of Refund or cancellation of services/ merchandise | Cardholder claims that a Refund issued by Merchant has never been posted to the Cardholder's Account or Cardholder received a cash refund in connection with a Card Sale. The Chargeback is limited to the amount of the Refund. | Cardholder's Credit Slip or credit advice, or proof of return or cancellation. | -Proof that a credit/refund was granted, or -Provide Store rebuttal if service / merchandise is not accepted for credit per the refund/return/ cancellation policy |
| Unauthorized Purchase | The Cardholder claims that neither the Cardholder nor any party authorized by the Cardholder participated in the Card Sale and that the Cardholder has no knowledge of the Card Sale. | Completed written dispute form from Citibank stating the claim by the Cardholder, and copy of Sales Record and authorization log. Additional investigation may also be necessary.. | Proof that the Sears Card was present at the time of the transaction and (i) a valid Authorization and (ii) consent of Cardholder or Cardholder's authorized representative were obtained. For Mail Orders/Telephone Orders (MOTO): proof that Cardholder received merchandise (or signed receipt of delivery by Cardholder or person to whom shipment was sent in accordance with Cardholder's instructions).Signature and imprinted draft or proof that card was present. |
| Non-Receipt of Merchandise | Merchant submitted a Card Sale in which the Merchandise was not yet shipped or otherwise provided to the Cardholder or the Cardholder claims they have not received the Merchandise for which they have been charged. | Completed written dispute form from Citibank stating the claim by the Cardholder | Proof that the cardholder or a person authorized by the Cardholder received the merchandise. |
| Non-Receipt of Requested Document | Sales Record or Refund Record has not been provided within 30 days of request. | None | Provide proof that documentation was sent within the same 30-day period. |
| Breach of representation or warranty of Merchant that relates directly to the Cardholder's complaint, except for instances of Merchant' employee fraud. | Citibank to provide detail to Merchant with respect to the specific breach and amount of Chargeback. | Proof of breach by Merchant. | Proof of compliance in all material respects with representation or warranty. |

Citibank may correspond on behalf of the Cardholder for submission of dispute summaries or Chargeback notifications. Merchant will furnish Citibank with copies of Card Sales and related information within the following timeframes: (i) within twenty (20) days of our request for any information request qualifying as a billing error under Regulation Z/Truth in Lending Act as determined by Citibank in its sole reasonable discretion or, (ii) within thirty (30) days for other requests that do not qualify as a billing error under

Regulation Z/Truth in Lending Act as determined by Citibank in its sole reasonable discretion. Doing so will not prevent a Chargeback, but failure to respond will significantly increase the probability of a Chargeback.

### 5.3.3    Representment

You must submit your request to Citibank within the following timeframes: (i) within twenty (20) days after receiving notice of a Chargeback that qualifies as billing error under Regulation Z/Truth in Lending Act as determined by Citibank in its sole reasonable discretion or, (ii) within thirty (30) days if a dispute is determined not to be a billing error under Regulation Z/Truth in Lending Act as determined by Citibank in its sole reasonable discretion. Your failure to act within that time may not provide Citibank with a reasonable number of days to evaluate your Representment of the Card Sale. Citibank will not be obligated to accept Representments of Chargebacks except to the extent allowed by your timely dispute of other Chargebacks. Citibank' obligation to you for a Chargeback is limited to Representment. Citibank will not engage in direct collection efforts against Cardholders on your behalf.

### 5.3.4    Type Three Chargeback

Citibank reserves the right to make a final decision and reverse a Chargeback back to you that Citibank does not believe you have provided sufficient proof of your position as outlined in Section 5.3.2 above. Citibank reserves the right to do so in it's sole discretion.

### 5.3.5    Immediate Payment for Chargebacks

Each Chargeback to you is immediately due and payable. Citibank may deduct, debit, and withhold the amount of the Chargeback or anticipated Chargeback from the deposits due to you at any time without advance notice. Citibank will notify you as debits occur.

In the event Citibank, in its sole discretion, determines that a Merchant, or any of the Merchants locations are experiencing excessive Chargebacks or fraud, Citibank reserves the right to suspend acceptance of the Sears Card from any Merchant or Merchant's location(s) immediately without further notices.

## 6    Business Type

We have agreed to allow you to accept the Sears Card based on the type of business you currently are in. In the future, if you elect to engage in any new lines or types of business activities, you must immediately inform us of this by contacting Citibank. If you fail to notify us, We may terminate acceptance of the Sears Card immediately and without further notice.

There are some types of businesses We have determined We will not accept as Merchants. We may elect not to extend our Merchant acceptance to any new lines or business activities you might enter in to.

Because of the irreparable damage to the value of the Sears Card and the Trademarks, the use of the Sears Card in connection with a going out of business sale, liquidation sale, insolvency or bankruptcy of Merchant is strictly prohibited. You agree that Citibank will be entitled to, and hereby consents to the entry without notice to your place of business or the posting of any bond in respect thereof by Citibank of, a stay, temporary injunction, and permanent injunctive relief prohibiting such use.

## 7    Advertising

### 7.1    Telephone, Internet, or Mail Order Merchants

You agree that you will offer the Sears Card as a payment option in accordance with any agreement you have with Citibank, or at least in such a manner and with such frequency as accorded any other third party credit or charge card with which you do not have a special marketing agreement.

### 7.2    All Other Merchants

You agree that you will prominently display at each of your locations advertising and promotional materials relating to the Sears Card in such a manner and with such frequency as accorded any other third-party credit or charge card. We may, at our expense or at a mutually agreed upon expense, supply advertising and display materials necessary to promote the Sears Cards.

## EXHIBIT B TO SCHEDULE 9.2A
Pricing Schedule

For Citibank's services hereunder, Merchant will pay compensation to Citibank at the rates set forth in this Pricing Schedule, and reimburse Citibank for certain expenses identified herein. Such rates are subject to increase by Citibank to reflect any business necessary increase in the assessments, interchange fees or other charges. In the event of such an increase Citibank will provide to Merchant as much advance notice as possible and a calculation or good faith estimate of the effect of such increase on the costs of providing the services hereunder.

If applicable, Citibank will compute such compensation and deliver a statement to Merchant monthly, and shall, on the first business day following the end of the month, debit the amount from the next settlement as stated in Section 8 of the Agreement, or if such settlement is insufficient, directly from the Account. Any compensation not paid by such a debit will be payable in cash on demand.

Merchant agrees that it will pay Citibank a processing fee equal to 0% of the net amount of all transactions processed under this Agreement.

The net amount shall equal total sales and chargeback reversals minus total credits, returns, and chargebacks.

The processing fee will be calculated daily and subtracted from the total amount due to the Merchant as described in the above Agreement.

**SCHEDULE 9.2B**

THIRD PARTY CREDIT CARD CONDITIONS

Licensee's acceptance and processing of the Third Party Credit Cards (as defined in the Agreement) shall be performed in accordance with the following:

1.  Acceptance of Third Party Cards. Licensee shall accept each Third Party Card presented by a Cardholder as payment for Authorized Merchandise/Services, and Company shall reimburse Licensee for the amount of such Third Party Card Sale in accordance with the terms of this Schedule 9.2B, provided that Licensee complies with all of the other procedures in the Agreement and this Schedule 9.2B relating to the acceptance of Third Party Cards each time it makes a Third Party Card Sale (as defined in the Agreement), including but not limited to the following conditions:

    (a)  The Third Party Card is presented to Licensee on or before the expiration date, if any;

    (b)  The Third Party Card is used as payment for Authorized Merchandise/Services purchased by a Cardholder;

    (c)  Licensee has followed the procedures for the completion of Sales Slips as set forth in Paragraph 2 below; and

    (d)  Licensee has obtained Authorization for the Third Party Card Sale as required pursuant to Paragraph 3 below.

    For purposes of this Schedule 9.2B, "Sales Slips" means evidence of a Third Party Card Sale in paper, electronic or imaged form, as designated by Company to Licensee, "Issuer" means a financial institution or other entity that issues a Third Party Card, and "Authorization" means permission from the Issuer or its agent to make a Third Party Card Sale.

2.  Completion of Sales Slips.

    (a)  General Requirements. For each Third Party Card Sale, Licensee shall prepare a Sales Slip using the form approved by Company, which may be modified from time to time by Company in its sole discretion. Each Sales Slip must be legible and fully completed with the following information:

        (i)  Date and location of the Third Party Card Sale, including the unit number assigned by Company for the Licensed Business location;

        (ii)  Brief description of the Authorized Merchandise/Services;

        (iii)  Total amount of the Third Party Card Sale, including itemized purchases, any additional fees and credits, and applicable state and local taxes;

        (iv)  Third Party Card account number; and

        (v)  Authorization number or code (where applicable).

    In the event Licensee obtains Authorization (as defined in Paragraph 3 below) for each Third Party Card Sale through the POS Terminal, Licensee shall not be required to obtain an imprint of the Third Party Card. Licensee shall include all

Authorized Merchandise/Services purchased in a single transaction on one Sales Slip except for customer deposits or partial payments. Licensee shall not increase the price of Authorized Merchandise/Services or charge an additional fee to Cardholders for using a Third Party Card for purchasing Authorized Merchandise/Services.

(b)     Cardholder's Signature. Except in the case of Internet, telephone or mail orders, a Sales Slip must be signed by the Cardholder for each Third Party Card Sale at the time the Third Party Card Sale is made and in the presence of an authorized representative or employee of Licensee. The signature on the Sales Slip must be reasonably similar to the signature appearing on the signature panel of the Third Party Card. After completion of the Third Party Card Sale, Licensee shall provide a legible and completed copy of the Sales Slip to the Cardholder. If Licensee fails to obtain the signature of the Cardholder on the Sales Slip and the Cardholder has not authorized the Third Party Card Sale or denies the validity of the Third Party Card Sale, the Third Party Card Sale shall be subject to Chargeback pursuant to Paragraph 6 below. If the Third Party Card has not been signed, Licensee shall ask the Cardholder to sign the Third Party Card and verify such signature with the Cardholder's driver's license or other government issued identification before completion of the Third Party Card Sale.

(c)     Loss and Retention of Sales Slips. Licensee shall be responsible for the loss, damage or corruption of any Sales Slips. Licensee shall retain copies of all Sales Slips for at least three (3) years after the date of the Third Party Card Sales to which they apply. Licensee shall provide copies of Sales Slips to Company or the Cardholder within five (5) days of a request from either party. Licensee's failure to provide a requested Sales Slip shall subject Licensee to Chargeback pursuant to Paragraph 6 below.

(d)     Internet, Telephone and Mail Order Sales. In addition to each of the requirements set forth in Paragraph 2(a) above, for Internet, telephone and mail order sales, Licensee must record the shipping address and shipping date, if known, at the time of the Third Party Card Sale, on the Sales Slip. Licensee will use reasonable judgment in identifying its customers. Licensee agrees to ship merchandise or deliver services within the time required by applicable law, and Licensee is responsible for compliance with all such applicable laws. The Cardholder's signature is not required with respect to mail order, telephone order or Internet order Third Party Card Sales, provided an Authorization number has been given and recorded and Licensee identifies each such Third Party Card Sale as "Mail Order", "Telephone Order" or "Internet Order" on the Sales Slip. If a Cardholder asserts that he/she had not authorized a mail order, telephone order or Internet order Third Party Card Sale, asserts that he/she did not receive the merchandise within the time required by law, or otherwise denies the validity of the Third Party Card Sale, such Card Sale shall be subject to Chargeback pursuant to Paragraph 6 below.

3.  Authorization.

   (a)  General Requirements.  In accordance with the terms of this Paragraph 3, Licensee shall obtain electronic Authorization for each proposed Third Party Card Sale.  For purposes of this Schedule 9.2B, the purchase of one or more Authorized Merchandise/Services made by a Cardholder at one Licensed Business location and at one time shall be deemed to constitute a single Third Party Card Sale.

   (b)  Obtaining Authorization.

      (i)  Electronic Locations.  Licensee will obtain Authorization for Third Party Card Sales through the POS Terminal (if Licensee is using a POS Terminal provided by Company).

      (ii)  Non-Electronic Authorization.  When the POS Terminal is unable to obtain Authorization electronically, Licensee shall contact an agent of Company (the "Authorization Center") using the telephone number provided for such purpose by Company.  If the Authorization Center approves the Third Party Card Sale, Licensee will obtain from the Authorization Center an Authorization code or number which must be recorded on the Sales Slip.

   (c)  Right of Chargeback.  If Authorization for any Third Party Card Sale is required but not obtained by Licensee, or an Authorization code or number is not recorded when Licensee is required to do so, or Authorization is requested by Licensee but declined by the Issuer, Company may process a Chargeback for such Third Party Card Sale pursuant to Paragraph 6 below.

   (d)  Card Retrieval and Retention.  Licensee shall follow reasonable instructions given by the Authorization Center in connection with a Third Party Card Sale, such as obtaining Cardholder identification or Third Party Card retention.   If the Authorization Center instructs Licensee to take the Third Party Card and the Cardholder refuses, Licensee will make no further effort to obtain the Third Party Card.

4.  Operating Standards.  Licensee shall observe other operating standards established by each Issuer from time to time ("Operating Standards") with respect to the Third Party Card Sales made by Licensee on such Issuer's Third Party Card.

5.  Cardholder Credits and Payments.  When Authorized Merchandise/Services originally purchased with a Third Party Card are returned for refund, unless specifically required by law, Licensee shall not give cash refunds for Authorized Merchandise/Services returned or rejected by a Cardholder to any Cardholder in connection with a Third Party Card Sale.  For each non-cash refund issued by Licensee to a Cardholder of all or a portion of a Third Party Card Sale (a "Credit"), Licensee shall prepare and deliver to the Cardholder evidence of each Credit in a paper form (a "Credit Slip"), which Licensee shall complete in accordance with the instructions provided by Company from time to time.  Licensee will retain copies of all Credit Slips for three (3) years from the date of the refund and will submit Credit Slips evidencing such Credits to Company within the time period required by law in order that the appropriate Credit may be entered on the Cardholder's

account. The Credit indicated on the Credit Slip may not exceed the original Third Party Card Sale amount.

6. <u>Chargeback Rights and Procedures</u>. If Licensee has not complied with any of the terms of this Schedule 9.2B or the Agreement with respect to any Third Party Card Sale, Company may process a Chargeback to Licensee for the amount of the Third Party Card Sale, including without limitation each Third Party Card Sale made on any Third Party Card account with respect to which Licensee did not properly process the Third Party Card Sale or any portion thereof. A "Chargeback" means Company's refusal, under the terms of this Schedule 9.2B, to pay Licensee pursuant to the terms of the Agreement, and reimbursement to Company of a Third Party Card Sale for which Licensee was previously paid. Company is not required to pay Licensee for a Third Party Card Sale that is being charged back. If Company has already paid Licensee for such Third Party Card Sale, Company in its sole discretion may deduct the amount to be charged back through its settlement with Licensee under Section 9.4 of the Agreement or offset such amount from future payments due Licensee under the Agreement. Any Chargebacks not paid by the aforesaid means shall be due and payable by Licensee promptly upon demand. Without limiting the foregoing, Licensees's failure to timely pay the amount of any Chargeback may result in the termination of the Agreement and/or appropriate legal action by Company against Licensee. In any such action, Company shall be entitled to recover its costs of collection and reasonable attorney fees, unless prohibited by applicable law.

7. <u>Reserve</u>. Company may request, and if requested, Licensee will immediately fund, a reserve account ("Reserve Account") upon the occurrence of any of the following: (i) Licensee exceeds a Chargeback threshold of [1.5]% of Third Party Card Sales processed; (b) Licensee issues credits in excess of [10]% of either Third Party Card Sales or amounts processed; (c) fraud by Licensee or its employees related to acceptance and processing of the Third Party Credit Cards. Licensee will fund the Reserve Account in an amount equal to the total amount of Chargebacks for the [six (6) months] preceding the date of occurrence of such event or, in the event that Licensee fails to do so, Company may withhold settlement funds in such amount. Company will own and maintain the Reserve Account in an interest-bearing account and the funds contained therein, to the extent such funds are not due and owing to Licensee following termination of this Agreement. Company shall maintain accurate records of such funds included in its standard reporting to Licensee. Company may (but shall not be required to) apply funds in the Reserve Account toward, and may set off any funds that would otherwise be payable to Licensee against, the satisfaction of any amounts which are or become due from Licensee pursuant to the Agreement or this Schedule 9.2(B). [Six (6) months] after the date of expiration or termination of the Agreement, Company will pay to Licensee an amount equal to any funds then remaining in the Reserve Account together with interest earned on such funds, less the amount of any outstanding Chargebacks. The parties' obligations and rights relating to the Reserve Account shall survive termination of the Agreement.

8. <u>Licensee Covenants</u>. Licensee covenants to Company that:

      (a)    each Third Party Card Sale will arise out of a bona fide sale of Authorized Merchandise/Services by Licensee and will not involve the use of a Third Party Card for any other purpose;

      (b)    unless otherwise agreed to in writing by Company, Licensee may not issue a cash advance on any Third Party Card; and

      (c)    Licensee will not present to Company, directly or indirectly, any Third Party Card Sale that (i) Licensee knows or should have known to be fraudulent or not authorized by the Cardholder, (ii) represents a Third Party Card Sale outside Licensee's normal course of business, (iii) represents the refinancing or transfer of an existing Cardholder obligation, (iv) represents a Third Party Card Sale arising from the dishonor of a Cardholder's personal check; or (v) represents another Third Party Card Sale that has already been presented to Company.

9.      <u>Indemnification</u>.  Licensee's breach of any of its obligations under this Schedule 9.2B will constitute breach of the Agreement subject to Section 12 of the Agreement.

10.    <u>Termination of Third Party Card Acceptance</u>.  Licensee acknowledges that Company may, in its sole discretion and upon notice to Licensee, terminate or suspend, at any time and from time to time, the acceptance of any Third Party Card at any Licensed Business location.

11.    <u>Defined Terms</u>.  Capitalized terms not otherwise expressly defined in this Schedule 9.2B have the meanings ascribed to them in the Agreement.

Action Time Inc.
Recap of Amounts Owed
Sears Bankruptcy
Fiscal Month:  September 2 - October 6, 2018

| | |
|---|---|
| Total Sales | $ 92,051.00 |
| Less: Returns and Allowances | (216.00) |
| Net Concession Sales | $ 91,835.00 |
| Sears Settlement | (18,285.00) |
| Total Due Before Credits & Deductions | $ 73,550.00 |
| Cash Over/(Short) | 2.00 |
| Sales Tax due Licensed Business | 6,006.00 |
| Less: Use Tax and Sales Tax on Returns | (1,188.00) |
| Net Due Licensed Business | $ 78,370.00 |

Advances given to Action Time:

| | |
|---|---|
| Sales from 09/02/2018 to 09/08/2018 paid 09/17/2018 | (13,749.00) |
| Sales from 09/09/2018 to 09/15/2018 paid 09/24/2018 | (17,053.00) |
| Sales from 09/16/2018 to 09/22/2018 paid 10/01/2018 | (14,801.00) |
| Total Advances given to Action Time from September | ######### |

**TOTAL DUE ACTION TIME INC.**   **$ 32,767.00**

# EXHIBIT "B"