**Hearing Date: January 2, 2019 @ 10:00 a.m. ET**
**Objection Deadline: December 31, 2018 @ 4:00 p.m. ET**

Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
MILBANK, TWEED, HADLEY & McCLOY LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Craig M. Price
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: January 2, 2019 |
| | Re: Docket No. 1396 |

**RESPONSE OF CYRUS CAPITAL PARTNERS, L.P. TO DEBTORS' NOTICE OF HEARING FOR APPROVAL OF SALE OF MEDIUM TERM INTERCOMPANY NOTES TO CYRUS CAPITAL PARTNERS, L.P.**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Cyrus Capital Partners, L.P. ("Cyrus") hereby submits this response (the "Response") to the Debtors' *Notice of Hearing for Approval of Sale of Medium Term Intercompany Notes to Cyrus Capital Partners, L.P.* [Dkt. No. 1396] (the "Sale Notice").[1] In support of its Response, Cyrus respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The hearing on January 2nd should be limited to the single issue left open by the Court at the December 20th hearing: Was it in the best interest of the Debtors and their estates on November 20, 2018, for the Debtors to agree in their Note Purchase Agreement with Cyrus that Sears Re would not sell any of its MTNs to any non-affiliated party? In light of the value provided to the estates under the Cyrus transaction, the answer to that question should clearly be "yes."

2. Omega and OZ undoubtedly will be back in front of the Court trying to perpetuate their smokescreen of empty promises of what they would have done differently and their false claims about Cyrus allegedly cornering the market, but the Court heard and dismissed those arguments at the December 20th hearing and Omega and OZ should be heard no longer. Simply put, they should not be permitted to try to take a second bite at an apple that they did not even truly try to bite back on November 20th when it was actually being offered.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Motion of Omega Advisors Inc. Pursuant to Sections 105 and 363 of the Bankruptcy Code to Enforce the Court's November 19, 2018 Sale Order and Invalidate the Ultra Vires Sale and Lockup of Medium-Term Intercompany Notes* [Dkt. No. 1077] (the "Omega Motion") and in Cyrus' objection [Dkt. No. 1199] to the Omega Motion.

1

3. On November 20th, the Debtors had an urgent need to sell their MTNs to capture a fleeting "temporary premium" available to the estates as a result of dynamics in the market for Sears-related CDS. Cyrus stepped up to meet that need, quickly bidding at the Auction, executing and ultimately closing on a transaction that provided the Debtors' estates with $82.5 million in cash, plus protection against dilution by more than $2.0 billion of claims that might arise absent the Cyrus transaction.

4. Despite claiming to be the "architect" of the sale process, Omega (and OZ) effectively opted out of the Auction, only submitting "bids" that were conditioned on a favorable ruling by the ISDA Determinations Committee (the "DC") that was not at all certain at the time of the Auction. Omega and OZ knew their bids were illusory when they made them, because they would never have to pay for the MTNs unless the DC made the very determination that the Debtors were trying to stay ahead of. In other words, Omega and OZ simply left the risk sitting with the estates, while Cyrus took on that risk by committing to its bid without regard for the decision of the DC then yet-to-come.

5. In the wake of their failure to step up at the Auction, Omega and OZ ran into Court with misleading claims that Cyrus was trying to corner the market on Sears deliverables, when Omega and OZ both knew that the DC had already listed as deliverable over $849 million in Sears debt instruments that were *separate from and in addition to* the MTNs involved in Cyrus' transaction. And Omega continues to spread that same inaccurate narrative, with its counsel having appeared on television to repeat these claims as recently as December 28th.

6. In advance of the January 2nd hearing, Cyrus respectfully offers two responses to the Debtors' Notice of Hearing resulting from the Court's ruling at the hearing on December 20th.

7. *First*, the Court should simply approve the agreement that Sears Re will not sell any of its MTNs to any non-affiliated party (the "Non-Transfer Covenant") and thereby confirm the entire Auction and Cyrus' winning bid. Cyrus' winning bid, including the Non-Transfer Covenant, is the best outcome for the estate *based on the state of play on November 20th at the Auction*, the only relevant point in time at which the merits of any bids should be evaluated. Confirmation of Cyrus' winning bid also promotes both of the policies that underlie the rule of finality of bankruptcy auctions: maximizing the value of the estate, and promoting that maximization of value by ensuring that bidders can rely on the outcome of an orderly run process.

8. *Second*, to allow the Auction result to be overturned in favor of any new, after-the-fact bid that Omega, OZ, or anyone else lobs in before January 2nd would result in manifest injustice to Cyrus. Cyrus is the only bidder of significance that "played by the rules" at the Auction and made a meaningful, non-conditional bid. Due to their conditional nature, the bids submitted by Omega and OZ were nothing more than shams, and rewarding those parties with a "do-over" seriously undermines the integrity of the Debtors' Auction and bankruptcy auctions in general.

9. To put this all in perspective, would the Court have ever considered vacating the Sale Order and returning the $82.5 million to Cyrus if, post-Auction, the DC had determined that the MTNs were *not* deliverable? That result seems highly unlikely, because the sale terms agreed to at the Auction were established at that moment in time

3

based upon the facts and circumstances existing then and not thereafter, for the very specific purpose of locking in the "temporary premium" for the estates then and there. The Court should enforce the finality of a process that was purposefully conducted by the Debtors under the conditions that existed at the time.

10. Come January 2nd, the Court should put an end to all of Omega's and OZ's histrionics by finding that the Non-Transfer Covenant, as part of the integrated Cyrus transaction, was in the best interests of the Debtors and their estates and therefore should be retroactively approved.

## RELEVANT FACTS

11. On November 9, 2018, the Debtors filed the Sale Motion (the "Sale Motion") seeking authority to sell all of the MTNs held by any Debtor.[2] On November 19, 2018, the Court entered the Sale Order (the "Sale Order") granting the Debtors the requested authority.[3]

12. It is undisputed that the Sale Motion was filed and considered on an emergency basis because the Debtors were determined to sell MTNs prior to any decision by the DC as to whether the MTNs were going to be listed as "deliverables" at the upcoming ISDA CDS auction related to Sears. Hr'g Tr. 170:19–171:13, Dec. 20, 2018;[4] *see also* Sale Motion ¶¶ 9–14.

13. By conducting an auction of the MTNs prior to such determination, the Debtors sought to maximize the "temporary premium" that MTNs might yield due to the

---

[2] *See Emergency Motion for Order Approving Sale of Medium Term Notes* [Dkt. No. 642].

[3] *See Order Authorizing Debtors to Sell Medium Term Notes* [Dkt. No. 826].

[4] All transcript citations refer to the December 20, 2018 hearing transcript.

4

possibility that MTNs could be listed as deliverables, while at the same time eliminating the risk that the Debtors might forfeit that value if the DC decided not to so list the MTNs.

14. In other words, the entire premise underlying the Sale Motion was that the Debtors needed to "beat the clock" in relation to a potentially adverse decision by the DC. *See* Hr'g Tr. 171:10–13. As a result, it was clear that any bid for MTNs that did not allow the Debtors to avoid that risk would be antithetical to the best interests of the estates.

15. On November 20, 2018, the Debtors conducted the Auction. Cyrus was the *only* bidder for any material portion of the MTNs that took the Debtors at their word and submitted an *unconditional* offer that protected the Debtors from the potential forfeiture of considerable value to the estates. *Debtors' Objection to Omega Motion* [Dkt. No. 1196] ("Debtors' Objection") ¶ 25 ("The Creditors' Committee's advisors supported the Debtors' business judgment to reject the contingent bids and accept the Cyrus bid, which eliminated any risk of an adverse decision by the ISDA determinations committee.").

16. At the conclusion of the Auction, the Debtors and the Official Committee of Unsecured Creditors (the "UCC") selected Cyrus' bid as the highest and best offer for the MTNs. They did so because Cyrus offered both the highest value and the least conditionality. Hr'g Tr. 132:20–23 (Debtors' counsel stating, "[T]he offer made by Cyrus of $82.5 million plus waiver of collections on approximately $630 million was the highest offer in terms of absolute dollars that was available on that day and that was not

5

contingent."); *id.* at 149:3–6 (Committee's counsel stating, "[T]he Cyrus bid was higher than all of the other bids combined . . . [w]ith no contingencies.").

17.  Ironically, both Omega and OZ submitted bids that would have required them to pay for the MTNs they bid on *if and only if* the DC decided to list the MTNs as deliverable. Despite their subsequent efforts to entice the Court with promises of "higher and better" offers, *at the time the Auction took place*, all that Omega and OZ were willing to put on the table for the Debtors were illusory, conditional bids that carried the very same risk that the Debtors were trying to avoid all along. The after-the-fact promises of "real" bids from Omega and OZ in the weeks *following* the conclusion of the Auction only serve to demonstrate that their supposed participation in the Auction was nothing but a sham.

18.  In addition, counsel for Omega and OZ either did not know or were not forthcoming with the Court on December 20th when asked whether their clients had been advised by Jefferies that they could bid on more than $251 million of Sears MTNs. Counsel for Omega answered with a definitive "No." Hr'g Tr. 122:6. Counsel for OZ answered, "I don't know the answer to it . . . I think the answer is no . . . ." Hr'g Tr. 121:23–25. On information and belief, these answers were inaccurate. On information and belief, both Omega and OZ were specifically told by Jefferies that they *could bid on more than* the $251 million in MTNs and also that they should bid under the assumption that the November 20th Auction would be the *only* auction for MTNs.

19.  On November 28, 2018, the Debtors' sale of MTNs to Cyrus closed, resulting in, among other things, Cyrus paying the Debtors $82.5 million in cash that was immediately deposited into the Debtors' Winddown Reserve. In addition, as part of its

6

bid Cyrus agreed to waive recoveries on $629 million of the $880 million of MTNs it offered to purchase. Finally, as part of the transaction, the Debtors agreed to the Non-Transfer Covenant, which had the effect of protecting the estate of SRAC from potential unsecured claims that would arise under those MTNs if they were to be sold to non-affiliated parties.

20. The conclusion that Cyrus' bid maximized the value of the MTNs to the Debtors' estates is indisputable. *See* ¶ 16, *supra*.

21. In addition, the Court expressly found that Cyrus acted in good faith throughout the MTNs sale process: "[T]he actions taken by Cyrus here . . . [do not] rise anywhere close to the level of a finding that they have not acted in good faith." Hr'g Tr. 178:25–179:4.

22. And the Court rejected nearly every other argument Omega (and OZ) made regarding the Debtors' sale of the MTNs to Cyrus in Omega's motion to "enforce" the Sale Order, which motion was simply a transparent effort to free up for sale the exact amount of MTNs that Omega and OZ apparently need to cover their naked short positions in Sears CDS. Specifically, the Court found:

- "Sears was authorized to sell more" than the $251,245,000 so-called "Listed" MTNs in the auction. Hr'g Tr. 172:21–25;

- The sale of approximately $880 million of so-called "Listed" and "Unlisted" MTNs to Cyrus was "approved" and "consistent with the sale order." Hr'g Tr. 172:21–25; 173:12–15;

- Omega and OZ made no "credible [contention] that they themselves would have bid differently *at the auction* than they actually bid, which was for a far smaller number of MTNs than the [$]251 million[,] or that they would have made their bids firm, as Cyrus did, as opposed to conditioned on the subsequent determination by the CDS Auction Committee, that these notes would be included in the overall CDS auction." Hr'g Tr. 176:6–14 (emphasis added);

7

- The so-called "Deliverability Language" in the Sale Order that Omega argued was the result of nefarious motives by Cyrus "was simply black letter law consistent with the New York General Obligations Law"—"the same type of proviso that applies to the purchase of *any* note . . . with respect to the Obligor under the note." Hr'g Tr. 177:16–24 (emphasis added); and

- The Auction was not "conducted in a way that, in fact, prejudiced" Omega or OZ. Hr'g Tr. 177:12–178:10.

(collectively, the "December 20th Ruling").

23. Ultimately, the Court stated: "And it's clear, I've approved every aspect of the sale except the Sears Re aspect." Hr'g Tr. 184:12–13. The "Sears Re aspect," the sole "open issue" in the Court's mind, is the question of whether the Sale Order granted the Debtors broad enough authority to consummate the sale to Cyrus under an agreement where the Debtors also agreed to the Non-Transfer Covenant. *See* Hr'g Tr. 179:15–21 (describing the agreement by Sears Re not to sell its MTNs as the remaining issue to be decided by the Court).

24. Notably, the Court framed the Non-Transfer Covenant issue as one of timing more than substance: "And if the facts were so exigent that I would need to make that determination today, I think I would approve it . . . ." Hr'g Tr. 182:14–16.

25. Unfortunately, the Court's finding that the Debtors lacked the authority under the Sale Order to enter into the Non-Transfer Covenant at that time means that the *application* of the December 20th Ruling could be read to open the door for Omega and OZ (or other naked short CDS investors) to try to overturn the results of the very Auction where they failed to even submit conforming, unconditional bids. Specifically, the Court concluded that: (i) the Debtors must seek retroactive approval of the Non-Transfer Covenant at the hearing on January 2nd; and (ii) in connection with that hearing, the Debtors apparently may entertain "new" bids for the Debtors' MTNs *even though the*

8

*Court has already announced its approval of the sale of those MTNs to Cyrus.* The Court appears to have recognized the unusual practical effect of its ruling when it stated: "I'm not reopening the auction, I'm not doing any of that, but in effect, I guess I am because of the Sears Re issue." Hr'g Tr. 184:13–15.

26. Any new bid will be made under drastically changed post-Auction circumstances. The most obvious is the fact that the DC has determined that the MTNs are deliverable into the upcoming ISDA auction.

27. In addition, on December 19th, the DC ruled that certain second lien debt instruments *other than* the MTNs are available for delivery into the upcoming ISDA CDS auction.[5] This means that the representation made to the Court by Omega's counsel on December 20th that Cyrus was trying "to take all the bonds off the market[,] or at least all

---

[5] To be clear, on December 19, 2018, the ISDA DC External Review Panel determined that the SRAC second lien PIK term loan and second lien line of credit loans satisfy the consent required loan deliverable obligation characteristic and will be included in the upcoming ISDA auction. *See* Andy Brindle *et al.*, *Decision and Analysis of the External Review Panel of the U.S. Determinations Committee DC Issue 2018101502 (Sears)* 1 (Dec. 21, 2018), https://www.cdsdeterminationscommittees.org/documents/2018/12/external-review-panel-decision-december-21-2018.pdf.

Thus, separate and apart from the SRAC MTNs, there are approximately $317 million in SRAC second-lien PIK term notes outstanding, and approximately $525 million in SRAC second-lien line of credit loans outstanding available as deliverables. These obligations are held by third parties and *are not covered by Cyrus' winning bid*. These facts should have been known to Omega at the December 20th hearing when it inaccurately accused Cyrus of trying to take all the deliverables off the market. To the extent the Court's conclusion regarding the Non-Transfer Covenant was influenced by a perception that the Non-Transfer Covenant makes it impossible for Omega and OZ to cover their naked short positions by purchasing *other*, non-MTN deliverable obligations, that conclusion would have been based on an inaccurate premise.

9

of the bonds that ISDA would consider deliverable obligations" was simply wrong.[6] Hr'g Tr. 98:5–7.

28. Finally, the DC also has taken under consideration certain proposed rule changes with respect to deliverability that, if adopted at an upcoming January 3 meeting of the DC, would have the effect of significantly reducing the value of any MTNs at the ISDA auction—casting even more uncertainty over the value of the MTNs and militating even further against any upsetting of an Auction that, if it stands, will have proven to be extremely beneficial to the Debtors.[7] Indeed, in light of this change in market conditions, Cyrus has begun closing out CDS positions with CDS counterparties to derisk itself from its CDS exposure.

## ARGUMENT

### A. The Court Should Approve The Non-Transfer Covenant And Confirm Cyrus' Winning Bid.

29. The Non-Transfer Covenant is a valuable component of the total consideration for Cyrus' winning bid at the Auction, and the Court should confirm it (along with the Auction result as a whole) on January 2nd. In the December 20th Ruling, the Court discussed the two-pronged rationale behind "the strong policy under the

---

[6] In a televised interview with Bloomberg on December 28, Omega's counsel repeated this inaccurate claim. *See* Bloomberg Daybreak: Americas, *The Battle Over Sears' Debt Heats Up*, Bloomberg, at 1:19–1:32 (Dec. 28, 2018, 7:23 AM), https://www.bloomberg.com/news/videos/2018-12-28/the-market-for-sears-cds-is-broken-video ("Cyrus . . . has effectively cornered all of the debt in that market such that parties are not able to deliver bonds into the auction that will be used to determine what the ultimate payouts will be on the CDS."). Omega's counsel also predicted—three times—that this Court will "unwind" Cyrus' winning bid on January 2nd. *See id.* at 4:35–4:45, 7:00–7:17, 7:27–7:31.

[7] On information and belief, Omega is behind the proposed eleventh-hour ISDA rule changes. In the televised Bloomberg interview on December 28, Omega's counsel repeatedly referenced "rules" and "steps" that the DC could undertake. *See* Bloomberg Daybreak, *supra* note 6, at 6:43–6:48, 7:31–7:36.

Bankruptcy Code in favor of the finality of bankruptcy auctions." Hr'g Tr. 173:16–17.

As the Court stated:

> One is that the estate needs to be maximized. . . .
>
> [T]he other is . . . the integrity of the bankruptcy process and the understanding that the maximization of value depends upon the reliability of the outcome of an auction so that bidders actually make their best bid and don't try to game the system by holding back and then seeing where everyone has gone, and then making a bid under changed circumstances.

Hr'g Tr. 175:7–19. Approval of Cyrus' bid, including the Non-Transfer Covenant, promotes both of those goals. The efforts of Omega and OZ to overturn an Auction where they attempted to skirt the rules by submitting blatantly conditional bids serves neither.

30.    The Non-Transfer Covenant is part of an overall bid that is value-maximizing for the estates. The Debtors received $82.5 million in cash for deposit into the Winddown Reserve. In addition, the Debtors received the substantial benefit of Cyrus' waiver of recoveries on approximately $650 million of the purchased MTNs.[8] And the Non-Transfer Covenant confers a similar benefit to the Debtors, by minimizing the chances that the MTNs held by Sears Re are sold to a non-affiliate and thereby give rise to up to $1.4 billion of "springing" claims against SRAC and its estate.[9]

---

[8]    In their objection to the Omega Motion, the Debtors explained that "even assuming, hypothetically, that an unsecured claim against SRAC were entitled to [only] a 5% distribution under a chapter 11 plan, this feature of the Cyrus purchase would have saved the SRAC estate almost $30 million in value." Debtors' Objection ¶ 24. Accordingly, at a 10% distribution, this feature would save the SRAC estate approximately $60 million in value, at a 20% distribution, it would save approximately $120 million in value, etc.

[9]    Using the Debtors' hypothetical 5% distribution for unsecured SRAC claims, the Non-Transfer Covenant would save the SRAC estate approximately $70 million in value. At a 10% distribution, it would save approximately $140 million in value, at a 20% distribution, it would save approximately $280 million in value, etc.

11

31. While Cyrus respectfully submits that the Non-Transfer Covenant should have been approved at the December 20th hearing as a valid exercise of the Debtors' sound business judgment that was authorized by the Sale Order, it should most certainly be approved now.

32. Confirming Cyrus' winning bid, including the Non-Transfer Covenant, also promotes the reliability of this Auction and the integrity of the sale process utilized by the Debtors and supported by the UCC. There can be no doubt that these factors are of paramount importance in these cases in particular, where the Debtors have already relied, and will continue to rely, so heavily on the outcome of successful section 363 sales to provide creditor recoveries.

33. The strong policy in favor of finality weighs heavily in Cyrus' favor. A bankruptcy court should reopen bidding only "where there is a grossly inadequate price or fraud in the conduct of the proceedings[.]'" *Wintz v. Am. Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 813 (8th Cir. 2000) (quoting *Four B. Corp. v. Food Barn Stores (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 565 (8th Cir. 1997) (affirming sale order because there was no evidence that winning bid was "grossly inadequate")). Indeed, "it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed." *In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 629 (1st Cir. 1975). Here, the Court has *already found* no unfairness to Omega and OZ in connection with the Auction, as well as good faith on the part of Cyrus. Hr'g Tr. 176:6–23.

12

34. In addition, approving the Non-Transfer Covenant rewards Cyrus for "actually making [its] best bid," rather than "try[ing] to game the system" by "holding back" and then "making a bid under changed circumstances." Hr'g Tr. 175:13–19. Cyrus took significant deliverability risk in making its bid, and it should be rewarded for that. On the other hand, Omega's and OZ's claim at the December 20th hearing that *now*, only *after* the DC has determined the MTNs are deliverable, they are willing to make bids significantly better than the sham bids they made during the Auction, is a textbook example of gaming the system that should *not* be rewarded.

### B. Overturning The Outcome Of The Auction, Via An After-the-Fact Bid Or Otherwise, Would Result In Manifest Injustice.

35. If the Court were to approve an after-the-fact bid on January 2nd or otherwise upset the results of the Auction, that would set a bad precedent for future potential bidders on other assets in these and other cases and work a manifest injustice to Cyrus.

36. As noted, the Debtors deliberately held the Auction *before* the DC made its decision about the deliverability of the MTNs in order to mitigate the risk of a finding that the MTNs were not deliverable, which would have significantly reduced their value to the estate. At the time of the Auction, Cyrus, Omega and OZ—and the six other entities that submitted bids in the Auction—operated on an even playing field where they were all subject to this deliverability risk. Cyrus was the only bidder to put in a material bid that was not conditioned on the MTNs' deliverability. Cyrus was the only bidder that offered up to $82.5 million in cash value to the estates. And Cyrus was the only bidder that delivered additional significant value to the SRAC estate by waiving recoveries on $629 million of the $880 million MTNs it offered to purchase *and* ensuring that the Sears

13

Re-owned MTNs remained in the Sears family of affiliates—providing further protection against significant dilution of creditors' recoveries.

37.  To allow another bidder to now take advantage of the DC's *post-Auction* deliverability determination and "win" the Auction on an *ex post* basis would be fundamentally unfair and wrong.  Numerous courts, citing fairness principles, have cautioned against allowing "do-overs" of auctions by disgruntled, losing bidders. *See, e.g.*, *In re Charter Co.*, 829 F.2d 1054, 1055 n.1 (11th Cir. 1987) ("reopening the bidding after the highest bidder has spent considerable time and money negotiating a contract could chill future interest in purchasing bankruptcy estate property"); *In re Gil-Bern Indus., Inc.*, 526 F.2d at 629 (". . . in the long run such a practice would be penny wise and pound foolish.  Creditors in general would suffer if unpredictability discouraged bidders altogether.  At the least such practices might encourage low formal bids.").

38.  In *In re Bigler*, *LP*, 443 B.R. 101 (Bankr. S.D. Tex. 2010), the bankruptcy court declined a frustrated bidder's attempt to reopen a concluded auction on fairness grounds.  In declining the losing bidder's request for a do-over, the court emphasized that "a clear winner [had] emerged from the auction as the party which had clearly made the highest bid." *Id.*  And the court refused to "punish[]" the winning bidder, who played by the rules and submitted the highest bid, by giving the frustrated bidder a second bite at the apple, concluding:  "The adage that 'no good deed goes unpunished' will not stand in this case." *Id.* at 114.  Nor should that adage stand here.

39.  Respect for the finality of auctions and the fairness concerns that emanate from that rule are especially important in a case like this, where numerous asset sales are contemplated.  Creditor recoveries will largely depend on the results of these auctions,

14

and if bidders fear the finality of their bids is at risk even after an auction has been closed and a sale consummated, they will either factor such risk into the amount of their bids and bid less—or simply choose not to participate at all.

## CONCLUSION

**WHEREFORE**, Cyrus respectfully requests that the Court retroactively approve the Non-Transfer Covenant as being in the best interests of the Debtors' estates and re-affirm its approval of the Debtors' entry into the Note Purchase Agreement in accordance with the Sale Order.

Dated: December 31, 2018
New York, New York

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By:   /s/ Thomas R. Kreller

Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Andrew M. Leblanc
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Craig M. Price
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*

15