# EXHIBIT A



## Dilworth
## Paxson LLP

Brett Wiltsey
New Jersey Managing Partner

DIRECT DIAL NUMBER:
(856) 675-1971

Jennifer L. Cordes
jcordes@dilworthlaw.com

July 12, 2018

### *NOTICE TO TERMINATE TENANT'S OPTION TO RENEW*

**VIA CERTIFIED MAIL, R.R.R.**
Sears, Roebuck and Co.
3333 Beverly Road
Department 824RE
Hoffman Estates, Illinois 60179
Attention: Vice President – Real Estate

> **Re:    Ground Lease between James J. Thompson Trust ("Landlord") and Sears, Roebuck and Co. ("Tenant"), dated April 15, 1998 (the "Lease")**

Dear Sir or Madam:

This office represents the James J. Thompson Trust as Landlord of Block 140, Lot 62 on the Tax Map of the Township of North Brunswick, New Jersey, located on Route 1 South (the "Property").

Our records indicate that the Commencement Date of the above-referenced Lease was February 7, 1999. Therefore, pursuant to Section 3(a) of the Lease, Landlord hereby gives notice that it has elected to terminate Tenant's option to renew the Lease. If Tenant intends to exercise its renewal option, Tenant must do so by written notice to the Landlord, with a copy to the undersigned, within thirty (30) days from your receipt of this letter.

Very truly yours,

Jennifer L. Cordes

JLC/
cc:    Sears, Roebuck and Co., Assistant General Counsel – Real Estate
Robert B. Williams, Esq. – for the Trust
Harold G. Cohen, Esq.

A Limited Liability Partnership Formed in Pennsylvania
LibertyView • 457 Haddonfield Road • Suite 700 • Cherry Hill, NJ 08002 • 856-675-1900 • fax: 856-663-8855
www.dilworthlaw.com • Philadelphia, PA • Harrisburg, PA • Wilmington, DE • New York, NY

120256042  1



## DILWORTH
## PAXSON LLP

Brett Wiltsey
New Jersey Managing Partner

DIRECT DIAL NUMBER:
(856) 675-1971

Jennifer L. Cordes
jcordes@dilworthlaw.com

August 28, 2018

**VIA CERTIFIED MAIL, R.R.R.**
Sears, Roebuck and Co.
3333 Beverly Road
Department 824RE
Hoffman Estates, Illinois 60179
Attention: Vice President – Real Estate

**Re:    Ground Lease between James J. Thompson Trust ("Landlord") and Sears, Roebuck and Co. ("Tenant" or "Sears"), dated April 15, 1998 (the "Lease")**

Dear Sir or Madam:

As a follow up to our July 12, 2018 correspondence providing Landlord's notice to terminate Tenant's option to renew, please allow this to confirm that the time within which Tenant could have exercised its option to renew has expired. The Lease shall therefore terminate on February 7, 2019.

To avoid issues at Lease end, kindly provide written confirmation that Sears has alerted its subtenant, Kentucky Fried Chicken of California, Inc., that Sears has not exercised its option to extend the Lease – thereby also terminating the sublease.

Very truly yours,

Jennifer L. Cordes

JLC/
cc:    Sears, Roebuck and Co., Assistant General Counsel – Real Estate
Robert B. Williams, Esq. – for the Trust
Harold G. Cohen, Esq.

A Limited Liability Partnership Formed in Pennsylvania
LibertyView • 457 Haddonfield Road • Suite 700 • Cherry Hill, NJ 08002 • 856-675-1900 • fax: 856-663-8855
www.dilworthlaw.com • Philadelphia, PA • Harrisburg, PA • Wilmington, DE • New York, NY

120321499 1

# EXHIBIT B



**Sandra K. Cash**
Director-Specialty Stores
Asset Management

*Sears, Roebuck and Co.*
3333 Beverly Road, B2-156B
Hoffman Estates, Illinois 60179
Phone: (847) 286-8583
Fax: (847) 286-3803
Scash1@sears.com

November 8, 1999

**REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

James J. Thompson Trust
c/o First Union National Bank
190 River Road, Second Floor
Summit, New Jersey 07901

Attention:    Trust Real Estate

Dear Landlord:

    Attached you will find a copy of the fully executed Sublease by and between Sears, Roebuck and Co., as sublessor, and Kentucky Fried Chicken of California, Inc., as sublessee, for the property in North Brunswick, New Jersey.

                    Sincerely,

                    **SEARS, ROEBUCK AND CO.**

                    Sandra K. Cash

Attachment

cc:    Robert B. Williams, Esq., Via Registered Mail/Return Requested ✓
      Milbank, Tweed, Hadley & McCloy
      One Chase Manhattan Plaza
      New York, NY 10005

cc:    Jeffrey H. Newman, Esq., Via Registered Mail/Return Requested
      Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross
      One Riverside Plaza
      Newark, New Jersey 07102-5400

## SUBLEASE

THIS SUBLEASE (hereinafter "Sublease") is made and entered into as of this _4th_ day of _November_, 1999, by and between **SEARS, ROEBUCK AND CO.**, a New York corporation ("Sublessor"), and **KENTUCKY FRIED CHICKEN OF CALIFORNIA, INC.**, a _Delaware_ corporation ("Sublessee").

## WITNESSETH:

WHEREAS, Sublessor entered into that certain lease ("Master Lease") dated April 15, 1998, between James J. Thompson Trust, as landlord ("Landlord"), and Sublessor, as tenant, whereby Landlord is leasing to Sublessor certain premises ("Demised Premises") located at Block 140, Lot 62, Route 1 South in North Brunswick, New Jersey. A copy of the Master Lease is attached hereto as Exhibit "A" and made a part hereof.

WHEREAS, Sublessor and Sublessee desire to enter into this Sublease for the Demised Premises, all as provided hereinafter;

NOW, THEREFORE, for and in consideration of and subject to the covenants and agreements hereinafter mentioned, the parties do hereby agree as follows:

1. **Demise**

   Sublessor hereby subleases to Sublessee and Sublessee hereby accepts from Sublessor the premises consisting of approximately 1.6 acres of land and outlined in blue on the plan attached hereto and made a part hereof as Exhibit "B" ("Subleased Premises"), subject to the covenants, terms, provisions and conditions of the Master Lease.

2. **Term**

   The term ("Term") of this Sublease shall commence on the Rental Commencement Date (as defined in Subsection 4.D.) and shall expire on February 7, 2019. The parties shall specify the Rental Commencement Date by supplemental agreement.

3. **Options of Sublessee to Renew**

   A.   Subject to the conditions set forth in Subsection 3.B. below, Sublessor grants to Sublessee two (2) consecutive options to extend this Sublease for periods of five (5) years each ("Option Periods"), which Option Periods shall be exercisable on written notice by Sublessee to Sublessor no later than two hundred seventy (270) days prior to the expiration of the Term (as extended by the previous Option Period if more than one extension option).

1

B.  Sublessor only has the right to exercise its right to an Option Period if: (i) Sublessor has the right to exercise an option under the Master Lease for the same timeframe; (ii) Sublessor is not in default under the Sublease beyond any applicable cure period at the time such option is exercised; and (iii) Sublessee has not been late in making any monetary payments to Sublessor under the Sublease more than five (5) times in the past.

C.  Sublessee has no right to exercise any options to extend the term of the Master Lease which exist, if any, in the Master Lease.

4.  **Rent**

A.  During the initial Term of the Sublease, Sublessee shall pay as rent for the Subleased Premises the sum of Eight Thousand Seven Hundred Fifty and 00/100 Dollars ($8,750.00) per month (or a proportionate share thereof for any partial month), payable in advance upon the Rental Commencement Date (as hereinafter defined) and thereafter on the first day of each month of the Term to: Sears, Roebuck and Co., Department 768H, 3333 Beverly Road, Hoffman Estates, Illinois 60179, Attention: National Property Controller, or to such other payee or at such other address as Sublessor shall direct by written notice. During the initial Term of the Sublease, Rent for the Subleased Premises shall increase by the amount of fifteen percent (15%) on each fifth anniversary date of the Rental Commencement Date (for example – on the fifth anniversary of the Rental Commencement Date, rent shall increase to $10,062.50 per month and on the tenth anniversary of the Rental Commencement Date rent shall increase to $11,571.88 per month and so on.)

B.  If Sublessee exercises its first option to extend this Sublease, Sublessee agrees to pay as rent during such first Option Period the sum of $14,939.42 per month under the same conditions set forth in Subsection 4.A.

C.  If Sublessee exercises its second option to extend this Sublease, Sublessee agrees to pay as rent during such second Option Period the sum of $17,180.33 per month under the same conditions set forth in Subsection 4.A.

D.  "Rental Commencement Date" shall be the earlier of: (i) the date three hundred (300) days after the date of this Sublease; or (ii) the date Sublessee opens for business on the Subleased Premises.

E.  An administrative charge of five percent (5%) of the monthly payment shall be due for any payments not received by Sublessor by the fifth of the month.

F.  In addition, Sublessee shall pay to Sublessor, as additional rent, any applicable realty tax.

G.  Rent not received by Sublessor when due shall accrue interest at four (4) percentage points above the "Prime Rate" published in The Wall Street

2

Journal (and if The Wall Street Journal is no longer published, then
another financial journal designated by Sublessor); provided, however,
that if such rate calculation as above provided shall, at any time, exceed
the maximum rate then permissible under law, such excess shall not be
charged and instead the applicable interest rate shall, for so long as such
condition continues, be equal to the maximum rate allowed by law.

5.    **Hold Over**

If Sublessee does not vacate the Subleased Premises upon the expiration of this
Sublease, such holdover shall result in a tenancy at sufferance, and in addition to
Sublessee paying all damages incurred by Sublessor as a result of Sublessee
holding over, Sublessee shall also pay to Sublessor monthly rent in the amount of
one and one-half (1-1/2) times the monthly rent applicable to Sublessee for the
month immediately prior to Sublessee holding over.

6.    **Utilities**

Sublessee shall pay for all utilities consumed on the Subleased Premises after the
date of this Sublease.

7.    **Common Area Maintenance, Insurance, Operating Expenses and Taxes**

Beginning on the Rental Commencement Date and throughout the Term,
Sublessee shall also pay to Sublessor any and all pass-throughs required to be
paid by Sublessor as tenant pursuant to the Master Lease, including, but not
limited to, real estate taxes, insurance expenses and common area maintenance
charges, if any.

8.    **Use**

Sublessee may use the Subleased Premises only for a fast food restaurant with
drive through and for no other use. Sublessee covenants that it shall open a fast
food restaurant with drive through on or before the date one hundred eighty (180)
days after the Rental Commencement Date.

9.    **Hazardous Materials**

No Hazardous Material (as hereinafter defined) shall be created, handled, placed,
stored, used, transported or disposed of by Sublessee on the Subleased Premises
except Hazardous Material incidental to the operation of a fast food restaurant
with a drive through and Sublessee agrees to comply with all applicable laws
pertaining to the storage, use and disposition of such Hazardous Material.
Sublessee shall meet all of Sublessor's obligations relating to Section 21 of the
Master Lease. Sublessee shall indemnify, defend and hold Sublessor, its
directors, officers, employees, agents and any successor to Sublessor's interest in
the Subleased Premises harmless from and against any and all claims, judgments,
damages, penalties, fines, costs, liabilities or losses (including, without limitation,
sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees)

3

which result from Sublessee's breach of this Section. As used herein, "Hazardous Material" shall mean any substance that is toxic, ignitable, reactive, corrosive and that is regulated by any local government, the State of New Jersey or the United States Government. "Hazardous Material" includes any and all material or substances that are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to state, federal or local governmental law. "Hazardous Material" includes, but is not restricted to, asbestos, polychlorobiphenyls ("PCBs") and petroleum.

10.  **Construction of Improvements**

A.  Sublessee shall have the right during the entire Term of this Sublease to construct, reconstruct and demolish any and all improvements and/or alterations (including exterior signage) subject to the following requirements: (i) the plans therefor shall be subject to Lessor's prior written approval (which approval shall not be unreasonably withheld) prior to commencement of such work unless the alterations are not structural and do not decrease the size of the existing building and cost less than $50,000.00; and (ii) the plans and all improvements and alterations are subject to all applicable provisions of the Master Lease and approval of the Landlord if required per the terms of the Master Lease prior to commencement of such work. All improvements as they exist upon expiration of the Term of this Sublease shall then (and only then) become the property of Sublessor except that prior to the expiration of the Term, subject to the Terms of the Master Lease, Sublessee has the right to remove all of Sublessee's personal property, and/or trade fixtures and all signs, structures and architectural features which in Sublessee's judgment must be removed to prevent identification of the Premises with Sublessee as long as Sublessee promptly repairs any damage caused by such removal. Any trust deed or other encumbrance placed on the Subleased Premises by Sublessee shall expressly authorize the foregoing, and Sublessee shall cause any existing trust deeds to be amended to so authorize.

B.  Work done under this Section 10: (i) shall be at Sublessee's sole cost and expense; (ii) shall be done in a good and workmanlike manner; (iii) shall be completed in compliance with all laws, ordinances, orders, rules, regulations and requirements applicable thereto; and (iv) shall be performed only if Sublessee shall have given Sublessor twenty (20) days prior written notice of any proposed work; and (v) shall be subject to all applicable provisions of the Master Lease.

C.  If any mechanic's, materialman's or other similar lien shall at any time be filed against the Subleased Premises on account of any work, labor or services performed or claimed to have been performed, or on account of any materials furnished or claimed to have been furnished, for or at the direction of Sublessee or anyone holding or occupying the Subleased Premises through or under Sublessee, Sublessee shall, without cost or

4

expense to Sublessor, forthwith cause the same to be either (i) discharged of record by payment, bond, order of a court of competent jurisdiction or otherwise; or (ii) contested, in which event any judgment or other process issued in such contest shall be paid or discharged before execution thereof.

11.  **Repairs and Maintenance**

Sublessee shall accept the Subleased Premises in its "AS-IS" condition. Sublessor makes no representations or warranties as to the condition of the Subleased Premises. Sublessee shall, at its own expense, make all repairs and replacements to or upon the Subleased Premises and any improvements thereon and perform all maintenance to the Subleased Premises and/or the improvements thereon. Sublessee shall also make all repairs and replacements and perform all maintenance to the Subleased Premises and/or the improvements thereon which are the responsibility of Sublessor as the tenant under the Master Lease. Sublessee shall also keep the Subleased Premises and the improvements thereon in a clean condition. Sublessee shall comply with all laws, statutes, governmental regulations and local ordinances and the direction of the proper public officials concerning its use of the Subleased Premises and the improvements thereon. Sublessee shall return the Subleased Premises and the improvements thereon to Sublessor "broom clean" and in the same condition as it exists as of the beginning of the Term, excluding ordinary wear and tear, with all improvements constructed by Sublessee in good working order.

12.  **Access to Subleased Premises**

Sublessee shall permit Sublessor and the agents and employees of Sublessor to enter into and upon the Subleased Premises at reasonable times and with two (2) business days prior notice (provided, however, if, in Sublessor's reasonable judgment, an emergency shall exist, then upon such notice to Sublessee as may be reasonable under the circumstances, which may mean without prior notice if the circumstances shall so require) for the purpose of inspecting the same; for exhibiting same to prospective purchasers and/or mortgagees; exercising its rights and remedies under this Sublease; and performing its obligations under this Sublease. If Sublessee has not exercised an option to renew, Sublessee shall permit Sublessor and its agents and employees, at any reasonable time upon reasonable notice during the last Lease Year prior to the expiration of the Term of this Lease in order to exhibit the Subleased Premises to prospective tenants at reasonable hours; provided, however, Sublessor agrees not to unreasonably interfere with Sublessee's operations in exercising its rights under this Section.

13.  **Assignment/Sublease**

Sublessee shall not have the right to assign this Sublease, or to further sublet the Subleased Premises, or any part thereof without the prior written consent of Sublessor. Notwithstanding anything to the contrary contained herein, Sublessee may sublet the Subleased Premises to a parent, subsidiary, franchisee, or other affiliate of Sublessor but only for as long as such entity remains a parent,

5

subsidiary, franchisee, or other affiliate of Sublessee and such entity assumes all obligations of Sublessee under this Sublease.  In the event of any assignment of this Sublease or subleasing of the Subleased Premises, Sublessee shall remain responsible for all of its obligations under this Sublease.

14.   **Default**

If Sublessee defaults (A) in the payment of the rental described herein; or (B) in any of its other covenants of this Sublease to be kept by Sublessee, then if Sublessee does not cure such default within ten (10) days of Sublessee's receipt of written notice thereof by Sublessor, in addition to all other rights which Sublessor has at law or in equity, Sublessor shall have the right to declare the Term ended and re-enter the Subleased Premises, and any part thereof, with process of law, and expel, remove and put out Sublessee or any person or persons occupying the Subleased Premises and to repossess the Subleased Premises again, without prejudice to any remedies which might otherwise be used for arrears of rent or breach of covenants by Sublessee.

15.   **Notices**

All notices herein provided for shall be in writing and shall be sent by (A) registered or certified mail, postage prepaid, return receipt requested, (B) personal delivery or (C) reputable overnight air courier, and shall be deemed to have been given (i) five (5) business days after deposit in the mail postage prepaid if sent via mail, (ii) upon receipt if personally delivered, and (iii) one (1) business day after being deposited with a reputable overnight air courier for guaranteed next day delivery.  Notices shall be addressed to:

| | |
|---|---|
| **Sublessor:** | **Sears, Roebuck and Co.**<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Attn:      Vice President Real Estate<br>               Department 824RE |
| **Copy to:** | **Sears, Roebuck and Co.**<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Attn:      Assistant General Counsel<br>               Real Estate<br>               Department 766 |
| **Sublessee:** | **Kentucky Fried Chicken of California, Inc.**<br>1441 Gardiner Lane<br>Louisville, Kentucky 40213 |

6

**Copy to:**                    **Kentucky Fried Chicken**
                                17901 Von Karman
                                Irvine, California 92614-6221
                                Attn:      Real Estate Dept. #11-5697

or to any other address furnished in writing by either of the respective parties. However, any change of address furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current notice addresses to be used for the party requesting the change.

16.   **Sublessee's Insurance**

Sublessee agrees to obtain and maintain at all times during the Term hereof:

A.     All-Risk Property Insurance (and during construction of any improvements, Builders Risk Insurance) upon all buildings, improvements and alterations, as well as Sublessee's fixtures, furniture, equipment, goods and merchandise located or stored in or about the Subleased Premises, including, but not limited to, fire and extended coverage, windstorm, vandalism, malicious mischief, sprinkler leakage, and flood in the amount of full replacement cost.

B.     Commercial General Liability Insurance covering Sublessee's operations at the Subleased Premises with coverage for premises/operations, products/completed operations, contractual liability, personal/advertising injury liability with combined single limits of $2,000,000.00 per occurrence for bodily injury and property damage, including Sublessor as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent).

C.     If Sublessee has any motor vehicles on the Subleased Premises, then Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $1,000,000.00 per occurrence for bodily injury and property damage.

D.     Workers' Compensation Insurance covering all costs, statutory benefits and liability under State Workers' Compensation and similar laws for the employees of Sublessee with a waiver of subrogation in favor of Sublessor, and Employer's Liability Insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.  In addition, Sublessee agrees to require and warrants that all contractors hired by Sublessee will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and Sublessee will require all subcontractors to maintain such insurance and Sublessee agrees to indemnify, defend and hold Sublessor harmless from any loss, injury, damage or liability which Sublessor may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

7

E.   Any insurance required to be maintained by the Sublessor under the Master Lease.

All policies described above shall be issued by companies qualified to do business in the State of New Jersey, and rated A-/VII or better in the most current edition of Best's Insurance Reports. Sublessee shall furnish Sublessor copies of certificates thereof prior to being given possession of the Subleased Premises and again upon the commencement of each succeeding policy period. Upon request Sublessee shall deliver Sublessor copies of such policies. Each policy shall provide that it shall not be subject to cancellation or material change without thirty (30) days' prior written notice to Sublessor. Sublessee may meet its insurance obligations under this Sublease through a blanket insurance policy, through any combination of primary or umbrella coverage or, so long as Sublessee has a net worth of at least $100,000,000, Sublessee shall have the right to self-insure its insurance obligations under this Sublease through a self-insurance program which does not diminish Sublessee's insurance obligations hereunder. If Sublessee shall ever have a net worth of less than $100,000,000, Sublessee shall purchase, at Sublessee's sole cost and expense, the insurance policies as set forth above.

17.   **Indemnity**

Sublessee shall defend Sublessor against all claims, actions, proceedings and suits relating to Subleased Premises during the Term of the Sublease. Sublessee shall indemnify Sublessor against, and save Sublessor harmless of and from, any and all loss, cost, damage, expense or liability (including, but not limited to, reasonable attorneys' fees and disbursements) incurred by Sublessor (except those caused solely by the willful misconduct or negligent acts or omissions of Sublessor) by reason of: (A) the conduct of Sublessee's business in, or use, occupancy and management of, the Subleased Premises; (B) any injuries to persons or damage to property occurring in, on or about the Subleased Premises; (C) any breach or default by Sublessee in the observance or performance of the covenants and agreements contained herein or in the Master Lease; (D) any work or thing whatsoever done, or any condition created, in, on or about the Subleased Premises during the Term hereof; or (E) any act or omission of Sublessee, its agents, contractors, servants, employees, invitees, guests or licensees. Sublessee's obligations under this Section shall survive the expiration of the Term or earlier termination of this Sublease.

18.   **Rules and Regulations**

Sublessee agrees to comply with any rules and regulations issued by Landlord pursuant to the Master Lease.

19.   **Risk of Loss**

Sublessee assumes all risk of damage or loss of any improvements, fixtures, equipment, merchandise or goods located in or about the Subleased Premises

8

from any cause whatsoever and for all damage or loss that may arise from delivery, receipt, piling, stacking or handling the goods and merchandise of Sublessee, whether on the Subleased Premises or otherwise.

20.   **Terms of Master Lease**

Sublessee agrees to abide by the terms of the Master Lease and to assume all rights and obligations of Sublessor,* as tenant, pursuant to the Master Lease, exclusive of the obligation to pay rental therein specified, insofar as they relate to the Subleased Premises.  Sublessee covenants and agrees that it will not do anything or permit anything to be done which would give rise to a breach of the Master Lease.   *and is entitled to all rights and benefits of Sublessor

21.   **Sublessee's Taxes**

Sublessee shall pay all taxes and assessments of every nature, kind and description, levied and assessed against Sublessee's fixtures, equipment, merchandise and goods stored in or about the Subleased Premises.

22.   **Loss by Casualty**

If any buildings, structures or other improvements located on the Subleased Premises, or any part thereof, shall be damaged or destroyed by fire or other casualty, Sublessee's obligations under this Sublease shall not be affected and Sublessee shall continue to pay rent and other charges hereunder.  If one of the conditions in Subsection 18 or Subsection 19 of the Master Lease giving the tenant under the Master Lease the right to terminate the Master Lease arises, then, on Sublessee's written direction to Sublessor, Sublessor shall attempt to exercise the right of tenant under the Master Lease to terminate the Master Lease.  In the event that Sublessor is successful in terminating the Master Lease, then this Sublease shall also terminate at the same time.

23.   **Contingencies**

A.   Inspection Period.  For a period of thirty (30) days after the date of this Sublease ("Inspection Period") Sublessee shall have the right to inspect the condition of title to the Subleased Premises, access to the Subleased Premises, and the condition of the soil on the Subleased Premises (collectively "Inspection Matters").  If Sublessee reasonably determines that any of the Inspection Matters do not meet the condition reasonably anticipated, then Sublessee has the right to terminate this Sublease by notifying Sublessor in writing that Sublessee is exercising such right to terminate this Sublease prior to expiration of the Inspection Period. During the Inspection Period, Sublessor shall request Landlord to enter into an agreement with Sublessee recognizing this Sublease ("Recognition Agreement") and agreeing that if the Master Lease is terminated, then Landlord shall enter into a direct lease with Sublessee on the same terms and conditions as contained in the Master Lease.  In the event a

9

Recognition Agreement is not executed prior to expiration of the
Inspection Period, then Sublessee has the right to terminate this Sublease
prior to the expiration of the Inspection Period. If Sublessee does not
exercise a right to terminate this Sublease contained in this Subsection
prior to the expiration of the Inspection Period, then Sublessee's right to
terminate this Sublease pursuant to this Subsection shall cease to exist.

B.    <u>Approvals Period</u>. For a period of two hundred seventy (270) days after
the date of this Sublease ("Approvals Period") Sublessee shall diligently
pursue obtaining any and all permits and approvals necessary to construct
and operate a fast food restaurant with a drive through ("Approvals"). If
Sublessee after acting in good faith and diligently pursuing the obtaining
of the Approvals is unable to obtain the Approvals, then Sublessee has the
right to terminate this Sublease by notifying Sublessor in writing that
Sublessee is exercising such right to terminate this Sublease prior to
expiration of the Approvals Period. If Sublessee does not so exercise its
right to terminate this Sublease prior to the expiration of the Approvals
Period, then Sublessee's right to terminate this Sublease pursuant to this
Subsection shall cease to exist. The Approvals Period shall expire once
Sublessor has obtained the Approvals.

## 24.    Attorney's Fees

In the event at any time during the Term of this Sublease the parties hereto shall
institute any action or proceeding against the other relating to the provisions
hereof, or any default hereunder, then, and in that event, the unsuccessful party, in
such action or proceeding, agrees to reimburse the successful party therein the
reasonable expenses of attorneys' fees and disbursements incurred therein by the
successful party.

## 25.    Memorandum of Sublease

The parties shall execute a Memorandum of Sublease ("Memorandum") in the
form attached hereto as Exhibit "C". Sublessee may record the Memorandum at
any time after expiration or waiver of the Inspection Period and Approvals Period.
The recording of the Memorandum by Sublessee shall waive Sublessee's rights to
terminate this Sublease during the Inspection Period and the Approvals Period.
Sublessee shall pay any recording fees to record the Memorandum and any
transfer taxes resulting from entering into this Sublease and/or the recording of
the Memorandum. Sublessee shall execute and record a memorandum relating to
the date the Term expired at the expiration of the Term of the Sublease.

## 26.    Brokers

Sublessor and Sublessee represent to each other than neither has dealt with any
broker in connection with the negotiation or execution of this Sublease, except for
Garrick-Aug & Associates Store Leasing, Inc. and Restinn Interstate (collectively,
"**Broker**"). Sublessor shall pay the commissions due to Garrick-Aug &

10

Associates Store Leasing, Inc. pursuant to separate agreement. Sublessor shall indemnify, defend and hold Sublessee harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker or other agent claiming by or through Sublessor. Sublessee shall indemnify, defend and hold Sublessor harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker or other agent claiming by or through Sublessee.

**IN WITNESS WHEREOF**, the parties have executed this Sublease as of the day and year first above written.

**ATTEST:**

_Victoria S. Berghel_
Assistant Secretary

**SUBLESSOR:**

**SEARS, ROEBUCK AND CO.**

By: _Ronald P. Douglass_
Print Name: Ronald P. Douglass
Print Title: Vice President
            Real Estate



**WITNESS OR ATTEST:**

_Laurence Gerich_
LAURENCE GERICH
Attorney In Fact

**SUBLESSEE:**

**KENTUCKY FRIED CHICKEN OF CALIFORNIA, INC.**

By: _____
Print Name:
Print Title: R. BRYCE SHIRLEY
             Attorney In Fact

Reviewed by
Ingrid Akers

Date_____

**Exhibits:**

"A"   Master Lease
"B"   Subleased Premises
"C"   Memorandum of Sublease

11

## North Brunswick, NJ

## GROUND LEASE

THIS GROUND LEASE (this "**Lease**") is made and entered into as of this 16 ᵗᴴ day of ___April___, 1998, by and between **JAMES J. THOMPSON TRUST,** a xxxxxxxxxxxx ("Landlord"), and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Tenant**").

## RECITALS

Landlord is the owner of a parcel of land (the "**Entire Tract**") situated at Block 140, Lot 62, Route 1 South in North Brunswick, New Jersey. Landlord desires to lease to Tenant, and Tenant desires to lease from Landlord, that portion of the Entire Tract that consists approximately of  1 . 6  acres of land located on the Entire Tract (the "**Premises**") as depicted on the Site Plan which is attached hereto and incorporated herein as **Exhibit "A"** (the "Site Plan").

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

1. **DEMISE**

Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, together with all rights, appurtenances, servitudes, charges, easements, rights of ingress and egress, licenses and hereditaments thereto.

Landlord hereby reserves a non-exclusive easement across and through the drive lanes located from time to time within the Premises, for the sole purpose of access between public streets and that portion of the Entire Tract which is not included within the Premises. Prior to utilizing this easement, Landlord and Tenant, in good faith, shall negotiate an access easement agreement which shall include provisions appropriate only for the purposes of ingress and egress, including without limitation, a maintenance and repair obligation by Tenant, a reasonable cost-sharing arrangement for such maintenance and repair, and cross-indemnification provisions. Tenant agrees to negotiate such agreement with reasonable diligence and that the agreement shall not contain additional restrictions on the use of the Entire Tract, other than the "Prohibited Uses" described below, and a restriction preventing the Entire Tract (excluding the Premises) from being utilized primarily for the purpose of selling automobile parts, supplies or service during the term of this Lease..

2.    <u>**USE**</u>

The Premises may be used by Tenant for the sale, servicing and storing of merchandise, all other items or services normally sold in Tenant's tire and battery stores and all other lawful uses, but subject to the "Prohibited Uses" which are set forth on <u>**Exhibit "D"**</u> which is attached hereto and incorporated herein. Tenant will set its hours and days of operation, in its sole and absolute discretion. Tenant shall not be required to open or operate a business in the Premises.

Tenant shall obtain and maintain in effect all applicable governmental permits, licenses, certificates and approvals required for use and occupancy of the Premises and the conduct of Tenant's business, if any. Tenant shall at all applicable times comply with the terms and conditions of each such license or permit.

3.    <u>**TERM**</u>

(a)    The initial Term of this Lease shall be for twenty (20) years, commencing on the earlier to occur of the date: (i) Tenant opens for business to the public in the Premises or (ii) one hundred eighty (180) days from the Delivery Date (as hereinafter defined), provided that the Premises have been delivered to Tenant by Landlord in accordance with <u>Sections 6</u> and <u>12(e)</u> ("**Commencement Date**"). As used herein, the expressions "**Term**" and "**Term of this Lease**" refer to such initial term and to any renewal thereof as hereinafter provided. Landlord grants to Tenant four (4) consecutive options to renew this Lease for periods of five (5) years each, provided that Tenant is not in default of any of its obligations hereunder after applicable notice and cure periods, at the time of exercise of any such option. Each option can be exercised by Tenant giving Landlord written notice of the exercise thereof at least one hundred eighty (180) days prior to the expiration of the then existing Term, provided, however, that if Tenant shall fail to give any such notice within such one hundred eighty (180) day time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant written notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said thirty (30) day period. Notwithstanding the above, Landlord may give such thirty (30) day notice to Tenant at any time within the two hundred ten (210) day period prior to the expiration of the existing term and Tenant shall have until the expiration of the thirty (30) day period to exercise its option or forfeit its option rights set forth in this Section 3(a). It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this <u>Section 3</u> through inadvertent failure to give notice thereof within the time limits prescribed. During any extension, all Sections of this Lease will be effective, and references to "Term" will incorporate

the extensions. Notwithstanding any provision to the contrary herein, the Term will in no event extend beyond the date which is forty (40) years after the Commencement Date.

(b)     Any holding over after the expiration of the Term of this Lease shall be construed to be a tenancy from month-to-month, at one hundred fifty percent (150%) of the monthly rental as required to be paid by Tenant for the period immediately prior to the expiration of the Term hereof, and shall otherwise be on the terms and conditions herein specified, so far as applicable.

(c)     The term **"Lease Year"** as used in this Lease shall mean each consecutive twelve (12) calendar month period during the Term, with the first Lease Year commencing on the first day of the Term if the Term begins on the first day of a calendar month or the first day of the first full calendar month after the first day of the Term if the first day of the Term is not the first day of a calendar month, and each successive Lease Year shall commence on the anniversary of the first day of the first Lease Year. If any Lease Year consists of less than twelve (12) full calendar months, then any charges or payments due from Tenant hereunder shall be prorated accordingly.

4.     <u>**DUE DILIGENCE PERIOD**</u>

(a)     From the execution date of this Lease through June 18, 1998, (the "Due Diligence Period"):

(i)     Landlord agrees that Tenant and its agents, consultants and contractors shall, upon not less than twenty-four (24) hours notice to Landlord, have access to the Premises at no cost to Landlord or Tenant to make any and all inspections and tests and to take other investigatory and assessment actions which it deems necessary to determine the condition of the Premises (collectively, the "Site Investigation and Assessment"). Tenant shall not use or store, nor permit the use or storage of, any ultra-hazardous materials (such as explosives) on the Premises. Landlord acknowledges that the duration of and the complexity and regulatory requirements associated with the Site Investigation and Assessment cannot be predicted with certainty. Tenant agrees to use reasonable efforts to complete the Site Investigation and Assessment in a diligent fashion. Tenant will conduct said work in such a way as to minimize interferences with the conduct of business at the Premises, or adjacent lands. Tenant agrees to defend and indemnify Landlord from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage arising out of the Site Investigation and Assessment, including without limitation, arising out of, or in connection with Tenant causing, contributing to or exacerbating the release

removed from the Title Commitment or endorsed over, at a total cost of less than $10,000, or unable to satisfy all of the requirements set forth in the Title Commitment, Tenant may elect, as its sole remedy hereunder, to either: (i) terminate this Lease by written notice to Landlord or (ii) accept this Lease of the Premises subject to the remaining exceptions disclosed in the Title Commitment. **"Permitted Encumbrances"** shall mean those exceptions to Tenant's title as approved or accepted by Tenant pursuant to this <u>Section 5(a)</u>.

(b)    Tenant, may obtain a current survey of the Premises certified to Landlord and Tenant and to the Title Company as having been prepared in accordance with ALTA standards and showing, among other things as may be requested by Tenant, the location of all utility easements and the location of all utility lines on the Premises or servicing the Premises. Tenant agrees to promptly provide a copy of any such survey to Landlord. If Tenant shall object to any matters shown on the Survey within the Due Diligence Period then the same terms and conditions set forth in <u>Section 5(a)</u> shall apply to such objections.

6.    <u>**DELIVERY OF PREMISES**</u>

(a)    **INTENTIONALLY OMITTED.**

(b)    Landlord shall deliver possession of the Premises to Tenant within thirty (30) days following the later of: (i) the expiration or earlier termination of the Due Diligence Period or (ii) the expiration or earlier termination of the Approvals Period (such date of delivery being referred to herein as the "**Delivery Date**").

(c)    If Landlord does not deliver the Premises to Tenant within the time period set forth in <u>Section 6(b)</u>, above and in the manner set forth in <u>Section 12(e)</u> herein, then Tenant may terminate this Lease by giving notice to Landlord prior to delivery of the Premises.

(d)    After the Delivery Date, Tenant shall have the right, but not the obligation, to construct: *(i)* a building ("**Tenant's Store Building**"); and (ii) related site improvements, at Tenant's expense (collectively referred to herein as "**Tenant's Improvements**").

7.    <u>**RENT**</u>

(a)    Rent ("**Rent**"), which shall be payable in equal monthly installments, without demand, and except as expressly provided in this Lease, without set-off or deduction, shall begin to accrue from, and the initial rental payment shall be due to Landlord on, the Commencement Date. Rent shall be paid in advance on the first day of each month. Landlord will, from time to time, designate some one person, firm or

Premises, the availability, capacity, flow or pressures of utilities or the ability to conduct or continue to conduct its business within or upon the Premises. Landlord shall not be required to perform any work to prepare the Premises for Tenant's use or occupancy.

(ii)    For a period of three hundred sixty-five (365) days after the full execution of this Lease (the "**Approvals Period**"), Tenant has the right to attempt to obtain all necessary final and non-appealable governmental approvals and permits for construction of Tenant's Improvements (as hereinafter defined) and for operation of Tenant's business in Tenant's Store Building (as hereinafter defined), which includes all zoning or variances required to operate and construct Tenant's Store Building in accordance with Tenant's plans and specifications and to install Tenant's prototypical signage on Tenant's Store Building and the Premises (the "**Permits**"). Tenant shall diligently pursue obtaining the Permits. If Tenant shall be unable to obtain such Permits during the Approvals Period, either Landlord or Tenant may terminate this Lease by notice to the other. Notwithstanding the above, the Approvals Period shall terminate upon the receipt of all Permits.

(b)    Landlord, upon request by Tenant and at Tenant's sole expense as to any out-of-pocket expenses incurred by Landlord, shall cooperate with Tenant in applying for and obtaining the Permits.

(c)    Tenant shall use reasonable efforts to provide copies of all Permits to Landlord and to notify Landlord of the date Tenant has obtained the Permits, however, the failure to do so by Tenant shall not be a default under this Lease by Tenant which will permit Landlord to terminate this Lease. Tenant agrees not to proceed with any construction until all Permits applicable to such construction have been received.

5.    **TITLE COMMITMENT AND SURVEY**

(a)    Tenant has received a current commitment (the "**Title Commitment**") for a standard ALTA Form B Leasehold Policy of title insurance on the Premises issued by Lawyers Title Insurance Company (the "**Title Company**") (which Policy will provide insurance over the general exceptions) and copies of all recorded documents affecting the Premises or disclosed in the Title Commitment. Tenant shall deliver written objection to any matters disclosed in the Title Commitment, or the recorded documents, to Landlord during the Due Diligence Period. If Tenant delivers such written notice to Landlord, then, prior to the Delivery Date (hereinafter defined), Landlord shall, at Landlord's expense up to a limit of $10,000, have such matters removed from title or cause the Title Company to commit to issue an endorsement acceptable to Tenant insuring Tenant against loss or damage to Tenant that may be caused by such matters. If Landlord is unable to have such unpermitted exceptions

removed from the Title Commitment or endorsed over, at a total cost of less than $10,000, or unable to satisfy all of the requirements set forth in the Title Commitment, Tenant may elect, as its sole remedy hereunder, to either: (i) terminate this Lease by written notice to Landlord or (ii) accept this Lease of the Premises subject to the remaining exceptions disclosed in the Title Commitment. "**Permitted Encumbrances**" shall mean those exceptions to Tenant's title as approved or accepted by Tenant pursuant to this Section 5(a).

(b)     Tenant, may obtain a current survey of the Premises certified to Landlord and Tenant and to the Title Company as having been prepared in accordance with ALTA standards and showing, among other things as may be requested by Tenant, the location of all utility easements and the location of all utility lines on the Premises or servicing the Premises. Tenant agrees to promptly provide a copy of any such survey to Landlord. If Tenant shall object to any matters shown on the Survey within the Due Diligence Period then the same terms and conditions set forth in Section 5(a) shall apply to such objections.

6.     **DELIVERY OF PREMISES**

(a)     INTENTIONALLY OMITTED.

(b)     Landlord shall deliver possession of the Premises to Tenant within thirty (30) days following the later of: (i) the expiration or earlier termination of the Due Diligence Period or (ii) the expiration or earlier termination of the Approvals Period (such date of delivery being referred to herein as the "**Delivery Date**").

(c)     If Landlord does not deliver the Premises to Tenant within the time period set forth in Section 6(b), above and in the manner set forth in Section 12(e) herein, then Tenant may terminate this Lease by giving notice to Landlord prior to delivery of the Premises.

(d)     After the Delivery Date, Tenant shall have the right, but not the obligation, to construct: (i) a building ("**Tenant's Store Building**"); and (ii) related site improvements, at Tenant's expense (collectively referred to herein as "**Tenant's Improvements**").

7.     **RENT**

(a)     Rent ("**Rent**"), which shall be payable in equal monthly installments, without demand, and except as expressly provided in this Lease, without set-off or deduction, shall begin to accrue from, and the initial rental payment shall be due to Landlord on the Commencement Date. Rent shall be paid in advance on the first day of each month. Landlord will, from time to time, designate some one person, firm or

corporation to receive Rent payments.  Landlord's Federal Tax Identification
Number is 22-6335475.

(b)     Tenant agrees to pay Rent under the following schedule as of the Commencement
Date:

| | | |
|---|---|---|
| Lease Years 1-5 | $8,541.67 per month; | $102,500.00 per year; |
| Lease Years 6-10 | $9,822.92 per month; | $117,875.00 per year; |
| Lease Years 11-15 | $11,296.33 per month; | $135,556.00 per year; |
| Lease Years 16-20 | $12,990.83 per month; | $155,890.00 per year; |

or a proportionate sum during partial months (or no payment during free Rent
periods, if any), in advance, on the first day of each month.

Except during the first three (3) months of the Term, in the event Tenant does not pay
any installment of Rent within ten (10) days, or Additional Rent or any other
financial obligation of Tenant within twenty (20) days, of when due, Tenant shall pay
interest at the Prime Rate plus four percent (4%) on such overdue amount from the
due date until the date of payment.

(c)     If Tenant exercises its first option to extend this Lease, Tenant agrees to pay as Rent
during the first extension period the sum of $14,939.42 per month ($179,273.00 per
year) under the same conditions as set forth in Subsection 7(a).

(d)     If Tenant exercises its second option to extend this Lease, Tenant agrees to pay as
Rent during the second extension period the sum of $17,180.33 per month
($206,164.00 per year) under the same conditions as set forth in Subsection 7(a).

(e)     If Tenant exercises its third option to extend this Lease, Tenant agrees to pay as Rent
during the third extension period the sum of $19,757.42 per month ($237,089.00 per
year) under the same conditions as set forth in Subsection 7(a).

(f)     If Tenant exercises its fourth option to extend this Lease, Tenant agrees to pay as
Rent during the fourth extension period the sum of $22,721.00 per month
($272,652.00 per year) under the same conditions as set forth in Subsection 7(a).

(g)     Sums payable by Tenant to Landlord pursuant to this Lease in addition to Rent are
sometimes herein referred to as "Additional Rent."  Landlord shall have the same
rights and remedies for default by Tenant in the payment of Additional Rent as for
a default in the payment of Rent, except that the applicable cure period shall be thirty
(30) rather than twenty (20) days.

8.    REAL ESTATE TAXES AND ASSESSMENTS

(a)    Landlord shall pay when due all real estate taxes, general and special assessments and any other charges, levies or impositions levied or assessed upon the Entire Tract, including the Premises (collectively, the "Real Estate Taxes"). Tenant shall reimburse Landlord for Tenant's pro rata share of the Real Estate Taxes (except for currently existing or currently proposed assessments as described in 8(e) below) within thirty (30) days after receipt of an invoice for such taxes, accompanied by a copy of the tax bill. Tenant's pro rata share shall be determined: (i) with respect to assessments for improvements, on relative building area; and (ii) with respect to assessments for land, on relative land area. All of the Real Estate Taxes under this Section 8 shall be prorated at the commencement and expiration of the Term hereof. Tenant's share of the Real Estate Taxes are currently estimated to be $6,000.00 per annum, prior to construction of Tenant's Improvements. Notwithstanding the foregoing, if Landlord is able to have the Premises designated as a separate tax parcel or is able to obtain from the assessor's office an identifiable and reasonable breakdown of taxes attributable to the Premises and/or the improvements thereon, then Tenant may pay directly to the taxing authority the amount of taxes so determined and provide Landlord with receipts thereof. Landlord shall have no obligation to have the Premises designated as a separate tax parcel.

(b)    Notwithstanding anything in this Section 8 to the contrary, Tenant shall not be required to pay any estate, gift, inheritance, succession, franchise, income or excess profits taxes which may be payable by Landlord or Landlord's legal representative, successors or assigns, nor shall Tenant be required to pay any tax that might become due on account of ownership of property other than the Entire Tract which may become a lien on the Entire Tract or collectable out of the same.

(c)    If Tenant shall, in good faith, desire to contest the validity or amount of any tax, assessment, levy or other governmental charge herein agreed to be paid by Tenant, and: (i) the Premises are separately assessed, then Tenant shall be permitted to do so; or (ii) if the Premises are not separately assessed, then Tenant shall request, in writing that Landlord undertake such contest, and in the event Landlord, at its sole option, declines to undertake such contest, Tenant shall have the right, at Tenant's cost and expense, to contest the real estate taxes payable with respect to the Premises, and, if legally permitted to do so without interest or penalty, (unless Tenant agrees to pay the same), to defer payment of the tax or charge, the validity or amount of which Tenant is so contesting, until final determination of the contest. If Tenant undertakes such contest Tenant shall pursue such contest diligently. If Landlord does undertake such contest Landlord shall pursue such contest diligently and any settlement and costs and expenses to be incurred shall be subject to Tenant's reasonable approval. If such contest is brought by Landlord and results in a reduction of such assessment.

Tenant agrees to pay its pro rata share of the approved reasonable and necessary expenses incurred thereby, provided that in no event shall Tenant's share of such expenses exceed its reduction in real estate taxes.

(d) All rebates on account of any taxes required to be paid and paid by Tenant under the provisions hereof shall belong to Tenant, and Landlord will, on the request of Tenant, execute any receipts, assignments or other acquittances that may be necessary in order to secure the recovery of any such rebates, and will promptly pay over to Tenant its pro-rata share of any such rebates that may be received by Landlord.

(e) Landlord represents that there are no currently existing or currently proposed assessments affecting the Premises and agrees to pay, and hereby indemnifies and holds Tenant harmless from and against, any and all such assessments (general or special) imposed upon the Premises. With respect to future special and/or general assessments, Landlord shall pay such assessments over the longest period allowed by law under the particular circumstances.

(f) If at any time during this Lease, the real property tax system in effect on the date hereof is replaced with another type of taxing system, then Tenant shall timely pay such real estate tax substitutes, provided that any such taxes are not excluded by virtue of Section 8(b) above, and only to the extent that any such substitute tax is directly related to the Premises and the Entire Tract and Landlord is responsible to pay such substitute tax.

9   UTILITIES

Tenant shall contract in its own name and fully and promptly pay for all water, gas, heat, light, power, telephone service and other public utilities of every kind that Tenant desires to be furnished to the Premises throughout the Term hereof.

Tenant agrees that Landlord is not required to furnish any water, sewer, gas, heat, electricity, light, power or any other facilities, equipment, labor, materials or services of any kind whatsoever and that Landlord shall not be liable for any loss, damage or expense which Tenant may incur if either the quantity or character of utility services is changed or is no longer available or suitable for Tenant's purposes, unless caused by the willful act or negligence of Landlord, its employees, agents or contractors. Tenant shall refrain from using utility services in excess of their capacity or which may from time to time be prescribed by applicable governmental authorities.

10.    **REPAIRS AND MAINTENANCE OF IMPROVEMENTS**

Tenant shall, throughout the Term of this Lease, at its own cost, and without any expense to Landlord, keep and maintain the Premises, Tenant's Store Building and Tenant's Improvements in clean order, condition and repair. Tenant shall comply with and abide by all applicable federal, state, county, municipal statutes, ordinances, laws and governmental regulations affecting the Premises or any activity conducted therein by Tenant.

11.    **LIENS**

(a)    Tenant shall keep all of the Premises, and every part thereof, and the building and other improvements at any time located thereon, free and clear of any and all mechanics', materialmen's and other liens for or arising out of or in connection with work or labor done, services performed or materials or appliances used or furnished for or in connection with any operations of Tenant, any alteration, improvement or repairs or additions which Tenant may make or permit or cause to be made, or any work or construction, by, for or permitted by Tenant on or about the Premises, or any obligations of any kind incurred by Tenant, and at all times promptly and fully to pay and discharge any and all claims on which any such lien may or could be based, and to indemnify Landlord and all of the Premises and all buildings and improvements thereon against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(b)    If Tenant desires to contest any such lien, it shall notify Landlord of its intention to do so within thirty (30) days after Tenant receives written notice from Landlord of such lien. In such case, Tenant shall not be in default hereunder until thirty (30) days after the final determination of the validity thereof, within which time Tenant shall satisfy and discharge such lien to the extent held valid, but the satisfaction and discharge of any such lien shall not, in any case, be delayed until execution is had on any judgment rendered thereon, and any such delay shall be a default of Tenant hereunder. In the event of any such contest, Tenant shall protect and indemnify Landlord against all loss, expense and damage resulting therefrom.

(c)    Nothing herein shall be deemed or construed as a consent by Landlord to the imposition of any lien upon the Entire Tract by reason of labor or materials furnished or to be furnished to Tenant. Notice is hereby given that Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the estate or interest of Landlord in and to the Premises or the Entire Tract.

(d)    In the event Landlord is transferring or mortgaging its interest in the Entire Tract or any portion thereof at a time while Tenant is contesting any lien as addressed in this

- 19 -

Section 11, Tenant agrees to take all reasonable steps at its sole cost (including, without limitation, indemnifying the applicable title insurer) in order to allow such transfer to occur free of any such lien or with the title insurer insuring over such lien.

12.   **LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS**

Landlord represents, warrants and covenants that:

(a)   Landlord is the owner of the Entire Tract, including the Premises. The provisions of this Lease do not violate any other contract, mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party or to which the Entire Tract is subject.

(b)   Landlord has the full right and lawful authority to enter into and perform its obligations under this Lease for the full Term.

(c)   With respect to matters of title, the Entire Tract is free and clear of all easements, restrictions, violations, mortgages and other liens, encumbrances or defects in title of any nature whatsoever affecting the Entire Tract, except for those shown in the Title Commitment, and the rights, easements and privileges granted Tenant in this Lease with respect to the Entire Tract are not in any way affected in an adverse manner, except for those shown in the Title Commitment.

(d)   If the Premises are, on the Commencement Date, subject to any mortgage or mortgages, Landlord will furnish Tenant a copy of such mortgage documents, together with Subordination, Attornment and Non-Disturbance Agreements executed by each of Landlord's mortgagees substantially in the form attached hereto as *Exhibit "B"*. If Landlord fails to provide Tenant with executed Subordination, Attornment and Non-Disturbance Agreements from all such mortgage holders within thirty (30) days of the date hereof, Tenant shall have the right to terminate this Lease upon written notice to Landlord given at any time after expiration of said 30-day period and prior to receipt by Tenant of said Subordination, Attornment and Non-Disturbance Agreement.

(e)   Upon the Delivery Date, Landlord will deliver actual possession of the Premises to Tenant free of all tenancies and occupancies.

(f)   Tenant, upon paying the Rent, Additional Rent, and performing Tenant's other obligations under this Lease, shall peaceably and quietly have, hold and enjoy the Premises for the Term, subject to the Permitted Encumbrances.

(g)    If Landlord does not remediate all Hazardous Materials (as defined in Section 21 below) located within the Premises (except Tenant's Hazardous Materials defined below) to the standards set forth in Section 21(b)(ii), the existence of which are disclosed to Tenant by Landlord prior to the Commencement Date, or discovered by Tenant and disclosed to Landlord prior to the Commencement Date, Tenant may terminate this Lease by written notice to Landlord prior to the Commencement Date.

(h)    **INTENTIONALLY OMITTED.**

(i)    **INTENTIONALLY OMITTED.**

(j)    Landlord has delivered to Tenant a copy of the most recent title insurance policy or title insurance commitment for the Entire Tract and/or the Premises, copies of recorded documents and a survey of the Entire Tract, including the Premises.  There have been no adverse material changes to the condition of the title to the Entire Tract since the date of such commitment or policy.

(k)    Landlord has no actual knowledge of actual or threatened actions or claims of any nature against the Premises or Landlord.

(l)    To the best of Landlord's knowledge, without duty of inquiry, no third parties (other than local governmental authorities) have the authority to approve or disapprove of this Lease or Tenant's Improvements.

(m)    Landlord will indemnify, defend and hold harmless Tenant from and against all claims, causes of action, expenses, including attorneys fees, and costs arising out of the material inaccuracy of or material breach of the foregoing warranties and representations.

13.    ASSIGNMENT AND SUBLETTING

Tenant shall have the right, without Landlord's prior written approval, to assign this Lease or sublet all or any portion of the Premises.  In the event of such assignment or sublease Tenant shall deliver to Landlord, not less than thirty (30) days prior to the effective date thereof, notice of such proposed assignment or sublease, and, not later than ten (10) days after the effective date thereof, a copy of the assignment and assumption agreement or sublease  In the event of such assignment or sublease, Tenant shall remain responsible for the payment of Rent, Additional Rent, and the performance of its other obligations hereunder.  Any such assignment or subletting shall be subject to all of the terms, covenants, provisions and conditions contained in this Lease; and in the event of assignment, the assignee assumes all of Tenant's obligations under this Lease.  If this Lease is assigned, or if the Premises or any part thereof is sublet, Landlord may, after default by Tenant, collect rent from the assignee or subtenant, and apply the net amount collected to the rent reserved

in the Lease, but no such assignment, subletting, occupancy or collection shall be deemed an acceptance of the assignee or subtenant as Tenant, or a release of Tenant from the further performance by Tenant of the terms, covenants and conditions of the Lease on the part of Tenant to be performed. Any violation of any provision of the Lease, whether by act or omission, by any assignee or subtenant shall be deemed a violation of such provision by Tenant and Tenant shall be entitled to the same notice and cure period rights as the current assignee or subtenant.

14. **ENCUMBRANCE OF TENANT'S LEASEHOLD INTEREST**

Tenant may, without Landlord's consent, encumber by mortgage, deed of trust, or other proper instrument ("**Leasehold Encumbrance**"), its leasehold interest in the Premises, and Tenant's right, title and interest in this Lease, together with all buildings and improvements placed by Tenant thereon, as security for any indebtedness of Tenant, provided that such Leasehold Encumbrance shall be subject to the terms, covenants and conditions of this Lease. Notwithstanding anything to the contrary set forth herein, Tenant shall have no right to encumber Landlord's fee estate. The execution of any such mortgage, deed of trust, or other instrument, or the foreclosure thereof, or any sale thereunder, either by judicial proceedings or by virtue of any power reserved to the holder of such Leasehold Encumbrance in such mortgage or deed of trust, or conveyance by Tenant to the holder of such indebtedness, or the exercising of any right, power or privilege reserved in any mortgage or deed of trust, shall not be held as a violation of any of the terms or conditions hereof, or as an assumption by the holder of such indebtedness personally of the obligations hereof unless and until such time as the Leasehold Lender becomes, and then only for so long as it remains, the owner of the leasehold interest created by this Lease. No such encumbrance, foreclosure, conveyance or exercise of right shall relieve Tenant from its liability hereunder. The holder of any such mortgage, deed of trust or other security instrument is herein referred to as a "**Leasehold Lender**". If a Leasehold Lender shall have given Landlord written notice of the creation of a Leasehold Encumbrance, Landlord shall give to such Leasehold Lender a copy of each notice of any claimed default by Tenant at the same time and whenever any such notice is given to Tenant, addressed to such Leasehold Lender at the address last furnished to Landlord, and no such notice shall be deemed to have been given to Tenant, unless and until a copy thereof shall have been so given to such Leasehold Lender. Such Leasehold Lender shall thereupon have a period of ten (10) days more, after service of such notice upon it, for remedying the default or causing the same to be remedied, than is given Tenant after service of such notice upon it. Such Leasehold Lender, in case Tenant shall be in default hereunder, within such period and otherwise as herein provided, shall have the right to remedy such default, or cause the same to be remedied. Landlord will accept performance by the Leasehold Lender of any covenant, condition or agreement on Tenant's part to be performed hereunder with the same force and effect as though performed by Tenant. No event of default of Tenant in respect of the performance of work required to be performed, or acts to be done, or conditions to be remedied, shall be deemed to exist, so long as Leasehold Lender shall, in good faith, have commenced promptly to rectify and to

- 13 -

prosecute the same to completion with diligence and continuity. If Leasehold Lender cannot reasonably take the action required to cure the default without being in possession of the Premises, the time of Leasehold Lender to cure the default shall be deemed extended for a period not to exceed ten (10) days; provided, however, that during such period all other obligations of Tenant under this Lease, including the payment of Rent and, Additional Rent, required to be paid by Tenant, are being duly performed. No Leasehold Lender shall become liable under the provisions of this Lease, unless and until such time as it becomes, and then only for as long as it remains, the owner of the leasehold interest created by this Lease ("**Leasehold Estate**"), nor shall the consent of Landlord be required to an assignment by a Leasehold Lender, or its successors and assigns, of its or their interest in the Leasehold Estate. From and after receiving notice of the existence of any Leasehold Lender, Landlord and Tenant will not, except as herein provided in case of Tenant's default, cancel, surrender, modify or amend this Lease without the prior consent of Leasehold Lender.

15.    **INSURANCE**

(a)    Landlord shall pay for (subject to reimbursement by Tenant as herein provided) and maintain, from the date of this Lease through the end of the Term, the following policies of insurance obtained from companies rated "A- VII" or better as defined in the then current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published) (provided, however, that in the event the trustee of Landlord is a bank or trust company organized under the laws of the United States or any jurisdiction thereof having a combined capital and surplus of at least $50,000,000, such a rating is not required):

(i)    Commercial General Liability Insurance covering Landlord's operations on the Entire Tract with coverage for premises operations, products completed operations, contractual liability, and personal advertising injury liability with combined single limits of $5,000,000.00 per occurrence for bodily injury and property damage, including Tenant as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent). Notwithstanding the above, as long as the Landlord is not involved with products or advertising as they relate to the Entire Tract, Landlord is not required to carry insurance covering products/completed operations or advertising liability.

(ii)    If, but only if, and for such period as Landlord has employees working at the Entire Tract, Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Landlord with a waiver of subrogation in favor of Tenant, and Employer's Liability Insurance with limits of $100,000.00 per accident or disease and $500,000.00 aggregate by disease. In addition, Landlord agrees to require and warrants that all contractors hired by Landlord will maintain the same Workers' Compensation Insurance and Employer's

Liability Insurance for such contractor's employees and will require all
subcontractors to maintain such insurance and Landlord agrees to indemnify,
defend and hold Tenant harmless from any loss, injury, damage or liability
which Tenant may suffer as a result of any such contractor or subcontractor
failing to maintain such insurance.

(iii)    "All-Risk" Property Insurance upon Tenant's Store Building and
improvements on the Premises owned by Tenant, including but not limited
to, those perils generally covered on a Causes of Loss - Special Form,
including fire, extended coverage, windstorm, vandalism, malicious mischief,
and sprinkler leakage coverage in the amount of ninety percent (90%) of full
replacement. Tenant shall pay the cost of such insurance premium directly
to the insurer upon receipt of a proper invoice. The "All-Risk" Property
Insurance may be provided through a program established by Tenant. In the
event such a program is available and Landlord chooses to utilize such
program, Tenant will notify Landlord in the event of a change in the
insurance provider.

(iv)    If, but only if, and for such period as Landlord will have vehicles on the
Premises, Motor Vehicle Liability Insurance with coverage for all owned,
non-owned and hired vehicles, if any, with combined single limits of not less
than $1,000,000.00 per occurrence for bodily injury and property damage.
If only private passenger vehicles are used, then a $500,000.00 combined
single limit is acceptable.

(v)    The specified limits of insurance may be satisfied by any combination of
primary or excess umbrella liability insurance policies. At the end of the
initial Term, and at the beginning of each extension period, or upon request
of either Landlord or Tenant, Landlord and Tenant shall review the coverage
and limits of the policy required above and below and, at that time, shall
cause such coverage and liability limits to be adjusted as reasonably agreed
upon by Landlord and Tenant in view of reasonable exposure anticipated
over the remainder of the Term.

(vi)    Each policy provided by Landlord or Tenant shall expressly provide that it
shall not be subject to cancellation or material change without at least thirty
(30) days prior written notice (ten (10) days prior written notice in the event
of cancellation for non-payment) to the other, and that the coverage provided
by such insurance policy shall be deemed primary insurance, and that any
insurance provided by or on behalf of the other shall be in excess of any
insurance provided by such policy. Landlord shall furnish Tenant, or cause
to be furnished to Tenant, concurrently with the execution of this Lease, and

prior to the inception of each successive policy period, insurance certificates required to be maintained by Landlord hereunder.

(b)    Tenant shall pay for and maintain, from the date of this Lease through the end of the Term, the following policies of insurance:

(i)    Workers' Compensation Insurance. Covering all costs, benefits and liabilities under State Workers' Compensation and similar laws in the State of New Jersey for Tenant's employees, and Employer's Liability Insurance, with limits of not less than $100,000 per accident or disease and $500,000 aggregate by disease In addition, Tenant agrees to require and warrants that all contractors hired by Tenant will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Tenant agrees to indemnify, defend and hold Landlord harmless from any loss, injury, damage or liability which Landlord may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

(ii)    Commercial General Liability Insurance. Including, but not limited to, coverage for premises/operations, products/completed operations, personal/advertising injury and contractual liabilities with combined single limits of not less than $5,000,000 per occurrence for bodily injury and property damage, naming Landlord and Landlord's mortgagee as additional insureds (as defined in ISO Form CG 20 26 11 85 or its equivalent)

(iii)    If, but only if, and for such period as Tenant will have vehicles on the Premises, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles, if any, with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage. If only private passenger vehicles are used, then a $500,000.00 combined single limit is acceptable.

Tenant may meet its insurance obligations under this Lease through a blanket insurance policy, through any combination of primary or umbrella coverage or, so long as Tenant has a net worth of at least $100,000,000, Tenant shall have the right to self-insure its insurance obligations under this Lease through a self-insurance program which does not diminish Tenant's insurance obligations hereunder. If Tenant shall ever have a net worth of less than $100,000,000, the Tenant shall purchase, at Tenant's sole cost and expense, the insurance policies as set forth above.

All policies described above shall be issued by companies qualified to do business in the State of New Jersey, and rated A- VII or better in the most current edition of Best's

prior to the inception of each successive policy period, insurance certificates required to be maintained by Landlord hereunder.

(b)     Tenant shall pay for and maintain, from the date of this Lease through the end of the Term, the following policies of insurance:

     (i)     Workers' Compensation Insurance. Covering all costs, benefits and liabilities under State Workers' Compensation and similar laws in the State of New Jersey for Tenant's employees, and Employer's Liability Insurance, with limits of not less than $100,000 per accident or disease and $500,000 aggregate by disease. In addition, Tenant agrees to require and warrants that all contractors hired by Tenant will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Tenant agrees to indemnify, defend and hold Landlord harmless from any loss, injury, damage or liability which Landlord may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

     (ii)     Commercial General Liability Insurance. Including, but not limited to, coverage for premises/operations, products/completed operations, personal/advertising injury and contractual liabilities with combined single limits of not less than $5,000,000 per occurrence for bodily injury and property damage, naming Landlord and Landlord's mortgagee as additional insureds (as defined in ISO Form CG 20 26 11 85 or its equivalent).

     (iii)     If, but only if, and for such period as Tenant will have vehicles on the Premises, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles, if any, with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage. If only private passenger vehicles are used, then a $500,000.00 combined single limit is acceptable.

Tenant may meet its insurance obligations under this Lease through a blanket insurance policy, through any combination of primary or umbrella coverage or, so long as Tenant has a net worth of at least $100,000,000, Tenant shall have the right to self-insure its insurance obligations under this Lease through a self-insurance program which does not diminish Tenant's insurance obligations hereunder. If Tenant shall ever have a net worth of less than $100,000,000, the Tenant shall purchase, at Tenant's sole cost and expense, the insurance policies as set forth above.

All policies described above shall be issued by companies qualified to do business in the State of New Jersey, and rated A-VII or better in the most current edition of Best's

Insurance Reports. Each policy will expressly provide that such policy will not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Landlord. Tenant shall furnish Landlord with satisfactory evidence of such insurance coverage.

In the event Tenant self-insures its obligations hereunder it shall be pursuant to a plan of self-insurance funded by reserves based on historical or actuarial data and in compliance with all requirements and regulations applicable to self-insurers. Upon request, but no more often than annually, Tenant shall furnish to Landlord a copy of its most recent Annual Report on Form 10-K.

16. **INDEMNIFICATION**

   (a)    Except as provided in Section 41 below, Landlord agrees to indemnify, protect, defend and hold Tenant, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses and liabilities (except those caused solely by the willful misconduct or negligent acts or omissions of Tenant), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Entire Tract (excluding the Premises), including the person and property of Tenant, its directors, officers, employees, agents, invitees, licensees or others.

   (b)    Except as provided in Section 41 below, Tenant agrees to indemnify, protect, defend and hold Landlord, its trustees, beneficiaries, directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses and liabilities (except those caused solely by the willful misconduct or negligent acts or omissions of Landlord), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises, including the person and property of Landlord, its directors, officers, employees, agents, licensees or others.

17. **DEFAULTS**

   (a)    If Tenant defaults in the payment of Rent or Additional Rent and fails to cure the default within twenty (20) days (or thirty (30) days for Additional Rent) of its receipt of written notice of default by Tenant, Landlord may bring suit to recover Rent due and unpaid after the twenty (20) (or thirty (30)) day period. Landlord's suing to recover Rent shall not waive or affect its right to bring suit for possession of the Premises.

   (b)    If Tenant is in default in performing any of the terms or provisions of this Lease, other than the provisions for the payment of Rent or Additional Rent, and Tenant receives written notice of the default from Landlord, and Tenant fails to cure the

default within thirty (30) days after receipt of the written notice by Tenant, or if the default is of a character as to require more than thirty (30) days to cure, and Tenant fails to commence to cure the default within thirty (30) days after service of the written notice, or fails to thereafter use reasonable diligence in curing the default, then Landlord may cure the default and the full amount so expended by Landlord, together with interest thereon at the Prime Rate will immediately be owing by Tenant to Landlord as Additional Rent.

(c)     If Landlord is in default in performing any of the terms or provisions of this Lease, and Landlord receives written notice of the default from Tenant, and Landlord fails to cure the default within thirty (30) days after receipt of the written notice, or if the default is of a character as to require more than thirty (30) days to cure, and Landlord fails to commence to cure the default within thirty (30) days after service of the written notice, or fails to thereafter use reasonable diligence in curing the default, then Tenant may cure the default, at the expense of Landlord, and may deduct from Rent all sums expended, plus interest at the Prime Rate, until Tenant is reimbursed in full.

(d)     If any of the covenants, conditions or other provisions of this Lease are breached, Landlord or Tenant shall have the right to obtain an injunction or other appropriate judicial relief against the other. No failure by Landlord or Tenant to insist upon the performance or the strict performance of any covenant, condition or other provisions of this Lease or to exercise any right or remedy consequent upon a breach or other default thereof shall constitute a waiver or assumption thereof by the other party, and no acceptance, use or occupancy of the Premises shall constitute a waiver or assumption by Tenant of any duty or obligations of Landlord with respect thereto The grant or reservation herein or the exercise of any right or remedy or of any supplementary or alternative rights or remedies, shall not affect or prejudice any other rights or remedies which Landlord or Tenant may have under this Lease or under law.

(e)     In the event that: (i) Tenant in good faith takes the position that Landlord has failed to perform its obligations under this Lease; (ii) Tenant undertakes to cure such failure on the part of Landlord to perform such obligations; and (iii) Tenant withholds Rent and/or other charges to the extent permitted under the terms of this Lease after Tenant cures a default of Landlord in order to receive reimbursement for the funds expended in curing the default of Landlord, then, in such event, Landlord shall not have the right to terminate this Lease or to evict Tenant for the non-payment of Rent or other charges nor shall Landlord have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Premises from Tenant until such dispute is resolved. In the event that a court of competent jurisdiction rules that Tenant did not have the right to withhold Rent or other payments to Landlord under the terms of this Lease, then, upon the issuance of

such a judgment, Tenant shall pay to Landlord the amount so withheld plus interest at the Prime Rate.

(f)    The acceptance by Landlord of Rent or Additional Rent with knowledge of breach by Tenant of any obligation of this Lease shall not be deemed a waiver of such breach.

18.    **DAMAGE AND DESTRUCTION OF IMPROVEMENTS**

(a)    Except as set forth below, the damage, destruction or partial destruction of any building, or other improvement which is a part of the Premises shall not release Tenant from its obligations hereunder. Except as set forth in 18(c) below, in case of damage to or destruction of any such building or improvement, Tenant shall have no obligation to repair or restore the same. Subject to the provisions of 18(b) below, it is agreed that the proceeds of any insurance covering such damage or destruction shall be made available to Tenant regardless of whether Tenant elects to perform such repair or replacement.

(b)    Notwithstanding anything to the contrary contained in this Section 18, in case of the destruction or damage to more than thirty five percent (35%) of the Gross Leasable Area of Tenant's Store Building or damage thereto from any cause so as to make Tenant's Store Building unusable for Tenant's purposes which occurs during the last three (3) years of the Term hereof or during any extended term, Tenant may elect to terminate this Lease by written notice served on Landlord within one hundred eighty (180) days after the occurrence of such damage or destruction. In the event of such termination, there shall be no obligation on the part of Tenant to repair or restore the building or improvements, however, Landlord shall be entitled to receive any proceeds collected under any insurance policies covering such building or any part thereof, after use of such proceeds by Tenant for any expenses pursuant to Section 18 (c) below. On such termination, Rent, taxes, assessments and any Additional Rent payable by Tenant to Landlord hereunder shall be prorated as of the termination date and, in the event any Rent, taxes or assessments shall have been paid in advance, Landlord shall rebate the same for the unexpired period for which payment shall have been made.

(c)    Notwithstanding anything to the contrary set forth in (a) or (b) above, in the event Tenant does not repair or restore Tenant's Store Building, Tenant shall remove Tenant's Store Building (including footings and foundations) and remove rubble and debris, within a reasonable time after the occurrence of the casualty.

19.    **EFFECT OF EMINENT DOMAIN**

- 19 -

(a)     In the event the entire Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, this Lease shall terminate and expire as of the date of such taking, and Tenant shall thereupon be released from any liability thereafter accruing hereunder.

(b)     In the event a portion of the Premises shall be so appropriated or taken and the remainder of the property shall not be suitable for the use then being made of the property by Tenant, or if the remainder of the property is not one undivided parcel of property, Tenant shall have the right to terminate this Lease as of the date of such taking on giving to Landlord written notice of such termination within forty-five (45) days after Tenant has been notified in writing that the property has been so appropriated or taken.

In the event of such partial taking and Tenant does not so terminate this Lease, then this Lease shall continue in full force and effect as to the part not taken, and the rental to be paid by Tenant during the remainder of the Term shall be proportionately, on a square footage basis, adjusted.

(c)     In the event of the termination of this Lease by reason of the total or partial taking of the Premises by eminent domain, then, in any such condemnation proceedings, Landlord and Tenant shall each be free to make claim against the condemning or taking authority for the amount of any damage incurred respectively by Landlord or Tenant.  In the event of a condemnation which results in termination of this Lease, Tenant shall pay to Landlord any condemnation proceeds allocated to Tenant's interest in Tenant's Improvements, to the extent such proceeds exceed Tenant's unamortized improvements costs

In the event of a partial taking of the Premises and this Lease is not terminated, then Landlord and Tenant shall each have the right to make claim against the condemning or taking authority for the amount of any damage done respectively to Landlord and Tenant.

Notwithstanding anything to the contrary contained herein, Tenant shall have no right to any value attributed to the unexpired term of this Lease or its leasehold interest hereunder.

20     DISPOSITION OF IMPROVEMENTS ON TERMINATION OF LEASE

(a)     On termination of this Lease for any cause Landlord shall become the owner of any building or improvements on the Premises without compensation or consideration therefore, except as provided in Section 20 (b) below.

(b)     Except as provided in Section 18(c) above, Tenant shall have no obligation to repair, restore or replace any building or other improvements located on the Premises at the expiration or other termination of this Lease.

21.   **HAZARDOUS MATERIALS**

Landlord and Tenant agree as follows with respect to the existence or use of Hazardous Material (as defined herein) on the Premises:

(a)     Landlord hereby represents and warrants to Tenant, to the best of Landlord's knowledge, without duty of inquiry, and except as disclosed in any soil or environmental reports received by Tenant prior to the execution of this Lease, that:

(i)     Landlord has no such knowledge that the Premises is in violation of any applicable Environmental Law (as hereinafter defined);

(ii)    no Hazardous Material has been used, disposed of or is located on or in, or migrating to or from the soil and ground water on or under the Premises; and

(iii)   there are no underground storage tanks under the Premises.

(b)     Landlord hereby covenants to Tenant as follows:

(i)     Landlord shall be responsible for all costs incurred in complying with any order, ruling or other requirement of any court, governmental body or agency relating to or arising out of the presence of any Hazardous Material at the Entire Tract caused by Landlord or its trustees, beneficiaries, employees, agents or contractors. Landlord shall diligently pursue to completion all such work required in connection with the same and shall do so in a manner that does not unreasonably interrupt or unreasonably interfere with any business or other activities being conducted on the Premises.

(ii)    Landlord shall indemnify, defend and hold Tenant, its directors, officers, employees, agents and successors harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees and expert fees) and all damages relating to or arising out of: (a) the presence of any Hazardous Materials at the Premises or the Entire Tract to the extent caused by Landlord or its trustees, beneficiaries, employees, agents or contractors; (b) Landlord's violation of any Environmental Law at the Premises; or (c) the inaccuracy or breach of any representation, warranty or covenant in this Section 21.

- 21 -

In the event of any inaccuracy or breach of any representation, warranty or covenant contained in this Section 21 or in the event of the presence of Hazardous Material (excluding the presence of any Hazardous Material caused by Tenant, or its employees, agents or contractors (**"Tenant's Hazardous Material"**)), Tenant has the right (without waiving any remedies provided by applicable Environmental Laws (defined below) against third parties) to either: (a) provide Landlord with written notice of Tenant's intent to terminate this Lease, in which case, if Landlord has not commenced and/or is not diligently pursuing a cure of such breach or diligently pursuing remediation of such Hazardous Material within sixty (60) days following the date of Tenant's written notice, then this Lease shall automatically terminate without further action by either party, such termination to be effective as of the end of such 60-day period, or (b) have its monthly rental and any other charges payable by Tenant abated in proportion to the extent of interference with Tenant's business until such time as the Premises has been remediated to the standards established in this subsection (ii), and the Entire Tract has been remediated to the point at which it no longer adversely affects the operation of Tenant's business within the Premises. Tenant shall also have the right to perform any necessary repair, cleanup, detoxification or other remedial action of Hazardous Material which is required to be remediated by Environmental Laws or this Lease, but Landlord has not remediated (excluding Tenant's Hazardous Material which is addressed in Section 21(c) below), and, except as to Hazardous Materials disclosed and/or discovered prior to the Commencement Date for which termination under Section 12(g) shall be Tenant's only remedy, to offset from Tenant's monetary obligations hereunder the amount so expended by Tenant. The parties agree that remediation pursuant to this Section 21 shall be performed in accordance with (i) the Non-Residential Soil Remediation Cleanup Criteria, as defined in the New Jersey Industrial Site Recovery Act, or such other standards as may in the future be used or permitted by the New Jersey Department of Environmental Protection in the remediation of soil and/or groundwater contamination, provided such future standards are consistent with Tenant's intention to operate a retail/commercial facility on the Premises; and (ii) the least restrictive standards required by all applicable governing authorities for commercial properties which will allow Tenant to continue to operate its retail business within the Premises.

(c)     Tenant hereby covenants to Landlord as follows:

(i)     Tenant shall not generate, treat, dispose of, install, sell, use, store or release into the environment in or around the Premises any Hazardous Materials except in the ordinary course of its business, and in full compliance with all applicable Environmental Laws. Tenant shall be responsible for all costs

incurred in complying with any order, ruling or other requirement of any court, governmental body or agency relating to or arising out of the presence of Tenant's Hazardous Material on the Premises. Tenant shall diligently pursue to completion all such work required in connection with Tenant's Hazardous Material and shall do so in a manner that does not interrupt or interfere with any business or other activities being conducted on the Entire Tract.

(ii)    Tenant shall indemnify, defend and hold Landlord, its trustees, beneficiaries, directors, officers, employees, agents and successors harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees and expert fees) and all damages relating to or arising out of: (a) the presence of Tenant's Hazardous Material on the Premises; (b) Tenant's operation or violation of any Environmental Law at the Premises; or (c) the inaccuracy or breach of any representation, warranty or covenant in this Section 21.

(d)    As used herein, the term "**Hazardous Material**" means petroleum products, asbestos, underground storage tanks, and any other hazardous or toxic substance, material or waste, which is or becomes regulated under any current or future Environmental Law .

(e)    As used herein, the term "**Environmental Law(s)**" means any and all current or future federal, state and local laws or regulations (as well as obligations, duties and requirements relating thereto under common law) pertaining to: (i) the protection of health, safety, environment, (ii) the conservation, management, or use of natural resources and wildlife, (iii) the protection or use of surface water, groundwater, water courses and wetlands, (iv) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, discharge, spill, release, threatened release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (v) pollution (including any release to air, land, surface water and groundwater).

22    ALTERATIONS

(a)    Tenant shall have the right to make such alterations, improvements and changes to any building which may, from time to time, be located on the Premises as Tenant may deem necessary, or to replace any such building with a new building. No alterations shall be undertaken until Tenant shall have procured all necessary permits Subject to the self-insurance provisions of Section 15, prior to commencing any alterations, Tenant shall obtain appropriate coverage for fire and extended coverage, and comprehensive public liability and property damage insurance, covering the risks

during the course of such alteration. All alterations shall be made with reasonable diligence, in a good and workmanlike manner and in compliance with all applicable laws. After completion, Tenant shall obtain, if necessary, any necessary amendment to the certificate of occupancy, and upon request, will furnish a copy to Landlord.

(b)    Any new building constructed by Tenant on the Premises, and all alterations, improvements, changes or additions made in or to the Premises shall be the property of Tenant except as provided in Section 20 above.

(c)    Tenant shall have the right to install and maintain its typical signs on the Premises and Tenant's Store Building, subject to municipal approval.

23.    **LANDLORD'S RIGHT OF ENTRY**

Tenant shall permit Landlord and the agents and employees of Landlord to enter into and upon the Premises at reasonable times and with two (2) business days prior written notice (provided, however, if, in Landlord's reasonable judgement, an emergency shall exist, then upon such notice to Tenant as may be reasonable under the circumstances, which may mean without prior notice if the circumstances shall so require) for the purpose of inspecting the same; for exhibiting same to prospective purchasers and/or mortgagees; exercising its rights and remedies pursuant to Section 17 (b) hereof; and performing its obligations under this Lease. If Tenant has not exercised an option to renew, Tenant shall permit Landlord and its agents and employees, at any reasonable time upon reasonable notice during the last Lease Year prior to the expiration of the Term of this Lease in order to exhibit the Premises to prospective tenants at reasonable hours; provided, however, Landlord agrees not to unreasonably interfere with Tenant's operations in exercising its rights under this Section 23.

24.    INTENTIONALLY OMITTED.

25.    INTENTIONALLY OMITTED.

26.    **NOTICES**

Notices shall be in writing and shall be deemed properly given or served: (a) upon being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) upon being deposited with a reputable overnight express carrier (e.g. Federal Express, Airborne, Express Mail, UPS) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, and shall be deemed received upon receipt or rejection. Notices shall be addressed as follows:

| | |
|---|---|
| Tenant: | **SEARS, ROEBUCK AND CO.**<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:  Vice President - Real Estate |
| Copy to: | **SEARS, ROEBUCK AND CO.**<br>3333 Beverly Road<br>Department 766T<br>Hoffman Estates, Illinois  60179<br>Attn.:  Assistant General Counsel - Real Estate |
| For Real<br>Estate Tax<br>Invoices: | **SEARS, ROEBUCK AND CO.**<br>Real Estate Taxes<br>Department 768TAX<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179 |
| For Rent and<br>Other<br>Real Estate<br>Invoices: | **SEARS, ROEBUCK AND CO.**<br>Real Estate Payments<br>Department 824RE<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179 |
| With a Copy<br>to: | Store Manager<br>*[street address of the Premises]* |
| Landlord: | **James J. Thompson Trust**<br>c/o First Union National Bank<br>190 River Road, 2nd Floor<br>Summit, New Jersey  07901<br>Attn:  Trust Real Estate |
| With a Copy to: | Robert B. Williams, Esq.<br>Milbank, Tweed, Hadley & McCloy<br>One Chase Manhattan Plaza<br>New York, New York  10005 |

With a Copy to:     Jeffrey H. Newman, Esq.
Sills, Cummis, Zuckerman, Radin,
Tischman, Epstein & Gross
One Riverside Plaza
Newark, New Jersey 07102-5400

or to any other address furnished in writing by any of the foregoing. However, any change of address furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current addresses to be used for all parties.

## 27. WAIVER

The waiver by either party of, or the failure of either party to take action with respect to, any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition, or subsequent breach of the same, or any other term, covenant or condition herein contained.

## 28. TRANSFER AND RECORDING TAXES

Upon execution of this Lease, a memorandum of this Lease in the form attached hereto and made a part hereof as *Exhibit "C"* shall be executed by both parties, and Tenant, at its option, may record such memorandum. Landlord will pay all transfer taxes, if any, and Tenant shall pay recording fees, levied, assessed or incurred upon execution, delivery or recordation of this Lease and/or the memorandum, as they become due.

## 29. ATTORNEYS' FEES

In the event at any time during the Term of this Lease the parties hereto shall institute any action or proceeding against the other relating to the provisions hereof, or any default hereunder, then, and in that event, the unsuccessful party in such action or proceeding agrees to reimburse the successful party therein for the reasonable expenses of attorneys' fees, court costs and disbursements incurred therein by the successful party.

## 30. PARTIES BOUND

The covenants and conditions herein contained shall, subject to the provisions as to assignment, transfer and subletting, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto, and all of the parties hereto shall be jointly and severally liable hereunder.

31. **TIME OF THE ESSENCE**

Time is of the essence of this Lease, and of each and every covenant, term, condition and provision hereof.

32. **BROKER**

Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease, except for Garrick-Aug & Associates Store Leasing, Inc. and Restinn Interstate (collectively, "**Broker**"). Landlord shall pay the commissions due to Broker pursuant to separate agreement. Landlord shall indemnify, defend and hold Tenant harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker or other agent claiming by or through Landlord. Tenant shall indemnify, defend and hold Landlord harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker or other agent claiming by or through Tenant.

33. **PRIME RATE**

The term "**Prime Rate**" as used herein shall mean the rate of interest announced from time to time by First of Chicago/NBD (or if First Chicago/NBD is not in existence, the largest bank headquartered in the City of Chicago, Illinois, measured in terms of net worth) as its "prime rate".

34. **SECTION CAPTIONS**

The captions appearing under the Section number designations of this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

35. **REMEDIES CUMULATIVE**

All remedies hereinbefore and hereafter conferred on Landlord and Tenant shall be deemed cumulative and no one exclusive of the other, or of any other remedy conferred by law.

36. **GOVERNING LAW**

This Lease shall be interpreted and construed under the laws of the state in which the Premises is located.

37.  <u>NO PARTNERSHIP</u>

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, and neither the method of computation of Rent nor any other provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

38.  <u>SEVERABILITY</u>

Any provision or provisions of this Lease which are or become illegal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Lease shall nevertheless remain in full force and effect.

39.  <u>FEE MORTGAGES</u>

(a)    Landlord shall have the right at any time during the Lease Term to encumber Landlord's fee interest in the Entire Tract, or any part thereof, but not the building, improvements or other property of Tenant, to any one or more mortgages, deeds of trust or other instrument to secure debt, and to renew, modify, consolidate, replace, extend and/or refinance any such mortgage, deed of trust or instrument to secure debt (individually and collectively, a "Fee Mortgage").  The holder of any such Fee Mortgage shall be referred to as a "Fee Mortgagee".

(b)    Tenant shall not be required to subordinate Tenant's leasehold interest to the lien of any Fee Mortgages encumbering the Premises entered into subsequent to the date of this Lease, unless and until the Fee Mortgagee shall enter into a Subordination, Attornment and Non-Disturbance Agreement substantially in the form attached as Exhibit "B", or other form mutually agreeable to Fee Mortgagee and Tenant, provided that its provisions relate to subordination, non-disturbance and attornment and do not constitute an amendment to the other terms and conditions of this Lease or a waiver of any of Tenant's rights hereunder.

(c)    If any Fee Mortgagee requires that this Lease have priority over the Fee Mortgage, Tenant shall, on request of Landlord or the Fee Mortgagee, execute, acknowledge and deliver an agreement reasonably acceptable to Tenant acknowledging and confirming such priority.

40. **EXCULPATORY PROVISIONS**

The persons executing this Lease are doing so as Trustees under the Trust referred to in the introductory paragraph of this Lease and not in their individual capacities. They and their successors shall have no personal individual liability hereunder.

Landlord shall incur no liability beyond Landlord's interest in the Premises (and any rents) and Tenant shall look exclusively to such interest in the Premises (and any rents) for the payment and discharge of any obligation imposed under this Lease. In the event that Tenant shall recover a money judgment against Landlord, Tenant hereby acknowledges that it shall look solely to the interest of Landlord in the Premises (and any rents) for the satisfaction or assertion of any such judgment.

41. **SUBROGATION**

Notwithstanding any other provisions herein, Landlord and Tenant each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property located on the Entire Tract to the extent that the loss or damage is customarily insurable (whether or not actually insured) by "All Risk" Property Insurance Policy. Landlord and Tenant agree to furnish to each insurance company which has or will issue policies of All Risk Insurance on their respective portions of the Entire Tract notice of the terms of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein. This waiver shall not be effective to relieve Landlord or Tenant of liability if such party fails to maintain the required "All-Risk" Property Insurance.

**IN WITNESS WHEREOF,** the parties have caused this Lease to be executed:

ATTEST or WITNESS:

LANDLORD:

**JAMES J. THOMPSON TRUST**

FIRST UNION BANK, TRUSTEE

By: _Joann Codella_

By: _____

Name: _Matt LaGio_

Title: _AGF_

ATTEST OR WITNESS:

TENANT:

**SEARS, ROEBUCK AND CO.**

By: _Victoria S. Berghel_

Name: Victoria S. Berghel

Title: Assistant Secretary

By: _Ronald P. Douglass_

Name: Ronald P. Douglass

Title: Vice President Real Estate

**Attachments:**

Exhibit "A"    Site Plan
Exhibit "B"    Subordination, Attornment and Non-Disturbance Agreement
Exhibit "C"    Memorandum of Lease
Exhibit "D"    Prohibited Uses



EXHIBIT A
SITE PLAN

Premises

US - NO. 1

## EXHIBIT "B"

## SUBORDINATION, ATTORNMENT AND
## NON-DISTURBANCE AGREEMENT

THIS AGREEMENT is made and entered into as of the ____ day of
_____, 199__, by and between _____ ("Lender")
and SEARS, ROEBUCK AND CO., 3333 Beverly Road, Hoffman Estates, Illinois 60179
("Tenant").

## WITNESSETH:

WHEREAS, by the Ground Lease dated _____, 1998 (the
"Lease"), the Tenant has leased from James J. Thompson Trust ("Landlord") certain premises (the
"Premises"), containing approximately three (3) acres located in the Town of North Brunswick,
New Jersey, which is legally described on *Exhibit "A"* attached hereto (the "Entire Tract").

WHEREAS, Lender is the holder of a mortgage on the Premises, given to the Lender
by Landlord dated as of _____, recorded on _____,
19__, in the Office of the Recorder of Deeds *[Registrar of Titles]* of _____
County, _____ in Book _____ at Page _____, as Document No.
_____ (collectively referred to herein with any other documents securing the
debt secured by the mortgage as the "Mortgage").

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth
and other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the parties agree as follows:

1.    Lender hereby consents to the Lease.

2.    In the event that Lender shall commence an action to foreclose the Mortgage
or to obtain a receiver of the Premises, or shall foreclose the Mortgage by
advertisement, entry and sale according to any procedure available under the
laws of the state where the Premises is located, Tenant shall not be joined as
a party defendant in any such action or proceeding and Tenant shall not be
disturbed in its possession of the Premises.

3.    In the event that Lender shall acquire the Premises upon foreclosure, or by
deed in lieu of foreclosure, or by any other means:

(a)    Tenant shall be deemed to have made a full and complete attornment
to Lender as the landlord under the Lease so as to establish direct
privity between the Lender and Tenant; and

(b)   All rights and obligations of Tenant under the Lease shall continue in full force and effect and be enforceable by and against Tenant respectively with the same force and effect as if the Lease had originally been made and entered into directly by and between Lender as the landlord thereunder, and Tenant;  and

(c)   Lender shall recognize and accept the rights of Tenant and shall thereafter assume the obligations of Landlord under the Lease, provided, however, Lender shall not be:

(i)   liable for any default of any prior landlord under the Lease (including the Landlord) unless such default is a continuing default or unless Tenant gave Lender written notice of such default in a timely fashion as required hereunder; or

(ii)   subject to any off-sets or defenses which Tenant might have against any prior landlord (including the Landlord), unless Tenant sends to lender concurrently with notice to Landlord, a copy of any notice served on Landlord specifying a default and, in such event, Lender shall be subject to any off-sets or defenses which Tenant may have against Landlord and Lender will be permitted to cure, but not obligated to cure, the default within the applicable cure period in the Lease; or

(iii)   bound by any rent or additional rent which Tenant may have paid for more than the one month in advance to any prior landlord (including the Landlord).

4.   Nothing herein contained shall impose any obligations upon Lender to perform any of the obligations of Landlord as landlord under the Lease, unless and until Lender shall become owner or mortgagee in possession of the Premises.

5.   Lender hereby acknowledges and agrees that pursuant to Section 18 of the Lease, the proceeds of any insurance covering damage or destruction of any improvement on the Premises shall be paid to Tenant regardless of whether Tenant elects to repair or replace such improvement.

6.   Tenant agrees that the Lease shall be subordinate to Lender's Mortgage; provided, however, such subordination is expressly conditioned upon recognition of the Lease by Lender, the rights of Tenant remaining in full force and effect during the Term of the Lease so long as Tenant shall continue to perform all of the covenants and conditions of the Lease and the other terms and conditions of this Agreement.

7.   Any notice required or desired to be given under this Agreement shall be in writing and shall be deemed given: (a) upon receipt if delivered personally;

(b) two (2) business days after being deposited into the U.S. mail if being sent by certified or registered mail, return receipt requested, postage prepaid; or (c) one (1) business day after being sent by reputable overnight air courier service (i.e., Federal Express, Airborne, etc.) with guaranteed overnight delivery, and addressed as follows:

**If to Lender:**      _____
                       _____
                       _____
                       _____
                       _____

**If to Tenant:**      **SEARS, ROEBUCK AND CO.**
                       3333 Beverly Road
                       Hoffman Estates, Illinois  60179
                       Attention:    Vice President
                                     Real Estate
                                     Department 824RE

**With a copy to:**    **SEARS, ROEBUCK AND CO.**
                       3333 Beverly Road
                       Hoffman Estates, Illinois  60179
                       Attention:    Assistant General Counsel
                                     Real Estate
                                     Department 766T

8.    Either party, at any time and from time to time (by providing notice to the other party in the manner set forth above), may designate a different address or person, or both, to whom such notice may be sent.

9.    This Agreement shall be binding upon and inure to the benefit of any person or entity acquiring rights to the Premises by virtue of the Mortgage, and the successors, administrators and assigns of the parties hereto.

10.   Tenants Improvements, Tenant's fixtures and Tenant's personalty shall not be subject to the lien of the Mortgage.

**IN WITNESS WHEREOF,** this Non-Disturbance Agreement has been signed and sealed on the day and year first above set forth.

WITNESS OR ATTEST:                    Lender

_____

_____             By: _____
                                      Name: _____
                                      Title: _____

                                      Tenant:

WITNESS OR ATTEST:                    **SEARS, ROEBUCK AND CO.**

_____             By: _____
                                      Name: _____
                                      Title: _____

**Prepared by and returned to when recorded:**

Thomas K. Hornacek, Esq.
Sears, Roebuck and Co.
Department 766T
3333 Beverly Road, B6-283B
Hoffman Estates, Illinois 60179

## EXHIBIT "C'

## MEMORANDUM OF LEASE

THIS **MEMORANDUM OF LEASE** ("Memorandum") made this ___ day of
_____, 1998, by and between **JAMES J. THOMPSON TRUST,** a
_____ ("**Landlord**"), and **SEARS, ROEBUCK AND CO.,** a New York
corporation ("**Tenant**").

### WITNESSETH:

1.  Landlord and Tenant have entered into a certain Ground Lease dated as of
    _____, 1998 (the "**Lease**"), pursuant to which Landlord has leased to Tenant
    certain premises (the "**Premises**") situated in the Town of North Brunswick, County
    of _____, State of New Jersey and located on that certain real property
    more particularly described in *Exhibit "A"* attached hereto and made a part hereof.
    Defined terms not defined in the Memorandum shall have the meaning as defined
    in the Lease.

2.  The addresses of the parties to the Lease are as follows:

    (a)   Landlord -   **JAMES J. THOMPSON TRUST**
                       c/o First Union National Bank
                       190 River Road, 2nd Floor
                       Summit, New Jersey 07901
                       Attn: Trust Real Estate

    (b)   Tenant -     **SEARS, ROEBUCK AND CO.**
                       3333 Beverly Road
                       Department 824RE
                       Hoffman Estates, Illinois 60179

3.  The Term of the Lease, more particularly described in Section 3 of the Lease,
    commences on the earlier to occur of the date: one hundred eighty (180) days after
    Landlord delivers the Premises to Tenant in accordance with the terms of the Lease
    or (b) the date Tenant begins retail selling operations in the Premises (the
    "**Commencement Date**"). The Term of the Lease ends on the date which is twenty
    (20) years after the Commencement Date.

4.  Tenant has the right to extend the Term of the Lease for four (4) additional periods
    of five (5) years each as more particularly set forth in the Lease.

5.  During the Term of the Lease, Tenant shall own the improvements now or hereinafter
    erected on the land.

6.     This Memorandum is not a complete summary of the Lease, nor shall any provisions of this Memorandum be used in interpreting the provisions of the Lease.  In the event of any conflict between this Memorandum and the Lease, the Lease shall control.

7.     This Memorandum is being executed and delivered for recording in the Office of the Clerk of _____ County, New Jersey.

**IN WITNESS WHEREOF,** this Memorandum has been executed and delivered as a sealed instrument by the parties hereto on the day, month and year first above written.

**LANDLORD:**

**JAMES J. THOMPSON TRUST**

By: _____
Name: _____
Title: _____

Witness or Attest: _____

**TENANT:**

**SEARS, ROEBUCK AND CO.**

By:_____
Name: _____
Title: _____

Witness or Attest: _____

This instrument was prepared by and after recording should be returned to:

Thomas K. Hornacek, Esq.
Sears, Roebuck and Co.
Department 766T
3333 Beverly Road, B6-283B
Hoffman Estates, Illinois  60179

## EXHIBIT D

## PROHIBITED USES

(i)    industrial, factory, assembling, manufacturing, distilling, refining, smelting, agricultural or mining uses; warehouse uses (except storage of merchandise and supplies for sale at the premises); processing or rendering plant, storage warehouse operation; a junkyard, recycling facility or stockyard;

(ii)    for the dumping, disposing, incineration or reduction of garbage or other waste (provided however, the foregoing restriction shall not be construed to prohibit the use of trash compactors in conjunction with a use not otherwise prohibited hereunder);

(iii)    dry cleaner or dry cleaning plant;

(iv)    mobile home park, trailer park, trailer court, labor camp, low income or subsidized housing or welfare residence;

(v)    any governmental use;

(vi)    for the operation of a massage parlor, adult book store, adult video store or peep show store (or any other similar store or club in which a material portion of its inventory includes obscene or pornographic materials, nude photos, sexual devices, sexually explicit magazines, sexually explicit videos or objects depicting nudity or sexual activity, or whose activities include the display of partially or totally nude males or females, whether topless, bottomless or otherwise); head shop store or other establishment displaying or exhibiting paraphernalia or materials related to illegal drugs or the use thereof;

(vii)    a gambling facility or operation, including without limitation, any so-called off-track betting or sports betting parlor, table games (such as "blackjack" or "poker"), slot machines, video "blackjack," video keno machines or similar devices, a bingo parlor or any establishment conducting games of chance (provided however, the foregoing restriction shall not be construed to prohibit an establishment from selling state sanctioned lottery tickets incidental to the operation of a retail business not otherwise prohibited by this Lease);

(viii)    a funeral parlor or mortuary; gun or ammunition store; tattoo shop; a rehabilitative facility; a church or other house of worship;

(ix)    an animal raising facility; or

(x)    as a facility primarily for the use, storage, generation, manufacture, treatment, transportation or disposal of any Hazardous Material.

6.   This Memorandum is not a complete summary of the Lease, nor shall any provisions of this Memorandum be used in interpreting the provisions of the Lease.  In the event of any conflict between this Memorandum and the Lease, the Lease shall control.

7.   This Memorandum is being executed and delivered for recording in the Office of the Clerk of _____ County, New Jersey.

**IN WITNESS WHEREOF**, this Memorandum has been executed and delivered as a sealed instrument by the parties hereto on the day, month and year first above written.

**LANDLORD:**

**JAMES J. THOMPSON TRUST**

By: _____
Name: _____
Title: _____

Witness or Attest: _____

**TENANT:**

**SEARS, ROEBUCK AND CO.**

By: _____
Name: _____
Title: _____

Witness or Attest: _____

This instrument was prepared by and after recording should be returned to:

Thomas K. Hornacek, Esq.
Sears, Roebuck and Co.
Department 766T
3333 Beverly Road, B6-283B
Hoffman Estates, Illinois  60179



LEGEND

|  | EXISTING | PROPOSED |
|---|---|---|
| CURB | | |
| MANHOLE | | |
| STORM SEWER | | |
| SANITARY SEWER | | |
| INLET | | |
| CONC. SIDEWALK | | |
| CONTOUR | | 120 |
| POINT ELEVATION | | |
| HYDRANT | | |
| UTILITY VALVE | | |
| OVERHEAD WIRES | | |
| GAS LINE | | |
| WATER LINE | | |
| ELECTRIC CABLE | | |
| UTILITY POLE | | |
| TRAFFIC SIGNAL | | |
| BOLLARD | | |

NOTES

1. BOUNDARY AND TOPOGRAPHIC INFORMATION FROM A PLAN ENTITLED "ALTA/ACSM LAND TOPOGRAPHICAL SURVEY, NATIONAL TIRE LOT 62, BLOCK 140, TOWNSHIP OF NORTH BRUNSWICK MIDDLESEX COUNTY, NEW JERSEY" PREPARED BY CONTROL POINT ASSOCIATES, INC. DATED

2. ALL EXISTING TREES WITHIN THE SITE DISTURBANCE AREA SHALL BE REMOVED.

3. ALL PROPOSED UTILITY SERVICE CONNECTIONS BE INSTALLED UNDERGROUND

4. WETLANDS LOT TAKEN FROM A PLAN ENTITLED "TOPOGRAPHIC & WETLANDS DELINEATION LOT 62 BLOCK 140 FOR WILLIAM FARIAS IN THE TOWNSHIP OF NORTH BRUNSWICK NEW JERSEY", PREPARED BY JOHN ZAVO ASSOCIATES, INC. DATED DEC 4, 1992 LAST REVISION 9-9-93

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft

SEARS PARCEL DESCRIPTION

THE FOLLOWING COMPANIES WERE NOTIFIED BY THE GARDEN STATE UNDERGROUND SYSTEM (1-800-272-1000) AND REQUESTED TO MARK OUT UNDERGROUND FACILITIES AFFECTING AND SERVICING THIS SITE. THE UNDERGROUND UTILITY INFORMATION SHOWN HEREON IS BASED UPON THE UTILITY COMPANY'S RESPONSE TO THIS REQUEST
SERIAL NUMBER #973600241

| UTILITY COMPANY | PHONE NUMBER |
|---|---|
| TRANSCONTINENTAL GAS | (701) 794-7563 |
| WORLD COMMUNICATIONS NETWORK | (908) 432-4879 |
| MCI | (800) 886-0800 |
| PSE&G | (908) 247-7600 |
| BELL ATLANTIC | (860) 437-9977 |
| AT&T | (800) 222-0300 |
| TCI CABLE | (908) 549-9634 |
| TEXAS EASTERN GAS CO | (908) 791-1212 |
| N.J. NATURAL GAS | (800) 221-0051 |
| TELEPORT COMMUNICATIONS | (908) 981-4400 |
| BY OK LC | |
| NORTH BRUNSWICK WATER DEPT | (908) 297-3759 |
| SOUTH BRUNSWICK WATER & SEWER | (908) 329-4050 |
| SUN PIPELINE | (810) 679-3244 |

LOT 8.135

U.S. NO. 1

JUGHANDLE TO NORTH OAKS BLVD.

R=231.00'
L=133.05'

S 82°00'00" W
458.84'

P.O.B.

APPROVED BY THE TOWNSHIP OF NORTH BRUNSWICK PLANNING BOARD

BOARD CHAIRPERSON _____ DATE _____

BOARD SECRETARY _____ DATE _____

BOARD ENGINEER _____ DATE _____

M. MANCUSO

Premises

SITE PLAN
SEARS/NATIONAL TIRE & B...
BLOCK 140 LOT 62
TOWNSHIP OF NORTH BRUNSWICK
MIDDLESEX COUNTY

98-114SP

## EXHIBIT "C"

|                                      |   |                                              |
|--------------------------------------|---|----------------------------------------------|
| Prepared by and after recording      | ) |                                              |
| return to:                           | ) |                                              |
|                                      | ) |                                              |
|                                      | ) |                                              |
|                                      | ) |                                              |
|                                      | ) |                                              |
|                                      | ) | [This space reserved for recording purposes] |

## MEMORANDUM OF SUBLEASE

THIS MEMORANDUM OF SUBLEASE (this **"Memorandum"**) is made and entered into as of _____, _____, by and between and **SEARS, ROEBUCK AND CO., ("Landlord")** and **KENTUCKY FRIED CHICKEN OF CALIFORNIA, INC., ("Tenant")**.

## W I T N E S S E T H:

For and in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are all hereby acknowledged, the parties hereto agree as follows:

1.  **Premises.**  Landlord, as Sublessor, and Tenant, as Sublessee, have entered into a certain Sublease dated _____ (hereinafter referred to as the **"Lease"**), pursuant to which Landlord has leased to Tenant certain premises (the **"Premises"** as indicated on the Site Plan, attached hereto as **Exhibit "A"**) located in the Town of North Brunswick, County of Middlesex, State of New Jersey.

2.  **Term.**  The Lease provides for an initial term beginning on the Rental Commencement Date, as defined in the Lease, and expiring on February 7, 2019.

3.  **Extensions.**  The initial term of the Lease may be extended for a total of two (2) successive periods of five (5) years each in accordance with the applicable provisions of the Lease.

4.  **Entire Agreement / Conflicts.**  This Memorandum is executed by the parties to the Lease for the purpose of recordation in the records of Middlesex County, New Jersey, it being intended that this Memorandum shall be so recorded and shall give notice of and concern the Lease which is incorporated herein by this reference.  This Memorandum is not a complete summary of the Lease, nor shall any provision of this Memorandum be used in interpreting the provisions of the Lease.  In the event of any conflict between this Memorandum and the Lease, the Lease shall control.

12

S:\thomac\NBRUNSWICK-2- doc

5.    **Statement of Obligations and Rights.**  For a definitive statement of the obligations and rights of Landlord and Tenant, reference must be made to the Lease and any amendments thereto.  All defined (capitalized) terms not defined herein shall have the meaning ascribed thereto in the Lease.

6.    **Notice to Parties.**  This Memorandum shall constitute notice to all parties of all amendments to the Lease, if any, from time to time hereafter executed, without the necessity for recording further memoranda of such amendments.

**IN WITNESS WHEREOF**, the parties hereto have caused this Memorandum of Lease to be executed on the day, month and year first above written.

**LANDLORD:**

**SEARS, ROEBUCK AND CO.**

By: _____
Its: _____

ATTEST:

_____

**TENANT:**

**KENTUCKY FRIED CHICKEN OF CALIFORNIA, INC.**

By: _____
Its: _____

ATTEST:

_____

13

S:\thomac\NBRUNSWICK-2-.doc

STATE OF _____      )
                              ) SS:
COUNTY OF _____       )


      THE undersigned, a Notary Public in and for the County and State aforesaid,
does hereby certify, that _____ and
_____, personally known to me to be the _____ Secretary
and _____, respectively, of
_____, a _____ corporation, appeared
before me this day in person and acknowledged under oath that in such capacities they
signed and delivered the said instrument pursuant to authority duly given to them by said
corporation.

      GIVEN under my hand and seal this _____ day of _____,
_____.


                                        _____
                                        Notary Public

My Commission Expires: _____



STATE OF ILLINOIS       )
                        ) SS:
COUNTY OF COOK         )


      THE undersigned, a Notary Public in and for the County and State aforesaid,
does hereby certify, that _____ and
_____, personally known to me to be the
_____ and Assistant Secretary, respectively, of **SEARS,
ROEBUCK AND CO.**, a New York corporation, appeared before me this day in person
and acknowledged under oath that in such capacities they signed and delivered the said
instrument pursuant to authority duly given to them by said corporation.

      GIVEN under my hand and seal this _____ day of _____,
_____.


                                          _____
                                        Notary Public

My Commission Expires: _____

14

S:\thornac\NBRUNSWICK-2-.doc

# EXHIBIT C

**From:** Schwartz, Cheryl [mailto:Cheryl.Schwartz@searshc.com]
**Sent:** Thursday, December 20, 2018 3:22 PM
**To:** Williams, Rob <RWilliams@milbank.com>
**Cc:** Schwartz, Cheryl <Cheryl.Schwartz@searshc.com>
**Subject:** Lease for property S#69722 - North Brunswick, NJ

- As you may be aware, on December 19, 2018 (the "Petition Date"), the Debtor and certain of its affiliates commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The cases are being jointly administered under chapter 11 case number 18-23538 (RDD).
- As you may also be aware, on the Petition Date, the Debtor filed a motion to reject the Lease pursuant to section 365 of the Bankruptcy Code effective as of the Petition Date.
- The Debtors hereby surrender the premises.

Cheryl Schwartz
Real Estate Manager
Acquisitions and Dispositions
Sears Holdings Corporation
3333 Beverly Road, BC-152A
Hoffman Estates, IL  60179
847-286-1696 (office)
847-286-7946 (fax)

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. This message is confidential and may contain attorney work product and/or proprietary information intended only for the use of the addressee(s) named above and/or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter.

Except where an express statement to the contrary is contained in this communication, (a) nothing in this communication is to be regarded or construed as an electronic signature, nor is this communication intended to be "signed," (b) nothing in this communication is to be regarded as an offer, an acceptance, or an undertaking to negotiate, and (c) any agreement, commitment, representation, warranty, undertaking, or waiver binding Sears or any affiliate may only be evidenced by a separate signed writing by an authorized signatory.

Thank you.


This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

# EXHIBIT D

## Cohen, Harold G.

| | |
|---|---|
| **From:** | Cohen, Harold G. <hcohen@dilworthlaw.com> |
| **Sent:** | Friday, December 21, 2018 12:04 PM |
| **To:** | 'Cheryl.Schwartz@searshc.com' |
| **Cc:** | Robert B. Williams (RWilliams@milbank.com); 'Jacqueline.Marcus@weil.com'; 'Ray.Schrock@weil.com'; 'Garrett.Fail@weil.com'; 'Sunny.Singh@weil.com'; Cordes, Jennifer L. |
| **Subject:** | Sears Rejection of Lease for property S#69722 - North Brunswick, NJ |
| **Attachments:** | Letter and Sublease to James Thompson Trust from Sears re Sublease.pdf |

Dear Ms. Schwartz:-

We represent James J. Thompson Trust – landlord of the premises referenced in your below notice. Your email (and a *Notice Of Rejection Of Certain Unexpired Leases Of Nonresidential Real Property And Abandonment Of Property In Connection Therewith* – dated December 19, 2018) were forwarded to me for evaluation and action.

The yellow highlighted text in your email (below) is inconsistent with language in the Notice regarding the date upon with the Debtor filed its Chapter 11 Petition and the date upon which the Debtor filed a motion to reject the lease effective as of the Petition Date. Kindly clarify these inconsistencies so that we can properly represent this Landlord.

The schedule attached to the Notice of Rejection acknowledges that the premises are subleased. The subtenant identified in the schedule attached to the Notice identifies FQSR LLC. The subtenant identified in the sublease is Kentucky Fried Chicken of California, Inc. Attached to this email is a copy of the Sublease as provided to the Landlord by Sears. Please clarify the discrepancy in the identity of the subtenant.

Kindly also provide contact information that you have for the subtenant – the person(s) with whom Sears communicates at the subtenant. The Notice of Rejection states that personal property belonging to 3rd parties at the premises is abandoned to the Landlord and that the Landlord can dispose of that property with impunity and without concern for the rights of the 3rd parties. We want to contact the subtenant to determine its intentions.

We prefer to resolve all issues quickly, amicably and without need to file an Objection to the Notice of Rejection. Your rapid response will be greatly appreciated.

This email is without prejudice to all rights and remedies of James J. Thompson Trust, all of which are expressly reserved.

HAROLD G. COHEN | DILWORTH PAXSON LLP
457 Haddonfield Road | Suite 700 | Cherry Hill, NJ 08002
Tel: (856) 675-1950 | Fax: (856) 663-8855
hcohen@dilworthlaw.com | www.dilworthlaw.com

**From:** Schwartz, Cheryl [mailto:Cheryl.Schwartz@searshc.com]
**Sent:** Thursday, December 20, 2018 3:22 PM
**To:** Williams, Rob <RWilliams@milbank.com>
**Cc:** Schwartz, Cheryl <Cheryl.Schwartz@searshc.com>
**Subject:** Lease for property S#69722 - North Brunswick, NJ

- As you may be aware, on December 19, 2018 (the "Petition Date"), the Debtor and certain of its affiliates commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The cases are being jointly administered under chapter 11 case number 18-23538 (RDD).
- As you may also be aware, on the Petition Date, the Debtor filed a motion to reject the Lease pursuant to section 365 of the Bankruptcy Code effective as of the Petition Date.
- The Debtors hereby surrender the premises.

1

Cheryl Schwartz
Real Estate Manager
Acquisitions and Dispositions
Sears Holdings Corporation
3333 Beverly Road, BC-152A
Hoffman Estates, IL  60179
847-286-1696 (office)
847-286-7946 (fax)

---

www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email: postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

# EXHIBIT E



Dilworth
Paxson LLP

Brett Wiltsey
New Jersey Managing Partner

DIRECT DIAL NUMBER:
(856) 675-1950

Harold G. Cohen
hcohen@dilworthlaw.com

December 21, 2018

*Via UPS Next Day Air*

Kentucky Fried Chicken of California, Inc.      FQSR LLC
1441 Gardiner Lane                              8900 Indian Creek Parkway, Suite 100
Louisville KY 40213                             Overland Park KS 66210

   Re:    Sublease for Property
          1055 Route 1 South, North Brunswick NJ 08902 - Block 140, Lot 62 ("**Premises**")

Dear Folks:

   We represent the James J. Thompson Trust ("**Landlord**"), land owner of the referenced Premises. Kentucky Fried Chicken of California, Inc. ("**KFC**") is a Sublessee of the Premises pursuant to a Sublease dated November 4, 1999 in which Sears, Roebuck and Co. ("**Sears**") is the Sublessor. Attached to this letter is a copy of the Sublease; attached to the Sublease is a copy of the Master Lease dated April 15, 1998 by and between the Landlord and Sears/Sublessor.

   Landlord has been advised that Sears, together with affiliates, filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Sears Chapter 11**"). Landlord received a *Notice Of Rejection Of Certain Unexpired Leases Of Non Residential Real Property And Abandonment Of Property In Connection Therewith* (the "**Rejection Notice**"). The Rejection Notice was issued in the Sears Chapter 11. A copy of the Rejection Notice is enclosed with this letter. Annex A to the Rejection Notice is a list of leases intended to be rejected, pursuant to the Rejection Notice, by Sears and its various affiliates. You will note that the top item on page 1 of Annex A references the Master Lease between Landlord and Sears and the Sublease between Sears and KFC [Annex A to the Rejection Notice actually identifies FQSR LLC as the counterparty-subtenant for the Premises]. December 19, 2018 is the proposed effective date of the Sears rejection of the Master Lease.

A Limited Liability Partnership Formed in Pennsylvania
LibertyView • 457 Haddonfield Road • Suite 700 • Cherry Hill, NJ 08002 • 856-675-1900 • fax: 856-663-8855
www.dilworthlaw.com • Exton, PA • Philadelphia, PA • Princeton, NJ • Harrisburg, PA • Wilmington, DE • New York, NY

120690011_1

Kentucky Fried Chicken of California, Inc.
FQSR LLC
December 21, 2018
Page 2

Sears has separately given notice to the Landlord that possession of the Premises has been tendered as of December 19, 2018. Therefore, pursuant to the Rejection Notice (and the Sublease), all rights of KFC under the Sublease, including possession, have also been terminated by Sears effective December 19, 2018.

The Sublease states that it expires, by its own terms, on February 7, 2019.

Your attention is directed to the fifth paragraph on page 2 the Rejection Notice which states, *inter alia*

"PLEASE TAKE NOTICE that with respect to any personal property … owned by a third party, such third party shall contact the Debtors and shall remove or cause to be removed such personal property from the leased premises prior to the Rejection Date. If any such personal property remains on the leased premises after the Rejection Date, the Landlord may depose of any and all such property as set forth above and without notice or a liability to the Debtors or any third party."

Without prejudice to the rights and remedies of the Landlord, all of which are expressly reserved, we make the following inquiries to KFC:

1. Is KFC now vacating the Premises? If so, is KFC removing all of its personal property or is it abandoning all personal property on the Premises?

2. Is KFC interested in remaining at the Premises pursuant to a direct lease with the Landlord? If so, Landlord will entertain discussions about the terms for a direct lease with KFC.

Time is of the essence for you to respond to these inquiries. The Rejection Notice allows Landlord a period of ten (10) days within which to file and serve any objection to the Rejection Notice and the proposed Rejection Order being sought by Sears. Because of the exigencies at hand, you are invited to forward your response by email: HCohen@DilworthLaw.com. Please call if you want to further discuss this time-sensitive matter.

Yours very truly,

Harold G. Cohen

HGC:AR
Enclosures

cc:   Kentucky Fried Chicken (w/enclosure) (via UPS Next Day Air)