**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                             :

                                 :        **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,    :

                                 :        **Case No. 18-23538 (RDD)**

                                 :

             Debtors.[1]            :        **(Jointly Administered)**

---------------------------------------------------------------x

## NOTICE OF DE MINIMIS ASSET SALE
## FOR SEARS STORE #1150 (WESTLAND, OH)

      **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets (the "**Assets**") to LGR Investments, LLC (the "**Purchaser**") pursuant to an agreement dated June 4, 2018 and subsequently amended (together with all amendments thereto, the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

      <u>Description of the Assets</u>. The Assets consist of an approximately twenty (20) acre parcel of real estate, together with the approximately 207,417 square foot building thereon and all other improvements, buildings, structures and attached fixtures, located at 4411 West Broad Street, Columbus, Ohio.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Relationship of the Purchaser to the Debtors.  The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets.  The Debtors are not aware of any liens and/or encumbrances on the Assets.  To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale.  The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code.  The Purchaser has agreed to pay a purchase price of $ 3,150,000.00 for the Assets.  The Purchase Agreement (without amendments) is annexed hereto as **Exhibit 1**.  The first amendment to the Purchase Agreement, dated September 10, 2018, is annexed hereto as **Exhibit 2**.  The second amendment to the Purchase Agreement, dated November 30, 2018, is annexed hereto as **Exhibit 3**.

Commission, Fees, or other Similar Expenses: The Debtors are required to pay $157,500.00 in commission, fees, or other similar expenses in connection with the sale.

Procedures to Object to the Proposed Sale.  Any objection to the proposed sale (an "**Objection**") must:  (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; Sunny Singh, Esq., and Jessica Liou, Esq.), as counsel to the Debtors **on or before January 17, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets; and (iii) the DIP Agents' Counsel.

WEIL:\96856288\6\73217.0004

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: January 8, 2019
New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

3

## Exhibit 1

**Store No. 1150 (Westland, OH) Purchase Agreement**

## CONTRACT FOR PURCHASE AND SALE OF PROPERTY

{Columbus, Ohio (Westland Mall) S#1150}

**THIS CONTRACT FOR PURCHASE AND SALE OF PROPERTY** (this "**Contract**") dated as of the last date of execution (the "**Effective Date**") is by and between **SEARS, ROEBUCK AND CO.,** a New York corporation ("**Seller**"), and LGR INVESTMENTS, LLC, an Ohio limited liability company ("**Buyer**"), upon the terms and conditions set forth below.

1.     **Purchase and Sale.** Subject to the terms and conditions hereof, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, that certain parcel of real estate consisting of approximately 20 acres of land located at 4411 West Broad Street, Columbus, Ohio and legally described on **Exhibit "A"** attached hereto and made a part hereof (the "**Land**"), together with the approximately 207,417 sf building thereon and all other improvements, buildings, structures and attached fixtures located on the Land, including any and all rights, privileges, easements and appurtenances, if any, thereunto belonging (the "**Improvements**"), and together with all permits, approvals, development rights and other such appurtenances (if any) to the extent assignable (collectively, the "**Approvals**"); the Land, the Improvements and the Approvals are hereinafter referred to together as the "**Real Property**" or the "**Property**").

2.     **Purchase Price/Deposit.**

   (a)     The purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be Three Million One Hundred Fifty Thousand and 00/100 Dollars ($3,150,000.00) payable as follows:

           (i)     The sum of Ten Thousand and 00/100 Dollars ($10,000.00) (the "**Deposit**") shall be deposited by Buyer with the Title Company (as hereinafter defined), as escrow agent ("**Escrowee**") within three (3) days after the Effective Date; and

           (ii)     The balance of the Purchase Price shall be paid at Closing, by wire transfer of immediately available funds, subject to the prorations identified in Section 9 hereof.

   The Deposit shall be held by Escrowee in an interest-bearing account in accordance with the terms of escrow instructions executed by the parties hereto and this Contract. Except as otherwise provided herein, interest on the Deposit shall accrue to the benefit of Buyer and shall be credited to the Purchase Price at Closing. In the event the Closing does not occur, interest on the Deposit will be paid to the party entitled to the Deposit, as provided in this Contract. Buyer shall pay any escrow fee or investment fee charged by the Title Company relating to the deposit of the Deposit into in interest bearing account, if desired by Buyer.

3.     **Title.** Within three (3) days following the Effective Date, Seller will deliver to Buyer a title commitment (the "**Title Commitment**"), for a standard ALTA Form B owner's policy of

1

title insurance on the Real Property issued by Chicago Title Insurance Company (the **"Title Company"**). If the Title Commitment or Survey (as defined below) discloses exceptions to title to which Buyer objects, then Buyer shall have until thirty (30) calendar days following the date of delivery of the Title Commitment to the Buyer to deliver written objection as to such matters to Seller. If Buyer fails to object to any such matters, then such matters shall be deemed to be "Permitted Exceptions". If Buyer delivers such written notice to Seller, then Seller shall have ten (10) calendar days after receipt of notice of such objections to notify Buyer in writing (**"Seller's Response"**) to either have such unpermitted exceptions removed from the Title Commitment or cause the Title Company to commit to issue an endorsement insuring Buyer and its lender, if applicable, against loss or damage that may be caused by such unpermitted exceptions. If Seller is unable or unwilling to commit to have such unpermitted exceptions removed from the Title Commitment or endorsed over or fails to timely provide Seller's Response, Buyer may elect, within five (5) days after the earlier of (i) receipt of Seller's Response or (ii) expiration of such seven calendar day period, and as Buyer's sole remedy hereunder, either to (a) terminate this Contract by written notice to Seller, in which event the Deposit and all accrued interest thereon shall be returned to Buyer or (b) accept title to the Real Property subject to the Permitted Exceptions and such exceptions which Seller has not agreed to cure, which shall thereafter be deemed to be Permitted Exceptions. If Buyer fails to make such election, Buyer shall be deemed to have elected to accept title to the Real Property in accordance with (b) above. On the Closing Date (as hereinafter defined), Seller shall cause the Title Company to issue an owner's standard CLTA title insurance policy (the **"Title Policy"**) in the amount of the Purchase Price insuring fee simple title to the Real Property in Buyer as of the Closing Date, subject to the Permitted Exceptions and the standard pre-printed policy exceptions. With respect to any Seller's proposed title resolution as set forth in Seller's Response, Seller shall, prior to the Closing, remedy or remove such disapproved title or survey exception in accordance with Seller's Response. Notwithstanding anything to the contrary herein, Seller shall cause to be removed on or prior to the Closing all mechanics' or materialmen liens, delinquent real property taxes, tax liens, judgment liens, deeds of trust and other encumbrances or other exceptions to title representing an obligation to pay money (any of the foregoing a "**Lien**" and collectively "**Liens**") to the extent any such Lien or Liens were caused by Seller or its affiliates; in no event shall any Liens caused by Seller or its affiliates constitute Permitted Exceptions.

4.    **Survey.** (Please note that Seller does not have any survey of the Property). Buyer shall have the right, at Buyer's sole cost, to either obtain a new survey of the Real Property or update any existing survey within the Inspection Period (as hereinafter defined), but the obtaining of such new survey or the updating of any existing survey shall not be a condition of Closing or extend the Closing Date except to the extent described in Section 3 above. Seller's most recent survey and any Buyer's update are collectively referred to as the "**Survey**".

5.    **Ownership Documents.** Within five (5) business days after the Effective Date, Seller shall deliver to Buyer copies of the most recent tax bills for the Property in Seller's possession, plans and drawings for the Improvements, reports and studies related to Hazardous Materials (as defined herein), , to the extent such documents exist and are in the possession

2

or control of Seller as of the Effective Date (collectively, the "**Ownership Documents**"). Seller makes no representation or warranty as to the accuracy of the Ownership Documents and Buyer agrees to return all of the Ownership Documents to Seller if the transaction contemplated by this Contract fails to close for any reason other than a default by Seller.

6.    **Conditions to Buyer's Obligations/The Inspection Period**

   (a)    Subject to the terms of this Section, the Buyer shall have sixty (60) days from the Effective Date (the "**Inspection Period**") within which to: (i) undertake any and all investigations, tests and studies which Buyer may elect to make or obtain (the "**Inspections**"); (ii) review and approve or disapprove of the Inspections in Buyer's sole and absolute discretion; and (iii) elect in Buyer's sole and absolute discretion to terminate this Contract by delivering written notice (the "**Cancellation Notice**") to Seller on or before the expiration of the Inspection Period.  If Buyer timely delivers the Cancellation Notice to Seller on or before the expiration of the Inspection Period, then the Deposit shall be returned to Buyer, and neither party shall have any further rights or obligations hereunder except as otherwise expressly provided in this Contract.

   If this Contract is not terminated as provided above, then Buyer shall be deemed to have satisfied itself as to the condition of the Property.  Upon expiration of the Inspection Period without termination of this Contract, the Deposit plus all accrued interest thereon shall be deemed fully earned by Seller and non-refundable to Buyer under any circumstances, except in the event of a default by Seller or failure of any other condition of Buyer's obligations hereunder.

   (b)    The Inspection Period shall be conducted subject to the following terms:

      (i)    During the Inspection Period and thereafter until Closing and upon three (3) business day's prior written notice, Seller shall permit Buyer or its authorized or designated representatives or agents, to enter the Property from time to time, for the purpose of showing the Property to potential tenants, performing non-invasive tests, environmental audits, engineering studies, surveys, and other inspections, studies and tests of the Real Property as Buyer may deem necessary or desirable, at Buyer's sole cost and expense.

      (ii)    If the transaction contemplated hereby does not close for any reason other than a default by Seller, Buyer shall promptly provide Seller with copies of any reports or test results taken from or related to the Property, which shall be without any representation or warranty of any kind by Buyer. Buyer shall conduct any such entry on to the Property:

         (1)    during reasonable business hours; and

         (2)    at Seller's option, accompanied by a representative, agent or employee of Seller.

3

(iii)    Prior to entering the Real Property, Buyer shall evidence to Seller that Buyer
has, and will require all agents and contractors who are engaged to perform
such inspections and tests to have and maintain insurance with a liability
limit of at least One Million Dollars ($1,000,000.00) and naming Seller as an
additional insured.  Prior to performing any invasive testing at the Real
Property, Buyer shall (a) provide Seller with a copy of the proposed scope of
work for review and approval by Seller at least five (5) business days prior to
the field activities and (b) enter into Seller's form of Invasive Access
Agreement, a copy of which is attached hereto as **Exhibit C**.

(iv)    Buyer agrees that prior to Closing it shall neither make nor allow to be made
any changes in or to any part of the Property without the prior written
consent of Seller.

(v)    Buyer agrees to defend, indemnify, protect and hold Seller harmless from
any claim, loss, liability or expense of any kind (including reasonable
attorney's fees) in connection with any entry on the Real Property by Buyer,
its representatives, agents, employees and independent contractors,
including, without limitation, any tests, inspections, studies and surveys
performed thereon except to the extent such claims arise from the negligence
or willful misconduct of Seller, its agents or contractors.  Notwithstanding
anything to the contrary in this Contract, Buyer shall not be liable for any
claims or occurrence arising out of any condition which existed at, in or
upon the Real Property prior to any such Inspection or entry or the discovery
of any such conditions except to the extent, if any, that Buyer exacerbates
such condition(s). This defense, indemnity and hold harmless shall survive
any termination of this Contract for a period of twelve (12) months.

(vi)    Buyer shall promptly repair and restore the Property to substantially the
same condition as existed immediately prior to such entry and, if Buyer fails
to do so, Seller shall be reimbursed for all of its costs in so restoring the
Property (and may, in Seller's sole discretion, set off such costs against any
portion of the Deposit which would otherwise be returned to Buyer).
Buyer's obligations of indemnity and for restoration of the Property as
provided in this Section shall survive the termination of this Contract prior to
Closing for a period of twelve (12) months.

(vii)    Buyer agrees that Seller makes no representation as to the scope or the
contents of any report or item delivered to Buyer by Seller related to the
Property.  Buyer agrees that it will keep confidential and not disclose any
information which it receives or discovers with respect to the Property,
including the results of any investigation, test, audit, study or survey, or any
information related to the operation, income and expenses of the Property, to
any third party except for Buyer's counsel, consultants and lending officers,
if applicable.  If Buyer discovers any information or test results that are
required, or Buyer believes are required by law to be disclosed or reported to

4

a government agency, Buyer shall immediately notify Seller of same, and Seller shall be responsible for determining and complying with any disclosure or reporting requirements, if applicable. If Buyer fails to close the purchase of the Property for any reason, then Buyer shall return to Seller all reports or items relating to the Property delivered to Buyer from Seller. The confidentiality agreement herein shall survive any termination of this Contract for a period of one (1) year.

7.    **Seller's and Buyer's Representations.**

   **(a)**   Seller hereby represents and warrants to Buyer that Seller has the requisite power and authority to enter into and fully carry out this Contract and the sale of the Property made pursuant hereto, including the execution of all instruments and documents delivered or to be delivered hereunder and no consent of any other party is required

   **(b)**   Seller is duly formed and validly existing in its state of formation. The individuals executing this Contract and the instruments referenced herein on behalf of Seller have the power, right and authority to bind Seller. Seller shall deliver to Title Company any documents reasonably requested by Title Company evidencing that Seller has the power and authority to enter into this Contract and to consummate the transactions hereunder.

   **(c)**   To "Seller's Knowledge", neither the execution of this Contract nor the consummation of the transactions contemplated hereby shall result in a breach of or constitute a default under any contract, document, instrument or other obligation to which Seller is a party or by which Seller may be bound, or under any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Seller or to the Property. For the purposes of this Contract, "Seller's Knowledge" means the current, actual knowledge, without investigation or inquiry, of Jeffrey Stollenwerck, President of Real Estate.

   **(d)**   The Property is vacant and there are no leases, licenses or other agreements permitting any person or entity to occupy or use any portion of the Property.

   **(e)**   Buyer hereby represents and warrants to Seller that Buyer has the requisite power and authority to enter into and fully carry out this Contract and the purchase of the Property, including the execution of all instruments and documents delivered or to be delivered hereunder and no consent of any other party is required.

   **(f)**   Seller makes no representations or warranties as to whether or not Buyer will be able to conduct or operate any business from or on the Property, or erect any improvements on the Property, or, that the Property will be in compliance with any and all Federal, state, or local laws, statutes, ordinances (including zoning) which may affect the Property after the closing of this transaction.

(g)     Buyer has or will conduct its own investigation and due diligence or Buyer has elected, at its sole discretion, not to conduct such investigation and due diligence, as to the feasibility and permissibility to conduct and operate any business or enterprise on or from the Property; or that the Property will be in compliance with any and all Federal, state or local laws, statutes, ordinances (including zoning) for which Buyer intends to use the Property. Buyer is not relying on any representation or warranty of the Seller, including any officer, employee, representative, attorney, broker or agent, regarding the ability to conduct business on the Property or that the Property will be in compliance with any and all Federal, state and local laws, statutes, ordinances, zoning requirements and the like.

(h)     Buyer has not taken and will not take any action which may give rise to a claim against any portion of the Property for or on account of any work done, materials furnished or utilities supplied to the Property for or at the request of Buyer and neither the execution of this Contract by Buyer nor the consummation by Buyer of the transaction contemplated under this Contract will result in the creation of any lien, charge or encumbrance upon the Property.

8.    **Closing and Obligations at Closing.**

(a)     The closing ("**Closing**") shall take place via escrow administered by the Title Company on a mutually agreeable date, but in no event later than thirty (30) days after the expiration of the Inspection Period set forth in Section 6 hereof (the "**Closing Date**"). On the Closing Date, the obligations of Buyer and Seller shall be as follows:

    (i)     Buyer shall cause the Purchase Price, as specified in Section 2(a) hereof, plus or minus prorations, to be paid in cash to Seller by wire transfer to Escrowee.

    (ii)    Seller shall execute and deliver a Limited Warranty Deed ("**Deed**"), substantially in the form attached hereto as **Exhibit "B"** conveying fee simple title to the Real Property to Buyer, subject only to the Permitted Exceptions and any other matters created or suffered by Buyer.

    (iii)   An original affidavit from Seller which satisfies the requirements of Section 1445 of the Internal Revenue Code, as amended.

    (iv)    Such other instruments and documents as may be reasonably requested by the Title Company including, without limitation, a customary Owner's Affidavit.

(b)     This sale shall be closed through Escrowee in accordance with the provisions of this Contract. Payment of the Purchase Price and delivery of the Deed shall be made through Escrowee.

6

Notwithstanding anything contained herein to the contrary, neither Seller nor Buyer are required to attend the Closing in person. Buyer and Seller shall each pay one-half of Escrowee's standard escrow fees for such Closing.

(c) On the Closing Date, subject to Title Company having received the documents and monies required to be deposited into escrow pursuant to this Contract and Escrowee having received no written notice by a party that a condition precedent to its obligation to close has not been satisfied, Title Company shall do or cause to be done each of the following:

(i)    Duly record the Deed and arrange for conformed copies to be delivered to the parties as soon as available;

(ii)   Deliver to Buyer one (1) fully executed original of the Section 1445 Affidavit; and

(iii)  Deliver to Seller the balance of the Purchase Price remaining after deducting all costs and expenses which Seller is obligated to pay pursuant to this Contract.

(d) Possession of the Property shall be delivered to Buyer upon the Closing.

9.    **Prorations/Closing Costs**.  All real estate taxes, special assessments (if any), expenses and charges in connection with the ownership, use, maintenance and operation of the Property shall be prorated as of the Closing Date.  To the extent that information for any such proration is not available on the Closing Date, such prorations shall be calculated using the most recent information available.  Seller shall pay:  (i) the cost of the basic Title Policy and the cost of any endorsements that Seller elects to procure to address any title matters disapproved by Buyer; (ii) fifty percent (50%) of all documentary transfer taxes and 100% of recording fees for documents necessary to clear title and to record the Deed; and (iii) one-half of Escrow Holder's fees and costs.  Buyer shall pay:  (a) the cost of any endorsements to the Title Policy requested by Buyer for which Seller is not obligated to pay the premium as required above; (b) fifty percent (50%) of all documentary transfer taxes; and (c) one half of Escrow Holder's fees and costs.  All other closing costs shall be apportioned in the manner customary in the county in which the Property is located.  Each party shall pay all attorneys' fees, accounting fees, and other expenses incurred by it in connection with the transactions contemplated hereby. Notwithstanding the foregoing, in the event of a default by Seller or Buyer hereunder, all cancellation fees and other Escrow charges shall be borne by the defaulting party.

10.   **Default.**

(a)    If Seller fails or refuses to close in accordance with the terms of this Contract for any reason other than Buyer's default hereunder or Seller breaches any of its representations or warranties or fails to perform any of its covenants in any material respect, and such breach or failure shall continue for a period of five (5) business days after notice from Buyer, then Buyer's sole and exclusive remedy shall be to (i) declare this Contract terminated in which event the Deposit shall be immediately

7

returned to Buyer, or (ii) to enforce the Contract under an action for specific performance. In the case of Buyer's termination of this Contract, then upon such return of the Deposit and reimbursement, all rights and obligations of the parties under this Contract shall expire (except for such provisions as expressly survive the expiration or termination hereof or as otherwise expressly provided herein) and this Contract shall become null and void.

**(b)**    If Buyer fails or refuses to close in accordance with the terms of this Contract for any reason other than Seller's default hereunder, Seller's sole remedy shall be to terminate this Contract, in which event Seller receive the Deposit and any accrued interest thereon shall be immediately delivered to Seller, in full and exclusive satisfaction of all damages suffered by Seller by reason of Buyer's default.

11.    **As Is/No Warranties.** Buyer expressly acknowledges that Buyer and Buyer's agents have made, or will have the opportunity pursuant to Section 6 of this Contract to make, independent investigations of the Property and have reviewed or will review pursuant to Section 6 all materials regarding the condition of the Property which it deems necessary. Subject to Buyer's rights to terminate this Contract pursuant to Section 6, Buyer is buying the Property in an "AS IS" "WHERE IS" condition except for any express warranties of Seller as expressly provided in Section 7. Buyer is, or after completion of such inspections pursuant to Section 6 will be, in all respects satisfied with the Property, including the physical condition thereof, and except as set forth in Section 7, Buyer has not relied upon any representation or warranty made by either Seller or any officer, employee, agent or representative of Seller in connection with the Property, including specifically, without limitation, as to the condition of the planning status, topography, grading, climate, air, flood or mudslide hazards, water rights, water, utilities, present and future zoning, governmental entitlements and restrictions, soil, subsoil, paint or contamination of soil or water, access to public roads or the presence or absence of any hazardous materials. As used herein, the term "hazardous material" shall mean asbestos, petroleum products and any materials defined as "hazardous substances", "hazardous waste", "hazardous constituents" or "solid waste" or language of similar import in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§9601 – 9657 and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42, U.S.C. §§6901 – 6987 and any amendments thereto and regulations thereunder, and (c) any other federal, state or local environmental statute, ordinance or regulation. The foregoing agreement of Buyer shall be extended to and shall be in full force and effect as of the Closing Date and shall survive the Closing Date. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 7, BUYER HEREBY DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO THE REAL PROPERTY TO BE SOLD PURSUANT HERETO, INCLUDING WITHOUT LIMITATION, WARRANTIES AS TO QUALITY HABITABILITY, FITNESS, MERCHANTABILITY AND SUITABILITY FOR ANY PURPOSE. Buyer acknowledges that Buyer's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" condition was bargained for in the Purchase Price.

12.    **Counterparts.** This Contract may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any party hereto may execute this

8

Contract by signing any such counterpart and delivering an executed signature page of this Contract to any party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering party as if the original had been delivered.

13. **Condemnation.** In the event of any (a) taking by the exercise of the power of eminent domain of any portion of the Real Property prior to the Closing Date or (b) notice that a governmental entity plans or has initiated an action exercising its power of eminent domain, then Buyer shall have the right to terminate this Contract by giving written notice to Seller within ten (10) days after receipt by Buyer of written notification of any such condemnation from Seller. If Buyer elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Deposit, plus any interest accrued thereon, shall be promptly returned to Buyer. If Buyer elects not to terminate this Contract or fails to give Seller notice of termination within said ten (10) day period, said right to terminate shall be deemed waived and Buyer shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Buyer shall remain obligated to purchase the Property with no reduction in the Purchase Price.

14. **Damage/Destruction.** If the Improvements are materially destroyed or damaged prior to the Closing, then either Seller or Buyer may elect, in its sole and absolute discretion, to terminate this Contract in which event the Escrowee shall immediately return the Deposit to Buyer and neither party shall have any further duties or responsibilities under this Contract. In the event of nonmaterial damage to the Property, which damage Seller is unwilling to repair prior to Closing, Buyer shall have the right either to terminate this Contract or accept the Property in its then existing condition; if Buyer elects to terminate this Contract because of non-material damage, Escrowee shall immediately return the Deposit, together with any accrued interest thereon, to Buyer and neither party shall have any further duties or responsibilities under this Contract. For purposes of this Section 14, a material destruction or damage shall mean destruction or damage which, as determined by Buyer in its reasonable discretion, will cost in excess of $25,000.00 to repair (whether or not such damage is covered by insurance).

15. **Notices.** Any and all notices, demands, consents and approvals required under this Contract shall be in writing and shall be sent by certified or registered mail, postage prepaid, return receipt requested, or by reputable overnight delivery service (such as Federal Express or Airborne), addressed to the parties as follows:

> Seller:                       Sears, Roebuck and Co.
>                               c/o Sears Holdings Corporation
>                               3333 Beverly Road
>                               Hoffman Estates, Illinois 60179
>                               Attn:   Associate General Counsel - Real Estate

|                    |                                          |
|--------------------|------------------------------------------|
| With a copy to:    | Sears, Roebuck and Co.                   |
|                    | c/o Sears Holdings Corporation           |
|                    | 3333 Beverly Road                        |
|                    | Hoffman Estates, Illinois 60179          |
|                    | Attn:  President – Real Estate           |
|                    |                                          |
| Buyer:             | LGR Weston Investments, LLC, an Ohio     |
|                    | limited liability company                |
|                    | 3016 Maryland Ave                        |
|                    | Columbus, Ohio 43209                     |
|                    | Attn:  Nick Vollman                      |
|                    |                                          |
| With a copy to:    | Frost Brown Todd LLC                     |
|                    | 10 West Broad Street                     |
|                    | Suite 2300                               |
|                    | Columbus, OH  43215                      |
|                    | Attn:  John I. Cadwallader, Esq.         |

Notices shall be deemed to have been given upon receipt or refusal to accept delivery.

16.   **Assignment.**  Buyer shall have the right to assign or transfer Buyer's interest in this Contract to a parent, subsidiary, affiliate or other related entity without Seller's consent provided that (i) Seller does not incur any additional out-of-pocket costs as a result of such assignment, and (ii) such assignment agreement is executed and a copy thereof delivered to Seller at least ten (10) days before Closing, and (iii) such assignment shall not delay Closing.  Such assignee must assume Buyer's obligations hereunder in writing, but Buyer shall remain liable to Seller for each and every one of Buyer's obligations under this Contract and, in the event of any default hereunder, Seller may proceed directly against Buyer without the need to join any assignee of Buyer as a party to any action against Buyer.

17.   **Brokers.**  Each party hereby represents and warrants to the other that no commission or other amount is payable to any person or entity for brokerage or similar services performed hereunder (except for Grant Chaney at Colliers International, "**Seller's Broker**" and LGR Realty, Inc. "**Buyer's Broker**", with Buyer's Broker and Seller's Broker being collectively referred to herein as the "**Brokers**"), and each party hereto agrees to indemnify, protect, defend and hold harmless the other party for any commission or amount owed to or claimed by any person or entity (other than arising from the Brokers) claiming through such indemnifying party.

18.   **Time is of the Essence.**  Buyer and Seller mutually agree that time is of the essence of this Contract and every provision hereof in which time is an element.  No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts except as expressly provided herein.  If any date for performance of any of the terms, conditions or provisions hereof shall fall on a

Saturday, Sunday or legal holiday, then the time of such performance shall be extended to the next business day thereafter.

19. **Section Headings.** The Section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several Sections hereof.

20. **Interpretation.** Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

21. **Applicable Law and Parties Bound.** This Contract shall be construed and enforced in accordance with the laws of the state in which the Property is located and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

22. **Attorneys' Fees.** In the event either party elects to file any action in order to enforce the terms of this Contract, or for a declaration of rights hereunder, the prevailing party, as determined by the court in such action, shall be entitled to recover all of its court costs and reasonable attorneys' fees as a result thereof from the losing party.

23. **Amendments.** All amendments and/or supplements to this Contract must be in writing and executed by both parties hereto.

24. **Entire Agreement.** The parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the parties, in final form, which has been executed and delivered by Buyer and Seller. The parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatsoever, except as and to the extent that such agreements and representations have been expressly incorporated in this Contract.

25. **No Recording.** Buyer shall not record this Contract or any memorandum or short form hereof.

26. **Publicity.** Any publicity concerning the transaction contemplated herein shall be subject to the prior written consent of Seller and Buyer.

27. **Section 1031 Exchange.**

    (a)    At Seller's option, Buyer agrees to cooperate with Seller in closing the sale of the Real Property as a like-kind exchange (the "Exchange") under Section 1031 of the Internal Revenue Code (the **"Code"**). Such cooperation shall include, without limitation, the substitution by Seller of an intermediary (the **"Intermediary"**) to act in place of Seller as the Seller of the Real Property. If Seller so elects, Buyer agrees to accept the Real Property and all other required performance from the

11

Intermediary and to render Buyer's performance of all of its obligations hereunder to the Intermediary. Buyer agrees that performance by the Intermediary shall be deemed performance by Seller and Seller agrees that Buyer's performance to the Intermediary shall be deemed as performance to Seller. Notwithstanding the foregoing, Seller shall remain liable to Buyer for each and every one of the representations, warranties, indemnities and obligations of Seller under this Contract and Buyer may proceed directly against Seller without the need to join the Intermediary as a party to any action against Seller. In no event shall Buyer be required to pay any amounts in addition to those specified elsewhere in this Contract, nor incur any other material costs or expenses arising from the Exchange. Buyer shall not be required to be involved in such exchange other than as specified herein.

**(b)**     At Buyer's option, Buyer may elect to effect a tax-deferred exchange under Section 1031 of the Code by designating other real property or the proceeds therefrom to be acquired by an intermediary selected by Buyer (**"Buyer's Intermediary"**) to act in place of Buyer as the Buyer of the Real Property. In such event, Buyer shall enter into an exchange agreement with Buyer's Intermediary prior to the Closing by the terms of which Buyer's Intermediary shall receive title to the Property, and Buyer may transfer its interest in this Contract to Buyer's Intermediary for such purpose, but all transfer documents shall be executed by Buyer and Buyer shall remain solely responsible for Buyer's obligations in this Contract. Notwithstanding Buyer's election to effect a tax-deferred exchange, such an exchange by Buyer shall not interfere with or excuse Buyer's obligations under this Contract. In no event shall Seller be required to pay any amounts in addition to those specified elsewhere in this Contract, nor incur any other material costs or expenses arising from the Exchange. Seller shall not be required to be involved in such exchange other than as specified herein.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, this Contract has been executed by the parties hereto as of the Effective Date.

**Buyer:**

**LGR WESTON INVESTMENTS, LLC**, an
Ohio limited liability company

By: _____
　　Laurence G. Ruben, Manager
May ___, 2018


**Seller:**

**SEARS, ROEBUCK AND CO,**
a New York corporation

By: _____
Name: JoAnn Catanese
Its: Divisional Vice President, Real Estate
May 30, 2018

**Schedule of Exhibits**

Exhibit A – Legal Description of the Land
Exhibit B – Form of Limited Warranty Deed
Exhibit C – Invasive Access Agreement

Signature Page

<u>EXHIBIT "A"</u>

<u>LEGAL DESCRIPTION OF THE LAND</u>

**CHICAGO TITLE INSURANCE COMPANY**                              **CHICAGO NCS NO. 21800872**

## SCHEDULE A
(continued)

5.  The Land is described as follows:

FEE PARCEL:

PARCEL NO. 1:

Situate in the State of Ohio, the County of Franklin, Township of Franklin and being part of Survey No. 1482 and No. 1425, Virginia Military Lands and being part of Tract "K" as conveyed by deed to Peoples Development Company and shown of record in Deed Book 1670, Page 139, records of the Recorder's Office, Franklin County, Ohio, being subsequently transferred to Nationwide Development Company by affidavit of record in the Auditor's Record Book 19, Page 282, Auditor's Office, Franklin County, Ohio and being more particularly described as follows:

Beginning at a point in the center line of West Broad Street (U. S. Route 40) same point being South 86 deg. 23' West a distance of 60.00 feet from the Northwesterly corner of the 15.75 Acre Tract conveyed to Federated Department Stores, Inc. by deed of record in Deed Book 2371, Page 385; thence from said place of beginning S. 3° 49' E. and along the Westerly line of Nationwide Boulevard a distance of 179.52 ft. to a point; thence S. 12° 49' 49" E. a distance of 63.83 feet to a point; thence S. 3° 49' E. continuing along the Westerly line of Nationwide Boulevard, a distance of 836.08 ft. to a point; thence N. 86° 23' E. and along a Southerly line of Shoppers Lane, a distance of 340.00 ft. to a point; thence S. 3° 37' E. a distance of 167.36 ft. to a point; thence S. 86° 23' W. parallel to the center line of West Broad Street (U. S. Route 40), a distance of 870.44 ft. to a point; thence N. 3° 37' W. a distance of 255.51 ft. to a point; thence N. 57° 15' W. a distance of 450.00 ft. to a point in the Easterly right-of-way line of Interstate Route 270, said point being N. 25° 00' 36" E. a distance of 230.88 ft. from an angle point in said right-of-way, said point also being in the Easterly line of a certain 44.27 Acre Tract as conveyed to the Industrial Commission of Ohio; thence N. 25° 00' 36" E. and along the Easterly right-of-way line of Interstate 270, a distance of 75.00 ft. to an iron pin set at an angle point in said right-of-way; thence N. 16° 23' 00" E. continuing along the Easterly right-of-way line of Interstate 270 a distance of 604.22 ft. to an iron pin; thence N. 3° 37' W. a distance of 90.0 ft. to a point in the center line of West Broad Street (U. S. Route 40) and at the Northeasterly corner of the said 44.27 Acre Tract; thence N. 86° 23' East along the center line of West Broad Street (U. S. Route 40) a distance of 636.46 feet to the point of beginning, containing 21.169 Acres, of which 1.169 Acres is within the right-of-way of West Broad Street (U. S. Route 40), leaving a net acreage of 20.000 Acres.

**EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PROPERTY:**
**(Per Deed Volume 2807, Page 83)**

Situated in the State of Ohio, County of Franklin, Township of Franklin, Township of Prairie and being part of survey Nos. 1425 and 1482, Virginia Military Lands and being part of a 21.169 acre tract of land as conveyed to Sears, Roebuck and Co. by Deed of record in Deed Book 2621, Page 509, Recorder's Office, Franklin County, Ohio and being more particularly described as follows;

Beginning at a point on the Northernmost Line of said 21.169 acre tract, the centerline of West Broad Street, U. S. Route 40, said Point being located 267.95 feet from the Northwesterly corner of said 21.169 acre tract;

Thence N 86° 23' E, with the Northerly line of said 21.169 acre tract, the centerline of said U.S. Route 40, distance of 368.51 feet to a point;

Thence S 3° 49' 00" E, on an Easterly line of said 21.169 acre tract, distance of 179.52 feet to a point;

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **CHICAGO NCS NO. 21800872**

## SCHEDULE A
(continued)

Thence S 12° 49' 49" E, on an Easterly line of said 21.169 acre tract, a distance of 63.83 feet to a point;

Thence S 3° 49' E, with an Easterly line of said 21.169 acre tract, a Westerly line of a 38.831 acre tract as conveyed to Richard R. Jacobs et al (4) by deed of Record in Deed Book 2681, Page 99 (Parcel 1) Recorder's Office, Franklin County, Ohio, a distance of 836.08 feet to a point at an interior corner of said 21.169 acre tract an exterior corner of said 38.831 acre tract;

Thence N 86° 23' E, with a Northerly line of said 21.169 acre tract, a Southerly line of said 38.831 acre tract, a distance of 340.00 feet to a point;

Thence S 3° 37' East with an Easterly line of said 21.169 acre tract, a Westerly line of said 38.831 acre tract, a distance of 167.36 feet to a point;

Thence S 86° 23' West with a Southerly line of said 21.169 acre tract, a Northerly line of said 38.831 acre tract, a distance of 723.22 feet to a point;

Thence N 3° 34' 20" West crossing said 21.169 acre tract, a distance of 1245.96 feet to the place of beginning, containing 12.160 acres of land, more or less, but subject to all legal highways.

**ALSO EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PROPERTY**
**(Per Deed Instrument 1414-D09)**

Situated in the State of Ohio, County of Franklin, Township of Franklin, being a part of Survey 1482, Virginia Military Lands, more particularly bounded and described as follows:

Beginning at the point of intersection of the centerline of West Broad Street, U.S. Route 40, with the centerline Georgesville Road; thence, S 86° 11' 00" W, 666.38 feet along the centerline of West Broad Street; thence, S 86° 23' 00" W, 102.51 feet along the centerline of West Broad Street; thence, S 86° 23' 00" W, 771.00 feet along the centerline of West Broad Street; thence, S 86° 23' 00" W, 324.51 feet along the centerline of West Broad Street; thence, S 03° 39' 20" E, 525.90 feet to the point of beginning of this description; thence, S 03° 34' 20" E, 480.00 feet; thence, S 86° 25' 90" W, 3.00 feet; thence, N 03° 34' 20" W, 130.00 feet; thence, S 86° 25' 40" W, 26.98 feet to a point on the existing Easterly exterior face of the Sears Building; thence, N 03° 36' 94" West, along the existing Easterly exterior face of the Sears Building, 100.00 feet; thence, N 86° 25' 40" E, 27.05 feet; thence, N 03° 34' 20" W, 250.00 feet; thence, N 86° 25' 40" E, 3.00 feet to the point of beginning of this description. Containing within said bounds 0.095 acres to be the same more or less.

**PARCEL NO. 2:**

Situated in the State of Ohio, County of Franklin, Township of Franklin, Township of Prairie and being part of Survey Nos. 1425 and 1482, Virginia Military Lands and being part of a 38.831 acre tract as conveyed to Richard E. Jacobs et al (4) by deed of record in Deed Book 2681, Page 99 (Parcel 1), Recorder's Office, Franklin County, Ohio and being more particularly described as follows:

Beginning at an angle point in a Northerly line of said 38.831 acre tract, an angle point in a Westerly line of a 21.169 acre tract conveyed to Sears, Roebuck and Co. by deed of record in said Recorder's Office, an Easterly line of State Route No. 200;

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **CHICAGO NCS NO. 21800872**

## SCHEDULE A
(continued)

Thence S 57° 15' E, with a Northerly line of said 38.831 acre tract, a Southerly line of said 21.169 acre tract, a distance of 450.00 feet to a point;

Thence S 3° 37' E, with an Easterly line of said 38.831 acre tract, a Westerly line of said 21.169 acre tract, a distance of 255.51 feet to a point;

Thence N 86 deg. 23' East, with a Northerly line of said 38.831 acre tract, a Southerly line of said 21.169 acre tract, a distance of 147.22 feet to a point;

Thence S 3° 34' 20" E, a distance of 485.51 feet to a point;

Thence S 86° 23' W, a distance of 828.49 feet to a point on a Westerly line of said 38.831 acre tract of land, an Easterly line of said State Route 200;

Thence N 12° 24' 44" E, with a Westerly line of said 38.831 acre tract, an Easterly line of said State Route No. 200, a distance of 120.50 feet to a point of curvature;

Thence with a Westerly line of said 38.831 acre tract, an Easterly line of said State Route No. 200, an arc of a curve to the left having a radius of 11.609.19 feet, whose chord bears N 10° 39' 27" E, a chord distance of 711.35 feet to a point;

Thence N 25° 00' 36" E, with a Westerly line of said 38.831 acre tracts, an Easterly line of said State Route No. 200, a distance of 230.88 feet to the place of beginning, containing 13.114 acres of land, more or less, but subject to legal, highways.

**EASEMENT PARCEL:**

Ingress/Egress as set forth in that certain Easement, Restriction and Operating Agreement filed for record May 3, 1967 and recorded in Volume 2807, Page 96 of the Franklin County Records.

First Amendment filed for record September 5, 1973 and recorded in Volume 3365, Page 248 of the Franklin County Records.

Second Amendment filed for record December 11, and recorded in Volume 1414, Page D12 of the Franklin County Records.

Plat filed for record December 11, 1981 and recorded in Plat Book 59, Page 13 of the Franklin County Records.

Third Amendment filed for record October 24, 1986 and recorded in Volume 8389, Page CO1 of the Franklin County Records.

Fourth Amendment filed for record January 14, 2014 and recorded in Instrument No. 201401140005508 of the Franklin County Records.

PPN: 240-005171-00 (Routing #240-O019C-039-01)
PPN: 140-003371-00 (Routing #140-O019C-039-00)
PPN: 140-003418-00 (Routing #140-O019C-040-00)

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a countersignature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



## EXHIBIT "B"

Limited Warranty Deed

## LIMITED WARRANTY DEED
(Statutory Form – Ohio Rev. Code §5302.07)

KNOW ALL MEN BY THESE PRESENTS, that _____, an Ohio _____ (the "Grantor"), for valuable consideration paid, grants with limited warranty covenants, to _____, an [Name of State] [Form of Entity], with a tax mailing address at [Address]_____ (the "Grantee"), the real property (the "Real Property") identified as on Exhibit A attached hereto and incorporated herein by this reference.

The conveyance of the above Real Property is subject to those exceptions (the "Real Estate Exceptions") described on Exhibit B attached hereto and incorporated herein by this reference.

PRIOR INSTRUMENT REFERENCE: Instrument No. _____ [or Volume _____, Page _____], in the _____ County, Ohio Recorder's Office.

The Real Property is also known as tax parcel number _____ and generally known as _____, _____, Ohio _____.

IN WITNESS WHEREOF, Grantor has caused this Limited Warranty Deed to be executed by its duly authorized representative on the date set forth below.

**GRANTOR:**

_____, an Ohio _____

By:_____

Its:_____

STATE OF ILLINOIS                    )
                                     ) SS:
COUNTY OF COOK                       )


     The foregoing instrument was acknowledged before me this _____ day of _____, 2018 by _____ of SEARS ROEBUCK AND CO., a New York corporation, on behalf of the corporation.

I certify under PENALTY OF PERJURY under the laws of the State of Illinois that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.


_____
Signature of Notary Public                    (seal)


                              _____
                                             Notary Public


My Commission Expires: _____


This instrument was prepared by and upon recording mail to:  John I. Cadwallader, Esq., Frost Brown Todd LLC, 10 West Broad Street, Suite 2300, Columbus, Ohio  43215, Telephone:  (614) 464-1211, Telecopy: (614) 464-1737; Email:  jcadwallader@fbtlaw.com

**EXHIBIT "A" TO DEED**


**<u>LEGAL DESCRIPTION</u>**

## EXHIBIT C

## PHASE II ACCESS LICENSE

[Columbus, Ohio (Westland Mall) #1150]

**THIS PHASE II ACCESS LICENSE** (the "**License**") is entered into as of the _____ day of
_____, 2018, by and between **SEARS, ROEBUCK AND CO.**, a New York corporation
("**Licensor**"), and **LGR WESTON INVESTMENTS, LLC** ("**Licensee**") (Licensor and Licensee
may also be collectively referred to in this License as the "**Parties**" and individually referred to in this
License as a "**Party**".

## RECITALS

A.    Licensor is owner of the certain real property located at 4411 West Broad Street,
Columbus, Ohio (the "**Property**") and has the authority to grant access to the Property.

B.  Licensor desires to sell the Property to the Licensee;

C.  Licensee desires to purchase the Property from Licensor;

D. The Licensor and Licensee have entered or will enter into a Real Estate Sales Contract (the
"**Contract**") to further such ends;

E. Licensee desires to perform an invasive environmental investigation of the Property as part of
its due diligence prior to purchasing the Property; and

F.    Licensee has requested access to the Property to perform a Phase II Environmental
Assessment and Licensor has agreed to permit Licensee and/or Licensee's agent a revocable license to
conduct the requested activity at the Property for the purposes set forth in this License.

**NOW THEREFORE**, in consideration of their mutual covenants and other valuable
consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

1.    Incorporation of Recitals.    The foregoing recitals are true and correct and are
incorporated into this License by reference.

2.    Access. Licensor has agreed to permit Licensee to carry out a Phase II investigation in

19

accordance with the terms and conditions of this License. The Phase II investigation will consist of the work plan attached as **Exhibit "A"** and incorporated into this License (the "**Work Plan**") and all work will be performed in accordance with the Work Plan.

At reasonable times and upon reasonable prior notice to Licensor, Licensor hereby grants Licensee reasonable access to the Property for the sole purpose of conducting the activities in the manner described in the Work Plan. Any changes to the existing Work Plan shall be submitted to Licensor in writing for Licensor's prior approval, which approval shall not be unreasonably withheld. If Licensor approves such proposal for additional or amended work on the Property, such additional work or amendments to the Work Plan shall be deemed to be a part of the Work Plan, and Licensee's implementation of such plan will be subject to the terms and conditions of this License.

3.      Conduct of Investigation.      Licensee, its employees, agents and subcontractors (collectively "**Licensee Entities**") will not conduct any work or engage in any activities on the Property other than those set forth in the Work Plan. In the event that the Licensee Entities engage in activity outside of or beyond the scope of the Work Plan ("**Unauthorized Activity**"), Licensor shall have a right to deny access for such unauthorized activity conducted beyond the Work Plan scope and the right to any other damages, remedy or relief that otherwise might be available. All costs associated with the activities conducted by Licensee Entities on the Property shall be borne by Licensee. The Work Plan shall be conducted in any event in a manner and at times that will not unreasonably interfere with Licensor's use of the Property and which comply with the terms and conditions of this License. Licensor reserves all rights or claims which they may have at law or in equity against Licensee or Licensee Entities related to or arising from the environmental condition of the Property.

4.      Data and Reports.  Licensee shall give reasonable advance notice to Licensor of any sampling, testing, drilling, or other on-site activities under the Work Plan, so as to allow a representative of the Licensor to observe such activity. Licensor shall have the right to obtain split samples or conduct contemporaneous sampling when any sampling is conducted by Licensee or its Licensees Entities on the Property. Licensee shall transmit to Licensor in writing the quality-assured results of samples taken pursuant to the Work Plan as soon as they are made available to Licensee and its Licensee Entities. A copy of any correspondence, data, report, test or other communication with any agency relating to the environmental condition of the Property or the presence of any petroleum or other hazardous substances shall be simultaneously sent to Licensor. As used in this License, the term "**Hazardous Substances**" shall mean any hazardous substance as defined in federal and state or local laws, regulations or ordinances.

5.      Repair.  If any portion of the Property, including any improvements and/or personal property of Licensor, suffers damage by reason of the entry of Licensee or Licensee Entities on the Property, including but not limited to damage arising from any tests, investigations and/or monitoring conducted upon the Property, Licensee or Licensee entities shall, at its own cost and expense, repair such damage and restore the Property to as good a condition as before such damage occurred. Repair of damage includes, without limitation, regrouting and resurfacing any holes, ditches, or other indentations, as well as any mounds or other inclines caused by any Licensee or Licensee Entities. If the location of the equipment installed pursuant to the approved Work Plan shall in the future interfere or conflict with Licensor's use of the Property, Licensee or Licensee Entities shall upon receipt of a request from Licensor to do so, close, remove and/or relocate said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Licensee or Licensee Entities of such governmental approvals as may be required to close, remove or relocate said well or wells. Licensee and Licensee Entities shall use its best efforts to obtain all such required governmental approvals.

6.    Safety.  Licensee shall be responsible for ensuring that the Licensee Entities comply with good safety and security practices in performing the Work Plan.  If monitoring wells are permitted in the Work Plan, Licensee shall install a locked cap on such wells, shall ensure that said caps are secure, and take all reasonable steps necessary to prohibit access to the recovery wells by Parties not authorized to do so by Licensee. As between Licensee and Licensor, Licensee is responsible for any contamination or damage caused by the authorized or unauthorized access to the recovery wells. Licensee agrees to ensure that its Licensee Entities also close any recovery wells upon the completion of the investigation or the termination of this License, whichever is sooner, and perform the Work Plan in accordance with federal, state and local laws, regulations and ordinances and prudent engineering principles.

7.    Indemnification.  Licensee shall indemnify, protect, defend and hold harmless Licensor, and its respective (manager and members) officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and subcontractors (collectively the "**Indemnified Parties**") against any and all costs, liabilities, claims, damages, including reasonable licensee and attorney's fees, losses, penalties, or suits resulting from (1) any release of Hazardous Substances on, in, under, or about the Property caused by the Licensee Entities during their entry on or use of the Property, (2) Licensee Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (3) the acts, omissions and/or willful misconduct of Licensee Entities during their entry upon and use of the Property or in performing the Work Plan under this License, and/or (4) a breach of the terms and conditions of this License by any Licensee Entity. Notwithstanding this indemnity, Licensor expressly reserves all rights it may have under the law to prosecute any claims or demands against either Licensee Entities arising out of or related to the environmental condition of the Property or otherwise.

8.    Compliance with Law/Permits.  Licensee shall cause all Licensee Entities to comply with all applicable federal, state, and local laws and regulations in the performance of the investigation of the Property. Licensee shall obtain, at its own expense, and prior to any access to the Property by Licensee Entities under this License, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the investigation pursuant to this License. Licensee shall ensure that Licensee Entities properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the Property generated by Licensee Entities in the course of conducting the investigation under this License. Licensee agrees that it shall be the licensee and/or generator of any and all Hazardous Substances generated in the course of conducting the Investigation authorized in this Li, and shall identify itself as the licensee and/or generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the investigation.

9.    Term.  The term of this License shall be until the Closing under the Purchase Contract, unless the Purchase Contract is terminated earlier.

10.    Upon Termination.  Upon termination of this License, Licensee shall ensure that Licensee (1) immediately removes any of the equipment, fixtures, improvements and other property located on any portion of the Property which was installed during the term of this License, (2) closes all work performed by Licensee Entities including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards, and (3) restores the Property to its condition existing immediately prior to Licensee Entities' entry thereon.

11.    Liens.  Licensee shall discharge at once or bond or otherwise secure all liens and attachments which are filed in connection with Licensee's implementation of the Work Plan and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

12.    Insurance.  Licensee shall ensure that the Licensee Entity that is the contractor responsible for performing the Work Plan shall maintain, at their sole cost and expense, the following policies of insurance (or policies otherwise approved by Licensor) procured from insurance companies reasonably satisfactory to Licensor and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company (or otherwise approved by Licensor):  (a)  Workers Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the Property is located with a waiver of subrogation in favor of Licensor, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease;  (b)  Motor Vehicle Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage;  (c)  Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage;  (d)  Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate; and, (e)  Any contractor hired to perform environmental tests at the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

All policies shall be issued by companies qualified to do business in the state where the Property is located, and shall be rated A-/VII or better in the most current edition of Best's Insurance Reports.  Prior to execution of this License, Licensee shall provide the Licensor with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Licensor, certified copies of such policies or portions thereof.  All such insurance policies shall provide that they may not be materially changed, non-renewed or canceled without at least thirty (30) days' prior written notice to the Licensor.  All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name Licensor and its affiliates as additional insureds and shall stipulate that Licensee's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Licensor or its affiliates.  Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Work Plan, naming Licensor and its affiliates as additional insureds during such period of continuation.

13.    Binding Effect.  This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the Parties hereto.

14.    Entire Agreement: Modification.  This License between Licensee and Licensor contains the entire understanding and agreement among the Parties and supersedes all prior understandings and agreements between the Parties whether oral or written.  This instrument may be modified only by a writing signed by all Parties.

15.    Governing Law.  This instrument shall be governed by and shall be construed in accordance with the laws of the State where the Property is located.

22

16.    Notice.  Any and all notices or other communication required or permitted by this License, or by law, to be delivered to, served on, or given to any Party to this License shall be in writing, and shall be deemed properly delivered, given or served when personally delivered to such Party, when electronically delivered with receipt acknowledged, or when mailed by United States mail, express, certified or registered with the return receipt signed, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

**To Licensor:**

Director Environmental Affairs
Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL 60179

**With copies to:**

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL  60179
Attn:  Counsel, Environmental

**To Licensee:**

LGR Weston Investments, LLC,
an Ohio limited liability company
3016 Maryland Ave
Columbus, Ohio 43209
Attn: Nick Vollman

**With copies to:**

Frost Brown Todd LLC
10 West Broad Street
Suite 2300
Columbus, OH  43215
Attn:  John I. Cadwallader, Esq.

Any Party may change its address by giving ten (10) day advance written notice of such change to the other Parties in the manner provided in this Section.

17.    Representation.  Licensee represents and warrants that it does not need the consent of any other Party to enter into this License.

18.    Severability.  If any term, provision, covenant, or condition of this License is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this License shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this License.

19.    Survivability.  All obligations and commitments by Licensee specified in this License (including, without limitation, the provisions of Sections 3 through 8 and 10 through 15, shall survive the expiration  or termination of this License.

23

20.    <u>Assignment</u>.  Licensee may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under this License, except with Licensor's prior written consent, and the failure of Licensee to obtain Licensor's prior written consent shall render any such attempt to assign, delegate, or subcontract of no force and effect.

21.    <u>No Waiver; Cumulative Remedies</u>.  The failure of any Party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this License or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the Parties with respect to such future performance will continue in full force and effect. Except as otherwise provided in this License, the remedies in this License are cumulative with and not in lieu of other remedies available to a Party at law or in equity.

22.    <u>No Third Party Beneficiaries</u>.  Other than Licensor's affiliates, this License shall not be deemed to confer any rights to any other party (other than Licensee or any Licensee Entity) as a third party beneficiary or otherwise.

23.    <u>Exhibits</u>.  The terms and conditions of each exhibit referenced in this License are hereby incorporated into this License.  In the event of a conflict between this License and the exhibits, the terms and conditions of this License shall prevail. Any provisions of Licensee's proposals, contracts, invoices, billing statements, acknowledgement forms or any other document which are inconsistent with the provisions of this License shall be of no force or effect.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**IN WITNESS WHEREOF**, the Parties have executed this Phase II Access License effective as of the date first above written.

LICENSEE:

**LGR WESTON INVESTMENTS, LLC**, an
Ohio limited liability company

By: _____
     Laurence G. Ruben, Manager

LICENSOR:

**SEARS, ROEBUCK AND CO.**
A New York corporation

By:     _____
Name:  _____
Title:    _____

## EXHIBIT "A" TO PHASE II ACCESS LICENSE

## WORK PLAN

## <u>Exhibit 2</u>

**First Amendment to the Purchase Agreement**

**FIRST AMENDMENT TO**
**CONTRACT FOR PURCHASE AND SALE OF PROPERTY**
{Columbus, Ohio (Westland Mall) S#1150}

This First Amendment (the "Amendment") amends a certain Contract for Purchase and Sale of Property entered into as of June 4, 2018 (the "Contract") entered into by and between LGR Investments, Ltd., an Ohio limited liability company, as Buyer, and Sears, Roebuck and Co., a New York corporation as Seller.

**RECITALS**

Terms that are capitalized in this Amendment but not specifically defined herein shall have the same meaning as those identically capitalized terms are defined in the Contract. The parties desire to amend the Contract to extend the Inspection Period.

WHEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

1.    <u>Inspection Period and Closing</u>.  Section 6(a) of the Contract is hereby amended to provide that the Inspection Period shall be extended to expire on Friday, October 5, 2018 at 5:00 p.m. eastern time zone.  The purpose of extending the Inspection Period is to provide Buyer with additional time in which to undertake Phase II environmental testing. Purchaser hereby waives all rights to terminate the Agreement under Sections 3 and 6 of the Agreement. The foregoing notwithstanding, Purchaser may terminate the Agreement under Section 6(a) and in accordance with the terms thereof on or before October 5, 2018, if, and only if, Purchaser objects to the results of such Phase II testing.   Buyer acknowledges that consistent with the terms of Section 6(b)(iii), prior to performing any invasive testing, Buyer shall provide Seller with a copy of the proposed scope of work for review and approval by the Seller within the time periods and subject to the terms and conditions set forth in the Contract, including, without limitation, requiring the Buyer to enter into Seller's Invasive Access Agreement, in the form attached as Exhibit C to the Contract.  The first sentence of Section 8(a) of the Contract is hereby deleted in its entirety and replaced with the following:  "The closing ("**Closing**") shall take place via escrow administered by the Title Company on a mutually agreeable date, but in no event later than Monday, October 15, 2018 (the "**Closing Date**")".

2.    <u>Miscellaneous</u>.  This Amendment may be executed in counterparts, each of which shall constitute one and the same instrument, and any party hereby may execute this Amendment by signing any such counterpart and delivering an executed signature page of this Amendment to any party hereto by facsimile or by scanned email transmission, and such facsimile or scanned email transmission shall be binding on the delivering party as if the original had been delivered. All references to the Contract shall be deemed to include the original Contract as hereby amended as of the last date of execution of this Amendment (the "Effective Date").

[END OF AMENDMENT – SIGNATURES APPEAR ON THE FOLLOWING PAGES]

**IN WITNESS WHEREOF,** this Amendment has been executed by the parties hereto as of the Effective Date established below.

**Buyer:**

**LGR INVESTMENTS, LTD,** an Ohio limited liability company

By: _____

Laurence G. Ruben, Manager

September 5, 2018

**Seller:**

**SEARS, ROEBUCK AND CO.,** a New York corporation

By: _____

Name: JoAnn Catanese

Its: Divisional Vice President, Real Estate

September 10, 2018

-Signature Page to First Amendment-

## Exhibit 3

**Second Amendment to the Purchase Agreement**

WEIL:\96856288\6\73217.0004

## SECOND AMENDMENT TO
## CONTRACT FOR PURCHASE AND SALE OF PROPERTY
{Columbus, Ohio (Westland Mall) S#1150}

This Second Amendment (the "**Amendment**") is entered into by and between LGR INVESTMENTS, LTD., an Ohio limited liability company, as Buyer, and SEARS, ROEBUCK AND CO., a New York corporation, as Seller, as of the last date of execution (the "**Effective Date**"), and amends a certain Contract for Purchase and Sale of Property entered into as of June 4, 2018 (the "**Underlying Contract**"), as amended by a certain First Amendment to Contract for Purchase and Sale of Property dated as of September 10, 2018 (the "**First Amendment**" with the Underlying Contract and the First Amendment being collectively referred to herein as the "**Original Contract**").

### RECITALS

Terms that are capitalized in this Amendment but not specifically defined herein shall have the same meaning as those identically capitalized terms are defined in the Underlying Contract.

The parties agree upon the remediation of certain environmental conditions at the Property.

WHEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

1. <u>Defined Terms</u>. The term "Contract" or "this Contract" as used in the Original Contract shall hereinafter refer to the Original Contract, as hereby amended, and as the same may be further amended, restated or otherwise modified from time to time.

2. <u>Inspection Period and Closing</u>. Section 1 of the First Amendment and Section 6 of the Underlying Contract are hereby deleted in their entirety. The Purchaser acknowledges that it has waived any further due diligence or Inspection Period. In addition, the first sentence of Section 8(a) of the Underlying Contract is hereby deleted in its entirety and replaced with the following:

"(a) Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer within forty-five (45) days after the expiration of the notice period (the "Notice Period") required by Section 2(a)(v) of the Approval Order or, in the event a timely objection to the Sale Notice is interposed, after entry of a final order specifically approving the sale of the Property, or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from entry of a final order specifically approving the sale of

the Property." Seller's counsel shall send Buyer's counsel via email a copy of the De Minimus Asset Sale Notice referenced in Section 2(a)(iii) of the Approved Order, and send Buyer via email copies of any timely filed objections to the Sale Notice, and once a Closing Date has been determined depending upon whether any objections to the Sale Notice are interposed, send Buyer via email a notice identifying the Closing Date, which Closing Date shall not be earlier than five (5) business days from the date of the email notice from Seller's counsel identifying the Closing Date.

3.    Intentionally Deleted.

4.    The last sentence of Section 3 of the Underlying Contract is hereby deleted and shall be replaced with the following:

"The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract (including any affirmative obligation of Seller to cure "Monetary Liens", if any, set forth in this Contract), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer."

5.    The following shall be added as new Subsection 6 of the Underlying Contract:

In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligations to close on the sale of the Property is conditioned on the following:

(a)    The sale shall be authorized by and subject to that certain *Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments* (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(b)    The applicable debtor(s) in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property. Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property."

2

6.     Subsection 7(a) of the Underlying Contract is hereby deleted and replaced with the following:

"(i)     Subject to the Approval Order and Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.   The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to the terms of the Approval Order."

7.     The following shall be added as the ultimate paragraph to Section 11:

"All representations and warranties of Seller and all representations and warranties of Buyer set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time.  Further, all representations and warranties of Seller and all representations and warranties of Buyer set forth in this Section 11 shall merge with the transfer of title and shall not survive Closing.  If the Closing takes place, Seller shall have no liability with respect to any claim which Buyer may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown."

8.     Escrow Agreement and Environmental Remediation.  Buyer and Seller acknowledge that CTL Engineering, Inc. ("**CTL**") has undertaken certain Phase II environmental tests, and based upon those tests, CTL has submitted a proposal outlined in an email dated October 3, 2018 from CTL's Mark Winterstein for obtaining a no further action letter ("**NFA**") for undertaking the environmental remediation (the "**Remediation Work**") to process the NFA request through the Ohio Bureau of Underground Storage Tank Regulation program ("BUSTR").  Buyer agrees to execute a contact (the "**Remediation Contract**") with CTL to undertake the Remediation Work and to cause CTL to process the NFA request through the BUSTR program.  The parties acknowledge that CTL's performance of the Remediation Contract and obtaining the NFA will not occur prior to the Closing Date, and accordingly, at the Closing, Seventy Thousand Dollars ($70,000.00) of the Seller's sales proceeds shall be placed in the Escrow Agreement to pay for the costs and expenses of undertaking the Remediation Work.  The form of the Escrow Agreement is attached hereto as **Exhibit A**, and it shall be executed simultaneously with the execution of this Amendment.

9.     Notices.  In addition to the method of serving notices under the Contract as provided in Section 15 of the Underlying Contract, the parties also agree that notices may also be given as follows, and notices shall be deemed given when sent as follows:

To the Seller:  (1)     elizabeth.williams@searshc.com
                (2)     cheryl.schwartz@searshc.com

To the Buyer:   (1)     nickv@plazaproperties.com

3

(2)    jcadwallader@fbtlaw.com

10.    <u>Governing Law</u>.  This Amendment shall be governed by, and construed in accordance with, the laws of the state of New York.

11.    <u>Miscellaneous</u>.  This Amendment may be executed in counterparts, each of which shall constitute one and the same instrument, and any party hereby may execute this Amendment by signing any such counterpart and delivering an executed signature page of this Amendment to any party hereto by facsimile or by scanned email transmission, and such facsimile or scanned email transmission shall be binding on the delivering party as if the original had been delivered.  All references to the Contract shall be deemed to include the Contract as hereby amended.

[END OF AMENDMENT – SIGNATURES APPEAR ON THE FOLLOWING PAGE]

0134718.0537948   4850-6998-9505v2                                4

**IN WITNESS WHEREOF**, this Amendment has been executed by the parties hereto as of the Effective Date established below.

**BUYER:**

**LGR INVESTMENTS, LTD.,**
an Ohio limited liability company

By: _____
      Laurence G. Ruben, Manager

November **30**, 2018

**SELLER:**

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
Name: **Jane S. Borden**
Its: **President – Real Estate**

November **30th**, 2018

-Signature Page to Second Amendment-

## Exhibit A

Escrow Agreement

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (**"Agreement"**) is made as of the last date of execution (the **"Effective Date"**), by and among Sears, Roebuck and Co., a New York corporation, as seller ("Seller") and LGR Investments, Ltd., an Ohio limited liability company, as buyer ("Buyer"); and  Chicago Title and Trust Company, 10 South LaSalle, Suite 3100, Chicago, IL 60603, as escrow agent (**"Escrow Agent"**).  Buyer, Seller and Escrow Agent may be sometimes collectively referred to herein as the **"parties"**.

## RECITALS

A.      Buyer and Seller entered into a certain Contract for Purchase and Sale and Property entered into as of June 4, 2018 (the "Original Agreement") as amended by a certain First Amendment dated as of September 10, 2018 (the "First Amendment"), as further amended by a certain Second Amendment dated on or about October 12, 2018 (the "Second Amendment").  The Original Agreement, the First Amendment and the Second Amendment may be collectively referred to herein as the "Contract".  Terms that are capitalized herein but not specifically defined in this Agreement have the same meanings as those identically capitalized terms are defined in the Contract.

B.      Pursuant to the terms of the Second Amendment, Buyer has agreed to execute the Remediation Contract with CTL in order to cause CTL to undertake the Remediation Work as described in the Second Amendment.  The Seller has agreed to enter into this Agreement to escrow Seventy Thousand Dollars ($70,000.00) (the "Escrow Deposit") to fund the cost of the Remediation Work.

WHEREFORE, the parties agree as follows:

1.      <u>Undertaking the Remediation</u>.  As provided in the Recitals above, Buyer shall enter into the Remediation Contract with CTL and cause CTL to perform the Remediation Work in order to cause CTL to obtain the NFA processed through the BUSTR program.  Buyer shall cause CTL to complete the Remediation Work with diligence consistent with the terms of the Remediation Contract until CTL has obtained the NFA.  Buyer shall not permit any liens or encumbrances to be placed against the Property as a result of the Remediation Work.

2.      <u>Escrow Deposit</u>.  Simultaneously with the Closing of the Contract, Seller shall deposit with the Escrow Agent in immediately available federal funds, the full Escrow Deposit which shall be held by the Escrow Agent pursuant to the terms of this Agreement.  The Escrow Deposit shall be kept in an interest-bearing account using the Buyer's tax identification number for interest reporting purposes, with all realized interest becoming part of the Escrow Deposit.

3.      <u>Disbursement of the Escrow Deposit</u>.  Buyer shall have the right to use the Escrow Deposit to pay for the Remediation Work as it is performed.  The Escrow Agent is directed to release the Escrow Deposit pursuant to the following procedures:

(a)      Buyer shall submit to the Escrow Agent all withdrawal requests together with copies of invoices (the request and the copies of the invoices being collectively referred to herein as the ("Withdrawal Request(s)"), for payment of the Remediation Work.  When Buyer submits a Withdrawal Request to the Escrow Agent, copies of it shall also be sent to Seller.  Within three (3) business days after the submission of each Withdrawal Request to the Escrow Agent, the

Escrow Agent shall disburse to Buyer the amount of the money reflected in the Withdrawal Request. Buyer shall have the right to direct the Escrow Agent to make payments directly to a contractor, subcontractor, material or other supplier (collectively a "Contractor") that performed any portion of the Remediation Work that is the subject of the Withdrawal Request. Buyer shall be solely responsible for obtaining any and all necessary mechanics' liens, waivers and/or releases in connection with the Contractors' performing the Remediation Work;

(b)    _Objection Notice._  Seller shall not have the right to object to a Withdrawal Request submitted by Buyer unless in good faith Seller believes that some portion of the Remediation Work is unsatisfactory or the Withdrawal Request relates to construction items unrelated to the Remediation Work, and if Seller so objects, it shall have the right to send written notice (the "Objection Notice") to both Buyer and the Escrow Agent describing with particularity the basis for its objection. If Buyer sends an Objection Notice, then Buyer shall have the right to obtain an affidavit from the respective Contractor (the "Contractor Affidavit") certifying that the work performed by the respective Contractor was part of the Remediation Work reflected in the Withdrawal Request or to obtain an engineering certification that the Remediation Work is satisfactory. Any such Contractor Affidavit shall be simultaneously delivered to the Escrow Agent and to Seller, and if the Contractor Affidavit so certifies that the Contractor had performed the Remediation Work that was the subject of the Withdrawal Request, the Escrow Agent shall immediately disburse the portion of the Escrow Deposit that was in dispute to Buyer or to the Contractor, as applicable.

(c)    _Method of Notification._  The parties agree that the delivery of Withdrawal Requests or Objection Notices may be delivered by email as follows:

|  | | |
|---|---|---|
| If to the Seller: | (1) | elizabeth.williams@searshc.com |
|  | (2) | cheryl.schwartz@searshc.com |
|  | (3) | bruce.kaye@searshc.com |
|  |  |  |
| If to the Buyer: | (1) | nickv@plazaproperties.com |
|  | (2) | jcadwallader@fbtlaw.com |

(d)    _Release of Escrow Deposit._  When the Remediation Work is fully completed and the NFA has been issued then after paying all amounts due to CTL and to any other Contractors for the performance of the Remediation Work and the issuance of the NFA, the remaining portion of the Escrow Deposit shall be released to the Seller. If the Escrow Deposit is not sufficient to pay the full amount of the Remediation Work, Seller shall have no obligation or liability to increase the amount of the Escrow Deposit or to otherwise have any contractual liability for any costs and expenses for any Remediation Work in excess of the amount of the Escrow Deposit made by Seller at the Closing as provided in Section 2 above.

4.    _Escrow Agent._  By execution of this Agreement, Escrow Agent acknowledges receipt of the Escrow Deposit, and agrees to disburse the Escrow Deposit in accordance with the terms and conditions herein, including the following:

(a)    Escrow Agent undertakes to perform only such duties as are expressly set forth and are limited to the safekeeping and disbursement of the Escrow Deposit in accordance with the terms of this Agreement.

(b)    Escrow Agent may act in reliance upon any writing or instrument or signature which it, in

good faith, believes to be genuine, assume the validity and accuracy of any statement or assertion contained in such a writing or instrument and assume that any person purporting to give any writing, notice, advice or instructions in connection with the provisions hereof has been fully authorized to do so.

(c)    Provided that Escrow Agent is not guilty of willful misconduct or gross negligence or otherwise breaches this Agreement, Buyer and Seller release Escrow Agent, its officers, directors and agents, from any and all claims, liabilities, suits or proceedings at law or in equity and any other expenses, fees or charges which they may incur by reason of the subject matter of this Agreement.

(d)    Provided that Escrow Agent is not guilty of willful misconduct or gross negligence or otherwise breaches this Agreement, Buyer and Seller jointly and severally agree to indemnify Escrow Agent, its officers, directors and agents, from any and all claims, liabilities, suits or proceedings at law or in equity and any other expenses, fees or charges which Escrow Agent may incur by reason of the subject matter of this Agreement and shall promptly reimburse Escrow Agent for the same upon written demand from Escrow Agent.

(e)    Escrow Agent shall be discharged of any responsibility hereunder at such time Escrow Agent has dispersed all of the Escrow Deposit as provided in this Agreement.

(f)    Escrow Agent may, in its sole discretion, elect to resign in its capacity as Escrow Agent under this Agreement upon not less than thirty (30) days written notice to Buyer and Seller.

(g)    Escrow Agent shall be entitled to a fee equal to $ 250.00, paid from the Escrow Deposit. Upon execution of this Agreement, Buyer shall pay such escrow fee in full.

5.    Notice.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given on the date that an email notice is sent.  Notices shall be sent as follows, which may be modified by written notice given in accordance with this section:

| If to the Seller: | (1) | elizabeth.williams@searshc.com |
| | (2) | cheryl.schwartz@searshc.com |
| | (3) | bruce.kaye@searshc.com |
| | | |
| If to the Buyer: | (1) | nickv@plazaproperties.com |
| | (2) | jcadwallader@fbtlaw.com |

If to the Escrow Agent:    Chicago Title and Trust Company
10 South LaSalle, Suite 3100
Chicago, IL 60603
Attn:  Krystina Cozzie
(312) 223-3366
Email:  Krystina.cozzie@ctt.com

Notices may be given on behalf of the parties by each party's respective legal counsel.

6.    <u>Miscellaneous</u>.  This Agreement represents the full agreement between the Parties, and there exist no other agreements, written or oral, express or implied, as to the matters contained herein. This Agreement shall be governed by the laws of the State of Ohio.  This Agreement may be executed in counterparts, each of which shall be deemed an original and the combination of which shall constitute one fully executed agreement.  Any party may change at any time its notice address by delivering a change of address notice using the foregoing notice procedures.  This Agreement may be changed, waived or amended only in an agreement signed by all parties to this Agreement.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their successors, assigns, heirs and personal representatives, as applicable, unless this Agreement expressly contains restrictions upon assignment, and in which case, those restrictions shall supersede the terms of this sentence.  The captions of the several sections of this Agreement are not a part hereof, and these captions shall not be used to interpret any of the terms of this Agreement.  The Recitals are intended to be a part of this Agreement and are incorporated into the body hereof.  All parties signing this Agreement have taken all duly authorized action necessary to authorize the execution of this Agreement and to execute any and all documents related hereto, and each of the parties may rely upon this section of the Agreement without the necessity of having further documentation to evidence such authority.  If either party defaults under its obligations set forth in this Agreement, the non-defaulting party shall be entitled to recover reasonable attorneys' fees and expenses incurred by the non-defaulting party in defending, initiating or otherwise enforcing its rights under the terms of this Agreement.  The parties specifically acknowledge, represent and warrant that all of the terms and conditions of this Agreement are adequately and fully supported by consideration.  The Effective Date of this Agreement shall be the date that the last party signs it.  In computing any period of time under this Agreement, the day of the act or event for which the designated period of time begins to run shall not be included, but the last day of the period shall be included, unless it is a Saturday, Sunday or a legal holiday, in which event, the period shall run through the next business day.  This Agreement may be executed with signatures delivered by either facsimile or scanned email, and copies of such signatures so delivered shall be deemed as originals.  All parties have been represented by legal counsel in connection with the negotiation and execution of this Agreement, and accordingly, in interpreting any of the provisions of this Agreement, no rules of construction shall be adopted to deem that the Agreement shall be read in favor of any party which may not have participated in drafting one or more provisions of the terms of this Agreement.

**[END OF AGREEMENT- SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date established below.

<div style="margin-left:40%">

**SELLER:**

**SEARS, ROEBUCK AND CO.,** a New York corporation



By: _____
Name: __Jane S. Borden_____
Its: __President - Real Estate____
__1-30-2018_____, 2018


**BUYER:**

**LGR INVESTMENTS, LTD.,** an Ohio limited liability company


By: _____
     Laurence G. Ruben, Manager
    _____, 2018


**ESCROW AGENT:**

Chicago Title and Trust Company


By: _____
Its: _____
    _____, 2018

</div>

-Signature Page-