**Hearing Date and Time: January 18, 2019 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re                                               :
                                                    :        **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,           :
                                                    :        **Case No. 18-23538 (RDD)**
                                                    :
**Debtors.** [1]                                    :        **(Jointly Administered)**
------------------------------------------------------------ x

## DEBTORS' OBJECTION TO MOTION OF GREENHORN VENTURES LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

    Sears Holdings Corporation and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), submit this objection in response to the motion filed by Greenhorn Ventures LLC ("**Greenhorn**") (ECF No. 969) (as supplemented, the "**Motion**"),[2] and respectfully represent as follows:

**Preliminary Statement**

    1.  In November 2018, Greenhorn purchased from Gershman Properties, LLC (the "**Predecessor Landlord**") the premises located at 2258 Addison Avenue East, Twin Falls, Idaho 83301 (the "**Leased Premises**") and leased to Debtor Kmart Corporation ("**Kmart**").[3] Kmart operates a store on the Leased Premises, identified as store number 7006, and has done so for approximately forty-six years.

    2.  Within weeks of acquiring the Leased Premises, Greenhorn filed the Motion seeking to (i) compel the Debtors to reject the Lease[4] or, in the alternative, establish a deadline by which Kmart must assume the Lease and cure the alleged defaults described in the Motion, and (ii) modify the automatic stay to permit Greenhorn to enforce its rights with respect to the alleged defaults or compel the Debtors to provide Greenhorn adequate assurance in the form of payment. The relief requested in the Motion should be denied for several reasons.

    3.  As an initial matter, the Bankruptcy Code precludes Greenhorn from shortening the Debtors' time to determine whether to assume, assume and assign, or reject the Lease. Indeed, Greenhorn has failed to cite to any authority to support the extraordinary relief

---

[2] Greenhorn filed a supplement to the Motion on December 14, 2018 (ECF No. 1220).

[3] The Debtors have not received any formal notification of the sale of the Leased Premises or the assignment of the Lease to Greenhorn.

[4] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

requested.  The record of these cases also compels denial of the relief requested in the Motion.

The Debtors commenced these chapter 11 cases as party to approximately 1,800 non-residential

real property leases and, as of the date hereof, remain party to more than 1,500 leases.  The

Debtors are at a critical stage in their deliberations about the future of their business and should

not be compelled to make a decision regarding the Lease until that process is complete.  As

provided by the Bankruptcy Code and prior orders of the Court, the Debtors are entitled to a

reasonable period within which to determine how to treat all of the unexpired leases in their real

estate portfolio, including the Lease.

4.      Further, the Motion provides no factual basis to justify the relief requested.

The defaults alleged in the Motion are trumped-up claims that evidence a clear attempt by

Greenhorn to terminate a long term, below market lease that constitutes property of the Debtors'

estates.  First, the conduct underlying two of the three alleged breaches under the Lease occurred

nearly thirty years ago.  Second, the third alleged breach, as described in the supplement to the

Motion, involves the filing of a mechanic's lien against the Leased Premises on December 10,

2018 for prepetition services rendered.  Pursuant to paragraph 39 of the Lease, Kmart has thirty

(30) days to pay and discharge undisputed liens.  Accordingly, as of the filing of the Motion, the

mechanic's lien did not constitute a default under the Lease and, nevertheless, Greenhorn

exaggerated its claim in a brazen attempt to recapture the Debtors' property.

5.      Greenhorn cannot sustain its burden of showing cause to compel the

Debtors to assume or reject the Lease or demonstrating that relief from the stay is appropriate

under the test set forth in *Sonnax v. Tri-Component Prods. Corp (In re Sonnax Indus., Inc.)*, 907

F.2d 1280, 1285 (2d Cir. 1990).  Even assuming all facts alleged in the Motion are true, any

perceived harm caused by the alleged defaults does not support setting aside the Debtors' statutory rights.

6.     For the foregoing reasons and as set forth more fully below, the Debtors respectfully request that the Motion be denied.

## Relevant Background

7.     Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in these chapter 11 cases.

9.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

10.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (ECF No. 3).

*The Lease*

11.     On June 8, 1972, Kmart became party to the Lease.   The Lease was amended and restated on September 1, 1989.  A copy of the Lease (as amended and restated) is annexed to the Motion as <u>Exhibit A</u>.  The Lease expressly provides that "Tenant desires to expand its store by constructing approximately 23,049 additional square feet of retail space onto its

3

existing k mart [*sic*] Department Store (the "**Expansion**") which will be located on a portion of the Canned Foods Parcel". *Lease* at 1. Further, the Lease states that Kmart entered into a purchase agreement with Canned Foods, Inc. ("**Canned Foods**") to purchase a portion of Canned Foods' property to accommodate the Expansion and the related parking facilities (the "**Purchased Parcel**"). *Id.* As provided for under the Lease, in 1990 Kmart built the Expansion on the agreed upon designated portion of the Leased Premises and the Purchased Parcel.

12.    On January 22, 2002, Kmart and thirty-seven of its subsidiaries filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "**First Kmart Bankruptcy**"). The Lease was assumed by Kmart in the First Kmart Bankruptcy and, in connection therewith, any existing defaults were cured pursuant to section 365 of the Bankruptcy Code.[5] Thus, Greenhorn is now attempting to assert alleged defaults that would have either been cured or subject to the discharge granted to Kmart in the First Kmart Bankruptcy.

13.    On November 5, 2018, at the request of the Predecessor Landlord, Kmart delivered an Estoppel Certificate to Greenhorn. The Estoppel Certificate states, among other things, that Kmart did not receive and has not given any notice of default pursuant to the terms of the Lease which has not been cured other than defaults arising out of the commencement of its chapter 11 case. A copy of the Estoppel Certificate is attached hereto as __**Exhibit 1**__.

14.    On December 10, 2018, Kloepfer Inc. filed a mechanic's lien in the amount of $135,889.67 against the Leased Premises for goods and services allegedly provided to the Debtors in connection with a project completed on or about September 11, 2018. Paragraph 39 of the Lease states:

---

[5] The First Kmart Bankruptcy docket is not accessible electronically. As a result the Debtors do not have copies of the relevant filings to annex to this objection but will endeavor to provide copies at the hearing on the Motion.

4

> <u>Free from Liens</u>. Tenant agrees to pay and discharge any mechanics', materialmen's or other lien against the demised premises of Landlord's interest therein claimed in respect to any labor, services, materials, supplies or equipment furnished or alleged to have been furnished to or upon the request of Tenant, within thirty (30) days after the filing of any lien for record which Tenant does not contest. Immediately upon entry of final judgment in any such action in which tenant contests any such claim of lien, if such judgment shall establish the validity of the lien, Tenant shall fully pay and discharge such judgment or lien, as the case may be, and Tenant shall reimburse Landlord upon demand for any and all loss, damage and expense, including reasonable attorneys' fees, which Landlord may suffer or be put to by reason thereof.

Lease at ¶ 39.

15.     As Greenhorn concedes in the Motion, the Debtors are current on their monthly base rent payment obligations under the Lease. *See* Motion, ¶ 8.

*The Storage Tanks*

16.     In accordance with federal law, Kmart was required to notify the state of all underground tanks used to store certain regulated substances.  Attached hereto as **Exhibit 2** is a copy of the notification submitted by Kmart to the Idaho Department of Health & Welfare in April 1986 reporting use of only one underground storage tank, and the subsequent notification filed by Kmart in August 1991 reflecting the removal of such tank.  As set forth in publicly available documents, on June 21, 1990, Kmart removed one 1,000 gallon underground waste oil tank from the Leased Premises.  The removal was conducted by Reis Plumbing & Heating.  A copy of the closure letter sent by Reis Plumbing & Heating to the Idaho Department of Health and Welfare Division of Environmental Quality concerning the removal of the underground tank is attached hereto as **Exhibit 3**.  Alchem Laboratory performed tests on soil removed from the storage tank extraction site and concluded that no contamination was present.  *See* Exhibit 3.

5

17.     Although the Debtors reviewed their environmental records and the site plan for the Leased Premises, they have not found any reference to two 1,000 gallon gasoline underground storage tanks located on the Leased Premises as alleged by Greenhorn.  *See* Motion, ¶ 14.  Additionally, in preparing to respond to the Motion, the Debtors contacted the Idaho Department of Environmental Quality (the "**IDEQ**") regarding its public database of underground storage tanks and the IDEQ has concurred that any reference to two 1,000 gallon gasoline underground storage tanks being located on the Leased Premises was in error and it has updated its website accordingly.  A copy of the revised Underground Storage Tank Database listing for the Leased Premises is annexed hereto as **Exhibit 4**.

*The 365(d)(4) Motion*

18.     On November 1, 2018, the Debtors filed the *Motion of Debtors for Authority to Extend the Time to Assume or Reject Unexpired Leases and Subleases of Nonresidential Real Property* (ECF No. 426) (the "**365(d)(4) Motion**").  On November 16, 2018, the Court entered an order approving the 365(d)(4) Motion and extending the initial 120-day period for the Debtors to assume or reject all of their unexpired leases and subleases of non-residential real property, including the Lease, by an additional ninety (90) days, from February 12, 2019, up to and including May 13, 2019 (ECF No. 776).

19.     Fourteen days after entry of the order approving the 365(d)(4) Motion, Greenhorn filed the Motion seeking to, among other things, shorten the time in which the Debtors may decide whether to assume, assume and assign, or reject the Lease.

6

## The Motion Should be Denied

**A.    Greenhorn Cannot Shorten the Time for Kmart to Decide Whether to Assume, Assume and Assign, or Reject the Lease**

20.    Greenhorn's reliance on section 365(d)(2) for authority to truncate the Debtors' statutory time to determine whether to assume, assume and assign, or reject the Lease, Motion, ¶ 26, is misplaced.

21.    Section 365(d)(2) of the Bankruptcy Code provides that a debtor "may assume or reject an executory contract or unexpired lease of *residential* real property or of personal property of the debtor at any time prior to the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." 11 U.S.C. § 365(d)(2) (emphasis added).    It is uncontroverted that the Lease is for *nonresidential* real property. Accordingly, by its terms, section 365(d)(2) of the Bankruptcy Code does not apply to the Lease.

22.    Congress intentionally omitted any reference to nonresidential real property leases in section 365(d)(2) to preclude a lessor from seeking the very relief sought in the Motion. Before the 1984 amendments to the Bankruptcy Code, section 365(d)(2) generally referenced unexpired leases and provided as follows:

> [T]he trustee may assume or reject an executory contract or *unexpired lease* of the debtor at any time before confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2) (1982) (amended 1984) (emphasis added); *see* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. 98-353, § 362, 98 Stat. 333 (July 10, 1984) ("**1984 Bankruptcy Amendments**").    "Until [the 1984 Bankruptcy Amendments], leases of both residential and nonresidential real property were governed by [section 365(d)(2)], which . . .

WEIL:\96841461\5\73217.0004

envisioned assumption or rejection at any point prior to confirmation of a plan unless a party to the lease convinced the court to compel assumption or rejection within a certain time." *In re Lippman*, 122 B.R. 206, 209 (Bankr. S.D.N.Y. 1990).

23.    To give lease counterparties certainty and to address the open-ended time frame originally provided under section 365(d)(2), the 1984 Bankruptcy Amendments enacted section 365(d)(4). *See* Pub. L. 98-353, § 362 (amending 11 U.S.C. § 365). At the time, section 365(d)(4) fixed a 60-day period, subject to extension, by which a debtor was required to assume or reject a lease of nonresidential real property.[6] By enacting section 365(d)(4) and specifying that only residential and personal property leases were within the purview of section 365(d)(2), the 1984 Bankruptcy Amendments clearly eliminated a lessor's authority to seek to compel the assumption or rejection of a lease of nonresidential real property outside of the time frame provided for under section 365(d)(4) of the Bankruptcy Code. *See* Pub. L. 98-353, § 362 (amending 11 U.S.C. § 365(d)(2)); 11 U.S.C. § 365(d)(2). Accordingly, a lease counterparty's prior ability to compel the assumption or rejection of a lease of nonresidential real property has been "legislatively overturned by the passage of § 365(d)(4)." *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 n.27 (Bankr. S.D.N.Y. 2003); *see also* Allan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 365.05[4] (["Section 365(d)(2)] excludes leases of nonresidential real property. The exclusion recognizes that leases of nonresidential real property in which the debtor is lessee are dealt with by section 365(d)(4).").

24.    This Court has already opined on similar requested relief. *See In re Great Atlantic & Pacific Company, Inc.*, Case No. 10-24549 (RDD) ("**2010 A&P Chapter 11 Cases**").

---

[6] Section 365(d)(4) of the Bankruptcy Code was further amended, to increase the 60-day period to 120 days with up to 90 days additional time and further additional time under certain circumstances. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, § 404, 119 Stat. 23, 104–05 (April 20, 2005) (amending 11 U.S.C. § 365(d)); see 11 U.S.C. § 365(d)(4).

8

In the 2010 A&P Chapter 11 Cases, a landlord filed a motion to shorten the time frame afforded under section 365(d)(4) of the Bankruptcy Code (as extended by order of the Court) for the debtors to assume or reject its non-residential real property lease by six weeks. *See* 2010 A&P Chapter 11 Cases, ECF No. 1043. This Court found, as it should here, that the Bankruptcy Code does not provide for a motion to shorten the time frame for a debtor to assume or reject a non-residential real property lease. *See* 2010 A&P Chapter 11 Cases, May 18, 2011 Hr'g Tr. at 32, 14:19 (stating "it's clear to me that Congress did not mean to permit a lessor of nonresidential real property to have the right to compel a shortening of the time set forth in Section 365(d)(4) to assume or reject, although of course, the debtor has the burden of showing cause for an extension of that time.").

25.    Less than three months into these large and complex chapter 11 cases, Greenhorn is attempting to force the Debtors to make an accelerated decision with respect to the treatment of the Lease. Both the Bankruptcy Code and the controlling case law are patently clear that Greenhorn cannot utilize section 365(d)(2) of the Bankruptcy Code to provide an earlier deadline than provided under section 365(d)(4) of the Bankruptcy Code. Greenhorn has not cited to any authority to support a contrary finding. Moreover, the equities favor the Debtors and the record of these chapter 11 cases reflects that the Debtors are acting prudently by not deciding at this time to assume, assume and assign, or reject the Lease.

**B.    The Motion Lacks Factual Basis for the Relief Requested**

26.    Even if the Court were to adjudicate the merits of the Motion, the Motion lacks factual support for the relief requested.

27.    First, Greenhorn asserts that Kmart built the Expansion twenty-eight years ago and it allegedly encroaches on a neighboring third-party's property. Greenhorn contends that the ongoing encroachment and trespass of the Expansion on the adjoining landowner's property is

9

a continuing breach and default under the Lease. *See* Motion, ¶¶ 11-12. Kmart never received any notice of default from the Predecessor Landlord in connection with the location of the Expansion, no third-party has brought a claim against Kmart, or, upon information and belief, Greenhorn, in connection with the Expansion, and any third-party seeking to now assert such a claim against Kmart or Greenhorn would be barred under federal and/or state law. Indeed, due to the passage of time, each of Kmart and/or Greenhorn would be in a position defend itself from third-party claims by using several defenses under Idaho state law, including, without limitation, the doctrines of laches,[7] relative hardship, quasi-estoppel, or adverse possession.[8]

28.    Second, Greenhorn contends that Kmart has failed to provide documentation regarding the removal twenty-nine years ago of certain underground storage tanks located on the Leased Premises. *See* Motion, ¶ 15. Contrary to Greenhorn's unfounded allegations and, as evidenced by the regulatory closure Kmart received in 1990, Kmart correctly removed the underground oil tank from the Leased Premises. Moreover, relevant documentation is publicly available through IDEQ upon request. Accordingly, the Debtors have no affirmative obligation to do anything further with respect to the removed underground waste oil tank. A contrary finding, as requested by Greenhorn, would undermine the entire closure process by allowing a third party to second guess regulatory closure on a post-hoc basis when there is no risk to human health and safety.

---

[7] *See Sherman Storage, LLC v. Global Signal Acquisitions II, LLC,* 360 P.3d 340, 347 (Idaho 2015) (holding that the successor purchaser was estopped by laches from ejecting tenant from a disputed strip of land because the original landowner failed to bring a claim between 1996, when the property was leased to the predecessor tenant, and 2010, when the successor purchaser bought the disputed land and filed an action against tenant. The District Court found, and the Supreme Court affirmed, that the original owner had notice of the encroachment because the owner visited the site following the construction of the tower, and subsequently accepted rent payments from predecessor tenant and also extended the term of the lease).

[8] As of the time of the alleged encroachment, Idaho Code 5-210 required a five year period of adverse possession. The statute was amended in 2006 to extend the time requirement for possession to twenty years. Given that it has been nearly thirty years, Kmart clearly satisfies the time period required to assert the defense of adverse possession.

10

29.    Third, pursuant to section 39 of the Lease, the Debtors had until January 9, 2019, to pay and discharge the mechanic's lien filed by Kloepfer Inc. to the extent such lien is not contested.  *See* Lease at ¶ 39.  The Debtors, however, reviewed the claim of lien filed and do not agree with certain amounts requested therein.  As a result, the nonpayment of the mechanic's lien does not constitute a default under the Lease.  Nevertheless, the Debtors have reached out to the vendor to discuss potential resolution and get the lien discharged.  Regardless of the Debtors' actions with respect to the lien, it bears noting that, as also provided for under section 39 of the Lease, if Greenhorn incurs any loss, damage or expense as a result of the mechanic's lien it may demand reimbursement from Kmart.  *Id.*  Accordingly, Greenhorn has the option of exercising self-help to discharge the mechanic's lien and avoid purportedly defaulting under its mortgage.  If the Debtors decide not to pay the mechanic's lien, Greenhorn will either have a cure claim against the Debtors that will be satisfied before the Lease is assumed or assumed and assigned or it will have a rejection damage claim for such amounts if the Debtors decide to reject the Lease.  In either scenario, Greenhorn has a remedy against the Debtors.

## C.    Greenhorn Cannot Circumvent Section 365(d)(4) of the Bankruptcy Code by Seeking Relief from the Automatic Stay

30.    The Motion makes a passing reference to modifying the automatic stay set forth in section 362 of the Bankruptcy Code to permit Greenhorn to "assert all its rights with respect to the Debtor-Tenant's continuing defaults under the Lease."  Motion, ¶ 31.

31.    Other than in the title of the Motion, Greenhorn has not even indicated the subsection of section 362(d) of the Bankruptcy Code upon which it relies.  Nor has it provided any authority for the extraordinary relief that it seeks.  Courts will only modify the automatic stay pursuant to section 362(d)(1) upon a showing of cause.  11 U.S.C. § 362(d)(1); *Sonnax*, 907 F.2d at 1285; *In re Lord*, 325 B.R. 121, 129 (Bankr. S.D.N.Y. 2005).  The Second Circuit established a

11

set of twelve factors in *Sonnax* (the "**Sonnax Factors**") that have become the standard by which courts in the Second Circuit consider whether to modify the automatic stay.[9]  *See In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 138 (S.D.N.Y. 2010) ("*Sonnax* . . . is routinely referenced as the leading relief from stay precedent in this Circuit."), *aff'd sub nom. Suncal Cmtys. I LLC v. Lehman Commercial Paper, Inc.,* 402 F. App'x 634 (2d Cir. 2010).

32.    Although the *Sonnax* Court outlined twelve factors, courts need not consider each factor, but may consider only the factors that are relevant to the particular case.  *See In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996) ("A court should . . . use only the factors that are deemed relevant . . . .").  In fact, the *Sonnax* Court itself considered only four of the twelve factors as relevant in that case.  *Sonnax,* 907 F.2d at 1286.  Additionally, courts need not assign equal weight to each factor, and have discretion in weighing the factors against one another.  *RCM Global*, 200 B.R. at 526 ("A court should apply these factors on a case-by-case basis . . . assigning to each factor whatever weight the court feels is appropriate.").

33.    The Second Circuit has held that the party seeking to lift or modify the automatic stay bears the initial burden to show cause as to why the stay should be modified or

---

[9] The *Sonnax* Factors are:
> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case;
> (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
> (5) whether the debtor's insurer has assumed full responsibility for defending it;
> (6) whether the action primarily involves third parties;
> (7) whether litigation in another forum would prejudice the interests of other creditors;
> (8) whether the judgment claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
> (10) the interests of judicial economy and the expeditious and economical resolution of litigation;
> (11) whether the parties are ready for trial in the other proceeding; and
> (12) impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.

WEIL:\96841461\5\73217.0004

lifted and "[i]f the movant fails to make an initial showing of cause . . . the court should deny

relief without requiring any showing from the debtor that it is entitled to continued protection."

*Sonnax*, 907 F.2d at 1285.  Once the movant has shown cause, the party opposing the motion must

show that it is entitled to the continuing protections of the automatic stay.  *See Enron*, 306 B.R. at

476 (citing *In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993)); *see also RCM

Global*, 200 B.R. at 526.

34.     Given Greenhorn's abject failure to satisfy its initial burden, the Court

should deny the Motion.  Nevertheless, even a cursory review of the *Sonnax* factors further

demonstrates that the Motion should be denied.

(i)     ***Whether Relief Would Result in a Partial or Complete Resolution of the
Issues* (First *Sonnax* Factor)**

35.     The first *Sonnax* factor concerns whether granting relief from the automatic

stay would result in partial or complete resolution of the issues.   Although the Motion is unclear

as to whether Greenhorn intends to assert a claim for damages against the Debtors, to the extent

any such claim is sought it would have to be resolved by the Bankruptcy Court.  As a result, lifting

the automatic stay would only provide piecemeal relief, if any.  *See In re Worldcom*, case no. 05-

cv-5704, 2006 WL 2270379 *8 (S.D.N.Y. Aug. 4, 2006) (affirming that the bankruptcy court

properly weighed the first factor against the movant when the claim could not be fully adjudicated

in a state court); *see also In re Schick*, 232 B.R. 589, 601 (Bankr. S.D.N.Y. 1999) (declining to lift

the automatic stay because the state court could not afford complete relief on all claims arising

from the same conduct).

36.     The first *Sonnax* factor, therefore, weighs in favor of denying relief from the

automatic stay.

13

      **(ii)**    ***Lack of Any Connection With or Interference With the Bankruptcy Case (Second *Sonnax* Factor)***

37.      The second *Sonnax* factor, lack of any connection with or interference with the bankruptcy case, militates against providing Greenhorn with relief from the automatic stay. The treatment of the Debtors' unexpired nonresidential real property leases, including the Lease, is one of the most fundamental aspects of a chapter 11 case, particularly for a large retail debtor with hundreds of non-residential real property leases.

38.      The next few weeks are likely to determine the direction in which the chapter 11 cases will proceed.  As the Court is aware, the Debtors received a bid for their go-forward retail footprint and certain related assets from an affiliate of ESL Investments, Inc. ("**ESL**").  On January 9, 2019, at the Court's direction, ESL submitted an earnest money cash deposit in the amount of $120 million in connection with its bid.  An auction has been scheduled for January 14, 2019.  *See* ECF No. 862.  Importantly, the Leased Premises are part of the go-forward store footprint, and are, therefore subject to ESL's bid.  Any decision made by the Debtors before the key sale events have transpired would be foolhardy, if not irresponsible.

39.      Moreover, if the Motion were granted, it is likely that other landlord counterparties would file similar motions, thus disrupting the orderly administration of the chapter 11 cases.  *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (denying a motion for relief from the automatic stay where "granting relief could open the floodgates to a multitude of similar motions causing further interference with the bankruptcy case"); *In re Northwest Airlines Corp.*, No. 05-17930 (ALE), 2006 WL 687163, at *2 (Bankr. S.D.N.Y. 2006) (denying a motion for relief from stay under the *Sonnax* factors where "lifting the automatic stay . . . would open the floodgates for similar motions and cause the Debtors to refocus their energies on litigation before other courts rather than emergence from Chapter 11.").  The

14

automatic stay was intended to precisely prevent the race to the courthouse and the inevitable damage to the Debtors' reorganization efforts.

40.    The second *Sonnax* factor weighs in favor of continuing the automatic stay.

**(iii)    *Whether the Other Proceeding Involves the Debtor as a Fiduciary* (Third *Sonnax* Factor)**

41.    The third *Sonnax* factor addresses whether there is another proceeding that involves Kmart as a fiduciary. "[G]enerally, proceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors." *In re Curtis*, 40 B.R. 795, 799 (Bankr. Utah 1984) (internal citation omitted). There is no other proceeding with respect to the Lease involving Kmart and Greenhorn (or the Predecessor Landlord). Furthermore, none of the alleged defaults asserted by Greenhorn involve Kmart in a fiduciary capacity. Greenhorn does not contend otherwise. Consequently, the third *Sonnax* factor weighs in favor of continuing the automatic stay.

**(iv)    *No Specialized Tribunal Has Been Established to Address Greenhorn's Allegations* (Fourth *Sonnax* Factor)**

42.    The fourth *Sonnax* factor weighs in favor of denial of the Motion. Greenhorn has not asserted that a specialized tribunal is necessary to address its claims against the Debtors. Moreover, the alleged defaults under the Lease asserted by Greenhorn are governed by state law and Courts in this District have recognized on numerous occasions that they can interpret and apply state law in resolving claims. See, e.g., *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009) ("[t]his Court has significant experience in applying state law …."); *In re WorldCom, Inc.*, No. 05 Civ. 5704, 2006 U.S. Dist. LEXIS 55284, at *31-32 (S.D.N.Y. Aug. 4, 2006) (affirming bankruptcy court's holding that California state court was a court of general jurisdiction, not a "specialized tribunal" within the meaning of the fourth *Sonnax* factor and noting that "[b]ankruptcy courts are often called upon to apply state laws in resolving

15

claims against the estate"). This Court is the proper forum and well equipped to address any of the purported claims Greenhorn seeks to assert under the Lease.

43.     Given the jurisdiction of this Court and the fact that no specialized tribunal will hear Greenhorn's lease-related claims, the fourth *Sonnax* factor also weighs in favor of denying relief from the automatic stay.

(v)     *No Insurer Has Assumed Responsibility for Any of the Actions* (**Fifth** ***Sonnax*** **Factor**)

44.     No insurer has assumed responsibility for the claims asserted by Greenhorn, and the Debtors would, therefore, need to pay all expenses in defending itself in an action commenced by Greenhorn. As a result, the fifth *Sonnax* factor does not support granting relief from the automatic stay.

(vi)    *Whether The Action Primarily Involves Third Parties* (**Sixth** *Sonnax* **Factor**)

45.     The sixth *Sonnax* factor addresses circumstances in which the debtor/defendant is a party to another action and it functions only as a bailee or conduit for the proceeds in question. Greenhorn does not assert that any other party is involved in the alleged defaults. Kmart is the only party involved in the disputes asserted by Greenhorn and, as stated above, there is no other action commenced against Kmart or any other Debtor in connection with the Lease. *See In Residential Capital, LLC*, 2012 WL 3556912, at *3 (Bankr. S.D.N.Y. 2012) ("The court should not grant relief from the stay under the sixth *Sonnax* Factor if the debtor is the main party to the litigation.") (internal citations omitted); *City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l)*, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the [automatic] stay was proper.").

16

46. Accordingly, the sixth *Sonnax* factor weighs in favor of the Debtors and the denial of the relief requested in the Motion.

**(vii)** ***Whether litigation in another forum would prejudice the interests of other creditors* (Seventh *Sonnax* Factor)**

47. Requiring the Debtors to address Greenhorn's allegations in another forum would upset the "strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court." *In re Cuyahoga Equip. Corp*., 980 F.2d 110, 117 (2d Cir. 1992). The disruption, delay, and expense attendant to litigating against Greenhorn's manufactured claims would effectively be borne by all of Kmart's other creditors.

48. The seventh *Sonnax* factor, therefore, leads to the conclusion that relief from the stay should be denied.

**(viii)** ***Whether the Judgment Claim Arising From the Other Action is Subject to Equitable Subordination* (Eighth *Sonnax* Factor)**

49. The eighth *Sonnax* factor is inapplicable.

**(ix)** ***Whether the Movant's Success in the Other Proceeding Would Result in a Judicial Lien Avoidable by the Debtor* (Ninth *Sonnax* Factor)**

50. The ninth *Sonnax* factor is inapplicable.

**(x)** ***The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation* (Tenth *Sonnax* Factor)**

51. Due to the nature of the breaches and defaults that Greenhorn alleges continue to occur under the Lease, including the fact that two of the alleged defaults occurred nearly thirty years ago, it is unlikely that lifting the automatic stay will result in expeditious or economical resolution of Greenhorn's allegations. Further, any resolution of Greenhorn's allegations will be more expeditious in this Court. As noted above, this Court is better suited to

17

rule on the issues raised by Greenhorn in the Motion and appropriately take into consideration the impact of the allegations on Kmart's estate.

52.     The tenth *Sonnax* factor, therefore, militates in favor of denying relief from the automatic stay.

### (xi)    *Whether the Parties Are Ready for Trial in the Other Proceeding (Eleventh Sonnax Factor)*

53.     The claims asserted by Greenhorn are not ready for trial.   Indeed, as previously noted, neither Greenhorn nor the Predecessor Landlord commenced any prepetition action against Kmart for the alleged defaults under the Lease.   Greenhorn's claims have only recently been asserted against the Debtors.   Accordingly, the eleventh *Sonnax* factor weighs in favor of denying relief from the automatic stay.

### (xii)   *Impact of the Stay on the Balance of Harms (Twelfth Sonnax Factor)*

54.     The balance of the harms weighs decisively against granting relief from the automatic stay.   The Debtors and their advisors are engaged in a comprehensive expedited sale process.   In addition to consuming substantial time of the Debtors' management in evaluating their real estate portfolio, as indicated above, the more fundamental problem with the relief Greenhorn seeks is that the Debtors simply cannot make a reasonable business judgment about how to treat the Lease at this time.   It is not feasible, particularly in the middle of a Court approved sale process, for the Debtors to review all of their unexpired non-residential real property leases and to make a measured, deliberate, and informed decision as to whether they should assume or reject a particular lease.   The practical realities of these chapter 11 cases provide sufficient reason for denying the Motion.   Moreover, section 365(d)(4) of the Bankruptcy Code does not even provide a legal basis upon which Greenhorn can rely.

WEIL:\96841461\5\73217.0004

55.    Greenhorn's alleged harms in having the automatic stay remain in place, namely that it cannot take actions in furtherance of its fabricated defaults, are unpersuasive. Further, paragraph 27 of the Lease clearly provides that Kmart must "indemnify and save Landlord harmless against all penalties, claims or demand of whatsoever nature arising from tenants use of the" Leased Premises. *Lease*, ¶ 27. Consequently, Greenhorn does have a remedy. Lastly, Greenhorn conducted due diligence in connection with its purchase of the Leased Premises and, presumably, was aware of the alleged defects but still proceeded to close on the transaction. Greenhorn should not be allowed to now claim it is prejudiced by the very defaults it was aware of at the time of purchase.

56.    The twelfth *Sonnax* factor weighs against granting relief from the automatic stay.

## Conclusion

57.    For the foregoing reasons, Greenhorn has failed to satisfy its burden to establish cause for the Court to enter an order compelling the Debtors to assume or reject the

Lease or lifting the automatic stay.

WHEREFORE the Debtors respectfully request that the Court deny the Motion.

Dated:  January 11, 2019
        New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors
and Debtors in Possession*

**Exhibit 1**

Estoppel Certificate

## ESTOPPEL CERTIFICATE

November 5, 2018

To:    Greenhorn Ventures, LLC ("**Purchaser**")
3303 E. Linden Street
Caldwell, ID 83605
Attn: Travis Stroud and Mark R. Schmitt, Managers


Gershman Properties, LLC ("**Landlord**")
12300 Wilshire Blvd, Suite 310
Los Angeles, CA 90025


Re:    Kmart #7006
2258 Addison Avenue East
Twin Falls, ID 83301


The undersigned, **KMART CORPORATION**, ("**Tenant**"), under that certain Amended and Restated Lease dated September 1, 1989 as memorialized by Amended and Restated Memorandum of Lease dated January 1, 1990 and extended by Lease Extension Letter dated June 17, 2014 (collectively, the "**Lease**"), by and between Landlord and Tenant, for the lease by Tenant of the premises commonly known as Kmart Unit #7006 (the "**Premises**"), located in the City of Twin Falls, State of Idaho and as more particularly described in the Lease, hereby certifies that as of the date hereof:

Subject to the provisions herein, Tenant hereby certifies that:

1. Tenant has not received nor given any notice of default pursuant to the terms of the Lease which has not been cured other than for defaults arising solely as a result of Tenant's filing of voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

2. The current term of the Lease expires on December 31, 2019, but may be extended or terminated as specified in the Lease.

3. All payments under the Lease have been made through November 2018. The current fixed minimum monthly rental amount is $12,083.33.

4. The Lease is in full force and effect, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and by general principles of equity, and has not been amended, except as noted above.

5. Tenant: (i) has not made a thorough inspection of the Premises or audit of the bills or other documents issued by Landlord under, pursuant to, or in connection with the Lease; (ii) expressly reserves the right to conduct such an inspection or audit at a later date; (iii) makes no representation as to Landlord's obligations under the Lease except as specifically stated

herein; and (iv) expressly reserves: (a) any and all claims Tenant has or may have against Landlord and/or its representatives, agents, successors, and assigns under, pursuant to, or in connection with the Lease, including, without limitation, claims relating to overcharges or other incorrect billings by Landlord and Landlord's failure to perform its obligations under the Lease, (b) any and all compliance issues relating to the Americans with Disabilities Act and/or state and local accessibility laws, including but not limited to, accessibility issues which may require a survey of the property, including exterior barriers to wheelchair and scooter accessibility that may be Landlord's responsibility under the Lease, and (c) all rights and remedies available to Tenant under the Lease or as otherwise provided at law or in equity.

6.  If any conflict between the terms of this document and the Lease should arise, the terms of the Lease shall prevail.

7.  This Estoppel Certificate is given solely for the information of the party or parties to whom addressed, and it may not be relied upon by any other person or entity. This Estoppel Certificate shall not create any liability in, or provide any right of action against Tenant, its officers, directors, agents, employees and representatives, but shall only act to estop Tenant from making any claims or statements against the party or parties to whom this Estoppel Certificate is addressed which are contrary to those made herein.

8.  For the avoidance of doubt, Tenant providing this Estoppel Certificate will not be deemed an assumption of the Lease pursuant to section 365 of Title 11 of the Bankruptcy Code and Tenant shall retain its rights to assume or reject the Lease pursuant to section 365 of the Bankruptcy Code and any orders entered by the United States Bankruptcy Court for the Southern District of New York and Tenant's rights to assume or reject the Lease shall not be prejudiced or adversely affected by Tenant providing this Estoppel Certificate or otherwise satisfying any information request.

KMART CORPORATION
a Michigan corporation

By: _JoAnn Catanese_
JoAnn Catanese
Divisional Vice President, Real Estate

**Exhibit 2**

Notification for Underground Storage Tanks

# Notification for Underground Storage Tanks

FORM APPROVED
OMB NO. 2050-0049
APPROVAL EXPIRES 5-30-88

| FOR TANKS IN **ID** | **RETURN COMPLETED FORM TO** | UST Coordinator, Water Quality Bureau<br>Idaho Dept. of Health & Welfare<br>Division of Environment<br>450 W. State Street<br>Boise, ID 83720      (208) 334-4251 | **STATE USE ONLY**<br>I.D. Number  ID920019<br>Date Received  4/8/ |
|---|---|---|---|

## GENERAL INFORMATION

Notification is required by Federal law for all underground tanks that have been used to store regulated substances since January 1, 1974, that are in the ground as of May 8, 1986, or that are brought into use after May 8, 1986. The information requested is required by Section 9002 of the Resource Conservation and Recovery Act, (RCRA), as amended.

The primary purpose of this notification program is to locate and evaluate underground tanks that store or have stored petroleum or hazardous substances. It is expected that the information you provide will be based on reasonably available records, or, in the absence of such records, your knowledge, belief, or recollection.

**Who Must Notify?** Section 9002 of RCRA, as amended, requires that, unless exempted, owners of underground tanks that store regulated substances must notify designated State or local agencies of the existence of their tanks. Owner means—
(a) in the case of an underground storage tank in use on November 8, 1984, or brought into use after that date, any person who owns an underground storage tank used for the storage, use, or dispensing of regulated substances, and
(b) in the case of any underground storage tank in use before November 8, 1984, but no longer in use on that date, any person who owned such tank immediately before the discontinuation of its use.

**What Tanks Are Included?** Underground storage tank is defined as any one or combination of tanks that (1) is used to contain an accumulation of "regulated substances," and (2) whose volume (including connected underground piping) is 10% or more beneath the ground. Some examples are underground tanks storing: **1.** gasoline, used oil, or diesel fuel, and **2.** industrial solvents, pesticides, herbicides or fumigants.

**What Tanks Are Excluded?** Tanks removed from the ground are not subject to notification. Other tanks excluded from notification are:
**1.** farm or residential tanks of 1,100 gallons or less capacity used for storing motor fuel for noncommercial purposes;
**2.** tanks used for storing heating oil for consumptive use on the premises where stored;
**3.** septic tanks;

**4.** pipeline facilities (including gathering lines) regulated under the Natural Gas Pipeline Safety Act of 1968, or the Hazardous Liquid Pipeline Safety Act of 1979, or which is an intrastate pipeline facility regulated under State laws;
**5.** surface impoundments, pits, ponds, or lagoons;
**6.** storm water or waste water collection systems;
**7.** flow-through process tanks;
**8.** liquid traps or associated gathering lines directly related to oil or gas production and gathering operations;
**9.** storage tanks situated in an underground area (such as a basement, cellar, mineworking, drift, shaft, or tunnel) if the storage tank is situated upon or above the surface of the floor.

**What Substances Are Covered?** The notification requirements apply to underground storage tanks that contain regulated substances. This includes any substance defined as hazardous in section 101 (14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), with the exception of those substances regulated as hazardous waste under Subtitle C of RCRA. It also includes petroleum, e.g., crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch absolute).

**Where To Notify?** Completed notification forms should be sent to the address given at the top of this page.

**When To Notify?** **1.** Owners of underground storage tanks in use or that have been taken out of operation after January 1, 1974, but still in the ground, must notify by May 8, 1986. **2.** Owners who bring underground storage tanks into use after May 8, 1986, must notify within 30 days of bringing the tanks into use.

**Penalties:** Any owner who knowingly fails to notify or submits false information shall be subject to a civil penalty not to exceed $10,000 for each tank for which notification is not given or for which false information is submitted.

## INSTRUCTIONS

Please type or print in ink all items except "signature" in Section V. **This form must be completed for each location containing underground storage tanks.** If more than 5 tanks are owned at this location, photocopy the reverse side, and staple continuation sheets to this form.

Indicate number of continuation sheets attached: 0

### I. OWNERSHIP OF TANK(S)

Owner Name (Corporation, Individual, Public Agency, or Other Entity)
**Kmart Corporation**

Street Address
**3100 W. Big Beaver**

County
**Oakland**

| City | State | ZIP Code |
|---|---|---|
| Troy | MI | 48084 |

| Area Code | Phone Number |
|---|---|
| 313 | 643-1790 |

Type of Owner *(Mark all that apply* ☒ *)*

| | | |
|---|---|---|
| ☒ Current | ☐ State or Local Gov't | ☒ Private or Corporate |
| ☐ Former | ☐ Federal Gov't (GSA facility I.D. no. _____ ) | ☐ Ownership uncertain |

### II. LOCATION OF TANK(S)

(If same as Section 1, mark box here ☐ )

Facility Name or Company Site Identifier, as applicable
**Kmart #  7006**

Street Address or State Road, as applicable
**2258 Addison Ave East**

County
**Twin Falls**

| City (nearest) | State | ZIP Code |
|---|---|---|
| Twin Falls | ID | 83301 |

Indicate number of tanks at this location: **1**

Mark box here if tank(s) are located on land within an Indian reservation or on other Indian trust lands ☐

### III. CONTACT PERSON AT TANK LOCATION

| Name (If same as Section I, mark box here ☐ ) | Job Title | Area Code | Phone Number |
|---|---|---|---|
| R.D. Pascual | Manager | 208 | 734-5400 |

### IV. TYPE OF NOTIFICATION

☐ Mark box here only if this is an amended or subsequent notification for this location.

### V. CERTIFICATION (Read and sign after completing Section VI.)

I certify under penalty of law that I have personally examined and am familiar with the information submitted in this and all attached documents, and that based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate, and complete.

| Name and official title of owner or owner's authorized representative | Signature | Date Signed |
|---|---|---|
| J.B. Ronan Assistant Controller | J.B. Ronan | APR 0 1 1986 |

**CONTINUE ON REVERSE SIDE**

Owner Name (from Section I) Kmart Corporation   Location (from Section II) Kmart #  7006   Page No. 1 of 1 Pages

## VI  DESCRIPTION OF UNDERGROUND STORAGE TANKS *(Complete for each tank at this location.)*

| Tank Identification No. (e.g., ABC-123), or Arbitrarily Assigned Sequential Number (e.g., 1,2,3...) | Tank No. None | Tank No. | Tank No. | Tank No. | Tank No. |
|---|---|---|---|---|---|
| **1. Status of Tank** *(Mark all that apply ☒)* — Currently in Use | XXX | ☐ | ☐ | ☐ | ☐ |
| Temporarily Out of Use | ☐ | ☐ | ☐ | ☐ | ☐ |
| Permanently Out of Use | ☐ | ☐ | ☐ | ☐ | ☐ |
| Brought into Use after 5/8/86 | ☐ | ☐ | ☐ | ☐ | ☐ |
| **2. Estimated Age (Years)** | 1973 / 13 | | | | |
| **3. Estimated Total Capacity (Gallons)** | 1000 | | | | |
| **4. Material of Construction** *(Mark one ☒)* — Steel | XXX | ☐ | ☐ | ☐ | ☐ |
| Concrete | ☐ | ☐ | ☐ | ☐ | ☐ |
| Fiberglass Reinforced Plastic | ☐ | ☐ | ☐ | ☐ | ☐ |
| Unknown | ☐ | ☐ | ☐ | ☐ | ☐ |
| Other, Please Specify | ___ | ___ | ___ | ___ | ___ |
| **5. Internal Protection** *(Mark all that apply ☒)* — Cathodic Protection | ☐ | ☐ | ☐ | ☐ | ☐ |
| Interior Lining (e.g., epoxy resins) | ☐ | ☐ | ☐ | ☐ | ☐ |
| None | XXX | ☐ | ☐ | ☐ | ☐ |
| Unknown | ☐ | ☐ | ☐ | ☐ | ☐ |
| Other, Please Specify | ___ | ___ | ___ | ___ | ___ |
| **6. External Protection** *(Mark all that apply ☒)* — Cathodic Protection | ☐ | ☐ | ☐ | ☐ | ☐ |
| Painted (e.g., asphaltic) | XXX | ☐ | ☐ | ☐ | ☐ |
| Fiberglass Reinforced Plastic Coated | ☐ | ☐ | ☐ | ☐ | ☐ |
| None | ☐ | ☐ | ☐ | ☐ | ☐ |
| Unknown | ☐ | ☐ | ☐ | ☐ | ☐ |
| Other, Please Specify | ___ | ___ | ___ | ___ | ___ |
| **7. Piping** *(Mark all that apply ☒)* — Bare Steel | ☐ | ☐ | ☐ | ☐ | ☐ |
| Galvanized Steel | XXX | ☐ | ☐ | ☐ | ☐ |
| Fiberglass Reinforced Plastic | ☐ | ☐ | ☐ | ☐ | ☐ |
| Cathodically Protected | ☐ | ☐ | ☐ | ☐ | ☐ |
| Unknown | ☐ | ☐ | ☐ | ☐ | ☐ |
| Other, Please Specify | ___ | ___ | ___ | ___ | ___ |
| **8. Substance Currently or Last Stored in Greatest Quantity by Volume** *(Mark all that apply ☒)* — **a. Empty** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **b. Petroleum** Diesel | ☐ | ☐ | ☐ | ☐ | ☐ |
| Kerosene | ☐ | ☐ | ☐ | ☐ | ☐ |
| Gasoline (including alcohol blends) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Used Oil | XXX | ☐ | ☐ | ☐ | ☐ |
| Other, Please Specify | | | | | |
| **c. Hazardous Substance** | ☐ | ☐ | ☐ | ☐ | ☐ |
| Please Indicate Name of Principal CERCLA Substance OR Chemical Abstract Service (CAS) No. | ___ | ___ | ___ | ___ | ___ |
| Mark box ☒ if tank stores a mixture of substances | ☐ | ☐ | ☐ | ☐ | ☐ |
| **d. Unknown** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **9. Additional Information (for tanks permanently taken out of service)** **a.** Estimated date last used (mo/yr) | / | / | / | / | / |
| **b.** Estimated quantity of substance remaining (gal.) | | | | | |
| **c.** Mark box ☒ if tank was filled with inert material (e.g., sand, concrete) | ☐ | ☐ | ☐ | ☐ | ☐ |

OMB NO. 2050-0068, Approval Expires 9/30/91
EPA form 7530-1 (Revised 9/89)

| Notification for Underground Storage Tanks | STATE USE ONLY |
|---|---|

State Agency Name and Address
Idaho Division of Environmental Quality, Water Quality Bureau, 1410 N. Hilton, Boise, ID 83706

FACILITY ID   4 - 420119

**TYPE OF NOTIFICATION**

DATE RECEIVED

☐ NEW FACILITY      ☐ AMENDED      ☒ CLOSURE

Date Entered Into Computer
Data Entry Clerk Initials

☐ No. of tanks at facility      ___ No. of continuation sheets attached

Owner Was Contacted to
Clarify Responses. Comments

INSTRUCTIONS - See additional Instructions on page 6

Please <u>type or print in ink</u> all items except "signature" in section VII and XI. This form must be completed for each location containing underground storage tanks. If more than five (5) tanks are owned at this location, photocopy the following sheets, and staple continuation sheets to the form.

## GENERAL INFORMATION

Notification is required by Federal law for all underground tanks that have been used to store regulated substances since January 1, 1974, that are in the ground as of May 8, 1986, or that are brought into use after May 8, 1986. The information requested is required by Section 9002 of the Resource Conservation and Recovery Act, (RCRA), as amended.

The primary purpose of this notification program is to locate and evaluate underground tanks that store or have stored petroleum or hazardous substances. It is expected that the information you provide will be based on reasonably available records, or in the absence of such records, your knowledge, belief, or recollection.

Who Must Notify? Section 9002 of RCRA, as amended, requires that, unless exempted, owners of underground tanks that store regulated substances must notify designated State or local agencies of the existence of their tanks. Owner means—

a) in the case of an underground storage tank in use on November 8, 1984, or brought into use after that date, any person who owns an underground storage tank used for the storage, use, or dispensing of regulated substances, and

b) in the case of any underground storage tank in use before November 8, 1984. but no longer is use on that date, any person who owned such tank immediately before the discontinuation of its use.

c) If the State agency so requires, any facility that has undergone any changes to facility information or tank system status (only amended tank information needs to be included).

What Tanks Are Included? Underground storage tank is defined as any one or combination of tanks that (1) is used to contain an accumulation of "regulated substances," and (2) whose volume (including connected underground piping) is 10% or more beneath the ground. Some examples are underground tanks storing: 1. Gasoline, used oil, or diesel fuel, and 2. industrial solvents, pesticides, herbicides or fumigants.

What Tanks Are Excluded? Tanks with a capacity of 110 gallons or less are not subject to notification. Other tanks excluded from notification are:

1. farm or residential tanks of 1,100 gallons or less capacity used for storing motor fuel for noncommercial purposes;
2. tanks used for storing heating oil for consumptive use on the premises where stored;

3. septic tanks;

4. pipeline facilities (including gathering lines) regulated under the Natural Gas Pipeline Safety Act of 1968, or the Hazardous Liquid Pipeline Safety Act of 1979, or which is an intrastate pipeline facility regulated under State laws;

5. surface impoundments, pits, ponds, or lagoons;

6. storm water or waste water collection systems;

7. flow-through process tanks;

8. liquid traps or associated gathering lines directly related to oil or gas production and gathering operations;

9. storage tanks situated in an underground area (such as a basement, cellar, mineworking, drift, shaft, or tunnel) if the storage tank is situated upon or above the surface of the floor.

What Substances Are Covered? The notification requirements apply to under ground storage tanks that contain regulated substances. This includes any substance defined as hazardous in section 101 (14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), with the exception of those substances regulated as hazardous waste under Subtitle C of RCRA. It also includes petroleum, e.g., crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch absolute).

Where To Notify? Send completed forms to:

UST Coordinator
Idaho Division of Environmental Quality
Water Quality Bureau
1410 N. Hilton
Boise, ID 83706          Tel. #: 208-334-5860

When To Notify? 1. Owners of underground storage tanks in use or that have been taken out of operation after January 1, 1974, but still in the ground, must notify by May 8, 1986. 2. Owners who bring underground storage tanks into use after May 8, 1986, must notify within 30 days of bringing the tanks into use. 3. If the State requires notification of any amendments to the facility send information to State agency immediately.

Penalties: Any owner who knowingly fails to notify or submits false information shall be subject to a civil penalty not to exceed $10,000 for each tank for which notification is not given or for which false information is submitted.

| I. OWNERSHIP OF TANK(S) | II. LOCATION OF TANK(S) |
|---|---|

Owner ID  38 - 0729500

Give the geographic location of tanks by degrees, minutes, and seconds. Examples Lat. 42, 36, 12 N Long. 85, 24, 17W or legal description.

(If same as Section I, mark box here ☐)

State Tax Number or Social Security Number

Name  KMART CORPORATION

Name  KMART  # 7006

Mailing Address  3600 W. BIG BEAVER

Street Address (P.O. Box not acceptable)  2258 ADDISON AVE EAST

City  TROY     State  MI     ZIP Code  4808

City  TWIN FALLS     State  ID     ZIP Code  83301

County  OAKLAND

County  TWIN FALLS     Latitude     Longitude

Phone Number (Include Area Code)  (313) 643-1790

Legal Description

Page 1

| III. TYPE OF OWNER | IV. INDIAN LANDS |
|---|---|

**III. TYPE OF OWNER**

☐ Federal Government    ☒ Commercial
☐ State Government    ☐ Private
☐ Local Government

**IV. INDIAN LANDS**

Tanks are located on land within an Indian Reservation or on other trust lands.  ☐

Tanks are owned by native American nation, tribe, or individual.  ☐

Tribe or Nation:
_____

## V. TYPE OF FACILITY

Select the Appropriate Facility Description

| | | |
|---|---|---|
| ____ Gas Station | ____ Local Government | ____ Contractor |
| ____ Petroleum Distributor | ____ State Government | ____ Trucking/Transport |
| ____ Air Taxi (Airline) | ____ Federal - Non-Military | ____ Utilities |
| ____ Aircraft Owner | ____ Federal - Military | ____ Farm |
| ____ Auto Dealership | ____ Commercial | ____ Residential  _AUTOMOTIVE_ |
| ____ Railroad | ____ Industrial | _X_ Other (Explain) _REPAIR SHOP_ |

## VI. CONTACT PERSON IN CHARGE OF TANKS

Name _MR. DAILY_    Title _KMART # 7006-REG'L CONST MGR_
Address _% 3258 ADDISON AVE EAST_    City _TWIN FALLS_
State _IDAHO_    Zip _83301_
Phone _(303) 794-0209_

## VII. CERTIFICATION (Read and sign after completing all sections)

I certify under penalty of law that I have personally examined and am familiar with the information submitted in this and all attached documents, and that based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate, and complete.

| Name and official title of owner or owner's authorized representative (Print) | Signature | Date Signed |
|---|---|---|
| Name _J. B. ROWAN_  Title _ASSISTANT CONTROLLER_ | _[signature]_ | _8/27/91_ |

## VIII. FINANCIAL RESPONSIBILITY

I have met the financial responsibility requirements in accordance with 40 CFR Subpart H   (Circle one.)   (**YES**)   NO

Check All that Apply

☒ Self Insurance
☐ Commercial Insurance
☐ Risk Retention Group
☐ Guarantee

☐ Surety Bond
☐ Letter of Credit
☐ State Funds
☐ Trust Fund

☐ Other Method Allowed Specify _____

EPA estimates public reporting burden for this form to average 30 minutes per response including time for reviewing instructions, gathering and maintaining the data needed and completing and reviewing the form. Send comments regarding this burden estimate to Chief, Information Policy Branch PM-223, U.S. Environmental Protection Agency, 401 M Street, Washington D.C. 20460, marked "Attention Desk Officer for EPA." This form amends the previous notification form as printed in 40 CFR Part 280, Appendix I. Previous editions of this notification form may be used while supplies last.

## IX. DESCRIPTION OF UNDERGROUND STORAGE TANKS (Complete for each tank at this location.)

| Identification Number | Tank No. _1_ | Tank No. ___ | Tank No. ___ | Tank No. ___ | Tank No. ___ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| **A. Status of Tank** | | | | | |
| Currently in Use | | | | | |
| Temporarily Out of Use (Remember to fill out section X.) | | | | | |
| Permanently Out of Use (Remember to fill out section X.) | ✕ | | | | |
| Date of Installation (mo./year) | 01/1973 | | | | |
| Estimated Total Capacity (gallons) | 1,000 | | | | |
| **B. Material of Construction** (Mark all that apply) | | | | | |
| Asphalt Coated or Bare Steel | X | | | | |
| Cathodically Protected Steel | | | | | |
| Epoxy Coated Steel | | | | | |
| Composite (Steel with Fiberglass) | | | | | |
| Fiberglass Reinforced Plastic | | | | | |
| Lined Interior | | | | | |
| Double Walled | | | | | |
| Polyethylene Tank Jacket | | | | | |
| Concrete | | | | | |
| Excavation Liner | | | | | |
| Unknown | | | | | |
| Other, Please specify | | | | | |
| Has tank been repaired? (circle one) | YES (NO) | YES / NO | YES / NO | YES / NO | YES / NO |
| **C. Piping (Material)** (Mark all that apply)   Bare Steel | | | | | |
| Galvanized Steel | X | | | | |
| Fiberglass Reinforced Plastic | | | | | |
| Copper | | | | | |
| Cathodically Protected | | | | | |
| Double Walled | | | | | |
| Excavation Liner | | | | | |
| Unknown | | | | | |
| Other, Please specify | | | | | |
| **D. Piping (Type)** (Mark all that apply) | | | | | |
| Suction: no check valve at tank | | | | | |
| Suction: check valve at tank | | | | | |
| Pressure | | | | | |
| Gravity Feed | ✕ | | | | |
| Has piping been repaired? (circle one) | YES (NO) | YES / NO | YES / NO | YES / NO | YES / NO |

| Tank Identification Number | Tank No. 30  31 Tank No. | | Tank No. ____ | Tank No. ____ | Tank No. ____ |
|---|---|---|---|---|---|
| E. Substance Currently or Last Stored In Greatest Quantity by Volume | | | | | |
| Gasoline | | | | | |
| Diesel | | | | | |
| Gasohol | | | | | |
| Kerosene | | | | | |
| Heating Oil | | | | | |
| Used Oil | X | | | | |
| Other petroleum product | | | | | |
| (Please specify) | | | | | |
| **If not a petroleum product:** | | | | | |
| Hazardous Substance (circle one) | YES / NO | YES / NO | YES / NO | YES / NO | YES / NO |
| CERCLA name and/or, | | | | | |
| CAS number | | | | | |
| **If not listed above:** | | | | | |
| Mixture of Substances (circle one) | YES / NO | YES / NO | YES / NO | YES / NO | YES / NO |
| Please specify | | | | | |

| X. TANKS OUT OF USE, OR CHANGE IN SERVICE | | | | | |
|---|---|---|---|---|---|
| Closing of Tank | | | | | |
| Tank was removed from ground | X | | | | |
| Tank was closed in ground | | | | | |
| Estimated date last used (mo./day/year) | 01/01/89  1989 | | | | |
| Estimate date tank closed (mo./day/year) | 01/01/89  1989 | | | | |
| Tank filled with inert material (indicate material) | | | | | |
| Change in service                - | | | | | |
| Site Assessment Completed (circle one) | YES / NO | YES / NO | YES / NO | YES / NO | YES / NO |
| Evidence of a leak detected (circle one) | YES / NO | YES / NO | YES / NO | YES / NO | YES / NO |

Page 4

**Exhibit 3**

Closure Letter and Laboratory Results

*Reis Plumbing & Heating, Inc.*

ROUTE 1, BOX 12
FILER, IDAHO  83328
PH. 208-734-8778   326-4126

RECEIVED

JUL 1 0 1990

DIVISION OF
ENVIRONMENTAL QUALITY
T. F. FIELD OFFICE

JULY 9, 1990

Patrick O'Rorke
Idaho Department of Health and Welfare
Division of Environmental Quality
P.O.Box 1626
Twin Falls, Idaho 83303-1626

RE: Waste oil tank - K-mart, Twin Falls, ID

Dear Mr. O'Rorke:

Location of Waste Oil Tank: From north west corner of K-mart building 45 feet south and 14 feet west of building is where center of tank was located. The total depth of tank was 9 feet. In removing tank all soil around it was removed and taken to Twin Falls County Landfill and import soil was brought in for fill.

The soil test was taken from center of tank at the bottom of hole.
The tank was removed June 21st and soil sample was taken same day. Sample was taken in a Mason jar with a tin foil cover and lid screwed down. Soil sample was kept on ice or refrigerated until Laboratory received it on June 26th. The soil test showed no contamination.

The Waste oil tank was removed from K-mart property and taken to Reis Plumbing & Heating, Inc. property to be used for fuel storage above ground. The tank appeared to be in good condition.

Sincerely

Bernie Reis

Bernie Reis

IDAHO UNDERGROUND STORAGE TANK
Permanent Closure Form

RECEIVED

Site Owner/Operator: **K-mart**

Site Address: __2258 Addison Avenue East, Twin Falls, ID__

Site County: __Twin Falls__

JUL 10 1990

DIVISION OF
ENVIRONMENTAL QUALITY
T. F. FIELD OFFICE

Telephone: __734-5400__      Facility ID (Notification) Number: __70006__

SITE NO# 42011?

Tank was previously (__XX__)Registered (____)Never Registered

Fire District: __Twin Falls Fire__ Department

Local Closure Permit obtained from: __City of Twin Falls Fire Department__

Tank Closure Performed by: (Company) __Reis Plbg.&Htg__ (Telephone)__734-8778__

Date of Closure: 6/14/90 Method of Closure: Removal (__XX__)In-Place Closure (____)
If closed in-place, type of fill material used:

How will old tanks be disposed of? (____)Scrap (____)Landfill (XX)Other (specify)keep for above
ground storage
of fuel

Disposal Location: 3963N 2300E, Filer, ID

TANKS CLOSED

| TANK ID # | SIZE | AGE | LAST SUBSTANCE STORED |
|-----------|------|-----|----------------------|
| _____ | 1000 gal | _____ | waste oil |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Will tanks be replaced by new underground tanks? Yes (____) No (XX)
(NOTE: If yes, you need to submit a notification form for the new tanks.)

Site assessment was completed and:     (__xx__)No contamination was found
(____)Contamination was found
(NOTE: Regional office of the Idaho Bureau of Water Quality should be contacted for
assistance if contamination is found. Records of closure must also be maintained at the
site and available upon inspector's request for three years after closure.)

Inspecting Agency: __Reis Plbg.& Htg., Inc.__ Inspector's Name: __Bernie Reis__

Owner/Operator Signature: __RBSilies__      Date: __07-05-90__

Return completed form to:
Patrick O'Rorke
Idaho Department of Health and Welfare
Division of Environmental Quality
P. O. Box 1626
Twin Falls, Idaho 83303-1626
Phone: (208) 734-9520

# ALCHEM LABORATORY

104 W. 31st Street
Boise, Idaho   83714
(208)336-1172

REIS PLUMBING & HEATING          DATE COLLECTED:   06/21/90
RT. 1, BOX 12                    DATE RECEIVED:    06/26/90
FILER, IDAHO  83328              DATE REPORTED:    06/27/90
                                 SUBMITTED:

ATTENTION:

SOURCE -: K-MART, TWIN FALLS (SOIL)

### LABORATORY REPORT

Date Analyzed:  06/27/90                    Analyst: KRIS STURTZ
========================================================================

| Lab No. | Sample I.D. | Time Collected | Total Petroleum Hydrocarbons |
|---------|-------------|----------------|------------------------------|
| 5525    | WASTE OIL TANK |             | 20.0 mg/kg                   |

========================================================================
The EPA analytical Method 418.1 for TPHC is applicable to measurement of light fuels, although loss of about half of any gasoline present during the extraction manipulations can be expected.


Suzanne Howell, Laboratory Manager

**Exhibit 4**

IDEQ Underground Storage Database

WEIL:\96841461\5\73217.0004

Protecting Idaho's Health and the Environment

| Return to Storage Tanks  |  Return to DEQ

Department of Environmental Quality
# Underground Storage Tank Database

Search UST and
LUST Database

View UST and
LUST Reports

# Facility Description

**Facility Id \***
4-420119

**Facility Name \***
KMART #7006

**Edited By**
lnelson

**Address Line 1 \***
2258 ADDISON AVE E

**Address Line 2**

**Facility Status**
Closure

**Facility City \***
TWIN FALLS

**Facility Zip \***
83301

**Facility Phone**

**Facility Latitude**
42.561791

**Facility Longitude  Map...**
-114.43922

**Date Certified**
08/27/1991

**Facility Type**
Other

**Owner Type \***

**Within 1000 feet of a drinking water source? \***
Yes

## Contacts ☑ Active Contacts Only

| Contact Name | Contact Type | Trained Date | Start Date | End Date | Delete |
|---|---|---|---|---|---|
| KMART CORP | Owner | | 08/27/1991 | | |
| MR. DAILY | Other | | 08/27/1991 | | |

## Financial Responsibility

| Type | Expiration Date | | Delete |
|---|---|---|---|
| Self-Insured | 08/27/1991 | | |

## Tanks ☑ Display Closed Tanks

| Tank # | Capacity | Status | Substance | Tank Material | Date Installed | Delete |
|---|---|---|---|---|---|---|
| 4-420119*1 | 1000 | Permanently Out of Use | Used Oil | Asphalt Coated or Bare Steel | 01/01/1973 | |

## Pipes ☐ Display Inactive Pipes

## Dispensers ☐ Display Inactive Dispensers

## Inspection List

## LUST Events

Contact DEQ  Idaho.gov

Copyright © 2017 State of Idaho, All rights reserved.