HERRICK, FEINSTEIN, LLP
Two Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500
Sean E. O'Donnell
Stephen B. Selbst
Steven B. Smith

*Proposed Conflicts Counsel to the Official Committee of*
*Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**EX-PARTE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 1103 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND 9016 <u>AUTHORIZING THE EXAMINATION OF THE CDS PARTICIPANTS</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears Holdings Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed special conflicts counsel, respectfully submits this motion (the "Motion") for entry of an order authorizing the examination of Cyrus Capital Partners, L.P. ("Cyrus"), Omega Advisors Inc. ("Omega"), Och-Ziff Capital Structure Arbitrage Master Fund, Ltd. ("Och-Ziff"), Barclays Capital ("Barclays") and the other participants of the Barclays Consortium (the "Consortium") (together with their affiliates, the "CDS Participants"), pursuant to sections 105 and 1103 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 2004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").[2]

## PRELIMINARY STATEMENT[3]

1. By this Motion, the Creditors' Committee seeks to take discovery of the CDS Participants relating to the Debtors' sale to Cyrus of certain Medium Term Notes Series B (the "MTNs") issued by Debtor Sears Roebuck Acceptance Corp. ("SRAC") (collectively, the "MTN Transactions"). On November 20, 2018, following a sales auction (the "Auction"), the Debtors selected Cyrus as the winning bidder for the MTNs. Unbeknownst to the Creditors' Committee, at that time, the Debtors' sale to Cyrus included an agreement by the Debtors to cause non-Debtor affiliate Sears Reinsurance Company Ltd. ("Sears Re") to refrain from selling, transferring or assigning approximately $1.4 billion of the MTNs held by Sears Re (the "Sears Re Lock-Up

---

[2] In accordance with the Chambers' Rules of the Hon. Robert D. Drain, U.S.B.J., this Motion is being submitted via email to chambers.

[3] Capitalized terms used and not otherwise defined in this section shall have the meanings ascribed to such terms elsewhere in the Motion.

2

Agreement"). Several CDS Participants, including Omega, Ox-Ziff and Barclays, objected to the sale of MTNs to Cyrus, arguing, among other things, that the Auction was improper because of the Sears Re Lock-Up Agreement. The objecting CDS Participants claimed that they were led to believe that only $251 million of MTNs held by the Debtors were available for sale at the Auction. *See* Transcript of December 20, 2018 Hearing ("Dec. 20 Hr'g Tr.") 118:2-119:16. At bottom, the objecting CDS Participants argued that if they had known of the intent to lock-up or purchase the remaining MTNs owned by the Debtors or Sears Re, they would have either bid higher for the $251 million of MTNs noticed for sale at the Auction or sought to purchase the other MTNs owned by the Debtors or Sears Re. *Id.* According to these objecting CDS Participants, the Debtors had essentially left millions of dollars on the table, to the detriment of the estate, including a $100 million "consortium bid" articulated by Barclays during the December 20 hearing. *Id.* at 130:7-14.

2. Having heard these arguments, the Court voiced concern about the lack of notice for the Sears Re Lock Up Agreement: "I believe that there is a serious concern here that the sale, as a whole, since the Sears Re part of it is an integral part of it, was not authorized by the Court." *Id.* at 182:8-10. The Court, accordingly, directed the Debtors to provide notice and an opportunity for the parties to object to the Sears Re Lock Up Agreement and submit new competing bids for some or all of the MTNs. *Id.* at 184:12-186:10.

3. In so holding, the Court recognized that it was effectively reopening the Auction, *id.*, and the deadline to object and submit a competing bid was set for December 31, 2018. *Id.* at 189:23-24.

4. Incredibly, during the span of only 11 days, the swell of interest in the MTNs completely dissipated. Despite the repeated representations by numerous CDS Participants of their

desire to rebid for the MTNs, no competing bids were made. In fact, Cyrus was the only CDS Participant to make any submission to the Court, cryptically referring to "derisk[ing]" transactions that took place between the December 20 and December 31. *See Response of Cyrus Capital Partners, L.P. to Debtors' Notice of Hearing For Approval of Sale Of Medium Term Intercompany Notes to Cyrus Capital Partners, L.P.* [ECF No. 1455] ¶ 28.

5. The Creditors' Committee and the Court were left to wonder what happened to the millions of dollars of promised value. Referring to the sudden and unexpected lack of interest in the MTNs, the Court stated during the hearing on January 2, 2019 (the "January 2 Hearing"):

> ***It clearly struck me as odd, as well as the Debtors, that a financial institution*** or it could be represented or be an agent for a consortium of other financial institutions, ***withdrew a bid that they had proudly announced at the last hearing before the deadline to submit such a bid officially***, and that the objectors also including [Omega] would be interested in the MTNs.

*See* Transcript of January 2, 2018 Hearing ("Jan. 2 Hr'g Tr.") 12:12-18 (emphasis added). The Debtors also expressed concern about the timing of Cyrus's "derisk[ing]" transactions: "[I]t is troubling that [the transactions] occurred during a Court-sanctioned auction process . . . ." *Id.* at 7: 6-11.

6. Accordingly, and in keeping with its fiduciary duties, counsel for the Creditors' Committee noted the "robust reservation of rights" under the governing sale order and promised an investigation. *Id.* at 8:23-9:6. This Motion is an integral part of that investigation.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

8. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4

9.  The bases for the relief requested herein are Bankruptcy Code section 105 and 1103 and Bankruptcy Rules 2004 and 9016.

## FACTUAL BACKGROUND

10. On November 9, 2018, the Debtors filed an emergency motion seeking to monetize the MTNs [ECF No. 642] (the "Sale Motion"),[4] in advance of an auction (the "CDS Auction") to be conducted by the International Swaps and Derivatives Association ("ISDA"). The value of the MTNs spiked temporarily because of the demand for qualifying SRAC obligations to tender into the CDS Auction.[5] *See* Sale Motion ¶ 11. The Debtors sought to capitalize on this opportunity and engaged Jefferies LLC to manage and conduct the sale process for the MTNs.

11. The Court held hearings on November 15, 2018 (the "November 15 Hearing") and November 19, 2018 (the "November 19 Hearing") with respect to the Sale Motion. Cyrus, a Credit protection seller, initially sought to block the Debtors' ability to sell the MTNs and filed the sole objection to the Sale Motion. [ECF No. 722]. Cyrus, however, withdrew its objection after it reached a resolution with the Debtors just prior to the November 19 Hearing. At that hearing, the Court granted the relief requested by the Sale Motion and entered an order approving the sale of the MTNs [ECF No. 826] (the "Sale Order"). Importantly, at the insistence of the Creditors' Committee, the Sale Order provides that "nothing contained in this Order shall waive any rights of the Debtors, the Creditors' Committee or any other party or governmental entity to the extent it is determined that a party engaged in inappropriate conduct with respect to the transactions contemplated by this Order." Sale Order ¶ 7.

---

[4] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

[5] As of the time of the filing of the Sale Motion, the CDS Auction was scheduled to occur on November 14, 2018, necessitating the request for emergency relief. The CDS Auction, however, has been postponed several times since the initial date and currently is scheduled for January 17, 2019.

12. On November 20, 2018, Jefferies issued the notice of auction requesting bids by 12:00 p.m. (ET) on the same day. Jefferies received nine bids for the MTNs by the bid deadline, including bids from certain of the CDS Participants. *See Debtors' Objection to Motion of Omega Advisors Inc. Regarding Sale of Medium-Term Intercompany Notes* [ECF No. 1196] (the "Debtors' Objection") ¶ 21. The Debtors, in consultation with the Creditors' Committee, determined that Cyrus's bid, which provided for a payment to the Debtors of $82.5 million and a waiver of a right to payment on $629,450,000 of MTNs, and which, unlike the other bids received, was not conditioned upon an ISDA determination that the MTNs were qualified to participate in the CDS Auction, represented the best alternative available to the Debtors. Debtors' Objection ¶ 26. Accordingly, the Debtors selected Cyrus as the winning bidder and entered into that certain Note Purchase Agreement dated November 20, 2018 [ECF No. 1019] (the "Note Purchase Agreement").

13. Following the auction and the Court's approval of the sale of MTNs to Cyrus, Omega filed the *Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code to Enforce the Court's November 19, 2018 Sale Order and Invalidate the Ultra Vires Sale and Lockup of Medium-Term Intercompany Notes* [ECF No. 1077] (the "Omega Motion"). By the Omega Motion, Omega argued, among other things, that the Note Purchase Agreement improperly, and without Court approval, restricted non-Debtor Sears Re from selling, transferring or assigning approximately $1.4 billion of the MTNs. Omega Motion ¶ 39. Omega requested that the Court invalidate certain portions of the sale of MTNs to Cyrus as outside the scope of the Sale Order and asked that the Court find that Cyrus's conduct during the sale process precluded it from the good faith protections of Bankruptcy Code section 363(m). *Id.* at ¶¶ 35, 42. Omega contended that such

relief would "provide additional value to the Debtors, as Omega and, upon information and belief, other market participants, remain interested bidders [for the MTNs]." *Id.* at ¶ 35.

14. Och-Ziff, echoing Omega's assertions regarding the unfairness of the sale process and the value still available, filed a joinder to the Omega Motion, [ECF No. 1177] ¶ 1, stating: "Were this Court to invalidate the extrajudicial actions of the Debtors, a subsequent sale of the remaining MTNs (which were never authorized to be sold in the first place) would undoubtedly result in more proceeds being collected by the Debtors and their affiliates."

15. The Debtors and the Creditors' Committee opposed the Omega Motion arguing, among other things, that the Debtors ran a fair and transparent sale process and the Debtors properly exercised their business judgment in selecting Cyrus as the purchaser of the MTNs based on the facts known at the time and the bids received. [ECF Nos. 1196, 1214]. The Creditors' Committee also noted that, even though it was not aware of the restriction in the Note Purchase Agreement prohibiting Sears Re from selling the MTNs, it did not believe that such limitation would have changed the outcome of the sale had it been known. *See* Dec. 20 Hr'g Tr. 153:25-154:15.

16. Both Omega and Och-Ziff filed replies in support of the Omega Motion further emphasizing the value available to the Debtors. [ECF Nos. 1292, 1294]. Omega, for example, asserted that, "if the Court were to void the *ultra vires* sale of the Unlisted MTNs and/or the Lockup Agreement on the Sears Re MTNs, the Debtors' estates and Sears Re could realize enormous additional value through further sales over the coming weeks." [ECF No. 1292] ¶ 24.

17. During the December 20 Hearing, Omega and Och-Ziff pressed their argument that additional value could be realized for the Debtors' estates if the Court re-opened the MTN sale process. Indeed, counsel to Omega represented that it had "submitted a written offer to Sears Re

7

to pay 40 cents on the dollar for $150 million of their $1.4 billion of medium term notes. That's $60 million that's still on the table as I stand here before you." Dec. 20 Hr'g. Tr. 100:8-11. In addition, counsel to Och-Ziff read into the record correspondence received from counsel to Barclays, pursuant to which Barclays offered in excess of $100 million for $235 million of MTNs to the extent the Court reopened the auction for the sale of the Debtors' MTNs. *Id.* at 169:20-21.

18. At the conclusion of the December 20 Hearing, the Court found that Omega and Och-Ziff had not provided credible evidence that they would have bid differently at the auction had they been aware of the intended scope of the Cyrus bid.

19. The Court, nevertheless, agreed that the Sale Order did not authorize the Debtors to restrict the sale of the MTNs held by Sears Re. Accordingly, the Court ordered the Debtors to file a notice and provide parties with the opportunity to object to the transaction with Cyrus (including the "lock-up" of the MTNs held by Sears Re) and submit new competing bids for the acquisition of all or a portion of the Debtors' MTNs by December 31, 2018. *Id.* at 183:9-15.

20. Notwithstanding the ardent interest shown in freeing up the sale of additional MTNs, none of Omega, Och-Ziff or any other party that purportedly was included in Barclays's $100 million "consortium bid" filed an objection or confirmed its prior offer to purchase MTNs made on the record less than two weeks prior.

21. In fact, the only response received on December 31, 2018 was from Cyrus, in which it alluded to "derisk[ing]" transactions that had occurred subsequent to the December 20 Hearing. [ECF No. 1455] ¶ 28 (noting that "Cyrus has begun closing out CDS positions with CDS counterparties to derisk itself from its CDS exposure.").[6]

---

[6] In response to this Court's questioning, Cyrus explained that these de-risking transactions "were open market transactions and inbound offers into Cyrus … there were no MTNs that were sold . . . it was purely a settlement of

8

22. When no competing bids materialized, the Creditors' Committee sought further information immediately from the Debtors and the other interested parties. *See* Creditors' Committee's Reservation of Rights ¶ 6. As set forth in more detail in the Creditors' Committee's Reservation of Rights, the Creditors' Committee learned that, following the December 20 Hearing, the CDS Participants, and potentially others, began settling their CDS exposure. The MTN Transactions had the effect of eliminating the demand for the sale of further MTNs and, thereby, forestalling a potential new auction that would have inured to the benefit of the Debtors' estates. Although consideration changed hands among CDS Participants, the Debtors were unable to realize any of that value.

23. At the January 2 Hearing, the Court commented that it was "odd . . . that a financial institution . . . withdrew a bid that they had proudly announced at the last hearing before the deadline to submit such a bid officially." Jan. 2 Hr'g Tr. 12:12-17. And the Debtors noted that the lack of competing bids was "troubling," *id*. at 7:6-11, but explained to the Court that no further objections were filed and requested approval of the MTN sale to Cyrus, including the "lock-up" of the Sears Re MTNs. *Id.* at 7:15-21.

24. Consistent with the Creditors' Committee's Reservation of Rights and this Motion, the Creditors' Committee explained to the Court that it would be investigating the MTN Transactions to determine whether any improper conduct occurred that halted further bidding. In approving the sale to Cyrus, the Court reiterated that the good faith finding in the Sale Order was based on the record before it and remained subject to the reservation therein. *Id.* at 12:19-21.

* * * *

---

CDS obligations and rights between parties in the market through corporate intermediaries." Jan. 2, 2019 Hr'g Tr. 10:5-10.

9

25. In sum, the MTN Transactions, and various other related transactions, may have prevented the Debtors from realizing additional value from the MTNs despite the repeated assurances from the CDS Participants of their intent to buy such MTNs. The Sale Order specifically preserves the rights of parties, including the Creditors' Committee, to investigate whether any party engaged in inappropriate conduct with respect to the transactions contemplated thereby—a reservation that the Court specifically reiterated at the January 2 Hearing. *Id.* at 12:19-21. Accordingly, for the reasons sets forth herein, in the Creditors' Committee's Reservation of Rights, and as expressed during the January 2 hearing, the Creditors' Committee believes that the MTN Transactions (and potentially other related transactions) warrant a full investigation to ensure that there was no improper conduct in connection therewith. The Creditors' Committee has made clear of its intent to do so to the Court and all parties in interest. *See, e.g.*, Jan. 2 Hr'g Tr. 8:17-22 (counsel for the Creditors' Committee stating that it "will investigate the facts of what transpired and figure out if there was something improper in light of issues regarding collusion and bids and the like, whether parties were inclined not to bid for some reasons other than something as appropriate.").

## RELIEF REQUESTED

26. The Creditors' Committee respectfully requests that the Court enter an order pursuant to Bankruptcy Rule 2004, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, authorizing the Creditors' Committee to (i) serve documents requests and subpoenas (the "Requests") on and (ii) take depositions of representatives of the CDS Participants and other entities involved in or having knowledge of the MTN Transactions and other related transactions.[7]

---

[7] While the Creditors' Committee believes that the CDS Participants are likely to have the relevant information required to complete its investigation, the Creditors' Committee reserves all rights to serve additional requests in the

**BASIS FOR RELIEF**

27. Bankruptcy Rule 2004(a) provides, in relevant part, that "[o]n motion of any party in interest, the court may order examination of any entity." Pursuant to Bankruptcy Rule 2004(b), a party in interest, such as the Creditors' Committee, may request discovery related to "acts, conduct, or property, or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b).

28. The purpose of Bankruptcy Rule 2004 is to "assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004). Rule 2004 permits discovery "to determine the extent of the estate's assets and recover those assets for the benefit of creditors." *In re Madison Williams & Co., LLC*, No. 11-15896, 2014 WL 56070, at *3 (Bankr. S.D.N.Y. Jan. 7, 2014); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re: Bernard L. Madoff)*, No. 09-11893 (SMB), 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) ("The underlying purpose of Rule 2004 is to 'allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate.'" (quoting *Keene Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 42 B.R. 362, 364 (S.D.N.Y. 1984))).

29. The scope of discovery allowed under Bankruptcy Rule 2004 is "'very broad and great latitude of inquiry is ordinarily permitted.'" *In re Madison Williams*, 2014 WL 56070, at *3 (quoting *In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985)). Courts repeatedly have

---

course of its investigation and to propound discovery to other parties in interest in connection with the MTN Transactions.

11

recognized that discovery provided for under Rule 2004 encompasses "broader discovery than is available under the Federal Rules of Civil Procedure." *In re: Bernard L. Madoff*, 2014 WL 5486279, at *2 (citing *In re Recoton Corp.*, 307 B.R. at 755); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[T]he scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a "'fishing expedition.'"); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (noting the same).

30.     Emphasizing Bankruptcy Rule 2004's broad purpose, courts routinely allow examination of third parties who have had dealings with the debtor. *In re Ecam Publ'ns, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991); *see also In re Recoton Corp.*, 307 B.R. at 755 ("Any third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation"); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("[T]he Court may authorize the examination of third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate.").

31.     Furthermore, pursuant to Bankruptcy Code section 1103, the Creditors' Committee is charged with the duty "to investigate the acts, conduct, assets, liabilities and financial condition of the Debtors." *In re Recoton Corp.*, 307 B.R. at 755. The Creditors' Committee requires the discovery requested in this Motion, which "may affect the administration of the debtor[s'] estate[s]," in order to investigate the potential Claims. Fed. R. Bankr. P. 2004(b).

32.     With the requested discovery, the Creditors' Committee can investigate whether the Debtors' estates may hold valuable rights, claims and remedies in connection with the MTN Transactions. The information sought through this Motion relates directly to the "acts, conduct, or property or to the liabilities and financial condition" of the Debtors and bears directly on the

12

potential estate claims. *See* Fed. R. Bankr. P. 2004(b). In addition, examination of the CDS Participants falls squarely within the broad scope of Bankruptcy Rule 2004, as such parties have competed as bidders for the Debtors' assets, actively participated in these Chapter 11 Cases and have appeared before this Court in their capacities as creditors. *See In re Recoton Corp.*, 307 B.R. at 755 (noting that "[a]ny third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation."). Thus, the discovery requested in this Motion is "*prima facie* consistent with [Bankruptcy Rule 2004's] . . . purposes of allowing the Committee to obtain information necessary to determine whether claims beneficial to the estates exist and whether to pursue such claims." *Id.* at 756.

33.     For the reasons set forth herein, an investigation into the MTN Transactions is necessary and appropriate here. The requested discovery will provide the Creditors' Committee with the information relevant to evaluate the potential claims that the estates could pursue to benefit their creditors. Accordingly, good cause exists to grant this Motion. *See In re Metiom, Inc.*, 318 B.R. 263, 268-270 (S.D.N.Y. 2004) (internal citations and quotations omitted) (affirming bankruptcy court's order granting Bankruptcy Rule 2004 examination).

## RESERVATION OF RIGHTS

34.     The Creditors' Committee reserves all of its rights, claims, defenses and remedies, including, without limitation, the right to amend, modify, or supplement this Motion, to seek additional discovery, add additional parties or to raise additional grounds for granting this Motion during any hearing on the Motion.

## NOTICE

35. Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405]. The Creditors' Committee respectfully submits that no further notice is required.

## NO PRIOR REQUEST

36. No prior request for the relief sought in this Motion has been made.

**WHEREFORE**, the Creditors' Committee respectfully requests that the Court enter an order, substantially in the form of **Exhibit A**, granting the relief requested herein and such other and further relief as it deems just, proper and equitable.

| | |
|---|---|
| New York, New York<br>January 12, 2019 | HERRICK, FEINSTEIN LLP<br><br>By: */s/ Sean E. O'Donnell*<br>Sean E. O'Donnell<br>Stephen B. Selbst<br>Steven B. Smith<br>Two Park Avenue<br>New York, New York 10016<br>Telephone: (212) 592-1400<br>Facsimile: (212) 592-1500<br>E-mail: sodonnell@herrick.com<br>          sselbst@herrick.com<br>          ssmith@herrick.com<br><br>*Proposed Special Conflicts Counsel to the Official Committee of Unsecured Creditors of Sears Holding Corporation, et al.* |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| 103071 | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | Case No. 18-23538 (RDD) |
| | : | |
| Debtors.[8] | : | (Jointly Administered) |
| | : | |

---

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 1103 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND 9016 AUTHORIZING THE EXAMINATION OF CDS PARTICIPANTS

Upon the motion (the "Motion")[9] of the Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears Holdings Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), for entry of an order pursuant to Bankruptcy Code sections 105 and 1103 and Bankruptcy Rules 2004 and 9016, authorizing the examination of the CDS Participants in connection with the MTN Transactions and other potential transactions (the "Rule 2004 Topics"); and it appearing that this Court has

---

[8] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[9] Capitalized but undefined terms used herein shall have the meaning ascribed to them in the Motion.

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and, after due deliberation, the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that, except as otherwise ordered herein, no other further notice is necessary; and good and sufficient cause appearing therefor, it is hereby ORDERED that:

1. The Motion is granted as set forth herein.

2. The Creditors' Committee is authorized, pursuant to Bankruptcy Rule 2004, to conduct an oral examination of the CDS Participants and other third parties regarding the Rule 2004 Topics.

3. The Creditors' Committee is authorized, pursuant to Bankruptcy Rule 9016, to issue subpoenas for the production of documents relevant to the Rule 2004 Topics and attendance for the foregoing examinations (each, a "<u>Rule 2004 Subpoena</u>").

4. The CDS Participants are directed to produce documents, communications and other materials responsive to the requests regarding the Rule 2004 Topics. The CDS Participants shall respond to such document requests no later than fourteen (14) days after service.

5. The production and examination required hereby are subject to all applicable privileges; *provided* that if production of a document required to be produced hereby is withheld on the basis of an asserted privilege, the recipient of each Rule 2004 Subpoena (or other party asserting privilege with respect to such document) shall provide a privilege log to counsel to the

Creditors' Committee at a time mutually agreed to between the producing party and the Creditors' Committee.

6. The recipient of each Rule 2004 Subpoena shall inform the counsel to the Creditors' Committee of its search terms and other search parameters when conducting an electronic search. If necessary, the recipient of each Rule 2004 Subpoena shall meet and confer with the counsel to the Creditors' Committee to attempt to agree on appropriate search terms and other search parameters.

7. All disputes concerning discovery pursuant to this order, including objections thereto and disputes regarding the scope or timing of production, that are not resolved by agreement of the parties may be raised by letter brief to the Court not exceeding five pages, single spaced (excluding attachments). The other party shall file a responsive letter brief within three business days, which shall not exceed five pages, single spaced (excluding attachments). Copies of such letter briefs shall also be emailed to the Court's chambers.

8. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

9. To the extent not otherwise limited by this Order, all discovery recipients reserve all substantive and procedural rights and objections they may have in connection with any discovery served pursuant to this Order.

Dated: White Plains, New York
      January __, 2019

THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

3