**Presentment Date and Time: January 23, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: January 22, 2019 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objections Filed): February 14, 2019 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
------------------------------------------------------------- x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**NOTICE OF PRESENTMENT OF STIPULATION, AGREEMENT, AND ORDER
GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY
(2078 ROUTE 481, FULTON, NEW YORK 13069)**

**PLEASE TAKE NOTICE** that Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), will present the *Stipulation, Agreement, and Order Granting Limited Relief from the Automatic Stay (2078 Route 481, Fulton, New York 13069)* (the "**Proposed Stipulation**") to the Honorable Robert D. Drain, United States Bankruptcy Judge, for signature on **January 23, 2019 at 10:00 a.m. (Eastern Time)**.  A copy of the Proposed Stipulation is attached hereto as **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that, unless a written objection to the Proposed Stipulation is served and filed with proof of service with the Clerk of the Court, and a courtesy copy is delivered to the undersigned and to the chambers of the Honorable Robert D. Drain, so as to be received by **January 22, 2019 at 4:00 p.m. (Eastern Time)**, there will not be a hearing to consider the Proposed Stipulation, and the Proposed Stipulation may be signed and entered by the Court.

**PLEASE TAKE FURTHER NOTICE** that, if a written objection is timely filed and served with respect to the Proposed Stipulation, a hearing (the "**Hearing**") will be held to consider such Proposed Stipulation before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on February 14, 2019 at 10:00 a.m. (Eastern Time).

2

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing and failure to appear may result in relief being granted upon default.

Dated: January 15, 2019
New York, New York

_/s/ Jacqueline Marcus_____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96873657\1\73217.0004

## Exhibit 1

**Proposed Stipulation**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re                                              :
                                                   :        **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*   :
                                                   :        **Case No. 18-23538 (RDD)**
                                                   :
        **Debtors.**[1]                            :        **(Jointly Administered)**

------------------------------------------------------------ x

## STIPULATION, AGREEMENT, AND ORDER GRANTING
## LIMITED RELIEF FROM THE AUTOMATIC STAY
## (2078 ROUTE 481, FULTON, NEW YORK 13069)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

This stipulation, agreement, and order (the "**Stipulation, Agreement, and Order**") is entered into by and among Kmart Corporation ("**Kmart**"), as debtor and debtor-in-possession in the above captioned chapter 11 cases, and David P. Martin, Esq., solely in his capacity as the receiver ("**Receiver**" and, together with Kmart, the "**Parties**" and each a "**Party**") appointed in the State Action (defined below).  The Parties hereby stipulate and agree as follows:

## RECITALS

A.    By Memorandum of Lease dated August 21, 1992 and recorded on December 30, 1993 in the Oswego County Clerk's Office (the "**Clerk's Office**") in Book 1237 at Page 341 (the "**Kmart Lease**"), Kmart, as tenant, leased approximately 94,841 square feet (the "**Kmart Portion**") of the real property located at 2078 Route 481, Fulton, New York 13069 (the "**Leased Premises**").  A copy of the Kmart Lease is annexed hereto as **Exhibit 1**.

B.    On May 5, 2016, U.S. Bank National Association, in its capacity as trustee ("**Lender**") under that certain mortgage encumbering the Leased Premises (the "**Mortgage**"), commenced an action captioned *U.S. Bank National Association, as Trustee, et al. v. CCCF River Glen Holdings, Inc., et al.* under Index No. 0521/2016 (the "**State Action**") in the Supreme Court of the State of New York, County of Oswego (the "**State Court**") to foreclose upon the Mortgage in the original principal amount of eight million dollars ($8,000,000.00).

C.    Lender named Kmart as a defendant in the State Action due to its tenancy interest in the Leased Premises vis-à-vis the Kmart Lease.

D.    The State Court issued the *Ex Parte Order Appointing Receiver in Commercial Mortgage Foreclosure Action* dated May 18, 2016 and entered in the Clerk's Office on May 23, 2016 (the "**Receivership Order**") appointing Receiver as temporary receiver of the

Leased Premises during the pendency of the State Action (a copy of the Receivership Order is annexed hereto as **Exhibit 2**).

E.    By motion dated October 12, 2018, Receiver sought entry of an order: (i) approving a Second Interim Accounting; (ii) granting an Interim Commission Payment to Receiver; and (iii) granting an Interim Distribution to Plaintiff (the "**Receiver's Motion to Approve Second Interim Accounting and Commission**").

F.    On October 15, 2018 (the "**Commencement Date**") and continuing thereafter, Kmart and its debtor affiliates (collectively, the "**Debtors**"), each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

G.    On October 15, 2018, the Debtors filed the *Omnibus Motion of Debtors to Reject Certain Unexpired Leases and Related Subleases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* [Doc. No. 25] (the "**Lease Rejection Motion**").  The Lease Rejection Motion included the Kmart Lease among the unexpired nonresidential real property leases and related subleases that the Debtors sought to reject.

H.    On November 19, 2018, the Bankruptcy Court entered the order approving the Lease Rejection Motion [Doc. No. 810] and, among other things, authorizing the Debtors to reject the Kmart Lease and abandon certain personal property in favor of the landlord of the Leased Premises (the "**Lease Rejection Order**").

I.    Kmart has vacated the Kmart Portion of the Leased Premises.

J.    Receiver seeks to pursue the Receiver's Motion to Approve Second Interim Accounting and Commission and to take all necessary steps to terminate the Kmart Lease as authorized in the Receivership Order.

K.      Receiver is in the process of winding up his practice and preparing for retirement effective January 31, 2019.

L.      Receiver anticipates filing a stipulation to appoint a successor Receiver prior to January 31, 2019 and will seek entry of an order discharging Receiver upon approval of the Receiver's Motion to Approve Second Interim Accounting and Commission.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT HEREBY IS STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, THROUGH THE UNDERSIGNED, AND UPON COURT APPROVAL HEREOF, IT IS ORDERED THAT:**

1.      This Stipulation, Agreement, and Order shall have no force or effect unless and until approved by the Court (the "**Effective Date**").

2.      Upon the Effective Date, the automatic stay, in effect pursuant to 11 U.S.C. §362(a), is hereby modified, *nunc pro tunc* as of the Commencement Date, solely to the extent necessary to permit continuation of the State Action as it relates to the Receiver's Motion to Approve Second Interim Accounting and Commission, and to permit (i) continuation of the State Action as it relates to the Receiver's Motion to Approve Second Interim Accounting and Commission, (ii) Receiver to exercise his right to terminate the Kmart Lease as a result of the Lease Rejection Order, (iii) appointment of a successor receiver, and (iv) discharge of the Receiver; provided, however, that all other provisions of the automatic stay, including, without limitation, those provisions prohibiting any act to collect, assess, or recover a claim that arose prior to the Commencement Date from the respective estates and/or assets or property of any of the Debtors (as defined in section 541 of the Bankruptcy Code), shall remain in full force and effect.

3.      Receiver reserves his right to file a proof of claim against the Debtors for, *inter alia*, damages arising from Kmart's rejection of the Kmart Lease, and the Debtors reserve all rights and positions with respect to objecting to any such claims.

4.      The Parties hereto consent to the entry of this Stipulation, Agreement, and Order.

5.      Nothing contained in this Stipulation, Agreement, and Order affects the terms of the Lease Rejection Order, which remains in full force and effect.

6.      Each person who executes this Stipulation, Agreement, and Order on behalf of a Party hereto represents that he or she is duly authorized to execute this Stipulation, Agreement, and Order on behalf of such Party.

7.      This Stipulation, Agreement, and Order may be executed simultaneously in one or more counterparts, and by the parties hereto in separate counterparts, and with facsimile or pdf signatures being deemed originals, each of which when executed shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

8.      The Parties hereby waive the fourteen (14) day stay as set forth in Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure.

9.      This Stipulation, Agreement, and Order and all the provisions hereof shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and assigns.

10.     This Stipulation, Agreement, and Order may not be modified, altered, amended, or vacated in any way except by a writing signed by the Parties.

Dated: New York, New York                    Dated: Syracuse, New York
      January 15, 2019                                January 15, 2019

**WEIL GOTSHAL & MANGES, LLP**          **HARRIS BEACH PLLC**

By: ____/s/ Jacqueline Marcus_____          By: __/s/ David P. Martin_____
    Jacqueline Marcus, Esq.                            David P. Martin, Esq.
    *Attorneys for Debtors and Debtors in*              *State Court-Appointed Receiver*
    *Possession*                                       Harris Beach PLLC
    767 5th Avenue                                     333 West Washington Street, Suite 200
    New York, New York 10153                           Syracuse, New York 13202
    (212) 310-8000                                     (315) 423-7100

SO ORDERED:
Dated: _____, 2019
      White Plains, New York

                            _____
                            HONORABLE ROBERT D. DRAIN
                            UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Kmart Lease**

K - Mart

LEASE.

Kmart #7451
Volney (Fulton), New York

**Parties**         THIS LEASE made and entered into as of this 25 day of November, 1992,
between WIDEWATERS PIERCE DRIVE ASSOCIATES, a New York general partnership,
having its principal office at c/o Widewaters Group, Inc., 5786 Widewaters
Parkway, P.O. Box 3, Dewitt, New York 13214 (herein referred to as
"Landlord"), and KMART CORPORATION, a Michigan corporation having its
principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein
referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions
herein set forth, Landlord and Tenant do hereby covenant, promise and agree as
follows:

**Demised**       1.    Landlord does demise unto Tenant and Tenant does take from Landlord
**Premises**      for the lease term the following property:  Tenant's completed building
(designated Kmart), together with site improvements to be constructed as
hereinafter specified by Landlord at its expense together with land comprising
not less than Nine and seven tenths (9.7) acres described in Parcel "A" of
Exhibit "A", attached hereto and made a part hereof, and situated in the Town
of Volney, County of Oswego, State of New York; said building to be in the
locations depicted on Exhibit "B" attached hereto and made a part hereof, and
of the following dimensions:

Kmart Building:  381' 4" in width by 239' 4" in depth plus a
31" in width by 115' 8" in depth enclosed garden shop.

Total Size: 94,841 sq. ft.

In addition, Landlord shall provide a fenced garden shop area having
dimensions of 70' in width by 184' in depth, as indicated on Exhibit "B",
attached hereto.

Said land, completed building and site improvements, together with all
licenses, rights, privileges and easements, appurtenant thereto shall be
herein collectively referred to as the "demised premises".

Landlord hereby gives and grants unto Tenant, in common with others
entitled thereto, including Landlord's and Tenant's agents, employees,
customers, licensees and invitees the following licenses, rights, privileges
and easements:  the use of parking areas, common areas (including rest rooms
and other facilities, if any), roadways, sidewalks and accessways to public
streets and highways indicated on said Exhibit "B", together with the use of
any delivery or servicing areas adjoining Tenant's said buildings or
designated as such on Exhibit "B", which areas shall be adequate for the
passage, unloading and, if necessary, turning around of trailer trucks and
other commercial vehicles.  "Shopping Center" in this Lease shall be defined
as all of the land and improvements described in Exhibit A and depicted on
Exhibit B.

**Term**          2.    The term of this lease shall commence upon the "date of occupancy by
Tenant"; as that term is defined in Article 11 hereof, and shall terminate
upon such date as shall be twenty-five (25) years from the last day of the
month in which said date of occupancy by Tenant shall occur; provided,
however, the term of this lease may be extended as provided in Article 13
hereof.  The phrase "lease term", as used in this lease, shall be the term of
this lease and any extension thereof pursuant to said Article 13.

**Annual**        3.    Tenant shall, during the lease term, pay to Landlord, at such place
**Minimum**       as Landlord shall designate in writing from time to time, an annual minimum
**Rental**        rental of FIVE HUNDRED FORTY-FIVE THOUSAND TWO HUNDRED TWO AND NO/100 DOLLARS
($545,202.00); unless abated or diminished as hereinafter provided, in equal
monthly installments on the first day of each month, in advance, commencing
upon the first day of the lease term; provided, however, in the event the

4/LSE7451.IW                          - 1 -                      DRAFT DATE  08/11/92

first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

In the event Tenant shall exercise any of its options to extend the term of this Lease as provided in Paragraph 13(a) of this Lease, then the Annual Minimum Rental payable under this Lease during each such option period shall be increased by the amount of TWENTY-THREE THOUSAND SEVEN HUNDRED TEN AND NO/100 DOLLARS ($23,710.00) for each such option exercised; provided, however, there shall be no increase in Annual Minimum Rent in the event Tenant exercises its option to extend the term of this Lease under Paragraph 13(b), and the Annual Minimum Rent during such extended term under Paragraph 13(b) shall be the rent that is in effect at the time such option is exercised.

**Additional Rental**    4.    In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of SEVENTEEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($17,500,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding SEVENTEEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($17,500,000.00).

In the event Tenant shall exercise any of it's options to extend the term of this Lease as provided in Article 13(a) of this Lease, then the amount of gross sales in excess of which Tenant shall pay Landlord additional rental as set forth in the immediately preceding paragraph shall be increased by the amount of SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($750,000.00) for each such option exercised. For purposes of illustration, in the event Tenant exercises its first option to extend the term of this Lease in accordance with Article 13(a), then Tenant shall pay to Landlord as additional rental an amount equal to one percent (1%) of gross sales exceeding EIGHTEEN MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($18,250,000.00); during the second option, if so exercised, Tenant shall pay an amount equal to one percent (1%) of gross sales exceeding NINETEEN MILLION AND NO/100 DOLLARS ($19,000,000.00), and continuing thereon in a likewise manner for each such option exercised by Tenant.

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lease period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within nine (9) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law

or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the demised premises, except that the following shall be excluded:

(a)  Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)  Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d)  Service and interest charges for time payment accounts and charge accounts;

(e)  All sales of automotive gasoline or diesel fuel.

In the event Tenant shall operate a food market in the Demised Premises, or shall assign or sublet the demised premises to a food market, then in such event the amount of gross sales in excess of which Tenant shall pay percentage rent shall be adjusted in accordance with the provisions of the last grammatical paragraph of this Article 4.

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within one hundred twenty (120) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said one hundred twenty (120) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more

particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraphs of Article 4 hereof shall be of no further force and effect.

Notwithstanding the provisions of the two preceding paragraphs, Tenant shall be entitled, at any time prior to the discontinuance of the operation of its store and the delivery of the notice to Landlord of its election to discontinue its operation (as hereinabove provided) to assign this lease or sublet the whole or any part of the demised premises pursuant to Article 22 hereof; subject, however, to the terms and conditions of this lease including the provisions of Article 4 hereof. Any such assignment or subletting shall not be construed to be a discontinuance of Tenant's operation of its store.

In the event Landlord shall fail to exercise its option to cancel and terminate this lease after receiving notice from Tenant of its intention to discontinue the operation of its store (as hereinabove provided) and Tenant thereafter assigns this lease or sublets the whole or any part of the demised premises pursuant to Article 22, the rent which Tenant or Tenant's assignee shall be obligated to pay to Landlord during the remainder of this Lease shall be the rent more particularly set forth in Article 3 and the word "minimum" in said Article 3 shall be deemed deleted and all the provisions contained in the preceding paragraphs of Article 4 shall be of no further force and effect; provided, however, in the event Tenant assigns or sublets the Demised Premises to a retail tenant after such a discontinuance, the foregoing provisions regarding payment of additional rental shall be reinstated in full force and effect; provided further, however, that the amount of gross sales in excess of which Tenant shall be required to pay one (1%) percent of such amount shall be amended to be an amount that is consistent with the standard and prevailing percentage rental provision typically agreed to by such retail tenant at other locations in the State of New York at the time of such assignment or subletting.

Real
Estate
Taxes

5.    Tenant shall pay and discharge all ad valorem real estate taxes and all assessments, general or specific, levied against the taxable premises during the term of the Lease, excluding therefrom payment of general or special assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

The term "taxable premises", as used in this lease, shall be that certain land described in Parcel A of Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

Landlord and Tenant shall use their reasonable efforts to obtain a separate tax assessment with respect to the taxable premises. In the event that a separate tax assessment with respect to the taxable premises cannot be obtained, then for purposes of this lease, the parties shall refer to the office records of the assessing authority including but not limited to worksheets and field reports, in order to obtain the relevant land and building valuations required to calculate Tenant's separate liability for the real estate taxes hereunder.

In the event that neither a separate tax assessment for the taxable premises can be obtained nor an accurate tax liability established from the assessing office records can be determined, the taxes allocable to the taxable premises (and Tenant's share of taxes attributable to the Common Areas) shall be equal to: (1) Tenant's pro rata share of taxes attributable to the Tenant's Building, plus (2) Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A". Tenant's pro rata share of taxes attributable to the Tenant's building shall be computed by multiplying the total tax liability against the buildings located within the land described in Exhibit "A" by a fraction the numerator of which shall be the number of square feet of ground floor area of Tenant's Building at the end of such real estate fiscal tax year (excluding the fenced portion of the garden shop) and the denominator of which shall be the total number of square feet of ground floor area of all of the buildings located within the land described in

Exhibit "A" (excluding Tenant's building) at the end of such real estate fiscal tax year plus the total number of square feet of ground floor area of Tenant's building at the end of such real estate fiscal year (excluding the fenced portion of the garden shop). Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A" shall be computed by multiplying the total tax liability against the land described in Exhibit "A" by a fraction, the numerator of which shall be the number of square feet of land within the demised premises and the denominator of which shall be the number of square feet of land within the land described in Exhibit "A". In no event shall Tenant be responsible for the payment of taxes and assessments incurred or levied on other buildings existing on the land other than the taxable premises. Landlord agrees that if the foregoing formula is used to determine Tenant's share of taxes, Landlord will in good faith reasonably reallocate taxes among the various buildings in the Shopping Center, such reallocation to be proportionate to and to account for the differences in building construction costs for each tenant's building in the Shopping Center, provided, however, in no event shall Tenant's share exceed its pro rata share in accordance with the formula previously set forth in this paragraph. Landlord shall provide Tenant with an explanation of the various tenant building costs and the manner in which taxes were allocated among such tenants.

The date of levy of all ad valorem real estate taxes shall be deemed to be the date specified by each applicable taxing jurisdiction for which such taxes become a lien on the taxable premises. The Tenant's liability and obligation hereunder to pay such ad valorem real estate taxes shall be fully accrued, fixed and final on the date of levy thereof.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with, nor be obligated to pay any income, profit, inheritance, estate, succession, gift, franchise, or transfer taxes which are or may be imposed upon Landlord, its successors or assigns, by whatsoever authority imposed or howsoever designated.

Written evidence of the payment of taxes and assessments hereunder shall be furnished by Tenant to Landlord upon Landlord's written request therefor.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed ONE HUNDRED TEN THOUSAND AND NO/100 DOLLARS ($110,000.00) during any lease year, shall be hereinafter referred to as an "excess tax payment". Commencing with the first option term under Article 13 hereof, the foregoing sum of ONE HUNDRED TEN THOUSAND AND NO/100 DOLLARS ($110,000.00) shall increase by ten (10%) percent for each such option exercised, i.e. during the first option - ONE HUNDRED TWENTY-ONE THOUSAND AND NO/100 DOLLARS ($121,000.00); during the second option - ONE HUNDRED THIRTY-THREE THOUSAND ONE HUNDRED AND NO/100 DOLLARS ($133,100.00), etc. All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year on a non-cumulative basis.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Parcel A of Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises or the Shopping Center by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall, at Tenant's expense, cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the Shopping Center, the Tenant will cooperate in such proceedings; provided, however, that Landlord shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises which might result in the termination of this Lease.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities, or if such refund relates to the entire Shopping Center, then its pro rata share of such refund. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

Payment in Lieu of Real Estate Taxes. In the event that Landlord applies for financing through the Industrial Development Authority and negotiates a payment in lieu of taxes with municipal taxing authorities, Tenant agrees to pay its proportionate share of such amount determined in the manner provided in this Article 5. No tax payment or payment in lieu of taxes owed by Tenant shall be reduced by any funds received by Landlord from any government unit or agency, or credited against any payment of taxes or payment in lieu of taxes by any government unit or agency due to site or related improvements performed by Landlord for the benefit of such government unit or agency, provided the cost of such improvements were not included in site development costs submitted by Landlord to Tenant and for which the annual base rent was determined and is intended as consideration to Landlord. In no event shall Tenant be liable for a payment in lieu of taxes which would be greater than the taxes which would otherwise be due.

New Building by Landlord

6.    Tenant's said building and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than May 1, 1993. If for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord unless Landlord shall complete such work within said sixty (60) day period; provided, further, in the event that,

regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to September 1, 1993, then Tenant shall, at any time thereafter, have the further option of terminating this Lease upon sixty (60) days prior notice to Landlord; provided, however, if Landlord tenders possession of said completed building and site improvements within such sixty (60) day period, then such termination shall be null and void. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Drawings and
Specifi-
cations

7.   Tenant's said building and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications (subject to any modifications required by the governing municipalities that are approved by Tenant's Design Division), prior receipt of which Landlord hereby acknowledges and which are identified as Set No. K-1095 containing such additions, changes, and modifications as are more particularly set forth in that certain letter dated October 10, 1991, written by Steven K. Li of Tenant to The Widewaters Group, 5786 Widewaters Parkway, DeWitt, New York 13214, Attention: Mr. Lou Aiello, a copy of which letter is attached hereto and marked Exhibit "C".

Said typical drawings and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a)   Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b)   Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Subsequent to approval of the typical drawings and specifications, in the event that changes to the typical drawings and specifications shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall pay Tenant an amount equal to the savings. In the event such changes result in extra construction costs to the Landlord, then Tenant shall pay Landlord the extra construction costs as agreed upon by

Landlord and Tenant resulting from such changes within sixty (60) days after completion and acceptance of Tenant's building and receipt of a detailed statement therefore. Any amounts due after said sixty (60) day period shall accrue interest at a rate of one (1%) percent per month until paid in full. To the extent any such changes result in a delay in the construction of Tenant's building, then the periods of time set forth in Article 6 hereof for Landlord to commence and complete Tenant's building shall be extended for an amount of time equal to the period of delay.

**Guarantee of Materials**

8.    Landlord shall unconditionally guarantee all work performed by or for the Landlord in the construction of Tenant's building and site improvements against defective workmanship and materials for a period of one (1) year from commencement of lease term or date of final acceptance by Tenant, whichever is later, unless a different period of time is expressly stated under a section of the criteria documents and/or job specifications.

Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

**Advance Possession for Fixturing and Merchandising**

9.    For a period of sixty seven (67) days after completion of Tenant's building by Landlord, as set forth in Article 11 (b), Tenant shall have the privilege, rent free of entering said buildings for the purposes of installing stockroom equipment and salesfloor trade fixtures, storing merchandise, training personnel and other pre-opening activities. The Landlord's completion of the building shall be construed to mean the building is substantially complete except connections to Tenant's equipment, i.e. permanently enclosed, completely decorated inside and out, floor covering installed, electrical system complete, mechanical systems functioning on controls, toilet facilities complete for both sexes, fire protection system including alarms complete.

Landlord shall advise Tenant's Regional Construction Manager in writing ninety (90) days prior to his projected completion date to allow Tenant to place orders for fixtures, arrange for personnel and order merchandise.

**Parking and Other Common Areas**

10.    Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord also covenants that the area within the demised premises provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than Four Hundred Fifty-Four (454) automobiles on the basis of arrangement depicted on Tenant's working drawings and specifications.

Landlord further covenants that the aggregate area depicted on Exhibit "B" provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than Eight Hundred Thirty-One (831) automobiles on the basis of arrangement depicted on Tenant's working drawings and specifications.

At least sixty-seven (67) days prior to the commencement of the lease term, Landlord shall provide in accordance with said working drawings and specifications as approved by Tenant and as shown on Exhibit "B" all of the sidewalks, service drives, parking areas and entrances, from adjoining public streets to permit receiving and delivering of fixtures, merchandise and other property and to permit parking for persons involved in the pre-opening activities of the Tenant.

Liability Insurance. During the lease term, Landlord at its sole expense (subject to reimbursement by Tenant as provided in Article 15 hereof) shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of said common areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of One Million and No/100 Dollars ($1,000,000) with respect to injury to any one person and Two Million and No/100 Dollars ($2,000,000) with respect to any one accident or disaster, and Five Hundred Thousand and No/100 Dollars ($500,000) with respect to damage to property. All such policies shall bear endorsements to the effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

Indemnification. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages for claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Should Tenant, at any time, utilize the portions of the common areas identified on Exhibit B as "Kmart Promotional Activity Area" for outdoor shows, entertainment or such other uses which in Tenant's judgment tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

**Store Opening**

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty-seven (67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's building and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 20 and January 9, the lease term shall not commence until January 10 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible;

provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's
Represent-
ations and
Warranties

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" Parcel "A" except as shown on said Exhibit "B".

Landlord also represents, warrants, and covenants that a food market tenant of at least 30,000 square feet shall be located within the shopping center premises as depicted on Exhibit "B" and shall open for business prior to or contemporaneously with Tenant Kmart.

Landlord further represents, warrants and covenants that: the land described in Exhibit "A" will, at the commencement of the lease term, be properly zoned for Tenant's intended use (which shall include, without limitation, a retail department store, an enclosed garden shop and outdoor sales of patio furniture, plants and lawn and garden supplies); the sale of patio furniture, plants and lawn and garden supplies on the sidewalks and any portion of the parking lot is permitted by applicable laws and regulations without additional permits or applications or change in zoning classification; and all necessary governmental consents, permits and approvals for Tenant's intended use have been obtained. If Tenant desires to use any portion of the Demised Premises as an automotive service center, Landlord shall use its best efforts to assist Tenant in obtaining any governmental or municipal approvals necessary for such automotive service center. Landlord shall deliver to Tenant a Certificate of Occupancy prior to the commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and any other charges due under this Lease for real estate taxes, common area maintenance and insurance, and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall, after notifying Landlord and identifying which representations and/or warranties have not been met and allowing Landlord thirty (30) days to cure such default, have the option of (i) completing said representations and warranties at Landlord's cost and expense including, without limitation, overhead plus interest at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, (ii) continue to pay monthly in arrears one percent (1%) of said gross sales and any other charges due under this Lease for real estate taxes, common area maintenance and insurance, until Landlord's said representations and warranties shall be fulfilled or (iii) terminating the Lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice, unless Landlord cures such failure within said sixty (60) day period.

Options
to Extend
Lease

13. (a)  Tenant shall have eight (8) successive options to extend the
term of this lease for an additional period of five (5) years on each such
option such extended term to begin respectively upon the expiration of the
term of this lease or of this lease as extended and the same terms and
conditions as herein set forth shall apply to each such extended term.  If
Tenant shall elect to exercise the aforesaid options, it shall do so by giving
notice to Landlord not less than six (6) months prior to the expiration of the
term of this lease or of this lease as extended.

(b)  Regardless of the exercise or nonexercise by Tenant of any or
all of the foregoing options, Tenant shall have, unless the last day of the
lease term shall be January 31 of any year, the option to extend (or further
extend, as the case may be) the term of this lease for such period of time as
shall cause the last day of the term of this lease to be the January 31 next
succeeding the date upon which the term of this lease would expire but for the
exercise of this option.  This option shall be exercised by notice to Landlord
not less than six (6) months prior to the expiration of the term of this lease
or any extension thereof.  Tenant's rental during this option period shall be
the same rental payable under the terms of this lease at the time Tenant
notifies Landlord of its intention to exercise this option.

First
Refusal to
Purchase
Option

14.  Intentionally Omitted.

Repairs and
Maintenance

15.  Tenant shall make and pay for all maintenance, replacement and
repair necessary to keep the demised premises in a good state of repair and
tenantable condition, except for the following maintenance, replacement or
repair which shall remain the Landlord's sole responsibility:

(a)  all maintenance, replacement and repair to the roof, outer walls and
structural portion of the buildings which shall be necessary to
maintain the buildings in a safe, dry and tenantable condition and
in good order and repair; and

(b)  all repairs, maintenance or replacement of or to the utility
services to the building and any underground storm sewers, sanitary
sewers, water lines or electrical lines under the parking areas,
service drives, streets, sidewalks, driveways, entrances; and

(c)  all repairs and replacement including resurfacing (exclusive of
sweeping, striping and snow and ice removal) necessary to maintain
all driveways, sidewalks, street and parking areas free of all
settling, clear of standing water, and in a safe, sightly and
serviceable condition, free of chuck holes, fissures and cracks.

Notwithstanding the foregoing provisions of Article 15 herein set forth,
Landlord shall contract for sweeping, striping and snow removal for the
parking areas, driveways, sidewalks and streets of the premises and maintain
same in a clean, safe, sightly and serviceable condition.  The Landlord shall
further maintain all landscaped areas.

Tenant shall pay the Landlord its pro-rata share of the costs of
maintaining the common areas as herein provided and for the cost of insuring
same in accordance with Article 10 hereof.  Tenant's said share shall be based
upon the ratio that the ground floor area of Tenant's building bears to the
total gross ground floor area contained in all buildings actually erected on
any portion of the land described in Exhibit "A", and depicted on Exhibit "B".

For purposes of this Article, the costs of maintaining the common areas
and common facilities shall mean the following:  (1) all amounts paid for
cleaning and sweeping (which shall be performed as often as necessary but not
less than once weekly) and restriping (which shall be done not less than once
every two years) of the parking areas, sidewalks and driveways, including snow

4/LSE7451.TW                              - 11 -                    DRAFT DATE 08/11/92

and ice removal, which shall be performed as often as necessary; (2) maintenance and repair of planted or landscaped areas including fertilizing of planted areas and mowing grassed areas during the term hereof; (3) maintenance, repair and replacement of bulbs and light standards with respect to the parking lot lighting and electrical cost of lighting if Tenant's parking lot lighting is not metered directly into Tenant's meter as provided in this Article; (4) wages and salaries of persons directly and actually performing services described herein, including persons whose primary responsibility is to bid and let contacts for the performance of these duties and supervise the performance of these duties; provided, however, Landlord shall furnish a detailed statement and explanation of the determination of such charges with such documentary support as Tenant deems necessary; and (5) an administrative charge in an amount equal to two (2%) percent of the total of the above listed common area maintenance costs. The cost of maintaining the common areas and common facilities shall not include real estate taxes, capital expenses, depreciation, permit fees, electric lighting charges beyond Tenant's normal business hours unless Tenant is operating during extended hours, rubbish removal for other tenants, or other administrative expenses, including overhead.

Tenant shall pay to Landlord on account of the aforesaid costs, an amount equal to one-twelfth (1/12) of Tenant's pro rata share of the estimated annual costs of such work performed by Landlord on the first day of each month in advance along with the monthly installment of minimum rental. Said amount shall be adjusted and revised by Landlord as of the end of the initial Lease year and each subsequent Lease year during the term hereof on the basis of the actual maintenance costs incurred during the immediately preceding Lease year plus reasonably anticipated increases in such costs. Upon Landlord's furnishing to Tenant a written statement setting forth such revised estimate of maintenance costs to be incurred by Landlord pursuant to Article 15, Tenant shall pay to Landlord such revised estimated share in monthly installments, in advance, on the first day of each month in each Lease year upon the next exceeding revision of such estimate. Landlord agrees to provide the Tenant, within thirty (30) days after the end of each Lease year, a written statement signed by Landlord setting forth the cost of reimbursable items incurred by the Landlord pursuant to this Article and the calculations for determining the pro rata share of Tenant then due. If Tenant's pro rata share of the maintenance costs incurred exceed Tenant's payment in that Lease year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of the statement. In the event of a dispute between Landlord and Tenant concerning the dollar amount or method of allocation contained in the statement of Landlord, initially, Tenant shall be responsible only for the portion of the billing not in dispute. Upon request, Landlord must provide copies of all paid receipts which form the basis for the statement. If Tenant's payment exceeds Tenant's pro rata share of the costs incurred by Landlord pursuant to this Article, Tenant shall be entitled to a credit for such excess against estimated payments next thereafter due to Landlord on account of Tenant's pro rata share of costs due hereunder.

Tenant may, upon seven (7) days notice, have Landlord's records of common area expenditures for the previous twelve (12) month period audited by Tenant's accountant; should such audit disclose any overpayment by Tenant, Landlord shall remit said overpayment upon demand.

Notwithstanding anything contained herein to the contrary, Tenant reserves the right, for any reason whatsoever, at any time upon thirty (30) days prior written notice to Landlord to assume the duties of Landlord to maintain the common areas located within Parcel A of Exhibit "A". If Tenant shall elect to maintain the common areas located within Parcel A of Exhibit "A", then, and in such event, Tenant shall not during such period be required to make any contributions to the common area costs as hereinabove defined, however, Landlord shall maintain the remaining portions of the common area described in Exhibit "A".

Unless otherwise specified in Tenant's typical drawings and specifications referred in Article 7 (Drawings and Specifications), Landlord

shall, at Landlord's sole cost and expense, have that portion of the common facilities lighting standards located within the land described in Parcel A of Exhibit "A" metered directly into Tenant's meter and Tenant shall be responsible for the cost of supplying electricity thereto. The balance of the common facilities lighting standards shall be metered into the meters of Landlord's other tenants as depicted on Exhibit "B" or into Landlord's own meter and Landlord's other tenants or Landlord shall be responsible for the cost of supplying electricity thereto.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs after seven (7) days prior notice to Landlord, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Thousand Dollars ($5,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**     16.  Tenant may, at its own expense, from time to time expand its building within the area designated as "Kmart Future Expansion Area" on Exhibit B hereto, or make such alterations, additions or changes, structural otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Tenant may, at its own expense, at any time, expand its building, erect or construct additional buildings or structures on any portion of the demised premises. In such event gross sales made in or from said expansions and/or additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, said additional building or structure shall be excluded from the taxable premises and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rents payable under the terms of Article 4 hereof. Tenant shall reimburse Landlord for any increase in insurance premiums attributable solely thereto, and the expanded ground floor area of Tenant's building shall be included in determining Tenant's pro rata share of the real estate taxes pursuant to Article 5 and common area expenses pursuant to Article 15. Tenant shall also be solely responsible solely responsible for exterior and interior repairs thereto, except those necessitated by fire, the elements or other casualty. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, and the number of parking spaces required under Article 10 shall be reduced by the number of spaces covered by such additional buildings or structures.

In undertaking any additions, alterations, changes or erecting any additional buildings or structures as provided in this Article 16, Tenant shall obtain all permits, approvals and certificates required by any governmental body or agency having jurisdiction over the same. Tenant shall indemnify and hold Landlord harmless with respect to any and all claims, losses, damages, liabilities and expenses (including without limitations, losses, damages, liabilities and expenses for investigating or defending any action or threatened actions) arising directly out of the doing of any such work by Tenant or its employees, agents or contractors including, but not

limited to, claims for personal injury and/or property damages. Tenant or its contractor shall provide Landlord upon request with proof of maintenance of the following insurances (or certificate of self-insurance); Builders' Risk, Workers' Compensation and Comprehensive General Liability and copies of all the foregoing government permits. Tenant shall promptly discharge any lien for work done or materials furnished in connection with any improvement, alteration or addition to the Demised Premises performed by Tenant under this Article 13, unless such work is subject to dispute.

Utilities       17.  Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility raw materials (gas, water, sewage, telephone, electricity, etc.) furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

Governmental   18.  Tenant shall observe and comply with all requirements of rules,
Regulations   orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

Exculpation   19.  Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

Damage to    20.  From and after the "date of occupancy by Tenant," as that term is
Demised     defined in Article 11 hereof, should Tenant's net worth at any time be less
Premises    than One Hundred Million Dollars ($100,000,000.00), upon written request of the Landlord or mortgagee, Tenant shall procure fire insurance with extended coverage endorsement upon the building erected by Landlord pursuant to Article 6 hereof in an amount equal to eighty per cent (80%) of the replacement value of the building above the foundation walls. At any time while Tenant's net worth shall exceed One Hundred Million Dollars ($100,000,000.00), the Tenant may elect to self-insure its obligation to restore.

Policies of fire insurance procured pursuant to this Article shall assure and be payable to Landlord, Tenant and mortgagee and shall provide for release of insurance proceeds to Tenant for restoration of loss.

Landlord and mortgagee, if any, shall be furnished certificates from the insuring company showing the existence of such insurance. In case of loss, Tenant is hereby authorized to adjust the loss and execute proof thereof in the name of all parties in interest. If Tenant elects to self insure hereunder Tenant shall upon written request no more than once every twelve (12) months, provide Landlord and mortgagee, if any, with a certificate of self insurance signed by an officer of Tenant, certifying that a program of self insurance is in effect.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's building and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Tenant

shall, at its expense, promptly and with due diligence either (1) repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction or (2) repair, rebuild and restore the same for the same use and purposes but in accordance with such plans and specifications as are then generally in use by Tenant for the construction of Kmarts and related structures, provided, however, the repaired, rebuilt or replaced building will have a value not less than its value just prior to said loss. Anything herein to the contrary notwithstanding, it is understood and agreed that if (1) as a result of any such damage or destruction during the last two years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding One Hundred Thousand Dollars ($100,000.00), or (2) if such damage or destruction shall have taken place within five years of the then scheduled expiration date of the current term of the lease and if the extent of such damage or destruction is such that the cost of restoration would exceed fifty per cent (50%) of the amount it would have cost to replace the Tenant's building on the demised land in its entirety at the time such damage or destruction took place, then Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. If Tenant is carrying fire insurance to eighty per cent (80%) of the replacement value, all the insurance proceeds shall belong to Landlord and/or Landlord's mortgagee as their interest may appear; in the event the property is self-insured at the time of the loss Tenant shall reimburse Landlord and/or the mortgagee for an amount equivalent to the insurance proceeds that would have been paid had insurance been in force, but not to exceed eighty per cent (80%) of the replacement value of the building. In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Tenant herein.

In the event that, at any time during the lease term, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or alternatively Landlord shall be required to clear, clean and raze the fire damaged buildings.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

Eminent
Domain

21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Parcel A of Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Parcel A of Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

Use, Assign-  22.  The premises hereby demised may be used for any lawful purpose,
ment and      provided, however, that so long as fifty (50%) percent of the Shopping Center
Subletting    buildings other than Tenant's building are used for retail purposes, then the
              Demised Premises may be used only for lawful retail purposes; provided

further, however, that so long as P&C Food Markets or a similar regional food market operator or their successors or assigns (so long as such successors or assigns are a regional food market chain operating and recognizable throughout upstate New York) are operating a full service food market in the shopping center of at least thirty thousand (30,000) square feet in size, then Tenant, it successors and assigns shall not operate a full service food market in the Demised Premises; provided further, however, that this restriction shall not prohibit Tenant, its successors or assigns from operating a fast food or cafeteria type restaurant in the Demised Premises or from selling food items for consumption off the premises so long as the total gross floor area devoted to the sale of such food items does not exceed twelve thousand (12,000) square feet (exclusive of said restaurant), and so long as such food items do not include fresh meats, poultry, fish, produce or dairy products. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease. Tenant shall provide Landlord with notice of any such assignment or subletting within thirty (30) days thereof.

**Signs**

23. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "Kmart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "Kmart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any respect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of its building signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

Without limiting the foregoing, Tenant may, subject to applicable governmental laws, statutes, and ordinances, install one (1) pylon sign at the location designated as "Tenant Pylon" on Exhibit "B"; provided, however, that if Landlord shall construct pylon sign of size and dimension acceptable to Tenant, then Tenant shall accept a panel on such pylon in lieu of constructing its own pylon sign, so long as Tenant has the largest and most prominently placed panel on said pylon. Landlord warrants that, except for Tenant's pylon, no additional pylon type signs shall be permitted on any portion of the shopping center premises located within the land described in Exhibit "A".

**Ingress and Egress**

24. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises

at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be payable monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

Bankruptcy    26.    If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

Covenant    27.    Landlord covenants, represents and warrants it has full right and
of Title    power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whatsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that prior to the commencement of construction it shall be seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Parcel A of Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

    (a)    Public utility easements not impairing Tenant's use of the demised premises.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) an ALTA leasehold policy of Title Insurance in form acceptable to Tenant in an amount not less than One Million Dollars ($1,000,000.00) showing that Landlord's title is as herein represented, (b) an as-built survey by a licensed surveyor of the land described in Parcel A of Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by

the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subor- dination**

28.  Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

Upon request of the holder of a mortgage to which this Lease becomes subordinate, Tenant shall (i) execute, acknowledge and deliver to such holder an agreement to attorn to such holder as Landlord if such holder becomes Landlord hereunder; and/or (ii) execute, acknowledge and deliver to such holder an agreement not to make any payment of fixed annual rent for a period of more than one (1) month in advance.  If the holder of any institutional first mortgage of the fee interest of the Shopping Center requires that this Lease have priority over such mortgage, Tenant shall, upon request of such holder, execute, acknowledge and deliver to such holder an agreement acknowledging such priority.

**Tenant Indemnifies Landlord**

29.  During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any, or their respective agents, contractors or employees.  The foregoing sentence is intended to provide Landlord and Landlord's ground lessor, if any, the same protection and coverage as would be provided if Tenant furnished general comprehensive liability insurance, naming Landlord and Landlord's ground lessor, if any, as additional insureds under said policy, except with respect to costs, liabilities, damages or claims resulting, in whole or in part, directly or indirectly from the default or negligence of Landlord, Landlord's ground lessor, if any, or their agents, contractors or employees.

**Tenant's Right to Cure Landlord's Defaults**

30.  In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for fifteen (15) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**    31.  At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following:  ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty.  All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

**Holding Over**    32.  In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect, except that the annual minimum rent shall be an amount equal to 110% of the annual minimum rent for the last day of the term just expiring.

**Investment Tax Credit**    33.  Landlord hereby agrees to elect under the applicable provisions of the Internal Revenue Code, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available to Tenant from time to time in respect of the demised premises under said Code.  Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

Landlord further agrees to maintain adequate records to enable Tenant to obtain such tax credit and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter.  Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

**Notices**    34.  Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, Attention:  Vice President Corporate Facilities or to any subsequent address which Tenant shall designate for such purpose.  Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

**Captions and Definitions**    35.  Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions hereof.  The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed.  Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**    36.  The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this lease shall run with the land.

**Severability**    37.  If any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

**Choice of Law**

38. This Lease shall be construed and enforced in accordance with the laws of the State of New York. The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Landlord or Tenant.

**Waiver and Modifications**

39. The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or obligations of this lease or of the right to exercise such right, remedy or election, but the same shall continue and remain in full force and affect with respect to any subsequent breach, act or omission. This lease may be changed or amended only by a writing signed by the party against whom enforcement thereof is sought.

**Memorandum of Lease**

40. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

**Hazardous Waste**

41. Landlord represents that it has made a thorough investigation of the physical condition of the Demised Premises, that it is familiar with the present and prior uses of the Demised Premises and that to the best of Landlord's knowledge and belief after due and appropriate inquiry there are not now nor have there been any toxic or hazardous wastes or substances used, generated, stored, treated or disposed on the Demised Premises. Landlord hereby indemnifies Tenant from and against any loss, liability, claim or expense, including, without limitation, cleanup, engineering and attorneys fees and expenses that Tenant may incur by reason of the above representation being false or by reason of any investigation or claim of any governmental agency in connection therewith. Landlord's representations and indemnity to Tenant under this paragraph shall survive the cancellation or termination of this lease.

At any time from the date of this Lease until Commencement Date, Tenant (or Tenant's contractor) may inspect the Demised Premises for the presence of such wastes or substances. If toxic or hazardous wastes or substances are discovered in the Demised Premises, Tenant may cancel this Lease by giving sixty (60) days prior written notice to Landlord and returning possession of the premises to the Landlord prior to the Commencement Date, if Tenant has taken possession. If Landlord shall have cured or remedied such situation in full compliance with all applicable laws or regulations within such sixty (60) day period, then such cancellation shall be void and of no force or effect.



IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

WIDEWATERS PIERCE DRIVE ASSOCIATES,
a New York general partnership

By: _____
    Joseph T. Scuderi, Partner

Attest: _____


KMART CORPORATION

By: _____
                        Vice President

Attest: _____
                   Assistant Secretary

STATE OF NEW YORK

COUNTY OF ONONDAGA

On this 21st day of August, 1992, before me personally came Joseph
T. Scuderi, to me personally known, who, being by me duly sworn,
did depose and say that he resides at Fayetteville, New York, that
he is a partner and member of the Executive Committee of Jolaine
Associates, a general partner of the firm of Widewaters Pierce
Drive Associates, a partnership, and that he executed the
foregoing instrument on behalf of said firm.

_____
(Notary Public)

JOSEPH B. GERARDI
Notary Public in the State of New York
Qualified in Onondaga County No. 4887371
My Commission Expires February 23, 19__

STATE OF MICHIGAN) SS:
COUNTY OF OAKLAND)

     I do hereby certify that on this 23 day of November, 1992, before me,
Deborah Daras                    , a Notary Public in and for the County and
State     aforesaid,     and     duly     commissioned,     personally     appeared
M.L. Stiles and A.F. Buckley known to me to be the Vice President and
Assistant Secretary of Kmart Corporation, who, being by me duly sworn, did depose and
say that they reside in Rochester and Bloomfield Hills, MI
respectively; that they are the Vice President and Assistant Secretary respectively
of Kmart Corporation, the corporation described in and which executed the foregoing
instrument; that they know the seal of said corporation; that the seal affixed to
said instrument is the corporate seal of said corporation; that, on behalf of said
corporation and by order of its board of directors, they signed, sealed and delivered
said instrument for the uses and purposes therein set forth, as its and their free
and voluntary act; and that they signed their names thereto by like order.

     In Witness Whereof, I have hereunto set my hand and affixed my official seal the
day and year in this certificate first above written.

                         DEBORAH DARAS
                Notary Public, Oakland County, Mich.
                My Commission Expires January 10, 1994
My commission expires: _____     _____
                                              Notary Public

*SHOPPING CENTER*

All that tract or parcel of land situate in the Town of Volney, County of Oswego and State of New York, being part of Subdivision 11 of Harper's Location in said Town and being more particularly described as follows:

Beginning at a point on the northerly boundary of Fulton-Three Rivers Pt. 1, State Highway No. 5251 (NYS Route No. 481), said point being N 79° 49' 04" W a distance of 10.31 feet, measured along said highway boundary, from the southeasterly corner of lands described in a deed from Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce Drive Development dated April 18, 1983 and recorded in Oswego County Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 19; running thence westerly along said highway boundary, the following 4 courses and distances:

1) N 79° 49' 04" W, 362.73 feet;

2) N 82° 24' 26" W, 1203.15 feet;

3) N 71° 18' 47" W, 288.17 feet;

4) N 46° 00' 46" W, 79.37 feet to

the most southerly corner of lands appropriated by The People of the State of New York by virtue of Map No. 38 R-1, Parcel No. 63; thence N 59° 41' 42" E along the southerly boundary of said lands, a distance of 150.91 feet to the southeasterly corner thereof; thence N 44° 12' 28" W along the northeasterly boundary of said lands, a distance of 116.90 feet to a point on the southeasterly boundary of Pierce drive; thence N 49° 24' 36" E along said southeasterly street boundary, a distance of 58.35 feet to the northwesterly corner of lands conveyed by Helen J. Collins to Donald R. Stanford and Elizabeth J. Stanford by deed dated December 1, 1977 and recorded in Oswego County Clerk's Office in book 814 of Deeds at Page 794; thence S 44° 12' 28" E along the southwesterly boundary of said lands conveyed to Stanford, a distance of 116.00 feet to the southwesterly corner thereof; thence N 46° 33' 20" E along the southeasterly boundary of said lands, a distance of 60.00 feet to the southeasterly corner thereof,

Exhibit A - Page 1 of 4                    (Shopping Center)

said point being on the southwesterly boundary of lands conveyed by Norma R. Pierce and Helen J. Collins to Helen J. Collins by deed recorded in Oswego County Clerk's Office July 5, 1966 in Book 690 of Deeds at Page 492; thence S 44° 12' 28" E along the southwesterly boundary of said lands conveyed to Collins, a distance of 7.00 feet to the southwesterly corner thereof; thence N 49° 27' 10" E along the southeasterly boundary of said lands, a distance of 132.52 feet to a point on the southwesterly boundary of lands conveyed by Robert A. Gillespie and Joyce L. Gillespie to Calvin L. Austin and Ruth A. Austin by deed dated February 15, 1969 and recorded in Oswego County Clerk's Office February 19, 1969 in Book 711 of Deeds at Page 240; thence S 45° 45' 38" E along the southwesterly boundary of said lands conveyed to Austin, a distance of 107.52 feet to the southwesterly corner therof; thence N 44° 14' 22" E along the southeasterly boundary of said lands, a distance of 60.00 feet to the southeasterly corner thereof; thence N 45° 45' 38" W along the northeasterly boundary of said lands of Austin, a distance of 147.73 feet to the southerly boundary of Pierce Drive; thence along said boundary of Pierce Drive, the following 7 courses and distances:

1) N 77° 48' 12" E, 122.56 feet;
2) southeasterly, following a curve to the right having a radius of 2814.90 feet whose chord bears S 64° 22' 52" E, an arc distance of 11.64 feet;
3) N 74° 49' 47" E, 112.68 feet;
4) N 86° 36' 14" E, 48.14 feet;
5) northwesterly, following a curve to the left having a radius of 2914.90 feet whose chord bears N 61° 54' 09" W, an arc distance of 14.36 feet;
6) N 75° 00' 00" E, 456.13 feet;
7) N 49° 11' 00" E, 799.13 feet to

a point, said point being S 49° 11' 00" W, a distance of 66.00 feet, measured along said street boundary from the northwesterly corner of lands described in a deed from Larry E. Rowlee to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce Drive Development dated April 19, 1983 and recorded in Oswego County Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 12, thence S 40° 51' 00" E, parallel with the southwesterly boundary of said lands conveyed to Rowlee and Clark and 66.00 feet

distant southwesterly therefrom, a distance of 374.00 feet to a point;
thence S 85° 50' 00" E, a distance of 93.36 feet to a point, said point
being the southwesterly corner of lands described in a deed from Robert
A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce Drive
Development dated April 18, 1983 and recorded in Oswego County Clerk's
Office April 20, 1983 in Book 889 of Deeds at Page 10, thence N 49° 11' 00" E
along the southeasterly boundary of said lands, a distance of 240.00
feet to the southwesterly boundary of lands described in a deed from
Larry E. Rowlee to Susan P. Rowlee dated December 23, 1986 and recorded
in Oswego County Clerk's Office in Book 1002 of Deeds at Page 1; thence
S 40° 51' 00" E along the southwesterly boundary of said lands conveyed
to Susan P. Rowlee, a distance of 167.63 feet to a point, said point
being 10 feet distant westerly, measured at right angles, from the
easterly boundary of said lands of Susan P. Rowlee; thence S 3° 50' 21" E,
parallel with said easterly boundary of lands of Susan P. Rowlee and the
easterly boundary of the aforementioned lands of Larry E. Rowlee and
Bruce J. Clark and 10 feet distant westerly therefrom, a distance of
728.94 feet to the point of beginning.

DEMISED PREMISES          (PARCEL A)

All that tract or parcel of land situate in the Town of Volney, County
of Oswego and State of New York, being part of Subdivision 11 of Harper's
Location in said Town and being more particularly described as follows:

Beginning at a point on the northerly boundary of Fulton-Three Rivers
Pt. 1, State Highway No. 5251 (NYS Route No. 481), said point being
N 79° 49' 04" N, a distance of 10.31 feet, measured along said highway
boundary, from the southeasterly corner of lands described in a deed from
Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce
Drive Development dated April 18, 1983 and recorded in Oswego County
Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 19; running
thence N 79° 49' 04" N along said highway boundary, a distance of 362.73
feet to an angle point; thence N 82° 24' 26" W, continuing along said
highway boundary, a distance of 342.07 feet to a point; thence the
following 7 courses and distances:

1)  N  9° 00' 00" E, 340.41 feet;
2)  S 81° 00' 00" E, 35.08 feet;
3)  N  9° 00' 00" E, 189.32 feet;
4)  N 81° 00' 00" W, 70.00 feet;
5)  N  9° 00' 00" E, 90.00 feet;
6)  S 81° 00' 00" E, 97.95 feet;
7)  S 85° 50' 00" E, 197.33 feet to a point,

said point being the southwesterly corner of lands described in a deed
from Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a
Pierce Drive Development dated April 18, 1983 and recorded in Oswego
County Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 10;
thence N 49° 11' 00" E along the southeasterly boundary of said lands,
a distance of 240.00 feet to the southwesterly boundary of lands described
in a deed from Larry E. Rowlee to Susan P. Rowlee dated December 23, 1986
and recorded in Oswego County Clerk's Office in Book 1002 of Deeds at
Page 1; thence S 40° 51' 00" E along the southwesterly boundary of said
lands conveyed to Susan P. Rowlee, a distance of 167.63 feet to a point,
said point being 10 feet distant westerly, measured at right angles, from
the easterly boundary of said lands of Susan P. Rowlee; thence S 3° 50' 21" E,
parallel with said easterly boundary of lands of Susan P. Rowlee and the
easterly boundary of the aforementioned lands of Larry E. Rowlee and Bruce
J. Clark and 10 feet distant westerly therefrom, a distance of 728.94 feet
to the point of beginning, containing 424,483 square feet equals 9.745
acres, more or less.

Exhibit A - Page 4 of 4          (Parcel A)

Exhibit B

K mart
River Glen
after Mod



October 10, 1991

**K**

Kmart Corporation
International Headquarters
3100 West Big Beaver Road
Troy MI 48084-3163

Mr. Lou Aiello
The Widewaters Group
5786 Widewaters Pkwy.
Dewitt, NY  13214

Re: Kmart #   - Fulton, NY
    SEC 481 & Pierce Dr.

Dear Mr. Aiello:

At the request of Mr. T. A. Wardlow of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Criteria Drawings and Outline
Specifications identified with the set number K-1095, covering our minimum
requirements for the construction of a Kmart.

The Typical Kmart Criteria Drawings and Specifications consist of the
following:

<u>91,266 sq. ft. Kmart dated December 1, 1990 (Series 38)</u>

    SO-1                          M-1G thru M-4G
    L-1, I-1                      P-1G thru P-4G
    A-1 thru A-12                 E-1 thru E-13

<u>Outline Specifications</u> dated December 1, 1990, including Specification Sheet
SPR-118 dated March 25, 1991, SPR-119 dated June 4, 1991, and SPR-120 dated
August 21, 1991.

<u>Please Note:</u>
1. Site irrigation is required at this location.

<u>3,575 sq. ft. Enclosed Garden Shop</u>
Drawings TD-361A, TD-361M-1G, TD-361M-2G, and TD-361E all dated revised
July 30, 1991.

The Typical Kmart store plans and specifications described above are to be
modified as indicated in the criteria revisions outlined in the following
paragraphs.

1. <u>Overhead Double Door Weather Seals</u> consisting of drawing TD-315 dated
   revised October 21, 1988.

2. <u>Exterior Elevation and Signage</u> consisting of drawings PED-1, "Prototype
   Exterior Design," dated April 3, 1991 and drawing TD-362 A-2 dated revised
   May 10, 1991.

3. <u>Relocated Wall Switch Locations in Eatery Express</u> consisting of drawing
   TD-368E dated revised May 30, 1991.

4. <u>Security Office CCTV</u> consisting of drawing TD-367E dated March 6, 1991.

EXHIBIT  C

Mr. Lou Aiello                                      -2-              October 10, 1991
The Widewaters Group
Re: Kmart #    - Fulton, NY

5.  Enlarged Plan - Checkout Area consisting of drawing TD-370E dated
    March 18, 1991.

6.  Relocation of Emergency Doors when Required by Code consisting of drawing
    TD-379A dated May 24, 1991.

7.  KIN II System consisting of drawing TD-350E dated revised September 26,
    1991.

8.  PCA Studio consisting of drawings TD-340AE dated revised November 2, 1990.

9.  Partial Stock Area Power Plan consisting of drawing TD-383E dated
    September 5, 1991.

10. Detail of Bulkhead at Vestibule consisting of drawing TD-384A dated
    August 27, 1991.

These drawings and specifications describe a 91,266 sq. ft. Kmart with the
Garden Shop to the right. At this location, however, the Kmart is opposite
hand. We are including a Preliminary Layout #K-1095, dated September 14,
1991, for this size and hand store. This drawing also indicates any required
modifications to the Typicals for this specific location.

Please advise your consultants regarding the following paragraphs on
utilities, services, and the supplemental mechanical/electrical information
which augment the enclosed drawings/specifications for the above mentioned
location.

Secondary electric service from Niagara Mohawk is acceptable. Power factor
correction is not required unless energy conservation codes in effect require
improvement.

Uninterruptible natural gas shall be utilized for space heating and other
equipment where specified in the Criteria Documents. Two pound (2 psig) gas
pressure may not be available from Niagara Mohawk. Building gas piping size
changes within the building and deletion of gas regulators must be coordinated
with utility if the 2 psig gas at the meter outlet is not available.
Coordinate gas pressure shown on the mechanical drawings with the gas
utility. In the event that natural gas is not available as required at this
site, Landlord shall advise Kmart Corporation, Energy Systems immediately.

Provide one (1) meter for each utility to the Kmart.

The Kmart parking lot and service drive lighting shall be connected directly
to Kmart switchboard through Kmart meter. Where the site includes one or more
co-tenants the parking lot lighting in front and on the Garden Shop side shall
be fed through the Kmart meter and the remaining portion on the Landlord or
other meters.

Landlord's Engineer shall consult the telephone company relative to proper
facilities, including conduit, to handle the telephone installation.

The following features shall be incorporated into the design:

1.  Stockroom air conditioning, per Criteria requirements, is not required.


                              EXHIBIT   C

Mr. Lou Aiello                                    -3-                October 10, 1991
The Widewaters Group
Re: Kmart #      - Fulton, NY

Please be advised that our insurance underwriter is:

        Protection Mutual Insurance Company
        17330 Preston Road
        Suite 200C
        L.B. 436 & 442
        Dallas, Texas  75252
        Contact:  Mr. G. Charles Striemer
        Phone:    (214) 931-7650

Direct any inquiries to the listed individual at the above address.

### SITE DEVELOPMENT

Kmart Corporation shall be party to the initial site development
decisions.  To enable Kmart Corporation to properly evaluate the site
conditions and have a meaningful input in these major decisions, the
Developer shall submit to Kmart Corporation, in written and drawing form,
a description of his proposed preliminary site development design.

The site development design shall encompass all aspects of the proposed
Kmart operation i.e. access, site drainage and the relationship of the
Kmart floor elevation to adjacent grades, roads and buildings.  Land
balance shall be given consideration but shall not be the overriding
factor in the ultimate site design.

Preparation of final engineering drawings or commitments affecting site
improvements and development shall not be made by the Developer until
approval has been granted by Kmart Corporation.

The design package shall indicate the proposed building location, floor
elevation, site drainage pattern and utilities.  The design package shall
also include a topographical survey of the entire site including an area
extending approximately 150' onto all adjacent properties and to the
centerline of all boundary roads, or as may be required to determine any
adjacent terrain conditions which might influence the site development
design.  The survey shall also include the site description, measurements
and all existing utilities.  Preliminary test boring reports indicating
the sub-surface soil conditions shall also be submitted.

Kmart Corporation will review all submitted data and if necessary, visit
the site.  If in the judgment of Kmart Corporation the proposed site
development design would be detrimental to the Kmart operation, the design
will be returned to the Developer for re-study.  Upon approval of the Site
Development Design by Kmart Corporation, the Developer may proceed with
final engineering drawing.

### BUILDING DESIGN DEVELOPMENT

Kmart Corporation shall be party to the initial design phase of the Kmart
building exterior in order to ensure its compatability with the entire
development.  Kmart exterior can be modified to achieve this requirement.
However, the economy of the design concept should be preserved.

EXHIBIT  C

Mr. Lou Aiello                    -4-              October 10, 1991
The Widewaters Group
Re: Kmart #.     - Fulton, NY

The Developer shall submit to the Tenant's Design Division two (2) sets of
preliminary design presentation drawings depicting the total project.  The
drawings shall include elevations, sections, dimensions and indicate
proposed materials.  A sample board of the proposed materials shall be
submitted.

The submittal shall be made and Tenant's approval shall be obtained prior
to the start of Construction Documents.

The checking and approval of the Contract Documents (for compliance with
Kmart Corporation minimum requirements) will not be processed unless the
above procedures are followed.

These sets of Typical Plans and Specifications are to be used only as a guide
for pricing purposes and as such are not intended, nor will their use be
permitted, for construction purposes.  If, at the time this project is
formalized, modifications which affect electrical or plumbing underfloor
locations have occured, additional information covering such modifications
will then be furnished.

At such time as all parties are authorized to proceed with this project, it is
required that you, your Architect, Civil Engineer, Electrical and Mechanical
Engineers attend a "KICK-OFF MEETING" at this office.

In order to expedite the completion of the Contract Documents by your
Architect/Engineers, we will furnish to you, at the "KICK-OFF" meeting, either
a set of mylar reproducibles, CADD (Intergraph) magnetic tape or diskette of
the criteria drawings for a basic Kmart project.

Please Note:  Kmart Corporation requires that the Developer's Architects
submit the contract drawings and specifications at least sixty (60) days
before the start of construction.

Very truly yours,

Stephen K. Li, A. I. A.
Manager, Design Division
Construction Department

SKL:sll
   Mr. J. M. Vachon.
   Mr. C. E. Strom
   Mr. T. A. Wardlow
   Energy Systems

623/100-103

EXHIBIT   C

**<u>Exhibit 2</u>**

**Receivership Order**



**PAID**
OSWEGO CO. CLERK'S OFFICE

*Ex-Parte Term*

At an IAS Part X of the Supreme Court of the State of New York held in and for the County of Oswego, at the Courthouse thereof, 25 East Oneida Street Oswego, New York 13126, on the *18* day of *May*, 2016.

PRESENT: **James W. McCarthy**
Justice of the Supreme Court

---

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF BANC OF AMERICA COMMERCIAL MORTGAGE INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-2, acting by and through its Special Servicer Torchlight Loan Services, LLC, | Index No.: *16 - 0521* |
| Plaintiff, | **EX PARTE ORDER APPOINTING RECEIVER IN COMMERCIAL MORTGAGE FORECLOSURE ACTION** |
| - against - | Foreclosure of Riverglen Square located at 2078 Route 481 Fulton, New York 13069 |
| CCCF RIVER GLEN HOLDINGS, INC., THE CAYUGA COUNTY COMMUNITY COLLEGE FOUNDATION, INC., KMART CORPORATION, CAYUGA COMMUNITY COLLEGE, NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, and "JOHN DOE NO. 1" TO "JOHN DOE NO. 100," inclusive, the last one hundred names being fictitious and unknown to plaintiff, the persons or parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint, | Section: 253.43 Block: 01 Lot: 14.02 |
| Defendants. | |

UPON the Summons and Complaint dated April 28, 2016 and filed in the Office

of the Oswego County Clerk, upon reading and filing the Attorney's Affirmation of Keith M.

Brandofino, Esq. dated May 3, 2016, and the affidavit of Jorge R. Rodriguez, Asset Manager of

Torchlight Loan Services, LLC, the Special Servicer of the subject loan for Plaintiff, U.S. Bank

National Association, as Trustee for the registered holders of Banc of America Commercial

11361669V.2 051121/0967639

5-5-16u

Mortgage Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-2 ("Plaintiff"),

sworn to on April 27, 2016 ("Rodriguez Affidavit"), requesting the appointment of a receiver;

and

IT appearing to the satisfaction of the Court that Plaintiff brings this action to

foreclose a Consolidation, Modification and Restatement of Mortgages and Mortgage and

Security Agreement dated March 17, 2006 (the "Consolidated Mortgage") on real property

situated in the City of Fulton, County of Oswego, State of New York, also described as Section

253.43, Block 01, Lot 14.02, also known by the street address 2078 Route 481, Fulton, New

York 13069, as more particularly described in Exhibit A hereto (the "Premises"); and

IT further appearing that pursuant to the Consolidated Mortgage, CCCF River

Glen Holdings, Inc. (the "Borrower"), as successor to the Borrower named therein, assigned the

rents, issues, income and profits of the Premises to Plaintiff and that upon default under the terms

of the Consolidated Mortgage, the right of Borrower to collect and receive the rents, issues,

income and profits of the Premises may be revoked by Plaintiff, and that a receiver may be

appointed without notice; and

IT further appearing that as set forth in the the Rodriguez Affidavit that, Plaintiff

is the current holder of the Consolidated Mortgage; and

IT further appearing from the Rodriguez Affidavit that the Borrower is in default

of its obligations under the Consolidated Mortgage, that the Premises is capable of being rented

and that the rentals, if they exist, produce income, and that such profits, if they exist, are not

being applied to the reduction of the charges against the Premises; and that a receiver is needed

to enter into leases and collect rents from current and future tenants of the Premises; and that the

appointment of a receiver of the rents and profits of the Premises is necessary for the protection

2

of Plaintiff;

NOW, on motion of Kilpatrick Townsend & Stockton, LLP, counsel of record for

Plaintiff, it is

ORDERED, that  DAVID P. MARTIN, ESQ  , Fiduciary Id No.:

_____ of MARNIS BEACH Syracuse NY , Telephone No.: 315-214-2631 be and

he/she hereby is appointed, with the usual powers and directions, temporary receiver (the

"Receiver") for the benefit of all the rents and profits now due and unpaid or to become due

during the pendency of this action and issuing out of the Premises; and it is further;

ORDERED, that the Receiver is authorized to forthwith take charge and enter into

possession of the Premises; and it is further

ORDERED, that before entering upon his/her duties, the Receiver shall comply

fully with the requirements of RPAPL § 1325, CPLR §§ 6401-6404, Section 35-A of the

Judiciary Law and that Receiver shall execute and file with the Office of the Clerk of the Court

his/her oath of office, pursuant to CPLR § 6402 and execute to the People of the State of New

York and file with the Clerk of this Court an undertaking pursuant to CPLR § 6403 in the penal

sum of $ 100,000.00  , conditioned for the faithful discharge of his/her duties as the Receiver;

and the Receiver shall serve a copy of his/her oath of office and his/her undertaking and all other

papers filed with the Court, pursuant to his/her appointment of Plaintiff's attorneys; and it is

further

ORDERED, that the Receiver be and hereby is directed to demand, collect and

receive from the occupants, tenants, and licensees in possession of the Premises, or other persons

liable therefor, inclusive of Borrower and the Guarantor, The Cayuga County Community

College Foundation, Inc. (the "Guarantor") all the rents and license fees thereof now due and

3

11361669V.2 051121/0967639

unpaid or hereafter to become fixed or due and in the event that Borrower and/or Guarantor is occupying the Premises, the fair use and occupancy of the space so occupied; and that the Receiver be and hereby is authorized to institute and carry on all legal proceedings necessary for the protection of the Premises or to recover possession of the whole, or any part thereof, and/or apply to the Court to fix reasonable rental value and license fee value and to compel the tenants and occupants to attorn to the Receiver; and it is further directed that the Receiver may institute and prosecute suits for the collection of rents, license fees and other charges now due or hereafter to become due or fixed and summary or other proceedings for the removal of any tenants or licensees or other persons therefrom; and it is further

ORDERED, that pursuant to the provisions of the General Obligations Law § 7-105, anybody holding any deposits or advances of rental as security under any lease or license agreement affecting space in the Premises shall turn same over to the Receiver within five (5) days after the Receiver shall have qualified; and thereupon the Receiver shall hold such security subject to such disposition thereof as shall be provided in an Order of this Court to be made and entered in this action; and it is further

ORDERED, that anybody in possession of same shall immediately turn over to the Receiver originals or copies of all records and information they may have concerning the Premises that are necessary for the operation and management of the Premises including but not limited to: rent lists, orders, unexpired and expired leases, agreements, correspondence, notices, registration statements, all books, records, insurance policies on the Premises, tenant and vendor insurance certificates, federal tax ID numbers, keys, passwords or access codes to the Premises, all operating information, security deposits, check ledgers, all documents pertaining to pending or threatened litigation, all documents pertaining to code or ordinance violations, all existing

4

utility or service contracts, all pending bids for contractor work, certificates of occupancy, including, any plans, engineering plans, site plans, floor plans or drawings of the Premises and all on-site employee records; and it is further

ORDERED, that the Receiver be and is hereby authorized to make any reasonable and necessary ordinary repairs to the Premises not to exceed $5,000.00 without further Order of this Court or written consent of Plaintiff's attorney; and it is further

ORDERED, that the Receiver forthwith deposit all monies received by him/her at the time he/she receives the same in his/her own name as the Receiver in a licensed New York FDIC insured depository and such account shall show the name of this action, and the Receiver shall not be permitted to make withdrawals therefrom except as directed by the Court herein, or on a check signed by the Receiver and countersigned by the surety on the undertaking and the Receiver shall send, on a monthly basis, a copy of the monthly statements of deposits and withdrawals for said account to Plaintiff's counsel, Kilpatrick Townsend & Stockton LLP, 1114 Avenue of the Americas, 21st Floor, New York, New York 10036 to the attention of Keith M. Brandofino, Esq.; and it is further

ORDERED, that the Receiver be and he/she is hereby authorized from time to time to rent or lease space and facilities for terms not exceeding one (1) year or such longer terms as may be required by the laws of the State of New York; to keep the Premises insured against loss by damage or fire; to pay the taxes, assessments, water rates, sewer rents, vault rents, salaries of employees, supplies and other charges; to comply with all lawful requirements of any municipal department or other authority of the municipality in which the Premises is situated; take such reasonable steps as are necessary to protect, prevent and repair the Premises from deterioration, vandalism, trespass and damage by natural forces and the elements; and to procure

5

such fire, plate glass, liability and other insurance as may be reasonably necessary, provided, however, that the Receiver shall not incur obligations in excess of the monies in his/her possession except upon Order of the Court; and it is further.

ORDERED, that if it is necessary in the fulfillment of Receiver's duties, Plaintiff may, but shall not be required to, advance funds to Receiver for the payment of repairs, maintenance, insurance, taxes, the curing of violations or any other expenses which may be necessary for the preservation and protection of the Premises by Receiver and to the extent that the rents, issue, revenues and profits collected by Receiver and remaining in Receiver's account are insufficient to reimburse Plaintiff for such advances, all such advances made by Plaintiff shall be secured by its Consolidated Mortgage and shall be added to and included to the debt thereupon due and in the judgment of foreclosure and sale; and it is further

ORDERED, that the tenants, licensees or other persons in possession of any part of the Premises attorn to the Receiver and pay over to the Receiver all rents and license fees and other charges of such premises now due and unpaid, or that may hereafter become due and perform any other obligations under the tenants' leases; and that Borrower and Guarantor be enjoined and restrained from collecting the rents and license fees and other charges of the Premises and from interfering in any manner with the Premises or its possession; and from transferring, removing or in any way disturbing any of the occupants or employees; and that all tenants, occupants, employees and licensees of the Premises and other persons liable for the rents be and are hereby enjoined and restrained from paying any rent or license fees or other charges for the Premises to Borrower, Guarantor, their agents, servants or attorneys; and it is further

ORDERED, that all persons now or hereafter in possession of the Premises, or any part thereof; and not holding such possession under valid and existing leases or tenancies, do

6

forthwith surrender such possession to the Receiver, subject to emergency rent laws, if any; and it is further

ORDERED, that the Receiver is prohibited from incurring obligations in excess of the monies in his/her hand without further Order of this Court or written consent of Plaintiff's attorney; and it is further

ORDERED, that the Receiver, after paying the expenses of the management and care of the Premises as above provided, retain the balance of the monies which may come into his/her hands until the sale of the Premises under a judgment to be entered in this action and/or until further Order of the Court; and it is further

ORDERED, that the Receiver, or any party hereto, may at any time on proper notice to all parties who may have appeared in this action, apply to this Court for further or other instructions or authority necessary to enable the Receiver to properly fulfill his/her duties; and it is further

ORDERED, that Borrower and Guarantor turn over to the Receiver all rents collected from and after the date of this Order; and it is further

ORDERED, that the Receiver named herein shall comply with Rule 36 of the Chief Judge, Section 35A of the Judiciary Law, Sections 6401-6404 of the Civil Practice Law and Rules and Sections 1325 of the Real Property Actions and Proceedings Law; and it is further

ORDERED, that, notwithstanding any other provision of this Order to the contrary, the Receiver shall not appoint an attorney, agent, appraiser, auctioneer or accountant,

11361669V.2 051121/0967639

landlord-tenant counsel or any other secondary appointments without prior authorization of the Court.

Signed: May 18, 2016

ENTER:

_____
HON. JAMES W. MCCARTHY JSC

11361669V.2 051121/0967639

EXHIBIT A

(See attached pages)

All that tract or parcel of land situate in the City of Fulton, formerly in the Town of Volney, County of Oswego and State of New York, being part of Subdivision 11 of Harper's Location in said Town and being more particularly bounded as follows:

Beginning at a point in the northerly boundary of Fulton-Three Rivers Pt. 1, State Highway No. 5251 (NYS Route No. 481), said point being the southeasterly corner of lands described in a deed from Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce Drive Development dated April 18, 1983 and recorded in Oswego County Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 19; running thence westerly along said Highway boundary, the following 4 courses and distances:

1) North 79 degrees 49 minutes 04 seconds West 373.04 feet;
2) North 82 degrees 24 minutes 26 seconds West, 1203.15 feet;
3) North 71 degrees 18 minutes 47 seconds West, 288.17 feet;
4) North 46 degrees 00 minutes 46 seconds West, 79.37 feet to the most southerly corner of lands appropriated by The People of the State of New York by virtue of Map No. 38R-1, Parcel No. 63;

THENCE North 59 degrees 41 minutes 42 seconds East along the southerly boundary of said lands, a distance of 150.91 feet to the southeasterly corner thereof;

THENCE North 44 degrees 12 minutes 28 seconds West along the northeasterly boundary of said lands, a distance of 116.90 feet to a point on the southeasterly boundary line of Pierce Drive;

THENCE North 49 degrees 24 minutes 36 seconds East along the southeasterly street boundary, a distance of 58.35 feet to the northwesterly corner of lands conveyed by Helen J. Collins to Donald R. Stanford and Elizabeth J. Stanford by deed dated December 1, 1977 and recorded in Oswego County Clerk's Office in Book 814 of Deeds at Page 794;

THENCE South 44 degrees 12 minutes 28 seconds East along the southwesterly boundary of said lands conveyed to Stanford, a distance of 116.00 feet to the southwesterly corner thereof;

THENCE North 46 degrees 33 minutes 20 seconds East along the southeasterly boundary of said lands, a distance of 60.00 feet to the southeasterly corner thereof, said point being on the southwesterly boundary of lands conveyed by Norma R. Pierce and Helen J. Collins to Helen J. Collins by deed recorded in Oswego County Clerk's Office July 5, 1966 in Book 690 of Deeds at Page 492;

THENCE South 44 degrees 12 minutes 28 seconds East along the southwesterly boundary of said lands conveyed to Collins, a distance of 7.00 feet to the southwesterly corner thereof;

THENCE North 49 degrees 27 minutes 10 seconds East along the southeasterly boundary of said lands, a distance of 132.52 feet to a point on the southwesterly boundary of lands conveyed by Robert A. Gillespie and Joyce L. Gillespie to Calvin L. Austin and Ruth A. Austin be deed dated February 15, 1969 and recorded in Oswego County Clerk's Office February 19, 1969 in Book 711 of Deeds at page 240;

11361669V.2 051121/0967639

THENCE South 45 degrees 38 minutes East along the southwesterly boundary of said lands conveyed to Austin, a distance of 107.52 feet to the southwesterly corner thereof;

THENCE North 44 degrees 14 minutes 22 seconds East along the southeasterly boundary of said lands, a distance of 60.00 feet to the southeasterly corner thereof;

THENCE North 45 degrees 45 minutes 38 seconds West along the northeasterly boundary of said lands of Austin, a distance of 147.73 feet to the southerly boundary of Pierce Drive;

THENCE along said boundary of Pierce Drive, the following 7 courses and distances:

1) North 77 degrees 48 minutes 12 seconds East, 122.56 feet;
2) Southeasterly, following a curve to the right having a radius of 2814.90 feet whose chord bears South 64 degrees 22 minutes 52 seconds East, an arc distance of 11.64 feet;
3) North 74 degrees 49 minutes 47 seconds East, 112.68 feet;
4) North 86 degrees 36 minutes 14 seconds East, 48.14 feet;
5) Northwesterly, following a curve to the left having a radius of 2914.90 feet whose chord bears North 61 degrees 54 minutes 09 seconds West, and arc distance of 14.36 feet;
6) North 75 degrees 00 minutes 00 seconds East, 456.13 feet;
7) North 49 degrees 11 minutes 00 seconds East, 199.13 feet to a point, said point being South 49 degrees 11 minutes 00 seconds West, a distance of 66.00 feet, measured along said street boundary, from the northwesterly corner of lands described in a deed to Oswego Industries, Inc. recorded in Oswego County Clerk's Office in Book 1200 of Deeds at Page 305, said point being designated as Point "A" for future reference;

THENCE South 40 degrees 51 minutes 00 seconds East, parallel with the southwesterly boundary of said lands conveyed to Oswego Industries, Inc. and 66.00 feet distant southwesterly therefrom, a distance of 374.00 feet to a point;

THENCE South 85 degrees 50 minutes 00 seconds East, a distance of 93.36 feet to a point, said point being the southwesterly corner of lands described in a deed from Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce Drive Development dated April 18, 1983 and recorded in Oswego County Clerk's Office April 30, 1983 in Book 889 of Deeds at Page 10, said point being designated as Point "B" for future reference;

THENCE North 49 degrees 11 minutes 00 seconds East along the southeasterly boundary of said lands, a distance of 84.44 feet to a point in the southerly boundary of said lands conveyed to Oswego Industries, Inc.;

THENCE South 81 degrees 00 minutes 44 seconds East along said southerly boundary, a distance of 241.20 feet to a point in the easterly boundary of the aforementioned lands conveyed to Larry E. Rowlee and Bruce J. Clark;

THENCE South 3 degrees 50 minutes 21 seconds East along said easterly boundary, a distance of 718.17 feet to the point of beginning, as shown on a Final Plan of River Glen Square prepared by Phillips & Associates, Surveyors, P.C. dated August 10, 1993 filed October 14, 1993 in the Oswego County Clerk's Office as Map No. 93-337, Plat 14, Line 54.

11

Together with a Permanent Right of Way for Ingress and Egress, bounded and described as follows:

Beginning at a point in the southeasterly boundary of Pierce Drive, said point being designated as Point "A" in the first above described parcel of land;

RUNNING THENCE South 40 degrees 51 minutes 00 seconds East along a northeasterly boundary of the said first above described parcel, a distance of 374.00 feet to a point;

THENCE South 85 degrees 50 minutes 00 seconds East along a northerly boundary of said parcel, a distance of 93.36 feet to the point designated as Point "B" in the above described parcel;

THENCE North 49 degrees 11 minutes 00 seconds East along a northwesterly boundary of said parcel, a distance of 84.44 feet to a point in the southerly boundary of lands conveyed to Oswego Industries, Inc. by deed recorded in Oswego County Clerk's Office in Book 1200 of Deeds at Page 305;

THENCE North 81 degrees 00 minutes 44 seconds West along said southerly boundary, a distance of 130.92 feet to a point;

THENCE North 40 degrees 51 minutes 00 seconds West along the southwesterly boundary of said lands, a distance of 340.00 feet to the southeasterly boundary of Pierce Drive;

THENCE South 49 degrees 11 minutes 00 seconds West along said southeasterly boundary of Pierce Drive, a distance of 66.00 feet to the point of beginning.

Excepting and reserving from the first above described parcel a Permanent Right-of-Way for Ingress and Egress, bounded and described as follows:

Beginning at the point designated Point "B" in the first above described parcel;

RUNNING THENCE North 49 degrees 11 minutes 00 seconds East along the southeasterly boundary of lands described in a deed from Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark, d/b/a Pierce Drive Development dated April 18, 1983 and recorded in Oswego County Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 10, a distance of 84.44 feet to a point in the southerly boundary of lands conveyed to Oswego Industries, Inc. by deed recorded in Oswego County Clerk's Office in Book 1200 of Deeds at Page 305;

THENCE South 81 degrees 00 minutes 44 seconds East along said southerly boundary, a distance of 241.20 feet to a point in the easterly boundary of the aforementioned lands conveyed to Larry E. Rowlee and Bruce J. Clark;

THENCE South 3 degrees 50 minutes 21 seconds East along said easterly boundary, a distance of 66.15 feet to a point;

THENCE North 81 degrees 00 minutes 44 seconds West, a distance of 310.38 feet to the point of beginning.

12

Excepting and reserving from the first above described parcel the following tract or land:

All that tract or parcel of land situate in the Town of Volney, County of Oswego and State of New York, being part of Subdivision 11 of Harper's Location in said Town, being Parcel No. 2 as shown on a Final Plan of River Glen Square prepared by Phillips & Associates, Surveyors, P.C. dated August 10, 1993 and filed in the Oswego County Clerk's Office October 14, 1993 as Map No. 93-337, Plat 14, Line 54, and being more particularly described as follows:

Commencing at a point on the northerly boundary of Fulton-three Rivers Pt. 1, State Highway No. 5251 (NYS Route No 481), said point being the southeasterly corner of lands described in a deed from Robert A. Gillespie to Larry E. Rowlee and Bruce N. Clark d/b/a Pierce Drive Development dated April 18, 1983 and recorded in Oswego County Clerk's Office April 20, 1983 in Book 889 of Deeds at Page 19, said point being marked by a concrete monument;

THENCE North 79 degrees 49 minutes 04 seconds West along said highway boundary, a distance of 373.04 feet to an angle point;

THENCE North 82 degrees 24 minutes 26 seconds West, continuing along said highway boundary, a distance of 342.07 feet to a point;

THENCE North 26 degrees 00 minutes 48 seconds West, a distance of 415.61 feet to the true point of beginning;

RUNNING THENCE North 81 degrees 00 minutes 00 seconds West, a distance of 302.00 feet to a point;

THENCE North 9 degrees 00 minutes East, a distance of 200.00 feet to a point;

THENCE South 81 degrees 00 minutes 00 seconds East, a distance of 60.00 feet to a point;

THENCE North 9 degrees 00 minutes 00 seconds East, a distance of 25.00 feet to a point;

THENCE South 81 degrees 00 minutes 00 seconds East, a distance of 80.00 feet to a point;

THENCE South 9 degrees 00 minutes 00 seconds West, a distance of 25.00 feet to a point;

THENCE South 81 degrees 00 minutes 00 seconds East, a distance of 162.00 feet to a point;

THENCE South 9 degrees 00 minutes 00 seconds West, a distance of 200.00 feet to the point of beginning.

For Information Only: Premises known as 2078 Route 481, Fulton, NY
Section 253.43 Block 01 Lot 14.02

11361669V.2 051121/0967639