Hearing Date:  To Be Determined
Objection Deadline:  To Be Determined

AKIN GUMP STRAUSS HAUER & FELD LLP          **FILED WITH REDACTIONS**
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Joseph Sorkin
Lacy M. Lawrence (*pro hac vice* pending)

*Counsel to the Official Committee of*
*Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

|  |  |  |
|---|---|---|
| **In re** | : | Chapter 11 |
|  | : |  |
| **SEARS HOLDINGS CORPORATION, *et al.*,** | : | Case No. 18-23538 (RDD) |
|  | : |  |
| **Debtors.**[1] | : | (Jointly Administered) |

-------------------------------------------------------------------

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
SEARS HOLDINGS CORPORATION, *ET AL*. FOR ENTRY OF AN ORDER
GRANTING (I) LEAVE, STANDING, AND AUTHORITY TO COMMENCE AND
PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES AND
(II) NON-EXCLUSIVE SETTLEMENT AUTHORITY IN RESPECT OF SUCH CLAIMS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

RELEVANT FACTUAL BACKGROUND................................................................................10

I.     ACT ONE:  ESL Sets the Stage for Sears's Demise with the Take Over and Stock
       Buybacks........................................................................................................................10
       A.     Sears, Roebuck and Co., a Celebrated Retail Giant...............................................11
       B.     Lampert, the Financial Engineer, and his Investment Company, ESL .................12
       C.     Lampert and ESL Acquired Kmart and Sears Roebuck, Which Became the
              Fund's Central Investments ...................................................................................14
       D.     Under Lampert's Direction, Sears Spent its Cash for ESL's Short-Term
              Benefit and to the Detriment of Sears's Long-Term Prospects ............................15

II.    ACT TWO:  With Cash Dwindling, ESL Takes Control of Sears's Desirable
       Business Units for ESL's Direct Benefit .........................................................................20
       A.     The Orchard Spin-off .............................................................................................22
       B.     The SHO Spin-off and Rights Offering ..................................................................22
       C.     The Sears Canada Partial Spin-off and Rights Offering .......................................24
              1.     The Sears Canada Partial Spin-off in 2012...................................................24
              2.     The Sears Canada Rights Offering in 2014 .................................................26
       D.     The Lands' End Spin-off.........................................................................................26
       E.     Sears in 2014 after the Spin-offs............................................................................30

III.   ACT THREE:  Lampert and ESL Secure for Their Own Benefit Sears's
       Remaining Valuable Assets—Prime Real Estate—From an Insolvent Sears ...................32
       A.     The Terms of the Seritage Transaction ...................................................................32
       B.     The Seritage Transaction Was a Windfall for Lampert and ESL ...........................36
              1.     Sears Received Far Below Reasonably Equivalent Value .........................37
              2.     Sears Was Insolvent at the Time of the Seritage Transaction ...................44
              3.     The Seritage Transaction Was an Insider Deal Orchestrated by
                     Lampert and ESL ..........................................................................................49
              4.     As Lampert Planned, the Seritage Transaction Provided ESL with
                     Direct, Ascertainable, and Quantifiable Financial Benefits......................51
              5.     ESL Received Direct, Ascertainable, and Quantifiable Financial
                     Benefits in its Capacity as a Sears Creditor ................................................54

IV.    ACT FOUR:  ESL "Finances" Sears to Protect its Investments, Lien Up
       Remaining Assets, and Solidify Sears's Fate...................................................................56
       A.     ESL's Financings Were Attempts to Purchase Sears's Remaining Valuable
              Unencumbered Assets at a Discount........................................................................62
       B.     ESL Provided Capital with No Expectation of Repayment.....................................63
       C.     ESL's Financings Were Meant to Buy Time for Lampert and ESL to
              Monetize Sears's Assets for their Own, Direct Benefit .........................................64
       D.     ESL Extended Financings to Play an Option on Sears ..........................................65
       E.     ESL Extended Financings to Protect its Investment in Seritage............................65
       F.     ESL's Contributions Were Problematic for Other Reasons as Well .....................68

V.     ACT FIVE:  The Long-Awaited Bankruptcy....................................................................70

i

VI.    EPILOGUE:  The Creditors' Committee's Investigation and Basis for Standing............70
    A.    The Creditors' Committee's Rule 2004 Investigation ............................................71
    B.    The Estates' Claims Against Lampert, ESL, and Kamlani ...................................72
    C.    The Debtors' Refusal to Assert the Proposed Claims ...........................................73

LEGAL STANDARD FOR STANDING ...................................................................................77

ARGUMENT ...............................................................................................................................78

I.    The Creditors' Committee Has Presented Colorable Claims Justifying Derivative
    Standing ...................................................................................................................................78
    A.    The Debt Recharacterization Claim is Colorable ..................................................79
    B.    The Equitable Subordination Claim is Colorable ..................................................86
        1.    ESL Abused its Insider Position to Unfairly Strip Value from Sears
            and its Creditors ........................................................................................88
        2.    ESL's Conduct Injured Creditors and Conferred an Unfair
            Advantage to ESL .....................................................................................92
        3.    Subordinating All ESL Claims to All Allowed Claims of
            Unsecured Creditors is Not Inconsistent with Bankruptcy Law...............93
    C.    The Actual Fraudulent Transfer Claims Are Colorable .........................................94
        1.    The Seritage Transaction is Subject to Avoidance as an Actual
            Fraudulent Transfer...................................................................................97
        2.    The Lands' End Spin-off Constitutes an Actual Fraudulent Transfer........99
        3.    The 2016-2018 ESL Contributions Constitute Actual Fraudulent
            Transfers..................................................................................................101
    D.    The Constructive Fraudulent Transfer Claims Are Colorable .............................103
        1.    The Seritage Transaction is Subject to Avoidance as a Constructive
            Fraudulent Transfer.................................................................................106
        2.    The Lands' End Spin-Off is Subject to Avoidance as a Constructive
            Fraudulent Transfer.................................................................................107
        3.    The Guarantees and Asset Grants In Connection With the
            IP/Ground Lease Term Loan Facility Are Subject to Avoidance as
            Constructive Fraudulent Transfers..........................................................108
    E.    The Claims to Recover the Value of the Properties Transferred in the
        Seritage Transaction and the Lands' End Spin-off from Lampert and ESL
        are Colorable .........................................................................................................109
        1.    The Seritage Transaction Was Made for the Benefit of Lampert and
            ESL ...........................................................................................................110
        2.    The Value of the Property Transferred in the Lands' End Spin-off
            Can Be Recovered from Lampert and ESL Pursuant to Section
            550(a)(1) ...................................................................................................112
    F.    The Claim for Disallowance of ESL's Claims is Colorable ...............................113
    G.    The Unjust Enrichment Claims are Colorable .....................................................115
        1.    The Estates Have a Colorable Claim for Unjust Enrichment
            Related to the Lands' End Spin-off...........................................................115
        2.    The Estates Have a Colorable Claim for Unjust Enrichment
            Related to the Seritage Transaction..........................................................116

3.      The Estates Have a Colorable Claim for Unjust Enrichment
Related to the 2016-2018 ESL Contributions ..........................................117

H.      The Breach of Fiduciary Duty Claims are Colorable .........................................117

II.    The Debtors Have Unjustifiably Refused to Prosecute the Proposed Claims
Despite Their Significant Value to the Estates ................................................................122

III.   This Court Should Grant the Creditors' Committee Authority to Settle the
Proposed Claims ..............................................................................................................123

RESERVATION OF RIGHTS .............................................................................................124

NOTICE ...............................................................................................................................124

CONCLUSION .....................................................................................................................124

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
   169 B.R. 832 (Bankr. S.D.N.Y. 1994)...................................................................92

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns
   Corp.)*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) ...............................................77, 122

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns
   Corp.)*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd in relevant part*, *Adelphia
   Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008)..........................79, 80, 88

*Alberts v. Tuft, et al. (In re Greater Se. Cmty. Hosp. Corp. I, et al.)*,
   353 B.R. 324 (Bankr. D.D.C. 2006) ...................................................................118

*Alidina v. Internet.com Corp.*,
   No. Civ. A. 17235-NC, 2002 WL 31584292 (Del. Ch. Nov. 6, 2002)..................119

*Am. Tissue, Inc. v. Donaldson Lufkin & Jenrette Secs. Corp.*,
   351 F. Supp. 2d 79 (S.D.N.Y. 2004)...................................................................104

*In re AutoStyle Plastics*,
   238 B.R. 346 (Bankr. W.D. Mich. 1999)...............................................................82

*Barber v. Golden Seed Co., Inc. (In re Ostrom-Martin, Inc.)*,
   129 F.3d 382 (7th Cir. 1997) .............................................................................104

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
   269 F.3d 726 (6th Cir. 2001) ........................................................................ *passim*

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................77

*Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings,
   Inc., et al.)*, 388 B.R. 548 (Bankr. D. Del. 2008)...............................................119

*Butler v. Enhanced Equity Fund II, LP (In re American Ambulette & Ambulance
   Serv. Inc.)*, 560 B.R. 256 (Bankr. E.D.N.C. 2016) .............................................110

*Campbell v. United States (In re Davis)*,
   889 F.2d 658 (5th Cir. 1989) .............................................................................113

*Carr v. New Enter. Assocs. Inc.*,
   No. 2017-0381-AGB, 2018 WL 1472336 (Del. Ch. Mar. 26, 2018)....................122

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1994) ...........................................................................118, 120

*Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    323 F.3d 228 (3d Cir. 2003)..................................................................................89

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006)............................................................................79, 80

*In re Cold Harbor Assocs. L.P.*,
    204 B.R. 904 (Bankr. E.D. Va. 1997)....................................................................82

*In re Comverge, Inc.*,
    No. CV 7368-VCP, 2014 WL 6686570 (Del. Ch. Nov. 25, 2014).......................121

*In re Copperfield Invs., LLC*,
    421 B.R. 604 (Bankr. E.D.N.Y. 2010)....................................................................77

*Crescent/Mach I Partners, L.P. v. Turner*,
    846 A.2d 963 (Del. Ch. 2000)..............................................................................119

*In re Duncan & Forbes Dev., Inc.*,
    368 B.R. 27 (Bankr. C.D. Cal. 2007)......................................................................96

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*,
    333 B.R. 205 (Bankr. S.D.N.Y. 2005)..............................................................87, 94

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    379 B.R. 425 (S.D.N.Y. 2007)................................................................................93

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*,
    926 F.2d 1458 (5th Cir. 1991) ...............................................................................91

*Flanagan v. Lampert et al.*,
    C.A. No. 11180-VCL (Del. Ch. June 19, 2015) ....................................................36

*Geltzer v. Mooney, et al. (In re MacMenamin's Grill Ltd.)*,
    450 B.R. 414 (Bankr. S.D.N.Y. 2011)..................................................................113

*Geltzer v. Salzman (In re ContinuityX, Inc.)*,
    582 B.R. 124 (Bankr. S.D.N.Y. 2018)..................................................................110

*Gen. Elec. Cap. Auto Lease, Inc. (In re Lucas Dallas, Inc.)*,
    185 B.R. 801 (B.A.P. 9th Cir. 1995).....................................................................110

*Gerloff v. Hostett Schneider Realty*,
    No. 12 Civ. 9404 (LGS), 2014 WL 1099814 (S.D.N.Y. Mar. 20, 2014) .............115

*Goode v. Hagerty (In re Sys. Impact, Inc.)*,
    229 B.R. 363 (Bankr. E.D. Va. 1998)....................................................................91

*Grochocinski v. Zeigler (In re Zeigler)*,
    320 B.R. 362 (Bankr. N.D. Ill. 2005) ...................................................................104

*In re Hellas Telecommunications (Luxembourg) II SCA*,
    526 B.R. 499 (Bankr. S.D.N.Y. 2015) ....................................................................95

*In re Herby's Foods*,
    134 B.R. 207 (Bankr. N.D. Tex. 1991) ...................................................................92

*Houseman v. Sagerman*,
    No. 8897-VCG, 2014 WL 1600724 (Del. Ch. Apr. 16, 2014) .............................119

*Hovis v. Powers Constr. Co. (In re Hoffman Assocs.)*,
    194 B.R. 943 (Bankr. D.S.C. 1995) ..........................................................87, 92, 94

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
    545 N.E.2d 672 (Ill. 1989) ...................................................................................115

*In re Hydrogen L.L.C.*,
    No. 08–14139, 2009 WL 2913448 (Bankr. S.D.N.Y. May 7, 2009).......................77

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001)................................................................................95

*La. World Exposition, Inc. v. Federal Ins. Co. (In re La. World Exposition, Inc.)*,
    832 F.2d 1391 (5th Cir. 1987) ................................................................................78

*Lampe v. Lampe (In re Lampe)*,
    665 F.3d 506 (3d Cir. 2011)..................................................................................118

*Leonard v. Mylex Corp. (In re Northgate Comput. Sys., Inc.)*,
    240 B.R. 328 ........................................................................................................104

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ...............................................88, 89, 92, 94

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co., LP*,
    910 F. Supp. 913 (S.D.N.Y. 1995)...............................................................105, 106

*In re Mid-American Waste Sys.*,
    284 B.R. 53 (Bankr. D. Del. 2002) .........................................................................87

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002).....................................................................87

*Mukamal v. Bakes*,
    383 B.R. 798 (S.D. Fla. 2007) ..............................................................................120

*Myun-Uk Choi v. Tower Res. Cap. LLC*,
165 F. Supp. 3d 42 (S.D.N.Y. 2016)....................................................................115

*N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) ......................................................................................118

*N.J. Steel Corp. v. Bank of N.Y.*,
No. 95 CIV 3071 (KMW), 1997 WL 716911 (S.D.N.Y. Nov. 17, 1997) ..............91

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
376 B.R. 390 (Bankr. S.D.N.Y. 2007).................................................................96

*Nisselson v. Salim & Saleem (In re Big Apple Volkswagen, LLC)*,
No. 11-11388 (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016).......110

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.)*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008)...................................................................87

*Official Comm. of Creditors v. Shearson Lehman Brothers Holdings (In re First
Capital Holdings Corp.)*, 146 B.R. 7 (Bankr. C.D. Cal. 1992) .............................78

*Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson
United Bank (In re America's Hobby Ctr.)*,
223 B.R. 275 (Bankr. S.D.N.Y. 1998)...................................................................77

*Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund,
LP (In re AppliedTheory Corp.)*, 345 B.R. 56 (S.D.N.Y. 2006), *aff'd*, 493 F.3d
82 (2d Cir. 2007)....................................................................................................86

*Official Comm of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527 (Bankr. D.
Del. 2009) ..............................................................................................................96

*Official Comm. of Unsecured Creditors of Hydrogen, LLC (In re Hydrogen LLC)*,
431 B.R. 337, 356-57 (Bankr. S.D.N.Y. 2010) ...................................................115

*Official Comm. of Unsecured Creditors of Lois/USA, Inc. (In re Lois/USA, Inc.)*
264 B.R. 69, 108-09 (Bankr. S.D.N.Y. 2001).......................................................115

*Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v.
Lattman (In re Norstan Apparel Shops, Inc.)*,
367 B.R. 68 (Bankr. E.D.N.Y. 2007)...................................................................105

*Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum
Cap. Partners, LLC (In re Radnor Holdings Corp.)*,
353 B.R. 820 (Bankr. D. Del. 2006) ......................................................................81

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009) .............................80, 82, 84, 88

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532 (W.D. Pa. 2005) ..............................................................................78

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003) ..........................................87, 91

*In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1 (Del. Ch. 2014).............................................................................118, 119

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002)......................................................................................119

*Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519 (1994) ......................................................................................115

*Pereira v. Grecolas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626 (Bankr. S.D.N.Y. 2009) .................................................................96

*Picard v. Cohmad Secs. Corp., et al. (In re Bernard L. Madoff Inv. Secs. LLC)*, 454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...............................................................104

*Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014)..............................................................................95

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ...............................................................................120

*In re Red Dot Scenic, Inc.*, 313 B.R. 181 (Bankr. S.D.N.Y. 2004) .................................................................114

*Rossof v. Lampert et al.*, C.A. No. 11178-VCL (Del. Ch. June 19, 2015) ....................................................36

*In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54 (Del. Ch. 2014)..............................................................................119

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382 (3d Cir. 2009)........................................................................87, 91

*Secs. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC ("Madoff I")*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012)................................................................110

*Secs. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC ("Madoff II")*, 501 B.R. 26 (S.D.N.Y. 2013)..............................................................................110

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ................................................................................95, 96

*Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)*,
    503 B.R. 820 (Bankr. W.D. Wash. 2013) ...............................................................87

*Solak v. Lampert et al.*,
    C.A. No. 11081-VCL (Del. Ch. May 29, 2015) ....................................................36

*In re Stanton*,
    457 B.R. 80 (Bankr. D. Nev. 2011) .......................................................................96

*Stein v. Lampert et al.*,
    C.A. No. 11173-VCL (Del. Ch. June 18, 2015) ....................................................36

*Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*,
    490 B.R. 84 (Bankr. S.D.N.Y. 2013) ...................................................................105

*Thornwood, Inc. v. Jenner & Block*,
    799 N.E.2d 756 (Ill. App. Ct. 2003) ....................................................................122

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ................................................101, 107, 108

*Tronox Inc. v. Anadarko Petroleum Corp. & Kerr-McGee Corp. (In re Tronox Inc.)*, 429 B.R. 73 (Bankr. S.D.N.Y. 2010) ....................................................118

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901 (2d Cir. 1985) .........................................................9, 77, 122

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005) ......................................................................118, 119

*Wantickets RDM, LLC v. Eventbrite, Inc.*,
    No. 654277/2016, 2017 WL 3130436 (N.Y. Sup. Ct. Jul. 21, 2017) ...................122

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) ............................................................ *passim*

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) ...................................................................105

*Wiggains v. Reed (In re Wiggains)*,
    No. 14-03064-SGJ, 2015 WL 1954438 (Bankr. N.D. Tex. Apr. 28, 2015) ...........96

*Zirn v. VLI Corp.*,
    681 A.2d 1050 (Del. 1996) ..................................................................................119

**Statutes**

11 U.S.C. § 101(32)(A)..................................................................................................105

11 U.S.C. § 510(c)(1)......................................................................................................86

11 U.S.C. § 548(a)(1)(A) .............................................................................95, 101, 114

11 U.S.C. § 548(a)(1)(B) ...................................................................................104, 105

11 U.S.C. § 550(a) ...................................................................................... *passim*

Del. Code Ann. tit. 6, § 1304(a)(1) ........................................................................95

Del. Code Ann. tit. 6, § 1305 ................................................................................104

Del. Code Ann. tit. 8, § 102(b)(7) .........................................................................119

Fed. R. Bankr. P. 2004.............................................................................................71

Fed. R. Bankr. P. 9006.............................................................................................71

Fed. R. Bankr. P. 9016.............................................................................................71

Ill. Comp. Stat. Ann. 160/5(a).......................................................................95, 104

Ill. Comp. Stat. Ann. 160/6(a)..............................................................................104

N.Y. Debt. & Cred. Law § 273 .............................................................................104

N.Y. Debt. & Cred. Law § 274 .............................................................................104

N.Y. Debt. & Cred. Law § 275 .............................................................................104

N.Y. Debt. & Cred. Law § 276 ...............................................................................95

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears Holdings Corporation ("Holdings") and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company" or "Sears"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for entry of an order, pursuant to sections 105(a), 1103(c), and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code"), in substantially the form attached as **Exhibit A** (the "Proposed Order") granting the Creditors' Committee (i) leave, standing, and authority to commence and prosecute certain claims (the "Proposed Claims"), as set forth in more detail in the draft complaint attached hereto as **Exhibit B** (the "Proposed Complaint"), on behalf of the Debtors' estates against ESL Investments, Inc. ("ESL Investments"), ESL Partners, L.P. ("ESL Partners"), JPP, LLC ("JPP"), JPP II, LLC ("JPP II") (collectively, "ESL"), Edward S. Lampert ("Lampert"), and Kunal S. Kamlani ("Kamlani") (together, with Lampert and ESL, "Defendants") and (ii) non-exclusive authority to compromise and settle the Proposed Claims on behalf of the Debtors' estates. In support of this Motion, the Creditors' Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      At this critical juncture of these Chapter 11 Cases,[2] the Creditors' Committee seeks standing to assert causes of action on behalf of the Debtors' estates against Lampert (Holdings's Chairman of the Board and former CEO), ESL (Lampert's investment firm and, with Lampert, Holdings's controlling shareholder), and Kamlani (ESL's President and a director of Holdings). Since its appointment, the Creditors' Committee and its professionals have spent considerable time and energy to investigate the prepetition transactions and conduct that led to the Debtors' bankruptcy filings. The Creditors' Committee has uncovered facts demonstrating that Sears's

---

[2] Capitalized terms not defined in this section have the definitions provided *infra*.

downfall—while, like the financial struggles of other big box retailers, was caused in part by the Internet age and other factors beyond Sears's control—also was precipitated by years of misconduct by Lampert and ESL.  By accepting ESL's bid to acquire Sears, made with a credit bid of disputed claims, the Debtors have capitulated to Lampert's and ESL's efforts to steal the remaining assets of Sears.  This is the final step of a multi-year and multi-faceted scheme—one made possible by the Debtors, which are led by Board members that were handpicked by and are beholden to Lampert and ESL.  The Creditors' Committee seeks standing on behalf of the Debtors' estates to remedy the injustices that Defendants have perpetrated on Sears and its stakeholders.

2.      Sears's downfall is nothing short of tragic.  After taking control of Sears in 2005, ESL—acting at all times at founder and namesake Lampert's direction—engaged in serial asset stripping, taking Sears's best assets out of the enterprise to shield them from the claims of other creditors and maximize ESL's investments (in Sears and other entities) in anticipation of these inevitable bankruptcy proceedings.  Over the course of Lampert's and ESL's reign, Sears closed over 3,500 stores, cut approximately 250,000 jobs, and lost untold billions in value.  In effect, Lampert and ESL managed Sears as if it were a private portfolio company that existed solely to provide the greatest returns on their investment, recklessly disregarding the damage to Sears, its employees, and its creditors.  As Sears's CEO, Chairman of the Board, controlling shareholder (with ESL), and "bank," Lampert was hopelessly conflicted as he presided over Sears's descent into insolvency and a persistent state of liquidity crisis.  Time after time, Lampert used those self-made crises to divert more of Sears's assets for his and ESL's benefit or to burden Sears with more and more purported "debt" obligations (held by ESL, of course) that would never and could never be paid back without some unfathomable turnaround.

2

3.      Theirs was an intricate scheme, and one that Lampert and ESL worked hard to conceal.  Every year, Lampert and ESL conjured up financial projections that they required Sears's management to adopt and that appeared to show Sears heading for a dramatic turnaround. Delusional at best or fraudulent at worst, Lampert's projections bore no reasonable relation to the financial realities of the enterprise:  Sears missed its revenue target every year from 2010 to 2017 by an average of *more than $4 billion per year* and missed its EBITDAP[3] target by an average of nearly *$1.4 billion per year*.  Sears has operated at a loss since 2010, but Lampert and ESL never once presented a realistic plan to turn the business around.  Instead, they set unachievable targets in order to further their self-serving scheme to rob Sears and its stakeholders of value, including by obtaining solvency opinions based on those unreasonable, Lampert-inspired projections and then using those opinions to justify stripping more assets from Sears.

4.      Lampert and ESL should not now be allowed to assert superior claims to the value of Sears's remaining assets over the very creditors they damaged through the asset stripping transactions they directed and secured financing transactions they coordinated for Lampert's and ESL's own benefit.  ESL's current bid to "save the Company" is nothing but the final fulfillment of a years-long scheme to rob Sears and its creditors of assets and its employees of jobs while lining Lampert's and ESL's own pockets.  Accordingly, the Creditors' Committee seeks standing to prosecute the Proposed Claims, seeking the following relief:

- The recharacterization as equity or equitable subordination of the "debt" that ESL provided to Sears during the years leading up to these Chapter 11 Cases.  ESL papered these capital infusions as debt and now seeks to assert claims against the Debtors' estates (as to all claims asserted by or on behalf of ESL against the Debtors' estates, "ESL's Claims"), when in fact ESL contributed this capital to Sears knowing it would be dissipated by unrelenting losses, and without any reasonable expectation (much less some formal projection) that such "debt" could ever be repaid according to its terms.  ESL's purpose in providing this capital to

---

[3] "EBITDAP" means earnings before interest, taxes, depreciation, amortization, and pension.

Sears was to maximize the value of its investments in Sears and the spin-off entities (including Seritage) and position itself advantageously vis-à-vis Sears's creditors in anticipation of these Chapter 11 Cases. These contributions (referred to herein as the 2016-2018 ESL Contributions) bear the hallmarks of equity, not debt, and should be recharacterized. They also are part of a years-long pattern of entirely unfair and inequitable conduct by Lampert and ESL against Sears and its stakeholders that requires the equitable subordination of all of ESL's Claims to the claims of all unsecured creditors.

- The recovery from ESL of the value of the properties transferred in the Seritage Transaction, in which Sears transferred some of its most valuable real estate to Seritage, an entity controlled by Lampert and ESL, for less than reasonably equivalent value and at a time when Sears was (or was rendered) insolvent. Lampert and ESL caused Sears to execute the Seritage Transaction with an actual intent to hinder, delay, or defraud creditors. Pursuant to sections 544 and 550 of the Bankruptcy Code (and applicable state law), Lampert and ESL must return the full value of the assets transferred to Seritage because of this constructive and actual fraudulent transfer. Relatedly, the Creditors' Committee seeks to disallow all of ESL's Claims in these Chapter 11 Cases pursuant to section 502 of the Bankruptcy Code.

- The avoidance of the obligations incurred in connection with a number of transactions, including the avoidance of (i) the Lands' End spin-off as a fraudulent transfer; (ii) the 2016-2018 ESL Contributions and/or liens associated therewith pursuant to sections 544 and 548 of the Bankruptcy Code and applicable state law because Lampert and ESL caused Sears to execute them with an actual intent to hinder, delay, or defraud creditors; and (iii) grants and guarantees made by certain of Sears's subsidiaries in connection with the creation of the IP/Ground Lease Term Loan Facility as constructively fraudulent because those subsidiaries incurred obligations for less than reasonably equivalent value (or no value) and at times when those subsidiaries were insolvent as a result of Lampert's and ESL's asset-stripping schemes. Relatedly, the Creditors' Committee seeks to disallow all of ESL's Claims under section 502 of the Bankruptcy Code.

- The recovery of all ill-gotten gains and compensation for the damages incurred by the Debtors and their stakeholders due to the wrongful actions of Lampert, ESL, and Kamlani (who is ESL's President and Lampert's right-hand man). By directing, facilitating, and approving a scheme to rob the Debtors and their stakeholders of value, Lampert, ESL, and Kamlani breached the fiduciary duties they owed to the Debtors and their stakeholders. For similar reasons, Lampert and ESL were unjustly enriched by the scheme to strip assets from the Debtors for their own benefit.[4]

---

[4] The Creditors' Committee is continuing to investigate the many additional prepetition transactions involving Sears and ESL and therefore reserves the right to assert additional claims if warranted by the evidence.

5.       The above remedies would rectify only some of the wrongs Lampert and ESL have perpetrated on Sears, its stakeholders, and its creditors.  Nothing can undo Sears's excruciating, slow motion destruction at the hands of Lampert and ESL.  The tortured story of Sears reads like a Shakespearean tragedy, playing out over five acts.

6.       **Act One—the ESL Take Over and Stock Buybacks.**  In the first act, Lampert and ESL set the stage in 2005 for Sears's almost certain demise.  They acquired a controlling stake in Sears, which at the time was a profitable retailer with a long and storied past, and immediately set their sights on Sears's assets, including its real estate.  Lampert and ESL treated Sears as their own private portfolio company—despite it being a public company—and gained key positions on the Board of Holdings.  They then enabled (if not directed) an aggressive stock buyback program by which they would increase their percentage ownership of Sears (thereby consolidating their hold on Sears), while also realizing huge financial gains as a result of the stock's inflated trading price.  These repurchases cost Sears dearly.  To fund the stock repurchases, Sears slashed corporate reinvestment by billions to the substantial detriment of its business operations, causing Sears to lag behind its competitors.  Sears's performance took a dramatic turn for the worse, operating at a loss every year since 2010.

7.       **Act Two—ESL-Controlled Spin-offs and Rights Offerings.**  During the second act, Sears's decline gained momentum.  Having drained Sears of cash through the stock buybacks, Lampert and ESL took advantage of Sears's need for additional liquidity.  It was the perfect opportunity to begin stripping away Sears's value.  Beginning in 2011, Lampert and ESL orchestrated the spin-off of some of Sears's most productive and valuable assets for their direct benefit.  For example, in 2012, Sears Hometown & Outlet Stores was spun off in a rights offering at an artificially low subscription price of $15.00 per share—a price that jumped to $30.68 after

5

the first day of trading.  In the span of a single day, ESL earned $232.7 million on the SHO rights

offering—gains that otherwise could have been realized by Sears.  Similarly, in 2014, Sears spun

off the desirable Lands' End business (which had reported $150 million of adjusted EBITDA for

2013) in a tax-free, pro rata distribution that generated only a $500 million cash dividend for

Sears—far short of its $1.4 billion to $1.5 billion enterprise valuation based on available market

indicators.  Within one year of the spin-off, ESL's stake in Lands' End—a stake that ESL had

acquired free of cost—had nearly doubled in value to almost $852 million.  Meanwhile, Sears

began reporting negative EBITDA every year since 2013, having been insolvent at the time of (or

rendered insolvent by) the Lands' End spin-off.

8.      **Act Three—the Real Estate Ploy.**  By 2015, Sears—now desperate for a

turnaround—was solidly under the control of ESL and Lampert, who acted without constraints as

Sears's CEO, Chairman of the Board, and controlling shareholder (with ESL).  Sears's dramatic

arc reached its peak in act three when Lampert and ESL—which had long been interested in Sears

primarily for its real estate—engineered the Seritage Transaction.   Through the Seritage

Transaction, Sears sold 235 of its properties and its interests in three joint ventures (which were

created immediately before the Seritage Transaction for 31 additional properties) to a new real

estate investment trust, Seritage, which Lampert and ESL controlled.  Seritage leased most of the

properties back to Sears, but under one-sided lease terms that gave Seritage the right to recapture

and redevelop the properties for more valuable uses and penalized Sears if it terminated leases on

money-losing stores.  The Seritage Transaction was an insider deal conceived and driven by

Lampert and ESL that was neither negotiated at arm's length nor exposed to the market—and it

showed.  Sears was insolvent at the time of the Seritage Transaction, contrary to a misleading

solvency opinion that expressly relied on Lampert's fraudulent projections.  The $2.7 billion in

6

aggregate consideration provided to Sears was an absurdly low purchase price, which the market recognized, based on rights trading prices before the transaction and stock prices afterward. This was because the purchase price did not take into account the highest and best use of the properties—many of which were among Sears's most valuable properties—and was instead predicated on Sears remaining a tenant and paying discounted rent indefinitely (discounted to account for disadvantageous lease terms, not because the rate was a bargain). But Seritage, Lampert, and ESL have not hesitated to make the best use of the transferred Seritage assets. Indeed, Seritage has since thrived at recapturing, redeveloping, and re-leasing space at many multiples of the rent Sears was paying and has attracted new marquee investors including Warren Buffett—all while Sears fell even deeper into insolvency.

9.    **Act Four—the Financings and Liens.**  After the Seritage Transaction, Sears was in a freefall, destined to take its final bow.  Lampert and ESL, fully aware that bankruptcy proceedings were inevitable, acted to wall off other creditors from Sears's remaining valuable assets.  For several years, ESL advanced capital contributions to Sears under the guise of helping Sears with its liquidity needs.  During that time, ESL provided capital in the form of secured "loans" in order to prop up Sears, lien up its remaining prized assets, and—in Kamlani's words— buy time for ESL "to realize the franchise value or the asset value [of Sears], whichever comes first."  Sears was dependent upon ESL as its bank, giving ESL freedom to pick and choose collateral among Sears's remaining assets.  Each of these transactions occurred against the backdrop of Sears's obvious insolvency, total inability to repay all of its creditors at or anywhere close to par, total inability to repay the ESL "financings" (which ESL knew or should have known), and looming bankruptcy—facts that Lampert and ESL could not reasonably have disputed.  But Lampert and ESL were motivated to take all that they could from Sears, and also to protect their

other key investment:  Seritage.  At its start, Seritage was financially dependent on Sears, the key

tenant for much of Seritage's newly acquired real estate.  Without ESL's capital propping up Sears,

Seritage's success would be at risk—at least until Seritage could reduce its exposure to Sears.

With each capital investment in Sears (which Sears could not repay), ESL improved its position

to the substantial detriment of Sears's creditors.  After all, Sears was hemorrhaging losses at such

a rate that the funds ESL provided in exchange for liens were certain to be wasted and of no benefit

to those holding legitimate claims against the Debtors' estates.

      10.    **The Final Act—the Long-Awaited Bankruptcy.**  These long overdue Chapter 11

Cases are the beginning of the final act of Sears's tragic descent from giant to ghost.  While under

Lampert's and ESL's control, Sears was decimated:  it closed over 3,500 stores, cut approximately

250,000 jobs, and lost billions in value.  Lampert and ESL benefited all along, raking in enormous

interest and fees, obtaining control of Sears's best assets and real estate, and positioning ESL to

be protected in this bankruptcy with its liens.  As part of its bid to acquire the remainder of Sears

as a going concern—a bid that is woefully inadequate as, among other infirmities, it will leave

these estates administratively insolvent and permit ESL to credit bid its objectionable claims—

ESL has demanded a release from all its past transgressions.  But Lampert and ESL should not be

permitted to seek immunity from valid claims arising from their (and others') years-long, asset and

value-stripping scheme.  The ESL Bid will be the ultimate catastrophe for the Debtors' estates and

legitimate creditors.

      11.    Through their investigation to date, the Creditors' Committee has unearthed myriad

facts that support colorable causes of action against Defendants that—when established at trial—

would return to the Debtors' estates hundreds of millions, if not billions, of dollars in value in the

form of recharacterized, subordinated, or disallowed claims;  significant damages;  and other

remedies. Indeed, the recharacterization and equitable subordination claims alone have the potential to provide ***more than $1.8 billion*** of value to the estates.

12.    Although these claims would have a profound and positive impact on the Debtors' estates and would go some length to remedying the Defendants' grossly inequitable conduct against Sears and its stakeholders, the Debtors apparently have made their decision to forgo these claims. Immediately prior to the Creditor's Committee's filing of this Motion, the Debtors announced their decision to select the ESL Bid to purchase the go-forward business of Sears, largely through a credit bid of ESL's disputed claims. Incredibly, the Debtors agreed to release ESL from ***any*** challenge to ESL's unfettered ability to credit bid and the allowance of all of ESL's Claims in exchange for ***just*** $35 million. By accepting ESL's credit bid and granting that release, the Debtors have decided not to pursue the Proposed Claims to eliminate, reduce, or subordinate ESL's Claims despite the Proposed Claims' signficant value to the estates. The Debtors' failure to bring these claims is unjustifiable and the Creditors' Committee should be granted standing. *See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985) (holding that a creditors' committee should be granted standing if it presents colorable claims that the debtor unjustifiably refused to pursue).

13.    As the tragedy of Sears comes to an end, Lampert and ESL wait in the wings to reap the final reward for years of control over and abuse of Sears by trying to assert ESL's Claims against the Debtors' estates. But such claims should be disallowed, recharacterized as equity, or subordinated to the claims of all unsecured creditors. The Creditors' Committee deserves the opportunity to pursue the causes of action against Defendants and return lost value to the Debtors' estates. Without such recourse, Lampert and ESL will have created the perfect blueprint for future bad actors to steal all of a company's assets and get away with it: stack its board of directors with

9

allies and devotees; with their blessing, raid the company's cash and assets; in the process,

dismantle operations and put hundreds of thousands of employees out of a job; and, finally,

manipulate chapter 11 proceedings to obtain the company's remaining assets for a bargain while

falsely claiming to "save" a fraction of the jobs already sacrificed.  Throughout these proceedings,

Lampert and ESL have painted themselves as saviors, stating that their bid will save the few jobs

they have not already eliminated—but for how long?  They have failed to set forth a business plan

that offers any go-forward path.  Sears cannot survive as a going concern.  The Court should not

permit Lampert's and ESL's fraud and abuse to continue.

## RELEVANT FACTUAL BACKGROUND[5]

14.    For more than a decade, Lampert and ESL have acted with methodical precision to

enrich themselves at Sears's expense, secure control over Sears's best assets, and attempt to shield

such assets from the reach of other creditors.  Their singular focus at all times has been to maximize

their own investments in Sears, which Lampert and ESL have controlled as the most significant

part of their portfolios for more than a decade.  Sears's tragedy has unfolded over a dramatic five

acts, all dominated by Lampert and ESL.

**I.    ACT ONE:  ESL Sets the Stage for Sears's Demise with the Take Over and Stock Buybacks**

15.    The beginning of the Sears tragedy traces back to 2005, when Lampert and ESL

engineered the Kmart-Sears Roebuck Merger.  From there, Lampert and ESL orchestrated a series

of stock buybacks, costing Sears billions, while earning billions in investment fees for ESL, and

fortifying their shareholder position within the Company.  At the same time, their strategy left

---

[5] The facts discussed in paragraphs 14 to 144 of this Motion are set forth in paragraphs 26 to 156 of the Proposed Complaint.

Sears with few resources for investment in its operations, setting the perfect stage for what was to come.

### A.    Sears, Roebuck and Co., a Celebrated Retail Giant

16.    Sears can trace its roots to 1886, when the company that would become Sears, Roebuck and Co. ("Sears Roebuck") began as a mail-order watch seller.  Throughout the 20th century, Sears Roebuck thrived as a retail innovator.  Sears Roebuck became famous for its revolutionary mail-order catalog that enabled customers to purchase a wide range of merchandise, even from remote areas of the country.  It also innovated on the consumer credit front, including with its introduction of the Discover credit card, which was the first credit card to offer cash rewards based on the volume of the customer's purchases.  Sears Roebuck also was an early mover in online shopping, joining with CBS and IBM to form the Prodigy Communications Corp. consumer online web portal, which in 1990 was the second-largest online service provider.

17.    Since 1931, however, Sears Roebuck's principal revenue driver has been its brick-and-mortar retail business conducted through its large stores.  By the end of the 1960s, Sears Roebuck's annual sales were just shy of 1% of the entire nation's gross domestic product—a staggering figure for a single retailer.  Although competition was fierce among big-box retailers in the latter part of the 20th century, Sears Roebuck remained a retail force into the early years of the 21st century.  In its annual report for 2003, for example, Sears Roebuck was characterized by:

- 871 full-line stores that averaged 91,000 net selling square feet located primarily in shopping malls and offered home appliances, apparel and accessories, and automotive services;

- Approximately 1,100 specialty stores that included hardware stores and outlet stores;

- Extensive in-home product repair services;

- Numerous recognizable proprietary brands, including Lands' End, Kenmore appliances, Craftsman tools, and DieHard batteries;

11

- 249,000 employees in the United States, Puerto Rico, and Canada; and

- Net income of $3.397 billion on revenues of $41.124 billion.[6]

**B.    Lampert, the Financial Engineer, and his Investment Company, ESL**

18.    Lampert is—or at least once was—a celebrated investor.  In 2004, Bloomberg described him as the "next Warren Buffett."[7]  In 2006, Fortune Magazine called him "the Steve Jobs of the investing world,"[8] and Time Magazine named him the "go-to money manager" on Wall Street in its "Builders & Titans" feature.[9]  Lampert is, by all accounts, adept at financial engineering.

19.    Lampert's investing successes began when he left the risk arbitrage desk at Goldman Sachs Group, Inc. to found his own hedge fund, ESL, in 1988.  Through ESL, Lampert managed his own money and that of other investors, including high-profile billionaires such as Michael Dell, David Geffen, and Thomas Tisch.  ESL enjoyed enormous successes from investments in such companies as AutoZone, AutoNation, Honeywell, Saatchi & Saatchi, and Liz Claiborne.[10]  ESL had an average annual return of 29% from its inception to 2003.

20.    ESL is not a typical hedge fund for two key reasons.  First, by its own admission, ESL operates more like a private equity firm.  Kamlani, ESL's President and Holdings Board member, noted in his interview that ESL is "more akin to a private equity than a hedge fund"

---

[6] Sears, Roebuck & Co., Annual Report (Form 10-K), at 2-4, 13 (Mar. 10, 2004).

[7]  Robert Berner & Susan Rutledge, *The Next Warren Buffett?*, BLOOMBERG (Nov. 21, 2004), https://www.bloomberg.com/ news/articles/2004-11-21/the-next-warren-buffett.

[8] *See* Patricia Sellers, *Eddie Lampert: The best investor of his generation*, FORTUNE MAGAZINE (Feb. 6, 2006), https://money.cnn.com/2006/02/03/news/companies/investorsguide_lampert/.

[9] Daniel Kadlec, *Builders & Titans: Eddie Lampert*, TIME MAGAZINE (May 8, 2006), http://content.time.com/ time/specials/packages/article/0,28804,1975813_1976769_1977369,00 html.

[10] William D. Cohan, *"They Could Have Made a Different Decision": Inside the Strange Odyssey of Hedge-Fund King Eddie Lampert*, VANITY FAIR (Apr. 2018), https://www.vanityfair.com/news/2018/03/the-strange-odyssey-of-hedge-fund-king-eddie-lampert-sears-kmart.

because "it takes significant positions in very few companies."[11]  In essential terms, hedge funds

tend to trade in various instruments, including stocks, commodities, and futures, while typically

using leverage.  On the other hand, private equity firms tend to perform diligence on a specific

company, acquire a controlling stake in the company, and then work closely with the company's

management or board of directors to drive results.  Kamlani explained that ESL does not have a

trader on staff, invests by taking an active role in managing portfolio companies, and works with

a longer time horizon than is typical for a hedge fund.

21.    ESL's private equity approach plays out in its major investments.  For example,

when ESL invested in AutoZone, it acquired approximately 30% of the company's outstanding

stock and then orchestrated a series of stock buybacks that had the effect of driving up AutoZone's

share price.  When ESL sold its stock, it realized a profit of around $750 million.[12]

22.    Second, ESL is unusual in that it and Lampert functionally behave as a unified

entity with regard to investments.  Not only is Lampert's personal wealth tied up in ESL's

investments, Lampert acts as the sole portfolio manager with authority to make investment

decisions at ESL.  In fact, he exercises such a level of control over ESL that Kamlani—ESL's own

President—claims to have only basic information on the number and identities of other investors

in ESL and the fund's investment performance.  Although Kamlani's focus at ESL largely is on

issues related to Sears, he is unable to describe how ESL even tracks its investments in Sears.

---

[11] Moreover, Kamlani previously was President and Chief Operating Officer of a portfolio company sponsored by Apollo, a private equity firm and was management at a private equity firm himself.

[12] William D. Cohan, *"They Could Have Made a Different Decision": Inside the Strange Odyssey of Hedge-Fund King Eddie Lampert*, VANITY FAIR (Apr. 2018), https://www.vanityfair.com/news/2018/03/the-strange-odyssey-of-hedge-fund-king-eddie-lampert-sears-kmart.

### C.    Lampert and ESL Acquired Kmart and Sears Roebuck, Which Became the Fund's Central Investments

23.    Sears's eventual decline was set in motion when Kmart Corporation ("Kmart") emerged from bankruptcy in May 2003 with Lampert and ESL as its largest shareholder.[13]  Rumor on Wall Street had it that "Lampert planned to milk the company for cash, using Kmart's real estate as his secret cache."[14]

24.    In June 2004, Kmart announced the sale of 51 stores to Sears Roebuck for $605 million in cash, a figure so unexpectedly high that by November 2004, Kmart's stock traded at eight times its price when Kmart first emerged from bankruptcy, for reasons largely tied to the estimated value of Kmart's real estate.   ESL pivoted and used Kmart's inflated market capitalization to acquire Sears Roebuck, merging the companies in 2005 under a new parent entity, Sears Holdings Corporation (the "Kmart-Sears Roebuck Merger").   Commentators noted that Lampert—who was known for investing wizardry but not for retail experience—was interested in Sears Roebuck primarily for its real estate portfolio (much as he was rumored to be for Kmart).

25.    ESL committed heavily to its investment in Sears, and the two became intrinsically inseparable.  After the Kmart-Sears Roebuck Merger, Lampert became Chairman of Holdings's Board and obtained authority from the Board to direct investment of Holdings's surplus cash.[15] Lampert and ESL initially owned 41% of Holdings's outstanding common stock, but their stake soon grew to 54.1% by January 2009 and peaked at 62.0% in January 2012.  As described more fully below, in the three years leading up to the bankruptcy filing, ESL also began making

---

[13] Riva D. Atlas, *Its Stock Up, Sears Searches for Recovery*, N.Y. TIMES (Aug. 2, 2005), https://www.nytimes.com/2005/08/02/business/its-stock-up-sears-searches-for-recovery.html.

[14] *See* Patricia Sellers, *Eddie Lampert: The best investor of his generation*, FORTUNE MAGAZINE (Feb. 6, 2006), https://money.cnn.com/2006/02/03/news/companies/investorsguide_lampert/.

[15] Sears Holdings Corp., Annual Report (Form 10-K), at 92 (Mar. 17, 2006).

significant capital contributions to Sears that totaled $2.6 billion as of the Petition Date.[16]  And, on information and belief, Sears and Sears-related businesses have comprised the core investments of ESL's portfolio since 2005.

### D.    Under Lampert's Direction, Sears Spent its Cash for ESL's Short-Term Benefit and to the Detriment of Sears's Long-Term Prospects

26.    With a controlling stake in the combined enterprise, and with the Board's delegation to Lampert of investment decisions regarding Holdings's surplus cash, Lampert and ESL set about lowering capital expenditures, drastically cutting investment in Sears's businesses, and funneling cash into a stock repurchase program.  By reducing the number of outstanding shares and thereby increasing earnings-per-share, price-to-earnings ratio, and return on equity metrics, the aggressive buybacks had the instant effect of artificially boosting Holdings's stock price to a peak of approximately triple its price at the time of the Kmart-Sears Roebuck Merger.  From 2005 to 2008, Sears spent an estimated $6 billion—the majority of its cash—on stock repurchases, with some repurchases made at prices as high as $180 per share.[17]  Lampert's and ESL's motive was simple:  they increased their ownership percentage by reducing the number of outstanding shares in the market and raked in astronomical investment fees from the fund's investors as a function of Holdings's rising stock price.  One commentator recently calculated that ESL earned an estimated *$1.9 billion* during the ascent of Holdings's stock in 2006 alone, based on an estimated 20% performance fee charged to ESL's investors.[18]

---

[16] The "Petition Date" refers to October 15, 2018, when the Debtors in these cases filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

[17] Suzanne Kapner, *Inside the Decline of Sears, the Amazon of the 20th Century*, WALL STREET JOURNAL (Oct. 31, 2017), https://www.wsj.com/articles/inside-the-decline-of-sears-the-amazon-of-the-20th-century-1509472095.

[18] Michelle Celarier, *Eddie Lampert Shattered Sears, Sullied His Reputation, and Lost Billions of Dollars. Or Did He?*, INSTITUTIONAL INVESTOR (Dec. 3, 2018), https://www.institutionalinvestor.com/article/b1c33fqdnhf21s/ Eddie-Lampert-Shattered-Sears-Sullied-His-Reputation-and-Lost-Billions-of-Dollars-Or-Did-He.

27.     By using the majority of its cash to repurchase stock, Sears grossly underinvested in its business and lagged behind its peers during a time of intense secular competition.  In 2004 alone, Sears Roebuck and Kmart managers spent a total of $1.1 billion on various reinvestments, including renovations and new-store openings.  Under ESL's direction, that number dropped to just $546 million in 2005 and $513 million in 2006.[19]  The difference quickly became apparent to commentators at the time:  Sears's stores featured empty shelves and out-of-date merchandise and looked "shabby next to those of rivals like Target and J.C. Penney."[20]  Against the backdrop of consumer belt-tightening during the financial crisis and ensuing recession, Sears's bottom line fell deeply in the red, even while competitors such as Walmart, Costco, and Target thrived.

28.     Lampert and ESL, however, consistently set overly optimistic but inaccurate financial projections for Sears's management.[21]  Every year, as part of an annual budgeting process, individual business units at Sears would set forth internal revenue and cost goals they viewed as attainable for the coming year.  And each year, Lampert and ESL would effectively ignore this bottom-up approach by management, instead setting a purely aspirational top-down financial projection—which was based on little more than Lampert's desire to achieve "best in class" results—that was then folded into Sears's Annual Plan.  These projections essentially would consist of a target EBITDAP for which returns would look favorable to investors.  The individual business units were then pressured to try to fill the gap between their own targets and those set by Lampert and ESL.  They invariably failed to do so.  Rather than lower the Lampert/ESL-imposed top-down projections, Sears instead would assume that the gap would be filled by "unidentified

---

[19]  Gretchen Morgenson, *et al.*, *Saving Sears Doesn't Look Easy Anymore*, N.Y. TIMES (Jan. 27, 2008), https://www.nytimes.com/2008/01/27/business/27eddie.html.

[20]  *Id.*

[21]  In his interview, former Sears CFO Robert Schriesheim ("Schriesheim") described the numbers in the financial projections as a "pretty aggressive stretch" and acknowledged that the projections had "a high degree of execution risk."

initiatives" or, in Lampert's own words, "go gets."  Simply put, not only was there no *achievable*

plan in place, often times there was no plan at all.

29.    Indeed, since Lampert's reign as CEO began in 2013, Sears lost billions of dollars

as shown in the below chart.



30.    Despite these consistent losses, each of Sears's annual projections forecasted

*positive* EBITDAP of hundreds of millions of dollars.  Lampert and ESL essentially projected,

year after year, a dramatic turnaround—typically based on vague initiatives related to an explosion

in the popularity of Sears's loyalty platform, Shop Your Way—and year after year, Sears missed

the Lampert/ESL target EBITDAP (and in fact has not attained positive EBITDAP since 2013).

The following charts illustrate how divorced from reality those projections were:

17





31.    For example, in 2014, Sears projected positive EBITDAP of $1.207 billion but ended the year with negative $638 million EBITDAP—a delta of $1.845 billion. 2015 was no different, with a spread of almost $1.3 billion between the projection of positive $461 million EBITDAP and the actual result of negative $836 million EBITDAP. In total, for the period 2010-

2017, Sears missed its revenue target every single year and by an average of more than $4 billion per year (a 13% miss from projections), and missed its EBITDAP target every year and by an average of nearly $1.4 billion per year (a 172% miss from projections). Lampert's and ESL's delusional (if not fraudulent) projections missed the mark every year because they depended on an imminent and massive turnaround that never materialized and was never realistic.

32.    Lampert's and ESL's influence on Sears extended beyond the mythical projections to Sears's very corporate structure and culture because of high level of involvement—through Lampert—in Sears's management and operations. For example, Lampert, a devotee of novelist Ayn Rand's free-market philosophies, announced on January 22, 2008 an initiative called Sears Holdings Organization, Actions, and Responsibilities—or "SOAR"—by which Lampert would divide Sears into more than thirty separate business units, assign executives and boards of directors for each unit, and encourage the units to compete for resources. A former Sears executive described the culture under Lampert's SOAR as that of "warring tribes." Others likened it to *The Hunger Games*.[22]  Product division executives even described having to waste resources by negotiating formal agreements with Sears's human resources and information technology departments.

33.    Within just a few years after the Kmart-Sears Roebuck Merger, Lampert and ESL had solidified control over the Company, fragmented it into rival business units that competed for scarcer and scarcer resources, and set forth unreachable projections while Sears's bottom line declined rapidly. By 2011, Sears lacked available cash and ESL looked to transition to the next

---

[22] Mina Kimes, *Lampert's Hunger Games Force Sears Bosses to Fight for Scraps*, BLOOMBERG (Jul. 11, 2013). *See also* Lisa Fickenscher, *How a hedge fund king's weird ideas about retail destroyed Sears*, N.Y. POST (Oct. 15, 2018), https://nypost.com/2018/10/15/how-eddie-lampert-led-sears-into-bankruptcy-disaster/.

act—a transition prompted by Lampert's SOAR initiative, which, as Lampert wrote in an email to Bloomberg in 2013, made it easier for Sears to divest its various businesses.

## II.    ACT TWO:  With Cash Dwindling, ESL Takes Control of Sears's Desirable Business Units for ESL's Direct Benefit

34.    With the stage set—Lampert and ESL in control and Sears's cash position deteriorating—Lampert, ever the financial engineer, directed Sears to spin off its most valuable assets in what amounted to a slow motion, out-of-court liquidation, with ESL being the glad recipient of such assets for no or inadequate consideration.  The stated reasons for the spin-offs were to improve liquidity or promote operational flexibility.  In reality, however, Lampert and ESL directly benefited on both sides of each transaction, acquiring control of spun-off assets while often receiving dividends as Sears's controlling shareholder.  All this was to the detriment of Sears and its creditors.

35.    The transactions that began in 2011—summarized in the following chart—provided substantial profit to Lampert and ESL, based on a review of public filings at or near the time of the transactions:

| Spin-offs and Rights Offerings From 2011-2014 | | |
| --- | --- | --- |
| **Date** | **Spin-off or Rights Offering** | **Benefit to Lampert and ESL** |
| December 2011 | Holdings spun off Orchard Supply Hardware Stores Corp. ("Orchard") through a tax-free, pro rata distribution to shareholders. | ESL owned 49.22% of the outstanding Class A Common Stock of Orchard after the spin-off.[23] After the first day of trading, ESL's stake in Orchard, for which it paid no consideration at all, was worth approximately $157 million. |

---

[23] Sears Holdings Corp., Schedule 14A (Form DEF-14A), at 18-19 (Mar. 16, 2012).

| | | |
|---|---|---|
| October 2012 | Holdings spun off Sears Hometown & Outlet Stores ("SHO") through a rights offering to shareholders.<br><br>Holdings received $346.5 million in gross rights offering proceeds plus $100 million in a cash dividend drawn under the SHO ABL Credit Agreement.[24] | Lampert supported the SHO rights offering and indicated an interest in oversubscribing. ESL became a majority shareholder of SHO with a stake of approximately 63%.<br><br>ESL benefited significantly and immediately from the rights offering: the subscription price was only $15.00, but SHO's stock price more than doubled on the first day of trading, closing at $30.68. SHO stock climbed to $43.92 within six months. |
| November 2012 | Holdings spun off 44.5% of Sears Canada, Inc. ("Sears Canada") through a pro rata dividend to Holdings shareholders. Holdings retained 51.0% of Sears Canada.<br><br>The partial spin-off of Sears Canada resulted in two dividends totaling C$611.3 million in dividend payouts to shareholders, of which C$101.9 million was in FY 2012 and C$509.4 million in FY 2013.[25] | After the partial spin-off, not only did ESL receive dividends of $160 million, it also gained direct control of 28% of Sears Canada's outstanding shares (in addition to its indirect control of Holdings's remaining 51% ownership of Sears Canada) for no consideration.[26] |
| April 2014 | Holdings spun off Lands' End, Inc. ("Lands' End") through a pro rata, tax-free distribution to Holdings shareholders.<br><br>The Lands' End spin-off resulted in a $500 million cash dividend used to reduce borrowings under Holdings's domestic revolving credit facility. | After the Lands' End spin-off, ESL initially owned 48.6% of Lands' End common stock (for which it paid no consideration at all). By early 2015, Lands' End's stock price had nearly doubled from its debut and ESL's stake was worth $852 million. |
| November 2014 | Holdings monetized much of its remaining 51% ownership of Sears Canada through a rights offering to | ESL participated in full, obtaining a pro forma ownership of Sears Canada of 49.5%.[27] |

[24] Sears Holdings Corp., Current Report (Form 8-K) (Sept. 10, 2012).

[25] Sears Canada, 2014 Annual Report, at 10 (Mar. 12, 2015).

[26] Sears Canada, 2012 Annual Report, at 32 (Mar. 15, 2013).

[27] Sears Canada, 2014 Annual Report, at 34 (Mar. 12, 2015).

|  | Holdings shareholders. Holdings retained 11.7% of Sears Canada.<br><br>Holdings received aggregate proceeds of $380 million from the Sears Canada rights offering, which was used for general corporate purposes. |  |
| --- | --- | --- |

36.    Each spin-off or rights offering generated immediate profits or benefits for Lampert and ESL and dealt blow after blow to an already reeling Sears.

### A.    The Orchard Spin-off

37.    Orchard was a wholly owned subsidiary of Holdings and consisted of a chain of general hardware stores that catered to the home-improvement market and do-it-yourselfers, which set it apart from contractor-focused, big-box hardware retailers like Lowe's.

38.    In December 2011, Holdings spun off Orchard in a tax-free, pro rata distribution to existing shareholders.  As a result of the spin-off, ESL owned 49.22% of the outstanding Class A Common Stock of Orchard, without having paid any consideration for the shares.[28]  After the first day of trading, ESL's stake in Orchard was worth approximately $157 million.

### B.    The SHO Spin-off and Rights Offering

39.    SHO is a national retailer primarily focused on selling home appliances, hardware, tools, and lawn and garden equipment.  In addition to merchandise, SHO provides a full suite of related complementary services, including home delivery and handling and extended service contracts.

40.    SHO was formed on April 23, 2012 as a wholly owned subsidiary of Holdings for the purpose of effecting the SHO spin-off.[29]  Prior to the SHO spin-off, Holdings operated the

---

[28] Sears Holdings Corp., Schedule 14A (Form DEF-14A), at 18-19 (Mar. 16, 2012).

[29] Sears Hometown & Outlet Stores, Inc., Registration Statement (Form S-1), at 2, 84 (Apr. 30, 2012).

22

SHO businesses through subsidiaries, including Sears Authorized Hometown Stores, LLC, Sears Outlet Stores, LLC, and Sears Home Appliance Showrooms, LLC, each of which was a wholly owned subsidiary of Sears Roebuck.[30]

41.    Holdings commissioned Duff & Phelps, LLC ("Duff & Phelps") to conduct a valuation of SHO prior to the spin-off.  Duff & Phelps estimated the enterprise value of SHO to be in the range of $425 million to $515 million.  After giving effect to the $100 million dividend to be paid in connection with the spin-off and "certain other adjustments to enterprise value," Duff & Phelps opined that the fair market value of the equity of SHO was "in the range of between $345 million and $435 million"—but reiterated that it viewed the midpoint enterprise valuation as $465 million.  The Board (controlled by Lampert) determined that the aggregate exercise price for the SHO spin-off would be only $346.5 million.  Through the SHO spin-off, Holdings distributed 100% of its outstanding shares of common stock of SHO and received $346.5 million dollars of aggregate gross proceeds.  Additionally, SHO drew $100 million under the SHO ABL Credit Agreement and paid a cash dividend of $100 million to Holdings.

42.    Based on the low exercise price, the subscription price was set at only $15.00 per share, which deeply undervalued SHO and robbed Sears of significant value.  On October 12, 2012, at the close of the first day of trading, SHO's stock price more than doubled to $30.68, giving SHO a market capitalization of $716 million.  Within six months, SHO's stock had jumped to $43.92, with a market capitalization of over $1 billion.

43.    In other words, ESL paid only $216.7 million for its equity stake in SHO—a stake that had become worth $443.2 million the day that SHO stock debuted.  In a single day, ESL gained $226.5 million on the SHO spin-off.

---

[30] *Id.* at 14, 52.

### C.    The Sears Canada Partial Spin-off and Rights Offering

44.    Sears Canada was incorporated under the laws of Canada in 1952 as a partnership between Robert Simpson Company and Sears Roebuck.  It represented an extension of Sears's operations in Canada and for years operated as a majority-owned indirect subsidiary of Holdings.  Much like its American counterpart, Sears Canada was a multi-channel retailer centered on merchandising and the sale of goods and services through both retail and direct channels.

45.    Under Lampert's and ESL's direction, Sears divested most of its equity in Sears Canada through (1) a partial spin-off in 2012 and (2) a rights offering in 2014.

### 1.    The Sears Canada Partial Spin-off in 2012

46.    On May 17, 2012, Holdings announced its plan to spin off approximately 45% of the common shares of Sears Canada through a pro rata dividend to Holdings's shareholders, dropping its ownership interest in Sears Canada from 95.5% to 51%.  At the time, senior management at Sears valued the approximately 45 million shares sought to be distributed at roughly $585 million.

47.    According to Holdings's Board minutes, at least three of the directors tasked with evaluating and approving the Sears Canada partial spin-off were investors in ESL:  Lampert, Steven Mnuchin, and Thomas Tisch.

48.    As a result of the spin-off, which was effected on November 13, 2012, ESL's direct holdings in Sears Canada rose to approximately 28%.  Because ESL was a controlling shareholder of Holdings, ESL had direct and indirect control of approximately 59.2% of Sears Canada's outstanding common shares after the spin-off.  Therefore, by November 2012, ESL controlled a majority of Sears Canada's common shares and had the ability to control the election of Sears Canada's board of directors and the outcome of certain shareholder votes.

24

49.    Though Sears Canada had its own board of directors even before the partial spin-off, it already was heavily influenced by ESL.  Specifically, of Sears Canada's eight directors, three had previously worked in senior management at ESL:  E.J. Bird, William C. Crowley, and William R. Harker.[31]

50.    After the partial spin-off in 2012 further cemented ESL's direct control of Sears Canada, the board of directors of Sears Canada approved two dividend payouts to shareholders totaling C\$611.3 million—C\$101.9 million in FY 2012 and C\$509.4 million in FY 2013.  By those dividends, ESL received a direct benefit of approximately C\$169 million.

51.    Lampert's and ESL's motive underlying the dividend payout appears to have been entirely self-interested; on November 5, 2018, a court-appointed monitor in the recent Sears Canada bankruptcy case found that ESL pressured Sears Canada into the dividend because of ESL's "urgent liquidity need at that time to satisfy redemption requests by clients of certain of its funds."[32]  Of course, absent the spin-off, the half-billion of cash at Sears Canada instead would have been available to Sears, which, among other things, would have greatly reduced the need for secured borrowing from ESL.  In effect, Sears paid dividends of vast amounts of money from its now former subsidiary to ESL, which in turn lent the funds back to Sears—this time secured by Sears's best assets.

---

[31] In addition, Harker apparently left his position as Executive Vice President and General Counsel of ESL to become Chairman of SHO in August 2012.  Harker's connections to the Debtors do not stop there.  He also (1) worked as an associate at Wachtell, Lipton, Rosen and Katz ("Wachtell")—a law firm advising the Debtors—from September 2000 to August 2005; (2) held various positions throughout Holdings from September 2005 through August 2009; and (3) continued to serve as a consultant to Holdings after his appointment as Chairman of SHO.

[32] See Twenty-Seventh Report of FTI Consulting Canada Inc., as Monitor dated November 5, 2018, *In the Matter of a Plan or Compromise or Arrangement of Sears Canada Inc.*, Court File No. CV-17-11846-00CL (Nov. 5, 2018). Sears Canada, through its Litigation Trustee, and the administrator of the Sears Canada Inc. Registered Pension Plan have brought claims related to this dividend payout against Lampert, ESL, Sears Canada directors, and others.

## 2.     The Sears Canada Rights Offering in 2014

52.     At the time of the Sears Canada partial spin-off, Lampert had signaled to and discussed with the Board the desire to monetize Holdings's remaining 51% ownership of Sears Canada.  In mid-2014, Holdings began exploring its options and valued its remaining 51% stake at $759 million.

53.     By September 28, 2014, Lampert was pushing the rights offering to the Board, arguing that proceeding to monetize Holdings's equity in Sears Canada "had become more urgent" because of the "uncertainty surrounding the business prospects of Sears Canada, coupled with its declining stock price."

54.     In November 2014, Holdings completed a $380 million rights offering to existing shareholders to reduce its Sears Canada stake to approximately 11.7%.  Through the rights offering, ESL exercised its pro rata portion of the rights in full and acquired an additional 21.8% resulting in a pro forma ownership of approximately 49.5% of Sears Canada common shares. Accordingly, ESL remained the controlling shareholder of Sears Canada through its direct and indirect ownership of stock.

### D.     The Lands' End Spin-off

55.     Lands' End is a casual clothing and home décor retailer based in Dodgeville, Wisconsin.[33]  Sears Roebuck acquired Lands' End in June 2002 for approximately $1.9 billion in cash and integrated the business into its large stores, with the first Lands' End Shop at Sears opening in 2005.[34]

---

[33] *About Us*, LANDS' END, https://www.landsend.com/aboutus/ (last visited Jan. 13, 2019); Lands' End, Inc., Registration of Securities (Form 10-12B), at 1 (Dec. 6, 2013).

[34] Sears, Roebuck & Co., Current Report (Form 8-K), at 2 (May 17, 2002).

56.    Lands' End was a profitable business—described as a "rare bright spot" on Sears's balance sheet[35]—with annual revenues north of $1.5 billion and over $100 million in adjusted EBITDA[36] every year for the five years leading up to the spin-off and during a period in which the Sears enterprise as a whole was operating at a loss.  The following chart illustrates Lands' End's profitability during that five-year period:

| Lands' End's Performance From FY 2009-2013 | | | |
|---|---|---|---|
| Fiscal Year | Net Merchandise Sales and Services | Net Income | Adjusted EBITDA |
| 2009 | $1.656 billion | $128.3 million | $225.4 million |
| 2010 | $1.656 billion | $121.3 million | $206.5 million |
| 2011 | $1.726 billion | $76.2 million | $145.0 million |
| 2012 | $1.586 billion | $49.8 million | $107.7 million |
| 2013 | $1.563 billion | $78.8 million | $150.0 million |

57.    At a December 12, 2012 Board meeting, however, Lampert stated that "Lands' End's cash flow and earnings are down and . . .  it has become less important as a material component of [Sears]."  Over the course of the following year, Lampert and ESL explored possibilities for a tax-free spin-off of Lands' End.

58.    On December 6, 2013, Holdings announced that it would spin off Lands' End in a pro rata, tax-free distribution of all shares of its common stock, with the stated purposes of promoting operational flexibility, implementing tailored capital structures, increasing the overall

---

[35] Samantha Sharf, *Sears Completes Lands' End Spinoff*, FORBES (Apr. 7, 2014), https://www.forbes.com/sites/samanthasharf/2014/04/07/sears-completes-lands-end-spinoff/#76dde55a1efc (noting also that Lands' End's net income had been $79 million for the year, up 58% from the prior year).

[36] Management for Lands' End used "Adjusted EBITDA," a non-GAAP measurement, as "an important indicator of operating performance" by excluding from EBITDA certain costs and gains that management considered not representative of ongoing operations:  costs associated with a call center and administrative reorganization in 2012; gain on a litigation settlement in 2010; and gain or loss on the sale of property or equipment based on investing decisions.  Lands' End, Inc., Annual Report (Form 10-K), at 37 (Mar. 25, 2014).

borrowing capacity of Lands' End, allowing investor choice, and "allowing management to focus on the specific business characteristics of the respective companies."[37]  The Board noted that the spin-off would involve potential negative factors, such as that the "benefits afforded to Sears Holdings by the transaction may not be sufficient to offset potential costs or other negative factors, such as a reduction in profit and earnings, arising from the spin-off and the loss of Lands' End business."

59.    On April 4, 2014, the Lands' End spin-off was accomplished through a pro rata, tax-free distribution to stockholders of Holdings of all of Lands' End's common stock—meaning that shareholders, including Lampert and ESL, received equity in Lands' End without paying a dime.  The spin-off removed one of Sears's few profitable segments, and Sears received only a $500 million cash dividend.  That dividend was not based on any valuation of Lands' End before the Lands' End spin-off (which Sears could have obtained while continuing to own 100% of the equity in Lands' End).  Rather, a November 30, 2013 Ernst & Young impairment analysis and an April 3, 2014 International Strategy & Investment Group valuation report showed that Lands' End's enterprise value was between *$1.4 billion and $1.5 billion*.  The $500 million cash dividend received by Sears from Lands' End therefore was between *$900 million and $1 billion less* than reasonably equivalent value.

60.    Worse yet, a Sears presentation on January 22, 2014 showed that it had received an indication of interest from a third party group including Leonard Green and Partners, a private equity fund, to purchase Lands' End using an enterprise valuation of *$1.6 billion to $1.8 billion*—again far above the $500 million cash dividend that the spin-off generated for Sears.

---

[37] Lands' End, Inc., Registration of Securities (Form 10-12B), at 6, 90 (Dec. 6, 2013).

28

61.     This vast underpayment had significant consequences for Sears's long-term financial health.  Though Sears commissioned a solvency opinion from Duff & Phelps in an attempt to legitimize the flawed transaction, the Duff & Phelps opinion itself was also deeply flawed.  As explained in further detail below, Duff & Phelps's solvency conclusions expressly depended on the Company's significantly overstated, Lampert/ESL-inspired internal projections, and Duff & Phelps either did not check those projections for reasonableness or somehow bought into the dramatic forecasted turnaround.  For the reasons stated previously, Duff & Phelps's reliance on Lampert's and ESL's fanciful projections was wholly improper.  Rather, proper, industry-standard analyses based on reasonable projections informed by Sears's actual historical performance over the prior five years show that the Lands' End spin-off rendered Sears insolvent due to inadequate capital and failure to pay debts when they come due.

62.     The market quickly understood that the dividend was far below Lands' End's reasonably equivalent value and that the Lands' End spin-off had severely damaged Sears's long-term viability.  Within months of the spin-off, Holdings's stock plummeted almost 20% while Lands' End traded at nearly double the price of its market debut.  Indeed, as of September 2018, ESL increased its ownership stake to 67.1% of Lands' End, compared to its initial ownership of 48.6% of the common equity (and as compared to its 49.7% equity ownership of Sears as of the Petition Date).  According to one article, "ESL and its affiliates bought six million more shares of Lands' Ends as the stock price climbed."[38]

63.     Lampert, however, admits that Sears never attempted to market Lands' End to third parties, which would have maximized value to Sears, particularly given the indication of interest received by Sears only months before the spin-off.  Lampert also has not been able to explain *why*

---

[38] Julie Creswell & Michael Corkery, *How the Hedge Fund Manager Running Sears Cut His Losses*, N.Y. TIMES (Oct. 18, 2018), https://www.nytimes.com/2018/10/18/business/sears-bankruptcy-edward-lampert.html.

he did not attempt to monetize Lands' End either as a sale to third parties or as an extraction of value while keeping Lands' End under Sears's control—which would have increased the value available to Sears's creditors.

### E.    Sears in 2014 after the Spin-offs

64.    By the end of 2014, Sears was a shell of its former self.  In 2011, Sears had 4,010 total stores—a number that had fallen to 1,725 by the end of 2014.[39]  And as of January 29, 2011, Sears had approximately 312,000 employees,[40] compared with only 196,000 employees by January 31, 2015.[41]  As of the Petition Date, that number had fallen to approximately 68,000.[42]

65.    The following chart illustrates the dwindling equity book value of Sears (and equity book value net of goodwill and intangibles) as Lampert and ESL continually spun off Sears's desirable assets, usually to entities they controlled.  By the end of 2014, Sears's equity book value had dropped to nearly negative $1 billion, and, net of goodwill and intangibles, to below negative $3 billion.  Meanwhile—in what hardly can be described as a coincidence—ESL's equity stake had also dropped in 2013 to below 50% from a high of 62.0% in January 2012 and its equity stake in the spun-off entities had generally increased.

---

[39] *Compare* Sears Holdings Corp., Annual Report (Form 10-K), at 2 (Mar. 14, 2012) *with* Sears Holdings Corp., Annual Report (Form 10-K), at 2 (Mar. 17, 2015).

[40] Sears Holdings Corp., Annual Report (Form 10-K), at 5 (Mar. 11, 2011).

[41] Sears Holdings Corp., Annual Report (Form 10-K), at 6 (Mar. 17, 2015).

[42] Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York, ¶ 8 [ECF No. 3].





66.    Simply put, from 2011 through 2015, Lampert and ESL spun off Sears's most

valuable assets, retained control over those assets while ostensibly shielding them from the reach

of Sears's creditors, and obtained direct benefits from the spin-offs (including from dividend

payments).  At the same time, Lampert and ESL reduced their equity ownership of a reeling Sears

enterprise while retaining a controlling stake.  They acted as expected:  these spin-offs had crippled Sears's long-term prospects but lined Lampert's and ESL's pockets.

**III.    ACT THREE:  Lampert and ESL Secure for Their Own Benefit Sears's Remaining Valuable Assets—Prime Real Estate—From an Insolvent Sears**

67.    By 2015, the tragedy of America's iconic retailer reached its dramatic peak when Lampert's and ESL's self-serving asset stripping and wind-down scored the biggest prize yet:  a commanding portion of Sears's most valuable remaining real estate.  ESL and Lampert, who had long been interested in Sears primarily for its real estate portfolio, engineered a sale-leaseback involving 266 of Sears's properties, many of which were among Sears's best remaining properties (the "Seritage Transaction").  ESL became the beneficial owner of much of Sears's most valuable real estate properties for a price that was hundreds of millions of dollars short of reasonably equivalent value—the kind of price available only to a self-dealing insider acting on both sides of the transaction.  At the time of the Seritage Transaction, Sears was hopelessly insolvent; if not, the Seritage Transaction certainly made it so.  And since the Seritage Transaction closed, Lampert and ESL have intentionally kept Sears afloat—risking little because of the security obtained for the continuous capital injections—to mask the Company's insolvency and delay its unavoidable bankruptcy in order to prop up Seritage's stock price for ESL's benefit.

**A.    The Terms of the Seritage Transaction**

68.    In 2014, Lampert began brainstorming methods through which he could monetize Sears's real estate portfolio for ESL's benefit, and began discussing the idea of a potential sale-leaseback transaction that eventually became the Seritage Transaction.  By September 2014, the Company—now in desperate need of liquidity—was considering a real estate financing, and understood that its unencumbered real estate portfolio was highly valuable:  a March 2014 Duff & Phelps appraisal valued the Company's properties at over $8 billion.

32

69.    Yet neither Lampert nor Sears ever considered a transaction that would sell Sears's properties to an unaffiliated third party.  No outside advisor was ever hired to evaluate or market the properties for sale to a third party, and in fact no process whatsoever was ever run to test what the market might pay.  Lampert and Sears similarly failed to consider the possibility of creating Seritage as a subsidiary of Sears itself, such that Sears (including its creditors) could share in any upside that Seritage might yield.  Instead, ESL formulated a structure that would place Sears's properties into a real-estate investment trust (a "REIT")—an entity that, through a contemplated rights offering, and related transactions, would also be controlled by Lampert and ESL.  At a September 21, 2014 Board meeting, Lampert raised the "possibility of a sale leaseback in the form of a rights offering which would provide [Holdings's] shareholders with the ability to buy into the REIT."  Lampert further explained that the Company was already "moving forward to retain advisors, identify properties, and prepare draft terms."

70.    Lampert and ESL directed the Company to assemble a portfolio of valuable properties that Sears eventually would sell to the REIT, requiring that the portfolio include some of the Company's most valuable real estate.  For example, Lampert and ESL eliminated from consideration for the portfolio most of the sites where the stores' long-term operating results were likely to be breakeven or negative, as well as stores that had contractually limited development rights—meaning only the most profitable stores and those ripe for redevelopment were included in the Seritage portfolio.  To that end, marketing materials for the Seritage Transaction boasted of the "unique collection of assets" and "[h]igh quality portfolio . . . concentrated in attractive markets throughout the U.S.," and made clear that the "ability to recapture stores and release rents . . . provides significant upside to the REIT."  Moreover, despite its initial leases to Sears, Seritage would work to find new "quality tenants" and "reduce[] its overall exposure to [Sears] as a tenant."

33

71.    The entire premise of the Seritage Transaction was more than the mere generation

of liquidity for Holdings; rather, it was designed to enrich Lampert and ESL through the recapture

and redevelopment of the properties, all while removing these valuable assets as a source to repay

the claims of legitimate creditors.  Indeed, commentators understood exactly what this deal was

designed to do, with one analyst noting in March 2015 that the REIT is an end-state to separate

assets from liabilities.  The market knew that Sears likely would not survive as a retailer.  One

analyst even observed that ESL's last hope was to monetize Sears's real estate assets and try to

use the cash infusion to tide over the Company to get past the statute of limitations on fraudulent

transfer actions.

72.    On December 18, 2014, Holdings formed the contemplated REIT, Seritage Growth

Properties ("Seritage").  Mirroring their control over Sears, ESL has been Seritage's controlling

shareholder and Lampert the Chairman of Seritage's board of trustees since Seritage's formation.

Indeed, Lampert and ESL effectively control one-third of the six seats on the Seritage board of

trustees, as Thomas Feinberg, a long-time investor and limited partner in ESL, also serves as a co-

trustee.  Lampert and ESL also are the sole limited partners of the Seritage operating partnership,

which holds title to Seritage's real estate assets and manages Seritage's day-to-day activities.  As

sole limited partners, Lampert and ESL have veto power over certain major transactions including

mergers, consolidations, conversions, and other combinations that constitute a "change of control"

for Seritage or its operating partnership.

73.    On July 7, 2015, Sears sold to Seritage, for approximately $2.7 billion, (i) 235 of

Sears's fee-owned or ground-leased properties and (ii) Sears's 50% interests in three joint ventures

with mall operators that together owned 31 properties.  To finance part of Seritage's purchase of

the 235 properties, Seritage launched a rights offering to Holdings's shareholders.  Seritage also

achieved additional financing through an agreement with ESL to allow ESL to exchange a portion

of its subscription rights for 43.5% of the limited partnership units in Seritage's operating

partnership, resulting in ESL's ownership of approximately 46.5% of the consolidated economics

of Seritage.  Lampert enthusiastically supported the Seritage Transaction and expressed an interest

in ESL over-subscribing to the extent other Holdings shareholders failed to participate in the rights

offering.

74.     The sale was accompanied by a leaseback, with Seritage (in some cases in

combination with its joint venture partner) leasing 255 of the properties to Sears Roebuck and

Kmart under new ten-year so-called master leases (the "Master Leases").  The Master Leases

contained "unusual features"—in the words of Sears's own advisors—that permitted Seritage to

recapture and/or redevelop certain properties, and, specifically, of the 235 non-joint-venture stores,

Seritage had the right to redevelop 100% of the space at 21 properties and the right to recapture

50% of the space at 203 properties.

75.     The recapture and redevelopment rights were the very premise of the transaction

itself and had, according to the same advisors of Sears, a negative economic effect on Sears's

position valued at $280 million to $549 million—and that is with the advisors using conservative

assumptions.   Sears, however, was not directly compensated for the allowance of Seritage's

recapture and redevelopment rights in yet another way by which significant value was transferred

away from Sears and to Seritage for less than reasonably equivalent value.  And those rights have

proven to be significantly valuable to Seritage, which recently acknowledged that it has historically

achieved a "3.5x to 4.5x rental uplift . . . upon re-leasing space formerly occupied by Sears

Holdings," allowing Seritage to "recover all the rental income generated from Sears Holdings by

re-leasing only 25-35% of the formerly occupied space and deploying the capital required to bring the rental income online."[43]

76.    The Master Leases also contained terms permitting Sears to opt out of certain underperforming properties and return those properties to Seritage.   This opt-out right had expensive conditions:  to exercise the right, Sears had to pay one year of rent and occupancy costs, and was limited to opt out of only up to 20% of the aggregate rent under the Master Leases per year.   Prior to the Seritage Transaction, Sears could close a money-losing store.   After, however, Sears was obligated to pay exit penalties potentially exceeding a hundred million dollars if it were to cease operations.   In short, the terms of the Master Leases were heavily one-sided because they had been dictated entirely by Lampert and implemented by counsel at Wachtell—a fact confirmed in a January 16, 2019 interview of Jeff Stollenwerck ("Stollenwerck"), the former head of Holdings's real estate division.   Stollenwerck confirmed that he was not aware of any negotiation or give-and-take regarding the terms of the Master Leases, including the exorbitant termination fee, and that no individual or entity was specifically tasked with protecting Sears's interests.

## B.    The Seritage Transaction Was a Windfall for Lampert and ESL

77.    In all, the Seritage Transaction was a windfall for Lampert and ESL and deeply unfair to Sears and its creditors for the reasons discussed below.[44]

---

[43] Seritage Growth Properties Provides Business Update with Respect to Recent Events Regarding Sears Holdings (Oct. 15, 2018), https://www.businesswire.com/news/home/20181015005546/en/Seritage-Growth-Properties-Business-Update-Respect-Events.

[44] Indeed, the Seritage Transaction (and accompanying rights offering) was the subject of four Delaware shareholder derivative suits (which eventually were consolidated) alleging breach of fiduciary duty claims against Lampert, ESL as controlling shareholder, and others.   *See Solak v. Lampert et al.*, C.A. No. 11081-VCL (Del. Ch. May 29, 2015); *Stein v. Lampert et al.*, C.A. No. 11173-VCL (Del. Ch. June 18, 2015); *Rossof v. Lampert et al.*, C.A. No. 11178-VCL (Del. Ch. June 19, 2015); *Flanagan v. Lampert et al.*, C.A. No. 11180-VCL (Del. Ch. June 19, 2015).   This Delaware litigation ultimately settled for nuisance value before defendants even filed an answer, in exchange for full releases. At the final hearing approving the settlement, the shareholder plaintiffs, the defendants, and the Delaware Court of Chancery discussed the Seritage Transaction's effects on Sears's shareholders but failed to consider its effects on Sears's creditors.

### 1.    Sears Received Far Below Reasonably Equivalent Value

78.    The $2.7 billion aggregate consideration paid by Seritage was not the result of any negotiation between Sears and Seritage.  As described at greater length below, not a single person or entity negotiated the price on Sears's behalf at all.  Rather, the price was set by conflicted advisors—who represented both Sears and Seritage—and rubber-stamped by the Company's directors.  The advisors even expressly caveated their opinion that there was no representation or assurance that a third party would not pay Sears more.

79.    No surprise, then, that the price was hundreds of millions of dollars—and perhaps even more than a billion dollars—below the reasonably equivalent value of the properties transferred by Sears.  In connection with the Seritage Transaction, Cushman & Wakefield Inc. ("Cushman & Wakefield") provided appraisals of the properties' value, but did so using an obviously flawed methodology that greatly undervalued the properties' fair market value.  First, Cushman & Wakefield calculated a "market rent" for each property.  Then, Duff & Phelps, which Sears and Seritage had jointly retained to provide a solvency analysis and fairness opinion, adjusted that rent—*i.e.*, lowered it—to account for the recapture and redevelopment provisions of the leases.  Duff & Phelps determined that those provisions benefited Seritage to the tune of hundreds of millions of dollars, and therefore discounted the rents by 20% for all properties subject to a 50% recapture right and 30% for all properties subject to a 100% redevelopment right, the idea being that the recapture and redevelopment provisions provided a benefit to Seritage and a detriment to Sears.  And then—critically—Cushman & Wakefield appraised each property ***based upon this discounted rent***.  To do so, Cushman & Wakefield divided the annual net operating income on a given property (including rent paid by Sears at the discounted rate) by a selected "capitalization rate."  Although dividing net operating income by a capitalization rate is a common

valuation technique in real estate valuation—whereby a higher capitalization rate results in lower value, and vice versa—Cushman & Wakefield used this technique in a completely twisted manner.

80.    Simply put, Cushman & Wakefield's process was irredeemably flawed in at least five respects.

81.    First, and perhaps most critically, because Cushman & Wakefield calculated net operating income based on the discounted rental rate, the recapture and redevelopment provisions resulted in a *lower* overall valuation even though those provisions were a recognized *benefit* to Seritage.  This is a wholly perverse result.  The appraised value effectively assumed that Sears would be the permanent tenant paying a depressed rent due to the existence of the recapture and redevelopment provisions, but that those recapture and redevelopment provisions would never be exercised.  This approach was illogical, backwards, and in express contravention of the fundamental premise of the transaction—*i.e.*, that Seritage would recapture and redevelop space to re-let at higher prices.[45]  A feature of the deal that should have caused Seritage to pay *more* ultimately resulted in it paying *less*.

82.    Second and relatedly, the Cushman & Wakefield appraisal process failed to consider adequately the highest and best use of the properties even though the foundation of the Seritage Transaction was that these properties had higher value uses.  This failure resulted in materially undervaluing the properties and was contrary to accepted valuation methodology—and a violation of the professional appraisal standards that Cushman & Wakefield is required to follow—for the very reason that it results in unreliable market value conclusions.  Cushman & Wakefield analyzed the land value of only 40 of the properties, and thus did not adequately

---

[45] During his December 13, 2018 interview, Richard Latella ("Latella"), the retail practice leader at Cushman & Wakefield, ███████████████████████████████████████████████████████████████████

consider the potential land value, which is a vital part of the highest and best use analysis required for a reliable fair market appraisal.

83.    Third, the assumed capitalization rates that the individual Cushman & Wakefield appraisers used generally were too high considering the discounted market rent Sears was paying and Seritage's ability to recapture and redevelop space.  Because capitalization rates are inversely related to value, these assumptions improperly decreased the appraised value.

84.    Fourth, the valuation approach that Cushman & Wakefield used—capitalizing the discounted lease income—was the *only* appraisal methodology employed.  This approach, known as the "income capitalization" approach, is but one of three recognized real estate valuation approaches, the others being the "cost approach" and the "sales comparison" approach. Remarkably, Cushman & Wakefield and Sears agreed at the very outset of the engagement that Cushman & Wakefield would value the properties using *only* the income capitalization approach; it was expressly written into the engagement letter.  At the very least, Cushman & Wakefield also should have applied the "sales comparison" approach by looking at comparable sales to assess value.  Not doing so was highly atypical for a real estate appraisal process.  Each of the Cushman & Wakefield appraisals contained the same counterfactual boilerplate language—*i.e.*, that insufficient sales exist to make the comparable sales approach useful.  But it simply is incorrect that, given the tremendous number of market transactions around large anchor stores in recent years (including the sales of hundreds of Sears stores themselves), in no market anywhere in the country, nor at a national level, were there sales from which one could derive meaningful valuation information from a sales comparison approach.

85.    And fifth, the Cushman & Wakefield appraisals were riddled with errors and inconsistencies.  Apart from the fact that all of the appraisals used standard boilerplate language

39

even when inconsistent with the specific facts of a property, the appraisals were pervaded by sloppy reporting wherein narrative discussion did not match the actual value analysis and inconsistent valuation metrics for comparable properties with similar attributes. The quality control process at Cushman & Wakefield was totally decentralized, with limited ability to confirm that individual appraisers across different offices and geographies adequately documented their appraisal analyses and assumptions and that they were consistent (where appropriate). To that end, Duff & Phelps observed "internal inconsistencies" in Cushman & Wakefield's analysis and reported that Sears's current CFO Robert Riecker ("Riecker") had "not been too pleased with the quality of Cushman's work" and "blasted Cushman for their ineptitude."[46]

86.     In contrast, the proper, industry-standard approach would consider the highest and best use for each property and, when it indicates a value higher than assuming perpetual occupancy at a discounted rate, would use a combination of (i) a residual development value analysis based on a discounted cash flow method to determine the developable value of the properties in question and (ii) a comparable sales approach for development properties. Here, a residual development value analysis based on Seritage's publicly-disclosed redevelopment plan provides a reasonable fair market value estimate based on the properties' highest and best uses (at least those contemplated by Seritage)—rather than the error-ridden and flawed methodology used in Cushman & Wakefield's appraisals. According to a preliminary analysis conducted by the Creditors' Committee's financial advisors, the residual development approach would have yielded far greater

---

[46] Jeffrey Schiedemeyer ("Schiedemeyer"), the managing director of Duff & Phelps who worked with Cushman & Wakefield during the appraisal process, described Cushman & Wakefield as a "challenging advisor to work with" because the company was "decentralized" and "resource constrained." The Cushman & Wakefield appraisal process was problematic because "there was a lot of issues with the initial data tapes" and Schiedemeyer acknowledged that there were inconsistencies across the various appraisals from the various Cushman & Wakefield appraisers. Schiedemeyer stated that Riecker had been dissatisfied with Cushman & Wakefield's work, an observation supported by emails Schiedemeyer had sent describing Riecker's frustration during the appraisal period.

40

appraised values for the properties. For example, the residual development value of the Santa Monica, California property is $85 million compared to Cushman & Wakefield's appraised value of $53 million (a 60% difference). The residual development value of the Braintree, Massachusetts property is $21 million compared to the Cushman & Wakefield appraised value of $15 million (a 40% difference). And the residual development value of the Cockeysville, Maryland property is $15 million compared to Cushman & Wakefield's $11 million value (a 36% difference).



87.     The undervaluing of the properties Cushman & Wakefield appraised also is apparent from Cushman & Wakefield's valuation of 17 of the 31 joint venture properties that were conveyed to Seritage by joint ventures (*i.e.*, in which Sears had to obtain consent for the conveyances from its joint venture partners). The total agreed-upon value of the joint venture properties was $858 million, with $429 million representing the 50% interest ultimately contributed to Seritage. Although Cushman & Wakefield appraised 17 of these properties at a total value of $364 million as part of its process for the Seritage Transaction, the properties were ultimately contributed to the joint ventures for $520 million— a number reached through what Stollenwerck described as "true negotiations between third parties" with the joint venture partners. This negotiated sale price was, on average, 43% higher than Cushman & Wakefield's appraisals for the same properties, demonstrating that the appraisals were woefully beneath fair purchase prices that would have been negotiated had a true marketing and valuation process been employed.

And in 2017, Seritage sold a portion of these same joint venture interests at significant gains (23-24%) over the basis established in the 2015 Seritage Transaction—despite flat market conditions—suggesting that even the arm's-length negotiation process with the joint venture partners undervalued the real estate conveyed.

88.     The inadequacy of Cushman & Wakefield's appraisal process has been borne out by subsequent events.  Cognizant that leasing to Sears does not represent the highest and best use of many of the newly acquired properties, Seritage has redeveloped and re-tenanted (or begun the process of redeveloping) Sears stores at a rapid pace, with such activity increasing 34% quarter-over-quarter since the fourth quarter of 2015.  On January 17, 2017, Seritage announced that it had signed new leases totaling 2.2 million square feet, increasing third-party rental income by 94% since Seritage's formation.  As of September 2018, Seritage had already redeveloped or was in the process of redeveloping 78 stores (*i.e.*, approximately 26 per year).  And, on information and belief, Seritage was able to recapture 100% of certain properties beyond the initial 21 stores set for redevelopment, which benefited Seritage beyond what was considered in the original Seritage Transaction.  Seritage's recapture efforts have been so aggressive that it even sent, on January 11, 2019, a notice to the Debtors to recapture a Sears Auto Center in violation of the automatic stay.



89.    Seritage's recapture and redevelopment strategy has been a wild success.  Seritage publicly stated that it has achieved uplifts of 350% to 450% on the rent Sears had been paying, thereby validating the underlying premise of the Seritage Transaction and demonstrating that "highest and best use" should have been a key consideration in the appraisal process.

90.    Moreover, outside of the Seritage Transaction, Cushman & Wakefield's low appraised values continued to be demonstrated by Sears's actual sales activity on disposal of other stores.  Beginning in 2016 and continuing into 2018, Sears sold 36 properties that had been appraised by Cushman & Wakefield.  Collectively, those stores had been valued at $565 million by Cushman & Wakefield but sold, in a generally anemic retail sales market, at $793 million, more than 40% above appraised value, once again showing that Cushman & Wakefield's valuations were too low.

91.    It is no coincidence, then, that Sears's stock price dropped by 97% from the day the Seritage Transaction closed through the Petition Date while Seritage grew in value and attracted

prominent investors—including Warren Buffett.   In the year after the Seritage Transaction, Seritage stock shot up to nearly 50% above its debut, reflecting the market's growing understanding of the true value of Seritage.  And even after these chapter 11 cases (the "Chapter 11 Cases") commenced, Seritage—which still receives significant rental income from Sears— continued to trade at meaningfully above its rights offering price.

92.     A fair market valuation based on highest and best use would have required aggregate consideration that would have been far above the $2.7 billion consideration, which did not—and based on the valuation process, could not have—come close to approximating the reasonably equivalent value of the properties Sears transferred to Seritage.

### 2.     Sears Was Insolvent at the Time of the Seritage Transaction

93.     In addition to all of the other problems with the Seritage Transaction, it took place at a time when Sears was insolvent (or, at a minimum, rendered Sears insolvent thereby).  Pushing forward transactions during Sears's insolvency was a natural consequence of Lampert's and ESL's intentions to hinder, delay, or defraud Sears's other creditors.  Although Lampert and ESL tried to mask Sears's insolvency with a solvency opinion prepared by Duff & Phelps, that opinion was premised on flawed methodologies and assumptions.  When corrected, those methodologies and assumptions actually show Sears was insolvent at the time of the Seritage Transaction (if not well before)—and deeply so.

94.     The principal flaw, among many, in Duff & Phelps's solvency conclusion was its express dependence on the Company's internal projections, which were based on nothing more than Lampert's wishful thinking (or downright fraud) and which Duff & Phelps did not adequately check for reasonableness.  As such, the projections could not be relied upon in conducting any proper valuation analysis.  As discussed above, Lampert and ESL caused Sears to concoct fanciful projections that consistently and materially missed actuals every single year, and often by billions.

Each year Sears projected an unsupported and unreasonable turnaround, and each year that turnaround had failed to materialize.  In the five full years prior to the Seritage Transaction from 2010 through 2014, Sears missed its annual EBITDAP forecasts by *approximately $1.5 billion per year*.  And by June 2015, around the time of the Seritage Transaction, the Company was already lagging far behind its projection for 2015, missing its February monthly EBITDAP forecast by $33 million and its March monthly EBITDAP forecast by $65 million—strongly suggesting the hoped-for turnaround was not materializing that year either.

95.    Unsurprisingly, despite Sears's inability to provide accurate forecasts and a total lack of evidence that a turnaround was at hand, the Company put forth a set of three-year projections in relation to the Seritage Transaction that predicted—yet again—a massive turnaround that would take place after the transaction.  These projections were exclusively top-down, dictated by Lampert and ESL, and did not reflect the realities of Sears's operations.[47]

96.    And they were laughable.  The following chart illustrates the magnitude by which Sears's actual performance missed management's Lampert-inspired, Seritage-related projections during the years after the Seritage Transaction—a total miss of $3.9 billion in EBITDAP over the three-year projection period:

**Actual vs. Projected Financial Results Variance**
*($ in millions)*

|  | Actuals Results | | | Projected Results | | | Variance | | | Cummulative Variance |
|---|---|---|---|---|---|---|---|---|---|---|
|  | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15-FY17 |
| Revenue | $ 25,110 | $ 22,113 | $ 16,686 | $ 28,085 | $ 29,149 | $ 29,617 | $ (2,975) | $ (7,036) | $ (12,931) | $ (22,942) |
| Gross Profit | 8,260 | 7,218 | 5,719 | 9,780 | 10,184 | 10,401 | (1,520) | (2,966) | (4,682) | (9,168) |
| EBITDAP | $ (836) | $ (808) | $ (562) | $ 316 | $ 573 | $ 771 | $ (1,152) | $ (1,381) | $ (1,333) | $ (3,866) |

97.    Yet these baseless projections were the foundation upon which Duff & Phelps valued Sears and opined on its solvency.  In so doing, Duff & Phelps acted recklessly because it

---

[47] When Schriesheim was asked about the financial projections that Sears provided to Duff & Phelps for the solvency report, he admitted the projections were "aspirational" at best because Sears "would often—or almost always fall pretty woefully short as compared to the projections."

was fully aware that Sears had consistently missed projections by miles in each of the years leading up to the Seritage Transaction. Duff & Phelps previously crafted solvency opinions in connection with the SHO and Lands' End spin-offs, and Sears's management's projections in each of those transactions had been as ridiculous as those used in the Seritage Transaction. Duff & Phelps should have known better than to continue relying on such projections for its solvency opinions.

98.    In truth, Sears was deeply insolvent at the time of the Seritage Transaction under the three relevant valuation methodologies: discounted cash flow, comparable companies, and liquidation value.

99.    A discounted cash flow analysis is highly dependent on the reasonableness of the projections utilized—in this case, the Lampert-inspired projections. Here, no reasonable person credibly could assume the accuracy of such projections. Instead, given that EBITDAP averaged negative $546 million over the prior three years with a negative 1.9% EBITDAP margin, an assumption that Sears would continue with current trends or reasonable improvement over the projection period would have been appropriate. Had that type of number been used in lieu of the patently unreasonable projections Lampert required Sears's management to provide, the Duff & Phelps valuation model—holding all else equal—would have shown Sears to be insolvent by billions of dollars. Thus, any good faith and industry-standard discounted cash flow analysis would show Sears to be insolvent at the time of the Seritage Transaction.

100.    Strangely, when Duff & Phelps provided a solvency opinion in connection with the Lands' End spin-off in 2014, it performed a sensitized projections discounted cash flow analysis— something it did not do for Seritage. Had Duff & Phelps done so for the Seritage Transaction, the analysis would have shown Sears to be insolvent. And Duff & Phelps's own model reveals that it

was aware that a sensitized projections discounted cash flow analysis would have reached that result.

101.    A comparative companies analysis also shows Sears to have been insolvent at the time of the Seritage Transaction.  As with the discounted cash flow analysis, it is entirely inappropriate to rely on management's inflated projections.  A more reliable indicator of value would have been Sears's performance over the prior twelve months, during which it had earned $80 million in EBITDARP[48] (and lost hundreds of millions of dollars).  Applying the median market multiple, as derived by Duff & Phelps, to Sears's last twelve months EBITDARP performance would result in an enterprise value (before debt) of approximately $875 million— and that is before consideration of Sears's rent costs, pension obligations, and all other liabilities and considerations.  Factoring in those considerations—precisely as Duff & Phelps did in its analysis—leads to a finding that Sears was insolvent by billions of dollars.

102.    Because accepted valuation approaches would have shown, even using favorable but not wholly unreasonably optimistic projections and historical figures, Sears to be insolvent by billions of dollars, it would have been appropriate to look at the non-going concern realizable value of Sears's assets—using a "sum of the parts" analysis.[49]  In its solvency analysis, Duff & Phelps prepared an "analogous" liquidation analysis by generally looking at the book value of Sears's assets and liabilities at the time of the Seritage Transaction and concluded that positive net asset value existed.  But Duff & Phelps never considered the costs that would be incurred in actually realizing the fair value of Sears's assets, including, for example:  the significant cash burn required to conduct asset sales at fair value; inventory being liquidated below cost; and damages associated

---

[48] "EBITDARP" means earnings before interest, taxes, depreciation, amortization, rent, and pension.

[49] Schiedemeyer acknowledged in his interview that Duff & Phelps did not consider looking at Sears's historical performance for the solvency analysis and chose instead to work with the representations Sears's management provided, without any review for reasonableness.

with rejecting, terminating, or modifying leases.  Duff & Phelps also grossly overvalued the intellectual property associated with the Kenmore, Craftsman, and DieHard brands by using Sears's grossly inflated projections, resulting in incorrectly valuing those brands at $3.8 billion even though Ernst & Young had separately valued those brands at approximately $1.1 billion around the same time in connection with its annual impairment analysis.  Additionally, Duff & Phelps incorrectly assumed Sears's pension obligations to be equal to the GAAP liability, which assumes a much higher discount rate.  If one uses a lower discount rate reflecting a non-going concern scenario, the pension liability would increase materially.  Had these and other errors been identified and corrected, it would have become apparent that Sears was insolvent on a liquidation basis by more than $1 billion.

103.    One cannot evade the complete circularity of what was undertaken.  To obtain a solvency opinion and thus allow the continued favorable disposition of corporate assets to control persons, Sears's management, at Lampert's and ESL's behest, required Duff & Phelps to use the Lampert/ESL-inflated projections, which led to a finding of solvency and purportedly formed a basis on which Sears's management could rely for the Seritage Transaction.  Thus, Sears's own unreasonable projections, directed by Lampert and ESL, formed the sole basis for Sears's management claiming a reasonable basis to proceed with the Seritage Transaction.

104.    In fact, under any of the relevant valuation methodologies, Sears was insolvent by a wide margin at the time of the Seritage Transaction.  After all, contemporaneous book value and analyst reports reached the same conclusion about Sears's insolvency.  Three separate and independent analyst reports about Sears issued in 2014 and 2015 all concluded that Sears had a negative sum-of-parts value and that if Sears were to liquidate, it would be unable to provide a full

recovery to all its creditors, resulting in hundreds of millions (and in one report, well over a billion) in unpaid claims.

>        **3.        The Seritage Transaction Was an Insider Deal Orchestrated by Lampert and ESL**

105.    Taking advantage of their position on both sides of the Seritage Transaction, Lampert and ESL quarterbacked the deal from inception through closing.  It was Lampert's idea to spin off Sears's valuable real estate into a REIT, and it was Lampert who continued to push for the transaction month after month during Board meetings from 2014 into 2015.  The Seritage Transaction fit comfortably into Lampert's goal of transforming Sears into an "asset-light" company with remaining assets encumbered by ESL "debt."[50]  Indeed, Sears—under Lampert's and ESL's direction—never credibly considered any alternative approaches to the Seritage Transaction that did not involve ESL as the primary beneficiary.

106.    Acting as CEO, Chairman of Holdings's Board, and controlling shareholder of Sears with the ability under Delaware law to remove other Board members, Lampert was able to exercise an inordinate amount of influence on other members of the Board.  Even though Lampert abstained from voting on the Seritage Transaction, when asked at a Board call on June 5, 2015, he told Board members "that he would vote 'yes' were he to vote," thus communicating his strong desire that the other Board members approve the transaction.  Indeed, Lampert faced no opposition or serious questions from other Board members with respect to the Seritage Transaction.  The extent of the Board's impartiality appears limited to one member's question to Lampert at a Board meeting on March 5, 2015 about the consequences of not completing the Seritage Transaction.  In

---

[50] Schriesheim explained in his interview that Lampert's vision was for Sears to become an "asset-light, member-centric integrated retailer" by finding ways to separate the Company from its assets.  The Seritage Transaction was part of Lampert's pursuit of this transformation.

response, Lampert warned that the failure to close the transaction exactly as Lampert proposed would lead to "liquidation mode" and require management to close and sell additional stores.

107.    At the same time, Lampert and ESL were both deeply invested in and exercised control over Seritage.  Lampert had positioned himself as Chairman of Seritage's board of trustees and as Seritage's controlling shareholder (with ESL).  And, in an email dated February 9, 2017, Lampert wrote that "it can be argued that I do currently control the REIT" based on his and ESL's high level of participation in the Seritage rights offering.

108.    The Board's Related Party Transactions Subcommittee ("RPT Subcommittee")— tasked with scrutinizing conflicted transactions—was not an adequate check on ESL's power and control.[51]  The RPT Subcommittee merely rubber-stamped the Seritage Transaction and failed to consider the fairness of the deal to Sears or its implications for Sears's creditors.  For example, the RPT Subcommittee never evaluated and weighed in on the Cushman & Wakefield appraisals, either the Solvency Analysis or Fairness Opinion issued by Duff & Phelps, the terms of the Master Leases, or the overall fairness of the transaction from Sears's perspective.  On information and belief, the RPT Subcommittee never considered hiring its own appraisers to value the properties independent of the Cushman & Wakefield appraisals, and further failed to even discuss a March 2014 Duff & Phelps appraisal of Sears's real estate portfolio that valued the properties at substantially higher rates.  Instead, the RPT Subcommittee's sole function with respect to the Seritage Transaction was to make sure that ESL was not getting a better deal relative to other Sears

---

[51] Kamlani stated during his interview that he could not recall from his time on the RPT Subcommittee a single proposed transaction involving ESL or Lampert that was not ultimately approved by the Board upon the recommendation of the RPT Subcommittee.  Ann Reese ("Reese"), another director of Holdings who also served on the RPT Subcommittee, corroborated Kamlani's testimony in her interview, stating that the RPT Subcommittee has never recommended that the Board *not* approve a related-party transaction.  After all, no shareholders, including those on the RPT Subcommittee, could have been impartial because they too benefited from the Seritage Transaction rights offering.

shareholders; it performed no function whatsoever in separately evaluating the merits and terms of the transaction to Sears and its other stakeholders.  It also bears noting that Kamlani, one of the three RPT Subcommittee members, joined ESL as its President in March 2016, less than one year after the Seritage Transaction closed.

### 4.    As Lampert Planned, the Seritage Transaction Provided ESL with Direct, Ascertainable, and Quantifiable Financial Benefits

109.    Through undue and unchecked influence over the Board and calculated efforts to force through the Seritage Transaction, Lampert and ESL were enriched by transferring Sears's core assets—235 of its most valuable properties and its interests in real estate joint ventures—to a privately held entity over which Lampert and ESL exercised even more dominion.  Not only was ESL the controlling shareholder of Seritage at the time of the Seritage Transaction, but Lampert also served as Chairman of the Seritage board of trustees.  Through Lampert's simultaneous control of both primary parties to the Seritage Transaction, ESL realized a substantial and direct benefit by capturing the value of Sears's prized assets purchased by Seritage at an artificially low price.

110.    On June 9, 2015, approximately a month prior to the launch of the rights offering to fund the Seritage Transaction, rights to purchase class A common shares began trading on the New York Stock Exchange.  During the trading period, the rights traded at a value of between $2.65 and $6, meaning that the market was willing to pay a premium over the $29.58 strike price, which was derived from the $2.719 billion purchase price set by Sears (via Lampert and ESL).  For example, a $4 trading price for the rights implies a total enterprise value of Seritage of approximately $3.2 billion, nearly $500 million more than the sales price dictated by Lampert.  This is clear evidence that the market saw an obvious upside in Seritage not captured by the $2.7 billion sale price, viewing that price as inadequate by hundreds of millions of dollars.  This

was borne out by trading of Class A Seritage shares on their first day on the market when they immediately traded up from $29.58 to $37.10, generating hundreds of millions in profits to the participants in the rights offering.

111.    Sears was well aware of how the rights were trading on the public market and the valuation implied by that trading price.  Schriesheim, Sears's then CFO, specifically observed in an email to Kamlani (then a director of Sears and, shortly thereafter, ESL's President) that "to the degree that a right trades in the 'positive' the market perceives there is value."  Sears's senior management, all of whom stood to make significant profits based upon their eligibility as shareholders to participate in the rights offering, monitored the trading price of the rights on a daily basis.

112.    ESL and Lampert similarly were aware that the trading price for the rights implied significantly higher valuation than the $2.7 billion purchase price.  For example, Lampert, while working with an employee of ESL on June 17, 2015—approximately three weeks prior to the closing of the Seritage Transaction—valued ESL's anticipated investment in Seritage using a $36.48 share price.  The next day, on June 18, 2015, he received an analysis from CRT Capital concluding that Seritage had a total enterprise value of $3.262 billion, implying a $38.34 share price.  And just weeks before the Seritage Transaction closed, Sears's CFO wrote in an email to Sears's top management that "the market thinks [Sears] is selling something for about $600M less than it is worth."

113.    Notwithstanding the clear knowledge that the Seritage Transaction was being conducted at a value the market viewed as grossly inadequate, Sears's management, Lampert, and ESL proceeded with the Seritage Transaction and earned hundreds of millions at the expense of Sears and its creditors.  And two years after the Seritage Transaction, Schriesheim reflected on his

investment in Seritage in an email to Riecker, noting that he had sold his shares at about $45 after purchasing at the $29.58 offering price, a 52% gain. Schreisheim went on to describe the tremendous upside in the Seritage Transaction, commenting that he "[knew] the math pretty well" and that that he had "always felt like [Seritage] was positioned well in [the] market."

114.    The harm the Seritage Transaction caused Sears was commensurate with the direct benefit ESL received as Seritage's controlling shareholder. The day after the subscription rights were distributed, Holdings's stock price declined by 19.5%. In contrast, shares of Seritage peaked at $56.47 within one year—nearly double their debut—as the market began to recognize the significant value to Seritage of the recapture and redevelopment rights in the Master Leases.[52] Given the opacity of information regarding the Seritage Transaction, the market took some time to understand the true value transferred to Seritage. In fact, Seritage itself was a source of misinformation in the market, including when it incorrectly stated in its prospectus that Cushman & Wakefield analyzed the highest and best use of each property (it had not) and that all three valuation approaches had been considered (they had not).

115.    Lampert made off like a bandit with ESL having purchased a 46.5% stake in the consolidated economics of Seritage for $750 million through a combination of Class A and B shares as well as operating partnership units. On information and belief, within roughly one year of the Seritage Transaction, ESL's stake had shot up in value to approximately $1.25 billion.

116.    In addition to its receipt of equity value, ESL directly profited from the fraudulently transferred portfolio of Sears's properties in the form of shareholder dividends. Since the Seritage Transaction closed, ESL has received approximately $76 million of ill-gotten gains stemming from

---

[52] Seritage's success was not lost on key members of the Holdings management team. In an email dated April 22, 2017, Schriesheim discussed the money he made from selling Seritage shares and how Lampert's investment in the company was a "natural hedge" to any of Holdings's financial issues.

dividends from Seritage through its Class A shares and partnership units and an additional

incalculable amount from its equity in Seritage and its operating partnership—with these gains all

from assets that had previously been vital to Sears's economic vitality.

>    **5.    ESL Received Direct, Ascertainable, and Quantifiable Financial Benefits in its Capacity as a Sears Creditor**

117.    ESL also benefited directly, in its capacity as a Sears creditor, from the Seritage

Transaction proceeds that went to Sears.  Just weeks after the Seritage Transaction closed, the

Board—at Lampert's request—directed approximately $1 billion of the Seritage Transaction

proceeds to prepay certain long-term, second lien debt, a significant amount of which ESL held.

Under the resulting all-cash tender offer in August 2015 (the "Exchange Offer"), ESL exited at 99

cents on the dollar from $165 million of Second Lien Notes[53]—roughly 80% of the Second Lien

Notes ESL had held as of January 2015.  But for the infusion of liquidity the Seritage Transaction

generated, Sears would not have been in a position to turn around and pay off Second Lien Notes.

After all, a primary purpose of the Seritage Transaction was to obtain funds to retire existing debt

obligations such as the Second Lien Notes held by ESL.

118.    That Sears would use more than one-third of the Seritage Transaction proceeds to

take out $1 billion of Second Lien Notes effectively at par can only be understood in light of

Lampert's and ESL's self-interested motivations.  ESL had contributed capital through various

financing facilities across Sears's capital structure, with an especially strong concentration of

second lien holdings.  Even before the Seritage Transaction closed, Lampert communicated to the

Board at a March 5, 2015 Board meeting his desire that the proceeds be used to pay down non-

---

[53] Under an indenture dated as of October 12, 2010, Holdings issued $1.25 billion in senior secured notes due 2018 (the "Second Lien Notes").  Sears Holdings Corp., Current Report (Form 8-K) (Oct. 12, 2010).  The Second Lien Notes accrued interest at an annual rate of 6.625% and matured on October 15, 2018.  Sears Holdings Corp., 2010 Annual Report (Form 10-K), at 39 (Mar. 11, 2011).

first lien debt "at attractive prices." Tellingly, when asked who decided that Sears should pay down the Second Lien Notes and not other facilities, Kamlani, ESL's President and member of the Holdings Board, answered that the recommendation "came from the management team. Eddie clearly was in support of it as the CEO."

119.    Kamlani all but admitted that it had always been Sears's intention—based on Lampert's and ESL's influence on Sears's management—to use the Seritage Transaction proceeds to pay down Second Lien Notes. When questioned about the Board's decision to pay off the Second Lien Notes and not other facilities, Kamlani responded that the determination was a "[f]unction of interest rate and maturity." Kamlani went onto explain that it only made sense to pay down debt that had the "closest maturity and most expensive rate," and that only the Second Lien Notes "fit that profile." Certainly, Lampert, ESL, and the Board knew which debt facility fit that profile prior to the closing of the Seritage Transaction, as well.

120.    Finally, although the RPT Subcommittee hired a financial advisor, Centerview Partners ("Centerview"), after the Seritage Transaction to analyze the use of proceeds to pay down ESL-held debt, it did so only as window dressing, retaining the advisor just days before it voted on the use of the Seritage Transaction proceeds and requiring the advisor to work on "expedited timeframes" to analyze transactions that were already negotiated. Lampert's aims were once again left unchecked.

121.    After all, the $1 billion buyback of Second Lien Notes was contrary to the Company's best interests and ongoing need for liquidity, which was borne out in spades in ensuing years.

**IV.    ACT FOUR:  ESL "Finances" Sears to Protect its Investments, Lien Up Remaining Assets, and Solidify Sears's Fate**

122.    The Seritage Transaction marked a turning point in Sears's demise.  With Sears in a freefall and its eventual bankruptcy a question of when, rather than if, Sears was desperate for cash—and ESL was always there.[54]  Sears, for the most part, never even bothered to seek financings from third-party creditors on the open market because ESL always was prepared to contribute capital—and happily so, being motivated to encumber previously unencumbered assets, buy time for ESL to maximize and protect its investments in Sears, and protect its equity interest in Seritage that remained dependent on Sears.  Under the guise of assisting Sears with its liquidity needs, ESL had free reign to secure remaining assets and wall off other creditors in inevitable bankruptcy proceedings.

123.    ESL's numerous further investments in Sears—papered as debt but playing the role of equity[55]—in the period since the Seritage Transaction include the following, among others:

| Secured Financings by ESL From 2016-2018 | | | |
|---|---|---|---|
| **Date** | **Financing Transaction** | **Benefit to ESL** | **Current Holdings[56]** |
| April 2016 | 2016 Term Loan:  On April 8, 2016, Holdings, Sears Roebuck Acceptance Corp. ("SRAC"), and Kmart entered into a $750 million term loan pursuant to the | JPP and JPP II funded $146 million of the 2016 Term Loan.[58]<br><br>ESL obtained liens on a package of receivables, | None. |

---

[54] Board member Reese explained in her interview that Sears relied on ESL to meet its short-term liquidity needs and stating that if ESL had not purchased Sears's commercial paper at certain times, then Sears would have struggled to raise funding on a short-term basis.  Reese also expressed her belief that ESL has been the only purchaser of Sears's commercial paper in the past year.  Sears's CFO Riecker confirmed that "ESL always had an interest in ensuring the company continued."

[55] To the extent this Complaint refers to such financings as "debt," it is reflective only of how those financings were ostensibly papered and not of their true nature, which is that of equity.

[56] The Company debt collectively held by ESL and/or its affiliates described in this column is current as of the Petition Date.

[58] Sears Holdings Corp., Annual Report (Form 10-K), at 115 (Mar. 21, 2017).

| | First Amendment to the First Lien Credit Agreement.[57] | accounts, cash, inventory, chattel paper, and other collateral described more fully in Exhibit 1 to the Proposed Complaint (the "First Lien Collateral") ("Compl. Ex. 1").<br><br>ESL also received interest and/or fees associated with this financing, as shown in Exhibit 2 to the Proposed Complaint ("Compl. Ex. 2"). | |
|---|---|---|---|
| April 2016 | 2016 Real Estate Secured Loan:  On April 8, 2016, certain of Holdings's subsidiaries entered into a 15-month, $500 million secured loan facility secured by 21 real properties. | JPP, JPP II, and Cascade Investment, LLC funded the 2016 Real Estate Secured Loan, which as discussed *infra* was later consolidated into the Consolidated Secured Notes in June 2018.<br><br>ESL affiliates and Cascade Investment, LLC obtained a first-priority lien on 21 real properties.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | *See entry on Consolidated Secured Notes.* |
| September 2016 | Second Lien Term Loan:  On September 1, 2016, Holdings, SRAC, and Kmart entered into a $300 million Second Lien Term Loan | JPP and JPP II funded the Second Lien Term Loan. | ESL held approximately 99% of the $317.1 million owed on |

---

[57] Referred to in Company documents as Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (the "First Lien Credit Agreement").

| | | | |
|---|---|---|---|
| | under the Second Lien Credit Facility.[59] | ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | the Second Lien Term Loan. |
| December 2016 | <u>Standalone Letter of Credit Facility</u>:  On December 28, 2016, Holdings, SRAC, and Kmart entered into a $500 million secured standby letter of credit facility with an initial commitment of $200 million.[60] | JPP and JPP II funded the initial $200 million Standalone Letter of Credit Facility and are currently co-lenders.<br><br>ESL obtained a lien on the First Lien Collateral senior to second lien claims.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | JPP and JPP II hold $105.7 million of these obligations (39% of the $271.1 million outstanding, with a maturity of December 28, 2018).[61] |
| January 2017 | <u>2017 Real Estate Secured Loan</u>:  On January 3, 2017, Sears Roebuck, Kmart Stores of Illinois LLC, Kmart of Washington LLC, and Kmart entered into a second $500 million real estate loan facility secured by 76 additional properties (after certain amendments). | JPP and JPP II funded the 2017 Real Estate Secured Loan.<br><br>As discussed *infra*, this facility was later consolidated into the Consolidated Secured Notes in June 2018.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | *See entry on Consolidated Secured Notes.* |

---

[59] Sears Holdings Corp., Annual Report (Form 10-K), at 81 (Mar. 21, 2017).

[60] *Id.* at 79-80.

[61] Sears Holdings Corp., Quarterly Report (Form 10-Q), at 18 (Sept. 13, 2018).

| July 2017 | Second Lien Line of Credit: On July 7, 2017, Holdings, SRAC, and Kmart entered into the Second Lien Line of Credit, with a maximum aggregate principal amount of up to $600 million.[62] | JPP and JPP II funded the Second Lien Line of Credit with other lenders.<br><br>ESL obtained a junior lien on the First Lien Collateral.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | JPP and JPP II were lenders on the Second Lien Line of Credit, holding approximately 96% of the $525 million in principal outstanding as of the Petition Date.[63] |
| --- | --- | --- | --- |
| January 2018 | IP/Ground Lease Term Loan Facility:  On January 4, 2018, SRAC and Kmart entered into a $300 million term loan. | JPP and JPP II funded the IP/Ground Lease Term Loan Facility with other lenders.<br><br>ESL obtained security interests over certain intellectual property assets (other than Kenmore, Craftsman, and DieHard) and certain real property ground lease interests, as detailed in Compl. Ex. 1.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | ESL and/or its affiliates collectively hold approximately $152.6 million of credits under the IP/Ground Lease Term Loan Facility. |
| March 2018 | Sparrow Term Loan and Sparrow Mezzanine Loan[64]: On March 14, 2018, certain non-Debtor affiliates of Holdings entered into a loan of $200 million (the "Sparrow Term Loan") and | ESL funded the consolidated Sparrow loans with another lender.<br><br>ESL obtained interests in 138 real properties that | ESL and/or its affiliates collectively own approximately $614.9 million of credits under the |

---

[62] Sears Holdings Corp., Current Report (Form 8-K), Ex. 10.1 (July 7, 2017).

[63] Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York, ¶ 34 [ECF No. 3].

[64] Note that the borrowers under these loan facilities are non-debtors.

|  | on the same day, other non-Debtor affiliates entered into a loan for $240 million (the "Sparrow Mezzanine Term Loan"). On November 13, 2018, the Sparrow Mezzanine Term Loan was reallocated to the Sparrow Term Loan, entirely owned by ESL. As of this date, approximately $614.9 million was outstanding on the Sparrow Mezzanine Term Loan. | were released from a ring-fence arrangement with the Pension Benefit Guaranty Corporation.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | Sparrow Term Loan. |
|---|---|---|---|
| March 2018 | FILO Loan: On March 21, 2018, in connection with the First Lien Credit Agreement, Holdings, SRAC, and Kmart entered into a loan of $125 million pursuant to the sixth amendment to the First Lien Credit Agreement. | JPP, JPP II, and Benefit Street 2018, LLC initially funded the FILO Loan.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | As of the Petition Date, $125 million in principal remained outstanding, of which ESL held approximately $70 million (56%). |
| June 2018 | Consolidated Secured Notes: On June 4, 2018, the 2016 Real Estate Secured Loan was paid off and terminated and the 2017 Real Estate Secured Loan was amended and restated into the Consolidated Secured Loan Agreement. Under the Consolidated Secured Loan Agreement, ESL and other lenders consolidated existing real estate secured loan facilities under which advances had been made in excess of $779 million.<br><br>On September 12, 2018, pursuant to the First Amendment to the Consolidated Loan | ESL's investment was secured by 88 real properties. Upon information and belief, 15 of those properties were sold prepetition. The 73 remaining properties that are collateral to the Consolidated Secured Notes are identified in Compl. Ex. 1.<br><br>ESL also received interest and/or fees associated with this financing, as shown in Compl. Ex. 2. | As of the Petition Date, $831.4 million in principal remains outstanding, $723.3 million of which is held by ESL, through its affiliates JPP and JPP II. |

60

| | Agreement, certain borrowers took an advance of $75 million to pay down obligations under the First Lien Credit Agreement. | | |
|---|---|---|---|

124.    As illustrated in the table above and the timeline below, ESL rapidly escalated the number and amount of financings it extended to the Company in the period following the Seritage Transaction.  The amount and the frequency of the ESL financings tied directly to the continued rapid decline in the Company's operating performance:



125.    Although these financing transactions ostensibly were debt financings, ESL did not intend to provide Sears with liquidity.  Rather, these were attempts essentially to **purchase** Sears's remaining capital assets through a series of liens in preparation for the imminent bankruptcy filing

and to keep Sears alive long enough for the Seritage operation to take flight. Thus, it was no surprise that ESL submitted a bid (a completely nonactionable bid) in these Chapter 11 Cases to acquire Sears using, in large part, a credit bid of the "debt" held by ESL. That "debt" bore the hallmarks of equity contributions and not debt for the following reasons.

### A.    ESL's Financings Were Attempts to Purchase Sears's Remaining Valuable Unencumbered Assets at a Discount

126.    Lampert and ESL had no doubt that these Chapter 11 Cases were unavoidable and therefore used the opportunity—and took advantage of Lampert's power and control over Sears—to lien up many of Sears's remaining unencumbered property. For instance, as explained by Board member Reese, Holdings's Board—which was chaired by Lampert—accepted an analysis provided by Centerview that "absent a liquidity infusion, [the Company] would be in covenant default" under the First Lien Credit Facility. The Board's RPT Subcommittee was aware of the inevitability of a covenant default absent taking on additional ESL-financed debt as of August 2016. It was clear that this was just a band-aid and, predictably, roughly a year later, having blown through the temporary liquidity provided by a spate of debt financings, Centerview again warned Sears that it would have to file for chapter 11 absent an ESL bailout and the cooperation of its vendors. Specifically, in an October 31, 2017 email to Lampert, Centerview provided an analysis showing that if a contemplated exchange offer for the Company's unsecured debt was not successful, and if ESL did not participate in the exchange, and if vendors reacted to the proposed exchange negatively, then "the Company should be prepared to file chapter 11 immediately."

127.    Lampert and ESL then used Sears's dependence on ESL to secure many of Sears's remaining unencumbered assets in what amounted to an attempt to purchase Sears's capital assets at a discount—not at fair value but at collateral values. In the years leading up to these Chapter 11 Cases, Holdings's Board and management understood that Lampert and ESL would always be

there to provide additional financing to Sears. Kamlani, who was at times both a member of the

Holdings Board and the President of ESL, described the "general sort of feeling that . . . Eddie will

cut a check" whenever Sears had issues with liquidity. But those checks came with strings:

Kamlani explained that at some point in time before the Second Lien Line of Credit (defined

below) was issued on July 7, 2017, ESL knew "it was prudent to make loans to the company on a

secured basis instead of on an unsecured basis." Centerview, as the Board's advisor, opined that

ESL would stop lending when "there is no more collateral" left.[65]

128.     To make matters worse, as Sears's financial performance declined, the Company

became wary of dealing with financiers other than Lampert and ESL. Sears's then CFO came to

prefer relying upon ESL for financing because Lampert closed deals "on a more expeditious basis"

and "there were certain documents that he wouldn't require." In contrast, he viewed offers from

third parties with suspicion because he felt that third parties "always wanted to take advantage"

since they "viewed [Sears] as a credit risk." That same suspicion did not seem to affect Sears's

view of ESL's offers, as Lampert had the benefit of deciding "which properties were selected [as

collateral] for [ESL] loans."

## B.     ESL Provided Capital with No Expectation of Repayment

129.     ESL provided capital with no expectation or plan for how it would be repaid, and

with no expectation that any repayment would be according to a schedule as is typical of debt.

ESL simply had free options on any potential recovery in Sears, with the upside of interest and

fees. On information and belief, ESL has earned an estimated $470 million in such interest and

fees thus far. In fact, Sears's current CFO noted that during this period, ESL was the most frequent

---

[65] Centerview's representative stated in his interview that, "as things got worse, as we got into '17 and '18, I think the company became more and more concerned that ESL was no longer going to fund commercial paper, unsecured commercial paper into the company."

lender because it would offer terms that were "not acceptable" to other lenders—yet always on a secured basis leapfrogging all third party unsecured or junior creditors. Lampert and ESL were abusing insider status and control over Sears during Sears's insolvency and unavoidable bankruptcy filing. After all, much of the financing transactions extended by ESL were provided after Sears had announced in its 2016 Annual Report that its "historical operating results indicate substantial doubt exists related to the Company's ability to continue as a going concern."

130.    Nor did Sears have any plan for repaying ESL other than by surrendering its newly encumbered assets. Sears's current CFO explained that Sears had no specific plan to repay the Second Lien Term Loan, the Consolidated Secured Notes, the IP/Ground Lease Term Loan Facility, the March 2018 Sparrow Term Loan, or the March 2018 Term Loan. He stated that there was no source of funds to repay any of these loans "other than the assets" that were collateral for such loans. In other words, ESL's contributions to Sears in the years after the Seritage Transaction were not focused on improving Sears's liquidity but rather to purchase Sears's assets while the proceeds from such purchases were squandered on continuing losses (or often used to retire ESL's junior debt).

   **C.    ESL's Financings Were Meant to Buy Time for Lampert and ESL to Monetize Sears's Assets for their Own, Direct Benefit**

131.    ESL also extended these financings to buy time to monetize Sears's remaining assets for Lampert's and ESL's benefit. As correspondence among Centerview, ESL, Lampert, and Holdings's Board and RPT Subcommittee shows, as of 2016, ESL's participation in debt financings and exchanges was necessary for the Company to stave off a chapter 11 filing as long as possible and for Lampert to secure additional Company assets—including real estate and IP— as collateral in preparation for the Company's eventual and inevitable collapse. The ESL financing transactions were "[i]n ESL's mind, . . . all integrated transactions, all designed towards the goal . . .

64

[of] alleviating pressure, creating liquidity, buying time to ultimately maximize the value of assets." In other words, ESL was buying time to explore possible asset sales *to itself*. For example, in April 2018, ESL indicated interest in purchasing for itself the Sears Home Improvement ("SHIP") and PartsDirect business lines of Sears Home Services. And in August 2018, ESL submitted non-binding proposals to acquire Kenmore and SHIP for itself. These were further indicators of Lampert's and ESL's plan to maximize the value of Sears's assets for their own benefit.

132.    Sears Roebuck's issuance of unsecured commercial paper—most of which was owned by ESL—likewise was intended only to keep the business afloat while ESL attempted to monetize remaining assets for its own benefit. ESL also benefited significantly from the interest charged—which was up to 11% by the second quarter of FY 2018—and on short average maturities of only 7 days in 2018 (compared to average maturities of 21 days in 2016).

### D.    ESL Extended Financings to Play an Option on Sears

133.    By contributing capital to Sears during the period after the Seritage Transaction, ESL was playing its options, which appeared to have only upsides for ESL. On the one hand, in the remote chance that capital infusions worked to keep Sears afloat, ESL benefited from Sears's higher stock price. On the other, if Sears continued to fail, ESL's capital infusions ostensibly were protected by collateral, to the substantial detriment of other creditors.

### E.    ESL Extended Financings to Protect its Investment in Seritage

134.    ESL's actions were designed to protect its investment in Seritage that depended on Sears remaining outside of bankruptcy for the initial few years. Seritage's sole source of revenue is rental income, and for several years after Seritage's formation, it relied heavily on Sears to provide that income. Its entire business would have been thrown into doubt had the rental income it received from Sears suddenly disappeared in 2016 or 2017. Seritage, which had borrowed $1.2

billion in connection with its formation, needed time to wean itself from its dependence on Sears by recapturing and redeveloping Sears stores for more profitable uses. Lampert and ESL, which controlled both Seritage and Sears, were fully aware of this and would not allow a Sears bankruptcy filing until such time as Seritage was self-sufficient.

135.    The numbers bear this out.    As of October 2015, rental payments by Sears represented 80% of the total net income Seritage generated. A Sears bankruptcy filing would have been disastrous at that time. Over time, however, that number gradually decreased as properties were recaptured and redeveloped, dropping to 76% by the end of 2015, 65% by the end of 2016, and 48% by the end of the 2017. Seritage reported that the portion of revenue attributable to Sears was down to 39.9% as of September 30, 2018—half what it had been at Seritage's formation— and stated in an August 2018 presentation to its board of trustees that the number was projected to fall to 27.1% by the end of 2018.

136.    It was only then, after Seritage had sufficiently reduced its exposure to Sears, that Lampert and ESL ceased extending credit to Sears and permitted Sears to file for bankruptcy. This reality is reflected in Seritage's own public filings. For its entire existence up through June 30, 2018, Seritage stated in its public filings that it had a "substantial dependence on Sears Holdings Corporation." But by the second half of 2018 that was no longer the case, and as a result Seritage removed the "substantial dependence" language from its September 30, 2018 disclosure, instead referring merely to its "significant exposure to Sears Holdings."

137.    Sears's financial health was a major concern of Seritage, and, to that end, Seritage spent significant amounts of time and money monitoring Sears. For example, Seritage retained PJT Partners ("PJT"), a global advisory-focused investment bank, to actively monitor Sears's capital structure, liquidity, and financial status generally. PJT's engagement appears to have begun

on or before November 2016 and continued up to the time of Sears's bankruptcy. During that period, PJT provided frequent presentations to Seritage commenting on, among other things, Sears's earnings, its operations, its operating cash flows, its working capital trends, its real estate and asset sales (including the sale of the Craftsman brand), contemplated sales of additional assets including Kenmore and SHIP to ESL, its existing debt (including the availability under its first- and second-lien loans), its efforts to refinance debt and raise new debt (including from ESL), the credit downgrades it faced, its financial flexibility and liquidity (including additional prospective sources of liquidity), its pension obligations, its modifications to its vendor terms, the various recapitalization proposals it considered, its ability to continue functioning as a going concern, and the general market outlook on Sears's financial health and viability. PJT apparently went so far as to produce its own independent forecasts of Sears's earnings and liquidity for Seritage to consider. The PJT materials indicate that Seritage was well-aware of ESL's continued financial support of Sears, noting for example in a March 21, 2018 presentation that ESL, together with Fairholme Capital Management LLC (and its affiliates), had provided nearly $3 billion of support through various loans and that ESL may be the source of additional liquidity that Sears could draw upon.

138. In the course of its duties, PJT provided routine updates to Seritage and regularly presented at meetings of the Seritage trustees on Sears's financial health. Seritage's trustees took a keen interest in Sears's financial health by August 2016 when they began discussing "the steps the Company could take to prepare itself in the event of further deterioration of Sears' business and operations." From this time and continuing up until these Chapter 11 Cases, Seritage actively considered "certain proactive and protective steps" it could implement to protect itself against a Sears bankruptcy filing. Those conversations took on a special urgency during January and

February of 2017 when Seritage's independent trustees met to discuss such "proactive strategies" in light of Sears's declining performance. At this time, Seritage began modeling various sensitivity and downside cases about what could happen to its business in a "Sears event" and received advice from a host of advisors on "the potential business and legal consequences of a Sears Holdings credit event, including the potential impact on Seritage's business and the Master Lease." Thereafter, Seritage developed "an action plan detailing certain key steps for [Seritage] to take in advance of and in response to a potential Sears Holdings credit event or disruption to the master lease" and continued to frequently assess and evaluate the strategies it could implement in such an event.

139.    Seritage's extensive efforts to monitor Sears are evidence that it understood how dependent it was on Sears during that time and how critical it was that Sears continue to survive as a going concern. The possibility of a Sears bankruptcy (or even a credit downgrade) weighed heavily on Seritage—and Lampert and ESL were no doubt aware of the significant ramifications that might occur if ESL did not continue to prop up Sears until such time as Seritage could stand on its own.

140.    On information and belief, Lampert and ESL likewise were motivated to contribute capital to Sears in order to protect their other investments that depended on Sears remaining outside of bankruptcy, including Lands' End (which to this day maintains a significant number of Lands' End Shops at Sears) and SHO (which is heavily dependent on Sears for its back office).

### F.    ESL's Contributions Were Problematic for Other Reasons as Well

141.    ESL's contributions to Sears in the post-Seritage Transaction period were problematic for other reasons as well. For example, as shown in Compl. Ex. 1, Sears Brands, L.L.C. owns almost all of the intangible assets/IP assets that were pledged under the agreement governing the IP/Ground Lease Term Loan Facility, even though Sears Brands, L.L.C. is not an

obligor on the First Lien debt that was paid down with the loan's proceeds. Thus, Sears Brands, L.L.C. did not receive any consideration in exchange for its incurrence of the obligations under the IP/Ground Lease Term Loan Facility. Similarly, Sears Development Co. is the leaseholder of one of the pledged real estate assets under the IP/Ground Lease Term Loan Facility, even though Sears Development Co. is not an obligor on the First Lien debt. And, as shown in Compl. Ex. 1, certain of Holdings's subsidiaries were named as guarantors on the IP/Ground Lease Term Loan Facility despite not being guarantors on the First Lien debt paid off with the proceeds from this loan. Each of these transactions were fraudulent to such Sears entities.

142.    Sears's hostage-like reliance on ESL's capital infusions in the years preceding these Chapter 11 Cases is illustrated by the chart below:



143.    Lampert and ESL, aware for years that bankruptcy proceedings were inevitable, forced Sears to undergo spin-offs, rights offerings, and financings all for Lampert's and ESL's benefit while Sears's net equity book value plunged in the years leading up to these Chapter 11 Cases. Lampert and ESL spent years as the master puppeteers preparing for these Chapter 11 Cases, using their undue influence over management and the Board to concoct transactions that

would insulate and maximize the value of ESL's Sears-related investments—including through financings disguised as debt that have the characteristics of equity—from the adverse effects of Lampert's and ESL's unparalleled siphoning of Sears's best assets for their own benefit.  Indeed, Lampert's and ESL's long, drawn-out scheme had the effect of ring fencing Sears's valuable assets for Lampert's and ESL's benefit with the clear objective of leaving little or nothing for the creditors that Lampert and ESL could orchestrate transactions around.

## V.      **ACT FIVE:  The Long-Awaited Bankruptcy**

144.      These long overdue Chapter 11 Cases mark the beginning of the final act of Sears's tragic collapse at the hands of Lampert, the master manipulator, and ESL, his investment vehicle. With Lampert and ESL at its helm, Sears closed over 3,500 stores, cut approximately 250,000 jobs, and lost billions in value—all while Lampert and ESL earned billions in dividends, interest, and fees; obtained control over, if not outright ownership of, Sears's best assets and real estate; and positioned ESL to credit bid and reacquire Sears in these Chapter 11 Cases and claiming to preserve thousands of jobs, while glossing over that Lampert's and ESL's prepetition conduct had the effect of decimating Sears's workforce leading up to the commencement of these cases. Lampert and ESL are not saviors they pretend to be; rather, they are using these Chapter 11 Cases to execute a final ploy to capture Sears's remaining assets.

## VI.      **EPILOGUE:  The Creditors' Committee's Investigation and Basis for Standing**

145.      Since its appointment on October 24, 2018, the Creditors' Committee has worked tirelessly to independently investigate the Debtors' prepetition transactions, including the above-described conduct, to determine whether claims exist that may return value to the Debtors' estates. While such investigation is ongoing, there can be no doubt that very real claims exist and that they should be pursued for the benefit of the estates.

### A.    The Creditors' Committee's Rule 2004 Investigation

146.    On November 16, 2018, the Court entered the Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016 Authorizing Expedited Discovery of the Debtors and Third Parties (the "Rule 2004 Order"), which authorized the Creditors' Committee to conduct oral examinations of the Debtors and other third parties and issue subpoenas for the production of documents relevant to certain prepetition transactions (the "Investigation").  Immediately thereafter, the Creditors' Committee served subpoenas seeking the production of documents and requested witness interviews.

147.    To date, the Creditors' Committee has received approximately 130,000 documents from the Debtors, ESL, and various third parties, and conducted interviews of the following 11 individuals:  (i) Lampert; (ii) Kamlani; (iii) Naren Sinha, SVP of Finance of Holdings; (iv) Rob Riecker, current CFO of Holdings; (v) Ann Reese, Director of Holdings and member of the Related Party Transaction Subcommittee of Holdings's Board; (vi) Scott Charles, Sears's counsel from Wachtell which has provided legal advice to Sears in connection with, among other things, the various transactions described above; (vii) Jeff Schiedemeyer, Managing Director at Duff & Phelps, the advisory firm retained to offer certain opinions in connection with certain prepetition transactions; (viii) Marc Puntus, Partner at Centerview, an investment banking firm that performed services for the Related Party Transaction Subcommittee of Holdings's Board; (ix) Richard Latella, Director at Cushman & Wakefield, the real estate services company engaged to value certain real estate assets; (x) Rob Schriesheim, former CFO of Holdings; and (xi) Jeff Stollenwerck, former head of Holdings's real estate division.

148.    Based on the Investigation to date, the Creditors' Committee has developed the facts described above and determined that the Debtors' estates possess numerous viable causes of action against Defendants, which are discussed in more detail below.  Nevertheless, the wrongful

conduct alleged herein may only be the tip of the iceberg. The discovery the Creditors' Committee has taken to date occurred on a compressed timeline and, as a result, was limited in scope. The Creditors' Committee was able to interview only a handful of important witnesses before filing this Motion, and it conducted those interviews on an extremely expedited timeline before the production of most of the documents the Creditors' Committee has received. Further, the Creditors' Committee's questioning at any interviews was limited by time and subject matter and was based on an extremely limited review of documents.[66] Continued discovery in connection with an adversary proceeding (if the Motion is granted) undoubtedly will strengthen and possibly broaden the Creditors' Committee's claims. Indeed, new facts and documents supporting these claims continue to emerge.

### B.    The Estates' Claims Against Lampert, ESL, and Kamlani

149.    As set forth in the Proposed Complaint, the Creditors' Committee has determined that the Debtors have viable claims to assert against Lampert, ESL, and Kamlani to seek the following relief:

- Recharacterization as equity of the following contributions made by ESL in 2016 through 2018 in the form of purported loans: the 2016 Term Loan, Second Lien Term Loan, Standalone Letter of Credit Facility, Second Lien Line of Credit, IP/Ground Lease Term Loan Facility, FILO Loan, and Consolidated Secured Notes (which resulted from the consolidation of obligations under the 2016 Real Estate Secured Loan and 2017 Real Estate Secured Loan, and the termination of the former loan) (together, the "2016-2018 ESL Contributions") (Count One);

- Equitable subordination of ESL's Claims on account of Lampert's and ESL's inequitable conduct (Count Two);

---

[66] Moreover, the Creditors' Committee's investigation has thus far proceeded in parallel with a similar investigation being conducted by the subcommittee (the "Restructuring Subcommittee") of the Holdings's Board's Restructuring Committee (the "Restructuring Committee"), which the Debtors authorized to evaluate prepetition affiliated transactions. The advisors to the Creditors' Committee have worked cooperatively with the advisors to the Restructuring Committee to avoid duplication.

- Recovery from ESL of the value of the properties transferred in the Seritage Transaction and the Lands' End spin-off pursuant to sections 544 and 550 of the Bankruptcy Code and applicable state law (Counts Three and Five);

- Avoidance of the Lands' End spin-off as an actual and constructive fraudulent transfer pursuant to section 544 of the Bankruptcy Code and applicable state law (Count Four);

- Avoidance of the 2016-2018 ESL Contributions as actual fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code and applicable state law (Counts Six and Seven);

- Avoidance of grants and guarantees made by certain of Sears's subsidiaries in connection with the creation of the IP/Ground Lease Term Loan Facility as constructive fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code and applicable state law (Counts Eight and Nine);

- Disallowance of all of ESL's Claims in these Chapter 11 Cases pursuant to section 502(d) of the Bankruptcy Code unless and until ESL returns the benefits it received because of the constructive and actual fraudulent transfers (Count Ten);

- Recovery on account of unjust enrichment claims against Lampert and ESL in connection with the Lands' End spin-off, the Seritage Transaction, and the 2016-2018 ESL Contributions (Counts Eleven through Thirteen); and

- Recovery on account of breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims against Lampert, ESL, and Kamlani in connection with the 2016-2018 ESL Contributions (Count Fourteen).

**C.     The Debtors' Refusal to Assert the Proposed Claims**

150.   On December 28, 2018, ESL, on behalf of a newly-formed entity controlled by ESL, submitted a bid in accordance with the *Order Approving Global Bidding Procedures and Granting Related Relief* [ECF No. 816] (the "Bidding Procedures Order") to acquire substantially all of the Debtors' go-forward retail footprint and other assets and component businesses of Sears (the "Dec. 28 ESL Bid").  After receiving feedback from the Debtors that the Dec. 28 ESL Bid was inadequate and, among other things, leaves the estates administratively insolvent, on January 9, 2019, ESL revised its Dec. 28 ESL Bid in an attempt to remedy the myriad of defects (the "Jan. 9 ESL Bid").

151.    ESL's January 9 revisions, however, not only failed to solve for administrative solvency and the other infirmities of the Dec. 28 ESL Bid that the Debtors rejected, the Jan. 9 ESL Bid was materially worse.  On January 11, 2019, counsel for the Creditors' Committee wrote to the Debtors' Board, identifying numerous material, fundamental problems with the Jan. 9 ESL Bid, expressing the Creditors' Committee's serious concerns with the Debtors' potential pursuit of that bid at tremendous cost and risk to the estates, and insisting that the Debtors instead choose the responsible, value-maximizing course of proceeding with the going-out-of-business sale while preserving or prosecuting all of the estates' claims against Lampert, ESL, and related parties.[67] The January 11 letter also identified numerous issues with a draft asset purchase agreement that ESL included with the Jan. 9 ESL Bid (the "ESL APA")

152.    On information and belief, on January 12, 2019, the Debtors' counsel provided ESL with a proposed mark-up of the ESL APA.  The Debtors' proposed revisions of the ESL APA, however, did not resolve many of the most significant issues with the ESL Bid and related ESL APA.  The Creditors' Committee's position, which its counsel communicated to the Holdings Board by letter on January 13, 2019—the eve of the Auction (as defined in the Bidding Procedures Order)—was that even if ESL capitulated on *every single "ask"* by the Debtors in their mark-up of the ESL APA, the Jan. 9 ESL Bid remained entirely non-actionable.[68]

153.    Even so, at the Auction on January 14, ESL still refused to meet the Debtors' minimal demands.  Despite the reality that—as the Debtors have acknowledged to this Court— continued delay of a going-out-of-business sale in pursuit of the fruitless ESL Bid costs the estates in excess of $6 million per day, the Debtors once again relented to Lampert's and ESL's

---

[67] A copy of the Creditors' Committee's January 11 letter is attached as **Exhibit C**.
[68] A copy of the Creditors' Committee's January 13 letter is attached as **Exhibit D**.

stranglehold over the Board by continuing the Auction—without requiring ESL to fund the additional $6 million per day burn—ostensibly to give ESL a last chance to submit an actionable bid.

154.    Given that opportunity, ESL further revised its bid in the morning of January 15, 2019 (the "Jan. 15 ESL Bid") and *still* failed to resolve the myriad issues that doomed its prior bids to purchase the Company on a go-forward basis.  As the Debtors' counsel stated on the Auction record, the Restructuring Committee rejected the Jan. 15 ESL Bid because it "is not executable and is not otherwise higher or better when compared to the company's alternatives" for several reasons.[69]

155.    At a chamber's conference that afternoon, the Court heard from the parties that the Jan. 15 ESL Bid was rejected (as with all other iterations) because, among other things, it would result in administrative insolvency, was subject to considerable execution risk because it was premised on an aggressive and unachievable business plan, was conditional in many respects, and did not provide adequate consideration for a release of claims that would inhibit ESL's right to credit bid.

156.    Finally, in the early morning hours of January 16, 2019—without consulting the Creditors' Committee and in spite of the concern its advisors had repeatedly raised—the Debtors decided to accept a final iteration of the ESL bid (the "ESL Bid"), and, after spending another full day documenting the transaction, formally announced their designation of ESL as the Successful Bidder (as defined in the Bidding Procedures Order) early in the morning on  January 17, 2019.

---

[69] *See* Transcript of Auction Proceedings, dated January 15, 2019 ("Jan. 15 Auction Tr.") at 51:1-5; *see also id.* at 56:12-17 (Debtors' counsel noting that "the company's other alternatives are conservative in their assumptions").  A copy of the January 15 Auction Transcript is attached hereto as **Exhibit E**.

157.    As will be set forth in detail in the Creditors' Committee's Sale Objection (as defined in the Bidding Procedures Order), the ESL Bid accepted by the Debtors continues to have fundamental flaws.    Aside from opting for a path forward that will leave their estates administratively insolvent and vulnerable to the execution risk resulting from ESL's unachievable business plan, by selecting the ESL Bid, the Debtors have chosen not to pursue any of the colorable Proposed Claims against ESL, Lampert, and Kamlani that would have a substantial impact on ESL's ability to credit bid approximately $1.3 billion of ESL's Claims.    By accepting ESL's credit bid, the Debtors have fully capitulated to Lampert's and ESL's grand scheme and are allowing ESL to realize the full secured value of the face amount of those disputed claims, which, as described herein, would otherwise be subject to colorable claims to be recharacterized as equity, equitably subordinated to the Debtors' other allowed claims, and avoidance of certain claims and liens.

158.    This is the sort of outrageous result that only could have been approved by a Board compromised by and beholden to Lampert and ESL—who handpicked Board members and have unduly influenced their decisions for years.    That loyal Board has now handed the keys to the kingdom to Lampert and ESL, gifting them the Debtors' assets as a reward for years of fraud, even though the ESL Bid is premised on ESL's empty claims against the estates and despite Lampert's and ESL's failure to provide a reasonable go-forward plan.    Given Lampert's and ESL's long history of conjuring up fraudulent projections—and their long history of failing to meet any goals other than their own agenda of robbing Sears's assets and destroying jobs—the Debtors should have refused the ESL Bid.    Their blind loyalty to Lampert and ESL should not be sanctioned by this Court.

## LEGAL STANDARD FOR STANDING

159.    There is "an implied . . . right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession[.]"  *STN*, 779 F.2d at 904.  In order to be granted derivative standing, a creditors' committee must:  (i) "present[] a colorable claim or claims for relief that on appropriate proof would support a recovery," and (ii) demonstrate that the debtor "unjustifiably failed to bring suit."  *Id.* at 905.

160.    A colorable claim is one "that on appropriate proof would support a recovery."  *STN*, 779 F.2d at 905.  The standard for presenting a "colorable" claim is a "relatively easy one to make," and is satisfied where the proposed litigation will not be a "hopeless fling."  *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376, 386 (Bankr. S.D.N.Y. 2005); *see also Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (standing should be denied only if claim is "facially defective").  Courts liken colorability to the minimal pleading requirement necessary to survive a motion to dismiss.  *See In re Copperfield Invs., LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010) (citing *In re Hydrogen L.L.C.*, No. 08–14139, 2009 WL 2913448, at *1 (Bankr. S.D.N.Y. May 7, 2009)).  To survive a motion to dismiss, a complaint must only include "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

161.    A debtor's refusal to bring suit is unjustifiable when bringing suit would be likely to benefit the estate, after accounting for any associated costs or delays.  *STN*, 779 F.2d at 905.  "The 'unjustifiable' failure of a debtor to bring the suit itself does not require an improper motive for the failure" so long as the "the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate."  *Adelphia*, 330 B.R. at 374 n. 19.  Additionally, where it is plain from the record that no action on

77

the part of the debtor would be forthcoming, a party seeking derivative standing is not required to make a formal demand on the debtor. *See, e.g.*, *La. World Exposition, Inc. v. Federal Ins. Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987) (formal demand not required because, inter alia, "it seems plain that [the debtors] would not have sought the relief the Committee seeks, even if the Committee had filed a formal request"); *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 545 (W.D. Pa. 2005) (formal request of the debtor to bring action would have been futile where the debtor waived action under the DIP order and, therefore, could not have "seriously entertained the idea"); *Official Comm. of Creditors v. Shearson Lehman Brothers Holdings (In re First Capital Holdings Corp.)*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (creditors' committee excused from making a demand on a debtor to pursue an action against its officers, directors and controlling shareholders where such a demand would be futile).

## **ARGUMENT**

162.    The Court should grant the Creditors' Committee standing because each of the *STN* prongs is satisfied here:  (1) each of the Proposed Claims is colorable and (2) the Debtors' acceptance of the ESL Bid and refusal or inability to pursue the Proposed Claims is unjustified because of the substantial benefit associated with prosecution of the causes of action.  Additionally, the Court should grant the Creditors' Committee the authority on behalf of the estates to settle each of the Proposed Claims.

**I.    The Creditors' Committee Has Presented Colorable Claims Justifying Derivative Standing**

163.    The Creditors' Committee's Proposed Complaint, attached as **Exhibit B** to this Motion, sets forth distinct colorable claims of the estates, satisfying the first prong of *STN Enterprises*.    Specifically,    the    Proposed    Complaint    sets    forth    colorable    claims

78

for: (a) recharacterization of ESL's purported debt claims (Count One); (b) equitable subordination of ESL's Claims (Count Two); (c) actual fraudulent transfer against ESL (Counts Four, Six, and Seven); (d) constructive fraudulent transfer against ESL (Counts Four, Eight, and Nine); (e) recovery of the value of the properties transferred in the Seritage Transaction and Lands' End spin-off directly from ESL and Lampert (Counts Three and Five, respectively); (f) disallowance of ESL's claims pursuant to section 502 of the Bankruptcy Code (Count Ten); (g) unjust enrichment against ESL and Lampert (Counts Eleven through Thirteen); and (h) breach of fiduciary duty and aiding and abetting breach of fiduciary duty against ESL, Lampert, and Kamlani (Count Fourteen).

### A.    The Debt Recharacterization Claim is Colorable

164.    Count One presents a colorable claim to recharacterize the 2016-2018 ESL Contributions, which were equity contributions even if crafted to give the appearance of being debt transactions.  The 2016-2018 ESL Contributions resulted in the Debtors (both as borrowers and guarantors) incurring billions of dollars in purported debt they never had the ability to repay.

165.    Pursuant to section 105(a) of the Bankruptcy Code, bankruptcy courts have the power to recharacterize ostensible debt as equity where circumstances show that the purported debt was, in fact, an equity contribution.  11 U.S.C. § 105(a); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007), *aff'd in relevant part*, *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008).  The "overarching inquiry" when determining whether a purported debt investment should be recharacterized as equity is "to discern the intent of the parties."  *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 101 (Bankr. S.D.N.Y. 2016).  In other words, recharacterization claims mark "a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else."  *Id*. (quoting *Cohen v. KB Mezzanine Fund II, LP (In*

*re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir. 2006)).  Thus, the "'paradigmatic'

recharacterization case involves a situation where 'the same individuals or entities (or affiliates of

such) control both the transferor and the transferee, and inferences can be drawn that funds were

put into an enterprise with little or no expectation that they would be paid back along with other

creditor claims.'"  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH

S&B Holdings LLC)*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) (quoting *Adelphia*, 365 B.R. at

74).

> 166.    To assist their inquiry into the parties' intent, courts within this district use as a

guide a series of non-exhaustive factors laid out by the Sixth Circuit in *Bayer Corp. v. MascoTech,

Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748-49 (6th Cir. 2001).  The *AutoStyle* factors

are as follows:

> > (1) the names given to the instruments, if any, evidencing the
> > indebtedness; (2) the presence or absence of a fixed maturity date
> > and schedule of payments; (3) the presence or absence of a fixed rate
> > of interest and interest payments; (4) the source of repayments;
> > (5) the adequacy or inadequacy of capitalization; (6) the identity of
> > interest between the creditor and the stockholder; (7) the security, if
> > any, for the advances; (8) the corporation's ability to obtain
> > financing from outside lending institutions; (9) the extent to which
> > the advances were subordinated to the claims of outside creditors;
> > (10) the extent to which the advances were used to acquire capital
> > assets; and (11) the presence or absence of a sinking fund to provide
> > repayments.

*AutoStyle*, 269 F.3d at 749-50.  No factor, however, is dispositive, and a court may recharacterize

a purported debt investment as equity "even if less than all of the factors weigh in favor of a capital

contribution."  *Lyondell*, 544 B.R. at 94; *see also SubMicron*, 432 F.3d at 454 ("No mechanistic

scorecard suffices.  And none should, for Kabuki outcomes elude difficult fact patterns.").

Although a party should "plead facts that trigger the applicability of the *AutoStyle* factors, or a

meaningful subset of them," the parties' intent controls, as determined "through a *common sense*

80

evaluation of the facts and circumstances surrounding a transaction." *Lyondell*, 544 B.R. at 94,

102 (quoting *Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum*

*Cap. Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006)

(emphasis in original)).

167.    In its Proposed Complaint, the Creditors' Committee pleads facts that demonstrate

the clear intent, expectation, and understanding of Lampert, ESL, and Sears that each of the 2016-

2018 ESL Contributions was a capital contribution and not a debt transaction.  The circumstances

of the 2016-2018 ESL Contributions show that they were intended as capital contributions for the

following reasons (which also constitute a meaningful subset of *AutoStyle* factors).

168.    ***First***, the 2016-2018 ESL Contributions were part of Lampert's and ESL's insider

scheme essentially to purchase Sears's remaining capital assets at a discount for Lampert's and

ESL's own benefits, to the substantial detriment of Sears and its creditors.   Compl. ¶ 163.[70]

Lampert and ESL stood on both sides of each of the 2016-2018 ESL Contributions, exercising

control both as lender and borrower (as Sears's CEO, Chairman of the Board, and controlling

shareholder). *Id.* ¶ 220.  During the period 2016 to 2018, Sears's financial performance continually

declined, and the Company became completely reliant upon ESL to fund its operations.  *Id.* ¶ 165.

In fact, receiving contributions from ESL was the Company's preferred way of funding because it

was able to get the necessary money without any of the headaches of dealing with third party

financiers.[71]   *Id.*   ESL's capital contributions to an entity it controlled were the classic,

---

[70] Citation format "Compl. ¶ _" used herein refers to the Proposed Complaint attached hereto as Exhibit B.

[71] Schriesheim said in his interview that he always had concerns dealing with third parties because "[t]hey always wanted to take advantage of Sears and extract something because they viewed us as a credit risk."  When asked if "all things being equal" he considered ESL to be "a better provider of capital than a third party," Schriesheim answered: "I did feel that way.  I felt that if Eddie was going to do something, he would do it.  That he would close on a more expeditious basis.  That there were certain documents that he wouldn't require or he was fine with if they were followed up subsequent to closing, like environmental, which is always a big deal as I learned in real estate transactions."  Compl. ¶ 165.

"paradigmatic" example of a recharacterization case. *See BH S&B Holdings LLC*, 420 B.R. at

157.

169.    Moreover, because the 2016-2018 ESL Contributions were not arm's-length

transactions with third parties, they did not reflect financing terms that could have been obtained

from outside lending institutions. Compl. ¶ 164. Indeed, the Company sought capital from ESL

because the terms it could offer were "not acceptable" to outside lenders. *Id.* ¶ 165. That no

reasonable outside lender would offer to lend money to the Debtors on similar terms supports

recharacterization. *See In re AutoStyle Plastics*, 238 B.R. 346, 350 (Bankr. W.D. Mich. 1999)

(citing *In re Cold Harbor Assocs. L.P.*, 204 B.R. 904, 918 (Bankr. E.D. Va. 1997) (evidence that

"a reasonable outside creditor would [not] have made a loan to the debtor on similar terms" weighs

in favor of recharacterization)); *see also BH S&B Holdings*, 420 B.R. at 158 (explaining that this

factor looks at whether "a reasonable creditor would have acted in the same manner") (citation

omitted).

170.    Meanwhile, Lampert and ESL—insiders with control over Sears—were fully aware

of Sears's declining performance and these inevitable Chapter 11 Cases. Compl. ¶ 166-68. ESL

used Sears's dependence on ESL to encumber Sears's remaining unencumbered assets. *Id.* ¶ 165.

The 2016-2018 ESL Contributions amounted to an attempt by ESL to unfairly leverage its insider

status to effectively purchase Sears's capital assets in anticipation of these Chapter 11 Cases and

ultimately by use of a credit bid. *Id*. These facts demonstrate that the 2016-2018 ESL

Contributions are "paradigmatic example[s]" of equity contributions by self-dealing insiders who

did not intend to be repaid along with other creditors—an *AutoStyle* factor. *See BH S&B Holdings*,

420 B.R. at 157. Moreover, use of equity infusions to purchase capital assets also satisfies the

tenth *AutoStyle* factor. *See AutoStyle*, 269 F.3d at 750.

171.    *Second*, neither Sears nor ESL intended or expected that Sears would repay the 2016-2018 ESL Contributions on any schedule, a critical characteristic of a debt transaction.  *Id.* ¶ 166.  When they entered into the 2016-2018 ESL Contributions, the Debtors were not adequately capitalized, being just a husk of what they once were after Lampert and ESL robbed them of value through the years-long asset-stripping scheme.  *Id.*  Sears never had any hope of repaying the purported debt.  *Id.*  As explained, directors of Holdings and Lampert himself were aware of analyses that showed continuous year-over-year declines in the Company's operating metrics (on a consolidated basis).  *Id.*  Likewise, the Board was aware of the continual need—beginning in at least 2016—for the Company to obtain funds from ESL to avoid an imminent chapter 11 filing, notwithstanding the Company's ever-declining cash flows.  *Id.*  Such "[t]hin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *AutoStyle*, 269 F.3d at 751; *see also Lyondell*, 544 B.R. at 97 (inadequate capitalization factor satisfied where the plaintiff alleged that, at the time of the purported loans, the debtors "were overleveraged, had grossly insufficient liquidity, and were severely undercapitalized").

172.    Lampert and ESL correspondingly knew that Sears could repay the 2016-2018 ESL Contributions only if Sears's performance improved dramatically.  Compl. ¶ 167.  Lampert and ESL also knew, given their long-term relationship and control over Sears, that there was no realistic expectation for such a turnaround.  *Id.*  Lampert's and ESL's expectations and intent were that Sears could not repay the 2016-2018 ESL Contributions and that ESL would instead receive free options on the collateral securing the 2016-2018 ESL Contributions that could be called upon through a credit bid.  *Id.*  These facts further support recharacterization of the 2016-2018 ESL Contributions.  *See AutoStyle*, 269 F.3d at 751 ("If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital

contribution."). To prevail on a recharacterization claim, a plaintiff need not establish that repayment is "solely dependent on the success of borrower's business." *Lyondell*, 544 B.R. at 96. Indeed, so long as the parties expected that the source of repayment would be the debtor's future earnings, this factor is satisfied notwithstanding any security interest associated with the purported debt, including a lien on all of the debtor's assets. *See, e.g.*, *AutoStyle*, 269 F.3d at 751 (holding that because source of repayment of the purported loan was borrower's earnings, this factor weighed in favor of recharacterization, notwithstanding that the purported loan was secured by a lien on all of borrower's assets); *BH S&B Holdings*, 420 B.R. at 159 (finding source of repayment factor satisfied where complaint pled that repayment would be from the debtor's earnings despite lender's argument that, because loan was secured by all of debtor's assets, repayment was not contingent on success of the business); *Lyondell*, 544 B.R. at 96-97 (finding factor satisfied where plaintiff alleged that debtor was overleveraged and insolvent at time of loan, lenders were aware of liquidity issues and that assets were already pledged to secured creditors, and that lenders could not expect their unsecured claims to repaid except by means of future profit).

173.    Moreover, the fraudulent financial projections that Lampert and ESL required Sears's management to adopt for Sears's Annual Plan underscore Lampert's and ESL's knowledge of Sears's inability to repay the 2016-2018 ESL Contributions absent a massive turnaround in the Company's performance.  Compl. ¶ 168.

174.    ***Third***, ESL provided the 2016-2018 ESL Contributions to buy time to acquire Sears's other assets for Lampert's and ESL's own benefit.  *Id.* ¶ 169.  ESL never intended to be repaid on a schedule characteristic of debt but rather to improve its equity positions and control over Sears's capital assets.

175.    *Fourth*, ESL provided the 2016-2018 ESL Contributions to play out its options on Sears without any apparent downside.  *Id.* ¶ 170.  By infusing capital into Sears, ESL potentially stood to gain from a rising stock price at Sears.  *Id.*  And if Sears continued to fail, ESL's investments were protected by collateral that would not be available to satisfy the claims of other creditors.  *Id.*  Like the capital contributions of an investor who expects returns based only on the investment's fortunes (unlike on interest according to a regular schedule), these options bear the hallmarks of equity.  *See SubMicron*, 432 F.3d at 456 (noting that when "funds infused are repaid based on the borrower's fortunes . . . they are equity").

176.    *Fifth*, ESL provided the 2016-2018 ESL Contributions with the intent and purpose to protect its investments in non-Debtor entities that depended on Sears remaining, at least for a time, outside of bankruptcy—including Seritage.  Compl. ¶ 171.  After the Seritage Transaction, Seritage and its former Sears properties had become a key part of ESL's portfolio.  *Id.*  For years after Seritage's formation, however, it relied heavily on Sears for rental income to fund its recapture and redevelopment of Sears stores for more profitable uses.  *Id.*  Because the financial health of Sears was of such concern to Seritage, Lampert and ESL had Seritage spend significant time, money, and effort monitoring Sears (including by hiring PJT) and keeping Sears out of bankruptcy proceedings.  *Id.*

177.    On information and belief, ESL similarly intended for the 2016-2018 ESL Contributions to protect its equity positions in other non-Debtor investments that depended on Sears remaining outside of bankruptcy, including in Lands' End (which maintains numerous Lands' End Shops at Sears) and SHO (which depends on Sears for its back office).  *Id.* ¶ 172.

178.    Granted, the documentation of the 2016-2018 ESL Contributions *looks* like that of debt transactions and facially satisfies some of the formalistic *AutoStyle* factors, but that is only

because Lampert and ESL put in significant effort to try to disguise their equity contributions.  As

the facts alleged above indicate, the specific circumstances underlying these Chapter 11 Cases—

namely, Lampert's and ESL's years-long abuse of their insider positions at Sears to rob it and its

legitimate creditors of value and maximize their own equity investments in Sears and Sears-related

businesses—show that both ESL and Sears intended for and understood that the 2016-2018 ESL

Contributions were, in truth, capital infusions into a company controlled by the lender.  The 2016-

2018 ESL Contributions never were debt and should be recharacterized as equity.

## B.    The Equitable Subordination Claim is Colorable

179.    Count Two presents a colorable claim to equitably subordinate all of ESL's Claims

against any of the Debtors' estates to all claims of non-ESL unsecured creditors in these Chapter

11 Cases.[72]  Equitable subordination of all of ESL's Claims is appropriate here because of ESL's

years-long scheme to abuse its insider status and dominion over Sears to strip away value for ESL's

own benefit in a blatant and wrongful attempt to shield such value from the reach of other creditors

in Sears's inevitable bankruptcy.

180.    Under section 510(c) of the Bankruptcy Code, a court has the power to equitably

subordinate all or part of an allowed claim to all or part of any other allowed claim.  11 U.S.C.

§ 510(c)(1).  "The purpose of equitable subordination is to undo wrongdoing by an individual

creditor in the interest of the other creditors."  *Official Comm. of Unsecured Creditors of*

*AppliedTheory Corp. v. Halifax Fund, LP (In re AppliedTheory Corp.)*, 345 B.R. 56, 59 (S.D.N.Y.

2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007).  Equitable subordination empowers a bankruptcy court

to consider whether, "notwithstanding the apparent legal validity of a particular claim, the conduct

of the claimant in relation to other creditors is or was such that it would be unjust or unfair to

---

[72] If the 2016-2018 ESL Contributions are recharacterized as equity, then ESL's equity interests in the 2016-2018 ESL
Contributions are outside of the scope of Count Two of the Proposed Complaint.

permit the claimant to share pro rata with the other claimants of equal status." *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002). ***Importantly, the claimant's inequitable conduct also need not be related to the assertion of the claim to warrant subordination.*** *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("The inequitable conduct underlying equitable subordination may be 'unrelated to the acquisition or assertion of the particular claim whose status [is] at issue.'") (quoting *Benjamin v. Diamond (In re Mobile Steel*, Co.) 563 F.2d 692, 701) (5th Cir. 1977); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 210 (Bankr. S.D.N.Y. 2005).

181.    Claims arising from the dealings between a debtor and an insider are rigorously scrutinized by the courts. *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.)*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008).[73]  For an insider creditor, the threshold for inequitable conduct is conduct that is simply unfair—or "virtually any conduct by which an insider gains an advantage over creditors." *Hovis v. Powers Constr. Co. (In re Hoffman Assocs.)*, 194 B.R. 943, 965 (Bankr. D.S.C. 1995).    Courts also consider whether "the insider or fiduciary creditor . . . actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment." *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 744 (Bankr. D. Del. 2003) (quoting *In re Mid-American Waste Sys.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002)).

---

[73] Insiders include both (i) "statutory insiders," which are the persons described in the non-exhaustive list of "insiders" set forth in section 101(31) of the Bankruptcy Code, including a director, officer, "person in control of the debtor," and affiliate of the debtor and (ii) "non-statutory insiders," which can include creditors who, while not having actual control of the debtor, have a "close relationship" to the debtor and additional facts "suggest that any transactions were not conducted at arm's length." *Winstar Commc'ns, Inc.*, 554 F.3d at 395-97. Whether a creditor is an insider-creditor is generally a question of fact, except where operative facts are undisputed. *Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)*, 503 B.R. 820, 830 (Bankr. W.D. Wash. 2013).

182.     There can be no serious dispute that ESL was, at all relevant times, an insider of

the Debtors, including as defined in sections 101(31)(B)(iii) and/or 101(31)(E) of the Bankruptcy

Code.  Since the Kmart-Sears Roebuck Merger, ESL has at all times held more than 20 percent of

Holdings's voting securities (Compl. ¶ 25), and ESL's principal, Lampert, was Holdings's CEO

and Chairman of the Board (*id.* ¶ 20).  At all relevant times, Lampert and ESL controlled Holdings

and the other Debtor entities.  As an insider, ESL's conduct as a creditor of the Debtors is subject

to greater scrutiny for purposes of equitable subordination.

183.     Courts in this district apply a three-part test set forth by the Fifth Circuit in  *Mobile*

*Steel Corp.*, 563 F.2d at 692 when evaluating claims for equitable subordination:  whether (i) the

claimant engaged in inequitable conduct; (ii) such misconduct injured other creditors or conferred

an unfair advantage on the claimant; and (iii) equitably subordinating the claim(s) at issue is not

inconsistent with bankruptcy law.  *See, e.g.*, *LightSquared LP v. SP Special Opportunities LLC (In*

*re LightSquared Inc.)*, 511 B.R. 253, 347 (Bankr. S.D.N.Y. 2014) (applying *Mobile Steel* test.).

The *Mobile Steel* test is a fact-intensive analysis that is often not suited for dismissal on a motion

to dismiss.  *See Adelphia*, 365 B.R. at 69 (observing that detailed allegations that "paint a picture

that, if proven, could establish the requisite inequitable conduct" naturally raise fact issues).  Each

*Mobile Steel* prong is satisfied as detailed below.

       **1.**       **ESL Abused its Insider Position to Unfairly Strip Value from Sears and**
                **its Creditors**

184.     The first prong of the *Mobile Steel* test requires that the court find some sort of

inequitable conduct by the party asserting the claim.  Courts often consider allegations related to

"(1) fraud, illegality, or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of

the debtor as an alter ego for the benefit of the claimant." *BH S&B Holdings*, 420 B.R. at 156.

But any "unfair act by the creditor" that affects other creditors also can satisfy the inequitable

conduct requirement.  *Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 234 (3d Cir. 2003).  Even lawful conduct may be considered inequitable for purposes of equitable subordination if it "shocks one's good conscience."  *LightSquared*, 511 B.R. at 347.

185.    This Motion and the attached 109-page Proposed Complaint paint a clear and supported picture of how Lampert and ESL abused insider status and positions of trust with the Company to strip away assets for Lampert's and ESL's benefit, to the substantial detriment of Sears and its stakeholders.  Lampert's and ESL's value and asset-stripping scheme satisfies the first *Mobile Steel* prong of requisite inequitable conduct, particularly given that ESL was an insider creditor and its conduct is subject to increased scrutiny.

186.    Indeed, Lampert, as CEO and Chairman of the Board, and ESL, as Holdings's controlling shareholder (with Lampert), breached fiduciary duties to Sears and its creditors and engaged in a pattern of unfair conduct since the mid-2000s that unjustly enriched Lampert and ESL.  Compl. ¶ 179.  The Proposed Complaint lays out a pattern of unfair conduct and breaches of fiduciary duties by Lampert and ESL designed to enrich themselves at the expense of the Debtors and other creditors, alleging, among other things, specific facts demonstrating:

a) Lampert and ESL abusing their control over Sears to extract cash in the form of unreasonable stock repurchases, robbing Sears of its long-term future.  *Id*.

b) Lampert and ESL crafting unsupportable and downright fraudulent financial projections that bore no relation to reality and grossly misrepresented Sears's performance, which underscored Lampert's and ESL's knowledge of—and efforts to disguise—Sears's insolvency and inevitable bankruptcy.  *Id*.

c) Requiring Sears's management to adopt Lampert's and ESL's manufactured projections so as to further their asset-stripping scheme, including by, among other things, requiring that Sears's management use those projections to produce false solvency reports and conceal Sears's actual performance so as to support Lampert's and ESL's asset-stripping transactions.  *Id*.

d) Recognizing the declining prospects of the Sears enterprise, Lampert and ESL abusing their control over Sears to extract the most valuable assets of Sears through a series of asset spin-offs and rights offerings as Sears continued to decline toward bankruptcy in an attempt to shield the value of such assets from Sears's creditors. The assets that Lampert and ESL had spun off for their own benefit include Orchard, SHO, Sears Canada, and Lands' End. Lampert and ESL also used the Sears Canada rights offering to line their own pockets to the substantial detriment of Sears's creditors. *Id.*

e) Through the Seritage Transaction, Lampert and ESL orchestrating transfers of some of Sears's most valuable real estate assets to new and separate entities over which ESL (and Lampert) retained significant ownership and control, all in order to shield such assets from the claims of Sears's other creditors. *Id.*

f) Lampert and ESL engaging in inequitable conduct by taking advantage of insider control on both sides of the Seritage Transaction in order to achieve a result that could not be negotiated at arm's-length. In particular, after completion of the Seritage Transaction, Lampert and ESL directly benefited from this inequitable conduct including by (i) receiving at least $76 million in dividends as a Seritage shareholder; (ii) enjoying an equity stake in Seritage that had grown within one year to be worth approximately $1.25 billion (compared to the $750 million ESL originally paid for such stake); and (iii) exiting nearly at par from $165 million of Second Lien Notes, even when doing so clearly was contrary to Sears's best interests and ongoing need for liquidity. *Id.*

g) ESL intentionally keeping Sears out of bankruptcy proceedings through a series of improper financing transactions, including the 2016-2018 ESL Contributions, and its extensive use of commercial paper, in order to mask Sears's insolvency and delay its inevitable demise; buy time to siphon off Sears's cash flows; and cordon off valuable assets, including real estate, as collateral for Lampert's and ESL's benefit; hinder, delay, or defraud other creditors' recoveries; and preserve the value of Seritage until it could wean itself off of Sears for the benefit of ESL—Seritage's controlling shareholder. *Id.*

187.   Further, the Proposed Complaint explains how Lampert and ESL used and controlled the Debtors as an alter ego for their own benefit, alleging, among other things, facts demonstrating:

a) Lampert and ESL causing Sears to form Seritage and enter into the Seritage Transaction to maximize ESL's investment in Seritage, despite the blatant unfairness of the Seritage Transaction to Sears and its creditors. Lampert used Sears as an alter ego to enter into this insider, below-market transaction for ESL's benefit. *Id.* ¶ 180.

90

b) Lampert and ESL causing Sears to enter into secured "loan" transactions with ESL, including the 2016-2018 ESL Contributions, at a time when Sears was insolvent in order to prop up Sears, lien up its remaining prized assets, and provide the greatest returns on ESL's investments. *Id.*

188.    While equitable subordination is sometimes described as an "extraordinary remedy," this is an extraordinary case. Equitable subordination is necessary here to achieve justice in these Chapter 11 Cases. The conduct of Lampert and ESL leading to Sears's downfall is grossly inequitable and certainly justifies equitable subordination. Courts have found inequitable conduct sufficient to justify equitably subordinating claims under similar facts. *See, e.g.*, *N.J. Steel Corp. v. Bank of N.Y.*, No. 95 CIV 3071 (KMW), 1997 WL 716911, at *5 (S.D.N.Y. Nov. 17, 1997) (holding that allegations that, *inter alia*, a creditor and insider of the debtor conducted a dubious lease-back deal with the debtor constituted inequitable conduct sufficient to state a claim for equitable subordination); *Winstar Commc'ns, Inc.*, 554 F.3d at 412-13 (equitably subordinating claims of an insider creditor who propped-up debtor to inflate its own revenue stream and caused the debtor to purchase hundreds of millions of dollars of unneeded equipment from creditor); *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1468 (5th Cir. 1991) (affirming bankruptcy court's decision to equitably subordinate insider creditor's claims where obtaining liens on debtor's assets was not an isolated act, but rather "one step interconnected with a series of actions . . . to gain an advantage over the position of other creditors"); *Goode v. Hagerty (In re Sys. Impact, Inc.)*, 229 B.R. 363 (Bankr. E.D. Va. 1998) (equitably subordinating claims of individual directors to those of debtor's other creditors where directors had elevated the status of their own claims above those of non-insider creditors, despite having adopted a subordination agreement for the benefit of those same non-insider creditors); *Exide Techs., Inc.*, 299 B.R. at 744-46 (denying motion to dismiss claim for equitable subordination founded on allegations that insider creditor used its position and leverage to obtain additional collateral and

security from debtor when debtor's economic position was deteriorating rapidly); *Hoffman Assocs.*, 194 B.R. at 963-65 (equitably subordinating claims of a creditor whose owner, in his role as the sole director of the debtor, caused the debtor to grant the creditor liens on substantially all of the debtor's assets and paid the debtor's expenses with loans from the creditor).

### 2. ESL's Conduct Injured Creditors and Conferred an Unfair Advantage to ESL

189.    The second prong of the *Mobile Steel* test requires a determination that "the claimant's conduct caused injury to the debtor or its creditors, or resulted in an unfair advantage to the claimant." *LightSquared*, 511 B.R. at 349. If the inequitable conduct harmed the entire creditor body, a plaintiff need not "identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994). "[I]t is sufficient to allege that the general creditors are less likely to collect their debts." *Id*. Further, there is no requirement that the creditor subject to equitable subordination had intent to harm other creditors. *See, e.g.*, *In re Herby's Foods, Inc.*, 134 B.R. 207, 213 (Bankr. N.D. Tex. 1991).

190.    The Proposed Complaint sets forth in detail how Lampert's and ESL's grossly inequitable conduct caused tremendous harm to the Debtors and legitimate creditors. After taking control of Sears in 2005, Lampert and ESL engaged in serial asset stripping, taking Sears's best assets out of the enterprise to shield them from the claims of other creditors and maximize ESL's investments in anticipation of inevitable bankruptcy proceedings. Compl. ¶ 1. Over the course of Lampert's and ESL's reign, Sears closed over 3,500 stores, cut approximately 250,000 jobs, and lost untold billions in value. *Id*. In effect, Lampert and ESL managed Sears as if it were a private

portfolio company that existed solely to provide the greatest returns on their investment, recklessly disregarding the detriment to Sears, its employees, and its creditors.  *Id*.

191.    Moreover, Lampert and ESL also leveraged their insider status to give their claims an unfair advantage over those of other creditors.  After stripping Sears of some of its most valuable assets, Lampert and ESL, fully aware that bankruptcy proceedings were inevitable, acted to wall off other creditors from the remaining valuable assets of Sears.  *Id*. ¶ 8.  For several years, ESL advanced the 2016-2018 ESL Contributions to Sears under the guise of helping Sears with its liquidity needs.  *Id*. ¶¶ 8, 134-52.  During that time, ESL provided capital in the form of secured "loans" in order to prop up Sears, lien up its remaining prized assets, and—in the words of ESL's President—buy time for ESL "to realize the franchise value or the asset value [of Sears], whichever comes first."  *Id*. ¶ 8.  Sears was dependent upon ESL as its bank, giving ESL freedom to pick and choose collateral among Sears's remaining assets.  *Id*.  With each capital investment in Sears, Lampert and ESL improved their positions to the substantial detriment of Sears's legitimate creditors.  *Id*.  After all, Sears was hemorrhaging value at such a rate that the funds ESL provided in exchange for liens were certain to be wasted and of no benefit to those holding junior creditor positions.  *Id*.

### 3.    Subordinating All ESL Claims to All Allowed Claims of Unsecured Creditors is Not Inconsistent with Bankruptcy Law

192.    Finally, the third prong of the *Mobile Steel* test is primarily "a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable."  *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007).  This prong is meant to ensure that the "full breadth of the remedy of

equitable subordination is available while ensuring that its reach does not violate any provision of the Bankruptcy Code or become punitive as opposed to remedial." *Enron*, 333 B.R. at 219.

193.    Where the first two prongs are satisfied, equitably subordinating an allowed claim to other allowed claims is not inconsistent with bankruptcy law.  Indeed, as Judge Chapman noted in *LightSquared*, "[b]y virtue of the codification of the doctrine in section 510(c) of the Code, the third prong of the *Mobile Steel* doctrine warrants little attention."  511 B.R. at 352.  Equitable subordination is appropriate here because the first two *Mobile Steel* prongs are satisfied.  *See Hoffman Assocs.*, 194 B.R. at 966  ("Equitable subordination is consistent with other provisions of the Bankruptcy Code if it is consistent with the basic goal of equality in distribution in bankruptcy.  A claimant whose inequitable conduct has harmed other creditors has skewed the prospects for equal distribution and subordination corrects this.").

## C.    The Actual Fraudulent Transfer Claims Are Colorable

194.    Counts Three, Four, Six, and Seven present colorable claims for actual fraudulent transfer under the Bankruptcy Code and applicable state law.[74]  The Creditors' Committee alleges numerous facts to support badges of fraud indicating Lampert's and ESL's actual intent to hinder, delay, or defraud creditors through the Seritage Transaction (which was intended to remove some of Sears's most valuable real estate out of the reach of Sears's creditors) and the 2016-2018 ESL Contributions (which were intended to hinder, delay, or defraud other creditors' recoveries).

---

[74] Count Three is a claim against Lampert and ESL to recover pursuant to section 550 of the Bankruptcy Code the value of the properties fraudulently transferred in the Seritage Transaction.  Although Count Three is not a claim against Seritage for fraudulent transfer, it is premised, in part, on both actual and constructive fraudulent transfer.  The aspect of Count Three concerning section 550 is addressed in section I.E.1 below.

Count Four is a claim against Lampert and ESL to avoid the Lands' End spin-off as an actual and a constructive fraudulent transfer under section 544 of the Bankruptcy Code and applicable state law.  Counts Six and Seven are claims against ESL to avoid the 2016-2018 ESL Contributions as actual fraudulent transfers under sections 544 and 548 of the Bankruptcy Code and applicable state law.

94

195.    A transfer or obligation may be avoided as an actual fraudulent transfer if it was

made or incurred with actual intent to hinder, delay, or defraud a creditor.    11 U.S.C.

§ 548(a)(1)(A); 740 Ill. Comp. Stat. Ann. 160/5(a)(1); Del. Code Ann. tit. 6, § 1304(a)(1); N.Y.

Debt. & Cred. Law § 276.[75]  The Bankruptcy Code allows a debtor or estate representative to assert

an actual fraudulent transfer claim either directly pursuant to section 548(a)(1)(A) or through state

law made applicable by section 544(b).

196.    "Actual intent" usually refers to the intent of the debtor, not the intent of the

transferee.  *See Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014).    The

transferee's intent is relevant, however, in situations where the transferee controls the debtor.

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 442-43 (S.D.N.Y. 2001).

Courts have adopted a three-factor test to determine when the intent of a transferee should be

imputed to the transferor: (i) the controlling transferee must possess the requisite intent to hinder,

delay, or defraud the debtor's creditors; (ii) the transferee must be in a position to dominate or

control the debtor; and (iii) the pertinent domination and control must relate to the transfer at issue.

*See In re Hellas Telecommunications (Luxembourg) II SCA,* 526 B.R. 499, 511-12 (Bankr.

S.D.N.Y. 2015).

197.    Because evidence of actual intent can be difficult to obtain, actual intent may be

proven through the presence of "badges of fraud" or "circumstances so commonly associated with

fraudulent transfers that their presence gives rise to an inference of intent."  *Sharp Int'l Corp. v.*

---

[75] For purposes of this Motion, a thorough choice-of-law analysis is unnecessary because there is no relevant conflict of laws among the potentially applicable state fraudulent transfer laws, which include those of Illinois (where Sears is headquartered), Delaware (where Holdings was incorporated), and New York (where these Chapter 11 Cases were commenced).  The principal difference between the applicable fraudulent transfer laws is in statutes of limitations: Illinois (four years), Delaware (four years), and New York (six years).  The four-year lookback period is sufficient for purposes of the fraudulent transfer claims relating to actual fraudulent transfer with respect to the Seritage Transaction and the 2016-2018 ESL Contributions.  The statute of limitations for the Lands' End spin-off is discussed in section I.C.2 below.

*State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). Courts often

recite a list of eight "badges of fraud" applicable to Bankruptcy Code section 548 claims:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction.

*See, e.g.*, *Pereira v. Grecolas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 643 (Bankr. S.D.N.Y.

2009). No exact number or combination of "badges of fraud" must be shown to establish the

presumption of actual intent to hinder, delay, or defraud creditors, *see In re Stanton*, 457 B.R. 80,

94 (Bankr. D. Nev. 2011), and the presence or absence of any one "badge" of fraud is not

dispositive, *see Official Comm of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs

Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 545 (Bankr. D. Del. 2009).

198.    The statutory requirement of the intent to hinder, delay, or defraud creditors is

disjunctive such that the "intent to hinder or delay creditors is sufficient, and intent to defraud need

not be proven." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376

B.R. 390, 403 (Bankr. S.D.N.Y. 2007). Thus, a scheme to defraud creditors may involve a scheme

to avoid paying them, but a "scheme to hinder or delay does not require an intent not to pay

creditors at all." *In re Duncan & Forbes Dev., Inc.*, 368 B.R. 27, 36 (Bankr. C.D. Cal. 2007).

Instead, a debtor acts with an intent to hinder "if he or she acts with an intent to impede or obstruct

creditors" and an intent to delay "if he or she acts with an intent to slow or postpone creditors."

*Wiggains v. Reed* (*In re Wiggains*), No. 14-03064-SGJ, 2015 WL 1954438, at *17 (Bankr. N.D.

Tex. Apr. 28, 2015) (internal citations and quotation marks omitted).

### 1.    The Seritage Transaction is Subject to Avoidance as an Actual Fraudulent Transfer

199.    Count Three of the Proposed Complaint is premised on an allegation that the Seritage Transaction is avoidable as an actual fraudulent transfer and/or a constructive fraudulent transfer.    As alleged, Lampert and ESL engineered and closed the Seritage Transaction, a sale-leaseback by which Sears transferred 235 of its most valuable properties and its interests in joint ventures (which owned 31 properties) to Seritage, a new REIT controlled by Lampert and ESL, for aggregate consideration of approximately $2.7 billion.

200.    The Proposed Complaint sets forth sufficient facts alleging that Sears, under the control of Lampert and ESL—who exercised undue influence over and controlled Sears in their roles as insiders—did not act in good faith in connection with the Seritage Transaction and, instead, acted with actual intent to hinder, delay, or defraud creditors.    Specifically, the Proposed Complaint alleges numerous facts constituting "badges of fraud" sufficient to find actual intent:

a.    Sears did not receive reasonably equivalent value for the properties transferred. The valuation methodology utilized by Cushman & Wakefield was transparently flawed in several ways, including that it assumed Sears would remain a permanent tenant paying a discounted rate indefinitely even though the premise of the transaction was that Seritage would recapture space and release it at higher rents, and thus was specifically designed to lead to artificially low property appraisals.  These below-market property appraisals dictated the $2.7 billion consideration paid to Sears in connection with the Seritage Transaction, thereby resulting in Sears receiving less than reasonably equivalent value for the transferred assets.  The market's reaction to the Seritage Transaction—both before it was closed via high trading prices of rights to purchase class A common stock as well as after it closed—also demonstrate the lack of reasonably equivalent value received by Sears.  *Id.* ¶¶ 188, 189.

b.    Lampert and ESL knew or reasonably should have known that Sears did not receive reasonably equivalent value, especially given their knowledge of the trading prices of the rights to purchase class A common shares of Seritage implying significantly higher valuation by the market than reflected in the $2.7 billion purchase price.  *Id.* ¶¶ 122-24.  In fact, Sears's CFO specifically observed in an email to top management just weeks before the Seritage Transaction closed that "the market thinks [Sears] is selling something for about $600M less than it is worth."  *Id.* ¶ 124.

97

c. There was no marketing process or efforts to determine what a third-party would pay for the assets in an arm's-length negotiation. *Id.* ¶ 189.

d. Sears was insolvent at the time of the Seritage Transaction—a fact that Lampert and ESL knew or reasonably should have known. *Id.* ¶¶ 188, 189.

e. The Seritage Transaction was a questionable transfer not made in the usual course of business. Sears's own advisors described the terms of the Seritage Transaction and resulting Master Leases as "unique" and "unusual" in how such terms favored Seritage's right to recapture and redevelop properties. *Id.* ¶ 189.

f. Lampert and ESL stood on both sides of the Seritage Transaction as insiders of both Sears and Seritage with close relationships with, and unchecked control of, both Sears (through Lampert as its controlling shareholder, Chairman of the Board, and CEO) and Seritage (through Lampert as its Chairman of the board of trustees and controlling shareholder). The Board and the RPT Subcommittee did not serve as adequate checks on Lampert's and ESL's self-dealing, and simply rubber-stamped the Seritage Transaction. *Id.*

g. Sears's financial condition both before and after the Seritage Transaction—that of hopeless insolvency—underscores Lampert's and ESL's intent to take real estate assets from Sears and attempt to shield their value from Sears's real creditors in inevitable bankruptcy proceedings. *Id.*

h. The Seritage Transaction is part of a cumulative effect of a pattern or series of transactions after the incurrence of debt and onset of financial difficulties at Sears that includes other Lampert/ESL-driven asset spin-offs (including the Lands' End, Sears Canada, SHO, and Orchard spin-offs) and financing transactions (including the 2016-2018 ESL Contributions), all of which inured to Lampert's and ESL's direct benefit. *Id.*

i. The general chronology of the Seritage Transaction in the context of Sears's insolvency and inevitable bankruptcy proceedings indicates Lampert and ESL exercising undue influence over and control of Sears in their roles as insiders with an actual intent to hinder, delay, or defraud creditors. *Id.*

j. The haste and unusualness of the Seritage Transaction, including the flawed methods by which the properties were appraised, the RPT Subcommittee's failure to hire independent appraisers, the unreasonable reliance by Cushman & Wakefield and Duff & Phelps on Lampert's and ESL's fraudulent projections, and the lack of third-party marketing, also evidence Lampert's and ESL's actual intent to hinder, delay, or defraud creditors. *Id.*

201.    Moreover, the Proposed Complaint sufficiently alleges intent to hinder, delay, or defraud creditors by alleging facts demonstrating that Lampert and ESL engineered the Seritage

98

Transaction to remove valuable real estate assets of Sears from the reach of Sears's other creditors for the benefit of ESL and other shareholders. *Id.*

### 2. The Lands' End Spin-off Constitutes an Actual Fraudulent Transfer

202.    Count Four asserts a colorable claim against Lampert and ESL to avoid the Lands' End spin-off as both an actual and constructive fraudulent transfer.[76]

203.    As detailed in the Proposed Complaint, on April 4, 2014, Holdings spun off Lands' End through a pro rata, tax-free distribution to Holdings shareholders. *Id.* ¶ 198.  The Lands' End spin-off resulted in a $500 million cash dividend used to reduce borrowings under Holdings's domestic revolving credit facility. *Id.* ¶ 199.  The dividend was not based on any valuation of Lands' End before the Lands' End spin-off that Sears could have obtained while continuing to own 100% of the equity in Lands' End, but rather represented the maximum amount Lands' End could borrow without significantly burdening itself. *Id.*  Under Lampert's and ESL's direction, Sears never attempted to market Lands' End to third parties, which would have maximized value to Sears. *Id.*

204.    Holdings's shareholders, including Lampert and ESL, paid no consideration for equity in the spun-off Lands' End. *Id.* ¶ 200.  After the Lands' End spin-off, Lampert and ESL initially owned 48.6% of Lands' End common stock—a stake for which they paid no consideration at all. *Id.*  By early 2015, Lands' End's stock price had nearly doubled and ESL's stake was worth $852 million. *Id.*

205.    Count Four includes facts supporting a viable claim that the Lands' End spin-off was engineered by Lampert and ESL who exercised undue influence over and controlled Sears in their roles as insiders, did not act in good faith, and had an actual intent to hinder, delay, or defraud

---

[76] The constructive fraudulent transfer claim with respect to the Lands' End spin-off is addressed in section I.D.2 below.

the Debtors' creditors. *Id.* ¶¶ 200, 204. Specifically, the Proposed Complaint alleges numerous

facts constituting "badges of fraud" sufficient to find actual intent:

a. Sears did not receive reasonably equivalent value for the assets transferred through the Lands' End spin-off. *Id.* ¶ 204.

b. Sears was insolvent at the time of the Lands' End spin-off—a fact that Lampert and ESL knew or should have known. *Id.*

c. The Lands' End spin-off was a questionable transfer not made in the usual course of business. Sears's own Board considered the many negative implications of the Lands' End spin-off on Sears and were aware that Lands' End was one of the few profitable segments of Sears and its removal from the Sears enterprise would have a negative effect on Sears and its creditors. *Id.*

d. Lampert and ESL stood on both sides of the Lands' End spin-off as insiders of Sears with close relationships with, and unchecked control of, Sears and its Board (through Lampert as its controlling shareholder, Chairman of the Board, and CEO). The Board did not serve as an adequate check on Lampert's and ESL's self-dealing, and simply rubber-stamped the Lands' End spin-off. *Id.*

e. Sears's financial condition both before and after the Lands' End spin-off—that of insolvency, years of consistently operating at a loss, and consistently negative EBITDAP following the Lands' End spin-off—underscores Lampert's and ESL's intent to strip the valuable Lands' End business from Sears and attempt to shield its value from Sears's real creditors in inevitable bankruptcy proceedings. *Id.*

f. The Lands' End spin-off is part of a cumulative effect of a pattern or series of transactions after the incurrence of debt and onset of financial difficulties at Sears that includes other Lampert/ESL-driven asset spin-offs (including the Sears Canada, SHO, and Orchard spin-offs), the Seritage Transaction, and financing transactions (including the 2016-2018 ESL Contributions), all of which inured to Lampert's and ESL's direct benefit. *Id.*

g. The general chronology of the Lands' End spin-off in the context of Sears's insolvency and inevitable bankruptcy proceedings indicates Lampert and ESL exercising undue influence over and control of Sears in their roles as insiders with an actual intent to hinder, delay, or defraud creditors. *Id.*

h. The haste and unusualness of the Lands' End spin-off, including the flawed methods by which the properties were appraised, the unreasonable reliance by Duff & Phelps on Lampert's and ESL's fraudulent projections, and the lack of third-party marketing, also evidence Lampert's and ESL's intent to hinder, delay, or defraud creditors. *Id.*

206.    That the Lands' End spin-off occurred more than four years prior to the Petition

Date does not impact the colorability of Count Four.  At the time of the Lands' End spin-off, on

information and belief, the United States government or an entity or agency of the United States

government—including, but not limited to, the United States Department of Justice, the United

States Department of Labor, the Occupational Safety and Health Administration, and the United

States District Court for the District of Rhode Island—had claims against Holdings and could have

challenged and set aside the Lands' End spin-off under the Fair Debt Collection Practices Act,

Internal Revenue Code, or any other applicable law.  *Id.* ¶ 205.  Thus, Count Four is timely under

the six-year statute of limitations provided by the Federal Debt Collection Procedure Act or the

ten-year statute of limitations available to the IRS, either of which function as the "applicable law"

for limitations purposes under Bankruptcy Code section 544(b).  *See, e.g.*, *In re Tronox Inc.*, 503

B.R. 239, 267-77 (Bankr. S.D.N.Y. 2013).

### 3.    The 2016-2018 ESL Contributions Constitute Actual Fraudulent Transfers

207.    Counts Six and Seven seek avoidance of the 2016-2018 ESL Contributions as

actual fraudulent transfers pursuant to state law under Bankruptcy Code section 544(b)(1) and

pursuant to Bankruptcy Code section 548(a)(1)(A), respectively.[77]  The Proposed Complaint

demonstrates that the estates have a colorable claim for avoiding each of the 2016-2018 ESL

Contributions as actual fraudulent transfers by, among other things, alleging that Lampert and ESL

did not act in good faith in connection with the execution of each of the 2016-2018 ESL

Contributions and that each of the 2016-2018 ESL Contributions was made or directed by Lampert

and/or ESL who exercised undue influence over and control of Sears in their roles as insiders,

---

[77] Count Seven applies to the following 2016-2018 ESL Contributions made within two years of the Petition Date: Standalone Letter of Credit Facility, Second Lien Line of Credit, IP/Ground Lease Term Loan Facility, FILO Loan, and Consolidated Secured Notes.

causing the Debtors to enter into each of the 2016-2018 ESL Contributions with an actual intent to hinder, delay, or defraud creditors.  Compl. ¶¶ 212-22.

208.    Lampert and/or ESL's actual intent to hinder, delay, or defraud creditors is demonstrated by, among other things, the following facts and "badges of fraud":

a. Each of the 2016-2018 ESL Contributions was an insider transaction.  Lampert and ESL stood on both sides of each financing transaction—on one side as a lender and on the other as a controlling shareholder.  Through Lampert's role as Chairman of Holdings's Board and as Sears's CEO, he was able to exercise a high degree of control over the Company.  The Board and the RPT Subcommittee failed to serve as effective controls on Lampert and ESL's self-dealing, and they simply rubber-stamped each subject transaction.  *Id*. ¶¶ 215, 220.

b. Each of the 2016-2018 ESL Contributions was made at a time when Sears was insolvent—a fact that Lampert and ESL knew or should have known.  *Id*. ¶¶ 215, 220.

c. Reasonably equivalent value was not given to each of the Additional Subsidiaries (as defined below) for the grants, pledges, or guarantees they made in connection with certain of the 2016-2018 ESL Contributions, including the IP/Ground Lease Term Loan Facility.  *Id*. ¶¶ 215, 220.

d. Sears's financial condition both before and after each of the 2016-2018 ESL Contributions—that of hopeless insolvency—underscores Lampert's and ESL's intent to encumber remaining unencumbered assets of Sears and attempt to deprive other creditors of recoveries in the inevitable bankruptcy proceedings of Sears.  *Id*. ¶¶ 215, 220.

e. Lampert and ESL crafted unsupportable and downright fraudulent financial projections that bore no relation to reality and grossly misrepresented Sears's performance, which underscored Lampert's and ESL's knowledge of—and efforts to disguise—Sears's insolvency and inevitable bankruptcy.  *Id*. ¶¶ 215, 220.

f. Lampert and ESL required Sears's management to adopt their manufactured projections to further their asset-stripping scheme, including by, among other things, requiring that Sears's management use those projections to produce false solvency reports and conceal Sears's actual performance to support the 2016-2018 ESL Contributions.  *Id*. ¶¶ 215, 220.

g. Each of the 2016-2018 ESL Contributions is part of a cumulative effect of a pattern or series of transactions after the incurrence of debt and onset of financial difficulties at Sears that hastened Sears's ultimate demise.  This

102

pattern or series includes other Lampert/ESL-driven asset spin-offs (including the Lands' End, Sears Canada, SHO, and Orchard spin-offs and the Sears Canada rights offering) and the Seritage Transaction, all of which inured to Lampert's and ESL's direct benefit. *Id*. ¶¶ 215, 220.

h.  The general chronology of the 2016-2018 ESL Contributions in the context of Sears's years-long insolvency and inevitable bankruptcy proceedings is evidence of Lampert and ESL exercising undue influence over and control of Sears in their roles as insiders with an actual intent to hinder, delay, or defraud creditors. *Id*. ¶¶ 215, 220.

i.  The haste and unusualness of each of the 2016-2018 ESL Contributions also point to Lampert's and ESL's actual intent to hinder, delay, or defraud creditors. For instance, each of the ESL deals was closed hastily and without the same standards of due diligence when compared to third party financings.[78] Additionally, the RPT Subcommittee did not adequately vet the financings provided by ESL.  Nor were the financings market-tested in any real way.[79]  *Id*. ¶¶ 215, 220.

### D.    The Constructive Fraudulent Transfer Claims Are Colorable

209.    Counts Three, Four, Eight, and Nine present several colorable claims for constructive fraudulent transfer against ESL pursuant to both applicable state law and the Bankruptcy Code.[80]

210.    A transfer or obligation may be avoided as a constructive fraudulent transfer if (i) the debtor received less than reasonably equivalent value in exchange for the transfer or

---

[78] Schriesheim noted in his interview that ESL closed deals on "a more expeditious basis" compared to third parties, and that there were "certain documents that [ESL] wouldn't require or [Lampert] was fine with if they were followed up subsequent to closing, like environmental" even though such documents were typically "a big deal" in real estate transactions.  Compl ¶¶ 215 n. 70, 220 n. 72.

[79] Centerview's representative stated in his interview that "we did this on a fairly accelerated timeframe.  Typically, it was under some pressure, covenant pressure or liquidity pressure" and that "we knew with ESL . . . we always needed to work very quickly."  As an example, he stated that the RPT Subcommittee would "just call up Centerview on a Monday and by the following Friday, had to advise the company as to their views on a transaction." Compl ¶ 215.

[80] Count Three is a claim against Lampert and ESL to recover pursuant to section 550 of the Bankruptcy Code the value of the properties fraudulently transferred in the Seritage Transaction.  Although Count Three is not a claim against Seritage for fraudulent transfer, it is premised, in part, on both actual and constructive fraudulent transfer.  The aspect of Count Three concerning section 550 is addressed in section I.E.1 below.

Count Four is a claim against Lampert and ESL to avoid the Lands' End spin-off as an actual and a constructive fraudulent transfer under section 544 of the Bankruptcy Code and applicable state law.  Counts Eight and Nine are claims against ESL to avoid certain guarantees and IP asset grants on the IP/Ground Lease Term Loan Facility as constructive fraudulent transfers under sections 544 and 548 of the Bankruptcy Code and applicable state law.

obligation; and (ii) at the time of the transfer or incurrence of the obligation, the debtor was, or was rendered, insolvent, inadequately capitalized, or unable to pay its debts as they came due. 11 U.S.C. § 548(a)(1)(B); 740 Ill. Comp. Stat. Ann. 160/5(a)(2), 160/6(a); Del. Code Ann. tit. 6, § 1305; *see also* N.Y. Debt. & Cred. Law §§ 273-75 (similar except that the first prong standard is met when debtor did not receive "fair consideration"). As with an actual fraudulent transfer, the Bankruptcy Code allows a debtor or estate representative to assert a constructive fraudulent transfer claim either directly pursuant to the section 548(a)(1)(B) or through state law made applicable by section 544(b).[81]

211.    Whether the debtor received reasonably equivalent value "is fundamentally one of common sense, measured against market reality." *Leonard v. Mylex Corp. (In re Northgate Comput. Sys., Inc.)*, 240 B.R. 328, 365. In making this determination, courts look to, among other things, "(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 375 (Bankr. N.D. Ill. 2005); *see Barber v. Golden Seed Co., Inc. (In re Ostrom-Martin, Inc.)*, 129 F.3d 382, 387 (7th Cir. 1997); *see also Picard v. Cohmad Secs. Corp., et al. (In re Bernard L. Madoff Inv. Secs. LLC),* 454 B.R. 317, 334 (Bankr. S.D.N.Y. 2011). Whether value given was reasonably equivalent is normally a question of fact, as valuation factors turn on the case-specific circumstances surrounding the debtor's decision to enter in the challenged transaction. *Am. Tissue, Inc. v. Donaldson Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 105-06 (S.D.N.Y. 2004) (quotation omitted).

---

[81] For the same reasons as discussed with the actual fraudulent transfer claims, a fact-intensive choice of law analysis is not necessary to a determination of whether the Proposed Complaint pleads colorable claims for constructive fraudulent transfer with respect to Counts Three, Four, Eight, and Nine.

212.    Whether a debtor was insolvent at the time of the challenged transaction (or rendered insolvent thereby) is demonstrated by one of three tests:  a balance sheet test, an inadequate capitalization test, and an inability to pay test.  Under the balance sheet test, a debtor is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," excluding property that is transferred with the intent to hinder, delay, or defraud creditors.  11 U.S.C. § 101(32)(A).  The inadequate capitalization test looks at whether a debtor was operating with "unreasonably small capital" at the time of the transfer or transaction in question and is "aimed at transferees that leave the transferor technically solvent but doomed to fail."  *Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013) (quoting *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co., LP*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995).  Relevant factors include "the company's debt to equity ratio, its historical 'capital cushion,' the need for working capital in the specific industry at issue, the reasonableness of the company's projections, the amount of time the company survives following a transaction, and its ability to obtain financing.  *Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 79 (Bankr. E.D.N.Y. 2007); *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017).  In applying this test the court "must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made."  *MFS/Sun Life*, 910 F. Supp. at 944 (citation omitted); *see also Lyondell Chem. Co.,* 567 B.R. at 110.  The inability to pay test asks whether the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."  11 U.S.C. § 548(a)(1)(B)(i)(III).  This "forward-looking standard" considers evidence of a debtor's inability to pay debts as they mature, allowing the court to engage in a more expansive

105

evaluation of the debtor's financial condition by looking beyond the boundaries of the debtor's balance sheet. *See MFS/Sun Life*, 910 F. Supp. at 943.

1. **The Seritage Transaction is Subject to Avoidance as a Constructive Fraudulent Transfer**

213.    Count Three asserts a colorable claim against Lampert and ESL that the Seritage Transaction was a constructive fraudulent transfer because Sears did not receive reasonably equivalent value and was insolvent at the time (or was rendered insolvent thereby).

214.    The Proposed Complaint demonstrates that Sears did not receive reasonably equivalent value from Seritage, Lampert, or ESL for the assets transferred through the Seritage Transaction.  As discussed above, the valuation methodology utilized by Cushman & Wakefield was flawed in several ways and led to artificially low property appraisals. Compl. ¶ 188.  These below-market property appraisals dictated the $2.7 billion consideration paid to Sears in connection with the Seritage Transaction, thereby resulting in Sears receiving less than reasonably equivalent value for the transferred assets.[82]   *Id.*   The market's reaction to the Seritage Transaction—both before it was closed via high trading prices of rights to purchase class A common stock as well as after it closed—also demonstrate the lack of reasonably equivalent value received by Sears.  *Id.*

215.    Moreover, Sears was insolvent at the time of the Seritage Transaction, or was rendered insolvent thereby.  Indeed, contrary to the flawed opinion prepared by Duff & Phelps and as described at great length in the Proposed Complaint, all commonly recognized valuation methodologies, including a discounted cash flow analysis, a comparable companies analysis, and

---

[82] For avoidance of doubt, causes of action set forth herein describe damages inflicted on Sears and its creditors by Defendants.  Plaintiff currently lacks sufficient information to determine which assets were stripped from which entities (Debtor or non-Debtor) by Defendants.

a liquidation analysis, reveal that Sears was insolvent at the time of the Seritage Transaction by a substantial margin. *Id.*

### 2. The Lands' End Spin-Off is Subject to Avoidance as a Constructive Fraudulent Transfer

216.    Count Four also asserts a colorable claim against Lampert and ESL to avoid the Lands' End spin-off as a constructive fraudulent transfer.

217.    As detailed in the Proposed Complaint, Sears did not receive reasonably equivalent value for the assets transferred through the Lands' End spin-off.  Available indicia show that the cash dividend paid to Sears was between $900 million and $1 billion below reasonably equivalent value. *Id.* ¶ 203.  Moreover, Sears had received an indication of interest from a third party to acquire Lands' End that used an enterprise valuation of $1.6 billion to $1.8 billion only months before the Lands' End spin-off was completed—also indicating that the dividend was between $1.1 billion and $1.3 billion shy of reasonably equivalent value to Sears. *Id.*

218.    Holdings was insolvent at the time of the Lands' End Spin-off or was rendered insolvent thereby, as demonstrated by, among other indicia, proper capital adequacy tests based on reasonable projections informed by Sears's actual historical performance over the five-year periods prior to the Lands' End spin-off. *Id.*

219.    Finally, as discussed above, that the Lands' End spin-off occurred more than four years prior to the Petition Date does not impact the colorability of Count Four because, on information and belief, the fraudulent transfer claims are timely under the six-year statute of limitations provided by the Federal Debt Collection Procedure Act or the ten-year statute of limitations available to the IRS, either of which function as the "applicable law" for limitations purposes under Bankruptcy Code section 544(b).  *See, e.g.*, *Tronox Inc., et al. v. Kerr-McGee*

*Corp., et al. (In re Tronox Inc.)*, 503 B.R. 239, 266-77 (Bankr. S.D.N.Y. 2013); *see also supra* ¶ 205.

> **3.**   **The Guarantees and Asset Grants In Connection With the IP/Ground Lease Term Loan Facility Are Subject to Avoidance as Constructive Fraudulent Transfers**

220.    Counts Eight and Nine assert colorable constructive fraudulent transfer claims against ESL related to the IP/Ground Lease Term Loan Facility under both the Bankruptcy Code and applicable state law.   As set forth in each of these claims, certain Debtors—within any applicable look-back period—(i) provided guarantees, pledged assets, or otherwise incurred obligations related to the IP/Ground Lease Term Loan Facility; (ii) received no value in exchange for the obligation incurred or asset pledged; and (iii) were insolvent at the time of the obligation incurred or asset pledged or rendered insolvent thereby.

221.    Specifically, as stated in the Proposed Complaint, on January 4, 2018, the IP/Ground Lease Term Loan Facility was created, under which SRAC and Kmart entered into a $300 million term loan with several lenders, including ESL.  Compl. ¶¶ 224, 237.  The guarantors on the IP/Ground Lease Term Loan Facility included all of the guarantors on the First Lien Credit Agreement and the Second Lien Credit Agreement, as well as several Debtor entities listed as "additional subsidiaries"—Sears Brands Business Unit Corporation, Sears Brands, L.L.C., Sears Development Co., and STI Merchandising, Inc. (the "Additional Subsidiaries")—that were not otherwise borrowers or guarantors under either the First Lien Credit Agreement or the Second Lien Credit Agreement.  *Id*. ¶¶ 225-226, 238-39.

222.    Several of the Additional Subsidiaries pledged certain IP and intangible assets as collateral for the IP/Ground Lease Term Loan Facility, as shown in Compl. Ex. 1.  *Id*. ¶¶ 227, 240. Specifically, Sears Brands, L.L.C. pledged thousands of IP assets in connection with the IP/Ground Lease Term Loan Facility, and Sears Development Co. pledged a ground lease at store number

1309 in Los Angeles, California as collateral for the IP/Ground Lease Term Loan Facility, as shown in Compl. Ex. 1. *Id*. ¶¶ 228, 241.

223.    On information and belief, none of the Additional Subsidiaries, Sears Brands, L.L.C., or Sears Development Co. received any benefit or value in exchange for committing collateral and incurring obligations under the IP/Ground Lease Term Loan Facility. *Id*. ¶¶ 233, 246. Although the proceeds of the IP/Ground Lease Term Loan Facility were used, in part, to pay down debt obligations under the First Lien Credit Facility, none of the Additional Subsidiaries, Sears Brands L.L.C., or Sears Development Co. were or are obligors or guarantors under the First Lien Credit Agreement. *Id*. ¶¶ 230-32, 243-45.

224.    Finally, the Proposed Complaint alleges, on information and belief, each of the Additional Subsidiaries was insolvent at the time the IP/Ground Lease Term Loan Facility was created or was rendered insolvent thereby. *Id*. ¶¶ 234, 247.

**E.      The Claims to Recover the Value of the Properties Transferred in the Seritage Transaction and the Lands' End Spin-off from Lampert and ESL are Colorable**

225.    As discussed above, the Seritage Transaction is avoidable as both an actual fraudulent transfer and a constructive fraudulent transfer and the Lands' End spin-off is avoidable as a constructive fraudulent transfer. Count Three presents a colorable claim pursuant to Bankruptcy Code section 550(a)(1) to recover from Lampert and ESL the value of the properties transferred in the Seritage Transaction, including with respect to benefits received by Lampert and ESL in their capacities as shareholders of Seritage and as participants in the Exchange Offer. Similarly, Count Five sets forth a colorable claim to recover from ESL or Lampert the value of the properties transferred in the Lands' End spin-off (avoidable as both an actual and a constructive fraudulent transfer pursuant to Count Four) or value thereof.

226.    Section 550(a)(1) of the Bankruptcy Code provides, in relevant part, that "to the extent that a transfer is avoided under section 544 . . . [or] 548 . . . of this title, the trustee may recover" the value of avoidable property, or the property itself, from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1).[83] Indeed, "the 'initial transferee' or the 'entity for whose benefit the transfer was made' is strictly liable for an avoided transfer." *See Nisselson v. Salim & Saleem (In re Big Apple Volkswagen, LLC)*, No. 11-11388 (JLG), 2016 WL 1069303, at *14 (Bankr. S.D.N.Y. Mar. 17, 2016) (citation omitted). For purposes of determining the "entity for whose benefit such transfer was made," courts acknowledge that "[t]he party who forces a debtor to make a transfer is almost always 'the entity for whose benefit such transfer was made,' and thus is generally always subject to strict liability." *Gen. Elec. Cap. Auto Lease, Inc. (In re Lucas Dallas, Inc.)*, 185 B.R. 801, 809 (B.A.P. 9th Cir. 1995) (citation omitted); *see also Butler v. Enhanced Equity Fund II, LP (In re American Ambulette & Ambulance Serv. Inc.)*, 560 B.R. 256, 271-72 (Bankr. E.D.N.C. 2016) (denying motion to dismiss section 550(a)(1) claim where defendants were alleged to have "controlled virtually all aspects of the Debtors and caused the transfers of the Debtors' assets in order to benefit the new ventures under their control or in whom they held controlling interests").

1.    **The Seritage Transaction Was Made for the Benefit of Lampert and ESL**

227.    Within the meaning of section 550(a)(1) of the Bankruptcy Code, Lampert and ESL were the entities for whose benefit the Seritage Transaction was made.

---

[83] It is of no moment that neither the Debtors, nor the Creditors' Committee asserting derivative standing, have yet sued Seritage—the initial transferee—for avoidance of the Seritage Transaction. Courts in this district, consistent with the majority of courts, have held that a trustee may seek recovery from subsequent transferees of avoidable property and transfer beneficiaries without first seeking a determination of liability against the initial transferee. *See, e.g.*, *Secs. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC ("Madoff II")*, 501 B.R. 26, 34 (S.D.N.Y. 2013); *Secs. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC ("Madoff I")*, 480 B.R. 501, 522 (Bankr. S.D.N.Y. 2012); *Geltzer v. Salzman (In re ContinuityX, Inc.)*, 582 B.R. 124 (Bankr. S.D.N.Y. 2018).

228.    The Proposed Complaint alleges in detail that Lampert and ESL were the intended beneficiaries of the Seritage Transaction, as evidenced by Lampert and ESL orchestrating the transaction, controlling the parties on both sides of the transaction, manipulating or dominating members of Holdings's Board into accepting the transaction without seriously considering alternatives, and forcing it to close despite the unfairness of the transaction to Sears and its creditors.  Specifically, ESL, through Lampert, took advantage of the controlling position as controlling shareholder, CEO of Sears, and Chairman of the Board of Holdings to effectuate the Seritage Transaction, knowing that ESL would profit from an enhancement in value of its equity in Seritage and receive dividends therefrom.  Compl. ¶ 191.  Moreover, upon information and belief, Lampert and ESL caused the Seritage Transaction knowing that the proceeds of the transfer would be used to finance the purchase of ESL's Second Lien Notes through a subsequent debt refinancing or pay down.  *Id.*

229.    Moreover, Lampert and ESL received a direct, ascertainable, and quantifiable benefit vis-à-vis their controlling ownership of Seritage.  Specifically, Lampert and ESL received a substantial monetary benefit in the form of immediate and longer-term increases in Seritage's share value following the close of the Seritage Transaction.  *Id*. ¶ 192.  Within one year of the Seritage Transaction, ESL's stake in Seritage had shot up in value to roughly $1.25 billion when it had paid only $750 million for that stake.  *Id.* ¶ 127.  Lampert and ESL also received dividends based on the performance of the assets owned by Seritage.  *Id*. ¶ 128.

230.    Lampert and ESL also received direct, ascertainable, and quantifiable benefits vis-à-vis ESL's ownership of Second Lien Notes prior to the Exchange Offer.  *Id*. ¶ 193.  Just weeks after the Seritage Transaction closed, the Board—at Lampert's request—directed approximately $1 billion of the Seritage Transaction proceeds to prepay the Second Lien Notes, a significant

amount of which ESL held. *Id.* ¶ 129. Under the resulting Exchange Offer, ESL exited at 99 cents on the dollar from $165 million of Second Lien Notes—roughly 80% of the Second Lien Notes ESL held at that time. *Id.* But for the infusion of liquidity the Seritage Transaction generated, Sears would not have been in a position to turn around and pay off Second Lien Notes—indeed, a primary purpose of the Seritage Transaction was to obtain funds to retire existing debt obligations such as the Second Lien Notes held by ESL. *Id.* It also is clear that the buyback of the Second Lien Notes was contrary to Sears's best interests and ongoing need for liquidity. *Id.*

231.    The benefits intended for, and received by, Lampert and ESL originated from the Seritage Transaction—*i.e.*, the initial transfer. *Id.* ¶ 194. The resulting financial benefits of the Seritage Transaction to Lampert and ESL, coupled with Lampert's intent to benefit ESL, demonstrate that Lampert and ESL were the intended beneficiaries of the Seritage Transaction in both capacities as the controlling shareholders of Seritage and as ESL was the substantial holder of Second Lien Notes. *Id.* ¶ 195.

232.    By "controlling virtually all aspects" of Sears and forcing the Seritage Transaction to transfer some of Sears's best real estate into a new REIT that they controlled and to receive other benefits as described above, Lampert and ESL were the entities for whose benefit the Seritage Transaction was made pursuant to section 550(a)(1) of the Bankruptcy Code. *See In re Am. Ambulette & Ambulance Serv., Inc.*, 560 B.R. at 271-72.

### 2.    The Value of the Property Transferred in the Lands' End Spin-off Can Be Recovered from Lampert and ESL Pursuant to Section 550(a)(1)

233.    Count Five presents a colorable claim that the value of the property transferred in the Lands' End spin-off is recoverable from Lampert and ESL as "initial transferees" of the Lands' End spin-off, which was a fraudulent transfer, under section 550(a)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 550(a)(1). Holdings's shareholders, including Lampert and ESL, paid no

consideration for equity in the spun-off Lands' End.  After the Lands' End spin-off, Lampert and

ESL initially owned 48.6% of Lands' End common stock—a stake for which they paid no

consideration at all.  Compl. ¶ 200.  By early 2015, Lands' End's stock price had nearly doubled

and ESL's stake was worth $852 million.  *Id.*

### F.     The Claim for Disallowance of ESL's Claims is Colorable

234.    Count Ten presents a colorable claim to disallow all of ESL's Claims pursuant to

section 502(d) of the Bankruptcy Code until such time as ESL returns to the Debtors' estates the

value of the property transferred that is subject to avoidance and/or recovery pursuant to Counts

Three through Nine discussed above in the event such ESL Claims are not otherwise equitably

subordinated or recharacterized as equity in accordance with Counts One and/or Two.

235.    Section 502(d) of the Bankruptcy Code provides that a court ***shall*** disallow "any

claim of any entity . . . that is a transferee" of an avoidable transfer "under section[s] 522(f), 522(h),

544, 545, 547, 548, 549 or 724(a) "unless such entity or transferee has paid the amount, or turned

over any such property, for which such entity or transferee is liable under section . . . 550 . . . of

this title."  11 U.S.C. § 502(d).[84]   "The legislative history and policy behind Section 502(d)

illustrates that the section is intended to have the coercive effect of insuring compliance with

judicial orders."  *Campbell v. United States (In re Davis)*, 889 F.2d 658, 661 (5th Cir. 1989).

Indeed, as this Court has held, section 502(d) requires the court to disallow *any and all* claims of

a liable entity, including transfer beneficiaries, irrespective of whether those claims arise from the

avoidable transaction.  *Geltzer v. Mooney, et al. (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414,

429 (Bankr. S.D.N.Y. 2011) (Drain, J.) (observing that section 502(d) "provides for the

---

[84] Through its reference to entities found liable under section 550 of Bankruptcy Code, section 502(d) applies not only to initial transferees of avoidable property, but also to subsequent transferees of such property and "entities for whose benefit a transfer was made."  11 U.S.C. § 550(a).

disallowance of 'any claim' of an entity from which property is recoverable under section 550 or

that is a transferee of an avoidable transfer, regardless whether the claim is related to the transfer").

Moreover, this Court has also recognized that section 502(d) "does not even necessarily require

the entry of a judgment, let alone the failure to enforce one, for a claim to be disallowed." *In re*

*Red Dot Scenic, Inc.*, 313 B.R. 181, 186 (Bankr. S.D.N.Y. 2004) (Drain, J.).

236.    Here, the Proposed Complaint pleads numerous claims against ESL that justify

disallowance of ESL's Claims pursuant to section 502(d) of the Bankruptcy Code.  Specifically:

a.   Count Three sets forth a claim that the Seritage Transaction is voidable both as an actual and a constructive fraudulent transfer under section 544 of the Bankruptcy Code and applicable state law and that the value of the properties transferred in the Seritage Transaction is recoverable from Lampert and ESL as the entities for whose benefit the transfer was made under section 550 of the Bankruptcy Code;

b.   Count Four sets forth a claim that the Lands' End spin-off is voidable both as an actual and a constructive fraudulent transfer under section 544 of the Bankruptcy Code and applicable state law, and Count Five sets forth a claim that the value of the property transferred in the Lands' End spin-off is recoverable from Lampert and ESL under section 550 of the Bankruptcy Code;

c.   Counts Six and Seven sets forth a claim that each of the 2016-2018 ESL Contributions is voidable as an actual fraudulent transfer under sections 548(a)(1)(A) and 544 of the Bankruptcy Code and applicable state law; and

d.   Counts Eight and Nine set forth claims that certain transfers made or obligations incurred in connection with the IP/Ground Lease Term Loan Facility are voidable as to the Additional Subsidiaries as constructive fraudulent transfers under sections 548(a)(b) and 544 of the Bankruptcy Code and applicable state law.

237.    Because ESL has not returned to the Debtors' estates the property transferred (or

the value of the property transferred) in the Seritage Transaction, the Lands' End spin-off, or the

2016-2018 ESL Contributions (including the IP/Ground Lease Term Loan Facility), any and all

claims of ESL, and/or its assignees, against the Debtors' estates must be disallowed until such time

as ESL returns to the Debtors' estates the value of the property transferred in those transactions.

114

### G.    The Unjust Enrichment Claims are Colorable

238.    Counts Eleven to Thirteen present colorable claims for unjust enrichment against Lampert and ESL relating to the Lands' End spin-off, the Seritage Transaction, and the 2016-2018 ESL Contributions, respectively.    To state an unjust enrichment claim, a plaintiff must allege (1) the defendant has unjustly retained a benefit, (2) to the plaintiff's detriment, and (3) defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).[85]  Lampert and ESL unjustly lined their pockets through their self-dealing schemes to the detriment of Sears and its legitimate creditors, and their retention of the hundreds of millions of dollars they stole from Sears and its legitimate creditors is wholly unjust and inequitable.

#### 1.    The Estates Have a Colorable Claim for Unjust Enrichment Related to the Lands' End Spin-off

239.    In Count Eleven, the Creditors' Committee pleads facts supporting a colorable claim on behalf of the Debtors for unjust enrichment against Lampert and ESL related to the Lands' End spin-off.  Lampert and ESL have been unjustly enriched by abusing their insider positions at Sears to direct and facilitate the Lands' End spin-off—a self-dealing scheme to enrich themselves unfairly and unjustly and to the substantial detriment of Sears and its legitimate creditors.  Compl. ¶ 262.  Lampert and ESL caused Sears to enter into the Lands' End spin-off and extracted hundreds of millions of dollars through stock ownership, dividends, and investment fees earned through

---

[85] Under New York's "interest analysis," Illinois law governs the unjust enrichment claims.  *See Gerloff v. Hostett Schneider Realty*, No. 12 Civ. 9404 (LGS), 2014 WL 1099814, at *9 (S.D.N.Y. Mar. 20, 2014) (citation omitted); *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994).  Because Sears's principal place of business is in Illinois, and because Lampert and ESL used their formal insider influence to induce Sears to enter into the Lands' End spin-off, the Seritage Transaction, and the 2016-2018 ESL Contributions, the conduct leading to Lampert's and ESL's unjust enrichment occurred in Illinois necessitating the application of Illinois law to the claims.  *See Official Comm. of Unsecured Creditors of Hydrogen, LLC (In re Hydrogen LLC)*, 431 B.R. 337, 356-57 (Bankr. S.D.N.Y. 2010); *see also Official Comm. of Unsecured Creditors of Lois/USA, Inc. (In re Lois/USA, Inc.)*, 264 B.R. 69, 108-09 (Bankr. S.D.N.Y. 2001).  Even if New York law applied, however, the "elements of an unjust enrichment claim are in essence the same under both New York and Illinois law."  *Myun-Uk Choi v. Tower Res. Cap. LLC*, 165 F. Supp. 3d 42, 50 (S.D.N.Y. 2016) (citation omitted).

Lands' End stock purchased at an artificially low price, while removing one of Sears's few profitable business segments and in turn causing Sears's stock price to plummet.  *Id*.

240.    Lampert and ESL have unjustly retained cash, credit, and other things of value that rightly belong to Sears by virtue of their wrongful acts and omissions, and through the wrongful receipt of payments and distributions relating to the Lands' End spin-off.  *Id*. ¶ 261.  Retention of those proceeds by Lampert and ESL violates fundamental principles of justice, equity, and good conscience.  *Id*.

### 2.    The Estates Have a Colorable Claim for Unjust Enrichment Related to the Seritage Transaction

241.    In Count Twelve, the Creditors' Committee pleads facts supporting a colorable claim on behalf of Debtors Sears Roebuck and Kmart for unjust enrichment against Lampert and ESL related to the Seritage Transaction.  In yet another self-dealing scheme, Lampert and ESL took advantage of their insider-status and caused Sears Roebuck and Kmart to enter into the Seritage Transaction, thereby enriching Lampert and ESL unfairly and unjustly and to the substantial detriment of Sears and its legitimate creditors.  Compl. ¶ 268.  As explained, through the Seritage Transaction Lampert and ESL extracted hundreds of millions of dollars from Sears through stock ownership, dividends, and investment fees earned through Seritage stock purchased at an artificially low price.  *Id*.  The Seritage Transaction removed from Sears Roebuck and Kmart some of their best real estate assets for a price that was hundreds of millions of dollars short of reasonably equivalent value, to the detriment of Sears and its legitimate creditors.  *Id*.

242.    The facts alleged demonstrate that Lampert and ESL have unjustly retained cash, credit, and other things of value that rightly belong to Sears Roebuck and Kmart by virtue of their wrongful acts and omissions, and through the wrongful receipt of payments and distributions

relating to the Seritage Transaction.  *Id.* ¶ 267.  Retention of those proceeds by Lampert and ESL

violates fundamental principles of justice, equity, and good conscience.  *Id.*

### 3.    The Estates Have a Colorable Claim for Unjust Enrichment Related to the 2016-2018 ESL Contributions

243.    Similarly, in Count Thirteen, the Creditors' Committee pleads facts supporting a

colorable claim for unjust enrichment on behalf of the Debtors against Lampert and ESL related

to the 2016-2018 ESL Contributions.  Lampert and ESL have been unjustly enriched by abusing

their insider positions at Sears to direct and facilitate a self-dealing scheme to enrich themselves

unfairly and unjustly and to the substantial detriment of Sears and its legitimate creditors by

causing Sears to enter into each of the 2016-2018 ESL Contributions.  *Id.* ¶ 274.  The purpose of

the 2016-2018 ESL Contributions was to hinder, delay, or defraud Sears's legitimate creditors and

protect Lampert's and ESL's own investments (to Sears's and its legitimate creditors' substantial

detriment) in non-Debtor entities that depended on Sears remaining outside of bankruptcy.  *Id.*

244.    Lampert and ESL have wrongfully retained payments, profits, fees, benefits,

incentives, and other compensation they received in connection with each of the 2016-2018 ESL

Contributions, in violation of fundamental principles of justice, equity, and good conscience.

*Id.* ¶ 273.

### H.    The Breach of Fiduciary Duty Claims are Colorable

245.    Finally, Count Fourteen presents colorable claims that by directing, facilitating, and

approving a scheme to rob certain of the Debtors and their stakeholders of value, Lampert, ESL,

and Kamlani each breached their fiduciary duties of care, good faith, and loyalty, and aided and

abetted others' breaches of those same duties.

246.    Directors, officers, and controlling shareholders of a Delaware corporation owe fiduciary duties of care, loyalty, and good faith to the corporation and its stakeholders.[86]  *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).  When a corporation is insolvent, because creditors are "the residual beneficiaries of any increase in value," they may assert claims for breach of fiduciary duty on the corporation's behalf.  *Id.*

247.    The duty of due care requires that directors "'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all material information reasonably available' in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent."  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (citations omitted).  Gross negligence "signifies more than ordinary inadvertence or inattention," and is thus distinct from recklessness, which "connotes a different type of conduct akin to the intentional infliction of harm."  *Alberts v. Tuft, et al. (In re Greater Se. Cmty. Hosp. Corp. I, et al.)*, 353 B.R. 324, 339 (Bankr. D.D.C. 2006) (citation omitted).

248.    The duty of loyalty requires "that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1994)); *see also Lampe v. Lampe (In re Lampe)*, 665 F.3d 506, 515 (3d Cir. 2011).  Allegations that fiduciaries were materially interested in the transaction, lacked independence, or did not satisfy their duty of good faith set forth a colorable claim for breach of the duty of loyalty.

---

[86] Because Holdings is a Delaware corporation, *see* Compl. ¶ 17, Delaware law applies to breach of fiduciary duty claims pursuant to New York's internal affairs doctrine.  *See Tronox Inc. v. Anadarko Petroleum Corp. & Kerr-McGee Corp. (In re Tronox Inc.)*, 429 B.R. 73, 105 (Bankr. S.D.N.Y. 2010).

*Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000).

249.    Additionally, a breach of the duty of good faith—considered a condition of the duty of loyalty—occurs when a fiduciary acts "for some purpose other than a genuine attempt to advance corporate welfare . . . [when the transaction] is known to constitute a violation of applicable positive law," or "fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d at 753, 755 (emphasis omitted); *see also In re Orchard*, 88 A.3d at 32-33 (citation omitted).

250.    The Proposed Complaint sufficiently alleges facts that Lampert, ESL, and Kamlani (1) owed fiduciary duties of care and loyalty to Holdings's creditors, (2) breached those duties by causing Holdings to enter into each of the 2016-2018 ESL Contributions for ESL's benefit and to Sears's detriment, and (3) aided and abetted those breaches.[87]

251.    First, at the time of the 2016-2018 ESL Contributions, Lampert, ESL, and Kamlani owed fiduciary duties to Holdings by virtue of their insider positions at the Company:  Lampert was the CEO of Holdings, Chairman of Holdings's Board, and controlling shareholder (with ESL) of Holdings, Compl. ¶ 279; ESL was Holdings's controlling shareholder (with Lampert), *id*. ¶ 280;

---

[87] Defendants may argue that breach of duty of care claims against Lampert and Kamlani are not colorable because Delaware law allows Delaware corporations to exculpate directors for liability for duty of care violations. *See* Del. Code Ann. tit. 8, § 102(b)(7).  But Delaware law does not permit such exculpations for breaches of the duties of loyalty or good faith or "for any transaction from which the director derived an improper personal benefit." *Id.*; *see also Zirn v. VLI Corp.*, 681 A.2d 1050, 1062 n.7 (Del. 1996).  Moreover, Delaware law holds that "when a duty of care breach is not the *exclusive* claim, a court may not dismiss [the duty of care claim] based upon the exculpatory provision." *Alidina v. Internet.com Corp.*, No. Civ. A. 17235-NC, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) ("Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiff's duty of care claim on a motion to dismiss.") (emphasis in original); *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc., et al.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008).

Additionally, the "provisions authorized by 8 Del. C. § 102(b)(7) exculpating directors from breaches of the duty of care do not extend to protect third parties from aiding and abetting fiduciary duty claims." *Houseman v. Sagerman*, No. 8897-VCG, 2014 WL 1600724, at *8 (Del. Ch. Apr. 16, 2014) (citing *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54 (Del. Ch. 2014)).

and Kamlani was a member of Holdings's Board, *id*. ¶ 281.  All throughout the period the 2016-2018 ESL Contributions were provided, the Debtors were insolvent.  *Id*. ¶ 283.

252.    Second, Lampert, ESL, and Kamlani each breached their fiduciary duties of care, loyalty, and good faith by exercising undue influence over Holdings and its Board by virtue of their insider status and causing the Company to enter into the 2016-2018 ESL Contributions. *Id*. ¶¶ 282-83.  Through these transactions, Lampert, ESL, and Kamlani saddled the Debtors with billions of dollars in debt, knowing that Sears was insolvent, inadequately capitalized, and had no ability to repay its debts. *Id*. ¶ 283.  Yet Lampert, ESL, and Kamlani directed and approved these self-dealing transactions, putting their own financial interests ahead of the interests of Holdings and its stakeholders.  *See Cede & Co.*, 634 A.2d at 362 (directors who "appear[] on both sides of a transaction" or "receiv[e] a personal benefit from a transaction not received by the shareholders generally" are considered interested in the transaction for purposes of the duty of loyalty); *see also Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (explaining that "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.") (citation omitted).

253.    Moreover, Lampert, ESL, and Kamlani breached their fiduciary duties because they caused Sears to enter into the 2016-2018 ESL Contributions even though the directors of Holdings, including Kamlani, and Lampert, repeatedly had been presented analyses showing consistent declines in the Company's operating metrics (on a consolidated basis), and therefore knew the Debtors were unable to repay the resulting debt.  *Id*. ¶ 283.  *See, e.g.*, *Mukamal v. Bakes*, 383 B.R. 798, 827-28 (S.D. Fla. 2007) (breach of fiduciary duty claim sufficient under Delaware law based on allegations of officers' "'refus[ing] to heed'" the advice of experts, failing to "'make realistic adjustments to booking and revenue projections,'" and "'prepar[ing] unsubstantiated business

plans based upon booking and revenue projections grounded exclusively on speculation and wishful thinking'") (citation omitted).  Further, as Holdings became more dependent on the 2016-2018 ESL Contributions, the Board—dominated by Lampert, ESL, and Kamlani—approved financings on an expedited basis and without a plan to repay the loans.  *Id*. ¶ 8.

254.    Lampert, ESL, and Kamlani disregarded Holdings's best interests when they caused Holdings to enter into the 2016-2018 ESL Contributions because Lampert, ESL, and Kamlani were materially interested in and benefited from the transactions.  As ESL insiders, they continued to approve pumping capital into a flailing Sears because it was in Lampert, ESL, and Kamlani's own interest to lien up many of Sears's remaining unencumbered assets—essentially "leapfrogging" all third party unsecured or junior creditors—for ESL's benefit.  *Id*. ¶¶ 282-83. The 2016-2018 ESL Contributions were designed to buy time for Lampert and ESL to monetize Sears's assets later on, allow ESL to play out its option on Sears, and protect ESL's investment in Seritage.  Purposely disregarding their roles as fiduciaries, Lampert, ESL and Kamlani failed to protect the Debtors and their stakeholders against numerous conflicts of interest and insider transactions, including the 2016-2018 ESL Contributions, favoring Lampert and ESL.  *Id*. ¶¶ 167, 170.

255.    Finally, Lampert, ESL, and Kamlani each also aided and abetted the others' breaches of fiduciary duties by knowingly participating in, directing, facilitating, arranging, and approving the self-dealing 2016-2018 ESL Contributions.  *Id*. ¶ 284.  *See In re Comverge, Inc.*, No. CV 7368-VCP, 2014 WL 6686570, at *17 (Del. Ch. Nov. 25, 2014) (claim for aiding and abetting a breach of fiduciary duties requires:  "(1) the existence of a fiduciary relationship; (2) a

breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants;[88] and

(4) damages.").[89]

## II.    The Debtors Have Unjustifiably Refused to Prosecute the Proposed Claims Despite Their Significant Value to the Estates

256.    The second *STN* prong asks whether a debtor has unjustifiably failed to bring suit.

*STN*, 779 F.2d at 905.

257.    Here, as explained above, there can be no real question that, by choosing the ESL

Bid as the path forward in these Chapter 11 Cases, the Debtors have decided not to bring suit

against Lampert, ESL, and Kamlani for any of the Proposed Claims that would affect ESL's ability

to credit bid in any way.  Indeed, the ESL Bid allows ESL an unfettered right to credit bid, and

provides for the waiver of any claims that could affect the status of ESL's purported secured

claims, in exchange for what can be described as nuisance value—**only $35 million**.  To be clear,

by accepting the ESL Bid, the Debtors would essentially release all claims to recharacterize or

equitably subordinate ESL's Claims, to avoid liens or guarantees, and to disallow ESL's Claims

under Bankruptcy Code section 502(d) on the basis of the fraudulent transfers that neither Lampert

nor ESL have paid back to the estates.

258.    Whether the Debtors' failure to bring suit is unjustifiable turns on whether bringing

suit would be likely to benefit the estate, after accounting for any associated costs or delays.  *STN*,

779 F.2d at 905; *Adelphia*, 330 B.R. at 374 n. 19 ("The 'unjustifiable' failure of a debtor to bring

the suit itself does not require an improper motive for the failure" so long as the "the committee

---

[88] "Knowing participation" does not need to be pled with particularity; rather, it may be reasonably inferred from the allegations.  *Carr v. New Enter. Assocs. Inc.*, No. 2017-0381-AGB, 2018 WL 1472336, at *16 (Del. Ch. Mar. 26, 2018).

[89] The internal affairs doctrine mandates that Delaware law govern the existence and potential breach of any fiduciary duties.  While Illinois law may apply to the Defendants' liability as aiders and abettors, *see Wantickets RDM, LLC v. Eventbrite, Inc.*, No. 654277/2016, 2017 WL 3130436, at *2-3 (N.Y. Sup. Ct. Jul. 21, 2017), its application would produce the same result here as Illinois' law is substantially the same as Delaware's.  *See Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003).  Therefore, a comprehensive choice of law analysis is unnecessary.

122

has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate.").

259.    The benefits associated with asserting the Proposed Claims are substantial and value-maximizing for the Debtors' estates.  The recharacterization and equitable subordination claims, alone, have the potential to eliminate (or subordinate) billions in face amount of the Debtors' funded debt claims held by ESL, including more than $1.8 billion in face amount of secured claims against the Debtors.  Equitably subordinating some or all of ESL's Claims, or recharacterizing the 2016-2018 ESL Contributions as equity, could, therefore, be the difference between a meaningful recovery for unsecured creditors or none at all.

260.    Granting the Creditors' Committee standing will also not result in delay to the administration of these Chapter 11 Cases.  If the Debtors (as they should regardless)—instead of proceeding with the wholly inadequate ESL Bid—pivot to a going-out-of-business sale and orderly liquidation of their assets, they will be fully able to wind down their affairs, maximize their assets, and stop the bleeding associated with the burn rate in these Chapter 11 Cases as quickly as possible. The Proposed Claims need not be resolved before the wind down.

## III.    This Court Should Grant the Creditors' Committee Authority to Settle the Proposed Claims

261.    The Creditors' Committee is entitled not only to prosecute the Proposed Claims, but must also be able to engage in settlement negotiations with parties in interest in relation to the Proposed Claims.  Of course, any such settlements would be subject to the approval of this Court. It is indisputable that any decision to settle any of the Proposed Claims, and at what level, will have a disproportionate economic impact on the Debtors' unsecured creditors, whose interests the Creditors' Committee represents in these cases.

123

**RESERVATION OF RIGHTS**

262.    The Creditors' Committee reserves its right to seek authority to commence and prosecute other claims and/or causes of action against the Defendants on behalf of the Debtors' estates.

**NOTICE**

263.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures* [ECF No. 405]. The Creditors' Committee respectfully submits that no further notice is required.

**CONCLUSION**

**WHEREFORE**, the Creditors' Committee respectfully requests that the Court (i) enter the proposed order, substantially in the form attached hereto as **Exhibit A**, granting the Creditors' Committee standing to commence, prosecute, and settle the Proposed Claims set forth in the Proposed Complaint attached hereto as **Exhibit B** on behalf of the Debtors' estates; and (ii) grant such additional relief as the Court may deem just, proper and equitable.

New York, New York
Dated:  January 23, 2019

AKIN GUMP STRAUSS HAUER & FELD LLP

By: /s/  *Ira S. Dizengoff*

Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Joseph L. Sorkin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
pdublin@akingump.com
aqureshi@akingump.com
jsorkin@akingump.com

Lacy M. Lawrence (*pro hac vice* pending)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
llawrence@akingump.com

*Counsel to the Official Committee of Unsecured*
*Creditors of Sears Holdings Corporation, et al.*

125