**Objection Deadline: February 4, 2019 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
In re                                    :
                                         :      Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :      Case No. 18-23538 (RDD)
                                         :
            Debtors.[1]                  :      (Jointly Administered)
                                         :
------------------------------------------------------------x
```

## NOTICE OF DE MINIMIS ASSET SALE
## FOR SEARS STORE #3628 (TOLLESON, AZ)

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets (the "**Assets**") to New Generation Properties, LLC (the "**Purchaser**") pursuant to an agreement dated September 28, 2018 and subsequently amended (together with all amendments thereto, the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

Description of the Assets. The Assets consist of a vacant parcel of land, including any interest of the Debtors in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all minerals, oil and gas thereon or thereunder, all mineral, oil and gas rights relating

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

thereto, and all easements for utilities and common roadway purposes and are located at 8701 West McDowell Road, in the City of Tolleson, Maricopa County, Arizona.

Relationship of the Purchaser to the Debtors. The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets. The Debtors are not aware of any liens and/or encumbrances on the Assets other than those described in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 952), and the *Final Junior Dip Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (ECF No. 1436). To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale. The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis (if applicable), free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code. The Purchaser has agreed to pay a purchase price of $51,600 for the Assets. The Purchase Agreement is annexed hereto as **Exhibit 1**.

Procedures to Object to the Proposed Sale. Any objection to the proposed sale (an "**Objection**") must: (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; Sunny Singh, Esq.; and Jessica Liou, Esq.), as counsel to the Debtors **on or before February 4, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets; and (iii) the DIP Agents' Counsel.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated:  January 24, 2019
        New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96824981\2\73219.0006

**<u>Exhibit 1</u>**

**Purchase Agreement**
**Store No. 3628 (Tolleson, AZ)**

# REAL ESTATE SALE CONTRACT
*Tolleson, AZ; Kmart #3628 (Outparcel)*

**THIS REAL ESTATE SALE CONTRACT** (**"Contract"**) is made as of September 28, 2018 (the "**Effective Date**"), by and between **KMART CORPORATION**, a Michigan corporation ("**Seller**") and **NEW GENERATION PROPERTIES, LLC**, a Nebraska limited liability company ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

## 1.   PURCHASE AND SALE

Seller is the owner of a vacant parcel of land (PIN 102-47-001M), including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all minerals, oil and gas thereon or thereunder, all mineral, oil and gas rights relating thereto, and all easements for utilities and common roadway purposes ("**Real Property**"), located at the northeast corner of improved property located at 8701 West McDowell Road, in the City of Tolleson (the "**City**"), Maricopa County, Arizona legally described on **Exhibit "A"** attached hereto and made a part hereof, together with all other improvements, structures and fixtures located on the Real Property, and all rights and appurtenances pertaining to the Real Property (collectively, the "**Improvements**"). The Real Property and the Improvements are sometimes collectively called the "**Property**". Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 6 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract).

## 2.   PURCHASE PRICE

(a)   The Purchase Price of the Property shall be Fifty-One Thousand Six Hundred and No/100 Dollars ($51,600.00) and payable by Purchaser in United States currency in good and certifiable funds at Closing.

(b)   Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract. This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

## 3.   EARNEST MONEY DEPOSIT

Intentionally Omitted.

## 4.   PRORATIONS AND EXPENSES

(a)   The following prorations, except as specifically provided set forth in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense

day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    **Taxes.** All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for the tax parcel number(s) that is attributable to the Property. All prorations shall be final. Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this Section 4(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

(ii)   **Miscellaneous.** If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing. All prorations shall be final.

(b)    At Closing, Seller shall pay (i) one-half (1/2) of the cost of the Closing Escrow; (ii) one-half (1/2) of the cost of obtaining the Title Policy (as hereinafter defined), excluding the cost of any endorsements thereto; (iii) the amount of any stamp or transfer tax imposed by the City and any county ordinance, and the State of Arizona and shall meet any other requirements as established by the City ordinance with regard to the City transfer tax and the amount of any stamp or transfer tax imposed by county ordinance or State of Arizona statute on the transfer of title; and (iv) all recording charges for the release of any financing related documents associated with Seller's indebtedness. At Closing, Purchaser shall pay (i) one half (1/2) of the cost of the Closing Escrow; (ii) the cost of obtaining a survey, if any; (iii) one-half (1/2) of the cost of obtaining the Title Policy and the entire cost of any endorsements to the Title Policy; (iv) any costs related to any inspections by the City and repairs necessitated by the City inspection ("**City Repairs**"), if any, and shall meet any other requirements as established by the City ordinance with regard to the transfer of real estate; (v) the cost of Purchaser's Studies (as hereinafter defined); (vi) all Purchaser financing related fees; and (vii) all recording charges for the Deed and all documents pertaining to any purchase money financing. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable equally by the Parties at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

## 5.    CONDITIONS TO CLOSING

(a)    In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to close on Purchaser's purchase of the Property is subject to each and all of the following conditions precedent:

(i)     All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of the Purchaser's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Purchaser shall thereupon have a reasonable period to cure any purported breach of its representations and warranties; and

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed.  If any condition precedent to Closing of Purchaser as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Seller may, after notice to Purchaser and Purchaser's failure to cure within the time period(s) set forth in this Contract, elect at any time thereafter, to terminate this Contract, provided that Seller is not itself in default beyond any applicable notice and cure period, and exercise such remedies as provided in Section 12 of this Contract.

(b)    In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent:

(i)     All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Seller shall thereupon have a reasonable period to cure any purported breach of its representations and warranties;

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Seller as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Purchaser may, after notice to Seller and Seller's failure to cure within the time period(s) set forth in this Contract, provided that Purchaser is not itself in default beyond any applicable notice and cure period, elect at any time thereafter, to terminate this Contract and exercise such remedies as provided in Section 12 of this Contract; and

(iii)   The willingness of the Title Insurer to issue, on the Closing Date, upon the sole condition of the payment of an amount no greater than its regularly scheduled premium, its standard extended coverage ALTA form owner's policy of title insurance including the endorsements specified in Section 8(c), insuring in the amount of the Purchase Price, that fee simple title to the Property is vested of record in Purchaser on the Closing Date, subject only to the Permitted Exceptions (as hereinafter defined) (the "**Title Policy**").  Notwithstanding anything herein to the contrary, a failure by Purchaser to satisfy any conditions to, or undertake any action necessary for, the issuance of the Title Policy or a requested endorsement shall not excuse Purchaser from its obligations under this Contract.

6. **CLOSING**

    (a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com ("**Title Insurer**") within five (5) days after the satisfaction or waiver of the Due Diligence Period (as hereinafter defined) (the "**Closing Date**").

    (b)    On or before the Closing Date, Seller shall deliver or cause to be delivered to the Title Insurer the following Closing documents:

        (i)    A Special Warranty Deed executed in proper form for recording so as to convey the title required by this Contract (the "**Deed**") to Purchaser, subject to matters of record;

        (ii)    A FIRPTA Affidavit in customary form duly executed by Seller;

        (iii)    An Affidavit of Property Value form duly executed by Seller; and

        (iv)    Such other instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the city, county and state where the Property is located.

    (c)    On the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

        (i)    The Purchase Price, plus or minus prorations;

        (ii)    The counterpart to the Affidavit of Property Value form; and

        (iii)    Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the city, county and state where the Property is located.

    (d)    On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and state, county and municipal transfer tax declarations and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

7. **CLOSING ESCROW**

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control.  All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as

closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

8.    **DUE DILIGENCE PERIOD**

(a)    Purchaser's agents, employees and independent contractors shall have the right and privilege to enter upon the Property from and after the Effective Date to survey and inspect the Property, including, but not limited to, the right to review of the utility capacity for the Property and the location of utilities (**"Purchaser's Studies"**), all at Purchaser's sole cost and expense. Prior to Purchaser or any agent, employee or independent contractor of Purchaser entering onto the Property to perform any non-invasive inspections or tests, Purchaser shall enter into a "**Non-Invasive Inspection Agreement**" attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference. Purchaser agrees not to disclose Purchaser's Studies or their results to any other persons or entities other than its employees, agents, attorneys, brokers, contractors, accountants, or other parties assisting Purchaser with the transaction contemplated hereby without the Seller's prior written consent, which consent may be granted or withheld in the absolute discretion of Seller or unless Purchaser is required by law to disclose such information. Purchaser's obligations under this Contract are subject to and conditioned upon Purchaser's investigation and study of the Property and reasonable satisfaction with such aspects thereof deemed relevant by Purchaser. Purchaser shall have thirty (30) days from the Effective Date (the **"Due Diligence Period"**) in which to make Purchaser's Studies with respect to the Property. All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date. In the event Purchaser in its sole discretion shall conclude that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given prior to the expiration of the Due Diligence Period, to terminate this Contract and this Contract thereupon shall be deemed to be terminated and both Parties shall be released from any further liability hereunder. If Purchaser fails to give such notice of termination to Seller as provided in this Section 8(a) and subject to the terms and provisions of Section 8(b) below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) except as otherwise provided in this Contract, Purchaser agrees to accept the Property **"AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION"** and to release, defend, hold harmless, and indemnify Seller from the Closing Date, for all costs and expenses resulting from any claim, demand, liability or loss relating to the condition of the Property including but not limited to the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur. Purchaser hereby covenants and agrees to defend, indemnify and hold harmless Seller and its respective officers, directors, employees, agents, representatives acting or purporting to act on behalf of Seller, beneficiaries, attorneys, subsidiaries, affiliates, partner, contractors, subcontractors, successors and assigns ("**Seller's Related Parties**"), from and against any and all loss, liability, cost, claim, demand, damage, lien, penalty, fine, interest and expense (collectively. "**Claims**") arising out of or in any manner related to the exercise by Purchaser of its rights under this Section 8, unless such Claim is a result of the gross negligence or willful misconduct of Seller, its agents, contractors or employees. If this

transaction does not close, Purchaser shall, at its sole cost and expense, restore the Property to its condition as of the Effective Date. Notwithstanding anything to the contrary contained in this Contract, the terms, provisions, conditions and indemnifications of this Section 8(a) shall survive Closing and the delivery of the Deed or the termination of this Contract without further need to document such agreement.

(b)     Within five (5) business days after the Effective Date, Seller shall provide to Purchaser the following to the extent such documents exist and are in the possession and control of Seller at its corporate office in Hoffman Estates, IL as of the date of this Contract:

   (i)    Copy of the most recent tax bill for the Property.

   (ii)   Copy of any survey affecting the Property.

   (iii)  Environmental reports and studies (collectively, the "**Environmental Reports**").

In the event this Contract is terminated, all materials provided by Seller to Purchaser shall be promptly returned by Purchaser to Seller at no cost to Seller (the "**Due Diligence Materials**"). SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING THE ACCURACY OR COMPLETENESS OF THE DUE DILIGENCE MATERIALS OR THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME.

(c)     Title Commitment. Within five (5) business days after the Effective Date, Seller shall deliver to Purchaser a current ALTA 2006 Form commitment for an Extended Coverage Owner's Policy of Title Insurance for the Land ("**Title Commitment**") issued through Title Insurer, together with legible copies of all documents identified on the Title Commitment as exceptions to the title. The Title Commitment shall name Purchaser as the party to be insured thereunder and commit to insure Purchaser with fee simple title in the full amount of the Purchase Price. The Title Commitment shall list and identify by reference to volume and page, where recorded, all easements, rights-of-way and other instruments or matters affecting title to the Property. Subject to the Title Insurer's requirements for issuance of same, the Title Commitment shall commit to issue the following endorsements as part of the Owner's Policy of Title Insurance, to the extent such endorsements are available in Arizona: (i) an "extended coverage endorsement" insuring over the general exceptions contained customarily in such policies; (ii) Same-As Survey endorsement; (iii) Accuracy of Survey Endorsement; (iv) Access Endorsement; and (v) "Contiguity" endorsement. Additional endorsements (which may take the form of affirmative insurance covering, for example, restrictive covenants, encroachments, etc.) may be required, depending upon the status of title as shown in the Title Commitment.

(d)     Survey. Within five (5) days after the Effective Date, Seller shall deliver to Purchaser a copy of any existing ALTA/ACSM land title surveys of the Property in Seller's possession at its corporate office in Hoffman Estates, IL. Within 20 days after the Effective Date, Purchaser, at its option, may obtain a new ALTA/ACSM land title survey ("**Survey**") of the Property conforming to current ALTA/ACSM Minimum Standard Detail Requirements for an ALTA/ACSM Land Title Survey certified to Purchaser and Title Insurer that in all respects is acceptable to Purchaser and to Title Insurer.

(e)    Review of Title and Survey.  On or before ten (10) days prior to the expiration of the Due Diligence Period, Purchaser may make written objections ("**Objections**") to the form or contents of the Title Commitment or the Survey (if Purchaser obtains a Survey).  Any matter shown on the Title Commitment or on the Survey which is not objected to by Purchaser shall be a "**Permitted Exception**".  Notwithstanding any provision in this Section 8(e) or Seller's response to the Objections to the contrary, the following items shall not be deemed Permitted Exceptions:  (A) all loans, mortgages, deeds of trust, judgments, mechanic's liens, and other similar monetary Liens capable of being removed by payment of a fixed and liquidated sum of money, (B) any delinquent real estate taxes or assessments, and (C) any Liens created or consented to by Seller after the Effective Date without Purchaser's written consent.  For purposes of this Contract, "**Liens**" means all charges, claims equitable interests, community or other marital property interests, security interests, conditional sale agreements, mortgages, indentures, deed of trusts, security agreements, pledges, hypothecations, options, restrictions, encroachments, easements, servitudes, rights of first refusal, conditions or other liens, encumbrances or defects of title of any kind or nature.  Seller will have until five (5) days prior to the expiration of the Due Diligence Period (the "**Cure Period**"), to attempt to cure the Objections.  If Seller is unwilling or unable to cure the Objections within the Cure Period, Purchaser's sole remedy shall be to elect to do one of the following by delivering written notice thereof to Seller and Title Insurer prior to the expiration of the Due Diligence Period: (1) terminate this Contract, in which case this Contract shall automatically terminate effective as of such date, and the parties shall have no further rights or obligations under this Contract, except those that expressly survive such termination, or (2) waive such Objections not cured and proceed with Closing.  In the event Purchaser does not provide a written waiver of any objectionable matter that Seller has failed to cure within the Cure Period, Purchaser shall be deemed to have waived such Objections.

9.    **REPRESENTATIONS AND WARRANTIES**

(a)    Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto.

(ii)    There are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property, except those of record.

(iii)    Seller has title to the Real Property and the Improvements free and clear of all Liens other than Permitted Exceptions.

(iv)    Seller is not in default under any agreement or instrument where the liability thereunder might adversely affect Seller's ability to perform its obligations under this Contract.

(v)    This Contract and all documents required hereby to be executed by Seller hereunder are and shall be valid, legally binding obligations of and enforceable against Seller in accordance with their terms.

(vi)    As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of the Seller's signatory and shall not be construed to refer to the knowledge of any other officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)    Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)    Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set

forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 9 shall not merge with the transfer of title but shall survive Closing for a period of two (2) years. If Purchaser delivers written notice of a breach within such period, then Purchaser's sole remedy shall be an action at law for actual damages, which must be commenced, if at all, on or before the first day following the second (2nd) anniversary of the Closing Date. The cumulative, maximum amount of liability that Seller shall have to Purchaser, in the aggregate, for breaches of the representations and warranties under this Contract shall not exceed Two Thousand Five Hundred and 00/100 Dollars ($2,500.00).

10.    **AS IS/NO WARRANTIES**

(a)    Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property without warranty or representation of any kind by Seller or any of Seller's Related Parties, including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Contract, the term "**Hazardous Material**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation. Purchaser hereby agrees to release Seller and Seller's Related Parties, with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs incurred by Purchaser, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property from any source.

(b)    Except as otherwise provided for in the representations and warranties in Section 9 of this Contract, Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 9 of this Contract:

(i)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)    Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Property is located; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 10(A) AND 10(B), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, OR (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY.

(d)    Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Seller's Related Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that

Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

11.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the **"Code"**), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

12.    **DEFAULT AND REMEDIES**

If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of notice of such default, for any reason other than Purchaser's default hereunder and failure to diligently complete or cure Purchaser shall have the right to (a) terminate this Contract, and this Contract shall be terminated and of no further force or effect except as provided for in this Contract, (b) seek specific performance of Seller's obligation to convey the Property pursuant to this Agreement, or (c) seek any other remedy available to Purchaser at law or in equity. If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default, for any reason other than Seller's default hereunder, Seller's shall have the right to (a) terminate this Contract and this Contract shall become null and void with neither Party having any further rights or liabilities hereunder, except as provided for in this Contract, or (b) seek any other remedy available to Seller at law or in equity.

13.    **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

| To Seller: | **Kmart Corporation** |
| | 3333 Beverly Road, Dept. 824RE |
| | Hoffman Estates, Illinois  60179 |
| | Attn: President, Real Estate |

| With copies to: | **Kmart Corporation** |
| | 3333 Beverly Road, Dept. 824RE |
| | Hoffman Estates, Illinois  60179 |
| | Attn:  Associate General Counsel, Real Estate |

| To Purchaser: | **New Generation Properties, LLC** |
| | 340 Victory Lane |
| | Lincoln, NE  68528 |
| | Attn:  Michael J. Tavlin |

With copies to:          **Maser Law, LLC**
                         123 North Locust Street, Suite 201B
                         P.O. Box 1151
                         Grand Island, NE 68801
                         Attn: Matthew D. Maser

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 13.

14.    **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

15.    **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

16.    **SURVIVAL AND BENEFIT**

Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

17.    **CONFIDENTIALITY**

Purchaser agrees that all terms of this Contract as well as any information provided to Purchaser pertaining to Seller (the "**Confidential Information**") will remain confidential and will not be divulged by Purchaser without the written consent of Seller, except that Purchaser may disclose the Confidential Information without Seller's consent to Purchaser's respective officers, affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) and to any agency (governmental or public) in connection with Purchaser's pursuit of any entitlements and/or approvals deemed by Purchaser to be necessary for construction of the Property, so long as the confidentiality obligations of Purchaser are binding upon all of the foregoing and Purchaser informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this Section 17. Notwithstanding anything contained in this Contract to the contrary, the obligation of confidentiality does not apply to (a) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 17 or breach of confidentiality by anyone bound under like terms of confidentiality to the Party making such public disclosure, (b) Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. If Purchaser seeks Seller's consent to the disclosure of the Confidential Information, Seller shall not unreasonably withhold its consent. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Contract or its terms will be provided to any third party not subject to the same confidentiality

obligation as Purchaser.  In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 17, in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Contract to the contrary, Purchaser may divulge Confidential Information without Seller's consent to a proposed institutional mortgagee in connection with any financing by Purchaser of the Property (who, in turn, may disclose the Confidential Information to its officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing).

18.    **BROKERAGE**

Each party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction.  Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party.  The provisions of this Section 18 shall survive the Closing and shall not merge with the transfer of title via the Deed.

19.    **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser has a majority ownership interest or has at least co-control over provided that written notice of such assignment is delivered to Seller at least ten (10) days prior to Closing.  No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

20.    **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any rights hereunder.  This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

21.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.  The term "prevailing party" as used in this Section 22 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled.  In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment

rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action. It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

22.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

23.    **GOVERNING LAW**

This Contract shall be construed and governed in accordance with the laws of the State of Arizona without regard to its conflicts of laws principles.

24.    **COUNTERPARTS**

This Contract may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument. Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Contract. The parties agree that the Purchaser shall be the first to execute this Contract.

25.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 19 of this Contract.

26.    **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract.

27.    **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State of Arizona are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of Arizona are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State of Arizona are authorized or required to be closed.

28.    **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

29.    **SECTION 1031 EXCHANGE**

At Seller's option, Purchaser agrees to cooperate with Seller in closing the sale of the Property as a like-kind exchange under Section 1031 of the Internal Revenue Code (the "**Code**"). Such cooperation shall include, without limitation, the substitution by Seller of an intermediary (the "**Intermediary**") to act in place of Seller as the Seller of the Property. If Seller so elects, Purchaser agrees to accept the Property and all other required performance from the Intermediary and to render Purchaser's performance of all of its obligations hereunder to the Intermediary. Purchaser agrees that performance by the Intermediary shall be deemed performance by Seller and Seller agrees that Purchaser's performance to the Intermediary shall be deemed as performance to Seller. Notwithstanding the foregoing, Seller shall remain liable to Purchaser for each and every one of the representations, warranties, indemnities and obligations of Seller under this Contract and Purchaser may proceed directly against Seller without the need to join the Intermediary as a party to any action against Seller.

At Purchaser's option, Seller agrees to cooperate with Purchaser in closing the sale of the Property as a like-kind exchange under Section 1031 of the Code. Such cooperation shall include, without limitation, the substitution by Purchaser of an Intermediary to act in place of Purchaser as the Purchaser of the Real Property. If Purchaser so elects, Seller agrees to accept the Property and all other required performance from the Intermediary and to render Seller's performance of all of its obligations hereunder to the Intermediary. Seller agrees that performance by the Intermediary shall be deemed performance by Purchaser and Purchaser agrees that Seller's performance to the Intermediary shall be deemed as performance to Purchaser. Notwithstanding the foregoing, Purchaser shall remain liable to Seller for each and every one of the representations, warranties, indemnities and obligations of Purchaser under this Contract and Seller may proceed directly against Purchaser without the need to join the Intermediary as a party to any action against Purchaser.

30.    **CONDEMNATION AND CASUALTY**

In the event of any taking, or notice is given of the intention to take, the Real Property by the exercise of the power of eminent domain of all or a substantial portion of the Real Property prior to the Closing Date, such portion as would materially impair or otherwise materially affect Purchaser's intended use of the Real Property will be deemed "substantial," Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.

If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof. If the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Purchaser may elect, by written notice delivered to Seller prior to the scheduled Closing Date, to:

(a)     Terminate this Contract by written notice to Seller, in which event this Contract shall become null and void and thereafter neither party shall have any liability or obligation to the other; or

(b)     Notify Seller that it desires to take title to the Property in its damaged condition, in which event the cost to repair the damage, up to a maximum amount of One Hundred Fifty Thousand Dollars ($150,000.00), shall be credited against the Purchase Price at Closing.  All risks of loss to the Property are borne by Seller prior to Closing.

**31.     SECTION HEADINGS**

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

**32.     INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

**33.     JURY TRIAL**

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

**34.     AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.  However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

**35.     ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller.  The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

**36.     PATRIOT ACT**

Seller certifies that its name is Kmart Corporation, a Michigan corporation, and to Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is New Generation Properties, LLC, a Nebraska limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

37.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this Section 37 shall survive the expiration of the term or any earlier termination of this Contract.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**KMART CORPORATION,**
a Michigan corporation

By: _____

Name: _____JoAnn Catanese_____

Its: _____Divisional Vice President, Real Estate_____

**PURCHASER:**

**NEW GENERATION PROPERTIES, LLC,**
a Nebraska limited liability company

By: _____

Name: _____Clay F Smith_____

Its: _____Manager_____

**EXHIBITS**

Exhibit "A"- Legal Description
Exhibit "B"- Non-Invasive Inspection Agreement

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

Commencing at the southeast corner of the north 55 feet of said northwest quarter; thence south 88 degrees 59 minutes 35 seconds west parallel with the north line of said northwest quarter, 71.49 feet to the point of beginning of the parcel of land herein described; thence south 0 degrees 50 minutes 36 seconds east 66.18 feet; thence north 88 degrees 59 minutes 35 seconds east 6.60 feet; thence south 1 degree 11 minutes 14 seconds east 136.67 feet; thence north 89 degrees 58 minutes 18 seconds west 122.32 feet; thence north 0 degrees 58 minutes 44 seconds west 200.64 feet to a point on the south line of the north 55 feet of said northwest quarter; thence north 88 degrees 59 minutes 35 seconds east along said south line, 115.36 feet to the point of beginning.

### EXHIBIT "B"

### NON-INVASIVE INSPECTION AGREEMENT

(please see attached)

## NON-INVASIVE INSPECTION AGREEMENT
*Tolleson, AZ; Kmart #3628; Outparcel*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _____ day of _____, 2018 ("**Effective Date**"), by and between **NEW GENERATION PROPERTIES, LLC,** a Nebraska limited liability company ("**Investigating Party**"), and **KMART CORPORATION,** a Michigan corporation ("**Company**") in connection with site investigation and site assessment work to be performed on the property owned by Company located at _____ in the City of Tolleson (the "**City**"), Maricopa County, Arizona (the "**Property**"), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

### RECITALS:

A.      Company desires to sell the Property to Investigating Party;

B.      Investigating Party desires to buy the Property from Company;

C.      Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

D.      Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.      Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.      The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall walk the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**Site Assessment Work**"). Invasive testing, including but not limited to borings, asbestos samplings, or any Phase II Environmental Assessment ("**Invasive Testing**"), shall NOT be performed at the Property. If Company elects to have its representative present during the Site Assessment Work, if any, and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment Work shall be performed only in the presence of the Company's local manager or any other such person assigned by Company. Investigating Party shall not perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's sole discretion. In the event Investigating Party engages in Unauthorized Activity, Company shall have the right to terminate access to the Property for such Unauthorized Activity.

3.      This Agreement shall terminate the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) thirty (30) days from the Effective Date, in each such event Investigating Party shall promptly restore the Property as provided in Section 8 of this Agreement.

1

4.    Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable. The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 4.

5.    Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement. This indemnity shall survive the termination of this Agreement.

6.    Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

   (i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

   (ii)   Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

   (iii)  Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

   Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

7.    Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

8.    If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property caused by Investigating Party and to restore

2

the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

9. This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

10. By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

11. Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

12. This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

DMLIB-#545273-v4-Real_Estate_Sale_Contract;_Tolleson__AZ;_Kmart_#3628_(Outparcel)

IN WITNESS WHEREOF, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

INVESTIGATING PARTY:

NEW    GENERATION    PROPERTIES, LLC,
a Nebraska limited liability company

By: _____
Name: _____
Title: _____

COMPANY:

KMART CORPORATION,
a Michigan corporation

By: _____
Name: _____
Title: _____

4

EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT

LEGAL DESCRIPTION

## AMENDMENT TO REAL ESTATE SALE CONTRACT
Tolleson, AZ; Kmart #3628 (Outparcel)

This Amendment to Real Estate Sale Contract (this "**Amendment**") is entered into as of December *10*, 2018, by and between **KMART CORPORATION**, a Michigan corporation ("**Seller**") and **NEW GENERATION PROPERTIES, LLC**, a Nebraska limited liability company ("**Purchaser**").

### W I T N E S S E T H :

**WHEREAS,** Seller and Purchaser entered into that certain Real Estate Sale Contract, dated as of September 28, 2018 (the "**Original Contract**", as amended hereby and as further amended, restated, or otherwise modified from time to time, the "**Contract**"), pertaining to that certain vacant property located at the northeast corner of 8701 West McDowell Road, Tolleson, Arizona (Store Number 3628), more particularly described on Exhibit A of the Original Contract; and

**WHEREAS,** Seller and Purchaser desire to amend the Original Contract as provided below.

**NOW, THEREFORE,** the parties agree as follows:

1.    <u>Defined Terms</u>. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Original Contract.

2.    <u>Amendments to the Original Contract</u>.

(a)    The term "Contract" or "this Contract" as used in the Original Contract shall hereinafter refer to the Original Contract, as hereby amended, and as the same may be further amended, restated or otherwise modified from time to time.

(b)    The following shall be added as new Subsection 5(c):

"(c)    In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)    The sale shall be authorized by and subject to that certain *Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments* (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(ii)    The applicable debtor(s) in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7)

business days' notice of the sale of the Property.  Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property.  In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other final order entered by the Bankruptcy Court specifically approving the sale of the Property."

(c)    The parties hereby acknowledge that the Due Diligence Period has expired. Subsection 6(a) is hereby deleted and replaced with the following:

"(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer within forty-five (45) days after the expiration of the notice period required by the Approval Order for the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, after entry of a final order specifically approving the sale of the Property, or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from entry of a final order specifically approving the sale of the Property."

(d)    The following shall be added to paragraph 8(e) as the new final sentence:

"The Approval Order shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract (including any affirmative obligation of Seller to cure "Monetary Liens", if any, set forth in this Contract), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer."

(e)    Subsection 9(a)(i) is hereby deleted and replaced with the following:

"(i)    Subject to the Approval Order and Section 5(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to the terms of the Approval Order."

(f)    The ultimate paragraph of Section 9 is hereby deleted and replaced with the following:

"The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall

WEIL:\96792714\8\73217.0004

be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time.  Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this <u>Section 9</u> shall merge with the transfer of title and shall not survive Closing."

3.    <u>Counterparts</u>.  This Amendment may be executed and delivered (including by facsimile transmission or in portable document format (PDF)) in one or more counterparts, each of which, when executed, shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement, with the same effect as if the signatures thereto and hereto were upon the same instrument.

4.    <u>Governing Law</u>.  This Amendment shall be governed by, and construed in accordance with, the laws of the state of New York.

5.    <u>No Modification</u>.    Except as modified by this Amendment, all of the terms, covenants, conditions and provisions of the Original Contract shall remain and continue unmodified, in full force and effect.    If and to the extent that any of the provisions of this Amendment conflict or are otherwise inconsistent with any provisions of the Original Contract, the provisions of this Amendment shall prevail.

6.    <u>Amendment</u>.  This Amendment cannot be modified in any manner except by a written agreement signed by Seller and Purchaser.

3

EXECUTION VERSION

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by or on behalf of each of the parties as of the date first written above.

**SELLER:**

KMART CORPORATION,
a Michigan corporation

By:

Name:
Title:

**Jane S. Borden**
**President – Real Estate**

**PURCHASER:**

NEW GENERATION PROPERTIES, LLC,
a Nebraska limited liability company

By:

Name: Clay F. Smith
Title: Manager

WEIL:\96792714\8\73217.0004