**Objection Deadline: February 4, 2019 at 4:00 p.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

### NOTICE OF DE MINIMIS ASSET SALE
### FOR SEARS STORE #1251 (LITHONIA, GA)

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets (the "**Assets**") to Stonecrest Resorts, LLC (the "**Purchaser**") pursuant to an agreement dated August 13, 2018 and subsequently amended (together with all amendments thereto, the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

<u>Description of the Assets</u>. The Assets consist of a parcel of land consisting of approximately 15,167 acres including any interest of the Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

roadway purposes, commonly known as 8020 Mall Parkway in the city of Lithonia, DeKalb County, Georgia.

Relationship of the Purchaser to the Debtors. The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets. The Debtors are not aware of any liens and/or encumbrances on the Assets other than those described in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 952), and the *Final Junior Dip Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (ECF No. 1436). To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale. The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code. The Purchaser has agreed to pay a purchase price of $2,750,000.00 for the Assets. The Purchase Agreement is annexed hereto as **Exhibit 1**.

Procedures to Object to the Proposed Sale. Any objection to the proposed sale (an "**Objection**") must: (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; Sunny Singh, Esq.; and Jessica Liou, Esq.), as counsel to the Debtors **on or before February 4, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

WEIL:\96866838\3\73217.0004

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets; and (iii) the DIP Agents' Counsel.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: January 24, 2019
     New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96866838\3\73217.0004

## **Exhibit 1**

**Purchase Agreement**
**Store No. 1251 (Lithonia, GA)**

# REAL ESTATE SALE CONTRACT

*Lithonia, GA – S#1251*

**THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of ~~August 13~~ , 2018 (the "**Effective Date**"), by and between **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Seller**") and **STONECREST RESORTS, LLC**, a Delaware limited liability company ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

1. **PURCHASE AND SALE**

    Seller is the owner of a parcel of land consisting of approximately 15.167 acres including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), commonly known as 8020 Mall Parkway in the City of Lithonia (the "**City**"), DeKalb County, Georgia legally described on **Exhibit "A"** attached hereto and made a part hereof , improved with a building of approximately 135,013 square feet (the "**Building**"), together with all other improvements, structures and fixtures located on the Real Property, and all rights and appurtenances pertaining to the Real Property (together with the Building, collectively, the "**Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Seller and associated with the ownership, operation or maintenance of the Real Property and Improvements, if any (collectively, the "**Personal Property**"). The Real Property, the Improvements and the Personal Property are collectively called the "**Property**". Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property for the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 7 of this Contract, Seller shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in Section 4 of this Contract).

2. **PURCHASE PRICE**

    The Purchase Price of the Property shall be Two Million Seven Hundred Fifty Thousand and No/100 Dollars ($2,750,000.00) and payable by Purchaser in United States currency in good and certifiable funds at Closing.

3. **EARNEST MONEY DEPOSIT**

    Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com ("**Title Insurer**") the sum of One Hundred Thousand and No/100 Dollars ($100,000.00) United States currency (the "**Earnest Money Deposit**") by means of a certified check, cashier's check or wire transfer, to be held by the Title Insurer in accordance with the terms of the strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the "**Earnest Money Escrow Instructions**") and also the terms and conditions of this Contract. Any escrow fees as set forth in the Earnest Money Escrow

Instructions will be paid by Purchaser.  Purchaser may elect to direct the Title Insurer to invest the Earnest Money on its behalf in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer.  The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, at the time of Closing by wire transfer of immediately available funds.  If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.    **TITLE AND SURVEY REVIEW**

(a)    Within three (3) days after the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at the address set forth in Section 14 of this Contract, at Purchaser's sole cost and expense, an updated title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") issued by Title Insurer on or after July 15, 2018.  Any exceptions to title shown on the Title Commitment to which Purchaser does not object in accordance with this Section 4(a) shall be "**Permitted Title Exceptions**".  If Purchaser objects to any exceptions to title shown in the Title Commitment or Survey (if applicable and if procured prior to the expiration of the Review Period) (the "**Unpermitted Exceptions**"), Purchaser shall give Seller written notice of such objection within ten (10) days following the date of Purchaser's receipt of the Title Commitment and the Survey (as that term is defined in this Contract) (the "**Review Period**"). If Purchaser has given notice of objection identifying Unpermitted Exceptions within the Review Period, Seller shall have ten (10) days from the date of receipt of Purchaser's notice of objection, to, at Seller's option, and at Seller's sole cost and expense, (i) have such Unpermitted Exceptions removed from the Title Commitment; or (ii) commit to having such Unpermitted Exceptions removed from the Title Policy at or prior to Closing, or (iii)  to have Title Insurer commit to insure over such Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser.  If Seller fails to commit to having such Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within five (5) days following the expiration of said ten (10) day period, to either (i) terminate this Contract (in which event the Earnest Money Deposit and any accrued interest shall be promptly returned to Purchaser), or (ii) accept title to the Property subject to such Unpermitted Exceptions.  If Purchaser fails to elect either (i) or (ii) described in the preceding sentence within such five (5) day period, Purchaser shall be deemed to have elected (ii) and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof.   Notwithstanding the foregoing, the following shall be deemed Permitted Exceptions: (r) restrictive covenants of record, (s) the standard printed exception for standby fees, taxes and assessments, (t) utility easements created by the dedication deed or plat of the subdivision in which the Property is located, (u) the standard printed exception as to waters, tidelands, beaches, streams, and related matters, (v) the standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements (Purchaser, at Purchaser's expense, may have the exception amended to read, "shortages in area"), (w) other declarations, easements and rights of way of record, (x) the Construction, Operation and Reciprocal Easement Agreement dated February 26, 2001, and (y) a mechanic's claim of lien filed by Choate Construction Company against Stonecrest Mall SPE, LLC, in the

original amount of $111,546.42, recorded July 20, 2017 in Lien Book 1908, Page 464, DeKalb County Georgia Records.  On the Closing Date, Seller shall cause the Title Insurer to issue, at Purchaser's sole cost and expense, a title policy in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject to the Permitted Title Exceptions (the "**Title Policy**").  It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before Closing.  Seller agrees to reasonably cooperate with Purchaser, at Purchaser's sole cost and expense, in satisfying any conditions required to secure said endorsements. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder. From the Effective Date through the Closing Date, Seller shall not create any encumbrances on the Property other than those listed in the Title Commitment or shown on the Survey or those that relate to real estate taxes not yet due or payable, without the prior consent of Purchaser.

(b)     No later than ten (10) days after receipt of the Title Commitment, Purchaser may, at Purchaser's sole cost and expense, order a current ALTA/NSPS land title survey, with Table A inclusions as indicated by Purchaser, of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a Georgia licensed surveyor of Purchaser's choosing, certified in a form acceptable to Purchaser, Purchaser's lender (if any), and Title Insurer (the "**Survey**").  The time required for Purchaser to obtain the Survey shall not extend or otherwise delay the time periods outlined in Section 4(a) above.

(c)     In the event the Title Commitment is updated after the expiration of Purchaser's title Review Period and such updated Title Commitment discloses new exceptions other than the Permitted Title Exceptions, and other than those which Seller has previously agreed to discharge or have Title Insurer commit to insure over, then, unless Purchaser agrees to accept title as it then is and unless Seller, at its option, agrees to have such new exceptions removed from the Title Commitment or commit to or have Title Insurer commit to having such exceptions removed from the Title Policy at or prior to Closing, Seller may, at its option, terminate this Contract, in which event, upon providing proof to Seller that Purchaser has paid in full any third parties hired by or on behalf of the Purchaser to perform any actions which could result in a lien against the Property, the Earnest Money Deposit shall be returned to Purchaser as Purchaser's sole remedy under this Contract.

**5.**     **PRORATIONS AND EXPENSES**

(a)     The following prorations, except as specifically set forth in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)     **Taxes.** All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s)

that is attributable to the Property. All prorations shall be final. Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this Section 5(a)(i) includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Purchaser without contribution from the Seller even if such rollback or deferred taxes are applicable to a period prior to Closing.

Notwithstanding the foregoing, if any tax reduction appeals or proceedings with respect to the Property relating to any period prior to the Closing are pending as of the Closing Date, Seller reserves and shall have the right to continue to prosecute and/or settle the same under Seller's direction and at Seller's sole cost and expense, provided that Seller shall be required to promptly forward copies of all notices, correspondence and filings relating to said appeal. Any refunds or savings in the payment of taxes resulting from such tax reduction appeals or proceedings applicable to taxes payable during the period prior to the Closing shall belong to and be the sole property/obligation of Seller, and any refunds or savings applicable to taxes payable after Closing shall belong to and be the sole property of Purchaser. This provision shall survive Closing.

(ii)    **Utilities.** Utilities and operating expenses relating to the Property for any open billing due and owing through the Closing Date (to the extent not the responsibility of a tenant, if any) shall be paid by Seller. Such utilities and operating expenses that cannot be determined with specificity as of Closing shall be estimated and re-prorated after Closing when the cost of such item is determined. This provision shall survive Closing.

(iii)    **Miscellaneous.** If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing. All prorations shall be final except as specifically provided in Section 5(a)(i), or 5(a)(ii) above.

(b)    At Closing, Seller shall pay one-half (1/2) of the cost of the Closing Escrow and one-half (1/2) of the amount of any stamp or transfer tax imposed by the City and any county ordinance, and the State of Georgia. At Closing, Purchaser shall pay (i) one half (1/2) of the cost of the Closing Escrow; (ii) the cost of obtaining the Survey; (iii) the cost of the Title Commitment, (iv) Title Commitment search and exam fees, if any; (v) Owner's Title Policy and the cost of any endorsements to the Title Policy; (vi) the cost of the Purchaser's Studies; (vii) any costs related to any inspections by the City and repairs necessitated by the City inspection ("**City Repairs**"), if any, and shall meet any other requirements as established by the City ordinance with regard to the transfer of real estate; (viii) one-half (1/2) the amount of any stamp or transfer tax imposed by the City and any county ordinance, and the State of Georgia and shall meet any other requirements as established by the City ordinance with regard to the City transfer tax and the amount of any stamp or transfer tax imposed by county ordinance or State of Georgia statute on the transfer of title; all financing related fees; and (ix) all recording charges for the Deed and all documents pertaining to any purchase money financing. All closing

costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable equally by the Parties at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.   **CONDITIONS TO CLOSING**

(a)   In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to close on Purchaser's purchase of the Property is subject to each and all of the following conditions precedent:

    (i)   All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of the Purchaser's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Purchaser shall thereupon have a reasonable period to cure any purported breach of its representations and warranties; and

    (ii)   All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Purchaser as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Seller may, after written notice to Purchaser and Purchaser's failure to cure within the time period(s) set forth in this Contract, elect at any time thereafter, to terminate this Contract upon ten (10) days written notice to Purchaser, provided that Seller is not itself in default beyond any applicable notice and cure period, and exercise such remedies as provided in Section 13 of this Contract. If Seller elects to provide Purchaser with notice of termination, Purchaser may nullify Seller's election by satisfying the obligation within ten (10) days of receipt of Seller's notice, in which event this Contract shall remain in full force and effect.

(b)   In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent:

    (i)   All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Seller shall thereupon have a reasonable period to cure any purported breach of its representations and warranties.

    (ii)   All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed.

    (iii)   On the Closing Date, there shall not exist any encumbrance or title defect affecting the Property not included within the Permitted Title Exceptions, if any,

or that is not released at Closing, and title shall be conveyed in accordance with the requirements in this Contract.

(iv)    The Property shall be in substantially the same condition as exists as of the Effective Date of this Contract, ordinary wear and tear, casualty and restoration excepted.

(v)    Seller shall maintain the Property in the ordinary course of business consistent with past practice, pay all taxes, assessments, fines, penalties, charges and other operating expenses, and shall make all repairs, maintenance and replacements as necessary and otherwise operate the Property in its ordinary and customary manner, and otherwise in the same manner as before the Effective Date of this Contract, as same as though Seller were retaining the Property. Seller shall not make any alterations to the Property without the prior written consent of Purchaser.

(vi)    Seller shall not enter into any agreement, lease, or contract with respect to the Property which is not terminable with respect to the Property on or before the Closing Date (without premium or penalty).

(vii)    Seller shall maintain its existing corporate insurance program until the Closing Date.

If any of the conditions set forth in this Section 6(b) are not satisfied by the Closing Date, or waived by Purchaser, in Purchaser's sole discretion, to be exercised by written notice to Seller on or before the Closing Date, Purchaser may either (a) terminate this Contract, in which event the Earnest Money Deposit and any accrued interest shall be returned to Purchaser and this Contract shall become null and void, and neither party shall have any further rights or obligations hereunder except for those provisions which survive termination of this Contract, or (b) allow the Seller an opportunity to satisfy any unsatisfied condition, provided, however, that if such condition is not satisfied within fifteen (15) days of Purchaser's notice to Seller, then clause (a) of this sentence shall apply.

7.    **CLOSING**

(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the **"Closing"**) shall take place at the downtown Chicago, Illinois office of Title Insurer within ten (10) days after the satisfaction or waiver of the later to occur of the Due Diligence Expiration Date or such other date mutually agreed to by Purchaser and Seller (the **"Closing Date"**).

(b)    On or before the Closing Date, Seller shall deliver or cause to be delivered to the Title Insurer the following Closing documents:

(i)    A Special Warranty Deed executed in proper form for recording so as to convey the title required by this Contract (the **"Deed"**) to Purchaser, subject to the Permitted Title Exceptions and Reservation;

(ii)     A FIRPTA Affidavit or Certificate of Non-Foreign Status in customary form duly executed by Seller;

(iii)    Seller shall execute a Bill of Sale transferring all of Seller's right, title and interest in the Personal Property ("**Bill of Sale**");

(iv)    If applicable, Seller shall execute an assignment of documents of record transferring all of Seller's right, title and interest in any documents of record ("**Assignment and Assumption Agreement**");

(v)     The Title Policy (or Title Policy Pro Forma);

(vi)    Such other instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the city, county and state where the Property is located.

(vii)   All keys, combinations to lockbox containing keys, and security codes for all locks and security devices on the Property.

(c)    On the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

(i)     Balance of the Purchase Price, plus or minus prorations;

(ii)    The counterpart to the Bill of Sale;

(iii)   The counterpart to the Assignment and Assumption Agreement; and

(iv)    Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the city, county and state where the Property is located.

(d)    On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and state, county and municipal transfer tax declarations and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

**8.     CLOSING ESCROW**

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control. All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective

attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

9.    **DUE DILIGENCE**

(a)    Purchaser's agents, employees and independent contractors shall have the right and privilege to enter upon the Property from and after the Effective Date to survey and inspect the Property, including, but not limited to, the right to (i) review of the utility capacity for the Property, (ii) review the location of utilities, (iii) conduct an environmental assessment and (iv) conduct other tests and/or studies as Purchaser may deem desirable, provided that Purchaser and Seller first enter into the appropriate agreements granting access to the Property, as described below (collectively, **"Purchaser's Studies"**), all of which Purchaser's Studies shall be at Purchaser's sole cost and expense. Prior to Purchaser or any agent, employee or independent contractor of Purchaser entering onto the Property to perform any inspections or tests, Purchaser shall enter into a "**Non-Invasive Inspection Agreement**" attached hereto as **Exhibit "C"** and incorporated into this Contract by this reference. Invasive testing is not permitted unless: (x) the results of the non-invasive inspections indicate invasive testing is needed, and (y) a "**Phase II Access License**" attached hereto as **Exhibit "D"** between Seller and Purchaser with Purchaser's proposed scope of work, approved by Seller in its sole discretion, attached thereto. Copies of all of Purchaser's Studies shall be furnished to Seller promptly upon receipt thereof by Purchaser. Purchaser agrees not to disclose Purchaser's Studies or their results to any other persons or entities, other than its employees, agents, attorneys, brokers, contractors, accountants, potential lenders, potential co-investors in which such potential co-investor has an actual majority ownership interest or has at least co-control over Purchaser, or other parties assisting Purchaser with the transaction contemplated hereby (collectively "**Representatives**"), without the Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, or unless Purchaser is required by law to disclose such information. Prior to entering onto the Property, Purchaser and any contractor or consultant engaged by Purchaser shall deliver to Seller certificates of insurance as required by the Non-Invasive Inspection Agreement and/or Phase II Access License, as applicable. Purchaser's obligations under this Contract are subject to and conditioned upon Purchaser's investigation and study of the Property and reasonable satisfaction with such aspects thereof deemed relevant by Purchaser. Purchaser shall have forty five (45) days from the Effective Date (the "**Due Diligence Period**") in which to make Purchaser's Studies with respect to the Property, provided, however, that the Due Diligence Period shall be extended for a period of one (1) additional day for each additional day past the timeframe set out in Section 4(a) of this Contract that it takes Seller to deliver the Title Commitment. All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date. In the event Purchaser in its sole discretion shall conclude that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given prior to the expiration of the Due Diligence Period, to terminate this Contract and this Contract thereupon shall be deemed to be terminated and both Parties shall be released from any further liability hereunder. If Purchaser does give such notice of termination to Seller, upon providing proof to Seller that Purchaser has paid in full any third parties hired by or on behalf of the Purchaser to

perform any actions which could result in a lien against the Property, the Earnest Money Deposit, including any interest earned,  shall be delivered to Purchaser and the Parties shall have no further obligation hereunder.  If Purchaser fails to give such notice of termination to Seller as provided in this Section 9(a) and subject to the terms and provisions of Section 9(b) below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) except as otherwise provided in this Contract, Purchaser agrees to accept the Property "**AS IS**" "**WHERE IS**" "**WITH ALL FAULTS CONDITION**" and to release, defend, hold harmless, and indemnify Seller from the Closing Date, for all costs and expenses resulting from any claim, demand, liability or loss relating to the condition of the Property including but not limited to the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur.  If Purchaser does not terminate the Contract in accordance with this Section 9(a), the Earnest Money Deposit shall be non-refundable to the Purchaser but shall be credited towards the Purchase Price at Closing.  Purchaser hereby covenants and agrees to defend, indemnify and hold harmless Seller and its respective officers, directors, employees, agents, representatives acting or purporting to act on behalf of Seller, beneficiaries, attorneys, subsidiaries, affiliates, partner, contractors, subcontractors, successors and assigns ("**Seller's Related Parties**"), from and against any and all loss, liability, cost, claim, demand, damage, lien, penalty, fine, interest and expense (collectively. "**Claims**") arising out of or in any manner related to the exercise by Purchaser of its rights under this Section 9, unless such Claim is a result of the gross negligence or willful misconduct of Seller, its agents, contractors or employees.  If this transaction does not close, Purchaser shall, at its sole cost and expense, restore the Property to the condition required in the Non-Invasive Inspection Agreement or Phase II Access License, as applicable.  Notwithstanding anything to the contrary contained in this Contract, the terms, provisions, conditions and indemnifications of this Section 9(a) shall survive Closing and the delivery of the Deed or the termination of this Contract without further need to document such agreement.

(b)    Within five (5) business days after the Effective Date, Seller shall provide to Purchaser the following to the extent such documents exist and are in the possession and control of Seller at its corporate office in Hoffman Estates, IL  as of the date of this Contract:

  (i)    Current tax assessment statements and copies of the most recent tax bills for the Property.

  (ii)   Copies of any surveys affecting the Property.

Purchaser acknowledges that Seller has provided to Purchaser the following: (x) a copy of that certain Phase I report dated September 25, 2000 prepared by ENSR, (y) a copy of that certain Phase II report dated November 9, 2000 prepared by ENSR and (x) as-built architectural and civil drawings with respect to the Building.

In the event this Contract is terminated, all materials provided by Seller to Purchaser, whether provided to Purchaser before or after the Effective Date, shall be promptly returned by Purchaser to Seller at no cost to Seller (the "**Due Diligence Materials**"). SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING THE ACCURACY OR COMPLETENESS OF THE DUE DILIGENCE MATERIALS OR THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME.

10. **REPRESENTATIONS AND WARRANTIES**

(a)     Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)     Seller has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto.

(ii)     To Seller's actual knowledge, the execution and delivery by Seller of this Contract and the performance by Seller of its obligations hereunder will not result in breach of any terms of provisions of or constitute a default under any agreement to which Seller is a party or by which Seller or the Property or any portion thereof is bound, and will not constitute a violation of any law, regulation, ordinance, order, judgment, writ, injunction or decree (collectively, "**Laws**") applicable to Seller or the Property.

(iii)     To Seller's actual knowledge, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property that are not disclosed on the Title Commitment and/or Title Policy.

(iv)     Seller has good and marketable title to the Real Property and the Improvements.

(v)     To Seller's actual knowledge, Seller has not received a notice of violation of applicable environmental laws.

(vi)     There is no action, suit or proceeding pending against Seller, the Property or any portion thereof in any court or before or by any federal, state or municipal body or authority having jurisdiction over Seller or any portion of the Property.

(vii)     Seller has not received written notice of, and does not otherwise have actual knowledge of, any pending or threatened condemnation or eminent domain proceedings (or proceedings in lieu thereof) affecting the Property or any portion thereof.

(viii)     To Seller's actual knowledge, Seller has not received notice of any violation of any law or regulation concerning the Property which is uncured as of the date hereof.

(ix)     To Seller's actual knowledge, Seller has not received a notice of violation of applicable federal, state, county, municipal or other government standards, laws, ordinances, statutes, regulations and requirements.

(x)     As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of Seller's signatory hereof and shall not be construed to refer to the knowledge of any other officers, directors, employees, agents, representatives, beneficiaries, attorneys,

subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)  Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)  Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.  Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)  Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)  This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)  As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors (**"Bankruptcy Law"**) a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a **"Custodian"**) of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)  Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder.  All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time.  Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall not merge with the transfer of title but shall survive Closing for a period of one (1) year. Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown. Purchaser's sole remedy shall be an action at law for actual damages, which must be commenced, if at all, on or before the first day following the second (2nd) anniversary of the Closing Date. The

cumulative, maximum amount of liability that Seller shall have to Purchaser, in the aggregate, for breaches of the representations and warranties under this Agreement shall not exceed $125,000.00.

**11.**   **AS IS/NO WARRANTIES**

    (a)    Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property without warranty or representation of any kind by Seller or any of Seller's Related Parties, including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Contract, the term "**Hazardous Material**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and Seller's Related Parties, with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

    (b)    Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", with regard to the physical condition of the Property, and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller, except for those representations and warranties expressly set forth in this Contract.   Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 10 of this Contract:

        (i)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

        (ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)    Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Property is located; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with respect to the physical condition of the Property.

(c)    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(A) AND 11(B), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, OR (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Seller's Related Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser shall rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

12.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the **"Code"**), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

13.    **DEFAULT AND REMEDIES**

If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of notice of such default, for any reason other than Purchaser's default hereunder and failure to diligently complete or cure Purchaser shall have as its sole and exclusive remedies the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Contract shall be terminated and of no further force or effect except as provided for in this Contract.  If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default, for any reason other than Seller's default hereunder, Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall become null and void with neither Party having any further rights or liabilities hereunder, except as provided for in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

14.    **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

| | |
|---|---|
| **To Seller:** | **SEARS, ROEBUCK AND CO.**<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Attn: SVP and President, Real Estate<br>Department 824RE |
| **With copies to:** | **SEARS, ROEBUCK AND CO.**<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Attn:  Associate General Counsel, Real Estate<br>Department 824RE |

| To Purchaser: | **STONECREST RESORTS, LLC** |
| | 111 East Wacker Drive, Suite 2400 |
| | Chicago, IL 60601 |
| | 312.915.3232 Office Phone |
| | 312.479.1702 Cell Phone |
| | Cdelasin@urbanretail.com |
| | |
| With copies to: | Steve Cicci |
| | 5112 West Taft Rd., Ste. M |
| | Liverpool, NY 13088 |
| | Phone: (315) 452-2000 x4006 |
| | E-mail: scicci@summitcrg.com |

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 14.

**15.    ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

**16.    FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

**17.    SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing.  Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

**18.    CONFIDENTIALITY**

Purchaser agrees that all terms of this Contract as well as any information provided to Purchaser pertaining to Seller (the "**Confidential Information**") will remain confidential and will not be divulged by Purchaser without the written consent of Seller, except that Purchaser may disclose the Confidential Information without Seller's consent to the Representatives, and to any agency (governmental or public) in connection with Purchaser's pursuit of any entitlements and/or approvals deemed by Purchaser to be necessary for construction of the Property, so long as the confidentiality obligations of Purchaser are binding upon all of the foregoing and Purchaser informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this Section 18.  Notwithstanding anything contained in this Contract to the contrary, the obligation of

confidentiality does not apply to (a) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 18 or breach of confidentiality by anyone bound under like terms of confidentiality to the Party making such public disclosure, (b) Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. If Purchaser seeks Seller's consent to the disclosure of the Confidential Information, Seller shall not unreasonably withhold its consent. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Contract or its terms will be provided to any third party not subject to the same confidentiality obligation as Purchaser. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 18, in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Contract to the contrary, Purchaser may divulge Confidential Information without Seller's consent to any proposed institutional mortgagee or proposed co-investor, provided such potential co-investor has an actual majority ownership interest or has at least co-control over Purchaser, in connection with any financing by Purchaser of the Property (who, in turn, may disclose the Confidential Information to its officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing). The terms of this Section shall expire on the earlier of (i) the Closing Date or (ii) 1 year after the Effective Date.

19.    **BROKERAGE**

Each party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction. Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party.

20.    **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser or Purchaser's principal has a majority ownership interest or has at least co-control over provided that written notice of such assignment or transfer is delivered to Seller at least ten (10) business days prior to Closing. No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

21.    **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any rights hereunder. This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

22.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an **"Action"**), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.  The term "prevailing party" as used in this Section 22 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled.  In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.  It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24.    **GOVERNING LAW**

This Contract shall be construed and governed in accordance with the laws of the State of Georgia without regard to its conflicts of laws principles.

25.    **COUNTERPARTS**

This Contract may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.  Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Contract.  The parties agree that the Purchaser shall be the first to execute this Contract.

26.    **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may only assign this Contract in accordance with the provisions of Section 20 of this Contract.

27.    **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract.  Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28. **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State of Georgia are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of Georgia are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State of Georgia are authorized or required to be closed.

29. **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30. **SECTION 1031 EXCHANGE**

At Seller's option, Purchaser agrees to cooperate with Seller in closing the sale of the Property as a like-kind exchange under Section 1031 of the Internal Revenue Code (the "**Code**"), provided such cooperation is at no additional cost to Purchaser. Such cooperation shall include, without limitation, the substitution by Seller of an intermediary (the "**Intermediary**") to act in place of Seller as the Seller of the Property. If Seller so elects, Purchaser agrees to accept the Property and all other required performance from the Intermediary and to render Purchaser's performance of all of its obligations hereunder to the Intermediary. Purchaser agrees that performance by the Intermediary shall be deemed performance by Seller and Seller agrees that Purchaser's performance to the Intermediary shall be deemed as performance to Seller. Notwithstanding the foregoing, Seller shall remain liable to Purchaser for each and every one of the representations, warranties, indemnities and obligations of Seller under this Contract and Purchaser may proceed directly against Seller without the need to join the Intermediary as a party to any action against Seller.

At Purchaser's option, Seller agrees to cooperate with Purchaser in closing the sale of the Property as a like-kind exchange under Section 1031 of the Code, provided such cooperation is at no additional cost to Seller. Such cooperation shall include, without limitation, the substitution by Purchaser of an Intermediary to act in place of Purchaser as the Purchaser of the Real Property. If Purchaser so elects, Seller agrees to accept the Property and all other required performance from the Intermediary and to render Seller's performance of all of its obligations hereunder to the Intermediary. Seller agrees that performance by the Intermediary shall be deemed performance by Purchaser and Purchaser agrees that Seller's performance to the Intermediary shall be deemed as performance to Purchaser. Notwithstanding the foregoing, Purchaser shall remain liable to Seller for each and every one of the representations, warranties, indemnities and obligations of Purchaser under this Contract and Seller may proceed directly against Purchaser without the need to join the Intermediary as a party to any action against Purchaser.

31. **CONDEMNATION AND CASUALTY**

In the event of any taking, or notice is given of the intention to take, the Real Property by the exercise of the power of eminent domain of all or a substantial portion of the Real Property prior to the Closing Date, such portion as would materially impair or otherwise materially affect Purchaser's intended use of the Real Property will be deemed "substantial," Purchaser shall have

the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Earnest Money Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.

If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof. If the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Purchaser may elect, by written notice delivered to Seller within thirty (30) days after Seller's written notice to Purchaser, to:

(a)     Terminate this Contract by written notice to Seller, in which event this Contract shall become null and void and thereafter neither party shall have any liability or obligation to the other except that the Earnest Money Deposit shall be refunded or returned to Purchaser; or

(b)     Notify Seller that it desires to take title to the Property in its damaged condition, in which event the cost to repair the damage, up to a maximum amount of One Hundred Fifty Thousand Dollars ($150,000.00), shall be credited against the Purchase Price at Closing. All risks of loss to the Property are borne by Seller prior to Closing.

If Closing is scheduled to occur within the thirty (30) day period, the Closing Date shall be rescheduled to ten (10) days after the expiration of said thirty (30) day period.

## 32.    SECTION HEADINGS

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

## 33.    INTERPRETATION

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

## 34.    JURY TRIAL

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

## 35.    AMENDMENTS

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in

writing and executed by each Party hereto.  However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

**36.**    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller.  The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

**37.**    **PATRIOT ACT**

Seller certifies that its name is **SEARS, ROEBUCK AND CO.**, a New York corporation, and to Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.  Purchaser certifies that its name is **STONECREST RESORTS, LLC**, a Delaware limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

**38.**    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract.  Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages.   The provisions of this Section 38 shall survive the expiration of the term or any earlier termination of this Contract.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _JoAnn Catanese_
Name: JoAnn Catanese
Its: ~~Divisional Vice President, Real Estate~~

REAL ESTATE
LEGAL

**PURCHASER:**

**STONECREST RESORTS, LLC,**
a Delaware limited liability company

By: _____
Name: Craig Delasin
Its: Manager

## EXHIBITS

Exhibit "A"  Legal Description
Exhibit "B"  Earnest Money Escrow Instructions
Exhibit "C"-  Non-Invasive Inspection Agreement
Exhibit "D" – Phase II License

## EXHIBIT "A"

### LEGAL DESCRIPTION OF PROPERTY

[LEGAL DESCRIPTION]

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 170, 16th District, DeKalb County, Georgia, and being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING, commence at northeastern end of the mitered intersection of the Northerly right of way line of Mall Parkway (100-foot right of way) and the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following five (5) courses and distances: (1) North 00 degrees 19 minutes 17 seconds East a distance of 196.09 feet to a point, (2) North 00 degrees 37 minutes 30 seconds West a distance of 1574.92 feet to a point, (3) North 89 degrees 22 minutes 30 seconds East a distance of 7.89 feet to a point, (4) along a curve to the left on arc distance of 24.49 feet (said arc being subtended by a chord bearing North 00 degrees 37 minutes 36 seconds West a chord distance of 24.49 feet and having a radius of 3908.15 feet) to a point, and (5) along a curve an arc distance of 90.63 feet (said arc being subtended by a chord bearing North 01 degree 28 minutes 14 seconds West a chord distance of 90.63 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; FROM THE TRUE POINT OF BEGINNING AS THUS ESTABLISHED, leaving said westerly right of way line, run thence South 87 degrees 51 minutes 56 seconds West a distance of 86.69 feet to a point; run thence along a curve to the right an arc distance of 409.79 feet (said arc being subtended by a chord bearing North 68 degrees 17 minutes 55 seconds West a chord distance of 401.95 feet and having a radius of 603.11 feet) to a point; run thence North 48 degrees 50 minutes 02 seconds West a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 511.30 feet (said arc being subtended by a chord bearing North 73 degrees 07 minutes 14 seconds West a chord distance of 496.12 feet and having a radius of 603.11 feet) to a point; run thence North 01 degree 43 minutes 47 seconds West a distance of 100.83 feet to a point; run thence along a curve to the left an arc distance of 399.66 feet (said arc being subtended by a chord bearing North 15 degrees 52 minutes 25 seconds West a chord distance of 395.61 (feet and having a radius of 809.50 feet) to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 262.32 feet to a point; run thence along a curve to the left an arc distance of 376.45 feet (said arc being subtended by a chord bearing North 45 degrees 10 minutes 48 seconds West a chord distance of 372.05 feet and having a radius of 709.50 feet) to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 560.12 feet to a point; run thence South 07 degrees 30 minutes 00 seconds East a distance of 52.80 feet to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 35.36 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 28.75 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 60.00 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 273.86 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 53.33 feet to a point; run thence North 69 degrees 22 minutes 30 seconds West a distance of 21.82 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 55.28 feet to a point; run thence North 75 degrees 00 minutes 00 seconds West a distance of 80.40 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 63.00 feet to a point; run thence North 60 degrees 00 minutes 00 seconds East a distance of 60.00 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 572.77 feet to a point; run thence along a curve to the right an arc distance of 249.74 feet (said arc being subtended by a chord bearing North 88 degrees 26 minutes 28 seconds East a distance of 248.42 feet and having a radius of 700.00 feet) to a point; run thence South 81 degrees 20 minutes 18 seconds East a distance of 491.88 feet to a point; run thence along a curve to the right an arc distance of 234.39 feet (said arc being

EXHIBIT B- 1

subtended by a chord bearing South 71 degrees 44 minutes 44 seconds East a chord distance of 233.30 feet and having a radius of 700.00 feet) to a point; run thence South 62 degrees 09 minutes 11 seconds East a distance of 70.01 feet to a point; run thence North 37 degrees 55 minutes 46 seconds East a distance of 135.88 feet to a point on the southerly right of way line of Interstate 20; run thence along said southerly right of way line the following two (2) courses and distances; (1) South 77 degrees 49 minutes 48 seconds East a distance of 318.42 feet to a point and (2) South 72 degrees 38 minutes 36 seconds East a distance of 88.28 feet to a point; leaving said southerly right of way line, run thence South 15 degrees 48 minutes 15 seconds West a distance of 257.69 feet to a point; run thence South 60 degrees 00 minutes 00 seconds West a distance of 108.38 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 35.36 feet to a point; run thence South 30 degrees 00 minutes 00 seconds East a distance of 211.47 feet to a point; run thence along a curve to the right an arc distance of 415.58 feet (said arc being subtended by a chord bearing South 15 degrees 59 minutes 36 seconds East a chord distance of 411.46 feet and having a radius of 850.00 feet) to a point; run thence North 88 degrees 00 minutes 47 seconds East a distance of 17.99 feet to a point; run thence along a curve to the left an arc distance of 83.66 feet (said arc being subtended by a chord bearing South 47 degrees 04 minutes 22 seconds East a chord distance of 77.04 feet and having a radius of 60.00 feet) to a point; run thence along a curve to the right an arc distance of 435.24 feet (said arc being subtended by a chord bearing South 67 degrees 55 minutes 31 seconds East a chord distance of 427.23 feet and having a radius of 653.11 feet) to a point; run thence South 48 degrees 50 minutes 02 seconds East a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 392.04 feet (said arc being subtended by a chord bearing South 69 degrees 08 minutes 19 seconds East a chord distance of 383.88 feet and having a radius of 553.11 feet) to a point; run thence along a curve to the left an arc distance of 96.45 feet (said arc being subtended by a chord bearing North 44 degrees 53 minutes 09 seconds East a chord distance of 86.56 feet and having a radius of 60.50 feet) to a point: run thence North 86 degrees 53 minutes 52 seconds East a distance of 2.10 feet to a point on the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following two (2) courses and distances; (1) South 03 degrees 06 minutes 08 seconds East a distance of 41.90 feet to a point and (2) run thence along a curve an arc distance of 66.01 feet (said arc being subtended by a chord bearing South 02 degrees 37 minutes 08 seconds East a chord distance of 66.01 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; shown as "Sears" and containing 15.167 acres on that certain plat of survey entitled "ALTA/ACSM Land Title Survey for Stonecrest Mall, LLC"-, prepared by Development Consultants Group, bearing the seal and certification of Donald G. Holland. Georgia Registered Land Surveyor No. 2637, dated October 10, 2000, last revised February 7, 2001.

TOGETHER WITH and benefiting the subject property, the easement created by that certain Declaration of Surface and Storm Water Drainage Easements by DeKalb Center Associates, a Georgia limited partnership, dated May 13, 1986, filed for record May 14, 1986 at 9:33 a.m., recorded in Deed Book 5470, Page 3905486, Page 5116421, Page 2716629, Page 189, Records of DeKalb County, Georgia; as amended by that certain First Amendment to Declaration of Surface and Storm Water Drainage Easement by and between DeKalb Center Associates, a Georgia limited partnership and JDN Associates, Ltd., Turner Hill Road, a Georgia limited partnership, dated May 2, 1986, filed for record June 4, 1986 at 8:57 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Second Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership and Atlanta East Mall Limited Partnership, a Georgia limited partnership dated February 28, 1989, filed for record May 2, 1989 at 10:12 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Third Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership, Lewis G. Abbott, Betty L. Abbott, Pat Abbott, as Executrix of the Estate of Robert G. Abbott, and Joseph Abbott as Executor of Joseph Ernest Abbott, dated November 13, 1989, filed for record January 31, 1990 at 8:30 a.m., recorded in Deed Book , aforesaid Records.

EXHIBIT B- 2

## EXHIBIT "B"

## EARNEST MONEY ESCROW INSTRUCTIONS

(please see attached)



# CHICAGO TITLE AND TRUST COMPANY

## 10 S. LASALLE, STE 3100, CHICAGO, IL 60603

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

<u>STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)</u>

ESCROW TRUST NO:                                                                 DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

<u>Customer Identification:</u>

Seller:  Sears, Roebuck and Co.

Purchaser:  Stonecrest Resorts, LLC

**Property Address:** 8020 Mall Parkway in the City of Lithonia, DeKalb County, Georgia

Project Reference:  Lithonia, GA – S#1251

Proposed Disbursement Date:

<u>Deposits:</u>

| | | | |
|---|---|---|---|
| 1. The sum of $100,000.00<br>INITIAL EARNEST MONEY | by | CHECK/WIRE | Representing: |
| 2. The sum of $<br>(Additional) | by | CHECK/WIRE | Representing: |

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

<u>Funds:</u>

( ) WILL    ( X ) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

<u>Delivery of Deposits:</u>

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

EXHIBIT B- 4

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.
The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement.  Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

EXHIBIT B- 5

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the
undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Agent is unsure as to its duties as a result, Escrow Agent may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Agent may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Agent for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, (i) where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, or (ii) where Seller has defaulted by filing a petition seeking an assignment for the benefit of creditors or has defaulted by filing a petition for liquidation or dissolution or similar relief under the United States Bankruptcy Code, then upon the delivery to Escrow Agent of commercially reasonable documentation evidencing the same, Escrow agent shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person.  Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

EXHIBIT B- 6

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

| For Seller: | For Purchaser: |
|---|---|
| Name: Sears, Roebuck and Co. | Name: Stonecrest Resorts, LLC |
| By:_____ | By:_____ |
| Name:_____ | Name: Craig Delasin |
| Its:_____ | Its: Manager |
| Address: | Address: |
| Phone: | Phone: |
| Fax: | Fax: |
| Email: | Email: |
| Legal Representative: | Legal Representative: |
| Name: | Name: |
| By: | By: |
| Address: | Address: |
| Phone: | Phone: |
| Fax: | Fax: |
| Email: | Email: |
| Signature: | Signature: |

Accepted: Chicago Title and Trust Company, as Escrow Trustee

By:                                              Date:

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

EXHIBIT B- 7

## EXHIBIT "C"

## NON-INVASIVE INSPECTION AGREEMENT

(please see attached)

EXHIBIT C

## NON-INVASIVE INSPECTION AGREEMENT
*Lithonia, GA – S#1251*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _____ day of _____, 2018 ("**Effective Date**"), by and between **STONECREST RESORTS, LLC**, a Delaware limited liability company ("**Investigating Party**"), and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Company**") in connection with site investigation and site assessment work to be performed on the property controlled by Company located at 8020 Mall Parkway in the City of Lithonia (the "**City**"), DeKalb County, Georgia (the "**Property**"), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

## RECITALS:

A.       Company desires to sell the Property to Investigating Party;

B.       Investigating Party desires to buy the Property from Company;

C.       Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

D.       Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.       Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.       The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall walk the Property and inspect the roof, structure, all heating and cooling systems and any other mechanical equipment situated on the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**Site Assessment Work**"). Invasive testing, including but not limited to borings, asbestos samplings, or any Phase II Environmental Assessment ("**Invasive Testing**"), may be performed at the Property subject to (i) Company's prior written approval of such Invasive Testing, which approval shall be at the reasonable discretion of the Company; and (ii) Investigating Party's execution of and agreement to abide by a Phase II Access License.  If Company elects to have its representative present during the Site Assessment Work and/or Invasive Testing, if any, and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment Work and/or Invasive Testing as the case may be, shall be performed only in the presence of the Company's local manager or any other such person assigned by Company.  Investigating Party shall not: (i) take photographs of store contents or any items owned or sold by Company; or (ii) perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's reasonable discretion.  In the event that Investigating Party engages in activity outside of or beyond the Site Assessment Work including but not limited to Invasive Testing, except if such Invasive Testing is performed under the conditions set forth in a

1

fully executed Phase II Access Agreement ("**Unauthorized Activity**").  Provided further, that in the event Investigating Party engages in Unauthorized Activity, Company shall have the right to terminate access to the Property for such Unauthorized Activity. Investigating Party, at its sole cost and expense, shall promptly restore the Property to the condition it was in prior to the Unauthorized Activity.

3.    This Agreement shall terminate upon the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) 45 days from the Effective Date, in each such event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

4.    Within seven (7) days after receipt by Investigating Party, Investigating Party agrees to provide Company with all test results and reports, including all correspondence and draft reports prepared in connection with the Site Assessment Work. This provision shall survive the termination of this Agreement.

5.    Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable.   The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

6.    Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement.  This indemnity shall survive the termination of this Agreement.

7.    Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

     (i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

     (ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

     (iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising

2

injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

(iv)   Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

(v)    Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8.    Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.    If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10.   This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11.   By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12.   Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

13.   This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

3

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

INVESTIGATING PARTY:

**STONECREST RESORTS, LLC,**
a  Delaware  limited  liability  company

By: _____

Name:  **Craig Delasin**
Title:  **Manager**

COMPANY:

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
Name: _____
Title: _____

4

## EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT

### LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 170, 16th District, DeKalb County, Georgia, and being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING, commence at northeastern end of the mitered intersection of the Northerly right of way line of Mall Parkway (100-foot right of way) and the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following five (5) courses and distances: (1) North 00 degrees 19 minutes 17 seconds East a distance of 196.09 feet to a point, (2) North 00 degrees 37 minutes 30 seconds West a distance of 1574.92 feet to a point, (3) North 89 degrees 22 minutes 30 seconds East a distance of 7.89 feet to a point, (4) along a curve to the left on arc distance of 24.49 feet (said arc being subtended by a chord bearing North 00 degrees 37 minutes 36 seconds West a chord distance of 24.49 feet and having a radius of 3908.15 feet) to a point, and (5) along a curve an arc distance of 90.63 feet (said arc being subtended by a chord bearing North 01 degree 28 minutes 14 seconds West a chord distance of 90.63 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; FROM THE TRUE POINT OF BEGINNING AS THUS ESTABLISHED, leaving said westerly right of way line, run thence South 87 degrees 51 minutes 56 seconds West a distance of 86.69 feet to a point; run thence along a curve to the right an arc distance of 409.79 feet (said arc being subtended by a chord bearing North 68 degrees 17 minutes 55 seconds West a chord distance of 401.95 feet and having a radius of 603.11 feet) to a point; run thence North 48 degrees 50 minutes 02 seconds West a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 511.30 feet (said arc being subtended by a chord bearing North 73 degrees 07 minutes 14 seconds West a chord distance of 496.12 feet and having a radius of 603.11 feet) to a point; run thence North 01 degree 43 minutes 47 seconds West a distance of 100.83 feet to a point; run thence along a curve to the left an arc distance of 399.66 feet (said arc being subtended by a chord bearing North 15 degrees 52 minutes 25 seconds West a chord distance of 395.61 (feet and having a radius of 809.50 feet) to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 262.32 feet to a point; run thence along a curve to the left an arc distance of 376.45 feet (said arc being subtended by a chord bearing North 45 degrees 10 minutes 48 seconds West a chord distance of 372.05 feet and having a radius of 709.50 feet) to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 560.12 feet to a point; run thence South 07 degrees 30 minutes 00 seconds East a distance of 52.80 feet to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 35.36 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 28.75 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 60.00 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 273.86 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 53.33 feet to a point; run thence North 69 degrees 22 minutes 30 seconds West a distance of 21.82 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 55.28 feet to a point; run thence North 75 degrees 00 minutes 00 seconds West a distance of 80.40 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 63.00 feet to a point; run thence North 60 degrees 00 minutes 00 seconds East a distance of 60.00 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 572.77 feet to a point; run thence along a curve to the right an arc distance of 249.74 feet (said arc being subtended by a chord bearing North 88 degrees 26 minutes 28 seconds East a distance of 248.42 feet and having a radius of 700.00 feet) to a point; run thence South 81 degrees 20 minutes 18 seconds East a distance of 491.88 feet to a point; run thence along a curve to the right an arc distance of 234.39 feet (said arc being subtended by a chord bearing South 71 degrees 44 minutes 44 seconds East a chord distance of 233.30 feet and having a radius of 700.00 feet) to a point; run thence South 62 degrees 09 minutes 11 seconds East a distance of 70.01 feet to a point; run thence North 37 degrees 55 minutes 46 seconds East a

5

distance of 135.88 feet to a point on the southerly right of way line of Interstate 20; run thence along said southerly right of way line the following two (2) courses and distances; (1) South 77 degrees 49 minutes 48 seconds East a distance of 318.42 feet to a point and (2) South 72 degrees 38 minutes 36 seconds East a distance of 88.28 feet to a point; leaving said southerly right of way line, run thence South 15 degrees 48 minutes 15 seconds West a distance of 257.69 feet to a point; run thence South 60 degrees 00 minutes 00 seconds West a distance of 108.38 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 35.36 feet to a point; run thence South 30 degrees 00 minutes 00 seconds East a distance of 211.47 feet to a point; run thence along a curve to the right an arc distance of 415.58 feet (said arc being subtended by a chord bearing South 15 degrees 59 minutes 36 seconds East a chord distance of 411.46 feet and having a radius of 850.00 feet) to a point; run thence North 88 degrees 00 minutes 47 seconds East a distance of 17.99 feet to a point; run thence along a curve to the left an arc distance of 83.66 feet (said arc being subtended by a chord bearing South 47 degrees 04 minutes 22 seconds East a chord distance of 77.04 feet and having a radius of 60.00 feet) to a point; run thence along a curve to the right an arc distance of 435.24 feet (said arc being subtended by a chord bearing South 67 degrees 55 minutes 31 seconds East a chord distance of 427.23 feet and having a radius of 653.11 feet) to a point; run thence South 48 degrees 50 minutes 02 seconds East a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 392.04 feet (said arc being subtended by a chord bearing South 69 degrees 08 minutes 19 seconds East a chord distance of 383.88 feet and having a radius of 553.11 feet) to a point; run thence along a curve to the left an arc distance of 96.45 feet (said arc being subtended by a chord bearing North 44 degrees 53 minutes 09 seconds East a chord distance of 86.56 feet and having a radius of 60.50 feet) to a point: run thence North 86 degrees 53 minutes 52 seconds East a distance of 2.10 feet to a point on the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following two (2) courses and distances; (1) South 03 degrees 06 minutes 08 seconds East a distance of 41.90 feet to a point and (2) run thence along a curve an arc distance of 66.01 feet (said arc being subtended by a chord bearing South 02 degrees 37 minutes 08 seconds East a chord distance of 66.01 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; shown as "Sears" and containing 15.167 acres on that certain plat of survey entitled "ALTA/ACSM Land Title Survey for Stonecrest Mall, LLC"-, prepared by Development Consultants Group, bearing the seal and certification of Donald G. Holland. Georgia Registered Land Surveyor No. 2637, dated October 10, 2000, last revised February 7, 2001.

TOGETHER WITH and benefiting the subject property, the easement created by that certain Declaration of Surface and Storm Water Drainage Easements by DeKalb Center Associates, a Georgia limited partnership, dated May 13, 1986, filed for record May 14, 1986 at 9:33 a.m., recorded in Deed Book 5470, Page 3905486, Page 5116421, Page 2716629, Page 189, Records of DeKalb County, Georgia; as amended by that certain First Amendment to Declaration of Surface and Storm Water Drainage Easement by and between DeKalb Center Associates, a Georgia limited partnership and JDN Associates, Ltd., Turner Hill Road, a Georgia limited partnership, dated May 2, 1986, filed for record June 4, 1986 at 8:57 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Second Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership and Atlanta East Mall Limited Partnership, a Georgia limited partnership dated February 28, 1989, filed for record May 2, 1989 at 10:12 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Third Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership, Lewis G. Abbott, Betty L. Abbott, Pat Abbott, as Executrix of the Estate of Robert G. Abbott, and Joseph Abbott as Executor of Joseph Ernest Abbott, dated November 13, 1989, filed for record January 31, 1990 at 8:30 a.m., recorded in Deed Book , aforesaid Records.

6

**EXHIBIT "D"**

**PHASE II ACCESS LICENSE**
(please see attached)

## PHASE II ACCESS LICENSE
*Lithonia, GA – S#1251*

**THIS PHASE II ACCESS LICENSE** (the "**License**") is entered into as of the _____ day of _____, 2018, by and between **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Licensor**"), and **STONECREST RESORTS, LLC**, a Delaware limited liability company ("**Licensee**") (Licensor and Licensee may also be collectively referred to in this License as the "**Parties**" and individually referred to in this License as a "**Party**".

### RECITALS

A.    Licensor is the owner of the certain real property located at 8020 Mall Parkway in the City of Lithonia (the "**City**"), DeKalb County, Georgia (the "**Property**") as more particularly described on **Exhibit "A"**, has the authority to grant access to the Property.

B.    Licensor desires to sell the Property to the Licensee;

C.    Licensee desires to purchase the Property from Licensor;

D.    The Licensor and Licensee have entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends;

E.    Licensee desires to perform an invasive environmental investigation of the Property as part of its due diligence prior to purchasing the Property; and

F.    Licensee has requested access to the Property to perform a Phase II Environmental Assessment and Licensor has agreed to permit Licensee and/or Licensee's agent a revocable license to conduct the requested activity at the Property for the purposes set forth in this License.

**NOW THEREFORE**, in consideration of their mutual covenants and other valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

### AGREEMENT

1.    <u>Incorporation of Recitals</u>.    The foregoing recitals are true and correct and are incorporated into this License by reference.

2.    <u>Access</u>.  Licensor has agreed to permit Licensee to carry out a Phase II investigation in accordance with the terms and conditions of this License.  The Phase II investigation will consist of the work plan attached as **Exhibit "B"** and incorporated into this License (the "**Work Plan**") and all work will be performed in accordance with the Work Plan.

At reasonable times and upon reasonable prior notice to Licensor, Licensor hereby grants Licensee reasonable access to the Property for the sole purpose of conducting the activities in the manner described in the Work Plan.  Any changes to the existing Work Plan shall be submitted to Licensor in writing for Licensor's prior approval, which approval shall not be unreasonably withheld.  If Licensor approves such proposal for additional or amended work on the Property, such additional work or amendments to the Work Plan shall be deemed to be a part of the Work Plan, and Licensee's implementation of such plan will be subject to the terms and conditions of this License.

3.    <u>Conduct of Investigation</u>.    Licensee, its employees, agents and subcontractors

1

(collectively "**Licensee Entities**") will not conduct any work or engage in any activities on the Property other than those set forth in the Work Plan. In the event that the Licensee Entities engage in activity outside of or beyond the scope of the Work Plan ("**Unauthorized Activity**"), Licensor shall have a right to deny access for such unauthorized activity conducted beyond the Work Plan scope and the right to any other damages, remedy or relief that otherwise might be available. All costs associated with the activities conducted by Licensee Entities on the Property shall be borne by Licensee. The Work Plan shall be conducted in any event in a manner and at times that will not unreasonably interfere with Licensor's use of the Property and which comply with the terms and conditions of this License. Licensor reserves all rights or claims which they may have at law or in equity against Licensee or Licensee Entities related to or arising from the environmental condition of the Property.

4.    Data and Reports. Licensee shall give reasonable advance notice to Licensor of any sampling, testing, drilling, or other on-site activities under the Work Plan, so as to allow a representative of the Licensor to observe such activity. Licensor shall have the right, at its sole cost and expense, to obtain split samples or conduct contemporaneous sampling when any sampling is conducted by Licensee or its Licensees Entities on the Property. Licensee shall transmit to Licensor in writing the quality-assured results of samples taken pursuant to the Work Plan as soon as they are made available to Licensee and its Licensee Entities. A copy of any correspondence, data, report, test or other communication with any agency relating to the environmental condition of the Property or the presence of any petroleum or other hazardous substances shall be simultaneously sent to Licensor. As used in this License, the term "**Hazardous Substances**" shall mean any hazardous substance as defined in federal and state or local laws, regulations or ordinances.

5.    Repair. If any portion of the Property, including any improvements and/or personal property of Licensor, suffers damage by reason of the entry of Licensee or Licensee Entities on the Property, including but not limited to damage arising from any tests, investigations and/or monitoring conducted upon the Property, Licensee or Licensee entities shall, at its own cost and expense, repair such damage and restore the Property to as good a condition as before such damage occurred. Repair of damage includes, without limitation, regrouting and resurfacing any holes, ditches, or other indentations, as well as any mounds or other inclines directly caused by any Licensee or Licensee Entities. If the location of the equipment installed pursuant to the approved Work Plan shall in the future interfere or conflict with Licensor's use of the Property, Licensee or Licensee Entities shall upon receipt of a request from Licensor to do so, close, remove and/or relocate said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Licensee or Licensee Entities of such governmental approvals as may be required to close, remove or relocate said well or wells. Licensee and Licensee Entities shall use its best efforts to obtain all such required governmental approvals.

6.    Safety. Licensee shall be responsible for ensuring that the Licensee Entities comply with good safety and security practices in performing the Work Plan. If monitoring wells are permitted in the Work Plan, Licensee shall install a locked cap on such wells, shall ensure that said caps are secure, and take all reasonable steps necessary to prohibit access to the recovery wells by Parties not authorized to do so by Licensee. As between Licensee and Licensor, Licensee is responsible for any contamination or damage directly caused by the authorized or unauthorized access to the recovery wells. Licensee agrees to ensure that its Licensee Entities also close any recovery wells upon the completion of the investigation or the termination of this License, whichever is sooner, and perform the Work Plan in accordance with federal, state and local laws, regulations and ordinances and prudent engineering principles.

7.    Indemnification. Licensee shall indemnify, protect, defend and hold harmless Licensor, and its respective officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and subcontractors (collectively the "**Indemnified Parties**") against any and all costs, liabilities, claims, damages, including reasonable licensee and attorney's fees, losses,

2

penalties, or suits resulting from (1) any release of Hazardous Substances on, in, under, or about the Property caused by the Licensee Entities during their entry on or use of the Property, (2) Licensee Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (3) the acts, omissions and/or willful misconduct of Licensee Entities during their entry upon and use of the Property or in performing the Work Plan under this License, and/or (4) a breach of the terms and conditions of this License by any Licensee Entity. Notwithstanding this indemnity, Licensor expressly reserves all rights it may have under the law to prosecute any claims or demands against either Licensee Entities arising out of or related to the environmental condition of the Property or otherwise.

8.    Compliance with Law/Permits.  Licensee shall cause all Licensee Entities to comply with all applicable federal, state, and local laws and regulations in the performance of the investigation of the Property. Licensee shall obtain, at its own expense, and prior to any access to the Property by Licensee Entities under this License, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the investigation pursuant to this License. Licensee shall ensure that Licensee Entities properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the Property generated by Licensee Entities in the course of conducting the investigation under this License. Licensee agrees that it shall be the licensee and/or generator of any and all Hazardous Substances generated in the course of conducting the Investigation authorized in this Li, and shall identify itself as the licensee and/or generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the investigation.

9.    Term.  The term of this License shall be until the Closing under the Purchase Contract, unless the Purchase Contract is terminated earlier.

10.    Upon Termination.  Upon termination of this License, Licensee shall ensure that Licensee (1) immediately removes any of the equipment, fixtures, improvements and other property located on any portion of the Property which was installed during the term of this License, (2) closes all work performed by Licensee Entities including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards, and (3) restores the Property to its condition existing immediately prior to Licensee Entities' entry thereon.

11.    Liens.  Licensee shall discharge at once or bond or otherwise secure all liens and attachments which are filed in connection with Licensee's implementation of the Work Plan and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

12.    Insurance.  Licensee shall ensure that the Licensee Entity that is the contractor responsible for performing the Work Plan shall maintain, at their sole cost and expense, the following policies of insurance (or policies otherwise approved by Licensor) procured from insurance companies reasonably satisfactory to Licensor and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company (or otherwise approved by Licensor):  (a)  Workers Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the Property is located with a waiver of subrogation in favor of Licensor, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease;  (b)  Motor Vehicle Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage;  (c)  Commercial General Liability

3

Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; (d)  Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate; and, (e)  Any contractor hired to perform environmental tests at the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

All policies shall be issued by companies qualified to do business in the state where the Property is located, and shall be rated A-/VII or better in the most current edition of Best's Insurance Reports.  Prior to execution of this License, Licensee shall provide the Licensor with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Licensor, certified copies of such policies or portions thereof.  All such insurance policies shall provide that they may not be materially changed, non-renewed or canceled without at least thirty (30) days' prior written notice to the Licensor. All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name Licensor and its affiliates as additional insureds and shall stipulate that Licensee's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Licensor or its affiliates. Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Work Plan, naming Licensor and its affiliates as additional insureds during such period of continuation.

   13. <u>Binding Effect</u>.  This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the Parties hereto.

   14. <u>Entire Agreement: Modification</u>.  This License between Licensee and Licensor contains the entire understanding and agreement among the Parties and supersedes all prior understandings and agreements between the Parties whether oral or written.  This instrument may be modified only by a writing signed by all Parties.

   15. <u>Governing Law</u>.  This instrument shall be governed by and shall be construed in accordance with the laws of the State of Georgia

   16. <u>Notice</u>.  Any and all notices or other communication required or permitted by this License, or by law, to be delivered to, served on, or given to any Party to this License shall be in writing, and shall be deemed properly delivered, given or served when personally delivered to such Party, when electronically delivered with receipt acknowledged, or when mailed by United States mail, express, certified or registered with the return receipt signed, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

  **To Licensor:**     Bruce Kaye
            Director Environmental Affairs
            Sears, Roebuck and Co.
            3333 Beverly Road
            Hoffman Estates, IL 60179

  **With copies to:**     Sears, Roebuck and Co.
            3333 Beverly Road
            Hoffman Estates, IL  60179

Attn:  Counsel, Environmental

**To Licensee:**    Stonecrest Resorts, LLC
111 East Wacker Drive, Suite 2400
Chicago, IL 60601
312.915.3232 Office Phone
312.479.1702 Cell Phone
Cdelasin@urbanretail.com

**With copies to:**    Steve Cicci
5112 West Taft Rd., Ste. M
Liverpool, NY 13088
Phone: (315) 452-2000 x4006
E-mail: scicci@summitcrg.com

Any Party may change its address by giving ten (10) day advance written notice of such change to the other Parties in the manner provided in this Section.

17.    Representation.  Licensee represents and warrants that it does not need the consent of any other Party to enter into this License.

18.    Severability.  If any term, provision, covenant, or condition of this License is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this License shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this License.

19.    Survivability.  All obligations and commitments by Licensee specified in this License (including, without limitation, the provisions of Sections 3 through 8 and 10 through 15, shall survive the expiration  or termination of this License.

20.    Assignment.  Licensee may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under this License, except with Licensor's prior written consent, and the failure of Licensee to obtain Licensor's prior written consent shall render any such attempt to assign, delegate, or subcontract of no force and effect.

21.    No Waiver; Cumulative Remedies.  The failure of any Party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this License or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the Parties with respect to such future performance will continue in full force and effect. Except as otherwise provided in this License, the remedies in this License are cumulative with and not in lieu of other remedies available to a Party at law or in equity.

22.    No Third Party Beneficiaries.  Other than Licensor's affiliates, this License shall not be deemed to confer any rights to any other party (other than Licensee or any Licensee Entity) as a third party beneficiary or otherwise.

23.    Exhibits.  The terms and conditions of each exhibit referenced in this License are hereby incorporated into this License.  In the event of a conflict between this License and the exhibits, the terms and conditions of this License shall prevail. Any provisions of Licensee's proposals, contracts, invoices,

5

billing statements, acknowledgement forms or any other document which are inconsistent with the provisions of this License shall be of no force or effect.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**IN WITNESS WHEREOF**, the Parties have executed this Phase II Access License effective as of the date first above written.

LICENSEE:

**STONECREST RESORTS, LLC,**
a Delaware limited liability company

By: _____
Name:    **Craig Delasin**
Title:    **Manager**

LICENSOR:

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
Name: _____
Title: _____

7

**EXHIBIT "A" TO PHASE II ACCESS LICENSE**
**LEGAL DESCRIPTION**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 170, 16th District, DeKalb County, Georgia, and being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING, commence at northeastern end of the mitered intersection of the Northerly right of way line of Mall Parkway (100-foot right of way) and the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following five (5) courses and distances: (1) North 00 degrees 19 minutes 17 seconds East a distance of 196.09 feet to a point, (2) North 00 degrees 37 minutes 30 seconds West a distance of 1574.92 feet to a point, (3) North 89 degrees 22 minutes 30 seconds East a distance of 7.89 feet to a point, (4) along a curve to the left on arc distance of 24.49 feet (said arc being subtended by a chord bearing North 00 degrees 37 minutes 36 seconds West a chord distance of 24.49 feet and having a radius of 3908.15 feet) to a point, and (5) along a curve an arc distance of 90.63 feet (said arc being subtended by a chord bearing North 01 degree 28 minutes 14 seconds West a chord distance of 90.63 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; FROM THE TRUE POINT OF BEGINNING AS THUS ESTABLISHED, leaving said westerly right of way line, run thence South 87 degrees 51 minutes 56 seconds West a distance of 86.69 feet to a point; run thence along a curve to the right an arc distance of 409.79 feet (said arc being subtended by a chord bearing North 68 degrees 17 minutes 55 seconds West a chord distance of 401.95 feet and having a radius of 603.11 feet) to a point; run thence North 48 degrees 50 minutes 02 seconds West a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 511.30 feet (said arc being subtended by a chord bearing North 73 degrees 07 minutes 14 seconds West a chord distance of 496.12 feet and having a radius of 603.11 feet) to a point; run thence North 01 degree 43 minutes 47 seconds West a distance of 100.83 feet to a point; run thence along a curve to the left an arc distance of 399.66 feet (said arc being subtended by a chord bearing North 15 degrees 52 minutes 25 seconds West a chord distance of 395.61 (feet and having a radius of 809.50 feet) to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 262.32 feet to a point; run thence along a curve to the left an arc distance of 376.45 feet (said arc being subtended by a chord bearing North 45 degrees 10 minutes 48 seconds West a chord distance of 372.05 feet and having a radius of 709.50 feet) to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 560.12 feet to a point; run thence South 07 degrees 30 minutes 00 seconds East a distance of 52.80 feet to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 35.36 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 28.75 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 60.00 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 273.86 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 53.33 feet to a point; run thence North 69 degrees 22 minutes 30 seconds West a distance of 21.82 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 55.28 feet to a point; run thence North 75 degrees 00 minutes 00 seconds West a distance of 80.40 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 63.00 feet to a point; run thence North 60 degrees 00 minutes 00 seconds East a distance of 60.00 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 572.77 feet to a point; run thence along a curve to the right an arc distance of 249.74 feet (said arc being subtended by a chord bearing North 88 degrees 26 minutes 28 seconds East a distance of 248.42 feet and having a radius of 700.00 feet) to a point; run thence South 81 degrees 20 minutes 18 seconds East a distance of 491.88 feet to a point; run thence along a curve to the right an arc distance of 234.39 feet (said arc being subtended by a chord bearing South 71 degrees 44 minutes 44 seconds East a chord distance of 233.30 feet and having a radius of 700.00 feet) to a point; run thence South 62 degrees 09 minutes 11 seconds East a distance of 70.01 feet to a point; run thence North 37 degrees 55 minutes 46 seconds East a distance of 135.88 feet to a point on the southerly right of way line of Interstate 20; run thence along said southerly right of way line the following two (2) courses and distances; (1) South 77 degrees 49 minutes

48 seconds East a distance of 318.42 feet to a point and (2) South 72 degrees 38 minutes 36 seconds East a distance of 88.28 feet to a point; leaving said southerly right of way line, run thence South 15 degrees 48 minutes 15 seconds West a distance of 257.69 feet to a point; run thence South 60 degrees 00 minutes 00 seconds West a distance of 108.38 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 35.36 feet to a point; run thence South 30 degrees 00 minutes 00 seconds East a distance of 211.47 feet to a point; run thence along a curve to the right an arc distance of 415.58 feet (said arc being subtended by a chord bearing South 15 degrees 59 minutes 36 seconds East a chord distance of 411.46 feet and having a radius of 850.00 feet) to a point; run thence North 88 degrees 00 minutes 47 seconds East a distance of 17.99 feet to a point; run thence along a curve to the left an arc distance of 83.66 feet (said arc being subtended by a chord bearing South 47 degrees 04 minutes 22 seconds East a chord distance of 77.04 feet and having a radius of 60.00 feet) to a point; run thence along a curve to the right an arc distance of 435.24 feet (said arc being subtended by a chord bearing South 67 degrees 55 minutes 31 seconds East a chord distance of 427.23 feet and having a radius of 653.11 feet) to a point; run thence South 48 degrees 50 minutes 02 seconds East a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 392.04 feet (said arc being subtended by a chord bearing South 69 degrees 08 minutes 19 seconds East a chord distance of 383.88 feet and having a radius of 553.11 feet) to a point; run thence along a curve to the left an arc distance of 96.45 feet (said arc being subtended by a chord bearing North 44 degrees 53 minutes 09 seconds East a chord distance of 86.56 feet and having a radius of 60.50 feet) to a point: run thence North 86 degrees 53 minutes 52 seconds East a distance of 2.10 feet to a point on the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following two (2) courses and distances; (1) South 03 degrees 06 minutes 08 seconds East a distance of 41.90 feet to a point and (2) run thence along a curve an arc distance of 66.01 feet (said arc being subtended by a chord bearing South 02 degrees 37 minutes 08 seconds East a chord distance of 66.01 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; shown as "Sears" and containing 15.167 acres on that certain plat of survey entitled "ALTA/ACSM Land Title Survey for Stonecrest Mall, LLC"-, prepared by Development Consultants Group, bearing the seal and certification of Donald G. Holland. Georgia Registered Land Surveyor No. 2637, dated October 10, 2000, last revised February 7, 2001.

TOGETHER WITH and benefiting the subject property, the easement created by that certain Declaration of Surface and Storm Water Drainage Easements by DeKalb Center Associates, a Georgia limited partnership, dated May 13, 1986, filed for record May 14, 1986 at 9:33 a.m., recorded in Deed Book 5470, Page 3905486, Page 5116421, Page 2716629, Page 189, Records of DeKalb County, Georgia; as amended by that certain First Amendment to Declaration of Surface and Storm Water Drainage Easement by and between DeKalb Center Associates, a Georgia limited partnership and JDN Associates, Ltd., Turner Hill Road, a Georgia limited partnership, dated May 2, 1986, filed for record June 4, 1986 at 8:57 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Second Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership and Atlanta East Mall Limited Partnership, a Georgia limited partnership dated February 28, 1989, filed for record May 2, 1989 at 10:12 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Third Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership, Lewis G. Abbott, Betty L. Abbott, Pat Abbott, as Executrix of the Estate of Robert G. Abbott, and Joseph Abbott as Executor of Joseph Ernest Abbott, dated November 13, 1989, filed for record January 31, 1990 at 8:30 a.m., recorded in Deed Book , aforesaid Records.

**EXHIBIT "B" TO PHASE II ACCESS LICENSE
WORK PLAN**

[to be attached]

## NON-INVASIVE INSPECTION AGREEMENT
*Lithonia, GA – S#1251*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _____ day of _____, 2018 ("**Effective Date**"), by and between **STONECREST RESORTS, LLC**, a Delaware limited liability company ("**Investigating Party**"), and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Company**") in connection with site investigation and site assessment work to be performed on the property controlled by Company located at 8020 Mall Parkway in the City of Lithonia (the "**City**"), DeKalb County, Georgia (the "**Property**"), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

### RECITALS:

A.      Company desires to sell the Property to Investigating Party;

B.      Investigating Party desires to buy the Property from Company;

C.      Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

D.      Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.      Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.      The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall walk the Property and inspect the roof, structure, all heating and cooling systems and any other mechanical equipment situated on the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**Site Assessment Work**"). Invasive testing, including but not limited to borings, asbestos samplings, or any Phase II Environmental Assessment ("**Invasive Testing**"), may be performed at the Property subject to (i) Company's prior written approval of such Invasive Testing, which approval shall be at the reasonable discretion of the Company; and (ii) Investigating Party's execution of and agreement to abide by a Phase II Access License.  If Company elects to have its representative present during the Site Assessment Work and/or Invasive Testing, if any, and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment Work and/or Invasive Testing as the case may be, shall be performed only in the presence of the Company's local manager or any other such person assigned by Company.  Investigating Party shall not: (i) take photographs of store contents or any items owned or sold by Company; or (ii) perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's reasonable discretion.  In the event that Investigating Party engages in activity outside of or beyond the Site Assessment Work including but not limited to Invasive Testing, except if such Invasive Testing is performed under the conditions set forth in a fully executed Phase II Access

Agreement ("**Unauthorized Activity**").  Provided further, that in the event Investigating Party engages in Unauthorized Activity, Company shall have the right to terminate access to the Property for such Unauthorized Activity. Investigating Party, at its sole cost and expense, shall promptly restore the Property to the condition it was in prior to the Unauthorized Activity.

3.   This Agreement shall terminate upon the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) 45 days from the Effective Date, in each such event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

4.   Within seven (7) days after receipt by Investigating Party, Investigating Party agrees to provide Company with all test results and reports, including all correspondence and draft reports prepared in connection with the Site Assessment Work. This provision shall survive the termination of this Agreement.

5.   Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable.  The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

6.   Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement. This indemnity shall survive the termination of this Agreement.

7.   Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

(i)   Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)   Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

(iii)   Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

2

(iv)     Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

(v)      Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8.      Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.      If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10.     This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11.     By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12.     Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

13.     This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

3

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

**INVESTIGATING PARTY:**

**STONECREST RESORTS, LLC,**
a   Delaware   limited   liability   company

By: _____

Name:   **Craig Delasin**
Title:   **Manager**

**COMPANY:**

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
Name: _____
Title: _____

4

## EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT

### LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 170, 16th District, DeKalb County, Georgia, and being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING, commence at northeastern end of the mitered intersection of the Northerly right of way line of Mall Parkway (100-foot right of way) and the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following five (5) courses and distances: (1) North 00 degrees 19 minutes 17 seconds East a distance of 196.09 feet to a point, (2) North 00 degrees 37 minutes 30 seconds West a distance of 1574.92 feet to a point, (3) North 89 degrees 22 minutes 30 seconds East a distance of 7.89 feet to a point, (4) along a curve to the left on arc distance of 24.49 feet (said arc being subtended by a chord bearing North 00 degrees 37 minutes 36 seconds West a chord distance of 24.49 feet and having a radius of 3908.15 feet) to a point, and (5) along a curve an arc distance of 90.63 feet (said arc being subtended by a chord bearing North 01 degree 28 minutes 14 seconds West a chord distance of 90.63 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; FROM THE TRUE POINT OF BEGINNING AS THUS ESTABLISHED, leaving said westerly right of way line, run thence South 87 degrees 51 minutes 56 seconds West a distance of 86.69 feet to a point; run thence along a curve to the right an arc distance of 409.79 feet (said arc being subtended by a chord bearing North 68 degrees 17 minutes 55 seconds West a chord distance of 401.95 feet and having a radius of 603.11 feet) to a point; run thence North 48 degrees 50 minutes 02 seconds West a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 511.30 feet (said arc being subtended by a chord bearing North 73 degrees 07 minutes 14 seconds West a chord distance of 496.12 feet and having a radius of 603.11 feet) to a point; run thence North 01 degree 43 minutes 47 seconds West a distance of 100.83 feet to a point; run thence along a curve to the left an arc distance of 399.66 feet (said arc being subtended by a chord bearing North 15 degrees 52 minutes 25 seconds West a chord distance of 395.61 (feet and having a radius of 809.50 feet) to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 262.32 feet to a point; run thence along a curve to the left an arc distance of 376.45 feet (said arc being subtended by a chord bearing North 45 degrees 10 minutes 48 seconds West a chord distance of 372.05 feet and having a radius of 709.50 feet) to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 560.12 feet to a point; run thence South 07 degrees 30 minutes 00 seconds East a distance of 52.80 feet to a point; run thence South 37 degrees 30 minutes 00 seconds West a distance of 35.36 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 28.75 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 60.00 feet to a point; run thence North 74 degrees 59 minutes 59 seconds West a distance of 273.86 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 53.33 feet to a point; run thence North 69 degrees 22 minutes 30 seconds West a distance of 21.82 feet to a point; run thence North 15 degrees 00 minutes 00 seconds East a distance of 55.28 feet to a point; run thence North 75 degrees 00 minutes 00 seconds West a distance of 80.40 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 63.00 feet to a point; run thence North 60 degrees 00 minutes 00 seconds East a distance of 60.00 feet to a point; run thence North 30 degrees 00 minutes 00 seconds West a distance of 572.77 feet to a point; run thence along a curve to the right an arc distance of 249.74 feet (said arc being subtended by a chord bearing North 88 degrees 26 minutes 28 seconds East a chord distance of 248.42 feet and having a radius of 700.00 feet) to a point; run thence South 81 degrees 20 minutes 18 seconds East a distance of 491.88 feet to a point; run thence along a curve to the right an arc distance of 234.39 feet (said arc being subtended by a chord bearing South 71 degrees 44 minutes 44 seconds East a chord distance of 233.30 feet and having a radius of 700.00 feet) to a point; run thence South 62 degrees 09 minutes 11 seconds East a distance of 70.01 feet to a point; run thence North 37 degrees 55 minutes 46 seconds East a distance of 135.88 feet to a point on the southerly right of way line of Interstate 20; run thence along said southerly

right of way line the following two (2) courses and distances; (1) South 77 degrees 49 minutes 48 seconds East a distance of 318.42 feet to a point and (2) South 72 degrees 38 minutes 36 seconds East a distance of 88.28 feet to a point; leaving said southerly right of way line, run thence South 15 degrees 48 minutes 15 seconds West a distance of 257.69 feet to a point; run thence South 60 degrees 00 minutes 00 seconds West a distance of 108.38 feet to a point; run thence South 15 degrees 00 minutes 00 seconds West a distance of 35.36 feet to a point; run thence South 30 degrees 00 minutes 00 seconds East a distance of 211.47 feet to a point; run thence along a curve to the right an arc distance of 415.58 feet (said arc being subtended by a chord bearing South 15 degrees 59 minutes 36 seconds East a chord distance of 411.46 feet and having a radius of 850.00 feet) to a point; run thence North 88 degrees 00 minutes 47 seconds East a distance of 17.99 feet to a point; run thence along a curve to the left an arc distance of 83.66 feet (said arc being subtended by a chord bearing South 47 degrees 04 minutes 22 seconds East a chord distance of 77.04 feet and having a radius of 60.00 feet) to a point; run thence along a curve to the right an arc distance of 435.24 feet (said arc being subtended by a chord bearing South 67 degrees 55 minutes 31 seconds East a chord distance of 427.23 feet and having a radius of 653.11 feet) to a point; run thence South 48 degrees 50 minutes 02 seconds East a distance of 137.86 feet to a point; run thence along a curve to the left an arc distance of 392.04 feet (said arc being subtended by a chord bearing South 69 degrees 08 minutes 19 seconds East a chord distance of 383.88 feet and having a radius of 553.11 feet) to a point; run thence along a curve to the left an arc distance of 96.45 feet (said arc being subtended by a chord bearing North 44 degrees 53 minutes 09 seconds East a chord distance of 86.56 feet and having a radius of 60.50 feet) to a point: run thence North 86 degrees 53 minutes 52 seconds East a distance of 2.10 feet to a point on the westerly right of way line of Turner Hill Road (right of way varies); run thence along said westerly right of way line the following two (2) courses and distances; (1) South 03 degrees 06 minutes 08 seconds East a distance of 41.90 feet to a point and (2) run thence along a curve an arc distance of 66.01 feet (said arc being subtended by a chord bearing South 02 degrees 37 minutes 08 seconds East a chord distance of 66.01 feet and having a radius of 3908.15 feet) to a point and THE TRUE POINT OF BEGINNING; shown as "Sears" and containing 15.167 acres on that certain plat of survey entitled "ALTA/ACSM Land Title Survey for Stonecrest Mall, LLC"-, prepared by Development Consultants Group, bearing the seal and certification of Donald G. Holland. Georgia Registered Land Surveyor No. 2637, dated October 10, 2000, last revised February 7, 2001.

TOGETHER WITH and benefiting the subject property, the easement created by that certain Declaration of Surface and Storm Water Drainage Easements by DeKalb Center Associates, a Georgia limited partnership, dated May 13, 1986, filed for record May 14, 1986 at 9:33 a.m., recorded in Deed Book 5470, Page 3905486, Page 5116421, Page 2716629, Page 189, Records of DeKalb County, Georgia; as amended by that certain First Amendment to Declaration of Surface and Storm Water Drainage Easement by and between DeKalb Center Associates, a Georgia limited partnership and JDN Associates, Ltd., Turner Hill Road, a Georgia limited partnership, dated May 2, 1986, filed for record June 4, 1986 at 8:57 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Second Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership and Atlanta East Mall Limited Partnership, a Georgia limited partnership dated February 28, 1989, filed for record May 2, 1989 at 10:12 a.m., recorded in Deed Book , aforesaid Records; as further amended by that certain Third Amendment to Declaration of Surface and Storm Water Drainage Easements by and between DeKalb Center Associates, a Georgia limited partnership, Lewis G. Abbott, Betty L. Abbott, Pat Abbott, as Executrix of the Estate of Robert G. Abbott, and Joseph Abbott as Executor of Joseph Ernest Abbott, dated November 13, 1989, filed for record January 31, 1990 at 8:30 a.m., recorded in Deed Book , aforesaid Records.



# CHICAGO TITLE AND TRUST COMPANY

## 10 S. LASALLE, STE 3100, CHICAGO, IL 60603

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

<u>STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)</u>

ESCROW TRUST NO:                                                     DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

<u>Customer Identification:</u>

Seller:  Sears, Roebuck and Co.

Purchaser:  Stonecrest Resorts, LLC

Property Address: 8020 Mall Parkway in the City of Lithonia, DeKalb County, Georgia

Project Reference:  Lithonia, GA – S#1251

Proposed Disbursement Date:

<u>Deposits:</u>

| | | | |
|---|---|---|---|
| 1. The sum of $100,000.00<br>INITIAL EARNEST MONEY | by | CHECK/WIRE | Representing: |
| 2. The sum of $<br>(Additional) | by | CHECK/WIRE | Representing: |

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

<u>Funds:</u>

( ) WILL    ( X ) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

<u>Delivery of Deposits:</u>

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.
The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement. Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the
undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Agent is unsure as to its duties as a result, Escrow Agent may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Agent may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Agent for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, (i) where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, or (ii) where Seller has defaulted by filing a petition seeking an assignment for the benefit of creditors or has defaulted by filing a petition for liquidation or dissolution or similar relief under the United States Bankruptcy Code, then upon the delivery to Escrow Agent of commercially reasonable documentation evidencing the same, Escrow agent shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person.  Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:

Name: Sears, Roebuck and Co.


By:_____
Name:_____
Its:_____

For Purchaser:

Name: Stonecrest Resorts, LLC


By:_____
Name:    Craig Delasin
Its:        Manager


Address:

Phone:

Fax:

Email:

Legal Representative:

Name:

By:

Address:


Phone:

Fax:
Email:

Signature:

Address:

Phone:

Fax:

Email:

Legal Representative:

Name:

By:

Address:


Phone:

Fax:
Email:

Signature:


Accepted: Chicago Title and Trust Company, as Escrow Trustee

By:                                                    Date:

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

## AMENDMENT TO REAL ESTATE SALE CONTRACT
### *[Lithonia, GA – S#1251]*

This Amendment to Real Estate Sale Contract (this "**Amendment**") is entered into as of January 8, 2019, by and between **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Seller**") and **FITNESS CENTRAL SPE, LLC**, a Delaware limited liability company, ("**Purchaser**").

## W I T N E S S E T H:

**WHEREAS,** Seller and Stonecrest Resorts, LLC, a Delaware limited liability company ("Resorts"), entered into that certain Real Estate Sale Contract, dated as of August 13, 2018 (the "**Original Contract**", as amended hereby and as further amended, restated, or otherwise modified from time to time, the "**Contract**"), pertaining to that certain property located at 8020 Mall Parkway, Lithonia, DeKalb County, Georgia (Store Number 1251); and

**WHEREAS**, under that certain Assignment and Acceptance of Real Estate Sale Contract dated as of October 12, 2018, and under the terms of Section 20 of the Original Contract, Resorts assigned to Purchaser, and Purchaser accepted all of same, the Contract and all of the right, title and interest of Resorts thereunder; and

**WHEREAS,** Seller and Purchaser desire to amend the Original Contract as provided below.

**NOW, THEREFORE,** the parties agree as follows:

1.    <u>Defined Terms.</u>  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Original Contract.

2.    <u>Amendments to the Original Contract.</u>

(a)    The term "Contract" or "this Contract" as used in the Original Contract shall hereinafter refer to the Original Contract, as hereby amended, and as the same may be further amended, restated or otherwise modified from time to time.

(b)    Subsection 4(c) is hereby deleted and shall be replaced with the following:

"(c)    The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract (including any affirmative obligation of Seller to cure "Monetary Liens", if any, set forth in this Contract), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer."

(c)    The following shall be added as new Subsection 6(c):

"(c)    In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

> (i)    The sale shall be authorized by and subject to that certain *Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments* (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

> (ii)    The applicable debtor(s) in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property (it being agreed that Seller's counsel shall deliver to Purchaser's counsel an email copy of the Sale Notice concurrent with such filing thereof). Either no objections to the Sale Notice were timely received (with Seller's counsel providing to Purchaser's counsel an email copy of the Sale Notice concurrent with the filing thereof any such objections) or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, and, as to the obligations of Purchaser hereunder the same does not impose any further obligations upon Purchaser and in all events shall not act to amend the Original Contract (including, without limitation, the Purchase Price) in any manner except as specifically provided in this Amendment, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property."

(d)    Subsection 7(a) is hereby deleted and shall be replaced with the following:

"(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer at a mutually acceptable date and time within forty-five (45) days after the expiration of the notice period required by the Approval Order for the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, after entry of a final order specifically approving the sale of the Property, or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from entry of a final order specifically approving the sale of the Property."

(e)    Subsection 10(a)(i) is hereby deleted and replaced with the following:

2

"(i)    Subject to Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to the terms of the Approval Order."

(f)    The ultimate paragraph of Section 10 is hereby deleted and replaced with the following:

"The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time.  Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall merge with the transfer of title and shall not survive Closing.  If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown."

3.    <u>Counterparts</u>.  This Amendment may be executed and delivered (including by facsimile transmission or in portable document format (PDF)) in one or more counterparts, each of which, when executed, shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement, with the same effect as if the signatures thereto and hereto were upon the same instrument.

4.    <u>Governing Law</u>.  This Amendment shall be governed by, and construed in accordance with, the laws of the state of New York.

5.    <u>No Modification</u>.  Except as modified by this Amendment, all of the terms, covenants, conditions and provisions of the Original Contract shall remain and continue unmodified, in full force and effect.   If and to the extent that any of the provisions of this Amendment conflict or are otherwise inconsistent with any provisions of the Original Contract, the provisions of this Amendment shall prevail.

6.    <u>Amendment</u>.  This Amendment cannot be modified in any manner except by a written agreement signed by Seller and Purchaser.

WEIL:\96794782\9\73217.0004

[Signature Page Immediately Following

WEIL:\96794782\9\73217.0004

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by or on behalf of each of the parties as of the date first written above.

**SELLER:**

**SEARS, ROEBUCK AND CO.**,
a New York corporation

By: _____

Name:

Title:

                        **Jane S. Borden**
               **President – Real Estate**

**PURCHASER:**

**FITNESS CENTRAL SPE, LLC,** a Delaware limited liability company

By: _____

Name:

Title:

Execution Copy

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by or on behalf of each of the parties as of the date first written above.

SELLER:

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____
    Name:
    Title:

PURCHASER:

FITNESS CENTRAL SPE, LLC, a Delaware limited liability company

By: _____
    Name: Craig Delasin
    Title: Manager