# EXHIBIT A

**MASTER OUTSOURCED SERVICES AGREEMENT**

**Between**

**Sears Holdings Management Corporation**

**("Customer")**

**And**

**24/7 Customer, Inc.**

**("Supplier")**

| | | | |
|---|---|---|---|
| 1. | | BACKGROUND AND OBJECTIVES | 1 |
| | 1.1 | Business Process Services | 1 |
| | 1.2 | Goals and Objectives. | 1 |
| 2. | | DEFINITIONS. | 2 |
| 3. | | SERVICES AND SOWS. | 2 |
| | 3.1 | General Description. | 2 |
| | 3.2 | SOWs. | 2 |
| | 3.3 | Start-Up and Start-Up Services. | 3 |
| | 3.4 | Change Order Procedure. | 4 |
| | 3.5 | Purchases by Affiliates. | 4 |
| | 3.6 | Customer Responsibilities. | 4 |
| 4. | | OTHER SERVICE TERMS. | 4 |
| | 4.1 | Account Management. | 4 |
| | 4.2 | Customer-Retained Authority. | 5 |
| | 4.3 | Supplier Provided Systems and Customer Provided Systems. | 5 |
| | 4.4 | Supplier Cooperation. | 6 |
| | 4.5 | Changes in the Services Environment. | 7 |
| | 4.6 | [RESERVED TO SOW]. | 8 |
| | 4.7 | Disaster Recovery Plan. | 8 |
| | 4.8 | Included Services. | 8 |
| | 4.9 | Reprioritization. | 8 |
| | 4.10 | Procedures Manual. | 8 |
| | 4.11 | Reports and Back-Up Documents. | 9 |
| | 4.12 | Use of Customer's Locations. | 9 |
| | 4.13 | Support of Supplier's Other Customers. | 10 |
| | 4.14 | Technology Refresh Plan. | 10 |
| | 4.15 | Ariba Electronic Communications. | 10 |
| | 4.16 | Compliance with Other Parties' Facility Rules. | 11 |
| 5. | | ADDITIONAL SERVICES. | 11 |
| | 5.1 | Incidental Services. | 11 |
| | 5.2 | New Services. | 11 |
| 6. | | SERVICES LEVELS. | 11 |
| | 6.1 | Generally. | 11 |

|  | 6.2 | Reports. | 12 |
|  | 6.3 | Application of Service Credits. | 12 |
|  | 6.4 | Excessive Service Level Failure. | 12 |
|  | 6.5 | Service Level Exceptions. | 12 |
| 7. | | PROPRIETARY RIGHTS. | 12 |
|  | 7.1 | Customer IP Rights. | 12 |
|  | 7.2 | Ownership. | 13 |
|  | 7.3 | Works Made For Hire. | 13 |
|  | 7.4 | Waiver of Moral Rights. | 13 |
|  | 7.5 | Supplier IP Rights. | 13 |
|  | 7.6 | Third Party Materials. | 14 |
|  | 7.7 | Customer Data. | 14 |
|  | 7.8 | General Knowledge. | 14 |
|  | 7.9 | No Liens. | 15 |
| 8. | | COMPENSATION. | 15 |
|  | 8.1 | Fees and Expenses. | 15 |
|  | 8.2 | Taxes. | 15 |
|  | 8.3 | Right to Set Off. | 15 |
|  | 8.4 | Invoices. | 15 |
|  | 8.5 | No Charge for Re-performance | 15 |
|  | 8.6 | Method of Payment and Timing. | 15 |
|  | 8.7 | Records. | 15 |
|  | 8.8 | Most Favored Company. | 16 |
|  | 8.9 | Paradigm Technological Shift. | 16 |
|  | 8.10 | Benchmarking. | 16 |
|  | 8.11 | Revised Pricing Model. | 17 |
| 9. | | TERM AND TERMINATION. | 17 |
|  | 9.1 | Term. | 17 |
|  | 9.2 | Termination for Cause By Customer. | 17 |
|  | 9.3 | Termination for Cause of a SOW By Supplier. | 18 |
|  | 9.4 | Termination For Convenience by Customer. | 18 |
| 10. | | TRANSITION SERVICES. | 19 |
|  | 10.1 | Licenses Perpetual. | 19 |

| | 10.2 | Transition Rights. | 19 |
| | 10.3 | Rights Upon Termination/Expiration. | 21 |
| | 10.4 | Discontinuance/Disablement of Services. | 21 |
| 11. | | REPRESENTATIONS, WARRANTIES AND COVENANTS. | 21 |
| | 11.1 | General. | 21 |
| | 11.2 | Disclaimer. | 25 |
| | 11.3 | Pass-Through. | 25 |
| | 11.4 | Responsibility. | 25 |
| 12. | | PERSONNEL. | 25 |
| | 12.1 | Responsibility. | 25 |
| | 12.2 | Independent Contractor. | 25 |
| | 12.3 | Key Personnel. | 25 |
| | 12.4 | Code of Conduct. | 25 |
| 13. | | CONFIDENTIALITY. | 26 |
| | 13.1 | Confidential Information. | 26 |
| | 13.2 | Use of Confidential Information. | 26 |
| | 13.3 | Supplier Policies for Confidential Personal Information. | 27 |
| | 13.4 | Miscellaneous. | 27 |
| 14. | | INSURANCE. | 28 |
| | 14.1 | Required Insurance. | 28 |
| | 14.2 | Policies. | 29 |
| 15. | | INDEMNIFICATION. | 29 |
| | 15.1 | By Supplier. | 29 |
| | 15.2 | Procedures. | 31 |
| | 15.3 | Independent Obligation. | 32 |
| 16. | | LIMITATION OF LIABILITY. | 32 |
| | 16.1 | Limitation of Damages. | 32 |
| | 16.2 | Cap on Liability. | 32 |
| | 16.3 | Exclusions. | 32 |
| 17. | | AUDITS. | 33 |
| | 17.1 | Customer Audit. | 33 |
| | 17.2 | SSAE 16 Audit. | 33 |
| | 17.3 | Special Government Audit. | 34 |

17.4    Audit Process. ........................................................................................ 34

17.5    Remedial Obligations. .......................................................................... 34

17.6    Supplier Breach. .................................................................................... 34

18.    MISCELLANEOUS. ..................................................................................... 34

18.1    Agreement Binding; Assignment. ......................................................... 34

18.2    Governing Law. ..................................................................................... 35

18.3    Dispute Resolution. ............................................................................... 35

18.4    Export Requirements. ............................................................................ 37

18.5    Notices. .................................................................................................. 37

18.6    Attorneys' Fees. ..................................................................................... 38

18.7    Customer Approval. ............................................................................... 38

18.8    Access to Electronic Systems. .............................................................. 38

18.9    Security and PCI Standards. ................................................................. 39

18.10   Prevention of Unauthorized Code. ....................................................... 39

18.11   Severability. .......................................................................................... 39

18.12   Subcontractors. ..................................................................................... 40

18.13   Publicity. ............................................................................................... 41

18.14   Injunctive Relief. .................................................................................. 41

18.15   Further Assurances. ............................................................................... 41

18.16   Force Majeure. ...................................................................................... 41

18.17   No Waiver; Cumulative Remedies. ....................................................... 42

18.18   Entire Agreement. ................................................................................. 42

18.19   Interpretation. ....................................................................................... 42

18.20   Enforcement .......................................................................................... 42

18.21   Third Party Beneficiaries. ..................................................................... 42

18.22   Time Of the Essence. ............................................................................ 42

18.23   Survival. ................................................................................................ 42

18.24   Hiring Restriction. ................................................................................ 42

18.24   Signatures. ............................................................................................ 43

APPENDIX 1 (GLOSSARY OF DEFINED TERMS)

APPENDIX 2 (INFORMATION SECURITY)

APPENDIX 3 (SELECTION OF BENCHMARKER)

APPENDIX 4 (TECHNOLOGY REFRESH PLAN)

APPENDIX 5 (TAXES)

APPENDIX 7 (SUBSIDIARIES AND AFFILIATES)

APPENDIX 8 (FORM OF CHANGE ORDER)

## MASTER OUTSOURCED SERVICES AGREEMENT
### (Business Process Outsourcing)

This Master Outsourced Services Agreement (this "**Agreement**") is made as of April 1, 2012 (the "**Effective Date**") by and between 24/7 Customer, Inc. ("**Supplier**"), a California corporation with offices at 910 East Hamilton Ave., Suite 240, Campbell, California 95008 and **SEARS HOLDINGS MANAGEMENT CORPORATION**, a Delaware corporation (the "**Customer**"), on behalf of itself and for the benefit of its Affiliates, with offices at 3333 Beverly Road, Hoffman Estates, Illinois 60179. Supplier and Customer may be referred to herein individually as a "Party" or together as the "Parties."

In consideration of the mutual promises and the other terms and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1.    BACKGROUND AND OBJECTIVES.

1.1    **Business Process Services**.  Customer desires that certain business process services presently performed and managed by or for Customer and its Authorized Users by their respective Personnel, and certain additional business process services, as each is described in a Statement of Work(s) (" SOWs") (defined below), be performed and managed by Supplier.  Supplier has carefully reviewed Customer's requirements, has performed all due diligence it deems necessary, and desires to perform and manage such business process services for Customer and its Authorized Users.

1.2    **Goals and Objectives**.

(a)    **General/Mission Statement.**  The parties acknowledge and agree that the goals and objectives of the Customer in entering into this Agreement are to create/develop a special relationship with a trusted, competent and technologically best in class company to run various Customer business processing functions in a business model that operates as if those functions were still departments within Customer and where Supplier's Personnel work cooperatively and proactively with Customer's Personnel in a "badge neutral" environment with the common goals set forth in this **Section 1.2(b)** below:

(b)    Specific Objectives.

(i)    Quality
- No drop-off in accuracy or timeliness

(ii)    Productivity
- Immediate cost savings through labor arbitrage
- Additional savings over time through productivity improvements
- Improve reliability, responsiveness and support for the entire organization.

(iii)    Customer Culture
- Supplier Personnel should act and feel as if they are part of Customer
  - ꞌ Dedicated to Customer
  - ꞌ Want Customer to win

- Adhere to the Customer mission in all they do

1

> ‣ Build customer relationships
> ‣ Make more money
> ‣ Improve every day

(iv)    Enhance Analytical Capability
- Provide value-added insight into Customer business through analysis of data processed
- Establish quality/ service metrics for measurement of cost benefit and improved decision making for procurement of future services.

(v)    Technological Capacity
- Best in class business processes and reporting systems
- Solid IT interconnectivity for remote access
- Practical relationship model between the parties for system upgrades

The provisions of this **Section 1.2** are intended to be a general statement of the parties' mutual intentions and objectives in entering into this Agreement and a general introduction to the provisions of this Agreement, but are not intended to alter the plain meaning of the specific terms and conditions of this Agreement or to impose obligations on the parties which are not otherwise contemplated by this Agreement. However, to the extent the terms and conditions of this Agreement do not address a particular circumstance or are otherwise unclear or ambiguous, such terms and conditions are to be interpreted and construed with reference to, and so as to give the fullest possible effect to, the mutual intentions and objections of the parties as of the Effective Date, set forth in this **Section 1.2**.

## 2.    DEFINITIONS.

Capitalized terms used in this Agreement have the meanings ascribed to them herein whenever they are used in this Agreement (including in any Appendixes or SOWs hereto). Certain capitalized terms are defined in **Appendix 1** (Glossary of Defined Terms) attached hereto. Other capitalized terms are defined in the context in which they are used.

## 3.    SERVICES AND SOWS.

3.1    **General Description**. This Agreement contains the terms and conditions upon which Customer and its Affiliates may procure professional services from Supplier. Except as otherwise set forth in a particular SOW, nothing in this Agreement shall give Supplier an exclusive right to provide, or require the Customer or its Affiliates to purchase exclusively from Supplier, any of the Services. Except as expressly set forth in any SOW, Customer makes no promises or representations as to the amount of business Supplier may expect under this Agreement. Any estimates or forecasts of Customer's or its Affiliates' future needs for Services are for Customer's planning purposes only, and Customer will have no liability for Supplier's reliance thereon.

3.2    **SOWs**. Supplier shall provide such professional services to Customer and its Authorized Users as the parties may mutually agree upon from time to time (all services provided, or to be provided, by Supplier under this Agreement, including those Services referenced in **Section 4.8**, Start Up Services, Transition Services, Incidental Services and New Services and all Services under a SOW, collectively, the "**Services**"). The parties intend to enter into a written statement of work (each a "**SOW**") which must be signed by both parties to be effective, before Supplier provides any Services to Customer or its

Authorized Users. All Services will be subject to the terms of this Agreement (regardless of whether a SOW is actually signed). In the event of a conflict among the terms of the various documents that at any given time constitute this Agreement, the following order of precedence shall apply: (a) an Amendment (as defined below) shall control over any inconsistent terms in the document that it is amending (e.g., a SOW or this Agreement); and (b) the Master Agreement shall control over any inconsistent terms of an SOW, unless the SOW specifically references inconsistent terms of the Master Agreement that the SOW is changing.

### 3.3    Start-Up and Start-Up Services

(a)    **Performance**. In the event of new service, during the Start-Up Period, Supplier will perform the Start-Up Services. Customer will not incur any charges, fees or expenses payable to Supplier or third parties in connection with the Start-Up Services, other than those charges, fees and expenses specified in a SOW. During the Start-Up Period, Customer will perform those tasks, but only those tasks, that are designated to be Customer's responsibility in the Start-Up Plan.

(b)    **Start-Up Plan and Start-Up Work Plan**. The Start-Up Plan is included in a SOW. Within thirty (30) days after the Effective Date (or such other period of time as is mutually agreed upon by the Parties), Supplier will deliver to Customer for Customer's review, comment and approval a detailed work plan ("**Start-Up Work Plan**"), which will be based on and consistent with the Start-Up Plan, identifying the specific Start-Up activities to be performed by Supplier Personnel during the Start-Up Period. Customer will begin reviewing the draft Start-Up Work Plan promptly after receiving it from Supplier and will provide Supplier with comments or revisions to, or approval of, the Start-Up Work Plan within a reasonable period of time thereafter. Supplier will make all reasonable changes to the Start-Up Work Plan that Customer suggests. Upon Customer approval, the updated Start-Up Work Plan will become a part of the SOW. The Start-Up Period may be extended by mutual agreement of the parties.

(c)    **Completion**. The Start-Up Plan sets forth Service Credits to be paid to Customer by Supplier if Supplier fails to meet Start-Up Milestones or to complete the Start-Up Services in accordance with the time period specified in the Start-Up Plan. Supplier agrees that these amounts will be paid whether or not Customer has paid any amount to Supplier and regardless of any limitation of liability set forth in **Section 16**. If Supplier fails to complete a Start-Up Milestone on time, or the Start-Up is not complete by the end of the Start-Up Period, Customer may terminate the Agreement pursuant to **Section 9.2**.

(d)    **Acceptance**. Supplier will not be deemed to have completed Start-Up Milestones or the Start-Up Services until the applicable Deliverables or Services are accepted in writing by Customer.

(e)    **Suspension or Delay of Start-Up Activities**. Customer reserves the right, in its sole discretion and subject to **Section 3.4** (Change Order Procedures), to suspend or delay the performance of the Start-Up Services and/or the Start-Up of all or any part of the Services. If Customer elects to exercise this right and Customer's decision is based, in material part, on reasonable concerns about Supplier's ability to perform the Services or Supplier's failure to perform its obligations under this Agreement, Customer shall not incur any additional charges or reimbursable expenses in connection with such decision. If Customer's decision is not based in material part on reasonable concerns about Supplier's ability to perform the Services or Supplier's failure to perform its obligations under this Agreement, Customer shall reimburse Supplier for any additional costs reasonably incurred by Supplier as a result of such decision, but only to the extent Supplier notifies Customer in advance of such costs, obtains Customer's written approval prior to incurring such costs and uses commercially reasonable efforts to minimize such costs.

3

3.4    **Change Order Procedure**. Customer may request changes to a SOW, at any time, by providing written notice to Supplier. Within four (4) days after receipt of any such request by Customer (or such other period of time as is mutually agreed upon by the parties in a given case), Supplier shall submit to Customer a proposed change to an SOW. Minor adjustments to an SOW, as determined by Customer, may be effected by use of a Change Order (a form of which is set forth as Appendix 9), which must be signed by both parties to become effective. If Customer deems any proposed change to be a material change to the Agreement, the parties shall negotiate in good faith to produce an amendment to the Agreement, which amendment must be executed by both parties in a formal writing. All Amendments (and all determinations as to whether Amendments are necessary or appropriate) are subject to **Section 4.8** (Included Services) and **Section 5** (Additional Services), below. Absent the execution of an amendment or Change Order, the parties shall fulfill their obligations under each SOW and this Agreement without change.

3.5    **Purchases by Affiliates**. Supplier agrees that Customer and Authorized Users are the recipients and users of the Services described herein and in an SOW without execution of any additional documents. If Customer desires that Supplier provide Services directly to one or more of Customer's Affiliates under a SOW directly between Supplier and one or more of Customer's Affiliates, then, Customer's Affiliates may purchase Services from Supplier under the same terms and conditions of this Agreement, provided that Supplier and such Affiliate of Customer's first mutually agree upon and enter into a SOW governing such purchase. Any Affiliate of Customer who executes such a SOW with Supplier will be deemed to be a "Customer" hereunder for purposes of such purchase and such SOW, and shall be deemed thereby to be bound by the terms and conditions of this Agreement. Unless otherwise agreed to in writing by Customer and Supplier, Supplier shall look solely to such Affiliate (and not to Customer or any other Authorized User) for satisfaction of any liability arising under or relating to such SOW.

3.6    **Customer Responsibilities**. References to Customer's responsibilities in any SOW, Appendix, or other attachment to this Agreement (other than for Customer's promise to pay for the Services procured thereunder) are intended solely for purposes of indicating what is not Supplier's responsibility and shall not in any circumstance constitute grounds for a claim of breach of such SOW, Appendix, or other attachment by Customer. Customer's failure to perform any responsibility assigned to Customer in a given SOW, Appendix, or other attachment to this Agreement may, however, to the extent such non-performance directly impedes Supplier's ability to perform under such SOW, Appendix, or other attachment: (a) limit Supplier's ability to perform, and (b) extend (on an equitable basis) the timeline for Supplier to fulfill its affected responsibilities (including producing affected Deliverables), under the SOW, Appendix, or other attachment, provided, in each such case, that (i) Supplier promptly notifies Customer in writing of such non-performance and its effect upon Supplier and (ii) Supplier uses commercially reasonable efforts to perform or to mitigate the impact. Any changes to a SOW, Appendix, or other attachment necessitated by Customer's non-performance will be subject to **Section 3.4** (Change Order Procedure). If Supplier does not promptly notify Customer in writing (pursuant to **Section 18.4** (Notice), below) of any such non-performance, Supplier shall be deemed to have waived its rights and claims with respect to such non-performance. Customer may not remarket or sell all or any portion of the Services provided under this Agreement, or make all or any portion of the Services available to any party other than Customer and its Authorized Users, without Supplier's prior written consent.

4.    **OTHER SERVICE TERMS.**

4.1    **Account Management**.

(a)    Supplier shall participate in meetings with Customer on a monthly basis, and otherwise as reasonably requested by Customer, to review the performance of the Services and

4

any issues and anticipated issues regarding the Services. Supplier shall identify and assign an Account Manager for the Supplier's program. The Account Manager shall work closely with Customer personnel to identify and implement appropriate account management policies and procedures, including without limitation, time and frequency of business reviews, reporting protocols, change management protocols and other policies and procedures as identified by Supplier and Customer. Any additional support services from the Supplier shall be set forth in the applicable SOW.

(b)    At least once every twelve (12) months, Supplier shall conduct a customer satisfaction survey of Customer's Personnel regarding the Services performed under each SOW. The timing, content, scope, method, and intended respondents of the surveys shall be as mutually agreed upon by the parties in writing and in advance. Supplier shall maintain and share at every business review, or ad-hoc as appropriate, an informal record of Customer's Personnel's satisfaction ratings. Supplier shall present to Customer, action plans to address any satisfaction issues uncovered during either the formal or informal customer satisfaction process.

4.2    **Customer-Retained Authority**. Customer shall have the exclusive right and authority to: (a) set Customer's strategy for the outsourced business process(es) related to the Services; (b) determine, alter, and define all of Customer's business processes and requirements; (c) define and prescribe design standards and architecture with regard to the technology platform and infrastructure for the Electronic Systems used to provide the Services hereunder; and (d) assess the quality and performance of Supplier and the Services. Supplier shall, at all times during the Term and any Transition Services period, perform and provide the Services in accordance, compliance, and conformity with the strategies, processes, and standards described in the immediately preceding sentence. Supplier shall also cooperate with Customer and provide Customer with advice, information, and assistance in identifying and defining projects outside the scope of the Services, but related to the Services, that Supplier believes would be beneficial to Customer. Changes to Supplier's Electronic Systems (not contemplated by the underlying SOW) that are mandated by Customer shall be subject to **Section 3.4 (Change Order Procedure)** above.

4.3    **Supplier Provided Systems and Customer Provided Systems.**

(a)    **Supplier Provided Systems**. Supplier hereby grants to Customer and its Authorized Users, for the term of the applicable SOW, a non-exclusive, worldwide, unlimited user, royalty-free (subject only to the fees provided for in the SOW), multi-site, enterprise-wide, irrevocable (except as expressly provided herein) license and right to access, copy, use, and modify, in connection with the Services, any Supplier Provided Systems which Supplier provides (or is required to provide) Customer and its Authorized Users access to pursuant to such SOW. Supplier shall be responsible for obtaining all Required Consents necessary to enable Supplier, Customer, and the Authorized Users to access, copy, use, and modify the Supplier Provided Systems in accordance herewith. Supplier shall bear all costs, if any, of obtaining the Required Consents described in this paragraph.

(b)    **Customer Provided Systems**. Customer hereby grants to Supplier, solely as necessary and appropriate for Supplier's use in providing the Services, a non-exclusive, non-transferable, limited, personal right to use, during the term of the applicable SOW, the Electronic Systems of Customer and its Affiliates that are designated as **"Customer Provided Systems"** in such SOW. Except as otherwise provided in **Section 18.3** (Export Requirements) or in the applicable SOW: (i) Customer shall be responsible for obtaining all Required Consents necessary to enable Supplier to use the Customer Provided Systems in accordance herewith; and (ii) Customer shall bear all costs, if any, of obtaining the Required Consents described in this paragraph. At Supplier's request, Customer shall cooperate with Supplier in obtaining the

5

Required Consents by executing appropriate Customer approved written communications and other documents prepared or provided by Supplier.

(c)    **Inventory.** Except as may be otherwise set forth in a SOW, each SOW shall contain an inventory (the "**Inventory**") of all: (i) Customer Provided Systems that will be used by Supplier under such SOW; (ii) Supplier Provided Systems that: (A) will located at any of Customer's or its Affiliates' locations; (B) Supplier shall otherwise provide Customer and its Authorized Users access to, pursuant to such SOW; or (C) Supplier will use in connection with providing the Services under such SOW. Unless otherwise stated in the SOW, the Inventory shall be updated by Supplier (subject to Customer's prior written approval) prior to each anniversary of the execution of the applicable SOW.

(d)    **Supplier's Responsibilities.** Except as expressly otherwise set forth in a SOW or elected by Customer in writing, Supplier shall be solely responsible for the procurement, provision, installation, repair, maintenance, operation, support, and replacement of all Supplier Provided Systems needed or otherwise used by Supplier to perform the Services or by the Authorized Users to receive or use the Services, as well as for, as described in the applicable SOW, the interfacing and integration of such Supplier Provided Systems with any Customer Provided Systems or other Electronic Systems of Customer and its Authorized Users.

(e)    **Non-Commercially Available Software.** Supplier shall clearly indicate on the Inventory contained in each SOW any software (whether of Supplier or of any third party) used in providing the Services under such SOW that is not commercially available, reasonably describing the function or purpose of such software and the party from which it was obtained (if other than Supplier).

(f)    **Risk of Loss.** Supplier is responsible for risk of loss of and damage to: (i) all Supplier Provided Systems; and (ii) any Customer Provided Systems in Supplier's control or custody; except that, in each such case, Customer shall be responsible for any such loss or damage to the extent such loss or damage is due to the negligence or willful misconduct of Customer.

4.4    **Supplier Cooperation.**

(a)    **Customer Interfaces.** Customer shall have the right to interface any Customer Provided Systems, and any other Electronic Systems developed or acquired at any time by Customer or its Authorized Users, to or with the Services and any Supplier Provided Systems that Supplier provides (or is required to provide) Customer access to. Customer shall also have the right to use the Services in conjunction with any such Customer Provided Systems and other Electronic Systems. Supplier shall have no ownership interest in any such Customer Provided System or other Electronic System by virtue of its having been interfaced with, or used in conjunction with, the Services, and Customer shall have no ownership interest in any Supplier Provided System by virtue of its having been interfaced with, or used in conjunction with, the Services. There shall be no additional charge for Customer to exercise the rights granted in this **Section 4.4(a)**, unless Customer requests Supplier to provide material additional Services that are then, in accordance with this Agreement, outside of the scope of the Services to be provided hereunder (in which case, such requested additional Services shall be subject to the Amendment procedure set forth in **Section 3.4** (Change Order Procedure).

(b)    **Customer Personnel.** Supplier shall reasonably cooperate (at no additional charge) with Customer's Personnel to allow the proper performance of any tasks, activities,

6

services, or duties of Customer or its Personnel that relate in any way to the Services. Such cooperation shall include, but shall not necessarily be limited to: (i) providing Customer's Personnel with reasonable access to any Supplier Provided Systems; (ii) if applicable, working with Customer's help desk Personnel to prepare appropriate help desk scripts and integrating Supplier's help desk procedures with Customer's help desk; and (iii) providing any other information reasonably requested by Customer regarding the day-to-day performance or use of the Services or the Supplier Provided Systems.

(c)   **Multiple Providers.**  Supplier acknowledges that, at any given time, Customer and its Affiliates may have multiple vendors providing the same Services or services that are similar to the Services, and that Customer's entering into this Agreement with Supplier was expressly conditioned upon Supplier's agreement: (i) to work with the third-party vendors of Customer and its Affiliates including attending joint governance meetings with Customer and such vendors, and, (ii) if so directed by Customer, to communicate and cooperate with such third-party vendors regarding the Services, in order to achieve consistency, uniformity, and seamless interaction between Customer's various suppliers.  Supplier shall at all times treat each of Customer's third-party service providers in a fair and nondiscriminatory manner and shall refrain from interfering with any such service-provider or Customer's relationship therewith.

(d)   **Documentation.**  Supplier will provide to Customer reasonable Documentation for the Services (including Documentation for the Supplier Provided Systems that are to be accessed or used by the Authorized Users).  Subject to limitations expressly set forth in the applicable SOW, Customer and its Authorized Users shall have the right to use, copy, modify, and make derivative works of such Documentation, provided that Customer does not remove any copyright notices or other proprietary notices appearing in such Documentation.

4.5   **Changes in the Services Environment.**  As the Services are integral to the operation of Customer's business, Supplier acknowledges and agrees that modifications to the methods and means by which Supplier provides the Services (including changes to any Supplier Provided Systems) could reasonably be expected to have a foreseeable, material, and adverse impact upon Customer. Consequently:

(a)   **Service Reductions.**  Supplier shall not reduce the quality of, or change the components of, any Services or functionality provided by Supplier to Customer hereunder, or refuse or cease to provide, or eliminate or remove any component or part of, any of the Services, without the prior written consent of Customer.

(b)   **Material Modifications.**  Except for repairs and replacements of items that are reasonably necessary to be conducted on an expedited basis due to equipment or software failures, Supplier shall notify Customer in writing and in advance of any significant planned modification to the environment in or from which the Services are provided (including any modification to, or replacement of, any material portion of any Supplier Provided System and any relocation of, or material modification to, any Supplier Facilities) and of the dates on which any such modification is scheduled to be implemented (any such modification, a "**Material Modification**").  Supplier shall, in a timely manner, inform Customer of and involve Customer in, planning and decisions regarding Material Modifications. Supplier shall provide Customer with a written report describing any benefits, savings or risks associated with such modification and propose strategies to mitigate any adverse risks or impacts associated with such change.  If, in Customer's reasonable business judgment, any such Material Modification could reasonably be expected to materially and adversely affect Customer, the Authorized Users, the Services or their level of quality or continuity, or the costs incurred by Customer or its Authorized Users in

7

connection with the Services, then Supplier shall obtain Customer's written approval, which approval shall not be unreasonably withheld or delayed, prior to making such Material Modification. Customer may withhold its approval of a Material Modification if Customer reasonably believes such modification will have a material adverse affect on Customer, the Authorized Users or the Services. In addition, Supplier shall be responsible for, and shall promptly pay or reimburse Customer and its Affiliates for, any incremental or additional costs incurred in connection with any Material Modification, other than Material Modifications (not otherwise required by this Agreement, including any SOW) that are required by Customer or that become necessary as a result of a negligent act or omission of Customer. Supplier shall make no change which may increase the Customer's total cost of receiving the Services without the prior written approval of Customer, in its sole discretion.

(c)    **Cooperation**. Supplier shall, in a timely manner, cooperate and work diligently and collaboratively with Customer in connection with each of the items described above in this **Section 4.5**.

4.6    **[Reserved to SOW]**.

4.7    **Disaster Recovery Plan**. Supplier shall maintain and keep current a reasonable disaster recovery plan for Supplier locations from which Services are provided under this Agreement (the **"Supplier Facilities"**). In addition, Supplier will require that any subcontractors of Supplier (other than those which provide only ancillary services, such as food service, janitorial service, building security and the like) also maintain and keep current a reasonable disaster recovery plan for locations from which such subcontractors perform Services. Upon Customer's reasonable request, Supplier shall make such plans available to Customer for review.

4.8    **Included Services**. If any services, functions, tasks, activities, or other responsibilities (including any such responsibilities related to compliance with Applicable Laws) not specifically described in this Agreement (including in any SOW) are an inherent, necessary, or customary part of the Services described herein, such services, functions, tasks, activities, and responsibilities shall be deemed to be included within the scope of the Services to be provided hereunder, as if such services, functions, tasks, activities, and responsibilities were specifically described in this Agreement. Additionally, the Services under each SOW shall be deemed to include all of the functions that were performed by Customer's employees who previously provided Services substantially similar to the Services to Customer. If there is a dispute between the parties as to whether a particular function is included within the scope of the Services, Supplier shall perform such function until such dispute is resolved, and such function shall be considered to be a part of the Services if it is consistent with and reasonably inferable to be within the scope of the Services to be provided hereunder.

4.9    **Reprioritization**. Customer may reprioritize the schedule for the performance of the Services, and designate which problems or issues relating to the Services shall be resolved immediately by Supplier (versus those for which resolution may be deferred), as Customer deems necessary and appropriate from time to time, and Supplier shall promptly comply with any directions by Customer in this regard. The immediately preceding sentence shall not relieve Supplier of its responsibility for identifying and addressing problems and otherwise meeting its obligations hereunder. Supplier may require that any of the foregoing changes that would have more than a de minimis impact upon Supplier shall be addressed pursuant to Section 3.4 (Change Order Procedure).

4.10    **Procedures Manual**. Within forty-five (45) days after the execution of any given SOW, Supplier shall develop and deliver to Customer, as part of the Services and at no additional charge, an operational procedures manual (the **"OPM"**) that documents: (a) how Supplier shall provide the Services

8

under such SOW; and (b) the procedures, including problem escalation procedures, for the interaction of Customer and Supplier with respect to such Services and such SOW. The OPM shall be subject to Customer's reasonable approval, and Supplier shall revise the OPM to incorporate changes requested by Customer within fifteen (15) days after receipt of such changes. Customer reserves the right to identify, from time to time, such other items, in addition to those listed herein, as Customer shall deem appropriate for inclusion in any given OPM. Each OPM shall be delivered to Customer, and maintained by Supplier, in hard copy and electronic formats and shall be made accessible electronically by Supplier to Customer's Personnel in a manner consistent with Customer's security policies. In the event of a conflict between the provisions of this Agreement (including those of any SOW) and any OPM, the provisions of this Agreement shall control. No OPM shall be considered an amendment to this Agreement. Prior to the anniversary of the execution of the given SOW, or more frequently as agreed by the parties, Supplier shall revise the OPM for such SOW as appropriate to reflect any changes to the Services or Customer's environment and business and to otherwise update it and make it current. Supplier shall submit the revised OPM to Customer for review, comment, and approval (which approval shall not be unreasonably withheld) and shall promptly incorporate any changes requested by Customer. The OPM shall be deemed to be a Deliverable, which shall become the sole and exclusive property of Customer in accordance with **Section 7.2** of this Agreement.

4.11   **Reports and Back-Up Documents**.

(a)   **Reports**. Supplier shall, in a prompt and timely manner, provide Customer with such reports pertaining to the performance of the Services and Supplier's other obligations under this Agreement as are reasonably necessary and sufficient, as further described below, to permit Customer to monitor and manage Supplier's performance hereunder ("**Reports**"). All Reports and invoices from Supplier to Customer shall be based upon Customer's fiscal calendar, which shall be communicated annually to Supplier by Customer. The Reports to be provided to Customer by Supplier shall include those described in each SOW and such additional Reports as are reasonably requested by Customer from time to time. All Reports shall be in electronic, editable form, in a format reasonably acceptable to Customer, and shall be provided by Supplier at such frequencies as are provided in the SOW or otherwise requested by Customer. In addition, Supplier shall provide Customer with any data and reports in Supplier's possession that are necessary or appropriate for the Customer and its Authorized Users to comply with all Applicable Laws. All Reports shall be provided to Customer as part of the Services and at no additional charge to Customer. Supplier shall promptly inform Customer of any deficiencies, omissions, or irregularities in Customer's requirements relating to the Services, or in Supplier's performance of the Services, that may come to Supplier's attention.

(b)   **Back-Up Documentation**. As part of the Services, Supplier shall provide Customer with such Documentation and other information as may be reasonably requested by Customer from time to time in order to verify the accuracy of the Reports provided by Supplier to Customer hereunder. In addition, Supplier shall provide Customer with all documentation and other information reasonably requested by Customer from time to time to verify that Supplier's performance of the Services is in compliance with the Service Levels and this Agreement.

4.12   **Use of Customer's Locations**. Except as otherwise set forth in a SOW, Supplier shall be responsible for providing the Services from Supplier Facilities. If any given SOW provides that Customer will make office space or storage space at any of Customer's facilities available to Supplier, then Customer will provide such space, and any reasonable and customary related office support services (such as parking privileges, access cards or badges, cafeteria services, and furniture), to Supplier, as such level of support services may be modified from to time, but only to the extent Customer provides such items to its own employees at such Customer location. Supplier shall only provide Services from the

locations set forth in the SOW and will not change these locations without Customer's prior written approval, which approval shall not be unreasonably withheld or delayed. Supplier's use of any of Customer's locations does not constitute or create a leasehold interest, and Customer may, upon request from time to time, require that Supplier re-locate to other reasonably equivalent space within Customer's location.

4.13 **Support of Supplier's Other Customers**. Supplier shall not use any Customer Provided Systems, any of Customer's Confidential Information, any Deliverables, or any space at any of Customer's locations, to provide services to Supplier's other customers.

4.14 **Technology Refresh Plan**. The Technology Refresh Plan, attached as **Appendix 4 (Technology Refresh Plan)** hereto, describes in detail Supplier's commitments to periodically refresh, at no additional cost to Customer, the technology used to deliver the Services. At least thirty (30) days prior to each anniversary of the Effective Date, Supplier shall revise the Technology Refresh Plan as appropriate to reflect any changes to Customer's environments, and related requirements, and submit such revised Technology Refresh Plan in writing to Customer for review and comment. Within fifteen (15) days after receipt of such revised Technology Refresh Plan, Customer shall notify Supplier in writing whether such revised plan shall have been accepted by Customer, in its reasonable discretion, or otherwise describe in reasonable detail the deficiencies of such revised plan, in which latter case Supplier shall have an additional period of fifteen (15) days to make further revisions and resubmit such revised plan to Customer for review, comment and, when such revised plan is reasonably acceptable to Customer, approval

4.15 **Ariba Electronic Communications:**

(i) **Electronic Communications.**

(i) If required by Company, in order for the parties to more effectively communicate electronically with one another and automate various operations between them, Company and Supplier shall utilize Company's third party e-commerce service provider, currently Ariba Supplier Network, or as otherwise identified by Company to Supplier from time to time ("**E-Commerce Provider**"). This will allow the parties to transmit to one another various documents and communications, including but not limited to, Purchase Orders, requests for proposals, invoices, acknowledgements, catalogs and catalog punch-outs (**E-Documents**").

(ii) Company and Supplier shall be individually responsible for purchasing or acquiring a license to install and/or use any software application, host site, support services agreement, equipment, maintenance service agreement or any other process or service deemed necessary by Company, and any renewals thereof, in order to access and utilize the E-Commerce Provider's electronic communications portal, record retention system and any other modules or accessory applications deemed necessary by Company (the "**E-Network**"). Company shall not be responsible for Supplier's failure to pay fees due to the E-Commerce Provider or Supplier's failure to adhere to the terms of use of the E-Network. Supplier shall agree to abide by the negotiated terms and conditions of its agreements with the E-Commerce Provider. In the event that Supplier fails to maintain a relationship or breaches or defaults on its agreements with the E-Commerce Provider, such failure may result in a cross-default of this Agreement, and the cancellation by Company of Purchase Orders placed with Supplier with no liability to Company for any such cancellation.

(iii)   Supplier shall be solely responsible for the purchase price or licensing fees, transaction fees, and renewal fees assessed by the E-Commerce Provider, and Supplier shall not pass

10

along any fees to Company. Supplier shall also be responsible for the training of its employees or agents in utilizing the E-Network and for their proper use of the E-Network and any associated user IDs and passwords.

(iv)    The transmission of E-Documents via the E-Network shall have the same validity and enforceability as hard copy written Purchase Orders and other written communications between the parties. Company shall provide to Supplier notice and a thirty (30) day period to cure if paper invoices submitted by Supplier are not acceptable. Neither party is responsible for any communication non-receipt, or the failure, crash or temporary unavailability of the E-Network, and neither party may use any such instance as a basis for any breach it commits under this Agreement.

4.16    **Compliance with Other Parties' Facility Rules**. Each party shall cause its Personnel who visit the other Party's facilities to comply, while at such facilities, with all reasonable written policies and procedures of the other party that are provided to its Personnel in advance, including anti-sexual harassment policies..

5.    **ADDITIONAL SERVICES.**

5.1    **Incidental Services**.

(a)    If Customer requests Supplier to assume additional responsibilities, or perform additional services or tasks that are related to, but not already included in, the Services under any SOW, then, to the extent such additional responsibilities, services or tasks are not New Services (defined below) Supplier shall perform such services and tasks at no additional charge to Customer (collectively, "**Incidental Services**"). In the event Supplier's performance of the Incidental Services results in a net reduction in Supplier's costs of providing the Services, Supplier will provide Customer a credit in the amount of such savings.

(b)    If changes to Supplier Provided Systems are initiated by Supplier (rather than Customer), or are undertaken with the intent to benefit Supplier's other customers, as well as Customer, or are undertaken as part of Supplier's general development or expansion of its services or business, the costs for such changes will be borne by Supplier.

5.2    **New Services**. In the event that Customer requests Supplier to perform additional services that (i) are different from the Services, (ii) require Supplier to provide additional resources or add additional costs, liability, Personnel or training that increase Supplier's cost of performance, and (iii) for which there is no pricing metric or charging method under a SOW (collectively, "**New Services**") then the charges for such New Services shall not exceed the fair market value for such New Services, and such additional services shall be addressed through an Amendment pursuant to **Section 3.4** (Change Order Procedure).

Notwithstanding anything to the contrary in this **Section 5.2**, increases in volumes of existing Services for which there exists a charging method or pricing metric shall not be New Services.

6.    **SERVICES LEVELS.**

6.1    **Generally**. In the event the parties agree to any service levels ("**Service Levels**"), such Service Levels shall be identified in the applicable SOWs. Supplier's performance of the Services shall meet or exceed each of the applicable Service Levels. Each SOW shall also contain any pre-determined, mutually agreed upon, monetary credits that Supplier shall issue to Customer (as provided below) in the

event Supplier fails to attain a Service Level (each such credit, a "**Service Credit**"). Supplier shall comply with the additional terms and conditions for Service Levels set forth in **Appendix 5**.

6.2    **Reports**. Each month Supplier shall provide Customer with a monthly Report, with detail reasonably requested by Customer with respect to each SOW, that identifies: (a) each Service Level and the actual level of performance achieved with respect to such Service Level for the previous month (the "**Measurement Month**") and for each of the 12 months immediately preceding the Measurement Month; (b) whether such Service Level has been met for the Measurement Month; (c) the amount of applicable Service Credits due for the Measurement Month and the amount of Service Credits which were due for each of the 12 months immediately preceding the Measurement Month; and (d) a detailed calculation of whether any Excessive Service Level Failures have occurred for the Measurement Month and whether any Excessive Service Level Failures have occurred for each of the 12 months immediately preceding the Measurement Month ("**Service Level Reports**"). In addition, Supplier shall provide the results of any trend analyses, or other statistical analyses, reasonably requested by Customer with respect to the performance of the Services in comparison with the Service Levels. Supplier shall provide such monthly Service Level Reports by the fifth (5th) business day of the month following the Measurement Month. Failure by Supplier to timely provide such Reports for any Service Level shall be deemed a failure by Supplier to meet such Service Level with respect to the applicable month. Supplier shall provide such other information or data pertaining to the Service Levels and performance of the Services that Customer may reasonably request from time to time.

6.3    **Application of Service Credits**. Supplier shall deduct any Service Credits that are to be issued, as set forth above, from Customer's invoices in accordance with **Section 8.6** (Method of Payment and Timing).

6.4    **Excessive Service Level Failure**. In the event the parties define in a SOW any Service Level failures, or combination of Service Level failures, as giving rise to a right for Customer to terminate such SOW (each, an "**Excessive Service Level Failure**"), and such an Excessive Service Level Failure occurs, Customer shall have the right to terminate the applicable SOW, without Termination Charges, pursuant to **Section 9.2** (Termination for Cause By Customer).

6.5    **Service Level Exceptions**. Supplier shall be relieved of a failure to meet a Service Level, and shall not be required to issue Service Credits for any failure to meet a Service Level to the extent that such failure is attributable to a Force Majeure Event, the failure of Customer to perform its responsibilities as set forth in the Agreement or any applicable SOW, or a negligent act or omission by Customer's Personnel (each an "**Excused SLA Failure**"). An Excused SLA Failure shall only apply to the specific failure and shall not apply to any future failure except to the extent the future failure is caused by an Excused SLA Failure.

7.    **PROPRIETARY RIGHTS.**

7.1    **Customer IP Rights**. Supplier acknowledges that: (a) Customer or its Affiliates have exclusive ownership in the Intellectual Property of Customer and its Affiliates (the "**Customer Intellectual Property**"); (b) except as expressly otherwise stated in this **Section 7** (Proprietary Rights), this Agreement is not a license or assignment of any right, title, or interest in the Customer Intellectual Property; and (c) Supplier shall not: (i) represent, in any manner, that it has any ownership or other interest in the Customer Intellectual Property, or (ii) use, print, or duplicate the Customer Intellectual Property unless it has obtained prior written approval from Customer. Any permitted use of any Customer Intellectual Property by Supplier is limited to the term of the SOW for which it was provided or

made available, and upon termination of such SOW or this Agreement, Supplier shall immediately cease all use of the Customer Intellectual Property received pursuant to the terminated SOW or this Agreement (absent a separate written agreement granting a license for such use).

7.2    **Ownership**.  Customer shall be, effective upon creation of any given Deliverable, the sole owner of such Deliverable and all Intellectual Property rights in such Deliverables (the "**Transferred IP Rights**").

7.3    **Works Made For Hire**.  Any copyrightable aspects of Deliverables shall be "works made for hire" to the fullest extent permitted by law.  Supplier hereby assigns to Customer, effective upon the creation of any given Deliverable, forever and in perpetuity, Supplier's entire and worldwide right, title, and interest in such Deliverable and all Transferred IP Rights pertaining thereto.  Supplier shall promptly execute any documents that Customer may reasonably request from time to time to give effect to the provisions of this **Section 7.3**.  Supplier shall enter into written agreements with its Personnel as necessary to establish Customer's sole ownership in such Deliverables and the Transferred IP Rights, and Supplier shall provide Customer with copies of such agreements upon Customer's request.  Supplier shall take all registration and other similar regulatory actions as may be required under Applicable Law to ensure that Customer receives the full rights of ownership in Deliverables as such rights are described in this **Section 7.3**.  Supplier appoints Customer its attorney-in-fact with the exclusive right to execute assignments of, and register all rights to, the Deliverables and the Transferred IP Rights.  This appointment is coupled with an interest and will survive termination of this Agreement.

7.4    **Waiver of Moral Rights**.  To the extent permitted by law, any assignment of copyright under the terms of this Agreement and the applicable SOW, shall include all Moral Rights, including any rights under Section 57 of the Indian copyright Act, 1957. To the extent such Moral rights cannot be assigned under Applicable laws, rules and regulations and to the extent the following is allowed by laws in the various countries where Moral Rights exist, Supplier hereby waives such Moral Rights and shall cause supplier Personnel who will provide any Services to waive such Moral Rights. Supplier acknowledges the receipt of equitable compensation for its assignment and waiver of such Moral Rights and agrees to provide equitable compensation to Supplier Personnel for any assignment or waiver of Moral Rights.

7.5    **Supplier IP Rights**.  The term "Deliverables" does not include **"Supplier Intellectual Property"** which for purposes of this Agreement means (a) any pre-existing Intellectual Property (including Supplier Provided Systems) that Supplier created, owned or licensed prior to Supplier's retention by Customer, or (b) any Intellectual Property that Supplier develops without using or reference to Deliverables, Customer's Confidential Information or (c) any Intellectual Property developed by Supplier other than in the course of providing Services to Customer or (d) Supplier Algorithms (as defined below and subject to the terms set forth in Section 7.7(d)).  Subject only to the licenses granted in this Agreement, title to the Supplier Intellectual Property will not be affected by this Agreement and will at all times remain with Supplier or the applicable third-party licensor.  To the extent reasonably required to permit Customer and its Authorized Users to fully and completely use and receive the benefit of the Services (during the Term) and the Deliverables (during and after the Term), Supplier hereby grants to Customer a perpetual, unrestricted, worldwide, royalty-free (subject only to the fees provided for in the applicable SOW), multi-site, enterprise-wide, irrevocable (except as otherwise provided herein), non-exclusive right and license to copy, use, modify and sub-license all Supplier Intellectual Property that is embedded in the Deliverables or that is otherwise required for Customer to fully and completely use the Deliverables during and after the term, to the same extent as if Customer were the sole owner thereof, without an obligation to account to Supplier.  Supplier shall not provide to Customer any Supplier Intellectual Property for which Supplier does not have the right to grant the foregoing license.  Customer shall have the right to approve the introduction or use of Supplier Intellectual Property which has a

13

material effect on the Services prior to the use of such materials by the Supplier in provision of Services to the Customer.

7.6    **Third Party Materials.** The Supplier's obligation with reference to the use of Third Party Materials in provision of Services to Customer is set forth in **Appendix 7.**

7.7    **Customer Data.**

(a)    **Ownership.** Customer Data, including all Intellectual Property Rights subsisting therein, is and will remain the sole property of Customer. Supplier hereby assigns to Customer any right, title, and interest in any Customer Data that shall at any time vest in Supplier. Customer Data will not be utilized by Supplier or its Subcontractors for any purpose other than the performance of Services under this Agreement and will not be sold, assigned, leased or otherwise transferred, disposed of or provided to third parties by Supplier or commercially exploited by or on behalf of Supplier or any Supplier Personnel. Supplier will not possess or assert any lien or other right against or to Customer Data.

(b)    **Customer Access.** Supplier, shall, upon Customer's request, at no additional charge, promptly provide Customer with a copy of all Customer Data in Supplier's possession. Supplier shall provide to the Customer all passwords, codes, comments, keys, documentation and the locations of any such files and other materials promptly upon Customer's request, including equipment and software keys and such information as to format, encryption (if any) and any other specification or information necessary for Customer to retrieve, read, revise or maintain such files and information.

(c)    **Customer Data Protection and Security.** In addition to other safety and security obligations set forth in this Agreement, the Supplier will establish and maintain physical facility procedures, technical and administrative data security procedures and other safeguards against the destruction, loss, alteration or theft of or unauthorized access to any Customer Data in the possession of Supplier as described in **Appendix 2.**

(d)    To the extent set forth in the applicable SOW, Customer shall furnish Supplier with Customer Data required for Supplier to perform the Services. Supplier may develop statistical algorithms based upon Customer's Data for its own internal use (the "**Supplier Algorithms**") and, unless otherwise agreed to by the parties in writing, Supplier shall not be required to disclose or provide the Supplier Algorithms or improvements thereto to Customer. Supplier may use the Supplier Algorithms in its business generally, subject in all cases to protecting the confidentiality of any Customer Data and provided that Supplier does not reveal o the third parties to whom Supplier discloses the existence of such Supplier Algorithms (and it is not otherwise evident to such third parties, from the facts and circumstances), that such Supplier Algorithms were developed, in whole or in part, based upon Supplier's experience with Customer Data. Notwithstanding the foregoing, if Supplier's Personnel disclose such Supplier Algorithms to Customer's Personnel, then Customer shall be entitled to treat such Supplier Algorithms as Deliverables and they shall be subject to the same license that applies to Supplier Intellectual Property generally under Section 7.5.

7.8    **General Knowledge.** This Agreement will not preclude Supplier from using its general knowledge, skills and experience for its other customers; provided, however, that Supplier shall not use in connection therewith any of Customer's Confidential Information or any Customer Intellectual Property.

7.9    **No Liens**. No mechanics' or other lien, or notice creating such lien, or claim or action thereon, will be filed by Supplier, or any person or entity acting through Supplier, for Services or Deliverables under this Agreement.

## 8.    COMPENSATION.

8.1    **Fees and Expenses**. The compensation to be paid by Customer for any Services will be set forth in the applicable SOW. The fees or rates set forth in each SOW shall remain in effect for the term of such SOW and will not be changed except by mutual written agreement of the parties. Supplier will only invoice Customer for time spent in the performance of the Services, in accordance with each SOW (e.g., travel time is not billable). All costs and expenses incurred by Supplier in performance under this Agreement will be borne by Supplier, and Supplier shall not be entitled to any compensation or reimbursement in connection with the Services unless such amounts are explicitly set forth in the applicable SOW. Reimbursable expenses, if any as set forth the applicable SOW, will be: (a) subject to Customer's expense reimbursement policy, as delivered to Supplier from time to time; (b) reasonable; and (c) billed at Supplier's actual out-of-pocket cost.

8.2    **Taxes**. The parties' respective responsibilities for taxes arising under or in connection with this Agreement are described in **Appendix 6**.

8.3    **Right to Set Off**. Customer will have the right to set off any amounts due Customer against any amounts owed to Supplier.

8.4    **Invoices**. Supplier will provide to Customer, in a form reasonably acceptable to Customer, monthly invoices with reasonably detailed documentation of, in accordance herewith, any reimbursable expenses. Invoices will be delivered to the location(s) specified by Customer and in accordance with the schedule reasonably required by Customer. In the event multiple Customer Affiliates receive Services under this Agreement, Supplier will, upon Customer's request, separately invoice each such Customer Affiliate for that entity's portion of the fees and reimbursable expenses.

8.5    **No Charge for Reperformance**. At no additional expense to Customer, Supplier shall reperform Services that are incorrect, or do not comply with the requirements of this Agreement, due to an error or breach by Supplier, so long as it is logical and possible to reperform the same Services. The resources required for such performance will not be counted in calculating the charges payable or resources utilized by Customer under this Agreement.

8.6    **Method of Payment and Timing**. Customer will initiate payment on Supplier's properly submitted invoices within sixty (60) days after receipt of the invoice. Customer has no obligation to pay any fees or expenses invoiced more than three (3) months after they accrue. Customer is not required to pay any disputed charge until after the resolution of the dispute. In the event that Customer disputes only a portion of the charges on an invoice, Customer shall timely pay (within the time frames set forth in the first sentence under this Section), the undisputed portions of such invoice. All fees, expenses and all other amounts under this Agreement are payable in U.S. Dollars. Credits incurred in any month will be applied against the next monthly invoice.

8.7    **Records**. Supplier shall: (a) maintain complete and accurate records and books of account with respect to this Agreement (including any SOWs) and transactions processed by Supplier on Customer's behalf under this Agreement (including any SOWs) utilizing United States generally accepted accounting principles, consistently applied and complying in all respects with all Applicable Laws; and (b) maintain any other records reasonably necessary to document Services provided (including Service Level performance) and fees paid or payable by Customer under this Agreement. All such records shall

be retained by Supplier until the later of: (i) three (3) years after billing of any related charges by Supplier (or such longer period as required by law); and (ii) final resolution of any actively pending disputes between the parties relating to Supplier's charges. Upon five (5) days' notice from Customer, Supplier shall provide Customer's Personnel with reasonable access to such records and documents. Supplier shall, at Customer's election, either deliver copies of such records to Customer or provide access to such records at Supplier's facility during regular business hours. Supplier and Customer will each bear their own costs associated with the review.

8.8    **Most Favored Company**. Supplier agrees to treat Customer as its most favored customer, including as provided below in this **Section 8.8**. Supplier represents that all of the prices, warranties, benefits and other terms being provided to Customer under this Agreement as of the Effective Date are equivalent to or more customer-favorable than the terms currently being offered by Supplier to its current customers for substantially similar services with similar volume and characteristics. If, at any time and from time to time during the Term, Supplier enters into an agreement with any other customer providing such customer with more favorable terms than those then applicable under this Agreement, and such other customer's agreement provides for services that are substantially similar to those provided for under this Agreement (including similar volume and characteristics), then this Agreement shall be deemed appropriately amended to provide such terms to Customer. Supplier shall promptly provide Customer with any refund or credits hereby created.

8.9    **Paradigm Technological Shift**. If a revolutionary, material shift and improvement occurs in the technology available to provide any type of services that constitutes a substantial portion of the Services, and if such technology is generally available (including availability to Supplier), is outside the normal evolution of technology experienced by the similar customers, and was not generally available as of the later of the Effective Date or the latest amendment to this Agreement (if any) pursuant to this **Section 8.11** and is beneficial to Customer such improvement shall be a **"Paradigm Technological Shift"** If a Paradigm Technological Shift occurs, and if Customer requests an amendment pursuant to this **Section 8.11** to receive the benefit, this Agreement shall be appropriately and equitably amended (including Fees, Statement of Work, and other relevant provisions) to take such Paradigm Technological Shift into account.

8.10    **Benchmarking**.

(a)    If Customer reasonably believes that Supplier is not providing services, performance or pricing that is commensurate with industry norms, Customer shall advise Supplier. In that event, Supplier and Customer shall as soon as practical thereafter commission at Customer's sole expense a benchmarking review conducted by an independent third party with knowledge and experience in customer call center programs selected by the parties (a "Benchmark").

(b)    **Other Price Reviews**. From time to time during the term of the applicable SOW, Customer may, at its own cost, engage a Benchmarker to conduct a Benchmarking or similar competitive review.

(c)    **General**. Any Benchmarker engaged by the parties or by Customer shall execute an appropriate non-disclosure agreement. Supplier shall cooperate fully, in a collaborative manner, with Customer and the Benchmarker and shall provide reasonable access to the Benchmarker during such effort, all at Supplier's cost and expense. The Benchmarking shall be conducted so as not to unreasonably disrupt Supplier's operations under this Agreement.

(d)    **Results of Required Benchmarking**. For any Benchmarking required under the applicable SOW, the Benchmarker shall submit a written report to both parties setting forth the Benchmarker's findings and conclusions (the "**Benchmark Results**").

(e)    **Non-Competitive Charges.**  If the Benchmark Results indicate that the charges being paid by Customer for the Benchmarked Services under the applicable SOW are greater than one standard deviation higher than the median of the prices charged by other well-managed business process providers for services of a similar nature, type and volume (the "Benchmark Standard"), or the service levels associated with the contracts reviewed in creating the Benchmark Standard are more stringent than those in effect under the applicable SOW, Customer and Supplier will negotiate new pricing in good faith for 30 days.  If no agreement is reached, Customer may exercise its right to terminate under Section 9.4 (Termination for Convenience).

8.11    **Revised Pricing Model**. At any time during the term of a SOW, Customer may request a change in the pricing methodology or billing units that comprise the charges under the SOW. For example, Customer may desire to move from an FTE based pricing model to one that is transaction or unit based. If Customer requests this change, Supplier shall promptly, but in no event more than thirty (30) days after Customer's request, provide to Customer a written document detailing the proposed new charges based on the pricing methodology requested by Customer. The parties shall within thirty (30) days after Customer receives Supplier's proposed pricing negotiate in good faith the revised pricing provided that Customer retains the right to cease such negotiations at any time and continue under the pricing terms documented in such SOW. Supplier covenants that the revised pricing model shall not result in Customer's overall charges increasing under a SOW unless Customer is requesting New Services or increased volumes of Services in connection with such pricing change. The revised pricing terms to which the parties agree shall be set forth in an Amendment.

## 9.    TERM AND TERMINATION.

9.1    **Term**. This Agreement will become effective as of the Effective Date and will continue for a period of five (5) year(s) (the "**Term**"), unless earlier terminated, or renewed or extended, as provided for herein. Upon expiration of this Agreement, or termination of this Agreement pursuant to **Section 9.4** (Termination for Convenience), the terms of this Agreement will survive for purposes of any SOW that is still in effect as of such date. The term of each SOW shall be set forth therein. The parties may extend the Term or the term of any SOW by mutual written agreement. **IN ADDITION, CUSTOMER MAY, BY PROVIDING SUPPLIER WITH WRITTEN NOTICE, UNILATERALLY ELECT TO EXTEND THE TERM OF THIS AGREEMENT, OR THE TERM OF ANY OR ALL SOWS HERETO, ON A MONTH-TO-MONTH BASIS, FOR A PERIOD NOT TO EXCEED TWELVE (12) MONTHS AFTER WHAT WOULD OTHERWISE HAVE CONSTITUTED THE EXPIRATION DATE OF THIS AGREEMENT OR THE APPLICABLE SOW, ON THE SAME TERMS AS WERE IN EFFECT UPON SUCH DATE.**

9.2    **Termination for Cause By Customer.**

(a)    **Agreement.** Customer  may terminate this Agreement, in whole or in part, upon providing written notice thereof to Supplier in accordance with **Section 18.4** (Notices), below, if Supplier: (i) commits any material breach of this Agreement (including any such failure to provide Transition Services) that is curable by Supplier and Supplier fails to cure such breach

17

within thirty (30) days after Supplier's receipt of notice thereof; (ii) commits a material breach of this Agreement that is not capable of being cured; or (iii) commits numerous breaches of its duties or obligations under this Agreement, whether or not individually material in nature and whether or not cured within applicable cure periods, that collectively constitute a material breach of this Agreement. Termination of this Agreement for cause will automatically and simultaneously terminate all SOWs.

(b)    **SOWs.** Customer may terminate any given SOW in whole or in part upon providing written notice thereof to Supplier in accordance with **Section 18.4** (Notices), below, if Supplier: (i) commits any material breach of such SOW (including any such failure to provide Transition Services) that is curable by Supplier and Supplier fails to cure such breach within thirty (30) days after Supplier's receipt of notice thereof; (ii) commits a material breach of such SOW that is not capable of being cured; or (iii) commits numerous breaches of its duties or obligations under such SOW, whether or not individually material in nature and whether or not cured within applicable cure periods, that collectively constitute a material breach of such SOW.

(c)    **No Termination Charges.** No Termination Charges shall apply to any termination under this **Section 9.2** (Termination for Cause by Customer) unless expressly set forth in an SOW.

(d)    **Improper Termination For Cause.** If a purported termination for cause by Customer under this **Section 9.2** (Termination for Cause) is determined by a competent authority not to have properly been a termination for cause, then such termination by Customer shall be deemed to have been a termination for convenience under **Section 9.4** (Termination for Convenience) by Customer as of the date of Customer's original termination (without regard to the notice period set forth in **Section 9.4**).

9.3    **Termination for Cause of a SOW By Supplier.**  Supplier may only terminate a given SOW (and not this Agreement), if: (i) Customer fails to pay, in accordance with this Agreement, a material portion of the charges due and payable under such SOW subject to Customer's dispute and set-off rights under this Agreement; (ii) Supplier provides Customer with a notice of such failure in accordance with **Section 18.4** (Notices); and (iii) such charges remain unpaid for at least thirty (30) days after such notice is received by Customer. Supplier acknowledges that this is Supplier's sole right of termination and it waives any other rights it may have to terminate. Notwithstanding the foregoing, Supplier may terminate the Agreement in the event of a material breach of the Agreement by Customer.

9.4    **Termination For Convenience by Customer.**

(a)    **Agreement.** Customer may terminate this Agreement, without cause, by providing ninety (90) days' prior written notice thereof to Supplier, and any such termination shall be without penalty or further obligation of any kind to Customer, except as set forth in **Section 9.4(c)** (Customer Obligations).

(b)    **SOW.** Customer may terminate any SOW or the Services, in whole or in part, then being provided under any SOW, without cause, by providing at least ninety (90) days' prior written notice thereof to Supplier, and any such termination will be without penalty, except that customer agrees to compensate Supplier for Services actually performed by Supplier during such ninety (90) day notice period.

(c)    **Customer Obligations.** Upon termination of this Agreement or any SOW or Services pursuant to this **Section 9.4** (Termination for Convenience), the only fees or charges that

Customer shall be liable for shall be (as applicable): (i) any fees earned by Supplier for Services actually performed prior to the date of such termination; and (ii) any Termination Charges, as further described below.

      (d)    **Termination Charges**.  No Termination Charges shall apply under this Agreement unless the applicable SOW lists such Termination Charges.

          (i)    <u>Limitations</u>.  Any Termination Charges specified in a SOW: (A) shall be the maximum amount Customer shall be required to pay in the event of a termination pursuant to this **Section 9.4** (Termination for Convenience) of such SOW or the Services, in whole or in part, under such SOW (regardless of whether such Services are terminated at one time, or in a series of terminations (such as for partial terminations)); (B) shall decline over time during the initial term of such SOW; and, (C) shall not apply upon the normal expiration of such SOW or to any termination during any renewal period of such SOW.

          (ii)    <u>Mitigation</u>.  The inclusion of Termination Charges in a SOW shall not limit Supplier's obligation to mitigate any costs and expenses that Supplier could incur as a result of Customer terminating this Agreement or any SOW or Services pursuant to this **Section 9.4** (Termination for Convenience) and that would otherwise constitute Termination Charges associated with the termination of such SOW, nor obligate Customer to pay any Termination Charges in excess of the actual out-of-pocket costs and expenses reasonably incurred as a direct result of Customer's termination of this Agreement or any SOW or Services pursuant to this **Section 9.4**.  For example, the amount of any Termination Charges otherwise payable shall be reduced by: (a) any severance fees saved by Supplier as a result of Customer's hiring of Supplier Personnel in connection with the termination; and (b) other amounts payable by Customer to Supplier that have the effect of reducing Supplier's costs or expenses upon such termination.

          (iii)    <u>Periodic Estimates</u>.  Customer may, from time to time, require Supplier to calculate a good faith estimate of (and provide to Customer within thirty (30) days after Customer's request, a detailed written explanation of) the amount of Termination Charges Supplier expects Customer would be required to pay in the event Customer were to terminate, for convenience, in whole or in part, any given SOW or any of the Services being provided under any SOW.  Customer shall be entitled to rely upon such estimate, and, if Customer exercises its right under this **Section 9** (Term and Termination) to terminate such SOW or Services, Customer shall not be obligated to pay Termination Charges in excess of the lesser of such estimate and the amount of Termination Charges set forth in the applicable SOW.

## 10.    TRANSITION SERVICES.

      10.1    <u>Licenses Perpetual</u>.  Notwithstanding anything to the contrary in this Agreement or any SOW, neither expiration nor termination of this Agreement or any SOW will, under any circumstances, terminate any perpetual licenses granted under this Agreement.

      10.2    <u>Transition Rights</u>.

      (a)    **Disengagement**.  During the Term and upon expiration or termination of this Agreement (or any SOW) by either party for any reason, Supplier shall provide Customer with reasonable transition Services ("**Transition Services**"), for up to twelve (12) months after

expiration or termination (the **"Transition Period"**), relating to the transition from the Services to another provider or in-house to Customer, all as designated by Customer, which Transition Services, unless otherwise directed by Customer, shall include all services necessary for an orderly transition from Supplier's Services. Notwithstanding the foregoing, Supplier shall be required to provide a maximum of three (3) months of Transition Services in the event that Supplier terminates an SOW pursuant to Section 9.3.

(b)  **Cooperation and Data Transfer.** Supplier shall cooperate with Customer and all of Customer's other service providers (including any replacement for Supplier designated by Customer) to ensure a smooth transition throughout the Transition Period, without any (unless pre-approved by Customer in writing): (i) interruption of the Services; (ii) adverse impact on the provision of Services or Customer's activities; or (iii) interruption of any services provided by third parties. Supplier shall promptly take all steps reasonably requested by Customer to assist Customer in effecting a complete transition. Supplier shall provide for the prompt and orderly conclusion of all work, as Customer may reasonably direct, including completion or partial completion of some projects, documentation of work in process, and other measures to provide for an orderly transition to Customer or Customer's designee. Subject to any express limitations set forth herein, Supplier shall promptly provide Customer with all Customer Data and all other information reasonably requested by Customer in connection with the transition, in such industry standard form and format as is requested by Customer. Supplier shall cooperate with Customer and all of Customer's other service providers so that the transition causes only minimal impact on the provision of services by third parties. Supplier shall bear all costs related to the final information transfer in connection with any termination of this Agreement and that Supplier shall not charge Customer any additional fees for such transfer unless such termination is by Supplier pursuant to Section 9.3.

(c)  **Customer's Direction.** Subject to the terms of this Agreement and any express conditions contained in the applicable SOW, Customer shall have the right to control the timing, duration, and method of Transition Services. The Transition Services will include, at Customer's discretion, the extension of all or a portion of the Services, on a month-to-month basis.

(d)  **Charges.** For extensions, as described above, of Services that Customer was receiving from Supplier prior to the applicable expiration or termination date, the fees applicable to such Services will be charged at the rates that Customer was paying prior to such expiration or termination. For all other Transition Services, Supplier will not charge Customer fees in excess of the Supplier's then-standard rates (taking into account the average discount Supplier provides to its similarly-sized customers). Promptly after Customer's request for Transition Services, Supplier shall identify (in advance of performing such Transition Services), any additional fees Supplier believes would apply to such Transition Services. All such charges shall be documented pursuant to **Section 3.4** (Change Order Procedures) prior to Supplier performing any Services that would result in additional fees.

(e)  **Additional Terms.** Customer's payment of any fees for Transition Services shall not be a waiver of Customer's right to claim the amount of such payment as damages, in the event Supplier has breached this Agreement or the applicable SOW. If Supplier has terminated this Agreement or the applicable SOW for non-payment pursuant to **Section 9.3** (Termination for Cause by Supplier), Supplier may require, as a condition precedent to providing such Transition Services, that Customer pre-pay, on a monthly basis, the reasonably expected cost of the Transition Services for the following month. Notwithstanding anything to the contrary in this Agreement, termination of this Agreement will not terminate, until expiration of the Transition

20

Period, any licenses granted under this Agreement that would have otherwise terminated on the date of such termination.

10.3    **Rights Upon Termination/Expiration**. At Customer's election, at any time during the Transition Period or upon termination or expiration of this Agreement, any SOW, or any Services for any reason, the following terms shall apply:

(a)    **Supplier Obligations**. Supplier must within a mutually agreed time frame not greater than fourteen (14) days of notice from Customer: (a) remove all of its property relating to such SOW or this Agreement, as applicable, from Customer's premises, and (b) deliver to Customer all of Customer's property, including the then-current versions of all Deliverables, whether complete or in process, related to the terminated/expired activities.

(b)    **Customer Provided Systems**. With respect to all Customer Provided Systems, Supplier shall, at Customer's option, return any such items then in Supplier's possession or control to Customer or, at Supplier's sole cost and expense, dispose of such Customer Provided Systems in a manner acceptable to Customer and in accordance with Applicable Laws.

(c)    **Exit of Customer Facilities**. Supplier shall promptly exit (after returning to their original condition, normal wear and tear excepted), all Customer facilities.

(d)    **Other rights**. Customer shall be entitled to any additional rights set forth in any applicable SOW (e.g., rights to purchase/license Supplier Provided Systems, etc).

(e)    **Reduction of Termination Charges**. Any Termination Charges payable by Customer with respect to any SOW shall be reduced (on a dollar-for-dollar basis) by: (a) any amounts paid or payable by Customer (or its designees) to Supplier (or its designees), pursuant to this **Section 10.3** (Rights Upon Termination/Expiration) (or pursuant to similar sections under any SOW); and (b) all costs and expenses avoided by Supplier as a result of Customer (or its designees) exercising such rights (e.g., reductions in severance fees, asset disposal costs, etc.).

10.4    **Discontinuance/Disablement of Services**. As the Services are integral to the operation of Customer's business, Supplier agrees that (except during and in conjunction with Customer authorized downtime or emergency service issues caused by factors beyond the reasonable control of Supplier that require maintenance or repairs to be performed), even if dispute(s) arise between the parties; in no event will Supplier, its Personnel, or anyone acting on its behalf during the term of the applicable SOW (or during the period of any Transition Services thereafter): (a) terminate, interrupt, or suspend or refuse to perform any Services; (b) discontinue, disable or otherwise impair the functionality or performance of (or permit or cause any embedded mechanism to disable or impair the functionality or performance of); or (c) impede or interfere with Customer's ability to conduct its business operations (other than minimal, routine interruptions agreed to in advance by Customer that are necessary in order for Supplier to provide the Services). Subject to Supplier's termination rights under Section 9 (Term and Termination) and Supplier's obligations under this Section 10 (Transition Services), Supplier waives and disclaims any right or remedy it may have to discontinue, de-install, disable or repossess the Services, any Supplier Provided Systems, or the Deliverables, without due process of law.

## 11.    REPRESENTATIONS, WARRANTIES AND COVENANTS.

11.1    **General**. Supplier represents to Customer that, as of the effective date of each SOW, and warrants and covenants that, during the Term and the term of each SOW, including the Transition Period:

(a)    **Authority**. (i) Supplier has full authority to enter into this Agreement, to carry out its obligations under this Agreement, and to grant the rights and licenses that it purports to grant to Customer in this Agreement; (ii) there are no outstanding obligations of Supplier (whether written, oral or implied) that are inconsistent with this Agreement; and (iii) Supplier's performance of the Services and compliance with this Agreement will not violate any Applicable Laws or any third-party agreements.

(b)    **Compliance with Laws**. Supplier shall perform Services under this Agreement in a manner that complies with all Applicable Laws as they pertain to the Services including: (i) all Services in a SOW that are legal and/or regulatory compliance functions to be performed by Supplier for Customer, and (ii) all aspects of Supplier's provision of Services including employment laws applicable to Supplier's Personnel and Applicable Laws in jurisdictions from which Supplier provides the Services. Supplier shall have, and shall obtain and maintain, at its own expense, all approvals, permissions, permits, licenses, and other forms of documentation required for Supplier's performance under this Agreement (including under any SOWs) to comply with all Applicable Laws. Customer reserves the right to reasonably request and review all such applications, permits, and licenses prior to the commencement of any Services hereunder. Supplier shall also provide to Customer all support requested by the Customer to make Customer compliant with Applicable Laws affecting Customer's business, including any changes to Applicable Laws. Supplier's costs associated with compliance with Applicable Laws shall be borne by Supplier. If Supplier is charged with violation or non-compliance with any Applicable Law, Supplier shall promptly notify Customer of such charges and shall promptly cure such non-compliance.

(c)    **Compliance with Anti-Corruption Laws**. Supplier represents and warrants that it is fully aware of and will comply with, and in the performance of its obligations to Customer will not take any action or omit to take any action that would cause either Customer or Supplier to be in violation of, (i) US. Foreign Corrupt Practices Act, (ii) any other applicable anti-corruption laws, or (iii) any regulations promulgated under any such laws. Supplier represents and warrants that to its knowledge neither it nor any of the Supplier Personnel is an official or employee of any government (or any department, agency or instrumentality of any government), political party, state owned enterprise or a public international organization such as the United Nations, or a representative or any such person (each, an "**Official**"). Supplier further represents and warrants that, to its knowledge, neither it nor any of the Supplier Personnel has offered, promised, made or authorized to be made, or provided any contribution, thing of value or gift, or any other type of payment to, or for the private use of, directly or indirectly, any Official for the purpose of influencing or inducing any act or decision of the Official to secure an improper advantage in connection with, or in any way relating to, (i) any government authorization or approval involving Customer, or (ii) the obtaining or retention of business by Customer. Supplier further represents and warrants that it will not in future offer, promise, make or otherwise to be made, or provide any payment and that it will take all lawful and necessary actions to ensure that no payment is promised, made or provided in future by any of the Supplier Personnel. Any violation of this Section 11.1(c) will be deemed to be a material breach of this Agreement.

(d)    **Interpretation of Laws and Changes in Laws Affecting Services or Customer.** Supplier shall notify Customer of material changes in Applicable Laws pertaining to the Services. Supplier shall also notify Customer of any changes in Applicable Laws and interpretations thereof that relate to Customer's business of which Supplier becomes aware through its provision of similar services to other customers, and shall share non-confidential methods and processes for compliance including interpretation of laws by other customers. Supplier shall be responsible for initially interpreting changes in Applicable Laws and for

22

identifying their impact on Services. Supplier shall cooperate and assist Customer in interpreting Applicable Laws affecting Customer and/or the Services, including changes in such laws. Supplier shall conform its own business processes to comply with such laws, and such processes shall be documented in the OPM. If the parties are unable to agree upon such interpretation or impact, then Customer shall retain the right in its sole discretion to interpret such laws or changes and determine the impact, and Supplier shall conform the Services in accordance with Customer's interpretation.

(e)    **Capability.**  Supplier: (i) has had adequate opportunity to inspect all material components, workings, capabilities, procedures, and capacities of the networks, hardware, and software associated with the provision of the Services, including those of Customer and its Affiliates; (ii) has received answers to all questions Supplier needed answered regarding the scope and substance of the Services; and (iii) is capable in all respects of providing Services in accordance with this Agreement.

(f)    **Financial Condition.**  Supplier: (i) is of, and shall maintain, a financial condition commensurate with its obligations under this Agreement sufficient to allow Supplier to readily and successfully fulfill all such obligations in accordance with this Agreement; (ii) shall, in the event the financial condition of Supplier changes during the Term in such a manner as to adversely affect Supplier or jeopardize its ability to satisfy the warranty set forth in the foregoing clause (i), promptly notify Customer in writing thereof (and such notice shall reasonably describe the nature and extent of such change); and (iii) shall, in the event that (x) Supplier materially breaches any financial covenants in any other agreement to which Supplier is a party, or (y) Supplier fails to make in a timely manner any governmental filings that it is required by law to make, and the existence of any such breach or failure to make such filing is related to or would adversely impact Supplier's provision of the Services, promptly notify Customer in writing thereof (and such notice shall reasonably describe the nature and extent of such breach or failure).

(g)    **Quality.**  Supplier shall: (i) perform all Services in a timely, good, workmanlike and professional manner, with due care, using Personnel fully familiar with the Services, the Deliverables, and the underlying technology; (ii) staff each project with sufficient Personnel possessing the skills, experience and abilities to perform the Services; and (iii) perform the Services in accordance with this Agreement (including any SOW) and any Milestones identified therein.

(h)    **Training.**  Supplier shall provide all such technical and interpersonal training to the Personnel of Supplier as may be necessary for them to perform, on behalf of Supplier, all of Supplier's duties under this Agreement.

(i)    **Conflict of Interest.**  (i) Supplier's performance under this Agreement shall at all times conform to the highest professional ethical and fiduciary standards; (ii) due care and commercially reasonable efforts will be utilized by Supplier in the performance of this Agreement; (iii) Supplier is under no obligation or restriction that would conflict with Supplier's provision of Services; and (iv) Supplier shall immediately disclose to Customer any actual or potential conflict of interest that may arise during the Supplier's performance under this Agreement. A "conflict of interest" shall not be deemed to include Supplier's obligations to other customers that are legally permissible and do not conflict with any terms of this Agreement or any SOW.

(j)    **Performance and Functionality.**  The Services provided under each SOW shall contain or provide the functionality specified in, and shall operate in accordance with and

23

conform to, the Documentation, the descriptions of the Services, and the Service Levels set forth in such SOW and the other requirements of this Agreement.

(k)    **Infringement.** (i) Customer's and its Authorized Users' use of the Supplier Provided Systems and Deliverables provided hereunder shall not infringe or misappropriate any Intellectual Proprietary rights of any third party; (ii) there is no action, suit, claim, investigation or proceeding pending, or to Supplier's knowledge threatened, against, by, or affecting Supplier, the Supplier Provided Systems or the Deliverables which, if adversely decided, might adversely affect: (a) Supplier's ability to enter into this Agreement; (b) Supplier's performance of its obligations herein; or (c) Customer's and its Authorized Users' use of the Deliverables or the Supplier Provided Systems; and (iii) to Supplier's knowledge there is not any basis for any such action, suit, claim, investigation, or proceeding as is described in the foregoing clause (ii).

(l)    **Unauthorized Code.** The Deliverables, at the time of receipt by Customer, and the Supplier Provided Systems, as provided to Customer, shall be free of any Unauthorized Code and Supplier and its Personnel shall not insert any Unauthorized Code into any Customer Provided Systems or other Electronic Systems of Customer.

(m)    **Third-Party Licenses.** No third-party licenses, or license fees, other than those specifically stated in the applicable SOW shall be required for Customer and its Authorized Users to use the Services, the Deliverables and any Supplier Provided Systems.

(n)    **Deliverables.** Supplier represents and warrants that all Deliverables shall be free from errors in operation and performance, shall comply with the applicable documentation and specifications, and shall provide the functions and features and operate in the manner described in the Agreement or SOW or as otherwise agreed to by the parties. Supplier shall promptly correct any material defects reported in such Deliverables at no cost to Customer.

(o)    **Foreign Taxes.** Supplier shall (i) properly, as dictated by local tax laws or regulations, calculate the appropriate "arms–length" fees for the services locally provided to Customer, report these "arms-length" fees less any related expenses, and pay all taxes due on the resulting net income, in each jurisdiction from which Supplier or its Affiliates provide the Services (e.g., India), and (ii) promptly notify Customer, in writing, if, during any given period, more than 50% of Supplier's or its Affiliates revenue in any non-US jurisdiction is derived from the Services provided to Customer, and, in such event, if requested by Customer, Supplier shall promptly provide Customer with all information requested by Customer which is reasonably necessary for Customer to determine whether Supplier is complying with its obligations under this subsection 10.1(l) (including, but not limited to, evidence that an appropriate arms-length fee is being calculated and reported to the applicable governmental entities, and that any related taxes are being paid in a timely manner, by Supplier or its applicable Affiliates).

(p)    **Remedy.** In the event of any breach by Supplier of any of the warranties set forth in this **Section 11**, Supplier will promptly correct or cause the correction of the deficiencies giving rise to the breach without charge to Customer. In the case of any breach of warranty that prevents or substantially interferes with Customer's ability to conduct its business, Supplier will use its diligent efforts to correct the deficiency within twenty-four (24) hours after Supplier discovers or receives notice of the deficiency. If Services have not been restored within such twenty-four (24) hour period, Supplier will immediately commence continuous twenty-four (24) hour per day (on-site, as appropriate) correction efforts until Services have been restored.

24

11.2    **Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS
AGREEMENT, THERE ARE NO EXPRESS WARRANTIES MADE BY EITHER PARTY, AND
ALL IMPLIED WARRANTIES AND COVENANTS (OTHER THAN THE DUTY OF GOOD
FAITH, BUT EXPRESSLY INCLUDING THE IMPLIED WARRANTIES OF
MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) ARE HEREBY
DISCLAIMED. FURTHER, THE PARTIES AGREE THAT THEY HAVE NOT RELIED ON
ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT AND THAT SUCH
RELIANCE WOULD NOT BE REASONABLE.

11.3    **Pass-Through.** Supplier hereby assigns to Customer all assignable representations,
warranties, covenants and indemnities granted to Supplier by third parties with respect to the Deliverables
or any components thereof, and all remedies for breach of such representations, warranties, and covenants
or for such indemnities. To the extent that Supplier is not permitted to assign any of such protections to
Customer, Supplier shall enforce such protections on behalf of Customer to the extent Supplier is
permitted to do so under the terms of the applicable third-party agreements.

11.4    **Responsibility.** Subject to the provisions of this Agreement, (including any SOWs),
Supplier shall be responsible for any damages, losses, costs and expenses imposed on Supplier, Customer
or its Affiliates resulting from failure of Supplier to comply with the provisions of this **Section 11** unless
such failure directly results from the sole acts or omissions of Customer or its Affiliates.

12.    **PERSONNEL.**

12.1    **Responsibility.** Each party is responsible for its own Personnel and shall be liable to the
other party for a failure by its Personnel to perform in accordance with this Agreement.

12.2    **Independent Contractor.** Supplier is an independent contractor under this Agreement,
and nothing in the parties' relationship or this Agreement will create a joint venture, partnership,
employment, agency, franchise, lease or other relationship other than as expressly stated in this
Agreement. Supplier will not pledge credit, incur any obligation or liability, hire any employee, nor
purchase any merchandise or services in the name of Customer or its Affiliates. Supplier's Personnel are
neither employees nor agents of Customer or its Affiliates and are not eligible to participate in any
employment benefit plans or other conditions of employment available to Customer's or its Affiliates'
employees. Supplier is solely responsible for its' own operation. Supplier has: (a) exclusive control over
its Personnel and over the labor and employee relations, and the policies relating to wages, hours,
working conditions or other conditions of its Personnel; (b) sole responsibility for making all deductions
and withholdings from its Personnel's compensation and for the payment of any payroll taxes,
contributions for unemployment or workers compensation, social security, pensions, or annuities for its
Personnel; and (c) exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline,
discharge and adjust grievances with its Personnel. At any time, however, Customer has the right to
require Supplier to remove from Customer's account or engagement any Personnel objectionable to
Customer for any lawful reason.

12.3    **Key Personnel.** Each SOW may identify certain of Supplier's Personnel as key
personnel ("**Key Personnel**"). Customer is entitled to approve or reject the appointment (and
replacements for) all Key Personnel. Except as set forth in an SOW, Supplier may not remove Key
Personnel from any project without Customer's consent, except for reasons outside of the Supplier's
control (e.g., such person's death, disability, resignation, termination for cause by Supplier, etc).

12.4    **Code of Conduct.** Supplier agrees to comply with the Sears Holdings Corporation *Code
of Vendor Conduct* (revised June 29, 2010), attached hereto as Exhibit B ("Code of Conduct"). As

25

referenced in the Code of Conduct, the Sears Holdings Corporation *Code of Conduct* is set forth at www.searsholdings.com/govern/code.htm, the Sears Holdings Corporation *Vendor Allowance Policy* is set forth at www.searsholdings.com/govern/shcvendorallowance.doc, and the Sears Holdings Corporation *Global Compliance Program for Merchandise Vendors* is set forth at www.searsholdings.com/govern/compliance.htm.

13.    **CONFIDENTIALITY.**

   13.1    **Confidential Information**.

     (a)    **Confidential Business Information.**  As used in this Agreement, "**Confidential Business Information**" means, with respect to each party, all non-public information (including the terms of this Agreement) received by such party (the "**Receiving Party**"), its Affiliates, and their Personnel in connection with this Agreement, relating to the other party (the "**Disclosing Party**") its Affiliates (and, in the case of Customer, its Authorized Users), and that, except as otherwise provided in the next sentence: (a) if in tangible form or other media that can be converted to readable form, is marked clearly as "confidential" (or with a similar term) when disclosed; or (b) if oral or visual, is identified as "confidential" (or with a similar term) at the time of disclosure and is promptly summarized in a writing marked as such thereafter.  It is understood that information in an intangible or electronic format can not be removed, erased or otherwise deleted from archival systems (also known as "computer or system back-ups") but that such information will continue to be protected under the confidentiality requirements contained in this Agreement.  Notwithstanding anything to the contrary contained herein, Supplier may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation or the Supplier's document retention policy.  The rights and obligations of the parties under this Agreement will survive any return, destruction or retention of Confidential Business Information.  Customer's Confidential Business Information shall also include, without the need to mark it as "confidential," Customer's and its Authorized Users': business plans, strategies, forecasts, projects, analyses, and financial information; employee and third-party vendor information; system designs and requirements, architectures, structure and protocols (including all hardware, software and specifications and documentation related thereto); business processes and methods and related information; and other confidential and proprietary information. This **Section 13** (Confidentiality) will also apply to any information exchanged between the parties regarding proposed business, regardless of whether the parties enter into a contract regarding such proposed business.  The terms and existence of this Agreement will also be Confidential Business Information of each party.

     (b)    **Confidential Personal Information.**  Furthermore, Supplier agrees that all information about Customer's or its Authorized Users, employees, customers and prospective employees and customers that is provided or made available by Customer or its Authorized Users to Supplier, its Affiliates, and their Personnel, including names, addresses, telephone numbers, social security numbers, account numbers, customer lists, and demographic, health, financial and transaction information ("**Confidential Personal Information**"), must be held in the strictest confidence.  In the event information may be deemed to be both Confidential Business Information and Confidential Personal Information (collectively, "**Confidential Information**"), such information will be subject to the stricter provisions applicable to Confidential Personal Information.  Customer Data is deemed to be Confidential Information of Customer.

   13.2    **Use of Confidential Information**.

(a)    **Restrictions**. The Receiving Party, its Affiliates and their Personnel will use all reasonable efforts to avoid disclosure, publication or dissemination of any Confidential Information. Further, the Receiving Party: (a) may use the Confidential Information only in connection with the Receiving Party's performance of its obligations or its full enjoyment of its rights hereunder, and (b) may not disclose the Confidential Information except to its Personnel and Authorized Users who have a need to know such Confidential Business Information in connection with this Agreement. Supplier must restrict disclosure of Customer's Confidential Information to Supplier's Personnel who have executed a written agreement by which they agree to be bound by terms substantially similar to this **Section 13.2**. Additionally, Supplier may not: (x) disclose Confidential Personal Information to any third parties (including Supplier's Affiliates) without Customer's prior written permission, nor (y) duplicate or incorporate the Confidential Personal Information into Supplier's own records or databases. Each Receiving Party is liable for any unauthorized disclosure or use of the other party's Confidential Information by the Receiving Party's Affiliates and its Personnel.

(b)    **Exceptions**.

(i)    Confidential Business Information. The obligations under this **Section 13.2** do not apply to any Confidential Business Information that the Receiving Party can demonstrate: (i) the Receiving Party possessed, without an obligation of confidentiality, prior to disclosure in connection with this Agreement; (ii) is or becomes public through no fault of the Receiving Party, its Affiliates and their Personnel; (iii) is independently developed by the Receiving Party without use of any Confidential Business Information; or (iv) is received by the Receiving Party from a third party (other than the Receiving Party's Personnel) that does not have an obligation of confidentiality to the Disclosing Party or its Affiliates.

(ii)    Confidential Personal Information. The restrictions on Confidential Personal Information do not apply to information independently developed by Supplier without the use of Customer's Confidential Personal Information; provided that Supplier is not using such information on Customer or its' Affiliates behalf.

(c)    **Disclosure**. If, in the reasonable opinion of its legal counsel, the Receiving Party is required by Applicable Laws to disclose any Confidential Information in connection with any legal proceeding, then the Receiving Party may disclose such information to the arbitrator, court or other governmental authority, as the case may be; provided, in each case, to the extent permitted by law, the Receiving Party notifies the Disclosing Party a reasonable time prior to such disclosure (in order to permit the Disclosing Party to seek appropriate protective measures); and the Receiving Party requests and supports the Disclosing Party's efforts to seek appropriate protective measures.

13.3    **Supplier Policies for Confidential Personal Information**. Supplier must establish and maintain written policies and procedures designed to ensure: (i) the security and the confidentiality of the Confidential Personal Information; (ii) protect against any anticipated threats or hazards to the security or integrity of such information; and (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer. Copies of such policies and procedures will be provided to Customer upon Customer's request.

13.4    **Miscellaneous**.

27

(a)    **Supplier Notification**. Supplier must immediately notify Customer upon the discovery of the loss, unauthorized disclosure or unauthorized use of any Confidential Information and cooperate with Customer, at no additional charge, in the investigation and mitigation of any such unauthorized disclosure. Supplier shall promptly, (i) provide Customer with detailed information regarding any such unauthorized disclosure, including how and when such disclosure occurred and what actions Supplier is taking to remedy such disclosure, (ii) cooperate with Customer in investigating such disclosure, (iii) reimburse Customer for its cost of notifying any individuals and/or authorities of the disclosure, and (iv) indemnify Customer against any claims, suits damages, actions, fines, penalties, attorney's fees if any or losses arising from such unauthorized disclosure.

(b)    **Customer Audit Rights**. Supplier must permit Customer to audit Supplier's compliance with the provisions of this **Section 13** (Confidential Information) upon reasonable advance notice, during Supplier's regular business hours.

(c)    **Supplier Breach**. A breach of this **Section 13.4** regarding Confidential Personal Information is grounds for immediate termination of this Agreement. In addition, Customer is entitled to the recovery of any pecuniary gain realized by Supplier from the unauthorized use or disclosure of Confidential Personal Information.

(d)    **Expiration of Obligations**. The Receiving Party's obligations as to Confidential Business Information shall expire two years after the expiration or termination of the underlying SOW.

(e)    **Return or Destruction of Confidential Information**. Within ten (10) days following the earlier of: (i) termination or expiration of this Agreement or any SOW and the completion of all Transition Services related thereto, and (ii) upon request by Customer as to Customer's Confidential Information, the Receiving Party must, at the Disclosing Party's discretion, either return to the Receiving Party all Confidential Information (including all copies/derivatives thereof); or certify in writing to the Disclosing Party that such Confidential Information (including all copies/derivatives thereof) have been destroyed in such a manner that it cannot be retrieved. It is understood that information in an intangible or electronic format can not be removed, erased or otherwise deleted from archival systems (also known as "computer or system back-ups") but that such information will continue to be protected under the confidentiality requirements contained in this Agreement. Notwithstanding anything to the contrary contained herein, Supplier may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation or the Supplier's document retention policy. The rights and obligations of the parties under this Agreement will survive any return, destruction or retention of Confidential Information.

14.    **INSURANCE**.

14.1    **Required Insurance**. Supplier must obtain and maintain, and shall require each of its subcontractors that Supplier uses to provide the Services to obtain and maintain, throughout the term of each SOW and for the first two (2) years after termination or expiration thereof, the following insurance (which, except for Workers' Compensation coverage, must be written on an occurrence basis and be primary over all other insurance maintained by Customer). Supplier may meet the required insurance coverages and limits with any combination of primary and umbrella/excess liability insurance:

(a)    Commercial General Liability, with coverage including premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with

28

limits of not less than $1,000,000 per occurrence, $2,000,000 aggregate (products/completed operations), and $2,000,000 general aggregate.

(b)    Motor Vehicle Liability insurance for owned, non-owned and hired vehicles, with limits of not less than $1,000,000 per person, $1,000,000 per accident, and $2,000,000 annual aggregate.

(c)    Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Supplier, for all states in which the project or work to be performed is located, and Employer's Liability insurance with limits of liability of not less than $100,000 per accident or disease (each employee) and $1,000,000 aggregate by disease. Such insurance will contain a waiver of subrogation in favor of Customer unless such waivers are not allowed in the state(s) where the Services are performed.

(d)    Professional Liability or Errors & Omissions Insurance (as applicable) with minimum limits of $3,000,000 each occurrence and aggregate.

(e)    Umbrella/Excess Liability (as applicable) with minimum limits of $4,000,000 each occurrence and aggregate.

(f)    Fidelity Bond or Criminal Insurance covering employee dishonesty with limits of not less than $1,000,000 per loss. Customer will be named as a loss payee.

14.2    **Policies**. Insurance must be purchased from companies having a rating of A-VII or better in the current BEST'S INSURANCE REPORTS published by A.M. Best Company. Policies of insurance must provide that they will not be canceled or materially changed without at least thirty (30) days' prior written notice to Customer. Should any of the above described policies be cancelled before the expiration date thereof, Supplier will endeavor to mail thirty (30) days written notice (except ten (10) days for non-payment) to Customer. Evidence of insurance shall be submitted in advance of or concurrent with the execution of this Agreement, on each insurance policy renewal thereafter, and annually for two (2) years after this Agreement ends. Customer and the Customer Indemnitees will be named as an additional insured (or alternate employer, as appropriate), for each of the foregoing policies. Failure to obtain and maintain required insurance will constitute a material breach of this Agreement. Additionally, any approval by Customer of any of Supplier's insurance policies (or failure to object to a late Certificate) will not relieve Supplier of any obligation contained in this Agreement, including, without limitation, liability under **Section 15** (Indemnification), for claims in excess of described limits.

## 15.    **INDEMNIFICATION**.

### 15.1    **Third Party Claims**.

(a)    The parties shall defend, indemnify, and hold harmless one another, their Authorized Users, and their respective present, former, and future shareholders, Personnel, successors and assigns (collectively, the "**Indemnitees**") against all damages, losses, costs, expenses (including reasonable attorneys' fees, costs, and expenses) and other liabilities arising out of any claims, demands, suits, or causes of action by third parties (collectively, "**Claims**") arising out of or in connection with this Agreement (including claims of negligence by the Personnel of either party) that result, or that are claimed to result, in whole or in part, from:

(i)        any act or omission of the parties, their Affiliates, or their Personnel (including, acts or omissions resulting in bodily injury, including death, or damage to real or personal property);

(ii)       any breach by the parties, their Affiliates, or their Personnel of this Agreement or of any agreement with any third party (e.g., an employment agreement or subcontracting agreement);

(iii)      the violation of any Intellectual Property rights of any third party by the parties, their Affiliates, or their Personnel in connection with this Agreement, by the Services, any Supplier Provided System, or any Deliverable, or by Customer's or the Authorized Users' use of the Services, the Supplier Provided Systems, or the Deliverables in connection with this Agreement or by Supplier's use of the Customer Provided Systems in connection with this Agreement (except that Supplier will not be liable for damages to third parties pursuant to this Section to the extent such damage was solely and proximately caused by: (x) modification of the Supplier Provided Systems by Customer Personnel (unless such modification was performed at the direction of Supplier);

(iv)      the violation by the parties, their Affiliates, or their Personnel of any Applicable Law;

(v)       any fraudulent acts of the parties, their Affiliates, and their Personnel in connection with the Services, regardless of time, place, or whether within the scope of employment or engagement;

(vi)      any fee, penalty or other amount imposed in connection with this Agreement by any credit card company or credit card industry regulatory body;

(vii)     any fee, penalty or other amount assessed or imposed in connection with this Agreement by any governmental, regulatory or quasi-governmental entity (or subdivision thereof) resulting from the parties' parties' failure to comply with its obligations regarding Applicable Laws; or

(vii)     the negligent or willful dissemination by the parties, their Affiliates, and their Personnel of false, incomplete, or incorrect information, information that either party directed the other not to disseminate, or information that the parties reasonably should have known not to disseminate, or the negligent or willful failure to disseminate information that the parties is obligated to provide pursuant to this Agreement.

The parties will not be relieved of their foregoing respective obligations by any allegation of negligence or willful misconduct by the other, their Affiliates or their Personnel; however, Supplier will not be liable for damages to third parties pursuant to this **Section 15.1** to the extent such damage was solely and proximately caused by the negligence or willful misconduct of the other Party, as determined in a final, non-appealable order of a court of competent jurisdiction.

(b)       **Infringement.**  In the event any portion of the Services, any Supplier Provided System, or any Deliverable is held or is likely to be held to constitute an infringement or misappropriation of Intellectual Property rights, Supplier, at its own expense, shall first use reasonable and prompt efforts to: (i) procure for Customer the right to continue to use the Services, the Supplier Provided System, or the Deliverable; or (ii) modify or replace the Services, the Supplier Provided System, or the Deliverable so that it is non-infringing and of at least

30

equivalent performance and functionality to that prior to the modification or replacement. Upon providing evidence to Customer's reasonable satisfaction that both of the options described in the immediately preceding sentence are not commercially feasible, then the portion of the Services involving the infringing Services, Supplier Provided System, or Deliverable shall be terminated (subject to Customer's rights to Transition Services), and Supplier shall promptly reimburse Customer for all costs and expenses (including any fees paid or payable to Supplier or to any third parties, as well as other transition expenses) of Customer's obtaining such replacement Services, systems, or deliverables. In the event of such a termination, Customer may elect to terminate all affected SOWs. No Termination Charges shall apply to any termination under this **Section 15.1(b)** (Infringement). Customer's rights under this **Section 15.1** will be in addition to and will not limit Customer's rights under **Section 15.1** (Third Party Claims). In the event any portion of any Customer Provided System is held or is likely to be held to constitute an infringement or misappropriation of Intellectual Property rights, Customer, at its own expense, shall, in its sole discretion, elect to either: (a) procure for Supplier the right to continue to use the Customer Provided System; (b) modify or replace the Customer Provided System so that it is non-infringing and of at least equivalent performance and functionality to that prior to the modification or replacement; or (c) terminate for convenience, upon providing Supplier with written notice thereof, the portion of the Services requiring use of the infringing Customer Provided System by Supplier (subject to Customer's rights to Transition Services) and Customer's obligations under Section 9.4(b) (SOW) above) (other than the extended notice period).

15.2    **Procedures**.

(a)    **General.** Except as provided in **Section 15.2(b)**, a Party subject to obligations of indemnification hereunder (the "**Indemnifying Party**") with respect to any given Claim has the right to control the defense of such Claim, provided, however, that the other Party (the "**Indemnified Party**") has the right to participate in such defense. Upon the Indemnifying Party's request, the Indemnified Party will reasonably cooperate in such defense, and the Indemnifying Party must reimburse the Indemnified Party for its reasonable out-of-pocket expenses in providing such cooperation. The Indemnified Party will provide prompt notification of any Claim to which it is entitled to be indemnified hereunder to the Indemnifying Party, provided, however, that any delay by the Indemnified Party in giving such notice will not relieve the Indemnifying Party of its obligations pursuant to this **Section 15** (Indemnification), except to the extent that the Indemnifying Party demonstrates actual damage caused by such delay.

(b)    **Government and Authorized User Claims.** With respect to claims by government regulators or agencies or any of the Authorized Users related to Supplier's failure to perform its responsibilities under this Agreement, Customer shall have the option of taking sole control over the defense and settlement of such Claims. Customer's election to take control over the defense and settlement shall not relieve Supplier of its obligations to indemnify under this Agreement and Supplier shall reimburse Customer for all damages, losses, costs, expenses (including reasonable attorneys' fees, costs, and expenses) incurred by Customer and the other Customer Indemnitees in defending such Claims. Where Supplier becomes aware of such claims Supplier shall immediately notify Customer of such Claims. Supplier shall remain liable for costs associated with defense of such Claims. Customer shall cooperate with Supplier on a regular basis regarding Claim processing and litigation strategy and will notify Supplier before entering into any settlement of such Claim.

31

15.3    **Independent Obligation**. The obligations of the parties to defend, indemnify and hold harmless the Indemnitees under this **Section 15** (Indemnification) are independent of each other and any other obligation of the parties under this Agreement.

**16.    LIMITATION OF LIABILITY.**

16.1    **Limitation of Damages**. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, NEITHER PARTY (NOR SUCH PARTY'S AFFILIATES, NOR CUSTOMER'S AUTHORIZED USERS NOR THE RESPECTIVE SHAREHOLDERS OR PERSONNEL OF ANY OF THE FOREGOING) SHALL BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS) ARISING IN CONNECTION WITH THIS AGREEMENT OR THE PERFORMANCE, OMISSION OF PERFORMANCE, OR TERMINATION HEREOF, WITHOUT REGARD TO THE NATURE OF THE CLAIM (E.G., BREACH OF CONTRACT, NEGLIGENCE, OR OTHERWISE), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

16.2    **Cap on Liability**. EXCEPT AS OTHERWISE PROVIDED IN SECTION 16.3 (EXCLUSIONS), IN NO EVENT SHALL THE MAXIMUM, CUMULATIVE, AND AGGREGATE LIABILITY OF A PARTY, ITS AFFILIATES (AND IN THE CASE OF CUSTOMER, ITS AUTHORIZED USERS), AND THE RESPECTIVE SHAREHOLDERS AND PERSONNEL OF EACH OF THE FOREGOING, IN CONNECTION WITH THIS AGREEMENT EXCEED: THE GREATER OF: (I) FOURTEEN (14) MILLION DOLLARS U.S. AND (II) THE AGGREGATE AMOUNT OF ALL CHARGES, FEES, AND OTHER AMOUNTS PAID (AND THOSE TO BE PAID) BY CUSTOMER TO SUPPLIER FOR ALL SERVICES UNDER THIS AGREEMENT DURING THE TWELVE MONTH (12) PERIOD IMMEDIATELY PRECEDING THE THEN-MOST RECENT ACT OR OMISSION GIVING RISE TO ANY SUCH LIABILITY. For the purposes of this Agreement, Customer's direct damages shall include (and the limitations set forth in **Section 16.1** shall not be deemed to preclude): (1) costs and expenses of implementing a work-around in respect of a failure of Supplier to provide any of the Services, any Supplier Provided System, or any Deliverable; (2) costs and expenses of replacing lost, stolen, or damaged Customer Data or Customer Provided Systems; (3) cover damages, including the costs and expenses incurred to procure replacement services or corrected services from an alternate source; (4) wages, salaries, and other charges, including overtime and overhead, for time expended by existing or additional Personnel due to Supplier's failure to perform; and (5) damages suffered by Customer's Authorized Users that would be direct damages if they had instead been suffered by Customer.

16.3    **Exclusions**. Notwithstanding anything contained herein to the contrary, the limitations of liability and exclusions of certain types of damages contained in this **Section 16** (Limitation of Liability) shall not apply to:

16.3.1    **Willful Abandonment**. Claims and losses caused by Supplier's: (i) repudiation of this Agreement (including any SOW), or (ii) willful abandonment of any significant portion of the Services (including any refusal to provide Transition Services); with such significance being determined by the actual or potential impact on the businesses of Customer and its Authorized Users.

16.3.2  **Willful Misconduct; Gross Negligence.** Claims and losses caused by the willful misconduct or gross negligence of Supplier, its Affiliates, or their respective Personnel;

16.3.3  **Indemnification.** Claims subject to, and amounts payable pursuant to either party's obligations under **Section 15** (Indemnification).

16.3.4  **Certain Obligations.** (i) Breaches by Supplier of: (1) **Section 10** (Disengagement); or (2) its obligations as to Confidential Personal Information hereunder; and (ii) Customer obligation to pay undisputed charges accrued hereunder.

16.3.5  **Damage to Property and Persons.** Claims for damages for personal injury, including death, and damage to property caused by the negligent or intentional acts of a party, its Affiliates or their Personnel.

## 17.  AUDITS.

17.1  **Customer Audit.** Supplier will allow Customer and its Personnel to conduct audits and examinations of the operations of Supplier relating to the Supplier's performance of the Services to verify: (a) that any of Supplier's charge and invoices are accurate and comply with the terms of this Agreement; and (b) that the Services are being provided in accordance with this Agreement. Such access will require twenty-four (24) hour advance notice to Supplier and will be provided at reasonable hours, except as may be required on an emergency basis, provided that any such audit may not interfere with Supplier's performance of its obligations under this Agreement or compromise any reasonable security processes or procedures. All audits will be conducted in a reasonable manner, and absent an allegation of a breach of this Agreement, such audits will occur no more frequently than once per calendar year with respect to the Services provided under each SOW, unless required pursuant to **Section 17.3** (Special Governmental Audit) below to satisfy a governmental or regulatory agency demand. There shall be no additional charge to Customer for Supplier's performance of its obligations under this **Section 17** (Audits).

17.2  **SSAE 16 Audit.** Unless otherwise set forth in the applicable SOW, Supplier shall, on an annual basis, retain an independent auditor to perform an audit of the electronic data processing environment(s) used by Supplier to provide the Services. Such audit will conform to the Statement of Auditing Standards for Attestation Engagements No. 16 ("SSAE 16"), or successor or replacement statement, adopted by the American Institute of Certified Public Accountants and shall be a "Type B" or "Type II" audit under SSAE 16 guidelines. Supplier shall provide Customer with a copy of the report resulting from each SSAE 16 audit within a reasonable time (in no event longer than two (2) months) after the audit and shall, as soon as reasonably practicable, remedy any material deficiencies revealed by any such audit. Supplier shall also require each of its subcontractors providing Services to similarly have such an audit performed, and to provide Customer with a copy of the resulting report, on an annual basis and to remedy any material deficiencies revealed in any such review as soon as reasonably practicable. In the event Customer's internal auditors or its independent third-party auditors are not able to rely on all or part of Supplier's or any of its subcontractors' independent auditor's report for purposes of the audit of Customer's financial statements, Customer's internal auditors or its independent third-party auditors may interact with Supplier's appropriate Personnel at any applicable facility of Supplier or its subcontractors and, if necessary, perform audit procedures onsite at any such facility to complete the audit of Customer's financial statements. Supplier shall promptly reimburse Customer for any reasonable increases in the fees and costs of Customer's independent third-party auditors that are incurred in connection with performance of additional audit or review procedures that are necessitated as a result of a failure by

33

Supplier to perform its obligations under this **Section 17.2**. In addition, so that Customer may comply with the Sarbanes-Oxley Act of 2002 and other relevant legal and regulatory requirements, Customer shall have the right to monitor and require modifications to Supplier's and its subcontractors' internal controls regarding the Services from time to time and as may be set forth in a SOW subject to the Change Order process set forth in Section 3.4.

      17.3    **Special Government Audit**. If at any time during the Term, Customer is required by a governmental or regulatory agency having jurisdiction over Customer to have an audit or inspection of the Services then being provided to Customer or of information concerning Customer held by Supplier under this Agreement and such requirement is not satisfied by the audit provided for in **Section 17.1** (Customer Audit) above, then Supplier, upon reasonable advance notice, shall allow the governmental or regulatory agency exercising jurisdiction over the business of Customer to conduct such an audit or inspection as it relates to Supplier's provision of the Services under this Agreement. Supplier's cooperation in such an audit or inspection will include providing access to facilities and records relevant to Customer as reasonably necessary to perform the audit.

      17.4    **Audit Process.** Supplier will provide Customer, its Personnel, and any applicable governmental authorities, access to the facilities, systems, books, records, internal costs and other information related to the provision of the Services as reasonably necessary to perform audits described in this **Section 17** (Audits). This will include the review of Supplier's practices, policies, procedures, and security (both physical and data) with respect to the Services. Supplier will also allow Customer, its Personnel, and any applicable governmental authorities, access to review documentation related to Service Levels and Service Credits. During such audits, Supplier will not allow Customer, Customer's Personnel, or applicable governmental authorities to access other Supplier customers' or Supplier's proprietary data and systems, except to the extent such data and systems relate to the Services or such access is mandated by the applicable governmental authorities. Supplier shall also assist Customer, Customer's Personnel, and applicable governmental authorities in testing data files, programs and procedures, and the operation of audit software. To the extent permitted by Applicable Laws, Supplier will provide Customer with a copy of the report or results of any such governmental audit.

      17.5    **Remedial Obligations.** If any audit or inspection reveals that Supplier has failed to comply with Applicable Laws, as applicable to Supplier or to Supplier's performance of the Services in accordance with this Agreement, then Supplier will remedy such failure as soon as reasonably practical, at Supplier's sole cost. In addition, if an audit or examination reveals that Supplier has over-billed Customer, then Supplier will promptly pay Customer: (a) the amount of such over-billings that Customer has paid; (b) interest, at the rate of 0.75% per month, accruing from the date on which the billing error was made until the date Supplier pays, or issues Customer a credit, for the over-billings paid by Customer; and (c) the reasonable costs of the audit incurred by Customer; provided that Supplier's obligation under this subsection (c) will not exceed the one-half of the amount due under subsection (a) of this sentence.

      17.6    **Supplier Breach**. A breach of this **Section 17** (Audits) by Supplier shall be deemed a material breach of this Agreement that is not capable of being cured and grounds for immediate termination of this Agreement by Customer.

**18.**    **MISCELLANEOUS.**

      18.1    **Agreement Binding; Assignment**. This Agreement is binding upon, and will inure to the benefit of, the parties and their successors and permitted assigns. Neither Party shall assign or transfer this Agreement or any interest therein, nor assign, subcontract, delegate, or otherwise transfer any rights or duties under this Agreement, without the prior written consent of the other Party (which consent shall

not be unreasonably withheld or delayed). Any prohibited assignment is void, and any assignment or subcontracting that is subject to the consent of the other Party shall not discharge the assigning or subcontracting party hereunder, unless otherwise stated in such a consent executed by such other Party.

18.2   **Governing Law**. This Agreement and the parties' performance hereunder shall be governed by Illinois law, excluding choice-of-law rules. The rights and obligations of the parties hereto shall not be governed by the provisions of the United Nations Convention on Agreements for the International Sale of Goods, nor by the Uniform Computer Information Transactions Act, as adopted at any time in any state. Supplier agrees, with respect to any matter for which a Party is entitled to proceed directly to court without first commencing Arbitration, that Supplier shall commence any such matter exclusively in the State of Illinois Courts in Cook County, Illinois or the United States District Court for the Northern District of Illinois, and Supplier, by entering into this Agreement, submits to the exclusive venue and personal jurisdiction of such courts, and waives all objections to jurisdiction and venue of such courts, including forum non-conveniens. Furthermore, to the extent permitted under Illinois law, Supplier waives the benefit all substantive, non-procedural, foreign and international laws, including the laws of India, which might otherwise grant Supplier rights which are different than those contemplated under this Agreement.

18.3   **Dispute Resolution**.

(a)   **Informal Dispute Resolution**. Subject to **Section 18.14**, prior to the initiation of formal dispute resolution procedures with respect to any dispute, the parties shall first attempt to resolve such dispute informally. Customer and Supplier Personnel named in the SOW shall attempt in good faith to resolve the dispute. In the event they are unable to resolve a dispute within ten (10) days, or in an amount of time that is provided in SOW, then either Party may refer the dispute for resolution to the their superiors as specified in the SOW upon written notice to the other Party. All negotiation shall be strictly confidential and used solely for the purposes of settlement. Any materials prepared by one Party for these proceedings shall not be used as evidence by the other Party in any subsequent arbitration or litigation; provided that the underlying facts supporting such materials may be subject to discovery.

(b)   **Arbitration.** . Any and all disputes arising out of or relating to this Agreement shall be resolved by final and binding arbitration ("**Arbitration**") under the then-in-force International Arbitration Rules of the International Center for Dispute Resolution ("**ICDR**").

(i)   Arbitral Panel. The Arbitration shall be conducted by three (3) arbitrators. The claimant shall nominate the arbitrator in its notice of arbitration and the respondent shall nominate its arbitrator in its statement of defense. The claimant shall inform the ICDR of the identity of its appointed arbitrator within ten (10) days of the filing of the notice of arbitration and the respondent shall inform the ICDR of the identity of its appointed arbitrator within ten (10) days of the filing of the statement of defense. The two Party-appointed arbitrators shall then have thirty (30) days in which to together appoint a third arbitrator to serve as chair of the arbitral panel. If either Party fails or refuses to appoint an arbitrator within the above-designated period, the single arbitrator appointed by the other Party shall resolve alone the issues set out in the notice of arbitration. In the event that the two (2) arbitrators fail to appoint a chair within thirty (30) days of the appointment of the second arbitrator, either arbitrator or either Party may apply for the appointment of a third arbitrator by the administrator. All arbitrators selected pursuant to this Section shall be practicing attorneys with at least ten (10) years' experience with commercial disputes and the governing law specified in **Section 18.2** (Governing Law).

(ii)     <u>Seat</u>. The location of the Arbitration shall be Cook County in the State of Illinois in the United States. The Arbitration shall be conducted in English unless the parties mutually agree otherwise.

(iii)     <u>Limitations Period</u>. An Arbitration claim shall be rejected as untimely if the notice of arbitration was filed after the earlier of: (a) any limitation period set forth in this Agreement and (b) the date that such claim would be barred by the applicable statute of limitations under the governing law specified in **Section 18.2** (Governing Law).

(iv)     <u>Discovery and Evidence</u>. Discovery as permitted by the United States Federal Rules of Civil Procedure then in effect will be allowed in connection with arbitration to the extent consistent with the purpose of the arbitration and as allowed by the arbitrator or arbitrators, as applicable.

(v)     <u>Limitation on Damages Awards</u>. Subject to applicable law, the arbitrators shall have no authority to award punitive, exemplary, or any other damages other than compensatory damages.

(vi)     <u>Costs and Fees</u>. During the arbitration, each Party shall bear its own arbitration costs, including attorneys' fees, expert fees and expenses and all other costs and expenses of the arbitration shall be divided equally between the parties; provided, however, the arbitrator or arbitrators shall allocate such costs, fees, and expenses between the parties in the final arbitration award in accordance with **Section 18.6** (Attorneys' Fees).

(vii)     <u>Decision</u>. The arbitrators shall be required to state the reasons for their decisions, including findings of fact and law, in writing. The arbitrators shall be bound by the warranties, limitations of liability and other provisions of this Agreement. The decision or award of the arbitrator or the majority of the three arbitrators, as applicable, shall be rendered within fifteen (15) days after the conclusion of the hearing, shall be in writing, shall set forth the legal and factual basis therefor, and shall be final, binding and, subject to the Federal Arbitration Act, non-appealable.

(viii)     <u>Award</u>. An award issued in Arbitration may be enforced and executed in any court having competent jurisdiction.

(ix)     <u>Confidentiality</u>. Unless otherwise agreed by the parties and subject to applicable law, the parties (including their Affiliates, employees, agents, experts and consultants), the arbitrators, and the ICDR shall maintain the confidentiality of all documents, communications, proceedings and awards provided, produced, or exchanged in an Arbitration.

(x)     <u>Interim Measures and Injunctive Relief</u>. Nothing in this Agreement shall prevent the parties, prior to the formation of the arbitral panel, from applying to a court of competent jurisdiction for provisional or interim measures or injunctive relief as may be necessary to safeguard the property or rights that are the subject matter of the Arbitration. Once the arbitral panel is in place, it shall have exclusive jurisdiction to hear applications for interim measures or injunctive relief, except that any interim measures or injunctive relief ordered by the arbitral panel may be immediately and specifically enforced by a court of competent jurisdiction.

(A) If injunctive relief is required for any of the reasons set forth immediately below, either Party may file for Arbitration immediately (and, if necessary, apply to a court of competent jurisdiction pending constitution of the arbitral panel)

>    (i)    to avoid the expiration of any applicable limitations period;

>    (ii)    to preserve a superior position with respect to other creditors;

>    (iii)    to address a claim arising out of the breach of a Party's obligations under **Sections 7** (Proprietary Rights) and/or **10** (Transition Services);

>    (iv)    to prevent other damages that are so immediate, so large or severe, and so incapable of adequate redress after the fact that a temporary restraining order or other immediate injunctive relief is the only adequate remedy.

(B)    **Irreparable Harm.** Supplier acknowledges that, in the event it breaches (or attempts or threatens to breach) its obligation to provide Services or Transition Services in accordance with this Agreement, Customer and/or its Affiliates will be irreparably harmed. In such a circumstance, Customer may proceed directly to Arbitration. If the arbitral tribunal should find that Supplier has breached (or attempted or threatened to breach) any such obligation, Supplier agrees that, without any additional findings of irreparable injury or other conditions to injunctive relief, it shall not oppose the entry of an appropriate order compelling performance by Supplier and restraining it from any further breach (or attempted or threatened breach).

18.4    **Export Requirements**. Supplier acknowledges and agrees that certain software, whether a Customer Provided System or Supplier Provided System (any such software, the "**Exported Software**"), may be subject to the "Export Administration Regulations" set forth at 15 C.F.R., Chapter VII, subchapter C (the "**EAR**") and other Applicable Laws governing exports (collectively, the "**Export Laws**"). Supplier hereby assumes all responsibility for complying with the Export Laws in connection with providing the Services hereunder. For purposes of this paragraph, "export" may (in accordance with the Export Laws) include accessing software from a location outside of the United States. In performing Services hereunder, Supplier will comply with the Export Laws in connection with: (i) Supplier's access of Customer systems, including any Exported Software, from outside the United States; (ii) the transfer, if applicable, of the Exported Software to any location outside of the United States; or (iii) any other circumstance, and in any other way, arising out of the Services provided hereunder. Without limiting the generality of the foregoing, Supplier shall: (x) ensure any Exported Software complies with the EAR; (y) where applicable: (I) obtain ECCN numbers (as defined in the EAR) for any Exported Software; and (II) obtain export licenses (as defined in the EAR) for any Exported Software; and (z) take such other steps as may be required to ensure compliance with the Export Laws. Furthermore, Supplier shall not "export" any software contained in Customer Provided Systems unless and until Supplier determines that such export would not be a violation of the terms of the applicable license (e.g., the terms of the license between Customer and the applicable third-party licensor) for such software.

18.5    **Notices**. All notices given by one Party to the other under this Agreement must be delivered by: (a) hand delivery, (b) certified mail, return receipt requested, (c) nationally recognized overnight courier service, or (d) facsimile, to the other Party's respective address given below:

If to Customer:   Sears Holdings Management Corporation
       3333 Beverly Road
       Hoffman Estates, Illinois 60179
       Attn.:  General Counsel
       Facsimile:  (847) 286-2471

With a copy to:   Sears Holdings Management Corporation
       3333 Beverly Road
       Hoffman Estates, Illinois 60179
       Attn.:  General Counsel
       Facsimile:  (847) 286-2471

If to Supplier    24/7 Customer, Inc.
       910 East Hamilton Ave., Suite 240
       Campbell, California 95008
       Attn: Corporate Counsel
       Facsimile:  (408) 377-7247

All notices will be effective:  (i) upon actual receipt; (ii) three (3) business days after being sent by certified mail; (iii) the next business day after being sent by a nationally recognized courier; or (iv) on the same business day on which it is sent by facsimile (or on the next business day, if transmission is completed after 5 p.m., recipient's time).  Facsimile notice must be promptly followed by notice given under clause (a), (b) or (c) above.  A Party may change its contact and notice information by giving the other Party proper notice of the change in accordance with this **Section 18.5**, but such change shall be effective only when it is actually received.

  18.6  **Attorneys' Fees**.  In the event of a dispute, claim, or litigation regarding a breach or an alleged breach of this Agreement, the non-prevailing Party shall reimburse the prevailing Party for all of its costs and expenses (including reasonable attorneys' fees) incurred in connection with such dispute, claim or litigation, including those incurred in any appeal therefrom.

  18.7  **Customer Approval**.  From time to time, Supplier may be entitled to receive (or Supplier may request), Customer's "approval" or "sign-off" of project plans or other Deliverables prior to proceeding with the next phase or step of a given project.  Supplier acknowledges that, in such a case: (i) Customer is relying upon Supplier's technical expertise in providing such Deliverables; and (ii) any such "approval" or "sign-off" by Customer's Personnel shall neither be construed as an endorsement by Customer as to the technical means Supplier has selected to achieve the required results, nor as a waiver of any of Customer's rights or Supplier's obligations under this Agreement.  All such approvals must be in writing and must be signed by Customer's designated "relationship manager" (or a designee identified by such relationship manager) or by an authorized Customer executive.

  18.8  **Access to Electronic Systems**.

    (a)  **Limited Use**.  If Supplier has access, whether on-site at Customer's facilities or through remote facilities, to any of Customer or its Authorized Users' Electronic Systems in connection with this Agreement, Supplier shall limit its Personnel's access and use thereof solely to: (i) those Electronic Systems that Customer has authorized Supplier to access (and Supplier shall not access or attempt to access any other Electronic System of Customer or its Authorized

Users); and (ii) performing its obligations within the scope of this Agreement. Supplier shall cease using such Electronic Systems upon termination or expiration of the applicable SOW.

(b)    **Supplier's Personnel.** Supplier may extend its access permission rights to Customer's and its Authorized Users' Electronic Systems only to those Personnel who need access for Supplier to perform its obligations under this Agreement. Upon Customer's request, Supplier shall notify Customer in writing of the names of its Personnel who have had such access, and Supplier shall strictly follow Customer's security rules and procedures for use of such Electronic Systems. Supplier is responsible for any unauthorized access or unauthorized use by its Personnel of Customer's and its Authorized Users' Electronic Systems.

(c)    **Information Confidential.** All user identification numbers and passwords disclosed to Supplier, and any information obtained from use of Customer's and its Authorized Users' Electronic Systems, shall be Customer's Confidential Information. Supplier shall be responsible for any unauthorized use of such identification numbers and passwords, and Supplier shall cooperate, at no additional charge, with Customer in investigating and mitigating any apparent unauthorized access by or through Supplier or its Personnel of Customer's or its Authorized Users' Electronic Systems.

18.9    **Security and PCI Standards.** As part of the Services, Supplier shall maintain and enforce at the Supplier Facilities safety and security procedures that are at least: (1) equal to industry standards for such facilities; and (2) as rigorous as those procedures in effect at the Supplier-owned Supplier Facilities as of the Effective Date. Customer shall, from time to time, provide to Supplier Customer's safety and security procedures that are then in effect at Customer's locations and Supplier shall comply with such procedures at such locations. Supplier shall also comply with **Appendix 2** (Information Security). Supplier shall promptly inform Customer of any breaches in security or potential breaches in security. Supplier shall be responsible for any and all security breaches at such locations (or with regard to Customer's Electronic Systems) relating to any acts or omissions of Supplier, its Affiliates, or their respective Personnel. Supplier shall also establish and maintain reasonable safeguards against the destruction, loss, or alteration of, or unauthorized access to, Customer Data or any other Customer information (including any Confidential Information of Customer) in Supplier's possession. Supplier acknowledges that to the extent it receives cardholder data in connection with the Agreement (e.g., data concerning a credit, debit, or other payment card or the person to whom it is issued), Supplier is responsible for the security of such cardholder data, and Supplier shall comply with data security standards of the payment card industry ("PCI"), as adopted by the PCI from time to time. Customer will be entitled to audit (pursuant to **Section 17** (Audits)) Supplier's compliance with this requirement. In the event of a data breach of Customer's cardholder information involving Supplier or Supplier's environment, Supplier will notify Customer within twenty-four (24) hours of the identified breach and cooperate fully with Customer and/or industry/government officials in a review and/or forensic investigation of Supplier's environment and/or processes.

18.10    **Prevention of Unauthorized Code.** Supplier shall use industry best practices to regularly and routinely identify, screen, and prevent any Unauthorized Code in Electronic Systems (including Customer Provided Systems) utilized by Supplier in connection with this Agreement, and Supplier shall not itself (or permit its Personnel to) intentionally install any Unauthorized Code in such Electronic Systems. Supplier shall promptly mitigate the effects of any Unauthorized Code discovered in any such Electronic Systems.

18.11    **Severability.** If any provision of this Agreement is determined to be unenforceable, the remainder of such provision and the rest of the Agreement will continue in full force, to the extent they are enforceable.

18.12  **Subcontractors**. With the prior approval of Customer, Supplier may contract with or use subcontractors to perform some of the Services to be managed by Supplier hereunder ("**Subcontractors**"). Customer hereby consents to the subsidiaries and affiliates of Supplier listed on Appendix 8 hereto to perform as Subcontractors.  Contractor shall be responsible for the acts and omissions of each of its Subcontractors.  For purposes of determining liability hereunder, any time the term "Supplier" is used in this Agreement it shall be deemed to include all Subcontractors or other persons and entities performing any part of the Services under this Agreement with or on behalf of Supplier, including suppliers and agents.  Supplier's entering into any subcontract shall not relieve, release or affect in any manner any of Supplier's duties, liabilities or obligations hereunder, and Supplier shall be and remain liable hereunder to the same extent as if Supplier had performed the Services.

(a)    Customer retains the sole right to reject any Subcontractor furnished, and in such event, Supplier shall provide alternative Subcontractors for Customer's consideration, until approved by Customer.  There shall be no additional costs incurred by Customer as a result of use of Subcontractors by Supplier.  Supplier shall be solely responsible for payments due to the Subcontractors it uses, and when requested by Customer, Supplier shall require a fully executed lien waiver from all Subcontractors it uses, prior to making final payment to said Subcontractor(s). Customer shall have the right to require further assurances, including a set-off, in the event that allegations are made that Supplier has failed to pay its Subcontractors, and such failure may be considered a substantial breach of the Agreement.

(b)    In the event that Customer approves the use of Subcontractors for any Services hereunder, Contractor will enter into written agreements with those Subcontractors to set forth the duties required for such Subcontractors to perform (each a "**Subcontractor Agreements**), subject to Customer's approval prior to execution.  Each Subcontractor Agreement shall be executed in Supplier's name, as an independent contractor and not as agent for Customer.

(c)    All Subcontractor Agreements must:

(i)    be subject to termination by Supplier without cause or penalty, upon notice to the Subcontractor;

(ii)    require the Subcontractor to comply with all security and safety rules implemented for Service locations;

(iii)    provide for insurance coverage as set forth in Section 14.1 of this Agreement and shall require the Subcontractor's insurance carriers for each coverage to waive all rights of subrogation which the insurer may have against the Supplier or Customer of the Indemnified Party; and

(iv)    provide for indemnification and defense obligations from the Subcontractor to Supplier, and Supplier shall defend and indemnify the Indemnified Party for the acts of the Subcontractors as provided for under Article 15 of this Agreement.

(d)    Supplier shall be responsible for tracking and ensuring that each Subcontractor has required insurance coverages as set forth in Section 14.1 of this Agreement.  Upon request by Customer, Supplier shall provide Customer with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Customer, certified copies of such policies of portions thereof.

(e)    Supplier shall be responsible for tracking and ensuring that each Subcontractor signs lien waivers for the work it has performed.

(f)    Nothing in the Subcontractor Agreement minimum requirements set forth above shall limit Supplier's liability to Customer under this Agreement for the actions of the Subcontractors, or their agents and employees, under this Agreement, including but not limited to the defense and indemnification provisions of Article 15 of this Agreement. In the event that a claim arises that involves Subcontractor's acts or omissions, Supplier shall be responsible for such actions under this Agreement, and Supplier shall accept Customer's tender of defense and request for indemnification from Customer, notwithstanding any rights that Supplier may have against the Subcontractor under the terms of a Subcontractor Agreement.

18.13    **Publicity**. Supplier will not publicize the existence of this Agreement (whether in a press release or other disseminating medium), nor disclose to any third party the Services or Deliverables, without Customer's prior written consent (e.g., in advertising, customer lists, or sales/marketing materials).

18.14    **Injunctive Relief**. Supplier acknowledges that any breach of **Section 7** (Proprietary Rights), **Section 10** (Transition Services), or **Section 15** (Indemnification) of this Agreement or Supplier's obligations as to Confidential Personal Information under this Agreement by Supplier would cause Customer irreparable harm for which Customer has no adequate remedies at law, and that, as a remedy for such breach, Customer shall be entitled to equitable relief, including an injunction and specific performance. In addition, either Party may institute formal proceedings to obtain injunctive relief in order to: (i) avoid the expiration of any applicable limitations period, (ii) preserve a superior position with respect to other creditors, or (iii) prevent other damages that are so immediate, so large or severe, and so incapable of adequate redress after the fact that a temporary restraining order or other immediate injunctive relief is the only adequate remedy. Supplier further waives any requirements for the securing or posting of any bond in connection with such remedy.

18.15    **Further Assurances**. Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement. Furthermore, in the event that Customer, at any time, has insecurity as to Supplier's ability to perform any of the Services in accordance with this Agreement, Customer may request, and Supplier shall promptly, but in no event more than ten (10) days after receipt of Customer's request, provide to Customer, adequate assurance that Supplier will properly perform the Services as set forth in this Agreement (including as set forth in any SOWs hereto).

18.16    **Force Majeure**. Each Party (a "**Non-Performing Party**") shall be relieved of its obligations under this Agreement to the extent: (a) its performance is delayed or made impossible by fire, acts of nature (e.g., floods, earthquakes, etc.), acts of war, terrorism, and civil disorders beyond such Party's reasonable control (each a "**Force Majeure Event**"); and (b) such Party exerts commercially reasonable efforts to minimize the duration and consequences of such non-performance; provided such non-performance could not have been prevented by the Non-Performing Party by commercially reasonable precautions and could not reasonably have been circumvented by the Non-Performing Party through the use of alternate sources, work-around plans or other means. The Non-Performing Party will immediately notify the other Party of any Force Majeure Event. Any such notice shall describe in a reasonable level of detail the circumstances causing such delay and upon request of the other Party, the Non-Performing Party shall promptly provide a written mitigation plan. The Non-Performing Party shall be excused to such extent as is reasonably necessary to accommodate such delay; provided that if such delay extends beyond five (5) days Customer may terminate this Agreement, or any applicable SOW, for

41

Customer's convenience, without Termination Charges or any other liability to Supplier. A Force Majeure Event shall not relieve Supplier of any disaster recovery, fail-over, or similar Services that Supplier is obligated to provide hereunder, unless such Force Majeure Event prevents the implementation of such disaster recovery, fail-over or similar Services.

18.17  **No Waiver; Cumulative Remedies**. A Party's waiver of any right under this Agreement is effective only if in writing. A Party's specific waiver will not constitute a waiver by that Party of any earlier, concurrent or later breach or default. Unless expressly otherwise provided in this Agreement, no remedy set forth in this Agreement is intended to be, nor shall be, exclusive of, or mutually exclusive with regard to, any other remedy. The remedies provided in this Agreement are cumulative with, and not in lieu of, other remedies available to either Party at law or in equity.

18.18  **Entire Agreement**. This Agreement constitutes the complete, final and exclusive statement of the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions of the parties. This Agreement also supersedes, and Customer shall not be bound by, any "shrink wrap license" which is bundled with the Deliverables or any "disclaimers" or "click to approve" terms or conditions contained in the Deliverables or any Web site that Customer uses in connection with the Services, now or in the future. A Party is not bound by any modification or rescission of this Agreement that it has not agreed to in a writing signed by such Party.

18.19  **Interpretation**. In this Agreement (including in any SOW): (a) section headings are for reference only and do not affect the interpretation of this Agreement, (b) defined or capitalized terms include the plural as well as the singular, and (c) "include" and its derivatives ("including," "e.g." and others) mean "include, but are not limited to."

18.20  **Enforcement** Customer shall have the right to enforce this Agreement (including the terms of SOW) on behalf of each Authorized User, and to assert all rights and exercise and receive the benefits of all remedies (including monetary damages) of each such Authorized User to the same extent as if Customer were such Authorized User, subject to limitation of liability under this Agreement.

18.21  **Third Party Beneficiaries**. Other than the Customer's Authorized Users, there are no third party beneficiaries to this Agreement.

18.22  **Time Of the Essence**. Supplier acknowledges that time is of the essence in performing its obligations hereunder.

18.23  **Survival**. Any terms of this Agreement that would, by their nature, survive the termination or expiration of this Agreement shall so survive, including **Section 7** (Proprietary Rights), **Section 8** (Compensation), **Section 9** (Term and Termination), **Section 10** (Transition Services), **Section 11** (Representations, Warranties and Covenants), **Section 12** (Personnel), **Section 13** (Confidentiality), **Section 14** (Insurance), **Section 15** (Indemnification), **Section 16** (Limitation of Liability), **Section 17** (Audits), and **Section 18** (Miscellaneous).

18.24  **Hiring Restriction**. During the Term and for twelve (12) months after the expiration of this Agreement or termination of this Agreement (or any applicable SOW), Customer and Supplier each agrees that it and its Affiliates (collectively, the "**Non-Employer**"), shall not employ any person currently employed by the other party if such person has worked with the Personnel of the Non-Employer under any SOW to this Agreement. Acknowledging that damage resulting from breach of this paragraph would be difficult or impossible to calculate, the breaching party agrees to pay, for each such breach, a one-time fee equal to: (i) $3,500 per contact center agent; (ii) $4,000 per supervisor; (iii) the first year salary offered by the Non-Employer to such individual for any other managerial, supervisory or executive

employee of such party. Notwithstanding the foregoing, it shall not be a violation of this Section (Hiring Restriction), if Customer or its Affiliates hire a person: (a) more than six (6) months after such employee worked on a Customer SOW; (b) such person has left the Supplier's employment before being offered a position by Customer or its Affiliates (unless such person was induced by Customer to leave such position in order to qualify for this exception); (c) such person responds to a bona fide general solicitation for employment or (d) to work in a non-contact center role.

18.25  **Signatures.**  This Agreement (and any SOW hereto), may be executed in counterparts, which together constitute one and the same agreement. Each Party may rely on a facsimile signature on this Agreement or any SOW. If a Party sends a signed copy of this Agreement (or any SOW hereto) via facsimile, such Party shall, upon request by the other Party, provide a signed original of this Agreement (or such SOW) via certified mail or overnight courier.

**IN WITNESS WHEREOF**, Supplier and Customer have caused this Agreement to be executed, as of the Effective Date, by persons duly authorized.

| Customer: | Supplier: |
|---|---|
| **Sears Holdings Management Corporation** | **24/7 Customer, Inc.** |
| By: | By: |
| Name: | Name: Madhu Ranganathan |
| Title: DVP CIO | Title: CFO |
| Date: 03/19/12 | Date: March 12, 2012 |

*Signature Page – Master Outsourced Services Agreement*

## APPENDIX 1

## GLOSSARY

"**Affiliate**" means, with respect to each Party, any individual or entity (e.g., a corporation, limited liability company, partnership, etc.) that, at the applicable time, directly or indirectly controls, is controlled with or by or is under common control with, a Party.  Notwithstanding the foregoing, only entities directly or indirectly controlled by Sears Holdings Corporation shall be deemed Affiliates of Customer for purposes of this Agreement.

"**Agreement**" means this Master Agreement including all: (i) SOWs, (ii) Appendixes, (iii) other attachments hereto, and (iv) other documents incorporated herein by reference.

"**Amendment**" has the meaning set forth in **Section 3.4.**

"**Applicable Laws**" means any applicable laws, regulations, ordinances, or court or administrative orders or decrees of any federal, state, local or other governmental unit that has jurisdiction in the given circumstances (including governmental units of countries other than the United States, to the extent Services are provided from such countries).

"**Arbitration**" has the meaning set forth in **Section 18.3.**

"**Authorized Users**" means: (a) Customer; (b) Customer's Affiliates; (c) any businesses divested or spun-off by Customer or its Affiliates, for the period of the first twenty-four (24) months following such divestiture or spin-off; (d) any individual or entity that: (i) is licensed to do business using the Customer's or any of its Affiliates' names (e.g., Sears' dealer stores); or (ii) does business within a store of Customer's or any of its Affiliates' (e.g., licensed businesses); (e) the former employees, retired employees and prospective employees of any of the entities described in the foregoing clauses (a) through (c); (f) the Personnel of any of the entities described in the foregoing clauses (a) through (d); and (g) any customers or prospective customers of the entities described in the foregoing clauses (a) through (d), to the extent that Supplier makes available (or any SOW contemplates that Supplier will make available), any Supplier Provided Systems to any such customers or prospective customers (e.g., voice-response units, online chat capabilities, etc.).

"**Benchmark Results**" has the meaning set forth in **Section 8.10(d).**

"**Benchmark Standard**" has the meaning set forth in **Section 8.10(e).**

"**Benchmarker**" has the meaning set forth in **Section 8.10(a).**

"**Benchmarking**" has the meaning set forth in **Section 8.10(a).**

"**Business Process Outsourcer**" has the meaning set forth in **Section 8.10(a).**

"**Change in Control**" has the meaning set forth in **Section 9.5.**

"**Claims**" has the meaning set forth in **Section 15.1(a).**

"**Confidential Business Information**" has the meaning set forth in **Section 13.1(a).**

"**Confidential Information**" has the meaning set forth in **Section 13.1(b).**

1

"**Confidential Personal Information**" has the meaning set forth in **Section 13.1(b)**.

"**Customer**" has the meaning set forth in the preamble.

"**Customer Data**" means (i) any data or information of Customer, its Affiliates, or their respective suppliers, customers or other business partners that is provided to or obtained by Supplier or Supplier Personnel in the performance of its obligations under this Agreement, (ii) any data or information created, generated, collected or processed in connection with the Services and (iii) data or information entered into any software, equipment or system by or on behalf of Customer, and all derivatives of any of the foregoing, including any such information as stored in or processed through any equipment, software or system.

"**Customer Indemnities**" has the meaning set forth in **Section 15.1(a)**.

"**Customer Information**" has the meaning set forth in **Appendix 2**.

"**Customer Intellectual Property**" has the meaning set forth in **Section 7.1**.

"**Customer Provided Systems**" has the meaning set forth in **Section 4.3(b)**.

"**Deliverables**" means all ideas, concepts, works, inventions, information, data, software (including object code and source code) and other materials supplied, conceived, originated, prepared, generated or required to be delivered by Supplier or any of its Personnel, either alone or with others, pursuant to a given SOW, including all developments, written reports, requirements documents, specifications, program materials, flow charts, notes, and outlines, and all intermediate and partial versions of any of the foregoing, developed in the course of providing the Services to Customer, but excluding the Supplier Intellectual Property.

"**Disclosing Party**" has the meaning set forth in **Section 13.1(a)**.

"**Documentation**" means any materials (e.g., user manuals, training manuals, etc.) published or otherwise made available or provided by Supplier that relate to the functional, operational, or performance capabilities of the Services or the Supplier Provided Systems.

"**EAR**" has the meaning set forth in **Section 18.3**.

"**Effective Date**" has the meaning set forth in the preamble.

"**Electronic System**" means any hardware, software, electronic data storage system, voice or data circuit, telephony system (e.g., an interactive voice response unit), other network components and resources, or other electronic system.

"**Excessive Service Level Failure**" has the meaning set forth in **Section 6.4**.

"**Export Laws**" has the meaning set forth in **Section 18.3**.

"**Exported Software**" has the meaning set forth in **Section 18.3**.

"**Extraordinary Event**" has the meaning set forth in **Section 8.9(a)**.

"**Fail-Over Procedure**" has the meaning set forth in **Section 4.7**.

2

"**Force Majeure Event**" has the meaning set forth in **Section 18.15.**

"**Incidental Services**" has the meaning set forth in **Section 5.1(a).**

"**Indemnified Party**" has the meaning set forth in **Section 15.2(a).**

"**Indemnifying Party**" has the meaning set forth in **Section 15.2(a).**

"**Intellectual Property**" means any patents and patent applications, know-how, processes, methods, designs, industrial design rights, trademarks, servicemarks, tradenames, trade dress, copyrights, mask works, trade secrets, moral rights, inventions and technology (whether or not patentable), confidential and proprietary information, domain names, software, databases and other collections and compilations of data, rights of publicity and privacy, and other intellectual property to which rights are conferred by contract or by any Applicable Law.

"**Inventory**" has the meaning set forth in **Section 4.3(c).**

"**Key Personnel**" has the meaning set forth in **Section 12.3.**

"**Material Modifications**" has the meaning set forth in **Section 4.5(b).**

"**Measurement Month**" has the meaning set forth in **Section 6.2.**

"**Milestone**" means any deadline(s) and schedule(s) for performance set forth in a SOW or any timeline agreed upon by the parties in writing.

"**Moral Rights**" means any right to claim authorship over a piece of work or to restrain or claim damages in respect of distortion, mutilation or other modification or other derogatory action in relation to a work, whether or not prejudicial to the author's honor or reputation, and any similar or neighboring right existing under common or statutory law of any country, province or state in the world or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right" or "droit moral."

"**New Services**" has the meaning set forth in **Section 5.2.**

"**Non-Performing Party**" has the meaning set forth in **Section 18.15.**

"**Official**" has the meaning set forth in **Section 11.1(a).**

"**OPM**" has the meaning set forth in **Section 4.10.**

"**Paradigm Technological Shift**" has the meaning set forth in **Section 8.11.**

"**PCI**" has the meaning set forth in **Section 18.8.**

"**Personnel**" means the directors, officers, employees, partners, agents, advisers, suppliers, independent contractors, and subcontractors of a party and its Affiliates or of another entity, as applicable; provided that the Personnel of Supplier and its Affiliates shall not be deemed to be Personnel of Customer.

"**Qualifications**" has the meaning set forth in **Appendix 3.**

"**Receiving Party**" has the meaning set forth in **Section 13.1(a).**

3

"**Reports**" has the meaning set forth in **Section 4.11(a)**.

"**Request for Arbitration**" has the meaning set forth in **Section 18.3**.

"**Required Consents**" means any consents or approvals required for a party, its Affiliates and its/their Personnel (and in the case of Customer, its Authorized Users), to use Supplier Provided System, Customer Provided System, any Electronic System or other applicable property, of the other party for the purposes contemplated by this Agreement.

"**SAS 70**" has the meaning set forth in **Section 17.2**.

"**Service Credits**" has the meaning set forth in **Section 6.1**.

"**Service Level Reports**" has the meaning set forth in **Section 6.2**.

"**Service Levels**" has the meaning set forth in **Section 6.1**.

"**Service Taxes**" means any and all sales, use, excise, value added (including without limitation VAT), service, lease, personal property, consumption and other similar taxes and duties that are assessed against either party on the provision or receipt of the Services as a whole, or on any particular Service received by Customer or its Affiliate from Supplier, excluding income taxes.

"**Services**" has the meaning set forth in **Section 3.2**.

"**SOW**" has the meaning set forth in **Section 3.2**.

"**Start-Up Milestones**" means the date(s) by which each Start-Up activities to be performed by Supplier and the changes in technology and business processes to be implemented by Service Provider, are to be completed.

"**Start-Up Period**" means the period that commences on the Effective Date and expires 11:59:00 p.m., Eastern Time, on the date specified for the completion of the transition as specified in the Start-Up Plan, unless expressly extended in writing by Customer.

"**Start-Up Plan**" means the plan set forth in SOW, which identifies all material Start-Up tasks and Deliverables to be undertaken by Supplier in connection with the transition of all Services to Supplier, the completion of all Start-Up Period enhancement projects to be completed during the Transition Period, and the dates by which each will be completed by Supplier. If any tasks, functions or responsibilities not described in the Start-Up Plan are required for the proper transition of the Services to Supplier, such tasks, functions and responsibilities will be deemed to be part of the Services to be performed pursuant to the Start-Up Plan.

"**Start-Up Services**" shall mean the services, functions and responsibilities described in the SOW and the Start-Up Plan to be performed by Supplier.

"**Start-Up Work Plan**" has the meaning set forth in **Section 3.3(b)**.

"**Supplier**" has the meaning set forth in the preamble.

"**Supplier Facilities**" has the meaning set forth in **Section 4.7**.

"**Supplier Intellectual Property**" has the meaning set forth in **Section 7.5**.

4

"**Supplier Provided System**" means any Electronic System that Supplier uses to provide the Services or that Supplier provides (or is required to provide) Customer and its Authorized Users with access to in connection with the Services (excluding, for the avoidance of doubt, the Customer Provided Systems).

"**Tax Audited Party**" has the meaning set forth in **Appendix 6.**

"**Tax Claim**" has the meaning set forth in **Appendix 6.**

"**Technology Refresh Plan**" means the plan for the periodic replacement or refreshing of technology used to perform the Services, or otherwise used in connection with the business processing environment, as set forth in **Appendix 4** attached hereto.

"**Term**" has the meaning set forth in **Section 9.1.**

"**Termination Charges**" means, subject to the limitations set forth in **Section 9.4(d)** (Termination Charges), the actual, out-of-pocket costs and expenses that Supplier reasonably incurs as a direct result of Customer's terminating this Agreement or any SOW or Services pursuant to (and as such costs and expenses are further described in) **Section 9.4** (Termination for Convenience by Customer).

"**Transferred IP Rights**" has the meaning set forth in **Section 7.2.**

"**Transition Period**" has the meaning set forth in **Section 10.2(a).**

"**Transition Services**" has the meaning set forth in **Section 10.2(a).**

"**Third Party Materials**" means intellectual property, software or other materials that are owned by third parties and provided under license to Supplier (or its Affiliates or Subcontractors) or Customer (or its Affiliates) and that have been or will be used to provide or receive the Services.

"**Unauthorized Code**" means any feature, routine or device that is intended or designed to, either automatically, upon the occurrence of a certain event, upon the taking of or failure to take a certain action, or at the direction or control of any person or entity: (a) disrupt the operation of a Deliverable or any Electronic System; (b) cause a Deliverable or Electronic System to be unintentionally destroyed, altered, erased, damaged, or otherwise made inoperable; or (c) permit any person or entity to destroy, alter, erase, damage, or otherwise render inoperable a Deliverable or any Electronic System. Unauthorized Code includes any computer virus, worm, trap door, back door, time bomb, malicious program, or mechanism such as a software lock or routine for password checking, CPU serial number checking, or time dependency, that is introduced by the Personnel of Supplier or its Affiliates and that could hinder Customer's and its Authorized Users' freedom to fully exercise its rights to the applicable Deliverable or Electronic System.

"**User IDs**" has the meaning set forth in **Appendix 2.**

*End of Appendix*

5

# APPENDIX 2

## (INFORMATION SECURITY)

At a minimum and as specified herein, Supplier shall provide security for all Supplier Provided Systems (and any Customer Provided Systems, to the extent in Supplier's possession or control). Supplier's security efforts will include, at no additional cost:

**Logical Access Controls:** Supplier agrees to employ effective access control measures over all Electronic Systems used to create, transmit, or process Customer or its Authorized Users' specific information (irrespective of whether or not such information may be deemed to be Confidential Information or not, hereafter "**Customer Information**"), including:

- User authentication must use unique identifiers ("**User IDs**") consistent with individual accountability; shared User IDs do not provide the level of accountability required by Customer;
- A complex password policy must be enforced by Supplier;
- User access rights/privileges to Electronic Systems containing Customer Information must be granted on a need-to-know basis consistent with role-based authorization;
- User access to Customer Information must be removed in a timely manner upon user separation or a role transfer which eliminates their need to access such system; and
- Default passwords and security parameters must be changed in third-party products/applications used to support Customer Information.

**Network Security Architecture:** Supplier agrees to employ effective network security control measures over all Electronic Systems used to create, transmit, or process Customer Information, including:

- Firewalls must at all times be operational and will be installed at the network perimeter between Supplier's internal (private) and public (Internet) networks;
- Properly configured and monitored IDS/IPS (Intrusion Detection/Prevention Systems) must be used on Supplier's network;
- Databases must be logically or physically separated from the web server, and the database may not reside on the same host as the web server, where applicable;
- The Electronic Systems used for the purposes of processing Customer Information must have only those services/processes and ports enabled to perform routine business, and all other services/processes on the host must be disabled; and
- All Electronic Systems used for Customer by Supplier, or its Affiliates or other business partners, must be physically located in a controlled data center environment used for the purpose of protecting information systems.

**Physical Access Controls:** Supplier agrees to maintain Electronic Systems that store information related to Customer Information in an access controlled and consistently monitored data center secured by appropriate alarm systems, which Electronic Systems and information will not be commingled with an unrelated party's hardware, software or information.

**Risk Assessment:** Supplier agrees to provide responses to a risk assessment questionnaire (if provided by Customer), participate in a passive scan of its network (upon notification), and provide Customer with results of a recent security assessment by a third party (e.g., penetration test results of internet-facing devices).

**Security Policy:** Supplier agrees to maintain and enforce security policies and audit and monitor consistent with security best practices. Upon request, Supplier shall provide copy of current security policy and standards.

**System Monitoring:** Supplier agrees to regularly audit monitor Electronic Systems processing Customer Information to ensure the protection of Customer Information. Monitoring includes looking for potential breaches or hacking activity and unauthorized access to devices.

**Vulnerability Management Controls:** Supplier agrees to employ effective vulnerability management control measures over all of its Electronic Systems used to create, transmit, or process Customer Information, including:

- Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices;
- Annual third-party assessment of Electronic Systems supporting Customer's customer credit card information;
- Deploying commercially available anti-virus software on all information system components and interconnecting networks, where applicable, used for the purpose of managing Customer Information, and, additionally, providing for regular scanning for viral infections and update virus signature files frequently; and
- Maintaining a standard patch management process and practice to ensure the protection of hosts used to process and store Customer Information.

*End of Appendix*

2

## APPENDIX 3

### (SELECTION OF BENCHMARKERS)

Customer and Supplier shall follow the process set forth below to select a Benchmarker to conduct benchmarking activities, as described in **Section 8.10** (Benchmarking) of the Agreement.  Each Benchmarker shall possess or meet all qualifications set forth in Section 2 below.

Process to Select a Benchmarker

When Customer desires to exercise its right to engage a Benchmarker to perform benchmarking activities, in accordance with **Section 8.10** of the Agreement, Customer may select a Benchmarker from among the benchmarking firms listed in the SOW, or Customer may choose a Benchmarker not listed in the SOW, but one that meets the Qualifications (described below) and provide Supplier with written notification of such selection at least thirty (30) days prior to the proposed date that such benchmarking activities are to begin.

The parties agree that the benchmarking firms identified in the SOW meet all of the qualifications set forth in **Section 2** of this Appendix (the "**Qualifications**").

2.      Qualifications of a Benchmarking Firm

Each Benchmarker selected by Customer shall:

Be neither a Customer Competitor nor a Supplier Competitor;

Have been in business continuously for at least three (3) years at the time of such selection, although the corporate form or name of the entity that constitutes such Benchmarker may have changed during such period of time; and

Have expertise in working with the applicable business processes to be benchmarked.

**APPENDIX 4**

**(TECHNOLOGY REFRESH PLAN)**

Supplier's standard technology refresh plan replaces technology in order to satisfy standards set forth in an SOW and as required to maintain certifications and to meet industry standards.  This encompasses all equipment including telephony such as the Avaya ACD/PBX, CMS and NICE systems, and Network WAN/LAN such as Cisco routers, switches and firewalls.

## APPENDIX 5

### TAXES

The parties' respective responsibilities for taxes arising under or in connection with this Agreement is as follows:

1. <u>Income Taxes</u>. Each party will be responsible for its own income Taxes.

2. <u>Sales, Use and Property Taxes</u>. Each party will be responsible for any sales, lease, use, personal property, stamp duty or other such taxes on equipment, software, systems or property it acquires, owns or leases from a third party.

3. <u>Taxes on Goods or Services Used by Supplier</u>. Supplier will be responsible for all sales, service, value-added, lease, use, personal property, excise, consumption and other taxes and duties, including VAT, payable by Supplier on any goods or services used or consumed by Supplier in providing the Services (including services obtained from Subcontractors).

4. <u>Taxes on Goods or Services Used by Customer</u>. Customer will be responsible for all Service Taxes payable by Customer on any goods or services used or consumed by Customer in obtaining the Services (including services obtained from Subcontractors).

5. <u>Efforts to Minimize Taxes</u>. The parties will cooperate to enable each party to more accurately determine its own tax liability and to minimize such liability to the extent legally permissible. Each party will provide and make available to the other any resale certificates, information regarding out-of-state or out-of-country sales or use of goods or services, and other exemption certificates or information reasonably requested by the other party. At Customer's request, Supplier will promptly provide Customer with (i) written certification signed by an authorized representative of Supplier confirming that Supplier has filed all tax forms and returns required in connection with any of the Services, and has collected and remitted all applicable Service Taxes and (ii) such other information pertaining to applicable taxes as Customer may reasonably request.

6. <u>Tax Audits or Proceedings</u>. The provisions of this **Appendix 6** will apply to any audit, assessment proceeding or other claim by any tax authority (collectively or individually a **"Tax Claim"**) of or against a party (the **"Tax Audited Party"**) that relates to taxes for which the other party is financially responsible. The Tax Audited Party will promptly notify the other party of, and coordinate with the other party the response to and settlement of, such Claim. With respect to any claim arising out of a tax form or return signed by a party, such party will have the right to elect to control the response to and settlement of the Claim, but the other party will have the right to participate in the response and settlement commensurate with its potential responsibilities or liabilities under such claim. Each party also will have the right to challenge the imposition of any tax liability for which it is financially responsible under this Agreement or, if necessary, to direct the other party to challenge the imposition of any such tax liability. If either party requests the other to challenge the imposition of any tax liability, such other party will do so (unless and to the extent it assumes financial responsibility for the tax liability in question), and, the requesting

5

party will reimburse the other for all fines, penalties, interest, additions to taxes or similar liabilities imposed in connection therewith, plus the reasonable legal, accounting and other professional fees and expenses the other party incurs. Each party will be entitled to any tax refund or rebate obtained with respect to the taxes for which such party is financially responsible under this Agreement.

7.   Tax Filings. Each party represents, warrants and covenants that it will promptly, in all applicable jurisdictions, file applicable tax returns and pay associated taxes in accordance with the provisions of this **Appendix 6**. Supplier additionally represents, warrants and covenants that it is registered to and will promptly remit Service Taxes in all applicable jurisdictions.

6

## APPENDIX 6

### (THIRD PARTY MATERIALS)

The terms and conditions for use of Third Party Materials are set forth in this Appendix.

**Customer Consent**.  Supplier will not use any Third Party Materials to provide the Services without Customer's prior written consent, which consent shall not be unreasonably withheld or delayed. Supplier will inform Customer of any license restrictions and costs associated with the use of Third Party Materials prior to obtaining Customer's consent, and Customer's rights will be subject to such restrictions and/or costs if Customer consents in writing to its use.  Unless Customer has otherwise agreed in writing in advance, Customer shall not be obligated to pay any license or transfer fees in connection with its receipt of the licenses, sublicenses and other rights specified in this **Appendix 7**.  Supplier shall not commit Customer to paying any such fees or expenses without Customer's prior approval. To the extent Customer has agreed in advance to pay any fees in connection with its receipt of such licenses, sublicenses or other rights, Supplier shall, at Customer's request, identify the licensing and sublicensing options available to Customer and the license or transfer fees associated with each.  Supplier shall use commercially reasonable efforts to obtain the most favorable options and the lowest possible transfer, license, relicense, assignment or termination fees for Third Party Materials. If the licensor offers more than one form of license, Customer (not Supplier) shall select the form of license to be received by Customer, its Affiliates or their designee(s).

**Rights During Term**.  Prior to introducing any Third Party Materials in providing the Services, Supplier will do the following

(a)     Obtain the right to grant Customer and its designees a license to use such Third Party Materials for the purpose of Supplier providing services to Customer during the Term and any transition period following termination of the Agreement; and

(b)     Verify that Customer and its designees for the purpose of providing services to Customer have the right to purchase ongoing maintenance and support for such Third Party Materials on commercially reasonable terms during the Term and any transition period following termination of the Agreement.

**Delivery of Third Party Materials**.  Upon expiration or termination of any of the Services, Supplier shall deliver to Customer a copy of such Third Party Materials (including source code, to the extent it has been available to Supplier) and related documentation).

## APPENDIX 7

### (SUBSIDIARIES AND AFFILIATES)

24/7 Customer Private Limited
24/7 Customer Guatemala, S.A.
24/7 Customer International Holdings, Ltd.
24/7 Customer Philippines, Inc.
Guatemala Contact Services Company, S.A.
iLabs, S.A.
Administradora de zona Industrial y de Servicios de Comunicacion, S.A.  24/7 Customer Nicaragua, S.A.

8

**Appendix 8**

**Form of Change Order**

## CHANGE ORDER REQUEST FORM

Change Order No.: _____        Contract No: _____

Date:_____

Project Name_____

Pursuant to Master Services Agreement dated, _____(MM/DD/YY) by and between
SEARS HOLDINGS MANAGEMENT CORPORATION and
_____. And
Statement of Work (SOW) #__ dated _____(MM/DD/YY) by and between SEARS HOLDINGS
MANAGEMENT CORPORATION AND _____

The Parties authorize and direct the following change(s) in accordance with terms and conditions of the
Master Services Agreement:

### (DESCRIPTION OF THE CHANGE)

FOR THE Additive (Deductive) Sum of: ($
).
Original Agreement Amount $_____
Sum of Previous Changes $_____
This Change Order Add (Deduct) $_____
Present Agreement Amount $_____

Execution of this Change Order shall constitute a modification of Statement of Work # _____ to the Master
Services Agreement noted above and shall be subject to all of the terms and conditions of the Statement
of Work and the Master Services Agreement..  In the event of a conflict between any term or condition of

9

this Change Order and the SOW to which it appends, this Change Order shall govern.

Accepted, _____MM/DD/YY

By: _____

_____NAME_____.

      (Contractor)

Printed Name:_____

By:_____

SEARS HOLDINGS MANAGEMENT CORPORATION

      (Customer)

Printed Name:_____

BY: _____

*End of Appendix*