Norman C. Witte (P40546)
WITTE LAW OFFICES, PLLC
119 E. Kalamazoo Street
Lansing, Michigan 48933-2111
(517) 485-0070

*Attorneys for 4th Street South II, LLC*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---

In re:

**Sears Holdings Corporation**, *et al.*,

    Debtors.

_____/

Chapter 11
Docket No. 18-23538 (RDD)

(Jointly Administered)

## 4TH STREET SOUTH II, LLC'S CURE OBJECTION, ADEQUATE ASSURANCE OBJECTION AND DEMAND FOR ADEQUATE PROTECTION

4th Street South II, LLC, through its attorneys Witte Law Offices, PLLC and Lasky Fifarek P.C., objects to the cure amount proposed by the Debtors and Debtors-in-Possession[1] (collectively referred to as "Sears"), make their adequate assurance objection, and demand adequate protection with respect to its lease of real property and in support states as follows:

    1.      Movant 4th Street South II, LLC ("4th Street") is the landlord with regard to a lease agreement dated December 29, 1953 (the "Lease") with Sears, Roebuck and Co., one of the Debtors, of real property located at 3131 E. Michigan Avenue, Lansing, Michigan 48912 (the "Premises"). A copy of the Lease is attached as **Exhibit A**.

    2.      As part of the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (DN 1731)

---

[1] As identified in footnote 1 to the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (DN 1731).

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

(the "Cure Notice") filed on January 18, 2019, Sears proposed a cure amount for the Lease (which

appears on Exhibit B, page 2, line 36, Store 1170, Contract No. S1170-1-A) of $121,288 (the "Cure

Amount").

3.     The Premises include a stand-alone structure containing 193,261 square feet of retail,

storage and automotive repair space and is part of the Frandor Shopping Center in Lansing, Michigan.

The Premises occupy approximately 14.5 acres of land.

4.     The Lease had an initial term of 35 years, with four options to extend for ten years.

*See* Lease, Exhibit A at 3, ¶¶ 3(b) and (c).

5.     Under the Lease, each lease year expires on November 30th.  *See id.* at 3, 12, ¶¶ 3(b)

and 7.6, and Affidavit of Patrick K. Gillespie attached as **Exhibit B**.

6.     Rent under the Lease is 1% of "Net Sales" as defined in the Lease, payable annually

on the fifteenth day after the end of the lease year.   "Net Sales" under the Lease is defined as "gross

sales made upon the demised premises by Tenant and its departmental sublessees, concessionaires,

and licensees occupying space upon said premises" subject to certain exclusions.  Exhibit A at 9-10,

¶¶ 7.3 and 7.4.

7.     The second exclusion to Net Sales is for mail order sales originating from the Premises.

*Id.* at 10, ¶ 7.4(b).  However, the second exclusion is limited by ¶ 7.5 of the Lease, which states as

follows:

> Mail Order Sales.  If, during any Lease Year of the Initial Term or any Extended Term
> of this lease, the mail order sales of Tenant excluded from the definition of Net Sales
> pursuant to paragraph (b) of Section 7.4 hereof shall exceed Forty Per Cent (40%) of
> the Net Sales for such Lease Year, Tenant shall pay to Landlord as further rent (in
> addition to the rent provided in Sections 7.2 and 7.3 hereof) a sum equal to One Per
> Cent (1%) of such excess of such mail order sales over  Forty Per Cent (40%) of the
> Net Sales.

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

8.      The rent for 2018 was due on the fifteenth day following the expiration of the lease year, which would have been December 15, 2018. *Id.* at 9-10, ¶ 7.3.

9.      Sears is also required to provide an audit of its sales on the 15th day after the expiration of the lease year (the "Audit"). *Id.* at 12, ¶ 7.7.

10.     Upon the receipt of the Audit, 4th Street has the right to re-audit Net Sales. *Id.*

11.     4th Street has not received the Audit, nor has it received a rent payment. Accordingly, Sears is currently in default under the Lease.

12.     4th Street is entitled to recover its attorneys' fees and costs under the Lease occasioned by Sears' default. *Id.* at 43, ¶ 19.1(ii).

13.     4th Street has incurred attorneys' fees in the amount of $4,133.40 in connection with Sears' breach of the Lease. Exhibit B at 2, ¶ 9.

14.     4th Street is entitled to recover those fees as part of the cure amount to the extent that the fees relate to Sears' default under the Lease, as opposed to fees incidental to the bankruptcy filing. *See, e.g., In re Child World, Inc.,* 161 B.R. 349, 353 (Bankr. S.D.N.Y. 1993) ("Although attorneys' fees are not independently recoverable under the Bankruptcy Code, section 365(b)(1)(B) allows for such recovery if based upon the existence of a separate agreement between the parties.")

15.     The Cure Amount does not include 4th Street's attorneys' fees.

16.     4th Street is informed and believes that Sears has been consistently driving sales to the Internet from the Premises in an effort to decrease net sales. These Internet sales are properly treated as mail order sales under the Lease.

17.     4th Street is informed and believes that the Cure Amount does not include Internet sales derived from the Premises.

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

18.     Because Sears has failed to provide the Audit as required by the Lease, including an accounting of Internet sales generated through Sears' store at the Premises, it is impossible for 4th Street to determine whether the Cure Amount is accurate.

19.     Sears must promptly cure the non-monetary default resulting from its failure to provide the accounting. *See* 11 U.S.C. § 365(b)(1)(A).

20.     The cure amount does not adequately compensate 4th Street for Internet sales and for its legal fees resulting from Sears' breach of the Lease as required under § 365(b)(1)(B).

21.     11 U.S.C. § 365(b)(1)(C) requires the trustee, in this case Sears or the Buyer, to "provide[ ] adequate assurance of future performance under such contract or lease".

22.     On or about January 23, 2019, Transform Holdco, LLC ("Buyer") provided 4th Street with the "Buyer's Adequate Assurance Information" referenced in ¶ 9 of the Cure Notice.

23.     The document provided, marked confidential, contained no information specific to 4th Street's lease.  It was presented in the form of an unverified letter with no attachments supporting broad factual assertions and generalities regarding Buyer's ability to operate the Sears business in the future.

24.     The financial information contained in the adequate assurance document at best established that Buyer could close the sale from Sears.  It did not provide any financial information (such as *pro forma* monthly projections) to show that there was a likelihood that the Buyer would be in business six months from now.

25.     Paragraph 19 of the Cure Notice states that any party who wishes to object to the assumption *or assignment* of their lease must do so pursuant to the procedures and subject to the time deadlines set forth in the Cure Notice.

26.     In ¶ 20 of the Cure Notice, 4th Street is notified in all caps and bold,

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION RECIPIENTS A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE ADEQUATE ASSURANCE OR FUTURE PERFORMANCE OF THE APPLICABLE CONTRACT OR LEASE.**

27.     Buyer's adequate assurance document states that if 4th Street's Lease is assigned to an unknown third party, 4th Street will be given additional adequate assurance information.  It does not, however, provide 4th Street with any right to challenge the sufficiency of that information, nor is that right preserved elsewhere in ¶¶ 19 and 20 of the Cure Notice.  4th Street does not consent to the waiver of its right to object to the Buyer's or assignee's adequate assurance information should Buyer decide to assign 4th Street's Lease to a third party.

28.     The rent 4th Street has been paid by Sears has plummeted as Sears has driven sales to the Internet and as its brick and mortar sales have suffered.  The following is a summary of rent paid by Sears in the past five years:

| | |
|---|---|
| 2013: | $ 258,700.19 |
| 2014: | $ 247,666.75 |
| 2015: | $ 219,659.48 |
| 2016: | $ 193,878.84 |
| 2017: | $ 155,789.47 |

29.     If Sears were allowed to pay only $121,288 for 2018 rent, this would amount to approximately $0.61 per square foot.  It was never intended by the parties that Sears would be able to lease the Premises for such a *de minimis* amount.

30.     Adequate assurance of future performance in the context of a shopping center lease such as this one must include an assurance that "any percentage rent due under such lease will not decline substantially."  11 U.S.C. § 365(3)(B).

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

31.     The Lease contemplates that damages under the Lease should be computed by averaging the last five years' Net Sales. *See* Exhibit A at 44, ¶ 19.4.

32.     Moreover, the Lease provided a similar protection to Landlord, so that in the event of an assignment, sublease or transfer, rent "shall not be less than the average monthly rental paid by Tenant to Landlord during the 60 months' period last preceding such assignment, transfer or subletting"; and, even in the event of an abandonment, the "rent monthly from and after the date of such abandonment shall be the average monthly rental paid by Tenant to Landlord during the 60 months' period last preceding such abandonment". *Id.* at 15-16, ¶ 8.4.

33.     The average rent for the last five years was $215,138.95, or $17,928.25 per month.

34.     Under the Lease, Sears is required to pay real property taxes promptly when due and payable. *Id.* at 16-18, ¶¶ 9.1 and 9.2.

35.     Under Michigan law, real property owners are issued two tax bills. The summer bill is last payable without penalty on September 14th of the year it is assessed, MICH. COMP. LAWS § 211.44a(6), and the winter bill is last payable without penalty on February 14th of the following year. MICH. COMP. LAWS § 211.44(3).

36.     The records of the Ingham County Assessors' office, attached as **Exhibit C,** show that Sears has a history of delinquent tax payment, paying the summer bill (by far the largest of the two) two months late in 2014 and five months late in 2017.

37.     The 2018 taxes assessed against the Premises were $129,305.09, more than the annual rent Sears claims is owing for the same period. *See* City of Lansing Treasurer's report attached as **Exhibit D**.

38.     Based upon Sears' history of delinquent payment, the anticipated Buyer's relationship to the present management of Sears, and the magnitude of the tax obligation compared to the

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

percentage rent Sears proposes to pay, adequate assurance of future performance should also include a requirement that Sears escrow rent $11,000 per month with 4th Street for the purposes of paying real property taxes on the Premises.

39.     On or about December 13, 2018 Sears attempted to exercise an option to extend the Lease for an additional ten years.  *See* December 12, 2018 letter transmitted via facsimile on December 13, 2018 attached as **Exhibit E**.

40.     In exercising the option, Sears stated that it was not waiving its rights to reject the Lease pursuant to 11 U.S.C. § 365, a right it contends in the Cure Notice that it continues to hold.  *See* Cure Notice at 4, ¶ 18.

41.     Rejection of the Lease would create a breach in the of the Lease immediately before the filing of the petition, which occurred on October 15, 2018.  11 U.S.C. § 365(g).

42.     State law governs Sears' rights under the Lease, including its right to exercise the option.  *See, e.g., In re C.A.F. Bindery, Inc.,* 199 B.R. 828, 834 fn. 6 (Bankr. S.D.N.Y 1996).

43.     The Lease is governed by Michigan law.  Exhibit A at 52, ¶ 27.3.

44.     Under Michigan law, it was a condition precedent to Sears' exercise of the renewal option that it not be in default under the Lease.  *Illiria, Inc. v. Pinebrook Plaza, LLC,* Nos. 338666, 338671 (Mich. App. October 25, 2018), slip op. at 4, attached as **Exhibit F**.

45.     Further, Michigan requires strict compliance with all requirements of a contract before an option can be exercised:

> An option is but an offer, strict compliance with the terms of which is required; acceptance must be in compliance with the terms proposed by the option both as to the exact thing offered and within the time specified; otherwise the right is lost.

*Le Baron Homes v. Pontiac Housing Fund,* 319 Mich. 310, 313, 29 N.W.2d 704 (1947).

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

46. Because Sears failed to exercise the option without strict compliance with its terms, Sears waived its right to do so. However, to the extent that Sears contends that it properly exercised the option, it must provide adequate assurance of future performance for ten years, the term of the extension period provided under the Lease.

WHEREFORE, 4th Street requests that this Honorable Court enter an order:

A. Requiring Sears to provide the Audit required under the Lease forthwith, including an accounting of Internet sales originated through Sears' store at the Premises for 2018;

B. Providing 4th Street a reasonable opportunity to review the Audit and if necessary enforce its re-audit rights under ¶ 7.7 of the Lease;

C. Determining that the Cure Amount must include 4th Street's reasonable attorney fees in the amount of $4,133.40;

D. Determining that 4th Street's rights to object to adequate assurances of future performance by any assignee of the 4th Street Lease survive assumption of the Lease by Sears and the process set forth in the Cure Notice;

E. Requiring Buyer, as adequate assurance of future performance, to pay monthly installments of $18,000 toward rent for the Premises under the Lease, effective as of December 1, 2018;

F. Requiring Buyer, as adequate assurance of future performance, to escrow $11,000 per month with 4th Street toward payment of real property taxes, effective as of December 1, 2018;

G. Determining that Sears failed to properly exercise the option for extension of the Lease term, or in the alternative, requiring Sears and/or Buyer to provide adequate assurances of performance for a period of eleven years; and

H.     Granting such other relief as may be proper.

Respectfully submitted,

**4ᵀᴴ Sᴛʀᴇᴇᴛ Sᴏᴜᴛʜ II, LLC**

Dated:  January 25, 2019                     /s/ Norman C. Witte
Norman C. Witte (P40546)
Wɪᴛᴛᴇ Lᴀᴡ Oғғɪᴄᴇs, PLLC
119 E. Kalamazoo Street
Lansing, Michigan 48933-2111
(517) 485-0070
Facsimile (517) 485-0187
ncwitte@wittelaw.com

John R. Fifarek (P35518)
Lᴀsᴋʏ Fɪғᴀʀᴇᴋ PC
120 N. Washington Square, Suite 625
Lansing, Michigan 48933-1624
(517) 267-2226
Facsimile (517) 267-2230
jfifarek@laskyfifarek.com

Attorneys for 4ᵗʰ Street South II, LLC

# EXHIBIT A

12/29/53

# L E A S E

THIS LEASE, Made this 29ᵗ day of December,
1953, between SPARROW GLENMOORE CORPORATION, a Michigan
corporation (hereinafter called "Landlord"), and SEARS, ROEBUCK
AND CO., a New York corporation qualified to do business in
Michigan (hereinafter called "Tenant");

## W I T N E S S E T H:

1. **Description of Demised Premises.** Landlord,
having full authority to make the agreements hereinafter set
forth, for and in consideration of the covenants and agree-
ments hereinafter mentioned, to be kept and performed by both
parties hereto, has demised and leased and by these presents
does demise and lease to Tenant the premises in Lansing Town-
ship, Ingham County and the State of Michigan, situate at the
northeasterly corner of the intersection of East Michigan Ave-
nue and Clippert Street and more fully described in the attached
Rider, bearing the caption "RIDER NUMBER ONE", which has been
signed by or on behalf of the parties hereto by the same per-
sons who have signed this Lease, which RIDER NUMBER ONE is
incorporated into this Lease and is hereby made a part hereof
by express reference thereto, which said premises (herein
called the "demised premises") include all easements, rights
of ingress and egress and all appurtenances and fixtures be-
longing or appertaining to said premises, and all of the build-
ings and improvements to be erected and installed upon said

premises at any time during the term of this Lease, together
with all of the fixtures, machinery, apparatus and equipment
procured for use in connection with the operation and main-
tenance of such buildings and attached thereto. The location
and dimensions of the demised premises are shown on the at-
tached plat, marked "RIDER NUMBER TWO", which has been signed
by or on behalf of the parties hereto by the same persons who
have signed this Lease, which RIDER NUMBER TWO is incorporated
into this Lease and is hereby made a part hereof by express
reference thereto.

2. _Use of Demised Premises_. Throughout the term
of this Lease the demised premises shall be occupied and used
by Tenant, actively, for the sale and storage of general mer-
chandise and, at Tenant's option, the sale, storage and ser-
vicing of automobile tires, batteries and accessories, the
servicing and parking of automobiles, and the storage and sale
of petroleum products.

3. _Term of Lease; Extensions_. The term of this
Lease shall include the following (and the phrase "term of
this Lease" as used herein shall mean):

(a) _Construction Period_ - A preliminary term
(herein sometimes called the "Construction Period") commencing
on the date of this Lease and expiring at midnight on the
last day of the calendar month in which the Opening Date (as
hereinafter defined) shall occur. The term "Opening Date",
as used herein, shall mean that day on which the retail store

2

on the demised premises, erected in accordance with the provisions of Section 4 hereof, is opened to the general public for the sale of merchandise; provided, however, that the retail store building shall at the time have been fully completed, as evidenced by the certificate of the architect who prepared the plans and specifications referred to in Section 4 hereof, or another architect approved by Landlord and Tenant in writing.  Upon such completion, Tenant will open such store to the general public as aforesaid as soon as practicable.

(b)  Initial Term - A term (herein sometimes called the "Initial Term") commencing on the first day of the calendar month immediately following the month in which the Opening Date shall occur and ending thirty-five (35) years thereafter.

(c)  Extended Terms - Each Extended Term (as hereinafter defined) for which Tenant shall have exercised its option, as hereinafter described.  The term of this Lease may, at the option of the Tenant (evidenced by written notice given by Tenant to Landlord at least twelve (12) months prior to the expiration of the then current term), be extended beyond the Initial Term for one (1) or more, but not in excess of four (4), successive periods of ten (10) years (each such period of ten (10) years being herein sometimes called an "Extended Term"), provided that Tenant shall not be in default under any of the provisions of this Lease and that this Lease shall not have theretofore been terminated for any reason.  Each Extended Term shall be upon the same terms, covenants and conditions as provided in

3

this Lease in respect of the Initial Term, except as other-
wise herein expressly provided, and except that Tenant shall
have no option to extend the term of this Lease beyond the
fourth such Extended Term.

4.   Improvements; Landlord's Property.   Promptly
after the execution of this Lease Tenant will commence and
prosecute with diligence to completion the erection upon the
demised premises of a first-class, modern, fireproof retail
store building and warehouse and an automobile service station,
and the grading and surfacing of an automobile parking lot upon
the demised premises, all in full accordance with plans and
specifications therefor which shall be signed by the parties
hereto or on behalf of the parties hereto by their duly auth-
orized officers and which plans and specifications, when so
signed, shall become a part of this Lease by express reference.
Such retail store building, warehouse, automobile service sta-
tion and parking lot grading and surfacing (herein called the
"Improvements"), and any and all other buildings and improve-
ments, and any alterations, repairs, replacements, renewals,
additions, betterments and restoration to or of any of the
foregoing, constructed, erected or made by Tenant from and af-
ter the date hereof in or upon or in connection with the de-
mised premises, shall, immediately upon the construction,
erection or making thereof, be and become the absolute property
of Landlord and shall be surrendered to Landlord upon the

4

expiration of the term of this Lease or any other termination of this Lease.

5. **Contractors; Payment for Improvements, etc.**

5.1. **Contractors and Bonds.** The construction of the Improvements shall be performed by a contractor or contractors satisfactory to both Landlord and Tenant whose bids and contracts shall be satisfactory in all respects to both Landlord and Tenant and shall have been approved by both Landlord and Tenant in writing.  If requested by either Landlord or Tenant, each contractor shall be required to furnish a good and sufficient completion bond, satisfactory in substance and form to both Landlord and Tenant, and executed by a responsible surety company satisfactory to both Landlord and Tenant, for the faithful performance of all of his obligations under such contract within the period therein specified.  Each contractor shall also be required (whether or not so requested) to carry appropriate workmans compensation and public liability insurance to protect Landlord and Tenant.

5.2. **Tenant's Responsibility to Landlord.**
Tenant will exercise due care in the performance of its obligation to construct the Improvements as herein provided and shall be responsible to Landlord for any negligence of itself, its officers, employees or agents in connection therewith, but shall not be responsible for any negligence on the part of any contractor covered by any such completion bond.

5.3. **Payment for Improvements.** Landlord will pay or cause to be paid, upon completion of the said Improvements, all of the costs of the construction of the Improvements upon Tenant's written request for such payment and upon the presentation of such architect's and engineer's certificates and such bills, invoices, receipts and certificates of Tenant as may be reasonably requested by Landlord or by the lender of the First Mortgage

5

Loan (as defined in Section 23 hereof). Until Tenant shall have been
fully paid all of the said costs of the construction of said Improvements,
Tenant shall have a first charge and lien upon the demised premises for
the amount of such unpaid costs, together with interest thereon at the
rate of Four and One-half Per Cent (4½%) per annum, computed from the
ninetieth (90th) day after the commencement of the Initial Term of this
Lease, until payment in full shall have been made; and Tenant shall have
the further right, until Tenant shall have been so fully paid for said
costs and said interest, if any, to deduct and retain so much of the
installments of rental next payable hereunder as may be necessary   so to
fully pay Tenant for said costs and said interest, if any.

6. **Rights of Cancellation; Purchase of Land by Tenant in
Certain Cases.** Landlord and Tenant shall each have the right to cancel
this Lease, upon ten (10) days' written notice to the other, if

(a)  the actual construction work for the construction of the
Improvements has not been commenced within one (1) year following
the date of this Lease; or

(b)  the construction of the Improvements is not fully com-
pleted, as evidenced by the certificate of the architect who
prepared the plans and specifications referred to in Section 4
hereof, or another architect approved by Landlord and Tenant in
writing, within three and one-half (3½) years (excluding a total
of not more than eighteen (18) months of periods of Unavoidable
Delays, as hereinafter defined) following the date of this Lease.
The term "Unavoidable Delays", as used herein, shall mean delays due
to Acts of God, governmental restrictions, enemy action, civil com-
motion, fire, unavoidable casualty, strikes, labor trouble and short-
ages of materials and labor, or other similar causes beyond the control
of Landlord and Tenant.

6

In the event that Tenant cancels this lease pursuant to the provisions of this Section 6, upon the written request of Landlord given within twenty (20) days following the receipt of Tenant's notice of cancellation Tenant will promptly

(i)   purchase the premises for a cash purchase price of ONE HUNDRED SEVENTY-SEVEN THOUSAND SEVEN HUNDRED TWENTY-FIVE DOLLARS ($177,725.00);

(ii)  pay to the lender of the First Mortgage Loan the full amount of its expenses payable pursuant to the Commitment Letter referred to in Section 23 hereof; and

(iii) pay to Landlord an amount equal to one-half the stand-by fee payable to the lender of the First Mortgage Loan pursuant to the Commitment Letter referred to in Section 23 hereof (such payment to be in addition to the amount payable in respect of such stand-by fee pursuant to Section 7.1 hereof).

In the event that Landlord cancels this Lease pursuant to the provisions of this Section 6, Tenant shall have the option, exercisable by giving written notice to Landlord within twenty (20) days following the receipt of Landlord's notice of cancellation, to purchase such land and the improvements existing thereon upon the same terms and conditions set forth above in this Section 6.  In the event that Tenant purchases the demised premises as hereinbefore provided in this Section 6, then, upon payment by Tenant of the sums set forth in the foregoing paragraphs (i), (ii) and (iii), Landlord shall convey to Tenant or such person, firm or corporation as may be designated by Tenant, all of the said demised premises, including all of the buildings and improvements thereon, by bargain and sale deed (with covenant against grantor's acts) free and clear of any and all mortgages and free and clear of any and all other liens (except tax liens) which may have attached to said premises by reason of any act of Landlord.

7. **Rent Payable by Tenant.**

7.1. **Rent During Construction Period.**  During the Construction Period Tenant will pay to Landlord as rental for the demised premises (or, as Land-

laid's option, will pay to the lender of the Construction Loan), which shall be due, an amount equal to one-half the stand-by fee payable to the lender of the First Mortgage Loan pursuant to the Commitment Letter referred to in Section 23 hereof.

7.2. Rent During Initial Term. During the Initial Term of this Lease, Tenant will pay to Landlord as rental for the demised premises,

(a)   on the first day of each calendar month, in advance, the sum of EIGHT THOUSAND, TWO HUNDRED THIRTY-NINE DOLLARS, FIFTY-EIGHT CENTS ($8,239.58).

(i)   plus one-twelfth (1/12th) of Five and Five Tenths Per Cent (5.5%) of any amount (not exceeding Eighty-five Thousand Dollars ($85,000.00) by which the total cost of the Improvements to Landlord (including architect's fees incurred prior or subsequent to the date of this Lease and other construction charges, but excluding the cost of the land included in the demised premises) exceeds TWO MILLION, TWO HUNDRED THIRTY THOUSAND DOLLARS ($2,230,000.00); or

(ii)   minus ONE HUNDRED SIXTY-FOUR DOLLARS SEVENTY-NINE CENTS ($164.79) for each FIFTY THOUSAND DOLLARS ($50,000.00) or each full multiple thereof by which such total cost of the Improvements to Landlord is less than TWO MILLION, TWO HUNDRED THIRTY THOUSAND DOLLARS ($2,230,000.00);

plus one-twelfth (1/12th) of the annual fees of the Michigan trustee acting in connection with such First Mortgage Loan. The rents payable pursuant to this paragraph (a) are herein called the "Minimum Monthly Payments".

*actual $ 8,670.52*

(b)   In the event the Net Sales (as defined in Section 7.4 hereof) made by the Tenant upon the demised premises during any Lease Year (as defined in Section 7.6 hereof) of the Initial Term are in excess of fifty (50) times the sum of:

(w)  The total amount of the Minimum Monthly Payments paid or payable by Tenant for such Lease Year; plus

(x)  The total amount of the Impositions paid by Tenant pursuant to Section 9 hereof during such Lease Year; plus

(y)  The total amount of either the premiums paid or payable in respect of such Lease Year (accruing premiums paid for more than one (1) year) for the insurance with respect to the demised premises maintained by Tenant pursuant to Section 14 hereof, or, if Tenant shall have elected to self-insure as hereinafter provided, then an amount equal to the premiums which Tenant would have been required to pay at standard rates if Tenant had purchased such insurance; plus

(z)  The total amount of the fees of the Michigan trustee acting in connection with the First Mortgage Loan which have been paid by Tenant during such Lease Year pursuant to Section 7.2 (a) hereof;

then Tenant shall pay to Landlord as additional rent hereunder (herein called "Additional Rentals") for such Lease Year a sum equivalent to Two Per Cent (2%) of such excess. Additional Rentals shall be paid by Tenant within fifteen (15) days after the end of the Lease Year for which the same are payable.

7.3.  <u>Rent During Extended Terms</u>.  During each Extended Term of this Lease Tenant shall not be required to pay any Minimum Monthly Payments but, in lieu of any and all of the said Minimum Monthly Payments and the said Additional

9

Rentals, Tenant shall pay to Landlord as a net rental for the demised premises (herein sometimes called "Extended Term Rentals") a sum equal to One Per Cent (1%) of all of the Net Sales (as defined in Section 7.4 hereof) made by Tenant upon the demised premises during each respective Lease Year of such Extended Term. Extended Term Rentals shall be paid by Tenant within fifteen (15) days after the end of the Lease Year for which the same are payable. It is the purpose and intent of Landlord and Tenant that the Extended Term Rentals shall be absolutely net to Landlord so that this Lease shall yield, net, to Landlord the percentage of Net Sales herein specified for each Lease Year of the Extended Terms of this Lease.

7.4.  <u>Definition of Net Sales</u>.  The term "Net Sales", as used herein, shall mean gross sales made upon the demised premises by Tenant and its departmental sublessees, concessionaires, and licensees occupying space upon said premises, but deducting or excluding, as the case may be:

(a)  Returns and allowances, as such terms are known and used by Tenant in the preparation of its Profit and Loss Statements;

(b)  Sales of merchandise selected from Tenant's mail order catalogues, made pursuant to orders received and filled by Tenant's Catalogue Order Division on the demised premises in the usual course of Tenant's business through Tenant's catalogue order channels, regardless of the place of delivery, subject, however, to the provisions of Section

10

7.4

7.5 hereof;

(c)  The amount of all sales, use, excise, retailer's occupation or other similar taxes imposed in a specific amount or percentage upon, or determined by, the amount of retail sales made on the demised premises;

(d)  Sales of departments or divisions not located on the leased premises;

(e)  Delivery, installation, and service charges (other than charges for the servicing of tires, batteries and automobiles);

(f)  Amounts in excess of Tenant's cash sales price charged on sales made on credit or under a time payment plan;

✗(g)  Premiums collected on policies of insurance sold from the demised premises.

7.5.  Mail Order Sales.  If, during any Lease Year of the Initial Term or any Extended Term of this Lease, the mail order sales of Tenant excluded from the definition of Net Sales pursuant to paragraph (b) of Section 7.4 hereof shall exceed Forty Per Cent (40%) of the Net Sales for such Lease Year, Tenant shall pay to Landlord as further rent (in addition to the rent provided in Sections 7.2 and 7.3 hereof) a sum equal to One Per Cent (1%) of such excess of such mail order sales over Forty Per Cent (40%) of the Net Sales.  Such further rent shall be deemed a part of "Additional Rentals" and "Extended Term Rentals" as such terms are used herein.

11

7.6.  <u>Lease Year</u>.  The term "Lease Year", as used
herein, shall mean each of the Twelve (12) month periods com-
mencing, respectively, on the first day of the Initial Term of
this Lease and upon the anniversary of such date in each calen-
dar year during the remainder of the Initial Term and each Ex-
tended Term of this Lease.

7.7.  <u>Audits</u>.  The audits of Tenant's Net Sales and
the calculations therefrom of the aforesaid rentals, made by
Tenant's Accounting Department, shall be taken and accepted by
Landlord as the audits of such Net Sales and as the calculations
of such rentals, and copies of such audits and calculations will
be furnished to Landlord annually within Fifteen (15) days after
the end of each Lease Year.  In the event Landlord is not satis-
fied with any such audit or calculation, and gives Tenant writ-
ten notice to that effect within Thirty (30) days after Land-
lord's receipt of such audit or calculation, then Landlord
shall have the right, within One Hundred Twenty (120) days
thereafter, at Landlord's expense, to cause any reputable
auditor mutually satisfactory and approved in writing for that
purpose by both Landlord and Tenant (such approval not to be
unreasonably withheld) to reaudit the Net Sales for the period
covered by such audit and to recalculate such rentals payable
for such period.  Such reaudit and recalculation, which shall
be completed as promptly as practicable, shall be accepted by
both Landlord and Tenant as final.

7.8.  <u>No Deductions, etc. Against Rent</u>.  The rent

payable hereunder shall be paid to Landlord without notice or demand and without abatement or deduction, except as provided in Section 10.2 hereof (relating to certain repairs), Section 15 hereof (relating to damage or destruction) and Section 16.3(d) hereof (relating to certain takings by condemnation, etc.).

7.9. Place of Payment, etc. All rent provided for in this Lease shall be paid to Landlord in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, at the address of Landlord referred to in Section 25 hereof.

7.10. Further Rent. Tenant will also pay, as further rent, all Impositions, costs, expenses, liabilities, obligations and other payments which Tenant under any of the provisions of this Lease assumes or agrees to pay (and will reimburse Landlord for any payments thereof made by Landlord pursuant to any provision of this Lease), and, in the event of any failure on the part of Tenant to pay any of the same, Landlord shall have all the rights and remedies provided for herein or by law in the case of the non-payment of the rent stipulated herein.

8. Assignments, Subleases, etc.

8.1. Assignments and Subleases of All of the Demised Premises. Tenant shall have the right to assign or otherwise transfer Tenant's interest in this Lease and to sublet all of the demised premises to a corporation which is a subsidiary of Tenant or under common control with Tenant, but Tenant shall not have the right otherwise to assign or transfer Tenant's

13

interest in this Lease or to sublet all of the demised prem-
ises without the prior written consent of Landlord, which
consent shall not unreasonably be withheld.  Landlord shall
have the right, as a condition precedent to the granting of
Landlord's consent to require the assignee, transferee or sub-
lessee to execute a written instrument whereby such assignee,
transferee or sublessee assumes all of the obligations of
Tenant under this Lease.

     8.2.  <u>Subleases of Parts of Demised Premises</u>.  Ten-
ant shall have the right to sublet any part or parts of the
demised premises to any persons, firms or corporations asso-
ciated or affiliated with Tenant in the conduct of its busi-
ness or who or which occupy the part or parts of the premises
so sublet as departmental sublesses, concessionaires or licen-
sees of Tenant, provided that the aggregate floor area of the
retail store so sublet shall not exceed 60% of the total floor
area of the retail store; but Tenant shall not have the right
otherwise to sublet any part or parts of the demised premises
without the prior written consent of Landlord, which consent
shall not unreasonably be withheld.

     8.3.  <u>Obligations of Tenant</u>.  No assignment or
transfer of Tenant's interest in this Lease and no sublease
of all of the demised premises and no execution and delivery
of an instrument of assumption pursuant to Section 8.1 hereof
shall in any way affect or reduce any of the obligations of
Tenant under this Lease, but this Lease and all of the obli-

14

gations of the original Tenant named as such in this Lease
shall continue in full force and effect during the term of
this Lease (including Extended Terms the option as to which
has been exercised by the assignee or transferee) as the
obligations of a principal (and not as the obligations of a
guarantor or a surety).

8.4.  Rentals Following Assignments and Subleases.
In the event that, pursuant to Section 8.1 hereof, Tenant,
with Landlord's prior written consent, assigns or otherwise
transfers its interest in this Lease or sublets all of the
demised premises otherwise than to a corporation which is a
subsidiary of Tenant or under common control with Tenant,
then and in any such event the rentals payable by such as-
signee, transferee or sublessee shall be paid to Landlord;
provided, however, that if the total of such rentals so pay-
able to Landlord in any Lease Year shall be less than the
average monthly rental paid by Tenant to Landlord during the
60 months' period last preceding such assignment, transfer or
subletting, the Tenant herein named shall pay to Landlord such
deficiency.  In the event Tenant abandons the demised premises
(and this Lease shall not have been terminated pursuant to the
provisions of Section 19 hereof), then it is agreed that in
lieu of all of the above rentals and payments for the remain-
der of the term thereafter the rent monthly from and after
the date of such abandonment shall be the average monthly
rental paid by Tenant to Landlord during the 60 months'

15

period last preceding such abandonment.  In no event shall
the monthly rentals hereinbefore provided in this Section
8.4 be less than the Minimum Monthly Payments provided in
Section 7.2(a) hereof.  However, in case Tenant after such
assignment, transfer, subletting or abandonment, again takes
actual possession of the demised premises and operates its
business therein, then the rental to be paid by Tenant after
Tenant so actually takes possession of the demised premises
and operates its business therein during the remainder of the
term thereafter shall be the rentals provided for in Section
7.2 and 7.3 hereof, in lieu of the rentals provided for in
this Section 8.4, in case of such assignment, transfer, sub-
letting or abandonment.

    9.  <u>Taxes, Assessments, etc.</u>

    9.1.  <u>Definition of Impositions.</u>  The term "Imposi-
tions", as used herein, shall mean all taxes, assessments (in-
cluding, without limiting the generality of the foregoing,
assessments for public improvements or benefits whether or
not such improvements or benefits were commenced or completed
prior to the date of this Lease), water, sewer or other rents,
rates and charges, excises, levies, license fees, permit fees
and other authorization fees and other charges (in each case
whether general or special, ordinary or extraordinary, or fore-
seen or unforeseen), of every character and description whatso-
ever (including all penalties or interest thereon) which at
any time during or in respect of the term of this Lease may

16

be assessed, levied, confirmed or imposed on or in respect of
or be a lien upon

   (i) the demised premises or any part thereof; or

   (ii) any occupancy, use or possession of the de-
mised premises or any part thereof; or

   (iii) any rent from the demised premises, or the
income to Landlord resulting from such rent, provided
that such tax upon such rent or income is in lieu of or
as a substitute for a real estate tax upon the demised
premises, and provided further that in no event shall
Tenant be obligated to pay for any year any greater amount
by way of such substitute tax than as if the rent in re-
spect of which such tax was imposed had been the sole
taxable income of Landlord for the year in question;
other than

   (a) any franchise, capital stock or similar tax
of Landlord,

   (b) any income or excess profits tax of Landlord
determined on the basis of its general income or revenues
(subject to the provisions of paragraph (iii) of this
Section 9.1), and

   (c) any estate, inheritance, succession, gift,
capital levy or similar tax.

   9.2. Payment of Impositions. Subject to the pro-
visions of Section 9.4 hereof relating to contests, throughout
the term of this Lease Tenant will pay all Impositions promptly

17

as the same become due and payable.  All Impositions for the last year of the term of this Lease shall be equitably pro-rated by Landlord and Tenant.

9.3.  <u>Proof of Payment</u>.  Tenant, upon Landlord's request, will furnish to Landlord and to the First Mortgagee (as defined in Section 23 hereof), for inspection official receipts of the appropriate taxing authorities, or other proof satisfactory to Landlord or such First Mortgagee as the case may be, evidencing the payment of Impositions.

9.4.  <u>Right to Defer Payment of Contested Imposi-tions</u>.  Tenant shall not be required to pay or discharge any Imposition, or to remove a lien resulting therefrom, so long as and provided

(a)  Tenant shall in good faith contest the amount, validity, or application thereof by appropriate legal proceedings conducted with due diligence which shall operate to suspend the collection of the Imposition from Landlord or the demised premises,

(b)  neither the demised premises nor any part thereof would, in the reasonable judgment of Landlord, be in danger of being forfeited or lost by reason of such contest, and

(c)  Tenant shall have given notice to Landlord of such contest prior to the date such tax or Imposition is due and payable and shall have given to Landlord and to the First Mortgagee such reasonable security as may be

18

requested by Landlord or such First Mortgagee or both,
as the case may be, to insure the payment of such Imposi-
tion and the discharge of whatever lien may result there-
from and to prevent any such forfeiture or loss, such
security not to exceed in aggregate value or principal
amount (as the case may be) one and one-half (1-1/2)
times the amount of such Imposition or the asserted lien.
Landlord shall not have the right during the period of such
contest to pay, remove or discharge such Imposition or the
lien resulting therefrom, notwithstanding the provisions of
Section 18 hereof.  Any such legal proceedings for the con-
test of an Imposition may be brought by Tenant in the name of
Landlord or in the name of Tenant, or both, as Tenant may deem
advisable; however, if any such proceeding be brought by Ten-
ant in the name of Landlord, Tenant shall indemnify and save
harmless Landlord against any or all loss, cost or expense of
any kind that may be imposed upon Landlord in connection there-
with.

     10.  <u>Condition, Repairs and Maintenance of Demised</u>
<u>Premises</u>.

     10.1.  <u>Tenant's Obligation to Repair</u>.  Throughout
the term of this Lease, Tenant, at its sole cost and expense
(except as provided in Section 10.2 hereof) will take good
care of the demised premises and the sidewalks, curbs, vaults
and vault space, if any, adjoining the demised premises, and
(except as prevented by Unavoidable Delays) will keep the

19

same in good order and condition and in compliance with all
Legal Requirements (as defined in Section 13.1 hereof) and
all Insurance Requirements (as defined in Section 14.4 hereof)
(whether or not compliance with Legal Requirements or Insur-
ance Requirements shall require structural changes), and will
make all necessary or appropriate repairs thereto, interior
and exterior (including, without limiting the generality of
the foregoing, repairs to structures, roofs, walls, elevators,
stairways, fire towers, fire escapes, machinery, public utility
connections, sewers, gutters, pipes, conduits, sprinkler systems,
heating, ventilating, air-conditioning, electric light and power
systems and repairs, changes and alterations necessary to comply
with Legal Requirements and Insurance Requirements), structural
and non-structural, ordinary and extraordinary, and foreseen
and unforeseen.  When used in this Section 10, the term "repairs"
shall include all necessary or appropriate replacements, re-
newals, additions, betterments and, subject to the provisions
of Section 11.1 hereof, changes and alterations.  All repairs
made by Tenant shall be at least equal in quality to the original
work.

   10.2.  <u>Reimbursement of Tenant for Repairs from Addi-
tional Rentals</u>.  During the Initial Term of this Lease only,
Tenant may deduct the cost of all repairs made by it pursuant
to Section 10.1 hereof from the Additional Rentals payable
during the Initial Term; subject, however, to the following:

      (a)  Tenant shall have the right so to reimburse

20

itself for the cost of all such repairs without obtain-
ing the approval or consent of Landlord to the making
of such repairs whenever and wherever the cost of such
repairs is FIVE HUNDRED DOLLARS ($500.00) or less or
whenever and wherever the making of such repairs shall
be urgently and immediately required for the protection
of the property of Landlord or Tenant and it is impracti-
cable to procure such approval or consent of Landlord
prior to the making of the required repairs. However,
if the cost of such repairs be in excess of FIVE HUNDRED
DOLLARS ($500.00) and if the making of such repairs be
not urgently and immediately required for the protection
of the property of Landlord or Tenant, then Tenant shall
not have the right so to reimburse itself for the cost
of such repairs unless Tenant shall have notified Land-
lord prior to the making of such repairs of the general
nature thereof, the necessity therefor and the estimated
cost thereof and Landlord shall have approved the same in
writing, it being expressly understood and agreed that
Landlord shall approve the making of such repairs and the
reimbursement of Tenant for the cost thereof in all cases
where such repairs are reasonably necessary and the cost
thereof is reasonable; and if Landlord and Tenant be un-
able to agree as to the necessity for such repairs and
the reasonableness of the cost thereof, then Tenant's
right so to reimburse itself for the cost of such repairs

21

shall be arbitrated in the manner hereinafter provided.

(b)  Tenant will deliver to Landlord from time to time during each Lease Year such receipted bills and invoices, receipts and certificates of Tenant as may be appropriate  to evidence the actual cost to Tenant of all repairs as to which Tenant asserts the right of deduction provided in this Section 10.2.

(c)  Tenant shall have no right to deduct from Additional Rentals the cost of

(i)  ordinary maintenance of the paved parking area on the demised premises, including the cost of such resurfacing as is incident to the ordinary maintenance of such parking area;

(ii)  interior painting, decorating, floor covering and floor maintenance with respect to the buildings upon the demised premises;

(iii)  any repairs in connection with the installation or removal of Tenant's trade fixtures and equipment;

(iv)  any repairs necessitated or occasioned by the fault or neglect of Tenant or any of its sublessees, assignees, concessionaires, contractors, suppliers, servants, employees, agents, customers, licensees, invitees, occupants or guests;

(v)  any repairs necessitated or occasioned by plate glass damage or a casualty against which Tenant is required to carry insurance pursuant to the provisions of Section 14 hereof;

(vi)  any repairs necessitated or occasioned by compliance with Insurance Requirements; and

(vii)  any repairs necessitated or occasioned by a Taking (as defined in Section 16.1 hereof).

(d)  In the event Landlord is not satisfied with

22

Tenant's statement as to the amount of any expenditures
as to which Tenant asserts the right of deduction provided
in this Section 10.2, and gives Tenant written notice to
that effect within Thirty (30) days after Landlord's re-
ceipt of Tenant's calculation of Additional Rentals for
the Lease Year in question, then Landlord shall have the
right, at Landlord's expense, to cause any reputable au-
ditor, mutually satisfactory and approved in writing for
that purpose by both Landlord and Tenant (such approval
not to be unreasonably withheld) to audit such expenditures.
Such audit, which shall be completed as promptly as prac-
ticable, shall be accepted by both Landlord and Tenant
as final.

10.3.   Cleaning, etc.   Tenant will put, keep and
maintain all portions of the demised premises and the side-
walks, curbs and passageways adjoining the same in a clean
and orderly condition, free of obstructions and rubbish.

11.   Changes and Alterations by Tenant; Trade Fix-
tures; Signs.

11.1.   Changes and Alterations by Tenant.   At any
time and from time to time during the term of this Lease,
Tenant may make, at its sole cost and expense, reasonable
changes, alterations and improvements, in or of the demised
premises or any part thereof, subject, however, in all cases
to the following:

(a)   Tenant shall give notice to Landlord of any

23

material change or alteration prior to the making there-
of.

(b)  The work performed shall be at least equal in
quality to the original work, and the fair value of the
demised premises following the completion of any such
change or alteration shall be not less than the fair
value thereof immediately prior to the commencement there-
of.

(c)  No change or alteration involving an estimated
expenditure of more than TEN THOUSAND DOLLARS ($10,000.00)
shall be made except with Landlord's prior written consent
and under the supervision of an architect or engineer ap-
proved in writing by Landlord and in accordance with de-
tailed plans and specifications prepared by such architect
or engineer and approved in writing by Landlord (such
approvals not to be unreasonably withheld).

11.2.  _Trade Fixtures and Tenant's Equipment_.  Tenant
and its sublessees and assignees shall have the right to install
signs, trade fixtures and equipment in or about the demised
premises and such signs, trade fixtures and equipment shall be
and remain the property of Tenant or its sublessees or assignees,
as the case may be.  Tenant and its sublessees or assignees may
remove any or all of such signs, trade fixtures and equipment
from the demised premises from time to time during the term of
this Lease or at the expiration of such term; provided, however,
that any damage caused to the demised premises by reason of such

removal will be repaired by Tenant or its sublessees or assignees so removing the same.

12. **Utility Services.** Tenant will pay or cause to be paid all charges for gas, electricity, light, heat, water and power, and for telephone, protective and other communication services, and for all other public and private utility services which shall be used, rendered or supplied upon, to or in connection with the demised premises or any part thereof at any time during the term of this Lease, and will comply with all contracts relating to any such services.

13. **Legal Requirements; Discharge of Liens; etc.**

13.1. **Definition of Legal Requirements.** The term "Legal Requirements", as used herein, shall mean all law, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all federal, state, county, municipal and other governments, departments, commissions, boards, courts, authorities, officials and officers, foreseen and unforeseen, ordinary and extraordinary, which now or at any time hereafter may be applicable to, and any covenants, agreements, conditions, restrictions, easements, reservations and other provisions contained in any former instruments of record affecting, the demised premises or any part thereof, or any of the streets, alleys, passageways, sidewalks, curbs, gutters, vaults and vault spaces adjoining the demised premises or any part thereof, or any use, manner of use or condition of the demised premises

25

or any part thereof, or any use, manner of use or condition of
the demised premises or any part thereof.

13.2  Compliance with Legal Requirements.  Tenant
will, throughout the term of this Lease, promptly comply with
all Legal Requirements (whether or not compliance therewith
shall require structural changes in any buildings on the
demised premises).  Landlord will give prompt written notice
to Tenant of the receipt by Landlord of any written notice of
any violation of any Legal Requirement.

13.3.  Permits.  Throughout the term of this Lease,
Tenant, at its sole cost and expense, will procure and main-
tain all permits, licenses and other authorizations required
for any use of the demised premises or any part thereof then
being made, for any repair, change, alteration or other work
to be undertaken by Tenant, and for the lawful and proper in-
stallation, operation and maintenance of all equipment and
appliances necessary or appropriate for the operation and main-
tenance of the demised premises or any public or private
utility service utilized in connection therewith.

13.4.  Tenant's Obligation to Discharge Liens.  Sub-
ject to the provisions of Section 9.4 hereof relating to con-
tests of Impositions, throughout the term of this Lease Ten-
ant will not create or permit to be created or to remain, and
will discharge, any lien, encumbrance or charge (on account of
any Imposition or any mechanic's, laborer's, materialman's or
vendor's lien or any mortgage, chattel mortgage, conditional

26

sale or title retention agreement, or otherwise) which is or
might be or become a lien, encumbrance or charge upon the de-
mised premises or any part thereof or the rents, issues, in-
come or profits therefrom, other than any mortgage created by
Landlord upon the demised premises or any part thereof or any
other lien, encumbrance or charge resulting from any liability
on the part of Landlord which Tenant is not obligated to assume.

14. Insurance.

14.1 Insurance to be Maintained by Tenant. Com-
mencing as the buildings on the demised premises are erected,
and throughout the term of this Lease, Tenant, at its sole cost
and expense, will obtain and maintain in force insurance against:

(a) Loss of or damage by fire to the buildings
located upon the demised premises up to the full in-
surable value thereof (or, at Tenant's option, up to
the full replacement value thereof), with extended
coverage, and with at least an Eighty Per Cent (80%)
co-insurance clause. Tenant will, whenever requested
by Landlord (but not more often than once each year),
obtain a provable appraisal for the purpose of determin-
ing the full insurable value of the buildings upon the
demised premises.

(b) Explosion insurance in respect of all steam
boilers, pressure boilers and similar apparatus, if any,
at the time located on the demised premises.

All such insurance shall be procured from a responsible insur-

27

ance company or companies authorized to do business in Michigan,
shall name as insureds Landlord and Tenant as their respective
interests may appear, with a standard mortgagee clause protect-
ing the First Mortgagee, any loss exceeding $10,000 to be pay-
able to the First Mortgagee if requested by it, it being under-
stood and agreed that Tenant's interest in the insurance proceeds
shall be limited to the right of reimbursement in the event the
premises be repaired, restored or rebuilt following damage to
or destruction of the demised premises as a result of any
casualty covered by said insurance. Tenant will deliver or
cause to be delivered to Landlord or, at Landlord's request, to
the First Mortgagee, originals of the insurance policies or,
in the case of a blanket policy, a certificate by the insurer
duly certifying as to the amount and character of the coverage
on the demised premises and that the insurance is payable as
herein provided. Prior to the expiration of any such policy,
Tenant will deliver appropriate renewal policies or certificates
to Landlord or, at Landlord's request, to the First Mortgagee.

14.2.  Self-Insurance by Tenant.  In any fiscal year
of Tenant at the beginning of which the net worth (as such
term is generally accepted, understood, defined and used in
the accepted accounting practice of certified public accoun-
tants in the State of Michigan) of Tenant, as indicated by its
certified financial statements as at the close of the next pre-
ceding fiscal year, ONE HUNDRED MILLION DOLLARS ($100,000,000.00)
or more, then Tenant shall have the right and privilege to self-

28

insure, assume the risks and indemnify Landlord against the
losses or damages for which Tenant is required under Section
14.1 hereof to obtain and maintain insurance. Such risks, to
the extent not set forth in detail in such Section 14.1, shall
be deemed to be those covered in standard policies of the
nature described in such Section 14.1 as in effect in the
State of Michigan at the time. In the event that Tenant self-
insures against any risk pursuant to this Section 14.2, Ten-
ant will deliver to the First Mortgagee and Landlord such
certificates or letters evidencing Tenant's election so to
self-insure, and specifying the coverage of such self-insurance,
as may be reasonably requested by First Mortgagee or Landlord.

      14.3.  _Indemnification of Landlord_.  Tenant will
protect, indemnify and save harmless Landlord from and
against all liabilities, obligations, damages, penalties,
claims, causes of action, costs, charges and expenses which
may be imposed upon or incurred by or asserted against Land-
lord by reason of any of the following occurring during the
term of this Lease irrespective of any assignment or transfer
of this Lease:

      (a)  any use, condition, operation of or work
or thing done in, on or about the demised premises
or any part thereof or any street, alley, passageway,
sidewalk, curb, gutter, vaults or vault space adjacent
thereto;

      (b)  any act or omission on the part of Tenant

29

or any of its sublessees, assignees, concessionaires, contractors, suppliers, servants, employees, agents, customers, licensees, invitees, occupants and guests with respect to the demised premises, or the use or management thereof, or this Lease;

(c)   any accident, injury or damage to any person or property occurring in, on or about the demised premises or any part thereof or any street, alley, passageway, sidewalk, curb, gutter, vaults or vault space adjacent thereto.

It is understood and agreed, however, that Tenant shall not be required or obligated so to protect, indemnify and save harmless Landlord from and against any of the above mentioned liabilities, obligations, damages, penalties, claims, causes of action, costs, charges or expenses where any of the same may be imposed upon or incurred by or asserted against Landlord by reason of any injury to person or damage to property or accident which may arise out of or be caused by the negligence of any building contractor or workmen or materialmen while engaged in the making of the above mentioned Improvements upon the demised premises.  In case any action or proceeding is brought against Landlord by reason of any such occurrence, Tenant upon written notice from Landlord will, at Tenant's sole cost and expense, resist and defend such action or proceeding, or cause the same to be resisted and defended, either by counsel designated by Tenant and approved by Landlord in

writing or, where such occurrence is covered by liability
insurance, by counsel designated by the insurer.

14.4. Compliance with Insurance Requirements. Through-
out the term of this Lease, Tenant, at its sole cost and expense,
will at all times promptly perform and comply with all Insurance
Requirements (as hereinafter defined), whether or not com-
pliance therewith shall require structural changes. The term
"Insurance Requirements", as used herein, shall mean all terms
and provisions of each insurance policy covering or applicable
to the demised premises or any part thereof, all requirements
of the issuers of all such insurance policies, and all orders,
rules, regulations and other requirements of the National
Board of Fire Underwriters (or any other body exercising
similar functions) applicable to the demised premises or any
part thereof or any use, manner of use of condition of the
demised premises or any part thereof or otherwise affecting
the demised premises or any part thereof.

14.5. Interests of Mortgagees. In case the demised
premises or any part thereof shall at any time be encumbered
by a mortgage or mortgages, Tenant will enter into any and
all such agreements and comply with any and all such re-
quirements as Landlord or the holder or holders of such mort-
gage or mortgages may reasonably request for the protection by
insurance of the interests of such holder or holders, provided
that the rights of such holder or holders in respect of insur-
ance shall not be greater than the rights of Landlord in re-

31

spect of insurance under this Lease.

15. Damage or Destruction.

15.1  Tenant's Obligation to Restore.  In case of
any material damage to or destruction of any building or
buildings, or any part thereof, on the demised premises, or
of the parking area or of any other part of the demised
premises during the term of this Lease, however caused, Ten-
ant will promptly give written notice thereof to Landlord, and,
at Tenant's sole cost and expense, whether or not the in-
surance proceeds, if any, shall be sufficient for the pur-
pose, will (except as otherwise provided in Section 16 hereof)
restore, repair, replace or rebuild such building or buildings
or other part of the demised premises as nearly as possible
to their value, condition and character immediately prior
to such damage or destruction or with such changes or altera-
tions as may be made, at Tenant's election, in conformity
with and subject to the conditions of Section 11.1 hereof.
Such restoration, repair, replacement or rebuilding (herein-
after collectively referred to as the "restoration") shall
be commenced promptly and prosecuted and completed with due
diligence by Tenant.

In the case of substantial damage to or destruction
of any such building, such Restoration, at the option of Ten-
ant (expressed by written notice to Landlord received within
sixty (60) days after the occurrence of the casualty), may
take the form of the erection, according to detailed plans and

32

specifications and cost estimates prepared by Tenant at its
expense and approved by Landlord, of a new building which
shall be a suitable and adequate improvement of the location
and at least as valuable as the building damaged or destroyed.

If the retail store building upon the demised premises
be totally destroyed or rendered wholly unfit for its accustomed
use by reason of any such casualty during the last three (3)
years of the Initial Term hereof, then either party hereto
shall have the right to terminate this Lease, effective as of
the date of such casualty, by giving to the other party hereto
written notice of such termination within sixty (60) days next
following such casualty; provided, however, that if the insur-
ance proceeds resulting from such casualty shall not equal the
replacement cost of the buildings so destroyed, Tenant will pay
to Landlord a sum equal to such deficiency.  If such notice be
so given, this Lease shall terminate as aforesaid and all ren-
tals shall abate from the happening of such casualty.  If said
notice be not so given, this Lease shall not terminate, but
Tenant shall, at Tenant's expense, promptly rebuild and restore
said premises as hereinbefore provided.

15.2.  <u>Tenant to be Reimbursed from Insurance
Proceeds</u>.  All insurance proceeds shall be made available to
Tenant to pay the costs of or reimburse Tenant in respect of
Restoration effected by Tenant during a period of not exceed-
ing two (2) years after the occurrence of such damage or des-
truction, as extended by the period of any Unavoidable Delays.

33

15.3.  **Tenant's Applications for Insurance Proceeds.**
If the insurance proceeds shall have been paid to and shall be
held by the First Mortgagee, such insurance proceeds shall be
paid by the First Mortgagee to Tenant (or as Tenant may direct)
from time to time, if Tenant is not at the time in default under
any of the provisions of this Lease, upon receipt by such First
Mortgagee of written requests of Tenant for the payment of spec-
ified amounts of such insurance proceeds, each such request to
be accompanied by such architect's and engineer's certificates
and such bills, invoices, receipts and certificates of Tenant
as may be appropriate to describe in reasonable detail the work
done and materials used and to evidence the actual cost thereof.

15.4.  **Abatement of Minimum Monthly Payments.**  In the
event of any such damage or destruction which renders untenant-
able a portion of the floor area of the retail store upon the
demised premises, upon the delivery by Tenant to Landlord of an
architect's or engineer's certificate and an affidavit of the
manager or other officer in charge of the said retail store
stating the exact location and dimensions (together with an
appropriate diagram) of the floor area so rendered untenant-
able, the Minimum Monthly Payments provided in Section 7.2(a)
hereof shall abate as of the date of such damage or destruction
by the percentage that

(i)  the square foot floor area of the part of
the store so rendered untenantable,

is of

34

(11)  the total square foot floor area of all of
such store immediately prior to such damage or destruc-
tion;

provided, however, that such abatement of Minimum Monthly Pay-
ments shall continue only for the period of time actually re-
quired for the Restoration of such building, so as to render
the floor area in question tenantable, and in no event for a
period longer than two (2) years (as extended by Unavoidable
Delays).

16.  Condemnation, Eminent Domain, etc.

16.1.  Definition of Taking.  The term "Taking", as
used herein, shall mean a taking during the term of this Lease
of all or part of the demised premises, or any interest there-
in or right accruing thereto, as the result of or in lieu of
condemnation or eminent domain.  The Taking shall be deemed
to have occurred as of the date at which Tenant, by reason of
the Taking, is no longer entitled to possession of the demised
premises.

16.2.  Taking Where Term Expires.  In the event of
a Taking of either the fee of or a perpetual easement upon

(i)  the entire demised premises, or

(ii)  twenty-five per cent (25%) or more of the
then total square foot floor area of the retail store
building on the demised premises and Tenant within
ninety (90) days after such Taking shall give written
notice to Landlord of its election to cause the term
of this Lease to expire,

then and in any such event the term of this Lease shall expire
as of the date of such Taking (such expiration shall in no way

35

affect Tenant's right to assert a claim for an award on account
of such Taking), and Landlord and Tenant may each file and pros-
ecute their respective claims for an award or other payment
(herein referred to as the "award" or "awards") on account of
such Taking.  The aggregate awards of Landlord and Tenant shall
be applied first (and Tenant hereby irrevocably assigns its
award to Landlord for such purpose) to the payment in full of
the then outstanding principal amount, together with the unpaid
interest accrued thereon, of the First Mortgage Loan.  The bal-
ance of such awards, if any, shall be apportioned between Land-
lord and Tenant as they may agree.  If Landlord and Tenant are
unable so to agree within thirty (30) days after the receipt of
such awards, such apportionment shall be determined by arbitra-
tion as provided in Section 24 hereof.

    16.3.  <u>Taking Where Term Does Not Expire</u>.  In the
event of a Taking of either the fee of or a perpetual ease-
ment upon a part of the demised premises, and

    (i)  such Taking includes less than twenty-five
per cent (25%) of the then total square foot floor
area of the retail store building on the demised prem-
ises, or

    (ii)  such Taking involves twenty-five per cent
(25%) or more of such total square foot floor area
but Tenant has not, within ninety (90) days after such
taking given written notice to Landlord that it elects
to cause the term of this Lease to expire,

then and in any such event:

    (a)  This Lease shall remain in full force and
effect with respect to the remaining portion of the
demised premises.

36

(b)  Tenant, at its sole cost and expense, whether
or not the awards shall be sufficient for the purpose,
will promptly and diligently enclose, restore, repair,
replace or rebuild any buildings affected by the Taking
so as to make the same as complete as they were before
such Taking except for the reduction in area caused
thereby (and, if practicable, may extend or add to the
remaining portions of such buildings so as to reconsti-
tute the same to their total square foot floor area im-
mediately prior to such Taking), all in conformity with
the provisions of Section 11.1 hereof (relating to changes
and alterations).

(c)  Landlord and Tenant may each file and prosecute
their respective claims for an award on account of such
Taking; but the aggregate awards shall be paid over to
the First Mortgagee if requested by it, and otherwise to
Landlord and Tenant jointly, and shall be applied, to the
extent thereof, in the following order:

(x)  To reimburse Tenant for the cost and
expense of such enclosure, restoration, repair,
replacement or rebuilding, if any, as is required
by paragraph (b) of this Section 16.3 upon re-
ceipt by the First Mortgagee of written requests
of Tenant for the payment of specified amounts of
such awards, each such request to be accompanied
by such architect's and engineer's certificates
and such bills, invoices, receipts and certificates
of Tenant as may be appropriate to describe in
reasonable detail the work done and materials used
and to evidence the actual cost thereof.

(y)  To the reduction or payment in full of
the principal amount of the First Mortgage Loan.

37

(z)  If the First Mortgage Loan has been discharged, and any balance of the awards remains, such balance shall be apportioned between Landlord and Tenant as they may agree.  If Landlord and Tenant are unable so to agree within thirty (30) days after the final payment pursuant to subparagraph (x) or (y) above, as the case may be, such apportionment shall be determined by arbitration as provided in Section 24 hereof.

(d)  If the Taking occurs during the Initial Term of this Lease, and if at the time Tenant shall not be in default under any of the provisions of this Lease, the Minimum Monthly Payments provided in Section 7.2(a) hereof shall be reduced as of the date of the payment, if any, made pursuant to subparagraph (y) above by the percentage that

(1)  the amount, if any, paid in reduction of the First Mortgage Loan pursuant to such subparagraph (y),

is of

(2)  the original principal amount of such First Mortgage Loan.

16.4.  <u>Taking for Use</u>.  In the event of a Taking for temporary use (whether or not for a period extending beyond the then current term of this Lease), there shall be no termination, cancellation or modification of this Lease in any respect except that, if the Taking prevents Tenant from using the retail store building on the demised premises, the Additional Rentals or Extended Term Rentals, as the case may be, shall be calculated upon the basis of the average Net Sales of Tenant made during the five (5) most recent complete

38

Lease Years.  Tenant shall be entitled to receive the award
or awards made in respect of such Taking (to the extent the
same are applicable to a period within the term of this Lease)
to the extent necessary to reimburse Tenant for all Minimum
Monthly Payments, Additional Rentals and Extended Term Rentals
paid to Landlord and for all other charges paid by Tenant pur-
suant to the provisions of this Lease during the period of such
Taking for use, and the balance of the award or awards shall be
apportioned between Landlord and Tenant as they may agree.  If
Landlord and Tenant are unable so to agree within thirty (30)
days after the final determination of the amount of the awards
so available for apportionment, such apportionment shall be
determined by arbitration as provided in Section 24 hereof.

16.5.  Other Takings, etc.  In the event of any
Taking not otherwise provided for in this Section 16, or in
the event of any change of grade affecting the demises prem-
ises, Landlord and Tenant may each file and prosecute their
respective claims for an award on account of such Taking or
change of grade, and the aggregate award or awards shall be
apportioned between Landlord and Tenant as they may agree.
If Landlord and Tenant are unable so to agree within thirty
(30) days after the receipt of such awards, such apportion-
ment shall be determined by arbitration as provided in Section
24 hereof.

16.6.  Award for Tenant's Trade Fixtures and Equip-
ment.  Nothing contained in this Section 16 shall be deemed
to give Landlord any interests in any award made in respect

39

of the trade fixtures and equipment of Tenant and its sub-lessees.

17. Landlord's Right of Entry for Inspection, etc. Landlord and the authorized representatives of Landlord shall have the right to enter the demised premises at all reasonable times for the purpose of inspecting the same and for making any repairs to the demised premises and doing any other work necessary by reason of any failure by Tenant to do so (nothing contained in this Section 17 shall imply any duty on the part of Landlord to make any inspection or repairs or do any other work in respect of the demised premises), and for the purpose of showing the demised premises to prospective purchasers or mortgagees thereof and, at any time within six (6) months prior to the expiration of the term of this Lease, for the purpose of showing the demised premises to prospective tenants.  Landlord shall have the right to place upon the demised premises a notice or notices advertising the demised premises for sale at all times and, within six (6) months prior to the expiration of the term of this Lease, for letting.

18. Landlord's Right to Perform Tenant's Covenants. If Tenant at any time shall fail to make any payment or perform any act under this Lease required to be made or performed by it, then Landlord, without notice to or demand upon Tenant and without waiving or releasing Tenant from any obligation or default under this Lease, may (but shall be under no obligation to), at any time thereafter make such payment or perform such

act for the account and at the expense of Tenant, and Landlord
and the authorized representatives of Landlord may enter upon
the demised premises for the purpose and take all such action
thereon as may be necessary therefor.  All sums so paid by
Landlord and all costs and expenses incurred by Landlord in
connection with the performance of any such act shall consti-
tute further rental payable by Tenant under this Lease and
shall be paid by Tenant to Landlord on demand.

   19.  Conditional Limitations; Default Provisions.

   19.1.  Events of Default.  If any one or more of
the following events (herein sometimes called "Events of De-
fault") shall happen:

   (a)  if default shall be made in the due and
punctual payment of any rent provided for herein, or
any part thereof, when and as the same shall become
due and payable and if such default in the payment of
rental shall continue for more than ten (10) days, or
if default shall be made by Tenant in the performance
of or compliance with any of the other covenants, agree-
ments, terms or conditions contained in this Lease, and
such default shall continue for a period of fifteen (15)
days after written notice thereof from Landlord to Ten-
ant; or

   (b)  if Tenant shall file a voluntary petition in
bankruptcy or shall be adjudicated a bankrupt or insol-
vent, or shall file any petition or answer seeking any

41

reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors or lessees, or if such a petition shall be filed against Tenant and approved by a court of competent jurisdiction, or if any trustee, receiver or liquidator of Tenant or of all or any substantial part of its properties or of the demised premises (except at the instance of a creditor of Landlord, as such) shall be appointed, or if Tenant shall make any general assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts generally as they become due;

then and in any such event Landlord at any time thereafter may give written notice to Tenant specifying the occurrence giving rise to such Event or Events of Default and stating that this Lease and the term hereby demised shall expire and terminate on the date specified in such notice, which shall be at least thirty (30) days after the giving of such notice, and upon the date specified in such notice, subject to the provisions of Section 19.4 hereof, the term of this Lease and the estate and interest hereby demised shall expire and terminate by limitation and all rights of the Tenant under this Lease shall cease (Tenant to remain liable as provided in Section 19.4 hereof), unless before such date

42

(i)  all arrears of rent and all other amounts payable by Tenant under this Lease shall have been fully paid by or on behalf of Tenant,

(ii)  all costs and expenses incurred by or on behalf of Landlord in connection with such Event or Events of Default, including reasonable attorneys' fees, shall have been fully paid by or on behalf of Tenant,

(iii)  in case one or more of the defaults specified in such notice relate to the condition or maintenance of the demised premises, Tenant shall be diligently proceeding to cure each such default, and

(iv)  all other defaults at the time existing under this Lease shall have been fully cured and made good or secured to the satisfaction of Landlord,

in which event the consequences of such Event or Events of Default, and such notice from Landlord, shall be deemed to be annulled.

19.2.  <u>Repossession, etc., by Landlord</u>.  At any time after any such expiration of the term of this Lease, Landlord without further notice, may enter upon and re-enter the demised premises for the purpose of making a distraint or levy or for any other purpose and repossess itself of the demised premises, by force, summary proceedings, ejectment or otherwise, and may remove Tenant and all other persons and any and all property from the demised premises.  Landlord shall be under no liability for or by reason of any such entry, re-entry, repossession or removal, or the manner thereof.

19.3.  <u>Reletting</u>.  At any time after any such expiration of the term of this Lease, Landlord will endeavor to relet the demised premises for the best rent obtainable and will

43

exercise reasonable diligence in that respect, but Landlord
shall have no obligation with respect to the reletting of the
demised premises beyond the exercise of reasonable diligence.

19.4.  <u>Survival of Tenant's Obligations; Damages</u>.
No such expiration of the term of this Lease or repossession
of the demised premises shall relieve Tenant of its liability
and obligations under this Lease.  In the event of any such
expiration Tenant shall pay to Landlord all rent and other
charges required to be paid by Tenant up to the time of such
expiration of the term of this Lease, and thereafter Tenant,
until the end of what would have been the term of this Lease
in the absence of such expiration and whether or not the de-
mised premises or any part thereof shall have been relet, shall
be liable to Landlord for, and shall pay to Landlord, as and
for liquidated and agreed current damages for Tenant's default
(herein called "Current Damages"),

(a)  the Minimum Monthly Payments, Additional
Rentals and Extended Term Rentals, as the case may
be, and other charges which would be payable under
this Lease by Tenant if the term of this Lease had
not expired (for this purpose Additional Rentals or
Extended Term Rentals shall be calculated upon the
basis of the average Net Sales of Tenant made during
the five (5) most recent complete Lease Years), less

(b)  the net proceeds, if any, of any reletting
effected pursuant to the provisions of Section 19.3

44

hereof, after deducting all of Landlord's expenses in
connection with such reletting.

Tenant shall pay such Current Damages to Landlord on the days
on which the rent would have been payable under this Lease if
the term of this Lease had not expired, and Landlord shall be
entitled to recover the same from Tenant on each such day.

19.5.  <u>Tenant's Waiver of Statutory Rights</u>.  In the
event of any expiration of the term of this Lease, Tenant, so
far as permitted by law, hereby expressly waives the service of
any notice of intention to re-enter provided for in any statute,
or of the institution of legal proceedings to that end, and
also waives any and all right of redemption or re-entry or
repossession or to restore the operation of this Lease in case
Tenant shall be dispossessed by a judgment or by a warrant of
any court or judge or in case of re-entry or repossession by
Landlord or in case of any expiration of the term of this Lease.

19.6.  <u>No Waiver, etc. by Landlord</u>.  No failure by
Landlord to insist upon the strict performance of any coven-
ant, agreement, term or condition of this Lease or to exercise
any right or remedy consequent upon a breach thereof, and no
acceptance of full or partial rent during the continuance of
any such breach, shall constitute a waiver of any such breach
or of such covenant, agreement, term or condition.

19.7.  <u>Landlord's Remedies Cumulative, etc</u>.  Each
right, power and remedy of Landlord provided for in this
Lease shall be cumulative and concurrent and shall be in

addition to every other right, power or remedy provided for
in this Lease or now or hereafter existing at law or in equity
or by statute or otherwise.

20. <u>Surrender of Demised Premises</u>. Tenant shall,
upon any expiration or earlier termination of this Lease,
peaceably vacate and surrender to Landlord the demised prem-
ises, together with all alterations and replacements thereof
(except Tenant's trade fixtures and equipment) in good order,
condition and repair except as permitted in the case of a
Taking to which Section 16.2 hereof is applicable.

21. <u>Quiet Enjoyment</u>. Landlord covenants that Ten-
ant, on paying the rent and performing and complying with all
covenants, agreements, terms and conditions of this Lease on
its part to be performed or complied with, shall and may peace-
ably and quietly have, hold and enjoy the demised premises dur-
ing the term of this Lease, subject to any Taking and to any
acts of God or of the public enemy or the armed forces of the
United States.

22. <u>Conveyance by Landlord</u>. In case Sparrow Glen-
moore Corporation, the original Landlord hereunder, or any
successor owner of the demised premises, shall convey or
otherwise dispose of the demised premises, all liabilities
and obligations on the part of said Corporation or successor
owner as Landlord under this Lease accruing after such convey-
ance or disposal shall terminate upon such conveyance or dis-
posal, and thereupon all such liabilities and obligations

46

shall be binding upon the new owner of the demised premises.

23. **Mortgagee's Agreement, Certain Definitions, etc.**

23.1. **Landlord's Title.** Landlord represents and warrants that, at the date of this Lease, Landlord has good title to the demised premises, free and clear of all encumbrances and liens except

(a) the lien of current taxes,

(b) an easement for ingress and egress, seventy (70) feet in width, extending in a north-south direction over the easterly seventy (70) feet of the eastern extremity of the demised premises, more fully described in the deed to the Landlord from Francis Jerome Conn, et al., a copy of which has been furnished to Tenant; and

(c) other liens and encumbrances described in the abstract of title furnished to Landlord upon its purchase of the land included in the demised premises.

23.2. **First Mortgage Loan.** It is anticipated that, at or about the Opening Date, Landlord will procure a first mortgage loan from certain pension trusts of which J. P. Morgan & Co. Incorporated is trustee, pursuant to the terms of a Commitment Letter, dated August 31, 1953, between Landlord and J. P. Morgan & Co. Incorporated, as trustee, as amended by letter agreement dated December 21, 1953. Such loan, and any refinancing, modification or extension thereof or supplement thereto, and any other loan incurred in sub-

47

stitution therefor (whether or not with the original lender
or lenders) in part or in whole, is herein called the "First
Mortgage Loan". The lender of such First Mortgage Loan, or
if there is a Michigan trustee acting for such lender under
an indenture of mortgage and deed of trust, then such trus-
tee, is herein sometimes called the "First Mortgagee". The
First Mortgage Loan will be secured by a first mortgage lien
upon the demised premises, but the First Mortgagee shall have
agreed in writing that Tenant's peaceable and quiet possession
of the demised premises under this Lease will not be disturbed
on account of such First Mortgage Loan, or by reason of any-
thing done or caused to be done thereunder, so long as Tenant
pays the rent provided for in this Lease and performs the other
covenants, agreements, terms and conditions on its part con-
tained in this Lease.

    23.3.  Subordination of Lease to Mortgages.  This
Lease and all rights and interests of Tenant hereunder are
subordinate to the lien of any mortgage or deed of trust now
or hereafter on the demised premises, provided, however, that
Tenant's peaceable and quiet possession of the demised prem-
ises under this Lease shall not be disturbed on account of
any such mortgage or deed of trust, or by reason of anything
done or caused to be done thereunder, so long as Tenant pays
the rent provided for in this Lease and performs the other
covenants, agreements, terms and conditions on its part con-
tained in this Lease.

48

24.  **Arbitration.**  Whenever in this Lease provision
is made for arbitration, such arbitration shall be by three
(3) arbitrators, one (1) chosen by Landlord, one (1) chosen by
Tenant, and the third (3rd) chosen by the two (2) arbitrators
named by Landlord and Tenant, respectively.  The decision of
any two (2) of the arbitrators shall be final and conclusive
upon the parties hereto.  The decision shall be in writing,
signed in duplicate by any two (2) of such arbitrators, and
one (1) copy shall be delivered to each of the parties hereto.
The party desiring arbitration in a case provided for in this
Lease shall give written notice to the other party of such de-
sire, naming the arbitrator selected by it.  In the event the
other party shall fail, within a period of Fifteen (15) days
after the giving of such notice, to notify the first party in
writing of the arbitrator selected by it, or in the event the
two (2) arbitrators chosen shall fail, within Fifteen (15)
days after the selection of the second (2nd) of them, to agree
upon the third (3rd) arbitrator, then any court of general
equity jurisdiction in the county in which the demised prem-
ises are situated, shall, on request of the party not in de-
fault in selecting an arbitrator, or upon the request of either
party if neither is so in default, appoint within Fifteen (15)
days after such request an arbitrator or arbitrators to fill
the position or positions remaining vacant.

25.  **Notices, Service of Process.**  All notices, de-
mands, requests, consents, approvals and other instruments

49

provided for in this Lease shall be in writing, and shall be
deemed to have been properly given if sent by United States
registered mail, postage prepaid,

    (a)  if to Tenant, addressed to Sears, Roebuck
and Co., 8 East Congress Street, Chicago 5, Illinois,
Attention:  its Vice President, or at such other address
as Tenant from time to time may have designated by written
notice to Landlord, and

    (b)  if to Landlord, addressed to Sparrow Glenmoore
Corporation, c/o G. Hale Pulsifer, One Wall Street, New
York, N. Y., or at such other address as Landlord from
time to time may have designated by written notice to
Tenant.

Tenant hereby irrevocably constitutes and appoints such cor-
poration, association, partnership, individual or other entity
as shall from time to time be in actual possession of the de-
mised premises as the agent and attorney-in-fact of Tenant to
accept service of process in any action, suit or proceeding by
Landlord relating to this Lease or the demised premises, pro-
vided that a copy of any such process so served shall be mailed
to Tenant in the manner provided in this Section 25.

    26.  <u>Estoppel Certificate by Tenant</u>.  Tenant, at any
time and from time to time upon not less than Twenty (20) days'
prior written notice from Landlord, will execute, acknowledge
and deliver to Landlord a certificate of Tenant certifying

50

(a)   that this Lease is unmodified, and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications),

(b)   whether or not there are then existing any offsets or defenses against the enforcement of any of the covenants, agreements, terms or conditions hereof upon the part of Tenant to be performed or complied with (and, if so, specifying the same), and

(c)   the dates, if any, to which the rent provided for herein and other charges have been paid in advance, it being intended that any such certificate may be relied upon by any prospective purchaser or mortgagee of the fee or any assignee of any mortgagee upon the fee of the demised premises or any part thereof.

27.   Miscellaneous.

27.1.   Separability of Provisions.   If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, and the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, as the case may be, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

27.2.   Changes, Waivers, etc.   Neither this Lease

51

nor any term or provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge or termination is sought.

27.3.  Law Governing.  This Lease shall be governed by and construed and enforced in accordance with the laws of the State of Michigan.

27.4.  Counterparts.  This Lease may be executed in several counterparts, each of which shall be an original but all of which shall constitute but one and the same instrument.

27.5.  Parties in Interest.  The covenants and agreements herein contained shall, subject to the provisions of this Lease, bind and inure to the benefit of Landlord, its successors and assigns, and Tenant, its successors and assigns, and the terms "Landlord" and "Tenant", as used herein, shall include such successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed and their respective corporate seals to be hereunto affixed and attested by their respective officers thereunto duly authorized.

ATTEST:                                          SPARROW GLENMOORE CORPORATION,

                                                                    Landlord

_____
              Secretary                          By _____
                                                                    President
Witness:

_____

G. N. Lindsay Jr.

52

ATTEST:                                    SEARS, ROEBUCK AND CO.,
                                                          Tenant

_____
        Assistant Secretary          By _____

Witness:                                      REAL ESTATE MANAGER

_____

_____

53

KNOW ALL MEN BY THESE PRESENTS:

That by a written lease dated the **29th** day of December, 19 **53**    SPARROW GLENMOORE CORPORATION,
a Michigan corporation

as Landlord(s) therein ha __s__ demised to    SEARS, ROEBUCK AND CO.,    a corporation organized
and existing under the laws of   New York   and qualified to do business in the state of Michigan   as Tenant therein,
for a term from the **29th** day of **December**, 19 **53** with the and as more fully set forth below   at
the rentals and upon the provisions, covenants, agreements, limitations, restrictions and conditions therein contained, the premises in
the City of Lansing Township County of   Ingham   and State of   Michigan   known as
described as follows:

That part of the East 1/2 of the Northeast 1/4 of Section 14, T4N, R2W,
Lansing Township, Ingham County, Michigan, commencing at the Northeast
corner of said Section 14 and running thence North 89°42' West 3082.87
feet on the Section line to the center of Clippert Street, thence on the center
line of Clippert Street South 0°17' West 1733.05 feet to the point of beginning;
thence on the center line of Clippert Street South 0°17' West 850.0 feet to the
North line of Michigan Avenue extended East, thence on the North line of Michigan
Avenue South 89°50' East 563.0 feet, thence North 0°17' East 419.8 feet, thence
South 89°50' East 419.1 feet to the West line of the East 1/4 of the East 1/2
of the Northeast 1/4 of said Section 14, thence N orth 0°15' East 430.2 feet
on said West line of the East 1/4 of the East 1/2 of the Northeast 1/4, thence
N orth 89°50' West 981.85 feet to the point of beginning.

Said Lease is for a preliminary term during which Tenant is to erect a retail
store buildin g, warehouse and automobile service station and certain other
improvements upon the demised premises; and Lease is also for a further term
of thirty-five (35) years commencing on the first day of the calendar month
next following the completion of the above mentioned buildings and improvements,
and the opening by Tenant of a retail store on the demised premises, all in
accordance with the provisions set forth in said Lease. Under said Lease, Tenant
has the right to extend said Lease for one or more, but not more than four further
successive terms of number (10) years each.
It is understood that terms of number (10) the party giving notice of the above mentioned lease.

IN WITNESS WHEREOF, the parties have hereunto set their hands and affixed their seals this
day of   December   , 19 **53**.

| WITNESSES TO EXECUTION BY LANDLORD(S): | ATTEST: | SPARROW GLENMOORE CORPORATION (SEAL) |
| | Hali Polnin | By Edward G. Sparrow (SEAL) |
| | Secretary | Edward G. Sparrow President |

| WITNESSES TO EXECUTION BY TENANT | ATTEST: | SEARS, ROEBUCK AND CO. (SEAL) |
| William J. Coughlin | Underwood | By W. G. Shoning (SEAL) |
| | Secretary | W.G. Shoning   Real Estate Manager |

Form of Acknowledgment to be used where Landlord(s) is/are natural persons

STATE OF

COUNTY OF

On the   day of   , in the year One thousand, nine hundred
before me personally came
to me known and personally known to me to be the person(s) described in and
who executed the foregoing instrument, who being by me duly sworn did depose and say that   he   reside(s) in
; that   he   signed, sealed and delivered said instrument as
voluntary act and deed for the uses and purposes therein set forth; and that   he   ha   the legal right to grant and execute
said instrument.

WITNESS my hand and notarial seal the day and year first above written.

Notary Public

My Commission Expires:

LIBER **57** PAGE **36**

Form of Acknowledgment to be used where Landlord is a corporation

STATE OF __NEW YORK__ } s. s.

COUNTY OF __NEW YORK__

On the __29th__ day of __December__ in the year One thousand, nine hundred __Fifty-three__, before me personally came __EDWARD G. SPARROW__ and __G. HALE PULSIFER__ to me known and personally known to me to be the persons who subscribed the foregoing instrument on behalf of __SPARROW GLENMOORE CORPORATION__, a corporation, the corporation described in and which executed the foregoing instrument, who being by me duly sworn did depose and say that they reside in __NEW YORK City__ __NEW YORK__ that they signed sealed and delivered the said instrument as their free and voluntary act and deed and as the free and voluntary act and deed of said corporation for the uses and purposes therein set forth; that they are the _____ President and _____ Secretary, respectively, of said corporation; that they know the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and they signed, sealed, and delivered said instrument on behalf of said corporation by like order.

WITNESS my hand and notarial seal the day and year first above written.

My Commission Expires:

Notary

AURELIA M. ANDISON
Notary Public, State of New York
No. 24-5072000
Qual. in Kings County Cert. filed with
Kings, New York, Nassau and
Westchester County Clerk's Office
Term Expires March 30, 1954

Form of Acknowledgment for Tenant

STATE OF __ILLINOIS__ } s. s. __LIBER 57 PAGE 37__

COUNTY OF __COOK__

On the __14th__ day of __December__ in the year One thousand, nine hundred __Fifty-three__, before me personally came __W. G. SKØNING__ and __A. M. WOOD__ to me known and personally known to me to be the persons who subscribed on behalf of __SEARS, ROEBUCK AND CO.__, a corporation, the corporation described in and which executed the foregoing instrument, who being by me duly sworn, did depose and say that they reside in __the State of Illinois__ that they signed, sealed and delivered the said instrument as their free and voluntary act and deed and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth; that they are the __Real Estate Manager__ and _____ Secretary, respectively, of said corporation; that they know the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and they signed, sealed, and delivered said instrument on behalf of said corporation by like order.

WITNESS my hand and notarial seal the day and year first above written.

Leonard Schram
Notary Public

My Commission Expires __Sept 14, 1957__

**PLEASE NOTE!**

1) If notary taking acknowledgment resides in a county other than the county in which the demised premises are located, a Certificate of Magistracy, showing that the notary is authorized to take acknowledgments, should be attached.

2) If additional forms of acknowledgment are required, the same can be attached.

LESSOR:
SPARROW GLENMOORE CORPORATION
% G. Hale Pulsifer, One Wall Street
New York, N.Y.

LESSEE:
SEARS, ROEBUCK AND CO.
8 East Congress Street
Chicago 5, Ill.

State of New York, } ss.:
County of New York, }

No. 87649

Form 1

I, ARCHIBALD R. WATSON, County Clerk and Clerk of the Supreme Court, New York County, a Court of Record having by law a seal, DO HEREBY CERTIFY that

*Amelia M. Addison*

whose name is subscribed to the annexed affidavit, deposition, certificate of acknowledgment or proof, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York duly commissioned and sworn and qualified to act as such throughout the State of New York, that pursuant to law a commission, or a certificate of his official character, and his autograph signature have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, powers of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such Notary Public, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this.......... 5 ..........day of......JAN......., 195....

FEE PAID 50¢

*Archibald R. Watson*
County Clerk and Clerk of the Supreme Court, New York County

L E A S E


Sparrow Glenmoore Corp.


to


ars Roebuck and Co.


Received for Record the 21st
of Jan     19 54 at    11:15    o'clock
A. M. and recorded in Liber 57
of Misc.      on page 35
Mia Bell Humphrey
Register of Deed





STATE OF    NEW YORK    )
                        )   SS.:
COUNTY OF   NEW YORK    )


On this 21st day of DECEMBER , 1953, before me appeared   EDWARD G. SPARROW                to me personally known, who, being by me duly sworn, did say that he is the President of SPARROW GLENMOORE CORPORATION, a Michigan corporation, and that the seal affixed to the within instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of the Board of Directors, and the said EDWARD G. SPARROW   acknowledges the execution of said instrument as the free act and deed of said corporation.


                                    _____
                                        Notary Public
                                    ALBERT W. HENDERSON
                                    Notary Public, State of New York
                                        No. 03-6847700
                                    Qualified in Bronx County
                                    Cert. Filed with Bronx and
                                    New York Counties Clerks & Regs.
                                    Term Expires March 30, 1954

My Commission Expires:

march 30, 1954


STATE OF  ILLINOIS    )
                      )   SS.:
COUNTY OF COOK        )


On this 29th day of  December   , 1953, before me appeared   W. G. SKONING              to me personally known, who, being by me duly sworn, did say that he is the  Real Estate Manager       of SEARS, ROEBUCK AND CO., a New York corporation, and that the seal affixed to the within instrument is the corporate seal of said corporation, and that said instrument was signed, and sealed in behalf of said corporation by authority of the Board of Directors; and the said  W. K. SKONING     acknowledges the execution of said instrument as the free act and deed of said corporation.


                                    _____
                                        Notary Public

My Commission Expires:

May 29, 1955.

RIDER NUMBER ONE

DESCRIPTION OF DEMISED PREMISES

LANSING, MICHIGAN

The premises demised under the attached Lease,
of which this Rider Number One is a part, are known and
described as follows:

That part of the East 1/2 of the Northeast
1/4 of Section 14, T4N, R2W, Lansing Town-
ship, Ingham County, Michigan, commencing
at the Northeast corner of said Section 14
and running thence North 89°42' West 1308.87
feet on the Section line to the center of
Clippert Street, thence on the center line
of Clippert Street South 0°17' West 1733.05
feet to the point of beginning; thence on the
center line of Clippert Street South 0°17'
West 850.0 feet to the North line of Michigan
Avenue extended West, thence on the North line
of Michigan Avenue South 89°50' East 563.0
feet, thence North 0°17' East 419.8 feet,
thence South 89°50' East 419.1 feet to the
West line of the East 1/4 of the East 1/2
of the Northeast 1/4 of said Section 14,
thence North 0°15' East 430.2 feet on said
West line of the East 1/4 of the East 1/2
of the Northeast 1/4, thence North 89°50'
West 981.85 feet to the point of beginning;

Subject, however, to a non-exclusive right-
of-way and easement over the Easterly 70
feet of the above described parcel to be
used in common with owners and occupants
of properties abutting the above described
parcel on the North;

Together with the right to use, maintain
and empty drainage into, without charge,
the storm drain situated in and across the
most Easterly 70 feet of the above-described
parcel and all continuations of such storm
drain; and

Together with a non-exclusive right-of-way
and easement for purposes of ordinary ingress
from and egress to Michigan Avenue over

and across the East 70 feet of the following described parcel:

Commencing at the intersection of the east 1/8 line of the northeast 1/4 of Section 14, T4N, R2W, Lansing Township, Ingham County, Michigan with the north line of Michigan Avenue extended east; thence south 89°55' east 563.0 feet for point of beginning; thence north 0°17' east 286.8 feet, thence south 89°55' east 410.5 feet; thence south 0°17' west 286.8 feet, thence north 89°55' west 419.8 feet to point of beginning.

Subject, however, to a right-of-way, dated September 8, 1953, from Helen D. Morgan, et al, to Consumers Power Company, recorded in Liber 56 of Miscellaneous Records, Page 396.

Subject, however, to a right-of-way, dated September 9, 1953, from Francis John Corr, et al, to Consumers Power Company, recorded in Liber 56 of Miscellaneous Records, Page 302.

This Rider Number One is hereby made a part of the Lease dated the 29th day of December, 1953, between the undersigned parties.

Attest:                              SPARROW CLEVEDORE CORPORATION

*Catherine G. Sparrow*              By *Edward J. Thomas*
    Asst. Secretary                        President

Attest:                              SEARS, ROEBUCK AND CO.

*J. S. Nelson*                       By *W. Q. Sommers*
    Assistant Secretary                  Vice President

2

840    Form 277

STATE OF ILLINOIS, }ss.
COOK COUNTY.          I, RICHARD J. DALEY, County Clerk of the County of Cook, Do Hereby Certify that I am
the lawful custodian of the official record of Notaries Public of said County, and as such officer am duly authorized to issue

certificates of magistracy, that _____ *Leonard P. Schram*
whose name is subscribed to the annexed Jurat, was, at the time of signing the same, a
Notary Public in Cook County, duly commissioned, sworn and acting as such, and authorized
to administer oaths and to take acknowledgments and proofs of deeds or conveyances of
lands, tenements or hereditaments, in said State of Illinois, all of which appears from the
records and files of my office; that I am well acquainted with the handwriting of said Notary,
and verily believe that the signature to the said Jurat is genuine.
    The law of Illinois does not require the impression of the Seal of a Notary Public to be
filed in the County Clerk's Office.
    In Testimony Whereof, I have hereunto set my hand and affixed the seal of the County

of Cook at my office in the City of Chicago, in the said County, this _____ 14

day of _____ 19 74

_____ *Richard J. Daley*    County Clerk.

---

STATE OF ILLINOIS, }ss.
COOK COUNTY.          I, RICHARD J. DALEY, County Clerk of the County of Cook, Do Hereby
the lawful custodian of the official record of Notaries Public of said County, and as such officer am d

certificates of magistracy, that _____ *Sylvia B. Shram*
whose name is subscribed to the annexed Jurat, was, at the time of signing the same, a
Notary Public in Cook County, duly commissioned, sworn and acting as such, and authorized
to administer oaths and to take acknowledgments and proofs of deeds or conveyances of
lands, tenements or hereditaments, in said State of Illinois, all of which appears from the
records and files of my office; that I am well acquainted with the handwriting of said Notary,
and verily believe that the signature to the said Jurat is genuine.
    The law of Illinois does not require the impression of the Seal of a Notary Public to be
filed in the County Clerk's Office.
    In Testimony Whereof, I have hereunto set my hand and affixed the seal of the County

of Cook at my office in the City of Chicago, in the said County, this _____ 30 d

day of _____ December _____ 19 53

_____ *Richard J. Daley* _____ County Clerk.

# EXHIBIT B

Norman C. Witte (P40546)
WITTE LAW OFFICES, PLLC
119 E. Kalamazoo Street
Lansing, Michigan 48933-2111
(517) 485-0070

*Attorneys for 4th Street South II, LLC*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re:

**Sears Holdings Corporation,** *et al.*,

    Debtors.

_____/

Chapter 11
Docket No. 18-23538 (RDD)

(Jointly Administered)

## AFFIDAVIT OF PATRICK K. GILLESPIE

STATE OF MICHIGAN  )
                ) ss
COUNTY OF INGHAM  )

    Patrick K. Gillespie, being duly sworn, states that if called he could competently testify from personal knowledge as follows:

    1.    I am the President of Gillespie Group Manager, Inc., the Manager of Autumn Ridge Partnership, LLC, being the Member of Movant 4th Street South II, LLC ("4th Street").

    2.    I am familiar with the lease agreement dated December 29, 1953 (the "Lease") between 4th Street and Sears, Roebuck and Co., one of the Debtors, of real property located at 3131 E. Michigan Avenue, Lansing, Michigan 48912 (the "Premises"), attached to 4th Street South II, LLC's Cure Objection, Adequate Assurance Objection and Demand for Adequate Protection ("Cure Objection") as Exhibit A.

Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

3.      The Lease had an initial term of 35 years, with four options to extend for ten years. *See* Lease, Exhibit A at 3, ¶¶ 3(b) and (c).

4.      The Lease specifies that the initial term commenced in the first calendar month after the Sears location opened. *Id.* at at 3, ¶ 3(b)

5.      Based upon the books and records of 4th Street associated with the Lease, the month upon which each term under the lease starts is December.  Thus, each year of the Lease ends on November 31.

6.      4th Street has retained John R. Fifarek of Lasky Fifarek PC and Norman C. Witte of Witte Law Offices, PLLC as its counsel related to Sears' breach of the Lease.

7.      Attached to this affidavit as **Exhibit 1** is a statement from Lasky Fifarek, PC which includes a summary of fees and expenses incurred that were related only to Sears' breach of the Lease. Time spent on the bankruptcy matter was billed separately.  To date, the total amount billed by that firm related to Sears' breach of the Lease is $3,090.00.

8.      Attached to this affidavit as **Exhibit 2** is a pre-bill showing work in process for invoice from Witte Law Offices, PLLC which includes fees and expenses incurred that were related only to Sears' breach of the Lease and to the bankruptcy, and breaks out the balance for each.  To date, the total amount billed by that firm related to Sears' breach of the Lease is $1,043.40.

9.      The total amount of legal expense incurred by 4th Street in connection with Sears breach of the Lease to date is $4,133.40.

10.     4th Street reserves all rights to assert claims for additional legal expenses under the Lease as part of the cure of Sears' default.

*Signature appears on next page.*

---

AFFIDAVIT OF PATRICK K. GILLESPIE

PAGE 2

*(left margin, rotated)* Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070

_Patrick K. Gillespie_

Patrick K. Gillespie

Sworn before me, a notary public, by Patrick K. Gillespie, this 25th day of January, 2019.

_Rose Mary Fox_

Rose Mary Fox , Notary Public

Kent County Acting in Kent County, Michigan

My commission expires May 29, 2019

_Witte Law Offices, PLLC · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111    (517) 485-0070_

AFFIDAVIT OF PATRICK K. GILLESPIE

PAGE 3

# EXHIBIT 1

# LASKY FIFAREK

CHARLES L. LASKY
JOHN R. FIFAREK

PROFESSIONAL  CORPORATION

### ATTORNEYS

———

120  NORTH WASHINGTON SQUARE
SUITE 625
LANSING, MICHIGAN 48933

———

(517) 267-2222
FACSIMILE (517) 267-2230

———

JOHN R. FIFAREK
JFifarek@laskyfifarek.com

DIRECT DIAL
(517) 267-2226

January 24, 2019

4th Street South II, LLC Re: Sears Lease / Summary of Invoiced Fees related to Sears Lease Default (non-bankruptcy specific)

| Date | | Description | Hours | Amount |
|---|---|---|---|---|
| 10/26/2018 | JRF* | Legal research regarding Sears lease default | 0.20 | $    60.00 |
| 11/13/2018 | JRF | Telephone Conference with client re: lease default | 0.20 | $    60.00 |
| 11/13/2018 | JRF | Review lease regarding Sear's obligations/default | 1.00 | $  300.00 |
| 11/19/2018 | JRF | Review lease and draft summary | 2.00 | $  600.00 |
| 11/26/2018 | JRF | Review emails from client regarding default and steps to take.  Draft response | 0.50 | $  150.00 |
| 11/27/2018 | JRF | Draft email to client regarding information/lease/rent and status of obligations | 0.80 | $  240.00 |
| 11/27/2018 | JRF | Legal research re: extension of time to cure default | 0.50 | $  150.00 |
| 11/28/2018 | JRF | Review Lease, Notices, and draft memo addressing Lease, Status and issues to be addressed | 1.00 | $  300.00 |
| 11/28/2018 | JRF | Draft email to client responding to questions raised and requesting information regarding lease default | 0.40 | $  120.00 |
| 12/3/2018 | JRF | Conference with client regarding Sears and default | 0.80 | $  240.00 |
| 12/3/2018 | JRF | Telephone Conference with Norm Witte regarding enforcing lease | 0.70 | $  210.00 |
| 12/17/2018 | JRF | Review emails regarding rent arrearage | 0.20 | $    60.00 |
| 12/27/2018 | JRF | Telephone Conference with Norm Witte regarding enforcing lease | 0.40 | $  120.00 |
| 01/08/2019 | JRF | Telephone conference w/client and Norm Witte re: next steps | 0.50 | $  150.00 |

| 01/08/2019 | JRF | Draft emails to Norm Witte with lease documents to review | 0.40 | $ | 120.00 |
| 01/09/2019 | JRF | Review email from Norm Witte with observations/ suggestions and draft reply | 0.50 | $ | 150.00 |
| 01/10/2019 | JRF | Draft email to client regarding notice of default | 0.20 | $ | 60.00 |
| | | For professional services rendered: | 9.90 | | $ 3,090.00 |

**\*Hourly rate $300.00**

# EXHIBIT 2

Page: 1

4th Street South II, LLC
330 Marshall Street, Suite 100
Lansing  MI  48912

January 23, 2019

Account No:          446M

Balance

$3,196.40

| | | |
|---|---|---|
| Primary Tmkpr: Norman Witte | Return To: | ☐ On Hold - Do not Bill |
| Reviewed By: | Review Date: | ☐ Reprint with Edits |
| Notes: | | ☐ Released to Bill |

4th Street South II, LLC
330 Marshall Street, Suite 100
Lansing, MI  48912

Statement Date:    January 23, 2019
Statement No.            17278
Account No.            446.0000
Page:    1

Highlighted items are fees related to bankruptcy case.

Interim Statement

### Professional Services

| Date | | Description | Rate | Hours | | |
|---|---|---|---|---|---|---|
| 01/08/2019 | NCW | GILLESPIE/SEARS Telephone conference with Pat Gillespie, Jason Kildea, and John Fifarek regarding background of case; additional research | 290.00 | 0.80 | 232.00 | |
| 01/09/2019 | NCW | Review of lease and further research | 290.00 | 2.50 | 725.00 | |
| 01/10/2019 | NCW | Correspondence with John Fifarek regarding next steps | 290.00 | 0.30 | 87.00 | |
| 01/11/2019 | NCW | GILLESPIE/SEARS Telephone conference with John Fifarek regarding definitive bid issues | 290.00 | 0.20 | 58.00 | |
| 01/15/2019 | NCW | Various correspondence, finalize letter, preparation of motion to appear pro hac vice, proposed order regarding the same, certificate of service regarding the same and notice of appearance   (.50 hours) | 290.00 | 1.20 | 348.00 | 145.00 |
| 01/17/2019 | NCW | Preparation of correspondence to client regarding next steps | 290.00 | 0.20 | 58.00 | |
| 01/21/2019 | NCW | Review of various pleadings and correspondence | 290.00 | 0.20 | 58.00 | |
| | NCW | Review of pleadings | 290.00 | 0.50 | 145.00 | |
| | NCW | Telephone conference with John Fifarek regarding next steps; review of lease terms | 290.00 | 0.50 | 145.00 | |
| | NCW | Conference call with Pat, Jason and John regarding next steps | 290.00 | 0.70 | 203.00 | |
| | NCW | Preparation of cure objection | 290.00 | 1.90 | 551.00 | |
| 01/22/2019 | NCW | Continued preparation of Cure Objection | 290.00 | 1.00 | 290.00 | |
| | NCW | Revisions to objection; correspondence regarding the same | 290.00 | 0.30 | 87.00 | |
| | | For Current Services Rendered | | 10.30 | 2,987.00 | |

### Recapitulation

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Norman Witte | 10.30 | $290.00 | $2,987.00 |

### Expenses

| | | |
|---|---|---|
| 01/17/2019 | Filing fee for Pro Hac Vice and Appearance | 200.00 |

4th Street South II, LLC

Page: 2
January 23, 2019
Account No:    446-0000M
Statement No:    17278

| 01/17/2019 | Postage mailing motion to creditors that are non efile recipients | 9.40 |
| | Total Expenses | 209.40 |
| | Total Current Work | 3,196.40 |
| | Balance Due | $3,196.40 |

Bankruptcy-related:    $1,543.40
Balance:    $1,653.10

Billing History

| Fees | Hours | Expenses | Finance Charge | Payments |
|---|---|---|---|---|
| 2,987.00 | 10.30 | 209.40 | 0.00 | 0.00 |

# EXHIBIT C

**3131 E MICHIGAN AVE** LANSING, MI 48912    (Property Address)

Parcel Number: 33-01-01-14-226-021    Click here to view local unit data for this parcel



**Property Owner:** 4TH STREET SOUTH II L L C

*Summary Information*

> Commercial/Industrial Building Summary
  - Yr Built: 1953          # of Buildings: 3
  - Total Sq.Ft.: 193,261

> Property Tax Information found

> Assessed Value: $2,410,700 | Taxable Value: $1,590,674

Item **1** of **5**    3 Images / 2 Sketches

---

Access additional record information for a small convenience fee. *

> Additional areas of information include:  *Delinquent Tax Information*

[ Show Purchase Options ]

\* Additional record information is free for all homeowners, click the 'Show Purchase Options' button for more information.

---

## Owner and Taxpayer Information

**Owner**          4TH STREET SOUTH II L L C          **Taxpayer**          SEE OWNER INFORMATION
                   GILLESPIE PROPERTY
                   MANAGEMENT INC
                   3333 BEVERLY RD
                   HOFFMAN ESTATES, IL 60179-
                   0001

## Legal Description

COM 1308.87 FT W & 1733.05 FT S OF NE COR SEC 14, TH S ON CL CLIPPERT ST 850 FT TO N LINE E MICHIGAN AVE E ON N LINE E MICHIGAN AVE 563 FT N 419.8 FT, E 419.1 FT TO E LINE OF W 3/4 OF E 1/2 OF NE 1/4, N 430.2 FT ON SAID E LINE, W 981.85 FT TO BEG; SEC 14 T4N R2W

## Recalculate amounts using a different Payment Date

You can change your anticipated payment date in order to recalculate amounts due as of the specified date for this property.

Enter a Payment Date  1/22/2019      [ Recalculate ]

## Tax History

| Year | Season | Total Amount | Total Paid | Last Paid | Total Due | |
|------|--------|-------------:|-----------:|-----------|----------:|--|
| 2017 | Winter | $14,692.57 | $14,692.57 | 02/05/2018 | $0.00 | |
| 2017 | Summer | $108,052.03 | $108,052.03 | 02/05/2018 | $0.00 | |
| 2016 | Winter | $14,356.10 | $14,356.10 | 02/13/2017 | $0.00 | |
| 2016 | Summer | $104,449.49 | $104,449.49 | 08/23/2016 | $0.00 | |
| 2015 | Winter | $13,806.22 | $13,806.22 | 02/10/2016 | $0.00 | |
| 2015 | Summer | $103,685.55 | $103,685.55 | 08/24/2015 | $0.00 | |
| 2014 | Winter | $20,419.03 | $20,419.03 | 02/09/2015 | $0.00 | |
| 2014 | Summer | $155,196.34 | $155,196.34 | 11/10/2014 | $0.00 | |
| 2013 | Winter | $18,802.98 | $24,280.15 | 02/05/2014 | ($5,477.17) | |
| 2013 | Summer | $154,702.14 | $199,992.11 | 08/05/2013 | ($45,289.97) | |
| [ Load More Years ] | | | | | | |

**Disclaimer:** BS&A Software provides BS&A Online as a way for municipalities to display information online and is not responsible for the content or accuracy of the data herein. This data is provided for reference only and WITHOUT WARRANTY of any kind, expressed or inferred. Please contact your local municipality if you believe there are errors in the data.

Copyright © 2019 BS&A Software, Inc.

# EXHIBIT D

**3131 E MICHIGAN AVE** LANSING, MI 48912    (Property Address)

Parcel Number: 33-01-01-14-226-021



**Property Owner:** 4TH STREET SOUTH II L L C

*Summary Information*
> Commercial/Industrial Building Summary
  - Yr Built: 1953        # of Buildings: 3
  - Total Sq.Ft.: 193,261
> 1 Special Assessment found
> 1 Building Department records found

> Assessed Value: $2,410,700 | Taxable Value: $1,590,674
> Property Tax information found
> 4 Invoices Found, Amount Due: 0.00

Item **1** of **5**        3 Images / 2 Sketches

## Owner and Taxpayer Information

| | | | |
|---|---|---|---|
| **Owner** | 4TH STREET SOUTH II L L C | **Taxpayer** | SEE OWNER INFORMATION |
| | GILLESPIE PROPERTY MANAGEMENT INC | | |
| | 3333 BEVERLY RD | | |
| | HOFFMAN ESTATES, IL 60179-0001 | | |

**Amount Due**

Current Taxes:        **$16,354.11**
Pay Now

## Legal Description

COM 1308.87 FT W & 1733.05 FT S OF NE COR SEC 14, TH S ON CL CLIPPERT ST 850 FT TO N LINE E MICHIGAN AVE E ON N LINE E MICHIGAN AVE 563 FT N 419.8 FT, E 419.1 FT TO E LINE OF W 3/4 OF E 1/2 OF NE 1/4, N 430.2 FT ON SAID E LINE, W 981.85 FT TO BEG; SEC 14 T4N R2W

## Recalculate amounts using a different Payment Date

You can change your anticipated payment date in order to recalculate amounts due as of the specified date for this property.

Enter a Payment Date    1/21/2019        Recalculate

## Tax History

| Year | Season | Total Amount | Total Paid | Last Paid | Total Due | |
|---|---|---|---|---|---|---|
| 2018 | Winter | $16,354.11 | $0.00 | | **$16,354.11** | Pay Now |
| 2018 | Summer | $112,950.98 | $112,950.98 | 09/10/2018 | $0.00 | |
| 2017 | Winter | $14,692.57 | $14,692.57 | 02/05/2018 | $0.00 | |
| 2017 | Summer | $108,052.03 | $108,052.03 | 02/05/2018 | $0.00 | |
| 2016 | Winter | $14,356.10 | $14,356.10 | 02/13/2017 | $0.00 | |
| 2016 | Summer | $104,449.49 | $104,449.49 | 08/23/2016 | $0.00 | |
| 2015 | Winter | $13,806.22 | $13,806.22 | 02/10/2016 | $0.00 | |
| 2015 | Summer | $103,685.55 | $103,685.55 | 08/24/2015 | $0.00 | |
| 2014 | Winter | $20,419.03 | $20,419.03 | 02/09/2015 | $0.00 | |
| 2014 | Summer | $155,196.34 | $155,196.34 | 11/10/2014 | $0.00 | |

Load More Years

**\*\*Disclaimer:** BS&A Software provides BS&A Online as a way for municipalities to display information online and is not responsible for the content or accuracy of the data herein. This data is provided for reference only and WITHOUT WARRANTY of any kind, expressed or inferred. Please contact your local municipality if you believe there are errors in the data.

Copyright © 2019 BS&A Software, Inc.

# EXHIBIT E

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

December 12, 2018

**VIA REGISTERED MAIL**
**& VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 527 US**
**# 7010 0290 0000 0645 0950**

4th Street South II, LLC
c/o Autumn Ridge Partnership LLC
330 Marshall Street, Suite 100
Lansing, MI  48912
Attn:  Jason Armistead

**VIA REGISTERED MAIL**
**& VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 535 US**
**# 7010 0290 0000 0645 0967**

Autumn Ridge Partnership LLC
c/o Gillespie Group
330 Marshall Street, Suite 100
Lansing, MI  48912
Attn:  Jason Armistead

Re:    Lease dated December 29, 1953, as amended ("Lease"),
       for the premises located at 3131 E. Michigan Avenue,
       Lansing, MI, and known as Sears Unit # 1170

Dear Landlord:

The undersigned ("Tenant") hereby elects to extend the subject Lease for an additional term of ten (10) years, commencing December 1, 2019, to and including November 30, 2029, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Notwithstanding anything in this letter to the contrary, Tenant's exercise of its option to extend the Lease will not be deemed an assumption of the Lease pursuant to section 365 of title 11 of the United States Code (the "Bankruptcy Code") and Tenant shall retain its rights to assume or reject the Lease pursuant to section 365 of the Bankruptcy Code and any orders entered by the United States Bankruptcy Court for the Southern District of New York and Tenant's rights to assume or reject the Lease shall not be prejudiced or adversely affected by Tenant's election to extend the Lease.

Sincerely,

SEARS, ROEBUCK AND CO.,
a New York corporation

By:

Jane Borden
President, Real Estate

JB/cm

cc:    Angela Lipovetsky
       Lease File

**VIA REGISTERED MAIL & VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 513 US**
**# 7010 0290 0000 0645 1773**

First National Bank of Michigan
348 West Michigan Avenue
Kalamazoo, MI  49007

# EXHIBIT F

# STATE OF MICHIGAN

# COURT OF APPEALS

---

ILLIRIA, INC.,

        Plaintiff/Counterdefendant-
        Appellant,

v

PINEBROOK PLAZA, LLC, and KANAAN
FAMILY TRUST,

        Defendants/Cross-Defendants-
        Appellees,

and

MIKHAIL PLAZA, LLC,

        Defendant/Third-Party
        Plaintiff/Counterplaintiff/Cross-
        Plaintiff-Appellee,

and

TITLE CONNECT, LLC, and FIRST
AMERICAN TITLE COMPANY,

        Third-Party Defendants.

UNPUBLISHED
October 25, 2018


Nos. 338666; 338671
Macomb Circuit Court
LC No. 2015-002888-CB

---

Before: MURRAY, C.J., and BORRELLO and RONAYNE KRAUSE, JJ.

PER CURIAM.

      These consolidated appeals arise from the same lower court file. In Docket No. 338666, plaintiff/counterdefendant, Illiria, Inc. (plaintiff), appeals as of right a stipulated order of

dismissal without prejudice.  In Docket No. 338671, plaintiff appeals by delayed leave granted[1] an opinion and order granting summary disposition to defendant/third-party plaintiff/counterplaintiff/cross-plaintiff, Mikhail Plaza, LLC (Mikhail Plaza), regarding Count III of plaintiff's complaint.  This Court consolidated the appeals, *Illiria, Inc v Pinebrook Plaza, LLC*, unpublished order of the Court of Appeals, entered June 21, 2017 (Docket No. 338671), and plaintiff has filed a single brief on appeal encompassing both of these consolidated appeals and challenging the trial court's grant of summary disposition to Mikhail Plaza regarding Count III of plaintiff's complaint.  For the reasons set forth in this opinion, we affirm.

## I.  BACKGROUND

This case arises out of a dispute related to a February 18, 2010 commercial lease by which defendant/cross-defendant Pinebrook Plaza, LLC (Pinebrook Plaza), rented property located in a plaza to plaintiff, which operated a restaurant at the location.  An addendum to the lease executed on the same date as the lease provided that the term of the lease continued until February 28, 2015.  Additionally, ¶ k of the addendum also granted to plaintiff a right of first refusal concerning the purchase of the property on which plaintiff's restaurant was located, stating as follows:

> Tenant shall be entitled to a right of first refusal should Landlord decide to sell the premises.  Tenant shall be permitted reasonable notice and a reasonable opportunity to respond to such notice, without unreasonably hindering or delaying Landlord.

Plaintiff claims to have sent an October 25, 2014 notice to Pinebrook Plaza of plaintiff's intent to renew the lease in accordance with a renewal provision in the lease, but Pinebrook Plaza denied receiving that notice.  In August 2015, the property was sold to Mikhail Plaza.  Plaintiff commenced this action.  In Count III of its complaint, plaintiff sought specific performance of the lease to allow plaintiff to purchase the property and an order requiring Mikhail Plaza to convey the property to plaintiff.  Plaintiff moved for summary disposition in its favor regarding Count III, Mikhail Plaza requested summary disposition in its favor, and the trial court granted summary disposition to Mikhail Plaza regarding Count III.  These appeals ensued.

## II.  ANALYSIS

On appeal, plaintiff presents arguments challenging the trial court's summary disposition ruling, specifically ¶ k of the addendum, and the issue of whether ¶ k remained in effect at the time that the property was sold to Mikhail Plaza.  For the reasons explained below, we conclude that the trial court properly granted summary disposition to Mikhail Plaza with respect to Count III of plaintiff's complaint.  Under the language of the lease, plaintiff's multiple late rent payments deprived it of the option to renew the lease, and the right of first refusal provided in the lease addendum did not extend to the period in which plaintiff was a holdover tenant.

---

[1] *Illiria, Inc v Pinebrook Plaza, LLC*, unpublished order of the Court of Appeals, entered June 21, 2017 (Docket No. 338671).

A trial court's decision on a motion for summary disposition is reviewed de novo. *Dell v Citizens Ins Co of America*, 312 Mich App 734, 739; 880 NW2d 280 (2015).

> In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Bank of America, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 488; 892 NW2d 467 (2016) (quotation marks and citations omitted).]

The proper interpretation of a contract presents a question of law that is reviewed de novo. *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008).

Plaintiff initially claims that the lease was successfully renewed, arguing that plaintiff and Pinebrook Plaza engaged in a course of dealing that waived or modified the renewal option provision of the lease. Paragraph 5a of the lease contained the following provision concerning plaintiff's option to renew the lease for a second five-year term: "As long as Tenant has Paid rent in a timely manner (Not late more than 3 time [sic] in the 5 year period) Tenant may exercise an option period of Five (5) additional years at the rate of Twenty Five Hundred ($2,500.00) dollars per month. Tenant must Notify the Landlord in writing Ninety (90) days prior to the end of the initial term if Tenant wants to exercise this option." In particular, plaintiff contends that the lease was renewed and remained in effect because Pinebrook Plaza's acceptance of late rent payments in amounts less than that required by the lease served to modify or waive the language in ¶ 5a requiring plaintiff to pay rent in a timely manner in order to exercise its option to renew the lease. According to plaintiff, the trial court should have granted summary disposition in favor of plaintiff or, at a minimum, denied Mikhail Plaza's motion for summary disposition because a genuine issue of material fact existed concerning the effect of the course of dealing between plaintiff and Pinebrook Plaza under the lease.

When interpreting the language of a contractual lease agreement, this Court generally applies ordinary principles of contract interpretation. *Id.* at 24. Thus, we "determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning," and we enforce unambiguous contractual language as written. *Id.* A party claiming breach of contract "must establish (1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014). "[S]pecific performance is an equitable remedy[,]" *Zurcher v Herveat*, 238 Mich App 267, 297; 605 NW2d 329 (1999), and "contracts involving the sale of land are generally subject to specific performance[,]" *In re Smith Trust*, 480 Mich at 26.

An option to purchase or lease property is a preliminary contract for the privilege of purchasing or leasing property at a fixed price within a specified timeframe. See *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 393; 761 NW2d 353 (2008);

-3-

*Oshtemo Twp v Kalamazoo*, 77 Mich App 33, 37; 257 NW2d 260 (1977). Although a lease itself can constitute an interest in real property, a mere option to lease is not such an interest. *Johnson Family Ltd Partnership*, 281 Mich App at 393. "Because an option is essentially an offer that requires strict compliance, it does not create an interest in land until the conditions of the offer are met." *Id*. As our Supreme Court has explained:

> An option is but an offer, strict compliance with the terms of which is required; acceptance must be in compliance with the terms proposed by the option both as to the exact thing offered and within the time specified; otherwise the right is lost. [*Le Baron Homes v Pontiac Housing Fund*, 319 Mich 310, 313; 29 NW2d 704 (1947) (quotation marks and citation omitted).]

The "[h]older of an option seeking specific performance has burden of showing his compliance with its terms." *Id*. at 315 (quotation marks and citation omitted).

Furthermore, "[t]he law of contracts recognizes that some agreements are not binding at the outset with respect to a right to performance, entailing conditions precedent to performance." *Wells Fargo Bank, NA v SBC IV REO, LLC*, 318 Mich App 72, 93; 896 NW2d 821 (2016). "A condition precedent . . . is a fact or event that the parties intend must take place before there is a right to performance. If the condition is not satisfied, there is no cause of action for a failure to perform the contract." *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 131; 743 NW2d 585 (2007) (quotation marks and citation omitted).

In this case, ¶ 5a of the lease made plaintiff's timely payment of rent a condition precedent of plaintiff's option to extend the lease for a second five-year period, and timely payment was specifically defined as not being late in paying rent more than three times in the five-year period of the lease. Plaintiff's manager, Robert Prekaj, admitted that plaintiff was late in paying rent more than five times, rendering the failure to comply with the condition precedent breach undisputed. Also, Prekaj testified that when he mailed the October 25, 2014 letter purportedly notifying Pinebrook Plaza of plaintiff's intent to renew the lease for an additional five year period, a check for three months of back rent was placed in the envelope. Because plaintiff failed to perform the condition precedent of making timely rent payments as defined within the renewal option provision and accordingly failed to strictly comply with the terms of the option provision, plaintiff did not accept the offer for a renewed lease in conformance with the terms proposed in the lease agreement and had no enforceable right to renew the lease. *Le Baron Homes*, 319 Mich at 313; *Harbor Park*, 277 Mich App at 131.

Nonetheless, according to plaintiff, such a finding does not preclude recovery for plaintiff as it argues that Pinebrook Plaza agreed to waive or modify the language in the lease requiring plaintiff not to be late in paying rent more than three times in order to exercise the option to renew the lease. Parties to a contract may "enter into new contracts or modify their existing agreements." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 370-371; 666 NW2d 251 (2003). "However, the freedom to contract does not authorize a party to *unilaterally* alter an existing bilateral agreement. Rather, a party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract." *Id*. at 372. "The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing

mutual agreement to waive the terms of the original contract." *Id*. at 373. "[W]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied." *Id*. at 374. "[W]aiver requires an intentional and voluntary relinquishment of a known right . . . ." *Id*. at 379. Although affirmative conduct, especially when combined with oral or written representations, can constitute a waiver, mere knowing silence is generally insufficient. See *id*. at 365, 376-379.

In this case, plaintiff relies on the fact that Pinebrook Plaza did not seek to evict plaintiff, provide plaintiff with a termination notice, or hold plaintiff in default for paying rent late. Plaintiff argues that because Pinebrook Plaza allowed plaintiff to remain on the premises and accepted plaintiff's tardy rent payments in amounts less than that called for by the lease, the lease continued in effect past the expiration of the lease term on February 28, 2015. Plaintiff's argument confuses the issue by conflating Pinebrook Plaza's potential remedies for plaintiff's default with the question whether plaintiff maintained a right to exercise its option to renew the lease. The fact that Pinebrook Plaza chose not to seek plaintiff's eviction for paying its rent late does not establish that Pinebrook Plaza agreed to waive or modify the requirements of the separate provision of the lease establishing the condition precedent for plaintiff's option to renew the lease. Paragraph 5a of the lease specifically addresses the effect of plaintiff's multiple late payments of rent by conditioning plaintiff's option to renew on not having been late in paying rent more than three times. Simply stated, how Pinebrook Plaza chose to address plaintiff's late rent payments during the term of the lease does not waive or modify the language of ¶ 5a regarding the effect of the late rent payments on plaintiff's option to renew.[2]

Plaintiff also suggests that a waiver or modification occurred because Pinebrook Plaza never objected to plaintiff's continued presence on the property after the expiration of the lease term on February 28, 2015. But the lease expressly provided for the possibility of plaintiff remaining on the property as a month-to-month holdover tenant following the expiration of the lease term, which suggests that the parties contemplated a situation where plaintiff would remain in possession of the property without having renewed the lease. Hence, plaintiff fails to explain how Pinebrook Plaza's declination to object to plaintiff's continued presence constituted a waiver or modification of the requirements of the lease renewal provision. Rather, plaintiff's argument that Pinebrook Plaza waived or modified the requirements of the lease renewal based on the silence of Pinebrook Plaza is a legally insufficient basis to establish that the renewal

---

[2] Plaintiff's reliance on *Park Forest of Blackman v Smith*, 112 Mich App 421; 316 NW2d 442 (1982), is misplaced. In *Park Forest*, this Court held that a landlord had waived strict compliance with the timely payment provision of a lease by accepting late rental payments, such that just cause to terminate the tenancy was not established. *Id*. at 428-429. But the issue in *Park Forest* concerned the landlord's waiver of its right to seek termination of the tenancy, not the landlord's modification or waiver of a separate provision of the lease establishing the requirements that must be satisfied in order for the tenant to exercise an option to renew the lease. *Id*. The holding in *Park Forest* is thus not pertinent to the issue presented in the instant case.

option provision of the lease was modified by mutual agreement or waived by a course of conduct. *Quality Prod*, 469 Mich at 365, 372-373, 376-379.

Plaintiff makes a related argument that Pinebrook Plaza failed to provide notice that it considered plaintiff to be in default, that plaintiff was thus deprived of an opportunity to cure the default, and that the lease and its provision giving plaintiff a right of first refusal to purchase the subject property therefore remained in effect. Plaintiff refers to the language of ¶ 23.B of the lease, which provides in pertinent part that, among the remedies available to Pinebrook Plaza in the event of a default by plaintiff, Pinebrook Plaza could do the following:

> Maintain [plaintiff's] right to possession, in which case this Lease shall continue in effect whether or not [plaintiff] shall have abandoned the Premises. In such event [Pinebrook Plaza] shall be entitled to enforce all of [Pinebrook Plaza's] rights and remedies under this Lease, including the right to recover the rent and any other charges and Adjustments as may become due hereunder . . . .

Again, plaintiff is confusing the remedies available to Pinebrook Plaza upon plaintiff's default during the express term of the lease with plaintiff's option to renew the lease after filling a condition precedent. Paragraph 23.B. does not contain any language indicating that it applies beyond the term of the lease itself. In other words, if plaintiff defaulted during the original term of the lease, Pinebrook Plaza was entitled under ¶ 23.B. to hold plaintiff accountable for its rent obligations during the remainder of the lease term even if plaintiff abandoned the premises, during which time all of the lease provisions also remained in effect. However, nothing in ¶ 23.B. permits such a set of circumstances to continue beyond the express term of the lease— i.e., February 28, 2015. The mere fact that plaintiff remained on the premises after the lease term expired on February 28, 2015, does not somehow make ¶ 23.B. applicable.

Indeed, such a scenario is dealt with under a separate lease provision in ¶ 20, which provides as follows:

> **Holding Over.** If [plaintiff] remains in possession of the Premises or any part thereof after the expiration of the term hereof *with the express written consent* of [Pinebrook Plaza], such occupancy shall be a tenancy from month to month at a rental in the amount of one hundred twenty percent (120%) of the last Monthly Minimum Rent, plus all other charges payable hereunder, and upon all the terms hereof applicable to a month to month tenancy. [Emphasis added.]

In this case, plaintiff makes no claim that it had obtained "the express written consent" of Pinebrook Plaza to become a hold over tenant as that term is contemplated in the lease. Moreover, as will be explained below, even if plaintiff had successfully become a month-to-month holdover tenant as that term is contemplated in the lease, this provision nevertheless does not indicat that the right-of-first-refusal provision continues to apply during the holdover period. Accordingly, plaintiff cannot rely on its continued possession of the leased premises beyond February 28, 2015, when the lease term expired to claim that the lease—including the important right-of-first-refusal provision—remained in effect and enforceable beyond February 28, 2015, because neither ¶ 20 nor ¶ 23.B. provide for the lease term to be extended under the circumstances here. Rather, the lease terms would only have stayed in effect if plaintiff had

-6-

successfully obtained a renewal of the lease for a second term. Furthermore, assuming without deciding that plaintiff's continued possession during the original lease term after making late payments was under the terms of ¶ 23.B., the renewal option in ¶ 5a was still subject to the condition precedent requiring plaintiff not to make more than three late payments of rent in the five-year lease period. It is undisputed that this condition precedent was not satisfied, and plaintiff therefore could not exercise the option to renew the lease regardless whether ¶ 23.B. was applicable to the situation. We note that the renewal provision has no language that required providing notice to plaintiff about any "default" or giving plaintiff an opportunity to "cure" any default. Hence, plaintiff failed to satisfy the condition precedent for exercising its option to renew the lease for a second five-year term pursuant to the renewal provision in the lease. *In re Smith Trust*, 480 Mich at 24.

Next, plaintiff argues that it was a holdover tenant after the expiration of the lease term on February 28, 2015, and that plaintiff still retained the right of first refusal regarding the purchase of the property during the holdover period, including at the time that the property was sold to Mikhail Plaza.

As previously stated, plaintiff could not be considered a holdover tenant as that term was defined in ¶ 20 of the lease because plaintiff did not actually obtain express written consent from Pinebrook Plaza to remain in possession of the premises after the lease expired on February 28, 2015. Moreover, even if the course of conduct between plaintiff and Pinebrook Plaza could somehow be considered a modification or waiver of the provisions of ¶ 20 involving the amount of rent and the need for written consent, there still is no language in ¶ 20 to indicate that the right-of-first-refusal provision remained in force during the holdover period. As previously noted, ¶ 20 states that the month-to-month tenancy is to be "upon all the terms *hereof applicable to a month to month tenancy*." (Emphasis added.) Contrary to plaintiff's apparent understanding, this provision does not say that all terms *in the lease* necessarily continue to apply to a month-to-month tenancy. The sole provision explaining the terms of such a month-to-month tenancy is contained in ¶ 20, which is limited to outlining the rent and charges that the tenant is to pay in exchange for its continued holdover possession once written consent is obtained from the landlord. There similarly is nothing in the right-of-first-refusal provision to indicate that it applies to a month-to-month holdover tenancy. Paragraph 20 is therefore inapplicable, and plaintiff's reliance on this provision to show that the right-of-first-refusal provision necessarily remained in effect after the expiration of the lease term is unavailing.

Nevertheless, "[a]s a general rule, when a tenant comes rightfully into possession of land by permission of the owner and continues to occupy the same after the time for which, by such permission, he had the right to hold the same, he becomes a tenant by sufferance." *Felt v Methodist Ed Advance*, 251 Mich 512, 517; 232 NW 178 (1930). More specifically, a person who holds over without right after lawfully possessing the land "becomes a tenant at sufferance, if the owner suffers him to remain in possession a sufficient length of time to imply an intentional acquiescence in the occupancy . . . ." *Sch Dist No 11 of Alpine Twp v Batsche*, 106 Mich 330, 334; 64 NW 196 (1895). "An express consent to occupancy is not necessary to create such a tenancy." *Id.* Moreover, the "tenancy is of such a nature as necessarily implies an absence of *any* agreement between the owner and the tenant, and if express assent is given by the owner to such possession the tenancy is thereby, *instanter*, converted into a tenancy at will, or from year to year, according to the circumstances." *Id.* (quotation marks and citation omitted).

-7-

Applying these principles to the case before us, the issue becomes whether the right of first refusal contained in ¶ k of the addendum was a term of the lease that somehow became automatically applicable to the holdover period despite the fact that a formal agreement between plaintiff and Pinebrook Plaza was no longer in effect.  "A right of first refusal, or preemptive right, is a conditional option to purchase dependent on the landowner's desire to sell."  *Randolph v Reisig*, 272 Mich App 331, 336; 727 NW2d 388 (2006).  This Court has previously explained the nature of a right-of-first-refusal agreement:

> An option contract does not create an interest in land.  A right of first refusal gives the promisee fewer rights than an option contract.  The promisee in an option contract holds the power to purchase the property at will for the specified price during the specified period.  But the option contract does not create an interest in land.  Conversely, the promisee in a right of first refusal agreement cannot exercise any right to purchase property unless the seller decides to sell to a different buyer.  Because the right of first refusal gives the holder fewer rights than an option, we conclude that if the latter does not create an interest in land, neither does the former.  Indeed, Michigan courts have generally treated similar agreements containing first-refusal rights as contracts, not property interests . . . .  [*Id.* at 338-339 (citation omitted).]

Regarding the right-of-first-refusal provision in the lease at issue in this case, it is true that generally, "when a tenant under a valid lease for years holds over, the law implies a contract on his part to renew the tenancy on the same terms for another year; but the landlord may treat him as a trespasser, or as a tenant holding upon the terms of the original lease."  *Glocksine v Malleck*, 372 Mich 115, 119; 125 NW2d 298 (1963) (quotation marks and citation omitted).  Despite the seemingly broad sweep of this general rule, our Supreme Court has explained that it is not the case that all lease terms automatically carry over and apply to a holdover tenancy:

> A presumption arises from the holding over by the tenant and acceptance of rent by the landlord, in a case of a lease for a term of years, that the parties intend to renew the tenancy for a period of 1 year.  There is no implication that the lease itself as a binding contract is to be continued in force.  Its provisions may be inquired into to determine the terms under which the tenant holds and the nature of his tenancy.  In an action to recover the rent, the liability would not be predicated upon the agreement of the tenant to pay as embodied in the lease, but upon the implied contract to pay according to the terms of the lease.

> . . . Thus the law in this State is not that the terms on which a holdover tenant holds are necessarily the same as those of the lease, but rather that the terms of the original tenancy may be inquired into to determine the terms of the holdover tenancy.  The most obvious illustration of the fact that all terms of the lease are not necessarily applicable to the holdover tenancy is that, although the lease may provide for a term of several years, each holdover tenancy is for only one year. . . .

> Our Court in its opinions has distinguished between the nature and terms of a renewal tenancy and those of a holdover tenancy.  When a lease contains an

option to purchase during its term and an option to renew the lease on the same terms, a renewal of the lease carries with it the right to exercise the purchase option during the renewed term. However, an option to purchase which expires at the end of a lease term, or at the end of a renewal thereof, cannot be exercised during the holdover tenancy. [*Id*. at 120-121 (quotation marks and citations omitted).]

In *Glocksine*, our Supreme Court held that "an option to purchase during the term of a lease is not one of the provisions of the lease which will automatically accompany a holdover tenancy," emphasizing that the nature and terms of a tenancy created by a tenant holding over are implied by law. *Id*. at 123-125. The *Glocksine* Court reasoned, as especially pertinent to the instant case, that an option provision was not essential to regulating the parties' landlord-tenant relationship, that the parties could have included an express lease provision allowing for the option provision to continue beyond the term of the lease, and that the legal rights of a holdover tenant should not by enlarged by implication beyond the terms necessary to maintain the landlord-tenant relationship. *Id*. at 122-123.

Moreover, "first refusal agreements, like option agreements, must be for a definite period of time. The absence of specific time limits will not render the agreement void. Rather, the courts will construe the agreement to be for a reasonable period of time." *Brauer v Hobbs*, 151 Mich App 769, 777; 391 NW2d 482 (1986); see also *Randolph*, 272 Mich App at 336-337 (citing *Brauer* for these propositions).

In this case, neither the lease nor the addendum specifically provides that the right of first refusal extends to any holdover period, and most importantly, neither the lease nor the addendum provides that this provision applies to a tenancy at sufferance. The right of first refusal must be limited in duration to a reasonable time, *Brauer*, 151 Mich App at 777, and contractual language granting a right of first refusal is construed narrowly, *LaRose Market, Inc v Sylvan Center, Inc*, 209 Mich App 201, 205; 530 NW2d 505 (1995). The right of first refusal here is reasonably understood as limited to the duration of the lease given that the right was granted in the context of a lease, the lease contained a specific provision for effecting a renewal of the entire lease,[3] the lease contained a separate provision that addressed a tenant's holdover without indicating that the right of first refusal applied to the holdover period, and there is no language in the lease or the addendum suggesting that the right of first refusal extended beyond the expiration of the lease.

Plaintiff has failed to establish that the right of first refusal contained in ¶ k of the lease addendum was a term that was applicable to a tenancy at sufferance or a holdover tenant under ¶ 20 of the lease such that the right of first refusal remained in effect during the holdover period.[4]

---

[3] Notably, and as previously discussed, plaintiff failed to properly avail itself of this option.

[4] We note that even if plaintiff were considered a holdover tenant under ¶ 20 of the lease, our conclusion would be the same. There is no language in the lease or addendum expressly stating that the right of first refusal constitutes a term applicable to a month-to-month tenancy. In discerning the meaning or import of an undefined legal phrase or term of art contained in a

Considering that a right of first refusal provides a promisee with even fewer rights than a purchase option, *Randolph*, 272 Mich App at 338-339, we conclude that a right of first refusal is clearly not essential to the parties' landlord-tenant relationship and is not a lease provision that automatically carries over to a tenancy at sufferance created by operation of law, see *Glocksine*, 372 Mich at 122-125. Plaintiff accordingly did not retain the right of first refusal after the lease expired on February 28, 2015, and did not have that right when the property was sold to Mikhail Plaza.

For all of the reasons stated above, the trial court did not err by granting summary disposition in favor of Mikhail Plaza.[5]

Affirmed. Mikhail Plaza, having prevailed, may tax costs. MCR 7.219(A).

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause

---

contract, a court may consider "common law understandings and case law explanations that those familiar with such terms of art are held to understand." *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 357-358, 357 & n 9; 596 NW2d 190 (1999).

[5] To the extent our reasoning differs from that of the trial court, we still affirm a trial court's ruling on a motion for summary disposition that reached the correct result. *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 449; 886 NW2d 445 (2015).

-10-