# Exhibit: A

PAD LEASE

between

FRINGE AREA (II) S.E.
("Landlord")

and

KMART CORPORATION
("Tenant")

# TABLE OF CONTENTS

Page

ARTICLE I

DEMISED PREMISES; COMMON AREAS; OTHER DEFINITIONS . . . 1
Section 1.1   Demised Premises. . . . . . . . . . . . . 1
Section 1.2   Common Areas . . . . . . . . . . . . . . 2
Section 1.3   Other Definitions . . . . . . . . . . . . 2

ARTICLE II

DRAWINGS, APPROVALS; CONSTRUCTION . . . . . . . . . . 4
Section 2.1   Landlord's Drawings. . . . . . . . . . . 4
Section 2.2   Tenant's Drawings. . . . . . . . . . . . 6
Section 2.3   Permits and Approvals. . . . . . . . . . 8
Section 2.4   Construction by Landlord. . . . . . . . 8
Section 2.5   Construction by Tenant . . . . . . . . . 9
Section 2.6   Opening. . . . . . . . . . . . . . . . . 12

ARTICLE III

LEASE TERM . . . . . . . . . . . . . . . . . . . . . 12
Section 3.1   Term . . . . . . . . . . . . . . . . . . 12
Section 3.2   Early Termination. . . . . . . . . . . . 13
Section 3.3   Surrender of Demised Premises to
              Landlord. . . . . . . . . . . . . . . . . 14

ARTICLE IV

RENT . . . . . . . . . . . . . . . . . . . . . . . . 14
Section 4.1   Fixed Annual Rent; Additional Rent; Rent. . 14
Section 4.2   Percentage Rent. . . . . . . . . . . . . 15
Section 4.3   Late Charges . . . . . . . . . . . . . . 19
Section 4.4   Rent is Net. . . . . . . . . . . . . . . 19

ARTICLE V

TAXES . . . . . . . . . . . . . . . . . . . . . . . 20
Section 5.1   Real Estate Taxes. . . . . . . . . . . . 20
Section 5.2   Payment of Impositions . . . . . . . . . 22

ARTICLE VI

COMMON AREAS . . . . . . . . . . . . . . . . . . . . 23
Section 6.1   Use of Common Areas. . . . . . . . . . . 23
Section 6.2   Management and Operation of Common Areas. . 23
Section 6.3   Tenant to Share Expense of Common Areas. . 24
Section 6.4   Landlord's Operating Costs Defined. . . . 24

Page

ARTICLE VII

  UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . 25
  Section 7.1  Utilities. . . . . . . . . . . . . . . . . . 25

ARTICLE VIII

  OPERATION, USE, AND ASSIGNMENT . . . . . . . . . . . . . 26
  Section 8.1  Use. . . . . . . . . . . . . . . . . . . . . 26
  Section 8.2  Continuous Operation . . . . . . . . . . . . 26
  Section 8.3  Trade Name. . . . . . . . . . . . . . . . . 27
  Section 8.4  Intentionally Deleted. . . . . . . . . . . . 27
  Section 8.5  Use Restrictions. . . . . . . . . . . . . . 27
  Section 8.6  Assignment and Subletting. . . . . . . . . . 27
  Section 8.7  Right of Recapture. . . . . . . . . . . . . 30
  Section 8.8  Acceptance of Rent from Transferee. . . . . 31
  Section 8.9  Tenant's Signs . . . . . . . . . . . . . . . 31

ARTICLE IX

  MAINTENANCE; ALTERATIONS; FIXTURES . . . . . . . . . . . 31
  Section 9.1  Maintenance. . . . . . . . . . . . . . . . . 31
  Section 9.2  Alterations. . . . . . . . . . . . . . . . . 32
  Section 9.3  Tenant's Store, Improvements and Trade
               Fixtures. . . . . . . . . . . . . . . . . . 32
  Section 9.4  Labor and Similar Liens. . . . . . . . . . . 33
  Section 9.5  Compliance with Laws. . . . . . . . . . . . 33
  Section 9.6  Compliance with Insurance Requirements. . . 34
  Section 9.7  Intentionally Deleted. . . . . . . . . . . . 34
  Section 9.8  Compliance with Environmental Laws. . . . . 34
  Section 9.9  Inspection of Demised Premises by
               Landlord. . . . . . . . . . . . . . . . . . 35

ARTICLE X

  SUBROGATION AND INSURANCE . . . . . . . . . . . . . . . . 35
  Section 10.1  Waiver of Subrogation. . . . . . . . . . . 35
  Section 10.2  Tenant's Insurance. . . . . . . . . . . . . 36
  Section 10.3  Certificates of Insurance. . . . . . . . . 38
  Section 10.4  Compliance with Requirements. . . . . . . . 38
  Section 10.5  Landlord's Insurance. . . . . . . . . . . . 38
  Section 10.6  Tenant's Insurance Charge. . . . . . . . . 40
  Section 10.7  Tenant's Obligation to Pay Any Increase
                in Insurance Premiums. . . . . . . . . . . 40
  Section 10.8  Tenant's Hold Harmless. . . . . . . . . . . 40
  Section 10.9  Landlord Liability Limitation. . . . . . . 41

Page

ARTICLE XI

    DAMAGE OR DESTRUCTION . . . . . . . . . . . . . . . . . 42
    Section 11.1  Damage by Casualty. . . . . . . . . . . 42
    Section 11.2  No Abatement of Rent. . . . . . . . . . 42

ARTICLE XII

    EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . 42
    Section 12.1  Total Taking . . . . . . . . . . . . . 42
    Section 12.2  Partial Taking. . . . . . . . . . . . . 43
    Section 12.3  Dealings with Taking Authority. . . . . 44
    Section 12.4  Termination. . . . . . . . . . . . . . 44

ARTICLE XIII

    PROMOTIONAL FUND . . . . . . . . . . . . . . . . . . . 45
    Section 13.1  Promotional Fund . . . . . . . . . . . 45
    Section 13.2  Tenant's Contribution to Grand Opening
        and Expansion Opening. . . . . . . . . . . . . 45

ARTICLE XIV

    QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . 45
    Section 14.1  Covenants and Warranties. . . . . . . . 45

ARTICLE XV

    BANKRUPTCY . . . . . . . . . . . . . . . . . . . . . . 46
    Section 15.1  Conditions to the Assumption and
        Assignment of the Lease under Chapter 7 of the
        Bankruptcy Act. . . . . . . . . . . . . . . . . 46
    Section 15.2  Conditions to the Assumption of the Lease
        in Bankruptcy Proceedings. . . . . . . . . . . 46
    Section 15.3  Intentionally Deleted . . . . . . . . . 48
    Section 15.4  Conditions to the Assignment of the Lease
        in Bankruptcy Proceedings. . . . . . . . . . . 48
    Section 15.5  Use and Occupancy Charge. . . . . . . . 49
    Section 15.6  Tenant's Interest Not Transferable by
        Virtue of State Insolvency Law Without Landlord's
        Consent. . . . . . . . . . . . . . . . . . . . 49
    Section 15.7  Landlord's Option to Terminate Upon
        Insolvency of Tenant Under State Insolvency Law. . 49
    Section 15.8  Regulated Tenants. . . . . . . . . . . 50

ARTICLE XVI

    DEFAULT . . . . . . . . . . . . . . . . . . . . . . . 50

Page

Section 16.1   Events of Default. . . . . . . . . . . . 50
Section 16.2   Rights and Remedies of Landlord. . . . . . 51
Section 16.3   Right to Re-Enter. . . . . . . . . . . . . 52
Section 16.4   Right to Relet. . . . . . . . . . . . . . 52
Section 16.5   Tenant to Remain Liable. . . . . . . . . . 53
Section 16.6   Current Damages. . . . . . . . . . . . . . 53
Section 16.7   Final Damages. . . . . . . . . . . . . . . 54
Section 16.8   Failure to Operate the Demised Premises
               Continuously. . . . . . . . . . . . . . . 55
Section 16.9   Removal of Personal Property. . . . . . . 55
Section 16.10  Rights Cumulative Non-Waiver. . . . . . . 55
Section 16.11  Attorneys' Fees. . . . . . . . . . . . . . 56
Section 16.12  Calculation of Percentage Rent. . . . . . 56

ARTICLE XVII

TRANSFERS BY LANDLORD . . . . . . . . . . . . . . . . . 57
Section 17.1   Transfers of Landlord's Interest. . . . . 57

ARTICLE XVIII

CONCERNING MORTGAGE OF THE LEASEHOLD . . . . . . . . . . 57
Section 18.1   No Right to Mortgage. . . . . . . . . . . 57

ARTICLE XIX

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . 57
Section 19.1   Holding Over . . . . . . . . . . . . . . . 57
Section 19.2   Non-Waiver of Default. . . . . . . . . . . 58
Section 19.3   Recording. . . . . . . . . . . . . . . . . 58
Section 19.4   Notice . . . . . . . . . . . . . . . . . . 58
Section 19.5   Successors and Assigns. . . . . . . . . . 59
Section 19.6   Time is of the Essence. . . . . . . . . . 59
Section 19.7   Partial Invalidity. . . . . . . . . . . . 59
Section 19.8   Interpretation. . . . . . . . . . . . . . 59
Section 19.9   Headings, Captions and References. . . . . 59
Section 19.10  Brokerage Commissions. . . . . . . . . . . 60
Section 19.11  Time. . . . . . . . . . . . . . . . . . . 60
Section 19.12  Estoppel Certificate. . . . . . . . . . . 60
Section 19.13  Governing Law. . . . . . . . . . . . . . . 60
Section 19.14  Force Majeure. . . . . . . . . . . . . . . 60
Section 19.15  Lease. . . . . . . . . . . . . . . . . . . 61
Section 19.16  Default Rate. . . . . . . . . . . . . . . 61
Section 19.17  No Joint Venture. . . . . . . . . . . . . 61
Section 19.18  Third Party Beneficiary. . . . . . . . . . 61
Section 19.19  Financial Information. . . . . . . . . . . 61
Section 19.20  Integration. . . . . . . . . . . . . . . . 61
Section 19.21  Priority of Lease and Mortgages . . . . . 61

Page

Section 19.22   Liability of Holder of Mortgage:
Attornment  . . . . . . . . . . . . . . . .   62
Section 19.23   No Oral Modifications.  . . . . . . . . .   63
Section 19.24   Waiver of Jury Trial. . . . . . . . . . .   63
Section 19.25   Recycle Program.  . . . . . . . . . . .   63
Section 19.26   Assignment by Landlord. . . . . . . . .   63

ARTICLE XX

RIGHTS RESERVED TO LANDLORD . . . . . . . . . . . . . .   63
Section 20.1   Rights Reserved to Landlord. . . . . . .   63

ARTICLE XXI

MORTGAGEE PROTECTION . . . . . . . . . . . . . . . . .   66
Section 21.1   Mortgagee Protection.  . . . . . . . . .   66

LIST OF EXHIBITS

Exhibit A -    Legal Description of the Land
Exhibit B -    Site Plan
Exhibit C -    Work and Work Schedule
Exhibit D -    Permitted Exceptions
Exhibit E -    Rules and Regulations and Construction Rules and
               Regulations
Exhibit F -    Tenant's Architectural Drawings

**THIS PAD LEASE** (herein this **"Lease"**) is made and entered into this __26th__ day of __August__ , 1997 by and between FRINGE AREA (II) S.E., a Puerto Rican entity, having an address at c/o Plaza Las Americas, Inc., P. O. Box 363268, San Juan, Puerto Rico 00936-3268 (**"Landlord"**) and KMART CORPORATION, a Michigan corporation, with its home office located at 3100 West Big Beaver Road, Troy, Michigan 48084-3163 (**"Kmart"**) (hereinafter called **"Tenant"**).

### RECITALS
### AND
### INTRODUCTORY PROVISIONS:

A.   **Landlord** is the owner of a certain parcel of land (hereinafter called the **"Land"**) at Hato Rey, Puerto Rico located South of the Diego Expressway consisting of approximately 13.6373 cuerdas described in Exhibit A attached hereto and shown on the Site Plan attached as Exhibit B hereto (the **"Site Plan"**).

B.   **Landlord** and **Tenant** desire to enter into a lease agreement to permit **Tenant** to develop a portion of the **Land** for a Kmart discount department store as hereinafter described.

C.   It is **Landlord's** intention to develop the **Land** as a retail center (**"Retail Center"**) consisting of the **"Tenant's Store"** (as hereinafter defined), other retail buildings and **"Common Areas"** (as hereinafter defined).

NOW, THEREFORE, for and in consideration of the covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **Landlord** hereby leases to **Tenant** and **Tenant** leases from **Landlord** the hereinafter defined **"Demised Premises."**

### ARTICLE I

#### DEMISED PREMISES; COMMON AREAS;
#### OTHER DEFINITIONS

Section 1.1   Demised Premises.   The term **"Demised Premises"** means that portion of the **Land** identified as the **Demised Premises** on Exhibit B consisting of the area up to and including the exterior curbs of the perimeter sidewalks and other sidewalks and the buildings and improvements including the truck loading dock and electric transformer to be constructed by **Tenant** thereon.   **Tenant** shall construct a two-story retail store consisting of approximately 137,000 square feet of gross building



area ("**Tenant's Store**") as hereinafter described on the **Demised Premises** and such other improvements as hereinafter set forth and which upon construction shall be included within the definition of **Demised Premises**.

Section 1.2    Common Areas.    Throughout the term of this **Lease**, **Tenant**, its agents, employees, customers, contractors, subtenants, licensees and concessionaires shall have the non-exclusive right to enjoy the use of the public areas of the **Retail Center** including the sidewalks on the **Demised Premises** (the "**Common Areas**"), subject to **Landlord's** rights as set forth in Article II below, in common with **Landlord** and with the agents, employees, customers, contractors, tenants, subtenants and licensees of **Landlord** and the other stores in the **Retail Center**.

Section 1.3    Other Definitions.    The following defined terms shall have the meanings set forth in the specified Section of this **Lease**:

| DEFINED TERMS | WHERE DEFINED |
| --- | --- |
| Additional Rent | 4.1.1 |
| adequate assurance | 15.2(c) |
| adequate assurance of future performance | 15.4 |
| Architectural Drawings | 2.2.1(a) |
| Break Point | 4.2 |
| Commencement Date | 3.1.2 |
| Common Areas | 1.2 |
| Damaged Improvements | 11.1 |
| Default Rate | 19.16 |
| Demised Premises | 1.1 |
| Environmental Law | 9.8 |
| Fixed Annual Rent | 4.1 |
| Force Majeure Event | 19.14 |
| go dark | 8.7 |

| DEFINED TERMS | WHERE DEFINED |
|---|---|
| Gross Leasable Area | 4.1.1 |
| Gross Sales | 4.2.2(a) |
| Impositions | 5.1 |
| Kmart Protected Area | 2.1 |
| Land | Recital A |
| Landlord | Preamble |
| Landlord Approvals | 2.3 |
| Landlord's Operating Costs | 6.4 |
| Landlord's Work | 2.1(a) |
| Laws | 3.3 |
| Lease | Preamble |
| Lease Year | 3.1.1 |
| Mortgage | 19.22 |
| national securities exchange | 8.6(d) |
| Net Award | 12.1.2 |
| No Build Area | 2.1(b) |
| Operating Covenant Term | 8.2 |
| Outside Completion Date | 2.5(b) |
| Partial Lease Year | 3.1.1 |
| Partial Taking | 12.2 |
| Percentage Rent | 4.2 |
| Possession Date | 12.1 |
| Preliminary Plans | 2.2 |
| Promotional Fund | 13.1(a) |
| Pueblo Exclusive | 14.1 |
| Pueblo Lease | 14.1 |
| Rent | 4.1.2 |

| DEFINED TERMS | WHERE DEFINED |
|---|---|
| Retail Center | Recital B |
| SEC | 19.19 |
| Site Plan | Recital A |
| State Law | 15.7 |
| Tenant | Preamble |
| Tenant's Annual Statement of Gross Sales | 4.2.3(b) |
| Tenant's Insurance Charge | 10.6 |
| Tenant's Operating Covenant | 8.2 |
| Tenant's Permits | 2.3(b) |
| Tenant's Share | 4.1.1 |
| Tenant's Store | 1.1 |
| Tenant's Trade Name | 8.3 |
| Tenant's Work | 2.1(a) |
| Term | 3.1 |
| Total Taking | 12.1.1 |
| transfer | 8.6(a) |
| transferee | 8.6(a)(i) |
| Working Plans | 2.2.3 |

## ARTICLE II

### DRAWINGS, APPROVALS; CONSTRUCTION

Section 2.1  Landlord's Drawings.

(a)  **Landlord's** architect has prepared and presented to **Tenant** preliminary plans showing the building pad on which the **Tenant's Store** is to be located and the **Common Areas** including the parking deck.  Exhibit C, Part 1 sets forth a description of Landlord's work (hereinafter "**Landlord's Work**") which description of **Landlord's Work** has been approved by Tenant.

It is expressly agreed that **Landlord's Work** shall be limited to the scope of construction delineated in Exhibit C, Part I as **Landlord's Work** so as to provide a **Retail Center**, and shall in no event include the performance, procurement or installation of those items of work, fixtures and equipment which are to be performed, procured or installed by **Tenant,** at **Tenant's** expense, and which are described as **"Tenant's Work"** in Exhibit C, Part II.

(b) It is agreed by the parties hereto that the reference herein to the **Site Plan** setting forth the general layout of the buildings, **Common Areas** and other improvements shall not be deemed to be a warranty, representation or agreement on the part of **Landlord** that the **Retail Center** has been laid out exactly as indicated on said Exhibit or that the **Retail Center** contains therein all of the buildings, driveways, walks, etc., as shown thereon. It is understood and agreed that **Landlord** may change the number, dimensions, height and locations of the buildings, the number, identity and type of stores and tenancies, the parking, other than the 2-story parking garage to be constructed by **Landlord** pursuant hereto, walks and other **Common Areas** as **Landlord** shall deem proper. Notwithstanding the foregoing, **Landlord** will not build any building or permanent structure within the **"No Build Area"** shown on the **Site Plan** nor make changes to the Common Area within the **"Kmart Protected Area"** (except for non-material changes such as relocation of landscaping and other amenities which may be made without **Tenant's** consent). "No Build Area" means the **No Build Area** shown on the **Site Plan**. "Kmart Protected Area" means the **Kmart Protected Area** shown on the **Site Plan**. For any changes in the **Common Areas** as so originally proposed in the **Site Plan** which are outside of the **Kmart Protected Area** and the **No Build Area** which would materially adversely affect **Tenant's** visibility, or materially affects ingress or egress from the **Tenant's Store** or the **Retail Center**, **Tenant** may withhold its consent. Notwithstanding the foregoing, **Landlord** may expand the parking deck into the **No Build Area** shown on the **Site Plan** provided **Tenant** shall have the right in its sole discretion to determine whether **Landlord** may expand the parking deck into the **No Build Area**. **Landlord** may relocate the entrance road into the **Retail Center** with **Tenant's** consent which will not be unreasonably withheld if ingress and egress to **Tenant's Store** is not materially adversely affected.

(c) **Landlord** shall maintain a parking ratio within the **Retail Center** of at least five cars per one thousand square feet of **Gross Leasable Area** (as hereinafter defined).

Section 2.2 **Tenant's** Drawings. **Tenant** will prepare and submit to **Landlord** for approval architectural, preliminary, working, and "as-built" drawings in connection with the construction of **Tenant's Store**, as follows:

2.2.1 **Tenant** has prepared the architectural drawings of **Tenant's Store** ("**Architectural Drawings**"), which are described on Exhibit F.

2.2.2 **Tenant** shall cause its architect to prepare preliminary plans and specifications, which shall be consistent developments of the **Architectural Drawings**, and on or before the date for submission of preliminary plans set forth in Exhibit C, Part III, **Tenant** shall submit such preliminary plans and specifications to **Landlord** for approval. The preliminary plans may be an incomplete (i.e., sixty percent (60%) complete) set of working drawings for **Tenant's Store**. **Landlord** shall indicate its approval or disapproval of said preliminary plans and specifications within fourteen (14) days of submission by **Tenant** and shall notify **Tenant** of the respects, if any, in which said preliminary plans and specifications fail to conform to the **Architectural Drawings** and any other requirements of this **Lease** and Exhibit C, Part II. **Tenant** shall promptly (and in any event within ten (10) days) revise and correct said preliminary plans and specifications to the satisfaction of **Landlord**. The preliminary plans and specifications as approved by **Landlord** shall be referred to herein as the "**Preliminary Plans**." Landlord's approval of Tenant's **Preliminary Plans** will be evidenced by endorsement to that effect on two (2) sets of the **Preliminary Plans** and specifications, one (1) set to be retained by **Landlord** and one (1) set by Tenant. A list of **Preliminary Plans** shall, when approved, be attached to Exhibit C, Part II.

2.2.3 **Tenant** shall deliver to **Landlord** two (2) sets of working plans and specifications prepared in conformity with the approved **Preliminary Plans** and initialed by **Tenant** by the date set forth for submission of working plans and specifications set forth in Exhibit C, Part III. **Landlord** shall notify **Tenant** within fifteen (15) days of receipt of the working plans and specifications of the respects, if any, in which said working plans and specifications fail to conform with the **Preliminary Plans** and with the applicable provisions of Exhibit C, Part II. **Tenant** shall promptly (and in any event by the date set forth for submission of revised working plans and specifications set forth in Exhibit C, Part III revise and correct said working plans and specifications to the satisfaction of **Landlord**. The working plans and specifications approved by **Landlord** shall be referred to as the "**Working Plans**." Landlord's

approval will be evidenced by endorsement to that effect on one
(1) set of the **Working Plans** and specifications and the return of
such signed set to Tenant. Upon receipt of the aforesaid, **Tenant**
shall return one (1) set of sepias of all approved drawings to
**Landlord.**

       2.2.4      **Landlord** may terminate this **Lease** in the
event of (a) failure by **Tenant** to obtain **Landlord's** approval of
the preliminary plans and specifications on or before the final
date for **Landlord's** approval of preliminary plans and
specifications set forth in Exhibit C, Part III due to **Tenant's**
failure to diligently prepare and revise plans to obtain such
approval; or (b) failure by **Tenant** to complete the working plans
and specifications on or before the final date for completion of
working plans and specifications set forth in Exhibit C, Part
III; provided, however, if **Tenant** is diligently working to
prepare such preliminary plans and specifications or working
plans and specifications, such dates shall be extended,
respectively, to the outside submittal dates set forth in Exhibit
C, Part III. In the event of any dispute between **Landlord** and
**Tenant** regarding compliance of the preliminary plans and
specifications or the **Working Plans** and specifications herewith,
**Tenant** may request a meeting with the **Landlord**, and the parties'
principals (i.e., Kmart's Director of Real Estate for Puerto Rico
(currently William J. Moreland) and Construction Team leader and
**Landlord's** representatives, and their architects and engineers)
shall meet in San Juan within forty-eight hours of such notice to
negotiate in good faith to resolve such dispute. The parties
must meet at least once pursuant hereto to attempt to resolve
disputes, prior to any termination hereof by **Landlord.** In the
event of such termination, **Landlord** and **Tenant** shall be fully
released from all liability or responsibility, one to the other,
under or arising out of this **Lease** except that **Tenant** shall
reimburse **Landlord** for the cost of **Landlord's** plans and
specifications for the **Common Areas** if **Tenant** intentionally or
wilfully fails to proceed to complete and submit such plans and
specifications.

       2.2.5      **Tenant** shall deliver to **Landlord** a copy
of the final as-built plans and specifications no later than
forty-five (45) days after the date of completion of construction
showing **Tenant's Store** and sidewalks, loading docks and other
appurtenances. Such as-built plans and specifications shall be
materially consistent with the **Working Plans** for such
construction. All plans, specifications and drawings required to
be submitted hereunder shall be delivered (i) in paper form and
(ii) on a diskette (or other approved storage medium) in a form
readable by Auto CAD 12.

Section 2.3  Permits and Approvals.  (a) **Landlord** shall
be responsible for obtaining such permits and approvals as are
necessary for the construction of the **Common Areas** to be
constructed by **Landlord** (including the parking deck) (the
"**Landlord Approvals**").  To the extent not currently obtained,
**Landlord** shall apply for and use its reasonable efforts to obtain
the **Landlord Approvals** by the date for obtaining Landlord's
Approvals set forth in Exhibit C, Part III and shall, upon
**Tenant's** request, keep **Tenant** informed regarding **Landlord's**
progress in obtaining same.  **Tenant** agrees to cooperate in good
faith with **Landlord's** application and to execute all documents
and do all things reasonably necessary to help obtain the
**Landlord Approvals**.

(b)  **Tenant** shall be responsible for obtaining,
and shall diligently and in good faith exercise its reasonable
efforts to obtain promptly and by the most expeditious means
available, all permits necessary for the performance of **Tenant's**
**Work** including the sidewalks in front of **Tenant's Store**
("**Tenant's Permits**"), and **Landlord** shall cooperate in good faith
with **Tenant** in obtaining the same and shall execute all documents
and do all things reasonably necessary to help **Tenant** obtain the
**Tenant's Permits** at no cost to **Landlord**.  **Tenant** shall provide
**Landlord**,  promptly upon its request, with accurate reports of
the progress of **Tenant's** efforts with respect thereto.  In the
event that **Tenant's Permits** have not been duly and validly issued
by the outside date for obtaining **Tenant's Permits** set forth in
Exhibit C, Part III and if failure to obtain **Tenant's Permits**
prevents **Tenant** from proceeding with the construction of **Tenant's**
**Store**, **Landlord**,  upon sixty (60) days' written notice to **Tenant**,
may cancel this **Lease** provided if **Tenant** shall obtain such
permits within such 60 day period, then by notice to **Landlord**,
**Tenant** may reinstate this **Lease**.  In the event of such
termination, **Landlord** and **Tenant** shall be fully released and
discharged from all liability or responsibility one to the other
under or arising out of this **Lease**, except that **Tenant** shall
reimburse **Landlord** for the cost of **Landlord's** plans and
specifications for the Common Area if **Tenant** intentionally or
willfully fails to proceed in good faith to obtain **Tenant's**
**Permits**.

Section 2.4  Construction by Landlord.  (a) **Landlord**
will provide, at **Landlord's** sole expense, a dirt building pad
(but only to the specifications required in Exhibit C, Part I) on
which the **Tenant's Store** is to be located and **Landlord** will bring
each utility to a point described on **Working Plans** (each point to
within five feet (5') of the **Demised Premises**) provided **Landlord**
shall have the right to relocate the points of connection

provided such relocation is carried out at **Landlord's** cost
without any disruption to **Tenant's** business if **Tenant** has opened
its store and does not significantly increase **Tenant's** cost of
construction if **Tenant** is still constructing its store. **Tenant**
will pay for all connections and connection fees for utilities
for **Tenant's Store**.

     **Landlord** will construct a parking deck (as shown
generally on the **Site Plan**), and the **Common Areas** (other than the
sidewalks in front of **Tenant's Store**), in accordance with the
description of **Landlord's Work**. **Landlord** has already commenced
construction of the **Landlord's Work** and shall diligently proceed
with **Landlord's Work**. If **Landlord** should fail to diligently
proceed with construction of the **Common Areas** within the **Kmart
Protected Area** and the **No Build Area** as shown on the **Site Plan**,
**Tenant** shall have the right and privilege to suspend its
construction until **Landlord** recommences construction, or if
**Landlord's** discontinuance of construction (unless prevented by
reason of a Force Majeure Event as defined in Section 19.14
hereof) shall continue for more than one hundred eighty (180)
days, **Tenant** may terminate this **Lease** on sixty (60) days' written
notice if **Landlord** does not recommence the **Landlord's Work** within
such sixty (60) day period. If **Landlord** shall willfully and
intentionally fail to diligently proceed with construction of
**Landlord's Work** for reasons other than a Force Majeure Event,
**Tenant** shall have the right to seek specific performance.

     (b) **Landlord** will turn over the building pad to **Tenant**
on the tenth (10th) day after full execution and delivery of this
**Lease**.

     (c) In the event of termination as provided in 2.3(b)
or 2.4(a), **Landlord** and **Tenant** shall be fully released from all
liability or responsibility, one to the other, arising out of
this **Lease** unless otherwise specifically provided in this **Lease**.

     Section 2.5 Construction by Tenant: (a) **Tenant** shall
cause to be constructed, at its sole cost and expense, upon the
**Demised Premises** a building erected on a pile foundation system
(it shall be **Tenant's** obligation to provide its own pilings)
consisting of a two-story Kmart retail store of approximately one
hundred thirty-seven thousand (137,000) square feet in gross
building area and the sidewalks, loading docks and other
appurtenances to be constructed adjacent thereto. **Tenant's**
building and other improvements shall meet all applicable codes
and shall include required rated separation fire walls on each
side of **Tenant's** building and shall include an interior vestibule
adjacent to the first floor entrance to the parking deck and a

continuous canopy across the front of **Tenant's** building.   **Tenant**
shall commence construction promptly, and in any event no later
than the outside date for commencement of construction of
**Tenant's** building as set forth on Exhibit C, Part III (the
"**Tenant Commencement Construction Date**") which shall be the date
on which **Tenant** actually commences construction.

       All of **Tenant's Work** shall be performed in a
workmanlike manner and in accordance with the **Working Plans**.
**Tenant's Work** shall be performed in compliance with rules and
regulations established by **Landlord** or **Landlord's** designated
representative, and with all legal requirements and insurance
requirements established by either the laws and regulations of
the Commonwealth of Puerto Rico, its instrumentalities and
agencies, or by this **Lease**.   **Landlord** and **Tenant** agree that they
shall work together and direct their general contractors to work
together to complete the construction of the **Retail Center** in a
timely and cost effective manner.   **Landlord** and **Tenant's**
construction representatives and general contractors shall meet
on a regular basis (no less often than bi-weekly) to discuss any
coordination issues regarding the development of the **Retail
Center** and the construction of **Tenant's Store**.   In the event of
any dispute which **Landlord** and **Tenant's** representatives cannot
resolve, upon notice by either party, **Landlord** and **Tenant's**
principals shall meet in San Juan, Puerto Rico, to negotiate in
good faith to resolve such dispute.

       (b)   <u>Completion of Construction</u>.   (a) **Tenant** shall
diligently proceed to complete all of **Tenant's Work** on or before
the targeted completion date for **Tenant's Work** set forth in
Exhibit C, Part III (as such period may be extended because of
delays referred to in Section 19.14), but must complete **Tenant's
Work** by the outside completion date for **Tenant's Work** as set
forth in Exhibit C, Part III ("**Outside Completion Date**").

       (c)   In the event that **Tenant**,   after commencement
of the construction work described in <u>sub-section (a)</u> of this
Section, shall not thereafter diligently <u>proceed with</u> such
construction work or complete such construction by the **Outside
Completion Date**, then **Landlord** shall have the right, at its sole
option, to terminate this **Lease** upon sixty (60) days' prior
written notice to **Tenant**.   In the event of such termination,
**Landlord** and **Tenant** shall be fully released and discharged from
all liability or responsibility, one to the other under or
arising out of this **Lease** except that if **Tenant** intentionally or
willfully fails to proceed with such construction work or
complete such construction by the **Outside Completion Date** as set
forth in Exhibit C, Part III, **Tenant** shall reimburse **Landlord** for

(i) the cost of **Landlord's** plans and specifications for the
**Common Areas**; (ii) the cost of any of **Landlord's** improvements
which were performed for the benefit of **Tenant** and cannot
reasonably be utilized for the benefit of a replacement **Tenant**,
(iii) Landlord's internal cost of carry on the cost of **Landlord's**
**Work** which can be used for a replacement **Tenant** at a rate of
seven percent (7%) per annum until a replacement **Tenant** is in
possession and open for business; (iv) and if **Landlord** elects to
demolish and remove the same, **Tenant** shall pay the cost of
demolition and removal of all of **Tenant's** improvements.
Notwithstanding the foregoing, if **Tenant's** delay is caused by
reason of a Force Majeure Event as defined in Section 19.14 or by
**Landlord's** failure to substantially complete the **Landlord's Work**
under Section 2.4 above then **Tenant's** duty to construct shall be
postponed until such event or condition has been repaired.

(d)  Before commencing any construction work
pursuant to this Section, **Tenant** shall at its sole cost and
expense obtain and keep in force, general liability, "builder's
risk", workman's compensation, casualty and property damage
insurance policies against any and all liability occasioned by
accident or disaster arising out of or in the course of such
construction, in the respective amounts of coverage specified
below and in Article X.  **Tenant** shall also cause its contractors
and subcontractors to maintain appropriate workman's compensation
policies.  The aforementioned builder's risk insurance shall
utilize a completed value form insuring against so-called "all
risks" of physical loss (not including loss resulting from
earthquake) for a limit of not less than the anticipated total
cost of construction including all related expenses.  Except for
the workman's compensation policies and **Tenant's** builder's risk
policy which shall be in favor of **Tenant** only, all of the
aforementioned policies shall specifically name **Landlord** as
additional insured, as its interest may appear.  All policies in
favor of **Landlord** shall specify that **Landlord** will be given at
least thirty (30) days prior written notice in the event that the
insurance is canceled or the limit reduced for any reason, and
**Tenant** shall cause to be delivered to **Landlord** a certificate of
**Tenant's** insurer so stating.  **Tenant** shall, before commencing
**Tenant's Work**, deposit with **Landlord** policies or certificates of
insurance evidencing compliance with the provisions of this
Section and Article X.

(e)  **Landlord** hereby expressly consents to the
construction work which **Tenant** shall cause to be performed on the
**Demised Premises** with the understanding and agreement that at the
end of the **Term** the **Tenant's Store** and all other improvements
will be the property of **Landlord**, free and clear of liens and

other encumbrances without any consideration or compensation to Tenant.

Section 2.6 Opening. **Tenant** shall open the **Demised Premises** for its business no later than the earlier to occur of (i) one hundred twenty (120) days after substantial completion of the **Tenant's Work** referred to in Section 2.3 hereof or (ii) within ninety (90) days after the **Outside Completion Date** provided **Tenant** shall not be required to open between November 15 and January 15 of any year. **Tenant** will use prudent efforts to open the **Demised Premises** for its business by November 15, 1998.

## ARTICLE III

### LEASE TERM

Section 3.1 Term. (a) This **Lease** shall take effect as of the date hereof. The term (herein sometimes referred to as the "**Term**") shall include any "**Partial Lease Year**," (as hereinafter defined) if any and continue until the end of the last day of the fortieth (40th) full "**Lease Year**" (as hereinafter defined), subject to the provisions of Section 3.2 relating to early termination thereof and Article XVI relating to **Lease** termination rights.

(b) **Tenant** shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend the **Term** of this **Lease** for such period of time as shall cause the last day of the **Term** of this **Lease** to be the January 31 next succeeding the date upon which the term of this **Lease** would expire but for the exercise of this option. This option shall be exercised by notice to **Landlord** not less than six (6) months prior to the expiration of the **Term** of this **Lease**. **Tenant's** rental during this option period shall be the same rental payable under the terms of this **Lease** at the time **Tenant** notifies **Landlord** of its intention to exercise this option.

3.1.1 The term "**Lease Year**" shall mean each 365 day period (or 366 day period in the event of a leap year) commencing on the July 1 immediately following the **Commencement Date** and ending 364 (or 365 days in the event of a leap year) days thereafter. If the **Commencement Date** occurs other than on July 1, the period from the opening date to the next following June 30 and the period from June 30 until the next succeeding January 31 at the end of **Term** shall be defined to mean a "**Partial Lease Year**." Fixed Annual Rent as provided for in Section 4.1 shall be apportioned on a daily basis for any **Partial Lease Year**

and shall for the **Partial Lease Year** at the beginning of the **Term**
be payable with the first monthly payment of Fixed Annual Rent.

3.1.2  The term "**Commencement Date**" means the date
which is the earlier to occur of (i) the date on which **Tenant**
opens for business on the **Demised Premises** or (ii) the last of
the dates as provided in subsections (i) and (ii) of Section 2.6
above, provided the **Commencement Date** shall not occur earlier
than seventy-five (75) days after the date on which the **Common
Areas** to be constructed by **Landlord** are usable by **Tenant** and its
customers.

Section 3.2   Early Termination.

(a)   Tenant's Termination Options.   **Tenant** shall have
four options to, without cause, terminate this **Lease** as of,
respectively, the end of twentieth (20th), twenty-fifth (25th),
thirtieth (30th) and thirty-fifth (35th) **Lease Year**.   **Tenant** may
exercise such options to terminate in each case by giving notice
in the manner prescribed in this **Lease** not less than three
hundred and sixty-five (365) days before the expiration of the
**Lease Year** in question stating that **Tenant** has determined to
terminate this **Lease**.

(b)   Landlord's Termination Options.   **Landlord** shall
have four options to, without cause, terminate this **Lease** as of,
respectively, the end of the twentieth (20th), twenty-fifth
(25th), thirtieth (30th) and thirty-fifth (35th) **Lease Year** if
(i) the original **Tenant** (i.e., Kmart Corporation) has assigned
this **Lease** except pursuant to Section 8.6(b) below or (ii) if the
original **Tenant** has subleased, licensed, or concessioned more
than twenty percent (20%) of the **Demised Premises** or (iii) if
occupants other than the original **Tenant** is or are occupying more
than twenty percent (20%) of the **Demised Premises**.   Each said
termination option may be exercised by **Landlord** by delivery of
written notice to **Tenant** in the manner prescribed in this **Lease**
not less than three hundred and sixty five (365) days before the
expiration of the respective **Lease Year**, stating that **Landlord**
elects to exercise this termination option.

(c)   Failure to Deliver Notice to Terminate.   If
**Landlord** or **Tenant** is permitted to but fails to deliver the
election to terminate within the period above set forth in (a) or
(b), this **Lease** shall continue, unless otherwise terminated as
set forth herein.   If either **Landlord** or **Tenant** exercises its
termination option, **Tenant** must, without further notice, vacate
the **Demised Premises** on the effective date of termination.

Section 3.3  <u>Surrender of Demised Premises to Landlord</u>. On or before the last day of the **Term**, **Tenant** shall surrender and yield up to **Landlord** the **Demised Premises**, and all improvements, fixtures and personal property not removed and taken by **Tenant** in the same condition as of the **Commencement Date**, ordinary wear and tear and casualty excepted (provided **Landlord** shall be entitled to all proceeds of insurance and to a payment equal to the balance of the full replacement cost of the **Tenant's Store** to the extent not insured).  **Tenant** shall have the express right to remove its trade fixtures and personal property which are part of the **Demised Premises** provided that (i) **Tenant** shall remove the trade fixtures and personal property and restore the **Demised Premises** in accordance with all applicable laws (sometimes referred to as "**Laws**") and **Tenant** must remove debris and trash from the **Demised Premises**; (ii) the **Demised Premises** shall not be left in an unsafe condition; and (iii) **Tenant** shall, at **Landlord's** request, promptly remove all trade fixtures and signs with **Tenant's** name and repair any damage or injury caused by such removal.  Title to the **Tenant's Store** and all other improvements remaining on the **Demised Premises** at the expiration of the **Term** or at any other termination of this **Lease** shall be the property of **Landlord**, free and clear, without any consideration or compensation to Tenant.

## ARTICLE IV

### RENT

Section 4.1  <u>Fixed Annual Rent; Additional Rent; Rent</u>. **Tenant** covenants and agrees to pay **Landlord** at the above referenced address, or such other place as **Landlord** shall designate in writing, a fixed annual rent of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) (hereinafter the "**Fixed Annual Rent**".

Fixed Annual Rent shall be payable in advance, in equal monthly installments, on the first day of each and every calendar month during the **Term** from and after the **Commencement Date**, and shall be prorated for any partial month.

4.1.1  **Tenant** shall pay to **Landlord** as additional rent ("**Additional Rent**") **Tenant's Share** (as defined below) of "**Landlord's Operating Costs**" (as defined below), **Tenant's Share** of "**Impositions**" (as defined below) and "**Tenant's Insurance Charge**" (as defined below), each such item of **Additional Rent** to be paid within the time period set forth therefor in a notice from **Landlord**.  "**Tenant's Share**" shall mean a fraction the

numerator of which is the **Gross Leasable Area** (as defined below) of **Tenant's Store** and the denominator of which is the **Gross Leasable Area** (as defined below) of all the stores in the **Retail Center**. "Gross Leasable Area" means the total number of square feet on each level of the space measured, measured from the exterior walls of the building(s) whose area is being determined, excluding mezzanines used for storage purposes.

4.1.2   Fixed Annual Rent, **Additional Rent** and all other sums or charges for which **Tenant** may be responsible pursuant to this **Lease** (collectively referred to as "**Rent**"), shall be paid without any offset (unless specifically provided elsewhere in this **Lease**) or deduction of any kind or nature whatsoever.

Section 4.2   Percentage Rent.   In addition to paying Fixed Annual Rent, **Tenant** also shall pay as percentage rent ("**Percentage Rent**") for each **Lease Year** and prorated for any **Partial Lease Year**, the amount, if any, by which one and three quarters percent (1 3/4%) multiplied by the **Gross Sales** (as hereinafter defined) for such **Lease Year** or as prorated for any **Partial Lease Year**, exceeds one and three quarters percent (1 3/4%) multiplied by Eighty Million Dollars ($80,000,000.00) (hereinafter called "**Break Point**").

4.2.1   Payment of Percentage Rent.

(a)   **Tenant** shall pay, within ninety (90) days after the end of any Lease Year (or Partial Lease Year with the break point being prorated for such **Partial Lease Year**) in which the **Break Point** for the Lease Year is exceeded, a sum equal to the **Percentage Rent** due for such **Lease Year**. Following expiration of the **Lease**, **Tenant** shall pay any deficiency in **Percentage Rent** within fifteen (15) days after the end of the **Term**. Without limitation of other obligations of **Tenant** which shall survive the expiration of the **Term**, the obligation of **Tenant** to pay **Percentage Rent** during the **Term** shall survive the expiration or termination of this **Lease**.

4.2.2   Gross Sales; Recording of Transactions.

(a)   "Gross Sales" shall mean and include the dollar aggregate of the entire amount of receipts from the gross sales of **Tenant** and its subtenants, licensees and concessionaires (except as hereinafter specifically excluded) arising from or out of its business conducted upon or from the **Demised Premises**, whether such sales are evidenced by cash, check, credit, credit card charge, charge

account, stamps, coupons, exchange (including the value of all goods and services accepted in lieu of cash payment) or otherwise, including, without limitation, all amounts received from the sale of goods, wares, merchandise and gift certificates (provided that gift certificates purchased at the **Demised Premises** and already included in **Gross Sales** shall not be included in **Gross Sales** when they are redeemed by customers of Tenant) and all amounts received for services performed (i) where the orders therefor originate at the **Demised Premises**, whether delivery or performance is made from the **Demised Premises** or from some other place; (ii) which are made pursuant to mail, telephone, telegraph, computer or other similar orders received or filled at or from the **Demised Premises**; (iii) which are made by means of mechanical and other vending devices in the **Demised Premises**; (iv) as a result of transactions originating at the **Demised Premises**; (v) which **Tenant** in the normal and customary course of its business would credit or attribute to its operations at the **Demised Premises** or any part thereof; or (vi) made as a result of solicitation outside of the **Demised Premises** conducted by personnel operating from, or reporting to, or under the supervision of, any employee of **Tenant** located at the **Demised Premises**.  **Gross Sales** shall also include, in addition to the **Gross Sales** previously defined, without limitation, sales of consigned merchandise, the income derived by **Tenant** from sales of lottery tickets and bonuses, premiums and commissions generated therefrom, check cashing fees and charges, travelers checks fees, money orders and commissions, copy machine charges, and game machine receipts, cigarettes, pay toilets, "kiddie rides" and all licenses sold to the public. No franchise, capital stock, occupancy, or personal property tax and no income or similar tax based upon income or profits as such shall be deducted from **Gross Sales**.  Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale is made, regardless of the time when **Tenant** receives payment therefor.  There shall be no deduction for uncollected or uncollectible credit accounts, for bad debts or other losses, for cash shortages;

(b)  **Gross Sales** shall not include:

(1)  Returns or refunds, or credits received in settlement of claims for loss or damage to goods, wares, or merchandise;

(2)   The amount of any tax due to sales, use, service, gross receipts or other similar tax imposed by a tax authority; separately collected by **Tenant** and subsequently paid out to the corresponding governmental authority; provided, however, that the amount of any Commonwealth of Puerto Rico excise tax or similar tax paid at the point of origin on manufactured or imported goods shall not be excluded from **Gross Sales**;

(3)   Any receipts for or derived from the transfer of goods, wares or merchandise from the **Demised Premises** to any other store or warehouse in the chain of stores operated by **Tenant**;

(4)   Any receipts for or derived from the delivery of goods, wares or merchandise from the **Demised Premises** to any other store or warehouse in the chain of stores operated by **Tenant**;

(5)   All receipts from vending machines and locker rentals used solely for employees, weighing machines, stamp machines, telephones installed by **Tenant** on the **Demised Premises**, except for the rental or other consideration paid to **Tenant** or such portion thereof as may be retained by **Tenant**;

(6)   Documented sales to employees made at a discount not to exceed one-half of one percent (1/2 of 1%) of total sales;

(7)   Sales of cigarettes, pay toilets, "kiddie rides", money orders, and all licenses sold to the public provided the income derived by **Tenant** therefrom shall not be excluded from **Gross Sales**;

(8)   Sales discounts or noncash donations to nonprofit, charitable or religious organizations.

(c)   **Tenant** shall record or shall cause to be recorded at the time of sale, in the presence of the customer, all receipts from sales or other transactions, whether for cash or credit, in computers or cash registers and shall cause to be generated and retained cash register, computer or other electronic receipts of sales similar to the types of receipts generated by other stores in the Kmart chain.   Any electronic device to record sales, must, as an absolute minimum, be able to provide: (a) a daily listing of all transactions, entered into the device each and every day;

(b) each transaction shall be serially numbered, (c) a daily listing that correctly reflects some form of original sales slips; (d) a daily sales report that reconciles sales and other transactions to cash; and (e) a monthly sales summary that reconciles with the applicable daily sales reports. **Tenant** shall notify **Landlord** on or prior to the **Commencement Date** of the type(s) of cash register, computer or other device that it will use at the **Demised Premises**. **Tenant** may from time to time, but only after twenty (20) days prior written notice to **Landlord**, change such cash register, computer or other device or system in **Tenant's** discretion to the system which has been or is planned to be implemented in a substantial number of **Tenant's** other stores.

4.2.3  <u>Statements of Gross Sales</u>.

(a)  Within twenty (20) days after the end of each calendar quarter of the **Term**, and without notice to **Tenant**, **Tenant** shall deliver to **Landlord** a written statement (which may be a good faith estimate) ("**Tenant's Quarterly Statement of Gross Sales**") setting forth the amount of **Gross Sales** for the preceding calendar quarter.

(b)  On or before September 30 of each **Lease Year** and/or **Partial Lease Year**, and/or within ninety (90) days after the end of the **Term**, and without notice to **Tenant**, **Tenant** shall deliver to **Landlord** a written statement ("**Tenant's Annual Statement of Gross Sales**") certified to be correct by an officer of **Tenant**, which statement shall be prepared in accordance with generally accepted accounting principles, setting forth (i) the amount of **Gross Sales** for the preceding **Lease Year** or **Partial Lease Year**; (ii) the amount of deductions or exclusions from **Gross Sales** as provided in Section 4.2.2(b); and (iii) **Percentage Rent** payable by **Tenant** for such **Lease Year** or **Partial Lease Year**.

(c)  In the event **Tenant** fails to comply in a material manner with all of the requirements of Section 4.2, such failure, (unless as a result of an unintentional clerical error) shall be deemed a material default under this **Lease** entitling **Landlord** to all remedies in the event of a default.

4.2.4  <u>Books and Records</u>.  **Landlord** and its agents shall have the right to inspect, audit and verify Tenant's permanent books of account and records of **Gross Sales** relating to the **Demised Premises**, at the **Landlord's** option either at the **Demised Premises** or at **Tenant's** office in Troy, Michigan, at

reasonable times during ordinary business hours during the course of each **Lease Year** upon notice, but not more than twice in any such **Lease Year**. Any claim by **Landlord** for revision of any statement of **Gross Sales** which is not made to **Tenant** within three (3) years after the date when the final yearly statement of **Gross Sales** is delivered to **Landlord** shall be deemed and hereby is waived by **Landlord**. If any audit made by **Landlord** discloses that **Gross Sales** have been understated for any **Lease Year** or **Partial Lease Year**, then any additional **Percentage Rent** discovered to be owed to **Landlord** shall be due and payable within twenty (20) days of receipt of notice from **Landlord** with interest at the Default Interest Rate from the end of the applicable **Lease Year** or **Partial Lease Year** until the date paid. In addition, if the audit or examination discloses that the understatement is greater than two percent (2%) of **Gross Sales** for any **Lease Year** or **Partial Lease Year** the expenses of the audit shall be paid by **Tenant**, and otherwise, by **Landlord**. In addition **Tenant** shall pay promptly (i.e., within twenty (20)) days of notice by **Landlord** of any deficiency.

Section 4.3  Late Charges. **Tenant** agrees that in the event any monthly installment of **Rent** is not paid by the tenth (10th) of the month in which same is due, provided such event occurs more than twice in any **Lease Year**, then upon notice from **Landlord** to **Tenant**, additional rent equal to two percent (2%) of the unpaid portion of the **Rent** which is late ten (10) days or more shall be paid to **Landlord** by **Tenant** monthly, for each subsequent rental payment in such **Lease Year** made more than ten (10) days after the first of the month.

Section 4.4  Rent is Net. **Tenant** agrees that all charges in respect of the **Demised Premises** and the **Retail Center** are net and that **Tenant** is responsible to pay for all costs and expenses of every kind or nature whatsoever associated with the **Demised Premises** which shall be borne by **Tenant** in accordance with **Tenant's Share** except for debt service of **Landlord** and as otherwise specifically set forth herein. If **Tenant** disputes that a specific item of cost or expense should be borne by **Tenant** under the terms of this **Lease**, **Tenant** shall send written notice thereof to **Landlord** including the basis for **Tenant's** position within thirty (30) days after receipt of such item of cost or expense and the parties will meet within thirty (30) days in an attempt to resolve such dispute in accordance with generally accepted accounting principles.

ARTICLE V

TAXES

Section 5.1   Real Estate Taxes.   **Tenant** shall pay, at **Tenant's** sole cost and expense, when due (or if **Landlord** is required to escrow taxes with any lender, on a monthly basis) as **Additional Rent**, (a) all taxes including without limiting the foregoing, ad valorem and use and occupancy or similar taxes, levies, assessments of every kind and character, whether general, ordinary or extraordinary, special, foreseen or unforeseen, which may be taxed, assessed, levied or imposed upon or against the **Demised Premises**, including the portion of the **Land** within the **Demised Premises** and, buildings on and other improvements to the **Demised Premises**, and the leasehold estate created hereby, or which may arise out of **Tenant's** use and operation of the **Demised Premises**, or any special service district charges imposed on the **Demised Premises** (all such taxes, assessments, water and sewer rents or charges, charges for public utilities, excises, levies, license and permit fees, all taxes, if any, on rents or rental payments and other governmental charges are hereinafter collectively referred to as the **"Impositions"**) and (b) **Tenant's Share** (as defined in Section 4.1.1 above) of **Impositions** imposed against the **Common Areas** including the parking deck and the **Land** underlying the **Common Areas**.   **Impositions**, however, shall not include the following:  income, intangible, franchise, capital stock, estate or inheritance taxes or taxes substituted for or in lieu of the foregoing exclusions.   **Tenant** also shall pay all **Impositions** assessed, levied or imposed against **Tenant's** personal property.

5.1.1   **Landlord** and **Tenant** shall use their reasonable efforts to obtain a separate tax assessment with respect to the **Demised Premises** including, if possible, a separate assessment for the portion of the **Land** which is part of the **Demised Premises** and for **Tenant's Store** and other improvements thereon.  In the event that a separate tax assessment with respect to the **Demised Premises** cannot be obtained, then for purposes of this **Lease**, the parties shall refer to the office records of the assessing authority including but not limited to worksheets and field reports, in order to obtain the relevant land and building valuations required to calculate **Tenant's** separate liability for the real estate taxes for the **Demised Premises** hereunder, to the extent possible.  If the **Demised Premises** are separately assessed or **Tenant's** separate liability can be determined as above set forth for the purpose of paying all **Impositions** that are levied or assessed by any lawful authority on the **Demised Premises**, **Tenant** shall pay all such **Impositions** directly to the appropriate authority before such

**Impositions** become overdue if separately assessed or upon notice from **Landlord** if based on work records. **Landlord** shall notify **Tenant** within thirty (30) days after such separate assessment is made. If the **Demised Premises** are separately assessed, **Tenant** may, in good faith and by appropriate legal proceeding, contest any such Imposition provided that **Tenant** provides adequate assurance of the following to Landlord: (i) **Tenant** provides adequate assurance (to the reasonable satisfaction of Landlord) that the funds necessary to pay the amount of such contested Imposition, plus estimated penalties and interest, is available and shall be continually available until such contest is complete or the Imposition is paid, (ii) the contest is maintained and prosecuted with diligence, and (iii) in all circumstances, the Imposition is paid before execution of any lien and enforcement by the applicable governmental authority. In addition to any other right or remedy available to **Landlord**, in the event **Tenant** fails to pay any such Imposition within thirty (30) days after when due and **Tenant** is not contesting such Imposition as aforesaid, **Landlord** may, but shall not be obligated, to pay any such Imposition. Any amount so paid by **Landlord** and costs and expenses incurred by **Landlord** in connection therewith, together with interest at the **Default Rate** from the date of **Landlord's** payment of the Imposition or the cost and expense, shall be paid immediately by **Tenant** to **Landlord** on demand.

5.1.2 If a separate assessment for **Demised Premises** or the value of the **Demised Premises** cannot be separately ascertained for purposes of determining the real estate tax assessment with respect to the **Demised Premises**, **Tenant** shall pay to Landlord "Tenant's Share" (as defined in Section 4.1.1) of **Impositions** against the **Retail Center** and **Landlord** agrees to pay all **Impositions** upon **Landlord's Land** and the improvements therein including the **Demised Premises** before the last date that the same may be paid without penalty or interest, or if a discount shall be available for early payment, before the last day that such maximum discount is available, provided that **Tenant** makes timely payment of **Tenant's Share** of the **Impositions** imposed against the **Retail Center** (if no other retail stores are constructed within the **Retail Center**, **Tenant's Share** of **Impositions** as to the **Land** only shall not exceed a maximum of eighty percent (80%) of such **Impositions**), including, without limitation, **Tenant's Share** of the **Impositions** imposed against the **Common Areas**. If **Tenant** makes such timely payment, **Landlord** shall bear all interest, penalties, late charges and lost discount amounts incurred as a result of **Landlord's** failure to timely pay any installment of real estate taxes.

Section 5.2  <u>Payment of Impositions</u>.  **Tenant** shall pay
**Landlord** within thirty (30) days following receipt of invoice
from **Landlord** for the amount of all payments to be made by
**Landlord** for which **Tenant** is liable pursuant to Section 5.1
hereof.

5.2.1  If the **Term** of this **Lease** shall terminate
on a date other than the last day of a tax year, the amount
payable by **Tenant** during the tax fiscal year in which such
termination occurs shall be prorated on the basis of the relation
that the number of days from the commencement of the tax year to
and including the termination date, bears to 365.  A similar
proration shall be made for the tax fiscal year in which the **Term**
commences.

5.2.2  If the **Demised Premises** (including the **Land**
and improvements thereon) are separately assessed, **Landlord** shall
furnish **Tenant** with copies of all bills for **Impositions** and
notices of assessments applicable to the **Demised Premises**
promptly upon receipt thereof and in sufficient time to allow
**Tenant** to determine whether or not to contest any such
**Impositions**.  If the improvements on the **Demised Premises** are
separately assessed but the portion of **Land** therein is not
separately assessed, then **Tenant** shall pay **Impositions** on the
separately assessed improvements and shall pay **Tenant's Share** of
**Impositions** on the **Land**, including the **Common Areas**.  If **Tenant**
desires to contest such Imposition, on said separately assessed
improvements, **Tenant**  shall promptly notify **Landlord** and **Tenant**
shall have the right to do so at its expense and **Landlord** shall
fully cooperate with **Tenant**  in any such proceeding and **Tenant**
shall be responsible for all of **Landlord's** out-of-pocket costs
and expenses, charges and fees incurred to third parties.

5.2.3  If the **Demised Premises** are not separately
assessed, the decision to contest any Imposition shall be made by
**Landlord** after consultation with Tenant.  **Tenant**  and **Landlord**
shall fully cooperate with one another in contesting such
Imposition and, upon receipt of an invoice from **Landlord**,  **Tenant**
shall pay to **Landlord** **Tenant's Share** of **Landlord's** costs
actually incurred in contesting such Imposition (including
reasonable attorneys' fees and costs), whether or not such
contest is successful.  If the **Demised Premises** are not
separately assessed, and **Landlord** elects not to contest such
assessment, on written request of **Tenant**,  **Landlord** will notify
**Tenant** in writing of the reasons why **Landlord** believes that the
contesting of such assessment would not be in the best interests
of the **Tenant** and other tenants of the **Retail Center**.  If **Tenant**
achieves a reduction in the assessment, **Tenant** shall be entitled

first to deduct its out of pocket third party costs and expenses.
If the **Demised Premises** are separately assessed, **Landlord** shall
have the right to contest any Imposition imposed against the Land
without notice to, or the consent of, Tenant.

## ARTICLE VI

### COMMON AREAS

Section 6.1  <u>Use of Common Areas</u>.  **Landlord** grants to
**Tenant** and its agents, employees and customers a non-exclusive
license to use the **Common Areas** in common with others during the
**Term**, subject to the exclusive control and management of the
**Common Areas** (including the sidewalks in front of **Tenant's Store**)
at all times by **Landlord** and subject, further, to the rights of
**Landlord** set forth in Section 6.2. and the limitations set forth
in Section 2.1.

Section 6.2  <u>Management and Operation of Common Areas</u>.
**Landlord** will operate and maintain, or will cause to be operated
and maintained, the **Common Areas** in a manner deemed by **Landlord**
to be reasonable and appropriate and in the best interests of a
retail center.  **Landlord** will have the right (i) to establish,
modify and enforce reasonable rules and regulations with respect
to the **Common Areas**; (ii) to enter into, modify and terminate
easement and other agreements pertaining to the use and
maintenance of the **Common Areas**; (iii) to enforce parking charges
to discourage long-term parking with appropriate provisions to
assure that such parking is at no cost to **Tenant's** customers and
with appropriate provisions for validation for free parking by
**Tenant's** customers at no cost to **Tenant** provided any expenses may
be included in **Landlord's Operating Costs** provided revenues are
off-set against **Landlord's Operating Costs**; (iv) to close all or
any portion of the **Common Areas** to such extent as may, in the
opinion of **Landlord,**  be necessary to prevent a dedication
thereof or the accrual of any rights to any person or to the
public therein; (v) to close temporarily any or all portions of
the **Common Areas**; (vi) to discourage non-customer parking; and
(vii) to do and perform such other acts in and to said areas and
improvements as, in the exercise of good business judgment,
**Landlord** shall determine to be advisable including such changes,
modifications and alterations as **Landlord** shall determine, but
all such changes and modifications within the **Kmart Protected**
**Area** shall be subject to the limitations set forth in Section 2.1
and in no event shall such changes, alterations or modifications
materially adversely affect ingress to or egress from the **Retail**
**Center** or materially adversely affect the visibility of **Tenant's**
**Store**, **Tenant's** rights under this **Lease** or **Tenant's** operations in
the **Demised Premises**.

Section 6.3   Tenant to Share Expense of Common Areas.
**Tenant** will pay **Landlord**,  as **Additional Rent**, **Tenant's Share** of
**Landlord's Operating Costs**.

**Tenant** will pay to **Landlord Tenant's Share** of
**Landlord's Operating Costs** in monthly installments in such
amounts as are reasonably estimated and billed by **Landlord** at the
beginning of each twelve (12) month period commencing and ending
on dates designated by **Landlord,** each installment being due on
the first day of each calendar month.  At any time during any
such twelve (12) month period, **Landlord** may reestimate **Tenant's**
proportionate share of **Landlord's Operating Costs** and thereafter
adjust **Tenant's** monthly installments payable during such twelve
(12) month period to reflect more accurately **Tenant's**
proportionate share of **Landlord's Operating Costs**.  Within one
hundred twenty (120) days (or such additional time thereafter as
is reasonable under the circumstances) after the end of each such
twelve (12) month period, **Landlord** shall deliver to **Tenant** a
statement of **Landlord's Operating Costs** for such twelve (12)
month period and the monthly installments paid or payable shall
be adjusted between **Landlord** and **Tenant,**  and **Tenant** shall pay
**Landlord** or **Landlord** shall credit **Tenant's** account (or, if such
adjustment is at the end of the **Term**, **Landlord** shall pay Tenant),
as the case may be, within fifteen (15) days of receipt of such
statement, such amounts as may be necessary to effect such
adjustment.  Unless such statement is an audited statement,
**Tenant** and its agents shall have the right to inspect, audit and
verify **Landlord's** books and records of **Landlord's Operating Costs**
at **Landlord's** office at reasonable times during ordinary business
hours.  If the statement is an audited statement, **Tenant** shall
have the right to consult with the accountant preparing the
statement as to any discrepancies, at **Tenant's** expense.

Section 6.4   Landlord's Operating Costs Defined.   The
term "**Landlord's Operating Costs**" means all costs and expenses
incurred by or on behalf of **Landlord** in operating, managing (but
excluding management fees), insuring, securing and maintaining
the **Common Areas**.  **Landlord's Operating Costs** include, but are
not limited to, all costs and expenses of operating, maintaining
and repairing and replacing (but excluding any repairs or
replacements which are capital repairs or replacements) the
**Common Areas** including, lighting, signing, cleaning, striping,
policing and security of the **Common Areas** (including the cost of
uniforms, equipment and employment taxes); alarm and life safety
systems; insurance, including, without limitation, liability
insurance for personal injury, death and property damage, all-
risks casualty insurance (including coverage against fire, flood,
theft or other casualties), worker's compensation insurance or

similar insurance covering personnel, fidelity bonds for personnel, insurance against liability for assault and battery, defamation and claims of false arrest occurring on and about the **Common Areas**; removal of water, trash and debris from the **Common Areas**; regulation of traffic; surcharges levied upon or assessed against parking spaces or areas by governmental or quasi-governmental authorities; payments toward mass transit or car pooling facilities or otherwise as required by governmental or quasi-governmental authorities; costs and expenses in connection with maintaining federal, state or local governmental ambient air and environmental standards; the cost of all materials, supplies and services purchased or hired therefor; operation of public toilets; installing and renting of signs; fire protection in the parking deck, if any; maintenance and repair and replacement of utility systems serving the **Common Areas**, including, but not limited to, water, sanitary sewer and storm water lines and other utility lines, pipes and conduits; costs and expenses of maintaining and operating sewage treatment facilities, if any; costs and expenses of inspecting and depreciation of machinery and equipment used in the operation and maintenance of the **Common Areas** and personal property taxes and other charges (including, but not limited to, financing, leasing or rental costs) incurred in connection with such equipment; costs and expenses of repair or replacement (but excluding repairs and replacements of a capital nature) of awnings, paving, curbs, walkways, landscaping, drainage, pipes, ducts, conduits and similar items, exterior lighting facilities; costs and expenses of planting, replanting, replacing and displaying flowers, shrubbery and planters; costs of providing light and power to the **Common Areas**; cost of water services, if any, furnished by **Landlord** for the non-exclusive use of all tenants; and administrative costs attributable to the **Common Areas** for on-site personnel and an overhead cost equal to five percent (5%) of the total costs and expenses of operating and maintaining the **Common Areas**. **Landlord** may elect to amortize or depreciate any of the foregoing costs and expenses over the useful life determined in accordance with generally accepted accounting principles provided there is no duplication of amortization and depreciation or inclusion of initial cost or leasing expense. Any services performed by **Landlord** or any affiliate of **Landlord** shall be performed at a cost which does not exceed the cost which would be paid to a bona fide third party.

## ARTICLE VII

### UTILITIES

Section 7.1  Utilities.  **Tenant** shall arrange to be separately billed for and shall pay the applicable public utility

authorities or governmental agencies for all connection fees, if
any, and for such utilities consumed on the **Demised Premises**
before any interest or penalty shall accrue thereon.   If **Tenant**
receives written notice from **Landlord** that **Tenant's** failure to
pay utility companies for all connection fees or for utilities
consumed is adversely affecting utility service to other parts of
the **Retail Center**, then **Tenant** shall pay such connection fees
and/or consumption charges within thirty (30) days of **Tenant's**
receipt of such notice or **Landlord** shall have the right to pay
such connection fees and/or consumption charges and **Tenant** shall
within fifteen (15) days reimburse **Landlord** therefor as
additional **Rent**.

## ARTICLE VIII

### OPERATION,
### USE, AND ASSIGNMENT

Section 8.1   Use.   The **Demised Premises** may be used for
a retail discount department store and ancillary retail use and
for first class retail purposes and for no other purpose
whatsoever.

Section 8.2   Continuous Operation.   **Tenant** acknowledges
that its continued operation of the **Demised Premises** for the
period hereinafter set forth is of the utmost importance to the
other tenants of the **Retail Center** and to **Landlord** in the rental
of space in the **Retail Center**, the renewal of other leases in the
**Retail Center**, the efficient and economic supply of services and
utilities, the receipt of **Percentage Rent** and the character and
quality of the other tenants in the **Retail Center**.   Accordingly,
**Tenant,**  for a period of eight (8) years after the date on which
**Tenant** first opens for business in the **Demised Premises**
("**Operating Covenant Term**"), shall continuously occupy, use and
operate the entire **Demised Premises** as a Kmart Store of the
highest quality and type operated in the Kmart chain selling
merchandise similar to the merchandise sold by the highest
quality stores operated by the Kmart chain and in a manner
consistent with the highest standards and shall be open for
business on each day except for days prohibited by local closing
laws at least from 9:00 a.m. until 9:00 p.m. ("**Tenant's Operating
Covenant**").

Section 8.3 <u>Trade Name</u>. **Tenant** shall operate the **Demised Premises** during the **Operating Covenant Term**, under the name "Kmart", and no other trade name without the prior written consent of the **Landlord** ("**Tenant's Trade Name**").

Section 8.4  <u>Intentionally Deleted</u>.

Section 8.5  <u>Use Restrictions</u>. **Tenant** shall not:

(a) conduct or permit to be conducted at the **Demised Premises** any fire, bankruptcy, liquidation, going out of business, auction or closeout sale or any other sale or promotion which is out of the ordinary course of **Tenant's** continuing business operations at the **Demised Premises**;

(b) use or permit to be used sidewalks adjacent to the **Demised Premises** (other than portions of the sidewalks, if any, identified in the **Site Plan** as permissible areas for sidewalk sales) or any other portion of the **Common Areas** for the sale or display of any merchandise or for any other business, occupation or undertaking;

(c) use or permit to be used any sound broadcasting system or amplifying device which can be heard outside of the **Demised Premises**;

(d) sell, distribute, display or offer for sale any roach clip, water pipe, bong, cocaine spoon, cigarette papers, hypodermic syringe or other paraphernalia commonly used with the consumption of illegal drugs;

(e) sell, distribute, display or offer for sale any pornographic, lewd, suggestive or "adult" newspaper, book, magazine, film, picture representation or merchandise of any kind;

(f) permit any person to smoke tobacco products in the **Demised Premises**, except in areas reasonably designated by **Tenant** for such purposes;

Section 8.6  <u>Assignment and Subletting</u>.

(a) **Tenant** shall not assign this **Lease**, in whole or in part, nor sublet all or any part of the **Demised Premises**, nor license concessions or lease departments therein comprising more than twenty percent (20%) of the square footage of the **Tenant's Store** and only if such leased departments and licensed concessions are typical in other

Kmart stores, nor pledge or encumber by mortgage or other
instruments its interest in this **Lease** (each individually
and collectively referred to in this Section as a
"**transfer**") without first obtaining the consent of **Landlord,**
which consent by **Landlord** will not be unreasonably withheld
(provided **Landlord's** agreement not to unreasonably withhold
consent shall not be applicable during Tenant's **Operating
Covenant Term** and nothing contained in this Section 8.6
shall be deemed to permit **Tenant** to violate its **Operating
Covenant**) and shall be applicable only to Kmart and not to
any subsequent assignee or sublessee and **Tenant's** right of
assignment hereunder is personal to Kmart and any such right
shall terminate after the twentieth (20th) **Lease Year** based
upon the **Landlord's** consideration of the following criteria

(i)     the net assets of the assignee, licensee,
sublessee or other transferee or permittee
(collectively "**transferee**") immediately prior
to the **transfer**;

(ii)    the quality and type of business operation
which **Tenant** has conducted theretofore;

(iii)   whether such **transferee** shall possess
qualifications for the **Tenant** business
substantially equivalent to those of **Tenant**
and shall have demonstrated recognized
experience in successfully operating such a
business, including, without limitation,
experience in successfully operating a
similar quality business in first-class
shopping centers;

(iv)    such **transferee** shall continue to operate the
business conducted in the **Demised Premises**
under the same **Tenant Trade Name**, in the same
manner as **Tenant** and pursuant to all of the
provisions of this **Lease**; and

(v)     such **transferee** shall assume in writing, in a
form acceptable to **Landlord,** all of **Tenant's**
obligations hereunder and **Tenant** shall
provide **Landlord** with a copy of such
assumption/transfer document.

(b)    The prohibition under (a) above shall not prohibit
an assignment which would occur by merger, consolidation or
sale of substantially all of **Tenant's** assets provided the

acquiring entity has a net worth of at least Five Hundred Million Dollars ($500,000,000) prior to such merger, consolidation, or sale of assets or the acquiring entity shall in the same transaction acquire substantially all of the other Kmart stores in the Kmart chain in Puerto Rico. Any **transfer** to or by a receiver or trustee in any federal or state bankruptcy, insolvency, or similar proceeding shall be prohibited.  Consent by **Landlord** to any **transfer** shall not constitute a waiver of the requirement for such consent to any subsequent **transfer**.

(c)  The **Demised Premises** may under no circumstances be sublet into more than three (3) spaces and no more than two of such sublet spaces shall contain more than five thousand (5,000) square feet (exclusive of permitted license concessionaires and leased departments).

(d)  If **Tenant** shall assign this **Lease** as permitted by the terms of this **Lease** and the assignee is a corporation (other than a corporation the outstanding voting stock of which is listed on a **"national securities exchange"**, as defined in the Securities Exchange Act of 1934) and if at any time thereafter any part or all of the corporate shares shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition (including, but not limited to, such a transfer to or by a receiver or trustee in federal or state bankruptcy, insolvency, or other proceedings) so as to result in a change in the then present control of said corporation by the person(s) then owning a majority of said corporate shares, **Tenant** shall give **Landlord** notice of such event promptly and in any event within fifteen (15) days of the date of such transfer.  If any such transfer is made (and regardless of whether **Tenant** has given notice of same), **Landlord** may elect to terminate this **Lease** at any time thereafter by giving **Tenant** notice of such election, in which event this **Lease** and the rights and obligations of the parties hereunder shall cease as of a date set forth in such notice which date shall not be less than sixty (60) days after the date of such notice.  In the event of any such termination, all **Rent** (other than any **Additional Rent** due **Landlord** by reason of **Tenant's** failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

(e)  No assignment or subletting shall relieve or release **Tenant** from **Tenant's** liability under this **Lease**.

Section 8.7 <u>Right of Recapture</u>. If the **Tenant** "**goes dark**," provided nothing herein provided shall be deemed to permit **Tenant** to "go dark" during Tenant's **Operating Covenant Term** or to limit **Landlord's** rights and remedies if **Tenant** violates its Operating Covenant, (other than a period of no more than three hundred sixty (360) days for rebuilding or as a result of a casualty or for a period of no more than ninety (90) days for remodeling or refurbishing as a Kmart Store) **Landlord** shall have a one (1) time option exercisable by notice to **Tenant** within one (1) year after **Tenant** "**goes dark**" to terminate this **Lease** and take back the **Demised Premises** (provided such right shall be null and void if not exercised prior to a permitted sublease or an assignment in accordance with this **Lease**). Upon the exercise of such option by **Landlord**, **Tenant** shall vacate the **Demised Premises** (and shall cause all sublessees, licensees, concessionaires, and others occupying the **Demised Premises** to do the same) within three (3) months after the date of said notice, and the **Term** of this **Lease** shall be automatically terminated as of the later to occur of (a) the expiration of said three month period or (b) the date on which **Tenant** returns the **Demised Premises** to **Landlord.** Upon such termination, neither party shall have any further obligation to the other hereunder except for **Tenant's** obligation to turn over the **Tenant's Store** free and clear and proceeds of insurance as required by Section 3.3 above and except for obligations arising prior to termination and claims made after termination for events occurring before the later to occur of the date of termination or the date on which **Tenant's Store** is turned over to **Landlord.**

The term "**go dark**" shall include the following situations: (a) if **Tenant** gives **Landlord** notice of its intention to discontinue the operation of the **Demised Premises** for the Permitted Use, then **Tenant** will be deemed to have "**gone dark**" as of the date of discontinuance specified in such notice (or six months from the date of the notice, if no date of discontinuance is specified in the notice); (b) if **Tenant** ceases operations at the **Demised Premises** for a period of six months or longer (regardless of whether concessionaires or licensees are operating at the Demises Premises); and (c) if only concessionaires or licensees or transferees (other than permitted transferees under Section 8.6) remain in operation at the **Demised Premises**.

If **Landlord** shall at any time elect to take back the entire **Demised Premises** in the event **Tenant** shall go dark, all prior subleases shall, including subleases, licenses, or other agreements with concessionaires or similar parties, be terminated and **Landlord** shall be entitled to recapture the entire **Demised Premises**.

Section 8.8  Acceptance of Rent from Transferee.  The acceptance by **Landlord** of the payment of **Rent** following any assignment or other **transfer** prohibited by this Article shall not be deemed to be a consent by **Landlord** to any such assignment or other **transfer** nor shall the same be deemed to be a waiver of any right or remedy of **Landlord** hereunder.

Section 8.9  <u>Tenant's Signs</u>.  **Landlord** expressly recognizes that Kmart has informed **Landlord** that the service marks and trademarks "Kmart" and "Big Kmart" are the valid and exclusive property of **Tenant,**  and **Landlord** agrees that it shall not either during the term of this **Lease** or thereafter directly or indirectly contest the validity of said marks "Kmart" and "Big Kmart," or any of Kmart's registrations pertaining thereto in the Commonwealth of Puerto Rico or elsewhere, nor adopt or use said marks or any term, work,  or designation which is in any aspect similar to the marks of Tenant.  **Landlord** further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of Kmart's right, title and interest in the aforesaid marks, and **Landlord** shall not in any manner represent that it has ownership interest in the aforesaid marks or registrations therefor, and specifically acknowledges that any use thereof pursuant to this **Lease** shall not create in **Landlord** any right, title and interest in the aforesaid marks.

**Tenant** shall have the option to erect at its sole cost and expense prototype signs on the **Tenant's Store** which are part of **Tenant's** standard sign package (including pylon signs but only in cooperation with Landlord) of such height and other dimensions as **Tenant** shall determine, bearing such legend or inscription as **Tenant** shall determine, which either have been approved by **Landlord** or are subject in each case to **Landlord's** approval which will not be unreasonably withheld if such signs are compatible with the design and architecture of the **Retail Center** and all applicable laws, rules and regulations.

Notwithstanding the foregoing, **Tenant** shall have the right to erect on **Tenant's Store** the standard sign package used by Kmart on a national basis, from time to time, provided that in no event shall any letter including "K" exceed eight feet in height.

## ARTICLE IX

MAINTENANCE; ALTERATIONS; FIXTURES

Section 9.1  <u>Maintenance</u>.  **Tenant** shall, at **Tenant's** expense, maintain the **Demised Premises** including the sidewalks in front of **Tenant's Store** in good and usable repair including the

exterior portions and structural elements of the **Demised Premises**
and the appurtenances thereto, if any constructed by **Tenant**
including the roof, roof structures and supports, foundations,
structural supports and exterior improvements and landscaping
within the perimeter sidewalks which landscaping shall be in
keeping with the balance of the **Retail Center**. **Tenant** shall keep
all exterior areas including perimeter sidewalks clean and free
of debris and merchandise. **Tenant** shall replace and repair
broken glass in any windows or doors and shall replace all
interior lights and ballasts. At **Landlord's** option, **Landlord** may
provide maintenance within the portions of the **Demised Premises**
outside of **Tenant's Store** at cost plus a fee as agreed to by the
parties if **Tenant** fails to adequately provide such maintenance.

Section 9.2 <u>Alterations</u>. **Tenant** shall have the right
to make at any time and from time to time, at its own expense
non-structural repairs and alterations. **Tenant** shall not have
the right to make any additions or structural repairs or
alterations to the **Demised Premises** or any non-structural repairs
or alterations costing more than four hundred thousand dollars
($400,000.00) without **Landlord's** approval, such approval not to
be unreasonably withheld. **Tenant** may install satellite
communication and other systems on the roof or elsewhere on the
**Demised Premises**, provided that such additions or alterations
cause no liability to **Landlord** and are made in compliance with
**Laws**; and provided further, that all such equipment and systems
are concealed or located in such a way that they are not visible
to passers-by.

9.2.1 **Landlord** shall cooperate by executing all
instruments necessary or appropriate from the applicable
governmental authorities to satisfy the requirements to make such
alterations. Unless any alterations, additions or improvements
are removed or demolished by **Tenant** in accordance with other
provisions of this **Lease**, all alterations, additions and
improvements made by **Tenant** to the **Demised Premises** shall become
the property of **Landlord** upon the termination of this **Lease**
without any compensation to **Tenant** and shall be surrendered at
such time as a part of the **Demised Premises** in accordance with
this **Lease**.

Section 9.3 <u>Tenant's Store, Improvements and Trade
Fixtures</u>. Any trade fixtures, furniture and equipment that
**Tenant** installs at the **Demised Premises** at its expense during the
**Term** hereof shall remain **Tenant's** property, provided such
property is removed in accordance with this **Lease** before the end
of the **Term**, and in the event any such property remains at the

**Demised Premises** after the termination of this **Lease**, such property shall revert to and become the property of **Landlord**.

Section 9.4   Labor and Similar Liens.

9.4.1   In connection with the construction of the **Tenant's** building and/or alterations, **Tenant** shall not create, or suffer to be created or to remain, and shall within thirty (30) days discharge, any laborer's or materialman's lien which might be or become a lien, encumbrance or charge upon (i) the **Demised Premises**, the **Retail Center** or any part thereof or (ii) the income therefrom; and **Tenant** will not suffer any other matter or thing arising out of **Tenant's** use and occupancy of the **Demised Premises** whereby the estate, rights and interests of **Landlord** in the **Demised Premises** or any part hereof might be impaired. Before commencement of any construction work at the **Demised Premises**, **Tenant** shall cause its contractors to execute and record in the appropriate offices mechanics' lien waivers in customary form.

9.4.2   **Tenant** hereby indemnifies, holds harmless, and agrees to defend, **Landlord**, from and against any and all claims, actions, damages, liabilities, losses, costs and expenses (including reasonable attorneys' and other professional fees) incurred or suffered by **Landlord** arising from or connected with any laborer's or materialman's lien or claim (threatened or actual) affecting the **Demised Premises** or any part thereof.

9.4.3   No work performed by **Tenant** pursuant to this **Lease** shall be deemed to be for the immediate use and benefit of **Landlord** so that no mechanic's or other lien shall be permitted against the estate of **Landlord** by reason of any consent given by **Landlord** to **Tenant** to improve the Land and **Demised Premises**. Nothing in this **Lease** shall be deemed or construed in any way as constituting the authorization by, or consent or request of, **Landlord**, expressed or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman, architect or consultant, for the construction or demolition of work or improvement, the performance of any labor or alteration to, or repair of, the **Demised Premises** or the **Retail Center** or any part thereof or to give **Tenant** any right, power or authority to contract for, or permit the rendering of any services or the furnishing of, any materials that would give rise to the filing of any lien against **Landlord's** interest in the **Demised Premises**, the **Retail Center** or any part thereof.

Section 9.5   Compliance with Laws.   **Tenant** hereby indemnifies and holds harmless, and agrees to defend, **Landlord**,

from and against any and all claims, actions, damages,
liabilities, losses, costs and expenses arising from or in
connection with any causes of action, penalties or fines which
arise out of **Tenant's** failure to conform to, comply with and/or
take any and all action necessary to avoid or eliminate any
violation of, any present or future law (including, without
limitation, the Americans with Disabilities Act), ordinance,
regulation or other requirement of any federal, state or
municipal government, department, commission, board or officers
having jurisdiction, foreseen or unforeseen, which shall be
applicable to the **Demised Premises**, the construction of the
**Demised Premises**, or the use or manner of use thereof by **Tenant**
or occupants thereof.

    Section 9.6    Compliance with Insurance Requirements.
**Tenant** likewise shall observe and comply with the requirements of
all policies of insurance which **Tenant** is required hereby to
maintain with respect to the **Demised Premises**.

    Section 9.7    Intentionally Deleted.

    Section 9.8    Compliance with Environmental Laws.
**Tenant** shall conduct its activities at the **Demised Premises** with
respect to all environmental matters in compliance with:  all
laws and regulations, now and hereafter in effect governing
**Tenant's** use of the **Demised Premises**, including any laws
concerning the discharge of any substance into the air, surface
water, groundwater or soil on or from the **Demised Premises**; laws
governing handling or disposal of waste products of any kind;
laws governing the handling of toxic or hazardous substances; or
any other Environmental Law (as hereinafter defined).  **Tenant**
agrees to defend, to indemnify and to hold **Landlord** harmless of,
from and against any and all claims, actions, damages, expenses,
losses or liabilities suffered by **Landlord** by reason of **Tenant's**
breach of any of the provisions of this Section 9.8 or any claims
of **Tenant's** employees, agents, contractors, customers or invitees
caused by, related to, or arising from such breach during the
**Term** of this **Lease**.  The indemnity in this subsection shall
survive the expiration or earlier termination of this **Lease**.  The
parties recognize that no adequate remedy at law may exist for
**Tenant's** breach of this Section 9.8.  Accordingly, in addition to
other remedies, **Landlord** may obtain specific performance of any
provision of this Section 9.8.  For purposes of this **Lease** the
term "**Environmental Law**" shall include the following statutes as
now or hereafter amended: (a) the Comprehensive Environmental
Response, Compensation and Liability Act; (b) the Resource
Conservation and Recovery Act; (c) all environmental laws in
effect in the Commonwealth of Puerto Rico; and (d) any other

local, commonwealth or federal ordinances, regulations and laws
regulating or concerning the environment.

       **Landlord** represents that it has obtained an environ-
mental report, a copy of which has been furnished to **Tenant** and
that based solely on the environmental report furnished to
**Landlord** and to the best of **Landlord's** own knowledge, there are
not now nor have there been any toxic or hazardous wastes or
substances used, generated, stored, treated or disposed on the
**Demised Premises**.   **Tenant** acknowledges that it has been afforded
the opportunity to inspect the **Demised Premises** and that **Tenant**
is taking the **Demised Premises** in "as is" condition.

       Section 9.9   <u>Inspection of Demised Premises by
Landlord</u>.   **Tenant** agrees to permit **Landlord** and the duly
authorized representatives of **Landlord** to enter the **Demised
Premises** at all reasonable times, upon twenty-four (24) hour
advance notice to **Tenant**,   except in case of emergency where no
notice shall be required, for the purpose of inspecting the same,
and performing any work for which **Tenant** shall be responsible
under the terms of this **Lease** not performed by **Tenant** after
notice to **Tenant** as provided for herein.   Nothing herein
contained shall imply any duty or obligation upon **Landlord** to
make any repair or to perform any work that **Tenant** is required to
make or perform, and the making or performing thereof by **Landlord**
shall not constitute a waiver of **Tenant's** default in failing to
make or perform the same.

<u>ARTICLE X</u>

SUBROGATION AND INSURANCE

       Section 10.1   <u>Waiver of Subrogation</u>.   **Landlord** and
**Tenant** agree to have all fire and extended coverage and other
property damage insurance which may be carried by either of them
endorsed with a clause providing that any release from liability
of or waiver of claim for recovery from the other party entered
into in writing by the insured thereunder prior to any loss or
damage shall not affect the validity of said policy or the right
of the insured to recover thereunder and providing further that
the insurer waives all rights of subrogation which such insurer
might have against the other party.   Without limiting any release
or waiver of liability or recovery set forth elsewhere in this
**Lease**, and notwithstanding anything in this **Lease** which may
appear to be to the contrary, each of the parties waives all
claims for recovery from the other party for any loss or damage
to any of its property insured under valid and collectible
insurance policies.   Notwithstanding the foregoing or anything

contained in this **Lease** to the contrary, any release or any
waiver of claims shall not be operative, and the foregoing
endorsements shall not be required, in any case where the effect
of such release or waiver is to invalidate insurance coverage or
invalidate the right of the insured to recover thereunder or
increase the cost thereof (provided that in the case of increased
cost, the other party shall have the right, within ten (10) days
following written notice, to pay such increased cost keeping such
release or waiver in full force and effect).

Section 10.2 <u>Tenant's Insurance</u>. **Tenant** shall carry
insurance during the entire **Term** hereof with terms, coverages and
companies satisfactory to **Landlord** and with such other insurance
and against such other insurable hazards which are commonly
insured against in the case of premises similar to the **Demised
Premises** and with increases in limits as **Landlord** may in each
case request from time to time provided such insurance is
customarily carried by similar tenants, but initially **Tenant**
shall maintain, at a minimum, the following coverages in the
following amounts:

(a) During the construction of **Tenant's Store**,
so-called "All Risks" builders risk coverage including
loss resulting from earthquake and (if the **Demised
Premises** is located in a federally or other designated
flood zone) loss resulting from flood on the
improvements being constructed in and on what will be
the **Demised Premises**, and after construction, so-
called "All Risks" of physical loss coverage on the
**Demised Premises**, including loss resulting from
earthquake and (if the **Demised Premises** is located in a
federally or other designated flood zone) loss
resulting from flood, to be valued on a replacement
costs basis containing the Agreed Value Endorsement for
a limit no less than 100% of the insurable replacement
value.

(b) Workmen's Compensation insurance in amounts
required by applicable law or statute (which may be
carried through a government sponsored program)
covering all persons employed in connection with any
work done on or about the **Demised Premises** with respect
to which claims for death or bodily injury could be
asserted against **Landlord,** **Tenant** or the **Demised
Premises**;

(c) Public liability insurance via either a
commercial general liability insurance policy or a

combination of a commercial general liability policy plus an
umbrella liability policy, either or both written on an
occurrence basis providing a combined single limit of no
less than $5,000,000 subject to a $5,000,000 aggregate limit
applicable to the **Demised Premises**. Said policy or policies
shall include contractual liability coverage applicable to
the tort liability assumed in this **Lease**. Further, said
policy or policies shall cover the **Tenant** as a named insured
and shall also name as an additional insured the **Landlord**,
its beneficiaries, its partners, officers, directors,
shareholders, agents and employees as additional insureds.
Further, said insurance will at all times be considered as
primary insurance and at no time will contribute with any
liability insurance separately maintained by the **Landlord.**

(d)  Insurance on the **Demised Premises** including all
additions and improvements and alterations made thereon
(except that the sidewalks in front of **Tenant's Store** shall
be covered by the insurance on the Common Area) providing
coverage on a so-called "All Risks" of physical loss basis
including loss resulting from earthquake and loss resulting
from flood (if the **Demised Premises** is located in a
federally or other designated flood zone). Said coverage
will also extend to include the value of footings,
foundations and excavations as respects loss resulting from
earthquake or flood. The basis of valuation in said
coverage shall be replacement cost with the limit of
coverage equal to the full replacement cost of all
additions, improvements and alterations to the **Demised
Premises** owned, constructed or made by the **Tenant** on the
**Tenant's** behalf. Said insurance shall specifically name the
**Landlord** and **Tenant** as insureds as their respective interest
may appear with the understanding that the **Landlord** agrees
to make the proceeds available for restoration, bank
proceeds to be held by the **Landlord's** lender, if any, or
another recognized bank, financial or institutional lender.
The **Tenant** may, at its option, insure all office furniture,
trade fixtures, office equipment, and all other items of the
**Tenant's** property on the **Demised Premises** on a similar so-
called "All Risk" of physical loss basis.

(e) The insurance as called for under Section 10.2
(a), (c),and (d) shall stipulate that the **Landlord**
will be provided with no less than thirty (30) days
prior written notice in the event that coverage is

cancelled or limits reduced by the insurer or the
**Tenant** with said notice to be sent by either certified
or registered mail.  In the case of non-payment of
premium, at least fifteen (15) days prior written
notice must be given to the **Landlord** again, said notice
being sent by either certified or registered mail.

At all times, the limit of **Tenant's** business
income and/or business interruption insurance coverage
shall be sufficient to pay at least one year's
continuing expenses including **Tenant's** rental expense.

Section 10.3  Certificates of Insurance.  Prior to the
commencement of the **Term** of this **Lease** and annually thereafter,
**Tenant** shall furnish to **Landlord** certificates of insurance
evidencing the coverages outlined in Section 10.2.  Said
certificate shall state that the insurance reflected thereon
shall not be canceled or non-renewed without at least sixty (60)
days' prior written notice to **Landlord** and **Tenant** unless such
cancellation is due to non-payment of premium, in which case only
fifteen (15) days' prior written notice shall be sufficient.
Further, the commitment to provide prior notice of cancellation
or non-renewal shall be without qualification with the
stipulation that any non-renewal or cancellation notification
will be by way of registered or certified mail.

**Tenant** shall be entitled to self-insure provided **Tenant**
has an established self-insurance plan, evidence of which shall
be furnished to **Landlord** and meets with **Landlord's** approvals, not
to be unreasonably withheld or delayed, and maintains a net worth
of not less than Three Hundred Million Dollars ($300,000,000.00).

Section 10.4  Compliance with Requirements.  **Tenant**
shall comply with all applicable laws and ordinances, all orders
and decrees of court and all requirements of other governmental
authorities, and shall not make any use of the **Demised Premises**,
directly or indirectly, which thereby may be prohibited or be
dangerous to person or property, which may jeopardize any
insurance coverage, or which may increase the cost of insurance
or require additional insurance coverage.  If such an increase in
the cost of insurance occurs or such additional coverage is
required, **Tenant** shall promptly pay on demand the amount of such
increase or the cost of such coverage.

Section 10.5  Landlord's Insurance.  **Landlord** shall
carry the following insurance:

(a)   On or after the **Commencement Date**, the
**Landlord** shall keep **Common Areas** (including the
sidewalks on the **Demised Premises**) with all
improvements built and paid for by the **Landlord** insured
under the so-called "All-Risk" of physical loss basis
including loss resulting from earthquake in an amount
sufficient to comply with any co-insurance requirement
of the **Landlord's** policy or an amount agreed to with
**Landlord's** insurer, utilizing the basis of valuation as
replacement cost.   **Landlord** shall have the right to
insure and maintain the insurance coverage as set forth
herein under blanket insurance policies covering other
properties owned, leased or operated by the **Landlord.**

(b)   **Landlord** shall maintain a policy of
commercial liability insurance or a combination of
commercial general liability insurance and umbrella
liability insurance providing limits of no less than
$5,000,000 on account of personal injury and property
damage incurred upon or about the **Common Areas** of the
**Retail Center** as respects personal injury to, or death
of any one or more persons in any one occurrence and as
respects damage to property.   However, it is agreed,
that at all times, the **Landlord's** insurance shall be
considered as excess insurance over and above that
maintained by the **Tenant** as respects any claim for
bodily injury or property damage arising out of or in
connection with the **Demised Premises** where liability
insurance is maintained by the **Tenant**, naming **Landlord**
as additional insured.   The **Landlord**,  at the request
of the **Tenant**,  shall have said insurance name the
**Tenant** as an additional insured with said protection on
behalf of the **Tenant** applying only to the **Common Areas**
of the **Retail Center**.   **Landlord's** liability insurance
shall not have a self-insured retention or deductible
greater than $25,000.00 and **Landlord's** property
insurance shall not have self-insured retention or
deductible which is greater than the deductibles for
such risks as earthquake damage, windstorm damage and
other deductibles which are customary in insurance
polices for similar properties in the Commonwealth of
Puerto Rico.

(c)   **Landlord** may carry additional insurance
against other insurance hazards commonly insured
against by owners of similar retail centers, such as

rent insurance or flood insurance, and the premiums shall be included in the determination of **Tenant's Insurance Charge**.

Section 10.6  Tenant's Insurance Charge.  **Tenant** agrees to pay **Landlord** within ten (10) days after presentation of a bill therefor, **"Tenant's Insurance Charge"**, which will be in an amount equal to the product obtained by multiplying the total cost of said insurance paid or incurred by **Landlord** in accordance with Section 10.5, by **Tenant's Share** (as defined in Section 4.1.1 above).

Section 10.7  Tenant's Obligation to Pay Any Increase in Insurance Premiums.  If, as a result of **Tenant's** use or occupancy of any portion of the **Retail Center**, or from any vacancy of the **Demised Premises**, **Landlord** is charged any increase in premiums on insurance carried by **Landlord**, **Tenant** shall promptly pay on demand the amount of such increase.  In determining whether increased premiums are attributable to **Tenant**, a schedule or makeup rate of the organization issuing the insurance shall be conclusive evidence of the several charges which make up the insurance rates and premiums on the **Demised Premises** and the **Retail Center**.

Section 10.8  Tenant's Hold Harmless.  **Tenant** covenants and agrees to defend, pay, indemnify and save harmless **Landlord** and **Landlord's** agents and employees from any and all injury, loss, claim or damage, cost, liability or expense, including reasonable attorneys' fees and expenses in respect to any injury to, or death of, any person, or damage to, or loss or destruction of, any property, including property of **Landlord** while on the **Demised Premises** or as to any other part of the **Retail Center** if caused by, or due to the negligence of, **Tenant**, its agents or employees, arising from, related to, or connected with this **Lease** or the conduct and operation of **Tenant's** business in the **Demised Premises**, any loss or damage arising out of or resulting from injury to the feelings or reputation of a person, including trauma and mental anguish from any cause including as a result of false eviction, false arrest, malicious prosecution, libel, slander, defamation of character, invasion of privacy or wrongful entry by whomsoever and howsoever caused.

In the event that **Tenant** fails to comply with **Tenant's** insurance requirements as stated herein, then, in addition to (and not in lieu of) all other remedies that **Landlord** may have hereunder for a breach by **Tenant**, **Landlord** may obtain such insurance at **Landlord's** sole option and keep the same in effect,

and **Tenant** shall pay **Landlord** the premium cost thereof upon
demand.

It is agreed, however, that **Landlord** is not responsible
for any inadequacy of insurance protection purchased by **Tenant** or
by **Landlord** on behalf of Tenant.  The acceptance of any insurance
certificates required in this **Lease** by **Landlord** whether or not
same reflects the insurance required of **Tenant** in this **Lease** or
the failure on the part of **Landlord** to exercise its option to
purchase insurance on behalf of the **Tenant,**  shall in no way
alter or affect the liability assumed by **Tenant** under this **Lease.**

Section 10.9  **Landlord** Liability Limitation.
Notwithstanding anything herein to the contrary, **Landlord** shall
not be responsible or liable to **Tenant,**  or to those claiming by,
through or under **Tenant,**  for any loss or damage which may be
occasioned by or through the acts or omissions of persons
occupying the Land or any portion thereof or any other part of
the **Retail Center**, or for any loss or damage resulting to **Tenant,**
or those claiming by, through or under **Tenant,**  or its or their
property, from the breaking, bursting, stoppage or leaking of
electrical cables and wires, or water, gas, sewer or steam pipes.

Section 10.10 Landlord's Reservations of Rights.
**Landlord** reserves the right and may, in **Landlord's** reasonable
discretion, require **Tenant** because of the nature of **Tenant's**
operation or because of other insurable hazards which at the time
are commonly obtained in the case of property similar to the
**Demised Premises**, to provide other forms of insurance or higher
limits of insurance protection above those outlined in this
Article X and shall so notify **Tenant** in writing.  Policies and/or
certificates evidencing the increased insurance protection shall
be deposited with the **Landlord** by the **Tenant** within thirty (30)
days of **Landlord's** written request.

Unless not allowable by law, said insurance shall at
all times name the **Landlord** as an additional insured and contain
the same cancellation or non-renewal notification requirements as
is called for under Section 10.2 (e).

Section 10.11 Tenant's Participation in Uninsured Costs
Under Landlord's Insurance Program. Upon the occurrence of any
accident, loss, claim or damage which is covered under **Landlord's**
insurance policies (as outlined in Section 10.5), but which
contemplate either a large deductible, a self-insured retention
and/or uninsured legal expenses or similar unreimbursed costs
which are deemed significant by the **Landlord,**  **Landlord** shall
have the right to collectively assess all tenants who lease or

occupy the **Retail Center** at the time of said occurrence their proportionate share of such unreimbursed costs or expenses (which in any event shall not exceed the retention or deductibles permitted under Section 10.5(b) above on any one claim), provided that the assessment paid by **Tenant** shall not exceed **Tenant's Share** of the deductible (to the extent that the deductible is reasonable as compared with insurance coverage maintained for comparable properties), or, as to self-insured retention, the amount which **Landlord** reasonably estimates would be saved by **Tenant** in lower premiums over the initial **Term** of the **Lease**. **Tenant** hereby agrees to pay the **Landlord** within ten (10) days after presentation of a bill for **Tenant's** share of said unreimbursed costs.

## ARTICLE XI

### DAMAGE OR DESTRUCTION

Section 11.1 <u>Damage by Casualty</u>. In the event that any of the **Demised Premises** shall be damaged or destroyed by fire or any other hazard, risk or casualty whatsoever (such damaged or destroyed improvements or alterations being hereinafter in this Article XI called "**Damaged Improvements**"), then **Tenant** shall promptly and without delay, fully restore, replace and repair the **Damaged Improvements** to the condition existing just prior to such damage or destruction or to such other configuration with **Landlord's** consent, such consent not to be unreasonably withheld or delayed.

Section 11.2 <u>No Abatement of Rent</u>. No damage to or destruction of the **Demised Premises** or any portion thereof as a result of fire or any other hazard, risk or casualty whatsoever shall permit **Tenant** to surrender this **Lease** or shall relieve **Tenant** from **Tenant's** liability to pay the full **Rent** payable under this **Lease**, or from any of the **Tenant's** other obligations hereunder, and **Tenant** waives any right now or hereafter conferred upon **Tenant** by statute or otherwise to surrender this **Lease** or the **Demised Premises**, or any part thereof, or to any suspension, abatement or reduction of **Rent** by reason of such damage or destruction.

## ARTICLE XII

### EMINENT DOMAIN

Section 12.1 <u>Total Taking</u>. If during the **Term**, a Total Taking (as hereinafter defined) shall occur, this **Lease**

shall terminate as of the date the taking authority takes possession (physically or constructively) of the **Demised Premises** (the "**Possession Date**").  Until the **Possession Date**, however, **Tenant** shall have the right to continue to occupy the **Demised Premises**, subject to the rights of the taking authority, and shall continue to abide by all of the terms and provisions of this **Lease** including, without limitation, the payment of **Rent**.

12.1.1  For purposes of this **Lease**, a "**Total Taking**" shall occur if, after the Effective Date and prior to the expiration of the **Term**, any taking under the power of eminent domain by a public or private authority or any conveyance by **Landlord** in lieu thereof, shall result in:

(a)  A taking of all of the **Demised Premises**; or

(b)  A taking of either (i) a portion of the **Demised Premises** which materially impacts **Tenant's** ability to conduct business from the **Demised Premises**; or (ii) the access roads to the **Demised Premises** which, in **Tenant's** reasonable judgment, materially impedes or interferes with access to the **Demised Premises**; or (iii) more than twenty percent (20%) of the parking deck (provided **Landlord** shall have the right to relocate the parking deck within reasonable proximity to the Premises); and such action by such public or private authority if contested is final and unappealable.

12.1.2  In the event of a Total Taking, **Tenant** shall have the right to terminate this **Lease** and **Landlord** shall be entitled to the **Net Award** as hereinafter defined except for (i) in the event of a termination of this **Lease** any separate award for **Tenant's** moving expenses and interruption to **Tenant's** business; (ii) after application of the award or so much thereof as is necessary to the restoration of the **Demised Premises** and the **Retail Center**, **Tenant** shall be entitled to a portion of the **Net Award** equal to the unamortized portion (on a straight line basis) of the cost of improvements made by **Tenant** to the **Demised Premises**.  For purposes of this **Lease**, "**Net Award**" shall mean the compensation paid to **Landlord** and/or **Tenant** by the condemning authority for the taking of the Land condemned or conveyed in lieu of condemnation, after payment therefrom of all expenses in obtaining such compensation, including without limitation appraisers, expert witnesses and attorneys' fees and costs incurred.

Section 12.2  <u>Partial Taking</u>.  In the event of an exercise of the power of eminent domain which does not give

**Tenant** the right of termination under Section 12.1.2 above, (a
"**Partial Taking**") **Tenant** shall not have the right to terminate
this **Lease** and **Tenant** and **Landlord** shall be entitled to receive
that portion of the **Net Award** on account of their respective
interests, as they may appear.  Upon the occurrence of a **Partial
Taking**, **Tenant** shall restore the remaining portions of **Tenant's
Store** or other improvements on the **Demised Premises**, including
any and all improvements made theretofore, together with the
remaining portions of the **Common Areas** located on the **Demised
Premises**, to an architectural whole in substantially the same
condition that the same were permitted to be in prior to such
taking, subject, however, to modifications made necessary by any
decrease in the area of the Land or the **Retail Center**.  In the
event of a **Partial Taking** of a portion of the **Demised Premises**,
**Rent** shall abate in proportion to the percentage of the Land
within the **Demised Premises** which is subject to the **Partial
Taking**, during any period of restoration, **Rent** shall not abate.

Landlord is in the process of building an overpass over the
DeDiego Expressway on or near the western edge of the Land, and
in connection therewith Landlord may be required to dedicate to
public use a portion of the western edge of the Land (near the
Pueblo "Xtra" store) and/or the air rights over said portion of
the Land.  Said dedication shall not constitute either a **Partial
Taking** or a **Total Taking**, provided the taking does not encroach
more than 100' in an easterly direction from the location of the
overpass as shown on the Site Plan.

Section 12.3  <u>Dealings with Taking Authority</u>.  **Landlord**
and **Tenant** agree to promptly notify the other party when either
of them receives actual notice of a taking or a threat thereof.
**Landlord** and **Tenant** shall cooperate in good faith in contesting
any taking, if such contest is desired by either party, with the
contesting party bearing all costs and expenses thereof and, if
said taking cannot be reasonably prevented, to endeavor to obtain
the highest award possible for the property taken, the costs of
said endeavor to be borne by the parties in proportion to their
respective awards.

Section 12.4  <u>Termination</u>.  In the event of any
termination of **Lease** as the result of the provisions of this
Article XII, **Landlord** and **Tenant,** effective as of such
termination and compliance with the provisions of this Article
shall be released, each to the other, from all liability and
obligations thereafter arising under this **Lease**.

## ARTICLE XIII

PROMOTIONAL FUND
Section 13.1   Promotional Fund

(a)   Promotional Fund.   **Landlord** may, from time to time
in **Landlord's** sole discretion, establish a marketing service
(herein called "**Promotional Fund**") to furnish and maintain
sales promotion efforts for the benefit of the **Retail
Center**.

(b)   As long as **Tenant** continues its widespread use of
advertising circulars which include the name of the **Retail
Center**, **Tenant** shall not be required to contribute to an
annual promotion fund.   Otherwise, **Tenant** shall pay, as its
share of the cost of the Promotional Fund dues for each full
year, an amount equal to Five Thousand Dollars ($5,000.00)
for the first **Lease Year** and each year thereafter.

(c)   The **Promotional Fund** shall be used to pay costs
and expenses associated with the formation and carrying out
of an ongoing program for the promotion of the Center, which
program may include, without limitation, special events,
shows, displays, signs, seasonal events, and other
activities designed to attract customers to the **Retail
Center**.

Section 13.2   Tenant's Contribution to Grand Opening
and Expansion Opening.   If a Grand Opening of the **Retail Center**
occurs, **Tenant** shall pay to **Landlord,**   no later than twenty-one
(21) days prior to the Grand Opening, a one-time contribution for
the Grand Opening in the amount of Five Thousand Dollars
($5,000.00).   Any such contribution shall be payable by **Tenant** to
**Landlord** within ten (10) days after demand therefor.

## ARTICLE XIV

QUIET ENJOYMENT
Section 14.1   Covenants and Warranties.   (a)   **Landlord**
agrees that, subject to the terms of this **Lease**, if and as long
as **Tenant** is not in default under the terms hereof, **Tenant** shall
quietly and peaceably hold, possess and enjoy the **Demised
Premises** for the full term of **Lease** without any hindrance or
molestation by **Landlord** or its agents or employees, subject to
the title matters set forth on Exhibit D.

(b)    **Landlord** hereby calls **Tenant's** attention to the existence of a provision (the "**Pueblo Exclusive**") in that certain lease with Pueblo International, Inc. (the "**Pueblo Lease**"), pursuant to which Pueblo International, Inc. is a tenant at certain property located proximate to the **Land**. **Tenant** acknowledges that it has received a copy of the **Pueblo Exclusive**.    Pursuant to the **Pueblo Exclusive**, the operation of a supermarket, grocery or convenience store is not permitted on the Land for the duration of the **Pueblo Lease**.    If all extensions are exercised, the term of the **Pueblo Lease** will expire on October 3, 2030.    **Tenant** hereby agrees not to operate or suffer the operation of a supermarket, grocery, or convenience store within the **Demised Premises** for the term of the **Pueblo Lease**.

ARTICLE XV

BANKRUPTCY

Section 15.1    <u>Conditions to the Assumption and Assignment of the Lease under Chapter 7 of the Bankruptcy Act</u>. In the event that **Tenant** shall file a petition, or an order for relief is entered against **Tenant,** under Chapter 7 of the Bankruptcy Code, and the trustee of **Tenant** shall elect to assume this **Lease** for the purpose of assigning the same, such election or any assignment may only be made if all of the terms and conditions of Sections 15.2 and 15.4 hereof are satisfied.    If such trustee shall fail to elect to assume this **Lease** for the purpose of assigning the same within sixty (60) days subject to such extensions as a court may grant after such trustee shall have been appointed, this **Lease** shall be deemed to have been rejected.    **Landlord** shall be thereupon immediately entitled to possession of the **Demised Premises** without further obligation to **Tenant** or such trustee, and this **Lease** shall be canceled, but **Landlord's** right to be compensated for damages in such bankruptcy proceeding shall survive.

Section 15.2    <u>Conditions to the Assumption of the Lease in Bankruptcy Proceedings</u>.    In the event that **Tenant** files a petition for reorganization under Chapters 11 or 13 of the Bankruptcy Code or a proceeding filed by or against **Tenant** under any other chapter of the Bankruptcy Code is converted to a Chapter 11 or 13 proceeding, and the trustee of **Tenant** or **Tenant** as a debtor-in-possession fails to assume this **Lease** within sixty (60) days subject to such extensions as a court may grant from the date of filing of the petition or such conversion, the trustee or debtor-in-possession shall be deemed to have rejected this **Lease**.    No election to assume this **Lease** (including any assumption under Section 15.1 above) shall be effective unless in

writing and addressed to **Landlord** and unless, in **Landlord's** business judgment, all of the following conditions, which **Landlord** and **Tenant** acknowledge to be commercially reasonable, have been satisfied:

(a)    The trustee or debtor-in-possession has cured or has provided **Landlord adequate assurance** (as defined hereunder) that: (i) within ten (10) days from the date of such assumption, subject to such extensions as a Court may grant, the trustee will cure or commences to cure and proceed with due diligence to cure all monetary defaults under this **Lease**, and (ii) within thirty (30) days from the date of such assumption, the trustee will cure all non-monetary defaults under this **Lease**.

(b)    The trustee or the debtor-in-possession has compensated **Landlord,**  or has provided to **Landlord adequate assurance** (as defined hereunder) that within ten (10) days subject to such extensions as a court may grant from the date of assumption **Landlord** will be compensated, for any pecuniary loss incurred by **Landlord** arising from the default of **Tenant,**  the trustee, or the debtor-in-possession, as such loss is described in **Landlord's** written statement of pecuniary loss, if acceptable to the court, sent to the trustee or debtor-in-possession.

(c)    The trustee or the debtor-in-possession has provided **Landlord** with adequate assurance of the future performance of each of **Tenant's** obligations under the **Lease**  such as is required by the court; provided, however, that except as may be modified by a court: (i) the trustee or debtor-in-possession shall also deposit with **Landlord,**  as security for the timely payment of Rent, an amount equal to three (3) months' Fixed Annual **Rent** (as adjusted pursuant to Section 15.2(c)(ii) below) accruing under this **Lease**; and (ii) from and after the date of the assumption of this **Lease**, the trustee or debtor-in-possession shall pay as minimum rent an amount equal to the sum of the Fixed Annual Rent otherwise payable hereunder, plus the highest amount of the annual **Percentage Rent** paid by **Tenant** to **Landlord** from the **Commencement Date** to the date of **Tenant's** petition under the Bankruptcy Code, which amount shall be payable in advance, in equal monthly installments, on each day that Fixed Annual Rent is payable; (iii) the obligations imposed upon the trustee

or debtor-in-possession shall continue with respect to **Tenant** after the completion of bankruptcy proceedings.

For the purposes of this Section, "**adequate assurance**" shall mean:

(aa) if the court shall determine that the trustee or the debtor-in-possession has, and will continue to have, sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure **Landlord** that the trustee or debtor-in-possession will have sufficient funds to fulfill the obligations of **Tenant** under this **Lease** and to keep the **Demised Premises** stocked with merchandise and properly staffed with sufficient employees to conduct a fully operational, actively promoted business on the **Demised Premises**; and

(bb) an order shall have been entered segregating sufficient cash payable to **Landlord** or there shall have been granted a valid and perfected first lien and security interest in property of the **Tenant,** trustee or debtor-in-possession, acceptable as to value and kind to the court, to secure to **Landlord** the obligation of the trustee or debtor-in-possession to cure the monetary and non-monetary defaults under this **Lease** within the time periods set forth above.

Section 15.3    Intentionally Deleted.

Section 15.4    Conditions to the Assignment of the Lease in Bankruptcy Proceedings.  If the trustee or debtor-in-possession has assumed the **Lease**, pursuant to the terms and provisions of Sections 15.1 or 15.2 herein, for the purpose of assigning **Tenant's** interest under this **Lease** or the estate created thereby to any other person, such interest or estate may be so assigned only if **Landlord** shall acknowledge in writing that the intended assignee has provided **adequate assurance of future performance** of all of the terms, covenants and conditions of this **Lease** to be performed by **Tenant,** as directed by the court.  For the purpose of this Section, "**adequate assurance of future performance**" shall mean that, except as may be modified by a court, **Landlord** shall have ascertained that at least each of the following conditions has been satisfied:

(a)  The assignee has submitted a current financial statement audited by a certified public accountant which shows a net worth and working capital

in amounts determined to be sufficient by **Landlord** to
assure the future performance by such assignee of
**Tenant's** obligations under this **Lease**;

(b)  If required by the court, the assignee shall
have obtained guarantees in form and substance
satisfactory to **Landlord** from one or more persons who
satisfy **Landlord's** standards of creditworthiness;

(c)  **Landlord** has obtained all consents or waivers
from any third party required under any lease,
mortgage, financing arrangement or other agreement by
which **Landlord** is bound to enable **Landlord** to permit
such assignment.

Section 15.5  <u>Use and Occupancy Charge</u>.  When, pursuant
to the Bankruptcy Code, the trustee or debtor-in-possession shall
be obligated to pay reasonable use and occupancy charges for the
use of the **Demised Premises** or any portion thereof, such charges
shall not be less than the Fixed Annual Rent and other monetary
obligations of **Tenant** unless the court determines otherwise.

Section 15.6  <u>Tenant's Interest Not Transferable by
Virtue of State Insolvency Law Without Landlord's Consent</u>.
Neither **Tenant's** interest in the **Lease**, nor any lesser interest
of **Tenant** herein, nor any estate of **Tenant** hereby created, shall
pass to any trustee, receiver, assignee for the benefit of
creditors, or any other person or entity, or otherwise by
operation of law under the laws of any state or territory or
other governmental entity having jurisdiction of the person or
property of **Tenant** unless **Landlord** shall consent to such transfer
in writing.  No acceptance by **Landlord** of **Rent** from any such
trustee, receiver, assignee, person or other entity shall be
deemed to have waived, nor shall it waive, the need to obtain
**Landlord's** consent or **Landlord's** right to terminate this **Lease**
for any transfer of **Tenant's** interest under this **Lease** without
such consent.

Section 15.7  <u>Landlord's Option to Terminate Upon
Insolvency of Tenant Under State Insolvency Law</u>.  In the event
the estate of **Tenant** created hereby shall be taken in execution
or by other process of law, or if **Tenant** shall be adjudicated
insolvent pursuant to the provisions of any present or future
insolvency law under the laws of any state or territory or other
governmental entity having jurisdiction (collectively referred to
as "**State Law**"), or if any proceedings are filed by or against
any guarantor of **Tenant's** obligation under the Bankruptcy Code,
or any similar provisions of any future federal bankruptcy law,

or if a receiver or trustee of the property of **Tenant** shall be
appointed under **State Law** by reason of **Tenant's** insolvency or
inability to pay its debts as they become due or otherwise, then,
and in such event, **Landlord** may, at its option, terminate this
**Lease** and all rights of **Tenant** hereunder, by giving **Tenant**
written notice of the election to so terminate, subject to
applicable laws regarding debtor's rights.

   Section 15.8  <u>Regulated Tenants</u>.  If **Tenant** is, or
becomes, a business not subject to the Bankruptcy Code, such as a
banking or an insurance entity, then, in addition to the other
remedies and rights provided to **Landlord** under this **Lease**, at
law, or in equity, **Landlord** may declare **Tenant** in default if (a)
any state, federal or other regulatory authority, administrative
agency, board or other body initiates a proceeding or other
action to take, or actually takes, control or possession of
**Tenant,** if any; or (b) if any such body or court of competent
jurisdiction orders or directs the liquidation or dissolution of
Tenant.


<div align="center">ARTICLE XVI</div>

<div align="center">DEFAULT</div>

   Section 16.1  <u>Events of Default</u>.  In addition to and
notwithstanding any other cause or causes of default which may
have been specified within the provisions of this **Lease**, any one
or more of the following occurrences or acts shall constitute an
Event of Default under this **Lease**:

   (a)  if **Tenant,**  at any time prior to the
**Commencement Date** or during the **Term**, shall (i) fail to
make any payment of **Rent** or other sum herein required
to be paid by **Tenant** for a period of ten (10) days
after delivery by **Landlord** of written notice to **Tenant**
that any such payment has become due (provided **Landlord**
shall be required to give such notice only two times in
any **Lease Year**); or (ii) fail to pay **Rent** or other sums
herein required to be paid by **Tenant** when due on two or
more occasions during any twelve (12) month period; or
(iii) fail to cure, immediately after notice from
**Landlord,**  any hazardous condition which **Tenant** has
created or suffered in violation of law or this **Lease**;
or (iv) fail to observe or perform any of the covenants
in respect to assignment, subletting and any
encumbrance set forth in Article 15 regardless of
whether any such assignment, subletting or encumbrance
is void or voidable; or (v) fail to observe or perform

any other provision of this **Lease** for thirty (30) days after **Landlord** shall have delivered to **Tenant** written notice of such failure (provided that in the case of any default referred to in this clause (v), which cannot be cured within such thirty (30) day period, if **Tenant** shall commence to cure the same within such thirty (30) day period and thereafter shall prosecute the curing of same with diligence and continuity, then the time within which such failure may be cured shall be extended, with **Landlord's** written consent, for such period not to exceed sixty (60) days as may be necessary to complete the curing of same with diligence and continuity); or

(b)   if the **Demised Premises** shall have been abandoned; for the purposes hereof the **Demised Premises** shall be deemed to have been abandoned if **Tenant** transfers a substantial part of **Tenant's** operations, business and personnel from the **Demised Premises** to another location or fails to carry on its business at the **Demised Premises** for a period of five (5) consecutive business days unless precluded from so doing by reason of casualty or condemnation; or

(c)   if **Tenant** fails to construct the **Tenant's Store** in a timely manner or **Tenant** fails to take possession of the **Demised Premises** or open for business when the **Tenant's Store** is complete; or

(d)   If the interest of **Tenant** in the **Demised Premises** shall be offered for sale or sold, or if **Tenant** does, or permits to be done, any act which creates a lien or claim, against the **Demised Premises** which is not bonded.

Section 16.2   Rights and Remedies of Landlord.   If an Event of Default occurs, **Landlord** shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative and shall not operate to exclude or to deprive **Landlord** of any other right or remedy allowed it by law:

(a)   **Landlord** may terminate this **Lease** by giving to **Tenant** notice of **Landlord's** election to do so, in which event the **Term** of this **Lease** shall end, and all right, title and interest of **Tenant** hereunder shall expire on the date stated in such notice;

(b)   **Landlord** may terminate the right of **Tenant** to possession of the **Demised Premises** without terminating this **Lease** by giving notice to **Tenant** that **Tenant's** right of possession shall end on the date stated in such notice, whereupon the right of **Tenant** to possession of the **Demised Premises** or any part thereof shall cease on the date stated in such notice; and

(c)   **Landlord** may enforce the provisions of this **Lease** and may enforce and protect the rights of **Landlord** hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from **Tenant** under any of the provisions of this **Lease**.

Section 16.3   <u>Right to Re-Enter</u>.   If **Landlord** exercises either of the remedies provided in Sections 16.2(a) or (b), **Tenant** shall surrender possession and vacate the **Demised Premises** and immediately deliver possession thereof to **Landlord,**  and **Landlord** may re-enter and take complete and peaceful possession of the **Demised Premises**, full and complete license to do so being hereby granted to **Landlord,**  and **Landlord** may remove all occupants and property therefrom, using such force as may be necessary without relinquishing **Landlord's** right to **Rent** or any other right given to **Landlord** hereunder or by operation of law.

Section 16.4   <u>Right to Relet</u>.   At any time and from time to time after the repossession of the **Demised Premises** or any part thereof pursuant to Section 16.3, whether or not this **Lease** shall have been terminated pursuant to Section 16.2, **Landlord** shall use prudent efforts to relet the **Demised Premises** or any part thereof, in the name of Tenant or **Landlord** or otherwise, without notice to **Tenant,**  for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the **Term**) and on such conditions (which may include free rent or other concessions) and for such uses as **Landlord,**  in its discretion, may determine, and **Landlord** may collect and receive any rents payable by reason of such reletting.   **Landlord** shall not be responsible or liable for any failure to collect any rent due upon such reletting.   **Tenant** agrees that **Landlord** shall have no obligation to relet the **Demised Premises** to a potential substitute tenant (i) before **Landlord** rents other vacant space in the **Retail Center**; (ii) if the nature of the substitute tenant's business is not consistent with the tenant mix of the **Retail Center** or with any other **Tenant's** leases containing provisions against **Landlord** leasing

space in the **Retail Center** for certain uses; or (iii) if the
nature of the substitute **Tenant's** business may have an adverse
impact upon the first-class, high-grade manner in which the
**Retail Center** is operated or with the high reputation of the
**Retail Center**, even though in each of the aforesaid circumstances
the potential substitute **Tenant** may have a good credit rating.

Section 16.5   <u>Tenant to Remain Liable</u>.   No expiration
or termination of this **Lease** pursuant to Section 16.2, by
operation of law or otherwise, and no repossession of the **Demised
Premises** or any part thereof pursuant to Section 16.3 or
otherwise, and no reletting of the **Demised Premises** or any part
thereof pursuant to Section 16.4, shall relieve **Tenant** of its
liabilities and obligations hereunder, all of which shall survive
such expiration, termination, repossession or reletting.

Section 16.6   <u>Current Damages</u>.   If **Landlord** terminates
the right of **Tenant** to possession of the **Demised Premises** without
terminating this **Lease**, **Landlord** shall have the right to
immediate recovery of all amounts then due hereunder.   Such
termination of possession shall not release **Tenant,**  in whole or
in part, from **Tenant's** obligation to pay the **Rent** hereunder for
the full **Term**, and **Landlord** shall have the right, from time to
time, to recover from **Tenant,**  and **Tenant** shall remain liable
for, all Fixed Annual Rent, **Percentage Rent** (as calculated
pursuant to Section 16.12), and any other sums accruing as they
become due under this **Lease** during the period from the date of
such notice of termination of possession to the stated end of the
**Term**.   In any such case, **Landlord** shall use prudent efforts to
relet the **Demised Premises** or any part thereof for the account of
**Tenant** for such rent, for such time (which may be for a term
extending beyond the **Term** of this **Lease**) and upon such terms as
**Landlord** shall determine and collect the rents from such
reletting.   **Landlord** shall not be required to accept any tenant
offered by **Tenant** or to observe any instructions given by **Tenant**
relative to such reletting.   Also, in the event of repairs or
alterations involving the structure or the structural integrity
of the **Demised Premises**, **Landlord** may, to the extent deemed
necessary by **Landlord,**  make such repairs or alterations and in
connection therewith, charge **Tenant,**  and **Tenant** upon demand
shall pay the cost of all the foregoing together with **Landlord's**
expenses of reletting (such liability not to exceed the entire
balance of the unpaid **Rent**).   The rents from any such reletting
shall be applied first to the payment of the expenses of reentry,
redecoration, repair and alterations and the expenses of
reletting and second to the payment of **Rent** herein provided to be
paid by Tenant.   Any excess or residue shall operate only as an
offsetting credit against the amount of **Rent** due and owing as the

same thereafter becomes due and payable hereunder, and the use of such offsetting credit to reduce the amount of **Rent** due **Landlord,** if any, shall not be deemed to give **Tenant** any right, title or interest in or to such excess or residue and any such excess or residue shall belong to **Landlord** solely, and in no event shall **Tenant** be entitled to a credit on its indebtedness to **Landlord** in excess of the aggregate sum, including Fixed Annual Rent, **Percentage Rent** (as calculated pursuant to Section 16.12) which would have been paid by **Tenant** for the period for which the credit to **Tenant** is being determined, had no Event of Default occurred.  No such reentry or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of **Tenant** or as an election on **Landlord's** part to terminate this **Lease**, unless a written notice of such intention is given to **Tenant,**  or shall operate to release **Tenant** in whole or in part from any of **Tenant's** obligations hereunder, and **Landlord,**  at any time, may sue and recover judgment for any deficiencies remaining from time to time after the application of the proceeds of any such reletting from time to time.

Section 16.7  <u>Final Damages</u>.  If this **Lease** is terminated by **Landlord** pursuant to Section 16.2(a), **Landlord** shall be entitled to recover from **Tenant** all **Rent** accrued and unpaid for the period up to and including such termination date, as well as all other additional sums payable by **Tenant,**  or for which **Tenant** is liable or with respect to which **Tenant** has agreed to indemnify **Landlord** under any of the provisions of this **Lease**, which then may be owing and unpaid, and all costs and expenses, including court costs and attorneys' fees incurred by **Landlord** in the enforcement of its rights and remedies hereunder, and, in addition, **Landlord** shall be entitled to recover as damages for loss of the bargain and not as a penalty the aggregate sum which at the time of such termination represents the excess, if any, of the present value discounted as set forth below of the aggregate rents which would have been payable after the termination date had this **Lease** not been terminated, including, without limitation, Fixed Annual Rent at the annual rate or respective annual rates for the remainder of the **Term** specified in Section 4.1 of this **Lease** or elsewhere herein, **Percentage Rent** (as calculated pursuant to Section 16.12) for the remainder of the **Term** of this **Lease**, over the then present value of the then aggregate fair rental value of the **Demised Premises** for the balance of the **Term**, such present value to be computed in each case on the basis of a five percent (5%) per annum discount from the respective dates upon which such rentals would have been payable hereunder had this **Lease** not been terminated, and (c) any additional damages, including reasonable attorneys' fees and court costs, which **Landlord** has sustained as a result of the

breach of any of the covenants of this **Lease** other than for the
payment of **Rent**.

Section 16.8   <u>Failure to Operate the Demised Premises</u>
<u>Continuously</u>.   **Landlord** and **Tenant** covenant and agree that
because of the difficulty or impossibility of determining
**Landlord's** damages by way of loss of anticipated **Percentage Rent**
or rent from other prospective tenants in the **Retail Center** or by
way of loss of value in the **Retail Center** because of adverse
publicity or appearances by **Tenant's** action, if **Tenant** (a) fails
to open the **Demised Premises** for business to the public on the
**Commencement Date**, or (b) ceases at any time during the **Operating**
**Covenant Term** to operate **Tenant's** business from the **Demised**
**Premises** continuously and without interruption, then, unless and
until **Landlord** exercises its right to terminate this **Lease** as
provided hereinabove, **Tenant** shall pay to **Landlord,**  in addition
to **Rent** and in lieu of lost **Percentage Rent**, one third (1/3) of
one-thirtieth (1/30) of the monthly installment of Fixed Annual
Rent then due under this **Lease**, for each day (excluding those
days **Tenant** is not obligated hereunder to be open for business)
the **Demised Premises** are not opened or reopened for business, as
the case may be.

Section 16.9   <u>Removal of Personal Property</u>.   All
property of **Tenant** removed from the **Demised Premises** by **Landlord**
pursuant to any provisions of this **Lease** or of law may be
handled, removed or stored by **Landlord** at the cost and expense of
**Tenant,**  and **Landlord** in no event shall be responsible for the
value, preservation or safekeeping thereof.   **Tenant** shall pay
**Landlord** for all expenses incurred by **Landlord** for such removal
and storage as long as the same is in **Landlord's** possession or
under **Landlord's** control.   All such property not removed from the
**Demised Premises** or retaken from storage by **Tenant** within thirty
(30) days after the end of the **Term**, however terminated, at
**Landlord's** option, shall be conclusively deemed to have been
conveyed by **Tenant** to **Landlord** as by bill of sale without further
payment or credit by **Landlord** to Tenant.

Section 16.10   <u>Rights Cumulative Non-Waiver</u>.   No right
or remedy herein conferred upon or reserved to either party is
intended to be exclusive of any other right or remedy, and each
and every right and remedy shall be cumulative and in addition to
any other right or remedy given hereunder or now and hereafter
existing at law or in equity or by statute.   The failure of
either party to insist at any time upon the strict performance of
any covenant or agreement or to exercise any option, right, power
or remedy contained in this **Lease** shall not be construed as a
waiver or relinquishment thereof for the future.   The receipt by

**Landlord** of any **Rent** or any other charge payable hereunder with knowledge of the breach of any covenant or agreement contained in this **Lease** shall not be deemed a waiver of such breach, and no waiver by either party of any provision of this **Lease** shall be deemed to have been made unless expressed in writing and signed by the party.  In addition to the other remedies provided in this **Lease**, each party shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the covenants, agreements, conditions or provisions of this **Lease**, or to a decree compelling performance of this **Lease**, or to any other remedy allowed at law or in equity.

Section 16.11  <u>Attorneys' Fees</u>.  Each party shall pay all of the other party's costs, charges and expenses, including court costs and attorneys' fees, incurred in enforcing such party's obligations under this **Lease**, incurred by the prevailing party, in any litigation, negotiation or transaction in which a party causes the other party, without the prevailing party's fault, to become involved or concerned.

Section 16.12  <u>Calculation of Percentage Rent</u>.  In the event that **Landlord,** after the occurrence of an Event of Default, either terminates this **Lease** or terminates **Tenant's** right of possession without terminating this **Lease**, **Percentage Rent**, for purposes of Sections 16.6 and 16.7, shall be calculated as follows:

(a)  If an Event of Default causing such termination occurs after the expiration of three (3) complete calendar years occurring within the **Term**, annual **Percentage Rent** shall be calculated on the basis of annual **Gross Sales** equal to the greater of (i) **Gross Sales** for the last complete **Lease Year** prior to the occurrence of the Event of Default, or (ii) the average of **Gross Sales** for each of the last three (3) complete **Lease Years** occurring within the **Term** prior to the occurrence of the Event of Default.

(b)  If the Event of Default causing such termination occurs prior to the expiration of three (3) complete **Lease Years** occurring within the **Term**, annual **Percentage Rent** shall be calculated on the basis of annual **Gross Sales** equal to the greater of (i) **Gross Sales** for the last complete **Lease Year**, if any, prior to the occurrence of the Event of Default, or (ii) twelve (12) times the average monthly **Gross Sales** occurring during the **Term** prior to the Event of Default.

## ARTICLE XVII

### TRANSFERS BY LANDLORD

Section 17.1  Transfers of Landlord's Interest.  Upon transfer or sale of **Landlord's** interest in the **Demised Premises** or under this **Lease**, such transfer or sale shall release **Landlord** from its obligations and duties hereunder upon the assumption of all such obligations and duties by the transferee of **Landlord;** provided, however, **Landlord** shall not be released from its obligations or duties arising before such transfer.

## ARTICLE XVIII

### CONCERNING MORTGAGE OF THE LEASEHOLD

Section 18.1  No Right to Mortgage.  **Tenant** shall not have the right to encumber by deed to secure debt, mortgage, deed of trust, or other instrument in the nature thereof as security for any debt or obligation, **Tenant's** right, title and interest hereunder, including but not limited to **Tenant's** interest in the **Demised Premises** and the **Tenant's Store** thereon.

## ARTICLE XIX

### MISCELLANEOUS

Section 19.1  Holding Over.  In the event **Tenant** remains in possession of the **Demised Premises** after the expiration of the tenancy created hereunder and without the execution of a new lease, **Tenant,**  at the option of **Landlord,** shall be deemed to be occupying said **Demised Premises** as a **Tenant** from month to month, at a monthly rental equal to one and one-third times (i) the amount of the last monthly installment of Fixed Annual Rent; (ii) one-twelfth (1/12th) of the average of the **Percentage Rent** payable hereunder for the last three (3) **Lease Years**; and (iii) the average monthly amount of all other items of **Rent** payable hereunder, subject to all other conditions, provisions and obligations of this **Lease** insofar as the same are applicable to a month-to-month tenancy.  **Tenant** shall indemnify **Landlord** against loss or liability resulting from **Tenant's** delay in so surrendering the **Demised Premises**, including, without limitation, any claims made by any succeeding tenant founded on such delay.  **Tenant** shall not interpose any counterclaim or counterclaims in an unlawful detainer proceeding or other action based on holdover.  Acceptance by **Landlord** of **Rent** after such termination shall not of itself constitute a renewal of this **Lease**.  Nothing contained in this Section shall be construed or

shall operate as a waiver of **Landlord's** right of reentry or any other right or remedy of **Landlord.**

Section 19.2  <u>Non-Waiver of Default</u>.  No acquiescence by either party to any default by the other party hereunder shall operate as a waiver of its rights with respect to any other breach or default, whether of the same or any other covenant or condition.

Section 19.3  <u>Recording</u>.  **Tenant** may record this **Lease** at **Tenant's** sole cost and expense. Once the **Lease** is terminated, **Tenant** shall pay for or reimburse **Landlord** for all costs related to cancellation at the Registry of Property of said recordation.

Section 19.4  <u>Notice</u>.  Any notice or consent required to be given by or on behalf of any party hereto to any other party shall be in writing and mailed by registered or certified mail, return receipt requested, or sent by air courier or expedited mail service or personal delivery, addressed as follows:

|  |  |
|---|---|
| If to Landlord: | Fringe Area (II) S.E.<br>c/o Plaza Las Americas, Inc.<br>P.O. Box 363268<br>San Juan, Puerto Rico 00936-3268 |
| With a copy to: | Fringe Area Director of Leasing<br>c/o Plaza Las Americas, Inc.<br>P.O. Box 363268<br>San Juan, Puerto Rico  00936-3268 |
| If to **Tenant**: | Kmart Stores, Inc.<br>3100 West Big Beaver Road<br>Troy, Michigan  48084-3163<br>Attention:  Vice-President -<br>Real Estate |
| With a copy to: | William J. Moreland,<br>Director of Real Estate<br>Southeast Region<br>1140 Roswell Road<br>Marietta, Georgia  30062 |

and

With a copy to:    Stephen Herseth, Esq.
                   Schwartz, Cooper, Greenberger
                     & Krauss
                   Suite 2700
                   180 N. LaSalle Street
                   Chicago, Illinois  60601

or at such other address as may be specified from time to time in
writing.  All such notices hereunder shall be deemed to have been
given on the date of delivery or the date marked on the return
receipt unless delivery is refused or cannot be made, in which
case the date of postmark shall be deemed the date notice has
been given.

Section 19.5  <u>Successors and Assigns</u>.  All covenants,
promises, conditions, representations, and agreements herein
contained shall be binding upon, apply, and inure to the parties
hereto and their respective heirs, executors, administrators,
successors, and permitted assigns.

Section 19.6  <u>Time is of the Essence</u>.  Time is of the
essence hereof.

Section 19.7  <u>Partial Invalidity</u>.  If any provision of
this **Lease** or the application thereof to any person or
circumstance shall, to any extent be held invalid or
unenforceable, then the remainder of this **Lease** or the
application of such provision to persons or circumstances other
than those as to which it is held invalid or unenforceable shall
not be affected thereby, and each provision of this **Lease** shall
be valid and enforced to the fullest extent permitted by law.
This Section shall not apply if **Tenant's** right to possession of
the **Demised Premises** is held invalid or unenforceable (except in
instances of a Total Taking or **Tenant's** default).

Section 19.8  <u>Interpretation</u>.  In interpreting this
**Lease** in its entirety, the printed provisions of this **Lease** and
any additions written or typed thereon shall be given equal
weight, and there shall be no inference or rule of construction,
by operation of law or otherwise, that in the event of ambiguity
or otherwise any provisions of this **Lease** shall be construed
against either party hereto.

Section 19.9  <u>Headings, Captions and References</u>.  The
section captions contained in this **Lease** are for convenience only
and do not in any way limit or amplify any term or provision
hereof.  The use of the masculine or neuter genders herein shall
include the masculine, feminine and neuter genders and the

singular form shall include the plural when the context so
requires.

Section 19.10  <u>Brokerage Commissions</u>.  Each party to
this **Lease** represents and warrants to the other that no real
estate broker or agent has been involved in the procurement of
this **Lease**.  Each party shall indemnify and save the other wholly
harmless against any loss, cost, or other expenses, including
reasonable attorney's fees, that may be incurred by such other
party by reason of any breach by such party of its foregoing
warranties.

Section 19.11  <u>Time</u>.  Whenever the last day for the
exercise of any privilege or the discharge of any duty hereunder
shall fall upon a Saturday, Sunday or any public or legal
holiday, the party having such privilege or duty shall have until
5:00 p.m. on the next succeeding business day to exercise such
privilege or to discharge such duty.

Section 19.12  <u>Estoppel Certificate</u>.  Either party
agrees within a reasonable period of time after request therefor
by the other party and in any event within thirty (30) days of
notice to execute and deliver to the requesting party a
statement, certifying to its actual knowledge (a) whether or not
this **Lease** is in full force and effect, (b) the date of
commencement and termination of the term of this **Lease**, (c) the
date to which rental and all other charges hereunder are paid
currently without any offset or defense thereto (or stating any
such offset or defense), (d) the amount of rental and all other
charges hereunder, if any, paid in advance, (e) whether or not
this **Lease** has been modified and, if so, identifying the
modifications, (f) to such party's knowledge that there are no
uncured defaults by the other party or describing the claimed
defaults and (g) such other matters as the requesting party shall
reasonably request.  Nothing in any such estoppel statement shall
be deemed to modify or amend this **Lease**.

Section 19.13  <u>Governing Law</u>.  This **Lease** shall be
construed under the laws of the Commonwealth of Puerto Rico,
without reference to choice of law rules.

Section 19.14  <u>Force Majeure</u>.  In the event that either
party shall be delayed or hindered in, or prevented from, the
performance of any construction work required under this **Lease** to
be performed by the party and such delay or hindrance is due to
strikes, lockouts, acts of God, governmental restrictions, enemy
act, civil commotion, unavoidable fire or other casualty, or
other causes of a like nature beyond the reasonable control of

the party so delayed or hindered (a "**Force Majeure Event**"), then performance of such construction work shall be excused for the period of such delay and the period for the performance of such work, shall be extended for a period equivalent to the period of such delay.  Lack of financial resources on the part of either party shall not be a **Force Majeure Event**.

Section 19.15  <u>Lease</u>.  Notwithstanding anything to the contrary herein contained, **Tenant** agrees that any liability that **Landlord** may have under this **Lease** shall be limited to liability arising from **Landlord's** failure to perform its obligations under this **Lease** and **Landlord's** liability arising from its failure to perform its obligations under this **Lease** shall be limited to **Landlord's** interest in the **Retail Center**.

Section 19.16  <u>Default Rate</u>.  "**Default Rate**" means an amount equal to the prime rate announced by Citibank, New York from time to time plus two percent (2%).

Section 19.17  <u>No Joint Venture</u>.  Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed.

Section 19.18  <u>Third Party Beneficiary</u>.  Nothing contained in this **Lease** shall be construed so as to confer upon any other party the rights of a third party beneficiary.

Section 19.19  <u>Financial Information</u>.  **Tenant** covenants and agrees that it will, upon the request of **Landlord,** furnish or cause to be furnished to **Landlord** within 90 days after the close of each fiscal year of **Tenant,**  the 10-K Annual Report of **Tenant** filed with the Securities Exchange Commission (the "**SEC**") or a balance sheet and profit and loss and surplus statement of **Tenant** audited by an independent public accounting firm showing the financial condition of **Tenant** as of the close of such fiscal year and the results of **Tenant's** operations during such fiscal year and certified without qualification by such firm to have been prepared in accordance with generally accepted accounting principles, consistently applied.

Section 19.20  <u>Integration</u>.  This **Lease** constitutes the entire agreement between the parties hereto and there are no other agreements, representations, warranties or understandings between the parties  other than those expressly set forth in the above-mentioned agreements.

Section 19.21  <u>Priority of Lease and Mortgages</u>.  (a) It is a condition of this **Lease** that **Landlord** shall obtain from the

mortgagee of any present mortgage on the **Retail Center** a non-disturbance and attornment agreement, which agreement shall provide, that in the event of foreclosure by such mortgagee, such mortgagee shall recognize this **Lease**, including all of **Tenant's** rights hereunder. **Landlord** further agrees that **Landlord** shall obtain a similar non-disturbance and attornment agreement from any mortgagee under any future mortgage which may be constituted prior to **Tenant's** recordation of this **Lease**.

(b)   In the event that **Tenant** shall record this **Lease** in the Registry of Property in accordance with the provisions of Article 36 hereof, **Landlord** agrees that **Landlord** shall obtain from any then existing mortgagee(s) the subordination of the lien of its (their respective) mortgage(s) to the lien of this **Lease**, subject to **Tenant's** executing and delivering or otherwise agreeing to attorn to the purchaser or subsequent owner of the **Retail Center** through foreclosure or other disposition.

Section 19.22   <u>Liability of Holder of Mortgage:</u> <u>Attornment</u>. It is further agreed that (a) if any existing or prospective mortgage, deed of trust or similar instrument ("**Mortgage**") shall be foreclosed, (i) the holder of the **Mortgage** (or its grantee) or purchaser at any foreclosure sale (or grantee in a deed in lieu of foreclosure), as the case may be, shall not be (A) liable for any act or omission of any prior landlord (including Landlord), (B) subject to any offsets or counterclaims which **Tenant** may have against a prior landlord (including Landlord), or (C) bound by any prepayment of **Rent** which **Tenant** may have made in excess of the amounts then due for the next succeeding month; (ii) the liability of the mortgagee or trustee hereunder or purchaser at such foreclosure sale or the liability of a subsequent owner designated as **Landlord** under this **Lease** shall exist only so long as such trustee, mortgagee, purchaser or owner is the owner of the **Retail Center** and such liability shall not continue or survive after further transfer of ownership; and (iii)upon request of the mortgagee or trustee, if the **Mortgage** shall be foreclosed, **Tenant** will attorn, as **Tenant** under this **Lease**, to the purchaser at any foreclosure sale under any **Mortgage**, and **Tenant** will execute such instruments as may be necessary or appropriate to evidence such attornment; and (b) this **Lease** may not be modified or amended so as to reduce the **Rent** or shorten the **Term** provided hereunder, or so as to affect adversely in any other respect any material extent the rights of **Landlord,** nor shall this **Lease** be canceled or surrendered, without the prior written consent, in each instance, of the mortgagee or trustee under any **Mortgage**.

Section 19.23  <u>No Oral Modifications</u>.  This **Lease** contains the entire agreement between the parties hereto and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this **Lease**, will alter the covenants, agreements and undertakings herein set forth.  This **Lease** shall not be modified in any manner, except by an instrument in writing executed by all parties.

Section 19.24  <u>Waiver of Jury Trial</u>.  Each party hereby waives its right to a jury trial in action, proceeding or counterclaim brought by either party against the other.

Section 19.25  <u>Recycle Program</u>. **Tenant** agrees to cooperate with **Landlord** in any reasonable recycling program adopted by **Landlord** for the **Retail Center**.

Section 19.26  <u>Assignment by Landlord</u>.  **Landlord** may at any time assign this **Lease** and all its right, title, and interest herein, including the rents, income, and proceeds generated or to be generated under this **Lease**.

## ARTICLE XX

### RIGHTS RESERVED TO LANDLORD

Section 20.1  <u>Rights Reserved to Landlord</u>. **Landlord** reserves the following rights, exercisable without notice and without liability to **Tenant** for damage or injury to property, person or business and without either effecting an eviction or disturbance of **Tenant's** use or possession, giving rise to any claim for setoff or abatement of **Rent** or affecting any of **Tenant's** obligations under this **Lease**:

(a)  to change the name or street address of the **Retail Center**;

(b)  to install and maintain signs on the **Retail Center**;

(c)  to prescribe the location and style of the store number for the **Retail Center**;

(d)  to grant to anyone the right to conduct any business or render any service in the **Retail Center**, or the right to use any premises in the **Retail Center** for a use which

is the same as or similar to the Permitted
Use;

(e)   upon three (3) days notice, if
**Tenant** ceases to pay **Rent** as required by this
**Lease**, if **Tenant** is in violation of **Tenant's
Operating Covenant** or if **Landlord** has a right
of recapture under Section 8.7, to exhibit
the **Demised Premises** at reasonable hours, and
to decorate, remodel, repair, alter or
otherwise prepare the **Demised Premises** for
reoccupancy at any time after **Tenant** vacates
or abandons the **Demised Premises**;

(f)   upon reasonable notice (except in
the event of an emergency) to enter the
**Demised Premises** at reasonable hours for
reasonable purposes, including inspection and
the performance of services to be provided
hereunder;

(g)   in case of fire, invasion,
insurrection, mob, riot, civil disorder,
public excitement or other commotion, or
threat thereof, **Landlord** reserves the right
to limit or prevent access to the **Retail
Center** during the continuance of the same or
otherwise to take such action or preventive
measures deemed necessary by **Landlord** for the
safety or security of the tenants or other
occupants of the **Retail Center** or for the
protection of the **Retail Center** and the
property in the **Retail Center**.  **Tenant** agrees
to cooperate in any reasonable safety or
security program developed by **Landlord;**

(h)   to control and prevent access to
non-general public areas of the **Retail
Center**;

(i)   provided that reasonable access to
the **Demised Premises** is maintained and the
business of **Tenant** is not interfered with
unreasonably, but subject to the limitations
set forth in Section 2.1 to rearrange,
relocate, enlarge, reduce or change walkways,
exits, entrances in or to the **Retail Center**
and to decorate and to make, at its own

expense, repairs, alterations, additions and improvements, structural or otherwise, in or to the **Retail Center** or any part thereof, and any adjacent building, land, street or alley, including for the purpose of connection with or entrance into or use of the **Retail Center** in conjunction with any adjoining or adjacent building or buildings, now existing or hereafter constructed, and for such purposes may erect scaffolding and other structures reasonably required by the character of the work to be performed, all materials that may be required to make such repairs, alterations, improvements or additions, and in that connection **Landlord** may temporarily close public entry ways and other public spaces and may interrupt or temporarily suspend any services or facilities agreed to be furnished by **Landlord,** all without the same constituting an eviction of **Tenant** in whole or in part and without abatement of **Rent** by reason of loss or interruption of the business of **Tenant** or otherwise and without in any manner rendering **Landlord** liable for damages or relieving **Tenant** from performance of **Tenant's** obligations under this **Lease**. **Landlord,** at its option, may make any repairs, alterations, improvements and additions in and about the **Retail Center** during ordinary business hours and, if **Tenant** desires to have such work done to the **Retail Center** other than during business hours, **Tenant** shall pay all overtime and additional expenses resulting therefrom;

(j) from time to time to make and to adopt such reasonable rules which are non-discriminatory and regulations, in addition to or other than or by way of amendment or modification of the rules and regulations contained in Exhibit E or other Sections of this **Lease**, for the protection and welfare of the **Retail Center** and its tenants and occupants, as **Landlord** may determine, provided no such rules shall diminish **Tenant's** rights under this **Lease**.

ARTICLE XXI

MORTGAGEE PROTECTION

Section 21.1  Mortgagee Protection.  **Tenant** agrees to give any holder of any **Mortgage** against the **Retail Center**, or any interest therein, by registered or certified mail, a copy of any notice or claim of default served upon **Landlord** by **Tenant,** provided that prior to such notice, **Tenant** has been notified in writing of the address of such **Mortgage** holder.  **Tenant** further agrees that if **Landlord** has failed to cure such default within thirty (30) days after such notice to **Landlord** (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if **Landlord** has commenced within such thirty (30) days and is diligently pursuing the remedies or steps necessary to cure or correct such default), then the holder of the **Mortgage** shall have an additional thirty (30) days within which to cure or correct such default (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary, if such holder of the **Mortgage** has commenced within such thirty (30) days and is diligently pursuing the remedies or steps necessary to cure or correct such default).

      IN WITNESS WHEREOF, intending to be legally bound, this
**Lease** has been executed as of the day and year first above
written.

LANDLORD:

FRINGE AREA (II) S.E., INC.

By: _____ (SEAL)
Its:

TENANT:

KMART CORPORATION

By: _____
Its:_____LORRENCE T. KELLAR_____
          V.P. REAL ESTATE

STATE OF MICHIGAN      )
                            ) SS

COUNTY OF OAKLAND    )

         I do hereby certify that on this _26_ day of _August_ 19_97_, before me, _Victoria L. Boekhout_ a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared _Lorrence T. Kellar_____ ~~and~~ _____, known to me to be the Vice President Real Estate ~~and Assistant Secretary~~ of Kmart Corporation, who, being by me duly sworn, did depose and say that ~~they~~ resides in _Troy, Michigan_____, respectively; that ~~they are~~ the Vice President - Real Estate ~~and Assistant Secretary~~ respectively of Kmart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposed therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

         In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                                     _____
                                       Notary Public, _____ County,
                                       State of _____

                                       _____

                              **VICTORIA L. BOEKHOUT**
                        Notary Public, Macomb County, Mich.
                           Acting in Oakland County
                    My Commission Expires: Sept.14,1998

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND


Portion No. 1 - URBAN:  Parcel of land of irregular shape and flat topography located in Hato Rey Ward of the Municipality of San Juan, Puerto Rico bounded on the North beginning on point 24 towards point 45 with a course N 39° 50' 35" East a distance of 39.834 meters bounding with the southerly limit of the easement of De Diego (PR #22) Expressway.  From point 45 running along to point 44 on a course of N 39° 50' 33" East, a distance of 81.414 meters bounding with the southerly limit of the easement of De Diego Expressway (PR #22).  From point 44 running along to point 43 with a course N 38° 46' 54" East, a distance of 49.147 meters, bounding with southerly limit of the easement of De Diego Expressway (PR #22).  From point 43 to point 42 a course of N 51° 56' 42" East a distance of 56.663 meters bounding with the southerly limit of the De Diego Expressway (PR #22).  From point 42 to point 41 a course of N 64° 28' 28" East a distance of 48.316 meters bounding with the southerly limit of the easement of the De Diego Expressway (PR #22).  From point 41 to point 40 a course of N 76° 36' 27" East a distance of 48.328 meters bounding with the southerly limit of the easement of De Diego Expressway (PR #22).  From point 40 to point 39 a course of S 90° 00' 00" a distance of 4.280 meters bounding with the southerly limit of the easement of De Diego Expressway (PR #22).  From point 39 to point 38 a course of S 26° 35' 59" East a distance of 196.161 meters, bounding with Frank Becerra Street.  From point 38 turning towards the right to point 36, in a central angle of 89° 57' 37" with a curve having a length of 13.346 meters, bounding with Frank Becerra Street and Plaza Las Americas Avenue.  From point 36 turning towards the right to point 34 in a central angle of 29° 30' 41" having a length of 15.452 meters, bounding with Plaza Las Americas Avenue.  From point 34 to point 33 running N 87° 02' 52" a distance of 27.376 meters, bounding with Plaza Las Americas Avenue.  From point 33 turning towards the left to point 31 in a central angle of 29° 30' 17" having a length of 20.598 meters bounding with Plaza Las Americas Avenue.  From point 31 to point 23 a course of S 63° 27' 29" a distance of 243.570 meters, bounding with Plaza Las Americas Avenue.  From point 23 to point 24, the point of beginning, a course of N 26° 42' 10" a distance of 114.921 meters, bounding with Parcel A segregated.  Has an area of 53,599.81 square meters equivalent to 13.6373 cuerdas.



415489.002
August 15, 1997

<u>EXHIBIT B</u>

SITE PLAN



| NO | ISSUE / REVISIONS | DATE |
|---|---|---|
| | | |

**LEGEND:**

- PROPERTY LIMIT LINE
- CENTER LINE
- 506 PROPERTY POINT NUMBER
- 72.9342 TIE LOT TO MAIN PROPERTY

**NOTES:**

1- ALL DISTANCES ARE EXPRESSED IN METERS.
2- ALL ANGLES REFERRED TO THE TRUE NORTH
3- THE HORIZONTAL CONTROL REFERRED TO THE PLAZA LAS AMERICAS TOPOGRAPHIC AND SURVEY PLAN, NO. 274-02-93, DATED MARCH 25,1993 PREPARED BY LAND SURVEYOR PEDRO J.DAVILA COLON LIC. NO. 9323.
4- ALL DRAWING AND CALCULATIONS FOR THIS MAP WERE DONE USING AUTOCAD RELEASE TWELVE (12) AND SURVCADD 12.3 SOFTWARE FOR WINDOWS.

**SURVEY CERTIFICATE**

I DO HEREBY CERTIFY THAT THIS SURVEY WAS MADE DURING THE MONTH OF JANUARY 1997, THAT ELECTRONIC DISTANCE MEASURING INSTRUMENT (NIKON TOTAL STATION, DTM-1 AND AUTOMATIC LEVEL NIKON AS-C) WERE USED FOLLOWING THE STANDARD SURVEY TECHNIQUES FOR THESE CASES.

Kelly Alvarez BSLS Lic. 7178

SEAL

ARTURO J. GARCIA, AIA
ARCHITECTS
815 FERNANDEZ JUNCOS AVENUE
MIRAMAR SANTURCE, PR 00907
(809) 722-0945 / 722-0993 FAX (809) 723-3082

CONSULTANT
KELLY ALVAREZ – ASSOCIATES
engineers – land surveyors

PO BOX 6888, SAN JUAN PUERTO RICO 00936 – TEL (809)783-6925 FAX (809)749-9060

PROJECT NAME
**PLAZA LAS AMERICAS**
**POWER CENTER**
CALLE CALAF ESQ. F BECERRA
HATO REY, PR
FRINGE AREA (PLA) & FRINGE AREA (II), INC.

DRAWING TITLE

| | |
|---|---|
| PROJECT ID: KA96-035 | SCALE: 1:500 |
| INITIAL DATE: 7/23/97 | PLOT SCALE: 1:500 |
| XREF 1: | DRAWING NO: |
| XREF 2: | |
| XREF 3: | |
| XREF 4: | |
| SERVER\\ PATH \ FILENAME: PLA-PC\tnt\km\dwg\exh\7/23/97 | ___ of ___ |

EXHIBIT C

WORK AND WORK SCHEDULE

Part I: Landlord's Work

The work to be performed by **Landlord** ("Landlord's Work") shall include and be limited to the following:

1. Building Pad: Provision of a dirt building pad "as is" (cleared, grubbed and partially graded) on which the **Tenant's Store** is to be located.

2. Site Improvement Work consisting of:

   i)   clearing and grading;
   ii)  off-site work, to the extent required by **Landlord's** approved plans;
   iii) storm water management system; and
   iv)  installation of common utility facilities as follows: potable water (2" service connection); fire protection (8" diameter service connection); sanitary sewer (6" diameter service connection), telephone service (2 empty conduits); and electrical service (three way GOABS, ground operated, air break switch), intercom connection (1" conduit to connect to delivery entrance gate), storm sewer system.

Each utility facility shall be brought to within 5' of the **Demised Premises** to points as shown on **Landlord's** plans (with the right of **Landlord** to relocate the points of connection, provided such relocation is carried out without disruption to **Tenant's** business if **Tenant** has opened its store and does not significantly increase **Tenant's** cost of constriction if **Tenant** is still constructing its store.) each utility stubbed off, **Tenant** to provide connections and hookups with local utility and pay related charges.

All utility facilities, except for electrical and telephone, will be made available by May 31, 1997.

3. **Common Areas** including access roads, parking areas, (including the parking deck consisting of a two level, reinforced concrete parking structure), concrete curbs and traffic islands,

parking lots and traffic control signs, landscaping consisting of trees, shrubs, sod and ground cover to the extent required by local authorities, planters and other common area amenities to the extent shown on approved plans.

## Part II: Tenant's Work

A.        **Tenant** shall construct a two-story retail store consisting of approximately 137,000 square feet of gross building area along with perim_____ k docks and accessories and all other improve_____ ithin the definition of **Landlord's Work** under _____ roved by **Landlord**.

B.        **Landlord** sha_____ h a staging area that is partially finished. Up_____ , **Tenant** shall promptly return the staging ar_____ e condition in which it was received from **Lan**_____

## Part III: Work Schedule

A.        Date for **Tenant's** submission of preliminary plans and specifications: June 4, 1997.

B.        Date for **Landlord's** approval or disapproval of **Tenant's** preliminary plans by June 24, 1997.

C.        Date for **Tenant's** submission of corrected preliminary plans and specifications: July 9, 1997.

D.        Outside submittal date for preliminary plans and specifications: Not Applicable.

E.        Date for **Tenant's** submission of working plans and specifications: July 31, 1997.

F.   Date for **Landlord's** notice to **Tenant** [within twenty-one (21) days of receipt of the working plans and specifications] of the conformity of the working plans and specifications to the **Preliminary Plans**: August 21, 1997.

G.   Date for **Tenant's** submission of revised working plans and specifications: August 30, 1997.

H.   Final date for completion of working plans and specifications: September 15, 1997.

I.   Outside submittal date for working plans and specifications: October 19, 1997.

J.   Date for obtaining **Landlord's Approvals**: May 31, 1997.

K.   Outside date for obtaining **Tenant's Permits**: September 15, 1997.

L.   **Tenant** Commencement Construction Date: August 18, 1997.

M.   Targeted completion date for **Tenant's Work**: September 14, 1998.

N.   Outside Completion Date: February 14, 1998.

## EXHIBIT D

### PERMITTED EXCEPTIONS

Please see attached copies of the Hato Rey Title Insurance Agency, Inc. Title Search of the **Land**. (English and Spanish versions) and the disclosure regarding exclusive use that appears in Section 14.1.

EXHIBIT E

RULES AND REGULATIONS
AND
CONSTRUCTION RULES AND REGULATIONS

**RULES AND REGULATIONS**

1.    **Tenant** agrees that it shall observe and comply with the following rules and regulations.  Any provision of these rules and regulations which is in conflict with any provision of the **Lease** shall be superseded by the **Lease.**

A.    **Tenant** shall at all times during the terms of this **Lease** or any extension thereof:

(1)    Keep all merchandise display windows, signs and other advertising and display devices in the **Demised Premises** suitably lighted during such periods of time as the store windows throughout at least twenty-five percent (25%) of the **Retail Center** are illuminated;

(2)    Refrain from using self-illuminated signs located in the interior of the **Demised Premises** and which are visible from the outside to advertise any product, and all signs located in the interior of the **Demised Premises** and visible from the exterior of the **Demised Premises** shall be in good taste so as not to detract from the general appearance of the **Tenant's Store** and the **Retail Center;**

(3)    Keep the **Demised Premises**, including all vestibules, lobbies, entrances, exits and returns located therein, all improvements thereon and all windows, doors, hallways fronting the **Demised Premises** and glass or plate glass fixtures in a safe, neat and clean condition at all times;

(4)    Store all trash, garbage and refuse within the **Demised Premises** in suitable containers and locate them so as not to be visible to customers and business invitees in the **Retail Center** and so as not to create or permit any health or fire hazard.  Such trash, garbage and refuse shall be removed only by way of the rear of the **Demised Premises** or such other places as **Landlord** may designate from time to time and as shall be reasonably convenient for **Tenant,**  and shall be placed outside of the **Demised Premises** prepared for collection in the manner and at the times and places specified by **Landlord** and as shall be reasonably convenient for Tenant.  If **Landlord** shall provide or

designate a service for picking up refuse and garbage, **Tenant** shall use same at **Tenant's** cost, providing such service is reasonably satisfactory to **Tenant** and that the cost thereof is in accordance with local market rates at the time and **Tenant** has not entered into any master agreement for all of **Tenant's** stores in Puerto Rico.  **Tenant** shall pay the cost of removal of any of **Tenant's** refuse or rubbish;

      (5)   Refrain from distributing handbills or advertising material or otherwise soliciting business in the **Common Areas**.  **Tenant** shall not display, paint, place or cause to be displayed, painted or placed any handbills, bumper stickers or other advertising or promotional materials or devices on any vehicle parked in the parking areas of the **Retail Center**;

      (6)   Unless **Tenant** has entered into a master agreement with a reputable pest control extermination contractor, use, at **Tenant's** cost, such pest extermination contractor as **Landlord** may direct and at such intervals as **Landlord** may require, provided such extermination service is reasonably satisfactory to **Tenant** and the cost thereof is in accordance with local market rates at the time, and that the intervals are as reasonably required by **Tenant**;

      (7)   Refrain from parking or unloading any truck or other delivery vehicle in any place other than in front of the freight entrance to the **Demised Premises** as shown on the final **Working Plans** and specifications for the **Retail Center**;

      (8)   Refrain from using the plumbing facilities for any other purpose than that for which they are constructed, and no foreign substance, of any kind whatsoever, shall be thrown therein, and the expense of any breakage, stoppage or damage to the pipes and lines connecting the utilities to the **Demised Premises** resulting from a violation of this provision shall be borne by the tenant who shall, or whose employees shall, have caused it;

      (9)   Refrain from burning any trash or garbage of any kind in or about the **Demised Premises** or the **Retail Center**;

      (10)   Furnish to **Landlord,**  upon **Landlord's** request, the automobile license numbers of **Tenant's** employees' cars.

   B.   **Tenant** shall not, without first obtaining **Landlord's** written consent, during the term of this **Lease** or any extension thereof:

(1)    Conduct any going out of business, fire, bankruptcy, auction or other distress sale in the **Demised Premises**, or in the sidewalks fronting the **Demised Premises**;

(2)    Change the exterior color of the **Demised Premises**, or the color, size, location or composition of any sign or advertisement on the exterior of the **Demised Premises** that may have been theretofore approved by **Landlord;**

(3)    Except as expressly permitted by the **Lease**, use any sidewalks, walkways, or areaways of the **Retail Center** or any vestibule or exterior entranceway located within the **Demised Premises** for the keeping or displaying of any merchandise or other objects, including but not by way of limitation the use of any of the foregoing for any newsstand, cigar stand, sidewalk shops, or vending or dispensing machines, or stands for the sale of food, beverages, ice-cream, popcorn, candy, gum or any other edibles, any other business, occupation or undertaking;

(4)    Place any fence, structure, building, improvement, division, rail, sign or other advertising or display device or obstruction of any type or kind upon the parking areas or any part thereof or upon any vestibule or exterior entranceway located within the **Demised Premises**; provided, however, that **Tenant** may place a fence around its delivery area and dumpsters, subject to **Landlord's** prior approval of the location and appearance of said fence;

(5)    Install in, or about the **Demised Premises** any exterior lighting, amplifiers or similar devices or use in or about the **Demised Premises** any advertising medium which may be heard or experienced outside the **Demised Premises**, such as flashing lights, searchlights, loudspeakers, phonographs or radio broadcasts;

(6)    Attach any awnings or other projections to the outside walls of the **Demised Premises**; and

(7)    Install in or about the **Demised Premises**, including the roof, any type of banner(s) to advertise **Tenant's** presence in the **Retail Center** or special promotions.

C.    **Tenant** agrees that **Landlord** may amend, modify, delete or add, from time to time, new and additional reasonable rules and regulations for the operation and care of the **Retail Center** buildings, and for the operation, care and use in common by all the tenants of the **Retail Center** of the parking and **Common**

**Areas** as defined in this **Lease**, provided that such amendments do not materially diminish **Tenant's** rights under this **Lease**.

2.   Except as expressly permitted by the terms of this **Lease** or any extensions thereof, **Tenant** shall not decorate, paint or in any other manner alter, and shall not install or affix any device, fixture or attachment upon or to the exterior of the **Demised Premises**, including the roof thereof, without the prior written consent thereto of **Landlord;**  and if **Tenant** shall do any of the foregoing acts in contravention of this provision, **Landlord** shall have the right to remove such decoration, paint, alteration, device, fixture or attachment and restore the **Demised Premises** to the condition thereof prior to such act, and the cost of such removal and restoration shall be paid by **Tenant** during the month following such removal or alteration.   **Tenant** shall have the right to install on the roof of the **Demised Premises** an antenna for use in connection with the display and sale of radio, television or other electronic equipment, the height and location and manner of installation of such antenna to be also subject to the approval of **Landlord,**  which approval shall not be unreasonably withheld provided that such equipment causes no liability to **Landlord** and is made in compliance with **Laws**; and provided further, that all equipment is concealed or located in such a way so that it is not visible to passers-by.

**Tenant's** obligation to comply with the foregoing rules and regulations (and any that may hereafter be promulgated by Landlord) is expressly made conditional on **Landlord's** reasonable efforts to cause said rules and regulations and any amendments or additions thereto, or substantially similar rules and regulations, amendments and additions to be applicable to and complied with by all tenants of the **Retail Center**.   Anything herein to the contrary notwithstanding, it is understood and agreed that the above rules and regulations shall only be binding if they are not contrary to any legally binding rules and regulations set forth by any governmental agency or in contradiction of specific provisions of the **Lease**.

## CONSTRUCTION RULES AND REGULATIONS

**Site Rules for Tenant Construction Operation**

1.  General contractor shall keep building area and staging area free from debris, garbage, chemical pollution, etc. And shall agree to a daily clean-up. Garbage receptacles shall be provided for workmen's use.

2.  Adequate portable toilet cubicles (portolets) shall be provided (1 per 25 workers) to be emptied on a weekly basis, or as required by **Landlord.**

3.  Contractors shall agree to attend meetings as designated by the **Landlord** periodically (bi-weekly) to discuss site operation and any conflicts.

4.  The access route to the north shall be kept unobstructed at all times, and used only by rubber-tired vehicles (no tracks).

5.  The construction Staging Area(s) shall be the area(s) designated as the "Staging Area" on Exhibit A-_. Each contractor shall arrange for security for his own construction and Staging Area. He shall install security lighting as necessary.

6.  The construction work force for each project shall park and eat within the designated Staging Area for such project. From time to time, the **Landlord** may designate additional parking space outside the Staging Area on the strict understanding that any damage to same shall be the responsibility of the contractor in question. **Tenant** shall be subject to a fine of $25/day/vehicle for each vehicle parked outside of the designated area.

7.  Each contractor shall ensure that his sub-contractors follow the same regulations, and he shall answer for them in relation to any infringement of these regulations by them.

8.  One project sign, as per **Landlord's** design, is required for each site not to exceed a 8'-0" x 8'-0" limit indicating:

    - name of project
    - name of contractor
    - architect's name

- name of store

No other signs shall be allowed.

.  Each contractor shall erect a perimeter fence around its staging area, as required by **Landlord.**

.  Contractors shall coordinate with **Landlord** when utilizing or moving heavy machinery in high traffic areas so that infringement upon traffic is minimized.

11.  Each contractor shall take adequate steps to prevent nuisance to neighboring businesses with regard to dust abatement, noise, and erosion.

12.  Each contractor shall establish a telephone on his construction site.

EXHIBIT F

TENANT'S ARCHITECTURAL DRAWINGS