# Exhibit H

## SECOND AMENDMENT TO CONSTRUCTION,
## OPERATION AND RECIPROCAL EASEMENT AGREEMENT

THIS SECOND AMENDMENT TO CONSTRUCTION, OPERATION AND
RECIPROCAL EASEMENT AGREEMENT is made as of the 31st day of August, 2004, by
and among FORBES/COHEN FLORIDA PROPERTIES LIMITED PARTNERSHIP, a
Michigan limited partnership (hereinafter referred to as "Developer"), MACY'S EAST, INC.,
an Ohio corporation authorized to do business in the State of Florida (hereinafter referred to as
"Macy"), SEARS, ROEBUCK AND CO., a New York corporation authorized to do business in
the State of Florida (hereinafter referred to as "Sears"), BURDINES, INC., an Ohio corporation
authorized to do business in the State of Florida (hereinafter referred to as "Burdines"),
BLOOMINGDALE'S, INC., an Ohio corporation authorized to do business in the State of
Florida (hereinafter referred to as "Bloomingdale's"), SAKS & COMPANY, a New York
corporation authorized to do business in the State of Florida (hereinafter referred to as "Saks"),
and NORDSTROM, INC., a Washington corporation authorized to do business in the State of
Florida (hereinafter referred to as "Nordstrom").

### R E C I T A L S:

1.        Developer, Macy's predecessor in interest, Macy's New York, Inc., a New York
corporation (hereinafter referred to as "MNY"), Sears and Burdines' predecessor in interest,
Federated Department Stores, Inc., a Delaware corporation (hereinafter referred to as
"Federated"), entered into that certain Construction, Operation and Reciprocal Easement
Agreement, dated May 29, 1987, and recorded in Book 5370, Page 437, Palm Beach County
Records, Palm Beach County, Florida, relating to The Gardens, Palm Beach Gardens, Florida
(hereinafter referred to as the "Original REA").

2.        MNY assigned all of its right, title and interest in and to the Original REA (and its
Lease covering the Macy Parcel) to Macy's predecessor in interest, Macy's South, Inc.,
(hereinafter referred to as "MS"), by instrument dated July 30, 1988.

3.        Federated assigned all of its right, title and interest in and to the Original REA
(and its Lease covering the Burdines Parcel) to Burdines predecessor in interest, Burdines Real
Estate, Inc. (hereinafter referred to as "Burdines RE"), by instrument dated July 29, 1988.

4.        On April 18, 1990, Developer, as Landlord, and Bloomingdale's predecessor in
interest, Bloomingdale's Real Estate, Inc. (hereinafter referred to as "Bloomingdale's RE"), as
Tenant, entered into a Lease of a portion of the Developer's Parcel consisting of approximately
13.398 acres situated in the County of Palm Beach, State of Florida, more particularly described
on Exhibit "A," Part 8, attached to the Original REA, as amended by First Amendment thereto
(hereinafter the Original REA as so amended is referred to as the "REA") and located as shown
on Exhibit "B" attached thereto.

5.        On April 18, 1990, Developer, as Landlord, and Saks, as Tenant, entered into a
Lease of a portion of the Developer's Parcel consisting of approximately 3.931 acres situated in
the County of Palm Beach, State of Florida, more particularly described on Exhibit "A," Part 9,
to the REA and located as shown on Exhibit "B" attached thereto.

6.        The description of the Developer's Parcel, as described in the Original REA, after
the deletion of the Bloomingdale's Parcel and the Saks Parcel therefrom, was reduced from
60.390 acres to 43.061 acres and is more particularly described on Exhibit "A," Part 5, to the
REA and located as shown on Exhibit "B" thereto.

7.        On April 18, 1990, Developer, MS, Sears, Burdines RE, Bloomingdale's RE and
Saks entered into that certain First Amendment to Construction, Operation and Reciprocal
Easement Agreement, recorded in Book 6428, Page 1130, Palm Beach County, Florida.

8.        MS assigned all of its right, title and interest in and to the REA (and its Lease
covering the Macy Parcel) to Macy's predecessor in interest, Macy's Primary Real Estate, Inc.
(hereinafter referred to as "MPRE"), by instrument dated December 19, 1994.

 

9.    Burdines RE was merged into Burdines and Burdines succeeded to Burdines RE's entire right, title and interest in and to the REA (and its Lease covering the Burdines Parcel) on or about March 31, 1998.

10.    Bloomingdale's RE was merged into Bloomingdale's and Bloomingdale's succeeded to Bloomingdale's RE's entire right, title and interest in and to the REA (and its Lease covering the Bloomingdale's Parcel) on or about March 31, 1998.

11.    MPRE assigned all of its right, title and interest in and to the REA (and its Lease covering the Macy Parcel) to Macy by instrument dated June 26, 1997.

12.    Simultaneously herewith, Developer and Burdines have terminated the Lease between Developer, as Landlord, and Burdines, as Tenant, covering the Burdines Parcel, dated July 29, 1987.

13.    Simultaneously herewith, Developer, as Landlord, and Nordstrom, as Tenant, have entered into a Lease of a portion of the Burdines Parcel, consisting of approximately 10.61 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A," Part 10, attached hereto (hereinafter referred to as the "Nordstrom Parcel") and located as shown on Exhibit "B" attached hereto.

14.    That portion of the Burdines Parcel not included within the Nordstrom Parcel has been added to the Developer Parcel.

15.    The parties wish to amend the REA in order to remove Burdines as a party thereto and to add Nordstrom as a party thereto.

16.    Simultaneously herewith, Landlord, as Landlord, and Macy, as Tenant, have entered into an Amendment to Lease covering the Macy Parcel in order to increase the size of the Macy Parcel to 18.322 acres, as more particularly described on Exhibit "A," Part 2, hereof, and Exhibit "A," Part 2, shall be substituted for Exhibit "A," Part 2, in the REA.

17.    As a result of the transactions described in Recitals 14 and 16 above, the Developer Parcel now consists of 43.533 acres, as more particularly described on Exhibit "A," Part 5, attached hereto and Exhibit "A," Part 5, attached hereto shall be substituted for Exhibit "A," Part 5, in the REA.

18.    The Developer Parcel, Macy Parcel, Sears Parcel, Bloomingdale's Parcel, Saks Parcel and Nordstrom Parcel are more particularly located as shown on the survey attached hereto as Exhibit "C."

19.    The parties desire to amend the REA in order to provide for the addition and the construction of the Nordstrom Improvements as herein defined and the operation thereof and to otherwise amend the REA as herein provided.

NOW, THEREFORE, for good and valuable consideration, including the mutual promises, covenants and agreements herein contained, the Parties agree as follows:

1.    (a)    Exhibit "A," Part 2, of the REA shall be deleted and Exhibit "A," Part 2, attached hereto shall be substituted therefor.

(b)    Exhibit "A," Part 4, of the REA shall be deleted.

(c)    Exhibit "A," Part 5, of the REA shall be deleted and Exhibit "A," Part 5, attached hereto shall be substituted therefor.

(d)    Exhibit "A," Part 10, attached hereto shall be incorporated into the REA as Exhibit "A," Part 10.

(e)    Exhibit "A", Part 11, attached hereto shall be incorporated into the REA as Exhibit "A," Part 11

2

 

(f)    Exhibit "B" of the REA shall be deleted and Exhibit "B" attached hereto shall be substituted therefor.

(g)    Exhibit "C" of the REA shall be deleted and Exhibit "C" attached hereto shall be substituted therefor.

2.    (a)    Section 1.2 of the REA shall be amended by deleting the phrase "Burdines Parcel" from the second line thereof and inserting the phrase "Nordstrom Parcel" therefor.

(b)    Section 1.15 of the REA shall be amended by deleting the word "Federated" from the first line thereof and inserting the word "Nordstrom" therefor.

(c)    Section 1.20 of the REA shall be amended by deleting the word "Burdines" from the second line thereof and inserting the word "Nordstrom" therefor.

(d)    Section 1.22 of the REA shall be amended by deleting the word "Federated" from the first line thereof and inserting the word "Nordstrom" therefor.

(e)    Section 1.23 of the REA shall be amended by deleting the phrase "and 7.4A. and B. thereof" from the first line thereof and inserting therefor the phrase "7.4A., 7.4B. and 7.4C." thereof.

(f)    Section 1.30 of the REA shall be amended by adding the phrase "or, if there is no such separate Supplemental Agreement between Developer and a Major, such Major's Lease shall constitute the Supplemental Agreement between Developer and such Major" at the end thereof.

3.    The addresses set forth in Section 4.1 of the REA for each of Macy, Sears and Federated shall be deleted and the following shall be substituted therefor:

| | |
|---|---|
| To Macy: | Macy's East, Inc.<br>c/o Federated Department Stores, Inc.<br>7 West Seventh Street<br>Cincinnati, Ohio 45202<br>Attn: Real Estate Department |
| with a copy to: | Macy's East, Inc.<br>c/o Burdines, Inc.<br>P.O. Box 2350<br>22 East Fagler Street<br>Miami, Florida 31131<br>Attn: Chairman |
| To Sears: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Property Manager, Southeast |
| with a copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Assistant General Counsel—Real Estate |
| To Bloomingdale's: | Bloomingdale's, Inc.<br>c/o Federated Department Stores, Inc.<br>7 West Seventh Street<br>Cincinnati, Ohio 45202<br>Attn: Real Estate Department |

3

F00166

with a copy to:       Bloomingdale's, Inc.
1000 Third Avenue
New York, New York 10022
Attn: Chairman

To Saks:       Saks & Company
115 N. Calderwood Street
P.O. Box 9388
Alcoa, Tennessee 37701
Attn: Eric Steven Faires

with a copy to:       Saks & Company
12 E. 49th Street
New York, New York 10017
Attn: General Counsel

To Nordstrom:       Nordstrom, Inc.
1700 Seventh Avenue, Suite 1000
Seattle, Washington 98101-4407
Attn: Real Estate Notices

4.     Developer shall construct the additions to the Mall Store Building(s) and the Enclosed Mall and reconfigure the Common Areas and construct the additional Common Area improvements as more particularly shown on Exhibit "B" hereto in accordance with the terms and provisions of the REA. The parties hereto hereby approve the construction thereof as shown on Exhibit "B" hereto. Developer shall complete such construction prior to the opening of the Nordstrom Building.

5.     Saks has submitted its plans for the Saks Expansion to the Developer in accordance with Section 4.4 of the REA. Nordstrom has submitted its plans for the construction of the Nordstrom Building to Developer in accordance with the provisions of Section 4.4 of the REA. In the event Macy shall elect to construct the Macy Expansion, Macy shall submit its plans for the Macy Expansion to Developer in accordance with Section 4.4 of the REA.

6.     Saks and Nordstrom have submitted a building schedule only to the Developer in accordance with Section 5.5 of the REA. In the event Macy shall elect to construct the Macy Expansion, Macy shall submit a building schedule only to the Developer in accordance with Section 5.5 of the REA.

7.     (a)     Macy shall have the right to construct a two (2) level expansion to the Macy Building of up to an aggregate of ninety thousand (90,000) square feet of Floor Area as more particularly shown on Exhibit "B" hereto (herein referred to as the "Macy Expansion"). In connection therewith, Macy shall make all necessary alterations to the Perimeter Sidewalks and landscaped and planted areas between the altered Perimeter Sidewalks and the Macy Building and Macy shall restore the parking and other Common Areas on the Macy Parcel to the condition the same existed prior to the construction of the Macy Expansion in order to accommodate such Expansion.

(b)     In the event Macy shall not have commenced construction of the Macy Expansion consisting of in excess of sixty thousand (60,000) square feet of Floor Area on or before the second anniversary of the date of this Second Amendment, the portion of the Macy Parcel more particularly described on Exhibit "A," Part 11, attached hereto shall be deleted from the Macy Parcel and added to the Developer Parcel.

8.     Saks shall construct an expansion to the Saks Building of up to thirty-five thousand (35,000) square feet of Floor Area as more particularly shown on Exhibit "B" hereto (herein referred to as the "Saks Expansion"). In connection therewith, Saks shall make all necessary alterations to the Perimeter Sidewalks and landscaped and planted areas between the altered Perimeter Sidewalks and the Saks Building and Saks shall restore the parking and other Common Areas on the Saks Parcel to the condition the same existed prior to the construction of the Saks Expansion in order to accommodate such expansion. Saks shall complete the

4

construction of the Saks Expansion and open the Saks Expansion to the public on or before November 15, 2007.

9.    The following shall be inserted as Section 7.4C. of the REA:

Section 7.4C   Construction of Nordstrom Improvements

Nordstrom shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Nordstrom Improvements"):

(a)    a two-level building within its Permissible Building Area containing approximately one hundred forty four thousand (144,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Nordstrom Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b)    the Perimeter Sidewalks on the Nordstrom Parcel from the back face of the curb which shall be set by Developer at Developer's expense and the landscaped and planted areas lying between said Perimeter Sidewalks and the Nordstrom Building;

(c)    the Truck Facilities serving the Nordstrom Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron; and

(d)    retaining walls, if any, and backfilling of same, required in grade arms to physically support the Nordstrom Improvements.

Nordstrom shall construct the Nordstrom Improvements in accordance with the Building Schedule and open the Nordstrom Improvements to the public on or before Nordstrom's Opening Date as set forth in the Nordstrom Lease.

10.    The provisions of Sections 7.1, 7.6 and 7.7 of the REA shall not be applicable with respect to Nordstrom; provided, however, that in no event shall Nordstrom be obligated to initially open between November 18th and February 15 or between March 17th and August 7th.

11.    (a)    In Section 9.2(a) of the REA, the phrase "the thirteenth (13th) anniversary of the Center Opening Date" shall be deleted from the first and second lines and the phrase "twenty-four (24) full calendar months prior to the expiration of the Operating Covenant Period set forth in Section 13.1(a)(1) (such period is hereinafter referred to as the "Restoration Period")" shall be substituted therefor.

(b)    In Section 9.2(b) of the REA, the phrase "thirteenth anniversary of the Center Opening Date" shall be deleted from the second line and the phrase "Restoration Period" shall be substituted therefor.

12.    (a)    In Section 9.3(a)(1) of the REA, the phrase "thirteenth (13th) anniversary of the Center Opening Date" shall be deleted from the second line and the phrase "Restoration Period" shall be substituted therefor.

(b)    In Section 9.3(a)(2) of the REA, the phrase "thirteenth (13th) anniversary of the Center Opening Date" shall be deleted from the first line and the phrase "Restoration Period" shall be substituted therefor.

(c)    Notwithstanding anything herein contained to the contrary, the Restoration Period with respect to Sears has expired.

13.    The first paragraph of Section 11.1 of the REA shall be deleted and the following shall be substituted therefor:

F00168

Except as otherwise provided in Article XVIII, a parking ratio of at least 4.5 automobile parking spaces for every 1,000 square feet of Floor Area shall be maintained on the Shopping Center Parcel as a whole.

14.    (a)    In the second line of the second paragraph of Section 12.1 of the REA, the phrase "for twenty (20) years" shall be deleted and the phrase "through and including February 28, 2015 (hereinafter referred to as the "Operating Covenant Period")" shall be substituted therefor.

(b)    In the first line of the third paragraph of Section 12.1 of the REA, the phrase "twenty (20) year period described above" shall be deleted and the phrase "Operating Covenant Period" shall be substituted therefor.

(c)    In the sixth line of the third paragraph of Section 12.1 of the REA, the phrase "said twenty (20) year period" shall be deleted and the phrase "the Operating Covenant Period" shall be substituted therefor.

15.    Sections 13.1(a)(1) and (2) of the REA shall be deleted and the following shall be substituted therefor:

(1)    (A)    With respect to Macy, Bloomingdale's, Saks and Nordstrom, during the period commencing with the opening of its Building to the public and terminating upon the expiration of the Operating Covenant Period, it will operate or cause to be operated the following specified Floor Area within its Building as a department store or specialty department store; in the case of Macy, at least one hundred fifty thousand (150,000) square feet of Floor Area which shall be operated under the name "Burdines-Macy's" or such other name as is then being used by Macy to identify its multi-level stores of over one hundred fifty thousand (150,000) square feet of Floor Area in Southeastern Florida; in the case of Bloomingdale's, at least one hundred fifty thousand (150,000) square feet of Floor Area which shall be operating under the name "Bloomingdale's" or such other name as is then being used by Bloomingdale's to identify its multi-level stores operated by Bloomingdale's of over one hundred fifty thousand (150,000) square feet of Floor Area in Southeastern Florida; in the case of Saks, at least seventy thousand (70,000) square feet of Floor Area which shall be operated under the name "Saks" or "Saks Fifth Avenue" or such other name as is then being used by Saks to identify its multi-level stores operated by Saks or Saks Fifth Avenue of over seventy thousand (70,000) square feet of Floor Area in Southeastern Florida; and in the case of Nordstrom, at least one hundred thousand (100,000) square feet of Floor Area which shall be operated under the name of "Nordstrom" or such other name as is then being used by Nordstrom to identify its multi-level stores of over one hundred thousand (100,000) square feet of Floor Area in the States of Florida and Georgia; provided, however, that if the Lease of a Major shall require it to operate for a period in excess of the Operating Covenant Period, such Major shall be required to operate for such longer period, subject to the terms of this REA and such Major's Lease.

(B)    With respect to Sears, during the period commencing with the opening of its Building to the public and terminating the fifteenth (15th) anniversary of the Center Opening Date, at least one hundred twenty thousand (120,000) square feet of Floor Area, which shall be operated under the name "Sears" or such other name as is then being used by Sears to identify its multi-level stores of one hundred thousand (100,000) square feet of Floor Area in Southeastern Florida, and in addition, during the period commencing on the fifteenth (15th) anniversary of the Center Opening Date and through and including the twentieth (20th) anniversary of the Center Opening Date, Sears shall operate or cause to be operated the Sears Building, if at all, as a department store or specialty department store and for no other purpose.

(2)    With respect to Macy, Bloomingdale's, Saks and Nordstrom, upon the expiration of the Operating Covenant Period and with respect to Sears, during the period commencing with the twentieth (20th) anniversary of the Center

6

F00169

Opening Date and in each case through and including the expiration of its respective Major's Lease, each of Macy, Bloomingdale's, Saks, Nordstrom and Sears shall operate its respective Building, if at all, for retail and service purposes and for no other purpose.

16.    Section 13.2(d) of the REA shall be amended by adding the following to the end thereof:

In addition to the foregoing, Nordstrom and Saks shall be released from its respective covenant to operate if for a period of twelve (12) consecutive calendar months or more either the Macy Building or the Bloomingdale's Building is not being operated as a department store, and is not replaced within eighteen (18) months after such Building first ceased operating with a department store of at least one hundred twenty thousand (120,000) square feet, unless the replacement department store is Neiman Marcus, in which event such replacement shall be at least seventy five thousand (75,000) square feet.

17.    (a)    In Section 13.4(b)(2) of the REA, subparagraph (iii) shall be deleted. Burdines shall be released from all of its obligations under the REA from and after the date of this Second Amendment.

(b)    In Section 13.4(b)(2) of the REA, at the end of the language inserted therein pursuant to Paragraph 12 of the First Amendment to the REA, delete the period, substitute a semi-colon and insert the following:

(vi)    Nordstrom shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a corporation or other Person which acquired a majority of the stores of Nordstrom or any successor thereto exceeding one hundred thousand (100,000) square feet in the States of Florida and Georgia and said transferee by written instrument in recordable form expressly assumes all of the obligations of Nordstrom hereunder and is financially capable of performing such obligations (as hereinafter provided).

18.    In Section 15.5 of the REA, the phrase "twentieth anniversary of the Center Opening Date" shall be deleted from the sixth line and the phrase "Operating Covenant Period" shall be substituted therefor.

19.    Section 17.1 of the REA shall be amended by deleting the word "Burdines" from the tenth (10th) line of the first paragraph thereof and substituting the word "Nordstrom" therefor.

20.    Section 17.4 of the REA shall be amended by deleting the word "Federated" from the ninth line thereof and substituting the word "Nordstrom" therefor.

21.    Section 17.5 of the REA shall be amended by deleting the word "Burdines" from the seventh line thereof and inserting the word "Nordstrom" therefor and deleting the word "Federated" from the tenth line thereof and inserting the word "Nordstrom" therefor.

22.    In Section 18.2(a), the phrase "with respect to Sears and prior to the Operating Covenant Period with respect to Macy, Bloomingdale's, Saks and Nordstrom," shall be inserted after the word "Date" on the third line.

23.    In Section 18.3(b) of the REA, the figure "4.25" shall be deleted from the fourth line and the figure "4.00" shall be substituted therefor.

24.    In Article XXI, the addresses of each of Macy, Sears and Federated shall be deleted and the following shall be substituted therefor:

7

F00170

 

| | |
|---|---|
| To Macy: | Macy's East, Inc.<br>c/o Federated Department Stores, Inc.<br>7 West Seventh Street<br>Cincinnati, Ohio  45202<br>Attn:  Real Estate Department |
| with a copy to: | Macy's East, Inc.<br>c/o Burdines, Inc.<br>P.O. Box 2350<br>22 East Fagler Street<br>Miami, Florida  31131<br>Attn:  Chairman |
| To Sears: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Attn:  Property Manager, Southeast |
| with a copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Attn:  Vice President — Real Estate |
| To Bloomingdale's: | Bloomingdale's, Inc.<br>c/o Federated Department Stores, Inc.<br>7 West Seventh Street<br>Cincinnati, Ohio  45202<br>Attn:  Real Estate Department |
| with a copy to: | Bloomingdale's, Inc.<br>1000 Third Avenue<br>New York, New York  10022<br>Attn:  Chairman |
| To Saks: | Saks & Company<br>115 N. Calderwood Street<br>P.O. Box 9388<br>Alcoa, Tennessee  37701<br>Attn:  Eric Steven Faires |
| with a copy to: | Saks & Company<br>12 E. 49th Street<br>New York, New York  10017<br>Attn:  General Counsel |
| To Nordstrom: | Nordstrom, Inc.<br>1700 Seventh Avenue, Suite 1000<br>Seattle, Washington  98101-4407<br>Attn:  Real Estate Notices |

And the addresses of the Fee Owner shall be changed to:

The Gardens Ventures, LLC
The Gardens of The Palm Beaches
3101 PGA Boulevard
Palm Beach Gardens, Florida 33410

25.    Nordstrom, by executing this Agreement, hereby assumes and agrees to be bound by all of the terms and provisions of the REA from and after the date hereof.

8

F00171

**IN WITNESS WHEREOF**, each Party has caused its duly authorized officers to sign this Second Amendment to the Construction, Operation and Reciprocal Easement Agreement as of the day and year first above written.

WITNESS:

FORBES/COHEN FLORIDA PROPERTIES
LIMITED PARTNERSHIP,
a Michigan limited partnership

By    Forbes/Cohen Properties, LLC,
Its general partner

By

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF OAKLAND    )

On this 31ST day of August, 2004, before me personally appeared _Sidney Forbes_, who, being by me duly sworn, did say that Forbes/Cohen Properties, L.L.C., a Michigan limited liability company, is the general partner of Forbes/Cohen Florida Properties Limited Partnership, a Michigan limited partnership, and that the said instrument was signed on behalf of said limited partnership by authority of its articles of agreement; and the said signatory acknowledged the said instrument to be the free act and deed of said limited partnership. Said signatory is personally known to me and did not take an oath.

Notary Public
_Oakland_ County, _Michigan_
My Commission Expires: _March 1, 2011_

9

F00172

WITNESS:

MACY'S EAST, INC.,
an Ohio corporation

_Elizabeth Re_

By _____

Its                      Vice President
_____

STATE OF OHIO          )
                       ) ss.
COUNTY OF HAMILTON     )

On this 27th day of August, 2004, before me personally appeared
Gary J. May          , being by me duly sworn, did say that he is the
Vice President          of Macy's East, Inc., an Ohio corporation, and that the foregoing
instrument was signed on behalf of said corporation, and the said signatory acknowledged the
said instrument to be the free act and deed of said corporation. Said signatory is personally
known to me and did not take an oath.

_Elizabeth J. Haass_
Notary Public
Hamilton County,          ELIZABETH J. HAASS
My Commission Expires:    Notary Public, State of Ohio
                          My Commission Expires Mar. 28, 2007

10

F00173

WITNESS:

SEARS, ROEBUCK AND CO.,
a New York corporation

By _____

By _____
James B. Terrell, Director
Real Estate Administration

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF Cook       )

On this 20th day of August _____, 2004, before me personally appeared James B. Terrell and _____, being by me duly sworn, did say that they are the Director Real and Estate Administration, respectively, of Sears, Roebuck and Co., a New York corporation, and that the foregoing instrument was signed on behalf of said corporation, and the said signatories acknowledged the said instrument to be the free act and deed of said corporation.  Said signatory is personally known to me and did not take an oath.

_____
Notary Public
_____ County, Illinois
My Commission Expires: 7/26/06

OFFICIAL SEAL
ALICIA ORTEGA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 07-26-06

11

F00174

WITNESS:                              BURDINES, INC.,
                                      an Ohio corporation

                                      By

                                      Its _____
                                               Vice President

STATE OF OHIO            )
                         ) s
COUNTY OF HAMILTON       )

On this 27th day of August, 2004, before me personally appeared
Gary J. King, being by me duly sworn, did say that he is the
___Vice President___ of Burdines, Inc., an Ohio corporation, and that the foregoing
instrument was signed on behalf of said corporation, and the said signatory acknowledged the
said instrument to be the free act and deed of said corporation. Said signatory is personally
known to me and did not take an oath.

                                      Notary Public
                                      Hamilton County, Ohio
                                      My Commission Expires:    ELIZABETH J. HAASS
                                                                Notary Public, State of Ohio
                                                                My Commission Expires Mar. 28, 2007

12

F00175



| WITNESS: | BLOOMINGDALE'S, INC. |
|---|---|
| | an Ohio corporation |

By _____

Its _____
        Vice President

STATE OF OHIO        )
                              ) s:
COUNTY OF HAMILTON )

On this 27th day of August, 2004, before me personally appeared
Gary J. Nay, being by me duly sworn, did say that he is the
Vice President of Bloomingdale's, Inc., an Ohio corporation, and that the
foregoing instrument was signed on behalf of said corporation, and the said signatory
acknowledged the said instrument to be the free act and deed of said corporation. Said signatory
is personally known to me and did not take an oath.

_____
Notary Public
Hamilton County,        ELIZABETH J. HAASS
My Commission Expires:        Notary Public, State of Ohio
                                        My Commission Expires Mar. 26, 2007

13

F00176

WITNESS:                                    SAKS & COMPANY,
                                            a New York corporation

*Mitch Glasgow*                      By     *Eric Steven Faires*

*J. Jeanine Bolin*                   Its     _____


STATE OF TENNESSEE          )
                            ) ss.
COUNTY OF BLOUNT            )

On this 24th day of August _____, 2004, before me personally appeared Eric Steven
Faires, being by me duly sworn, did say that he is the Senior Vice President, of Saks &
Company, a New York corporation, and that the foregoing instrument was signed on behalf of
said corporation, and the said signatory acknowledged the said instrument to be the free act and
deed of said corporation. Said signatory is personally known to me and did not take an oath.

                                     *Mitch Glasgow*
                                     Notary Public
                                     Blount _____ County, Tennessee
                                     My Commission Expires: June 7, 2005

MITCH GLASGOW
NOTARY
PUBLIC
AT
LARGE
SHELBY CO. TN

14

F00177

WITNESS:                                NORDSTROM, INC.,
                                        a Washington corporation


*Alison Patterson*                  By  *David L. Mackie*
                                        David L. Mackie, Vice President
                                        Real Estate and Corporate Secretary

*Pat Sour*


STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

    On this 24 day of *August*, 2004, before me personally appeared David L. Mackie, being by me duly sworn, did say that he is the Vice President Real Estate and Corporate Secretary of Nordstrom, Inc., a Washington corporation, and that the foregoing instrument was signed on behalf of said corporation, and the said signatory acknowledged the said instrument to be the free act and deed of said corporation. Said signatory is personally known to me and did not take an oath.


                                *Shannon M. Valderas*
                                  Notary Public
                                *King* County, *Shoreline City*
                                My Commission Expires: *10-28-2007*

15

F00178

 

### CONSENT OF FEE OWNER

THE GARDENS VENTURE, LLC (hereinafter referred to as the "Fee Owner"), successor to the Trustees under Trust Agreement, dated December 28, 1983, and known as the MacArthur Liquidating Trust, as fee title owner of the "Shopping Center Parcel" (as defined in the "REA", as defined below), on behalf of itself, its successors and assigns, hereby consents to the foregoing Second Amendment to the Construction, Operating and Reciprocal Easement Agreement (hereinafter referred to as the "Second Amendment") relating to that certain Construction, Operating and Reciprocal Easement Agreement, dated May 29, 1987, and recorded in Book 5370,, Page 437, Palm Beach County Records, as amended by First Amendment to Construction, Operation and Reciprocal Easement Agreement, dated April 18, 1990, recorded in Book 6428, Page 1130, Palm Beach County Records (herein referred to as the "REA") and agree that its fee title interest in and to the Shopping Center Parcel shall be bound by and be subject to the REA as amended by the Second Amendment in accordance with the terms, provisions and conditions thereof.

Dated:        August 3l, 2004

WITNESS:                                FEE OWNER

                                        THE GARDENS VENTURE, LLC

_Martine Y Prasnjak_   By  _[signature]_

_Jennie M Grant_

STATE OF MICHIGAN      )
                       ) ss.
COUNTY OF OAKLAND      )

On this 3l day of August, 2004, before me personally appeared
G. T. York, being by me duly sworn, did say that he is the
Authorized Signatory of The Gardens Venture, LLC, a limited liability company, and
that the foregoing instrument was signed on behalf of said limited liability company, and the said
signatory acknowledged the said instrument to be the free act and deed of said limited liability
company.  Said signatory is personally known to me and did not take an oath.

                                _[signature]_
                                Notary Public
                                Oakland County, Michigan
                                My Commission Expires: 11.29.2005

                        MARTINE Y. PRASNJAK
                        Notary Public, Macomb County, MI
                        Acting in Oakland Co., MI
                        My Commission Expires 11/29/2005

16

F00179

## CONSENT OF MORTGAGEE

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, the Mortgagee of the "Shopping Center Parcel" (as defined in the "REA" as defined below) pursuant to that certain Amended and Restated Mortgage and Security Agreement, dated January 21, 1988, recorded in Official Records Book 5554, Page 798, Public Records of Palm Beach County, Florida, as amended, hereby consents to the foregoing Second Amendment to Construction, Operation and Reciprocal Easement Agreement dated May 29, 1987, and recorded in Book 5370, page 437, Palm Beach County Records, as amended by First Amendment to Construction, Operation and Reciprocal Easement Agreement, dated April 18, 1990, recorded in Book 6438, page 1130, Palm Beach County Records (collectively, the "REA") and acknowledges and agrees that said Amended and Restated Mortgage and Security Agreement shall be subordinate to the REA, as amended by said Second Amendment to Construction, Operation and Reciprocal Easement Agreement.

WITNESS:

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY
A Wisconsin corporation

By      Northwestern Investment Management
         Company, LLC,
         A Delaware limited liability company,
         Its wholly owned affiliate and
         Authorized representative

Robin Miller
Robin Miller

By
Richard F. Von Haden , Managing Director

Janis E. Miller
Janis E. Miller

Attest
Robert W. Francour , Assistant Secretary

STATE OF WISCONSIN    )
                                         ) ss.
COUNTY OF MILWAUKEE)

The foregoing instrument was acknowledged before me this _24th_day of August, 2004, by _Richard F. Von Haden_, the Managing Director of Northwestern Investment Management Company, LLC, on behalf of The Northwestern Mutual Life Insurance Company, the corporation that executed the within and foregoing instrument and that said instrument was signed and sealed on behalf of said corporation, and said _Richard F. Von Haden_ acknowledged said instrument to be the free act and deed of said corporation. Said signatory is personally known to me and did not take an oath.

Robin Miller
Notary Public
Milwaukee County, Wisconsin
My Commission Expires: _February 24, 2008_

```
ROBIN MILLER
NOTARY PUBLIC
STATE OF WISCONSIN
```

DBT_C.608230.6

17

F00180

EXHIBIT "A", PART 2

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88° 45' 08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00 feet to the POINT OF BEGINNING; thence continue North 1° 14' 52" East a distance of 257.39 feet; thence North 88° 45' 08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28° 13'10"; thence North 60° 31' 58" West a distance of 29.24 feet; thence North 29° 28' 02" East a distance of 164.38 feet;  thence N38°49'19"W a distance of 32.54 feet; thence N79°45'30"W a distance of 59.90 feet; thence N36°49'33"W a distance of 63.51 feet; thence N80°31'58"W a distance of 55.74 feet; thence N43°27'31" W a distance of 27.91 feet; thence N29°28'02"E a distance of 82.13 feet; thence N36°28'52W a distance of 30.66 feet; thence N29°28'02E a distance of 156.51 feet; thence S65°56'34"E a distance of 4.75 feet to the beginning of a curve concave Northerly, having a radius of 115.00 feet; thence Easterly a distance of 79.46 feet along said curve through a central angle of 39°35'24"; thence N74°28'03"E a distance of 170.84 feet; thence North 29° 28' 02" East a distance of 66.17 feet to a point on a non tangent curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 4° 53' 25" West; thence Easterly a distance of 30.98 feet along said curve through a central angle of 22° 54' 12"; thence North 27° 47' 36" East a distance of 74.26 feet; thence North 74° 14' 52" East a distance of 52.47 feet; thence North 1° 14' 52" East a distance of 54.38 feet; thence South 88° 45' 08" East a distance of 225.00 feet; thence South 1° 14' 52" West a distance of 85.40 feet; thence South 71° 45' 08" East a distance of 126.22 feet; thence South 25° 32' 54" East a distance of 24.10 feet to a point on a curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 25° 32' 54" West; thence Easterly a distance of 59.24 feet along said curve through a central angle of 43° 47' 46"; thence South 71° 45' 07" East a distance of 25.82 feet; thence S17°34'04"W a distance of 23.34 feet; thence S72°30'06"E a distance of 105.90 feet; thence S76°21'39"E a distance of 69.97 feet; thence S86°55'04"E a distance of 65.09 feet; thence S69°59'03"E a distance of 67.66 feet; thence S24°12'48"E a distance of 359.64 feet; thence S66°35'43"W a distance of 61.87 feet; thence S24°42'20"E a distance of 63.47 feet; thence S66°35'43W a distance of 106.04 feet; thence S70°41'28"W a distance of 69.73 feet; thence South 66° 35' 43" West a distance of 189.53 feet to the beginning of a curve concave Northerly, having a radius of 750.00 feet; thence Westerly a distance of 322.70 feet along said curve through a central angle of 24°39' 09"; thence North 88° 45' 08" West a distance of 44.82 feet; thence North 89° 53' 54" West a distance of 50.00 feet thence North 88° 45' 08" West a distance of 10.00 feet to the beginning of a curve concave Southeasterly, having a radius of 45.00 feet thence Southwesterly a distance of 70.69 feet along said curve through a central angle of 90° 00' 00" to its point of tangency with a line parallel with and Easterly 40.00 feet from that certain course described above as North 1° 14' 52" East a distance of 257.39 feet; thence South 1° 14' 52" West along said parallel line a distance of 126.39 feet to the beginning of a curve concave Northeasterly, having a radius of 50.00 feet; thence Southerly a distance of 41.65 feet along said curve through a central angle of 47° 43' 53" to a line bearing South 88° 45' 08" East from the POINT OF BEGINNING; thence North 88°45' 08" West a distance of 56.41 feet to the POINT OF BEGINNING.

Containing an area of 18.322 acres, more or less.

 

## EXHIBIT "A", PART 5

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commence at the center of said Section 6, thence S.88°45'08" E. along the South line of the Northeast one-quarter of said Section 6, a distance of 763.55 feet; thence N. 01°14'52" E. a distance of 70.00 feet to a point on the North right-of-way line as recorded in O.R.B. 4442, Pages 856 thru 874 of the Public Records of said Palm Beach County and the POINT OF BEGINNING; thence S. 88°45'98" E. along said right-of-way line and through the following courses a distance of 167.97 feet; thence N. 01°14'52" E. a distance of 12.00 feet thence S. 88°45'08" E. a distance of 162.07 feet; thence N. 43°40'03" W. departing from said right-of-way line a distance of 35.41 feet thence N. 01°25'01" E. a distance of 167.93 feet; thence S. 88°34'59" E. a distance of 165.49 feet to a point of curvature of a curve concave Northwesterly, having a radius of 225.00 feet; thence Northeasterly along the arc of said curve through a central angle of 24°47'18" a distance of 97.47 feet to a point of tangency thence N. 86°35'43" E. a distance of 487.89 feet; thence S. 29°09'19" E. a distance of 57.23 feet to a point of curvature of a curve concave Northeasterly, having a radius of 150.00 feet; thence Southeasterly along the arc of said curve through a central angle 44° 37'12'25" a distance of 97.41 feet to a point of tangency; thence S. 86°21'44" E. a distance of 41.84 feet; thence S. 22°58'41" E. a distance of 48.08 feet to a point on a non-tangent curve concave Southeasterly having a radius of 585.87 feet, the chord of which bears N. 32°47'12" E.; thence Northeasterly along the arc of said curve through a central angle of 24°45'39" a distance of 253.19 feet to a point of tangency thence N. 45°10'02" E. a distance of 20.00 feet; thence N. 46°09'36" E. a distance of 150.00 feet to a point on a non-tangent curve concave Northwesterly, having a radius of 470.87 feet; the chord of which bears N.18°22'52" E.; thence Northeasterly along the arc of said curve through a central angle of 33°55'42" a distance of 278.83 feet to a point of tangency; thence N. 01°25'01" E. a distance of 388.61 feet to the point of curvature of a curve concave Southwesterly having a radius of 570.87 feet; thence Northeasterly along the arc of said curve through a central angle of 35°04'51" a distance of 349.53 feet to a point of tangency; thence N. 36°29'52" E. a distance of 20.34 feet; thence N. 08°30'08" W. a distance of 49.50 feet; thence N. 53° 30'08" W. a distance of 625.88 feet to the point of curvature of a curve concave Southerly having a radius of 1100.32 feet; thence Westerly along the arc of said curve through a central angle of 46° 55'16" a distance of 901.57 feet to the point of tangency; thence S. 79°34'36" W. a distance of 1355.52 feet; thence S. 34°04'49" W. a distance of 49.93 feet; thence S. 11°24'59" E. a distance of 175.38 feet to the point of curvature of a curve concave Westerly having a radius of 570.87 feet; thence Southerly along the arc of said curve through a central angle of 12°50'02" a distance of 127.87 feet to the point of tangency, thence S. 01°25'01" W. a distance of 1174.96 feet to a point of curvature of a curve concave Northeasterly having a radius of 470.87 feet; thence Southeasterly along the arc of said curve through a central angle of 31°44'43" a distance of 260.89 feet to the point of tangency; thence S. 30°19'43" E. a distance of 420.42 feet to a point of curvature of a curve concave Southwesterly having a radius of 570.87 feet; thence Southeasterly along the arc of said curve through a central angle of 10°29'34" a distance of 104.54 feet; thence N. 70°09'49" E. a distance of 10.00 feet; thence N. 19°33'44" E. a distance of 44.43 feet to a point on a non-tangent curve concave Northwesterly, having a radius of 325.00 feet, the chord bears N. 44°17'59" E. thence Northeasterly along the arc of said curve through a central angle of 29°19'21" a distance of 166.33 feet to the point of tangency; thence N. 29°38'19" E. a distance of 43.82 feet; thence S. 60°31'58" E. a distance of 436.75 feet to the point of curvature of a curve concave Northeasterly having a radius of 500.00 feet; thence Southeasterly along the arc of said curve through a central angle of 25°19'58" a distance of 221.07 feet; thence S. 01°25'01" W. a distance of 181.46 feet; thence S. 46°18'20" a distance of 35.30 feet to the POINT OF BEGINNING

LESS and EXCEPT that portion thereof described as follows: (NORDSTROM LEASE PARCEL)
That portion of the North Half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45' 08" East along the South line of the Northeast Quarter of said Section a distance of 763.55 feet; thence North 1° 14'52 East a distance of 70.00 feet, thence North 46°19'57" East a distance of 35.30 feet thence North 1° 25' 01" East a distance of 181.46 feet to a point on a non tangent curve concave Northerly, having a radius of 500.00 feet a radial to said point bears South 4° 08' 03" West; thence Northwesterly a distance of 221.07 feet along said curve through a central angle of 25° 19' 59"; thence North 60° 31'58" West a distance of 436.75 feet; thence South 29° 38'18" West a distance of 43.82 feet to the beginning of a curve concave Northwesterly, having a radius of 325.00 feet; thence Southwesterly a distance of 166.33 feet along said curve through a central angle of 29° 19'21" thence South 19° 33'44" West a distance of 44.43 feet; thence South 70° 09' 49" West a distance of 10.00 feet to a point on a curve concave Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70° 09'49" East; thence Northwesterly a distance of 73.44 feet along said curve through a central angle of 7°22'15" to the POINT OF BEGINNING; thence continuing Northwesterly a distance of 31.10 feet along curve through a central angle of 3° 07'19"; thence North 30° 19' 43" West a distance of 18.90 feet to a point on a non tangent curve concave Northerly, having a radius of 45.00 feet, a radial to said point bears South 22° 48' 04" West, thence Northeasterly a distance of 43.01 feet along said curve through a central angle of 54° 45'53" to a compound curve concave Northwesterly having a radius of 247.00 feet; thence Northeasterly a distance of 122.42 feet along said curve through a central angle of 28° 23'53"; thence North 29°38'18" East a distance of 16.50 feet to the beginning of a curve concave Westerly, having a radius of 30.00 feet; thence Northerly a distance of 47.21 feet along said curve through a central angle of 90° 10'16"; thence North 60° 31'58" West a distance of 98.59 feet; thence North 51° 19'33" West a distance of 75.00 feet to a point on a curve concave Northeasterly, having a radius of 450.00 feet, a radial to said point bears South 29°26'02" West; thence Northwesterly a distance of 486.55 feet along said curve through a central angle of 61° 56' 59"; thence North 1° 25'01" East a distance of 260.89 feet; thence South 88°34'59" East a distance of 48.00 feet; thence North 1° 25'01" East a distance of 144.65 feet to the beginning of a curve

concave Southeasterly, having a radius of 332.00 feet thence Northerly a distance of 30.28 feet along said curve through a central angle of 5'13'32"; thence S63'32'09"E a distance of 204.49 feet; thence N47'01'31"E a distance of 17.86 feet; thence S63'32'9"E a distance of 344.34 feet; thence N74'25'01"E a distance of 44.14 feet; thence S15'45'08"E a distance of 249.38 feet; thence N74'22'01"E a distance of 61.00 feet; thence S15'37'59"E a distance of 98.50 feet; thence S29'55'39"W a distance of 100.02 feet; thence N58'44'33"W a distance of 7.78 feet thence S29'55'39"W a distance of 241.08 feet; thence N39'31'20"W a distance of 28.90 feet; thence N80'11'30"W a distance of 59.64 feet; thence N39'31'37"W a distance of 27.98 feet; thence S29'55'39W a distance of 126.12 feet; thence S60'04'21"E a distance of 41.91 feet; thence South 29'38'18" West a distance of 106.68 feet to the beginning of a curve concave Northwesterly, having a radius of 276.50 feet, said curve being concentric with and Southeasterly 31.50 feet from that certain curve described above as having a radius of 247.00 feet and a length of 122.42 feet; thence Southwesterly a distance of 142.53 feet along said concentric curve through central angle of 29'19'20"; thence South 58'57'39" West a distance of 34.54 feet to the POINT OF BEGINNING.

Containing an area of 10.61 acres, more or less

ALSO LESS and EXCEPT that portion thereof described as follows: (MACY'S LEASE PARCEL)
That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88' 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1' 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88' 45' 08" East along said North line a distance of 167.97 feet; thence North 1' 14' 52" East along said North line a distance of 12.00 feet to the POINT OF BEGINNING; thence continue North 1' 14' 52" East a distance of 257.39 feet; thence North 88' 45' 08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28' 13'10"; thence North 60' 31' 58" West a distance of 29.24 feet; thence North 29' 28' 02" East a distance of 164.38 feet; thence N38'49'19"W a distance of 32.54 feet; thence N79'45'30"W a distance of 59.90 feet; thence N36'49'33"W a distance of 63.51 feet; thence N80'31'58"W a distance of 55.74 feet; thence N43'27'31" W a distance of 27.91 feet; thence N29'28'02"E a distance of 82.13 feet; thence N36'28'52W a distance of 30.66 feet; thence N29'28'02"E a distance of 156.51 feet; thence S65'56'34"E a distance of 4.75 feet to the beginning of a curve concave Northerly, having a radius of 115.00 feet; thence Easterly a distance of 79.46 feet along said curve through a central angle of 39'35'24"; thence N74'28'03"E a distance of 170.84 feet; thence North 29' 28' 02" East a distance of 68.17 feet to a point on a non tangent curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 4' 53' 25" West; thence Easterly a distance of 30.98 feet along said curve through a central angle of 22' 54' 12"; thence North 27' 47' 36" East a distance of 74.26 feet; thence North 74' 14' 52" East a distance of 52.47 feet; thence North 1' 14' 52" East a distance of 54.38 feet; thence South 88' 45' 08" East a distance of 225.00 feet; thence South 1' 14' 52" West a distance of 85.40 feet; thence South 71' 45' 08" East a distance of 126.22 feet; thence South 25' 32'-54" East a distance of 24.10 feet to a point on a curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 2' 32' 54" West; thence Easterly a distance of 59.24 feet along said curve through a central angle of 43' 47' 46"; thence South 71' 45' 07" East a distance of 25.82 feet; thence S17'54'04"W a distance of 23.34 feet; thence S72'30'06"E a distance of 105.90 feet; thence S76'21'36"E a distance of 69.97 feet; thence S86'55'04"E a distance of 65.09 feet; thence S69'59'03"E a distance of 67.66 feet; thence S24'12'48"E a distance of 359.64 feet; thence S66'35'43"W a distance of 61.87 feet; thence S24'42'20"E a distance of 63.47 feet; thence S86'35'43W a distance of 106.04 feet; thence S70'41'28"W a distance of 69.73 feet; thence South 66' 35' 43" West a distance of 189.53 feet to the beginning of a curve concave Northerly, having a radius of 750.00 feet; thence Westerly a distance of 322.70 feet along said curve through a central angle of 24'39' 09"; thence North 88' 45' 08" West a distance of 44.82 feet; thence North 89' 53' 54" West a distance of 50.00 feet thence North 88' 45' 08" West a distance of 10.00 feet to the beginning of a curve concave Southeasterly, having a radius of 45.00 feet thence Southwesterly a distance of 70.69 feet along said curve through a central angle of 90' 00' 00" to its point of tangency with a line parallel with and Easterly 40.00 feet from that certain course described above as North 1' 14' 52" East a distance of 257.39 feet; thence South 1' 14' 52" West along said parallel line a distance of 126.39 feet to the beginning of a curve concave Northeasterly, having a radius of 50.00 feet; thence Southerly a distance of 41.65 feet along said curve through a central angle of 47' 43' 53" to a line bearing South 88' 45' 08" East from the POINT OF BEGINNING; thence North 88'45' 08" West a distance of 56.41 feet to the POINT OF BEGINNING.

Containing an area of 18.322 acres, more or less.

ALSO LESS and EXCEPT that portion thereof described as follows:  (SEAR'S LEASE PARCEL)

That portion of the North half of Section 5, Township 42 South, Range 43 East in the City of
Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of  the
Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00
feet to the North line of P.G.A. Boulevard as described in the deed recorded in official Record Book 4442, Pages
856 through 874 of the public records of said Palm Beach County; thence South 88° 45'08" East along said
North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00feet;
thence South 88° 45' 08" East along said North line a distance of 162.07 feet; thence North 43° 40' 03" West
a distance of 35.41 feet; thence North 1° 25' 01" East a distance of 187.93 feet; thence South 88° 34' 59"
East a distance of 155.49 feet to the beginning of a curve concave Northerly, having a radius of 225.00 feet;
thence Easterly a distance of 97.47 feet along said curve through a central angle of 24° 49' 18"; thence North
66° 35' 43" East a distance of 487.89 feet; thence South 29° 09' 19" East a distance of 57.23 feet to the
beginning of a curve concave Northeasterly having a radius of 150.00 feet; thence Southeasterly a distance of
97.41feet along said curve through a central angle of 37° 12' 25"; thence South 66° 21' 44" East a distance of
41.48 feet; thence South 22° 58' 41" East a distance of 48.08 feet to a point on a non tangent curve concave
Southeasterly, having a radius of 585.87 feet, a radial to said point bears North 60° 35' 38" West; thence
Northeasterly a distance of 99.69 feet along said curve through a central angle of 9° 44' 57" to the POINT OF
BEGINNING; thence North 66° 21' 44" West a distance of 79.84 feet to the beginning of a curve concave
Northeasterly, having a radius of 83.50 feet; thence Northwesterly a distance of 62.60 feet through a central
angle of 42° 57' 27"; thence North 23° 24' 17" West a distance of 104.92 feet; thence North 88° 35 43" East
a distance of 40.86 feet; thence North 23° 24' 17" West a distance of 51.50 feet; thence South 66° 35' 43"
West a distance of 8.20 feet; thence North 23° 24' 17" West a distance of 276.41 feet to a point on a non
tangent curve concave Northeasterly having a radius of 580.50 feet, a radial to said point bears South 30° 11'
30" West; thence Northwesterly a distance of 45.44 feet along said curve through a central angle of 4° 29'
07";  thence North 55° 19' 23" West a distance of 24.15 feet; thence North 71° 45' 08" West a distance of
74.95 feet; thence North 88° 10' 54" West a distance of 43.85 feet to the beginning of a curve concave
Northeasterly having a radius of 259.50 feet; thence Northwesterly a distance of 39.37 feet along said curve
through a central angle of 0° 41'32"; thence North 18° 14' 52" East a distance of 348.14 feet; thence South 71°
45' 08" East a distance of 35.00 feet; thence North 18° 14' 52" East a distance of 97.66 feet; thence South
72° 26' 25" East a distance of 187.97 feet; thence North 56° 14' 52" East a distance of 235.08 feet; thence
North 13° 45' 08" West a distance of 29.80 feet; thence North 56° 14' 52" East a distance of 17.96 feet;  ·
thence North 53° 45' 08" West a distance of 29.80 feet; thence North 56° 14' 52" East a distance of 157.60
feet to a point on a non tangent curve concave Westerly having a radius of 532.00 feet, a radial to said point
bears North 81° 41' 19" East; thence Southerly a distance of 276.03 feet along said curve through a central
angle of 29° 43' 42" ; thence South 1° 25' 01" West a distance of 329.36 feet; thence South 88° 34' 59" East
a distance of 48.00 feet; thence South 1° 25' 01" West a distance of 49.46 feet to the beginning of a curve
concave Northwesterly, having a radius of 350.00 feet; thence Southwesterly a distance of 398.15 feet along
said curve through a central angle of 65° 10' 42" thence South 66° 35' 43" West a distance of 93.61 feet;
thence South 65° 26' 57" West a distance of 50.00 feet; thence South 66° 35' 43" West a distance of 36.00
feet to the beginning of a curve concave Southeasterly having a radius of 30.00 feet thence Southwesterly a
distance of 47.12 feet along said curve through a central angle of 90° 00' 00" to its point of tangency with a
line parallel with and Northeasterly a distance of 31.50 feet from that certain course described above as North
24° 24' 17" West a distance of 104.93 feet. Thence South 23° 24' 17" East along said parallel line a distance of
25.92 feet to the beginning of curve concave Northeasterly, having a radius of 52.00 feet, said curve being
concave from that certain curve described above as having a radius of 83.50 feet and a central angle of 42°
57' 27"; thence Southeasterly a distance of 38.99 feet along said concentric curve through a central angle of
42° 57' 27"; thence South 66° 21' 44" East a distance of 56.52 feet to the beginning of a curve concave
Northerly, having a radius of 45.00 feet; thence Easterly a distance of 32.28 feet along said curve through a
central angle of 41° 05' 54" to a non tangent intersection with the Northeasterly prolongation of that certain
curve described above as being concave Southeasterly, having a radius of 585.87 feet, a radial of said 585.87
foot radius curve to said point bears North 55° 37' 52" West; thence Southwesterly a distance of 43.08 feet
along said curve through a central angle of 4° 15' 43" to the POINT OF BEGINNING.  Containing an area of
10.606 Acres, more or less.

ALSO LESS and EXCEPT that portion thereof described as follows:  (BLOOMINGDALE'S LEASE PARCEL)

That portion of the North·half of Section 6, Township 42 South, Range 43 East in the City of Palm
Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45'08" East along the South line of
the Northeast Quarter of said Section. A distance of 763.55 feet; thence North 1°14'52" East a
distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in

Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach
County; thence South 88° 45'08" East along said North line a distance of 167.97 feet; thence North
1° 14' 52" East along said North line a distance of 12.00 feet; thence South 88° 45'08" East along
said North line a distance of 162.07 feet; thence North 43° 40' 03" West a distance of 35.41 feet;
thence North 1° 25' 01" East a distance of 167.93 feet; thence South 88° 34' 59" East a distance
of 165.49 feet to the beginning of a curve concave Northerly, having a radius of 225.00 feet;
thence Easterly a distance of 97.47 feet along said curve through a central angle of 24° 49' 18";
thence North 66° 35' 43" East a distance of 487.89 feet; thence South 28° 09' 19" East a
distance of 57.23 feet to the beginning of a curve concave Northeasterly having a radius of 150.00
feet; thence Southeasterly a distance of 97.41 feet along said curve through a central angle of 37°
12' 25"; thence South 66° 21' 44" East a distance of 41.84 feet; thence South 22° 58' 41" East a
distance of 48.08 feet to a point on a non tangent curve concave Southeasterly, having a radius of
585.87 feet, a radial to said point bears North 69° 35' 38" West; thence Northeasterly a distance
of 253.19 feet along said curve through a central angle of 24° 45' 39"; thence North 45° 10'02"
East a distance of 20 feet; thence North 46°.09' 35" East a distance of 150.00 feet to a point on
a non—tangent curve concave Westerly, having a radius of 470.87 feet; a radial to said point bears
South 54° 39' 17" East; thence Northerly a distance of 278.83 through a central angle of 33° 55'
42"; thence North 01° 25'01" East a distance of 368.61 feet to the beginning of a curve concave
Easterly, having a radius of 570.87 feet; thence Northerly a distance of 349.53 feet through a
central angle of 35° 04' 51"; thence North 35° 29' 52" East a distance of 20.34 feet; thence North
8° 30' 08" West a distance of 49.50 feet; thence North 53° 30'08" West a distance of 442.50 feet
to the POINT OF BEGINNING; thence South 32° 13' 58" West a distance of 151.63 feet; thence
South 48° 42' 00" East a distance of 182.23 feet; thence South 58° 16' 16" West a distance of
535.29 feet; thence North 72° 05' 27" West a distance of 71.90 feet to the beginning of a curve
concave Northeasterly, having a radius of 65.00 feet; thence Northwesterly along said curve a
distance of 78.21 feet through a central angle of 68° 56' 31"; thence on a radial line to said curve
South 86° 51' 04" West a distance of 58.14 feet; thence South 18° 15' 19" West a distance of 81.51
feet; thence North 71° 44' 41" West a distance of 315.00 feet; thence North 18° 47' 22" East a
distance of 62.46 feet; thence North 53° 49' 44" West a distance of 102.16 feet; thence North 18°
33' 26" East a distance of 59.24 feet; thence North 86° 26' 34" West a distance of 55.00 feet;
thence North 18° 23' 26" East a distance of 446.00 feet; thence North 81° 26' 34" West a distance
of 20.00 feet; thence North 61° 20' 13" West a distance of 36.21 feet; thence North 18° 30' 32"
East a distance of 128.00 feet to a non-tangent curve concave Southerly, having a radius of
800.00 feet, a radial to said point bears North 6° 11' 57" West; thence Easterly a distance of
355.17 feet, along said curve through a central angle of 25° 26' 14" to a point on a non—tangent,
compound curve concave Southerly, having a radius of 390.00 feet, a radial to said point bears
North 7° 50' 42" East; thence Easterly along said curve a distance of 297.37 feet through a central
angle of 43° 41' 13"; thence South 31° 48' 36" East a distance of 79.05 feet to a non—tangent
curve concave Northerly having a radius of 321.66 feet, a radial to said point bears South 53° 57'
42" West; thence Easterly a distance of 150.00 feet through a central angle of 26° 43' 08"; thence
North 32° 13' 58" East a distance of 99.20 feet to the Southwesterly Right of Way line of Gardens
Boulevard; thence South 53° 30' 08" East along said Right of Way line a distance of 55.54 feet to
the POINT OF BEGINNING.

Containing 13.398 Acres, more or less.

ALSO LESS and EXCEPT that portion thereof described as follows: (SAK'S LEASE PARCEL)
That portion of the North Half of Section 6, Township 42 South, Range 43 East in the City of Palm
Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the south line of
the Northeast Quarter of said Section a distance of 763.55 feet; thence North 1° 14' 52" East a
distance of 70.00 feet; thence North 46° 19' 57" East a distance of 35.30 feet; thence North 1°
25' 01" East a distance of 181.46 feet to a point on a non tangent curve concave Northerly, having
a radius of 500.00 feet, a radial to said point bears South 4° 08' 03" West; thence Northwesterly a
distance of 221.07 feet along said curve through a central angle of 25° 19' 59"; thence North 60°
31' 58" West a distance of 436.75 feet; thence South 29° 38' 18" West a distance of 43.02 feet to
the beginning of a non—tangent curve concave Northwesterly, having a radius of 325.00 feet;

thence Southwesterly along a chord bearing South 44°17'59" West a distance of 166.33 feet along said curve through a central angle of 29° 19' 21"; thence South 19° 33' 44" West a distance of 44.43 feet; thence South 70° 09' 49" West a distance of 10.00 feet to a point on a curve concave Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70° 09' 49" East; thence Northwesterly a distance of 104.54 feet along said curve through a central angle of 10° 29' 34" West a distance of 420.42 feet to the beginning of a curve concave Easterly, having a radius of 470.87 feet; thence Northerly a distance of 260.89 feet along said curve through a central angle of 31° 44' 43"; thence North 1° 25' 01" East a distance of 574.96 feet to the beginning of a curve concave Westerly, having a radius of 570.87 feet; thence Northerly a distance of 127.87 feet along said curve through a central angle of 12° 50' 02"; thence North 11° 24' 59" West a distance of 175.38 feet; thence North 34° 04' 49" East a distance of 49.93 feet; thence North 79° 24' 36" East a distance of 849.27 feet; thence South 23° 17'51" East a distance of 26.44 feet to the POINT OF BEGINNING; thence continue South 23° 17' 51" East a distance of 413.00 feet; thence South 74° 37' 00" East a distance of 104.71 feet to a point on a non—tangent curve concave Northeasterly, having a radius of 123.00 feet, a radial to said point bears South 64° 45' 32" West; thence Southeasterly a distance of 54.17 feet along said curve through a central angle of 25° 13' 58" to a point on a compound curve concave Northeasterly, having a radius of 300 feet; thence Southeasterly a distance of 75.53 feet along said curve through a central angle of 14° 25' 31"; thence South 25° 06' 02" West along radial to said curve a distance of 15.00 feet, thence South 05° 15' 43" East a distance of 62.63 feet; thence South 29° 34' 03" West a distance of 87.98 feet; thence South 15° 45' 14" East a distance of 36.79 feet; thence South 74° 14' 46" West a distance of 200.45 feet; thence North 15° 45' 14" West a distance of 24.65 feet; thence North 41° 58' 20" West a distance of 100.16 feet; thence North 60° 15' 57" West a distance of 43.98 feet; thence North 23° 33' 47" West a distance of 300.76 feet; thence North 46° 31' 47" East a distance of 30.33 feet; thence North 22° 35'16" West a distance of 9.49 feet; thence North 85° 53' 54" East a distance of 27.63 feet; thence North 23° 25' 59" West a distance of 217.48 feet; thence North 68° 58' 59" East a distance of 6.08 feet; thence North 23° 25' 59" West a distance of 48.76 feet; thence North 69° 02' 04" East a distance of 163.37 feet to the POINT OF BEGINNING.

Containing 3.931 Acres, more or less.

EXHIBIT "A", PART 10

That portion of the North Half of Section 6, Township 42 South, Range 43 East in the
City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45' 08" East along the South line of the Northeast
Quarter of said Section a distance of 763.55 feet; thence North 1° 14'52 East a distance of 70.00 feet, thence
North 46°19'57" East a distance of 35.30 feet thence North 1° 25' 01" East a distance of 181.46 feet to a
point on a non tangent curve concave Northerly, having a radius of 500.00 feet a radial to said point bears
South 4° 08' 03" West; thence Northwesterly a distance of 221.07 feet along said curve through a central angle
of 25° 19' 58"; thence North 60° 31'56" West a distance of 438.75 feet; thence South 29° 38'19" West a
distance of 43.82 feet to the beginning of a curve concave Northwesterly, having a radius of 325.00 feet;
thence Southwesterly a distance of 166.33 feet along said curve through a central angle of 29° 19'21" thence
South 19° 33'44" West a distance of 44.43 feet; thence South 70° 09' 49" West a distance of 10.00 feet to a
point on a curve concave Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70°
09'49" East; thence Northwesterly a distance of 73.44 feet along said curve through a central angle of 7°
22'15" to the POINT OF BEGINNING; thence continuing Northwesterly a distance of 31.10 feet along said curve
through a central angle of 3° 07'19"; thence North 30° 19' 43" West a distance of 18.90 feet to a point on a
non tangent curve concave Northerly, having a radius of 45.00 feet, a radial to said point bears South 22° 46'
04" West, thence Northwesterly a distance of 43.01 feet along said curve through a central angle of 54° 45'53"
to a compound curve concave Northwesterly having a radius of 247.00 feet; thence Northeasterly a distance of
122.42 feet along said curve through a central angle of 28° 23'53"; thence North 29°38'18" East a distance of
16.50 feet to the beginning of a curve concave Westerly, having a radius of 30.00 feet; thence Northerly a
distance of 47.21 feet along said curve through a central angle of 90° 10'16"; thence North 60° 31'58" West a
distance of 98.59 feet; thence North 51° 19'33" West a distance of 75.00 feet to a non-tangent curve
concave Northeasterly, having a radius of 450.00 feet, a radial to said point bears South 28°28'02" West; thence
Northwesterly a distance of 486.55 feet along said curve through a central angle of 61° 56' 59"; thence North
1° 25'01" East a distance of 260.89 feet; thence South 88°34'59" East a distance of 48.00 feet; thence North
1° 25'01" East a distance of 144.65 feet to the beginning of a curve concave Southeasterly, having a radius of
332.00 feet thence Northerly a distance of 30.28 feet along said curve through a central angle of 5°13'32";
thence S63° 32'09"E a distance of 204.49 feet; thence N47° 01'31"E a distance of 19.32 feet; thence S63°
31'30"E a distance of 323.93 feet; thence N74° 22'01"E a distance of 59.44 feet; thence S15°37'59"E a distance
of 262.00 feet; thence N74°22'01"E a distance of 61.00 feet; thence S15°37'59"E a distance of 98.50 feet;
thence S29°55'39"W a distance of 58.78 feet; thence N76°13'29"W a distance of 8.32 feet thence S29°55'39"W a
distance of 288.66 feet; thence N39°31'20"W a distance of 29.90 feet; thence N80°11'30"W a distance of 59.64
feet; thence N39°31'37"W a distance of 27.98 feet; thence S29°55'39W a distance of 125.45 feet; thence
S60°04'21"E a distance of 40.11 feet;  thence South 29°38'18" West a distance of 108.88 feet to the beginning
of a curve concave Northwesterly, having a radius of 278.50 feet, said curve being concentric with and
Southeasterly 31.50 feet from that certain curve described above as having a radius of 247.00 feet and a
length of 122.42 feet; thence Southwesterly a distance of 142.53 feet along said concentric curve through
central angle of 29°19'20"; thence South 58°57'39" West a distance of 34.58 feet to the POINT OF BEGINNING.

Containing an area of 10.61 acres, more or less



### EXHIBIT "A", PART 11

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88° 45' 08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00 feet; thence continue North 1° 14' 52" East a distance of 257.39 feet; thence North 88° 45' 08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28° 13'10"; thence North 60° 31' 58" West a distance of 29.24 feet; thence North 29° 28' 02" East a distance of 164.38 feet; thence North 38°49'19" West a distance of 32.54 feet; thence North 79°45'30"West a distance of 59.90 feet; thence North 36°49'33" West a distance of 27.46 feet to the POINT OF BEGINNING; thence continue North 36°49'33" West a distance of 36.05 feet; thence North 80°31'58" West a distance of 55.74 feet; thence North 43°27'31" West a distance of 27.81 feet; thence North 29° 28'02"East a distance of 82.13 feet; thence North 36°28'52 West a distance of 30.66 feet; thence North 29°28'02 East a distance of 156.51 feet; thence South 65°56'34" East a distance of 4.75 feet to the beginning of a curve concave Northerly, having a radius of 115.00 feet; thence Easterly a distance of 79.46 feet along said curve through a central angle of 39°35'24"; thence North 74° 28'03" East a distance of 122.64 feet; thence South 28°31'36" West a distance of .259.24 feet; thence North 41°28'24" West a distance of 29.80 feet; thence South 28°31'36" West a distance of 125.64 feet to the POINT OF BEGINNING.

Containing an area of 1.023 acres, more or less.



EXHIBIT "B"
SITE PLAN
THE GARDENS
THE FORBES COMPANY

F00189



F00190



THE · GARDENS MALL
SKETCH OF LEASE
PARCELS

### FIRST AMENDMENT TO
### CONSTRUCTION, OPERATION AND RECIPROCAL
### EASEMENT AGREEMENT

THIS FIRST AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT is made as of the 18th day of April , 19XX, by and among FORBES/COHEN FLORIDA PROPERTIES LIMITED PARTNERSHIP, a Michigan limited partnership (hereinafter referred to as "Developer"), MACY'S SOUTH, INC., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Macy"), SEARS, ROEBUCK AND CO., a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Sears"), BURDINES REAL ESTATE, INC., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Burdines"), BLOOMINGDALE'S PROPERTIES, INC., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Bloomingdale's"), and SAKS & COMPANY, a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Saks").

### R E C I T A L S

1.    Developer, Macy's predecessor in interest, Macy's New York, Inc., a New York corporation (hereinafter referred to as "MNY"), Sears and Burdines' predecessor in interest, Federated Department Stores, Inc., a Delaware corporation (hereinafter referred to as "Federated"), entered into that certain Construction, Operation and Reciprocal Easement Agreement dated May 29, 1987, and recorded in Book 5370, Page 437, Palm Beach County Records, Palm Beach County, Florida, relating to The Gardens, Palm Beach Gardens, Florida (hereinafter referred to as the "REA").

2.    MNY assigned all of its right, title and interest in and to the REA (and its Lease covering the Macy Parcel) to Macy by instrument dated July 30, 1988. MNY subsequently merged with Macy's New Jersey, Inc., and the merged company's name was changed to Macy's Northeast, Inc., a Delaware corporation.

3.    Federated assigned all of its right, title and interest in and to the REA (and its Lease covering the Burdines Parcel) to Burdines by instrument dated July 29, 1988.

4.    Simultaneously herewith, Developer, as Landlord, and Bloomingdale's, as Tenant, have entered into a Lease of a portion of the Developer's Parcel consisting of approximately 13.398 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A", Part B attached hereto (hereinafter referred to as the "Bloomingdale's Parcel") and located as shown on Exhibit "B" attached hereto.

5.    Simultaneously herewith, Developer, as Landlord, and Saks, as Tenant, have entered into a Lease of a portion of the Developer's Parcel consisting of approximately 3.931 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A", Part 9 attached hereto (hereinafter referred to as the "Saks Parcel") and located as shown on Exhibit "B" attached hereto.

6.    The description of the Developer's Parcel, after the deletion of the Bloomingdale's Parcel and the Saks Parcel therefrom, has been reduced from 60.390 acres to 43.061 acres and is more particularly described on Exhibit "A", Part 5 attached hereto, and located as shown on Exhibit "B" hereto.

7.    The Developer's Parcel, Macy Parcel, Sears Parcel, Burdines Parcel, Bloomingdale's Parcel and Saks Parcel are more particularly located as shown on the survey attached hereto as Exhibit "C".

8.    The Parties desire to amend the REA in order to provide for the addition and the construction of the Bloomingdale's Improvements and Saks Improvements as herein defined and the operation thereof.

NOW, THEREFORE, for good and valuable consideration, including the mutual promises, covenants and agreements herein contained, the Parties agree as follows:

1.  (a) Exhibit "A", Part 5, of the REA shall be deleted and Exhibit "A", Part 5, attached hereto shall be substituted therefor.

(b) Exhibit "A", Part 8, and Exhibit "A", Part 9, attached hereto shall be incorporated into the REA as Exhibit "A", Part 8, and Exhibit "A", Part 9, respectively.

(c) Exhibit "B" of the REA shall be deleted and Exhibit "B" attached hereto shall be substituted therefor.

(d) Exhibit "C" of the REA shall be deleted and Exhibit "C" attached hereto shall be substituted therefor.

2.  (a) Section 1.2 of the REA shall be amended by inserting the phrase "Bloomingdale's Parcel, Saks Parcel" after the phrase "Sears Parcel" on the first line thereof.

(b) Section 1.15 of the REA shall be amended by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on the first line thereof.

(c) Section 1.20 of the REA shall be amended by inserting the phrase "Bloomingdale's Parcel, Saks Parcel" after the phrase "Sears Parcel" on the first and second lines thereof.

(d) Section 1.22 of the REA shall be amended by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on the first line thereof.

(e) Section 1.23 of the REA shall be amended by deleting the phrase "and 7.4" from the first line thereof and inserting the phrase "7.4, 7.4A and 7.4B" therefor.

3.  The following shall be inserted at the end of Section 4.1 of the REA:

"To Bloomingdale's:  Bloomingdale's Properties, Inc.
7 West Seventh Street
Cincinnati, Ohio 45202
Attn: Real Estate Department

To Saks:  Saks Fifth Avenue Service Center
3rd Floor
450 W. 15th Street
New York, New York 10011
Attn: Vice President, Construction"

4.  Each of Bloomingdale's and Saks shall be required to submit its plans to the Developer for approval in accordance with the provisions of Section 4.4 of the REA and within ninety (90) days after the date of this First Amendment.  The provisions of Section 4.3 of the REA shall not be applicable, as the Developer has heretofore completed construction of the Developer's Facilities.

5.  Each of Bloomingdale's and Saks shall submit a Building Schedule only to the Developer in accordance with Section 5.5 of the REA.

6.  The following shall be inserted as Section 7.4A of the REA:

"Section 7.4A  Construction of Bloomingdale's Improvements

Bloomingdale's shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Bloomingdale's Improvements"):

-2-

A00153

(a) a three-level building within its Permissible Building Area containing not less than one hundred fifty thousand (150,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Bloomingdale's Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Bloomingdale's Parcel and the landscaped and planted areas lying between said Perimeter Sidewalks and the Bloomingdale's Building;

(c) the Truck Facilities serving the Bloomingdale's Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron;

(d) retaining walls and backfilling of same required in grade arms to physically support the Bloomingdale's Building; and

(e) the common wall between the Bloomingdale's Improvements and the Enclosed Mall.

Bloomingdale's has heretofore commenced construction of the Bloomingdale's Improvements and shall complete the same and open the Bloomingdale's Improvements to the public on or before November 1, 1990."

7.   The following shall be inserted as Section 7.4B of the REA:

"Section 7.4B  Construction of Saks Improvements

Saks shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Saks Improvements"):

(a) a two-level building within its Permissible Building Area containing not less than seventy two thousand (72,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Saks Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Saks Parcel and the landscaped and planted areas lying between said Perimeter Sidewalks and the Saks Building;

(c) the Truck Facilities serving the Saks Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron; and

(d) retaining walls, if any, and backfilling of same, required in grade arms to physically support the Saks Improvements.

Saks shall commence construction of the Saks Improvements in accordance with the Building Schedule and open the Saks Improvements to the public on or before November 1, 1991."

8.   The provisions of Sections 7.6 and 7.7 of the REA shall not be applicable with respect to Bloomingdale's and/or Saks.

9.   At the end of Section 13.1(a)(1) of the REA delete the period, substitute a semi-colon and add the following:

-3-

F00154

"in the case of Bloomingdale's, at least one hundred fifty thousand (150,000) square feet of Floor Area, which shall be operated under the name "Bloomingdale's", or such other name as is then being used by Bloomingdale's to identify its multi-level stores operated by Bloomingdale's, Inc. of over one hundred fifty thousand (150,000) square feet of Floor Area in southeastern Florida; and in the case of Saks, at least seventy thousand (70,000) square feet of Floor Area, which shall be operated under the name "Saks" or "Saks Fifth Avenue" or such other name as is then being used by Saks to identify its Saks Fifth Avenue stores in southeastern Florida."

10. Section 13.1(a)(2) of the REA shall be amended by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on each of the fourth and ninth lines thereof.

11. Sections 13.2(c) and (d) of the REA shall each be amended by deleting the period at the end of such Section, substituting a semi-colon, and inserting the word "or" after the semi-colon.

12. In Section 13.4(b)(2) of the REA on the twenty fifth line thereof immediately preceding the word "For", delete the period, substitute a semi-colon and insert the following:

"(iv) Bloomingdale's shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a corporation or other Person which acquired a majority of the stores of Bloomingdale's, or any successor thereto, exceeding one hundred fifty thousand (150,000) square feet in Southeastern Florida and said transferee, by written instrument in recordable form, expressly assumes all of the obligations of Bloomingdale's hereunder and is financially capable of performing such obligations (as hereinafter provided); and (v) Saks shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a corporation or other Person which acquires a majority of the stores of Saks, or any successor thereto, in Southeastern Florida and said transferee, by written instrument in recordable form, expressly assumes all of the obligations of Saks hereunder and is financially capable of performing such obligations (as hereinafter provided)."

13. Section 17.1 of the REA shall be amended by inserting the phrase "Bloomingdale's Improvements, Saks Improvements" after the phrase "Sears Improvements" on the tenth line thereof.

14. Section 17.4 of the REA shall be amended by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on the ninth line thereof.

15. Section 17.5 of the REA shall be amended by inserting the phrase "Bloomingdale's Improvements, Saks Improvements" after the phrase "Sears Improvements" on the seventh line thereof and by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on the tenth line thereof.

16. (a) The following shall be inserted in Article XXI after the address of Federated on Page 68 of the REA:

"and addressed in the case of Bloomingdale's to:

Bloomingdale's Properties, Inc.
c/o Federated Department Stores, Inc.
Seven West Seventh Street
Cincinnati, Ohio 45202
Attn: Real Estate Department

-4-

with a copy to:

Bloomingdale's
1000 Third Avenue
New York, New York  10022
Attn:  Chairman

and addressed in the case of Saks to:

Saks & Company
c/o Batus Retail
1270 Avenue of the Americas
New York, New York  10020
Attn:  Sr. Vice President, Corporate
       Real Estate

with a copy to:

Saks & Company
611 Fifth Avenue
New York, New York  10022
Attn:  Chairman of the Board"

(b)  In Article XXI of the REA the phrase "with a copy to: Howard Kane, Esq., Rudnick & Wolfe, 30 North LaSalle Street, Chicago, Illinois 60602" shall be deleted.

17.  Article XXIII of the REA shall be amended by deleting the phrase "the expiration of a period of seventy (70) years after the Center Opening Date or March 31, 2059, whichever shall earlier occur" and the phrase "October 31, 2058" shall be substituted therefor.

18.  Pursuant to Section 24.21 of the REA, the Parties acknowledge that the Center Opening Date occurred on October 5, 1988.

19.  Each of Bloomingdale's and Saks, by executing this agreement, hereby assume and agree to be bound by all of the terms and provisions of the REA from and after the date hereof as if they were original signatories thereto.

IN WITNESS WHEREOF, each Party has caused its duly authorized officers to sign this First Amendment to the Construction, Operation and Reciprocal Easement Agreement as of the day and year first above written.

-5-

F00156

FORBES/COHEN FLORIDA PROPERTIES
LIMITED PARTNERSHIP
a Michigan limited partnership

By: FORBES/COHEN PROPERTIES,
Its: General Partner

WITNESS:

By _____
Sidney Forbes, its general
partner

By _____
Maurice Cohen, its general
partner

STATE OF MICHIGAN    )
                     ) SS.
COUNTY OF OAKLAND    )

The foregoing instrument was acknowledged before me this 16th day
of _April_, 1990, by SIDNEY FORBES and MAURICE COHEN, general
partners of FORBES/COHEN PROPERTIES, the General Partner of Forbes/Cohen
Florida Properties Limited Partnership, a Michigan limited partnership, on
behalf of said limited partnership.

_____
Notary Public
My Commission Expires: 1-14-91

A7631h/6

JANET L. GALLINATI
Notary Public, Wayne County, Michigan
My Commission Expires January 14, 1991
ACTING IN OAKLAND CTY.

-6-

F00157

WITNESS:

MACY'S SOUTH, INC.,
a Delaware corporation

vocl

By _____
Executive Vice President - Corporate Affairs

By _____
Assistant Secretary

STATE OF NEW YORK        )
                         ) SS.
COUNTY OF NEW YORK       )

The foregoing instrument was acknowledged before me this 11th day of December        1989  by Myron E. Ullman, III  and  David C. Stonsky, the Executive Vice President- Corporate Affairs  and  Assistant Secretary  , respectively of MACY'S SOUTH, INC., a Delaware corporation, on behalf of said corporation.

Lucy Ann Earley
Notary Public
My Commission Expires:

LUCY ANN EARLEY
Notary Public, State of New York
No. 01-4667274
Qualified in Orange County
Certificate Filed in New York County
Commission Expires Oct. 31, 1990

MACY'S NORTHEAST, INC., a Delaware corporation (successor by merger to Macy's New York, Inc.), predecessor in interest to Macy's South, Inc., hereby consents to the foregoing First Amendment to Construction, Operation and Reciprocal Easement Agreement and acknowledges its continuing obligations pursuant to the Construction, Operation and Reciprocal Easement Agreement, as so amended, notwithstanding the assignment by it to Macy's South, Inc.

MACY'S NORTHEAST, INC.,
a Delaware corporation

vocl

By _____
Executive Vice President - Corporate Affairs

By _____
Assistant Secretary

STATE OF NEW YORK        )
                         ) SS.
COUNTY OF NEW YORK       )

The foregoing instrument was acknowledged before me this 11th day of December        1989, by Myron E. Ullman, III  and  David C. Stonsky, the Executive Vice President- Corporate Affairs  and  Assistant Secretary  , respectively of MACY'S NORTHEAST, INC., a Delaware corporation, on behalf of said corporation.

Lucy Ann Earley
Notary Public
My Commission Expires:

A7631h/7

LUCY ANN EARLEY
Notary Public, State of New York
No. 01-4667274
Qualified in Orange County
Certificate Filed in New York County
Commission Expires Oct. 31, 1990

~7~

F00158

WITNESS:

SEARS, ROEBUCK and CO.,
a New York corporation

*Erick Vanorbley*

*Jane Battle*

By *Ronald B. Ruth*
Ronald B. Ruth, National Manager
Real Estate Planning Group
Attest: _____
Assistant Secretary

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

The foregoing instrument was acknowledged before me this 20th day
of *December* , 19 89 , by  Ronald B. Ruth   and  Donald J. Jeruc ,
the  National Manager   and  Assistant Secretary
respectively, of SEARS, ROEBUCK AND CO., a New York corporation, on behalf
of said corporation.

*Grace Sharp*

Notary Public
My Commission Expires: _____

A7631h/8

```
"OFFICIAL SEAL"
GRACE SHARP
Notary Public, State of Illinois
My Commission Expires 3/11/93
```

-8-

WITNESS:

*Elizabeth J. Haass*

*Helen S. Wehl*

BURDINES REAL ESTATE, INC.
a Delaware corporation

By _____
            Operating Vice President

By _____
            Assistant Secretary

STATE OF Ohio            )
                                    ) SS.
COUNTY OF Hamilton )

The foregoing instrument was acknowledged before me this 19th day of December, 1989, by Maurice A. Fry and Gwyneth G. Stewart the Operating Vice President and Assistant Secretary, respectively, of BURDINES REAL ESTATE, INC., a Delaware corporation, on behalf of said corporation.

*Cheryl K. Neithaus (Boston)*

Notary Public                    CHERYL K. BOSTON
My Commission Expires: _____    Notary Public, State of Ohio
                                              My Commission Expires July 1, 1992

FEDERATED DEPARTMENT STORES, INC., a Delaware corporation, predecessor in interest to Burdines Real Estate, Inc., hereby consents to the foregoing First Amendment to Construction, Operation and Reciprocal Easement Agreement and acknowledges its continuing obligations pursuant to the Construction Operation and Reciprocal Easement Agreement, as so amended, notwithstanding the assignment by it to Burdines Real Estate, Inc.

FEDERATED DEPARTMENT STORES, INC.,
a Delaware corporation

By _____

By _____
            ASSISTANT SECRETARY

STATE OF Ohio            )
                                    ) SS.
COUNTY OF Hamilton )

The foregoing instrument was acknowledged before me this 19 day of December, 1989, by Maurice A. Fry and Gwyneth G. Stewart the _____ and _____, respectively, ASSISTANT SECRETARY of FEDERATED DEPARTMENT STORES, INC., a Delaware corporation, on behalf of said corporation.

*Cheryl K. Neithaus (Boston)*

Notary Public                    CHERYL K. BOSTON
My Commission Expires: _____    Notary Public, State of Ohio
                                              My Commission Expires July 1, 1992

A7631h/9

-9-

WITNESS:

*Helen G. Welsh*

*Lois A. Giancola*

BLOOMINGDALE'S PROPERTIES, INC.,
a Delaware corporation

By *Barry J. May*
      Operating Vice President

By *Gwyneth G. Stewart*
      ASSISTANT SECRETARY

STATE OF *Ohio*     )
                ) SS.
COUNTY OF *Hamilton* )

    The foregoing instrument was acknowledged before me this *19* day of *December*, 19*89* by *Gary J. May* and *Gwyneth G. Stewart* the Operating Vice President and ASSISTANT SECRETARY, respectively, of BLOOMINGDALE'S PROPERTIES, INC., a Delaware corporation, on behalf of said corporation.

*Cheryl K. Neuhaus (Boston)*

Notary Public     CHERYL K. BOSTON
My Commission Expires: Notary Public, State of Ohio
                      My Commission Expires July 1, 1992

A7631h/10

E00161

WITNESS:

_Clement S. Albert_

_Joan M. Schrager_

SAKS & COMPANY,
a New York corporation

By _S. Quintin_
                    *Vice President*

By _John Kiley Secy_

STATE OF   NEW YORK   )
                      ) SS.
COUNTY OF  NEW YORK   )

    The foregoing instrument was acknowledged before me this __2nd__ day
of ___April___ , 19_90_, by Stephen A. Quintin and Joan F. Kiey ,
the _Vice President_ and _Secretary_ , respectively,
of SAKS & COMPANY, a New York corporation, on behalf of said corporation.

                                _John R. Kehoe_
Notary Public                   CHOW LAI CHU
My Commission Expires:_____    Notary Public, State of New York
                                No. 01CH6019062
                                Qualified in Suffolk County
                                Commission Expires March 30, 19___

Instrument Drafted By And
When Recorded Return To:

William J. Zousmer, Esq.
Honigman Miller Schwartz and Cohn
2290 First National Building
Detroit, Michigan 48226
(313) 256-7673

A7631h/11

–11–

F00162

May 1, 1990


Erick Vanoskey
Department 824RE

Re:  The Gardens, Palm Beach Gardens, Florida

Enclosed is one (1) fully executed original of the First
Amendment to Construction, Operation and Reciprocal Easement
Agreement regarding the above-captioned location.  Kindly
see that this amendment is put into the real estate file.


                              *Tom*
                         Thomas K. Hornacek
                         Department 766

TKH/tg
Encl.
cc:  John Murphy (w/encl.)

F00163

CONSTRUCTION, OPERATION AND
RECIPROCAL EASEMENT AGREEMENT

THE GARDENS
PALM BEACH GARDENS, FLORIDA



PLAINTIFF'S DEPOSITION
EXHIBIT
# 4
PENGAD 800-631-6989

Exhibit  _C_

CF00034

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| RECITALS |  |  |
| ARTICLE I | DEFINITIONS | 3 |
| Section 1.1 | Access Roads | 3 |
| Section 1.2 | Center | 3 |
| Section 1.3 | Center Opening Date | 3 |
| Section 1.4 | Common Area | 3 |
| Section 1.5 | Common Utility Facilities | 3 |
| Section 1.6 | Condemnation | 4 |
| Section 1.7 | Developer Facilities | 4 |
| Section 1.8 | Enclosed Mall | 4 |
| Section 1.9 | Fee Owner | 4 |
| Section 1.10 | Fee Owner's Parcels | 4 |
| Section 1.11 | Fee Owner's Southerly Parcels | 4 |
| Section 1.12 | Floor Area | 4 |
| Section 1.13 | Land Lease | 5 |
| Section 1.14 | Lease | 6 |
| Section 1.15 | Major | 6 |
| Section 1.16 | Major's Lease | 6 |
| Section 1.17 | Mall Store Building(s) | 6 |
| Section 1.18 | Minimum Number of Majors | 6 |
| Section 1.19 | Occupant | 6 |
| Section 1.20 | Parcel | 6 |
| Section 1.21 | Parking Area | 6 |
| Section 1.22 | Party | 7 |
| Section 1.23 | Party's Improvements | 7 |
| Section 1.24 | Perimeter Sidewalks | 7 |
| Section 1.25 | Permissible Building Area | 7 |
| Section 1.26 | Permittees | 7 |
| Section 1.27 | Person | 7 |
| Section 1.28 | Ring Road | 7 |
| Section 1.29 | Service Purposes | 7 |
| Section 1.30 | Supplemental Agreements | 7 |
| Section 1.31 | Truck Facilities | 7 |
| ARTICLE II | EASEMENTS | 9 |
| Section 2.1 | Definitions and Documentation | 9 |
| Section 2.2 | Easements for Use of Enclosed Mall and Other Common Areas (Other than Common Utility Facilities, Access Roads and Ring Road) | 9 |
| Section 2.3 | Easements for Access Roads and Ring Road | 10 |
| Section 2.4 | Easements for Common Utility Facilities | 11 |
| Section 2.5 | Construction Easements | 12 |
| Section 2.6 | Maintaining Common Footings and/or Common Foundations | 13 |
| Section 2.7 | Self-Help Easements | 13 |
| Section 2.8 | Abandonment of Easements | 14 |
| Section 2.9 | No Dedication of Easement and Benefit to Permittees | 14 |
| Section 2.10 | Right to Grant Private Easements and Easements to Utility Companies | 14 |
| Section 2.11 | Curb Cuts | 14 |
| ARTICLE III | ON-SITE AND OFF-SITE IMPROVEMENT WORK PLANS - CONSTRUCTION | 16 |
| Section 3.1 | Description of On-Site and Off-Site Improvement Work | 16 |

-i-

F00035

Page

| | | |
|---|---|---|
| Section 3.2 | General Responsibility of Developer | 17 |
| Section 3.3 | Independent Consultants | 18 |
| Section 3.4 | Development and Establishment of On-Site and Off-Site Improvement Plans - Approval Thereof | 19 |
| Section 3.5 | Construction of On-Site and Off-Site Improvement Work | 21 |
| Section 3.6 | Total Expenditure to be Paid by Parties | 22 |
| Section 3.7 | Schedule of On-Site and Off-Site Improvement Work | 22 |
| Section 3.8 | Utility Connections of Majors | 22 |
| ARTICLE IV | PLANS AND SPECIFICATIONS | 23 |
| Section 4.1 | Addresses to which Plans are to be Sent | 23 |
| Section 4.2 | General Design Data | 23 |
| Section 4.3 | Plans of Developer | 23 |
| Section 4.4 | Plans of Majors | 24 |
| Section 4.5 | Final Design Plans | 24 |
| Section 4.6 | Center to be Architecturally Harmonious | 24 |
| Section 4.7 | Request for a Sepia | 25 |
| ARTICLE V | GENERAL CONSTRUCTION REQUIREMENTS | 26 |
| Section 5.1 | "Construction" and "Commencement of Construction" Defined | 26 |
| Section 5.2 | Performance of Construction | 26 |
| Section 5.3 | Safety Measures | 26 |
| Section 5.4 | Construction: Storage and Time Schedule | 27 |
| Section 5.5 | Building Schedule | 27 |
| Section 5.6 | License for Subsequent Construction and Maintenance | 27 |
| Section 5.7 | Evidence of Compliance with Construction Requirements | 28 |
| Section 5.8 | Liens | 28 |
| Section 5.9 | Location and Height of Buildings | 29 |
| ARTICLE VI | CONSTRUCTION BY DEVELOPER | 30 |
| Section 6.1 | Developer's Construction Duty | 30 |
| Section 6.2 | Proof of Developer's Financing | 30 |
| ARTICLE VII | CONSTRUCTION BY MAJORS | 31 |
| Section 7.1 | Conditions to Major's Construction Duty | 31 |
| Section 7.2 | Construction of Macy Improvements | 31 |
| Section 7.3 | Construction of Sears Improvements | 32 |
| Section 7.4 | Construction of Burdines Improvements | 32 |
| Section 7.5 | Connection to Enclosed Mall | 33 |
| Section 7.6 | Completion of Majors' Improvements | 33 |
| Section 7.7 | Opening of Majors' Improvements | 33 |
| ARTICLE VIII | ALTERATIONS AND ADDITIONS TO IMPROVEMENTS | 34 |
| Section 8.1 | Alterations | 34 |
| Section 8.2 | Additional Floor Area | 34 |

F00036

Page

ARTICLE IX            MAINTENANCE, REPAIR AND RESTORATION OF
        -             BUILDINGS AND IMPROVEMENTS:  GENERAL          35

    Section 9.1       Maintenance of Buildings and Improvements on
                      Each Parcel                                   35
    Section 9.2       Damage or Destruction of Developer
                      Facilities                                    35
    Section 9.3       Damage or Destruction to the Building of a
                      Major                                         36
    Section 9.4       Duty to Complete Rebuilding                   36
    Section 9.5       Clearing Debris from Razed Improvements       36
    Section 9.6       Damage to or Destruction of Common Area       37

ARTICLE X             MAINTENANCE, REPAIR AND RESTORATION —
                      COMMON AREA                                   38

    Section 10.1      Maintenance of Common Area (Other than
                      Enclosed Mall)                                38
    Section 10.2      Operation and Maintenance of Enclosed Mall    38
    Section 10.3      Illumination of Common Area                   39
    Section 10.4      Right of Each Party to Maintain Own Parcel    40
    Section 10.5      Failure of Performance                        40

ARTICLE XI            PARKING REQUIREMENTS                          41

    Section 11.1      Required Parking Ratio                        41
    Section 11.2      Charges for Parking; Employee Parking Areas;
                      Valet Parking Area                            41
    Section 11.3      Use of Parking Areas                          41
    Section 11.4      Changes and Additions to Parking Area         42
    Section 11.5      Multi-Level Parking                           42

ARTICLE XII           OPERATING COVENANTS OF DEVELOPER              44

    Section 12.1      Developer's General Operating Covenants       44
    Section 12.2      Exceptions to Operating Covenant              45
    Section 12.3      Name of Center                                45

ARTICLE XIII          OPERATING COVENANTS OF MAJORS                 46

    Section 13.1      Operating Covenant                            46
    Section 13.2      Termination of Operating Covenant by a
                      Major                                         47
    Section 13.3      No Regulations of Manner of Operation         48
    Section 13.4      Exceptions to Operating Covenant              48

ARTICLE XIV           FEE OWNER'S SOUTHERLY PARCELS                 50

    Section 14.1      Fee Owner's Southerly Parcels                 50

ARTICLE XV            GENERAL COVENANTS — CENTER APPEARANCE         51

    Section 15.1      Removal of Buildings                          51
    Section 15.2      Limitation on Detrimental Characteristics     51
    Section 15.3      Non-Interference with Permittee Circulation   51
    Section 15.4      Signs                                         52
    Section 15.5      Operation of The Shopping Center Parcel       52
    Section 15.6      No Discrimination                             52

F00037

Page

ARTICLE XVI        TRANSFER OR CONVEYANCE OF PARCELS        53

    Section 16.1    Certain Definitions for this Article    53
    Section 16.2    Transfer During Construction            53
    Section 16.3    Assignment and Transfer                 53
    Section 16.4    Notice to Mortgagee and Fee Owner       55

ARTICLE XVII       INSURANCE                                56

    Section 17.1    Duty to Carry Fire Insurance - Release and
                    Waiver of Subrogation                   56
    Section 17.2    General Requirements for Fire Policies  56
    Section 17.3    Use of Policy Proceeds                  56
    Section 17.4    Duty to Carry Liability Insurance       57
    Section 17.5    Joint Liability Insurance               57
    Section 17.6    Additional Insurance                    58
    Section 17.7    Indemnification by Parties              58
    Section 17.8    Contractual Liability Insurance         59
    Section 17.9    Self-Insurance; "Blanket Policies"      59
    Section 17.10   Certificate of Insurance                59
    Section 17.11   Fee Owner                               59

ARTICLE XVIII      CONDEMNATION                             61

    Section 18.1    "Condemnation" and "Condemnation Date"
                    Defined                                 61
    Section 18.2    Condemnation of a Building              61
    Section 18.3    Condemnation of Parking Area            62
    Section 18.4    Award                                   63
    Section 18.5    Effect of Exclusion                     63
    Section 18.6    Instrument Evidencing Exclusion or
                    Termination                             64
    Section 18.7    Termination of Land Lease               64

ARTICLE XIX        REAL ESTATE TAXES                        65

    Section 19.1    Payment of Taxes                        65
    Section 19.2    Contesting Taxes                        65
    Section 19.3    Failure to Pay Taxes                    65

ARTICLE XX         EXCUSES FOR NON-PERFORMANCE              66

ARTICLE XXI        NOTICES AND APPROVALS                    67

ARTICLE XXII       AMENDMENT                                69

ARTICLE XXIII      TERM OF AGREEMENT                        70

ARTICLE XXIV       MISCELLANEOUS                            71

    Section 24.1    Table of Contents and Captions - Exhibits  71
    Section 24.2    Locative Adverbs; Terms                 71
    Section 24.3    REA for Exclusive Benefit of Parties    71
    Section 24.4    Waiver of Default                       71
    Section 24.5    Payment on Default                      71
    Section 24.6    No Partnership, Joint Venture or Principal-
                    Agent Relationship                      72
    Section 24.7    Successors                              72
    Section 24.8    Governing Laws                          72
    Section 24.9    Written Consent Required                72
    Section 24.10   Reasonableness of Consent               72

-iv-

F00038

|  |  |  | Page |
|---|---|---|---|
| Section 24.11 | Covenants Run with the Land | | 72 |
| Section 24.12 | Default Shall Not Permit Termination | | |
| | of REA | | 72 |
| Section 24.13 | Right to Enjoin | | 73 |
| Section 24.14 | Certification of Floor Area and | | |
| | Parking Spaces | | 73 |
| Section 24.15 | Merchants' Association or Promotion Fund | | 73 |
| Section 24.16 | Correction of Parcel Descriptions | | 74 |
| Section 24.17 | Authority of Developer | | 75 |
| Section 24.18 | Representation of Majors | | 75 |
| Section 24.19 | Limitation of Liability | | 75 |
| Section 24.20 | Notice of Non-Conformity to Law | | 76 |
| Section 24.21 | Confirmation of Center Opening Date | | 76 |
| Section 24.22 | Inducements | | 76 |
| Section 24.23 | Counterparts | | 76 |
| Section 24.24 | Rules | | 77 |
| Section 24.25 | Release of Major Upon Expiration of its | | |
| | Major's Lease | | 77 |

SIGNATURES

CONSENT OF FEE OWNER

EXHIBITS

Exhibit "A" - Legal Descriptions
Exhibit "B" - Site Plan
Exhibit "C" - Survey
Exhibit "D" - Rules, Regulations and Maintenance Standards
Exhibit "E" - Sign Criteria
Exhibit "F" - Minimum Technical Standards

A0018g

F00039

THE GARDENS
PALM BEACH GARDENS, PALM BEACH COUNTY, FLORIDA
CONSTRUCTION, OPERATION AND RECIPROCAL
EASEMENT AGREEMENT

This Construction, Operation and Reciprocal Easement Agreement (hereinafter referred to as the "REA") is made as of the _29th_ day of _May_, 1987, by and among Forbes/Cohen Florida Properties Limited Partnership, a Michigan limited partnership (hereinafter referred to as "Developer"), Macy's New York, Inc., a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Macy"), Sears, Roebuck and Co., a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Sears"), and Federated Department Stores, Inc., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Federated").

RECITALS

1.   Developer has a leasehold interest in certain land consisting of approximately 100.36 acres situated in the County of Palm Beach, State of Florida, more particularly described in Exhibit "A", Part 1 (hereinafter referred to as the "Shopping Center Parcel") and located as shown on Exhibit "B".

2.   Macy is leasing from Developer that portion of the Shopping Center Parcel consisting of approximately 14.15 acres situated in the County of Palm Beach, State of Florida, more particularly described in Exhibit "A", Part 2 (hereinafter referred to as the "Macy Parcel") and located as shown on Exhibit "B".

3.   Sears is leasing from Developer that portion of the Shopping Center Parcel consisting of approximately 10.6 acres situated in the County of Palm Beach, State of Florida, more particularly described in Exhibit "A", Part 3 (hereinafter referred to as the "Sears Parcel") and located as shown on Exhibit "B".

4.   Federated is leasing from Developer that portion of the Shopping Center Parcel consisting of approximately 15.22 acres situated in the County of Palm Beach, State of Florida, more particularly described in Exhibit "A", Part 4 (hereinafter referred to as the "Burdines Parcel") and located as shown on Exhibit "B".

5.   That portion of the Shopping Center Parcel leased by Developer and not leased to Macy, Sears or Federated consists of approximately 60.23 acres of land situated in the County of Palm Beach, State of Florida, more particularly described in Exhibit "A", Part 5 (hereinafter referred to as the "Developer Parcel") and located as shown on Exhibit "B."

6.   The Developer Parcel, Macy Parcel, Sears Parcel and Burdines Parcel are collectively described in Exhibit "A", Part 1 and are hereinafter collectively referred to as the "Shopping Center Parcel", each of which Parcels is more particularly located as shown on the Survey attached hereto as Exhibit "C".

7.   The Parties desire to make an integrated use of the Shopping Center Parcel and to develop and improve the Shopping Center Parcel as a first class regional shopping center (hereinafter referred to as the "Shopping Center" or the "Center") of the multi-level enclosed-mall type.

8.   The Parties desire to provide for the construction, maintenance and operation of the Common Area and the buildings and other improvements to be situated on and off the Shopping Center Parcel, and in that regard to create

certain rights, privileges, obligations, duties and easements and to impose
certain restrictions and covenants upon their respective Parcels.

NOW, THEREFORE, for good and valuable consideration, including the
mutual promises, covenants and agreements herein contained, the Parties
agree as follows:

-2-

F00041

ARTICLE I

DEFINITIONS

As used in this REA, the following terms have the following meanings:

Section 1.1   Access Roads

"Access Roads" means all of those roads providing ingress to and egress from the Ring Road on the Shopping Center Parcel to the existing and proposed public streets and which roads are designated on Exhibit "B" as Access Roads.

Section 1.2   Center

"Center" means the Developer Parcel, Macy Parcel, Sears Parcel and Burdines Parcel, together with all buildings and other improvements constructed at any time thereon.

Section 1.3   Center Opening Date

"Center Opening Date" means the earliest date upon which the buildings of two Majors and the Enclosed Mall are first open for business, which is currently scheduled for October 5, 1988; provided, however, if the buildings of two Majors and the Enclosed Mall are not so open by March 1, 1989, the Center Opening Date shall be the earlier of (a) the date thereafter upon which the buildings of two or more of the Majors are first open for business and (b) December 1, 1989.

Section 1.4   Common Area

"Common Area" means (a) all areas within the boundaries of the Shopping Center Parcel that pursuant to this REA are, or are designated and intended to be, constructed, installed or improved, and available for the nonexclusive use, convenience and benefit of Developer, the Majors, all Occupants and their respective Permittees and (b) the easement areas upon the Fee Owner's Parcels upon which signs for the Shopping Center are maintained and the Fee Owner's Southerly Parcels prior to the development thereof and during the period the landscaping thereon is maintained by Developer.

Among other things, Common Area includes by way of illustration and not of limitation: (a) Access Roads and the Ring Road; (b) the Parking Area; (c) the Enclosed Mall, including all amenities therein, after its completion, except for areas thereof occupied by kiosks; (d) sidewalks and walkways, including Perimeter Sidewalks; (e) landscaped and planted areas (including the irrigation system therefor); (f) drainage retention areas; (g) all curbs, lighting standards, traffic and directional signs, traffic striping and markings located within the Center; (h) Common Utility Facilities; (i) retaining walls and grade separations (other than any portion of a retaining wall which is an integral part of a building or the Truck Facilities serving the Floor Area of any Party's Parcel); (j) bus stops and shelters; (k) bike racks and (l) the project sign easement areas and project signs.

Common Area does not include any community room, management and security offices, the Truck Facilities serving the Floor Area of any Party's Parcel or any storage area used exclusively for maintenance and promotional equipment, supplies and materials for Common Area maintenance and Shopping Center promotions and outside sales area as shown on Exhibit "B".

Section 1.5   Common Utility Facilities

"Common Utility Facilities" means all storm drainage facilities; sanitary sewer systems; natural gas systems (if any); water systems; fire protection installations; electrical power systems; T.V. Cable systems, if

-3-

F00042

any; and telephone systems situated on the Shopping Center Parcel, except as
to any located within five feet (5') of any Party's exterior building wall
which serve only such Party's Improvements.

Section 1.6   Condemnation

"Condemnation" means (a) the permanent taking of all or any part of the
Shopping Center Parcel or the possession thereof under the power of eminent
domain; or (b) the voluntary sale of all or any part of the Shopping Center
Parcel to any person having the power of eminent domain, provided that such
portion of the Shopping Center Parcel is then under the actual and imminent
threat of eminent domain.

Section 1.7   Developer Facilities

"Developer Facilities" means the following improvements located on the
Developer Parcel:

   (a)   The Mall Store Building(s);

   (b)   The Enclosed Mall;

   (c)   Truck Facilities;

   (d)   All related improvements, including Perimeter Sidewalks,
landscaped and planted areas in the area from the back of the curb
nearest the Mall Store Building(s) (other than such curb) to the
building perimeter of the Mall Store Building(s). Excluded therefrom
shall be (i) any portion of the Common Utility Facilities which may be
located in such area and (ii) the masonry wall of each Major's building
abutting the Enclosed Mall, which masonry wall shall be constructed by
each respective Major.

Section 1.8   Enclosed Mall

"Enclosed Mall" means the multi-level enclosed, lighted, sprinklered,
heated, ventilated and air-conditioned mall to be located on the Developer
Parcel as shown on Exhibit "B" and thereon designated "Enclosed Mall".

Section 1.9   Fee Owner

"Fee Owner" means John E. Corbally, James M. Furman and Philip M. Grace
(successor to David M. Murdoch), not personally but solely as Trustees under
Trust Agreement, dated December 28, 1983, and known as the MacArthur
Liquidating Trust, and their successors and assigns as fee owners of the
Shopping Center Parcel.

Section 1.10   Fee Owner's Parcels

"Fee Owner's Parcels" means the parcels consisting of approximately 458
acres situated in the County of Palm Beach, State of Florida, more
particularly described in Exhibit "A", Part 6.

Section 1.11   Fee Owner's Southerly Parcels

"Fee Owner's Southerly Parcels" means the two parcels of the Fee Owner's
Parcels immediately to the south of the Shopping Center Parcel, consisting
of approximately 10.911 acres, more particularly described in Exhibit "A",
Part 7 and located as shown on Exhibit "B".

Section 1.12   Floor Area

"Floor Area" means, from time to time, the aggregate of the actual
number of square feet of enclosed floor space in any building located on the

-4-

F00043

Shopping Center Parcel, exclusively appropriated for use by an Occupant and not part of Common Area, whether or not actually occupied.

(a) Floor Area includes:

(1) Basement space and subterranean areas;

(2) Space occupied by columns, dumbwaiters, conveyors or other interior equipment within the building involved (except as excluded below); and

(3) Space occupied by any kiosk.

(b) Notwithstanding the foregoing provisions of this Section, Floor Area shall not include space designed and used for:

(1) The second or more levels of any multi-deck stock areas;

(2) Mechanical, electrical, telephone, air-conditioning and similar equipment, including any computer equipment, not used for sale or lease to third persons and used solely for the Occupant and any garbage (or other waste) collecting area or waste baling or compacting area; escalators, elevators and stairwells; penthouses; or any plenum area which may be created by extending an upper level roof line from the building wall to an outside parapet wall so long as such plenum area is not used for any purpose whatsoever, other than for the hanging or servicing of mechanical equipment;

(3) The Center's management and security offices and Merchant's Association office or similar offices used exclusively for the benefit of Occupants and Permittees of the Center;

(4) Community Hall and meeting rooms;

(5) Common Area Maintenance office and equipment storage areas used exclusively for the storage of maintenance and promotional equipment, supplies and materials for Common Area maintenance and Shopping Center promotions;

(6) Emergency service and fire corridors between fire resistant walls required by building codes and not contained within any area exclusively appropriated for the use of any single Occupant;

(7) Truck Facilities;

(8) Any Enclosed Mall public restrooms;

(9) One non-profit customer-oriented child care center or child play area in the Mall Store Building(s); not to exceed two thousand (2,000) square feet;

(10) One post office in the Mall Store Buildings(s); not to exceed two thousand three hundred (2,300) square feet.

Floor Area shall be measured from the exterior faces of the exterior walls (including basement walls), except that where party and interior common walls are involved, Floor Area shall be measured from the center thereof instead of from the exterior faces thereof.

Section 1.13 Land Lease

"Land Lease" means that certain Ground Lease, dated June 14, 1984, between the Fee Owner, as Landlord, and the Developer, as Tenant, as amended by instruments dated July 24, 1986 and May 29, 1957, and a memorandum of

-5-

F00044

which was recorded on *August 30, 1984* and amendments of such memorandum were
recorded on *October 7, 1986*.

Section 1.14  <u>Lease</u>

"Lease" means any lease, deed or other instrument or arrangement in
writing (other than this REA) whereby an Occupant acquires rights to use
and/or occupy Floor Area.

Section 1.15  <u>Major</u>

"Major" means Macy, Sears or Federated and their respective successors
and assigns.

Section 1.16  <u>Major's Lease</u>

"Major's Lease" means any lease, sublease or other instrument or
arrangement in writing (other than this REA and the Supplemental Agreement)
whereby a Major acquires rights to a portion of the land of the Shopping
Center Parcel.

Section 1.17  <u>Mall Store Building(s)</u>

"Mall Store Building(s)" shall mean the building(s) which Developer is
obligated or permitted to construct pursuant to this REA within Permissible
Building Area on the Developer Parcel.

Section 1.18  <u>Minimum Number of Majors</u>

"Minimum Number of Majors" means any two (2) Majors; provided, that if
the Shopping Center Parcel shall at any time have four (4) or five (5)
Majors' Buildings, the Minimum Number of Majors shall mean three (3)
Majors.

Section 1.19  <u>Occupant</u>

"Occupant" or "Occupants" means each Major, Developer and any other
Person entitled by Lease to use and occupy Floor Area within the Center, or
one or more of them, as the context may require.

Section 1.20  <u>Parcel</u>

"Parcel" or "Parcels" means the Developer Parcel, Macy Parcel, Sears
Parcel, or Burdines Parcel, or any combination or portions thereof, as the
context may require. Whenever the REA refers to a transfer, conveyance,
sale, lease, sublease or mortgage of a Party's Parcel and such Party is not
the fee owner of such Parcel, the term "Parcel" shall mean such Party's
leasehold interest in such Parcel.

Section 1.21  <u>Parking Area</u>

"Parking Area" means all areas in the Center which are set apart or used
from time to time for automobile and other vehicle traffic and parking,
including, without limitation, traffic lanes, aisles and roadways (including
the Ring Road and Access Roads) and curbs adjacent thereto; vehicle parking
stalls at grade or in multi-level parking decks; pedestrian walkways (other
than Perimeter Sidewalks); grade separations, including retaining walls
(other than retaining walls which are an integral part of a Party's building
or the Truck Facilities serving the Floor Area of any Party's Parcel);
landscaped areas (other than those located in the area located from the back
of the curb nearest any Party's building(s) and a Party's building);
lighting standards; and traffic and directional signals and all amenities
relating thereto.

-6-

Parking Area does not include Truck Facilities or any customer drop-off or package pick-up area for the exclusive benefit of any one Party.

Section 1.22  Party

A "Party" means Developer, Macy, Sears or Federated and "Parties" mean all of the foregoing, or any successor Person(s) acquiring the leasehold and/or fee interest, as the case may be, of a Party in or to any portion of such Party's Parcel.

Section 1.23  Party's Improvements

Each Major's Improvements are defined in Sections 7.2, 7.3 and 7.4.  The Developer's Improvements mean Developer Facilities as defined in Section 1.7.

Section 1.24  Perimeter Sidewalks

"Perimeter Sidewalks" means those sidewalk areas (other than within the Enclosed Mall) within the area from the back of the curb line (the line at the edge of each sidewalk, which line runs between the curb and each such sidewalk area), to the landscaped areas immediately adjoining the building perimeters of each Party's building(s) or to the building perimeter of each Party's building(s) as the context may appropriately require; provided, however, sidewalks and curbs adjoining or on retaining walls or berms within grade changes shall not be considered Perimeter Sidewalks.

Section 1.25  Permissible Building Area

"Permissible Building Area" means the area(s) designated as such on Exhibit "B" within which a building has been or is either obligated or permitted to be constructed, as hereinafter more fully provided.

Section 1.26  Permittees

"Permittees" means all Occupants and their respective officers, directors, employees, agents, partners, contractors, customers, visitors, invitees, licensees and concessionaires.

Section 1.27  Person

"Person" or "Persons" means individuals, partnerships, associations, corporations and any other form of business organization, or one or more of them, as the context may require.

Section 1.28  Ring Road

"Ring Road" means the area designated as such on Exhibit "B".

Section 1.29  Service Purposes

"Service Purposes" means such services as are normally ancillary to a shopping center at such time.

Section 1.30  Supplemental Agreement

"Supplemental Agreement" means that certain written agreement (other than this REA and a Major's Lease) between Developer and a Major entered into in respect of further rights and obligations of each in connection with the Shopping Center.

F00046

Section I.31  Truck Facilities

Truck Facilities are those areas designated as such on Exhibit "B" and to be used exclusively for shipping and receiving and truck accommodation in connection therewith, including:

(a)  Truck docks, open or enclosed, and ramps and approaches thereto;

(b)  Areas constructed for truck loading, unloading, parking or turn-arounds; and

(c)  Trash compactor area.

-8-

F00047

## ARTICLE II

### EASEMENTS

Section 2.1   Definitions and Documentation

For purposes of this Article, the following will apply:

(a) All rights, privileges and easements granted herein are non-exclusive and in common with the party granting such rights, privileges and/or easements (the "Grantor") and, unless provided otherwise, are irrevocable and for the benefit of each of the Parties hereto and their respective heirs, representatives, successors and assigns as owners of their respective Parcels.

(b) All easements granted hereunder shall exist by virtue of this REA, without the necessity of confirmation by any other document. Likewise, upon the termination of any easement (in whole or in part) or its release in respect of all or any part of any Parcel, the same shall be deemed to have been terminated or released without the necessity of confirmation by any other document. However, upon the request of any other Party, each Party will sign and acknowledge a document memorializing the existence (including the location and any conditions), or the termination (in whole or in part), or the release (in whole or in part), as the case may be, of any easement, if the form and substance of the document is acceptable to each Party.

(c) Fee Owner, by executing the Consent of Fee Owner attached to this REA, recognizes all of the easement rights granted by this Article II and Fee Owner acknowledges and agrees that all such easements have been granted pursuant to and in accordance with the Land Lease.

Section 2.2   Easements for Use of Enclosed Mall and
Other Common Area (Other Than Common
Utility Facilities, Access Roads and
Ring Road)

(a) Each Party hereby grants to each of the other Parties easements in the Common Areas on its (Grantor's) Parcel (other than the Ring Road and Access Road portions thereof referred to in Section 2.3 and the Common Utility Facilities referred to in Section 2.4) for the benefit of each Grantee's Parcel for:

(1) ingress to and egress from the Grantee's Parcel; and

(2) circulation, passage and parking of vehicles, subject to Section 11.2; and

(3) circulation, passage and accommodation of pedestrians.

Provided, however, such easements are limited to such portions of the Common Area of the Grantor's Parcel as are herein or hereafter set aside, required and authorized for such use pursuant to this REA, including, without limitation, those portions of the Common Area located as shown on Exhibit "B"; provided, however, as to the Enclosed Mall, such grant is subject to non-availability of access if the Enclosed Mall is closed to the public during those times when the Enclosed Mall is not required to be open in accordance with Section 10.2 of this Agreement.

(b) Enjoyment of the easements granted by this Section shall commence on the date each respective portion of the Common Area over which easements are granted is completed.

(c) Each Party hereby reserves the right to eject or cause to be ejected from such portions of the Common Area on its Parcel, including the

-9-

F00048

Enclosed Mall, any Persons not authorized, empowered or privileged to use
the same. In addition, each Party reserves the right to close off the
Common Area of its Parcel (other than Common Utility Facilities) for such
reasonable periods of time as may be legally necessary to prevent the
acquisition of prescriptive rights by anyone; provided, however, before
closing off any part of the Common Area as provided above, such Party must
give notice to each of the other Parties of its intention to do so and must
coordinate its closing with the activities of each of the other Parties so
that no unreasonable interference with the operation of the Center occurs.

(d)  Commencing on completion of the Enclosed Mall, Developer grants,
conveys and assigns to each Major an easement to have each such Major's
building abut on and open onto the Enclosed Mall.

(e)  The easements provided for in this Section 2.2 are subject to the
rights to use such portions of the Common Area for other purposes provided
for in this REA; however, except as otherwise in this REA provided, no
changes, other than insignificant changes or changes made in accordance with
Section 11.4 of this REA, shall be made in the Common Area or in location or
design of Common Area prior to the termination of the easements granted
pursuant to this Section 2.2.

(f)  Notwithstanding any other provision of this REA, the easements
granted under this Section 2.2 shall terminate on the date of expiration or
sooner termination of this REA; provided, however, that (i) any such
easement granted in or in favor of a Parcel which is excluded from the
operation and effect of this REA pursuant to Article XVIII hereof shall
terminate as to said Parcel on the date it is so excluded, unless otherwise
provided to the contrary in said Article; and (2) such easement as to
opening onto the Enclosed Mall, shall not be applicable (i) as to the
Parcels of all Parties while the Developer is neither operating the Enclosed
Mall nor is obligated to operate or cause to be operated the Enclosed Mall
as required by Section 12.1 and (ii) as to the Parcel of any Party which has
razed the whole of its improvements, or any part thereof, and not rebuilt
all or a part thereof such that its building does not abut on and open onto
the Enclosed Mall, in accordance with Section 9.5.

Section 2.3   Easements for Access Roads
              and Ring Road

Each Party hereby grants to each of the other Parties for the benefit of
their respective Parcels, easements during the term of this REA for
pedestrian and vehicular traffic in those strips of land on its Parcel which
are designated as Access Roads and Ring Road on Exhibit "B" for the purpose
of providing ingress to and egress from such respective Grantee's Parcel and
the public roadway which intersects or abuts with any such Access Road,
together with the following rights and subject to the following restrictions
and reservations:

(a)  Grantors of the Access Roads and Ring Road easements agree not
to obstruct or interfere in any way with the free flow of pedestrian and
vehicular traffic over the roadways which comprise the Access Roads and
Ring Road, except to the extent reasonably necessary for repair and
maintenance, traffic regulation and control, and to prevent a dedication
thereof or the accrual of any rights to any other Person therein except
as may expressly otherwise be provided in this REA;

(b)  In the event of exclusion by a Grantor of its Parcel from the
operation and effect of this REA pursuant to Article XVIII hereof, after
the date of such exclusion and upon not less than thirty (30) days'
prior notice to the other Parties, Grantor shall have the right to
change the location of all or any portion of the Access Road or Ring
Road easements on its respective Parcel, provided (1) such relocation
shall be made at the sole cost and expense of the Grantor, (2) access
for pedestrian and vehicular traffic is not unreasonably restricted or

-10-

F00049

its enjoyment in any way materially impaired by such changes, (3) the quality of construction and the width of the relocated Ring Road or Access Road shall be substantially similar to the portion being relocated, (4) the relocation shall be carried out in such manner as to cause the least possible interference with the conduct or operation of business of the other Parties during such relocation, and (5) the Grantor shall record a plan showing the location of the relocated portion of the Ring Road or Access Road.

(c)  If after the exclusion by a Party of its Parcel from the operation and effect of this REA pursuant to Article XVIII hereof, any Grantor shall fail to maintain and repair the Ring Road and Access Road on its Parcel, any Grantee shall have the right to enter upon the Parcel of such Grantor for the purpose of maintaining and repairing said Ring Road and Access Road at Grantee's cost and expense. Any Grantee entering upon the Parcel of a Grantor to effect such maintenance and repair shall defend and save harmless the Grantor from all loss, liability, cost or expense incurred in connection with Grantee's exercise of such right.

(d)  The provisions of this Section 2.3 shall survive the exclusion by any Party of its Parcel from the operation and effect of this REA.

(e)  Each Party reserves the right to close off the Access Road and/or Ring Road on its Parcel in the same manner as provided in Section 2.2(c) as to Common Areas.

(f)  The Access Road and Ring Road shall be at least forty-four feet (44) in width and as shown on Exhibit "B".

Section 2.4   Easements for Common Utility Facilities

(a)  Each Party hereby grants to each of the other Parties easements during the term of this REA in its (Grantor's) Parcel, except within such Grantor's Permissible Building Area, for the installation, use, operation, maintenance, repair, enlargement, replacement, relocation and removal of Common Utility Facilities serving the Parcel of the Grantee at the locations determined in accordance with Article III. Upon completion of construction of the Common Utility Facilities, the Parties shall initial an "as-built" plan prepared by Developer (Common Utility Plan), in recordable form, so as to appropriately identify the type and location of the Common Utility Facilities in the Shopping Center Parcel.

The Grantor of any easement under this Section may relocate on its Parcel any Common Utility Facilities installed thereon under any easement granted by it, provided such relocation:

(1)  may be performed only after Grantor has given Grantee thirty (30) days' notice of its intention to relocate such facilities;

(2)  shall not interfere with or diminish the utility services to the Grantee; however, temporary interferences with and diminutions in utility services shall be permitted if:

(A)  they occur during non-business hours of the Grantee, and

(B)  Grantor promptly reimburses Grantee for the actual cost, expense and loss incurred by Grantee as a result of such interferences or diminutions; or both;

(3)  shall not reduce or unreasonably impair the usefulness or function of the facilities in question;

(4)  shall not be relocated other than underground; and

-11-

F00050

(5) shall be performed at the sole cost of Grantor, including required changes to the Common Utility Plan made by way of a supplement thereto executed and recorded by Grantor.

(b) Fee Owner has reserved the right to grant easements for utilities under the Shopping Center Parcel in connection with the development of the Fee Owners Parcels' provided that the construction and maintenance of such easements shall be performed without cost to any Party and do not materially interfere with the operation of the Shopping Center and provided that the Fee Owner restores any damage to the easement area to its conditions prior to the exercise of the easements. Notwithstanding the foregoing, no such easements shall be granted under buildings nor under any parking areas or roadways within the Shopping Center subsequent to the period expiring one (1) year prior to the Center Opening Date, and whenever practical and feasible, the Fee Owner shall endeavor to locate such easements along the perimeter boundaries of the Shopping Center Parcel. During the period of the installation and maintenance of improvements in such easements, the Fee Owner shall carry insurance as provided for in Section 17.4 naming all Parties as additional insureds and indemnify all Parties as provided in Section 17.7. Fee Owner also has reserved an easement for ingress and egress for pedestrians and vehicles to and from the Fee Owner's Southerly Parcels and to and from PGA Boulevard over, upon and across the Access Roads and Ring Road, subject to Sections 2.11 and 14.1(a).

(c) Subject to Section 2.8 hereof, the provisions of this Section 2.4 shall survive the exclusion by any Party of its Parcel from the operation and effect of this REA and/or the termination of the Major's Lease covering the portion of the Shopping Center Parcel with respect to which such easement has been granted.

(d) It is understood and agreed that all utilities other than transformers, electrical switch gear, fire hydrants, stand pipes, manhole covers or a sanitary sewer lift station, located on the Shopping Center Parcel shall be underground.

Section 2.5    Construction Easements

(a) Each Party hereby grants to each of the other Parties an easement to the extent needed in accordance with good construction practices in the Common Area of its (Grantor's) Parcel, and when and where approved pursuant to Section 2.5(b), where applicable within the Permissible Building Area on its Parcel, for:

(1) The performance of construction pursuant to Articles III, V, VI and VII of this REA. Said easement shall subsist during that period of time that construction is proceeding in accordance with the terms of this REA.

(2) The construction, maintenance, use, repair and replacement of "Common Footings" and/or "Common Foundations" if Developer and any Major agree in their discretion to the use of what is known in the construction trade as "Common Footings" and/or "Common Foundations" for their respective improvements.

(3) The attachment of building improvements (including the Enclosed Mall) constructed on Grantee's Parcel to and on building improvements of Grantor, provided the manner of attachment· shall be designed in accordance with generally accepted construction and engineering practice in the manner customary for improvements of such type and so as not to impose any load on Grantor's building improvements, except as may be approved by Grantor.

(4) The installation, use, maintenance, repair, replacement and removal of underground footings for the purpose of supporting building improvements of Grantee which encroach upon the Parcel of Grantor.

F00051

(5) The installation, use, maintenance, repair, replacement and removal of any permitted improvements such as signs, entrances, marquees, canopies, lights and lighting devices, fire stair towers and doors, awnings, alarm bells, wing walls, roof flashings, roof and building overhangs and other overhangs encroaching upon the Parcel of the Grantor.

(b) The location and extent of all easements under this Section shall be subject to the approval of the respective Grantors. The plans and specifications showing the improvements specified in subparagraphs (2) through (5) of subsection (a) of this Section 2.5 together with a specific request by the Grantee for approval of the location and extent of the encroachment on the Parcel of the Grantor, shall be submitted to Grantor. Approval thereof by Grantor shall constitute designation by such Grantor of the portions of its Parcel to be used for such easements; any such approval of Grantor shall not be unreasonably withheld or delayed, except to the extent such approval relates to signs or marquees, provided that the granting of any such easement does not result in a significant increase in cost of construction to the Grantor of its buildings. In the case of an easement for the attachment of building improvements pursuant to subparagraph (3) of subsection (a) of this Section 2.5, approval of the plans and specifications therefor may be granted or withheld in the sole discretion of Grantor.

The easements described in subparagraphs (2) through (5) of subsection (a) of this Section 2.5 shall remain in existence so long as the building of the Grantee (or any restoration or replacement thereof made during the term of this REA) remains in existence, subject to the limitations contained in Section 2.6 hereof.

If requested by any Party, the Parties shall execute a suitable easement agreement in recordable form evidencing the location of any easements granted under this Section 2.5.

Section 2.6   Maintaining Common Footings and/or
              Common Foundations

Each Party severally covenants that if all or any part of its Improvements is removed or destroyed at a time when it is not required to restore and does not elect to restore the same under this REA, it will leave in place any foundations and footings (or portions thereof) not removed or destroyed if, immediately before such removal or destruction, such foundations or footings (or portions thereof) were shared jointly between such Party and any other Party. Each Party shall be obligated to leave the foundations and footings in place only for so long as the Improvements of the other Party's whose foundations or footings (or portions thereof) shall stand (as originally constructed or as replaced under this REA) or shall be in the process of being restored or replaced.

Nothing in this Section nor in Section 2.5 hereof imposes any obligation on any Party to restore or reconstruct all or any part of its Improvements beyond the termination of such restoration obligations as are otherwise contained in this REA. In addition, nothing in this Section nor in Section 2.5 hereof prohibits any Party from demolishing its Improvements (other than such foundations and footings) after the time it is obligated to maintain the same under the REA.

Section 2.7   Self-Help Easements

To the extent any Party exercises the rights granted in Section 10.5, each Party hereby grants to each of the other Parties easement(s) in the Common Area of its (Grantor's) respective Parcel so to do.

-13-

F00052

Section 2.8   Abandonment of Easements

The easements granted in Section 2.3 and Section 2.4, or either or any part thereof, may be abandoned and terminated after the exclusion by a Party of its Parcel pursuant to Article XVIII hereof from the operation and effect of this REA or by non-use for a continuous period of three (3) years.  If the then record owner of the leasehold of the Parcel burdened with such easement alleges such non-use, it shall give written notice of such fact by United States registered or certified mail, return receipt requested, mailed to the then record owner of the leasehold of the Parcel or Parcels benefited by such easement, stating its belief that such easement has been abandoned. If the record owner of the leasehold of the benefited Parcel or Parcels disputes the abandonment of such easement, it shall serve notice of such dispute by certified or registered mail upon the leasehold owner of the burdened Parcel or Parcels within six (6) months of the receipt of notice of non-use.  If the record owner of the leasehold interest in the benefited Parcel or Parcels shall not serve such notice of dispute upon the fee and/or leasehold owner of the burdened Parcel or Parcels within said six (6) month period, said easement shall be conclusively deemed abandoned and terminated and the Parties thereto shall execute an appropriate instrument confirming said abandonment and termination, failing of which Grantor may apply for an appropriate judicial decree to said effect.  In the event that the record owner of the leasehold interest shall serve such notice of dispute upon the leasehold owner of the burdened Parcel or Parcels within said six (6) month period, such dispute may be resolved by the record owner of the leasehold interest of the burdened Parcel or Parcels by bringing the appropriate judicial action to have the easement declared abandoned.

Section 2.9   No Dedication of Easement and
              Benefit to Permittees

Nothing contained in this Article II, including the grant of any or all easements herein provided, shall be deemed to constitute a dedication of any Parcel, or any portion or portions thereof, to any governmental body or agency or to the general public, or be construed to create any rights in or for the benefit of any space lessee of any part of the Shopping Center Parcel, it being the intention of the Parties that this REA shall be strictly limited to and for the purpose herein expressed. Developer and/or the Majors may, however, extend the benefit of the easements created by this Article II to each of its Permittees, but such grant shall be subject to the provisions of Article XXIII hereof. Notwithstanding the foregoing, the Developer reserves the right to dedicate the Common Utility Facilities, or parts thereof, to any governmental unit, subject to fulfilling the same requirements set forth in Section 2.4(a) in case of relocation.

Section 2.10   Right to Grant Private Easements and
               Easements to Utility Companies

Subject to fulfilling the same requirements set forth in Section 2.4(a) in case of a relocation, nothing herein shall limit the right of any Party to grant easements to any governmental unit, public body and/or utility company for the construction, installation, operation, maintenance, repair, relocation, modification, extension or alteration of sanitary sewers; storm drainage systems; fire protection installations; gas; water; T.V. cable lines, if any; power and telephone lines, mains and trunks in its Parcel (so long as such utility lines are installed underground and so long as no such easement affects, limits, or interferes with any of the Common Utility Facilities or with the use of any Common Area for its intended purpose).

Section 2.11   Curb Cuts

In connection with the right-of-way easements over the Access Roads and Ring Road for the benefit of the Fee Owner's Southerly Parcels, such easements shall include the right to make not more than two (2) curb cuts (without turning restrictions) with respect to each of the Fee Owner's

-14-

F00053

Southerly Parcels onto said Ring Road at points shown on Exhibit "B" or such substitute curb cuts which shall be located in a manner which, and the cuts shall be constructed in a manner which, will not unreasonably interfere with safe and unimpeded use of the Access Roads and Ring Road as contemplated hereunder. None of such curb cuts shall be within one hundred fifty (150) feet of an Access Road. This provision shall not in any way be construed as a grant of any parking rights or other rights in and to any portion of the Shopping Center Parcel. No Party shall grant parking easements on any part of the Shopping Center Parcel for the benefit of property outside the Shopping Center Parcel.

In exercising the right to grant curb cuts, as aforesaid, other than as shown on Exhibit "B", the location and manner of any such curb cuts shall be subject to the verification by a qualified traffic consultant as is approved by the Parties that same do not unreasonably interfere with the safe and unimpeded use of the Access Roads and Ring Road.

F00054

ARTICLE III

ON-SITE AND OFF-SITE IMPROVEMENT
WORK PLANS - CONSTRUCTION

Section 3.1    Description of On-Site and
Off-Site Improvement Work

For the purposes hereof, the phrase "On-Site and Off-Site Improvement Work" shall include, without limitation, the following improvements to be designed and installed in accordance with the Final Improvement Plans approved in accordance with Section 3.4 hereof as well as the design and installation thereof and the providing of the following services:

(a)  A cleared and graded Shopping Center Parcel, including any necessary undercutting or stabilization of subgrades so that the entire Shopping Center Parcel is at a subgrade capable of supporting the buildings and improvements to be constructed by the Parties as contemplated in this REA.  Said clearing and grading shall include the construction of temporary staging areas for each Party's building sites and construction roads leading thereto, as well as the construction of any berms and retaining walls (other than retaining walls which are an integral part of any Party's Buildings, Truck Facilities or parking deck facility) within the Parking Area or along the perimeter of the Shopping Center Parcel which are necessary to implement the Site Plan as set forth in Exhibit "B".

(b)  A water line(s) running to the property line of the Shopping Center Parcel which shall connect to a municipal or public utility water facility which shall provide rate of flow and pressure necessary for the full enjoyment of the buildings and improvements to be erected upon the Shopping Center Parcel, as provided by this REA, including the operation of such fire protection system as may be installed by the Parties or as may be required by law.

(c)  Temporary water service at the Shopping Center Parcel and all other water mains, both domestic and fire, on the Shopping Center Parcel, including fire hydrants and main trunk section valves and plugs and sleeves.

(d)  An off-site sanitary sewer line running to the property line of the Shopping Center Parcel which shall connect to municipal or public utility sewage facilities, together with all connections therefrom to the on-site sanitary sewer system and providing sanitary sewer laterals and main trunk sanitary sewer and appurtenances thereto, in the Shopping Center Parcel, including a lift station, if required.

(e)  An off-site storm sewer system suitable to drain the Shopping Center Parcel running to the property line of the Shopping Center Parcel, together with all connections therefrom to the storm sewer system located on the Shopping Center Parcel, and providing the storm sewer system on the Shopping Center Parcel, adequate for proper drainage of the Parking Areas and for proper drainage of the building roofs and Truck Facilities, including, without limitation, all underground pipes and catch basins, as may be necessary or appropriate.

(f)  Off-site electric power lines and gas mains (if available) running to the property line of the Shopping Center Parcel of sufficient capacity to service the buildings and improvements to be erected upon the Shopping Center Parcel, as provided by this REA, and extension and connection thereof to the on-site system and providing the on-site system to service the buildings and improvements to be constructed on the Shopping Center Parcel, including temporary electric service to the sites of the buildings to be constructed initially, and the relocation of services presently existing and/or installation of main feeder lines,

-16-

F00055

conduits, piping, wiring, valves, manholes and other appurtenant
devices. Each Party shall pay for all such utilities consumed by it.

(g) Means of ingress to and egress from the Shopping Center Parcel
and adjoining roadways, including the Access Roads and Ring Road,
substantially as shown on Exhibit "B", and signalization, lighting,
drainage, widening and other street improvements. Those roads
designated as "Dedicated Roads" on Exhibit "B" shall be dedicated to a
governmental or quasi-government agency prior to the Center Opening
Date.

(h) Off-site telephone lines and cable television lines, if any,
running to the property line of the Shopping Center Parcel and extension
thereof to the buildings and improvements to be constructed initially on
the Shopping Center Parcel.

(i) A complete Parking Area lighting system, including concrete
bases, conduits, fittings and fixtures. The parking lot lighting system
shall be designed to provide separate circuits for the parking lot
lighting fixtures serving the individual Parcels of each of the Parties
and terminating at each Party's respective service panel. Such lighting
fixtures serving the individual Parcels of each of the Parties shall be
controlled by a master project time clock, with each Party having the
right to provide an override to permit such Party to control said
lighting from its respective electrical panel if desired.

(j) A complete Parking Area, including paving and installing
concrete curbs, islands, sidewalks (excluding Perimeter Sidewalks and
excluding truck aprons which are to be located on and serve each
respective Party's Parcel and which shall be the responsibility of each
Party), bus stops, interior roads and road system, including Parking
Area identification, traffic control signs on the Shopping Center
Parcel, including entrance and exit driveways and parking lot striping
and painting of the Shopping Center Parcel generally in accordance with
the Site Plan and specifically in accordance with the Final Improvement
Plans. Design and construction of Perimeter Sidewalks and planters
between Perimeter Sidewalks and each Party's building will be the
responsibility of each individual Party. However, all curbing shall be
provided as part of the On-Site and Off-Site Improvement Work.

(k) Landscaping of the Common Area (except for the area between
the back of the curbs shown on Exhibit "B" and each Party's buildings
other than grade separations) and any incidental irrigation system
(including tree drains) required in the maintenance thereof.

(l) Common Utility Facilities adequate to service all Parties'
Improvements to such service points as may be designated by each Major
respectively to within five feet (5') of each such Major's building
walls and stubbed; provided, that electric service shall be extended to
each Major's transformer vault. It shall be the responsibility of each
of the Parties hereto to provide service laterals from each such point
to its building.

(m) Any other Off-Site Improvements required to be constructed by
Developer pursuant to the terms of the Land Lease.

Section 3.2    General Responsibility of Developer

Subject to the terms, conditions and provisions hereinafter provided,
the Developer, with the technical assistance of such qualified outside
consultants as may, in Developer's discretion, be retained, has the
following general responsibilities (which are not all inclusive) for the
planning, design, development, construction and installation of On-Site and
Off-Site Improvement Work:

-17-

F00056

(a) Providing all plans and specifications (in this Article III collectively hereinafter referred to as "Plans") which may be necessary for each and every phase of the On-Site and Off-Site Improvement Work (except such On-Site and Off-Site Improvement Work for which plans and specifications will be provided by utility companies or municipal or governmental authorities), distributing the plans and specifications as required herein and procuring the approvals thereof in each instance in which such approval is required pursuant to the terms of this REA.

(b) Providing qualified full-time field personnel for inspecting and reviewing the work progress and construction of the On-Site and Off-Site Improvement Work including final inspection and statement thereof by the Developer, that to the best of its knowledge, all On-Site and Off-Site Improvements, as constructed, conform with approved Final Improvement Plans;

(c) Preparing and updating a master activity schedule (hereinafter "Construction Schedule") with respect to the design and construction of all On-Site and Off-Site Improvement Work in accordance with the dates set forth in Section 3.5 hereof and said Construction Schedule is to be submitted to the Parties for their approval as to format and content and is to include a program to update said schedule;

(d) Holding periodic project coordination and progress meetings among the Parties and/or the consultants and maintaining and distributing memorandum notes concerning all such meetings, including confirmation of decisions, reports and correspondence, together with the performance of appropriate administrative duties to accomplish appropriate follow up;

(e) Providing, either alone or in conjunction with Developer's agents and consultants the appropriate coordination of all planning and construction of On-Site and Off-Site Improvement Work, including the design services by various consultants and including, but not limited to, the directing and scheduling of construction (with such scheduling to be in conjunction with the Parties), all field inspections, tests, surveys and other activities related to the construction of the On-Site and Off-Site Improvement Work;

(f) Causing the furnishing of line and grade surveying services as well as an "as-built" survey, in recordable form, which shall be furnished as soon as reasonably possible after completion of that portion of the On-Site and Off-Site Improvement Work located on the Shopping Center Parcel and which as-built survey shall show the Parcel boundaries of all Parties and the location on the Shopping Center Parcel of all buildings, the Common Utility Facilities and Parking Area layout; and

(g) Securing all authorizations, permits and licenses, including those of a temporary nature, as may be necessary to effectuate the construction and intended use of the On-Site and Off-Site Improvement Work and, where appropriate, the Developer will assist each Party in obtaining such authorizations, permits or licenses for each Party's Improvements so as to be in full and complete compliance with all applicable Federal, State and local laws and requirements, and the cost of said authorizations, permits and licenses and all monies expended in pursuit thereof (except cost of the Party's authorizations, permits and licenses for construction of each Party's Improvements) are hereby included and made a part of the Total Expenditure, as that term is hereinafter defined in Section 3.6 hereof.

Section 3.3   Independent Consultants

In order to aid Developer in the preparation of the On-Site and Off-Site Improvement Plans, as is hereinafter provided, but without releasing

F00057

Developer from its obligations hereunder. Developer shall have the right to select and retain independent architects, engineers and consultants who shall have the responsibilities as specified herein in connection with the On-Site and Off-Site Improvement Work, each duly qualified and licensed in his own area of expertise (hereinafter referred to as "Independent Consultants"), such as, but not limited to, the following:

(a) _Architectural_. An architect(s) who shall be responsible for the coordination of all On-Site Improvement Work.

(b) _Civil Engineering_. A civil engineer(s) who shall be responsible for the detailed engineering and coordination of all On-Site and Off-Site Improvement Work with the exception of Parking Area lighting.

(c) _Electrical Engineer_. An electrical engineer(s) who shall be responsible for the detailed design and engineering and coordination of the Parking Area lighting.

(d) _Testing and Soil Analysis_. A testing laboratory and a geotechnical engineer to perform services relating to preliminary soil analysis, on-site inspection and testing during all On-Site and Off-Site Improvement Work.

(e) _Surveyor_. A surveyor who will be responsible for all topography, survey and legal description work and for the establishing of targets, monuments, grade stakes and lines as may be required.

(f) _Landscape Architect_. A landscape architect who shall be responsible for the detailed design and plans and specifications for all landscape and related work.

(g) _Traffic Engineer_. A traffic engineer who shall be responsible for the design of all traffic configuration as it relates to the Parking Area and for ingress and egress of same, including the coordination, as may be required, with all governing authorities.

Each Independent Consultant's responsibilities shall include, but shall not be limited to, acting as interpreter, in the first instance, of the On-Site and Off-Site Improvement Plans, which involve their respective areas of expertise and all related documents, including resolving any inconsistencies or discrepancies therein, and, to the extent requested by any individual Major, certifying to each such Major that the various portions of the On-Site and Off-Site Improvement Work (such certifications to be made by each only as to his area of expertise) have been completed in conformity with the approved Final Improvement Plans as specified in this REA.

Section 3.4   Development and Establishment of
On-Site and Off-Site Improvement
Plans - Approval Thereof

(a) _Technical Reports_. Prior to or simultaneously with the development of the various individual On-Site and Off-Site Improvement Plans, the Developer, to the extent required by the nature of the improvement being planned and designed, shall have prepared by Independent Consultants possessing expertise relative to the respective improvement, complete reports, including the preparation of technical specifications and drawings (herein collectively referred to as "Report(s)"), regarding the preliminary studies, data and other necessary information upon which the Developer can prepare or cause to be prepared required On-Site and Off-Site Improvement Plans, Specifications and Drawings. Upon written request of any Party, Developer shall send to such Party copies of any Report so requested. Without limiting the areas in which such Reports may be required, the Developer is required to obtain a Report from an Independent Consultant regarding all soil testing, including, but not limited to, borings, the

-19-

F00058

proctor and in-place density tests and compaction tests and concrete control
tests, which may be reasonably necessary for the design, development,
planning and construction of any of the On-Site and Off-Site Improvement
Work and Parties' Improvements, particularly the grading, paving and
installation of the Parking Area and the Common Utility Facilities. If any
Party shall request an additional Report, then the Developer shall request
and obtain such additional Report or Reports as may be reasonably necessary
to prepare said On-Site and Off-Site Improvement Plans and two (2) complete
copies of all additional Reports shall be mailed by the Developer to each
Party, or its designated representative.

(b)  On-Site and Off-Site Improvement Plans.   The   Developer   shall
prepare or cause to be prepared the On-Site and Off-Site Improvement Plans
for the integrated development of all Common Areas, except for those areas
located within and back of curb and building lines. Such Plans as completed
shall be submitted to the Parties for approval.

Such On-Site and Off-Site Improvement Plans shall be developed from
Exhibits "B" and "F" hereof in accordance with the requirements of this REA
and shall include, without limitation:

(1)  All Access Roads, Ring Roads, roadways, street widening and
improvements on or, immediately adjacent to the Shopping Center Parcel,
retaining walls not an integral part of a Party's building, berms, guard
rails or fences, if any, sidewalks (sidewalks and landscaping along the
perimeter of Parties' buildings shall be designed by the building
architect of each Party; subject, however, to the requirements of
Exhibit "B" and "F"), curbs, curb cuts, entrance driveways, interior
roadways, Parking Areas and sewer, storm and other drainage systems and
other Common Utility Facilities, with connections to established public
systems, fire hydrants, lighting facilities and other similar facilities
for common use.

(2)  A comprehensive rough grading plan for the entire Shopping
Center Parcel, including the unimproved portions, if any, and including
the size and the dimensions of all facilities for common use, storm
sewers, including drains that are for common use and not for exclusive
service of one Party's Improvements, surface drainage installations and
taps for building connections and sanitary sewers for common use,
including taps for building connections.

(3)  A composite Parking Area Plan with estimated car counts for
the entire Shopping Center Parcel, including paving, striping, bumpers,
curbs, traffic control devices, location of light standards and lighting
systems, designating areas which may be separately illuminated from time
to time at the request of a Party.

(4)  A composite landscaping plan as prepared by a landscape
architect specifying overall plant materials and planting (except for
the area between the back of the curbs and building walls other than
grade separations).

(5)  Specifications setting forth the conditions, standards and
architectural treatment under which the On-Site and Off-Site Improvement
Work shall be located, constructed or installed. Such conditions,
standards or architectural treatment shall not be less than the
applicable minimum governmental requirements and standards or the
Minimum Technical Specifications, as set forth on Exhibit "F", whichever
requirements and standards are greater.

(6)  The general location of all buildings and other areas not
included within the definition of "Common Area", as set forth in this
REA.

-20-

F00059

(7) Design and construction documents for storm sewers and area drains, including extensions thereof off the Shopping Center Parcel; sanitary sewers; water; telephone; gas, if available; electric power; and other utility systems, including taps for connections to the internal systems of each Parties' buildings which may be prepared by the utility companies or municipal, public or governmental agencies responsible for such installations under the supervision of the Independent Consultants or by the Independent Consultants or other architect or engineers.

Improvement Plans which shall be submitted by the Developer to the Parties for their review and approval, which approval or disapproval shall be made within twenty-one (21) days from the date of submission and which Improvement Plans shall be submitted in stages as completed in sufficient time to allow the Parties to comply with their obligations hereunder. To the extent that such Improvement Plans conflict with Exhibit "F" hereto, such Improvement Plans shall govern.

(c) Approval of Plans. If the letter transmitting the Improvement Plans to a Party clearly indicates that if a Party receiving the Improvement Plans does not specify any objection or make a proposal relating to said Plans within twenty-one (21) days after submission of said Plans by Developer, such Plans will be deemed approved, and if a Party does not, within twenty-one (21) days after such date of submission, notify Developer of its specific objections thereto or make a proposal with regard to such Plans, with a copy to the other Parties, such respective Plans shall be deemed to be satisfactory for final development. Any modifications, alterations or additions to any drawings submitted to the Parties shall be prominently noted in the drawings. Each drawing or specification comprising all or a part of a Plan may be disapproved, in whole or in part; and any proposed modifications, alterations or additions thereto, or deletions therefrom, shall, if possible, be prominently noted on the Plan or drawing so affected or shall otherwise be clearly stated. If there is such objection or proposal from any Party, the Developer shall call a meeting of all Parties to be held within fifteen (15) days from such date of submission of such objection or proposal at a mutually acceptable location to resolve and adjust any such objections or proposals with reference to such respective Plans. All objections or proposals shall be considered at such meeting with a view toward developing such Plans in their final form at such meeting.

After approval, all Improvement Plans shall be stamped "approved", dated and certified by the Independent Consultants, each with respect to their area of responsibility, and shall thereupon constitute "Final Improvement Plans" and shall be maintained by the Developer in a safe and convenient place, the address of which shall from time to time be provided each Party.

Material changes may be made in approved Final Improvement Plans only by the agreement in writing of all Parties.

Section 3.5   Construction of On-Site and Off-Site Improvement Work

Upon approval of the Final Improvement Plans provided for in Section 3.4, the Developer shall enter into written contracts for all work required to construct the On-Site and Off-Site Improvement Work. All On-Site and Off-Site Improvement Work shall be prosecuted in compliance with any and all permits and/or approvals received in connection therewith. The contracts shall provide for the completion of (a) the grading work in the areas in which the buildings are to be constructed, the staging areas and temporary construction haul roads to be installed by March 15, 1987; (b) the temporary electric service to be furnished to the areas in which the buildings are to be constructed by March 15, 1987; (c) temporary water service to be made available by March 15, 1987; (d) the storm sewers to be completed by April 1, 1987; (e) each Major's building pad to be completed and accepted by

-21-

F00060

April 1, 1987; provided, that the Sears building pad shall be completed and
accepted subsequent to June 1, 1987 and prior to July 31, 1987; (f) the
sanitary sewers to be completed by September 1, 1987; (g) the electric
facilities to be completed by December 1, 1987; (h) the remainder of the
Common Utility Facilities to be completed by May 1, 1988; (i) the Access
Roads and Ring Road to be completed by June 1, 1988; (j) the off-site road
improvements specified on the Site Plan to be completed by June 1, 1988; (k)
the Parking Area to be completed by June 1, 1988; and (l) all other On-Site
and Off-Site Improvement Work to be completed by September 1, 1988.
Developer agrees with each Major to use its best efforts to cause all of the
On-Site and Off-Site Improvement Work called for herein to be timely
completed in accordance with the above schedule.

Section 3.6    Total Expenditure to be Paid by Parties

All costs and expenses to the Parties for the On-Site and Off-Site
Improvement Work required hereby (whether expended prior or subsequent to
the execution of this REA), including but not limited to, preparation of
Plans; costs of any Reports; design, engineering and consultant fees; all
fees and charges of the Independent Consultants and like incidental fees,
costs, and expenses; insurance; contractors fees; construction supervision
fees; and fees paid to governmental agencies and like incidental fees, costs
and expenses, all of which are collectively referred to as "Total
Expenditure." The Total Expenditure is to be proportioned, allocated and
paid by and among the respective Parties in the manner and in the respective
amounts as provided for in the individual Supplemental Agreements entered
into between Developer and each of the other Parties.

Section 3.7    Schedule of On-Site and
               Off-Site Improvement Work

The performance of the On-Site and Off-Site Improvement Work under any
contract shall be scheduled by the Developer in consultation with the
Parties to coordinate such On-Site and Off-Site Improvement Work with the
construction work of the Parties under this REA and to insure that all of
such portions of On-Site and Off-Site Improvement Work will be completed
when they are required to be completed under the various provisions of this
REA and in accordance with the Construction Schedule.

Section 3.8    Utility Connections of Majors

Each Major shall have heretofore provided Developer with detailed
utility connection (lateral) information specifying the point(s) of entry,
load, sizes and elevations, as well as other pertinent information,
regarding each Major's utility connection demands so as to enable Developer
to proceed with the preparation of the On-Site and Off-Site Improvement
Plans.

F00061

ARTICLE IV

PLANS AND SPECIFICATIONS

Section 4.1   Addresses to Which Plans Are to be Sent

Each party shall designate a person to whose attention all plans and
specifications to be submitted pursuant to Sections 4.3 and 4.4 hereof, as
well as any plans required to be submitted in accordance with Article III,
are to be sent. Unless otherwise modified in writing by the Party making
such designation, all such plans are to be submitted to the following
persons on behalf of the Parties:

TO DEVELOPER:   Forbes/Cohen Florida Properties Limited Partnership
                Galleria Officentre
                27700 Northwestern Highway
                Suite 427, P.O. Box 667
                Southfield, Michigan   48037

TO MACY:        R. H. Macy & Co., Inc.
                151 West 34th Street
                New York, New York   10001
                Attention:  Senior Vice President -
                            Design and Construction

TO SEARS:       Sears, Roebuck and Co.
                Construction Department, 824C
                Sears Tower
                Chicago, Illinois 60684
                Attention:  Construction Planning Manager

TO FEDERATED:   Burdines
                22 East Flagler Street
                Miami, Florida  33131
                Attention:   Senior Vice-President
                             Operations and Store Development

Section 4.2   General Design Data

In the preparation of each Party's plans under this Article IV, the
General Design Standards and Minimum Technical Specifications set forth on
Exhibit "F" or applicable governmental specifications, if higher, shall be
followed. All plans shall conform to Exhibit "B" and the other requirements
of this REA as applicable and shall provide for first class materials and
buildings of at least the same quality as the presently existing Towne Center
regional shopping center in Boca Raton, Florida.

Section 4.3   Plans of Developer

As promptly as possible but, in any event, within thirty (30) days from
the date hereof, Developer shall, at its expense, complete and deliver to
each Major, for informational purposes only, three (3) sets of outline
specifications and other drawings indicating the interior of the Enclosed
Mall and exterior architectural, elevations (including proposed materials),
locations, number of levels, height, size and shape of the Developer
Facilities, including the general configuration of the Enclosed Mall, the
Mall Store Buildings (but not the space to be occupied by individual tenant
units), interior construction of, the elevation of, and the architectural
treatment of the Enclosed Mall and landscaping plans (said plans and drawings
referred to herein as "Developer Facilities Preliminary Design Plans"). Such
Developer Facilities Preliminary Design Plans shall be prepared for all items
of construction which Developer is obligated or permitted to build in
accordance with Article VI and shall in all events be in accordance with the
requirements of Exhibit "B". Notwithstanding the foregoing, the Developer
need not prepare and submit a portion of the Developer Facilities Preliminary

-23-

F00062

Design Plans relating to Future Lease Area(s) until such time as Developer
prepares plans which specifically relate to said areas.

Within twenty-one (21) days after receipt of the Developer Facilities
Preliminary Design Plans, each Major shall notify Developer of any questions
or comments it may have with regard thereto or any objections thereto
(specifying in detail the nature thereof). Thereafter, the Parties shall
meet for the purpose of reviewing and discussing the Developer Facilities
Preliminary Design Plans and any objections which a Party may have to any
such Developer Facilities Preliminary Design Plans; provided, however, in any
dispute over what is to be contained in the Developer Facilities Preliminary
Design Plans, Developer's decision with regard thereto shall be deemed final
so long as same have been prepared consistent with the requirements of this
REA.

Section 4.4    Plans of Majors

As promptly as possible but, in any event, within thirty (30) days from
the date hereof, each Major shall submit to the Developer, for informational
purposes only, three (3) sets of drawings consistent with Exhibit "B"
indicating the location, dimension, size and height of each building to be
initially constructed by such Major pursuant to Article VII hereof.

Within a reasonable time after submission by Developer of the Developer
Facilities Preliminary Design Plans, each Major shall submit to the
Developer, for informational purposes only, three (3) sets of outline
specifications ("Preliminary Design Plans") and other drawings indicating the
exterior appearance, elevations (including proposed materials), locations,
number of levels, height, size and shape of, each building to be initially
constructed by it pursuant to Article VII and landscaping plans.

Copies of any changes therein or supplements or amendments thereto shall
similarly be submitted to the Developer.

Within twenty-one (21) days after receipt of such Preliminary Design
Plans, the Developer shall notify the Party submitting said Plans of any
questions or comments it may have with regard thereto (specifying in detail
the nature thereof). Thereafter, such Party and Developer shall meet for the
purpose of reviewing and discussing the Preliminary Design Plans and any
objections which Developer may have to any such Preliminary Design Plans;
provided, however, in any dispute over what is to be contained in the
Preliminary Design Plans, the decision of the Party submitting said Plans
with regard thereto shall be deemed final so long as same have been prepared
consistent with the requirements of the REA.

Section 4.5    Final Design Plans

As promptly as possible after review and recommendation of each Party's
Preliminary Design Plans, each such Party shall cause its respective final
design plans to be prepared, which, as relates to integration with any other
Party's improvements, shall be a logical progression and extension of its
Preliminary Design Plans. Each Party shall complete and deliver to each
other Party whose building its own integrates with three (3) sets of its
final design plans for the exterior building structure, in respect only of
its integration with such other Party's improvements, for informational
purposes only.

Section 4.6    Center to be Architecturally Harmonious

Within the limitations imposed by this Article IV, each Party shall cause
its architect to work with the Developer to the end that the design and the
exterior of all Improvements will blend harmoniously and attractively so as
to provide the appearance of a unified, integrated center. To this end, each
Party shall consult with all other Parties concerning the color treatment and
exterior materials to be used in the construction and reconstruction of all

-24-

F00063

buildings and structures on each Party's respective Parcel and to consider the views of all other Parties with respect thereto prior to selecting the specific materials and colors for its Parcel, it being understood that in the event of any dispute hereunder, the decision of any Party preparing any relevant plans shall be final.

Section 4.7   Request for a Sepia

Any Party receiving plans under this Article shall have the right to request and receive, from any Party providing any plans hereunder, a sepia of the plans to be submitted instead of three (3) sets of plans as in this Article provided.

F00064

ARTICLE V

GENERAL CONSTRUCTION REQUIREMENTS

Section 5.1   "Construction" and "Commencement of
Construction" Defined

Construction shall have been deemed to have commenced as respects each
Party's Improvements when pouring of footings and foundations shall have
begun. The word "construction" includes initial construction under this REA
and, except where otherwise specified, subsequent construction, alterations,
additions, repair and maintenance, replacement, rebuilding, demolition and
razing permitted or required under this REA.

Section 5.2   Performance of Construction

Each Party agrees to perform its respective construction and as to
Developer, the On-Site and Off-Site Improvement Work (a) in accordance with
the final plans provided in accordance with Articles III and IV applicable
to it as provided in this REA; (b) with due diligence and in a good and
workmanlike manner, using new and/or first-class materials; (c) in full
cooperation with each of the other Parties to the extent necessary to effect
a unified, integrated shopping center development; (d) in accordance with
all applicable laws, ordinances, rules and regulations of all governmental
and quasi-governmental agencies and authorities having jurisdiction over
such construction and all orders, rules and regulations of the National
Board of Fire Underwriters or any other body now or hereafter constituted
performing similar functions in the County of Palm Beach, State of Florida;
(e) only after having procured and paid for, so far as the same are
required, all municipal and other governmental permits and authorizations of
the various departments and governmental subdivisions having jurisdiction;
and (f) in accordance with the terms and provisions of this REA. Each Party
in the performance of its construction shall not (a) cause any unnecessary
or unreasonable increase in the cost of construction of the other Parties;
(b) unreasonably interfere with any other construction being performed on
the Shopping Center Parcel; or (c) unreasonably impair the use, occupancy or
enjoyment of the Shopping Center Parcel or any part thereof as permitted or
contemplated by this REA.

Section 5.3   Safety Measures

Each Party shall, at all times take any and all safety measures
reasonably required to protect the other Parties hereto and all Permittees
from injury or damage caused by or resulting from the performance of its
construction. If any construction to be performed on the Shopping Center
Parcel shall not have been substantially completed (to the extent that the
remaining construction to be performed could reasonably be deemed to
constitute a hazardous or unsightly condition for Permittees) when the
building of any Major, any Mall Store Building or the Enclosed Mall, or any
of them, shall have opened to the public, or if any construction shall be
commenced at any time or times after the building of any Major, any Mall
Store Building, or the Enclosed Mall, or any of them, shall have opened to
the public (to the extent such construction work could reasonably be deemed
to constitute a hazardous or unsightly condition for Permittees), then the
Party carrying on such construction shall erect or cause to be erected an
adequate and sightly appearing construction barricade at least eight feet
(8') in height substantially enclosing the area of its construction, and
shall maintain such barricades until such construction shall have been
substantially completed (to the extent necessary to remove such hazardous or
unsightly condition, as aforesaid).

Commencing with the date that the Enclosed Mall is opened or required to
be opened, whichever is first to occur, Developer shall, in accordance with
good construction practices, take appropriate measures so that any vacant
space in the Mall Store Buildings will be attractively hidden from public

-26-

F00065

view and, in addition, will cause, where possible, all tenants and occupants
of the Mall Store Buildings and their respective contractors to keep all
construction material within their respective leased premises and refrain
from allowing accumulations of refuse within the Enclosed Mall.

Section 5.4   Construction: Storage and Time Schedule

Before any Major commences any construction, it shall submit to
Developer and before Developer commences any construction, it shall submit
to each Major, for informational purposes only:

(a) a site plan for the Shopping Center Parcel showing, as
respects the construction in question, material and equipment storage
sites, construction shacks and temporary improvements incidental to its
construction, and the assigned parking areas for its architects,
contractors, subcontractors and their agents, employees and
representatives; and

(b) a time schedule containing approximations of the period of
time the areas referred to in subparagraph (a) hereof shall be so used.

Developer shall have the right to suggest reasonable adjustments to the
designated locations and/or time periods contained in the aforesaid document
in order to prevent unnecessary conflicts with the performance of
construction by any other Party.

Section 5.5   Building Schedule

With a view to achieving a simultaneous opening of the Developer
Facilities and the Major's buildings to be initially constructed pursuant to
this REA, each Party hereto, prior to commencement of its construction work
described in Article VI or Article VII hereof, as the case may be, shall
prepare and submit to the other Parties hereto, for informational purposes
only, a schedule ("Building Schedule") showing the respective dates upon
which it anticipates (a) commencing construction, (b) having its building(s)
enclosed, (c) having its building(s) substantially completed and (d) having
its building(s) ready to open to the public. Periodically during the course
of construction, each Party shall prepare and submit to the other Parties
updated Building Schedules showing the status of its construction and, if
there shall be any changes in said dates, the revised date or dates for each
phase thereof. The submittal by a Party of a Building Schedule or revised
Building Schedule shall not in any way change the obligation of any Party
with respect to commencement, prosecution and/or completion of construction
of its building(s) in accordance with the provisions of this REA, or deprive
the other Parties of any rights which they may have because of the delays or
failure of performance by the notifying Party.

Section 5.6   License for Subsequent Construction
              and Maintenance

Subsequent to the period of the initial construction of the Parties'
Buildings and the Perimeter Sidewalks and the Enclosed Mall and subject to
the provisions of Article XI hereof from time to time during the term of
this REA, the Parties each (for the purposes of this Section 5.6,
hereinafter "Licensee" or "Licensor", as the context may require) may
require a temporary license to use portions of the respective Parcels of the
Licensor other than areas upon which buildings and Truck Facilities,
respectively, are located for the purpose of performing construction
required or permitted by this REA, which such temporary license shall be
granted by the Licensor pursuant to the provisions of this Section 5.6;
provided, that if there are reasonable alternatives available to such Party
other than the use of such other Parties' Parcel no such license shall be
granted and in no event shall any staging areas or haul roads be located on
the Licensor's Parcel. In the event that the Licensee shall so require such
temporary license, then not less than twenty (20) days prior to the

-27-

F00066

commencement of any construction, the Licensee shall submit to the Licensor
for approval (which approval shall not be unreasonably withheld or delayed)
a plan of the Parcel of the Licensor on which the Licensee shall have
delineated those portions of such Parcel, other than the aforesaid areas
upon which buildings and the Truck Facilities, respectively, are located, in
respect of which the Licensee reasonably requires such temporary license.
All construction performed under such temporary license shall be done with
due diligence and in a manner as will cause the least interference with the
Licensor's Parcel as reasonably is possible. During the period such license
shall be in effect, the Licensee shall indemnify the Licensor as provided in
Section 17.7 and obtain appropriate insurance naming Licensor as a named
insured covering such activities on the Licensor's Parcel. Upon the
completion of any such construction, such temporary license shall terminate
and the Licensee shall promptly restore the area or areas in respect of
which such license existed to a condition substantially the same as that
which existed prior to the time the Licensee commenced construction under
the temporary license. Licensee shall clear such area or areas of all loose
dirt, debris and construction materials and shall restore any other portions
of the Shopping Center Parcel which may have been damaged by the performance
of such construction or use of such temporary license.

Section 5.7    Evidence of Compliance with
               Construction Requirements

    After it has completed any construction, each Party shall, within sixty
(60) days after the request of any other Party, deliver to the requesting
Party evidence that the construction has been completed in compliance with
all applicable laws, ordinances, rules and regulations. A permanent
Certificate of Occupancy (or the equivalent thereof) issued by the
governmental body having jurisdiction thereover shall be deemed satisfactory
evidence of compliance with the requirements of this Section.

Section 5.8    Liens

    Any Party ordering or contracting for any services, labor or materials
(or Developer in respect of any Occupant of Mall Store Floor Area or in
respect of any On-Site and Off-Site Improvement Work or in respect of any
Common Area maintenance work performed by Developer as provided in this REA)
or suffering or permitting any lien for services, labor or materials on its
Parcel hereby agrees to indemnify, defend and save harmless the Fee Owner
and the other Parties hereto from all loss, damage, liability, expense or
claims whatsoever (including attorneys' fees and other costs of defending
against the foregoing), by reason of any lien or claim for lien for such
work, services or materials performed or supplied which shall be filed
against any portion of the Shopping Center Parcel during the term of this
REA or, within any statutory periods allowed for filing a lien with respect
to work, services or materials supplied or performed during the term of this
REA. In the event any such lien is filed, the Party so obligated shall pay
and discharge the same of record as promptly as possible but in no event
later than forty-five (45) days after the filing thereof, subject to the
provisions of the following sentence. Each such Party shall have the right
to contest the validity, amount or applicability of any such respective
liens by appropriate legal proceedings and so long as it shall furnish a
bond, if bonding is necessary to secure a stay of execution or, if bonding
is not so required, indemnify, as in this Section 5.8 hereinafter provided,
and be prosecuting such contest in good faith, the requirement that it pay
and discharge such liens promptly but in no event later than the aforesaid
forty-five (45) day period shall not be applicable; provided, however, that
in the event such lien has not been discharged of record, such Party shall
promptly, but in any event, within forty-five (45) days after the filing
thereof, bond or indemnify against such liens in amount and form
satisfactory to induce the title insurance company which insured title to
the respective Parcel to each of the Parties hereto to insure over such
liens or to reissue or update its existing policy, binder or commitment

-28-

without showing any title exception by reason of such liens and to so insure
the Fee Owner, except that no Party qualified to maintain self-insurance
need furnish a bond unless such is required to effect a stay of execution
but shall, if necessary, in connection with the closing of any sale,
transfer or financing permitted under the terms of this REA, provide such
form and amount of security as may be reasonably necessary to induce a title
insurance company to insure over such liens as aforesaid.  In the event such
legal proceedings shall be finally concluded (so that no further appeal may
be taken) adversely to the Party contesting such liens, such Party shall,
within five (5) days thereafter cause the lien(s) to be discharged of
record.

Section 5.9   Location and Height of Buildings

No building(s), other than parking decks as permitted under this REA,
may be located on the Shopping Center Parcel other than within the
Permissible Building Areas shown on Exhibit "B".  No building(s) shall be
constructed on any Permissible Building area which exceeds sixty-five (65)
feet from the lower level Enclosed Mall finished floor elevation; provided
however, that the centermost portion of the grand court skylight may be
approximately seventy-six (76) feet from the lower level Enclosed Mall
finished floor elevation.

F00068

ARTICLE VI

CONSTRUCTION BY DEVELOPER

Section 6.1   Developer's Construction Duty

Developer agrees to commence as soon as practicable, following the
review procedure contained in Article IV hereof, but in no event later than
March 1, 1987, and thereafter, diligently pursue to completion the
construction of the Developer Facilities within its Permissible Building
Area and as shown on Exhibit "B", with the Mall Store Buildings to have a
total Floor Area of not less than Three Hundred Thousand (300,000) square
feet. Developer agrees to complete the Developer Facilities and to have
both levels of the Enclosed Mall open to the public and completely
functional including being air-conditioned, ventilated, lighted, with all
decorative and landscaping elements in place and free from obstruction on or
before October 1, 1988; provided, however, that if Majors' obligations to
commence construction or open for business are delayed hereunder (other than
as a result of Developer's failure or delay), Developer's obligations shall
likewise be delayed for a comparable period.

In the event Common Footings and/or Common Foundations are utilized
which service the Mall Store Buildings and any Major's building, Developer
shall construct the same and the cost thereof shall be shared by Developer
and such Major on the basis of the load imposed by each building.

Section 6.2   Proof of Developer's Financing

Prior to commencement of construction of Developer Facilities,
Developer, upon the request of any Major, shall furnish such Major with
evidence that Developer will have the means of paying for the construction
of the On-Site and Off-Site Improvement Work and the Developer Facilities.
No such Major so requesting said evidence shall be obligated to commence
construction of its respective building until Developer shall have complied
with the foregoing.

-30-

F00069

ARTICLE VII

CONSTRUCTION BY MAJORS

Section 7.1    Conditions to Major's Construction Duty

A Major shall not be obligated to commence construction of its
Improvements unless Developer is in substantial compliance with its
obligations set forth in Articles III and VI and until:

(a) the Shopping Center Parcel has been graded sufficiently to
permit each Major to commence construction and the Permissible Building
Area of each Major has been prepared for construction in accordance with
Developer's obligations to each Major;

(b) Developer Facilities Final Design Plans have been prepared and
submitted to the Majors for review in accordance with the provisions of
Section 4.5;

(c) necessary construction easements which each Party is entitled
to have approved shall have been approved as provided for in Section
2.5;

(d) Developer shall have commenced construction of the Developer
Facilities;

(e) the temporary facilities to be provided in accordance with
Sections 3.1(a), (c) and (f) have been so installed;

(f) the Developer satisfying each Major as to proof of Developer's
financing as provided in Section 6.2 hereof;

(g) the Developer's providing each Major with adequate assurance
that the On-Site and Off-Site Improvement Work required of Developer in
accordance with Article III hereof and the Developer Improvements
required of Developer in accordance with Article VI hereof will be
timely completed as required;

(h) the representations and warranties set forth in Section 24.22
hereof are true as of such date.

No later than thirty (30) days after the last to occur of each of the
foregoing, but in no event prior to such time as each Major need commence
construction in order to complete its Improvements and open its Building to
the public by the Center Opening Date, each Major shall commence
construction of its Improvements on its Parcel.

Section 7.2    Construction of Macy Improvements

Macy shall construct or cause to be constructed the following buildings
and improvements (which buildings and improvements, together with any
additions thereto or replacements thereof, are herein referred to as the
"Macy Improvements"):

(a) a three-level building within its Permissible Building Area
containing not less than one hundred fifty thousand (150,000) square
feet of Floor Area (which term, whenever used in this REA, shall be
subject to a tolerance of fifty (50) square feet) and having a maximum
height as provided in Section 5.9 (the "Macy Building"), which shall
have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Macy Parcel and the landscaped
and planted areas lying between said Perimeter Sidewalks and the Macy
Building;

-31-

F00070

(c) the Truck Facilities serving the Macy Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron;

(d) retaining walls and backfilling of same required in grade arms to physically support the Macy Improvements; and

(e) the common wall between the Macy Building and the Enclosed Mall.

Section 7.3    <u>Construction of Sears Improvements</u>

Sears shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Sears Improvements"):

(a) a two-level building within its Permissible Building Area containing not less than one hundred twenty thousand (120,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Sears Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Sears Parcel and the landscaped and planted areas lying between said Perimeter Sidewalks and the Sears Building;

(c) the Truck Facilities serving the Sears Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron;

(d) retaining walls and backfilling of same required in grade arms to physically support the Sears Improvements; and

(e) the common wall between the Sears Building and the Enclosed Mall.

Section 7.4    <u>Construction of Burdines Improvements</u>

Federated shall construct or cause to be constructed the following buildings and improvements (which buildings and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Burdines Improvements"):

(a) a two-level building within its Permissible Building Area containing not less than one hundred fifty thousand (150,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Burdines Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Burdines Parcel and the landscaped and planted areas lying between said Perimeter Sidewalks and the Burdines Building;

(c) the Truck facilities serving the Burdines Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron;

(d) retaining walls and backfilling of same required in grade arms to physically support the Burdines Building; and

(e) the common wall between the Burdines Building and the Enclosed Mall.

-32-

F00071

Section 7.5   _Connection to Enclosed Mall_

In the construction of its respective Building, each Major shall provide
for the attachment and connection of the Enclosed Mall and mall entrances by
Developer to such Building, in accordance with plans and specifications to
be prepared by Developer and approved in advance by each respective Major,
which approval shall not be unreasonably withheld. Developer shall make
such connections at its sole cost and expense and the Major's Buildings
shall not be required to provide support for the Enclosed Mall.

Section 7.6   _Completion of Majors' Improvements_

Each Major shall cause construction of its Improvements to be
substantially completed and ready to open for use on or about October 5,
1988, but in no event later than October 19, 1988, subject to the same
conditions set forth in Section 7.7 in respect of its opening requirement
and to Article XX. If any Major shall be delayed in completing construction
of its Improvements by reason of the failure of Developer to meet any of the
construction commencement or completion dates specified in Articles III, IV,
VI or Section 7.1 or to comply with the requirements of Section 6.2, then
the required completion date set forth in this Section 7.6 for such Major
may be extended by the number of days by which such Major was delayed by
such failure; provided, however, if such extended date shall fall within the
periods that a Major is not obligated to open as set forth in Section 7.7,
then the date the Major is required to open shall be extended to the first
day following any such period other than on Sundays and holidays.

Section 7.7   _Opening of Majors' Improvements_

Each Major shall use its best efforts (but not requiring the use of
overtime labor) to open its Improvements to the public on the date
established in Section 7.6; provided, however, that no Major shall be
required to open to the public:

(a) if construction of the Developer Facilities and the On-Site
and Off-Site Improvement Work shall not have been substantially
completed and available for use by the Parties and Permittees thereof;

(b) until the Enclosed Mall and occupants occupying at least one
hundred eighty five thousand (185,000) square feet of Floor Area in the
Mall Store Buildings shall be open or ready to open to the public with
the Enclosed Mall functional as defined in Section 6.1; or

(c) during the period between November 1 of any year to
February 28 of the following year, during the period from May 1 to
August 1 of any year or during the thirty (30) day period prior to
Easter Sunday.

No Major shall open prior to the Center Opening Date, except for
unadvertised "soft" openings.

-33-

## ARTICLE VIII

### ALTERATIONS AND ADDITIONS TO IMPROVEMENTS

Section 8.1   Alterations

Each Party shall have the right to make, at its own cost and expense, such alterations to its Improvements (other than the Enclosed Mall) as it deems necessary or advisable, including, without limitation, altering the exterior architectural appearance thereof so long as the same is architecturally harmonous with the other Improvements on the Shopping Center Parcel and so long as the same will not result in a condition inconsistent with the Improvements as shown or provided for on Exhibit "B" or otherwise be inconsistent with the terms and provisions of this REA or result in the elimination around its building(s) of Perimeter Sidewalks of sufficient size and design to accommodate the safe and orderly movement of pedestrians or reduce the scope of such Improvement below the minimum size herein required. Developer shall have the right, from time to time and at any time, to make alterations to the interior or in the arrangement of space in the Mall Store Buildings or in the design of Mall Store fronts opening onto the Enclosed Mall or to otherwise modify the architectural or decorative features of the Enclosed Mall provided that in the event of Developer's performance of such modifications to the architectural or decorative features, the same shall be consistently performed and applied throughout the Enclosed Mall, and shall be of equal quality and attractiveness.

Section 8.2   Additional Floor Area

No Party may erect additions to its buildings, except within the Permissible Building Area on its Parcel designated on Exhibit "B". No Party shall have the right to expand its Improvements beyond that shown on Exhibit "B" as Permissible Building Area(s). Notwithstanding anything herein contained to the contrary, if any Party intends to construct Floor Area on its Parcel in excess of that designated in the Floor Area and Parking Summary set forth on Exhibit "B" hereto, such Party shall be required to obtain all necessary zoning and other governmental approvals therefor; provided, that no such zoning or other governmental approvals shall adversely affect the use or development of or impose any additional conditions or restrictions not then existing or require further Development of Regional Impact review on the Fee Owner's Parcel (other than the Parcel of the Party so obtaining such approvals).

-34-

F00073

ARTICLE IX

MAINTENANCE, REPAIR AND RESTORATION
OF BUILDINGS AND IMPROVEMENTS:  GENERAL

Section 9.1   Maintenance of Buildings and Improvements
on Each Parcel

Each Party shall keep and maintain or cause to be kept and maintained the exterior of all buildings on its Parcel and all Improvements lying thereon between the back of curb surrounding its buildings and the buildings on its Parcel and any parking deck facility in a good and safe state of repair and in a clean and orderly condition.

Section 9.2   Damage or Destruction of Developer Facilities

Developer hereby agrees that in the event of the damage or destruction of all or any part of the Developer Facilities during the time periods hereinafter provided from any casualty required to be insured against pursuant to this REA, Developer shall promptly commence reconstruction of the Developer Facilities within Developer's Permissible Building Area and shall diligently prosecute such reconstruction to completion to the extent hereinafter provided:

(a)  If such damage or destruction occurs prior to the thirteenth anniversary of the Center Opening Date, Developer shall reconstruct the Developer Facilities so that the Enclosed Mall will connect with the buildings of the Majors and the Mall Store Buildings will abut the length of the Enclosed Mall and shall contain not less than Three Hundred Thousand (300,000) square feet of Floor Area.

(b)  If such damage or destruction occurs on or subsequent to the thirteenth anniversary of the Center Opening Date, Developer shall have no obligation to reconstruct the Developer Facilities; provided however, that (i) if the cost of such reconstruction shall not exceed Four Million Dollars ($4,000,000), as adjusted for inflation as provided below, and if at least one (1) Major shall then be operating as provided in Article XIII, Developer shall be required to perform such reconstruction, or (ii) if the cost of such reconstruction shall exceed Four Million Dollars ($4,000,000), as so adjusted for inflation and if within ninety (90) days after the occurrence of such damage or destruction, the Minimum Number of Majors in the exercise of their independent judgment, notify Developer in writing that they will extend their operating covenants with Developer as set forth in Section 13.1(a)(i) hereof for an additional period of ten (10) years each from the later of (i) the date upon which such covenants would otherwise expire or (ii) twenty (20) months after the date of such damage or destruction, Developer shall be obligated to reconstruct the Developer Facilities to the same extent required in subsection (a) above and the operating covenant of Developer with such Majors so extending their covenant as aforesaid shall be extended for a like ten (10) year period.  The Four Million Dollar ($4,000,000) figure set forth in (i) above shall be adjusted annually effective January first, based on the percentage increase, if any, in the United States Department of Labor, Bureau of Labor Statistics Revised Consumers Price Index for Urban Wage Earners and Clerical Workers (1967=100) for the December immediately preceeding such adjustment over such Index for December, 1987.  In the event such Index is discontinued, comparable statistics on the purchasing power of the consumer dollar, as published from time to time by a responsible financial authority, reasonably chosen by Developer and reasonably approved by the Majors shall be used for making such computation.

-35-

F00074

Section 9.3  *Damage or Destruction to the Building of a Major*

(a) Each Major hereby agrees that in the event of the damage or destruction of its building during the time periods hereinafter provided from any casualty required to be insured against pursuant to this REA, such Major shall promptly commence reconstruction of the Major's building within its Permissible Building Area and shall diligently prosecute such reconstruction to completion to the extent hereinafter provided:

(1) In the event such damage or destruction occurs prior to the thirteenth anniversary of the Center Opening Date, such Major shall reconstruct such building so as to contain not less than the minimum Floor Area which such Major was required to construct hereunder.

(2) After the thirteenth anniversary of the Center Opening Date, in the event such damage or destruction occurs at a time when there is less than three (3) years to run under its operating covenant pursuant to Section 13.1(a)(i), such Major shall have no obligation to reconstruct said building.

The reconstructed building shall have the same entrances in terms of location on the Enclosed Mall as existed before the damage or destruction.

(b) Notwithstanding anything contained in this Section 9.3 to the contrary, (i) no Major shall have the obligation to reconstruct in the event that at the time of such damage or destruction the Developer is in default under its covenant to operate as provided in Article XII of this REA, and (ii) if the Developer Facilities shall have been damaged or destroyed, a Major shall not be obligated to commence reconstruction until Developer, upon request of such Major, prior to Developer commencing such reconstruction, shall furnish such Major with evidence that Developer will have the means of paying for the reconstruction of the Developer Facilities and Developer commences reconstruction of the Developer Facilities in accordance with the provisions of Section 9.2.

Section 9.4  *Duty to Complete Rebuilding*

The Parties agree to use due diligence in order to cause any building or other improvement which a Party is required to repair, replace or rebuild pursuant to this Article IX to be completed and ready for occupancy within twenty-four (24) months after such damage or destruction occurs. Each Party agrees that prior to commencing any such rebuilding, replacement or repair, such Party shall comply with the requirements herein set forth with respect to initial construction except as to any such requirement that may be modified under this Article IX.

Section 9.5  *Clearing Debris from Razed Improvements*

To the extent a Party is not expressly required, pursuant to the provisions of Sections 9.2 and 9.3, to restore all or a portion of its building which is damaged or destroyed by a casualty and does not elect to restore such damaged or destroyed building or portion thereof, such Party shall raze the portions thereof which are not restored or rehabilitated, clear away all debris and take all other action (including landscaping) required by good construction practice so that the area which had been occupied by the razed building or portions thereof will be attractive, usable Common Area subject to the easements referred to in Section 2.2 hereof; provided, however, this provision shall not prevent such a Party from subsequently building in accordance with the restrictions and requirements hereof on the area so converted to Common Areas. Such area, to the extent it is rebuilt upon, shall cease being Common Area for all purposes of this REA including, but not limited to, being subject to the easements referred to in Section 2.2 hereof, on the date which is the earlier of the date construction of such subsequent building commences or

-36-

F00075

the date construction material is placed *upon such area and is thereafter
immediately used in such subsequent* construction. Notwithstanding the
foregoing, any Party performing any such razing shall *do so in a manner so*
as not to interfere with or affect the structural integrity of any other
Party's Improvements.

Section 9.6   Damage to or Destruction of
Common Area

If any portion of the Common Area (other than the Enclosed Mall as to
which Section 9.2 is applicable) on a Party's Parcel is damaged or destroyed
by any casualty required to be insured against pursuant to this REA during
the term of this REA, but in no event longer than the same is burdened by an
*easement granted in* Article II, such Party will promptly rebuild, replace
and repair such damaged or destroyed portion of the Common Area to the same
*condition and usefulness* and to the same general appearance as existed
immediately prior to such damage or destruction. Any insurance proceeds
paid to any Party by virtue of such damage or destruction shall be made
available to the Party obligated to so rebuild, replace and repair. The
Parties covenant and agree with each other that any Common Area which such
Party is required to rebuild, replace or repair shall be completed as
expeditiously as reasonably possible and, in any event, within six (6)
months after such damage or destruction occurs, and further agree that such
Party shall, prior to commencing such rebuilding, replacement or repair,
comply with the requirements herein set forth with respect to initial
construction and the requirements set forth in Article III.

F00076

ARTICLE X

MAINTENANCE, REPAIR AND RESTORATION –
COMMON AREA

Section 10.1  Maintenance of Common Area
(Other Than Enclosed Mall)

Developer shall, from the date the first Major shall initially open for business from its Building until the earlier of the expiration date of this REA or the date when Developer is not operating and is no longer obligated to operate the Developer Facilities pursuant to Section 12.1 of this REA, keep and maintain the Common Area (other than the Enclosed Mall) on the Developer Parcel, except as otherwise provided in this Article X, and on the Majors' Parcels (except for the Perimeter Sidewalks and landscaped and planted areas located on any such Parcels in the area lying between the back of the curb nearest the building(s) on any such Parcels and the building(s) and parking deck facilities located thereon, which areas shall be maintained by each respective Party, provided that Developer shall clean and sweep the Perimeter Sidewalks on each Major's Parcel and shall maintain the landscaped and planted areas in the grade separations) in first-class condition, order and repair in accordance with the standards set forth in Exhibit "D" and shall perform, without limitation, the services set forth in Exhibit "D".

Each Major shall share in the expenses incurred by Developer under this Section 10.1 in accordance with the terms of its Supplemental Agreement; provided however, that if any Major shall have withdrawn its parcel from maintenance by Developer pursuant to Section 10.4, then effective upon notice of such fact to the other Majors, Developer shall be relieved of its obligations to maintain the Common Area of such Major and such Major shall be obligated to keep and maintain the Common Area on its Parcel in first-class order in accordance with the provisions of this Section 10.1. The provisions of the preceding sentence shall not relieve any Major of its obligations to pay to Developer any and all sums due to Developer under this Section 10.1 for the period during which Developer kept and maintained the Common Area on the Parcel of such Major. As regards the Perimeter Sidewalks and any landscaped and planted areas located on any Major's Parcel in the area lying between the back of the curb nearest the building(s) on any such Parcel and the building(s) located thereon, same shall be maintained by each Major as to its Parcel in accordance with the same standards as set forth above, except that, Developer shall clean and sweep the Perimeter Sidewalks on each Major's Parcel and shall maintain the landscaped and planted areas in the grade separations.

From and after the expiration of Developer's obligations to maintain the Common Utility Facilities as provided in (a) above each Party (or in the case of a Party which excludes its Parcel from the operation and effect of this Agreement, such Party from and after the date of such exclusion) shall maintain and repair, as necessary, any Common Utility Facility on its Parcel serving, in whole or in part, the Parcel of any other Party, but the cost of such repair or maintenance shall be borne solely by the Party or Parties serviced thereby in the proportion which the Floor Area of the buildings on each such Parcel bears to the total Floor Area of the buildings of all Parcels serviced thereby. The provisions of the preceding sentence shall survive the exclusion by a Party of its Parcel from the operation and effect of this REA.

Section 10.2  Operation and Maintenance
of Enclosed Mall

From and after the date Developer opens the Enclosed Mall to the public, or is obligated to open the Enclosed Mall to the public in accordance with this REA, and for so long thereafter as Developer is operating or is obligated to operate the Enclosed Mall in accordance with the terms of this REA, Developer shall operate and maintain the Enclosed Mall in first-class

-38-

F00077

order, condition and repair in accordance with the standards set forth in Exhibit "D" and shall perform without limitation the following services:

(a) promptly remove all accumulated papers, debris, filth and refuse and thoroughly sweep all paved areas as required;

(b) clean lighting fixtures and relamp as needed;

(c) maintain and keep public rest rooms in a clean and sanitary condition; and

(d) maintain, repair and operate the ventilating and cooling systems and the lighting and sprinkler systems for the Enclosed Mall in compliance with the specifications therefor.

The Enclosed Mall shall be open to the public and the ventilating, cooling and lighting systems for the Enclosed Mall shall be operated in accordance with the provisions of this REA from and after the date the same is first opened to the public during the hours that any two of the Majors' buildings are open for business to the general public and for one-half (1/2) hour before and after said hours; provided that except as hereinafter provided, these obligations shall not apply to Easter, Thanksgiving Day or Christmas Day or between the hours of 10:30 p.m. of one day and 9:00 a.m. of the succeeding day, unless the Minimum Number of Majors are open for business. Each Major agrees to periodically advise Developer as to its store hours and each Major shall use its best efforts to notify Developer as to any changes which it plans on making thereto.

The air conditioning and ventilating systems of the Enclosed Mall shall be capable of maintaining 76 degrees Fahrenheit dry bulb and 50% relative humidity inside conditions with outside conditions of 91 degrees Fahrenheit dry bulb and 79 degrees Fahrenheit wet bulb. The entire system shall be automatically controlled. Developer shall operate such system in such manner as not to drain ventilation or air-conditioning from any other Party's building. It being agreed that each of the other Parties hereto shall likewise operate the ventilating and cooling system(s) which serve each Party's building in a manner so as not to drain ventilation or air-conditioning from the Enclosed Mall.

There shall be no charge levied for entering, traversing or leaving the Enclosed Mall.

Each Major shall share in the expenses incurred by Developer under this Section 10.2 in accordance with the terms of its Supplemental Agreement.

Section 10.3   Illumination of Common Area

With respect to each respective Party hereto, for the fifteen (15) year period commencing on the Center Opening Date and for so long thereafter as such Party utilizes any Floor Area on its Parcel, such Party shall keep the Parking Area on its Parcel well-lighted with a minimum maintained intensity of not less than one (1) foot candle measured at ground level during all periods of darkness when the buildings of at least one-half of the Parties are opened for business and for not less than one-half (1/2) hour after said period; provided, however, this obligation shall not apply to Easter, Thanksgiving Day or Christmas Day or between the hours of 10:30 p.m. of one day and 9:00 a.m. of the succeeding day, unless the Enclosed Mall is required to be opened as in Section 10.2 provided. There shall be kept lighted for security purposes seven (7) days of each week during those hours of darkness when full lighting is not required at least those lights to be erected on each Parcel and designated or described as its Security Lights on the Plans jointly approved by the Parties under Article III. Developer shall relamp the Parking Area lighting fixtures as a part of its maintenance of the Common Area pursuant to Section 10.1 hereof.

F00078

In the event a Party ("Requesting Party") desires that the Parking Area
or any portion thereof be lighted during hours or during any period that any
of the other Party(s) hereto ("Requested Parties") are not so required to
light its Parking Area(s), the Requesting Party(ies) hereto may elect to
perform such lighting as Requesting Party(ies) deems necessary or desirable
to the proper operation of the Shopping Center Parcel or its Parcel; and
Developer shall cause such Parking Areas to be lighted and the Requested
Party shall, at no expense to it, cooperate with such Requesting Parties.
The Requesting Party(ies) requiring such lighting shall agree upon an
equitable allocation and contribution towards the cost of any such
lighting.

### Section 10.4  Right of Each Party to Maintain Own Parcel

Each Major shall have the right to withdraw its Parcel from maintenance
by Developer only in accordance with the requirements set forth in its
Major's Lease or Supplemental Agreement.

If a Party withdraws its Parcel under this Section, such Party shall, at
its sole cost and expense perform all of the obligations imposed upon
Developer under Section 10.1 hereof with respect to the Common Area on its
Parcel to the same standards as required of Developer, and Developer shall
be relieved of its obligations under Section 10.1 with respect to such
Parcel.

### Section 10.5  Failure of Performance

If Developer fails, or any other Party to the extent an election has
been made pursuant to Section 10.4 fails, to perform or cause to be
performed any of its duties or obligations provided in this Article X (such
failing Party is hereinafter referred to as the "Failing Party"), any Major,
if such Failing Party is Developer, or Developer, if such Failing Party is a
Major (such Party is hereinafter referred to as the "Curing Party"), may at
any time give a written notice to the Failing Party with a copy to the other
Parties setting forth the specific failure to comply with this Article X. If
such failures are not corrected with reasonable promptness and in any event,
within thirty (30) days after receipt of such notice, or if such failures
are such that they cannot be corrected within such time and the Failing
Party fails to commence the correction of such failures within such period
and diligently prosecute the same thereafter, then, in either such event,
the Curing Party giving such notice shall have the right to correct such
failures, including the right to enter upon any Parcel to correct such
failures, at the cost of the Failing Party. In any event, the Failing Party
shall pay any amounts so expended, with interest, in accordance with Section
24.5; provided, however, these provisions shall be without prejudice to the
Failing Party contesting the right of the Curing Party to make such repairs
or expend such monies. Notwithstanding anything hereinabove contained to
the contrary:

(a)  In the event of an emergency situation, the Curing Party may,
with such notice as may be possible or appropriate under the
circumstances, cure any such default and thereafter shall be entitled to
the benefits of this Section 10.5; and

(b)  No Party shall have the right, whether under this Section or
otherwise, to enter upon the Floor Area (or the Enclosed Mall) of any
other Party to make any repairs or perform any maintenance or any of the
other obligations imposed hereunder; provided, however, that in case of
an emergency situation threatening life or personal injury, a Major may
enter upon the Enclosed Mall to make emergency repairs or take such
other reasonable action as is required.

F00079

ARTICLE XI

PARKING REQUIREMENTS

Section 11.1  Required Parking Ratio

Except as otherwise provided in Article XVIII, each Party shall maintain
on its Parcel at least 5.0 automobile parking spaces for every 1,000 square
feet of Floor Area on its Parcel; provided, however, that if the Shopping
Center shall at any time in the future contain five (5) department stores,
one of which is Saks Fifth Avenue, Lord and Taylor or Neiman-Marcus not
exceeding one hundred ten thousand (110,000) square feet of Floor Area, the
parking ratio relating to such named department store shall be three and
one-half (3-1/2) automobile parking spaces for each one thousand (1,000)
square feet of Floor Area.

The parking configuration, including parking bays and lanes, shall
conform to the typical parking layout specified on Exhibit "B" and the
requirements of Exhibit "F".

Notwithstanding anything herein contained to the contrary Sears shall
have the right to utilize up to twenty (20) automobile parking spaces on the
Sears Parcel in the area designated on Exhibit "B" for the storage of rental
cars, but such spaces so utilized shall not be credited against the required
parking on the Sears Parcel; provided, however, that Sears shall not utilize
such parking spaces or any Parking Areas for the storage of trucks or vans
and no free standing signs or kiosks shall be constructed or utilized on the
Sears Parcel in connection with such rental car operation.

There shall be no Parking Areas constructed outside the Ring Road.

Section 11.2  Charges for Parking;
             Employee Parking Areas;
             Valet Parking Area

Except as provided below, no charge of any type shall be made to or
collected from any Occupants or Permittees for the right to park vehicles in
the Parking Areas, except such common area maintenance costs as may be
provided for in any Lease with any Occupant.

Developer may, from time to time, designate certain sections within the
Parking Area upon each Party's Parcel for non-exclusive automobile parking
use by the Occupants and their employees, agents, contractors, licensees and
concessionaires of such Party, subject to the approval of the Major upon
whose Parcel such sections will be designated, which approval shall not be
unreasonably withheld. Each Party shall use its best efforts to require its
employees and the employees of its tenants and subtenants, contractors,
licensees and concessionaires to use only the designated parking sections.
No such designated area shall be provided within three hundred (300') feet
of any entrance of any Major's building or within three hundred (300') feet
of any entrance to the Enclosed Mall, without the consent of the Party on
whose Parcel such parking is intended to be provided and the consent of any
Party whose entrance would be within three hundred (300') feet of such
designated area. Furthermore, each Party shall have the right to designate
a portion of its Parking Area (not to exceed seventy-five (75) parking
spaces) for paying or nonpaying valet parking purposes provided that the
location thereof is approved by the other Parties hereto, which approval
shall not be unreasonably withheld.

Section 11.3  Use of Parking Areas

Except as otherwise expressly provided in Article V and Section 11.1, no
Party shall use or permit the use of the Parking Area on its Parcel for any
purposes other than pedestrian movement and the parking and passage of

-41-

F00080

passenger motor vehicles. No Party shall grant any parking rights to any
owner or user of property not within the Shopping Center Parcel.

Section 11.4  Changes and Additions to Parking Area

Developer shall have the right from time to time to make reasonable
minor changes and modifications in and to the Parking Area located on each
Party's Parcel and each of the Parties shall have the right to make
reasonable minor changes and modifications in and to the Parking Area
located on each Party's respective Parcel only in connection with an
expansion of its building(s); provided, however, that no such changes and
modifications may be made which (a) shall adversely affect the orderly flow
of pedestrian and vehicular traffic in the Center or render any Parcel or
the buildings thereon less accessible to such traffic; (b) reduce the number
of parking spaces on the Parcel in question below the number required to be
maintained in order to meet the requirements of Section 11.1 hereof; (c)
would be inconsistent with the requirements of Sections E, F and G of
Exhibit "F" or would result in the Parking Area lighting being inconsistent
with the requirements of Section 10.3 hereof; or (d) would result in
multi-level parking other than as provided in Section 11.5; provided,
further, no Party shall at any time have any right to relocate any part of
the Ring Road or Access Roads or to change any dividers, islands or turning
patterns indicated on Exhibit "B" for the Ring Road and Access Roads or to
otherwise materially modify the Ring Road or Access Roads leading to and
from the public roadways except as otherwise provided in Section 2.3.

Section 11.5  Multi-level Parking

In the event any Party elects to build a multi-level parking deck, said
multi-level parking deck shall be located only within the Permissible Deck
Area indicated on Exhibit "B", except as provided in Article XVIII. The
design criteria for same shall be consistent with first-class parking deck
construction; shall be in compliance with all applicable laws, ordinances,
rules and regulations; and shall be subject to the specific approval of all
Parties as to the following matters:

    (a)  Materials and colors;

    (b)  Ramp slope;

    (c)  Ramp width;

    (d)  Parking module and parking stalls;

    (e)  Lighting;

    (f)  Height clearance;

    (g)  Functional design; and

    (h)  Architectural elevations.

The above specified multi-level parking deck criteria shall be
applicable to all multi-level parking constructed on the Shopping Center
Parcel, whether constructed as a result of a condemnation or otherwise. Any
Party seeking any permits and/or approvals which may be necessary in order
to construct mult-level parking as aforesaid shall be obligated to notify
each of the other Parties hereto of such fact. Each Party agrees that no
permit or approval shall be sought or obtained which would serve to modify
any of the rights or obligations of any of the Parties under this REA. Any
Party constructing any such multi-level parking shall be solely responsible
for maintaining, lighting, operating, repairing and restoring, to the
standards set forth in this REA, same, notwithstanding the fact that such
multi-level parking area is part of the Common Area. Any approvals to be
given hereunder shall not be unreasonably withheld or delayed.

-42-

F00081

Notwithstanding anything herein contained to the contrary, the approval
of such design criteria by the Parties shall not constitute the assumption
of any responsibilities by such Parties for their accuracy, efficacy or
sufficiency, and the Party who prepared such design criteria shall be solely
responsible for such items.

F00082

ARTICLE XII

OPERATING COVENANTS OF DEVELOPER

Section 12.1  Developer's General Operating Covenants

Subject to the provisions of Articles XVIII and XX hereof and Section 9.2 hereof and to any interruptions due to repair, alteration, remodeling or reconstruction of the Developer Facilities (if specifically authorized herein), Developer covenants and agrees that it will operate or cause to be operated the Developer Facilities in the following manner:

(a)  To open and continuously manage and operate the Developer Facilities (or cause the same to be continuously managed and operated) in accordance with the provisions of this REA as a complex of retail stores and service enterprises that are a part of a first-class regional shopping center with a two-level enclosed mall.

(b)  To use its best efforts to have substantially all of the Floor Area of the Mall Store Buildings occupied for the sale of goods and providing of services.

(c)  In determining occupancy of Floor Area contained within the Mall Store Building, Developer will use reasonable efforts to maintain a balanced and diversified grouping of retail stores, merchandise and services.

(d)  To have at least 300,000 square feet of Floor Area in the Mall Store Building(s) available for occupancy.

The covenants in this Section 12.1 shall be effective commencing on the Center Opening Date and shall continue thereafter for twenty (20) years and for so long thereafter as the buildings of the Minimum Number of Majors are being operated as retail stores.  Subject to the terms and provisions of this Article XII, after the expiration of the covenants in this Section 12.1 and through and including the expiration of the term of this REA, Developer shall operate the Developer Facilities, if at all, for retail and service purposes and for no other purpose.

After the expiration of the twenty (20) year period described above, Developer's obligations under this Section 12.1 shall be limited to those portions of the Enclosed Mall, and the Mall Store Buildings adjoining such portions which connect the buildings of those Majors in which there is then being operated a retail store providing a continuous connection between said buildings.  If at any time after the said twenty (20) year period, when only the buildings of the Minimum Number of Majors are being operated as retail stores, one of said buildings ceases to be so operated and, accordingly, there is less than the Minimum Number of Majors being operated, Developer's obligations under this Section 12.1 shall continue for a period of twelve (12) months after the date such building ceases to be so operated and shall then terminate unless on or before the expiration of said period such Major shall serve notice upon Developer and the other Majors that it intends to re-open within the next six (6) months.  If said Major shall serve such notice, Developer's obligations shall continue if, in fact, such Major does re-open within such six (6) month period.

A temporary cessation of business by an Occupant of Mall Store Building(s) or by a Major by reason of temporary, non-recurring interruptions as are incidental to the reasonable conduct of its business, including, without limitation, when necessary for the purpose of taking inventory or to permit alterations or repairs to be made to the premises occupied by any such Occupant or Major, shall not be deemed to be a cessation of operation by any such Occupant or Major.

-44-

Section 12.2  Exceptions to Operating Covenant

Notwithstanding anything to the contrary contained in this Article XII, (a) if any mortgage, deed of trust or other instrument in the nature of a mortgage on the Developer's Parcel be foreclosed or a power of sale pursuant thereto is exercised or a deed in lieu of foreclosure is delivered, or (b) Developer having entered into a sale leaseback or lease and subleaseback of all or part of the Developer Parcel under which Developer is the lessee or sublessee thereunder and such lessee or sublessee shall be deprived of possession of Developer's Parcel by reason of its failure to comply with the terms of such leaseback or subleaseback or (c) if the Fee Owner shall terminate the Land Lease or deprive Developer of possession of the Developer's Parcel, any one who has acquired or thereafter acquires title to Developer's Parcel or leasehold interest therein shall hold the same free of any and all obligations to complete the initial construction of the Developer Facilities pursuant to Articles III, IV and VI and Section 5.5 and/or to carry on any operation whatsoever on the Developer Parcel, but the Developer's Parcel shall be operated, if at all, for retail and service purposes and for no other purpose. No such person acquiring title to the Developer Parcel or leasehold interest therein shall be liable for any prior breach or default of Developer under this REA.

Section 12.3  Name of Center

Developer agrees to manage and operate (or cause the same to be managed and operated) the Center under the name "The Gardens" and under no other name without the prior approval of each Major.

F00084

ARTICLE XIII

OPERATING COVENANTS OF MAJORS

Section 13.1  Operating Covenant

(a) Each Major hereby covenants and agrees that, subject to the provisions of Articles IX, XVIII and XX of this REA:

(1)  During the period commencing with the opening of its building to the public and terminating on the fifteenth (15th) anniversary of the Center Opening Date, it will operate or cause to be operated the following specified Floor Area within its building as a department store or specialty department store; in the case of Macy, at least one hundred fifty thousand (150,000) square feet of Floor Area, which, shall be operated under the name "Macy's", or such other name as is then being used by Macy to identify its multi-level stores of over one hundred fifty thousand (150,000) square feet of Floor Area in Southeastern Florida; in the case of Sears, at least one hundred twenty thousand (120,000) square feet of Floor Area, which shall be operated under the name of "Sears", or such other name as is then being used by Sears to identify its multi-level stores of over one hundred thousand (100,000) square feet of Floor Area in Southeastern Florida; and in the case of Federated, at least one hundred fifty thousand (150,000) square feet of Floor Area, which shall be operated under the name "Burdines", or such other name as is then being used by Federated to identify its multi-level stores in its Burdines Division of over one hundred thousand (100,000) square feet of Floor Area in Southeastern Florida.

(2)  In addition, during the period commencing with the fifteenth (15th) anniversary of the Center Opening Date and through and including the twentieth (20th) anniversary of the Center Opening Date, each of Macy, Sears and Federated shall operate or cause to be operated its respective Building, if at all, as a department store or specialty department store and for no other purpose and during the period commencing with the twentieth (20th) anniversary of the Center Opening Date and through and including the expiration of its respective Major's Lease, each of Macy, Sears and Federated shall operate its respective Building, if at all, for retail and service purposes and for no other purpose.

(3)  Throughout the period it is obligated to operate or cause to be operated Floor Area in its building as a department store, it will maintain or cause to be maintained as entrances to its building at least one main entrance to each level of the Enclosed Mall.

(4)  For purposes hereof, reference to "operate or cause to be operated" shall mean, for the first fifteen (15) year period, operate or cause to be operated in generally the same manner and during substantially the same hours as the majority of each Major's department stores under the same name are being operated in Southeastern Florida.

(5)  For purposes hereof, the term "department store" means a retail store containing a number of departments for the sale of varied merchandise and services.

(b)  Sears' covenant to operate as set forth in Section 13.1(a) is for the benefit of Developer and its successors and assigns, as hereinafter defined, and is not assignable to any person other than Developer's successors and assigns, as hereinafter defined. Any purported assignment of, or contract to assign, said covenant or any agreement granting the right to enforce the same or to require that Developer enforce the same, or any grant of any other right thereunder to any person other than such a defined successor or assign shall be void and unenforceable. In the event Developer takes any action which purports to make a prohibited assignment, a

-46-

F00085

prohibited contract to assign, or a prohibited grant of any other right with
regard to any such covenant, Developer shall pay any and all loss, cost and
expense incurred by Sears arising therefrom, including, without limitation,
the reasonable fees of attorneys of Sears' choice, reasonable litigation
preparation costs and court costs and fees arising out of litigation
resulting from such prohibited assignment, contract to assign or grant such
contract right or an action by Sears to obtain a declaration that any such
prohibited assignment or prohibited contract right is void and
unenforceable. For purposes of this Section 13.1(b), Developer's successors
and assigns shall be deemed to include only any transferee of the portion of
Developer Parcel containing the Enclosed Mall, the Fee Owner, any mortgagee
(including any purchaser at a foreclosure sale or grantee under a deed in
lieu of foreclosure) or any trustee of a deed of trust of Developer relating
to the Developer Parcel.  Notwithstanding anything herein contained to the
contrary, (1) no other Major shall have any right to enforce Sears' covenant
to operate, and (2) Sears shall not have any right to enforce any other
Major's covenant to operate as set forth in Section 13.1(a).

(c)  Except as provided in Section 13.1(b), the covenants of each Major
in this Section 13.1 shall run to and for the benefit of each Party hereto
(and the Fee Owner and any institutional holder of any mortgage on any
Party's Parcel, which holder shall have served notice on each other Party of
the existence of said mortgage and the address to which notices are to be
sent to it under this REA), and said covenants are subject to (a) such
temporary, non-recurring interruptions as are incident to the reasonable
conduct of each Major's business, including without limitation, when
necessary for the purpose of taking inventory or to permit alterations or
repairs to be made to the Majors' building and (b) to other temporary
interruptions described in Section 13.2.

(d)  It is specifically understood that the rights granted to the Fee
Owner and the holder of a mortgage as provided in Section 13.1(b) and (c)
are valid and enforceable, notwithstanding that the Fee Owner and said
holder are not parties hereto.  The Fee Owner and such holder shall have the
right to seek and obtain against any such Major any and all remedies or
relief available to the Fee Owner and such holder at law or in equity;
provided, however, that the Fee Owner or such holder is then in possession
of the Parcel to which its mortgage pertains or is in the process of
enforcing its rights to obtain possession of the Parcel and provided further
that the Fee Owner and any such mortgagee of Developer who attempts to
enforce any such covenant shall be entitled to so enforce such covenant only
in the event it is currently performing the obligations of Developer set
forth in this REA.

(e)  If any Major has defaulted in the performance of its operating
covenant or is no longer obligated to operate pursuant to its operating
covenant, such Major shall not be entitled to enforce the operating covenant
of any other Major.

Section 13.2  Termination of Operating Covenant
             by a Major

The covenants of each Major in Section 13.1 may be terminated by each
such Major on thirty (30) days' prior notice to Developer if:

(a)  Within one (1) year from the Center Opening Date, one other
Major has not opened its building for business in accordance with
Section 13.1 with the public; or

(b)  Developer is in default of its covenants under Section 12.1 of
this REA and fails to cure such default within sixty (60) days after
receipt of notice of such default from any Major, or if such default is
one which cannot reasonably be cured within sixty (60) days, if
Developer fails to commence the curing of such default within such sixty

-47-

(60) day period and thereafter fails to prosecute such cure with diligence; or

(c) Developer fails to cause occupants occupying a minimum of sixty-five percent (65%) of the Floor Area of the Mall Store Buildings to operate from and after the second anniversary of the Center Opening Date and such condition continues for in excess of twelve (12) consecutive calendar months, subject to extension pursuant to the provisions of Article XX hereof (but Article XX shall not include Developer's inability to lease portions of the Mall Store Buildings). In computing the Floor Area of the Mall Store Buildings for purposes of this Section 13.2(c), the area shown on as Exhibit "B" as "Future Lease Area" (although the same may be constructed prior to the Center Opening Date), not to exceed Twenty Thousand (20,000) feet, shall be excluded until the earlier to occur of (i) the date such portion thereof is initially leased and occupied by an Occupant (and then only such portion so leased and occupied shall be included) and (ii) six (6) months after an additional Major initially opens for business adjacent to such area.

(d) A Major or Majors (the "Major(s) in default"), having opened its (their) building(s) for business, ceases to operate its (their) building(s) as a department store(s) in violation of its operating covenant set forth in Section 13.1, so that there are for a continuous period in excess of one (1) year less than a total of the Minimum Number of Majors whose respective Building contains in excess of One Hundred Thousand (100,000) square feet of Floor Area. Subject to Section 13.1(b), Developer shall expeditiously utilize its best efforts to enforce such operating covenant, including, but not limited to, the prompt institution and diligent prosecution of legal proceedings to enforce such covenant.

(e) In the event Developer is not required to and does not reconstruct the Developers Facilities pursuant to Section 9.2(b).

For purposes of Section 13.1 hereof and subparagraph (c) above, a temporary cessation of business by a Major or an Occupant when necessary to permit alterations, repair or restoration of the building of such Major, or the premises of such Occupant, or a temporary cessation for a reasonable period to allow for a change in occupancy as a result of a sale, lease or sublease of such Major's Parcel and assignment of its obligations under this REA shall not be deemed to be a cessation of operation by such Major.

Section 13.3  No Regulations of Manner of Operation

Nothing in this Article shall be deemed in any way to regulate the manner of operation or merchandise offered or types and number of departments of the business being conducted on any Major's Parcel or the hours or days of such operation, except as provided in Section 13.1(a)(4).

Section 13.4  Exceptions to Operating Covenant

Notwithstanding anything to the contrary contained in this Article XIII, but subject to the obligation contained herein, each Major may:

(a) subject to the provisions of Section 13.1(a)(1), lease all or any portion(s) of its building and/or license departments therein and/or grant concessions to other parties;

(b) (1) lease, sell or otherwise transfer all or any part of its Parcel and/or the Improvements thereon. Upon any such lease, sale or other transfer, and during the period described in Section 13.1(a)(1) such lessee, purchaser or other transferee shall continue to operate under the name such Major was required to operate or the name such lessee, purchaser or other transferee utilizes for a majority of its comparable stores in Southeastern Florida.

-48-

F00087

(2) If any such lease, sale or transfer as provided in Section 13.4(b)(1) is made during the period of the operating covenant set forth in Section 13.1 (a)(1), then (i) Macy shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a Person which acquired a majority of the stores of Macy, or any successor thereto, exceeding One-Hundred Fifty Thousand (150,000) square feet in Southeastern Florida and said transferee, by written instrument in recordable form, expressly assumes all of the obligations of Macy hereunder and is financially capable of performing such obligations (as hereinafter provided), (ii) Sears shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a Person or other entity which acquired a majority of the stores operated as Sears or any successor thereto, exceeding One-Hundred Twenty Thousand (120,000) square feet in Southeastern Florida and said transferee, by written instrument in recordable form, expressly assumes all of the obligations of Sears hereunder and is financially capable of performing such obligations (as hereinafter provided) and (iii) Federated shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a corporation or other Person which acquired a majority of the stores of the Burdines Division of Federated, or any successor thereto, exceeding One-Hundred Fifty Thousand (150,000) square feet in Southeastern Florida and said transferee, by written instrument in recordable form, expressly assumes all of the obligations of Federated hereunder and is financially capable of performing such obligations (as hereinafter provided). For purposes hereof, an entity whose net worth is in excess of One Hundred Million Dollars ($100,000,000) shall be deemed financially capable of performing the obligations of a Major. No other lease, sale or other transfer shall in any way serve to release the transferor of any of its obligations under this Article XIII.

(c) Mortgage all or any part of its Parcel and/or Improvements thereon and/or sell and leaseback or lease and subleaseback all or any part of its Parcel and/or Improvements thereon and in connection with any such transaction, assign its interest in this Agreement. If any mortgage, deed of trust or other instrument in the nature of a mortgage on a Major's Parcel be foreclosed or a power of sale pursuant thereto is exercised or a deed in lieu of foreclosure is delivered, or any Major having entered into a sale and leaseback or lease and subleaseback of all or part of its Parcel under which either such Major or a subsidiary or affiliate of such Major or the parent corporation of such Major is the lessee or sublessee thereunder and such lessee or sublessee shall be deprived of possession of such Parcel by reason of its failure to comply with the terms of such leaseback or subleaseback, any one who has acquired or thereafter acquires title to such Parcel or leasehold interest therein shall hold the same free of any and all obligations to carry on any operation whatsoever on such Parcel including, without limitation, any obligation set forth herein to operate a retail department store operation under any particular trade name or otherwise but such Parcel shall be operated, if at all, for retail and service purposes and for no other purpose; provided, however, that any such party so acquiring title or possession shall provide Developer with notice thereof and Developer shall have one hundred eighty (180) days after receipt of such notice to acquire the interest of the party so acquiring title or possession for an amount equal to the total sum owed by the Major to such party relating to such Major's Parcel, as well as such other sums as may have been incurred by such Mortgagee with regard to such Major's Parcel, including those incurred as a result of the foreclosure of any such lien. No such person so acquiring title to such Major's Parcel or leasehold interest therein shall be liable for any prior breach or default of such Major under this REA. No such foreclosure, deed in lieu of foreclosure or deprivation of possession shall relieve such Major of liability for breach of its covenants under Section 13.1 hereof.

-49-

F00088

## ARTICLE XIV

### FEE OWNER'S SOUTHERLY PARCELS

Section 14.1  Fee Owner's Southerly Parcels

Pursuant to the Land Lease and this REA, the development of the Fee Owner's Southerly Parcels shall be subject to the following, which restrictions shall remain in full force and effect during the term of this REA and expire upon the expiration or earlier termination of this REA:

(a) The only vehicular accesses to and from the Fee Owner's Southerly Parcels shall be from not more than two (2) curb cuts for each such Parcel off the Ring Road surrounding the Shopping Center Parcel immediately to the north of the Fee Owner's Southerly Parcels, such curb cuts to be located within the areas shown on Exhibit "B," and each curb cut permitting full ingress and egress with no turning restrictions, subject to Section 2.11.

(b) Each such portion of the Fee Owner's Southerly Parcels so developed shall contain the required parking pursuant to the applicable zoning ordinances of Palm Beach Gardens. Each such portion of the Fee Owner's Southerly Parcels so developed for an office building shall contain at least three (3) parking spaces for each one thousand square feet of gross office building area in the building so developed.

(c) The construction of no building shall be commenced upon the Fee Owner's Southerly Parcels for a period ending with the earlier to occur of (i) March 31, 1989, and (ii) twenty-four (24) months after initial opening of any stores in the Shopping Center Parcel to the general public.

(d) No building constructed upon the Fee Owner's Southerly Parcels shall exceed four (4) stories in height.

(e) During the term of this REA but only so long as the Shopping Center Parcel is operated as a shopping center, the Fee Owner's Southerly Parcel shall, if developed, be used for the development and operation of office buildings, banks or other financial institutions or similar institutional uses and no other purpose.

A0007/0008g

-50-

F00089

ARTICLE XV

GENERAL COVENANTS - CENTER APPEARANCE

Section 15.1    Removal of Buildings

The Mall Store Buildings, the Enclosed Mall, or the buildings of any Major shall not be razed or removed from their respective Permissible Building Areas except as may be necessary prior to rebuilding or restoration following damage or destruction, or by reason of a taking by Condemnation. In the event a Party razes or removes its building(s) pursuant to this REA, said building area shall be left in the same condition as required under Section 9.5 and shall become part of the Common Area as therein provided until built upon as permitted under this REA.

Section 15.2    Limitation on Detrimental Characteristics

No use, operation or occupancy will be made, conducted or permitted on any part of the Shopping Center Parcel which use or operation is obviously detrimental to the operation of the Shopping Center in the reasonable judgment of the Party(ies) still using their Parcels for retail use. Included among the uses or operations which are prohibited because of their obvious detriment to a balanced and diversified grouping of retail stores, merchandise and services usually found in a retail center, as well as their obvious detrimental effect upon the general appearance of the Center and conflict with the reasonable standards of appearance, maintenance and housekeeping required by this REA, are uses or operations which produce or are accompanied by characteristics such as, but not limited to, the following:

(a) Any noise, litter, odor or other activity which may constitute a public or private nuisance;

(b) Any physically damaging or dangerous hazards;

(c) Any assembly or manufacturing operation which would be permitted only in a heavy manufacturing or industrial zone, distillation, refining, smelting, industrial, agriculture, drilling or mining operation; except that the Fee Owner has reserved the mineral rights and the right to mine minerals; provided, however, any mining activities of Fee Owner shall not materially interfere with the operation of the Shopping Center and in connection with such mining activities the Fee Owner may not drill from the surface of the Shopping Center Parcel (but instead may use slant drilling beneath the Shopping Center Parcel) or within one hundred fifty (150) feet of the surface of the Shopping Center Parcel and may not drill in the area of the Fee Owner's Southerly Parcels.

(d) Any trailer court, mobile home park, lot for sale of new or used motor vehicles, auto repair (except as may be strictly ancillary to the operation of a department store), labor camp, junk yard, stock yard, or animal raising (other than pet shops and veterinarians);

(e) Any dumping, disposal, incineration or reduction of garbage or refuse, other than handling or reducing such waste if produced on the Shopping Center Parcel from permitted uses and if handled in a reasonably clean and sanitary manner.

Section 15.3    Non-Interference with Permittee Circulation

So as not to interfere with efficient pedestrian traffic flow in the Enclosed Mall, no selling or rental activity shall be conducted in the Enclosed Mall other than (a) in non-movable kiosk structures located in areas therefor as shown on Exhibit "B", and no such kiosk shall engage in the sale of food or beverages (b) from flower carts, suitable for use in a first-class

-51-

F00090

enclosed mall, provided that no such flower carts shall be located within one
hundred fifty (150) feet of the entrance to a Major's building, and (c) in
connection with special events (not of a regular, recurring nature) of any
Merchants' Association or supported by any Center promotional fund as
referred to in Section 24.15 hereof, which activities shall not be located
within one hundred fifty feet (150') of any Major's building without the
consent of such Major, provided, that the Central Court Stage Area and
activities thereon may be within said one hundred fifty (150) foot area.

So as neither to interfere with the use of the Common Area nor detract
from the appearance of the Center, outdoor selling (other than outdoor
seating for restaurants in the areas shown on Exhibit "B" and outdoor sales
areas in the areas shown on Exhibit "B") will not be permitted on the
Shopping Center Parcel. No fence, structure or other obstruction of any
kind, except as may be specifically permitted in this REA or as may be
indicated on Exhibit "B" or except for decorative features and customer
conveniences, shall be placed, kept, permitted or maintained nor any goods
stored or delivery vehicles parked upon the Common Areas without the prior
written consent of the Parties hereto, except such of the foregoing as are
reasonably necessary or proper for the construction, repair or rebuilding
authorized hereunder.

Section 15.4    Signs

The criteria for all signs to be installed within the Shopping Center
Parcel is set forth in Exhibit "E", and no signs shall be installed in the
Shopping Center Parcel that do not conform to the criteria.

Section 15.5    Operation of the Shopping Center Parcel

Notwithstanding anything herein contained to the contrary but subject to
Section 12.2 hereof, during the entire term of this REA, the Shopping Center
Parcel shall be operated as a regional shopping center and for no other
purpose, in a manner at least equivalent to the operating standards of other
first-class enclosed mall regional shopping centers in the State of Florida;
provided that after the twentieth anniversary of the Center Opening Date, if
less than the Minimum Number of Majors is then operating, the Shopping Center
Parcel need not be operated as a regional shopping center but shall be used
for a shopping center or for the retail sale of merchandise and retail sale
of such services as are normally ancillary to a shopping center and for no
other purpose.

Section 15.6    No Discrimination

In the operation and management of the Shopping Center Parcel, and each
part thereof, including, without limitation, the Common Area and Common
Utility Facilities, and in all other respects in which work or services are
performed or materials or equipment supplied to or for any Occupant,
Developer will accord treatment to each Major with respect to its Parcel and
Improvements of the respective kind as favorable as that accorded to the
other Majors and to the Occupants of the Mall Store Buildings; it being
understood that this covenant applies, without limitation, with respect to
the time when and the manner (but not the cost) in which each of the
foregoing shall be operated, maintained, repaired and/or furnished with any
service, materials, supplies and equipment, including the restoration of any
of the same the furnishing of which may have been interrupted or impaired,
and the effect of the promulgation of any rules or regulations for the
general government of the Shopping Center Parcel. The foregoing shall apply
generally, but is not to be construed in a manner inconsistent with or
contrary to any express provision of this REA.

F00091

## ARTICLE XVI

### TRANSFER OR CONVEYANCE OF PARCELS

Section 16.1    Certain Definitions for This Article

As used in this Article, the following terms shall have the following respective meanings:

(a) "Transfer" means a conveyance by way of sale, assignment, lease, grant or transfer, including, without limitation, the sale portion of a Sale and Leaseback, but excluding the making of a Mortgage.

(b) "Transferor" means the seller, assignor, grantor, lessor or Transferor in a particular Transfer.

(c) "Transferee" means the purchaser, assignee, grantee, lessee or Transferee in a particular Transfer.

(d) "Affiliate" means, with respect to any Person, another Person controlled by, or controlling, or under common control with, the Person in question ("control" for this purpose means the legal or beneficial ownership of in excess of fifty percent (50%) of the voting securities of the Person controlled).

(e) "Mortgage" means a mortgage, deed of trust or other instrument securing a loan.

(f) "Sale and Leaseback" means a Transfer in which the Transferor, or an Affiliate thereof, acquires as a part of the same transaction a leasehold interest in all or substantially all of the Parcel Transferred. The term "Sale and Leaseback" also includes an assignment of Lease and Subleaseback.

(g) "Institutional Lender" means a bank, insurance company, pension fund, pension trust, foundation and any other Person who or which is generally regarded in the real estate financing field, at the time in question, as an "Institutional Lender."

Section 16.2    Transfer During Construction

Developer hereby agrees that, prior to one (1) year after the date upon which the Developer Facilities and the On-Site and Off-Site Improvement Work have been completed, the Enclosed Mall has been opened to the public and occupants occupying at least one hundred eighty-five thousand (185,000) square feet of Mall Store Floor Area have opened for business, Sidney Forbes and/or Maurice Cohen shall retain a controlling interest in the Developer or in the controlling partners of the Developer and the Developer shall not Transfer all or any portion of its Parcel except by way of Mortgage or Sale and Leaseback as collateral security for, or any other bona fide financing arrangement with, an Institutional Lender and except for a Transfer of all or any portion of its Parcel upon foreclosure of a mortgage or deed in lieu of foreclosure or to any person thereafter succeeding to such interest, or upon termination of the Land Lease, a Transfer to the Fee Owner or a successor lessee of the Developer Parcel. Nothing contained in this Section 16.2 shall prevent Developer from entering into leases for occupancy of Mall Store Floor Area. Any other such Transfer during such time shall be null and void.

Section 16.3    Assignment and Transfer

(a) Except as expressly provided for in this Section 16.3 or in Section 13.4 no Transfer by any Party of all or any part of its Parcel shall be deemed to release such Party from any of its obligations hereunder.

-53-

F00092

(b)  If any Major shall transfer all of its Parcel, such Major shall be released from all liability thereafter arising hereunder and cease to be a Party from and after the later of (1) the date upon which the operating covenant on the part of such Major set forth in Section 13.1(a)(1) shall expire or otherwise terminate, and (2) the date upon which the Transferee shall become liable for the terms, conditions, covenants and agreements in this REA thereafter to be kept, observed and performed by its respective Transferor, but only on condition that:

(i)  a duly executed and acknowledged copy, in recordable form, of the instrument by which the Transferee shall have become liable for the obligations of its Transferor shall be delivered to the other Parties hereto, which instrument shall be reasonably satisfactory to counsel for such other Parties;

(ii)  at the time the Transferor is to be released of all further liability hereunder, any and all amounts which shall then be due and payable by such Transferor to the other Parties hereto shall be paid to such other Parties hereto or adequate provision therefor be made; and

(iii)  at the time of any such transfer, the Transferor has not been notified of any default hereunder which has not theretofore been remedied.

(c)  Subject to the provisions of Section 16.2, if the Developer shall transfer all of its Parcel, Developer shall be released from all further liability hereunder from and after the later of (i) one (1) year after the date of completion of the On-Site and Off-Site Improvement Work and the Developer Facilities and opening to the public of one hundred eighty-five thousand (185,000) square feet of Mall Store Building Floor Area and (ii) the date upon which the Transferee shall become liable for the terms, conditions, covenants and agreements in this REA thereafter to be kept, observed and performed by Developer, but only on condition that:

(i)  a duly executed and acknowledged copy, in recordable form, of the instrument by which the Transferee shall have become liable for the obligations of Developer shall be delivered to the other Parties hereto, which instrument shall be reasonably satisfactory to counsel for such other Parties; and

(ii)  at the time Developer is to be released of all further liability hereunder, any and all amounts which shall then be due and payable by Developer to the other Parties hereto shall be paid to such other Parties hereto; and

(iii)  at the time of any such transfer, Developer has not been notified of any default hereunder which has not theretofore been remedied.

(d)  In the event the Developer transfers less than all of its Parcel at any time and from time to time, then all owners of the Developer Parcel shall be jointly and severally liable for the performance of all obligations imposed upon Developer under the terms of the REA with respect to the whole and/or any part of the Developer Parcel.

(e)  Notwithstanding anything to the contrary herein contained, if any Party shall:  (1) transfer its Parcel in connection with a Sale and Leaseback, and it or its Affiliate shall simultaneously become vested with a leasehold estate or similar possessory interest in its Parcel by virtue of a lease made by the Transferee, or (2) give a Mortgage on its Parcel and it or its Affiliate shall retain its possessory interest in its Parcel, then in none of such events shall the Transferee under such Sale and Leaseback or any subsequent owner of the Parcel in question, or the Mortgagee under any such Mortgage, be deemed to have assumed or be bound to perform any of such Transferor's obligations hereunder for so long as such Transferor or its

-54-

F00093

Affiliate shall retain such possessory interest and such obligations shall
continue to remain those of such Transferor so long as it or its Affiliate
retains such possessory interest and performance by it or its Affiliate of
any act required to be performed under this REA by it or fulfillment of any
conditions of this REA by it or its Affiliate shall be deemed the performance
of such act or the fulfillment of such conditions by such Transferee or
Mortgagee, as the case may be, and shall be acceptable to the Parties hereto
with the same force and effect as if performed or fulfilled by such
Transferee or Mortgagee, subject to the provisions of Section 13.4(c).

However, subject to the provisions of Section 13.4(c), at such time as
the Transferor or its Affiliate who Transferred or Mortgaged such Parcel
ceases to retain such possessory interest, any such Transferee or Mortgagee
shall be deemed to have assumed and to be bound to perform such Transferor's
obligations hereunder. Nothing herein contained shall be construed as in any
way releasing or diminishing the obligations and liabilities of any Party
hereto of any obligations hereunder.

Section 16.4    Notice to Mortgagee and Fee Owner

Each Party serving a notice of default or any other notice of an event
or act which if taken or not taken, may become a default (any of the
foregoing hereinafter referred to as a "notice of default") under this REA or
any Major's Lease shall send by registered or certified United States Mail,
postage prepaid, a copy of such notice to the Fee Owner and any holder of a
Mortgage on the Parcel and/or Improvements of the Party so served, provided
such holder shall have sent the Party serving the notice of default a notice
informing it of the existence of such Mortgage and the name of the person or
officer and the address to which copies of such notices of default are to be
sent. The Fee Owner and such holder shall be permitted to cure any such
default not later than sixty (60) days after a copy of the notice of default
shall have been sent to the Fee Owner and such holder; provided, that in the
case of a default which cannot with diligence be remedied within such period
of sixty (60) days if the Fee Owner or such holder has commenced within the
sixty (60) days and is proceeding with diligence to remedy such default, then
such holder shall have such additional period as may be necessary to remedy
such default with diligence and continuity. The Fee Owner or Mortgagee shall
advise each Major as to what actions, if any, it shall elect to take in order
to remedy any such default, which notice shall be without obligation on the
part of the Fee Owner or Mortgagee to perform, failing of which, however, any
Party hereto shall have the right to proceed to enforce the terms and the
conditions of this REA. In the case of an emergency the above required
notice shall not be required but such notice shall be given as may be
reasonably practicable under the circumstances.

-55-

F00094

## ARTICLE XVII

### INSURANCE

Section 17.1  Duty to Carry Fire Insurance – Release and Waiver of Subrogation

Each Party shall carry (or cause to be carried) policies of all risk property coverage insurance on its buildings and other improvements, including such as may be located in the Common Area. Such insurance shall be so carried by each Party commencing with the start of construction by each in form of so-called builder's risk insurance and Developer shall be responsible for carrying so-called builder's risk insurance on the entire Shopping Center Parcel until delivery of the building pads to the Majors and thereafter until the completion of the On-Site Improvements, Developer shall be responsible for carrying such insurance on the Shopping Center Parcel, other than the Macy Improvements, the Sears Improvements and the Burdines Improvements.

Notwithstanding the foregoing, the Majors shall not be required to carry such insurance after the expiration of their operating covenants pursuant to Section 13.1(a)(1), as the same may be extended hereunder. During periods that any Major does not carry such insurance, it shall be deemed to have self insured.

No Party nor the Fee Owner shall be liable to any other Party, or to any insurance company insuring the other Party, for any loss or damage to any building or improvements which was or could have been covered by such insurance even though such loss or damage might have been occasioned by the negligence of such Party or the Fee Owner, its agents or employees, and each Party hereby releases all of its rights to recover from each other Party and the Fee Owner for such loss or damage. Without in any manner limiting or conditioning the effectiveness of the foregoing waiver and release, each Party covenants that it will obtain for the benefit of each other Party and the Fee Owner a waiver of any right the insurer of such Party may acquire against any other Party or Parties and the Fee Owner by virtue of the payment of any such loss covered by such insurance.

Section 17.2  General Requirements for Fire Policies

All policies carried under Section 17.1:

(a)  Shall be carried with financially responsible insurance companies licensed or approved to conduct business in Florida.

(b)  Shall be in an amount equal to the full replacement cost (exclusive of cost of excavations, foundations and footings) of the buildings and improvements being insured and, in any event, in at least such an amount as shall prevent the Party from becoming a co-insurer under the terms of applicable policies, with deductibles not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00) as to any Party not qualified as a self-insurer as provided in Section 17.9 hereof, excepted.

Section 17.3  Use of Policy Proceeds

Proceeds of insurance under policies covered by Section 17.1 paid to a Party by reason of damage to or destruction of its buildings and improvements shall be used by such Party to restore such damaged or destroyed buildings and improvements, to the extent required under Article IX hereof.

Any loss covered by insurance required pursuant to Section 17.1 of this REA shall be adjusted with the insured, and if the loss is in excess of Two Hundred Fifty Thousand ($250,000.00) Dollars and neither the insured nor a

F00095

Person guarantying or personally liable for the Insured's obligations under this REA shall have a net worth of more than One Hundred Million Dollars ($100,000,000.00), the insurance proceeds shall be deposited in a bank or trust company reasonably satisfactory to each of the Parties hereto and the Fee Owner (or with the institutional first mortgagee of such Party's Parcel as hereinafter provided) to be held in trust and disbursed as the work of rebuilding, reconstruction and repair shall progress in amounts designated by certification, by architects licensed to do business in the State of Florida showing the application of said amounts as payment for such repairs, rebuilding and reconstruction; provided, however, that it first be made to appear to the satisfaction of the trustee or institutional mortgagee that the amount necessary to provide for reconstruction or repair of any buildings and other improvements destroyed or damaged, as aforesaid, according to the plans adopted therefor, which may be in excess of the amount received upon such policies, has been provided by the Insured for such purposes and its application for such purposes assured. The Insured shall pay to the trustee all reasonable fees for its services. Any excess of monies received from insurance remaining with the trustee or institutional mortgagee after the reconstruction or repair of such building or buildings or other improvements, if there be no default on the part of the Insured in the performance of the covenant herein or in the mortgage or note thereby secured, shall be paid to the Insured.

If the loss does not exceed Two Hundred Fifty Thousand Dollars ($250,000.00) or the Insured or a Person which has guaranteed or is personally liable for performance of the Insured's obligations under this REA shall have a net worth of One Hundred Million Dollars ($100,000,000.00) or more, the insurance proceeds shall be paid directly to the Insured and applied by it in satisfaction of its obligations under Article IX hereof.

Such policies may be made payable to the holder of a first mortgage which is a lien upon the Parcel of the Insured under a standard mortgagee clause, provided such mortgagee is a bank, trust company, insurance company or savings and loan association, and agrees that it will, in the event of loss, apply the proceeds in accordance with the provisions of this REA.

Section 17.4  Duty to Carry Liability Insurance

Each Party shall carry (or cause to be carried) with financially responsible insurance companies, comprehensive general liability insurance covering its legal liability in connection with claims for personal injury or death, and property damage incurred upon or about its Parcel. Such insurance shall have limits of Ten Million Dollars ($10,000,000.00) per occurrence. The separate policies provided for in this Section 17.4 shall cover only such portions of the respective Parcels not covered by the joint policy provided for in Section 17.5 hereof. Each of the Fee Owner, Developer, Macys, Sears and Federated shall be named as an "insured" party under such policies.

Section 17.5  Joint Liability Insurance

Commencing thirty (30) days prior to the Center Opening Date, the Parties hereto each agree that they will, jointly, and at all times and continuously thereafter during the term of this REA, maintain comprehensive general liability insurance covering their legal liability in connection with claims for personal injury or death, and property damage incurred upon the Common Areas (excluding the Developer Facilities, Macy Improvements, Sears Improvements, Burdines Improvements and any parking deck facilities). Such insurance shall have limits of Ten Million Dollars ($10,000,000) per occurence. Said insurance shall be effected under a joint policy, under the terms of which the Fee Owner, Developer, Macy, Sears and Federated shall each be an "insured" party. Developer is hereby designated the agent of the other Parties for the purpose of obtaining such insurance, provided that the approval of the other Parties as to the insurer, terms and cost shall first be obtained. The premium for said policy shall be apportioned among the

-57-

F00096

Developer and the Majors in a proporation based on the acreage that each
Parties' Parcel bears to the total acreage in the Shopping Center Parcel,
and each of the Majors shall reimburse Developer for its proportionate share
within thirty (30) days after receipt of an invoice therefor. Each Major
reserves the right to withdraw from participation in the joint Common Area
insurance herein provided upon ninety (90) days' written notice prior to the
expiration or anniversary date of such policy, and, in lieu thereof, to
obtain separate policies of insurance as provided in Section 17.4 or to
self-insure, if permitted pursuant to this REA.

Section 17.6  Additional Insurance

Each of the Parties shall throughout the term of this REA procure and
maintain:

(a) Boiler and machinery insurance, coverage of building
equipment, machinery and apparatus consisting of, but not limited to,
boilers, heating apparatus, fired and unfired pressure vessels, air
conditioning equipment, miscellaneous electrical apparatus and their
appurtenant equipment.

(b) If the Shopping Center Parcel is located in a flood hazard
area, flood insurance in the amount of the lesser of (1) the maximum
amount obtainable from time to time, and (2) the full insurable value of
such Party's Improvements.

(c) No Party shall use or permit the use of the Shopping Center
Parcel or any Buildings or any part thereof for manufacture, use or
gift, sale or sale and consumption of alcoholic or fermented liquor
unless in each case such Party shall pay for and maintain, or cause its
subtenants to pay for and maintain, a dram shop or liquor liability
insurance policy from a responsible insurance company protecting the Fee
Owner and all other Parties and the Shopping Center Parcel from any and
all claims, liens, judgments or damages which may be imposed under and
by virtue of the provisions of any present or future statutes of the
State of Florida or the United States of America, or the ordinances of
the City of Palm Beach Gardens, or County of Palm Beach or otherwise,
concerning such use.  The limits of such liquor liability policy shall
not be less than Five Million Dollars ($5,000,000) for any one person,
Five Million Dollars ($5,000,000) for the loss of means of support and
Five Million Dollars ($5,000,000) for property damage.

(d) Such other insurance and in such amounts (including increasing
the amount of insurance of the other insurance provided for in this
Article XVII) as may be carried from time to time by prudent owners of
buildings in the locale of the Shopping Center Parcel similar to the
buildings comprising the Center and also as may be required, from time
to time, under the laws, ordinances or regulations of the United States
of America, State of Florida, the County of Palm Beach or the City of
Palm Beach Gardens.

Section 17.7  Indemnification By Parties

Each Major respectively agrees to defend, indemnify and save the Fee
Owner, Developer, and each other Major and the respective agents,
contractors, Occupants and Permittees of the Fee Owner, Developer and each
Major harmless against and from all claims, loss, damages, costs and
expenses, including reasonable attorneys' fees, because of personal injury
or death of persons or destruction of property resulting from or arising out
of or in any manner connected with such Majors' construction on and use,
occupancy or possession of its respective building, and if a Major shall be
obligated for the maintenance of the Common Area on its Parcel as provided
in Article X, such Majors' indemnification above shall extend to any
personal injury, death of persons or destruction of property occurring
thereafter on its Parcel; Developer agrees to defend, indemnify and save the

F00097

Fee Owner, each Major and their respective agents, contractors, Occupants and Permittees harmless against and from all claims, loss, damages, costs and expenses, including reasonable attorneys' fees, because of personal injury, death of persons or destruction of property anywhere in the Shopping Center Parcel with the exception of the buildings of the Major resulting from or arising out of or in any manner connected with (a) the Enclosed Mall, (b) Floor Area on the Developer Parcel, (c) those portions of the Common Area of the Shopping Center Parcel if and for so long as Developer is obligated to maintain or cause to be maintained those portions in accordance with Section 10.1 and (d) Developer's construction activities. However, there shall be (a) included in such indemnity the results of, except as otherwise specifically provided in (b) below, the negligent or willful acts or omissions of the respective indemnitor or its employees or agents no matter where in the Shopping Center Parcel done or omitted to be done; and (b) excluded from each such indemnity the result of the negligent or willful acts or omission of the party otherwise indemnified or its employees or agents no matter where in the Shopping Center Parcel done or omitted to be done and claims paid pursuant to the joint policy provided for in Section 17.5 hereof; provided, however, notwithstanding the foregoing inclusions and exclusions to the contrary, such inclusions or exclusions shall be null and void and of no effect as fully as though same were entirely omitted from this REA to the extent that such are inconsistent with and/or would achieve or cause a result contrary to the provisions regarding the release and waiver of subrogation set forth in Section 17.1.

Section 17.8  Contractual Liability Insurance

Each Party further agrees to maintain Contractual Liability Insurance insuring its obligations set forth in Section 17.7, with the same limits as provided in Section 17.4.

Section 17.9  Self-Insurance; "Blanket Policies"

As long as any Party or the Fee Owner (including a Person guarantying or personally liable for the obligations of said Party or the Fee Owner under this REA) has a net worth according to its published financial statement or a statement from a nationally recognized firm of certified public accountants for the most recent full year of at least One Hundred Million Dollars ($100,000,000.00), such Party or the Fee Owner may elect to carry any insurance required to be carried under this Article XVII, in whole or in part, under any plan of self-insurance.

Any Party or the Fee Owner may carry any insurance required to be maintained under this Article XVII under a "blanket policy" covering other property of such Party or of the Person guarantying or liable for its obligations under this REA or of the principals or affiliates of any Party.

Section 17.10  Certificate of Insurance

Each Party shall, on the request of another Party or the Fee Owner, promptly furnish the requesting Party or the Fee Owner, a certificate evidencing the former Party's compliance with the insurance coverage requirements of this Article or a statement that such Party is a self-insurer. Each certificate of insurance shall stipulate therein that the insurance evidenced thereby shall not be materially reduced, cancelled or not renewed unless thirty (30) days' prior written notice shall have been given by the insurer to all other Parties and the Fee Owner. No Party shall be required during any given One Hundred Eighty (180) day period to honor more than one such request from another Party.

Section 17.11  Fee Owner

Each of the Parties hereby agrees that Fee Owner, as fee title owner of the Shopping Center Parcel, shall be named as additional insured on the

F00098

insurance policy provided by each Party pursuant to Section 17.4 hereof and the joint policy provided pursuant to Section 17.5 hereof, and shall be entitled to the indemnification of each Party provided in Section 17.7 hereof. Anything contained in the Land Lease to the contrary notwithstanding, the Fee Owner agrees that so long as this REA is in effect, except as to any Parcel which may have been excluded therefrom, the provisions of this Article XVII shall control as it relates to insurance requirements and the disposition of insurance proceeds; provided, however, to the extent the Land Lease requires the maintenance of broader coverage and/or higher limits of insurance than is herein provided, Developer will maintain the same with respect to the Developer Parcel.

F00099

ARTICLE XVIII

CONDEMNATION

Section 18.1   "Condemnation" and "Condemnation Date" Defined

"Condemnation" is defined in Section 1.6 hereof.  "Condemnation Date"
means the date when possession of the condemned Parcel (or any part thereof)
is taken or given by or to the condemning authority.

Section 18.2   Condemnation of a Building

(a)  If any part of the building of a Major or the Enclosed Mall or Mall
Store Buildings shall be taken by Condemnation prior to the fifteenth
anniversary of the Center Opening Date, then, except as hereinafter provided
in this Section and unless a Party having the right to exclude as set forth
in this Article XVIII, elects so to exclude, the Party whose building(s) were
so taken in Condemnation shall proceed to restore or replace the same so as
to constitute a complete architectural unit.  In the event a Party is
obligated or elects to restore or replace the building(s) so taken in
Condemnation, such restoration or rebuilding shall be done in accordance with
the provisions set forth in Articles IV and V of this REA, and shall be
completed within twenty-four (24) months of the Condemnation Date; provided,
however, nothing herein shall require a Party to replace or restore a
building so as to contain more Floor Area than would be required in the event
of a restoration at that time pursuant to Article IX hereof.

(b)  If as a result of a Condemnation either (1) less than fifteen
percent (15%) of a Major's building shall be taken and in the good faith
judgment of said Major reasonably exercised it shall not be economically
and/or physically feasible to restore or replace the same to a complete
architectural unit capable of being used for the use then being made
immediately prior to the Condemnation and having access to both levels of the
Enclosed Mall or (2) fifteen percent (15%) or more of a Major's building
shall be taken, then, and in either such events, said Major shall so notify
the other Parties hereto within One Hundred Twenty (120) days after the
Condemnation Date and shall have the right and option to exclude its Parcel
from the operation and effect of this REA by specifying in said notice that
it has so elected to exclude its Parcel.

(c)  If as a result of a Condemnation (1) all or a substantial portion
of the Mall Store Buildings shall be taken and in the good faith judgment of
Developer reasonably exercised it shall not be physically and/or economically
feasible to restore the Mall Store Buildings to a complete two-level
architectural unit containing not less than eighty-five percent (85%) of the
Floor Area which such Mall Store Buildings contained before such
Condemnation, or (2) all or any portion of the Enclosed Mall shall be taken
and it shall not be economically and/or physically feasible to restore or
replace the same to a complete architectural unit connecting the buildings of
all Majors then operating their buildings as retail department stores, then,
and in either case, Developer shall so notify the other Parties hereto of
such fact(s) within One Hundred Twenty (120) days after the Condemnation
Date.  In the event Developer so notifies the other Parties within said One
Hundred Twenty (120) day period, any Party shall have the right and option to
exclude its Parcel from the operation and effect of this REA, in the case of
Developer, by specifying in such notice that it has elected so to exclude its
Parcel, and in the case of a Major (if Developer has not elected to exclude
its Parcel), by serving notice of such election on the other Parties within
ninety (90) days after Developer shall have served such notice upon the
Majors.

(d)  If any Party shall have the right and option to exclude its Parcel
from the operation and effect of this REA, and shall exercise its option as
provided herein, such exclusion shall take effect automatically thirty (30)
days following the giving of such notice of exercise of such option.

-61-

F00100

(e) If all or any part of a Party's Building after the time any such Party is obligated to operate as provided in Section 12.1 as to Developer and in Article XIII as to the Majors, be taken by Condemnation so as to render the remaining portion thereof unfit for the purposes for which constructed, such Party shall have the obligation to demolish and clear its Parcel of any such building or return the same to an attractive architecturally whole unit. In such event, the area not taken by Condemnation so cleared shall be left in a clean, safe and attractive condition at such Party's expense.

Section 18.3   Condemnation of Parking Area

(a) If any part of the Parking Area on a Party's Parcel shall be taken by Condemnation, the Party whose Parking Area is so taken shall replace or restore the same as herein provided:

(1) In the event of a taking by Condemnation of a Party's Parking Area resulting in a reduction of the number of car spaces on such Party's Parcel to not less than ninety-five percent (95%) of the number of car spaces which such Party is required to maintain pursuant to Section 11.1 of this REA, the Party owning such Parcel shall have no obligation to restore or provide additional car spaces.

(2) In the event of a taking by Condemnation of a Party's Parking Area resulting in a reduction of the number of car spaces on such Party's Parcel to less than ninety-five percent (95%) but not less than fifty percent (50%) of the number of car spaces which such Party is otherwise required to maintain pursuant to Section 11.1 of this REA, the owner of such Parcel shall, at its cost, but not in excess of the amount of the condemnation award relating thereto, replace the car spaces so taken so that the number of car spaces on such Parcel shall not be less than ninety-five percent (95%) of the number of car spaces such Party would otherwise be required to maintain pursuant to Section 11.1 of this REA; and

(3) In the event of a taking by Condemnation of a Party's Parking Area resulting in a reduction of the number of car spaces on such Party's Parcel to less than fifty percent (50%) of the number of car spaces which such Party is required to maintain pursuant to Section 11.1 of this REA and such party shall determine in its judgment reasonably exercised that it is not physically or economically feasible to so replace the number of car spaces so taken to ninety-five percent (95%) of the number of car spaces such Party would otherwise be required to maintain pursuant to Section 11.1 of this REA, such Party shall notify the other Parties within ninety (90) days after the Condemnation Date of the number of car spaces taken, the number it is obligated to restore pursuant to this paragraph and the number of car spaces which it is feasible to restore, and such Party shall have the right and option to exclude its Parcel from the operation and effect of this REA by specifying in said notice that it has so elected to exclude its Parcel.

(b) If, as a result of a taking or takings by Condemnation, the aggregate number of car spaces in the Shopping Center Parcel (including any car spaces which any Party is required or elects to replace) is reduced to less than 4.25 car spaces for each 1,000 square feet of Floor Area then on the Shopping Center Parcel, any Party may elect to exclude its Parcel from the operation and effect of this REA by giving notice of such exclusion within six (6) months from the last Condemnation Date.

(c) If any Party shall have the right to exclude its Parcel from the operation and effect of this REA and shall exercise such option as herein provided, such exclusion shall take effect automatically thirty (30) days after the giving of the required notice of exercise of such option.

(d) If and to the extent that a Party is either obligated to or elects to replace car spaces, the same may be done by either the construction of

-62-

F00101

multi-level parking facilities on its Parcel or by the acquisition or other
right to use land contiguous to the Shopping Center Parcel, or both. In the
case of acquisition or use of contiguous land, such land, or in the event
there is no area on a Party's Parcel upon which multi-level parking is
permitted, the area upon which such Party desires to construct multi-level
parking, shall be subject to approval of the other Parties as to location,
which approval shall not be unreasonably withheld or delayed.    Any
construction of additional car spaces shall be in accordance with the
provisions of this REA on the basis of plans approved by the other Parties,
which approval shall not be unreasonably withheld or delayed.

(e)  Such replacement Parking referred to in Section 18.3(d) shall, upon
completion of construction, become part of the Parking Area and subject to
the easements granted in Section 2.2, but shall not be deemed Common Area for
purposes of Article X, except to the extent a parking deck is constructed in
the Shopping Center Parcel.

Section 18.4    Award

In the event a Parcel or any part thereof is taken by Condemnation, each
Party waives, in favor of the Party whose Parcel or any part thereof is taken
by Condemnation, any value of the condemnation award attributable to any
easements a Party holds in the Parcel of such other Party; and no part of
such award shall be payable to the holder of the dominant tenement by virtue
of such easement.  However, a waiver under this Section shall not preclude
the holder of any interest in another Parcel from claiming and collecting
from the Condemnor the severance and consequential damages to its own Parcel
resulting from the taking of the condemned portion of the other Parcel.

If this REA shall not have been terminated or if the Party whose Parcel
was taken shall not have excluded its Parcel from the operation and effect of
this REA, then the entire award payable to such Party shall be applied first,
before being devoted to any other purpose, to restoration to the extent
required by this Article XVIII.  In the event a Party elects to exclude, so
much of the award as necessary shall be applied to the work obligated of each
Party as provided in Section 18.2(e).

Except with respect to an award to a Party who would not be required to
so deposit funds in accordance with said Section 17.3, in the event of an
award to any Party in excess of Two Hundred Fifty Thousand Dollars
($250,000.00), the proceeds thereof shall be deposited in a bank or trust
company reasonably satisfactory to each of the Parties hereto or with the
Institutional first mortgagee of such Party's Parcel in the same manner
provided in Section 17.3 but subject to the terms of this Section 18.4 and
shall be held and readvanced in accordance with the procedure set forth in
Section 17.3.

Nothing contained in this REA shall be deemed to diminish or effect the
Fee Owner's rights with respect to any such award pursuant to the terms of
the Land Lease.

Section 18.5    Effect of Exclusion

If any Party shall exclude its Parcel from the operation and effect of
this REA pursuant to the provisions of Articles XIV or this Article XVIII,
then and in such event from and after the date of such exclusion, the
provisions of this REA (other than the provisions of Articles II, X and XIV
hereof which specifically survive such exclusion) shall cease to apply to
such Party and its Parcel, and the Party whose Parcel was so excluded shall
be released from all liability accruing hereunder after such exclusion
(except as otherwise specifically provided in said Articles II, X and XIV).

If Developer or the Minimum Number of Majors shall exclude their Parcels
from the operation and effect of this REA pursuant to the provisions of this
Article XVIII, this REA shall automatically terminate on the date of

F00102

exclusion of the Parcel of Developer or the Parcel of the Major which
constitute the last of the Minimum Number of Majors to Terminate.

Section 18.6   Instrument Evidencing Exclusion
              or Termination

Upon the request of a Party, all Parties shall sign and exchange an
instrument in recordable form evidencing the exclusion of a Party's Parcel or
termination of this REA as the case may be, pursuant to this Article XVIII.

Section 18.7   Termination of Land Lease

In the event the Land Lease shall be terminated as a result of
Condemnation, then notwithstanding anything herein contained to the contrary
this REA shall be terminated and of no further force or effect as of the date
of such termination of the Land Lease.

F00103

ARTICLE XIX

REAL ESTATE TAXES

Section 19.1   Payment of Taxes

Each Party shall pay (or cause to be paid) before delinquency all real estate taxes and assessments (herein collectively called "Taxes") levied on its Parcel and the Improvements situated thereon.

Section 19.2   Contesting Taxes

Subject to the Land Lease as to Developer and each Major's Lease as to such Major, each Party may, at its own cost and after notice to the other Parties of its intention to contest Taxes, by appropriate proceedings contest the validity, applicability and/or the amount of any Taxes. Upon the institution of such a contest, each Party shall so notify the other Parties. Subject to the Land Lease as to Developer and each Major's Lease as to such Major, nothing in this Article requires a Party to pay any Taxes so long as it contests the validity, applicability or the amount thereof in good faith and so long as it does not allow the affected Parcel to be forfeited as a result of its non-payment.

Section 19.3   Failure to Pay Taxes

If a Party fails to comply with this Article, any other Party may pay the Taxes in question and shall be entitled to prompt reimbursement from the defaulting Party for the sums so expended with interest thereon as stated in Section 24.5.

-65-

F00104

## ARTICLE XX

### EXCUSES FOR NON-PERFORMANCE

Notwithstanding anything contained in this REA, each Party shall be excused from performing any obligation under this REA, and any delay in the performance of any obligation under this REA shall be excused, if and so long as the performance of the obligation is prevented, delayed or otherwise hindered by acts of God, fire, earthquake, floods, explosion, actions of the elements, war, riots, mob violence, inability to procure or a general shortage of labor, equipment, facilities, materials or supplies in the open market failure of transportation, strikes, lockouts, actions of labor unions, condemnation, court orders, laws, regulations or orders of governmental or military authorities or any other cause, whether similar or dissimilar to the foregoing, not within the control of such Party (other than lack of or inability to procure funds or financing to fulfill its commitments and obligations under this REA).

F00105

ARTICLE XXI

NOTICES AND APPROVALS

Each notice, demand, request, consent, approval, disapproval, designation or other communication, other than those called for under Articles III, IV or V (all of the foregoing are herein referred to as a "notice"), that a Party is required or desires to give or make or communicate to any other Party shall be in writing and shall be deemed to have been given or made when mailed by certified or registered United States Mail, postage prepaid, return receipt requested, or sent via a recognized overnight courier service addressed in the case of Developer to:

> Forbes/Cohen Florida Properties
>   Limited Partnership
> Galleria Officentre
> 27700 Northwestern Highway
> Suite 427
> P.O. Box 667
> Southfield, Michigan 48037
>
> with a copy to:
>
> William J. Zousmer, Esquire
> Honigman Miller Schwartz and Cohn
> 2290 First National Building
> Detroit, Michigan 48226

and addressed in the case of Macy to:

> Macy's New York, Inc.
> c/o R. H. Macy & Co., Inc.
> 151 West 34th Street
> New York, New York 10001
> Attention: Secretary
>
> with a copy to:
>
> Macy's New York, Inc.
> c/o R. H. Macy & Co. Inc.
> 151 West 34th Street
> New York, New York 10001
> Attention: Senior Vice President, General Counsel

and addressed in the case of Sears to:

> Sears, Roebuck and Co.
> Sears Tower
> Chicago, Illinois 60684
> Attention: National Manager Real Estate
> Planning Group, Dept. 824 R.E.
>
> with a copy to:
>
> Sears, Roebuck and Co.
> Sears Tower
> Chicago, Illinois 60684
> Attention: General Counsel-
> Merchandising Group, Dept. 766

-67-

F00106

and addressed in the case of Federated to:

    Burdines
    22 East Flagier Street
    Miami, Florida 33131
    Attention: Chairman

    with a copy to:

    Federated Department Stores, Inc.
    7 West Seventh Street
    Cincinnati, Ohio  45202
    Attention:  Real Estate Department

subject to the right of a Party from time to time to designate a different address by giving notice similarly given, such different address being effective under this Section from and after the day of receipt of notice thereof by such other Party.

Any notice, demand, request, consent, approval, disapproval, designation or other communication that a Party is required or desires to give or make or communicate to the Fee Owner shall be in writing and shall be deemed to have been given or made when mailed by certified or registered United States Mail, postage prepaid, return receipt requested, or sent via a recognized overnight courier service addressed to:

    MacArthur Liquidating Trust
    c/o John D. and Catherine T. MacArthur Foundation
    140 South Dearborn Street
    Seventh Floor
    Chicago, Illinois  60603

    with a copy to:

    Howard Kane, Esq.
    Rudnick & Wolfe
    30 North LaSalle Street
    Chicago, Illinois  60602

subject to the right of the Fee Owner from time to time to designate a different address by giving notice similarly given.

In the event any Party is a partnership or is composed of more than one Person, then such Party shall designate one Person for purposes of service of process and receipt of notices.

Developer shall, by notice to the Parties, designate an agent in the State of Florida for purpose of service of process. In the event Developer does not specifically designate a person for service of process, any other Party shall have the right to designate CT Corporation System or any successor thereto on behalf of Developer for purpose of service of process in the State of Florida and shall have the right to use the last designated address of Developer for these purposes.

F00107

## ARTICLE XXII

### AMENDMENT

This REA may be amended, modified or terminated by the Parties without the consent or approval of any other Person(s) (including Permittees of the Parties); provided, any amendment or modification of the REA made without the consent of the institutional holder of a Mortgage of a Party's Parcel which has notified all Parties of its status as such a holder ("mortgagee") or the Fee Owner shall not be binding upon such mortgagee without such mortgagee's consent or upon the Fee Owner without its consent; and except as expressly permitted by the terms of this REA, this REA shall not be terminated or amended or modified in any material respect which would or might adversely affect such mortgagee without such mortgagee's consent or the Fee Owner without its consent.

The foregoing limitations shall also be applicable to each respective Party as respects any Major's Lease or Supplemental Agreement simultaneously or hereafter entered into by and between any such Party and Developer. Any such amendment, modification or termination, in order to be effective, shall be made by written instrument in recordable form executed by the Parties to such agreement.

No Major's Lease or Supplemental Agreement shall be binding upon any other Major or derogate from or diminish the obligations of the Parties to such Major's Lease(s) or Supplemental Agreement(s) to the other Parties to this REA. No default under any Major's Lease or Supplemental Agreement shall be deemed a default under this REA nor shall any such default be deemed an excuse for a Party's not performing or defaulting in its performance of any of its obligations to the Developer or other Majors under this REA who are not parties to such Major's Lease or Supplemental Agreement.

F00108

ARTICLE XXIII

TERM OF AGREEMENT

Subject to the provisions of Section 24.25, this Agreement and the
obligations hereunder shall remain binding from the date hereof and shall
continue until the expiration of a period of seventy (70) years after the
Center Opening Date or March 31, 2059 whichever shall earlier occur;
provided, however that each Party shall be responsible to perform all
obligations imposed upon it hereunder which accrue prior to such expiration
and are not fully performed as of such expiration.

OCT. 31, 2058
FIRST AMEND.', PG. 3
DATED 4/10/90

–70–

F00109

ARTICLE XXIV

### MISCELLANEOUS

Section 24.1    Table of Contents and
Captions - Exhibits

The table of contents and captions of this REA are inserted only as a matter of convenience and for reference. They do not define, limit or describe the scope or intent of this REA and they shall not affect the interpretation hereof. All exhibits attached hereto which are specifically mentioned in this REA are hereby made a part hereof.

Section 24.2    Locative Adverbs; Terms

The locative adverbs, "herein", "hereunder", "hereto", "hereby", "hereinafter", and like words, wherever the same appear herein, mean and refer to this REA in its entirety and not to any specific Article, Section or Subsection hereof, unless expressly otherwise provided. When used herein, the term, "including" shall mean "including without limitation" unless otherwise specifically provided.

Section 24.3    REA for Exclusive Benefit of Parties

The provisions of this REA are for the exclusive benefit of the Parties hereto and the Fee Owner and not for the benefit of any other Person nor shall this REA be deemed to have conferred any rights, express or implied, upon any third person. Nothing herein shall be construed to create any rights in or for the benefit of any space lessee of any part of the Shopping Center Parcel.

Section 24.4    Waiver of Default

No express written waiver of any default shall affect any default or cover any period of time other than the default and period of time specified in such express waiver. One or more written waivers of any default in the performance of any provision of this REA shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained herein. The consent or approval by a Party to or of any act or request by another Party requiring consent or approval shall not be deemed to waive or render unnecessary the consent or approval to or of any subsequent similar acts or requests. Unless expressly herein provided to the contrary, the rights and remedies given to a Party by this REA shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive of any of the others, or of any other right or remedy at law or in equity which a Party might otherwise have by virtue of a default under this REA, and the exercise of one such right or remedy by a Party shall not impair such Party's standing to exercise any other right or remedy.

Section 24.5    Payment on Default

If under this REA a Party is compelled or elects pursuant to this REA to pay any sum of money or do any acts that require the payment of money by reason of another Party's failure or inability to perform any of the provisions of this REA to be performed by such other Party, the defaulting Party shall promptly, upon demand, reimburse the paying Party for such sums. All such sums shall bear interest at the rate of two percent (2%) per annum over the then existing prime rate of interest from time to time charged by Chase Manhattan Bank, N.A., New York, New York (but in no event exceeding the applicable maximum rate per annum permitted by Florida law) from the date of expenditure until the date of such reimbursement. The prime rate shall be the announced and published prime rate or base rate by Chase Manhattan Bank from time to time. A determination of the interest rate in effect as aforesaid shall be made on the date of expenditure and on the last business

-71-

F00110

day of each month thereafter and shall remain in effect until the effective date of the next determination.

If such payment shall not be made within ten (10) days after such demand is made, the paying Party shall have the right to deduct the amount thereof, together with interest as aforesaid, from any sums then due or thereafter becoming due from it to the defaulting Party under this REA or any Major's Lease entered into between said Parties, regardless of who may have an interest in the Parcel of the defaulting Party at the time such deduction(s) is/are made.

Section 24.6    No Partnership, Joint Venture
               or Principal-Agent Relationship

Neither anything in this REA contained nor any acts of the Parties hereto shall be deemed or construed by the Parties hereto, or any of them, or by any third person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the Parties to this REA or between any of the Parties and the Fee Owner.

Section 24.7    Successors

This REA shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties.

Section 24.8    Governing Laws

This REA shall be construed and governed in accordance with the laws of the State of Florida.

Section 24.9    Written Consent Required

Except as otherwise may be provided in Articles III and IV, whenever a Party is requested to consent to or approve of any matter with respect to which its consent or approval is required by this REA, such consent or approval, if given, shall be given in writing and shall be given within sixty (60) days of request therefor, and if the letter requesting such consent or approval clearly indicates that if the Party receiving the same does not refuse such consent or approval within sixty (60) days such consent or approval shall be deemed to have been given, then if such Party shall not refuse such consent or approval within sixty (60) days, it shall be deemed to have granted such consent or approval.

Section 24.10    Reasonableness of Consent

Unless specifically provided in this REA that a Party or the Fee Owner may not unreasonably withhold its consent or approval, such consent or approval may be withheld in the absolute discretion of such Party or the Fee Owner.

Section 24.11    Covenants Run With the Land

Except as provided in Section 12.2, it is intended that the covenants, easements, agreements, promises and duties of each Party as set forth in this REA, shall be construed as covenants and that, to the fullest extent legally possible, all such covenants shall run with and be enforceable against both the covenantor and the Land or constitute equitable servitudes as between the Parcel of the respective covenantor, as the servient tenement, and the Parcel of the respective covenantee, as the dominant tenement. Such covenants shall terminate upon termination or expiration of this REA.

Section 24.12    Default Shall Not Permit Termination of REA

No default under this REA shall entitle any Party to terminate, cancel or otherwise rescind this REA; provided, however, this limitation shall not

-72-

affect any other rights or remedies the Parties may have by reason of any
default under this REA or any Major's Lease or Supplemental Agreement.

Section 24.13  Right to Enjoin

In the event of any violation or threatened violation of any of the
provisions of this REA by a Party or Occupant, any other Party and the Fee
Owner shall have the right to apply to a court of competent jurisdiction for
an injunction against such violation or threatened violation, and/or for a
decree of specific performance.

Section 24.14  Certification of Floor Area and Parking Spaces

For purposes of assuring compliance with Article XI, upon the completion
of any construction on its Parcel, each Party shall certify to the other
Parties the number of square feet of initially or subsequently constructed
Floor Area on such Parcel and the number of parking spaces on its Parcel,
which certification shall be based on a determination by an architect.

Notwithstanding anything contained in this REA, during the period of any
damage, destruction or razing and until the completion of any razing,
rebuilding, repairing or replacement of any building in the Center, the Floor
Area of the building shall be deemed to be the same as the Floor Area of the
building immediately before such period, and upon the completion of the
razing, rebuilding, repairing or replacement of such building, the Party
shall again certify to the other Parties the number of square feet of Floor
Area on such Parcel, which certification shall be based on a determination by
an architect.

Section 24.15  Merchants' Association or Promotion Fund

(a)  If Developer shall form and sponsor a not-for-profit Merchants'
Association for the promotion of the Center, each Major agrees to join and
maintain membership in the Association from the date of its opening and for
the period provided in its respective Supplemental Agreement provided:

(1)  it has membership on the Board of Directors of the Association
and there is provided as a part of the annual budget an amount
sufficient to pay the premium for officers' and directors' indemnity
insurance;

(2)  each member of the Board of Directors of the Association be
entitled to only one vote, and one member of the Board of Directors of
the Association shall at all times be a representative of the
Developer;

(3)  its annual contribution to the Association shall not exceed
the amount specified in its Supplemental Agreement;

(4)  the Developer makes an annual cash contribution to the
Association equal to at least twenty-five percent (25%) of all annual
contributions required to be made thereto by all other members thereof;

(5)  that each other Major(s) obligated to be open is a member;

(6)  at least ninety percent (90%) of the tenants of the Mall
Stores are members;

(7)  Developer (or such other agent of the Developer as may be
approved by the Majors) is the person providing the promotional services
and personnel for the Association; and

(8)  it shall not be bound by the acts or omissions of the
Merchants' Association, the only obligation of a Major with respect to

-73-

F00112

the Merchants' Association being to make contributions in conformity
with its Supplemental Agreement.

(b)  If Developer or its agent is providing promotional services and
personnel to formulate and effect an advertising, promotional and public
relations program for the Shopping Center, Developer shall be reimbursed by
the Merchants' Association, if one has been created, for the cost of such
promotional services and personnel, such cost not to exceed twenty-five
percent (25%) of the annual budget of the Merchants' Association.

(c)  If a Merchants' Association has not been created and if Developer
has formed and established a promotion service (the "Fund") for the promotion
of the Center, each Major agrees to support the Fund from the date of its
opening and for the period provided in its respective Supplemental Agreement,
provided:

(1)  its annual contribution to the Fund shall be payable only on
the terms provided in, and shall not exceed the amount specified in its
Supplemental Agreement;

(2)  the Developer makes a cash contribution to the Fund equal to
at least twenty five percent (25%) of all annual contributions required
to be made thereto by all contributors thereto;

(3)  that each other Major obligated to be open is contributing to
the Fund;

(4)  at least ninety percent (90%) of the tenants of the Mall
Stores are contributing to the Fund;

(5)  the contributions paid to the Fund are being used for the
promotion of the Center and Developer's representative at the Center
consults with said Major's designated representative on a regular basis
to review and coordinate the activities of the Fund;

(6)  it shall not be bound by the acts or omissions of the Fund,
its only obligation with respect to the Fund being to pay sums in
conformity with its Supplemental Agreement; and

(7)  Developer maintains separate accounts and books of account for
the Fund and periodically upon the request of said Major provides said
Major with an itemized statement and review of such accounts.

Subject to the foregoing, any promotional services and personnel so
provided shall be under the exclusive control and supervision of Developer
who shall have the sole authority to employ and discharge such personnel.

Section 24.16  Correction of Parcel Descriptions

If the "as-built" survey prepared in accordance with Section 3.2(f) or
any other survey which a Party may prepare discloses that any Party's
Improvements have not been constructed completely within the boundaries of
its respective Parcel, and unless such encroachment is otherwise authorized
pursuant to Section 2.5, then upon request of the encroaching Party, each
other Party upon whose Parcel such Improvements have been constructed shall,
at its option, either (a) grant an easement, subject to easements and
encumbrances of record and otherwise in form satisfactory to the grantor,
over that part of its Parcel required to reflect the use of its Parcel, or
(b) convey satisfactory title, subject to easements and encumbrances of
record and otherwise in form satisfactory to the grantor, to the encroaching
Party of the part of its Parcel being so used by the encroaching Party,
provided the encroaching Party conveys to such other Party satisfactory
title, subject to easements and encumbrances of record and otherwise in form
satisfactory to the grantor, to an equivalent amount of acreage of its Parcel
contiguous to the grantee's Parcel as is reasonably satisfactory to such

-74-

other Party. All expenses incurred by the granting Party in connection with
either the grant of easement or the conveyance of title as aforesaid shall be
borne by the encroaching Party.

Nothing herein contained shall in any manner be construed as diminishing
or be deemed to constitute a waiver of any rights of a Party resulting from
another Party's failure to construct its Improvements as herein required and
this Section shall not relieve or excuse a Party from exercising all due
diligence to construct its Improvements within the Permissible Building Areas
as shown on Exhibit "B".

Section 24.17  Authority of Developer

As inducements by Developer to each of the Majors to enter into this
Agreement, Developer represents, covenants and agrees that Developer has full
power and authority to execute, acknowledge, deliver and record this REA and
to grant all the interests, rights and privileges granted to each of the
Majors hereby.

Section 24.18  Representation of Majors

Each of the Majors hereto represents, covenants and agrees that as of
the date of execution of this REA, it has the full right and lawful authority
to enter into this Agreement for the full term hereof.

Section 24.19  Limitation of Liability

If at any time after completion of the On-Site and Off-Site Improvement
Work and the Developer's Facilities and the opening of the Enclosed Mall and
185,000 square feet of Mall Store Building Floor Area has been opened to the
public, Developer fails to observe, fulfill or perform any covenant, term or
condition of this REA upon its part to be observed, fulfilled or performed
and, as a consequence of such default, a Major recovers a money judgment
against Developer, such judgment shall be a lien on and shall be satisfied
only out of the proceeds of sale received upon execution of such judgment and
levy thereon against the right, title and interest of Developer in the
Shopping Center Parcel, and out of rents, issues or profits and other
payments received from the Shopping Center Parcel and Developer Improvements
receivable after the date of such judgment (and before the date of such
judgment if not yet paid) by Developer and/or out of the consideration
received by Developer from sale or other disposition of all or any part of
Developer's rights, title and interest in the Shopping Center Parcel, and no
other assets of the Developer nor any of the partners comprising the
partnership which is the Developer herein shall be liable for any
deficiency. It is understood and agreed that the rights of any Major(s)
under this Section 24.19 are subject and subordinate to the lien of any first
mortgage in existence prior to the time any such Major(s) recovers a money
judgment against Developer as aforesaid and the rights of the Fee Owner
pursuant to the Land Lease.

Notwithstanding the limitations of financial liability hereinabove set
forth, in the event Developer shall default in its maintenance or restoration
obligations set forth in Article IX in respect of casualty, or to the extent
Developer is a self-insurer under Article XVII or Article XVIII in respect of
a Condemnation, the estate of Developer, which shall be available to the
Majors for the satisfaction of any judgment to enforce same, shall include
any insurance proceeds (or in the case of self-insurance, the amount that
would be payable if there was insurance) or Condemnation proceeds payable as
a result of such casualty or Condemnation, as the case may be, without regard
to the costs of determination and collection.

This provision shall be for the benefit of and binding upon Developer,
its successors and assigns, including, specifically, any mortgagee of
Developer who may succeed to the interest of Developer or any party acquiring

-75-

F00114

any interest in and to the Developer Parcel by or through said mortgagee and
the Fee Owner.

Section 24.20  Notice of Non-Conformity to Law

In the event that any Party receives a notice from any governmental
agency or authority to the effect that the Party so notified is in violation
of the governmental order, regulation or requirement in respect of the
operation of any part of the Shopping Center Parcel, the Party so receiving
such notice shall promptly transmit a copy thereof to the other Parties.

Section 24.21  Confirmation of Center Opening Date

When the Center Opening Date has been established, it shall be confirmed
by a document in recordable form executed by the Parties hereto.

Section 24.22  Inducements

As inducements by Developer to each of the Majors to enter into this
Agreement, Developer represents, covenants and agrees that;

(a) as of the date of execution of this REA, Developer has full
power and authority to execute, acknowledge, deliver and record this REA
and to grant all the interests, rights and privileges granted to each of
the Majors hereby;

(b) except for the Land Lease, there are no existing, and shall be
no future leases, covenants, agreements, promises, liens, easements,
restrictions or other encumbrances which limit or conflict with any of
the interests, rights or privileges granted to or obligations imposed
upon the Majors by this REA;

(c) as of the date of execution of this REA, the Shopping Center
Parcel is zoned to permit Developer and the Majors to construct and
operate thereon and otherwise perform their obligations hereunder as
contemplated by this REA;

(d) as of the date of execution of this REA, Developer has secured
from the governmental and quasi-governmental agencies having
jurisdiction thereof all approvals in respect of the Shopping Center
Parcel as to all buildings and improvements which Developer and the
Majors are permitted and/or obligated to each other to complete or cause
to be completed so as to permit each Party, subject to compliance by
each such Major with the requirements of the applicable zoning, building
and use requirements, to submit its plans for construction and obtain
building and other permits in respect thereof and to open and use its
Improvements as contemplated under this REA; and

(e) as of the date of execution of this REA, there are no
ecological or environmental requirements, permits or licenses other than
those which have been obtained or complied with prior to the date
hereof, or any other laws, regulations or ordinances which would
prohibit the installation, initial construction or use of all or any
portion of the On-Site and Off-Site Improvement Work as described in
Article III or of any Party's Improvements.

Section 24.23  Counterparts

This REA may be signed in several counterparts, each of which shall be
deemed an original, and all such counterparts shall constitute one and the
same instrument.

-76-

F00115

Section 24.24  <u>Rules</u>

The Parties acting unanimously may adopt rules and regulations pertaining to the use of the Common Areas, provided that all such rules and regulations and oher matters affecting the users of the Common Area shall apply equally and without discrimination to all persons entitled to use the Common Area.

Section 24.25  Release of Major Upon
<u>Expiration of Its Major's Lease</u>

Upon the expiration or termination of a Major's Lease, other than as a result of the default of such Major under its Major's Lease, such Major shall be released of all obligations and responsibilities thereafter accruing under this REA and shall thereafter have none of the rights and/or privileges herein granted; provided, however, that such Major's Parcel shall continue to be subject to all of the terms and provisions of this REA. Developer and each Major hereby agrees that no Majors' Lease shall be terminated without the consent of all Majors except (a) as a result of Condemnation and the exclusion of such Major's Parcel from this REA, (b) after damage or destruction of such Major's building after the thirteenth anniversary of the Center Opening Date, and (c) in the event of the termination of such Major's Sublease as a result of a material default by such Major thereunder. Upon the termination of the Land Lease and all of the Major's Leases, this REA shall terminate.

IN WITNESS WHEREOF, each Party has caused its duly authorized officers to sign and seal this REA as of the day and year first above written.

F00116

WITNESS:

FORBES/COHEN FLORIDA PROPERTIES
LIMITED PARTNERSHIP
a Michigan limited partnership

By   FORBES/COHEN PROPERTIES,
Its General Partner

By _____
SIDNEY FORBES, its general

partner

By _____
MAURICE COHEN, its general

partner

STATE OF MICHIGAN      )
                       ) ss
COUNTY OF OAKLAND      )

The foregoing instrument was acknowledged before me this _21st_ day
of _May_____, 19_87_, by Sidney Forbes and Maurice Cohen, general
partners of Forbes/Cohen Properties, the General Partner of Forbes/Cohen
Florida Properties Limited Partnership, a Michigan limited partnership, on
behalf of said limited partnership.

_____
Notary Public
My Commission Expires: _Dec. 15, 1990_

F00117

*Beverly Cobb*

*Bernadette Kelley*

MACY'S NEW YORK, INC.,
a New York corporation

By _____
Senior Vice President, Corporate
Affairs

By _____
Assistant Secretary

STATE OF NEW YORK }
                  } ss
COUNTY OF NEW YORK }

The foregoing instrument was acknowledged before me this 18th day of __March__, 19_87_, by __James O. York__ and __David C. Stopsky__, the __Sr. VP-Corporate Affairs__ and __Assistant Secretary__, respectively of Macy's New York, Inc., a __New York__ corporation, on behalf of said corporation.

*Lucy Ann Earley*
Notary Public
My Commission Expires: _____

LUCY ANN EARLEY
Notary Public, State of New York
No. 01-4667274
Qualified in Orange County
Certificate filed in New York County
Commission Expires Oct. 31, 1988

F00118

ATTEST:

_John Lehrer_

Assistant Secretary

SEARS, ROEBUCK and CO.,
a New York corporation

By _Ronald B. Ruth_

National Manager
Real Estate Planning Group

WITNESS:

_Wylie D. Obrow_

_Laura C. Mangan_

R. E. DIRECTOR
LEGAL

STATE OF ILLINOIS )
                  ) ss
COUNTY OF ~~COOK~~ DuPage )

The foregoing instrument was acknowledged before me this 30th day of April, 1987, by Ronald B. Ruth and _____, the Nat'l Mgr. R/E Plan Grp and _____, respectively, of Sears, Roebuck and Co., a New York corporation, on behalf of said corporation.

_Debra S. Lohse_

Notary Public

My Commission Expires: _____

'OFFICIAL SEAL'
DEBRA S. LOHSE
Notary Public, State of Illinois
My Commission Expires July 13, 1989

CONSTRUCTION, OPERATION AND
RECIPROCAL EASEMENT AGREEMENT

THE GARDENS
PALM BEACH GARDENS, FLORIDA

F00119

FEDERATED DEPARTMENT STORES,
INC., a Delaware corporation

By _____
        Senior Vice President

By _____
        Secretary

STATE OF OHIO                )
                             ) SS
COUNTY OF HAMILTON           )

    The foreing instrument was acknowledged before me this 7th day
of April, 1982, by James B. Schonk, and Bois Auerbach
the Senior Vice President and Secretary, respectively,
of Federated Department Stores, Inc., a Delaware corporation, on behalf of
said corporation.

_____
Notary Public
My Commission Expires: _____

JOANN K. KERR
Notary Public, State of Ohio
My Commission Expires June 22, 1990

INSTRUMENT DRAFTED BY AND
WHEN RECORDED RETURN TO:

William J. Zousmer, Esq.
Honigman Miller Schwartz and Cohn
2290 First National Building
Detroit, Michigan  48226
(313) 256-7673

A0008/0007g

-81-

F00120

## CONSENT OF FEE OWNER

John E. Corbally, James M. Furman and Philip M. Grace (successor to David M. Murdock), not personally but solely as Trustees under Trust Agreement dated December 28, 1983, and known as the MacArthur Liquidating Trust (hereinafter referred to as the "Fee Owner"), as fee title owner of Shopping Center Parcel, on behalf of themselves, their successors and assigns, including any mortgagee of the Fee Owner, its successors and assigns, hereby consent to the foregoing Construction, Operation and Reciprocal Easement Agreement (hereinafter referred to as the "REA") and the Supplemental Agreements, as defined in the REA, to the extent the same relate to the REA and agree that their fee title interest in and to the Shopping Center Parcel shall be bound by and be subject to the REA in accordance with the terms, provisions, and conditions thereof and agree that their fee title interest in and to the Fee Owner's Southerly Parcels shall be bound by and subject to the terms, provisions and conditions of Article XIV of the REA.

This Consent of Fee Owner is being executed by John E. Corbally, James M. Furman and Philip M. Grace, not personally, but solely as Trustees under Trust Agreement dated December 28, 1983 and known as the MacArthur Liquidating Trust for the singular purpose of subjecting the fee simple interest of the Fee Owner in the Shopping Center Parcel to this REA. Under no circumstances whatsoever shall any claim or liability under this REA be asserted or enforced against the individual Trustees personally or the assets of the Fee Owner other than the Shopping Center Parcel, all such liability against the Trustees or the assets of the Fee Owner other than the Shopping Center Parcel being hereby expressly waived by each Party to the REA and anyone claiming by, through or under such Party.

IN WITNESS WHEREOF, the Fee Owner has executed this Consent this 29th day of May, 1987.

Witnesses:

FEE OWNER:

_____
John E. Corbally, not personally but
solely as a Trustee as aforesaid

_____
James M. Furman, not personally but
solely as a Trustee as aforesaid

_____
Philip M. Grace, not personally but
solely as a Trustee as aforesaid

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

The foregoing instrument was acknowledged before me this 29th day of May, 1987, by John E. Corbally, not personally but solely as Trustee under Trust Agreement dated December 28, 1983, and known as the MacArthur Liquidating Trust.

Given under my hand and notarial seal this 29th day of May, 1987.

_____
Notary Public of the State of Illinois

SEAL

My Commission Expires:

```
OFFICIAL SEAL
LAURA PAVLOWSKI
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. MAY 10, 1991
```

F00121

STATE OF ILLINOIS        )
                         ) SS
COUNTY OF COOK           )

The foregoing instrument was acknowledged before me this 29th day of May , 1987, by James H. Furman, not personally but solely as Trustee under Trust Agreement dated December 28, 1983, and known as the MacArthur Liquidating Trust.

Given under my hand and notarial seal this 29th day of May , 1987.

_Laura Pavlowski_
Notary Public of the State of _Illinois_

My Commission Expires:

> OFFICIAL SEAL
> LAURA PAVLOWSKI
> NOTARY PUBLIC STATE OF ILLINOIS
> MY COMMISSION EXP. MAY 10,1991

STATE OF ILLINOIS        )
                         ) SS
COUNTY OF COOK           )

The foregoing instrument was acknowledged before me this 29th day of May , 1987, by Philip M. Grace, not personally but solely as Trustee under Trust Agreement dated December 28, 1983, and known as the MacArthur Liquidating Trust.

Given under my hand and notarial seal this 29th day of May , 1987.

_Laura Pavlowski_
Notary Public of the State of _Illinois_

My Commission Expires:

> OFFICIAL SEAL
> LAURA PAVLOWSKI
> NOTARY PUBLIC STATE OF ILLINOIS
> MY COMMISSION EXP. MAY 10,1991

00009g

-2-

F00122

EXHIBIT "A", PART 1
SHOPPING CENTER PARCEL

A Parcel of land lying in the North 1/2 of Section 6, Township 42 South, Range 43 East, City of Palm Beach Gardens, Palm Beach County, Florida, more particularly described as follows:

Commence at the center of said Section 6, thence S. 88°45'08" E. along the South line of the Northeast one-quarter of said Section 6, a distance of 763.55 feet; thence N. 01°14'52" E. a distance of 70.00 feet to a point on the North right-of-way line of P.G.A. Boulevard as recorded in O.R.B. 4442, Pages 861 through 862 of the Public Records of said Palm Beach County and the POINT OF BEGINNING; thence S. 88°45'08" E. along said right-of-way line and through the following courses a distance of 167.97 feet; thence N. 01°14'52" E. a distance of 12.00 feet; thence S. 88°45'08" E. a distance of 162.07 feet; thence N. 43°40'03" W. departing from said right-of-way line a distance of 35.41 feet; thence N. 01°25'01" E. a distance of 167.93 feet; thence S. 88°34'59" E. a distance of 165.49 feet to a point of curvature of a curve concave Northwesterly, having a radius of 225.00 feet; thence Northeasterly along the arc of said curve through a central angle of 24°49'18" a distance of 97.47 feet to a point of tangency thence N. 66°35'43" E. a distance of 487.89 feet; thence S. 29°09'19" E. a distance of 57.23 feet to a point of curvature of a curve concave Northeasterly, having a radius of 150.00 feet; thence Southeasterly along the arc of said curve through a central angle of 37°12'25" a distance of 97.41 feet to a point of tangency; thence S. 66°21'44" E. a distance of 41.84 feet; thence S. 22°58'41" E. a distance of 48.08 feet to a point on a non-tangent curve concave Southeasterly having a radius of 585.87 feet, the chord of which bears N. 32°47'12" E.; thence Northeasterly along the arc of said curve through a central angle of 24°45'39" a distance of 253.19 feet to a point of tangency; thence N. 45°10'02" E. a distance of 20.00 feet; thence N. 46°09'35" E. a distance of 150.00 feet to a point on a non-tangent curve concave Northwesterly, having a radius of 470.87 feet; the chord of which bears N. 18°22'52" E.; thence Northeasterly along the arc of said curve through a central angle of 33°55'42" a distance of 278.83 feet to a point of tangency; thence N. 01°25'01" E. a distance of 368.61 feet to the point of curvature of a curve concave Southeasterly having a radius of 570.87 feet; thence Northeasterly along the arc of said curve through a central angle of 35°04'51" a distance of 349.53 feet to a point of tangency; thence N. 36°29'52" E. a distance of 20.34 feet; thence N. 08°30'08" N. a distance of 49.50 feet; thence N. 53°30'08" N. a distance of 625.68 feet to a point of curvature of a curve concave Southerly having a radius of 1100.92 feet; thence Westerly along the arc of said curve through a central angle of 46°55'16" a distance of 901.57 feet to the point of tangency; thence S. 79°34'36" N. a distance of 1355.52 feet; thence S. 34°04'49" N. a distance of 49.93 feet; thence S. 11°24'59" E. a distance of 175.38 feet to the point of curvature of a curve concave Westerly having a radius of 570.87 feet; thence Southerly along the arc of said curve through a central angle of 12°50'00" a distance of 127.87 feet to the point of tangency; thence S. 01°25'01" N. a distance of 574.96 feet to a point of curvature of a curve concave Northeasterly having a radius of 470.87 feet; thence Southeasterly along the arc of said curve through a central angle of 31°44'44" a distance of 260.89 feet to the point of tangency; thence S. 30°19'43" E. a distance of 420.42 feet to a point of curvature of a curve concave Southwesterly having a radius of 570.87 feet; thence Southeasterly along the arc of said curve through a central angle of 10°29'34" a distance of 104.54 feet; thence N. 70°09'49" E. a distance of 10.00 feet; thence N. 19°33'44" E. a distance of 44.43 feet to a point on a non-tangent curve concave Northwesterly, having a radius of 325.00 feet, the chord bears N. 44°17'59" E. thence Northeasterly along the arc of said curve through a central angle of 29°19'21" a distance of 166.33 feet to the point of tangency; thence N. 29°38'19" E. a distance of 43.82 feet; thence S. 60°31'58" E. a distance of 436.75 feet to the point of curvature of a curve concave Northeasterly having a radius of 500.00 feet; thence Southeasterly along the arc of said curve through a central angle of 25°19'59" a distance of 221.07 feet; thence S. 01°25'01" a distance of 181.46 feet; thence S. 46°19'57" N. a distance of 35.30 feet to the POINT OF BEGINNING.

Containing 100.367 Acres, more or less.

F00123

EXHIBIT "A", PART 2
MACY PARCEL

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45'08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1°14'52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88°45'08" East along said North line a distance of 167.97 feet; thence North 1°14'52" East along said North line a distance of 12.00 feet to the POINT OF BEGINNING; thence continue North 1°14'52" East a distance of 257.39 feet; thence North 88°45'08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28°13'10"; thence North 60°31'58" West a distance of 29.24 feet; thence North 29°28'02" East a distance of 244.00 feet; thence North 40°31'58" West a distance of 29.80 feet; thence North 29°28'02" East a distance of 9.60 feet; thence North 80°31'58" West a distance of 29.80 feet; thence North 29°28'02" East a distance of 389.36 feet to a point on a non tangent curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 4°53'25" West; thence Easterly a distance of 30.98 feet along said curve through a central angle of 22°54'12"; thence North 27°47'36" East a distance of 74.26 feet; thence North 74°14'52" East a distance of 52.47 feet; thence North 1°14'52" East a distance of 54.38 feet; thence South 88°45'08" East a distance of 225.00 feet; thence South 1°14'52" West a distance of 85.40 feet; thence South 71°45'08" East a distance of 126.22 feet; thence South 25°32'54" East a distance of 24.10 feet to a point on a curve concave Southeasterly, having a radius of 77.50 feet, a radial to said point bears North 25°32'54" West; thence Easterly a distance of 59.24 feet along said curve through a central angle of 43°47'46"; thence South 71°45'07" East a distance of 25.82 feet; thence South 23°24'17" East a distance of 618.23 feet; thence South 66°35'43" West a distance of 189.53 feet to the beginning of a curve concave Northerly, having a radius of 750.00 feet; thence Westerly a distance of 322.70 feet along said curve through a central angle of 24°39'09"; thence North 88°45'08" West a distance of 44.82 feet; thence North 89°53'54" West a distance of 50.00 feet; thence North 88°45'08" West a distance of 10.00 feet to the beginning of a curve concave Southeasterly, having a radius of 45.00 feet; thence Westerly a distance of 70.69 feet along said curve through a central angle of 90°00'00" to its point of tangency with a line parallel with and Easterly 40.00 feet from that certain course described above as North 1°14'52" East a distance of 257.39 feet; thence South 1°14'52" West along said parallel line a distance of 126.39 feet to the beginning of a curve concave Northeasterly, having a radius of 50.00 feet; thence Southerly a distance of 41.65 feet along said curve through a central angle of 47°43'53" to a line bearing South 88°45'08" East from the POINT OF BEGINNING; thence North 88°45'08" West a distance of 56.37 feet to the POINT OF BEGINNING. Containing an area of 14.150 acres, more or less.

A0167g

F00124

EXHIBIT "A", PART 3
SEARS PARCEL

That portion of the North half of Section 6, Township 42 South, Range 43
East in the City of Palm Beach Gardens, Palm Beach County, Florida,
described as follows:

Commencing at the center of said Section; thence South 88°45'08" East
along the South line of the Northeast Quarter of said Section, a distance of
763.55 feet; thence North 1°14'52" East a distance of 70.00 feet to the
North line of P.G.A. Boulevard as described in the deed recorded in Official
Record Book 4442, Pages 856 through 874 of the Public Records of said Palm
Beach County; thence South 88°45'08" East along said North line a distance
of 167.97 feet; thence North 1°14'52" East along said North line a distance
of 12.00 feet; thence South 88°45'08" East along said North line a distance
of 162.07 feet; thence North 43°40'03" West a distance of 35.41 feet; thence
North 1°25'01" East a distance of 167.93 feet; thence South 88°34'59" East a
distance of 165.49 feet to the beginning of a curve concave Northerly,
having a radius of 225.00 feet; thence Easterly a distance of 97.47 feet
along said curve through a central angle of 24°49'18"; thence North
66°35'43" East a distance of 487.89 feet; thence South 29°09'19" East a
distance of 57.23 feet to the beginning of a curve concave Northeasterly
having a radius of 150.00 feet; thence Southeasterly a distance of 97.41
feet along said curve through a central angle of 37°12'25"; thence South
66°21'44" East a distance of 41.84 feet; thence South 22°58'41" East a
distance of 48.08 feet to a point on a non tangent curve concave
Southeasterly, having a radius of 585.87 feet, a radial to said point bears
North 69°35'38" West; thence Northeasterly a distance of 99.69 feet along
said curve through a central angle of 9°44'57" to the POINT OF BEGINNING;
thence North 66°21'44" West a distance of 79.64 feet to the beginning of a
curve concave Northeasterly, having a radius of 83.50 feet; thence
Northwesterly a distance of 62.60 feet through a central angle of 42°57'27";
thence North 23°24'17" West a distance of 104.92 feet; thence North
66°35'43" East a distance of 40.86 feet; thence North 23°24'17" West a
distance of 51.50 feet; thence South 66°35'43" West a distance of 8.20 feet;
thence North 23°24'17" West a distance of 276.41 feet to a point on a non
tangent curve concave Northeasterly having a radius of 580.50 feet, a radial
to said point bears South 30°11'30" West; thence Northwesterly a distance of
45.44 feet along said curve through a central angle of 4°29'07"; thence
North 55°19'23" West a distance of 24.15 feet; thence North 71°45'08" West
a distance of 74.95 feet; thence North 88°10'54" West a distance of 43.85
feet to the beginning of a curve concave Northeasterly having a radius of
259.50 feet; thence Northwesterly a distance of 39.37 feet along said curve
through a central angle of 8°41'32"; thence North 18°14'52" East a distance
of 346.14 feet; thence South 71°45'08" East a distance of 35.00 feet; thence
North 18°14'52" East a distance of 97.66 feet; thence South 72°26'25" East a
distance of 187.97 feet; thence North 56°14'52" East a distance of 235.08
feet; thence North 13°45'08" West a distance of 29.80 feet; thence North
56°14'52" East a distance of 17.96 feet; thence North 53°45'08" West a
distance of 29.80 feet; thence North 56°14'52" East a distance of 157.60
feet to a point on a non tangent curve concave Westerly having a radius of
532.00 feet, a radial to said point bears North 61°41'19" East; thence
Southerly a distance of 276.03 feet along said curve through a central angle
of 29°43'42"; thence South 1°25'01" West a distance of 329.36 feet; thence
South 88°34'59" East a distance of 48.00 feet; thence South 1°25'01" West a
distance of 49.46 feet to the beginning of a curve concave Northwesterly,
having a radius of 350.00 feet; thence Southwesterly a distance of 398.15
feet along said curve through a central angle of 65°10'42" thence South
66°35'53" West a distance of 93.63 feet; thence South 65°26'57" West a
distance of 50.00 feet; thence South 66°35'43" West a distance of 36.00 feet
to the beginning of a curve concave Southeasterly having a radius of 30.00
feet; thence Southwesterly a distance of 47.12 feet along said curve through
a central angle of 90°00'00" to its point of tangency with a line parallel
with and Northeasterly a distance of 31.50 feet from that certain course
described above as North 23°24'17" West a distance of 104.92 feet; thence

South 23°24'17" East along said parallel line a distance of 25.92 feet to the beginning of curve concave Northeasterly, having a radius of 52.00 feet, said curve being concentric with a Northeasterly 31.50 feet from that certain curve described above as having a radius of 83.50 feet and a central angle of 42°57'27"; thence Southeasterly a distance of 38.99 feet along said concentric curve through a central angle of 42°57'27"; thence South 66°21'44" East a distance of 56.52 feet to the beginning of a curve concave Northerly, having a radius of 45.00 feet; thence Easterly a distance of 32.28 feet along said curve through a central angle of 41°05'54" to a non tangent intersection with the Northeasterly prolongation of that certain curve described above as being concave Southeasterly, having a radius of 585.87 feet, a radial of said 585.87 foot radius curve to said point bears North 55°37'52" West; thence Southwesterly a distance of 43.09 feet along said curve through a central angle of 4°12'49" to the POINT OF BEGINNING. Containing an area of 10.606 Acres, more or less.

A0168g

F00126

EXHIBIT "A", PART 4
BURDINES PARCEL

That portion of the North Half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45'08" East along the South line of the Northeast Quarter of said Section a distance of 763.55 feet; thence North 1°14'52" East a distance of 70.00 feet; thence North 46°19'57" East a distance of 35.30 feet; thence North 1°25'01" East a distance of 181.46 feet to a point on a non tangent curve concave Northerly, having a radius of 500.00 feet, a radial to said point bears South 4°08'03" West; thence Northwesterly a distance of 221.07 feet along said curve through a central angle of 25°19'59"; thence North 60°31'58" West a distance of 436.75 feet; thence South 29°38'18" West a distance of 43.82 feet to the beginning of a curve concave Northwesterly, having a radius of 325.00 feet; thence Southwesterly a distance of 166.33 feet along said curve through a central angle of 29°19'21"; thence South 19°33'44" West a distance of 44.43 feet; thence South 70°09'49" West a distance of 10.00 feet to a point on a curve concave Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70°09'49" East; thence Northwesterly a distance of 73.44 feet along said curve through a central angle of 7°22'15" to the POINT OF BEGINNING; thence continuing Northwesterly a distance of 31.10 feet along said curve through a central angle of 3°07'19"; thence North 30°19'43" West a distance of 18.90 feet to a point on a non tangent curve concave Northerly, having a radius of 45.00 feet, a radial to said point bears South 22°48'04" West; thence Northeasterly a distance of 43.01 feet along said curve through a central angle of 54°45'53" to a compound curve concave Northwesterly having a radius of 247.00 feet; thence Northeasterly a distance of 122.42 feet along said curve through a central angle of 28°23'53"; thence North 29°38'18" East a distance of 16.50 feet to the beginning of a curve concave Westerly, having a radius of 30.00 feet; thence Northerly a distance of 47.21 feet along said curve through a central angle of 90°10'16"; thence North 60°31'58" West a distance of 98.59 feet; thence North 51°19'33" West a distance of 75.00 feet to a point on a curve concave Northeasterly, having a radius of 450.00 feet, a radial to said point bears South 29°28'02" West; thence Northwesterly a distance of 486.55 feet along said curve through a central angle of 61°56'59"; thence North 1°25'01" East a distance of 260.89 feet; thence South 88°34'59" East a distance of 48.00 feet; thence North 1°25'01" East a distance of 144.65 feet to the beginning of a curve concave Southeasterly, having a radius of 332.00 feet; thence Northerly a distance of 216.56 feet along said curve through a central angle of 37°22'26"; thence South 63°29'53" East a distance of 402.67 feet; thence South 6°30'07" West a distance of 29.80 feet; thence North 63°29'53" West a distance of 7.28 feet; thence South 46°30'07" West a distance of 29.80 feet; thence South 63°29'53" East a distance of 234.67 feet to a point on a non tangent curve concave Southeasterly, having a radius of 1251.62 feet, a radial to said point bears North 12°22'18" West; thence Easterly a distance of 46.33 feet along said curve through a central angle of 2°07'16"; thence South 15°45'08" East a distance of 467.43 feet; thence South 29°28'02" West a distance of 458.45 feet; thence North 60°31'58" West a distance of 184.50 feet to the Northeasterly prolongation of a line parallel with and Southeasterly 31.50 feet from that certain course described above as North 29°38'18" East a distance of 16.50 feet; thence South 29°38'18" West along said prolongation and said parallel line a distance of 106.68 feet to the beginning of a curve concave Northwesterly, having a radius of 278.50 feet, said curve being concentric with and Southeasterly 31.50 feet from that certain curve described above as having a radius of 247.00 feet and a length of 122.42 feet; thence Southwesterly a distance of 142.53 feet along said concentric curve through a central angle of 29°19'20"; thence South 58°57'39" West a distance of 34.54 feet to the POINT OF BEGINNING. Containing an area of 15.221 acres, more or less.

A0169g

EXHIBIT "A", PART 5
DEVELOPER PARCEL

That portion of the North half of Section 6, Township 42 South, Range 43
East in the City of Palm Beach Gardens, Palm Beach County, Florida,
described as follows:

Commence at the center of said Section 6, thence South 88°45'08" East
along the South line of the Northeast one-quarter of said Section 6, a
distance of 763.55 feet; thence North 01°14'52" East a distance of 70.00
feet to a point on the North right-of-way line of P.G.A. Boulevard as
recorded in O.R.B. 4442, Pages 856 through 874 of the Public Records of
said Palm Beach County and the POINT OF BEGINNING; thence South 88°45'08"
East along said right-of-way line and through the following courses a
distance of 167.94 feet; thence North 01°14'52" East a distance of 12.00
feet; thence South 88°45'08" East a distance of 162.07 feet; thence North
43°40'03" West departing from said right-of-way line a distance of 35.41
feet; thence North 01°25'01" East a distance of 167.93 feet; thence South
88°34'59" East a distance of 165.49 feet to a point of curvature of a curve
concave Northwesterly, having a radius of 225.00 feet; thence Northeasterly
along the arc of said curve through a central angle of 24°49'18" a distance
of 97.47 feet to a point of tangency thence North 66°35'43" East a distance
of 487.89 feet; thence South 29°09'19" East a distance of 57.23 feet to a
point of curvature of a curve concave Northeasterly, having a radius of
150.00 feet; thence Southeasterly along the arc of said curve through a
central angle of 37°12'25" a distance of 97.41 feet to a point of tangency;
thence South 66°21'44" East a distance of 41.84 feet; thence South 22°58'41"
East a distance of 48.08 feet to a point on a non-tangent curve concave
Southeasterly having a radius of 585.87 feet, the chord of which bears North
32°47'12" East; thence Northeasterly along the arc of said curve through a
central angle of 24°45'39" a distance of 253.19 feet to a point of tangency;
thence North 45°10'02" East a distance of 20.00 feet; thence North 46°09'35"
East a distance of 150.00 feet to a point on a non-tangent curve concave
Northwesterly, having a radius of 470.87 feet; the chord of which bears
North 18°22'52" East; thence Northeasterly along the arc of said curve
through a central angle of 33°55'42" a distance of 278.83 feet to a point of
tangency; thence North 01°25'01" East a distance of 368.61 feet to the point
of curvature of a curve concave Southeasterly having a radius of 570.87
feet; thence Northeasterly along the arc of said curve through a central
angle of 35°04'51" a distance of 349.53 feet to a point of tangency; thence
North 36°29'52" East a distance of 20.34 feet; thence North 08°30'08" West a
distance of 49.50 feet; thence North 53°30'08" West a distance of 625.68
feet to a point of curvature of a curve concave Southerly having a radius of
1100.92 feet; thence Westerly along the arc of said curve through a central
angle of 46°55'16" a distance of 901.57 feet to the point of tangency;
thence South 79°34'36" West a distance of 1355.52 feet; thence South
34°04'49" West a distance of 49.93 feet; thence South 11°24'59" East a
distance of 175.38 feet to the point of curvature of a curve concave
Westerly having a radius of 570.87 feet; thence Southerly along the arc of
said curve through a central angle of 12°50'00" a distance of 127.87 feet to
the point of tangency; thence South 01°25'01" West a distance of 574.96 feet
to a point of curvature of a curve concave Northeasterly having a radius of
470.87 feet; thence Southeasterly along the arc of said curve through a
central angle of 31°44'44" a distance of 260.89 feet to the point of
tangency; thence South 30°19'43" East a distance of 420.42 feet to a point
of curvature of a curve concave Southwesterly having a radius of 570.87
feet; thence Southeasterly along the arc of said curve through a central
angle of 10°29'34" a distance of 104.54 feet; thence North 70°09'49" East a
distance of 10.00 feet; thence North 19°33'44" East a distance of 44.43 feet
to a point on a non-tangent curve concave Northwesterly, having a radius of
325.00 feet, the chord bears North 44°17'59" East thence Northeasterly along
the arc of said curve through a central angle of 29°19'21" a distance of
166.33 feet to the point of tangency; thence North 29°38'18" East a distance
of 43.82 feet; thence South 60°31'58" East a distance of 436.75 feet to the
point of curvature of a curve concave Northeasterly having a radius of

500.00 feet; thence  Southeasterly along the arc of said curve through a central angle of 25°19'59" a distance of 221.07 feet; thence South 01°25'01" West a distance of 181.46 feet; thence South 46°19'57" West a distance of 35.30 feet to the POINT OF BEGINNING.  Except that portion thereof described as follows:

Commencing at the Southeasterly terminus of that certain curve described above as being concave Southwesterly, having a radius of 570.87 feet and a central angle of 10°29'34"; thence Northwesterly a distance of 73.44 feet along said curve through a central angle of 7°22'15" to the POINT OF BEGINNING; thence continuing Northwesterly a distance of 31.10 feet along said curve through a central angle of 3°07'19"; thence North 30°19'43" West a distance of 18.90 feet to a point on a non tangent curve concave Northerly, having a radius of 45.00 feet, a radial to said point bears South 22°48'04" West; thence Northeasterly a distance of 43.01 feet along said curve through a central angle of 54°45'53" to a compound curve concave Northwesterly having a radius of 247.00 feet; thence Northeasterly a distance of 122.42 feet along said curve through a central angle of 28°23'53"; thence North 29°38'18" East a distance of 16.50 feet to the beginning of a curve concave Westerly, having a radius of 30.00 feet; thence Northerly a distance of 47.21 feet along said curve through a central angle of 90°10'16"; thence North 60°31'58" West a distance of 98.59 feet; thence North 51°19'33" West a distance of 75.00 feet to a point on a curve concave Northeasterly having a radius of 450.00 feet, a radial to said point bears South 29°28'02" West; thence Northwesterly a distance of 486.55 feet along said curve through a central angle of 61°56'59"; thence North 1°25'01" East a distance of 260.89 feet; thence South 88°34'59" East a distance of 48.00 feet; thence North 1°25'01" East a distance of 144.65 feet to the beginning of a curve concave Southeasterly, having a radius of 332.00 feet; thence Northerly a distance of 216.56 feet along said curve through a central angle of 37°22'26"; thence South 63°29'53" East a distance of 402.67 feet; thence South 6°30'07" West a distance of 29.80 feet; thence North 63°29'53" West a distance of 7.28 feet; thence South 46°30'07" West a distance of 29.80 feet; thence South 63°29'53" East a distance of 234.67 feet to a point on a non tangent curve concave Southeasterly, having a radius of 1251.62 feet, a radial to said point bears North 12°22'18" West; thence Easterly a distance of 46.33 feet along said curve through a central angle of 2°07'16"; thence South 15°45'08" East a distance of 467.43 feet; thence South 29°28'02" West a distance of 458.45 feet; thence North 60°31'58" West a distance of 184.50 feet to the Northeasterly prolongation of a line parallel with and Southeasterly 31.50 feet from that certain course described above as North 29°38'18" East a distance of 16.50 feet; thence South 29°38'18" West along said prolongation and said parallel line a distance of 106.68 feet to the beginning of a curve concave Northwesterly, having a radius of 278.50 feet, said curve being concentric with and Southeasterly 31.50 feet from that certain curve described above as having a radius of 247.00 feet and a length of 122.42 feet; thence Southwesterly a distance of 142.53 feet along said concentric curve through a central angle of 29°19'20"; thence South 58°57'39" West a distance of 34.54 feet to the POINT OF BEGINNING.

Also except that portion thereof described as follows:

Beginning at the Northerly terminus of that certain course described above as North 1°14'52" East a distance of 12.00 feet; thence continue North 1°14'52" East a distance of 257.39 feet; thence North 88°45'08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28°13'10"; thence North 60°31'58" West a distance of 29.24 feet; thence North 29°28'02" East a distance of 244.00 feet; thence North 40°31'58" West a distance of 29.80 feet; thence North 29°28'02" East a distance of 9.60 feet; thence North 80°31'58" West a distance of 29.80 feet; thence North 29°28'02" East a distance of 389.36 feet to a point on a non tangent curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 4°53'25" West; thence Easterly a distance of 30.98 feet along said curve through a central angle

F00129

of 22°54'12"; thence North 27°47'36" East a distance of 74.26 feet; thence
North 74°14'52" East a distance of 52.47 feet; thence North 1°14'52" East a
distance of 54.38 feet; thence South 88°45'08" East a distance of 225.00
feet; thence South 1°14'52" West a distance of 85.40 feet; thence South
71°45'08" East a distance of 126.22 feet; thence South 25°32'54" East a
distance of 24.10 feet to a point on a curve concave Southeasterly, having a
radius of 77.50 feet, a radial to said point bears North 25°32'54" West;
thence Easterly a distance of 59.24 feet along said curve through a central
angle of 43°47'46"; thence South 71°45'07" East a distance of 25.82 feet;
thence South 23°24'17" East a distance of 618.23 feet; thence South
66°35'43" West a distance of 189.53 feet to the beginning of a curve concave
Northerly, having a radius of 750.00 feet; thence Westerly a distance of
322.70 feet along said curve through a central angle of 24°39'09"; thence
North 88°45'08" West a distance of 44.82 feet; thence North 89°53'54" West a
distance of 50.00 feet; thence North 88°45'08" West a distance of 10.00 feet
to the beginning of a curve concave Southeasterly, having a radius of 45.00
feet; thence Westerly a distance of 70.69 feet along said curve through a
central angle of 90°00'00" to its point of tangency with a line parallel
with a Easterly 40.00 feet from that certain course described above as North
1°14'52" East a distance of 257.39 feet; thence South 1°14'52" West along
said parallel line a distance of 126.39 feet to the beginning of a curve
concave Northeasterly, having a radius of 50.00 feet; thence Southerly a
distance of 41.65 feet along said curve through a central angle of 47°43'53"
to a line bearing South 88°45'08" East from the POINT OF BEGINNING; thence
North 88°45'08" West a distance of 56.37 feet to the POINT OF BEGINNING.

   Also except that portion thereof described as follows:

   Commencing at the Southwesterly terminus of that certain curve described
above as being concave Southeasterly, having a radius of 585.87 feet and a
central angle of 24°45'39"; thence Northeasterly a distance of 99.69 feet
along said curve through a central angle of 9°44'57" to the POINT OF
BEGINNING; thence North 66°21'44" West a distance of 79.64 feet to the
beginning of a curve concave Northeasterly, having a radius of 83.50 feet;
thence Northwesterly a distance of 62.60 feet through a central angle of
42°57'27"; thence North 23°24'17" West a distance of 104.92 feet; thence
North 66°35'43" East a distance of 40.86 feet; thence North 23°24'17" West a
distance of 51.50 feet; thence South 66°35'43" West a distance of 8.20 feet;
thence North 23°24'17" West a distance of 276.41 feet to a point on a non
tangent curve concave Northeasterly having a radius of 580.50 feet, a radial
to said point bears South 30°11'30" West; thence Northwesterly a distance of
45.44 feet along said curve through a central angle of 4°29'07"; thence
North 55°19'23" West a distance of 24.15 feet; thence North 71°45'08" West a
distance of 74.95 feet; thence North 88°10'54" West a distance of 43.85 feet
to the beginning of a curve concave Northeasterly having a radius of 259.50
feet; thence Northwesterly a distance of 39.37 feet along said curve through
a central angle of 8°41'32"; thence North 18°14'52" East a distance of
346.14 feet; thence South 71°45'08" East a distance of 35.00 feet; thence
North 18°14'52" East a distance of 97.66 feet; thence South 72°26'25" East a
distance of 187.97 feet; thence South 56°14'52" East a distance of 235.08
feet; thence North 13°45'08" West a distance of 29.80 feet; thence North
56°14'52" East a distance of 17.96 feet; thence North 53°45'08" West a
distance of 29.80 feet; thence North 56°14'52" East a distance of 157.60
feet to a point on a non tangent curve concave Westerly having a radius of
532.00 feet, a radial to said point bears North 61°41'19" East; thence
Southerly a distance of 276.03 feet along said curve through a central angle
of 29°43'42"; thence South 1°25'01" West a distance of 329.36 feet; thence
South 88°34'59" East a distance of 48.00 feet; thence South 1°25'01" West a
distance of 49.46 feet to the beginning of a curve concave Northwesterly,
having a radius of 350.00 feet; thence Southwesterly a distance of 398.15
feet along said curve through a central angle of 65°10'42"; thence South
66°35'43" West a distance of 93.63 feet; thence South 65°26'57" West a
distance of 50.00 feet; thence South 66°35'43" West a distance of 36.00 feet
to the beginning of a curve concave Southeasterly, having a radius of 30.00
feet; thence Southwesterly a distance of 47.12 feet along said curve through

-3-

F00130

a central angle of 90°00'00" to its point of tangency with a line parallel
with and Northeasterly a distance of 31.50 feet from that certain course
described above as North 23°24'17" West a distance of 104.92 feet; thence
South 23°24'17" East along said parallel line a distance of 25.92 feet to
the beginning of a curve concave Northeasterly, having a radius of 52.00
feet, said curve being concentric with and Northeasterly 31.50 feet from
that certain curve described above as having a radius of 83.50 feet and a
central angle of 42°57'27"; thence Southeasterly a distance of 38.99 feet
along said concentric curve through a central angle of 42°57'27"; thence
South 66°21'44" East a distance of 56.52 feet to the beginning of a curve
concave Northerly, having a radius of 45.00 feet; thence Easterly a distance
of 32.28 feet along said curve through a central angle of 41°05'54" to a non
tangent intersection with the Northeasterly prolongation of that certain
curve described above as being concave Southeasterly, having a radius of
585.87 feet, a radial of said 585.87 foot radius curve to said point bears
North 55°37'52" West; thence Southwesterly a distance of 43.09 feet along
said curve through a central angle of 4°12'49" to the POINT OF BEGINNING.
Containing an area of 60.390 acres, more or less.

A0166g

F00131

EXHIBIT "A", PART 6
FEE OWNER'S PARCEL

A portion of Sections 5 and 6, Township 42 South, Range 43 East, of the public records of Palm Beach County, Florida, being more particularly described as follows:

Beginning at the Northwest (NW) corner of said Section 5, thence South 89°16'50" East, along the North line of said Section 5, a distance of 1932.73 feet; thence South 00°47'03" West, a distance of 295.16 feet; thence South 89°16'50" East, a distance of 295.16 feet; thence North 00°47'03" East, a distance of 295.16 feet, the last three courses being coincident with those lands as described in O.R.B. 2307, Page 1868, of the Public Records of Palm Beach County, Florida; thence South 89°16'50" East, along the North line of said Section 5, a distance of 400.00 feet to the North one-quarter corner (N1/4) of said Section 5; thence South 89°16'35" East, along the North line of the Northeast one-quarter (NE1/4) of said Section 5, a distance of 55.00 feet; thence South 01°05'31" West, along the Westerly R/W line of Prosperity Farms Road, as shown on that Map prepared by the Palm Beach County Engineering Department, No. 3-70-001 R/W, a distance of 660.01 feet; thence continue South 01°05'31" West, along the said Westerly R/W Line, a distance of 979.81 feet, thence North 88°15'18" West, along the Westerly extension of the North R/W Line, of that County road known as Idlewild Road, a distance of 46.20 feet, thence South 00°47'03" West, along the East line of the Northwest one-quarter (NW1/4) of said Section 5, a distance of 12.61 feet; thence North 89°16'50" West, a distance of 1323.04 feet; thence North 01°05'58" East, a distance of 10.54 feet, the last five (5) courses being coincident with those lands as described in O.R.B. 1637, Page 695, of the Public Records of Palm Beach County, Florida; thence North 88°53'53" West, a distance of 1322.96 feet, to a point on the West line of said Section 5; thence South 01°25'01" West, along the West line of said Section 5, a distance of 656.01 feet; thence South 88°53'53" East, a distance of 1326.60 feet, the last three courses are coincident with those lands as described in O.R.B. 2900, Page 77, and O.R.B. 3317, Page 451, of the Public Records, of Palm Beach County, Florida; thence South 01°05'58" West, a distance of 595.78 feet; thence North 88°51'28" West, along a line sixty (60) feet North of and parallel with the South Line of the Northwest one-quarter (NW1/4) of Section 5, a distance of 1329.89 feet, to a point on the West Line of said Section 5, thence North 88°45'08" West, along a line sixty (60) feet North of and parallel with the South Line of the North one-half (N1/2) of said Section 6, a distance of 2744.17 feet to the point of curvature of a circular curve, concave Southerly; thence Westerly, along the arc of said curve, having a radius of 2924.79 feet, a central angle of 15°18'09", and an arc distance of 781.15 feet to the point of tangency; thence South 75°56'43" West, a distance of 1233.86 feet, the last four courses being coincident with the North R/W Line of P.G.A. Boulevard, as described in O.R.B. 2353, Page 1529, and O.R.B. 2772, Page 1782, of the Public Records of Palm Beach County, Florida; thence North 14°05'09" West, a distance of 1233.26 feet to the point of curvature of a circular curve, concave Easterly; thence Northerly along the arc of said curve, having a radius of 2654.93 feet, a central angle of 15°25'02", and an arc distance of 714.38 feet to the point of tangency; thence North 01°19'52" East, a distance of 1074.57 feet, the last three courses being coincident with that R/W for Alt. A-1-A, as described in Documents 93090-2521, Parcel 100.1R, as executed on June 24th, 1981; thence South 88°44'48" East, a distance of 503.33 feet; thence North 01°34'00" East, a distance of 303.00 feet; thence North 88°44'48" West, a distance of 530.52 feet, the last three courses being coincident with those lands as described in O.R.B. 1310, Page 42, of the Public Records, of Palm Beach County, Florida; thence North 01°15'12" East, a distance of 0.10 feet; thence North 44°42'22" East, a distance of 48.08 feet; thence South 88°44'48" East, a distance of 10.00 feet; thence North 01°15'12" East, a distance of 5.00 feet; the last four courses are coincident with the said Easterly R/W Line of Alt. A-1-A; thence South 88°44'48" East, along the North line of said Section 6, a distance of

2462.99 feet, to the North one-quarter (N1/4) corner of said Section 6;
thence South 88°45'01" East, along the North Line of the Northeast
one-quarter (NE1/4) of said Section 6, a distance of 2653.21 feet to the
POINT OF BEGINNING.

Said lands situate, lying and being in Palm Beach County, Florida.
Containing 458.185 acres, more of less.

A0164g

-2-

F00133

EXHIBIT "A", PART 7
FEE OWNER'S SOUTHERLY PARCELS

PARCEL "A":

A Parcel of land lying in the North 1/2 of Section 6, Township 42 South, Range 43 East, City of Palm Beach Gardens, Palm Beach County, Florida, more particularly described as follows:

Commence at the center of said Section 6, thence S. 88°45'08" E. along the South line of the Northeast one-quarter of said Section 6, a distance of 763.55 feet; thence N. 01°14'52" E. a distance of 70.00 feet to a point on the North right-of-way line of P.G.A. Boulevard as recorded in Official Record Book 4442, Pages 861 thru 862 of the Public Records of Palm Beach County, Florida and the POINT OF BEGINNING; thence N. 88°45'08" W. a distance of 297.91 feet; thence N. 84°49'46" W. a distance of 175.41 feet; thence N. 88°45'08" W. a distance of 165.89 feet; thence N. 43°40'03" W. a distance of 56.65 feet; thence N. 01°25'01" E. a distance of 7.96 feet to a point of curvature of a curve concave Southwesterly having a radius of 580.87 feet, the chord of which bears N. 09°12'34" W.; thence Northwesterly along the arc of said curve through a central angle of 21°15'11" a distance of 215.47 feet to a non-tangent line; thence N. 19°33'44" E. a distance of 44.43 feet to the beginning of a non-tangent curve concave to the Northwest having a radius of 325.00 feet, the chord of which bears N. 44°17'59" E.; thence Northeasterly along the arc of said curve through a central angle of 29°19'21" a distance of 166.33 feet to the point of tangency; thence N. 29°38'19" E. a distance of 43.82 feet; thence S. 60°31'58" E. a distance of 436.75 feet to the point of curvature of a curve concave Northeasterly having a radius of 500.00 feet, the chord of which bears S. 73°11'56" E.; thence Southeasterly along the arc of said curve through a central angle of 25°19'59" a distance of 221.07 feet; thence S. 01°25'01" W. a distance of 181.46 feet; thence S. 46°19'57" W. a distance of 35.30 feet to the POINT OF BEGINNING.

Containing 5.314 Acres, more or less.

PARCEL "B":

A Parcel of land lying in the North 1/2 of Section 6, Township 46 South, Range 43 East, City of Palm Beach Gardens, Palm Beach County, Florida, more particularly described as follows:

Commence at the center of said Section 6, thence S. 88°45'08" E. along the South line of the Northeast one-quarter of said Section 6, a distance of 1093.58 feet; thence N. 01°14'52" E. a distance of 82.00 feet to a point on the North right-of-way line of P.G.A. Boulevard as recorded in Official Record Book 4442, Pages 861 and 862 of the Public Records of said Palm Beach County, Florida and the POINT OF BEGINNING; thence N. 43°40'03" W. a distance of 35.41 feet; thence N. 01°25'01" E. a distance of 167.93 feet; thence S. 88°34'59" E. a distance of 165.49 feet to a point of curvature of a curve concave Northwesterly having a radius of 225.00 feet; thence Northeasterly along the arc of said curve through a central angle of 24°49'18" a distance of 97.47 feet; thence N. 66°35'43" E. a distance of 487.89 feet; thence S. 29°09'19" E. a distance of 57.23 feet to a point of curvature of a curve concave to the Northeast having a radius of 150.00 feet; thence Southeasterly along the arc of said curve through a central angle of 37°12'25" a distance of 97.41 feet; thence S. 66°21'44" E. a distance of 41.84 feet; thence S. 22°58'41" E. a distance of 48.08 feet to the beginning of a non-tangent curve concaved to the Southeast having a radius of 585.87 feet the chord of which bears S. 10°51'42" W.; thence Southwesterly along the arc of said curve through a central angle of 18°59'21" a distance of 194.17 feet; thence S. 01°25'01" W. a distance of 26.17 feet to a point in the North right-of-way line of aforesaid P.G.A. Boulevard; thence S. 46°19'57" W. a distance of 56.48 feet; thence N. 88°

45'08" W. a distance of 589.08 feet; thence N. 84°49'46" W. a distance of
175.41 feet; thence N. 88°45'08" W. a distance of 1.93 feet to the POINT OF
BEGINNING.

Containing 5.597 Acres, more or less.

A0158g

-2-

F00135

EXHIBIT "D"
RULES, REGULATIONS AND MAINTENANCE STANDARDS

Each Party, during the period it is obligated to maintain its Parcel or the Parcel of another Party in accordance with the terms of this REA, shall observe and use its best efforts to cause its respective Permittees to observe the Rules, Regulations and Maintenance Standards of each relevant section of this Exhibit "D" as may from time to time be amended or modified as respects the Parcel(s) it is obligated to maintain.

A.   COMMON AREA

1.   Inspect, maintain, repair and replace the surface of the Parking Areas, curbs and sidewalks, keeping them level, smooth and evenly covered with the type of surface material originally installed thereon or such substitute therefor as shall be, in all respects, equal in quality, appearance and durability and inspect, maintain, repair and replace the structural, mechanical and electrical portions of any multi-level parking decks.

2.   Maintain, replace and repair such appropriate Parking Area entrance, exit and directional signs; markers; and lights to keep same in good, clean and legible condition, as well as repair and replace striping as required.

3.   Clean Parking Area lighting fixtures and relamp, repair and replace fixtures and standards as needed.

4.   Maintain, repair and replace landscaping in the Common Areas as necessary to keep the same in a first-class and thriving condition.

5.   Clean any signs within the Common Area, including relamping and repairs being made as required.

6.   Furnish pest abatement controls, as necessary.

7.   Clean, repair, maintain and replace all Common Utility Facilities, to the extent that the same are not cleaned, repaired, maintained or replaced by public utilities.

8.   Provide traffic control, if necessary, and security patrol.

9.   All papers, debris, filth and refuse shall be removed from the Center; and paved areas shall be thoroughly swept as required. All sweeping shall be done before the Buildings of the Majors shall be open for business with the public, using proper motor-driven cleaning vehicles in the Parking Areas where feasible.

10.   All trash and rubbish containers located in the Common Area for the use of Permittees shall be emptied at least daily and shall be washed at intervals sufficient to maintain the same in a clean and sanitary condition, and shall be otherwise maintained and kept in an attractive and good working condition.

11.   All landscaping shall be properly watered and maintained, including removal of dead plants, weeds and foreign matter and such replanting and replacement as the occasion may require.

12.   All hard-surfaced markings shall be inspected at regular intervals and promptly repainted as the same shall become unsightly or indistinct from wear and tear, or other cause.

F00136

13. All sewer catch basins shall be cleaned on a schedule sufficient to maintain all sewer lines in a free-flowing condition, and all mechanical equipment related to storm and sanitary sewer facilities shall be regularly inspected and kept in proper working order.

14. All ramps and stairways, if any, shall be: (a) swept at intervals sufficient to maintain the same in a clean condition; (b) inspected at regular intervals; and (c) promptly repaired upon the occurrence of any irregularities or worn portions thereof.

15. All glass, including skylights, plate glass and/or glass-enclosed devices shall be cleaned at intervals sufficient to maintain the same in a clean condition.

16. All surface utility facilities servicing the Common Area, including, but not by way of limitation, hose bibbs, standpipes, sprinklers and domestic water lines, shall be inspected at regular intervals and promptly repaired or replaced, as the occasion may require, upon the occurrence of any defect or malfunctioning.

17. All Common Area amenities; benches; and institutional, directional, traffic and other signs shall be inspected at regular intervals; maintained in a clean and attractive surface condition; and promptly repaired or replaced upon the occurrence of any defects or irregularities thereto.

18. All lamps shall be inspected at regular intervals and shall be promptly replaced when no longer properly functioning.

19. The improvements on and to the Common Areas shall be repaired or replaced with materials, apparatus and facilities of a quality at least equal to the original quality.

20. All Parties shall use their best efforts to require their respective Permittees to comply with all regulations with respect to the Common Area, including, but not by way of limitation, posted speed limits, directional markings and parking stall markings.

21. With respect to all mechanical and electrical facilities and systems, including, but not by way of limitation, the lighting facilities; vertical transportation facilities; plumbing, ventilating, cooling and sprinklering systems; and actuated or manually operated doors, each Party shall (a) inspect the same at regular intervals; (b) promptly repair the same upon the occurrence of any failure or malfunctioning; and (c) as respects the said plumbing, ventilating and cooling systems, maintain the same so as to comply with the performance specifications set forth in Section 10.2 of the REA.

B.    <u>MALL STORE FLOOR AREA APPLICABLE TO DEVELOPER</u>

The provisions of this Section B shall apply to Mall Stores.

1. All Floor Area, including vestibules, entrances and returns, doors, fixtures, windows and plate glass shall be maintained in a safe, neat and clean condition.

2. All trash, refuse and waste materials shall be regularly removed from the premises of each Occupant of the Center and, until removal, shall be stored (a) in adequate containers, which containers shall be located so as not to be visible to the general public shopping in the Center and (b) so as not to constitute any health or fire hazard or nuisance to any Occupant. No burning of trash, refuse or waste materials shall occur.

F00137

3.   No portion of the Developer Mall Stores shall be used for lodging purposes.

C.   <u>CONDUCT OF PERSONS</u>

Except for events and activities sponsored by the Merchants Association, the Service and/or Developer, the Parties hereto do hereby establish the following rules and regulations for the use of roadways, walkways, malls, Parking Areas and other common facilities provided for the use of Permittees:

1.   Subject to Article XIV of the REA, no person shall use any roadway, walkway or mall, except as a means of egress from or ingress to any Floor Area and Parking Areas within the Center, or adjacent public streets. Such use shall be in an orderly manner, in accordance with the directional or other signs or guides. Roadways shall not be used at a speed in excess of twenty (20) miles per hour and shall not be used for parking or stopping, except for the immediate loading or unloading of passengers.

2.   Except for employees as provided in Section 11.2 of the REA, no Person shall use any Parking Areas except for the parking of automobiles during the period of time such Persons or the occupants of such vehicle are customers or business invitees of the retail establishments within the Center. All automobiles shall be parked in an orderly manner within the painted lines defining the individual parking places.

3.   Unless required by applicable law, the following shall not be allowed without the written consent of Developer and all of the Majors in or on any part of the Common Area:

(a)   Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever.

(b)   Exhibit any sign, placard, banner, notice or other written material.

(c)   Distribute any circular, booklet, handbill, placard or other material.

(d)   Solicit membership in any organization, group or association or contribution for any purpose.

(e)   Parade, rally, patrol, picket, demonstrate or engage in any conduct that might tend to interfere with or impede the use of any of the Common Area by any Permittees, use the Common Area in any way not consistent with the operation of the Shopping Center for its intended purpose, create a disturbance, attract attention or harass, annoy, disparage or be detrimental to the interest of any of the retail establishments within the Center.

(f)   Use any Common Area for any purpose (other than restoration, repair, maintenance or construction as permitted hereunder) when none of the Majors or tenants within the Center is open for business (except that the Enclosed Mall and such portions of the Common Area as may be necessary may be used during such times but only for charity events, Merchant's Association promotional fund sponsored or community events not occurring on a regular basis, or things of like nature).

F00138

(g) Throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles or create litter or hazards of any kind.

(h) Create or produce in any manner noise or sound that is annoying, unpleasant or distasteful to any Permittee.

(i) Deface, damage or demolish any sign, light standard or fixture, landscaping material or other improvement within the Center, or the property of any Permittee situated within the Center.

The listing of specific items as being prohibited is not intended to be exclusive, but to indicate, in general, the manner in which the right to use the Common Area solely as a means of access and convenience in shopping at the retail establishments in the Center is limited and controlled by the Parties in the Center. A Party shall not be deemed to be in default of this Paragraph C3 if such Party is using its best efforts to exclude or stop such act or acts on its Parcel or if it is prevented by law from excluding or stopping such act or acts on its Parcel.

Any Party shall have the right to remove or exclude from or to restrain (or take legal action to do so) any unauthorized person from, or from coming upon, the Center or any portion thereof, and prohibit, abate and recover damages arising from any unauthorized act, whether or not such act is in express violation of the prohibitions listed above. In so acting such Party is not the agent of any other Party or Occupant of the Center, unless expressly authorized or directed to do so by such other Party or Occupant in writing.

A0005g

-4-

F00139

EXHIBIT "E"

SIGN CRITERIA

These criteria have been established for the purpose of establishing standards for signs on the Shopping Center Parcel and assuring an outstanding Center and for the mutual benefit of all tenants in the Center. Conformance herewith will be strictly enforced and any non-conforming or unapproved signs that are installed must be brought into conformance at the expense of the tenant or be removed by the tenant within ten (10) days after notice of non-conformance.

I.    AS TO MAJORS:

It is understood and agreed that the Majors may have their usual identification signs on their Store Buildings. The identification and other signs of Majors shall meet the following criteria:

A.    Flashing, blinking, moving, animated or audible signs will not be permitted.

B.    All electrical sign components shall bear the UL label and their installation must comply with all local building and electrical codes. Such UL label shall be inconspicuously placed.

C.    No exposed wiring, conduit, tubing lamps, ballast boxes or raceways will be permitted.

D.    No signs, or any portion thereof, may project above the parapet or top of wall upon which it is mounted.

E.    No roof-top signs nor signs mounted to mechanical penthouses will be permitted.

F.    No weepholes or exposed fasteners will be permitted on signs facing the interior of the Enclosed Mall.

II.    AS TO MALL STORES:

Signs on the Developer Parcel shall meet the criteria of this Section II.

A.    GENERAL REQUIREMENTS

1.    All permits for signs and their installation shall be obtained by the tenant or his representative.

2.    Each tenant in the Mall Store Building(s) shall be responsible for the fulfillment of all requirements and specifications and Developer's Leases shall require that this Exhibit "E" be complied with.

B.    GENERAL SPECIFICATIONS

1.    Painted lettering, symbols or identification of any nature will not be permitted, except as specifically permitted hereunder.

2.    Flashing, blinking, moving, animated or audible signs will not be permitted.

3.    Pylon or pole signs will not be permitted, except as follows in this Section 3. Four Shopping Center pylon signs shall be permitted in the location shown on Exhibit "B" provided such signs identify only the Shopping

Center and no Majors or other Occupants thereof. A reader board sign shall be permitted and shall be limited to theater advertising. It is understood that customary traffic and parking location signs are not within the scope of this subparagraph B3.

4. All electrical sign components shall bear the UL label and their installation must comply with all local building and electrical codes. Such UL label shall be inconspicuously placed.

5. No exposed wiring, conduit, tubing, lamps, ballast boxes or raceways will be permitted.

6. All cabinets, conductors, transformers, ballasts, attachment devices and other equipment shall be concealed.

7. Electrical service to all signs shall be at tenant's cost.

8. Signs of box or cabinet type employing luminous plastic panels will not be permitted.

C. CONSTRUCTION REQUIREMENTS

1. All exterior signs, bolts, fastenings and clips shall be of hot dipped galvanized iron, stainless steel, aluminum, brass or bronze and no black iron materials of any type will be permitted.

2. All exterior letters or signs exposed to the weather shall be mounted so as to permit proper dirt and water drainage.

3. Mall Store Building tenants shall install signs in accordance with this Exhibit "E".

4. No labels will be permitted on the exposed surface of signs, except those required by local ordinance which shall be applied in an inconspicuous location.

5. Mall Store Building tenants shall repair any damage to any work caused in installing his signs.

6. Mall Store Building tenants shall be fully responsible for the operations of any person constructing, installing or repairing such tenant's signs.

D. DESIGN REQUIREMENTS

1. No signs shall be permitted on the exterior of the Mall Store Buildings; provided, if permitted and approved by Developer, uniformly designed and applied signs may be installed on non-customer doors for receiving merchandise in the Mall Stores and directory boards and signs for receiving areas, general Center operational signs and signage required to comply with applicable codes and regulations may be installed. Signs permitted by this subparagraph D1 may be non-illuminated or printed but shall be in keeping with the intent of this Exhibit "E". Notwithstanding the foregoing, exterior signs denoting the name and location of an entranceway to any restaurant, food court or theatre will be permitted.

2. Letter size and location of identification signs of tenants facing the Enclosed Mall shall be within the physical limits of the tenant's storefront and appropriately scaled and proportioned to the overall storefront design. No such sign shall project beyond six (6) inches from face of storefront. The extreme outer limits of sign letters, components or insignia shall fall within a rectangle, the two short sides of which shall fall          no                    closer                  than

-2-

F00141

twenty-four (24) inches to the side lease lines of the leased premises, the top side of which shall not be closer than twelve (12) inches to the soffit of the mall facia element. Other than neon signs, no part of the sign letters shall hang free of background.

3.   No exterior signs perpendicular to the face of the building will be permitted.

4.   Wording of signs shall be limited to identification and shall not include any specification of the merchandise offered for sale therein or the services rendered therein, except as part of tenant's trade name or insignia, crest or corporate shield (which insignia, crest or corporate shield will be permitted if less than thirty-six (36) inches in width and height).

5.   No sign, or any portion thereof, may project above the parapet or top of wall upon which it is mounted.

6.   Exterior building sign letters or components shall not have exposed neon or other lamps. All light source therefor shall be concealed by translucent material. Sign letters or components thereof shall be back-illuminated with lamps contained wholly within the depth of the letter.

7.   No sign shall exceed a maximum brightness of 100 foot lamberts.

E.   **MISCELLANEOUS REQUIREMENTS**

1.   Each tenant in the Mall Store Buildings who has a non-customer door for receiving merchandise may have uniformly applied on said door, in a location and design uniform with other tenant's non-customer doors as directed by Developer, in small letters, the tenant's name and store number. Where more than one tenant uses the same door, each name and store number shall be applied. Color of letters, which are to be uniformly coordinated with other tenant signs in the mall as a whole, will be selected by the Developer.

2.   Cloth, wood, cardboard or paper signs and/or stickers or decals utilized as signs, as well as all signs of a temporary character or purpose, irrespective of the composition of the sign or material used therefor, will not be permitted.

F.   **NATIONAL TENANTS**

There shall be no deviation from this Exhibit "E" except Developer may permit reasonable minor modification of specific technical requirements of this Exhibit "E" where they would otherwise prohibit the usual identification signs of national tenants of Mall Stores which are similar to the identification signs of the same national tenant in a substantial number of its stores in first-class enclosed mall shopping centers.

G.   **MISCELLANEOUS**

As used in this Exhibit "E", the word "tenant" shall be deemed to have the meaning given to the word "Occupant" by Section 1.18 of the REA but shall not include a Major.

A0006

F00142

EXHIBIT "F"
MINIMUM TECHNICAL SPECIFICATIONS

A.    PLAN REQUIREMENTS:    A minimum of one (1) sepia or three (3) copies of
each of the following drawings, and all revisions thereof, as well as three
(3) copies of relevant specifications, shall be furnished to each Major by
the Developer, which drawings shall be preferably at a scale of one inch
(1") equals fifty feet (50'), but not smaller than one inch (1") equals one
hundred feet (100').

(1)    Topographic plat of existing conditions at the Shopping
Center Parcel, which shall detail the following information in
accordance with these minimum requirements:

(a)    The starting benchmark (point of beginning) and other
key benchmarks referenced to USGS Datum and/or local municipal
datum, with a minimum of one (1) permanent benchmark set adjacent
to the Shopping Center Parcel.

(b)    Contour  ...nes drawn at two foot (2') intervals, except
in flat terrain (that is, overall slopes less than 1%) contours
shall be drawn at one foot (1') intervals.

(c)    Perimeter boundary lines showing monuments, bearings,
distances and radii.

(d)    The location of pertinent natural physical features such
as trees, undergrowth and prominent rock outcroppings.

(e)    The location and, where significant, the sizes and
elevations of all man-made improvements including:

(1)    Existing buildings or obstructions on the property
.and on neighboring property within approximately 100 feet,
the approximate dimensions and heights of which shall be
noted for line of site studies.

(ii)    Existing rights-of-way and dimensions of all
streets and sidewalks within the area of the Shopping Center
Parcel and, unless otherwise specified by the Majors, within
the area at least 200 feet beyond each boundary line and to a
sufficient distance to show adjacent major streets, highways,
ramps and access roads.

(iii) Existing surface and subsurface utilities within
the Shopping Center Parcel, including storm and sanitary
sewers (show flow lines, pipe size and type of material),
storm drains, manholes, catch basins, water lines, gas lines,
hydrants, high voltage transmission lines, electrical power
lines, telephone lines, street lighting, tanks, fuel lines,
cable television lines, and high voltage transmission
towers.

(2)    Perimeter Boundary Survey of the Shopping Center Parcel and
of each Parcel therein (including a complete metes and bounds
description of the Center and of each Party's Parcel), shall be
prepared in accordance with the minimum requirements for surveys in the
State of Florida which shall include, in addition, the following
information:

(a)    All angles and bearings shall be to the nearest fifteen
seconds and all distances to .01 feet, with error of closure less
than 1:10,000.

F00143

(b) All boundaries shall be tied to known or record monuments that can be referenced to offset points if possible. On curved boundary lines, the arc length, chord length, chord bearing and radius shall be noted.

(c) All monuments shall be identified as "found", "set" or "reset" and described (for example, "iron pipe"). In any event, an iron pipe or a concrete monument is to be placed at all property corners.

(d) All adjacent streets, highways, ramps and access roads in the area shall be identified and any private streets shall be so noted. The record width of each street to be placed adjacent to the street name and any recorded restrictions on such public or private rights-of-way and any restrictions of record on access to the Shopping Center Pacel shall be noted.

(e) All record easements (including utilities) shall be indicated with dimensions, bearings, to whom granted, purpose and all restrictions posed by the easement and referenced to the corresponding deed, book and page of recording.

(f) All known above-grade and below-grade encroachments across property lines shall be indicated and located dimensionally from property lines.

(g) Zoning classifications as established by zoning authorities shall be shown.

(3) Soil boring plan showing the location of on-site and off-site soil test borings. The coordinates of the soil boring plan shall be identical to the coordinates of the site grading plan hereinafter referred to. Each Major shall also be furnished with boring logs and other technical data, which may be indicated on the soil boring plan or in the accompanying report.

(4) Temporary facilities plan(s) with reference to location, size and type of material for power, telephone, water, drainage, sediment or retention basins, construction access roads, construction yards and any other like items.

(5) Site grading plan showing existing and new contours drawn at two foot (2') intervals, except in flat terrain (overall slopes less than 1%) where contours shall be drawn at one foot (1') intervals.

(6) Permanent utilities plan with reference to location, size and type of material for storm drainage, sanitary sewers, water, gas, electric distribution, telephone and cable television (if available).

(7) On-site paving and parking plan detailing all curbs, retaining walls, exterior berms, striping, signalization, signing, light poles and other parking lot obstructions, as well as stairways, walkways and typical parking stall and island configurations. Areas for heavy duty paving and concrete aprons in loading areas outside of any Party's truck facilities shall also be located.

(8) Site lighting plan, including isolux curves, circuiting, location of fixtures, pole and luminaire catalogue cuts and any other information, including, detail of base, pole luminaire assembly and manufacturer's computer printouts, needed to evaluate the lighting plan.

-2-

F00144

(9)  Landscaping and irrigation plan showing the lines and hose bibs to be installed (except for areas back of curb to building lines).

B.   SITE WORK:   A project coordinate grid shall be used to locate site improvements and to relate information between drawing packages.  Appropriate geometric ties shall be shown between the project coordinate grid and other coordinate grids which government agencies may require for public improvements.  A permanent project benchmark will be set and will be the basis for horizontal control.  In addition, the following requirements shall apply:

(1)  All grading plans shall show contours and final elevation of selected improvements, including those adjacent to the Shopping Center Parcel.

(2)  Excavated material from site work operations shall be stockpiled for the Major's use as backfill around its building.  The quantity of materials to be stockpiled and the location of the stockpile shall be as directed by the Majors.  The stockpiles shall be placed on the user's Parcel and shall be located so as to preclude interference with other site or building work progress.

Each Party shall be responsible for providing additional imported material should a shortfall occur due to the unavailability of suitable on-site material.  In addition, each Party shall be responsible for removing any excess material not used.

(3)  Maximum final side slopes shall be 2:1 and precautions shall be taken (for example, sodding and other planting for stabilization) to preserve the integrity of the slopes.

(4)  All building pad areas (which shall include an area extending 25' beyond the exterior building wall line of each building) shall be graded to approximately eight (8) or more inches below the finished floor (excluding basement floors, if any) at the option of each Major. All building pad areas shall be compacted to not less than 95% Modified Proctor for cohesionless soil material and 90% Modified Proctor for cohesive soil material in accordance with ASTM-D-1557-70.  All other areas of the Center shall be compacted to not less than 90% Modified Proctor in accordance with ASTM-D-1557-70.  All compacted areas of the site shall be verified by an independent professional soils engineer testing laboratory and a certificate indicating compliance with these specifications, and upon request all test data upon which such certificate is based shall be furnished to the Majors.  All areas shall be graded to a tolerance of 0.1 feet.

(5)  Earth stabilization and/or replacement shall be performed as necessary so that when the building pad area is delivered the subsoil at minimum footing depth in all building pad areas shall have a minimum bearing capacity (dead load plus live load) of 3500 lbs per square foot with a total settlement not to exceed one (1) inch and differential settlements not to exceed three eights (3/8) inch within a distance of 24'.

(6)  During construction, temporary sedimentation controls shall be provided as needed to prevent silting downstream of the Shopping Center Parcel.  The Majors shall cause all water run-off from their building pad area to be diverted through the sedimentation control system.

(7)  Except as required by (3) above and Landscaping plans, all unpaved areas in the Shopping Center Parcel shall be seeded, sodded or landscaped.

-3-

F00145

C.   TEMPORARY SIGN:   Developer shall prepare and erect a temporary sign which shall indicate the names of all Majors in a prominent position and which shall be the only such sign on the Shopping Center Parcel.

D.   PERMANENT UTILITIES:   Developer shall provide the following listed permanent utility services to a point(s) not more than five feet (5') from the wall of each building, which point(s) shall be at an elevation and a specific point(s) of entry as mutually agreed upon by the Party owning such building and Developer; however, in no case will permanent utility service point(s) of entry be placed more than 8.0 feet below the lower level floor elevation. In addition to providing all necessary preliminary coordination with the various utility companies to assure adequate service will be provided to the Center, said permanent utilities shall be furnished in accordance with these requirements:

(1)  Sanitary sewer lines, storm sewer lines and other utility lines, conduits, ducts or systems shall be constructed underground.

(2)  Sanitary Sewer – at not more than two (2) points of entry, a service connection from a sanitary sewer line that shall be a minimum of six inches (6") in diameter.

(3)  Storm Sewer – at not more than four (4) points of entry, a service connection.

(4)  Storm sewer and sanitary sewer line inverts shall be sufficiently deep so as to receive all building drains by gravity including yard drains in any truck dock wells located no more than four feet (4') below floor slab grade, provided such elevation for draining truck dock wells shall not require oversizing or lowering the area drainage system.

(5)  The storm drainage systems shall be closed conduit systems and shall include lateral connections for building roof drainage.  All pertinent inlet and outlet structures, rip-rap and bank protection, with an overall design conforming to applicable State, County, City and other municipal and governmental ordinances, rules and regulations, and the following minimum requirements:

(a)  a regional 3-year frequency storm event with 10-minute initial time of concentration acceptable to local authorities.

(b)  discharge velocities from the on-site system shall be low enough so as to prevent damage downstream.

(c)  a minimum of 18-inch freeboard shall be maintained between each building floor elevation and the water surfaces resulting from a 100-year frequency storm.

(6)  Water Supply System:

(a)  Developer shall provide a system of underground water mains of a sufficient size to adequately supply both fire protection and domestic demands simultaneously.

(b)  The minimum eight inch (8"), two-source loop shall have sectional valve control and fire hydrants at intervals of not more than three hundred feet (300').  A fire hydrant shall be located within one hundred fifty feet (150') of each exterior store entrance.

(c)  Fire Protection Water – one service connection that shall be a minimum of eight inches (8") in diameter, having a

-4-

F00146

pressure, rate of flow, and degree of reliability adequate for all fire protection requirements of all buildings on each Party's parcel in accordance with the reasonable and applicable requirements of each Party's fire insurance underwriter association and/or the local building and fire departments having jurisdiction.

(d) Domestic Water – One service connection that shall be a minimum of four inches (4") in diameter, having a pressure and a rate of flow to adequately serve the plumbing systems in all buildings on each Party's parcel without the need for pumping. Pressure reducing devices, if required, shall be each Party's responsibility.

(7) Electricity – Developer will provide conduit or direct burial system to each Party's point of entry or, at the option of such Party, to the exterior transformer pad on such Party's Parcel.

(8) Telephone – a conduit or direct burial system to specifications provided by each Major and the utility company furnishing the telephone service to a point of entry to be designated by each Party.

(9) Actual connections will be made by Major's contractor and permits and meters for these connections obtained by Major at its expense.

E.   OPEN PARKING LOTS:   Minimum design standards for open parking lots are as follows:

(1) Slope in parking areas – 5% maximum and 0.70% minimum, with no retaining walls or embankments forming a break in grade except as shown on Exhibit "B".

(2) Parking Module – width of an aisle plus the depth of a parking stall on each side measured perpendicular to the aisle shall be as provided on Exhibit "B".

(3) Parking Stalls – width between center lines or between midpoints between the lines of adjacent stall striping shall be a minimum of nine feet (9'). The stall layout shall be in accordance with the Typcial Parking Layout shown on Exhibit "B".

(4) Stall Striping – Developer shall prepare a drawing showing the typical parking stall and island striping configuration. Striping shall be of a paint type and color as mutually agreed upon.

(5) Lighting – minimum design standards are as follows:

(a) Lighting for motor vehicle parking areas, access roads and ring road shall be provided by metal halide light source, or equivalent, sufficient to produce a minimum maintained intensity of one (1) foot candle of lighting measured at ground level or such other minimum as may be mutually agreed upon by all of the Parties and upon request of any Party, shall be so circuited so that at least twenty-five percent (25%) of the lights on all or any portion of such parking site may be kept illuminated during the hours of darkness when the Shopping Center is not open for business. There shall be separate circuiting for each Major, all of which will be controlled by a master system which will provide individual override capability.

-5-

F00147

(b) Developer shall establish the height and location of light poles, fixtures and type of fixture shielding so as to provide appropriate on-site lighting while minimizing the off-site effect.

(c) Developer shall prepare a drawing of the complete lighting arrangement, equipment, fixture types and control of parking lot lights, including the wiring of all parking lot lights on each Major's Parcel to a mutually agreed upon entry point at Major's Store.

(6) Handicapped — Handicapped ramps, marked crosswalks, parking stalls, etc. shall be of uniform design throughout the Center and shall be provided in the vicinity of each Party's store entrance.

F.   PAVING:

(1) With respect to parking and roadway surfacing:

(a) Pavement design shall be based on the State of Florida Department of Transportation flexible and non-flexible pavement design criteria of recent revision.

(b) In connection with the foregoing, all areas to be paved in the Center are classified as follows:

(i) Heavy duty paving — The Ring Road and main driveways, truckloading zones and designated bus/truck thoroughfares.

(ii) Light duty paving — automobile parking aisles and stalls.

(2) With respect to sidewalks and curbs:

(a) All sidewalks shall have a minimum slope toward curbs of 1/8 inch per foot and shall be scored air-entrained concrete, minimum four inches (4") thick, or equivalent material of a rough non-skid texture over a suitable granular base. Sidewalks are to be doweled into the buildings at all entrances.

(b) Entrance and access roads and other areas shall have six inch (6") curbs with eighteen inch (18") gutters, provided however, next to sidewalks and buildings when drainage is not a factor, a straight curb six inches (6") above the finished paving may be provided. Parking lot islands and landscape enclosures shall be permanently cast in place. Curbs and gutters shall be concrete, cast in place.

G.   CONTROL SIGNS AND PAVEMENT STRIPING:   Developer shall prepare a separate signing and pavement striping plan which shall show the type (e.g., regulatory, special directional, etc.) and location of all signs and lane lines.

H.   RETAINING WALLS:

(1) Where retaining walls are required in the design of a Major's building, such retaining walls shall be designed and constructed by the Major at its expense.

(2) The type, quality and finished appearance of all retaining walls in the Center shall be aesthetically compatible with nearby exteriors of buildings and subject to the approval of the Parties.

F00148

I.   ENCLOSED MALL:   In addition to the foregoing requirements, the
following items shall apply to any enclosed malls and mall buildings:

(1) Majors shall have the right to erect a sign over any mall
entrances to the Major's building at its expense.   Such sign shall be
in accordance with Sign Criteria, Exhibit "E."

(2) Developer shall install a continuous expansion joint through
the enclosed malls and mall buildings not more than twenty feet (20')
from each Major's building wall abutting the Enclosed Mall.   Developer
shall provide the roof, wall, and floor expansion joints and the Majors
shall make accommodation for Developer to fasten such joints to their
buildings in accordance with the Architect's drawings.

(3) The finished floor elevation of each Major's Building shall be
established at the same elevation as the finished floor of the Enclosed
Mall at all points adjoining each such building mall entrance.

J.   GENERAL:   In addition to the specific requirements called for above,
the design and construction of all on-site and off-site improvements,
buildings and structures shall conform to applicable federal, state and
municipal governmental requirements, including but not by way of limitation,
local zoning and highway ordinances, fire and building codes, regional
planning directives and regulations pertaining to health, safety and
environmental protection.

A0004g

-7-

F00149





### FIRST AMENDMENT TO
### CONSTRUCTION, OPERATION AND RECIPROCAL
### EASEMENT AGREEMENT

THIS FIRST AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT is made as of the 18th day of _April_, 1989, by and among FORBES/COHEN FLORIDA PROPERTIES LIMITED PARTNERSHIP, a Michigan limited partnership (hereinafter referred to as "Developer"), MACY'S SOUTH, INC., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Macy"), SEARS, ROEBUCK AND CO., a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Sears"), BURDINES REAL ESTATE, INC., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Burdines"), BLOOMINGDALE'S PROPERTIES, INC., a Delaware corporation authorized to do business in the State of Florida (hereinafter referred to as "Bloomingdale's"), and SAKS & COMPANY, a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Saks").

### R E C I T A L S

1.    Developer, Macy's predecessor in interest, Macy's New York, Inc., a New York corporation (hereinafter referred to as "MNY"), Sears and Burdines' predecessor in interest, Federated Department Stores, Inc., a Delaware corporation (hereinafter referred to as "Federated"), entered into that certain Construction, Operation and Reciprocal Easement Agreement dated May 29, 1987, and recorded in Book 5370, Page 437, Palm Beach County Records, Palm Beach County, Florida, relating to The Gardens, Palm Beach Gardens, Florida (hereinafter referred to as the "REA").

2.    MNY assigned all of its right, title and interest in and to the REA (and its Lease covering the Macy Parcel) to Macy by instrument dated July 30, 1988. MNY subsequently merged with Macy's New Jersey, Inc., and the merged company's name was changed to Macy's Northeast, Inc., a Delaware corporation.

3.    Federated assigned all of its right, title and interest in and to the REA (and its Lease covering the Burdines Parcel) to Burdines by instrument dated July 29, 1988.

4.    Simultaneously    herewith,    Developer,    as    Landlord,    and Bloomingdale's, as Tenant, have entered into a Lease of a portion of the Developer's Parcel consisting of approximately 13.398 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A", Part 8 attached hereto (hereinafter referred to as the "Bloomingdale's Parcel") and located as shown on Exhibit "B" attached hereto.

5.    Simultaneously herewith, Developer, as Landlord, and Saks, as Tenant, have entered into a Lease of a portion of the Developer's Parcel consisting of approximately 3.931 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A", Part 9 attached hereto (hereinafter referred to as the "Saks Parcel") and located as shown on Exhibit "B" attached hereto.

6.    The description of the Developer's Parcel, after the deletion of the Bloomingdale's Parcel and the Saks Parcel therefrom, has been reduced from 60.390 acres to 43.061 acres and is more particularly described on Exhibit "A", Part 5 attached hereto, and located as shown on Exhibit "B" hereto.

7.    The Developer's Parcel, Macy Parcel, Sears Parcel, Burdines Parcel, Bloomingdale's Parcel and Saks Parcel are more particularly located as shown on the survey attached hereto as Exhibit "C".

8.    The Parties desire to amend the REA in order to provide for the addition and the construction of the Bloomingdale's Improvements and Saks Improvements as herein defined and the operation thereof.

NOW, THEREFORE, for good and valuable consideration, including the mutual promises, covenants and agreements herein contained, the Parties agree as follows:

1.   (a)  Exhibit "A", Part 5, of the REA shall be deleted and Exhibit "A", Part 5, attached hereto shall be substituted therefor.

(b)  Exhibit "A", Part 8, and Exhibit "A", Part 9, attached hereto shall be incorporated into the REA as Exhibit "A", Part 8, and Exhibit "A", Part 9, respectively.

(c)  Exhibit "B" of the REA shall be deleted and Exhibit "B" attached hereto shall be substituted therefor.

(d)  Exhibit "C" of the REA shall be deleted and Exhibit "C" attached hereto shall be substituted therefor.

2.   (a)  Section 1.2 of the REA shall be amended by inserting the phrase "Bloomingdale's Parcel, Saks Parcel" after the phrase "Sears Parcel" on the first line thereof.

(b)  Section 1.15 of the REA shall be amended by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on the first line thereof.

(c)  Section 1.20 of the REA shall be amended by inserting the phrase "Bloomingdale's Parcel, Saks Parcel" after the phrase "Sears Parcel" on the first and second lines thereof.

(d)  Section 1.22 of the REA shall be amended by inserting the phrase "Bloomingdale's, Saks" after the word "Sears" on the first line thereof.

(e)  Section 1.23 of the REA shall be amended by deleting the phrase "and 7.4" from the first line thereof and inserting the phrase "7.4, 7.4A and 7.4B" therefor.

3.   The following shall be inserted at the end of Section 4.1 of the REA:

"To Bloomingdale's:    Bloomingdale's Properties, Inc.
                       7 West Seventh Street
                       Cincinnati, Ohio 45202
                       Attn: Real Estate Department

To Saks:               Saks Fifth Avenue Service Center
                       3rd Floor
                       450 W. 15th Street
                       New York, New York 10011
                       Attn: Vice President, Construction"

4.   Each of Bloomingdale's and Saks shall be required to submit its plans to the Developer for approval in accordance with the provisions of Section 4.4 of the REA and within ninety (90) days after the date of this First Amendment.  The provisions of Section 4.3 of the REA shall not be applicable, as the Developer has heretofore completed construction of the Developer's Facilities.

5.   Each of Bloomingdale's and Saks shall submit a Building Schedule only to the Developer in accordance with Section 5.5 of the REA.

6.   The following shall be inserted as Section 7.4A of the REA:

"Section 7.4A  Construction of Bloomingdale's Improvements

Bloomingdale's shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Bloomingdale's Improvements"):

-2-

(a) a three-level building within its Permissible Building Area containing not less than one hundred fifty thousand (150,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Bloomingdale's Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Bloomingdale's Parcel and the landscaped and planted areas lying between said Perimeter Sidewalks and the Bloomingdale's Building;

(c) the Truck Facilities serving the Bloomingdale's Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron;

(d) retaining walls and backfilling of same required in grade arms to physically support the Bloomingdale's Building; and

(e) the common wall between the Bloomingdale's Improvements and the Enclosed Mall.

Bloomingdale's has heretofore commenced construction of the Bloomingdale's Improvements and shall complete the same and open the Bloomingdale's Improvements to the public on or before November 1, 1990."

7.   The following shall be inserted as Section 7.4B of the REA:

"Section 7.4B  Construction of Saks Improvements

Saks shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Saks Improvements"):

(a) a two-level building within its Permissible Building Area containing not less than seventy two thousand (72,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Saks Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b) the Perimeter Sidewalks on the Saks Parcel and the landscaped and planted areas lying between said Perimeter Sidewalks and the Saks Building;

(c) the Truck Facilities serving the Saks Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron; and

(d) retaining walls, if any, and backfilling of same, required in grade arms to physically support the Saks Improvements.

Saks shall commence construction of the Saks Improvements in accordance with the Building Schedule and open the Saks Improvements to the public on or before November 1, 1991."

8.   The provisions of Sections 7.6 and 7.7 of the REA shall not be applicable with respect to Bloomingdale's and/or Saks.

9.   At the end of Section 13.1(a)(1) of the REA delete the period, substitute a semi-colon and add the following:

-3-

F00154

"In the case of Bloomingdale's, at least one hundred
fifty thousand (150,000) square feet of Floor Area, which
shall be operated under the name "Bloomingdale's", or
such other name as is then being used by Bloomingdale's
to identify its multi-level stores operated by
Bloomingdale's, Inc. of over one hundred fifty thousand
(150,000) square feet of Floor Area in southeastern
Florida; and in the case of Saks, at least seventy
thousand (70,000) square feet of Floor Area, which shall
be operated under the name "Saks" or "Saks Fifth Avenue"
or such other name as is then being used by Saks to
identify its Saks Fifth Avenue stores in southeastern
Florida."

10.  Section 13.1(a)(2) of the REA shall be amended by inserting the
phrase "Bloomingdale's, Saks" after the word "Sears" on each of the fourth
and ninth lines thereof.

11.  Sections 13.2(c) and (d) of the REA shall each be amended by
deleting the period at the end of such Section, substituting a semi-colon,
and inserting the word "or" after the semi-colon.

12.  In Section 13.4(b)(2) of the REA on the twenty fifth line thereof
immediately preceding the word "For", delete the period, substitute a
semi-colon and insert the following:

"(iv)  Bloomingdale's shall be released from all of its
obligations under this REA if such transfer is to an
Affiliate or to a corporation or other Person which
acquired a majority of the stores of Bloomingdale's, or
any successor thereto, exceeding one hundred fifty
thousand (150,000) square feet in Southeastern Florida
and said transferee, by written instrument in recordable
form, expressly assumes all of the obligations of
Bloomingdale's hereunder and is financially capable of
performing such obligations (as hereinafter provided);
and (v) Saks shall be released from all of its
obligations under this REA if such transfer is to an
Affiliate or to a corporation or other Person which
acquires a majority of the stores of Saks, or any
successor thereto, in Southeastern Florida and said
transferee, by written instrument in recordable form,
expressly assumes all of the obligations of Saks
hereunder and is financially capable of performing such
obligations (as hereinafter provided)."

13.  Section 17.1 of the REA shall be amended by inserting the phrase
"Bloomingdale's Improvements, Saks Improvements" after the phrase "Sears
Improvements" on the tenth line thereof.

14.  Section 17.4 of the REA shall be amended by inserting the phrase
"Bloomingdale's, Saks" after the word "Sears" on the ninth line thereof.

15.  Section 17.5 of the REA shall be amended by inserting the phrase
"Bloomingdale's Improvements, Saks Improvements" after the phrase "Sears
Improvements" on the seventh line thereof and by inserting the phrase
"Bloomingdale's, Saks" after the word "Sears" on the tenth line thereof.

16.  (a) The following shall be inserted in Article XXI after the
address of Federated on Page 68 of the REA:

"and addressed in the case of Bloomingdale's to:

Bloomingdale's Properties, Inc.
c/o Federated Department Stores, Inc.
Seven West Seventh Street
Cincinnati, Ohio  45202
Attn:  Real Estate Department

-4-

F00155

with a copy to:

Bloomingdale's
1000 Third Avenue
New York, New York  10022
Attn:  Chairman

and addressed in the case of Saks to:

Saks & Company
c/o Batus Retail
1270 Avenue of the Americas
New York, New York  10020
Attn:  Sr. Vice President, Corporate
        Real Estate

with a copy to:

Saks & Company
611 Fifth Avenue
New York, New York  10022
Attn:  Chairman of the Board"

(b)  In Article XXI of the REA the phrase "with a copy to:  Howard Kane, Esq., Rudnick & Wolfe, 30 North LaSalle Street, Chicago, Illinois 60602" shall be deleted.

17.  Article XXIII of the REA shall be amended by deleting the phrase "the expiration of a period of seventy (70) years after the Center Opening Date or March 31, 2059, whichever shall earlier occur" and the phrase "October 31, 2058" shall be substituted therefor.

18.  Pursuant to Section 24.21 of the REA, the Parties acknowledge that the Center Opening Date occurred on October 5, 1988.

19.  Each of Bloomingdale's and Saks, by executing this agreement, hereby assume and agree to be bound by all of the terms and provisions of the REA from and after the date hereof as if they were original signatories thereto.

IN WITNESS WHEREOF, each Party has caused its duly authorized officers to sign this First Amendment to the Construction, Operation and Reciprocal Easement Agreement as of the day and year first above written.

F00156

FORBES/COHEN FLORIDA PROPERTIES
LIMITED PARTNERSHIP
a Michigan limited partnership

By: FORBES/COHEN PROPERTIES,
    Its: General Partner

WITNESS:

By _____
   Sidney Forbes, its general
   partner

By _____
   Maurice Cohen, its general
   partner

STATE OF MICHIGAN     )
                      ) SS.
COUNTY OF OAKLAND     )

The foregoing instrument was acknowledged before me this 16th day
of _April_, 19 90, by SIDNEY FORBES and MAURICE COHEN, general
partners of FORBES/COHEN PROPERTIES, the General Partner of Forbes/Cohen
Florida Properties Limited Partnership, a Michigan limited partnership, on
behalf of said limited partnership.

_____
Notary Public
My Commission Expires: _1-14-91_

JANET L. GALLINATI
Notary Public, Wayne County, Michigan
My Commission Expires January 14, 1991
ACTING IN OAKLAND CTY.

A7631h/6

-6-

F00157

WITNESS:

_Rosalia Philipson_

_Norah Anne Collins_

MACY'S SOUTH, INC.,
a Delaware corporation

By _____
Executive Vice President – Corporate Affairs

By _____
Assistant Secretary

STATE OF NEW YORK     )
                      ) SS.
COUNTY OF NEW YORK    )

The foregoing instrument was acknowledged before me this 11th day of December 1989, by Myron E. Ullman, III and David C. Stonsky, the Executive Vice President- Corporate Affairs and Assistant Secretary, respectively of MACY'S SOUTH, INC., a Delaware corporation, on behalf of said corporation.

_Lucy Ann Earley_
Notary Public
My Commission Expires:

LUCY ANN EARLEY
Notary Public, State of New York
No. 01-4667274
Qualified in Orange County
Certificate Filed in New York County
Commission Expires Oct. 31, 1990

MACY'S NORTHEAST, INC., a Delaware corporation (successor by merger to Macy's New York, Inc.), predecessor in interest to Macy's South, Inc., hereby consents to the foregoing First Amendment to Construction, Operation and Reciprocal Easement Agreement and acknowledges its continuing obligations pursuant to the Construction, Operation and Reciprocal Easement Agreement, as so amended, notwithstanding the assignment by it to Macy's South, Inc.

MACY'S NORTHEAST, INC.,
a Delaware corporation

By _____
Executive Vice President – Corporate Affairs

By _____
Assistant Secretary

STATE OF NEW YORK     )
                      ) SS.
COUNTY OF NEW YORK    )

The foregoing instrument was acknowledged before me this 11th day of December 1989, by Myron E. Ullman, III and David C. Stonsky, the Executive Vice President- Corporate Affairs and Assistant Secretary, respectively of MACY'S NORTHEAST, INC., a Delaware corporation, on behalf of said corporation.

_Lucy Ann Earley_
Notary Public
My Commission Expires:

A7631h/7

LUCY ANN EARLEY
Notary Public, State of New York
No. 01-4667274
Qualified in Orange County
Certificate Filed in New York County
Commission Expires Oct. 31, 1990

-7-

F00158

WITNESS:

*Erick Vanoskey*

*Jane Battle*

SEARS, ROEBUCK and CO.,
a New York corporation

By *Ronald B. Ruth*
Ronald B. Ruth, National Manager
Real Estate Planning Group
Attest: *[signature]*
Assistant Secretary

STATE OF ILLINOIS    )
) SS.
COUNTY OF COOK    )

    The foregoing instrument was acknowledged before me this 20th day of *December*, 19 89, by  Ronald B. Ruth    and  Donald J. Jeruc , the  National Manager    and  Assistant Secretary  respectively, of SEARS, ROEBUCK AND CO., a New York corporation, on behalf of said corporation.

*Grace Sharp*

Notary Public
My Commission Expires:_____

A7631h/8

"OFFICIAL SEAL"
GRACE SHARP
Notary Public, State of Illinois
My Commission Expires 3/11/93

-8-

WITNESS:

BURDINES REAL ESTATE, INC.
a Delaware corporation

*Elizabeth J. Haas*

By _____
      Operating Vice President

*Helen A. Welsh*

By _____
      Assistant Secretary

STATE OF Ohio        )
                     ) SS.
COUNTY OF Hamilton   )

The foregoing instrument was acknowledged before me this 19TH day
of December, 1989, by _____Maurice A. Fry_____ and Gwyneth G. Stewart
the Operating Vice President and Assistant Secretary, respectively, of
BURDINES REAL ESTATE, INC., a Delaware corporation, on behalf of said
corporation.

*Cheryl K. Neithaus (Boston)*
Notary Public                    CHERYL K. BOSTON
My Commission Expires:_____  Notary Public, State of Ohio
                               My Commission Expires July 1, 1992

FEDERATED DEPARTMENT STORES, INC., a Delaware corporation, predecessor
in interest to Burdines Real Estate, Inc., hereby consents to the foregoing
First Amendment to Construction, Operation and Reciprocal Easement Agreement
and acknowledges its continuing obligations pursuant to the Construction
Operation and Reciprocal Easement Agreement, as so amended, notwithstanding
the assignment by it to Burdines Real Estate, Inc.

FEDERATED DEPARTMENT STORES, INC.,
a Delaware corporation

By _____

By _____
      ASSISTANT SECRETARY

STATE OF Ohio        )
                     ) SS.
COUNTY OF Hamilton   )

The foregoing instrument was acknowledged before me this 19 day
of December, 1989, by _____Maurice A. Fry_____ and Gwyneth G. Stewart
the _____ and ___ASSISTANT SECRETARY___, respectively,
of FEDERATED DEPARTMENT STORES, INC., a Delaware corporation, on behalf of
said corporation.

*Cheryl K. Neithaus (Boston)*
Notary Public                    CHERYL K. BOSTON
My Commission Expires:_____  Notary Public, State of Ohio
                               My Commission Expires July 1, 1992

A7631h/9

–9–

F00160

WITNESS:

*Arlene J. Welsh*

*Lois A. Giancola*

BLOOMINGDALE'S PROPERTIES, INC.,
a Delaware corporation

By *Gary J. May*
       Operating Vice President

By *Gwyneth G. Stewart*
       ASSISTANT SECRETARY

STATE OF Ohio        )
                     ) SS.
COUNTY OF Hamilton   )

The foregoing instrument was acknowledged before me this 19 day
of December, 19 89, by   Gary J. May   and Gwyneth G. Stewart
the   Operating Vice President   and   ASSISTANT SECRETARY   , respectively,
of BLOOMINGDALE'S PROPERTIES, INC., a Delaware corporation, on behalf of
said corporation.

*Cheryl K. Neithaus (Boston)*

Notary Public
My Commission Expires:   Notary Public, State of Ohio
       CHERYL K. BOSTON
       Notary Public, State of Ohio
       My Commission Expires July 1, 1992

A7631h/10

-10-

F00161

WITNESS:

_Clement L. Albert_

_Joan M. Schrager_

SAKS & COMPANY,
a New York corporation

By _Quintin_
   Vice President

By _John Riley Secy_

STATE OF    NEW YORK    )
                        ) SS.
COUNTY OF   NEW YORK    )

   The foregoing instrument was acknowledged before me this _2nd_ day
of __April__ , 19_90_, by _Stephen A. Quintin_ and _Joan F. KRey_,
the _Vice President_ and __Secretary__ , respectively,
of SAKS & COMPANY, a New York corporation, on behalf of said corporation.

                              _Jon W. Adrue_
Notary Public
My Commission Expires: _____    CHOW LAI CHI
                                   Notary Public, State of New York
                                   No. 01CH4806062
                                   Qualified in Suffolk County
                                   Commission Expires March 30, 19__

Instrument Drafted By And
When Recorded Return To:

William J. Zousmer, Esq.
Honigman Miller Schwartz and Cohn
2290 First National Building
Detroit, Michigan 48226
(313) 256-7673

A7631h/11

-11-

F00162

May 1, 1990


Erick Vanoskey
Department 824RE


Re:  The Gardens, Palm Beach Gardens, Florida

Enclosed is one (1) fully executed original of the First
Amendment to Construction, Operation and Reciprocal Easement
Agreement regarding the above-captioned location.  Kindly
see that this amendment is put into the real estate file.


*Tom*

Thomas K. Hornacek
Department 766


TKH/tg
Encl.
cc:  John Murphy (w/encl.)


F00163

## SECOND AMENDMENT TO CONSTRUCTION,
## OPERATION AND RECIPROCAL EASEMENT AGREEMENT

THIS SECOND AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT is made as of the 31st day of August, 2004, by and among FORBES/COHEN FLORIDA PROPERTIES LIMITED PARTNERSHIP, a Michigan limited partnership (hereinafter referred to as "Developer"), MACY'S EAST, INC., an Ohio corporation authorized to do business in the State of Florida (hereinafter referred to as "Macy"), SEARS, ROEBUCK AND CO., a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Sears"), BURDINES, INC., an Ohio corporation authorized to do business in the State of Florida (hereinafter referred to as "Burdines"), BLOOMINGDALE'S, INC., an Ohio corporation authorized to do business in the State of Florida (hereinafter referred to as "Bloomingdale's"), SAKS & COMPANY, a New York corporation authorized to do business in the State of Florida (hereinafter referred to as "Saks"), and NORDSTROM, INC., a Washington corporation authorized to do business in the State of Florida (hereinafter referred to as "Nordstrom").

### RECITALS:

1.    Developer, Macy's predecessor in interest, Macy's New York, Inc., a New York corporation (hereinafter referred to as "MNY"), Sears and Burdines' predecessor in interest, Federated Department Stores, Inc., a Delaware corporation (hereinafter referred to as "Federated"), entered into that certain Construction, Operation and Reciprocal Easement Agreement, dated May 29, 1987, and recorded in Book 5370, Page 437, Palm Beach County Records, Palm Beach County, Florida, relating to The Gardens, Palm Beach Gardens, Florida (hereinafter referred to as the "Original REA").

2.    MNY assigned all of its right, title and interest in and to the Original REA (and its Lease covering the Macy Parcel) to Macy's predecessor in interest, Macy's South, Inc., (hereinafter referred to as "MS"), by instrument dated July 30, 1988.

3.    Federated assigned all of its right, title and interest in and to the Original REA (and its Lease covering the Burdines Parcel) to Burdines predecessor in interest, Burdines Real Estate, Inc. (hereinafter referred to as "Burdines RE"), by instrument dated July 29, 1988.

4.    On April 18, 1990, Developer, as Landlord, and Bloomingdale's predecessor in interest, Bloomingdale's Real Estate, Inc. (hereinafter referred to as "Bloomingdale's RE"), as Tenant, entered into a Lease of a portion of the Developer's Parcel consisting of approximately 13.398 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A," Part 8, attached to the Original REA, as amended by First Amendment thereto (hereinafter the Original REA as so amended is referred to as the "REA") and located as shown on Exhibit "B" attached thereto.

5.    On April 18, 1990, Developer, as Landlord, and Saks, as Tenant, entered into a Lease of a portion of the Developer's Parcel consisting of approximately 3.931 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A," Part 9, to the REA and located as shown on Exhibit "B" attached thereto.

6.    The description of the Developer's Parcel, as described in the Original REA, after the deletion of the Bloomingdale's Parcel and the Saks Parcel therefrom, was reduced from 60.390 acres to 43.061 acres and is more particularly described on Exhibit "A," Part 5, to the REA and located as shown on Exhibit "B" thereto.

7.    On April 18, 1990, Developer, MS, Sears, Burdines RE, Bloomingdale's RE and Saks entered into that certain First Amendment to Construction, Operation and Reciprocal Easement Agreement, recorded in Book 6428, Page 1130, Palm Beach County, Florida.

8.    MS assigned all of its right, title and interest in and to the REA (and its Lease covering the Macy Parcel) to Macy's predecessor in interest, Macy's Primary Real Estate, Inc. (hereinafter referred to as "MPRE"), by instrument dated December 19, 1994.



9.   Burdines RE was merged into Burdines and Burdines succeeded to Burdines RE's entire right, title and interest in and to the REA (and its Lease covering the Burdines Parcel) on or about March 31, 1998.

10.   Bloomingdale's RE was merged into Bloomingdale's and Bloomingdale's succeeded to Bloomingdale's RE's entire right, title and interest in and to the REA (and its Lease covering the Bloomingdale's Parcel) on or about March 31, 1998.

11.   MPRE assigned all of its right, title and interest in and to the REA (and its Lease covering the Macy Parcel) to Macy by instrument dated June 26, 1997.

12.   Simultaneously herewith, Developer and Burdines have terminated the Lease between Developer, as Landlord, and Burdines, as Tenant, covering the Burdines Parcel, dated July 29, 1987.

13.   Simultaneously herewith, Developer, as Landlord, and Nordstrom, as Tenant, have entered into a Lease of a portion of the Burdines Parcel, consisting of approximately 10.61 acres situated in the County of Palm Beach, State of Florida, more particularly described on Exhibit "A," Part 10, attached hereto (hereinafter referred to as the "Nordstrom Parcel") and located as shown on Exhibit "B" attached hereto.

14.   That portion of the Burdines Parcel not included within the Nordstrom Parcel has been added to the Developer Parcel.

15.   The parties wish to amend the REA in order to remove Burdines as a party thereto and to add Nordstrom as a party thereto.

16.   Simultaneously herewith, Landlord, as Landlord, and Macy, as Tenant, have entered into an Amendment to Lease covering the Macy Parcel in order to increase the size of the Macy Parcel to 18.322 acres, as more particularly described on Exhibit "A," Part 2, hereof, and Exhibit "A," Part 2, shall be substituted for Exhibit "A," Part 2, in the REA.

17.   As a result of the transactions described in Recitals 14 and 16 above, the Developer Parcel now consists of 43.533 acres, as more particularly described on Exhibit "A," Part 5, attached hereto and Exhibit "A," Part 5, attached hereto shall be substituted for Exhibit "A," Part 5, in the REA.

18.   The Developer Parcel, Macy Parcel, Sears Parcel, Bloomingdale's Parcel, Saks Parcel and Nordstrom Parcel are more particularly located as shown on the survey attached hereto as Exhibit "C."

19.   The parties desire to amend the REA in order to provide for the addition and the construction of the Nordstrom Improvements as herein defined and the operation thereof and to otherwise amend the REA as herein provided.

NOW, THEREFORE, for good and valuable consideration, including the mutual promises, covenants and agreements herein contained, the Parties agree as follows:

1.   (a)   Exhibit "A," Part 2, of the REA shall be deleted and Exhibit "A," Part 2, attached hereto shall be substituted therefor.

(b)   Exhibit "A," Part 4, of the REA shall be deleted.

(c)   Exhibit "A," Part 5, of the REA shall be deleted and Exhibit "A," Part 5, attached hereto shall be substituted therefor.

(d)   Exhibit "A," Part 10, attached hereto shall be incorporated into the REA as Exhibit "A," Part 10.

(e)   Exhibit "A", Part 11, attached hereto shall be incorporated into the REA as Exhibit "A", Part 11

2

 

(f)    Exhibit "B" of the REA shall be deleted and Exhibit "B" attached hereto shall be substituted therefor.

(g)    Exhibit "C" of the REA shall be deleted and Exhibit "C" attached hereto shall be substituted therefor.

2.    (a)    Section 1.2 of the REA shall be amended by deleting the phrase "Burdines Parcel" from the second line thereof and inserting the phrase "Nordstrom Parcel" therefor.

(b)    Section 1.15 of the REA shall be amended by deleting the word "Federated" from the first line thereof and inserting the word "Nordstrom" therefor.

(c)    Section 1.20 of the REA shall be amended by deleting the word "Burdines" from the second line thereof and inserting the word "Nordstrom" therefor.

(d)    Section 1.22 of the REA shall be amended by deleting the word "Federated" from the first line thereof and inserting the word "Nordstrom" therefor.

(e)    Section 1.23 of the REA shall be amended by deleting the phrase "and 7.4A. and B. thereof" from the first line thereof and inserting therefor the phrase "7.4A., 7.4B. and 7.4C." thereof.

(f)    Section 1.30 of the REA shall be amended by adding the phrase "or, if there is no such separate Supplemental Agreement between Developer and a Major, such Major's Lease shall constitute the Supplemental Agreement between Developer and such Major" at the end thereof.

3.    The addresses set forth in Section 4.1 of the REA for each of Macy, Sears and Federated shall be deleted and the following shall be substituted therefor:

| | |
|---|---|
| To Macy: | Macy's East, Inc.<br>c/o Federated Department Stores, Inc.<br>7 West Seventh Street<br>Cincinnati, Ohio 45202<br>Attn: Real Estate Department |
| with a copy to: | Macy's East, Inc.<br>c/o Burdines, Inc.<br>P.O. Box 2350<br>22 East Fagler Street<br>Miami, Florida 31131<br>Attn: Chairman |
| To Sears: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Property Manager, Southeast |
| with a copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Assistant General Counsel—Real Estate |
| To Bloomingdale's: | Bloomingdale's, Inc.<br>c/o Federated Department Stores, Inc.<br>7 West Seventh Street<br>Cincinnati, Ohio 45202<br>Attn: Real Estate Department |

F00166



with a copy to:        Bloomingdale's, Inc.
                       1000 Third Avenue
                       New York, New York 10022
                       Attn: Chairman

To Saks:               Saks & Company
                       115 N. Calderwood Street
                       P.O. Box 9388
                       Alcoa, Tennessee 37701
                       Attn: Eric Steven Faires

with a copy to:        Saks & Company
                       12 E. 49th Street
                       New York, New York 10017
                       Attn: General Counsel

To Nordstrom:          Nordstrom, Inc.
                       1700 Seventh Avenue, Suite 1000
                       Seattle, Washington 98101-4407
                       Attn: Real Estate Notices

4.    Developer shall construct the additions to the Mall Store Building(s) and the Enclosed Mall and reconfigure the Common Areas and construct the additional Common Area improvements as more particularly shown on Exhibit "B" hereto in accordance with the terms and provisions of the REA. The parties hereto hereby approve the construction thereof as shown on Exhibit "B" hereto. Developer shall complete such construction prior to the opening of the Nordstrom Building.

5.    Saks has submitted its plans for the Saks Expansion to the Developer in accordance with Section 4.4 of the REA. Nordstrom has submitted its plans for the construction of the Nordstrom Building to Developer in accordance with the provisions of Section 4.4 of the REA. In the event Macy shall elect to construct the Macy Expansion, Macy shall submit its plans for the Macy Expansion to Developer in accordance with Section 4.4 of the REA.

6.    Saks and Nordstrom have submitted a building schedule only to the Developer in accordance with Section 5.5 of the REA. In the event Macy shall elect to construct the Macy Expansion, Macy shall submit a building schedule only to the Developer in accordance with Section 5.5 of the REA.

7.    (a)    Macy shall have the right to construct a two (2) level expansion to the Macy Building of up to an aggregate of ninety thousand (90,000) square feet of Floor Area as more particularly shown on Exhibit "B" hereto (herein referred to as the "Macy Expansion"). In connection therewith, Macy shall make all necessary alterations to the Perimeter Sidewalks and landscaped and planted areas between the altered Perimeter Sidewalks and the Macy Building and Macy shall restore the parking and other Common Areas on the Macy Parcel to the condition the same existed prior to the construction of the Macy Expansion in order to accommodate such Expansion.

(b)    In the event Macy shall not have commenced construction of the Macy Expansion consisting of in excess of sixty thousand (60,000) square feet of Floor Area on or before the second anniversary of the date of this Second Amendment, the portion of the Macy Parcel more particularly described on Exhibit "A," Part 11, attached hereto shall be deleted from the Macy Parcel and added to the Developer Parcel.

8.    Saks shall construct an expansion to the Saks Building of up to thirty-five thousand (35,000) square feet of Floor Area as more particularly shown on Exhibit "B" hereto (herein referred to as the "Saks Expansion"). In connection therewith, Saks shall make all necessary alterations to the Perimeter Sidewalks and landscaped and planted areas between the altered Perimeter Sidewalks and the Saks Building and Saks shall restore the parking and other Common Areas on the Saks Parcel to the condition the same existed prior to the construction of the Saks Expansion in order to accommodate such expansion. Saks shall complete the

F00167



construction of the Saks Expansion and open the Saks Expansion to the public on or before November 15, 2007.

9.    The following shall be inserted as Section 7.4C. of the REA:

Section 7.4C    Construction of Nordstrom Improvements

Nordstrom shall construct or cause to be constructed the following building and improvements (which building and improvements, together with any additions thereto or replacements thereof, are herein referred to as the "Nordstrom Improvements"):

(a)    a two-level building within its Permissible Building Area containing approximately one hundred forty four thousand (144,000) square feet of Floor Area and having a maximum height as provided in Section 5.9 (the "Nordstrom Building"), which shall have a main entrance to each level of the Enclosed Mall;

(b)    the Perimeter Sidewalks on the Nordstrom Parcel from the back face of the curb which shall be set by Developer at Developer's expense and the landscaped and planted areas lying between said Perimeter Sidewalks and the Nordstrom Building;

(c)    the Truck Facilities serving the Nordstrom Building, including the paving, curbing, sidewalks, guardrails, etc., for the truck dock apron; and

(d)    retaining walls, if any, and backfilling of same, required in grade arms to physically support the Nordstrom Improvements.

Nordstrom shall construct the Nordstrom Improvements in accordance with the Building Schedule and open the Nordstrom Improvements to the public on or before Nordstrom's Opening Date as set forth in the Nordstrom Lease.

10.    The provisions of Sections 7.1, 7.6 and 7.7 of the REA shall not be applicable with respect to Nordstrom; provided, however, that in no event shall Nordstrom be obligated to initially open between November 18th and February 15 or between March 17th and August 7th.

11.    (a)    In Section 9.2(a) of the REA, the phrase "the thirteenth (13th) anniversary of the Center Opening Date" shall be deleted from the first and second lines and the phrase "twenty-four (24) full calendar months prior to the expiration of the Operating Covenant Period set forth in Section 13.1(a)(1) (such period is hereinafter referred to as the "Restoration Period")" shall be substituted therefor.

(b)    In Section 9.2(b) of the REA, the phrase "thirteenth anniversary of the Center Opening Date" shall be deleted from the second line and the phrase "Restoration Period" shall be substituted therefor.

12.    (a)    In Section 9.3(a)(1) of the REA, the phrase "thirteenth (13th) anniversary of the Center Opening Date" shall be deleted from the second line and the phrase "Restoration Period" shall be substituted therefor.

(b)    In Section 9.3(a)(2) of the REA, the phrase "thirteenth (13th) anniversary of the Center Opening Date" shall be deleted from the first line and the phrase "Restoration Period" shall be substituted therefor.

(c)    Notwithstanding anything herein contained to the contrary, the Restoration Period with respect to Sears has expired.

13.    The first paragraph of Section 11.1 of the REA shall be deleted and the following shall be substituted therefor:

F00168

Except as otherwise provided in Article XVIII, a parking ratio of at least 4.5 automobile parking spaces for every 1,000 square feet of Floor Area shall be maintained on the Shopping Center Parcel as a whole.

14.    (a)    In the second line of the second paragraph of Section 12.1 of the REA, the phrase "for twenty (20) years" shall be deleted and the phrase "through and including February 28, 2015 (hereinafter referred to as the "Operating Covenant Period")" shall be substituted therefor.

(b)    In the first line of the third paragraph of Section 12.1 of the REA, the phrase "twenty (20) year period described above" shall be deleted and the phrase "Operating Covenant Period" shall be substituted therefor.

(c)    In the sixth line of the third paragraph of Section 12.1 of the REA, the phrase "said twenty (20) year period" shall be deleted and the phrase "the Operating Covenant Period" shall be substituted therefor.

15.    Sections 13.1(a)(1) and (2) of the REA shall be deleted and the following shall be substituted therefor:

(1)    (A)    With respect to Macy, Bloomingdale's, Saks and Nordstrom, during the period commencing with the opening of its Building to the public and terminating upon the expiration of the Operating Covenant Period, it will operate or cause to be operated the following specified Floor Area within its Building as a department store or specialty department store; in the case of Macy, at least one hundred fifty thousand (150,000) square feet of Floor Area which shall be operated under the name "Burdines-Macy's" or such other name as is then being used by Macy to identify its multi-level stores of over one hundred fifty thousand (150,000) square feet of Floor Area in Southeastern Florida; in the case of Bloomingdale's, at least one hundred fifty thousand (150,000) square feet of Floor Area which shall be operating under the name "Bloomingdale's" or such other name as is then being used by Bloomingdale's to identify its multi-level stores operated by Bloomingdale's of over one hundred fifty thousand (150,000) square feet of Floor Area in Southeastern Florida; in the case of Saks, at least seventy thousand (70,000) square feet of Floor Area which shall be operated under the name "Saks" or "Saks Fifth Avenue" or such other name as is then being used by Saks to identify its multi-level stores operated by Saks or Saks Fifth Avenue of over seventy thousand (70,000) square feet of Floor Area in Southeastern Florida; and in the case of Nordstrom, at least one hundred thousand (100,000) square feet of Floor Area which shall be operated under the name of "Nordstrom" or such other name as is then being used by Nordstrom to identify its multi-level stores of over one hundred thousand (100,000) square feet of Floor Area in the States of Florida and Georgia; provided, however, that if the Lease of a Major shall require it to operate for a period in excess of the Operating Covenant Period, such Major shall be required to operate for such longer period, subject to the terms of this REA and such Major's Lease.

(B)    With respect to Sears, during the period commencing with the opening of its Building to the public and terminating the fifteenth (15th) anniversary of the Center Opening Date, at least one hundred twenty thousand (120,000) square feet of Floor Area, which shall be operated under the name "Sears" or such other name as is then being used by Sears to identify its multi-level stores of one hundred thousand (100,000) square feet of Floor Area in Southeastern Florida, and in addition, during the period commencing on the fifteenth (15th) anniversary of the Center Opening Date and through and including the twentieth (20th) anniversary of the Center Opening Date, Sears shall operate or cause to be operated the Sears Building, if at all, as a department store or specialty department store and for no other purpose.

(2)    With respect to Macy, Bloomingdale's, Saks and Nordstrom, upon the expiration of the Operating Covenant Period and with respect to Sears, during the period commencing with the twentieth (20th) anniversary of the Center

6

Opening Date and in each case through and including the expiration of its respective Major's Lease, each of Macy, Bloomingdale's, Saks, Nordstrom and Sears shall operate its respective Building, if at all, for retail and service purposes and for no other purpose.

16.    Section 13.2(d) of the REA shall be amended by adding the following to the end thereof:

> In addition to the foregoing, Nordstrom and Saks shall be released from its respective covenant to operate if for a period of twelve (12) consecutive calendar months or more either the Macy Building or the Bloomingdale's Building is not being operated as a department store, and is not replaced within eighteen (18) months after such Building first ceased operating with a department store of at least one hundred twenty thousand (120,000) square feet, unless the replacement department store is Neiman Marcus, in which event such replacement shall be at least seventy five thousand (75,000) square feet.

17.    (a)    In Section 13.4(b)(2) of the REA, subparagraph (iii) shall be deleted. Burdines shall be released from all of its obligations under the REA from and after the date of this Second Amendment.

(b)    In Section 13.4(b)(2) of the REA, at the end of the language inserted therein pursuant to Paragraph 12 of the First Amendment to the REA, delete the period, substitute a semi-colon and insert the following:

> (vi)    Nordstrom shall be released from all of its obligations under this REA if such transfer is to an Affiliate or to a corporation or other Person which acquired a majority of the stores of Nordstrom or any successor thereto exceeding one hundred thousand (100,000) square feet in the States of Florida and Georgia and said transferee by written instrument in recordable form expressly assumes all of the obligations of Nordstrom hereunder and is financially capable of performing such obligations (as hereinafter provided).

18.    In Section 15.5 of the REA, the phrase "twentieth anniversary of the Center Opening Date" shall be deleted from the sixth line and the phrase "Operating Covenant Period" shall be substituted therefor.

19.    Section 17.1 of the REA shall be amended by deleting the word "Burdines" from the tenth (10th) line of the first paragraph thereof and substituting the word "Nordstrom" therefor.

20.    Section 17.4 of the REA shall be amended by deleting the word "Federated" from the ninth line thereof and substituting the word "Nordstrom" therefor.

21.    Section 17.5 of the REA shall be amended by deleting the word "Burdines" from the seventh line thereof and inserting the word "Nordstrom" therefor and deleting the word "Federated" from the tenth line therefor and inserting the word "Nordstrom" therefor.

22.    In Section 18.2(a), the phrase "with respect to Sears and prior to the Operating Covenant Period with respect to Macy, Bloomingdale's, Saks and Nordstrom," shall be inserted after the word "Date" on the third line.

23.    In Section 18.3(b) of the REA, the figure "4.25" shall be deleted from the fourth line and the figure "4.00" shall be substituted therefor.

24.    In Article XXI, the addresses of each of Macy, Sears and Federated shall be deleted and the following shall be substituted therefor:

7

  

To Macy:

Macy's East, Inc.
c/o Federated Department Stores, Inc.
7 West Seventh Street
Cincinnati, Ohio 45202
Attn: Real Estate Department

with a copy to:

Macy's East, Inc.
c/o Burdines, Inc.
P.O. Box 2350
22 East Fagler Street
Miami, Florida 31131
Attn: Chairman

To Sears:

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn: Property Manager, Southeast

with a copy to:

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn: Vice President — Real Estate

To Bloomingdale's:

Bloomingdale's, Inc.
c/o Federated Department Stores, Inc.
7 West Seventh Street
Cincinnati, Ohio 45202
Attn: Real Estate Department

with a copy to:

Bloomingdale's, Inc.
1000 Third Avenue
New York, New York 10022
Attn: Chairman

To Saks:

Saks & Company
115 N. Calderwood Street
P.O. Box 9388
Alcoa, Tennessee 37701
Attn: Eric Steven Faires

with a copy to:

Saks & Company
12 E. 49th Street
New York, New York 10017
Attn: General Counsel

To Nordstrom:

Nordstrom, Inc.
1700 Seventh Avenue, Suite 1000
Seattle, Washington 98101-4407
Attn: Real Estate Notices

And the addresses of the Fee Owner shall be changed to:

The Gardens Ventures, LLC
The Gardens of The Palm Beaches
3101 PGA Boulevard
Palm Beach Gardens, Florida 33410

25.    Nordstrom, by executing this Agreement, hereby assumes and agrees to be bound
by all of the terms and provisions of the REA from and after the date hereof.

8

F00171

**IN WITNESS WHEREOF**, each Party has caused its duly authorized officers to sign this Second Amendment to the Construction, Operation and Reciprocal Easement Agreement as of the day and year first above written.

WITNESS:

FORBES/COHEN FLORIDA PROPERTIES
LIMITED PARTNERSHIP,
a Michigan limited partnership

By    Forbes/Cohen Properties, LLC,
      Its general partner

By    _____

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF OAKLAND    )

On this 31ST day of August, 2004, before me personally appeared Sidney Forbes, who, being by me duly sworn, did say that Forbes/Cohen Properties, L.L.C., a Michigan limited liability company, is the general partner of Forbes/Cohen Florida Properties Limited Partnership, a Michigan limited partnership, and that the said instrument was signed on behalf of said limited partnership by authority of its articles of agreement; and the said signatory acknowledged the said instrument to be the free act and deed of said limited partnership. Said signatory is personally known to me and did not take an oath.

_____
Notary Public,
Oakland County, Michigan
My Commission Expires: March 1, 2011

9

F00172

WITNESS:                              MACY'S EAST, INC.,
                                      an Ohio corporation


_Elizabeth R_____              By  _____

_____              Its  _____
                                              Vice President


STATE OF OHIO         )
                      ) ss.
COUNTY OF HAMILTON    )

   On  this  27th day  of  August,  2004,  before  me  personally  appeared
_____Gary J. May_____ , being by me duly sworn, did say that he is the
_____Vice President_____ of Macy's East, Inc., an Ohio corporation, and that the foregoing
instrument was signed on behalf of said corporation, and the said signatory acknowledged the
said instrument to be the free act and deed of said corporation.  Said signatory is personally
known to me and did not take an oath.

                              _Elizabeth J. Haass_____
                                  Notary Public
                              __Hamilton__ County, ____Notary Public, State of Ohio____
                              My Commission Expires: __My Commission Expires Mar. 26, 2007__

                              ELIZABETH J. HAASS
                              Notary Public, State of Ohio
                              My Commission Expires Mar. 26, 2007

10

F00173

WITNESS:                          SEARS, ROEBUCK AND CO.,
                                  a New York corporation

_Laurie Torrey_                   By _James B. Terrell_

_Loya R. Wooten_                  By
                                      James B. Terrell, Director
                                      Real Estate Administration

STATE OF ILLINOIS        )
                         ) ss.
COUNTY OF Cook           )

     On this 30th day of _August_____, 2004, before me personally appeared
_James B. Terrell_ and _____, being by me duly sworn,
did say that they are the _Director Real and Estate Administration_,
respectively, of Sears, Roebuck and Co., a New York corporation, and that the foregoing
instrument was signed on behalf of said corporation, and the said signatories acknowledged the
said instrument to be the free act and deed of said corporation.  Said signatory is personally
known to me and did not take an oath.

                                  _Alicia Ortega_
                                  Notary Public
                                  _____ County, Illinois
                                  My Commission Expires:  _7/26/06_

```
+-----------------------------------+
|          OFFICIAL SEAL            |
|          ALICIA ORTEGA            |
|  NOTARY PUBLIC - STATE OF ILLINOIS |
|  MY COMMISSION EXPIRES: 07-26-06  |
+-----------------------------------+
```

11

WITNESS:

BURDINES, INC.,
an Ohio corporation

By _____

Its _____
                 Vice President

STATE OF OHIO       )
                      ) s
COUNTY OF HAMILTON  )

On this 27th day of August, 2004, before me personally appeared Gary J. May, being by me duly sworn, did say that he is the Vice President of Burdines, Inc., an Ohio corporation, and that the foregoing instrument was signed on behalf of said corporation, and the said signatory acknowledged the said instrument to be the free act and deed of said corporation. Said signatory is personally known to me and did not take an oath.

_____
Notary Public
Hamilton County, Ohio
My Commission Expires: _____

ELIZABETH J. HAASS
Notary Public, State of Ohio
My Commission Expires Mar. 28, 2007

12

F00175



WITNESS:

BLOOMINGDALE'S, INC.
an Ohio corporation

By

Its          Vice President

STATE OF OHIO          )
                       ) s:
COUNTY OF HAMILTON     )

On this 27th day of August, 2004, before me personally appeared _____Gary J. Nay,_____, being by me duly sworn, did say that he is the _____Vice President_____ of Bloomingdale's, Inc., an Ohio corporation, and that the foregoing instrument was signed on behalf of said corporation, and the said signatory acknowledged the said instrument to be the free act and deed of said corporation. Said signatory is personally known to me and did not take an oath.

Notary Public

_____Hamilton_____ County, **ELIZABETH J. HAASS**
My Commission Expires:      Notary Public, State of Ohio
                            My Commission Expires Mar. 26, 2007

13

F00176

WITNESS:

SAKS & COMPANY,
a New York corporation

*Mitch Glasgow*

By *Eric Steven Faires*

*T. Jamini Bohi*

Its _____

STATE OF TENNESSEE    )
                                        ) ss.
COUNTY OF BLOUNT    )

On this 24ᵗʰ day of *August*, 2004, before me personally appeared Eric Steven Faires, being by me duly sworn, did say that he is the Senior Vice President, of Saks & Company, a New York corporation, and that the foregoing instrument was signed on behalf of said corporation, and the said signatory acknowledged the said instrument to be the free act and deed of said corporation. Said signatory is personally known to me and did not take an oath.

*Mitch Glasgow*
Notary Public
*Blount* County, *Tennessee*
My Commission Expires: *June 7, 2005*

MITCH GLASGOW
NOTARY
PUBLIC
AT
LARGE
SHELBY CO. TN

14

F00177

WITNESS:                           NORDSTROM, INC.,
                                   a Washington corporation


*Alissa Pattterson*                By  *David L Mackie*
                                       David L. Mackie, Vice President
                                       Real Estate and Corporate Secretary
*Pat Jones*


STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

   On this 24 day of August, 2004, before me personally appeared David L.
Mackie, being by me duly sworn, did say that he is the Vice President Real Estate and Corporate
Secretary of Nordstrom, Inc., a Washington corporation, and that the foregoing instrument was
signed on behalf of said corporation, and the said signatory acknowledged the said instrument to
be the free act and deed of said corporation. Said signatory is personally known to me and did
not take an oath.

                                   *Shannon M. Valderas*
                                   Notary Public
                                   King County, Shoreline City
                                   My Commission Expires: 10-28-2007

15

F00178

## CONSENT OF FEE OWNER

      **THE GARDENS VENTURE, LLC** (hereinafter referred to as the "Fee Owner"), successor to the Trustees under Trust Agreement, dated December 28, 1983, and known as the MacArthur Liquidating Trust, as fee title owner of the "Shopping Center Parcel" (as defined in the "REA", as defined below), on behalf of itself, its successors and assigns, hereby consents to the foregoing Second Amendment to the Construction, Operating and Reciprocal Easement Agreement (hereinafter referred to as the "Second Amendment") relating to that certain Construction, Operating and Reciprocal Easement Agreement, dated May 29, 1987, and recorded in Book 5370,, Page 437, Palm Beach County Records, as amended by First Amendment to Construction, Operation and Reciprocal Easement Agreement, dated April 18, 1990, recorded in Book 6428, Page 1130, Palm Beach County Records (herein referred to as the "REA") and agree that its fee title interest in and to the Shopping Center Parcel shall be bound by and be subject to the REA as amended by the Second Amendment in accordance with the terms, provisions and conditions thereof.

Dated:      August **31**, 2004

**WITNESS:**                             **FEE OWNER**

                                      **THE GARDENS VENTURE, LLC**

       _(signatures)_  By  _(signature)_

STATE OF MICHIGAN    )
                       ) ss.
COUNTY OF OAKLAND  )

      On this **31** day of August, 2004, before me personally appeared **G.T. YONK**, being by me duly sworn, did say that he is the _Authorized Signatory_ of The Gardens Venture, LLC, a limited liability company, and that the foregoing instrument was signed on behalf of said limited liability company, and the said signatory acknowledged the said instrument to be the free act and deed of said limited liability company. Said signatory is personally known to me and did not take an oath.

                            _(signature)_
                            Notary Public
                            Oakland County, Michigan
                            My Commission Expires: **11. 29. 2005**

                                MARTINE Y. PRASNJAK
                           Notary Public, Macomb County, MI
                           Acting in _Oakland_ Co., MI
                           My Commission Expires 11/29/2005

16

F00179

### CONSENT OF MORTGAGEE

**THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,** the Mortgagee of the "Shopping Center Parcel" (as defined in the "REA" as defined below) pursuant to that certain Amended and Restated Mortgage and Security Agreement, dated January 21, 1988, recorded in Official Records Book 5554, Page 798, Public Records of Palm Beach County, Florida, as amended, hereby consents to the foregoing Second Amendment to Construction, Operation and Reciprocal Easement Agreement dated May 29, 1987, and recorded in Book 5370, page 437, Palm Beach County Records, as amended by First Amendment to Construction, Operation and Reciprocal Easement Agreement, dated April 18, 1990, recorded in Book 6438, page 1130, Palm Beach County Records (collectively, the "REA") and acknowledges and agrees that said Amended and Restated Mortgage and Security Agreement shall be subordinate to the REA, as amended by said Second Amendment to Construction, Operation and Reciprocal Easement Agreement.

WITNESS:

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY
A Wisconsin corporation

By    Northwestern Investment Management
Company, LLC,
A Delaware limited liability company,
Its wholly owned affiliate and
Authorized representative

_____
Robin Miller

By _____
Richard F. Von Haden , Managing Director

_____
Janis E. Miller

Attest _____
Robert W. Francour , Assistant Secretary

STATE OF WISCONSIN    )
                                       ) ss.
COUNTY OF MILWAUKEE )

The foregoing instrument was acknowledged before me this __24th__ day of August, 2004, by __Richard F. Von Haden__ , the Managing Director of Northwestern Investment Management Company, LLC, on behalf of The Northwestern Mutual Life Insurance Company, the corporation that executed the within and foregoing instrument and that said instrument was signed and sealed on behalf of said corporation, and said __Richard F. Von Haden__ acknowledged said instrument to be the free act and deed of said corporation. Said signatory is personally known to me and did not take an oath.

_____
Notary Public
Milwaukee County, Wisconsin
My Commission Expires: __February 24, 2008__

DET_C.608230.6

```
ROBIN MILLER
NOTARY PUBLIC
STATE OF WISCONSIN
```

17

## EXHIBIT "A", PART 2

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88° 45' 08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00 feet to the POINT OF BEGINNING; thence continue North 1° 14' 52" East a distance of 257.39 feet; thence North 88° 45' 08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28° 13'10"; thence North 60° 31' 58" West a distance of 29.24 feet; thence North 29° 28' 02" East a distance of 164.38 feet;   thence N38°49'19"W a distance of 32.54 feet; thence N79°45'30"W a distance of 59.90 feet; thence N36°49'33"W a distance of 63.51 feet; thence N80°31'58"W a distance of 55.74 feet; thence N43°27'31" W a distance of 27.91 feet; thence N29°28'02"E a distance of 82.13 feet; thence N36°28'52W a distance of 30.66 feet; thence N29°28'02E a distance of 156.51 feet; thence S65°56'34"E a distance of 4.75 feet to the beginning of a curve concave Northerly, having a radius of 115.00 feet; thence Easterly a distance of 79.46 feet along said curve through a central angle of 39°35'24"; thence N74°28'03"E a distance of 170.84 feet; thence North 29° 28' 02" East a distance of 66.17 feet to a point on a non tangent curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 4° 53' 25" West; thence Easterly a distance of 30.98 feet along said curve through a central angle of 22° 54' 12"; thence North 27° 47' 36" East a distance of 74.26 feet; thence North 74° 14' 52" East a distance of 52.47 feet; thence North 1° 14' 52" East a distance of 54.38 feet; thence South 88° 45' 08" East a distance of 225.00 feet; thence South 1° 14' 52" West a distance of 85.40 feet; thence South 71° 45' 08" East a distance of 128.22 feet; thence South 25° 32' 54" East a distance of 24.10 feet to a point on a curve concave Southerly, having a radius of 77.50 feet , a radial to said point bears North 25° 32' 54" West; thence Easterly a distance of 59.24 feet along said curve through a central angle of 43° 47' 46"; thence South 71° 45' 07" East a distance of 25.82 feet;   thence S17°34'04"W a distance of 23.34 feet; thence S72°30'06"E a distance of 105.90 feet; thence S76°21'39"E a distance of 69.97 feet; thence S86°55'04"E a distance of 65.09 feet; thence S69°59'03"E a distance of 67.66 feet; thence S24°12'48"E a distance of 359.64 feet; thence S66° 35'43"W a distance of 61.87 feet; thence S24°42'20"E a distance of 63.47 feet; thence S66° 35'43W a distance of 106.04 feet; thence S70°41'28"W a distance of 69.73 feet; thence South 66° 35' 43" West a distance of 189.53 feet to the beginning of a curve concave Northerly, having a radius of 750.00 feet; thence Westerly a distance of 322.70 feet along said curve through a central angle of 24'39' 09"; thence North 88° 45' 08" West a distance of 44.82 feet; thence North 89° 53' 54" West a distance of 50.00 feet thence North 88° 45' 08" West a distance of 10.00 feet to the beginning of a curve concave Southeasterly, having a radius of 45.00 feet thence Southwesterly a distance of 70.69 feet along said curve through a central angle of 90° 00' 00" to its point of tangency with a line parallel with and Easterly 40.00 feet from that certain course described above as North 1° 14' 52" East a distance of 257.39 feet; thence South 1° 14' 52" West along said parallel line a distance of 128.39 feet to the beginning of a curve concave Northeasterly, having a radius of 50.00 feet; thence Southerly a distance of 41.65 feet along said curve through a central angle of 47° 43' 53" to a line bearing South 88° 45' 08" East from the POINT OF BEGINNING; thence North 88°45' 08" West a distance of 56.41 feet to the POINT OF BEGINNING.

Containing an area of 18.322 acres, more or less.

 

**EXHIBIT "A", PART 5**

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commence at the center of said Section 6, thence S.88°45'08" E. along the South line of the Northeast one-quarter of said Section 6, a distance of 763.55 feet; thence N. 01°14'52" E. a distance of 70.00 feet to a point on the North right-of-way line of P.G.A. Boulevard as recorded in P.G.A. 4442, Pages 856 thru 874 of the Public Records of said Palm Beach County and the POINT OF BEGINNING; thence S. 88°45'98" E. along said right-of-way line and through the following courses a distance of 167.97 feet; thence N. 01°14'52" E. a distance of 12.00 feet thence S. 88°45'08" E. a distance of 162.07 feet; thence N. 43°40'03" W. departing from said right-of-way line a distance of 35.41 feet thence N. 01°25'01" E. a distance of 167.93 feet; thence S. 88°34'59" E. a distance of 165.49 feet to a point of curvature of a curve concave Northwesterly, having a radius of 225.00 feet; thence Northeasterly along the arc of said curve through a central angle of 24°49'18" a distance of 97.47 feet to a point of tangency thence N. 66°35'43" E. a distance of 487.89 feet; thence S. 29°09'19" E. a distance of 57.23 feet to a point of curvature of a curve concave Northeasterly, having a radius of 150.00 feet; thence Southeasterly along the arc of said curve through a central angle of 37°12'25" a distance of 97.41 feet to a point of tangency, thence S. 66°21'44" E. a distance of 41.84 feet; thence S. 22°58'41" E. a distance of 48.08 feet to a point on a non-tangent curve concave Southeasterly having a radius of 585.87 feet, the chord of which bears N. 32°47'12" E.; thence Northeasterly along the arc of said curve through a central angle of 24°45'39" a distance of 253.19 feet to a point of tangency; thence N. 45°10'02" E. a distance of 20.00 feet; thence N. 46°09'36" E. a distance of 150.00 feet to a point on a non-tangent curve concave Northwesterly, having a radius of 470.87 feet; the chord of which bears N.18°22'52" E.; thence Northeasterly along the arc of said curve through a central angle of 33°55'42" a distance of 278.83 feet to a point of tangency; thence N. 01°25'01" E. a distance of 368.61 feet to the point of curvature of a curve concave Southeasterly having a radius of 570.87 feet; thence Northeasterly along the arc of said curve through a central angle of 35°04'51" a distance of 349.53 feet to a point of tangency; thence N. 36°29'52" E. a distance of 20.34 feet; thence N. 08°30'08" W. a distance of 49.50 feet; thence N. 53° 30'08" W. a distance of 625.68 feet to a point of curvature of a curve concave Southerly having a radius of 1100.92 feet; thence Westerly along the arc of said curve through a central angle of 46° 55'16" a distance of 901.57 feet to the point of tangency; thence S. 79°34'36" W. a distance of 1355.52 feet; thence S. 34°04'49" W. a distance of 49.93 feet; thence S. 11°24'59" E. a distance of 175.38 feet to the point of curvature of a curve concave Westerly having a radius of 570.87 feet; thence Southerly along the arc of said curve through a central angle of 12°50'02" a distance of 127.87 feet to the point of tangency; thence S. 01°25'01" W. a distance of 574.96 feet to a point of curvature of a curve concave Northeasterly having a radius of 470.87 feet; thence Southeasterly along the arc of said curve through a central angle of 31°44'43" a distance of 260.89 feet to the point of tangency; thence S. 30°19'43" E. a distance of 420.42 feet to a point of curvature of a curve concave Southwesterly having a radius of 570.87 feet; thence Southeasterly along the arc of said curve through a central angle of 10°29'34" a distance of 104.54 feet; thence N. 70°09'49" E. a distance of 10.00 feet; thence N. 19°33'44" E. a distance of 44.43 feet to a point on a non-tangent curve concave Northwesterly, having a radius of 325.00 feet, the chord bears N. 44°17'59" E. thence Northeasterly along the arc of said curve through a central angle of 29°19'21" a distance of 166.33 feet to the point of tangency; thence N. 29°38'19" E. a distance of 43.82 feet; thence S. 60°31'58" E. a distance of 436.75 feet to the point of curvature of a curve concave Northeasterly having a radius of 500.00 feet; thence Southeasterly along the arc of said curve through a central angle of 25°19'58" a distance of 221.07 feet; thence S. 01°25'01" W. a distance of 181.46 feet; thence S. 46°18'28" a distance of 35.30 feet to the POINT OF BEGINNING

LESS and EXCEPT that portion thereof described as follows: (NORDSTROM LEASE PARCEL)
That portion of the North Half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45' 08" East along the South line of the Northeast Quarter of said Section a distance of 763.55 feet; thence North 1° 14'52 East a distance of 70.00 feet, thence North 46°19'57" East a distance of 35.30 feet thence North 1° 25' 01" East a distance of 181.46 feet to a point on a non tangent curve concave Northerly, having a radius of 500.00 feet a radial to said point bears South 4° 08' 03" West; thence Northwesterly a distance of 221.07 feet along said curve through a central angle of 25° 19' 59"; thence North 60° 31'58" West a distance of 436.75 feet; thence South 29° 38'18" West a distance of 43.82 feet to the beginning of a curve concave Northwesterly, having a radius of 325.00 feet; thence Southwesterly a distance of 166.33 feet along said curve through a central angle of 29° 19'21" thence South 19° 33'44" West a distance of 44.43 feet; thence South 70° 09' 49" West a distance of 10.00 feet to a point on a curve concave Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70° 09'49" East; thence Northwesterly a distance of 73.44 feet along said curve through a central angle of 7°22'15" to the POINT OF BEGINNING; thence continuing Northwesterly a distance of 31.10 feet along said curve through a central angle of 3° 07'19"; thence North 30° 19' 43" West a distance of 18.90 feet to a point on a non tangent curve concave Northerly, having a radius of 45.00 feet, a radial to said point bears South 22° 48' 04" West, thence Northeasterly a distance of 43.01 feet along said curve through a central angle of 54° 45'53" to a compound curve concave Northwesterly having a radius of 247.00 feet; thence Northeasterly a distance of 122.42 feet along said curve through a central angle of 28° 23'53"; thence North 29°38'18" East a distance of 16.50 feet to the beginning of a curve concave Westerly, having a radius of 30.00 feet; thence Northerly a distance of 47.21 feet along said curve through a central angle of 90° 10'16"; thence North 60° 31'58" West a distance of 98.59 feet; thence North 51° 19'33" West a distance of 75.00 feet to a point on a curve concave Northeasterly, having a radius of 450.00 feet, a radial to said point bears South 29°28'02" West, thence Northwesterly a distance of 486.55 feet along said curve through a central angle of 61° 06' 59"; thence North 1° 25'01" East a distance of 260.89 feet; thence South 88°34'59" East a distance of 48.00 feet; thence North 1° 25'01" East a distance of 144.65 feet to the beginning of a curve

F00182

concave Southeasterly, having a radius of 332.00 feet thence Northerly a distance of 30.28 feet along said curve through a central angle of 5°13'32"; thence S63°32'09"E a distance of 204.49 feet; thence N47°01'31"E a distance of 17.86 feet; thence S63°32'9"E a distance of 344.34 feet; thence N74°22'01"E a distance of 44.14 feet; thence S15°45'08"E a distance of 249.38 feet; thence N74°22'01"E a distance of 61.00 feet; thence S15°37'59"E a distance of 98.50 feet; thence S29°55'39"W a distance of 106.02 feet; thence N68°44'33"W a distance of 7.78 feet thence S29°55'39"W a distance of 241.08 feet; thence N39°31'20"W a distance of 29.90 feet; thence N80°11'30"W a distance of 59.64 feet; thence N39°31'37"W a distance of 27.98 feet; thence S29°55'39W a distance of 126.12 feet; thence S60°04'21"E a distance of 41.91 feet;    thence South 29°38'18" West a distance of 106.68 feet to the beginning of a curve concave Northwesterly, having a radius of 276.50 feet, said curve being concentric with and Southeasterly 31.50 feet from that certain curve described above as having a radius of 247.00 feet and a length of 122.42 feet; thence Southwesterly a distance of 142.53 feet along said concentric curve through central angle of 29°19'20"; thence South 58°57'39" West a distance of 34.54 feet to the POINT OF BEGINNING.

Containing an area of 10.61 acres, more or less

ALSO LESS and EXCEPT that portion thereof described as follows: (MACY'S LEASE PARCEL)
That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88° 45' 08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00 feet to the POINT OF BEGINNING; thence continue North 1° 14' 52" East a distance of 257.39 feet; thence North 88° 45' 08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28° 13'10"; thence North 60° 31' 58" West a distance of 29.24 feet; thence North 29° 28' 02" East a distance of 164.38 feet;   thence N38°49'19"W a distance of 32.54 feet; thence N79°45'30"W a distance of 59.90 feet; thence N36°49'33"W a distance of 63.51 feet; thence N80°31'58"W a distance of 55.74 feet; thence N43°27'31" W a distance of 27.91 feet; thence N29°28'02"E a distance of 82.13 feet; thence N36°28'52W a distance of 30.66 feet; thence N29°28'02E a distance of 156.51 feet; thence S65°56'34"E a distance of 4.75 feet to the beginning of a curve concave Northerly, having a radius of 115.00 feet; thence Easterly a distance of 79.46 feet along said curve through a central angle of 39°35'24"; thence N74°28'03"E a distance of 170.84 feet; thence North 29° 28' 02" East a distance of 66.17 feet to a point on a non tangent curve concave Southerly, having a radius of 77.50 feet, a radial to said point bears North 4° 53' 25" West; thence Easterly a distance of 30.98 feet along said curve through a central angle of 22° 54' 12"; thence North 27° 47' 36" East a distance of 74.26 feet; thence North 74° 14' 52" East a distance of 52.47 feet; thence North 1° 14' 52" East a distance of 54.38 feet; thence South 88° 45' 08" East a distance of 225.00 feet; thence South 1° 14' 52" West a distance of 85.40 feet; thence South 71° 45' 08" East a distance of 126.22 feet; thence South 25° 32'·54" East a distance of 24.10 feet to a point on a curve concave Southerly, having a radius of 77.50 feet , a radial to said point bears North 2° 32' 54" West; thence Easterly a distance of 59.24 feet along said curve through a central angle of 43° 47' 46"; thence South 71° 45' 07" East a distance of 25.82 feet;    thence S17°34'04"W a distance of 23.34 feet; thence S72°30'06"E a distance of 105.90 feet; thence S76°21'39"E a distance of 69.97 feet; thence S86°55'04"E a distance of 65.09 feet; thence S69°59'03"E a distance of 67.66 feet; thence S24°12'48"E a distance of 359.64 feet; thence S66°35'43"W a distance of 61.87 feet; thence S24°42'20"E a distance of 63.47 feet; thence S66°35'43W a distance of 105.04 feet; thence S70°41'28"W a distance of 69.73 feet; thence South 66° 35' 43" West a distance of 189.53 feet to the beginning of a curve concave Northerly, having a radius of 750.00 feet; thence Westerly a distance of 322.70 feet along said curve through a central angle of 24°39' 03"; thence North 88° 45' 08" West a distance of 44.82 feet; thence North 89° 53' 54" West a distance of 50.00 feet thence North 88° 45' 08" West a distance of 10.00 feet to the beginning of a curve concave Southeasterly, having a radius of 45.00 feet thence Southwesterly a distance of 70.69 feet along said curve through a central angle of 90° 00' 00" to its point of tangency with a line parallel with and Easterly 40.00 feet from that certain course described above as North 1° 14' 52" East a distance of 257.39 feet; thence South 1° 14' 52" West along said parallel line a distance of 126.39 feet to the beginning of a curve concave Northeasterly, having a radius of 50.00 feet; thence Southerly a distance of 41.65 feet along said curve through a central angle of 47° 43' 53" to a line bearing South 88° 45' 08" East from the POINT OF BEGINNING; thence North 88°45' 08" West a distance of 56.41 feet to the POINT OF BEGINNING.

Containing an area of 18.322 acres, more or less.

F00183

ALSO LESS and EXCEPT that portion thereof described as follows: (SEAR'S LEASE PARCEL)

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in official Record Book 4442, Pages 856 through 874 of the public records of said Palm Beach County; thence South 88° 45'08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00feet; thence South 88° 45' 08" East along said North line a distance of 162.07 feet; thence North 43° 40' 03" West a distance of 35.41 feet; thence North 1° 25' 01" East a distance of 167.93 feet; thence South 88° 34' 59" East a distance of 165.49 feet to the beginning of a curve concave Northerly, having a radius of 225.00 feet; thence Easterly a distance of 97.47 feet along said curve through a central angle of 24° 49' 18"; thence North 66° 35' 43" East a distance of 487.89 feet; thence South 29° 09' 19" East a distance of 57.23 feet to the beginning of a curve concave Northeasterly having a radius of 150.00 feet; thence Southeasterly a distance of 97.41feet along said curve through a central angle of 37° 12' 25"; thence South 66° 21' 44" East a distance of 41.48 feet; thence South 22° 58' 41" East a distance of 48.08 feet to a point on a non tangent curve concave Southeasterly, having a radius of 585.87 feet, a radial to said point bears North 69° 35' 38" West; thence Northeasterly a distance of 99.69 feet along said curve through a central angle of 9° 44' 57" to the POINT OF BEGINNING; thence North 66° 21' 44" West a distance of 79.84 feet to the beginning of a curve concave Northeasterly, having a radius of 83.50 feet; thence Northwesterly a distance of 62.60 feet through a central angle of 42° 57' 27"; thence North 23° 24' 17" West a distance of 104.92 feet; thence North 66° 35' 43" East a distance of 40.86 feet; thence North 23° 24' 17" West a distance of 51.50 feet; thence South 66° 35' 43" West a distance of 8.20 feet; thence North 23° 24' 17" West a distance of 276.41 feet to a point on a non tangent curve concave Northeasterly having a radius of 580.50 feet, a radial to said point bears South 30° 11' 30" West; thence Northwesterly a distance of 45.44 feet along said curve through a central angle of 4° 29' 07"; thence North 55° 19' 23" West a distance of 24.15 feet; thence North 71° 45' 08" West a distance of 74.95 feet; thence North 88° 10' 54" West a distance of 43.85 feet to the beginning of a curve concave Northeasterly having a radius of 259.50 feet; thence Northwesterly a distance of 39.37 feet along said curve through a central angle of 8° 41'32"; thence North 18° 14' 52" East a distance of 346.14 feet; thence South 71° 45' 08" East a distance of 35.00 feet; thence North 18° 14' 52" East a distance of 97.66 feet; thence South 72° 26' 25" East a distance of 187.97 feet; thence North 56° 14' 52" East a distance of 235.08 feet; thence North 13° 45' 08" West a distance of 29.80 feet; thence North 56° 14' 52" East a distance of 17.96 feet; thence North 33° 45' 08" West a distance of 28.80 feet; thence North 56° 14' 52" East a distance of 157.60 feet to a point on a non tangent curve concave Westerly having a radius of 532.00 feet, a radial to said point bears North 61° 41' 19" East; thence Southerly a distance of 276.03 feet along said curve through a central angle of 29° 43' 42" ; thence South 1° 25' 01" West a distance of 329.36 feet; thence South 88° 34' 59" East a distance of 48.00 feet; thence South 1° 25' 01" West a distance of 49.46 feet to the beginning of a curve concave Northwesterly, having a radius of 350.00 feet; thence Southwesterly a distance of 398.15 feet along said curve through a central angle of 65° 10' 42" thence South 66° 35' 43" West a distance of 93.67 feet; thence South 65° 26' 57" West a distance of 50.00 feet; thence South 66° 35' 43" West a distance of 36.00 feet to the beginning of a curve concave Southeasterly having a radius of 30.00 feet thence Southwesterly a distance of 47.12 feet along said curve through a central angle of 90° 00' 00" to its point of tangency with a line parallel with and Northeasterly a distance of 31.50 feet from that certain course described above as North 24° 24' 17" West a distance of 104.93 feet. Thence South 23° 24' 17" East along said parallel line a distance of 25.92 feet to the beginning of curve concave Northeasterly, having a radius of 52.00 feet, said curve being concave from that certain curve described above as having a radius of 83.50 feet and a central angle of 42° 57' 27"; thence Southeasterly a distance of 38.99 feet along said concentric curve through a central angle of 42° 57' 27"; thence South 66° 21' 44" East a distance of 56.52 feet to the beginning of a curve concave Northerly, having a radius of 45.00 feet; thence Easterly a distance of 32.28 feet along said curve through a central angle of 41° 05' 54" to a non tangent intersection with the Northeasterly prolongation of that certain curve described above as being concave Southeasterly, having a radius of 585.87 feet, a radial of said 585.87 foot radius curve to said point bears North 55° 37' 52" West; thence Southwesterly a distance of 43.08 feet along said curve through a central angle of 4° 15' 43" to the POINT OF BEGINNING. Containing an area of 10,606 Acres, more or less.

ALSO LESS and EXCEPT that portion thereof described as follows: (BLOOMINGDALE'S LEASE PARCEL)

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45'08" East along the South line of the Northeast Quarter of said Section, A distance of 763.55 feet; thence North 1°14'52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in

Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88° 45'08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00 feet; thence South 88° 45'08" East along said North line a distance of 182.07 feet; thence North 43° 40' 03" West a distance of 35.41 feet; thence North 1° 25' 01" East a distance of 167.93 feet; thence South 88° 34' 59" East a distance of 165.49 feet to the beginning of a curve concave Northerly, having a radius of 225.00 feet; thence Easterly a distance of 97.47 feet along said curve through a central angle of 24° 49' 18"; thence North 66° 35' 43" East a distance of 487.89 feet; thence South 29° 09' 19" East a distance of 57.23 feet to the beginning of a curve concave Northeasterly having a radius of 150.00 feet; thence Southeasterly a distance of 97.41 feet along said curve through a central angle of 37° 12' 25"; thence South 66° 21' 44" East a distance of 41.84 feet; thence South 22° 58' 41" East a distance of 48.08 feet to a point on a non tangent curve concave Southeasterly, having a radius of 585.87 feet, a radial to said point bears North 69° 35' 38" West; thence Northeasterly a distance of 253.19 feet along said curve through a central angle of 24° 45' 39"; thence North 45° 10'02" East a distance of 20 feet; thence North 46°.09' 35" East a distance of 150.00 feet to a point on a non-tangent curve concave Westerly, having a radius of 470.87 feet; a radial to said point bears South 54° 39' 17" East; thence Northerly a distance of 278.83 through a central angle of 33° 55' 42"; thence North 01° 25'01" East a distance of 368.61 feet to the beginning of a curve concave Easterly, having a radius of 570.87 feet; thence Northerly a distance of 349.53 feet through a central angle of 35° 04' 51"; thence North 36° 29' 52" East a distance of 20.34 feet; thence North 8° 30' 08" West a distance of 49.50 feet; thence North 53° 30'08" West a distance of 442.50 feet to the POINT OF BEGINNING; thence South 32° 13' 58" West a distance of 151.63 feet; thence South 48° 42' 00" East a distance of 182.23 feet; thence South 56° 16' 16" West a distance of 535.29 feet; thence North 72° 05' 27" West a distance of 71.90 feet to the beginning of a curve concave Northeasterly, having a radius of 65.00 feet; thence Northwesterly along said curve a distance of 78.21 feet through a central angle of 68° 56' 31"; thence on a radial line to said curve South 86° 51' 04" West a distance of 58.14 feet; thence South 18° 15' 19" West a distance of 81.51 feet; thence North 71° 44' 41" West a distance of 315.00 feet; thence North 18° 47' 22" East a distance of 62.46 feet; thence North 53° 49' 44" West a distance of 102.16 feet; thence North 18° 33' 26" East a distance of 59.24 feet; thence North 86° 26' 34" West a distance of 55.00 feet; thence North 18° 23' 26" East a distance of 446.00 feet; thence North 81° 26' 34" West a distance of 20.00 feet; thence North 61° 20' 13" West a distance of 36.21 feet; thence North 18° 20' 32" East a distance of 128.00 feet to a non-tangent curve concave Southerly, having a radius of 800.00 feet, a radial to said point bears North 6° 11' 57" West; thence Easterly a distance of 355.17 feet, along said curve through a central angle of 25° 26' 14" to a point on a non-tangent, compound curve concave Southerly, having a radius of 390.00 feet, a radial to said point bears North 7° 50' 42" East; thence Easterly along said curve a distance of 297.37 feet through a central angle of 43° 41' 13"; thence South 31° 48' 36" East a distance of 79.05 feet to a non-tangent curve concave Northerly having a radius of 321.66 feet, a radial to said point bears South 53° 57' 42" West; thence Easterly a distance of 150.00 feet through a central angle of 26° 43' 08"; thence North 32° 13' 58" East a distance of 99.20 feet to the Southwesterly Right of Way line of Gardens Boulevard; thence South 53° 30' 08" East along said Right of Way line a distance of 55.54 feet to the POINT OF BEGINNING.

Containing 13.398 Acres, more or less.

ALSO LESS and EXCEPT that portion thereof described as follows: (SAK'S LEASE PARCEL)
That portion of the North Half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the south line of the Northeast Quarter of said Section a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet; thence North 46° 19' 57" East a distance of 35.30 feet; thence North 1° 25' 01" East a distance of 181.46 feet to a point on a non tangent curve concave Northerly, having a radius of 500.00 feet, a radial to said point bears South 4° 08' 03" West; thence Northwesterly a distance of 221.07 feet along said curve through a central angle of 25° 19' 59"; thence North 60° 31' 58" West a distance of 436.75 feet; thence South 29° 38' 18" West a distance of 43.82 feet to the beginning of a non-tangent curve concave Northwesterly, having a radius of 325.00 feet;

thence Southwesterly along a chord bearing South 44°17'59" West a distance of 166.33 feet along
said curve through a central angle of 29° 19' 21"; thence South 19° 33' 44" West a distance of
44.43 feet; thence South 70° 09' 49" West a distance of 10.00 feet to a point on a curve concave
Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70° 09' 49" East;
thence Northwesterly a distance of 104.54 feet along said curve through a central angle of 10° 29'
34" West a distance of 420.42 feet to the beginning of a curve concave Easterly, having a radius
of 470.87 feet; thence Northerly a distance of 260.89 feet along said curve through a central angle
of 31° 44' 43"; thence North 1° 25' 01" East a distance of 574.96 feet to the beginning of a curve
concave Westerly, having a radius of 570.87 feet; thence Northerly a distance of 127.87 feet along
said curve through a central angle of 12° 50' 02"; thence North 11° 24' 59" West a distance of
175.38 feet; thence North 34° 04' 49" East a distance of 49.93 feet; thence North 79° 34' 36"
East a distance of 849.27 feet; thence South 23° 17'51" East a distance of 26.44 feet to the
POINT OF BEGINNING; thence continue South 23° 17' 51" East a distance of 413.00 feet; thence
South 74° 37' 00" East a distance of 104.71 feet to a point on a non—tangent curve concave
Northeasterly, having a radius of 123.00 feet, a radial to said point bears South 64° 45' 32" West;
thence Southeasterly a distance of 54.17 feet along said curve through a central angle of 25° 13'
58" to a point on a compound curve concave Northeasterly, having a radius of 300 feet; thence
Southeasterly a distance of 75.53 feet along said curve through a central angle of 14° 25' 31";
thence South 05° 06' 02" West along radial to said curve a distance of 15.00 feet, thence South
05° 15' 43" East a distance of 62.83 feet; thence South 29° 34' 03" West a distance of 87.98
feet; thence South 15° 45' 14" East a distance of 36.79 feet; thence South 74° 14' 46" West a
distance of 200.45 feet; thence North 15° 45' 14" West a distance of 24.65 feet; thence North 41°
58' 20" West a distance of 100.16 feet; thence North 60° 15' 57" West a distance of 43.98 feet;
thence North 23° 33' 47" West a distance of 300.76 feet; thence North 46° 31' 47" East a
distance of 30.33 feet; thence North 22° 35'16" West a distance of 9.49 feet; thence North 85° 53'
54" East a distance of 27.63 feet; thence North 23° 25' 59" West a distance of 217.48 feet;
thence North 68° 58' 59" East a distance of 6.08 feet; thence North 23° 25' 59" West a distance
of 48.75 feet; thence North 69° 02' 04" East a distance of 163.37 feet to the POINT OF
BEGINNING.

Containing 3.931 Acres, more or less.

## EXHIBIT "A", PART 10

That portion of the North Half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88°45' 08" East along the South line of the Northeast Quarter of said Section a distance of 763.55 feet; thence North 1° 14'52 East a distance of 70.00 feet, thence North 46°19'57" East a distance of 35.30 feet thence North 1° 25' 01" East a distance of 181.46 feet to a point on a non tangent curve concave Northerly, having a radius of 500.00 feet a radial to said point bears South 4° 08' 03" West; thence Northwesterly a distance of 221.07 feet along said curve through a central angle of 25° 19' 58"; thence North 60° 31'58" West a distance of 436.75 feet; thence South 29° 38'19" West a distance of 43.82 feet to the beginning of a curve concave Northwesterly, having a radius of 325.00 feet; thence Southwesterly a distance of 166.33 feet along said curve through a central angle of 29° 19'21" thence South 19° 33'44" West a distance of 44.43 feet; thence South 70° 09' 49" West a distance of 10.00 feet to a point on a curve concave Southwesterly, having a radius of 570.87 feet, a radial to said point bears North 70° 09'49" East; thence Northwesterly a distance of 73.44 feet along said curve through a central angle of 7° 22'15" to the POINT OF BEGINNING; thence continuing Northwesterly a distance of 31.10 feet along said curve through a central angle of 3° 07'19"; thence North 30° 19' 43" West a distance of 18.90 feet to a point on a non tangent curve concave Northerly, having a radius of 45.00 feet, a radial to said point bears South 22° 48' 04" West, thence Northeasterly a distance of 43.01 feet along said curve through a central angle of 54° 45'53" to a compound curve concave Northwesterly having a radius of 247.00 feet; thence Northeasterly a distance of 122.42 feet along said curve through a central angle of 28° 23'53"; thence North 29°38'18" East a distance of 16.50 feet to the beginning of a curve concave Westerly, having a radius of 30.00 feet; thence Northerly a distance of 47.21 feet along said curve through a central angle of 90° 10'18"; thence North 60° 31'58" West a distance of 98.59 feet; thence North 51° 19'33" West a distance of 75.00 feet to a non-tangent curve concave Northeasterly, having a radius of 450.00 feet, a radial to said point bears South 29°28'02" West; thence Northwesterly a distance of 486.55 feet along said curve through a central angle of 61° 56' 59"; thence North 1° 25'01" East a distance of 260.89 feet; thence South 88°34'59" East a distance of 48.00 feet; thence North 1° 25'01" East a distance of 144.65 feet to the beginning of a curve concave Southeasterly, having a radius of 332.00 feet thence Northerly a distance of 30.28 feet along said curve through a central angle of 5°13'32"; thence S63° 32'09"E a distance of 204.49 feet; thence N47° 01'31"E a distance of 19.32 feet; thence S63° 31'30"E a distance of 323.93 feet; thence N74° 22'01"E a distance of 59.44 feet; thence S15°37'59"E a distance of 262.00 feet; thence N74°22'01"E a distance of 61.00 feet; thence S15°37'59"E a distance of 98.50 feet; thence S29°55'39"W a distance of 58.78 feet; thence N76°13'29"W a distance of 8.32 feet thence S29°55'39"W a distance of 288.66 feet; thence N39°31'20"W a distance of 29.90 feet; thence N80°11'30"W a distance of 59.64 feet; thence N39°31'37"W a distance of 27.98 feet; thence S29°55'39"W a distance of 125.45 feet; thence S60°04'21"E a distance of 40.11 feet; thence South 29°38'18" West a distance of 106.88 feet to the beginning of a curve concave Northwesterly, having a radius of 278.50 feet, said curve being concentric with and Southeasterly 31.50 feet from that certain curve described above as having a radius of 247.00 feet and a length of 122.42 feet; thence Southwesterly a distance of 142.53 feet along said concentric curve through central angle of 29°19'20"; thence South 58°57'39" West a distance of 34.58 feet to the POINT OF BEGINNING.

Containing an area of 10.61 acres, more or less

**EXHIBIT "A", PART 11**

That portion of the North half of Section 6, Township 42 South, Range 43 East in the City of Palm Beach Gardens, Palm Beach County, Florida, described as follows:

Commencing at the center of said Section; thence South 88° 45' 08" East along the South line of the Northeast Quarter of said Section, a distance of 763.55 feet; thence North 1° 14' 52" East a distance of 70.00 feet to the North line of P.G.A. Boulevard as described in the deed recorded in Official Record Book 4442, Pages 856 through 874 of the Public Records of said Palm Beach County; thence South 88° 45' 08" East along said North line a distance of 167.97 feet; thence North 1° 14' 52" East along said North line a distance of 12.00 feet; thence continue North 1° 14' 52" East a distance of 257.39 feet; thence North 88° 45' 08" West a distance of 74.44 feet to the beginning of a curve concave Northerly, having a radius of 612.00 feet; thence Westerly a distance of 301.42 feet along said curve through a central angle of 28° 13'10"; thence North 60° 31' 58" West a distance of 29.24 feet; thence North 29° 28' 02" East a distance of 164.38 feet; thence North 38°49'19" West a distance of 32.54 feet; thence North 79°45'30"West a distance of 59.90 feet; thence North 36°49'33" West a distance of 27.46 feet to the POINT OF BEGINNING; thence continue North 36°49'33" West a distance of 36.05 feet; thence North 80°31'58" West a distance of 55.74 feet; thence North 43°27'31" West a distance of 27.91 feet; thence North 29° 28'02"East a distance of 82.13 feet; thence North 36°28'52 West a distance of 30.66 feet; thence North 29°28'02 East a distance of 156.51 feet; thence South 65°56'34" East a distance of 4.75 feet to the beginning of a curve concave Northerly, having a radius of 115.00 feet; thence Easterly a distance of 79.46 feet along said curve through a central angle of 39°35'24"; thence North 74° 28'03" East a distance of 122.64 feet; thence South 28°31'36" West a distance of 259.24 feet; thence North 41°28'24" West a distance of 29.80 feet; thence South 28°31'36" West a distance of 125.64 feet to the POINT OF BEGINNING.

Containing an area of 1.023 acres, more or less.



EXHIBIT "B"
SITE PLAN
THE GARDENS

F00189





THE · GARDENS MALL
SKETCH OF LEASE
PARCELS