# Exhibit A

# Section B
## Church Street, LLC - Kmart Store #4016 (1 K-Mart Plaza, Greenville, SC 29605)
## Index

|     |                                                                                      | Page(s)   |
| --- | ------------------------------------------------------------------------------------ | --------- |
| 1.  | Church Street, Inc. - Kmart Corporation - (f.k.a) S.S. Kresge Company - Lease        | 84 - 100  |
| 2.  | Church Street, Inc. - Kmart Corporation - (f.k.a.) S.S. Kresge Company - Amended Lease | 101 - 118 |
| 3.  | Church Street, Inc. - Kmart Corporation - (f.k.a.) S.S. Kresge Company - Rider       | 119 - 122 |
| 4.  | Church Street, Inc. - Kmart Corporation Lease Extension (1977)                       | 123 - 124 |
| 5.  | Church Street, Inc. - Kmart Corporation - 1st Amendment                              | 125 - 128 |
| 6.  | Church Street, Inc. - Kmart Corporation - 2nd Amendment                             | 129 - 130 |
| 7.  | Church Street, LLC - Kmart Corporation Lease Extension (1987)                        | 131       |
| 8.  | Church Street, Inc. - Kmart Corporation Lease Extension (1987)                       | 132 - 133 |
| 9.  | Church Street, Inc. - Kmart Corporation Lease Assignment to Church Street            | 134 - 135 |
| 10. | Church Street, Inc. - Kmart Corporation - 3rd Amendment                              | 136 - 139 |
| 11. | Church Street, Inc. - Kmart Corporation Lease Amendment 1991                         | 140       |
| 12. | Church Street, Inc. - Kmart Corporation - 4th Amendment                              | 141 - 144 |
| 13. | Church Street, Inc. - Kmart Corporation - 5th Amendment                              | 145 - 148 |
| 14. | Church Street, Inc. - Kmart Corporation Change of Address Letter                     | 149 - 150 |
| 15. | Church Street, Inc. - Kmart Corporation Lease Extension (2011)                       | 151       |
| 16. | Church Street, LLC - Kmart Corporation Lease Extension (2016)                        | 152       |

**Parties**

    THIS LEASE made and entered into as of this 26th    day of   JANUARY    ,
1962 , between  CENTER CITY

a South Carolina    corporation having its principal office at  303 East McBee Avenue
Greenville, South Carolina
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 2727 Second Avenue, Detroit 32, Michigan (herein referred to as "Tenant"),

    WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

    1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term herein-
after provided, and any extension thereof, the following property: a completed store unit to be con-
structed, as hereinafter specified, by Landlord at its expense on part of the land described in Exhibit
"A", attached hereto and made a part hereof, said store unit to be a part of the Commercial Develop-
ment known as    SOUTHGATE SHOPPING CENTER

to be in the location designated on Exhibit "B", attached hereto and made a part hereof, and to be
of the following dimensions:

        Being four hundred and forty (440') feet in front by a
        depth of equal width of two hundred and seventy-five
        (275') feet; less an area of 7500 square feet (100' x
        75') at the westerly corner thereof; and less an area
        of 3,000 square feet (40' x 75') at the easterly corner
        thereof; said store unit containing 110,500 square feet
        of ground floor area.



Said completed store unit, together with the licenses, rights, privileges and easements set forth in
Article 9 hereof, shall be hereinafter collectively referred to as the "demised premises".

**Term**

    2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that
term is defined in Article 10 hereof, and shall terminate upon such date as shall be    fifteen
(15 ) years from the last day of the month in which said date of occupancy by Tenant shall occur;
provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase
"lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant
to said Article 12.

**Annual Minimum Rental**

    3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall desig-
nate in writing from time to time, an annual minimum rental of  ONE HUNDRED AND FORTY-FOUR
THOUSAND FIVE HUNDRED –   –   –   –   –   –   –
DOLLARS ($ 144,500.00    ), unless abated or diminished as hereinafter provided, in equal
monthly installments on the first day of each month, in advance, commencing upon the first day of the
lease term; provided, however, in the event the first day of the lease term shall not be the first day of
a calendar month, then the rental for such month shall be prorated upon a daily basis.

1

84

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which its "gross sales", as hereinafter defined, shall exceed the sum of FIVE MILLION EIGHT HUNDRED THOUSAND – – – – – – DOLLARS ($ 5,800,000 ) Tenant shall pay to Landlord as additional rental an amount which shall be:

ONE AND ONE-HALF – – per cent ( 1½ %) of gross sales exceeding FIVE MILLION EIGHT HUNDRED THOUSAND – – – – – – – DOLLARS ($ 5,800,000 ) and not exceeding

DOLLARS ($             ), and

             per cent (     %) of gross sales exceeding

DOLLARS ($             ) and not exceeding

DOLLARS ($             ), and

             per cent (     %) of gross sales in excess of

DOLLARS ($             ). The foregoing dollar amount or amounts shall hereinafter be referred to as the "minimum basis of sales".

Said additional rental shall be paid on or before the twenty-first (21st) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the twenty-first (21st) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then said minimum basis of sales shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening its store unit for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales in said store unit annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant, or any occupant, in said store unit whether wholesale or retail, cash or credit (including merchandise ordered on the store unit premises and delivered from another place), except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said store unit, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not

(c) All sales of the food market produced in an area not to exceed 20,000 square feet located as shown on Exhibit "B".

2

85

**Additional Rental (Cont'd)**

collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) ~~Sales of merchandise or services made by concessionaires occupying an aggregate area within said store unit not exceeding five per cent (5%) of the total selling area; provided, however, that in lieu of such sales the total rents paid to Tenant by said concessionaires shall be added to gross sales;~~

(d) Receipts from cigarette machines, lockers, stamp machines, public telephones and pay toilets; and

(e) Service and interest charges for time payment accounts and charge accounts.

**New Building by Landlord**

5. Said store unit shall be completed and delivered to Tenant promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and construction delays; provided, however, in the event that, regardless of the reason therefor, a general contract for construction of said store unit and the buildings and improvements referred to in Article 11 hereof shall not have been let and any net income tax, franchise tax, or any other completed and, pursuant to said general contract, foundations and footings shall not have been commenced for Tenant's store unit and other stores specified in Article 11 hereof prior to March 15, 1963, Tenant shall have the option to terminate this lease by notice to Landlord within sixty (60) days thereafter; provided, further, in the event that, regardless of the reason therefor, said store unit shall not have been completed and the lease term shall not have commenced prior to October 1, 1963, then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without the further act of either party hereto.

**Plans and Specifications**

6. Said store unit shall be constructed by Landlord, at its sole cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially conform to the requirements of Tenant's Typical Store Plans and Specifications Set No. D-123 dated October 16, 1961, and ~~revised to~~ automobile center and garden Shop, Plans No. 111, receipt of which is hereby acknowledged by Landlord/ subject only to changes or deviations thereto approved in writing by Tenant's Construction Department and subject to the following exceptions:

(a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections.

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

and plans and specifications covering the food market area of 20,000 square feet located as shown on Exhibit "B",

3

**Plans and Specifications (Cont'd)**

Said working plans and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working plans and specifications Tenant shall, in writing, inform Landlord of all exceptions or objections thereto, and Landlord shall revise said working plans and specifications to satisfy any such exceptions or objections and resubmit them for Tenant's approval after any such revision. In the event Tenant shall not so object in writing within said sixty (60) days, said working plans and specifications shall be approved and accepted for the purposes hereof. food market plans and specifications,

Said typical store plans and specifications/store layout drawing and working plans and specifications, as approved by Tenant, shall be a part of this lease.

**Guarantee of Materials**

7. Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense, in the construction of Tenant's store unit against defective workmanship and materials either for the period of one (1) year from the date of completion of said store unit or for the period of any guarantee therefor given Landlord, whichever period shall be the longer.

**Advance Possession for Fixturing**

8. For a period of four (4) ~~three (3)~~ weeks prior to completion of said store unit by Landlord, Tenant shall have the privilege, rent free, of entering its store unit for installing storage bins, storing merchandise, and other purposes not creating unreasonable interference with the work of Landlord. Such entry shall not be construed as acceptance of the store unit under the provisions of this lease, or as a waiver of any of the provisions hereof.

**Parking and Other Common Areas**

9. Prior to the date of commencement of the lease term, Landlord shall construct (as hereinafter provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease term, be either in the ratio of four (4) square feet of parking area for each square foot of floor area contained in buildings in said Commercial Development or sufficient to accommodate not less than one thousand   -       -      -   ( 1,000  automobiles, whichever shall be the greater. All sidewalks shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking areas shall be graded, levelled and paved with concrete or asphalt, and marked for the orderly distribution of automobiles. Landlord covenants, represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and roadways for automotive and pedestrian ingress and egress to and from the Commercial Development and adjacent public streets and highways. Landlord shall make no charge of any kind or nature for the use of said common facilities or any additions thereto. All of said common facilities shall be constructed in a workmanlike manner and shall, during the lease term, be maintained by Landlord, at its sole cost and expense, in good order and repair and in an adequate and serviceable condition, which maintenance shall include, but shall not be limited to, keeping the same reasonably free and clear of debris, obstructions, water, snow and ice, and supplying adequate illumination therefor during such hours as Tenant's store unit shall be open for business.

During the lease term, Landlord shall maintain a paved driveway at the rear of Tenant's store unit in order to provide convenient ingress and egress from the delivery or service entrance of said store unit to adjacent public streets and highways for the purpose of receiving and delivering merchandise and otherwise servicing said store unit. Said driveway shall be of sufficient width so as to permit the passage, unloading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common facilities indicated on Exhibit "B" and those which shall at any time and from time to time be contained in said Commercial Development or any future enlargement thereof, (b) areas within the Commercial Development which shall be open to the public generally, such as rest rooms and other facilities, if any, and (c) all other areas (except those areas which shall be occupied from time to time by building structures) included within the confines of the land described in Exhibit "A" or any enlargement of said Commercial Development.

During the lease term, Landlord shall keep ~~Tenant~~ insured against all statutory and common law liabilities for damages on account of injuries to property or person, including death, sustained by any person or persons while within said common areas, in a policy or policies in the amount of One Hundred Thousand Dollars ($100,000) with respect to injury to any one person and in the amount of Three Hundred Thousand Dollars ($300,000) with respect to any one accident or disaster, and in the amount of Twenty-five Thousand Dollars ($25,000) with respect to damage to property; and Landlord shall ~~also~~ indemnify and save harmless Tenant against any such liability. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

4

**Parking and other Common Areas (Cont'd)**

Landlord hereby gives and grants unto Tenant, its agents, employees, customers and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants of the land described in said Exhibit "A", and their respective agents, employees, customers and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said Commercial Development. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

**Store Opening**

10. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open its said store unit for business, and (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) said store unit shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant and (ii) all of the representations and warranties set forth in Article 11 with respect to said Commercial Development shall be fulfilled; provided, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and February 15, the lease term shall not commence until February 16, unless Tenant shall elect to open its store unit for business prior thereto. Tenant shall have the option to open its said store unit for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said store unit as expeditiously as possible; provided, however, if Landlord shall have failed to complete said store unit according to the said working plans and specifications within ninety (90) days after such opening of Tenant's store unit for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

11. Landlord represents and warrants that it shall, prior to commencement of the lease term, complete said Commercial Development substantially in accordance with the plan shown on said Exhibit "B". Said Commercial Development shall be completed substantially in accordance with said plan when the following representations and warranties have been fulfilled:

    (a)  Completion of said common facilities (including a service drive at the rear of said store unit) in accordance with the provisions of Article 9 hereof.

    (b)  Any buildings or other structures shall be erected or constructed only within the confines of the building site or sites (or future building sites) shown on said Exhibit "B" and upon no other part of the land described in said Exhibit "A". The land described in said Exhibit "A" shall consist of not less than    twenty-one    ( 21 ) acres.

    ~~(c)  Completion of buildings comprised of not less than~~     ~~( )~~
~~individual store units having an aggregate of not less than~~
    ~~( )~~
~~square feet of gross rentable floor area and not less than~~
    ~~( )~~
~~lineal feet of store frontages, all relatively located as shown on said Exhibit "B". Tenant's store unit, the number of square feet of gross rentable floor area therein and the lineal feet of store frontage thereof shall be included in the foregoing totals.~~

    ~~(d)  Store premises (excluding Tenant's store unit) having an aggregate of~~
    ~~( )~~
~~square feet of gross floor area shall be leased and open for business; provided, however, included in said store premises required to be leased and open for business shall be store premises occupied by the tenants hereinafter set forth in this Article, each of which tenants shall, so long as each shall be in occupancy of any store premises in said Commercial Development, occupy store premises which shall be in the relative location shown on Exhibit "B" and shall be of the dimensions hereinafter set forth:~~



**Landlord's Representations and Warranties (Cont'd)**

~~Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open its store for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears three per cent (3%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.~~

~~In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open its said store unit for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.~~

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's store unit, or the space above it, for sign display purposes.

**Option to Extend Lease**

12. (a)  Tenant shall have the option to extend the term of this lease for an additional period of ten  –    –    –  ( 10 ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to expiration of the term hereof.

(b)  If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of ten  –    –    10  ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such extended term.

(c)  ~~If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of ――――――――――― ( ― ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the end of such further extended term.~~

(d)  Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as

6

**Option to Extend Lease (Cont'd)**  shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months from the expiration of the term of this lease, or any extension thereof.

**Option for Additional Space**  13.  Upon the written request of Tenant at any time after the third (3rd) lease year, Landlord shall, at its sole expense, enlarge the ground floor area of said store unit to an amount specified by Tenant not to exceed  twenty thousand –    –    –    –    –    –    ( 20,000) square feet. If at the time of such request by Tenant, there shall remain less than fifteen (15) years of the original term of this lease, said term shall be automatically extended so as to expire fifteen (15) years following the first day of the month during which such addition to said store unit shall be completed as hereinafter specified and possession thereof shall be tendered to Tenant. Said addition shall be constructed in accordance with working plans and specifications prepared by Landlord which shall as nearly as practicable conform to Tenant's typical store plans and specifications described in Article 6 hereof, and shall be located where specified by Tenant within the confines of the area on Exhibit "B" designated as "Optional Expansion". Landlord shall do all work necessary to integrate the additional space with the initial store unit. Landlord shall proceed promptly and complete said addition with reasonable dispatch, subject to delays due to conditions beyond Landlord's control. Upon such completion of said addition and the tender of the possession thereof to Tenant, said minimum rental and minimum basis of sales shall be increased in the proportion in which the total gross floor area shall be increased thereby, and all the terms and provisions of this lease applicable to said store unit shall be applicable to such addition.

**Repairs**  14.  Tenant shall make and pay for all replacement of plate glass and all ordinary nonstructural repairs to the interior of Tenant's store unit (including repairs to, but excluding replacements of, the heating, ventilating and air conditioning systems and components thereof) which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said store unit which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements.

In the event said store unit shall be rendered untenantable due to Landlord's default or negligence with respect to required repairs, said annual minimum rental and all other charges payable under this lease shall abate until said premises shall be made tenantable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the building or its contents may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Hundred Dollars ($500.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations**  15.  Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its store unit as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work.  The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.   Tenant may place signs in, on and about said store unit and may remove such signs.

**Utilities**  16.  Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's store unit during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord may install reregistering meters and collect any and all charges aforesaid from Tenant, and Landlord shall pay the proper public utility company or governmental unit for such utilities; provided, however, Tenant shall not be charged more than the rates it would be charged for the same services if furnished direct to Tenant's store unit by such companies or governmental units. Landlord covenants, represents and warrants that, during the lease term, said store unit shall at all times be connected to electric and gas lines of an adequate source of supply and to the water and sewer systems generally serving the area. Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Landlord., except Tenant shall pay such sewer charges as are billed on the water bill and based on the amount of water metered to the store unit.

7

90

Govern-
mental
Regula-
tions

17.   Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said store unit, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

Landlord's
Covenant.

18.   Landlord covenants, represents and warrants that, within the confines of the area of the Commercial Development described in Exhibit "A" and upon any other premises within a radius of thirty-five hundred (3500) feet of the land described in said Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's store unit) shall be leased, rented, used or occupied for the operation or conduct of a "variety store" or "junior department store". This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, said store unit shall cease to be used for the operation of a variety store or junior department store for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7) years from the date of the execution of this lease. The terms "variety store" and "junior department store", as used herein, shall be any store similar to the type operated by Tenant and shall include, by manner of illustration and not by manner of limitation, stores operated by F. W. Woolworth Co., Neisner Brothers, Inc., W. T. Grant Company, J. J. Newberry Co., G. C. Murphy Company, H. L. Green Company, Inc., S. H. Kress & Co., Rose's 5-10-25¢ Stores, Scott-Burr Stores Corporation, Butler Bros., Sprouse-Reitz Co., Inc., Hested Stores Co. and McCrory-McLellan Stores Corporation.
(See Article 18-A in Rider attached)

Fire

19.   From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the Commercial Development, including Tenant's store unit, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All policies with respect to said Commercial Development shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to the Commercial Development or in or about the demised premises resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting said store unit shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Five Thousand Dollars ($5000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (d) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the permanent improvements constituting said store unit as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction and ending upon the date of completion of the repairs, rebuilding and restoration required herein, the annual

8

**Fire (Cont'd)**

minimum rental and any other charges payable under this lease shall abate in the proportion that the part of the store unit which shall be untenantable shall bear to the whole.

~~In the event that, at any time during the lease term except the last two (2) years thereof, any other building or buildings of said Commercial Development shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either (a) twenty per cent (20%) or more of the gross rentable floor area (as set forth in paragraph (e) of Article 11) of the Commercial Development shall be so rendered untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to Tenant's opening its store unit for business (as set forth in paragraph (d) of Article 11) shall not be open for business because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's store unit shall be damaged or destroyed and during such period Tenant shall pay monthly in arrears three per cent (3%) of its gross sales.~~

**Eminent Domain**

20. In the event all of Tenant's store unit shall be expropriated by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's store unit shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's store unit, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the store unit which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said store unit as nearly as practicable to a complete unit of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's store unit so expropriated shall bear to the total ground floor area of said store unit prior to such expropriation.

Without limiting the foregoing, in the event that more than ten per cent (10%) of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the Commercial Development. Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings in the Commercial Development shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's store unit, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its store unit, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

9

Assign-
ment and
Subletting

21.  During the first three (3) years of the lease term, Tenant shall not assign this lease or sublet said store unit, or any part thereof. After the first three (3) years of the lease term, Tenant may assign this lease or sublet all or any part of said store unit. In the event that Tenant shall discontinue its store operation, assign this lease or sublet the entire store unit (to other than a successor, subsidiary or controlling corporation) then, in lieu of the rent heretofore reserved, the rent for the remainder of the lease term shall be a fixed annual amount payable in equal monthly installments, in advance, equal to the sum of the annual minimum rental and the average annual additional rental, if any, paid by Tenant under the provisions of Article 4 hereof during the three (3) lease years preceding such discontinuance, assignment or subletting. Nothing herein contained shall prevent Tenant from assigning this lease to a successor, subsidiary or controlling corporation provided that any such corporation shall assume the covenants and obligations of this lease. Neither the assignment of this lease nor the subletting of said store unit shall relieve Tenant of its primary liability for the payment of rent or other charges provided for in this lease. Any assignment of this lease or sublease hereunder by Tenant shall restrict the use of said store unit by any such assignee or sublessee to the extent required in order to avoid a breach of any duly recorded covenant which shall, on the date of such assignment or sublease, be contained in any lease to any tenant of the Commercial Development and which shall, in good faith, restrict the use of said store unit. As a condition precedent to any such restriction, an affidavit which shall (a) be executed by an officer of Landlord, (b) set forth a full excerpt of any such covenant, and (c) fully identify the lease containing any such covenant, shall be delivered to Tenant within ten (10) days after the written request therefor.

If Tenant shall elect either to discontinue its store operation, or assign this lease or sublet the entire store unit (to other than a successor, subsidiary or controlling corporation), it shall give notice to Landlord at least ninety (90) days prior thereto during which time Landlord shall have the option to terminate this lease upon notice to Tenant.

The use and occupancy of said store unit by concessionaires or licensees of Tenant, as part of Tenant's store operation, shall not be a subletting of any part of said store unit.
(See Article 21-A in Rider attached)

Landlord's
Remedies

22.  If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter said store unit by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said store unit at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said store unit and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

Bankruptcy

23.  If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

Covenant
of Title

24.  Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

**Covenant of Title (Cont'd)**

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions only as set forth in Exhibit "C".

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Sub-ordination**

25. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

26. During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its store unit, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**

27. In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for thirty (30) days after notice thereof by Tenant, pay said taxes, assessments, principal, interest or other charges and cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

28. At the expiration or earlier termination of the lease term, Tenant shall surrender its store unit, together with alterations, additions and improvements then a part of said store unit, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said store unit at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

**Holding Over**

29. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of said store unit after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

30. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Detroit, Michigan, or to any subsequent address which Tenant shall designate for such purpose.

**Captions and Definitions**

31. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

32. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Short Form Lease**

33. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a short form lease for recording.

IN WITNESS WHEREOF, the parties hereto have executed these presents in duplicate and affixed their seals hereto as of the day and year first above written.

WITNESSES:

CENTER CITY

By: _R. E. Heeghee_
                                President

Attest: _____
                                Secretary

S. S. KRESGE COMPANY

By: _John B. Hollister_  Vice President
       John B. Hollister

Attest: _____
       John C. Cook    Assistant Secretary

H. E. Black

Mabel I. Kay

APPROVED

12

95

ACKNOWLEDGMENTS

STATE OF **SOUTH CAROLINA** }
COUNTY OF    **GREENVILLE**    } SS:

I do hereby certify that on this **26th** day of **January**   , 1962   , before me, **Frances B. Holtzclaw**                            , a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared   **R. E. Hughes**          and    **G. J. Hughes**                    , known to me to be the Vice President and Assistant Secretary of **Center City**

who, being by me duly sworn, did depose and say that they reside at    **Greenville, S. C.,**

respectively; that they are the Vice President and Assistant Secretary respectively of **Center City**                    , the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: ~~at the pleasure~~   *Frances B. Holtzclaw*
~~of the Governor of South Carolina~~                 Notary Public

**for South Carolina.**

STATE OF MICHIGAN }
COUNTY OF WAYNE   } SS:

I do hereby certify that on this   9th    day of   February      , 1962 , before me, Mabel I. Kay                         , a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared JOHN B. HOLLISTER           and    JOHN C. COOK                        , known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside at   Detroit, Michigan

respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires:   August 10, 1962      *Mabel I. Kay*
                                    Mabel I. Kay          Notary Public

13

CODE No. 920-80—200—Onlys—5/60—3299/59K—Printed in U.S.A.

THIS RIDER CONSISTING OF TWO TYPEWRITTEN
PAGES  IS A PART OF THE LEASE ENTERED BETWEEN
CENTER CITY, AS LANDLORD AND S. S. KRESGE
COMPANY, AS TENANT

USE, ASSIGN-
MENT AND
SUBLETTING

ARTICLE 21-A    Tenant may use said store unit for any lawful mercantile

purpose, including the operation of a retail store, or may

vacate or sublet, license or concession space, in total or part, or assign

this lease, but no such assignment, subletting, vacating, licensing or con-

cessioning of space, shall relieve the Tenant of any liability for the pay-

ment of rent or other charges under the terms and provisions of this lease.

LANDLORD'S
COVENANT

ARTICLE 18-A    Landlord covenants, represents and warrants that, within the

confines of the area of the Commercial Development described

in Exhibit "A" and upon any other premises within the "restricted radius" of

the land described in said Exhibit "A" now or in the future owned or controlled,

directly or indirectly, by Landlord, Landlord's principal owners, or their

assignees or vendees, no premises (other than Tenant's store unit) shall be

leased, rented, used or occupied for the operation or conduct of a "variety

store" or "junior department store" or "cut-rate store" or "discount store".

This covenant shall run with the land commencing with the date of execution

of this lease and shall continue until such date as shall be the last day of

the lease term;  provided, however, this covenant shall cease and determine

and be of no further force or effect in the event that either (a) subsequent

to the commencement of the lease term, said store unit shall cease to be used

for the operation of a cut-rate store, or discount store or any store managed

by Tenant for a period of six (6) consecutive months, excluding temporary

interruptions of said operation because of causes beyond Tenant's control, or

(b) said date of occupancy described in Article 10 hereof shall not occur

prior to such date as shall be seven (7) years from the date of the execution

of this lease.  The terms "variety store" and "junior department store", as

used herein, shall be any store similar to the type operated by S. S. Kresge

Co. and shall include, by manner of illustration and not by manner of limit-

ation, stores operated by F. W. Woolworth Co., Neisner Brothers, Inc., W. T.

Grant Company, J. J. Newberry Co., G. C. Murphy Company, H. L. Green Company,Inc.,

-1-

97

S. H. Kress & Co., Rose's 5-10-25¢ Stores, Scott Stores Corporation, Butler
Bros., Sprouse-Reitz Co., Inc., Hested Stores Co. and McCrory-McLellan Stores
Corporation. The terms "cut-rate store" and "discount store", as used herein,
shall include, by manner of illustration and not by manner of limitation,
stores operated under any of the following names: Arlan's Department Store,
Atlantic Mills, Atlas Shoppers World, Bargain City (U.S.A.), Clark's, Family
Fair, Fashion Fair, J. M. Fields, Giant Tiger, Grant Store, Grant Department
Store, Grandway Stores, G.M.S. Stores, Jubilee City, King's Department Stores,
Mason's, Maxam's, Miracle Mart, Shopper's City, Shopper's Fair, Shoppers World
Stores, and Spartan Discount Department Stores, or any store of similar oper-
ation, whether operated as a so-called "closed door" store or otherwise. The
term "restricted radius", as used herein, shall be a radius of thirty-five
hundred (3500) feet with respect to a "variety store" or "junior department
store", and a radius of four (4) miles with respect to a "cut-rate store" or
"discount store".

Without written permission of the Tenant, Landlord shall not lease space,
or permit subletting thereof in the "Commercial Development" described in
Exhibit "A", to a Food Market or Delicatessen, or a Drug Store not exceeding
a total area of 8,000 square feet.

-2-

98

"EXHIBIT A"

LEGAL DESCRIPTION
OF
SOUTHGATE SHOPPING CENTER

ALL that certain piece, parcel or lot of land situate,
lying and being in the State of South Carolina, County of
Greenville, just without the Southern boundary of the City of
Greenville, and having according to a survey made in January,
1961, the following metes and bounds:

BEGINNING at the intersection of the South side of Mills
Avenue with the West side of Henrydale Street, and running thence
with Henrydale Street, S. 41-54 E., 244 feet; thence S. 1-02 E.,
28.16 feet to an iron pin on the North side of new U. S. Highway
No. 29; thence with the North side of said Highway, the following
courses and distances:  S. 43-55 W., 564.8 feet to a point; thence
S. 41-47 W., 200 feet to a point; thence S. 37-41 W., 200 feet to
a point; thence S. 33-56 W., 200 feet to a point; thence S. 30-0 W.,
200 feet to a point; thence S. 27-44 W., 91.2 feet to a point on
the  North side of West Faris Road; thence with the North side of
said West Faris Road, N. 86-41 W., 100 feet to a point; thence
S. 83-12 W., 100 feet to a point; thence S. 72-10 W., 100 feet to
a point; thence S. 61-35 W., 97.8 feet to a point; thence S. 57-
49 W., 116.9 feet to a point; thence S. 62-56 W., 86.9 feet to a
point on the South side of Wallace Street; thence with Wallace
Street, N. 4-22 E., 34.5 feet to a point; thence N. 6-31 E., 225.5
feet to a point; thence N. 10-39 E., 93.2 feet to a point; thence
N. 17-06 E., 96.9 feet to a point; thence N. 24-56 E., 886.9 feet
to a point on the South side of Mills Avenue; thence with the
South side of Mills Avenue, N. 71-27 E., 889.85 feet to the point
of beginning.



EXHIBIT  B

## A M E N D E D

**Parties**       THIS LEASE made and entered into as of this 26th       day of    JANUARY
1962 , between   CENTER CITY

a South Carolina       corporation having its principal office at  303 East McBee Avenue
Greenville, South Carolina
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 2727 Second Avenue, Detroit 32, Michigan (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised
Premises**        1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term herein-
after provided, and any extension thereof, the following property: a completed store unit to be con-
structed, as hereinafter specified, by Landlord at its expense on part of the land described in Exhibit
"A", attached hereto and made a part hereof, said store unit to be a part of the Commercial Develop-
ment known as       SOUTHGATE SHOPPING CENTER

to be in the location designated on Exhibit "B", attached hereto and made a part hereof, and to be
of the following dimensions:

> Being four hundred and forty (440') feet in front by a
> depth of equal width of two hundred and seventy-five
> (275') feet; less an area of 7500 square feet (100' x
> 75') at the westerly corner thereof; and less an area
> of 3,000 square feet (40' x 75') at the easterly corner
> thereof; said store unit containing 110,500 square feet
> of ground floor area.

Said completed store unit, together with the licenses, rights, privileges and easements set forth in
Article 9 hereof, shall be hereinafter collectively referred to as the "demised premises".

**Term**         2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that
term is defined in Article 10 hereof, and shall terminate upon such date as shall be    fifteen
(15  ) years from the last day of the month in which said date of occupancy by Tenant shall occur;
provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase
"lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant
to said Article 12.

**Annual
Minimum
Rental**        3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall desig-
nate in writing from time to time, an annual minimum rental of   ONE HUNDRED AND FORTY-FOUR
THOUSAND FIVE HUNDRED   -   -   -   -   -   -   -   -   -
DOLLARS ($  144,500.00      ), unless abated or diminished as hereinafter provided, in equal
monthly installments on the first day of each month, in advance, commencing upon the first day of the
lease term; provided, however, in the event the first day of the lease term shall not be the first day of
a calendar month, then the rental for such month shall be prorated upon a daily basis.

1

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which its "gross sales", as hereinafter defined, shall exceed the sum of FIVE MILLION EIGHT HUNDRED THOUSAND – – – – – – – DOLLARS ($ 5,800,000 ) Tenant shall pay to Landlord as additional rental an amount which shall be:

ONE AND ONE-HALF – – per cent ( 1½%) of gross sales exceeding FIVE MILLION EIGHT HUNDRED THOUSAND – – – – – – – DOLLARS ($ 5,800,000 ) ~~and not exceeding~~ ――――――――――――――

~~DOLLARS ($――――――), and――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――

―――――――――――――― ~~per cent (  %) of gross sales exceeding――――――――――

~~DOLLARS ($――――――) and not exceeding――――――――――――――――――――――――――――――――――――――――

~~DOLLARS ($――――――), and――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――

―――――――――――――― ~~per cent (  %) of gross sales in excess of―――――――――

~~DOLLARS ($――――――). The foregoing dollar amount or amounts shall hereinafter be referred to as the "minimum basis of sales".

Said additional rental shall be paid on or before the twenty-first (21st) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the twenty-first (21st) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then said minimum basis of sales shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening its store unit for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales in said store unit annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant, or any occupant, in said store unit whether wholesale or retail, cash or credit (including merchandise ordered on the store unit premises and delivered from another place), except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said store unit, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not

(c) All sales of the food market produced in an area not to exceed 20,000 square feet located as shown on Exhibit "B".

2

**Additional Rental (Cont'd)**

collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Sales of merchandise or services made by concessionaires occupying an aggregate area within said store unit not exceeding five per cent (5%) of the total selling area; provided, however, that in lieu of such sales the total rents paid to Tenant by said concessionaires shall be added to gross sales;

(d) Receipts from cigarette machines, lockers, stamp machines, public telephones and pay toilets; and

(e) Service and interest charges for time payment accounts and charge accounts.

**New Building by Landlord**

5. Said store unit shall be completed and delivered to Tenant promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and construction delays; provided, however, in the event that, regardless of the reason therefor, a general contract for construction of said store unit and the buildings and improvements referred to in Article 11 hereof shall not have been let and rough site grading shall not have been completed and, pursuant to said general contract, foundations and footings shall not have been commenced for Tenant's store unit and other stores specified in Article 11 hereof prior to    March 15, 1963    , Tenant shall have the option to terminate this lease by notice to Landlord within sixty (60) days thereafter; provided, further, in the event that, regardless of the reason therefor, said store unit shall not have been completed and the lease term shall not have commenced prior to October 1, 1963    , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without the further act of either party hereto.

**Plans and Specifications**

6. Said store unit shall be constructed by Landlord, at its sole cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially conform to the requirements of Tenant's Typical Store Plans and Specifications Set No. D-123    dated October 16, 1961, and    , revised to Shop, Plans No. 111    , receipt of which is hereby acknowledged by Landlord, subject only to changes or deviations thereto approved in writing by Tenant's Construction Department and subject to the following exceptions:

(a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections.

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

and plans and specifications covering the food market area of 20,000 square feet located as shown on Exhibit "B",

3

103

**Plans and
Speci-
cations
(Cont'd)**

Said working plans and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working plans and specifications Tenant shall, in writing, inform Landlord of all exceptions or objections thereto, and Landlord shall revise said working plans and specifications to satisfy any such exceptions or objections and resubmit them for Tenant's approval after any such revision. In the event Tenant shall not so object in writing within said sixty (60) days, said working plans and specifications shall be approved and accepted for the purposes hereof. food market plans and specifications,
Said typical store plans and specifications/store layout drawing and working plans and specifications, as approved by Tenant, shall be a part of this lease.

**Guarantee
of
Materials**

7. Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense, in the construction of Tenant's store unit against defective workmanship and materials either for the period of one (1) year from the date of completion of said store unit or for the period of any guarantee therefor given Landlord, whichever period shall be the longer.

**Advance
Possession
for
Fixturing**

8. For a period of three (3) four (4) weeks prior to completion of said store unit by Landlord, Tenant shall have the privilege, rent free, of entering its store unit for installing storage bins, storing merchandise, and other purposes not creating unreasonable interference with the work of Landlord. Such entry shall not be construed as acceptance of the store unit under the provisions of this lease, or as a waiver of any of the provisions hereof.

**Parking
and
Other
Common
Areas**

9. Prior to the date of commencement of the lease term, Landlord shall construct (as hereinafter provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease term, be either in the ratio of four (4) square feet of parking area for each square foot of floor area contained in buildings in said Commercial Development or sufficient to accommodate not less than one thousand   ~      =      ~   ( 1,000 automobiles, whichever shall be the greater. All sidewalks shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking areas shall be graded, levelled and paved with concrete or asphalt, and marked for the orderly distribution of automobiles. Landlord covenants, represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and roadways for automotive and pedestrian ingress and egress to and from the Commercial Development and adjacent public streets and highways. Landlord shall make no charge of any kind or nature for the use of said common facilities or any additions thereto. All of said common facilities shall be constructed in a workmanlike manner and shall, during the lease term, be maintained by Landlord, at its sole cost and expense, in good order and repair and in an adequate and serviceable condition, which maintenance shall include, but shall not be limited to, keeping the same reasonably free and clear of debris, obstructions, water, snow and ice, and supplying adequate illumination therefor during such hours as Tenant's store unit shall be open for business.

During the lease term, Landlord shall maintain a paved driveway at the rear of Tenant's store unit in order to provide convenient ingress and egress from the delivery or service entrance of said store unit to adjacent public streets and highways for the purpose of receiving and delivering merchandise and otherwise servicing said store unit. Said driveway shall be of sufficient width so as to permit the passage, unloading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common facilities indicated on Exhibit "B" and those which shall at any time and from time to time be contained in said Commercial Development or any future enlargement thereof, (b) areas within the Commercial Development which shall be open to the public generally, such as rest rooms and other facilities, if any, and (c) all other areas (except those areas which shall be occupied from time to time by building structures) included within the confines of the land described in Exhibit "A" or any enlargement of said Commercial Development.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of injuries to property or person, including death, sustained by any person or persons while within said common areas, in a policy or policies in the amount of One Hundred Thousand Dollars ($100,000) with respect to injury to any one person and in the amount of Three Hundred Thousand Dollars ($300,000) with respect to any one accident or disaster, and in the amount of Twenty-five Thousand Dollars ($25,000) with respect to damage to property; and Landlord shall also indemnify and save harmless Tenant against any such liability. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the

documents to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

4

**Parking and other Common Areas (Cont'd)**

Landlord hereby gives and grants unto Tenant, its agents, employees, customers and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants of the land described in said Exhibit "A", and their respective agents, employees, customers and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said Commercial Development. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

**Store Opening**

10. The term "date of occupancy by Tenant," as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open its said store unit for business, and (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) said store unit shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant and (ii) all of the representations and warranties set forth in Article 11 with respect to said Commercial Development shall be fulfilled; provided, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and February 15, the lease term shall not commence until February 16, unless Tenant shall elect to open its store unit for business prior thereto. Tenant shall have the option to open its said store unit for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said store unit as expeditiously as possible; provided, however, if Landlord shall have failed to complete said store unit according to the said working plans and specifications within ninety (90) days after such opening of Tenant's store unit for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

11. Landlord represents and warrants that it shall, prior to commencement of the lease term, complete said Commercial Development substantially in accordance with the plan shown on said Exhibit "B". Said Commercial Development shall be completed substantially in accordance with said plan when the following representations and warranties have been fulfilled:

(a) Completion of said common facilities (including a service drive at the rear of said store unit) in accordance with the provisions of Article 9 hereof.

(b) Any buildings or other structures shall be erected or constructed only within the confines of the building site or sites (or future building sites) shown on said Exhibit "B" and upon no other part of the land described in said Exhibit "A". The land described in said Exhibit "A" shall consist of not less than    twenty-one    ( 21 ) acres.

(c) Completion of buildings comprised of not less than ( ) individual store units having an aggregate of not less than ( ) square feet of gross rentable floor area and not less than ( ) lineal feet of store frontages, all relatively located as shown on said Exhibit "B". Tenant's store unit, the number of square feet of gross rentable floor area therein and the lineal feet of store frontage thereof shall be included in the foregoing totals.

(d) Store premises (excluding Tenant's store unit) having an aggregate of ( ) square feet of gross floor area shall be leased and open for business; provided, however, included in said store premises required to be leased and open for business shall be store premises occupied by the tenants hereinafter set forth in this Article, each of which tenants shall, so long as each shall be in occupancy of any store premises in said Commercial Development, occupy store premises which shall be in the relative location shown on Exhibit "B" and shall be of the dimensions hereinafter set forth:

5

**Landlord's Representations and Warranties (Cont'd)**

~~Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open its store for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears three per cent (3%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.~~

~~In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open its said store unit for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.~~

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's store unit, or the space above it, for sign display purposes.

**Option to Extend Lease**

12. (a) Tenant shall have the option to extend the term of this lease for an additional period of ten - - - ( 10 ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to expiration of the term hereof.

(b) If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of ten - - (10 ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such extended term.

(c) ~~If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of ________ ( ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the end of such further extended term.~~

(d) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as

**Option to Extend Lease (Cont'd)**

shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months from the expiration of the term of this lease, or any extension thereof.

**Option for Additional Space**

13. Upon the written request of Tenant at any time after the third (3rd) lease year, Landlord shall, at its sole expense, enlarge the ground floor area of said store unit to an amount specified by Tenant not to exceed    twenty thousand –    –    –    –    –    –    ( 20,000 ) square feet. If at the time of such request by Tenant, there shall remain less than fifteen (15) years of the original term of this lease, said term shall be automatically extended so as to expire fifteen (15) years following the first day of the month during which such addition to said store unit shall be completed as hereinafter specified and possession thereof shall be tendered to Tenant. Said addition shall be constructed in accordance with working plans and specifications prepared by Landlord which shall as nearly as practicable conform to Tenant's typical store plans and specifications described in Article 6 hereof, and shall be located where specified by Tenant within the confines of the area on Exhibit "B" designated as "Optional Expansion". Landlord shall do all work necessary to integrate the additional space with the initial store unit. Landlord shall proceed promptly and complete said addition with reasonable dispatch, subject to delays due to conditions beyond Landlord's control. Upon such completion of said addition and the tender of the possession thereof to Tenant, said minimum rental and minimum basis of sales shall be increased in the proportion in which the total gross floor area shall be increased thereby, and all the terms and provisions of this lease applicable to said store unit shall be applicable to such addition.

**Repairs**

14. Tenant shall make and pay for all replacement of plate glass and all ordinary nonstructural repairs to the interior of Tenant's store unit (including repairs to, but excluding replacements of, the heating, ventilating and air conditioning systems and components thereof) ~~and servers (as an interval~~ which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said store unit which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements.

In the event said store unit shall be rendered untenantable due to Landlord's default or negligence with respect to required repairs, said annual minimum rental and all other charges payable under this lease shall abate until said premises shall be made tenantable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the building or its contents may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Hundred Dollars ($500.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations**

15. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its store unit as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work. The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.    Tenant may place signs in, on and about said store unit and may remove such signs.

**Utilities**

16. Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's store unit during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord may install reregistering meters and collect any and all charges aforesaid from Tenant, and Landlord shall pay the proper public utility company or governmental unit for such utilities; provided, however, Tenant shall not be charged more than the rates it would be charged for the same services if furnished direct to Tenant's store unit by such companies or governmental units. Landlord covenants, represents and warrants that, during the lease term, said store unit shall at all times be connected to electric and gas lines of an adequate source of supply and to the water and sewer

Landlord covenants, represents and warrants that, during the lease term, said store unit shall at all times be connected to electric and gas lines of an adequate source of supply and to the water and sewer systems generally serving the area. Sewer charges or sewer taxes, ~~regardless of the manner billed or assessed,~~ shall be paid by Landlord, except Tenant shall pay such sewer charges as are billed on the water bill and based on the amount of water metered to the store unit.

7

**Governmental Regulations**

17.  Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said store unit, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

**Landlord's Covenant**

18.  ~~Landlord covenants, represents and warrants that, within the confines of the area of the Commercial Development described in Exhibit "A" and upon any other premises within a radius of thirty-five hundred (3500) feet of the land described in said Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's store unit) shall be leased, rented, used or occupied for the operation or conduct of a "variety store" or "junior department store". This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, said store unit shall cease to be used for the operation of a variety store or junior department store for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7) years from the date of the execution of this lease. The terms "variety store" and "junior department store", as used herein, shall be any store similar to the type operated by Tenant and shall include, by manner of illustration and not by manner of limitation, stores operated by F. W. Woolworth Co., Neisner Brothers, Inc., W. T. Grant Company, J. J. Newberry Co., G. C. Murphy Company, H. L. Green Company, Inc., S. H. Kress & Co., Rose's 5-10-25¢ Stores, Scott-Burr Stores Corporation, Butler Bros., Sprouse-Reitz Co., Inc., Hested Stores Co. and McCrory-McLellan Stores Corporation.~~
(See Article 18-A in Rider attached)

**Fire**

19.  From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the Commercial Development, including Tenant's store unit, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All policies with respect to said Commercial Development shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to the Commercial Development or in or about the demised premises resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting said store unit shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding ~~Five~~ Thousand Dollars ~~($500.00)~~, then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (d) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the permanent improvements constituting said store unit as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction and ending [illegible]

During any period commencing upon the date of any such damage or destruction and ending upon the date of completion of the repairs, rebuilding and restoration required herein, the annual

8

108

**Fire (Cont'd)**

minimum rental and any other charges payable under this lease shall abate in the proportion that the part of the store unit which shall be untenantable shall bear to the whole.

~~In the event that, at any time during the lease term except the last two (2) years thereof, any other building or buildings of said Commercial Development shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either (a) twenty per cent (20%) or more of the gross rentable floor area (as set forth in paragraph (c) of Article 11) of the Commercial Development shall be so rendered untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to Tenant's opening its store unit for business (as set forth in paragraph (d) of Article 11) shall not be open for business because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's store unit shall be damaged or destroyed and during such period Tenant shall pay monthly in arrears three per cent (3%) of its gross sales.~~

**Eminent Domain**

20.  In the event all of Tenant's store unit shall be expropriated by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's store unit shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's store unit, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the store unit which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said store unit as nearly as practicable to a complete unit of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's store unit so expropriated shall bear to the total ground floor area of said store unit prior to such expropriation.

Without limiting the foregoing, in the event that more than ten per cent (10%) of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the Commercial Development. Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings in the Commercial Development shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's store unit, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its store unit, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

9.

**Assign-ment and Subletting**

21.   ~~During the first three (3) years of the lease term, Tenant shall not assign this lease or sublet said store unit, or any part thereof. After the first three (3) years of the lease term, Tenant may assign this lease or sublet all or any part of said store unit. In the event that Tenant shall discontinue its store operation, assign this lease or sublet the entire store unit (to other than a successor, subsidiary or controlling corporation) then, in lieu of the rent heretofore reserved, the rent for the remainder of the lease term shall be a fixed annual amount payable in equal monthly installments, in advance, equal to the sum of the annual minimum rental and the average annual additional rental, if any, paid by Tenant under the provisions of Article 4 hereof during the three (3) lease years preceding such discontinuance, assignment or subletting. Nothing herein contained shall prevent Tenant from assigning this lease to a successor, subsidiary or controlling corporation provided that any such corporation shall assume the covenants and obligations of this lease. Neither the assignment of this lease nor the subletting of said store unit shall relieve Tenant of its primary liability for the payment of rent or other charges provided for in this lease. Any assignment of this lease or sublease hereunder by Tenant shall restrict the use of said store unit by any such assignee or sublessee to the extent required in order to avoid a breach of any duly recorded covenant which shall, on the date of such assignment or sublease, be contained in any lease to any tenant of the Commercial Development and which shall, in good faith, restrict the use of said store unit. As a condition precedent to any such restriction, an affidavit which shall (a) be executed by an officer of Landlord, (b) set forth a full excerpt of any such covenant, and (c) fully identify the lease containing any such covenant, shall be delivered to Tenant within ten (10) days after the written request therefor.~~

~~If Tenant shall elect either to discontinue its store operation, or assign this lease or sublet the entire store unit (to other than a successor, subsidiary or controlling corporation), it shall give notice to Landlord at least ninety (90) days prior thereto during which time Landlord shall have the option to terminate this lease upon notice to Tenant.~~

~~The use and occupancy of said store unit by concessionaires or licensees of Tenant, as part of Tenant's store operation, shall not be a subletting of any part of said store unit.~~
(See Article 21-A in Rider attached)

**Landlord's Remedies**

22.   If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter said store unit by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said store unit at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said store unit and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

23.   If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

24.   Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

10

110

**Covenant of Title (Cont'd)**

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions only as set forth in Exhibit "C".

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Sub-ordination**

25.  Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

26.  During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its store unit, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**

27.  In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for thirty (30) days after notice thereof by Tenant, pay said taxes, assessments, principal, interest or other charges and cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

28.  At the expiration or earlier termination of the lease term, Tenant shall surrender its store unit, together with alterations, additions and improvements then a part of said store unit, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said store unit at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air-conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

**Holding Over**

29.  In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of said store unit after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

30.  Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Detroit, Michigan, or to any subsequent address which Tenant shall designate for such purpose.

11

**Captions and Definitions**

31. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

32. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Short Form Lease**

33. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a short form lease for recording.


IN WITNESS WHEREOF, the parties hereto have executed these presents in duplicate and affixed their seals hereto as of the day and year first above written.


WITNESSES:

CENTER CITY

By: _R. E. Hughes_                    President

Attest: _E. P. Hughes_               Secretary


S. S. KRESGE COMPANY

By: _John B. Hollister_   Vice President

Attest: _John C. Cook_   Assistant Secretary

H. E. Black

Mabel I. Kay

APPROVED

12

112

ACKNOWLEDGMENTS

STATE OF SOUTH CAROLINA )
COUNTY OF GREENVILLE )ss:

I do hereby certify that on this **26th** day of **January**, 1962, before me, **Frances B. Holtzclaw**, a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared **R. E. Hughes** and **G. J. Hughes** known to me to be the Vice President and Assistant Secretary of **Center City** who, being by me duly sworn, did depose and say that they reside at **Greenville, S. C.,** respectively; that they are the Vice President and Assistant Secretary respectively of **Center City** the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: at the pleasure of the Governor of South Carolina

*Frances B. Holtzclaw*
Notary Public

for South Carolina.

STATE OF MICHIGAN )
COUNTY OF WAYNE )ss:

I do hereby certify that on this 9th day of February, 1962, before me, Mabel I. Kay, a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared JOHN B. HOLLISTER and JOHN C. COOK known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside at Detroit, Michigan respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: August 10, 1962

*Mabel I. Kay*
Mabel I. Kay          Notary Public

13

CODE No. 920-80—200—Only—5/60—3299/59K—Printed in U.S.A.

THIS RIDER CONSISTING OF TWO TYPE-WRITTEN
PAGES IS A PART OF THE LEASE ENTERED BETWEEN
CENTER CITY, AS LANDLORD AND S. S. KRESGE
COMPANY, AS TENANT

**USE, ASSIGN-
MENT AND
SUBLETTING**

ARTICLE 21-A    Tenant may use said store unit for any lawful mercantile
purpose, including the operation of a retail store, or may
vacate or sublet, license or concession space, in total or part, or assign
this lease, but no such assignment, subletting, vacating, licensing or con-
cessioning of space, shall relieve the Tenant of any liability for the pay-
ment of rent or other charges under the terms and provisions of this lease.

**LANDLORD'S
COVENANT**

ARTICLE 18-A    Landlord covenants, represents and warrants that, within the
confines of the area of the Commercial Development described
in Exhibit "A" and upon any other premises within the "restricted radius" of
the land described in said Exhibit "A" now or in the future owned or controlled,
directly or indirectly, by Landlord, Landlord's principal owners, or their
assignees or vendees, no premises (other than Tenant's store unit) shall be
leased, rented, used or occupied for the operation or conduct of a "variety
store" or "junior department store" or "cut-rate store" or "discount store".
This covenant shall run with the land commencing with the date of execution
of this lease and shall continue until such date as shall be the last day of
the lease term; provided, however, this covenant shall cease and determine
and be of no further force or effect in the event that either (a) subsequent
to the commencement of the lease term, said store unit shall cease to be used
for the operation of a cut-rate store, or discount store or any store managed
by Tenant for a period of six (6) consecutive months, excluding temporary
interruptions of said operation because of causes beyond Tenant's control, or
(b) said date of occupancy described in Article 10 hereof shall not occur
prior to such date as shall be seven (7) years from the date of the execution
of this lease. The terms "variety store" and "junior department store", as
used herein, shall be any store similar to the type operated by S. S. Kresge
Co. and shall include, by manner of illustration and not by manner of limit-
ation, stores operated by F. W. Woolworth Co., Neisner Brothers, Inc., W. T.
Grant Company, J. J. Newberry Co., G. C. Murphy Company, H. L. Green Company,Inc.,

-1-

114

S. H. Kress & Co., Rose's 5-10-25¢ Stores, Scott Stores Corporation, Butler
Bros., Sprouse-Reitz Co., Inc., Hested Stores Co. and McCrory-McLellan Stores
Corporation. The terms "cut-rate store" and "discount store", as used herein,
shall include, by manner of illustration and not by manner of limitation,
stores operated under any of the following names: Arlan's Department Store,
Atlantic Mills, Atlas Shoppers World, Bargain City (U.S.A.), Clark's, Family
Fair, Fashion Fair, J. M. Fields, Giant Tiger, Grant Store, Grant Department
Store, Grandway Stores, G.M.S. Stores, Jubilee City, King's Department Stores,
Mason's, Maxam's, Miracle Mart, Shopper's City, Shopper's Fair, Shoppers World
Stores, and Spartan Discount Department Stores, or any store of similar oper-
ation, whether operated as a so-called "closed door" store or otherwise. The
term "restricted radius", as used herein, shall be a radius of thirty-five
hundred (3500) feet with respect to a "variety store" or "junior department
store", and a radius of four (4) miles with respect to a "cut-rate store" or
"discount store".

Without written permission of the Tenant, Landlord shall not lease space,
or permit subletting thereof in the "Commercial Development" described in
Exhibit "A", to a Food Market or Delicatessen, or a Drug Store not exceeding
a total area of 8,000 square feet.

"EXHIBIT A"

## AMENDED LEGAL DESCRIPTION
## OF
## SOUTHGATE SHOPPING CENTER

ALL that certain piece, parcel or lot of land situate, lying and being in the State of South Carolina, County of Greenville, just without the Southern boundary of the City of Greenville, and having according to a survey made October 10, 1973, by Webb Surveying and Mapping Co., and marked Exhibit "B", the following metes and bounds:

BEGINNING at the intersection of the South side of Mills Avenue with the West side of Henrydale Street, and running thence with Henrydale Street, S. 41-54 E., 244 feet; thence S. 1-02 E., 28.16 feet to an iron pin on the North side of new U. S. Highway No. 29 or U.S. I-185; thence with the North side of said Highway, the following courses and distances: S. 43-55 W., 564.8 feet to a point; thence S. 41-47 W., 200 feet to a point; thence S. 37-41 W., 200 feet to a point; thence S. 33-56 W., 200 feet to a point; thence S. 30-0 W., 200 feet to a point; thence S. 27-44 W., 91.2 feet to a point on the North side of West Faris Road; thence with the North side of said West Faris Road, N. 86-41 W., 100 feet to a point; thence S. 83-12 W., 100 feet to a point; thence S. 75-55 W., 355.7 feet to an iron pin; thence N. 6-31 E., 166 feet to a point; thence N. 10-39 E., 93.2 feet to a point; thence N. 17-06 E., 96.9 feet to a point; thence N. 24-56 E., 886.9 feet to a point on the South side of Mills Avenue; thence with the South side of Mills Avenue, N. 71-27 E., 889.85 feet to the point of beginning.

AMENDED

"EXHIBIT A"

AMENDED LEGAL DESCRIPTION
OF
SOUTHGATE SHOPPING CENTER


      ALL that certain piece, parcel or lot of land situate, lying and being in the State of South Carolina, County of Greenville, just without the Southern boundary of the City of Greenville, and having according to a survey made in January, 1961, the following metes and bounds:

      BEGINNING at the intersection of the South side of Mills Avenue with the West side of Henrydale Street, and running thence with Henrydale Street, S. 41-54 E., 244 feet; thence S. 1-02 E., 28.16 feet to an iron pin on the North side of new U. S. Highway No. 29; thence with the North side of said Highway, the following courses and distances: S. 43-55 W., 564.8 feet to a point; thence S. 41-47 W., 200 feet to a point; thence S. 37-41 W., 200 feet to a point; thence S. 33-56 W., 200 feet to a point; thence S. 30-0 W., 200 feet to a point; thence S. 27-44 W., 91.2 feet to a point on the North side of West Faris Road; thence with the North side of said West Faris Road, N. 86-41 W., 100 feet to a point; thence S. 83-12 W., 100 feet to a point; thence S. 77-28 W., 27 feet to a point; thence S. 74-51 W., 291.8 feet to a point; thence S. 74-52 W., 39.55 feet to a point; thence N. 6-31 E., 166 feet to a point; thence N. 10-39 E., 93.2 feet to a point; thence N. 17-06 E., 96.9 feet to a point; thence N. 24-56 E., 886.9 feet to a point on the South side of Mills Avenue; thence with the South side of Mills Avenue, N. 71-27 E., 889.85 feet to the point of beginning.

AMENDED LEGAL DESCRIPTION OF
SOUTHGATE SHOPPING CENTER

ALL THAT CERTAIN PIECE, parcel or lot of land situate, lying and being in the State of South Carolina, County of Greenville, just without the southern boundary of the City of Greenville, having the following metes and bounds:

BEGINNING at the intersection of the south side of Mills Avenue with the west side of Henrydale Street and running thence with Henrydale Street, S 41° 54' E, 244 feet;

THENCE: S 1° 02' E, 28.16 feet to an iron pin on the north side of new U.S. Highway No. 29 or U.S. I-185;

THENCE: with the north side of said Highway, the following courses and distances:

S 43° 55' W, 564.8 feet to a point;

THENCE S 41° 47' W, 200 feet to a point;

THENCE S 37° 41' W, 200 feet to a point;

THENCE S 33° 56' W, 200 feet to a point;

THENCE S 30° 00' W, 200 feet to a point;

THENCE S 27° 44' W, 91.2 feet to a point on the north side of West Faris Road;

THENCE: with the north side of said West Faris Road, N 86° 41' W, 100 feet to a point;

THENCE S 83° 12' W, 100 feet to a point;

THENCE S 75° 55' W, 355.7 feet to an iron pin;

THENCE N 6° 31' E, 166 feet to a point;

THENCE N 10° 39' E, 93.2 feet to a point;

THENCE N 17° 06' E, 96.9 feet to a point;

THENCE N 24° 56' E, 886.9 feet to a point on the south side of Mills Avenue;

THENCE: with the south side of Mills Avenue N 71° 27' E, 889.85 feet to the point of beginning.

EXHIBIT "A"

118

THIS RIDER CONSISTING OF TWO TYPEWRITTEN PAGES IS A PART OF THE LEASE
ENTERED BETWEEN CENTER CITY, AS LANDLORD, AND S.S. KRESGE COMPANY,
AS TENANT

ARTICLE 21-A  Tenant may use said store unit for any lawful mercantile purpose, including the
operation of a retail store, or may vacate or sublet, license or concession space, in total or in part,
or assign this lease, but no such assignment, subletting, vacating, licensing or concessioning of
space, shall relieve the Tenant of any liability for the payment of rent or other charges under the
terms and provisions of this lease.

ARTICLE 18-A  Landlord covenants, represents and warrants that, within the confines of the
area of the Commercial Development described in Exhibit "A" and upon any other premises
within the "restricted radius" of the land described in said exhibit "A" now or in the future
owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, or their
assignees or vendees, no premises (other than Tenant's store unit) shall be leased, rented, used or
occupied for the operation or conduct of a "variety store" or "junior department store" or "cut-
rate store" or "discount store." This covenant shall run with the land commencing with the date
of execution of this lease and shall continue until such date as shall be the last day of the lease
term; provided, however, this covenant shall cease and determine and be of no further force or
effect in the event that either (a) subsequent to the commencement of the lease term, said store
unit shall cease to be used for the operation of a cut-rate store, or discount store or any store
managed by Tenant for a period of six (6) consecutive months, excluding temporary
interruptions of said operation because of causes beyond Tenant's control, or (b) said date of
occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7)
years from the date of the execution of this lease. The terms "variety store" and "junior
department store," as used herein, shall be any store similar to the type operated by S.S. Kresge
Co. and shall include, by manner of illustration and not by manner of limitation, stores operated
by F.W. Woolworth Co., Neisner Brothers, Inc., W.T. Grant Company, J.J. Newberry Co., G.C.
Murphy Company, H.L. Green Company, Inc., S.H. Kress & Co., Rose's 5-10-25¢ Stores, Scott
Stores Corporation, Butler Bros., Sprouse-Reitz Co., Inc., Hested Stores Co. and McCrory-
McLellan Stores Corporation. The terms "cut-rate store" and "discount store," as used herein,
shall include, by manner of illustration and not by manner of limitation, stores operated under
any of the following names: Arlan's Department Store, Atlantic Mills, Atlas Shoppers World,
Bargain City (U.S.A.), Clark's Family Fair, Fashion Flair, J.M. Fields, Giant Tiger, Grant Store,

820847

119

Grant Department Stores, Grandway Stores, G.M.S. Stores, Jubilee City, King's Department Stores, Mason's, Maxam's, Miracle Mart, Shopper's City, Shopper's Fair, Shopper's World Stores, and Spartan Discount Department Stores, or any store of similar operation, whether operated as a so-called "closed door" store or otherwise. The term "restricted radius," as used herein, shall be a radius of thirty-five hundred (3,500) feet with respect to a "variety store" or "junior department store," and a radius of four (4) miles with respect to a "cut-rate store" or "discount store."

Without written permission of the Tenant, Landlord shall not lease space, or permit subletting thereof in the "Commercial Development" described in Exhibit "A," to a Food Market or Delicatessen, or a Drug Store exceeding a total area of 8,000 square feet.

820847

120

EXHIBIT "A"

LEGAL DESCRIPTION

OF

SOUTHGATE SHOPPING CENTER

BEGINNING at the intersection of the South side of Mills Avenue with the West side of Henrydale Street, and running thence with Henrydale Street, S. 41-54 E., 244 feet; thence S. 1-02 E., 28.16 feet to an iron pin on the North side of new U. S. Highway No. 29; thence with the North side of said Highway, the following courses and distances: S. 43-55 W., 564.8 feet to a point; thence S. 41-47 W., 200 feet to a point; thence S. 37-41 W., 200 feet to a point; thence S. 33-56 W., 200 feet to a point; thence S. 30-0 W. 200 feet to a point; thence S. 27-44 W., 91.2 feet to a point on the North side of West Faris Road; thence with the North side of said West Faris Road, N. 86-41 W., 100 feet to a point; thence S. 83-12 W., 100 feet to a point; thence S. 72-10 W., 100 feet to a point; thence S. 61-31 W., 91.8 feet to a point; thence S. 57-49 W., 116.9 feet to a point; thence S. 62-56 W., 86.9 feet to a point on the South side of Wallace Street; thence with Wallace Street, N. 4-22 E., 34.5 feet to a point; thence N. 6-31 E., 225.5 feet to a point; thence N. 10-39 E., 93.2 feet to a point; thence N. 17-06 E., 96.9 feet to a point; thence N. 24-56 E., 886.9 feet to a point on the South side of Mills Avenue; thence with the South side of Mills Avenue, N. 71-27 E., 889.85 feet to the point of beginning.

# S. S. KRESGE COMPANY
### INTERNATIONAL HEADQUARTERS
### TROY, MICHIGAN 48084

#### REAL ESTATE DEPARTMENT

J. P. JOHNSON
VICE PRESIDENT

J. G. SCHMIDT
D. H. BURDICK II
C. E. LOTZAR, JR.
R. N. COMBS
P. H. WEHMEIER
W. A. TORPHY
A. J. POTTS
M. L. SKILES
L. D. ROSS
F. A. ZANTELLO
D. L. DAYNE
F. D. PECK
J. A. SIRACO
W. F. HERRINGTON
J. R. COTE

March 3, 1977

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Center City
P. O. Box 1821
Greenville, South Carolina 29602

RE:  Indenture of Lease dated
January 26, 1962
K mart #4016
1 K mart Plaza
Church Street Extension
Greenville, South Carolina

Gentlemen:

The undersigned hereby elects to extend subject lease for an
additional term of ten (10) years, commencing November 1, 1977
and terminating on October 31, 1987, upon the same terms,
conditions and rental covering this option, as set forth in
said lease, as amended.

Very truly yours,

S. S. KRESGE COMPANY

By_____
J. P. Johnson, Vice President

JPJ:ph

123



**S. S. KRESGE COMPANY**
INTERNATIONAL HEADQUARTERS
TROY, MICHIGAN 48084

REAL ESTATE DEPARTMENT

J. P. JOHNSON
VICE PRESIDENT

W. B. CANFIELD, JR
P. H. HARN, JR.
J. G. SCHMIDT
D. H. BURDICK II
C. E. LOTZAR, JR.
R. E. DAVIS
R. N. COMBS
P. H. WEHMEIER
W. A. TORPHY
A. J. POTTS
M. L. SKILES
R. C. HORN, JR
L. D. ROSS
F. A. ZANTELLO
D. J. DOK, JR.

February 5, 1974

Mr. R. E. Hughes
Center City
Post Office Drawer 1821
Greenville, S. Carolina 29602

Re:  K mart #4016
     Greenville, S. C.

Dear Mr. Hughes:

This letter will constitute the First Amendment to that certain lease dated
January 26, 1962 between Center City, as Lessor, and the S. S. Kresge Com-
pany, as Lessee, encumbering the above captioned property.

Exhibit "A" attached to said lease shall be and is hereby deleted in its
entirety and Exhibit "A" attached hereto and made a part hereof is substi-
tuted therefor.

Exhibit "B" attached to said lease shall be and is hereby deleted in its
entirety and Exhibit "B" attached hereto and made a part hereof is substi-
tuted therefor.

If the foregoing modification is acceptable to you, please indicate your
approval in the space provided below and return one copy of this letter to
us for our files.

                          Very truly yours,

                          S. S. KRESGE COMPANY

JPJ/rnc/jt

                          By _____
                             J. P. Johnson, Vice President

Approved and accepted in accordance with the above.

CENTER CITY

By _____

Date 2-28-1974

125

AMENDED LEGAL DESCRIPTION OF
SOUTHGATE SHOPPING CENTER

ALL THAT CERTAIN PIECE, parcel or lot of land situate, lying and being in the State of South Carolina, County of Greenville, just without the southern boundary of the City of Greenville, having the following metes and bounds:

BEGINNING at the intersection of the south side of Mills Avenue with the west side of Henrydale Street and running thence with Henrydale Street, S 41° 54' E, 244 feet;

THENCE:  S 1° 02' E, 28.16 feet to an iron pin on the north side of new U.S. Highway No. 29 or U.S. I-185;

THENCE:  with the north side of said Highway, the following courses and distances:

S 43° 55' W, 564.8 feet to a point;

THENCE S 41° 47' W, 200 feet to a point;

THENCE S 37° 41' W, 200 feet to a point;

THENCE S 33° 56' W, 200 feet to a point;

THENCE S 30° 00' W, 200 feet to a point;

THENCE S 27° 44' W, 91.2 feet to a point on the north side of West Faris Road;

THENCE:  with the north side of said West Faris Road, N 86° 41' W, 100 feet to a point;

THENCE S 83° 12' W, 100 feet to a point;

THENCE S 75° 55' W, 355.7 feet to an iron pin;

THENCE N 6° 31' E, 166 feet to a point;

THENCE N 10° 39' E, 93.2 feet to a point;

THENCE N 17° 06' E, 96.9 feet to a point;

THENCE N 24° 56' E, 886.9 feet to a point on the south side of Mills Avenue;

THENCE:  with the south side of Mills Avenue N 71° 27' E, 889.85 feet to the point of beginning.

EXHIBIT "A"

126





SECOND AMENDMENT OF LEASE

THIS SECOND AMENDMENT OF LEASE, made and entered into this
20ta day of March, 1987, by and between Center City, Inc., a
South Carolina corporation (hereinafter referred to as
"Landlord") and K mart Corporation, a Michigan corporation,
having its principal office at 3100 West Big Beaver, Troy,
Michigan  48084 (hereinafter referred to as "Tenant").

WITNESSETH:

WHEREAS, a certain indenture of lease was made and entered
into on January 26, 1962, by and between Center City, a South
Carolina corporation, as Landlord, and S. S. Kresge Company, a
Michigan corporation, as Tenant, under the terms of which
Landlord leased to Tenant certain premises located near the City
of Greenville, County of Greenville, State of South Carolina,
which premises are more fully described in the lease; and

WHEREAS, said indenture of lease was first amended on
February 5, 1974; and

WHEREAS, by name change, Center City is now known as Center
City, Inc. and S. S. Kresge Company is now known as K mart
Corporation; and

WHEREAS, Landlord and Tenant now desire to amend and modify
said lease as is more fully hereinafter setforth; and

NOW, THEREFORE, in consideration of the sum of One Dollar
and no/100 Dollar ($1.00) the mutual covenants herein contained,
the premises, and other good and valuable consideration, the
receipt and sufficiency of which is hereby acknowledged, Landlord
and Tenant hereby agree that the lease shall be amended as
follows:

1.  Article 18A is hereby deleted in its entirety and the
following substituted therefore:

"RESTRICTIONS ON USE:  Tenant agrees and covenants that so
long as Bi-Lo or its successors is occupying and operating a
grocery supermarket on part of the land described in Exhibit A,
then no portion of the K mart building shall be leased to or
subleased to any person or entity for the purposes of operating a
grocery supermarket therein, or for purposes of selling therein

129

those items normally sold in a grocery supermarket. This restriction shall not apply in the event Bi-Lo ceases to operate a grocery supermarket in the shopping center or in the event Bi-Lo subleases or assigns this lease to an entity which is not the corporate successor of Bi-Lo.

"K mart shall be permitted to sell its standard food items and to sell from its existing delicatessen and cafeteria, provided such space for the sale of miscellaneous food items, including prepared foods sold at the deli, does not exceed 5,000 square feet of sales area, exclusive of aisle space."

EXCEPT, as specifically amended hereby, the lease, as heretofore amended, and all terms and provisions thereof shall remain in full force and effect.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Second Amendment of Lease under seal the day and year first above written.

LANDLORD:

WITNESSES:                     CENTER CITY, INC.

                               By: _R. E. Hughes  Pres._

                                   R. E. Hughes, President

                               TENANT:

                               K MART CORPORATION

                               By: _Michael L. Skiles_

                                   Michael L. Skiles, V. President

                               ATTEST:

2

130

*Lease file*

# K MART CORPORATION

INTERNATIONAL HEADQUARTERS
3100 WEST BIG BEAVER RD.
TROY, MICHIGAN 48084

—

REAL ESTATE DEPARTMENT

March 23, 1987

Center City
303 East McBee Avenue
Greenville, SC  29602

RE:   Indenture of Lease dated
January 26, 1962 between
Center City and K mart Corp.
Store #4016

Gentlemen:

The undersigned hereby elects to extend the subject Lease for an additional
term of ten years, commencing November 1, 1987, to and including October
31, 1997, upon the same terms, conditions and rental as set forth in said
Lease, as amended.

Very truly yours,

K MART CORPORATION

By _____
M. L. Skiles / Vice President

MLS/trm

REGISTERED MAIL

131

*Lease*

# K MART CORPORATION

### INTERNATIONAL HEADQUARTERS
### 3100 WEST BIG BEAVER RD.
### TROY, MICHIGAN 48084

—

### REAL ESTATE DEPARTMENT
April 29, 1987

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Center City, Incorporated
c/o Hughes Real Estate
304 N. Church Street
Greenville, South Carolina  29602

Re:  Lease dated January 26, 1962 between
     Center City and S. S. Kresge Company
     K mart Store #4016

Gentlemen:

The undersigned hereby elects to extend the subject Lease for an additional
term of ten years, commencing November 1, 1987, to and including October 31,
1997, upon the same terms, conditions and rental as set forth in said Lease,
as amended.

Very truly yours,


K mart Corporation


By:  _____
     M. L. Skiles / Vice President


MLS/GCB/cf

LEASE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned Center City, Inc. does hereby assign and transfer without recourse all its right, title, and interest in and to the within lease as amended between it and K mart Corporation to Church Street, Inc., this 1st day of October, 1989.

WITNESS

CENTER CITY, INC.

By:

134

## THIRD AMENDMENT OF LEASE

This Third Amendment of Lease, made and entered into as of November 1, 1991 by and between CHURCH STREET, INC., a South Carolina corporation, having a mailing address c/o Hughes Real Estate, Inc., P.O. Box 2567, Greenville, South Carolina 29602 (hereinafter referred to as "Landlord") and KMART CORPORATION, having its principal offices at 3100 West Big Beaver Road, Troy, Michigan 48084 (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, Center City, a South Carolina corporation ("Center City") and Tenant entered into a certain Lease dated as of January 26, 1962, as amended by a letter dated February 5, 1974 and by a Second Amendment of Lease dated as of March 20, 1987 (as amended, the "Lease") under the terms of which Tenant leased from Landlord certain premises in the City of Greenville, State of South Carolina as more particularly described in the Lease.

WHEREAS, Landlord succeeded to all right, title and interest of Center City in and to the Lease by Lease Assignment dated as of October 1, 1989.

WHEREAS, the Landlord and Tenant now desire to further amend and modify the Lease as more particularly set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties agree to amend the Lease as follows:

1. Article 2 of the Lease is hereby deleted in its entirety and the following substituted therefore:

The term of this Lease shall commence upon the "date of occupancy by Tenant," as that term is defined in Article 10 hereof, and shall terminate on October 31, 2011; provided, however, that term of this Lease may be extended as provided in Article 12 hereof. The phrase "lease term", as used in the Lease shall be the term of this Lease and any extension thereof pursuant to said Article 12.

2. Article 3 of the Lease is hereby amended by adding the following new paragraph thereto:

Notwithstanding the foregoing, Tenant shall, commencing upon November 1, 1991, and in equal monthly installments on the first day of each month thereafter, pay to Landlord at such place as Landlord shall designate in writing from time to time an annual minimal rental of Three Hundred Thirty-One Thousand Five Hundred Dollars ($331,500) unless abated or diminished as hereinafter provided.

Greenville, S. Carolina
Store No. 4016
10/24/91

136

3.    Article 4 of the Lease is hereby amended by substituting the words and number "FOURTEEN MILLION DOLLARS ($14,000,000)" for the words and number "FIVE MILLION EIGHT HUNDRED THOUSAND DOLLARS ($5,800,000)" contained therein.

4.    Article 12 of the Lease is hereby deleted in its entirety and the following substituted therefor:

12.    (a)    Tenant shall have five (5) successive options to extend the term of this Lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this Lease or of this Lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term.    If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this Lease or of this Lease as extended.

(b)    Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the Lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this Lease for such period of time as shall cause the last day of the term of this Lease to be the January 31 next succeeding the date upon which the term of this Lease would expire but for the exercise of this option.    This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this Lease or any extension thereof.    Tenant's rental during this option period shall be the same rental payable under the terms of this Lease at the time Tenant notifies Landlord of its intention to exercise this option.

5.    The parties hereby agree to execute an Amendment to the Memorandum of Lease previously executed by the parties to the Lease or to record and execute a copy of this Third Amendment with all dollar amounts deleted, to be recorded in the real estate records of the county where the demised premises is located.

6.    This Third Amendment may be executed in one or more counterparts and shall become effective when one or more counterparts have been signed by all the parties; each counterpart shall be deemed an original, but all counterparts shall constitute a single instrument.

7.    Except as expressly modified herein, the terms and provisions of the Lease are affirmed by the parties hereto and all terms and conditions of the Lease shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to executed as of the date and year first above written.

WITNESSES:

"Landlord"
CHURCH STREET, INC.,
a South Carolina corporation

By: _R. E. Hughes Pres_

    Its: _Pres._

Attest: _R. E. Hughes Sec._

    Its: _Sec._

"Tenant"
KMART CORPORATION,
a Michigan corporation

By: _M. L. Skiles_
M. L. Skiles
Its Senior Vice President

Attest: _D. H. Burdick II_
D. H. BURDICK II
Its: Assistant Secretary

- 3 -

138

## ACKNOWLEDGMENTS

STATE OF ___S. C.___ )
                     ) SS.
COUNTY OF GREENVILLE )


      The foregoing instrument was acknowledged before me this _7th_ day of
_November_ 1991, by ___R. E. Hughes___ and ___R. E. Hughes___ of
_Church Street, Inc.___ a _South Carolina___ corporation on behalf of the
corporation.


                              _Jane L. McLeod_
                          Notary Public
                          _Patricia J. Stewart_
                          My Commission Expires: _2-13-2000_


STATE OF _MICHIGAN_ )
                    ) SS.
COUNTY OF _OAKLAND_ )


      The foregoing instrument was acknowledged before me this 19th day of
_November_ 1991, by _M. L. Skiles___ and _D. H. Burdick II_ of
_Kmart Corporation_ a _Michigan___ corporation on behalf of the
corporation.


                              _Carol L. Fletcher_

**CAROL L. FLETCHER**
Notary Public, Oakland County, Mich.
My Commission Expires August 1, 1994
                          Notary Public

                          My Commission Expires: _8/1/94_


DMD/11335/0000/BJ6/3

                          - 4 -

November 20, 1991


Ms. C. A. Bitner
Real Estate Accounting

                              Re:   Kmart #4016 - Greenville, SC
                                    Rental Increase

Dear Chris:

Effective November 1, 1991 we amended the lease to extend the
term to October 31, 2011 with five 5-year renewal options.

The new rental effective November 1, 1991 is $331,500 per year
plus one and one half percent of gross sales exceeding fourteen
million dollars.  All other terms of the existing lease remain
the same.

The purpose of this letter is to request that you send the land-
lord the balance due on the November 1991 rent payment with
December and future monthly payments at the new rate.

A Supplemental Information Sheet will follow.


                              DAN BURDICK
                              3-1449

DHB:ar

cc:  Mr. R. E. Hughes

## FOURTH AMENDMENT OF LEASE

This Fourth Amendment of Lease, made and entered into as of this 20th day of November, 1997, by and between **CHURCH STREET, INC.,** a South Carolina corporation, having a mailing address of P. O. Box 2567, Greenville, South Carolina 29602 (hereinafter referred to as "Landlord") and **KMART CORPORATION,** having its principal offices at 3100 West Big Beaver Road, Troy, Michigan 48084 (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Center City, Inc., a South Carolina corporation ("Center City") and Tenant entered into a certain Lease dated as of January 26, 1962, as amended by a letter dated February 5, 1974, and by a Second Amendment of Lease dated as of March 20, 1987, and a Third Amendment of Lease (as amended, the "Lease") under the terms of which Tenant leased from Landlord certain premises in the City of Greenville, State of South Carolina as more particularly described in the Lease.

WHEREAS, Landlord succeeded to all right, title and interest of Center City in and to the Lease by Lease Assignment dated as of October 1, 1989.

WHEREAS, the Landlord and Tenant now desire to further amend and modify the Lease as more particularly set forth herein.

NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties agree to amend the Lease as follows:

1.      Exhibit "A" of the Lease is hereby deleted in its entirety and the attached Exhibit "A" is substituted therefor.

2.      Exhibit "B" of the Lease is hereby deleted in its entirety and the attached Exhibit "B" is substituted therefor.

3.      The second paragraph of Article 18A, as amended by the Second Amendment of Lease, is hereby deleted and replaced by the following:

"K mart shall be permitted to sell food items, whether from a delicatessen or otherwise, provided such space for the sale of miscellaneous food items, including prepared foods sold at a deli, does not exceed 7,000 sq. ft. of sales area, exclusive of aisle space. K mart shall also be permitted to sell prepared food items from a cafeteria or a restaurant, whether for on or off-premises consumption on an unrestricted basis. This restriction shall lapse under the conditions set forth in the preceding paragraph."

141

4:    Except as expressly modified herein, the terms and provisions of the Lease are affirmed by the parties hereto and all terms and conditions of the Lease shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the date and year first above written.

WITNESSES:

"Landlord"
CHURCH STREET, INC.
a South Carolina Corporation

By: _____
    Its: _____

Attest: _____
    Its: _____

"Tenant"
KMART CORPORATION
a Michigan Corporation

By: _____
    Its: ___LORRENCE T. KELLAR___
         V.P. REAL ESTATE

Attest: _____
    Its: ___D.H. BURDICK II___
         ASSISTANT SECRETARY

142

EXHIBIT "A"

AMENDED LEGAL DESCRIPTION

ALL that certain piece, parcel or lot of land situate, lying and being in the State of South Carolina, County of Greenville, just without the Southern boundary of the City of Greenville, and having according to a survey by Fant Engineering Surveying Co., Inc., dated June 10, 1997, the following metes and bounds:

BEGINNING at the intersection of the South side of Mills Avenue with the West side of Henrydale Street, and running thence with Henrydale Street, S 41-09-35 E, 259.81 feet; thence S 26-03-34 W, 21.69 feet to an iron pin on the North side of U. S. Highway 29 (U.S. I-185); thence with the North side of said highway, the following courses and distances: S 43-46-00 W, 540.04 feet to a point; thence S 37-27-41 W, 471.53 feet to a point; thence on a curve with a radius of 2,980.90 a chord bearing and distance of S 38-34-56 W, 61.38 feet to a point; thence S 41-13-47 W, 147.82 feet to a point; thence on a curve to the left with a radius of 2,980.90 a chord bearing and distance of S 29-45-26 W, 219.55 feet to a point on the North side of West Faris Road; thence with the North side of said West Faris Road on a curve to the left with a radius of 527.46 a chord bearing and distance of S 82-35-42 W, 322.54 feet to a point; thence S 75-58-00 W, 184.48 feet to a point; thence on a curve to the right with a radius of 841.48 a chord bearing and distance of S 82-01-46 W, 177.90 feet to a point; thence turning N 26-14-22 E, 176.33 feet on the South side of Wallace Street; thence S 63-50-25 E, 8.68 feet; thence N 26-07-44 E, 1145.45 feet to a point on the South side of Mills Ave; thence with the South side of Mills Avenue N 72-44-23 E, 867.43 feet to a point, the point of beginning.

143

EXHIBIT "B"
REV. 6/20/67

GRAPHIC SCALE

( IN FEET )
1 inch = 100 ft.

PARKING

950 SPACES

WEST FARIS ROAD (P-230)

BRIDGE

U.S. HIGHWAY 29 (U.S. I-185)

BANK

1 STORY BRANCH
BANK 2,108 S.F.

FUTURE EXPANSION
9,655 S.F.

NEW BLDG
47,519 S.F.

175'
252'
157'

EXISTING BLDG
33,000 S.F.

194'

BIG LOTS
20,000 S.F.

200'

K-MART
93,500 S.F.

340'

100'

275'

N. BROAD ST - WILLACE STREET
S23-718

S23-608

SERVICE DRIVE

MILLS AVENUE (S23-44)

SERVICE STATION

BANK

HENRYDALE STREET
(S23-280)

144

*Church Street*
*Kmart Lease File*

# HUGHES

June 10, 2004

Ms. Carol Downes                                    *Sent Via Federal Express*
Real Estate Department
Kmart Corporation
3100 West big Beaver Road
Troy, Michigan 48084

**Re:    Fifth Amendment of Lease**
**Between Church Street, Inc. and Kmart Corporation**
**Store #4016, Greenville, South Carolina**

Dear Carol:

Enclosed please find three executed originals of the Fifth Amendment of Lease for Kmart #4016 here in Greenville, South Carolina. This is the store location where we are replacing the two cooling tower units. As of today's date, one tower has been installed and the second one is being installed during the week of June 21st.

As we had discussed previously, we agreed to replace the cooling towers so long as Kmart Corporation would amend Article 14 of the Lease. This Fifth Amendment includes the language to be added to Article 14.

Please review this amendment and return one fully executed original for our records. If you have any questions, please do not hesitate to call.

Yours very truly,

CHURCH STREET INC.

by: Jayne L. McCall
Vice President

JLM:cr
Enclosures

*Improving Land – Improving Life*

Hughes Real Estate, Inc. / 304 North Church Street / P.O. Box 2567 / Greenville, South Carolina 29602 / (864) 242-4483 / Fax (864) 242-4486

145

## FIFTH AMENDMENT OF LEASE

_____ This Fifth Amendment of Lease, made and entered into as of this 8ᵗʰ day of ﹍June﹍, 2004, by and between **CHURCH STREET, INC.**, a South Carolina corporation, having a mailing address of P.O. Box 2567, Greenville, South Carolina 29602 (hereinafter referred to as "Landlord") and **KMART CORPORATION**, having its principal offices at 3100 West Big Beaver Road, Troy, Michigan 48084 (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, Center City, Inc., a South Carolina corporation ("Center City") and Tenant entered into a certain Lease dated January 26, 1962, as amended by a letter dated February 5, 1974, and by a Second Amendment of Lease dated as of March 20, 1987, and by a Third Amendment of Lease dated November 1, 1991, and by a Fourth Amendment of Lease dated November 20, 1997 (as amended, the "Lease") under the terms of which Tenant leased from Landlord certain premises in the City of Greenville, State of South Carolina as more particularly described in the Lease.

WHEREAS, Landlord succeeded to all right, title and interest of Center City in and to the Lease by Lease Assignment dated as of October 1, 1989.

WHEREAS, Landlord and Tenant now desire to further amend and modify the Lease as more particularly set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreement of Landlord to replace the two cooling tower units for the heating, ventilating and air conditioning systems and components thereof (the "HVAC System") serving Tenant's store unit, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree to amend the Lease as follows:

1.    The following paragraph shall be added after the first paragraph of Article 14 of the Lease:

> Without limiting Tenant's obligations under the preceding paragraph, Tenant shall also maintain, at all times during the term of this Lease and at Tenant's expense, a maintenance contract approved by Landlord that provides for scheduled maintenance of the HVAC System, specifically including the cooling tower equipment. The maintenance contract shall provide that Landlord will receive copies of all inspection reports made by the HVAC contractor and shall further provide that the maintenance contract will not be cancelled without 20 days prior written notice to Landlord.    In addition, Tenant shall perform all necessary operations to prevent freezing of water in the condenser water piping and cooling towers when the HVAC System is operated during freezing conditions.

The remaining provisions of Article 14 shall be unchanged and shall remain in full force and effect.

     2.     The Lease, as hereby amended, is hereby ratified and confirmed by Landlord and Tenant. Except as expressly hereby amended, the Lease shall remain unchanged and in full force and effect.

     IN WITNESS WHEREOF, the parties have hereto caused this instrument to be executed as of the date and year first above written.

WITNESSES:

"Landlord"
CHURCH STREET, INC.
a South Carolina Corporation

By: _____
    Its: _Vice President_

Attest: _____
    Its: _V.P._

"Tenant"
KMART CORPORATION
a Michigan Corporation

By: _____
    Its: _____

Attest: _____
    Its: _____

907762

2

147

STATE OF SOUTH CAROLINA    §
                           §                **ACKNOWLEDGMENT**
COUNTY OF GREENVILLE       §


The foregoing instrument was acknowledged before me this 8th day of _June_____, 2004, by Robert E. Hughes, Jr. as Vice President of Church Street, Inc., a South Carolina corporation, on behalf of the corporation.

Notary Public for South Carolina
My Commission Expires: My Commission Expires
                        February 3, 2008


STATE OF MICHIGAN    §
                     §                **ACKNOWLEDGMENT**
COUNTY OF OAKLAND    §


The foregoing instrument was acknowledged before me this ___ day of _____, 2004, by _____, as _____ of Kmart Corporation, a Michigan corporation, on behalf of the corporation.


Notary Public for Michigan
My Commission Expires: _____


907762                                   3

148

Church St.

# SEARS HOLDINGS

**CERTIFIED/REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

CENTER CITY
PO DRAWER 2567
C/O HUGHES REAL ESTATE
GREENVILLE                    SC      29602

Kmart Store #    4016    **Greenville, South Carolina**

Re:    **NOTICE OF ADDRESS CHANGE**

You are hereby notified that all notices required or permitted from Lessor [Landlord/Tenant/Lessee] to Lessee [Tenant/Lessor/Landlord] shall be addressed as follows:

Kmart Corporation
c/o Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL 60179
Attn.: Vice President Real Estate
        Department 824RE

With a copy to:

Kmart Corporation
c/o Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL 60179
Attn.: Vice President Law – Real Estate
        Department 766X

**Also, for quick reference, please include the unit # referenced above in all correspondence and invoices.**

Dated this 12th day of March, 2007.

KMART CORPORATION

By: Kim Facer, Divisional Vice President
Its: Authorized Agent

cc: Real Estate File

149

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL 60179

April 21, 2011

**REGISTERED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 132 376 US**

Church Street, Inc.
c/o Hughes Real Estate
P. O. Drawer 2567
Greenville, SC 29602
Attn: R.E. Hughes, President

**REGISTERED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 132 362 US**

Center City
c/o Hughes Real Estate
P. O. Drawer 2567
Greenville, SC 29602
Attn: R.E. Hughes, President

> Re:    Lease dated January 26, 1962, as amended,
> for the premises located at Church St Extension,
> Greenville, SC, and known as Kmart #4016

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing November 1, 2011, to and including October 31, 2016, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan corporation

By:    _____
Jeffrey Stollenwerck
Sr. Vice President of Real Estate

JS/ljb

cc:    J. Catanese
Lease File

**REGISTERED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 132 380 US**

Carolina First
Re: Hughes Real Estate Inc.
Acct # 100510703
P. O. Box 12249
Columbia, SC 29211

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

April 19, 2016

**VIA REGISTERED MAIL**
**AND CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 561 US**
**# 7008 0150 0001 1952 2665**
Church Street, Inc. / Church Street, LLC
c/o Hughes Development Corporation
P.O. Box 2567
Greenville, SC  29602
Attn: Jayne L. McCall

**VIA REGISTERED MAIL**
**AND CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 575 US**
**# 7008 0150 0001 1952 2672**
Church Street, Inc./ Church Street, LLC
c/o Hughes Development Corporation
1 North Main Street, Suite 902
Greenville, SC  29601
Attn:  Jayne L. McCall

**VIA REGISTERED MAIL**
**AND VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 589 US**
**# 7008 0150 0001 1952 2689**
Summa Corp. dba Church Street, LLC
P.O. Box 2567
Greenville, SC  29602
Attn:  Jayne L. McCall

**VIA REGISTERED MAIL**
**AND VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 544 US**
**# 7008 0150 0001 1952 2795**
TD Bank
Account:  Hughes Development Corporation
104 S. Main Street
Greenville, SC  29601

Re:    Lease dated January 26, 1962, as amended,
for the premises located at 1 Kmart Plaza,
Greenville, SC and known as Kmart # 4016

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing November 1, 2016, to and including October 31, 2021, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan Corporation

By:
S. Jeffrey Stollenwerck
SVP and President, Real Estate

JS/cm

cc:   JoAnn Catanese
Lease File

**VIA REGISTERED MAIL**
**AND VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**# RB 206 133 558 US**
**# 7010 0290 0000 0651 4089**
Hughes Development Corporation
P.O. Box 2567
Greenville, SC  29602
Attn: Molly Stengel, Property Manager