**CLARK HILL PLC**
210 Carnegie Center, Suite 102
Princeton, NJ 08540
Telephone: (609) 785-2911
Fax: (609) 785-2999

830 Third Avenue, Suite 200
New York, NY 10022
Telephone: (646) 395-8580
Fax: (646) 395-8700
srichman@clarkhill.com
Steven M. Richman

**CLARK HILL STRASBURGER**
720 Brazos, Suite 700
Austin, TX 78701
Telephone: (512) 499-3600
Facsimile: (512) 499-3660
duane.brescia@clarkhillstrasburger.com
Duane J. Brescia (*pro hac vice* admission pending)

*Counsel to Epicor Software Corporation*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **IN RE** | § | **Chapter 11** |
|  | § | |
| **SEARS HOLDING CORPORATION,** | § | **Case No. 18-23538 (RDD)** |
| *et al.,*[1] | § | |
|  | § | |
| **Debtors.** | § | **(Jointly Administered)** |
|  | § | |

## OBJECTION OF EPICOR SOFTWARE CORPORATION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive, Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**F/K/A ACTIVANT SOLUTIONS, INC. TO DEBTOR'S INITIAL AND
SUPPLEMENTAL NOTICES OF CURE COSTS AND POTENTIAL
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES IN CONNECTION WITH GLOBAL SALE TRANSACTION**

Epicor Software Corporation, formerly known as Activant Solutions, Inc. ("**Epicor**"),
files this Objection to Debtors' *Initial and Supplemental Notices of Cure Amounts and Potential
Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in
Connection with Global Sale Transaction* [D.I. 1731 and 1774] (the "**Cure Notices**").  In support
of this objection, Epicor states as follows:

1.      On January 18, 2019 and January 24, 2019, Debtors filed their Initial and
Supplemental Cure Costs Notices, each of which lists certain Epicor contracts with a proposed
cure amount of $0.00 for all contracts.  The deadline to object to the Initial Cure Notice is
January 26, 2019 at or before 4:00 pm Eastern Time and the deadline to object to the
Supplemental Cure Notice proposed cure amount is Saturday, January 31, 2019 at or before 4:00
pm Eastern Time.

2.      Epicor provides the Debtor with retail software products and support services,
including maintenance, pursuant to a Master Data and Services Agreement with Debtor Sears
Holdings Management Corporation, dated October 17, 2006 (the "**MDSA**").  See *Exhibit 1*.
Pursuant to the MDSA, the parties entered into supplemental statements of work, amendments,
an NDA and other related documents (collectively with the MDSA, the "**Epicor Contracts**").
See *Exhibit 2*.   The MDSA, which is the master agreement under which the relationship is
governed, was first listed on the Supplemental Cure Notice.  The only Epicor Contracts listed on
the Initial Cure Notice were three amendments to the MDSA.   Epicor asserts that the applicable
objection deadline is therefore January 31, 2019.

3.      Epicor objects to the assumption and/or assignment of the Epicor Contracts as follows:

4.      <u>The Cure Notices List An Insufficient Cure Amount and the Epicor Contracts Cannot be Assumed and Assigned Under 11 U.S.C. §365(b)(1)</u>.    Epicor objects to the assumption and assignment of the Epicor Contracts and to the proposed cure amount because the total cure amount owed to Epicor under the Contracts is $106,141.86, plus any applicable transfer fees.   See *Exhibit 3*, attached hereto.   Epicor does not consent to the assumption and/or assignment of the Epicor Contracts unless and until the full balance is paid and the other objections listed herein are satisfied or until an agreement can be reached with the Debtor and/or proposed assignee.

5.      <u>Debtors Must Provide Adequate Assurance of Future Performance in Order to Assume and Assign the Epicor Contracts, Which Has Not Been Provided</u>.   The Sale Notice and any related Cure Notice do not provide Epicor with adequate assurance regarding the Buyer's ability to perform the terms of Epicor Contracts.   Under § 365(b)(1) of the Bankruptcy Code, before assuming and/or assigning any executory contract, the Debtors must provide adequate assurance of future performance. At this time, Epicor does not have such assurance.   Epicor is willing to discuss granting its consent with the Debtors and Buyer if they can satisfy Epicor's requirements and provide adequate assurances of future performance

6.      <u>Reservation of Rights</u>.    Epicor reserves the right to contest the assumption, assignment or rejection of the Contract on any basis other than the proposed cure amount and to supplement the legal authority cited herein.   Epicor further reserves the right to prosecute a motion for allowance and payment of an administrative expense for that portion of Epicor's claim that may be subject to a §503(b)(9) administrative priority.

WHEREFORE, Epicor prays that this Court sustain Epicor's objection to the proposed

cure amount and for such other and further relief to which it may show itself to be justly entitled.

Dated: January 25, 2019
        New York, New York

                                Respectfully submitted,


                                /s/ Steven M. Richman_____
                                Steven M. Richman
                                **CLARK HILL PLC**
                                210 Carnegie Center, Suite 102
                                Princeton, NJ 08540
                                Tel.: (609) 785-2911
                                Fax: (609) 785-2999

                                830 Third Avenue, Suite 200
                                New York, NY 10022
                                Telephone: (646) 395-8580
                                Fax: (646) 395-8700
                                srichman@clarkhill.com

                                And

                                Duane J. Brescia (*pro hac vice* pending)
                                **CLARK HILL STRASBURGER**
                                720 Brazos, Suite 700
                                Austin, Texas 78701
                                Tel. (512) 499-3647
                                Fax (512) 499-3660
                                duane.brescia@clarkhillstrasburger.com

                                **Attorneys for Epicor Software Corporation**

# Exhibit 1

## MASTER DATA AND SERVICES AGREEMENT

**THIS MASTER DATA AND SERVICES AGREEMENT** ("**Agreement**") is made as of October 17, 2006 (the "**Effective Date**") by and between Activant Solutions, Inc. ("**Vendor**"), a Delaware corporation with offices at 7683 Southfront Road, Livermore, CA 94551, and **Sears Holdings Management Corporation** and its Affiliates (collectively "**Sears**"), a Delaware corporation with offices at 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**WHEREAS,** Vendor is interested in licensing certain data and/or providing certain services to Sears; and

**WHEREAS,** the parties wish to set forth the terms and conditions under which Vendor will provide to Sears certain data and/or services through this Agreement;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **DEFINITIONS**.

Capitalized terms used herein shall have the meaning ascribed to them herein whenever they are used in this Agreement, or any Appendixes or Procurement Documents hereto. Certain terms are defined in Appendix 1 (Glossary) attached hereto. Other capitalized terms are defined in the context in which they are used.

2.    **PROCUREMENT DOCUMENTS**.

2.1.    **General Description**. This Agreement sets forth the terms and conditions upon which Sears and/or its Affiliates may from time-to-time procure Data and Services. Except as set forth in a particular Procurement Document, Sears makes no promises or representations whatsoever as to the amount of business Vendor can expect at any time under this Agreement. Any estimates or forecasts of Sears' or its Affiliates future needs for Data and Services are for Sears' planning purposes only and Sears shall have no liability for Vendor's reliance thereon. The parties intend that they will enter into a Procurement Document to this Agreement before Vendor provides any Data and/or Services to Sears or its Affiliates. Sears will be under no obligation to compensate Vendor for Data and Services not described in a Procurement Document or other written agreement executed by both parties. Notwithstanding the foregoing, if Vendor licenses any Data or provides any Services to Sears or its Affiliates in the absence of a Procurement Document, this Agreement will nevertheless apply to, and Sears will compensate Vendor for, such Services and/or Data.

2.2.    **Procurement Documents**. If Sears elects to procure Data, Implementation Services or Maintenance Services from Vendor on the terms and conditions contained in this Agreement, then Sears will issue either a Purchase Order and/or a Schedule or Statement of Work to Vendor for such Data or Services. Any orders for: (i) Services other than

Implementation Services or Maintenance Services, and (ii) any orders for Data, Implementation Services or Maintenance Services subject to terms and conditions in addition to or different from those contained in this Agreement (other than price), shall be subject to the execution of a Schedule or Statement of Work.

2.2.1    **Purchase Orders**.  Sears may place orders for certain Data and Services (as described above), by issuing to Vendor a written, or electronic, purchase order, signed or (in the case of electronic transmission) sent by a Sears' authorized representative (each a "**Purchase Order**") which shall contain the price and quantity of the Data and/or Services being procured by Sears.  Purchase Orders shall be deemed accepted by Vendor upon the earlier of: (i) a written or electronic acceptance by Vendor, or (ii) shipment or delivery of the Data/Service ordered under such Purchase Orders.  Sears may include the delivery location for Data/Services in the Purchase Order or in a writing delivered with a Purchase Order (in which case such delivery list shall be deemed to be part of the Purchase Order), it being understood, however, that the Delivery of Data will be made through a secure FTP site ("FTP Site") established by Vendor for which authorized access is provided to Sears.  A Schedule and/or SOW may provide that any Purchase Order issued for the types of Data or Services described therein shall be subject to such Schedule/SOW.

2.2.2    **Schedules**.  In addition, the parties may enter into a written schedule, which must be executed by both parties to be effective (each a "**Schedule**"), for Data under this Agreement.  An example of a Schedule is attached hereto as **Appendix 2.2.2** (Form of Schedule).  A Schedule may include Services related to the Data described therein.

2.2.3    **Statements of Work**.  In addition, the parties may enter into one or more written statements of work, which must be executed by both parties to be effective (each a "**Statement or Work**"), for Services under this Agreement.  Generally for any Project which includes Data, a Schedule would be used instead of a SOW; however, designation as a Schedule versus a SOW is for convenience of the parties and shall not affect how such Procurement Documents are treated under this Agreement.  An example of a SOW is attached hereto as **Appendix 2.2.3** (Form of SOW).

2.2.4    **Change Order Procedure**.  If either party believes that a change in a Procurement Document (whether in time frames, costs or deliverables) is necessary or desirable, such party shall submit a written change request to the other (a "**Change Request**").  Vendor represents to Sears that it has factored into Vendor's fee adequate contingencies for de minimis Change Requests, and such de minimis Change Requests shall not impact the fees under this Agreement.  In the event of a Sears-initiated Change Request, Vendor shall promptly provide Sears with a written quote describing in detail:  (a) the modifications to the Data or Sears' computer system that will be required as a result of the Change Request

2

including changes in Data, equipment, if any, and Services; (b) the effect, if any, on overall system performance and the Specifications, (c) the effect, if any, of the Change Request on the applicable Milestones; and (d) an estimate of the affect of such change (if any) on the costs of the Project to implement each Change Request.  If Vendor submits a Change Request to Sears, such Change Request shall include the foregoing information. Changes to a Procurement Document shall not become effective unless an amendment to the Procurement Document (each an "**Amendment**"), is executed by both parties.  Absent the execution of such an Amendment, the parties shall proceed to fulfill their obligations under this Agreement.

2.3.    **Relationship Between Contract Documents**.    Each Procurement Document will be subject to the terms and conditions of this Agreement.

2.3.1 **Purchase Orders**.    Other than: (a) a description of the Data/Services being procured, (b) price, (c) quantity (e) delivery location (if other than the FTP Site), and (f) Specifications, a Purchase Order shall not contain any additional or different terms or conditions from those contained in this Agreement, and this Agreement shall control over any such inconsistent terms in a Purchase Order.

2.3.2 **Schedules and SOWs**.    Schedules and SOWs may include additional or different terms and conditions than this Agreement; provided that in order for any such terms to control over this Agreement, there must be an explicit statement in such Schedule or SOW that a term therein controls over a specific provision of this Agreement.  In all other cases, this Agreement shall control over any different or inconsistent terms in a Procurement Document.

2.3.3 **No Additional Terms**.  No additional terms contained in any invoice, order acknowledgment, other correspondence, or verbal communication, between the parties shall be valid and such additional or conflicting terms are deemed rejected by the Parties unless such terms (i) are contained in a Schedule, SOW, an Amendment, or other written agreement executed by both parties, and (ii) specifically reference the terms in this Agreement to be superseded as described in Section 2.3.2 above.

3.    **LICENSE**.

3.1.    **License Grants and Restrictions**.  Vendor hereby grants to Sears and its Authorized Users a non-exclusive license to Use (defined below) and copy the Data identified in the applicable Procurement Document.  For purposes of this Section 3.1, "Use" shall mean that Sears has the right to: (i) access an ftp site which contains the Data and is maintained by Vendor on behalf of Sears; (ii) download the Data and integrate it into Sears' automotive center point of sales system and Sears' intranet websites, to which third parties do not have access except as permitted by this Section 3.1; (iii) maintain copies of the Data at

3

Sears' support centers for testing, analysis, or archival purposes; and (iv) distribute copies of the Data to Sears or Affiliate store or outlet locations ("Outlets"), subject to any limitations set forth in the applicable Procurement Document. Data may be licensed on an enterprise or per outlet basis as set forth in the applicable Procurement Document. No right of sublicense is granted to Sears; provided, however, that Sears may permit Third Party vendors, outsourcers and other service providers to access and/or use the Data pursuant to the rights granted to Sears and its Authorized Users hereunder on behalf, and for the benefit, of Sears, in conjunction and consistent with Sears' permitted Use, as agreed to between Sears and such Third Parties. Said Third Party vendors, outsourcers and other services providers shall not be a competitor of Vendor, and the Third Party vendor's access and/or use of the Data shall be subject to and limited by the terms of this Agreement. Sears shall be responsible for the acts or omissions of a Third Party vendor, outsourcer or other service provider who accesses/uses the Data.

Additionally, unless otherwise set forth in the applicable Procurement Document, Vendor hereby grants to Sears and its Authorized Users a non-exclusive, unlimited user, multi-site, enterprise-wide license to use and copy the Software (and any Software-related Documentation, if any) as needed for access to/Use of the Data, as provided under this Agreement. No right of sublicense is granted to Sears; provided, however, that Sears may permit Third Party vendors, outsourcers and other service providers to access and/or use the Software pursuant to the rights granted to Sears and its Authorized Users hereunder on behalf, and for the benefit, of Sears as agreed to between Sears and such Third Parties. Said Third Party vendors, outsourcers and other services providers shall not be a competitor of Vendor, and the Third Party vendor's access and/or use of the Software shall be subject to the terms of this Agreement. Sears shall be responsible for the acts or omissions of a Third Party vendor, outsourcer or service provider who accesses/uses the Software as permitted herein.

Except as permitted by this Section 3.1, Sears shall not use, distribute, deliver, provide access to, modify or otherwise make available the Data or the Software to any Third Parties. Sears shall have the right to format the Data and the right to combine excerpts of the Data with its own data, provided that in no event shall Sears use the Data or Software for the purpose of building a similar database or other competing product or service for sale  or license to any third party. Sears shall not reverse engineer, translate, modify, disassemble or decompile the Software or Data or create derivative works therefrom. Sears shall not export the Software or the Data outside of the United States, including Puerto Rico. The term of the foregoing licenses shall commence on the Effective Date and continue for the term of the Maintenance Services. All rights in the Software and Data not expressly granted to Sears and its Authorized Users herein are reserved by Vendor.

3.2.    **Copies**.  Sears may copy the Data and Documentation for its business operations as permitted in Section 3.1 above.  In addition, Sears may copy the Data and Documentation as required for backup, archival,  disaster recovery, testing, training, development and/or other similar purposes, and such copies may be stored off-site and shall not be included in determining the number of copies in use by Sears under any per-copy license or pricing arrangement.  Sears shall not remove any copyright notices or other

proprietary notices appearing in the Data or Documentation.  In addition, Sears shall ensure that all such pre-existing proprietary and copyright notices are reproduced in any copies Sears creates or has created on its behalf.  If Sears loses or damages the media containing the Data or Documentation, to the extent not otherwise delivered through the FTP Site, Vendor shall provide, to the extent reasonable, replacement copies of such Data and Documentation, at no additional charge other than for replacement media.

3.3.      **Reporting Requirements**.  Following Acceptance (as provided in Section 5 below) and continuing on a quarterly basis throughout the Term of this Agreement, Sears agrees to provide Vendor with the number of Outlets, within fifteen (15) days before the end of the prior quarter, to which Data has been distributed to enable Vendor to issue invoices for the applicable charges, as provided under the applicable Procurement Document.  Sears shall permit Vendor to audit, not more than twice per year, Sears' usage of the Data to verify Sears' compliance with the terms of this Agreement.  Sears shall promptly pay to Vendor any undisputed amounts determined to be due (or Sears shall receive a credit, as the case may be) as determined by such audits.

3.4.      **New Locations**.  Sears shall have the right to transfer, at any time, without prior notice to or consent of Vendor, the Data and Documentation to any United States location, including Puerto Rico, which is owned or controlled by Sears or by any Sears Affiliates, subsidiaries, divested entities, Third Party disaster recovery providers or outsourcers (where access is necessary for the provision of services on behalf of Sears), so long as such transfer and the transferee do not violate any license, restriction or confidentiality obligation set forth in this Agreement or the applicable Procurement Document and Sears or the applicable Sears Affiliate is responsible for the acts or omissions of the transferee and such transferee is not a competitor of Vendor.

3.5.      **Ordering Affiliates**.  Affiliates of Sears may acquire Data and/or Services from Vendor under the terms and conditions of this Agreement, provided that such Affiliate enters into a Procurement Document governing such purchase and agrees in writing signed by an authorized officer of such Affiliate to be bound by the terms of this Agreement. Sears will notify Vendor in the event an Affiliate desires to make a purchase hereunder.  Any Affiliate who makes such a purchase shall be deemed to be "Sears" hereunder for purposes of such purchase, provided that Vendor shall look solely to such Affiliate (and not to Sears) for satisfaction of any liability arising under or relating to such purchase by an Affiliate.

4.    **SERVICES**.

4.1.      **Implementation Services, Committed Resources and Testing**. If set forth in the applicable Procurement Document, Vendor shall implement the Data and make it functional in a Sears' production environment in accordance with the responsibilities and criteria set forth in such Procurement Document (collectively, the "**Implementation Services**").  From the Effective Date of such a Procurement Document, until Acceptance of the Data, Vendor shall make available sufficient, qualified and competent Vendor Personnel to complete its responsibilities with respect to such implementation of the Data in accordance

with the applicable Procurement Document. Charges for such Implementation Services, if any, shall be set forth in the applicable Procurement Document. The parties may also provide, in an applicable Schedule or Statement of Work that Vendor shall perform certain testing Services in accordance with a test plan described therein.  Such testing may include pre- and post-production phases, unit testing, functional testing, operational testing, business acceptance testing and such other procedures as are agreed to by the parties.

4.2.        **Development Services**.  The parties may agree, pursuant to a Procurement Document, that Vendor will develop new Data or modifications to existing Data for Sears as part of the Deliverables (collectively, "**Developments**").        Unless otherwise provided in the Procurement Document, Vendor shall incorporate such Developments into future Enhancements of the Data for the term of the Maintenance Services and so long as any manufacturers identified by Sears in conjunction with such Development continue to supply the underlying information to Vendor required for the development and maintenance of such Data.  Sears' rights to such Developments shall be subject to **Section 9.2** (Deliverables) below.

4.3.        **Training**.  Upon Sears' request, Vendor shall provide Sears and its Authorized Users with training by telephone on the use and operation of the Software and/or Data.    Additionally, Vendor shall provide to Sears telephone support regarding the integration, testing and implementation of the Data as necessary for Sears to affect the rights granted to it herein.  Any information provided by Vendor to Sears under this Section 4.3 shall be deemed to be Vendor Confidential Information.

4.4.        **Know-How Disclosure.** During the term of this Agreement, Vendor shall upon Sears' request (as part of the Services), disclose knowledge, ideas, concepts, information and the like regarding the Data and Documentation ("**Know-How**") in order that Sears-identified Personnel will become self-reliant with respect to the day-to-day operation of the Data and will be able to develop and implement all necessary interfaces with the Data. As required or necessary, Vendor shall provide to Sears any and all updated, changed or revised policies, practices, procedures, processes and/or techniques with respect to any Know-How disclosed hereunder.    Any Know-How provided by Vendor to Sears under this Section 4.4 shall be deemed to be Vendor Confidential Information.  Requests for Know-How, to the extent required for the foregoing purpose,  may include, to the extent available from Vendor, the following:

4.4.1    Data files, file and data definitions and relationships, data definition Specifications, data models, interfaces, program architecture, program structure, sequence and organization, screen displays, reference and user manuals, design and functional Specifications relating to the Data; except for proprietary trade secret databases provided through documented APIs.

4.4.2    Maintenance, support utilities and tools relating to the Data;

4.4.3    Security requirements and methodologies relating to the Data; and

4.4.4    Such other material as Sears may reasonably request.

4.5.    **APIs**. Sears shall have the right to interface the Data and to Use it in conjunction with other, data, software, programs, routines and subroutines developed or acquired by Sears. Upon Sears' request, Vendor shall cooperate and work with Sears and, if necessary, Third Parties, as reasonably required to answer questions and/or consult with Sears so that Sears can interface the Software with other systems, equipment, and data software used by Sears for the purposes of Use of the Data. Sears and any of Sears Authorized Users shall have the right to access the available Documentation and Confidential Information of Vendor (which shall include, but not be limited to, data base structures, data models, data schema, table structures, object libraries and other data and other elements of the Data as required for such purposes. Vendor shall not have any ownership interest in any data, software, program, routine or subroutine developed by Sears or acquired by Sears from a Third Party other than Vendor by virtue of its having been interfaced with or used in conjunction with any Data.

Notwithstanding the foregoing or any other terms herein to the contrary, Sears hereby agrees that Vendor shall own all rights in and to any enhancements or improvements to or derivative works of the Data, Software, Documentation, or Services, whether created by Vendor, Sears, a Sears Affiliate or a Third Party on behalf of Sears or a Sears Affiliate, and Sears will cooperate with Vendor in the execution or filing of any documents necessary to effect the intent of this provision. To the extent such rights are not granted to Vendor by operation of law, Sears hereby agrees to assign, and to ensure that its Affiliates and Third Parties operating on behalf of Sears or its Affiliates, assign to Vendor all rights in and to any such enhancements, improvements or derivative works.

4.6.    **Other Services**.    Upon Sears' request, the parties may agree, in an appropriate Schedule or Statement of Work, for the Vendor to provide other Services to Sears. Any such Services shall be set forth in the applicable Schedule or SOW. Sears shall compensate Vendor for all such Services performed by Vendor at the rates set forth in the applicable Schedule or SOW.

4.7.    **Implementation Delays**. If Vendor has failed to meet a Milestone solely as a result of its own delay, then in addition to any other rights and remedies that may be available to Sears, at no additional cost to Sears and at Sears' option, Vendor shall provide to Sears all necessary additional Vendor Personnel to accelerate performance as may be required or necessary to timely achieve the next Milestone or, if there is no next Milestone, to achieve the missed Milestone as soon as is practicable.

4.8.    **Sears Responsibilities.**    Sears understands and agrees that Vendor's obligations hereunder and under any Procurement Document will be dependent upon tasks to be performed, data and information to be provided and decisions to be made by Sears (or its supplier manufacturers) as described herein or the applicable Procurement Document. Sears' failure to timely perform such tasks, provide such data and information or make such decisions may impede Vendor's ability to perform, and accordingly, Vendor shall not be

7

liable for any such delays or non-performance. Vendor shall promptly notify Sears in writing if Vendor fails to receive any required assistance from Sears and the parties shall work in good faith to make any applicable adjustments to the timeline, or in the event Vendor is materially and adversely affected, the fees.

5.    **ACCEPTANCE AND TESTING**.

5.1.    **Acceptance Period**.  Sears shall have a 90 day period from the date the Data is fully implemented and operational in a production environment on Sears' computer systems ("**Acceptance Period**"), to test such Data to determine whether it operates in accordance with the Specifications applicable to such Data.

5.2.    **Defects and Correction**.  If, during the Acceptance Period (as extended pursuant to the terms of this Section 5.2, if applicable), Sears discovers Defects in the Data, Sears shall provide, in reasonable detail, a notice of such Defects to Vendor's Project manager (or other representative). Once such notice has been given, the Acceptance Period shall be suspended, and Vendor shall have a reasonable period (not to exceed thirty (30) days) to correct the Data. Once Vendor has delivered the corrected Data to Sears, the Acceptance Period shall resume; provided that, if required, the Acceptance Period shall be extended to provide Sears with a minimum of thirty (30) days to accept or reject the Data after delivery of such corrected Data by Vendor. If Vendor fails to correct a material Defect, Sears may reject the Data.

5.3.    **Acceptance and Rejection**.  Sears may accept the Data upon written notice to Vendor at any point during the Acceptance Period (as extended pursuant to Section 5.2, if applicable).  Additionally, Sears may at any point during the Acceptance Period reject the Data if Sears discovers a Defect by providing a written notice to Vendor.  If Sears does not give notice of rejection of the Data within the Acceptance Period (as extended pursuant to Section 5.2, if applicable), the Data shall be deemed to have been accepted as the last day of such Acceptance Period or such earlier date if written notice of acceptance is provided (in both cases, "**Acceptance**").  Any Acceptance shall not prejudice Sears' other rights under this Agreement (e.g., representations, warranties, Maintenance Services, etc.).  If Sears rejects the Data pursuant to **Section 5.2** due to a material Defect, Sears shall be entitled to: (a) declare that a material breach has occurred, and (b) receive a refund of 50% of all amounts paid by Sears for the Software and/or Data and all Related Services through such date and Sears shall have no further obligation to pay any amounts due to Vendor in connection therewith.

5.4.    **Post Acceptance Correction of Defects**.  The parties hereby agree that this Section 5 of the Agreement only applies to the initial set of Data delivered by Vendor. Vendor shall correct any Defects remaining to be corrected following Sears' Acceptance in accordance with the Maintenance Service obligations.

6.    **REPRESENTATIONS AND WARRANTIES**.

6.1.    **General**.    Vendor represents, warrants and covenants (as to future performance) to Sears as follows:

6.1.1    **Authority**.    That: (a) Vendor has full power and authority to enter into this Agreement, to carry out its obligations under this Agreement and, subject to the limitations described herein with regard to information supplied by third parties, to grant the rights and licenses granted to Sears in this Agreement; (b) there are no outstanding assignments, grants, licenses, encumbrances, obligations or agreements (whether written, oral or implied) that are inconsistent with this Agreement and the rights granted herein; and (c) Vendor's compliance with the terms and conditions of this Agreement will not violate any federal, state or local laws, regulations or ordinances or any Third Party agreements.

6.1.2    **Warranty Period and Defects**.    That, for the period of time specified in the applicable Procurement Document, or if no time frame for a warranty is specified therein, one (1) year from the date of Acceptance (the "**Warranty Period**"), and subject to Sears being a continuous, fully paid-up subscriber of Maintenance Services, the Data supplied by Vendor shall, to the extent within Vendor's control, contain the functionality and operate in accordance with, and conform to, the Specifications applicable to such Data. Vendor shall use reasonable efforts to correct any failure of the applicable Data to conform to such applicable Specification in the next subsequent scheduled release of such Data at no additional cost to Sears other than the cost Sears is already paying for Maintenance Services. Notwithstanding anything in this Agreement to the contrary, Sears understands that Vendor's obligations hereunder are limited to (i) correcting errors in the Data caused by the actions or omissions of Vendor, such as a failure of the Data to meet the Specifications as a result of a modification made by Vendor in formatting the Data and (ii) notifying its suppliers of any recommended content changes to the Data.  Vendor is not responsible for the accuracy of the content as provided to Vendor and cannot ensure that its suppliers will provide corrected content or that such content will be available for the next scheduled release.  Any Maintenance Service obligations imposed upon Vendor hereunder or in a Procurement Document shall apply only to (i) above and to any Defects in the Software.  Subject to the foregoing sentence, in the event Vendor is unable to correct such a Defect within the agreed-to time periods set forth in the Statement of Work, Vendor shall replace the defective Data with Data that functions in accordance with the Specifications for such Data. If after repeated attempts Vendor fails to provide corrected replacement Data and Sears notifies Vendor in writing of its decision to terminate Maintenance Services with respect to such defective Data , Vendor shall (at Sears' option) either refund to Sears any amounts paid for said defective Data and any Related Services applicable to such defective Data, or offset in the next invoice all of the fees paid by Sears for the portion of Data that is defective and any Related Services

9

applicable to such defective Data. Sears shall have no further obligation to pay any amounts due to Vendor in connection with such defective Data. Upon return or credit of the fees set forth above, Sears shall return or destroy the portion of Data that is defective.

6.1.3    **Quality**. That Vendor shall perform all Services: (a) in a good and workmanlike manner using people familiar with the Data and the underlying technology; (b) in accordance with the Procurement Document and any mutually agreed upon Milestones; and (c) in compliance with all applicable laws, regulations, orders and decrees.

6.1.4    **Infringement**. That the Software, the structure sequence and organization of the Data and all Deliverables provided hereunder are either owned free and clear of any encumbrances or licensed to Vendor with the right to sublicense to Sears (in accordance with **Section 3.1** (License Grant)) or are in the public domain. No representation or warranty is made herein with regard to non-infringement of the content of the Data. Further, that there is no action, suit, claim, investigation or proceeding pending, or to the best of Vendor's knowledge, threatened against, Vendor which, if adversely decided, might adversely affect: (a) Vendor's ability to enter into this Agreement; (b) Vendor's performance of its obligations herein; or (c) Sears' use of the Data.

6.1.5    **Unauthorized Code**. That the Software will be free, at the time of receipt by Sears, of any computer virus, worm, trap door, back door, timer, counter, locks or other such limited routine, instruction or design ("**Unauthorized Code**"). Unauthorized Code includes harmful programs or data incorporated into the Software which destroys, erases, damages or otherwise disrupts the normal operation of the Data or other programs, hardware or systems utilized by Sears or allows for unauthorized access to the Data or other programs, hardware or systems utilized by Sears. Unauthorized Code also includes any mechanism, such as password checking, CPU serial number checking or time dependency. For purposes of clarity, the parties hereby agree that nothing herein shall be construed to mean that Vendor will assume any liability for actions by third parties, such as hackers, or any misuse or unauthorized use by Sears or its Authorized Users; provided, however, that Vendor shall be liable for actions of third parties, such as hackers, taken against the Vendor's systems.

6.1.6    **Documentation**. That upon delivery of the Data (or such sooner period as is requested by Sears), Vendor shall provide to Sears any available user Documentation for the Data that Vendor normally provides its other customers and that such Documentation is detailed and complete and accurately describes the functional and operational characteristics of the Data. Vendor further represents and warrants that it will provide to Sears updated versions of all such user Documentation, if any, when it provides to Sears Enhancements to the Data and that all such updated user

Documentation will be at least as detailed as the user Documentation issued to Sears or other Vendor customers with the initial version of the Data.

6.1.7 **Third Party Data Licenses**. That with regard to the third party proprietary database products identified in a Procurement Document (such as the Mitchell® Labor Guide), no additional Third Party Data licenses or license fees other than those specifically itemized in the applicable Procurement Document are required in order for Sears and its Authorized Users to operate such Data supplied by Vendor, including the Web-based versions of the Data, in accordance with the Specifications.

6.1.8 **Other**. Vendor warrants that it will comply with all applicable laws in the performance of its obligations under this Agreement.

6.2.    **Disclaimer**.    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, VENDOR MAKES NO WARRANTY REGARDING THE DATA, SOFTWARE OR DOCUMENTATION, AND ALL SUCH DATA, SOFTWARE AND DOCUMENTATION IS PROVIDED "AS IS". EXCEPT AS OTHERWISE PROVIDED FOR HEREIN AND IN THIS SECTION 6, VENDOR DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. IN ADDITION, THE FOREGOING WARRANTIES SHALL NOT APPLY AND VENDOR SHALL INCUR NO LIABILITY IN THE EVENT SEARS, ITS AFFILIATES OR AUTHORIZED USERS, (I) MODIFY THE DATA, SOFTWARE, DOCUMENTATION, OR SERVICES OR (II) USE THE DATA, SOFTWARE, DOCUMENTATION, OR SERVICES IN A MANNER NOT EXPRESSLY AUTHORIZED BY THE TERMS OF THIS AGREEMENT OR THE DOCUMENTATION.

6.3.    **Pass-Through**. To the extent Vendor has a contractual right to do so, Vendor hereby agrees to make available on behalf of Sears any applicable warranties, representations and indemnities granted to Vendor by Third Parties in the Software and/or Data or any components thereof provided to Sears, and all remedies for breach of such warranties, representations and indemnities. To the extent that Vendor is not permitted to assign any of such warranties and indemnities to Sears, Vendor shall enforce such warranties and indemnities on behalf of Sears to the extent Vendor is permitted to do so under the terms of the applicable Third Party agreements.

6.4    **Sears/General**. Sears represents, warrants and covenants (as to future performance) to Vendor as follows:

6.4.1 **Duly Authorized**. Sears warrants and represents it has all necessary corporate power, authority and capacity to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Sears. Sears warrants

and represents this Agreement constitutes a valid and binding obligation of Sears enforceable against it in accordance with the terms hereof.

6.4.2 **No Conflicts**.  Sears warrants and represents that the entering into and performance of this Agreement will not violate, contravene, breach or offend against, result in any default under or require any consent under any security agreement, indenture, mortgage, lease, order, undertaking, license, permit, agreement, instrument, charter, bylaw provision, resolution of shareholders or directors, statute, regulation, judgment, decree or law to which Sears is a party or by which it may be bound or affected.

6.4.3. **Other**.  Sears warrants that any materials provided to Vendor will not infringe on the intellectual property rights of any third party.  Sears warrants that it will comply with all applicable laws in the performance of its obligations hereunder.

7.    **DATA MAINTENANCE**.

7.1.    **Maintenance Services**.  During the Term of this Agreement or the applicable Procurement Document if shorter, or until any earlier termination by Sears of the Maintenance Services, Vendor shall provide the support and maintenance Services set forth in **Appendix 7.1** (Maintenance Services), and/or the applicable Procurement Document ("**Maintenance Services**").  Vendor shall provide all Maintenance Services at the rates set forth in the applicable Procurement Document ("**Maintenance Fees**").

7.2.    **Term and Termination**.  Unless otherwise set forth in a Procurement Document or earlier terminated as provided in this Section 7.2, Maintenance Services shall be provided for successive one (1) year terms.  Subject to receipt of payment by Vendor and the continuation of the Maintenance Services and this Agreement, Vendor shall not discontinue its Maintenance Services, and Sears will subscribe to the Maintenance Services, for a period of three (3) years from Acceptance of the Data.  Vendor shall offer and make available Maintenance Services to Sears for a period of five (5) years after the Effective Date.  Upon at least ninety (90) days' advance written notice of the end of the applicable Maintenance Services period, Sears shall have the right to notify Vendor of its decision not to renew Maintenance Services for successive one (1) year terms.  Subsequent to any such termination by Sears, Sears shall have the right to renew the initial Maintenance Services period for successive one (1) year terms upon written notice to Vendor.  After the three year period after Acceptance of the Data, Sears shall have the right to discontinue receiving Maintenance Services at any time upon thirty (30) calendar days' notice to Vendor.  In the event of such termination by Sears, Sears shall receive a proportional refund of any prepaid but unused Maintenance Fees.  Subsequent to any such termination, Sears may, at its option, reinstate the Maintenance Services by providing notice to Vendor.  Vendor shall be entitled to increase the Maintenance Fees upon each renewal term; however, for the two (2) years immediately following the initial three-year Maintenance Services period, said increase shall not exceed the increase, if any, in the Consumer Price Index published by the U.S.

Department of Labor for the applicable year. Vendor may terminate the Maintenance Services if Vendor notifies Sears in writing of a failure to receive undisputed amounts due for Maintenance Services, and Vendor does not then receive payment of such amounts within thirty days after the date of Vendor's original written notice of such failure. Upon any termination of the Maintenance Services, Sears shall, at Vendor's discretion, return or destroy (upon the signature of an authorized representative of Sears) all Data, Software and Documentation and all copies thereof.

7.3. **Features and Functionality**. If Vendor deletes features or functionality from the Data and transfers the same (either directly or through an agreement with a Third Party) to other or new products, the portion of those other or new products that contains the features or functionality in question, or the entire product, if such features and functionality cannot be separated out, shall be: (a) provided to Sears under the terms of this Agreement at no cost to Sears; and (b) covered under the support and maintenance terms applicable to the Data at no additional cost to Sears.

7.4. **Defects**. During any period in which Sears is receiving Maintenance Services, the Data for which Vendor has control as described in Section 6.1.2 shall contain the functionality, and shall operate in accordance with, and conform to, the applicable Specifications. Vendor shall timely (within thirty (30) days after receipt of written notice) correct any material Defect in such Data. Vendor shall not be responsible for correction of errors caused by modifications made to the Data by Sears. This paragraph is descriptive of the Maintenance Services and shall not be construed as a new or additional warranty with regard to the Data or Maintenance Services.

7.5. **Maintenance Standards**. Vendor shall perform the Maintenance Services at least according to the Specifications of the Data as of the date of the applicable Procurement Document, and otherwise in a good and workmanlike manner using qualified people familiar with the Data.

8. **COMPENSATION TERMS**.

8.1. **Invoices, Time and Method of Payment**. All fees payable to Vendor under this Agreement shall be broken down in Vendor's invoices by category as related to Services, Software or Data. Except for fees related to Maintenance Services which shall be paid annually in advance and other fees as provided in the applicable Procurement Document, Vendor shall invoice Sears, on a monthly basis for work performed and reimbursable expenses incurred during the prior month. Sears will pay all "undisputed" and "properly invoiced" amounts set forth in such invoices within sixty (60) calendar days after receipt of such invoice, unless such sixtieth (60th) day is a Saturday, Sunday or bank holiday, in which case Sears will pay on the next banking day. For purposes of this Agreement, "undisputed" shall mean that the fees charged are consistent with the terms of the Agreement and the applicable Procurement Document, and "properly invoiced" shall mean that the fees are broken down by category as described above. In the event of a dispute with regard to any portion of an invoice that is not undisputed, the parties shall proceed to the dispute resolution

process set forth in Section 18.2, and the undisputed portion will be paid by Sears within the sixty-day timeframe as provided herein. All amounts payable under this Agreement shall be payable in U.S. Dollars. Vendor shall submit all invoices to the following address:

> Sears, Roebuck and Co.
> c/o Accounts Payable
> P.O. Box 957437
> Hoffman Estates, Illinois 60179-7437
> IT Manager:    Lori Crozier
> IT Ledger Code: 704OP

or to such other address as may be specified by Sears upon notice to Vendor. Each invoice must reference the applicable Procurement Document number and, if available, the Project number identified in the applicable Procurement Document.

8.2.      **License and Maintenance Fees for Data**. All license and maintenance fees shall be paid in accordance with the terms set forth in this Agreement and the mutually agreed to Procurement Document(s).

8.3.      **Fees and Expenses for Services**. The hourly labor rate or applicable fixed fee for Services hereunder shall be set forth in the applicable Procurement Document. For each hourly engagement, the rates set forth in each Procurement Document shall remain in effect for the term thereof and shall not be changed except by mutual agreement of the Parties. For time and material engagements, Vendor shall only invoice Sears for time spent in the performance of the Services (e.g., travel time is not billable).

8.4.      **Taxes**. Vendor shall calculate and assess, and Sears shall pay, all sales and use taxes resulting from this Agreement, subject to **Appendix 8.4** (Illinois **Data** Taxes) attached hereto and incorporated herein. Taxes for each applicable jurisdiction shall be separately stated on the invoice. In the event any taxes are assessed against Vendor related to the Software or Data delivered to Sears or the Services performed on behalf of Sears or a Sears Affiliate, Sears shall reimburse Vendor for such taxes, including any late fees, penalties or other charges in connection therewith but only if Sears is the cause of the late fees, penalties or other charges.

8.5.      **Right to Set Off**. Sears will have the right to set off any mutually agreed upon amounts actually due Sears under this Agreement against any undisputed amounts owed to Vendor under this Agreement.

8.6.      **Records**. Vendor shall: (1) retain records to document the Services and fees paid or payable by Sears under this Agreement until the later of three (3) years after billing and final resolution of any actively pending disputes between the Parties relating to Vendor's charges; and (2) upon reasonable notice from Sears, provide Sears with reasonable access (no more than twice per year) to such records and documents.

9.    **OWNERSHIP**.

9.1.    **Data and Software**.  Title to the Data and Software shall not be affected by this Agreement and, as between Sears and Vendor, shall at all times remain with Vendor.

9.2.    **Deliverables**.  Title to all Deliverables shall not be affected by this Agreement and shall at all times remain with Vendor (or, with Vendor's licensor); provided that Vendor shall not obtain any ownership right in any pre-existing concepts, works, information, data and other ideas and materials provided to Vendor by, or on behalf of, Sears, its Affiliates and their Personnel, unless otherwise agreed to in writing by both parties. Unless otherwise agreed by the parties in a Procurement Document, Vendor hereby grants to Sears the right to use the Deliverables provided by Vendor in accordance with the grant of license for Data set forth in this Agreement.

9.3.    **General Knowledge**.  This Agreement shall not preclude Vendor from using: (a) the Deliverables, or (b) its general knowledge, skills and experience for its other clients; provided, in each case, however, that Vendor does not use in connection therewith any of Sears' Confidential Information.

9.4.    **Sears Data**.  Vendor understands and acknowledges that Sears shall have the right to, among other things:  (a) manage, modify, maintain and update any of its pre-existing data and information; and (b) generate, manage, modify, maintain and update additional data and information, provided that such additional information is not otherwise supplied by Vendor or a Third Party (collectively, "**Sears Data**").  Sears Data shall be treated as Sears' Confidential Information, and Sears shall retain all right, title and interest in and to all Sears Data.  For purposes of clarity, Sears owns all data structures, user interfaces, software and algorithms created by Sears and Sears shall have no right to modify or create derivative works of the Data provided by Vendor.

9.5.    **No Liens**.  No mechanics' or other lien, or notice creating such lien, or claim or action thereon shall be filed by Vendor, or any person or entity acting through Vendor, for Data, Services or Deliverables under this Agreement.

10.    **PERSONNEL**.

10.1.    **Independent Contractor**.  The relationship of Vendor and its Personnel to Sears shall be that of independent contractors and nothing set forth in this Agreement shall be deemed or construed to render the parties as joint venturers, partners or employer and employee. Vendor's Personnel are neither employees nor agents of Sears and are not eligible to participate in any employment benefit plans or other conditions of employment available to Sears' employees.  Vendor shall be solely responsible for making or causing to be made all deductions and withholdings from its Personnel's salaries and other compensation.  Vendor shall have exclusive control over its Personnel and over the labor and employee relations, and the policies relating to wages, hours, working conditions or other conditions of its Personnel. Vendor shall have the exclusive right to hire, transfer, suspend, lay off, recall, promote,

assign, discipline, discharge and adjust grievances with its Personnel. At any time, however, Sears shall have the right to require Vendor to remove from any Sears' Project any Personnel objectionable to Sears for any lawful reason.

      10.2.    **Key Personnel**.  If requested by Sears, Vendor shall identify key individuals, including Vendor's employees, agents and subcontractors ("**Key Personnel**"), in the applicable Schedule or Statement of Work.  Sears reserves the right to approve or reject the appointment of and replacements for all Key Personnel.  Vendor shall not remove Key Personnel from any Sears' Project less than eleven (11) months in duration without Sears' consent; <u>provided</u> that this prohibition shall not apply to re-assignments outside of the Vendor's control (e.g., death, disability, voluntary resignation, termination by Vendor of such Personnel for cause, etc).

11.    **CONFIDENTIALITY**.

      11.1.    **Confidential Information**.

          11.1.1 **Definition**.  "**Confidential Information**" means any information, whether disclosed in oral, written, visual, electronic or other form, disclosed by, or on behalf of, a party or such party's Affiliates and their Personnel (the "**Disclosing Party**") to the other party, or such party's Affiliates (the "**Receiving Party**") or to Receiving Party's Personnel, or which the Receiving Party or its Personnel observe in connection with this Agreement, whether before or after the date of this Agreement; which (a) if in tangible form or other media that can be converted to readable form, is marked clearly as "confidential" (or with a similar term) when disclosed, or (b) if oral or visual, is identified as "confidential" (or with a similar term) at the time of disclosure and is promptly summarized in a writing marked as such thereafter, or (c) if a reasonable person would deem such information confidential.  Each party's Confidential Information shall include, without the need to mark it as such, its or its Affiliates': business plans, strategies, forecasts, projects, analyses; financial information; employee and vendor information; system designs and requirements, architectures, structure and protocols (including all hardware, software and specifications and documentation related thereto); and other business processes and proprietary information. Notwithstanding anything in this Agreement to the contrary, the Software and Data shall constitute the Confidential Information of Vendor.  This **Section 11** (Confidentiality) shall also apply to any information exchanged between the parties regarding proposed business, regardless of whether the parties enter into a contract regarding such proposed business.  The terms and existence of this Agreement shall also be Confidential Information of each party.  Sears acknowledges that the Software, Data (excluding the content of Data intended for public display), Know-How, and Documentation constitute Confidential Information of Vendor.

          11.1.2 **Failure to Denote as Confidential**. If the Disclosing Party fails to denote Confidential Information as "confidential" (or with a similar term) prior to

disclosure, and later does so, the Receiving Party shall, after receiving such notice, treat such information as Confidential Information of the other party to the extent such untimely notice does not prejudice the Receiving Party.

11.1.3 **Treatment of Confidential Information**.  The Receiving Party shall use the same care and discretion to avoid disclosure, publication or dissemination of any Confidential Information received from the Disclosing Party as the Receiving Party uses with its own similar information that it does not wish to disclose, publish or disseminate, provided that no less than a reasonable degree of care be exerted.  Further, the Receiving Party shall: (a) use the Disclosing Party's Confidential Information only in connection with the Receiving Party's performance of its obligations or its full enjoyment of its rights hereunder, and (b) not disclose the Disclosing Party's Confidential Information except to its Personnel, who have a need to know such Confidential Information in connection with the performance of the Receiving Party's obligations or the full enjoyment of its rights hereunder. Each party shall restrict disclosure of the other party's Confidential Information to its Personnel who have executed a written agreement by which they agree to be bound by terms substantially similar to this Section.  In any case, the Receiving Party is liable for any unauthorized disclosure or use of Confidential Information by any of its Personnel.

11.1.4 **Exceptions to Confidential Treatment**.  The obligations under this Section do not apply to any Confidential Information that the Receiving Party can demonstrate:

(a)    the Receiving Party possessed prior to disclosure by the Disclosing Party, or its Affiliates, without an obligation of confidentiality;

(b)    is or becomes publicly available without breach of this Agreement by the Receiving Party;

(c)    is independently developed by the Receiving Party without use of any Confidential Information of the Disclosing Party; or

(d)    is received by the Receiving Party from a Third Party that does not have an obligation of confidentiality to the Disclosing Party or its Affiliates.

11.1.5 **Disclosure**. If, in the reasonable opinion of its legal counsel, a Receiving Party is: (a) required by law to disclose any Confidential Information of the other party in connection with any legal proceeding, or (b) such disclosure would be material in any legal proceeding concerning the Confidential Information, the Services provided for hereunder, or this Agreement; then the Receiving Party may disclose such information to the arbitrator, court or other governmental authority, as the case may be; provided, in each case, the Receiving Party shall notify the other Party a reasonable time prior to such disclosure and

17

shall allow the Disclosing Party a reasonable opportunity to seek appropriate protective measures.

11.1.6 **Duration**. The Receiving Party's obligations under this **Section 11.1** (Confidential Information) shall survive the termination/completion of the applicable Procurement Document for a period of three (3) years from the date that the applicable Confidential Information was initially disclosed.

11.2.      **Removal of Documents**.   Each party shall not remove from the other party's premises the original or any reproduction of any notes, memoranda, files, records, writings or other documents, whether on tangible or electronic media, containing any Confidential Information of the other party, and neither party shall disclose, use or prepare any document which contains or is based on any Confidential Information of the other party, without the prior written consent of an authorized representative of the other party.

11.3.      **Return or Destruction of Confidential Information**. Within ten (10) days following the earlier of: (a) termination or expiration of this Agreement, or (b) completion of a Project for which the Confidential Information has been provided, each party shall, at the other party's discretion, either return the other party's Confidential Information, and all copies/derivatives thereof; certify in writing to the other party that such Confidential Information, and that all copies/derivatives, have been destroyed in such a manner that it cannot be retrieved.

12.    **INDEMNIFICATION AND INFRINGEMENT**.

12.1.      **Defense and Indemnification**.   Vendor shall, at its own expense, defend, indemnify and hold harmless Sears and its Affiliates, and their respective Personnel, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits, or causes of action by Third Parties (hereinafter "**Claims**"), which result or are claimed by Third Parties to result in whole or in part from (i) tangible property damage or personal injury caused by the gross negligence or willful misconduct of Vendor or its Personnel; (ii) a breach of a representation or warranty made under Section 6.1.1 by Vendor; (iii) the infringement of any Third Parties' rights by any Software developed and supplied by Vendor to Sears; or (iv) the violation by Vendor of any law, statute or regulation applicable to Vendor's performance hereunder.  Notwithstanding the foregoing, Vendor shall not be liable for damage to Third Parties to the extent such damage was caused by the gross negligence or willful misconduct of Sears or its Affiliates or any Third Parties acting on their behalf, or if the infringing materials were provided by Sears or its Affiliates to Vendor.  Notwithstanding the foregoing, Vendor shall have no obligation to indemnify Sears for Third Party claims of intellectual property infringement if Sears or an Affiliate, or a Third Party acting on behalf of Sears or its Affiliates: (a) combined the Software, Data or Documentation with other data or documentation not permitted by the Documentation or under this Agreement, (b) performed an unauthorized modification to the Software, Data or Documentation (c) used the Software, Data or Documentation in an

18

unauthorized manner, or (d) if such claim of infringement is based upon the combination of Software, Data or Documentation supplied by Vendor with software, data or documentation supplied by Sears.

12.2.    **Infringement**.  In the event the Software is held or is likely to be held to constitute an infringement, Vendor, at its own expense, shall first use reasonable and prompt efforts to:  (i) procure for Sears the right to continue to use the Software; (ii) modify the Software so that it is non-infringing and of at least equivalent performance and functionality; or (iii) upon adequate showing to Sears that both of the foregoing options are not commercially feasible, to either provide functionally equivalent replacement Software to Sears or reimburse Sears for all Software license fees, as depreciated over a three-year period. Sears' rights under this Section shall be in addition to and shall not limit Sears' rights under **Section 12.1** (Defense and Indemnification).

12.3.  **Indemnification by Sears.**  Sears shall, at its own expense, defend, indemnify and hold harmless Vendor and its affiliates, and their respective personnel, successors and assigns (collectively, the "**Vendor Indemnified Parties**") from and against any and all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any Claims, which result or are claimed to result in whole or in part from the violation by Sears of any applicable law, statute or regulation.

12.4.    **Procedures**.  The indemnifying party shall have the right to control the defense of any Claim; provided, however, that the indemnified party shall have the right to participate in the defense and in selecting counsel therefor at its expense.  Upon the indemnifying party's request, the indemnified party shall reasonably cooperate in such defense, and the indemnifying party shall reimburse the indemnified party for its reasonable out-of-pocket expenses in providing such cooperation.  The indemnified party shall provide prompt notification of any Claim; provided, however, that any delay by the indemnified party in giving such notice shall not relieve the indemnifying party of its indemnity obligations pursuant to this **Section 12** (Indemnification and Infringement), except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

12.5.    **Independent Obligation**.  The obligations of the parties to defend and indemnify the Indemnified Parties or the Vendor Indemnified Parties (as the case may be) under this **Section 12** (Indemnification and Infringement) shall be independent of each other and any other obligation of the parties hereunder.

13.    **INSURANCE**.

13.1.    **Required Insurance**.  Vendor shall, at its own expense, obtain and maintain the following insurance:

13.1.1 Commercial General Liability, with coverage including premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of not less than $2,000,000

general total, $2,000,000 Products and Completed Work total limit, $1,000,000 Advertising Injury each person limit, $1,000,000 each person limit with a $3,000,000 general aggregate. Sears shall be named as an additional insured, and Vendor's policy will be primary over all other valid and collectible insurance. Limits of liability requirements may be satisfied by a combination of Commercial General Liability and any Umbrella Excess Liability policies.

13.1.2  Motor Vehicle Liability insurance for owned, non-owned and hired vehicles, with limits of not less than $1,000,000 per occurrence for bodily injury and property damage combined. If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles. Sears shall be named as an additional insured. Limits of liability requirements may be satisfied by a combination of Automobile Liability and Umbrella Excess Liability policies.

13.1.3 Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Vendor, for all states in which the Project or work to be performed is located, and Employer's Liability insurance with limits of liability of not less than $100,000 per accident or disease and $500,000 aggregate by disease. Such insurance shall contain a waiver of subrogation in favor of Sears unless such waivers are not available in the state(s) where the Project or work to be performed is located. Vendor warrants and represents that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Vendor further agrees to indemnify Sears for any loss, cost, liability, expense and/or damage suffered by Sears as a result of the failure of Vendor's subcontractors to maintain such insurance.

13.1.4  Fidelity Bond or Criminal Insurance covering employee dishonesty with limits of not less than $1,000,000 per loss. Sears shall be named as a loss payee.

13.1.5  Professional Liability or Errors & Omissions Insurance with limits of not less that $3,000,000 per claim with $3,000,000 aggregate limit.

13.2.    **Policies**.  Insurance shall be purchased from companies having a rating of A-VII or better in the current BEST'S INSURANCE REPORTS published by A.M. Best Company. Upon written request of Sears, Vendor shall deliver to Sears a Certificate of Insurance evidencing the required coverage under this Agreement, and shall update said Certificate on each insurance policy renewal thereafter. Failure to obtain and maintain required insurance shall constitute a material breach of this Agreement. Additionally, any approval by Sears of any of Vendor's insurance policies shall not relieve Vendor of any obligation contained in this Agreement, including, without limitation, liability under **Section 12** (Indemnification and Infringement), for claims in excess of described limits.

14.    **TERM AND TERMINATION**.

14.1.    **Agreement**.  This Agreement will become effective as of the Effective Date and shall continue in full force and effect thereafter for a period of 3 year(s) (the "**Term**"), unless earlier terminated as provided for herein.    Upon expiration or termination of this Agreement pursuant to **Section 14.3** (Termination for Convenience), the terms of this Agreement shall survive for purposes of any Procurement Documents that are still in effect as of such date; provided that no new Procurement Documents shall be entered into after such expiration/termination.

14.2.    **Termination for Cause**.

14.2.1  **Agreement**. In the event of a material breach of this Agreement by a party, the other party may terminate this Agreement in accordance with **Section 14.2.3** (Notice and Cure) below. Unless otherwise specified by Sears, termination of this Agreement for cause shall automatically terminate all Procurement Documents hereto.

14.2.2  **Procurement Documents**. In the event of a material breach of a Procurement Document by a party, the other party may terminate such Procurement Document in accordance with **Section 14.2.3** (Notice and Cure) below.  Upon termination of a Procurement Document for cause, the terminating party shall have the option, in its sole discretion, of terminating for cause any related Procurement Documents (e.g., Maintenance Services related to a Data and/or Software license).

14.2.3  **Notices and Cure**.  A party seeking to terminate this Agreement and/or a Procurement Document due to the material breach must first give the breaching party written notice specifying the breach.  If the breaching party fails to cure the breach within thirty (30) days after receipt of the written notice, then the non-breaching party may thereafter notify the breaching party in writing that it is terminating for cause this Agreement or the Procurement Document(s), as applicable.  Any such termination shall be effective as of the date specified in such termination notice.

14.2.4  **Termination Charges**.  No termination charges shall apply to any termination under this **Section 14.2** (Termination for Cause).

14.3.    **Termination For Convenience**.

14.3.1  **Agreement/Procurement Document**.  Sears shall have the right, starting three (3) years after the Effective Date, to terminate this Agreement or a particular Procurement Document, without cause, by (i) providing ninety (90) days' written notice to Vendor and (ii) complying with **Section 14.3.2** (Sears Obligations).

21

14.3.2 **Sears Obligations**. Upon termination of this Agreement and/or any Procurement Document without cause pursuant to this **Section 14.3** (Termination for Convenience), Sears shall be liable only for (as applicable): (i) committed, but unpaid Data license fees; and (ii) any Service fees earned for Services actually performed and/or Deliverables (including any partial versions thereof) actually delivered to Sears provided prior to the date of such termination.

14.4. **Effect of Expiration/Termination**.

14.4.1 **Licenses Terminate**. Notwithstanding anything to the contrary in this Agreement or any Procurement Document, the expiration or termination of this Agreement or any Procurement Document shall terminate any and all licenses granted under this Agreement (or only those pertaining to the applicable Procurement Document if the Agreement is still in effect), provided that Sears shall have the right to continue such licenses through the Transition Period (as defined herein) Sears shall, at Vendor's option, either return or destroy (upon a written and signed certification by an authorized officer of Sears) all Data, Software and Documentation and all copies thereof upon termination/expiration of the Agreement and the Transition Period.

14.4.2 **Transition Rights**. Upon expiration or termination of this Agreement by either party for any reason other than Sears' failure to pay an undisputed amount (subject to the notice and cure provisions contained herein), unless said failure to pay was due to Sears or its Affiliate filing for bankruptcy, Vendor shall provide Sears, at Vendor's then-standard rates, reasonable termination assistance for up to twenty-four (24) months after such termination (the "**Transition Period**") relating to the transition from the Data to another system, including Maintenance Services and all other Services necessary for an orderly conversion of the system as mutually agreed to by the parties. Notwithstanding anything to the contrary in this Agreement, termination of this Agreement shall not terminate any licenses granted under this Agreement until expiration of the Transition Period.

15. **LIMITATION OF LIABILITY**.

15.1. **Limitation Upon Types of Recoverable Damages**. **EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION, ANY DAMAGES RESULTING FROM LOSS OF PROFITS, DATA, OR GOODWILL, REGARDLESS OF WHETHER THE CLAIM GIVING RISE TO SUCH DAMAGES IS BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, OR NEGLIGENCE, OR STRICT LIABILITY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY THEREOF. MOREOVER, EXCEPT**

**AS OTHERWISE PROVIDED IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY'S LIABILITY UNDER THIS AGREEMENT EXCEED THE AGGREGATE FEES PAID (OR TO BE PAID) UNDER THIS AGREEMENT BY SEARS TO VENDOR.**

15.2.    **Exclusions from Limitations of Liability**.    Notwithstanding anything contained herein to the contrary, the limitations of liability contained in this Section 15 (Limitation of Liability) shall not apply to:  (a) a party's defense and indemnification obligations under Section 12 (Indemnification and Infringement); (b) personal injury, including death, and damage to tangible property caused by the grossly negligent or intentional acts of a party, its Affiliates or their Personnel; (c) a party's breach of Section 11 (Confidentiality); (d) either party's obligation to pay litigation costs and attorneys' fees incurred by the other party in enforcing the terms of this Agreement as set forth in Section 18.5 (Attorneys' Fees); or either party's willful breach of the terms of this Agreement.

16.    **DISABLEMENT OF DATA / HARDWARE**.

Except during and in conjunction with Maintenance Services or any other authorized servicing or support and except in the event of failure by Sears to pay an undisputed amount (subject to the notice and cure provisions contained herein), unless said failure to pay was due to Sears or its Affiliate filing for bankruptcy, in no event shall Vendor, its Personnel, or anyone acting on its behalf, disable or otherwise impair the functionality or performance of (or permit or cause any embedded mechanism to disable or impair the functionality or performance of) the Data or hardware owned or utilized by Sears or its Affiliates without the written permission of a corporate officer of Sears

17.    **ADVERTISING**.

Each party shall not, without the prior written consent of the other party in each instance, use the names, service marks and/or trademarks of the other party or any of its Affiliates, or publicize the existence of this Agreement in any manner, including in any advertising, publicity release or sales presentation, except as may otherwise be required by law.

18.    **GENERAL**.

18.1.    **Agreement Binding; Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns; provided, however, that no assignment by either party shall be of any force except with the prior written consent of the other party, which may be withheld only "for cause."  For purposes of this **Section 18.1** only, the following shall constitute "cause": (1) the other party's uncured material breach of this Agreement; (2) the non-assigning party's reasonable conclusion that the assigning party's proposed assignee lacks the resources or experience to perform the assigning party's ongoing and future obligations under this Agreement, or (3) the attempted assignment is to a competitor of the non-assigning party.  Sears understands that the sale or

transfer of a controlling interest in Sears' business shall be deemed to be an assignment under this Section.

18.2. **Internal Dispute Resolution**.  Except as otherwise provided by this Section 18.2, in the event of any dispute (other than a rejection of a Change Request), the parties agree to work together in good faith first to resolve the matter internally in accordance with this paragraph. The project managers for each party shall first attempt to resolve any disputes that arise between the parties.  Any dispute that cannot be readily resolved by these individuals within thirty (30) business days shall be escalated by either party to an officer of each party.  In the event such company officers are unable to resolve the dispute within thirty (30) business days, such dispute shall be escalated by either party to the executive management of each party.  In the event the executive management of both parties are unable to resolve the dispute within a reasonable period of time not to exceed thirty (30) business days, either party can exercise its rights under this Agreement. The parties shall take such steps as reasonably necessary to mitigate any damages that such party may accrue during the escalation procedure.   For breaches or disputes involving confidential or proprietary information, either party may seek available remedies in any forum, including without limitation litigation in any court of competent jurisdiction.  The foregoing procedure shall also apply to payment disputes so long as the other provisions of this Agreement with regard to payment terms prevail and shall not be extended by this provision.

18.3.        **Governing Law**.  The rights and duties of the parties will be governed by the local law of the State of California, excluding any choice-of-law rules that would require the application of the laws of any other jurisdiction. Vendor consents to service of process in the same manner as notice may be given under **Section 18.4** (Notices) below.

18.4.        **Notices**.  All notices required or permitted to be given by one party to the other under this Agreement shall be sufficient if sent by:  (a) hand delivery; (b) certified mail, return receipt requested; (c) nationally recognized overnight courier service; or (d) facsimile with electronic confirmation to the sender, to the applicable party at its address(es) or facsimile number(s) set forth below:

If to Sears:          Sears Holdings Management Corporation
                      3333 Beverly Road
                      Hoffman Estates, Illinois 60179
                      Attn.:  Senior V.P. & C.I.O.
                      Facsimile:  (847) 286-2471

With a copy to:       Sears Holdings Management Corporation
                      3333 Beverly Road
                      Hoffman Estates, Illinois 60179
                      Attn.:  General Counsel
                      Facsimile:  (847) 286-2471

If to Vendor          Activant Solutions, Inc.

> 60334 Tall Pine Avenue
> Bend, Oregon  97702
> Attn: Richard Ross,
> Major Account Executive, Automotive Group
> Facsimile:  (541) 617-9296

With a copy to:     Activant Solutions, Inc.
7683 Southfront Road
Livermore, California 94551
Attn: Corporate Counsel
Facsimile: (512) 356-0567

All notices shall be effective:  (i) when delivered personally; (ii) three (3) business days after being sent by certified mail; (iii) the first business day after being sent by a nationally recognized courier; or (iv) on the same business day on which it is sent by facsimile; provided such transmittal is complete before 5 p.m. (C.S.T.) and is followed by notice under subsection (i), (ii) or (iii) above.  Either party may change its notice information by giving proper notice of such change to the other party, provided that such notice shall only be effective upon receipt.

18.5.     **Attorneys' Fees**.  In the event of an alleged breach of this Agreement, the prevailing party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom.  For purposes of this Section, the determination of which party is to be considered the prevailing party shall be decided by the court of competent jurisdiction or independent party (i.e., mediator or arbitrator) that resolves such dispute, claim or litigation.

18.6.     **Online Access**.  If Vendor is given access, whether on-site or through remote facilities, to any Sears' or its Affiliates computer or electronic data storage system, in order for Vendor to perform Services or provide Data pursuant to this Agreement, Vendor shall limit such access and use solely to performing such Services and/or providing such Data within the scope of this Agreement and shall not attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to accomplish the work required under this Agreement.  Vendor shall limit such access to those of its Personnel who need to have such access in connection with this Agreement, shall advise Sears in writing of the name of each such Personnel who will be granted such access, and shall strictly follow all Sears' security rules and procedures for use of Sears' electronic resources provided to Vendor Personnel in advance.  All user identification numbers and passwords disclosed to Vendor and any information obtained by Vendor as a result of Vendor's access to, and use of, Sears' computer and electronic storage systems shall be deemed to be, and shall be treated as, Sears' Confidential Information.  Vendor shall cooperate with Sears in the investigation of any apparent unauthorized access by Vendor to Sears' computer or electronic data storage systems or unauthorized release of Sears' Confidential Information by Vendor.

18.7.    **Security Policies**.  Vendor and Sears agree that their Personnel, while working at or visiting the premises of the other party, shall comply with all the internal rules and regulations of the other party communicated in writing to the visiting party's Personnel, including security procedures, and all applicable federal, state, and local laws and regulations applicable to the location where said Personnel are working or visiting.

18.8.    **Severability**. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the extent that they are enforceable.

18.9.    **Subcontractors**.  Vendor acknowledges that it is the commitment of Sears to successfully bring minorities and women into the American economic system by doing business with qualified minority and women sources.  In furtherance of Sears' aforesaid commitment, if Vendor utilizes the services of subcontractors, Vendor shall use reasonable efforts to utilize subcontractors that are qualified minority-owned and/or women-owned sources.

18.10.    **No Waiver; Cumulative Remedies**.  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right hereunder, shall not be construed as an election or remedies, waiver, or relinquishment of the future performance of any rights, and the obligations of the party with respect to such future performance shall continue in full force and effect.  Except as otherwise provided for herein, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

18.11.    **Entire Agreement**.  This Agreement, together with all Appendices, Exhibits and Procurement Documents thereto, constitutes the complete, final and exclusive statement of the terms of this Agreement among the parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions of the parties.  This Agreement shall supercede, and Sears shall not be bound by, any "shrink wrap license" which is bundled with the Software and/or Data, the Documentation or any "disclaimers" or "click to approve" terms or conditions now or hereafter contained in the Data, the Documentation, or any web site which Sears uses in connection with Vendor's Data or Services.  No modification or rescission of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  Each Appendix and Procurement Document shall be subject to the terms of this Agreement.

18.12.    **Data License Rights in Bankruptcy**. Failure by Sears to assert its right to retain its benefits to the intellectual property embodied in the Software pursuant to Section 365(n)(1)(B) of the Bankruptcy Code with respect to an executory contract rejected by Vendor or Vendor's trustee in bankruptcy shall not (absent Sears' written waiver of such rights) be construed by the courts as a termination of such contract (or the related Software license rights) by Sears under Section 365(n)(1)(A) of the Bankruptcy Code.

18.13.    **Interpretation**.  The Section and Section headings of this Agreement and of any Appendixes and Procurement Documents under this Agreement are for convenience only and shall not be deemed part of this Agreement.  As used in this Agreement (including any Appendixes or Procurement Documents hereto): (a) any defined terms include the plural as well as the singular, and (b) references to the word "include" and its derivatives (including, "e.g.") shall be deemed to mean "including but not limited to".  The parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

18.14.    **Export Controls**.  Vendor shall comply with all applicable export control laws of the United States with respect to the Data and/or Services, if any. Vendor shall cooperate with Sears in obtaining any regulatory approvals, permits, or licenses that are necessary to enable Sears to exercise its rights herein.

18.15.    **Survival**.  Any terms of this Agreement that would, by their nature, survive the termination of this Agreement shall so survive including **Section 3** (License, with respect to the license restrictions only)**, Section 4.5** (APIs), **Section 6** (Representations and Warranties), **Section 9** (Ownership), **Section 11** (Confidentiality) **Section 12** (Indemnification and Infringement), **Section 14** (Term and Termination), **Section 15** (Limitation of Liability), **Section 16** (Disablement of Data/Hardware) **Section 17** (Advertising) and **Section 18** (General).

18.16.    **Signatures**.  This Agreement may be executed in counterparts, which together shall constitute one and the same agreement.  Each party shall have the right to rely on a facsimile signature on this Agreement, and each party shall, if the other party so requests, provide an originally signed copy of this Agreement to the other party.

*Signature Page Follows*

**IN WITNESS WHEREOF**, Vendor and Sears have caused this Agreement to be executed, as of the Effective Date, by persons duly authorized.

**SEARS:**

**VENDOR:**

**Sears Holdings Management Corporation**

**Activant Solutions, Inc.**

By: _Carol Ricchio_

By: _[signature]_

Name: CAROL RICCHIO

Name: STEVE BIERCHA

Title: IT VP - STORE SYSTEMS

Title: VP INFO SERVICES

*Signature Page – Master Data and Services Agreement*

## APPENDIX 1

## GLOSSARY

"**Affiliate(s)**" means: (a) any individual or entity located in the United States or Canada (e.g., corporation, LLC, joint venture, etc.) that, at the applicable time, directly or indirectly controls, is controlled with or by or is under common control with, a party, with control meaning ownership, directly or indirectly of 50% or more of the shares of such party or the power to otherwise influence management, (b) any businesses divested by Customer for a period of twenty-four (24) months following such divestiture; provided that shareholders of Sears Holdings Corporation shall not be deemed to be Affiliates of Customer.

"**Agreement**" shall mean this Master Data and Services Agreement inclusive of all Procurement Documents, Appendices, Exhibits and other documents incorporated herein by reference.

"**API**" shall mean application programming interfaces, including any interfaces necessary to achieve interoperability between the Data and any other Sears' proprietary or Third Party data or systems.

"**Authorized User(s)**" shall mean:  (a) Sears, (b) Sears' Affiliates, and (c) the Personnel of any of the foregoing entities.

"**Claim**" shall have the meaning set forth in Section 12.1.

"**Confidential Information**" shall have the meaning set forth in **Section 11** (Confidentiality).

"**Defects**" shall mean any failure of the Data to operate in accordance with the Specifications.

"**Deliverables**" shall mean all ideas, concepts, works, information, and other materials supplied, conceived, originated, prepared, generated or required to be delivered by Vendor pursuant to and as specifically identified as such in the applicable Procurement Document, including, Developments, all written reports, requirements documents, specifications, program materials, flow charts, notes, outlines and all intermediate and partial versions thereof developed. Deliverables do not include the Vendor's Data, Documentation or the Software licensed to Sears pursuant to this Agreement or any item not specified as a Deliverable in a Procurement Document.

"**Developments**" shall have the meaning set forth in **Section 4.2** (Development Services) of this Agreement.

"**Documentation**" shall mean, collectively:  (a) all of the written, printed, electronic or other format materials published or otherwise made available by Vendor that relate the functional, operational and/or performance capabilities of the Data; and (b) all user, operator, system administrator, technical, support and other manuals and all other written, printed, electronic or other format materials published or otherwise made available by Vendor that describe the

functional, operational and/or performance capabilities of the Data. Documentation does not include Source Code.

"**Enhancements**" shall mean any new Data, releases, improvements, modifications, upgrades (e.g., ver. 1 to ver 1.1, 1.1.1 or 2.1), updates, patches, updated data, fixes and additions to the Data that Vendor markets or makes available to its customers who are eligible to receive maintenance or support services from time-to-time to correct deficiencies and/or improve or extend the capabilities, including, but not limited to, increases in the speed, efficiency or ease of operation of the Data, and shall include any re-platformed data, whether on different operating systems or equipment; provided, however, that Enhancements shall not include new, separate product offerings. Enhancements shall include all Web-based versions. The terms "Data" shall be deemed to include any Enhancements for purposes of this Agreement.

"**Key Personnel**" shall have the meaning set forth in **Section 10.2** (Key Personnel) of this Agreement.

"**Maintenance Fees**" shall have the meaning set forth in **Section 7.1** (Maintenance Services) of this Agreement.

"**Maintenance Services**" shall have the meaning set forth in **Section 7.1** (Maintenance Services) of this Agreement.

"**Milestone**" means any deadline set forth in a Procurement Document or a timeline agreed upon the parties in writing.

"**Personnel**" shall mean the directors, officers, employees, partners, agents, advisers, independent contractors and subcontractors of a party or another entity, as applicable; provided that the Personnel of Vendor and its Affiliates shall not be deemed to be Personnel of Sears.

"**Procurement Documents**" means Purchase Orders, Schedules and/or Statements of Work.

"**Project**" shall mean the Sears initiative for which the applicable Data and Services are being procured.

"**Purchase Order**" shall have the meaning set forth in **Section 2.2.1** (Purchase Orders) of this Agreement.

"**Related Services**" means any Services purchased in connection with Data procured hereunder regardless of whether such Services are stated in the same Procurement Document as the Data, or in other Procurement Documents (e.g., Maintenance, implementation or training Services, etc.). All such Procurement Documents, together with this Agreement, shall constitute a single integrated agreement.

"**Schedules**" shall have the meaning set forth in **Section 2.2.2** (Schedules) of this Agreement.

"**Services**" shall mean, individually or collectively, any professional or other services that may be provided by Vendor to Sears including installation, implementation, integration, testing, development, conversion, training, consulting and Maintenance Services. Services shall include Related Services.

"**Data**" shall mean all data that is supplied or made available to Sears by Vendor under this Agreement, including all data (including all data from Third Parties) identified in the applicable Procurement Document as being provided by Vendor, and all Enhancements thereto (including the Web-based versions of all Data).

"**Software**" shall mean the APIs and any and all other software provided by Vendor to Sears as identified in the applicable Procurement Document and subject to the license grant set forth in the Agreement.

"**Specifications**" shall consist of: (a) any specifications and Sears' requirements contained in the Procurement Document, and (b) any technical specifications and Documentation which Vendor makes publicly available and which are in effect as of the effective date of the applicable Procurement Document (or the date any Enhancement is provided to Sears). In the event of any inconsistency between the "Specifications" contained in the Procurement Document and Specifications Vendor makes generally available, the Specifications in the Procurement Document shall control. Upon Sears' request, Vendor shall provide copies of all applicable Specifications. No limitations contained within the publicly available "Specifications" which conflict with the scope of the license granted herein shall apply (e.g. limitations on the number of users, etc. ); unless such terms are stated in the applicable Procurement Document.

"**Statements of Work**" or "**SOWs**" shall have the meaning set forth in **Section 2.2.3** (Statements of Work) of this Agreement.

"**Third Party**" shall mean persons, corporations and entities other than Sears, Vendor or any of their Affiliates.

Appendix 1

### APPENDIX 2.2.2

## FORM OF SCHEDULE

Sears-Activant MDSA Final
Dallas 1158167v.5

# APPENDIX 2.2.3

## STATEMENT OF WORK

Sears-Activant MDSA Final

Dallas 1158167v.5

## APPENDIX 7.1

## MAINTENANCE SERVICES

1.      **GENERAL**.  During the Warranty Period, and thereafter during all times Sears has engaged Vendor to provide the Maintenance Services, Vendor shall provide the following Maintenance Services in accordance with this Appendix.

2.      **ENHANCEMENTS**.  Vendor shall provide to Sears, without additional charge, copies of the Data and Documentation revised to reflect any and all Enhancements to the Data made by Vendor during the Maintenance Services period, as soon as such Enhancements are offered to any other Vendor customers.

3.      **CATEGORIES OF DEFECTS**.  All Defects shall be categorized by Sears according to the category definitions outlined below.  In the event Vendor disagrees with Sears' classification of any Defect, such dispute shall be resolved in accordance with the mutually agreed upon dispute resolution process set forth in the Agreement.

      3.1.      **Severity 1 Defect**.  A Severity 1 Defect arises when the Software and/or Data is unable to function properly in a production environment due to a failure of the Software and/or Data to conform to the Documentation and/or Specifications.

      3.2.      **Severity 2 Defect**.  A Severity 2 (production environment) Defect arises when a Software and/or Data problem exists which materially impacts Sears' business operations, although the Software and/or Data is substantially operational.

      3.3.      **Severity 3 Defect**.  A Severity 3 Defect arises when a production environment Software and/or Data problem exists which does not materially impact Sears' business operation.

4.      **TELEPHONE SUPPORT**.  Vendor shall, at no additional cost, provide to Sears unlimited telephone support (via a toll-free telephone number) relating to the installation, implementation, configuration, use and operation of the Data or any problems therewith. Telephone support shall be available on a continuous (twenty-four (24) hours per day, seven (7) days per week) basis.

5.      **INITIAL RESPONSE; INTERIM RESOLUTION; FINAL RESOLUTION**.  For purposes of this Appendix:

      5.1.      "**Initial Response**" means the time it takes from Sears' initial fax, e-mail or telephone call notification of the Defect until Vendor responds to the appropriate Sears Personnel.

5.2.        "**Interim Resolution**" means the time it takes Vendor to apply a functional resolution to the reported Defect measured from the time at which the initial notification was made, meaning Vendor provides Sears with a temporary fix or workaround that solves a reported Defect and that can be used by Sears with minimal inconvenience and minimal impact on Sears' business operations.

5.3.        "**Final Resolution**" means Vendor provides a final correction or modification of the Data that corrects the Defect.

6.    **DEFECT RESPONSE AND RESOLUTION PROCEDURE**.  For purposes of the table below:

6.1.        "**Effort**" means continuous and uninterrupted commercially reasonable efforts during normal business hours.

6.2.        "**Hours**" means consecutive hours during Vendor's normal business hours of 8 am to 5 pm PST.

| Severity Level | Initial Response | Interim Resolution | Final Resolution |
|---|---|---|---|
| Severity 1 Defect | Efforts to respond within 1 Hour | Will provide follow-up status within 24 Hours of receiving notification. . | The next release but no later than 30 days. |
| Severity 2 Defect | Efforts to respond within 4 Hours | Will provide follow-up status within 1 business day of receiving notification. | Within the 2nd release from the time the problem was reported. |
| Severity 3 Defect | Efforts to respond within 6 Hours | N/A | Within the 2nd release from the time the problem was reported |

7.    **SERVICE CREDITS**.  The Service Credits, if any, shall be credited by Vendor to Sears as set forth in the following tables:

| Severity Level | Initial Response Service Credit | Final Resolution Service Credit |
|---|---|---|
| Severity 1 Defect | 2% of monthly Maintenance Fees | 5% of monthly Maintenance Fees |
| Severity 2 Defect | 1% of monthly Maintenance Fees | 3% of monthly Maintenance Fees |

| Severity Level | Initial Response Service Credit | Final Resolution Service Credit |
|---|---|---|
| Severity 3 Defect | 0.5% of monthly Maintenance Fees | 1.5% of monthly Maintenance Fees |

For each hour after the expiration of the time periods set forth in the table above for which Vendor fails to provide an Initial Response for a Severity 1 Defect, Severity 2 Defect or Severity 3 Defect, Vendor shall grant Sears a credit in an amount equal to the percentage of Sears' monthly Maintenance Fee specified in the Initial Response Service Credit column in the table above ("**Initial Response Service Credit**"). Subject to the limitations set forth in Section 15 of the Agreement, such Initial Response Service Credit shall be in addition to any other applicable Final Resolution Service Credit and to any other remedies available to Sears at law, in equity or under this Agreement. The maximum amount of Initial Response Service Credits that Sears may accrue shall be limited to the percentage of monthly Maintenance Fees identified in the Maximum Monthly Initial Response Service Credit column in the table above ("**Maximum Monthly Initial Response Service Credit**").

For each calendar day after the expiration of the time periods set forth in the table above for which Vendor fails to satisfactorily complete a Final Resolution for a Severity 1 Defect, Severity 2 Defect or a Severity 3 Defect, Vendor shall grant Sears a credit in an amount equal to the percentage of Sears' monthly Maintenance Fee specified in the Final Resolution Service Credit column in the table above ("**Final Resolution Service Credit**"). Subject to the limitations set for in Section 15 of the Agreement, such Final Resolution Service Credit shall be in addition to any applicable Initial Response Service Credit and any other remedies available to Sears at law, in equity or under this Agreement. The maximum amount of Final Resolution Service Credits that Sears may accrue shall be limited to the percentage of monthly Maintenance Fees identified in the Maximum Monthly Final Resolution Service Credit column in the table above ("**Maximum Monthly Final Resolution Service Credits**").

8.     **ON-SITE SUPPORT**. Upon request of Sears, Vendor shall provide on-site support within twenty-four (24) hours or within a mutually agreed time frame between the parties, not to exceed five (5) calendar days, where telephone support fails to correct any material error, malfunction or nonconformity within the time periods set forth in **Section 6** of this Appendix. If Vendor is required to be on-site because telephone support fails to correct said material error, malfunction or nonconformity, then Vendor shall provide qualified Vendor Personnel to work exclusively to correct Defects until such Defects are corrected.

9.     **SERVICE CREDITS**. Vendor's failure to meet the requirements, including the timeframes, set forth in **Section 6** of this Appendix shall be subject to the Service Credits, if any, set forth in **Section 7** of this Appendix. Service Credits shall be applied as a credit to the next monthly invoice for such Maintenance Services. The parties agree that any Service Credits are not damages nor are they intended to be punitive in nature, but rather are measurement tools used to highlight the lower level of performance received by Sears.

Sears-Activant MDSA Final

## APPENDIX 8.4

### ILLINOIS DATA TAXES

The following terms and conditions are incorporated into this Agreement for all Data which has a situs for tax purposes within Illinois (e.g., Data that is installed at locations within Illinois):

1.      Sears has limited duplication rights with respect to the Data, although Sears can make a limited number of back up copies for its internal use.  Furthermore, Sears is limited to the uses for the Data specified in this Agreement.

2.      Sears is prohibited from licensing, sublicensing, or transferring the Data to a Third Party (other than a related Third Party Affiliate).

3.      Vendor shall provide a new copy of the Data to Sears at minimal or no charge if Sears loses or damages the Data pursuant to the terms of the Agreement.

4.      Sears must destroy or return all copies of the Data to Vendor upon the termination of or at the end of the license period.

5.      Notwithstanding anything stated in this Agreement to the contrary, the terms and conditions of this Appendix, to the extent inconsistent or different from those set forth in this Agreement, shall supersede such terms.  Except as modified by this Appendix, the terms of this Agreement shall remain in full force and effect.  Because the data license granted under this Agreement satisfies section 86 Illinois Administrative Code 130.1935(a)(1), no sales tax will be due on charges in connection with this data license for any data licensed for use in Illinois, maintenance agreements or updates, as this transaction is not considered a taxable retail sale.  Furthermore, no sales tax will be shown on any invoice with respect to charges for the license of Data, a maintenance agreement or an update, as no sales tax is due.  Furthermore, all Services, including but not limited to maintenance, telephone support, training and implementation will be separately stated on any invoices sent by Vendor, specifying what the Services consist of, and in which state the Services will be performed.

# Exhibit 2

### AMENDMENT #1 TO MASTER DATA AND SERVICES AGREEMENT AND
### STATEMENT OF WORK #1
(Term Extension)

**THIS AMENDMENT #1** (this "**Amendment**"), is made as of October 11, 2009 (the "**Amendment Date**"), by and between **Activant Solutions, Inc.** ("**Contractor**"), and **Sears Holdings Management Corporation** ("**Company**") and amends that certain Master Data and Services Agreement and Statement of Work #1 dated October 11, 2006 by and between Company and Contractor (collectively, the "**Agreement**"). All terms capitalized herein, but not defined herein, shall have the meanings ascribed to them in the Agreement.

**WHEREAS** the parties agree to extend the Term of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Contractor and Company (individually or collectively referred to as the "**Party**" or "**Parties**") agree as follows:

1.    **Amendments**.

    (a) As of the Amendment Date, the Agreement and Statement of Work #1 shall continue on a month to month basis not to exceed July 31, 2010 ("**Month to Month Term**"). The terms and conditions of both the Master Data and Services Agreement and Statement of Work #1 shall apply.

    (b) Contractor will notify Company no less than 60 days prior to the end of the Month to Month Term whether or not it has established new contracts with the third party providers needed to continue to provide the Data and Services.

    (c) In the event Contractor has established new contracts with such third party providers, then Contractor and Company shall mutually agree upon a renewal of the Agreement.

    (d) In the event Contractor has not established new contracts prior to the end of the Month to Month Term, then Company may terminate the Agreement in accordance with Section 14 of the Agreement.

2.    **No Other Amendments**.   Except as expressly amended herein, the Agreement shall continue in full force and effect, in accordance with its terms, without any waiver, amendment or other modification of any provision thereof.

*Signature Page Follows*

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the Amendment Date.

**Company:**                                              **Contractor:**

**Sears Holdings Management Corporation**          **Activant Solutions Inc.**

By: _____               By: _____

Name: _____             Name: _

Title: _____            Title: _  Randy Imhoff
                                                   VP & Corporate Controller
Date: _____             Date: _ *10/19/2009*

*Signature Page*
*Amendment No.1 to Master Data and Services Agreement*

734581

## AMENDMENT #2 TO THE MASTER DATA AND SERVICES AGREEMENT AND STATEMENT OF WORK #1

This Amendment #2 ("Amendment") is made as of July 31, 2010 (the "Amendment Effective Date") by and between Activant Solutions Inc. ("Activant" or "we" or "Contractor") and Sears Holdings Management Corporation ("Company" or "you") and amends that certain Master Data and Services Agreement and Statement of Work #1 dated October 11, 2006, as amended, by and between Company and Contractor (singularly and collectively the "Agreement"). All terms capitalized but not defined herein shall have the meaning ascribed to them in the Agreement.

### RECITALS

**WHEREAS**, the parties entered into the Agreement pursuant to which Contractor provides certain Services and Data as specified therein;

**WHEREAS**, the parties entered into Amendment #1 to the Agreement as of October 11, 2009 to extend the term of the Agreement; and

**WHEREAS**, Contractor has extended certain key contracts with third party data providers and is finalizing other key contracts.

### AGREEMENT

**NOW, THEREFORE**, the parties hereby agree as follows:

**Term.** The Agreement shall continue from the Amendment Effective Date and continue on a month to month basis until Contractor completes finalizing certain key contracts and the parties mutually agree upon a renewal of the Agreement. The terms and conditions of both the Master Data and Services Agreement and Statement of Work #1 shall apply

If there is an inconsistency between a term in this Amendment and a term in the Agreement, the term in this Amendment will prevail. All other terms and conditions in the Agreement remain full force and effect.

**IN WITNESS HEREOF**, the parties hereto have executed this Amendment as of the Amendment Effective Date:

Sears Holdings Management Corporation                    Activant Solutions Inc.

By: _____                    By: _____
                                                                          Richard Russo
Name: _____JOE FINNEY_____                    Name: _____
                                                                          VP & Corporate Controller
                                                                          Date 11/17/10

Sears-Amd#2- 081710.02F

Date: _____9/24/10_____          Date: _____

Sears-Amd#2- 081710.02F

**AMENDMENT No. 3 TO THE MASTER DATA AND SERVICES AGREEMENT AND STATEMENT OF WORK #1**

This Amendment No. 3 ("Amendment") is effective as of March XX, 2011 (the "Amendment Effective Date") by and between Activant Solutions Inc. ("Activant" or "we" or "Contractor") and Sears Holdings Management Corporation " Sears" or "Company" or "you") and amends that certain Master Data and Services Agreement and Statement of Work #1 dated October 11, 2006, as amended, by and between Company and Contractor (the "Agreement"). All terms capitalized but not defined herein shall have the meaning ascribed to them in the Agreement.

### RECITALS

**WHEREAS,** the parties entered into the Agreement pursuant to which Contractor provides certain Services and Data as specified therein;

**WHEREAS,** the parties entered into previous amendments to extend the term of the Agreement;

**WHEREAS,** Contractor has extended certain key contracts with its third party data providers; and

**WHEREAS,** the parties desire to extend the term of the Agreement and modify prices as specified below.

**NOW, THEREFORE,** the parties hereby agree as follows:

### AGREEMENT

1. **Term.** The Agreement shall continue from the Amendment Effective Date until December 31, 2011, and thereafter continue on a month to month basis subject to Section 14 of the Agreement.

2. **Fees.** From the Amendment Effective Date through December 31, 2011, the Fees specified in Section 9.1 (a) and (b) of Statement of Work No.1 shall be increased, as permitted by Section 7.2, by 1.1% (one and one tenth of a percent), which the parties acknowledge is the permitted change attributable to increases in the Consumer Price Index as published by the U.S. Department of Labor. For clarity, the revised monthly and/or annual fees are specified on Attachment #1.

    a. For the avoidance of doubt, the fees described under section 9.1(a) continue to apply for the term of this Amendment.
    b. For the avoidance of doubt, the discounts described under Section 9.1(b) continue to apply for the term of this Amendment.
    c. For the avoidance of doubt, the fees under section 9.1(e) are in effect and continue to apply for the term of this Amendment.
    d. Any fees in the SOW that are not stated or clarified under this Amendment are no longer in effect as of the Amendment Effective Date.

3. **Third Party Requirements.** The parties hereby agree to incorporate the provisions specified in Attachment #2 relative to data supplied by Mitchell Repair Information Company, LLC ("Mitchell") and R.I. Polk & Co. ("Polk").

4. **Professional Services.** Section 9.1(e) of Statement of Work No.1 is modified by deleting section 9.1(e) and replacing it with the following "If, during the term of Amendment No. 3, Sears requests that Activant provide additional professional services, the parties agree to prepare the appropriate Procurement Documents and Activant's hourly labor rate shall be its then-current labor rate for such professional services."

5. **Travel and Lodging.** The Sears travel policy in effect from the time of the Amendment Effective Date is included as Attachment 3 to this Amendment.

If there is an inconsistency between a term in this Amendment and a term in the Agreement, the term in this Amendment will prevail. All other terms and conditions in the Agreement remain full force and effect.

**IN WITNESS HEREOF,** the parties hereto have executed this Amendment as of the Amendment Effective Date:

Sears Holdings Management Corporation

By: _____

Name: _____

Date: _____

Contractor

By: _____

Name: _____ Richard Russo _____

Date: _____ VP & Corporate Controller

Date_____

**Attachment #1**

The revised fees as of the Amendment Effective Date through December 31, 2011 will be the following:

| Data Description | Previous Fees | | | Revised Fees | |
|---|---|---|---|---|---|
| | Monthly Fees (per Sears location) | Enterprise Monthly Fees (unlimited Sears locations) | | Monthly Fees (per Sears location) | Enterprise Monthly Fees (unlimited Sears locations) |
| Activant Parts Catalog License | | | | | |
| Activant VIN Decoder License | | | | | |
| Mitchell1 Labor License | | | | | |
| Mitchell1 Service Interval License | | | | | |
| Mitchell1 TSB License | | | | | |
| Motor Specifications License | | | | | |
| Motor TPMS License | | | | | |
| Motor Maintenance Reset License | | | | | |
| Mitchell1 Labor and Service Interval API | | | | | |
| Motor(CheckChart) Specifications API | | | | | |
| | | | | | |
| | | | | | |
| Mitchell1(Pearl) Tire Fitment Data License | | | | | |
| Mitchell1(Pearl) Tire Fitment API | | | | | |
| Mitchell1(Pearl) Tire Fitment Data License | | | | | |
| Mitchell1(Pearl) Tire Fitment Internet License | | | | | |

## Amendment #3 – Additional Terms Required By Third Party Data Suppliers

Section 3.1 of the Agreement is revised to add the following paragraphs relative to data Activant obtains from certain third parties:

With regard to your Use of Data which includes a description reference to "Mitchell" in Section 9.1(b) of Statement of Work No.1, the following additional terms apply: (x) you are prohibited from modifying in any manner whatsoever any element of information contained in the Data comprising such database ("Mitchell Data") (including, without limitation, any unit of time, any labor operation description or other description of a unit of time or any related notes or comments), except that you are permitted to modify the Mitchell Data so long as such modifications are made for the purpose of conforming the Mitchell Data to relevant local conditions; (y) you may not display or create a printout that displays Mitchell Data in comparison with similar information supplied by vendors other than the Mitchell; and (z) you are not permitted to delete from the Mitchell Data any definitions, advice, instructions or disclaimers contained in the Mitchell Data.

With regard to your Use of VIN Decoder (also referred to as "VIN LookUp"), the following additional terms apply: This Data is licensed exclusively for Use within the United States and Canada. You may use VIN LookUp only within the Software to search Data. The only Data you may search for and obtain using VIN LookUp are the year, make, model, and vehicle attributes of a vehicle. Except as we have otherwise permitted in Section 3.1, you are not permitted to grant, enable or otherwise provide access to VIN LookUp to any third party and you are required to prevent the unauthorized use of VIN LookUp. VIN LookUp includes proprietary products and data of R.L. Polk & Co, which we have obtained under a license. You are expressly prohibited from using VIN LookUp for any other purposes, including but not limited to i) disassembling, decompiling, or reverse engineering VIN LookUp or the R.L. Polk & Co. products and data, (ii) using VIN LookUp to search any catalogs or databases other than those provided to you by Activant; (iii) enabling VIN LookUp for any use, other than searching the Databases; (iv) using VIN LookUp to generate motor vehicle registration statistical reports, title statistics or vehicle population statistics derived from motor vehicle information; (v) using VIN LookUp to create a substitute or parallel product; (vi) reselling, sublicensing, or otherwise disclosing VIN LookUp or VIN LookUp data to third parties, except as allowed by this Agreement.

### Attachment #3 – Updated Sears Travel and Expense Policy

This establishes Sears Holdings minimum requirements for reimbursement of third party out-of-pocket travel expenses, where required by contractual agreement. This applies to consultants, contractors and other service providers who submit authorized, reimbursable travel expenses to Sears Holdings. Future reference to these individuals is made collectively as "service providers".

All service providers who require travel and lodging have the responsibility to ensure that their travel expenses are appropriate, reasonable, and documented. All expenses are subject to Sears Holdings' approval.

**A.  Invoice Processing**

Prior to submitting any invoice for payment, regardless of the invoice payment processing arrangements set forth in the agreement, a summary report with line item detail must be sent to the Sears Holdings business contact for the project for their review and approval. Required Travel Expense report is attached.



Third Party Expense
Report.xls

**B.  Receipt Requirements**

Individual receipts for air, hotel, car rental, taxi, meals, etc. must be available upon request should the SHC business project contact have any inquiries. All individual receipts submitted for payment to SHC must be retained by the supplier (hard copy or scanned image) for a period up to three years following the end of the project term.

**C.  Reimbursable/Not Reimbursable Expenses**

| Reimbursable | Not Reimbursable |
|---|---|
| **Air Travel** | |
| • | • |
| • | • |
| | • |
| **Lodging** | |
| • | • |
| | • |
| | • |
| **Ground Transportation** | |
| • | • |
| • | |
| | • |
| • | • |
| | • |
| • | • |

| | |
|---|---|
| • | |

| **Meals** | |
|---|---|
| •<br>•<br>• | •<br>•<br>• |

| **Miscellaneous** | |
|---|---|
| •<br>•<br>• | •<br>•<br>•<br>• |

**D.   Reservation Process**

SHMC may require the use of their online travel reservation system, depending on variables such as the amount of travel on  SHMC business, type of travel required, etc.  This will be determined on an individual service provider basis.

**E.   Air Transportation**

- When possible, travelers should plan business trips at least 14 days in advance to secure reduced fares.
- Travelers are strongly encouraged to accept the lowest priced flight available within a 2 hour window.  This includes alternate airports, connections, one-stop flights, etc.  If lowest fares are not utilized, reimbursement may be subject to further review, resulting in partial reimbursement.
- When non-refundable tickets are the least expensive airfare, they should be utilized.
- If a trip is cancelled or postponed, airline tickets must be cancelled before the time of departure.
- Additional airfares, and other fees due to changes, will be reimbursed only if the change was requested by Sears Holdings, and the additional expense was approved in advance by Sears Holdings.
- Only a reasonable number of travelers will be reimbursed.  This is subject to pre-approval.

**F.   Ground Transportation**

- Travelers should use courtesy or other scheduled services provided by the hotel (if available) for travel between the hotel and airport.
- Economy or compact cars should be rented unless the size of the group makes them impractical. Rental cars should be shared whenever feasible.

**G.   Lodging**

- If a reserved room will not be used, it is the traveler's responsibility to notify the hotel directly, prior to the hotel's cancellation deadline.  Failure to cancel a hotel reservation will result in a "no-show" charge that will not be reimbursed.
- Special rates have been negotiated with several hotels:

| Hotel | City | Telephone | Breakfast | Shuttle to Office | Free Internet |
|---|---|---|---|---|---|

| Hampton Inn  Hoffman Estates | Hoffman Estates | (847) 882-4301 | yes | yes | yes |
|---|---|---|---|---|---|
| Marriott Town Place Suites (extended stay rates available) | West Dundee | (847) 608-6320 | yes | yes | yes |
| Comfort Suites | Elgin | (847) 836-9500 | yes | yes | yes |
| Holiday Inn & Suites | Elgin | (847) 488-9000 | yes | yes | yes |
| Hilton Garden Inn | Hoffman Estates | (847) 277-8780 | yes | yes | yes |
| Comfort Suites – Elgin | Elgin | (847) 836-9500 | yes | yes | yes |
| Candlewood Suites – Good for extended stays | Hoffman Estates | (847) 490-1686 | Yes | Yes | yes |
| Drury Inn & Suites – Troy, MI  575 W. Big Beaver Rd. | Troy, MI | (248) 528-3330 | yes | yes | yes |
| Holiday Inn Detroit  2537 Rochester Court | Troy, MI | (248) 689-7500 | no | no | yes |
| Radisson Hotel Detroit  39475 Woodward Ave. | Bloomfield Hills, MI | (248) 644-1400 | no | yes | yes |

Note: Extended stay rates for stays over 5 nights are available at the Marriott NW in Hoffman Estates.

**H.  Meals**

- Meal expense limits:
  - per day, plus gratuity
    - Individual meal limit of    breakfast,    lunch and    dinner applies when the travel schedule includes partial travel days.
- Exceptions:
  - per day, plus gratuity - Boston, Chicago (Downtown only), Honolulu, Los Angeles, New York, San Diego, San Francisco, Seattle, Washington,   D. C., and International destinations including Puerto Rico and Canada
    - Individual meal limit of    breakfast,    lunch and    dinner applies when the travel schedule includes partial travel days.
- Fifteen percent (15%) is the recommended guideline for gratuities.

For questions contact:  Sue Sheeman @ Suzanne.sheeman@searshc.com