**Exhibit A**

GROUND LEASE
PLAZA LAS AMERICAS SHOPPING CENTER
SAN JUAN, PUERTO RICO

INDEX


| ARTICLE | NAME | PAGE |
|---|---|---|
| I | PREMISES, TERM AND OPTION | 3 |
| II | PLOT PLAN AND DESIGN PLAN | 5 |
| III | SEARS CONSTRUCTION | 6 |
| IV | LANDLORD'S CONSTRUCTION | 7 |
| V | EXPANSION AND ADDITIONAL PARKING REQUIREMENTS | 9 |
| VI | RENT | 11 |
| VII | OPTION TO BORROW MONEY | 18 |
| VIII | SEARS CONTRIBUTION TO LANDLORD TO OFFSET LANDLORD'S LOSSES DURING THE CONSTRUCTION PERIOD | 20 |
| IX | REPRESENTATIONS AND WARRANTIES | 20 |
| X | GRANT OF PERMITS, LICENSES AND EASEMENTS | 22 |
| XI | ENCLOSED MALL | 32 |
| XII | MAINTENANCE AND LIGHTING | 32 |
| XIII | REPAIRS AND RESTORATION | 36 |
| XIV | RULES AND REGULATIONS | 37 |
| XV | LEASES IN THE SHOPPING CENTER EXPANSION | 40 |
| XVI | SPECIAL REMEDIES OF SEARS | 41 |
| XVII | SPECIAL REMEDIES OF LANDLORD | 42 |
| XVIII | SETTLEMENT OF DISPUTES | 42 |
| XIX | UNAVOIDABLE DELAYS | 43 |
| XX | COVENANTS TO OPERATE | 44 |
| XXI | SUBORDINATION OF MORTGAGES AND QUIET POSSESSION | 45 |
| XXII | ALTERATIONS AND ADDITIONS | 45 |
| XXIII | LIENS | 46 |
| XXIV | INSURANCE | 47 |

# INDEX


| ARTICLE | NAME | PAGE |
|---|---|---|
| XXV | CONDEMNATION | 50 |
| XXVI | MORTGAGE, ASSIGNMENT, SUBLEASE, DISCONTINUANCE | 53 |
| XXVII | UTILITIES | 54 |
| XXVIII | MERCHANTS ASSOCIATION | 55 |
| XXIX | DEFAULTS | 56 |
| XXX | TAXES | 60 |
| XXXI | COVENANT OF QUIET ENJOYMENT | 65 |
| XXXII | EQUIPMENT AND FIXTURES INSTALLED | 65 |
| XXXIII | OPTION TO BUY AND LEASE-BACK | 66 |
| XXXIV | ESTOPPEL CERTIFICATE | 67 |
| XXXV | OPENING CLAUSE | 68 |
| XXXVI | INVALIDITY OF ANY PROVISIONS | 68 |
| XXXVII | RELATIONSHIP OF THE PARTIES | 68 |
| XXXVIII | EXECUTION OF THIS LEASE | 68 |
| XXXIX | NOTICES | 69 |
| XL | MISCELLANEOUS | 70 |


## EXHIBITS


| | |
|---|---|
| A | LEGAL DESCRIPTION AND SURVEY OF LANDLORD'S PROPERTY (PARCEL "C" - LAND) INCLUDING PARCELS "D" AND "E" (DEMISED PREMISES), SHOWING UNDERGROUND UTILITY LINES AFFECTING PARCELS "D" AND "E" (DEMISED PREMISES). |
| B | LEGAL DESCRIPTIONS AND SURVEYS OF ACTUAL PLAZA LAS AMERICAS SHOPPING CENTER (PARCELS "A" AND "B"). |
| C | PLOT PLAN SHOWING SEARS FACILITIES AND LANDLORD'S IMPROVEMENTS. |
| D | DESIGN PLAN. |
| E | TIME SCHEDULE. |

PLAZA LAS AMERICAS SHOPPING CENTER

LANDLORD: PLAZA LAS AMERICAS, INC.

TENANT: SEARS, ROEBUCK DE PUERTO RICO, INC.

GROUND LEASE

In Ward Hato Rey, in the City of San Juan, Commonwealth of Puerto Rico, this 27th day of April 1977.

APPEARS:

AS PARTY OF THE FIRST PART: PLAZA LAS AMERICAS, INC., a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with offices at Plaza Las Américas Shopping Center, Franklin D. Roosevelt Avenue, Hato Rey, San Juan, Puerto Rico, and mailing address of G.P.O. Box 3268, San Juan, Puerto Rico 00936, represented by its Vice President-Treasurer, Mr. Jaime Fonalledas Córdova, married, who is of legal age, executive and resident of Guaynabo, Puerto Rico, hereinafter called "Landlord";

AS PARTY OF THE SECOND PART: Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation, with principal offices in San Juan, Puerto Rico, located at Muñoz Rivera Avenue and Coll y Toste Street and mailing address of G.P.O. Box 71204, San Juan, Puerto Rico, 00936, duly qualified to do business in Puerto Rico and herein represented by its President, Mr. R. B. Gibson, of legal age, married, executive and resident of San Juan, Puerto Rico, hereinafter called "Tenant" or "Sears".

The authority of the appearing parties to act herein shall be demonstrated whenever and wherever required, and they state:

A. Landlord represents that it shall acquire from the Fonalledas Family (only stockholders of Landlord), in fee simple, the land identified as Parcel "C" described in the attached exhibit, herein called Exhibit "A". The location and dimensions of the parcels of land within Parcel "C" designated as Parcels "D" and "E" are also shown on the attached survey which is an integral part of said Exhibit "A".

B. Landlord and Sears have agreed to the lease of the Parcels of land described on Exhibit "A" as Parcels "D" and "E" and said parcels of land are herein called "Demised Premises" and said lease is herein called "Land Lease" or "Ground Lease".

C. Landlord is the owner and developer of that certain shopping center presently in operation located on the land described on the attached Exhibit "B" and the location thereof is shown on the above mentioned Exhibit "B" and said shopping center known as "Plaza Las Américas Shopping Center" is herein called "Shopping Center" or "Center".

D. Landlord has agreed to raze and demolish any buildings and structures on the demised premises and to make said premises available to Sears for the construction by Sears of a retail department store building on Parcel D, including loading, unloading and pick-up areas, and a detached auto center building on Parcel E, including outside gasoline dispensing and sale areas and gasoline tanks, herein called "Sears Buildings" or "Sears Facilities", as an integral part of an expansion of said Shopping Center.



E. Landlord has agreed to expand the Shopping Center to include, but not limited to, the following herein called "Landlord's Improvements":



(i) not less than 137,500 square feet of Gross Leasable Area with a two (2) deck, fully enclosed, air-conditioned mall, and

(ii) a parking deck building with access to the second floor of Sears Department Store Building, herein called "Sears Store", and to the upper mall of said expansion and, also, finished grade level parking including all paving, striping and necessary utilities to comply with all covenants herein contained specifically pertaining to parking facilities.



F. The use by Sears of the Demised Premises shall include the use in common with others, entitled thereto, of the common areas, service roads, sidewalks, customer car parking areas and all other facilities located in said Center and the Demised Premises as may be designated as areas of common use, herein called "Common Areas".

G. All exhibits referred to above, or herein, shall be included herein, and be a part hereof, by express reference thereto.

The parties hereto have agreed and hereby agree that no restrictions whatsoever will govern or apply to this Lease except those specifically herein set forth.

The appearing parties having agreed to the lease by Sears of the Demised Premises, now do hereby agree to all of the following covenants, terms, representations and conditions:

ARTICLE I

PREMISES, TERM AND OPTION

1.1 It is hereby mutually covenanted and agreed by and between Landlord and Sears that this Lease is made upon the foregoing and upon the following terms, covenants and conditions, and Landlord and Sears hereby mutually covenant and agree to perform each and everyone of the terms, covenants and conditions herein provided to be respectively performed by each of them.

1.1 (a) Landlord shall, at its expense, obtain from the Planning Board of Puerto Rico, and any other governmental agencies as required, such approval and permits as may be required for the lease of the Demised Premises to Sears enabling said premises to be used for the construction of Sears facilities and for the use and purpose herein agreed by the parties. Sears shall, at its expense, obtain from the Planning Board of Puerto Rico, and from any other governmental agencies as required, such approval and permits as may be required for the construction and operation, on the Demised Premises, of a retail department store and of an automotive service center including sales of gasoline, warehouse and customer service center.

1.2 Landlord does hereby lease to Sears and Sears hereby takes from Landlord the Demised Premises to have and to hold unto Sears, its successors and assigns for a term commencing effective upon the date upon which Sears partially or totally opens Sears' Stores upon the Demised Premises to the public for business or the date when at least ground parking adjacent to Sears is complete and usable and sixty percent (60%) of the projected expansion of the Center

(exclusive of the projected office building) is completed and opened to the public for business, whichever of these two events occurs earlier, and continuing thereafter for a term of forty (40) years.

1.3 Sears shall have, and is hereby expressly granted, the right to extend the term of this Lease, hereinabove provided, for a further term of ten (10) years, upon the same rentals and upon all other terms and conditions herein contained, by giving to Landlord at least one (1) year prior written notice of Sears' intention to extend the term hereinabove provided.

1.4 Anything contained in this Lease to the contrary notwithstanding, Sears shall have and is hereby expressly granted the right to cancel and terminate this Lease in the event that Sears has not received, within ninety (90) days (or at the end of this time period if it might have been extended by agreement between the Parties) from the date of this Agreement, the following:

(i) all necessary permits and approvals by the Planning Board of Puerto Rico and by each and all pertinent Governmental Agencies as may be required for the lease of the Demised Premises to Sears for the use and purpose herein agreed by the parties; and

(ii) written confirmation from Landlord that all conditions needed for the commencement of construction on the Demised Premises by Sears, as herein provided have been satisfied and that Sears may proceed with construction of Sears Facilities upon the Demised Premises. Landlord further represents that it will confirm in writing to Sears that it will start construction of Landlord's improvements within the time limits set forth in Article IV of this Lease.

1.5 Landlord shall obtain a written instrument from each mortgagee holding a mortgage upon Landlord's fee interest in the Demised Premises, which shall expressly agree not to disturb Sears quiet possession so long as Sears shall comply with the terms, covenants and conditions herein provided, and Landlord shall also provide Sears with written evidence thereof within thirty (30) days from the execution of any such mortgage; Sears, in the event Landlord fails to obtain such written instrument, shall have and is hereby expressly granted the right to cancel and terminate this Lease.

ARTICLE II

PLOT PLAN AND DESIGN PLAN

2.1 The parties hereto hereby approve a plot plan herein called "Plot Plan" and attached hereto as Exhibit "C", which is hereby by reference made a part hereof, showing the location of the Sears Facilities and Landlord's Improvements.

2.2 (a) Prior to the commencement of construction, each of the parties will submit to the other party for approval, a plan, herein called "Design Plan" of the buildings, structures, facilities and improvements projected to be actually constructed as an expansion of Plaza Las Américas Shopping Center and located upon or within their respective properties and which shall include the information herein described. A copy of said Design Plan so approved in writing by the respective parties hereto shall be incorporated herein by express reference as Exhibit "D". The Design Plan will show by accurate scale the exterior architecture, elevation, location, height, external size and shape of the Sears Facilities, Landlord's Improvements, Site Improvements, Off-Site Improvements, the structures so far as the same are actually to be constructed at or above ground level, the specifications of the materials to be used in the external construction of the buildings, structures and other improvements to be shown on the Design Plan.

(b) All buildings or structures of the projected expansion shall be constructed on the respective properties in accordance with the approved Design Plan, and no change of the actually projected expansion of the Shopping Center (as in this Lease defined) shall be made in the Plot Plan or in the Design Plan without the prior written consent of all the parties hereto.

2.3 It is the intent of the parties hereto, if it is possible, to commence and complete concurrently the construction of their respective improvements and therefore, the parties hereto shall agree on a detailed time schedule for the construction and completion of Sears' Facilities, Landlord's Improvements, the On-Site and Off-Site Improvements and the ingress and egress to the respective properties. The parties agree to use their best efforts to conform to such schedule and a copy thereof will be approved, in writing, by the parties hereto and included herein by reference

as Exhibit "E". No change shall be made in such time schedule without the prior written approval of the parties hereto.

ARTICLE III

SEARS CONSTRUCTION

3.1 Promptly upon the execution of this Lease, Landlord shall demolish and remove, at its expense, any buildings or structures now located on the Demised Premises.

3.2 As soon as the Demised Premises are cleared and graded and Landlord delivers to Sears the Pads and Landlord shall have provided Sears with evidence that it has fee simple title to Parcel C (which contains the Demised Premises) free and clear of all liens and encumbrances except those set forth in Article 9.4 hereinafter, provided said exceptions shall not deprive Sears of any of its rights or benefits hereunder, Sears shall commence the construction on the Demised Premises of the Sears Facilities. Notwithstanding the above, Sears shall have the option to construct its facilities concurrently with the construction of Landlord's buildings. Sears' Facilities shall be designed so as to harmonize esthetically with the Shopping Center and shall include:



(a) a three story retail store building plus three or more mechanical penthouses on the fourth level, containing said building not less than 200,000 square feet plus the areas of the penthouses as hereinafter indicated, with a maxim of 80,710 square feet on the ground floor and a maximum of 242,130 square feet in said building plus 10,000 square feet in the aggregate for the penthouses.



(b) a two (2) story automotive center building, containing not more than 40,000 square feet but not less than 25,000 square feet, with a maximum of 25,000 square feet on the ground floor and a maximum of 15,000 square feet on the second floor plus 1,000 square feet for a mechanical penthouse on a third level; and

(c) perimeter sidewalks adjacent to Sears Buildings, all Sears Truck-Loading Facilities and Auto Center Motor Vehicles Service areas.

3.3 Fee simple title to Sears' Facilities (but not to the land upon which they are constructed) shall be vested in Sears free and clear of any liens and encumbrances. Promptly after commencement of construction of Sears' Facilities, Sears shall notify Landlord the date Sears shall complete said Facilities and shall

not be deemed in default in completion by said date if the delay is caused by reasons beyond Sears' control.

3.4 Upon the termination of this Lease by expiration of the term or otherwise, the title to said Sears Facilities shall be surrendered and said facilities delivered to the Landlord in good order and repair, reasonable wear and tear excepted, and free and clear of all liens and encumbrances. In such event Sears shall execute such instruments and perform such other acts as may be required to transfer fee simple titles in Sears Facilities to Landlord and Sears shall not be entitled to any compensation in connection with such transfer of title; provided, however, that Sears shall have the right to remove therefrom all personal property and trade fixtures not permanently affixed or attached thereto, but Sears shall promptly repair to its original condition any damage caused to the buildings by such removal.



3.5 Landlord and Sears shall execute the appropriate Act or Deed of Edification and Construction in order that title to the buildings to be built by Sears may be recorded in Sears' name in the corresponding section of the Registry of Property of Puerto Rico and, if possible, proper and necessary, Landlord will cause the mortgagees of said Demised Premises to execute said Act or Deed of Edification and Construction. The cost of recording any such instruments shall be borne by the party requesting the same.





ARTICLE IV

LANDLORD'S CONSTRUCTION

4.1 Promptly, after the date of the execution of this Lease, Landlord shall commence and diligently proceed with the construction of Landlord's Improvements all in accordance with the Design Plan and said Improvements shall be designed to harmonize esthetically with the Shopping Center and shall include:



(a) a building or buildings comprising not less than 137,500 square fe of Gross Leasable area; and

(b) a two (2) level fully enclosed air-conditioned mall; and

(c) a parking deck building with access to the second (2d) floor of Sears' Department Store building and to the second (2d) level of the mall referred to in (b) above; and

(d) enough finished grade level and deck parking to provide 5,500 parking spaces for the use of the Shopping Center and Sears' Facilities; and

(e) the reconditioning of the existing mall interiors which shall be performed in accordance with a written agreement to be executed by the parties hereto as to the form and extent of such reconditioning; and

(f) all off-site improvements and all on-site grading including all utilities of sufficient and adequate capacity to serve Sears Facilities and such utilities shall be brought to within five (5) feet of Sears' retail store building and automotive center building, at such location to be mutually agreed upon by the parties hereto; provided, however, that Sears shall furnish and install or cause to have furnished and installed its own electrical substation and switchgear; and



(g) a roadway (including curbing), which shall be at least one (1) lane for automobile ingress to the Demised Premises from the De Diego Expressway as shown on Exhibit "C". Such roadway shall be constructed at Landlord's sole cost and expense and Landlord, so long as it is in the possession of the right of way of said roadway, expressly agrees to maintain in good, clean condition and repair and insure (as a part of common areas under the provisions of Article 24.4) said roadway during the term of this Lease and any extension thereof.

4.2 Promptly after commencement of construction of Landlord's improvements, Landlord shall notify Sears the date Landlord shall complete said improvements and shall not be deemed to be in default in completion by said date if the delay is caused by reasons beyond Landlord's control.

4.3 The above mentioned two (2) level mall, herein called "Mall", shall be constructed in accordance with the Design Plan and shall be air-conditioned, and equipped with lighting and ventilating equipment required to operate such Mal in accordance with standards customarily used in enclosed, air-conditioned shopping centers with the air-conditioning design standards to be an outside dry bulb

temperature of ninety (90) degrees Fahrenheit coincident with a wet bulb temperature of eighty (80) degrees, and, during the cooling season such standard to be a prevailing maximum temperature of seventy six (76) degrees Fahrenheit and a relative humidity of fifty five (55) percent.

4.4 Sears agrees that said Mall may be attached to Sears retail store building without any obligation to pay any amount to Sears for such right and the respective buildings shall be designed to allow for such attachment; provided, however, that Landlord shall repair, at its expense, any damage to Sears property caused by such attachment and, further, agrees to indemnify and hold Sears harmle from any liens, claims for damage, either actual or alleged, on account of personal injury or damage to property which result from or are alleged to result from such attachment.



4.5 In the event a part of said Mall shall be constructed upon a portion of the Demised Premises, Sears grants to Landlord a license for said construction and operation of said Mall, during the term of this Lease, provided such constructi has been provided for in the Design Plan approved by the parties hereto.



ARTICLE V

EXPANSION AND ADDITIONAL PARKING REQUIREMENTS

5.1 The parties hereto mutually agree that during the term of this Lease or during the extension herein in this Lease provided there shall be no construction o new buildings without Sears approval, which approval shall not be unreasonably withheld by Sears, upon the Shopping Center in the area encompassed within the following perimeter: (a) a line starting at the southeast corner of "Landlord's Improvements" and running eastward along part of the north wall of Velasco buildir up to its intersection with the west boundary of the right of way of Las Américas Expressway; (b) a line starting at this intersection and running northward along the east boundary of Plaza Las Américas, Inc. property line up to its intersection with the south boundary of Calaf Street; (c) a line starting at this intersection and running westward along the south boundary of Calaf and "B" Streets to its poi of intersection with a line running northward along the west side of the deck parki

building; (d) a line starting at this intersection and running south to the northwest corner of the deck parking building; (e) a line starting at this corner and running eastward along the north side of the deck parking building up to the northwest corner of Sears building; (f) and then a line running eastward along the north side of Sears Department Store Building and then running southward follow the east side of Sears Department Store Building and of "Landlord's Improvements" up to the point of departure of this line.

5.2 Landlord expressly agrees that, during the term of this Lease or any extension thereof, in the event there shall be any additional future vertical expansions of retail sale and service facilities in the Shopping Center (exclusive of and excepting the construction of an additional floor to each of the buildings actually occupied by the J. C. Penney's and Velasco's stores and the expansion of the building actually occupied by González Padín's retail store, limited said González Padín expansion to forty thousand square feet either vertically or horizontally), Landlord will provide, in addition to, and in excess of, the parking facilities herei provided for the Shopping Center as herein projected to be expanded in Article 4.1 additional parking facilities sufficient to provide two (2) automobile parking space for each one-thousand (1,000) square feet of gross leasable area of such future vertical expansion; provided, however, that in case of additional horizontal expansions, Landlord shall keep a ratio of three and one-half (3 1/2) square feet of common and parking areas to each foot of ground covered by such horizontal expansions.

5.3 Sears accepts, agrees and acknowledges that Plaza Las Américas, Inc. has and shall have the right to erect a multi-story office building, to be located parallel and to the west side of the two (2) level mall of the projected expansion of the Shopping Center.

5.4 Landlord expressly agrees that, notwithstanding any other provisions herein contained, any additional buildings, including the multi-story office buildi referred to in the immediately preceding subparagraph hereof, constructed for othe than retail sale and service facilities in the Shopping Center as herein expanded and enlarged, will have provided, also, sufficient additional parking spaces to

comply with the applicable Planning Board regulations for a free standing building of the type being constructed, exclusive of the 5,500 automobile parking spaces, as hereinabove provided. The sum total of these additional automobile parking spaces and the hereinabove agreed amount of five thousand five hundred (5,500) automobile parking spaces shall be for the use of the Shopping Center, Sears' Facilities and of any such additional buildings constructed for other than retail sale and service facilities.

ARTICLE VI

RENT

6.1 Sears obligation to pay rent upon the Demised Premises will commence effective upon the earliest date that either of the following events occur:

(i) the first day that Sears partially or totally opens Sears' Facilities to the public for business; or

(ii) March 1, 1979, whichever of these two events occurs earlier.

6.2 Notwithstanding the preceding Paragraph 6.1, in the event the construction of the Shopping Center Expansion, as heretofore provided, including the additional parking facilities, is not complete within twenty-four (24) months from the date this Lease has been fully executed, then Sears shall have the option to partially or totally open Sears' Facilities to the public for business in which case rental payments shall commence as of the date of such partial or total opening for business or Sears shall have the option to delay such opening of Sears Facilities to coincide with the final completion of the Shopping Center Expansion as hereinabo provided, in which case Sears shall not pay rent until it partially or totally opens Sears Facilities to the public for business.

6.3 Subject to the preceding paragraphs in this Article VI, Sears shall pay to Landlord as Fixed Minimum Rent for all of said Demised Premises, the sum of Three Hundred Fifty Thousand Dollars ($350,000.00) annually payable in equal monthly payments of Twenty Nine Thousand One Hundred Sixty Six Dollars and Sixty-Six Cents ($29,166.66) in advance upon the first (1st) day of each month

during the term hereof, or any extension thereof, said monthly installments of rental herein, being called "Fixed Minimum Monthly Payments". If such rent shall be payable for a fraction of a month, the amount payable shall be a pro-rata share of a full month's rent.

6.4 In the event the "Net Sales" (as herein defined) made by Sears in Sears Facilities during any "Lease Year" (as herein defined), of the term of this Lease and of the term of this Lease as it may have been extended, are in excess of Forty Million Dollars ($40,000,000.00), then Sears will also pay to Landlord as "Additional Rent" hereunder for any such Lease Year a sum equal to three quarters of one percent (3/4%) of the first Ten Million Dollars of such excess sales; and in the event the said Net Sales made by Sears in "Sears Facilities" during any Lease Year are in excess of Fifty Million Dollars ($50,000,000.00), then Sears will also pay to Landlord as Additional Rent hereunder for any such Lease Year a sum equal to one-half of one percent (1/2%) of said Net Sales, if any, in excess of Fifty Million Dollars ($50,000,000.00). Said Additional Rentals shall be paid by Sears to Landlord within thirty (30) days after the end of the respective Lease Year for which the same are payable.



6.5 The expression "Net Sales", as used herein, is hereby defined to mean, and shall be construed to mean, the aggregate amount of all sales made in Sears Facilities located upon the Demised Premises, and the amount of all sales made by Sears' departmental sublessees, concessionaires, and licensees occupying space in said Sears Facilities, whether for cash or credit, of goods, wares, merchandise, gift or merchandise certificates, income from services and of all other sales of merchandise and/or services, whether retail, wholesale or through bids, made or conducted at, in, on or from Sears Facilities, including, but not limited to, all mail, telephone or catalogue orders received or filled at o from said Sears Facilities, whether or not said orders are executed elsewhere, sales or receipts occurring or arising as a result of solicitation off Sears Faciliti conducted by personnel operating from Sears Facilities or reporting to Sears Faci ties' store manager (except such solicitation as may be conducted in other Sears



Units not located upon the Demised Premises). Each sale upon installment or credit shall be treated as a sale for the full cash sale price thereof in the month in which said sale shall be made, irrespective of the time when Sears shall receive payment from its customer, and no deduction shall be allowed for uncollected or uncollectible credit accounts. There shall be excluded or deducted, as the case may be, the following: (1) sales of departments or divisions not located in Sears Facilities; (2) amounts in excess of Sears' (or of its sublessees', concessionaires' and licensees') cash sales price charged on sales made on credit or under a time payment plan; (3) policies of insurance sold on Sears Facilities and premiums collected on policies of insurance; (4) all refunds and allowances made to customers by Sears in connection with merchandise, goods, wares, and/or services sold by or returned to the Sears Facilities; (5) gift or merchandise certificates actually redeemed at Sears Facilities upon the Demised Premises; (6) the amount of any sales tax or any other direct tax to be paid by the customer and directly collected from the customer by Sears and subsequently paid over by Sears to the taxing authority; (7) Sale of Maintenance Agreements made by Sears at Sears Facilities and that are priced and sold separate from merchandise; (8) Service income received by Sears for labor rendered to repair merchandise where repair will be and is made outside of Sears Facilities; (9) charges for delivery of merchandise if amount received is shown separately from price of merchandise; (10) fabrication charges to customers specifically related to custom drapery and curtains if work is not performed at Sears Facilities; (10) (a) installation charges (exclusive of any installation made or related with the operation of the Automotive Service Center) if work is not performed at Sears Facilities; (11) whole sale or bid sales conducted thru Sears contract sales department (Division 400). "Wholesale or Bid Sales" are deemed to mean sales made by or thru Sears' Contract Sales' Department (Division 400) outside of the ordinary scope of retail sales to large users such as, but not limited to, a developer, a hotel, etc., etc., ordering large quantities of merchandise; (12) food and beverage sales to employees in the Sears employee-only cafeteria; and (13) handling and transportation charges

and excise taxes charged in excess of the stated catalog price on merchandise sold in the D-200 (Catalog Sales Division) located in the Sears Facilities.

6.6 Sears makes no representation or warranty as to the sales which it expects to make in said Sears Facilities and Landlord agrees to hold in confidence all sales figures and other information with respect to Sears' business which may be obtained from Sears or by means of any inspection or audit of Sears' books and records.

6.7 The expression "Lease Year", as used herein, is hereby defined to mean, and shall be construed to mean, the period beginning on the first day of the first month after the date on which the term of this Lease commences and ending on the date twelve (12) months thereafter, and succeeding lease years shall commence and end on corresponding dates of subsequent years; provided, however, that if the date on which the term hereof commences shall be the first day of a month, the first Lease Year shall commence on said date and end one year later, and succeeding lease years shall commence and end on corresponding dates of subsequent years. In the event the term of this Lease shall commence on a date other than the first day of a month, Sears shall pay Landlord as contingent or Additional Rent for the period between the date on which Sears Facilities shall open for business with the public and the date of commencement of the first Lease Year an amount equal to three fourths of one percent (3/4%) and to one half of one percent (1/2%), as the case may be, of the Net Sales for said period in excess of an amount which bears the same ratio to the foregoing base figures in Section 6.4 as the number of days in such period bears to the number three hundred sixty-five (365).

6.8 (a) During each and everyone of the lease years Sears shall furnish Landlord quarterly reports, through the manager of its stores on the Demised Premises, indicating the total Net Sales for the preceding quarter of the Lease Year and, within one (1) month following the termination of each Lease Year Sears shall furnish Landlord a statement verified by one of the corporate officers of Tenant Company which shall indicate the total Net Sales for the preceding Lease Year.

(b) Landlord shall have the right each year to audit, at Sears Facilities or other mutually agreeable location, Sears' records of Net Sales as herein defined, but only for the purpose of ascertaining the amount of such Net Sales made during the preceding Lease Year. The term "records of sales" shall include adequate records which shall show all receipts from all such Net Sales made by Sears and any other person conducting any business upon or from said Sears Facilities, including such sales records which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of Sears' sales and the sales of Sears' subtenants, assignees, concessionaires or licensees. Such audit shall not be made more often than once for each Lease Year and shall be made on behalf of Landlord by a Certified Public Accountant to be selected by Landlord subject to the approval by Sears, said approval not to be unreasonably withheld. Landlord shall be deemed to have accepted Sears' Annual Statement of Net Sales (as herein defined), for the preceding Lease Year, and the Additional Rent, if any, payable by Sears to Landlord for such Lease Year, as correct, unless, within sixty (60) days after Landlord's receipt of any such statement, Landlord gives Sears written notice of Landlord's dissatisfaction therewith, in which event Landlord shall have the right to audit Sears' records of sales to determine Sears' Net Sales (as hereinbefore defined) for any such Lease Year. Landlord, within the sixty (60) day time limit above stated, shall notify Sears its intention of auditing Sears' records of sales submitting therewith the name of the Certified Public Accountant to be used by Landlord for said purposes, and shall proceed to start such audit within six (6) months from the date of Sears' approval of the Certified Public Accountant proposed by Landlord. Should Landlord fail to start to audit Sears' records of sales within six (6) months from the date of Sears' approval of the Certified Public Accountant proposed by Landlord, then and in that event Landlord shall have no further right to audit Sears' records of sales for the subject Lease Year or the Lease Year in question.

(c) Any such audit by Landlord shall be at Landlord's own expense,

except that if such audit discloses an understatement of Net Sales by an amount equal to one percent (1%) or more of the Net Sales shown by such audit to have been actually made, Sears shall promptly reimburse Landlord for the cost of such audit. If such audit shall show a discrepancy between the amount of Additional Rent paid and the amount Landlord is entitled to receive, the difference shall forthwith be paid by Sears to Landlord.

6.9 At any time after the expiration of the first twenty-five (25) years of the term of this Lease, Sears shall have the right to assign this Lease or sublet all of Sears' Facilities to any person, firm or corporation not a subsidiary of Sears, nor associated or affiliated with it in the conduct of its business, or to discontinue the use of all of Sears' Facilities in its business; in such events, Sears, from and after the date of such assignment, subletting or discontinuance shall pay to Landlord as rent for said demised premises in lieu of the contingent or Additional Rent hereinbefore provided to be paid by Sears to Landlord, and in addition to the Fixed Minimum Rent, the following alternative rent, at Landlord's option, to wit:

(a) The actual amount of contingent or additional rent based on the assignee's or sublessee's annual sales, in accordance with Section 6.4 hereinabove, or

(b) An amount each Lease Year until the end of the term of this Lease equal to the average of the amounts paid and payable by Sears to Landlord under the foregoing provisions for contingent or Additional Rent for each Lease Year (and fractions of a Lease Year, if any) during the period between the beginning of the original term of this Lease and the time of such assignment, subletting or discontinuance. Said annual amount shall be payable on or before the last day of each Lease Year during the remainder of said term. In the event of a Partial Lease Year the alternative rent for a fraction of a Lease Year shall be determined by multiplying the alternative rent for a full Lease Year by a fraction having as its numerator the number of days in such fractional Lease Year and as its denomin the number three hundred sixty five (365); provided, however, in case Sears,

after such assignment or subletting again takes actual possession of Sears' Facilities and operates its business therein, then the rentals to be paid by Sears, after Sears so actually takes possession of Sears' Facilities and operates its business therein during the remainder of the term thereafter, shall be the rentals provided for in the preceding subparagraphs of this Article VI in lieu of the rentals in this subparagraph 6.9 provided for in case of said assignment, subletting or discontinuance.

6.10 Anything contained in this Lease to the contrary notwithstanding, it is expressly understood and agreed that Sears, at any time during the term of this Lease, but limited to an aggregate area not to exceed twenty percent (20%) of the floor area of Sears' Facilities, may lease departments or grant concessions, giving other persons, firms or corporations the right to sell goods, wares, merchandise and services in said twenty percent (20%) of the floor area of Sears' Facilities, provided that said departments, concessionaires, persons, firms or corporations shall not (unless required by law to do so) be designated by sign or notice in Sears' Facilities, or in advertising, as being operated by someone other than Sears, and further upon the condition that the sales made by any such department, concessionaire, person, firm or corporation lessees shall be included for the purpose of determining the Additional Rent payable by Sears hereunder on the same basis as if such sales were made by Sears, and that the leasing of such departments, or the granting of such concessions, shall not be considered a subletting within or under the provisions of this Lease.



6.11 Tenant may, at any time during the term of this Lease, sublet the Demised Premises or assign this Lease to Sears, Roebuck and Co. or to any corporation which may, as a result of a reorganization, merger or consolidation, succeed to the business carried on by Sears, Roebuck and Co., or to any subsidiary corporation of Sears, Roebuck and Co., (so long as such corporation remains a subsidiary of Sears, Roebuck and Co.) and that the occupancy of the Demised Premises by any such subtenant or assignee which continues to operate a department store sales business and an automotive center in Sears



Facilities similar in character to that conducted by Tenant herein named shall be considered to be the continued occupancy of the Demised Premises by Tenant, and the rent payable by any such subtenant or assignee shall be the same, except as hereinafter provided, as if Tenant herein named had itself continued to occupy the premises. If Tenant does so sublet the Demised Premises or assign this Lease, Tenant shall remain jointly and severally, directly and primarily liable hereunder with any such subtenant or assignee for the full term of this Lease; provided, however, that Sears, Roebuck de Puerto Rico, Inc., Tenant herein named, may assign this Lease to a corporation which acquires all of the assets of Sears, Roebuck and Co., and which, by written instrument duly executed and acknowledged and delivered to Landlord, assumes and covenants and agrees with Landlord to pay the rent to be paid by Tenant hereunder, and to carry out and perform all of the terms, covenants and conditions of this Lease which, by the terms hereof, are to be carried out and performed by Tenant, provided further that any assignee (which, under the terms, covenants and conditions of this Lease succeeds Tenant herein named) shall keep the same kind of records as Tenant and as herein required of Tenant, and that said records shall be subject to inspection by Landlord in the same manner herein provided for the inspection of Tenant's records by Landlord.





6.12 Until it receives other instructions in writing from Landlord, Sears shall pay all rents under this Lease by check payable to the order of Plaza Las Américas, Inc., and addressed to G.P.O. Box 3268, San Juan, Puerto Rico 00936.

ARTICLE VII

OPTION TO BORROW MONEY

7.1 Sears agrees, upon the written request of Landlord submitted to Sears not earlier than the date the actual construction of the Shopping Center Expansion buildings is started by Landlord and provided further, that such written request is made not later than the date of commencement of the term of this Lease, to loan to Landlord the sum of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00). Said sum of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) shall be repaid by Landlord to Sears as follows:

(a) Landlord agrees to repay said loan in five (5) equal yearly installments of Three Hundred Fifty Thousand Dollars ($350,000.00) each, to be counted from the date of commencement of the term of this Lease and payable within thirty (30) days after the end of each and every year following thereafter. Landlord retains the right and option at any time during the term of this loan, to prepay any amount or to pay in full the then outstanding balance of said loan.

(b) Landlord shall pay to Sears within thirty (30) days after the end of each and every year following the date Sears loans to Landlord the above stated sum of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) and until said loan is fully paid to Sears by Landlord, an interest charge equal to the sum total of the monthly interest charges. Said interest charges shall be computed monthly by multiplying the then outstanding balance of the loan by one twelfth (1/12) of the then prevailing Prime Rate. For the purpose of this agreement, the Prime Rate is defined as follows: the base commercial loan rate from time to time existing at 399 Park Avenue, New York, New York, of Citibank, N.A. (for ninety (90) day notes) for loans to responsible and substantial commercial borrowers.



7.2 Notwithstanding the provisions contained in Section 7.1 above, the parties have agreed that Sears, at any moment after the date of commencement of the term of this Lease, shall have the option and right, which is hereby expressly granted to Sears, to withhold and retain each and every monthly payment of the fixed minimum rent as the same become due and payable to Landlord by Sears on the first (1st) day of each month, until any and/or each (as the case may be) of the principal installments are fully paid to Sears.



7.3 If the Landlord shall fail to make timely payment of said interest charge, in accordance with the preceding Section 7.1 (b), then within fifteen (15) days after the same has become due and payable, Sears shall have and is hereby expressly granted the right (without the necessity of notice to Landlord) to deduct, withhold and retain, from the Additional Rent, if any (as provided in Articl 6.4 above) a sum equal to said interest charge; provided, however, if such Additional Rent shall not be due, or if due, shall be insufficient therefor, then the the

outstanding balance of the loan and all interest charges incurred and unpaid, as defined in Section 7.1 (a) (b) above, shall immediately become due and payable to Sears.

7.4 The withholding by Sears of any Fixed Minimum Monthly Rent payment and/or Additional Rent for the exclusive purpose of applying such amounts to the partial or total payment, as the case may be, of the loan and/or its corresponding interest, will not constitute a default on the part of the Tenant under any provisions of this Lease.

## ARTICLE VIII

## SEARS CONTRIBUTION TO LANDLORD TO OFFSET LANDLORD'S LOSSES DURING THE CONSTRUCTION PERIOD

8.1 Effective within thirty (30) days after the full execution of this Lease by all of the parties hereto, Sears shall pay to Landlord the sum of Fifty Thousand Dollars ($50,000.00) as Sears' aid in off-setting Landlord's losses during the construction period of the Shopping Center expansion (as hereinabove provided).

## ARTICLE IX

## REPRESENTATIONS AND WARRANTIES

9.1 Landlord represents and warrants that, after commencement of the construction of the Shopping Center Expansion, Landlord will complete said construction and deliver to Sears a certificate of the Architects certifying the substantial completion of:





(1) The building or buildings having an aggregate of at least 137,500 square feet of Gross Leasable Area; and

(2) a two (2) level fully enclosed and air-conditioned mall; and

(3) the reconditioning of the existing mall; and

(4) that portion of the Site Improvements required to be constructed on Landlord's Property; and



(5) a parking deck building; and

(6) enough finished grade level and deck parking for 5,500 cars.

9.2 Landlord will make every reasonable effort to:

(1) Create and maintain the character of the Shopping Center as a first-class top quality Regional Shopping Center, and

(2) obtain and keep merchants in the Shopping Center Expansion buildings who have excellent reputation for operating attractive retail stores

who shall be financially sound.

9.3 Landlord represents and warrants that the buildings and other structures of the projected Expansion shall be erected or constructed within the confines of the building sites shown on the Plot Plan.

9.4 (a) Landlord warrants and represents that Landlord has the financial ability to complete construction of Landlord's Improvements, as provided in this Lease, and that it will submit to Sears Counsel prior to the start of Sears' construction, a letter certifying that Landlord has the financial ability to so complete Landlord's Improvements.

(b) Sears warrants and represents that Sears has the financial ability to complete construction of Sears' Facilities as provided in this Lease, and that it will submit to Landlord, not later than fifteen (15) days after the execution of this Agreement, a letter certifying that Sears has the financial ability to so complete Sears' Facilities.

9.5 Landlord represents and warrants that Landlord has the full right and lawful authority to enter into this Lease for the full term aforesaid and for all extensions herein provided, and that Landlord shall be lawfully seized of the entire premises herein demised and of the land on which said shopping center Expansion is to be erected, and shall have good recordable fee simple title thereto within one hundred and twenty (120) days from the date of the execution of this Lease, free and clear of all leases, tenancies, party wall agreements, violations and liens, except:

(a) Leases between Landlord and other tenants of premises in said Shopping Center as expanded; however, Landlord represents and warrants that said leases will not prevent performance of the terms of this Lease or interfere with Sears' rights hereunder;

(b) Current taxes and assessments not yet due and payable;

(c) Zoning maps and regulations, which maps and regulations permit the use of the area outlined on said Exhibits "A" and "B" as a shopping center for the sale of goods and services at retail;

(d) Utility easements, which easements will not interfere with Sears' rights hereunder;

(e) Any other matter or thing, provided the same shall not interfere with or prevent the construction, operation, maintenance and use of the Demised Premises and the Shopping Center (as expanded) as herein provided and intended and shall not

2) to remove promptly, to the extent reasonably practical, surface waters.

3) to keep all markings and directional signs in the Common Areas distinct and legible.

4) to repair, replace and renew lighting in their respective properties, as may be necessary.

5) to care for and replant, when necessary, all landscaped areas.

12.2 If, after thirty (30) days notice in writing given by one party to the other party hereto, the party receiving notice shall not have started to correct or repair any condition agreed to be performed in the preceding section hereof, then the party giving such notice shall have the right to enter upon the property of the party to whom notice was given and correct or repair such condition and the party receiving such notice shall pay the cost thereof; provided however, if such condition is of an emergency nature, then the notice required to be given hereunder shall be such reasonable notice as is warranted by the nature of the specific condition involved.

12.3 During any period when the Sears Store and the occupants of fifty (50%) percent or more of the Gross Floor Area of the tenant buildings are open for business, and for a reasonable period of time after such business hours, Landlord will, at its own expense, keep open and well lighted all Common Areas.

12.4 (a) During the term of this Lease and any written extension thereof, Sears shall contribute to the total Mall, Parking and Common Areas' Operation and Maintenance Costs excluding any and all charges for electric power consumption of the Shopping Center as expanded, determined and ascertained by multiplying the total of such costs by a fraction, the numerator of which shall be Sears Facilities G.L.A., and the denominator of which shall be the entire Shopping Center's G.L.A. after the projected expansion and including Sears Facilities G.L.A.

(b) During the term of this Lease and any written extension

thereof, Sears shall contribute to the total charges for electric power consumption of the total Shopping Center's Parking and Common Areas including the Mall, determined and ascertained by multiplying the total charges by a fraction, the numerator of which shall be Sears Facilities G.L.A., and the denominator of which shall be the entire Shopping Center's G.L.A. after the projected expansion and including Sears Facilities G.L.A.

(c) Subject to Article 12.5 below:

(1) Landlord agrees to furnish Sears a statement each month, setting forth Sears' share of the Operation and Maintenance Costs for the previous month pursuant to the terms set forth in Section 12.4 (a) above. Sears shall pay Landlord the amount of its obligation under the terms of said Section 12.4 (a) within twenty (20) days after receipt of such statement.

(2) Landlord agrees to furnish Sears a statement each month, setting forth Sears' share of the total charge for electric power of the total Shopping Center's Parking and Common Areas including the Mall, calculated under the terms set forth in Section 12.4 (b) above. Sears shall pay Landlord the amount of its obligation under the terms of said Section ~~12.4 (b)~~ within twenty (20) days after receipt of such statement.

(3) Within sixty (60) days after the end of the Lease Year, Landlord shall submit to Sears certified statements setting forth the actual amount of Landlord's total Operation and Maintenance Costs under the terms of Section 12.4 (a) and Landlord's total charges for electric power consumption of the total Shopping Center's Parking and Common Areas including the Mall under the terms of Section 12.4 (b), both for the immediately preceding Lease Year. In the event any such statement indicates that the actual amount of Landlord's total Operation and Maintenance Costs and total charges for electric consumption reveals a difference from the annual total of the corresponding monthly statements subject also to Article 12.6 below, such difference shall be adjusted by payment by Landlord to Sears or by Sears to Landlord, as the case may be, within forty-five (45) days after receipt of such statements.

12.5 The parties hereto expressly agree that notwithstanding the provisions of Article 12.4 (a) above, Sears' maximum annual contribution for Operation and Maintenance Costs excluding any and all charges for electric power consumption for any lease year after the first lease year shall be calculated as follows: the maximum annual contribution during the term of this Lease or any extention thereof for the current lease year shall be a sum equal to 115% of the amount paid to Landlord by Sears as Sears' contribution to said Operation and Maintenance Costs excluding any and all charges for electric power consumption in the preceding lease year.

12.6 It is understood and agreed that Administrative Costs charged for overhead as a percentage of "Landlord's Total Operation and Maintenance Costs" shall not be added to Landlord's total operation and maintenance costs in computing Sears' pro-rata share. Sears shall have and is hereby expressly granted the right, at Sears' own cost to conduct annually or have made an audit of "Landlord's Total Operation and Maintenance Costs". In such event, Sears, prior to the expiration of the forty-five (45) day period provided in Section 12.4 (c) (3) above, shall notify Landlord that Sears intends to perform and complete within the next one hundred and twenty (120) days an audit of Landlord's books and records relating to Landlord's determination of Landlord's Total Operation and Maintenance costs. Any excess in the amounts herein already paid by Sears over the amounts resulting and disclosed by such an audit to be paid by Sears in accordance with Sections 12.4 (a), 12.4 (b) and 12.5 hereinabove, shall be paid promptly to Sears, or at Sears' option, may be deducted from the sums next payable hereunder by Sears.

12.7 In addition to the remedies herein provided in Section 12.2 hereinabove, in the event Landlord shall fail to perform its obligation under this Article XII, then if, after thirty (30) days notice in writing from Sears to Landlord, Landlord shall not proceed to so perform its obligations hereunder, Sears shall have the right to perform said Landlord's obligations at Landlord's expense and to deduct the cost thereof from any pro-rata contribution payments due Landlord.

deprive Sears of any of its rights or benefits hereunder or its possession and quiet enjoyment of the Demised Premises in accordance with the terms and conditions herein set forth.

9.6 Landlord further covenants that if Sears shall discharge the obligations herein set forth to be performed by Sears, Sears shall have and enjoy, during the term hereof and all extensions herein provided, the quiet and undisturbed possession of the Demised Premises, together with all appurtenances appertaining or appendant thereto.

9.7 During the term of this Lease Sears' Facilities shall only be used for the operation of a first class, top quality department store retail sales business and Automotive Service Center, respectively, it being agreed that Sears' right to make sales on or from Sears' Facilities shall be interpreted broadly and shall include the sale of property, services and choses in action of every kind or nature and whether or not of a kind or character normally sold in a first class, top quality department store and Auto Center. Said premises shall not be used (a) for any immoral purpose; (b) for the operation of a warehouse; (c) for bankruptcy or going out of business sales by Sears or by any assignee or subtenant to whom Sears may assign this Lease or sublet Sears' Facilities pursuant to the provisions contained in this Lease, and (d) for any other use inconsistent with the operation of a first class top quality department store and Automotive Service Center.

9.8 During the full period between the commencement date of the term hereof and the end of the twenty-five lease years of such term, Sears, its successors, assignees, lessees and sublessees shall, except when prevented from so doing by causes beyond its control, operate a first class, top quality department store retail sales business and an Automotive Service Center in the Demised Premises, and so long as Sears, its successors, assignees, lessees and sublessees occupy Sears' Facilities on the Demised Premises, it shall carry on its business under its own name.

## ARTICLE X

## GRANT OF PERMITS, LICENSES AND EASEMENTS

A. Definitions and Documentation

This Article X sets forth the easements and licenses and the terms and

conditions thereof, which the respective parties hereby grant to each other, for the respective periods set forth in the case of each such easement or license. As used in this Article:

(1) a party granting an easement or license is referred to as the "Grantor" thereof, it being intended that the grant shall thereby bind, and include, not only such party, but its successors and assigns as well; and

(2) a party to which an easement or license is granted, is referred to as the "Grantee" thereof, it being intended that the grant shall benefit, and include, not only such party but its successors and assigns as well; and

(3) the word "in", in respect to an easement granted "in" a particular tract, shall be deemed to mean, as the context may require, "in", "to", "on", "over", "through", "upon", "across", and/or "under", and

(4) the word "invitee" in respect to an easement granted shall be deemed to mean officers, employees, agents, customers, tenants, business visitors and licensees.

As to the easements herein granted:

(5) the grant of a particular easement by a Grantor shall bind and burden its respective Property which shall, for the purpose of this Article, be deemed to be the servient tenement, but where only a portion thereof is bound and burdened by the particular easement, only that portion thereof so bound and burdened shall be deemed to be the servient tenement; and

(6) the grant of a particular easement to a Grantee shall benefit its respective Property which shall, for the purposes of this Article, be deemed to be the dominant tenement, but where only a portion thereof is so benefited, only that portion shall be deemed to be the dominant tenement; and

(7) all easements and licenses granted in this Article X shall exist by virtue of this Agreement, without the necessity of confirmation by any other document, and likewise, upon the extinguishment, expiration or termination of any easement or license, in whole or in part, or its release in respect to all or any portion of any Property, pursuant hereto, the same shall be deemed to have

expired or terminated without the necessity of confirmation by any other document. However, each party shall, as to any easement(s) or license(s), at the request of the other party, upon the submission by the requesting party of an appropriate document in form and substance acceptable to the requested party, execute and acknowledge such a document memorializing the existence, or the extinguishment (in whole or in part), or the release in respect of all or any portion of any property, as the case may be, of any easement or license; and

(8) all easements and licenses hereby granted, are, unless limited herein, non-exclusive and irrevocable during the term of this Lease and during any extension thereof.

B. Temporary License for Construction

During the period of the construction of the Sears Facilities and Landlord's expansion each party grants to the other party hereto, its architects, contractors, materialmen and others engaged in performing such work for it, a temporary license to use portions of the respective Property of the Grantor, as and to the extent necessary for the purpose of performing the construction in question; provided that (i) each such license as to any particular Property benefited thereby shall end when the construction of the building or structure, the construction of which gives rise to such license, shall be completed but shall not extend beyond the time when it is needed under good construction practice, and (ii) such licensee shall not unreasonably interfere with the Grantor's construction of the buildings on the Property. During the period of construction described in the preceding sentence each party grants to the other a temporary license, to be used for so long as reasonably necessary in the performance of such construction;

(i) to use any roads, constituting part of the Common Areas, to provide access for all personnel, equipment, supplies and like matters to and from the site of the particular construction, to the extent so reasonably necessary and

(ii) to use, notwithstanding anything to the contrary in this Agreement contained, such parts of the Common Areas on the property where the work

is being done as may have previously been agreed by the parties herein and that as may be reasonably needed for (x) access to the work site and/or (y) storage and shack sites and location of such other materials as are needed in doing such construction. Upon the completion of any work as to which a temporary license was enjoyed, the licensee shall promptly, at its own expense, repair and/or restore any damage done and leave such area affected free and clear of all loose dirt, debris and construction materials.

C. Easements for Use of Common Areas

(a) Beginning with the commencement of the term of this Lease Agreement, Landlord grants to Sears easements to use the Common Areas located on the Shopping Center (other than the Mall) for their intended purposes; such easements to be for the non-exclusive use in common with others by Sears, Sears' licensees and concessionaires, and their respective officers, agents and employees, and their respective customers, invitees, business guests and visitors, for the following purposes:

(i) easements to use the parking facilities for the parking and passage of passenger motor vehicles and passage of trucks (but not parking of trucks), so long as there is no unreasonable interference with customers and employees parking and passage by pedestrians; and

(ii) easements to use the various roadways to provide passage by motor vehicles (passenger and truck) and pedestrians between each property in the Shopping Center, and the adjoining public highways and to provide passage between the various portions of each property in the Shopping Center, all shown on Exhibits "B" and "C";

(iii) easements to use the various walkways and all other portions of the Common Areas for the general use, in common with others, of the Grantee and its invitees.

(b) The easements provided in this Section C are subject, in each case to (x) the right of Landlord to use the Common Areas for other purposes consisten with the terms and conditions of this agreement, and to (y) the right of Landlord to change and relocate portions of the Common Areas.

(c) The easements provided in this Section C shall terminate as to the Grantee thereof on the Termination of this Lease by the expiration of the term hereof or otherwise.

(d) Landlord may designate specific areas in which vehicles owned by Sears, its employees, sublessees and concessionaires must park and may prohibit the parking of any such vehicles in any other part of the Common Areas. Sears, upon request of Landlord, shall promptly furnish Landlord the license numbers of the motor vehicles operated by such persons. In the event an employee of Sears shall park a vehicle in an area not designated for employee parking, Landlord, itself or thru its authorized agents or employees, agrees:

(i) to give notice either verbally, by telephone or in writing to Sears that an employee of Sears has, or is parked in an area restricted from employee parking and will furnish Sears with the name of such employee and/or the employee's vehicle license and identification numbers; and



(ii) Sears agrees to take prompt remedial action with the named employee to correct the situation and to avoid a future violation and Sears agrees to forthwith inform Landlord of the remedial action taken; and

(iii) in the event the employee fails to comply with Sears' admonition and/or order to refrain from parking in an area not permitted for employee parking, then Landlord may cause the offending vehicle to be towed away.

D. Easements to Use the Mall

Commencing on completion of the Mall, Landlord grants to Sears easements (i) to have the Sears Store abut and open on the Mall and (ii) to Sears and its invitees, in common with others and with Landlord and its invitees to use the Mall to provide access between the Sears Department Store and any other stores or buildings opening on the Mall.

E. Easement to Perform Right of Self-Help.

Each party grants to the other party hereto and their employees, agents and contractors, easements to enter upon the Property of the Grantor, and into all improvements thereon, for the purpose of performing any obligation which the Grantor is required to perform under this Agreement, but fails or refuses to do, has the right then so to perform, and in exercising these easements, Grantee shall minimize, to the extent possible, any interference or interruption of any business being conducted on the Property in question, provided however, that such right of self-help shall not be exercised until the Grantee has given to Grantor at least thirty (30) days prior written notice and Grantor has failed to perform its obligations hereunder within said thirty (30) day period.

F. Easement for Abutment of Mall.



(a) Sears grants to Landlord the right to have the Mall abut the Sears Store as mutually to be approved. Sears further grants an easement for ingress and egress to and from Sears' Store.



(b) The easements as provided in this Section F shall terminate if and when:

(i) The Mall is demolished or destroyed and not replaced, or

(ii) The Sears Store shall, insofar as the Mall abuts it, be demolished or destroyed and Sears is not obligated under the terms of this Agreement to restore said Store, and does not, within a reasonable time not to exceed eighteen (18) months, restore said Store.

G. Easements for Repairs to Structure on Grantee's Property.

(a) Each party grants to the other easements for the purpose of maintaining, repairing or reconstructing any of the facilities of the Grantee located in such proximity to the Property of the Grantor that such facilities can, as a practical matter, be so maintained, repaired or reconstructed most advantageou:

from the Property of the Grantor; such easements shall permit the Grantee and its employees, agents and contractors, to enter upon and use such parts of the Property of the Grantor as are adjacent to the perimeter of said facilities to such extent, in such manner (including, without limitation, the erection of scaffolding) and for so long as is reasonably necessary to the accomplishment of said purpose, provided, however, and on condition that, each such Grantee shall restore the portion of the Property and any facility thereon so used to the same condition or as good a condition as immediately before such work was begun and provided further, that no such use by such Grantee and no such scaffolding as may be erected by it shall interrupt the business being conducted on the Property so used or interfere therewith. Grantee shall, in the course of maintaining, repairing, or reconstructing its facilities from the Grantor's Property, fully indemnify and hold harmless Grantor from any and all expenses, costs or liability for any injury or damage which shall or may arise because of Grantee's actions.

(b) The easements provided in this Section G with respect to any servient tenement shall cease as of the date of termination of this Lease by termination of its term by any cause whatsoever.

H. Easement for Ring Road

(a) Commencing on the completion of construction thereof, and of each portion thereof as the same may be built or extended, Landlord grants to Sears easements to use in common with others, the Ring Road located on the Shopping Center for its intended purposes; such easements to be for the non-exclusive use of Sears, Sears licensees and concessionaires, and their respective officer agents and employees, and their respective customers, invitees, business guests and visitors, together with Landlord, Landlord's tenants and licensees, and Landlord's invitees, for the purpose of vehicular traffic (passenger vehicles and trucks) and pedestrian access, between each property on the Shopping

Center and the adjoining public highways, and between the various portions of each property on the Shopping Center.

(b) Landlord may relocate, enlarge, narrow or alter, at its own expense, and without the necessity of consent of Sears, the location of any place of access from any portion of its property to the Ring Road; provided, however, that said relocation, enlargement or alteration of any place of access shall not affect the ingress and egress to the parking facilities located in the Shopping Center Expansion.

(c) The easements provided in this Section H shall be for the original term of this Lease and any extension thereof, unless Landlord dedicates the Ring Road as a public road and in such event, all easements granted by this Section H shall terminate.



I. Permanent Easements

With respect to such of the easements as are in this Article X declared to be "perpetual", each such easement (other than the easements described in Section K) shall, notwithstanding such characterization, expire, terminate, and be extinguished in relation to the Grantee (a) when such easement(s) is no longer being used by such Grantee, or those holding under or through such Grantee (non-user resulting from any reasonable interruptions incidental to the conduct of a business, or made reasonably necessary because of construction, alterations, improvements or repairs, shall not be deemed to be non-user for the purposes hereof), or (b) when such Grantee exercises its right, if and only when provided in this Lease to withdraw from this Agreement or (c) when it is reasonable to believe that such easement(s) will no longer be useful, or that the right to exercise the same in the future will not be valuable, to such Grantee, or those holding under such Grantee, for the purposes of the Property of the Grantee. An assertion by a Grantor that the easement in question has ceased, terminated, or been extinguished in accordance with the foregoing



sentence, shall be deemed to have been made when notice to that effect, citing this Section I, is given by the Grantor to and received by the Grantee and such assertion shall be deemed to have been agreed to by such Grantee unless it shall, within thirty (30) days thereafter, by notice to the Grantor, deny such assertion and give its reasons therefor. Pending the resolution of such dispute, the easement(s) in question shall be deemed to continue.

J. Installation Responsibility.

Except as otherwise specifically provided for in this Agreement, the Grantee of the easements shall be responsible for the installation, maintenance and repair of all facilities which are the subject of such easements.

K. Easements to Public Authorities.

Each party covenants and agrees with the other party hereto that it will grant to governmental or public authorities, public utility easements in its respective Property. Such easement(s) shall be perpetual so long as such authority use the same to provide utility services to any part of the Shopping Center.

L. Extinguishment of Easements.

Any of the easements or licenses granted hereby may be (a) released or extinguished, or (b) amended, waived, or modified by instrument, in recordable form, executed by the parties to this Lease. All easements granted pursuant to this Article X shall terminate upon the termination of this Lease by any cause whatsoever arising out from the terms and conditions of this Agreement, except that if Landlord elects, pursuant to the right granted Landlord in this Agreement to cease operating a shopping center on a portion or portions of Landlord's Property, the easements granted in Article X (C) shall, as of the date Landlord's election is effective, terminate with respect to the portion or portions of the Landlord's Property no longer being operated as a shopping center.

M. Easements for Exterior Lights.

Landlord hereby grants to Sears, its successors and assigns, for the benefit of Sears' Facilities and for so long as a retail facility is being operated on the Demised Property, the right, privilege and easement to install, maintain, repair and replace, at the sole cost and expense of Sears, lights for the purpose of highlighting the exterior of Sears' Facilities to be placed on light standards within that portion of Landlord's parking area contiguous to Sears' Facilities, the exact light standards to be used to be agreed to by Sears and Landlord, together with the right, privilege and easement of ingress and egress to and from such light standards to accomplish such purpose, the location, position, type and character of such lights to be subject to the approval of Landlord, which approval or disapproval shall not be unreasonably withheld or delayed. Sears agrees to use due care in the exercise of the rights granted hereunder and to obtain Landlord's consent (such consent not to be unreasonably withheld or any denial not to be unreasonably delayed or withheld) as to the methods and timing of the exercise of such rights, and further agrees, at its expense, to promptly repair, replace or restore any and all improvements of Landlord, its successors and assigns, which have been or might from time to time be damaged or destroyed by Sears, its successors and assigns, in the exercise of the rights granted hereunder and to hold Landlord, its successors and assigns, harmless from all loss, liability, cost or expense incurred in connection with the exercise of such rights.

N. Footings and Foundations for Building Support and Encroachments.

Landlord and Sears hereby grant to each other, their respective successors and assigns, for their respective benefit, the right and privilege to use such portions of their respective properties as may be designated in the Design Plan, (i) for the construction, erection, maintenance, repair and replacement of the following construction improvements: footings, foundations, supports, and walls; (ii) for the construction, maintenance, repair and replacement of

underground footings for the purpose of supporting their respective building improvements which may encroach upon their respective properties; and (iii) for the installation, maintenance, repair and replacement of improvements such as signs, lights and entrances, marquees, canopies or other overhang encroaching upon Landlord's Property.

## ARTICLE XI

## ENCLOSED MALL

11.1 Landlord agrees to provide, at its expense, air conditioning, lighting and ventilating equipment required to operate the Mall in accordance with standards customarily used in enclosed air-conditioned shopping centers, during any period when the Sears store and the occupants of fifty percent (50%) or more of the Gross Floor Area of the tenants' stores abuting the mall are open for business.



11.2 During the term of this Agreement, Landlord shall maintain the Mall in a neat and clean condition and in good repair and shall furnish cooled air and ventilation required for the comfortable use of the Mall.



11.3 Sears and Landlord agree to reasonably maintain at all times temperatures in their respective buildings consistent with the temperature in the Mall so as not to cause any material increase or decrease in the temperature in the Mall when the same is being cooled.

## ARTICLE XII

## MAINTENANCE AND LIGHTING

12.1 Landlord and Sears hereby covenant that maintenance as to their respective properties shall include without limitation the following:

1) to keep and maintain all structures, buildings and improvements on their respective properties including all utility lines, sidewalks and parking surfaces at all times, in a clean, unlittered, safe, orderly and sanitary condition.

ARTICLE XIII

REPAIRS AND RESTORATION

13.1 Landlord covenants and agrees to keep and maintain in good order, condition and repair, the Tenant or Satellite Store Buildings, the Mall and the Site Improvements located on Landlord's Property. In the event of any damage or destruction of any portion of the tenant buildings or of the Mall, of the Shopping Center as expanded or of the Site Improvements on Landlord's Property or any part thereof, Landlord shall rebuild and repair or replace the same to as good a condition, to the same general appearance and to the extent necessary so that there shall be retail stores containing at least 350,000 square feet of Gross Floor Area in the tenant and/or Satellite Store Buildings exclusive of Sears Facilities. Landlord covenants and agrees that any building or repair pursuant to this Section 13.1 shall be rebuilt and ready for occupancy within eighteen (18) months from the time when the loss or destruction occurred.

13.2 Sears covenants and agrees that Sears shall keep and maintain in good order, condition and repair Sears Retail Facilities located on the Demised Premises and in the event of any damage or destruction of said Sears Retail Facilities, or any portion thereof, during the term of this Lease, Sears agrees that it will, at its own cost and expense, repair, restore and rebuild its Retail Facilities within eighteen (18) months from the date such damage or destruction occurred to the extent necessary so that there shall be the number of square feet of Gross Floor Area in its Retail Facilities as set forth in Article III. Sears shall not be entitled to any rent abatement during the period of Sears' restoration and repair.

13.3 The parties agree that, notwithstanding the foregoing provisions of this Article XIII, that if any substantial and material damage or destruction occurs at any time after the first twenty-five (25) years of the term of this Lease, which damage or destruction renders such buildings untenantable, then the party whose buildings have been so damaged or destroyed may elect not to repair or restore such damage or destruction, but such party shall have the obligation of clearing

ARTICLE XIII

REPAIRS AND RESTORATION

13.1 Landlord covenants and agrees to keep and maintain in good order, condition and repair, the Tenant or Satellite Store Buildings, the Mall and the Site Improvements located on Landlord's Property. In the event of any damage or destruction of any portion of the tenant buildings or of the Mall, of the Shopping Center as expanded or of the Site Improvements on Landlord's Property or any part thereof, Landlord shall rebuild and repair or replace the same to as good a condition, to the same general appearance and to the extent necessary so that there shall be retail stores containing at least 350,000 square feet of Gross Floor Area in the tenant and/or Satellite Store Buildings exclusive of Sears Facilities. Landlord covenants and agrees that any building or repair pursuant to this Section 13.1 shall be rebuilt and ready for occupancy within eighteen (18) months from the time when the loss or destruction occurred.

13.2 Sears covenants and agrees that Sears shall keep and maintain in good order, condition and repair Sears Retail Facilities located on the Demised Premises and in the event of any damage or destruction of said Sears Retail Facilities, or any portion thereof, during the term of this Lease, Sears agrees that it will, at its own cost and expense, repair, restore and rebuild its Retail Facilities within eighteen (18) months from the date such damage or destruction occurred to the extent necessary so that there shall be the number of square feet of Gross Floor Area in its Retail Facilities as set forth in Article III. Sears shall not be entitled to any rent abatement during the period of Sears' restoration and repair.

13.3 The parties agree that, notwithstanding the foregoing provisions of this Article XIII, that if any substantial and material damage or destruction occurs at any time after the first twenty-five (25) years of the term of this Lease, which damage or destruction renders such buildings untenantable, then the party whose buildings have been so damaged or destroyed may elect not to repair or restore such damage or destruction, but such party shall have the obligation of clearing

the area of debris in order not to create an unsightly condition.

ARTICLE XIV

RULES AND REGULATIONS

14.1 Sears agrees that it shall observe and comply with, but not limited to, the following rules and regulations:

A. Sears shall at all times during the term of this Lease:

1) Keep all merchandise display windows, signs and other advertising and display devices in Sears' Facilities suitably lighted during such periods of time as the store windows throughout a major portion of the Shopping Center are illuminated;

2) Use no self-illuminated signs located in the interior of Sears' Facilities and which are visible from the outside to advertise any product, and all signs located in the interior of Sears' Facilities shall be in good taste so as not to detract from the general appearance of the store and the Shopping Center;

3) Keep in Sears' Facilities, including all vestibules, entrances and returns located therein, all improvements thereon and all windows, doors and glass or plate glass fixtures in a safe and neat and clean condition at all times;



4) Store all trash, garbage and refuse within Sears' Facilities in suitable containers so located as not to be visible to customers and business invitees in the Shopping Center and so as not to create or permit any health or fire hazard. Such trash, garbage and refuse shall be removed only by way of the rear of Sears' Facilities or such other places as Landlord may designate and as shall be reasonably convenient for Sears, and shall be placed outside of the premises prepared for collection in the manner and at the times and places specified by Landlord and as shall be reasonably convenient for Sears. If Landlord shall provide or designate a service for picking up refuse and garbage, Sears shall use same at Sears' cost, providing such service is reasonably satisfactory to Sears and that the cost thereof is reasonable. Sears shall pay the cost of removal of any of Sears' refuse or rubbish;

5) Refrain from distributing any handbills or other advertising matter on or about any part of the parking or common areas;

6) Use at Sears' cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require, providing such extermination service is reasonably satisfactory to Sears and the cost thereof is reasonable, and that the intervals are as reasonably required by Sears;

7) Refrain from parking or unloading any truck or other delivery vehicle in any place other than in front of the freight entrance to Sears' Facilities as shown on the final working plans and specifications for the buildings;

8) Refrain from using the plumbing facilities for any other purpose than that for which they are constructed, and no foreign substance, of any kind whatsoever, shall be thrown therein, and the expense of any breakage, stoppage or damage to the pipes and lines connecting the utilities to Sears' Facilities resulting from a violation of this provision shall be borne by Sears, who shall, or whose employees, agents or invitees shall, have caused it;

9) Refrain from burning any trash or garbage of any kind in or about Sears' Facilities or the Shopping Center; provided, however, that Sears may burn trash or garbage in an incinerator installed by Sears within Sears' Facilities which complies with all requirements of applicable governmental bodies; and

10) Take reasonable steps to prevent traffic congestion or unsightly conditions resulting from the use of Sears' Automotive Service Center facilities and gasoline pumps;

11) Furnish to Landlord, upon Landlord's request, the automobile license numbers of Sears employees' cars.

B. Sears shall not, without first obtaining Landlord's written consent, during the term of this Lease:

1) Conduct any going out of business, fire, bankruptcy, auction or other distress sale in Sears' Facilities, except for legitimate fire sales, each

of which shall be limited in duration to thirty (30) days, the promotion and handling of which shall not create an unsightly appearance in Sears' Facilities.

2) Change the exterior color of Sears' Facilities, or the color, size, location or composition of any sign or advertisement on Sears' Facilities that may have been theretofore approved by Landlord;

3) Use any sidewalks, walkways, or areaways of the Shopping Center or any vestibule or exterior entranceway located within Sears' Facilities for the keeping or displaying of any merchandise or other objects, including but not by way of limitation the use of any of the foregoing for any newsstand, cigar stand, sidewalk shops, or any business, occupation or undertaking;

4) Place any fence, structure, building, improvement, division, rail, sign or other advertising or display device or obstruction of any type or kind upon the parking areas or any part thereof or upon any vestibule or exterior entranceway located within the Sears' Facilities;

5) Install in, or about Sears' Facilities any exterior lighting, amplifiers or similar devices or use in or about Sears' Facilities any advertising medium which may be heard or experienced outside the Sears' Facilities, such as flashing lights, searchlights, loudspeakers, phonographs or radio broadcasts;

6) Attach any awnings or other projections to the outside walls of Sears' Facilities.

C. Sears agrees that Landlord may amend, modify, delete or add, from time to time, new and additional reasonable rules and regulations for the operation and care of the Shopping Center buildings, and for the operation, care and use in common by all the tenants of the Shopping Center of the parking and common areas as defined in this Lease.

14.2 Except as expressly permitted by the terms of this Lease, Sears shall not decorate, paint or in any other manner alter, and shall not install or affix any device, fixture or attachment upon or to the exterior of Sears' Facilities, including the roof thereof, without the prior written consent thereto of Landlord;

and if Sears shall do any of the foregoing acts in contravention of this provision, Landlord shall have the right to remove such decoration, paint, alteration, device, fixture or attachment and restore Sears' Facilities to the condition thereof prior to such act, and the cost of such removal and restoration shall be paid by Sears during the month following such removal or alteration. Sears shall have the right to install on the roofs of Sears' Facilities antenna for use in connection with the display and sale of radio, television or other electronic equipment, the height and location and manner of installation of such antenna to be also subject to the approv of Landlord, which approval shall not be unreasonably withheld.

14.3 Sears' obligation to comply with the foregoing rules and regulations (and any that may hereafter be promulgated by Landlord) is expressly made conditional on the compliance with such rules and regulations or substantially similar rules and regulations by all tenants in the Shopping Center. Landlord agrees that it will make all reasonable efforts to cause said rules and regulations and any amendments or additions thereto, or substantially similar rules and regulations, amendments and additions to be applicable to and complied with by all main tenants in the Shopping Center. Anything herein to the contrary notwithstanding, it is understood and agreed that the above rules and regulations shall only be binding if they are not contrary to any legally binding rules and regulations set forth by any governmental agency.

ARTICLE XV

LEASES IN THE SHOPPING CENTER EXPANSION

15.0 It is the express intention of the parties hereto that Landlord shall exercise its best efforts to enter into such leases or agreements for the occupancy of stores in the Shopping Center Expansion that will result in a well balanced, integrated and mutually complementary tenant mix, it being mutually understood and agreed that excellence in leasing is as necessary to such expansion as excellence in designing, layout and architecture and the expression "well balance

as used herein is hereby defined to mean:

1) Compatibility of the merchants with the customers in the Shopping Center trading area; and

2) A variety of fairly wide range of lines of merchandise as well as a wide range of services and recreational facilities, in order to achieve in the Expansion of this Shopping Center a balance which will satisfy the needs of customers in this trading area by an over-all adequate representation of merchandise assortments, services and recreational facilities.

ARTICLE XVI

SPECIAL REMEDIES OF SEARS

16.1 In the event Landlord, (i) after commencing of construction of the Expansion, shall not thereafter proceed with the completion of the construction of said Expansion or facilities, in compliance and following the time scheduled for construction in accordance with Section 2.3 and as agreed by the parties herein (unavoidable delays as in this Lease defined to be taken into account); or (ii) shall not furnish to Sears a copy of Landlord's final plans for construction not later than January 1, 1978, then, in any of such events at any time thereafter upon thirty (30) days prior written notice from Sears to Landlord, Sears shall have the right, at its sole option to terminate this Lease and recover from Landlord the cost of any improvements constructed by Sears plus all sums previously loaned and/or paid by Sears to Landlord pursuant to Articles Seven (VII) and Eight (VIII) of this Lease.





16.2 The right granted to Sears to terminate this Lease, as provided above in Section 16.1, shall terminate, cease and shall thereafter have no further legal effects whatsoever when Landlord has completed construction of forty per-cent (40%) of the Shopping Center Expansion, as in this Lease provided. For the purposes of this Section forty percent (40%) of construction shall be deemed to mean that amount of construction certified by the Architect for payment equivalent to forty percent (40%) of the total construction cost.

ARTICLE XVII

SPECIAL REMEDIES OF LANDLORD

17.1 In the event Sears, (i) after commencement of construction of Sears' Facilities shall not thereafter proceed with the completion of the construction of Sears' Facilities in compliance and following the time scheduled for construction in accordance with Section 2.3 and as agreed by the parties herein (unavoidable delays as in this Lease defined to be taken into account); or (ii) shall not furnish to Landlord a copy of Sears' final plans for construction not later than January 1, 1978, then, in any of such events at any time thereafter, upon thirty (30) days prior written notice from Landlord to Sears, Landlord shall have the right at its sole option, to terminate this Lease and Landlord shall not be required to refund the cost of any improvements constructed by Sears.

17.2 The right granted to Landlord to terminate this Lease, as above provided in Section 17.1, shall terminate, cease and shall thereafter have no further legal effects whatsoever when Sears has completed construction of forty percent (40%) of Sears' Facilities, as in this Lease provided. For the purposes of this Section forty percent (40%) of construction shall be deemed to mean that amount of construction certified by the Architect for payment equivalent to forty percent (40%) of the total construction cost.





ARTICLE XVIII

SETTLEMENT OF DISPUTES

18.1 All questions, differences, disputes or controversies arising among the parties, not otherwise disposed of in this Lease and which the parties are unable to settle through discussion among themselves within a period of sixty (60) days following the inception of such controversy, shall be settled by arbitration in accordance with the then existing rules of the American Arbitration Association, or under the provisions of law relating to arbitration of the Common wealth of Puerto Rico, and such arbitration shall be conducted at the request of any party hereto before three (3) arbitrators (unless the parties agree to one (1) arbitrator) designated as follows: The party requesting the arbitration shall designate in writing, within fifteen (15) days of such request, the name of an

arbitrator who is knowledgeable in the issues being arbitrated, and the party wishing to take a part in the arbitration proceedings adverse to the party requesting the arbitration shall make a similar designation. Within twenty (20) days after the designations as aforesaid, the two arbitrators shall select and designate a third arbitrator. In the event the two arbitrators chosen are unable to agree on a third arbitrator, then such third arbitrator shall be designated by the Chief Justice of the Supreme Court of Puerto Rico. The arbitrators designated and acting under this Agreement shall not be affiliated in any way with any party to this Agreement and shall make their award in strict conformity with the Association's or of the Commonwealth's rules pertaining to arbitration and shall have no power to depart from or change any of the provisions thereof. Any such award shall be binding upon the parties and enforceable by any court exercising jurisdiction over the proceedings. The expense of arbitration proceedings conducted hereunder shall be borne equally by the parties to the arbitration. All arbitration proceedings hereunder shall be conducted in the city of San Juan, Puerto Rico. During the pendency of any arbitration proceeding, each party shall continue to comply with all of the other covenants and agreements of this Lease not then under arbitration proceedings. Notwithstanding the above, Sears shall continue paying all of the payments due Landlord under the provisions of this Lease; provided however, that said payments made by Sears to Landlord shall not preclude or invalidate Sears' right to contest and arbitrate the propriety and validity of the evidence supporting or purporting to support any of such payments.

## ARTICLE XIX

## UNAVOIDABLE DELAYS

19.1 The time for performance of construction by any party shall be extended for a period of time equal to the time of delay caused by any of the following reasons (herein called "Unavoidable Delays"): Governmental orders

or edicts, governmental refusal to adopt appropriate zoning, governmental rationing or allocation of materials, adverse weather conditions, strikes, lock-outs, fires, acts of God, disasters, riots, delays in transportation, shortages of labor, failure to enter into utility agreements, or any other cause beyond the reasonable control of the party asserting such delay.

ARTICLE XX

COVENANTS TO OPERATE

20.1 Landlord covenants that for twenty-five (25) years from the partial or total opening by Sears to the public for business upon the Demised Premises, herein called "Sears Opening Date" Landlord will operate in its property a shopping center.

20.2 Sears agrees with Landlord that it will continuously operate in the Sears' Facilities a Sears retail department store and an Automotive Service Center as set forth in Sections 9.7 and 9.8 hereinabove, for a period of at least twenty-five (25) years from the Sears Opening Date, the name of such store and Automotive Service Center to include Sears or Sears Roebuck and Co.

20.3 Temporary cessation of business to make alterations or to make repairs of damages caused by strike, picketing or labor dispute or other circumstances which are reasonably beyond any party's control shall not be deemed a discontinuance of the operation of the Shopping Center or of Sears' Facilities as the case may be. In any event, any cessation of business for a period of up to sixty (60) days shall not be deemed a discontinuance of the operation of the Shopping Center or Sears Facilities as the case may be.

20.4 Landlord agrees that, at the expiration of the first twenty-five (25) years of the term hereof, Landlord will extend its covenant to operate a shopping center for so long a period of time (but in no event in excess of the 40-year term of this Lease or of any extensions thereof) as Sears and either J.C. Penney or González Padín continue to operate a department store in said shopping center. Provided, however, that in the event no other department store except Sears, agrees to operate a department store in the shopping center for a term longer

than twenty-five (25) years after Sears Opening Date and Landlord wishes to divest itself of the shopping center or ceases its operation, then Landlord, at Sears' option, shall purchase Sears' Facilities at Sears book value, determined and ascertained at such time following the straight line method of depreciation with an asset life of forty (40) years.

20.5 In the event Landlord purchases Sears' Facilities as provided in 20.4 above, and Sears decides to discontinue the use of all of the Sears' Facilities in its business, this Lease, and every provision therein, shall terminate and have no further force or effect, and Sears' obligation to pay Rent and/or Additional Rentals pursuant to Article VI above shall likewise terminate.

ARTICLE XXI

SUBORDINATION OF MORTGAGES AND QUIET POSSESSION

21.1 Landlord agrees that it will not place any mortgage on Parcel "C" or any part thereof unless such mortgage complies in all respects with the requirements of this Article XXI.

21.2 Landlord shall provide Sears with written evidence, acceptable to Sears, from each mortgagee, or any future mortgagee, holding or which may hold a mortgage upon the Landlord's fee interest in Parcel "C" agreeing not to disturb the possession of Sears, nor to terminate any interest of Sears created hereunder by foreclosure or otherwise so long as Sears shall comply with the terms, covenants and conditions of this Lease.

21.3 It is agreed that this Lease should be superior to any such mortgage on Parcel "C" and/or including the Demised Premises, and Landlord agrees to cause any Mortgagee to subordinate its mortgage to this Lease. Landlord shall provide Sears with a written subordination agreement or with written evidence acceptable to Sears providing that any such mortgage and the lien or liens related thereby shall be subordinated to this Lease.

ARTICLE XXII

ALTERATIONS AND ADDITIONS

22.1 Subject to the conditions in this Article provided, Sears shall have the right, from time to time at Sears' own expense, to make alterations, additions or improvements within Sears' Facilities, provided that the same do not diminish the value of the Demised Premises and of the Shopping Center.

22.2 The foregoing shall be subject to:

1) Before commencing any of the foregoing whose estimated cost is One Hundred Thousand Dollars ($100,000.00) or more, Sears shall furnish to Landlord, for "Landlord's approval", a duplicate set of the working drawings and specifications for the proposed work prepared by a duly licensed architect or engineer.

2) All alterations or additions shall be made in accordance with all governmental statutes, ordinances and regulations.

3) Sears shall, at its own expense, obtain or cause to be obtained insurance coverage before the commencement and during the completion of the proposed work and also Sears shall hold harmless Landlord from and against all claims, costs and damages of any nature whatsoever directly or indirectly caused or arising out or from such construction.

4) Such work shall be performed so as not to interfere with the operation of other occupants in the Shopping Center.



ARTICLE XXIII

LIENS

23.1 Should any construction work, or repairs, by Sears upon the Demised Premises, subject Sears' interest in said Demised Premises to a mechanic's or materialman's lien, then Sears promptly and properly shall discharge the same at Sears' own cost and expense and, if Sears fails to do so, Landlord may (unless the amount of the claimed lien shall be deposited with Landlord or in a court of competent jurisdiction) at its option, upon giving to Sears at least thirty (30) days' prior written notice of Landlord's election to exercise said option, pay the same and add the sum so paid as additional rent to the next installment of rent due under this Lease, in which event Landlord shall have, for the sum or sums so paid, the same lien and remedies as are conferred upon Landlord for non-payment of rent by Sears.

ARTICLE XXIV

INSURANCE

24.1 Sears and Landlord agree, commencing with the start of construction upon each party's respective property (Sears' Facilities and Landlord's Improvements) and thereafter during the term of this Lease, to insure, at each party's own expense, all buildings and improvements located on each party's property (Sears' Facilities and Landlord's Improvements) against fire, extended coverage, vandalism and malicious mischief, sprinkler leakage, collapse and earthquake. Said limit of insurance must either be in an amount equal to at least ninety percent (90%) of the full replacement value of the respective Property and Improvements (Sears' Facilities and Landlord's Improvements), without deduction for depreciation (and except for loss caused by earthquake excluding foundations, underground facilities and excavation costs) or in amounts (except in the case of total destruction), sufficient enough to prevent the parties to become a coinsuror or co-contributor or to prevent that the proceeds available from the insuror would be insufficient to restore or rebuild the damaged property to the condition it was prior to any loss.



One party shall not be liable to the other party for any loss or damage to any Property or Improvement and betterment which is covered by said property insurance even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees.

Such policy or policies shall provide for waivers of subrogation against the other party hereto, and each party hereto agrees that such policies will be endorsed accordingly.

Such insurance shall be carried with financially responsible fire or property insurance companies licensed and authorized to do business in the Commonwealth of Puerto Rico with a Best's Financial Rating Category of no less than Class VII and may be carried under a blanket policy covering other

Property owned or controlled by such party, and each party hereto shall, upon request, furnish to the other party, insurance certificates evidencing that the insurance required to be carried pursuant to the provisions hereof is in full force and effect. Such policies shall provide that the policies shall not be cancelled for any reason whatsoever without at least sixty (60) days prior written notice to the other party to this Lease.

24.2 Commencing with the date of the execution of this Lease, during construction and thereafter during the term hereof, Landlord and Sears shall maintain, at each parties' expense, general public liability insurance against claims for personal injury and/or death and property damage occasioned by an occurrence or accident occurring upon, in or about the property of each of the respective parties, such insurance to afford protection to the limit of not less than Two Million Dollars ($2,000,000) with respect to Bodily Injury, Personal Injury or death of any one person, or number of persons, arising out of any one accident or occurrence, and such insurance against property damage to afford protection to the limits of not less than Five Hundred Thousand Dollars ($500,000.00) with respect to any instance of property damage. The insurance coverage required hereinabove shall extend to any liability of the parties arising out of the indemnities provided for in 24.5 hereof.

24.3 Notwithstanding Articles 24.1 and 24.2 above, the parties agree that Sears shall have the right to self-insure Sears' Facilities on the Demised Premises but if in the opinion of Landlord, the financial position of Sears, Roebuck and Co. or of Sears, Roebuck de Puerto Rico, Inc. is impaired to the point wherein self-insurance creates an unreasonable risk which cannot safely be assumed, Sears shall immediately purchase Property and General Liability insurance in accordance with the requirements of this Section as well as Section 24.2. If Sears fails to so buy such insurance and to deliver to Landlord

satisfactory evidence thereto, Landlord may, at its option, purchase said insurance on behalf of Sears. The premium for said insurance will be paid by Sears on demand. Landlord's failure to take up this option shall in no way affect or invalidate the requirements of this Article.

24.4 Landlord agrees that it shall, commencing with the completion of the Common Areas, at all times and continuously thereafter during the term of this Lease, maintain general public liability insurance against claims on account of bodily injury or death and property damage occurring upon, in or about the Common Areas on the Shopping Center, as expanded, such insurance to afford protection to the limit of not less than Two Million Dollars ($2,000,000.00) in respect of bodily injury, personal injury or death to any person or number of persons arising out of any one accident or occurrence, and such insurance against property damage to afford protection to the limit of not less than Five Hundred Thousand Dollars ($500,000.00) in respect to any one instance of property damage. Landlord shall include Sears as an additional insured with respect to the Common Areas under said liability policy. The premium for the Common Areas shall be apportioned among the parties hereto in the proportion which the Gross Leasable Area in Sears' Facilities bears to the total Gross Leasable Area in the entire Shopping Center as expanded, including Sears Facilities' Gross Leasable Area. Also, Sears will pay any additional premium specifically charged by the insurance company for adding Sears as an additional insured with respect to the Common Areas.

24.5 Except with respect to claims arising out of the Common Areas for which the Landlord is required to provide insurance under 24.4, each party agrees to protect, defend, hold harmless and indemnify each other from and against any and all claims, actions, liabilities, losses, costs and expenses arising out of any actual or alleged death of or injury to any person or persons, damage to any property and any other damage or loss including injury to the feelin

or reputation of a person as a result of false eviction, false arrest, malicious prosecution, libel, slander, defamation of character, invasion of privacy and wrongful entry incident to or resulting from, arising out of or due to the construction, alteration, repair, use, maintenance, occupancy and operation of the respective property of each of the parties hereto.

24.6 In the event the aforesaid damage by fire or other casualty should occur within the last five (5) years of the initial term of this Lease, or within the last three (3) years of the extended term, if any, Sears shall have the option to surrender the proceeds of any insurance to Landlord and to vacate the Demised Premises.

ARTICLE XXV

CONDEMNATION

25.1 In the event all or any part of Sears' Facilities shall be taken in any proceeding by the public authorities by condemnation or otherwise, or be acquired for public or quasi-public purposes, or of the sale to any public authority of all or any part of said Sears' Facilities under threat of condemnation, i.e., exercise of the power of eminent domain, the amounts of money paid by the public authorities for any such taking, acquisition or sale, (including, without being limited to, the value of the unexpired portion of this Lease) in any proceeding or awarded as just compensation for their condemnation or other wise paid for their acquisition for public or quasi-public purposes shall go to and shall be the sole property of Sears or Landlord as follows:



(a) All amounts so awarded or paid for the land comprising the Demised Premises shall go to and shall be the sole property of Landlord;

(b) All amounts so awarded or paid for the unexpired portion of this Lease shall go to and shall be the sole property of Landlord;

(c) All amounts so awarded or paid for the Sears' Facilities shall be distributed between Sears and Landlord in the following manner:

(i) To Sears, the amount resulting from multiplying the

amounts so awarded or paid for Sears' Facilities by a fraction, the numerator of which shall be the unexpired number of years of the original term of this Lease and the denominator of which shall be the original term of this Lease; and

(ii) to Landlord, the amount resulting from multiplying the amounts so awarded or paid for Sears' Facilities, by a fraction, the numerator of which shall be the expired number of years of the original term of this Lease and the denominator of which shall be the original term of this Lease.

If Fifty Percent (50%) or more of Sears Facilities upon the Demised Premises be so taken or sold, then this Lease shall immediately terminate and the rent shall cease upon the date of such taking or sale.

25.2 If less than Fifty Percent (50%) but more than Thirty-Five Percent (35%) of Sears Facilities upon the Demised Premises be so taken or sold, then Sears shall have the right, at its option, to terminate this Lease by giving written notice to Landlord within Forty-five (45) days of such taking or sale.



25.3 If Thirty-Five Percent (35%) or less of Sears Facilities be so taken or sold, this Lease shall continue and the rentals payable by Sears to Landlord hereunder shall be reduced or adjusted in the following manner:

(a) The Fixed Minimum Rent shall be reduced to that proportion of said rent, which is hereinbefore provided to be paid by Sears to Landlord, which the area of the remaining portions of said buildings bears to the total of such areas as of the date of such taking or sale.



(b) The base figure of Forty Million Dollars ($40,000,000.00) of Net Sales (as hereinbefore defined) agreed and set forth in Article VI of this Lease to determine, ascertain or figure Sears' excess Net Sales for calculating, determining, ascertaining or figuring the Additional Rent (Percentage Rent) which is hereinbefore provided to be paid by Sears to Landlord on excess Net Sales, shall be reduced to that proportion of said base figure for Net Sales of Forty Million Dollars ($40,000,000.00) which the area of the remaining portions of said buildings bears to the total of such areas

as of the date of such taking or sale.

(c) The excess Net Sales on which said Additional Rent is to be paid shall be determined, calculated, ascertained or figured from the reduced base figure of Net Sales as hereinbefore in this Section 25.3(b) is set forth and agreed by the parties hereto; provided further, that to calculate, ascertain, figure or determine said Additional Rent, the three fourths of one percent (3/4%) shall continue to be applied to the excess Net Sales from and above the reduced base figure of Net Sales as hereinabove in Section 25.3(b) is set forth, up to Ten Million Dollars ($10,000,000.00) of such excess sales, and that the one half of one percent (1/2%) shall continue to be so applied thereafter to such excess Net Sales in excess of said Ten Million Dollars ($10,000,000.00).

(d) If this Lease shall continue after any such taking or sale of Sears' Facilities, as aforesaid, the condemnation proceeds therefrom, respectively received by the parties hereto, shall be applied pro-rata, to the extent necessary, for the restoration, so far as feasible, of the improvements damaged or reduced in size as the result of such taking or sale. Nothing herein contained shall require either party hereto to apply a greater sum to such restoration than it shall have received by virtue of such taking or sale.

25.4 If more than thirty-five percent (35%) of the total area of the parking facilities within the Shopping Center shall be taken in any proceeding by the public authorities by condemnation or be acquired or sold for public or quasi-public purposes, then, and in that event, Sears shall have the option of terminating this Lease by giving Landlord written notice of its intention to do so on or before the date which is forty-five (45) days after such area shall have become unavailable for the use of the Center's customers; provided however, that Landlord shall have the right, at its sole option, to cancel Sears' right to terminate this Lease as herein provided, by providing enough additiona parking (grade level or deck-parking) to bring the parking facilities of the Cent to the capacity existing before such taking. It is further understood and agree

by the parties hereto, that if less than thirty-five percent (35%) of the total area of the parking facilities within the Shopping Center, as the same may have been enlarged from time to time, shall be so taken or sold in the aggregate, Sears shall have no right to terminate this Lease by reason of such taking or sale.

25.5 Each party shall promptly notify the other of any projected taking affecting the Shopping Center and each party shall bear its own expenses incurred in connection with any proceeding resulting therefrom.

ARTICLE XXVI

MORTGAGE, ASSIGNMENT, SUBLEASE, DISCONTINUANCE

26.1 Sears may assign this Lease and the leasehold estate hereby created, at any time, or sublet the entire Demised Premises to any wholly owned subsidiary of Sears or to any corporation wholly owned by Sears, Roebuck de Puerto Rico, Inc., or by Sears, Roebuck and Co., or in which Sears, Roebuck de Puerto Rico, Inc. or Sears, Roebuck and Co. owns at least a two-third (2/3) interest, subject however to all of the terms, covenants and conditions of this Lease.



26.2 Except as provided in the preceding Section 26.1 hereof, Sears shall not assign this Lease or sublet the Demised Premises during the twenty-five (25) year period of Sears' operating covenant hereinbefore provided, withou the prior written consent of Landlord, provided, however, that Sears shall have the right to sublease or license parts of Sears Facilities to such sublessees, concessionaires and licensees as hereinbefore in this Lease provided and who normally occupy space in a Sears retail department store; provided that such sublessees, concessionaires and licensees shall not occupy in the aggregate more than twenty percent (20%) of the G.L.A. in either the Sears' Store or Sears' Automotive Center.



26.3 In the event of an assignment of this Lease or a sublease of the Demised Premises, as in this Lease provided, Sears shall cause the assignee or sublessee to execute and deliver to Landlord an agreement in writing assumi

all of the terms, covenants and conditions of Sears under this Lease. No assignment or subletting nor the acceptance of rent, or other payment shall release Sears from its obligation to pay Landlord a monthly rental as provided for in Article 6.9 of this Lease but in no event shall such rental be less than the Minimum Monthly Payments and other charges as herein provided to be paid by Sears during the term of this Lease.

26.4 Except as provided in Article 20.5 of this Lease, if Sears abandons the Demised Premises, then at the option of Landlord this Lease shall terminate and title to Sears' Facilities on the Demised Premises shall vest in Landlord and Sears shall pay to Landlord a monthly rental thereafter as provided in the preceding Section 26.3 hereof.

26.5 During the first ten (10) years of this Lease but not thereafter, Sears may mortgage its interest under this Lease. Said mortgage shall be subject and subordinate to the provisions of this Lease and to any mortgage previously placed by Landlord on its Property (including, but not limited to the Demised Premises) and no such mortgage shall diminish the rights, remedies or interests of Landlord under this Lease. Landlord expressly agrees to give a written notice of any default by Sears to any mortgagee of Sears' interest under this Lease provided that such mortgagee shall have (i) given Landlord written notice of such mortgage, (ii) furnished Landlord with a certified copy of such mortgage and note and (iii) agreed that such mortgage shall be subject to the business restrictions and conditions provided in this Lease and Landlord further agrees to accept performance by such mortgagee of the terms, covenants and conditions of this Lease in the manner, and within the time provided hereunder, as if such performance were by Sears.



ARTICLE XXVII

UTILITIES

27.1 Sears shall timely pay all charges for water, gas, electricity, telephone, sewerage or any other utilities servicing Sears' Facilities in the Demised Premises and Landlord shall not be liable for the interruption or failure of such service to Sears' Facilities; provided, however, that if Landlord fails to maintain in good condition and repair any utility equipment including, but not limited to, sewerage pipes or utility conduits, located in the Shopping Center's

common areas and utilized by Sears, which were installed by and are under Landlord's control, if Landlord does not promptly correct any such interruption or failure of service within ten (10) days after written notice thereof from Sears, then Sears shall have the right promptly to correct such interruption or failure of service, in Landlord's name and at Landlord's expense and if Sears shall not be reimbursed for the charges therefor paid by Sears on Landlord's behalf within ten (10) days from the date Sears require payment thereof, then Sears may deduct and retain the cost thereof from rental payments due under the provisions of this Lease.

ARTICLE XXVIII

MERCHANTS' ASSOCIATION

28.1 Sears agrees to join Plaza Las Américas Merchants' Association comprised of merchants occupying space and doing business in the Shopping Center and Sears shall maintain its membership in such Association as long as Sears operates its business in Sears' Facilities following the opening for business of said Facilities and Sears agrees to timely and promptly pay its dues to said Merchants' Association and to cooperate on a fair and equitable basis with such Association in furthering the purposes of the Association as long as such purposes do not violate any governmental statutes, ordinances or laws.

28.2 So long as Sears is a member of the Merchants' Association, Sears shall pay to said Association an amount each lease year equal to the number of square feet of gross floor area within Sears' Facilities multiplied by eighteen ($0.18) cents. Such annual contribution shall be payable in equal monthly installments monthly in advance during the term of this Lease.

28.3 The continuing monthly contributions to the Merchants' Association will be adjusted annually by a percentage equal to the percentage increase or decrease from the base period as reflected by the column for All Principal Cities entitled "All Items" in the Consumer Price Index (hereinafter termed "Index") published by the Bureau of Labor Statistics of the United States Department of Labor. The term "base period" shall refer to the twelve (12) month peri

expiring closest to the date of opening of Sears' Facilities and the increase or decrease shall be computed in relation to the arithmetical average of the numbers included in said column of the Index for such twelve month period. If publication of said Consumer Price Index shall be discontinued, the parties hereto shall thereafter accept comparable statistics on the cost of living as the same shall be computed and published by an agency of the United States as successor to said Consumer Price Index.

28.4 Landlord agrees to make a monthly contribution to said Merchants' Association which, during the term of this Lease and any renewal or extension thereof, shall be in an amount equal to one-fourth (1/4) of the total monthly contribution payable to such Association by all of the other members of such Association.

28.5 Each member (excepting Landlord) of the Association shall be entitled, in the election of directors or other governing members of the Association, to one vote for each square foot of floor space in the premises demised to such tenant, and as to Sears, one vote for each square foot in Sears' Facilities and the by-laws of the Association shall not contain any voting provisions inconsistent with this provision.

28.6 Landlord shall be entitled to a number of votes which shall be in the same proportion to the total number of votes that could be cast by all the members of said Merchants' Association as the contribution then currently being made by Landlord to said Association bears to the total of all contributions required to be made by all members of said Association.

28.7 Landlord covenants and warrants that all leases for stores in the Shopping Center shall require the tenants to be members of the Merchants' Association and to pay the corresponding dues to the Association.

## ARTICLE XXIX

## DEFAULTS

29.1 If Sears shall default in the payment of rentals (minimum or additional rent) as herein provided to be paid by Sears to Landlord, or of any other payments due Landlord to be paid by Sears under the terms, covenants, clauses and conditions of this Lease and if such default shall continue without correction

for a period of ninety (90) days after written notice by Registered Mail from Landlord to Sears requesting Sears to cure such default, then Landlord shall have the right to terminate this Lease by giving a second written notice thereof by Registered Mail to Sears and if Sears does not cure such default within thirty (30) days counted from the date of this second notice, then, in said event, this Lease and the term hereof shall, upon the date specified in a third notice to Sears by Registered Mail, which date shall be not less than ten (10) business days (Sundays and legal holidays excluded) after the date of mailing of this last notice by Landlord to Sears, wholly cease and terminate with the same force and effect as though the date so specified were the date hereinabove set forth as the date of expiration of the original term of this Lease.

The non-payment of any taxes, if permitted by Law, which Sears may be contesting, shall not be deemed to be a default under this Section 29.1.

29.2 In the event of such termination as provided for in subparagraph 29.1 of this Lease, title to Sears' Facilities shall vest in Landlord without any compensation to Sears and Sears shall peacefully surrender Sears' Facilities and the Demised Premises to Landlord and thereupon Landlord may enter said facilities and premises and dispossess Sears by summary proceedings, ejectment or otherwise; it being understood that no demand for the rent and for condition broken and no notice to quit possession, or other notice prescribed by statute shall be necessary to enable Landlord to obtain such possession, and that any right to any such demand and to any notice to quit possession or other statutory notices or pre-requisites are hereby expressly waived by Sears.

29.3 In the event of termination as provided for in subparagraph 29.1 Sears shall pay to Landlord the Minimum Monthly Payments, hereinabove provided, for the remainder of the term of this Lease (less the net proceeds of any reletting), provided that Landlord, in good faith, shall make every reasonable effort to relet the Sears Facilities and the Demised Premises for the maximum rei and term as business conditions prevailing at such time shall permit.

29.4 If Sears shall default in the performance or compliance of any of the covenants, conditions or provisions of this Lease other than as provided in subparagraph 29.1 hereof, and such default shall continue for thirty (30) days after written notice thereof to Sears, then Landlord, at its option, may submit the matter to arbitration as provided in Article XVIII hereinabove.

29.5 In the event Landlord shall default in the performance of, or compliance with, any of the covenants, conditions or provisions of this Lease,

then Sears shall have the right to proceed as follows:

1) If Landlord's default shall be in the performance of work provided in this Lease to be performed by Landlord and which Sears is willing to perform, then Sears shall give Landlord written notice setting forth in detail the work which is required of Landlord and which Sears intends to perform if Landlord fails to do so. Within sixty (60) days after such notice Landlord shall commence and diligently proceed with the work until the same shall have been completed or if the Landlord disputes Sears' claim that such work is to be performed then Landlord shall submit such dispute to arbitration within said sixty (60) days; provided however, in the event Landlord fails to perform the work, or submit the matter to arbitration within said sixty (60) days, Sears shall have the right, at its option, to perform such work and to deduct the cost thereof from the payment due Landlord by Sears pursuant to Article XII or to submit the matter to arbitration under Article XVIII.

2) If Landlord's default shall be in the performance of work which Sears is unwilling to undertake, then, if Landlord fails to commence and proceed diligently to complete such work within sixty (60) days after written notice from Sears, Sears, at its option, may submit the matter to arbitration under Article XVIII.

29.6 If the Landlord's default shall be determined to constitute an eviction of Sears by the arbitration proceedings under Article XVIII, then Sears' withholding of any payment in accordance with Section 29.5, after such determination, shall not be deemed to be a default under Section 29.1 hereof.

29.7 In addition to any other remedies, herein provided, in the event of a breach by any party hereto, of any of the covenants, conditions and agreements in this Lease provided, the agrieved party may seek such injunctive relief as permitted by law, in equity, by statute or otherwise, for such breach.

29.8 No failure by any party hereto to require strict compliance of any covenant, condition or agreement in this Lease, or to exercise any right or remedy for a breach thereof, shall be deemed to be a waiver of any such breacl or default.

29.9 It is mutually agreed by and between Landlord and Tenant that they shall and hereby do subject themselves to the jurisdiction of the courts of the Commonwealth of Puerto Rico in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of said premises, and/or any claim of injury or damage occurring within the Shopping Center.

29.10 (a) In the event of a breach or threatened breach by Sears of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if entry, summary proceedings and other remedies were not herein provided for; mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy in law or in equity, provided however that the use of such other remedy or remedies shall not deprive Sears of any rights or remedies Sears otherwise would have but for the use by Landlord of such other remedy or be inconsistent with the rights of Sears under this Lease.

(b) In the event of a breach or threatened breach by Landlord of any of the covenants or provisions hereof, Sears shall have the right of injunctio and the right to invoke any remedy allowed at law or in equity as if other remed were not herein provided for; mention in this Lease of any particular remedy shal not preclude Sears from any other remedy in law or in equity, provided however that the use of such other remedy or remedies shall not deprive Landlord of any rights or remedies Landlord otherwise would have but for the use by Sears of suc other remedy or be inconsistent with the rights of Landlord under this Lease.

29.11 It is the intent of the parties hereto that all questions, differenc disputes or controversies between the parties hereto should be settled by arbitra tion pursuant to Article XVIII.

29.12 If Sears shall make any assignment for the benefit of creditors or file a voluntary petition in bankruptcy or be by any court adjudicated a bankrupt or take the benefit of any insolvency act or be dissolved pursuant thereto, or if a receiver or trustee of Sears and/or its property shall be appointed in any proceedings other than bankruptcy proceedings, and such appointment, petition for an arrangement or reorganization, if made in proceedings instituted by Sears, shall not be vacated within one hundred twenty (120) days after it has been made, then, in any of said events this Lease and the term hereof shall, upon the date specified in a notice by registered mail, which date shall be not less than ten (10) business days (Sundays and legal holidays excluded) after the date of mailin of such notice by Landlord to Sears, wholly cease and terminate with the same force and effect as though the date so specified were the date hereinabove set forth as the date of the expiration of the original term of this Lease.

In no event, without the express written approval of Landlord, which approval may be granted or withheld at its sole option and discretion, shall this Lease be considered an asset of Sears' estate in bankruptcy (whether in a voluntary or involuntary proceeding) or insolvency proceedings or of any receiver or trustee with respect thereto.



ARTICLE XXX

TAXES

30.1 Sears hereby agrees to pay, when and as the same become due and payable during the term of this Lease, all real estate taxes levied upon Sears' Store and Sears' Automotive Service buildings and Sears shall submit to Landlord within thirty (30) days after such payment, copies of the receipted, paid real estate tax bills or such other evidence of payment thereof as is reasonably satisfactory to Landlord. Provided however:

a) If Sears' Store and Sears' Automotive Service buildings are not taxed as a separate parcel from the rest of the Shopping Center as expanded, Sears covenants and agrees to pay to Landlord, within thirty (30) days from recei of an imposition computation of the amount of real estate taxes for the Sears'

property provided, however, Sears need not pay to Landlord such amount more than thirty (30) days prior to the last day when Landlord may pay such amount and receive any discounts or benefits from such payment. It is understood by the parties hereto that Sears will only be entitled to the discounts and/or benefit provided by law for the early payment of taxes if Sears pays to Landlord or the taxing authorities, as the case may be, such imposition computation within the time limits established in the law for the taxpayers right to receive such discounts and/or benefits. Sears' share of such impositions shall be the amount of real estate taxes due on Sears' Retail Store and Sears' Automotive Service buildings.

b) Sears shall have the right, at its own cost and expense, to initiate and prosecute any proceedings to make Sears' Facilities a separate tax parcel. Landlord shall cooperate with Sears as Sears may reasonably require in connection with such matter.



c) Sears shall have the right, at its own cost and expense, to initiate and prosecute any proceedings permitted by law for the purpose of obtaining abatement or reduction of any impositions assessed against Sears' Retail Store and Sears' Automotive Service buildings, provided that Sears shall, prior to the date such impositions are due and payable, have given such reasonable security as may be demanded in writing by Landlord from Sears to insure payment and to prevent any sale or forfeiture of the Demised Premises or of the tax parcel of which it is a part by reason of such tax assessment or other charge thereon imposed by law. With respect to any tax year entirely or partially included in the term of this Lease, Sears may take such action in the name of Landlord, and Landlord shall cooperate with Sears as Sears may reasonably requ in connection with bringing such proceedings to a successful conclusion; provid however, that Sears shall indemnify and save Landlord harmless from all loss, costs or expenses incurred in connection with such proceedings. Any abatemen or reduction obtained through such proceedings shall be applied first against all costs and expenses, including attorneys' fees incurred in connection with such proceedings, and the balance shall accrue to the benefit of Sears and Landlord



as their interest may appear according to their respective contributions to the taxes involved in any such proceedings.

30.2 Sears hereby agrees to pay, when and as the same become due and payable during the term of this Lease, all real estate taxes levied upon the ground or land occupied by each, the Department Store and the Automotive Service Center (the Demised Premises) which hereinafter in this Lease shall be denominated as the "Land Pads", and Sears shall submit to Landlord within thirty (30) days after such payment, copies of the receipted, paid real estate tax bills or such other evidence of payment thereof as is reasonably satisfactory to Landlord. Provided, however:

a) If the Land Pads are not taxed as a separate tax parcel, Sears covenants and agrees to pay to Landlord, within thirty (30) days from receipt of an imposition computation, the amount so stated therein, provided, however, Sears need not pay to Landlord such amount more than thirty (30) days prior to the last day when Landlord may pay such amount and receive any discounts or benefits from such payment. It is understood by the parties hereto that Sears will only be entitled to the tax discounts and/or benefits provided by law for the early payment of taxes if Sears pays such imposition computation within the time limits established in the law for the taxpayers' right to receive such tax discounts and/or benefits. Sears' share of such imposition shall be the amount of the imposition due on the Land Pads.



b) Sears shall have the right, at its own cost and expense, to initiate and prosecute any proceedings to make the Land Pads a separate tax parcel. Landlord shall cooperate with Sears as Sears may reasonably require in connection with such matter.

c) Sears shall have the right, at its own cost and expense, to initiate and prosecute any proceedings permitted by law for the purpose of obtainin abatement or reduction of any impositions assessed against the Land Pads, provided that Sears shall, prior to the date such impositions are due and payable, have given such reasonable security as may be demanded in writing by Landlord

from Sears to insure payment and to prevent any sale or forfeiture of the Land Pads (Demised Premises), or of the tax parcel of which it is a part, by reason of such tax assessment or other charges, including any penalties and/or interest charges thereon imposed by law. With respect to any tax year entirely or partially included in the term of this Lease, Sears may take such action in the name of Landlord, and Landlord shall cooperate with Sears as Sears may reasonably require in connection with bringing such proceedings to a successful conclusion; provided, however, that Sears shall indemnify and save Landlord harmless from all loss, costs, or expenses incurred in connection with such proceedings. Any abatement or reduction obtained through such proceedings shall be applied first against all costs and expenses, including attorneys' fees incurred in connection with such proceedings and the balance shall accrue to the benefit of Sears and Landlord as their interest may appear according to their respective contributions to the taxes involved in any such proceedings.

30.3 Sears agrees to pay to Landlord a pro-rata share of the real estate taxes levied upon the land devoted to the expansion, to wit, Parcels B and C of the Shopping Center (exclusive of and excepting the Land Pads), during the term of this Lease. Sears' share of said real estate taxes shall be determined and ascertained by a fraction, the numerator of which shall be the gross leasable area in Sears' Facilities and the denominator of which shall be the total gross leasable area in said expansion, excluding any vertical expansion of actually existing buildings, as herein above provided, but including Sears' Facilities and any office building which may be erected within the land on which said expansion shall be built.

30.4 Sears agrees to pay to Landlord a pro-rata share of the real estate taxes levied upon the deck parking building of the Shopping Center expansion, during the term of this Lease. Sears' share of said real estate taxes shall be determined and ascertained by a fraction, the numerator of which shall be the gross leasable area in Sears Facilities and the denominator of which shall be the total gross leasable area of the expansion, as hereinabove provided, has been

completed, including Sears' Facilities, and the gross leasable area of any office building which may be built within the land on which said expansion shall be built, but excluding the gross leasable area of any vertical expansion of presently existing buildings with the exception of the gross leasable area of the projected expansion on top of the existing Building No. 6.

30.5 Sears shall pay the amounts stated in an imposition computation made by Landlord of the payments provided to be paid by Sears to Landlord in Sections 30.3 and 30.4 hereinabove. Said payments shall be made by Sears within thirty (30) days from the receipt of the above mentioned imposition computation, provided Landlord has submitted to Sears a statement showing in detail (i) the total amount of the real estate taxes, (ii) the area upon which said real estate taxes are levied, (iii) the gross leasable area for Sears' Facilities, and (iv) the gross leasable area of the Shopping Center expansion, as set forth, respectively, in Sections 30.3 and 30.4 hereof, provided further, that Sears need not pay to Landlord such amounts more than thirty (30) days prior to the last day when Landlord may pay such amount and receive any discounts or benefits from such payment. It is understood by the parties hereto that Sears will only be entitled to the discounts and/or benefits provided by law for the early payment of taxes if Sears pays such imposition computation within the time limits established in the law for the taxpayers' right to receive such discounts and/or benefit

30.6 In the event Sears shall not agree with Landlord's computations and the parties hereto shall not resolve the differences, then either party hereto shall have the right after thirty (30) days prior written notice to the other party hereto of its intention so to do, to submit the matter for arbitration under Article XVIII hereof.

30.7 In the event the term of this Lease shall not begin on the first day of the fiscal year, the taxes Sears shall be required to pay under the terms of this Lease, shall be apportioned to the date of the commencement of this Lease, as in this Lease provided, and in the event the term of this Lease shall not terminate on the last day of the fiscal year, the taxes Sears shall be required

to pay under the terms of this Lease, shall be apportioned to the date of such termination of this Lease.

## ARTICLE XXXI

## COVENANT OF QUIET ENJOYMENT

31.1 Landlord covenants that Sears, its successors, and such assigns of Sears to whom the assignment of this Lease is permitted, upon paying the rent and all other sums payable by Sears under this Lease, in the manner herein set forth, and upon observing and performing all of the covenants herein contained on its or their part to be observed and performed, shall and may peaceably and quietly hold and enjoy the Demised Premises during the term of this Lease, or any extension thereof, in the manner herein set forth, without disturbance or eviction by Landlord or by any other person or persons lawfully claiming by, from or under Landlord.

## ARTICLE XXXII

## EQUIPMENT AND FIXTURES INSTALLED

32.1 From time to time during the term hereof, or any extended term, Sears may install equipment and fixtures for use in connection with Sears' busir upon the Demised Premises and, upon the installation of any such equipment or fixtures in the Demised Premises by Sears, the same shall remain the property c Sears and at any time during the term hereof, or extension thereof, and upon the termination of this Lease, Sears shall have the right to remove any and all of su equipment and fixtures, provided that such equipment and fixtures were not pe nently attached to Sears' Facilities. In the event such removal shall cause damage to the buildings on the Demised Premises, Sears shall promptly repair s damage in a manner agreeable and acceptable to Landlord.

32.2 Upon the expiration or other termination of this Lease, Landlord may require Sears to remove any or all of such equipment and fixtures, at Sears expense, and Sears shall promptly repair any damage to the buildings caused b such removal.

ARTICLE XXXIII

OPTION TO BUY AND LEASE BACK

33.1 In consideration of the mutual agreements herein contained, Sears hereby grants to Landlord the exclusive right and option to purchase Sears' Facilities upon the Demised Premises upon the following terms and conditions:

1) Said option shall be valid for and exercisable only within a period of five (5) years, said period to commence effective upon that certain date upon which Sears shall open Sears' Facilities to the public for business; and

2) Landlord shall exercise said option to purchase upon giving to Sears at least six (6) months prior written notice by certified mail, return receipt requested and postage prepaid.

3) The purchase price of Sears' Facilities upon the Demised Premises shall be the total cost of construction of said Sears' Facilities including but not limited to:

i) cost of material;

ii) cost of labor;

iii) architectural drawings;

iv) title insurance policy;

v) all fees and permits;

vi) the sum of Fifty Thousand Dollars ($50,000.00) paid to Landlord as provided in Article VIII above; and

vii) Attorneys fees (both that of Sears' House Counsel as well as attorneys in private practice),

all as shown in the books, records, invoices and statements of Sears, less straight line depreciation. It is hereby expressly understood and agreed that Sears shall have the right to take straight line depreciation, until the date of closing in the event Landlord shall exercise the option to purchase in this Article granted to Landlord.

4) Upon the exercise of said option Landlord and Sears shall ente into a formal Purchase and Sale Contract containing the customary provisions

for the sale of real property in the City of San Juan, Commonwealth of Puerto Rico.

5) Landlord shall pay, by certified check, the purchase price under the terms and conditions agreed by the parties and as ascertained and definitively established in accordance with subparagraph 3) above, at the closing of the purchase which shall take place not later than thirty (30) days after such Purchase and Sale Contract shall have been executed by Sears and Landlord.

6) At closing, as aforesaid, Sears shall convey good and marketabl title, free and clear of all liens and encumbrances, except as in this Article provided, by Sears Limited Warrant Deed.

7) No broker shall be involved and no brokers' commissions shall be payable.

33.2 In the event Landlord shall exercise the option and shall purchase Sears' Facilities, as aforesaid, such sale shall be expressly subject to a lease-back of Sears' Facilities to Sears in the form of a lease in which shall be incorpo rated all of the terms, covenants and conditions contained in this Lease except (i) Article VI of this Lease captioned Rent and (ii) except those provisions relati to the construction of Sears' Facilities and the Shopping Center expansion but including a new agreement on Rent and such other provisions as shall be mutually agreed upon by Landlord and Sears; provided, however, that if the parties hereto shall fail to agree on the new rent and all of the other terms, covenants and cond tions of the Lease-Back Agreement simultaneously with the execution of a formal Purchase and Sale Contract, as provided in subparagraph (4) of Article 33.1, then this option shall terminate and shall have no further force or effect.

ARTICLE XXXIV

ESTOPPEL CERTIFICATE

34.1 Upon the request of Landlord or any holders of a mortgage against the fee of the Demised Premises, Sears shall from time to time deliver to Landlor or such mortgagee, within thirty (30) days from the date of such a written reques a certificate duly executed and acknowledged by Sears, in form for recording,

certifying that this Lease is (i) valid and subsisting, (ii) in full force and effect, (iii) that Sears is not in default in the payment of rentals and (iv) that Landlord is not in default under any of the terms of this Lease.

ARTICLE XXXV

OPENING CLAUSE

35.1 It is the intent of the parties to actually establish the date of October 12, 1978 as a tentative Opening Date for Landlord's Improvements and for Sears Facilities on the demised premises. The parties, prior to September 1, 1977, shall review and confirm in writing the definitive Opening Date. If a date other than October 12, 1978 is established for the opening, such date shall not be later than March 1, 1979 nor shall the date fall between November 1, 1978 and January 30, 1979; provided, however, that in the event only one party can attain the date of October 12, 1978 for its opening, then said party shall have the option either to open on said date or to postpone its opening to the re-scheduled Opening Date or to any other date prior to March 1, 1979.

ARTICLE XXXVI

INVALIDITY OF ANY PROVISIONS

36.1 If any term or provisions of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalidated or unenforceable, the remainder of this Lease and the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provisions of this Lease shall be valid and shall be enforceable to the fullest extent permitted by law.

ARTICLE XXXVII

RELATIONSHIP OF THE PARTIES

37.1 Nothing contained in this Lease shall be construed to make Landlord and Sears partners on joint ventures or to render any of said party liable for the debts or obligations of the other, except as in this Lease expressly provided.

ARTICLE XXXVIII

EXECUTION OF THIS LEASE

38.1 This Lease shall not be binding upon the parties hereto until it has been executed on behalf of the parties, by one or more of its corporate officers or duly authorized representatives, and satisfactory evidence of such authority shall

be delivered by each of the parties hereto to the other. No act of omission of any employee or agent of any of the parties shall alter, change or modify any of the provisions hereof and any alteration, change or modification hereof, in order to become effective, shall be made by written instrument or endorsed hereon and, in each such instance, executed on behalf of each of the parties hereto as aforesaid.

38.2 Each of the Exhibits mentioned in this Lease shall be signed by the duly authorized officers, agents or attorneys of the parties hereto and are incorporated herein by reference and made a part hereof as fully as if set forth in full herein.

ARTICLE XXXIX

NOTICES

39.1 Any notice, demand, request, consent or approval which any party is required or desires to give or make hereunder shall be in writing. A copy shall be provided for each of the parties hereto and the original and all copies shall be sent by United States Registered Mail or Certified Mail, Return Receipt Requested postage pre-paid, and addressed as follows:

In the case of Landlord:

PLAZA LAS AMERICAS, INC.
P.O. Box 758
Hato Rey, Puerto Rico 00919

Attention: Mr. Jerónimo Fonalledas, President

with a copy to:

PLAZA LAS AMERICAS, INC.
G.P.O. Box 3268
San Juan, Puerto Rico 00936

Attention: Mr. Joseph Martin, Manager

In the case of Sears:

SEARS, ROEBUCK DE PUERTO RICO, INC.
G.P.O. Box 71204
San Juan, Puerto Rico 00936

Attention: Mr. Robert B. Gibson, President

with a copy to:

SEARS, ROEBUCK AND CO.
Sears Tower
Chicago, Illinois 60684

Attention: Mr. William J. Scalet
Department 824-INT.

Each party shall have the right to designate a different address or additional addresses by notice similarly given and each notice, demand, request, consent or approval shall be deemed to have been given on the date the same was deposit in the United States Mail as Registered or Certified Mail with postage pre-paid.

ARTICLE XL

MISCELLANEOUS

40.1 All of the headings and the numbering of the Articles in this Lease are for convenience of reference only and shall not define or limit the scope and content of this Lease or in any way affect its provisions.

40.2 This Lease shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

40.3 Landlord acknowledges that Sears may wish to present this Lease, at Sears' sole expense, for recordation in the corresponding Registry of the Property of the Commonwealth of Puerto Rico. Landlord agrees that it will appear in, execute and deliver the necessary documents in order that Sears may, if Sears wishes to, record this Lease in the corresponding Registry of the Property.

40.4 This Lease may be executed in several counterparts, each of which shall be deemed an original and all such counterparts shall constitute one and the same instrument.

40.5 This Lease embodies the entire agreement and understanding between the parties and supersedes all prior negotiations, agreements and understandings.

IN WITNESS WHEREOF, the parties hereto have duly executed this instrument, as of the date and year first above written.

PLAZA LAS AMERICAS, INC.

By: ______________________

SEARS, ROEBUCK DE PUERTO RICO, INC.

By: ______________________

Affidavit Number: 8497

At San Juan, Puerto Rico, on this 27th day of April 1977, before me, a Notary Public duly authorized in the Commonwealth of Puerto Rico to take acknowledgements, personally appeared Mr. JAIME FONALLEDAS, of legal age, married, executive and resident of Guaynabo, Puerto Rico, to me known and known to me to be the Vice-President Treasurer of PLAZA LAS AMERICAS, INC., the corporation described in the foregoing instrument as LANDLORD; and personally also appeared Mr. ROBERT B. GIBSON, of legal age, married, executive and resident of San Juan, Puerto Rico,

to me known and known to me to be the President of SEARS, ROEBUCK DE PUERTO RICO, INC., the corporation described in the foregoing instrument as SEARS, and both parties acknowledged that as such officers, being authorized so to do, they executed the foregoing instrument on behalf of their respective corporations by subscribing the names of such Corporations by themselves as such officers, and caused the corporate seals of said Corporations to be affixed thereto, as their free and voluntary acts and as the free and voluntary acts of said corporations, for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY PUBLIC

My commission is for life.

# FIRST AMENDMENT TO GROUND LEASE PLAZA LAS AMERICAS SHOPPING CENTER

THIS AGREEMENT, made as of the 27th day of March, 1979, between PLAZA LAS AMERICAS, INC., a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with offices at Plaza Las Américas Shopping Center, Franklin D. Roosevelt Avenue, Hato Rey, Puerto Rico, represented by its Vice President-Treasurer, Mr. Jaime Fonalledas Córdova, married, who is of legal áge, executive and resident of Guaynabo, Puerto Rico, hereinafter called "Landlord", and SEARS, ROEBUCK DE PUERTO RICO, INC., a Delaware corporation, with principal offices in San Juan, Puerto Rico, located at Muñoz Rivera and Coll y Toste, duly qualified to do business in Puerto Rico, and herein represented by its President, Mr. Robert B. Gibson, of legal age, married, executive and resident of San Juan, Puerto Rico, hereinafter called "Tenant" or "Sears".

The authority of the appearing parties to act herein shall be demonstrated whenever and wherever required, and they state:

WHEREAS, the above parties executed a certain Ground Lease dated April 27, 1977 (The "Lease") relating to the leasing, expansion, development and operation of the Plaza Las Américas Shopping Center in Hato Rey, Puerto Rico, which Lease is incorporated by reference herein and made a part hereof; and

WHEREAS, the parties desire to amend the Lease, in the manner hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing, the mutual agreements herein contained and other good and valuable consideration to each of the parties hereto paid to the other, the receipt and sufficiency whereof is acknowledged, it is mutually covenanted and agreed as follows:

1. Article XX, Section 20.4 of the Lease is amended by deleting therefrom the following:

> "Landlord agrees that, at the expiration of the first twenty-five (25) years of the term hereof, Landlord will extend its covenant to operate a shopping center for so long a period of time (but in no event in excess of the 40-year term of this Lease or of any extensions thereof) as Sears and either J.C. Penney or González Padín continue to operate a department store in said shopping center. Provided, however, that in the event no other department store except Sears, agrees to operate a department store in the shopping center for a term longer than twenty-five (25) years after Sears Opening Date and Landlord wishes to divest itself of the shopping center or ceases its operation, then Landlord, at Sears' option shall purchase Sears' Facilities at Sears book value, determined and ascertained at such time following the straight line method of depreciation with an asset life of forty (40) years."

and substituting therefore the following:

> "Landlord agrees that, at the expiration of the firs twenty-five (25) years of the term hereof, Landlord will extend its covenant to operate a shopping cente

JUAN M. CASSE BALLESTEROS PUERTO RICO ABOGADO - NOTARIO

for so long a period of time (  in no event in excess of the 40-year term of this Lease or of any extensions thereof) as Sears and either J. C. Penney or González Padín continue to operate a department store in said shopping center. Provided, however, that in the event no other department store except Sears, agrees to operate a department store in the shopping center for a term longer than twenty-five (25) years after Sears Opening Date and: (A) Landlord wishes to cease the operation of the Shopping Center, then Landlord, at Sears' option, shall purchase Sears' Facilities at Sears book value, said book value determined by generally accepted accounting practices at the time Sears exercises the option hereinbefore provided, and further determined and ascertained at such time following the straight line method of depreciation with an asset life of forty (40) years; and/or: (B) Landlord wishes to divest itself of the Shopping Center, then Landlord shall promptly give Sears written notice of Landlord's intention to divest itself of the Shopping Center, and provide Sears, at Sears request, with all pertinent and necessary information in order to permit Sears, at Sears election, to make an offer promptly to purchase the Shopping Center."

2. Article XXXIX, Section 39.1 of the Lease is amended by adding thereto the following:

"Furthermore, Sears also agrees to send a written copy of any such notice, demand, request, consent or approval to the holder(s) of any mortgage against the fee of the demised premises, at such holder(s) last address furnished Sears by Landlord."

Except as modified herein, the parties ratify and affirm the Lease dated April 27, 1977.

IN WITNESS WHEREOF, the parties hereto have executed this FIRST AMENDMENT TO GROUND LEASE the day and year first above written.

PLAZA LAS AMERICAS, INC.

By ______________________

SEARS, ROEBUCK DE PUERTO RICO, I

By ______________________

JUAN M. CASSE BALLESTEROS
PUERTO RICO
ABOGADO - NOTARIO

Affidavit Number 642(cf-g)

At San Juan, Puerto Rico, on this 27th day of March 1979 before me, a Notary Public duly authorized in the Commonwealt of Puerto Rico to take acknowledgements, personally appeared MR. JAIME FONALLEDAS, of legal age, married, executive and resident of Guaynabo, Puerto Rico, to me known and known to me to be the Vice-President Treasurer of PLAZA LAS AMERICAS, INC., the corporation described in the foregoing instrument as LANDLORD; and personally also appeared MR. ROBERT B. GIBS( of legal age, married, executive and resident of San Juan,

Puerto Rico, to me known and known to me to be the President of SEARS, ROEBUCK DE PUERTO RICO, INC., the corporation described in the foregoing instrument as SEARS, and both parties acknowledged that as such officers, being authorized so to do, they executed the foregoing instrument on behalf of their respective corporations by subscribing the names of such Corporations by themselves as such officers, and caused the corporate seals of said Corporations to be affixed thereto, as their free and voluntary acts and as the free and voluntary acts of said corporations, for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY PUBLIC








## SECOND AMENDMENT TO GROUND LEASE

**THIS SECOND AMENDMENT TO GROUND LEASE** is made as of this 16th day of June, 1995, between **PLAZA LAS AMERICAS, INC.,** a corporation organized and existing under the laws of the Commonwealth of Puerto Rico ("Landlord"), and **SEARS, ROEBUCK DE PUERTO RICO, INC.,** a Delaware corporation ("Tenant").

## RECITALS:

**A.** Landlord and Tenant entered into a Ground Lease dated April 27, 1977 which has been amended by a First Amendment to Ground Lease dated March 27, 1979 (collectively, the "Lease") for the lease by Tenant of certain property located in Plaza Las Americas Shopping Center in Hato Rey, Puerto Rico, which property is more specifically described in the Lease (the "Demised Premises").

**B.** Landlord and Tenant desire to amend the Lease as provided herein to allow Tenant to sublease its auto center to Western Auto of Puerto Rico, Inc. ("Western Auto"), a wholly owned subsidiary of Sears, Roebuck and Co., parent company of Tenant.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, the parties agree as follows:

1. Notwithstanding anything in the Lease to the contrary, the parties agree that Tenant may sublease its auto center to Western Auto.

2. Tenant agrees not to alter the existing footprint of the auto center.

3. The parties agree that the sign elevations and exterior elevations attached hereto as Exhibit A are hereby approved.

4. Tenant acknowledges that it has information regarding the possibility of the condemnation by certain authorities of a portion of the auto center building. The parties agree that any condemnation award shall be governed by the condemnation provision contained in Article XXV of the Lease, except that Tenant's portion of any award shall not be increased by the sublease contemplated herein, any investment made in connection

therewith, or any increase in market value as a result of the sublease permitted hereunder.

**6.** Landlord hereby approves the remodeling of the interior of the auto center in preparation for reopening the auto center as a Western Auto store.

**7.** The Lease, except as amended herein, is in all other respects fully ratified and confirmed.

**8.** Except as defined herein, all capitalized items used in this Second Amendment to Lease shall have the meanings ascribed to such terms in the Lease.

**9.** Each party executing this Second Amendment to Lease represents and warrants that he/she has the power and authority to execute this document on behalf of his/her respective party.

**IN WITNESS WHEREOF**, the parties have executed this Second Amendment to Lease as of the day and year first above written.

**ATTEST OR WITNESS:**

By: ______________________

**LANDLORD:**

**PLAZA LAS AMERICAS, INC.**

By: ______________________
Jaime Fonalledas, Jr.
President

**ATTEST:**

By: ______________________

**TENANT:**

**SEARS, ROEBUCK DE PUERTO RICO, INC.**

By: ______________________
Edward R. Cameron
President