

# PLAZA LAS AMERICAS, INC.

PO BOX 363268 SAN JUAN PR 00936-3268 • (809) 767-1525 • FAX (809) 766-4825

March 1, 1996

Sears Roebuck de Puerto Rico, Inc.
P.O. Box 3670302
San Juan, Puerto Rico  00936-7302

Gentlemen:

This will confirm the understanding on certain points related to the lease signed between you and Sears on this date.

Those points are as follows:

1.  With respect to mid-year Rent Adjustments made under Section 7.04, in the event Landlord elects to adjust at any time during the year other than annually, Landlord will notify Sears by separate letter or highlight for Sears on the monthly bill the fact that the bill contains an adjustment. Sears will have up to sixty (60) days from the date of the notification of adjustment to modify its payment system to accommodate the new monthly payment and to reimburse Landlord for the difference between the previous monthly payment amount and the new monthly payment amount.

2.  Landlord acknowledges that the stairway located adjacent to the Leased Premises is a common stairway and that Sears has no obligation to place an alarm system on the doors to or from the stairway.

3.  Landlord has agreed that Sears may use the same trash removal service for the Leased Premises as Sears uses for its main store and may pay for such service in lieu of making the payment contemplated in Section 1.25. All other requirements regarding handling of trash remain in effect.

4.  With respect to §10.05(g), Landlord has covenanted with Pueblo International, Inc. that it will not permit during the term of the Pueblo lease permit "the operation of a supermarket, grocery or convenience store within (i) the adjacent shopping center presently known as Plaza las Americas (as such shopping center may be expanded in the future) and (ii) the Service Mall (other than the Demised Premises)."

Very truly yours,

Plaza las Americas, Inc.

By: _____

T:\KUP\PLA\SEARS\0L030595.A

*Es una felicidad comprar en Plaza Las Americas*

**Exhibit "B"**

## PLAZA LAS AMERICAS
### HATO REY, PUERTO RICO

### SHOPPING CENTER RETAIL LEASE

Between

## PLAZA LAS AMERICAS, INC.,

as Landlord,

and

## SEARS, ROEBUCK DE PUERTO RICO, INC.

as Tenant

Dated MARCH 1, 1996

I:\HRF\PLA\SEARS\030196.A

Shopping Center Retail Lease
TABLE OF CONTENTS

**ARTICLE 1 FUNDAMENTAL LEASE PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.01    **Landlord** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.02    **Landlord's Address** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.03    **Tenant** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.04    **Federal Employee Identification Number (FEIN)** . . . . . . . . . . . . . . . . 1
    1.05    **Tenant's Trade Name** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.06    **Tenant's Physical Address** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.07    **Closing Date/Delivery Date** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.08    **Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.09    **Leased Premises** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.10    **Gross Leasable Area** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.11    **Permitted Uses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.12    **Tenant's Construction Period** . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.13    **Lease Term** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.14    **Lease Year/Partial Lease Year** . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.15    **Commencement Date** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.16    **Expiration Date** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.17    **Fixed Annual Minimum Rent** . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.18    **Percentage Rent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.19    **Percentage Rent Periods** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.20    **Tenant's Proportionate Share** . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.21    **Sprinkler Charge** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.22    **Cooling Service Charge** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.23    **Taxes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.24    **Insurance Charges** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.25    **Common Dining Area Charges** . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.26    **Advance Six Months Tax Payment** . . . . . . . . . . . . . . . . . . . . . . . 2
    1.27    **Pre-Opening/Reopening Promotional Charge** . . . . . . . . . . . . . . . . . 2
    1.28    **Grand or Expansion Opening Contribution Charge** . . . . . . . . . . . . . . 2
    1.29    **Radius Restriction Limit** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.30    **Security Deposit** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.31    **Term for Rent Adjustment** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.32    **Merchants Association or Promotional Fund Dues** . . . . . . . . . . . . . . 3
    1.33    **Guarantor(s)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.34    **One-Time Payment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.35    **Effect of Reference to a Defined Term** . . . . . . . . . . . . . . . . . . . . 3
    1.36    **Exhibits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ARTICLE 2 THE DEMISE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.01    **Shopping Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.02    **Leased Premises** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARTICLE 3 TERM AND POSSESSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**ARTICLE 4 FIXED ANNUAL MINIMUM RENT AND PERCENTAGE RENT** . . . . . . . . . 5
    4.01    **Fixed Annual Minimum Rent** . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    4.02    **Percentage Rent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    4.03    **Payment of Percentage Rent** . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    4.04    **Net Sales; Recording of Transactions** . . . . . . . . . . . . . . . . . . . . . 5
    4.05    **Statements of Net Sales** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    4.06    **Books and Records** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.07    **Landlord's Right to Audit Tenant's Books and Records** . . . . . . . . . . . . 8
    4.08    **Manner of Payment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**ARTICLE 5 COMMON AREAS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    5.01    **Use of Common Areas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    5.02    **Management and Operation of Common Areas** . . . . . . . . . . . . . . . . 8
    5.03    **Employee Parking Areas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    5.04    **Changes and Additions to Shopping Center** . . . . . . . . . . . . . . . . . 9
    5.05    **Roof and Walls** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9



**ARTICLE 6  PROMOTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
6.01  Participation of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
6.02  Promotional Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**ARTICLE 7  RENT ADJUSTMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
7.01  Obligation to Pay Rent Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . 10
7.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
7.03  Computation of Rent Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
7.04  Payments of Rent Adjustments; Projections . . . . . . . . . . . . . . . . . . . . . 12
7.05  Readjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
7.06  Proration and Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
7.07  Tenant's Obligation to Pay Personal Taxes or Other Taxes . . . . . . . . . . . . 14
7.08  Direct Tax Collections for the Government . . . . . . . . . . . . . . . . . . . . . . 14
7.09  Installment Payment of Assessments . . . . . . . . . . . . . . . . . . . . . . . . . 14
7.10  Contest Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
7.11  Tax Disputes Between Landlord and Tenant . . . . . . . . . . . . . . . . . . . . . 14

**ARTICLE 8  CONSTRUCTION OF IMPROVEMENTS** . . . . . . . . . . . . . . . . . . . . . 14
8.01  Construction by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
8.02  Construction by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
8.03  Opening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
8.04  Processing Cost. (Intentionally omitted) . . . . . . . . . . . . . . . . . . . . . . . 15

**ARTICLE 9  MAINTENANCE AND REPAIR OF LEASED PREMISES** . . . . . . . . . . . 15
9.01  Maintenance and Repairs by Landlord . . . . . . . . . . . . . . . . . . . . . . . . 15
9.02  Maintenance and Repairs by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . 16
9.03  Governmental Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**ARTICLE 10  USE AND OPERATION OF LEASED PREMISES** . . . . . . . . . . . . . . . 17
10.01  Permitted Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.02  Continuous Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.03  Trade Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.04  Radius Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.05  Use Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10.06  Cleaning  [Intentionally Omitted] . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10.07  Inventory, Staff and Fixtures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10.08  Displays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10.09  Air Conditioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10.10  Disturbances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10.11  Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
10.12  Deliveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
10.13  Trash Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
10.14  Compliance with Laws and Insurance Requirements . . . . . . . . . . . . . . . 19
10.15  Tenant Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
10.16  Landlord's Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**ARTICLE 11  UTILITIES AND OTHER SERVICES** . . . . . . . . . . . . . . . . . . . . . . 20
11.01  Landlord's Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
11.02  Tenant's Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
11.03  Air Conditioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
11.04  Regulations Regarding Utilities Services . . . . . . . . . . . . . . . . . . . . . . 22
11.05  Cleaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**ARTICLE 12  DAMAGE OR DESTRUCTION BY CASUALTY** . . . . . . . . . . . . . . . . 22
12.01  Damage or Destruction By Casualty . . . . . . . . . . . . . . . . . . . . . . . . . 22
12.02  Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
12.03  Abatement of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**ARTICLE 13  CONDEMNATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
13.01  Total Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
13.02  Partial Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
13.03  Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
13.04  Common Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24





ARTICLE 14 WAIVER OF CERTAIN CLAIMS; INDEMNITY BY
TENANT [Intentionally Omitted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE 15 BANKRUPTCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
15.01 Conditions to the Assumption and Assignment of the Lease under Chapter 7 of the
Bankruptcy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
15.02 Conditions to the Assumption of the Lease in Bankruptcy Proceedings . . . . . 24
15.03 Landlord's Option to Terminate Upon Subsequent Bankruptcy of Tenant . . . 25
15.04 Conditions to the Assignment of the Lease in Bankruptcy Proceedings . . . . . 25
15.05 Use and Occupancy Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
15.06 Tenant's Interest Not Transferable by Virtue of State Insolvency Law Without
Landlord's Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
15.07 Landlord's Option to Terminate Upon Insolvency of Tenant or Guarantor Under
State Insolvency Law or Upon Insolvency of Guarantor Under Federal Bankruptcy
Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
15.08 Regulated Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
15.09 Bankruptcy Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE 16 DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
16.01 Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
16.02 Rights and Remedies of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . 27
16.03 Right to Re-Enter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
16.04 Right to Relet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
16.05 Tenant to Remain Liable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
16.06 Current and Final Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
16.07 Final Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
16.08 Failure to Operate the Leased Premises Continuously [Intentionally Omitted] . . 29
16.09 Removal of Personal Property . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
16.10 Rights Cumulative, Non-Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . 29
16.11 Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
16.12 Calculation of Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . . 29
16.13 Default Under Other Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
16.14 Default by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE 17 SECURITY DEPOSIT
[Intentionally Omitted] . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE 18 HOLDING OVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE 19 QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE 20 SUBORDINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
20.01 Subordination and Non-Disturbance . . . . . . . . . . . . . . . . . . . . . . . . 31
20.02 Liability of Holder of Mortgage; Attornment . . . . . . . . . . . . . . . . . . . 31
20.03 Modification Required by Mortgagee . . . . . . . . . . . . . . . . . . . . . . . . 31
20.04 Recording of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
20.05 Assignment by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE 21 ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . 32
21.01 Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
21.02 Change of Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
21.03 Additional Rent for Assignment or Sublet . . . . . . . . . . . . . . . . . . . . . 32
21.04 "As-Built" Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
21.05 Assignment Upon Expiration of Operating Covenant; Recapture . . . . . . . . . 33

ARTICLE 22 MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
22.01 Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
22.02 Modifications in Writing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
22.03 No Option; Irrevocable Offer . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
22.04 Definition of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
22.05 Definition of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
22.06 Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
22.07 Default Rate of Interest; Late Charge . . . . . . . . . . . . . . . . . . . . . . . 34
22.08 Relocation [Intentionally Omitted] . . . . . . . . . . . . . . . . . . . . . . . . . 34
22.09 Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

22.10   Satisfaction of Requirements .................................... 34
22.11   Entire Agreement .............................................. 34
22.12   Force Majeure ................................................. 34
22.13   Security Program .............................................. 34
22.14   Estoppel Certificate ........................................... 34
22.15   Right of Landlord to Perform Covenants ......................... 34
22.16   [Intentionally Omitted] ......................................... 34
22.17   Counterparts .................................................. 34
22.18   No Joint Venture .............................................. 35
22.19   Partial Invalidity ............................................. 35
22.20   Survival ...................................................... 35
22.21   Time of Essence .............................................. 35
22.22   Accord and Satisfaction ....................................... 35
22.23   Entire Agreement ............................................. 35
22.24   Recordation ................................................... 35
22.25   Governing Law ............................................... 35
22.26   Waiver of Trial by Jury; Tenant not to Counterclaim ............ 35
22.27   Mechanics' Liens ............................................. 35
22.28   Construction on Adjacent Leased Premises ...................... 36
22.29   Net Lease .................................................... 36
22.30   Notices ...................................................... 36
22.31   Nonwaiver ................................................... 36
22.32   Tenant - Corporation or Partnership ........................... 36
22.33   Real Estate Brokers .......................................... 37
22.34   Title and Covenant Against Liens .............................. 37
22.35   Attornment ................................................... 37
22.36   Financial Statements .......................................... 37
22.37   Disabilities Act ............................................... 37

ARTICLE 23   RULES AND REGULATIONS .................................. 37

ARTICLE 24   RETURN OF LEASED PREMISES ............................. 38
24.01   Surrender of Possession ....................................... 38
24.02   Installations and Additions .................................... 38
24.03   Trade Fixtures and Personal Property .......................... 38
24.04   Survival ...................................................... 38
24.05   Tenant's Obligations Upon Termination ......................... 38

ARTICLE 25   RIGHTS RESERVED TO LANDLORD .......................... 38
25.01   Rights Reserved to Landlord ................................... 38
25.02   Use of Roof, Walls and Land .................................. 40

ARTICLE 26   ALTERATIONS ............................................ 40

ARTICLE 27   MORTGAGEE PROTECTION ................................. 40

ARTICLE 28   SUBROGATION, INDEMNITY AND INSURANCE ................ 41
28.01   Waiver of Subrogation; Release and Waiver ..................... 41
28.02   Tenant's Insurance ............................................ 41
28.03   Certificates of Insurance ...................................... 42
28.04   Compliance with Requirements ................................. 42
28.05   Landlord's Insurance .......................................... 42
28.06   Tenant's Insurance Charge ..................................... 42
28.07   Tenant's Obligation to Pay Any Increase in Insurance Premiums .. 43
28.08   Hold Harmless ................................................ 43
28.09   Review of Coverages .......................................... 43
28.10   Primary/Excess Coverage ...................................... 43
28.11   Tenant's Right to Self-Insure .................................. 43

ARTICLE 29   HAZARDOUS SUBSTANCES ................................. 44
29.01   Defined Terms ................................................ 44
29.02   Tenant's Obligations With Respect to Environmental Matters ..... 45
29.03   Copies of Notices ............................................. 45
29.04   Tests and Reports. ............................................ 45
29.05   Tenant's Obligation to Respond ................................ 46
29.06   Indemnification ............................................... 46





## ARTICLE 1 - FUNDAMENTAL LEASE PROVISIONS

The following sets forth basic data hereinafter referred to in this Lease and, where appropriate, constitutes definitions of the terms hereinafter listed:

1.01    **LANDLORD:**  Plaza Las Américas, Inc.

1.02    **LANDLORD'S ADDRESS:** P.O. Box 363268, San Juan, Puerto Rico, 00936-3268.

1.03    **TENANT:** Sears, Roebuck de Puerto Rico, Inc.

1.04    **FEDERAL EMPLOYEE IDENTIFICATION NUMBER (FEIN):** 66-02333626

1.05    **TENANT'S TRADE NAMES:**  (a) Sears Home Improvements and
                                                    (b) Sears Brand Central

1.06    (a)    **TENANT'S PHYSICAL ADDRESS:**  Sears, Roebuck de Puerto Rico, Inc.; P.O. Box 3670302; San Juan, Puerto Rico  00936-7302
          (b)    **COPIES TO:**  Sears, Roebuck and Co.; 3333 Beverly Road; Hoffman Estates, Illinois 60179;  Attn:  Vice President Real Estate, Department 824RE
                        Sears, Roebuck and Co.; 3333 Beverly Road; Hoffman Estates, Illinois 60179;  Attn:  Assistant General Counsel, Real Estate, Department 766
                        Sears, Roebuck de Puerto Rico, Inc.; El Mundo Building, Suite 200; 383 Franklin D. Roosevelt Avenue; Hato Rey, Puerto Rico  00918

1.07    (a) **CLOSING DATE:** March 1, 1996
          (b) **DELIVERY DATE:** April 1, 1996

1.08    **CENTER:**  The Shopping Center commonly known as Plaza Las Américas located at Hato Rey, Puerto Rico.

1.09    **LEASED PREMISES:** Store Nos. 009 and No. 199 of the Center, as shown on Exhibit A attached hereto and made a part hereof.

1.10    **GROSS LEASABLE AREA:**  Approximately Forty-Nine Thousand Five Hundred (49,500) Square Feet.

1.11    **PERMITTED USES:** Solely to be used as a Sears Home Improvements department and a Sears Brand Central appliance department, which departments shall be consistent in content with Sears Home Improvements departments (carrying paint, hardware, lawn and garden, and other home improvement-related items) and Sears Brand Central appliance departments (carrying appliances and other appliance-related items) similar in content to those departments located in Sears, Roebuck and Co. stores in the United States and Puerto Rico at the time of opening.

No more than twenty percent (20%) of the Leased Premises shall be used for non-selling space.

1.12    **TENANT'S CONSTRUCTION PERIOD:**  One Hundred Fifty (150) days after Landlord's delivery of possession [Section 1.07(b)] of the Leased Premises to Tenant.

1.13    **LEASE TERM:**  From the date of execution of this Lease through February 11, 2019, with one (1) option to renew for a ten (10) year term upon one (1) year's prior written notice by Tenant to Landlord of such renewal, but only if Tenant has previously extended the term of that certain Ground Lease between Landlord and Tenant dated as of April 27, 1977 (the "Ground Lease"), as provided in Section 1.3 of the Ground Lease.

1.14    **LEASE YEAR/PARTIAL LEASE YEAR:**  "Lease Year" shall mean the twelve (12) month period commencing on the first day of July next following the Commencement Date and each succeeding twelve (12) month period commencing on July 1 of each calendar year thereafter. "Partial Lease Year" shall mean any portion of the Term which is less than a Lease Year, e.g., from the Commencement Date through the following June 30. If at any time during the Term, the commencement date of the real estate tax year for the Center shall be changed from July 1, the Lease Year shall simultaneously be changed accordingly and all necessary adjustments to reflect such change of Lease Year

1

shall be made between Landlord and Tenant.

1.15   **COMMENCEMENT DATE:** The date of execution of this Lease.

1.16   **EXPIRATION DATE:** February 11, 2019

1.17   **FIXED ANNUAL MINIMUM RENT:** From the earlier to occur of (a) the date on which Tenant opens the Leased Premises for business or (b) one hundred fifty (150) days after the date of Landlord's delivery of possession of the Leased Premises to Tenant through the Lease Term, plus any Partial Lease Year, if any, and throughout the renewal option term, in an amount of Nine Hundred Ninety Thousand Dollars ($990,000.00) per annum. The Fixed Annual Minimum Rent is based on a rate of Twenty Dollars ($20.00) per square foot and a Gross Leasable Area of approximately 49,500 square feet. The Fixed Annual Minimum Rent and all other charges shall be adjusted in accordance with Landlord's architects' certification of the gross leasable area of the Leased Premises, which certification shall be conclusive.

1.18   **PERCENTAGE RENT:** At the rate of three and one-half percent (3.5%) of all Net Sales transacted between $28,433,714.00 and $33,433,714.00 and two percent (2%) of all Net Sales transacted in excess of $33,433,714.00, as set forth in Section 4.02.

1.19   **PERCENTAGE RENT PERIODS:** Each Lease Year and Partial Lease Year, as set forth in Section 4.03.

1.20   **TENANT'S PROPORTIONATE SHARE:** As defined in 7.02(g) hereof.



1.21   **SPRINKLER CHARGE:** Initially estimated to be at a cost of Ten Cents ($.10) per square foot, which equals Four Thousand Nine Hundred Fifty Dollars ($4,950.00) per annum, as adjusted from time to time, as provided in Section 11.01, plus the proportionate share of the annual charge for sprinkler water service, which initially is estimated at a cost of Two Cents ($.02) per square foot, which equals Nine Hundred Ninety Dollars ($990.00), as may be adjusted from time to time, both amounts herein constituting the Sprinkler Charge.

1.22   **COOLING SERVICE CHARGE:** Initially estimated to be at a cost of Three Dollars and Forty Cents ($3.40) per square foot, which equals One Hundred Sixty Eight Thousand Three Hundred Dollars ($168,300.00) per annum, as provided in Section 11.03; provided, however, that for any year, Tenant shall not be required to pay as the Cooling Service Charge an amount that is greater than one hundred two percent (102%) of the highest amount owed by Tenant for any prior year.

1.23   **TAXES:** Pro-rata, initially estimated to be One Dollar and Thirty-Five Cents ($1.35) per square foot, which equals Sixty-Six Thousand Eight Hundred Twenty-Five Dollars ($66,825.00) per annum, as adjusted from time to time, as provided in Section 7.03.
**COMMON AREA MAINTENANCE:** Pro-rata, initially estimated to be Six Dollars and Twelve Cents ($6.12) per square foot, which equals Three Hundred Two Thousand Nine Hundred Forty Dollars ($302,940.00) per annum, as adjusted from time to time, as provided in Section 7.03; provided, however, that, for any year, Tenant shall not be required to pay as its pro-rata share of the Common Area Expenses (as defined in Section 7.02(c)) an amount that is greater than one hundred fifteen percent (115%) of the highest amount owed by Tenant for any prior year.

1.24   **INSURANCE CHARGES:** Pro-rata, initially estimated to be Two Dollars and Two Cents ($2.02) per square foot, which equals Ninety-Nine Thousand Nine Hundred Ninety Dollars ($99,990.00) per annum, as adjusted from time to time, as provided in Sections 28.06 and 28.07.

1.25   **TRASH REMOVAL CHARGE:** Initially estimated to be at a cost of Thirty-Three Cents ($.33) per square foot, which equals Sixteen Thousand Three Hundred Thirty-Five Dollars ($16,335.00) per annum, as adjusted from time to time, as provided in Section 10.13.

1.26   **ADVANCE SIX MONTHS TAX PAYMENT:** N/A

1.27   **PRE-OPENING/REOPENING PROMOTIONAL CHARGE:** N/A

1.28   **GRAND OR EXPANSION OPENING CONTRIBUTION CHARGE:** N/A



1.29    **RADIUS RESTRICTION LIMIT:** A radius of one (1) miles from the Leased Premises, excepting Tenant's existing stores, as provided in Section 10.04.

1.30    **SECURITY DEPOSIT:** N/A

1.31    **TERM FOR RENT ADJUSTMENT:** As provided in this Lease.

1.32    **MERCHANTS ASSOCIATION OR PROMOTIONAL FUND DUES:** Three Thousand Dollars ($3,000.00) per annum, payable in equal monthly installments, in advance, at the rate of Two Hundred Fifty Dollars ($250.00) per month.

1.33    **GUARANTOR:**    N/A

1.34    **ONE-TIME PAYMENT:** Tenant agrees to pay Landlord a one-time payment of Seven Hundred Fifty Thousand Dollars ($750,000.00). Payment will be made in full within seven (7) business days of execution of this Lease.

1.35    **EFFECT OF REFERENCE TO A DEFINED TERM.** Each of the Defined Terms contained in Article I shall be construed in conjunction with the references thereto contained in the other provisions of this Lease and shall be limited by such other provisions. Each reference in the Lease to any of the Defined Terms contained in Article I shall be construed to incorporate all of the terms provided under each such Defined Terms. In the event of any conflict between any Defined Terms and the balance of the Lease, the latter shall prevail.

1.36    **EXHIBITS.** The exhibits listed in this section and attached to this Lease are incorporated in this Lease by reference and are to be construed as an integral part of this Lease.

**EXHIBIT A - Site Plan.**
**EXHIBIT B - Tenant's Monthly Statement of Gross Sales**
**EXHIBIT C - Description of Landlord's and Tenant's Work in the Premise and Related Areas and Facilities.**
**EXHIBIT D - Rules and Regulations.**
**EXHIBIT E -  Form of Assignable Lease**

## ARTICLE 2  THE DEMISE

2.01   **Shopping Center**. Each of Landlord and Tenant represents and warrants to the other that it has full right, power and authority to enter into this Lease for the Term (as defined in Article 3), and to grant those rights hereinafter granted to each other in connection with the Leased Premises, which are more fully described in Exhibit A attached hereto and by this reference incorporated herein.

"Shopping Center" means the parcel(s) of real property bounded and described in Exhibit A hereto attached; plus (1) any other parcel(s) of real property at any time designated by Landlord to be added (but only so long as any such designation remains unrevoked) which are, or are to be, used for Shopping Center or related purposes, including, but not limited to, employee parking, or the furnishing to the Shopping Center of any utility or other service, or for any other improvement appropriate or related to the operation or functioning of the Shopping Center, together with all buildings on and improvements to any such parcel(s) of real property plus (2) any plant or other facility, including, but not limited to, a sewage or garbage disposal plant, serving the Shopping Center, even though it is not located upon land which is a part of the Shopping Center, and facilities connecting any such plant or facility (whether or not so located) to the remainder of the Shopping Center (but not including the land under or through which any such connection passes, if not otherwise included within the Shopping Center). The term "Shopping Center" also means, when used not solely to designate the geographical location thereof, the operation and functioning thereof primarily as a general shopping center for the sale of goods, wares, merchandise, food, beverages and services at retail, together with such services and facilities as are incident to or desirable in connection with the operation thereof, including, but not limited to, medical, dental and other office space. No road, way, street, easement, utility or facility otherwise included within the Shopping Center shall be deemed for any purpose to be partially or wholly excluded therefrom by reason of the fact that the same may also serve or be used by the occupant of any other premises or the customers thereof. Any portion of the Shopping Center which is condemned or dedicated to public use or ceded or conveyed to any governmental authority for street or related purposes shall be thereafter excluded from the Shopping Center. Landlord reserves the right to remove any parcel(s) of real property from the Shopping Center provided that the remainder shall at all times continue to be an integrated enclosed mall shopping center.

2.02   **Leased Premises**. Landlord hereby leases to Tenant and Tenant hereby accepts from Landlord, subject to and with the benefit of the terms, covenants, conditions and provision of this Lease, certain premises (herein defined and hereinafter referred to as "Leased Premises") situated within the Shopping Center, extending to the exterior faces of all exterior walls or to the building line where there is no wall or to the center line of those walls (or prolongations thereof) separating said store premises from other premises in the Shopping Center (said store premises being crosshatched on the Site Plan attached hereto as Exhibit A and being more particularly referred to herein as the Leased Premises) together with the appurtenances specifically granted in this Lease, but reserving and excepting to Landlord the use of the exterior walls, the roof, the land under the Leased Premises or, in the case of a store on any of the upper levels, if any, the lower surface of the floor slab beneath the Leased Premises, all air rights, similar property rights and Common Areas (as hereinafter defined) of the Shopping Center, and the right to install, maintain, use, repair, relocate and replace pipes, ducts, conduits and wires leading through the Leased Premises serving other parts of the Shopping Center in locations which will not materially interfere with Tenant's use of the Leased Premises. It is expressly agreed and understood that said Leased Premises do not include any space above a height of twelve feet measured from the concrete floor except for mezzanine floor or similar structures if incorporated therein; provided the construction of such mezzanine or similar structures shall have received the previous written approval of Landlord. If Tenant constructs a mezzanine, then the square footage of the Leased Premises shall be increased by an amount equal to the square footage of each mezzanine or similar areas and in such case, the rents and other charges reserved hereby and computed upon Gross Leasable Area shall be adjusted accordingly including Fixed Annual Minimum Rent. Prior to the construction of any such mezzanine or similar structure Tenant must submit, for Landlord's approval, its plans and specifications for the construction of such mezzanine. Should said construction be approved, Landlord and Tenant shall execute and deliver a statement in recordable form, at Landlord's option, confirming the increase of any square footage of the Leased Premises, and such statement, when so executed and delivered, will be deemed to be incorporated in, and become part of this Lease. The size and location of the Leased Premises may be changed by Landlord, temporarily or permanently, for the purpose of expanding, renovating or repairing the Shopping Center, or for other purposes, during the Term, pursuant to the terms and conditions of an amendment to be executed by Landlord and Tenant to that effect. Tenant acknowledges that Landlord has provided Tenant with access to the Leased Premises prior to the execution date of the Lease for purposes of performing any environmental, fixturing, and construction studies deemed necessary by Tenant.

## ARTICLE 3  TERM AND POSSESSION

The term of this Lease (the "Term") shall commence on the date set forth as the Commencement Date in Section 1.15 and shall expire at midnight on the last day of the last Lease Year or Partial Lease Year (as the case may be) of the Term, unless sooner terminated as provided herein. It is understood that delivery of possession prior or subsequent to the Commencement Date shall not affect the expiration date of the Term of this Lease.

## ARTICLE 4  FIXED ANNUAL MINIMUM RENT AND PERCENTAGE RENT

4.01    **Fixed Annual Minimum Rent.**  Tenant shall pay annual fixed minimum rent ("Fixed Annual Minimum Rent") to Landlord for the Leased Premises at the rates set forth in Section 1.17, payable in equal monthly installments, in advance on the first day of each calendar month of the Term commencing on the date set forth in the following sentence and at the same rate for fractions of a month if the Term commences on any day other than the first day of a calendar month or ends on any day other than the last day of a calendar month. Tenant shall commence paying Landlord installments of Fixed Annual Minimum Rent one hundred fifty (150) days after the date Landlord delivers possession of the Leased Premises to Tenant.

4.02    **Percentage Rent.**  In addition to paying Fixed Annual Minimum Rent, Tenant also shall pay as percentage rent ("Percentage Rent") for each Lease Year and Partial Lease Year, the amount, if any, by which the product of the percentage rent rate set forth in Section 1.18 for the Lease Year or Partial Lease Year in question, multiplied by Net Sales (as hereinafter defined) for such Lease Year or Partial Lease Year, exceeds the minimum rent set forth in Section 1.17, for such Lease Year or Partial Lease Year.

4.03    **Payment of Percentage Rent.**  Tenant shall pay Percentage Rent within thirty (30) days after the end of each Lease Year or Partial Lease Year. Following expiration of the Lease, Tenant shall pay Percentage Rent within fifteen (15) days after the end of the Term. Without limitation of other obligations of Tenant which shall survive the expiration of the Term, the obligation of Tenant to pay Percentage Rent during the Term shall survive the expiration or termination of this Lease.

4.04    **Net Sales; Recording of Transactions.**



(a)    "Net Sales" shall mean and include the dollar aggregate of the entire amount of receipts from the gross sales of Tenant and its subtenants, licensees and concessionaires arising from or out of its business conducted upon or from the Leased Premises, whether such sales are evidenced by cash, check, credit, credit card charge, charge account, stamps, coupons, exchange (including the value of all goods and services accepted in lieu of cash payment) or otherwise, including, without limitation, all amounts received from the sale of goods, wares, merchandise and gift certificates (provided that gift certificates purchased at the Leased Premises and already included in Net Sales shall not be included in Net Sales when they are redeemed by customers of Tenant) and all amounts received for services performed; (i) where the orders therefor originate at the Leased Premises, whether delivery or performance is made from the Leased Premises or from some other place; (ii) which are made pursuant to mail, telephone, telegraph, computer or other similar orders received or filled at or from the Leased Premises; (iii) by means of mechanical and other vending devices in the Leased Premises; (iv) as a result of transactions originating at the Leased Premises; (v) which Tenant in the normal and customary course of its business would credit or attribute to its operations at the Leased Premises or any part thereof; or (vi) made as a result of solicitation outside of the Leased Premises conducted by personnel operating from, or reporting to, or under the supervision of, any employee of Tenant located at the Leased Premises. Net Sales shall also include, in addition to the Net Sales previously defined, without limitation, sales of consigned merchandise, sales of lottery tickets and bonuses, premiums and commissions generated therefrom, check cashing fees and charges, travelers checks fees and commissions, copy machine charges, and game machine receipts. No franchise, capital stock or personal property tax and no income or similar tax based upon income or profits as such shall be deducted from Net Sales. Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale is made, regardless of the time when Tenant receives payment therefor. There shall be no deduction for uncollected or uncollectible credit accounts, for bad debts or other losses, for employee discounts or for cash shortages. There shall be allowed a deduction for employee discounts to the extent that the aggregate of such employee discounts does not exceed one percent (1%) of Tenant's Net Sales.

(b)    "Net Sales" shall not include the following (i) sales of departments or divisions not located in the Leased Premises; (ii) finance charges on sales made on credit or under a time payment plan; (iii) all refunds and allowances made to customers by Tenant in connection with merchandise, goods, wares, and/or services sold by or returned to the Leased Premises, provided that the original sale was included in Net Sales; (iv) gift or merchandise certificates actually

redeemed at the Leased Premises; (v) the amount of any sales tax or any other direct tax to be paid by the customer and directly collected from the customer by Tenant and subsequently paid over by Tenant to the taxing authority; provided, however, that the amount of any Common-wealth of Puerto Rico excise tax or similar tax paid at the point of origin on manufactured or imported goods shall be included in Net Sales; (vi) sale of Maintenance Agreements made by Tenant at the Leased Premises and that are priced and sold separately from merchandise; (vii) service income received by Tenant for labor rendered to repair merchandise where repair will be and is made outside of the Leased Premises; (viii) charges for delivery of merchandise if amount received is shown separately from price of merchandise; (ix) wholesale or bid sales conducted through Tenant's contract sales department (Division 400). "Wholesale or Bid Sales" are deemed to mean sales made by or through Tenant's Contract Sales Department (Division 400) outside of the ordinary scope of retail sales to large users such as, but not limited to, a developer, a hotel, etc., ordering large quantities of merchandise; and (x) food and beverage sales to employees in Tenant's employee-only cafeteria.

(c)    Tenant shall record or shall cause to be recorded at the time of sale, in the presence of the customer, all receipts from sales or other transactions, whether for cash or credit, in a cash register or in cash registers which shall contain locked-in cumulative tapes with adequate cumulation capacity. Cash register(s) shall be sealed in a manner approved by Landlord and shall have such other features as shall be approved by Landlord, or Tenant shall utilize such other method as may be first approved in writing by Landlord. Any cash register will have the following features as an absolute minimum: (a) a sealed, continuous, cash register tape that duplicates and serially numbers each transaction entered into the register, and such transaction numbers shall not reset if the register is summary totalled or "closed out"; (b) the continuous cash register tape must be sealed in such a manner that it is not accessible to the person operating the register; and (c) a continuous register that gives a constant, cumulative, running total of all transactions entered into the register. The register shall be nonresettable, and the total must print on all summary readings of the cash register. Prior to purchasing cash registers, Tenant shall provide Landlord the description of the cash registers it intends to purchase, including serial numbers and, if these satisfy Landlord's requirements, Landlord shall approve the use of such registers in writing. Prior to using any such register, Tenant shall provide Landlord with the serial number of any and all cash registers to be used in the Leased Premises. If Tenant, with Landlord's consent, chooses to use any other electronic device to record sales, the device must, as an absolute minimum, be able to provide: (a) a daily listing of all transactions, entered into the device each and every day; (b) each transaction shall be serially numbered, the serial number shall not be resettable and shall consist of at least five (5) digits beginning with number 00000 and ending with number 99999; (c) a daily listing that correctly reflects some form of original sales slips; (d) a daily sales report that reconciles sales and other transactions to cash; and (e) a monthly sales summary that reconciles with the applicable daily sales reports. Notwithstanding anything to the contrary contained herein, Tenant is allowed to use Tenant's point of sale terminals used by Tenant in Tenant's other similar stores. Upon Landlord's request, Tenant shall disclose to Landlord the type of point of sale equipment being used by Tenant in the Leased Premises.



4.05    Statements of Net Sales.

(a)    Within fifteen (15) days after the end of each calendar month of the Term, and without notice to Tenant, Tenant shall provide to Landlord a written statement of: (i) the amount of Net Sales for the preceding calendar month; and (ii) the amount of deductions or exclusions from Net Sales taken in accordance with Section 4.04(b). Such statement may be in the form attached hereto as Exhibit B and by this reference incorporated herein or as otherwise agreed by the parties.

(b)    Within sixty (60) days of the end of each Lease Year and/or Partial Lease Year, and/or within sixty (60) days after the end of the Term, and without notice to Tenant, Tenant shall deliver to Landlord a written statement ("Tenant's Annual Statement of Net Sales") certified to be correct by an authorized financial representative, which statement shall be prepared in accordance with generally accepted accounting principles, setting forth (i) the amount of Net Sales for the preceding Lease Year or Partial Lease Year; (ii) the amount of deductions or exclusions from Net Sales taken in accordance with Section 4.04(b); and (iii) Percentage Rent payable by Tenant for such Lease Year or Partial Lease Year. Tenant's Annual Statement of Net Sales shall include a signed statement of such authorized financial representative certifying specifically that (a) he has examined Tenant's Monthly Statements of Net Sales and Tenant's Annual Statement of Net Sales for the preceding Lease Year or Partial Lease Year; (b) his examination included such tests of Tenant's books and records as he considered necessary or appropriate under the circumstances; (c) Tenant's Monthly Statements of Net Sales accurately reflect the Net Sales for each month covered by such statements; (d) Tenant's Annual Statement of Net Sales accurately reflects the Net Sales of the preceding Lease Year or Partial Lease Year; and (e) the Net Sales conform with and are computed in compliance with the definition of Net Sales contained in

Section 4.04. So long as Sears Roebuck de Puerto Rico, Inc. ("Sears") is the party identified as the "Tenant" in Section 1.03, the form of report currently provided by Tenant shall be acceptable.

(c) In the event that (i) Tenant fails to comply with all of the requirements of Section 4.05 within ten (10) days of receipt of written notice from Landlord of such non-compliance, or (ii) Tenant fails on four or more occasions to comply with all of the requirements of Section 4.05 (regardless of whether Landlord has given notice of, or Tenant has cured, such non-compliance), then, Landlord shall estimate Net Sales for any particular period by taking one hundred fifty percent (150%) of the actual Net Sales for the same period during the previous Lease Year. Where there is no previous sales history, the monthly or annual (as the case may be) net sales breakpoint shall be multiplied by one hundred fifty percent (150%). Said estimated Net Sales will become due and payable upon presentation by Landlord and is to be considered as Percentage Rent pursuant to Article 4. Notwithstanding the above, this does not release Tenant from its obligation to strictly comply with Sections 4.05(a) and (b). If Landlord's estimate of Tenant's Net Sales pursuant to this section is overstated, Landlord shall give Tenant a credit against future Percentage Rent payable for the balance of the overpaid Percentage Rent after deducting from the overpayment the cost of expenses incurred by Landlord, which shall not be less than 2% of the Fixed Annual Minimum Rent.

4.06    **Books and Records.** Tenant shall prepare and keep on the Leased Premises, or at some other location, complete and proper books and records, prepared in accordance with generally accepted accounting principles, and with adequate audit trails, which are necessary or are of use in examining, evaluating and determining the amount of Net Sales. Tenant shall cause its subtenants, licensees and concessionaires, if any, to do the same. Such records shall include, without limitation, (a) purchase orders or delivery receipts of inventory and merchandise delivered to the Leased Premises; (b) cash register tapes, including tapes from temporary registers; (c) serially numbered sales slips; (d) the originals of all mail and catalog orders received, filled or executed at or from the Leased Premises; (e) the original records of all telephone, telegraph, teletype, telecopy, and computer orders received, filled or executed at or from the Leased Premises; (f) settlement report sheets of transactions with sublessees, concessionaires and licensees; (g) sales and personal property tax returns; (h) the original records showing that merchandise returned by customers was purchased at the Leased Premises by such customers; (i) memorandum receipts or other records of merchandise taken out on approval; (j) bank deposit records; (k) such other sales and inventory records, if any, which would normally be examined by an independent accountant pursuant to generally accepted auditing standards in performing an audit of the entire business affairs and sales of Tenant at, in, upon or from the Leased Premises; and (l) the records specified above of sublessees, concessionaires or licensees, if any. Tenant shall record at the time of each sale or other transaction, in the presence of the customer, all receipts from such sale or other transaction, whether for cash, credit or otherwise, in a cash register or cash registers having a cumulative total which shall be sealed in a manner approved by Landlord and which shall possess such other features as shall be required by Landlord. All of the foregoing books and records shall be maintained by Tenant for at least three (3) years after the expiration of the applicable calendar year.



If, upon examination of Tenant's available books and records of account, Landlord determines that Tenant has failed to maintain records from which Net Sales may be determined, Landlord shall give Tenant sixty (60) days' written notice to cure said deficiencies. If Tenant fails to cure the deficiencies within said sixty (60) days, Landlord may, at its option, either grant Tenant additional time to cure the deficiencies, hold the Tenant in default of the Lease, or, at Tenant's expense, and for Tenant's benefit, retain a good and reputable independent accounting firm to prepare and maintain all documents and records from which Net Sales may be established. If Landlord elects the latter options, Tenant agrees and covenants that the representative or representatives of the accounting firm retained by Landlord will have full right of entry and access to Tenant's premises and existing financial records, all documents and data considered necessary, and full cooperation from Tenant, for the purposes hereinabove expressed. Any expenses incurred by Landlord in furtherance of these rights hereunder will be considered, and hereby are, additional Rent for the Leased Premises payable by Tenant upon receiving a proper invoice therefore.

Notwithstanding the preceding paragraphs, so long as Sears, Roebuck de Puerto Rico, Inc. is the party identified as the "Tenant" in Section 1.03, Tenant may maintain its books and records pertaining to the Leased Premises in the same manner as it maintains its books and records pertaining to the majority of its stores in the United States. In the event that Tenant keeps its books and records at a location other than the Leased Premises, then Tenant (a) shall make those books and records available to Landlord as Landlord shall reasonably require at Landlord's offices upon reasonable notice at Tenant's expense or (b) shall pay for the travel, lodging and reasonable per diem costs of Landlord's auditors to travel to the site where the books and records are located.

4.07    **Landlord's Right to Audit Tenant's Books and Records.** At any time or from time to time (but no more frequently than once a year) upon not less than thirty (30) days' prior written notice by Landlord to Tenant, Landlord or Landlord's designated representative shall have the right during normal business hours to examine or audit Tenant's books and records. In connection with such examination or audit, Landlord or its representative shall have the right to inspect the books and records

of subtenants, licensees and concessionaires, if any, and Landlord shall have the right to examine the books and records from other stores of Tenant if such examination is necessary to verify Tenant's Net Sales as reported on Tenant's Annual Statement of Net Sales. Tenant shall cause its subtenants, licensees and concessionaires, if any, to make its books and records available to Landlord or its representative. In the event that Tenant's books and records are not all made available for examination, Landlord or Landlord's designated representative shall, with the records available, compute the Net Sales for the period under examination by performing, as part of the audit examination scope, analytical review using the gross profit method or any other method considered appropriate by the examiner under the circumstances. If an audit or an examination of Tenant's books and records by Landlord or its representative discloses that Net Sales for a Lease Year or Partial Lease Year, as reported on Tenant's Annual Statement of Net Sales, have been understated, then any additional Percentage Rent discovered to be owed to Landlord shall be due and payable immediately with interest at the interest rate set forth in Section 22.07(a) from the end of the applicable Lease Year or Partial Lease Year. In addition, if the audit or examination discloses that the understatement is greater than four percent (4%) for any Lease Year or Partial Lease Year, Tenant shall reimburse Landlord for all costs and expenses incurred by Landlord in performing such audit or examination. If the audit or examination discloses that the understatement is greater than five percent (5%) for any one (1) Lease Year or Partial Lease Year, Tenant shall have committed a Default and Landlord, in addition to other remedies provided hereunder, shall have the right to terminate this Lease immediately upon notice to Tenant.

4.08    **Manner of Payment.** Fixed Annual Minimum Rent, Percentage Rent, Rent Adjustments (as hereinafter defined), Rent Adjustment Deposits (as hereinafter defined) and all other amounts due from Tenant to Landlord hereunder (hereinafter collectively referred to as "Rent") shall be paid in lawful money of the United States of America to Landlord at the office of Landlord, or as otherwise designated from time to time by written notice from Landlord to Tenant. The payment of Rent hereunder is independent of each and every other covenant and agreement contained in this Lease, and Rent shall be paid without any setoff, abatement, counterclaim or deduction whatsoever except as may be provided expressly herein.

## ARTICLE 5  COMMON AREAS

5.01    **Use of Common Areas.** Landlord grants to Tenant and its agents, employees and customers a nonexclusive license to use, in common with others, during the Term, those areas and facilities (the "Common Areas") which may be furnished by Landlord from time to time in the Shopping Center for the nonexclusive general common use of tenants and other occupants of the Shopping Center, their officers, agents, employees and customers, including, without limitation, all exterior stairways, if any, sidewalks, parking areas, access roads, employee parking areas, truckways, driveways, landscaped areas, loading docks and areas, restrooms, utility lines, and other similar areas, facilities or improvements, as well as scheduled access to at least one truck bay at the loading dock, as deemed reasonable by Landlord and Tenant and the exclusive use of the freight elevator serving the Leased Premises. Tenant's rights with respect to the Common Areas are subject to the exclusive control and management thereof at all times by Landlord and are subject, further, to the rights of Landlord set forth in Sections 5.02 and 5.04.

5.02    **Management and Operation of Common Areas.** Landlord will operate and maintain or will cause to be operated and maintained the Common Areas in a first class manner deemed by Landlord to be reasonable and appropriate and in the best interests of the Shopping Center. Landlord will have the right (a) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas; (b) to enter into, modify and terminate easement and other agreements pertaining to the use and maintenance of the parking areas and other Common Areas; (c) to close all or any portion of the parking areas or other Common Areas to such extent as, in the opinion of the Landlord, may be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (d) to close temporarily any or all portions of the Common Areas; (e) to discourage non-customer parking; (f) to erect and install in the Common Areas kiosks, planters, pools, sculptures, free standing buildings or other such structures; and (g) to do and perform such other acts in and to such areas and improvements as, in the exercise of good business judgment, Landlord determines to be advisable. In addition, with respect to operations and maintenance activities conducted in the area immediately adjacent to the Leased Premises, Landlord shall use reasonable efforts so as to minimize interference with Tenant's access to and enjoyment of the Leased Premises.

5.03    **Employee Parking Areas.** Tenant and its employees shall park their cars only in such areas as may be designated for that purpose by Landlord. Tenant shall furnish Landlord with commonwealth automobile license numbers assigned to Tenant's cars and cars used by its employees within five (5) days after Landlord's request and shall notify Landlord thereafter of any changes in such information within five (5) days after such changes occur. At Landlord's option, Landlord may designate an area for off-site employee parking and provide a shuttle service to the Shopping Center. In such event, Tenant's employees shall be required to park in such off-site area and the expense associated with

operating such shuttle service shall be included in Common Area Expenses. Tenant shall notify its employees in writing of the provisions of this Section.

5.04    **Changes and Additions to Shopping Center.** Subject to the conditions hereinafter set forth, Landlord reserves the right at any time and from time to time (a) to make or permit changes or revisions in its plan for the Shopping Center, including additions to, subtractions from, rearrangement of, alterations of, modification of or supplements to the building areas, walkways, parking areas, driveways or other Common Areas; (b) to construct other buildings or improvements in the Shopping Center and to make alterations thereof or additions thereto and to build additional stories on any such building or buildings and to buildings adjoining same; and (c) to make or permit changes or revisions in the Shopping Center, including additions thereto and/or subtractions therefrom, and to convey or lease portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. The exercise of such right, however, shall neither diminish the parking available in the Shopping Center to a level below that required by applicable laws nor materially obstruct access to the Leased Premises. With respect to changes and additions in the area immediately adjacent to the Leased Premises, Landlord shall use reasonable efforts so as to minimize interference with Tenant's access to and enjoyment of the Leased Premises.

5.05    **Roof and Walls.** Landlord shall have the exclusive right to use all or any part of the roof of the Leased Premises for any purpose and to install, maintain use repair and replace within the Leased Premises pipes, ducts, conduit, wires and all other mechanical equipment serving other parts of the Shopping Center. Landlord may make any use it desires of the side or rear walls of the Leased Premises and the areas above the finished ceiling or below the floor, provided that such use shall not encroach on the interior of the Leased Premises.

## ARTICLE 6 PROMOTION

6.01    **Participation of Tenant.** Landlord shall have the right and option to establish a Promotional Fund for the Shopping Center. Tenant agrees to pay to Landlord Tenant's Share of the Promotional Fund subject to the provisions of Section 1.32. It is understood and agreed that any default or breach in Tenant's obligations to pay the dues referred to in Section 1.32 shall be deemed a default under this Lease. The Promotional Fund has appointed Landlord as its agent for the collection of the Promotional Funds contributions with the right to collect and enforce on behalf of the Promotional Fund all debts owing by Tenant to either of said entities. The purpose of the Promotional Fund shall be to promote the general business interests of the Shopping Center and, in furtherance of such purpose, to engage in and conduct promotional programs and publicity, special events, decorations, cooperative advertising and any other joint endeavors in the general interests of the Shopping Center. Nothing in the by-laws or regulations of the Promotional Fund shall affect the rights of Landlord or be in conflict with the provisions of this Lease, including, without limitation, any reasonable rules and regulations adopted pursuant to the provisions of this Lease. So long as the Promotional Fund exists, Tenant agrees that Landlord may delegate to either entity the right to perform and/or enforce all or any part of Landlord's rights or obligations set forth in this Article 6.



6.02    **Promotional Fund.** Landlord may, from time to time in Landlord's sole discretion, establish a marketing service (herein called "Promotional Fund") to furnish and maintain sales promotion efforts for the benefit of the Shopping Center. Landlord shall appoint a retail advisory committee composed of at least one representative of no fewer than three (3) tenants in Landlord's buildings, to provide comment on the advertising and other potential activities provided by the Marketing Service. Such a committee shall function solely in an advisory capacity subject to Landlord's direction. Tenant shall pay, as its share of the cost of the Promotional Fund Dues for each full year, the amount set forth in Section 1.32. Landlord may establish a separate bank account into which the Landlord shall deposit the contributions referred to herein to be made by Tenant and other tenants. Tenant shall contribute to the Promotional Fund one twelfth (1/12) of the annual amount set forth in Section 1.32 (as adjusted at the time and in the manner provided below), on the first day of each calendar month throughout the Term.

The Promotional Fund shall be used to pay all costs and expenses associated with the formation and carrying out of an ongoing program for the promotion of the Shopping Center, which program may include, without limitation, special events, shows, displays, signs, seasonal events, and other activities designed to attract customers to the Shopping Center. In connection with the operation of the Promotional Fund, Landlord shall have the right to contract for or otherwise employ a professional promotional organization and/or other personnel which, in the Landlord's judgment, are necessary to administer the Promotional Fund and may be used to defray the cost of administration of such marketing activities, including the salary or payments and reimbursements due such organizations and personnel, rent, travel expenses, and other business expenses. Such reasonable amount of space within the Shopping Center as may be necessary to carry out the Promotional Fund (or Merchants' Association), will be assessed in line with the rentals for similarly sized commercial office space.

## ARTICLE 7 RENT ADJUSTMENTS

7.01    **Obligation to Pay Rent Adjustments**. In addition to paying Fixed Annual Minimum Rent, Percentage Rent and the other Rent described in this Lease, Tenant shall also pay as additional rent the amounts determined in accordance with this Article.

7.02    **Definitions**. As used in this Lease,

(a)    "Adjustment Date" shall mean the first day of the Term and the first day of each Lease Year or Partial Lease Year thereafter falling within the Term.

(b)    "Adjustment Year" shall mean each Lease Year or Partial Lease Year, as applicable.

(c)    "Common Area Expenses" shall mean and include those costs and expenses paid or incurred by or on behalf of Landlord for owning, managing, operating, maintaining and repairing the Shopping Center and the Common Areas, including, without limitation, the cost of security and security devices and systems; trash removal; cleaning and sweeping; planting and replacing decorations, flowers and landscaping; maintenance, repair and replacement of utility systems; repair and maintenance of roof; electricity, water, sewers, fuel, lighting; window cleaning; janitorial service; costs of parking lot maintenance, striping and policing and traffic regulation; painting; uniforms; management fees; supplies; sundries; sales or use taxes on supplies or services; wages and salaries of all persons engaged in the operation, management, maintenance and repair of the Shopping Center, and fringe benefits, including social security taxes, unemployment insurance taxes, costs for providing coverage for disability benefits, cost of any pensions, hospitalization, welfare or retirement plans, or any other similar expenses incurred under the provisions of any collective bargaining agreement, or any other cost or expense which Landlord pays or incurs to provide benefits for employees so engaged in the operation, management, maintenance and repair the Shopping Center; the charges of any independent contractor who, under contract with Landlord or its representatives, does any of the work of operating, managing, maintaining or repairing the Shopping Center; costs payable by Landlord under any reciprocal easement and operating agreement in effect in connection with the operation of the Shopping Center; legal fees, appraisal fees and accounting expenses; costs incurred in connection with auditing Common Area Expenses; surcharges levied upon or assessed against parking space or areas; payments toward mass transit or carpooling facilities; costs and expenses in connection with maintaining Federal, State or local governmental ambient air and environmental standards; any other expense or charge, whether or not hereinbefore mentioned, which, in accordance with generally accepted accounting or management principles, would be considered an expense of owning, managing, operating, maintaining or repairing the Shopping Center or the Common Areas, except as hereinafter provided; and, administrative costs equal to fifteen percent (15%) of the Common Area Expenses determined hereunder. Common Area Expenses shall not include costs or other items included within the meaning of the term "Taxes" (as hereinafter defined); costs of alterations of the premises of tenants of the Shopping Center; costs of capital improvements to the Shopping Center (except as hereinafter provided); depreciation charges, except for depreciation and amortization on furniture, fixtures, leasehold improvements, automobiles and any other equipment used in connection with the Common Areas; interest and principal payments on mortgages; ground lease rental payments; real estate brokerage and leasing commissions; and any expenditures for which Landlord has been reimbursed (other than pursuant to this Article or provisions in other leases requiring the tenants thereunder to pay a share of expenses associated with the Shopping Center), except as hereinafter provided. Notwithstanding anything contained in this clause (c) to the contrary: (i) the cost of any capital improvements to the Shopping Center made after the date of this Lease which are intended to reduce Common Area Expenses or which are required under any governmental laws, regulations or ordinances which were not applicable to the Shopping Center at the time it was constructed, amortized over such reasonable period as Landlord shall determine, together with interest on the unamortized cost of any such improvement (at the prevailing construction loan rate available to Landlord on the date the cost of such improvement was incurred) shall be included in Common Area Expenses; and (ii) if any item of Common Area Expenses, although paid or incurred in one Lease Year, relates to more than one Lease Year, such item may be proportionately allocated among such related Lease Years at the option of Landlord.

(d)    "Taxes" shall mean real estate taxes, general or special assessments, sewer rents, rates and charges, transit and transit district taxes, taxes based upon the receipt of rent, and any other federal, state or local governmental charge, whether general, special, ordinary or extraordinary, which may now or hereafter be levied, assessed or imposed against the Shopping Center, or arise in connection with the use, occupancy or possession of the Shopping Center or any part thereof, including all reasonable costs and fees, including reasonable attorneys' and appraisers' fees, incurred by Landlord in contesting Taxes or negotiating with the public authorities as to the same. Taxes shall include all assessments and costs in connection with all road,



10

highway and transportation improvements and all water, sewage and power-mains, which are paid for by Landlord and which improvements have been or will be irrevocably deeded and dedicated to the public or private authority having jurisdiction thereover and any personal property taxes (attributable to the Lease Year in which paid) imposed upon the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances which are components of the Shopping Center. Taxes shall not include such amounts which are separately assessed and paid directly by an Anchor Store or an Outlot Store or which are paid to Landlord by an Anchor Store or an Outlot Store on account of Taxes.

If at any time the method of taxation then prevailing is altered so that any new or additional tax, assessment, levy, imposition or charge or any part thereof shall be imposed upon Landlord in place or partly in place of any such Taxes or contemplated increase therein, or in addition to Taxes, and is measured by or is based in whole or in part upon the economic value of the Shopping Center or the rents or other income therefrom, then all such new taxes, assessments, levies, impositions or charges any or part thereof, to the extent that they are so measured or based, shall be included in Taxes levied, assessed or imposed against the Shopping Center to the extent that such items would be payable if the Shopping Center were the only property of Landlord subject thereto and the income received by Landlord from the Shopping Center were the only income of Landlord. Without regard to the year for which any such taxes or assessments are levied, (i) the amount of each installment for special assessments, plus any interest payable thereon, paid during a Lease Year shall be included in Taxes for that year and (ii) if any taxes or assessments payable during any Lease Year shall be computed with respect to a period in excess of twelve (12) calendar months, then taxes or assessments applicable to the excess period shall be included in Taxes for that year. Except as provided in the preceding sentence, all references to Taxes "for" a particular Lease Year shall be deemed to refer to taxes levied, assessed or otherwise imposed for such Lease Year without regard to when such taxes are payable.

(e)     "Gross Leasable Area" shall mean the number of square feet of the space in the Leased Premises, as set forth in Section 1.10, which shall be measured (i) to the outside face of permanent exterior building walls, whether solid or glass, (ii) to the center line of interior demising partitions, (iii) to the corridor side of walls adjoining, but not opening onto, an exterior Common Areas mall, and (iv) a predetermined lease line, commonly known as the storefront line; and in no case shall there be any deduction for stairs, elevators, escalators, interior partitions, columns or other structural elements within the Leased Premises. If Tenant constructs a mezzanine, then the Gross Leasable Area shall be increased by an amount equal to the square footage of each mezzanine or similar area. A determination by Landlord's architect shall be conclusive as to the calculation of Gross Leasable Area, unless Tenant can demonstrate that Landlord's architect failed to measure the Leased Premises in accordance with the definition of "Gross Leasable Area" set forth in this Section 7.02(e).



(f)     "Floor Area of the Shopping Center" shall mean the aggregate amount of leasable floor area in the Shopping Center (exclusive of the floor area of all major tenants occupying 15,000 square feet or more and Outlot Stores), as initially constructed or as the Shopping Center may at any time thereafter be enlarged or reduced, designated by Landlord for the exclusive use and occupancy of rent-paying tenants, which shall be calculated in accordance with Section 7.02(e) and shall exclude Common Areas, storage areas leased separately from retail areas, and areas used for management and promotion offices. A determination by Landlord's architect shall be conclusive as to the calculation of Floor Area of the Shopping Center.

(g)     "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Gross Leasable Area of the Leased Premises and the denominator of which is equal to the Floor Area of the Shopping Center which is occupied and open for business to tenants under leases, the terms of which are in effect during the Adjustment Year in question.

(h)     "Rent Adjustments" shall mean all amounts determined pursuant to this Article, or any other amounts payable by Tenant to Landlord designated in any other Article of this Lease including, but not limited to, all amounts payable by Tenant to Landlord on account of: (i) Percentage Rent charges pursuant to Article 4; (ii) Promotional Fund Dues pursuant to Article 6; (iii) trash removal charges under Section 10.13; (iv) the Sprinkler Charge pursuant to Section 11.01; (v) the Cooling Service Charge pursuant to Section 11.03; and (vi) insurance charges pursuant to Sections 28.05 and 28.06.

7.03     **Computation of Rent Adjustments.** Tenant shall pay Rent Adjustments for each Adjustment Year as hereinafter determined. Rent Adjustments payable by Tenant with respect to each Adjustment Year during which an Adjustment Date falls shall include, in addition to the amounts described in Section 7.02(h) above, (a) the product of Tenant's Proportionate Share multiplied by the amount of Taxes for such Adjustment Year (said product being hereinafter referred to as the "Tax Adjustment") plus (b) the product of Tenant's Proportionate Share multiplied by the amount of Common

Area Expenses for such Adjustment Year (said product being hereinafter referred to as the "Expense Adjustment"). Tenant agrees and acknowledges that Landlord has made no representation, warranty or guaranty relating to the amount of Taxes and Common Area Expenses. Tenant has had an opportunity to consult with Landlord with respect to the Taxes and Common Area Expenses projected for the operation of the Shopping Center but has not relied upon any statements or representations of Landlord or any agent or affiliate of Landlord in regard thereto in executing this Lease and in agreeing to perform the terms and covenants hereof and shall make no claim against Landlord based thereon.

7.04    **Payments of Rent Adjustments; Projections.** Tenant shall make payments on account of Rent Adjustments other than Tax Adjustment and Expense Adjustment as required under the Lease provisions governing those Rent Adjustments or as otherwise set forth in a notice delivered by Landlord to Tenant. Tenant shall make payments on account of Tax Adjustment and Expense Adjustment (the aggregate of such payments with respect to any Adjustment Year being hereinafter referred to as the "Rent Adjustment Deposit") as follows:

(a)    Prior to each Adjustment Date and from time to time during the Adjustment Year in which such Adjustment Date falls, Landlord may deliver to Tenant a written notice or notices (each such notice being hereinafter referred to as a "Projection Notice") setting forth (i) Landlord's reasonable estimates, forecasts or projections (collectively, the "Projections") of either or both of Taxes and Common Area Expenses for such Adjustment Year and (ii) Tenant's Rent Adjustment Deposits with respect to the Tax Adjustment and Expense Adjustment components of Rent Adjustments for such Adjustment Year based upon the Projections.

(b)    Tenant shall commence payments of monthly installments of Rent Adjustment Deposits on the first day of the first calendar month during the Term following Landlord's delivery of the first Projection Notice hereunder. On such date, and on or before the first day of each calendar month thereafter of the Adjustment Year covered by such Projection Notice, Tenant shall pay to Landlord one-twelfth (1/12) of the Rent Adjustment Deposits shown in the Projection Notice. Within thirty (30) days following Landlord's delivery of a Projection Notice for an Adjustment Year in progress, Tenant shall also pay Landlord a lump sum equal to the Rent Adjustment Deposits shown in the Projection Notice less the sum of (i) any previous payments on account of Rent Adjustment Deposits made with respect to such Adjustment Year and (ii) monthly installments on account of Rent Adjustment Deposits due for the remainder of such Adjustment Year. Until such time as Landlord furnishes a Projection Notice for an Adjustment Year, Tenant shall continue to pay monthly installments of Rent Adjustment Deposits in the amount shown by the most recent Projection Notice or, if the Tax Adjustment and Expense Adjustment for the Adjustment Year covered by such Projection Notice has been determined, one-twelfth (1/12) of such Tax Adjustment and Expense Adjustment, whichever is greater. Notwithstanding the provisions of Section 22.07(a) to the contrary, interest on unpaid Rent Adjustment Deposits shall begin to accrue from the fifth (5th) day after any such amount is due.



(c)    If any mortgagee or ground lessor of Landlord requires a tax escrow deposit in excess of an amount equal to Tenant's Tax Adjustment for six (6) months, Tenant shall pay to Landlord when required the Tax Adjustment required by the schedule established by said mortgagee or ground lessor.

(d)    Any fiscal tax year or years commencing during any Lease Year or Partial Lease Year hereof, shall be deemed to correspond to such Lease Year.

(e)    If there is an increase by the assessing authority in the assessed value of the Shopping Center or the Leased Premises, Tenant shall pay its proportionate share of the amount of such increase within thirty (30) days of receipt of notice thereof from Landlord. Landlord shall provide Tenant with such reasonable evidence of such increase as may be requested by Tenant.

7.05    **Readjustments.** The following readjustments shall be made by Landlord and Tenant for Expense Adjustment and Tax Adjustment:

(a)    Following the end of each Adjustment Year and after Landlord has determined the amount of Common Area Expenses to be used in calculating the Expense Adjustment for such Adjustment Year, Landlord shall notify Tenant in writing (any such notice referred to being hereinafter as "Landlord's Expense Statement") of such Common Area Expenses and Tenant's Expense Adjustment for such Adjustment Year. If the Expense Adjustment owed for such Adjustment Year exceeds the Expense Adjustment component of the Rent Adjustment Deposit paid by Tenant during such Adjustment Year, then, within thirty (30) days after the date of Landlord's Expense Statement, Tenant shall pay to Landlord an amount equal to the excess of the Expense Adjustment over the Expense Adjustment component of the Rent Adjustment Deposit paid by Tenant during such Adjustment Year. If the Expense Adjustment component of the Rent Adjustment Deposit paid by Tenant during such Adjustment Year exceeds the Expense

Adjustment owed for such Adjustment Year, then Landlord shall credit such excess to Rent payable after the date of Landlord's Expense Statement, or, at its option, may credit such excess to any Rent theretofore due and owing, until such excess has been exhausted. If this Lease expires or is terminated prior to full application of such excess, Landlord shall pay to Tenant the balance thereof not theretofore applied against Rent and not reasonably required for payment of Rent for the Adjustment Year in which this Lease expires, subject to Tenant's obligations under Section 7.06, provided Tenant has vacated the Leased Premises and otherwise has surrendered the Leased Premises to Landlord in accordance with this Lease and Tenant is not then in Default under this Lease.

(b)     Following the end of each Adjustment Year and after Landlord has determined the actual amount of Taxes to be used in calculating the Tax Adjustment for such Adjustment Year, Landlord shall notify Tenant in writing (any such notice hereinafter referred to as "Landlord's Tax Statement") of such Taxes for such Adjustment Year. If the Tax Adjustment owed for such Adjustment Year exceeds the Tax Adjustment component of the Rent Adjustment Deposit paid by Tenant during such Adjustment Year, then, within thirty (30) days after the date of Landlord's Tax Statement, Tenant shall pay to Landlord an amount equal to the excess of the Tax Adjustment over the Tax Adjustment component of the Rent Adjustment Deposit paid by Tenant during such Adjustment Year. If the Tax Adjustment component of the Rent Adjustment Deposit paid by Tenant during such Adjustment Year exceeds the Tax Adjustment owed for such Adjustment Year, then Landlord shall credit such excess to Rent payable after the date of Landlord's Tax Statement, or, at its option, may credit such excess to any Rent theretofore due and owing, until such excess has been exhausted. If this Lease expires or is terminated prior to full application of such excess, Landlord shall pay to Tenant the balance thereof not theretofore applied against Rent and not reasonably required for payment of Rent for the Adjustment Year in which this Lease expires, subject to Tenant's obligations under Section 7.06, provided Tenant has vacated the Leased Premises and otherwise has surrendered the Leased Premises to Landlord in accordance with this Lease and Tenant is not then in Default under this Lease.

No interest or penalties shall accrue on any amounts which Landlord is obligated to credit or pay to Tenant pursuant to this Section 7.05.

7.06    **Proration and Survival.** With respect to any Adjustment Year which does not fall entirely within the Term, Tenant shall be obligated to pay as Rent Adjustments for such Adjustment Year only a pro rata share of Rent Adjustments as determined herein, based upon the number of days of the Term falling within the Adjustment Year. Following expiration or termination of this Lease, Tenant shall pay any Rent Adjustments due to Landlord within thirty (30) days after the date of each Landlord's Statement sent to Tenant. Without limitation of other obligations of Tenant which shall survive the expiration of the Term, the obligation of Tenant to pay Rent Adjustments as provided in this Article accruing during the Term shall survive the expiration or termination of this Lease.



7.07    **Tenant's Obligation to Pay Personal Taxes or Other Taxes.** Tenant agrees to pay prior to delinquency, any and all taxes and assessments levied or assessed during the Term against either Tenant or Landlord upon or against (i) any furniture, fixtures, signs and equipment and any other personal property installed or located within the Leased Premises; (ii) any alterations, additions, betterments or improvements of whatsoever kind or nature, made by Tenant to the Leased Premises, or which had already been constructed when Tenant occupied the Leased Premises, including Tenant's Work; and (iii) the Rent payable hereunder by Tenant to Landlord. With respect to any taxes for which Tenant is responsible hereunder, the official tax bill shall be conclusive evidence of the amount of taxes assessed or levied, as well as of the items taxed.

7.08    **Direct Tax Collections for the Government.** Should any governmental authority require that a tax, other than the taxes above mentioned, be paid by Tenant, but collected by Landlord, for and on behalf of said governmental authority, and from time to time forwarded by Landlord to said governmental authority, the same shall be paid by Tenant to Landlord, payable monthly, in advance.

7.09    **Installment Payment of Assessments.** Landlord shall have the right, if permitted by law, to make installment payments of any assessments levied against the Shopping Center. In such event, Taxes shall be computed upon the installments and interest thereon paid by Landlord in each Lease Year. If Landlord has been or will be required to install and pay for assessments and thereafter deed and dedicate the same to the public or private authority having jurisdiction thereover, the cost thereof shall be included in the computation of Taxes only to the extent of equal installments for each Lease Year of the Term.

7.10    **Contest Proceedings.** Landlord shall have the right to contest the validity or amount of any Taxes by appropriate proceedings. Tenant shall not institute any proceedings with respect to the assessed valuation of the Shopping Center for the purpose of securing a tax reduction. In the event Landlord receives any refund of Taxes, Landlord shall credit such proportion of such refund as shall be allocable to payments of the tax charge actually made by Tenant (less reasonable costs, expenses and

attorneys' and appraisers' fees), against the next succeeding payments of Tenant's Tax Adjustment, or during the last Lease Year, Landlord will refund such net refund to Tenant within thirty (30) days following the expiration of the Term.

7.11    **Tax Disputes Between Landlord and Tenant.** In the event of any dispute, Tenant shall pay Tenant's Tax Adjustment in accordance with the applicable statement, and such payment shall be without prejudice to Tenant's position. If the dispute shall be determined in Tenant's favor by agreement or otherwise, Landlord shall credit Tenant's account the amount of Tenant's overpayment resulting from compliance with such bill or statement. Any such bill or statement shall be deemed binding and conclusive on Tenant if Tenant fails to object thereto in writing, stating the reasons therefor, within thirty (30) days after the date thereof and if Tenant fails to comply with the provisions of this Section.

## ARTICLE 8  CONSTRUCTION OF IMPROVEMENTS

8.01    **Construction by Landlord.** Landlord has constructed, at Landlord's sole expense, the building of which the Leased Premises are a part (the "Building"), as shown generally on Exhibit A, in accordance with the description of Landlord's Work and outline specifications set forth in Exhibit C attached hereto. It is agreed by the parties hereto that the reference herein to Exhibit A setting forth the general layout of the buildings, Common Areas and other improvements shall not be deemed to be a warranty, representation or agreement on the part of Landlord that the Shopping Center has been laid out exactly as indicated on said exhibit or that the Shopping Center contains therein all of the buildings, driveways, walks, etc., as shown thereon. It is understood and agreed that Landlord may change the number, dimensions, height and locations of the buildings, the number, identity and type of stores and tenancies, the parking, mall, walks and other Common Areas as Landlord shall deem proper, provided only that the Leased Premises as herein defined shall be substantially as depicted on Exhibit A and reasonable access between the Leased Premises and parking facilities provided shall not be substantially or materially impaired. The depiction of the Shopping Center on Exhibit A shall not be a limitation on Landlord's right to build or construct free standing Kiosk or Kiosks in Common Areas; or additional buildings on the Shopping Center site whether connected to the enclosed mall or freestanding, for commercial, office or other use. Landlord's Work is deemed accepted by Tenant as is in all respects. It is expressly agreed that Landlord's Work shall be limited to the scope of construction delineated in Exhibit C as Landlord's Work and shall in no event include the performance, procurement or installation of those items of work, fixtures and equipment which are to be performed, procured or installed by Tenant, at Tenant's expense, and which are described as "Tenant's Work" in Exhibit C.

8.02    Construction by Tenant.



(a) Except as otherwise herein specified, Landlord shall deliver to Tenant possession of the Leased Premises in "as is" condition on the Delivery Date as set forth in Section 1.07(b). All work other than that to be performed by Landlord shall be accomplished at Tenant's sole expense and in accordance with the plans and specifications hereinafter referred to in this Section 8.02, prepared by Tenant's architect in conformity with the description of Tenant's Work and outline specifications set forth in Exhibit C attached hereto. Tenant agrees to prepare and submit to Landlord for approval and, if necessary, revise and resubmit to Landlord, plans and specifications covering Tenant's Work prepared in conformity with the applicable provisions of Exhibit C.

Landlord's approval will be evidenced by endorsement to that effect on two (2) sets of the preliminary plans and specifications, one (1) set to be retained by Landlord and one (1) set by Tenant. Within fifteen (15) days after the approval of preliminary plans and specifications, Tenant shall deliver to Landlord two (2) sets of working plans and specifications prepared in conformity with the approved preliminary plans and specifications, one (1) counterpart of which shall have been initialled on behalf of Tenant, thereby evidencing Tenant's approval thereof. Landlord shall notify Tenant of the matters, if any, in which said working plans and specifications as submitted by Tenant fail to conform with the preliminary plans and specifications and with the applicable provisions of Exhibit C and the store design and construction criteria for tenants set forth in the document entitled "Store Design and Construction Criteria for Tenants." Tenant shall promptly revise and correct said working plans and corrections to Landlord. Landlord's approval will be evidenced by endorsement to that effect on one (1) set of the working plans and specifications and the return of such signed set to Tenant. Upon receipt of the aforesaid, Tenant shall return one (1) set of sepias of all approved drawings to Landlord. Tenant will commence construction of Tenant's Work in accordance with the approved working plans and specifications and Exhibit C. Tenant's Work shall be diligently prosecuted without interfering with any work being done in the Shopping Center by Landlord, or by any other Tenants or permittees, and shall be performed in compliance with rules and regulations established by Landlord or Landlord's designated representative, and with all legal requirements and insurance requirements established by either the laws and regulations of the Commonwealth of Puerto Rico, its instrumentalities and agencies, or by this Lease. Landlord's designated representative may deny access to Tenant's

contractors if the same interfere with or unnecessarily delay the completion of other work being performed in the Shopping Center. Subject to the provisions of Article 28, Tenant shall, before commencing Tenant's Work, deposit with Landlord certificates of insurance evidencing compliance with the provisions of this Section and Article 28.

(b)    Tenant shall comply with all fire protection standards required by the applicable laws, regulations, and codes and shall assume the cost of complying with said requirements.

(c)    Tenant shall submit its Record Drawings or as-built drawings at the time of surrendering of the Leased Premises.

8.03    **Opening.** Tenant shall open the Leased Premises for its business upon completion of the work referred to in Section 8.02 hereof, said work to be completed on or before one hundred fifty (150) days after the Delivery Date. In the event Tenant fails to open for business on or before January 1, 1997 and the delay in opening was not caused by Landlord's delay in approving Tenant's drawings, then, in addition to Landlord's other remedies hereunder, Tenant shall pay to Landlord one hundred twenty-five percent (125%) the Fixed Annual Minimum Rent set forth in Section 1.17 for the period commencing on January 1, 1997 during which Tenant's store shall not be open. The foregoing sentence shall not be construed as altering Tenant's obligation to commencement payment of Rent one hundred fifty (150) days after the Delivery Date as set forth in Section 4.01.

8.04    **Processing Cost.** (Intentionally omitted)

## ARTICLE 9  MAINTENANCE AND REPAIR OF LEASED PREMISES

9.01    **Maintenance and Repairs by Landlord.** At its sole cost and expense throughout the Term, Landlord shall keep the foundation and exterior walls of the Leased Premises (except windows, plate glass, showcases, doors, door frames and signs) in good repair, order and condition; provided Tenant shall give Landlord notice of the necessity for such maintenance or repairs and provided that the necessity for such repairs shall neither arise from nor shall be caused by the negligence or wilful acts of Tenant, its agents, concessionaires, officers, employees, licensees, customers, invitees or contractors, in which case such maintenance or repairs shall be made by Tenant or, at Landlord's option, by Landlord at Tenant's sole cost and expense. In no event shall Landlord be required to incur any additional expense for work to be done during hours or days other than regular business hours and days. The provisions of this Section 9.01 shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which events the obligations of the Landlord shall be controlled by the provisions of Articles 12 and 13. Except as provided in this Section, Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Leased Premises or upon any equipment, facilities or fixtures contained therein, all of which shall be the responsibility of Tenant as provided in Section 9.02. In the event that Landlord fails to undertake the repairs of the Leased Premises required by this Section within sixty (60) days of receipt of notice from Tenant requesting such repairs, Tenant may engage a contractor approved by Landlord to make such repairs, and Landlord shall reimburse Tenant for the reasonable cost thereof. Landlord shall advise Tenant whether the contractor proposed by Tenant is acceptable to Landlord within ten (10) days of receipt of contractor's name from Tenant, and Landlord shall not unreasonably withhold its approval of contractors selected by Tenant. Notwithstanding the terms of the preceding two sentences to the contrary, in the event that an emergency repair (as defined below) to the Leased Premises is required (and such repair is of the type required to be made by Landlord hereunder) and Tenant is unable to notify Landlord or, after receiving notice Landlord fails to respond to such notice in a timely fashion, Tenant may make such emergency repair, and Landlord shall reimburse Tenant for the reasonable costs of doing the same. An emergency repair or replacement is one which, in the judgment of the person making the determination, is likely to constitute an immediate threat to the health, safety and/or welfare of the customers, employees or business invitees of Tenant or could reasonably be expected to cause damage to the merchandise or other property of Tenant.



9.02    **Maintenance and Repairs by Tenant.** Except for repairs required in Section 9.01 to be performed by Landlord, Tenant agrees, at Tenant's sole cost and expense, to keep and maintain the Leased Premises and each and every part thereof in good repair, order and condition. Tenant shall keep the Leased Premises in a clean, neat and orderly manner at all times and, without limitation, shall (a) keep all glass in the Leased Premises clean, including the inside and outside surfaces of any glass storefronts, display windows, doors, canopies, awnings, exterior signs, partitions or other glass surfaces except for the outside surface of any glass located in the exterior walls of the Shopping Center; (b) maintain the Leased Premises free of insects, rodents, vermin and other pests; (c) keep the Leased Premises free of trash, refuse and other debris; and (d) keep the Leased Premises free of objectionable or offensive odors. Tenant further agrees, at its sole cost and expense, promptly to make all repairs and replacements (including, without limitation, repairs of damage caused by Tenant or any of its employees, contractors, agents, invitees, or licensees) to the Leased Premises, to the fixtures and equipment therein and to the appurtenances thereto including, without limitation, Tenant's Work erected and installed

pursuant to Exhibit C, the exterior and interior windows and window frames, doors and door frames, entrances, store fronts, including store front metal work, signs, showcases, floor coverings, interior walls, partitions, lighting, electrical, air conditioning, plumbing, and sewerage systems, grease traps, exhaust fans, equipment, fixtures and facilities within or protruding from the Leased Premises, the escalators and elevators therein, if any, the floor slab and that portion of any pipes, lines, ducts, wires or conduits contained under, above or within, and serving the Leased Premises. Tenant shall keep and maintain the Leased Premises in a first-class and attractive condition throughout the Term. Tenant further agrees to keep all drains inside the Leased Premises open, to keep all glass, including that in windows, doors and skylights, clean and in good condition and to replace any glass which may be damaged or broken with glass of the same quality (damage by fire or other casualty covered by Landlord's insurance excepted), and to use all such facilities for their intended purposes. Tenant shall comply with the provisions of Article 26 in making repairs. Landlord may, but need not, make such repairs and replacements in the event that Tenant fails to make such repairs promptly and adequately and, in any event, within sixty (60) days of receipt of notice from Landlord, and Tenant shall pay Landlord the cost thereof on demand; provided, however, that if such repairs to the Leased Premises cannot be made within such sixty (60) day period and provided that Tenant has commenced such repairs within said period and shall be prosecuting the same with diligence and continuity, then the time for such repairs shall be extended, with Landlord's written consent, for a period not to exceed sixty (60) days or as may be necessary to complete such repairs. The foregoing to the contrary notwithstanding, in the event that an emergency repair (as defined below) to the Leased Premises of the type required to be made by Tenant hereunder or other emergency action involving the Leased Premises is required and Landlord is unable to notify Tenant or, after receiving notice Tenant fails to respond to such notice in a timely fashion, Landlord may make such emergency repair, and Tenant shall reimburse Landlord for the reasonable costs of doing the same on demand. An emergency repair or replacement or event requiring emergency action is one which, in the judgment of the person making the determination, is likely to constitute an immediate threat to the health, safety and/or welfare of the customers, employees or business invitees of Tenant or could reasonably be expected to cause damage to the merchandise or other property of Tenant. Tenant agrees, at Tenant's sole cost and expense, to make all repairs to the Leased Premises required because of Tenant's use of the Leased Premises by any law or ordinance or any order or regulation of any public authority having jurisdiction. Tenant will perform all maintenance needed and necessary to assure itself that all of its equipment and facilities meet optimum fire prevention and environmental, legal and regulatory requirements, including, but not limited to, the regular cleaning of exhaust fans and grease traps.

9.03    **Governmental Requirements.** Tenant agrees to make all repairs, alterations, additions or replacements to the Leased Premises, including equipment, facilities and fixtures therein, required because of Tenant's use of the Leased Premises by any law or ordinance or any order or regulation of any public authority having jurisdiction. Tenant further agrees to keep the Leased Premises equipped with all safety appliances so required because of such use and to comply with the orders and regulations of all governmental authorities.



### ARTICLE 10  USE AND OPERATION OF LEASED PREMISES

10.01    **Permitted Use.** Tenant shall use and occupy the Leased Premises during the Term and any permitted extension thereof only as a Sears Home Improvements department and as a Sears Brand Central appliance department as specified in Section 1.11 and for no other purpose or purposes. Landlord's approval shall be required for any change in use of the Leased Premises, and any such approval shall be at Landlord's sole discretion. Notwithstanding the foregoing, however, Landlord's approval of a change in use of the Leased Premises shall not be unreasonably withheld so long as the Leased Premises are used by Tenant.

10.02    **Continuous Operation.** Tenant acknowledges that Landlord has communicated to Tenant that Tenant's continued operation of the Leased Premises is of the utmost importance to Landlord in the rental of space in the Shopping Center, the renewal of other leases in the Shopping Center, the efficient and economic supply of services and utilities, the receipt of Percentage Rent and the character and quality of the other tenants in the Shopping Center. Accordingly, Tenant, during the fifteen (15) year period following the date of opening, shall operate continuously in the Leased Premises as a Sears Brand Central appliance store, and thereafter, if Tenant continues to operate at the Leased Premises, Tenant shall use and operate the entire Leased Premises in a manner consistent with the highest standards prevailing in regional shopping centers and shall be open for business on each day and during such hours as a majority of the other tenants in the Shopping Center are open for business. The foregoing obligation of Tenant to operate continuously for fifteen (15) years from the date of opening as a Sears Brand Central appliance store is referred to herein as the "Operating Covenant." In the event that the Leased Premises are not operated continuously following expiration of the Operating Covenant, Landlord may at any time notify Tenant of Landlord's intent to recapture the Leased Premises and terminate this Lease. Tenant shall be deemed to have ceased to operate the Leased Premises continuously if Tenant fails to use and operate the entire Leased Premises in a manner consistent with the highest standards prevailing in regional shopping centers and shall be open for business on each day and during such hours as a majority of the other tenants in the Shopping Center are open for business. In such event, this Lease shall terminate at the time

specified in the notice, and the provisions herein pertaining to termination of this Lease by Landlord shall apply.

In the event that Tenant opens the Leased Premises during hours other than the hours in which the Shopping Center is open, Tenant shall keep closed the doors between the Leased Premises and the rest of the Shopping Center.

10.03    **Trade Name**.    Tenant shall operate the Leased Premises throughout the Term under Tenant's Trade Names, as set forth in Section 1.05, and no other trade name without the prior written consent of Landlord.

10.04    **Radius Restriction**.    Recognizing that this Lease provides for Percentage Rent based on Net Sales made by Tenant in or from the Leased Premises, neither Tenant, nor any of its heirs, legal representatives, beneficiaries, agents, parents, subsidiaries, subsidiaries of its parents, successors, sublessees, franchisees or assigns or any entity in which they or any of them have an interest, shall (i) directly or indirectly engage in, own or operate any competing store or business, which sells retail merchandise or services sold by Tenant in or from the Leased Premises under the Trade Name specified in Section 1.05, including a department or concession in another store, or (ii) use or permit the use of the same or a similar trade name, within the Radius set forth in Section 1.29 during the Term; provided, however, that nothing herein shall be construed to prevent the operation of any of Tenant's stores in existence as of the date of this Lease under their present name. Tenant shall prepare, keep, maintain and furnish to Landlord the same reports and records with respect to such other store or business locations operating within the Radius set forth in Section 1.29 as Tenant is required to prepare, keep, maintain and furnish to Landlord with respect to the Net Sales at the Leased Premises in order that Landlord may audit Net Sales as provided herein. Notwithstanding anything to the contrary contained herein, this Radius Restriction does not apply to any existing locations operated by Tenant on the date of this Lease.

In the event of any violation of Section 10.04 Landlord may hold Tenant in default under this Lease, and, in addition to all other remedies provided under Article 16, Landlord may elect to:

(a)    include the gross income of any such store or business within the Radius (computed in the same manner as for the Net Sales under Section 4.05(c)) in the Net Sales made from the Leased Premises and compute the Percentage Rent hereunder upon the aggregate of the Net Sales made from the Leased Premises and from such other store or business locations; or

(b)    terminate this Lease by giving to Tenant notice of Landlord's election to do so, in which event the Term of this Lease shall end, and all right, title and interest of Tenant hereunder shall expire on the date stated in such notice.

10.05    **Use Restrictions**.    Tenant shall not:



(a)    conduct or permit to be conducted at the Leased Premises any fire, bankruptcy, liquidation, going out of business, auction or closeout sale or any other sale or promotion which is out of the ordinary course of Tenant's continuing business operations at the Leased Premises;

(b)    use or permit to be used sidewalks adjacent to the Leased Premises or any other portion of the Common Areas for the sale or display of any merchandise or for any other business, occupation or undertaking;

(c)    use or permit to be used any sound broadcasting system or amplifying device which can be heard outside of the Leased Premises;

(d)    sell, distribute, display or offer for sale any roach clip, water pipe, bong, cocaine spoon, cigarette papers, hypodermic syringe or other paraphernalia commonly used with the consumption of illegal drugs;

(e)    sell, distribute, display or offer for sale any pornographic, lewd, suggestive or "adult" newspaper, book, magazine, film, picture representation or merchandise of any kind;

(f)    permit any persons to smoke tobacco products in the Leased Premises, except in areas designated by Landlord for such purposes;

(g)    use or occupy the Leased Premises for a purpose which would violate an exclusive use granted to another tenant of the Shopping Center, provided that Tenant has been notified in writing by Landlord of the existence of such exclusive use; or

(h)    use, occupy or permit the use of the Leased Premises for any purpose which would violate the Shopping Center's Rules and Regulations and, specifically, Exhibit D of this Agreement.

10.06    **Cleaning**  [Intentionally Omitted].

10.07    **Inventory, Staff and Fixtures**.  Tenant shall use for office, storage and other non-selling purposes only such space in the Leased Premises as is reasonably required to maintain Tenant's retail sales at the Leased Premises.  Tenant shall install and maintain at all times in the Leased Premises fixtures, furnishings, fittings and equipment consistent with a first-class retail establishment.  The weight of Tenant's fixtures, furnishings, fittings, equipment, supplies and inventory shall not exceed the safe loads for the Leased Premises.

10.08    **Displays**.  Tenant shall maintain complete and attractive displays of merchandise in the Leased Premises.  Tenant shall change such displays periodically as appropriate for a first-class retail establishment.  Tenant shall keep the displays clean and shall keep the same illuminated.  If, in Landlord's reasonable judgment, Tenant has failed to merchandise fully and attractively the displays so as to promote maximum sales within the Leased Premises, Tenant shall take under consideration Landlord's advice regarding re-merchandising such displays.

10.09    **Air Conditioning**.  Tenant at all times shall fully and adequately air condition the Leased Premises.

10.10    **Disturbances**.  Tenant shall neither commit or permit any waste upon the Leased Premises nor perform any act or carry on any practice which may injure the Leased Premises or any other part of the Shopping Center, or cause any offensive odor, noise or vibration, or constitute a nuisance or menace to any other occupant or other persons in the Shopping Center, and in no event shall any offensive noises be emitted from the Leased Premises.

10.11    **Signs**.  Tenant shall not place on the exterior of the Leased Premises any signs other than those signs (including the design, number and location of such signs and any replacements thereof) which shall have been approved first by Landlord, which approval shall not be unreasonably withheld.  All signs must be professionally designed and prepared and shall be limited in number.

10.12    **Deliveries**.  Tenant shall receive and deliver goods and merchandise only in the manner, at such times, and in such areas as Landlord may reasonably designate for such purpose.

10.13    **Trash Removal**.  Tenant shall keep all trash and refuse in covered trash receptacles, which trash receptacles shall be kept within the Leased Premises at all times, and in no event shall be stored outside of the Leased Premises.  Tenant shall cause such trash and refuse to be removed from the Leased Premises in the manner, at such times, and in such areas as Landlord may reasonably designate for such purpose.  If Landlord provides for trash removal by a contractor, Tenant shall use such contractor for its trash removal and pay when due all charges assessed in connection with such trash removal at the rates established therefor but only as long as such rates are in line with comparable services.  Payment will be made pursuant to the provisions of Sections 7.03 and 7.04.



10.14    **Compliance with Laws and Insurance Requirements**.  Tenant, at its expense, shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities pertaining to Tenant's use of the Leased Premises, with the requirements of Landlord's insurance carriers as set forth in this Agreement, and with the recorded covenants, conditions and restrictions affecting the Shopping Center existing as of the date of this Lease, regardless of when they become effective, including, without limitation, all applicable federal, state and local laws, regulations or ordinances pertaining to air and water quality, toxic or hazardous materials and substances, waste disposal, air emissions and other environmental matters, all zoning and other land use matters, and utility availability, and with any direction of any public officer or officers, pursuant to law, which shall impose any duty upon Landlord or Tenant with respect to the use or occupation of the Leased Premises. Tenant shall not directly or indirectly make any use of the Leased Premises which may jeopardize any insurance coverage or may increase the cost of insurance or require additional insurance coverage.  If improvements to the Leased Premises or the Shopping Center are made necessary, as a result of Tenant's specific use of the Leased Premises, to comply with any of the foregoing or with the requirements of insurance carriers, Tenant shall pay the entire cost thereof.

10.15    **Tenant Taxes**.  Tenant shall pay before any fine, penalty or interest accrues, and in any event before delinquency, every tax, assessment, license fee, excise, fine or penalty for violation of the State Closing Laws and other charge, however described, which is separately imposed on or levied, assessed or charged against Tenant by any governmental or quasi-governmental authority having jurisdiction, including, without limitation, upon or on account of:

(a)    operations at, occupancy of, or conduct of business in or from, the Leased Premises, by or with the permission of Tenant;

(b)    fixtures or personal property in the Leased Premises which do not belong to Landlord; and

      (c)    the Rent paid or payable by Tenant to Landlord for the Leased Premises or for the use and occupancy of all or any part thereof;

provided that if the fine, penalty, tax or other charge is imposed or levied on Landlord, Tenant shall pay to or reimburse Landlord such portion of any amounts payable under this Section 10.15 as Landlord may require at the time of and together with the monthly installments of Fixed Annual Minimum Rent payable under Section 4.01 and Landlord shall remit such amounts to the appropriate authorities as the same become due and payable.

10.16    **Landlord's Rights.**  Landlord may, from time to time, and at its sole discretion, close the enclosed mall and require that Tenant close the entrance from the Leased Premises to the enclosed mall for a period of time which Landlord may deem proper, to prevent any hazardous situation, to comply with any law, ordinance or order or regulation of any public authority having jurisdiction, or, during any strike, lockout, labor dispute, act of God, crime, commotion, fire or other casualty, or other conditions similar or dissimilar to those enunciated, or under circumstances in which fear or injury to life or property damage is present, or for any situation, which in the opinion of Landlord, warrants the closing or opening of such entrance. Landlord's decision to close, or not to close, Tenant's business or parts thereof or said entrance on any particular occasion shall not limit Landlord's prerogative on any future occasion. Under the provisions of this Section or any other part of this Lease, if Landlord decides to close Tenant's business or parts thereof or said entrance for any particular period of time Landlord shall not be liable to Tenant in any way, for any losses, costs, damages, expenses (direct or consequential) which Tenant may suffer, incur or pay due to any variation of business days or hours within the Premises. There shall be no abatement of Rent while the Shopping Center is closed at Landlord's request. Tenant's failure to comply with any notice served by Landlord requesting the closing or opening of all or parts of its business or of the entrance from the Leased Premises to the mall, for any particular period of time pursuant to the provisions of this or any other section of the Lease, shall constitute an Event of Default under the provisions of Article 16 of this Lease. In the event of an emergency, Landlord may require that Tenant open or close its business for a period of time which Landlord may deem proper. A situation shall be considered to constitute an emergency if, in Landlord's judgment, it is likely to constitute an immediate threat to the health, safety and/or welfare of the customers, employees or business invitees of Landlord or the tenants of the Shopping Center or could cause damage to the merchandise of tenants of the Shopping Center or to the property of Landlord or tenants of the Shopping Center. An emergency may include, among other things, a political rally, a hurricane or other natural phenomenon, and a visit to the region by religious figure(s).

## ARTICLE 11  UTILITIES AND OTHER SERVICES

11.01    **Landlord's Obligations.**  Landlord agrees to provide and maintain the necessary mains and conduits in order that water and electricity may be furnished to the Leased Premises. Landlord shall not be required to furnish Tenant any water, gas, electricity, light, power, telephone or any other facilities or services of any kind whatsoever. Except as otherwise provided in this Section or in Exhibit C hereof, Landlord shall not be responsible for providing any meters or other devices for the measurement of utilities supplied to the Leased Premises. Throughout the Term, Landlord, at its expense, shall maintain and keep in good order and repair the sprinkler system in the Leased Premises, including regular checking, testing and servicing thereof, and shall make any necessary replacements of such sprinkler system; provided that Landlord, at Tenant's expense, shall make any or all repairs and replacements thereto necessitated by acts, omissions to act or negligence of Tenant or Tenant's agents, employees and contractors. In consideration thereof, Tenant shall pay to Landlord, for each Lease Year or Partial Lease Year during the Term, the Sprinkler Charge, as set forth in Section 1.21. The Sprinkler Charge shall be paid in twelve (12) equal monthly installments, in advance, on the first day of each and every calendar month during the Term. Should the utility company furnishing water to the Shopping Center levy, assess or impose upon Landlord a sprinkler system backup charge, Tenant shall pay to Landlord Tenant's Proportionate Share thereof within thirty (30) days after billing by Landlord, in addition to the Sprinkler Charge.



11.02    **Tenant's Obligations.**  Tenant shall apply for and arrange for the installation of all utility meters or other devices and Tenant shall be solely responsible for the prompt payment of all installations and service charges, as and when the same become due and payable. Tenant shall pay when due all charges for water, sewer, electricity, gas, telephone or any other utility used or consumed in the Leased Premises. If Tenant fails to so pay, Landlord, in addition to declaring Tenant in default pursuant to Article 16, may, but shall not be obligated to, pay for such utilities and treat such amount, together with the interest accruing thereon, as additional Rent. Landlord shall not be liable in the event of any interruption in the supply of any of such utilities to the Leased Premises. Tenant agrees that it will not install any equipment which will exceed the capacity of the utility lines leading into the Leased Premises or the Building and that if any equipment so installed shall require additional utility facilities to be brought into the Leased Premises, the same shall be installed at Tenant's expense in accordance with plans and specifications to be approved in writing by Landlord. Interruption or impairment of any such utility or related service caused by or necessitated by repairs, improvements or any other cause shall not

give rise to an abatement or a right or cause of action by Tenant against Landlord in damages or otherwise. Landlord may at any time, without obligation to Tenant, discontinue furnishing any such utility or related service that Landlord may have been rendering, provided that such service is otherwise available in the community. No such action by Landlord shall be construed as an eviction or disturbance of possession or as an election by Landlord to terminate this Lease. Tenant shall pay for and indemnify and hold Landlord harmless against any liability on account of charges for water, gas, electricity, light, power, air conditioning, telephone or other communications service or other utility used, rendered or supplied to, upon or in connection with the Leased Premises. References herein to "charges for water" shall include any sewer rent, charge or other tax, rent, or levy assessed, imposed or made a lien upon the Leased Premises pursuant to law, order or regulation, made in connection with the use, consumption, maintenance or supply of water, or any water system or sewage connection system. Anything herein to the contrary notwithstanding, it is expressly understood and agreed that if Landlord shall elect to supply the water, gas or electricity for any purpose in the Leased Premises, Tenant hereby covenants and agrees to accept and use the same as tendered by Landlord or by any agent employed by Landlord or by an independent contractor selected by Landlord and to pay therefor at a rate not exceeding the rate which Tenant would be required to pay should Tenant have bought said water, sewer, gas, electricity or any other utility directly from the utility company or companies furnishing same to the Shopping Center.

11.03   **Air Conditioning**. Landlord shall provide Cooling Service to the Leased Premises during all normal hours in which the Shopping Center is in operation and open for business. The term "Cooling Service" as used herein is defined to mean, either (i) if the Leased Premises contain an air handling unit, chilled water service for Landlord's central air conditioning system; or (ii) if the Leased Premises are served by one zone of a multi-zone air handling unit, cooled air in accordance with the design conditions of said multi-zone unit. Landlord shall operate, service, maintain, repair and replace the air-conditioning system up to, but not beyond, the point where it is connected to Tenant's air handling unit installed in the Leased Premises, and to pay for all utilities, including, but not limited to, water and power and for parts used in connection with such air conditioning system up to, but not beyond, the point where it is connected to Tenant's air handling unit installed in the Leased Premises. Tenant covenants and agrees to accept and use the central air-conditioning system for the Shopping Center installed by Landlord, in accordance with the following terms and conditions as to the operation, maintenance, repair and replacement of the air-conditioning system:

(a)   Tenant shall pay the cost and expense of operating, servicing, maintaining, replacing and repairing the air handling units and all other appurtenances installed in the Leased Premises as shown and illustrated in the plans, specifications and drawings for the construction of the Leased Premises. Tenant shall also pay the cost of all materials (including, without limitation, air filters and lubricants), components, replacement parts and the like, required to maintain, service and repair the air handling unit servicing the Leased Premises. Whenever an air handling unit serves more than one tenant's space, the maintenance charges for such multi-zone unit will be prorated among all tenants served by such air handling unit determined in accordance with the following sentences. The share of maintenance charges for multi-zone units for each such tenant shall be a fraction, the numerator of which shall be the Gross Leasable Area for each such tenant, and the denominator of which shall be the gross leasable area of all areas served by the air handling unit. Tenant shall use air handling units in accordance with the approved plans, specifications and drawings and Tenant shall not alter or vary the quantities of air and water indicated therein. Tenant shall not increase its cooling load or electric usage capacity (including changing the Tenant's lighting system) beyond that initially installed in the Leased Premises in accordance with the approved plans thereof, without the prior written consent of Landlord, and Tenant shall not use cooling water for any purpose other than comfort conditioning of the Leased Premises. If, in any event or for any reason whatsoever, said quantities of air or water are altered by Tenant, Tenant's employees, servants or by any person acting in Tenant's name or behalf, Tenant shall be charged and be liable to Landlord for all cost and expense incurred by Landlord in readjusting the air conditioning system of the Shopping Center to its designed condition. Landlord shall not be liable for damages to third parties, either direct or consequential, that may arise from any alterations in the quantities of air or water made by Tenant, its employees, servants, concessionaires or agents, or by any person acting in Tenant's name or behalf. Tenant shall be liable for said damages.



(b)   At all times during the Term, Tenant shall have and keep in force a maintenance contract, in a form and with a contractor satisfactory to Landlord, providing for inspection, maintenance and necessary repairs (including, without limitation, the replacement of parts) of the ventilating and air conditioning equipment in the Leased Premises at least once each quarter. Said contract shall provide that it will not be cancelable by either party thereto except after thirty (30) days written notice to Landlord.

(c)   Tenant shall pay Landlord, for Cooling Service in the Leased Premises during all business days during which the Shopping Center shall be in operation and open for business, the annual Cooling Service Charge specified in Section 1.22 which sum represents the annual charge Landlord shall make for combined electric energy, service and maintenance of such air

conditioning service, subject to subsection (f) hereinbelow. The Cooling Service Charge shall be adjusted by Landlord, from time to time, to reflect any excess in Tenant's design conditions over and above Landlord's basic design criteria, in accordance with a schedule of adjustment prepared by Landlord. The Cooling Service Charge shall be paid by Tenant in equal monthly installments, in advance, on the first day of each calendar month during the Term or any extensions thereof.

(d)     In addition to the Cooling Service Charge, Tenant shall pay Landlord for Cooling Service in the Leased Premises outside normal Hours of Operation of the Shopping Center an amount based upon Tenant's Proportionate Share of the cost of providing such service and/or the tonnage of the unit installed in the Leased Premises, determined by a rate schedule prepared by Landlord from time to time. Cooling Service outside normal Hours of Operation shall only be provided to Tenant if Tenant has made a prior written request to Landlord for such additional service.

(e)     Landlord shall use reasonable efforts to provide Cooling Service in the Leased Premises during normal Hours of Operation of the Shopping Center on a continuous basis and at a maximum practicable efficiency consistent with the designed conditions and requirements, but Landlord shall not be liable to Tenant, its permitted subtenants, licensees, concessionaires, officers, employees, agents, customers or invitees for damages, either direct or consequential, that may arise (i) from any reasonable interruptions of Cooling Service or (ii) from any interruptions of Cooling Service not solely attributable to Landlord.

(f)     During the Term, and any extension thereof, the charges that Tenant shall pay Landlord may be adjusted by Landlord annually to reflect the percentage increase over the previous year in the cost of operation, maintenance, repair and replacement of the central air conditioning system.

(g)     Whenever Tenant vacates or ceases to conduct business in all or any part of the Leased Premises by reason of condemnation, damage by fire or the elements or other causes beyond Tenant's control, the sum herein payable for Cooling Service shall abate in the ratio that the floor area of the part of the Leased Premises so vacated or not used in the conduct of business (measured in the same manner as the Gross Leasable Area) bears to the total Gross Leasable Area.

11.04   **Regulations Regarding Utilities Services.** Subject to the terms of Section 11.03(g), above, Tenant agrees to cooperate fully at all times with Landlord in abiding by all reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of all utilities and services reasonably necessary for the operation of the Leased Premises and the Shopping Center. Throughout the Term of this Lease, Landlord shall have free access to any and all mechanical installations, and Tenant agrees that there shall be no construction of partitions or other obstructions which might interfere with access to or the moving of servicing equipment to or from the enclosures containing said installations. Tenant further agrees that neither Tenant nor its employees, agents, licensees, invitees or contractors at any time (including, without limitation, while making any alterations, improvements, or additions) shall tamper with, adjust or otherwise affect Landlord's mechanical installations or utilities and services reasonably necessary for the operation of the Leased Premises and the Shopping Center in any manner.



11.05   **Cleaning.** Tenant shall arrange for its own janitorial or cleaning services for the Leased Premises, at its sole cost and expense.

## ARTICLE 12   DAMAGE OR DESTRUCTION BY CASUALTY

12.01   **Damage or Destruction By Casualty.** In the event the Leased Premises are damaged by fire, explosion or any other casualty or occurrence covered by Landlord's insurance, to the extent of twenty-five percent (25%) or less of the cost of replacement of the Leased Premises, and so long as the mortgagee under any Mortgage (as defined in Section 20.01 below) makes available to Landlord the necessary insurance proceeds, then, subject to the provisions of Section 12.02 hereof, Landlord shall, upon Landlord's receipt of the insurance proceeds promptly, and in any event within thirty (30) days of receipt of such proceeds, commence repair and restore Landlord's Work, as described in Section II of Exhibit C, substantially to the condition thereof as existed immediately prior to such damage or destruction, said Work to be finished within two hundred seventy (270) days and limited, however, to the extent of the insurance proceeds actually received by the Landlord therefor. In the event the Leased Premises are damaged by fire, explosion or any other casualty or occurrence and (a) such casualty or occurrence shall not be covered by Landlord's insurance or the mortgagee under any Mortgage does not make available to Landlord the necessary insurance proceeds, or (b) the Leased Premises are damaged to the extent of more than twenty-five percent (25%) of the cost of replacement thereof, or (c) the buildings (taken in the aggregate) in the Shopping Center are damaged to the extent of more than

twenty-five percent (25%) of the cost of replacement thereof, or (d) the Building is damaged to the extent of more than forty percent (40%) of the cost of replacement thereof (notwithstanding the fact that the Leased Premises may be so damaged to an extent which shall be twenty-five percent (25%) or less of the cost of replacement thereof), or (e) the Leased Premises or the Building cannot, in Landlord's opinion, be repaired within two hundred seventy (270) days of such damage, regardless of the extent of the damage to any of them, then (x) Landlord may elect either to repair or rebuild Landlord's Work or the Building or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days after the happening of the event causing the damage and (y) notwithstanding Landlord's election to rebuild under the preceding subparagraph (x), if the term of the Operating Covenant has expired at the time of the happening of the event causing such casualty and such casualty was not caused by the act or neglect of Tenant, Tenant may elect to terminate this Lease upon giving notice of such election in writing to Landlord within ninety (90) days after the happening of said event.

12.02  **Restoration.**

(a)     If Landlord is required or elects to repair or rebuild the Leased Premises as provided in Section 12.01, Landlord shall not be obligated to expend for such repair or rebuilding an amount in excess of the insurance proceeds recovered as a result of such damage, it being understood that Landlord insures the Leased Premises and the building of which the Leased Premises are a part to the extent of at least eighty percent (80%) of the replacement value, exclusive of the cost of excavations, footings below floor level and foundations. In any event, Landlord's obligation to repair or rebuild shall be limited to restoring Landlord's Work as described in Exhibit C to substantially the condition in which the same existed prior to the casualty.

(b)     If Landlord is required or elects to repair or rebuild the Leased Premises as provided in Section 12.01, Tenant agrees that, in the event that Tenant does not elect to terminate this Lease under §12.01, promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence, but in no event for a period of time longer than Tenant's Construction Period, at its sole cost and expense, to rebuild, repair and restore its signs, stock in trade, fixtures, furnishings, floor coverings, equipment and all items of Tenant's Work as described in Exhibit C.

(c)     If Landlord is required or elects to repair or rebuild the Leased Premises as provided in Section 12.01, but Tenant nevertheless elects to terminate this Lease pursuant to Section 12.01, then Tenant shall proceed with reasonable diligence, but in no event for a period of time longer than Tenant's Construction Period, at its sole cost and expense, to rebuild, repair and restore the Leased Premises to the condition it was in at the time possession of the Leased Premises was delivered to Tenant. If as a result of the casualty, Landlord must reconstruct the shell around the Leased Premises, Tenant shall have no obligation with respect to repairing or rebuilding the Leased Premises except to remove debris of Tenant remaining at the site of the Leased Premises.



(d)     Notwithstanding anything contained in this Article 12 to the contrary, Landlord shall have no obligation to rebuild the Shopping Center (or any part thereof) or the Leased Premises if the damage occurs at any time during the last two (2) years of the original term, or renewal term, as the case may be, of this Lease. If such damage occurs in said last two (2) years, either party may terminate this Lease by written notice to the other within sixty (60) days after such damage.

12.03  **Abatement of Rent.** In the event any such fire or casualty damage not caused by the act or neglect of Tenant, its agents or employees, renders the Leased Premises untenantable and if this Lease is not terminated pursuant to the provisions of Section 12.01, then Rent shall abate during the period beginning with the date of such damage and ending with the date that the Leased Premises re-open for business (or the expiration of Tenant's term for rebuilding, repairing and restoring as provided in Section 12.02, whichever occurs sooner). Such abatement shall be in an amount bearing the same ratio to the total amount of Rent for such period as the portion of the Leased Premises not ready for occupancy from time to time bears to the entire Leased Premises. In the event of termination of this Lease pursuant to Section 12.01, Rent shall be apportioned on a per diem basis and shall be paid to the date of the fire or casualty.



## ARTICLE 13   CONDEMNATION

13.01   **Total Condemnation.** If all of the Leased Premises are taken by any public or quasi-public authority under the power of condemnation, eminent domain or appropriation, or in the event of conveyance in lieu thereof, the Term shall cease as of the day possession shall be taken by such authority, and Tenant shall pay Rent up to that date with an appropriate refund by Landlord of such Rent as shall have been paid in advance for a period subsequent to said date.

13.02   **Partial Condemnation.** If twenty-five percent (25%) or more of the Gross Leasable Area shall be so taken or conveyed or if the Leased Premises shall be divided into separate parts by reason of such taking and, provided Landlord does not extend the Leased Premises or build additionally to complete seventy-six percent (76%) of the original Gross Leasable Area or restore the Leased Premises to a retail store unit, then Landlord shall have the right to terminate this Lease by written notice to Tenant within sixty (60) days after receiving knowledge of the taking, which termination shall be effective as of the date possession shall be taken by the condemning authority. If the Leased Premises shall be rendered totally unusable, then Tenant shall have the right to terminate this Lease on sixty (60) days' notice to Landlord. Any unearned Rent shall be refunded to Tenant. In the event of any such taking of part of the Leased Premises, the Rent payable hereunder shall be reduced in the same proportion that the Gross Leasable Area is reduced by or as a consequence of such condemnation. If twenty-five percent (25%) or less of the Gross Leasable Area shall be so taken or conveyed, a proportionate abatement of Rent shall be allowed, if and to the extent that such Rent, or a portion thereof, is paid on the basis the Gross Leasable Area and this Lease shall otherwise remain in full force and effect. If more than fifty percent (50%) of the floor area of the Leased Premises or more than twenty-five percent (25%) of the Floor Area of the Shopping Center, shall be so taken or conveyed, Landlord may, by notice in writing to Tenant delivered on or before the day of surrendering possession to the authority, terminate this Lease, and any unearned Fixed Annual Minimum Rent or any other unearned prepaid Rent shall be paid or refunded as of the date of such termination. If more than fifty percent (50%) of the floor area of each floor of the Leased Premises or more than twenty-five percent (25%) of the Floor Area of the Shopping Center shall be so taken or conveyed, and such taking or conveyance materially adversely affects the operations of Tenant, Tenant may, on sixty (60) days' prior written notice to Landlord, terminate this Lease.

13.03   **Compensation.** All compensation awarded for any such taking or conveyance, whether for the whole or a part of the Leased Premises, shall go to and be the sole property of Landlord, whether such damages shall be awarded as compensation for the unexpired portion of, or diminution in the value of, the leasehold or for compensation for or damages to the fee of the Leased Premises or otherwise. Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation, provided, however, that nothing herein contained shall be construed to preclude Tenant from prosecuting any claim directly against the condemning authority, but not against Landlord, for the value of or damages to, or for the cost of removal of, Tenant's trade fixtures and other personal property which under the terms of this Lease would remain Tenant's property upon the expiration of the Term, as may be recoverable by Tenant in Tenant's own right, provided further that no such claim shall diminish or otherwise affect Landlord's award. Landlord shall not be liable to Tenant or Tenant's creditors, subtenants, licensees, concessionaires, officers, employees, agents, customers and invitees for any damage, loss of property or loss of business which they may suffer as a consequence of government or public authority expropriation or condemnation of any or all parts of the Shopping Center.



13.04   **Common Areas.** If any part of the Common Areas are taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, this Lease shall not terminate, nor shall the Rent payable hereunder be reduced, nor shall Tenant be entitled to any part of the award made for such taking. Notwithstanding the foregoing, Landlord may terminate this Lease if the area of the Common Areas remaining following such taking or purchase in lieu thereof plus any additional parking area provided by Landlord, shall be less than sixty-five percent (65%) of the total area of the Common Areas at the time of such taking or purchase in lieu thereof; provided, that the purpose of the termination was not to replace Tenant in the Leased Premises with another tenant. It shall be deemed conclusive evidence that Landlord's reason for terminating this Lease was not to replace Tenant in the Leased Premises if the Leased Premises remain vacant for a period in excess of one hundred twenty (120) days following termination of this Lease.

## ARTICLE 14   WAIVER OF CERTAIN CLAIMS; INDEMNITY BY TENANT

[Intentionally Omitted]

## ARTICLE 15  BANKRUPTCY

15.01  **Conditions to the Assumption and Assignment of the Lease under Chapter 7 of the Bankruptcy Act.**  In the event that Tenant shall file a petition, or an order for relief is entered against Tenant, under Chapter 7 of the Bankruptcy Code, and the trustee of Tenant shall elect to assume this Lease for the purpose of assigning the same, such election or any assignment may only be made if all of the terms and conditions of Sections 15.02 and 15.04 hereof are satisfied.  If such trustee shall fail to elect to assume this Lease for the purpose of assigning the same within sixty (60) days after such trustee shall have been appointed, this Lease shall be deemed to have been rejected.  Landlord shall be thereupon immediately entitled to possession of the Leased Premises without further obligation to Tenant or such trustee, and this Lease shall be cancelled, but Landlord's right to be compensated for damages in such bankruptcy proceeding shall survive.

15.02  **Conditions to the Assumption of the Lease in Bankruptcy Proceedings.**  In the event that Tenant files a petition for reorganization under Chapters 11 or 13 of the Bankruptcy Code or a proceeding filed by or against Tenant under any other chapter of the Bankruptcy Code is converted to a Chapter 11 or 13 proceeding, and the trustee of Tenant or Tenant as a debtor-in-possession fails to assume this Lease within sixty (60) days from the date of filing of the petition or such conversion, the trustee or debtor-in-possession shall be deemed to have rejected this Lease.  No election to assume this Lease (including any assumption under Section 15.01 above) shall be effective unless in writing and addressed to Landlord and unless, in Landlord's business judgment, all of the following conditions, which Landlord and Tenant acknowledge to be commercially reasonable, have been satisfied:

(a)  The trustee or debtor-in-possession has cured or has provided Landlord adequate assurance (as defined hereunder) that:  (i) within ten (10) days from the date of such assumption, the trustee will cure all monetary defaults under this Lease, and (ii) within thirty (30) days from the date of such assumption, the trustee will cure all non-monetary defaults under this Lease.

(b)  The trustee or the debtor-in-possession has compensated Landlord, or has provided to Landlord adequate assurance (as defined hereunder) that within ten (10) days from the date of assumption Landlord will be compensated, for any pecuniary loss incurred by Landlord arising from the default of Tenant, the trustee, or the debtor-in-possession, as such loss is described in Landlord's written statement of pecuniary loss sent to the trustee or debtor-in-possession.



(c)  The trustee or the debtor-in-possession has provided Landlord with adequate assurance of the future performance of each of Tenant's obligations under the Lease; provided, however, that: (i) the trustee or debtor-in-possession shall also deposit with Landlord, as security for the timely payment of Rent, an amount equal to three (3) months' Fixed Annual Minimum Rent (as adjusted pursuant to Section 15.02(c)(iii) below) accruing under this Lease; and (ii) if not otherwise required by the terms of this Lease, trustee or debtor-in-possession shall also pay in advance on each day that Fixed Annual Minimum Rent is payable, one half (1/2) of Tenant's annual obligations under this Lease for Rent Adjustments, Merchant's Association or Promotional Fund dues, Advertising Service Charge, Cooling Service Charge and Sprinkler Charge; (iii) from and after the date of the assumption of this Lease, the trustee or debtor-in-possession shall pay as minimum rent an amount equal to the sum of the Fixed Annual Minimum Rent otherwise payable hereunder, plus the highest amount of the annual Percentage Rent paid by Tenant to Landlord from the Commencement Date to the date of Tenant's petition under the Bankruptcy Code, which amount shall be payable in advance, in equal monthly installments, on each day that Fixed Annual Minimum Rent is payable; (iv) the obligations imposed upon the trustee or debtor-in-possession shall continue with respect to Tenant after the completion of bankruptcy proceedings.

(d)  Landlord has determined that the assumption of the Lease will not:  (i) breach any provision in any other lease, mortgage, financing agreement or other agreement by which Landlord is bound relating to the Shopping Center, or (ii) adversely affect, in Landlord's judgment, the tenant mix of the Shopping Center or any other attempt by Landlord to provide a specific variety of retail stores in the Shopping Center which, in Landlord's judgment, would be most beneficial to all of the tenants of the Shopping Center and would enhance the image, reputation and profitability of the Shopping Center.

For the purposes of this Section, "adequate assurance" shall mean:

(aa)  Landlord shall determine that the trustee or the debtor-in-possession has, and will continue to have, sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that the trustee or debtor-in-possession will have sufficient funds to fulfill the obligations of Tenant under this Lease and to keep the Leased Premises stocked with merchandise and properly staffed with sufficient employees to conduct a fully operational, actively promoted business on the Leased Premises; and

(bb)    an order shall have been entered segregating sufficient cash payable to Landlord or there shall have been granted a valid and perfected first lien and security interest in property of the Tenant, trustee or debtor-in-possession, acceptable as to value and kind to Landlord, to secure to Landlord the obligation of the trustee or debtor-in-possession to cure the monetary and non-monetary defaults under this Lease within the time periods set forth above.

15.03  **Landlord's Option to Terminate Upon Subsequent Bankruptcy of Tenant.** In the event that this Lease is assumed by a trustee appointed for Tenant or by Tenant as debtor-in-possession under the provisions of Section 15.02 hereof, and, thereafter, Tenant is either adjudicated a bankrupt or files a subsequent Petition for Arrangement under Chapter 11 of the Bankruptcy Code, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder by giving written notice of its election to so terminate.

15.04  **Conditions to the Assignment of the Lease in Bankruptcy Proceedings.** If the trustee or debtor-in-possession has assumed the Lease, pursuant to the terms and provisions of Sections 15.01 or 15.02 herein, for the purpose of assigning Tenant's interest under this Lease or the estate created thereby to any other person, such interest or estate may be so assigned only if Landlord shall acknowledge in writing that the intended assignee has provided adequate assurance of future performance of all of the terms, covenants and conditions of this Lease to be performed by Tenant. For the purposes of this Section, "adequate assurance of future performance" shall mean that Landlord shall have ascertained that at least each of the following conditions has been satisfied:

(a)    The assignee has submitted a current financial statement audited by a certified public accountant which shows a net worth and working capital in amounts determined to be sufficient by Landlord to assure the future performance by such assignee of Tenant's obligations under this Lease;

(b)    If requested by Landlord, the assignee shall have obtained guarantees in form and substance satisfactory to Landlord from one or more persons who satisfy Landlord's standards of creditworthiness;

(c)    The assignee has submitted written evidence satisfactory to Landlord of substantial retailing experience in a shopping center of comparable size to the Shopping Center and in the sale of merchandise and services permitted under this Lease; and

(d)    Landlord has obtained all consents or waivers from any third party required under any lease, mortgage, financing arrangement or other agreement by which Landlord is bound to enable Landlord to permit such assignment.



15.05  **Use and Occupancy Charges.** When, pursuant to the Bankruptcy Code, the trustee or debtor-in-possession shall be obligated to pay reasonable use and occupancy charges for the use of the Leased Premises or any portion thereof, such charges shall not be less than the Fixed Annual Minimum Rent and other monetary obligations of Tenant for the payment of Rent Adjustments, Merchants Association or Promotional Fund dues, Advertising Service Charge, Cooling Service Charge and Sprinkler Charge.

15.06  **Tenant's Interest Not Transferable by Virtue of State Insolvency Law Without Landlord's Consent.** Neither Tenant's interest in the Lease, nor any lesser interest of Tenant herein, nor any estate of Tenant hereby created, shall pass to any trustee, receiver, assignee for the benefit of creditors, or any other person or entity, or otherwise by operation of law under the laws of any state or territory or other governmental entity having jurisdiction of the person or property of Tenant unless Landlord shall consent to such transfer in writing. No acceptance by Landlord of Rent from any such trustee, receiver, assignee, person or other entity shall be deemed to have waived, nor shall it waive, the need to obtain Landlord's consent or Landlord's right to terminate this Lease for any transfer of Tenant's interest under this Lease without such consent.

15.07  **Landlord's Option to Terminate Upon Insolvency of Tenant or Guarantor Under State Insolvency Law or Upon Insolvency of Guarantor Under Federal Bankruptcy Act.** In the event the estate of Tenant created hereby shall be taken in execution or by other process of law, or if Tenant or any guarantor of Tenant's obligations hereunder ("guarantor") shall be adjudicated insolvent pursuant to the provisions of any present or future insolvency law under the laws of any state or territory or other governmental entity having jurisdiction (collectively referred to as "State Law"), or if any proceedings are filed by or against such guarantor under the Bankruptcy Code, or any similar provisions of any future federal bankruptcy law, or if a receiver or trustee of the property of Tenant or guarantor shall be appointed under State Law by reason of Tenant's or guarantor's insolvency or inability to pay its debts as they become due or otherwise, or if any assignment shall be made of Tenant's guarantor's property for the benefit of creditors under State Law; then, and in such event, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder, by giving Tenant written notice of the election to so terminate.

15.08   **Regulated Tenants**. If Tenant or Tenant's guarantor, if any, is, or becomes, a business not subject to the Bankruptcy Code, such as a banking or an insurance entity, then, in addition to the other remedies and rights provided to Landlord under this Lease, at law, or in equity, Landlord may declare Tenant in default if (a) any state, federal or other regulatory authority, administrative agency, board or other body initiates a proceeding or other action to take, or actually takes, control or possession of Tenant, or Tenant's guarantor, if any; or (b) if any such body or court of competent jurisdiction orders or directs the liquidation or dissolution of Tenant, or Tenant's guarantor, if any.

15.09   **Bankruptcy Code**. Notwithstanding any provision of this Article 15 to the contrary, Tenant and Landlord shall have no right granted to them or obligation imposed upon them hereunder that is prohibited by the provisions of the Bankruptcy Code (as the same may have been modified or superseded as of the date enforcement is sought).

### ARTICLE 16  DEFAULT

16.01   **Events of Default**. In addition to and notwithstanding any other cause or causes of Default which may have been specified within the provisions of this Lease, any one or more of the following occurrences or acts shall constitute an Event of Default under this Lease:

(a)   if Tenant during the Term shall (i) fail to make its initial payment of Rent one hundred fifty (150) days after the Delivery Date or thereafter fail to make any payment of Rent or other sum herein required to be paid by Tenant for a period of thirty (30) days after delivery by Landlord of written notice to Tenant that any such payment has become due; or (ii) fail to pay Rent or other sums herein required to be paid by Tenant when due on three or more occasions during any twelve (12) month period; or (iii) fail to cure, within a reasonable period of time following notice of the condition or following receipt of notice from Landlord, any condition which Tenant has created or suffered in violation of law or this Lease that is dangerous and that could cause imminent harm; or (iv) fail to observe or perform any of the covenants in respect to assignment, subletting and any encumbrance set forth in Article 15 regardless of whether any such assignment, subletting or encumbrance is void or voidable; or (v) fail to pay when due utilities as required under Section 11.02; or (vi) fail to open for business on or before April 1, 1997 (so long as the delay in opening was not caused by Landlord's delay in approving Tenant's drawings) or cease at any time during the Term to operate Tenant's business from the Leased Premises continuously and without interruption during the term of the Operating Covenant; or (vii) make an assignment or sublet the Leased Premises and/or act in contravention of Section 21.05; or (viii) fail to observe or perform any other provision of this Lease for thirty (30) days after Landlord shall have delivered to Tenant written notice of such failure (provided that in the case of any default referred to in this clause (viii), which cannot be cured within such thirty (30) day period, if Tenant shall commence to cure the same within such thirty (30) day period and thereafter shall prosecute the curing of same with diligence and continuity, then the time within which such failure may be cured shall be extended, with Landlord's written consent, for such period not to exceed ninety (90) days as may be necessary to complete the curing of same with diligence and continuity); or

(b)   if the Leased Premises shall have been abandoned; for the purposes hereof the Leased Premises shall be deemed to have been abandoned if Tenant transfers a substantial part of Tenant's operations, business and personnel from the Leased Premises to another location or fails to carry on its business at the Leased Premises for a period of ten (10) consecutive business days unless precluded from so doing by reason of casualty or condemnation or remodelling permitted pursuant to Article 26; or

(c)   if Tenant fails to take possession of the Leased Premises when possession is tendered by Landlord, or fails to submit plans or other information regarding Tenant's Work for Landlord's approval, or fails to commence and complete construction of Tenant's Work to be constructed by Tenant when and as required by the provisions of this Lease and open its business therein promptly upon such completion; or

(d)   if the interest of Tenant in the Leased Premises shall be offered for sale or sold, or if Tenant does, or permits to be done, any act which creates a mechanic lien or claim, against the Building and Tenant does not comply with provisions of Section 22.27.

16.02   **Rights and Remedies of Landlord**. If an Event of Default occurs, Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative and shall not operate to exclude or to deprive Landlord of any other right or remedy allowed it by law:

(a)   Landlord may terminate this Lease by giving to Tenant notice of Landlord's election to do so, in which event the Term of this Lease shall end, and all right, title and interest of Tenant hereunder shall expire on the date stated in such notice;



(b)     Landlord may terminate the right of Tenant to possession of the Leased Premises without terminating this Lease by giving notice to Tenant that Tenant's right of possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Leased Premises or any part thereof shall cease on the date stated in such notice; and

(c)     Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law  for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

In addition to the foregoing remedies and any other remedies available to Landlord at law or in equity, in the event that Tenant does not fully comply with the provisions of Section 10.02, Fixed Annual Minimum Rent (prorated on a minimum daily basis) shall be increased by fifty percent (50%) for any day that Tenant fails to occupy, use, operate, and open for business the entire Leased Premises pursuant to the Operating Covenant as required by Section 10.02. Such sum represents liquidated damages (and not a penalty) which the parties agree Landlord will suffer by reason of Tenant's noncompliance.

16.03   **Right to Re-Enter**.   If Landlord exercises either of the remedies provided in Sections 16.02(a) or (b), Tenant shall surrender possession and vacate the Leased Premises and immediately deliver possession thereof to Landlord, and Landlord may re-enter and take complete and peaceful possession of the Leased Premises, with process of law, full and complete license to do so being hereby granted to Landlord, and Landlord may remove all occupants and property therefrom, using such force as may be necessary and permitted by law, without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law.



16.04   **Right to Relet**.   At any time and from time to time after the repossession of the Leased Premises or any part thereof pursuant to Section 16.03, whether or not this Lease shall have been terminated pursuant to Section 16.02, Landlord may (but shall be under no obligation to) relet the Leased Premises or any part thereof, in the name of Tenant or Landlord or otherwise, without notice to Tenant, for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) and on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its absolute discretion, may determine, and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be responsible or liable for any failure to collect any rent due upon such reletting. Tenant agrees that Landlord shall have no obligation to relet the Leased Premises to a potential substitute tenant (i) before Landlord rents other vacant space in the Shopping Center; (ii) if there is a risk or probability that the substitute tenant will make fewer sales upon which Landlord is entitled to collect Percentage Rent; (iii) if the nature of the substitute tenant's business is not consistent with the tenant mix of the Shopping Center or with any other Tenant's leases containing provisions against Landlord leasing space in the Shopping Center for certain uses; or (iv) if the nature of the substitute Tenant's business may have an adverse impact upon the first-class, high-grade manner in which the Shopping Center is operated or with the high reputation of the Shopping Center, even though in each of the aforesaid circumstances the potential substitute Tenant may have a good credit rating.

16.05   **Tenant to Remain Liable**.   No expiration or termination of this Lease pursuant to Section 16.02, by operation of law or otherwise, and no repossession of the Leased Premises or any part thereof pursuant to Section 16.03 or otherwise, and no reletting of the Leased Premises or any part thereof pursuant to Section 16.04, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting. The parties acknowledge that Tenant's right to extend or renew this Lease does not give rise to any obligation on the part of Tenant with respect to the term covered by such extension or renewal, if Tenant does not exercise its option to extend or renew this Lease.

16.06   **Current and Final Damages**.   If Landlord terminates the right of Tenant to possession of the Leased Premises without terminating this Lease or if this Lease is terminated by Landlord pursuant to Section 16.02(a), Landlord shall have the right to immediate recovery of all Rent accrued and unpaid for the period up to and including such termination date as well as all other amounts which Tenant has agreed to pay under any of the provisions of this Lease, which then may be owing and unpaid, and all costs and expenses, including court costs and attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder. In addition, Landlord shall be entitled to recover any additional damages, including attorneys' fees and court costs, which Landlord has sustained as a result of the breach of any of the covenants of this Lease other than for the payment of Rent. Such termination of possession or termination of the Lease shall not release Tenant, in whole or in part, from Tenant's obligation to pay the Rent hereunder for the full Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Fixed Annual Minimum Rent, Percentage Rent (as calculated pursuant to Section 16.12), Rent Adjustments and Re-Adjustments and any other sums accruing as they become due under this Lease during the period from the date of such notice of termination of

possession to the stated end of the Term. In any such case, Landlord may relet the Leased Premises or any part thereof for the account of Tenant for such rent, for such time (which may be for a term extending beyond the Term of this Lease) and upon such terms as Landlord reasonably shall determine and collect the rents from such reletting. Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting. Also, in any such case, Landlord may make repairs, alterations and additions in or to the Leased Premises and redecorate the same to the extent reasonably deemed by Landlord necessary or desirable and in connection therewith change the locks to the Leased Premises, and Tenant upon demand shall pay the cost of all the foregoing together with Landlord's expenses of reletting. The rents from any such reletting shall be applied first to the payment of the expenses of reentry, redecoration, repair and alterations and the expenses of reletting and second to the payment of Rent herein provided to be paid by Tenant. Any excess or residue shall operate only as an offsetting credit against the amount of Rent due and owing as the same thereafter becomes due and payable hereunder, and the use of such offsetting credit to reduce the amount of Rent due Landlord, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue and any such excess or residue shall belong to Landlord solely, and in no event shall Tenant be entitled to a credit on its indebtedness to Landlord in excess of the aggregate sum, including Fixed Annual Minimum Rent, Percentage Rent (as calculated pursuant to Section 16.12) and Rent Adjustments and Re-Adjustments, which would have been paid by Tenant for the period for which the credit to Tenant is being determined, had no Event of Default occurred. No such reentry or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease, unless a written notice of such intention is given to Tenant, or shall operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, and Landlord, at any time, may sue and recover judgment for any deficiencies remaining from time to time after the application of the proceeds of any such reletting from time to time. The parties acknowledge that Tenant's right to extend or renew this Lease does not give rise to any obligation on the part of Tenant with respect to the term covered by such extension or renewal, if Tenant does not exercise its option to extend or renew this Lease.

16.07   **Final Damages.** [Intentionally Omitted].

16.08   **Failure to Operate the Leased Premises Continuously** [Intentionally Omitted].



16.09   **Removal of Personal Property.** All property of Tenant removed from the Leased Premises by Landlord pursuant to any provisions of this Lease or of law may be handled, removed or stored by Landlord at the cost and expense of Tenant, and Landlord in no event shall be responsible for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses incurred by Landlord for such removal and storage as long as the same is in Landlord's possession or under Landlord's control. All such property not removed from the Leased Premises or retaken from storage by Tenant within thirty (30) days after the end of the Term, however terminated, at Landlord's option, shall be conclusively deemed to have been conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant.

16.10   **Rights Cumulative, Non-Waiver.** No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute. The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement or to exercise any option, right, power or remedy contained in this Lease shall not be construed as a waiver or relinquishment thereof for the future. The receipt by Landlord of any Rent or any other charge payable hereunder with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the covenants, agreements, conditions or provisions of this Lease, or to a decree compelling performance of this Lease, or to any other remedy allowed to Landlord at law or in equity.

16.11   **Attorneys' Fees.** Tenant shall pay all of Landlord's reasonable costs, charges and expenses, including court costs and reasonable attorneys' fees, incurred in enforcing Tenant's obligations under this Lease, incurred by Landlord in any action brought by Tenant in which Landlord is the prevailing party, or incurred by Landlord in any litigation, negotiation or transaction in which Tenant causes Landlord, without Landlord's fault, to become involved or concerned.

16.12   **Calculation of Percentage Rent.** In the event that Landlord, after the occurrence of an Event of Default, either terminates this Lease or terminates Tenant's right of possession without terminating this Lease, Percentage Rent, for purposes of Section 16.06, shall be calculated as follows:

(a)   If an Event of Default causing such termination occurs after the expiration of three (3) complete calendar years occurring within the Term, annual Percentage Rent shall be



calculated on the basis of the average annual Net Sales during the last three (3) complete Lease Years occurring within the Term prior to the occurrence of the Event of Default.

(b)    If the Event of Default causing such termination occurs prior to the expiration of three (3) complete Lease Years occurring within the Term, annual Percentage Rent shall be calculated on the basis of annual Net Sales equal to the greater of (i) Net Sales for the last complete Lease Year, if any, prior to the occurrence of the Event of Default, or (ii) twelve (12) times the average monthly Net Sales occurring during the Term prior to the Event of Default.

16.13  **Default Under Other Leases**. If the term of the Ground Lease shall be terminated or terminable after the making of this Lease because of any default by Tenant under the Ground Lease, such fact shall empower Landlord, at Landlord's sole option, to hold Tenant in default under this Lease and to terminate this Lease by notice to Tenant or to exercise any of the other rights or remedies of Landlord set forth in Article 16.

16.14  **Default by Landlord**. In the event Landlord shall default in the performance of, or compliance with, any of the covenants, conditions or provisions of this Lease, then Tenant shall have the right to proceed as follows:

(a)    except as otherwise provided under Section 9.01, if Landlord's default shall be in the performance of work provided in this Lease to be performed by Landlord and which Tenant is willing to perform, then Tenant shall give Landlord written notice setting forth in detail the work which is required of Landlord and which Tenant intends to perform if Landlord fails to do so. Said notice shall also advise Landlord of the name of the contractor that Tenant proposes to engage to do such work. Within sixty (60) days after such notice, Landlord shall commence and diligently proceed with the work until the same shall have been completed, or if Landlord disputes Tenant's claim that such work is to be performed by Landlord, or if Landlord disputes the nature of the work to be done, then such dispute shall be submitted to arbitration within said sixty (60) days for the purpose of resolving what work is required to be done and whether Landlord is required to do it; provided, however, that in the event that Landlord fails to perform the work or the matter is not submitted to arbitration within said sixty (60) days, Tenant shall have the right, at its option, to perform such work or have such work performed by the contractor previously identified to Landlord (which contractor Landlord shall have the right to approve, but which approval shall not be unreasonably withheld) and to deduct the cost thereof from the payment of Expense Adjustment due Landlord by Tenant pursuant to Section 7.04.



(b)    If Landlord's default shall be in the performance of work which Tenant is unwilling to undertake, then, if Landlord fails to commence and proceed diligently to complete such work within sixty (60) days after written notice from Tenant, Tenant at its option, may submit the matter to arbitration for the purpose of resolving what work is required to be done and whether Landlord is required to do it.

## ARTICLE 17  SECURITY DEPOSIT
[Intentionally Omitted]

## ARTICLE 18  HOLDING OVER

In the event Tenant remains in possession of the Leased Premises after the expiration of the tenancy created hereunder and without the execution of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying said Leased Premises as a Tenant from month to month, at a monthly rental equal to one hundred fifty percent (150%) of the sum of (i) the monthly Fixed Annual Minimum Rent; (ii) one twelfth (1/12th) of the average of the highest Percentage Rent payable hereunder for the last three (3) Lease Years; (iii) the monthly installment of Rent Adjustments payable for such month; (iv) the monthly Sprinkler Charge; (v) the monthly Merchants Association or Promotional Fund dues; (vi) the monthly Advertising Service Charge; (vii) the monthly Cooling Service Charge; and (viii) the average monthly amount of all other items of Rent payable hereunder, subject to all other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy. Tenant shall indemnify Landlord against loss or liability resulting from Tenant's delay in so surrendering the Leased Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay. Acceptance by Landlord of rent after such termination shall not of itself constitute a renewal. Nothing contained in this Section shall be construed or shall operate as a waiver of Landlord's right of reentry or any other right or remedy of Landlord.

## ARTICLE 19  QUIET ENJOYMENT

Landlord covenants that Tenant, upon paying all Rent and performing all covenants and agreements on its part to be performed, shall have quiet enjoyment and possession of the Leased Premises during the Term, subject to the terms and conditions of this Lease and to any agreements to which this Lease is or may become subordinate.

## ARTICLE 20  SUBORDINATION

20.01  **Subordination and Non-Disturbance**.

(a)    Tenant agrees and acknowledges that this Lease and Tenant's rights hereunder shall be subject and subordinate and is hereby made subject and subordinate at all times to all covenants, restrictions, easements and encumbrances now or hereafter affecting the fee title of the Shopping Center property, and to all and any mortgages, trust indentures, trust deeds, ground or underlying leases or any other method of financing or refinancing in any amounts and all advances thereon, presently existing or that hereafter may be placed upon the Shopping Center or the Leased Premises and to all renewals, modifications, consolidations, participations, replacements and extensions thereof (any of the foregoing instruments or methods, herein referred to as a "Mortgage"). The aforesaid provisions shall be self-operative and no further instrument or subordination shall be necessary unless required by any such ground or underlying lessors, or mortgagees or trustees. Should Landlord or any ground or underlying lessors or mortgagees or trustees desire confirmation of such subordination, Tenant, within thirty (30) days following Landlord's written request therefor, agrees to execute and deliver, without charge, any and all documents (in form acceptable to such ground or underlying lessors or mortgagees or trustees) subordinating this Lease and the Tenant's rights hereunder. However, should any such ground or underlying lessors or any mortgagees' or any trustees' request that this Lease be made superior, rather than subordinate, to any such ground or underlying lease or mortgage or trust, then Tenant, within thirty (30) days following Landlord's written request therefor, agrees to execute and deliver, without any charge, any and all documents (in form acceptable to such ground or underlying lessors or mortgagees) effectuating such priority.



(b)    If Tenant is requested to execute subordination documents, Landlord will use reasonable efforts to obtain from mortgagee a non-disturbance letter. Landlord will notify Tenant if Landlord is unable to obtain such non-disturbance letter.

20.02  **Liability of Holder of Mortgage; Attornment**. It is further agreed that (a) if any existing or prospective Mortgage shall be foreclosed, (i) the holder of the Mortgage (or its grantee) or purchaser at any foreclosure sale (or grantee in a deed in lieu of foreclosure), as the case may be, shall not be (A) liable for any act or omission of any prior landlord (including Landlord), (B) subject to any offsets or counterclaims which Tenant may have against a prior landlord (including Landlord), or (C) bound by any prepayment of Rent which Tenant may have made in excess of the amounts then due for the next succeeding month; (ii) the liability of the mortgagee or trustee hereunder or purchaser at such foreclosure sale or the liability of a subsequent owner designated as Landlord under this Lease shall exist only so long as such trustee, mortgagee, purchaser or owner is the owner of the Shopping Center and such liability shall not continue or survive after further transfer of ownership; and (iii) upon request of the mortgagee or trustee, if the Mortgage shall be foreclosed, Tenant will attorn, as Tenant under this Lease, to the purchaser at any foreclosure sale under any Mortgage, and Tenant will execute such instruments as may be necessary or appropriate to evidence such attornment; and (b) this Lease may not be modified or amended so as to reduce the Rent or shorten the Term provided hereunder, or so as to affect adversely in any other respect to any material extent the rights of Landlord, nor shall this Lease be cancelled or surrendered, without the prior written consent, in each instance, of the mortgagee or trustee under any Mortgage.

20.03  **Modification Required by Mortgagee**. Should any existing or prospective mortgagee require a modification or modifications of this Lease, which modification or modifications will not cause an increased cost or expense to Tenant or in any other way change the rights and obligations of Tenant hereunder, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are required therefor and deliver the same to Landlord within thirty (30) days following the request therefor.

20.04  **Recording of Lease**. Should Landlord or any lending institution require this Lease to be recorded in the Registry of Property, Tenant agrees to execute promptly such instruments or deeds necessary to record this Lease within thirty (30) days of being notified by Landlord. Should Tenant desire to have this Lease recorded and the Term of the Lease is more than six (6) years, Landlord, at Tenants' entire cost and expense, will execute the instrument or deed required to have the Lease recorded and once the Lease is terminated Tenant shall pay for or reimburse Landlord for all costs related to the cancellation at the Registry of Property of said recordation.

20.05 **Assignment by Landlord**. Landlord, at any time, may assign this Lease and all right, title and interest it has herein, including the income, rents and proceeds generated or to be generated by this Lease.

## ARTICLE 21  ASSIGNMENT AND SUBLETTING

21.01 **Assignment and Subletting**. Except as provided in Section 21.05, Tenant shall not (a) assign, transfer, mortgage, pledge, hypothecate or encumber or subject to or permit to exist upon or be subjected to any lien or charge, this Lease or any interest under it; (b) allow to exist or to occur any transfer of or lien upon this Lease or Tenant's interest herein by operation of law; (c) sublet the Leased Premises or any part thereof; or (d) permit the use or occupancy of the Leased Premises or any part thereof for any purpose other than the Permitted Use or by anyone other than Tenant and Tenant's employees. Except as expressly provided in, and in accordance with, Article 15, in no event shall this Lease be assigned or assignable by voluntary or involuntary bankruptcy proceedings or otherwise, and in no event shall this Lease or any rights or privileges hereunder be an asset of Tenant under any bankruptcy, insolvency or reorganization proceedings.

21.02 **Change of Control**. A transfer of any of the stock of Tenant or a transfer or change in control of Tenant, if a corporation, or a change in the composition of persons or entities owning any direct or indirect interest in any non-corporate Tenant (any such transfer or change herein referred to as a "Change of Control"), shall be deemed an assignment for purposes of this Article 21. Notwithstanding the foregoing, the preceding sentence shall not apply to transfers of outstanding voting stock of Tenant which are traded on a recognized national securities exchange if such stock continues to be so traded after any such transfer. For purposes of this Section 21.02, a change in control of a corporation shall be deemed to have occurred at any time and as often as the persons owning a majority of such corporation's voting stock on the date of this Lease, or immediately following the date on which any change of control shall occur, cease to own a majority of such stock, whether in one or a series of related or unrelated transfers. The term "voting stock" means the shares of stock regularly entitled to vote for the election of directors of the corporation. A change in the control of a partnership shall be deemed to have occurred at any time that there is a change in any general partner of such partnership. In the event of a Change of Control in violation of this Section 21.02, then, in addition to the Rent otherwise payable by Tenant, the Fixed Annual Minimum Rent payable by Tenant shall be increased by an amount equal to the average Percentage Rent payable by Tenant during the three (3) year period immediately preceding the date of such Change of Control to the effect that the new Fixed Annual Minimum Rent due and payable from the date of such Change of Control to the Expiration Date shall be the total of the Fixed Annual Minimum Rent set forth in Section 1.17 and the average Percentage Rent hereinabove described.



21.03 **Additional Rent for Assignment or Sublet**. Anything hereinabove to the contrary notwithstanding, in the event Tenant elects to transfer this Lease under the terms of Section 21.01 and Landlord provides its written consent as required by said Section 21.01, then in addition to the Fixed Annual Minimum Rent set forth in Section 1.17 of this Lease, Tenant further agrees to pay to Landlord the average additional percentage rent payable by Tenant during the three (3) year period immediately preceding the date of such subletting and/or assigning. Therefore, in such case, the new Fixed Annual Minimum Rent due and payable from the date of such subletting and/or assigning to the termination date of this Lease will be the total of both the Fixed Annual Minimum Rent set forth in Section 1.17 and the average rental, if any, as hereinabove set forth.

If the payments of Percentage Rent during such three (3) year period amount to less than an amount equal to (i) the aggregate sum of the Fixed Annual Minimum Rent due and payable by Tenant during the period comprising said three (3) years, plus (ii) twenty-five percent (25%) thereof, then and in such event the new Fixed Annual Minimum Rent due and payable from the date of such subletting and/or assigning of this Lease shall be equal to the percentage of increase from the base period (as hereinafter defined) of the "Consumers' Price Index for Wage Earners' Families in Puerto Rico, All Principal Cities, All Items (1982-84=100)," issued and published by the Bureau of Labor Statistics of the Commonwealth of Puerto Rico Department of Labor. The term "base period" as used herein shall refer to the date on which said Index is published, which is closest to the three (3) year period immediately preceding the date of subletting and/or assigning. In any event, however, and notwithstanding any decrease in such Index, the Fixed Annual Minimum Rent shall at no time be less than the amount of the Fixed Annual Minimum Rent as of the Commencement Date of the Term. In the event said Consumers' Price Index shall be discontinued or no longer published, Landlord may use a comparable non-partisan substitute price index or formula and such substitute index of formula may have the same effect as if it had been originally designated herein.

21.04 **"As-Built" Plans**. Prior to approval of a request for assignment, Tenant shall submit to Landlord an "as-built" plan of its space duly certified by its architects.



21.05  **Assignment Upon Expiration of Operating Covenant; Recapture.**  Upon expiration of the term of the Operating Covenant, Tenant may assign this Lease or sublet all of the Leased Premises, as set forth below:

(a)  prior to any effort to so assign or sublet, Tenant shall advise Landlord in writing of Tenant's intention to assign or sublet, and Landlord shall have one hundred twenty (120) days within which to notify Tenant of Landlord's intentions to terminate this Lease.  If Landlord chooses to exercise such option and so advises Tenant, this Lease shall terminate ninety (90) days after the date of exercise of such option, and the provisions hereof pertaining to termination by Landlord shall apply;

(b)  if Landlord does not exercise its option as described, Tenant may proceed to assign this Lease or sublet all of the Leased Premises, provided that immediately prior to such assignment or sublease, Landlord and Tenant shall enter into a modified lease in the form attached hereto as Exhibit E, and such modified lease (including, without limitation, the restrictions on use of the Leased Premises) shall be the document that may be assigned pursuant to this Section 21.05.

Notwithstanding any assignment or sublet, Tenant shall remain responsible for the payment of Rent and the performance of its other obligations hereunder for the term hereof (but not during any option period not exercised by Tenant prior to such assignment or sublease).

<h2 style="text-align:center;">ARTICLE 22  MISCELLANEOUS</h2>

22.01  **Successors and Assigns**.  Each provision of this Lease shall extend to and shall bind and inure to the benefit not only of Landlord and Tenant, but also to their respective heirs, legal representatives, successors and assigns, but this provision shall not operate to permit any transfer, assignment, mortgage, encumbrance, lien, charge, or subletting contrary to the provisions of this Lease.

22.02  **Modifications in Writing**.  No modification, waiver or amendment of this Lease or of any of its conditions or provisions shall be binding upon Landlord or Tenant unless in writing signed by both Landlord and Tenant.



22.03  **No Option; Irrevocable Offer**.  Submission of this instrument for examination shall not constitute a reservation of or option for the Leased Premises or in any manner bind Landlord and no lease or obligation of Landlord shall arise until this instrument is signed and delivered by Landlord and Tenant; provided, however, the execution and delivery by Tenant of this Lease to Landlord or the agent of Landlord's beneficiary, if any, shall constitute an irrevocable offer by Tenant to lease the Leased Premises on the terms  and conditions herein contained, which offer may not be revoked for thirty (30) days after such delivery.

22.04  **Definition of Tenant**.  The word "Tenant" whenever used herein shall be construed to mean Tenants or any one or more of them in all cases where there is more than one Tenant; and the necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships or other entities, or individuals, shall be assumed in all cases as though in each case fully expressed.  In all cases where there is more than one Tenant, the liability of each shall be joint and several.

22.05  **Definition of Landlord**.  The term "Landlord," as used in this Lease, shall mean at any given time, the owner, or owners, collectively, for the time being (a) of the fee or leasehold of all or any portion of the Shopping Center, but (b) so long as there is then a lease of the fee of all or substantially all of the Shopping Center, the lessee thereunder and not the owner of the fee shall be deemed to be Landlord; it being intended and agreed that in the case where this (b) is applicable, such owner of the fee shall not be personally liable for the obligations of Landlord but such lessee shall be so personally liable.  If any such person, firm or corporation so a "Landlord" shall sell or transfer the fee or the leasehold interest, the ownership of which so makes him or it a Landlord, he or it, as such grantor or transferor, shall thereafter be entirely relieved of all terms, covenants and obligations thereafter to be performed by Landlord under this Lease.

22.06  **Headings**.  The headings of Articles and Sections are for convenience only and do not limit, expand or construe the contents of the Articles or Sections.

22.07  **Default Rate of Interest; Late Charge**.  All amounts, including, without limitation, Fixed Annual Minimum Rent, Percentage Rent and Rent Adjustments, owed by Tenant to Landlord pursuant to any provision of this Lease shall bear interest from the date due until paid at the annual rate of eighteen percent (18%), unless a lesser rate shall then be the maximum rate permissible under the laws of the Commonwealth of Puerto Rico, in which event said lesser rate shall be charged.

22.08  **Relocation** [Intentionally Omitted].

22.09  **Guaranty**. [Intentionally Omitted].

22.10  **Satisfaction of Requirements**. Whenever a requirement is imposed on any party hereto, such party shall be required to perform such requirement at its sole cost and expense unless it is specifically otherwise provided herein.

22.11  **Entire Agreement**. All understandings and agreements, oral or written, heretofore made between the parties are merged in this Lease, which alone fully and completely expresses the agreement between Landlord (and its beneficiary, if any, and their agents) and Tenant.

22.12  **Force Majeure**. If either party fails to timely perform any of the terms, covenants and conditions of this Lease on its part to be performed and such failure is due in whole or in part to any strike, lockout, labor trouble, civil disorder, inability to procure materials, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, fuel shortages, accidents, casualties, acts of God, acts caused directly or indirectly by such party (or its agents, employees, contractors, licensees or invitees) or any other cause beyond the reasonable control of such party, then such party shall not be deemed in default under this Lease as a result of such failure and any time for performance by such party provided for herein shall be extended by the period of delay resulting from such cause. The terms of the preceding sentence shall not apply to a failure by Tenant to pay Rent when due.

22.13  **Security Program**. Tenant agrees to cooperate with any reasonable safety or security program developed by Landlord.

22.14  **Estoppel Certificate**. Tenant agrees that from time to time upon not less than ten (10) days' prior request by Landlord, or the holder of any Mortgage, Tenant (or any permitted assignee, subtenant, licensee, concessionaire or other occupant of the Leased Premises claiming by, through or under Tenant) will deliver to Landlord or to the holder of any Mortgage, a statement in writing signed by Tenant certifying: (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, identifying such modifications and certifying that this Lease as modified is in full force and effect); (b) the date upon which Tenant began paying Rent and the dates to which the Rent and other charges have been paid; (c) that Landlord is not in default under any provision of this Lease, or, if in default, the nature thereof in detail; (d) that the Leased Premises have been completed in accordance with the terms hereof and Tenant is in occupancy and paying Rent on a current basis with no rental offsets or claims; (e) that there has been no prepayment of Rent other than that provided for in this Lease; (f) to the best of Tenant's knowledge, information, and belief that there are no actions, whether voluntary or otherwise, pending against Tenant under the bankruptcy laws of the United States or any State or Commonwealth thereof; and (g) such other matters as may reasonably be required by Landlord or the holder of the Mortgage.



22.15  **Right of Landlord to Perform Covenants**. All covenants and agreements to be performed by Tenant under any of the terms of this Lease shall be performed by Tenant, at Tenant's sole cost and expense, and without any abatement of Rent. If Tenant fails to perform any act on its part to be performed hereunder, and such failure continues for ten (10) days after notice thereof from Landlord, Landlord may perform, but shall not be obligated to perform, such act without waiving or releasing Tenant from any of its obligations relative thereto. All sums paid or costs incurred by Landlord in so performing such acts under this Section, together with interest thereon at the rate set forth in Section 22.07(a) from the date each such payment was made or each such cost incurred by Landlord, shall be payable by Tenant to Landlord on demand.

22.16  [Intentionally Omitted].

22.17  **Counterparts**. This Lease may be executed in any number of counterparts. Each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute one and the same instrument.

22.18  **No Joint Venture**. The relationship of the parties is that of landlord and tenant only, and nothing in this Lease shall be construed as creating a partnership, joint venture, principal-agent or any other relationship. Except as expressly otherwise provided herein, neither party shall have any right or power to create any expense or liability chargeable to the other party.

22.19  **Partial Invalidity**. If any term or provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

22.20 **Survival**. Any provision of this Lease which obligates the Landlord or the Tenant to pay an amount or perform an obligation before the commencement of the Term or after the expiration of the Term shall be binding and enforceable notwithstanding that payment or performance is not within the Term, and the same shall survive.

22.21 **Time of Essence**. Time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

22.22 **Accord and Satisfaction**. No payment by Tenant or receipt by Landlord of an amount less than the Rent herein stipulated shall be deemed to be other than on account of the stipulated Rent, nor shall any endorsement or statement on any check or any letter or other communication accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease.

22.23 **Entire Agreement**. This Lease and the Exhibits, Riders, Supplements and Guaranty, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Leased Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between Landlord and Tenant concerning the Leased Premises except those set forth herein. Except as otherwise provided herein, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

22.24 **Recordation**. Tenant shall not have the right to record this Lease or any memorandum of or other reference to this Lease, except as provided in Section 20.04.

22.25 **Governing Law**. This Lease shall be construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico.

22.26 **Waiver of Trial by Jury; Tenant not to Counterclaim**. It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall and hereby do waive trial by jury and subject themselves to the jurisdiction of the Courts of the Commonwealth of Puerto Rico in San Juan in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Leased Premises, or any claim of injury or damage, and any emergency statute or any other statutory remedy. Any such action or proceeding against the Tenant may be commenced by the service of the papers necessary to commence such action or proceeding upon the Tenant in the same manner as a notice pursuant to Section 22.30 hereof.



22.27 **Mechanics' Liens**. Tenant shall not permit or suffer any lien, mechanic or otherwise, to be filed against the Leased Premises or the Shopping Center by reason of any work, labor, services or materials performed at or furnished to the Leased Premises through or under the Tenant. If any such lien shall at any time be filed against the Leased Premises or the Shopping Center, Tenant shall forthwith cause the same to be discharged of record by payment, bond or order of a court of competent jurisdiction or otherwise within thirty (30) days after Tenant receives written notice from Landlord of the date of the filing thereof, but Tenant shall have the right to contest in good faith and with reasonable diligence any and all such liens; provided security satisfactory to Landlord is deposited with Landlord to insure payment thereof and to prevent any sale, foreclosure or forfeiture of the Leased Premises or Shopping Center by reason thereof. Upon final determination of the lien or claim for lien, Tenant shall immediately pay any judgment rendered, together with all proper costs and expenses, and shall have the lien released of record and any judgment satisfied. If Tenant shall fail to cause such lien to be discharged within the period aforesaid, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by bonding or other procedure deemed appropriate by Landlord, and the amount so paid by Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in procuring the discharge of such lien, shall be deemed to be additional Rent for the Leased Premises and shall be due and payable by Tenant to Landlord within thirty (30) days of Tenant's receipt of written demand for payment from Landlord on the first day of the next following month. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Leased Premises to any lien or liability under any applicable law.

22.28 **Construction on Adjacent Leased Premises**. If any excavation or other building construction shall be about to be made or shall be made on any premises adjoining the Leased Premises or on any other premises in the Shopping Center pursuant to Landlord's rights (and subject to the provisions of Sections 5.02 and 5.04) as set forth in Section 8.01, Tenant shall permit Landlord, its agents, employees, licensees and contractors, to enter the Leased Premises and to shore-up the foundations and walls thereof, and to erect scaffolding and protective barricades around and about the Leased Premises (but not so as to preclude entry thereto) and to do any act or thing necessary for the safety or preservation of the Leased Premises. Tenant's obligations under this Lease shall not be affected by any

such construction or excavation work or any such shoring-up. Landlord shall not be liable in any such case for any inconvenience, disturbance, loss of business or any other annoyance arising from any such construction, excavation, shoring-up, scaffolding or barricades. In no event shall Landlord be required to incur any additional expenses for work to be done during hours or days other than regular business hours and days.

22.29   **Net Lease**. Tenant recognizes and acknowledges, without limiting the generality of any other terms or provisions of this Lease, that it is the intent of the parties hereto that any and all rentals in this Lease provided to be paid by Tenant to Landlord, shall be paid to Landlord, without any deduction or setoff whatsoever, and any and all expenses incurred in connection with the Leased Premises and the Shopping Center, or in connection with the operations thereon, including any and all taxes, assessments, general or special license fees, insurance premiums, public utility bills and costs of repair, maintenance and operation of the Leased Premises and Tenant's pro rata share of the costs of repair, maintenance, and operation of the Shopping Center and all buildings therein, together with the appurtenances thereto, shall be paid by Tenant and other tenants of the Shopping Center.

22.30   **Notices**. All notices and demands required or desired to be given by either party to the other with respect to this Lease or the Leased Premises shall be in writing and shall be delivered personally, sent by overnight courier service, prepaid, or sent by United States registered or certified mail, return receipt requested, postage prepaid, and addressed as provided herein. Notices to or demands upon Tenant shall be addressed to Tenant at Tenant's Address set forth in Section 1.06. Notices to or demands upon Landlord shall be addressed to Landlord at Landlord's Address set forth in Section 1.02. Notices and demands shall be deemed given and served (a) upon receipt or refusal, if delivered personally; (b) two (2) business day after deposit with an overnight courier service; or (c) on the tenth business day after deposit in the United States mails, if mailed. Either party may change its address for receipt of notices by giving notice of such change to the other party in accordance herewith. Notices and demands from Landlord to Tenant may be signed by Landlord, its beneficiaries, the managing agent for the Shopping Center or the agent of any of them.

22.31   **Nonwaiver**. No waiver of any condition expressed in this Lease shall be implied by any failure or neglect of Landlord to enforce any remedy on account of the violation of such condition whether or not such violation is continued or repeated subsequently, and no express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated. Without limiting Landlord's rights under Articles 16 and 18, it is agreed that no receipt of moneys by Landlord from Tenant after the termination in any way of the Term or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the Term or affect any notice given to Tenant prior to the receipt of such moneys. It is also agreed that after the service of notice or the commencement of a suit or after final judgment for possession of the Leased Premises, Landlord may receive and collect any moneys due, and the payment of said moneys shall not waive or affect said notice, suit or judgment.



22.32   **Tenant - Corporation or Partnership**. Tenant represents and warrants that this Lease has been duly authorized, executed and delivered by and on behalf of Tenant and constitutes the valid and binding agreement of Tenant in accordance with the terms hereof. If Landlord so requests, Tenant shall deliver to Landlord or its agent, concurrently with the delivery of the Lease executed by Tenant, certified resolutions of the board of directors (and shareholders, if required) authorizing Tenant's execution and delivery of this Lease.

22.33   **Real Estate Brokers**. Tenant represents and warrants that Tenant has not dealt with any broker, agent or finder in connection with this Lease, and each party agrees to indemnify and hold the other harmless from all damages, liability and expense, including reasonable attorneys' fees, arising from any claims or demands of any broker, agent or finder for any commission alleged to be due such broker, agent or finder in connection with its having introduced Tenant to the Leased Premises.

22.34   **Title and Covenant Against Liens**. Landlord's title is paramount and always shall be paramount to the title of Tenant and nothing contained in this Lease shall empower Tenant to do any act which can, shall or may encumber the title of Landlord. Tenant covenants and agrees not to suffer or permit any lien of mechanics or materialmen to be placed upon or against the Leased Premises or the Shopping Center or against Tenant's leasehold interest in the Leased Premises and, in case of any such lien attaching, to pay and remove the same immediately. Tenant has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Tenant, operation of law or otherwise, to attach to or be placed upon the Leased Premises or the Shopping Center, and any and all liens and encumbrances created by Tenant shall attach only to Tenant's interest in the Leased Premises. If any such liens attach and Tenant fails to pay and remove the same within thirty (30) days, or if Landlord is fined or penalized as a result of Tenant's violation of any statute or regulation, or if Landlord is made responsible for any obligation of Tenant by disposition of law, Landlord, at its election, may pay and satisfy the same and in such event the sums so paid by Landlord, with interest from the date of payment at the rate set forth in Section 22.07(a) for amounts owed Landlord by Tenant. Such sums shall be deemed to be additional Rent due and payable by Tenant at once without notice or demand.

22.35   **Attornment.** In the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under, any Mortgage made by Landlord covering the Leased Premises, Tenant shall attorn to the mortgagee, trustee or purchaser upon any such foreclosure or sale and recognize such mortgages, trustee or purchaser as Landlord under this Lease.

22.36   **Financial Statements.** At the request of Landlord, Tenant shall, not later than ninety (90) days following the close of each fiscal year of Tenant during the Term, furnish to Landlord a balance sheet of Tenant as of the end of such fiscal year and a statement of income and expenses, and funds application for the fiscal year then ended, together with an opinion of an independent certified public accountant of recognized standing, or, at the election of Landlord, a certificate of the chief financial officer of Tenant, to the effect that said financial statements have been prepared in conformity with generally accepted accounting principles consistently applied and fairly present the financial condition and results of operations of Tenant as of and for the periods covered.

22.37   **Disabilities Act.** During the Term of this Lease, Tenant shall make the Leased Premises and Tenant's business operation comply with all applicable provisions of the Americans With Disabilities Act (ADA), 42 U.S.C. {12,101 et seq. and any other applicable federal or state legislation regarding the disabled and will hold Landlord harmless from any claim, fine or penalty filed or imposed against Tenant and/or Landlord as a result of Tenant's violation of this Section 22.37 of the applicable provisions of the ADA, or any other applicable federal or state statute or regulation protecting the rights of the disabled.

## ARTICLE 23  RULES AND REGULATIONS

Tenant agrees to observe and not to interfere with the rights reserved to Landlord in Article 25 and agrees, for itself, its employees, agents, contractors, invitees and licensees, to comply with the rules and regulations set forth in Exhibit D attached to this Lease and made a part hereof and such other rules and regulations as may be adopted by Landlord pursuant to Section 25.01(l) of this Lease. Any violation by Tenant of any of the rules and regulations contained in Exhibit D or any other Section of this Lease, or as may hereafter be adopted by Landlord pursuant to Section 25.01(l), may be restrained; but whether or not so restrained, Tenant acknowledges and agrees that it shall be and remain liable for all damages, loss, cost and expense resulting from any violation by Tenant of any of said rules and regulations. Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce said rules and regulations or the terms, covenants and conditions of any other lease against any other tenant or any other persons, and Landlord and its beneficiaries shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, invitees or any other person.

## ARTICLE 24  RETURN OF LEASED PREMISES



24.01   **Surrender of Possession.** At the termination of this Lease by lapse of time or otherwise or upon termination of Tenant's right of possession without termination of this Lease, Tenant shall surrender possession of the Leased Premises to Landlord and deliver all keys to the Leased Premises to Landlord and make known to Landlord the combination of all locks and vaults then remaining in the Leased Premises, and, subject to the provisions of Section 24.02, shall return the Leased Premises and all equipment and fixtures of Landlord therein to Landlord in as good condition as when Tenant originally took possession, ordinary wear, loss or damage by fire or other insured casualty, (but only to the extent that Landlord has been fully made whole by such insurance) and damage resulting from the act of Landlord or its employees and agents excepted. If Tenant fails to return the Leased Premises and such equipment and fixtures in the aforesaid condition, Landlord may restore the Leased Premises and such equipment and fixtures to such condition and Tenant shall pay the cost thereof to Landlord on demand.

24.02   **Installations and Additions.** All installations, additions, partitions, hardware, light fixtures, non-trade fixtures and improvements, whether temporary or permanent, except movable furniture and equipment belonging to Tenant, in or upon the Leased Premises, whether placed there by Tenant or Landlord, shall be Landlord's property and shall remain upon the Leased Premises, all without compensation, allowance or credit to Tenant; provided, however, that if prior to such termination Landlord so directs by notice, Tenant, at Tenant's sole cost and expense, shall promptly remove such of the installations, additions, partitions, hardware, light fixtures, non-trade fixtures and improvements placed in the Leased Premises by Tenant as are designated in such notice and repair any damage to the Leased Premises caused by such removal, failing which Landlord may remove the same and repair the Leased Premises and Tenant shall pay the cost thereof to Landlord on demand. At the sole option of Landlord, Tenant shall leave in place any floor covering without compensation to Tenant, or Tenant shall remove any floor covering and shall remove all fastenings, paper, glue, bases or other vestiges and restore the floor surface to its previous condition, or shall pay to Landlord upon demand the cost for restoring the floor surface to such condition.

24.03   **Trade Fixtures and Personal Property.** Tenant shall also remove Tenant's furniture, machinery, safes, trade fixtures and other items of movable personal property of every kind and



description from the Leased Premises and restore any damage to the Leased Premises caused thereby, such removal and restoration to be performed prior to the end of the Term or ten (10) days following termination of this Lease or Tenant's right of possession, whichever is earlier. If Tenant fails to remove such items, Landlord may do so and thereupon the provisions of Sections 24.02 and 16.09 shall apply and Tenant shall pay to Landlord upon demand the cost of removal and of restoration of the Leased Premises.

24.04   **Survival**. All obligations of Tenant and Landlord under this Article shall survive the expiration of the Term or the earlier termination of this Lease.

24.05   **Tenant's Obligations Upon Termination**. A termination by Tenant under Section 12.01 or 13.02 shall not release Tenant from Tenant's obligation to pay the Rent accrued through the termination date, and Landlord shall be entitled to recover:  Rent accrued and unpaid for the period up to and including such termination date; as well as all other additional sums payable by Tenant, or for which Tenant is liable or with respect to which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease, which then may be owing and unpaid.  In addition, termination shall not affect Landlord's rights arising prior to or at the time of termination, including, without limitation, damages, including reasonable attorney's fees and court costs, which Landlord has sustained as a result of the breach of any of the covenants of this Lease prior to the termination date and for which Landlord has not been paid; and all costs and expenses, including court costs and attorneys' fees, incurred by Landlord in the enforcement of its rights and remedies hereunder.

## ARTICLE 25  RIGHTS RESERVED TO LANDLORD

25.01   **Rights Reserved to Landlord**.  Landlord reserves the following rights, exercisable without notice and without liability to Tenant for damage or injury to property, person or business and without either effecting an eviction or disturbance of Tenant's use or possession, giving rise to any claim for setoff or abatement of Rent or affecting any of Tenant's obligations under this Lease:



      (a)     to change the name or street address of the Shopping Center;

      (b)     to install and maintain signs on the exterior of the Shopping Center;

      (c)     to prescribe the location and style of the store number and identification sign or lettering for the Leased Premises;

      (d)     [Intentionally Omitted]

      (e)     to grant to anyone the exclusive right to conduct any business or render any service in the Shopping Center (provided that such grant does not interfere with Tenant's use of the Leased Premises for its Permitted Use as provided in Section 1.11), or the nonexclusive right to use any premises in the Shopping Center for a use which is the same as or similar to the Permitted Use;

      (f)     to exhibit the Leased Premises at reasonable hours, and to decorate, remodel, repair, alter or otherwise prepare the Leased Premises for reoccupancy at any time after Tenant vacates or abandons the Leased Premises;

      (g)     to enter the Leased Premises at reasonable hours for reasonable purposes and upon reasonable prior notice, including inspection and the performance of services to be provided hereunder, and at any time in the event of any emergency (as defined in Section 10.16);

      (h)     in case of fire, invasion, insurrection, mob, riot, civil disorder, public excitement or other commotion, or threat thereof, Landlord reserves the right to limit or prevent access to the Shopping Center during the continuance of the same or otherwise to take such action or preventive measures deemed necessary by Landlord for the safety or security of the tenants or other occupants of the Shopping Center or for the protection of the Shopping Center and the property in the Shopping Center.  Tenant agrees to cooperate in any reasonable safety or security program developed by Landlord;

      (i)     to regulate access to telephone, electrical and other utility closets in the Shopping Center and to require use of designated contractors for any work involving access to the same;

      (j)     to control and prevent access to non-general public areas of the Shopping Center;

      (k)     provided that reasonable access to the Leased Premises from the immediately adjacent area is maintained, that Landlord uses reasonable efforts so as to minimize interference with Tenant's enjoyment of the Leased Premises and access to the Leased Premises from the

immediately adjacent area, and that the business of Tenant is not interfered with unreasonably (it being understood that Landlord shall use reasonable efforts so as to minimize interference with Tenant's access to and enjoyment of the Leased Premises), to rearrange, relocate, enlarge, reduce or change walkways, exits, entrances in or to the Shopping Center and to decorate and to make, at its own expense, repairs, alterations, additions and improvements, structural or otherwise, in or to the Shopping Center or any part thereof, and any adjacent building, land, street or alley, including for the purpose of connection with or entrance into or use of the Shopping Center in conjunction with any adjoining or adjacent building or buildings, now existing or hereafter constructed, and for such purposes may erect scaffolding and other structures reasonably required by the character of the work to be performed, and during such operations may enter upon the Leased Premises and take into and upon or through any part of the Shopping Center, including the Leased Premises, all materials that may be required to make such repairs, alterations, improvements or additions, and in that connection Landlord may temporarily close public entry ways and other public spaces and may interrupt or temporarily suspend any services or facilities agreed to be furnished by Landlord, all without the same constituting an eviction of Tenant in whole or in part and without abatement of Rent by reason of loss or interruption of the business of Tenant or otherwise and without in any manner rendering Landlord liable for damages or relieving Tenant from performance of Tenant's obligations under this Lease. Landlord, at its option, may make any repairs, alterations, improvements and additions in and about the Shopping Center and the Leased Premises during ordinary business hours and, if Tenant desires to have such work done to the Leased Premises other than during business hours, Tenant shall pay all overtime and additional expenses resulting therefrom. Notwithstanding the foregoing, except in case of an emergency (as defined in Section 10.16), Landlord shall provide Tenant with not less than thirty (30) calendar days' prior written notice of scheduled changes to the Leased Premises as well as prior written notice of scheduled changes to the areas adjacent to the Leased Premises if such changes are expected to be significantly disruptive;

(l)    as long as such new or amended rules or regulations do not increase Tenant's costs or decrease Tenant's rights under this Lease, from time to time to make and to adopt such reasonable rules and regulations, in addition to or other than or by way of amendment or modification of the rules and regulations contained in Exhibit D or other Sections of this Lease, for the protection and welfare of the Shopping Center and its tenants and occupants, as Landlord may determine.

25.02  **Use of Roof, Walls and Land**.  Landlord specifically excepts and reserves to itself the exclusive right to use any roof decks, all or any part of the roof of the Leased Premises, the exterior portions of the Leased Premises (including side and rear walls), the areas above the finished ceiling of the Leased Premises, the land and improvements below the improved floor level of the Leased Premises, the improvements and air rights above the Leased Premises, the improvements and air rights located outside the demising walls of the Leased Premises, such areas within the Leased Premises as are required for the installation, maintenance, use, repair and replacement within the Leased Premises of utility lines, pipes, ducts, conduits, wires, mechanical equipment or any other installations required to serve other occupants of the Shopping Center and no rights with respect thereto are conferred upon Tenant, unless otherwise specifically provided herein. This Lease does not grant to Tenant any rights to light or air or the land on which the Shopping Center is located.



# ARTICLE 26  ALTERATIONS

Tenant shall not make, without the prior written consent of Landlord, any alterations, additions or improvements to the Leased Premises (a) the cost of which is in excess of One Hundred Thousand Dollars ($100,000.00) or (b) that would affect the exterior of the Leased Premises. Landlord's consent to alterations, additions or improvements to the Leased Premises, the cost of which is in excess of One Hundred Thousand Dollars ($100,000), shall be necessary.  If Landlord consents to such alterations, additions or improvements, before commencement of the work or delivery of any materials onto the Leased Premises or into the Shopping Center, Tenant shall furnish to Landlord for its approval such plans and specifications, names and addresses of contractors, copies of contracts, necessary permits and licenses, and instruments of indemnification against any and all claims, costs, expenses, damages and liabilities which may arise in connection with such work, all in such form, substance and amount as may be satisfactory to Landlord.  In addition, prior to commencement of any such work or delivery of any materials into the Leased Premises, Tenant shall provide Landlord with appropriate evidence of Tenant's ability to pay for such work and materials in full.  All alterations, additions and improvements shall be installed in a good, workmanlike manner and shall be carried out in compliance with the terms of Section 11.04.  All such work shall be done only by contractors or mechanics approved by Landlord, which approval shall not be unreasonably withheld, and shall be subject to Landlord's scheduling requirements and regulations.  Tenant shall permit Landlord to inspect construction operations in connection with the foregoing work if Landlord requests to do so.  Tenant shall pay the cost of all its alterations, additions and improvements as well as the cost of decorating the Leased Premises occasioned by its alterations, additions and improvements, including the cost of labor and materials, contractors' profits, overhead and

general conditions. Tenant's failure to pay any such costs shall constitute an Event of Default subject to Article 16 of this Lease. Promptly after completing any alterations, additions or improvements, Tenant shall furnish Landlord with contractors' affidavits in form required by law, and full and final waivers of liens from Tenant's contractors. All alterations, additions and improvements shall comply with all insurance requirements, all city and county ordinances and regulations, and all state and federal statutes and regulations.

Tenant may close the Leased Premises for purposes of remodelling them for up to three (3) weeks; provided, however, that such remodelling is conducted in accordance with the foregoing provisions of this Article 26 (and the other terms and conditions of this Lease), and provided further that Tenant has given Landlord at least thirty (30) days' prior written notice of such closure. Rent shall not abate during the time that the Leased Premises are closed for remodelling.

## ARTICLE 27  MORTGAGEE PROTECTION

Tenant agrees to give any holder of any Mortgage (as defined in Section 20.01) against the Shopping Center, or any interest therein, by registered or certified mail, a copy of any notice or claim of default served upon Landlord by Tenant, provided that prior to such notice, Tenant has been notified in writing of the address of such Mortgage holder. Tenant further agrees that if Landlord has failed to cure such default within thirty (30) days after such notice to Landlord (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if Landlord has commenced within such thirty (30) days and is diligently pursuing the remedies or steps necessary to cure or correct such default), then the holder of the Mortgage shall have an additional thirty (30) days within which to cure or correct such default (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if such holder of the Mortgage has commenced within such thirty (30) days and is diligently pursuing the remedies or steps necessary to cure or correct such default, including the time necessary to obtain possession if possession is necessary to cure or correct such default).

## ARTICLE 28  SUBROGATION, INDEMNITY AND INSURANCE

### 28.01  **Waiver of Subrogation; Release and Waiver**.

(a)    Notwithstanding any other provisions herein, each of Landlord and Tenant releases the other and, on its own behalf and that of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property which would commonly be insured under the "so-called" "All-Risk" Property Insurance policy described in Sections 28.02(d) and 28.05(a) below.



(b)    In addition, Tenant releases Landlord from claims for loss or damage to Tenant's property sustained by Tenant for which Tenant is not insured under the property insurance policy described in section 28.01(a), irrespective of the person or persons whose act or neglect was responsible for such damage.

(c)    If required by the insurance company, Landlord and Tenant agree to furnish to each insurance company which has issued or will issue policies of property insurance on the Leased Premises or the Shopping Center, copies of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

(d)    Notwithstanding the foregoing or anything contained in this Lease to the contrary, any release or any waiver of claims shall not be operative, and the foregoing endorsements shall not be required, in any case where the effect of such release or waiver is to invalidate insurance coverage or invalidate the right of the insured to recover thereunder.

28.02    **Tenant's Insurance**.  Tenant shall carry insurance during the entire Term hereof with insurance companies rated "A-/X" or better by the then-current edition of Best's Insurance Reports published by A.M. Best Company and shall maintain, at a minimum, the following coverages in the following amounts:

(a)    During the construction of Tenant's Work, all risk builders risk coverage (including loss resulting from flood and earthquake) on the improvements being constructed in the Leased Premises to one hundred percent (100%) of the insurable replacement value thereof;

(b)    Employer's liability limits of $1,000,000 for bodily injury by accident for each accident, and $1,000,000 for bodily injury by disease for each employee, and workers compensation insurance in an amount required by applicable law or statute covering all persons employed in connection with any work done on or about the Leased Premises with respect to

which claims for death or bodily injury could be asserted against the Landlord, Tenant or the Leased Premises;

(c)     Commercial general liability insurance, including contractual liability, on an occurrence basis, in an amount not less than Three Million Dollars ($3,000,000.00) combined single limit per occurrence, naming Landlord as an additional insured with respect to the Leased Premises and/or Tenant's operations therefrom;

(d)     Insurance against all risks of physical damage, including flood, earthquake, steam explosion, including rupture or cracking, for ninety percent (90%) of the full replacement cost of all additions, improvements and alterations to the Leased Premises owned or made by Tenant, if any, and of all office furniture, trade fixtures, office equipment, merchandise and all other items of Tenant's property on the Leased Premises;

(e)     Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of One Million Dollars ($1,000,000.00) per occurrence;

(f)     If the Permitted Use includes the sale of alcoholic beverages, liquor liability insurance covering bodily injury or property damage for which one may be held liable by reason of causing or contributing to the intoxication of any person or furnishing of alcoholic beverages to persons under the legal drinking age, or under the influence of alcohol, or arising under applicable laws relating to the storage, sale, use or giving away of any fermented alcohol or other intoxicating liquor or beverage, which claims could be asserted against Landlord, Tenant or the Shopping Center.  Said liquor liability insurance shall be no less than $3,000,000 in any one occurrence;

(g)     Insurance against loss or damage to plate glass in or on the Leased Premises; and

(h)     Tenant shall, during the term of this Lease, obtain and keep in effect a business interruption insurance policy to cover the Fixed Minimum Rent, Percentage Rent and all other charges due under this Lease.

Tenant may comply with its obligations under this Section 28.02 by self-insuring as provided in Section 28.11



28.03   **Certificates of Insurance**.  Prior to the commencement of the Term, each of Landlord and Tenant shall furnish to the other certificates of insurance evidencing coverages, as set forth in Sections 28.02 and 28.05 which policies shall state that such insurance coverage may not be reduced, cancelled or not renewed without at least thirty (30) days' prior written notice to Landlord and Tenant (unless such cancellation is due to nonpayment of premium, in which case only ten (10) days' prior written notice shall be sufficient).  Before commencing any work in connection with alterations, additions or improvements under Article 26, Tenant shall furnish Landlord with certificates of insurance from all contractors performing labor or furnishing materials insuring Landlord against any and all liabilities which may arise out of or be connected in any way with such alterations, additions or improvements or shall otherwise provide Landlord with evidence satisfactory to Landlord of Tenant's ability to protect, indemnify, and hold Landlord harmless from and against all such liabilities.

28.04   **Compliance with Requirements**.  Tenant shall comply with all applicable laws and ordinances, all orders and decrees of court and all requirements of other governmental authorities, and shall not make any use of the Leased Premises, directly or indirectly, which thereby may be prohibited or be dangerous to person or property, which may jeopardize any insurance coverage, or which may increase the cost of insurance or require additional insurance coverage.  If such an increase in the cost of insurance occurs or such additional coverage is required, Tenant shall promptly pay on demand the amount of such increase or the cost of such coverage.

28.05   **Landlord's Insurance**.  Landlord shall maintain, with insurance companies rated "A-/X" or better by the then-current edition of Best's Insurance Reports published by A.M. Best Company, the following insurances:

(a)     On or after the Commencement Date, Landlord shall keep the enclosed mall, all Common Areas, the structural shell which forms a part of the Leased Premises, and all other buildings and improvements built and paid for by Landlord, insured against all risks of physical damage including flood, earthquake, steam explosion, including rupture or cracking, sufficient to comply with any policy co-insurance or agreed value requirement utilizing replacement cost as a basis for valuation (exclusive of the cost of excavations, footings below floor level and foundations), and containing such waivers as may be required hereunder.  Landlord shall have the right to insure and maintain the insurance coverages set forth herein under blanket insurance policies covering other properties owned, leased and operated by Landlord.

(b)     Landlord shall maintain a policy of commercial general liability insurance against claims on account of personal injury and property damage arising out of the operations of the Shopping Center with limits of not less than Three Million Dollars ($3,000,000.00) per occurrence, naming Tenant as an additional insured but only as respects bodily injuries or damages to property incurred in the Common Areas of the Shopping Center.

(c)     Landlord may carry additional insurance against other insurance hazards commonly insured against by owners or developers of regional shopping centers and the premiums for said coverages shall be included in the determination of Tenant's Insurance Charge.

28.06   **Tenant's Insurance Charge**.  Tenant agrees to pay Landlord within ten (10) days after presentation of a bill therefor, Tenant's Insurance Charge, which will be in an amount equal to the product obtained by multiplying the total cost of said insurance paid or incurred by Landlord in accordance with Section 28.05, by a fraction, the numerator of which shall be the Gross Leasable Area of the Leased Premises and the denominator of which shall be the Floor Area of the Shopping Center which is open and occupied for business, determined as of the date such Insurance Charge is billed to Tenant.

28.07   **Tenant's Obligation to Pay Any Increase in Insurance Premiums**.  If, as a result of Tenant's use or occupancy of any portion of the Shopping Center, or from any vacancy of the Leased Premises, Landlord is charged any increase in premiums on insurance carried by Landlord, Tenant shall promptly pay on demand the amount of such increase.  In determining whether increased premiums are attributable to Tenant, a schedule or "makeup" rate of the organization issuing the insurance shall be conclusive evidence of the several times and charges which make up the insurance rates and premiums on the Leased Premises and the Shopping Center.

28.08   **Hold Harmless**.

(a)     Tenant covenants and agrees to indemnify, protect, defend, and hold harmless Landlord and Landlord's directors, officers, employees and agents from and against any and all claims, actions, losses, damages, costs, expenses (including but not limited to reasonable attorneys' fees and court costs) and liabilities (except those caused solely by the wilful misconduct or negligent acts or omissions of Landlord) arising out of or pertaining to any and all actual or alleged injury to, including death of, any person, or damage to, or loss or destruction of any property (excluding property of Landlord to the extent not covered under Landlord's "All-Risk" insurance policy but caused by or due to Tenant's negligence) while on the Leased Premises or any other part of the Shopping Center arising from, related to, or connected with this Lease or the conduct and operation of Tenant's business from the Leased Premises.  Notwithstanding the foregoing, Tenant hereby agrees to indemnify, defend, and hold harmless Landlord and its agents and employees from and against any and all losses, costs, claims, damage, liability and expenses, actual or alleged, arising out of or connected with the activities of Tenant's agents, contractors, suppliers or workmen in or about the Leased Premises or the Building relating to the performance of Tenant's Work or to alterations, additions, or improvements to the Leased Premises.

(b)     Landlord covenants and agrees to indemnify, protect, defend and hold harmless Tenant and its directors, officers, employees and agents, from and against any and all claims, actions, losses, damages, costs, expenses (including but not limited to reasonable attorneys' fees and court costs) and liabilities (except those caused solely by the wilful misconduct or negligent acts or omissions of Tenant), arising out of or pertaining to any or all actual or alleged injury to or death of any person or loss or damage to or destruction of property (excluding property of Tenant) while in or upon the Common Areas arising from, related to, or connected with this Lease or the conduct and operation of Landlord's business in the Common Areas.

28.09   **Review of Coverages**.  The specified limits of insurance, as set forth in Sections 28.02 and 28.05, may be satisfied by any combination of primary or excess/umbrella insurance policies.  From time to time at the request of either party, Landlord and Tenant shall review insurance coverages and limits of any or all of the policies required in Sections 28.02 and 28.05 as well as the advisability of maintaining any other insurance commonly obtained in the case of property similar to the Shopping Center.  Following such review, Landlord and Tenant  shall cause such coverages and limits to be obtained and/or adjusted as reasonably required by Landlord in view of reasonable exposure anticipated over the remainder of the Term.

28.10   **Primary/Excess Coverage**.  Where either party (Landlord or Tenant) is an additional insured under the other party's liability policy, the other party's liability policy will be considered as the primary policy as respects any claim or action against the additional insured.  Further, it is understood and agreed that any specific insurance maintained by an additional insured separately and distinctly in its own name, will at all times be considered as excess insurance over and above what is available to said additional insured under the other party's liability policy.



This provision also applies where Tenant is self-insured. The defense and indemnity obligation of Tenant will be primary as respects any claim that would be defended and indemnified if Tenant had in effect a commercial general liability policy providing all the coverage required under this Lease. In this event, any specific and distinct liability insurance separately maintained by Landlord will at all times be considered as excess insurance over and above what is attributable to or the responsibility of Tenant.

28.11 **Tenant's Right to Self-Insure.** Notwithstanding the provisions of this Article 28 to the contrary, with respect to Tenant's obligations hereunder, the parties agree that so long as Tenant is Sears Roebuck de Puerto Rico, Inc., Tenant shall have the right to self-insure the Leased Premises and Tenant shall stand to fulfill all obligations under this Article 28. If in the opinion of Landlord, the financial position of Sears, Roebuck and Co. or of Tenant is impaired to the point wherein self-insurance creates an unreasonable risk which cannot safely be assumed, upon written notice from Landlord, Tenant shall immediately purchase property and commercial general liability insurance in accordance with the requirements of this Article 28. If Tenant fails to so buy such insurance and to deliver to Landlord satisfactory evidence thereof within thirty (30) days of Landlord's notice, Landlord may, at its option, purchase said insurance on behalf of Tenant. Landlord is not responsible for any inadequacy of insurance protection purchased by Tenant or by Landlord on behalf of Tenant as is outlined herein. The premium for said insurance will be paid by Tenant on demand, with said costs being considered as additional Rent. The acceptance of any insurance certificates as required in this Lease or Landlord's failure to take up this option shall in no way affect or invalidate the requirements of this Section 28.

## ARTICLE 29  HAZARDOUS SUBSTANCES

29.01 **Defined Terms**.

(a) "Claim" shall mean and include any demand, cause of action, proceeding, or suit (i) for actual or punitive damages, losses, injuries to person or property, damages to natural resources, fines, penalties, interest, contribution or settlement, and (ii) for the costs of site investigations, feasibility studies, information requests, health or risk assessments, or Response actions (as hereinafter defined), and (iii) for enforcing insurance, contribution or indemnification agreements.



(b) "Environmental Laws" shall mean and include all federal, state and local statutes, ordinances, regulations and rules relating to Hazardous Materials, environmental quality, health, safety, contamination and clean up, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq., and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. Section 136 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq.; the Noise Control Act, 42 U.S.C. Section 4901 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right-to-Know Act, and Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act ("TSCA"), 15 U.S.C. Section 2601 et seq.; the Atomic Energy Act, 42 U.S.C. Section 2011 et seq., and the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 et seq. Environmental Laws shall also include all laws, regulations and ordinances of the Commonwealth of Puerto Rico or any instrumentality thereof insofar as they are equivalent or similar to the laws recited above or purport to regulate Hazardous Materials (as hereinafter defined).

(c) "Hazardous Materials" shall mean and include the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product or constituent regulated under CERCLA; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; pesticides regulated under the FIFRA; asbestos and asbestos-containing materials, PCBs, and other substances regulated under the TSCA; source material, special nuclear material, by-product materials and any other radioactive materials or radioactive wastes, however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. { 1910.1200 et seq.; and industrial process and pollution control wastes whether or not hazardous within the meaning of RCRA.

(d) "Manage" or "Management" means to sell, generate, manufacture, process, treat, store, use, re-use, refine, recycle, reclaim, blend or burn for energy recovery, incinerate, accumulate speculatively, transport, transfer, dispose of or abandon Hazardous Materials.

(e)    "Permitted Hazardous Materials" means any Hazardous Materials but with respect to which all of the following requirements are satisfied at all times:

(i)    Tenant maintains such materials solely for Tenant's use or retail sale in unopened containers on the Leased Premises and only of such types and in such quantities as are reasonably required for the normal operation of Tenant's business on the Leased Premises; and

(ii)    Tenant complies at all times with any and all applicable Environmental Laws with respect to such materials: and

(iii)    Tenant provides to Landlord upon Landlord's request with (A) copies of the Material Safety Data Sheets ("MSDS's") for such materials (if and to the extent that MSDS's are required to be maintained on the Leased Premises under applicable Environmental Laws), (B) such information regarding the quantities, uses and disposition of such Hazardous Materials as Landlord may request  if Landlord has a reasonable basis to believe that Tenant is handling Hazardous Materials in violation of its obligations under this Article 29, and (C) such information regarding the quantities, uses and disposition of such Hazardous Materials as Landlord may reasonably request from time to time in response to notices and other communications of the type referred to in Section 29.03.

If at any time any such materials containing any Hazardous Materials do not comply with all of the foregoing requirements, such materials shall not be deemed to be Permitted Hazardous Materials.

(f)    "Release" or "Released" shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of Hazardous Materials into the environment, as "environment" is defined in CERCLA.

(g)    "Response" or Respond" shall mean action taken in compliance with Environmental Laws to correct, remove, remediate, clean up, prevent, mitigate, monitor, evaluate, investigate, assess or abate the Release of a Hazardous Material.

29.02    **Tenant's Obligations With Respect to Environmental Matters**.  During the Term of this Lease, (a) Tenant shall comply at its own cost with all applicable Environmental Laws which are applicable to Tenant's use of, and operation of its business in, the Leased Premises; (b) Tenant shall not conduct or authorize the Management of any Hazardous Materials on the Leased Premises other than Permitted Hazardous Materials; (c) Tenant shall not install any underground storage tanks at the Leased Premises; (d) Tenant shall not take any action that would subject the Leased Premises to permit requirements under RCRA for storage, treatment or disposal of Hazardous Materials; (e) Tenant shall only dispose of Hazardous Materials in compliance with applicable Environmental Laws and in any event Tenant shall not dispose of any such Hazardous Materials on the Leased Premises or other portions of the Shopping Center; (f) Tenant shall not discharge Hazardous Materials into drains or sewers on the Leased Premises or other portions of the Shopping Center so as to cause either Landlord or Tenant to be in violation of any applicable Environmental Laws, including without limitation any sewer discharge code or ordinance applicable to the Leased Premises or the Shopping Center, or to be liable for any clean up of such Hazardous Materials; (g) Tenant shall not cause or allow the Release of any Hazardous Materials on, to or from the Shopping Center, provided that Tenant's use and management of Permitted Hazardous Materials in compliance with Environmental Laws shall not constitute a breach of Tenant's obligation under this Section 29.02(g); and (h) Tenant shall arrange at its own cost for the lawful transportation and off-site disposal of all Hazardous Materials that it generates, with Tenant identified as the generator of such Hazardous Materials.



29.03    **Copies of Notices**.  During the Term of this Lease, Landlord and Tenant shall promptly provide the other party with copies of all summons, citations, directives, information inquiries or requests from the EPA or OSHA or other governmental agencies, notices of potential responsibility, notices of violation or deficiency, orders or decrees, Claims, complaints, investigations, judgments, letters, notices of environmental liens or response actions in progress, and other written communications, from the United States Environmental Protection Agency, Occupational Safety and Health Administration, or other agency or authority, or any other entity or individual, concerning (a) any Release of a Hazardous Material on, to or from the Leased Premises; (b) the imposition of any lien on the Leased Premises; or (c) any alleged violation of or responsibility under Environmental Laws by Tenant related to the use or operation of Tenant's business on the Leased Premises.  Landlord and Landlord's representatives shall have the right to enter the Leased Premises upon reasonable notice to Tenant and conduct appropriate inspections or tests in order to determine Tenant's compliance with Environmental Laws and with Tenant's obligations under this Article 29.  Landlord shall make reasonable efforts to minimize interference with Tenant's operations during such inspection.



29.04   **Tests and Reports**.  Upon written request by Landlord (which requests will be made only with such frequency as Landlord reasonably deems necessary), Tenant shall provide Landlord with the results of appropriate reports and tests, if any, with transportation and disposal contracts for Hazardous Materials, if any, with any permits issued under Environmental Laws, and with any other applicable documents to demonstrate that Tenant complies with all Environmental Laws, if any, relating to the Leased Premises and with Tenant's obligations under this Article 29.

29.05   **Tenant's Obligation to Respond**.  If Tenant's Management of Hazardous Materials at the Leased Premises (a) gives rise to liability or to a Claim under any of the Environmental Laws, (b) causes a significant public health effect, or (c) creates a nuisance, trespass, or other liability under any common law doctrine, Tenant shall promptly take all applicable action in Response.

29.06   **Indemnification**.   Tenant shall indemnify, defend and hold harmless Landlord, its beneficiaries, its lenders, any managing agents and leasing agents of the Leased Premises, and their respective agents, partners, officers, directors and employees from all Claims arising from or attributable to any breach by Tenant of any of its warranties, representations, or obligations in this Article 29 or arising from or related to any Claim or other liability involving Hazardous Materials Managed by Tenant or Tenant's operations at the Leased Premises under any theory of nuisance or trespass under any common or civil law doctrine.  Tenant's obligations under this Article 29 shall survive the termination or expiration of this Lease.

**IN WITNESS WHEREOF**, Landlord and Tenant have hereunto executed this Lease as of the day and year set forth next to their respective signatures.

Signed and acknowledged
in the presence of:

ATTEST:

_____

Secretary

WITNESSES (as to Landlord)

LANDLORD:

By: _____

Date: _____ March 1, 1996

ATTEST:

ASSISTANT Secretary

WITNESSES (as to Tenant)

TENANT
SEARS, ROEBUCK DE PUERTO RICO, INC.

By: _____
Its:  PRESIDENT
Date:  MARCH 1, 1996

R. E. DIRECTOR
LEGAL
SNA

**EXHIBITS**

COMMONWEALTH OF PUERTO RICO
MUNICIPALITY OF SAN JUAN                    ss:

AFFIDAVIT NUMBER:  _46 7 (copy)_

On this _1st_ day of _March_, before me, a Notary Public duly authorized in and for the said Municipality in the Commonwealth aforesaid to take acknowledgments, personally appeared _Jaime F. Malldeda Rubert_ residing at _San Patricio, San Juan, PR_ to me known and known to me to be the _President_ of _Olga Los Americas, Inc._, the corporation described in the foregoing instrument, and acknowledged that as such officer, being authorized so to do, he/she executed the foregoing instrument on behalf of the corporation by subscribing the name of such corporation by himself/herself as such officer, and caused the corporate seal of said corporation to be affixed thereto, as his/her free and voluntary act and as the free and voluntary act of the said corporation, for the uses and purposes therein set forth.

OLABARRIETA  GILORMINI

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

ABOGADA  NOTARIO
PUERTO  RICO

_____
NOTARY PUBLIC


COMMONWEALTH OF PUERTO RICO
MUNICIPALITY OF SAN JUAN                    ss:

AFFIDAVIT NUMBER:  _____

On this ____ day of _____, before me, a Notary Public duly authorized in and for the said Municipality in the Commonwealth aforesaid to take acknowledgments, personally appeared _____ residing at _____ to me known and known to me to be the person described in and who executed the foregoing instrument, and he/she acknowledged that the same was executed by him/her as his free and voluntary act, for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC


COMMONWEALTH OF PUERTO RICO
MUNICIPALITY OF SAN JUAN                    ss:

AFFIDAVIT NUMBER:  _____

On this ____ day of _____, before me, a Notary Public duly authorized in and for the said Municipality in the Commonwealth aforesaid to take acknowledgments, personally appeared _____ residing at _____ to me known and known to me to be the _____ of _____, the corporation described in the foregoing instrument, and acknowledged that as such officer, being authorized so to do, he/she executed the foregoing instrument on behalf of the corporation by subscribing the name of such corporation by himself/herself as such officer, and caused the corporate seal of said corporation to be affixed thereto, as his/her free and voluntary act and as the free and voluntary act of the said corporation, for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC



**COMMONWEALTH OF PUERTO RICO**
**MUNICIPALITY OF SAN JUAN**                          ss:

AFFIDAVIT NUMBER: _1187_

On this _1st_ day of _March, 1996_ before me, a Notary Public duly authorized in and for the said Municipality in the Commonwealth aforesaid to take acknowledgments, personally appeared _Edward R Cameron_ residing at _San Juan, Puerto Rico_ to me known and known to me to be the _President_ of _Sears Roebuck De PR Inc_ the corporation described in the foregoing instrument, and acknowledged that as such officer, being authorized so to do, he/she executed the foregoing instrument on behalf of the corporation by subscribing the name of such corporation by himself/herself as such officer, and caused the corporate seal of said corporation to be affixed thereto, as his/her free and voluntary act and as the free and voluntary act of the said corporation, for the uses and purposes therein set forth.

**IN WITNESS WHEREOF**, I hereunto set my hand and official seal.

_____
**NOTARY PUBLIC**

**COMMONWEALTH OF PUERTO RICO**
**MUNICIPALITY OF SAN JUAN**
    ss:

AFFIDAVIT NUMBER: _____

On this ____ day of _____, before me, a Notary Public duly authorized in and for the said Municipality in the Commonwealth aforesaid to take acknowledgments, personally appeared _____ _____ residing at _____to me known and known to me to be the person described in and who executed the foregoing instrument, and he/she acknowledged that the same was executed by him/her as his/her free and voluntary act, for the uses and purposes therein set forth.

**IN WITNESS WHEREOF**, I hereunto set my hand and official seal.

_____
**NOTARY PUBLIC**

**COMMONWEALTH OF PUERTO RICO**
**MUNICIPALITY OF SAN JUAN**
    ss:

AFFIDAVIT NUMBER: _____

On this ____ day of _____, before me, a Notary Public duly authorized in and for the said Municipality in the Commonwealth aforesaid to take acknowledgments, personally appeared _____ _____ residing at _____ to me known and known to me to be the person described in and who executed the foregoing instrument, and he/she acknowledged that the same was executed by him/her as his/her free and voluntary act, for the uses and purposes therein set forth.

**IN WITNESS WHEREOF**, I hereunto set my hand and official seal.

_____
**NOTARY PUBLIC**

# EXHIBIT A

## SITE PLAN

The dimensions of the Leased Premises described below are approximate, and are measured to the centerline of walls between tenant spaces, to the exterior of walls abutting the Common Areas, and to the lease line along the mall frontage.





# EXHIBIT B

## TENANT'S MONTHLY STATEMENT OF NET SALES

[DATE]

From:  To: Naseem Anjam                        Date: 3/1/96  Time: 6:44:08 PM                        Page 2 of 2

     The above diagrams are for the sole purpose of indicating the approximate location of the Leased Premises within the Shopping Center, and shall not be construed or interpreted to define or limit the size or dimensions of other areas, or as a representation by Landlord of the size and location of buildings within the Shopping Center or of the exact or final location of columns, division walls or other architectural, structural, mechanical or electrical elements. Landlord reserves the right to eliminate, add or make changes in the size or location of such elements and of the buildings and parking areas. The location of kiosks and other exhibits are not shown on this diagram, but shall be located at various points along the enclosed mall as Landlord may determine from time to time. Landlord reserves the right to change the number, size and location of all buildings, kiosks and Common Areas, provided, however, that Landlord's right to change the size and location of the Leased Premises is subject to the provisions of Section 2.02.

     The depiction of the Shopping Center on Exhibit A shall not be a limitation on Landlord's right to build or construct additional buildings on the Shopping Center site, whether connected to the enclosed mall or freestanding, for commercial, office or other use. Landlord shall operate, manage, repair and maintain such Common Areas for their intended purposes in such manner as Landlord shall determine, and may from time to time change the size, location, nature and use of any Common Areas, make installations therein and move and remove the same. Landlord also reserves the right to dedicate portions of such Common Areas and other portions of the Shopping Center (excepting only the Leased Premises) for street, park, utility and other public purposes. All Common Areas shall be subject to the exclusive control and management of Landlord, expressly reserving to Landlord, without limitation, the right to erect and install within the enclosed mall and other public areas, kiosks, planters, pools, sculptures, freestanding buildings or other such improvements.

RECEIVED DATE : 03/01/96   18:44   FROM   : FRANCO 809-765-3106

## EXHIBIT C

### DESCRIPTION OF LANDLORD'S WORK AND TENANT'S WORK
### IN THE Leased Premises AND RELATED AREAS AND FACILITIES

I.  **Administration**.

A.  **Description of Shell**.  Upon execution by both parties of this Lease, Landlord shall deliver to Tenant all available technical information and design criteria, together with other administrative information to be presented in a Tenant's Lease Package.

B.  **Schedule**.



(1)  All communication between Landlord and Tenant regarding design and construction shall be conducted in writing, in compliance with Section 22.30 of this Lease.

(2)  Tenant shall inform Landlord of the name, address, telephone number and professional license number of Tenant's architect, and shall subsequently inform Landlord of any changes thereof.

(3)  Within five (5) days from the date of the above notice, Landlord shall notify Tenant of the acceptability of the architect selected by Tenant, and Tenant shall then proceed with the preparation of Preliminary Plans (as hereinafter defined) related to the Leased Premises.  Under no circumstances shall Landlord be liable to any party for claims arising from work rejected or modified by Landlord, whether such work is performed by Tenant's approved architect or by another party.  Preliminary Plans shall include: (i) storefront and interior elevation(s), (ii) floor plans, reflected ceiling plans and partition and door location plans, (iii) telephone and electrical plans noting any special lighting and power load requirements, (iv) a perspective color rendering or photograph of the proposed storefront including any graphics and signage, (v) (for informational purposes only) merchandising plan of the Leased Premises, including both permanent and movable fixture locations, (vi) storefront and interior finishes, including a material and color sample board, along with catalog cut sheets of all light fixture and store merchandising fixtures.

(4)  Tenant shall deliver to Landlord two (2) complete sets of the Preliminary Plans, prior to commencing construction.

(5)  Within thirty (30) days from Tenant's delivery of the Preliminary Plans, Landlord shall submit to Tenant one (1) copy of the Preliminary Plans with appropriate notations by Landlord's architect.  Depending on the nature of Landlord's architect's notations, Tenant shall then proceed as follows:

(a)  if the Preliminary Plans are approved by Landlord's architect, Tenant shall direct Tenant's architect to proceed with the preparation of the Final Plans (as hereinafter defined) and request any and all applicable permits for construction and operation of the Leased Premises;

(b)  if the Preliminary Plans are approved in general, but contain specific notations requiring revision of Tenant's architect work, Tenant shall then direct his architect to proceed with said revision to Landlord's architect's satisfaction and to present, within ten (10) days from the date of receipt of the annotated Preliminary Plans, two (2) copies of the revisions required;

(c)  if the Preliminary Plans should be generally unacceptable, Landlord and Tenant shall convene a meeting with both architects present, with the objective of discussing the reasons for rejection.  Tenant shall reimburse Landlord for all added costs resulting from the review and consultation performed by Landlord's representatives.

(6)  Tenant shall submit to Landlord two (2) complete sets of the Final Plans.  The Final Plans shall include the Preliminary Plans revised in accordance with the comments of Landlord's architect and the following additional plans, drawings and specifications: (i) plumbing plans, (ii) mechanical plans, (iii) shop drawings for air conditioning ductwork; (iv) fire protection and security plans, (v) sign drawings, including two (2) sets of Tenant's sign manufacturer's shop drawings



prior to sign fabrication, (vi) specifications of architectural, structural, plumbing, mechanical, electrical and sprinkler work to be performed, and (vii) a construction schedule for Tenant's Work.

(7)     Within thirty (30) days from Tenant's delivery of the Final Plans, Landlord shall submit to Tenant one (1) copy of the Final Plans with appropriate notations by Landlord's architect. The procedure described in sections 5(a) through (c) above shall apply to the aforesaid notations on the Final Plans.

(8)     If Tenant, at any stage of the design process, elects to make changes to plans which have been approved by Landlord or which are in the process of being approved, Tenant shall then immediately forward to Landlord two (2) copies of any such changes.

(9)     Tenant shall not start actual construction until so authorized by Landlord in writing. Completion of all steps outlined in this schedule shall be a prerequisite for said authorization.

(10)    After all changes to the Final Plans have been effected, a complete set of reproducible documents and two (2) complete sets of prints shall be submitted to Landlord. Upon receipt, Landlord shall furnish Tenant with documentation required on Landlord's part for Tenant's filing for approvals and permits from governmental authorities. No deviation from the Final Plans shall be permitted without Landlord's prior written consent.



(11)    Prior to contracting for construction of Tenant's Work, Tenant shall deliver to Landlord a list of possible candidates whom Tenant intends to use in selecting a contractor. Only contractors who receive Landlord's approval and who have met all government requirements will be admitted on the job site.

(12)    All drawings and specifications for Tenant's Work and Tenant's Work itself shall comply with all applicable laws, codes, rules, regulations and other legal requirements and Landlord's approval of any such drawings and specifications shall not relieve Tenant of its obligation to cause such compliance.

II.     **Landlord's Work.**

A.      **Common Areas**:

(1)     **Parking Areas, Roads, and Walkways**: Installation of hard surfaced, drained and lighted parking areas, together with access roads, walkways, sidewalks, directional signs, markers and landscaping as determined by Landlord.

(2)     **Enclosed Mall**: The enclosed mall shall be sprinklered, lighted, surfaced and air conditioned and shall contain such amenities and vertical transportation facilities as are, in Landlord's judgment, appropriate.

B.      **Typical Shell**:

(1)     **Structural**: Steel or concrete with a maximum load capacity of seventy (75) pounds per square foot.

(2)     **Floor**: Concrete with troweled finish on all levels.

(3)     **Roof and Ceilings**: Exposed structure.

(4)     **Walls**: Gypsum board and metal studs, without tape, spackle or finishing, exposed concrete block or exposed concrete, all as shown on Landlord's Drawings.

(5)     **Doors, Frames and Hardware**: To satisfy code only on rear walls of stores with access to Landlord's service corridors, as shown on Landlord's Drawings.

(6)     **Sprinkler System**: Construction within store will be by Tenant as per Tenant's design, after approval by Landlord and Factory Mutual Engineer. Landlord will deliver sprinkler water to a point within the Leased Premises. Tenant will construct, using approved contractor, all connections within the Leased Premises. Tenant will pay a flat charge for amortization of Landlord's Work as well as Tenant's Proportionate Share of the charge for the fire protection water billed by



the Puerto Rico Aqueduct and Sewer Authority. Landlord may elect to construct Tenant's sprinkler system and charge Tenant the actual cost of said construction.

(7) **Electrical**: Empty conduit from meter bank through wall of Leased Premises from main panel at 120/208 volts, three phase, four wire 7.5 watts per square foot connected load. Special requirements at added cost to Tenant.

(8) **Gas**: Available only to food service tenants. Landlord will bring main to a point near Landlord's building. All leads, meters and connections will be at Tenant's expenses.

(9) **Water**: 3/4 inch cold water through wall of Leased Premises if toilet or cooking facilities are to be provided. Special requirements at Tenant's expense. Meter permit, charges and installation by Tenant at Tenant's expense.

(10) **Sanitary Sewer**: If toilet facilities are to be provided, Landlord will furnish one (1) sewer connection for water closet, in a location shown on Landlord's Drawings.



(11) **Ventilation, Air Conditioning**: No steam or hot water. Landlord will provide chilled water supply, return and condensate piping, air handling unit or mixing box connection to a central air handling unit, and controls of adequate size. The air handling unit to be provided by Landlord will be based on an internal electric load of five (5) watts per square foot, one person per fifty (50) square feet, ten percent (10%) outside air, outside air conditions ninety (90) degrees FDB and eighty (80) degrees FWB and fifty percent (50%) relative humidity. Should Tenant's criteria or usage exceed any of these conditions, Tenant shall reimburse Landlord for any increase in air handling unit size as well as appropriate adjustment in the chilled water energy charges due to any increase in load. All other specific requirements, including supply and return ducts, grilles, diffusers, etc., shall be by Tenant as per approved drawings. Mechanical ventilation system and toilet exhaust systems, if any, within the Leased Premises, shall be connected by Tenant to Landlord's system as shown on Landlord's Drawings.

(12) **Telephone**: Landlord will provide a main terminal at a point within the Building. Tenant shall connect as per Puerto Rico Telephone Company requirements, with Landlord's authorization, at Tenant's expense.

(13) **Roof Penetration**: To be done by Landlord's contractor at Tenant's expense. No stacks, extractors, antennae, etc. will be provided, except by special arrangement.

(14) **Allowance for Chases**: Landlord may use portions within the Leased Premises for utilities or other facilities.

(15) **Utilities Charges**: Tenant shall pay all utility deposits, taxes, charges, etc., directly to utility company, except for charges for fire protection water. Tenant shall also pay for any installation beyond that provided by Landlord.

(16) **Acceptance of Landlord's Work**: Opening of store by Tenant constitutes acceptance of Landlord's Work unless delivery of punchlist to Landlord occurs fifteen (15) days prior to opening.

III. **Tenant's Work**.

Tenant shall perform, at Tenant's sole cost and expense, all work required to complete and place the Leased Premises in finished condition for the opening for business in accordance with Section 8.03 of the Lease, except for such work described hereinabove as Landlord's Work. All such work shall be performed in accordance with mutually approved plans and specifications prepared by Tenant's architect in conformity with this Exhibit C, and shall include, without limitation:

(1) **Floors**. Installation of the floor finish to the elevation of the adjacent mall floor. Tenant agrees that Landlord's floor shall not be loaded in excess of seventy-five (75) pounds per square foot.

(2) **Walls and Wall Finishes**. Interior partition and walls within the Leased Premises and finished on walls and columns, including the finishes required on metal studs, gypsum



board or masonry partitions erected under Landlord's Work, and all interior painting and decoration.

(3) **Doors**. Doors and hardware within the Leased Premises except as provided for in Landlord's Work.

(4) **Store Fronts**. All store fronts and show windows, as approved by Landlord's architect.

(5) **Ceilings**. Tenant must install a U.L. approved, fire-rated ceiling system, as required by code, to a maximum height of twelve (12) feet, or as otherwise authorized in writing by Landlord.

(6) **Plumbing**. Installation of a complete plumbing system as may be required by local codes, connected to Landlord's Work.

(7) **Electrical**. Installation of a complete electrical system from a point of connection to Landlord's meter bank, to include, as per approved plans and specifications, a main distribution panel and adequate protective devices as required by applicable codes.

(8) **Roof Openings**. Roof penetrations, if authorized by Landlord, shall be performed by Landlord as per approved Tenant Drawings. The re-roofing and flashing of openings will be done by Landlord at Tenant's expense, and Tenant agrees to pay Landlord the reasonable cost thereof within ten (10) days of billing.



(9) **Air Conditioning and Ventilation**. Tenant shall furnish and install all supply, return and fresh air ducts according to approved plans and specifications. The ductwork shall be connected by Tenant to Landlord's air handling unit. Tenant shall also construct a mechanical ventilation system, if required by Landlord.

(10) **Signs**. The design and location of all signs, either for the interior or the exterior of the Leased Premises, shall be subject to prior approval by Landlord. Tenant shall submit detailed Sign Shop Drawings to Landlord. No sign shall be installed until Landlord's written approval has been obtained by Tenant. Shop Drawings shall be in duplicate and contain all vital information pertaining to dimensions, location, material, color and type of illumination. Color samples of all signs, if not white, shall be submitted to Landlord. Details on signing will be included in the Space Package.

(11) **Special Equipment**. Tenant shall install all safety and emergency equipment and any other special equipment required by code or by any governmental body.

(12) **Utility Meters**. Tenant shall cause to be installed all utility meters required, in such locations as Landlord designated for that purposes.

(13) **Telephone**. Tenant shall install conduits, cabinets and outlets within the Leased Premises as required by the utility company supplying the service, for telephone service required by Tenant.

(14) **Store Fixturing and Merchandising**. Tenant shall bear the entire expense and responsibility for providing within the Leased Premises (whether affixed or not), all trade fixtures and merchandise and all other property incidental to the operation of the type of business to be operated by Tenant.

(15) **Garbage and Rubbish**. Tenant shall provide adequate storage for dry rubbish collection containers and wet garbage cans within the Leased Premises readily accessible to truck receiving areas.

(16) **Protection, Intercommunication and Alarm**. Tenant shall provide all fire and other protection systems required, such as A.D.T., intercommunication, alarms, etc.

(17) **Janitorial and Drinking Fountain Facilities**. Tenant shall provide janitorial and drinking fountain facilities, if required, together with items customarily incidental thereto.

(18) **Mechanical Equipment**. Tenant shall provide mechanical equipment, including dumb waiters, elevators, escalators, freight elevators, conveyors and their shafts and doors, located within the Leased Premises, including all electrical, mechanical and structural work required for these items.

(19) **Temporary Services**. During the construction period for Tenant's Work, Tenant shall provide and pay for connections and meters for temporary water, gas and electrical



services brought to such point as Landlord shall determine. Tenant shall pay for all water, gas, electrical current and fuels used during this period. Should Landlord or Landlord's contractor elect to provide such services, Tenant shall reimburse Landlord or Landlord's contractor for Tenant's share of such cost.

(20)    **Mezzanines**. No mezzanines shall be constructed within the Leased Premises.

(21)    **Permits**. Tenant shall arrange for and obtain all permits and pay all costs and expenses related thereto.

IV.    **Tenant's Contractors' Insurance Requirements**.

Prior to commencement of Tenant's Work and until completion thereof, Tenant shall cause each contractor to provide Landlord with payment and performance bonds for Tenant's Work; proof of worker's compensation insurance for statutory limits and employers' liability insurance for a limit of not less than $1,000,000; proof of property damage and public liability insurance, naming Landlord and Landlord's mortgagee as an additional insured, for a combined single limit of not less than $2,500,000; proof of automobile liability insurance for owned, non-owned and hired vehicles for a limit of not less than $1,000,000; and Builders' Risk completed value form affording "All Risks of Physical Loss or Damage" on Tenant's Work as it relates to the Building, naming the interests of Landlord, Landlord's mortgagee and their respective agents and employees and Tenant's contractors, as their respective interests may appear. All policies shall provide for thirty (30) days' prior written notice of expiration of cancellation. The construction of Tenant's Work may not commence until Tenant has delivered to Landlord appropriate certificates of insurance evidencing the foregoing coverages.



V.    **Construction Escrow**.

Tenant shall pay for Tenant's Work and shall not permit the Leased Premises to become subject to any lien on account of labor, material or services furnished to Tenant. Tenant shall provide such contractor's affidavits and statements, tenant (owner) statements, partial and final waivers of lien, architect's certificates and any additional documentation of Tenant or contractor undertakings which may be requested by Landlord.

VI.    **Indemnification**.

The contractors, suppliers and workmen of Tenant shall not unreasonably interfere with other tenants in the Building and shall comply with reasonable rules and regulations instituted by Landlord for the protection of other occupants of the Building.



## EXHIBIT D

## RULES AND REGULATIONS

Tenant agrees that it shall observe and comply with the following rules and regulations.

A.    Tenant shall keep the Leased Premises, including the sidewalks, if any, and the front and rear immediately adjoining the Leased Premises, clean and free from rubbish and dirt at all times, and shall store all trash and garbage within the Leased Premises in suitable containers so located so as not to be visible to customers and business invitees in the Shopping Center and so as not to create or permit any health or fire hazard.  Tenant shall not install or permit the installation of automatic garbage disposal equipment.  Tenant shall remove such trash, garbage, and refuse only in such places as Landlord may designate, and Tenant shall leave such trash, garbage and refuse for collection outside the Leased Premises in the manner and at the times specified by Landlord.  If Landlord shall provide or designate a service for disposing or picking up refuse and garbage, then Tenant shall use same, at Tenant's expense.  Tenant shall pay to Landlord monthly, in advance, Tenant's Proportionate Share of actual cost to Landlord of such service plus fifteen percent (15%) for administrative expenses paid or incurred by Landlord.

B.    During hours when the Shopping Center is not open for business, Tenant shall maintain well lit those sections of the Leased Premises as Landlord may from time to time designate.

C.    Tenant shall wash and clean Tenant's signs at least every three (3) months.



D.    Tenant shall not change the exterior color, signage or architectural treatment of the Leased Premises or the Building or any part thereof.  Tenant shall not perform modifications to the Leased Premises, including the air conditioning, electrical, plumbing, sprinkler and other systems, without Landlord's prior written consent, except as permitted under Article 26.

E.    If the Leased Premises face or shall face an enclosed mall, Tenant shall operate its air conditioning units in the Leased Premises when the Leased Premises are open for business and at all times whenever the air conditioning units in the mall are in operation and Tenant's store is open to the public for business, in order that at all times a compatible temperature, as directed by Landlord's engineers, shall be maintained between the Leased Premises and the mall.

F.    Tenant shall not injure, overload, deface or otherwise harm the Leased Premises or any part thereof or any equipment or installation therein; nor commit any nuisance or illegal action of any kind in the Leased Premises or elsewhere in the Shopping Center; nor permit the emission of any objectionable noise, vibration or odor; nor burn any trash or refuse within the Shopping Center; nor sell, display, or distribute any alcoholic liquors or beverages without Landlord's written approval; nor dispose of cooking oils, fats or any solid materials in the sanitary sewer system; nor to conduct business at, in, on, about or from any part of the Leased Premises on any day when the conduct of business is prohibited by any statutes, laws, regulations or ordinances of the Commonwealth of Puerto Rico or any governmental authority having jurisdiction over the Shopping Center.

G.    Tenant shall not make any use of the Leased Premises or of any part thereof or equipment therein which is improper, offensive or contrary to any law or ordinance or to reasonable rules and regulations of Landlord as such may be issued from time to time, or which will invalidate or increase the cost of any of Landlord's insurance over a standard mercantile rating, notwithstanding the permitted uses; nor use or install in or above the Leased Premises any advertising medium or sound producing mechanism that may constitute a nuisance, such as parking lights, searchlights, radios, television sets, loudspeakers, videos and radios, sound amplifiers or phonographs in manner to be heard or experienced outside the Leased Premises; nor conduct any auction, fire, or other distress sale "going out of business," "close out" or bankruptcy sales; nor do any act tending to injure the reputation of the Shopping Center; nor to use or occupy the Leased Premises, or to suffer or permit them to be used or occupied, in whole or in part, as a discount house, discount store, surplus store, Army-Navy type store, bargain store, or by any similar business or activity; nor sell, display, or promote merchandise underneath the facade or entrance to the Leased Premises; nor sell or display merchandise on, or otherwise obstruct the driveways, walks, malls, courts, parking areas and other Common Areas in the Shopping Center; nor permit Tenant's officers or employees to use any parking areas other than those designated by Landlord for such use; nor use the malls, courts and walks for any purpose other than pedestrian traffic; nor suffer or commit any nuisance or other act or thing which may disturb the quiet enjoyment of any tenant in the Shopping Center or the quiet enjoyment of any person within five hundred (500) feet of the boundaries of the Shopping Center; nor distribute handbills, advertising material or otherwise solicit business in the Common Areas.  In no event shall Tenant permit deliveries of bulk items through the enclosed mall during the hours in which the Shopping Center is open for business.  Tenant shall refrain from entering the enclosed mall or service corridors during those hours in which the Shopping Center is not open for business, unless a written previous authorization is granted by Landlord.  Landlord may remove, at



Tenant's expense, such items belonging to Tenant or Tenant's permittees which are placed or stored in the enclosed mall, service corridors or fire corridors, and Tenant hereby waives any liability to Landlord resulting therefrom. In addition, Landlord may assess a fine of Fifty Dollars ($50.00) against Tenant for any day or part of a day in which items belonging to Tenant are stored in a prohibited area.

H.      Tenant shall refrain from storing merchandise, goods or business articles, or installing or permitting to be installed any cover, partition, decoration, alteration, improvement or the like, over, upon or under the sprinkler heads within the Leased Premises.

I.      Tenant shall not decorate, paint, make any alterations or additions to the Leased Premises, nor permit the making of any holes in the walls, partitions, ceilings, or floors thereof, nor permit the painting or placing of any exterior signs, interior illuminated signs, placards or other advertising media, awnings, banners, flags, pennants, aerials, antennae or the like therein or thereon, without on each occasion obtaining prior written consent of Landlord. Tenant shall not attach interior signs, placards or other advertising media or other objects to the windows or locate the same in such manner as to materially obstruct the view of the Leased Premises from the mall area or from the outside, nor place a load upon any floor of the Leased Premises which exceeds the floor load per square foot set forth in Exhibit D. Tenant shall not perform construction or repair work without prior written consent from Landlord.

J.      Tenant shall store soiled or dirty linen in metal containers with self-closing fusible link covers approved by fire rating organizations.

K.      Tenant shall use, at Tenant's own cost, a pest exterminator contractor as Landlord may direct and at such intervals as may reasonably be required or as Landlord may direct.



L.      Tenant shall not permit the (i) extermination of vermin to be performed in, on or about the Leased Premises except by Landlord or by a person or company, if any, designated by Landlord or (ii) laundry accumulated in Tenant's operations or on the Leased Premises to be collected and serviced except by Landlord or a person or company, if any, designated by Landlord; but in each case Landlord agrees that the prices to be charged therefor by Landlord or such person or company so designated shall be competitive. Window cleaning and janitorial services in and for the Leased Premises shall only be performed by Tenant's own employees or an outside person or company approved by Landlord. Such work as is performed by or on behalf of Tenant on the exterior of the Leased Premises in connection with the cleaning, maintenance and upkeep thereof shall only be performed during reasonable hours designated from time to time for such purposes by Landlord. Tenant shall not permit the use of any fork-lift truck, tow truck or any other mechanical powered machine or equipment for handling freight in the Leased Premises or other portion of the Shopping Center (except the truck yard portion thereof). All equipment and devices for the handling freight in the Leased Premises or portions of the Shopping Center other than the truck yard portion thereof shall be propelled by hand and shall be provided with rubber tired wheels.

M.      Tenant shall not use or permit the use of any portion of the Leased Premises as living, sleeping or lodging quarters, nor allow live animals to be kept on or within the Leased Premises, unless expressly provided under Section 1.25 of the Lease.

N.      The plumbing facilities shall not be used for any purpose other than that for which they were constructed. All sewer lines shall be kept open and no foreign substance of any kind shall be disposed of therein. The expense of any breakage, stoppage, or damage resulting from a violation of this provision by Tenant, its agents, employees or invitees shall be borne by Tenant.

O.      Tenant shall install and maintain at a readily available location, which may be designated by Landlord, within the Leased Premises, a fire extinguisher with the capacity that may be required by Landlord or by code of law.

P.      Tenant shall not, without Landlord's prior written consent, operate, install or permit to be installed in the Leased Premises within ten (10) feet of the enclosed mall, vending or dispensing machines, or stands for the sale of food, beverages, ice-cream, pop corn, candy, gum or any other edibles.

Q.      Tenant shall not, without Landlord's prior written consent, operate, inside or outside the Leased Premises, any coin or token operated vending machine or similar device for the sale of any goods, wares, merchandise, food, beverages, or services, including, but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices and machines for the sale of beverages, foods, candy, cigarettes or other commodities.

R.      Tenant shall park, load and unload vans, trailers, trucks or other delivery vehicles only in those areas and at such reasonable times as Landlord may designate, and shall remove such vehicles promptly upon completion of their loading or unloading activity. Tenant shall direct its officers and employees to park in such areas as Landlord may from time to time designate for employee parking.

Tenant shall also direct its officers, licensees, vendors, and employees to refrain from parking in loading areas, sidewalks, roadways and other areas set aside by Landlord for other uses.

S.   Tenant shall not operate or cause to be operated an "elephant train," or other means of transportation.

T.   Tenant shall not display, paint, place or cause to be displayed, painted or placed any handbills, bumper stickers or other advertising or promotional materials or devices on any vehicle parked in the parking areas of the Shopping Center.

U.   Tenant agrees that Landlord may amend, modify, delete or add, from time to time, new and additional reasonable rules and regulations applicable to the occupancy of the Building, the Leased Premises or the Common Areas.

V.   Tenant agrees not to carry on or permit to be carried on any business in the Leased Premises under a name other than that set forth herein, without the prior written consent of Landlord.

W.   Tenant shall comply with all laws, rules and regulations applicable to Tenant's business promulgated by the federal, commonwealth or municipal governments or any of their bodies, agencies, or instrumentalities.

X.   If at the time of the Grand Opening of the Shopping Center or during the Term of this Lease Tenant is in the process of, but has not completed the remodeling of its store and is not open for business, Tenant shall paint on the facade of the gypsum and/or wood barricade enclosing the front of its store, a life size artistic rendition of what its store front will look like once it is open for business.



Y.   Landlord or its designated representative shall have the right to inspect periodically and/or request the government or its agencies to inspect the Leased Premises to verify and confirm Tenants' compliance with all governmental rules and regulations, as well as rules and regulations set forth in the Lease Agreement and specifically Exhibit D.  Should Landlord discover that Tenant has violated and/or is not complying with the provisions of Exhibit D, Landlord shall have the right to provide or designate a third party to perform the responsibilities and obligations of Tenant pursuant to this Exhibit, at Tenant's expense.  Tenant shall reimburse Landlord the full amount of this expense within fifteen (15) days after being required full payment.



## FIRST AMENDMENT TO SHOPPING CENTER RETAIL LEASE

THIS FIRST AMENDMENT TO SHOPPING CENTER RETAIL LEASE ("First Amendment"), entered into this __16TH__ day of __OCTOBER__ 2000, by and between PLAZA LAS AMERICAS, INC. ("Landlord") and SEARS, ROEBUCK DE PUERTO RICO, INC. ("Tenant").

## WITNESSETH:

WHEREAS, by a Lease dated March 1, 1996 (the "Lease"), Landlord leased to Tenant certain premises located in the Shopping Center commonly known as Plaza Las Américas, located in Hato Rey, Puerto Rico, consisting of approximately 49,500 square feet, as more fully defined in the Lease (the "Demised Premises");

WHEREAS, Landlord and Tenant differ in their interpretation of the provisions of the Lease relating to the calculation of Percentage Rent during a Partial Lease Year;

WHEREAS, the amount of Percentage Rent due under Landlord's interpretation of the Lease is $56,803.00 greater than the amount due under Tenant's calculation;

WHEREAS, the parties have agreed that in settlement of the dispute over the amount of Percentage Rent due, Tenant will pay to Landlord the amount of $28,408.50 as additional Percentage Rent; and



WHEREAS, since the current lease expiration date would result in the occurrence of a partial lease year at the end of the term, the parties have agreed to modify the termination date so that the Lease expires at the end of a full Lease Year.

NOW, THEREFORE, in consideration of the mutual promises, obligations and covenants contained herein the sufficiency and receipt of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.  Tenant shall pay Landlord $28,408.50 upon execution of this First Amendment.

2.  Section 1.13 of the Lease is deleted in its entirety and the following is inserted in place thereof:

    **LEASE TERM:** Commencing August 8, 1996 and ending June 30, 2019, with one (1) option to renew for a period of ten (10) years, commencing on July 1, 2019 and ending on June 30, 2029, upon one (1) year's prior written notice by Tenant to Landlord of such renewal, but only if Tenant has previously extended the term of that certain Ground Lease between Landlord and Tenant dated as of April 27, 1977 (the "Ground Lease"), as provided in Section 1.3 of the Ground Lease.

3.  Section 1.14 of the Lease is deleted in its entirety and the following is inserted in place thereof:

    **LEASE YEAR/PARTIAL LEASE YEAR:** "Lease Year" shall mean the twelve (12) month period commencing the first day of July 1997 and each succeeding

twelve (12) month period commencing on July 1 of each calendar year thereafter. "Partial Lease Year" shall mean the period commencing August 8, 1996 and ending June 30, 1997."

4.   Section 1.16 of the Lease is amended as follows: the phrase "February 11, 2019" is deleted and the phrase "June 30, 2019" is inserted in lieu thereof.

5.   In the event of any conflict between this First Amendment and the Lease, it is agreed that this First Amendment shall supercede the Lease. Otherwise, the Lease as hereby amended, is ratified, confirmed and continued in all respects and all covenants of the Lease are hereby incorporated herein by reference.

6.   Except as defined herein, all capitalized items used in this First Amendment shall have the meanings ascribed to such terms in the Lease.

7.   Each Party executing this First Amendment represents and warrants that its has the power and authority to execute this document on behalf of its respective party.

8.   Landlord represents and warrants that it has the full power and authority to enter into this First Amendment and to amend the Lease and that the Landlord does not need the consent of any lender holding a mortgage or a deed of trust on the Demised Premises or any other party.



IN WITNESS WHEREOF, this First Amendment is executed as of the day first written above.

ATTEST OR WITNESS:                              LANDLORD:
                                                PLAZA LAS AMERICAS, INC.


By:_____                              By: _Raul Ubarri Benitez_
                                                Name: _Raúl Ubarri Benítez_
                                                Title: _Secretary_


ATTEST: WITNESS:                                TENANT:
                                                SEARS,
                                                   ROEBUCK DE PUERTO RICO, INC.


By: _Philip E. Goodchild_                       By:_____
    Assistant Secretary
                                                Name: _____
                                                Title: _Its Authorized Agent_

REMITTANCE ADVICE

SEARS, ROEBUCK AND CO.
768P
3333 BEVERLY RD.
HOFFMAN ESTATES, IL 60179

IF THIS REMITTANCE APPEARS TO BE INCORRECT
WRITE AT ONCE TO OUR DEPARTMENT AT ADDRESS AT RIGHT MENTIONING THE CHECK NO. & DATE

TRANSACTION CODES
1 REGULAR INVOICE
2 OUR MEMO
3 YOUR MEMO
4 RETURNED GOODS
5 ERROR ON INVOICE
6 TRANSPORTATION CHARGES
7 YOUR LETTER OR BAL DUE

BILLS
9 FRT. CUT DOWN

| STORE NO. | DOC DATE MO DAY YR | DOCUMENT NO. | AMOUNT | DEPT | SUPPLEMENTAL INFORMATION |
|---|---|---|---|---|---|
| .0099391 | 013 00 | 0161129 | 2840850 | 206 | |

HE ACCTS PAYABLE II

| /0/16/00 DATE | CONTROL NUMBER 589 | 0404398 CHECK NUMBER | 2840850 CHECK AMOUNT | 000008334 DUNS NO. (OR VENDOR NO.) |
|---|---|---|---|---|

**THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER**

CHECK NUMBER

**SEARS, ROEBUCK AND CO.**
HOFFMAN ESTATES, IL 60179

**M404398**

74-1329
724

**OLD KENT**
ELMHURST, IL 60126

| MONTH | DATE DAY | YEAR |
|---|---|---|
| 10 | 16 | 00 |

DUNS OR VENDOR NO.
000008334

| | DOLLARS | CENTS |
|---|---|---|
| PAY ▶ | ****28408 | 50 |

SEARS, ROEBUCK AND CO.
**VOUCHER ACCOUNT**

TO THE
ORDER
OF

PLAZA LAS AMERICAS INC
P O BOX 363268
SAN JUAN, PR
00936-3268

Harry R. Raymond

SEARS, ROEBUCK AND CO. SEARS, ROEBUCK AND CO. SEARS, ROEBUCK AND CO.

⑈404398⑈ ⑆072413298⑆ ⑈90 708 2⑈

**THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW**

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL 60179

June 15, 2018

**VIA OVERNIGHT DELIVERY**
**and VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7007 0220 0004 3210 8002**

**VIA OVERNIGHT DELIVERY**
**and VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7007 0220 0004 3210 8019**

Plaza Las Americas, Inc.
P.O. Box 363268
San Juan, Puerto Rico  00936-3268
Attn:  President

Plaza Las Americas, Inc.
525 Ave Franklin Delano Roosevelt
San Juan, Puerto Rico  00918
Attn:  President

Re:    Shopping Center Retail Lease dated March 1, 1996, as amended, covering
       the premises consisting of approximately 49,500 square feet, located at the
       Plaza Las Americas, Hato Rey, San Juan, PR, and known as Sears Unit #7842

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of ten (10) years,
commencing July 1, 2019, to and including June 30, 2029, upon the terms, conditions, and rental as
set forth in said Lease, as amended.

Sincerely,

SEARS, ROEBUCK DE PUERTO RICO, INC.,
a Delaware corporation

By: _____
     Lawrence J. Meerschaert
     Vice President

JC/cm

cc:    Lease File

**VIA OVERNIGHT DELIVERY**
**and VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7007 0220 0004 3210 7982**

Plaza Las Americas, Inc.
P.O. Box 363268
San Juan, Puerto Rico 00936-3268
Attn:  Corporate Leasing Director

**VIA OVERNIGHT DELIVERY**
**and VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7009 3410 0000 2361 8071**

Plaza Las Americas, Inc.
525 Ave Franklin Delano Roosevelt
San Juan, Puerto Rico  00918
Attn:  Corporate Leasing Director