# Exhibit: A

PONCE, PUERTO RICO
PLAZA DEL CARIBE

LANDLORD: PLAZA DEL CARIBE, S.E.
TENANT: SEARS, ROEBUCK DE PUERTO RICO, INC.

TABLE OF CONTENTS

PART I
LEASE

SECTION                               PAGE

1.  Definitions . . . . . . . . . . . . . . . . . . . . 1

2.  Demised Premises . . . . . . . . . . . . . . . . 4

3.  Use . . . . . . . . . . . . . . . . . . . . . . . 5

4.  Term . . . . . . . . . . . . . . . . . . . . . . 7
    (a)  Term. . . . . . . . . . . . . . . . . . . . 7
    (b)  Extension Rights. . . . . . . . . . . . . . 7
    (c)  Interim Term. . . . . . . . . . . . . . . . 7
    (d)  Holding Over. . . . . . . . . . . . . . . . 7

5.  Opening Date. . . . . . . . . . . . . . . . . . . 7

6.  Construction of the Demised Premises. . . . . . . 8

7.  Occupancy . . . . . . . . . . . . . . . . . . . . 10

8.  Landlord's Warranties . . . . . . . . . . . . . . 11
    (a)  Landlord's Title. . . . . . . . . . . . . . 11
    (b)  Landlord's Authority. . . . . . . . . . . . 11
    (c)  Permitted Encumbrances. . . . . . . . . . . 11
    (d)  Mortgages . . . . . . . . . . . . . . . . . 11
    (e)  Zoning. . . . . . . . . . . . . . . . . . . 11
    (f)  Quiet Possession. . . . . . . . . . . . . . 12
    (g)  Environmental Warranties. . . . . . . . . . 12
    (h)  Compliance With Laws. . . . . . . . . . . . 12
    (i)  Roof Warranty . . . . . . . . . . . . . . . 12
    (j)  Indemnity . . . . . . . . . . . . . . . . . 13
    (k)  Additional Covenants, Warranties and
         Representations Regarding Asbestos
         Materials . . . . . . . . . . . . . . . . . 13

9.  Rent. . . . . . . . . . . . . . . . . . . . . . . 13
    (a)  Fixed Rent. . . . . . . . . . . . . . . . . 13
    (b)  Percentage Rent . . . . . . . . . . . . . . 14
    (c)  Recalculation of Rent . . . . . . . . . . . 14
    (d)  Net Sales . . . . . . . . . . . . . . . . . 14
    (e)  Contract Sales. . . . . . . . . . . . . . . 16

Exhibit "A"

TABLE OF CONTENTS
PAGE 2

SECTION                                                                    PAGE

        (f)  Catalogue Sales . . . . . . . . . . . . . . . 16
        (g)  Limitation on Net Sales . . . . . . . . . . . 16
        (h)  Formula . . . . . . . . . . . . . . . . . . . 17
        (i)  Unaudited Statement . . . . . . . . . . . . . 17
        (j)  Right to Audit. . . . . . . . . . . . . . . . 17
        (k)  No Warranty as to Sales . . . . . . . . . . . 18
        (l)  Rental Receipt. . . . . . . . . . . . . . . . 18

10.  Transfer and Recording Taxes. . . . . . . . . . . . . 18

11.  Repairs . . . . . . . . . . . . . . . . . . . . . . . 18
        (a)  Tenant's Repairs. . . . . . . . . . . . . . . 19
        (b)  Landlord's Repairs. . . . . . . . . . . . . . 19
        (c)  Exterior and Structural Repairs . . . . . . . 19
        (d)  Emergency Repairs . . . . . . . . . . . . . . 19
        (e)  Maintenance Contract. . . . . . . . . . . . . 19

12.  Tenant's Right to Repair. . . . . . . . . . . . . . . 20

13.  Landlord's Access . . . . . . . . . . . . . . . . . . 20

14.  Assignment and Subletting . . . . . . . . . . . . . . 20

15.  Right to Alter or Improve . . . . . . . . . . . . . . 21

16.  Damage or Destruction to Demised Premises . . . . . . 22

17.  Damage or Destruction to the Shopping Center  . . . . 23

18.  Exclusives . . . . . . . . . . . . . . . . . . . . . . 25

19.  Title Insurance . . . . . . . . . . . . . . . . . . . 25

20.  Insurance for the Shopping Center . . . . . . . . . . 26

20A. Tenant's Insurance  . . . . . . . . . . . . . . . . . 28

21.  Waiver of Subrogation . . . . . . . . . . . . . . . . 29

22.  Indemnity . . . . . . . . . . . . . . . . . . . . . . 29
        (a)  Landlord's Indemnity. . . . . . . . . . . . . 29
        (b)  Tenant's Indemnity. . . . . . . . . . . . . . 30

23.  Certificates of Insurance . . . . . . . . . . . . . . 30

24.  Real Estate Taxes . . . . . . . . . . . . . . . . . . 30

TABLE OF CONTENTS
PAGE 3

SECTION                                                                    PAGE

25.  Defaults. . . . . . . . . . . . . . . . . . . . . . 32

26.  Utilities; Trash Removal. . . . . . . . . . . . . . 33

27.  Hazardous Materials . . . . . . . . . . . . . . . . 34

PART II
DEVELOPMENT AND OPERATION OF THE SHOPPING CENTER

1.  Construction and Plans. . . . . . . . . . . . . . . 36

 2.  Outparcels. . . . . . . . . . . . . . . . . . . . . 37

 3.  Construction and Occupancy Requirements . . . . . . 38

 4.  Tenant's and Landlord's Operating Covenants . . . . 38

 5.  Maintenance Contribution . . . . . . . . . . . . . 40

 6.  Marketing Fund. . . . . . . . . . . . . . . . . . . 40

 7.  Mall Entrance . . . . . . . . . . . . . . . . . . . 40

 8.  Assignments, Transfers and Financing. . . . . . . . 41

 9.  Notices to Holders of Mortgages . . . . . . . . . . 42

10.  Kiosks. . . . . . . . . . . . . . . . . . . . . . . 42

11.  Design Development Drawings . . . . . . . . . . . . 43

12.  Easements and Parking . . . . . . . . . . . . . . . 43
         (a)  Grant of Common Area Easements
              by Landlord . . . . . . . . . . . . . . . 43
         (b)  Parking Rules and Regulations . . . . . . 43

13.  No Impediments to Traffic Flow. . . . . . . . . . . 43

14.  Operation and Air Pressure. . . . . . . . . . . . . 44

15.  Ancillary Uses. . . . . . . . . . . . . . . . . . . 45

16.  Sign Criteria . . . . . . . . . . . . . . . . . . . 46

J:\WPF\CL1\83952.LSE
October 8, 1991

TABLE OF CONTENTS
PAGE 4

SECTION                                                           PAGE

17. Common Area Maintenance . . . . . . . . . . . . . . . 47

18. Sanitation and Safety . . . . . . . . . . . . . . . . 48

19. Parking Ratio . . . . . . . . . . . . . . . . . . . . 48

20. Lighting. . . . . . . . . . . . . . . . . . . . . . . 48

21. Condemnation. . . . . . . . . . . . . . . . . . . . . 49

22. Utility Easements . . . . . . . . . . . . . . . . . . 50

23. Surrender of Possession . . . . . . . . . . . . . . . 50

PART III
GENERAL

1. Notices . . . . . . . . . . . . . . . . . . . . . . . 51

2. Choice of Law . . . . . . . . . . . . . . . . . . . . 51

3. No Partnership. . . . . . . . . . . . . . . . . . . . 51

4. Partial Invalidity. . . . . . . . . . . . . . . . . . 52

5. Unavoidable Delays. . . . . . . . . . . . . . . . . . 52

6. No Waiver . . . . . . . . . . . . . . . . . . . . . . 52

7. Rights Cumulative . . . . . . . . . . . . . . . . . . 52

8. Running with the Land . . . . . . . . . . . . . . . . 52

9. Estoppel Certificate and Subordination,
   Non-Disturbance and Attornment Agreement. . . . . . . 53

10. Benefit of Successors and Assigns . . . . . . . . . . 53

11. Rules and Regulations . . . . . . . . . . . . . . . . 53

12. Joint Preparation . . . . . . . . . . . . . . . . . . 53

J:\MPF\CLI\83952.LSE
October 8, 1991

TABLE OF CONTENTS
PAGE 5

SECTION                                                            PAGE

13.  Entire Agreement. . . . . . . . . . . . . . . . . . . . 53

14.  Broker. . . . . . . . . . . . . . . . . . . . . . . . . 53

15.  Right to Audit. . . . . . . . . . . . . . . . . . . . . 54

16.  Headings. . . . . . . . . . . . . . . . . . . . . . . . 54


EXHIBITS:

"A"  -  Shopping Center Legal Description

"B"  -  Shopping Center Site Plan

"C"  -  Permitted Encumbrances

"D"  -  Plans and Work Completion Schedule

"E"  -  Estoppel Certificate

"F"  -  Rules and Regulations

"G"  -  Sign Criteria



## LEASE AGREEMENT

### PONCE, PUERTO RICO
### PLAZA DEL CARIBE

THIS LEASE made this ____ day of April, 1991, by and between PLAZA DEL CARIBE, S.E., a Puerto Rico special partnership (Landlord) and SEARS, ROEBUCK DE PUERTO RICO, INC. a Delaware corporation, (Tenant).

### WITNESSETH:

WHEREAS, Landlord is the owner of approximately Sixty-Three (63) acres of land located in the City of Ponce, Commonwealth of Puerto Rico ("Entire Tract"), as identified on the site plan ("Site Plan") attached and incorporated as Exhibit B and legally described on Exhibit A; and

WHEREAS, Landlord will develop a two-level enclosed Shopping Center containing approximately 630,000 square feet of Gross Leasable Area including at least two other Major Stores, all of which are intended to be opened on September 9, 1992, all as indicated on the Site Plan; and

WHEREAS, Landlord desires to lease to Tenant a portion of the Entire Tract which portion shall contain approximately 151,487 square feet of Gross Leasable Area exclusive of the Garden Shop and Tenant desires to lease from Landlord such parcel; and

WHEREAS, Tenant and Landlord believe that it will be in their best interests to cooperate in the operation of the Shopping Center by Landlord under the terms and conditions of this Lease.

NOW, THEREFORE, in consideration of the mutual covenants of this Lease, the parties agree as follows:

### PART I - LEASE

1. Definitions
   Wherever used in this Lease, the following words and phrases have the following meanings:

   Appropriation shall mean any exercise of the power of eminent domain, whether by condemnation proceeding or otherwise, or any transfer of all or any part of the Shopping Center or any interest therein made in avoidance of eminent domain.

   Base Tax Year shall have the meaning as defined in Part I, Subsection 24(a) hereof.

J:\WPF\CLI\83952.LSE
October 8, 1991

Blackout Period shall mean the period between November 1, and February 1, of the following year.

Catalogue Sales shall have the meaning as defined in Part I Subsection 9(e) hereof.

Commencement Date shall have the meaning as defined in Part I, Subsection 4(a) hereof.

Common Areas shall mean all portions of the Shopping Center which may from time to time be available for the general use, convenience and benefit of Tenant, other tenants and occupants of the Shopping Center. The Common Areas shall include, without limitation, the Mall, including, but not limited to, the elevators and escalators in the Mall (excluding permissible kiosks shown on Exhibit B-2, Leasing Plan) and the following to the extent the same serve more than one occupant: truck ramps, fire corridors, service corridors, loading facilities and docks, all automobile parking areas, access roads, sidewalks, traffic lanes, bus stations, taxi stations, parcel pickup areas, entrances and exits from and to public roads, landscaping, restrooms and utility facilities.

Contract Sales shall have the meaning as defined in Part I, Subsection 9(e) hereof.

Demised Premises shall have the meaning as defined in Part I, Section 2 hereof.

Entire Tract shall have the meaning as defined in the first recital hereof.

Garden Shop Area shall mean the 2,432 square foot area for sales outside Tenant's Store Building.

Gross Leasable Area shall mean the total number of square feet of floor space covered and enclosed within buildings which are constructed within the permissible building areas shown on the Site Plan, whether rented or rentable or not, measured to the outside of the exterior walls of the buildings, to the center line of party walls, and to the exterior of walls abutting exit or service corridors, but not including Common Areas, exterior open truck docks, outdoor sales area, garden shop area, mall offices or enclosures used exclusively for mechanical equipment (i.e. the Penthouse as hereinafter defined) or nonstructural mezzanines.

Interest shall mean the announced ("prime") rate of Chase Manhattan Bank, N.A. or any successor thereto (or if Chase Manhattan Bank, N.A. or its successor shall cease to be in business, a substitute New York Bank agreed upon by the parties).

Landlord's Mortgagee shall mean the holder or holders of a mortgage, deed of trust or other security instrument covering the Demised Premises.

Landlord's Plans and Specifications shall have the meaning as defined in Part I, Subsection 6(a)

Lease Year shall mean each consecutive twelve (12) calendar month period beginning with the Commencement Date if that day is the first day of a calendar month. If not, then the first Lease Year will commence on the first day of the next succeeding calendar month after the Commencement Date, and each Lease Year thereafter shall commence on the anniversary thereof.

Major Store shall mean the premises occupied by Tenant, and the premises occupied by any other occupant now or hereafter using and occupying 50,000 square feet or more of Gross Leasable Area on the Shopping Center for the operation of several departments for the sale of hard or soft goods and miscellaneous merchandise and services.

Mall shall mean the enclosed and air conditioned mall located on the Shopping Center, excluding kiosks within Permissible Kiosk Areas shown on Exhibit B.

Mall Tenants shall mean tenants and occupants of the Mall, excluding Major Stores.

Net Sales shall have the meaning as defined in Part I, Subsection 9(d) hereof.

Notice or to Notify shall mean written notice and will be deemed properly served when deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or when sent by overnight express carrier (e.g. Federal Express, Purolator Courier, Express Mail) with a request that the addressee sign a receipt evidencing delivery.

Off Site Work shall have the meaning as defined in Part II, Subsection 1(b) hereof.

Penthouse shall mean the electrical and mechanical penthouse on the roof of Tenant's Store Building having an area of approximately 3,380 square feet.

Permitted Encumbrances shall mean those exceptions to Landlord's title as set forth in the attached and incorporated Exhibit C.

Rent shall mean the Fixed Rent payable under Part I, Subsection 9(a), and the Percentage Rent payable under Part I, Subsection 9(b).

Retail Store Building shall mean Tenant's two-level Retail Store Building having approximately 137,288 square feet of Gross Leasable Area.

Sears Family of Financial Services Group shall mean any subsidiary and/or an operating unit of Sears, Roebuck and Co. and/or Tenant.

Service Center shall mean Tenant's one-level attached Service Center having approximately 5,512 square feet of Gross Leasable Area.

Shopping Center shall mean the land and improvements located within and including the ring roads, and the entrance roads as located and as shown on the Site Plan.

Site Plan shall have the meaning as defined in the first recital hereof.

TBA Building shall mean the one-level attached thirteen (13) bay Automotive Center building having approximately 8,687 square feet of Gross Leasable Area.

Tenant's Alterations shall have the meaning as defined in Part I, Section 15 hereof.

Tenant's Store Building shall mean Tenant's buildings and improvements consisting of approximately 151,487 square feet of Gross Leasable Area and shall include the Retail Store Building, Service Center and TBA Building.

Term shall have the meaning as defined in Part I, Section 4 hereof.

2.   Demised Premises
     (a)   Landlord leases to Tenant and Tenant takes from Landlord the following described premises (the "Demised Premises") situated in the City of Ponce, Commonwealth of Puerto Rico:

     building, improvements and the floor surface within such building and improvements equal to approximately 151,487 square feet of Gross Leasable Area plus the Garden Shop located in Plaza Del Caribe, outlined in red, on the Site Plan.

     It is understood and agreed that the Lease shall not grant to Tenant any rights with respect to the subsurface of the Demised Premises, including, without limiting the generality

of the foregoing, any mineral rights, water rights or other similar rights pertaining to the subsurface of the land to which an owner of real property is entitled under the laws of Puerto Rico.

TOGETHER WITH non-exclusive rights, servitude, licenses, easements, alleys, parking rights, unloading and loading rights, rights of ingress and egress, machinery, equipment, fixtures and appurtenances now or hereafter belonging or granted or reserved to Tenant and TOGETHER WITH non-exclusive rights, servitude, charges, encumbrances, restrictions and privileges of Landlord on, over, in, running with and binding all of the land on the Entire Tract and the buildings and other improvements existent or hereafter erected thereon (all of the foregoing is collectively referred to herein as the "Demised Premises"). The common address of the Demised Premises is Carretera Estatal Num. 2 (state Road #2) KM 227 HM 9, Bo. San Anton, Ponce, Puerto Rico 00731.

(b) The Site Plan is signed by Landlord and Tenant and establishes the layout of the Shopping Center. It shows the Shopping Center, Tenant's Store Building, the Common Areas, the ingress and egress to public roadways and building areas, all as shown on the Site Plan attached hereto as Exhibit B, none of which shall be materially changed except in accordance with the terms of this Lease or as allowed on the Site Plan.

(c) Landlord reserves the right to maintain, use, repair and replace pipes, duct work, conduits, utility lines and wires through hung ceiling space, column space, and partitions, in or beneath the floor slab or above or below the Demised Premises or other parts of the Shopping Center, except that Landlord shall not unreasonably interfere with or interrupt the business operations of Tenant within the Demised Premises, but in no event shall Landlord be required to incur any additional expenses for work to be done during hours or days other than regular business hours or days. Any damage caused by Landlord due to such work shall be returned to its original condition as soon as reasonably possible by Landlord at Landlord's sole expense.

3.   Use

(a) The Demised Premises shall be occupied by Tenant during the Tenant's operating covenant as provided in Part II, Section 4 as a Sears retail store including but not limited to the sale, storage and servicing of merchandise, for an automobile service center and for outside sales, and thereafter as a long as a first class shopping center is being operated on the Entire Tract only for retail and related purposes. If the Demised Premises shall be used and operated at all, such use must include a Major Store on each of the two (2) levels of the Demised Premises.

(b)   In addition, the Demised Premises and the Shopping Center shall not be used for any of the following uses ("Prohibited Uses") which Prohibited Uses shall be binding on Tenant, Landlord and Landlord's other tenants:

(1)   Any use which emits or results in an obnoxious odor, noise or sound which constitutes a public or private nuisance; provided, however, this provision shall not prohibit an outdoor paging system, nor shall it prohibit the reasonable emanation of cooking odors from any restaurants or other food establishments.

(2)   Any use which is physically damaging to other portions of the Shopping Center or which creates dangerous hazards.

(3)   Any assembly or manufacturing operation which would be permitted only in a heavy manufacturing or industrial zone; or any distillation, refining, smelting, industrial, agricultural, drilling or mining operation.

(4)   Any trailer court, mobile home park, junk yard, stock yard or animal raising operation (other than pet shops and veterinarians); except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance.

(5)   Any dump or disposal, or any operation for the incineration or reduction of garbage or refuse, unless the same is intended solely for the handling or reducing of waste produced within the Entire Tract by occupants conducting permitted uses, if handled in a reasonably clean and sanitary manner.

(6)   Any central laundry, dry cleaning plant, or laundromat; provided, however, this restriction shall not apply to any facility providing on-site service oriented to pick-up and delivery by the ultimate consumer, including nominal supporting facilities.

(7)   Any mortuary.

(8)   Any establishment selling or exhibiting pornographic material.

(9)   Any flea market.

(10)   Any activity which unreasonably physically interferes with the business of any party or occupant.

(c)   The foregoing shall not prohibit the operation by Tenant, or other occupant, of an automotive or other service center within the Entire Tract.

4.   Term

(a)   The term ("Term") of this Lease will be twenty (20) years, commencing on the earlier of the date Tenant opens Tenant's Store Building to the public for business or one hundred twenty (120) days after the date on which Landlord completes Tenant's Store Building in accordance with Part I, Section 6 hereof, provided that at least one other Major Store and fifty percent (50%) of the Mall Tenants are open and operating or simultaneously open on the same date ("Commencement Date") and if such other Major Store is not J. C. Penney, J. C. Penney is obligated by the terms of its lease to open by said date. The parties shall specify the Commencement Date by Supplemental Agreement.

(b)   Tenant may extend the Term of this Lease on the same terms and conditions contained herein for one (1) ten (10) year renewal option, followed by two (2) five (5) year renewal options, by giving Landlord Notice, not less than one (1) year prior to the end of the Term. During any extension period, all Sections of this Lease shall be effective, and references to Term will incorporate the extensions.

(c)   During the period beginning with the date of this Lease and ending with the Commencement Date ("Interim Term"), Tenant and Landlord shall have all rights and obligations as provided in this Lease, except that during the Interim Term no Rent or any other monetary obligations due hereunder shall be charged except that Tenant will pay for all utilities when Tenant alone is working in the Demised Premises and one-half of the cost of such utilities during any period in which both Tenant and Landlord are working in the Demised Premises. When Landlord is working in the Demised Premises only to repair minor punch-list-item-work, Tenant will pay for all utilities.

(d)   Unless Landlord and Tenant otherwise agree in writing, any holding over by Tenant after the expiration of the Term will constitute a tenancy from month-to-month upon the same terms as in this Lease, provided if Tenant shall hold over more than ninety (90) days Tenant shall pay market rent for the Demised Premises as reasonably estimated by Landlord, subject to Tenant's right to submit the issue of market rent to arbitration in which event any dispute shall be determined in accordance with the rules then applicable of the American Arbitration Association.

5.   Opening Date

Tenant will exercise reasonable efforts (not to include overtime labor) to open for business on or before September 9, 1992 if Tenant receives the Demised Premises by May 9, 1992 from Landlord in accordance with Part I, Section 6. If the Demised Premises are tendered after May 9, 1992 Tenant will exercise reasonable efforts (not to include overtime labor) to open for business within one hundred twenty (120) days after the Demised

Premises are tendered to Tenant.    Landlord agrees the Demised
Premises will be tendered to Tenant no later than November 9, 1993
(which date shall not be subject to Part III, Section 5), but shall
be subject to extension under Part I, Section 6.  However, Tenant
will not be required to initially open unless at least one (1)
other Major Store and Mall Tenants occupying at least 50% of the
Mall are open for business and operating or simultaneously open on
the  same date and if such other Major Store is not J. C. Penney,
J. C. Penney is obligated by the terms of its lease to open by said
date, nor under any circumstances shall Tenant be required to
initially open for business during the Blackout Period.

6.  Construction of the Demised Premises
    (a) Upon its receipt of Tenant's "Design Criteria and Fixture
drawings" and preliminary plans and specifications ("Tenant's
Plans"), Landlord will promptly prepare its plans and specifi-
cations in accordance with Tenant's Plans and submit them for
Tenant's review.  After the receipt of the plans and specifica-
tions, Tenant will review them and furnish Landlord with its
comments.  All submittals and reviews including the "100% Review"
shall be in accordance with the Schedule attached hereto as Exhibit
D.  For each day in such Schedule for which Landlord is delayed by
Tenant's failure to comment or review in accordance with the
Schedule, Landlord's schedule for commencement and completion shall
be delayed by an equal number of days.  Landlord's plans and
specifications, as finally reviewed by Tenant, shall be referred to
as "Landlord's Plans and Specifications" and will be incorporated
herein by reference.  When Tenant completes its final review of
Landlord's Plans and Specifications they will be initialed by each
of the parties for identification and two (2) sets of Landlord's
Plans and Specifications will be delivered to each party.  Promptly
upon final review, Landlord shall, at its expense, commence and
prosecute with diligence the construction of Tenant's Store
Building in accordance with Landlord's Plans and Specifications.

    (b)  In connection with the making of the improvements and
alterations, the making of repairs or replacements, the curing of
defects or the restoration of the Demised Premises pursuant to
provisions of this Lease, Landlord will use reasonable due
diligence efforts to promptly adjust and settle any labor dispute
to avoid unfavorable publicity and unnecessary delay, in a manner
reasonably satisfactory to Tenant.

    (c)  Landlord shall commence construction of the improvements
and alterations to the extent of grading the Demised Premises site
and let contracts for completing the foundations and complete the
foundations on or before the dates set forth therefore in the
Exhibit D Schedule.  If Landlord has not so commenced construction
Tenant may terminate this Lease, without liability for any damage
which Landlord may sustain, upon thirty (30) days Notice to
Landlord provided such notice is given prior to the date of such
commencement.  Once Landlord has commenced construction it shall
diligently perform the construction to completion.  The term

J:\MPF\CLI\83952.LSE
October 8, 1991                    - 8 -

"Completion" as used in this Lease means completion other than minor punch list, finish and other work which can be carried out during the period of Tenant's fixturing and stocking. Landlord will use all reasonable efforts to complete the improvements on the Demised Premises, except for minor punch list items, and to deliver the Demised Premises to Tenant, ready for occupancy, free and clear of all occupancies, on or before September 9, 1992. If Landlord shall be unable to complete the improvements on the Demised Premises using all reasonable efforts by September 9, 1992, Landlord shall nevertheless fully complete the alterations and improvements, except for minor punch list items, and deliver the Demised Premises to Tenant on or before May 9, 1993. If the improvements have not been so completed and delivered, Tenant may terminate this Lease, without liability for any damage which Landlord may sustain, upon thirty (30) days Notice to Landlord provided such notice is given prior to such completion and delivery. The date upon which the improvements have been completed will be fixed by the written agreement of the parties, or if the parties are unable to agree, by the certificate of an architect or a firm of architects approved in writing by Tenant. Tenant agrees to accept possession of the Demised Premises upon the date of completion of the Demised Premises and all Major Stores and the Mall Tenants space (other than Mall Tenant build-out) and Common Area are completed. Unbuilt out space will be treated with suitable barricades or temporary store frames as are customary in first class shopping centers.

(d)   Landlord shall give Tenant sixty (60) days prior written notice of the date on which Landlord's construction of the Tenant's Store Building will be completed ("Completion Date"). Within thirty (30) days after the Completion Date, Tenant will inspect the Tenant's Store Building, accept the Tenant's Store Building, subject to Landlord's obligation to repair latent defects, if Landlord's construction of Tenant's Store Building has been completed in accordance with Landlord's Plans and Specifications and a certificate of occupancy has been obtained, and shall have the right to enter the Tenant's Store Building for a 120-day rent-free period to complete Tenant's improvements, including, but not limited to, installing fixtures, supplies, merchandise and other property. If Landlord fails to complete the Tenant's Store Building in accordance with the Landlord's Plans and Specifications by the Completion Date, then until such completion and acceptance, Tenant's rent-free period shall toll and Landlord shall pay to Tenant Tenant's actual expenses. If Tenant occupies the Tenant's Store Building prior to Landlord's completion, such use shall not be construed as acceptance of the Tenant's Store Building, or a waiver of Landlord's obligations under this Section and, until the completion and acceptance or the opening for business by Tenant, whichever shall first occur, the risk of loss or damage to Tenant's merchandise and fixtures occasioned by fire or other casualty insured against under a standard builder's risk insurance policy

J:\MPF\CL\\83952.LSE
October 8, 1991

- 9 -

shall be borne by Landlord, and Landlord will indemnify Tenant and
obtain insurance against this loss. During Landlord's construction
period, prior to Tenant's occupancy, Landlord shall place signs on
the Tenant's Store Building announcing Tenant's forthcoming
occupancy and intention.

(e)   Landlord and Tenant recognize that during the course of
construction of the improvements and alterations referred to in
Part I, Subsection 6(a), Tenant may desire to amend or revise
Landlord's Plans and Specifications.   Landlord gives Tenant the
right to amend or revise Landlord's Plans and Specifications after
they have been approved by Landlord and Tenant, provided the
amending or revising does not increase the cost to Landlord of the
improvements provided for in Part I, Subsection 6(a), by an amount
in excess of Fifty Thousand Dollars ($50,000) in the aggregate and
in the event such amending or revising causes Landlord any delay,
Landlord shall be entitled to increase the time periods under other
applicable provisions of this Lease, including Section 5, by one
(1) day for each day of such delay.   Landlord may review any
proposed revision or modification affecting the exterior appearance
of Tenant's Store Building to insure that the building as modified
is architecturally harmonious with the remainder of the Shopping
Center.   Landlord will bear all of the additional costs which
result from the revision or modification up to but not in excess of
the sum stipulated in this Subsection. Tenant shall pay any costs
in excess of the maximum amount, provided the excess costs are
shown to be directly attributable to revisions or modifications
directed and approved by Tenant and are not a result of a
correction of Landlord's Plans.   All the amendments or revisions
proposed by Tenant will be submitted to Landlord's architect, who
will obtain from the general contractor a cost price for the work
which will be promptly submitted in writing to Tenant and Landlord.
Tenant shall not be charged for or be responsible for construction
change orders which have not been approved by Tenant's National
Construction Manager.

(f)   Promptly after Tenant commences retail selling operations
in Tenant's Store Building, Landlord agrees to obtain from
Landlord's architect and to deliver to Tenant a complete set of "as
built" plans and specifications for the improvements, incorporating
all changes made during the course of construction.

7.   Occupancy
If at any time during the first Lease Year (hereinafter
defined) Mall Tenants occupying (i) at least 50% of the Gross
Leasable Area of the Mall plus (ii) two (2) other Major Stores are
not open for business (or in the case of J. C. Penney, is not
required to be open for business) or if at any time after the first
Lease Year (iii) Mall Tenants occupying at least seventy percent
(70%) of the Gross Leasable Area of the Mall plus (iv) two (2)
other Major Stores are not open for business, then Tenant may

deliver to Landlord Notice thereof, and Landlord shall have twelve
(12) months to cure any such deficiency under (i) or (iii) above
and six (6) months under (a)(ii) and eighteen (18) months under
(iv) above. If Landlord fails to remedy said deficiency within the
permitted cure period, then, in addition to other remedies accorded
Tenant by or under any law or under this Lease, Tenant may
terminate this Lease at any time upon Notice to Landlord (provided
such notice is given to Landlord prior to the date on which such
deficiency is remedied) and Tenant will be released from all
further obligations under this Lease.

8.   Landlord's Warranties
     Landlord represents and warrants that:

     (a)  Landlord is the owner of the Entire Tract and the
provisions of this Lease do not violate any mortgage, lease,
operating agreement or any other written or oral agreement to which
Landlord is a party.

     (b)  Landlord has the full right and lawful authority to enter
into and perform its obligations under this Lease for the full
Term.  Landlord agrees that the work agreed to be done hereunder
shall be done in good workmanlike manner and shall comply with all
requirements of law.

     (c)  The Entire Tract is free and clear of all easements,
restrictions, violations, mortgages and other liens, encumbrances
or defects in title of any nature whatsoever affecting the Entire
Tract except as set forth in Exhibit C ("Permitted Encumbrances"),
and the rights, easements and privileges granted Tenant in this
Lease with respect to the Entire Tract are not in any way affected
in a manner which would adversely affect Tenant's intended use of
the Demised Premises and non-exclusive use of the Common Areas
(except for the Permitted Encumbrances).

     (d)  If the Demised Premises are, on the Commencement Date
subject to any mortgage or mortgages, Landlord will furnish Tenant
an agreement of non-disturbance executed by Landlord's Mortgagee(s)
in a form and substance reasonably satisfactory to Tenant.

     (e)  Prior to the Commencement Date, Landlord will deliver
actual possession of the Demised Premises to Tenant free of all
tenancies and occupancies and in good condition and repair.  The
Demised Premises when delivered to Tenant, will be zoned to permit
the operation of a retail store and an automobile service center of
the sizes required pursuant to this Lease, including: the sale and
servicing of merchandise through the use of Tenant's mail order
catalog; the filling of orders through Tenant's catalogue order
channels; the storage and sale, at retail, of all merchandise and
services normally offered by Tenant at a retail store similar to
the Tenant's store at Plaza Las Americas, San Juan, Puerto Rico,

J:\MPF\CLI\83952.LSE
October 8, 1991

- 11 -

(but also including a service center), including, but not limited to, operation of a garden shop and operation of an automobile service center, selling and installing tires, batteries, petroleum products, mufflers and other motor vehicle accessories and other automobile services.

(f) Tenant, upon paying the Rent and performing Tenant's other obligations under this Lease, shall peaceably and quietly have, hold and enjoy the Demised Premises for the Term, subject to the Permitted Encumbrances.

(g) Landlord shall remove all underground tanks, contamination, hazardous or toxic materials that may be on the Demised Premises and warrants that the Demised Premises are in full compliance with all applicable environmental standards or is exempt from same. Tenant shall have the immediate right to terminate this Lease upon thirty (30) days prior Notice if at any time during the Term the Demised Premises fail to comply with environmental standards to the extent that Tenant is inhibited from conducting business. Tenant shall not bear any cost or expense in obtaining such compliance.

(h) Landlord will make, at all times during the Term, at its expense, such additions, alterations, and replacements to the exterior and structural portions of Tenant's Store Building as may be necessary to make it comply, in all respects, with every applicable requirement of law or duly constituted authority having jurisdiction over the Entire Tract. If Tenant's Store Building is not so delivered at the beginning of the Term, then the covenants and obligations of Tenant will abate until Tenant's Store Building is so delivered to Tenant. Additionally, after opening, Tenant may give Landlord Notice of the repairs, additions or replacements necessary to make Tenant's Store Building comply with all laws, regulations and requirements promulgated by any governmental agency having jurisdiction over it, and Landlord will have ninety (90) days from the date of the Notice in which to correct the problem. This obligation of Landlord shall not arise if the necessity for such additions, alterations, replacements or repairs is caused by: (1) Tenant's unique use of Tenant's Store Building (as differentiated from general retail use); or (2) improvements which have been constructed or altered by Tenant without Landlord's consent; or (3) an item which is Tenant's obligation to repair under the provisions of Part I, Section 11 hereof.

(i) Landlord shall provide Tenant, prior to occupancy, or as soon thereafter as is reasonably possible, with a certification from an independent roofing inspection service, that the roof over the Tenant's Store Building is in good and watertight condition and in good order and repair.

J:\WPF\CLI\83952.LSE
October 8, 1991

- 12 -

(j)   Landlord will indemnify and hold harmless Tenant from and
against all claims, causes of action expenses, including attorney's
fees, or costs arising out of the inaccuracy of or breach of the
foregoing warranties and representations.

(k)   Additional Covenants, Warranties and Representations
Regarding Asbestos Materials:

(i)   Landlord covenants, warrants and represents that no
part of Tenant's Store Building, including, without limitation, the
walls, ceiling, structural steel, flooring, pipes or boilers, will
be   wrapped,   insulated,   fireproofed   or   surfaced   with   any
asbestos-containing materials (hereinafter "ACM").

(ii)   During the Term hereof, if Tenant's or any other
party's testing or examination indicates the presence of ACM in
Tenant's Store Building, within thirty (30) days after Notice from
Tenant to Landlord, unless present as a result of Tenant's
Alterations (as defined in Part I, Section 15), Landlord, at its
sole cost and expense, shall remove or abate same, and shall
restore Tenant's Store Building to the condition it was in prior to
such removal or abatement, but with new non-ACM wrapping,
insulation, fireproofing or surfacing. If within thirty (30) days
after receipt of such Notice or so long thereafter as be required
to cure such condition with due diligence, Landlord has not
completed removal or abatement and restoration, Tenant may either
terminate this Lease upon thirty (30) days Notice to Landlord, or
make all changes and alterations and hire any contractors and
experts Tenant reasonably deems necessary to effect and supervise
such removal or abatement and restoration of Tenant's Store
Building.   Removal or abatement of ACM, and restoration, shall be
performed in compliance with all applicable Federal, Commonwealth,
County and Municipal laws, rules, regulations and ordinances
governing abatement, removal handling or disposal of ACM.

(iii)   Tenant shall be entitled to claim from Landlord any
and all damages (including lost profits) arising out of Landlord's
breach of the covenants and warranties   contained in this
Subsection (k).

(iv)   In addition to any other remedy which Tenant may
have under this Lease, at law or in equity, if Landlord breaches
any of the covenants and warranties contained in this Subsection
(k), Tenant shall be entitled to terminate this Lease.

9.   Rent

(a)   Tenant shall pay Landlord, per year, the sum of Six
Hundred Fifty-Five Thousand Nine Hundred Thirty-Eight and 71/100
Dollars ($655,938.71), in equal monthly installments of $54,661.56
each, or a proportionate sum during partial months ("Fixed Rent").

Rent shall begin to accrue from, and the initial rental payment shall be due to Landlord on the Commencement Date. Rent shall be paid in advance on the first day of each month, and will not be in default until the fifteenth day after the date for payment (provided if any such default shall occur more than twice in any Lease Year, Interest shall be due and payable from the first day of the month thereafter during such Lease Year). Tenant shall not be required to commence paying Rent during the Blackout Period unless Tenant is then open and operating at the Demised Premises.

If Tenant exercises its options to extend the Term, Tenant agrees to pay Fixed Rent in accordance with Subsection 9(a) above during such extension periods, if any.

(b)    In addition to Fixed Rent where Net Sales exceed $32,976,936.00 in any Lease Year, Tenant shall pay Percentage Rent ("Percentage Rent").    Percentage Rent shall be paid according to the following schedule:

(i)    1.5% of Net Sales for all Net Sales between $32,976,936.00 and $36,976,934.00; and

(ii)    1.0% of Net Sales for all Net Sales that exceed $36,976,935.00.

(c)    The Rent amount set forth in Subsection (a) above and the breakpoints set forth in Subsection (b) above have been calculated on the basis of Tenant's Store Building containing 151,487 square feet of Gross Leasable Area.    If after construction, it is determined that Tenant's Store Building does not contain 151,487 square feet the figures set forth in Subsections (a) and (b) shall be adjusted accordingly.    (For each square foot in excess of that figure, $4.33 will be added to the annual Rent set forth in Subsection (a) above, and for each square foot less than that figure, $4.33 will be subtracted.    For each square foot in excess of that figure, $216.50 will be added to the breakpoints set forth in Subsection (b) above, and for each square foot less than that figure, $216.50 will be subtracted.    Fixed Rent during the extension periods shall likewise be adjusted based upon $4.33 per square foot annually for the extension periods.)

(d)    "Net Sales" means gross retail sales of merchandise made by Tenant from Tenant's Store Building and deducting or excluding (as the case may be):

(i)    All returns and other cancellations, and allowances;

(ii)    Rental Charges, including but not limited to charges for or pursuant to rentals of automobiles, tools and other merchandise and equipment;

(iii)   Charges to customers for or pursuant to services, deluxing, delivery, installation or inspection;

(iv)   Amounts, debits or charges of, for or pursuant to maintenance or service agreements (currently known as "Maintenance Agreements"), or for replacement or repair parts of merchandise furnished without additional charge in connection with repairs or replacements pursuant to warranties, guarantees, good will adjustments or Maintenance Agreements;

(v)   All sales ordered through the use of or from Sears catalogues or filled through Sears catalogue channels regardless of the place of order, payment or delivery, subject to Subsection 9(f) below;

(vi)   Finance charges or other amounts in excess of Tenant's (or its concessionaires or licensees) cash sales price charged on, for or pursuant to sales made on credit or under a time payment or layaway plan;

(vii)   The amount of all sales, use, retailers occupation or other similar taxes, imposed in a specific amount of percentage upon, or determined by, the amount of sales, or sale, made from Tenant's Store Building, subject to Subsection 9(g) below;

(viii)   Sales of departments, divisions or offices not located in Tenant's Store Building, even though administratively controlled therefrom;

(ix)   Amounts received for or in connection with the making of personal loans and the rendering of other financial services, and premiums, proceeds, commissions, payments and other amounts received, collected or charged for or in connection with the sale of policies of insurance or investment fund shares and other securities, whether or not sold on or from the Tenant's Store Building, but only to the extent these services are rendered through the Sears Family of Financial Services Group.

(x)   Contract sales (hereinafter defined) or installed home improvement sales regardless of whether Tenant maintains an office, showroom or samples for the merchandise, or whether made on or from the Tenant's Store Building;

(xi)   Receipts from vending or weighing machines, amusement devices (not to exceed two such devices) and public telephones;

(xii)   Receipts from sales of tickets for admission to entertainment, sporting or other similar events, from sales of licenses issued by governmental agencies and from collection of utility bills and check cashing, gifts and prizes;

(xiii)    Receipts from the operation of eating facilities primarily available for use by employees and their dependents and/or invitees, and not generally open to the public;

(xiv)    Receipts from the sale of merchandise or gift certificates and purchase coupons; however, the sale of merchandise made by Tenant from Tenant's Store Building, paid for with gift certificates or purchase coupons, is included in Net Sales, unless otherwise excluded;

(xv)    Fees for building and like permits in connection with sales of merchandise or services;

(xvi)    Amounts credited on the purchase price of merchandise by reason of merchandise traded in, or employee discounts;

(xvii)    Unclaimed funds and property;

(xviii)    Sales made by Tenant's subtenants, concessionaires and licensees, subject to Subsection 9(h) below; and

(xix)    Commissions or amounts received in conjunction with the sale, leasing or financing of real estate, but only to the extent provided through the Sears Family of Financial Services Group.

(e)    The phrase "contract sales" means sales of goods or merchandise made to persons or entities other than the general public and including, but not limited to, sales of merchandise made to industrial, commercial or institutional purchasers or to governmental or quasi-governmental bodies, and sales of goods manufactured to the purchaser's specifications whether or not installed by Tenant.  All of the terms utilized in this Section, including "returns", "allowances", "contract sales" and "catalogue sales," will have the meaning used by Tenant in the normal course of its business.

(f)    Notwithstanding the foregoing Subsection 9(d)(v) above, in the event Tenant's catalogue sales department exceeds 2,000 square feet of sales area, including but not limited to customer counter, and adjacent stock areas directly related to catalogue sales, such catalogue sales shall be included in the calculation of "Net Sales" for the payment of Percentage Rent, by dividing total catalogue sales by total sales area in use, the result shall then be multiplied by the area in excess of 2,000 square feet.

(g)    Notwithstanding the foregoing Subsection 9(d)(vii) above, deductions on exclusions from "Net Sales" pursuant to such Subsection shall be limited to the amount of any sales tax or any other direct taxes added to sales prices to be paid by the customer




to Tenant and subsequently paid out by Tenant to a taxing
authority, such as taxes payable to the Commonwealth of Puerto
Rico, excise tax or similar tax paid at the point of origin or on
manufactured or imported goods.

(h) Notwithstanding the foregoing Subsection 9(d)(xviii)
above, in the event Tenant's subtenants, concessionaires and
licensees whose sales are not excluded from Net Sales other than as
result of the general exclusion under Subsection 9(d)(xviii) above,
occupy floor area within the Demised Premises in excess of ten
percent (10%) of the floor area within the Demised Premises, then
the sales made by subtenants, concessionaires and licensees to the
extent not otherwise excluded, shall be included in Net Sales
according to the following formula:    Sales (not otherwise
specifically excluded) made by subtenants, concessionaires and
licensees shall be multiplied by a fraction the numerator of which
is the number of square feet of the floor area in the Demised
Premises occupied by said subtenants, concessionaires, and
licensees (not otherwise excluded) in excess of ten percent (10%)
of the floor area in the Demised Premises and the denominator of
which is the number of square feet of floor area occupied by
subtenants, concessionaires and licensees (not otherwise excluded)
in the Demised Premises.

(i) Tenant shall furnish to Landlord within twenty (20) days
after the end of each calendar month an unaudited statement of
Tenant's Net Sales for the previous month, and within thirty (30)
days after the end of the month in which the break point has been
exceeded and by the end of each calendar month thereafter during
the same Lease Year, Tenant shall pay to the Landlord Percentage
Rent for the previous calendar month, subject to final adjustment
as set forth in (j) below.

(j) Within sixty (60) days after the end of each Lease Year,
Tenant will furnish to Landlord a statement of Tenant's Net Sales
and the payment of Percentage Rent, if any, payable for that Lease
Year.   If the Commencement Date is other than the first day of a
calendar month, all Net Sales from the Commencement Date to the
first day of the month next following shall be included in the
Percentage Rent for the first Lease Year. Landlord will have six
(6) months, following its receipt of Tenant's statement of Net
Sales within which to Notify Tenant of Landlord's dissatisfaction
with Tenant's statement or else Landlord will be deemed to have
accepted Tenant's statement as correct.    If Landlord is
dissatisfied with Tenant's statement of Net Sales, Landlord may, at
Landlord's expense, cause an impartial, reputable firm of certified
public accountants, a firm known and doing business on a nationwide
basis either in the United States or the Commonwealth of Puerto
Rico, reasonably satisfactory and approved in writing by both
Landlord and Tenant, to audit Tenant's Net Sales for the period
covered by the statement within six (6) months after the giving of

Notice. If the auditor does not submit a detailed report to Landlord and Tenant in support of its findings within forty-five (45) days after its selection and approval by the parties, Tenant's statement of Net Sales will be deemed correct and conclusive. Time, wherever specified in this Section, is deemed to be of the essence.

(k) Tenant makes no representation or warranty as to the amount of sales or mix of merchandise and services which it expects to make from Tenant's Store Building. Landlord will hold in confidence all sales figures and other information obtained from Tenant or upon the inspection and audit of Tenant's books and records, but may provide such information on a confidential basis to prospective Mortgagees and purchasers and to governmental authorities as to which Landlord is required to report such information.

(l) Landlord will, from time to time, designate some one person, firm or corporation to receive Rent payments. The Rent provided for will be made payable to and mailed to Plaza Del Caribe, S.E., P. O. Box 363268, San Juan, Puerto Rico 00936-3268 until the address is changed by Notice from Landlord. Landlord's FEIN is 660461629.

10.   Transfer and Recording Taxes

The parties will share equally in the cost of recording this Lease including all transfer and recording taxes, charges and assessments levied, assessed or incurred upon execution, delivery or recordation of this Lease, as they become due. If either party shall advance the cost of such recordation, the other party shall promptly reimburse the party advancing such costs upon receipt of an invoice therefor. Each party agrees to execute a Spanish version of this Lease or a Memorandum thereof in order that recording complies with the laws of the Commonwealth.

11.   Repairs

(a) Tenant shall, at Tenant's expense:

(i) make all repairs and replacements to Tenant's Store Building necessitated by the fault or neglect of Tenant's employees;

(ii) keep Tenant's Store Building in a clean condition according to local ordinances as directed by the proper public officials;

(iii) perform interior painting and decorating of Tenant's Store Building after Landlord's initial painting and decorating those areas required to be painted or decorated by Tenant's Design Criteria;

J:\WPF\CLI\83952.LSE
October 8, 1991

- 18 -

(iv)    Tenant shall maintain all improvements made by Tenant and any fixtures installed by Tenant, including painting and decorating, all interior construction and equipment, whether provided by Tenant or by Landlord, and all roof-mounted equipment, escalators, elevators, exterior doors, windows, signs, and loading areas.

(b)  Subject to the provision of Subsection (a) above Landlord shall, maintain the structure of the Tenant's Store Building, including the floor structure, exterior walls, roof structure, and roofing materials, including flashing, coping, expansion joints, and roof drains.

(c)  Subject to the provisions of Subsection (a) above Landlord shall perform all repairs and replacements necessary to have the exterior and structural portions of the Tenant's Store Building comply with all Federal, Commonwealth, County and Municipal laws.

(d)  For the immediate protection of property or prevention of injury, Tenant will have the right at all times, after making a reasonable effort to notify Landlord (or if no prior notice is practicable under emergency circumstances, Notice shall be sent as soon thereafter as is reasonably possible), but without prior Notice to Landlord, to make emergency repairs or replacements to Items which Landlord would otherwise be obligated to repair or replace as deemed necessary by Tenant, and (if the repairs or replacements are not necessitated by the fault or neglect of Tenant) the costs of such repairs shall be paid within fifteen (15) days of Landlord's receipt of a bill therefor.

(e)  During the first two (2) full Lease Years, Landlord shall, at Landlord's expense provide Tenant with a maintenance contract for the air conditioning equipment serving the Demised Premises.   Tenant shall provide normal operation maintenance and spot checks, and shall promptly advise Landlord of any significant conditions observed.   During the remainder of the Term of the Lease, Landlord shall provide Tenant with yearly maintenance agreements providing for the maintenance of such air conditioning equipment, such maintenance shall be with a reputable air conditioning service company and the cost of such contract and the level of service provided shall be competitive with other local providers.   Tenant shall reimburse Landlord for the cost of maintenance under such maintenance agreements, including labor, filters, refrigerators, lubricants, chemicals, and fan belts. Tenant's liability for repairs and replacement of air-conditioning equipment during any one Lease Year other than stated above, shall be limited as follows:

J:\HPF\CLI\83952.LSE
October 8, 1991

- 19 -

Lease Year  1 through Lease Year  2              -0-

Lease Year  3 through Lease Year 10           $1,000.00

Lease Year 11 through Lease Year 20           $2,000.00

Lease Year 21 through Lease Year 30           $3,500.00
(first option period, if option is exercised)

Lease Year 31 through Lease Year 35           $5,000.00
(second option period, if option is exercised)

Lease Year 36 through Lease Year 40           $5,000.00
(third option period, if option is exercised)

12.   Tenant's Right To Repair
      If Landlord fails promptly to perform or commence to perform
and diligently pursue to completion its obligations with respect to
the making of replacements, repairs or the curing of defects, after
being given ten (10) days prior Notice by Tenant, Tenant will have
the right to make or cure them and to deduct from Tenant's
maintenance contributions only as they come due pursuant to Part
II, Section 5 hereof, Tenant's costs together with interest if same
are not paid within fifteen (15) days of Landlord's receipt of a
bill therefor.

13.   Landlord's Access
      Landlord will have access to the Demised Premises during
business hours to examine and exhibit it or for making necessary
repairs or alterations, providing Tenant has received Notice, but
in so doing, Landlord will not unreasonably interfere with the
conduct of Tenant's business.  This shall include rescheduling
inspections at Tenant's request and Tenant shall act reasonably in
making such requests.  Landlord will have the right to place upon
the Demised Premises, in a location acceptable to Tenant, a notice
or sign offering the Demised Premises for sale at all times, and
for rent during the last six (6) months of the Term, provided
Landlord shall have first given Tenant thirty (30) days Notice of
its intention to do so.

14.   Assignment or Subletting
      (a)   Tenant may assign this Lease or sublet all or a portion
of the Demised Premises after the earlier to occur of: (i)
expiration of the fifteenth (15th) Lease Year; or (ii) the date
Tenant is no longer obligated to operate pursuant to Tenant's
operating covenant under Part II, Section 4 of this Lease, which
assignment or subletting shall be made only with Landlord's
consent, which consent shall not be unreasonably withheld.  Upon
receipt of written notice from Tenant of Tenant's intention to
assign this Lease or sublet the Demised Premises (the "Tenant's
Notice"), Landlord shall have ninety (90) days within which to

J:\MPF\CL1\83952.LSE
October 8, 1991                    - 20 -

notify Tenant, in writing, of its intention to recapture the portion of the Demised Premises affected by such proposed assignment or subletting (the "Landlord's Notice"). In the event Landlord chooses to exercise such option and sends Tenant such Landlord's Notice, and pays to Tenant the book value of Tenant's fixtures and leasehold improvements depreciated on a straight line basis over the useful life of such fixtures or leasehold improvements, and all of Tenant's obligations and duties under the Lease shall terminate in respect of the period subsequent to such termination date as specified in Landlord's Notice, (but in no event later than one hundred eighty (180) days after Tenant is served with Landlord's Notice), and all Rents and other charges payable hereunder shall be prorated as of the termination date stated in Landlord's Notice. If Landlord does not exercise such option within such sixty (60) day period after receipt of Tenant's Notice and Landlord does not otherwise deliver to Tenant written Notice of its reasonable objection to such assignment of sublease within said time, Landlord shall be deemed to have consented to Tenant's assignment of the Lease or sublease of all or part of the Demised Premises but Tenant shall remain liable for all obligations under this Lease, regardless of assignment or sublet, but only for the then current Term of this Lease.

(b)  For the purposes of this Lease, an assignment of this Lease or subletting or the Demised Premises to Sears, Roebuck and Co. or to a subsidiary and/or affiliate of Sears, Roebuck and Co. and/or Sears Roebuck De Puerto Rico, Inc. shall not be subject to subsection 14(a) above, provided Tenant shall remain liable under this Lease.

15.  **Right to Alter or Improve**

Tenant, its assignee or sublessee, may make interior nonstructural alterations and improvements and install fixtures and equipment in or about Tenant's Store Building, and post or attach signs, subject to Part II, Section 16, on the interior or exterior as the tenant in possession may deem desirable ("Tenant's Alterations"). Any exterior or structural alterations or improvements will be subject to the prior written consent of Landlord. All signs, fixtures and equipment installed by Tenant will remain the property of Tenant and may be removed by Tenant or shall be removed by Tenant at Landlord's request if notice is given at least one-hundred and twenty (120) days prior to the end of the initial Term or Renewal Term as the case may be or upon at least sixty (60) days notice if this Lease shall terminate for any other reason prior to the end of the initial Term of applicable renewal term, provided Tenant shall repair any damage caused by such removal if removed by Tenant at its election and if removed at Landlord's election Tenant shall repair any structural damage caused by such removal by Tenant. Non-structural damage shall not be required to be repaired by Tenant if Tenant removes any of said signs, fixtures and equipment at Landlord's request.

16. Damage or Destruction to Demised Premises

(a) Except as otherwise provided in (c), (d) or (e) below, if the Demised Premises are damaged or rendered unfit for their accustomed use, either in part or totally, by fire, or any casualty, during the first eighteen (18) years of the initial Term, Landlord shall, at its expense, promptly restore the Demised Premises to substantially the same condition immediately prior thereto.

(b) Except as otherwise provided in (c) through (f) below if the Demised Premises are partially destroyed or rendered partially unfit for their accustomed use by fire or other casualty, during the last two (2) years of the initial Term, or at any time during any renewal term, Landlord shall, at its expense, promptly restore the Demised Premises to substantially the same condition immediately prior to the casualty. Any damage or destruction to the improvements on the Demised Premises which can be repaired for less than 25% of the replacement cost of the Tenant's Store Building will be considered partially destroyed.

(c) If the Demised Premises are damaged, destroyed or rendered unfit for their accustomed use by fire or other casualty during the last two (2) years of the initial Term or at any time during any extension period, and the cost to Landlord of repairing or restoring the Demised Premises to their original condition exceeds 25% of the replacement cost of the Tenant's Store Building, and if Landlord or Tenant desires to cancel this Lease, then Landlord or Tenant will, within sixty (60) days of the casualty, by Notice to the other, advise the other party of Tenant's or Landlord's desire to cancel this Lease. Landlord may cancel this Lease unless Tenant, within thirty (30) days of receipt of the Notice, exercises its next available option pursuant to the provisions of Part I, Section 4 hereof, if any. If Tenant exercises an option, or if neither Landlord nor Tenant provides the other party with Notice of its desire to cancel this Lease pursuant to the provisions of this Section, Landlord shall, at its expense, promptly restore the Demised Premises to substantially the same condition immediately prior to the fire or casualty.

(d) Notwithstanding the provisions of (a), (b) and (c) above Landlord shall not be required to restore the Demised Premises if such damage or destruction occurs during the last two (2) years of Tenant's operating covenant or thereafter unless at the time of such casualty Tenant was operating as required by Part II Section 4 of this Lease (unless Tenant, its assignees or sublessees ceased to operate due to a default by Landlord under the terms of this Lease or as a result of an Unavoidable Delay) (i) under the name of Sears or such other name as Tenant was operating in the majority of its comparable retail stores in the same Commonwealth, Tenant agrees to reopen the Tenant Store Building for business to the public following such restoration or (ii) if the Tenant at the time

J:\WPF\CLI\83952.LSE
October 8, 1991                    - 22 -

of such casualty was operating as required by Part II Section 4 of this Lease under a name other than Sears or such other name as Tenant was operating in the majority of its comparable retail stores in the same Commonwealth or is an assignee or sublessee other than an assignee or sublessee under Part I, subsection 14(b), such Tenant agrees to operate for at least five (5) years following the date on which Tenant reopens for business.

(e)   Landlord shall be obligated to restore, under this Section 16, only if Tenant, its assignees or sublessees have operated for business as required by Part II Section 4 of this Lease at some time during the thirty (30) day period prior to such fire or other casualty  unless Tenant, its assignees or sublessees ceased operating during the thirty (30) day period due to a default by Landlord under the terms of this Lease or as a result of an Unavoidable Delay, in which event Landlord shall still have the obligation to restore.

(f)   If Landlord fails to repair or restore the Demised Premises as required in this Section within the time limit set forth in Subsection 17(d), Tenant may upon thirty (30) days Notice to Landlord, and any Mortgagee(s), unless Landlord or its Mortgagee proceeds with due diligence to complete repairing and restoring the Demised Premises during such thirty (30) day Notice Period, either terminate this Lease or repair and restore the Demised Premises, and Landlord will pay to Tenant, upon demand, Tenant's expense incurred in so repairing or restoring the Demised Premises, plus interest thereon.   If Tenant does not receive such payment from Landlord within fifteen (15) days of its demand, Tenant will have the right to deduct the same from any installments of Rent payable until reimbursed in full.

(g)   If the Demised Premises are partially or totally destroyed by fire or other casualty or rendered totally or partially unfit for their accustomed use by fire or other casualty, then until the Demised Premises are restored, and repaired and rendered fit for customer occupancy or this Lease is canceled, all of Tenant's obligations under this Lease, including Rent and any other monetary payments, will abate during such period when Tenant determines it cannot operate its business in Tenant's Store Building. If Tenant operates its business in a portion of Tenant's Store Building, Fixed Rent shall abate in proportion to the Gross Leasable Area of Tenant's Store Building which Tenant determines is not useable.

17.   Damage or Destruction to the Shopping Center

(a)   If the buildings or other improvements on the Shopping Center (excluding Tenant's Store Building) or any part thereof, are damaged or destroyed during the first eighteen (18) years of the initial Term, and as often as any of these buildings or improvements during this period are destroyed or damaged by fire or other

casualty, Landlord will rebuild, repair or replace all store buildings leased and occupied at the time of the casualty and the Common Areas so that there will be on the Shopping Center an enclosed, air conditioned mall and other improvements constituting an architecturally complete unit (provided Landlord shall not be required to rebuild, repair or replace other improvements on the Shopping Center unless Landlord is required to replace the Demised Premises under Section 16 above).

(b) During the last two (2) years of the initial Term and during any extension period, if the buildings or other improvements on the Shopping Center (excluding Tenant's Store Building), or any part thereof, are damaged or destroyed and the cost to Landlord of repairing or restoring the Shopping Center to its original condition equals or exceeds 25% of the replacement cost of all the buildings on the Shopping Center (excluding Tenant's Store Building), Landlord may elect not to rebuild or repair the damaged or destroyed improvements by giving Notice of Landlord's election to Tenant within ninety (90) days of the casualty. However, if Landlord elects not to rebuild or repair, Tenant may, within one hundred twenty (120) days of its receipt of such Notice from Landlord, cancel this Lease effective at any specified date within two (2) years after receipt of the Notice. In the alternative, Tenant may within the one hundred twenty (120) day period, require Landlord to rebuild and repair or replace all the store buildings leased and occupied at the time of the casualty and the Common Areas so that there will be on the Shopping Center an enclosed air conditioned mall and other improvements constituting an architecturally complete unit on the meeting of the following two (2) conditions:

(i) Tenant exercises its next available option, pursuant to the provisions of Part I, Section 4 hereof, by notifying Landlord in writing within the one hundred twenty (120) day period.

(ii) There will be at least two (2) Major Stores, other than Tenant, open and operating after the completion of restoration (the Major Stores need not be obligated to operate).

(c) During the last two (2) years of the initial Term and during any extension period if the buildings or other improvements on the Shopping Center (excluding Tenant's Store Building), or any part thereof, are damaged or destroyed and the cost to Landlord of repairing or restoring the Shopping Center to its original condition is less than 25% of the replacement cost of all the buildings on the Shopping Center (excluding Tenant's Store Building), Landlord shall rebuild and repair or replace all the store buildings leased and occupied at the time of the casualty and the Common Areas so that there will be on the Shopping Center an,

enclosed air conditioned mall and other improvements constituting an architecturally complete unit.

(d)   Any building or other improvements which Landlord is required to rebuild or repair pursuant to this Lease will be rebuilt and ready for occupancy within eighteen (18) months from the time of the loss or destruction (unless as a result of an Unavoidable Delay unrelated to the casualty requiring restoration). Work, repair or reconstruction once started by Landlord will be carried through continuously and diligently to conclusion.

(e)   Nothing contained in this Section will require Landlord to rebuild a Major Store building if Landlord is not required to do so under the terms of Landlord's lease with the Major Store.

(f)   Any mortgage renewals or replacements placed by Landlord on the Entire Tract, or any agreement otherwise extending or modifying them will be consistent with the provisions of this Section.

(g)   Landlord shall be obligated to restore under this Section 17, only if Tenant, its assignees or sublessee have operated for business at some time during the thirty (30) day period prior to such destruction or damage, unless Tenant, its assignees or sublessee ceased operating during the thirty (30) day period due to a default by Landlord under the terms of this Lease, in which event Landlord shall still have the obligation to restore.

(h)   If any buildings are not required to be rebuilt pursuant to this Section, the properties will be cleared and left in a sightly condition and landscaped or paved for parking as would be appropriate.

18.   Exclusives
Landlord warrants that it has not, prior to the execution of this lease, granted to any person, firm or corporation any exclusive rights to sell, or offer to sell, any line or lines of goods, merchandise or service, which will in any way limit the right of Tenant to sell, any goods, merchandise or services in or from the Demised Premises.

19.   Title Insurance
Landlord will furnish Tenant, prior to the Commencement Date, a Leasehold Title Insurance policy insuring Tenant's leasehold interest in Tenant's Store Building, for the value of Tenant's leasehold interest, only with Permitted Encumbrances and exceptions reasonably acceptable to Tenant.



20.  Insurance for the Shopping Center
    (a)   Landlord, at its expense, will obtain and maintain at all
times during the construction of the improvements specified in Part
I, Section 6, and throughout the Term, the following insurance with
companies currently rated "A/VII" (as defined in the latest Best's
Guide), containing standard provisions covering all buildings,
betterment and improvements on the Entire Tract:

        (i)   Workers' Compensation

            Covering all costs, benefits and liabilities under
State Workers' Compensation and similar laws with statutory limits
and Employer's Liability Insurance with limits of not less than
$500,000.00 per occurrence.

        (ii)   Commercial General Liability Insurance
            Including but not limited to, coverage for Personal
Injuries with limits of not less than $1,000,000.00 combined single
limit for personal injury and property damage, including Tenant as
an additional insured.

        (iii)   Contractual Liability Insurance
            The insurance under (ii) above shall include
contractual liability coverage or Landlord will obtain contractual
liability insurance in Landlord's name specifically endorsed to
cover the indemnity agreement contained in Part I, Section 22 and
containing limits of liability of not less than $1,000,000.00 per
accident for personal injury and property damage.

        (iv)   Motor Vehicle Liability Insurance
            The Landlord will cause its contractor to carry
Employer's Non-Ownership Liability Endorsement in its contractor's
name. Limits of liability will not be less than $1,000,000.00 per
accident, for bodily injury and property damage.

        (v)   Umbrella Policy
            An umbrella type policy containing limits of
liability for the insurance required to be carried under (ii),
(iii) and (iv) in an amount of not less than $5,000,000.00.

        (vi)   Property Insurance
            All risk property insurance including, but not
limited to, Fire and Extended Coverage, (providing coverage against
loss or damage by flood, earthquake, fire, windstorm, hail,
explosion, damage from aircraft, vehicles, and smoke damage),
vandalism and malicious mischief, in the amount of 90% of the full
replacement-cost with an agreed value stated limit in the policy or
by endorsement. Said coverage may be included as a part of a
blanket policy provided the policy limits exceed the agreed value
for the Shopping Center, and provided that said coverage provides
that in the event of a simultaneous covered loss involving the
Plaza del Caribe and other locations covered by the policy,
sufficient proceeds will be available at all times while the policy
is in effect to pay for the reconstruction and/or replacement of

J:\MPF\CLI\83952.LSE
October 8, 1991

- 26 -

the physical structure known as the Plaza del Caribe located in Ponce, Puerto Rico.

(b)   At the end of each five (5) years of the initial Term of this Lease, and at the beginning of each extension period, upon Tenant's request, Landlord shall review with Tenant the limits of the insurance policy or policies and, at that time, shall cause such liability limits to be adjusted in view of reasonable exposure anticipated over the remainder of the Term; provided, however, that in no event shall such limits be adjusted lower than the limits stated above unless such limits are no longer commercially available.

(c)   Landlord and Tenant will use their best efforts to promptly resolve any dispute which may arise between various insurance companies insuring the Shopping Center, particularly in regard to the question of which insurance company or companies are the proper carrier or carriers to accept a claim under the applicable provisions of this Lease.

(d)   The policy of insurance required to be carried pursuant to Subsection (a)(v) above will contain a clause providing that unless Landlord and its parent and affiliates have a net worth, according to its last published report, of at least $25,000,000.00 (provided to the extent such net worth is the net worth of a parent or affiliate such parent or affiliate covenants to make such net worth available to the extent of insurance proceeds in excess of $500,000.00), any proceeds of insurance in excess of $500,000.00 will be payable in trust to Landlord's Mortgagee or a trustee. Certificates of insurance will from time to time, as issued, be deposited with Landlord's Mortgagee or the trustee; however, all amounts collected on any policy or policies by Landlord's Mortgagee or the trustee will be made available to the insured for the reconstruction or repair of any building or buildings and other improvements damaged or destroyed.  The insurance proceeds will be paid out by Landlord's Mortgagee or the trustee from time to time as the work of rebuilding, reconstruction and repair progresses, upon architect's certificates by architects licensed to do business in the Commonwealth of Puerto Rico, showing the application for the amount paid for the repairs, rebuilding or reconstruction.  The trustee, if Landlord's Mortgagee does not hold the insurance award, will be approved by Landlord, Tenant and Landlord's Mortgagee.  If the damage is so slight that the insurance award is less than $500,000.00, then the insurance award will be paid directly to Landlord, without the necessity of payment to Landlord's Mortgagee or the trustee as otherwise provided in this Subsection, but this will not be construed as relieving Landlord from the necessity of repairing the damage promptly in accordance with the terms of this Subsection.  Any excess monies received from insurance remaining with Landlord's Mortgagee or the trustee after the reconstruction or repair of the building or buildings or other improvements under

the provisions of Part I, Sections 16 and 17, will be paid to Landlord.

(e)  Any mortgage placed by Landlord on the Shopping Center, subsequent to the date of this Lease, including renewals or replacement, or any agreement otherwise extending or modifying them, will be consistent with the provisions of this Section 20.

(f)  Tenant shall reimburse Landlord for pro rata increases in exterior Common Area Commercial General Liability Insurance above the cost of such insurance for the first Lease Year.

20A. Tenant's Insurance.
(a)  Tenant, at its expense, will obtain and maintain at all times during which Tenant is in possession of the Demised Premises and throughout the Term, the following insurance with companies currently rated "A/VII" (as defined in the latest Best's Guide), containing standard provisions covering the Demised Premises. Provided Tenant has a net worth of at least $200,000,000.00, Tenant may satisfy the requirements of this Section under a plan or plans of self-insurance.

(i)   Workers' Compensation

Covering all costs, benefits and liabilities under State Workers' Compensation and similar laws with statutory limits and Employer's Liability Insurance with limits of not less than $500,000.00 per occurrence.

(ii)  Commercial General Liability Insurance
Including but not limited to, coverage for Personal Injuries with limits of not less than $1,000,000.00 combined single limit for personal injury and property damage, including Tenant as an additional insured.

(iii) Contractual Liability Insurance
The insurance under (ii) above shall include contractual liability coverage or Tenant will obtain contractual liability insurance in Tenant's name specifically endorsed to cover the indemnity agreement contained in Part I, Section 22 and containing limits of liability of not less than $1,000,000.00 per accident for personal injury and property damage.

(iv)  Motor Vehicle Liability Insurance
The Tenant will cause its contractor to carry Employer's Non-Ownership Liability Endorsement in its contractor's name.  Limits of liability will not be less than $1,000,000.00 per accident, for bodily injury and property damage.

(v)   Umbrella Policy

J:\MPF\CLI\83952.LSE
October 8, 1991                  - 28 -

An umbrella type policy containing limits of liability for the insurance required to be carried under (ii), (iii) and (iv) in an amount of not less than $5,000,000.00.

(vi)   <u>Property Insurance</u>
Tenant shall insure or self-insure, any improvements made to the Demised Premises by Tenant, all equipment in the Tenant's TBA Building all trade fixtures and Tenant's personal property and merchandise.

(b) The insurance required to be carried by Tenant under (a) above shall be adjusted in the same manner and to the same limits to which Tenant's insurance is adjusted under Part I, Sections 20(b) and (c) above.

21.   <u>Waiver of Subrogation</u>
(a)   Each party releases and waives any and every claim which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, (which loss or damage is customarily covered by all risk type Property Insurance policies).

(b)   This mutual waiver will be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties.

(c)   Landlord and Tenant agree to furnish to each insurance company which has or will issue policies of Property Insurance on the Demised Premises, Notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

22.   <u>Indemnity</u>
(a)   Landlord will protect, defend, hold harmless and indemnify Tenant and the directors, officers and employees of Tenant, from and against any and all claims, actions, liabilities, losses and expenses (except such as result from the negligence of Tenant) relating to any and all losses or damages which arise out of (including, without limitation, injury to or death of persons and damage to property in) the Demised Premises or in the Common Areas, (i) allegedly or actually suffered by any person or persons as a result of Landlord's failure to make repairs or improvements to the Shopping Center (including the Demised Premises) which Landlord has agreed to make, or (ii) allegedly or actually arising out of or incidental to the work, services and activities of Landlord and any of its contractors and subcontractors including, without limiting the foregoing, all acts and omissions of the partners, employees and agents of Landlord and its contractors and subcontractors in connection with any construction repair or work

performed pursuant to the provisions of this Lease, or (iii) allegedly or actually arising from or occasioned by the condition, use or occupancy of all Common Areas on the Shopping Center by the customers, invitees, licensees, employees of Landlord, Tenant, Landlord's other tenants, owners and all other occupants of the Shopping Center.

(b)   Tenant will protect, defend, hold harmless and indemnify Landlord, its officers and employees from and against any and all claims, actions, liabilities, losses and expenses (except such as result from the negligence of Landlord) relating to any and all losses or damages (including, without limitation, injury to or death of persons and damage to property), on the Demised Premises allegedly or actually suffered by any person or persons, as a result of Tenant's failure to make repairs or improvements to the Demised Premises which Tenant has agreed to make or allegedly or actually arising out of or incidental to the work, services and activities of Tenant performed under these provisions including, without limiting the foregoing, all acts and omissions of the officers, employees and agents of Tenant and its contractors and subcontractors in connection with any construction, repair or work under this Lease or while proceeding to or from the site of any such construction, repair or work, whether or not lawful or within the scope of their employment. Any assignee or sublessee of Tenant will carry Contractual Liability Insurance specifically insuring this indemnity agreement.

23.   Certificates of Insurance
Landlord shall furnish Tenant, concurrently with the execution of this Lease, and at the inception of each succeeding policy period, with insurance certificates and upon request by Tenant, copies of such policies required to be maintained hereunder. Each policy will expressly provide that it will not be subject to cancellation without at least thirty (30) days prior Notice to Tenant. Landlord shall promptly give Tenant a copy of any notice of non-renewal of such policy or policies it may receive.

24.   Real Estate Taxes
Except as provided in this Section, Landlord will pay or indemnify Tenant against the payment of all taxes, charges and assessments levied or assessed against the Entire Tract, as they become due.   To the extent that taxes measured on the Rent hereunder are used in lieu of real estate taxes, those taxes will be considered real estate taxes.

(a)   After the first year that the appropriate governmental authority has assessed the Shopping Center, including the land and Tenant's Store Building on the Demised Premises as fully completed (the "Base Tax Year"), Tenant will reimburse Landlord for its pro rata share of all increases in real estate taxes (but no other Taxes or assessments) over the Base Tax Year, imposed by Federal,

Commonwealth or local governmental authority or any other taxing authority having jurisdiction over the Entire Tract, against the land, buildings and all other improvements within the Shopping Center ("Real Estate Tax Expense"); provided, however, Tenant agrees to pay prior to delinquency, any and all taxes and assessments levied or assessed against either Tenant or Landlord during the Lease Term or renewals thereof upon or against (i) all furniture, fixtures, signs and equipment and any other personal property installed or located within the Demised Premises by Tenant; and (ii) all alterations, betterments or improvements of whatsoever kind or nature, made by Tenant to the Demised Premises. With respect to any taxes for which Tenant is responsible hereunder, an official tax bill shall be conclusive evidence of the amount of taxes assessed or levied. A copy of such tax bill shall upon request of Tenant, be submitted by Landlord to Tenant. Real Estate Tax Expense shall be prorated on a daily basis if the Term begins or ends during a tax year. Real Estate Tax Expense shall include the increase in the gross amount of real estate taxes, but such amount shall not include assessments nor be increased by any additional charges or penalties incurred by Landlord due to late payment of real estate taxes, nor be reduced by any discount earned by Landlord due to early payment of real estate taxes. Tenant's pro rata share shall be computed by multiplying the total of such Real Estate Tax Expense by a fraction, the numerator of which is the Gross Leasable Area of Tenant's Store Building and the denominator of which is the total Gross Leasable Area within the Shopping Center.

(b)    Landlord shall furnish Tenant a statement in reasonable detail of the Real Estate Tax Expense payable, on an annual basis, along with a copy of the bill for taxes, and Tenant agrees to tender payment to the Landlord of Tenant's pro rata share within thirty (30) days after receipt by Tenant of Landlord's statement and a copy of the tax bill. However, if Tenant deems the Real Estate Tax excessive or illegal, Tenant may direct Landlord to defer payment of such tax as long as the validity or the amount thereof is contested by Tenant in good faith. Tenant may contest the Real Estate Tax Expense; provided, that if at any time payment of the whole or any part of it should become necessary to prevent the foreclosure of a tax lien on Tenant's Store Building, or any part thereof, or to prevent interference with Landlord's interest in Tenant's Store Building, then Tenant shall pay or cause to be paid the same, together with all penalties in sufficient time to prevent the foreclosure of a tax lien or to prevent interference with Landlord's interest in Tenant's Store Building. Tenant shall pay all costs, expenses, attorneys' fees, penalties, interest and court costs incurred in such a contest. If Tenant is successful in such a contest, the remission or refund shall be paid out: first, to Tenant for its reasonable costs, expenses and attorneys' fees; next to Tenant as a refund of any overpayment of Real Estate Tax,

penalties or interest paid by Tenant; finally, to any other party having a claim to such refund or remission.

(c)   If Landlord obtains a remission or a refund of all or part of Landlord's Real Estate Tax Expense for any tax year for which the Tenant's pro rata share has been paid, Landlord will promptly refund to Tenant a proportionate share of the remission or refund, the proportionate share to be calculated after Landlord first deducts all costs, expenses, attorneys' fees, penalties, interest and court costs incurred in obtaining the remission or refund, but only to the extent Tenant's proportionate share has been paid.

(d)   Landlord shall exercise reasonable efforts to obtain a separate tax assessment for the Demised Premises and the land and Common Areas.   If Landlord obtains such separate assessment, then Tenant's Real Estate Expense shall be calculated on such separate assessment of the Demised Premises and Tenant's pro rata share of the assessment of the land and Common Areas and tax bill thereon instead of the third sentence of Subsection (a) above.

(e)   Landlord agrees to pay and hereby indemnifies and holds Tenant harmless from and against all assessments or liens imposed upon the Demised Premises as a result of any on or off site work in connection with the development of the Shopping Center.

25.   Defaults
(a)   If Tenant defaults in the payment of Rent and fails to cure the default within thirty (30) days of its receipt of a Notice of default from Landlord, Landlord may bring suit to recover Rent due and unpaid after the thirty (30) day period.   Landlord's suing to recover Rent shall not waive or affect its right to bring suit for possession of the Demised Premises.

(b)   If Tenant is in default in performing any of the terms or provisions of this Lease, other than the provisions for the payment of Rent, and Tenant receives a Notice of the default from Landlord and Tenant fails to cure the default within thirty (30) days after service of the Notice, or if the default is of a character as to require more than thirty (30) days to cure and Tenant fails to use reasonable diligence in curing the default after service of the Notice, then Landlord may cure the default and the full amount so expended by Landlord will immediately be owing by Tenant.

(c)   If Landlord is in default in performing any of the terms or provisions of this Lease and Landlord receives a Notice of the default from Tenant and Landlord fails to cure the default within thirty (30) days after receipt of the Notice, or if the default is of a character as to require more than thirty (30) days to cure and Landlord fails to use its best efforts in curing the default after receipt of the Notice, then Tenant may cure the default, at the

J:\WPF\CLI\83952.LSE
October 8, 1991

- 32 -

expense of Landlord, and may deduct from Rent all sums expended, plus interest, until Tenant is reimbursed in full or, at Tenant's option, Tenant may terminate this Lease effective upon written Notice to Landlord.

(d)   If any of the covenants, conditions or other provisions of this Lease are breached, Landlord or Tenant shall have the right to obtain an injunction or other appropriate judicial relief against the other.   No failure by Landlord or Tenant to insist upon the performance or the strict performance of any covenant, condition or other provisions of this Lease or to exercise any right or remedy consequent upon a breach or other default thereof shall constitute a waiver or assumption thereof by the other party, and no acceptance, use or occupancy of the Demised Premises or Common Areas shall constitute a waiver or assumption by Tenant of any duty or obligation of Landlord with respect thereto.   The grant or reservation herein or the exercise of any right or remedy, or of any supplementary or alternative rights or remedies, shall not affect or prejudice any other rights or remedies which Landlord or Tenant may have under this Lease or under law.

26.   Utilities; Trash Removal

(a)   From the date the Demised Premises are completed and tendered to Tenant, Tenant agrees to pay for all utility services rendered or furnished to the Tenant's Store Building, including water, gas, electricity, sprinkler charges, fire line charges, sewer rental, sewage treatment facilities and the like, together with all taxes levied or other charges made on such utilities and governmental charges based on utility consumption, standby utility capacity or potential utility use.   If Landlord shall supply any such services, Tenant will purchase same from Landlord at charges not in excess of the charges for the services in question made by any utility corporation or governmental agency supplying such utilities in the area.   Any such charges for services supplied by Landlord, or charges for utilities which may be rebilled by Landlord, shall be due and payable within thirty (30) days after such billings are rendered to Tenant.   Landlord shall not be liable for the quality, quantity, failure or interruption of such services to the Demised Premises, unless caused by Landlord its employees and agents.   As of the date of delivery of the Demised Premises, all utilities and services to Tenant's Store Building shall be separately metered.   Landlord agrees to pay all impact, hookup and inspection fees for utilities serving the Demised Premises.

(b)   Sears shall collect, and dispose at its expense all of the trash and debris generated from the Demised Premises in accordance with the standards appropriate for a first class shopping center.

J:\MPF\CLI\83952.LSE
October 8, 1991

- 33 -

27.  Hazardous Materials

Landlord and Tenant agree as follows with respect to the existence or use of "Hazardous Material" (as defined below), on the Demised Premises and on the Shopping Center.

(a)  Landlord hereby represents and warrants to Tenant, to the best of Landlord's knowledge, that it is not aware that any Hazardous Material has been used, disposed of or is located on or in either the buildings constructed in the Entire Tract or the soil and ground water on or under the Entire Tract.

(b)  Landlord hereby covenants to Tenant as follows:

(i)  Landlord shall be responsible for all costs incurred in complying with any law, order, ruling or other requirement of any court or governmental body or agency having jurisdiction over the Entire Tract requiring Landlord to comply with any laws (collectively "Environmental Requirements") which relate to Hazardous Material or which relate to Hazardous Material created, handled, placed, stored, used, transported or disposed of by Landlord, including, without limitation, the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure of other required plans, and Landlord shall diligently pursue to completion all such work required in connection with the same (excluding, however, any such costs relating to Hazardous Material on the Demised Premises or the Entire Tract either brought onto the Demised Premises or the Entire Tract by Tenant or its employees, agents, or contractors, subtenants or concessionaires, or arising out of the use, occupancy or operation of the Demised Premises by Tenant or its employees, agents, contractors, subtenants or concessionaires (Tenant's Hazardous Material"), unless Tenant's Hazardous Material is released onto the Demised Premises or the remainder of the Entire Tract by reason of the negligence or fault of Landlord, its employees, agents, or contractors); and

(ii)  Landlord shall indemnify, defend and hold Tenant, its directors, officers, employees and agents and any successor to Tenant's interest in the Demised Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which might directly or indirectly or in whole or in part be caused by, arise out of, or be related to (a) Hazardous Material which was created, handled, placed, stored, used, transported or disposed of by Landlord or its employees, agents or contractors, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Entire Tract holds Landlord responsible or otherwise requires Landlord to undertake any repair, cleanup, detoxification or other remedial action (excluding Tenant's Hazardous Material, unless Tenant's

Hazardous Material was released onto the Demised Premises or the remainder of the Entire Tract by reason of the negligence or fault of Landlord, its employees, agents, or contractors), or (c) the breach of any representation, warranty or covenant contained herein.

(c)    Tenant hereby covenants to Landlord as follows:

(i)    Tenant shall comply with all Environmental Requirements (including tests and analysis as required) in the use, occupancy and operation of the Demised Premises, including without limitation, all laws, orders, rules and regulations relating to Tenant's Hazardous Materials and shall permit Landlord to perform the same to monitor compliance therewith.    In particular, the Tenant shall be responsible for full compliance with Environmental Requirements as they relate to the automobile service center on the Demised Premises and Tenant shall at its expense keep, maintain, replace and upgrade any and all facilities and improvements associated with the use, storage and disposal of petroleum products so as to remain in compliance with all Environmental Requirements. Tenant shall be responsible for all costs incurred in complying with any Environmental Requirements which relate to Tenant's Hazardous Material including, without limitation, the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure or other required plans, and Tenant shall diligently pursue to completion all such work required in connection with the same, excluding, however, any such costs relating to Hazardous Material on the Entire Tract established to have been caused directly either by use of the Entire Tract by the Landlord or Landlord's acts or omissions relating to the Demised Premises or Entire Tract, or use of the Entire Tract by any other third party; and

(ii)    Tenant shall indemnify, defend and hold Landlord, its directors, officers, employees and agents and any successor to Landlord's interest in the Demised Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which might directly or indirectly or in whole or in part be caused by, arise out of, or be related to (a) Tenant's Hazardous Material, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Demised Premises holds Tenant responsible or otherwise requires Tenant to undertake any repair, cleanup, detoxification or other remedial action, excluding, however, Hazardous Material on the Entire Tract caused directly either by use of the Entire Tract by Landlord, or Landlord's or its employees, agents or contractors acts or omissions relating to the Entire tract, or use of the entire Tract by any co-tenant or third party, or (c) the breach of any representation, warranty or covenant contained herein.

J:\MPF\CLI\83952.LSE
October 8, 1991                    - 35 -

(d)   As used herein, the term "Hazardous Material" means petroleum products, asbestos, and any other hazardous or toxic substance, material or waste, which is or becomes regulated by any local government's authority, the Commonwealth of Puerto Rico, or the United States government, whether originating from the Demised Premises or the Entire Tract or, as to Landlord, migrating, flowing, percolating, diffusing or in any way moving onto or under the Demised Premises or the Entire Tract.


PART II - DEVELOPMENT AND OPERATION OF THE SHOPPING CENTER

1.   Constructions and Plans
     (a)   (i)   Landlord will prosecute to completion the improvements both on and off the Shopping Center which are described below, in accordance with Landlord's Plans and Specifications, and Tenant will not be responsible for any portion of the cost of the work.

          (ii)   Schedule D attached hereto includes a construction schedule, showing the commencement and completion dates of each portion of its work.   In addition to being developed in accordance with Tenant's Plans, Landlord's Plans and Specifications shall include separate plans for:   (A) the entrances and exits to the Shopping Center; (B) abutting highways; (C) improvements on the Shopping Center which are more particularly shown on the Site Plan; (D) the improvements to be constructed on the Demised Premises; and (E) any portion of the improvements required to be performed off the Shopping Center.   Landlord shall furnish Tenant with such portions of the plans and specifications for existing improvements on the Shopping Center as Tenant requests in writing.

          (b)   For the purposes of this Lease, "off-site work" means the work required on the exterior perimeter or outside boundaries of the Shopping Center, including but not limited to:

          (i)   The improvements, if any, which must be made to the perimeter roadways and the roads providing access to and from the parcels, including the dedication of land which is required for that purpose and the construction of curbs and gutters or stand up curbs along the Shopping Center perimeter road and any engineering work which is required in connection with the construction of these improvements.

          (ii)   The construction and installation of the facilities described in Tenant's Construction Standards which are a part of Tenant's Design Criteria.

          (c)   "On-site work" means and includes, but is not limited to, the construction and installation of all improvements on the Shopping Center which are necessary to prepare the Shopping Center



for use as a regional retail shopping center containing an enclosed
mall.  The on-site work includes, but is not limited to the items
of work delineated in Tenant's Construction Standards which are a
part of Tenant's Design Criteria.

(d)  The Project Architect will be responsible for the
supervision of the performance of the off-site and on-site work.
Landlord's contract with the general contractor will provide for
the completion of the off-site and on-site work, on or before the
dates required for completion as set forth in this Lease for so
much of the work called for by this Lease as is not being done by
government authorities.  Landlord covenants and represents that
Landlord has entered into binding agreements with the appropriate
governmental authorities to complete the remainder of the work
called for by this Lease before Tenant's opening date.

(e)  Notwithstanding the rights of approval and/or review
reserved by Tenant, Landlord will be solely and primarily
responsible for the design, construction, supervision and
inspection of the grading work, on and off-site improvements (to
the extent Landlord is required to perform them), and neither the
reservation, the granting of the rights nor the giving by Tenant of
any approval will be deemed to relieve Landlord from the duty to
provide grading work, on and off-site improvements (to the extent
Landlord is required to perform them), which are of a quality equal
to or better than accepted industry standards for first-class
regional shopping centers.  The giving of any approvals by Tenant
will not constitute a waiver by Tenant of any claim arising out of
Landlord's failure to meet the foregoing responsibilities and
duties.

2.  Outparcels

(a)  The Outparcels within the Entire Tract are designated on
Exhibit B.  In order to assure no substantial adverse effect on
traffic flow curb cuts from Outparcels I, II and III shall be
permitted only within the permissible curb cut areas generally
shown on Exhibit B.

(b)  Each Outparcel shall be developed in a first class manner
and Outparcels shall each be provided with parking sufficient to
satisfy the zoning requirements for the use in question.  The
dimension and design of parking spaces on the Outparcels shall
comply with the dimension and design of parking spaces depicted on
Exhibit B.

(c)  During the period of Tenant's operating covenant and as
long as Tenant is operating in compliance therewith opened for
business, the following standards shall apply to buildings on
Outparcel III.  No building shall be erected which would obscure a
view of the Sear's sign, or if such building would obscure a view



J:\MPF\CLI\83952.LSE
October 8, 1991

- 37 -

of the Sears sign, a sign identifying the location of the Sears Store, so as to be visible from the road, shall be erected at Landlord's expense.

(d)    Tenant's share of Common Area Maintenance costs shall not be increased due to the planning, development, construction or operation of Outparcels.

3.    Construction and Occupancy Requirements

Landlord shall construct on the Entire Tract: an enclosed air-conditioned Shopping Center; Mall Stores containing approximately 300,000 square feet of Gross Leasable Area; a J. C. Penney Major Store containing approximately 124,656 square feet of Gross Leasable Area at the location shown on the Site Plan; another Major Store containing approximately 60,000 square feet of Gross Leasable Area at the location shown on the Site plan.    Landlord covenants that it has used or will use reasonable due diligence to enter into bona fide leases noncancelable by tenants except for default, condemnation, noncompliance with construction provisions or provisions for restoration in case of substantial damage by fire or other casualty, or like matters, or other termination rights customary in mall tenant leases with tenants, for the occupancy of not less than 70% of Mall Tenants' existing Gross Leasable Area.

4.    Tenant's and Landlord's Operating Covenant

(a)    Tenant will, from and after the opening for business in Tenant's Store Building and for the first fifteen (15) years of the Term after the opening date, continuously operate or cause to be operated in Tenant's Store Building a retail store, under the name of Sears or another name as Tenant will be operating in the majority of its comparable retail stores in the same Commonwealth ("Tenant's Operating Covenant").    Tenant's Operating Covenant is subject to the following conditions: (i) Landlord is not in default beyond any applicable cure period; and (ii) Mall Tenants occupying not less than 70% of Gross Leasable Area of the Mall are open and operating [Mall Tenants occupying not less than fifty percent (50%) of Gross Leasable Area of the Mall are open and operating during the First Lease Year]; and (iii) at least two other Major Stores have similarly covenanted to have a retail store, open and operating for at least as long as Tenant's Operating Covenant and are in fact open for business (subject to the applicable cure period within which Landlord may cure the failure of such other Major Store or Stores to be open for business but in no event later than eighteen months (18) after Notice from Tenant).    Landlord will promptly notify Tenant if the lease with any other major store does not contain such a covenant.  If, at any time during Tenant's Operating Covenant, Landlord has not met all of the foregoing conditions, Landlord will have twelve (12) months after Notice from Tenant in which to cure the condition under (ii) above and eighteen (18) months after Notice from Tenant in which to cure the condition under (iii) above, or Tenant may cease to operate.    Tenant's

Operating Covenant will be personal to Landlord and not assignable except to a successor Landlord who acquires the Demised Premises or to a Mortgagee or a successor or assignee, provided such Mortgagee, assignee or successor is in possession or is pursuing appropriate legal remedies to take possession. Tenant's Operating Covenant is conditioned upon Landlord not entering into an agreement with a third party where the third party has the right to enforce Tenant's Operating Covenant.

(b) The hours of business, the number and types of departments to be operated in Tenant's Store Building, the particular contents, wares and merchandise to be offered for sale and the services to be rendered, the methods and extent of merchandising and storage thereof, and the manner of operating Tenant's Store Building in every respect whatsoever shall be within the sole and absolute discretion of Tenant.

(c) Subject to the provisions of Part II, subsection 4(a) Tenant may operate Tenant's Store Building in whole or in part by licensees, subtenants or concessionaires, provided, however, that the appearance to the public shall be that of a retail Major Store consistent with the appearance of the majority of Tenant's comparable retail Major Stores in regional shopping centers being operated in the same Commonwealth.

(d) Nothing contained herein shall be deemed to impose any radius or other restriction on the activities of Tenant outside of the Shopping Center.

(e) Tenant will set its own hours and days of operations.

(f) A cessation of business by Tenant, by any Major Store or by any Mall tenant shall not be deemed a cessation of business for the purposes of this Part II, Section 4 if such cessation:

(i) is occasioned by the making of repairs, alterations, or renovations due to damage or destruction of the premises where such cessation of business occurs; or

(ii) is occasioned by an eminent domain taking; or

(iii) is caused by a condition which is less than three (3) consecutive months in duration.

(g) Landlord shall for the first twenty (20) Lease Years, and for so long thereafter as Tenant and either J. C. Penney or at least one other Major Store are operating, continuously operate the Shopping Center under the name "Plaza Del Caribe," in a first class manner; and Landlord shall use its best efforts to keep all store space in the Shopping Center leased, and substantially used for retail and service purposes only.

J:\MPF\CLI\83952.LSE
October 8, 1991
- 39 -

5.  Maintenance Contribution
    (a)  Exterior Common Area Maintenance Contribution.

         (i)    During the first through and including the fifth
Lease Year, Tenant shall pay to Landlord per year the sum of
$54,640.95 ($.35 per square foot of Gross Leasable Area in Tenant's
Store Building), in equal monthly installments of $4,553.41 each,
as Tenant's contribution to maintenance of the exterior Common
Areas.

         (ii)   Tenant shall increase its contribution every five
(5) years, (commencing with the sixth Lease Year) by $7,805.85 per
year ($.05 per square foot of Gross Leasable Area in Tenant's Store
Building).

         (iii)   The contribution amounts set forth in Subsections
(i) and (ii) above have been calculated on the basis of the
Tenant's Store Building containing 151,487 square feet of Gross
Leasable Area.   If after construction of the Tenant's Store
Building it is determined that Tenant's Store Building does not
contain 151,487 square feet of Gross Leasable Area, the figures set
forth in Subsections (i) and (ii) above shall be adjusted
accordingly.

         (v)    Tenant's obligation to pay the exterior Common Area
Maintenance contribution will continue only if Tenant or its
sublessee or assignee is operating or is required to operate a
retail store on the Demised Premises with an opening on the Mall,
and only if Landlord is performing the Common Area Maintenance as
required in Part II, Section 17.

    (b)  Mall Maintenance.

         Tenant shall not contribute any sum to Mall maintenance
costs.

6.  Marketing Fund
    Tenant shall become a member of the Shopping Center Merchant's
Association or Marketing Fund Program if one is formed for the
first Lease Year provided Tenant shall have no obligation to make
any payments thereto.   Thereafter, such membership shall be
voluntary.

7.  Mall Entrance
    Tenant will occupy its Retail Store Building so that an
entrance will open onto each level of the Mall.   The entrances will
be open during all times that its store is open for business,
provided the enclosed Mall is lighted and air conditioned, and open
for business and Landlord is not in default, and further provided
if Tenant is open during hours other than during ordinary business

J:\MPF\CLI\83952.LSE
October 8, 1991                    - 40 -

hours, Landlord shall not be obligated to keep open the enclosed
Mall or the enclosed Mall entrances to Tenant's store.

8.  Assignments, Transfers and Financing
     (a)  Subject to the provisions of Part I, Section 14, as to
Tenant, this Lease may be assigned by either party upon an
assignment or transfer of all or any part of its interest in its
premises.  Except as specifically provided in Subsections (b) and
(c) below, the assignment or transfer by any party of all or any
part of its interest in its premises, or assignment of provisions
of this Lease during the Term, will not release the party from any
of its obligations under this Lease.

     (b)  If Landlord makes a _bona fide_ sale, transfer or
assignment to an individual, corporation, partnership, limited
partnership or other legal entity (whether or not Landlord has an
interest in the grantee or transferee) of all of Landlord's rights,
title and interest in the Shopping Center after the Shopping Center
is opened for business, and if at the time of the sale, transfer or
assignment, Landlord has complied with its obligations under this
Lease, Landlord will be released and discharged from all further
liability under this Lease arising on and after the date of the
sale, transfer or assignment, provided the purchaser or assignee
will assume in writing all of Landlord's obligations under this
Lease, and a copy of the instrument of assignment and assumption,
in proper form for recordation, is delivered to Tenant.

     (c)  Landlord may assign its interest in this Lease as
collateral security to any mortgagee, trustee or landlord in
connection with any present or future financing in connection with
the Demised Premises, or any part or all of the Shopping Center.
So long as Landlord retains a possessory or legal interest in all
or any part of the Shopping Center pursuant to the security
instrument, Landlord will not be deemed to have assigned or
transferred any of its powers or obligations under this Lease.  If
the legal or possessory interest of Landlord terminates pursuant to
the security instrument, this power will vest with the holder of
the security instrument or anybody who acquires the interest of the
holder by virtue of foreclosure of the instrument.

     (d)  Subject to (c) above, prior to the Commencement Date,
Landlord shall not assign its interest in this Lease without the
prior written consent of Tenant, which consent may be withheld in
Tenant's sole discretion.  Thereafter, Landlord may assign its
interest in this Lease if at the time of such assignment Landlord
has complied with all of its obligations under this Lease.  In such
event, Landlord will be released from all obligations and liability
under this Lease arising after the date of such assignment provided
the assignee assumes in writing all of Landlord's obligations under
this Lease and a copy of such assumption, in proper form for
recording, is delivered to Tenant.

J:\MPF\CLI\83952.LSE
October 8, 1991                      - 41 -

(e)  Notwithstanding anything contained herein to the contrary, Tenant may from time to time during the Term, without the consent of Landlord, place a mortgage on Tenant's leasehold estate and rights hereunder, or otherwise assign or pledge its leasehold estate and rights hereunder (for example, by way of a so-called "lease and leaseback" transaction), as security for payment of an indebtedness.    The holder of such mortgage or other security interest may enforce such mortgage or other security interest and acquire title to the leasehold estate by foreclosure or any other lawful way and, upon acquiring title to the leasehold estate, such holder may sell and assign the leasehold estate hereby created, but only subject to the limitations on assignment and requirements relating thereto as set forth in Lease, provided the sale or assignment of such leasehold mortgage shall not be subject to the right of recapture as provided in the second sentence of Part I, subsection 14(a) and the purchaser or assignee shall be relieved solely of the obligation to operate under the name "Sears" (provided Sears, Roebuck de Puerto Rico, Inc. shall not be so relieved).    If Tenant grants such a mortgage or other security interest, Tenant may furnish Landlord with Notice of the name and address of the holder of such mortgage or other security interest and thereafter Landlord shall simultaneously send to such holder any Notice of default that Landlord may send to Tenant.    Landlord shall accept cure by such holder of any default by Tenant as if such cure had been performed by Tenant.

9.    <u>Notices to Holders of Mortgages</u>

If Landlord has given Tenant Notice of the existence of a lien or other interest in the Demised Premises of a Mortgagee, and an address to which Notices should be directed, Tenant will send to Landlord's Mortgagee a copy of Notices which it serves upon Landlord specifying a default or any instance in which Tenant proposes to advance money for Landlord.    Landlord's Mortgagee(s) will be permitted to cure the default not later than sixty (60) days after the date of Tenant's Notice; provided, that in the case of a default which cannot with diligence be remedied in the sixty (60) day period, Landlord's Mortgagee(s) will have an additional period to remedy the default with diligence.

10.    <u>Kiosks</u>

All permanent kiosks will be located generally only in the areas so designated on the Exhibit B - Site Plan and permanent kiosks within one hundred (100) feet from the mall entrances of the Tenant's store shall be no closer to the Tenant's store than the closest point shown on the Site Plan and the locations shall be limited as shown thereon.    Temporary or seasonal kiosks will be located in such a manner that there will be at all times at least a ten (10) foot passage way from the Lease line of the mall tenant stores towards the center of the Mall.    Total Mall Exhibits shall be held no more than fifteen (15) days in succession.    Kiosks shall not impede the flow of traffic in the enclosed mall.    No kiosk



(permanent or temporary) shall exceed twenty (20) feet in length, ten (10 feet in width and eight (8) feet in height.

11.   Design Development Drawings
Landlord will cause all future improvements on the Shopping Center, if any, to be constructed and maintained so that they form an integrated shopping center with harmonious architectural style and quality.   Landlord will, prior to the commencement of construction, deliver to Tenant, for informational purposes only, design development drawings, and other data and pertinent information showing:   (1) the location of all buildings and improvements; (2) exterior dimensions, elevations and building heights; (3) exterior architectural design of the buildings of each party's premises;   (4) exterior architectural design of the buildings on each party's premises; and (5) exterior color of buildings and specifications of materials to be used in the exterior construction which will be harmonious with one another. All improvements to be constructed will conform with all applicable Federal, Commonwealth and local laws and ordinances, and construction will reflect first-class workmanship.

12.   Easements and Parking
(a)   During the Term, Landlord grants to Tenant and its assigns, sublessee, business invitees and customers, a nonexclusive easement for access, ingress and egress for pedestrians and vehicles and for the parking of vehicles, in common with tenants and other occupants of the Shopping Center, their visitors and customers, over all Common Areas of the Shopping Center as shown on the Site Plan.

(b)   Landlord will not charge any fee for parking on the Shopping Center, so long as this Lease is in force, unless the charges are required by law.   Landlord and Tenant agree to use reasonable efforts to require their employees and the employees of their tenants to park in mutually agreeable areas designated for employee parking on the Shopping Center.

13.   No Impediments to Traffic Flow
(a)   Neither Landlord nor Tenant will erect barricades, fences or other dividers which will interfere with or prevent the free flow of traffic and pedestrian access, ingress and egress through and across the roadways, sidewalks or other areas used for motor vehicle parking or motor vehicle or pedestrian access, ingress and egress on its premises.   However, nothing herein provided shall prohibit buildings in permitted expansion areas as shown on the Site Plan and on Outparcels in accordance with the provisions of this Lease.

(b)   Each party may close or block traffic for the time necessary for the purpose of protecting ownership rights and



preventing the creation of easements other than as provided in this
Lease.

14.   Operation and Air Pressure
      (a)   Landlord agrees to:

          (i)   Operate and maintain the Shopping Center in a first
class manner, for the benefit of Tenant and the other occupants of
the Shopping Center.   Landlord will maintain or cause to be
maintained at all times all buildings or improvements located on
the Shopping Center and all its appurtenances in good order,
condition and repair.

          (ii)   Prohibit merchants from displaying or selling
merchandise in the Shopping Center outside of their premises.   This
prohibition shall not apply to:   kiosks or sales made from
permissible outdoor sales areas there shown on the Site Plan.

          (iii)   Subject to all public rights required by law, limit
the use of the Shopping Center to providing access, ingress and
egress for customers, invitees, employees and business invitees of
the individuals or businesses served by the Shopping Center unless
it receives the prior written consent of the other party.

          (iv)   Subject to any laws or restrictions imposed by
governmental authorities limiting the use of electricity or fuel in
any form, keep the Mall lighted and air conditioned during such
times as the Shopping Center is open and operated under the
provisions of this Lease.   Landlord will adequately and in
conformity with the usual and customary standards maintained in the
operating of enclosed shopping center malls, cool the Mall so as to
provide a temperature and ventilation as required in Tenant's
Plans.

          (v)   Notify Tenant of any addition to Gross Leasable
Area, and such increase shall be incorporated by reference in this
Lease and all rights and obligations based on Gross Leasable Area
shall be adjusted accordingly.   If Landlord fails to give such
Notice, Landlord shall refund to Tenant upon request any
overpayment by Tenant resulting therefrom.   Landlord hereby waives
any applicable statute of limitations restricting Tenant's right to
recover any such adjustments.

          (vi)   Prohibit the erection or placement of any interior
landscaping and any other potential impediment which obscures
Tenant's customers' view of Tenant's Mall door signage fronting the
Mall, which landscaping or other impediment is to be placed between
the escalator closest to the Sears court and Tenant's entrance to
the Mall, without first obtaining Tenant's approval therefor.
Landlord further agrees in the erection or placement of any
exterior landscaping and any other similar potential impediment to



take into account the visibility of Tenant's exterior signage from
Intersection of State Road No. P.R. #2 and Mall access road and
intersection of West Main Street and North Main Street as shown on
the Site Plan and to retain view corridors in order that the view
of the signage on the Tenant's Store Building will not be obscured.

(b)   Landlord and Tenant will operate the air conditioning
equipment in their respective buildings with a positive air
pressure so that cool air will not be unduly drawn from the Mall
into the Tenant's Retail Store Building or from the Tenant's Retail
Store Building into the Mall.   Landlord shall be responsible for
any and all alterations, including the cost thereof, which may be
required to cause the Mall to comply with this Section.

15.   Ancillary Uses
Landlord may lease part of the Gross Leasable Area to Mall
Tenants having an interior entrance to the Mall within one hundred
fifty (150) feet of Tenant's interior entrances to the Mall (as
shown on Leasing Plan Exhibit B-2) and operating in the following
categories of uses:

1.   ready to wear
2.   shoe and athletic footwear
3.   selling and serving restaurant meals for on-premises
     consumption
4.   book store
5.   nutrition and health food store
6.   children's apparel store
7.   fashion accessories sales
8.   fashion apparel sales
9.   jewelry sales
10.  toy sales
11.  tobacco sales
12.  optical goods sales
13.  fabric sales & sewing supplies
14.  child care facility, children's recreation facility
     (other than game room), and/or baby-sitting service,
     provided no such service shall generate such noise as to
     constitute a nuisance
15.  telephone store
16.  restaurant - selling of prepared food for on- and
     off-premises consumption
17.  arts and crafts
18.  gift shop, cards & party goods
19.  engraving/key shop
20.  luggage shop
21.  graphics
22.  cutlery
23.  furniture & home furnishings
24.  video equipment store
25.  audio/stereo store

J:\MPF\CLI\83952.LSE
October 8, 1991                        - 45 -



26.   music, record & tape shop
27.   piano and organ shop
28.   candy or snack food shop
29.   bakery selling breads, cakes, cookies and pastries
30.   camera shop
31.   cosmetics, perfume and skincare shop
32.   custom shirt shop
33.   custom tailor
34.   curtains and draperies
35.   apothecary/drug store
36.   oriental/fine carpet shop
37.   florist
38.   table top/linen shop
39.   cheese and gourmet food shop
40.   maternity shop
41.   millinery shop
42.   optometrist
43.   stamp and coin
44.   shoe repair
45.   sporting goods
46.   travel agent
47.   variety store
48.   watch shop, including repair
49.   hosiery
50.   uniforms
51.   lingerie
52.   handbags
53.   formal wear
54.   interior decorator
55.   leather goods
56.   fireplace shop
57.   kitchen boutique
58.   bath boutique
59.   riding apparel
60.   stuffed animals
61.   candle shop
62.   needlepoint & knitting
63.   oriental gift shop
64.   other retail uses (but not including a pet store) which
      are commonly found within 150 feet of major stores in
      shopping centers of a comparable quality at the time in
      question

16.   <u>Sign Criteria</u>
      (a)   Landlord will require that the erection and maintenance
of any signs on the Shopping Center shall be in conformity with the
Sign Criteria set forth in Exhibit G attached hereto and made a
part hereof.

      (b)   Tenant, and its permitted successors or assigns may
install or use any exterior signs which are usual and customary in



Tenant's other stores performing the functions as described in the
Use clause herein, or such other drawing as may be approved by
Landlord, or replacement signs therefor of the same general size,
character, location and number, provided no such sign shall be in
violation of any governmental regulation.

17.   Common Area Maintenance
      (a)   Landlord will, or will cause a third party to, sweep,
clean, operate, maintain, repair, replace and provide security for
the Common Areas of the Shopping Center, and keep the same in a
first-class condition according to the following standards:   (i)
all hard-surfaced portions of the Common Area and improvements
shall be swept at intervals sufficient to maintain the same in a
clean condition before the retail stores within the Shopping Center
open for daily business with the public; (ii) all sidewalks shall
be swept and washed and steam cleaned at intervals sufficient to
maintain the same in a clean condition and all surface waters shall
be promptly removed; (iii) all public trash and rubbish containers
located in the Common Areas for the use of the public shall be
emptied at intervals necessary to avoid noxious odors, rodents and
vermins and an uncleanly condition and shall be washed at intervals
sufficient to maintain the same in a clean condition; (iv) all
landscaping shall be properly maintained, including irrigation, or
other means of watering, subject to governmental restrictions,
removal of weeds and foreign matter, and trimming, removal and
replacement of dead plant materials; (v) all hard-surfaced markings
shall be inspected at regular intervals and promptly repainted as
they become unsightly or indistinct from wear and tear or other
cause; (vi) all sewer catch basins shall be cleaned on a schedule
sufficient to maintain all sewer lines in a free flowing condition;
and all mechanical equipment which is part of storm and sanitary
sewer facilities shall be regularly inspected and kept in proper
working order; (vii) all asphalt paving shall be inspected at
regular intervals and maintained in a good condition; (viii) all
surface utility facilities servicing the common facilities,
including, but not by way of limitation, hose bibs, sandpipes,
sprinklers and domestic water lines, shall be inspected at regular
intervals and promptly repaired or replaced, as the occasion may
require or upon the occurrence of any defect or malfunctions; (ix)
all common utility facility amenities, benches and institutional,
directional, traffic and other signs, shall be inspected at regular
intervals and maintained in a clean and attractive condition; (x)
all lamps on lighting standards or otherwise on the Common Areas
shall be inspected at regular intervals and all lamps shall be
promptly replaced when no longer properly functioning; (xi) provide
police and other security measures commensurate with similar
shopping centers within the Commonwealth; (xii) provide lighting
for the parking areas and walkways on the Demised Premises during
periods of darkness when Tenant's Store Building is open for
business and for one (1) hour thereafter, but said lighting shall
not be required after 11:00 p.m.; (xiii) provide lighting, for the

parking lots and walkways within the Common Areas of the Shopping
Center, provide  air-conditioning and lighting for the Mall and
maintain the Mall during periods when Tenant and one (1) other
Major Store are open for business and for one (1) hour after such
business hours, but said lighting and operation of the Mall shall
not be required after 11:00 p.m.

(b)   If Landlord fails to perform Landlord's obligations set
out in Subsection (a) above, after being given thirty (30) days
Notice by Tenant, Tenant may:  (i) suspend Tenant's Exterior Common
Area Maintenance Contribution provided for under Part II, Section
5; and/or (ii) perform all or any portion of said obligations and
recover Tenant's cost and expense, together with interest, from
Landlord.  If Tenant's cost, expense and interest, are not paid
upon demand, Tenant may deduct them from any payments otherwise
payable under this Lease by Tenant to Landlord, until reimbursed in
full with interest.

18.   Sanitation and Safety
Landlord and Tenant will observe reasonable standards for
sanitation, handling of trash and debris, loading and unloading of
trucks and other vehicles, safety and security against fire and
theft, vandalism, personal injury and other hazards, including a
prohibition against unsightly window advertising, unsightly or
unsanitary accumulation of trash and other similar misuse of
walkways, landscaping and loading areas.

19.   Parking Ratio
Landlord agrees to maintain a parking ratio on the Entire
Tract of five (5) automobile parking spaces for each 1,000 square
feet of Gross Leasable Area located in the Entire Tract except that
the parking for uses on the Outparcels shall be governed by the
provisions of Part II, Section 2 hereof.

20.   Lighting
Landlord will keep the Mall open, lighted and air conditioned,
as the case may be, and Landlord will keep the parking areas on the
Shopping Center adequately lighted during any period of darkness
which Tenant and one (1) other Major Store are open for business,
and for one (1) hour thereafter.  This requirement will not apply
after 10:30 p.m.  During such hours of darkness when Tenant is the
only Major Store open for business, Landlord shall illuminate the
main access road to the Tenant's Store Building, entrance and exits
to the Sears Store, and shall maintain security lighting (defined
as  25%  of  the  aforesaid  requirement  for  lighting  uniformly
distributed) on the remainder of the Shopping Center.

21.   Condemnation
(a)   If  all  or  any  part  of  the  Shopping  Center,  or  any
interest  therein  is  Appropriated  prior  to  or  during  the  Term
hereof,  the  rights  and  obligations  of  Landlord  and  Tenant  with

respect to such Appropriation shall be as provided in this Section.

(b)  If all of the Demised Premises are Appropriated, this Lease shall terminate as of the date of the Appropriation, and Rent and all other charges payable pursuant to this Lease shall be prorated as of that date.

(c)  If less than all of the Demised Premises is Appropriated, the Fixed Rent and all other charges payable pursuant to this Lease for the portion of the Demised Premises remaining shall be reduced for the remainder of the Term and for any extension period in the same proportion which the number of square feet of Gross Leasable Area of Tenant's Store Building is Appropriated bears to the number of square feet of Gross Leasable Area of Tenant's Store Building is prior to such Appropriation.  Landlord shall make all necessary repairs or alterations to the Demised Premises so as to constitute the portion of the Demised Premises not taken as a functional unit, except that Landlord shall have no obligation to make such repairs if this Lease is terminated as hereinafter provided.

(d)  If there is an Appropriation of (A)(i) more than 10% of the Demised Premises or (ii) any portion of the Demised Premises which materially affects the operation of the Demised Premises; or (iii) ingress and egress to the Shopping Center which materially affect the operation of the Demised Premises or (B)(i) more than 30% of the parking spaces on the Shopping Center (or more than 20% of the parking spaces within 300 feet of the Demised Premises) or (ii) more than 20% of the Mall then in case (A) Tenant or in case B, either Landlord or Tenant shall have the right to terminate this Lease by Notice to the other party given within one hundred twenty (120) days from the date possession of said portion of the Demised Premises or parking spaces or points of ingress and egress, as the case may be, is Appropriated.  Termination of this Lease shall be effective as of the date of such Notice.  Notwithstanding the foregoing, Tenant may override Landlord's termination of this Lease in case (B) above by notifying Landlord of Tenant's desire to continue this Lease and agreeing to amend this Lease to eliminate any of the provisions hereof which impose requirements upon Landlord which it cannot perform as a result of an Appropriation; and Landlord may override Tenant's termination of this Lease because of an Appropriation of parking spaces by notifying Tenant of Landlord's commitment to provide alternate parking in locations reasonably satisfactory to Tenant.

(e)  If Landlord overrides Tenant's cancellation of this Lease, it shall promptly replace the parking area Appropriated.  If Landlord fails to commence to replace the parking area Appropriated within ninety (90) days of the date of Landlord's Notice, or Landlord fails to proceed diligently to complete such parking spaces (but in any event within one (1) year) Tenant may replace the parking areas, and recover its costs with interest from any

Rent payable, until Tenant will have been reimbursed in full, with interest.

(f)   FIRST:  The award shall be divided in the following order of priority:  Landlord shall be entitled to so much of the entire award made for Appropriation as shall be necessary to satisfy any outstanding Mortgage(s) encumbrancing the Shopping Center.

SECOND:  Tenant shall be entitled to (i) the unamortized value (on a straight line basis) of leasehold improvements made by Tenant, at its cost and expense, and not reimbursed by Landlord; (ii) Tenant's removal or relocation costs and damage to or loss of Tenant's personal property and trade fixtures; plus (iii) the value of Tenant's leasehold interest for the balance of the Initial Term of this Lease taking into account all of the terms of this Lease as determined by an independent appraiser selected jointly by Landlord and Tenant.  If Landlord and Tenant are unable to agree on such appraiser, such appraiser shall be selected in accordance with the then applicable rules of the American Arbitration Association.

THIRD:   The balance of the award shall be paid to Landlord.

Nothing herein shall prohibit Tenant from seeking a separate award for moving expenses and relocation costs.

22.   Utility Easements
On the written request of Landlord, Tenant will join with Landlord in granting or signing utility easements, the terms of which are acceptable to Landlord and Tenant, serving the Shopping Center.

23.   Surrender of Possession
Tenant will surrender the Demised Premises to Landlord at the end of the Term in good condition and repair, except for normal wear and tear and casualty loss.  Notwithstanding the foregoing, Tenant will have no responsibility to repair or replace the parking lot, buildings and equipment that Landlord has the responsibility to repair or maintain under this Lease.  Additionally, Tenant will have the right, but not the obligation, to remove from the Demised Premises all trade fixtures which were installed by Tenant.

PART III - GENERAL

1.   Notices
Notices will be addressed as follows:

J:\MPF\CLI\83952.LSE
October 8, 1991



Tenant-     Sears, Roebuck de Puerto Rico, Inc.
          c/o  Sears, Roebuck and Co.
          National Manager
          Real Estate Planning Group
          Department 824RE, BSC 36-36
          Sears Tower
          Chicago, Illinois  60684

     cc: Sears, Roebuck de Puerto Rico, Inc.
          c/o Store Manager
          Sears Store
          Carretera Estatal
          Num. 2 (State Road#2)
          Plaza Del Caribe
          Ponce, Puerto Rico 00731

     cc: Sears, Roebuck de Puerto Rico, Inc.
          c/o  General Counsel
          Sears Merchandise Group
          Department 766
          Sears Tower
          Chicago, Illinois  60684

Landlord-    Plaza Del Caribe, S.E.
          P. O. Box 363268
          San Juan, Puerto Rico  00936-3268

     cc: Jaime Fonalledas, Jr.
          President
          P. O. Box 758
          Hato Rey, Puerto Rico 00918

or to any other address furnished in writing by any of the foregoing. Any Notices of change of address by Landlord to Tenant shall completely restate all addresses to which Tenant shall send Notices. A copy of any Notice shall at the request of Landlord be sent to Landlord's Mortgagee at the address set forth in such request.

2. Choice of Law
  This Lease will be governed by law of the Commonwealth of Puerto Rico and/or federal laws and state and local laws (if applicable).

3. No Partnership
  Nothing contained in this Lease will be construed to make the parties partners or joint venturers or to render any party liable for the debts or obligations of the other.

4. Partial Invalidity
  Should any part, term or provision of this Lease be held illegal or in conflict with any law, the validity of the remaining provisions will not be affected.

5.   <u>Unavoidable Delays</u>
   A time within which Landlord or Tenant shall be required to
perform any act under this Lease shall be extended by a period of
time equal to the number of days during which the performance of
such act is prevented or delayed by acts of God, fire, earthquake,
floods, explosions, actions of the elements, or strikes, lockout(s)
or labor dispute, inability to obtain labor or material, enemy or
hostile casualty, orders of government; governmental restrictions
or similar or dissimilar causes not within the reasonable control
of such party (excluding any inability on the part of Landlord to
obtain financing).   Notwithstanding the foregoing, unless the party
entitled to such extension shall give notice to the other
interested party of its claim to such extension within fifteen (15)
days after the event giving rise to such claim shall have begun (no
such notice shall be required if the reason for such delay is or
should be clearly evident to the other party), there shall be
excluded in computing the number of days by which the time for
performance of the act in question shall be extended, the number of
days which shall have elapsed between the occurrence of such event
and the actual giving of notice.

6.   <u>No Waiver</u>
   The exercise by Landlord or Tenant of any right or remedy or
of any alternative rights or remedies, granted under this Lease to
Landlord or Tenant will not affect or prejudice any other rights or
remedies that Landlord and Tenant may have.   Any failure of
Landlord or Tenant promptly to exercise the rights or pursue the
remedies accruing hereunder by reason of any breach or default of
the other will not operate as a waiver, but the respective rights
and remedies will be available to each party at any time prior to
the complete remedying of any breach or default by the other.

7.   <u>Rights Cumulative</u>
   All rights, privileges and remedies afforded the parties by
this Lease will be deemed cumulative and the exercise of any one of
the remedies will not be deemed to be a waiver of any other right,
remedy or privilege.

8.   <u>Running with the Land</u>
   All the covenants, agreements, conditions and restrictions in
this Lease are covenants running with the land during the Term of
this Lease, inuring to the benefit of and enforceable by the
parties and all subsequent owners of the Shopping Center or any
parts, and to the holders of any mortgages or deeds of trust who
have succeeded to the interests of the mortgagors and the
occupants.

9.   <u>Estoppel Certificate and Subordination, Non-Disturbance
   and Attornment Agreement</u>
   (a)  If at the Commencement Date or during the Term, the
Demised Premises shall be, or becomes, subject to one or more

mortgages, Landlord, or Landlord's Mortgagee, and Tenant, upon written request, shall execute a Subordination, Non-Disturbance and Attornment Agreement in the form and substance reasonably acceptable to Tenant's counsel.

(b) Each party will, upon written request from the other party, provide an estoppel certificate in the form attached hereto as Exhibit E, whereby each party will advise the other by certified or registered mail, and any prospective purchaser or mortgagee designated by Landlord, of the status of this Lease and to the parties' knowledge whether or not it is in full force and effect, or in default. If the party receiving the request contends that the Lease is not in full force or is in default, it will specify the default.

## 10. Benefit of Successors and Assigns

This Lease will inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties. Nothing in this Lease, express or implied, is intended to confer upon any person, other than the parties and their successors and assigns, any rights or remedies under or by reason of this Lease.

## 11. Rules and Regulations

Tenant will, only to the extent consistent with this Lease, comply with the attached and incorporated Rules and Regulations (Exhibit F), which Landlord may change from time to time, but such changes shall not be binding upon Tenant until approved by Tenant in writing, which approval shall not be unreasonably withheld.

## 12. Joint Preparation

This Lease has been drafted and prepared through the joint efforts of the parties and shall be construed accordingly.

## 13. Entire Agreement

This Lease and the attached exhibits constitute the entire agreement between Landlord and Tenant with respect to the Demised Premises. Neither this Lease nor any of its provisions may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the parties.

## 14. Broker

Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease. Landlord shall indemnify and hold Tenant harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker.

## 15. Right to Audit



Tenant shall have the right, exercisable upon at least thirty (30) days prior Notice to Landlord, to made one audit each Lease Year (provided such audit is made with six months after the end of such Lease Year) of such books, invoices and records as are relevant to Real Estate Taxes, and Insurance Premiums to which Tenant contributes. If the audit disclose any error in the amount of the statement or the determination of Tenant's prorata share the allocable appropriate adjustment and payment or reimbursement, as the case may be, shall promptly be made between Landlord and Tenant to correct such error.

16. Headings

The Section headings are for convenience and are not part of this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease.

LANDLORD:

WITNESS:

PLAZA DEL CARIBE, S.E., a Puerto Rico special partnership

By: Empresas Fonalledas, Inc.

By: _____
Jaime Fonalledas, Jr.,
President

ATTEST:

TENANT:

SEARS, ROEBUCK DE PUERTO RICO, INC., a Delaware corporation

By: _____
Ronald B. Ruth,
Authorized Agent

Assistant Secretary

J:\MPF\CLI\83952.LSE
December 12, 1991

- 54 -



EXHIBIT A

### SHOPPING CENTER LEGAL DESCRIPTION

42.8809 Cuerdas -- Property Number 53,409

RUSTIC: Parcel of land located in the San Anton Ward of the Municipality of Ponce, Puerto Rico, having an area of forty-two point eight eight zero nine cuerdas (42.8809 cds.) equivalent to one hundred sixty eight thousand five hundred thirty nine point zero one square meters (168,539.01 sq. mts.) bounding on the North with State Road Number Two; on the South with properties belonging to Plaza del Caribe, S.E.; on the East with the North Main Street dedicated to public use; and on the West with properties of the Municipality of Ponce.

26.4670 Cuerdas -- Property Number 38,797

RUSTIC:  Parcel of land located in the San Anton and Salitral Wards of the Municipality of Ponce, Puerto Rico, having an area of twenty-four point four six seven zero cuerdas (24.4670 cds.) equivalent to ninety six thousand one hundred sixty five point thirty three square meters (96,165.33 sq. mts.) bounding on the North with segregated properties of Plaza del Caribe, S.E.; on the South with the South Main Street dedicated to public use; on the East with the North Main Street dedicated to public use; and on the West with properties of the Municipality of Ponce.

Both parcels of land are property of Plaza Del Caribe,





K:\MML\CLI\88764.MSC
August 27, 1991



EXHIBIT C

PERMITTED ENCUMBRANCES

PROPERTY NUMBER 53,409

LIENS AND ENCUMBRANCES

By its origin:

Sewer easement in favor of the Municipality of Ponce.
Easement in favor of the Commonwealth of Puerto Rico.
Perpetual Right-of-Way easement in favor of Hacienda Constancia.
Recital of an easement for pipelines.
Easement in favor of the underground irrigation channel.
Easement in favor of property number 6716.
Underground easement in favor of property number 15,502.

By itself:

Mortgage made by Plaza del Caribe, S.E. guaranteeing a Note in favor of Puerto Rico Industrial, Medical, Educational and Environmental Pollution Control Facilities Financing Authority and/or its assigns, in the amount of $63,000,000.00, executed in San Juan, Puerto Rico on August 7, 1991, before Notary Public Aurelio Emanuelli Belaval, recorded at page 50 of volume 1714, third inscription.

Mortgage made by Plaza del Caribe, S.E. guaranteeing a Note in favor of the Municipality of Ponce and/or its assigns, in the amount of $4,757,068.00, with no interest, due in fifteen years, as per Deed #3 executed in San Juan, Puerto Rico on April 15, 1991 before Notary Public Norma M. Rivera Padilla, recorded at page 51 of volume 1714, fourth inscription.

Constitution of personal use easement over future construction of property (parking) as per Deed #9 executed in San Juan, Puerto Rico on August 7, 1991 before Notary Public Luis Morales Steinmann, recorded at page 280 of volume 714.





K:\MML\CLI\106617.MSC
December 20, 1991

## EXHIBIT C

### PERMITTED ENCUMBRANCES
(continuation)

PROPERTY NUMBER 38,797

### LIENS AND ENCUMBRANCES

#### By its origin:

Easement for sewer in favor of the Municipality of Ponce,
Right-of-Way easement (perpetual) in favor of Hacienda Constancia.
Easement in favor of the Commonwealth of Puerto Rico.
Underground irrigation channel easement.
Easement in favor of the Puerto Rico Water Resources Authority.
Easement in favor of property 6716.
Underground easement in favor of property 15,502.

#### By itself:

Constitution of personal use easement over certain other property
of Plaza del Caribe, S.E. (parking), as per Deed #10 executed in
San Juan, Puerto Rico before Notary Public Luis Morales Steinmann,
filed for record but pending inscription at entry 315 of book 741
on August 8, 1991.

Landlord represents and warrants that the easements and
restrictions set forth in this Exhibit will not adversely affect
the use and occupancy of the demised premises.





EXHIBIT D

## PLANS AND WORK COMPLETION SCHEDULE

| | |
|---|---|
| Final Design Package from Sears | April 12, 1991 |
| Bid Set finished by Landlord | May 12, 1991 |
| Final Approval by Sears | June 21, 1991 |
| Access to Sears for Tenant Work | June 9, 1992 |
| Substantial Completion of Landlord's Work | July 30, 1992 |
| Grand Opening | September 9, 1992 |







J:\MPF\CLI\83952.LSE
October 8, 1991

EXHIBIT E

ESTOPPEL CERTIFICATE

DATE_____

TO:    _____
       _____
       _____

RE:    _____
       _____
       _____

The undersigned, Sears, Roebuck de Puerto Rico, Inc., as the tenant under that certain lease dated _____ (the "Lease"), by and between Plaza Del Caribe, S.E. as Landlord, and Sears, Roebuck de Puerto Rico, Inc., as Tenant, covering the premises located in Plaza Del Caribe (the "Demised Premises"), hereby certifies that as of the date hereof:

1.    The Lease is in full force and effect.

2.    The term of the Lease commenced on _____ and will continue until _____, subject to _____ rights as provided in the Lease.

3.    No rent has been paid more than one month in advance. :

4.    Tenant has not received nor has Tenant given any notice of default pursuant to the terms of the Lease.

This Estoppel Certificate is given solely for your information and may not be relied upon by any other person or entity, nor shall it in any way create any liability in, or provide any right of action against Sears, Roebuck de Puerto Rico, Inc., its officers, directors, agents, employees and representatives.

                           SEARS, ROEBUCK DE PUERTO RICO, INC.,
                           a Delaware corporation


                           By:_____

J:\MPF\CLI\83952.LSE
October 8, 1991

EXHIBIT F

RULES AND REGULATIONS

1.

Tenant agrees that it shall observe and comply with the following rules and regulations and any other rules or regulations enacted by Landlord from time to time as provided for in paragraph C below.  Any provision of these rules and regulations which is in conflict with any provision of the Lease shall be superseded by the Lease.

A.   Tenant shall at all times during the terms of this Lease or any extension thereof:

(1)   Keep all merchandise display windows, signs and other advertising and display devices in the Demised Premises suitably lighted during such periods of time as the store windows throughout at least twenty-five percent (25%) of the Shopping Center are illuminated;

(2)   Refrain from using self-illuminated signs located in the interior of the Demised Premises and which are visible from the outside to advertise any product, and all signs located in the interior of the Demised Premises shall be in good taste so as not to detract from the general appearance of the Retail Store Building and the Shopping Center;

(3)   Keep the Demised Premises, including all vestibules, lobbies, entrances, exits and returns located therein, all improvements thereon and all windows, doors, hallways fronting the Demised Premises and glass or plate glass fixtures in a safe, neat and clean condition at all times;

(4)   Store all trash, garbage and refuse within the Demised Premises in suitable containers and located them so as not to be visible to customers and business invitees in the Shopping Center and so as not to create or permit any health or fire hazard. Such trash, garbage and refuse shall be removed only by way of the rear of the Demised Premises or such other places as Landlord may designate from time to time and as shall be reasonably convenient for Tenant, and shall be placed outside of the Demised Premises prepared for collection in the manner and at the times and places specified by Landlord and as shall be reasonably convenient for Tenant.   If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost, providing such service is reasonably satisfactory to Tenant and that the cost thereof is in accordance with local market rates



at the time.   Tenant shall pay the cost of removal of any of Tenant's refuse or rubbish;

    (5)   Refrain from distributing any handbills or other advertising matter on or about any part of the parking or Common Areas;

    (6)   Use, at Tenant's cost, such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require, providing such extermination service is reasonably satisfactory to Tenant and the cost thereof is in accordance with local market rates at the time, and that the intervals are as reasonably required by Tenant;

    (7)   Refrain from parking or unloading any truck or other delivery vehicle in any place other than in front of the freight entrance to the Demised Premises as shown on the final working plans and specifications for the Shopping Center;

    (8)   Refrain from using the plumbing facilities for any other purpose than that for which they are constructed, and no foreign substance, of any kind whatsoever, shall be thrown therein, and the expense of any breakage, stoppage or damage to the pipes and lines connecting the utilities to the Demised Premises resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall, have caused it;

    (9)   Refrain from burning any trash or garbage of any kind in or about the Demised Premises or the Shopping Center;

    (10)   Take reasonable steps to prevent traffic congestion or unsightly conditions resulting from the use by Tenant of the TBA Building;

    (11)   Conduct all the activities related to the use by Tenant of the TBA Building in full compliance with all Environmental Requirements as provided for in the Lease; and

    (12)   Furnish to Landlord, upon Landlord's request, the automobile license numbers of Tenant employees' cars.

    B.   Tenant shall not, without first obtaining Landlord's written consent, during the term of this Lease or any extension thereof:

    (1)   Conduct any going out of business, fire, bankruptcy, auction or other distress sale in the Demised Premises, or in the hallways fronting the Demised Premises;



J:\MPF\CLI\83952.LSE
October 8, 1991

F-2

(2)   Change the exterior color of the Demised Premises, or the color, size, location or composition of any sign or advertisement on the Demised Premises that may have been theretofore approved by Landlord;

(3)   Use any sidewalks, walkways, or areaways of the Shopping Center or any vestibule or exterior entranceway located within the Demised Premises for the keeping or displaying of any merchandise or other objects, including but not by way of limitation the use of any of the foregoing for any newsstand, cigar stand, sidewalk shops, or any business, occupation or undertaking;

(4)   Place any fence, structure, building, improvement, division, rail, sign or other advertising or display device or obstruction of any type or kind upon the parking areas or any part thereof or upon any vestibule or exterior entranceway located within the Demised Premises;

(5)   Install in, or about the Demised Premises any exterior lighting, amplifiers or similar devices or use in or about the Demised Premises any advertising medium which may be heard or experienced outside the Demised Premises, such as flashing lights, searchlights, loudspeakers, phonographs or radio broadcasts;

(6)   Attach any awnings or other projections to the outside walls of the Demised Premises; and

(7)   Install in or about the Demised Premises, including the roof, any type of banner(s) to advertise Tenant's presence in the Shopping Center or special promotions.

C.   Tenant agrees that Landlord may amend, modify, delete or add, from time to time, new and additional reasonable rules and regulations for the operation and care of the Shopping Center buildings, and for the operation, care and use in common by all the tenants of the Shopping Center of the parking and Common Areas as defined in this Lease, provided that no such amendments shall be binding on Tenant without its consent, which consent shall not be unreasonably withheld.

2.

Except as expressly permitted by the terms of this Lease or any extensions thereof, Tenant shall not decorate, paint or in any other manner alter, and shall not install or affix any device, fixture or attachment upon or to the exterior of the Demised Premises, including the roof thereof, without the prior written consent thereto of Landlord; and if Tenant shall do any of the foregoing acts in contravention of this provision, Landlord shall have the right to remove such decoration, paint, alteration, device, fixture or attachment and restore the Demised Premises to


TKH

the condition thereof prior to such act, and the cost of such removal and restoration shall be paid by Tenant during the month following such removal or alteration. Tenant shall have the right to install on the roofs of the Demised Premises an antenna for use in connection with the display and sale of radio, television or other electronic equipment, the height and location and manner of installation of such antenna to be also subject to the approval of Landlord, which approval shall not be unreasonably withheld.

Tenant's obligation to comply with the foregoing rules and regulations (and any that may hereafter be promulgated by Landlord) is expressly made conditional on the compliance with such rules and regulations or substantially similar rules and regulations by all tenants in the Shopping Center. Landlord agrees that it will make all reasonable efforts to cause said rules and regulations and any amendments or additions thereto, or substantially similar rules and regulations, amendments and additions to be applicable to and complied with by all Major Stores in the Shopping Center. Anything herein to the contrary notwithstanding, it is understood and agreed that the above rules and regulations shall only be binding if they are not contrary to any legally binding rules and regulations set forth by any governmental agency.





J:\MPF\CLI\83952.LSE
October 8, 1991

F-4



## EXHIBIT G

### SIGN CRITERIA

The following Sign Criteria apply to the Landlord, Tenant, other Major Stores and to the Mall Tenants (collectively "occupants"):

Landlord will not permit the erection of any signs on the Entire Tract or on any buildings within the Entire Tract in contravention of the following prohibitions:

(1)    There shall be no exterior flashing, rotating or moving signs or markers of any type.

(2)    There shall be no signs painted on the exterior masonry surface of any building.

(3)    No exposed wiring, conduits, tubing, lamps, ballast boxes or raceways will be permitted.

(4)    All cabinets, conductors, transformers, ballasts, attachment devices, and other equipment shall be concealed.

(5)    The advertising or informative content of all signs shall be limited to letters designating the establishment name and/or type of establishment.

(6)    Professional handwritten signs shall be permitted only upon the prior approval thereof by Landlord.

Nothing herein shall prevent any Major Store from erecting signs which are typically erected by such Major Store on stores of a similar type.





J:\MPF\CLI\83952.LSE
October 8, 1991

## FIRST AMENDMENT TO LEASE AGREEMENT

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** is made as of this _9th_ day of April, 1997 between **PLAZA DEL CARIBE, S.E.**, a Puerto Rico special partnership ("Landlord") and **SEARS, ROEBUCK DE PUERTO RICO, INC.**, a Delaware corporation ("Tenant").

### RECITALS:

A.      Landlord and Tenant entered into a Lease Agreement dated January 20, 1992, as amended by Agreement dated March 26, 1992 (collectively, the "Lease") for the lease by Tenant of certain property located in the City of Ponce, Commonwealth of Puerto Rico, which property is more specifically described in the Lease (the "Demised Premises").

B.      Landlord and Tenant desire to amend the Lease as provided herein to allow Tenant to sublease its auto center to Western Auto of Puerto Rico, Inc. ("Western Auto"), a wholly owned subsidiary of Sears, Roebuck and Co., parent company of Tenant, and change the requirement of at least two other Major Stores to at least one other Major Store.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, the parties agree as follows:

1.      The parties agree that Tenant may sublease its auto center to Western Auto.

2.      The parties agree that the sign elevation attached hereto as Exhibit A is hereby approved.

3.      Tenant agrees not to alter the existing footprint of the auto center, except as provided for in the attached Exhibit B relating to the Garden Center wall.

4.      Tenant agrees to provide Landlord with an informal monthly sales report of its Net Sales.

5.      The parties agree that certain provisions of the Lease shall be amended as follows:

    a.      The second **WHEREAS** clause is amended by deleting the words "at least two other Major Stores" and substituting "at least one other Major Store" in lieu thereof;

    b.      Part I, Section 7 is amended by deleting "two (2) other Major Stores" in subsections (ii) and (iv) and substituting "one (1) other Major Store" in lieu thereof;

    c.      Part II, Section 3 is amended by deleting the words "another Major Store containing approximately 60,000 square feet of Gross Leasable Area at the location shown on the Site Plan" and the words **"MAJOR STORE TWO LEVELS"** are deemed deleted from the Site Plan;

    d.      Part II, Section 4 is amended by deleting the words "at least two other Major Stores" in subsection (iii) and inserting "at least one other Major Store" in lieu thereof;

6.      The Lease, except as amended herein, is in all other respects fully ratified and confirmed.

7.      Except as defined herein, all capitalized items used in this First Amendment to Lease Agreement
shall have the meanings ascribed to such terms in the Lease.

8.      Each party executing this First Amendment to Lease Agreement represents and warrants that
he/she has the power and authority to execute this document on behalf of his/her respective
party.


**IN WITNESS WHEREOF**, the parties have executed this First Amendment to Lease Agreement as of the
day and year first above written.


ATTEST OR WITNESS:                          LANDLORD:
                                            PLAZA DEL CARIBE, S.E.

By: _____                By: _____
                                                Jaime Fonalledas, Jr.
                                                President


ATTEST:                                     TENANT:
                                            SEARS, ROEBUCK DE PUERTO RICO, INC.

By: _Shirley Maldonado_                     By: _____
    Shirley Maldonado                           Edward R. Cameron
    Assistant Secretary                         President


2



# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

August 4, 2011

**CERTIFIED MAIL/
RETURNRECEIPT REQUESTED
#7010 0290 0000 0646 2106**

Plaza Del Caribe S.E.
P.O. Box 363268
San Juan, PR 00936-3268

Re:   Lease dated January 20, 1992, as amended,
for the premises located at Ponce By Pass, Ste 135,
Ponce, PR, and known as Sears # 1945-01-A

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of ten (10)
years, commencing September 2, 2012, to and including  September 1, 2022, upon the terms,
conditions, and rental as set forth in said Lease, as amended.

Sincerely,

SEARS, ROEBUCK DE PUERTO RICO, INC.,
a Delaware corporation

By:   Jeffrey Stollenwerck
Sr. Vice President of Real Estate

JS/al

cc:   J. Catanese
Lease File

**CERTIFIED MAIL/
RETURNRECEIPT REQUESTED
#7010 0290 0000 0646 2113**

Jamie Fonalledas, Jr.
President
P.O. Box 758
Hato Rey, PR 00918