# Exhibit 1

069147

BK1240PG0090

New Castle County Tax
Parcel Numbers:

06-029.00-008
06-019.00-005
06-029.00-017
06-029.00-018
06-020.00-299
06-020.00-297
06-020.00-298
06-020.00-300
06-029.00-019
06-029.00-027

Document Prepared by:
William S. Gee, Esq.
Saul, Ewing, Remick & Saul
Suite 1200
222 Delaware Avenue
P O Box 1266
Wilmington, DE 19899

## CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT

CONCORD MALL SHOPPING CENTER

by and between

CONCORD MALL

AND

SEARS, ROEBUCK AND CO.

December 21, 1990

*See Plat Plan # 11024*

5 13 13 J 6 30 16            000000            116
                                              74544

BK 1240 PG 0091

CONSTRUCTION, OPERATION AND RECIPROCAL
EASEMENT AGREEMENT

CONCORD MALL SHOPPING CENTER

by and between

CONCORD MALL

AND

SEARS, ROEBUCK AND CO.

6971a/12-04-90

BK 1240 PG 0092

CONSTRUCTION, OPERATION AND RECIPROCAL
EASEMENT AGREEMENT
CONCORD MALL SHOPPING CENTER

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **ARTICLE I - DEFINITIONS** | | 3 |
| Section 1.1 | Terms Defined.................................... | 3 |
| **ARTICLE II - PRELIMINARY SITEWORK, CONSTRUCTION OF COMMON AREA** | | |
| **ADDITIONS, AND CONNECTION OF SEARS BUILDING TO MALL** | | 12 |
| Section 2.1 | Definitions..................................... | 12 |
| Section 2.2 | General Design Data............................. | 14 |
| Section 2.3 | Completion of the Developer Sears Parcel Work... | 14 |
| Section 2.4 | Administration of the Work...................... | 15 |
| Section 2.5 | Changes After Completion of Developer | |
| | Sears Parcel Work............................ | 15 |
| Section 2.6 | Additional Conditions to Performance............ | 16 |
| **ARTICLE III - TERMINATION** | | 16 |
| Section 3.1 | Termination Date................................ | 16 |
| Section 3.2 | Termination..................................... | 16 |
| Section 3.3 | Interest After Termination...................... | 17 |
| Section 3.4 | Consequences of Termination..................... | 17 |
| **ARTICLE IV - GRANT OF EASEMENTS** | | 17 |
| Section 4.1 | Definitions and Documentation................... | 17 |
| Section 4.2 | Temporary License to Perform the Work and | |
| | Future Department Store Building Expansion...... | 18 |
| Section 4.3 | Temporary Licenses for Construction............. | 19 |
| Section 4.4 | Easements for Use of Common Area................ | 20 |
| Section 4.5 | Easements to Open On and Use the Mall........... | 21 |
| Section 4.6 | Easements for Protective Devices................ | 21 |
| Section 4.7 | Easements to Perform Right of Self-Help......... | 22 |
| Section 4.8 | Easement for Abutment of Mall................... | 22 |
| Section 4.9 | Easements for Repair to Structure | |
| | on Grantee's Parcel............................ | 23 |
| Section 4.10 | Easement for Common Utility Facilities.......... | 23 |
| Section 4.11 | Permanent Easements............................. | 26 |
| Section 4.12 | Easements for Public Authorities................ | 26 |
| Section 4.13 | Easements for Building Encroachments | |
| | and Common Footings............................ | 27 |
| Section 4.14 | Extinguishment of Easements..................... | 27 |
| Section 4.15 | Bridge Easements................................ | 27 |
| **ARTICLE V - REFURBISHMENT AND EXPANSION OF MALL** | | 28 |
| Section 5.1 | Developer Mall Work............................. | 28 |
| Section 5.2 | Developer Improvement Plans and | |
| | Specifications.................................. | 30 |
| Section 5.3 | Connections Between Buildings................... | 32 |
| Section 5.4 | Mall Work Approval Items........................ | 32 |
| Section 5.5 | Mutual Cooperation Respecting HVAC | |
| | Systems......................................... | 33 |
| Section 5.6 | Changes in Developer Improvement Plans.......... | 33 |
| Section 5.7 | Exercise of Approval Rights Over Developer | |
| | Improvement Plans............................... | 34 |
| Section 5.8 | Mall and Mall Stores............................ | 34 |
| Section 5.9 | Reductions...................................... | 34 |

6971a/12-04-90

BK 1240 PG 0093

|  |  | Page |
|---|---|---|
| **ARTICLE VI – CONSTRUCTION OF THE SEARS IMPROVEMENTS** |  | 35 |
| Section 6.1 | Architectural Elevations and Design Studies...................................... | 35 |
| Section 6.2 | Location of the Sears Improvements.............. | 36 |
| Section 6.3 | Construction of the Sears Improvements.......... | 36 |
| Section 6.4 | Minimum Floor Area of Sears Building............ | 36 |
| Section 6.5 | Intentionally Omitted........................... | 37 |
| Section 6.6 | Completion of Construction and Opening......... | 37 |
| Section 6.7 | Additional Conditions to Performance............ | 37 |
| Section 6.8 | Intentionally Omitted........................... | 37 |
| Section 6.9 | Payment of Certain Charges...................... | 37 |
| **ARTICLE VII – CONSTRUCTION REQUIREMENTS AND STANDARDS** |  | 38 |
| Section 7.1 | Standards of Construction....................... | 38 |
| Section 7.2 | Correction of Site Descriptions and Descriptions of Easements........................ | 39 |
| Section 7.3 | Construction Estoppel Certificates.............. | 40 |
| Section 7.4 | Building Heights................................ | 40 |
| **ARTICLE VIII – COVENANTS OF SEARS AND DEVELOPER** |  | 40 |
| Section 8.1 | Covenant of Sears to Open and Operate........... | 40 |
| Section 8.2 | Intentionally Omitted........................... | 42 |
| Section 8.3 | Covenant of Developer to Operate................ | 42 |
| Section 8.4 | Temporary Cessation of Operation................ | 43 |
| Section 8.5 | Operation of Mall............................... | 43 |
| Section 8.6 | Additional Covenants............................ | 44 |
| Section 8.7 | Release from Operating Covenant................. | 44 |
| **ARTICLE IX – USE AND OPERATION OF SHOPPING CENTER** |  | 45 |
| Section 9.1 | Use and Operation of Shopping Center............ | 45 |
| Section 9.2 | Kiosks.......................................... | 46 |
| **ARTICLE X – MAINTENANCE AND MANAGEMENT OF THE COMMON AREA** |  | 47 |
| Section 10.1 | Developer's Duty to Operate Common Area......... | 47 |
| Section 10.2 | Employee Parking................................ | 49 |
| Section 10.3 | Intentionally Omitted........................... | 49 |
| Section 10.4 | Payment of Allocable Share...................... | 49 |
| **ARTICLE XI – SELF-HELP AND OTHER REMEDIES** |  | 49 |
| Section 11.1 | Rights of Self-Help............................. | 49 |
| Section 11.2 | Lien............................................ | 50 |
| Section 11.3 | Notice to Defaulting Party's Mortgagee.......... | 51 |
| Section 11.4 | Determination of Default........................ | 51 |
| Section 11.5 | Remedies Cumulative............................. | 51 |
| **ARTICLE XII – OBSTRUCTION OF COMMON AREA** |  | 51 |
| Section 12.1 | Covenants Respecting Common Area................ | 51 |
| Section 12.2 | Exceptions to Covenants......................... | 52 |
| **ARTICLE XIII – MAINTENANCE AND REPAIRS** |  | 52 |
| Section 13.1 | Covenant to Maintain Mall ...................... | 52 |
| Section 13.2 | "Rebuild" Defined............................... | 53 |
| Section 13.3 | Damage or Destruction to Mall or Mall Stores.......................................... | 53 |

ii.

6971a/12-04-90

BK 1240P60094

|  |  | Page |
|---|---|---|
| Section 13.4 | Covenant to Maintain Sears Building............. | 56 |
| Section 13.5 | Destruction of Sears Department Store Building By Fire or Other Casualty.............. | 56 |
| Section 13.6 | No Razing or Removal........................... | 56 |
| Section 13.7 | Certain Alterations, Additions or Improvements.. | 57 |

ARTICLE XIV - INSURANCE                                                   57

| Section 14.1 | Construction Insurance.......................... | 57 |
| Section 14.2 | Liability Insurance for Common Area and Buildings....................................... | 58 |
| Section 14.3 | Insurance for Completed Improvements............ | 59 |
| Section 14.4 | Self-Insurance or Blanket Policy................ | 60 |
| Section 14.5 | Developer Performance by Others................. | 60 |
| Section 14.6 | Waiver of Subrogation........................... | 60 |
| Section 14.7 | Payment of Proceeds............................. | 61 |
| Section 14.8 | Evidence of Insurance........................... | 61 |

ARTICLE XV - INDEMNIFICATION                                              62

| Section 15.1 | Indemnification................................. | 62 |

ARTICLE XVI - FORCE MAJEURE                                               62

| Section 16.1 | Performance Excused............................. | 62 |

ARTICLE XVII - PARKING RATIO                                             63

| Section 17.1 | Required Ratio.................................. | 63 |
| Section 17.2 | No Default...................................... | 63 |

ARTICLE XVIII - REAL ESTATE TAXES, WATER AND SEWER RATES AND OTHER CHARGES                                                63

| Section 18.1 | Covenant to Pay................................. | 63 |
| Section 18.2 | Right to Contest or Appeal...................... | 64 |
| Section 18.3 | Payment of Taxes................................ | 64 |

ARTICLE XIX - CONDEMNATION                                               64

| Section 19.1 | Restoration Upon Condemnation................... | 64 |
| Section 19.2 | Termination of Obligations...................... | 65 |
| Section 19.3 | Condemnation Does Not Affect Easements.......... | 66 |
| Section 19.4 | Waiver of Award................................. | 66 |
| Section 19.5 | Application of Condemnation Proceeds............ | 66 |

ARTICLE XX - SIGNS                                                       66

| Section 20.1 | Covenants....................................... | 66 |
| Section 20.2 | Amendments...................................... | 66 |
| Section 20.3 | Intentionally Omitted........................... | 66 |
| Section 20.4 | Prohibited Signs................................ | 66 |
| Section 20.5 | Prior Signs..................................... | 66 |

ARTICLE XXI - SALE, ASSIGNMENT, TRANSFER AND ENCUMBRANCE OF PARCELS - SUCCESSORS AND ASSIGNS BOUND AND BENEFITED                                                     67

| Section 21.1 | Certain Definitions for this Article............ | 67 |
| Section 21.2 | Rights to Make a Transfer, Mortgage or Sale and Leaseback.............................. | 67 |
| Section 21.3 | Corporate Successors to Sears................... | 71 |
| Section 21.4 | Successors and Assigns Bound and Benefited ..... | 71 |

iii.

BK 1240 PG 0095

|  | **Page** |
|---|---|
| ARTICLE XXII – NOTICES | 71 |
|     Section 22.1  Place and Manner of Notice...................... | 71 |
|     Section 22.2  Legend on Notices............................... | 73 |
|     Section 22.3  Drawings and Specifications..................... | 73 |
| ARTICLE XXIII – CONSENTS | 74 |
|     Section 23.1  Developer Consents.............................. | 74 |
| ARTICLE XXIV – FUTURE EXPANSION | 74 |
|     Section 24.1  Future Expansion................................ | 74 |
|     Section 24.2  Further Assurances.............................. | 75 |
|     Section 24.3  Amendment to the Agreement...................... | 75 |
| ARTICLE XXV – MISCELLANEOUS | 76 |
|     Section 25.1  No Waiver....................................... | 76 |
|     Section 25.2  Interest........................................ | 76 |
|     Section 25.3  No Relationship of Principal and Agent.......... | 76 |
|     Section 25.4  Separability of Void Provisions................. | 77 |
|     Section 25.5  Captions........................................ | 77 |
|     Section 25.6  Governing Law................................... | 77 |
|     Section 25.7  Amendment....................................... | 77 |
|     Section 25.8  Right to Enjoin................................. | 77 |
|     Section 25.9  Counterparts.................................... | 77 |
|     Section 25.10  Exhibits....................................... | 77 |
|     Section 25.11  No Gift or Dedication.......................... | 77 |
|     Section 25.12  Covenants Run with Land........................ | 78 |
|     Section 25.13  No Brokers..................................... | 78 |
|     Section 25.14  Recordation.................................... | 78 |
|     Section 25.15  No Third-Party Beneficiaries................... | 78 |
|     Section 25.16  Promotional Services Program | |
|         and Merchants' Association...................... | 78 |
|     Section 25.17  Estoppel Certificates.......................... | 78 |
|     Section 25.18  Rule Against Perpetuities...................... | 79 |
|     Section 25.19  Standard of Approval........................... | 79 |
|     Section 25.20  Default........................................ | 79 |
|     Section 25.21  Limitation of Liability........................ | 79 |
|     Section 25.22  Gender......................................... | 81 |
|     Section 25.23  Attorneys' Fees................................ | 81 |

EXHIBITS

| Exhibit A | Legal Descriptions |
|---|---|
| Part I | Developer Parcel |
| Part II | Sears Parcel |
| Part III | Boscov Parcel |
| Part IV | Strawbridge Leasehold Parcel |
| Part V | Intentionally Omitted |
| Part VI | Shopping Center Site |
| Exhibit B | Plot Plan |
| Exhibit C | Building Level Specifications |
| Exhibit D | Building Heights |
| Exhibit E | Rules and Regulations |
| Exhibit F | Sign Criteria |

iv.

6971a/12-04-90

BK 1240 °60096

CONSTRUCTION, OPERATION AND RECIPROCAL
EASEMENT AGREEMENT
CONCORD MALL SHOPPING CENTER

## TABLE OF DEFINITIONS

|  | Section | Page |
|---|---|---|
| Access Roads | § 1.1(a) | 3 |
| Accounting Period | § 1.1(b) | 3 |
| Affiliate | § 21.1(d) | 67 |
| Agreement | Preamble | 1 |
| Allied | Recitals—¶ C | 1 |
| Allocable Share | § 1.1(c) | 3 |
| Amendment | § 24.3 | 75 |
| Anchor | § 1.1(d) | 3 |
| Architectural Elevations and Design Studies | § 6.1 | 35 |
| Assessments | § 18.1 | 64 |
| Boscov | Recitals—¶ C | 1 |
| Boscov Building | Recitals—¶ C | 1 |
| Boscov Leasehold Parcel | Recitals—¶ C | 1 |
| Boscov REA | Recitals—¶ F | 2 |
| Burdened Party | § 7.2 | 40 |
| business of Sears | § 21.3 | 71 |
| Close-off | § 3.2 | 17 |
| Commence Construction and Commencement |  |  |
|   of Construction | § 1.1(e) | 4 |
| Common Area | § 1.1(f) | 4 |
| Common Area Maintenance Cost | § 1.1(g) | 4 |
| Common Utility Facilities | § 1.1(h) | 6 |
| Condemnation, Condemn or Condemned | § 1.1(i) | 6 |
| Construction | § 7.1 | 38 |
| control | § 21.1(d) | 67 |
| Cost of Developer Sears Parcel Work | § 2.1(b) | 13 |
| Court | § 1.1(j) | 6 |
| Defaulting Party | § 11.1 | 48 |
| Department Store Building(s) | § 1.1(l) | 7 |
| Department Store Improvement(s) | § 1.1(m) | 7 |
| Department Store(s) | § 1.1(k) | 6 |
| Developer | Preamble | 1 |
| Developer Improvement Plans | § 5.2(a) | 30 |
| Developer Improvements | § 1.1(n) | 7 |
| Developer Mall Work | § 5.1(a) | 28 |
| Developer Operating Covenant | § 8.3(a) | 42 |
| Developer Operating Covenant Standards | § 8.5(d) | 44 |
| Developer Parcel | Recitals—¶ A | 1 |
| Developer Sears Parcel Work | § 2.1(a) | 12 |
| Developer Work | § 1.1(o) | 7 |
| Devices | § 4.6 | 21 |
| Developer Working Drawings and Specifications | § 2.2(c) | 14 |
| Excepted Circumstances | § 8.7(e) | 44 |
| Excluded Period | § 6.7 | 37 |
| Extended Operating Covenant | § 13.3(b) | 55 |
| Extension Notice | § 13.3(b) | 55 |
| Facilities | § 4.9(a) | 23 |
| First Level Refurbishment | § 5.1(a) | 28 |
| Floor Area | § 1.1(p) | 7 |
| Force Majeure | § 16.1 | 63 |
| Future Department Store Building Expansion | Recitals—¶ I | 2 |
| Future Department Stores | Recitals—¶ 1 | 2 |
| Future Expansion Area | § 1.1(q) | 8 |
| Grantee | § 4.1(b) | 17 |
| Grantor | § 4.1(a) | 17 |
| Institutional Lender | § 21.1(f) | 67 |
| JMB Realty | § 21.2(d) | 69 |

v.

BK 1240 PG 0097

| | Section | Page |
|---|---|---|
| Lease | § 1.1(r) | 8 |
| Major Casualty | § 1.1(s) | 8 |
| Mall | § 1.1(t) | 8 |
| Mall Store(s) | § 1.1(u) | 8 |
| Mall Work Approval Items | § 5.4(a) | 32 |
| Mortgagee and Mortgage | § 1.1(v) | 8 |
| Necessary Consents | § 5.1(b) | 28 |
| Necessary Department Store(s) | § 1.1(w) | 8 |
| Necessary Mall Stores | § 1.1(x) | 8 |
| Necessary Third Parties | § 5.1(b) | 29 |
| Non-Mall Store Buildings | § 1.1(y) | 8 |
| Occupant(s) | § 1.1(z) | 9 |
| Opening Date | § 1.1(aa) | 9 |
| Operate, Operating, Operation | § 1.1(bb) | 9 |
| Operating Covenant | § 1.1(cc) | 10 |
| Operating Covenant Standards | § 1.1(dd) | 10 |
| Outdoor Selling Area | § 1.1(ee) | 10 |
| Pad Work | § 2.3(a)(i) | 15 |
| Parcel | § 1.1(ff) | 10 |
| Parking and Access Easement Declaration | § 1.1(gg) | 10 |
| Parking Area | § 1.1(hh) | 10 |
| Parking Surcharges | § 18.1 | 64 |
| Payment Amount | § 5.1(c)(i) | 29 |
| Payment Date | § 5.1(c) | 29 |
| Party or Parties | Preamble | 1 |
| Pedestrian Bridges | § 4.15(a) | 28 |
| Perimeter Sidewalk(s) | § 1.1(ii) | 11 |
| Permissible Building Area(s) | § 1.1(jj) | 11 |
| Permittee(s) | § 1.1(kk) | 11 |
| Person(s) | § 1.1(ll) | 11 |
| Pipe or Pipes | § 4.10 | 23/24 |
| Plans | § 2.1(c) | 13 |
| Prime Rate | § 25.2 | 76 |
| Prior Signs | § 20.5 | 66 |
| Purchase Agreement | Recitals-¶ B | 1 |
| Rebuild, Rebuilt, Rebuilding | § 13.2 | 53 |
| Rebuilding Completion Period | § 1.1(mm) | 11 |
| Representative | § 22.3 | 73 |
| Sale and Leaseback | § 21.1(e) | 67 |
| Sears | Preamble | 1 |
| Sears Basic Plans | § 6.1 | 35 |
| Sears Building | Recitals-¶ H | 2 |
| Sears Construction Commencement Date | § 6.3 | 36 |
| Sears Construction Standards | § 2.1(a) | 13 |
| Sears Improvements | Recitals-¶ H | 2 |
| Sears Minimum Floor Area | § 6.4 | 37 |
| Sears Operating Covenant | § 8.1(a) | 41 |
| Sears Operating Covenant Standards | § 8.1(b) | 41 |
| Sears Parcel | Recitals-¶ B | 1 |
| Sears Parking Area | § 1.1(nn) | 11 |
| Sears TBA | Recitals-¶ H | 2 |
| Sears Work | § 6.3 | 36 |
| Second Level Development | § 5.1(a) | 28 |
| Shopping Center | Recitals-¶ G | 2 |
| Shopping Center Site | Recitals-¶ G | 2 |
| Significant Design Components | § 2.2(b) | 14 |
| Strawbridge | Recitals-¶ D | 1 |
| Strawbridge Building | Recitals-¶ D | 1 |
| Strawbridge Leasehold Parcel | Recitals-¶ D | 1 |
| Strawbridge REA | Recitals-¶ F | 2 |
| Supplemental Agreement | § 1.1(oo) | 11 |
| TBA | § 1.1(pp) | 11 |
| Termination Date | § 3.1 | 16 |
| Transfer | § 21.1(a) | 66 |

vi.

6971a/12-04-90

BK 1240 PG 0098

| | Section | Page |
|---|---|---|
| Transferee | § 21.1(c) | 66 |
| Transferor | § 21.1(b) | 66 |
| Truck Facilities | § 1.1(qq) | 11 |
| Trust | § 21.1(d) | 69 |
| Vesting Date | § 25.18 | 79 |
| Woolworth | Recitals–¶ E | 2 |
| Woolworth Building | Recitals–¶ E | 2 |
| Woolworth Leasehold Parcel | Recitals–¶ E | 2 |
| Work | § 1.1(rr) | 11 |

6971a/12-04-90

BK 1240 PG 0099

CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT
CONCORD MALL, NEW CASTLE COUNTY, DELAWARE

THIS CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT
("Agreement"), made as of the 21st day of December, 1990, by and between
CONCORD MALL ("Developer"), a Delaware general partnership, composed of JMB
GROUP TRUST III, an Illinois trust, and CONCORD MALL TRUST, an Illinois trust,
having its principal offices at c/o JMB Institutional Realty Corporation,
900 North Michigan Avenue, Chicago, Illinois 60611-1575, and SEARS, ROEBUCK
AND CO. ("Sears"), a New York corporation, having its principal offices at
Sears Tower, Chicago, Illinois 60684. Developer and Sears are each sometimes
called "Party" and sometimes collectively called "Parties".

## RECITAL OF FACTS

A.    Developer is the owner in fee of a certain parcel of real
property containing approximately 58.95 acres located in the County of New
Castle, State of Delaware, which parcel is described in Part I of the attached
Exhibit "A" and delineated upon the Plot Plan attached as Exhibit "B" (the
"Developer Parcel") upon which certain retail and office facilities have been
constructed.

B.    Contemporaneously herewith, Developer and Sears have entered
into that certain purchase and sale agreement ("Purchase Agreement"), dated
December 21, 1990, pursuant to which Developer shall convey to Sears by
special warranty deed a parcel of land containing approximately 2.34 acres
located in the County of New Castle, State of Delaware, which parcel of land
is described in Part II of Exhibit "A" and delineated upon Exhibit "B" (the
"Sears Parcel").

C.    Boscov's Department Stores, Inc., a Pennsylvania corporation
("Boscov"), as successor of interest to Alstores Realty Corporation, a
Delaware corporation ("Allied"), holds a leasehold interest in a parcel of
land located in the County of New Castle, State of Delaware (the "Boscov
Leasehold Parcel"), on which a two-level retail department store facility
containing approximately 175,000 square feet (the "Boscov Building") has been
constructed. The Boscov Leasehold Parcel is a part of the Developer Parcel
and is described in Part III of Exhibit "A" and delineated upon Exhibit "B".

D.    Strawbridge & Clothier, a Pennsylvania corporation
("Strawbridge"), holds a leasehold interest in a parcel of land located in the
County of New Castle, State of Delaware (the "Strawbridge Leasehold Parcel"),
on which a two-level retail department store facility containing approximately
150,000 square feet (the "Strawbridge Building") has been constructed. The
Strawbridge Leasehold Parcel is a part of the Developer Parcel and is
described in Part IV of Exhibit "A" and delineated upon Exhibit "B".

3889a/12-04-90

BK 1240 PG 0100

E.   F.W. Woolworth Co., a New York corporation ("Woolworth"), holds
a leasehold interest in a one-level retail department store facility
containing approximately 50,000 square feet (the "Woolworth Building") located
on a parcel of land located in the County of New Castle, State of Delaware
(the "Woolworth Leasehold Parcel"). The Woolworth Leasehold Parcel is a part
of the Developer Parcel and is delineated upon Exhibit "B".

F.   Developer has heretofore entered into (i) an Operating,
Construction and Reciprocal Easement Agreement dated July 23, 1970, with
Allied and Pomeroy's Department Stores, Inc., a Pennsylvania corporation, in
connection with the development of the Shopping Center Site, including,
without limitation, the Developer Parcel and Sears Parcel, which agreement was
recorded in Deed Record E, Volume 84, Page 882, of the Official Records of New
Castle County, Delaware (such agreement as heretofore amended and assigned is
hereinafter referred to as the "Boscov REA"), and (ii) a Construction,
Operation and Reciprocal Easement Agreement, dated November 25, 1981, with
Strawbridge in connection with the further development of the Shopping Center
Site, including, without limitation, the Developer Parcel and Sears Parcel,
which agreement was recorded on December 17, 1981, in Deed Record B,
Volume 117, Page 285, of the Official Records of New Castle County, Delaware
(such agreement as heretofore amended and assigned is hereinafter referred to
as the "Strawbridge REA").

G.   The Parties desire to make an integrated use of the parcels of
land owned by them and to develop and improve the Developer Parcel, and Sears
Parcel, as more particularly set forth herein, which Parcels are collectively
described in Part VI of Exhibit "A" (said Parcels being sometimes collectively
called the "Shopping Center Site"), as a regional shopping center known as
"Concord Mall" (sometimes called the "Shopping Center").

H.   Sears intends to construct and "Operate" (as hereinafter
defined) as a part of the Shopping Center, a two-level retail department store
facility (called the "Sears Building") and to construct as part of the Sears
Building, an attached tire, battery and accessory facility (called the "Sears
TBA"), containing in the aggregate approximately 174,000 square feet. The
Sears Building and the Sears TBA (collectively, the "Sears Improvements"),
shall be located within the "Permissible Building Area" (as hereinafter
defined) on the Sears Parcel as shown on Exhibit "B".

I.   Developer intends to renovate and refurbish the "Mall" and may
construct a second level to the existing Mall and "Mall Stores" (as such terms
are hereinafter defined) pursuant to Section 5.1 hereof. Developer also may,
at its option, desire to further expand the Shopping Center in the future (the
"Future Department Store Building Expansion") to add an additional department
store or stores ("Future Department Stores") and add additional Floor Area to
the then existing "Department Store Buildings" (as hereinafter defined). The
Future Department Stores shall be constructed within the areas so designated
on Exhibit "B" in accordance with the provisions of Article XXIV herein.

2.

3889a/12-04-90

BK 1240 PG 0101

J.   The Parties each desire to grant to each other certain rights, privileges and easements and to impose certain restrictions and covenants upon their respective Parcels for the benefit of the respective Parcel of the other Party as hereinafter set forth.

K.   The Parties intend to set forth in this Agreement their rights, obligations, duties and responsibilities in connection with the development and use of, and the buildings and operations on, the Shopping Center Site, and to make other covenants and agreements with each other as more specifically set forth.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants contained herein and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1   Terms Defined.  As used in this Agreement, the following terms shall have the following respective meanings:

(a)  "Access Roads" means those strips of land which are shown on Exhibit "B" as shaded roadways to provide passage by motor vehicles (passenger and truck) and pedestrians between each Parcel in the Shopping Center Site and to the public roads and highways abutting the Shopping Center Site, subject to relocation in connection with the future expansion contemplated under Article XXIV hereof.

(b)  "Accounting Period", as to Sears, means any period commencing January 1 and ending on the next following December 31, except that the first Accounting Period shall commence as to Sears on the date Sears shall initially open for business with the general public on its Parcel, but not earlier than the date on which Developer actually commences to perform maintenance of the Common Area located on the Sears Parcel or the Sears Parking Area in accordance with Section 10.1(a), and shall end on and include the next following December 31, and as to Sears, its last Accounting Period shall end on the last day that Developer performs such maintenance of the Common Area located on the Sears Parcel and the Sears Parking Area.

(c)  "Allocable Share" means that part of any cost which under this Agreement is allocable to Sears and that is to be computed by multiplying such costs by a fraction, the numerator of which shall be the number of square feet of Floor Area in the Sears Parcel and the denominator of which shall be the number of square feet of Floor Area in the Shopping Center Site including the Sears Parcel.

(d)  "Anchor" means a retail department store, retail specialty store or clothing and accessory store such as Nordstrom, Saks Fifth Avenue, Dillards, J.C. Penney, Lord & Taylor, Macy's, Neiman Marcus, Wanamaker, Hechts, Hess, Bergdorf Goodman and any other similar retail department store, retail specialty store, or clothing and accessory store containing at least 70,000 square feet of Floor Area.

BK 1240 PG 0102

(e) "Commence Construction" and "Commencement of Construction" mean
with respect to the Sears Building, pouring of the footings and foundations
therefor; and with respect to any other "Work" (as hereinafter defined)
(including but not limited to portions of the Work referred to in Article II)
and with respect to to any Future Department Store Building Expansion, the
initial performance of physical construction under an agreement which provides
for such Work to be done.

(f) "Common Area" means all of those portions of the Shopping Center
Site that are intended to be and will be available from time to time for the
general non-exclusive use of the Parties and their "Permittees" (as
hereinafter defined). Common Area shall include, without limiting the
generality of the foregoing, the "Parking Area", the Mall, the "Pedestrian
Bridges", the "Common Utility Facilities" (as such terms are hereinafter
defined), sidewalks, walkways and curbs, "Perimeter Sidewalks" (as hereinafter
defined), public escalators, restrooms not located on the premises of any
"Occupant" (as hereinafter defined), planted areas, bus stops, those public
stairs and public service corridors which are required by fire codes or
governmental regulations or required for public protection or safety, Common
Area management and maintenance offices and rooms and equipment sheds (which
offices, rooms and equipment sheds shall not in the aggregate exceed 10,000
square feet of floor space which is to be measured as if it were "Floor Area"
(as hereinafter defined); excepting and excluding, however, from Common Area,
any of the foregoing within the Sears Building or the Department Store
Buildings. The Common Area shall not include the Sears TBA nor the adjacent
apron used by Sears in connection with Sears TBA, or "Truck Facilities" (as
hereinafter defined), except roadways and retaining walls leading into Truck
Facilities, and shall not include Floor Area.

(g) "Common Area Maintenance Cost" means the total of all monies
paid out that are applicable to an Accounting Period for reasonable costs (net
of any income derived from any charges for use of any Common Area, whether or
not such charges are permitted hereunder, except any such income that is
received by and used by the Promotional Services Program for promotional
services) directly relating to the Operation, policing, management,
maintenance and repair of the Common Area. Any portion or portions of the
Common Area Maintenance Cost relating to a period of time only part of which
is included within an Accounting Period of Sears shall be prorated on a daily
basis as to Sears.

Common Area Maintenance Cost shall include, without limitation, the
reasonable expenses under generally accepted accounting principles,
consistently applied, paid out for the following:

(i) maintenance, repair, replacement and reconstruction work
(hereinafter collectively called "maintenance") required with respect to the
Common Area in accordance with Section 10.1;

4.

3889a/12-04-90

(ii)  the straight-line depreciation of all capital items of equipment used in the Operation, maintenance, repair or management of the Common Area, including interest expense at the rate equal to the "Prime Rate" (as defined in Section 25.2) plus two percent (2%) and such interest shall be deemed to be additional Common Area Maintenance Cost as of December 31st on the undepreciated balance of all capital items of equipment used exclusively in the Operation and maintenance, repair and management of the Common Area;

(iii)  maintenance of all items of equipment used in the Operation, maintenance, repair or management of the Common Area;

(iv)  rental for equipment used in the Operation, maintenance, repair or management of the Common Area;

(v)  the small tools and supplies and other non-capital items of equipment used in the Operation, maintenance, repair or management of the Common Area;

(vi)  traffic direction, control and regulation of the Shopping Center Site;

(vii)  cleaning or removal of rubbish, dirt and debris from the Common Area;

(viii)  landscape replacement or maintenance and supplies incident thereto including, without limitation, landscaping between a building and the Perimeter Sidewalk;

(ix)  preserving, maintaining, repairing and replacing the Parking Area (including, without limitation, the sealing of the Parking Area, the repair of potholes, the restriping, and the maintenance and repair of lighting fixtures in the Parking Area);

(x)  public utility services (when all of the Occupants that have a common meter are open) and light bulb replacement;

(xi)  premiums on fire, extended coverage and vandalism insurance on equipment used in the maintenance of the Common Area improvements and equipment provided that the Parties have approved the insurer, the insurance policy and premium, which approval shall not be unreasonably withheld; and

(xii)  charges for indirect costs for Developer in supervision of the Common Area (including, hut not limited to, the cost of the operation of any office and accounting service), if any, in accordance with the Supplemental Agreement.

Common Area Maintenance Cost shall specifically exclude the following:

(i)  costs of Operation, maintenance and repair of the Mall;

(ii)  compensation of home office executives, including, but not limited to, general overhead expense (except as the same are included in the indirect costs of Developer set forth in subsection (xii) above);

(iii)  debt service, interest, capital costs, amortization and depreciation (except depreciation of equipment used in the Operation, maintenance or repair of the Common Area, provided that said equipment shall be used exclusively on the Shopping Center Site, and further provided that any equipment located in Developer's home office shall not be included);

3889a/12-04-90

5.

BK 1 2 4 0 PG 0 1 0 4

(iv)  real estate and personal property taxes except personal
property taxes levied and accrued against items of equipment used exclusively
in the Operation and maintenance of the Common Area;

(v)  matters covered by Sections 14.2 and 15.1;

(vi)  initial construction and installation costs; and

(vii)  the costs of initial construction and installation clean-up
(each Party agreeing to conduct, at its sole cost and expense, an initial
clean-up on its Parcel with respect to the construction and installation
performed by such Party on its Parcel).

(h)  "Common Utility Facilities" means storm drainage facilities,
detention and/or retention ponds, sanitary sewer systems, gas lines, water
lines and systems, fire protection installations, underground (or above
ground, if any) power and telephone cables, and line and cable television
systems for security purposes and cable television reception, if any, and
other forms of energy, signals or services that are available for service to
and use by the Parties (including, without limitation, Developer's lessees),
provided the Parties consent thereto, which facilities are located on or off
the Shopping Center Site, for their respective improvements and/or the Common
Area; excluding, however, (i) those facilities, if any, that are available
only for the exclusive use of the "Department Store Buildings", "Department
Store Improvements" or "Developer Improvements" (as such terms are hereinafter
defined), and (ii) those facilities between five (5) feet from the building
line of any Department Store Buildings or Developer Improvements and such
Department Store Building or Developer Improvements, which facilities shall be
deemed, for the purpose of maintenance, repair, "Rebuilding" (as hereinafter
defined) and insurance, to be part of such Department Store Building or
Developer Improvements.

(i)  "Condemnation", "Condemn" or "Condemned" means the taking of any
portion of the Shopping Center Site pursuant to an exercise of the power of
eminent domain or any conveyance in lieu of condemnation under a threat
thereof to a purchaser having the power of condemnation with respect to the
property in question. "Condemnation" also means a requisitioning by military
or other public authority for any purpose arising out of a temporary emergency
or other temporary circumstance. "Condemnation" also means any inverse
condemnation which results by reason of actions of a public authority as
determined by a court of competent jurisdiction.

(j)  "Court" means those portions of the Mall on each level thereof
abutting the entrance from any Department Store Building to the Mall, as
delineated on Exhibit "B".

(k)  "Department Store(s)" means any retail store(s) in the Shopping
Center Site of at least 70,000 square feet of Floor Area containing a number
of departments for the sale of men's, women's and children's clothing and
accessories and other related goods, merchandise and services commonly sold in
retail department stores, which may but need not include automotive supplies
and services, and shall also mean the operator(s) of said retail store.

6.

BK 1240 PG 0105

(1) "Department Store Building(s)" means, individually and collectively, the Woolworth Building, the Sears Building, the Strawbridge Building, the Boscov Building, and any other building constructed on the Shopping Center Site and "Operated" (as hereinafter defined) as a Department Store.

(m) "Department Store Improvement(s)" means, individually and collectively, the Department Store Buildings and those portions of the Common Area situated on the Department Store Building fee or leasehold parcels.

(n) "Developer Improvements" means the Department Store Buildings located on the Developer Parcel, the Mall Stores, the Mall and those other portions of the Common Area situated on the Developer Parcel.

(o) "Developer Work" means all Work to be performed by Developer pursuant to this Agreement, including, without limitation, the "Developer Sears Parcel Work" and the "Developer Mall Work" (as such terms are hereinafter defined).

(p) "Floor Area" means the total number of square feet of floor space on all levels or floors at the time of the determination thereof contained within a building and located on the Shopping Center Site, bounded by the exterior facade of the exterior walls of any such building (except party walls as to which the centers thereof, instead of the exterior faces thereof, shall be used). Floor Area shall include, without limitation, basement space, balcony and mezzanine space (other than additional space created by fixture installations designed to increase the usability of space exclusively for stock or storage purposes), and space occupied by walls, columns, elevators, dumb-waiters, stairs, escalators, conveyors or other interior construction and equipment, except as excluded below. Floor Area shall not include space within the Mall (other than areas occupied by kiosks located within the Mall) or other Common Area nor Truck Facilities, nor electrical, mechanical or computer equipment penthouses and rooms for so long as such penthouses and rooms are used to contain only mechanical, electrical or computer equipment, or all three, nor space utilized for electrical, telephone, telemetric and/or communication equipment and mechanical equipment used to service the Mall (including, without limitation, elevators and escalators), penthouses or pits, nor transformer rooms or vaults (while used for such purpose), nor rubbish rooms (while used for the storage, baling and/or compacting of trash and rubbish), nor service corridors, nor emergency exit corridors or stairs between fire resistant walls required by applicable building codes and not contained within any area exclusively appropriated for the use by any single Occupant, nor "Outdoor Selling Area" (as hereinafter defined) (provided, however, that nothing herein shall be deemed to restrict the right of the Occupant of the Boscov Leasehold Parcel to use the Outdoor Selling Area on said Parcel identified on Exhibit "B" hereto as a garden shop), nor any space within Department Store Buildings or any buildings used exclusively for the purposes of Common Area management and/or maintenance offices, rooms and equipment sheds, not to exceed 10,000 square feet in the

BK 1240 PG 0106

aggregate (which is to be measured as if it were Floor Area). Upon the completion of its construction, Sears shall cause its architect to certify the number of square feet of initially or subsequently constructed Floor Area on its Parcel to the Developer.

(q) "Future Expansion Area" means the portion of the Developer Parcel designated as the "Future Expansion Area" on Exhibit "B" hereto.

(r) "Lease" means any lease or other instrument or arrangement whereunder an Occupant has acquired legal status, rights or privileges with respect to the use and occupancy of any Floor Area.

(s) "Major Casualty" means a fire or other casualty which costs more to restore than twenty percent (20%) of the then replacement cost of the Mall and Mall Stores if the Mall and Mall Stores are damaged or destroyed or the Sears Building if the Sears Building is damaged or destroyed.

(t) "Mall" means the one or two level mall structure and related improvements constructed or to be constructed upon the Developer Parcel within the area designated "Mall" on Exhibit "B", including, without limitation, that portion between each of the Department Store Buildings. The Mall shall not include those areas occupied by Floor Area. Further, the Mall may include an area located as shown on Exhibit "B" as the seating area for a "Food Court" for the Permittees of food service operations.

(u) "Mall Store(s)" means the individual retail stores (other than Department Stores and Non-Mall Stores) to be leased to and Operated by Occupants of the Shopping Center.

(v) "Mortgagee" means a mortgagee, trustee and beneficiary under any "Mortgage" (as hereinafter defined) on a Party's "Parcel" (as hereinafter defined) and to the extent applicable, and as hereinafter provided, shall include a fee owner of any Party's Parcel which is the subject of a lease under which any Party becomes a lessee in a sale and leaseback transaction. "Mortgage" means any first mortgage or first deed of trust, and, to the extent applicable, a sale and leaseback transaction, and shall include, without limitation, the Mortgage of any Department Store Buildings and/or Department Store Improvements and/or Lease. The term "Mortgagee" shall not refer to any of the foregoing Persons when in possession of any Parcel of any Party or the Parcel of the lessee of any Party.

(w) "Necessary Department Store(s)" means individually and collectively, Sears, Strawbridge and Boscov.

(x) "Necessary Mall Stores" means the Mall Stores located between the Sears Building and the Boscov Building.

(y) "Non-Mall Store Buildings" means the buildings located on the Shopping Center Site which do not abut the Mall or are designated on Exhibit "B" as "Non-Mall Stores", as the same may exist from time to time, including any replacements thereof.

8.

3889a/12-04-90

BK1240PG0107

(z)  "Occupant(s)" means any of the Parties, and Developer lessees
including, without limitation, Boscov, Strawbridge and Woolworth to the extent
that the Occupant occupies Floor Area, and any other Person that from time to
time is entitled to the use and occupancy of Floor Area.

(aa) "Opening Date" means October 7, 1992; provided, however, in the
event that Developer shall not have satisfied the requirements set forth in
Section 2.3 within the time periods specified therein, the Opening Date may be
postponed at Sears election by a period equal to the number of days commencing
on the date any such requirement was to have been satisfied, up to and
including the date Developer has satisfied such requirement.  In the event
Sears elects to so postpone the Opening Date, Sears shall deliver written
notice to Developer at least sixty (60) days prior to the scheduled Opening
Date setting forth in reasonable detail the requirements which were not timely
satisfied by Developer and the postponed Opening Date.  Notwithstanding
anything to the contrary contained herein, in the event that the "Pad Work"
(as hereinafter defined) is not completed by Developer on or before
September 1, 1991, Sears shall have the right, at any time thereafter, to
terminate this Agreement by delivering written notice to Developer, in which
event this Agreement shall be deemed terminated and the Parties shall have no
further rights or obligations with respect hereto; provided, however, that if
the Pad Work is completed by Developer prior to the date Sears delivers the
termination notice, Sears shall not have the right to terminate this Agreement
and the Parties shall proceed in accordance with the terms of this Agreement.

(bb) "Operate", "Operating", or "Operation" means: (i) with respect
to Sears, that the "Sears Minimum Floor Area" (as hereinafter defined) is open
to the general public for business during its business hours in accordance
with Section 8.1(b) or shall be temporarily not so open for business by reason
of (A) any provision of Articles XVI or XIX, (B) restoration or reconstruction
of the Sears Building pursuant to the provisions of Article XIII, or (C) such
reasonable interruptions as are incidental to the conduct of its business;
(ii) with respect to Strawbridge, that the Strawbridge Department Store is
open to the general public for business during its business hours in
accordance with the Strawbridge REA or shall be temporarily not so open for
business by reason of (A) force majeure, (B) condemnation, (C) restoration or
reconstruction of the Strawbridge Building, or (D) such reasonable
interruptions as are incidental to the conduct of its business; (iii) with
respect to Boscov, that the Boscov Department Store is open to the general
public for business during its business hours in accordance with the Boscov
REA or shall be temporarily not so open for business by reason of (A) force
majeure, (B) condemnation, (C) restoration or reconstruction of the Boscov
Building, or (D) such reasonable interruptions as are incidental to the
conduct of its business; (iv) with respect to the Mall, that those portions of
the Mall which are required to be open pursuant to the terms of this Agreement
at the time in question are open to the public for business or shall be
temporarily not so open for business by reason of (A) any provision of

3889a/12-04-90

BK 1240 PG 0108

Articles XVI or XIX, (B) restoration or reconstruction pursuant to the
provisions of Article XIII, or (C) such reasonable interruptions as are
incidental to the Operation of the Mall; (v) with respect to the Common Area,
other than the Mall, that the Common Area is available for the uses
contemplated herein, subject to interruptions (A) contemplated by Articles XVI
and XIX, (B) due to restoration or reconstruction pursuant to the provisions
of Article XIII, or (C) such reasonable interruptions as are incidental to the
Operation of such Common Area; and (vi) with respect to the Mall Stores, that
the Mall Stores are open to the general public for business pursuant to their
leases or shall be temporarily not so open for business by reason of (A) force
majeure, (B) condemnation, (C) restoration or reconstruction, or (D) such
reasonable interruptions as are incidental to the conduct of their businesses.

(cc) "Operating Covenant" means the applicable one of the "Developer
Operating Covenant", the "Sears Operating Covenant", the "Strawbridge
Operating Covenant" and the "Boscov Operating Covenant", as such terms are
defined in Article VIII. Furthermore, if Developer receives the requisite
"Extended Covenant" from Sears as defined and provided for in Section 13.3,
then the "Sears Operating Covenant" shall also be deemed to include its
"Extended Covenant".

(dd) "Operating Covenant Standards" means the applicable one of the
"Developer Operating Covenant Standards" and the "Sears Operating Covenant
Standards", as such terms are defined in Article VIII.

(ee) "Outdoor Selling Area" means the space, not permanently and
fully enclosed and not containing either heating or cooling other than on a
temporary basis, within the Permissible Building Area. A decorative fence
surrounding all or part of the Permissible Building Area shall not be deemed,
for purposes of this Agreement, to render it permanently and fully enclosed.

(ff) "Parcel" means the applicable one of the Developer Parcel, the
Sears Parcel, the Strawbridge Leasehold Parcel, the Boscov Leasehold Parcel,
the Woolworth Leasehold Parcel, and any other areas of land on the Developer
Parcel upon which any Future Department Stores shall be constructed.

(gg) "Parking and Access Easement Declaration" means that certain
declaration made by Developer, captioned "PARKING AND ACCESS EASEMENT
DECLARATION", dated August 29, 1990, as recorded in the official records of
New Castle County, Delaware, Deed Record Book 1085, Page 223, on September 24,
1990, granting certain non-exclusive easements for the parking of vehicles and
for vehicular and pedestrian access to the Sears Parcel and the Developer
Parcel and Concord Pike (U.S. Highway 202).

(hh) "Parking Area" means all portions of the Common Area shown as
such on Exhibit "B" to be used for the passage and parking of motor vehicles,
and shall include all parking levels of any parking structure, the Access
Roads, and all other roadways, walkways, sidewalks, traffic lanes, vehicular
parking spaces, and any other portion or portions of the Common Area within
the Shopping Center Site which shall be improved in order that motor vehicles
may be driven thereon or Permittees may walk thereon, but in each case only to

10.

BK 1240 PG 0109

the face of the outer curb of the Perimeter Sidewalk around and adjacent to the Mall and Mall Stores and the Department Store Buildings, excepting and excluding from Parking Area, however:

(i) areas occupied or intended to be occupied by improvements containing Floor Area (but as to areas intended so to be occupied, this exception shall be applicable only after such area ceases to be usable for parking in anticipation of such occupancy);

(ii) Perimeter Sidewalks;

(iii) Outdoor Selling Area;

(iv) all Truck Facilities; and

(v) the Mall.

(ii) "Perimeter Sidewalk(s)" means the sidewalks, excluding curbs, along any perimeter of the Mall and Mall Stores and the Department Store Buildings.

(jj) "Permissible Building Area(s)" means the land shown on Exhibit "B" within the Shopping Center Site upon which a Department Store Building is Operating or may be constructed and/or Operated, or upon which the Mall or a Mall Store is Operating or may be constructed and/or Operated, as provided in this Agreement.

(kk) "Permittee(s)" means the officers, directors, employees, agents, contractors, subcontractors, patrons, customers, visitors, invitees, licensees and concessionaires of the respective Parties and of each Occupant.

(ll) "Person(s)" means individual(s), partnership(s), firm(s), association(s) and corporation(s), or any other form of legal entity.

(mm) "Rebuilding Completion Period" means the period of time reasonably estimated by Developer or Sears to rebuild the applicable portion of the Mall and Mall Stores or the Sears Building, respectively, in the event of a Major Casualty.

(nn) "Sears Parking Area" means the Parking Area designated on Exhibit "B" as the "Sears Parking Area" for the non-exclusive use by Sears and its Permittees for parking and passage of motor vehicles.

(oo) "Supplemental Agreement" means the unrecorded agreement entered into concurrently herewith between Developer and Sears setting forth Sears share of the "Cost of Developer Sears Parcel Work" (as hereinafter defined) and describing certain other rights and obligations of the Parties.

(pp) "TBA" refers to the building, if any, adjacent to, contiguous to or a part of a Department Store Building and intended to be constructed and used for the sale of automobile tires, batteries and accessories, servicing and minor repair of motor vehicles (exclusive of body and fender repairs) and for the sale of merchandise and services related thereto.

(qq) "Truck Facilities" means truck court and docks and ramps contiguous thereto, areas for truck loading and unloading, all as shown on Exhibit "B".

(rr) "Work" means the "Sears Work" (as hereinafter defined) and the Developer Work, collectively, and any portion or portions thereof.

3889a/12-04-90

BK 1240 PG 0110

Section 1.2    Additions or Replacements.  Any reference in any
defined term in this Agreement to any construction or improvement whatsoever
shall be deemed to also refer to any expansion, alterations, reconstruction or
replacement thereof pursuant to this Agreement, unless the express language of
such reference shall otherwise indicate.

## ARTICLE II
### PRELIMINARY SITEWORK, CONSTRUCTION OF COMMON AREA ADDITIONS,
### AND CONNECTION OF SEARS BUILDING TO MALL

Section 2.1    Definitions.

(a)  The term "Developer Sears Parcel Work" means all of the
following items on or off the Shopping Center Site, relating to the
preparation of the Sears Parcel for construction by Sears of the Sears
Building and the construction of the Sears Parking Area by Developer, which
are set forth, specified or depicted in the "Plans" (as hereinafter defined)
and as expressly approved by the Parties as being a portion of the Developer
Sears Parcel Work covered by this Agreement:

(i)  Soil analysis, including borings, laboratory reports,
engineering surveys and a corrosivity test as needed for preparation of the
Sears Parcel and the Sears Parking Area;

(ii)  Demolition of existing improvements on and site clearance for
the Sears Parcel and the Sears Parking Area;

(iii)  Any necessary rough grading and rough excavation of the Sears
Parcel and the Sears Parking Area;

(iv)  Collection and disposal of water to be drained from the Sears
Parcel and the Sears Parking Area;

(v)  Necessary filling and finish grading of the Common Area
adjacent to the Sears Parcel and the Sears Parking Area;

(vi)  Necessary Parking Area paving and striping (exclusive of
Sears Truck Facilities);

(vii)  On and off-site traffic lights and traffic parking control
signs if necessary;

(viii)  Common Area curbing if necessary (exclusive of curbs
abutting Perimeter Sidewalks) and ramps, exclusive of any ramps servicing any
Sears Floor Area;

(ix)  Construction and installation of Common Utility Facilities to
within five (5) feet of the building walls of the Sears Building at points
approved and designated by Sears;

(x)  Installation of the expansion joints and flashings between
the Sears Building and the Mall; and

(xi)  Such other mutually approved items as are necessary and
commonly incidental to any of the foregoing.

The Developer Sears Parcel Work shall be performed in accordance with
the Concord Mall Sears Construction Standards – Company Owned General
Requirements – Minimum Site Requirements dated  September,      1990, which
standards have been exchanged and initialled by Developer and Sears and are

3BB9a/12-04-90

BK 1240 PG 0 1 1 1

incorporated herein by reference (the "Sears Construction Standards").  If, through no fault of Developer, following delivery of the Sears Parcel as set forth in Section 2.3 and following receipt by Sears of a certification in form reasonably acceptable to Sears from VanDemark & Lynch, Developer's project engineers, that the Sears Building Pad has been prepared in accordance with the Sears Construction Standards, any erosion or disintegration of such certified building pad occurs before or after Sears commences construction of the Sears Building or Sears TBA on the Sears Parcel, Sears shall bear the total cost and responsibility for restoration of such building pad to a condition suitable for construction.

(b)  The term "Cost of Developer Sears Parcel Work" means any and all of the following:

(i)  The actual costs and expenses of performance of the Developer Sears Parcel Work as set forth in this Section 2.1;

(ii)  The architectural-engineering-design service fees and charges for the Developer Sears Parcel Work;

(iii)  The total net cost of all casualty, public liability and builders risk insurance, if any, maintained during performance of the Developer Sears Parcel Work, without duplication for any such insurance required of any contractor performing the Developer Sears Parcel Work; and

(iv)  All sums paid and to be paid by the Parties to the County of New Castle and any agencies or autborities thereof, or to any other governmental bodies, agencies or authorities for the extension or installation (off the Shopping Center Site) of utility lines to provide services to the Sears Building and if necessary the Mall Stores and Department Store Buildings, including, without limitation, all sums paid to engineers and consultants in connection therewith.

Sears share of the Cost of Developer Sears Parcel Work shall be determined in accordance with the Supplemental Agreement.

(c)  The term "Plans" means the preliminary drawings and specifications, prepared in accordance with Section 2.2(a), which show the items set forth in Section 2.1(a) in connection with the Developer Sears Parcel Work, as well as the following items:

(i)  The location and the entrances to the Parking Area from the Sears Building and the Mall;

(ii)  The connections of tbe Mall with the Sears Building and the parking layout, landscaping and loading areas of the exterior Common Areas located on Parcel 1, as indicated on Exhibit "B" hereto; and

(iii)  The locations of fire corridors and service areas with respect to that portion of the Mall abutting the Sears Building.

The Plans shall be prepared as soon hereafter as is reasonably possible, but no later than February 1, 1991.  The Plans shall conform to the Sears Construction Standards and shall be submitted to Sears for informational purposes only, except as provided in Section 2.2(b) and as provided in the Sears Construction Standards, prior to the Commencement of Construction.

13.

3889a/12-04-90

BK 1240 PG 0112

Notwithstanding anything to the contrary contained herein, Sears shall have the right to reasonably disapprove the Plans if they fail to conform to the Sears Construction Standards. Any notice of disapproval is to be given by Sears within thirty (30) days after receipt of the Plans and shall set forth specifically the items disapproved and the reasons therefor. If disapproved by Sears, the Plans shall be revised by Developer to conform to the Sears Construction Standards.

Section 2.2   General Design Data.

(a)  In the preparation of all Plans provided for in this Article II for the Developer Sears Parcel Work and any additional plans for future development or changes in the Common Area, Developer shall cause its architect to take into account the facade of the Sears Building to which the connection to the Mall is to be made, the sheathing of any Mall columns adjacent to the Sears Building facade, and signing requirements of the Sears Building.

(b)  Certain aspects of the design of the Mall abutting the Sears Building are of concern to Sears and the Parties agree that the items described in subparagraph 2.1(c)(ii) above (the "Significant Design Components") shall be subject to the reasonable approval of Sears and, in addition, any proposed encroachment onto the Sears Parcel shall be subject to the approval of Sears in its sole discretion. Sears shall have thirty (30) days after receipt of such Plans to approve or disapprove in writing the Significant Design Components and any proposed encroachments onto the Sears Parcel, which approvals (which shall be subject to Section 4.13) shall be obtained prior to the Commencement of Construction of that portion of the Mall abutting the Sears Building. In its notice disapproving the Significant Design Components, or any portion thereof, Sears shall set forth specifically the items disapproved and its reasons therefor.

(c)  After the Significant Design Components are approved by Sears, Developer will submit to Sears one (1) set of working drawings and specifications (the "Developer Working Drawings and Specifications"), which will conform with the Plans, and which will incorporate the Significant Design Components as previously approved by Sears; provided that Sears shall have the right to reasonably disapprove such Developer Working Drawings and Specifications only if they fail to conform with the Plans or fail to incorporate the Significant Design Components as previously approved by Sears; such disapproval to be given by Sears to Developer within thirty (30) days after the receipt of such Developer Working Drawings and Specifications. Any such notice of disapproval from Sears shall set forth specifically the items disapproved and the reasons therefor. If disapproved by Sears, the Developer Working Drawings and Specifications shall be revised by Developer to conform with the Plans or to incorporate the Significant Design Components.

Section 2.3   Completion of the Developer Sears Parcel Work.

(a)  Subject to Section 16.1, the following completion dates shall apply to the various components of the Developer Sears Parcel Work:

14.

BK 1240 PG 0113

(i) The rough grading, necessary excavation and fill, compaction and general preparations of a building pad for the Sears Improvements (the "Pad Work") shall be completed on or before April 1, 1991;

(ii) The construction and installation of Common Utility Facilities to within five (5) feet of the Sears Improvements shall be completed by no later than one hundred and sixty (160) days prior to the Opening Date;

(iii) The necessary filling and finish grading, paving and striping of the Sears Parking Area shall be completed on or before thirty (30) days prior to the Opening Date; and

(iv) All other items of the Developer Sears Parcel Work shall be completed by no later than seven (7) days prior to the Opening Date or by any such earlier date as may be necessary for Sears to obtain a certificate of occupancy for the Sears Improvements by the Opening Date.

(b) Sears shall furnish to the Developer an estimation of the date on which Sears Department Store will open for business to the public (as provided in Section 8.1) at least one hundred eighty (180) days in advance of such estimated date. It is understood that in order for Developer to complete the Developer Sears Parcel Work as required by this Section 2.3 it is essential that upon reasonable request of Developer, Sears shall furnish Developer with such information regarding the Sears Parcel and proposed Sears Improvements as Developer needs to complete the Developer Sears Parcel Work, such as utility location and installation and Perimeter Sidewalk configuration.

Section 2.4    Administration of the Work. Developer shall provide efficient business administration of each contract for the Developer Sears Parcel Work, so that the Developer Sears Parcel Work shall be completed in accordance with the Sears Construction Standards and by the dates set forth in Section 2.3 hereof.

Any material changes in the previously submitted Plans which are governed by the Sears Construction Standards shall be submitted to Sears for its reasonable approval.

Section 2.5    Changes After Completion of Developer Sears Parcel Work. If, after any portion of the Developer Sears Parcel Work has been completed or partially completed on the Shopping Center Site in accordance with the Developer Working Drawings and Specifications, Sears desires to change the completed or partially completed Developer Sears Parcel Work, and provided such change ia approved in writing by Developer and all other Department Stores which have rights to approve the type of change proposed by Sears pursuant to the Leases of such Department Stores or pursuant to the Strawbridge REA or the Boscov REA, then Developer will provide Sears with an estimate of the cost of such change, and if Sears desires to proceed with such change, the cost of such change shall be borne by Sears and such other Department Stores, if any, jointly requesting such change together with Sears and shall not be included in the Cost of Developer Sears Parcel Work to be shared by the Parties. Nothing contained herein will cause any Person to be

3889a/12-04-90

BK 1240 PG 0114

obligated to share in the cost of any such changes solely as a result of such Person approving the changes requested. Any such material change shall be shown on the Plans and submitted to Sears for its approval only to the extent any approval rights are granted under Section 2.1(c). Developer shall use reasonable efforts to obtain the consent of any other Department Stores which have approval rights over the changes requested by Sears. Notwithstanding anything to the contrary contained in this Agreement, Sears shall not be entitled to delay the Opening Date due to any delays in completion of the Developer Sears Parcel Work caused by any changes requested by Sears pursuant to this Section 2.5 unless such delays are caused solely by Developer's default under this Agreement or by Developer's unreasonable delay in performing such Developer Sears Parcel Work.

Section 2.6    Additional Conditions to Performance. The time for Developer to proceed diligently with its construction of the building pad for the Sears Improvements and the Sears Parking Area, as well as that portion of the Mall abutting the Sears Building, shall be extended by any period or periods of delay as the result of any cause referred to in Section 16.1 hereof or delays pursuant to Section 2.5 hereof. In addition, if Sears has not completed its required construction following commencement of same (whether or not resulting from a cause referred in to said Section 16.1), then (unless the same is the result of Developer's failure to keep or perform its obligations under this Agreement) Developer shall not be obligated to proceed with construction of that portion of the Mall abutting and connecting to the Sears Building until a reasonable time after Sears is again proceeding diligently with the construction of the Sears Building.

ARTICLE III

TERMINATION

Section 3.1    Termination Date.

The term of this Agreement shall commence on the date hereof and shall terminate, in any event, if this Agreement is not sooner terminated as provided in this Agreement, on the date which is fifty (50) years after the date hereof (the "Termination Date").

Section 3.2    Termination. If this Agreement terminates as provided above, all rights and obligations under this Agreement of the Parties and benefits and burdens hereof appurtenant to the Parcels of the Parties shall cease, except as provided in this Section 3.2 and in Sections 3.3 and 4.11. In such event:

(i)    Developer shall have the right, at its own cost, to "Close-off" (as hereinafter defined) all or any portion(s) of its Parcel (other than the juncture point to the Access Roads or the Mall, except to the extent provided in Section 4.5 and Section 8.3(c)) from all or any portion(s) of the Sears Improvements; and

(ii)    If requested so to do by Developer, Sears shall so Close-off its Parcel, at its sole cost, if it is not observing or complying with the zoning or other applicable governmental rules, regulations, ordinances and

16.

BK 1240 PG 0115

laws (if any), as would be applicable thereto if such Parcel were separate and apart from the other Parcel and the buildings thereon were freestanding and such Parcel were not in any way connected with or related to the Shopping Center Site.

"Close-off", as used herein, means (to the extent not in violation of applicable law) (a) fencing off the applicable Parcel from the other Parcel, and (b) physically blocking all entrances and exits leading to and from the buildings on such Parcel or from the Mall; in each case, the same shall be done in a reasonably attractive and appropriate manner.

Section 3.3    Interest after Termination. Notwithstanding anything contained in this Article III, any interest (i.e., easement, license, right or other interest) of one Party in the Parcel of the other, which by this Agreement is to remain in effect following the Termination Date, either for a limited period thereafter or in perpetuity, shall remain in full force and effect in accordance with this Agreement.

Section 3.4    Consequences of Termination. Upon the occurrence of the Termination Date, then all rights, benefits, burdens and obligations created or imposed by this Agreement shall cease, except as provided in Sections 3.2, 3.3 and 4.11, and such termination shall not limit or affect any remedy at law, in equity or under this Agreement of either Party against the other Party with respect to any liability or obligation (including, without limitation, the obligation to pay costs or attorneys' fees) arising or to be performed under this Agreement prior to the Termination Date.

## ARTICLE IV

### GRANT OF EASEMENTS

Section 4.1    Definitions and Documentation. This Article IV sets forth the easements which the respective Parties hereby grant to each other, for the respective periods set forth with respect to each such easement. As used in this Article:

(a) A Party granting an easement is referred to as the "Grantor" thereof; it being intended that the grant shall thereby bind and include not only such Party but its successors and assigns as well; and

(b) A Party to which an easement is granted is referred to as the "Grantee" thereof, it being intended that the grant shall benefit and include not only such Party but its successors and assigns as well; and

As to easements herein granted:

(c) The grant of a particular easement by a Grantor shall bind and burden its respective Parcel which shall, for the purpose of this Article, be deemed to be a servient tenement, but where only a portion thereof is bound and burdened by the particular easement, only that portion thereof so bound and burdened shall be deemed to be the servient tenement; and

(d) The grant of a particular easement to a Grantee shall benefit its respective Parcel which shall, for the purpose of this Article, be deemed to be the dominant tenement, but where only a portion thereof is so benefitted, only that portion shall be deemed to be the dominant tenement, and

3889a/12-04-90

17.

BK 1240 PG 0116

(e) All easements granted in this Article IV shall exist by virtue
of this Agreement, without the necessity of confirmation by any other
document; and likewise, upon the extinguishment, expiration or termination of
any easement, in whole or in part, or its release in respect of all or any
portion of a Parcel pursuant hereto, the same shall be extinguished or
released or be deemed to have expired or terminated without the necessity of
confirmation by any other document. However, each Party will, as to any
easement(s), at the request of the other Party, upon the submission by the
requesting Party of an appropriate document in form and substance reasonably
acceptable to both Parties, execute and acknowledge such a document
memorializing the existence, or the extinguishment (in whole or in part), or
the release in respect of all or any portion of either Parcel, as the case may
be, of any easement; and

(f) All easements hereby granted are, unless limited herein,
non-exclusive and irrevocable; and

(g) All easements granted shall terminate upon the Termination Date
unless otherwise provided; and

(h) All provisions applicable to "easements" shall be similarly
applicable to "licenses" except for irrevocability which shall be applicable
to easements alone; and

(i) Nothing contained in this Article IV shall be deemed to require
Developer, by implication, to Operate the Mall or any portion of the Common
Area when or at such times as Developer is not specifically required to
Operate the Mall or the Common Area under this Agreement.

(j) The easements granted under this Article IV by Sears to
Developer shall be for the benefit of Developer and its lessees including,
without limitation, Boscov, Strawbridge and Woolworth; the easements granted
under this Article IV by Developer to Sears shall include that portion of the
easements directly benefiting Sears that were previously granted to Developer
by Boscov under the Boscov REA and by Strawbridge under the Strawbridge REA.

Section 4.2    Temporary License to Perform the Work and Future
Department Store Building Expansion.

(a) During the period of the performance by Developer of the
Developer Work or any Future Department Store Building Expansion, Sears hereby
grants Developer and its architects, contractors, subcontractors, materialmen
and others engaged in performing the Developer Work or any Future Department
Store Building Expansion, temporary non-exclusive licenses to enter upon the
Sears Parcel (except for those areas on the Sears Parcel used as staging or
storage areas) for the purpose of engaging in necessary activities connected
with the performance of the Developer Work or connected with such Future
Department Store Building Expansion, each such license to terminate when the
activities giving rise to such license are completed, but in no event beyond
the time when it is needed under good construction practice. The licenses
granted by this Section 4.2(a) shall not permit the use of any portion of the
Sears Parcel upon which a building or other improvement is located or is to be

18.

3889a/12-04-90

located if construction or use, as the case may be, of such building would thereby be interfered with or delayed. The temporary non-exclusive licenses referred to in this Section shall be deemed to be coupled with an interest.

(b) During the period of the performance by Sears of the Sears Work, Developer grants to Sears and its architects, contractors, subcontractors, materialmen and others engaged in performing the Sears Work a temporary non-exclusive license to use portions of the Developer Parcel (except for those areas on the Developer Parcel used as staging or storage areas and except for the Mall Stores and the Department Store Buildings), as and to the extent necessary for the purpose of performing the Sears Work; provided that such license shall not interfere with the day to day operations of the Shopping Center and shall end when the Sears Work shall be completed, but shall not extend beyond the time when it is needed under good construction practice.

Section 4.3    Temporary Licenses for Construction. During the period of construction described in Section 4.2, and during the period of any other "Construction" (as such term is defined in Section 7.1) on the Shopping Center Site, each Party grants to the other temporary non-exclusive licenses, to be used for so long as reasonably necessary in the performance of such Construction:

(a) To use roads designated by Developer, constituting part of the Common Area, to provide access for all personnel, equipment, supplies and like matters to and from the site of the particular Construction, to the extent reasonably necessary; and

(b) To use, notwithstanding anything to the contrary in this Agreement contained, such parts of the Parking Area on the Parcel where the Construction is being done as may reasonably be needed for access to the work site and/or storage and shack sites and location of such other materials as are needed in doing such Construction. Any Grantee enjoying such license shall be deemed to be bound by Section 7.1 with respect to that portion of the Parcel of the other Party so used. Any Grantor shall have the right to redesignate an area if it is reasonably required in order for the Grantee to complete its required Construction. Upon completion of any Construction as to which a temporary license was enjoyed, the Grantee shall promptly, at its own cost, repair and/or restore any damage done and leave such area affected free and clear of all loose dirt, debris and construction materials and at the original grade. The licenses granted in this Section 4.3 shall not permit the use of any portion of any Parcel upon which portion a building is located or to be located if the Operation or Construction of such building would thereby be adversely and materially interfered with or delayed. The temporary non-exclusive licenses referred to in this Section shall be deemed to be coupled with an interest. If either Party enters the building(s) of the other Party, it shall take all protective measures required by the Occupant of the building (including, without limitation, Mall Stores and Department Store Buildings of Developer lessees).

BK 1240 PG 0118

Section 4.4    Easements for Use of Common Area.  In addition to the easements relating to the use of Common Area as set forth in the Parking and Access Easement Declaration, which agreement is incorporated herein by reference and made a part hereof, and to the extent applicable to Sears:

(a)  Commencing upon the Opening Date and ending as provided by subparagraph (c) of this Section 4.4, each Party hereto grants to the other Party hereto the following easements relating to the use of each portion of the Common Area constructed on each Party's Parcel (other than the Mall, as to which Section 4.5 shall be controlling, and Common Utility Facilities, as to which Section 4.10 shall be controlling) for its respective intended purpose, such easements to be for the use of the Grantee thereof and its Permittees:

(i)  easements to use the respective Parking Area (except the landscaped or planted portions thereof) for the parking and passage of passenger motor vehicles; notwithstanding the foregoing, such easements shall be deemed to include the use of the Parking Area (except the landscaped or planted portions thereof) for the passage of trucks for delivery purposes so long as there is not unreasonable interference with customer and employee parking;

(ii)  easements to use the respective Parking Area for the passage by pedestrians;

(iii)  easements to use the Access Roads to provide passage by motor vehicles (passenger and truck) and pedestrians between each Parcel in the Shopping Center Site and to the public roads and highways abutting the Shopping Center Site; and.

(iv)  easements to use the various walkways and all other portions of the Common Area for the general use, comfort and convenience of the Grantee, the Grantor and the Permittees of either.

(b)  The easements granted by this Section 4.4 are subject in each case to the rights to use the Common Area for other purposes specifically provided in this Agreement, and the rights, if any, of each Grantor to change and relocate portions of the Common Area to the extent provided in this Agreement.

(c)  Except as provided in the Parking and Access Easement Declaration, the easements granted by this Section 4.4 shall terminate and expire on the Termination Date.

(d)  Notwithstanding anything to the contrary contained in the Parking and Access Easement Declaration:

(i)  Developer shall not take any action pursuant to Paragraphs 2(c), 3(c) and 6(a) of the Parking and Access Easement Declaration without the prior written consent of Sears;

(ii)  Sears access to and from the Sears Parcel and to and from Concord Pike (Highway 202) shall not be impeded except as permitted under this Agreement; and

3889a/12-04-90

BK 1240 PG 0119

(iii)    Developer shall deliver to Sears copies of any notices which Developer gives or receives pursuant to Paragraph 5 of the Parking and Access Easement Declaration.

Section 4.5    Easements to Open On and Use the Mall.

(a)    Commencing on completion of the construction of the Sears Building, Developer grants to Sears easements:

(i)    To have the Sears Building open on the first level of the Mall and, when and if there is a second level, on the second level of the Mall; and

(ii)    To use the Mall to provide access among the Department Store Buildings and between each of said Department Store Buildings and any other stores or buildings opening on each level of the Mall and to and from any outside exits on the Mall for the Grantee and its Permittees, in common with the Grantor and its Permittees.  These easements are subject to the right of Developer to relocate and expand various improvements in the Mall to the extent permitted in this Agreement, provided, however, the entrances thereto from the Sears Building as shown on Exhibit "B" shall remain the same, with access to and from each level of the Mall and the Sears Building being unimpeded except during the performance of any Construction.

(b)    The easements granted in this Section 4.5 shall terminate as to either Parcel as dominant tenement on the Termination Date.  Upon such termination, Developer shall have the right to Close-off the Court adjoining the Sears Building, provided that such Closing-off is not contrary to any governmental ordinance or regulation.  Developer shall have the right to perform alterations to the Mall as necessary to comply with any such ordinance or regulation.

Section 4.6    Easements for Protective Devices.  Developer grants to Sears easements, until the Termination Date, to install, maintain, repair, replace, use and operate in the Mall immediately outside of the Mall building wall of the Sears Building such protective devices and installations (herein called the "Devices") as may be necessary or appropriate to permit Sears to obtain a separate minimum rate for fire insurance for the Sears Building.  The Devices may include, without limitation, smoke curtains, detectors and water deluge systems.  Prior to the installation thereof, the type, design and location of the Devices shall be subject to the approval of Developer, which approval shall not be unreasonably withheld.  Developer agrees to give adequate notice to Sears of its construction schedule for that portion of the Mall abutting the Sears Building so as to give Sears sufficient time to install the Devices in accordance with Section 7.1 and Sears may install the Devices as part of said Construction of the portion of the Mall adjacent to it.  All expenses incident to the exercise of these easements in respect of the Devices shall be borne solely by Sears and, to the extent that Sears shall exercise such easements, it shall indemnify and hold Developer and Developer's lessees, harmless from and against any and all claims, liabilities and demands of any nature whatsoever arising therefrom as provided in Article XV.  Any

BK 1240 PG 0120

maintenance or other work concerning the Devices done after initial
installation thereof by Sears shall be done in such manner as to minimize
interference with normal use of the Mall, and in accordance with good
construction practice.

Notwithstanding the foregoing, the easements granted in this
Section 4.6 shall terminate on such date that Sears no longer has easements
for access to and from the Mall as provided in Section 4.5, unless,
notwithstanding any termination of such access, 1) Developer continues to
Operate the Mall, 2) said easements continue to be required in connection with
the Devices for Sears to obtain or continue to obtain a separate minimum rate
for fire insurance for the Sears Building, and 3) said easements do not
materially interfere with any use by Developer of the Developer Parcel.

Section 4.7    Easements to Perform Right of Self-Help.

(a)  Notwithstanding anything to the contrary contained in
Article XI, Sears grants to Developer and Developer grants to Sears and each
of its respective employees, agents and contractors, easements to enter upon
the Parcel of the Grantor, and into all improvements thereon, for the purpose
of performing an obligation which the Grantor is required to perform under
this Agreement, but fails or refuses to perform, and which the Grantee has the
right then so to perform under Section 11.1; but Grantee shall not have the
right to enter into any building containing Floor Area including, without
limitation, the Department Store Buildings and in exercising these easements
Grantee shall minimize, to the extent possible, any interference or
interruption of any business being conducted on the Parcel(s) in question.

(b)  The easement provided in this Section 4.7 shall terminate as to
any obligation to which the Grantee has the right of self-help pursuant to
Section 11.1 on the date that Grantee's right to perform terminates pursuant
to Section 11.1.

Section 4.8    Easement for Abutment of Mall.

(a)  Sears grants to Developer and Developer grants to Sears
perpetual easements to have the Mall abut and connect (but not to bear
structurally upon) the Sears Building, and to have the Sears Building abut and
connect to (but not to bear structurally upon) the Mall, but only to the
extent indicated on the "Developer Working Drawings and Specifications"
referred to in Section 2.2(c) and on the "Sears Basic Plans" referred to in
Section 6.1.

(b)  The easements provided in this Section 4.8 shall terminate if
and when:

(i)  The Mall is demolished or destroyed and Developer is not
obligated hereunder to replace it and does not replace it in the time
allocated in Article XIII, or

(ii)  The Sears Building is demolished or destroyed and Sears is
not obligated hereunder to replace it and does not replace it in the time
allotted in Article XIII.

22.

3889a/12-04-90

BK 1240 PG 0121

Section 4.9    Easements for Repair to Structure on Grantee's Parcel.

(a)  Developer grants to Sears and Sears grants to Developer easements for the purpose of maintaining, repairing or reconstructing any of the improvements (referred to as "Facilities") belonging to the Grantee located in such proximity to the Parcel of the Grantor that the Facilities can, as a practical matter, be so maintained, repaired or reconstructed most advantageously from the Parcel of the Grantor; such easements shall permit the Grantee and its employees, agents and contractors to enter upon and use the adjacent parts of the Grantor's Parcel to such extent, in such manner (including, without limitation, the erection of scaffolding) and for so long as is reasonably necessary to the accomplishment of the purpose therefor; provided, however, that no such Grantee shall have the right to enter into any building containing Floor Area; provided further, however, and on the condition that, such Grantee shall promptly restore the portion of the Grantor's Parcel and any Facilities thereon so used to the same or as good condition as existed immediately before such maintenance, repair and reconstruction was begun; and finally provided that no such use by such Grantee and no such scaffolding as may be erected by it shall interrupt the business being conducted on the Parcel so used or unreasonably interfere therewith, block any entrance to the Mall or the Department Store Buildings or the Sears Building, reduce the number of parking spaces below that required by this Agreement, or take place during the period from Thanksgiving Day to January 10th of the following year, except in an emergency.  Such Grantee covenants that it will defend, indemnify and save the Grantor and the Grantor's lessees, harmless from and against any and all claims, liabilities and demands of any nature whatsoever arising from injury or death to persons and/or damage to property on the Parcel of Grantee and/or Grantor growing out of or resulting from maintenance, repair or reconstruction done pursuant hereto, as and to the extent provided in Article XV in respect to the respective Parcels.

(b)  The easement provided in this Section 4.9 with respect to any servient tenement shall be perpetual, except that it shall terminate at the election of Grantor as evidenced by written notice if, (i) on a date after which a retail Operation (being then no longer required to be Operated) is not being Operated on the Sears Parcel, (ii) any alteration or new construction is made to Grantee's Building or any other structure on Grantee's Parcel that causes the need for or any exercise of the Section 4.9 easements to be substantially more onerous on the Grantor than it was prior thereto or (iii) Grantee has failed to "Rebuild" (as hereinafter defined) if required under this Agreement.

Section 4.10    Easement for Common Utility Facilities.  Each Party grants to the other Party the following perpetual easements in its Parcel for Common Utility Facilities and other utility facilities (the term "pipe" or

3889a/12-04-90

"pipes", as used in this Section, shall mean any and all pipes, lines, conduits, wires, cables, other means of providing utility facilities, as the context may require):

(a) Easements in the Parcel of the respective Grantor for the purpose of installing, using, operating, maintaining, repairing, relocating, replacing or enlarging any of the Common Utility Facilities; subject to Section 4.10(d). The location, relocation and/or enlargement of any such easement shall be subject to the prior approval of the respective Grantor, which approval shall not be unreasonably withheld or delayed.

(b) To the extent that alternate locations are not reasonably feasible, easements in the Parcel of the respective Grantor for the purpose of installing therein in the future other pipes, not part of the Common Utility Facilities as originally constructed, to provide gas, water, fire loops and hydrants therefor, electric power, other forms of energy, signal, telephone, sanitary sewer and storm sewer services, or any combination thereof, to or from any present or future facilities on the Parcel of the Grantee; subject to Section 4.10(d). The location of any such easement shall be subject to the prior approval of the respective Grantor, which approval shall not be unreasonably withheld or delayed.

(c) Easements in the Parcel of the respective Grantor for the purposes of connecting any and all of the pipes of the Common Utility Facilities, referred to in subparagraph (a) hereof, with any utility facilities on the Parcel of the Grantee to the extent that location thereon is necessary in the Grantee's reasonable judgment so to service such utility facilities, provided, however, that (except in the case of an emergency) the Grantor shall first give its written approval for such locations, such approval not to be unreasonably withheld and such approval not to include terms that would have the effect of materially and unreasonably increasing Grantee's cost of connection; and after any such connection, for the purpose of using, operating, maintaining, repairing, relocating, replacing and enlarging any or all of said pipes; subject to Section 4.10(d).

(d) For exercising the right granted in subparagraphs (a), (b) and (c) of this Section 4.10, each Grantee, and its respective employees, agents and contractors, shall have the right to enter upon and use the Parcel of each Grantor to such extent and so long as reasonably necessary to accomplish such purposes; subject to the following conditions:

(i) No fewer than twenty (20) days prior written notice shall be given to the Grantor that Grantee anticipates performing such activities, together with notification of the proposed nature, extent and location of such activities; and the anticipated date of start and completion of such activities; but if the activities involved are emergency repair work, only such advance notice, written or oral, as is reasonably practicable need be given;

24.

3889a/12-04-90

BK 1240 PG 0123

(ii) After the performance of such activities, the pipes in question shall be underground and not beneath or within the Grantor's curb line but in no event within five (5) feet of any actual or Permissible Building Area on the Grantor's Parcel provided, however, that this subparagraph (ii) shall not require the moving of any pipes theretofore installed not in violation of this Agreement, nor permit any such activities if as a result thereof a Party utilizing the Common Utility Facilities to provide utilities to improvements on its Parcel would be required to relocate any connection between any Common Utility Facilities and such improvements in order for such Party to continue to be able so to utilize the Common Utility Facilities therefor, or if its ability so to utilize the same is otherwise materially adversely affected, unless in any such latter case, the Party shall consent to such activities or the Grantee proposing to do such activities shall agree to pay all resulting costs of such Party (direct or indirect) upon the performance of such activities by such Grantee, and shall place the money therefor in escrow if reasonably required to do so by such Party;

(iii) Except for the initial installation of all Common Utility Facilities (which shall be installed as provided in Article II), such activities shall be performed by and at the sole cost of the Grantee undertaking the same and shall be performed in such a manner as not to cause any interruption of the business conducted on the Parcel of the Grantor and Grantee shall minimize any interference with Grantor's conduct of business or any unreasonable interruption in the services provided in the pipes servicing the Grantor's Parcel;

(iv) After the completion of such activities, the Grantee shall restore, at its own cost, the portion of the Parcel and improvements of the respective Grantor so used to the same or as good condition as existed immediately before the commencement of such activities; and

(v) To the extent that Grantee shall exercise such easements, it shall defend, indemnify and save the Grantor, and its lessees, successors and assigns harmless from and against any and all claims, liabilities and demands of any nature whatsoever arising from injury or death to persons and/or damage to property on the Parcel of Grantee and/or Grantor growing out of or resulting from Grantee's exercise of such easements as and to the extent provided in Article XV to the extent Grantor is not protected against said claims, liabilities and demands under the Common Area liability policy required by Section 14.2. The foregoing indemnity shall not apply, however, to any claims or liabilities arising from the willful act or the negligence of the Grantor, or its agents, servants or employees.

(e) The easements granted in subparagraphs (a), (b) and (c) of this Section 4.10 shall be exclusive insofar as they relate to pipes, not a Common Utility Facility, and non-exclusive insofar as they relate to Common Utility Facilities. To the extent that any such easement is exclusive, the Grantee

3889a/12-04-90

BK 1240 PG 0124

shall at all times perform all activities necessary to maintain the same and shall assume and pay all costs incurred in the maintenance, repair, replacement and/or enlargement thereof.

(f)  A Grantor shall have the right to relocate any pipes located on its own Parcel if reasonably deemed by the Grantor to be necessary to the enjoyment of its Parcel, if the Grantor complies with all of the conditions imposed upon Grantee by Section 4.10(d).

Section 4.11   Permanent Easements.  With respect to such of the foregoing easements as are in this Article IV declared to be "perpetual", each such easement shall, notwithstanding such characterization, expire, terminate and be extinguished in relation to a Grantee and such Grantee's Parcel (i) when such easement is not used for a continuous period of three (3) years by such Grantee, or those holding under or through such Grantee, or (ii) when all of the Parties agree that such easement will no longer be useful, or that the right to exercise the same in the future will no longer be valuable, to such Grantee, or those holding under such Grantee; provided, however, if the easement is not for a regular day-to-day use (i.e., an easement to maintain, or repair or replace), Grantor shall provide written notice to Grantee that Grantor believes that such non-regular easement will no longer be useful, or the right to exercise same will not be valuable to Grantee or those holding under Grantee.  If during  the forty-five (45) day period following receipt of such written notice, Grantee gives written notice to Grantor that said easement has not been abandoned, said easement shall not expire, terminate or otherwise be extinguished; provided that the notice from the Grantor, in order to be valid, must state the address to which notices to Grantor may be mailed and state that pursuant to this Section 4.11 such non-regular easement benefiting the recipient of such notice will terminate if said notice is delivered in compliance with Article XXII herein and Grantee fails to respond as provided herein.

An assertion by a Grantor that the easement in question has ceased, terminated or been extinguished in accordance with the foregoing paragraph shall be deemed to have been made when written notice to that effect, citing this Section 4.11, is given by the Grantor to and received by the Grantee in question; and such assertion shall be deemed to have been agreed to by such Grantee unless it shall, within forty-five (45) days thereafter, by notice to the Grantor as above provided, deny such assertion and give its reasons therefor.  Pending the resolution of such dispute the easement(s) in question shall be deemed to continue, and the dispute shall be resolved by judicial determination in litigation wherein the Grantor shall have the burden of proving the existence of condition (i) contained in the preceding paragraph of this Section 4.11.

Section 4.12   Easements for Public Authorities.  Each Party covenants with the other Party that it will grant to governmental or public authorities or any public utility companies having jurisdiction, easements in its Parcel, in accordance with Section 4.10 and in form acceptable to the

3889a/12-04-90

BK 1240PG0125

Grantor for the installation and/or maintenance and operation of utility
facilities reasonably required for either or both Parcels. Such easement(s)
shall be continuous so long as any such authorities or companies use the same
to provide utility services to any part of the Shopping Center Site.

Section 4.13    Easements for Building Encroachments and Common
Footings.

(a)  Developer grants to Sears and Sears grants to Developer, the
right, privilege and easement to use such portions of the Grantor's Parcel
(but only at such locations, if any, as may be approved in writing by the
Grantor and shown on the working drawings and specifications for the Grantee's
improvements, copies of which have been approved in advance by the respective
Grantor thereof) for the purpose of construction, reconstruction, erection and
maintenance of any such foundations, footings, supports, canopies, roofs,
building and other overhangs, awnings, alarm bells, signs, lights and lighting
devices and other similar appurtenances to the Grantee's improvements as are
shown on such working drawings and specifications. The easement shall be
limited to distance of six (6) feet from the Grantor's property line. If
common footings are approved, the first such Party prepared to construct
footings for its building shall, upon request, be furnished by the other Party
with all required column loading and anchor bolt information required by the
Party first constructing in order to cast same in the common footings at the
time of concrete placements. The cost of common footings shall be allocated
between such Parties based on the weight each such Party's building will place
on such common footings. Each Party covenants and agrees, respectively, that
its exercise of such easements shall not result in damage or injury to the
improvements of the other Party and shall not interfere with the business
operations conducted by the other Party in the Shopping Center. No such
easement for construction by a Grantee will permit the use of the Grantor's
Building for load-bearing purposes. Upon completion of any of the
construction elements referred to above, the Grantor and Grantee shall, upon
the request of either of them, executed a recordable document, appropriately
identifying the nature and location of each such construction element.

(b)  The easements provided for in this Section 4.13 and in
Section 4.15 hereof, to the extent they exist on the Termination Date, shall
be perpetual, but shall end if, at any time, either before or after such
applicable termination date the particular appurtenance for which the easement
is granted is razed, destroyed or demolished and not Rebuilt, as required or
permitted under this Agreement.

Section 4.14    Extinguishment of Easements.  Any of the easements
granted may be (a) released or extinguished, or (b) amended, waived or
modified by instrument, in recordable form, executed by the owners of the
Parcels benefited and burdened by the respective easements affected thereby.

Section 4.15    Bridge Easements.

(a)  Sears grants to Developer easements for the construction and
attachment of the pedestrian bridges and pedestrian decks (including, without

3889a/12-04-90

limitation, expansion joints and supporting columns) shown on Exhibit "B" (the "Pedestrian Bridges"), and for such Pedestrian Bridges to abut and connect to, but not bear structurally upon the Sears Building. Developer shall coordinate the design of the Pedestrian Bridges with Sears. Developer shall not commence construction of the Pedestrian Bridges until Sears has approved the design and location of the Pedestrian Bridges, which approval shall not be unreasonably withheld or delayed. Developer shall also coordinate the construction of the Pedestrian Bridges with Sears so as to minimize interference with the business of Sears. Nothing contained herein shall obligate Developer to construct any or all of the Pedestrian Bridges shown on Exhibit "B".

(b) Developer shall construct, maintain and repair the Pedestrian Bridges at its sole cost and expense, and Sears acknowledges that the easements granted to Developer by Sears pursuant to Section 4.9 of this Agreement shall be construed so as to allow Developer to so construct, maintain and repair the Pedestrian Bridges.

## ARTICLE V

### REFURBISHMENT AND EXPANSION OF MALL

Section 5.1    Developer Mall Work.

(a) As used herein, "Developer Mall Work" means all items, including, without limitation, all structural analyses, plan preparation, design work, governmental approvals, third party approvals, and construction, required to be obtained or performed in connection with (a) the refurbishment of the existing level of the Mall and Mall Stores (the "First Level Refurbishment"), and/or (b) the addition of a second level to the Mall and Mall Stores (the "Second Level Development"). Sears hereby acknowledges and agrees that subject to Section 5.1(c), the scope, timing, nature and performance of the Developer Mall Work shall be in the sole discretion of Developer.

(b) Developer and Sears hereby acknowledge and agree that the performance by Developer of the Developer Mall Work is subject to Developer obtaining all of the following approvals and consents (the "Necessary Consents"):

(i) Developer shall have obtained or performed any and all studies, reports, written agreements, permits, approvals and actions, including, without limitation, a resubdivision plan approval, variance, conditional use permit, special exceptions, precise or specific plan, environmental impact report or similar environmental report or permit, wetland permits, site plan approvals, traffic impact study approvals, plat acceptances, demolition, building and use permits and architectural approvals, required by any public or governmental authorities as a prerequisite to allowing the development of the Mall, the Mall Stores and the Shopping Center Site in the manner contemplated by this Agreement; and

3889a/12-04-90

BK 1240 PG 0127

(ii)  Developer shall have obtained the consent and/or approval of all "Necessary Third Parties" to such Developer Mall Work and shall deliver copies of such consents and/or approvals to Sears for informational purposes only prior to commencing construction of the Developer Mall Work.

Developer shall not be deemed to have obtained or performed the items described in paragraph (i) above until the last time period within which to contest each such matter by administrative or judicial proceedings, referendums, petitions for rehearing or otherwise has expired and no such contest has been initiated.

As used herein, "Necessary Third Parties" means, collectively, Boscov, Strawbridge, Woolworth, and any other third parties whose consent or agreement, in the judgment of Developer exercised in good faith, is required in order for Developer to perform the Developer Mall Work, without causing thereby a breach or default of any agreement, document or instrument affecting or relating to Developer, the Mall, the Mall Stores, Department Store Buildings or the Shopping Center Site, which breach or default would adversely affect Developer or Sears.

(c)  In the event Developer has not Commenced Construction of the Second Level Development by March 31, 1994, then:

(i)  Developer shall pay to Sears on April 1, 1994 (the "Payment Date") the sum of Four Hundred Fifty Thousand Dollars ($450,000) plus simple interest accruing annually at the "Prime Rate" (as such term is defined in Section 25.2 of this Agreement) from the execution date of this Agreement to the Payment Date (the "Payment Amount"); and

(ii)  Developer shall Commence Construction of the First Level Refurbishment on or before March 31, 1994, and shall complete such work on or before September 30, 1995.

(d)  In the event that on or before the Payment Date Developer "Transfers" all of its interest in the Developer Parcel to a "Transferee" (as such terms are hereinafter defined), other than to a Transferee under Section 21.2(d)(ii) below, Developer shall, concurrently with the Transfer of the Developer Parcel, deliver the Payment Amount into an escrow account mutually established by Developer and Sears, to be paid to Sears in the event the Transferee does not Commence Construction of the Second Level Development as provided hereunder by March 31, 1994.  In the event the Transferee commences construction of the Second Level Development as provided hereunder on or before March 31, 1994, the Payment Amount shall be immediately released from escrow and delivered to Developer.

(e)  In the event Developer fails to deliver to Sears all or any portion of the Payment Amount on or before the Payment Date as provided herein, Sears shall have the right to offset any payments otherwise due to Developer under this Agreement or the Supplemental Agreement against any such unpaid amount.

3889a/12-04-90

29.

BK 1240 PG 0128

Section 5.2    Developer Improvement Plans and Specifications.

(a)  The term "Developer Improvement Plans" means the working drawings and specifications for the Developer Mall Work.  The Developer Improvement Plans shall be prepared by Developer's architect and other consultants retained by Developer and shall be submitted to Sears for information purposes only except to the extent Sears approval is required pursuant to Sections 5.3, 5.4, 5.6 and 5.7 hereof.  The "Developer Improvement Plans" shall also include any subsequent changes therein provided that any changes requiring approval of Sears pursuant to Sections 5.3, 5.4, 5.5 and 5.7 hereof have been so approved.  The Developer Improvement Plans shall show the following, to the extent applicable to the First Level Refurbishment and/or the Second Level Development:

(i)  Outline floor plans of the building shell of the Mall, principal exterior dimensions, the exterior design concept and the exterior facing materials (exclusive of storefronts) and the basic exterior painting (exclusive of storefronts), the marquees, canopies and truck court shielding.

(ii)  A two-level covered, air-conditioned and heated mall, fully sprinklered, with adequate heating, cooling, lighting and ventilating equipment, with adequate drainage facilities and designed to assure proper removal of any smoke and water that might arise in or about the Mall.

(iii)  The location of the Mall and the entrances to the Parking Area.

(iv)  The design concept and dimensions of the Mall, including elevations, slopes and materials, including, but not limited to, the Courts and the center court area.

(v)  The signage of the Mall.

(vi)  The location and nature of the major decorative features, including, without limitation, lighting, hard surfacing, landscaping, drainage, planters, directories and benches.

(vii)  An air-conditioning system adequate to cool the Mall to an average temperature of not more than 78° F. when the outside temperature is 95° F. dry bulb and 77° F. wet bulb and a heating system adequate to heat the Mall to an average temperature of not less than 68° F. when the outside temperature is 30° F., during each day of the year when climatic conditions require and the means designed to prevent undue drainage of cooled or heated air between the Mall and the adjoining Department Store Buildings.

(viii)  The lighting load.

(ix)  The connections between the Mall and each of the Department Store Buildings.

(x)  The design and locations of escalators, stairways, fire corridors and service areas.

(xi)  The locations of floor drains.

(xii)  That the Mall is to be constructed within its Permissible Building Area.

30.

3889a/12-04-90

BK I 240 PG 0 I 29

(xiii)  That the exteriors of the Mall and the Mall Stores meet first-class regional shopping center standards of construction quality and contains amenities designed to provide customer appeal.

(xiv)  The design and location plans of all Perimeter Sidewalks and all truck loading areas and truck parking, turn-around and dock areas and ramps.

(xv)  The architectural elevations of the Mall.

(xvi)  The exterior perspective renderings reflecting design concepts of the Mall, including, without limitation, height, signing, materials selections, colors, entrances, and windows.

(xvii)  The layout of all tenant space in the Mall Stores (but not the individual tenant units).

(xviii)  The interior design of the Mall, including architectural elevations and renderings.

(xix)  The design and location plans for all forms of vertical transportation, seating arrangements, directories, truck docks, refuse and trash collection and compaction areas, the food court and food preparation areas, public restrooms, rest areas, service corridors, fire corridors and all other amenities, and fixed obstructions in the Mall (including, but not limited to, kiosks).

(xx)  The landscape plans (including plant specifications) for the Mall showing all exterior and interior areas to be landscaped.

(xxi)  The proposed specifications, including without limitation, materials and colors, for the exterior of the Developer Mall Work and the interior and amenities for the Mall.

(h)  In the preparation of the portion of the Developer Improvement Plans with respect to the interior of the Mall, the following general design data, without limitation, shall be followed, as minimums, unless governmental specifications for such work establish higher standards, in which event the higher standards shall prevail:

(i)  The surface of that portion of each level of the Mall devoted to pedestrian traffic shall be in a continuous plane without steps except as required to match the second floor elevations of the Boscov Building and the Strawbridge Building.  The maximum slope in such surface shall not exceed one-half percent (1/2%), unless otherwise shown on the approved Developer Improvement Plans.

(ii)  All fire protective systems shall be installed in accordance with the requirements of local authorities having jurisdiction over such installation.  The Mall (a) shall have sprinkler protection, including, as required by applicable building code; (b) shall include a smoke control system as required by applicable building code, including smoke alarms (which shall he automatically controlled) as required by code; and (c) shall include a heat and smoke detection system, including an automatic smoke evacuation system.

31.

BK 1240 PG 0130

(iii) The finished floor surfaces of the Mall shall be at the same elevation as the corresponding finished floor surfaces of each adjoining store at all points adjoining the entrance to such store.

(iv) The heating, ventilating and cooling system of the Mall shall be designed so as to meet the criteria specified in Section 5.2(a)(vii). The entire system shall be automatically controlled.

Section 5.3    Connections Between Buildings. In the portion of the Developer Improvement Plans for connection of the Mall to the Sears Building, Developer's architect shall take into account the facade of the building to which the connection is to be made, the sheathing of any Mall columns adjacent to any such building facade, signage requirements of the Parties in their respective Mall entrances, building code requirements and the fact that there shall be no loading imposed upon any such building. If the Sears Building exterior wall adjoining the second level of the Mall is higher in elevation than the adjoining second level of the Mall, then Sears will provide a reglet on its exterior wall, immediately above the roof of the adjoining second level of the Mall, and Developer will counterflash to such reglet on the Sears Building. If the second level of the Mall adjoining the Sears Building exterior wall is higher in elevation than the Sears adjoining exterior wall, Developer will provide a reglet on the exterior wall of the second level of the Mall immediately above the roof of the adjoining Sears Building and Sears will counterflash to such reglet on the second level of the Mall. Developer shall, at its expense, provide an expansion joint and the tie-in for the wall connection between the Sears Building and the second level of the Mall. Sears shall have the right to approve, in its reasonable judgment, such plans and specifications for such attachment.

Section 5.4    Mall Work Approval Items.

(a)  Certain aspects of the Developer Mall Work are of critical concern to Sears and the Parties agree that the items set forth in clause (b) (the "Mall Work Approval Items") below shall be subject to the reasonable approval of Sears as provided herein and, in addition, any proposed encroachment onto the Sears Parcel shall be subject to the sole discretion of Sears. During the course of the preparation of the Developer Improvement Plans, Developer shall submit or shall cause Developer's architect to submit to Sears for its reasonable approval, in accordance with Section 5.7(b) below, at least ninety (90) days prior to the anticipated commencement of construction of the Developer Mall Work, design development drawings showing the Mall Work Approval Items and any proposed encroachment onto the Sears Parcel, and Sears shall have thirty (30) days to approve or disapprove such items, provided that any disapproval of the Mall Work Approval Items so given shall specifically set forth the items disapproved and the reasons therefor.

(b)  This clause sets forth the Mall Work Approval Items to the extent applicable to the First Level Refurbishment and/or the Second Level Development:

(i)  the interior elevations of the Mall at the Sears Court;

32.

3889a/12-04-90

BK 1240 PG 0131

(ii) the connections of the second level of the Mall to the Sears Building; and

(iii) The design of the Sears Court, including, without limitation, the decor, the amenities, the layout, the color, the materials, the decorative elements, the furnishings and the location of any escalators within the Sears Court. Sears agrees to cooperate with the Developer's architect in securing a harmonious design concept for the Sears Court with the remainder of the Mall.

(c) After the Mall Work Approval Items are approved by Sears, Developer shall submit to Sears when completed one (1) set of the final Developer Improvement Plans, which shall incorporate the Mall Work Approval Items previously approved by Sears and the items approved pursuant to Section 5.3; provided that (i) Sears shall have the right to reasonably disapprove such Developer Improvement Plans only if they fail to comply with the requirements of this Section 5.4; and (ii) Sears shall have thirty (30) days from the receipt thereof, to the extent such disapproval is provided for herein, to disapprove such Developer Improvement Plans. Any such notice of disapproval from Sears shall set forth specifically the items disapproved and the reasons therefor.

Section 5.5    Mutual Cooperation Respecting HVAC Systems.    The Parties recognize that the air conditioning and heating specifications of their respective buildings and the Mall are critical and that the same shall be so designed, constructed, operated and maintained so as not to unduly drain air from nor unduly discharge or return air into the Mall or the Department Store Buildings, and Developer agrees that the Mall heating, ventilating and cooling systems shall be constructed, operated and maintained in accordance with the Developer Improvement Plans and this Section and that Occupants of the Mall Stores shall be similarly required not to unduly drain air from, or unduly discharge or return air into, the Mall.

Section 5.6    Changes in Developer Improvement Plans.

(a) Any proposed change in the Developer Improvement Plans during construction of the Developer Mall Work shall be presented to Sears or its designee. Any proposed change which materially affects any of the Mall Work Approval Items shall require the reasonable approval of Sears. Failure of Sears to approve or disapprove such requested changes within thirty (30) days from the date of submission thereof, subject to the requirements of Section 5.7 hereof, shall be deemed approval by Sears.

(b) If, after any portion of the Developer Mall Work has been completed or partially completed on the Shopping Center Site in accordance with the Developer Improvement Plans, Sears desires to change the completed or partially completed Developer Mall Work, and provided such change is approved in writing by Developer and all other Department Stores which have rights to approve the type of change proposed by Sears pursuant to the Leases of such Department Stores or pursuant to the Strawbridge REA or the Boscov REA, then Developer will provide Sears with an estimate of the cost of such change, and

BK 1240 PG 0132

if Sears desires to proceed with such change, the cost of such change shall be borne by Sears and such other Department Stores, if any, jointly requesting such change together with Sears.

Section 5.7    Exercise of Approval Rights Over Developer Improvement Plans.

(a) Except with respect to requests for changes which are based upon Developer's failure to conform to the general design data as set forth in Sections 5.2(a) and 5.2(b) hereof, or other requirements of this Agreement, and except with respect to Sears approval of the location of any escalators within the Sears Court, Sears shall not, in exercising its right to approval over any Developer Improvement Plans set forth in this Article V, make any request which would unreasonably increase the charges or cost of the Developer Mall Work to be performed. In its notice disapproving the Mall Work Approval Items or any portion thereof, Sears shall set forth specifically the items disapproved and its reasons therefor.

(b) Each document submitted by Developer for review or approval by Sears pursuant to this Article V shall contain a cover page prominently listing the date mailed, the required return date and a statement to the effect that the document (except progressive working drawings) will be deemed approved by Sears unless Sears makes objection thereto within the time specified in this Article V. As to those items which are not in conformity with this Agreement, or which contain changes from previously approved plans or specifications, (1) any such item shall be specifically identified by highlighting on the transmitted plan or specification, (2) the cover letter accompanying such transmittal shall specifically identify those items that do not comply with the requirements of this Agreement or which are different from previously approved plans and specifications, and state that any highlighted item shall be deemed approved unless objected to within the period specified in this Article V. The failure of Sears to respond to or object within thirty (30) days shall not be deemed to constitute approval of those items which are not in conformity with this Agreement or previously approved plans and specifications unless (1) and (2) of this Section 5.7(b) are complied with.

Section 5.8    Mall and Mall Stores. Developer covenants and agrees that the existing Mall and Mall Stores are on one (1) level and contain, in the aggregate, no fewer than 240,000 square feet of Floor Area; and Developer further covenants and agrees that subject to Section 7.2, the Mall and the Mall Stores are constructed within their respective Permissible Building Areas as shown on Exhibit "B".

Section 5.9    Reductions. The covenant and agreement of Developer set forth in Section 5.8 hereof shall be subject only to:

(a) A temporary reduction of Floor Area by reason of any cause or event stated in Article XIII hereof;

(b) A temporary or permanent reduction of Floor Area during the process of permitted alteration, remodeling or repairing; or

34.

3889a/12-04-90

BK 1240 PG 0133

(c) A reduction of Floor Area by reason of any cause or event stated in Article XIX hereof.

## ARTICLE VI
### CONSTRUCTION OF THE SEARS IMPROVEMENTS

Section 6.1    Architectural Elevations and Design Studies. By May 31, 1991, Sears will cause to be prepared and delivered to Developer, for the reasonable approval of Developer, one (1) copy of the architectural elevations and design studies (the "Architectural Elevations and Design Studies") for the exterior of the Sears Building and the Sears TBA showing, among other matters, the exterior elevations, building cross sections, exterior access points, and color and material of the Sears Building and the Sears TBA which shall be architecturally harmonious with the remainder of the Shopping Center. Developer shall have thirty (30) days after receipt to approve or disapprove the Architectural Elevations and Design Studies in writing. In its notice disapproving all or any part of the Architectural Elevations and Design Studies, Developer shall set forth specifically the items disapproved and its reasons therefor. After the approval of the Architectural Elevations and Design Studies by Developer and no later than thirty (30) days prior to Commencement of Construction of the Sears Building and the Sears TBA, Sears shall submit to Developer one (1) set of the working drawings and plans (the "Sears Basic Plans") showing the exact size, configuration, elevation and location of the Sears Building, which shall provide for the connection of the Sears Building to the Mall (but not for the support of the Mall), shall show the locations of the Perimeter Sidewalks for the Sears Improvements and which shall conform with the Architectural Elevations and Design Studies; provided that Developer shall have the right to reasonably disapprove such Sears Basic Plans only if they fail to so conform; such disapproval to be given by Developer to Sears within ten (10) days after the receipt of such Sears Basic Plans. Any notice of disapproval from Developer shall set forth specifically the items disapproved and the reasons therefor. The Sears Basic Plans shall contain with respect to the Sears Building and the Sears TBA:

(a) The principal exterior dimensions (including, without limitation, scaled elevations, floor to floor height, and height of principal components), the exterior design concept and the exterior materials;

(b) Outline specifications (a plan showing the outline of the Sears Improvements and Perimeter Sidewalks); and

(c) Locations of the Sears Building entrances on the Mall.

The connection of the Sears Building to the Mall and certain other features of the construction of the Sears Improvements are of special importance to Developer, and accordingly, in promoting the unified development of the Shopping Center, Sears agrees to furnish to Developer for its reasonable approval such portions of its plans as will permit Developer to determine:

BK 1240°S0134

(i) The location, floor elevations, size and dimensions of the Sears Building and the Sears TBA,

(ii) The locations, sizes and widths of the Sears Building openings to the Mall, and

(iii) Utility connection points for the Sears Building and the Sears TBA.

Section 6.2    Location of the Sears Improvements.  Sears agrees that, subject to Section 7.2 herein, the Sears Improvements shall be constructed only within their Permissible Building Area and to the fixed building lines as shown on Exhibit "B", with at least one (1) major entrance onto each level of the Mall.

Section 6.3    Construction of the Sears Improvements.  Provided Developer has prepared the Sears Parcel in accordance with Sears Construction Standards to permit Commencement of Construction by Sears, and temporary utilities, construction roads and staging areas, if any, have been installed to a sufficient extent to permit Commencement of Construction by Sears, Sears agrees (a) to Commence Construction of the Sears Building, the Sears TBA and Perimeter Sidewalks consistent with its Architectural Elevations and Design Studies, by the later to occur of (i) six (6) months after the execution of this Agreement by the Parties hereto, or (ii) within sixty (60) days after delivery of the Sears Parcel as provided in Section 2.3 hereof (the "Sears Construction Commencement Date"), but in any event, sufficiently prior to the Opening Date so that the construction of the Sears Building (containing the "Sears Minimum Floor Area" referred to in Section 6.4), the Sears TBA and Perimeter Sidewalks is completed by the Opening Date, (b) to provide the reglet on the exterior wall of the Sears Building abutting the Mall, and (c) to use its best efforts (excluding overtime or premium labor costs) to complete the construction of the same within fourteen (14) months of the Sears Construction Commencement Date, but in any event, within sixteen (16) months after the Sears Construction Commencement Date, and clean up all debris caused by such construction. The provisions of Sections 6.1, 6.2 and this Section 6.3 are referred to herein as the "Sears Work". Sears shall construct the two levels of the Sears Building so as to be on the same horizontal planes as the existing and anticipated levels of the Mall, as set forth in the specifications attached hereto as Exhibit "C".

Section 6.4    Minimum Floor Area of Sears Building.

Sears covenants and agrees with Developer that upon completion of construction of the Sears Building, the Sears Building shall consist of two (2) levels aggregating approximately 170,000 square feet of Floor Area within its Permissible Building Area shown on Exhibit "B", with openings on each existing level of the Mall. On the Opening Date, Sears shall Operate, pursuant to Section 8.1, no less than 170,000 square feet of Floor Area in the aggregate on two levels of the Sears Building. After the Opening Date, Sears shall Operate, pursuant to Section 8.1, no less than 50,000 square feet of Floor Area on each level of the Sears Building, and in the aggregate no fewer

36.

BK1240PG0135

than 100,000 square feet of Floor Area (the "Sears Minimum Floor Area") in the Sears Building, exclusive of the Sears TBA, and shall have all exterior access points in the Sears Building as shown on the Architectural Elevations and Design Studies open to the general public during Sears business hours such that pedestrian passage is permitted through the Sears Building into the Mall.

Section 6.5    Intentionally Omitted.

Section 6.6    Completion of Construction and Opening. Sears agrees only with Developer that Sears shall complete construction of the Sears Building and the Sears TBA and open a Department Store for business to the public in the Sears Building on or before the Opening Date. Each Party agrees that, from time to time, until completion of such Party's construction obligations as provided in this Agreement, at the request of the other Party, to advise such Party of the then existing status of the Party's construction.

Section 6.7    Additional Conditions to Performance. The time for Sears to proceed diligently with its construction and to complete construction shall be extended by any period or periods of delay that result from any cause referred to in Section 16.1 hereto. Anything herein or in Section 6.6 contained to the contrary notwithstanding, Sears shall not be required to initially open for business between November 1 and February 1 of the succeeding year, nor between May 1 and July 15 (the "Excluded Period").

Section 6.8    Intentionally Omitted.

Section 6.9    Payment of Certain Charges. Sears and Developer shall each pay one-half (1/2) of any and all environmental impact fees, traffic impact fees, assessments and charges levied or assessed by any municipal, local or state governmental authority or agency, as well as any and all costs relating to any environmental impact reports, filings, studies or proceedings (whether judicial or quasi-judicial), which relate, in whole or part, to the preparation of the Sears building pad on the Sears Parcel, the construction of the Sears Building or the construction or reconstruction of the Sears Parking Area or any improvements thereon (exclusive of any parking structures); provided, however, (a) Sears shall be solely responsible for all costs in connection with obtaining any licenses and permits with respect to the operation and construction of the Sears Improvements including, but not limited to, all permits required under applicable law pertaining to the actual construction of the Sears Improvements (including, without limitation, separate permits for grading beyond that required to be performed by Developer hereunder, if any, plumbing and electrical work required for the construction of the Sears Building and occupancy permits required for the occupancy of the Sears Building), and (b) Developer shall be solely responsible for any costs and expenses incurred in connection with the "Environmental Report" prepared by O'Brien & Gere pursuant to the Purchase Agreement. Sears shall deliver payment to Developer within thirty (30) days of written notice of such amounts from Developer. Sears shall have no obligation to pay any portion of such fees or assessments when such fees or assessments are related solely to the expansion of the remaining portions of the Shopping Center. Developer shall also pay any

3889a/12-04-90                    37.

BK 1240 PG 0136

"tap-in" fees, including any storm water management fees and other similar fees charged by utility companies for allowing Sears the right to connect to such utilities.

## ARTICLE VII
### CONSTRUCTION REQUIREMENTS AND STANDARDS

Section 7.1    Standards of Construction. The "Construction" (which word, as used in this Article, includes the Work and, except where otherwise specified, alterations, Rebuilding [as defined in Article XIII], modernization, demolition, razing, expansion and new construction [including, without limitation, Future Department Store Building Expansion] which shall or may be performed by either Party as provided in this Agreement) shall be subject to the following requirements:

(a)   The Construction shall conform to (i) the Plans, the Developer Working Drawings and Specifications and the Sears Construction Standards for the Developer Sears Parcel Work and (ii) the Architectural Elevations and Design Studies and the Sears Basic Plans for the Sears Work, as the case may be;

(b)   Upon any Commencement of Construction, each Party shall diligently prosecute said construction to completion in accordance with the terms of this Agreement;

(c)   All Construction shall be performed in a good and workmanlike manner using first-class materials and in accordance with all applicable laws, ordinances, rules and regulations and the safety (including, without limitation, fire safety) standards of a rating service such as Industrial Risk Insurers, Factory Mutual or Shirmer Engineering, and the exterior of the Sears Building shall be in general architectural harmony with the exteriors of the other buildings on the Shopping Center Site;

(d)   Each Party shall perform its respective Construction so as not to:

(i)   Cause any unnecessary increase in the cost of Construction of the other,

(ii)   Unreasonably interfere with the Construction of the other and/or any other Construction being performed on the Shopping Center Site or any part thereof,

(iii)   Unreasonably impair the use, occupancy or enjoyment of the Shopping Center Site or any part thereof by any Occupant or Permittee, and

(iv)   Cause or allow any mechanics' or materialmen's liens to attach to the Parcel(s) of the other Party;

(e)   Each Party shall use good faith efforts to cause its architects, contractors and subcontractors to cooperate and coordinate its Construction with the other Party, and their respective architects, contractors and subcontractors to the extent reasonably practical to achieve the objectives of Section 7.1(d);

3889a/12-04-90

BK I 240 PG 0 I 37

(f)  Each Party shall at all times take any and all safety measures reasonably required to protect every other Person and Permittees from injury or damage caused by or resulting from the performance of such Party's Construction.  If any Construction to be performed on the Shopping Center Site could reasonably be deemed to constitute a hazardous condition for Permittees in the use of the Common Area or other buildings on the Shopping Center Site, or to detract from the attractiveness that would otherwise exist, such Party will, as promptly as is reasonably possible, erect an adequate and attractive-appearing construction barricade, or other protective device, at or substantially near the building line (and around any work area, shack area or storage areas, if there be any such) of adequate height, and otherwise, so as to provide adequate protection to, and screening from, the public, and shall maintain the same until removal would be justified under good construction practice;

(g)  Each Party will at all times in the performance of its Construction or reconstruction anywhere within the Shopping Center Site:

(i)  Take any and all safety measures reasonably required to protect the other Party and all Permittees from injury or damage caused by or resulting from the performance of its Construction or reconstruction,

(ii)  Indemnify, hold harmless and defend the other Party and its lessees from and against all claims, demands, suits, costs, expenses and liabilities arising from or in respect to the death, accidental injury, loss or damage caused to any natural person or to the property of any Person as shall occur by virtue of such Construction or reconstruction,

(iii)  Indemnify and hold the other Party and its lessees successors and assigns harmless from and against mechanics', materialmen's and/or laborer's liens, and all costs, expenses and liabilities in connection with or arising from such construction or reconstruction, and

(iv)  Take any and all measures reasonably necessary to prevent undue interruption of pedestrian and vehicular traffic flow within the Shopping Center.

(h)  All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements upon or adjacent to the Sears Parcel required by the Sears Construction Standards shall be installed by Developer and connected under valid permits, and shall be in good working order.

Section 7.2    Correction of Site Descriptions and Descriptions of Easements.  By reason of construction errors, the improvements of each Party may not be precisely constructed within the respective Parcel of such Party as described in Exhibits "A" and "B", but may encroach on the other's Parcel.  As soon as reasonably possible after the completion of the Construction of the Sears Improvements, Developer shall, as part of the Developer Sears Parcel Work described in Section 2.2(a), cause an "as-built" survey to be made of the Shopping Center Site showing all property lines, easements, utilities and buildings.  Nothing herein contained shall be deemed to relieve or excuse

39.

3889a/12-04-90

BK 1240 PG 0138

Sears from exercising all due diligence to construct the Sears Improvements within its Parcel. Upon request, either Party upon whose Parcel an encroachment resulting from a construction error as shown on the "as-built" survey has occurred (the "Burdened Party"), agrees to either grant such an easement or convey by ground lease, or otherwise, insurable title to the encumbering Party over that portion of the Burdened Party's Parcel as is required to permit such encroachment to remain thereon, or to convey to the encroaching Party satisfactory title to an equivalent amount of acreage of real estate reasonably acceptable to the Burdened Party, provided the building of the encroaching Party does not contain more Floor Area than is permitted hereunder.

Section 7.3    Construction Estoppel Certificates. Each of the Parties may request of the other an estoppel certificate, and, within forty-five (45) days after request therefor, each Party of whom a certificate is requested will deliver to the requesting Party its certificate stating either that (a) it has performed all matters to be performed with respect to the construction of its respective improvements or (b) setting forth the respects in which its has failed to perform or satisfy such matters. If a certificate pursuant to clause (b) is delivered by a Party, then upon completion of the matters and conditions therein set forth, such Party shall thereupon deliver a certificate pursuant to clause (a) above. Failure of either Party to deliver any certificate within forty-five (45) days after receiving a request therefor from the other Party shall be deemed to be the equivalent of delivery of a certificate pursuant to clause (a) above by such Party, and may be relied upon for such purpose by the requesting Party, as well as third parties, provided the request for the certificate states thereon the time in which the response must be made and the result of a failure to respond within such time period and otherwise conforms to the requirements of the terms and conditions of Section 25.18 of this Agreement.

Section 7.4    Building Heights. The height of buildings in the Shopping Center shall not exceed those specified in Exhibit "D".

### ARTICLE VIII

#### COVENANTS OF SEARS AND DEVELOPER

Section 8.1    Covenant of Sears to Open and Operate. Sears covenants and agrees with and for the benefit of the Developer only and its successors in interest (subject to Articles VIII, XIII, XVI and XIX) as follows:

(a)  Sears covenants and agrees with, and for the benefit of, the Developer only, and its successors in interest, that on or before the Opening Date and for a period of fifteen (15) consecutive years following the initial opening of business in the Sears Building, Sears shall open for business to the public as a Department Store containing at least two (2) levels in the Sears Building conforming with Sections 6.2 and 6.4, under a name that includes the word "Sears" or under such other name that is used by Sears for the majority of its retail department stores in regional malls which are

40.

BK 1240 PG 0139

comparable with the Shopping Center and contain at least 80,000 square feet of Floor Area in the SCSA of Philadelphia, Trenton and Wilmington, which were, prior to the name change, operated under the trade name specified above, and shall continuously Operate such business or cause such business to be Operated as a Department Store in no less than the Sears Minimum Floor Area in the Sears Building. The covenant described in this Section is hereinafter called the "Sears Operating Covenant".

(b) During the period that Sears is required to Operate its Department Store Building as hereinbefore provided, Sears shall cause the Sears Building and each of the entrances of the Sears Building that connects to the Mall to be opened at least six (6) days a week for forty-eight (48) hours per week, except for retail holidays, so that pedestrian traffic may travel to and from the Sears Building and the Mall in an uninterrupted manner. The provisions of subparagraph (a) above and this subparagraph (b) are referred to herein as the "Sears Operating Covenant Standards".

(c) Developer shall make no representation to or agreement with the lessees of the Department Store Buildings that it will seek to enforce the Sears Operating Covenant.

(d) The Sears Operating Covenant is personal to Developer, is not assignable to any Person other than Developer's successors who become obligated to perform all or substantially all of Developer's obligations and covenants under this Agreement, any mortgagee of Developer in possession, such mortgagee's successor, a purchaser of Developer's interest in the Shopping Center, a purchaser of Developer's interest in the Shopping Center at a foreclosure sale or a purchaser who accepts a deed in lieu of foreclosure, and is not intended to be for the benefit of any third-party beneficiaries. Except as permitted in the foregoing sentence, if Developer (1) enters into any agreement with any Person, giving such Person the right to enforce directly or to require Developer to enforce directly or indirectly the Sears Operating Covenant or (2) purports to assign the Sears Operating Covenant to any Person, such purported assignment, or prohibited agreement granting the right to enforce the Sears Operating Covenant to any Person, shall be void and unenforceable by such Person.

(e) In the event Sears elects to conduct any business or allow any business to be conducted on the Sears Parcel after the expiration or earlier termination of the Sears Operating Covenant and so long as at least sixty-five percent (65%) of the then existing Floor Area in the Mall Stores in the Shopping Center is then being Operated as a customary regional shopping center, Sears shall use or cause the Sears Parcel to be used as a single retail Department Store; provided, however, that Developer shall have six (6) months after written notice from Sears that the occupancy level of the Mall Stores has fallen below 65% to remedy such condition. The condition shall be deemed to have been remedied if during such six (6) month period, bona fide leases are executed which require the opening for business of Floor Area of the Mall Stores sufficient to increase the occupancy of the Mall Stores

3889a/12-04-90

41.

BK 1240PG0140

to more than 65%, which bona fide leases provide for the actual commencement
of occupancy of Floor Area by the Occupant within six (6) months of the
execution date of such leases.  In the event Sears elects to conduct any
business or allow any business to be conducted on the Sears Parcel after the
expiration or earlier termination of the Sears Operating Covenant, but the
majority of the Floor Area then being Operated in the Shopping Center is not
being used for retail purposes, Sears shall use or cause the Sears Parcel to
be used for any use compatible with the uses being conducted in the remainder
of the Shopping Center.

      Section 8.2      Intentionally Omitted.

      Section 8.3      Covenant of Developer to Operate.

(a)  Developer covenants and agrees with, and for the benefit of,
Sears only and its successor in interest, that, for the period of time
commencing on the date that Sears initially opens the Sears Building for
business with the public and continuing thereafter until the fifteenth (15th)
anniversary of the initial opening of the Sears Building for business with the
public, Developer, subject to any interruptions due to repair, permitted
alteration, permitted remodeling or reconstruction of the Mall, will
continuously Operate or cause to be Operated at least a one-level Mall in the
manner set forth in Section 8.5 hereof. The covenants described in this
Section are referred to herein as the "Developer Operating Covenant".

(b)  Notwithstanding the provisions of Section 8.3(a), Developer
shall be released from the Developer Operating Covenant if Sears is not
Operating a Department Store in the Sears Building in accordance with the
Sears Operating Covenant Standards; provided, however, that Sears shall have
ninety (90) days after receipt of written notice of such condition to remedy
the same.  Subject to Section 13.3 hereof, after the Sears Operating Covenant
has expired, Developer covenants and agrees during the term of this Agreement
to so Operate or cause to be Operated the portion of the Mall which is
required to be Operated pursuant to the terms of this Agreement so long as
Sears is using the Sears Building for the purposes set forth in Section 8.1(e).

(c)  Subject to Section 8.4 below, and provided that Developer is not
in material default under this Agreement, in the event the Sears Building is
not being used for its permitted uses under this Agreement for a period of
thirty (30) days or more, Developer shall have the right, after 30 days notice
to Sears, to Close-off the Court adjoining the Sears Building during the
period of time in which the Sears Building is being used for such unpermitted
use(s), provided such Closing-off is not contrary to any governmental
ordinance or regulation.  During the period following any such Close-off of
the Court adjoining the Sears Building, should Sears request that such Court
be re-opened, Developer will re-open such Court, provided that the Sears
Building is then being used for its permitted uses under this Agreement, and
Sears shall bear the expense of such re-opening of the Court as well as the
expense of the prior Close-off of such Court.  Sears shall reimburse Developer

3889a/12-04-90

BK 1240 PG 0141

for such expenses relating to the Close-off and re-opening of the Court within
thirty (30) days of receipt by Sears of evidence supporting the expenditures
made by Developer.

Section 8.4    Temporary Cessation of Operation. Temporary cessation
or interruption of Operation due to (i) any cause or event set forth in
Articles XVI or XIX, or (ii) the razing of a building under Article XIII, or
(iii) any reasonable interruptions of any other nature as may be incidental to
the conduct of similar retail business or operations of a regional mall of not
more than ninety (90) days in the aggregate in any one (a) calendar year, and
not resulting from the inability to obtain financing or to proceed with such
obligation because of lack of funds, or (iv) total or partial stoppages made
reasonably necessary because of permitted construction, alterations,
improvements or repairs, shall not be deemed to be a violation of this
Article VIII.

Section 8.5    Operation of Mall. For the periods hereinafter set
forth, Developer, subject to Sections 8.3, 8.4 and 16.1 hereof, agrees with
Sears that:

(a)  For the period commencing on the date that Sears shall initially
open the Sears Building for business with the public and continuing thereafter
until the fifteenth (15th) anniversary of the initial opening of the Sears
Building for business with the public, Developer will cause the Mall to be
open to the public during normal business hours, provided the Sears Building
shall likewise be open and Operating, and at least one-half (1/2) hour before
and one-half (1/2) hour after the hours that the Sears Building is open to the
public for business; and Developer will further cause the exterior entrances
of that portion of the Mall closest to the Sears Building to be opened (during
the hours the Sears Building plus one other Department Store or at least
eighty-five percent (85%) of the Mall Stores are open to the public) so that
pedestrian traffic may travel to and from the Mall and the Sears Building in
an uninterrupted manner; provided, however, that if Developer is not in
material default under this Agreement, Developer shall be released from this
obligation if Sears is not Operating a Department Store in the Sears Building
in accordance with the Sears Operating Covenant Standards for a period of
thirty (30) days or more and has not cured such condition within ninety (90)
days of written notice of such fact from Developer; and

(b)  For the period commencing on the day next following the
conclusion of the period described in subparagraph (a) of this Section 8.5 and
ending on the Termination Date, Developer will cause that portion of the Mall
which is within 150 feet of the opening of the Sears Building onto the Mall to
be open as provided in subparagraph (a) during any time when Sears is
Operating the Sears Building in accordance with Section 8.1(e); and

(c)  Except as set forth in Section 8.5(d) hereof, nothing herein
shall require the Mall to be open between 10:00 p.m. of any given day, and
9:00 a.m. of the following day.

3889a/12-04-90

BK 1240 PG 0142

    (d)  In the event that Sears desires any portion of the Mall to be opened during any of the hours which Developer is not required to so Operate the Mall pursuant to Section 8.5 above, Developer shall, upon the request of Sears, cause such portion of the Mall to be opened at the sole cost and expense of Sears.

    The provisions of Sections 8.3, 8.6 and this Section 8.5 are referred to herein as the "Developer Operating Covenant Standards".

    Section 8.6    Additional Covenants.  Developer covenants and agrees that, subject to Sections 8.1, 8.4, 8.5, 10.1 and 10.4 and Articles XIII, XVI, XIX and XXI, it will continuously manage and Operate, or cause to be managed and Operated, the Mall and the Mall Stores as a complex of retail stores and commercial enterprises that is part of a first-class regional mall shopping center development.

    Section 8.7    Release from Operating Covenant.  Sears shall be released from the Sears Operating Covenant in the event any one or more of the following conditions occurs:

    (a)  If during the period of time between the date Sears opens the Sears Building for business to the general public as provided under Section 8.1 hereto and the commencement by Developer of the Second Level Development, less than sixty-five percent (65%) of the existing Floor Area of the Mall Stores is occupied and open for business and Operating at least forty-eight (48) hours per week, except for retail holidays; provided, however, that Developer shall have six (6) months after written notice of such condition to remedy the same;

    (b)  If during the period of time following the commencement of the Second Level Development through the period ending twelve (12) months after the completion of such Second Level Development, less than fifty-five percent (55%) of the Floor Area of the first level of the Mall Stores is occupied and open for business and Operating at least forty-eight (48) hours per week, except for retail holidays; provided, however, that for the purposes of this Section 8.7, the date of completion of the Second Level Development shall in no event be deemed to have occurred later than twenty-four (24) months after the commencement of the Second Level Development, and provided further, that Developer shall have six (6) months after written notice of such condition to remedy the same.

    (c)  If at any time after twelve (12) months following the completion of the Second Level Development, less than sixty-five percent (65%) of the existing Floor Area of the Necessary Mall Stores is occupied and open for business and Operating at least forty-eight (48) hours per week, except for retail holidays; provided, however, that Developer shall have six (6) months after written notice of such condition to remedy the same;

    (d)  If any time after twelve (12) months following any required Rebuilding by Developer after a Major Casualty, less than sixty-five percent (65%) of the then existing Floor Area of the Mall Stores which Developer is required to Operate is occupied and open for business and Operating at least

44.

3889a/12-04-90

BK 1240PG0143

forty-eight (48) hours per week, except for retail holidays; provided, however, Developer shall have six (6) months after written notice of such condition to remedy same.

(e)  If at any time prior to the commencement of the Second Level Development, less than two Anchors other than Sears are Operating their respective Department Stores for a concurrent period in excess of six (6) consecutive months, except by reason of (i) force majeure, (ii) condemnation, or (iii) restoration or reconstruction of such Department Store (herein collectively referred to as the "Excepted Circumstances"); provided, however, that Developer shall have fifteen (15) months after written notice of such condition to remedy the same;

(f)  If at any time following the commencement of the Second Level Development, neither Boscov nor Strawbridge, nor any of their permitted successors or assigns under the Boscov REA or Strawbridge REA, respectively, is Operating its Department Store in the Shopping Center for a concurrent period exceeding six (6) consecutive months, except by reason of any Excepted Circumstances, provided, however, that Developer shall have fifteen (15) months after written notice of such condition to remedy the same.

The conditions set forth in Sections 8.7(a), (b), (c) and (d) shall conclusively be deemed to have been remedied if during such applicable period of time, bona fide leases are executed which require the opening for business of Floor Area of the Mall Stores sufficient to increase the occupied Floor Area of the Mall Stores to more than the applicable percentages set forth in such sections, which bona fide leases shall provide for the actual commencement of occupancy of Floor Area by the Occupant within six (6) months of the execution date of such leases.

### ARTICLE IX
### USE AND OPERATION OF SHOPPING CENTER

Section 9.1   Use and Operation of Shopping Center.  The Parties hereby covenant and agree with each other for the benefit of the Shopping Center Site that during the time that Sears is Operating a Department Store on its Parcel and Developer is Operating the Mall on its Parcel, during the term of this Agreement, no part of its Parcel may be used for other than commercial or business purposes nor during said term will any use or operation that is obnoxious to or inconsistent or out of harmony with the development or operation of an integrated regional first-class shopping center be made, conducted or permitted on or with respect to all or any part of its respective Parcel including but not limited to the following:

(a)  Any public or private nuisance;

(b)  Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;

(c)  Any obnoxious odor;

(d)  Any noxious, toxic, caustic or corrosive fuel or gas;

(e)  Any dust, dirt or fly ash in excessive quantities;

45.

3889a/12-04-90

BK 1240 PG 0144

(f) Any unusual fire, explosion or other damaging or dangerous hazard, including, without limitation, the storage, display or sale of explosives or fireworks:

(g) Any warehouse (any area for the storage of goods intended to be sold within a period no longer than one year at any retail establishment in the Shopping Center shall not be deemed to be a warehouse);

(h) Any assembling, manufacturing, distilling, refining, smelting, agriculture or mining operation;

(i) Any solicitations, demonstrations or other activity inconsistent with such standards or with the private ownership of its Parcel;

(j) Any use of the Common Area (including, without limitation, the Mall, or sidewalks adjacent to such Occupant's space, or any other premises outside such space) for the sale or display of any merchandise or for any other business, occupation or undertaking, except for activities sponsored by any merchants association or promotional service;

(k) The burning or storage of any trash or garbage in any area other than inside the Occupant's own premises or within appropriate enclosed receptacles:

(l) The parking of trucks and delivery vehicles so as to unreasonably interfere with the use of any driveways, walks, roadways, highways, streets, malls or Parking Areas or other Common Area; and

(m) Funeral parlors.

Section 9.2    Kiosks.

(a) Developer shall have the right to place kiosks or temporary kiosks or pushcarts in the Mall under the following conditions:

(i)    No kiosk or pushcart shall be located in the Sears Court without the prior written approval of Sears;

(ii)   No kiosk or pushcart shall exceed eight feet in height, except to the extent otherwise shown on Exhibit "B";

(iii)  No kiosk or pushcart shall occupy more than 200 square feet;

(iv)   No kiosk or pushcart shall have a width greater than 12 feet or a length greater than 16 feet; and

(v)    There shall not be more than 26 kiosks or pushcarts on each level of the Mall.

This Section 9.2(a) shall not apply to automatic teller machines or to other electronic devices enabling a Person to transact banking or to engage in other financial transactions or to place orders for the purchase of merchandise or services, provided that such electronic devices are placed next to or affixed to a wall in the Mall and do not protrude into the Mall by more than 36 inches. The electronic devices meeting such criteria are not kiosks within the meaning of that term as applied in this Section 9.2; and Developer may, from time to time, place or cause to be placed such electronic devices throughout the Mall, except within the Sears Court without first having to obtain the consent of Sears.

46.

3889a/12-04-90

BK 1240 PG 0145

(b) Sears shall be permitted to erect and maintain, at Sears sole cost and expense, a temporary pre-opening kiosk until the Opening Date, at the location shown on Exhibit "B". Sears shall remove such temporary pre-opening kiosk on or before the Opening Date.

## ARTICLE X

### MAINTENANCE AND MANAGEMENT OF THE COMMON AREA

Section 10.1   Developer's Duty to Operate Common Area.

(a) For the period hereinafter set forth, Developer covenants with Sears to keep, maintain, repair, replace and reconstruct, as may be appropriate, manage and Operate:

(i) The Sears Parking Area and the Common Area other than the Mall, on the Parcel of each Party from and after the date Sears shall open for business with the general public, or the Opening Date, whichever date shall be later and continuing thereafter for so long as the Mall is required to be Operated pursuant to Section 8.3 or is in fact being Operated; and

(ii) The Mall, from and after the date Sears shall open the Sears Building for business with the general public, but not before the Opening Date and continuing thereafter for so long as the Mall is required to be Operated pursuant to Section 8.3 or is in fact being Operated, in all cases in good and clean order, Operation, condition and repair, in conformity with first-class regional shopping center standards, and in such manner as to establish, maintain and present the appearance of a clean, well-managed, attractive, coordinated and unified Operation of all of the Common Area.

Developer shall have the right, from time to time, to utilize other Persons for the maintenance, management and Operation of the Common Area and the Mall; provided, however, that Developer shall remain responsible and liable for the maintenance, management and Operation of the Common Area in the manner provided in this Article X.

Each Party shall have the duty to maintain or cause to be maintained all other improvements on its Parcel.

(b) Notwithstanding the foregoing:

(i) If Sears shall open the Sears Building for business to the general public prior to the Opening Date, then Developer's obligations under this Section 10.1 shall commence on the date that is specified in a written request given no fewer than thirty (30) days prior thereto by Sears to Developer, provided that such obligations are performed by Developer at Sears sole cost and expense until the Opening Date, at which time such cost will be allocated in accordance with Section 10.4 below; and

(ii) If Sears has not so opened by the Opening Date through no fault of Developer, then, commencing on the Opening Date, Developer's sole obligation with respect to Sears hereunder until the actual opening of the Sears Building for business shall be to keep the Sears Parking Area cleaned and clear of refuse at Sears sole cost and expense. The Sears Parking Area shall also be illuminated to the extent necessary for the safety and well being of Permittees using said Sears Parking Area from said Opening Date until

BK 1240 PG 0146

the initial opening of the Sears Building (at Sears sole cost and expense) at which time Developer shall assume its obligations under Section 10.1(a) to maintain the Common Area on the Sears Parcel.

(c) Without limiting the generality of the foregoing, Developer, in the Operation, maintenance and repair of the Common Area other than the Mall, pursuant to Sections 10.1(a) and (b), and Sears, if and when it elects to Operate, maintain and repair the Sears Parking Area pursuant to the Supplemental Agreement, shall observe or cause to be observed customary regional shopping center standards as follows:

(i) Maintain, repair and replace the surface of the Parking Area and the sidewalks (including, without limitation, the Perimeter Sidewalks);

(ii) Remove all papers, debris, filth, refuse, snow and ice from the Shopping Center and wash or sweep paved areas as reasonably required;

(iii) Maintain such appropriate Parking Area entrance, exit and directional signs, markers and lights in the Common Area as shall be reasonably required;

(iv) Repair lighting fixtures of the Common Area and relamp and reballast as needed;

(v) Repair and repaint striping, markers, directional signs, etc. as necessary to maintain in a good condition;

(vi) Maintain, water and replace the landscaping as necessary to keep in a good condition;

(vii) Keep the Parking Area properly illuminated during all hours of darkness that the Mall is open or required to be open to the public (at times when the Mall is not open or required to be open to the public, Developer will cause the Parking Area to be properly illuminated for security purposes only, such illumination to be uniformly distributed throughout the Parking Area); and

(viii) Provide traffic control and security consistent with the practice prevailing in the operation of similar shopping centers.

(d) Without limiting the generality of the foregoing, Developer, in the Operation and maintenance of the Mall pursuant to Sections 10.1(a) and (b), shall observe or cause to be observed customary regional shopping center standards as follows:

(i) Maintain the surface thereof smooth and evenly covered with the type of surfacing material originally installed thereon, or such substitute therefor as shall have been approved by Developer and Sears;

(ii) Remove all papers, debris, filth and refuse and wash or thoroughly sweep the surface thereof;

(iii) Clean lighting fixtures and relamp as needed;

(iv) Maintain the landscaping in a first class, thriving condition;

(v) Maintain all signs (excluding those of the Occupants) in a clean and orderly condition, including relamping and repairing as may be required;

3889a/12-04-90

48.

BK 1240 PG 0147

(vi) Patrol the Mall during Mall hours and such other hours as may be prudent for the safety and security of Permittees and consistent with prevailing practice, in similar shopping centers;

(vii) Maintain and keep in a sanitary condition the public restrooms and other common use facilities therein;

(viii) Clean, repair and maintain all utility systems that are a part thereof;

(ix) Clean and maintain the structure thereof, the roof, skylights, wall surfaces, doors and other appurtenances thereto; and

(x) Maintain the heating, ventilating and cooling system thereof, fire protection system and mechanical systems in good order, condition and repair, so that at all times the same shall operate within the standards prescribed herein, and so as not to unduly discharge air out of or return air into the Mall or the Mall Stores.

(e) Developer and Sears agree to observe and comply with, and shall cause their respective Permittees to observe and comply with, the Rules and Regulations attached hereto as Exhibit "E". Such Rules and Regulations shall be amended only by agreement in writing, executed by Developer and Sears, provided, however, such amendment need not be an amendment to this Agreement. Developer shall enforce the Rules and Regulations adopted hereunder against all Occupants of the Shopping Center in a reasonable and nondiscriminatory manner as part of Developer's obligation to maintain the Common Area.

Section 10.2    Employee Parking.  Each Party shall use its reasonable efforts to require its employees (and any employees of its agents, lessees, contractors, licensees or concessionaires) to use only such sections of the Parking Area as are prescribed for parking.

Section 10.3    Intentionally Omitted.

Section 10.4    Payment of Allocable Share.  Sears obligation to contribute to Common Area Maintenance Cost is set forth in the Supplemental Agreement.

## ARTICLE XI

### SELF-HELP AND OTHER REMEDIES

Section 11.1    Rights of Self-Help.  Except as to taxes or assessments being contested as provided in Section 18.2, and except as to the period of time when a Party is in good faith attempting to resolve any conflicts with its contractors or suppliers, which conflict is causing a delay in the performance of any obligation hereunder, and except as to the respective covenants of Sears set forth in Article VI and Section 8.1, and except as to the period of time when a Party is contesting a default in good faith in accordance with Section 11.4, if either Party (hereinafter the "Defaulting Party") shall fail to perform any of the provisions of this Agreement on its part to be performed at the time and in the manner herein provided, including, but not limited to, the making of payments to others that the Defaulting Party has agreed herein to make (e.g., the payment of taxes and assessments as provided in Section 18.1 herein), then the other Party shall

BK 1240 PG 0148

have the right, but not the obligation, upon thirty (30) days written notice to the Defaulting Party (unless within such thirty (30) day period the Defaulting Party shall cure such default, or in the case of a default which by its nature cannot be cured within such thirty (30) day period, the Defaulting Party shall commence the curing thereof within such thirty (30) day period, and thereafter shall diligently prosecute the curing thereof to completion) to proceed to make such payment or take such action as shall be necessary to cure such default, all in the name of and for the account of the Defaulting Party. In such case, the Defaulting Party shall, within thirty (30) days after receipt of evidence of payment, reimburse the Party paying such sum or taking such action for the money actually expended by it, and its reasonable out-of-pocket expenses including, without limitation, attorney's fees, in so doing, together with all penalties, if any, arising from such default, if paid by the other Party, with interest computed in accordance with Section 25.2 hereof from the date of demand to date of payment. If a Party other than the Defaulting Party shall in good faith deem that an emergency is occurring or has occurred, so that the default requires immediate curing, then no notice shall be required and such non-Defaulting Party may act promptly without giving notice and take such action as is reasonably necessary to cure the alleged failure. The Party performing any action pursuant to the preceding sentence shall interfere to the minimum extent possible with the other Party's business, and with reasonable promptness shall give notice to the Defaulting Party of the doing of such work and the claimed default; such notice, notwithstanding any other provisions of this Agreement, need not be in writing if the giving of a written notice would not be reasonably possible under the circumstances, so long as the same is given to an officer or responsible agent of the Defaulting Party. Written confirmation of the action shall be given as soon as reasonably possible. The Party so acting shall prosecute any work performed by it under this Section 11.1 diligently to completion. If and to the extent a Party shall have obligations to the other Party with respect to an easement granted by this Agreement and which shall survive the Termination Date, the rights granted by this Article XI shall survive with respect to such easement for the duration of such easement.

Section 11.2    Lien.    Any amount due under this Article XI from the Defaulting Party to the other Party shall, without further act of the Parties, be deemed to constitute a lien against the Parcel of the Party obligated to pay the same, subordinate to all existing liens and encumbrances thereon and to the interest in Parcels that may be owned by a Transferee in a Sale and Leaseback (as such terms are used in Article XXI) or its successors at such time, provided that the holder of such liens, or encumbrance, or such Transferee of its successor, as may be, was not in possession or control of the Parcel liened pursuant to this Section 11.2 at the time of the action taken giving rise to such amount due. The Parties agree, however, that in no event shall such lien created by this Article XI be foreclosed by means of a non-judicial foreclosure.

3889a/12-04-90

BK 1240 PG 0149

### Section 11.3   Notice to Defaulting Party's Mortgagee.

Notwithstanding anything to the contrary herein provided, and provided the
other Party has been given notice (pursuant to Article XXII) of the identity
and address of or any change in the identity or address of a Defaulting
Party's Mortgagee, such Party shall not have any rights against that
Defaulting Party's Parcel, by reason of a Default on the part of that
Defaulting Party, unless (a) that Defaulting Party's Mortgagee shall have been
first given written notice of said default and an opportunity to cure the same
or to cause the same to be cured and (b) after receiving said notice, that
Defaulting Party's Mortgagee shall have failed to cure said default or to have
caused the same to be cured within the same period of time allowed for that
Defaulting Party to cure said default (or, in the case of a default which, by
its nature, cannot be cured within such period, that Defaulting Party's
Mortgagee shall have failed to commence the curing thereof within such period
or shall have failed to diligently proceed with the curing thereof).

### Section 11.4   Determination of Default.   If the Defaulting Party

shall contend it is not in default, then if the matter is not resolved by the
parties to the dispute within thirty (30) days, the matter shall be submitted
to a court of competent jurisdiction for determination, and the Defaulting
Party need not make any payment provided for in this Article unless and until
the same shall have been resolved against the Defaulting Party at the trial or
any appellate level.  If the contention of the Defaulting Party shall be
sustained, it need make no payment to the other (but if it be sustained
thereby only in part, then there shall likewise be determined what portion, if
any, of the amount expended by the other Party is payable by the Defaulting
Party, with interest, as aforesaid, to the other Party.)

### Section 11.5   Remedies Cumulative.   Any remedies of either Party

specifically provided for in this Agreement are cumulative and shall be deemed
additional to any and all other remedies to which either of them may be
entitled in law or equity, and shall include the right to restrain by
injunction any violation or threatened violation by either Party of any of the
terms, covenants or conditions of this Agreement and by decree to compel
performance of any such terms, covenants or conditions; it being agreed that
the remedy at law for any breach of any such term, covenant or condition
(except those, if any, requiring the payment of a liquidated sum) is not
adequate.  Nothing herein shall derogate from any provisions of this Agreement
where certain provisions as to exclusivity of remedy are expressly set forth.

## ARTICLE XII

## OBSTRUCTION OF COMMON AREA

### Section 12.1   Covenants Respecting Common Area.   Each Party

covenants and agrees with respect to the Common Area on its Parcel as follows:

(a) It will not obstruct the free flow of pedestrian or vehicular
traffic.  No Party will change, modify, diminish or alter the Common Area as
shown on Exhibit "B", except for changes in the Mall made by Developer, which
changes do not affect the proper use of the Mall for its intended purpose.

BK 1240 PG 0150

(b) It will not use or permit the use of the Parking Area on its respective Parcel or, in the case of Sears, the Sears Parking Area, for any purpose other than the parking and passage of vehicles (except with respect to Sears service and delivery trucks which shall be permitted to park only in the Truck Facilities adjacent to the Sears Building) and the movement of pedestrian traffic, landscaping, directional and traffic control signs and signs (at locations specified in the Plans and shown on Exhibit "B") identifying the Shopping Center by its name.

(c) It will not construct or locate, or suffer to be constructed or located, any fence or barricade (except as permitted under Sections 3.2 and 7.1(f)), structure, building, merchandise, commercial facility, amenity, landscaping, lights, sign (including, without limitation, floor signs) or other obstruction or installation of any kind whatsoever on its Parcel outside its building that would interfere with the uses provided for in this Agreement for its Parcel, or prevent the free flow of traffic to, across or from its Parcel as and where shown on Exhibit "B". Notwithstanding the above, each Party shall have the right one day each calendar year, but more often if legally desirable, to erect barriers or chains for the purpose of blocking off access to the Common Area located on its respective Parcel in order to avoid the possibility of dedicating the same for public use; if possible such barriers or chains shall be erected for such purposes at a time, or upon a day, when the Shopping Center is not open for business.

Section 12.2 **Exceptions to Covenants.** Notwithstanding Section 12.1, the Parties each may use or construct upon its Common Area to the extent reasonably required in connection with:

(a) The proper exercise of the easements and licenses granted pursuant to Article IV or any other rights specifically granted to each Party under this Agreement; or

(b) The performance of any Construction (as such term is used in Article VII) which each Party is permitted or required to make under this Agreement and subject to Section 4.3, including, without limitation, the Construction of any future improvements within the area designated for future expansion in accordance with Article XXIV hereof; or

(c) Periodic promotions sponsored and approved by the Shopping Center's promotional services program, except that no such promotion can be held within 150 feet of the opening of the Sears Building onto the Mall entrances to the Sears Building unless Sears shall give its prior approval of the same.

## ARTICLE XIII
## MAINTENANCE AND REPAIRS

Section 13.1 **Covenant to Maintain Mall.** Developer covenants and agrees with Sears that from and after the opening of the Sears Building for business to the public, and thereafter during the entire term of this Agreement, Developer will keep and maintain the Mall in good order, condition and repair, subject to ordinary wear and tear and restoration or

52.

3889a/12-04-90

BK 1240 PG 0151

reconstruction pursuant to the provisions of Article XIII hereof.  Nothing
contained herein shall be deemed to prohibit Developer from charging Occupants
of the Department Stores or Mall Stores for said maintenance and repairs or
cause such Occupants to make such maintenance and repair, except as provided
in the Supplemental Agreement.

Section 13.2    "Rebuild" Defined.  As used in this Agreement,
"Rebuild" (also "Rebuilt" and "Rebuilding") shall mean, with respect to any of
the improvements constructed on either Party's Parcel, to restore, replace or
repair such improvement or improvements so that after such restoration, there
will be at least the minimum number of square feet of Floor Area required by
Section 13.3 (if such improvement must be restored or caused to be restored by
Developer pursuant to this Agreement) or Section 13.5 (if such improvement
must be restored by Sears pursuant to this Agreement) within the Permissible
Building Area as shown on Exhibit "B", and of the same general appearance and
design and in as good condition as originally constructed as the improvement
or improvements that existed immediately prior to their damage or destruction,
and in accordance with this Agreement.

Section 13.3    Damage or Destruction to Mall or Mall Stores.

(a)    If all or any part of the Mall or Mall Stores is damaged or
destroyed by a Major Casualty, Developer shall reconstruct such Mall and Mall
Stores to the extent provided below.  The reconstruction of the Mall and Mall
Stores pursuant to this Section 13.3 shall be as follows:

(i)    if such Major Casualty occurs prior to the completion of
the Second Level Development at a time when after the Rebuilding Completion
Period, Sears will be the only Necessary Department Store then Operating in
the Shopping Center with at least three (3) years remaining on its Operating
Covenant or under an Extended Operating Covenant, Developer shall perform such
reconstruction as may be required in order to rebuild the Mall and Mall Stores
on one (1) level located within 150 feet from the opening of the Sears
Building onto the Mall; and

(ii)    If such Major Casualty occurs prior to the completion of
the Second Level Development at a time when after the Rebuilding Completion
Period, Sears and at least one of Strawbridge or Boscov will be Operating in
the Shopping Center with at least three (3) years remaining on their
respective Operating Covenants or under Extended Operating Covenants,
Developer shall perform such reconstruction as may be required in order to
Rebuild the Mall and Mall Stores on one (1) level located between Sears and
the other Necessary Department Store which will be so Operating.

(iii)    If such Major Casualty occurs after the completion of
the Second Level Development at a time when after the Rebuilding Completion
Period, Sears will be the only Necessary Department Store then Operating in
the Shopping Center with at least three (3) years remaining on its Operating
Covenant or under an Extended Operating Covenant, Developer shall, at its

3889a/12-04-90

53.

BK 1240 PG 0152

option, either (a) Rebuild the Mall and Mall Stores on two (2) levels located
within 150 feet from the opening of the Sears Building onto the Mall, or (b)
Rebuild the Mall and Mall Stores on one (1) level located within 150 feet from
the opening of the Sears Building onto the Mall and reimburse Sears for its
actual out-of-pocket costs and expenses incurred in conjunction with sealing
off the second level entrance of the Sears Building from the Mall.  Developer
shall deliver written notice to Sears of Developer's election under this
Section 13.3(a)(iii) within ninety (90) days of the Major Casualty;

          (iv)  If such Major Casualty occurs after the completion of
the Second Level Development at a time when after the Rebuilding Completion
Period, Sears and only one of Strawbridge or Boscov will then be Operating in
the Shopping Center with at least three (3) years remaining on their
respective Operating Covenants or under Extended Operating Covenants,
Developer shall, at its option, either (a) Rebuild the Mall and Mall Stores on
two (2) levels located between Sears and the other Necessary Department Store
which will be so Operating, or (b) Rebuild the Mall and Mall Stores on one (1)
level located between Sears and the other Necessary Department Store which
will be so Operating and reimburse Sears for its actual out-of-pocket costs
and expenses incurred in conjunction with sealing off the second level
entrance of the Sears Building from the Mall.  Developer shall deliver written
notice to Sears of Developer's election under this Section 13.3(a)(iv) within
ninety (90) days of the Major Casualty;

          (v)  If such Major Casualty occurs after the completion of
the Second Level Development at a time when after the Rebuilding Completion
Period, all of the Necessary Department Stores will then be Operating in the
Shopping Center with at least three (3) years remaining on their respective
Operating Covenants or under Extended Operating Covenants, Developer shall
Rebuild substantially the same amount of the Mall and Mall Stores that existed
prior to such damage or destruction with the exception of any Mall or Mall
Stores contained in the Future Expansion Area.

          (vi)  Subject to 13.3(b), if such Major Casualty occurs at a
time when, after the Rebuilding Completion Period, none of the Necessary
Department Stores will then be Operating in the Shopping Center with at least
three (3) years remaining on their respective Operating Covenants or under
Extended Operating Covenants, Developer shall have no obligation to Rebuild,
or cause the Rebuilding of, any of the Mall or Mall Stores.

          (b)  In the event a Major Casualty occurs at a time when after the
Rebuilding Completion Period, any of the Necessary Department Stores shall
have less than three (3) years remaining in their respective Operating
Covenants, Developer shall request in writing within sixty (60) days after the
Major Casualty that such Necessary Department Stores agree to Operate their
respective Department Stores, in accordance with their respective Operating
Covenant Standards, for a period of five (5) years commencing on the earlier
to occur of (i) the date of completion of any Rebuilding required to be

3889a/12-04-90

BK 1240 PG 0153

performed by Developer and such Necessary Department Stores as provided hereunder or under any other agreement, or (ii) twenty-four (24) months after the date of such Major Casualty (the "Extended Operating Covenant").

Developer shall be deemed to have obtained an Extended Operating Covenant from a Necessary Department Store if, within thirty (30) days after such request, Developer receives a duly executed and acknowledged agreement in recordable form from a Necessary Department Store, in form and substance satisfactory to Developer, setting forth the extension of the Operating Covenant as provided herein (the "Extension Notice"); provided, however, that if Sears is the only Necessary Department Store to deliver the Extension Notice to Developer within such thirty (30) day period, then at the conclusion of such thirty (30) day period, Developer shall give Sears written notice of such fact, and Sears shall have ten (10) days after receipt of such notice from Developer to deliver written notice to Developer cancelling the Extension Notice previously delivered by Sears.

Subject to Sears right to cancel its Extension Notice as provided above, if Developer obtains any Extended Operating Covenant(s) from Necessary Department Store(s), then Developer's rebuilding obligations will be as set forth in Sections 13.3(a)(iii), (iv), (v), (vi) and (b) above as if such Extended Operating Covenants were in place at the conclusion of the Rebuilding Completion Period.

(c)  Notwithstanding anything to the contrary contained in this Agreement, Developer shall have no obligation at any time to Rebuild any Department Store Building or Non-Mall Store Building, or any buildings located on any portion of the Future Expansion Area.

(d)  Developer covenants with Sears that if any damage or destruction to all or any portion of the Parking Area occurs during the term of this REA, Developer shall cause the Parking Area to be repaired, rebuilt or reconstructed to at least the same quality that existed prior to such damage or destruction, as either surface parking or parking structures, in order to maintain the parking ratio provided under 17.1(b) hereof for the Floor Area then being Operated or required to be Rebuilt and Operated as provided hereunder.

(e)  If all or any part of the Mall or Mall Stores is damaged by a casualty which is not a Major Casualty, Developer shall promptly commence such reconstruction so that Developer may comply with its obligations, if any, which remain in effect at the time of the damage, to Operate such Mall or Mall Stores.

(f)  Developer agrees that any building (including, without limitation, the Mall) that it is required to Rebuild pursuant to this Agreement, will be Rebuilt and ready for Occupancy within twenty-four (24) months from the time when the loss or destruction occurred. Rebuilding, when once commenced by Developer, or caused to be commenced by Developer, will be carried through continuously to conclusion by it, but delays caused by Force Majeure (as defined in Article XVI) will not be deemed such an interruption as

BK 1240 PG 0154

constitutes Developer in default in the obligation to cause such work to be
done continuously to completion, nor shall such period of delay be deemed a
part of the twenty-four (24) months last herein mentioned.

Section 13.4    Covenant to Maintain Sears Building.  Subject to
Section 13.6, Sears covenants and agrees that from and after the opening of a
Department Store on its Parcel for business to the public, and thereafter
during the entire term of this Agreement, it will keep and maintain, without
cost or expense to Developer, the Sears Building in good order, condition and
repair.

Section 13.5    Destruction of Sears Building by Fire or Other
Casualty.

(a)  Sears covenants that for and during the period that it is
required to Operate a Department Store in the Sears Building pursuant to the
Sears Operating Covenant, in the event of the destruction or damage to the
Sears Building, or any part thereof, and as often as the Sears Building or any
part thereof, shall, during such period, be destroyed or damaged by fire or
other casualty, it shall Rebuild the Sears Building on two levels containing
at least 100,000 square feet of Floor Area (exclusive of the Sears TBA).

(b)  Notwithstanding the foregoing provision, in the event that
Developer is not obligated to Rebuild and fails to elect to Rebuild any of the
Mall and Mall Stores as provided in Section 13.3, so that there will not be
Operated at the time of completion of the Rebuilding of the Sears Building at
least a one (1) level Mall and Mall Stores located within 150 feet from the
opening of the Sears Building onto the Mall, Sears shall have no obligation to
Rebuild the Sears Building.

(c)  Notwithstanding anything to the contrary contained herein, Sears
shall not be required to Rebuild the Sears TBA in the event of any damage or
destruction thereto.

(d)  Sears agrees that any building or other improvements it is
required to Rebuild shall be Rebuilt and ready for Occupancy within twenty
(20) months from the time when the loss or destruction occurred.  Rebuilding,
when once commenced, shall be carried through continuously to conclusion by
Sears, but delays caused by Force Majeure shall not be deemed such an
interruption as constitutes a default in the obligation to cause such
Rebuilding to be done continuously to completion, nor shall such period of
delay be deemed a part of the twenty (20) months last herein mentioned.  Upon
completion of such Rebuilding, Sears shall have substantially the same
entrances in terms of locations on the Mall as theretofore, and shall not
materially be inconsistent with the Architectural Elevation and Design Studies
for the Sears Building.

Section 13.6    No Razing or Removal.  During the period that each
Party is required to Operate its building(s) pursuant to its Operating
Covenant, the buildings constructed on such Party's Parcel shall not be razed
or removed from its Permissible Building Area as shown on Exhibit "B",
except:  (i) to the extent that such razing or removal may be necessary prior

56.

3889a/12-04-90

BK 1240 PG 0155

to Rebuilding following destruction or damage pursuant to this Article XIII or following condemnation pursuant to Article XIX; or (ii) at the option of the Party on whose Parcel such Building is located, following destruction or damage that does not require Rebuilding under the terms hereof. From and after the conclusion of that period during which each Party is obligated to Operate its building(s) pursuant to its Operating Covenant or Extended Operating Covenant and continuing until the Termination Date, and subject to Section 13.3 above, if the building of either Party is either totally or partially destroyed, and if such Party does not elect to Rebuild its building(s), such Party will then cause its building(s) (or that portion thereof so damaged or destroyed) to be razed or removed within one hundred eighty (180) days of such damage . r destruction. Any portion of a Party's building(s) not so razed or removed shall be repaired, as needed, by such Party, in order to make the exterior of the same architecturally harmonious and compatible with the exterior of the other Party's buildings. In addition, from and after the conclusion of that period during which each Party is obligated to Operate its building(s) pursuant to its Operating Covenant and continuing until the Termination Date, if any Party does raze or remove its building(s) (whether or not following damage or destruction), so long as it does not replace its building(s) with another building conforming to this Agreement's provisions, that Party will maintain the ground area formerly occupied by said building(s) in good order and repair and in a sightly manner.

Section 13.7   Certain Alterations, Additions or Improvements.   Any exterior alteration, addition or improvement to any building, or TBA, constructed on a Party's Parcel or to any portion of said Parcel subsequent to completion of construction referred to in Sections 5.4 and 6.6 shall comply with Sections 5.2 or 6.4, as the case may be, as well as any other applicable Sections of this Agreement as if such alteration, addition or improvement were part of such building as originally constructed. No such alteration, addition or improvement shall unreasonably restrict pedestrian and vehicular access to the Shopping Center or result in a permanent reduction of parking spaces below the parking ratio set forth in Section 17.1.

### ARTICLE XIV
### INSURANCE

Section 14.1   Construction Insurance.

(a) Each Party shall require evidence of Public Liability insurance from all contractors and sub-contractors throughout any period of time during which it performs any construction of improvements, expansion, remodeling, extensive repairs or maintenance upon its Parcel. Insurance must be for limits of at least $5,000,000 (in 1990 Dollars) Combined Single Limit for Commercial General Liability Insurance, including but not limited to Blanket Contractual, Personal Injury (Libel, Slander, Wrongful Eviction, etc.), Products Liability, Completed Operations, Broad Form Property Damage and Owned and Non-Owned Auto.

57.

3889a/12-04-90

BK 1240 PG 0156

(b)  Developer shall cause each of its contractors and each of their
subcontractors to carry Contractor's Protective Liability insurance, covering
Developer and Sears as Additional Named Insureds, in the minimum limits of
$1,000,000 (in 1990 Dollars) Combined Single Limit for bodily injury, or such
greater amount as Developer deems commercially reasonable, including death or
property damage resulting from any occurrence during the period of time from
the beginning of the Developer Work to and including the completion of the
construction of that portion of the Mall which abuts and is connected to the
Sears Building, the Common Areas on the Sears Parcel and the remainder of the
Developer Work.  This policy shall be endorsed to be primary; that any other
valid and collectible insurance will be excess.

(c)  Each Party shall maintain, or cause to be maintained, All Risk
Builder's Risk insurance, including Water Damage and Earth Movement,
throughout any period of time during which it performs any construction of
improvements, expansion, or remodeling upon its Parcel.  Such insurance shall
name the Party and its contractor as named insureds.  Such insurance shall
continue in force until such construction, expansion or remodeling is
completed.

(d)  Each Party shall require evidence of Workers Compensation and
Employers Liability Insurance from all contractors and subcontractors
throughout any period of time during which it performs any construction of
improvements, expansion, remodeling, extensive repairs or maintenance upon its
Parcel.  Such evidence of insurance shall be kept current until such
activities are completed.

Section 14.2    Liability Insurance for Common Area and Buildings.

(a)  Developer shall, during the term of this Agreement, maintain, or
cause to be maintained, in full force and effect, Commercial General Liability
Insurance covering the Common Area (including coverage with respect to any
vehicle utilized in maintaining the Common Area) with an insurer rated AVII or
better in Best's Rating Guide, such insurance to afford protection of not less
than $5,000,000 (in 1990 Dollars) Combined Single Limit for Personal Injuries,
including Bodily Injury, Death and Property Damage.  It will include Blanket
Contractual Liability, Libel, Slander, Wrongful Eviction, False Arrest,
Products Liability, Completed Operations, Owned and Non-Owned Auto Liability
and Broad Form Property Damage.  Developer shall furnish to Sears, on or
before the effective date of any such policy, evidence that the insurance
referred to in this Section 14.2(a) is in force and effect.  Such insurance
shall name Sears as additional insured thereunder as its interest may appear.
Such insurance shall include a "cross liability" endorsement and shall provide
that the same may not be cancelled without at least thirty (30) days prior
written notice being given by the insurer to Sears.  If Sears shall be
Operating and maintaining the Common Area on its Parcel, the insurance
required by this Section 14.2(a) shall nevertheless be carried by Developer

58.

3889a/12-04-90

BK 1240 PG 0157

and shall cover the entire Common Area.  Sears will pay its Allocable Share of the cost of the insurance required to be carried by this Section 14.2(a) pursuant to the Supplemental Agreement.

(b) Each Party shall, severally, during the term of this Agreement, maintain in full force and effect Commercial General Liability Insurance covering the portions of its respective Parcel not included in Section 14.2(a) hereof, with an insurer rated AVII or better in Best's Rating Guide, such insurance to afford protection of not less than $5,000,000 Combined Single Limit for Personal Injuries, including Bodily Injury or Death, Blanket Contractual Liability, Libel, Slander, Wrongful Eviction, False Arrest, Products Liability, Completed Operations, Owned and Non-Owned Auto Liability and Broad Form Property Damage Liability to any number of Persons arising out of any one occurrence.  Such insurance shall name the other Party as an additional insured thereunder, shall include a "cross liability" endorsement and shall provide that the same may not be cancelled without at least thirty (30) days prior written notice being given by the insurer to the other Party.

Section 14.3   Insurance For Completed Improvements.

(a) Effective upon the Opening Date, Developer covenants with Sears that during the period Developer is obligated to Operate the Mall and the Shopping Center pursuant to Section 8.3 above or is in fact so Operating the Mall, the Mall Stores and the Shopping Center, it will carry All Risk Property Insurance, including Water Damage and Earth Movement, subject to the definitions and provisions contained in said policy in an amount equal to at least one hundred percent (100%) of the replacement cost (exclusive of the cost of excavation, foundations and footings) of the Developer Improvements, insuring against loss or damage from causes or events customarily included in an All Risk Policy.  Developer shall furnish to Sears prior to the effective date of any such policy, evidence that the insurance required by this Section 14.3(a) is in full force and effect.  Developer agrees that such policies shall contain a provision that the same may not be cancelled or materially changed without at least thirty (30) days prior written notice being given by the insurer to Sears.

(b) Effective upon the completion of construction of the Sears Building, Sears covenants with Developer that (during the period Sears is obligated to Operate a Department Store on its Parcel pursuant to Section 8.1 above) it will carry All Risk Property Insurance, including Water Damage and Earth Movement, subject to the definitions and provisions contained in said policy in an amount equal to at least one hundred percent (100%) of the replacement cost (exclusive of the cost of excavation, foundations and footings) of the Sears Building, insuring against loss or damage from causes or events customarily included in an All Risk Policy.  Sears, upon request, shall furnish to Developer prior to the effective date of any such policy, evidence that the insurance required by this Section 14.3(b) is in full force

3889a/12-04-90

BK 1240 PG 0158

and effect.  Sears agrees that its policy shall contain a provision that the same may not be cancelled or materially changed without at least thirty (30) days prior written notice being given by the insurer to Developer.

Section 14.4    Self-Insurance or Blanket Policy.  All insurance required to be carried by the Parties pursuant to this Article XIV shall be carried with insurance companies rated AVII or better in Best's Rating Guide. Nevertheless, each of the Parties shall have the right to comply with and satisfy its respective obligations under Sections 14.2(b) and 14.3 by means of:

(i)  Self-insurance to the extent of all or any part of insurance required under said Sections, but only as and to the extent that any such self-insurance is guaranteed to the other Party by the Party so self-insuring and the latter shall have a net worth, either according to its last published annual report or as audited by an independent certified public accounting firm, of at least $100,000,000 (in 1990 Dollars), or if such self-insurance plan is furnished through an Affiliate (as defined in Section 21.1(d)), subsidiary or parent corporation of the Party, only if such affiliate, subsidiary or parent corporation shall have a net worth, either according to its last published annual report or as audited by an independent certified public accounting firm, of at least $100,000,000 (in 1990 Dollars) and shall advise the other Party that it is providing self-insurance; and/or

(ii)  Any so-called blanket policy or policies of insurance covering this and other liability and locations of such Party, or an Affiliate, subsidiary or parent corporation of such Party, provided that such policy or policies by the terms thereof shall allocate to the building and liabilities to be insured hereunder an amount not less than the amount of insurance required to be carried pursuant to this Article XIV so that the proceeds from such insurance shall be an amount not less than the amount of proceeds that would be available if the Party was insured under a unitary policy.

Section 14.5    Developer Performance by Others.  Anything in this Article XIV to the contrary notwithstanding, the obligations of Developer for carrying public liability insurance and casualty insurance with respect to the Mall Stores may be carried in whole or in part by the lessees of Developer as to the particular location of each lessee, provided that the insurance carried by such lessees shall be in the same aggregate amount as herein before provided to be carried by Developer as to the Mall Stores and shall be inclusive as to coverage, and shall otherwise comply with this Article XIV.

Section 14.6    Waiver of Subrogation.  Each Party hereby releases (for itself and to the extent legally possible for it to do so on behalf of its insurer) the other Party from any liability for any loss or damage to property located on the Shopping Center Site, which loss or damage is caused by a risk of the type generally covered by policies of insurance of the type referred to in Section 14.3.  Each Party covenants that it will, to the extent such insurance endorsement is available (even if such endorsement requires the payment of an additional premium), obtain for the benefit of the other Party a

60.

BK 1240 PG 0159

waiver of any right of subrogation which the insurer of the former Party might otherwise acquire against the other Party by virtue of the payment of any loss covered by such insurance.

Section 14.7  Payment of Proceeds. The loss, if any, under any policy obtained by a Party under this Article XIV shall be adjusted with the insurer by that Party. Any excess monies received from insurance after the Rebuilding of such building or buildings or other improvements shall be paid to the primary named insured or to its designee. If a Party shall not commence the Rebuilding of buildings or other improvements that Party is required to perform under this Agreement promptly after the date of payment of loss, after damage or loss occasioned by fire or other casualty for which insurance monies shall be payable, and prosecute the same thereafter with such dispatch as may be necessary to complete the same in a reasonable time with due diligence, but in no event more than eighteen (18) months (plus the period of delays caused by Force Majeure as defined in Section 16.1) after the occurrence of such damage, or loss, occasioned as aforesaid, then the amount so collected, may at the option of the other Party be paid to it for the purpose of performing the required Rebuilding.

The Parties agree that any Mortgage placed by either of them on their respective Parcel, or any part thereof, or any Mortgage placed on the improvements on such Parcel by either of them or their lessees, or any renewals or replacements thereof, or any agreement otherwise extending or modifying the same, shall contain a provision whereby the Mortgagee shall acquiesce in and consent to this Agreement's insurance provisions, including, when applicable and without limitation, the requirement that any insurance proceeds resulting from a loss on the Shopping Center Site, or any portion thereof, which are received by such Mortgagee shall be applied for the purpose of paying for the cost of repairing, restoring or replacing the Parties' building(s) and improvements, including the Mall, upon the Shopping Center Site, in accordance with the provisions of this Agreement.

Section 14.8  Evidence of Insurance. Each Party shall furnish to the other Party requesting the same, evidence that the insurance referred to in this Article XIV is in full force and effect and that the premiums therefor have been paid. All policies of insurance carried by either Party pursuant to this Article XIV, or endorsements issued under any blanket policy or policies covering these liabilities required to be insured against by this Article XIV, shall provide that the same may not be cancelled or reduced without at least thirty (30) days prior written notice being given by the insurer to the other Party. The failure of either Party to request such evidence of insurance or the failure of either Party to provide evidence of such insurance shall not affect the obligation to obtain insurance as provided in this Article XIV. If a Party chooses to self-insure and complies with the provisions of Section 14.4(i) above, this Section 14.8 shall have no force or effect as to that Party.

3889a/12-04-90

61.

BK 1240 PG 0160

## ARTICLE XV
### INDEMNIFICATION

Section 15.1   Indemnification.

(a)   Each Party, as to the Common Area on its Parcel, covenants to, and does hereby, indemnify and hold harmless and agrees to defend the other Party, and its lessees, from and against all claims and all costs, expenses and liabilities (including, without limitation, reasonable attorneys' fees) incurred in connection with all claims, including, without limitation, any action or proceedings brought thereon, arising from or as a result of the death of or any accident, personal injury, loss or damage whatsoever caused to any Person, or to the property of any Person, that may occur in or about the Common Area that each such indemnifying Party is Operating and maintaining. The foregoing indemnity shall not apply to any claims or liabilities arising from any negligent act or omission of the indemnified Party, or its agents, lessees, servants or employees, wherever the same may occur.  In addition, the foregoing indemnity shall not apply as to matters covered by the Common Area liability insurance policy required to be maintained by Developer pursuant to Section 14.2 hereof, except to the extent of any claims, costs, expenses and liabilities (including, without limitation, reasonable attorney fees) which exceed the amount of coverage afforded by such Common Area liability insurance policy.

(b)   Each Party covenants to, and does hereby, indemnify and hold harmless and agrees to defend the other Party, and its lessees, from and against all claims and all costs, expenses and liabilities (including, without limitation, reasonable attorneys' fees) incurred in connection with all claims, including, without limitation, any action or proceedings brought thereon, arising from or as a result of the death of or any accident, personal injury, loss or damage whatsoever caused to any Person, or to the property of any Person, that may occur on the Parcel of each indemnifying Party, as the case may be appropriate, except (i) as to the Common Area on such Parcel (but subject to Section 15.1(a) and also except as to the Mall), and (ii) claims insured against by the insurance referred to in Section 14.4 hereof.  There shall be excluded from such indemnification all claims and liabilities arising from any negligent act or omission of each indemnified Party, or its agents, lessees, servants or employees, wherever the same may occur.

### ARTICLE XVI
### FORCE MAJEURE

Section 16.1   Performance Excused.  Each Party shall (whether or not any particular provision of this Agreement makes specific reference to this Article XVI) be excused from performing any of its duties, obligations or undertakings provided in this Agreement (except any of its duties, obligations or undertakings to pay any sums of money) in the event and so long as the performance of such duty, obligation or undertaking is prevented, delayed, retarded or hindered by act of God, epidemic, fire, earthquake, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob

62.

3889a/12-04-90

BK 1240 PG 0161

violence, civil commotion, sabotage, malicious mischief, strikes, lock-outs, action of labor unions, Condemnation, governmental restrictions, order of civil or military or naval authorities, embargoes, impossibility of obtaining materials, or any other cause, whether similar or dissimilar to the foregoing, not within the reasonable control of the Party in question (any or all of which events are defined as "Force Majeure"); provided, however, that the Party entitled to any extension of time hereunder shall give prompt written notice to the other Party as soon as reasonably possible after it becomes apparent that the occurrence will cause such delay asserting its claim of right to such extension and the reasons therefor. Specifically excluded, however, from the extensions of time permitted under this Section are delays resulting from a Party's inability to obtain financing or a Party's lack of capital, except if due to the default of the other Party to this Agreement.

## ARTICLE XVII
### PARKING RATIO

Section 17.1   Required Ratio.

(a)   In order to maintain the required parking as shown on Exhibit "B" throughout the Shopping Center, each of the Parties agrees that it will not interfere with or obstruct the Parking Area shown on Exhibit "B", except as may be permitted by Sections 5.2, 6.2, 6.3 and 24.1.

(b)   Subject to Section 19.2, Developer agrees that it shall provide or cause to be provided within the Parking Area in the Shopping Center Site at all times from and after completion of the construction thereof and continuing until the Termination Date, the greater of (i) five (5) automobile parking spaces for each 1,000 square feet of Floor Area in the Shopping Center Site, and (ii) a sufficient number of Parking Spaces to conform to applicable governmental requirements as they pertain to the types of uses conducted by the business establishments in the Shopping Center. Developer agrees to take no action that would reduce the parking ratio below that specified.

Section 17.2   No Default.   No Party shall be in default of its obligations pursuant to Section 17.1 hereof, and no Party shall be entitled to terminate this Agreement pursuant to Section 19.2 hereof, if (a) the cause of such Party's failure to maintain its required Parking Area is a result of Condemnation or any other governmental action (state, local, municipal or otherwise), and (b) within ninety (90) days after such Party fails to maintain its required Parking, such Party commences to cure such failure and diligently pursues such cure to completion.

## ARTICLE XVIII
### REAL ESTATE TAXES, WATER AND SEWER RATES AND OTHER CHARGES

Section 18.1   Covenant to Pay.

(a)   Except as set forth in Section 6.9 and Section 18.1(b)(ii) below, Developer covenants to pay with respect to its Parcel all real estate taxes and assessments thereon, all water and sewer rates (charged by governmental authorities), all charges for any services of utilities, if any, provided to its Parcel through the Common Utility Facilities, and all

3889a/12-04-90

63.

BK 1240 PG 0162

assessments hereafter made by governmental authorities for improvements
hereafter commenced (including, without limitation, any taxes and assessments
known as "Parking Surcharges"), the non-payment of which would give rise to a
lien superior to Sears' rights under this Agreement (such taxes, charges,
rates and assessments are hereinafter referred to as the "Assessments").

(b) Except as set forth in Section 6.9, Sears covenants to pay
within thirty (30) days after receipt of the applicable invoice, statement or
bill, (i) all Assessments with respect to the Sears Parcel, and (ii) Sears
prorata share of all Assessments with respect to Parcel 1 (as such Parcel is
delineated on Exhibit "B" hereto), which prorata share shall be deemed to be
an amount equal to 63% of the amount of such Assessments levied on Parcel 1,
excluding any Assessments that may be separately levied on any parking
structure(s) located thereon, calculated on the basis of the total number of
parking stalls serving the Sears Parcel (824) divided by the total number of
parking stalls contained in Parcel 1 (1311).

Section 18.2  Right to Contest or Appeal. Each Party may defer
payment of any such Assessments payable by it, as aforesaid, while appealing
or contesting the validity and/or amount thereof, provided that such contest
shall be in good faith and that any such Party shall, upon receiving a final
adverse ruling or decision, immediately pay any such Assessments payable, and
at all times take such steps as may be necessary, including, without
limitation, the payment thereof under protest, to insure that foreclosure or
sale of the property in question will not occur.

Section 18.3  Payment of Taxes. If, by law, any real estate taxes
or assessments are payable or may at the option of the taxpayer be paid in
installments (whether or not interest shall accrue on the unpaid balance of
such imposition), the Parties may each pay the same, together with any accrued
interest on the unpaid balance thereof, in installments as the same
respectively become due and before any fine, penalty, interest for late
payment or cost may be added thereto for the non-payment of any such
installment or interest thereon.

ARTICLE XIX
CONDEMNATION

Section 19.1  Restoration Upon Condemnation. Subject to
Section 19.2, if any improved portion of the Parcel of either of the Parties
is Condemned, the Party owning the Parcel upon which the Condemnation occurs
shall, insofar as it is practicable to do so, promptly upon payment of the
award thereof, Rebuild any building or improvement on its Parcel to the extent
of such award; provided, however, that nothing herein shall require Sears to
Rebuild the Sears Building or Developer to Rebuild the Mall or Mall Stores to
any greater extent than such Party is required to Rebuild in the event of
damage or destruction under Article XIII hereof, as of the date of the
Condemnation.

3889a/12-04-90

BK 1240 PG 0163

In case of any Party not beginning any Rebuilding of improvements which that Party is required to perform under this Agreement promptly after the date of payment of the award and prosecuting the same thereafter with such dispatch as may be necessary to complete the same in a reasonable time with due diligence but in no event more than eighteen (18) months (plus the period of delays caused by Force Majeure as defined in Section 16.1) thereafter, then the proceeds so collected may, at the option of the other Party, be paid to it for the purpose of performing the required Rebuilding. Any excess proceeds remaining after the required construction and/or Rebuilding shall belong to the Party owning the Parcel Condemned for which the award was made. Should so much of a Party's Parcel be Condemned that such Party is not required by this Article to Rebuild but, rather, to raze, remove or level certain improvements and to convert that portion of its Parcel upon which those improvements were previously located to Parking Area (either landscaped or paved), upon compliance with this Article, any excess funds remaining after the required razing, removing or leveling shall belong to the Party owning the Parcel Condemned for which the award was made.

Section 19.2    Termination of Obligations.    If so much of a Parcel is Condemned that it is impracticable, in the reasonable business judgment of the Party owning such Parcel, to Operate thereon the improvements that the Party owning such Parcel is required to Operate pursuant to this Agreement or if, as a result of Condemnation, there is available within the Shopping Center Site fewer than 4.5 automobile parking spaces for each 1,000 square feet of Floor Area in the Shopping Center Site and a Party desires to terminate this Agreement, then this Agreement shall terminate in accordance with Article III, effective as of the date of such Condemnation. For purposes of determining "impracticability" referred to in the second line of this Section 19.2, if so much of a Party's Parcel is Condemned that there is available to said Parcel fewer than 4.5 automobile parking spaces for each 1,000 square feet of Floor Area in said Party's Parcel, such unavailability shall be deemed at said Party's option, to render the Operation of the improvements thereon "impracticable"; provided, however, that this sentence shall not be read to imply that a Condemnation that leaves more than 4.5 automobile parking spaces for each 1,000 square feet of Floor Area in any Parcel necessarily does not render the Operation of the improvements on such Parcel "impracticable". If any improvements of any Party shall be partially taken and such Party elects not to Rebuild the same (if such Party is not obligated to do so under this Article XIX), such Party shall promptly raze and level the improvements so destroyed or damaged and, if and for so long as this Agreement shall not terminate, convert the building site or sites into Parking Area or landscaped area and to maintain such Parking Area in good order and repair and in a sightly manner for so long as this Agreement shall be in full force and effect. Nothing in this Section 19.2 shall be deemed to modify the required parking ratio on each Party's Parcel set forth in Section 17.1; except that should the number of automobile parking spaces on a Party's Parcel be reduced

3889a/12-04-90

BK 1240 PG 0164

(by reason of Condemnation) to no fewer than 4.5 for each 1,000 square feet of
Floor Area in said Party's Parcel, then such Party shall not be required to
provide additional automobile parking spaces to bring the parking ratio on its
Parcel up to the parking ratio set forth in Section 17.1.

Section 19.3    Condemnation Does Not Affect Easements.  Except as may
result from a termination of this Agreement, a Condemnation shall not affect
the existence of the easements or licenses referred to in Article IV, except
to the extent that they burden the land so taken.

Section 19.4    Waiver of Award.  Each of the Parties hereby waives in
favor of the other Party whose Parcel or any portion thereof is Condemned any
value attributable to any easements or licenses of the former and in the
Parcel of the latter as to any award for the Condemnation; and no part of such
award or proceeds shall be payable to the owner of the dominant tenement by
virtue of such easement or licenses.

Section 19.5    Application of Condemnation Proceeds.  The Parties
agree that the provisions of the second paragraph of Section 14.7 above, which
covers the application of insurance proceeds, shall also apply to Section 19.1
as to the application of condemnation proceeds as though said paragraph was
fully set forth in Section 19.1.

### ARTICLE XX

### SIGNS

Section 20.1    Covenants.  Developer covenants and agrees that it
will not at any time install or use or permit the installation or use of any
signs or other advertising devices in or on the Mall or the exterior of the
Mall Stores or any part or parts thereof (or the interior thereof when such
signs or advertising devices would be visible from outside of the particular
premises) or anywhere on the Shopping Center Site which shall not comply with
Exhibit "F" hereof.  Developer further agrees that the Occupants of the
Developer Parcel or any portion or portions thereof shall comply with
Exhibit "F" to the extent already obligated to do so, if at all, under their
respective Leases.  Sears agrees that it will comply with Exhibit "F".

Section 20.2    Amendments.  Exhibit "F" is subject to amendment by
agreement among the Parties, but no such amendment shall invalidate the
continued existence or require replacement or modification of a sign that was
proper under Exhibit "F" when installed.

Section 20.3    Intentionally Omitted.

Section 20.4    Prohibited Signs.  The Parties shall not permit any
exterior flashing action (or flashing action which is visible from the
exterior), moving action, or audible signs on their respective Parcels.

Section 20.5    Prior Signs.  Notwithstanding the foregoing, the signs
presently located on the Developer Parcel ("Prior Signs") and their operation
shall not be deemed to come within the provisions of this Article XX except
that as such signs are replaced (because of repair, destruction, or otherwise)
the replacement signs shall come within the provisions of this Section XX.

66.

3889a/12-04-90

BK 1240 PG 0165

### ARTICLE XXI
#### SALE, ASSIGNMENT, TRANSFER AND ENCUMBRANCE OF
#### PARCELS - SUCCESSORS AND ASSIGNS BOUND AND BENEFITED

Section 21.1   **Certain Definitions for this Article.**  The following terms shall have the following meanings:

(a) "Transfer" means a sale, assignment, grant, release or other conveyance (other than in a Condemnation) of the fee of a particular Parcel or portion thereof including, without limitation, the sale portion of a Sale and Leaseback, but excluding the making of a Mortgage;

(b) "Transferor" means the seller, assignor, grantor or transferor in a particular Transfer;

(c) "Transferee" means the purchaser, assignee, grantee or transferee in a particular Transfer;

(d) "Affiliate" means, with respect to any Person, another Person controlled by, or controlling, or under common control with, the Person in question ("control" for this purpose means the legal or beneficial ownership of at least fifty percent (50%) of the voting securities or of the legal and equitable interest of the Person controlled);

(e) "Sale and Leaseback" means a Transfer in which the Transferor, or an Affiliate thereof, acquires as part of the same transaction, a leasehold interest with an initial term of a minimum of twenty-five (25) years after the date hereof in all or substantially all of the property transferred or fifteen (15) years after the date of such lease; and

(f) "Institutional Lender" means a bank, insurance company, pension fund, pension trust, foundation and any other Person that is generally regarded in the real estate financing field, at the time in question, as an "Institutional Lender".

Section 21.2   **Rights to Make a Transfer, Mortgage or Sale and Leaseback.**

(a) Each Party as to its particular Parcel, shall have the right, at any time, and from time to time, to do any or all of the following, and nothing in this Agreement other than in this Article XXI shall be deemed to restrict any such right, but, with respect to any such Transfer before the Termination Date, the right shall be subject to the following terms:

(i) Transfer its whole fee and/or leasehold interest in its Parcel and its entire interest under this Agreement in respect of the fee or leasehold interest in the Parcel so Transferred, but subject and subordinate to this Agreement, but (x) if such Transfer occurs prior to the expiration of such Party's Operating Covenant and if such Transfer is of the Sears Parcel, then only if the Transferee is an Affiliate of the Transferor (except in the case of a Sale and Leaseback, in which case Section 21.2(a)(iii) shall be controlling), and (y) if such Transfer occurs prior to the date of completion by Developer of the Developer Sears Parcel Work in accordance with Article II hereof, then only if the Transferee is a responsible, experienced developer approved by Sears in its reasonable discretion;

BK 1240 PG 0166

(ii) Make a Mortgage of the Parcel or leasehold interest in question and of its entire interest under this Agreement in respect of the Parcel or leasehold interest so Mortgaged, but subject and subordinate to this Agreement;

(iii) Consummate a Sale and Leaseback of the Parcel in question and of its entire interest under this Agreement in respect of the Parcel which is the subject of such Sale and Leaseback, but subject and subordinate to this Agreement;

(iv) With respect to the Developer only, transfer portions of the Developer Parcel and Developer's interest in this Agreement (as to the portion or portions so transferred) in accordance with Article XXIV hereof; and no other Transfer, Mortgages or Sale and Leasebacks shall be permitted except as hereinafter provided.

(b) In the event of any Transfer made under subparagraph (a)(i) or (a)(iii) above, the Transferor agrees that there shall be delivered to the other Party (delivery thereof to be a condition of the right to make such Transfer), a written undertaking, in recordable form, executed by the Transferee, and stating that such undertaking is made for the benefit of the other Party hereto, in which the Transferee expressly assumes and covenants, effective upon the making of such Transfer, to perform and be bound by all the terms, covenants and conditions under this Agreement to be performed by the Transferor (including, without limitation, the provisions of this Section 21.2 to be applicable to any future Transfer by the Transferee), with respect to such Parcel. However, in the event of a Sale and Leaseback under subparagraph (a)(iii) above, in which the Transferee is an Institutional Lender (or a non-Institutional Lender who as part of the same transaction is procuring all or a major portion of the funds for such purchase by means of a Mortgage covered by subparagraph (a)(ii) above), the Transferee, and its successors and assigns, shall, notwithstanding anything to the contrary contained in this Agreement (x) not be required so to assume the terms, covenants and conditions under this Agreement to be performed by the Transferor or to execute the foregoing written undertaking, and (y) not be personally liable to the other Party for default in performance of any of the terms, covenants or conditions under this Agreement to be performed in respect of the Parcel being Transferred; but the Transferor (or an Affiliate thereof, as the case may be) as holder of the leasehold interest under the lease that is a part of such Sale and Leaseback shall be deemed to have agreed to be bound hereby in a recordable instrument (if it is not otherwise liable therefor on any other basis) for the benefit of the other Party hereto and in a case where this sentence has become operative, the Transferee, or its successor or assign at such time as it shall become the owner or ground lessee of such Parcel, shall, without further act, become (and shall be deemed to have agreed so to become) liable upon such terms, covenants and conditions, to the extent thereafter to be performed with respect to such Parcel on that date when such lease is terminated for default or is surrendered or when the demised term thereunder

3889a/12-04-90

BK 1240 PG 0167

expires, but only if, and so long as, such Transferee, or its successor or
assign at such time, is the owner or ground lessee of such Parcel. It shall
be a condition of such Sale and Leaseback described in the previous sentence
that at least twenty (20) days' prior notice of closing thereof shall be given
to the other Party.

(c) Upon the consummation of a Transfer in subparagraph (a)(i) or
(a)(iii) above, unless such Transfer is within the ambit of the second
sentence of the immediately foregoing paragraph, the Transferor shall, upon
delivery to the other Party of the assumption agreement described in such
immediately foregoing paragraph, be released from any and all liability that
would thereafter arise from or in connection with any obligation imposed by
any term, covenant or condition of this Agreement and to be performed by the
Party that owns or leases the Parcel in question in respect of the Parcel or
leasehold interest so Transferred, but the Transferor shall remain liable for
all such liability in respect of events theretofore occurring.

(d) Notwithstanding the foregoing paragraphs and the succeeding
paragraph of this Section 21.2, however, (i) except as provided in
Section 21.3, neither a Transfer of the Sears Parcel, nor the making of a
Mortgage encumbering the Sears Parcel, shall release Sears, Roebuck and Co., a
New York corporation, from its liability (A) for the completion of the Sears
Building, as required by Article VI, and in accordance with this Agreement,
but only until the initial completion thereof, (B) for all payments or
obligations required on its part to be made or performed hereunder or under
the Supplemental Agreement, until paid or performed; and (ii) except as set
forth below, neither a Transfer of the Developer Parcel nor the making of a
Mortgage encumbering the Developer Parcel shall release Developer from its
liability for the completion of the Developer Mall Work as required by
Article V, and for its covenants in Sections 2.1, 2.2, 2.3, 5.1(c), 8.3, 8.5,
10.1 and 13.1 and the Supplemental Agreement, unless such Transfer of all or
any portion of the Developer Parcel is to a nationally recognized shopping
center developer or operator, or an affiliate thereof, with a net worth of at
least $10,000,000, who assumes, by written instrument in recordable form, all
of Developer's obligations hereunder. Upon the consummation of the Transfer
as described above, Developer shall, upon delivery to Sears of the assumption
agreement described above, be released from any and all liability which would
thereafter arise from or in connection with any term, covenant or condition
under this Agreement to be performed by Developer. Developer shall also be
released upon the Transfer (and written assumption in recordable form) of all
or any part of its interest in the Developer Parcel to (1) JMB Realty
Corporation, a Delaware corporation ("JMB Realty"), (2) JMB Realty Trust, a
real estate investment trust (the "Trust"), (3) a partnership in which
Developer, JMB Realty or the Trust or any of their Affiliates is a general
partner, (4) a real estate investment trust of which Developer or JMB Realty
or any of their Affiliates is the manager or investment advisor in each case

69.

BK 1240 PG 0168

with decision making authority, (5) an Affiliate of Developer, and (6) any trust or common fund of which Developer or JMB Realty or any of their Affiliates is an advisor with decision making authority.

(e) In the event of the making of any Mortgage described in (a)(ii) above by the then owner or owners of any Parcel, or by a lessee of any interest therein, the holder of such Mortgage shall take its interest subject and subordinate to this Agreement, provided that nothing in this Agreement contained shall be deemed to make the holder thereof liable for the performance of any term, covenant or condition under this Agreement to be performed by the Party to this Agreement that owns the Parcel in question or leases an interest therein (except for acts, omissions or defaults which are of a continuing nature and of which the holder of such Mortgage receives written notice within a reasonable time after the occurrence of the same), but the Mortgage shall expressly provide as a condition to the right to make the same that if and when title to, or a leasehold interest in, such Parcel becomes vested in any Person as a result of a default under said Mortgage or the holder of said Mortgage becomes a "Mortgagee in possession," then such Person shall become liable for the performance of any such term, covenant or condition thereafter to be performed and it shall remain liable so long as such title is vested in it or so long as it shall be such "Mortgagee in possession." Neither the making of such Mortgage nor its foreclosure shall release the maker thereof from any liability it would have had under this Agreement had such Mortgage not been made.

(f) However, notwithstanding the foregoing and anything else contained in this Agreement:

(i) No Person in which title to the Sears Parcel shall so become vested as a result of or following a default under any Mortgage of such Parcel, and

(ii) No Person who is, or succeeds to the interest of, the Transferee under a Sale and Leaseback of the Sears Parcel, shall be deemed to be obligated to perform the obligations of Sears under the trade name referred to in Section 8.1, unless in such case such Person is an Affiliate of Sears; provided, however, that the foregoing shall not be deemed to relieve such Person of the obligation to Operate a Department Store pursuant to Section 8.1. Subject to Section 8.1(e), if as a result of this subparagraph (f) becoming effective, the Operation of the Department Store on the Sears Parcel ceases, then Developer shall have the right to Close-off the Sears Parcel. Such Close-off shall be at the cost and expense of Developer. Notwithstanding the foregoing, Sears shall at all times continue to be obligated to make payments toward Common Area Maintenance Costs as well as any other payment or charges provided for hereunder and under the Supplemental Agreement. At such time, if any, as Sears is again Operating a Department Store on the Sears Parcel, Sears shall, at its own cost, promptly remove any fence, barricade, wall or other device erected in the course of Close-off,

3889a/12-04-90

BK 1240 PG 0169

thereby causing the Sears Parcel to be restored to the same condition as existed immediately prior to Close-off. Nothing in this Section 21.2 shall be deemed to release Sears from its obligations under Section 8.1.

(g)  While in no way restricting the right of a Party to make a Mortgage of its Parcel or a portion thereof, or a Mortgage of the improvements thereon by a Party's lessee, or to enter into a Sale and Leaseback, pursuant to this Section 21.2, any Party so doing or permitting shall be solely responsible for, and shall hold the other Party and its lessees, successors and assigns harmless from, any charges, fees, costs or the like (including but not limited to administrative charges, processing fees, out-of-pocket costs or fees of outside counsel) charged by its Mortgagee or Transferee-Lessor under a Sale and Leaseback as consideration for or in connection with the giving of its (i.e., the Mortgagee's or the Transferee-Lessor's) consent and subordination to any modification of, restatement of or amendment to, this Agreement, or of any easement, estoppel certificate or other matter provided for in this Agreement.

Section 21.3   Corporate Successors to Sears.  Notwithstanding anything to the contrary herein contained, Sears may lease or Transfer the Sears Parcel and/or the Sears Improvements (1) to any parent company that owns all of the outstanding shares of Sears, or (ii) to any Person that may succeed to the business of Sears or to any Person that may, as the result of reorganization, merger, consolidation or sale of stock or assets, succeed to the business of Sears (the "business of Sears" shall mean the Operation of the Sears Department Store), and in either case, Sears shall be released from all further obligations imposed by this Agreement and by the Supplemental Agreement if such lease or Transfer is to a Person that acquires all or substantially all of Sears stock or assets and which, by written instrument in recordable form, expressly assumes any and all of Sears obligations hereunder and its obligations contained in the Supplemental Agreement, provided such Person shall have published net current assets and a net worth, determined in accordance with generally accepted accounting principals, at least equal to that of Sears twelve (12) months prior to any such lease or Transfer.

Section 21.4   Successors and Assigns Bound and Benefited.  This Agreement shall be binding upon and inure to the benefit of each Party and its respective successors and assigns, subject to the foregoing provisions of this Article XXI, and to Section 25.12.

### ARTICLE XXII

### NOTICES

Section 22.1   Place and Manner of Notice.  Any notice, demand, request, consent, approval, designation or other communication that any Party hereto is required or desires to give, make or communicate to any other Party shall be in writing and shall be given, made or communicated in person or by United States registered or certified mail, return receipt requested, with postage thereon fully prepaid or by private courier service with independent verification of delivery, addressed to:

71.

3889a/12-04-90

BK 1240 PG 0170

In the case of Developer:

Concord Mall, a Delaware general partnership
c/o JMB/Urban Development Company
900 North Michigan Avenue
15th Floor
Chicago, Illinois  60611-1575

Attention:  President, Retail Division

with copies to:

JMB/Urban Development Company
900 North Michigan Avenue
15th Floor
Chicago, Illinois  60611-1575

Attention:  Legal Department

Concord Mall
4737 Concord Pike
P.O. Box 7189
Wilmington, Delaware  19803-1431

Attention:  Mall Manager

and in the case of Sears:

Sears, Roebuck and Co.
Sears Tower
Chicago, Illinois  60684

Attention:   National Manager
             Real Estate Planning Group
             Department 824 RE

with a copy to:

Sears, Roebuck and Co.
Sears Tower
Chicago, Illinois  60684

Attention:  General Counsel

subject to the right of either Party to designate a different address (other
than a post office box) by notice similarly given.  Any notice, demand,
request, consent, approval, designation or other communication so sent by
registered or certified or by expedited private courier shall be deemed to
have been given, made, received, or communicated, as the case may be, on the
date of delivery as shown on the return receipt; and any notice, demand,
request, consent, approval, designation or other communication sent or
delivered by hand shall be deemed given, made, received or communicated, as
the case may be, as of the time of the actual receipt thereof.  In addition,

        (i) From and after the date that a Party receives notice
from the other Party containing the name and address of the other Party's
Mortgagee, the first Party shall give any and all notices given to the other
Party to the holder of the first mortgage covering the other Party's Parcel,
and

3889a/12-04-90

BK 1240 PG 0171

(ii) Each Party may designate no more than three (3) other Persons to whom a copy of any notice shall be sent.

Section 22.2   Legend on Notices. A notice under this Agreement wherein it is provided that the failure to take certain action with respect to such notice, within the period of time therein specified, shall result in the approval of the matters prescribed therein, must contain the following legend, in capital letters:

THIS IS A NOTICE UNDER SECTION (here appropriate Section number is to be inserted) OF THE CONCORD MALL SHOPPING CENTER CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT WHICH REQUIRES ACTION TO BE TAKEN WITHIN (here appropriate number of days, applicable time limitation, etc. is to be inserted). FAILURE TO RESPOND WITHIN THE TIME LIMIT INDICATED SHALL RESULT IN THE MATTER BEING DEEMED APPROVED.

If any notice does not contain the aforementioned legend, the failure to take certain action with respect to such notice within the period of time specified in the Section in question shall not have the therein prescribed result.

Section 22.3   Drawings and Specifications. Each party shall designate a Person (the "Representative") who shall have authority to act for such Party in regard to any approvals of drawings, specifications, documents, or other writings submitted pursuant to this Agreement with respect to the Work or other Construction. Each Party shall designate to the other Party, the name of said designating Party's Representative. Notices may be mailed to said Representatives at the addresses below unless otherwise modified in writing by the Party making such designation:

For Developer:

Concord Mall

c/o JMB/Urban Development Company
900 North Michigan Avenue
15th Floor
Chicago, Illinois 60611-1581
Attn: President, Retail Division

With a copy to:

JMB Realty Corporation
900 North Michigan Avenue
15th Floor
Chicago, Illinois 60611-1581
Attention: Partnership Coordinator--Concord Mall

For Sears:

Sears, Roebuck and Co.
Department 824FS (BSC 36-31)
Sears Tower
Chicago, Illinois 60684
Attn: Construction Planning Director
      Department 824FS (CP)

3889a/12-04-90

BK 1240 PG 0172

Any notice shall cite the applicable section(s) of this Agreement and conspicuously specify the correct time period, if applicable, within which a response must be given and, if applicable, specify that if no response is made, the matter will be deemed approved.

## ARTICLE XXIII

### CONSENTS

Section 23.1. Developer Consents. Except for any licenses and permits to be obtained by Sears with respect to the construction and operation by Sears of the Sears Building, Developer has obtained the consents necessary from the applicable governmental authorities and Department Stores in the Shopping Center to permit Sears to construct and operate a two-level Department Store in the Shopping Center at the location indicated in Exhibit "B" hereto in accordance with the Architectural Elevations and Design Studies.

## ARTICLE XXIV

### FUTURE EXPANSION

Section 24.1   Future Expansion.

(a)  Notwithstanding any provisions of this Agreement to the contrary, Developer shall have the right, but not the obligation, at any time in its sole and absolute discretion, (i) to sell, assign, lease or otherwise transfer all or any part of the Future Expansion Area, including, without limitation, any portions of the Developer Parcel to be used for parking decks, to third parties for the construction and operation of a Department Store or specialty retail store (of 20,000 square feet or more) thereon, and (ii) to expand the existing Mall and Mall Stores, and the Department Store Buildings (excluding the Sears Building), subject to the following conditions:

(1)  Such sale(s), assignment(s), lease(s) or transfer(s) and the land sold, assigned, leased or transferred shall be subject to all of the terms, covenants and conditions of this Agreement;

(2)  Developer (i) may enlarge the Mall, the Mall Stores, and/or the Department Store Buildings (excluding the Sears Building) into the Future Expansion Area, subject to Articles II and VII in order to connect, if necessary, the then existing Mall Stores, Mall, and Department Store Buildings (excluding the Sears Building) to any Future Department Store or specialty retail store, and (ii) subject to Article VII, may enlarge the Strawbridge Building into the Future Expansion Area on the second level of the Mall and also into the area on the first floor or first level of the Mall corresponding to the area within the Future Expansion Area on the second level of the Mall to be occupied by the enlarged Strawbridge Building;

(3)  No such sale, assignment, lease or other transfer shall result in the Parking Area on the Shopping Center Site being permanently reduced below the ratio required in this Agreement; and

(4)  No such sale, assignment, lease or other transfer shall result in an increase in the Allocable Share of Sears;

(5)  In no event shall Sears be required to bear any of the costs arising out of, or in connection with, such conveyance or the construction of the Future Department Store Buildings or future Mall Stores;

74.

3889a/12-04-90

BK 1240 PG 0173

(6)  The exterior of the Future Department Stores and the future Mall Stores shall be architecturally harmonious with the then existing Shopping Center;

(7)  The construction quality of the Future Department Stores and the future Mall Stores shall be equal to the construction quality of the then existing Shopping Center;

(8)  The building height of the Future Department Stores and the future Mall Stores shall not exceed the height therefor specified on Exhibit "D" hereof;

(9)  Any proposed modification to the Parking Area in the Future Expansion Area or in the adjacent exterior Common Area shall be subject to the reasonable approval of Sears to insure satisfactory traffic circulation and parking within the Shopping Center; and

(10)  The construction schedules, staging areas and construction access routes which materially impact Sears use of Parcel 1 shall be subject to the reasonable approval of Sears.

(b)  The Future Department Store and the Future Mall Stores shall be constructed in compliance with Article VII and all other applicable requirements of this Agreement applying to construction of a Department Store or of Mall Stores and in accordance with the plans and specifications therefor which shall be submitted to Sears; provided that (i) Sears shall have the right to reasonably disapprove such plans and specifications if they fail to comply with the requirements of this Section 24.1; and (ii) Sears shall have thirty (30) days from the receipt thereof to comment on and, to the extent such disapproval is provided for herein, to disapprove such plans and specifications.  Any such notice of disapproval from Sears shall set forth specifically the items disapproved and the reasons therefor.

(c)  Prior to the construction of improvements on the Future Expansion Area as contemplated under this Article XXIV, the Future Expansion Area shall either contain the businesses which currently exist on such property or other permitted uses hereunder, and may be covered with gravel, grass, ground cover or other similar surfaces.

Section 24.2  Further Assurances.  Subject to Section 24.1, Sears shall, whenever and as often as it shall be requested to do by Developer, but at Developer's sole cost and expense, cause to be executed, acknowledged and delivered any and all such further instruments or documents as may be necessary or proper for purposes of evidencing Developer's right to expand the Shopping Center pursuant to this Article XXIV.

Section 24.3  Amendment to the Agreement.  In the event Developer sells, leases, assigns or transfers, pursuant to Section 24.1 hereof, any Future Department Store site to a Transferee, the Parties and the Transferee shall execute an amendment (in this Section 24.3 "Amendment") to this REA, in form and substance reasonably satisfactory to Sears, in order to carry out the purposes of this Article XXIV.  The Amendment shall provide that the Transferee shall become a "Party" to this Agreement.

3889a/12-04-90

75.

BK 1240 PG 0174

Upon execution of the Amendment and the delivery by the Transferee to Sears of a written undertaking, in recordable form, in which the Transferee expressly assumes and covenants, effective upon the making of the Transfer, to perform and be bound by all the terms, covenants and conditions under this Agreement to be performed by Developer with respect to any such Future Department Store site, Developer shall be released of all liability and obligations arising hereunder after the effective date of such Transfer with respect to any such Future Department Store site.

## ARTICLE XXV

### MISCELLANEOUS

Section 25.1    No Waiver.  No waiver of any default by either Party hereto shall be implied from any omission by either Party to take any action in response to such default if such default continues or is repeated.  No express waiver of any default shall affect any default or cover any period of time other than the default and period of time specified in such express waiver.  One or more waivers of any default in the performance of any term of this Agreement shall not be deemed to be a waiver of any subsequent default in the performance of the same term of this Agreement.  The consent or approval by any Party to or of any act or request by the other Party requiring consent or approval shall not be deemed to waive or render unnecessary consent or approval to or of any subsequent similar acts or requests.  The rights and remedies of each Party shall be deemed to be cumulative and none of such rights or remedies at law or in equity which either Party might otherwise have from a default under this Agreement and the exercise of any right or remedy by a Party shall not impair any such Party's standing to exercise any other right or remedy.  Furthermore, any remedies of either Party specifically provided for shall be deemed additional to any and all other remedies to which either of them may be entitled in law or equity, and shall include the right to restrain by injunction any violation or threatened violation by a Party of any of the terms, covenants or conditions of this Agreement and by decree to compel performance of any such terms, it being agreed that the remedy at law for any breach of any such term, is not adequate.  Nothing herein shall derogate from the provisions of this Agreement where certain provisions as to exclusivity of remedy are expressly set forth.

Section 25.2    Interest.  Any sums payable by a Party to the other Party pursuant to this Agreement that are not paid when due shall bear interest from the date payment became due at the rate of three percent (3%) in excess of the bank "Prime Rate" (as hereinafter defined) but in no event exceeding the maximum rate per annum permitted by Delaware law.  As used herein, the "Prime Rate" shall mean the rate of interest announced from time to time by The First National Bank of Chicago as its bank's reference rate or prime rate.

Section 25.3    No Relationship of Principal and Agent.  Neither anything contained in this Agreement nor any acts of the Parties, including, without limitation, the acts of Developer in compliance with its maintenance

3889a/12-04-90

BK 1240 PG 0175

obligations set forth herein, shall be deemed or construed by any Party or by any third person to create the relationship of principal and agent or of limited or general partnership or of joint venture or of any association between or among either of the Parties.

Section 25.4    Separability of Void Provisions.    If any provision of this Agreement, or the application thereof to a Party, and/or any Person and/or circumstances shall be held to be invalid, void or illegal, the remaining provisions and/or the application of such provisions to a Party and/or any circumstances other than as to those which it is held to be invalid, or illegal, shall nevertheless remain in full force and effect and not be affected thereby, and the Parties agree that they would have entered into this Agreement independently of any provision or provisions of this Agreement held to be invalid, void or illegal.

Section 25.5    Captions.    The captions of the Sections, Articles and Table of Contents of this Agreement are for convenience only and shall not be considered or referred to in resolving questions of interpretation and construction. This document is the result of an arms length transaction among the Parties and is to be construed according to its fair meaning and not strictly against a Party.

Section 25.6    Governing Law.    This Agreement shall be construed, interpreted and applied under the laws of the State of Delaware.

Section 25.7    Amendment.    This Agreement may be amended or terminated by, and only by, the written agreement of the Parties hereto or their successors or assigns. Nothing herein shall be deemed to prohibit any agreement between the Parties supplementing this Agreement which deals with the rights, duties and obligations of those Parties.

Section 25.8    Right to Enjoin.    In the event of any violation or threatened violation by a Party or any Occupant of any part of the Shopping Center Site of any of the terms of this Agreement, any Party shall have the right to apply to a court of competent jurisdiction for an injunction against such violation or threatened violation.

Section 25.9    Counterparts.    This Agreement may be signed in several counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

Section 25.10    Exhibits.    Any reference to any Exhibit contained within this Agreement shall be deemed to mean any Exhibit to this Agreement as from time to time amended by the Parties.

Section 25.11    No Gift or Dedication.    Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center Site to the general public, or for the general public or for any public purpose whatsoever, it being the intention of the Parties that this Agreement shall be strictly limited to and for the purpose expressed.

With the concurrence of the Parties and in accordance with Section 12.1(c) hereof, all or a portion of the Common Area may be closed from time to time to such an extent and for such length of time as may be

3889a/12-04-90

BK 1240 PG 0176

sufficient in the opinion of the Parties' respective legal counsel, to prevent a dedication or the accrual of rights of any Person or of the public therein.

Section 25.12  Covenants Run with Land.  The agreement of the Parties set forth in this Agreement shall be construed as covenants and not as conditions and that, to the fullest extent legally possible, all the covenants of the Parties (including, without limitation, the Operating Covenants and all use restrictions) shall run with the land.

Section 25.13  No Brokers.  The Parties represent, warrant and agree each to and with the other that no broker, agent or realtor was involved in the negotiations of, or the sale of property to or by it preceding this Agreement and each Party hereby agrees to indemnify and hold harmless the other against any claims by any such broker, agent or realtor originating or based upon any contract, actual or alleged, with the indemnifying Party, including, without limitation, reasonable counsel fees and disbursements.

Section 25.14  Recordation.  Developer will cause a duplicate original of this Agreement to be recorded in New Castle County, Delaware and the fees therefor shall be shared equally by the Parties.

Section 25.15  No Third-Party Beneficiaries.  Except as herein specifically provided, no rights, privileges or immunities of a Party shall inure to the benefit of any tenant, non-party Occupant or other third party; nor shall any tenant non-party Occupant or such other third party be deemed to be a third party beneficiary of any of the provisions contained herein.

Section 25.16  Promotional Services Program and Merchants' Association.  Developer shall form and supervise either a promotional services program or a merchants' association for the Shopping Center, and Sears agrees, subject to the Supplemental Agreement, to contribute to the promotional services program or the merchants' association, as the case may be.

Section 25.17  Estoppel Certificates.  Each of the Parties agrees that it will, at any time and from time to time (but in no event more often than three (3) times per any twelve (12) month period per such requesting Party), within thirty (30) days following receipt of Notice by the other Party hereto specifying that it is given pursuant to this Section, execute, acknowledge and deliver to the Party so requesting the same, a statement certifying (i) that this Agreement is unamended, unsupplemented and unmodified and in full force and effect (or, if there shall be any such amendments, supplements and modifications stating the nature thereof), (ii) that to the best of the signer's knowledge and belief, there are no defaults in the performance of this Agreement (or, if there are any such defaults of which the signer may have knowledge specifying the nature of said defaults), (iii) whether or not the certifying Party has prepaid any monies not then due for more than one (1) month in advance of the dates, and if so, the nature and amount thereof, and (iv) it has neither given nor received any notice of default.  The foregoing certifications shall not be deemed to be affirmative representations, warranties or covenants of the certifying Party and shall in no event subject the certifying Party to any liability whatsoever, the sole

3889a/12-04-90

BK1240PG0177

effect of the same being to estop the certifying Party from making any
assertions contrary to said certifications. Any statement delivered pursuant
to this Section 25.17 may be relied upon by any prospective Transferee,
Mortgagee or Institutional Lender of the Party requesting such statement or by
any prospective assignee of the Agreement.

Section 25.18  **Rule Against Perpetuities.**  Notwithstanding anything
to the contrary herein contained, any contingent license, easement  or other
right granted by this Agreement that has not vested by the "Vesting Date", as
hereinafter defined, shall terminate as of said Vesting Date.  The "Vesting
Date" is defined as the twenty-first (21st) anniversary of the death of the
last to die of all Persons whose signatures appear on this Agreement, in
whatever capacity.

Section 25.19  **Standard of Approval.**  Wherever  in this Agreement
approval of either Party or signatory is required, and unless otherwise
provided in any Section of this Agreement such approval or disapproval shall
not be unreasonably withheld and shall be given within thirty (30) days
following the receipt of the item to be so approved or disapproved, or the
same shall, pursuant to Section 22.2 hereof, be conclusively deemed to have
been approved by said Party if the notice so states.  Any disapproval shall
specify with particularity the reasons therefor; provided, however, that
wherever in this Agreement a Party is given the right to approve or disapprove
in its sole and absolute discretion, it may disapprove without specifying a
reason therefor.

Section 25.20  **Default.**  Unless otherwise provided in this Agreement,
no Party shall be deemed to be in default under this Agreement until and
unless such Party shall have been given written notice by the other Party
describing the nature of such default, and within thirty (30) days after the
receipt of such notice, the Defaulting Party shall have failed to cure said
default, or if said default is incapable of being cured within such thirty
(30) day period, commence to cure such impending default and/or to proceed
diligently to complete the curing of such impending default as promptly as
possible, utilizing all reasonable means to effectuate and expedite the curing
of such impending default; provided, however, in the event of emergency
conditions constituting default, the non-defaulting party acting in good faith
shall have the right to cure such default upon such advance notice as is
reasonably possible under the circumstances or, if necessary, without advance
notice, so long as notice is given as soon as possible thereafter.

Section 25.21  **Limitation of Liability.**

(a)  Notwithstanding anything to the contrary contained herein, Sears
shall look solely to the then equity of Developer in and to the Shopping
Center (including, without limitation, net cash flow from the Shopping Center)
and the net proceeds from the sale of the Shopping Center as limited below, in
the event of breach or default by Developer pursuant to the provisions of this
Agreement or any agreement or instrument executed in connection herewith, and
Sears agrees that the liability of Developer under this Agreement or any such

79.

BK 1240 PG 0178

other agreement or instrument shall not exceed the value of such equity (including, without limitation, net cash flow) of Developer in and to the Shopping Center and such net sales proceeds as herein limited.

Sears shall be entitled to look only to the net proceeds from the sale of the Shopping Center: (i) in the event of a breach or default by Developer pursuant to the provisions of this Agreement or any agreement or instrument executed in connection herewith; and (ii) upon Sears obtaining a final monetary judgment against Developer as a result of such breach or default; provided, however, that Sears shall have no rights to any net sales proceeds if: (a) Sears fails to indicate with specificity the scope and nature of any such Developer breach or default on any estoppel certificate requested pursuant to Section 25.17 hereto; (b) in the event such a breach or default is so indicated on the estoppel certificate, Sears fails to file a complaint in the appropriate jurisdiction for the recovery of such proceeds within three (3) months from the date Sears has executed such estoppel certificate; or (c) in any event, regardless of whether an estoppel certificate is requested or given, Sears fails to file a complaint for the recovery of such proceeds within three (3) months of a sale by Developer of all or any portion of its interest in the Shopping Center.

Without limitation on the foregoing, no properties or assets of Developer other than the Shopping Center or the net proceeds from the sale of the Shopping Center on the conditions described above shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) arising out of, or in connection with, a default by Developer under this Agreement; and if Sears shall acquire a lien on any other properties or assets of Developer by judgment or otherwise, Sears shall promptly release such lien on such other properties and assets by executing, acknowledging and delivering to Developer an instrument to that effect prepared by Developer's attorneys and approved by Sears.

(b) This Agreement is executed by the partners of Developer solely as such partners of same and not in their own individual capacities. No present or future advisor, trustee, director, officer, partner, employee, beneficiary, shareholder, participant or agent of or in Developer or of or in any entity now or hereafter having a direct or indirect ownership interest in Developer shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into by Developer under or in connection with this Agreement or any agreement made or entered into by Developer under or pursuant to the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Sears and its successors and assigns and, without limitation, all other Persons, partnerships, corporations and entities, shall look solely to Developer's equity in the Shopping Center (which shall not include the deficit capital account of any present or future partner in Developer) for the payment of any claim or for any performance by Developer, and Sears hereby waives any and all such personal liability.

3889a/12-04-90

BK 1240 PG 0179

Notwithstanding anything seemingly to the contrary contained herein, this Section 25.21 shall not affect the ability of Sears to bring an action for and obtain injunctive relief, declaratory judgment and/or suit for specific performance.

(c) The limitations of liability provided in subparagraphs (a) and (b) above are in addition to, and not in limitation of, any limitation on liability applicable to Developer provided by law or by any other contract, agreement or instrument.

Section 25.22 _Gender_. In construing the provisions of this Lease and whenever the context so requires, the use of a gender shall include all other genders, the use of the singular shall include the plural, and the use of the plural shall include the singular.

Section 25.23 _Attorneys' Fees_. If either Party shall be required to employ an attorney to enforce or defend the rights of such Party hereunder, the prevailing Party shall be entitled to recover reasonable attorneys' fees and costs, including expert witness' costs.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

under seal

Sealed and Delivered
in the Presence of:

CONCORD MALL,
a Delaware general partnership

By: JMB GROUP TRUST III,
an Illinois trust,
General Partner

By: JMB INSTITUTIONAL ADVISORS-III,
an Illinois general partnership,
Investment Manager

By: JMB INSTITUTIONAL REALTY CORPORATION,
an Illinois corporation,
Managing Partner

By: _____
Its: _____

[CORPORATE SEAL]

Attest:

_____
Its: Assistant Secretary

Sealed and Delivered
in the Presence of:

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____
Its: National Manager
Real Estate Planning Group

[CORPORATE SEAL]

Attest:

_____
Its: Assistant Secretary

R. E. DIRECTION
RK
LEGAL
KNW

3889a/12-04-90

BK 1240 PG 0180

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF COOK       )

This instrument was acknowledged before me on _December 20_, 1990,
by _Ronald B. Full_ and _Joyce E. Horan_ as the National Manager, Real Estate
Planning Group, and Assistant Secretary of SEARS, ROEBUCK AND CO., a New York
corporation, the party on behalf of whom the instrument was executed.

WITNESS my hand and official seal this _20th_ day of _November_, 19__.

By _Lelia P. Isaac_
                              Notary Public

_Lelia P. Isaac_
                        (Notary Printed Name)

My Commission Expires:

_August 25, 1993_

"OFFICIAL SEAL"
LELIA P. ISAAC
Notary Public, State of Illinois
My Commission Expires 8/25/93

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF COOK       )

This instrument was acknowledged before me on _December 7_, 1990,
by _Gary M. Surros_, as Executive Vice President of JMB INSTITUTIONAL
REALTY CORPORATION, an Illinois corporation, as Managing Partner of JMB
INSTITUTIONAL ADVISORS-III, an Illinois general partnership, as Investment
Manager of JMB GROUP TRUST III, the General Partner of CONCORD MALL, a
Delaware general partnership, the party on behalf of whom the instrument was
executed.

WITNESS my hand and official seal this _7th_ day of _December_, 19_90_.

By _Lisa A. Skul_
                              Notary Public

_Lisa A. Skul_
                        (Notary Printed Name)

My Commission Expires:

_June 22, 1994_

"OFFICIAL SEAL"
LISA A. SKUL
Notary Public, State of Illinois
My Commission Expires June 22, 1994

82.

3889a/12-04-90



EXHIBIT A
PART I
DEVELOPER PARCEL

BK 1240PG0181

**VANDEMARK & LYNCH, INC.**
ENGINEERS • PLANNERS • SURVEYORS

4305 MILLER RD./PO BOX 2047
WILMINGTON, DE 19899/(302) 764-7635

Project No.  17961.09
Drawing No.  26800-F

January 17, 1991

Description of a parcel of land known as Concord Mall,
Concord Turnpike,  Brandywine Hundred, New Castle County,
Delaware.

-------------------------------------------------------------

ALL THAT CERTAIN TRACT, piece or parcel of land situate on
the Concord Pike, U.S. Route 202, in Brandywine Hundred, New
Castle County, Delaware and shown as Concord Mall on a Record
Major Subdivision and Land Development Plan prepared by
VanDemark & Lynch, Inc., Engineers, Planners and Surveyors,
Wilmington, Delaware, dated April 25, 1990 and revised
through August 13, 1990, recorded on September 13, 1990, in
the Office of the Recorder of Deeds in and for New Castle
County on Microfilm No. 10569 and described to wit:

BEGINNING at a point on the southeasterly right of way
line of the Concord Pike, said point being a corner for
property now or formerly of Brandywine College, Inc., said
southeasterly right of way of the Concord Pike being distant
southeasterly 75.00 feet from the centerline thereof,
measured at right angles thereto;

THENCE from said point of Beginning and along the side
southeasterly side of the Concord Turnpike, the eight
following described courses and distances;
(1)  North 33°-24'-17" East, 9.39 feet to a point;
(2)  North 33°-05'-36" East, 849.16 feet to a point;
(3)  North 35°-57'-21" East, 100.12 feet to a point;
(4)  North 33°-05'-36" East, 201.00 feet to a point;
(5)  North 30°-13'-51" East, 100.12 feet to a point;
(6)  North 33°-05'-36" East, 499.35 feet to a point;
(7)  North 33°-54'-53" East, 69.77 feet to a point of
     curvature; and
(8)  Northeasterly along a curve to the left having a radius
     of 5,804.65 feet, an arc distance of 724.93 feet to a
     point, a corner for lands now or formerly of Wilmington
     Trust Company, said point being distant by a chord of
     North 29°-31'-04" East, 724.47 feet from the last
     described point;

THENCE along the northeasterly line of said lands now or
formerly of the Wilmington Trust Company, the two following
described courses and distances:
(1)  South 58°-49'-30" East, 176.96 feet to a point
(2)  North 31°-10'-30" East, 152.97 feet to a point in the
     southwesterly boundary line of Perry Park;

THENCE THEREBY, South 69°-32'-20" East, 747.87 feet to a
point in the northwesterly boundary line of Devonshire,
Section 1;

BK 1240 PG 0182

17961.09-26800-F
January 17, 1991
Page 2

THENCE THEREBY, the three following described courses and
distances:

(1)    South 32°-47'-03" West, 449.11 feet to a point;
(2)    South 17°-36'-00" West, 263.00 feet to a point; and
(3)    South 33°-05'-36" West, 2,231.52 feet to a point in the
       northeasterly line of said lands now or formerly of
       Brandywine College, Inc.

THENCE THEREBY, North 53°-13'-00" West, 931.99 feet to a
point on the said southeasterly side of the Concord Turnpike
and the point and place of Beginning;

CONTAINING within said metes and bounds, 58.947 acres of land
being the same, more or less...

**SAVE AND EXCEPTING THEREFROM THE FOLLOWING:**

ALL THAT CERTAIN tract, piece or parcel of land situate off
Concord Pike (U.S. Route 202), being a portion of lands known
as Concord Mall, Brandywine Hundred, New Castle County,
Delaware and shown as Parcel 10 on a Record Major Subdivision
and Land Development Plan prepared by VanDemark & Lynch,
Inc., Engineers, Planners and Surveyors, Wilmington,
Delaware, dated April 25, 1990 and revised through August 13,
1990, recorded on September 13, 1990, in the Office of the
Recorder of Deeds in and for New Castle County on Microfilm
No. 10569 and described to wit:

       BEGINNING at a point on the line dividing the herein
described parcel and Parcel 1, said point being distant the
four following described courses and distances from a point
on the southeasterly side of the Concord Pike, said point
being a common corner for said Parcel 1 of the Concord Mall,
a Delaware General Partnership and lands now or formerly of
Brandywine College Inc.;

(1)    Along the said southeasterly side of the Concord Pike,
       North 33°-24'-17" East, 9.39 feet to a point; and
(2)    Continuing along the said southeasterly side of Concord
       Pike, North 33°-05'-36" East, 707.89 feet to a point, a
       corner for said Parcel 3,
(3)    Leaving the said southeasterly side of the Concord Pike
       and along the southwesterly line of said Parcel 3 in
       part and southwesterly line of Parcel 4, in part South
       56°-54'-24" East, 540.00 feet to a point; and
(4)    Along the northwesterly line of said Parcel 4 and a line
       through said Parcel 1, South 33°-05'-36" West,
       44.67 feet to the point and place of Beginning;

BK 1240 PG 0183

17961.09-26800-F
January 17, 1991
Page 3

THENCE from the said point of Beginning and by lines along lands of said Parcel 1, the seven following described courses and distances:

(1)   South 56°-54'-24" East, 135.63 feet to a point;
(2)   South 33°-05'-36" West, 58.00 feet to a point;
(3)   South 56°-54'-24" East, 74.00 feet to a point;
(4)   South 33°-05'-36" West, 218.50 feet to a point;
(5)   North 56°-54'-24" West, 407.50 feet to a point;
(6)   North 33°-05'-36" East, 276.50 feet to a point; and
(7)   South 56°-54'-24" East, 197.87 feet to the point and place of Beginning;

CONTAINING within said metes and bounds, 2.488 acres of land being the same, more or less...

WWD/SLJ/jbk
Checked By ____

BK 1240 PG 0184



EXHIBIT A
PART II
SEARS PARCEL

# VANDEMARK & LYNCH, INC.
ENGINEERS • PLANNERS • SURVEYORS

4306 MILLER RD./PO BOX 2047
WILMINGTON, DE 19899/(302) 764-7635

Project No. 17961.09
Drawing No. 26800-F
Revision No. 1

January 17, 1991

Description of Parcel 10, Concord Hall, Concord Pike,
Brandywine Hundred, New Castle County, Delaware.

------------------------------------------------------

ALL THAT CERTAIN tract, piece or parcel of land situate off
Concord Pike (U.S. Route 202), being a portion of lands known
as Concord Hall, Brandywine Hundred, New Castle County,
Delaware and shown as Parcel 10 on a Record Major Subdivision
and Land Development Plan prepared by VanDemark & Lynch,
Inc., Engineers, Planners and Surveyors, Wilmington,
Delaware, dated April 25, 1990 and revised through August 13,
1990, recorded on September 13, 1990, in the Office of the
Recorder of Deeds in and for New Castle County on Microfilm
No. 10569 and described to wit:

BEGINNING at a point on the line dividing the herein
described parcel and Parcel 1, said point being distant the
four following described courses and distances from a point
on the southeasterly side of the Concord Pike, said point
being a common corner for said Parcel 1 of the Concord Hall,
a Delaware General Partnership and lands now or formerly of
Brandywine College Inc.;

(1)  Along the said southeasterly side of the Concord Pike,
     North 33°-24'-17" East, 9.39 feet to a point; and
(2)  Continuing along the said southeasterly side of Concord
     Pike, North 33°-05'-36" East, 707.89 feet to a point, a
     corner for said Parcel 3,
(3)  Leaving the said southeasterly side of the Concord Pike
     and along the southwesterly line of said Parcel 3 in
     part and southwesterly line of Parcel 4, in part South
     56°-54'-24" East, 540.00 feet to a point; and
(4)  Along the northwesterly line of said Parcel 4 and a line
     through said Parcel 1, South 33°-05'-36" West,
     44.67 feet to the point and place of Beginning;

THENCE from the said point of Beginning and by lines along
lands of said Parcel 1, the seven following described courses
and distances:
(1)  South 56°-54'-24" East, 135.63 feet to a point;
(2)  South 33°-05'-36" West, 58.00 feet to a point;
(3)  South 56°-54'-24" East, 74.00 feet to a point;
(4)  South 33°-05'-36" West, 218.50 feet to a point;
(5)  North 56°-54'-24" West, 407.50 feet to a point;
(6)  North 33°-05'-36" East, 276.50 feet to a point; and
(7)  South 56°-54'-24" East, 197.87 feet to the point and
     place of Beginning;

CONTAINING within said metes and bounds, 2.488 acres of land
being the same, more or less...

WWD/SLJ/jbk
Checked By

BK 1240 PG 0185



EXHIBIT A
PART III
BOSCOV LEASEHOLD PARCEL

# VANDEMARK & LYNCH, INC.

ENGINEERS • PLANNERS • SURVEYORS

4305 MILLER RD./PO BOX 2047
WILMINGTON, DE 19899(302) 764-7635

Project No. 17961.09
Drawing No. 26800-P

January 17, 1991

Description of a portion of property of the Concord Mall Partnership, known as Parcel 7, Brandywine Hundred, New Castle County, Delaware.

---

BEGINNING at a point on the southeasterly side of the Concord Turnpike, said point of Beginning being the six following described courses and distances measured along the said southeasterly side of the Concord Turnpike from a corner for lands now or formerly of Brandywine College, Inc.;

(1)  North 33°-24'-17" East, 9.39 feet to a point;
(2)  North 33°-05'-36" East, 849.16 feet to a point;
(3)  North 35°-57'-21" East, 100.12 feet to a point;
(4)  North 33°-05'-36" East, 201.00 feet to a point;
(5)  North 30°-13'-51" East, 100.12 feet to a point; and
(6)  North 33°-05'-36" East, 397.78 feet to said point of Beginning; THENCE from said point of Beginning and along the said southeasterly side of the Concord Turnpike, the three following described courses and distances:
(1)  North 33°-05'-36" East, 101.57 feet to a point;
(2)  North 33°-54'-53" East, 69.77 feet to a point of curvature; and
(3)  Northeasterly along a curve to the left having a radius of 5,804.65 feet, an arc distance of 392.96 feet to a point, a corner for Parcel No. 5, said point being distant by a chord of North 31°-09'-22" East, 392.89 feet from the last described point;

THENCE along the northeasterly line of said Parcel No. 5, the seven following described courses and distances:
(1)  South 56°-54-24" East, 398.16 feet to a point;
(2)  South 33°-05'-36" West, 15.00 feet to a point;
(3)  South 56°-54'-24" East, 158.20 feet to a point;
(4)  North 33°-05'-36" East, 13.00 feet to a point;
(5)  South 56°-54'-24" East, 27.00 feet to a point;
(6)  North 33°-05'-36" East, 2.00 feet to a point;
(7)  South 56°-54'-24" East, 345.12 feet to a point in the northeasterly boundary line of Devonshire, Section 1;

THENCE THEREBY, the two following described courses and distances:
(1)  South 17°-36'-00" West, 51.67 feet to a point;
(2)  South 33°-05'-36" West, 504.21 feet to a point, a corner for Parcel 2;

BK 1240 PG 0186

17961.09-26800-F
January 17, 1990
Page 2

THENCE THEREBY, the five following described courses and distances:

(1)  North 56°-54'-24" West, 263.30 feet to a point;
(2)  North 33°-05'-36" East, 50.00 feet to a point;
(3)  North 56°-54'-24" West, 280.00 feet to a point;
(4)  South 33°-05'-36" West, 60.00 feet to a point;
(5)  North 56°-54'-24" West, 386.70 feet to a point on the said southeasterly side of the Concord Turnpike and to the point and place of Beginning;

CONTAINING within said metes and bounds, 11.581 acres of land, being the same, more or less...

SMC/jbk
Checked By _SMV_

BK 1240 PG 0187



**VANDEMARK & LYNCH, INC.**
ENGINEERS • PLANNERS • SURVEYORS

4305 MILLER RD./PO BOX 2047
WILMINGTON, DE 19899/(302) 764-7635

EXHIBIT A
PART IV
STRAWBRIDGE LEASEHOLD PARCEL

Project No. 17961.09
Drawing No. 26800-F
Revision 1

March 25, 1991

Description of Parcel 9, JMB Properties Co., Concord Pike,
Brandywine Hundred, New Castle County, Delaware.

------------------------------------------------------------

ALL THAT CERTAIN tract, piece or parcel of land situate at
Concord Mall off Concord Pike, Brandywine Hundred, New Castle
County, Delaware and shown as Parcel 9 on a Record Major
Subdivision and Land Development Plan prepared by VanDemark &
Lynch, Inc., Engineers, Planners and Surveyors, Wilmington,
Delaware, dated April 25, 1990, revised through August 13,
1990, Drawing No. 26800-F, Revision 1, recorded September
13, 1990, in the Office of the Recorder of Deeds in and for
New Castle County on Microfilm No. 10569 and being more
particularly described as follows, to wit:

   BEGINNING at a point, a common corner for Parcel Nos. 2
and 4, said point being distant the six following described
courses and distances from a point on the southeasterly side
of the Concord Pike, said point being a common corner for
Parcel No. 1 of JMB Properties Co., and lands now or formerly
of Brandywine College, Inc., courses one through five to
follow being along the said southeasterly side of the Concord
Pike:
(1)  North 33°-24'-17" East, 9.39 feet to a point;
(2)  North 33°-05'-36" East, 849.16 feet to a point;
(3)  North 35°-57'-21" East, 100.12 feet to a point;
(4)  North 33°-05'-36" East, 201.00 feet to a point;
(5)  North 30°-13'-51" East, 52.80 feet to a point; and
(6)  Leaving the said southeasterly side of the Concord Pike,
     South 56°-54'-24" East, 45.62 feet to the point of
     Beginning;

THENCE from said point of Beginning and along lines of said
Parcel No. 2, the five following described courses and
distances:
(1)  Northeasterly by a curve to the right having a radius of
     185.00 feet, an arc distance of 184.03 feet to a point
     of reverse curvature, said point being distant by a
     chord of North 89°-20'-46" East, 176.53 feet from the
     last described point;
(2)  Southeasterly along a curve to the left, having a radius
     of 80.00 feet, an arc distance of 55.50 feet to a point
     of tangency for said curve, said point being distant by
     a chord of South 82°-01'-54" East, 54.39 feet from the
     last described point;

BK 1240 PG 0188

EXHIBIT A
PART IV
STRAWBRIDGE LEASEHOLD PARCEL

17961.09-26800-F
Revision 1
March 25, 1991
Page 2

    (3)  North 78°--05'-36" East, 138.14 feet to a point;
    (4)  South 56°-54'-24" East, 25.00 feet to a point; and
    (5)  South 33°-05'-36" West, 218.84 feet to a point, a corner
        for said Parcel No. 4,

THENCE by lines of said Parcel No. 4, the eleven following
described courses and distances:
    (1)  South 33°-05'-36" West, 53.66 feet to a point;
    (2)  South 56°-54'-24" East, 20.00 feet to a point;
    (3)  South 33°-05'-36" West, 65.00 feet to a point;
    (4)  North 56°-54'-24" West, 20.00 feet to a point;
    (5)  South 33°-05'-36" West, 152.50 feet to a point;
    (6)  North 56°-54'-24" West, 155.00 feet to a point of
        curvature;
    (7)  Northwesterly by a curve to the right having a radius of
        185.00 feet, an arc distance of 209.62 feet to a point
        of compound curvature, said point being distant by a
        chord of North 24°-26'-45" West, 198.59 feet from the
        last described point;
    (8)  Northeasterly along a curve to the right having a radius
        of 150.00 feet, an arc distance of 65.66 feet to a point
        of tangency for said curve, said point being distant by
        a chord of North 20°-33'-15" East, 65.13 feet from the
        last described point;
    (9)  North 33°-05'-36" East, 29.67 feet to a point of
        curvature;
    (10) Northeasterly by a curve to the right having a radius of
        150.00 feet, an arc distance of 65.66 feet to a point of
        compound curvature, said point being distant by a chord
        of North 45°-37'-57" East, 65.13 feet from the last
        described point; and
    (11) Northeasterly by a curve to the right having a radius of
        185.00 feet, an arc distance of 8.65 feet to the point
        and place of Beginning, said point being distant by a
        chord of North 59°-30'-37" East, 8.64 feet from the last
        described point;

CONTAINING within said metes and bounds, 2.812 acres of land
being the same, more or less...

WWD/SLJ/jbk
Checked By_____

BK 1240 PG 0189

**EXHIBIT A**

**PART V**

**INTENTIONALLY OMITTED**



EXHIBIT A BK 1240 PG 0190
PART VI
SHOPPING CENTER SITE

# VANDEMARK & LYNCH, INC.
ENGINEERS • PLANNERS • SURVEYORS

4305 MILLER RD./PO BOX 2047
WILMINGTON, DE 19899/(302) 764-7635

Project No. 17961.09
Drawing No.  26800-F

January 17, 1991

Description of a parcel of land known as Concord Mall,
Concord Turnpike,  Brandywine Hundred, New Castle County,
Delaware.

---------------------------------------------------------------

ALL THAT CERTAIN TRACT, piece or parcel of land situate on
the Concord Pike, U.S. Route 202, in Brandywine Hundred, New
Castle County, Delaware and shown as Concord Mall on a Record
Major Subdivision and Land Development Plan prepared by
VanDemark & Lynch, Inc., Engineers, Planners and Surveyors,
Wilmington, Delaware, dated April 25, 1990 and revised
through August 13, 1990, recorded on September 13, 1990, in
the Office of the Recorder of Deeds in and for New Castle
County on Microfilm No. 10569 and described to wit:

BEGINNING at a point on the southeasterly right of way
line of the Concord Pike, said point being a corner for
property now or formerly of Brandywine College, Inc., said
southeasterly right of way of the Concord Pike being distant
southeasterly 75.00 feet from the centerline thereof,
measured at right angles thereto;

THENCE from said point of Beginning and along the side
southeasterly side of the Concord Turnpike, the eight
following described courses and distances;
(1)   North 33°-24'-17" East, 9.39 feet to a point;
(2)   North 33°-05'-36" East, 849.16 feet to a point;
(3)   North 35°-57'-21" East, 100.12 feet to a point;
(4)   North 33°-05'-36" East, 201.00 feet to a point;
(5)   North 30°-13'-51" East, 100.12 feet to a point;
(6)   North 33°-05'-36" East, 499.35 feet to a point;
(7)   North 33°-54'-53" East, 69.77 feet to a point of
      curvature; and
(8)   Northeasterly along a curve to the left having a radius
      of 5,804.65 feet, an arc distance of 724.93 feet to a
      point, a corner for lands now or formerly of Wilmington
      Trust Company, said point being distant by a chord of
      North 29°-31'-04" East, 724.47 feet from the last
      described point;

THENCE along the northeasterly line of said lands now or
formerly of the Wilmington Trust Company, the two following
described courses and distances:
(1)   South 58°-49'-30" East, 176.96 feet to a point
(2)   North 31°-10'-30" East, 152.97 feet to a point in the
      southwesterly boundary line of Perry Park;

THENCE THEREBY, South 69°-32'-20" East, 747.87 feet to a
point in the northwesterly boundary line of Devonshire,
Section 1;

BK 1240 PG 0191

17961.09-26800-F
January 17, 1991
Page 2

THENCE THEREBY, the three following described courses and
distances:

(1)  South 32°-47'-03" West, 449.11 feet to a point;
(2)  South 17°-36'-00" West, 263.00 feet to a point; and
(3)  South 33°-05'-36" West, 2,231.52 feet to a point in the
     northeasterly line of said lands now or formerly of
     Brandywine College, Inc.

THENCE THEREBY, North 53°-13'-00" West, 931.99 feet to a
point on the said southeasterly side of the Concord Turnpike
and the point and place of Beginning;

CONTAINING within said metes and bounds, 58.947 acres of land
being the same, more or less...

BK 1240 PG 0192

EXHIBIT "B"

PLOT PLAN

ATTACHED HERETO

89.

BK 1240 PG 0193

## EXHIBIT "C"

### BUILDING LEVEL SPECIFICATIONS

| | |
|---|---|
| Existing First Floor Mall Level (at Sears Court) | 382.83' |
| First Floor Sears | 383.17' |
| Second Floor Sears (anticipated second level Mall) | 407.17' |

BK 1240 PG 0194

## EXHIBIT "D"

### BUILDING HEIGHTS

Maximum height of Future Department Stores, and the future Mall Stores shall not exceed 50' - 0".

BK 1240 PG 0195

EXHIBIT "E"
TO
CONCORD MALL
CONSTRUCTION, OPERATION AND
RECIPROCAL EASEMENT AGREEMENT

RULES AND REGULATIONS

A. COMMON AREA

The following matters with respect to maintenance of the Common Area shall be performed by Developer or caused to be performed by Developer:

1. The surface of the Parking Areas, Mall, curbs and sidewalks shall be maintained in good and safe condition and kept level, smooth and evenly covered with the type of surfacing material originally installed thereon, or such substitute thereof as shall be in all respects equal thereto in quality, appearance and durability and approved by the Parties.

2. All papers, debris, filth and refuse shall be promptly removed from the Common Area in the Shopping Center which areas shall be washed or thoroughly swept as required to keep the same in a clean condition. The Parking Areas and all sidewalks shall be kept reasonably free of snow, ice and water. All sweeping shall be at intervals before the stores shall be open for business to the public, using motor driven parking lot vacuum cleaning vehicles where feasible.

3. All trash and rubbish containers located in the Common Area for the use of Permittees shall be emptied as frequently as necessary but in any event at least daily and shall be washed at intervals sufficient to maintain the same in a clean condition.

4. All landscaping shall be properly maintained, including removal of dead plants, weeds and foreign matter, pruning, fertilizing and such replanting and replacement as the occasion may require.

5. All hard-surfaced marking (such as, for example, pavement signs and striping) shall be inspected at regular intervals and promptly repainted as the same shall become unsightly or indistinct from wear and tear, or other cause.

6. All storm drain catch basins shall be cleaned on a schedule sufficient to maintain all storm drain lines in a free-flowing condition and all mechanical equipment related to storm drain and sanitary sewer facilities shall be regularly inspected and kept in proper working order.

7. All asphalt paving shall be inspected at regular intervals and maintained in a first-class condition.

1623e/12-19-90

1.

BK 1240 PG 0196

8.   All stairways shall be:  (a) swept and washed at intervals sufficient to maintain the same in a clean condition; (b) inspected at regular intervals; and (c) promptly repaired upon the occurrence of any irregularities or worn portions thereof.

9.   All glass, including skylights, plate glass and/or glass-enclosed devices shall be cleaned and/or replaced at intervals sufficient to maintain the same in a clean condition.

10.   All surface utility facilities servicing the Common Area, including, but not by way of limitation, electrical systems, storm drainage systems, sanitary sewer systems, hose bibbs, standpipes, sprinklers and domestic water lines, shall be inspected at regular intervals and promptly cleaned, maintained, repaired or replaced, as the occasion may require, to the extent that the same are not cleaned, maintained, repaired or replaced by public utilities.

11.   All Common Area amenities, including without limitation public restrooms, benches, and institutional, directional, traffic and other signs, markers and lights shall be inspected at regular intervals, maintained in a clean and attractive (and as applicable sanitary) condition and promptly repaired or replaced upon the occurrence of any defects or irregularities thereto.

12.   All lamps shall be inspected at regular intervals and all lamps, as needed, shall be promptly cleaned, relamped, reballasted or replaced.

13.   The improvements on and to the Common Area shall be repaired or replaced with materials, apparatus and facilities of quality at least equal to the quality of the materials, apparatus and facilities repaired or replaced.

14.   All signs of the Shopping Center (as contrasted with those of Occupants), shall be maintained in good order, condition and repair, including without limitation relamping and repairs being made as required.

15.   The employment of courteous personnel to patrol the Common Area, in such numbers, and during store hours and such other hours as are necessary for traffic control, security and security patrol for the safety and security of Occupants and Permittees in accordance with practices prevailing in other first-class regional shopping centers in the Northeastern region of the United States.

16.   Use good faith efforts to require Permittees and Occupants of the Developer Parcel to comply with all regulations with respect to the Common Area, including, but not

2.

1623e/12-19-90

BK 1240PG0197

by way of limitation, posted speed limits, directional markings and parking stall markings.

17. With respect to all mechanical and electrical facilities and systems serving the Mall, including, but not by way of limitation, the lighting facilities, vertical transportation facilities, heating, ventilating and cooling systems, and actuated or manually operated doors, Developer shall (a) inspect the same at regular intervals, and (b) promptly repair the same upon the occurrence of any failure, defect or malfunctioning.

18. The heating, ventilating and cooling systems for the Mall shall be operated in accordance with the provisions of the Agreement and of these Rules and Regulations.

19. All surfaces of the Mall which are painted or otherwise finished shall be cleaned at regular intervals, and repainted or otherwise refinished as necessary, and the ceiling of the Mall shall be regularly cleaned, and painted or repainted, as necessary, giving particular attention to the areas surrounding the diffusers. The floor of the Mall shall be regularly cleaned and sealed, waxed or otherwise finished as appropriate for the type of floor materials utilized.

20. All of the Common Area shall be maintained free from any obstructions not required or specifically permitted under the Agreement, including the prohibition of the sale or display of merchandise outside the exterior walls of buildings within the Shopping Center, including those within any recessed area, except in Outdoor Selling Areas and kiosks, and within the areas specifically designated therefor on the plot plan or as approved for such purposes in the Agreement.

21. Necessary mosquito and pest abatement controls shall be furnished.

22. All multi-deck parking structures in the Shopping Center, and all portions thereof and facilities and systems thereof, shall be cleaned, maintained and repaired as necessary to keep in a good condition.

B. FLOOR AREA

The Parties hereto hereby establish the following rules and regulations to govern the occupancy of Floor Area in the Shopping Center, such rules and regulations to be enforced by Developer as to Floor Area on and Occupants of the Developer Parcel:

1. All Floor Area, including vestibules, entrances and returns, doors, fixtures, windows and plate glass shall be maintained in a safe, neat and clean condition.

2. All trash, refuse and waste materials shall be regularly removed from the premises of each Occupants of the Shopping Center at reasonable intervals, and until removal shall be stored (a) in a sanitary and inoffensive manner in adequate containers, which such containers shall be located so

1623e/12-19-90                    3.

BK 1240PG0198

as not to be visible to the general public shopping in the
Shopping Center either inside premises or in screened areas
approved by Developer as to Occupants of the Developer's
Parcel, and (b) so as not to constitute any health or fire
hazard or nuisance to any Occupant. No such materials shall be
burned in the Shopping Center Site.

      3.   No portion of the Shopping Center Site shall be
used for residential purposes.

      4.   Except as permitted under the Agreement, neither
sidewalks nor walkways shall be used to display, store or
replace any merchandise, equipment or devices.

      5.   No advertising medium shall be utilized which can
be heard or experienced outside of the Floor Area, including,
without limitation the generality of the foregoing, flashing
lights, searchlights, loudspeakers, phonographs, radios or
television.

      6.   No use shall be made of the Shopping Center or
any portion or portions thereof which would (a) violate any
law, ordinance or regulation, (b) constitute a nuisance,
(c) constitute a hazardous use, or (d) violate, suspend or void
any policy or policies of insurance on the Department Stores'
Buildings.

      7.   Developer shall use its good faith efforts to
require Occupants of the Developer Parcel to cause all trucks
servicing the retail facilities of Developer Parcel to load and
unload prior to the hours of the Shopping Center opening for
business to the general public. No delivery of goods,
supplies, merchandise or fixtures to or from any premises shall
be made through the Mall unless such premises have no entrance
other than on the Mall, in which latter case such deliveries
shall be made prior to or after Shopping Center business hours,
except with Developer's approval in a particular instance. In
addition, no owner or Occupant shall permit more trailers or
trucks servicing its premises to remain on the Shopping Center
Site than available loading dock doors on such owner's or
Occupant's property.

    C.   CONDUCT OF PERSONS

      The Parties hereto do hereby establish the following
rules and regulations, which Developer hereby agrees to use its
good faith efforts to enforce, for the use of roadways,
walkways, the Mall, Parking Areas, and other Common Area
provided for the use of Permittees:

      1.   Except as permitted under the Agreement, no
person shall use any roadway, sidewalk, walkway or the Mall,
except as a means of egress from or ingress to any Floor Area

4.

1623e/12-19-90

BK 1240 PG 0199

and Parking Areas within the Shopping Center, or adjacent
public streets. Such use shall be in an orderly manner, in
accordance with the directional or other signs or guides.
Roadways shall not be used at a speed in excess of twenty (20)
miles per hour and shall not be used for parking or stopping,
except for the immediate loading or unloading of passengers.
No walkway, sidewalk or any portion of the Mall shall be used
for other than pedestrian travel except for kiosks and seasonal
promotions as permitted by the terms of the Agreement.

2.    No person shall use any utility area, Truck
Facilities, or other area reserved for use in connection with
the conduct of business, except for the specific purpose for
which permission to use such area is given.

3.    Except as permitted under the Agreement, no
person, without the written consent of the Parties, except as
mandated by law, shall in or on any part of the Common Area:

(a)   Vend, peddle or solicit orders for sale or
distribution of any merchandise, device, service,
periodical, book, pamphlet or other matter whatsoever.

(b)   Exhibit any sign, placard, banner, notice or
other written material.

(c)   Distribute any circular, booklet, handbill,
placard or other material.

(d)   Solicit membership in any organization,
group or association or contribution for any purpose.

(e)   Parade, rally, patrol, picket, demonstrate
or engage in any conduct that might tend to interfere with
or impede the use of any of the Common Area by any
Occupants or Permittee, create a disturbance, attract
attention or harass, annoy, disparage or be detrimental to
the interest of any of the retail establishments within the
Shopping Center.

(f)   Use any Common Area for any purpose when
none of the retail establishments within the Shopping
Center is open for business or employment.

(g)   Throw, discard or deposit any paper, glass
or extraneous matter of any kind, except in designated
receptacles, or create litter or hazards of any kind.

(h)   Use any sound-making device of any kind or
create or produce in any manner noise or sound that is
annoying, unpleasant, or distasteful to Occupants or
Permittees.

(i)   Deface, damage or demolish any sign, light
standard or fixture, landscaping material or other
improvement within the Shopping Center Site, or the

1623e/12-19-90

5.

BK 1240 PG 0200

property of any Permittee or Occupant within the Shopping
Center Site.

The listing of specific items as being prohibited
is not intended to be exclusive, but to indicate in general the
manner in which the right to use the Common Area solely as a
means of access and convenience in shopping at the retail
establishments in the Shopping Center Site is limited and
controlled by the Parties.

Either Party shall have the right to remove or
exclude from or to restrain (or take legal action to do so) any
unauthorized person from, or from coming upon, the Shopping
Center Site or any portion thereof, and prohibit, abate and
recover damages arising from any unauthorized act, whether or
not such act is in express violation of the prohibitions listed
above. In so acting such Party is not the agent of the other
Party or Occupants of the Shopping Center Site, unless
expressly authorized or directed to do so by such Party or
Occupants in writing.

All defined terms used herein shall have the
meaning set forth for such terms in that certain Construction,
Operation and Reciprocal Easement Agreement (the "Agreement")
by and between Concord Mall, a Delaware general partnership
("Developer") and Sears, Roebuck and Co., a New York
corporation ("Sears"). In the event of any conflict between
the terms or provisions of the Agreement and these Rules and
Regulations, the provisions of the Agreement shall govern.

6.

1623e/12-19-90

BK 1240 PG 0201

EXHIBIT F

SIGN CRITERIA

These criteria have been established for the purpose of assuring an outstanding shopping center. Conformance will be strictly enforced; and any installed non-conforming or unapproved signs must be brought into conformance at the expense of the Occupant.

A.  ADMINISTRATION

The Developer is to administer and interpret the criteria, but is not empowered to authorize any departure without the prior written approval of the Parties.

1.  Each Occupant shall submit or cause to be submitted to the Developer for approval before fabrication at least three (3) copies of detailed drawings covering the location, size, layout, design and color of the proposed sign, including all lettering and/or graphics, attachment devices, construction and fabrication details.

2.  In the event of any conflict of interpretation between any Occupant and Vandemark & Lynch, Inc. (the "Project Architect"), as to the application of these criteria that cannot be satisfactorily resolved, the Project Architect shall submit the design to the Parties; their decision shall be final and binding upon the Occupant.

3.  Each sign contractor is to provide written certification to the Developer that the sign installation conforms with all applicable codes and ordinances, and that it has been inspected and approved by the controlling government agency(ies).

4.  Each Occupant or its agent shall obtain all permits required for its sign and its installation.

5.  Each Occupant shall be responsible for the fulfillment of all requirements and specifications at its sole cost, risk and obligation, and shall be responsible for the actions or failures of its sign contractor.

6.  No signs of Occupants (other than Occupants containing at least 35,000 square feet of Floor Area, restaurants with an exterior entrance containing at least 3,000 square feet of Floor Area and any theaters permitted by the REA) shall be permitted on the exterior of the Developer Mall Stores unless approved in writing by the Parties, which approval may be withheld in each Party's sole discretion.

B.  CONSTRUCTION AND DESIGN REQUIREMENTS

1.  Total sign area (rectangle enclosing each group of letters, symbols or logos) shall not exceed one (1) square foot of sign area per each lineal foot of Occupant's store frontage, except that in any case the minimum total allowed shall be at least sixteen (16) square feet and in no case may any sign total exceed twenty percent (20%) of the area of the Occupant's store front. In case of conflict, New Castle County requirements shall govern.

1660e/01-10-91

BK 1240PG0202

2.    Signs shall not be less than one (1) foot from the neutral strip.

3.    All permits for signs and their installation shall be obtained by the Occupant or his representative.

4.    No signs perpendicular to the face of the building shall be permitted unless uniformly established by the Project Architect, and as shown on the approved improvement plans, and no signs shall be permitted on the building roofs.

5.    Wording of signs shall not include the product except as a part of the Occupant's trade name or insignia.

6.    All electrical signs shall bear the UL label, shall be connected to the Occupant's electric service, and their installation must comply with all local building and electrical codes.

7.    No exposed conduit, tubing or race-ways will be permitted.

8.    No exposed neon tubing shall be used on signs, symbols or decorative elements, unless approved by the Developer. Occupant shall be fully responsible for the maintenance and repair of said neon sign. In the event said neon sign becomes broken or dysfunctional in any fashion, it shall be removed immediately by the Occupant until such time as the sign is repaired and fully functional. Any temporary signage erected while Occupant's neon sign is being repaired shall conform to this Sign Criteria (Exhibit F).

9.    All conductors, transformers and other equipment shall be concealed.

10.    All signs, bolts, fastenings and clips shall be of glass, plastic, hot dipped galvanized iron, stainless steel, aluminum, brass or bronze, and no black iron materials of any type will be permitted.

11.    All permitted exterior letters or signs exposed to the weather shall be mounted with at least three-quarters of an inch (3/4") clearance from the building wall to permit proper dirt and water drainage, and no letter shall project more than six and three-quarters inches (6-3/4") from the wall face.

12.    Location of all openings through building walls for conduit and sleeves in sign panels of building walls shall be indicated by the sign contractor on drawings submitted to the Developer. Sign contractor shall install same in accordance with the approved drawings.

13.    No signmaker's labels or other identification will be permitted on the exposed surface of signs, except those required by local ordinance which latter shall be in an inconspicuous location.

14.    All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight condition.

15.    Flashing, moving or audible signs will not be permitted.

16.    Painted lettering shall not be permitted, except as specified in Articles B-21 and C-2 hereof.

17.    Occupant shall repair or cause its sign contractor to repair any damage to any work caused by his work.

2.

1660e/01-10-91

BK 1240PG0203

18. Occupant shall be fully responsible for the operations of Occupant's sign contractors and shall indemnify, defend and hold the Parties harmless from damages or liabilities on account thereof.

19. All signs shall occur in the signbands or locations shown on the approved final improvements plans.

20. Crests, shields or symbols as required by law (i.e., banks, etc.) will be permitted but shall be limited to six inches (6") high and the center of which shall be five feet (5') above the floor line and shall be in gold or silver leaf or in one (1) color on the glass storefronts only.

21. Decals, gold leaf or white painted lettering shall be permitted on display windows only within the limits set forth herein: one hundred forty-four (144) square inches per entrance in lettering not to exceed four inches (4") in height, indicating hours of business, emergency telephone numbers, ADT stickers, etc.

22. Signs may be of the following types:

a. Illuminated plastic-faced channel letters or plaques with sheet metal sides and return.

b. Illuminated logos.

c. Metal letters, back-lit (halo effect), or non-illuminated.

d. Veiled neon tubing.

e. Printed fabrics.

f. Non-illuminated individual letter signs.

23. The following types of signs are prohibited unless specifically approved in writing by the Developer and by all other Parties on an individual basis, which approval may be withheld in each Party's sole discretion:

a. Signs employing moving or flashing lights.

b. Signs employing exposed conduit, conductors, ballast boxes, transformers or other equipment.

c. Signs employing luminous vacuum formed type plastic letters.

d. Signs of box or cabinet type employing luminous plastic panels, "plaque" type cabinet signs excepted.

e. Signs employing unedged or uncapped letters with no returns and exposed fastenings.

f. No signs will be allowed to become attached to or temporarily placed within display windows except where they are constructed of self-supporting material and are made an integral part of the display in said window.

g. Pylon signs.

h. Moving signs.

i. Paper, cardboard or painted signs.

j. Audible signs.

k. Canopy or building roof-top signs.

3.

1660e/01-10-91

BK 1240 PG 0204

C.    **MISCELLANEOUS REQUIREMENTS**

1.    Signs shall only be permitted within the sign areas as
designed by the Project Architect, and as shown on the approved improvement
plans.

2.    Each Occupant who has a non-customer door for receiving
merchandise may have uniformly applied on said door in location, as directed
by the Project Architect, in two-inch-high block letters, the Occupant's name
and address. Where more than one Occupant uses the same door, each name and
address shall be applied. Color of letters will be as selected by the Project
Architect.

3.    Occupant may install, if required by the U.S. Post Office
or the New Castle County Fire Department, the numbers only for the street
address in exact location stipulated by the Project Architect. Size, type and
color of numbers shall be as stipulated by the Project Architect.

4.    Electrical service to all signs shall be on Occupant's
meters and shall be part of Occupant's construction and operation costs.

D.    **DEPARTMENT STORES**

Nothing herein shall be deemed to prohibit Department Stores
from having identification signs attached to the exterior facades of any
mechanical penthouse upon its respective Department Store Building, provided
that such sign(s) shall not extend higher than the top of such penthouse.

E.    **COST - MAINTENANCE - REPLACEMENT - REPAIR**

Each Occupant shall at its own sole cost, risk, expense and
obligation (including without limiting the same) design, construct, install,
clean, maintain, replace, repair and refurbish the signs herein required or
permitted to be installed.

F.    **NON-MALL STORE BUILDINGS**

The Non-Mall Store Buildings shall be governed by these same
criteria with the exceptions that each Non-Mall Store Building shall be
permitted (i) one (1) monument sign not exceeding ten feet (10') in height nor
eight feet (8') in width, and (ii) one (1) wall-mounted exterior sign not
exceeding sixty (60) square feet in area on each wall facing a public street
or the Parking Area.

*See Plot Plan # 11024*

4.

1660e/01-10-91