# EXHIBIT A

**EXECUTION VERSION**

# PENSION PLAN PROTECTION AND FORBEARANCE AGREEMENT

**By and Between**

**SEARS HOLDINGS CORPORATION,**

**KCD IP, LLC, and**

**SEARS BRANDS, LLC,**

**as SEARS PARTIES**

**and**

**PENSION BENEFIT GUARANTY CORPORATION**

**Dated MARCH 18, 2016**

**(As Amended on November 7, 2017)**

## TABLE OF CONTENTS

RECITALS ...................................................................................................................................1

ARTICLE I  DEFINITIONS AND CONSTRUCTION................................................................2

1.01. Defined Terms ...........................................................................................................2

1.02. Other Definitional and Interpretive Matters .............................................................8

ARTICLE II  REPRESENTATIONS AND WARRANTIES OF THE SEARS PARTIES ...........9

2.01. General.......................................................................................................................9

2.02. Existence, Power, and Execution...............................................................................9

2.03. [Intentionally Omitted.] ..........................................................................................11

2.04. [Intentionally Omitted.] ..........................................................................................11

2.05. IP Securitization......................................................................................................11

2.06. IP Organizational Documents..................................................................................12

(a)      Representations and Warranties ................................................................12

ARTICLE III  PROHIBITED SEARS RE OBLIGATIONS .....................................................13

3.01. [Intentionally Omitted.] ..........................................................................................13

3.02. [Intentionally Omitted.] ..........................................................................................13

3.03. [Intentionally Omitted.] ..........................................................................................13

3.04. [Intentionally Omitted.] ..........................................................................................13

3.05. [Intentionally Omitted.] ..........................................................................................13

3.06. [Intentionally Omitted.] ..........................................................................................13

3.07. [Intentionally Omitted.] ..........................................................................................13

3.08. Sears Re Claims ......................................................................................................13

3.09. Discovery of Prohibited Sears Re Obligation..........................................................13

ARTICLE IV  PLAN PROTECTION TRANSACTION: IP ASSETS........................................14

4.01. Covenants Regarding Replacement .........................................................................14

4.02. Limitations Upon Voting.........................................................................................14

4.03. Insurance Coverage..................................................................................................14

4.04. IP Covenants ...........................................................................................................14

4.05. IP Covenant Carve-outs ..........................................................................................16

ARTICLE V  ENFORCEMENT................................................................................................18

5.01. Specific Performance...............................................................................................18

5.02. Violative Actions Void Ab Initio.............................................................................18

5.03. Additional Contribution...........................................................................................18

5.04. Additional Contribution Liability ...........................................................................19

5.05.   Non-Exclusivity of Additional Contribution Liability ...................................19

5.06.   Prefunding Balance Limitation ...................................................................20

ARTICLE VI  SPRINGING LIEN .............................................................................20

6.01.   Springing Lien Events ...............................................................................20

6.02.   Springing Lien ...........................................................................................21

6.03.   IP Springing Lien Conditions ....................................................................21

6.04.   Secured Obligations ..................................................................................21

6.05.   Acknowledgement of Joint and Several Liability........................................21

6.06.   Reservation of Rights Regarding UBL Determination.................................22

6.07.   Perfection of Security Interests ..................................................................22

    (a)         Escrow Arrangements .........................................................22

    (b)         [Intentionally Omitted.] ......................................................22

    (c)         IP Assets ...........................................................................22

    (d)         [Intentionally Omitted.] ......................................................22

    (e)         Authority to File .................................................................22

    (f)         Custodian Funds; Custodian Fees and Expenses ................22

6.08.   Rights of Foreclosure ................................................................................23

    (a)         When PBGC May Foreclose ................................................23

    (b)         Contingent UBL Claims ......................................................23

6.09.   ERISA Lien...............................................................................................23

6.10.   Non-Exclusivity of Rights and Remedies....................................................24

6.11.   Credit Facility ..........................................................................................24

6.12.   Termination of Springing Lien ..................................................................24

ARTICLE VII  PBGC COMMITMENT ......................................................................24

7.01.   [Intentionally Omitted.] .............................................................................24

7.02.   Forbearance ..............................................................................................24

7.03.   Forbearance Inapplicable to Compulsory Involuntary Termination.............24

7.04.   Forbearance Termination ...........................................................................24

7.05.   UBL Documentation ..................................................................................24

7.06.   Forbearance-Related Definitions ................................................................25

    (a)         Forbearance Termination Event............................................25

    (b)         Material Transaction ...........................................................26

    (c)         Material Transaction Carve-Out ..........................................26

    (d)         Material Transaction Cap Calculations.................................27

    (e)         "Material" for this Agreement Only .....................................27

(f)    Company's Market Capitalization ................................................................27

(g)    Average Quoted Price ............................................................................28

ARTICLE VIII  TERMINATION OF AGREEMENT ....................................................28

8.01.  Termination ..........................................................................................28

(a)    Achievement of 85% Funding ................................................................28

(b)    Passage of Time ....................................................................................29

(c)    Standard Termination of Pension Plan ....................................................29

ARTICLE IX  CLOSING ..............................................................................29

9.01.  Closing Date ........................................................................................29

9.02.  Conditions to Closing ............................................................................29

ARTICLE X  POST-CLOSING MONITORING........................................................31

10.01.  Company Notification Requirements ......................................................31

10.02.  Noncompliance Notice ........................................................................32

ARTICLE XI  MISCELLANEOUS ..................................................................32

11.01.  Notices ..............................................................................................32

11.02.  Governing Law, Jurisdiction and Venue ................................................33

11.03.  Currency............................................................................................33

11.04.  Waiver of Jury Trial............................................................................34

11.05.  Captions ............................................................................................34

11.06.  Entire Agreement; Amendments and Waivers ........................................34

11.07.  No Waiver of Breach ..........................................................................34

11.08.  Severability, Substantive Error ............................................................34

11.09.  Further Assurances ..............................................................................34

11.10.  Multiple and Electronic Counterparts ....................................................35

11.11.  Time of the Essence ............................................................................35

11.12.  Public Disclosure ................................................................................35

11.13.  U.S. Bank Trust Association..................................................................35

# **EXHIBITS**

| EXHIBITS | *Attached hereto and fully incorporated herein.* |
|---|---|
| Exhibit 1 | All Direct and Indirect Subsidiaries of the Company |
| Exhibit 2 | Underlying Documents and Changes Thereto |
| Exhibit 3-A | [Intentionally Omitted] |
| Exhibit 3-B | [Intentionally Omitted] |
| Exhibit 4 | [Intentionally Omitted] |
| Exhibit 5 | [Intentionally Omitted] |
| Exhibit 6 | [Intentionally Omitted] |
| Exhibit 7 | [Intentionally Omitted] |
| Exhibit 8 | All Sales, Substitutions, or Transfers of Any IP Assets Out of the IP Subsidiary From and After October 1, 2014 Until Closing |
| Exhibit 9 | IP Existing Liens |
| Exhibit 10-A | Certain Information Relating to the IP Subsidiary |
| Exhibit 10-B | IP Assets |
| Exhibit 11 | Escrow Arrangements (including Powers of Attorney) |
| Exhibit 12 | [Intentionally Omitted] |
| Exhibit 13 | [Intentionally Omitted] |
| Exhibit 14 | Corporate Opinions |
| Exhibit 15 | IP Bring-Down Opinion (together with IP 2006 Bankruptcy Opinion) |
| Exhibit 16 | [Intentionally Omitted] |
| Exhibit 17 | Independent Manager List Schedule of Compensation & Benefits for Current Managers |
| Exhibit 18 | Custodian |
| Exhibit 19 | [Intentionally Omitted] |
| Exhibit 20 | PBGC IP Perfection Documents |
| Exhibit 21 | Subordination Agreement |
| Exhibit 22 | Issuer Order |
| Exhibit 23 | Agreements Limiting IP Independent Manager's Voting Authority |
| Exhibit 24 | [Intentionally Omitted] |

Exhibit 25          Specified Organizational Document Provisions

Exhibit 26          Press Release

Exhibit 27          [Intentionally Omitted]

Exhibit 28          Acknowledgment of Liability

Exhibit 29          Sears Re Instruction Letter

## PENSION PLAN PROTECTION AND FORBEARANCE AGREEMENT

THIS PENSION PLAN PROTECTION AND FORBEARANCE AGREEMENT (together with the Exhibits, which are fully-incorporated herein) as originally made and entered into the 18th day of March, 2016 (as amended, supplemented or otherwise modified from time to time, including, without limitation by that certain Consent, Waiver and Amendment entered into on March 8, 2017 (the "Craftsman Consent"), that certain Amendment No. 1 to Consent, Waiver and Amendment entered into on June 29, 2017 (the "Craftsman Consent Amendment"), and that certain REMIC Amendment to PPPFA, Craftsman Consent and Other Transaction Documents entered into on November 7, 2017 (the "REMIC Amendment"), the "Agreement"), by and between Sears Holdings Corporation, a Delaware corporation (the "Company"), KCD IP, LLC, a Delaware limited liability company (the "IP Subsidiary"), Sears Brands, LLC, an Illinois limited liability company (the "Member", and together with the Company and the IP Subsidiary, the "Sears Parties"); and the Pension Benefit Guaranty Corporation ("PBGC").  The Sears Parties and PBGC are sometimes referred to herein collectively as the "Parties," and individually as a "Party."

### RECITALS

PBGC is a wholly owned United States government corporation established under 29 U.S.C. § 1302 to administer the pension plan termination insurance program created under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301 – 1461 (2012 & Supp. III 2015) (as amended from time to time, together with the regulations thereunder, "ERISA").

The Company is the plan sponsor, as such term is defined in ERISA Section 3(16)(B), of the Sears Holdings Pension Plan 1 (as amended effective December 1, 2016) and the Sears Holdings Pension Plan 2 (effective December 1, 2016) (each a "Pension Plan" and collectively the "Pension Plans").

The Company is the ultimate corporate parent company of the Subsidiaries, including the other Sears Parties.

Each Subsidiary is a member of the Company's "controlled group" (each Sears Party and any and all other such members, collectively the "Controlled Group"), as that term is defined in ERISA Section 4001(a)(14).

The Sears Parties have offered to provide PBGC and the Pension Plan with certain enhanced protections in exchange for PBGC's agreement to forbear from initiating termination proceedings with respect to the Pension Plan pursuant to ERISA Section 4042 for the term and under the conditions provided herein.

The Parties, with the assistance of their respective advisors and counsel, have exchanged certain information and engaged in good-faith, arms'-length negotiations.

As a result of such negotiations, on September 4, 2015, PBGC and the Company entered into that certain *Summary of Proposed Terms Regarding the Pension Plan Protection and Forbearance Agreement Between PBGC and Sears* (as amended, supplemented or otherwise

modified from time to time, the "Term Sheet"), the terms of which are memorialized in this Agreement.

The Parties, along with certain additional members of the Controlled Group (the Sears Parties, together with such additional members of the Controlled Group, the "Original Sears Parties") executed the Agreement on March 18, 2016.

The Original Sears Parties, Sears Roebuck Acceptance Corp. and PBGC entered into the Craftsman Consent on March 8, 2017.

The Original Sears Parties, Sears Roebuck Acceptance Corp. and PBGC entered into the Craftsman Consent Amendment on June 29, 2017.

The Original Sears Parties, Sears Roebuck Acceptance Corp. and PBGC entered into the REMIC Amendment on November 7, 2017.

NOW, THEREFORE, for and in consideration of the premises and of the mutual agreements, provisions and covenants herein contained, and the mutual benefits to be derived therefrom, the Parties do hereby covenant and agree as follows:

# ARTICLE I
## DEFINITIONS AND CONSTRUCTION

1.01. *Defined Terms*. Each capitalized term used herein shall have the meaning ascribed to it in this Article I unless such term is defined elsewhere in this Agreement.

"*Action*" shall have the meaning given to it in Section **11.02**.

"*Actuarial Valuation Report*" means a report for a plan year containing all of the information described in 29 C.F.R. § 4010.8(a)(11)(i) through (xii).

"*Additional Contribution*" shall have the meaning given to it in Section **5.03**.

"*Affiliate*" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"*Agreement*" shall have the meaning given it in the introductory paragraph.

"*Average Quoted Price*" shall have the meaning given to it in Section **7.06(g)**.

"*Audit Period*" means the period beginning on the date on which PBGC receives a Form 501 Post-Distribution Certification for the Pension Plan indicating that the Pension Plan has terminated in a standard termination under ERISA Section 4041(b) and ending on the later of (a) the 180th day after such receipt, and (b) if PBGC has, by such 180th day, issued audit findings or a notice of noncompliance with respect to such standard termination, the date on which such audit findings have been complied with or rescinded or on which such notice of noncompliance has been rescinded.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

"*Breaching Action*" shall have the meaning given to it in Section **5.04**.

"*Business Day*" means any day other than Saturday, Sunday, a federal holiday or other day on which PBGC is closed.

"*Closing*" shall have the meaning given to it in Section **9.01**.

"*Closing Conditions*" shall have the meaning given to it in Section **9.02**.

"*Closing Date*" shall have the meaning given to it in Section **9.01**.

"*Collateral Documents*" shall have the meaning given to it in **Exhibit 11**.

"*Company*" shall have the meaning given to it in the introductory paragraph.

"*Company's Market Capitalization*" shall have the meaning given to it in Section **7.06(f)**.

"*Controlled*" or "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"*Controlled Group*" shall have the meaning given to it in the recitals.

"*Craftsman Consent*" shall have the meaning given it in the introductory paragraph.

"*Craftsman Consent Amendment*" shall have the meaning given it in the introductory paragraph.

"*Credit Facility*" means that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders from time to time party thereto, the issuing lenders from time to time party thereto, Bank Of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association and General Electric Capital Corporation, as co-collateral agents and co-syndication agents, PNC Bank, National Association, Siemens Financial Services, Inc., Ally Bank and CitiGroup Global Markets Inc. as co-documentation agents, Merrill Lynch, Pierce, Fenner & Smith Inc., Wells Fargo Bank, National Associations. and GE Capital Markets, Inc., as joint lead arrangers, and Merrill Lynch, Pierce, Fenner & Smith Inc., Well Fargo Bank, National Association, GE Capital Markets, Inc., PNC Bank, National Association and CitiGroup Global Markets, Inc., as joint bookrunners, together with all related agreements, in each case as amended, supplemented, otherwise modified, refinanced or replaced from time to time.

"*CSC*" means Corporation Service Company.

"*CSC Service Agreement*" means any agreement between a Sears Party and CSC in the forms attached hereto as **Exhibit 23**.

"*Custodian*" means the entity specified in **Exhibit 18** (together with its successors and assigns permitted under the terms of the Escrow Arrangements).

"*Deposit*" shall have the meaning given to it in Section **9.02(o)**.

"*Designated Assets*" shall have the meaning given to it in Section **6.02**.

"*Distribute*" or "*Distribution*" means to fund any dividend, equity repurchase, intercompany loan or capital contribution.

"*ERISA*" shall have the meaning given to it in the recitals.

"*ERISA Lien*" shall have the meaning given to it in Section **6.09**.

"*Escrow Arrangements*" shall have the meaning given to it in Section **6.07(a)**.

"*Exhibits*" means the exhibits listed on Pages iv and v of this Agreement.

"*Final and Non-Appealable Order*" means an order or judgment entered by a court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, revoked, varied or set aside, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived, or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed, and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought, and (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has been waived or expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending, provided, however, that no order or judgment will fail to be a "Final and Non-Appealable Order" hereunder solely because of the possibility that a motion pursuant to Section 502(j) or 1144 of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such order or judgment.

"*Final Injunction Order*" shall have the meaning given to it in Section **5.04(c)**.

"*Forbearance*" and "*Forbear*" shall each have the meaning given to it in Section **7.02**.

"*Forbearance Termination Event*" shall have the meaning given to it in Section **7.06(a)**.

"*Foreclose*" and "*Foreclosure*" shall have the meanings given to them in Section **6.08(a)**.

"*Indebtedness*" means, with respect to any Person, (a) all Primary Indebtedness and (b) all Third Party Indebtedness.

"*Indenture Amendment Covenant*" shall have the meaning given to it in Section **4.04(a)(2)**.

"*Involuntary Bankruptcy Event*" means commencement of an involuntary bankruptcy case or similar proceeding (including without limitation appointment of a receiver or other custodian or required winding up or liquidation) with respect to the Company or any of its Material Subsidiaries that is not dismissed or vacated within 60 days after commencement thereof.

"*IP 2006 Bankruptcy Opinion*" means the 22-page legal opinion letter issued by IP Subsidiary Counsel on May 18, 2006 in connection with the IP Notes transaction.

"*IP Assets*" means all of the IP Subsidiary's (i) trademarks and intellectual property licenses (including (x) those related to Kenmore and Diehard and (y) any others identified on Exhibit 10-B hereto), and (ii) rights under ancillary agreements to which it is party, all of the foregoing under clauses (i) and (ii) whether currently owned or after-acquired.

"*IP Bring-Down Opinion*" shall have the meaning given to it in Section **9.02(k)**.

"*IP Existing Liens*" shall have the meaning given to it in Section **4.05(b)(6)**.

"*IP Independent Manager*" shall have the meaning given to it in Section **9.02(j)(1)**.

"*IP Note Lien*s" means the liens on the IP Assets and the proceeds thereof that secure the IP Notes.

"*IP Notes*" means the KCD IP, LLC Asset-Backed Notes issued by the IP Subsidiary in the aggregate face amount of $1,800,000,000, which are secured by the IP Note Liens.

"*IP Notes Indenture*" means that certain Indenture dated as of May 18, 2006, between IP Subsidiary and U.S. Bank National Association, which governs the IP Notes (such indenture, as amended, supplemented or otherwise modified, but only to the extent such amendments, supplements or other modifications (i) occur prior to the Closing Date and are disclosed in writing to PBGC prior to the Closing Date or (ii) are permitted by the Indenture Amendment Covenant).

"*IP Springing Lien Conditions*" shall have the meaning given to it in Section **6.03**.

"*IP Subsidiary*" shall have the meaning given to it in the introductory paragraph.

"*IP Subsidiary Counsel*" means Mayer Brown LLP, formerly known as Mayer, Brown, Rowe & Maw LLP.

"*IP Subsidiary Operating Agreement*" means the Limited Liability Company Operating Agreement of the IP Subsidiary, dated as of May 18, 2006.

"*Limited License*" means the limited license of intellectual property granted in connection with the Credit Facility, the Secured Notes or other secured Indebtedness to the lenders

thereunder, the holders thereof and/or any applicable collateral agents thereunder of a customary kind and nature in order to facilitate a liquidation of their collateral.

"*Management Agreement*" means that certain Management Agreement attached hereto at **Exhibit 23** and executed on the Closing Date.

"*Material Subsidiary*" means any direct or indirect Subsidiary (i) for which the Company's share (determined on a pro rata basis by reference to the portion of the equity of such Subsidiary held directly or indirectly by the Company) of the assets of such Subsidiary and its direct and indirect Subsidiaries, taken as a consolidated whole, constitutes more than 5% of the assets of the Company and its direct and indirect Subsidiaries, taken as a consolidated whole, (ii) which is the IP Subsidiary or Sears Re or (iii) which is a direct or indirect parent of the IP Subsidiary or Sears Re.

"*Material Transaction*" shall have the meaning given to it in Section **7.06(b)**.

"*Member*" shall have the meaning given to it in the introductory paragraph.

"*Noncompliance Notice*" shall have the meaning given to it in Section **10.02**.

"*Ordinary Course of Business*" means the usual transactions, customs and practices of the Company or its relevant Subsidiary, as applicable, of a kind, amount, and nature as common before the Closing Date.

"*Original Sears Parties*" shall have the meaning given it in the introductory paragraph.

"*Other Company Subsidiaries*" means all direct and indirect Subsidiaries of the Company other than the IP Subsidiary and the Member.

"*Parties*" or "*Party*" shall have the meaning given it in the introductory paragraph.

"*PBGC*" shall have the meaning given to it in the introductory paragraph.

"*PBGC Demand Letter*" shall have the meaning given to it in Section **6.08(a)(2)**.

"*PBGC IP Perfection Documents*" shall have the meaning given to it in Section **9.02(h)**.

"*PBGC UBL Claims*" shall have the meaning given to it in Section **6.04**.

"*Pension Plan*" and "*Pension Plans*" shall have the meanings given to them in the recitals.

"*Person*" means an individual, group, partnership, limited partnership, limited liability company, corporation, trust (including any statutory trust), governmental unit or other entity.

"*Plan Administrator*" shall have the meaning given to it in Section **6.01(d)**.

"*Pledge*" means to pledge, hypothecate, or grant a lien, security interest or other financial encumbrance, or to permit to exist any such lien, security interest or other financial encumbrance.

"*Primary Indebtedness*" means, with respect to any Person, (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all capital lease obligations and all synthetic lease obligations, (d) all obligations, contingent or otherwise, of such Person as an account party in respect of financial guarantees, letters of credit, letters of guarantee, surety bonds and other similar instruments, and (e) all attributable indebtedness arising under sale lease-back transactions.

"*Prohibited Sears Re Obligation*" shall have the meaning given to it in Section **2.02(k).**

"*REIT Transaction*" means the transactions described in the Registration Statement on Form S-11 filed with the Securities and Exchange Commission by Seritage Growth Properties and declared effective on June 9, 2015, and any transactions related thereto.

"*REMIC Amendment*" shall have the meaning given it in the introductory paragraph.

"*Sears Parties*" shall have the meaning given to it in the introductory paragraph.

"*Sears Re*" means Sears Reinsurance Company, Ltd., a Bermuda Class 3 insurer.

"*Sears Re Instruction Letter*" shall have the meaning give to it in Section **9.02(i)**.

"*Secured Notes*" means the 6 5/8% Senior Secured Notes due 2018 issued by the Company pursuant to that certain Indenture, dated as of October 12, 2010, among the Company, the guarantors party thereto and Wells Fargo Bank, National Association, as trustee and collateral agent, together with all related agreements, in each case as amended, supplemented, otherwise modified, refinanced or replaced from time to time.

"*Secured Obligations*" shall have the meaning given to it in Section **6.04**.

"*Specified Shareholders*" means ESL Investments, Inc., Fairholme Capital Management, LLC and their respective Affiliates and managed funds, together with the Company's officers and directors as of the date of determination (and, if different, those officers and directors within the prior 6 months as well).

"*Springing Lien*" shall have the meaning given to it in Section **6.02**.

"*Springing Lien Event*" shall have the meaning given to it in Section **6.01**.

"*Subordination Agreement*" shall have the meaning given to it in Section **9.02(m)**.

"*Subsidiary*" shall mean each Person in the Controlled Group (except the Company), including all of the Company's direct and indirect subsidiaries listed on **<u>Exhibit 1</u>** attached hereto.

"*Termination Basis*" means the assets and liabilities of the Pension Plan are valued pursuant to ERISA Section 4044 as of a specified actual or assumed termination date.

"*Third Party Indebtedness*" means, with respect to any Person, (a) all Primary Indebtedness of any other Person secured by any lien on property owned by the reference Person, whether or not the Indebtedness secured thereby has been assumed by the reference Person, and (b) all guarantees by the reference Person of Primary Indebtedness of any other Person.

"*Transaction Documents*" means this Agreement, the Craftsman Consent, the Craftsman Consent Amendment, the REMIC Amendment, and all other agreements, instruments and documents related to this Agreement, each as amended, supplemented, or otherwise modified from time to time.

"*Transfer*" means to sell, transfer, or otherwise dispose.

"*UBL*" shall have the meaning given to it in Section **6.04**.

"*UBL Documentation*" shall mean PBGC's supporting documentation relating to its determination of, estimate of, or other calculations relating to the UBL of any Pension Plan (including, but not limited to, its Pension Information Profile relating thereto in locked Excel format).

"*Underlying Documents*" shall have the meaning given to it in Section **2.01(b)**.

"*Voluntary Bankruptcy Event*" means voluntary commencement (or consent to, including, without limitation, by failure to timely defend against, either involuntary commencement or entry of an order for relief in an involuntary case) of a bankruptcy case or similar proceeding (including, without limitation, appointment of a receiver or other custodian or general assignment for the benefit of creditors) with respect to the Company or any of its Material Subsidiaries.

1.02.  ***Other Definitional and Interpretive Matters.***

(a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

*Exhibits*.  The Exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any references to the "Agreement" herein shall include the Exhibits hereto.  Each capitalized term used in any Exhibit but not otherwise defined therein has the meaning ascribed thereto in this Agreement.

*Herein*.  The words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

*Including*.  The word "including" or any variation thereof means (unless the context of its usage requires otherwise) "including, but not limited to," and shall not be construed to limit any

general statement that it follows to the specific or similar items or matters immediately following it.

*Singular/Plural.* Unless specifically otherwise provided herein or the context otherwise requires, the singular includes the plural and the plural the singular.

(b)     The Parties have participated jointly and collectively in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly and collectively drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SEARS PARTIES

2.01. *General.*

(a)     The Company represents and warrants to PBGC that, as of the Closing Date, (i) **Exhibit 1** contains a full, complete, and accurate list of all of the Company's Subsidiaries, and (ii) except for the Company and such Subsidiaries, there are no other members of the Company's Controlled Group.

(b)     The Company represents and warrants to PBGC that, as of the Closing Date, the Company has provided PBGC with the most recent and complete version of any and all agreements, indentures, appraisals, leases, articles, governance documents, or other documents of any kind or nature that are referred to on **Exhibit 2** attached hereto, including all amendments thereto (collectively, the "Underlying Documents"); provided that the Parties explicitly recognize and agree that the list of Underlying Documents provided on the form of **Exhibit 2** on the Closing Date is a preliminary list only; provided further that the Company covenants to PBGC that the Company will engage in good-faith, expeditious post-Closing negotiations with PBGC to finalize an agreed-upon list of Underlying Documents that, once agreed-upon by the Company and PBGC, will be deemed to be in full force and effect as of the Closing Date and not subject to further modification.

(c)     Subject to Section 2.01(b), the Company represents and warrants to PBGC that, as of the Closing Date, no changes, waivers, or amendments to the Underlying Documents were made between September 4, 2014 and the Closing Date, except as otherwise identified on Exhibit 2.

2.02. *Existence, Power, and Execution.*

(a)     *Sears Holdings Corporation.* The Company represents and warrants to PBGC that, as of the Closing Date: (i) it is a corporation duly organized, validly existing, and in good standing under the laws of the state of Delaware; (ii) it has the legal power and right to enter into and perform the obligations contained in this Agreement, and to perform the transactions contemplated hereby; (iii) the consummation of the transactions contemplated by this Agreement will not violate or be in conflict with any provisions of the Company's organizational documents or any judgment, decree, order, statute, rule, or regulation applicable

to the Company as a party in interest or any laws applicable to the Company; (iv) to the Company's knowledge, the consummation of the transactions contemplated by this Agreement will not violate or be in conflict with any provisions of any material agreement or instrument to which the Company is a party or by which the Company is bound; and (v) the execution, delivery, and performance of this Agreement and the transactions contemplated hereunder are duly and validly authorized by all requisite authorizing action, corporate, membership, partnership or otherwise, on the part of the Company.

      (b)    *[Intentionally Omitted.]*

      (c)    *[Intentionally Omitted.]*

      (d)    *[Intentionally Omitted.]*

      (e)    *[Intentionally Omitted.]*

      (f)    *[Intentionally Omitted.]*

      (g)    *[Intentionally Omitted.]*

      (h)    *KCD, IP, LLC.*    IP Subsidiary represents and warrants to PBGC that, as of the Closing Date: (i) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Delaware; (ii) it has the legal power and right to enter into and perform the obligations contained in this Agreement, and to perform the transactions contemplated hereby; (iii) the consummation of the transactions contemplated by this Agreement will not violate or be in conflict with any provisions of IP Subsidiary's organizational documents or any judgment, decree, order, statute, rule, or regulation applicable to IP Subsidiary as a party in interest or any laws applicable to IP Subsidiary; (iv) to IP Subsidiary's knowledge, the consummation of the transactions contemplated by this Agreement will not violate or be in conflict with any provisions of any material agreement or instrument to which IP Subsidiary is a party or by which IP Subsidiary is bound; (v) the execution, delivery, and performance of this Agreement and the transactions contemplated hereunder are duly and validly authorized by all requisite authorizing action, corporate, membership, partnership or otherwise, on the part of IP Subsidiary; and (vi) **<u>Exhibit 10-A</u>** accurately sets forth: (A) the organizational identification number of IP Subsidiary or, if IP Subsidiary does not have an organizational identification number, a statement that it has none; and (B) the chief executive office of IP Subsidiary.

      (i)    *Sears Brands, LLC.*    Member represents and warrants to PBGC that, as of the Closing Date: (i) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Illinois; (ii) it has the legal power and right to enter into and perform the obligations contained in this Agreement, and to perform the transactions contemplated hereby; (iii) the consummation of the transactions contemplated by this Agreement will not violate or be in conflict with any provisions of Member's organizational documents or any judgment, decree, order, statute, rule, or regulation applicable to Member as a party in interest or any laws applicable to Member; (iv) to Member's knowledge, the consummation of the transactions contemplated by this Agreement will not violate or be in conflict with any provisions of any material agreement or instrument to which Member is a party or by which

Member is bound; (v) the execution, delivery, and performance of this Agreement and the transactions contemplated hereunder are duly and validly authorized by all requisite authorizing action, corporate, membership, partnership or otherwise, on the part of Member; and (vi) it is the sole member of IP Subsidiary.

(j)      *Other Company Subsidiaries*. The Company represents and warrants to PBGC that, as of the Closing Date: (i) each Other Company Subsidiary is a legal entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization; (ii) each Other Company Subsidiary has the legal power and right to enter into and perform the obligations contained in the Subordination Agreement and any other Transaction Document to which it is a party and to perform the transactions contemplated thereby; (iii) the consummation of the transactions contemplated thereby will not violate or be in conflict with any provisions of any Other Company Subsidiary's organizational documents or any judgment, decree, order, statute, rule, or regulation applicable to any Other Company Subsidiary as a party in interest or any laws applicable to any Other Company Subsidiary; (iv) to the Company's knowledge, the consummation of the transactions contemplated by the Subordination Agreement and any and all other such Transaction Documents will not violate or be in conflict with any provisions of any material agreement or instrument to which any Other Company Subsidiary is a party or by which any Other Company Subsidiary is bound; and (v) the execution, delivery, and performance by each Other Company Subsidiary of the Subordination Agreement and any other Transaction Document to which it is a party and the transactions contemplated thereunder are duly and validly authorized by all requisite authorizing action, corporate, membership, partnership or otherwise, on its part.

(k)      *Sears Re Claims.*  The IP Subsidiary represents and warrants to PBGC that, as of the Closing Date, it does not have any obligations of any kind to Sears Re except to the extent arising under the IP Notes, the IP Notes Indenture or any agreements or other documents related thereto; provided however that if any obligation of a kind or nature that would cause such representation and warranty to be untrue  ("Prohibited Sears Re Obligation") is subsequently found to have existed as of the Closing Date, it shall not constitute a breach of this Section 2.02(k) if the Company causes such obligation to be discharged or subordinated in right of payment to those obligations owed to PBGC as set forth in the Subordination Agreement promptly, but in any event within ten (10) Business Days, after such obligation is discovered by the Company.

(l)      PBGC agrees that, if the Closing occurs, PBGC shall not assert that anything disclosed in writing to it by the Company in connection with, or during the course of, the negotiation and entry into the Term Sheet or this Agreement prior to the Closing Date constitutes a breach of the representations or warranties set forth in Clause (iv) of any of Paragraphs (a) through (j) of this Section 2.02.

2.03.  *[Intentionally Omitted.]*

2.04.  *[Intentionally Omitted.]*

2.05.  **IP Securitization**.  The Company represents and warrants to PBGC the following as of the Closing Date:

(a)       The Member is the sole member of the IP Subsidiary.

(b)       The IP Subsidiary has issued the IP Notes secured by the IP Note Liens on the IP Assets.

(c)       All IP Notes are held by Sears Re.

(d)       The IP Subsidiary is in material compliance with its organizational documents; provided that PBGC agrees that, if the Closing occurs, PBGC shall not assert that anything disclosed in writing to it by the Company in connection with, or during the course of, the negotiation and entry into the Term Sheet or this Agreement prior to the Closing Date constitutes a breach of the representations set forth in this Clause (d).

(e)       To the Company's knowledge, none of the parties to the IP Notes or the IP Notes Indenture is in default thereunder, nor does an event of default exist thereunder; provided that PBGC (1) acknowledges to the Company that, to PBGC's knowledge, none of the parties to the IP Notes or the IP Notes Indenture is in default thereunder and no event of default exists thereunder and (2) agrees that, if the Closing occurs, PBGC shall not assert that anything disclosed to it in writing by the Company in connection with, or during the course of, the negotiation and entry into the Term Sheet or this Agreement prior to the Closing Date constitutes a breach of the representations set forth in this Clause (e).

(f)       There are no default waivers under the IP Notes or the IP Notes Indenture.

(g)       **Exhibit 8** contains a full, complete, and accurate list of all sales, substitutions, Transfers or Distributions of any IP Assets out of the IP Subsidiary from and after October 1, 2014 until the Closing Date.

(h)       **Exhibit 9** contains a full, complete, and accurate list of all IP Existing Liens that are permitted under this Agreement solely as a result of Section 4.05(b)(6) and not pursuant to any other provision of Section 4.05(b).

(i)       The IP Assets owned by the IP Subsidiary as of the Closing Date include the trademark registrations and applications identified on **Exhibit 10-B**.

(j)       The full details of the current director insurance and compensation packages to which the IP Independent Manager will be a beneficiary are set forth at **Exhibit 17.**

2.06.   *IP Organizational Documents.*

(a)       *Representations and Warranties.*   The Company represents and warrants to PBGC the following as of the Closing Date:

(1)       The organizational documents of the IP Subsidiary provide that the IP Subsidiary has been, and shall continue to be, operated as a special purpose entity consistent with the special purpose vehicle provisions of the organizational documents of the IP Subsidiary (including, without limitation, provisions intended to ensure and preserve the bankruptcy-

remoteness of such entity) and the prior opinions provided by IP Subsidiary Counsel including the IP 2006 Bankruptcy Opinion.

(2)      The IP Subsidiary Operating Agreement provides that at least one Manager (as defined in the IP Subsidiary Operating Agreement) of the IP Subsidiary shall be an individual meeting the requirements of an Independent Manager (as defined in the IP Subsidiary Operating Agreement).

(3)      The IP Subsidiary Operating Agreement provides that a filing of a bankruptcy petition by the IP Subsidiary, or consent to the institution of bankruptcy proceedings against the IP Subsidiary, is permissible only with the prior written consent of the Member and the Board (each as defined in the IP Subsidiary Operating Agreement) (including the IP Independent Manager).

## ARTICLE III
## PROHIBITED SEARS RE OBLIGATIONS

3.01.  *[Intentionally Omitted.]*

3.02.  *[Intentionally Omitted.]*

3.03.  *[Intentionally Omitted.]*

3.04.  *[Intentionally Omitted.]*

3.05.  *[Intentionally Omitted.]*

3.06.  *[Intentionally Omitted.]*

3.07.  *[Intentionally Omitted.]*

3.08.  *Sears Re Claims*.  The IP Subsidiary shall not become obligated to Sears Re except to the extent of obligations arising under the IP Notes, the IP Notes Indenture or any agreements or other documents related thereto; <u>provided however</u> that if any inadvertent or involuntary obligation that would have constituted a Prohibited Sears Re Obligation if in existence on the Closing Date arises after the Closing Date, it shall not constitute a breach of this Section **3.08** if the Company causes such obligation to be discharged or subordinated in right of payment to those obligations owed to PBGC as set forth in the Subordination Agreement promptly, but in any event within ten (10) Business Days after, such obligation is discovered by the Company. Promptly, but in no event greater than five (5) Business Days after PBGC's written request (such requests not to be made more frequently than quarterly), the Company shall either certify to PBGC that no Prohibited Sears Re Obligations exist to the best knowledge of the Company (whether arising before, on, or after the Closing Date, and whether arising intentionally, inadvertently, or involuntarily) or disclose all Prohibited Sears Re Obligations then existing to the best knowledge of the Company.

3.09.  *Discovery of Prohibited Sears Re Obligation*.  Promptly, but in any event within five (5) Business Days after any discovery by the Company of any Prohibited Sears Re

Obligation (whether arising prior to the Closing Date or thereafter), the Company shall provide notice of such discovery to PBGC.

### ARTICLE IV
### PLAN PROTECTION TRANSACTION: IP ASSETS

4.01. ***Covenants Regarding Replacement***.   Each of the Company and the Member hereby covenants to PBGC and agrees that it will not seek to remove the existing IP Independent Manager or appoint any successor IP Independent Manager unless the existing IP Independent Manager is promptly replaced by a successor IP Independent Manager set forth on **Exhibit 17** hereto or otherwise expressly approved in advance in writing by PBGC.   Each of the Company and the Member hereby further covenants to PBGC and agrees that the IP Independent Manager shall be the sole Independent Manager (as such term is defined in the Limited Liability Company Operating Agreement of KCD IP, LLC, as in effect on the Closing Date).   The Parties agree that a termination by CSC of the CSC Service Agreement for the IP Independent Manager shall not constitute a breach of this Section 4.01 by the Company or the Member so long as a successor IP Independent Manager is promptly appointed in accordance with this Section 4.01.

4.02. ***Limitations Upon Voting***.   Any IP Independent Manager shall be entitled to vote solely on:

(a)   the authorization of IP Subsidiary to enter into the Agreement or any other Transaction Document;

(b)   the commencement of a Voluntary Bankruptcy Event or a Transfer, Pledge, or Distribution of all or substantially all of the assets of the IP Subsidiary;

(c)   any amendment to the organizational documents of the IP Subsidiary; and

(d)   any action which, in the IP Independent Manager's reasonable judgment, may impair the bankruptcy remoteness of the IP Subsidiary in any material respect, or would otherwise be in violation of any provision set forth in any Transaction Document.

4.03. ***Insurance Coverage***.   All IP Independent Managers shall (i) receive coverage from the applicable directors' and officers' liability policies of insurance; and (ii) be paid and receive all other benefits at the same level and amount as the other managers of the IP Subsidiary, at the IP Subsidiary's sole expense.

4.04. ***IP Covenants***.

(a)   The Company covenants to PBGC and agrees that it shall not permit the IP Subsidiary to, and the IP Subsidiary covenants to PBGC and agrees (as an independent covenant and solely to the extent that such agreement by the IP Subsidiary does not impair the rights of the holder of the IP Notes thereunder or materially impair the marketability of the IP Notes) that it shall not:

(1)   Transfer or Distribute any Designated Assets;

(2)     amend in any manner that is materially adverse to the interests of PBGC (i) the organizational documents of the IP Subsidiary (it being understood that, without limitation, any amendments to the sections of the organizational documents identified in **Exhibit 25** would be materially adverse to PBGC, and are therefore prohibited) or (ii) the IP Notes Indenture (this Section **4.04(a)(2)**, the "Indenture Amendment Covenant");

(3)     Pledge any Designated Assets;

(4)     institute or consent to the institution of (including, without limitation, by failing to timely defend against) bankruptcy or insolvency proceedings in respect to the IP Subsidiary, or file a petition seeking or consenting to reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency, or seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the IP Subsidiary or any substantial part of its assets, or make any assignment for the benefit of creditors, or admit in writing its inability to pay its debts generally as they become due, or take any corporate action in furtherance of such action;

(5)     incur, assume or guaranty any Indebtedness;

(6)     make any expenditure (by long-term or operating lease or otherwise) for any capital assets (either realty or personalty);

(7)     merge, dissolve, liquidate or consolidate with or into any other entity or engage in any other business combination with any other entity;

(8)     (A) change its name or organizational identification number (if applicable), or conduct its business operations under any fictitious business name or trade name, (B) change its type of organization, jurisdiction of organization, or other legal structure except as otherwise expressly permitted hereunder or (C) change its chief executive office, in each case unless the IP Subsidiary promptly (and, in any event, within thirty (30) calendar days following such change) notifies PBGC of such change;

(9)     form any subsidiaries; or

(10)     take any action in violation of or not authorized under the organizational documents of the IP Subsidiary.

(b)     The Company covenants to PBGC and agrees that the Company and its Subsidiaries shall continue to pay all royalties as and when due (subject to any applicable grace periods) with respect to the IP Assets and the IP Notes.

(c)     The Company and, as an independent covenant of the IP Subsidiary and solely to the extent that such agreement by the IP Subsidiary does not impair the rights of the holder of the IP Notes thereunder or materially impair the marketability of the IP Notes, the IP Subsidiary covenant to PBGC and agree that in the event that the Company or any of its Subsidiaries, including the IP Subsidiary, is required to deliver (or otherwise delivers) a schedule of liens and encumbrances pertaining to any property owned by the IP Subsidiary to any third

party, they shall deliver such schedule (including updates) to PBGC promptly following delivery to the applicable third party.

(d)    Each Sears Party covenants to PBGC and agrees that it shall not cause or allow, and that there shall not be, (A) any direct or indirect Transfer or Distribution or (B) any Pledge, in each case of any membership or other equity interests in the IP Subsidiary to any Person other than the Company or any of its Subsidiaries (other than the Limited License) and in any such case, only if (y) such interests are (or will) be owned by the Company or a Subsidiary organized under the laws of and domiciled in any state of the United States of America or the District of Columbia, and (z) upon giving effect to such Transfer, Distribution, or Pledge, the IP Subsidiary will remain a member of the Company's Controlled Group.

(e)    The records concerning the IP Assets are and shall be kept at the address shown in **Exhibit 10-A** as the chief executive office of IP Subsidiary or at the offices of applicable outside counsel.

(f)    The Company and the IP Subsidiary covenant to PBGC and agree that the IP Subsidiary shall deliver to PBGC a written update to **Exhibit 10-B** (i) immediately upon the occurrence of a Springing Lien Event and (ii) from and after the Closing Date, promptly after the IP Subsidiary's acquisition or disposition of any IP Asset that, either individually or in the aggregate, is material to the business of any Sears Party; provided that, in the case of the disposition of any IP Asset, the IP Subsidiary shall deliver to PBGC the written update to **Exhibit 10-B** no later than ten (10) Business Days after the IP Subsidiary's disposition of such IP Asset.

4.05.    *IP Covenant Carve-outs*.

(a)    Notwithstanding anything to the contrary set forth in Section **4.04(a)(1)** of this Agreement, the IP Subsidiary shall be permitted to:

(1)    make payments in respect of the IP Notes or as required by the IP Notes Indenture;

(2)    Transfer or Distribute the IP Assets to the extent that such Transfer or Distribution either:

(A)    is permitted by the IP Notes Indenture and is otherwise undertaken for fair market value and in its Ordinary Course of Business; or

(B)    is a Transfer or Distribution following the occurrence of a default under the IP Notes Indenture, with the net proceeds thereof being first applied to the IP Notes and after payment in full of such IP Notes and the other obligations under the IP Notes Indenture, such remaining proceeds (being Designated Assets) subject to the Springing Lien and thereafter to be applied to the PBGC UBL Claims (or, in the event that the PBGC UBL Claims are then contingent, unliquidated and/or unmatured, transferred within five (5) Business Days to, and held by, PBGC or its

designated agent for the benefit of PBGC in express trust or escrow (as applicable) until such time as the PBGC UBL Claims are fully liquidated and after application, such amount (if any) in excess of that required to pay the PBGC UBL Claims in full (provided such PBGC UBL Claims have not become unenforceable by reason of a lapse of time) shall be remitted to the Company or its appropriate Subsidiary as directed by the Company), or as otherwise required by law; and

(3)    so long as a Springing Lien Event has not occurred, Transfer or Distribute cash or cash equivalents (even if constituting Designated Assets of the IP Subsidiary) to the Company or any of its Subsidiaries in a manner generally consistent with the regular cash flow circulation processes employed by the Sears Parties in the Ordinary Course of Business, including without limitation by:

(A)    maintaining loans (as lender) from the initial proceeds from the issuance of the IP Notes;

(B)    making loans (as lender) to any Affiliate out of payments from the licenses constituting IP Assets;

(C)    canceling, amending, modifying or refinancing any such loans; or

(D)    making distribution of amounts received by the IP Subsidiary under the waterfall provisions of the IP Notes Indenture.

(b)    The covenants and restrictions in Section **4.04(a)(3)** shall not apply to:

(1)    the IP Note Liens;

(2)    liens granted in the IP Subsidiary's Ordinary Course of Business to licensees and qualified sub-licensees under the applicable licenses and sublicenses;

(3)    licenses and sublicenses of IP Assets on arms'-length terms and otherwise in the IP Subsidiary's Ordinary Course of Business; provided that long-term licenses or sub-licenses providing only upfront (as opposed to regular and periodic) royalty payments shall not be permitted unless the IP Subsidiary (A) promptly reports such transaction(s) to PBGC and (B) retains (and does not Distribute, Transfer, or unless expressly permitted by this Section **4.05(b)**, Pledge (except as required by the IP Notes Indenture) such upfront royalty payments or proceeds thereof;

(4)    any rights to the Limited License granted pursuant to Section 1.12 of the IP Notes Indenture;

(5)    ordinary course or involuntary liens and encumbrances;

(6)    liens and other encumbrances existing at the Closing Date (the "IP Existing Liens");

(7)      Permitted Liens (as such term is defined in the IP Notes Indenture); and

(8)      continuations or substitutions of the foregoing with substantially equivalent liens or encumbrances.

(c)      The covenants and restrictions in Section **4.04(a)(5)** shall not apply to:

(1)      the IP Notes;

(2)      other liabilities arising under the IP Notes Indenture (as in effect as of the Closing Date) and the Transaction Documents (in this instance only, as that term is defined in the IP Notes Indenture as in effect as of the Closing Date, and with respect to each such Transaction Document only as in effect as of the Closing Date); and

(3)      liabilities of the IP Subsidiary incurred in its Ordinary Course of Business (and then, only to the extent permitted under the IP Notes Indenture).

## ARTICLE V
## ENFORCEMENT

5.01.  *Specific Performance*.  Each Party acknowledges and agrees that money damages may not be an adequate remedy for any breach or threatened breach of any Transaction Document.  In addition to any and all other remedies that the Parties may have, the Parties shall each be entitled to specific performance as a remedy for breach of any covenant, undertaking or other agreement set forth in any Transaction Document and PBGC, the Company and all Subsidiaries shall be deemed to have consented to specific performance in respect of any such violation and to have waived any objection to the granting of such relief (provided that such Party is found to have been in violation of any provision of any Transaction Document), to the greatest extent permitted by law; provided, however, that upon the occurrence of a Material Transaction (as defined below), PBGC may not rely on this Section 5.01 in order to seek to enjoin or otherwise prevent such Material Transaction, it being recognized that PBGC's sole remedy under the Transaction Documents with respect to such Material Transaction is as set forth in Section 7.04 hereof; provided further, however, that nothing in the immediately preceding proviso will in any way impair or abrogate any rights or remedies of PBGC arising under ERISA or any other source other than the Transaction Documents, including, without limitation, to seek to enjoin or otherwise prevent such Material Transaction to the extent it may otherwise do so by operation of law, statute, regulation, or otherwise.

5.02.  *Violative Actions Void Ab Initio*.  Any transactions or other actions in breach of any covenant, undertaking or other agreement set forth in this Agreement or any other Transaction Document shall be, *ab initio*, null, void and of no force or effect.

5.03.  *Additional Contribution*.  Subject to Section **5.04**, the Company agrees that it shall, within five (5) Business Days after entry of a Final Injunction Order, make a contribution of cash, cash equivalents, or liquid, marketable, and publicly-traded securities (but in the case of cash equivalents or such securities, only to any extent permitted by ERISA and any other applicable law) to the Pension Plan (an "Additional Contribution") in an amount equal to (or

with a value of) $100 million; *provided, however*, that upon the occurrence of a Material Transaction (as defined below), PBGC may not rely on this Section 5.03 or Section 5.04 in order to seek an Additional Contribution as a result of such Material Transaction, it being recognized that PBGC's sole remedy under the Transaction Documents with respect to such Material Transaction is as set forth in Section 7.04 hereof; *provided further, however*, that nothing in the immediately preceding proviso will in any way impair or abrogate any rights and remedies of PBGC arising under ERISA or any other source other than the Transaction Documents, including, without limitation, to seek to enjoin or otherwise prevent such Material Transaction to the extent it may otherwise do so by operation of law, statute, regulation, or otherwise.  The Additional Contribution shall be in addition to the minimum required contribution under 26 U.S.C. § 430 for the plan year for which the Additional Contribution is made.

5.04.  ***Additional Contribution Liability***.  The Company shall be required to make the Additional Contribution in accordance with Section **5.03** only if the Company or any of its Subsidiaries, takes, or attempts to take, any action (either, a "<u>Breaching Action</u>") which:

(a)    is or would be in breach of the Agreement or any other Transaction Document, and the Company does not, within ten (10) Business Days following delivery of notice of such Breaching Action by PBGC to the Company or any other Sears Party either: (1) cure such breach, provided however that (A) for the purposes of this Section 5.04 only, PBGC shall not assert that such breach is incurable (but may contest the sufficiency of any cure asserted by the Company), and (B) nothing in the Agreement limits or otherwise impairs PBGC's rights to assert that any such breach is incurable for purposes of any other provision (or any other remedy available for the breach of such a provision) of this Agreement or any other Transaction Document, or (2) provides written notice to PBGC that it will not (and, in fact it does not) take such Breaching Action.  For the purposes of providing notice to any Sears Party (other than the Company) under this Section **5.04**, PBGC shall direct any such notice to such Sears Party in care of the Company, Attention: General Counsel.  Subject to the immediately preceding sentence, PBGC, in its sole discretion, may provide any notice under this Section **5.04** to any Sears Party, regardless of which Sears Party or Subsidiary has taken or attempted to take the Breaching Action at issue;

(b)    reduces or, if consummated, would reasonably be expected to reduce the aggregate value of the Designated Assets held by the IP Subsidiary that may be realized by PBGC (whether as a result of a prohibited Transfer, Distribution or Pledge of any Designated Asset, reduction in the value of any Designated Asset or impairment of the bankruptcy remoteness or special purpose nature of the IP Subsidiary, or otherwise) by at least $50 million; and

(c)    is enjoined by a permanent injunction (after reasonable notice to and an opportunity to be heard by the Company) set forth in a Final and Non-Appealable Order or is determined in a Final and Non-Appealable Order to constitute a breach of this Agreement or such other Transaction Document (a "<u>Final Injunction Order</u>").

5.05.  ***Non-Exclusivity of Additional Contribution Liability***.  Nothing set forth in Sections **5.03** and **5.04**, including, without limitation, payment of the Additional Contribution, will:

(a)    relieve any Sears Party from, or otherwise mitigate, its obligation to fully comply with the Final Injunction Order (including, without limitation, any obligation to pay damages to PBGC or the Pension Plan);

(b)    constitute a waiver by PBGC, or cure of, any breach under this Agreement or any other Transaction Document; or

(c)    in any way impair, waive, or abrogate any of PBGC's remedies under this Agreement, any other Transaction Document (including the right hereunder to cease Forbearance as provided herein) or applicable law, other than the occurrence of a Springing Lien Event arising from the requirement to make an Additional Contribution.

5.06.    ***Prefunding Balance Limitation***.    The Company shall not at any time elect under 26 U.S.C. § 430(f)(6)(B) to create or to increase any prefunding balance (as defined in 26 U.S.C. § 430(f)(6)) of the Pension Plan by using all or part of any Additional Contribution, or all or any portion of any excess described in 26 U.S.C. § 430(f)(6)(B) that is directly or indirectly attributable to any Additional Contribution.    Such election prohibition is continuing and will survive termination of this Agreement.

## ARTICLE VI
## SPRINGING LIEN

6.01.    ***Springing Lien Events.***    Each of the following shall constitute a "Springing Lien Event":

(a)    a Voluntary Bankruptcy Event or an Involuntary Bankruptcy Event;

(b)    a failure by the Company or any of its Subsidiaries to timely make any quarterly installment or other legally required Pension Plan contribution or any Additional Contribution;

(c)    other than pursuant to the Limited License, entry into an agreement by the Company or any Subsidiary providing for (i) the direct or indirect Distribution or Transfer or (ii) the Pledge, in each case of any ownership interest in the IP Subsidiary, by the Company or any of its Subsidiaries to any Person other than the Company or any of its Subsidiaries without the IP Subsidiary remaining liable for its obligations to PBGC;

(d)    the initiation by the "plan administrator" (as defined in 29 C.F.R. § 4001.2) of any Pension Plan (the "Plan Administrator") of a distress termination of any Pension Plan under ERISA Section 4041(c);

(e)    entry by a court of competent jurisdiction of a decree under ERISA Section 4042(c)(1) adjudicating that any Pension Plan is terminated;

(f)    agreement between PBGC and the Plan Administrator that any Pension Plan is terminated; or

(g)    the Company's failure to timely make the Company Cash Contribution(s) (as defined in the REMIC Amendment), as and when required by the REMIC Amendment.

6.02.  **Springing Lien**.  Upon and continuing after the occurrence of any Springing Lien Event, the IP Subsidiary hereby agrees that it will automatically be deemed to have granted to PBGC, on the date of such occurrence and without further action of any Party or other Person, as security for the Secured Obligations, a lien on and security interest in (the "<u>Springing Lien</u>") the following:

(a)    [intentionally omitted;]

(b)    [intentionally omitted;]

(c)    subject to the terms of Section **6.03**, the IP Assets; and

(d)    all proceeds (but with respect to proceeds of IP Assets, subject to the terms of Section **6.03**) in any form and whenever arising (whether arising before, upon, or after such Springing Lien Event), of any of the foregoing set forth in Sections **6.02(a)-(c)**, including proceeds of proceeds (collectively with the assets described in Sections **6.02(a)-(c)**, the "<u>Designated Assets</u>").

6.03.  **IP Springing Lien Conditions**.  If the grant of the Springing Lien respecting the IP Assets (and all proceeds thereof) would constitute a default under the IP Notes Indenture as of the Closing Date, then the Springing Lien as respecting the IP Assets (and all proceeds thereof) shall be of no force and effect until either:

(a)    the IP Notes and all other obligations under the IP Notes Indenture have been paid in full (or the IP Notes and the IP Notes Indenture have otherwise been defeased or fully discharged); or

(b)    the grant of the Springing Lien respecting the IP Assets (and all proceeds thereof) ceases to constitute a default under the IP Notes Indenture (together with Section **6.03(a)**, the "<u>IP Springing Lien Conditions</u>").

6.04.  **Secured Obligations**.  Any Springing Lien arising under Sections **6.02** or **6.03** shall secure any and all claims (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed) of PBGC for the "unfunded benefit liabilities" together with interest (the "<u>UBL</u>") of the Pension Plans under ERISA Section 4062(b)(1)(A) (such claims, the "<u>PBGC UBL Claims</u>") against the Company and each of its Subsidiaries (the "<u>Secured Obligations</u>").  For the avoidance of doubt, the Springing Lien shall consensually secure the PBGC UBL Claims in total, without regard to any rights of the Sears Parties or any other members of the Company's Controlled Group to seek marshalling or similar remedies.  Each Sears Party hereby waives any and all defenses based on marshalling, suretyship or impairment of collateral.

6.05.  **Acknowledgement of Joint and Several Liability**.  Each Sears Party hereby acknowledges, in accordance with **Exhibit 28**, (a) that it is a member of the Company's Controlled Group and (b) its joint and several contingent liability for the PBGC UBL Claims.

6.06. ***Reservation of Rights Regarding UBL Determination***.  Notwithstanding anything to the contrary in this Agreement, the Parties reserve all rights regarding the determination of UBL, or any determination made on a Termination Basis, including, but not limited to, the applicability, validity, interpretation, and application of PBGC regulations relating thereto.

6.07. ***Perfection of Security Interests.***

(a)  ***Escrow Arrangements***.  The Parties hereby agree to and herein adopt the escrow arrangements attached hereto as **Exhibit 11** (the "Escrow Arrangements") pursuant to which certain Collateral Documents (as defined in the Escrow Arrangments) are to be held in escrow on behalf of PBGC, which, *inter alia*, set forth and govern the Custodian's rights, obligations, and authority with respect to the Designated Assets.

(b)  *[Intentionally Omitted.]*

(c)  *IP Assets*.  Upon the occurrence of a Springing Lien Event and determined only at such time, the Springing Lien shall, with respect to the lien on the Designated Assets consisting of the IP Assets (and all proceeds thereof), be, subject to and conditioned upon the satisfaction of at least one of the IP Springing Lien Conditions:

(1)  a valid, binding and enforceable lien on and security interest in such IP assets (and all proceeds thereof) senior to all other liens (A) except for the IP Note Liens and non-consensual liens which may prime by operation of statute (if any) and (B) subject to the Limited License; and

(2)  perfected by filing and recordation of the appropriate PBGC IP Perfection Documents upon the occurrence of a Springing Lien Event.

(d)  *[Intentionally Omitted.]*

(e)  *Authority to File*.  Upon the occurrence of a Springing Lien Event, PBGC may remove any of the PBGC IP Perfection Documents (subject to and conditioned upon the satisfaction of at least one of the IP Springing Lien Conditions) from escrow, file such PBGC IP Perfection Documents with applicable government entities, file applicable UCC-1 financing statements and take such other actions, in each case to the extent reasonably necessary to perfect the applicable Springing Lien and, to the extent in accordance with applicable law and not otherwise expressly restricted by this Agreement, Foreclose on the Designated Assets.

(f)  *Custodian Funds; Custodian Fees and Expenses.*  PBGC shall apply the Deposit solely to reimburse PBGC for its out-of-pocket costs and expenses incurred in connection with the execution, perfection and recordation of the PBGC IP Perfection Documents and other security interests related to the Springing Lien.  Any unused portion of such Deposit shall be returned by the Custodian to the Company promptly following the termination of this Agreement.  For the avoidance of doubt, the Deposit shall not be released by the Custodian to PBGC until PBGC asserts that a Springing Lien Event has occurred.

6.08.  ***Rights of Foreclosure***.

(a)    *When PBGC May Foreclose*.  Without any limitation to any other rights or remedies of whatever kind or nature PBGC may have (whether under the Transaction Documents, at law, in equity or otherwise), and notwithstanding anything herein to the contrary, PBGC may foreclose or otherwise enforce the Springing Lien on the Designated Assets (or any portion thereof) (any such foreclosure or other enforcement, a "Foreclosure"; to take any such action, to "Foreclose") only:

(1)    if the Plan Administrator initiates a distress termination of any Pension Plan under ERISA Section 4041(c); or

(2)    upon satisfaction of the following conditions: (A) any Pension Plan is terminated, and (B) within five (5) Business Days after a written demand by PBGC to the Company (or to any other Sears Party, if the Company is a debtor in bankruptcy at the time of any such demand) (the "PBGC Demand Letter", which shall include the UBL Documentation), PBGC does not receive payment for the full amount of the PBGC UBL Claims demanded in the PBGC Demand Letter.  PBGC's reasonable estimate of the PBGC UBL Claims shall suffice for purposes of such demand and PBGC Demand Letter.

(b)    *Contingent UBL Claims*.  If, at the conclusion of any Foreclosure instituted in accordance with Section **6.08(a)**, the PBGC UBL Claims are contingent, unliquidated or unmatured, then any proceeds of such Foreclosure shall (i) be held by PBGC or its designated agent for the benefit of PBGC in express trust or escrow (as applicable), and (ii) if invested, then invested as PBGC shall reasonably determine.  Such funds shall be held or invested in accordance with the preceding sentence until such time as the PBGC UBL Claims are fixed, matured and fully liquidated, whereupon such funds may be applied to the PBGC UBL Claims.  After application of such funds, such amount (if any) in excess of that required to pay the PBGC UBL Claims in full (provided such PBGC UBL Claims have not become unenforceable by reason of a lapse of time) shall be remitted to the owner(s) of the Designated Assets subjected to such Foreclosure or as otherwise required by law.  If the amount of the PBGC UBL Claims is ultimately determined by Final and Non-Appealable Order (unless otherwise agreed by PBGC in writing) to be less than PBGC's reasonable estimate as set forth above, any amounts paid in respect of the PBGC UBL Claims that are in excess of the amount so determined shall be promptly turned over to the owner(s) of the Designated Assets subjected to the Foreclosure or disposed of as otherwise required by law, together with, to the extent permitted by applicable law, interest and earnings (in either case, if any) on the trust or escrow account.

6.09.  ***ERISA Lien***.  Notwithstanding anything herein to the contrary, the Springing Lien shall not be subject to the collective net worth limit applicable to a statutory lien under ERISA Section 4068 (the "ERISA Lien").  Nothing herein in any way limits PBGC's rights, if any, to an ERISA Lien.  However, any amount PBGC collects pursuant to an ERISA Lien from the IP Subsidiary shall serve to reduce the amount owed by the IP Subsidiary for the PBGC UBL Claims that would otherwise be secured by the Springing Lien; provided that no amounts collected hereunder, or under any other Transaction Document, pursuant to an ERISA Lien, or otherwise, from any Sears Party will reduce the PBGC UBL Claims or the amount of the

Springing Lien therefor against any other of the foregoing Persons until PBGC has received a single full satisfaction of such claim.

6.10. ***Non-Exclusivity of Rights and Remedies***.  Except as otherwise expressly agreed to herein, nothing in this Agreement or any other Transaction Document limits or otherwise impairs PBGC's or any Pension Plan's rights and remedies, whether by statute, contract, at law, in equity or otherwise.

6.11. ***Credit Facility***.  The Springing Lien shall not extend to such rights with respect to the IP Assets as are reasonably necessary to permit the lenders, holders or collateral agents under the Credit Facility or the Secured Notes to enforce their rights and remedies under the documents governing such indebtedness with respect to the collateral securing such indebtedness; provided however that such limitation to the Springing Lien shall apply only to the extent required by the terms of such indebtedness: (i) as currently in effect, or (ii) as set forth in any amendment, supplement, modification, refinancing or replacement thereof, but only to the extent that the scope of such Springing Lien limitation is not expanded beyond that in effect as of the Closing Date.

6.12. ***Termination of Springing Lien***.  Any Springing Lien shall remain in existence until such time as (i) the PBGC UBL Claims are paid in full, or become unenforceable by reason of lapse of time or (ii) otherwise terminated in accordance with this Agreement.

## ARTICLE VII
## PBGC COMMITMENT

7.01. *[Intentionally Omitted.]*

7.02. ***Forbearance***.  Except as provided in Sections **7.03** and **7.04**, PBGC shall forbear from initiating any involuntary termination of any Pension Plan pursuant to ERISA Section 4042 (the "Forbearance"; to "Forbear").

7.03. ***Forbearance Inapplicable to Compulsory Involuntary Termination***. Notwithstanding Section **7.02**, the Forbearance does not limit PBGC's right to initiate and complete an involuntary termination of any Pension Plan that is based solely on PBGC's determination (in accordance with then-applicable legal standards) that (a) such Pension Plan "does not have assets available to pay benefits which are currently due under the terms of the plan" within the meaning of ERISA Section 4042(a) and (b) PBGC is therefore required to initiate termination proceedings with respect to such Pension Plan pursuant to ERISA Section 4042(a).

7.04. ***Forbearance Termination***.  PBGC shall not be required to Forbear if, after the Closing Date either (a) a Forbearance Termination Event occurs that is continuing and has not been cured at the time of PBGC's issuance of a notice of determination under 29 U.S.C. § 1342(a) that it is instituting proceedings to terminate any Pension Plan or (b) the Company or any of its Subsidiaries enters into an agreement providing for a Material Transaction.

7.05. ***UBL Documentation***.  If at any time PBGC determines that a Forbearance Termination Event has occurred pursuant to Section **7.06(a)(3)** below, PBGC shall provide the

Company with the UBL Documentation no less than five (5) Business Days prior to issuing any notice of determination that a Pension Plan should be terminated except in connection with any involuntary termination described in Section **7.03**.  During such five (5) Business Day period, PBGC shall, if requested by the Company in writing, meet and confer with the Company (including for either Party, its selected advisors) and address, in good faith, any issues or questions that the Company may, in good faith, have with respect to the UBL Documentation. Except as specified in the immediately preceding two sentences, neither PBGC's provision of the UBL Documentation to the Company nor the Company's review thereof or response thereto or to such determination will prevent or delay PBGC from pursuing any and all remedies hereunder, under any other Transaction Document, or under applicable law.

> 7.06. ***Forbearance-Related Definitions.***

> > (a) *Forbearance Termination Event.*  A "<u>Forbearance Termination Event</u>" means:

> > > (1) the occurrence of any Springing Lien Event (it being understood that the occurrence of a Springing Lien Event is not subject to cure);

> > > (2) an event of default under any third-party debt issued by the Company or any Material Subsidiary with an aggregate outstanding principal amount in excess of $350 million, which event of default (A) results in the acceleration of the maturity date of such debt; or (B) arises from non-payment upon the expiry of such debt's term and, in either case, such debt remains outstanding for a period of five (5) calendar days following such acceleration or non-payment;

> > > (3) both (A) the Company's Market Capitalization is less than $1.0 billion on a fully-diluted basis, determined at market close; and (B) either (1) the UBL of the Pension Plans exceeds $625 million in the aggregate (disregarding any overfunding on a Termination Basis of either Pension Plan); or (2) both (x) the Pension Plans in the aggregate are less than 80% funded on a Termination Basis (disregarding any overfunding on a Termination Basis of either Pension Plan) and (y) the UBL of the Pension Plans in the aggregate is greater than $250 million (disregarding any overfunding on a Termination basis of either Pension Plan); or

> > > (4) any breach by the Company or any of its Subsidiaries of any applicable representation, warranty, covenant, undertaking or agreement set forth in this Agreement or any other Transaction Document applicable to such entity that (A) PBGC concludes, in its reasonable discretion, constitutes a material breach (determined by reference to the extent which such breach, individually or when aggregated with all other such breaches, reduces the aggregate value of the Designated Assets held by the IP Subsidiary that may be realized by PBGC (whether as a result of a prohibited Transfer, Distribution or Pledge of any Designated Asset, reduction in the value of any Designated Asset or impairment of the bankruptcy remoteness or special purpose nature of the IP Subsidiary, or otherwise)), and (B) if a curable breach, is not cured within three (3) Business Days after notice of such breach has been delivered by PBGC to either the Company, or any other Sears Party.  For the avoidance of doubt, Springing Lien Events are not curable.  For the purposes of providing notice to any Sears Party

(other than the Company) under this Section **7.06(a)(4)**, PBGC shall direct any such notice to such Sears Party in care of the Company, Attention: General Counsel.  Subject to the immediately preceding sentence, PBGC, in its sole discretion, may provide any notice under this Section **7.06(a)(4)** to any Sears Party, regardless of which Sears Party or Subsidiary is in breach.

(b)    *Material Transaction.*    A "Material Transaction" means any of the following:

(1)    subject to Section **7.06(c)**, if the Company's Market Capitalization is equal to or greater than $1.5 billion, asset dispositions (other than dispositions of equity interests of Subsidiaries, which are addressed in Section **7.06(b)(3)**) that are not either (A) fair and reasonable, or (B) the result of an arm's-length transaction;

(2)    subject to Section **7.06(c)**, if the Company's Market Capitalization is less than $1.5 billion, asset dispositions (other than dispositions of equity interests of Subsidiaries, which are addressed in Section **7.06(b)(3)**) that are not both: (A) on terms that are either (1) fair and reasonable or (2) the result of an arm's length transaction; and (B) having a total value not in excess of $600 million, as calculated from and after the most recent date on which the Company's Market Capitalization fell below such threshold (but excluding transactions required under agreements entered into prior to such date);

(3)    irrespective of the Company's Market Capitalization, and subject to Section **7.06(c)**, the disposition of equity or other ownership interests of any Subsidiary (including without limitation by means of a rights offering) with total value in excess of  $500 million;

(4)    irrespective of the Company's Market Capitalization, and subject to Section **7.06(c)**, spinoffs, dividends or share repurchases with a total value in excess of $250 million; or

(5)    new financing to or a sale-leaseback by, the Company or any of its Subsidiaries (including, without limitation, any sale-leaseback of real property or REIT transaction) such that, immediately following such transaction, the amount of outstanding Indebtedness of the Company and its Subsidiaries (for this purpose, including, without limitation, commitments under revolving credit facilities and letter of credit commitment amounts, but (A) counting Primary Indebtedness only once even if more than one of the Company and its Subsidiaries are obligors thereunder and (B) not counting Third Party Indebtedness if the obligor under the related Primary Indebtedness is the Company or any of its Subsidiaries) exceeds the amount of outstanding Indebtedness of the Company and its Subsidiaries (for this purpose, including, without limitation, commitments under revolving credit facilities and letter of credit commitment amounts, but (y) counting Primary Indebtedness only once even if more than one of the Company and its Subsidiaries are obligors thereunder and (z) not counting Third Party Indebtedness if the obligor under the related Primary Indebtedness is the Company or any of its Subsidiaries) on July 1, 2015 by at least $1.0 billion.

(c)    *Material Transaction Carve-Out*.    Notwithstanding the definition in Section **7.06(b)**, the following transactions are not "Material Transactions" and shall not count

against any cap calculation set forth in Section **7.06(b)**: (i) a disposition of inventory and/or other assets held for sale in the Ordinary Course of Business of the Company and its Subsidiaries; (ii) the REIT Transaction; provided however that no proceeds thereof may be used to effect a transaction as set forth in Section **7.06(b)(4)** but without regard to the $250 million transaction cap amount set forth in such Section; and (iii) any transaction that is solely among the Company and/or any of its Subsidiaries.

(d)     *Material Transaction Cap Calculations*.

(1)     Any transaction cap amount under Section **7.06(b)(2)** shall be calculated as the sum of all transactions in such section required under agreements entered into during any consecutive 12-month period.

(2)     Any transaction cap amounts under Sections **7.06(b)(3)** and **7.06(b)(4)** shall be calculated as the sum of all transactions in such section required under agreements entered into during any calendar year, with any unused amounts in any calendar year carried forward into the following calendar year at the Company's sole discretion; provided that any unused amount with respect to a particular calendar year may not be carried forward to any calendar year other than the immediately following calendar year.

(e)     *"Material" for this Agreement Only*.  Qualification of a transaction as a "Material Transaction" for the limited purposes of this Agreement shall not constitute an admission by the Company or any of its Subsidiaries that such Material Transaction is material for any other purpose.

(f)     *Company's Market Capitalization*.  The "Company's Market Capitalization" means and shall be determined in the following order of priority as of the relevant date of determination:

(1)     *First*, so long as the Specified Shareholders beneficially own or control, in the aggregate, no more than 88% of the total amount of outstanding fully-diluted shares of the Company's common stock, the product of (A) the number of fully-diluted shares of the Company's common stock then outstanding and (B) the closing price of a share of the Company's common stock as of the end of the most recently ended trading day as reported by the Nasdaq Stock Market or such successor or other securities exchange on which the Company's common stock may then be listed.  The Company shall deliver to PBGC the Specified Shareholder common equity ownership totals (to the best of the Company's knowledge) within three (3) Business Days of receipt of a written request by PBGC therefor;

(2)     *Second*, if PBGC or the Company requests a determination of the Company's Market Capitalization by written notice delivered to the other Party and the Specified Shareholders own or control more than 88% of the total amount of outstanding fully-diluted shares of the Company's common stock, the product of (A) the number of fully-diluted shares of the Company's common stock outstanding and (B) the then-current Average Quoted Price;

(3)     *Third*, if (A) PBGC requests a determination of the Company's Market Capitalization by written notice delivered to the Company, (B) the Specified Shareholders own or control more than 88% of the total amount of outstanding fully-diluted

shares of the Company's common stock, and (C) an Average Quoted Price cannot be promptly calculated (due to a lack of available quotes or otherwise) within three (3) Business Days after such request, then the Company's Market Capitalization shall be deemed (for the purposes of this Agreement only) to be less than $1.0 billion on a fully-diluted basis unless the Company then has issuer ratings (A) by both S&P of CCC- or higher and Moody's of Caa3 or higher, in which case the Company's Market Capitalization shall be deemed to be greater than $1.0 billion but, except as specified in the next sub-clause (B), less than $1.5 billion or (B) by both S&P of CCC or higher and Moody's of Caa2 or higher, in which case the Company's Market Capitalization shall be deemed (for purposes of this Agreement only) to be greater than $1.5 billion, in each case until such time as a subsequent determination of the Company's Market Capitalization is requested by either PBGC or the Company and determined in accordance with the procedures set forth herein.

(4)     If either S&P or Moody's withdraws its rating or otherwise no longer rates the Company, then, in the circumstances contemplated by Section **7.06(f)(3)**, the Company's Market Capitalization shall be deemed (for purposes of this Agreement only) to be less than $1.0 billion on a fully-diluted basis.

(5)     The Company's Market Capitalization as calculated under Sections **7.06(f)(3)** and **7.06(f)(4)** shall only be for the purposes of this Agreement.

(g)     *Average Quoted Price*.  The "Average Quoted Price" shall be determined from time-to-time, promptly following a request by PBGC or the Company, as follows: (i) the Company shall solicit and obtain a quoted price per share for a sale of 50,000 shares from each of five independent broker-dealers reasonably acceptable to each of PBGC and the Company; (ii) the highest and lowest price quotes will be eliminated; and (iii) the Average Quoted Price will be the arithmetic average of the remaining three quotes.

## ARTICLE VIII
## TERMINATION OF AGREEMENT

8.01. *Termination*.   This Agreement and all other Transaction Documents shall terminate and shall be of no further effect, and any Springing Lien shall be released upon the earliest to occur of the following:

(a)     *Achievement of 85% Funding*.  The Pension Plans in the aggregate achieve an 85% funded level on a Termination Basis (disregarding any overfunding on a Termination Basis of either Pension Plan) as of the last day of two consecutive plan years of the Pension Plans; provided that the Company may, at any time, provide to PBGC a calculation of each Pension Plan's funding percentage on a Termination Basis with supporting documentation, and request PBGC's review thereof and, in such event, PBGC will promptly inform the Company in writing that it agrees or disagrees with any such calculation and, if it disagrees with any such calculation, will simultaneously provide the Company with the UBL Documentation relating to such disagreement and a written explanation of the bases upon which it disagrees.  During the period five (5) Business Days after so providing such UBL Documentation and written explanation, PBGC shall, if requested by the Company in writing, meet and confer with the Company (including for either Party, its selected advisors) and address, in good faith, any issues

or questions that the Company may, in good faith, have with respect to the UBL Documentation or such disagreement.

(b)    *Passage of Time*.  Five years after the earlier of (i) the Closing Date and (ii) November 3, 2015; <u>provided that</u>, if PBGC has commenced an enforcement action with respect to its rights hereunder or any other Transaction Document, this Agreement, the Transaction Documents, and any Springing Lien shall not terminate solely as a result of the lapse of time until such enforcement action is finally resolved.

(c)    *Standard Termination of Pension Plan*.  The Company completes a standard termination of each Pension Plan.  Any such standard termination will be deemed completed for purposes of this Agreement upon the expiration of the Audit Period.

**ARTICLE IX**
**CLOSING**

9.01.  ***Closing Date***.  The closing of this Agreement (the "<u>Closing</u>") shall occur upon the satisfaction (or written waiver in accordance with Section **11.06**) of the Closing Conditions.  The Closing shall take place at the offices of Locke Lord LLP, 701 8th Street, N.W., Suite 700, Washington, D.C. 20001, on March 18, 2016, at 10:00 a.m., Eastern Standard Time, or as otherwise mutually agreed to by the Parties (the "<u>Closing Date</u>").  In no event will there be an extension of the Closing Date unless agreed to by the Parties in writing.

9.02.  ***Conditions to Closing.***  The obligations of the Parties are subject to the satisfaction (or written waiver in accordance with Section **11.06**) of the following conditions (the "<u>Closing Conditions</u>"):

(a)    *Execution of this Agreement.*  Each of the Parties shall have executed and delivered to each other Party a counterpart to this Agreement.

(b)    *[Intentionally Omitted.]*

(c)    *[Intentionally Omitted.]*

(d)    *[Intentionally Omitted.]*

(e)    *[Intentionally Omitted.]*

(f)    *[Intentionally Omitted.]*

(g)    *[Intentionally Omitted.]*

(h)    *Delivery of PBGC IP Perfection Documents and Powers of Attorney*.  The Company and the IP Subsidiary shall have executed, and caused to be delivered to the Custodian or PBGC's designated agent, to be held in escrow on behalf of PBGC in accordance with the Escrow Arrangements, the documents of perfection and the powers of attorney (the "<u>PBGC IP Perfection Documents</u>") attached hereto as **Exhibit 20**.

(i)      *Instruction to Sears Re.*      The Company and SRe Holding Corporation each shall have executed the instruction letter attached hereto as **Exhibit 29** (the "Sears Re Instruction Letter"), and shall have delivered the executed version of the Sears Re Instruction Letter to Sears Re, with a fully-executed copy to PBGC.

(j)      *The IP Independent Manager.*

(1)      The Member shall have appointed the Person identified on **Exhibit 17** as the Independent Manager (as defined in the Limited Liability Company Operating Agreement of KCD IP, LLC, as in effect on the Closing Date) of the IP Subsidiary in accordance with the terms of the IP Subsidiary's existing organizational documents (the "IP Independent Manager"), and

(2)      The IP Subsidiary shall have caused an Issuer Order (as defined in the IP Notes Indenture) in the form attached hereto as **Exhibit 22** to be given to the Trustee (as defined in the IP Notes Indenture) (it being understood that the IP Notes Indenture does not, in every instance, obligate the Trustee to adhere to the terms of any Issuer Order). The IP Subsidiary shall have delivered to PBGC a copy of such Issuer Order.

(3)      The IP Independent Manager shall have executed and delivered (i) to the IP Subsidiary, a counterpart to the CSC Service Agreement for the IP Independent Manager; (ii) to the Company, a counterpart to the agreement limiting the matters on which the IP Independent Manager may vote; and (iii) to the IP Subsidiary, a counterpart to the Management Agreement, the forms of which are attached hereto as **Exhibit 23**.

(k)      *Issuance of IP Bring-Down Opinion*. The Company shall have caused IP Subsidiary Counsel to deliver a bring-down opinion (the "IP Bring-Down Opinion"), in the form attached hereto as **Exhibit 15**.

(l)      *Issuance of Pre-Closing Corporate Opinions.* The Company shall have caused counsel reasonably acceptable to PBGC to deliver corporate opinions with respect to each of the Sears Parties substantially in the forms attached hereto as **Exhibit 14.**

(m)      *Subordination Agreement.* Each of the Sears Parties, each of the Other Company Subsidiaries and PBGC shall have entered into the subordination agreement (the "Subordination Agreement") attached hereto as **Exhibit 21**.

(n)      *Acknowledgment of Liability*. Each of the Sears Parties shall have executed the acknowledgement of liability attached hereto as **Exhibit 28**.

(o)      *Deposit.*      The Company shall have deposited with the Custodian or PBGC's designated agent, to be held in escrow on behalf of PBGC in accordance with the Escrow Arrangements, the sum of $250,000 (the "Deposit") to cover all out-of-pocket costs and expenses of PBGC to be incurred in connection with the execution, perfection and recordation of the PBGC IP Perfection Documents and other security interests related to the Springing Lien.

(p)      *All Other Exhibits Attached Hereto*.  The Company shall have delivered to PBGC each other Exhibit not referenced above in this Section **9.02**.

# ARTICLE X
# POST-CLOSING MONITORING

10.01. ***Company Notification Requirements.*** From and after the Closing Date, the Company shall, in addition to all other reporting requirements in this Agreement, all other Transaction Documents, or otherwise required by law, provide PBGC with:

(a)    written notification within five (5) Business Days after any breach by any Sears Party of the terms of this Agreement or any other Transaction Document, including any representations and warranties herein or therein;

(b)    (i) all quarterly asset statements for each Pension Plan within five (5) Business Days after the Company's receipt thereof; and (ii) each Pension Plan's Actuarial Valuation Report annually within five (5) Business Days after the earlier of (A) the last day of the ninth calendar month of the plan year and (B) the date on which such report is received by the Company;

(c)    prompt written notification of any proposed or actual replacement of the IP Independent Manager; provided that (i) the Sears Parties shall not materially prevent or hinder PBGC from having the full right and opportunity to communicate with the IP Independent Manager on the matters with respect to which such IP Independent Manager is entitled to vote pursuant to the organizational documents of the applicable Sears Party and (ii) any post-Closing confidentiality agreement which the IP Independent Manager enters into with any Sears Party must expressly provide for PBGC's right to fully and regularly communicate with the IP Independent Manager;

(d)    if the Company is no longer subject to public company reporting requirements, copies of any financial statements, including any management discussion and analysis statements, annual or quarterly reports, or any other materials that the Company provides to any lender holding Indebtedness with a principal amount in excess of $100 million, whether provided to such lender on the Company's behalf or on behalf any other Sears Party;

(e)    [intentionally omitted;]

(f)    [intentionally omitted;]

(g)    [intentionally omitted;]

(h)    any and all reporting materials provided to holders of the IP Notes, including any materials required by the IP Notes Indenture, concurrently with the provision of such materials to the holders of the IP Notes;

(i)    written notice of any Forbearance Termination Event within five (5) Business Days after its occurrence and within five (5) Business Days after any discontinuance thereof;

(j)    written notice of (1) any event of default under any third-party debt with an aggregate outstanding principal amount in excess of $50 million, or (2) any event that with

notice or passage of time, or both, would constitute an event of default under any such third-party debt, within five (5) Business Days after such event of default or event;

(k)    written notice of the Company's or any Subsidiary's entry into an agreement providing for a Material Transaction within two (2) Business Days after such entry;

(l)    quarterly reports that indicate usage and remaining availability of the assets subject to the calculations in Sections **7.06(b)(2)-(5)**;

(m)    written notice of the occurrence of, and discontinuance, if any, of any Springing Lien Event, within two (2) Business Days after such occurrence or discontinuance; and

(n)    written notice by any Sears Party of its entry into any agreement for the Distribution, Transfer, or Pledge of any ownership interest in the IP Subsidiary, within two (2) Business Days after such entry.

10.02.    *Noncompliance Notice*.    If the Company fails to comply with any requirement set forth in Section 10.01 of this Agreement, PBGC may deliver in writing to the Company a notice of noncompliance (the "Noncompliance Notice") identifying the requirement in Section **10.01** with which the Company or any of its Subsidiaries has failed to comply.    After the delivery of the Noncompliance Notice, the Company shall have fifteen (15) business days to cure the identified non-compliance.    PBGC shall, if requested by the Company in writing, meet and confer with the Company (including for either Party, its selected advisors) within five (5) Business Days of the delivery of the Noncompliance Notice, and address, in good faith, any issues or questions that the Company may, in good faith, have with respect to the Noncompliance Notice.    Notwithstanding anything to the contrary set forth in this Agreement or any other Transaction Document, absent delivery of a Noncompliance Notice with respect to any failure by the Company to comply with any requirement set forth in Section 10.01 and expiration of the cure period set forth in this Section 10.02 without timely cure, such failure by the Company shall not constitute a breach under Section 7.06(a)(4) hereof.    For the avoidance of doubt, (a) for purposes of Section 7.06(a)(4), the cure period provided in Section 7.06(a)(4) shall not apply with respect to any such failure to comply with any requirement set forth in Section 10.01, and (b) no cure period provided in this Agreement or any other Transactional Document is cumulative.

# ARTICLE XI
# MISCELLANEOUS

11.01.    *Notices*.    Except as otherwise expressly provided herein, all notices, communications, requests or other correspondence to be given under this Agreement shall be in writing and mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered personally (which shall include delivery by a courier or messenger service) or by telecopy transmission with confirmation of receipt, as follows:

| | |
|---|---|
| If to any of the Sears Parties, addressed to: | c/o Sears Holdings Corporation<br>3333 Beverly Road<br>Hoffman Estates, IL<br>Attention: General Counsel<br>Facsimile: (847) 286-2471 |
| with a copy (which shall not constitute notice) to: | Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Attention: Scott K. Charles<br>Facsimile: (212) 403-2202 |
| If to PBGC addressed to: | Pension Benefit Guaranty Corporation<br>Director, Corporate Financing and Restructuring Department<br>1200 K Street, N.W., Suite 270<br>Washington, DC  20005-4026<br>Facsimile: (202) 842-2643 |
| with a copy (which shall not constitute notice) to: | Pension Benefit Guaranty Corporation<br>General Counsel, Office of the General Counsel<br>1200 K Street, N.W., Suite 300<br>Washington, DC 20005-4026<br>Facsimile: (202) 326-4112 |

Notices given by mail or by personal delivery shall be effective (and deemed to have been given) upon actual receipt.  Notice given by telecopier shall be effective upon actual receipt if received and confirmed by return transmission during the recipient's normal business hours or at the beginning of the recipient's next Business Day after receipt if not received during the recipient's normal business hours. With respect to any Sears Party (other than the Company), all such Sears Parties acknowledge and agree that the Office of the General Counsel for the Company shall be the authorized agent for the receipt of any notice hereunder.

Any Party may change any address to which notice is to be given to it by giving notice of such change as provided above.

11.02.  ***Governing Law, Jurisdiction and Venue***.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (excluding any conflicts-of-law rule or principle that might refer same to the laws of another jurisdiction).  Exclusive venue for any legal action or proceeding based upon, arising out of, or relating to this Agreement or the transactions contemplated hereby (an "Action"), to the fullest extent permitted by law, shall be in the United States District Court for the Southern District of New York.

11.03.  ***Currency***.  All currencies and dollar amounts referenced herein shall be in United States dollars.

11.04.  *Waiver of Jury Trial*.  THE PARTIES DO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION.

11.05.  *Captions*.  The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

11.06.  *Entire Agreement; Amendments and Waivers*.  This Agreement (inclusive of all Exhibits attached hereto), together with the other Transaction Documents, constitutes the entire agreement between the Parties pertaining to the subject matter hereof and thereof and supersedes all prior agreements (including the Term Sheet), understandings and discussions, whether oral or written, of the Parties, and there are no representations, warranties, covenants or agreements between the Parties in connection with the subject matter hereof or thereof except as set forth specifically herein or therein.  No supplement, modification or waiver of this Agreement will be binding unless executed in writing by the Company, PBGC and any other Sears Parties to be bound thereby and expressly referencing this Agreement.  No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof (regardless of whether similar) nor will any such waiver constitute a continuing waiver unless otherwise expressly provided.

11.07.  *No Waiver of Breach*.  The waiver by either Party of a breach or violation of any provision of this Agreement will not operate as or be construed to be a waiver of any subsequent breach of any provision of this Agreement.  The obligations of the Sears Parties under each Transaction Document shall be absolute and unconditional irrespective of any lack of validity or enforceability of such Transaction Document, any PBGC IP Perfection Document or any other document or instrument executed and delivered in connection with such Transaction Document, any defense or counterclaim whatsoever on the part of any Sears Party (in any case, whether based on contract, tort or any other theory), any circumstance whatsoever with respect to such Transaction Document, or any legal or equitable defense available to any Sears Party, and each Sears Party hereby irrevocably waives the right to assert any such defenses, setoffs or counterclaims in any litigation or other proceeding relating to any Transaction Document, any PBGC IP Perfection Document or any other document or instrument executed and delivered in connection with any Transaction Document.

11.08.  *Severability, Substantive Error*.  If any one or more of the provisions contained in this Agreement or in any document delivered pursuant hereto shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such document.  Moreover, if any Party hereto identifies a substantive error with respect to this Agreement or any other Transaction Document, the Parties shall promptly negotiate in good faith to address such error (including, if necessary, by amending such document(s)) so as to, as nearly and fairly as possible, approximate the economic and legal substance originally intended.

11.09.  *Further Assurances*.  After Closing, the Parties shall take all appropriate action and execute any documents, instruments or conveyances of any kind that may be reasonably necessary to effectuate the intent of this Agreement.

11.10.  ***Multiple and Electronic Counterparts***.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

11.11.  ***Time of the Essence***.  The Parties acknowledge and agree that time is of the essence hereunder.

11.12.  ***Public Disclosure***.  The content of the press releases to be issued promptly following the Closing relating to the terms of this Agreement and the other Transaction Documents shall be substantially in the form attached hereto as **Exhibit 26**.  No Party may issue any other press release or public disclosure regarding this Agreement or any of the other Transaction Documents except (a) as to which the timing and content shall have been mutually agreed by the Company and PBGC prior to the issuance of such disclosure or release or (b) as required by applicable law or compulsory legal process or in connection with any pending legal proceeding (in which case each of the Company and PBGC agrees, to the extent permitted by applicable law, to inform the other promptly thereof such that the other may reply or otherwise respond as it deems necessary or advisable).

11.13.  ***U.S. Bank Trust Association***.  It is expressly understood and agreed by the Parties that with respect to any Transaction Document to which U.S. Bank Trust National Association is a party (including, without limitation, this Agreement), (a) such Transaction Document is executed and delivered by U.S. Bank Trust National Association, not individually or personally but solely as trustee of the SRC Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements therein made on the part of the SRC Trust, SRC R.E. and SRC Holdings is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose of binding only the SRC Trust, SRC R.E. and SRC Holdings, (c) nothing herein contained or in any Transaction Document shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the Parties hereto, (d) U.S. Bank Trust National Association has made no investigation as to the accuracy or completeness of any representations and warranties made by the SRC Trust, SRC R.E. and SRC Holdings in this Agreement or any other Transaction Document and (e) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the SRC Trust, SRC R.E. or SRC Holdings or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the SRC Trust, SRC R.E. or SRC Holdings under this Agreement, any Transaction Document, or any other related document.

<u>Exhibit 1</u>

**All Direct and Indirect Subsidiaries of the Company**

[See Attached]

<u>Exhibit 2</u>

**Underlying Documents and Changes Thereto**

[See Attached]

<u>Exhibit 3-A</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 3-B</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 4</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 5</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 6</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 7</u>

**[INTENTIONALLY OMITTED]**

Exhibit 8

**All Sales, Substitutions, or Transfers of Any IP Assets Out of IP Subsidiary From and After October 1, 2014 Until Closing**

None.

<u>Exhibit 9</u>
**IP Existing Liens**

None.

<u>Exhibit 10-A</u>
**Certain Information Regarding the IP Subsidiary**

A.  Organizational identification number of IP Subsidiary:

FEIN: NONE (disregarded entity for tax purposes)
Organizational ID#: 4153029

B.  Address of chief executive office of IP Subsidiary:

3333 Beverly Road
Hoffman Estates, IL 60179

Exhibit 10-B

**IP Assets**

[See Attached]

<u>Exhibit 11</u>
**Escrow Arrangements (including Powers of Attorney)**
[See Attached]

Exhibit 12

**[INTENTIONALLY OMITTED]**

Exhibit 13

**[INTENTIONALLY OMITTED]**

<u>Exhibit 14</u>
**Corporate Opinions**
[See Attached]

<u>Exhibit 15</u>
**IP Bring-Down Opinion (together with IP 2006 Bankruptcy Opinion)**
[See Attached]

Exhibit 16

**[INTENTIONALLY OMITTED]**

Exhibit 17
**Independent Manager Lists**
**Schedule of Compensation & Benefits for Current Managers**

**List of Independent Managers**

Sandra Horwitz

Michelle Dryer

William Popeo

**Schedule of Compensation & Benefits for Current Managers**

*Compensation:*

KCD, IP LLC: $2,400 annually

*Benefits:*

See attached copy of Insurance Policy.

<u>Exhibit 18</u>
**Custodian**

State Street Bank and Trust Company

Exhibit 19

**[INTENTIONALLY OMITTED]**

<u>Exhibit 20</u>
**PBGC IP Perfection Documents**
[See Attached]

<u>Exhibit 21</u>
**Subordination Agreement**
[See Attached]

Exhibit 22
**Issuer Order**
[See Attached]

<u>Exhibit 23</u>
**Agreements Limiting IP Independent Manager's Voting Authority**
[See Attached]

<u>Exhibit 24</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 25</u>
**Specified Organizational Document Provisions**

The following sections and schedules of the Limited Liability Company Operating Agreement of KCD IP, LLC:

5(b), 5(c), 6, 7, 8, 9, 10, 14, 16, 17, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, Schedule A and Schedule C.

<u>Exhibit 26</u>
**Press Release**
[See Attached]

<u>Exhibit 27</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit 28</u>
**Acknowledgment of Liability**
[See Attached]

<u>Exhibit 29</u>
**Sears Re Instruction Letter**
[See Attached]