AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Joseph L. Sorkin
Sara L. Brauner

*Counsel to the Official Committee of*
*Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| | : | |
| **In re** | : | Chapter 11 |
| | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | Case No. 18-23538 (RDD) |
| | : | |
| **Debtors.**[1] | : | (Jointly Administered) |
| | : | |

---

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL INVESTMENTS, INC.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...........................................................................................................12

    I.      General Background .........................................................................12

          A.     Chapter 11 Cases ....................................................................12

          B.     Prepetition Capital Structure ...................................................13

    II.     The Creditors' Committee's Investigation Uncovers Viable and Valuable Claims and Causes of Action Against ESL and Lampert .......................................14

          A.     The Creditors' Committee Investigates the Debtors' Prepetition Transactions .........................................................................14

          B.     The Creditors' Committee Files the Standing Motion To Assert Claims of the Debtors' Estates Arising from ESL's and Lampert's Scheme to Destroy Sears for ESL's Benefit ...................................15

               1.     ESL's Investment: Lampert and ESL Acquire Kmart and Sears Roebuck, Which Became ESL's Central Investments ........15

               2.     The Stock Buy-Backs: Under Lampert's Direction, Sears Spent Its Cash for ESL's Short-Term Benefit and to the Detriment of Sears's Long-Term Prospects ...................................17

               3.     The Spin-Offs: With Cash Dwindling, ESL Takes Control of Sears's Desirable Business Units for ESL's Direct Benefit ..........................................................................21

               4.     The Real Estate Play: Lampert and ESL Secure for Their Own Benefit Sears's Remaining Valuable Assets—Prime Real Estate—From an Insolvent Sears ...................................22

               5.     The Capital Contributions: ESL "Finances" Sears To Protect Its Investments, Lien Up Remaining Assets and Solidify Sears's Fate ................................................................24

          C.     The Estates' Claims Against Lampert, ESL and Kamlani ........................25

          D.     The Debtors' Refusal to Assert the Proposed Claims ...............................26

    III.    The Debtors' Sale Process ...................................................................27

          A.     The Global Bidding Procedures ...............................................27

          B.     ESL's Initial Bids and the Auction ...........................................31

          C.     The ESL Bid ........................................................................38

OBJECTION ...............................................................................................................43

    I.      Applicable Legal Standard ..................................................................43

          A.     The ESL Sale Is Subject to Heightened Scrutiny that It Cannot Satisfy .................................................................................43

B.    The ESL Sale Would Not Even Satisfy the Lesser Business
       Judgment Test ...................................................................................46

II.    The Debtors Have Failed To Meet Their Burden of Showing that the ESL
        Sale Is in the Best Interests of the Debtors' Estates ..................................48

        A.    The ESL Sale Is Non-Actionable as Sears NewCo Is Not a Viable
               Go Forward Business ...........................................................................51

               1.    The ESL Business Plan Is Unrealistic and Unreasonable .............51

               2.    The Debtors Cannot Demonstrate Adequate Assurance of
                      Future Performance Under Bankruptcy Code Section
                      365(b) .......................................................................................59

        B.    The ESL Sale Will Leave the Estates Administratively Insolvent............63

               1.    The Debtors' Estimates Discount Their Administrative
                      Shortfall by ██████████████ ...............................65

               2.    The Debtors' Analysis Relies on Potential Upsides, but
                      Fails To Account for Significant Downsides that Would
                      Increase Administrative Expenses .................................................68

               3.    The APA Contains Numerous Conditions that May Prevent
                      the ESL Sale from Closing—Putting an Even Greater
                      Strain on the Estates....................................................................74

III.    The ESL Sale Impermissibly Permits ESL to Credit Bid and Grants ESL a
         Release for Inadequate Consideration .....................................................77

        A.    The ESL Claims Are Disputed Claims and Cannot Be Allowed for
               Credit Bidding Purposes or Otherwise ...................................................79

               1.    The 2016-2018 ESL Contributions Should Be
                      Recharacterized as Equity ............................................................81

               2.    ESL's Claims are Subject to Equitable Subordination .................86

               3.    ESL's Claims Are Subject to Disallowance Under
                      Bankruptcy Code Section 502(d).................................................90

        B.    If ESL Is Permitted to Credit Bid, Protections Must Be Put in Place........97

               1.    ESL Should Be Required to Backstop any Credit Bid..................97

               2.    If ESL Is Permitted To Credit Bid, ESL's Claims Should
                      Not Be Allowed in Excess of the Amount Permitted To Be
                      Credit Bid .................................................................................99

               3.    If Permitted To Credit Bid, ESL Must Allocate Its Credit
                      Bid to the Collateral Securing the Underlying Debt...................100

        C.    The Consideration for the Proposed Release Is Woefully
               Inadequate .........................................................................................103

IV.    An Orderly Asset Monetization and GOB Process Maximizes Value to the
         Estates and Creditors............................................................................107

        A.    The Flawed Sale Process Conducted by the Debtors Did Not
               Result in a Competitive Auction for the Debtors' Assets .......................109

1.    The Debtors' Process Was Rushed, Disorganized and
Confusing, Which Prevented True Market Testing of the
Value of the Debtors' Assets .......................................................109

2.    The Debtors Possess Other Highly Valuable and Complex
Unencumbered Assets that they Failed To Market Properly........114

3.    The Poorly Conducted Auction Prevented Third-Party
Participation ................................................................................116

4.    Unsurprisingly, ESL Emerged as the Winning Bidder in a
One-Horse Race ...........................................................................118

B.    The Debtors Relied on Unsupported Assumptions in Comparing
the ESL Sale to the Wind-Down .............................................................121

1.    The Debtors Undervalued the Unencumbered Real Estate
Assets by Using Flawed Methodology ........................................121

2.    ESL Cannot Prove Its Entitlement to a Claim Pursuant to
Bankruptcy Code Section 507(b)................................................125

3.    The Debtors Inexplicably Failed to Surcharge Collateral
Pursuant to Bankruptcy Code Section 506(c)..............................129

C.    Analysis of an Alternative Sale Process Confirms that an Asset
Monetization and GOB Process Maximizes Value ..................................132

V.    ESL Is Not Entitled to the Protections of Bankruptcy Code Section 363(m)
or Relief from the Automatic 14-Day Stay Required by Bankruptcy Rule
6004(h)...............................................................................................................134

CONCLUSION....................................................................................................................138

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbotts Dairies, Inc.*,
   788 F.2d 143, 14 C.B.C.2d 811 (3d Cir. 1986)....................................................................135

*In re Adelphia Commc'ns Corp.*,
   361 B.R. 337 (S.D.N.Y. 2007)..........................................................................................137

*In re Aeropostale, Inc.*,
   555 B.R. 369 (Bankr. S.D.N.Y. 2016).....................................................................80, 99, 100

*In re After Six, Inc.*,
   154 B.R. 876 (Bankr. E.D. Pa. 2010) ..........................................................................50, 135

*Androse Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co.)*,
   472 B.R. 666 (S.D.N.Y. 2012)...........................................................................................60

*In re AppliedTheory Corp.*,
   345 B.R. 56 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007) ...........................................86

*In re AutoStyle Plastics*,
   238 B.R. 346 (Bankr. W.D. Mich. 1999)..............................................................................83

*In re AutoStyle Plastics, Inc.*,
   269 F.3d 726 (6th Cir. 2001) ............................................................................................85

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)........................................................................................................49

*Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*,
   624 F.3d 274 (5th Cir. 2010), *modified*, 649 F.3d 320 (5th Cir. 2011) ................................126

*In re BH S&B Holdings LLC*,
   420 B.R. 112 (Bankr. S.D.N.Y. 2009) .............................................................................. 83-4

*In re Bidermann Indus. U.S.A., Inc.*,
   203 B.R. 547 (Bankr. S.D.N.Y. 1997)..................................................................................44

*Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.)*,
   942 F.2d 1462 (9th Cir. 1991) ..........................................................................................44

*C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*,
   92 B.R. 87 (Bankr. S.D.N.Y. 1988)....................................................................................44

*In re Callister*,
  15 B.R. 521 (Bankr. D. Utah 1981) ............................................................... 127-8

*Campbell v. United States (In re Davis)*,
  889 F.2d 658 (5th Cir. 1989) ...............................................................................90

*CFTC v. Weintraub*,
  471 U.S. 343 (1985).............................................................................................107

*Chase Manhattan Bank USA NA v. Stembridge (In re Stembridge)*,
  394 F.3d 383 (5th Cir. 2004) ..............................................................................125

*Cheatham v. Cent. Carolina Bank & Trust Co., N.A. (In re Cheatham)*,
  91 B.R. 382 (Bankr. E.D.N.C. 1988)...................................................................127

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................107

*In re Cold Harbor Assocs. L.P.*,
  204 B.R. 904 (Bankr. E.D. Va. 1997)....................................................................82

*In re Combined Crofts Corp.*,
  54 B.R. 294 (Bankr. D. Wisc. 1985).....................................................................129

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983).......................................................................46-7, 106

*In re Constr. Supervision Servs., Inc.*,
  No. 12–00569–8 (SWH), 2015 WL 4873062 (Bankr. E.D.N.C. Aug. 13, 2015).................126

*Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin.
  News Network Inc.)*,
  980 F.2d 165 (2d Cir. 1992).................................................................................108

*In re Croton River Club, Inc.*,
  162 B.R. 656 (Bankr. S.D.N.Y. 1993) .................................................................129

*In re CS Mining, LLC*,
  574 B.R. 259 (Bankr. D. Utah 2017) .....................................................................80

*In re Daufuskie Island Props., LLC*,
  441 B.R. 60 (Bankr. D.S.C. 2010) .........................................................................80

*In re Drexel Burnham Lambert Grp.*,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991) .................................................................107

*In re DWE Screw Prods., Inc.*,
  157 B.R. 326 (Bankr. N.D. Ohio 1993) ..................................................................61

*In re Embers 86th St., Inc.*,
    184 B.R. 892 (Bankr. S.D.N.Y. 1995) ........................................................................60

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*,
    926 F.2d 1458 (5th Cir. 1991) .................................................................................89

*In re Family Christian LLC*,
    533 B.R. 600 (Bankr. W.D. Mich. 2015) ............................................................49, 105

*First Servs. Grp., Inc. v. O'Connell (In re Ceron)*,
    412 B.R. 41 (Bankr. E.D.N.Y. 2009) .......................................................................130

*In re Fisker Automotive Holdings, Inc.*,
    510 B.R. 55 (Bankr. D. Del. 2014) ...........................................................................80

*In re Flour City Bagels, LLC*,
    557 B.R. 53 (Bankr. W.D.N.Y. 2016) ...........................................................65, 73, 105

*Ford Motor Credit Co. v. Dobbins*,
    35 F.3d 860 (4th Cir. 1994) ...................................................................................126

*In re Franklin Indus. Complex Inc.*,
    No. 01-67457 (SDG), 2008 WL 3992233 (Bankr. N.D.N.Y. Aug. 21, 2008) ......................127

*In re Free Lance-Star Publishing Co.*,
    512 B.R. 798 (Bankr. E.D. Va. 2014) .......................................................................100

*G-K Dev. Co. v. Broadmoore Place Invs., L.P. (In re Broadmoor Place Invs.,
    L.P.)*,
    994 F.2d 744 (10th Cir. 1993) ...............................................................................108

*Geltzer v. Mooney, et al. (In re MacMenamin's Grill Ltd.)*,
    450 B.R. 414 (Bankr. S.D.N.Y. 2011) (Drain, J.) ........................................................90

*Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice
    Corp.)*,
    739 F.2d 73 (2d Cir. 1984) ...................................................................................129

*Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*,
    762 F.2d 10 (2d Cir. 1985) ............................................................................. 129-30

*In re General Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) .....................................................................135

*Goode v. Hagerty (In re Sys. Impact, Inc.)*,
    229 B.R. 363 (Bankr. E.D. Va. 1998) .......................................................................89

*In re The Great Atl. & Pac. Tea Co.*,
   No. 15-23007 (RDD) (Bankr. S.D.N.Y.) ............................................................................49

*In re Gucci*,
   126 F.3d 380 (2d Cir. 1997) ...........................................................................................135

*In re Gulph Woods Corp.*,
   No. 87-03093S, 1988 WL 134688 (Bankr. E.D. Pa. Dec. 13, 1988) ...............................45, 49

*In re Gymboree Grp., Inc.*,
   No. 19-30258 (KLP) (Bankr. E.D. Va.) ...........................................................................49

*In re Hoffman Assocs.*,
   194 B.R. 943 (Bankr. D.S.C. 1995) ...............................................................................87, 89

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...........................................................................44

*In re Ionosphere Clubs, Inc.*,
   85 F.3d 992 (2d Cir. 1996) ...............................................................................................60

*In re Iridium Op. LLC*,
   478 F.3d 452 (2d Cir. 2007) ...........................................................................................107

*In re Joshua Slocum Ltd.*,
   922 F.2d 1081 (3d Cir. 1990) ...........................................................................................60

*In re Kohl*,
   421 B.R. 115 (Bankr. S.D.N.Y. 2009) ...................................................................129, 131

*In re Lafayette Radio Elecs. Corp.*,
   9 B.R. 993 (Bankr. E.D.N.Y. 1981) ...............................................................................61

*Lawsky v. Condor Capital Corp.*,
   No. 14 CIV. 2863 (CM), 2015 U.S. Dist. LEXIS 96347 (S.D.N.Y. July 21,
   2015) ...............................................................................................................................48

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
   511 B.R. 253 (Bankr. S.D.N.Y. 2014) ...........................................................................99

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
   247 B.R. 38 (S.D.N.Y. 2000) ...........................................................................................125

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
   No. 92 Civ. 7584 (MBM), 1997 U.S. Dist. LEXIS 12858 (S.D.N.Y. Aug. 27,
   1997) ...............................................................................................................................126

*In re Lyondell Chem. Co.*,
   544 B.R. 75 (Bankr. S.D.N.Y. 2016) ......................................................................... 81, 83-4

*In re M. Fine Lumber Co.*,
   383 B.R. 565 (Bankr. E.D.N.Y. 2008) .............................................................................. 60

*In re Mary Holder Agency, Inc.*,
   No. 11-34280 (MBK), 2012 WL 4434362 (Bankr. D.N.J. Sept. 24, 2012) ......................... 126

*In re McLean Indus., Inc.*,
   84 B.R. 340 (Bankr. S.D.N.Y. 1988) .............................................................................. 129

*Mission Iowa Wind Co. v. Enron Corp.*,
   291 B.R. 39 (S.D.N.Y. 2003) ............................................................................................ 45

*N.J. Steel Corp. v. Bank of N.Y.*,
   No. 95 CIV 3071 (KMW), 1997 WL 716911 (S.D.N.Y. Nov. 17, 1997) ............................ 89

*In re Natco*,
   54 B.R. 436 (Bankr. S.D.N.Y. 1985) ........................................................................... 60, 62

*In re Octagon Roofing*,
   123 B.R. 583 (Bankr. N.D. Ill. 1991) ............................................................................... 98

*Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Serv., Inc.
   (In re KDI Holdings, Inc.)*,
   277 B.R. 493 (Bankr. S.D.N.Y. 1999) ............................................................................. 43

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide
   Techs., Inc.)*,
   299 B.R. 732 (Bankr. D. Del. 2003) ................................................................................ 89

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A (In re Residential
   Capital, LLC)*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013) ............................................................................ 126

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
   4 F.3d 1095 (2d Cir. 1993) ........................................................................................... 46-7

*Pepper v. Litton*,
   308 U.S. 295 (1939) ........................................................................................................ 44

*Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) .............................................................................. 99

*In re President Casinos, Inc.*,
   314 B.R. 784 (Bankr. E.D. Mo. 2004) .............................................................................. 45

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)...................................................................................107

*In re PSINet Inc.*,
268 B.R. 358 (Bankr. S.D.N.Y. 2001) ................................................................137

*Qmect, Inc. v. Burlingame Capital Partners II, L.P.*,
373 B.R. 682 (N.D. Cal. 2007) ......................................................................125

*In re Quality Beverage Co., Inc.*,
181 B.R. 887 (Bankr. S.D. Tex. 1995) ......................................................... 126-28

*RadLAX Gateway Hotel v. Amalgamated Bank*,
132 S.Ct. 2065 (2012)................................................................................100

*In re Red Dot Scenic, Inc.*,
313 B.R. 181 (Bankr. S.D.N.Y. 2004) (Drain, J.)..................................................91

*In re Residential Capital, LLC*,
No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) .....................................44

*In re RML Development, Inc.*,
528 B.R. 150 (Bankr. W.D. Tenn. 2014).........................................................80, 98

*In re RS Legacy Corp.*,
2015 Bankr. LEXIS 2206 (Bankr. D. Del. June 25, 2015)....................................................61

*Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*,
423 F.3d 166,175 (2d Cir. 2005)...........................................................................107

*In re SubMicron Sys. Corp.*,
432 F.3d 448 (3d Cir. 2006)........................................................................85

*In re Tidal Const. Co.*,
446 B.R. 620 (Bankr. S.D. Ga. 2009) .................................................................44

*U.S. v. Boatmen's First Nat'l Bank*,
5 F.3d 1157 (8th Cir. 1993) ..........................................................................132

*United States v. Deer Park, Inc. (In re Deer Park, Inc.)*,
136 B.R. 815 (B.A.P. 9th Cir. 1992), *aff'd*, 10 F.3d 1478 (9th Cir. 1993)............................50

*In re Ware*,
12-30566-KLP, 2014 Bankr. LEXIS 2437 (Bankr. E.D. Va. June 3, 2014) .................129, 131

*In re Westview 74th St. Drug Corp.*,
59 B.R. 747 (Bankr. S.D.N.Y. 1986).................................................................61

*In re The Wet Seal, LLC*,
  No. 17-10229 (CSS) (Bankr. D. Del. 2017) .........................................................................49

*In re Winstar Commc'ns, Inc.*,
  554 F.3d 382 (3d Cir. 2009)..............................................................................................89

**Statutes**

11 U.S.C.
  § 101(2).............................................................................................................................43
  § 101(31)...........................................................................................................................43
  § 363........................................................................................................................ *passim*
  § 363(b).................................................................................................................... *passim*
  § 363(k).................................................................................................................... *passim*
  § 363(m)..................................................................................................................... 134-37
  § 364(d).............................................................................................................................125
  § 365........................................................................................................................ *passim*
  § 365(b).................................................................................................................... *passim*
  § 502(a).....................................................................................................................40, 104
  § 502(b).............................................................................................................................81
  § 502(d).................................................................................................................... *passim*
  § 503(b).................................................................................................................... *passim*
  § 506(c).................................................................................................................... *passim*
  § 507(a)(2)........................................................................................................................126
  § 507(b).................................................................................................................... *passim*
  § 510(c).................................................................................................................... *passim*
  § 544........................................................................................................................ *passim*
  § 548........................................................................................................................ *passim*
  § 550........................................................................................................................ *passim*
  § 1102................................................................................................................................13
  § 1107................................................................................................................................12
  § 1108................................................................................................................................12
  § 1129................................................................................................................................78

**Rules**

Fed. R. Bankr. P.
  § 6004(h)..................................................................................................................134, 136
  § 9019..............................................................................................................................107

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 363.11......................................................................................135
4 COLLIER ON BANKRUPTCY ¶ 506.05......................................................................................129
10 COLLIER ON BANKRUPTCY ¶ 6004.11...................................................................................136

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears

Holdings Corporation ("Holdings") and its affiliated debtors and debtors in possession

(collectively, the "Debtors" and, together with their non-Debtor affiliates, "Sears" or the

"Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through

its undersigned counsel, hereby files this objection (the "Objection") to the proposed sale of

substantially all of the Debtors' businesses and assets to Transform Holdco, LLC ("Buyer" and,

together with its affiliates and principals, including ESL Investments, Inc., "ESL") pursuant to

section 363(b) of title 11 of the United States Code (the "Bankruptcy Code").  In support of this

Objection, the Creditors' Committee respectfully states as follows.

## **PRELIMINARY STATEMENT**[2]

1.      The Debtors' process for the sale of their assets was supposed to be multifaceted,

including both a "go forward" sale process and a "sum of the parts" sale process.  With respect to

the go forward sale process, the Debtors initially were to solicit bids for the sale of over 500 of

the Debtors' operating stores that would continue as a "going concern."  The primary stated

objectives in pursuing a going concern transaction were laudable:  (i) ensuring the Debtors'

administrative solvency and (ii) saving up to 45,000 jobs.  But the true intended beneficiaries of

such process were the Debtors' former CEO and Chairman of the Board, Edward S. Lampert

("Lampert") and his hedge fund, ESL Investments, Inc.  Indeed, since early in these cases, the

Debtors have acknowledged that ESL likely was the only "going concern" bidder and would

seek to credit bid nominally secured claims—claims that the Debtors acknowledged were subject

to significant dispute—as part of its bid.

---

[2] Capitalized terms used but otherwise not defined in this section shall have the meanings ascribed to such terms elsewhere in this Objection.

2.      The sum of the parts sale process was to be markedly different from the going

concern sale process.  In connection with the sum of the parts process, the Debtors were to (i)

obtain bids from liquidators to conduct GOB sales at all of their operating stores; (ii) market their

extensive real estate portfolio comprising over ███ separate owned and leased properties; (iii)

market their various business lines including Sears Home Improvement, Sears Home Services,

Sears Auto Centers, PartsDirect, Innovel and Monark; and (iv) market their other remaining

assets.  As part of this process, also referred to as the GOB or wind-down process, the Debtors

always maintained that they would be administratively solvent.

3.      A significant number of the Debtors' assets to be sold in connection with either

the go forward or the GOB sale process are unencumbered, including each of the business lines

noted above and ███ real estate assets with significant aggregate value.  The majority of the

Debtors' other assets currently are encumbered by a significant amount of secured debt

obligations.  Certain of these secured debt obligations arose from "regular way" financings from

reputable third party lenders, such as the lenders under the Debtors' first lien asset backed

lending facility, which is secured by liens on accounts receivable (and related cash proceeds) and

inventory.  The vast majority of the Debtors' other "secured debt obligations," however, arose

from insider financing transactions with ESL.  The ESL-centric financing facilities were put in

place while Sears was lying on its deathbed following a series of spin-off transactions, like

Seritage and Lands' End, that lined Lampert's and ESL's pockets while stripping Sears of its

most valuable business lines and real estate assets.  These financing transactions were papered as

debt obligations, but have significant *indicia* of being equity contributions and were supported by

financial projections artfully, but artificially, manufactured by Lampert.  Indeed, as discussed in

detail in the Creditors' Committee's Standing Motion and Proposed Complaint[3] and summarized herein, the Creditors' Committee is seeking to pursue colorable and highly valuable causes of action against Lampert and ESL in connection with fraudulent spin-off transactions and the incurrence of the ESL financing facilities, including causes of action to equitably subordinate and/or recharacterize ESL's claims against the Debtors' estates—claims that ESL is seeking to use as credit bid consideration for its acquisition of not just 425 stores, but substantially all of the Debtors' assets.  The Debtors are proposing to release a significant portion of these causes of action, including with respect to the allowance and treatment of the ESL Claims,[4] for the *de minimis* amount of $35 million.

4.     As noted above, although only ESL was ever interested in making a "go forward stores" bid, numerous parties were interested in the Debtors' assets in connection with a sum of the parts sale process.  In order to determine the values that the Debtors' estates could obtain in connection with the sum of the parts process, however, the Debtors were required to formulate and run a robust and fair sale process.  Unfortunately, the Debtors were never prepared to undertake—and, thus, never undertook—such a process.  As a result, the Debtors have been unable to determine the values that could have been obtained in connection therewith to compete with ESL's purported "going concern" bid.

---

[3] *See Motion of the Official Committee of Unsecured Creditors of Sears Holdings Corporation,* et al. *for Entry of an Order Granting (I) Leave, Standing, and Authority To Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority in Respect of Such Claims*, dated January 17, 2019 [ECF No. 1765] (the "Standing Motion" and the underlying draft complaint attached thereto, the "Proposed Complaint").  Contemporaneously herewith, the Creditors' Committee has filed the *Preliminary Omnibus Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corporation,* et al. *to the ESL Proofs of Claim* (the "ESL Claims Objection"), formally disputing the allowance of ESL's secured claims reflected in its proofs of claim, as set forth on Schedule G of the APA (the "ESL Claims").  Each of the Standing Motion, Proposed Complaint and ESL Claims Objection is expressly incorporated herein by reference as if fully set forth herein and are part of the record before the Court in connection with this proceeding.

[4] The Creditors' Committee reserves its rights to object to, or otherwise challenge, any and all of ESL's unsecured claims that it has asserted or may assert against the Debtors' estates.

3

5.      The fact that the Debtors did not run a comprehensive process to compete with ESL is unsurprising.  Indeed, the Debtors never were prepared for—and at no point during the pendency of these cases have the Debtors seriously engaged in—efforts to truly test the market for what their assets are worth.  As a result, the "auction" process itself was exclusionary and noncompetitive, amounting instead to a one-horse race to transfer Sears and its valuable assets and operating businesses to ESL in exchange for consideration that allowed the Debtors to get closer to, but not achieve, administrative solvency and without regard to the value of unencumbered assets or distributions to the Debtors' general unsecured creditors.  Indeed, under the Creditors' Committee's analysis, the ESL Bid undervalues the Debtors' unencumbered assets by approximately ████████████, on the low end, to ██████████, on the high end, and provides no consideration for such value that rightfully belongs to unsecured creditors.

6.      Notwithstanding this Court's mandate that the Debtors run a sale process to determine what transaction or series of transactions would garner the most value for these estates, the only process the Debtors ran was to compare successive ESL bids to their own hypothetical and conservative wind-down estimates.  As a result, and unsurprisingly, without consulting the Creditors' Committee in connection with making their final determinations, the Debtors and the Restructuring Subcommittee accepted the ESL Bid—a bid that (i) is the result of a flawed process, (ii) fails to provide value for unencumbered assets by a dramatic margin, (iii) will render the Debtors administratively insolvent, (iv) is premised on an inappropriate credit bid of disputed claims, (v) releases causes of action worth hundreds of millions of dollars and, importantly and (vi) is based on an unrealistic business plan that, if approved by this Court, will forestall for only a short period of time the inevitable liquidation of Sears and the cessation of the

45,000 jobs that Sears and ESL assert will be saved in connection with the ESL Sale.  Indeed,

approval of the ESL Sale is the likely precursor of yet another retail "chapter 22" case.

7.       In seeking approval of the ESL Sale, the Debtors bear the burden of

demonstrating to this Court not only that selection of the ESL Bid reflects an appropriate

exercise of their business judgment, but also that the ESL Sale has been proposed in good faith

and is "entirely fair" under the heightened scrutiny standard that must be applied to this insider

transaction.  The Debtors' decision to select ESL as the successful bidder notwithstanding their

significant (and unresolved) administrative solvency concerns, exacerbated by the myriad

deficiencies in the ESL Bid discussed herein, neither withstands heightened scrutiny nor supports

a sound exercise of the Debtors' business judgment.

8.       ***First***, although the Debtors and ESL tout the ESL Sale as a "going concern"

transaction that "would preserve 45,000 jobs,"[5] this Court, unfortunately cannot take any

comfort in such an assertion.  The business plan upon which the ESL Sale is premised (the "ESL

Business Plan") assumes—without adequate (if any) support—that the same insiders that drove

Sears into bankruptcy can "transform" the enterprise through unprecedented and unsubstantiated

growth rates and with razor thin liquidity.  The ESL Business Plan assumes that, notwithstanding

its near decade-long decline, the post-sale enterprise ("Sears NewCo") will emerge and begin

growing revenue, growing EBITDAP[6] and growing margins, all while cutting corporate SG&A

expenses, ███████████████████████████████████████████████████ within

a year of closing.  The ESL Business Plan predicts that same store sales will ████████████

████ in 2019—███████████████████████████████████████—and then

---

[5] *See* Press Release, Sears Holdings Corporation, Sears Holdings Announces ESL Investments as Winning Bidder in
Bankruptcy Court-Supervised Auction (Jan. 17, 2019) (the "ESL Sale Press Release"); ESL Partners, L.P.,
Beneficial Ownership Report (Schedule 13-D) (Jan. 18, 2019), Item 4.

[6] "EBITDAP" means earnings before interest, taxes, depreciation, amortization, and pension.

simply predicts that those sales will ███████████████████████████████████

███████████████████████████. The ESL Business Plan also anticipates that EBITDAP

margins will immediately ████████████████████████████████████████████

████. For its stores, as well as for Sears Auto Centers, the ESL Business Plan forecasts a ████

███████████████████████████████████████████████████████████████

███████████████████████████. While Sears has not generated positive

EBITDAP since 2012, the ESL Business Plan assumes that Sears NewCo will immediately ████

███████████████████████████. None of the speculative initiatives contained in the ESL

Business Plan, however, suggest that Sears's historical inability to achieve sales and profitability

targets will suddenly abate.

9.       With the fanciful ESL Business Plan that disregards historical financials and the

reality of the current retail environment, Sears NewCo is destined to follow the same downward

trajectory.  When Sears NewCo inevitably runs into financial distress in the near future, the

Debtors' creditors—whose claims purportedly are being assumed by Sears NewCo's holding

company—will bear the brunt, once again.  And ESL's promises of continued employment for

tens of thousands of Sears's employees necessarily will vaporize.  Indeed, although the ESL Bid

contemplates offers of employment to 45,000 current Sears employees, there is no restriction on

Buyer's ability to terminate such employees immediately thereafter. ████████████████

███████████████████████████████████████████████████████████

██████████████████████████. *See* Transcript of Robert Riecker,

dated January 25, 2019 (the "Riecker Transcript") 140:25-142:19, ████████████████

██████████████████ Given Sears's historical performance with ESL and Lampert at

the helm, it strains credulity that the ESL Sale will result in a viable go-forward enterprise.

6

Instead, the ESL Sale will authorize ESL to leverage these Chapter 11 Cases to conduct its own

GOB process for its sole benefit, while freeing Sears NewCo from towering liabilities and

offering only limited benefits to the Debtors' estates and creditors.  Even before the ESL

Business Plan is proven wrong with actual results, under the terms of the APA, ESL will begin

liquidating the assets being acquired.  For example, the APA provides Buyer with the right, for

up to 60 days following the Closing Date, to conduct an extended marketing process for the sale

of the Debtors' executory contracts and leases of non-residential real property to third parties,

with the proceeds of such sales to inure solely to ESL's benefit.[7]  *See* APA §§ 2.7(c) and (d), 2.9,

5.2.  Moreover, ESL's President testified, and the ESL Business Plan assumes, ████████████

████████████████████████████████████████████  *See* Transcript of Kunal Kamlani,

dated January 24, 2019 (the "Kamlani Transcript") 116:14-121:11.

10.    ***Second***, the ESL Sale will, ████████████████, render the estates

administratively insolvent.  While ESL pays lip service to solving for the payment in full of

administrative liabilities, the proposed consideration in the ESL Sale ████████████

████████████████████████████████████████████████████████████

████████████████████████.  Indeed, Buyer's obligation under the APA to pay

approximately $667 million in assumed administrative liabilities is nothing more than a

contingent reimbursement obligation, the sole remedy for which is a general unsecured claim in

favor of the Debtors against Buyer, a newly created ESL shell entity whose only value is tethered

to a sinking ship without a viable go-forward strategy.  *See* APA § 2.3(k)(x); Proposed Sale

Order, attached as Ex. B to the Sale Notice, ¶ 25.  Without a viable business plan to support the

---

[7] Remarkably (but perhaps not surprisingly), the Creditors' Committee was unsuccessful in its strident efforts to compel the Debtors to conduct such a marketing process for the benefit of these estates, which the Debtors' repeatedly refused.

ESL Bid, there can be no expectation that Sears NewCo will have the financial wherewithal to remain in business or that assumed liabilities will be satisfied on a go forward basis. Based on the Creditors' Committee's analysis of ESL's proposed financing and the ESL Business Plan, Sears NewCo likely will be in financial distress in a matter of months. And, by design, the third-party creditors whose claims are being "assumed" will have no recourse.

11.    The ESL Sale also contemplates numerous other administrative expenses that will deepen the Debtors' administrative insolvency and cause the Debtors to bear significant credit risk in respect of Sears NewCo. These expenses result from, among other things: (i) royalty payment obligations in connection with intellectual property owned by non-Debtor KCD IP, LLC;[8] (ii) ongoing administrative expenses incurred by the Debtors following closing of the APA (and as required under the APA) on account of assets sold to Buyer; (iii) █████████████ professional fees including in connection with the prosecution of the ESL Sale and the extended post-Closing period during which the Debtors are required to provide services to Buyer under the APA; and (iv) numerous potential reductions of assumed liabilities.

12.    Moreover, the proposed ESL Sale is fraught with execution risk because of the highly conditional nature of ESL's obligation to close. Specifically, the APA contains numerous closing conditions that are outside of the Debtors' control, certain of which may result in an inability to close the transaction (and the return of ESL's $120 million deposit).

- **Sale of Non-Debtor Assets.** The APA provides for the sale of assets by non-Debtors to Buyer or otherwise makes the assumption of certain liabilities contingent on such non-Debtor asset sales, including, among other things, the

---

[8] The indenture trustee for the KCD Notes (as defined below) has asserted that royalty payments obligations are due and owing. While the Creditors' Committee continues to evaluate the propriety of such assertion, █████████████ ████████████████████████████████████████████████

8

KCD Notes[9] and intellectual property owned by KCD IP, LLC.  *See* APA § 2.1(e),
(r).

- **Completion of Marketing Period for ESL's Financing.**  The APA provides that
  the Closing is conditioned upon expiration of a marketing period for Buyer's
  financing.  *See id.* § 4.1.  If the marketing period is interrupted and the Closing is
  delayed, the Closing may not occur before the Outside Date, and in turn, Buyer
  would have a right to terminate the APA and receive a refund of its $120 million
  deposit.

- **Value of Acquired Assets/Maximum Liabilities.**  The APA sets forth numerous
  conditions to Buyer's obligation to close that give Buyer significant leeway to
  walk away from the transaction without recourse (and with a refund of its $120
  million deposit), including, most significantly:  (i) the aggregate value of the
  acquired inventory and accounts receivable must be at least $1.657 billion; (ii) the
  outstanding indebtedness under the DIP ABL Facility shall be no greater than
  $850 million; and (iii) the outstanding indebtedness under the Junior DIP Facility
  shall be no greater than $350 million.  Sellers' projections indicate that it will be a
  challenge for them to meet these inventory and receivables thresholds as well as
  the DIP balance thresholds.  *See id.* §§ 10.9, 10.10.

- **Milestones.**  Buyer can terminate the APA and receive a refund of its $120 million
  deposit in the following circumstances, among others: (i) the ESL Sale has not
  closed by February 19, 2019 (*see id.* § 12.1(a)(ii)); or (ii) the Court has not
  approved the transactions or the Approval Order is not obtained (or is vacated or
  stayed) by February 8, 2019 (*see id.* § 12.1(b)(ii)).

13.     Left with insufficient assets to satisfy the claims that will be left in its wake, the

ESL Sale all but guarantees administrative insolvency for the Debtors.

14.     *Third*, ESL accomplishes its feat of exchanging $35 million in cash for (i)

allowance of all the ESL Claims and (ii) a broad release of valuable estate causes of action to

enable it to submit an inappropriate and impermissible credit bid.  The credit bid, however, is

premised on disputed claims in contravention of applicable law and, moreover, cannot credibly

be offered as consideration for the purchase of the Debtors' unencumbered assets.  By the

Debtors' own estimates, ███████████████ of unencumbered value exists in the estates—

---

[9] "KCD Notes" means the 6.90% KCD IP, LLC Asset-Backed Notes issued pursuant to the Indenture dated as of
May 18, 2006, by non-Debtor KCD IP, LLC as Issuer and U.S. Bank National Association as Trustee.  APA § 1.1.

including valuable business segments and ███████ real estate assets.  Yet, ESL has refused to

allocate its purchase price, as expressly required under the Global Bidding Procedures.

Therefore, it is impossible to know what value (if any) ESL is ascribing to the acquisition of the

Debtors' unencumbered assets.  By the Creditors' Committee's estimates, however, the purchase

price paid in connection with the ESL Sale undervalues the Debtors' unencumbered assets by up

to ███████████.  ESL surely will contend that Buyer's agreement to assume certain of the

Debtors' administrative liabilities is in consideration for the unencumbered assets, but even if the

obligation to assume liabilities were ironclad and not illusory, the magnitude of the value of the

unencumbered assets to be acquired vastly exceeds the extent of the assumed administrative

liabilities.

15.    In addition, the claims that ESL purports to credit bid are vigorously contested by

the Creditors' Committee, as evidenced by the ESL Claims Objection filed contemporaneously

herewith and the Standing Motion and Proposed Complaint filed previously with this Court.  By

the Standing Motion, the Creditors' Committee seeks standing to pursue certain claims and

causes of action against ESL, including avoidance actions, recharacterization claims and

equitable subordination claims.  For the reasons discussed herein and set forth in the Standing

Motion, the Proposed Complaint and the ESL Claims Objection, these causes of action are

colorable and viable and, therefore, subject ESL's claims, and thus its right to credit bid, to

legitimate dispute.  Yet, to date, ESL has been unwilling to cash collateralize its bid despite the

Court's clear instruction to do so in the event legitimate disputes arise.  The ESL Sale also

contemplates allowance of all of the ESL Claims aggregating approximately $2 billion, which

vastly exceed the claims ESL intends to credit bid.  In the unlikely event that ESL is permitted to

credit bid at all, the ESL Claims should be allowed solely for that limited purpose and without

limiting remedies that otherwise would be available to the Debtors' estates upon successful

prosecution of the causes of action referenced in the Standing Motion, Proposed Complaint and

ESL Claims Objection.

16.      ***Fourth***, all evidence, ███████████████████, indicates that the

value-maximizing path for these Chapter 11 Cases is an orderly sum of the parts sale process and

a contemporaneous GOB process run by the Debtors.  A properly conducted wind-down process

will yield higher and better results than the ESL Sale, which will, in turn, enable the Debtors to

distribute to their unsecured and true third-party creditors the value to which such creditors are

entitled.  And such process would not include the inappropriate release in favor of ESL or

permission for ESL to credit bid disputed claims.  The Debtors, who up until the very last minute

were in agreement that a wind-down was the value maximizing path, relied on a number of

dubious assumptions, as well as a deeply flawed marketing and auction process, in justifying

their ultimate decision to seek approval of the ESL Sale—again, a decision made without

consulting with the Creditors' Committee.

17.      In short, the Debtors seek approval of a highly questionable transaction

representing a Hail Mary for their controlling insider that (i) places massive risk on the Debtors'

unsecured creditors and leaves them with nothing but up to $35 million in cash and limited

preserved causes of action, (ii) results in administrative insolvency, (iii) is premised on an

unsupportable business plan and (iv) requires the release of colorable and valuable causes of

action.  And the Debtors endeavor to proceed with the ESL Sale notwithstanding the availability

of a value-maximizing alternative in the form of GOB sales that would, at worst, leave the

Debtors administratively solvent and, at best, provide hundreds of millions of dollars in

recoveries to unsecured creditors.  The Creditors' Committee has communicated repeatedly to

the Debtors, the Restructuring Subcommittee and their various professionals that despite its

shared desire to preserve the Sears enterprise and save jobs, there are incurable deficiencies in

the ESL Bid.  Such concerns were disregarded and, consequently, the Debtors' pursuit of the

ESL Sale raises serious questions as to the Debtors' exercise of their fiduciary duties in

determining the ESL Sale was in the best interests of the Debtors' estates.

18.     The ESL Sale does not comport with a sound exercise of the Debtors' business

judgment, let alone the heightened scrutiny that must be applied in connection with this insider

transaction.  Indeed, even absent the broad release and inappropriate credit bid provided to ESL

in connection with the transaction, the ESL Sale falls woefully short of satisfying the applicable

legal standards.  Against this backdrop, the Court should put an end to the pretense of a "going

concern" bid by ESL and deny the ESL Sale in its entirety as not in the best interests of the

Debtors' estates.

## **BACKGROUND**

### I.      GENERAL BACKGROUND

### A.     Chapter 11 Cases

19.     On October 15, 2018 (the "Petition Date")[10] and continuing thereafter, each of the

Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code").  The Debtors continue to operate their businesses as debtors in

possession pursuant to Bankruptcy Code sections 1107 and 1108.  No request has been made for

the appointment of a trustee or an examiner.

---

[10] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the
Asset Purchase Agreement, dated as of January 17, 2019, by and among Transform Holdco LLC, Sears Holdings
Corporation and its subsidiaries party thereto (the "APA"), attached as Exhibit B to the *Notice of Successful Bidder
and Sale Hearing*, dated January 18, 2019 [ECF No. 1730] (the "Sale Notice").

20.     On October 24, 2018, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee pursuant to Bankruptcy Code section 1102 [ECF No. 276].[11]

**B.    Prepetition Capital Structure**

21.     As of the Petition Date, the Debtors had outstanding obligations under the following facilities: (i) First Lien Credit Facility; (ii) Stand-Alone L/C Facility; (iii) Second Lien Credit Facility; (iv) Second Lien PIK Notes; (v) Second Lien Notes; (vi) IP/Ground Lease Term Loan; (vii) Consolidated Secured Loan Facility; (viii) Holdings Unsecured PIK Notes; (ix) Holdings Unsecured Notes; (x) SRAC Unsecured PIK Notes; and (xi) SRAC Unsecured Notes. *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, dated October 15, 2018 [ECF No. 3] (the "First Day Decl.") ¶ 34.[12]  The Debtors' prepetition capital structure, along with the percentage of each facility held by ESL is set forth below.

---

[11] The Creditors' Committee currently comprises: (i) Apex Tool Group, LLC; (ii) Brixmor Operating Partnership, L.P.; (iii) Computershare Trust Company, N.A., as indenture trustee; (iv) Oswaldo Cruz; (v) Pension Benefit Guaranty Corporation; (vi) Simon Property Group L.P.; (vii) The Bank of New York Mellon Trust Company, N.A., as indenture trustee; and (viii) Winiadaewoo Electronics America, Inc.

[12] Each credit facility discussed herein shall have the meaning ascribed to such term in the First Day Decl.

| Debt Facilities<br>(As of Petition Date) | Principal Outstanding<br>($mm) | ESL Amount<br>Owned (%) | ESL Amount<br>Owned ($mm) |
|---|---|---|---|
| Revolving Credit Facility | $836.0 | 0% | - |
| First Lien Letters of Credit | 123.8 | 0% | - |
| First Lien Term Loan B | 570.8 | 0% | - |
| FILO Term Loan | 125.0 | 56% | 70.6 |
| **Total First Lien Debt** | **$1,655.6** | **4%** | **$70.6** |
| | | | |
| **Stand-Alone L/C Facility** | **$271.1** | **40%** | **$108.4** |
| | | | |
| Second Lien Term Loan | 317.1 | 100% | 318.6 |
| Second Lien Line of Credit | 525.0 | 97% | 507.1 |
| Alternative Tranche Line of Credit Loans | 45.0 | 0% | - |
| Second Lien PIK Notes | 175.4 | 12% | 21.3 |
| Second Lien Notes | 89.0 | 0% | - |
| **Total Second Lien Debt** | **$1,151.5** | **74%** | **$847.0** |
| | | | |
| IP/Ground Lease Term Loan | 231.2 | 81% | 187.3 |
| Consolidated Secured Note A | 108.1 | 0% | - |
| Consolidated Secured Note B | 723.3 | 100% | 726.5 |
| **Total Secured Loan Debt** | **$1,062.6** | **86%** | **$913.8** |
| | | | |
| Holdings Unsecured PIK Notes | 222.6 | 88% | 195.9 |
| Holdings Unsecured Notes | 411.0 | 0% | - |
| SRAC Unsecured PIK Notes | 107.9 | 0% | - |
| SRAC Unsecured Notes | 185.6 | 0% | - |
| **Total Unsecured Debt** | **$927.1** | **21%** | **$195.9** |
| **Total Funded Debt** | **$5,067.9** | **42%** | **$2,135.7** |

## II.   THE CREDITORS' COMMITTEE'S INVESTIGATION UNCOVERS VIABLE AND VALUABLE CLAIMS AND CAUSES OF ACTION AGAINST ESL AND LAMPERT

### A.   The Creditors' Committee Investigates the Debtors' Prepetition Transactions

22.     Since its appointment, the Creditors' Committee has worked tirelessly to conduct an independent investigation into the Debtors' prepetition transactions to determine whether claims exist that may return value to the Debtors' estates.  On November 16, 2018, the Court entered the *Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016 Authorizing Expedited Discovery of the Debtors and Third Parties* [ECF No. 802], which authorized the Creditors' Committee to conduct oral examinations of the Debtors and other third parties and issue subpoenas for the production of documents relevant to certain prepetition transactions (the "Investigation").

14

23.    The Creditors' Committee undertook this Investigation on an extremely compressed timeframe, reviewing approximately 130,000 documents from, and interviewing representatives of, the Debtors, ESL and various third parties.  Through its Investigation, the Creditors' Committee uncovered substantial evidence that Lampert and ESL have acted with methodical precision for more than a decade to enrich themselves at Sears's expense, secure control over Sears's best assets and attempt to shield such assets from the reach of other creditors.

**B.    The Creditors' Committee Files the Standing Motion To Assert Claims of the Debtors' Estates Arising from ESL's and Lampert's Scheme to Destroy Sears for ESL's Benefit**

24.    On January 24, 2019, the Creditors' Committee filed the Standing Motion and Proposed Complaint.  Through the Standing Motion and the 109-page Proposed Complaint, the Creditors' Committee set forth detailed factual support for numerous viable causes of action the Debtors' estates possess against ESL, Lampert and Kunal Kamlani ("Kamlani") arising from ESL's and Lampert's decade-long scheme to strip Sears's assets, including claims for recharacterization, equitable subordination, actual and constructive fraudulent transfer, breach of fiduciary duty and unjust enrichment.  A brief overview of the facts discussed at length in the Standing Motion and Proposed Complaint follow.

**1.    ESL's Investment: Lampert and ESL Acquire Kmart and Sears Roebuck, Which Became ESL's Central Investments**

25.    Lampert is—or at least once was—a celebrated investor.  He operates his namesake hedge fund—ESL—more like a private equity firm, taking a significant position in a few companies, acquiring a controlling stake in those companies, and then working closely with the companies' management or board of directors to drive results and value back to ESL.

15

Lampert and ESL used this private equity approach in its take-over and management of Kmart Corporation ("Kmart") and, eventually, Sears.

26.    In May 2003 Kmart emerged from bankruptcy with Lampert and ESL as its largest shareholder.[13]  Rumor on Wall Street had it that "Lampert planned to milk the company for cash, using Kmart's real estate as his secret cache."[14]

27.    In June 2004, Kmart announced the sale of 51 stores to Sears, Roebuck and Co. ("Sears Roebuck") for $605 million in cash, a figure so unexpectedly high that by November 2004, Kmart's stock traded at eight times its price when Kmart first emerged from bankruptcy, for reasons largely tied to the estimated value of Kmart's real estate.  ESL pivoted and used Kmart's inflated market capitalization to acquire Sears Roebuck, merging the companies in 2005 under a new parent entity, Sears Holdings Corporation (the "Kmart-Sears Roebuck Merger"). Commentators noted that Lampert—who was known for investing wizardry but not for retail experience—was interested in Sears Roebuck primarily for its valuable real estate portfolio (much as he was rumored to be for Kmart).

28.    ESL and Sears became intrinsically inseparable.  After the Kmart-Sears Roebuck Merger, Lampert became Chairman of the Board of Holdings (the "Board") and obtained authority from the Board to direct investment of surplus cash.[15]  Lampert and ESL initially owned 41 percent of Sears's outstanding common stock, but their stake soon grew to 54.1 percent by January 2009 and peaked at 62.0 percent in January 2012.  On information and belief,

---

[13] Riva D. Atlas, *Its Stock Up, Sears Searches for Recovery*, N.Y. TIMES (Aug. 2, 2005), https://www.nytimes.com/2005/08/02/business/its-stock-up-sears-searches-for-recovery.html.

[14] *See* Patricia Sellers, *Eddie Lampert: The best investor of his generation*, FORTUNE MAGAZINE (Feb. 6, 2006), https://money.cnn.com/2006/02/03/news/companies/investorsguide_lampert/.

[15] Sears Holdings Corp., Annual Report (Form 10-K), at 92 (Mar. 17, 2006).

Sears and Sears-related businesses have comprised the core investments of ESL's portfolio since 2005.

**2.      The Stock Buy-Backs: Under Lampert's Direction, Sears Spent Its Cash for ESL's Short-Term Benefit and to the Detriment of Sears's Long-Term Prospects**

29.      With a controlling stake in the combined enterprise, and with the Board's delegation to Lampert of investment decisions regarding the surplus cash, Lampert and ESL set about lowering capital expenditures, drastically cutting investment in Sears's businesses and funneling cash into a stock repurchase program.  By reducing the number of outstanding shares and thereby increasing earnings-per-share, price-to-earnings ratio and return on equity metrics, the aggressive buybacks had the instant effect of artificially boosting the stock price to a peak of approximately triple its price at the time of the Kmart-Sears Roebuck Merger.  From 2005 to 2008, Sears spent an estimated $6 billion—the majority of its cash—on stock repurchases, with some repurchases made at prices as high as $180 per share.[16]  Lampert's and ESL's motive was simple:  they increased their ownership percentage by reducing the number of outstanding shares in the market and raked in astronomical investment fees from the fund's investors as a function of the rising stock price.  One commentator recently calculated that ESL earned an estimated *$1.9 billion* during the ascent of Sears's stock in 2006 alone, based on an estimated 20 percent performance fee charged to ESL's investors.[17]

30.      By using the majority of its cash to repurchase stock, Sears grossly underinvested in its businesses and lagged behind its peers during a time of intense secular competition.  In

---

[16] Suzanne Kapner, *Inside the Decline of Sears, the Amazon of the 20th Century*, WALL STREET JOURNAL (Oct. 31, 2017), https://www.wsj.com/articles/inside-the-decline-of-sears-the-amazon-of-the-20th-century-1509472095.

[17] Michelle Celarier, *Eddie Lampert Shattered Sears, Sullied His Reputation, and Lost Billions of Dollars. Or Did He?*, INSTITUTIONAL INVESTOR (Dec. 3, 2018), https://www.institutionalinvestor.com/article/b1c33fqdnhf21s/Eddie-Lampert-Shattered-Sears-Sullied-His-Reputation-and-Lost-Billions-of-Dollars-Or-Did-He.

2004 alone, Sears Roebuck and Kmart managers spent a total of $1.1 billion on various

reinvestments, including renovations and new-store openings.  Under ESL's direction, that

number dropped to just $546 million in 2005 and $513 million in 2006.[18]  The difference quickly

became apparent to commentators at the time:  Sears's stores featured empty shelves and out-of-

date merchandise and looked "shabby next to those of rivals like Target and J.C. Penney."[19]

Against the backdrop of consumer belt-tightening during the financial crisis and ensuing

recession, Sears's bottom line fell deeply in the red, even while competitors such as Walmart,

Costco and Target thrived.

31.    Despite the worsening outlook for the retail industry and Sears, Lampert and ESL

consistently set overly optimistic but inaccurate financial projections for Sears's management.

Every year, as part of an annual budgeting process, individual business units at Sears would set

forth internal revenue and cost goals they viewed as attainable for the coming year.  And each

year, Lampert and ESL effectively would ignore this bottom-up approach by management,

instead setting a purely aspirational top-down financial projection—which was based on little

more than Lampert's desire to achieve "best in class" results—that was then folded into Sears's

Annual Plan.  These projections essentially would consist of a target EBITDAP for which returns

would look favorable to investors.  The individual business units were then pressured to try to fill

the gap between their own targets and those set by Lampert and ESL.  They invariably failed to

do so.  Rather than lower the Lampert/ESL-imposed top-down projections, Sears instead would

assume that the gap would be filled by "unidentified initiatives" or, in Lampert's own words, "go

---

[18] Gretchen Morgenson, *et al.*, *Saving Sears Doesn't Look Easy Anymore*, N.Y. TIMES (Jan. 27, 2008),
https://www.nytimes.com/2008/01/27/business/27eddie.html.
[19] *Id.*

gets."  Simply put, not only was there no achievable plan in place, often times there was no plan
at all.[20]

32.    Indeed, since Lampert's reign as CEO began in 2013, Sears lost billions of
dollars, as shown in the below chart.



**Loss before Income Taxes**
*($ in millions)*

33.    Despite these consistent losses, each of Sears's annual projections forecasted
*positive* EBITDAP of hundreds of millions of dollars.  Lampert and ESL essentially projected,
year after year, a dramatic turnaround—typically based on vague initiatives related to an
explosion in the popularity of Sears's loyalty platform, Shop Your Way—and year after year,
Sears missed the Lampert/ESL target EBITDAP (and in fact has not attained positive EBITDAP
since 2013).  The following charts illustrate how divorced from reality those projections were:

---

[20] The expert report of Jan Kniffen, the Creditors' Committee's retained expert concerning retail strategies and
business planning, contains a detailed discussion on Sears's inaccurate projections and unreasonable business
strategies.  *See generally* Expert Report of Jan R. Kniffen (the "Kniffen Report"), attached hereto as **Exhibit C**,
Parts III.C.iv, IV.D-E.





34.    Lampert's and ESL's influence on Sears extended beyond the mythical projections to Sears's very corporate structure and culture because of active involvement—through Lampert—in Sears's management and operations.

35.    Within just a few years after the Kmart-Sears Roebuck Merger, Lampert and ESL

had solidified control over the Company, fragmented it into rival business units that competed

for scarcer and scarcer resources and set forth unreachable projections while Sears's bottom line

declined rapidly.

### 3.    The Spin-Offs: With Cash Dwindling, ESL Takes Control of Sears's Desirable Business Units for ESL's Direct Benefit

36.    With Lampert and ESL in control and Sears's cash position deteriorating,

Lampert, ever the financial engineer, directed Sears to spin off its most valuable assets in what

amounted to a slow motion, out-of-court liquidation, with ESL being the glad recipient of such

assets for no or inadequate consideration.  The stated reasons for the spin-offs were to improve

liquidity or promote operational flexibility.  In reality, however, Lampert and ESL directly

benefited on both sides of each transaction, acquiring control of spun-off assets while often

receiving dividends as Sears's controlling shareholder.  All this was to the detriment of Sears and

its creditors.

37.    Beginning in 2011, Lampert and ESL orchestrated the spin-off of some of Sears's

most productive and valuable assets for their direct benefit.  A prime example:  in 2014, Sears

spun off the desirable Lands' End business (which had reported $150 million of adjusted

EBITDA for 2013) in a tax-free, pro rata distribution that generated only a $500 million cash

dividend for Sears—far short of its $1.4 billion to $1.5 billion enterprise valuation based on

available market indicators.  Within one year of the spin-off, ESL's stake in Lands' End—a stake

that ESL had acquired free of cost—had nearly doubled in value to almost $852 million.

Meanwhile, Sears began reporting negative EBITDAP every year since 2013, having been

insolvent at the time of (or rendered insolvent by) the Lands' End spin-off.

38.     Each spin-off or rights offering generated immediate profits or benefits for Lampert and ESL and dealt blow after blow to an already reeling Sears.  By the end of 2014, Sears was a shell of its former self.  In 2011, Sears had 4,010 total stores—a number that had fallen to 1,725 by the end of 2014.[21]  And as of January 29, 2011, Sears had approximately 312,000 employees,[22] compared with only 196,000 employees by January 31, 2015.[23]  As of the Petition Date, that number had fallen to approximately 68,000.  First Day Decl. ¶ 8.

39.     By the end of 2014, Sears's equity book value had dropped to nearly negative $1 billion and, net of goodwill and intangibles, to below negative $3 billion.  Meanwhile—in what hardly can be described as a coincidence—ESL's equity stake had also dropped in 2013 to below 50 percent from a high of 62.0 percent in January 2012 and its equity stake in the spun-off entities had generally increased.

40.     Simply put, from 2011 until 2015, Lampert and ESL spun off Sears's most valuable assets, retained control over those assets while ostensibly shielding them from the reach of Sears's creditors, and obtained direct benefits from the spin-offs (including from dividend payments).  At the same time, Lampert and ESL reduced their equity ownership of a reeling Sears enterprise while retaining a controlling stake.  They acted as expected:  these spin-offs had crippled Sears's long-term prospects but lined Lampert's and ESL's pockets.

**4.     The Real Estate Play: Lampert and ESL Secure for Their Own Benefit Sears's Remaining Valuable Assets—Prime Real Estate—From an Insolvent Sears**

41.     In 2015, Lampert's and ESL's self-serving asset stripping and wind-down scored the biggest prize yet:  a commanding portion of Sears's most valuable remaining real estate.

---

[21] *Compare* Sears Holdings Corp., Annual Report (Form 10-K), at 2 (Mar. 14, 2012) *with* Sears Holdings Corp., Annual Report (Form 10-K), at 2 (Mar. 17, 2015).

[22] Sears Holdings Corp., Annual Report (Form 10-K), at 5 (Mar. 11, 2011).

[23] Sears Holdings Corp., Annual Report (Form 10-K), at 6 (Mar. 17, 2015).

ESL and Lampert, who had long been interested in Sears primarily for its real estate portfolio, engineered a sale-leaseback involving 266 of Sears's properties, many of which were among Sears's best remaining real estate assets (the "Seritage Transaction").  ESL became the beneficial owner of many of Sears's most valuable real estate properties for a price that was hundreds of millions of dollars short of reasonably equivalent value—the kind of price available only to a self-dealing insider acting on both sides of the transaction.  At the time of the Seritage Transaction, Sears was hopelessly insolvent; if not, the Seritage Transaction certainly made it so.  And since the Seritage Transaction closed, Lampert and ESL have intentionally kept Sears afloat—risking little because of the security obtained for the continuous capital injections—to mask the Company's insolvency and delay its unavoidable bankruptcy in order to prop up the stock price of Seritage Growth Properties ("Seritage") for ESL's benefit.

42.     The Seritage Transaction was an insider deal conceived and driven by Lampert and ESL that was neither negotiated at arm's length nor exposed to the market—and it showed.  The $2.7 billion in aggregate consideration provided to Sears was an absurdly low purchase price, which the market recognized, based on rights trading prices before the transaction and stock prices afterward.  As detailed in the Proposed Complaint, this below-market purchase price was caused, in part, by Cushman & Wakefield Inc.'s ("Cushman & Wakefield") flawed appraisals that greatly undervalued the properties' fair market value.

43.     The purchase price did not take into account the highest and best use of the properties—many of which were among Sears's most valuable properties—and was instead predicated on Sears remaining a tenant and paying discounted rent indefinitely (discounted to account for disadvantageous lease terms, not because the rate was a bargain).  But Seritage, Lampert and ESL have not hesitated to make the best use of the transferred Seritage assets.

23

Indeed, Seritage has since thrived at recapturing, redeveloping and re-leasing space at many multiples of the rent Sears was paying and has attracted new marquee investors including Warren Buffett—all while Sears fell even deeper into insolvency.

44.     The Board's Related Party Transactions Subcommittee ("RPT Subcommittee")—tasked with scrutinizing conflicted transactions—was not an adequate check on ESL's power and control.  The RPT Subcommittee merely rubber-stamped the Seritage Transaction and failed to consider the fairness of the deal to Sears or its implications for Sears's creditors.

### 5.     The Capital Contributions: ESL "Finances" Sears To Protect Its Investments, Lien Up Remaining Assets and Solidify Sears's Fate

45.     The Seritage Transaction marked a turning point in Sears's demise.  With Sears in a freefall and its eventual bankruptcy a question of when, rather than if, Sears was desperate for cash—and ESL was always there.  Sears, for the most part, never even bothered to seek financings from third-party creditors on the open market because ESL always was prepared to contribute capital—and happily so, being motivated to encumber previously unencumbered assets, buy time needed to maximize and protect its investments in Sears, and protect its equity interest in Seritage that remained dependent on Sears.  Under the guise of assisting Sears with its liquidity needs, ESL had free reign to secure remaining assets and wall off other creditors in inevitable bankruptcy proceedings.

46.     ESL's numerous further investments in Sears—papered as debt but playing the role of equity—in the period since the Seritage Transaction include:  the 2016 Term Loan, Second Lien Term Loan, Stand-Alone L/C Facility, Second Lien Line of Credit, IP/Ground Lease Term Loan, FILO Term Loan and Consolidated Secured Loan Facility (which resulted from the consolidation of obligations under the 2016 Real Estate Secured Loan and 2017 Real

24

Estate Secured Loan, and the termination of the former loan) (together, the "2016-2018 ESL Contributions").

47.    Although the 2016-2018 ESL Contributions ostensibly were debt financings, ESL did not intend to provide Sears with liquidity.  Rather, they were attempts essentially to purchase Sears's remaining capital assets through a series of liens in preparation for the imminent bankruptcy filing and to keep Sears alive long enough for the Seritage operation to take flight. Thus, it was no surprise that ESL submitted a bid (a completely nonactionable bid) in these Chapter 11 Cases to acquire Sears using, in large part, a credit bid of the "debt" held by ESL. That "debt" bore the hallmarks of equity contributions and not debt for the reasons discussed in detail in the Standing Motion and Proposed Complaint.

**C.    The Estates' Claims Against Lampert, ESL and Kamlani**

48.    Lampert and ESL, aware for years that bankruptcy proceedings were inevitable, forced Sears to undergo spin-offs, rights offerings and financings all for Lampert's and ESL's benefit while Sears's net equity book value plunged in the years leading up to these Chapter 11 Cases.  Lampert and ESL spent years as the master puppeteers preparing for these Chapter 11 Cases, using their undue influence over management and the Board to concoct transactions that would insulate and maximize the value of ESL's Sears-related investments—including through financings disguised as debt that have the characteristics of equity—from the adverse effects of Lampert's and ESL's unparalleled siphoning of Sears's best assets for their own benefit.  Indeed, Lampert's and ESL's long, drawn-out scheme had the effect of ring fencing Sears's valuable assets for Lampert's and ESL's benefit with the clear objective of leaving little or nothing for the creditors that Lampert and ESL could orchestrate transactions around.

49.    As set forth in the Standing Motion, Proposed Complaint and ESL Claims Objection, the Creditors' Committee has determined that the Debtors have viable claims to assert

against Lampert, ESL and Kamlani (ESL's President and a director of Holdings) to seek the

following relief:

- recharacterization as equity of the 2016-2018 ESL Contributions;

- equitable subordination of ESL's Claims on account of Lampert's and ESL's inequitable conduct;

- recovery from Lampert and ESL of the value of the properties transferred in the Seritage Transaction and the Lands' End spin-off pursuant to Bankruptcy Code sections 544 and 550 and applicable state law;

- avoidance of the Lands' End spin-off as an actual and constructive fraudulent transfer pursuant to Bankruptcy Code section 544 and applicable state law;

- avoidance of the 2016-2018 ESL Contributions as actual fraudulent transfers pursuant to Bankruptcy Code sections 544 and 548 and applicable state law and recovery of payments made on account thereof;

- avoidance of grants and guarantees made by certain of Sears's subsidiaries in connection with the creation of the IP/Ground Lease Term Loan as constructive fraudulent transfers pursuant to Bankruptcy Code sections 544 and 548 and applicable state law;

- disallowance of all of ESL's Claims in these Chapter 11 Cases pursuant to section 502(d) of the Bankruptcy Code unless and until ESL returns the benefits it received because of the constructive and actual fraudulent transfers;

- recovery on account of unjust enrichment claims against Lampert and ESL in connection with the Lands' End spin-off, the Seritage Transaction and the 2016-2018 ESL Contributions; and

- recovery on account of breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims against Lampert, ESL and Kamlani in connection with the 2016-2018 ESL Contributions.

**D.    The Debtors' Refusal to Assert the Proposed Claims**

50.    Aside from opting for a path forward that will leave their estates administratively

insolvent, by selecting the ESL Sale, the Debtors have decided not to pursue any of the very

valuable claims, including the claims underlying the Standing Motion and Proposed Complaint,

against ESL, Lampert and Kamlani.  The ESL Sale is dependent upon a credit bid of

26

approximately $1.3 billion of ESL's Claims.  By allowing ESL to credit bid in exchange for

paltry consideration of only $35 million, and accepting that credit bid, the Debtors are allowing

ESL to realize the full secured value of the face amount of those disputed claims, which, as

described herein, would otherwise be subject to colorable claims for recharacterization as equity,

equitable subordination to other allowed claims, avoidance and/or disallowance.

## III.    THE DEBTORS' SALE PROCESS

### A.    The Global Bidding Procedures

51.    On November 1, 2018, the Debtors filed the *Debtors' Motion for Approval of*

*Global Bidding Procedures* [ECF No. 429] (the "Global Sale Motion").  By the Global Sale

Motion, the Debtors sought approval of global bidding and sale procedures (the "Global Bidding

Procedures") for the "efficient marketing, auction and sale of their assets . . . in an orderly and

value maximizing manner . . . in order to consummate transactions for the highest and best value,

all while protecting the due process rights of all interested parties."  Global Sale Motion ¶ 2-3.

52.    The Creditors' Committee opposed the Global Sale Motion and the proposed

Global Bidding Procedures.  On November 9, 2018 and November 14, 2018, respectively, the

Creditors' Committee filed its *Preliminary Objection of the Official Committee of Unsecured*

*Creditors of Sears Holdings Corporation,* et al. *to Debtors' Motion for Approval of Global*

*Bidding Procedures* [ECF No. 640] (the "Preliminary Global Bid Procedures Objection") and the

*Supplemental Objection of the Official Committee of Unsecured Creditors of Sears Holdings*

*Corporation,* et al. *to Debtors' Motion for Approval of Global Bidding Procedures* [ECF No.

729] (the "Supplemental Global Bid Procedures Objection" and, together with the Preliminary

Global Bid Procedures Objection, the "Global Bid Procedures Objections"), which was

accompanied by a declaration by Steven Simms of FTI Consulting, Inc. (the "Simms

Declaration").

27

53.     By the Global Bid Procedures Objections, the Creditors' Committee expressed

significant reservations with respect to the Debtors' pursuit of a going concern sale, for which,

by all likelihood, ESL would be the only bidder.[24]  Specifically, the Creditors' Committee

argued that pursuing a going concern sale may not be a value maximizing strategy and, indeed,

may lead to administrative insolvency, *see* Preliminary Global Bid Procedures Objection ¶ 6,

leaving unsecured creditors to bear the substantial risks associated with pursuing a going concern

sale.  *See* Simms Decl. ¶ 24.  As such, the Creditors' Committee urged the Debtors to pivot to a

GOB sale process, or at least be prepared to pivot immediately to such a process if and when it

became clear that no viable going concern bid exists.  *See* Supplemental Global Bid Procedures

Objection ¶ 8.  The Debtors, in their reply, disputed the views of the Creditors' Committee and

characterized the Global Bid Procedures Objections as premature and uninformed.  *See Debtors'*

*Omnibus Reply in Support of Motion for Approval of Global Bidding Procedures* [ECF No. 683]

¶¶ 9, 12-14.

54.     On November 15, 2018, the Court held a hearing to consider the Debtors' Global

Sale Motion (the "November 15 Hearing").  At the November 15 Hearing, this Court recognized

the concerns raised by the Creditors' Committee in the Global Bid Procedures Objections, as

well as the uncertain and imprecise process by which the Debtors would entertain bids other than

a going concern proposal, such as GOB bids.  *See, e.g.*, Nov. 15 Hr'g. Tr. 42:16-19 ("I'm clearly

guided by case law that says the whole point of a sale process is to maximize value, and ***I'm***

---

[24] The Debtors always acknowledged, "ESL may be the only bidder for the Debtors' assets on a going-concern basis."  *Reply in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Evercore Group L.L.C. as Investment Banker for the Debtors Nunc Pro Tunc to the Petition Date*, dated Nov. 13, 2018 [ECF No. 671] (the "Evercore Reply") ¶ 4; *see also* First Day Decl. ¶ 15 ("The Debtors are in discussions with ESL regarding a stalking-horse bid for the purchase of the Company's viable store base.").

*reluctant to cut out a potential source [i.e., GOB proposals] of the highest and best value*.")
(emphasis added).

55.     As such, this Court instructed the Debtors to modify the Global Bidding
Procedures to provide that the Debtors would consider all reasonable alternatives in parallel, and
that the Debtors would provide regular updates to the Creditors' Committee on its wind-down
preparations in the event a going concern sale did not materialize.  *Id.* at 54:10-16 (noting that
"the Debtors will prepare a Debtor-run going concern – an analysis for a Debtor-run GOB sale,
and will frequently and periodically update the committee on that process.").

56.     After the entry of the order approving the Global Sale Motion [ECF No. 816] (the
"Global Bidding Procedures Order"), the Debtors embarked on a process of soliciting bids for
their assets, purportedly both on going concern and liquidation bases.  *Notice of Filing of Global
Bidding Procedures Process Letter*, dated November 21, 2018 [ECF No. 862], Ex. 1 (the
"Global Bidding Procedures Process Letter"), at 4.  Further, with respect to liquidator bids, the
Debtors solicited cash and non-cash considerations bids (*e.g.*, equity, hybrid, fee, debt or
designation rights).  *Id.*

57.     Distinct from the sale process for the operating businesses or liquidation sales, the
Debtors also began to market their real estate portfolio on a separate, compressed timeline.  To
facilitate the sale of real estate, the Debtors engaged Jones Lang LaSalle Americas, Inc. [ECF
No. 1081] ("JLL").  At the outset, the Debtors' intent was to market a small number of "non-
core" properties for sale, none of which would include the 425 properties constituting the "go
forward stores."  Subsequently, however, the Debtors expanded their process to include
marketing for the entirety of their real estate portfolio.  Specifically, the Debtors sought bids for
███ total real estate assets, including ███ unencumbered assets owned and leased by Debtors,

██ encumbered assets owned and leased by Debtors, and ██ encumbered assets owned and leased by non-Debtor affiliates.

58.     While the Global Bidding Procedures contemplated definitive bids from interested parties for the Debtors' assets on a going-concern basis by December 28, 2018, the Debtors' real estate process only sought *non*-binding indicative bids by the same date. *See* Letter from Jones Lang LaSalle Americas, Inc., at 1 (Nov. 30, 2018).  The solicitation process for the Debtors' real estate did not commence until December 2, 2018, when JLL began its outreach through an "email blast," alerting potential buyers to submit bids for the Debtors' real estate assets.  On December 21, 2018—a week before indicative bids were due—JLL launched official marketing websites and data rooms for the full set of Debtors' real estate assets.  Upon information and belief, however, the Debtors contacted only parties who had previously bid on assets and, in the case of leased assets, certain landlords.

59.     In response to the Debtors' marketing efforts, certain parties other than ESL conducted diligence on the assets, and several parties submitted bids for various parts of the Debtors' businesses or assets.  Specifically, the Debtors received:

- ██ liquidation bids, including both equity and fee proposals, the economic terms of which increased materially from the indications of interest to the definitive bids;

- ██ bids for the Visa/MasterCard antitrust litigation claims;

- indications of interest for a total of ██ of the Company's ██ real estate properties, with several assets receiving multiple bids and approximately ██ bids of $0 or $1 (*i.e.*, placeholder bids generally meant to show interest or begin negotiations);

- ██ bids for franchise operations;

30

- ▮▮▮ for certain parts of the Sears Home Services business and ▮▮ bids for the PartsDirect business (other parties expressed interest in completing more due diligence before submitting a formal bid);[25]

- ▮▮▮▮▮ for Sears Auto Centers;

- ▮▮▮ for Monark;[26] and

- ▮▮▮▮▮ for Innovel.[27]

60.    As expected, ESL was the only party to submit a bid for substantially all of the Debtors' assets on a go forward basis.  And, as described in the declaration of Saul Burian, of Houlihan Lokey, Inc. ("Houlihan Lokey"), the Creditors' Committee's investment banker, numerous parties expressed objection to the Debtors' sale process outside of the "going concern" sale process, including with respect to the Debtors' efforts, or lack thereof, to market their real estate portfolio and meaningfully engage and follow up with prospective bidders.  *See generally* Declaration of Saul Burian, attached hereto as **Exhibit A** (the "Burian Declaration").

## B.    ESL's Initial Bids and the Auction

61.    On December 5, 2018, ESL submitted an indicative bid (the "ESL Indicative Bid") pursuant to the Global Bidding Procedures.[28]  The Debtors acknowledged to the Creditors' Committee that this bid was non-actionable, both legally and financially, and expressed in correspondence to ESL its view of the shortcomings in the ESL Indicative Bid, including that it failed to cash collateralize or otherwise backstop the credit bid and acquired assets owned by non-Debtors that the Debtors had no authority to assume.  The Creditors' Committee, in turn,

---

[25] Sears Home Services has various sub-business lines, including, among others, appliance and product repair services, sale of repair parts through its PartsDirect segment and origination of protection agreements and home warranties.  *See* Sears Holdings Corp., 2017 Annual Report (Form 10-K) (March 23, 2018).

[26] Monark Premium Appliance Company ("Monark") is a nationwide distributor of home appliances that serves architects, builders, designers, developers and homeowners.  *Id.*

[27] Innovel Solutions ("Innovel") provides delivery services for third-party customers.  *Id.*

[28] *See* Sears Holdings Corp., General Statement of Acquisition of Beneficial Ownership (Form SC 13D/A) Ex. 99.81 (Dec. 6, 2018).

expressed its view to the Debtors that the ESL Indicative Bid: (i) failed to provide any cognizable value for unsecured creditors; (ii) purported to assign value to the assumption of claims against non-Debtors; (iii) contemplated the purchase of "substantially all" of the assets of the Debtors and certain non-Debtor affiliates which the Debtors have no ability to sell, but failed to allocate value to the individual assets as required by the Debtors' Global Bidding Procedures Process Letter;[29] (iv) failed to offer sufficient consideration for the assets contemplated to be purchased, including assets held by non-Debtors and valuable tax attributes that ESL would acquire as part of its bid, or to pay down the DIP ABL Facility[30] in full as required to credit bid; and (v) failed to provide a viable business plan for a profitable go-forward Sears in light of the staggering SG&A expense associated with continued operations.

62.    On December 28, 2018, ESL submitted its definitive bid in accordance with the Global Bidding Procedures to acquire substantially all of the Debtors' go-forward retail footprint and other assets and component businesses of Sears.[31]  Following submission of ESL's December 28 bid, the Debtors' advisors engaged with ESL and its advisors to discuss the infirmities of the bid.  On December 30, 2018, counsel to the Debtors informed counsel to the Creditors' Committee that it expected ESL's bid would not be a "Qualified Bid" under the Global Bidding Procedures and, accordingly, the Debtors expected to pivot to a wind-down.

---

[29] *See* Global Bidding Procedures Process Letter ("Bid must include an allocation of value to various assets included in the Transaction.  For example, in an Indicative Bid for Sears NewCo, please include the allocation of value to Retail NewCo and SHS."); *see also* Global Bidding Procedures § VI(D)(3)(b).

[30] "DIP ABL Facility" has the meaning ascribed to such term in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [ECF No. 955] (the "Final DIP Order").

[31] *See* Sears Holdings Corp., General Statement of Acquisition of Beneficial Ownership (Form SC 13D/A, Ex. 99.81) (Jan. 2, 2019).

63.     On January 4, 2019, the date the Debtors were required to notify bidders as to whether they were "Qualified Bidders" under the Global Bidding Procedures, the Debtors advised the Creditors' Committee and others that the Debtors would begin pivoting to a liquidation process as soon as the following week.  The Debtors explained that this decision came as a result of ESL's failure to satisfy certain threshold conditions the Debtors had identified for the ESL's December 28 bid to be considered a "Qualified Bid."  ESL's counsel acknowledged that the Debtors were clear as to the necessary conditions for its bid to be considered qualified and that ESL had not satisfied such conditions.

64.     On January 8, 2019, this Court held a status conference (the "January 8 Status Conference") at which the Debtors announced ESL had agreed to fund the costs of the estates through the auction to be held on January 14, 2019 (the "Auction") as ESL worked to improve its bid.  *See* Jan. 8, 2019 Status Conf. Tr. 9:17-25 ("After you know, several days of virtually around the clock negotiations and you know, some conversations with the court and our consultation parties[,] the debtors have determined that they will not be adjourning the auction on January 14, and that subject to ESL putting in a revised form of bid letter, APA as well as a deposit for 120 million dollars by 4:00PM tomorrow, that the debtors will be reviewing that bid and comparing it against the company's other alternatives at an auction on January 14.").  In addition, in light of the significant cash burn associated with delaying a pivot to a liquidation to hold the Auction, the parties agreed that $17.9 million of the $120 million deposit—representing the cash burn of delaying GOB sales—would be non-refundable and paid to the estate if ESL were to lose the Auction.  *Id.* at 10:8-18.

65.     This Court summarized the difficult position in which the Debtors found themselves.  First, the Court noted that at the Auction, the Debtors should be evaluating "all their

alternatives . . . including the potential liquidation under the auspices of one or other group of

liquidators and the realization by the debtors on their assets that wouldn't be involved in a

liquidation.  *Id*. at 10:8-18.  Second, this Court recognized that, while it appeared to be a "good

development" that there was a potential going-concern bid, "the debtors have an obligation to

review all of their alternatives and will do so at the auction."  *Id*. at 14:1-9.  The Court continued,

explaining its expectation of the Auction as such that "the debtors will be evaluating the ESL

proposal as against their alternatives.  Those alternatives are somewhat open ended.  They

include not only bids that have been made so far . . . by sort of the larger liquidation firms, but

also their assessment of the value of assets that are not included in those bids, and that includes

potential litigation claims."  *Id*. at 16:12-19.

　　　　66.　　In accordance with the Court's instructions, on January 9, 2019, ESL submitted a

revised bid in an attempt to remedy the identified defects (such bid, including as modified

thereafter and during the Auction, the "ESL Bid").  The Debtors again determined that ESL's

January 9 revisions failed to solve for administrative solvency and continued to contain the

infirmities identified in the prior rejected bids.  Moreover, on January 11, 2019, the Creditors'

Committee communicated to the Debtors its concerns with the ESL Bid, including, among other

things, that the ESL Bid: (i) assumed various administrative liabilities, yet under the terms of

APA, such payments were wholly illusory; (ii) contained numerous closing conditions that

rendered the agreement a one-way option; and (iii) required the payment of a $30 million

expense reimbursement, contrary to the Global Bidding Procedures Order prohibiting such

provisions absent further order of the Court.  Global Bidding Procedures Order ¶ 10.  The

Creditors' Committee also expressed its serious concerns that the Debtors might pursue the ESL

Bid at tremendous cost and risk to the estates, and insisted that the Debtors instead pivot to the

responsible, value-maximizing course of proceeding with GOB sales, while preserving or

prosecuting all of the estates' valuable causes of action against Lampert, ESL and related parties.

The January 11 letter also identified numerous issues with the APA.

67.     On information and belief, on January 12, 2019, Debtors' counsel provided ESL

with a proposed mark-up of the APA.  The Debtors' proposed revisions of the APA, however,

did not resolve many of the most significant issues with the ESL Bid identified by the Creditors'

Committee.  The Creditors' Committee's position, which its counsel communicated to the Board

by subsequent letter on January 13, 2019—the eve of the Auction—was that even if ESL

capitulated on *every single "ask"* by the Debtors in their mark-up, the ESL Bid remained entirely

non-actionable as, among other things, it did not resolve many of the material issues, including

rendering the Debtors' estates administratively insolvent and failing to resolve substantial

uncertainty as to whether a sale could close on the timeline and under the conditions required by

ESL and whether Sears NewCo could survive as a viable enterprise.

68.     At the Auction on January 14, however, ESL held firm on the terms of its bid.

After waiting until the day of the Auction to respond to the Debtors' revisions, ESL rejected

many of the Debtors' demands.  Despite the reality that—as the Debtors also have acknowledged

to this Court—continued delay of a GOB process in pursuit of the ESL Bid costs the estates in

excess of $6 million per day, the Debtors once again relented to ESL and continued the Auction

to January 15, 2019 without requiring ESL to fund the additional $6 million per day burn.  On

January 15, 2019, the Debtors continued to reject the ESL Bid.  The Debtors stated on the record

that the ESL Bid was "not otherwise higher or better when compared to the company's

alternatives," based on, among other things, administrative insolvency concerns.  *See* Transcript

of January 15 Auction (the "January 15 Auction Transcript") at 50:23-51:10, 52:2-10.

35

Moreover, as ESL sought to improve its bid, the Debtors continued to view these changes as immaterial or otherwise required by law or order of the Court—as, for example, ESL's "agreement" to remove its requested $30 million expense reimbursement when such reimbursement contravened the Global Bidding Procedures Order.  *See id*. at 58:17-21. Specifically, the Debtors identified a number of infirmities with the ESL Bid, such as: (i) transfer taxes reducing the purchase price; (ii) "unresolved" issues with respect to the credit bid; (iii) "significant" closing risk attendant to the transaction, which "risk was primarily being borne by the estate for getting to the closing and without recourse to the remainder of the deposit"; and (iv) issues surrounding the KCD IP, LLC license agreements and the resulting $100 million administrative claim.  *See id.* at 59:16-60:4, 60:18-61:4.

69.   Moreover, the Special Committee of the Restructuring Committee of the Board (the "Restructuring Subcommittee")—tasked with evaluating the potential claims against ESL— stated on the record its misgivings with respect to the ESL Sale:

> The subcommittee has reached the conclusion that substantial claims exist against ESL and its affiliates, as well as other defendants relating to ESL's ***abuse of its control*** of the debtors and the transfer of hundreds of millions of dollars of assets to ESL and its affiliates for inadequate consideration.  Those transfers hurt Sears and its employees.

*Id*. at 63:12-21 (emphasis added).  Counsel to the Restructuring Subcommittee also explained as follows:

> **[A]*ny benefits of the ESL transaction are ephemeral*** . . . for the reason that the company does not have sufficient cash to close the transaction.  Administrative solvency is a commitment by the company to pay back those parties that provide goods and services to the estate post-petition, so it can conduct a reorganization and get to the other side.  ESL's bid leaves the company admittedly administratively insolvent.

*Id*. at 66:3-15 (emphasis added).

36

70.     After ESL's counsel touted a number of so-called concessions to the latest draft

APA, Debtors' counsel made clear that a majority of such changes were required by applicable

law or orders of this Court or otherwise were far less favorable than ESL had asserted.

Specifically, with respect to the assumption of claims pursuant to Bankruptcy Code section

503(b)(9) (the "503(b)(9) Claims"), Debtors' counsel explained that while the Debtors

appreciated the modification, such change was required as "that's just the law" and further

explained that "while I appreciate the [*sic*] ESL made those changes, I don't think the court

really had the ability to modify those terms otherwise." *Id.* at 58:7, 10-14.  With respect to

elimination of ESL's requested $30 million expense reimbursement, Debtors' counsel explained

that such expense reimbursement "was being requested in contravention of the global asset

bidding procedures order," and as such, had to be removed. *Id*. at 58:17-21.  Finally, with

respect to the proposed assumption of additional severance obligations, Debtors' counsel noted

that the extension of severance payments through fiscal year 2020, in effect, only added an

additional month of severance payments from prior offers. *Id*. at 59:12-15.  Debtors' counsel

then concluded by stating:  "I can speak personally that we have done everything we can to try

and make this work." *Id*. at 62:7-9.

71.     On January 16, 2019, despite the myriad ongoing deficiencies inherent in the ESL

Bid, as identified by the Debtors' advisors themselves less than 12 hours prior to the

announcement, and after refusing to consult with the Creditors' Committee regarding the

purported modifications to the ESL Bid as required by the Global Bidding Procedures Order

despite confirming its obligation to do so,[32] the Debtors designated ESL as the Successful Bidder

---

[32] *See* Jan. 15 Auction Tr. 40:11-19 ("[W]e decided late last night to allow ESL overnight to put together a response
to the proposal from the debtors, and at this time, we will have them put that proposal on the record, ***after which
time we are going to take a break, go discuss it with the restructuring committee and the consultation parties***.")

(as defined in the Global Bidding Procedures Order).[33]  Despite the Court's clear instructions at

the January 8 status conference, the Debtors made no serious effort to facilitate a competitive

process that could have led to value-maximizing proposals.

**C.     The ESL Bid**

72.     The material terms of the ESL Bid, as accepted by the Debtors on January 16, and

pursuant to the terms of documentation finalized on January 17, are set forth below.  The specific

terms of the APA, including myriad closing conditions, termination events and other obligations

of the parties are discussed later herein.  *See infra* Objection, Part II.B.2-3.

73.     **Acquired Assets.**  The ESL Bid contemplates Buyer's acquisition of substantially

all of the Company's assets, including, but not limited to:

- a go-forward retail footprint of approximately 425 retail stores under the "Sears" and "Kmart" brands and certain other owned and leased real estate interests;

- the Kenmore business, the DieHard business, various websites and the Shop Your Way loyalty program;

- certain contracts and agreements, including rights to have the Sellers assume and assign to Buyer certain leases after the closing occurs under the APA (including certain manufacturer's warranties and repaid services contracts);

- all Acquired Inventory, all Acquired Receivables, all Acquired Equipment and all Acquired Improvements and the right to receive certain Pending Inventory;

- certain intellectual property owned by the Sellers;

- certain prepaid taxes and certain rights to any refund, rebate or credit of taxes;

---

(emphasis added); *id*. at 75:6-17 ("[W]e will have a brief adjournment just for the restructuring committee to consider the proposal that has been made on the record and we will come back on with the restructuring committee's decision. . . . *I should have added and will consult with the consultation parties before coming back on record*.") (emphasis added) (internal quotations omitted).

[33] *See* Transcript of January 16 Auction 76:20-77:5 ("So on behalf of the debtors and particularly the restructuring committee, having considered ESL's revised proposal and the material increase and consideration that has been put on the table, after deliberation, the restructuring committee has decided to accept the ESL offer as a higher or better offer, subject to, importantly, documentation.").

- subject to compliance with the APA including obtaining the required Bermuda Monetary Authority approval, the KCD Notes;

- certain Credit Card Claims, representing estimates potential damages of $400 million, arising from Seller's involvement as a class plaintiff in the class actions consolidated in the multi-district litigation *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-MD-01720 (E.D.N.Y.) against Visa Inc., Mastercard Inc., JPMorgan Chase & Co, Citigroup N.A., Bank of America N.A. and other defendants, and any proceeds or settlement proceeds thereof; and

- the proceeds from the closing of the sale under the Asset SHIP Purchase Agreement as defined in the *Order (I) Approving the Sale of the Sears Home Improvement Business and (II) Granting Related Relief* [ECF No. 1417] (the "SHIP Purchase Agreement") in the amount of approximately $45,000,000, or, if the transactions under the SHIP Purchase Agreement are not consummated, certain assets as described in the SHIP Purchase Agreement.

*See* Sale Notice, Ex. A (Material Terms of the Successful Bid) (the "ESL Bid Term Sheet"), at 1-3; APA § 2.1.

74.    **Release.**  In addition, the ESL Bid contemplates a release (the "Release") in exchange for $35 million (the "Release Consideration") and "other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions."  APA § 9.13(a); *see also* Proposed Sale Order ¶ 7(a)-(d).  The "other good and valuable consideration" is unidentified.  By the Release, the Debtors propose to release ESL (including Lampert and any of ESL's respective directors, officers or employees, in such capacities and their individual capacities) from Released Estate Claims.[34]  These Released

---

[34] The APA defines "Released Estate Claims" to include "any and all Claims and causes of action of the Debtors and their estates against ESL arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) equitable principles of subordination or recharacterization, or (iii) any other applicable Law that could be asserted to challenge the allowance of the ESL Claims pursuant to section 9.13(c).  For the avoidance of doubt the Released Estate Claims do not include any other Claims or causes of action of the Debtors or their estates against ESL or any other Person, including but not limited to any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b) or 550(a) or any applicable state or federal law, for breach of fiduciary duty (including any Claims for breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G), or for illegal dividend under 8 Del. C. 170-174 or any other state law; (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth

Estates Claims include, among other things: claims arising under (i) Bankruptcy Code sections 363(k), 502(a) or 510(c), (ii) equitable principles of subordination or recharacterization or (iii) any other applicable law that could be asserted to challenge the allowance of (a) the IP/Ground Lease Term Loan Facility, (b) the FILO Facility, (c) the Real Estate Loan 2020, (d) the Second Lien Term Loan, (e) the Second Lien Line of Credit Facility, (f) the Second Lien PIK Notes and (g) the Citi L/C Facility. *See* ESL Bid Term Sheet, at 7-8; APA § 9.13; Proposed Sale Order ¶ 7(a)-(d). By its terms, the Release releases any estate causes of action against ESL that would limit ESL's right to credit bid or challenge or collaterally attack the allowance of the ESL Claims on any basis.

75. **Purchase Price.** In exchange for substantially all of the Debtors' assets, along with the releases set forth herein, ESL purports to offer the following consideration for a headline price of $5.2 billion. *See* ESL Bid Term Sheet, at 3-4; APA § 3.1.

- $850 million in cash from a new ABL facility;

- $1,334 million in credit bids, comprising: (i) $544 million credit bid of the Consolidated Secured Loan Facility; (ii) $231 million credit bid of the IP/Ground Lease Term Loan; (iii) $125 million credit bid of FILO Term Loan; and (iv) $434 million in Second Lien Debt;

- $621 million in roll-over obligations, comprising: (i) $271 million in Stand-Alone L/C Facility; and (ii) $350 million in Junior DIP Facility;[35]

---

Properties, Inc., Seritage Growth Properties, L.P., or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.:. CV-17-11846-00CL."

[35] "Junior DIP Facility" has the meaning ascribed to such term in the *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [ECF No. 1436].

- $1,682 million in total assumption of non-administrative liabilities, comprising: (i) assumption of Sparrow liability; (ii) assumption of protection agreement liabilities; and (iii) assumption of Shop Your Way and gift card liabilities;

- $667 million in total assumption of administrative claims, comprising: (i) $139 million in assumed 503(b)(9) claims; (ii) $166 million in postpetition accounts payable (merchandise and non-merchandise); (iii) $20 million in severance and WARN obligations; (iv) $8 million in employee claims; (v) $134 million in property taxes; and (vi) $200 million in cure costs;

- $35 million in cash for the Release; and

- $17 million in cash for store register cash.

76.     The Global Bidding Procedures required any bidder to allocate its purchase price in accordance with the value the bidder associates with each asset or group of assets.  *See* Global Bidding Procedures § VI(D)(3)(b).  Yet, the ESL Bid did not allocate the purchase price amongst the various assets being acquired.

77.     **Business Plan**.  In support of the ESL Bid, adequate assurance of future performance under assumed contracts and leases and the future envisioned for Sears NewCo, ESL has submitted the ESL Business Plan.  The ESL Business Plan ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Remarkably, however, ESL's initiatives for Sears NewCo ████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████.

78.     Specifically, the ESL Business Plan bases the future success of Sears NewCo on certain key attributes: ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

████████████████████. *See* ESL Business Plan, at 6.  From these attributes, the ESL

Business Plan builds out ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████

79.     For Sears NewCo as a whole, the ESL Business Plan contemplates ████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

80.     Notwithstanding its near decade-long decline, under the ESL Business Plan, Sears

NewCo will ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

42

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████    While Sears has not generated positive

EBITDAP since 2012, the ESL Business Plan assumes that Sears NewCo ████████████████

██████████████████████████

**OBJECTION**

## I.      APPLICABLE LEGAL STANDARD

### A.      The ESL Sale Is Subject to Heightened Scrutiny that It Cannot Satisfy

81.      This Court must apply heightened scrutiny to the ESL Sale due to ESL's status as

an insider of the Debtors.  Bankruptcy Code section 101(31) defines an insider of a corporate

debtor to include, *inter alia*, a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in

control of the debtor; . . . or . . . affiliate [of the debtor], or insider of an affiliate as if such

affiliate were the debtor . . . ."  Affiliate, in turn, is defined as an "entity that directly or indirectly

owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting

securities of the debtor . . ."  11 U.S.C. § 101(2).  ESL qualifies as an insider because of its

control over and sufficiently close relationship to the Debtors, including on account of its role as

controlling shareholder (with Lampert), Chairman of the Board (through Lampert) and the

beneficial holder of over 20 percent of the voting securities of the Debtors.  *See Official Comm.*

*of Unsecured Creditors of the Debtors v. Austin Fin. Serv., Inc. (In re KDI Holdings, Inc.)*, 277

B.R. 493, 511 (Bankr. S.D.N.Y. 1999) ("The legislative history of [Bankruptcy Code section]

101(31) indicates that the term applies to one who has a sufficiently close relationship with the

debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with

43

the debtor.") (internal citations and quotations omitted).  Accordingly, the ESL Sale must be examined through a critical lens and subjected to heightened scrutiny.

82.    The law is well-settled that an insider transaction, including a sale pursuant to Bankruptcy Code section 363, cannot be approved unless it is the product of an "arm's length bargain" with "inherent fairness from the viewpoint of" interested parties.  *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939); *see also Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.)*, 942 F.2d 1462, 1466 (9th Cir. 1991) (applying "rigorous scrutiny" to an insider's transactions with a bankrupt corporation); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (noting that sales to insiders in chapter 11 cases necessarily are subjected to heightened scrutiny because such transactions are rife with opportunities for abuse); *C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (same).  "'In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction ***not only appear fair but are fair*** and ***whether fiduciary duties were properly taken into consideration***.'"  *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at \*19 (Bankr. S.D.N.Y. June 27, 2013) (emphasis added) (quoting *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).

83.    Therefore, in determining whether to approve the ESL Sale, this Court must not only scrutinize the Debtors' business decision to pursue the ESL Sale, but also conclude that such decision was made in good faith and with due care, was not an abuse of discretion or a waste of corporate assets and was not driven by other factors.  *Id*.; *see also In re Tidal Const. Co.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) (stating that, in a sale context, heightened scrutiny requires a debtor to demonstrate "that the assets are being sold for the highest price

44

attainable" and "that [the] insider transaction is the result of bona fide arm's length transaction[ ] and not driven by other factors.").

84.     Further to the fairness and good faith considerations attendant to ESL's insider status, the contemplated sale of substantially all of the Debtors' assets without the protections afforded to creditors by the plan confirmation process serves as independent and sufficient grounds for applying heightened scrutiny.  *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003) (vacating bankruptcy court's order approving sale under Bankruptcy Code section 363(b) and stating that "[w]here a debtor attempts to sell substantially all of its assets pursuant to [Bankruptcy Code section] 363(b), instead of waiting for confirmation of a reorganization plan and the safeguards that that process provides, ***more than cursory scrutiny is required by the Bankruptcy Court***") (emphasis added); *In re President Casinos, Inc.,* 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004) (stating that a sale of all, or substantially all, of the assets of a chapter 11 estate "in the absence of a confirmed plan," while not forbidden, "is subject to close scrutiny by creditors and the court"); *see also In re Gulph Woods Corp.*, No. 87-03093S, 1988 WL 134688, at *4 (Bankr. E.D. Pa. Dec. 13, 1988) (noting that "there must be a strong showing of adequate notice and good faith, as well as *feasibility*, of the transaction, to prompt us to approve a pre-confirmation [Bankruptcy Code section] 363(b)(2) sale") (emphasis added) (internal citations and quotations omitted).

85.     Against the backdrop of (i) the unsubstantiated and fanciful ESL Business Plan, (ii) the high likelihood of the Debtors' administrative insolvency following consummation of the ESL Sale as compared to the greater likelihood of administrative solvency in connection with an asset-by-asset monetization, (iii) the inappropriate credit bid of the disputed Credit Bid Claims; (iv) the viable and valuable causes of action underlying the Standing Motion and Proposed

Complaint (certain of which are to be released for *de minimis* consideration in connection with the ESL Sale) and (v) the flaws in the Debtors' sale process and wind-down analysis, as well as the myriad deficiencies in the APA, the ESL Sale does not—and cannot—withstand heightened scrutiny.

**B.    The ESL Sale Would Not Even Satisfy the Lesser Business Judgment Test**

86.    The evidence makes clear that pursuit of the ESL Sale is not a sound exercise of business judgment.  *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a [Bankruptcy Code section] 363(b) application ***expressly find from the evidence presented before him at the hearing a good business reason*** to grant such an application.") (emphasis added).

87.    In *Lionel*, the Second Circuit promulgated a non-exhaustive list of factors to guide courts in determining whether a good business reason exists for a proposed section 363 transaction, including: (i) proportionate value of the asset to the estate as a whole; (ii) the amount of time that has elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value.  722 F.2d at 1071.

88.    This Court has cited the standard set forth in *Orion* numerous times during the pendency of these Chapter 11 Cases and has articulated its clear application to approval of a sale pursuant to Bankruptcy Code section 363.  For example, during the hearing held on December 14, 2018 regarding the Debtors' key employee retention plan, this Court explained that

"[u]ltimately, the bankruptcy judge has to apply his or her own sense of whether the decision is

in good exercise of business judgment, informed by all the facts and circumstances as laid out on

the record."). Dec. 14 Hr'g Tr. 39:20-40:18.

89.     The *Orion* business judgment standard militates against approval of the ESL Sale

for the reasons discussed herein.  Unlike with respect to the Debtors' earlier motions, however,

this Court cannot take "comfort" in sophisticated financial stakeholders' "lack of objection or . . .

support of the [ESL Sale]."  Dec. 14 Hr'g. Tr. 40:14-16.  Indeed, the Creditors' Committee has

questioned the propriety of any ESL-sponsored transaction since the Debtors first sought

approval of their sale processes[36] and has continued to voice its concerns to the Court, the

Debtors, the Board, the Restructuring Subcommittee and their respective advisors throughout the

pendency of these cases.

90.     Moreover, this Court cannot defer to the independence of the parties involved.  As

set forth in the Standing Motion and Proposed Complaint, the trajectory of these Chapter 11

Cases has been primarily for the benefit of ESL, a hopelessly conflicted insider of the Debtors,

that, at Lampert's direction, (i) manipulated the Debtors' projections for ESL's benefit, (ii)

engaged in nearly a decade of serial asset stripping, (iii) cost over 250,000 employees their jobs

and (iv) syphoned Sears's best assets out of the enterprise to shield them from the claims of other

creditors and maximize ESL's own investments in anticipation of these inevitable bankruptcy

cases.  The Debtors' dependence on ESL's directives was further evidenced during the Auction,

---

[36] *See* Preliminary Global Bid Procedures Objection ¶ 12 (explaining that the Debtors made clear on the first day of the Chapter 11 Cases that causes of action arising from affiliate transactions involving ESL prior to the Petition Date may exist and requesting that the Global Bidding Procedures expressly provide that "ESL cannot credit bid on any assets that the Debtors propose to sell, whether for the Go Forward Stores or otherwise, until the Creditors Committee completes its investigation and determines whether to pursue claims and causes of action against ESL."); Supplemental Global Bid Procedures Objection ¶ 10 (expressing concerns with respect to any credit bid by ESL because ESL is "the target of significant investigations by the [Restructuring Subcommittee] and the Creditors' Committee, which investigations may result in claims . . . [against] ESL.")

when the Debtors failed to consult with the Creditors' Committee—despite their requirement to

do so under the Global Bidding Procedures—in approving the ESL Sale, thus raising significant

questions regarding the independence of the Debtors and the Restructuring Committee from

ESL.  For the reasons set forth herein and that will be demonstrated at trial, the ESL Sale,

including the contemplated credit bid and Release (for which minimal value is to be provided),

does not meet the applicable legal standards for approval and, as such, the ESL Sale must be

rejected by this Court.

## II. THE DEBTORS HAVE FAILED TO MEET THEIR BURDEN OF SHOWING THAT THE ESL SALE IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES

91.     The Debtors have determined that the ESL Sale is the highest and best offer for

their assets because it is a "going concern" transaction that "would preserve 45,000 jobs" in

exchange for $5.2 billion in consideration.[37]  The Debtors, however, never undertook any critical

analysis of the business plan underpinning the "going concern" nature of the ESL Sale or the

likelihood that the preservation of 45,000 jobs at this time is anything more than a short reprieve

from the inevitable wind-down of Sears.  Indeed, the Debtors' designation of the ESL Sale as the

highest and best alternative for these estates as compared to the value that would be obtained and

preserved in an orderly wind-down of the Debtors' businesses does not withstand scrutiny and

does not comport with their fiduciary duty to maximize the value of their estates.  *See Lawsky v.*

*Condor Capital Corp.*, No. 14 CIV. 2863 (CM), 2015 U.S. Dist. LEXIS 96347, at *24 (S.D.N.Y.

July 21, 2015).

92.     The Debtors' fiduciary duty to maximize the value of their estates does not

mandate that a debtor "mechanically accept" the bid with the highest dollar amount.  *Id.* (citing

---

[37] *See* ESL Press Release; ESL Partners, L.P., Beneficial Ownership Report (Schedule 13-D) (Jan. 18, 2019), Item 4.

*In re Family Christian LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)).  Instead, a debtor

must demonstrate that the contemplated purchase price is the highest and ***best*** offer, which

includes considerations of good faith and feasibility.  *Family Christian*, 533 B.R. at 626; *Gulph*

*Woods Corp.*, 1988 WL 134688, at \*4 (emphasis added) (noting that "there must be a strong

showing of adequate notice and good faith, as well as ***feasibility***, of the transaction, to prompt us

to approve a pre-confirmation" sale pursuant to Bankruptcy Code section 363) (emphasis added)

(internal quotations omitted).  Accordingly, a court should consider the future use of the assets

contemplated to be sold in connection with determining whether to approve a sale under

Bankruptcy Code section 363, as that future use will have a material impact on the treatment of

the debtor's creditors.[38]  While preserving a debtor as a going concern and saving jobs is a

laudable goal of chapter 11, it must be balanced with—and cannot override—the equally

fundamental tenet of maximizing value for a debtor's creditors.  *See Bank of Am. Nat'l Trust &*

*Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (describing "the two

---

[38] As the Court likely is aware, debtors operating in the brick-and-mortar retail space often emerge from chapter 11 only to land in "chapter 22," as proposed go-forward business plans and forecasts prove overly optimistic—and ultimately unrealistic—in a period of intense competition and shifting market dynamics.  *See, e.g.*, *In re Gymboree Grp., Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va.), *Decl. of Stephen Coulombre, Chief Restructuring Officer of Gymboree Group, Inc., in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 11] ¶ 8 ("[T]he unanticipated degree of decline of the brick-and-mortar retail industry, among other factors, has made it increasingly difficult for the Debtors to support their cost and capital structure. The combination of declining profitability and general market uncertainty has hampered the Debtors' ability to sustain their funded debt burden and to commit the capital necessary for investing in their operations.  Poorer-than-expected product sales led to deep in-store merchandise discounting, which in turn led to thinner profit margins."); *In re The Great Atl. & Pac. Tea Co.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y.), *Decl. of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [ECF No. 4] ¶ 34 (stating that "[t]his is the Debtors' second bankruptcy in just five years.  A&P previously filed the 2010 Cases seeking to achieve an operational and financial restructuring . . . .  Unfortunately, despite best efforts and the infusion of more than $500 million in new capital in the 2010 Cases, A&P did not achieve nearly as much as was needed to turn around its business and sustain profitability."); *In re The Wet Seal, LLC*, No. 17-10229 (CSS) (Bankr. D. Del. 2017), *Decl. of Judd P. Tirnauer in Support of Chapter 11 Petitions and Requests for First Day Relief* [ECF No. 19] ¶ 11 (noting the financial challenges that have plagued the debtors in the wake of their prior chapter 11 cases and stating that "[t]hese collective challenges were amplified by unexpected operational hurdles that arose from relocation of the corporate headquarters and the transition to a third party distribution center . . .").  Commentary on retail "chapter 22s" points out that the common trait underlying such filings is a focus on de-leveraging while failing to fix the underlying company's operations—characteristics that are present in the ESL Sale and ESL Business Plan.  *See, e.g.*, Petition, Interview with T. Gavin (Jan. 23, 2019), available at https://petition.substack.com/.

recognized policies underlying [c]hapter 11" as "preserving going concerns and maximizing

property available to satisfy creditors") (citations omitted).  Ultimately, the determination of

what constitutes the "highest and best" offer in an auction conducted pursuant to Bankruptcy

Code section 363 must be determined on the basis of value maximization, not job preservation.

*See In re After Six, Inc.*, 154 B.R. 876, 883-84 (Bankr. E.D. Pa. 2010) (holding that, despite

policy goal of chapter 11 to preserve jobs, potential purchaser's non-guaranteed offer to employ

debtor's former employees could not outweigh greater purchase price of competing bid).

93.    Here, while the Creditors' Committee certainly is cognizant of the public interest

in preserving jobs, such interest alone cannot justify the Debtors' decision to choose a path that

is not value maximizing.  This particularly is true in these Chapter 11 Cases given that the ESL

Sale likely will result in a financially unviable Sears NewCo (rendering any offer of continued

employment entirely illusory).[39]  By contrast, under any analysis, value would be maximized

through an orderly asset monetization and GOB process.  *See United States v. Deer Park, Inc. (In

re Deer Park, Inc.)*, 136 B.R. 815, 818 (B.A.P. 9th Cir. 1992), *aff'd*, 10 F.3d 1478 (9th Cir.

1993)  (upholding orderly liquidation as valid option in chapter 11 where "a debtor's continuing

participation in a planned, orderly liquidation may in fact be necessary to bring about the

maximum recovery for the creditors.").

94.    As discussed herein, the unfortunate confluence of (i) the deeply flawed and

unreasonably optimistic ESL Business Plan; (ii) the Debtors' virtually guaranteed administrative

insolvency under the ESL Sale, (iii) the numerous flaws in the APA, (iv) the inappropriate credit

bid of disputed claims; (v) the *de minimis* consideration to be provided by ESL for the release

---

[39] Moreover, the APA does not require Buyer to continue employment (or refrain from terminating any employee)
for any period of time, and Buyer's obligation to pay severance to terminated employees is capped.  *See* APA §
9.7(a).

that will allow its credit bid and (vi) the superior recoveries that would be available to the

Debtors' creditors through orderly asset monetization, compounded by the fatal defects in the

Debtors' marketing and auction process, all militate in favor of the value-maximizing alternative

of a GOB process.  Accordingly, for the reasons set forth herein, the ESL Plan fails to represent

the highest *or* the best alternative available to the Debtors and, as such, does not comport with a

sound exercise of the Debtors' business judgment.

A.      **The ESL Sale Is Non-Actionable as Sears NewCo Is Not a Viable Go Forward
        Business**

        95.     The ESL Business Plan is premised upon false and flawed assumptions and fails

to offer a viable go-forward strategy.  Indeed, even a cursory review of the ESL Business Plan

shows it to be, at best, wishful thinking and, at worst, another layer of ESL's smokescreen to

enable it to continue its own out-of-court liquidation of Sears for its own benefit and to the

detriment of third-party creditors.

        1.      **The ESL Business Plan Is Unrealistic and Unreasonable**

        96.     The ESL Business Plan suggests that Sears NewCo will ████████████████

████████████████████████████████████████  Specifically, the ESL Business

Plan contemplates ████████████████████████████████████.

████████████████████████████████████████████████████████████

████████████████████████████████████.  At the same time, the ESL Business Plan

claims ████████████████████████████████████████

████████████████████████  All this with no explanation for how it is to be

accomplished.

        97.     In addition, the ESL Business Plan:

        •   raises serious doubts as to whether Sears NewCo can satisfy its obligations or
            become a truly viable business;

51



98.    In short, the ESL Business Plan and its going-forward projections for Sears

NewCo are fantasy.  It continues the Sears tradition of unrealistic projections and depends on

previously (and currently) unsuccessful business initiatives to achieve results.  Significantly, the

---

[40] All proceeds are presumed to pay down the Junior DIP Facility and, with the full $350 million outstanding balance being assumed, it is likely that even more assets will need to be sold.

ESL Business Plan touts employment numbers that are not feasible and that will only become

less realistic as the anticipated downturn of Sears NewCo takes effect.

99.    The key to Sears NewCo's promised economic achievements under the ESL

Business Plan is that Sears will undergo a miraculous transformation from a struggling retailer

with declining sales year-over-year to a ████████████████████████████████████

████████████████████.  Jan Kniffen, the Creditors' Committee's expert concerning retail

strategies and business planning with decades of experience as a senior executive in the retail

industry, opines that like prior financial plans generated by Sears during the ESL period, actual

financial results will be worse than those forecasted.  A more likely outcome should Sears

NewCo pursue the stated plan is that the company would continue its longstanding, downward

trajectory of divesting assets, cutting jobs and losing money.  *See generally* Kniffen Report.

100.    Sears has been deteriorating for years, and the ESL Business Plan offers no new

initiatives that would be sufficient to reverse the trend.  The turnaround upon which the ESL

Business Plan is premised is made all the more unlikely in a challenging retail environment in

which Sears must compete with thriving big box chains like Walmart, Target, Home Depot, and

Lowe's, in addition to the rapid expansion of online retailers like Amazon and the equally rapid

decline of regional malls where Sears has made its home.  *See id*. ¶¶ 30-40.

101.    The ESL Business Plan ignores that Sears had been failing for nearly a decade

before filing for bankruptcy protection in October 2018.  Its topline revenue declined from over

███████████████████████████████████████████████████████████████████████████

███████████.  *Id*. ¶ 24 & Ex. 1.  At the same time, the total number of Sears stores has

declined almost 90 percent, from 4,038 in 2010, 505 in 2018 and 425 as of today.  *Id*. ¶¶ 24, 26

& Ex. 1.  Yet its radically smaller footprint has not translated to profitability—if anything, the

53

opposite is true. Sears has not generated positive EBITDAP since 2012 and has reported

operating losses of over $500 million for each of the last four years. *Id*. ¶ 25 & Ex. 2. Sears's

decline can be attributed, in part, to a challenging retail environment that has taken its toll on

traditional brick and mortar stores. *See id*. ¶¶ 30-40. But Sears has underperformed even

compared to its peers, losing same-store sales at a far greater rate than comparable companies

like Macy's and Kohl's. *Id*. ¶ 29 & Ex. 4.

102.    Not only did Sears underperform as compared to its peers, it also consistently

failed to meet its own internal targets, year after year. Between 2010 and 2017, it missed its

revenue, gross margin and EBITDAP targets *every single year*. *Id*. ¶¶ 56-58 & Exs. 10-12.

During this timeframe, it missed its revenue targets by an average of ▮▮▮▮▮▮; it missed its

gross margin targets by an average of ▮▮▮▮▮▮; and it missed its EBITDAP targets by an

astonishing yearly average of $1.4 billion, repeatedly predicting positive EBITDAP and then

operating at massive losses. *Id*. Sears's pattern of repeated EBITDAP misses is set forth in

detail below.

103.    The ESL Business Plan, however, reads as though none of this history ever

occurred.  Notwithstanding its near decade-long decline, under the ESL Business Plan, Sears

NewCo purportedly will now emerge from bankruptcy and ███████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████    While Sears has not generated positive EBITDAP since 2012, the ESL

Business Plan assumes that Sears NewCo ███████████████████████

██████    This kind of turnaround, set forth in the charts below, simply is unheard of and is not

remotely achievable.  *Id.* ¶ 67 ██████████████████████████████

█████████████████████████████████████

██████████████████████████    *see generally id.* ¶¶ 62-

71.  There is every reason to believe Sears NewCo will ███████████████    just as it

missed its targets every year since 2010.

**Comparison of Sears Prior EBITDAP to Forecasted EBITDAP in the 2019 ESL Business Plan**
**2015 - 2021**



**Sears Business Unit EBITDAP Margin before Deducting Corporate SG&A and Other Adjustments**
**2015 - 2021**



104.    Over the years, Sears devised several initiatives to try to right the ship, including



 And in every management plan

since 2013, 

▮▮▮▮▮▮▮▮▮ *Id*.  But as evidenced by Sears's dismal performance, none of those

initiatives succeeded in reversing Sears's persistent declines in revenue and EBITDAP.  Now,

Sears NewCo anticipates a 180-degree transformation of Sears's businesses without proposing

any actual transformative changes to the company.  *Id.* ¶¶ 92-107.  Instead, the ESL Business

Plan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

105.    For example, the ESL Business Plan places heavy emphasis ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

106.    The ESL Business Plan also proposes to ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  But Sears has

been cutting costs for years, with no corresponding improvements in its revenue or earnings.  *Id*.

Such drastic cuts, moreover, may be difficult to achieve and may not live up to expectations.  *Id.*

¶ 70.  Even if these cuts are attainable, they are virtually impossible to achieve without causing

significant reductions in sales and gross margin.  *Id.* ¶¶ 70-71.

107.    The ESL Business Plan also envisions ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

108.    Sears has been projecting for years that its fortunes will turn around, and every year it has been very wrong.  There is no reason to think that this time is any different.  And while Sears has touted its 45,000 employees as a reason to avoid a liquidation, there is every indication that this "new" plan will fail to provide stability, and Sears NewCo will continue to shed employees going forward, if it survives at all.  *Id.* ¶ 112 & Ex. 24.  Indeed, the number of U.S. Sears employees has dropped dramatically from 302,000 in 2007 to only 68,000 as of October 2018, as shown in the chart below.



**Total Number of U.S. Sears Employees**
**2007 - 2019**

Note:
[1] The number of U.S. employees includes all full-time and part-time employees in the United States and U.S. territories for subsidiaries of Sears Holdings Corporation.

109. 

would lead to thousands of Sears employees losing their jobs, in addition to those that have lost their jobs since Sears filed for bankruptcy

110.    Finally, compounding the uncertainties inherent in ESL's Business Plan is the fact that Sears NewCo is a newly formed entity,[41] likely with very little (if any) assets prior to consummation of the ESL Sale.  None of the obligations of Buyer under the APA, including post-Closing obligations to pay Cure Costs and assume liabilities, are guaranteed or backstopped by ESL Investments Inc. (or any other entity).  Simply put, no basis exists upon which to conclude that Buyer will be able to satisfy the obligations it purportedly is assuming or provide adequate assurance of future performance under assumed leases and contracts.  The ESL Business Plan offers no viable go-forward strategy and renders the ESL Sale non-actionable.

**2.      The Debtors Cannot Demonstrate Adequate Assurance of Future Performance Under Bankruptcy Code Section 365(b)**

111.    As a result of the deficiencies in the ESL Business Plan, the Debtors and ESL have not satisfied their burden of providing adequate assurance of future performance under the

---

[41] According to Delaware's Division of Corporations, the Buyer—Transform Holdco LLC—was formed on September 28, 2018.  See https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.

leases to be assumed and assigned in connection with the ESL Sale.  Bankruptcy Code section

365(b)(1)(C) requires that in order to assume and assign any unexpired lease or executory

contract, a debtor must provide, among other things, "adequate assurance of future performance"

under the lease or contract.  11 U.S.C. § 365(b)(1)(C); *In re Embers 86th St., Inc.*, 184 B.R. 892,

902 (Bankr. S.D.N.Y. 1995) (holding that the debtor bears the burden of showing that the

requirements for assumption under Bankruptcy Code section 365 have been met).[42]  Congress's

intent in imposing adequate assurance as a condition on the ability of the debtor to assume a

contract was "to insure that the contracting parties receive the full benefit of their bargain if they

are forced to continue performance." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir.

1996); *In re Natco Indus., Inc.*, 54 B.R. 436, 440-41 (Bankr. S.D.N.Y. 1985) ("[T]he obvious

purpose of this section, particularly in light of the statutory voiding of bankruptcy default clauses

contained in [Bankruptcy Code section] 365(e)(1), is to afford landlords with a measure of

protection from having to be saddled with a debtor that may continue to default and return to

bankruptcy.").

---

[42] The term "adequate assurance" is not defined in the Bankruptcy Code, but courts have determined that "[w]hether 'adequate assurance of future performance' has been provided is determined by the facts and circumstances of each case." *In re M. Fine Lumber Co.*, 383 B.R. 565, 572 (Bankr. E.D.N.Y. 2008) (citations omitted).  In determining whether a contract counterparty is adequately assured, courts apply a facts and circumstances test and look to a non-exclusive list of factors, including, among other things: (i) the debtor's payment history; (ii) the extent and history of defaults; (iii) the presence of a guarantee and/or a security deposit; (iv) evidence of profitability; (v) a plan with earmarked funds exclusively for the landlord; (vi) the general outlook in the debtor's industry; and (vii) whether the lease is at or below the prevailing market rate. *Androse Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co.)*, 472 B.R. 666, 675 (S.D.N.Y. 2012); *see In re M. Fine Lumber*, 383 B.R. at 573-74 (collecting cases).  Moreover, Bankruptcy Code section 365(b)(3), "imposes heightened restrictions on the assumption and assignment of leases for shopping centers . . . to protect the rights of the lessors and the center's other tenants," *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990), by requiring additional adequate assurance: "(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease; (B) that any percentage rent due under such lease will not decline substantially; (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center." *Id.* (citing 11 U.S.C. § 365(b)(3)).

112.    Courts have found adequate assurance of future performance in a number of different circumstances, generally when the facts of the case indicated that the contract counterparty was insulated from some measure of risk by improved performance of the lessee or some other security.  *See In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 755 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance was sufficient where the debtor increased sales, reduced operating expenses, and provided two months' security);  *In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 1000 (Bankr. E.D.N.Y. 1981) (court previously held that debtor's sublease program, together with a proposed merger, provided adequate assurance; court further found that proposed sublessee had a likelihood of success and that the $10,000 security deposit, $10,000 promissory note and value of the sublease to the debtor was sufficient).  By contrast, courts have held that a debtor's history of financial losses, if not contradicted with evidence of future profitability, may preclude a finding of adequate assurance.  *See, e.g.*, *In re DWE Screw Prods., Inc.*, 157 B.R. 326, 332 (Bankr. N.D. Ohio 1993) (denying assumption of lease where debtor's "collective disbursements exceed[ed] receipts" and "monthly expenses extrapolated over an annual basis exceed[ed] Debtor's gross [annual] sales"); *see also In re RS Legacy Corp.*, 2015 Bankr. LEXIS 2206, at *3 (Bankr. D. Del. June 25, 2015) ("[T]he concept of adequate assurance is a flexible one, mainly requiring evidence satisfactory to the Court that the proposed assignee possesses the financial wherewithal to perform all of the obligations under the agreement at issue.").

113.    Here, adequate assurance of future performance is clearly lacking as neither ESL nor the Debtors have established that Buyer or Sears NewCo intends to perform, or is capable of performing, under the assumed contracts and leases after Closing.  The ESL Business Plan is built on faulty and unrealistic assumptions that leave contract counterparties with no assurance that there will be sufficient free cash flow to avoid financial distress in the near future.  *In re*

*Natco*, 54 B.R. at 440-41.  Specifically, as discussed herein, the ESL Business Plan is based on

the assumption that Sears NewCo will ███████████████████████████████████

███████████████ ignoring that Sears has not generated positive EBITDAP since 2012 (and, to

be precise, has *lost* $500 million for each of the last four years).  *Id.* ¶ 75 & Ex. 15.  As set forth

in the Kniffen Report, ████████████████████████████████████████████

██████████████████.  Neither the Debtors nor ESL can demonstrate that the go forward

business will have the financial wherewithal necessary to satisfy the obligations under the

assumed leases and contracts.  Indeed, the more likely outcome will be that Sears NewCo will

continue the longstanding, downward trajectory of divesting assets, cutting jobs and losing

money.

114.    Moreover, aside from the doubtful ability of Sears NewCo to fulfill the

obligations under the assumed contracts and leases, the terms of the APA create additional

uncertainty.  The APA sets forth a construct of "designatable leases" and "additional contracts"

that allows Buyer to assign such contracts and leases as it wishes to third parties *after the*

*Closing Date*.  This construct leaves contract counterparties without visibility into when, if at all,

their obligations may be assumed and rendering it practically impossible to satisfy the

requirements of adequate assurance.

115.    Specifically, the APA provides Buyer with a 60-day, post-closing Designation

Rights Period during which it is not required to pay Cure Costs in respect of "designatable

leases" and "additional contracts."  *See* APA §§ 2.7(c)-(d); *see also* Proposed Sale Order ¶¶ 29-

36.  During the Designation Rights Period, Buyer has the right to delay the assumption of any

contract or lease and has the option to either not assume any contract or lease (and therefore not

pay any liabilities associated therewith, including Cure Costs) or alternatively (as it relates to

62

leases), *designate a completely unrelated third party to assume any lease on its behalf*.  APA §

1.1 (definitions of "Assignee" and "Designation Rights"), 2.1, 2.6.  As the APA contemplates

that Buyer will make its determination on whether to designate a third party assignee for such

contracts after the approval of the ESL Sale and the Closing Date, the contract counterparties

will have no opportunity to object once they learn of the identity of any third party designee.

The APA provides no mechanism for these contract counterparties to object after Buyer has

made its designation determination.

116.    In effect, the APA allows ESL to claim the Debtors' statutory rights (*i.e.*, the right

to assume and assign) while sidestepping the concomitant burdens (*i.e.*, the requirement of notice

and hearing and adequate assurance of future performance) under Bankruptcy Code sections 363

and 365.  Suffice to say, no adequate assurance can be provided as it relates to the performance

of unknown, un-identified third parties who may become, in ESL's sole right and determination,

assignees under the Debtors' leases and contracts.  Under the construct of the APA,

counterparties are stripped of their statutory protections while ESL gains another opportunity to

monetize valuable assets on its own timeline and for its sole benefit.  Accordingly, the lack of

adequate assurance violates the express provisions of Bankruptcy Code section 365(b)(1)(C) and

precludes the Debtors from assuming and assigning contracts and leases to Buyer.

**B.    The ESL Sale Will Leave the Estates Administratively Insolvent**

117.    The ESL Sale fails the Debtors' own litmus test in selecting a successful bid:

administrative solvency.  Despite consistently expressing the importance of selecting a path that

would ensure the Debtors' estates remained administratively solvent, the Debtors constructed

their administrative claims analysis by using overly conservative estimates of their liabilities and

overly optimistic estimates of their assets left behind by the ESL Sale.  Even by the Debtors'

own cherry-picked analysis as of the date of the Auction, however, the ESL Sale will render the

63

Debtors' estates' **_administratively insolvent by_** ▮▮▮▮▮▮—and that is a **_conservative_**
**_estimate_**.[43]  The Debtors nonetheless have decided to accept the ESL Sale through unjustified
reliance on potential upsides that they claim could cover that shortfall, while ignoring material
risks and downsides.

118.    The Debtors' assessment of administrative claims that will remain obligations of
the estates is flawed for two principal reasons.  **_First_**, the Debtors' estimates ignore the Debtors'
own cash flow projections, assume certain assets remain with the estates when, in fact, they are
sold and omit the ▮▮▮▮▮▮ in accrued post-petition royalties that may be payable to KCD IP,
LLC.  Accounting for those factors, the estimated administrative shortfall reaches $226 million.
**_Second_**, the Debtors justified their decision to accept the ESL Bid by citing potential upsides
related to the transaction that **_might_** (but might not) cover the shortfall, but fail to adjust for the
risk associated with myriad potential downsides—significant downsides that could increase the
shortfall materially.  Indeed, the Creditors' Committee's financial advisor estimates that, if
properly calculated and based on information available, the shortfall in covering the Debtors'
administrative expenses after consummation of the ESL Sale could exceed $250 million.  *See*
Declaration of Matthew Diaz, Managing Director, FTI Consulting, Inc., attached hereto as
**Exhibit B** (the "Diaz Declaration").

119.    As one of the more egregious examples, ESL cannot demonstrate, or even
credibly claim, that the assumed liabilities (purporting to represent hundreds of millions of
dollars in value to the estates) will ever be paid because of the doubtful financial wherewithal of
Sears NewCo and the illusory nature of assumed liabilities under the APA.  Moreover, in light of

---

[43] Since that time, the Debtors and their advisors have provided information to reduce the amount of this number.
Regardless, there is no dispute that there will be a shortfall.  For the avoidance of any doubt, the Objection relies on
the numbers that were used by the Debtors and their advisors at the time of the Auction.

the highly conditional nature of ESL's obligations even to close the ESL Sale, the Debtors

remain at significant risk that ESL could unilaterally terminate the APA and demand the return

of its entire $120 million deposit—creating an even bigger strain on the administrative solvency

of the estates.

120.    In contrast to the risks and dubious assumptions related to the ESL Sale, the asset

monetization and wind-down process modeling prepared by the Debtors and the Creditors'

Committee shows not only administrative solvency, but also a potential distribution to unsecured

creditors.  *See infra* Objection, Part IV.  Accordingly, the Court should reject the ESL Sale as not

in the best interests of the Debtors' estates and their creditors.  *See, e.g., In re Flour City Bagels,*

*LLC*, 557 B.R. 53, 80 (Bankr. W.D.N.Y. 2016) (denying the debtor's motion to approve a 363

sale where such sale would leave the debtor's estate with scant value and holding that "[i]n light

of the substantial risk that the $1.3 million in cash that Canal offers to pay will render Flour City

administratively insolvent, the Court finds that the structure of the sale is not reasonable or

supported by a good business justification.").

**1.    The Debtors' Estimates Discount Their Administrative Shortfall by** ██████████████

121.    While the ESL Sale purports to provide for the assumption of a substantial portion

(but not all) of the Debtors' estimate of administrative expenses, the Debtors' estimates at the

time of the Auction fail to account for (i) the Debtors' projected outstanding obligations under

the DIP ABL Facility; (ii) assets that are being sold to Buyer and not retained by the Debtors;

and (iii) accrued post-petition royalties that may be owed to KCD IP, LLC at the Closing of the

ESL Sale.  Indeed, as depicted in the chart below (even when using the Debtors' favorable

administrative expense estimates), once each of the aspects of the ESL Sale is properly

accounted for, it becomes clear that the transaction will render the Debtors' estates

administratively insolvent.  Diaz Decl. ¶¶ 20-23.



| $ in millions | Debtors' Estimate | Committee's Estimate |
|---|---|---|
| **Administrative Obligations Not Assumed by ESL** | | |
| 503(b)(9) | | |
| Accounts Payable | | |
| Taxes and Other | | |
| RemainCo Winddown Costs | | |
| ABL DIP | | |
| **Total Administrative Claims** | | $290 |
| **Sources of Value Left Behind by the Debtors' Estate** | | |
| Less: MTN Sale Proceeds | (81) | (81) |
| Less: Cash at Banks | | |
| Less: Store Cash | | |
| Less: Other Cash - Utility Deposit | | |
| Less: Insurance Proceeds | | |
| Less: SHIP Sale Deposit | (6) | (6) |
| Less: UHAUL Unencumbered Proceeds | (7) | (7) |
| **Potential Additional Post-Petition Obligations** | | |
| Add: KCD Royalties | | |
| **Total Potential Administrative Claims Shortfall As Of the Time of the Auction** | | $226 |

122.    While the Debtors' projections at the time of the Auction show approximately

██████████ in outstanding obligations under the DIP ABL Facility as of February 9, 2019, *see*

Project Blue, Rolling Cash Flow Budget (Week 13), dated January 17, 2019, at 4, the Debtors

have stated that they must "manage down" the obligations under the DIP ABL Facility by

another ██████████ to bridge the gap between its projected balance on the date of closing and

the cap of $850 million required to satisfy a condition precedent in the APA.  *See* APA § 10.10.

In order to accomplish these further reductions, the Debtors will have to achieve in part better

cash flow than forecasted through a targeted inventory disposition strategy, which, remarkably,

66

the Debtors acknowledged as imprudent just one day before accepting the ESL Sale.  *See* Jan. 15

Auction Tr. 54:8-11 (counsel for the Debtors stating that "managing down" the amount

outstanding under the DIP ABL Facility "was not something that we felt was fair or in the

company's best interest to take that risk").  By taking into account actual cash flow results that

do not depend on simply "managing down" obligations under the DIP ABL Facility, the

Debtors' estimate of the administrative shortfall should be higher.  Diaz Decl. ¶ 21.

123.    In addition, at the time of the auction, the Debtors assumed they would be able to

retain ██████████ in proceeds from utility deposits.  However, section 2.1 of the APA, which

concerns the assets to be acquired in connection with the ESL Sale, provides that Buyer, not the

Debtors, would retain any such security deposits.  APA § 2.1(o).  Accordingly, the Debtors'

administrative claims shortfall estimate should be increased by ██████████.  Diaz Decl. ¶ 22.

124.    Lastly, the Debtors' administrative solvency analysis does not account for the

accrued post-petition royalties that may be due to KCD IP, LLC as of the Closing Date.  Under

the applicable license agreements, the Debtors are obligated to pay royalty payments related to

selling products with intellectual property owned by KCD IP, LLC, including for the use of

Kenmore and DieHard trade names and other intellectual property.  If payable, those royalty

payments are projected to be approximately ██████████ by the Closing Date.  The Debtors have

not paid these royalties since the Petition Date, meaning the entire ██████████ may be due upon

Closing.  The Debtors, however, do not take into account these potential obligations in their

solvency analysis.[44]  Diaz Decl. ¶ 23.

---

[44] As noted in the Diaz Declaration and explained in further detail below, the "Cash at Banks" amount of
██████████ assumes the cash is free of all liabilities and readily available, which may not be the case.  Diaz Decl. ¶
33.

**2.      The Debtors' Analysis Relies on Potential Upsides, but Fails To Account for Significant Downsides that Would Increase Administrative Expenses**

125.    Exacerbating the administrative insolvency evident in the Debtors' own analysis are numerous downside risks the Debtors essentially ignore while taking into account potential upsides that *might* cover the administrative shortfall.  The potential upsides the Debtors consider include inventory not being sold to Buyer (estimated to be approximately ▮▮▮▮▮), the value of inventory and receivables in excess of $1.657 billion (if any), reducing accounts payable and favorable budget to actual results to the Debtors' cash flow budget.

126.    The Debtors, however, fail to factor in significant potential downsides to the ESL Sale.  As explained below, these downsides threaten the Debtors' liquidity position even further.

- **The Debtors Are Contractually Obligated To Incur Additional Administrative Expenses After the Closing, which they Have No Ability To Pay.**  Under the APA, Buyer has no obligation to disclose which contracts and leases it intends to assume at Closing until two business days prior to the Closing Date.  *See* APA § 2.7(b)(ii).  Moreover, Buyer has the right, for up to 60 days following the Closing Date (but no later than May 3, 2019) (the "Designation Rights Period"), to designate those leases and contracts it wishes to assume.  *See id*. §§ 2.7(c) and (d), 2.9, 5.2.  As such, there is no obligation for Buyer to assume any contract or lease (or any liability associated therewith) for the entirety of the Designation Rights Period, if at all, and no visibility as to which contracts and leases may be subject to this delayed assumption period until two business days prior to the Closing Date.  Moreover, the costs and expenses incurred during the Designation Rights Period (which, at its extreme, could include costs and expenses associated with all of the Debtors' existing leases and contracts) are liabilities of the Debtors—and not Buyer.  This shifting of liability (from Buyer to the Debtors) post-Closing may result in the Debtors incurring additional administrative expenses after the Debtors have sold substantially all their assets to Buyer.  Further, Buyer has no obligation to pay any compensation to the Debtors under the occupancy agreement or the APA for use of the leases and is solely obligated to pay (or reimburse) the Debtors for expenses incurred in connection with the leased premises, *See id*., Ex. D (Form of Occupancy Agreement) §§ 4-5.  It remains to be seen how the Debtors can pay *any* expenses on account of any contract or lease following the Closing Date.

- **The Debtors Will Be Liable for Accrued Payroll Obligations through Closing.**  Under the APA, Buyer does not assume the liability of payroll obligations until the anticipated closing date of February 9, 2019.  APA §§ 2.4(f), 9.7(b).  Diaz Decl.¶ 31.  Therefore, the Debtors are liable to pay all accrued but unpaid payroll

68

obligations until the sale closing date.  The Debtors' own Cash Flow Budget demonstrates that approximately ███████ in payroll, taxes, and benefits are due to be paid out during the week of February 16, 2019, meaning that they would have accrued as of the previous week (*i.e.*, the week ending February 9, 2019). The Debtors have not accounted for these payroll liabilities in their administrative claims estimates.

- **The Debtors Will Be Liable for Warranties and Protection Agreement Liabilities for an Unknown Period.**  Under sections 2.3(e) and 2.8(e) of the APA, the Debtors will remain obligated on warranty and protection agreement liabilities unless and until the KCD Notes, which are debt obligations of non-Debtor KCD IP, LLC owed to non-Debtor Sears Reinsurance Company Ltd. ("Sears Re"), are transferred to Buyer.  Diaz Decl. ¶ 32.  In order to transfer the KCD Notes, Sears Re must first obtain consent form the Bermuda Regulatory Authority, and the timing of that consent and subsequent transfer is uncertain. Until the transfer is complete, Buyer will service the warranty claims and protection agreements, and the Debtors will reimburse Buyer for the costs.  APA §§ 2.3(e), 2.8(e).  Historically, Sears Re has reimbursed the Debtors for the costs of servicing the warranties and protection agreements but has ceased remitting reimbursement since the Petition Date.  The costs of servicing these agreements is approximately ███████ per month, and the Debtors' estimates do not account for reimbursement to Buyer for these costs.

- **The Debtors' Cash May be Restricted.**  The Debtors estimate they have approximately ███████ in cash at banks remaining after the ESL Sale Closing. Diaz Decl. ¶ 33.  However, even the Debtors' most recent analysis acknowledges the risk of recovering the full amount and places a ██ percent risk on these proceeds.  To the extent any of the Debtors' cash is not readily available for use, the Debtors' administrative shortfall will grow.

- **The Debtors May Not Be Able to Retain the SHIP Deposit.**  The Debtors' estimates currently assume that they will be able to retain the $6 million received from Service.com in connection with the termination of the SHIP Purchase Agreement.  *See* APA §§ 2.1(z), 2.2(p).  The Creditors' Committee understands, however, that Service.com may contest the Debtors' termination of the SHIP Purchase Agreement and the Debtors' entitlement to retain the $6 million deposit. If the Debtors are not permitted to retain the $6 million deposit, there would be a dollar for dollar increase in the Debtors' administrative insolvency.  Diaz Decl. ¶ 34.

- **The Debtors Remain Liable for Mechanics' Lien Obligations**.  There is approximately $4 million in mechanics' liens alleged or asserted against the Debtors' estates.  While ESL's counsel stated during the Auction that ESL would assume these obligations, *see* Jan. 15 Auction Tr. 72:22-23, the executed APA considers those lien obligations to be excluded liabilities.  APA § 2.4(r).  Buyer has not agreed to assume these mechanics' liens, and therefore, the Debtors' administrative shortfall will increase.  Diaz Decl. ¶ 35.

- **Any Delay in Closing the ESL Sale Will Cause the Debtors To Incur Substantial Costs.** The Debtors' estimates and analysis are entirely dependent upon ESL being able to close the proposed sale on February 9, 2019. However, as described in further detail *supra*, there is significant uncertainty surrounding ESL's ability to close on time. This uncertainty includes, but is not limited to, ESL's ability to demonstrate adequate assurance of future performance to contract and lease counterparties and matters pertaining to the completion of the marketing period for the ESL's financing as well as any appeals that may be filed in the event the ESL Sale is approved. In the event that ESL is unable to close by February 9, 2019, then the Debtors' estates will be saddled with even larger administrative costs of ▮▮▮▮▮▮ per day based on the Debtors' estimates. Diaz Decl. ¶ 36.

- **The Debtors May Experience Unfavorable Budget to Actual Variances.** In addition, due to the uncertainty inherent in the ESL Sale and the Debtors' go-forward path, it is quite possible that the Debtors will experience unfavorable budget to actual variances. Diaz Decl. ¶ 37.

- **The Debtors Remain Liable for "Assumed" Liabilities.** ESL purports to provide for the assumption of numerous liabilities, including all of the Debtors' 503(b)(9) Claims and Other Payables, as listed on Schedule 1.1(g) of the APA. APA § 2.3(k). Disturbingly, however, the APA and Proposed Sale Order contain provisions that put the Debtors at risk of never actually being relieved of these administrative and priority claims, which eventuality is all the more likely given Sears NewCo's razor thin financial margins. APA §§ 2.3(k)(x). In this event, the Debtors will be left with significant additional administrative claims (which were contemplated to be assumed in connection with the ESL Sale), but without any ability to satisfy those claims. Diaz Decl. ¶ 40.

- **Assumed Liabilities Are Capped and Subject to Significant Reduction.** The APA caps the assumption of liabilities and, therefore, leaves the Debtors with significant unpaid administrative expenses (even if the purportedly assumed obligations are actually paid by Buyer or Sears NewCo) through the imposition of caps. Specifically, severance is capped at $43 million; 503(b)(9) Claims are capped at $139 million, despite estimates that these claims will total $173 million *at the very least*; and Other Payables are capped at $166 million. *Id.* With respect to 503(b)(9) Claims and accounts payable, the APA does not identify which of such obligations will be assumed and which will remain the Debtors' responsibility. Under Sections 2.3(k)(vii)-(ix) of the APA, if the value of certain current assets (specified receivables, warranty receivable and prepaid inventory) is lower than the dollar value that ESL set forth in the APA, thus resulting in a working capital "shortfall," then the amount of liabilities Buyer has agreed to assume related to severance, 503(b)(9) Claims and accounts payables will be reduced dollar-for-dollar by the shortfall amount. *Id.* In such an event, the administrative claims shortfall would increase. In fact, as of January 23, 2019, the Debtors' estimate for warranty receivables and prepaid inventory are barely in excess of the targets set forth in the APA. Because payments on some of these

claims are not due until 120 days following the Closing or the date of confirmation, if Buyer fails to meet assumed obligations, recourse regarding 503(b)(9) Claims and other administrative and priority claims will remain at the Debtors' estates.  Diaz Decl. ¶¶ 38-40.

- **Assumed Liabilities, Including 503(b)(9) Claims and Severance Obligations, Are Subject to Further Reduction if There Is a "DIP Shortfall."**  The APA provides that Buyer's obligations to assume liabilities shall be reduced (dollar for dollar) to the extent that the "Aggregate DIP Shortfall Amount" is a ***positive*** number. APA § 2.3(k)(vi).  The Aggregate DIP Shortfall Amount is defined as "an amount equal to $1,200,000,000 less the aggregate amounts required to be paid (net of any available cash) to fully satisfy the existing indebtedness of Sellers under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement.  *Id.* § 1.1 (definition of "Aggregate DIP Shortfall Amount").  Under the plain language of the APA, the Debtors are penalized for incurring less indebtedness under its DIP facilities **as *every dollar under $1.2 billion that the Debtors do not need to repay under its DIP facilities reduces the amount of assumed liabilities that Buyer is obligated to pay***.  Diaz Decl. ¶¶ 38-40.

- **The Debtors Are Responsible for Liabilities Regarding Employee Benefits.**  Pursuant to section 9.7(j) of the APA, the Debtors remain responsible for the medical, dental, and health claims of eligible employees for services rendered prior to the Closing.  Because the majority of the Debtors' medical plans are self-insured, it is not unusual for such benefit-related claims to lag as a result of delays in processing.  According to the Debtors' first day wage motion, they had approximately $19.1 million in employee benefit liabilities, which is an appropriate proxy for estimating this liability as of the Closing.  Diaz Decl. ¶¶ 40.

- **Payments of Cure Costs Are Delayed.**  Buyer is not required to pay Cure Costs in respect of "designatable leases" or "additional contracts" unless and until it decides to assume these leases and contracts, which could be throughout the entirety of the 60-day Designation Rights Period.  *See id.* §§ 2.7(c)-(d).  As such, there is no guarantee that Buyer will pay any of the purported $200 million of Cure Costs at estimated by the Debtors at Closing.

- **The Debtors May Be Required To Pay for Transition Services, Including Professional Fees.**  Under the APA, the Debtors are required to use reasonable best efforts to agree to and execute a transition services agreement pursuant to which Sellers provide to Buyer (and vice versa) "certain services for a transitional period following the Closing."  APA § 8.8(a).[45]  The duration and extent of these

---

[45] Section 8.8(b) of the APA requires the applicable Seller, for a period of up to six months after the Closing, to remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premises or Sparrow Properties to remain effective.  Sellers appoint Buyer as their agent to manage, control and operate each of such properties.  Buyer has the right to receive all revenues produced by such properties.  Seller has no right to such revenues and only has the right to reimbursement of reasonable and documented out-of-pocket

transition services, and the attendant costs to the Debtors associated therewith (and whether such costs will be ultimately borne by Debtors' estates or Buyer) is unknown.  Unless Buyer agrees to pay ***100 percent of the costs (including professional fees)*** associated with the Debtors' ongoing servicing requirements, such costs, along with the additional amounts associated with prosecuting a contested ESL Sale, will further increase the Debtors' administrative insolvency. Similarly, the Debtors are required to remain as the manager or operator under certain leased properties for a period of up to six months after the Closing to allow Buyer time to obtain requisite permits.  *See id*. § 8.8(b).  As such, the Debtors assume the significant risk that Buyer will fail to pay operating expenses, operate the premises and reimburse the Debtors for acting as manager, made all the less likely by the razor thin liquidity of the ESL Business Plan.  Moreover, as set forth further in the Diaz Declaration, the Creditors' Committee estimates even further administrative burn, resulting from the staggering daily operational losses of at least ███████.  *See* Diaz Decl. ¶ 36.

127.    In isolation or taken together, these significant downside risks to the ESL Sale expose the Debtors to unjustified and unreasonable expenses that, after consummation of the ESL Sale, it will not have the ability or assets to satisfy.

128.    In short, an analysis that properly estimates the administrative shortfall and factors in potential upsides as well as downsides to the ESL Sale demonstrates an administrative insolvency increase, as shown in the following chart based on the more accurate administrative claims shortfall reached by the analysis described herein.

---

costs, fees and expenses incurred in providing the management services, including any income and other taxes incurred by Seller in respect of the payment and receipt of such reimbursement.  Buyer will also indemnify Sellers from any Liability arising from the provisions of the Management Services.

| $ in millions | Committee's Estimate |
|---|---|
| **Total Potentail Administrative Claims Shortfall As Of the Time of the Auction** | $226 |
| **Potential Upsides** | |
| 1. Inventory Not Being Sold to ESL | |
| 2. Value from Credit Bid Release Consideration Reserve | (35) |
| 3. Value from Excess Inventory and Receivables | tbd |
| 4. Reduced Accounts Payable | tbd |
| 5. Historical Favorable Budget to Actual Variance | tbd |
| **Total Potential Administrative Claims Shortfall Considering Only Potential Upsides** | $148 - tbd |
| **Potential Downsides** | |
| 6. Accrued Payroll Due at Closing | |
| 7. Warranties and Protection Agreements Liabilities | |
| 8. Loss of Cash at Banks | |
| 9. Loss of the SHIP Deposit | 6 |
| 10. Mechanics' Lien Obligations | 4 |
| 11. Cost of Closing Delays | tbd |
| 12. Unfavorable Budget to Actual Variances | tbd |
| 13. Unfavorable 503(b)(9) Claims | tbd |
| 14. Working Capital Adjustments | tbd |
| 15. Liabilities Remaining With the Debtors | tbd |
| 16. Liabilities regarding Employee Benefits | tbd |
| **Total Potential Administrative Claims Shortfall Considering Both Potential Upsides and Downsides** | $259 +/- tbd |

129.    The ESL Sale fails to clear the crucial hurdle of administrative solvency.  Not only does the Debtors' own analysis of the administrative claims reveals that the ESL Sale will produce a shortfall, the Debtors have not taken into account the numerous potential downsides that would accompany the ESL Sale.  *See* Diaz Decl. ¶¶ 31-42.  Given that the asset monetization and GOB process modeling prepared by the Debtors and the Creditors' Committee shows that all administrative claims would be paid and provide recoveries to unsecured creditors, the Debtors' decision to accept the ESL Bid cannot be sustained as in the best interests of the Debtors' estates and their creditors.  *See, e.g.*, *In re Flour City Bagels*, 557 B.R. at 80.  The

significant administrative insolvency risk attendant to the ESL Sale alone precludes a finding

that the Debtors exercised sound business judgment by accepting the ESL Bid.

**3.      The APA Contains Numerous Conditions that May Prevent the ESL Sale from Closing—Putting an Even Greater Strain on the Estates**

130.    Moreover, the Debtors may be footing the bill for the above downsides without

receiving any value from ESL because the ESL Sale may never close.  The APA is fraught with

execution risk due to the highly conditional nature of Buyer's obligation to close.  Specifically,

the APA contains a number of conditions, many of which are both unlikely to occur by the

required deadline (often the Outside Date) and/or entirely out of the Debtors' control.  In the

event the ESL Sale does not close by the Outside Date of February 19, 2019 (the likelihood of

which is significant in view of the numerous conditions precedent and other execution risk

factors), ESL is entitled—in virtually all circumstances—to terminate the APA and receive a

refund of its entire $120 million deposit.

131.    Set forth below is a list of certain of the closing conditions contained in the APA

that are outside of the Debtors' control, and which very well may result in an inability to close

the transaction by the Outside Date.

- **Sale of Non-Debtor Assets.**  The APA provides for the sale of assets by non-Debtors to Buyer or otherwise makes the assumption of certain liabilities contingent on such non-Debtor asset sales.

  - Section 2.1(e): provides for the sale of all Intellectual Property including Intellectual Property that is owned by non-Debtors such as the Kenmore Marks and the DieHard trade names, which are owned by KCD IP, LLC (collectively with all Intellectual Property owned by KCD IP, LLC, the "KCD IP").  Alternatively, section 9.14 of the APA enumerates a number of options for the Debtors to enable Buyer to gain access to the use of the KCP IP based on the consents of non-Debtors (including, potentially, PBGC).  Among the options are the Debtors' assumption of all KCD Agreements and the grant of a perpetual sublicense to Buyer.  Yet, the Debtors cannot assume the KCD Agreements, as they eventually will be wound down following the consummation of the ESL Sale.  Failure to

74

transfer the KCD IP to Buyer or satisfy the conditions of section 9.14, would enable ESL to terminate the APA and obtain its deposit.

○ Section 2.1(r):  requires non-Debtor Sears Re to sell the KCD Notes to Buyer, absent which, Buyer will not assume the PA Liabilities.[46]  The KCD Notes cannot be transferred until the Bermuda Monetary Authority, which has jurisdiction over Sears Re, consents to the transfer of these items.  As a result, the transfer of the KCD Notes and protection agreement liabilities may be delayed, potentially indefinitely.  Until the consent is obtained, Seller is required to continue to hold the protection agreement liabilities, and Buyer will service those liabilities under a servicing agreement.  The cost for the servicing is the amount of royalties that Buyer would be paying under the KCD IP license.  There is no indication that the value of the servicing is equivalent to the royalty payments.  Additionally, Sellers have additional incremental expense and liability exposure while they are holding these assets.  *See id*. § 2.8(e).  This requirement is also an ESL closing condition and presents significant execution risk for Seller.  Specifically, ESL could determine that Seller did not use its reasonable best efforts to obtain one of these items and terminate the APA.  As noted *supra*, it remains unclear how Seller can cause KCD to take such actions, or encumber the Kenmore and DieHard intellectual property, without KCD IP LLC's (and, potentially, PBGC's) consent or grant a perpetual sublicense when Sellers soon will cease to exist.  Moreover, there is concern that the exclusive license ESL is requiring in respect of the KCD IP has so many indicia of full ownership that the grant may constitute a disposition of the KCD IP.  *See id*. §§ 9.14, 10.8.

○ Section 2.1(s): requires non-Debtor SRC Sparrow 2 LLC to sell its equity interests in non-Debtor SCR O.P. LLC to Buyer.

• **Completion of Marketing Period for ESL's Financing.**  Section 4.1 of the APA provides that the Closing is conditioned upon expiration of a marketing period for ESL's financing.  If the marketing period has not ended at the time that the conditions set forth in Article X and Article XI have been satisfied or waived, then the Closing cannot occur until the earlier of (x) any Business Day as may be specified by the Buyer on no less than two (2) Business Days' notice or (y) two (2) Business Days following the final day of the marketing period.  As such, if the marketing period is interrupted and the Closing is delayed, the Closing may not occur before the Outside Date, and in turn, ESL would have a right to terminate the APA and receive a refund of its $120 million deposit.  *See id*. § 4.1.

---

[46] "PA Liabilities" are all Liabilities for warranties and protection agreements or other services contracts (other than warranties relating to Intellectual Property) for the good and services of Sellers sold or performed prior to the Closing, including any Liabilities owed by Sears Re to any Sellers in respect of reinsurance of such warranties and protection agreements.  APA § 2.3(e).

- **Inability to Deliver Documents.**  Section 4.3 of the APA requires the delivery to Buyer of a variety of agreements and documents in order to consummate the transactions contemplated by the APA.  Those agreements include documents required by ESL's lenders (which, upon information and belief, had not been disclosed to Sellers as of the execution date of the APA) and significant records for all intellectual property being acquired pursuant to the APA.  It may not be possible for Sellers to obtain all of these documents by the Outside Date, which would give ESL the right to terminate the APA and receive a return of its deposit. *See id*. § 4.3.

- **Value of Acquired Assets/Maximum Liabilities.**  Article X of the APA sets forth numerous conditions to ESL's obligation to close (certain of which are also noted *supra*) that give ESL significant leeway to walk away from the transaction without recourse (and ESL would receive a refund of its $120 million deposit), including, most significantly:  (i) the aggregate value of the acquired inventory and accounts receivable must be at least $1.657 billion; (ii) the outstanding indebtedness under the DIP ABL Facility shall be no greater than $850 million; and (iii) the outstanding indebtedness under the Junior DIP Facility shall be no greater than $350 million.  Sellers' projections indicate that it will be a challenge to meet these inventory and receivables thresholds as well as the DIP balance thresholds.  *See id.* §§ 10.9, 10.10.

- **Milestones.**  ESL can terminate the APA and receive a refund of its $120,000,000 deposit in the following circumstances, among others: (i) the ESL Sale has not closed by February 19, 2019 (*See id.* § 12.1(a)(ii)); or (ii) if the Court has not approved the transactions or the sale order is not obtained (or is vacated or stayed) by February 8, 2019.  *See id.* § 12.1(b)(ii).

132.    Indeed, the Debtors are only permitted to retain the $120 million deposit if the APA is terminated by the Debtors due to ESL's breach of a representation and warranty or if the Debtors are ready, willing and able to close but ESL chooses not to close the transactions. Indeed, under the terms of the ESL Sale, ESL's maximum liability as a result of the termination of the APA by the Debtors because of ESL's conduct, ***even in cases of willful and material breach***, is the loss of the Deposit.  *See id.* § 12.2.

133.    In other words, given its significant conditionality, ESL could unilaterally decide to terminate the APA, collect its $120 million deposit and leave the Debtors holding the bag for the substantial administrative liabilities they continue to accrue in a sale process being conducted at ESL's request and for its benefit.

134.    Given the infirmities described above, the ESL Sale fails to achieve the highest

and best option for the Debtors' estates.

## III.    THE ESL SALE IMPERMISSIBLY PERMITS ESL TO CREDIT BID AND GRANTS ESL A RELEASE FOR INADEQUATE CONSIDERATION

135.    As explained in detail in the Standing Motion and Proposed Complaint and

summarized herein, Sears's downfall was precipitated, in large part, by years of self-dealing,

breaches of fiduciary duties, abuses of control and undue influence by the hopelessly conflicted

Lampert and ESL.  ESL and Lampert managed Sears as if it were a private portfolio company

that existed solely to provide the greatest returns on their investments, recklessly disregarding the

damage to Sears, its employees, and its creditors.  They have diverted Sears's assets for their

own benefit (and with no benefit to Sears) at a time when Sears was insolvent and saddled Sears

with purported "debt" obligations that would never—and could never—be paid back.  ESL is

now attempting to use this "debt" as currency to buy Sears's valuable assets.

136.    In connection with the ESL Sale, the Debtors agreed to permit ESL to credit bid

$1.3 billion in allegedly secured claims (the "Credit Bid Claims") and otherwise allow all of the

ESL Claims even though such claims are disputed.  To facilitate this credit bid, the APA

provides ESL and related entities with a powerful and extremely valuable release, which is

premised upon the waiver of viable and valuable causes of action and remedies that is far broader

than is necessary to effectuate the credit bid contemplated by the ESL Sale.  As set forth in detail

in the Standing Motion and Proposed Complaint, the Creditors' Committee has gathered

substantial factual support for causes of action that, if litigated, have the potential to return

hundreds of millions in value to the Debtors' estates through the recharacterization, equitable

subordination and/or disallowance of the ESL Claims as a remedy for years of wrongdoing

perpetrated by Lampert and ESL against the Debtors and their stakeholders—and yet the

77

Debtors' propose to release and neutralize any such actions and allow all of the ESL Claims[47] for

only the $35 million in Release Consideration and "other good and valuable consideration

provided to the Debtors and their estates by ESL in connection with the Transactions."  APA

§ 9.13(a); *see also* Proposed Sale Order ¶¶ 7(a)-(d).  The "other good and valuable

consideration" is worthless as it is unidentified, unvalued or otherwise would have been paid in

connection with Sears's wind-down.[48]

137.    By accepting the ESL Bid to acquire Sears, made in large part through a credit bid

of hotly disputed claims, the Debtors—led by Board members who were handpicked by and

beholden to Lampert and ESL—have capitulated to Lampert's and ESL's efforts to control the

---

[47] Section 9.13 of the APA provides, in relevant part:

   (b) Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease
   Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term
   Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C
   Facility (together with the any security interests securing any of the Claims described in the preceding sub-
   clauses (c)(i)-(vi), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the
   Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the
   credit bid set forth in Section 3.1(b).

   (c) After giving effect to the credit bid set forth in <u>Section 3.1(b)</u>, ESL shall be entitled to assert any deficiency
   Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that
   it may have against the Debtors and their estates in the Chapter 11 Cases, provided that (i) no Claims or causes
   of action of ESL shall have recourse to, or any other right of recovery from, any Claims or causes of action of
   the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information
   Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth
   Properties, L.P., the "Transaction" (as that term is defined in the registration statement on Form S- 11 filed by
   Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause
   of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing, (ii) any ESL
   Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than
   $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the
   Claims and causes of action described in the preceding clause (c)(i); provided that, in the event that, in the
   absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in
   distributions in respect of such ESL Claims in excess of $50 million, the right to receive such distributions in
   excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general
   unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i), and (iii)
   notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it
   shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL
   Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

APA § 9.13(b), (c).

[48] Moreover, to the extent it purports to include the "assumption" of liabilities, such value is illusory given that the
only remedy provided by the APA and Sale Order is a general unsecured claim by the applicable Debtor against a
shell entity (Buyer).  *See supra* Objection, Part II.B.

remaining assets of Sears and deprive these estates and their unsecured creditors of any chance

of a recovery on account of colorable and very valuable causes of action against Lampert and

ESL.  As explained below, the Debtors' acceptance of only $35 million for the release of these

valuable causes of action cannot possibly be the product of good business judgment, much less

survive the heightened scrutiny that necessarily applies to a release of causes of action against

the Debtors' insiders.  The credit bid is further fundamentally flawed because it is being used to

acquire assets that are not collateral for the Credit Bid Claims.

**A.    The ESL Claims Are Disputed Claims and Cannot Be Allowed for Credit Bidding
Purposes or Otherwise**

138.    As set forth in the Standing Motion, Proposed Complaint and the ESL Claims

Objection, the Creditors' Committee has identified facts to support causes of action against

Lampert and ESL and bases to object to the ESL Claims that are not only colorable, but also

extremely valuable, even after accounting for litigation cost, risk and delay.  These causes of

action are founded in recharacterization, equitable subordination and fraudulent conveyance.

Allowing the ESL Claims, including the Credit Bid Claims, in connection with the credit bid for

the Acquired Assets is inconsistent with applicable law.

139.    Bankruptcy Code section 363 permits the holder of an ***allowed*** secured claim to

credit bid the amount of such claim when the underlying collateral is sold outside the ordinary

course of business.  Specifically, section 363(k) provides:

> At a sale under subsection (b) of this section of property that is
> subject to a lien that secures an ***allowed*** claim, ***unless the court for
> cause orders otherwise*** the holder of such claim may bid at such
> sale, and, if the holder of such claim purchases such property, such
> holder may offset such claim against the purchase price of such
> property.

11 U.S.C. § 363(k) (emphasis added).  The decision of whether to allow or deny (for cause) a

credit bid is within the discretion of the bankruptcy court, and the court has the flexibility to

fashion an appropriate remedy on a case-by-case basis. *In re Aeropostale, Inc.*, 555 B.R. 369, 415 (Bankr. S.D.N.Y. 2016) ("The term 'cause' is not defined by the Bankruptcy Code, and it is left to the court to determine whether cause exists on a case-by-case basis."); *In re RML Development, Inc.*, 528 B.R. 150, 155 (Bankr. W.D. Tenn. 2014) ("Because the Code provides no definition of what constitutes 'cause' . . . , courts must determine whether discretionary relief is appropriate on a case-by-case basis.") (internal citations omitted).

140.    Numerous courts have found that a genuine dispute as to the validity of a creditor's underlying claim constitutes sufficient "cause" under Bankruptcy Code section 363(k) to abrogate or limit a creditor's right to credit bid. *See, e.g.*, *In re CS Mining, LLC,* 574 B.R. 259, 285 (Bankr. D. Utah 2017) (denying creditor's right to credit bid where its claim was subject to pending objection and adversary proceeding); *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) (finding cause existed to cap credit bid at fraction of amount proposed by creditor due to dispute as to amount of creditor's secured claim); *RML*, 528 B.R. at 156 (prohibiting creditor from credit bidding portion of its claim that was subject to pending objection); *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (finding cause to deny credit bid due to dispute over validity of creditor's claim and lien as a result of pending adversary proceeding to avoid lien as preference and for equitable subordination of claim); *see also Aeropostale*, 555 B.R. at 415 (denying debtors' motion to bar creditor from bidding its claim but acknowledging that dispute over validity of a creditor's lien may constitute cause to limit credit bid).

141.    Here, the ESL Claims (including the Credit Bid Claims) are subject to the pending ESL Claims Objection, Standing Motion and Proposed Complaint, pursuant to which the Creditors' Committee seeks to disallow, recharacterize and/or equitably subordinate such claims.

80

The Credit Bid Claims are squarely in dispute and, as such, cannot support a credit bid pursuant

to section 363(k), regardless of the Debtors' efforts to contract around the requirements of the

Bankruptcy Code.  *See, e.g, In re CS Mining*, 574 B.R. at 285 (denying a settlement agreement

that permitted credit bidding in part because the credit bid was impermissible under section

363(k) due to a pending dispute over the claims).

142.    Until the ESL Claims Objection, Standing Motion and Proposed Complaint are

heard and resolved, the Credit Bid Claims are not allowed claims and should not be credit bid.

*See* 11 U.S.C. § 502(b) (requiring, if a claim objection is made, that "the court, ***after notice and***

***a hearing***, ***shall*** determine the amount of such claim . . . and shall allow such claim . . .")

(emphasis added).  The estates' valuable causes of action include the following.

### 1.    The 2016-2018 ESL Contributions Should Be Recharacterized as Equity

143.    A debt recharacterization claim against ESL finds strong support in the facts.  As

set forth in detail in the Proposed Complaint, the Creditors' Committee's Investigation has

identified numerous facts demonstrating that Lampert, ESL and the Debtors had a clear intent,

expectation and understanding that the 2016-2018 ESL Contributions were capital contributions

and not debt transactions.  For the following reasons, that clear intent compels recharacterization

of the 2016-2018 ESL Contributions as equity.  *See In re Lyondell Chem. Co.*, 544 B.R. 75, 101

(Bankr. S.D.N.Y. 2016) (noting that when determining whether to recharacterize a purported

debt investment as equity, the "overarching inquiry" is "to discern the intent of the parties").

144.    ***First***, the 2016-2018 ESL Contributions were part of Lampert's and ESL's insider

scheme to purchase Sears's remaining capital assets at a discount for Lampert's and ESL's own

benefit, to the substantial detriment of Sears and its creditors.  Lampert and ESL stood on both

sides of each of the 2016-2018 ESL Contributions, exercising control both as lender and

borrower (as Sears's CEO, Chairman of the Board and controlling shareholder).  During the

period from 2016 to 2018, Sears's financial performance declined continually, and Sears became completely reliant upon ESL to fund its operations.  In fact, receiving contributions from ESL was the Company's preferred method of funding because it was able to get the necessary money without dealing with third party financing sources.  ESL's capital contributions to an entity it controlled were the classic, "paradigmatic" example of a recharacterization case.  *See In re BH S&B Holdings LLC*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) (observing that the "paradigmatic recharacterization case involves a situation where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims") (internal quotations omitted).

145.    Moreover, because the 2016-2018 ESL Contributions were not arm's-length transactions with third parties, they did not reflect financing terms that could have been obtained from outside lending institutions.  Indeed, Sears sought capital from ESL because the terms it could offer were "not acceptable" to outside lenders.  That no reasonable outside lender would offer to lend money to the Debtors on similar terms supports recharacterization.  *See In re AutoStyle Plastics*, 238 B.R. 346, 350 (Bankr. W.D. Mich. 1999) (citing *In re Cold Harbor Assocs. L.P.*, 204 B.R. 904, 918 (Bankr. E.D. Va. 1997) (evidence that "a reasonable outside creditor would [not] have made a loan to the debtor on similar terms" weighs in favor of recharacterization)); s*ee also BH S&B Holdings*, 420 B.R. at 158 (explaining that this factor looks at whether "a reasonable creditor would have acted in the same manner") (citation omitted).

146.    Meanwhile, Lampert and ESL—insiders with control over Sears—were fully aware of Sears's declining performance and these inevitable Chapter 11 Cases.  ESL used

Sears's dependence on ESL to encumber Sears's most valuable remaining unencumbered assets. The 2016-2018 ESL Contributions amounted to an attempt by ESL to unfairly leverage its insider status to effectively purchase Sears's capital assets in anticipation of these Chapter 11 Cases and ultimately by use of a credit bid to purchase substantially all of the Debtors' assets. These facts demonstrate that the 2016-2018 ESL Contributions are "paradigmatic example[s]" of equity contributions by self-dealing insiders who did not intend to be repaid along with other creditors. *See BH S&B Holdings*, 420 B.R. at 157.

147.    ***Second***, neither Sears nor ESL intended or expected that Sears would repay the 2016-2018 ESL Contributions on any schedule, a critical characteristic of a true debt transaction. When they entered into the 2016-2018 ESL Contributions, the Debtors were not adequately capitalized, being just a shadow of what they once were after Lampert and ESL robbed them of value through the years-long asset-stripping scheme.  Sears never had any hope of repaying the purported debt.  As explained in the Proposed Complaint, directors of Holdings and Lampert himself were aware of analyses that showed continuous year-over-year declines in Sears's operating metrics (on a consolidated basis).  Likewise, the Board was aware of the continual need—beginning in at least 2016—for Sears to obtain funds from ESL to avoid an imminent chapter 11 filing, notwithstanding ever-declining cash flows.  Such "[t]hin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."  *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 751 (6th Cir. 2001); *see also Lyondell*, 544 B.R. at 97 (inadequate capitalization factor satisfied where the plaintiff alleged that, at the time of the purported loans, the debtors "were overleveraged, had grossly insufficient liquidity, and were severely undercapitalized").

148.    Lampert and ESL correspondingly knew that Sears could repay the 2016-2018 ESL Contributions only if Sears's performance improved dramatically.  Lampert and ESL also knew, given their long-term relationship with and control over Sears, that there was no realistic expectation for such a turnaround.  Lampert's and ESL's expectations and intent were that Sears could not repay the 2016-2018 ESL Contributions and that ESL would instead receive options on the collateral securing the 2016-2018 ESL Contributions that could be called upon through a credit bid.  These facts further support recharacterization of the 2016-2018 ESL Contributions.  *See AutoStyle*, 269 F.3d at 751 ("If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.").  To prevail on a recharacterization claim, a plaintiff need not establish that repayment is "solely dependent on the success of borrower's business."  *Lyondell*, 544 B.R. at 96.  Indeed, so long as the parties expected that the source of repayment would be the debtor's future earnings, this factor is satisfied notwithstanding any security interest associated with the purported debt, including a lien on all of the debtor's assets.  *See, e.g.*, *AutoStyle*, 269 F.3d at 751 (holding that because source of repayment of the purported loan was borrower's earnings, this factor weighed in favor of recharacterization, notwithstanding that the purported loan was secured by a lien on all of borrower's assets); *BH S&B Holdings*, 420 B.R. at 159 (finding source of repayment factor satisfied where complaint pled that repayment would be from the debtor's earnings despite lender's argument that, because loan was secured by all of debtor's assets, repayment was not contingent on success of the business); *Lyondell*, 544 B.R. at 96-97 (finding factor satisfied where plaintiff alleged that debtor was overleveraged and insolvent at time of loan, lenders were aware of liquidity issues and that assets were already pledged to secured creditors, and that lenders could not expect their unsecured claims to repaid except by means of future profit).

84

149.     Moreover, the fraudulent financial projections that Lampert and ESL required

Sears's management to adopt for Sears's Annual Plan underscore Lampert's and ESL's

knowledge of Sears's inability to repay the 2016-2018 ESL Contributions absent a massive and

implausible turnaround in the Company's performance.

150.     **Third**, ESL provided the 2016-2018 ESL Contributions to buy time to acquire

Sears's other assets for Lampert's and ESL's own benefit.  ESL never intended to be repaid on a

schedule characteristic of debt but rather to improve its equity positions and control over Sears's

capital assets.  For example, prior to these Chapter 11 Cases, ESL indicated interest in

purchasing for itself certain business lines of Sears Home Services, as well as the Kenmore

brand.

151.     **Fourth**, ESL provided the 2016-2018 ESL Contributions to play out its options

on Sears without any apparent downside.  By infusing capital into Sears, ESL potentially stood

to gain from a rising stock price at Sears.  And if Sears continued to fail, ESL's investments were

protected by collateral that would not be available to satisfy the claims of other creditors.  Like

the capital contributions of an investor who expects returns based only on the investment's

fortunes (unlike on interest according to a regular schedule), these options bear the hallmarks of

equity.  *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 455-56 (3d Cir. 2006) (noting that when

"funds infused are repaid based on the borrower's fortunes . . . they are equity").

152.     **Fifth**, ESL provided the 2016-2018 ESL Contributions with the intent and

purpose to protect its investments in non-Debtor entities that depended on Sears remaining, at

least for a time, outside of bankruptcy—including Seritage.  After the Seritage Transaction,

Seritage and its former Sears properties had become a key part of ESL's portfolio.  For years

after Seritage's formation, however, it relied heavily on Sears for rental income to fund its

recapture and redevelopment of Sears stores for more profitable uses.  Because the financial

health of Sears was of such concern to Seritage, Lampert and ESL had Seritage spend significant

time, money and effort monitoring Sears (including by hiring financial advisors) and keeping

Sears out of bankruptcy proceedings.

153.    On information and belief, ESL similarly intended for the 2016-2018 ESL

Contributions to protect its equity positions in other non-Debtor investments that depended on

Sears remaining outside of bankruptcy, including in Lands' End (which maintains numerous

Lands' End Shops at Sears) and other business units that had been spun off for ESL's benefit.

154.    Granted, the documentation of the 2016-2018 ESL Contributions *looks* like that

of debt transactions, but that is only because Lampert and ESL put in significant effort to try to

disguise their equity contributions.  As the facts alleged above indicate, the specific

circumstances underlying these Chapter 11 Cases—namely, Lampert's and ESL's years-long

abuse of their insider positions at Sears to rob it and its legitimate creditors of value and

maximize their own equity investments in Sears and Sears-related businesses—show that both

ESL and Sears intended for and understood that the 2016-2018 ESL Contributions were, in truth,

capital infusions into a company controlled by the lender.  The 2016-2018 ESL Contributions

never were debt and should be recharacterized as equity.

## 2.    ESL's Claims are Subject to Equitable Subordination

155.    The facts developed through the Creditors' Committee's Investigation are equally

supportive of an equitable subordination claim.  The purpose of equitable subordination is "to

undo wrongdoing by an individual creditor in the interest of the other creditors."  *In re*

*AppliedTheory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007); 11

U.S.C. § 510(c)(1).  Recognizing that insider transactions merit rigorous scrutiny, courts have

held that the threshold for inequitable conduct of an insider is satisfied by "virtually any conduct

86

by which an insider gains an advantage over creditors." *In re Hoffman Assocs.*, 194 B.R. 943,

965 (Bankr. D.S.C. 1995).

156.    The facts both above and in the Proposed Complaint paint a clear and factually

supported picture of how Lampert and ESL abused insider status and positions of trust with

Sears to strip away assets for their own benefit, to the substantial detriment of Sears and its

stakeholders.   Indeed, Lampert, as CEO and Chairman of the Board, and ESL, as controlling

shareholder (with Lampert), breached fiduciary duties to Sears and engaged in a pattern of unfair

conduct since the mid-2000s that unjustly enriched Lampert and ESL.   This pattern of unfair

conduct and breaches of fiduciary duties is characterized by, among other things:

- Lampert and ESL abusing their control over Sears to extract cash through
  unreasonable stock repurchases.   From 2005 to 2008, Lampert and ESL caused
  Sears to spend over $6 billion—the majority of its cash—on stock repurchases in
  order to enrich themselves on fees earned from ESL's investors while Sears fell
  into disrepair as Lampert and ESL slashed corporate reinvestment by half.

- Lampert and ESL crafting unsupportable, downright fraudulent financial
  projections that bore no relation to reality and grossly misrepresented Sears's
  performance, underscoring their knowledge of, and efforts to hide, Sears's
  insolvency and inevitable bankruptcy.   For 2010-2017, Sears missed the
  Lampert/ESL-set revenue target every year by an average of more than $4 billion
  per year (a 13 percent miss from projections), and missed the EBITDAP target
  every year by an average of nearly $1.4 billion per year (a 172 percent miss from
  projections).

- Requiring Sears's management to adopt Lampert's and ESL's manufactured
  projections to further their asset-stripping scheme, including by, among other
  things, requiring that management use those projections to produce false solvency
  reports and conceal Sears's actual performance.   Specifically, the Seritage
  Transaction, the Lands' End spin-off and the 2016-2018 ESL Contributions were
  made possible by Lampert's and ESL's misleading projections (which were fed to
  advisors who based solvency and fairness opinions on them).

- Recognizing the declining prospects of the Sears enterprise, Lampert and ESL
  abusing their control over Sears to extract the most valuable assets of Sears
  through a series of asset spin-offs and rights offerings as Sears continued to
  decline toward bankruptcy in an attempt to shield the value of such assets from
  Sears's creditors.

- Through the Seritage Transaction, Lampert and ESL orchestrating transfers of some of Sears's most valuable real estate assets to new and separate entities over which ESL (and Lampert) retained significant ownership and control, all in order to shield such assets from the claims of Sears's other creditors.

- Lampert and ESL engaging in inequitable conduct by taking advantage of insider control on both sides of the Seritage Transaction in order to achieve a result that could not be negotiated at arm's-length.  In particular, after completion of the Seritage Transaction, Lampert and ESL directly benefited by (i) receiving at least $76 million in dividends as a Seritage shareholder, (ii) enjoying an equity stake in Seritage that had grown within one year to be worth approximately $1.25 billion (compared to the $750 million ESL originally paid for such stake), and (iii) exiting nearly at par from $165 million of second lien notes, even when doing so clearly was contrary to Sears's best interests and ongoing need for liquidity.

- ESL intentionally keeping Sears out of bankruptcy through a series of improper financing transactions, including the 2016-2018 ESL Contributions, and its extensive use of commercial paper, in order to mask Sears's insolvency and delay its inevitable demise; buy time to siphon off Sears's cash flows; and cordon off valuable assets, including real estate, as collateral for Lampert's and ESL's benefit; hinder, delay, or defraud other creditors' recoveries; and preserve the value of Seritage until it could wean itself off of Sears for the benefit of ESL—Seritage's controlling shareholder.

157.    Further, Lampert and ESL used and controlled the Debtors as an alter ego for their own benefit.  For example, the Proposed Complaint details that:

- Lampert and ESL caused Sears to form Seritage and enter into the Seritage Transaction to maximize ESL's investment in Seritage, despite the blatant unfairness of the Seritage Transaction to Sears and its creditors.  Lampert used Sears as an alter ego to enter into this insider, below-market transaction for ESL's benefit.

- Lampert and ESL caused Sears to enter into secured "loan" transactions with ESL, including the 2016-2018 ESL Contributions, at a time when Sears was insolvent in order to prop up Sears, lien up its remaining prized assets, and provide the greatest returns on ESL's investments.

158.    While equitable subordination sometimes is described as an "extraordinary remedy," this is an extraordinary case where equitable subordination is necessary to achieve justice.  Lampert and ESL's conduct leading to Sears's downfall is grossly inequitable and certainly justifies equitable subordination.  Courts have found inequitable conduct sufficient to

justify equitably subordinating claims under similar (even less egregious) facts.  *See, e.g.*, *N.J. Steel Corp. v. Bank of N.Y.*, No. 95 CIV 3071 (KMW), 1997 WL 716911, at *5 (S.D.N.Y. Nov. 17, 1997) (holding that allegations that, *inter alia*, a creditor and insider of the debtor conducted a dubious lease-back deal with the debtor constituted inequitable conduct sufficient to state a claim for equitable subordination); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412-13 (3d Cir. 2009) (equitably subordinating claims of an insider creditor who propped-up debtor to inflate its own revenue stream and caused the debtor to purchase hundreds of millions of dollars of unneeded equipment from creditor); *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1468 (5th Cir. 1991) (affirming bankruptcy court's decision to equitably subordinate insider creditor's claims where obtaining liens on debtor's assets was not an isolated act, but rather "one step interconnected with a series of actions . . . to gain an advantage over the position of other creditors"); *Goode v. Hagerty (In re Sys. Impact, Inc.)*, 229 B.R. 363 (Bankr. E.D. Va. 1998) (equitably subordinating claims of individual directors to those of debtor's other creditors where directors had elevated the status of their own claims above those of non-insider creditors,); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 744-46 (Bankr. D. Del. 2003) (denying motion to dismiss claim for equitable subordination based on allegations that insider used its position and leverage to obtain collateral and security from debtor when debtor's economic position was deteriorating rapidly); *Hoffman Assocs.*, 194 B.R. at 963-65  (equitably subordinating creditor's claims whose owner, in his role as the sole director of the debtor, caused the debtor to grant the creditor liens on substantially all of the debtor's assets and paid the debtor's expenses with loans from the creditor).  Since taking control of Sears in 2005, Lampert and ESL have leveraged their insider status to give their claims an unfair advantage over those of other creditors.  They

89

successfully stripped Sears of some of its most valuable assets, and then fully aware that

bankruptcy proceedings were inevitable, acted to wall off other creditors from the remaining

valuable assets of Sears.  In short, the facts demonstrate a clear pattern of inequitable conduct by

ESL that requires equitable subordination of its purported debt to the claims of the unsecured

creditors.

> **3.** **ESL's Claims Are Subject to Disallowance Under Bankruptcy Code Section 502(d)**

159.    Because ESL is the transferee or beneficiary of avoidable fraudulent transfers—

namely, the Seritage Transaction, the Lands' End spin-off, and the 2016-2018 ESL

Contributions—all of its claims against the Debtors' estates must be disallowed unless and until

ESL returns the property or the value of the property it received from such transfers.

160.    Bankruptcy Code section 502(d) provides that a court *shall* disallow "any claim

of any entity . . . that is a transferee" of an avoidable transfer "under section[s] 522(f), 522(h),

544, 545, 547, 548, 549 or 724(a) . . . unless such entity or transferee has paid the amount, or

turned over any such property, for which such entity or transferee is liable under section . . . 550 .

. . of this title."  11 U.S.C. § 502(d).[49]  "The legislative history and policy behind Section 502(d)

illustrates that the section is intended to have the coercive effect of insuring compliance with

judicial orders."  *Campbell v. United States (In re Davis)*, 889 F.2d 658, 661 (5th Cir. 1989).

Indeed, as this Court has held, section 502(d) requires the court to disallow *any and all* claims of

a liable entity, including transfer beneficiaries, irrespective of whether those claims arise from

the avoidable transaction.  *Geltzer v. Mooney, et al. (In re MacMenamin's Grill Ltd.)*, 450 B.R.

414, 429 (Bankr. S.D.N.Y. 2011) (Drain, J.) (observing that section 502(d) "provides for the

---

[49] Through its reference to entities found liable under Bankruptcy Code section 550, section 502(d) applies not only to initial transferees of avoidable property, but also to subsequent transferees of such property and "entities for whose benefit a transfer was made."  11 U.S.C. § 550(a).

disallowance of 'any claim' of an entity from which property is recoverable under section 550 or that is a transferee of an avoidable transfer, regardless whether the claim is related to the transfer"). Moreover, this Court has also recognized that section 502(d) "does not even necessarily require the entry of a judgment, let alone the failure to enforce one, for a claim to be disallowed." *In re Red Dot Scenic, Inc.*, 313 B.R. 181, 186 (Bankr. S.D.N.Y. 2004) (Drain, J.).

161. Here, the facts ***overwhelmingly*** support causes of action against ESL that justify disallowance of the ESL Claims pursuant to Bankruptcy Code section 502(d).

162. ***First***, the Seritage Transaction is voidable both as an actual and a constructive fraudulent transfer under Bankruptcy Code section 544 and applicable state law, and the value of the properties transferred in the Seritage Transaction is recoverable from Lampert and ESL as entities for whose benefit the transfer was made under Bankruptcy Code section 550.

163. The facts show that Sears, under the control of Lampert and ESL—who exercised undue influence over and controlled Sears in their roles as insiders—did not act in good faith in connection with the Seritage Transaction and, instead, acted with actual intent to hinder, delay or defraud creditors. Specifically, the following facts constitute "badges of fraud" sufficient to find actual intent to support an actual fraudulent transfer claim with respect to Seritage:

- Sears did not receive reasonably equivalent value for the properties transferred. The valuation methodology utilized by Cushman & Wakefield was transparently flawed in several ways, including that it assumed Sears would remain a permanent tenant paying a discounted rate indefinitely even though the premise of the transaction was that Seritage would recapture space and release it at higher rents, and thus was specifically designed to lead to artificially low property appraisals. These below-market property appraisals dictated the $2.7 billion consideration paid to Sears in connection with the Seritage Transaction, thereby resulting in Sears receiving less than reasonably equivalent value for the transferred assets. The market's reaction to the Seritage Transaction—both before it was closed via high trading prices of rights to purchase class A common stock as well as after it closed—also demonstrate the lack of reasonably equivalent value received by Sears.

- Lampert and ESL knew or reasonably should have known that Sears did not receive reasonably equivalent value, especially given their knowledge of the trading prices of the rights to purchase class A common shares of Seritage implying significantly higher valuation by the market than reflected in the $2.7 billion purchase price. In fact, Sears's CFO specifically observed in an email to top management just weeks before the Seritage Transaction closed that "the market thinks [Sears] is selling something for about $600M less than it is worth."

- There was no marketing process or efforts to determine what a third-party would pay for the assets in an arm's-length transaction.

- Sears was insolvent at the time of the Seritage Transaction—a fact that Lampert and ESL knew or reasonably should have known.

- The Seritage Transaction was a questionable transfer not made in the usual course of business. Sears's own advisors described the terms of the Seritage Transaction and resulting Master Leases as "unique" and "unusual" in how such terms favored Seritage's right to recapture and redevelop properties.

- Lampert and ESL stood on both sides of the Seritage Transaction as insiders of both Sears and Seritage with close relationships with, and unchecked control of, both Sears (through Lampert as its controlling shareholder, Chairman of the Board, and CEO) and Seritage (through Lampert as its Chairman of the Board of trustees and controlling shareholder). The Board and the RPT Subcommittee did not serve as adequate checks on Lampert's and ESL's self-dealing, and simply rubber-stamped the Seritage Transaction.

- Sears's financial condition both before and after the Seritage Transaction—that of hopeless insolvency, as demonstrated by proper discounted cash flow analysis, comparable companies analysis and liquidation analysis—underscores Lampert's and ESL's intent to take real estate assets from Sears and attempt to shield their value from Sears's real creditors in inevitable bankruptcy proceedings.

- The Seritage Transaction is part of a cumulative effect of a pattern or series of transactions after the incurrence of debt and onset of financial difficulties at Sears that includes other Lampert/ESL-driven asset spin-offs (including the Lands' End and other spin-offs) and financing transactions (including the 2016-2018 ESL Contributions), all of which inured to Lampert's and ESL's direct benefit.

- The general chronology of the Seritage Transaction in the context of Sears's insolvency and inevitable bankruptcy proceedings indicates Lampert and ESL exercising undue influence over and control of Sears in their roles as insiders with an actual intent to hinder, delay or defraud creditors.

- The haste and unusualness of the Seritage Transaction, including the flawed methods by which the properties were appraised, the RPT Subcommittee's failure to hire independent appraisers, the unreasonable reliance by the advisors on

92

Lampert's and ESL's fraudulent projections and the lack of third-party marketing, also evidence Lampert's and ESL's actual intent to hinder, delay or defraud creditors.

164.    These same facts show that the Seritage Transaction also is voidable as a constructive fraudulent transfer because the Debtors did not receive reasonably equivalent value in the Seritage Transaction and that the Debtors were insolvent at the time of the Seritage Transaction.

165.    **Second**, the Lands' End spin-off is voidable as an actual and constructive fraudulent transfer under Bankruptcy Code section 544 and applicable state law, and the value of the property transferred in the Lands' End spin-off is recoverable from Lampert and ESL as entities for whose benefit the transfer was made under Bankruptcy Code section 550 under section 550 of the Bankruptcy Code

166.    The facts show that the Lands' End spin-off was engineered by Lampert and ESL, who exercised undue influence over and controlled Sears in their roles as insiders, did not act in good faith, and had an actual intent to hinder, delay or defraud the Debtors' creditors. Specifically, the following facts constitute "badges of fraud" sufficient to find actual intent:

- Sears did not receive reasonably equivalent value for the assets transferred through the Lands' End spin-off.  Available indicia show that the $500 million cash dividend paid to Sears in connection with the Lands' End spin-off was between $900 million and $1 billion below reasonably equivalent value. Moreover, Sears had received an indication of interest from a third party to acquire Lands' End that used an enterprise valuation of $1.6 billion to $1.8 billion only months before the Lands' End spin-off was completed—also indicating that the dividend was between $1.1 billion and $1.3 billion shy of reasonably equivalent value to Sears.

- Sears was insolvent at the time of the Lands' End spin-off—a fact that Lampert and ESL knew or should have known.  Among other indicia, proper analysis based on reasonable projections informed by Sears's actual historical performance over the five years prior to the Lands' End spin-off show that the spin-off rendered Sears insolvent due to inadequate capital and failure to pay debts when they came due (if it was not already insolvent before).

93

- The Lands' End spin-off was a questionable transfer not made in the usual course of business. Sears's own Board considered the many negative implications of the Lands' End spin-off on Sears and were aware that Lands' End was one of the few profitable segments of Sears and its removal from the Sears enterprise would have a negative effect on Sears and its creditors.

- Lampert and ESL stood on both sides of the Lands' End spin-off and again, the Board did not serve as an adequate check on Lampert's and ESL's self-dealing, and simply rubber-stamped the Lands' End spin-off.

- Sears's financial condition both before and after the Lands' End spin-off—that of insolvency, years of consistently operating at a loss, and consistently negative EBITDAP following the Lands' End spin-off—underscores Lampert's and ESL's intent to strip the valuable Lands' End business from Sears and attempt to shield its value from Sears's real creditors in inevitable bankruptcy proceedings.

- Like Seritage, the Lands' End spin-off is part of a cumulative effect of a pattern or series of transactions after the incurrence of debt and onset of financial difficulties at Sears that includes other Lampert/ESL-driven asset spin-offs, the Seritage Transaction, and financing transactions (including the 2016-2018 ESL Contributions), all of which inured to Lampert's and ESL's direct benefit.

- The general chronology of the Lands' End spin-off in the context of Sears's insolvency and inevitable bankruptcy proceedings indicates Lampert and ESL exercising undue influence over and control of Sears in their roles as insiders with an actual intent to hinder, delay or defraud creditors.

- The haste and unusualness of the Lands' End spin-off, including the flawed methods by which the properties were appraised, the unreasonable reliance by advisors on Lampert's and ESL's fraudulent projections, and the lack of third-party marketing, also evidence Lampert's and ESL's intent to hinder, delay or defraud creditors.

167. Likewise, these same facts show that the Lands' End spin-off is voidable as a constructive fraudulent transfer because the Debtors did not receive reasonably equivalent value and they were rendered insolvent by the spin-off (if not already insolvent at the time).

168. *Third*, each of the 2016-2018 ESL Contributions is voidable as an actual fraudulent transfer and the IP/Ground Lease Term Loan Facility also is voidable as a constructive fraudulent transfer under Bankruptcy Code sections 544 and 548 and applicable state law, and the value of the property transferred in the 2016-2018 ESL Contributions is

recoverable from Lampert and ESL as entities for whose benefit such transfers were made under Bankruptcy Code section 550.

169.    As demonstrated above and in the Proposed Complaint, the facts show that each of the 2016-2018 ESL Contributions was made or directed by Lampert and/or ESL, who exercised undue influence over and control of Sears in their roles as insiders, causing the Debtors to enter into each of the 2016-2018 ESL Contributions with an actual intent to hinder, delay, or defraud creditors.

170.    Lampert and/or ESL's actual intent to hinder, delay, or defraud creditors is demonstrated by, among other things, the following facts and "badges of fraud":

- Each of the 2016-2018 ESL Contributions was an insider transaction. Lampert and ESL stood on both sides of each financing transaction—on the one side as a lender and on the other as a controlling shareholder. Through Lampert's role as Chairman of the Board and as Sears's CEO, he was able to exercise a high degree of control over the Company. As usual, the Board and the RPT Subcommittee failed to serve as effective controls on Lampert and ESL's self-dealing, and again rubber-stamped each subject transaction.

- Each of the 2016-2018 ESL Contributions was made at a time when Sears was insolvent—a fact that Lampert and ESL knew or should have known.

- Reasonably equivalent value was not given to each of Sears Brands Business Unit Corporation, Sears Brands, L.L.C., Sears Development Co. and STI Merchandising, Inc. (the "Additional Subsidiaries") for the grants, pledges or guarantees they made in connection with certain of the 2016-2018 ESL Contributions, including the IP/Ground Lease Term Loan Facility.

- Sears's financial condition both before and after each of the 2016-2018 ESL Contributions—that of hopeless insolvency—underscores Lampert's and ESL's intent to encumber valuable remaining unencumbered assets and attempt to deprive other creditors of recoveries in these inevitable bankruptcy cases.

- Lampert and ESL crafted unsupportable and downright fraudulent financial projections that bore no relation to reality and grossly misrepresented Sears's performance, which underscored Lampert's and ESL's knowledge of—and efforts to disguise—Sears's insolvency and inevitable bankruptcy.

- Lampert and ESL required management to adopt their manufactured projections to further their scheme, including by, among other things, requiring that Sears's

95

management use those projections to produce false solvency reports and conceal Sears's actual performance to support the 2016-2018 ESL Contributions.

- Each of the 2016-2018 ESL Contributions is part of a cumulative effect of a pattern or series of transactions after the incurrence of debt and onset of financial difficulties at Sears that hastened its demise. This pattern or series includes other Lampert/ESL-driven asset spin-offs (including the Lands' End and others) and the Seritage Transaction, all of which inured to Lampert's and ESL's direct benefit.

- The general chronology of the 2016-2018 ESL Contributions in the context of Sears's years-long insolvency and inevitable bankruptcy proceedings is evidence of Lampert and ESL exercising undue influence over and control of Sears in their roles as insiders with an actual intent to hinder, delay or defraud creditors.

- The haste and unusualness of each of the 2016-2018 ESL Contributions also point to Lampert's and ESL's actual intent to hinder, delay or defraud creditors. For instance, each of the ESL deals was closed hastily and without the same standards of due diligence at Sears when compared to third party financings.[50] Additionally, the RPT Subcommittee did not adequately vet the financings provided by ESL. Nor were the financings market-tested in any real way.[51]

171. Additionally, guarantees and asset grants in connection with IP/Ground Lease Term Loan Facility are voidable as constructive fraudulent transfers because none of the Additional Subsidiaries received any benefit or value in exchange for committing collateral and incurring obligations under the IP/Ground Lease Term Loan Facility. Moreover, each of these Debtor entities was insolvent at the time the IP/Ground Lease Term Loan was created or was rendered insolvent thereby.

172. Because Lampert and ESL were entities for whose benefit each of the foregoing transfers were made and neither has returned to the Debtors' estates the property transferred (or

---

[50] Schriesheim noted in his interview that ESL closed deals on "a more expeditious basis" compared to third parties, and that there were "certain documents that [ESL] wouldn't require or [Lampert] was fine with if they were followed up subsequent to closing, like environmental" even though such documents were typically "a big deal" in real estate transactions.

[51] A representative from the RPT Subcommittee's financial advisor, Centerview, stated in his interview that "we did this on a fairly accelerated timeframe. Typically, it was under some pressure, covenant pressure or liquidity pressure" and that "we knew with ESL . . . we always needed to work very quickly." As an example, he stated that the RPT Subcommittee would "just call up Centerview on a Monday and by the following Friday, had to advise the company as to their views on a transaction."

the value of the property transferred) in the Seritage Transaction, the Lands' End spin-off, or the

2016-2018 ESL Contributions (including the IP/Ground Lease Term Loan Facility), any and all

claims of ESL, and/or its assignees, against the Debtors' estates must be disallowed under

section 502(d) of the Bankruptcy Code until such time as Lampert or ESL returns to the Debtors'

estates the value of the property transferred in those transactions.

173.    Given the genuine and significant disputes concerning the allowance of the ESL

Claims, ESL should not be permitted to credit bid under Bankruptcy Code section 363(k).

**B.    If ESL Is Permitted to Credit Bid, Protections Must Be Put in Place**

174.    For the reasons articulated herein, to the extent the Court allows ESL to credit bid

***any*** of its claims, protections must be put in place to ensure that such credit bid comports with

applicable law and the orders of this Court.  Specifically: (i) ESL should be required to backstop

any credit bid in respect of disputed claims, as previously directed by this Court; (ii) any ESL

credit bid should serve to limit the amount of the ESL Claims that are deemed "allowed"

pursuant to the terms of the APA; and (iii) ESL should be required to confirm the value of the

collateral securing the Credit Bid Claims and provide an allocation of such claims to the specific

assets that secure such claims (and therefore can be acquired pursuant to the credit bid), as

required by the Global Bidding Procedures.  Absent such protections, the Creditors' Committee

respectfully submits that ESL's proposed credit bid must be denied in its entirety.

**1.    ESL Should Be Required to Backstop any Credit Bid**

175.    As discussed *supra* and set forth in the Standing Motion, Proposed Complaint and

ESL Claims Objection, there is substantial doubt regarding the validity of the ESL Claims and

ESL's potential liability to the estates.  Accordingly, if ESL is permitted to credit bid the Credit

Bid Claims, the only measure that would provide sufficient protection to the estates that a proper

remedy will be available following successful prosecution of the causes of action discussed

herein is an order requiring ESL to backstop its credit bid with cash or an irrevocable letter of credit from a third party bank in the full amount of the credit bid.  Such security could be held in escrow pending complete resolution of the ESL Claims Objection and the Standing Motion (and any potential adversary proceeding arising therefrom).  If ESL is correct that its hands are clean, it will receive its security back.  If the Creditors' Committee is correct, the estates will have a remedy for Lampert's and ESL's wrongful conduct.

176.    The imposition of this provisional remedy is not new to ESL.  Indeed, this Court advised ESL previously that if it wanted to credit bid despite the existence of colorable claims against it, ESL may be required to provide security to the estates.  *See* Dec. 18 Hr'g. Tr. 21:2-11 ("I mean, I don't want to be cryptic, I mean you want to finesse it is to say [*sic*] that if it turns out later that the claim can't be bid then you back it up with cash, but absent a modification of the bid, this is what needs to be undertaken."); Nov. 15 Hr'g. Tr. 59:21-60:4 ("And you well know that I have more than—many times held that, if there's some legitimate issue, either about what the collateral is that's in the package that's being bid on, or about the claim or the lien, ***I require people who want to credit bid to show that they have the cash to back it up, if it turns out that's a real issue***.") (emphasis added).

177.    Other courts have exercised their equitable powers to place similar conditions on the exercise of a credit bid under similar circumstances.  *See, e.g.*, *RML*, 528 B.R. at 157 (requiring creditor to submit letter of credit, surety bond or other similar instrument in order to proceed with credit bid in light of dispute over validity of creditor's claims); *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (noting that court had previously ordered creditor to post an irrevocable letter of credit from a third party bank in order to proceed with

credit bid in light of chapter 7 trustee's adversary proceeding to avoid lien and claim of creditor as fraudulent conveyance or preference).  The circumstances here warrant such vital protection.

> **2.    If ESL Is Permitted To Credit Bid, ESL's Claims Should Not Be Allowed in Excess of the Amount Permitted To Be Credit Bid**

178.    The Creditors' Committee respectfully submits that there is ample evidence in the record that the causes of action that underlie the Proposed Complaint and the objections to the ESL Claims set forth in the ESL Claims Objection are colorable and highly valuable to the Debtors' estates and the proposed Release Consideration is woefully inadequate.  In the event this Court nevertheless is inclined to permit ESL to credit bid any portion of the Credit Bid Claims, in addition to the other remedies requested herein (such as the provision of cash or a letter of credit to backstop such credit bid), the Creditors' Committee submits that the Court should preserve the Creditors' Committee's ability to dispute the allowance of any of the ESL Claims not used for purposes of the credit bid.

179.    Bankruptcy courts "have broad equitable powers and the ability to invoke equitable principles to achieve fairness and justice in the reorganization process." *LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014).  To that end, pursuant to Bankruptcy Code section 510(c)(1), a bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c); *see also In re Aeropostale, Inc.*, 555 B.R. at 397 (noting same and quoting 11 U.S.C. § 510(c)(1)); *Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC)*, 515 B.R. 117, 157-58 (Bankr. S.D.N.Y. 2014) (same).

180.    In order for the ESL Sale to be consummated, there is no need for the ESL Claims in excess of the Credit Bid Claims to be deemed allowed, as provided in the APA.  *See* APA

§ 9.13 and Ex. G; Proposed Sale Order ¶ 7(b).  Indeed, as the Credit Bid Claims are over 50

percent of the ESL Claims, preserving the Creditors' Committee's ability to challenge the

allowance of the remainder of the ESL Claims would permit the Debtors' estates to have

recourse, albeit a fraction of the full amount of recourse, for Lampert's and ESL's destructive

and self-serving conduct that has imperiled these estates.  As the focus of ESL wanting its claims

allowed always has been for purposes of credit bidding, it should not be permitted to bootstrap

allowance of all of its claims for all purposes in connection with the ESL Sale, particularly not

without the Creditors' Committee having had the opportunity to prosecute its Standing Motion

and the ESL Claims Objection.

### 3.    If Permitted To Credit Bid, ESL Must Allocate Its Credit Bid to the Collateral Securing the Underlying Debt

181.    It is indisputable that a secured creditor only is entitled to credit bid its secured

claims in respect of the collateral that secures such claims and, then, only to the extent of the

creditors' interests in the estate's interests in such collateral.  *RadLAX Gateway Hotel v.*

*Amalgamated Bank*, 132 S.Ct. 2065, 2070 fn. 2 (2012) ("[Credit bidding] enables the creditor to

purchase the collateral for what it considers the fair market price (up to the amount of its security

interest)"); *In re Aeropostale, Inc.*, 555 B.R. at 414 (stating that a credit bid allows a secured

creditor to bid for its collateral) (emphasis added); *In re Free Lance-Star Publishing Co.*, 512

B.R. 798, 805-06 (Bankr. E.D. Va. 2014) (ordering that a credit bid must be limited solely to

those properties in which the secured creditor had a valid and properly perfected lien when

creditor sought to credit bid unencumbered assets).

182.    As such, if any credit bid is permitted here (which it should not be), then it must

be attendant with certain protections, including (i) confirming the value of the collateral securing

the claims to be credit bid and (ii) providing an allocation of the credit bid to the specific assets

that secures the Credit Bid Claims. Specifically, prior to being granted the right to credit bid the

Credit Bid Claims, ESL should be required to demonstrate that the collateral securing such

claims actually is worth the value thereof (*i.e.*, $1.33 billion) or, in the alternative, pay the

estates, for the benefit of their unsecured creditors, the difference between the value that would

be obtained on such claims in connection with a GOB process and the "value" being ascribed to

such claims under the APA.

183.     In addition, the credit bid portion of the purchase price and the assets acquired in

connection therewith must be limited to the collateral securing such claims in accordance with

applicable law. Because the collateral securing the Credit Bid Claims comprises specific assets

and not a blanket lien on all assets, there must be an asset-by-asset breakdown of what ESL is

acquiring under the credit bid portion of the purchase price. Notwithstanding the express

provisions in the Global Bidding Procedures requiring a bidder to allocate its purchase price on

an asset-by-asset basis, *see* Global Bidding Procedures § VI.D(3)(b), the ESL Bid does not

provide for such allocation and ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

184.     Set forth below is the Creditors' Committee's analysis of the ESL Bid and an

attempt to allocate the purchase price (including the credit bid portion thereof) based on, among

other things, the terms of the APA, the Credit Bid Claims, the collateral purportedly securing the

Credit Bid Claims, the terms of the Final DIP Order and applicable law. As set forth below, ESL

effectively is not paying any consideration for a significant portion of the unencumbered assets it

intends to acquire, including unencumbered real estate and Sears's valuable unencumbered

business units, including, among other things, PartsDirect, Innovel, Monark, Sears Home

Services (repair business), Sears Auto Center and SHIP. *See* Jan. 15 Auction Tr. 67:10-16 (P.

Basta) ("The analysis of the subcommittee and its financial advisors is that while ESL is, in fact,

assuming liabilities, ***the unencumbered assets that they are receiving in exchange have a value***

***that is greater than the liabilities that ESL is assuming***.") (emphasis added).

## ESL "Consideration" vs. Assets Taken



185.    The foregoing chart makes clear that ESL is not paying for a substantial portion of

the assets that it is seeking to acquire in connection with the ESL Sale.  As evidenced by the

analyses prepared by the Debtors and the Creditors' Committee, the value of the assets for which

ESL is offering ***no consideration*** (including unencumbered assets and equity value in real estate

for which ESL is credit bidding) range from approximately ███████, on the low end, to

███████, on the high-end.  Specifically, unencumbered real estate ranges in value from

███████████████████ and, in the aggregate, the encumbered real estate has value of ███

███. Credit card tort litigation ranges from ██████████████. Other encumbered

assets, including numerous of the Debtors valuable business lines, range from ██████████ to

██████████. By contrast, the consideration ESL offers in connection with its bid ranges from

██████████, on the low end, to ██████████, on the high end. The high end of this range

assumes the payment of cure costs, as contemplated by the APA, but which payments would not

be made in a wind-down scenario. Accordingly, there is a shortfall in ESL's purchase price in

respect of ██████████████████████, without even accounting for the paltry

consideration of $35 million offered in respect of the Release. Clearly, ESL cannot acquire

assets without paying for them. And since the ESL Sale does not provide any purchase price for

such assets, the ESL Sale cannot be approved.

## C.    The Consideration for the Proposed Release Is Woefully Inadequate

186.    Since the start of these Chapter 11 Cases, ESL has embarked on a public relations

campaign to repaint itself as a savior of Sears, while simultaneously pursuing a broad release

from liability for its years of wrongdoing against the Debtors and their stakeholders. With the

first ESL Indicative Bid on December 5, 2018, ESL demanded a "full release . . . from any

liability related to any prepetition transactions involving ESL." Each of its bids thereafter sought

a similarly broad release, always offering minimal consideration in return.

187.    During the Auction, the release transformed from being a "full" release to one that

allowed all of the ESL Claims for practically all purposes in connection with the Chapter 11

Cases[52] and permitted ESL to credit bid the Credit Bid Claims freely as part of the ESL Sale.

Specifically, the APA contemplates a release of ESL (which includes ESL Investments, Lampert,

---

[52] See supra Background, Part III.B.

certain affiliates, and any of their respective directors, officers, or employees in any capacity) from the "Released Estate Claims"[53] against ESL, which releases any estate causes of action against ESL that would limit ESL's right to credit bid or challenge or collaterally attack the allowance of the ESL Claims on any basis.  At the same time, the Release purports to exclude from its reach any claims or causes of action for fraudulent transfer and breach of fiduciary duty or any claims or causes of action that are related to the Lands' End spin-off or the Seritage Transaction, but it does not achieve that result as the Release precludes remedies under Bankruptcy Code section 502(d) in connection with such transactions.

188.    Specifically, by precluding challenges such as recharacterization, equitable subordination or any other challenge to the allowance of the ESL Claims, the Release waives the Debtors' rights under section 502(d) to seek to disallow the ESL Claims in connection with actual and constructive fraudulent transfers, including as related to Lands' End and Seritage.  *See* 11 U.S.C. § 502(d).  If these causes of action and related remedies were preserved, substantial

---

[53] The APA defines "<u>Released Estate Claims</u>" to include:

> any and all Claims and causes of action of the Debtors and their estates against ESL arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) equitable principles of subordination or recharacterization, or (iii) any other applicable Law that could be asserted to challenge the allowance of the ESL Claims pursuant to section 9.13(c).  For the avoidance of doubt the Released Estate Claims do not include any other Claims or causes of action of the Debtors or their estates against ESL or any other Person, including but not limited to any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b) or 550(a) or any applicable state or federal law, for breach of fiduciary duty (including any Claims for breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G), or for illegal dividend under 8 Del. C. 170-174 or any other state law; (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P., or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.:. CV-17-11846-00CL.

APA § 9.13(e).

value in the Debtors' estates could become unencumbered for the Debtors' unsecured and true

third-party creditors.  Under the current construct, however, the Debtors' only remedy in respect

of these "preserved" causes of action is to seek damages against ESL, whose primary investment

is anchored to a sinking ship.  But the ESL Sale and Release would operate to eliminate the

estates' ability to recover on any judgment from the Acquired Assets—assets or the value thereof

that would be available in connection with a wind-down.  In other words, the Debtors are

permitting ESL to make immediate use of purported claims, through a credit bid, that would

otherwise be the source of a remedy in an action against ESL (even if for a cause of action that is

not directly included in the Released Estate Claims).

189.    The facts surrounding ESL's and Lampert's prepetition conduct and scheming are

astounding and provide ample support for causes of action for recharacterization, equitable

subordination and disallowance against ESL.  Such claims, if fully litigated, would eliminate the

ESL Claims against these estates (in whole or in part), and ESL's ability to credit bid its

purported secured claims, while returning immense value to the estates such that the $35 million

Release Consideration cannot possibly be considered the exercise of sound business judgment,

much less survive the stricter scrutiny applicable to insider transactions.

190.    As discussed *supra*, in seeking approval for an insider transaction that is subject

to heightened scrutiny under Bankruptcy Code section 363, the Debtors must demonstrate that

they have received a "fair price."  *See, e.g.*, *In re Flour City Bagels, LLC*, 557 B.R. at 79 (finding

that debtor had not met burden of proof with respect to value of releases of claims against insider

being given as part of insider's purchase of substantially all assets of the debtor); *In re Family*

*Christian, LLC*, 533 B.R. at 628 (finding that debtors had not satisfied burden of establishing

fairness of price for claims against insiders being released as part of insider's purchase of

substantially all of the assets of the debtors and stating that court would have difficulty

approving transaction "without more significant disclosure and justification for the releases

being granted by the Debtors"); *see also In re Lionel*, 722 F.2d at 1071 (noting that a court must

evaluate "the proceeds to be obtained from the disposition vis-a-vis any appraisals of the

property").

191.    The $35 million Release Consideration (plus the illusory and zero-value "other

good and valuable consideration") represents nothing more than a nuisance payment for ESL to

have the right to credit bid its secured claims in the nominal amount of $1.3 billion and allow the

remainder of its claims (which likewise are subject to recharacterization, equitable subordination

and disallowance under section 502(d)) for all purposes in connection with these Chapter 11

Cases.  The Creditors' Committee seeks standing to recharacterize, equitably subordinate or

disallow over $2 billion in ESL's claims against the Debtors.  The chart below sets forth

potential recoveries to general unsecured creditors on the estates' recharacterization,

subordination.



*See* Burian Decl., Ex. B, at 18.

192.    It is clear, therefore, that the contemplated Release is fundamentally at odds with a core tenet of the Bankruptcy Code: to maximize the value of the estates, including by prosecuting estate causes of action.  *See CFTC v. Weintraub*, 471 U.S. 343, 352 (1985) (noting that the trustee of a bankruptcy estate has the duty to maximize the value of the estate, including by prosecuting claims against "officers, directors, and other insiders"); *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166,175 (2d Cir. 2005) ("[T]he [Bankruptcy] Code not only authorizes the chapter 11 debtor to manage the estate's legal claims, but in fact requires the debtor to do so in a way that maximizes the estate's value"). While the settlement of estate causes of action can play a role in maximizing estate value and minimize the time, expense and uncertainties associated with litigation, the Credit Bid Release provides an outsized benefit to an insider (ESL) at the expense of the Debtors' unsecured creditors.

193.    Given the massive delta between the $35 million Release Consideration and the hundreds of millions of dollars that likely would be returned to the estates without the Release, the ESL Sale cannot be the product of good business judgment and cannot survive the heightened scrutiny applicable to releases of the Debtors' insiders.[54]

## IV.    AN ORDERLY ASSET MONETIZATION AND GOB PROCESS MAXIMIZES VALUE TO THE ESTATES AND CREDITORS

194.    All evidence indicates that an orderly asset sale and contemporaneous GOB process run by the Debtors is the best alternative available to the Debtors to maximize value for

---

[54] The Release also cannot satisfy the standard under Bankruptcy Rule 9019, which requires that a settlement be "fair and equitable," *In re Iridium Op. LLC*, 478 F.3d 452, 464 (2d Cir. 2007), and in the "best interests of the estate." *In re Chemtura Corp.*, 439 B.R. 561, 593 (Bankr. S.D.N.Y. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).  As with a sale to an insider under section 363, courts have subjected settlements with an insider to "closer scrutiny."  *See, e.g. In re Drexel Burnham Lambert Grp.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991).  For the same reasons the Release cannot be approved under section 363, it also cannot meet the standard under Bankruptcy Rule 9019 because, among other reasons, the paltry $35 million Release Consideration falls well below the "lowest point in the range of reasonableness."  *Id.*

their estates and creditors and, therefore, the ESL Sale should not be approved.  *See Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992) (noting that the "principal responsibility [of the bankruptcy court] is to secure for the benefit of creditors the best possible bid."); *G-K Dev. Co. v. Broadmoore Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*, 994 F.2d 744, 746 (10th Cir. 1993) (finding that a bankruptcy court has "power to disapprove a proposed sale . . . if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable").

195.    The Creditors' Committee advocated shortly after its appointment, based on the information available to it at the time, that an orderly wind down of the Debtors' businesses (*i.e.*, GOB sales, a robust real estate marketing process, monetization of various individual assets and component businesses and the pursuit of valuable estate causes of action) represented the best path forward in these Chapter 11 Cases.  *See* Supplemental Global Bid Procedures Objection ¶¶ 5-6 (noting that the go forward store business plan is based on unrealistic cost reductions, undetermined working capital or financing needs, while leaving what would be left of the estates administratively insolvent); Simms Decl. ¶¶ 11-19 (attesting that based on the Creditors' Committee's analysis, the incremental cost of pursuing a going concern sale could be over $300 million through February 15).  Indeed, it quickly became apparent that any proposed sale to ESL would be nothing more than a dressed-up foreclosure auction at discounted values.  The Creditors' Committee's continued diligence and receipt of financial information from the Debtors has only confirmed this view.

196.    Nonetheless, at the Auction, the Debtors selected the ESL Bid over the superior alternative of a GOB and wind-down process.  In accepting the ESL Bid, the Debtors relied on various assumptions and projections that undervalued the Debtors' assets and inappropriately

108

increased the extent of the claims that would be allowed against the Debtors' estates in

connection with a wind-down scenario to compare with the ESL Sale.  As set forth further in the

Burian Declaration, a wind-down scenario premised upon a properly run sale process would

generate substantial value for the estates over and above the ESL Sale.  *See* Burian Decl. ¶ 35 &

Ex. B.

**A.**     **The Flawed Sale Process Conducted by the Debtors Did Not Result in a Competitive Auction for the Debtors' Assets**

197.     The Debtors cannot demonstrate that the ESL Sale is in the best interests of the

Debtors' estates relative to an orderly GOB process because the Debtors' marketing and auction

process was confusing and inadequate from the start.  Accordingly, such process provides an

insufficient basis to evaluate the bids received, and the Debtors cannot meet their burden to show

that they have attained the highest and best price.  Burian Decl. ¶¶ 4-7.

**1.**     **The Debtors' Process Was Rushed, Disorganized and Confusing, Which Prevented True Market Testing of the Value of the Debtors' Assets**

198.     Upon filing for bankruptcy, the Debtors were wholly unprepared to conduct a

meaningful sale process for individual assets and business lines and have made no serious efforts

to do so at any point during these Chapter 11 Cases.  That lack of planning and effort damaged

the sales process significantly:  interested third parties were unable to diligence operating

businesses and real estate assets.  *Id.* ¶ 16.  What should have been a competitive process to

maximize value to the estates became a one-horse race to transfer Sears and its valuable assets

and operating businesses to ESL, which, with its insider status, was the only party able to

understand and diligence the Debtors' various unencumbered assets well enough to submit a bid

on the Debtors' extremely accelerated timeline.  *Id.* ¶ 17.  The Debtors never conducted an

auction for individual assets and businesses that could, in sum, have exceeded the ESL Bid.

Instead, the Debtors only compared successive ESL bids to hypothetical and conservative wind-

down estimates.  The result of this flawed sale process was acceptance of the ESL Bid, which

fails to provide appropriate value for unencumbered assets and will plunge the Debtors' estates

into administrative insolvency.  *Id*. ¶ 7.

201.    The Debtors, however, were fully aware of the need for a robust sale process to

maximize value to the estates.  In 2017, Centerview Partners advised the Debtors that bidders

███████████████████████████████████ during a 2016 sale process conducted by

Citibank.  The problem then had been that the Debtors had not made any progress towards

marketing ███████████████████████. *Id*. ¶ 15.

200.    Rather than heed that warning, the Debtors did virtually no planning with respect

to the marketing and sale of their unencumbered assets.  Instead, the Debtors retained Lazard on

the eve of filing, and neither the Debtors nor Lazard were prepared to run a sale process that

would enable third parties to perform the due diligence necessary to evaluate the Debtors as a

going concern, the underlying businesses as standalone entities, or the Debtors' real estate assets.

*Id*. ¶ 16.  The Debtors failed to engage meaningfully with prospective bidders other than ESL,

which discouraged potential third-party bidders from participating in the sale process altogether.

*Id*. ¶ 18.  Only ESL, given its history with and control over Sears, had sufficient information to

submit a bid on the timeline necessitated by these proceedings.  *Id*. ¶ 17.

201.    Further, as described in the Burian Declaration, the real estate marketing process

run by the Debtors was flawed in four primary respects.  ***First***, the condensed timeline for the

process did not allow sufficient time for prospective bidders to evaluate the Debtors' assets and

submit bids.  Despite the massive undertaking that marketing ████ disparate real estate assets

would entail, the Debtors, through their advisors at JLL, did not begin their outreach to potential

purchasers for their real estates until December 2, 2018, just 26 holiday-filled days before

indicative bids were due on December 28, 2018—and this initial outreach was only for a small

number of "non-core" properties.  Then, on December 21, 2018—just ***one holiday-shortened***

***week*** before indicative bids were due—JLL launched official marketing websites and datarooms

for the full set of the Debtors' real estate assets.  The Debtors apparently expected potential

bidders—most of whom are local and regional investors—to evaluate the opportunities available

and to submit a bid within seven days, including over the Christmas holidays, of receiving access

to an inadequate dataroom.  It is difficult to conceive how the shortened timetable could permit

bidders to engage in the necessary diligence and analysis to make an informed bid or was

otherwise conducive to a successful auction for the Debtors' real estate.  *Id*. ¶ 23.

202.    As described in the report of Ronald Greenspan, a senior managing director of

FTI Consulting, Inc. to maximize the realizable value from the Debtors' real estate, the Debtors

needed to market to potential buyers by reaching out broadly, providing sufficient time to bid,

and making sufficient information available for diligence.  Report of Ronald Greenspan, attached

hereto as **<u>Exhibit D</u>** (the "<u>Greenspan Report</u>") § F.  A true value-maximizing process (or one that

would provide information from which one could reach a reasonable conclusion of likely

achievable value) typically would occur over a 60 to 120-day period (which is similar to the

period that ESL intends to use during the post-Closing "Designation Rights Period" when it will

be marketing the Debtors' leases and contracts to third parties for its own benefit).  *See* APA §

2.6, Art. V.  During that period, brokers would be selected, a data room would be fully

populated, email blasts and cold calls would be made and asset tours and other extensive

diligence would be conducted, all of which would culminate in competitive negotiations amongst

interested parties and execution of purchase agreements.  The Debtors' abbreviated real estate

process bore none of these characteristics of a well-run sale.

111

203.  *Second*, the process was disorganized and confusing to potential bidders.  Given

the abrupt changes to the number of properties the Debtors were marketing, the tight timeframe,

and the lack of communication with the market generally, there was considerable confusion over

precisely which assets actually were for sale and which assets were subject to the December 28,

2018 deadline.  Indeed, members of the Creditors' Committee informed Houlihan Lokey that

they did not understand how to submit bids and which properties were for sale.  Burian Decl. ¶

24.  Overhanging the entire real estate process was the presence of ESL and the outcome of the

going-concern sale process, which had its own competing deadlines and likely depressed bids

due to the uncertainty of success.  The fact that definitive bids for all of the Debtors' assets were

due on the same day as indicative real estate bids created additional confusion.  Potential real

estate buyers have been highly critical of the lack of information and organization regarding the

Debtors' auction, which is reflected in the quality and quantity of the bids and indications of

interest received.  *Id.*

204.  *Third*, the limited scope of the Debtors' outreach prevented obtaining a true

market value from any and all interested parties.  Instead, the Debtors contacted only parties who

had previously bid on the assets, and in the case of leased assets, certain landlords.  This is

reflected in a report provided to the Creditors' Committee by the Debtors' advisors on December

18, 2018, only ten days before the indicative bid deadline, indicating that the Debtors had only

made ▮▮▮ points of contact in connection with the marketing and sale of ▮▮▮ separate

properties.  The Debtors' approach necessarily constrained the potential universe of bidders and

resulted in fewer and lower bids.  Indeed, despite frequent requests, advisors to the Creditors'

112

Committee were never apprised of any meaningful marketing process undertaken by the Debtors and have serious concerns that no such process ever took place.[55]  Burian Decl. ¶ 25.

205.    **Finally**, the Debtors failed to provide sufficient information to allow bidders the opportunity to develop a fully formed view of the properties.  At the time of its launch on December 21, 2018, the data room lacked basic information such as individual asset financials and marketing materials.  Even as of January 8, 2019, eleven days **after** the deadline for indicative bids had passed, the data room was still under construction and did not contain the customary real estate due diligence materials for each property, such as updated title policies with underlying assets, existing surveys, zoning reports and environmental reports.  *Id.* ¶ 26. The result of these various deficiencies was that only a small number of potential bidders were aware of what the Debtors were selling, they had limited information on which to base a decision to bid, and they lacked adequate time to evaluate that information and decide whether to bid and how much.  The sale process therefore attracted primarily opportunistic buyers who could submit laughably low offers with no cost or penalty, and incentivized stakeholders, particularly landlords, to submit placeholder bids as a means of expressing interest and opening a channel for negotiations.  For example, the Debtors received ██ bids of either $0 or $1 for entire assets, and only ██ bids for a total of ██ assets.  For the various reasons set forth in the Greenspan Report, these bids provide a grossly insufficient basis for establishing the value of the properties—values that the Debtors further discounted and then incorporated into their recovery analysis to justify the economics of the ESL Sale.  *Id.* ¶ 27.

---

[55] For example, on a December 12, 2018 call with the Creditors' Committee's advisors (just sixteen days before indicative bids were due), it became clear that the Debtors' advisors at JLL still had not developed a marketing strategy or detailed insight into the sale process.  And despite the Creditors' Committee's repeated requests and assurances from the Debtors' advisors that marketing and progress reports (including tracking reports and lists of parties contacted) would be forthcoming, they only ever produced one such report.

**2.      The Debtors Possess Other Highly Valuable and Complex Unencumbered Assets that they Failed To Market Properly**

206.      Beyond just the valuable real estate portfolio, the Debtors possess numerous unique and fully functioning operating businesses that are complex and cannot be marketed and sold without devoting considerable time and attention, meaningful advance planning, and specialized treatment to the sale process.  These include (i) Sears Home Services, (ii) Innovel, (iii) Monark and (iv) other assets.  Burian Decl. ¶¶ 10-13.  The Debtors likewise failed to engage seriously with third parties to market test these assets.

207.      **Sears Home Services ("SHS")**.  SHS is a multi-faceted, stand-alone business.  SHS is comprised of various sub-business lines including a home warranty business, an appliance repair business, a home improvement and remodeling service, a home improvement/maintenance business and a business known as "Parts Direct" that sells parts for different household appliance brands. ███████████████████████████████████████████████████  *Id.* ¶ 10.

208.      **Innovel Solutions ("Innovel")**.  The Debtors also own Innovel, an end-to-end logistics solutions provider.  Innovel provides warehousing, transportation, installation and home delivery services to retail, manufacturing and commercial clients, making more than four million deliveries annually with 1,100 truck on the road daily.  Innovel is one of the largest warehousing and transportation networks in the country, capable of providing both last-mile and end-to-end services. ████████████████████████████████████████████████  *Id.* ¶ 11.

209.      **Monark Premium Appliance Company ("Monark")**.  The Debtors also own Monark.  Monark and its affiliates form a nationwide distributor of premium home appliances that serve architects, builders, designers, developers and homeowners.  Monark's 20 showrooms

114

across Arizona, California, Florida and Nevada offer customers a high-end selection of cooking, cooling and cleaning appliances from a variety of brands. ████████████████ ████████████ *Id.* ¶ 12.

210.  **Other Assets**.  The Debtors possess a variety of other unencumbered assets that should also have been subject to a robust sales process, including the customer data owned by the Debtors and Sears Auto Centers. *Id.* ¶ 13.

211.  Two prime examples underscore the consequences of the Debtors' failure to create a clear process to enable potential third-party bids as to these unique and valuable assets of the Debtors.  First, on October 17, 2018, ████████████████ submitted a fully financed ████████████ offer to be the stalking horse bidder for the Parts Direct business within SHS, along with a marked-up asset purchase agreement and proposed bidding procedures, representing that they had very limited due diligence remaining before their bid could be committed. *Id.* ¶ 19.

████ is a strategic buyer uniquely positioned to purchase the PartsDirect business notwithstanding the deficit in information provided by the Debtors. *Id.*  Despite this significant offer, the Debtors failed to engage and instead allowed the offer to languish, with ████ waiting on the sideline.  On December 5, 2018, ████ submitted a revised, fully financed stalking horse bid of ████████.  The Debtors again failed to keep ████ engaged or advance the state of negotiations.  Ultimately, ████ submitted a further revised bid, dropping its proposed purchase price to only ████████ on December 28, 2018.  ████ was never afforded an opportunity to actually bid at the Auction despite repeatedly stating its desire and willingness to increase its price if there was more certainty and/or structure around the actual process being run. *Id.*  The Debtors' inability to run a proper sale process caused progressively less attractive bids that cost the estates approximately ████████████—in this example alone. *Id.*

115

212.    As a second example of the failed sale process, ███████████

███████████, which was exploring transaction structures related to SHS (including the

treatment of protection agreement liabilities), told Houlihan Lokey on January 8, 2019 that they

could not obtain the due diligence they required from the Debtors regarding standalone general

and administrative expenses.  *Id.* ¶ 20.  According to ███████, Lazard had uploaded only

***three*** files regarding those assets to a data room on December 27, 2018, and had provided

nothing further since that date.  *Id.*  ███████ was unable to move forward with a bid because

of its inability to conduct proper due diligence that *any* prospective buyer would require.

213.    These are but two examples of the Debtors' failure to conduct a proper section

363 sale process.  Had the Debtors conducted a proper sale process, the benefit to the estates

would have been maximized.

### 3.    The Poorly Conducted Auction Prevented Third-Party Participation

214.    It is no exaggeration to state that no legitimate auction ever took place.  Instead,

over the course of several days and nights, beginning on January 14, 2019, bilateral negotiations

between the Debtors and ESL played out.  Burian Decl. ¶ 32.  As originally conceived, the

Auction was supposed to be a forum where various parties would compete to bid on many if not

all of the Debtors' valuable unencumbered assets.  That never happened.

215.    For example, as this Court is aware, real estate bidders who sought to participate

in the Auction on January 14 were told by counsel for the Debtors that they could not even be in

the room "as there is no reasonable prospect that such bids will be competitive with an ESL bid."

In response, this Court instructed the Debtors that the landlords should be permitted to attend the

Auction, make binding bids, which could be aggregated with the value of any additional

liquidator bids and the reasonable value of the Debtors' other assets, to compete with ESL.  Yet,

at the Auction, the Debtors never asked for bids or even engaged with the landlords—the focus,

as usual, was solely on ESL.  While the Debtors continued to negotiate exclusively with ESL,

third parties who wished to bid for discrete assets literally roamed the offices of Debtors' legal

counsel, confused as to whether they would get a chance to bid in a competitive auction.  *Id.* ¶

31.

216.     Moreover, the Debtors have refused to engage with prospective bidders following

the conclusion of the Auction, including highly qualified bidders that have demonstrated

significant interest and the clear financial wherewithal to consummate a transaction that could

result in significantly more value for the Debtors' estates and creditors than the value

contemplated by the ESL Sale for the same assets.  Such refusal is inconsistent with the express

terms of the APA and wholly antithetical to the Debtors' fiduciary duties.  Specifically, the APA

provides, in relevant part, that the ESL Sale is "subject to approval by the Bankruptcy Court ***and***

***the consideration by Sellers of higher or better Competing Transaction***."  APA § 8.2(b)(iii)

(emphasis added).[56]  In addition, the Debtors are free to terminate the APA to the extent they

"accept or agree to any Competing Transaction or upon approval by the Bankruptcy Court of, or

the filing by or on behalf of any Seller of a motion or other request to approve, a Competing

Transaction."  *Id*. § 12.1(a)(iii).  Finally, the APA includes neither a no-shop provision nor any

other form of restriction on the Debtors' ability to consider alternative proposals.  Accordingly,

and in view of the insider nature of the ESL Sale and the significant execution and credit risk

attendant thereto, failing to engage with such potential bidders is inconsistent with the Debtors'

fiduciary duty to maximize the value of their estates.

217.     And, for reasons unknown, the Debtors failed to comply with the Global Bidding

Procedures and consult at critical times during the Auction with the Creditors' Committee.  *See*

---

[56] The APA defines "Competing Transaction" to include any alternative transaction related to the sale of the
Debtors' assets or business.  *Id*. § 1.1.

Global Bidding Procedures Art. VII.B.3 ("[T]he Debtors, *after consulting with the Consultation Parties*, shall announce the bid that they believe to be the highest and best offer.").[57] The Debtors therefore did not have the benefit of the Creditors' Committee's position to encourage ESL to improve the terms of the ESL Bid. By declining to abide by the Global Bidding Procedures and conduct a meaningful, competitive auction, the Debtors have failed to maximize value to the estates.

### 4. Unsurprisingly, ESL Emerged as the Winning Bidder in a One-Horse Race

218.    Given the Debtors' extensive focus on negotiations with ESL to the exclusion of potential third-party bidders, it is no surprise that the flawed sale process and Auction concluded with the Debtors accepting the ESL Bid. The Debtors' efforts to court ESL date back at least to December 5, 2018, when ESL submitted an indicative bid (the "ESL Indicative Bid"). The Debtors conducted diligence in respect of the ESL Indicative Bid and discussed such bid with ESL and its advisors, but ultimately determined that it was non-actionable, both legally and financially. Subsequently, on December 28, 2018, ESL submitted a revised bid to acquire substantially all of the Debtors' go-forward retail footprint and other assets and component businesses of Sears. Following submission of ESL's December 28 bid, the Debtors' advisors

---

[57] The Debtors clearly were aware of their duty to consult with the Consultation Parties (as defined in the Global Bidding Procedures), as evidenced by numerous statements made during the Auction by the Debtors' counsel. *See, e.g.*, Transcript of January 14, 2019 Auction ("Jan. 14 Auction Tr.") 8:17-20 ("Importantly, one of the most important auction rules, the Debtors can modify the rules at any time in consultation with the consultation parties in their reasonable discretion in order to maximize value."); *Id*. at 11:12-16 ("We're going to adjourn the auction, talk with parties, and make that determination after consultation with consultation parties and the restructuring committee, and we hope after further negotiations with the ESL. The record negotiations."); *Id*. at 26:4-9 ("On bid evaluation, the Debtors have the right at the direction of the restructuring committee and subcommittee as applicable in its sole discretion and after consultation with the consultation parties to determine which bid is the highest or otherwise best bid."); *see also* Jan. 15 Auction Tr. 40:11-19 ("[W]e decided late last night to allow ESL overnight to put together a response to the proposal from the debtors, and at this time, we will have them put that proposal on the record, after which time we are going to take a break, go discuss it with the restructuring committee and the consultation parties."); *Id*. at 75:6-17 ("[W]e will have a brief adjournment just for the restructuring committee to consider the proposal that has been made on the record and we will come back on with the restructuring committee's decision. . . . I should have added and will consult with the consultation parties before coming back on record.") (internal quotations omitted).

118

engaged with ESL and its advisors to discuss the infirmities of the bid, ultimately determining

that this bid was also not actionable.  Burian Decl. ¶ 29.  At that time, the Debtors indicated that

they intended to pivot to a wind-down process, but continued to negotiate with ESL.  On January

9, 2019, ESL submitted a revised bid attempting to remedy the deficiencies in its prior two bids.

But as with ESL's prior bids, all parties, including the Debtors, agreed that this bid would have

left the Debtors administratively insolvent.  Nevertheless, the Debtors continued to engage in

"around the clock" negotiations with ESL over the proposed bid.  *Id.* ¶ 30.

219.    The Debtors' negotiations with ESL continued up to and throughout the Auction

as well, again to the exclusion of any potential third party bidders and despite the constant

shortcomings with ESL's various bids.  Even as of January 15, 2019, the Debtors' counsel stated

that "the [ESL Bid] is not otherwise higher or better when compared to the company's

alternatives.  There are a number of significant problems that the company has with the ESL bid

and we have tried, and I want to say, so very hard to get there with this deal."  Jan. 15 Auction

Tr. 50:23-51:10.  The Debtors' counsel went on to explain that among these infirmities was the

insufficient cash available to get the Debtors to Closing.  *Id*. at 52:2-10.

220.    Similarly, counsel for the Restructuring Subcommittee determined that

"***substantial claims exist against ESL and its affiliates, as well as other defendants***."  *Id*. at

63:12-21, 64:4-11 (emphasis added).  Counsel for the Restructuring Subcommittee went on to

explain that "***any benefits of the ESL transaction are ephemeral*** for the reasons that [Debtors'

counsel] articulated and that the company does not have sufficient cash to close the transaction."

*Id*. at 66:3-15 (emphasis added).

221.    In the early hours of January 16 (fewer than twelve hours after admitting an all

but certain impasse), however, the Debtors came back on the record to report that

119

notwithstanding the numerous "significant" deficiencies inherent in the ESL Bid and their utter

inability to achieve an actionable resolution for weeks prior, they miraculously had determined to

accept the ESL Bid.  In support of the "revised" ESL Bid, ESL's counsel again touted certain

additional consideration that had been added to the purchase price.  *See id*. 72:14-73:14.

222.    The Debtors have explained that the primary driver of their decision to accept the

ESL Bid—when they had just rejected a substantially similar bid hours earlier—was that the new

ESL Bid included an agreement by ███████████ to purchase and subsequently roll over

the entire outstanding Junior DIP Facility.  Burian Decl. ¶ 33.  In the Debtors' view, ███████

agreement remedied an existing $120 million shortfall, thereby bringing the Debtors close

enough (but not all the way there) to administrative solvency to justify proceeding with the ESL

Bid.  The Debtors' position, however, is misguided because this alleged improvement to the ESL

Bid generated zero additional value for the benefit of the estates.  Instead, the entirety of the

$120 million in Junior DIP Facility serves only to bridge the estates to the closing date for the

ESL transaction and provides no incremental value to the estates.  Put differently, this touted

"improvement" in the ESL Bid benefits ESL alone and is no different for the Debtors' estates

than if the Debtors simply had rejected the ESL Bid and pivoted to an orderly wind-down.  This

is evidenced by the Debtors' analysis of an orderly wind-down scenario, which projects only

███████████ of draws on the Junior DIP Facility versus $350 million required to be drawn to

fund the closing of the ESL Bid.  *Id.*  As a result, the Debtors' unsecured creditors are paying

███████████ through the consumption of unencumbered assets to satisfy the additional ███████

███████ of borrowings under the Junior DIP Facility that are being incurred for ESL to

consummate the insider ESL Sale.  This ███████████ rightfully belongs to the Debtors'

120

unsecured creditors, who are being left with up to $35 million in cash and fewer causes of action to pursue to remedy ESL's wrongs.

223.    Ultimately, the Debtors never seriously pursued or entertained any alternative to ESL even though ESL never corrected the infirmities with its bids—including certain fundamental problems that are described in greater detail in the presentation attached to the Burian Declaration.  *Id.* ¶ 32 & Ex. B.

## B.    The Debtors Relied on Unsupported Assumptions in Comparing the ESL Sale to the Wind-Down

224.    In declining to pursue a GOB process, the Debtors relied upon a flawed liquidation analysis that assumed, among other things, (i) artificially depressed valuations for their unencumbered real estate assets; (ii) the existence of $331 million of unproven—and unprovable—superpriority claims under Bankruptcy Code section 507(b) ("507(b) Claims") that ESL threatened to assert in a liquidation scenario, but would agree to limit the assertion of certain scenarios if the Debtors accepted its "going concern" bid;[58] and (iii) an inexplicable decision not to surcharge collateral under Bankruptcy Code section 506(c).  These faulty assumptions and legal conclusions resulted in an analysis that grossly understates the realizable value in a wind-down scenario and inflates administrative expense claims.

### 1.    The Debtors Undervalued the Unencumbered Real Estate Assets by Using Flawed Methodology

225.    In large part owing to the flawed sales process described above, the Debtors substantially undervalued their real estate assets in connection with determining potential

---

[58] ESL shall have no right to receive proceeds from litigation regarding Seritage, Land's End or other acts of intentional misconduct on behalf of any 507(b) Claim or deficiency claim.  In addition, ESL shall not be entitled to receive in excess of $50 million on account of its 507(b) claims, if any, from the proceeds of any other Claims or causes of action of the Debtors' estates, with any ESL 507(b) Claims in excess thereof being treated as general unsecured claims that are to receive pro rata recoveries with general unsecured claims.  *See* APA § 9.13(c).

recoveries to creditors under a wind-down scenario.  They then included their undervalued and

inaccurate real estate valuations in the wind-down analysis they relied upon to justify their

selection of the ESL Bid.  As discussed in greater detail in the Greenspan Report, the Debtors

committed three primary errors in their real estate valuation.

226.    *First*, the Debtors █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

227.    *Second*, █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████



228.    ***Third***, the Debtors

*Id.*

229.    As a result of these and other errors discussed at greater length in the Greenspan

Report and below, the Debtors' estimated proceeds from their real estate dispositions of

was misleadingly low.  The Greenspan Report corrects the valuation errors and excessive

discounting, concluding that the properties should have been valued based on proper, industry-

standard valuation techniques.  To arrive at his estimates, Greenspan used the appropriate market

values for the properties.  He did this by first using all of the appraisals and value estimates

performed by the Debtors' professionals as follows: (i) using the 2018 and 2019 JLL appraisals;

(ii) if no JLL appraisal existed, using the A&G 2018 value estimates; (iii) if no JLL appraisals or

A&G value estimates existed, using 2017 and 2018 Cushman & Wakefield appraisals; (iv) if no

appraisal values existed at all, using JLL broker valuations; and (v) if no value estimates by the

Debtors' professionals were available, employing commonly-accepted portfolio valuation

techniques such as discounted cash flow, direct capitalization, and/or the sale comparison

approach.  *Id.*  Having determined this "market value" (███ of which was determined by the

Debtors' professionals), Greenspan then applied a liquidation discount in light of the fact that the

properties would be disposed in an orderly wind-down process.  *Id.*  The amount of that

liquidation discount varies based on ownership and property type, ranging from 0% to 60% with

an overall average discount range of 15 to 35%.  *Id.*  Greenspan's approach is consistent with

well-recognized real estate appraisal techniques, unlike the Debtors' ███████████████████

████████████████████████████████████████████████████████████████████

███████  *Id*.

230.    Once the Debtors' valuations are corrected based on these industry-standard

techniques, the Debtors' properties should have estimated proceeds of ███████ (using the

mid-point estimate).  *Id*.  Of that ███████, ███████ is attributable to unencumbered real

estate and ███████ is attributable to encumbered real estate.  *Id.*  When these inputs are

inserted into the Debtors' waterfall analysis, the difference is striking—a delta of ███████

from the Debtors' analysis.  Burian Decl., Ex. B, at 13-14.

## 2.    ESL Cannot Prove Its Entitlement to a Claim Pursuant to Bankruptcy Code Section 507(b)

231.    The Debtors' wind-down analysis also assumes that in a liquidation scenario, ESL would be entitled to ▮▮▮▮▮▮▮ in superpriority adequate protection claims under section 507(b) of the Bankruptcy Code (a "507(b) Claim").  This claim amount should be $0.  Indeed, under well-established case law, ESL is not entitled to a 507(b) Claim at all.

232.    To demonstrate entitlement to a 507(b) Claim, a secured creditor must prove that its collateral has diminished in value as a result of (i) the stay of action against such property, (ii) the use, sale or lease of such property or (iii) the granting of a lien under Bankruptcy Code section 364(d) during the bankruptcy case, despite the creditor's receipt of adequate protection. *See* 11 U.S.C. § 507(b);[59] *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 44-45 (S.D.N.Y. 2000); *see also Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 690 (N.D. Cal. 2007) (finding that creditors were not entitled to recover on replacement liens granted as adequate protection absent proof that collateral diminished in value as a result of the bankruptcy case).

233.    The allowed amount of a 507(b) Claim is determined by calculating the diminution in the value of the secured creditor's collateral from the petition date, less the value conferred by adequate protection during the bankruptcy case.  *See Chase Manhattan Bank USA NA v. Stembridge* (*In re Stembridge*)*,* 394 F.3d 383, 387-88 (5th Cir. 2004) (finding diminution

---

[59] Bankruptcy Code section 507(b) provides:

If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and *if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section* arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b) (emphasis added).

in value is the amount of the relevant asset's decrease in value from the petition date, less any

adequate protection payments received during the pendency of the case).

234.    The secured creditor must further establish that the diminution in value is an

allowable claim under Bankruptcy Code section 507(a)(2), which further references Bankruptcy

Code section 503(b).  11 U.S.C. § 507(b).  In other words, the diminution in value must

constitute an administrative expense as a necessary cost of preserving the estate.  *Ford Motor*

*Credit Co. v. Dobbins*, 35 F.3d 860, 865-66 (4th Cir. 1994); *LNC Invs., Inc. v. First Fid. Bank,*

*N.A.*, No. 92 Civ. 7584 (MBM), 1997 U.S. Dist. LEXIS 12858, at *12 (S.D.N.Y. Aug. 27, 1997);

*In re Mary Holder Agency, Inc.*, No. 11-34280 (MBK), 2012 WL 4434362, at *2-3 (Bankr.

D.N.J. Sept. 24, 2012); *In re Quality Beverage Co., Inc.*, 181 B.R. 887, 897 (Bankr. S.D. Tex.

1995).

235.    A secured creditor bears the burden of proof with respect to establishing its

entitlement to a 507(b) Claim.  *Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*,

624 F.3d 274, 284 (5th Cir. 2010), *modified*, 649 F.3d 320 (5th Cir. 2011) ("The [secured]

Noteholders had the burden to prove their entitlement to a [Bankruptcy Code section] 507(b)

priority claim.") (citing *Dobbins,* 35 F.3d at 866); *In re Constr. Supervision Servs., Inc*., No. 12–

00569–8 (SWH), 2015 WL 4873062, at *5 (Bankr. E.D.N.C. Aug. 13, 2015) ("The party seeking

superpriority status bears the burden of proving entitlement to a [Bankruptcy Code section]

507(b) priority claim.") (citing *Official Comm. of Unsecured Creditors v. UMB Bank, N.A (In re*

*Residential Capital, LLC)*, 501 B.R. 549, 590-91 (Bankr. S.D.N.Y. 2013)).

236.    ESL has not proved, and indeed cannot prove, its entitlement to ***any*** 507(b)

Claim, and the Debtors have failed to explain why they included such a superpriority claim in

their analysis of the various alternatives.  In fact, the Debtors themselves agreed that an ESL

507(b) Claim should not be included in the analysis:

> While ESL acknowledges that infirmity in the bid, they suggest
> that the company would be administratively insolvent in a wind-
> down.  That is not the analysis of the subcommittee or its advisors,
> and it's predicated on the threat of a significant administrative
> [507(b)] claim to be asserted by ESL *when this company has
> engaged in bankruptcy and incurred substantial losses for the
> purpose of trying to enable a going concern bid by ESL*.

Jan. 15 Auction Tr. 66:16-67:3 (emphasis added).

237.    The only possible trigger underlying ESL's claim to 507(b) entitlement would be

that the use, sale or lease of ESL's prepetition collateral diminished and the adequate protection

provided was insufficient.  This argument would fail.  The Debtors' use of the proceeds from the

DIP ABL Facility to satisfy claims and finance the Chapter 11 Cases was foreseeable and agreed

upon by ESL.  Indeed, the Debtors' sale process, and these Chapter 11 Cases generally, have

been run primarily for ESL's benefit and, as such, ESL is not entitled to any 507(b) Claim.  *See

In re Franklin Indus. Complex Inc.,* No. 01-67457 (SDG), 2008 WL 3992233, at *6-7 (Bankr.

N.D.N.Y. Aug. 21, 2008) (denying a secured creditor's 507(b) Claim because there was no

evidence before the court showing diminution in the collateral's value and observing that "there

is a reluctance to grant superpriority status if the claimed losses were *occasioned by the

creditor's own conduct*.") (emphasis added); *Quality Beverage*, 181 B.R. at 897 (disallowing

section 507(b) claim where court found that diminution claim resulted from creditor's *self-

interested business decision* not to foreclose on collateral); *In re Callister*, 15 B.R. 521, 528

(Bankr. D. Utah 1981) (finding that a superpriority claim is intended to "recapture value

*unexpectedly* lost during the course of a case") (emphasis added); *Cheatham v. Cent. Carolina

Bank & Trust Co., N.A., (In re Cheatham)*, 91 B.R. 382, 386 (Bankr. E.D.N.C. 1988) (citing

*Callister*, 15 B.R. at 531-34) ("[S]uperpriority status is not available where the creditors [*sic*]

loss . . . is due to ***ordinary or foreseeable depreciation***.") (emphasis added).

238.    As the details of the sale process make clear, it was run to accommodate one

buyer: ESL.  Had the Debtors pivoted to the GOB process at the commencement of these cases,

as the Creditors' Committee urged, there would be more value for the estates.  ESL cannot claim

that any decline in the value of collateral was "unforeseeable" or "unexpected" when ESL was

the party solely responsible for the Debtors' pursuit of a going concern sale.  *See, e.g.*, Oct. 15,

2018 Hr'g Tr. 26:24-25 ("We've been in negotiations with one likely bidder, which is ESL.");

Evercore Reply ¶ 4 (stating that "ESL may be the only bidder for the Debtors' assets on a going-

concern basis.").

239.    Moreover, ESL cannot establish that the diminution in the value of its collateral

constitutes a legitimate administrative expense, as required by Bankruptcy Code section 507(b),

because it is not a necessary cost of preserving the value of the Debtors' estates.  In fact, the only

reason for the diminution in value to ESL's collateral (to the extent any diminution has occurred)

would be ESL's self-interested decision to keep the Debtors out of an orderly liquidation in order

to buy time to make a bid for the Debtors' assets through the going concern sale process.  It

would be entirely inequitable to force the estates and unsecured creditors to bear the costs of

ESL's conduct.  *See e.g.*, *Quality Beverage*, 181 B.R. at 897.  As such, the inclusion of any ESL

507(b) Claim in the Debtors' wind-down analysis disproportionately and improperly deflates

value available to creditors through a GOB process and cannot support the Debtors'

determination that the ESL Sale was highest and best.  The Debtors' wind-down analysis should

be adjusted downward to exclude ESL 507(b) Claims in the amount of ████████ .  Burian

Decl., Ex. B, at 14.

128

### 3. The Debtors Inexplicably Failed to Surcharge Collateral Pursuant to Bankruptcy Code Section 506(c)

240.    The purpose for the surcharge of costs and expenses against a secured creditor's

collateral under Bankruptcy Code section 506(c)[60] is "the ***prevention of a windfall to the***

***secured creditor***; a secured creditor should not reap the benefit of actions taken to preserve the

secured creditor's collateral without shouldering the costs."  *In re Kohl*, 421 B.R. 115, 123

(Bankr. S.D.N.Y. 2009) (citing 4 COLLIER ON BANKRUPTCY ¶ 506.05) (emphasis added).   In

order to surcharge collateral, a debtor bears the burden of demonstrating that (i) the expenses

sought to be surcharged against the collateral were necessary to preserve or dispose of the

secured creditor's collateral, (ii) the amounts expended were reasonable and (iii) the expenses

were incurred for the direct and primary benefit of the secured creditor.  *Gen. Elec. Credit Corp.*

*v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12 (2d Cir. 1985) ("*Flagstaff II*"); *In re*

*McLean Indus., Inc.*, 84 B.R. 340, 350 (Bankr. S.D.N.Y. 1988).  Expenses may also be

surcharged where the secured creditor expressly or impliedly consented to bear such expenses.

*Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73,

77 (2d Cir. 1984); *In re Croton River Club, Inc.*, 162 B.R. 656, 659 (Bankr. S.D.N.Y. 1993).

241.    Generally, an expenditure is "necessary" if it was unavoidably incurred in the

preservation or disposal of collateral of the secured creditor.  *In re Ware*, 12-30566-KLP, 2014

Bankr. LEXIS 2437, at *17-18 (Bankr. E.D. Va. June 3, 2014); *In re Combined Crofts Corp.*, 54

B.R. 294, 297 (Bankr. D. Wisc. 1985).  An expenditure is "reasonable" if it is "in some sensible

proportion to the value of the benefit received."  *First Servs. Grp., Inc. v. O'Connell (In re*

---

[60] Bankruptcy Code section 506(c) provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c).

*Ceron)*, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009).  Lastly, there must be evidence of the direct,

non-incidental benefit provided to the secured creditor rather than suggestions of "possible or

hypothetical benefits."  *Flagstaff II*, 762 F.2d at 12.

242.    Here, the Debtors' wind-down analysis employs a questionable methodology that

fails to account appropriately for the availability of various surcharges against the collateral of

the Debtors' secured creditors.  Specifically, the Debtors estimate gross administrative expense

claims through completion of the wind-down process of approximately ▆▆▆▆▆.  Burian

Decl., Ex. B, at 15.  The Debtors estimate that the sale of the unencumbered assets through

liquidation will yield proceeds of approximately ▆▆▆▆▆—$▆▆▆▆ of which is

allocated to the wind-down reserve (pursuant to the Final DIP Order) and ▆▆▆▆ to

repayment of the Junior DIP Facility.  *Id.* at 16.  Then, without explanation, and contrary to the

position taken in all of their prior wind-down analyses, the Debtors allocate all of the remaining

▆▆▆▆ in unencumbered asset sale proceeds to payment of administrative expense claims,

which would deplete entirely the remaining value of the unencumbered assets.  *See id.*  The

Debtors then apply a surcharge of ▆▆▆▆, in respect of the remaining administrative claims

not satisfied by unencumbered assets, against the ABL Collateral,[61] which the Debtors estimate

will yield proceeds of approximately ▆▆▆▆▆▆▆ in an orderly

liquidation.  *Id.* at 13, 16.  Therefore, the Debtors' allocation methodology results in the

complete depletion of unencumbered assets even though the majority of the administrative

expenses incurred are directly related to the monetization of the ABL Collateral.  These expenses

are properly surcharged against the second lien lenders, who did not have the benefit of a waiver

of Bankruptcy Code section 506(c).

---

[61] The Debtors' Wind-down Analysis also reflects a charge of ▆▆▆▆ against the ABL Collateral for the
professional fee carve-out.

243.    The Debtors' allocation inappropriately shifts the burden of these Chapter 11

Cases onto unsecured creditors.  As set forth in the Burian Declaration and as referenced in the

chart below, in a wind-down scenario, the Debtors should apply an additional surcharge against

the ABL Collateral of approximately ▮▮▮▮▮▮▮ on account of necessary costs and expenses to

be incurred in disposing of (and preserving the value of) the ABL Collateral (after payment in

full of the DIP ABL Facility and the non-ESL First Lien Facility and the Stand-Alone L/C

Facility).  *Id.* at 14.

244.    The Debtors' allocation of administrative expense claims appears to be calculated

to deplete unencumbered asset value artificially in an effort to make the ESL Sale appear more

attractive than a wind-down scenario, while also preserving value for repayment of the Second

Lien Facility and ensuring such facility can be used to credit bid in connection with the ESL

Sale.  Moreover, the Debtors' Wind-down Analysis fails to properly surcharge the direct,

quantifiable costs that were incurred, and will continue to be incurred, primarily to benefit

secured creditors and should be properly surcharged against such creditors' collateral in

accordance with applicable law.  *See In re Ware*, 2014 Bankr. LEXIS 2437, at *17-18.  In turn,

the Debtors' construct would result in a proscribed "wind fall to secured creditors" of hundreds

of millions of dollars from avoiding surcharges that should properly be applied to the collateral

securing their claims in the event of a wind-down."  *Se In re Kohl*, 421 B.R. at 123.

245.    Such a result in the wind-down scenario would be grossly inequitable to

unsecured creditors, who would be forced to bear the bulk of the administrative expenses that the

Debtors have incurred over the course of these Chapter 11 Cases and in connection with the monetization of secured creditors' collateral and which are a ***direct result of pursuing a going-concern option primarily for ESL's benefit***, the holder of nearly all of the claims in the Second Lien Facility. *Flagstaff II*, 762 F.2d at 12 (holding that a debtor must show that funds were expended primarily for the benefit of the secured creditor, which creditor benefited directly); *see also U.S. v. Boatmen's First Nat'l Bank*, 5 F.3d 1157, 1160 (8th Cir. 1993) (stating that secured creditor should bear the burden of administrative expenses that are incurred to preserve going concern value for benefit of secured creditor). To allow ESL to avoid the costs of pursuing an unsuccessful option (in the event of a wind-down) while reaping the residual benefits is wholly antithetical to the policies underlying the Bankruptcy Code. As set forth in the Burian Declaration, a proper allocation of administrative expenses results in at least a ███ increase in recoveries for unsecured creditors[62] (and approximately an ███ increase in recoveries for unsecured creditors after proper asset value adjustments), further demonstrating that the ESL Sale does not represent the highest and best alternative for the Debtors' assets. Burian Decl., Ex. B, at 19.

## C.    Analysis of an Alternative Sale Process Confirms that an Asset Monetization and GOB Process Maximizes Value

246.    The marketing and sale process run by the Debtors during these Chapter 11 Cases was laden with flaws, and their wind-down analysis—which leaves unsecured creditors with no recovery—is understated as a result. By contrast, a properly conducted wind-down process will yield higher and better results than the ESL Sale, which will, in turn, enable the Debtors to distribute to their unsecured and true third-party creditors the value to which they are entitled.

---

[62] Recoveries referenced are without taking into account substantial litigation proceeds that would be received in connection with the claims and causes of action against Lampert and ESL that are to be released as part of the ESL Sale.

As explained in the Burian Declaration and the Greenspan Report, a robust sale process would enable the Debtors to market their real asset assets and business lines more effectively without the overhang of ESL to depress interest from potential bidders.

247.    The chart below compares the three recovery analysis scenarios.  The first is the ESL Bid, which depicts the recoveries anticipated as a result of the ESL Bid as ███████████ ██████.  Of note, ██████████████████, the ESL Bid leaves the estate administratively insolvent.  *See supra* Objection, Part II.B.  The second is the "Alternative Sale Process," which shows a recovery analysis based on an orderly sale of assets.  This Alternative Sale Process recovery ██████████████████████████████

███████████████████████████████████████████

████████    As described in detail above, however, this analysis relies on flawed assumptions and valuations.  The third analysis, the "Adjusted Alternative Sale Process," fixes those flaws. Prepared by the Creditors' Committee's advisors, the Adjusted Alternative Sale Process makes three essential adjustments to the Debtors' Alternative Sale Process recovery analysis— correcting the concerns detailed above.  *First*, the analysis allocates expenses incurred for the benefit of the ABL Collateral to the ABL Collateral through a surcharge pursuant to Bankruptcy Code section 506(c) against secured creditors that did not have the benefit of a 506(c) waiver under prior Court orders.  The Debtors' recovery analysis allocated a disproportionate amount of claims to unencumbered assets by failing to surcharge such collateral.  *Second*, the Adjusted Alternative Sale Process recovery analysis reduces the value assigned to certain claims. Specifically, it reduces the value tied to 507(b) Claims asserted by ESL—scheduled at ████ ████ in the Debtors' analysis—to $0.  *Third*, the Adjusted Alternative Sale Process recovery analysis provides more accurate and substantiated values for certain assets.  For example, as

133

described above, the Debtors grossly undervalue the unencumbered real estate in their analysis

by ▮▮▮▮▮. Burian Decl., Ex. B, at 9, 14.



248.    Based on the adjusted analysis, taking into account more reasonable valuations of

key assets, including real estate, and incorporating more appropriate assumptions regarding

claims under Bankruptcy Code section 507(b) and collateral surcharge, the wind-down results in

a ▮▮▮ recovery to unsecured creditors. *Id.* at 9. This is a far superior outcome than the ESL

Sale, which provides no recovery for unsecured creditors and leaves the Debtors' estates

administratively insolvent.

## V.    ESL IS NOT ENTITLED TO THE PROTECTIONS OF BANKRUPTCY CODE SECTION 363(M) OR RELIEF FROM THE AUTOMATIC 14-DAY STAY REQUIRED BY BANKRUPTCY RULE 6004(H)

249.    Bankruptcy Code section 363(m) provides that a purchaser or lessee of property

of the estate is protected from the effects of a reversal or modification on appeal of the

authorization to sell or lease as long as the purchaser acted in good faith and the appellant failed

to obtain a stay of the sale pending appeal. This Court should reject not only the Debtors'

request for an express finding that the "[t]he Buyer is a good faith purchaser within the meaning

of section 363(m)," but also its related request to deprive the Creditor's Committee of the opportunity to seek a stay pending appeal.  Proposed Sale Order ¶¶ 39, 41.

250.    Although the Bankruptcy Code does not define "good faith," the Second Circuit has "adopted a traditional equitable definition:  one who purchases the assets for value, in good faith and without notice of adverse claims."  *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (citation and internal quotation marks omitted).  Typically, lack of good faith is evidenced by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.  *See, e.g.*, *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009).  "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings."  *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147, 14 C.B.C.2d 811 (3d Cir. 1986).  Particularly relevant here, in considering whether a sale is in "good faith" under Bankruptcy Code section 363(m), courts may consider whether a potential purchaser is an insider of the debtor.  *See In re After Six, Inc.*, 154 B.R. at 883 (purchaser's lack of connections with debtor is factor supporting finding of "good faith").

251.    The proponent of good faith carries the burden to show good faith.  *See* 3 COLLIER ON BANKRUPTCY ¶ 363.11. ("The burden of proof to show good faith is on the proponent of good faith, usually the party seeking dismissal of the appeal; it may not be assumed.").

252.    The Debtors and ESL have not satisfied that burden here.  Indeed, nothing in the proposed sale order or the Sale Notice substantiates the bald assertion that ESL is a good-faith purchaser.  *See* Proposed Sale Order ¶ 39.  For good reason:  the evidence shows that ESL is anything but a good-faith purchaser.  As explained *supra*, ESL's actions prior to and during the Chapter 11 Cases, taken together with its status as an "insider" of the Debtors, confirm beyond

doubt that ESL has not conducted itself in good faith and thus is not entitled to a finding of statutory mootness under Bankruptcy Code section 363(m).

253.     Nor should the Court waive the automatic 14-day stay period required by Bankruptcy Rule 6004(h).  Under Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h)

254.     The Advisory Committee Notes to the Rule make abundantly clear that "the purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented."  10 COLLIER ON BANKRUPTCY ¶ 6004.11.  As is true here, "[a] short period of time is often needed and essential to an objecting party intending to appeal because, if the sale is closed in the absence of a stay, any appeal by an objecting party may well be moot" under section 363(m) of the Bankruptcy Code.  *Id.* (citing 11 U.S.C. § 363(m) and supporting cases).  Accordingly, "if an objection has been filed and is overruled, the court should eliminate or reduce the 14-day stay period *only* upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party . . . are sufficiently protected."  *Id.* (emphasis added) (citing cases); *see also id.*  ("If the objecting intends to appeal and seek a stay, the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests.").

255.     There is no basis in the record to depart from this general rule, should this Court approve the ESL Sale.  The Debtors and ESL urge the Court to find that "[t]ime is of the essence in closing the Sale Transaction and the Debtors and Buyer intend to close the Sale Transaction as

soon as practicable."  Proposed Sale Order ¶ 41.  But they offer no basis for that naked assertion.

*See In re PSINet Inc.*, 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (declining to waive automatic

stay period where, as here, "Debtors made no evidentiary showing of a business exigency

requiring a closing within" the stay period" and where, as here, "the Motion contained no more

than a contention that the [stay] period should be eliminated . . . and a generalized assertion that

the Debtors require 'an expedited closing'").  To the extent the APA attempts to manufacture

exigency by contemplating consummation soon after the sale hearing, notably the APA does not

impose that consummation must occur by a certain date as a condition of the ESL Sale; rather, it

expressly contemplates that a party can *choose* whether to terminate the APA in the event that

the sale order is stayed as of February 8, 2019.

256.    Ultimately, by urging this Court to make a premature (and unwarranted) finding

of statutory mootness under section 363(m)—an issue that is ultimately for the appellate court to

decide—through an unsubstantiated "good faith" finding and an unjustified waiver of the

ordinary 14-day automatic stay, the Debtors and ESL effectively invite this Court to deprive the

Committee of its well-established right to obtain appellate review.  *See In re Adelphia Commc'ns*

*Corp.* , 361 B.R. 337, 349-350 (S.D.N.Y. 2007) (holding that objecting parties "have a right to

appellate review" and that "there is a significant public interest in vindicating the rights of the

minority and preventing the will of the majority to go unchecked by appellate review") (citation

and internal quotation marks omitted).  This Court should reject that transparent effort to curtail

the Creditor Committee's (and other objectors') appellate rights.

## **CONCLUSION**

257.    For the reasons set forth herein, the Debtors have not met their burden of

demonstrating that the ESL Sale is in the best interest of the Debtors' estates and creditors.  Even

if the Debtors were entitled to deference under the guise of "business judgment" (which they are

not), the ESL Sale still would fail.  Not only is the ESL Sale premised on an impermissible credit

bid of over $1.3 billion and an unrealistic and unreasonable business plan for Sears NewCo, the

terms of the sale are nothing more than an illusory one-way option for ESL to acquire the

Debtors' assets while leaving the Debtors' estates administratively insolvent and without

satisfying outstanding obligations or, at best, poised for a chapter 22 filing in the near term.  The

ESL Sale would leave the Debtors administratively insolvent, while depriving the Debtors'

unsecured creditors and all of the Debtors' true third-party creditors of value to which they are

entitled and would receive through (i) properly conducted GOB sales, (ii) the monetization of

valuable real estate by way of a market-based sale process and (iii) the pursuit of viable causes of

action.  Accordingly, this Court should (i) deny the ESL Sale in its entirety and (ii) grant such

other relief as it deems just, equitable and proper.

New York, New York
Dated:  January 26, 2019

AKIN GUMP STRAUSS HAUER & FELD LLP

/s/  Ira S. Dizengoff
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
E-mail: idizengoff@akingump.com
        pdublin@akingump.com
        aqureshi@akingump.com
        jsorkin@akingump.com
        sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Sears Holdings Corporation, et al.*