## LEASEBACK

### Gaithersburg, MD
### Site 1754

**THIS LEASE** (this "**Lease**") is made as of the 18th day of May, 2018 ("**Effective Date**"), between **NW GAITHERSBURG LLC**, a Delaware limited liability company, having an office at c/o Northwood Investors, 575 Fifth Avenue, 23rd Floor, New York, New York 10017 ("**Landlord**") and **SEARS, ROEBUCK AND CO.**, a New York corporation, having an office at 3333 Beverly Road, Hoffman Estates, Illinois 60179 ("**Sears**").

### W I T N E S S E T H:

**WHEREAS,** pursuant to that certain Purchase and Sale Agreement ("**PSA**") dated of even date herewith between Sears, SRC O.P. LLC, a Delaware limited liability company and SRC Facilities LLC, a Delaware limited liability company, as seller ("**Seller**"), and Landlord, NW Duluth LLC, NW Northgate II LLC and NW Springs LLC, as buyer ("**Buyer**"), Seller agreed to sell to Buyer, and Buyer agreed, *inter alia*, to purchase from Seller certain real property, including the existing Sears store (together with any existing auto center) and parking area located thereon (collectively, the "**Store**"), and which real property is more particularly described on Exhibit A annexed hereto (collectively, the "**Property**");

**WHEREAS,** as a condition to the closing pursuant to the PSA, immediately following the transfer of the Property by the Seller to Landlord, Landlord is required to lease to Sears, and Sears is required to lease from Landlord, the Premises (as hereinafter defined) pursuant to the terms and conditions of this Lease; and

**WHEREAS,** the closing under the PSA occurred on the Effective Date and Sears and Landlord wish to enter into this Lease to complete the transaction.

**NOW, THEREFORE,** Sears and Landlord agree as follows (all capitalized items shall have the meaning in the PSA, unless otherwise defined herein):

1.  **Demise.** Landlord hereby leases to Sears, and Sears hereby leases from Landlord, the Premises. The "**Premises**" means the Property (together with all easements and appurtenances for the benefit of the Property, including the non-exclusive use of the existing parking areas benefiting the Property in existence on the date hereof, for the Term (as hereinafter defined). All Leases with the tenants listed on the attached **Schedule 1** together with any concessions, licenses, subleases, franchise agreements, department arrangements and other occupancy agreements relating to portions of the Premises, whether in existence on the Effective Date, or entered into by Sears after the Effective Date and as the same may be modified, amended or extended (collectively, the "**Sears Leases**") shall continue to inure to the sole benefit of Sears through the Termination Date. Notwithstanding anything contained herein to the contrary, in no event shall any of the Sears Leases allow any tenant or occupant to remain in the Premises following the Termination Date, as hereinafter defined, without Landlord's prior written consent which may be given or withheld in Landlord's sole discretion. For the avoidance

of doubt, Sears expressly retains all obligations under, and rights, remedies and privileges in and to, the Sears Leases for the duration of the Term, including all rents payable under the Sears Leases.

2.    **Term.**  The term of this Lease (the "**Term**") shall commence on the date hereof and shall end on the last day of the calendar month in which the fourth (4th) anniversary of the Effective Date occurs, or upon any earlier Termination Date (as hereinafter defined).  If the date otherwise scheduled for termination or expiration of this Lease is not a regular Business Day, the Termination Date shall be on the first Business Day thereafter.  A "**Business Day**" means any day other than a Saturday, Sunday or other day on which federally chartered banks are authorized or required by law to be closed in the jurisdiction in which the Property is located.  A "**Lease Year**" shall mean each successive twelve (12) calendar month period commencing on the first day of a calendar month.  The first Lease Year shall be the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the month in which the Term of this Lease commences plus any partial calendar month during the calendar month in which the Term of this Lease commences.

3.    **Termination of Lease; Surrender of Possession.**  Upon the first to occur of (i) the expiration of the Term, or (ii) the termination of this Lease which may be elected by either Sears or Landlord upon not less than six (6) months' written notice by either Sears or Landlord to the other party, but only if such termination is effective after the expiration of the second Lease Year, or (iii) any sooner termination of the Lease pursuant to Section 6(d), Section 9 or Section 10 hereof (the "**Termination Date**"), Sears shall surrender possession of the Premises, free of all subtenants, licensees, leases, subleases, concessionaires, franchisees, department arrangements and other occupants claiming by, through or under Sears (or any assignee of Sears), including all Sears Leases, if any, free of violations of record, free of liens or mortgages created by Sears or a person, firm or entity operating under a Sears Lease, and free of hazardous substances introduced by Sears (or a party operating under a Sears Lease), in substantially the same condition existing at the date hereof, reasonable wear and tear and damage by casualty and the elements excepted, and without any obligation by Sears to make any capital expenditures or structural repairs, alterations or restoration, or to remove any fixtures, furnishings or equipment or other Personal Property, except as expressly provided herein.  On or prior to the Termination Date, Sears shall remove all of Sears' inventory, merchandise, furnishings, movable equipment and trade fixtures, and other Personal Property, and any of the same remaining after the Termination Date may, at Landlord's election, be removed at Sears' expense or retained by Landlord for its account. On or before the Termination Date, Sears may, but shall not be required to, remove any fixtures used in connection with Sears' operations, but in no event shall Sears remove any fixtures necessary for the operation of the mechanical systems existing in the Premises (including but not limited to heating, ventilation and cooling systems and plumbing systems) or any lighting fixtures installed in or about the Premises. In the event of a termination of this Lease pursuant to Section 9, Sears shall have up to an additional ninety (90) Business Days (as elected by Sears) beyond the stated Termination Date to remove any or all of its property at its election from the Premises but Sears shall pay Rent at the rate set forth herein for any period beyond the stated Termination Date that Sears remains in possession of the Premises (such Rent not to be apportioned on a per-square-foot basis).  Notwithstanding the foregoing, in the event that any termination of this Lease by Landlord would be effective between November 15 and January 15 of the following calendar year, Sears shall have the

2

option, in Sears' sole discretion, to accelerate or delay such termination to any Business Day between (and including) November 14 and January 16 by written notice to Landlord following receipt of Landlord's termination notice.

4.     **Rent.**

(a)     As consideration for this Lease, Sears shall pay to Landlord annual fixed rent ("**Annual Fixed Rent**") during each Lease Year in the aggregate amount set forth on **Schedule 2** attached hereto.   The Annual Fixed Rent then in effect shall be payable in equal monthly installments ("**Monthly Fixed Rent**") in advance, without notice, demand or setoff, on or prior to the fifth (5th) day of each month.   Monthly Fixed Rent shall be prorated on a per diem basis for any portion of a month; provided, that the Monthly Fixed Rent for (i) the portion of the calendar month in which the Effective Date occurs and (ii) the first full calendar month thereafter, shall be paid by Sears at the Closing (as defined in the PSA).

(b)     As "**Additional Rent**" Sears shall also pay, during the Term, on or prior to the fifth (5th) day of each month, the following:

(i)     All of the real estate taxes assessed against the Property in equal monthly installments based on the then most recent amounts actually due and payable to the relevant taxing authority; provided however that Sears shall not be responsible for any real estate taxes allocable to any additional improvements built or installed on the Property after the Effective Date by any party other than Sears or a tenant under a Sears Lease.

(ii)     All of Landlord's insurance premiums, in equal monthly installments, for the coverages applicable to the Property that Landlord purchases pursuant to the Lease (provided such insurance premiums, and the insurance coverages (including deductibles) purchased therewith are commercially reasonable and consistent with the types and amounts of coverages that would be purchased by prudent owners of properties similar in type to and in the general vicinity of the Property). Landlord hereby estimates that the annual insurance premium amounts due from Sears for the first twelve months of the Lease Term will be $27,000, but the foregoing is just an estimate and Sears shall be required to pay Landlord for the actual insurance premiums irrespective of the estimated amount in accordance with the provisions hereof.

(c)     In addition, Sears shall pay to the Landlord as Additional Rent, any amounts billed to Landlord or Sears by the developer under the REA (as hereinafter defined) and/or any counterparty to any Ancillary Rights and Agreements (as hereinafter defined), in the same manner as billed to Landlord ("**Developer Charges**"), it being expressly understood that Landlord shall pay the developer and counterparty (as applicable) directly and Sears shall remit payments to Landlord for such Developer Charges within sixty (60) days following receipt by Sears of copies sent by Landlord of any relevant invoices from the developer and counterparty (as applicable) and Landlord shall, in due course, provide reasonable evidence that the same was paid to the developer and counterparty (as applicable). Notwithstanding the generality of the foregoing, Sears' responsibility for charges accruing under the REA and/or any Ancillary Rights and Agreement shall be subject to any scheduled increases pursuant to the express terms of the REA and/or any Ancillary Rights and Agreement; provided, however, Sears shall not be responsible for any increased charges under the REA or any Ancillary Rights and Agreements

3

that are a result of any amendment or modification to the REA or any Ancillary Rights and Agreements, as applicable, entered into, or negotiated for, by Landlord and Landlord shall indemnify and hold Sears harmless from any liability resulting from any failure by Landlord to remit payment to the developer or counterparty (as applicable).

(d)     Landlord shall give prompt notice to Sears of all real estate taxes, Developer Charges, and insurance premiums, payable by Landlord (and ultimately Sears) hereunder of which Landlord has knowledge and shall send Sears copies of all bills and notices received by Landlord. Promptly after receipt of such notice and any backup information or materials reasonably requested by Sears, the actual amount of Additional Rent in respect of real estate taxes, Developer Charges and insurance will be adjusted between Landlord and Sears in cash. Sears reserves the right to audit the books and records of Landlord with respect to any component of Additional Rent within one (1) year of the expiration of the year to which such Additional Rent relates.

(e)     Subject to Section 4, all real estate taxes applicable to the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available tax bill and adjusted in cash once actual taxes are known.

(f)     To the extent that Landlord has not previously instituted tax certiorari proceedings, Landlord shall, at the request of Sears, and, except as otherwise provided herein, at Landlord's own expense (subject to the last sentence of this paragraph), contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any tax (including penalties and interest), assessment, tax lien, forfeiture or other imposition or charge upon or against the Property or any part thereof, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no default under this Lease has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority, Landlord posts a bond or takes other steps acceptable to such taxing authority that removes such lien or stays enforcement thereof; (iv) Landlord shall promptly provide Sears with copies of all notices received or delivered by Landlord and filings made by Landlord in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Sears to pay the amount of any such tax and assessment or part thereof applicable to the Premises as finally determined in such proceedings (or, if applicable, Sears will be entitled to any refund resulting therefore), to the extent the payment thereof to Landlord was deferred during the prosecution of such proceedings, together with any costs or fees (including attorneys' fees and disbursements) in connection therewith, to the extent not previously remitted to Landlord by Sears, and the remainder of which shall be the obligation of Landlord.  Landlord and Sears shall take such actions as are reasonably necessary or at the request of Sears (including executing any instruments or documents) necessary in connection with such contest or proceedings. The cost of any tax contest or legal proceedings with respect to any real estate taxes applicable to the Property, as more fully described in this subsection (f) above, may be included, by Landlord, in the real estate tax charges for the Property.

(g)     If the Termination Date occurs on any day other than the last day of a calendar month, Sears will be entitled to a refund in an amount equal to Monthly Fixed Rent and

4

Additional Rent theretofore paid with respect to the Property allocable on a per-diem basis to the remainder of the month.

(h)     The parties acknowledge and agree that Sears shall be responsible for all of its own ordinary operating costs and expenses (such as but not limited to utility costs and phone service) in connection with Sears' use and occupancy of the Property prior to the Effective Date and the Premises during the Term, in accordance with its customary practices, subject to Section 8, and except (i) for costs, expenses and damages resulting from the negligence or willful misconduct by Landlord or its agents, employees, customers or invitees,  or contractors, and (ii) as otherwise expressly set forth herein.

(i)     All Annual Fixed Rent, Monthly Fixed Rent and Additional Rent (if any) payable under this Lease from Sears to Landlord shall be collectively referred to herein as "**Rent.**"

(j)     For the avoidance of doubt, Sears shall be solely responsible for payment of all real estate taxes for the period of January 1, 2018 up to and including the Effective Date.

(k)     Notwithstanding anything contained herein to the contrary, the Additional Rent for the portion of the calendar month in which the Effective Date occurs and the first full calendar month thereafter shall be paid by Sears at the Closing under the PSA.

5.     **Alterations; "Going out of Business Sale".**

(a)     Sears shall not make, or cause to be made, any alterations to (i) the building structure or building systems, or (ii) the exterior portion of the Store, or (iii) any other material alterations, or (iv) affix any fixtures to the Premises, without in each instance obtaining Landlord's prior written consent; provided, however, that Sears shall not be required to obtain any consent for any non-structural alterations within the Premises including any non-structural interior alterations in connection with Sears Leases, any downsizing of the Store, or any other reductions or changes in business operations or reductions or reconfigurations in utilizing space within the Premises.

(b)     Notwithstanding any provision herein to the contrary but subject to any restrictions contained in the REA and compliance with applicable law, Sears shall have the right to conduct and advertise a "going out of business sale" ("**GOB Sale**") to be completed during the one hundred twenty (120) Business Day period prior to the Termination Date (as extended herein) and to cease store operations and to remove its personal property and prepare for the turnover of possession of the Premises to Landlord pursuant to the provisions in this Lease.

6.     **Use.**

(a)     Sears shall use the Premises (if at all) solely (i) for the operation of a Sears store (including Sears Leases) and (ii) in compliance with all applicable laws and consistent with the terms of the reciprocal easement agreement applicable to the Premises, if any, and described on **Schedule 3** attached hereto (the "**REA**"), for purposes in connection with or incidental to the cessation of or reduction or change in scope or nature of the operation of the Premises as such, including the sale of fixtures, furnishings, equipment and inventory (including sale of additional

or non-Sears merchandise from other Sears stores or Sears auto centers and other sources) located at the Premises, and/or in connection with liquidation and/or store closing sales.

(b)     Without limiting the foregoing, Sears will continue to enjoy the benefit of all existing and future easements, covenants, parking agreements, rights of access and ingress, and all other rights and benefits as it currently enjoys under the REA and otherwise with respect to the Property and any similar or ancillary agreements with respect thereto (all of the foregoing, collectively, "**Ancillary Rights and Agreements**"), and in furtherance thereof, Landlord agrees to comply with and enforce all applicable Ancillary Rights and Agreements for the benefit of Sears and the operation of the Store.  Sears and Landlord each hereby covenant that it shall not take any action (or fail to take action if action is required of such party) as will cause the other party to be in default under the REA or otherwise impose the other party to monetary damages under the REA, during the Term of this Lease (other than in connection with the PSA, entering into this Lease or any termination of this Lease).  Sears agrees to continue to comply with the applicable non-monetary provisions (if any) of the Ancillary Rights and Agreements in accordance with its past practices in the ordinary course of business; provided, however, Sears' obligation to pay any common area charges, assessments or other costs or expenses (if any) set forth in the Ancillary Rights and Agreements or otherwise shall be as stated Section 4 and in addition, Sears (or its successors or assigns, other than Landlord and its successors and assigns) shall at all times be responsible for any costs, fees or expenses resulting from a violation of the Ancillary Rights and Agreements by Sears (or its successors or assigns, other than Landlord and its successors and assigns), or occupants of the Premises deriving rights through Sears (or its successors or assigns, other than Landlord and its successors and assigns) (expressly excluding any consequences resulting from any triggering of any repurchase option or any failure by Landlord to comply with any Ancillary Rights and Agreements or to remit to the developer any applicable payment made by Sears to Landlord in respect of any amount due under any Ancillary Rights and Agreements).  Landlord agrees to cooperate with, and reasonably assist, Sears in any effort by Sears to seek or enforce the developer's compliance with the terms and conditions of the REA and any Ancillary Rights and Agreements (including, but not limited to, the developer's obligation to provide any services to Sears pursuant thereto).

(c)     For the avoidance of doubt, except as expressly provided in this Lease, Sears shall not have any obligation to operate or use or conduct business in any portion of the Premises or, except as expressly provided in this Lease, be subject to any restrictions on any operations or the use of or conduct of business at the Premises.

(d)     Sears hereby acknowledges and agrees that notwithstanding any provision to the contrary in the REA with respect to a leaseback transaction, as of the Effective Date, Landlord shall be the "approving party" under the REA (that is, the party making decisions that would otherwise be made by Sears under the REA) and substituted in place of Sears under the REA and otherwise have the right to grant or withhold consents, approvals and the like as owner of the Sears Parcel (as such term is defined in the REA) under the REA. In accordance with the foregoing, Sears expressly waives any rights it may have with respect to the issuance of any consent, amendment or modification of the REA and agrees to promptly forward any request or correspondence pertaining to same to Landlord.  Landlord shall have the right to terminate the REA and/or any or all of the Ancillary Rights and Agreements, provided that: (i) Landlord notifies Sears at least thirty (30) days prior to Landlord delivering the termination notice to the

6

developer or applicable counterparty and thereafter simultaneously delivers to Sears a copy of the termination notice sent to the developer or applicable counterparty (the "**REA Termination Notice**"), and (ii) Sears shall have thirty (30) days following receipt of the REA Termination Notice to elect by notice to Landlord to terminate this Lease effective as of the date the REA (and/or the Ancillary Rights and Agreements, as applicable) terminates (which such date of termination of the REA and/or the Ancillary Rights and Agreements, as applicable, shall be at least ninety (90) Business Days following the date of the REA Termination Notice and shall not occur between (and including) November 14 and January 16), whereupon this Lease shall be so terminated as of such date, and (iii) if Sears elects not to terminate this Lease as provided in clause (ii) (or is deemed to have elected not to terminate this Lease by not providing notice of its election to terminate to Landlord), this Lease shall remain in full force and effect. Landlord shall also have the right to amend or modify any Ancillary Rights and Agreements in its sole opinion and discretion, provided, however, Landlord agrees that Landlord shall not amend or modify the Ancillary Rights and Agreements in a manner which would materially increase any obligations or liabilities of Sears, or would materially reduce any benefits or services to Sears under the Ancillary Rights and Agreements, or materially interfere with Sears' use of the Premises without Sears' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed by Sears. It is understood and agreed that Sears may not withhold its consent to any modification of any Ancillary Rights and Agreements if Landlord makes alternative arrangements to provide Sears with such easements, parking agreements, rights of access and ingress, and all other rights, benefits and services as it enjoyed under the applicable Ancillary Rights and Agreements prior to the Effective Date at a cost to Sears (if any) that is not greater than any proportionate share of costs that Sears is currently paying under the applicable Ancillary Rights and Agreements. From and after the Effective Date, in no event shall Sears retain any authority to terminate, amend or modify the Ancillary Rights and Agreements. Sears shall reasonably cooperate with Landlord (at no cost or expense to Sears) in facilitating or acting as a conduit in any discussions or negotiations with the developer or any other parties under the Ancillary Rights and Agreements. Notwithstanding the foregoing, Landlord shall indemnify, defend and hold Sears harmless from and against any liability resulting from Landlord's actions taken, or failure to take any actions required (or actions taken or not taken by Sears at Landlord's direction), under the Ancillary Rights and Agreements, as provided for in this Section 6.

(e)     From and after the Effective Date, Sears will not (i) provide written notice to the developer under the REA of any election by Sears to close the Sears store or terminate operations at the Premises; (ii) notify the developer under the REA of any planned downsizing of the Sears store; (iii) seek or respond to changes to the REA proposed by any party to the REA; (iv) communicate any proposed changes in use of the Premises by Sears to any party to the REA; (v) discuss an event of default under the REA with any party to the REA without first communicating the same to Landlord; or (vi) communicate any proposed changes to the parking facilities with any party to the REA.

7.     **Access and Cooperation.**  Upon at least twenty-four (24) hours prior notice to Sears, Landlord and its representatives shall be granted access to the Premises during normal business hours; provided, however, that in emergency circumstances Landlord and its representatives may have immediate access to the Premises at any time after making all reasonable attempts to contact Sears, but otherwise without the necessity of prior notice. Landlord shall be permitted to physically inspect the Premises so long as (i) such access and

7

inspection shall not unreasonably interfere with Sears' business operations at the Premises, and (ii) to the extent that Landlord conducts physical testing or invasive studies during such access or entry, Landlord shall provide 5 days' prior notice and shall promptly restore or repair any damage to sales area then in use occasioned by such access or entry.

8.  **Services and Repairs; Utilities.**

(a)     Sears shall accept the Premises in its then-existing condition as of the Effective Date, "as is," "where is," with all faults and without any written or verbal representations or warranties whatsoever, whether express or implied, other than representations and warranties expressly set forth in this Lease, and except for any surviving provisions of the PSA and any ancillary documents executed in connection therewith.

(b)     Subject to the foregoing and the following provisions of this Section 8 and the other terms and conditions of this Lease, Landlord shall have no obligation to supply any services or make any repairs to the Premises (other than with respect to the common areas for which Landlord shall be solely responsible), the parties expressly intending that subject to the further provisions of this Section 8, Sears' current arrangements for all other services and general maintenance and ordinary repairs shall continue unaffected during the Term (and Landlord shall not interfere with same).

(c)     Except as expressly set forth above and elsewhere in this Lease, Sears shall have no obligation to make any extraordinary or structural repairs or replacements or capital expenditures of whatsoever nature (collectively, "**Property Repairs**") during the Term except (i) as and to the extent necessitated by Sears' failure to perform general maintenance in accordance with past practices at the Property, and (ii) as arising from the negligence or willful misconduct of Sears. Sears shall have the right to continue to exercise and enforce exclusively as against its sub-tenants, licensees, concessionaires and occupants under the Sears Lease, any and all rights of the owner or landlord under the Sears Leases, (including, without limitation, with respect to subtenants' or occupants' maintenance and upkeep of the Premises), and Landlord agrees to reasonably cooperate with Sears at no cost to Landlord in connection therewith.

(d)     [Intentionally omitted.]

(e)     Notwithstanding the foregoing, subject to the obligations of Sears to continue to pay Additional Rent (if any) as provided herein, without limiting the provisions of Section 6(b) Landlord shall continue to diligently enforce, for the benefit of Sears and the Property, all obligations of the owner or developer under the Ancillary Rights and Agreements.

(f)     Sears shall pay directly to the utility company(ies), the cost of trash removal and all utilities consumed by Sears during the Term (other than with respect to common areas, including parking areas, for which Sears sole obligation shall be the payment of Additional Rent pursuant to Section 4).

9.  **Insurance; Casualty.**

(a)     Landlord shall maintain commercial general public liability insurance for the common area of the Property and Special Form – Causes of Loss property damage insurance

8

covering the Premises and other building improvements on the Premises (including, but not limited to, earthquake, and/or flood insurance, if purchased by Landlord), and such other types and amounts of coverage (and deductibles) that are commercially reasonable and consistent with the types and amounts of coverages (and deductibles) that would be purchased by prudent owners of properties similar in type to and in the general vicinity of the Property, and Sears shall pay to Landlord the costs of such insurance maintained by Landlord with respect to the Property in accordance with Section 4. Sears shall maintain all personal property and liability insurance programs presently in effect or as replaced by Sears from time to time in accordance with Sears' general corporate policies throughout the Term. Notwithstanding the generality of the foregoing, liability insurance shall at all times be provided by a policy written by reputable and financially sound, duly licensed insurance companies, authorized to do business in the state in which the Premises are located and with such financial ratings as would be considered prudent by a national retailer acting reasonably, and a duplicate original or certificate thereof shall be delivered to the Landlord upon request from time to time.

(b)     This Lease shall terminate upon the occurrence of a fire or other casualty which results in material damage (defined herein as damage to at least twenty five percent 25% of the Premises), with an appropriate prorated refund to Sears on a per-diem basis of all prepaid Monthly Fixed Rent and Additional Rent. If this Lease terminates as provided above, Sears may elect to extend the Term for a period not to exceed ninety (90) Business Days (and the initial Termination Date shall be extended accordingly), upon ten (10) days' notice to Landlord after the initial scheduled Termination Date, for the purpose of winding down its business operations and/or conducting a GOB Sale, during which extended Term Sears shall continue to pay Monthly Fixed Rent and Additional Rent. In no event shall Sears or Landlord be obligated to make any repairs or restorations in the event of casualty damage to the Premises.

(c)     Upon any actual condemnation or other taking of a material portion of the Premises, this Lease shall automatically terminate provided that Sears shall have the right to extend the Term and the initial Termination Date for a period not to exceed ninety (90) Business Days upon ten (10) days' notice to Landlord after Sears receives notice of the condemnation or other taking, during which to wind down its business operations and/or conduct a GOB Sale, and shall continue to pay Monthly Fixed Rent and Additional Rent for such period after the date the Lease automatically terminates. Sears shall not have any right to any portion of the proceeds of any award for a condemnation or other taking, or a conveyance in lieu thereof, of all or any portion of the Premises, but shall have the right to make a separate claim only for its relocation costs, goodwill, signage, merchandise, inventory, personal property and trade fixtures.

    10.    **Default.**

    (a)    **By Sears.**

        (i)    If Sears defaults in (A) the payment of Monthly Fixed Rent or Additional Rent reserved hereunder for seven (7) Business Days after receipt of written notice from Landlord or (B) the observance or performance of any other material obligations of Sears hereunder for a period of thirty (30) Business Days after receipt of written notice from Landlord (or such longer period as may be reasonably required to cure such default, provided that Sears is diligently prosecuting such cure to completion), then in addition to all rights and remedies

9

available at law, or in equity, Landlord may give Sears written notice of its intention to terminate this Lease at the end of the expiration of thirty (30) Business Days (such period is not intended to be an additional cure right or provide Sears with any right of redemption) from the date of the giving of such notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) Business Days with the same effect as if the last of such thirty (30) Business Days was the date originally set forth herein for the expiration of the Term.

        (ii)     If (A) Sears becomes insolvent or bankrupt or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Sears or for the major part of its property; (B) a trustee or receiver is appointed for Sears or for the major part of its property; or (C) any voluntary or involuntary proceedings are filed by or against Sears under any bankruptcy, insolvency or similar laws, Landlord may give Sears written notice of intention to terminate this Lease at the end of the expiration of ten (10) Business Days from the date of giving such notice, and in such event, this Lease and the Term shall terminate upon the expiration of such ten (10) Business Days with the same effect as if the last of such ten (10) Business Days was the date originally set forth herein for the expiration of the Term.

        (iii)    Upon the termination of this Lease in accordance with the provisions of this Section 10(a), Sears shall remain liable to Landlord for any portion of the Monthly Fixed Rent and Additional Rent reserved hereunder through the end of the Term but in no event shall Sears be liable for any consequential, special, punitive or other damages, or any other costs, fees or expenses. In such event, Landlord shall make reasonable efforts to mitigate damages.

        (b)    **By Landlord.**  If Landlord defaults in (i) the payment of any amount to be paid by Landlord hereunder for seven (7) Business Days after receipt of written notice from Sears or (ii) the observance or performance of any other material obligations of Landlord hereunder for a period of thirty (30) Business Days after receipt of written notice from Sears (or such longer period as may be reasonably required to cure such default provided that Landlord is diligently prosecuting such cure to completion), then in any such event Sears may give Landlord written notice ("**Sears Notice**") of its intention to (A) cure any or all non-monetary defaults of Landlord, in which event Landlord shall pay to Sears the reasonable cost of curing the same upon demand, and/or (B) set off against the Rent and all other sums due or becoming due from Sears to Landlord hereunder, the amount of all sums as to which Landlord is in default, together with the reasonable cost of curing all non-monetary defaults of Landlord in the event Sears elects to cure the same, at the end of (I) with respect (A), the expiration of ten (10) Business Days from the date of the giving of such Sears Notice and (II) with respect to (B), the expiration of five (5) Business Days from the date of giving of such Sears Notice. The provisions of this Section 10(b) shall survive the expiration or sooner termination of this Lease.

       11.    **Assignment/Subleasing.**

        (a)    Except as provided in paragraph (b) below, Sears shall not (i) assign this Lease, or (ii) sublease any portion of the Premises except for Sears Leases which shall be terminated on or prior to the Termination Date.

10

(b)    Sears shall also have the right, upon prior written notice to Landlord (to the extent such transaction has been publically announced, otherwise promptly after the closing of such transaction), but without Landlord's prior approval, to (i) assign this Lease to Parent or any Subsidiary of Sears; (ii) assign or transfer all of Sears' rights and obligations under this Lease (either directly or indirectly, by operation of law or through a merger or other corporate transaction) to any other Person that (1) acquires all or substantially all of the assets of Sears Holdings Corporation ("**Parent**"), (2) is the surviving entity of a merger with Parent, or (3) results from a consolidation, reorganization or recapitalization of Parent with a solvent corporation, partnership or other legal entity; or (iii) assign or transfer all of Sears' rights and obligations under this Lease to any Person that concurrently acquires not less than ten (10) Sears' stores (including the Premises) by purchase, consolidation, merger or spin-off; provided, that in each case the successor tenant (if not the named tenant herein, the "**Unrelated Successor Tenant**") assumes all of Sears' obligations under this Lease (except that any such Unrelated Successor Tenant shall not be required to comply with any operating covenant provided for herein). In the case of an assignment or transfer in connection with clause (iii) above, Sears shall be released from all liability under this Lease provided the assignee has a net worth of not less than $25,000,000 as of the effective date of such assignment or transfer and the assignee assumes in writing the obligations of Sears under this Lease which arise on and after the date upon which the assignment becomes effective.  As used in this Lease, (x) "**Subsidiary**" means, as to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination and (y) "**Person**" or "**person**" means any natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity.

(c)    Notwithstanding the provisions of this Section 11, nothing contained herein shall constitute a waiver of Landlord's rights under 11 U.S.C. §365.

12.    **Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the State in which the Property is located applicable to agreements made, and to be wholly performed, in such state.

13.    **Waiver of Trial by Jury.**  LANDLORD AND SEARS EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE.

14.    **Binding Effect.** Subject to Section 11 above, this Lease shall bind and inure to the benefit of the parties hereto and their respective legal representatives, permitted successors and assigns.

15.     **Complete Agreement; No Oral Modification.** This Lease may not be altered or terminated, nor may its provisions be waived, except in a writing signed by each of the parties hereto. This Lease, together with the PSA and the documents referred to in the PSA or executed in connection with the Closing thereunder, represents the entire agreement and understanding of the parties with respect to the subject matter hereof, and completely supersedes and integrates any and all other promises, understandings and agreements between the parties (including all of the same by and between any of the parties' agents and representatives on behalf of the parties), both oral and written.

16.     **Counterparts.** This Lease may be executed in two or more counterparts and by facsimile or electronic signatures which taken together shall constitute collectively one agreement. In making proof of this Lease it shall not be necessary to produce or account for more than one such counterpart with each party's original, facsimile or electronic signature.

17.     **Invalidity.** If any term or provision of this Lease shall to any extent or for any reason be held invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be valid and enforceable to the fullest extent permitted by law, subject to such modification hereof as may be necessitated by such invalidity, illegality or unenforceability provided that the purpose and intent hereof is not in any way abrogated.

18.     **Notices.**

(a)     Notices shall be either (i) personally delivered, (ii) sent by a nationally recognized overnight courier delivery service, or (iii) mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If personally delivered, then notices shall be effective when received as evidenced by affidavit of the Person making such delivery; if sent by overnight courier delivery service then notices shall be deemed to have been received by the addressee on the next Business Day following the date so sent; if mailed, then notices or other communication shall be deemed to have been received by the addressee on the date received as evidenced by the return receipt. The inability to make delivery because of changed address of which no notice was given or by reason of rejection or refusal to accept delivery of any notice shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. All notices, demands or requests made pursuant to, under or by virtue of this Agreement must be in writing and addressed as follows:

If to Sears:

c/o Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: President – Real Estate
Telephone: (847) 286-5303

With copies to:

c/o Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE

WEIL:\96568149\3\73219.0007

Hoffman Estates, IL 60179
Attention: Associate General Counsel – Real Estate
Telephone: (847) 286-1719

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: W. Michael Bond, Esq.
Telephone: (212) 310-8035
Email: Michael.Bond@Weil.com

If to Landlord:

Northwood Investors
575 Fifth Avenue, 23rd Floor
New York, New York 10170
Attention: Shiva Viswanathan
Telephone: (212) 573-0839
Email: shiva@northwoodinvestors.com

With a copy to:

Law Offices of David Skrilow
250 Park Avenue, Suite 2050
New York, New York 10177
Attention: David Skrilow, Esq.
Telephone: (212) 808-0801
Email: dskrilow@skrilowlaw.com

(b)     Any party may change its address for notice purposes hereunder by providing all other parties written notice thereof ten (10) days prior to such change. Notices may be given by a party by its attorneys.

19.     **Mechanic's Liens.**     Sears shall not permit any mechanic's, laborer's or materialman's lien to be filed at any time against the Property or any part thereof by reason of work performed with prior authorization by or on behalf of Sears or any agent or contractor claiming by, through or under Sears, which are not bonded, discharged or otherwise stayed pursuant to appropriate proceedings within forty-five (45) days of the later of (a) the filing thereof or (b) Sears' receipt of written notice thereof.

20.     **Hazardous Materials.**     During the Term, no hazardous material shall be created, handled, placed, stored, used, transported or disposed of by Sears on the Property except in accordance with Sears' customary use and practice in the ordinary course of business, and in all events, only in material compliance with applicable law.

21.     **Indemnification; Waiver of Subrogation.**

(a)     Each party shall indemnify, defend and hold the other harmless from and against all claims, actions, damages, liability and expense, including reasonable attorneys' fees ("**Loss**"), in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Property to the extent caused by any act or omission of the indemnifying party and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of the other party, its agents, contractors, employees, servants or licensees (as to all of which Loss the party charged with such acts or omissions shall indemnify, defend and hold harmless the other party).    Notwithstanding anything contained herein to the contrary, in all instances throughout this Lease where one party is indemnifying the other, in no event shall either Landlord or Sears be liable for punitive, indirect or consequential damages.

(b)     Each party releases and waives any and every claim and right of recovery against the other which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, which loss or damage is customarily covered by a Causes of Loss-Special Form Insurance policy.   This mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties.   Landlord and Sears agree to furnish to each insurance company which has or will issue property damage policies on its premises, notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

22.     **Hold Over.**   No holding over by Sears nor acceptance of rent, additional rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord.   Should Sears hold over after the Termination Date, without the consent of Landlord as thereon may be extended in accordance with the terms hereof, this Lease shall continue in force from month to month, subject to all of the provisions hereof, except Monthly Fixed Rent shall from and after the Termination Date (as the same may be extended) increase to 200% of Monthly Fixed Rent.

23.     **Subordination; Quiet Enjoyment.**

(a)     Subject to and expressly conditioned upon the provisions of Section 23(b), this Lease and all rights of Sears hereunder are hereby made and shall be subject and subordinate in all respects to the lien of all mortgages or other methods of financing which may now or hereafter encumber Landlord's interest in the Property; provided that no such mortgages shall increase any liabilities or obligations nor decrease any rights or remedies of Sears under or with respect to this Lease.

(b)     Notwithstanding the foregoing or any such subordination, or any other provision contained in this Lease to the contrary, so long as Sears shall not be in material default of the express provisions of this Lease (without reference to any such mortgages) beyond any applicable grace, notice or cure period, Landlord covenants and agrees that Sears shall peacefully and quietly possess and enjoy the Premises and all rights of Sears under this Lease in accordance with all terms and conditions hereof (without reference to Section 23(a) hereof), without let, hindrance or disturbance and free from all rights and claims of Landlord and of all persons or

14

entities claiming by or through Landlord, including under any mortgage referred to in Section 23(a).

24.     **Attorneys' Fees.** If any legal action is instituted as a result of a default by either party under this Lease that is not cured within the applicable cure period, the prevailing party in such action shall be entitled to recover from, or be reimbursed by the other party for, it's reasonable and actual attorneys' fees and costs through all levels of proceedings.

25.     **Lease Not to Be Recorded; Memorandum of Lease.** The parties agree that this Lease shall not be recorded, but the parties shall record a Memorandum of Lease concurrently with the execution hereof.

26.     **Limitation of Landlord's Liability.** Sears agrees that it shall look solely to the estate and property of Landlord in the land and buildings comprising the Property for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed or performed by Landlord; and no other assets of any partners (or partners of any partner) in Landlord or of any members, shareholders, officers, directors, agents or employees of Landlord shall be subject to levy, execution or other procedures for the satisfaction of Sears' remedies.

27.     **OFAC Certification**.

(a)     Sears certifies that (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.

(b)     Landlord certifies that (a) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and (b) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.

[Remainder of Page Left Blank]

WEIL:\96568149\3\73219.0007

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By:_____
    Name: Robert A. Riecker
    Title: Chief Financial Officer

**NW GAITHERSBURG LLC**,
a Delaware limited liability company

By: _____

    Name:  Marshall W. Nevins

    Title:   Managing Director

## EXHIBIT A

## LEGAL DESCRIPTION

All that certain lot or parcel of land together with all improvements thereon located and being in the County of Montgomery, Maryland and being more particularly described as follows:
Parcel number Nine (9) in a subdivision known as "Plat numbered Two Hundred Nineteen (219), Lakeforest, Montgomery Village", as per plat thereof duly recorded among the Land Records of Montgomery County, Maryland, in Plat Book 101 at plat 11356.

Together with the non-exclusive easements over the "Developer Parcel", the "Developer Reserved Parcels", the "May Parcel" and the "Penney Parcel" as set forth in a Construction, Operation and Reciprocal Easement Agreement by and among Lakeforest Associates, a general partnership; The May Department Stores Company; Sears, Roebuck and Co. and J. C. Penney Properties, Inc. dated the 20th day of October 1976 recorded October 20th 1976 in Liber 4859 at folio 007 and as set forth in a Supplemental Agreement between Lakeforest Associates, a general partnership and Sears, Roebuck and Co. dated October 20, 1976 recorded October 20, 1976 in Liber 4859 at folio 253; as amended by First Amendment to Construction, Operation and Reciprocal Easement Agreement recorded in Liber 5069 at folio 467.

Exhibit A

## SCHEDULE 1

### SEARS LEASES

Lands' End, Inc.
Luxottica Retail North America, Inc., d.b.a. Sears Optical
Jackson Hewitt Inc., d.b.a. Jackson Hewitt Tax Service
Avis Budget Car Rental LLC, d.b.a. Avis Budget Car Rental
Universal Vending Management, LLC, d.b.a. Universal Vending

## SCHEDULE 2

### ANNUAL FIXED RENT

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|------------|-------------------|--------------------|
| 1-4 | $840,000.00 | $70,000.00 |

WEIL:\96568149\3\73219.0007

## SCHEDULE 3

## REA

Construction, Operation and Reciprocal Easement Agreement dated October 20 1976 by and among Lakeforest Associates, The May Department Stores Company, Sears, Roebuck and Co., and J.C. Penny Properties, Inc., recorded October 20, 1976 in Liber 4859 at folio 007; as affected by that certain Lakeforest Supplemental Agreement No. 2 dated October 20, 1976 by and between Lakeforest Associates and Sears, Roebuck and Co., recorded October 20, 1976 in Liber 4859 at folio 253; and as amended by that certain First Amendment to Construction, Operation and Reciprocal Easement Agreement dated October 18, 1977 by and among Lakeforest Associates, The May Department Stores Company, Sears, Roebuck and Co., and J.C. Penny Properties, Inc., and Woodward and Lothrop, Inc., recorded December 22, 1977 in Liber 5069 at folio 467.

WEIL:\96568149\3\73219.0007